**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | |
|---|---|
| THE SOUTH CAROLINA STATE CONFERENCE OF THE NAACP, <br><br> and <br><br> TAIWAN SCOTT, on behalf of himself and all other similarly situated persons, <br><br> Plaintiffs, <br><br> v. <br><br> HENRY D. MCMASTER, in his official capacity as Governor of South Carolina; HARVEY PEELER, in his official capacity as President of the Senate; LUKE A. RANKIN, in his official capacity as Chairman of the Senate Judiciary Committee; JAMES H. LUCAS, in his official capacity as Speaker of the House of Representatives; CHRIS MURPHY, in his official capacity as Chairman of the House of Representatives Judiciary Committee; WALLACE H. JORDAN, in his official capacity as Chairman of the House of Representatives Elections Law Subcommittee; HOWARD KNAPP, in his official capacity as interim Executive Director of the South Carolina State Election Commission; JOHN WELLS, JOANNE DAY, CLIFFORD J. ELDER, LINDA MCCALL, and SCOTT MOSELEY, in their official capacities as members of the South Carolina State Election Commission, <br><br> Defendants. | **Case No.:** _____ <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** <br><br> **THREE-JUDGE PANEL REQUESTED** |

## INTRODUCTION

1.      As the 2020 U.S. Census results demonstrate, South Carolina has experienced significant population shifts and growth during the past decade. These changes have rendered South Carolina's U.S. Congressional and state House districts unconstitutionally malapportioned. Yet the South Carolina Legislature ("Legislature") is currently adjourned, with no clear plan to fix these ongoing violations in time for key election dates early next year.

2.      The Legislature has the constitutional duty and privilege of redrawing South Carolina's U.S. Congressional and state legislative districts every ten years, following the completion of the decennial census and release of data by the U.S. Census Bureau. In doing so, the Legislature must ensure equal representation for all South Carolinians. Meeting this obligation, in part, requires that congressional districts have equal population, and that legislative districts have roughly equal population. Otherwise, some people will have too little voice, and others too much. "Diluting the weight of votes because of place of residence impairs basic constitutional rights under the Fourteenth Amendment." *Reynolds v. Sims*, 377 U.S. 533, 566 (1964).

3.      To achieve equal representation while respecting existing communities and boundaries, the U.S. Supreme Court has emphasized that redistricting requires a nuanced and intensely local analysis. This analysis for a single district—let alone for South Carolina's 7 U.S. Congressional districts and 124 state House districts—takes significant time. And this analysis— which is performed by the Legislature but requires input from members of the public, like Plaintiffs—must be completed well in advance of the next election cycle. This is so (i) South Carolinian communities, including those that Plaintiff South Carolina NAACP serves, and if necessary courts can thoroughly vet the maps for compliance with constitutional and other legal

standards; (ii) candidates know where and whether they will run, qualify, and campaign for office; (iii) interested parties like Plaintiffs can start educating and mobilizing the electorate; and (iv) individuals like Plaintiff South Carolina NAACP's members and others it serves can educate themselves on potential candidates and hold the appropriate representatives accountable at election time.

4.      Despite the release of Census data two months ago, the Legislature has not proposed or adopted new maps. Instead, on September 22, 2021, the South Carolina House of Representatives announced that it would adjourn for the fall with "no plans to reconvene for a special session,"[1] even though it had not enacted or even proposed new electoral maps. The House has not been in session since a special budget session on June 29, 2021, and has provided no explanation for this course of conduct.

5.      On September 24, 2021, the state Senate followed suit. After initially indicating it would reconvene for a special session on October 12, 2021, to discuss redistricting and COVID-19 relief money, the Senate instead announced it would also adjourn for the fall, without providing any timeline for proposing, let alone enacting, new electoral maps.[2] Senate President Harvey Peeler wrote to his Senate colleagues that the work on new districts would not be done by mid-October and it was futile to hold a special session this fall, only to "have these bills

---

[1] Jay Lucas (@schousespeaker), Twitter (Sep. 22, 2021, 2:23 PM), https://twitter.com/schousespeaker/status/1440743475549401088; *see also* Associated Press, *South Carolina Senate Cancels Next Month's Senate Session* (Sept. 24, 2021), https://www.usnews.com/news/best-states/south-carolina/articles/2021-09-24/south-carolina-senate-cancels-next-months-special-session

[2] Sept. 24, 2021 Ltr. From Harvey S. Peeler, Jr., President to Members of the South Carolina Senate, Subject: Session Update – October 12, 2021 Session Cancelled (on file with the undersigned).

languish in the House till January."[3]

6.      Consistent with these announcements, both the state House and the state Senate have adjourned. Neither the House nor the Senate has announced a concrete timeline for when it will consider or enact proposed maps, and Defendant Lucas affirmatively stated that the House had no plans for a special session. Defendant Peeler has indicated the Senate will not reconvene unless the House does. By adjourning without scheduling a time to reconvene to take up redistricting, the Legislature has unnecessarily delayed fulfilling this once-in-a-decade, time-consuming, time-sensitive obligation, despite repeated requests from members of the public that it do so.

7.      Without calling a special session, the Legislature's first opportunity to consider redistricting maps will be during the 2022 regular legislative session, beginning on January 11, 2022—just eleven weeks before candidates must declare their intent to run for office and less than eight weeks before various election officials are required to publicize certain information, including the dates of the candidate filing period.[4]

8.      South Carolina also has a troubling record of enacting legally inadequate maps over the last five decades. Each cycle, it has taken significant time to resolve issues in the courts. Therefore, the Legislature's decision to delay mapmaking practically guarantees that the Legislature will not produce timely maps that meet constitutional and other requirements or follow a process that offers an opportunity for meaningful public consideration.

