# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# COLUMBIA DIVISION

| | |
|---|---|
| THE SOUTH CAROLINA STATE CONFERENCE OF THE NAACP, <br><br> and <br><br> TAIWAN SCOTT, on behalf of himself and all other similarly situated persons, <br><br>      *Plaintiffs*, <br><br>  v. <br><br> HENRY D. MCMASTER, in his official capacity as Governor of South Carolina; HARVEY PEELER, in his official capacity as President of the Senate; LUKE A. RANKIN, in his official capacity as Chairman of the Senate Judiciary Committee; JAMES H. LUCAS, in his official capacity as Speaker of the House of Representatives; CHRIS MURPHY, in his official capacity as Chairman of the House of Representatives Judiciary Committee; WALLACE H. JORDAN, in his official capacity as Chairman of the House of Representatives Elections Law Subcommittee; HOWARD KNAPP, in his official capacity as interim Executive Director of the South Carolina State Election Commission; JOHN WELLS, JOANNE DAY, CLIFFORD J. ELDER, LINDA MCCALL, and SCOTT MOSELEY, in their official capacities as members of the South Carolina State Election Commission, <br><br>      *Defendants*. | Civil Action No.: 3:21-cv-3302-JMC <br><br> **Governor McMaster's Opposition to Plaintiffs' Request for Three-Judge Panel** |

Henry McMaster, in his official capacity as Governor of South Carolina, submits this Opposition to Plaintiffs' Request for Three-Judge Panel.

**Introduction**

Plaintiffs' Complaint is replete with legal flaws and inconsistencies. As one example, Plaintiffs want the Court to order that no elections be held under the congressional and state legislative districts enacted based on the 2010 census. *See* ECF No. 1, at 28. Yet Plaintiffs readily acknowledge that the General Assembly is currently developing new maps, which will be based on the recently released 2020 census data, so the State does not intend to hold elections under the 2010 maps. *See, e.g.*, ECF No.1, at 22. As another example, Plaintiffs accuse the General Assembly of repeatedly violating federal law in drawing districts, *see, e.g.*, ECF No. 1, at 17–19, but they fail to note that when the most recent maps were drawn following the 2010 census, the U.S. Department of Justice gave them preclearance in less than 60 days and the legal challenge to those maps failed, *compare* ECF No. 1, at 17, *with Backus v. South Carolina*, 857 F. Supp. 2d 553 (D.S.C.), *aff'd*, 568 U.S. 801 (2012).

But all of those flaws can wait for another day. Right now, the issue is whether Plaintiffs are entitled to a three-judge court under 28 U.S.C. § 2284(a). They summarily insist they are because their Complaint involves a challenge to the constitutionality of the State's congressional and State House districts. *See* ECF No. 17, at 4.

Such a surface-level review, however, belies what this case is *really* about. Unlike the typical apportionment challenge, in which plaintiffs allege a map enacted by a state legislature violates the Constitution or federal law, Plaintiffs here want a federal court to supervise the legislative process of drawing the maps. That request presents multiple jurisdictional hurdles, including standing, ripeness, and the scope of Article III's judicial power. And although most

1

threshold merits challenges to apportionment cases belong to a three-judge court to decide, *see Shapiro v. McManus*, 577 U.S. 39 (2015), this case does not.

That's because this is not actually an *apportionment* case. "Apportionment" has always been understood to mean the allocation of representatives among the States after a census and (post-*Baker* and *Reynolds*) the maps that are ultimately enacted for congressional representatives and state legislative members. By contrast, the process of drawing those maps has not been considered "apportionment" under § 2284. Plaintiffs' demand to have this Court supervise the General Assembly's drawing of new maps thus does not fall within § 2884, and a three-judge court is not appropriate. Plaintiffs' Request should be denied, and this Court (as a single district judge) should handle this case moving forward.

## Legal Standard

Interpretation of a statute is a question of law. *Stone v. Instrumentation Lab'y Co.*, 591 F.3d 239, 242 (4th Cir. 2009).

## Argument

**Plaintiffs' pre-apportionment challenge does not fall within the scope of § 2284.**

The usual federal judicial process is well known: A case starts in district court, then goes to the court of appeals, before finally (albeit rarely) finishing in the Supreme Court. But in a few instances, Congress has created a different system in which a three-judge district court (consisting of at least one circuit judge) hears the case initially, and then an appeal goes directly to the Supreme Court.

