## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## COLUMBIA DIVISION

| | |
|---|---|
| THE SOUTH CAROLINA STATE CONFERENCE OF THE NAACP, | |
| and | Civil Action No.  3:21-cv-03302-JMC |
| TAIWAN SCOTT, on behalf of himself and all other similarly situated persons, | |
| Plaintiffs, | |
| v. | **MOTION TO STAY AND MEMORANDUM IN SUPPORT** |
| HENRY D. MCMASTER, in his official capacity as Governor of South Carolina; et. al, | |
| Defendants. | |

Defendants James H. Lucas, Chris Murphy, and Wallace H. Jordan (collectively, the "House Defendants") respectfully move this Court for an Order staying this action.[1]  Contrary to any suggestion otherwise in their Complaint or other papers, Plaintiffs do not challenge the constitutionality of active or operative district lines.  Instead, in a thinly veiled effort to draw active

---

[1] Plaintiffs' constitutional challenge is not ripe and, therefore, non-justiciable. *See National Park Hospitality Ass'n v. Department of the Interior*, 583 U.S. 803, 807, 123 S.Ct. 2023, 2030 (2003) ("Ripeness is a justiciability doctrine designed to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements…." (internal quotation omitted)). For the reasons stated in the House Defendants' Response (ECF 18) to Plaintiffs' Motion for the Appointment of a Three-Judge Panel (ECF 17), 28 U.S.C. § 2284 does not apply and a three-judge panel is not required.  Furthermore, because section 2284 is inapplicable, the Court is not constrained by subsection (b)(3), which limits a judge's ability to rule—alone—on various matters when a three-judge panel has been appointed.  The House Defendants ask this Court to exercise its equitable powers and issue a stay, and it can do so prior to determining if the claims are justiciable. *See Hulley Enterprises Ltd. v. Russian Federation*, 211 F.Supp.3d 269, 278 (D.D.C. 2016) (recognizing that courts have the equitable powers to manage their dockets and issue stays even when non-merits, threshold questions are unresolved). Alternatively, however, this Court could decide that Plaintiffs' claims are non-justiciable and dismiss the action.

federal court supervision into the ongoing state legislative redistricting process, Plaintiffs challenge outdated election lines enacted by the South Carolina General Assembly in 2011. Plaintiffs cite no judicial precedent, constitutional provision, or act of Congress empowering the Court to intervene in the ongoing legislative work entrusted to the General Assembly by the South Carolina Constitution.  S.C. Const. art. III, § 3; S.C. Const. art. VII, § 13.  Plaintiffs' purported "constitutional challenge" is premature, therefore, non-justiciable.  For this reason and others, as more fully explained herein, the House Defendants respectfully move this Court for an order staying this action until the General Assembly has timely passed a bill enacting new state House, state Senate, and Congressional district lines, and the Governor has signed it into law.

## INTRODUCTION

When considering the federal judiciary's role within the larger context of our government, the Supreme Court of the United States recognized that "the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways." *Younger v. Harris*, 401 U.S. 37, 44 (1971).  Further expounding upon this point, the Supreme Court explained:

> [this] does not mean blind deference to 'States' Rights' any more than it means centralization of control over every important issue in our National Government and its courts. The Framers rejected both these courses. What the concept[2] does represent is a system in which there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States.

*Id*. at 44-45.

---

[2] The "concept" explained by the Court is comity, which weighs in favor of staying this matter because Plaintiffs' constitutional challenge is not ripe and entertainment of this abstract issue would "unduly interfere with the legitimate activities of" South Carolina.

Every ten years each of the 50 states redraws district lines for representative political offices because, inevitably, the decennial census exposes that the then-current districts are no longer apportioned appropriately.[3]  Over the ten years preceding each redistricting cycle some districts gain residents while others experience a decrease in population.  Either scenario, if significant enough, could present an imbalance of population and political representation that states must correct in accordance with federal and state laws.  Additionally, the demographic makeup of any given district likely shifted since the last time election districts were enacted—and this might present a reason to redraw district boundaries. The process of redrawing district lines in light of population shifts in order to comply with the law is a predictable part of the American political system.

