**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

| | |
|---|---|
| THE SOUTH CAROLINA STATE CONFERENCE OF THE NAACP, <br><br> and <br><br> TAIWAN SCOTT, on behalf of himself and all other similarly situated persons, <br><br>    Plaintiffs, <br> v. <br> HENRY D. MCMASTER, in his official capacity as Governor of South Carolina; HARVEY PEELER, in his official capacity as President of the Senate; LUKE A. RANKIN, in his official capacity as Chairman of the Senate Judiciary Committee; JAMES H. LUCAS, in his official capacity as Speaker of the House of Representatives; CHRIS MURPHY, in his official capacity as Chairman of the House of Representatives Judiciary Committee; WALLACE H. JORDAN, in his official capacity as Chairman of the House of Representatives Elections Law Subcommittee; HOWARD KNAPP, in his official capacity as interim Executive Director of the South Carolina State Election Commission; JOHN WELLS, Chair, JOANNE DAY, CLIFFORD J. ELDER, LINDA MCCALL, and SCOTT MOSELEY, in their official capacities as members of the South Carolina State Election Commission, <br><br>    Defendants. | **Case No.: 3:21-cv-03302-JMC** <br><br> **MOTION AND MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |

**INTRODUCTION**

The South Carolina Legislature is still not in session to pass new electoral maps. The state House has released a proposed map for its own redistricting, but that proposal is not law. Neither the state House nor the state Senate has released a proposed map for the U.S. Congress. And the chambers have not informed the public when they will reconvene to enact final maps after meaningful public input, leaving any reasonable observer to assume it will happen, at the earliest, when regular session reconvenes on January 11, 2022. Meanwhile, the period for candidates to declare for office starts just two months later, in March 2022. This despite the fact that judicial vetting of enacted maps has taken at least four months in every South Carolina electoral cycle since the 1970s.

The Legislature's needless delay is violating the First Amendment in two ways. First, the right to associate with others around an election is well-settled. But people generally organize around elections according to their electoral districts, and these districts have not yet been drawn, hindering their ability to do so. Second, because existing districts are currently severely malapportioned, people in overpopulated districts are having a harder time petitioning their current elected officials. Petitioning the government is, of course, also a fundamental First Amendment right.

Against this backdrop, Plaintiffs Taiwan Scott and the South Carolina State Conference of the NAACP ("SC NAACP") make a straightforward request of this court: set a deadline of December 15, 2021, for the Legislative Defendants and the Governor[1] to pass state House and U.S. Congressional maps into law. If Defendants miss this deadline, Plaintiffs ask this court to set

---

[1] The Legislative Defendants in this matter are Messrs. Peeler, Rankin, Lucas, Murphy, and Jordan. Beyond the Legislative Defendants and Governor, Plaintiffs do not seek preliminary injunctive relief against the other named Defendants at this time.

(1) a schedule for trial that will resolve this case in sufficient time before any candidate declaration period begins, and (2) a status conference immediately after the December 15, 2021 deadline to discuss any further appropriate remedies.

Plaintiffs meet the requirements for this narrow relief. First, as noted above, they are likely to succeed on the merits of their First Amendment claims. The rights of people to assemble for elections and petition their government are sacrosanct, and the Legislative Defendants are violating them through their inaction. Second, Plaintiffs will suffer irreparable harm without this relief because we are already in a critical period for organizing ahead of the election, and the time in which constitutional rights are being infringed is something they cannot get back. Third, the balance of equities and public interest weigh in favor of this simple injunction. A deadline to produce finalized maps after meaningful public input will burden Defendants little if at all, given their obligation to create maps. But continued delay in *passing* those maps more heavily burdens Plaintiffs, who are suffering real constitutional harm as we speak. Indeed, this delay is harming all South Carolinians, and it must stop.

## FACTUAL BACKGROUND

### A.     South Carolina's Current Legislative and U.S. Congressional Districts Are Based on 2010 Census Data Despite the Available 2020 Data

On August 12, 2021, the U.S. Census Bureau released data from the 2020 decennial census pursuant to Public Law 94-171. The release of this data allows all states, including South Carolina, to conduct legislative redistricting.[2]

---

[2] U.S. Census Bureau. *Decennial Census P.L. 94-171 Redistricting Data* (Aug. 12, 2021) available at https://www.census.gov/programs-surveys/decennial-census/about/rdo/summary-files.2020.html. The U.S. Census Bureau released the same redistricting data on September 16, 2021 in a format for user-friendly for the public. U.S. Census Bureau, *Census Bureau Delivers 2020 Census Redistricting Data in Easier-to-Use Format* (Sept. 16, 2021), https://www.census.gov/newsroom/press-releases/2021/2020-census-redistricting-data-easier-to-

The release of the Census Bureau data demonstrated that, right now, the state House and U.S. Congressional districts in South Carolina are severely out of proportion because they are based on population data from 2010, and it is indisputable that there will need to be significant adjustments to district lines. Each of the 124 state House districts was drawn in 2011 based on an approximate population of 37,301 persons; based on the 2020 Census data, the population for each House district should be approximately 41,278 persons. Bryant Decl. ¶ 1. Similarly, each of the 7 congressional districts was drawn in 2011 based on an approximate population of 660,766 persons; based on the 2020 Census data, the population for each congressional district should be approximately 731,204 persons. Bryant Decl. ¶ 2.

