IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| THE SOUTH CAROLINA STATE CONFERENCE OF THE NAACP, <br><br> and <br><br> TAIWAN SCOTT, on behalf of himself and all other similarly situated persons, <br><br> *Plaintiffs*, <br><br> v. <br><br> HENRY D. MCMASTER, in his official capacity as Governor of South Carolina; HARVEY PEELER, in his official capacity as President of the Senate; LUKE A. RANKIN, in his official capacity as Chairman of the Senate Judiciary Committee; JAMES H. LUCAS, in his official capacity as Speaker of the House of Representatives; CHRIS MURPHY, in his official capacity as Chairman of the House of Representatives Judiciary Committee; WALLACE H. JORDAN, in his official capacity as Chairman of the House of Representatives Elections Law Subcommittee; HOWARD KNAPP, in his official capacity as interim Executive Director of the South Carolina State Election Commission; JOHN WELLS, JOANNE DAY, CLIFFORD J. ELDER, LINDA MCCALL, and SCOTT MOSELEY, in their official capacities as members of the South Carolina State Election Commission, <br><br> *Defendants*. | Civil Action No.: 3:21-cv-3302-JMC <br><br><br> **GOVERNOR MCMASTER'S MOTION TO DISMISS** |

**COMES NOW** Defendant Henry D. McMaster, in his official capacity as Governor of South Carolina ("Governor McMaster" or "Governor"), by and through the undersigned counsel, and hereby moves the Court for an order dismissing Plaintiffs' Complaint (ECF No. 1) in the

above-captioned matter pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.[1]

**INTRODUCTION**

Since *Baker v. Carr*, 369 U.S. 186 (1962), and *Reynolds v. Sims*, 377 U.S. 533 (1964), challenges to legislative district maps after apportionment have become commonplace. But this case is different. Plaintiffs are not challenging maps that the South Carolina General Assembly enacted and the Governor approved. Nor are they (as plaintiffs in previous decades have done) coming to court after the General Assembly failed to pass new maps due to political gridlock. Here, Plaintiffs demand the Court inject itself on the front end of the redistricting process and "order the Legislature to abide by a concrete timeline that will allow sufficient time for public notice, input, and the resolution of any litigation" over new maps before the 2022 election cycle. ECF No. 1, at 8.

Plaintiffs' Complaint suffers from multiple fatal flaws, any one of which is independently sufficient to dismiss their claims and deny the request for injunctive relief. *First*, as for their claims about the old 2010 maps, (1) Plaintiffs lack standing because they have no imminent injury-in-fact traceable to Defendants and nothing will be redressed by any judicial order, (2) those claims are moot because the State does not intend to hold elections in 2022 based on the 2010 maps, and (3) the Court should, in its discretion, decline to grant the requested relief and effectively render an advisory opinion.

*Second*, as for their insistence that this Court impose a timeline on the General Assembly for drawing the new maps based on the 2020 census, (1) Plaintiffs lack standing because the

---

1. Pursuant to Rule 7.04 of the Local Civil Rules (D.S.C.), "a supporting memorandum is not required" because this Motion contains "a full explanation" of the Governor's arguments such that a separate memorandum "would serve no useful purpose."

1

process for drawing new maps is well underway, meaning there is no credible risk that the State will conduct elections in 2022 based on the 2010 maps, (2) Plaintiffs' claims are not ripe because these issues are not fit for judicial review when the Constitution commits redistricting to the States, and (3) *Growe v. Emison*, 507 U.S. 25 (1993), precludes the relief Plaintiffs seek.

*Third*, Plaintiffs' First Amendment freedom of association claim fails because the Supreme Court has made clear that redistricting imposes "no restrictions on speech, association, or any other First Amendment activities." *Rucho v. Common Cause*, 139 S. Ct. 2484, 2504 (2019).

## FACTUAL BACKGROUND

Every ten years, the State redraws congressional and state legislative districts after new census data is released. *See* S.C. Code Ann. § 7-19-50. The Census Bureau provided the data for the 2020 census in its final format on September 16, 2021—months later than usual due to COVID-19. *See* Press Release, U.S. Census Bureau, *Census Bureau Delivers 2020 Redistricting Data in Easier-to-Use Format* (Sept. 16, 2021), https://tinyurl.com/a7esca9v. The redistricting process is now well underway.