---

[3] *Id.*

[4] S.C. Const., art. III, § 9 ("The annual session of the General Assembly shall convene at the State Capitol Building in the City of Columbia on the second Tuesday of January of each year."); S.C. Code Ann. § 7-11-15 (requiring candidates to file statement of intent between March 16 and March 30); S.C. Code Ann. § 7-13-45 (requiring election officials to publicize certain information two weeks before March 16).

4

9.      This poses an immediate problem. Right now, the state House, state Senate,[5] and U.S. Congressional districts in South Carolina are severely out of proportion because they are based on population data from 2010, and it is clear that there will need to be significant adjustments to district lines. For example, applying 2020 Census data to 2010 maps, South Carolina's U.S. House Congressional District ("CD") 6 is almost 12% underpopulated compared to what it should be (namely, the mean U.S. House district population). CD1, by contrast, is almost 12% overpopulated. Similarly, there are currently more than twice as many people in state House district 45 as there are in state House districts 55, 64, and 90.

10.      This means that, at this very moment, the people of these districts and many others exemplified by Plaintiffs as discussed below (i) do not know whether their current representatives will be eligible to run in their districts in the upcoming election and whether these representatives can be held accountable at election time for the conduct and policy positions they have advocated for while in office; (ii) cannot identify the proper persons to whom to communicate their concerns effectively because those individuals may or may not be accountable to them in the next election; and (iii) have no prospect of finding out any of this information in time to plan for the upcoming election.

11.      The people of South Carolina, including those represented by Plaintiffs, face a substantial and imminent risk that constitutionally compliant district lines will not be redrawn in time to cure the current unconstitutional malapportionment for the 2022 elections. The

---

[5] Because the state Senate is not holding elections until 2024, Plaintiffs in this suit are not currently suing over the malapportionment in state Senate districts. However, 2020 Census data makes clear that malapportionment in these districts exists. Plaintiff South Carolina NAACP has submitted numerous letters and suggested maps to the state Senate, as it also has to the state House as discussed below, to encourage the state Senate to timely redraw its districts in a manner compliant with constitutional and other legal standards.

Legislature's decision to delay mapmaking renders it virtually impossible for any maps the Legislature may ultimately propose to undergo judicial scrutiny and be in place for the scheduled start of the 2022 election cycle.

12.    For example, the statutory deadline for candidates to declare their intent to run for state and federal office through the party primary process is March 30, 2022—less than six months from now. These candidates, and the people who would organize and vote for or against them, need to know where new district lines will be drawn before then. Individuals who seek to communicate, campaign on behalf of, or contribute to independent candidates are particularly burdened because independent candidates and their supporters must collect thousands of signatures to be placed on the ballot but are unable to effectively do so until the district lines are known. If the Legislature refuses to reconvene before January 11, 2022, candidates and individuals who would support them would have too little time to plan, organize, and file.

13.    Potential candidates for legislative seats also do not know the districts they may run in. And although U.S. House candidates do not have residency requirements, state House candidates do, and individuals who seek to communicate, campaign on behalf of, or contribute to both state House and U.S. House candidates are unable to do so effectively until they know their district lines.

14.    Moreover, every day without new maps is a day in which candidates and interested organizations, such as Plaintiff South Carolina NAACP and its volunteers, cannot be contacting and educating the electorate in their districts.

15.    The Legislature's abrupt decision to suspend the redistricting process without any timeline for reconvening is especially problematic because of South Carolina's track record of taking many months to finalize maps. This includes inevitable time for judicial review to ensure

compliance with the U.S. Constitution and Voting Rights Act of 1965 ("VRA"). In each of the last five ten-year cycles, it has taken at least four months *after* the Legislature released its initial maps to receive public comment, resolve litigation, and finalize maps for adoption. In some cycles, it has taken many more months—and sometimes years—for legislative consideration and court remedial action to play out. In other words, even if the Legislature returned and released draft maps *today*, it would be a herculean task to ensure compliance with constitutional and other legal standards *before* South Carolina's statutorily set and scheduled election deadlines. The Legislature's decision to delay that process until January renders the task not just herculean but unnecessarily arduous.

16.     For decades, litigation often revealed serious deficiencies in the Legislature's initial maps that only courts could fix. In four out of the last five redistricting cycles, federal court intervention was necessary for South Carolina to have legally compliant maps. As this Court has noted, "judicial intervention in the South Carolina redistricting process has been frequently unavoidable." *Burton v. Sheheen*, 793 F. Supp. 1329, 1337 (D.S.C. 1992), *vacated on other grounds*, 508 U.S. 968 (1993). Given this history, the Legislature should be developing maps right now and releasing them as soon as possible, to avoid public, voter, and candidate confusion ahead of the declaration deadline and the 2022 primaries. *Cf. Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006); *see also Reynolds*, 377 U.S. at 570 (observing that "[l]egislative inaction, coupled with the unavailability of any political or judicial remedy, had resulted, with the passage of years, in the perpetuated scheme [that is, Alabama's existing legislative maps] becoming little more than an irrational anachronism").

17.     The Plaintiffs in this case are an individual South Carolina voter and an organization, the South Carolina State Conference of the NAACP. Plaintiffs are being presently

harmed by the Legislature's decision to suspend the redistricting process, which denies them the ability to know and influence the representatives they can hold accountable at election time or their opponents, to associate with others in their district and advocate and organize for candidates, and to educate the electorate and other constituents in their proper district lines.

18.    Accordingly, Plaintiffs respectfully ask this Court to order the Legislature to abide by a concrete timeline that will allow sufficient time for public notice, input, and the resolution of any litigation, and result in finalized, legally compliant maps well in advance of critical deadlines, including the March 30, 2022 candidate declaration deadline.