One of the few areas in which Congress has mandated three-judge courts is for challenges to "the constitutionality of the apportionment of congressional districts or the apportionment of any statewide legislative body." 28 U.S.C. § 2284(a). Reviewing the text and history of this

statute—both its amendments by Congress and its treatment by the courts—shows that Plaintiffs' claims here do not fall within the statute's reach.

Before turning there, it is worth clarifying what this case is about—and what it is not about. *Cf. Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 755 (2017) (to determine what relief a plaintiff seeks, "[w]hat matters is the crux—or, in legal speak, the gravamen—of the plaintiff's complaint, setting aside any attempts at artful pleading"). To be sure, Plaintiffs allege that the General Assembly's apportionment of congressional and state legislative districts after the 2010 census are now malapportioned, and they even ask for a declaration that the 2010 maps violate the First and Fourteenth Amendments and for an injunction prohibiting any elections from being conducted under those maps. *See, e.g.*, ECF No. 1, at 15, 28. But no one disputes that the General Assembly is required to draw new maps based on the 2020 census (which was released later than after any previous census). *See* S.C. Code Ann. § 7-19-50; *cf. Mayfield v. Texas*, 206 F. Supp. 2d 820, 824 (E.D. Tex. 2001) (three-judge court) (finding a case was not ripe when "the Texas Legislature has not been given the opportunity to act"). Indeed, the General Assembly is working now on drawing new maps. If this case really were about whether elections could be held under the 2010 maps, a three-judge court would be statutorily required. Yet Plaintiffs cannot credibly claim that the State intends to hold the 2022 elections using the old maps. Thus, there is no need for any declaratory relief on this point. *Cf. Wilton v. Seven Falls Co.*, 515 U.S. 277, 282 (1995) ("district courts possess discretion in determining whether and when to entertain an action under the Declaratory Judgment Act").

A careful reading of the Complaint makes clear that Plaintiffs' ultimate aim—and the real dispute between the parties—is Plaintiffs' demand for this Court to impose a schedule on the General Assembly for the redistricting process to ensure that the State enacts legislation providing

3

for the apportionment of congressional and state legislative districts before the 2022 elections. *See* ECF No. 1, at 28. Plaintiffs want the Court "order the Legislature to abide by a concrete timeline that will allow sufficient time for public notice, input, and the resolution of any litigation" over new maps before the 2022 election cycle. ECF No. 1, at 8. Unsurprisingly, the Governor (as well as the Legislative Defendants) oppose federal intervention into a process that is constitutionally committed to the States.

### A.     The text of § 2284 does not support Plaintiffs' request.

Start with the statutory text. *See Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1976 (2016) ("In statutory construction, we begin with the language of the statute." (cleaned up)). Section 2284(a) provides: "A district court of three judges shall be convened when otherwise required by Act of Congress, or when an action is filed challenging the constitutionality of the apportionment of congressional districts or the apportionment of any statewide legislative body." 28 U.S.C. § 2284(a).

Congress first established three-judge courts in 1910. *See* Act of June 18, 1910, ch. 309, § 17, 36 Stat. 539, 557. This act prohibited any interlocutory injunction restricting the enforcement of a state statute by a federal court unless the injunction was entered by a three-judge court. The statute did not specifically reference "apportionment" cases, but this 1910 act necessarily applied to apportionment legislation because state legislatures are charged with establishing and reapportioning legislative districts. *See* U.S. Const. art. I, § 4, cl. 1; *see also, e.g.*, *White v. Weiser*, 412 U.S. 783, 795 (1973) ("state legislatures have 'primary jurisdiction' over legislative reapportionment"); *cf.* S.C. Const. art. II, § 10 (giving the General Assembly the power to enact laws necessary for conducting elections). This new requirement for a three-judge court was inspired by *Ex parte Young*, 209 U.S. 123 (1908), and the deluge of federal lawsuits that followed

4

that decision attacking state rate-fixing and tax laws regarding railroads and utilities. *See* S. Rep. 94-204, at 7 (1975). Fifteen years later, the requirement of three-judge court was extended to permanent injunctions as well. *See* Act of Feb. 13, 1925, ch. 229, § 240, 43 Stat. 936, 938–39. A dozen years later, parties obtained the right to appeal directly to the Supreme Court from a three-judge court. *See* Act of Aug. 24, 1937, ch. 754, § 3, 50 Stat. 751, 752–53. The statute began to resemble its current structure in 1948, when the process for convening and the composition of three-judge courts were codified. *See* Act of June 25, 1948, ch. 646, 62 Stat. 968, 968–69.