In South Carolina, the state Constitution makes clear that redistricting is a legislative undertaking entrusted to the General Assembly.  With rare exception, the General Assembly has routinely passed legislation establishing new districts to redress malapportionment that occurs over time, and the Governor has signed these bills into law.   Litigants have challenged the constitutionality of these new laws in federal court each time.  Setting aside the merits of those previous cases, each suit was proper insofar as the relief plaintiffs sought was available to them under the law. The challenges were directed at newly enacted legislation establishing revised district lines that the General Assembly and Governor intended for use in the next election cycle. This suit is far different. Plaintiffs seek relief that would require this Court to alter fundamentally

---

[3] Indeed, every state either gains or loses population and experiences population shifts during the period between each census in a manner that could affect the apportionment of their election districts.  However, as the Court is well aware, states are not required to constantly engage in the redistricting process, but only redistrict once every ten years after the release of new census data.

the balance of power in American government. For this reason, as well as those explained below, this Court should grant the House Defendants' motion to stay.

## LEGAL STANDARD

A keystone case in American jurisprudence decided more than 200 years ago, the Supreme Court recognized in *Marbury v. Madison* that the judiciary was not to make law, but "to say what the law is*." Marbury v. Madison*, 1 Cranch 137, 177, 2 L.Ed. 60 (1803). Plaintiffs ask this Court to participate in South Carolina's law-making process and to provide them with relief that is not within this Court's authority to afford them at this point[4]—so stay is both necessary and appropriate.

"[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. American Co.*, 299 U.S. 248, 254 (1936). A district court must exercise judgment when determining whether to grant or deny a motion to stay by "balanc[ing] the various factors relevant to the expeditious and comprehensive disposition of the causes of action on the court's docket." *Maryland v. Univ. Elections, Inc.*, 729 F.3d 370, 375 (4th Cir. 2013) (quotations omitted). Factors district courts consider in determining whether to exercise their discretion to stay proceedings include "the interests of judicial economy, the hardship and inequity to the moving party in the absence of a stay, and the potential prejudice to the non-moving

---

[4] Plaintiffs' challenge to the 2011-enacted district lines is moot, even though their action is not ripe with respect to challenging the to-be-enacted district lines. A case is moot where "legal resolution of the [dispute] would have no effect on the relief afforded the parties." *SAS Institute, Inc. v. World Programming Limited*, 874 F.3d 370, 389 (4th Cir. 2017). The General Assembly will pass legislation creating new district lines regardless of the outcome of this case. "It has long been settled that a federal court has no authority 'to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it.' " *Church of Scientology of California v. U.S.*, 506 U.S. 9, 12, 113 S.Ct. 447, 449 (1992), quoting *Mills v. Green,* 159 U.S. 651, 653, 16 S.Ct. 132, 133, 40 L.Ed. 293 (1895).

party in the event of a stay." *Yadkin Riverkeeper, Inc. v. Duke Energy Carolinas, LLC*, 141 F.Supp.3d 428, 452 (M.D.N.C. 2015). This balancing does not require strict adherence to any formula. As one District Judge described his analysis:

> I have broad discretion to stay proceedings when appropriate to control my docket. In considering whether a stay is appropriate, I must weigh competing interests including potential prejudice or hardship to either party, as well as judicial economy. The party seeking the stay must make out a clear case of hardship or inequity….

*Gould v. Farmers Ins. Exch.*, 326 F.R.D. 530, 531 (E.D. Mo. 2018) (internal quotations omitted). Finally, "courts will not hesitate to grant a stay when the interests of justice seem to require it." *In re Worldcom, Inc. Sec. Litig.*, No. 02-CV-03288 (DLC), 2002 WL 31729501, at *3 (S.D.N.Y. Dec. 5, 2002).