Below is a sampling of these and other severely malapportioned state House districts:

| District | 2010 Population | 2020 Population | Shift | Deviation from Ideal 2020 Population | Percent Deviation |
|---|---|---|---|---|---|
| 55 | 36,619 | 32,164 | -4,455 | -9,114 | -22.08% |
| 64 | 38,015 | 32,279 | -5,736 | -8,999 | -2.01% |
| 90 | 36,637 | 32,448 | -4,189 | -8,830 | -21.39% |
| 26 | 36,435 | 57,221 | +20,786 | +15,943 | 38.62% |
| 100 | 36,406 | 61,053 | +24,647 | +19,775 | 47.91% |
| 45 | 36,382 | 66,141 | +29,759 | +24,863 | 60.23% |

Below are the population shifts in all seven U.S. Congressional districts:

| District | 2010 Population | 2020 Population | Shift | Deviation from Ideal 2020 Population | Percent Deviation |
|---|---|---|---|---|---|
| 1 | 660,766 | 818,893 | +158,127 | +87,689 | 11.99% |
| 2 | 660,766 | 721,829 | +61,063 | -9,375 | -1.28% |
| 3 | 660,767 | 706,785 | +46,018 | -24,419 | -3.34% |

use-format.html. These August 12 and September 30 data sets, although packaged differently, contain the same redistricting numbers.

| 4 | 660,766 | 760,233 | +99,467 | +29,029 | 3.97% |
| 5 | 660,766 | 736,286 | +75,520 | +5,082 | 0.70% |
| 6 | 660,766 | 646,463 | -14,303 | -84,741 | -11.59% |
| 7 | 660,767 | 727,936 | +67,169 | -3,268 | -0.45% |

Bryant Decl. ¶¶ 4-5.

Because the population also shifted across South Carolina over the past decade, the districts are now malapportioned. This means that, at this very moment, the people of these districts and many others do not know whether their current representatives will be eligible to run in their districts in the upcoming election and whether these representatives can be held accountable at election time for the conduct and policy positions they have advocated for while in office.  Pl. South Carolina NAACP Decl. ¶¶ 11-13; Pl. Scott Decl. ¶¶ 7-9. Members and constituents of the South Carolina NAACP who desire to influence the views of their candidates and representatives will not be able to communicate their concerns effectively because current members or candidates may not be held accountable to those citizens as voters in the next election. Pl. South Carolina NAACP Decl. ¶10, 13. And it means that Plaintiffs and others in these districts cannot plan and organize for the upcoming elections. Pl. Decl. South Carolina NAACP ¶¶ 11-13; Pl. Scott Decl. ¶¶ 7-9.

Because potential candidates for the U.S. House and South Carolina Legislature will not be able to come forward and advance policy platforms, the South Carolina NAACP members cannot educate their members and constituents on those policy platforms, including taking positions on issues. Pl. South Carolina NAACP Decl. ¶11. Moreover, Plaintiffs Mr. Scott and the South Carolina NAACP's members and constituents who desire to communicate with and contribute financially to candidates for the U.S. House and South Carolina Legislature who will represent them—a right guaranteed by the First Amendment—are hindered from doing so until

districts are correctly apportioned. Pl. South Carolina NAACP Decl. ¶¶ 11, 13; Pl. Scott Decl. ¶¶ 7, 9.

There are critical deadlines coming up. For example, the statutory deadline for candidates to declare their intent to run for state and federal office through the party primary process is March 30, 2022—less than five months from now. Bryant Decl. ¶ 6. Every day without new maps is a day in which candidates and interested organizations, such as Plaintiff South Carolina NAACP and its volunteers, cannot be contacting and educating the electorate in their districts. Pl. South Carolina NAACP Decl. ¶¶ 7-13. Candidates, and the people who would organize and vote for or against them, need to know where new district lines will be drawn before then because these lines may influence whether a candidate runs for office and what district they run in. Pl. South Carolina NAACP Decl. ¶¶ 10-11, 13; Pl. Scott Decl. ¶¶ 8-9. If the South Carolina Legislature refuses to reconvene before January 11, 2022, candidates and individuals who would support them would have too little time to effectively plan and organize regarding candidate and platform education before key upcoming election dates. Pl. South Carolina NAACP Decl. ¶¶ 11, 13.

### B.    The Legislature Adjourns Without Enacting Legislative Maps

Notwithstanding this release of Census data in August, on September 22, 2021, the South Carolina House of Representatives (the "House") announced that it would adjourn for the fall with "no plans to reconvene for a special session,"[3] even though it had not enacted or even proposed new electoral maps. The House has not been in session since a special budget session on June 29, 2021.