The Senate held a subcommittee meeting this summer at the beginning of the process and then held ten public hearings across the State, followed quickly by another subcommittee meeting. *See Meeting Information*, Senate Judiciary Committee, https://tinyurl.com/7w2cb52p. The House of Representatives also held a committee meeting this summer, *see House Judiciary Committee Meetings*, S.C. House of Representatives, https://tinyurl.com/38d39xv6, before holding 11 public hearings across the State, *see Public Hearings*, S.C. House of Representatives, https://tinyurl.com/2vbwt4fm. Throughout this process, both the Senate and the House have received and reviewed multiple proposed plans. *Plan Proposal*, Senate Judiciary Committee,

https://tinyurl.com/8a3dsx44; *2021 Public Submissions*, S.C. House of Representatives, https://tinyurl.com/3puw79rj.

The process continues to move forward in the absence of Court-imposed deadlines. The Senate and the House recently introduced staff plans for new maps. *See Notice of Meeting*, Senate Judiciary Committee, https://tinyurl.com/ed26y6ts; *2021 Senate Plan Proposals*, Senate Judiciary Committee, https://tinyurl.com/8a3dsx44 (providing link to Staff Plan map); *Draft Plans, South Carolina House of Representatives Redistricting 2021*, S.C. House of Representatives, https://tinyurl.com/4wtrav4 (providing link to Draft Statewide Map). The House is holding another committee meeting on November 10, and yet another on November 12, if necessary. *See Redistricting Ad Hoc Committee*, S.C. House of Representatives, https://tinyurl.com/78n5xus8.

Unsatisfied with the General Assembly's prompt action following the Census Bureau's delayed release of key data, Plaintiffs sued. *See* ECF No. 1. They contend that the redistricting process is not moving quickly enough and assert that the new maps will not be finalized in time for them to challenge them before the 2022 election cycle. They want both a declaration that the 2010 maps are now malapportioned and an injunction prohibiting those maps from being used in the 2022 election cycle. *See* ECF No. 1, at 24–27.[2] Plaintiffs also assert a freedom of association claim, alleging that without new maps, they cannot associate with others and advocate for candidates. *See* ECF No. 1, at 27. Plaintiffs finally demand that this Court supervise the redistricting process itself and set deadlines Defendants must adhere to while this work remains ongoing. *See* ECF No. 1, at 28.

---

2. Plaintiffs curiously seek this relief while simultaneously recognizing that the General Assembly is working on new maps for next year's election cycle, as provided by South Carolina law. *See* ECF No. 1, at 19–21; S.C. Code Ann. § 7-19-50.

Since this lawsuit was filed, Plaintiffs have moved for a three-judge court under 28 U.S.C. § 2284. *See* ECF No. 17. Defendants have opposed that premature request. *See* ECF Nos. 18, 45, 47. Additionally, the House Defendants have filed a Motion to Stay. *See* ECF No. 51. On November 9, 2021, nearly a month after filing their Complaint, Plaintiffs filed a Motion for Preliminary Injunction. ECF No. 59.

**LEGAL STANDARD**

"A Rule 12(b)(1) motion for lack of subject matter jurisdiction raises the fundamental question of whether a court has jurisdiction to adjudicate the matter before it." *Career Counseling, Inc. v. Amerifactors Fin. Grp., LLC*, 509 F. Supp. 3d 547, 553 (D.S.C. 2020). A Rule 12(b)(1) motion to dismiss should be granted "if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Id.* (internal quotation marks omitted). Under Rule 12(b)(1), "[t]he plaintiff has the burden of establishing standing." *Somers v. S.C. State Election Comm'n*, 871 F. Supp. 2d 490, 496 (D.S.C. 2012). The court may consider jurisdictional evidence outside the pleadings without converting the motion to one for summary judgment. *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 459 (4th Cir. 2005).

A motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted "challenges the legal sufficiency of a complaint." *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009) (citation omitted). The Court should grant a motion to dismiss whenever a complaint fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To state a claim, "a plaintiff must plead enough factual allegations 'to state a claim to relief that is plausible on its face.'" *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 616 (4th Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A court must accept only "well-pleaded allegations" "as true and draw all reasonable factual inferences from those facts in the plaintiff's favor." *Harrell v.*

4

*Freedom Mortg. Corp.*, 976 F.3d 434, 439 n.5 (4th Cir. 2020) (internal alteration omitted). But the Court "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008). Plaintiffs must "allege facts sufficient to state all the elements of [their] claim." *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003).