## **PARTIES**

19.    Plaintiff **THE SOUTH CAROLINA STATE CONFERENCE OF THE NAACP** ("South Carolina NAACP") is a nonprofit, nonpartisan membership organization in South Carolina. The South Carolina NAACP is a state conference of branches of the National Association for the Advancement of Colored People ("NAACP"), a national civil rights organization. The South Carolina NAACP was chartered in 1939 and is the oldest civil rights group in South Carolina.

20.    Consistent with the national NAACP's mission, the South Carolina NAACP, on behalf of its members and the other constituents it serves, seeks to remove all barriers of racial discrimination through democratic processes and the enactment and enforcement of federal, state, and local laws securing civil rights, including laws relating to voting rights. For example, on behalf of its members and other constituents, the South Carolina NAACP has held and has sponsored voter education and voter registration activities for years and has been credited with registering thousands of voters throughout South Carolina.

21.    In this post-2020 redistricting cycle, the South Carolina NAACP's mission has been frustrated by the Legislature's conduct, which has delayed traditional voter education and mobilization efforts. Further, the South Carolina NAACP has used its limited resources to advocate for electoral and representational equality on behalf of its members and other constituents in congressional and state legislative maps, specifically by urging the Legislature, by written and verbal testimony, to comply with the Fourteenth Amendment's one-person, one-vote mandate and other legal requirements, and by proposing maps for its consideration.

22.    The South Carolina NAACP has 77 branches comprised of adult members across the state, including at least one branch in each of South Carolina's 46 counties.

23.    Together, across South Carolina, the South Carolina NAACP has more than 13,000 members, who are predominantly, but not exclusively Black people. Its membership also includes other minority residents of South Carolina.

24.    Its members and constituents currently live in malapportioned congressional and state legislative districts. Specifically, members live in overpopulated CD 1, as well as overpopulated House districts like HD15, 113, 116, and 117. These members and constituents also reside in areas of the state that could constitute properly apportioned congressional and state legislative districts that, if established, would remedy the identified one-person, one-vote violations. The Legislature's refusal to set a schedule for enacting maps to replace these malapportioned districts that will allow for public comment and judicial review in time for the 2022 elections thus harms the South Carolina NAACP's members and constituents.

25.    The South Carolina NAACP and its members and constituents are also harmed right now by the Legislature's refusal to establish valid districts because, until valid redistricting occurs, South Carolinians cannot decide which candidates to support, cannot decide to run or to

encourage candidates to run, cannot educate themselves or others on the positions the candidates in their districts hold and prepare to hold those candidates accountable, and cannot associate with others in their districts to advocate and organize for candidates who share their views.

26.     The current absence of a constitutionally and legally compliant redistricting plan and the Legislature's apparent refusal to pass one before January 2022 also harms the South Carolina NAACP as an organization, because it engages in accountability and voter education efforts that are hindered by the lack of a valid redistricting plan in the following ways:

    a.  Its members and constituents who desire to influence the views of their representatives in the Legislature or candidates for the Legislature are not able to communicate their concerns effectively because current members of the Legislature or legislative candidates may not be held accountable to those citizens as voters in the next election;

    b.  Potential candidates for the Legislature will not be able to come forward and the policy platforms those candidates advance be supported or opposed by Plaintiff South Carolina NAACP or its members, until potential candidates know the borders of the districts in which they, as residents of the district, could seek office; and

    c.  Plaintiff's members and constituents who desire to communicate with and contribute financially to candidates for the Legislature who will represent them—a right guaranteed by the First Amendment—are hindered from doing so until districts are correctly apportioned.

27.     Plaintiff's members and constituents are also harmed by the inability of candidates to campaign effectively and provide a meaningful election choice to voters.

28.     Plaintiff **TAIWAN SCOTT** is a U.S. citizen and Black, registered voter, and resident of Hilton Head in Beaufort County, South Carolina. Specifically, Mr. Scott resides in CD1, which is overpopulated based on 2020 Census data. Mr. Scott and members of his family, who have lived in Hilton Head for seven generations, are Gullah people, descendants of West African people who were enslaved and forcibly brought to America's southeastern coast, including South Carolina's coastal plain and Beaufort Sea Islands. While living and contributing to South Carolina in a myriad of ways, Black South Carolinians, including Gullah community members like Mr. Scott, have endured discrimination and other harms relating to taxation, heirs' property, land seizures, highway construction, lack of business and development opportunities, and many other issues. Mr. Scott plans to participate in the upcoming elections in South Carolina, including the 2022 primary and general elections for seats in the U.S. House of Representatives and state House. Mr. Scott seeks fairly apportioned redistricting plans for South Carolina's legislature before these 2022 consequential elections so that he can communicate his concerns with and hold accountable the appropriate representatives, given the many pressing needs facing Black South Carolinians and Gullah people specifically that state officials must respond to.

29.     Defendant **HENRY D. MCMASTER**, in his official capacity as Governor of South Carolina, is a proper defendant because, under Article IV, Section 21 of the South Carolina Constitution, he possesses the authority to sign or veto any redistricting plan passed by the Legislature. Defendant McMaster also has the authority under Article IV, Section 19 of the South Carolina Constitution to convene the General Assembly for extra sessions, including to address redistricting.

11

30.     Defendant **HARVEY PEELER**, in his official capacity as President of the South Carolina Senate, is a proper defendant as leader of the Senate, which drafts and passes reapportionment legislation for consideration by the General Assembly.

31.     Defendant **LUKE A. RANKIN**, in his official capacity as Chairman of the Senate Judiciary Committee, is a proper defendant as leader of the committee responsible for drafting and passing reapportionment legislation for consideration by the full Senate.