Congress made a more significant change to the statute governing three-judge courts in 1976, at which point "apportionment" came into the statutory lexicon. By that time, the push to limit or even abolish three-judge courts had great support, including from Chief Justice Burger, the Judicial Conference of the United States, the American Bar Association, the American Law Institute, chief circuit judges, and leading academics like Charles Alan Wright. *See* S. Rep. 94-204, at 3–4. They noted the burden that three-judge courts imposed on the judiciary and uncertainties about when three-judge courts were required (along with the narrow interpretation given to that question in light of the burdens these courts brought). *See id.* at 4–5. Moreover, other statutory and regulatory changes had already addressed the problems that led to the creation of three-judge courts after *Ex parte Young*, as had various judicial abstention doctrines. *See id.* at 7–8. All of this meant that the scope of three-judge courts could be greatly reduced. Congress ultimately decided to eliminate the requirement for a three-judge court except for when Congress explicitly required it or "when an action is filed challenging the constitutionality of the apportionment of congressional districts or the apportionment of any statewide legislative body." Pub. L. 94-381, § 3, 90 Stat. 1119, 1119 (Aug. 12, 1976). Congress kept this requirement for certain apportionment challenges because "these issues are of such importance that they ought to

5

be heard by a three-judge court and, in any event, they have never constituted a large number of cases." S. Rep. 94-204, at 9.

When Congress uses a term of art like "apportionment," Congress "presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken." *FAA v. Cooper*, 566 U.S. 284, 292 (2012). From the beginning of our Republic, "apportionment" has been understood in the legislative-representation context to be the division of legislative representatives among the States, not the process of drawing their districts. For instance, during the Constitutional Convention, the delegates discussed the national legislature's authority, "from time to time, to apportion the number of representatives" among the States, without any mention of overseeing how States drew districts for the number of representatives they received. James Madison, *Notes of Debates in the Federal Convention of 1787*, July 26, 1787, https://tinyurl.com/2cxpmadx. Similarly, in *Federalist No. 58*, Madison discussed the "the apportionment of representatives" to the States based on each census "every successive term of ten years." *The Federalist No. 58*, pp. 354 (J. Madison) (C. Rossiter & C. Kelser eds. 2003). Context here makes clear that Madison is referring to the number of congressional representatives per State, not the process of drawing or redrawing districts within each State. Similarly, the Supreme Court's earliest references to "apportionment" of representatives suggest a division of representatives among the States, not a process for drawing legislative districts. *See, e.g.*, *McPherson v. Blacker*, 146 U.S. 1, 30 (1892); *Elk v. Wilkins*, 112 U.S. 94, 111 (1884); *Cherokee Nation v. Georgia*, 30 U.S. 1, 42 (1831) (Johnson, J.).

At the time three-judge courts were created in 1910, "apportionment" was still understood to be distinct from the process of drawing districts. Consider *Ohio ex rel. Davis v. Hildebrant*, 241 U.S. 565 (1916). In that case, Ohio enacted new maps following the 1910 census, but the maps

6

were rejected when challenged by the voters in a referendum. *Id.* at 566–67. Supporters of the maps sued, claiming the referendum violated Article I, § 4's Time, Places, and Manner Clause because it took the power away from Ohio's legislature and gave it to the voters. *Id.* at 567. The Court rejected this argument, holding that a State's legislative power included the power to establish the process for how new maps are drawn and approved, including whether a referendum could be involved. *Id.* at 568–69. Although this case began in Ohio's courts and thus did not implicate the new three-judge-court act, the Supreme Court's reasoning indicates that Court believed that drawing and approving districts was a process that should not involve the federal courts.