## ARGUMENT

**I.     A stay is necessary to avoid the prejudicial effect of premature judicial encroachment into a uniquely state legislative function.**

If this action is not stayed, the House Defendants will face hardship and prejudice because the Court will have prematurely and unnecessarily engaged in the ongoing state legislative redistricting process.[5] The federal judiciary in South Carolina has never actively participated in the General Assembly's redistricting process before it was completed—and for good reason. Well-established redistricting law makes clear that judicial intervention should occur only after a state

---

[5] In addition to the harm suffered by the House Defendants in the absence of a stay, the citizens of South Carolina will suffer harm. The people of South Carolina elected state Representatives and Senators to write state laws, and the task of redistricting belongs to these elected officials. Intervention by the federal judiciary at this time would—contrary to the interests Plaintiffs purport to protect—lessen the importance of South Carolinians' votes in this important political process.

has had a meaningful opportunity to draw new election lines in accordance with the federal constitution and the state has failed or refused to do so:

> From the beginning, we have recognized that '[redistricting] is primarily a matter for legislative consideration and determination, and that judicial relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so.'

*White v. Weiser*, 412 U.S. 783, 794-95 (1973) (quoting *Reynolds v. Sims*, 377 U.S. 533, 586 (1964)). Indeed, even as to congressional (*i.e.*, federal office) redistricting, "a district court should not pre-empt [a state's] legislative task nor intrude upon state policy any more than necessary." *White* at 795 (quotation omitted).

With respect, the House Defendants do not need judicial assistance in order to fulfill their obligation under the law. In fact, as noted in *Burton v. Sheheen*, 793 F.Supp. 1329, n.11 (D.S.C. 1992), cited more than once by Plaintiffs,[6] with "'respect to the apportionment of the House of Representatives, South Carolina's General Assembly is one of those [states] which has faithfully complied with its constitutional obligations.'"[7] (quoting *O'Shields v. McNair*, 254 F.Supp. 708, 717 (D.S.C. 1966)).

The Supreme Court has explained that the federal judiciary has no role in the legislative redistricting *process*: "[T]he Court has required federal judges to defer consideration of disputes

---

[6] *See* ECF 1 ¶¶ 16, 53.

[7] As this Court is aware, in 2002 a three-judge panel drew interim district lines for South Carolina after the General Assembly and Governor stipulated that they were "at an impasse" and that there was "no chance that [they] will reach a compromise in time for" upcoming elections. *Colleton County Council v. McConnell*, 201 F.Supp. 618, 627 (D.S.C. 2002). As the Court's sentiment in *Burton* highlights, this scenario was unprecedented in 2002 and has not presented itself since. Regardless, the federal judiciary's intervention two decades ago demonstrates that its role in the legislative redistricting process, if any, occurs only after the General Assembly and Governor have had a chance to enact redistricting legislation on their own and that it merely "'perform[s] in the legislature's stead' when [state officials have] failed to redistrict…." *Id.* quoting *Reynolds*, 377 U.S. at 585.

involving redistricting where the State, through its legislative or judicial branch, has begun to address that highly political task itself." *Growe v. Emison*, 507 U.S. 25, 33 (1993); *see Scott v. Germano,* 381 U.S. 407, 409 (1965); *Chapman v. Meier*, 420 U.S. 1, 27, 95 S.Ct. 751, 766 (1975) ("We say once again what has been said on many occasions: [redistricting] is primarily the duty and responsibility of the State through its legislature or other body, rather than of a federal court.") "[A] federal court must neither affirmatively obstruct state [redistricting] nor permit federal litigation to be used to impede it" absent evidence that the state legislature "will fail timely to perform that duty." *Growe*, 507 U.S. at 34. There is no reason to believe that the South Carolina General Assembly "will fail timely to perform" its duty to redistrict. Indeed, the pace of the General Assembly's process demonstrates both chambers are actively engaged in and faithfully performing their obligations in accordance with the law. The House Redistricting Ad Hoc Committee is meeting on November 10, 2021 and, if necessary, on November 12, 2021 to discuss H. 4493 and proposed new district lines. The Ad Hoc Committee will release its proposed district lines prior to this meeting. The public may provide in-person or virtual testimony.[8] The Senate Judiciary Committee's Redistricting Subcommittee is conducting a similar hearing today, November 4, 2021, at which time it will release its proposed new district lines.[9] Plaintiffs are actively participating in this ongoing process.[10]

---

[8] Speaker James Lucas announced this meeting and details are available to the public online. *See* https://www.scstatehouse.gov/agendas/124h11562.pdf.