---

[3]        South    Carolina    House    Speaker    Jay    Lucas, https://twitter.com/schousespeaker/status/1440743475549401088 (Sep. 22, 2021) ("My statement from this afternoon:"); *see also* Associated Press, *South Carolina Senate Cancels Next Month's Senate Session* (Sept. 24, 2021), https://www.usnews.com/news/best-states/south-carolina/articles/2021-09-24/south-carolina-senate-cancels-next-months-special-session

On September 24, 2021, the South Carolina Senate (the "Senate") followed suit. After initially announcing (on September 16) it would reconvene for a special session on October 12, 2021, to discuss redistricting and COVID-19 relief money, the Senate instead announced it would also adjourn for the fall, without providing any timeline for proposing, let alone enacting, new electoral maps.[4] Senate President Harvey Peeler wrote to his Senate colleagues that the work on new districts would not be done by mid-October and it was futile to hold a special session this fall, only to "have these bills languish in the House till January."[5]

Consistent with these announcements, both the House and Senate have adjourned because they have no plans to fully return to consider redistricting maps. In making their announcements, neither the House nor the Senate has announced a concrete timeline for when it will consider or enact proposed maps, and Defendant Lucas affirmatively stated that the House had no plans for a special session. Bryant Decl. ¶ 7. Defendant Peeler has indicated the Senate will not reconvene unless the House does.[6] The next regular legislative session is January 11, 2022. Bryant Decl. ¶ 8. While both the Senate and House have released maps last week, on November 5 and November 8[7] respectively, and announced hearings on November 10 and 12, neither body has set out a full schedule for the public to know the timing and process these bodies will take before any final approval of maps. Bryant Decl. ¶ 10. Following its release, the House has subsequently withdrawn and replaced its map and the related data files. Bryant Decl. ¶ 11. And neither chamber of the

---

[4] Sept. 24, 2021 Ltr. From Harvey S. Peeler, Jr., President to Members of the South Carolina Senate, Subject: Session Update – October 12, 2021 Session Cancelled (on file with the undersigned).

[5] *Id.*

[6] Sept. 24, 2021 Ltr. From Harvey S. Peeler, Jr., President to Members of the South Carolina Senate, Subject: Session Update – October 12, 2021 Session Cancelled (on file with the undersigned).

[7] S.C. House of Representatives Redistricting 2021 Working Draft, available at https://redistricting.schouse.gov/submittedplans.html (last checked Nov. 9, 2021).

Legislature has yet released a proposed Congressional map, nor indicated any details about timing of public comment or ultimate adoption. Bryant Decl. ¶ 12.

By adjourning without scheduling a time when the full Legislature will reconvene and clear process for taking up redistricting before January 11 and given the time it will take for meaningful public input on proposed plans and any litigation to determine the legality of such plans, as explained below, the Legislature has unnecessarily delayed fulfilling this once-in-a-decade, time-consuming, time-sensitive obligation.

Without calling a special session, or being called back to session through the current *sine die* resolution,[8] the Legislature's first opportunity to consider and adopt redistricting maps will be during the 2022 regular legislative session. As explained below, that will be just eleven weeks before candidates must declare their intent to run for office and less than eight weeks before various election officials are required to publicize certain information, including the dates of the candidate filing period.[9]

## C.    Likely Court Intervention and Prolonged Litigation

South Carolina has a history of requiring adjudication over its maps over the last five decades. Each cycle, court intervention has been required, and it has taken significant time to resolve these issues. Over this time, litigation often revealed serious deficiencies in the Legislature's initial maps that only courts could fix.

---

[8] Under the current *sine die* resolution, the Legislature has another tool at its disposal to authorize the full legislative body to reconvene for considering and adopting redistricting maps. *See* ECF No. 45 at 3. But as described herein, neither the President of the Senate nor the Speaker of the House have indicated that they plan to utilize this resolution to fully reconvene the entire Legislature to consider and adopt new maps before January 11, 2022.

[9] S.C. Const., art. III, § 9 ("The annual session of the General Assembly shall convene at the State Capitol Building in the City of Columbia on the second Tuesday of January of each year."); S.C. Code Ann. § 7-11-15 (requiring candidates to file statement of intent between March 16 and March 30); S.C. Code Ann. § 7-13-45 (requiring election officials to publicize certain information two weeks before March 16).

For the last five redistricting cycles—every cycle since Congress enacted the VRA—courts have needed, at a minimum, four months after the Legislature released its initial maps to receive public comment and to adjudicate claims relating to South Carolina's state legislative and congressional redistricting plans. Bryant Decl. ¶ 13. In some cycles, it has taken many more months—and sometimes years—for legislative consideration and court remedial action to play out. Bryant Decl. ¶ 14. And in four out of the last five redistricting cycles, federal court intervention was necessary for South Carolina to have legally compliant maps. Bryant Decl. ¶ 15. Indeed, as the Governor publicly acknowledged in mid-October of this year, "[a]nytime we go through redistricting, we go through lawsuits as well."[10] And as this court has noted, "judicial intervention in the South Carolina redistricting process has been frequently unavoidable." *Burton v. Sheheen*, 793 F. Supp. 1329, 1337 (D. S.C. 1992).

Specifically:

- During the 2010 cycle, new maps were signed into law in June and August of 2011. The maps were challenged in court, and that action was not resolved until March 2012. *Backus v. South Carolina*, 857 F. Supp. 2d 553, 557 (D.S.C. 2011).