**ARGUMENT**

## I.     Plaintiffs' claims based on the 2010 maps fail.

At the outset, it is worth noting that Plaintiffs' Complaint does not focus on the 2010 maps. To be sure, they mention the prior maps, and they seek, in passing, certain relief based on them, *see, e.g.*, ECF No. 1, at 15, 28, but even Plaintiffs acknowledge that the General Assembly is in the process of drawing new maps, *see, e.g.*, ECF No. 1, at 4, 19–21. In fact, the General Assembly is required under South Carolina law to redistrict based on the new census data. *See* S.C. Code Ann. § 7-19-50. Because that process is well underway, Plaintiffs have not stated, and cannot state, viable or plausible claims based on the 2010 maps.

### A.     Plaintiffs lack standing to "challenge" the 2010 maps.

Federal courts may decide only "Cases" and "Controversies." U.S. Const. art. III, § 2. The case-and-controversy requirement means that a plaintiff must establish standing. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). Standing requires a plaintiff to show "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *Id.* Plaintiffs, as the parties seeking to invoke federal jurisdiction, bear the burden of showing they meet all three elements. *See Mirant Potomac River, LLC v. U.S. E.P.A.*, 577 F.3d 223, 226 (4th Cir. 2009). Plaintiffs here, however, have failed to satisfy any of these threshold elements.

5

As for the first element, an injury-in-fact must be "'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). In other words, the injury "must actually exist." *Id.* at 340. Plaintiffs do not have any such injury. Assuming the NAACP has a member in every congressional and State House district,[3] Plaintiffs still cannot show they have a concrete injury. The State does not intend to hold any elections under the old 2010 maps, so Plaintiffs' claimed injury is purely conjectural.[4] *See Snider Int'l Corp. v. Town of Forest Heights*, 906 F. Supp. 2d 413, 422 (D. Md. 2012) ("To show that an injunction or declaratory judgment would redress their injuries and would not constitute a mere advisory opinion, plaintiffs would need to demonstrate a 'real and immediate threat' that they would again be cited for speeding by a speed camera and would again receive ostensibly deficient citations."), *aff'd sub nom. Snider Int'l Corp. v. Town of Forest Heights, Md.*, 739 F.3d 140 (4th Cir. 2014). Thus, a declaration that those maps are now malapportioned would be pointless, and an injunction prohibiting the State from conducting elections based on those maps would be futile.

With respect to the second element, Plaintiffs have failed to sufficiently allege, much less establish, that their purported injuries—or, more appropriately, generalized grievances, are caused by or fairly traceable to Defendants, particularly the Governor. To satisfy the traceability requirement of standing, "it must be likely that the injury was caused by the conduct complained

---

3.    Courts have repeatedly recognized that someone suffers an injury in the malapportionment context only if that person is in an underrepresented district. *See, e.g.*, *Wright v. Dougherty Cty., Ga.*, 358 F.3d 1352, 1355 (11th Cir. 2004). Plaintiffs have not actually alleged that. They instead have alleged only that the NAACP has members in each of the State's 46 counties. *See* ECF No. 1, at 9.
4.    As discussed in more detail in the context of Plaintiffs' demand that the Court supervise the redistricting process, there is little, if any, risk that the new maps will not be ready for the 2022 election cycle. *See infra* Part II.B.

6

of and not by the independent action of some third party not before the court." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 154 (4th Cir. 2000). Here, to the extent Plaintiffs' conclusory complaints are premised on their objections to the General Assembly's timeframe for redistricting, any alleged injury is not fairly traceable to the Governor, whose role is to approve or veto legislation passed by the General Assembly upon presentment. *See* S.C. Const. art. IV, § 21. Moreover, any effort by Plaintiffs to lay blame at the feet of, or trace injury to, Defendants fails to account for the Census Bureau's significant delay in releasing the 2020 census data. Although this critical detail is noticeably absent from Plaintiffs' Complaint, federal law required the Census Bureau to produce the relevant 2020 census data by April 1, 2021. *See* 13 U.S.C. § 141. However, due to, *inter alia*, COVID-19, the Census Bureau did not release the required data until August 12, 2021, and it did not provide the data it in its final format until September 16, 2021. *See* Press Release, U.S. Census Bureau, *Census Bureau Delivers 2020 Redistricting Data in Easier-to-Use Format* (Sept. 16, 2021), https://tinyurl.com/a7esca9v. Thus, while Plaintiffs whistle-by this five-and-half month delay in their Complaint, Plaintiffs' alleged injuries are more traceable to the Census Bureau than to any Defendant.