32.     Defendant **JAMES H. LUCAS**, in his official capacity as Speaker of the South Carolina House of Representatives, is a proper defendant as leader of the House charged with presiding over the House and ratifying bills upon passage by both houses of the Legislature pursuant to Article III, Section 18 of the South Carolina Constitution.

33.     Defendant **CHRIS MURPHY**, in his official capacity as Chairman of the Judiciary Committee of the House of Representatives, is a proper defendant as leader of the committee responsible for drafting and passing reapportionment legislation for consideration by the full House.

34.     Defendant **WALLACE H. JORDAN**, in his official capacity as Chairman of the Election Laws Subcommittee of the House of Representatives, is a proper defendant as leader of the subcommittee responsible for drafting and passing reapportionment legislation for consideration by the Judiciary Committee of the House of Representatives and the full House.

35.     Defendant **HOWARD KNAPP**, in his official capacity as the interim Executive Director of the South Carolina State Election Commission, is a proper defendant as the head of the South Carolina agency responsible for implementing and conducting elections pursuant to S.C. Code Ann. §§ 7-3-10, et seq. and 7-13-10, et seq., as amended. Specifically, S.C. Code Ann. § 7-13-45 requires the Executive Director of the State Election Commission to (1) accept filings

12

for U.S. Congressional and state House candidates and (2) publicize certain details related to the filing period. In practice, the Executive Director also provides guidance to the 46 directors of the county boards of voter registration and election regarding their acceptance of filings for U.S. Congressional and state House candidates, as well as their publicization of details related to the filing period.

36.     Defendants **JOHN WELLS, JOANNE DAY, CLIFFORD J. ELDER, LINDA MCCALL, and SCOTT MOSELEY**, in their official capacities as members of the South Carolina State Election Commission, are proper defendants as persons charged with the powers and duties of the South Carolina State Election Commission pursuant to S.C. Code Ann. §§ 7-3-10, et seq. and 7-13-10, et seq., as amended. In addition, S.C. Code Ann. § 7-11-15 requires the State Election Commission to design, distribute, and process forms for the statement of intention of candidacy, which candidates for U.S. Congressional and state House seats must file during a specified time period.

## JURISDICTION AND VENUE

37.     This action arises under Article I, § 2 and the First and Fourteenth Amendments to the U.S. Constitution.

38.     This court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, 2201, and 2202, as well as 42 U.S.C. § 1983.

39.     Venue is proper pursuant to 28 U.S.C. § 1391(b).

40.     A three-judge panel of this district court has jurisdiction to adjudicate, and must adjudicate, this lawsuit because Plaintiffs are challenging the constitutionality of the apportionment of South Carolina's congressional districts and the apportionment of South

Carolina's statewide legislative body. 28 U.S.C. § 2284(a); *Shapiro v. McManus*, 136 S. Ct. 450 (2015).

## STATEMENT OF FACTS

***South Carolina has an obligation to correct its severely malapportioned legislative and Congressional districts.***

41.     The U.S. Constitution requires that members of the Legislature and congressional delegation be elected on an "equipopulous basis in accordance with the results of the decennial census." *Colleton Cty. Council v. McConnell*, 201 F. Supp. 2d 618, 623 (D.S.C. 2002). Each census reveals inevitable malapportionment of districts, and the Legislature has the obligation to redraw districts with substantially equal populations.

42.     Article III, Section 3 and Article IV, Section 21 of the South Carolina Constitution assign the responsibility for state legislative redistricting to the Legislature and Governor. Article VII, Section 13 and Article IV, Section 21 assign the Legislature and Governor the responsibility for drawing U.S. Congressional districts. All redistricting plans must comply with both the federal and state constitutions.

43.     Article IV, Section 19 of the South Carolina Constitution gives the Governor the authority to "convene the General Assembly in extra session" on "extraordinary occasions."

44.     The Due Process Clause of the Fourteenth Amendment of the U.S. Constitution provides that states may not "deprive any person of life, liberty, or property, without due process of law."

45.     The Equal Protection Clause of the Fourteenth Amendment guarantees citizens the right to vote in state and federal elections and requires that state legislative districts be apportioned with substantially equal populations, giving each person equal representational

14

access and each voter equal electoral opportunity. For U.S. Congressional districts, the

Legislature must enact as close to numerically equal districts as possible.

### *South Carolina's current legislative and U.S. Congressional districts are based on 2010 Census data, even though 2020 data is available.*

46.    In 2011, South Carolina Act 72 divided the South Carolina population, as

determined by the 2010 Census, into 124 state House districts with relatively equal populations.

Each state House district contained approximately 37,301 persons. Act 75 divided the population

into seven U.S. Congressional districts containing approximately 660,766 persons each.

47.    The 2012 congressional and state legislative elections, and every subsequent

biennial election, were conducted under the district boundaries created by Acts 72 and 75 in

2011.

48.    Following a delay in administering the 2020 Census on account of the COVID-19

pandemic, the 2020 Census results were released on August 12, 2021. As a result of significant

population shifts and growth during the past decade, South Carolina's current state House and

U.S. Congressional districts are unconstitutionally malapportioned. Yet the Legislature has

decided to further delay the process another three months before even convening to address that

malapportionment.

49.    Based on the 2020 Census, the ideal population—that is to say, the total 2020

Census population divided by the number of districts—for each state House district is 41,278

persons. The ideal population for each U.S. Congressional district is 731,204. Because the

population also shifted across South Carolina over the past decade, the districts are now

malapportioned and give some South Carolinians more access to representation than others and

some votes more weight than others. In addition to having their votes devalued, individuals in

15

overpopulated districts must work harder as compared to individuals in underpopulated districts to gain meaningful access to their representatives.