Fast-forward to the 1970s when Congress amended § 2284 to add the word "apportionment" to the statute, and the meaning of "apportionment" is even clearer. *Black's Law Dictionary* defined that term as the "[d]etermination of the number of representatives which a State, county, or other subdivision may send to a legislative body." *Black's Law Dictionary* 91 (5th ed. 1979). *Black's* distinguished "apportionment" from "districting," which is the "establishment of the precise geographical boundaries of each such unit or constituency." *Id.*

Courts embraced this distinction between apportionment and districting. For example, the City of Philadelphia and several of its elected representatives sued the Secretary of Commerce, alleging the 1980 census undercounted Philadelphia, which would have resulted in the city's citizens being underrepresented in Congress and the Pennsylvania legislature. *See City of Philadelphia v. Klutznick*, 503 F. Supp. 657, 658 (E.D. Pa. 1980). They sought a three-judge court under § 2284, but the district court denied that motion. The court explained the "plain language [of § 2284] implies that, in order to necessitate the convening of a three-judge court, the challenge must be to an existing apportionment. No existing apportionment is challenged here." *Id.* Although

the 1980 census would, "in the future, be relied upon in the design of reapportionment legislation for Philadelphia and that there may result some reapportionment effect adverse to the city is not enough to trigger the requirement of § 2284." *Id.* Instead, to trigger § 2284, "the legal challenge must be to the final product—the apportionment—and not merely to the composition of an ingredient—the census—used in the product's manufacture." *Id.*; *see also Alabama v. United States Dep't of Com.*, 493 F. Supp. 3d 1123, 1128 (N.D. Ala. 2020) (denying a request for a three-judge court in a case that did not involve "a challenge to the actual division of congressional districts"); *Fed'n for Am. Immigr. Reform v. Klutznick*, 486 F. Supp. 564, 577 (D.D.C. 1980) (refusing to convene a three-judge court in a case challenging census practices rather than the apportionment of districts). Plaintiffs tried to distinguish *City of Philadelphia* in their Reply to the House Defendants' response by saying *City of Philadelphia* was about how the census was conducted. *See* ECF No. 24, at 2. That does not matter here. What matters is the distinction the court in *City of Philadelphia* drew: a case challenging an "existing appointment" and any other challenge. Plaintiffs' claims fall into the "any other challenge" bucket.

By contrast, another group of plaintiffs challenged the fact that the District of Columbia was not apportioned any members of the House of Representatives after the 1990 census. *See Adams v. Clinton*, 26 F. Supp. 2d 156 (D.D.C. 1998). The district court in that case held that a three-judge court was required because the "the core of plaintiffs' case is a challenge to the apportionment of congressional districts." *Id.* at 161. It just so happened that the challenge there was having not been apportioned any congressional representatives, rather than some other allegedly incorrect number. Accordingly, this was not a premature objection to a process not yet completed but a challenge to the "existing allocation" of representatives. *Id.* (emphasis omitted).

8

The wrinkles in this historical analysis are *Baker v. Carr*, 369 U.S. 186 (1962), and *Reynolds v. Sims*, 377 U.S. 533 (1964). Before those cases, courts did not exercise jurisdiction over challenges to legislative maps. These one-person, one-vote cases held that for both Congress and state legislatures, the Equal Protection Clause required districts consisting of (ether precisely or roughly, respectively) the same number of voters. These cases opened the door to federal litigation challenging the maps that States enacted, so that the ultimate decision of who would elect which representatives complied with the Constitution. Thus, apportionment litigation subject to § 2284 is now more common than it was before the 1960s. But these cases do not change the well-established understanding of "apportionment." One-person, one-vote challenges were to maps that were enacted, not requests to have federal courts oversee the process of drawing districts.

Logic indicates Congress agrees with this distinction too. Congress is presumed to know existing law when it enacts legislation. *Mississippi ex rel. Hood v. AU Optronics Corp.*, 571 U.S. 161, 169 (2014). Congress was thus aware of *Baker* and *Reynolds* and of courts' view that apportionment was distinct from districting. Yet Congress used "apportionment" (and only "apportionment") in § 2284. Moreover, Congress amended § 2284 specifically to reduce the frequency with which three-judge courts were empaneled and limit the corresponding burdens on the judiciary. It would be inconceivable then to presume that Congress simultaneously intended to expand "apportionment" cases to include preemptive challenges such that three-judge courts would have to oversee state legislatures during the labor-intensive process of drawing maps, rather than simply exercising jurisdiction over lawsuits challenging maps once they were enacted into law.