[9] *See* https://www.scstatehouse.gov/agendas/124s11550.pdf.

[10] Indeed, Plaintiffs and their counsel are actively participating in this process by, among other things, submitting proposed maps to the General Assembly and testifying in redistricting committee meetings formed by both chambers. After Plaintiffs filed this case, Brenda Murphy, President of the South Carolina State Conference of the NAACP, testified before the Senate Redistricting Subcommittee, stating: "The South Carolina NAACP and our coalition view our proposed maps as the beginning, not the end, of this process. These are not the only possible maps that could satisfy the criteria I discussed today . . . . They are simply examples of maps that we

Due to the global pandemic caused by COVID-19, the United States Census Bureau did not release its final 2020 census data until mid-September 2021 rather than in March, which has historically been when census data was released in prior decades. The General Assembly did not create or cause the shortened time period available to redistrict, but has nonetheless moved quickly to accomplish the extraordinary task before it in a timely manner. Lawsuits like this one do not aid in the process—they only serve to divert the General Assembly's attention and resources away from the task. A stay is clearly in the public interest.

## II.    The relief Plaintiffs seek is premature and/or unnecessary.

As explained above, redistricting in South Carolina is a state legislative function. The Court's role with regard to a state's redistricting process is to ensure and validate, or where appropriate invalidate, redistricting legislation alleged to violate Constitutional requirements, or other federal or state law. None of the Plaintiffs' requests for relief are ripe. Requiring the House Defendants to litigate this case in the middle of the redistricting process would only waste judicial resources and distract the General Assembly from continuing to perform diligently its task of redistricting.

---

believe this subcommittee should consider." *See* https://www.scstatehouse.gov/video/archives.php, Thursday, October 21, 2021 at 57:45. Leah Aden, counsel of record in this matter, also testified in that hearing and described the NAACP's proposal, referring to it as "an example of a map that we believe merits this subcommittee's due consideration and incorporates the key analysis that should guide the assessment and development of any map this body considers seriously and ultimately adopts." *Id*. at 1:13:08. Somil Trivedi, also counsel of record, testified that Plaintiffs and counsel "are also cognizant that this conversation must happen fast and certainly in time for maps to be drawn and scrutinized well in advance of relevant election dates in 2022." *Id*. at 1:14:34 and 1:16:06. In addition to this recent testimony, evidence of the map submissions submitted to the House by Plaintiffs was attached to the House Defendants' response in opposition to the motion to appoint a three-judge panel. ECF 18.

**A.  Plaintiffs' requests are unnecessary, illusory, improper, or not ripe.**

Plaintiffs seek relief that is premature, unnecessary, illusory, and/or improper.[11]  Plaintiffs ask this Court for such relief when it asks it to:

> i.    Declare that the current configurations of South Carolina's U.S. Congressional districts under S.C. Code Ann. § 2-1-70 and S.C. Code Ann. § 7-19-35, violate Article I, § 2 of, and the First and Fourteenth Amendments to, the U.S. Constitution;
>
> ii.   Declare that the current configurations of South Carolina's state House districts under the 2010 legislative districting plan, S.C. Code Ann. § 2-1-70 and S.C. Code Ann. § 7-19-35, violate the First and Fourteenth Amendments to the U.S. Constitution; [and]
>
> iii.  Permanently enjoin Defendants and all persons acting on their behalf or in concert with them from implementing, enforcing, or conducting any elections under South Carolina's current U.S. Congressional or state House districts;

ECF 1, Prayer for Relief, ¶¶ i-iii.