- During the 2000 cycle, the Legislature was unable to promulgate new maps by September 2001, at which point the court stepped in and, in March 2002, ordered "remedial districting plans" to "insure that no further elections were conducted under the invalid plans." *Colleton Cty. Council v. McConnell*, C.A. No. 3:01-3892-10, Doc. 164, 13-14 (citations omitted) (D.S.C. Mar. 20, 2002).

---

[10] Maayan Schechter and Zak Koeske, *Groups Sue SC Gov. McMaster, State Lawmakers Over Redistricting Delay*, The State (Oct. 12, 2021), https://www.thestate.com/news/politics-government/article254945997.html.

- During the 1990 cycle, the Legislature was unable to promulgate new maps by October of 1991, at which point the court stepped in and issued its own maps in May 1992, having ordered a delay in the candidate filing deadline and primary elections. *Burton*, 793 F. Supp. at 1329.

- During the 1980 cycle, the Legislature was unable to promulgate new maps "for many months," forcing the court to draw its own maps by March 1982. *S.C. State Conference of Branches of the NAACP v. Riley*, 533 F. Supp. 1178 (D.S.C. 1982) *aff'd* 459 U.S. 1025 (1982).

- During the 1970 cycle, the Legislature promulgated its first maps in November 1971, which were struck down and replaced by May of 1972. *Twigg v. West*, D. S.C. No. 71-1211 (April 7, 1972).

Bryant Decl. ¶¶ 13-15.

The Legislature's adjournment without setting a clear schedule for the public's engagement with proposed maps and adoption of them, puts at risk the ability to determine their legality before March 30 qualifying. Notably, the Senate Judiciary Redistricting Committee held ten public hearings on redistricting, but nine of these were held before the Census Bureau released the Public Law 94-171 data, and the final hearing was on August 12, 2021, the date the Census Bureau released the data in a format not user-friendly for the public. Bryant Decl. ¶ 16.

Moreover, the Senate held a hearing on November 4 on the maps that the public proposed by the Senate's deadline of October 8; but the Senate had not yet proposed any map at that time. Bryant Decl. ¶ 17. The Senate also has scheduled a hearing on November 12 on its proposed map now that one has been released. Bryant Decl. ¶ 18. The public has not been informed of any further hearings after November 12. Bryant Decl. ¶ 19. The state House has scheduled one guaranteed

hearing on November 10, 2021, with the possibility of a second on November 12. Neither chamber has scheduled any hearings for input on Congressional maps—and, at the time of this filing, neither chamber nor any Defendant to this suit has proposed such maps either. Bryant Decl. ¶ 20.

In addition, the House also has scheduled a hearing on its recently-released proposed map on November 10—only two days after it released it for 124 state representative districts— and one on November 12, as necessary. The public has not been informed of any further hearings. Bryant Decl. ¶¶ 18-20.

The Legislature continues to engage in a piecemeal process and fail to clearly inform the public about its redistricting process.

## ARGUMENT

A preliminary injunction is warranted if Plaintiffs show: (1) a likelihood of success on the merits, (2) likelihood of suffering irreparable harm, (3) the balance of hardships favor them, and (4) the injunction serves the public interest. *Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*, 722 F.3d 591, 595 (4th Cir. 2013) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). As set forth below, Plaintiffs all four prongs of this standard.

## I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR FIRST AMENDMENT CLAIM

The First Amendment "promises Americans the right not just to proclaim a political vision but to join with their compatriots and actually advance that vision." *6th Cong. Dist. Republican Comm. v. Alcorn*, 913 F.3d 393, 401 (4th Cir. 2019). Americans also have the right to petition the government to adopt said vision. U.S. Const. Am. I ("Congress shall make no law . . . abridging . . . the right of the people. . . to petition the Government for a redress of grievances."). Both rights are guaranteed by the First Amendment. Both rights are unconstitutionally burdened by the Legislature's unnecessary delay in drawing and approving maps for the 2022 election cycle.

Through their inaction, the Legislative Defendants have infringed the right to associate. It is beyond dispute that "[t]he First Amendment protects political association as well as political expression." *Buckley v. Valeo*, 424 U.S. 1, 1 (1976). This protection stems from the recognition that "effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association." *Id.*; *see also Alcorn*, 913 F.3d at 401 ("Freedom of association has, for centuries, been at the heart of the American system of government and individual rights."). Accordingly, laws or conduct that burden "associational opportunities at the crucial juncture at which the appeal to common principles may be translated into concerted action" are unconstitutional. *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 216 (1986).

The Legislature's delay, including in meaningfully engaging with the public on proposed maps and adopting legislative maps, currently imposes such an unnecessary burden on the associational rights of South Carolinians. The run up to the first deadlines of an election cycle—which South Carolina is currently in—is a "crucial juncture," *see id.*, for activists and campaigners to begin forming associations to organize for candidates and educate the electorate and other constituents in their proper district lines.