Turning to the third element, redressability requires "that it must be likely, and not merely speculative, that a favorable decision will remedy the injury." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 154 (4th Cir. 2000). Even if the premise that the 2010 maps technically remain in effect between the release of the 2020 census data and the enactment of new maps could result in a concrete injury, that injury cannot be redressed here. If the Court declared the old maps malapportioned, the State would simply continue doing what it is already doing—drawing new maps. Plaintiffs would be in no better position than they are now. An injunction would not redress any injury because it would prohibit something (that is, 2022 elections

7

under the old 2010 maps) that is not going to happen. At a minimum, Plaintiffs have not shown that any such scenario is "likely" to occur, as they must do to satisfy Article III's standing requirements.

### B.    Plaintiffs' claims regarding the 2010 maps are moot.

For similar reasons, Plaintiffs' claims about the 2010 maps are moot. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (describing mootness as "the doctrine of standing set in a time frame"). "Article III of the Constitution requires that there be a live case or controversy at the time that a federal court decides the case." *Burke v. Barnes*, 479 U.S. 361, 363 (1987). As the Supreme Court has explained, "it is not enough that there may have been a live case or controversy when the case was decided by the court whose judgment we are reviewing." *Id.* A case must remain live "throughout the proceedings." *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 796 (2021). A case becomes moot when a court order would not have "a practical effect on the outcome" of the case. *SAS Inst., Inc. v. World Programming Ltd.*, 874 F.3d 370, 390 (4th Cir. 2017).

Plaintiffs' claims based on the 2010 maps are moot because the relief they request (both the declaratory judgment and the injunction) would not have any practical effect. As previously noted, the State does not intend to hold elections in 2022 under the 2010 maps, and Plaintiffs have not shown that it is likely new maps will not be ready in time for next year's election cycle. *See, e.g.*, *Chestnut v. Merrill*, 446 F. Supp. 3d 908, 920 (N.D. Ala. 2020) (noting case "fail[ed] to present a live controversy" when "a new districting cycle looms on the horizon" because "the court cannot offer effective relief"). Thus, neither a declaratory judgment nor an injunction related to the 2010 maps would change anything about or otherwise impact the 2022 elections.

At the very least, Plaintiffs' claims related to the 2010 maps merely beg for an advisory opinion, given that the State does not intend to hold an election under those maps. *See Clayland Farm Enterprises, LLC v. Talbot Cty., Md.*, 987 F.3d 346, 358 (4th Cir. 2021) (concluding that where "claims all seek prospective equitable relief on laws no longer in effect," "a declaratory judgment would constitute an advisory opinion"). But of course, this Court "is without power . . . to give advisory opinions which cannot affect the rights of the litigants in the case before it." *St. Pierre v. United States*, 319 U.S. 41, 42 (1943).

    **C.**    **The Court should, in its discretion, decline to grant any relief related to the 2010 maps.**

The Declaratory Judgment Act allows district courts, "[i]n a case of actual controversy within its jurisdiction," to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201. This Act is "an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 287 (1995); *see also Brillhart v. Excess Ins. Co. of Am.*, 316 U.S. 491, 494 (1942) (emphasizing that a district court "is under no compulsion" to exercise jurisdiction under the Declaratory Judgments Act). A litigant is thus never entitled to a declaratory judgment as a matter of right. *See Wilton*, 515 U.S. at 287 ("We have repeatedly characterized the Declaratory Judgment Act as 'an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant.'" (quoting *Public Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 241 (1952))). Rather, "district courts possess discretion in determining whether and when to entertain an action under the Declaratory Judgment Act." *Id.* at 282. The "propriety of declaratory relief in a particular case will depend upon a circumspect sense of its fitness informed by the teachings and experience concerning the functions and extent of federal judicial power." *Id.* at 287; *see also Riley v. Dozier Internet L., PC*, 371 F. App'x 399, 401 (4th Cir. 2010) (noting under the *Brillhart*/*Wilton* doctrine,

9

"when a plaintiff brings a declaratory judgment action, the district court enjoys discretion in deciding whether to assert jurisdiction over the action or abstain from hearing it").