50.     Population shifts have been dramatic in the state House. For example, state House District 45 is 60.23% overpopulated, while state House District 55 is 22.08% underpopulated. Thus, state House District 45 has over twice the population of state House District 55.

51.     Below is a sampling of these and other severely malapportioned House districts:

| District | 2010 Population | 2020 Population | Shift | Deviation from Ideal 2020 Population | Percent Deviation |
|---|---|---|---|---|---|
| 55 | 36,619 | 32,164 | -4,455 | -9,114 | -22.08% |
| 64 | 38,015 | 32,279 | -5,736 | -8,999 | -2.01% |
| 90 | 36,637 | 32,448 | -4,189 | -8,830 | -21.39% |
| 26 | 36,435 | 57,221 | +20,786 | +15,943 | 38.62% |
| 100 | 36,406 | 61,053 | +24,647 | +19,775 | 47.91% |
| 45 | 36,382 | 66,141 | +29,759 | +24,863 | 60.23% |

52.     As noted above, unequal population growth also results in unequal apportionment in the U.S. Congressional map. For example, CD1 is nearly 12% overpopulated, while CD6 is 11.59% underpopulated. Below are the population shifts in all seven U.S. Congressional districts:

| District | 2010 Population | 2020 Population | Shift | Deviation from Ideal 2020 Population | Percent Deviation |
|---|---|---|---|---|---|
| 1 | 660,766 | 818,893 | +158,127 | +87,689 | 11.99% |
| 2 | 660,766 | 721,829 | +61,063 | -9,375 | -1.28% |
| 3 | 660,767 | 706,785 | +46,018 | -24,419 | -3.34% |
| 4 | 660,766 | 760,233 | +99,467 | +29,029 | 3.97% |
| 5 | 660,766 | 736,286 | +75,520 | +5,082 | 0.70% |
| 6 | 660,766 | 646,463 | -14,303 | -84,741 | -11.59% |
| 7 | 660,767 | 727,936 | +67,169 | -3,268 | -0.45% |

***For the last 50 years, South Carolina's redistricting process has required court intervention and prolonged litigation.***

53.     Based on South Carolina history across numerous redistricting cycles, there is a strong likelihood that the Legislature's redistricting plans will require judicial review. For the last five redistricting cycles—every cycle since Congress enacted the VRA—courts have needed, at minimum, at least four months to adjudicate claims relating to South Carolina's state legislative and congressional redistricting plans. As this court has noted, "judicial intervention in the South Carolina redistricting process has been frequently unavoidable." *Burton v. Sheheen*, 793 F. Supp. 1329, 1337 (D. S.C. 1992).

### A.  2010 Redistricting Cycle

54.     During the 2010 cycle, it took nearly four months to adjudicate redistricting claims. *Backus v. South Carolina*, 857 F. Supp. 2d 553 (D.S.C.), *aff'd*, 568 U.S. 801 (2012).

55.     The South Carolina House Judiciary Committee received the 2010 census data on March 23, 2011. The legislative and congressional plans were signed into law on June 28, 2011, and August 1, 2011, respectively. Voters filed a lawsuit on November 11, 2011. The court held hearings on various motions to dismiss throughout January and February and held a trial from March 1-2, 2012. The court issued an order on March 9, 2012.

### B.  2000 Redistricting Cycle

56.     During the 2000 cycle, it took over six months to adjudicate malapportionment claims and draw new districts for the 2002 elections. *Colleton Cty. Council v. McConnell*, 201 F. Supp. 2d 618 (D.S.C. 2002), *opinion clarified* (Apr. 18, 2002).

57.     The South Carolina House Judiciary Committee received the 2000 census data on March 15, 2001. The Legislature failed to override the Governor's veto of its initial maps on September 4, 2001, and a lawsuit alleging malapportionment of the congressional and legislative

districts was filed the same day. After expedited discovery, trial ran from mid-January 2002 to

mid-February 2002. The court issued a March 20, 2002 order "implementing remedial districting

plans" to "insure that no further elections were conducted under the invalid plans." *Colleton Cty.*

*Council v. McConnell*, C.A. No. 3:01-3892-10, Doc. 164, 13-14 (citations omitted) (D.S.C. Mar.

20, 2002).

### C.   *1990 Redistricting Cycle*

58.     The 1990 census data was released in March 1991. However, much like today, the

Legislature adjourned for the year on June 6, 1991, without passing maps or calling a special

session to do so. A group of voters and others sued on October 4, 1991, on the basis that then-

operative legislative and congressional plans were unconstitutionally malapportioned and sought

to enjoin the use of any of the 1980 cycle plans for upcoming elections. *Burton*, 793 F. Supp. at

1329. When the state government still failed to produce a map, trials ran from February 18 to

March 6, 1992. On March 6, 1992, the court ordered the candidate filing deadline moved to June

25, 1992, and the primary election to August 25, 1992. The court issued its order and its own

plans on May 1, 1992. *Id.* at 1370.

### D.   *1980 Redistricting Cycle*

59.     The 1980 census data was released in early 1981. After the state government

failed to devise its own congressional redistricting plan for "many months," the state adopted

maps drawn by a three-judge panel in March 1982. *S.C. State Conference of Branches of the*

*NAACP v. Riley*, 533 F. Supp. 1178 (D.S.C. 1982) *aff'd* 459 U.S. 1025 (1982). After a separate

three judge panel put an interim plan in place, the Legislature did not pass a Senate redistricting

plan until 1984, which was promptly challenged by the Department of Justice and faced

litigation from the South Carolina Republican Party and the NAACP and was not resolved until

18

July 1984. *Graham and NAACP v. South Carolina*, C.A. No. 3:84-1430-15 (D.S.C., July 31, 1984).