An analogy to math homework helps make this distinction between apportionment and districting clear. When a teacher assigns math homework, the teacher will collect the homework

9

the next day and grade students' answers (and perhaps even their work showing the answers). But the teacher does not follow the students home to watch them do their homework, tell them whether to do their math homework before or after dinner, and grade the work in real time. Similarly, with apportionment and districting, the federal government (through Congress) assigns a number of representatives to the States. The States then decide how they will divide their States into districts (both for congressional and state legislative seats) ahead of the next election cycle. Then, if someone wants to challenge those maps, the federal government (through the judiciary) may check a State's answers (*i.e.*, its maps) and depending on the case and the credibility of the allegations, its work in drawing the maps (if, for example, there are claims of impermissible discrimination).

Finally, consider the ultimate result of accepting Plaintiffs' contention that that this case requires a three-judge court. After every new census, every congressional and state legislative map will be malapportioned. If Plaintiffs are correct, then as soon as the new census data is released, plaintiffs could file lawsuits in all 50 States, assert that the old maps are now malapportioned, and demand federal judicial oversight (from a three-judge court) of the process of drawing new maps. Such a result creates myriad problems. It reintroduces the burden Congress sought to eliminate in its 1976 amendment of § 2284. It violates the well-established constitutional rule that drawing districts belongs to the States. And most importantly, it is inconsistent with the text of § 2284.

### B.     Precedent does not support Plaintiffs' request.

Turn now to the apportionment cases that courts have decided under § 2284. Since three-judge courts were created, cases involving the apportionment of legislative districts have normally (and logically) involved challenges to maps that had been enacted by state legislatures. For instance, the Supreme Court's first apportionment case on appeal from a three-judge court, *Wood v. Broom*, 287 U.S. 1 (1932), dealt with a challenge to Mississippi's act apportioning seven

congressional districts after the 1930 census. The next decade, *Colegrove v. Green*, 328 U.S. 549 (1946), addressed Illinois's newly approved maps after the 1940 census. Even the Supreme Court's seminal case on apportionment—*Baker v. Carr*—focused on enacted maps in Tennessee. And the list goes on (and on). *See, e.g.*, *Shaw v. Reno*, 509 U.S. 630 (1993) (North Carolina congressional districts); *Wesberry v. Sanders*, 376 U.S. 1 (1964) (Georgia congressional districts); *Pohoryles v. Mandel*, 312 F. Supp. 334, 335 (D. Md. 1970) (three-judge court) (Maryland state legislative districts); *Mann v. Davis*, 213 F. Supp. 577 (E.D. Va. 1962) (three-judge court) (Virginia state legislative districts).

All of these cases make clear that *Shapiro* is irrelevant here. That case involved a challenge to political gerrymandering in Maryland. 577 U.S. at 41–42. In light of binding Supreme Court precedent, a single district judge concluded those claims necessarily failed as a matter of law, and rather than referring the case to a three-judge court, went ahead and dismissed it. *Id.* at 42. The Supreme Court reversed, holding that § 2284(a) required virtually all apportionment cases to be referred to a three-judge court. *Id.* at 45–46. As already discussed at length, Plaintiffs' claim here is not an apportionment case, as that term is used in § 2284(a). Therefore, *Shapiro* has no application to Plaintiffs' request for a three-judge court.

Of course, there have been some three-judge courts that have exercised jurisdiction over preemptive challenges like this one. *See, e.g.*, *Arrington v. Elections Bd.*, 173 F. Supp2d 856 (E.D. Wisc. 2001) (three-judge court). But those cases do not address the Governor's argument here, so they offer Plaintiffs no support. *See United States v. L. A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 38 (1952) ("The [issue] was not there raised in briefs or argument nor discussed in the opinion of the Court. Therefore, the case is not binding precedent on this point."); *see also Thomas v. Reeves*, 961 F.3d 800, 823 (5th Cir. 2020) (Willett, J., concurring) ("Today's case is, after all, a statutory-

11

interpretation dispute, and what matters most are Congress's words, not the until-now-unchallenged assumptions of litigants."). Moreover, and although a merits point, it is worth noting that even these three-judge courts have refused to preempt States' redistricting efforts, deferring any judicial action while legislators were at work. *See, e.g.*, *Vigil v. Lujan*, 191 F. Supp. 2d 1273, 1274–75 (D.N.M. 2001) (three-judge court). Other courts have more soundly dismissed such preemptive challenges as not ripe. *See, e.g.*, *Mayfield*, 206 F. Supp. 2d at 824 (finding a case was not ripe when "the Texas Legislature has not been given the opportunity to act").