Not surprisingly, the 2020 census data exposes population shifts in South Carolina, and the General Assembly is drafting legislation to establish new district lines.  The Court does not need to declare that the existing districts would violate the law or "enjoin Defendants and all persons acting on their behalf or in concert with them from" using the maps in future elections. That is

---

[11] This Court faced an analogous issue in the matter of *Aiken County v. Bodman*, 509 F.Supp.2d 548 (D.S.C. 2007).  In *Aiken*, "[t]he ultimate relief [the] County [wa]s seeking…[wa]s an Order that shipments of defense plutonium be suspended…." *Id*. at 555.  The Court concluded the issue was not ripe because "it is undisputed that currently there are no shipments of defense plutonium or defense plutonium materials in transit or scheduled for delivery" to the County.  *Id*. at 555-56.  The Court ruled, "further factual development of the issues is needed" prior to adjudication.  *Id*. at 556.  The situation here is the same: it is undisputed that there is *no* plan to use the 2011-drawn election districts for the 2022 election.

because there is *no* chance that future elections will be based on these outdated district maps.  At

best, Plaintiffs present an abstract question that the Court should properly decline to entertain.[12]

   **B.  Plaintiffs request improper relief.**

   Next, in their fourth and fifth requests for relief, Plaintiffs ask this Court to provide relief

that would be premature and thus not proper:

> iv. *Establish a schedule that will enable the Court, in the absence of timely enacted and lawful plans for South Carolina's U.S. Congressional and state House districts, to adopt and implement new plans for South Carolina's U.S. Congressional and state House districts;*
>
> v. *Issue an order, as needed, staying the deadlines contained in S.C. Code Ann. §§ 7-11-15, 7-13-45, 7-11-210, and 7-13-40, as well as any other deadlines that are dependent upon these deadlines, as they pertain to elections for seats in the United States Congress and the South Carolina House of Representatives pending either:*
>
> > i. *The Court's determination that the new districts for those elective bodies are constitutional; or*
> >
> > ii. *The Court's implementation of interim redistricting plans for those elective bodies.*

ECF 1, Prayer for Relief, ¶¶ iv-v.

---

[12] What Plaintiffs seek is an advisory opinion, not a declaratory judgment as they claim.  Plaintiffs ask whether, *in the abstract*, South Carolina *could* conduct a *future* election using the 2011 drawn lines without violating the law.  As the Court is well aware:

> '(T)he federal courts established pursuant to Article III of the Constitution do not render advisory opinions. For adjudication of constitutional issues 'concrete legal issues, presented in actual cases, not abstractions' are requisite.  This is as true of declaratory judgments as any other field.'

*Golden v. Zwickler*, 394 U.S. 103, 108, 89 S.Ct. 956, 959 (1969), *quoting United Public Workers of America (C.I.O.) v. Mitchell*, 330 U.S. 75, 89, 67 S.Ct. 556, 564 (1947).

As discussed previously, the South Carolina Constitution confers the authority to redistrict upon the General Assembly and the Court should decline to intervene in this process in the manner Plaintiffs request. The House Defendants are currently drawing new district lines using the 2020 census data and, aside from bald allegations to the contrary, there is no evidence that they will not "adopt and implement new plans for South Carolina's U.S. Congressional and state House districts" in time for the 2022 election cycle. Thus, there is no indication that the General Assembly "will fail timely to perform [its] duty."[13] *Id.*

Furthermore, Plaintiffs' request for an order staying the deadlines pertaining to the 2022 election cycle is improper because, as Plaintiffs admit, one may not be "needed." The date by which candidates must declare their intent to run in party primaries is March 30, 2022—nearly half a year from now. This is more than enough time to complete the legislative process already underway and resolve a challenge to the new plans (assuming a challenge is asserted). Asking the Court to now set a schedule for a legislative process and stay the 2022 election cycle so that the Court can draw interim plans for the election is highly inappropriate where "[redistricting] is primarily the duty and responsibility of the State through its legislature or other body, rather than of a federal court." *Chapman*, 420 U.S. at 27.[14]

### III.     Consideration of judicial economy weighs in favor of a stay.

A stay will serve judicial economy because the outcome of the ongoing legislative process will directly impact potential, future litigation concerning redistricting. In the absence of a stay,

---

[13] In addition to this obvious impropriety, establishing a schedule when Plaintiffs clearly cannot demonstrate the necessity of one would waste judicial resources.