These associations often use legislative districts as their organizing principle. *See*, *e.g.*, *Alcorn*, 913 F.3d at 401 (political association of Republicans *in the Sixth Congressional District* as plaintiff). These types of association are, naturally, impossible to form until legislative districts are known. There will be 7 congressional districts and 124 state representative districts, all of whose lines will need to be adjusted before the start of candidate qualifying on March 16, 2022 and ending on March 30. Two people in the same district after the 2010 Census could easily be in different districts after the 2020 Census. The Legislature's delay thus stymies people who could otherwise already be engaged in First Amendment-protected campaigns and advocacy for the 2022

elections. In the words of the Supreme Court, the Legislature's delay hinders and burdens their "ability . . . to band together in promoting among the electorate candidates who espouse their political views," and, without this ability, "[r]epresentative democracy in any populous unit of governance is unimaginable." *Cal. Democratic Party v. Jones*, 530 US 567, 574 (2000).

The injury caused by the Legislature's inaction is not abstract: in the current state of uncertainty, "[v]olunteers [are] more difficult to recruit and retain, media publicity and campaign contributions [are] more difficult to secure, and voters [are] less interested in the campaign." *See Anderson v. Celebrezze*, 460 U.S. 780, 792 (1983). The Legislature, through its delay, is burdening the fundamental right of political association—"an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment", *Nat'l Ass'n for the Advancement of Colored People v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 460 (1958). Accordingly, the South Carolina Legislature's unnecessary inaction, which may impede political association in the State for up to an additional three months—far more than a "minimal period of time"—is "unquestionably" injuring Plaintiffs and other South Carolinians. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976).

The Legislature's delay also violates Plaintiffs' right to petition the government in two distinct ways. First, because the Legislature has thus far prevented Plaintiff Scott, South Carolina NAACP's members, and other South Carolinians from learning who their representatives will be at the time of the 2022 election, South Carolinians cannot effectively hold their representatives accountable. In addition to being a "crucial juncture" for organizers, the run up to an election cycle is a "crucial juncture" for voters as well, who may be assigned to new districts and face new or unfamiliar candidates. After a substantially delayed Census data release, the Legislature's insistence on further delay in propounding district maps until a time much closer to the qualifying

for elections, increases voter confusion over which elected officials they should be looking to for representation. *See*, *e.g.*, *Perez v. Texas*, 970 F. Supp. 2d 593, 606 (W.D. Tex. 2013) ("Shifting district and precinct lines can leave candidates wondering, [and] voters confused."). It also makes it likely that election-related deadlines will need to be changed, as the Defendant Senate has acknowledged. ECF No. 45 at 9.

Second, Plaintiffs and tens of thousands of South Carolinians will either be forced to vote in their districts which are severely malapportioned or in new districts that will not have been thoroughly vetted through judicial review for compliance with constitutional and other legal requirements. Neither option is acceptable, and both are unconstitutional.

If Plaintiffs and other South Carolinians remain in over-populated districts, they are at a disadvantage when it comes to their ability to influence their elected representatives. The Constitution requires that a state's seats in the state legislature and Congress be apportioned so that each person's vote carries as close to the same weight as possible. Federal and state electoral districts must be drawn and political representatives apportioned in accordance with the principle of "one person, one vote." *Gray v. Sanders,* 372 U.S. 368 (1963). "Full and effective participation by all citizens in [] government requires . . . that each citizen have an equally effective voice in the election of members of [the] legislature." *Reynolds v. Sims*, 377 U.S. 533, 565 (1964). This principle ensures that every voter, no matter what district he or she lives in, will have an equal say in electing a representative. *Daly v. Hunt*, 93 F.3d 1212, 1216 (4th Cir. 1996). It also ensures that every person receives equal representation by his or her elected officials, and "to prevent debasement of voting power and diminution of access to elected representatives." *Kirkpatrick v. Preisler*, 394 U.S. 526, 530-31 (1969).

Leaving South Carolinians in overpopulated districts constitutes "[i]nterference with individuals' free access to elected representatives" which "impermissibly burdens their right to petition the government." *See Garza v. Cty. of Los Angeles*, 918 F.2d 763, 775 (9th Cir. 1990). After all, the Constitution guarantees that every person "receives a fair share of the governmental power, through his or her representative." *Daly v. Hunt,* 93 F.3d 1212, 1226 (4th Cir. 1996); cited by *City of Greensboro v. Guilford Cty Bd. of Elections*, 120 F. Supp. 3d 479, 491 (M.D.N.C. 2015). In addition to having their votes devalued, individuals in overpopulated South Carolina congressional and legislative districts must work harder as compared to individuals in underpopulated districts to gain meaningful access to their representatives. Thus, Plaintiffs' have an unfairly small share of the governmental power.

If, on the other hand, Plaintiffs are placed in new districts that have not been thoroughly vetted for legal and Constitutional compliance, that would pose a serious risk to having maps "in place a sufficient time before the first election to which it is to be applied to permit the orderly functioning of the electoral process." *Riley*, 533 F. Supp. at 1179, 1183.