Likewise, an injunction is a form of equitable relief that the district court has "discretion" "to grant, or not to grant." *Inland Steel Co. v. United States*, 306 U.S. 153, 156 (1939). Courts in equity have had this discretionary authority "from time immemorial." *Id.* "[C]ourts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). After all, equity does not lead but "follows the law." *Hedges v. Dixon Cty.*, 150 U.S. 182, 192 (1893).

This case is a textbook example of when discretion counsels against declaratory or injunctive relief. There is no dispute, much less a "case" or "controversy," over the 2010 maps. The State does not intend to hold elections based on the 2010 maps, and if it did, the General Assembly would not be drawing new ones. These 2010 maps will be historical artifacts, without any ongoing legal import. Therefore, no one—including Plaintiffs—has any need for federal courts to review and opine on these maps.[5]

**II.    Plaintiffs' claims to have the Court oversee redistricting fail.**

Without any plausible claims based on the 2010 maps, it is evident what Plaintiffs' real endeavor is: searching for a possible nexus by which to have this Court oversee the redistricting process. Indeed, they are explicit about that goal. *See* ECF No. 1, at 8 (demanding the Court impose a "concrete timeline" for the redistricting process); ECF No. 1, at 28 (Prayer for Relief iv).

---

5.    If Plaintiffs truly thought the State intended to conduct elections next year based on the 2010 maps, they presumably would not have waited nearly a month to seek belated, and largely unrelated, preliminary injunctive relief based solely on their First Amendment claim. ECF No. 59.

### A. Plaintiffs lack standing to seek judicial oversight of the redistricting process.

As they did on their claims about the 2010 maps, Plaintiffs run into a similar standing problem on their request to have the Court oversee the current redistricting process. They contend that it is "practically guarantee[d]" maps will not be ready in time for the next election cycle. ECF No. 1, at 4. However, as Plaintiffs should know from their own participation in the General Assembly's redistricting process, that contention is false, and any asserted injury from not having new maps in time for the 2022 election cycle is conjectural and hypothetical.

The redistricting process is actively underway. Both the House and Senate have provided the public with data for and principles governing redistricting, and both legislative bodies have held public hearings and taken submissions from interested South Carolinians (including the NAACP, which has submitted multiple proposed maps). *See South Carolina Redistricting 2021*, Senate Judiciary Committee, https://redistricting.scsenate.gov/; *South Carolina House of Representatives Redistricting 2021*, S.C. House of Representatives, https://redistricting.schouse.gov/. Indeed, the NAACP has been an active participant in that process, submitting multiple maps to the General Assembly. *See Plan Proposal*, Senate Judiciary Committee, https://tinyurl.com/8a3dsx44; *2021 Public Submissions*, S.C. House of Representatives, https://tinyurl.com/3puw79rj. The Senate and the House have already introduced staff plans for new maps. *See Notice of Meeting*, Senate Judiciary Committee, https://tinyurl.com/ed26y6ts; *2021 Senate Plan Proposals*, Senate Judiciary Committee, https://tinyurl.com/8a3dsx44 (providing link to Staff Plan map); *Draft Plans, South Carolina House of Representatives Redistricting 2021*, S.C. House of Representatives, https://tinyurl.com/4wtrav4 (providing link to Draft Statewide Map). Meanwhile, the House is holding another committee meeting on November 10, and yet another on

November 12, if necessary. *See Redistricting Ad Hoc Committee*, S.C. House of Representatives, https://tinyurl.com/78n5xus8.

None of this timing makes Plaintiffs' alleged injury anything close to concrete. The filing period for candidates seeking nomination by political party for the 2022 elections does not even open until March 16 of next year. *See* S.C. Code Ann. § 7-11-15(A). And the primaries are more than seven months away, on June 14, 2022. *See id.* § 7-13-15(B). Even if the General Assembly did not return and enact new maps prior to its next ensuing regular session in early January, that means potential candidates would presumably still have more than a month (if not two) to decide whether to run after the new maps are finalized. (Of course, Plaintiffs' Complaint makes no mention of the numerous candidates who have already stated their intentions to run for the new congressional and state legislative districts.) It is not uncommon for redistricting cycles to result in shorter-than-usual windows for potential candidates to make decisions, and the combination of COVID-19 and the Census Bureau's unprecedented delays further complicated and condensed this window. But that does not mean there is not sufficient time for candidates to make those decisions. Plus, the new maps likely would be enacted six months before the State actually held any election for the soon-to-be apportioned districts.