60.    In reaching a conclusion on a new congressional redistricting plan, the *Riley* court stressed the importance of having a plan "in place a sufficient time before the first election to which it is to be applied to permit the orderly functioning of the electoral process." *Riley*, 533 F. Supp. at 1179, 1183. The court noted that "candidates should know the boundaries of their districts and the voters their choice of candidates." *Id.* at 1183.

### E.  1970 Redistricting Cycle

61.    After the 1970 census data was released, the Legislature met in special session and passed maps on November 11, 1971. *See* Act No. 932 of 1971. The plans were promptly challenged by civil rights groups, and the Department of Justice objected to the maps under the VRA. On April 7, 1972, a federal district court struck down the maps for violating the Fourteenth Amendment's one-person, one-vote principle. *Twigg v. West*, No. 71-1211 (D.S.C. Apr. 7, 1972).

62.    In May 1972, the Legislature adopted revised maps (Act 1204 and Act 1205), and the Department of Justice objected to the proposed state Senate map. Litigation over the proposed maps lasted until at least 1975.

#### *The Legislature's redistricting process thus far has been insufficiently transparent and inaccessible to the public at large, and the relevant committees have failed to provide a timeline for action on any maps.*

63.    The Legislature's redistricting process has not been transparent.

64.    The South Carolina Judiciary Redistricting Subcommittee ("Senate Subcommittee") conducted nine of its ten redistricting public hearings before the release of the 2020 Census data results on August 12, 2021. And it held the last hearing on August 12, 2021—

the day Census data was released—providing members of the public no meaningful opportunity to review the 2020 data, let alone understand and articulate its impact, while the Senate Subcommittee was in session.

65.     The Senate Subcommittee provided insufficient notice prior to the first week of its public hearings beginning on July 27, 2021, giving members of the public less than a week to prepare testimony. In the two months since the Senate Subcommittee's last hearing on August 12, 2021, it has also refused to provide meaningful updates to members of the public about when the state Senate plans to return to session to consider redistricting plans or provide proposed maps to the public. Nor has the Senate Subcommittee taken any steps or announced any plans to ensure that its timeline for considering and approving maps will be sufficient for members of the public to meaningfully review proposed redistricting plans before the March 30, 2022 candidate filing deadline for the June 2022 party primaries, much less that the timeline will be sufficient to allow judicial review.

66.     The parallel House committee—the South Carolina Redistricting Ad Hoc Committee (the "House Committee")—has proceeded in similar fashion. The House Committee's hearings have been largely inaccessible to members of the public. Meetings have been announced with less than a week's notice, leaving insufficient time for community members to adjust their schedules and prepare meaningful testimony. Only two House Committee public hearings provided a remote testimony option, despite the resurgence of the COVID-19 pandemic in the state. The in-person only hearings were limited to two hours (6 to 8 pm) on weeknights and required people to travel to the hearing site (which effectively limited participation to those who lived near the location and had access to transportation), and potentially risk exposure to COVID-19. If people could not attend these sessions, they could not

provide oral testimony or meaningfully engage with other people's testimony during most of the House Committee's public hearings. Similarly, the two hearings at which a remote testimony option was available began at 4:30 p.m. and ended at 6:30 p.m. on weekdays, making it unlikely that working people and people with children or other family obligations could attend.

67.     The House Committee added its second hearing with a remote testimony option following public pressure. But it did not engage in meaningful efforts to publicize the hearing or otherwise inform members of the public of this additional opportunity to participate remotely. Plaintiff South Carolina NAACP used its limited resources to raise awareness of the second hearing.

68.     Like the Senate Subcommittee, the House Committee has refused to provide updates to the public about when the state House plans to return to session to consider redistricting plans or when the House Committee plans to provide proposed maps to the public. Nor has the House Committee taken any steps or announced any plans to ensure that its timeline for considering and approving maps will allow sufficient time for members of the public to meaningfully review the plans before the March 30, 2022 candidate filing deadline or the June 2022 partisan primaries, much less that the timeline will be sufficient to enable judicial review. Nor has it provided a deadline for when it desires to receive proposed maps from members of the public or if it intends to hold any additional public hearings.

69.     The House Committee's and Senate Subcommittee's failure to provide basic public information to members of the public, along with the compressed timeline for assessing and approving maps, leaves insufficient time to achieve compliance with constitutional and other legal requirements.

***The Legislature has adjourned and has no plan to call a special legislative session to consider or enact a redistricting plan.***

70.     On September 16, 2021, the Senate announced that it would convene a special session to start on October 12, 2021, to, among other things, consider legislative maps. Less than a week later, however, Defendant Senate President Peeler announced that this session was cancelled. In cancelling the special session, Senator Peeler did not say when the state Senate would reconvene. And he stated that state Senate redistricting plans will not be ready for the Senate to debate until an unspecified time later this year.

71.     According to public reporting, House Leadership, including the Majority Leader, does not believe the state House will reconvene for any session before December 2021, at the earliest, to consider redistricting.[6] And Defendant Lucas stated the state House has adjourned with "no plans to reconvene for a special session."[7]

72.     Absent a special session, the soonest a redistricting plan could be considered is during the next regular legislative session, which begins on January 11, 2022. Both the Legislature and the Governor have the power to call a special session before then, but neither has committed to doing so.