Even the cases Plaintiffs cite in their Complaint make this point. Two of the cases involved after-the-fact challenges to new districts apportioned by the General Assembly and approved by the Governor. After the 1970 census, plaintiffs challenged the maps the General Assembly enacted. *See Twigg v. West*, No. 71-1106 (D.S.C.); *McCollum v. West*, 71-1211 (D.S.C.). The same thing happened after the 2010 census, when a lawsuit was filed after the General Assembly completed the redistricting process and apportioned state and federal legislative districts based on the new census data. *See Backus*, 857 F. Supp. 2d 553.

To be sure, the other three lawsuits (following the 1980, 1990, and 2000 censuses) did not involve specific maps that had been enacted into law. But the timing of those three lawsuits is a critical distinction. They were filed only after it became clear that the General Assembly, despite repeated efforts, was not able to enact new maps. *See Colleton Cty. Council v. McConnell*, 201 F. Supp. 2d 618, 623 (D.S.C. 2002) (new maps were passed "[a]fter a lengthy period" but were vetoed, and the General Assembly "failed in its attempt to override the veto"); *Burton on Behalf of Republican Party v. Sheheen*, 793 F. Supp. 1329, 1336 (D.S.C. 1992) (new maps were vetoed, but the veto was not overridden, and after "no compromise was reached," a lawsuit was filed "to break the legislative impasse"); *S.C. State Conf. of Branches of Nat. Ass'n for Advancement of*

12

*Colored People, Inc. v. Riley*, 533 F. Supp. 1178, 1179 (D.S.C. 1982) (after "many months" of trying to enact new maps, the General Assembly was "hopelessly deadlocked" and "abandoned" its efforts). Those three cases stand in stark contrast with this one, in which even Plaintiffs admit the General Assembly is currently working on redistricting and shows no sign of an impasse. *See, e.g.*, ECF No. 1, at 19–21. Indeed, Plaintiffs are actively involved in that process, submitting their own proposed maps to the General Assembly. *See infra* p. 14–15.

The Supreme Court's decision in *Growe v. Emison*, 507 U.S. 25 (1993), is also instructive here. There, dueling federal and state lawsuits challenged Minnesota's redistricting process. The Supreme Court held that the federal court overstepped by enjoining that process. In doing so, the Court took care to explain why the district court abused its discretion. The Court stated that federal courts must "defer consideration of disputes involving redistricting where the State . . . has begun to address that highly political task itself." *Id.* at 33. This deference is required because "the Constitution leaves with the States primary responsibility for apportionment of their federal congressional and state legislative districts." *Id.* at 34.

The Court specifically rejected the idea that a State must finish its redistricting work in time for litigation over new maps to conclude. *See id.* at 35 ("We fail to see the relevance of the speed of appellate review."). The Court noted that imposing "such a requirement would ignore the reality that States must often redistrict in the most exigent circumstances—during the brief interval between completion of the decennial federal census and the primary season for the general elections in the next even-numbered year." *Id.* This makes Plaintiffs' claim that the timeline here needs to include "inevitable time for judicial review" irrelevant.[1] ECF No. 1, at 6; *see also* ECF

---

[1] This statement is revealing. It shows that no matter what maps the General Assembly enacts, Plaintiffs plan to sue about them. That lawsuit (however meritless it may ultimately be) is what could require a three-judge court.

13

No. 1, at 8 (wanting the Court to impose a "concrete timeline that will allow sufficient time for . . . the resolution of any litigation" over the new maps).

All a State has to do for a federal court not to intervene in the districting process is "adopt a constitutional plan within ample time to be utilized in the upcoming election." *Growe*, 507 U.S. at 35. Only if there is "evidence" making it "apparent" that a State "would not develop a redistricting plan in time" may a federal court conceivably step in to review the claims and the "evidence." *Id.* at 34, 36; *see also Branch v. Smith*, 538 U.S. 254, 278 (2003) ("When the State, through its legislature or other authorized body, cannot produce the needed decision, then federal courts are left to embark on the delicate task of redistricting." (cleaned up)). Thus, the litigation over redistricting in South Carolina following the 1980, 1990, and 2000 censuses fit exactly the situation in which the *Growe* Court said federal courts could become involved in redistricting when a particular map was not being challenged.