[14] The House Defendants do not specifically list and analyze Plaintiffs' final three boilerplate prayers for relief ("Retain jurisdiction while Defendants enact plans by this Court's deadline;" "Award Plaintiffs' attorneys' fees and costs in this action;" and "Grant such other and further relief as this Court deems just and proper in the circumstances" ECF 1, Prayer for Relief, ¶¶ vi, vii, viii. … ). They are unnecessary as is made clear by analysis of Plaintiffs' preceding requests.

the Court will quickly confront various issues, including but not limited to: (1) whether the 2011-drawn district lines would be, if used in the 2020 election cycle, malapportioned and otherwise violate the law; (2) whether imposing a schedule on a legislative process is necessary, or even permissible; and (3) whether to stay 2022 election deadlines.  Expending time and energy addressing these questions would be a waste of judicial resources.  The legislative process will provide definitive answers to these critical questions "that could impact the viability of some or all of the claims asserted by Plaintiffs."  *Int'l Refugee Assistance Project v. Trump*, 323 F.Supp. 726, 734 (D. Md. 2018).  In fact, the imminent completion of the legislative process will likely moot many of these questions and could make any litigation entirely unnecessary.  Thus, there is no doubt that "considerations of judicial economy strongly counsel in favor of a stay."  *Id*.

## IV.     A stay would not prejudice Plaintiffs.

Granting the House Defendants' motion to stay would have *no* impact whatsoever on Plaintiffs.  Plaintiffs will be in the same position even if the Court stays this action—district lines will be redrawn in light of the 2020 census and such redistricting will occur before the preliminary filing deadlines for the 2022 election cycle, which is still many months away.  If the General Assembly fails to reapportion in accordance with the law after it has had adequate time to do so, for the reasons discussed above, then and only then should the District Court consider judicial relief. *See Reynolds*, 377 U.S. at 586 (recognizing "that legislative [redistricting] is primarily a matter for legislative consideration and determination, and that judicial relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so.").

## CONCLUSION

The House Defendants move this Court for an order retaining jurisdiction of and staying this action in its entirety until the defendants have enacted law establishing new legislative districts. The House Defendants also request that the Court defer any decision on the motion for a three-judge panel until new districts are put in place prior to the 2022 election cycle and Plaintiffs declare an intention to challenge those districts.  Alternatively, for the reasons discussed above, the Court could dismiss Plaintiffs' action.  Prior to filing this Motion, and pursuant to Local Civ. Rule 7.02, undersigned counsel consulted with counsel for Plaintiffs, and Plaintiffs' counsel indicated that they do not consent to the relief requested herein.

*(signature page to follow)*

Respectfully submitted,

*s/ William W. Wilkins*

William W. Wilkins (Fed. ID No. 4662)
Andrew A. Mathias (Fed. ID No. 10166)
NEXSEN PRUET, LLC
104 S. Main Street, Suite 900 (29601)
Post Office Box 10648
Greenville, SC  29603-0648
Telephone: 864.370.2211
bwilkins@nexsenpruet.com
amathias@nexsenpruet.com


Mark C. Moore (Fed. ID No. 4956)
Jennifer J. Hollingsworth (Fed. ID No. 11704)
Hamilton B. Barber (Fed. ID No. 13306)
NEXSEN PRUET, LLC
1230 Main Street, Suite 700 (29201)
Post Office Drawer 2426
Columbia, SC 29202
Telephone: 803.771.8900
MMoore@nexsenpruet.com
JHollingsworth@nexsenpruet.com
HBarber@nexsenpruet.com

*Attorneys for James H. Lucas, Chris Murphy and*
*Wallace H. Jordan*

November 4, 2021
Greenville, South Carolina