The Constitution and the VRA put important, substantive limitations on how the Legislature can draw its maps. But if the Legislature, as its leaders have announced, has no plans to reconvene before the January 11, 2022 session, the earliest it could release its new maps, under the schedule it set for itself, would be sometime after that. Even if the Legislature were then to proceed at a breakneck pace and generate and release these maps in record time, this leaves just *two months at the most* between the promulgation of new maps and the statutory March 30 candidate filing deadline, which is the latest possible point when candidates need to know which districts they are qualified to run for. *See Branch v. Smith*, 538 U.S. 254, 260–62 (2003) (approving the use of the candidate filing deadline, in lieu of an election date, to establish a deadline by which

14

states must enact maps to avoid federal adjudication). It will likely be impossible, even with expedited discovery, for the court to review and adjudicate all the potential legal and constitutional defects the new maps may contain during that time. If the Legislature is allowed to set such a compressed schedule for redistricting, the Legislature will render its maps unreviewable, at least before statutory deadlines for the 2022 elections, meaning elections would be conducted under maps that violate those limitations and South Carolinians would have no remedy. This is important because South Carolina's experience over the last five redistricting cycles—spanning back more than fifty years—demonstrates both that the Legislature has, time and again, proven incapable of producing redistricting maps compliant with constitutional and legal standards, and that it has taken months if not years to adjudicate these issues.

This is not just a question of delay. Litigation over the Legislature's maps often reveals serious legal and constitutional deficiencies. For example, during the 2000, 1990, and 1980 cycles, absent court intervention, voters in South Carolina would have been forced to vote in "elections conducted under the invalid plans." *Colleton Cty. Council v. McConnell*, C.A. No. 3:01-3892-10, Doc. 164, 13-14 (citations omitted) (D.S.C. Mar. 20, 2002). And in 1970, the Legislature promulgated maps that violated the principle of one person one vote. *Twigg v. West*, D. S.C. No. 71-1211 (April 7, 1972). This Court should not blind itself to this history, which reinforces that "judicial intervention in the South Carolina redistricting process has been frequently unavoidable." *Burton v. Sheheen*, 793 F. Supp. 1329, 1337 (D.S.C. 1992), *vacated on other grounds*, 508 U.S. 968 (1993).

The Legislature's inaction, even if only for several months, is "unquestionably" injuring Plaintiffs and South Carolina. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976).

## II.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM WITHOUT AN INJUNCTION

If preliminary relief is denied, Plaintiffs and those similarly situated will suffer irreparable injury. Courts routinely find irreparable harm where, as here, constitutional rights are impaired or even threatened. *Ross v. Messe*, 818 F.2d 1132,1135 (4th Cir 1987). Where there "is a likely constitutional violation, the irreparable harm factor is satisfied." *Leaders of a Beautiful Struggle v. Baltimore Police Dept.*, 2 F.4th 330, 346 (4th Cir. 2021) (*en banc*) (citing *Elrod*, 96 S. Ct. 2673); *see also Stuart v. Huff*, 834 F.Supp.2d 424, 427–28 (M.D.N.C. 2011); *Cannon v. N. Carolina State Bd. of Educ.*, 917 F. Supp. 387, 391 (E.D.N.C. 1996). Here, there are two discrete harms—one current and one imminent.

The Legislature's self-imposed delay in enacting and adopting new redistricting maps has already frustrated, and continue to frustrate, Plaintiffs and other South Carolinians in their exercise of their First Amendment rights of association and to petition. Right now, South Carolinians are stymied in their efforts to hold their representatives accountable because they do not know who their representatives in the next election will be. And South Carolinians are impeded in organizing to support candidates and educate the electorate because they do not know where lines will be drawn or which candidates will run to represent which districts—this makes "volunteers more difficult to recruit and retain, media publicity and campaign contributions more difficult to secure" and makes "voters less interested in the campaign." *See Anderson*, 460 U.S. at 792. Moreover, this is a "crucial juncture" in the election cycle, as campaigns need to start recruiting volunteers and raising funds now, well in advance of the primary and general election. *Tashjian*, 479 U.S. at 216. The delay in adopting maps has delayed the South Carolina NAACP's traditional voter education and mobilization efforts, and once maps are released the South Carolina NAACP will need to divert its limited resources for these voter education and voter mobilization efforts on an

unnecessarily condensed timetable. The one resource that a political campaign cannot make up is time. That is why "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod*, 427 U.S. at 373.

Plaintiff South Carolina NAACP (through its members),[11] Plaintiff Scott, and other South Carolinians also imminently face irreparable harm if they are forced to vote in malapportioned districts or in a newly drawn districts that have not been thoroughly vetted through judicial review for compliance with constitutional and other legal requirements. *See* Pl. South Carolina NAACP Decl. ¶ 6; Pl. Scott Decl. ¶ 6. The Legislature's actions to delay adoption of new maps have significantly increased the risk that such injury will occur. Absent convening another special session, or utilizing the *sine die* resolution, the full Legislature will not even begin the process of passing proposed maps until January 2022. Before the Legislature can finalize the maps, the Senate Subcommittee has also indicated that it will invite public comment on a provisional set of maps. Accordingly, even if the plans are signed by the Governor on the earliest possible date, after a meaningful public comment period on the proposed maps, and after the House and Senate have passed redistricting plans, there will not be sufficient time to adjudicate the plans for constitutional and legal compliance in time for the 2022 elections. Instead, South Carolina voters are entitled to a more expeditious schedule.

For example, Plaintiff Scott and members of the South Carolina NAACP reside in CD1, which is significantly overpopulated based on 2020 Census data. Pl. South Carolina NAACP Decl.