Rushing to the courthouse as Plaintiffs have done does not create or confer standing, and the Court should neither approve of nor encourage such an approach. In *Growe*, dueling federal and state lawsuits challenged Minnesota's redistricting process. The Supreme Court held that the federal court overstepped by enjoining that process. In doing so, the Court took care to explain why the district court abused its discretion. The Court stated that federal courts must "defer consideration of disputes involving redistricting where the State . . . has begun to address that highly political task itself." 507 U.S. at 33. The Court further emphasized that this deference is

12

required because "the Constitution leaves with the States primary responsibility for apportionment of their federal congressional and state legislative districts." *Id.* at 34. In stark contrast to the Supreme Court's command of restraint in *Growe*, all Plaintiffs have done here is "race to" the courthouse to seek federal intervention on the front end because they claim they are concerned that they may not have the desired amount of time to sue about the ultimate apportionment between enactment and the candidate filing deadline. *Id.* at 37.

### B.     Plaintiffs' premature claims for judicial oversight are not ripe.

Like standing, ripeness is an Article III doctrine. *See Allen v. Wright*, 468 U.S. 737, 750 (1984). This doctrine involves "the appropriate timing of judicial intervention" in a dispute. *Renne v. Geary*, 501 U.S. 312, 320 (1991). Whether a case is ripe focuses on "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003). Here, both factors support and compel the conclusion that Plaintiffs' case is not ripe.

*First*, claims seeking oversight of the redistricting process are not fit for judicial review, particularly when the General Assembly is actively working on new maps. And again, the Supreme Court has plainly stated that federal courts must "defer consideration of disputes involving redistricting where the State . . . has begun to address that highly political task itself" because "the Constitution leaves with the States primary responsibility for apportionment of their federal congressional and state legislative districts." *Growe*, 507 U.S. at 33, 34. Instead of mere allegations of what amount to premature generalized grievances, only when there is "evidence" making it "apparent" that a State "would not develop a redistricting plan in time" may a federal court conceivably step in to review the claims and the "evidence." *Id.* at 34, 36. Plaintiffs have offered

13

no such evidence, and the public record belies their contention that the time is too short. Thus, Plaintiffs' unripe and nonjusticiable request for oversight is not fit for judicial review.

Plaintiffs suggest that litigation must be resolved before next year's election cycle begins, *see* ECF No. 1, at 8, but that does not make their claims ripe now. And Plaintiffs' suggestion is legally incorrect anyway. The Supreme Court specifically rejected the idea that a State must finish its redistricting work in time for litigation over new maps to conclude. *See Growe*, 507 U.S. at 35. The Supreme Court noted that imposing "such a requirement would ignore the reality that States must often redistrict in the most exigent circumstances—during the brief interval between completion of the decennial federal census and the primary season for the general elections in the next even-numbered year." *Id.* The fact that Plaintiffs principally complain of, and take issue with, the length of the normally "brief interval" that may follow the redistricting process simply underscores the applicability of the *Growe* Court's directed deference.

*Second*, Plaintiffs will not face any hardship if the Court does not proactively oversee the ongoing redistricting process. Condensed timeframes for candidates to decide to run, and for parties and activists to organize and campaign, is the norm in redistricting years, and the introduction of COVID-19 and the Census Bureau's delays into the equation does not alter the relevant analysis. Plus, Plaintiffs remain free to engage in those processes now, even if all of the details of the new maps are not yet finalized. Lastly, given that Plaintiffs do not have any legal right to litigate the new maps to conclusion before the 2022 election cycle starts, waiting to file any apportionment-related lawsuit until the maps are finalized cannot be a legally recognized hardship.

14

### C. Supreme Court precedent forecloses Plaintiffs' requested relief.

It is axiomatic that redistricting is constitutionally committed to the States. *See id.* at 34; *see also, e.g.*, *Chapman v. Meier*, 420 U.S. 1, 27 (1975); *White v. Weiser*, 412 U.S. 783, 794–95 (1973). All a State has to do for a federal court not to intervene in that process is "adopt a constitutional plan within ample time to be utilized in the upcoming election." *Growe*, 507 U.S. at 35. Only if there is "evidence" making it "apparent" that a State "would not develop a redistricting plan in time" may a federal court conceivably step in to review the claims and the "evidence." *Id.* at 34, 36.