---

[6] Seanna Adcox, *SC House Unlikely to Return Until December, and then Only for Redistricting* (Sept. 22, 2021), available at https://www.postandcourier.com/columbia/sc-house-unlikely-to-return-until-december-and-then-only-for-redistricting/article_142b89f0-1bbf-11ec-a986-07909036ac92.html

[7] Jay Lucas (@schousespeaker), Twitter (Sep. 22, 2021, 2:23 PM), https://twitter.com/schousespeaker/status/1440743475549401088.

*The Legislature has created an imminent and substantial risk of failing to enact lawful legislative and congressional maps to resolve the current malapportionment.*

73.     The next primary election in South Carolina is scheduled for June 14, 2022, and the next general election is scheduled for November 8, 2022. Candidate filing for these state House and U.S. Congressional primary elections has a deadline of noon on March 30, 2022.

74.     Over the last 50 years of redistricting cycles in South Carolina, federal courts have needed months—sometimes many months—to assess the validity and constitutionality of proposed plans.

75.     As noted, absent convening another special session, it will not *begin* consideration of maps until January 2022 at the earliest. Before the Legislature can finalize the maps, the Senate Subcommittee has also indicated that it will invite public comment on a provisional set of maps. This comment period is necessary given the complex and intensely local nature of redistricting; it will also add to the already compressed timeline the Legislature itself has created by announcing it will not reconvene for a special session. Even if the plans are signed by the Governor on this earliest possible date after the House Committee and Senate Subcommittee propose and release them to the public, after a meaningful public comment period on the proposed maps, and after the House and Senate have passed redistricting plans, there will not be sufficient time to adjudicate the plans for constitutional and legal compliance in time for the 2022 elections.

76.     The current timeline deprives Plaintiffs and South Carolinians of the ability to conduct meaningful review of the maps and, if necessary, seek judicial review in advance of the 2022 filing deadlines and elections. Potential candidates benefit from district lines being in place well before elections, enabling them to decide where, whether, and how to run their campaigns. Voters are severely burdened by not knowing the details of the district in which they reside in

advance of elections, because they cannot engage in candidate advocacy and recruitment, know which candidates are running to represent them, hold their representatives accountable, or associate and organize with others who share their favored candidates.

77.    Without districts in place, people will be unable to associate with like-minded citizens, educate themselves on the positions of candidates, or advocate for their candidates of choice.

78.    All of these harms are a consequence of the Legislature's unexplained and inexplicable choice to effectively leave redistricting until 2022, precluding sufficient time for public input, judicial review, or for the enactment of maps that comply with federal law sufficiently in advance of the elections.

79.    Unless this court creates a schedule itself, Plaintiffs will be deprived of their constitutional rights in the upcoming 2022 election cycle, beginning as early as March.

## CAUSES OF ACTION

### COUNT I

**Congressional Malapportionment
In Violation of Article I, § 2 of the U.S. Constitution**

80.    Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

81.    Article I, § 2 of the U.S. Constitution requires that every vote for the U.S. Congress be given the same weight as all other votes. *Wesberry v. Sanders*, 376 U.S. 1, 8, 84 S (1964) ("[T]he command of Art. I, § 2, that Representatives be chosen 'by the People of the several States' means that as nearly as is practicable[,] one [person]'s vote in a congressional election is to be worth as much as another's") (citation omitted).

82.  Indeed, the U.S. Constitution requires virtually identically sized Congressional districts. *Karcher v. Daggett*, 462 U.S. 725, 730 (1983). Any deviation from absolute population equality dilutes equality of access to representation and must be justified by the state. *Kirkpatrick v. Preisler*, 394 U.S. 526, 531 (1969).

83.  The 2020 Census revealed significant population shifts; thus, the 2010 U.S. Congressional districts that had a total population deviation of only two people now have a difference of 172,430 between the smallest and largest districts.

84.  There is no justification for this continued deviation, and yet the Legislature, by its actions, has created substantial, imminent, and unnecessary risk that constitutionally compliant electoral districts will not be in place before commencement of the 2022 election cycle.

85.  Accordingly, if elections are allowed to take place under these circumstances, voters in overpopulated districts, like Plaintiff Scott, will suffer from vote dilution and be deprived of political power and tangible resources. Malapportionment and the uncertainty it creates ahead of the 2022 election cycle also harms voters like Plaintiff Scott by preventing them from, among other things, knowing the details of the district in which they reside, engaging in candidate advocacy and recruitment, learning which candidates are running to represent them, holding their representatives accountable, and associating and organizing with others who share his favored candidates.

86.  Plaintiff South Carolina NAACP's members—voters and organizers in South Carolina—and the constituents the organization serves are also directly harmed in the same ways voters like Plaintiff Scott are, as listed in the paragraph above.

87.  The Legislature's inaction also creates the imminent risk of confusion prior to the current candidate declaration deadline in March 2022 and possibly the June 2022 primaries.

88.  Plaintiffs are suffering these harms on a current and ongoing basis.

**COUNT II**

**Legislative Malapportionment**
**In Violation of the Fourteenth Amendment to the U.S. Constitution**

89.  The Fourteenth Amendment to the U.S. Constitution requires that no state shall "deny to any person within its jurisdiction the equal protection of the laws." This "requires that the seats in both houses of a bicameral state legislature must be apportioned on a population basis." *Reynolds v. Sims*, 377 U.S. 533, 568 (1964).

90.  *Reynolds* goes on: "Simply stated, an individual's right to vote for state legislators is unconstitutionally impaired when its weight is in a substantial fashion diluted when compared with votes of citizens living [in] other parts of the *State*." *Id.*

91.  The 2020 Census revealed significant population shifts in South Carolina that have left state House and state Senate districts malapportioned.