Unsurprisingly, Plaintiffs try to squeeze this case into that mold, insisting South Carolina will not have new maps in time for next year's primary and that the General Assembly does not have a "concrete timeline" for when it will enact those maps. *E.g.*, ECF No. 1, at 2, 4. They even go so far as to say that it is "practically guarantee[d]" maps will not be ready for the next election cycle. ECF No. 1, at 4. None of this hyperbole is credible, and they allege no plausible facts to support it, much less present any "evidence" with their Complaint or Request for Three-Judge Panel, as contemplated by *Growe*. The redistricting process is already underway. South Carolina finally received the census data on August 12, 2021. *See* ECF No. 1, at 15. Both the House and Senate have provided the public with data for and principles governing redistricting, and both legislative bodies are currently holding public hearings and taking submissions from South Carolinians (including the NAACP, which has submitted multiple proposed maps). *See South*

14

*Carolina Redistricting 2021*, Senate Judiciary Committee, https://redistricting.scsenate.gov/; *South Carolina House of Representatives Redistricting 2021*, House Judiciary Committee, https://redistricting.schouse.gov/. Put simply, these facts do not "support a conclusion that the state [legislature is] either unwilling or unable to adopt a congressional plan in time for the elections." *Growe*, 507 U.S. at 37.

And Plaintiffs do not really suggest the General Assembly is unwilling or unable to adopt new maps. Instead, they complain about the timing of the process. *See, e.g.*, ECF No. 1, at 22. Plaintiffs note in their Complaint the House may return in December. *See* ECF No. 1, at 22. Plus, Chairman Murphy had already told Plaintiffs that directly, before they filed this lawsuit. *See* ECF No. 18-1. At a minimum, the General Assembly will return by January 11, when its next regular session convenes.[2]

None of this timing presents a practical problem, much less a "Case" or "Controvers[y]" warranting or authorizing judicial intervention. The filing period for candidates seeking nomination by political party for the 2022 elections does not even open until March 16 of next year. *See* S.C. Code Ann. § 7-11-15(A). Even if the General Assembly does not return and enact new maps prior to its next ensuing regular session, that means potential candidates will presumably have more than a month (if not two months) to decide whether to run after the new maps are finalized. Plus, the more relevant date in June 14, 2022—when the primaries will be held. *See* S.C. Code Ann. § 7-13-15(B) (setting the date for primaries). That's more than seven months from now.

---

[2] As an additional problem with Plaintiffs' request for a "concrete schedule" be imposed on the General Assembly's redistricting work, *Growe* never suggests that federal courts have the power to impose any sort of schedule on a State legislature; it merely observes that, if by a certain point the legislature has not acted, a federal court may become involved in the redistricting process.

15

Every redistricting cycle results in a shorter-than-usual window for potential candidates to make decisions, and COVID-19 made the window this cycle even shorter. But that does not mean there is not sufficient time for candidates to make those decisions or for the 2022 elections to be held on schedule. All Plaintiffs have done here is "race to" the courthouse to seek federal intervention on the front end because they are worried that they will not have the desired amount of time to sue about the new maps between their enactment and the filing deadline. *Growe*, 507 U.S. at 37; *cf. Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2029 (2020) (resolving a dispute between the political branches only after the question had been "hashed out in the hurly-burly, the give-and-take of the political process between the legislative and the executive" (internal quotation mark omitted)). But as just discussed, having time for a federal lawsuit before an election is not a sufficient justification for federal intervention in a process that is constitutionally committed to the States.

## **Conclusion**

Plaintiffs Request for Three-Judge Panel should be denied.

Respectfully submitted,

s/Wm. Grayson Lambert
Thomas A. Limehouse, Jr. (Fed. Bar No. 12148)
*Chief Legal Counsel*
Wm. Grayson Lambert (Fed. Bar No. 11761)
*Senior Legal Counsel*
Michael G. Shedd (Fed. Bar No. 13314)
*Deputy Legal Counsel*
OFFICE OF THE GOVERNOR
South Carolina State House
1100 Gervais Street
Columbia, South Carolina 29201
(803) 734-2100
tlimehouse@governor.sc.gov
glambert@governor.sc.gov
mshedd@governor.sc.gov

        Christopher E. Mills (Fed. Bar No. 13432)
        SPERO LAW LLC
        557 East Bay Street #22251
        Charleston, South Carolina 29413
        (843) 606-0640
        cmills@spero.law

        *Counsel for Governor McMaster*

October 28, 2021
Columbia, South Carolina

17