---

[11] A voting rights organization is "irreparably harmed when the right to vote is wrongfully denied or abridged—whether belonging to its membership or the electorate at large." *N.C. State Conf. of NAACP v. Cooper*, No. 18-cv-1034, 2019 WL 7372980, at *24 (M.D.N.C. Dec. 31, 2019); *see also Common Cause Georgia v. Kemp*, 347 F. Supp. 3d 1270, 1295 (N.D. Ga. 2018) (finding plaintiff organization's harm "to its organizational interests is coterminous with the harms suffered by its citizen members"); *Common Cause Ind. v. Lawson*, 327 F. Supp. 3d 1139, 1154 (S.D. Ind. 2018), *aff'd* 937 F.3d 944 (7th Cir. 2019) (similar).

¶ 6; Pl. Scott Decl. ¶ 6. The Legislature has a long history of failing to adopt maps that comply with constitutional and legal requirements, and with their adjournment, the state House and state Senate's inaction will not leave sufficient time to adjudicate the plans in advance of election deadlines—such litigation which has been necessary in South Carolina for the past five decades. *See*, *e.g., Burton v. Sheheen*, 793 F. Supp. 1329, 1337 (D. S.C. 1992). And if the Legislature promulgates constitutionally and legally non-compliant maps that, for example, do not comply with the VRA or retain CD1's overpopulated status, then Plaintiff Scott will be forced to vote in a district that violates his rights and be deprived of the political power his vote deserves.

The Supreme Court has long recognized in redistricting cases that the "right of suffrage is a fundamental matter in a free and democratic society . . . and the right of suffrage can be denied by debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds*, 377 U.S. at 555, 561–62. "[N]o right is more precious in a free country than that of having a voice in the election of those who make the laws. . . . our Constitution's plain objective [is] making equal representation for equal numbers of people." *Wesberry*, 376 U.S. at 17–18. Deprivation of those rights, even for a single election, unquestionably constitutes irreparable harm. "[O]nce the election occurs, there can be no do-over and no redress," so the injury to "voters is real and completely irreparable if nothing is done to enjoin" the challenged conduct. *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014).

## III.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST SUPPORT INJUNCTIVE RELIEF

When the defendants are governmental actors, these two factors merge and are properly considered together. *Roe v. Dep't of Defense*, 947 F.3d 207, 230 (4th Cir. 2020) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)); *Taliaferro v. N.C. State Bd. of Elections*, 489 F. Supp. 3d 433,

438 (E.D.N.C. 2020) ("The Court considers the public interest and the balance of the equities together.").

Where, as here, the defendant is a government entity, "upholding constitutional rights surely serves the public interest." *Giovani Carandola, Ltd. v. Bason*, 303 F.3d. 507, 521 (4th Cir. 2002); *see also Legend Night Club v. Miller*, 637 F.3d 291, 303 (4th Cir. 2011) ("Upholding constitutional rights is in the public interest."). This is particularly true where the constitutional right involves the right to vote. *See*, *e.g.*, *Republican Party of N.C. v. Hunt*, 841 F. Supp. 722, 732 (E.D.N.C. 1994).

Plaintiffs are not creating any additional work for Defendants. This is work the Legislature must and will do at some point; Plaintiffs merely demand that they do it in time to allow for any judicial vetting that has been required every cycle for the past fifty years. A "state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." *Middleton v. Andino*, 488 F. Supp. 3d 261, 303 (D.S.C. 2020) (citing *Giovani Carandola Ltd.*, 303 F.3d at 521); *see also Newson ex rel. Newsom v. Albemarle Cty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003) (similar). After all, "upholding constitutional rights surely serves the public interest," of which the state is the custodian. *Giovani Carandola Ltd.*, 303 F. 3d at 521.

Conversely, no public interest will be compromised by an injunction setting a deadline for passing new maps and, if necessary, a schedule for any necessary litigation—which is all Plaintiffs seek at this juncture, despite House Defendants' breathless claims in other filings that Plaintiffs' Complaint is a "thinly veiled effort to draw active federal court supervision" into the redistricting process, and that relief would "require this Court to alter fundamentally the balance of power in American government." ECF No. 51 at 1, 3-4. *See*, *e.g.*, Op. & Order at 4, *Hunter v. Bostelmann*,

19

No. 3:21-cv-000512 (W.D. Wis. Sept. 21, 2021), ECF No. 103 (setting a date by which maps must be enacted because, even though "responsibility for redistricting falls first to the states . . . [f]ederal rights are at stake").

There is still sufficient time for maps to be enacted and vetted without undermining the public's interest in an orderly election in 2022—but that requires a schedule to be imposed *now*. These timing-based concerns, far from harming Defendants or the public interest, "simply serve to emphasize why a preliminary injunction during these early stages of the filing period would better serve the public than waiting until the eve of the election." *NAACP-Greensboro Branch v. Guilford Cnty. Bd. of Elections*, 858 F. Supp. 2d 516, 529 (M.D.N.C. 2012). At that point, or any time thereafter, "[a] victory on the merits by plaintiffs would require the court either to nullify the elections that had already taken place and thereafter order new elections at considerable cost and time to the public and to all involved, or to bring the campaigns then in process to a staggering halt . . . . Either alternative would be equally undesirable and would result in further delay and hardship to plaintiffs in vindicating their rights established by a victory on the merits." *Republican Party of N.C.*, 841 F. Supp. at 728..