Nothing Plaintiffs have alleged here comes remotely close to "evidence" establishing that it is "apparent" the State will not enact new maps in time for the 2022 election cycle. As noted, the redistricting process in South Carolina is well underway. The Senate's and House's respective committees have met, held numerous public hearings, released draft maps, and scheduled further proceedings. *See, e.g.*, *South Carolina Redistricting 2021*, Senate Judiciary Committee, https://redistricting.scsenate.gov/; *South Carolina House of Representatives Redistricting 2021*, S.C. House of Representatives, https://redistricting.schouse.gov/. Contrary to Plaintiffs' unadorned and conclusory allegations, everything in fact supports Defendants' contentions that the State will enact new maps well ahead of the 2022 election cycle.

Moreover, nothing in *Growe* or any other Supreme Court precedent on redistricting or apportionment suggests that federal courts have the authority to impose, particularly on a preemptive basis, timelines on state legislatures in this context. The fact that federal courts have drawn maps themselves when state legislatures failed to enact maps only reinforces the obvious— that courts must exercise restraint and allow the legislative process to continue without intervention. *See, e.g.*, *Colleton Cty. Council v. McConnell*, 201 F. Supp. 2d 618, 623 (D.S.C.

15

2002) (addressing instance in which new maps were passed "[a]fter a lengthy period" but were vetoed, and the General Assembly "failed in its attempt to override the veto"). The Court should decline Plaintiffs' invitation to embark on their requested foray into this uncharted territory.

### III.     Plaintiffs' freedom of association claim fails as a matter of law and logic.

Plaintiffs' sole cause of action not directly based on prior or future maps is their First Amendment claim. They insist that "uncertainty about district boundaries impedes candidates' ability to effectively run for office" and Plaintiff Taiwan Scott's right to associate is infringed by restricting his ability "to assess candidate positions and qualifications, advocate for their preferred candidates, and associate with like-minded voters." ECF No. 1, at 27.

This claim should be dismissed for at least two reasons. *First*, the redistricting process—in which Plaintiffs' have actively participated—does not adversely impact Plaintiffs' associational rights. Implicit in the First Amendment is "a corresponding right to associate with others" to "further[] a wide variety of political, social, economic, educational, religious, and cultural ends." *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2382 (2021) (internal quotation mark omitted). But nothing about that right is implicated, much less infringed, here. As the Supreme Court recognized just two years ago, "there are no restrictions on speech, association, or any other First Amendment activities in the districting plans at issue." *Rucho*, 139 S. Ct. at 2504. In other words, Plaintiffs here "are free to engage in those activities no matter what the effect of a plan may be on their district." *Id.* Of course, experience teaches us that this is true. People campaign for and donate to candidates in their districts and in others every election cycle. Political groups coordinate and advocate across districts and races. No matter what the final maps show, people—including Plaintiffs—remain free to exercise all of their First Amendment rights.

*Second*, the invocation of any burden on candidates is unavailing. For one, Scott never alleges that he intends to run for office. *See* ECF No. 1, at 11. Nor does the NAACP allege that its members are running for office. *See* ECF No. 1, at 8–10. Thus, Plaintiffs have not established that any arguable or theoretical injury to a prospective candidate is a harm to Plaintiffs here. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) ("For an injury to be particularized, it must affect the plaintiff in a personal and individual way." (cleaned up)). For another, *Growe* recognizes that it is not unusual for there to be a condensed window after a census, when "States must often redistrict in the most exigent circumstances" after receiving census data. 507 U.S. at 35. That does not mean that every conceivable candidate suffers a First Amendment violation each decade while awaiting the outcome of a decennial process.

\*     \*     \*

The Article III concerns—standing, mootness, ripeness, and constitutional commitment of redistricting to the States—all counsel in favor of, if not require, dismissing this case. *See Sansotta v. Town of Nags Head*, 724 F.3d 533, 548 (4th Cir. 2013) ("Because a district court can abstain only when it has subject matter jurisdiction, a case must be ripe before a district court may abstain. Accordingly, the Town cannot contend that the Owners' taking claim is unripe and that the Owners should have asked the district court to abstain, as such legal positions are logically incompatible." (citation omitted)).[6] Indeed, any other rule would create perverse incentives, encouraging litigants