92.  Accordingly, if elections are allowed to take place before the legal sufficiency of districts are resolved, voters in overpopulated districts, such as Plaintiff Scott, will suffer from vote dilution and be deprived of political power and tangible resources. Malapportionment and the uncertainty it creates ahead of the 2022 election cycle also harms voters like individual Plaintiff Scott by preventing them from, among other things, knowing the contours of the district in which they reside, engaging in candidate advocacy and recruitment, learning which candidates are running to represent them, holding his representatives accountable, and associating and organizing with others who share their favored candidates.

93.   Plaintiff South Carolina NAACP's members—voters and organizers in South Carolina—and the constituents the organization serves are also directly harmed in the same ways voters like individual Plaintiff Scott are, as listed in the paragraph above.

94.   The Legislature's inaction also creates the imminent risk of confusion prior to the current candidate declaration deadline in March 2022 and possibly the June 2022 primaries.

95.   Plaintiffs are suffering these harms on a current and ongoing basis.

## COUNT III

### Deprivation of the Freedom of Association
### In Violation of the First and Fourteenth Amendments to the U.S. Constitution

96.   The First Amendment to the U.S. Constitution protects the freedom of association and applies to the states via the Fourteenth Amendment. U.S. Const. amends. §§ 1, 14; *Preston v. Leake*, 660 F.3d 726, 729 (4th Cir. 2011).

97.   Unduly prolonged uncertainty about the district boundaries impedes candidates' ability to effectively run for office. This infringes upon Plaintiff Scott's First Amendment right to association because it restricts an individual's ability to assess candidate positions and qualifications, advocate for their preferred candidates, and associate with like-minded voters.

98.   Plaintiff South Carolina NAACP's members—voters and organizers in South Carolina—and the constituents the organization serves are also directly harmed in the same ways that voters like individual Plaintiff Scott are, as listed in the paragraph above.

99.   The Legislature's inaction also creates the imminent risk of confusion prior to the current candidate declaration deadline in March 2022 and possibly the June 2022 primaries.

100.  Plaintiffs are suffering these harms on a current and ongoing basis.

**REQUEST FOR A THREE-JUDGE PANEL**

101.  Plaintiffs request trial of this case by a three-judge court pursuant to 42 U.S.C. § 1973c(a) and 28 U.S.C. § 2284.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

i.      Declare that the current configurations of South Carolina's U.S. Congressional districts under S.C. Code Ann. § 2-1-70 and S.C. Code Ann. § 7-19-35, violate Article I, § 2 of, and the First and Fourteenth Amendments to, the U.S. Constitution;

ii.     Declare that the current configurations of South Carolina's state House districts under the 2010 legislative districting plan, S.C. Code Ann. § 2-1-70 and S.C. Code Ann. § 7-19-35, violate the First and Fourteenth Amendments to the U.S. Constitution;

iii.    Permanently enjoin Defendants and all persons acting on their behalf or in concert with them from implementing, enforcing, or conducting any elections under South Carolina's current U.S. Congressional or state House districts;

iv.     Establish a schedule that will enable the Court, in the absence of timely enacted and lawful plans for South Carolina's U.S. Congressional and state House districts, to adopt and implement new plans for South Carolina's U.S. Congressional and state House districts;

v.      Issue an order, as needed, staying the deadlines contained in S.C. Code Ann. §§ 7-11-15, 7-13-45, 7-11-210, and 7-13-40, as well as any other deadlines that are dependent upon these deadlines, as they pertain to elections for seats

in the United States Congress and the South Carolina House of

Representatives pending either

    a.  The Court's determination that the new districts for those elective

        bodies are constitutional; or

    b.  The Court's implementation of interim redistricting plans for those

        elective bodies.

vi.  Retain jurisdiction while Defendants enact plans by this Court's deadline;

vii.  Award Plaintiffs' attorneys' fees and costs in this action; and

viii.  Grant such other and further relief as this Court deems just and proper in the

circumstances.

[SIGNATURE PAGE TO FOLLOW]

Dated: October 12, 2021

Respectfully submitted,

Leah C. Aden*
Stuart Naifeh*
Raymond Audain*
John S. Cusick*
NAACP Legal Defense & Educational Fund, Inc.
40 Rector St, 5th Fl.
NY, NY 10006
Tel.: (212) 965-7715
laden@naacpldf.org

Samantha Osaki*
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: (212) 549-2500
sosaki@aclu.org

John A. Freedman*
Elisabeth S. Theodore*
Gina M. Colarusso*
John "Jay" B. Swanson*
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., N.W.
Washington, D.C.  20001
Tel: (202) 942-5000
john.freedman@arnoldporter.com

Jeffrey A. Fuisz*
Paula Ramer*
Jonathan I. Levine*
Theresa M. House*
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
Tel: (212) 836-8000

Sarah Gryll*
ARNOLD & PORTER KAYE SCHOLER LLP
70 West Madison Street, Suite 4200
Chicago, IL 60602-4231
Tel: (312) 583-2300

*/s/ Christopher J. Bryant*
Christopher J. Bryant, Fed. ID 12538
Boroughs Bryant, LLC
1122 Lady St., Ste. 208
Columbia, SC 29201
Tel.: (843) 779-5444
chris@boroughsbryant.com

Somil B. Trivedi*
Patricia Yan*
American Civil Liberties Union Foundation
915 15th St., NW
Washington, DC 20005
Tel.: (202) 457-0800
strivedi@aclu.org
pyan@aclu.org

Allen Chaney, Fed. ID 13181
American Civil Liberties Union
of South Carolina
Charleston, SC 29413-0998
Tel.: (843) 282-7953
Fax: (843) 720-1428
achaney@aclusc.org

*Attorneys for Plaintiffs*

*Motion for admission *Pro Hac Vice*
forthcoming