For the reasons discussed, the balance of equities and public interest support injunctive relief at this stage.

## IV.    SETTING A SCHEDULE FOR THE SOUTH CAROLINA LEGISLATURE TO ACT IS APPROPRIATE INJUNCTIVE RELIEF

Plaintiffs respectfully ask this Court to order the Legislature to abide by a concrete deadline that will allow sufficient time for public notice, input, and the resolution of any litigation, and therefore result in finalized, legally compliant maps well in advance of critical deadlines, including the currently scheduled March 30, 2022 statutory candidate declaration deadline. Plaintiffs seek an order setting this deadline at December 15, 2021—several months

before the first day candidates can declare for office—for the Legislature to pass House and U.S. Congressional maps into law. If Defendants fail to meet this deadline, Plaintiffs further ask this Court to set a schedule for trial that will resolve this case in sufficient time before any candidate declaration period begins, and hold a status conference immediately after the December 15, 2021 deadline to discuss any further appropriate remedies. This contingent remedy is only necessary if Defendants themselves fail to pass legally compliant maps on time and thereby fail to protect the rights of Plaintiffs and all South Carolina voters, as described herein.

Following the Supreme Court's direction in *Growe v. Emison*, it is common in redistricting litigation for the Court to establish "a deadline by which, if the Special Redistricting Panel had not acted, the federal court would proceed." 507 U.S. 25, 34 (1993). While a federal court must give state actors "adequate opportunity to develop a redistricting plan," many federal courts establish a deadline by which sate actors must act. *Branch v. Smith*, 538 U.S. 254, 262 (2003) (affirming district court decision requiring state to act by a January 7 deadline to make clear that a redistricting plan would be in place by March 1); s*ee also Scott v. Germano*, 381 U.S. 407, 409 (1965) (remanding case "with directions that the District Court enter an order fixing a reasonable time within which the appropriate agencies of the State of Illinois . . . may validly redistrict"); *Arrington v. Elections Bd.*, 173 F. Supp. 2d 856, 867 (E.D. Wis. 2001); *Balderas v. Texas*, 2001 WL 36403750 at *1 (E.D. Tex. 2001) (noting state actors had been given until October 1 to adopt plan). Such deadlines are typically set with regard to deadlines for elections in the state, and the Supreme Court has approved of a district court's use of a candidate-qualification deadline as a basis to establish a deadline by which a state must adopt new maps "to forestall federal adjudication." *Branch v. Smith*, 538 U.S. 254, 260-62 (2003).

In light of South Carolina's prior history of failing to adopt maps that meet constitutional or legal requirements and the time necessary to adjudicate such issues, requiring a map by this time is sufficient to ensure the state has an "adequate opportunity to develop a redistricting plan." *Branch*, 538 U.S. at 263.

## CONCLUSION

For the foregoing reasons, the motion for preliminary injunction should be granted.

Dated: November 9, 2021                                    Respectfully submitted,

Leah C. Aden**                                             */s/ Christopher J. Bryant*
Stuart Naifeh**                                            Christopher J. Bryant, Fed. ID 12538
Raymond Audain**                                          Boroughs Bryant, LLC
John S. Cusick**                                           1122 Lady St., Ste. 208
NAACP Legal Defense & Educational Fund, Inc.              Columbia, SC 29201
40 Rector St, 5th Fl.                                     Tel.: (843) 779-5444
NY, NY 10006                                              chris@boroughsbryant.com
Tel.: (212) 965-7715
laden@naacpldf.org                                        Somil B. Trivedi**
                                                          Patricia Yan**
Samantha Osaki**                                          American Civil Liberties Union Foundation
American Civil Liberties Union Foundation                 915 15th St., NW
125 Broad Street, 18th Floor                              Washington, DC 20005
New York, NY 10004                                        Tel.: (202) 457-0800
Tel.: (212) 549-2500                                      strivedi@aclu.org
sosaki@aclu.org                                           pyan@aclu.org

John A. Freedman*                                         Allen Chaney, Fed. ID 13181
Elisabeth S. Theodore*                                    American Civil Liberties Union
Gina M. Colarusso*                                        of South Carolina
John "Jay" B. Swanson*                                    Charleston, SC 29413-0998
ARNOLD & PORTER KAYE SCHOLER LLP                          Tel.: (843) 282-7953
601 Massachusetts Ave., N.W.                              Fax: (843) 720-1428
Washington, D.C. 20001                                    achaney@aclusc.org
Tel: (202) 942-5000
                                                          *Attorneys for Plaintiffs*
Jeffrey A. Fuisz*
Paula Ramer*                                              *Motion for admission *Pro Hac Vice*
Jonathan I. Levine*                                       forthcoming

22

Theresa M. House*
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
Tel: (212) 836-8000

Sarah Gryll**
ARNOLD & PORTER KAYE SCHOLER LLP
70 West Madison Street, Suite 4200
Chicago, IL 60602-4231
Tel: (312) 583-2300

**Admitted *Pro Hac Vice*