---

6.     *See generally Rogers v. Dobbs*, No. 6:20-CV-00066-RBH, 2021 WL 267826, at *4 n.5 (D.S.C. Jan. 27, 2021) ("The Court concludes a stay is improper given the lack of subject matter jurisdiction . . . ."); *S.C. Elec. & Gas Co. v. Randall*, 333 F. Supp. 3d 552, 567 n.20 (D.S.C. 2018) (Childs, J.) ("Even though '[r]ipeness is a question of subject matter jurisdiction,' . . . . Ripeness is not the same as the abstention issues that were raised by Defendants and Intervenor Defendants. 'Because a district court can abstain only when it has subject matter jurisdiction, a case must be ripe before a district court may abstain.'" (quoting *Sansotta*, 724 F.3d at 548)); *Allied World Surplus Lines Ins. Co. v. Blue Cross & Blue Shield of S.C.*, No. CV 3:17-903-RMG, 2017 WL

to file lawsuits as early as possible (and long before they are ripe) and then to ask for or not vigorously oppose a stay, so that when (or if) the case becomes ripe, a federal court may then take up the merits. *Cf. Bank of N.C. v. Bouscaren*, No. 9:12-CV-02767-PMD, 2014 WL 12623059, at *6 (D.S.C. Nov. 13, 2014) (noting that if jurisdiction was in question, the defendant should have "argued for dismissal, on the basis that a stay would not cleanse the subject matter jurisdiction deficiencies"). Article III has never been interpreted to allow such tactics, and the Court cannot proceed on the basis of hypothetical jurisdiction. *See, e.g.*, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (rejecting and "declin[ing] to endorse [the doctrine of hypothetical jurisdiction] because it carries the courts beyond the bounds of authorized judicial action and thus offends fundamental principles of separation of powers," while noting that "[t]his conclusion should come as no surprise, since it is reflected in a long and venerable line of [the Court's] cases"). After all, "courts must always assure themselves of subject matter jurisdiction before reaching the merits, even if the parties have not raised it." *Va. Dep't of Corr. v. Jordan*, 921 F.3d 180, 187 (4th Cir.), *cert. denied*, 140 S. Ct. 672 (2019). Likewise, "[t]he Supreme Court has cautioned against exceptions that allow courts, for reasons of expedience, to sidestep jurisdictional issues." *Id.*

Notwithstanding the foregoing, in the alternative event the Court determines it has jurisdiction over this matter, the Court should, at a minimum, stay this case or otherwise abstain pending completion of the redistricting process and the timely apportionment of new congressional and state legislative districts. Although Governor McMaster maintains that Plaintiffs' Complaint warrants dismissal, a stay would nevertheless respect the principles articulated in *Growe* and account for the Supreme Court's requirement that "federal judges . . . defer consideration of

---

3328230, at *2 n.2 (D.S.C. Aug. 3, 2017) ("The Court cannot stay or abstain from hearing an action that is not ripe.").

disputes involving redistricting where the State, through its legislative . . . branch, has begun to address that highly political task itself." 507 U.S. at 33. Of course, if the General Assembly has enacted new maps by the time the Court decides Governor McMaster's Motion to Dismiss and Plaintiffs' Motion for Preliminary Injunction, then the Court could grant this Motion without prejudice, allowing Plaintiffs leave to file an amended complaint that seeks to state a plausible claim.

## CONCLUSION

For the foregoing reasons, Governor McMaster respectfully submits that the Court should grant his Motion to Dismiss and dispose of Plaintiffs' Complaint.

Respectfully submitted,

s/Thomas A. Limehouse, Jr.
Thomas A. Limehouse, Jr. (Fed. Bar No. 12148)
*Chief Legal Counsel*
Wm. Grayson Lambert (Fed. Bar No. 11761)
*Senior Legal Counsel*
Michael G. Shedd (Fed. Bar No. 13314)
*Deputy Legal Counsel*
OFFICE OF THE GOVERNOR
South Carolina State House
1100 Gervais Street
Columbia, South Carolina 29201
(803) 734-2100
tlimehouse@governor.sc.gov
glambert@governor.sc.gov
mshedd@governor.sc.gov

Christopher E. Mills (Fed. Bar No. 13432)
SPERO LAW LLC
557 East Bay Street #22251
Charleston, South Carolina 29413
(843) 606-0640
cmills@spero.law

*Counsel for Governor McMaster*

November 9, 2021
Columbia, South Carolina