IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| The South Carolina State Conference of the NAACP, and Taiwan Scott, on behalf of himself and all other similarly situated persons,<br><br>    Plaintiffs,<br><br>v.<br><br>Henry D. McMaster, *in his official capacity as Governor of South Carolina*; Harvey Peeler, *in his official capacity as President of the Senate*; Luke A. Rankin, *in his official capacity as Chairman of the Senate Judiciary Committee*; James H. Lucas, *in his official capacity as Speaker of the House of Representatives*; Chris Murphy, *in his official capacity as Chairman of the House of Representatives Judiciary Committee*; Wallace H. Jordan, *in his official capacity as Chairman of the House of Representatives Elections Law Subcommittee*; Howard Knabb, *in his official capacity as interim Executive Director of the South Carolina State Election Commission*; John Wells, *Chair*, Joanne Day, Clifford J. Elder, Linda McCall, and Scott Moseley, *in their official capacities as members of the South Carolina State Election Commission*,<br><br>    Defendants. | Civil Action No.: 3:21-cv-03302-JMC<br><br>**ORDER AND OPINION** |

Before the court is Defendants James H. Lucas, Chris Murphy, and Wallace H. Jordan's ("House Defendants") Motion to Stay (ECF No. 51), and Defendants Harvey Peeler, and Luke A. Rankin's ("Senate Defendants") Motion to Dismiss or, in the Alternative, to Stay the Case (ECF No. 57.) House and Senate Defendants challenge the court's jurisdiction over this case, arguing

1

Plaintiffs' request for a declaratory judgment is unripe and prematurely draws the federal judiciary into the "ongoing state legislative redistricting process" in South Carolina. (ECF No. 51 at 5.) They request the court "to accord the General Assembly sufficient time to perform its constitutionally delegated redistricting function." (ECF No. 57 at 1.) Plaintiffs oppose Defendants' Motions, insisting they do not "deny the primacy of state actors in redistricting" and that they simply "seek a concrete, publicized schedule for state actors to complete that redistricting." (ECF No. 60 at 2.) House Defendants seek to stay this action until the "General Assembly has timely passed a bill enacting new state House, state Senate, and Congressional district lines, and the Governor has signed it into law." (ECF No. 51 at 2.) For the following reasons, the court (1) **GRANTS IN PART** House Defendants' Motion to Stay (ECF No. 51); (2) **DENIES** Senate Defendants' Motion to Dismiss (ECF No. 57); and (3) **STAYS** the case until January 18, 2022. The court shall retain jurisdiction of this matter and make appropriate decisions and rulings in this matter as it deems necessary.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

The United States Constitution guarantees all South Carolinians an equal voice in the electoral process. In this light, the Constitution "requires South Carolina's governing officials [to] enact new districting plans for the South Carolina Senate, the South Carolina House of Representatives, and the United States Congressional districts within the state on an equipopulous basis every ten years," in accordance with the results of the decennial census and release of data by the U.S. Census Bureau. *Colleton Cty. Council v. McConnell*, 201 F. Supp. 2d 618, 623 (D.S.C. 2002), *opinion clarified* (Apr. 18, 2002); *see* U.S. Const. art. I, § 2.

Following a delay in administering the 2020 census due to the COVID-19 pandemic, the 2020 census results were released on August 12, 2021. The results revealed that South Carolina

experienced significant population growth and substantial population shifts among existing districts. (*See* ECF No. 1 at 15, ¶ 48; *Id.* at 25, ¶ 83.) It is now undisputed that South Carolina's House and Senate districts must be redrawn in accordance with the constitutional mandate. (ECF No. 51 at 3 (stating that "inevitably, the decennial census exposes that the then-current districts are no longer apportioned appropriately").)

In South Carolina, the Legislature is responsible for drawing United States Congressional districts, *see* S.C. Const., art. III, § 3; *id.* art. VII, § 13. On May 13, 2021, the South Carolina Legislature unanimously adopted a concurrent resolution upon *sine die* adjournment. H.R. 4285, 124th Sess. S.C. Gen. Assem. (2021). Under this resolution, the General Assembly technically remains in session until it "reconvenes for a regular legislative session in January." (ECF No. 17 at 2 n.1.) No Special Session may therefore be called. (*Id.*) State officials also confirmed that there are no current "plans to reconvene [the Legislature] for a special session." (ECF No. 1 at 22, ¶ 71 (citing Jay Lucas (@schousespeaker), Twitter (Sep. 22, 2021, 2:23 PM), https://twitter.com/schousespeaker/status/1440743475549401088).)

On October 12, 2021, Plaintiffs filed this action under the First and Fourteenth Amendments to address the "substantial and imminent risk that constitutionally compliant district lines will not be redrawn in time to cure the current unconstitutional malapportionment for the 2022 elections." (ECF No. 1 at 5, ¶ 11.) Plaintiffs contend that while the concurrent resolution is in place, and absent a special session, the Legislature cannot consider a redistricting plan until the start of the next regular legislative session, slated to begin on January 11, 2022. (ECF No. 1 at 22; ECF No. 18 at 5 n.4.) Pursuant to 28 U.S.C. § 2284, Plaintiffs also request a three-judge court

to adjudicate their constitutional malapportionment claims.[1]  (ECF No. 17.)

Plaintiffs argue the delay in redistricting will affect elections for the United States House of Representatives and the General Assembly which will take place during 2022.  (*See* ECF No. 17 at 2-3.)  The next primary election is scheduled for June 14, 2022, and the next general election is scheduled for November 8, 2022.  (ECF No. 1 at 23, ¶ 73.) To qualify as a candidate for the State House and United States Congressional primary elections, all candidates must file a statement of intention of candidacy and party pledge and pay a filing fee between noon, March 16, 2022, and noon, March 30, 2022.  (*Id.*); *see also* S.C. Code Ann. § 7-11-15 (2021).  If district lines remain undetermined by that date, Plaintiffs argue potential candidates will not know in which district to run and interested organizations will not be able to communicate with voters and plan effectively for their campaigns.  (*Id*. at 6, ¶ 12-14.)

House Defendants now move to stay the case until the Legislature timely passes a redistricting bill and the Governor signs it into law.  (ECF No. 51 at 2.)  Defendants concede that in the wake of the 2020 census, South Carolina's population distribution has changed, and redistricting is necessary.  (*Id*. at 10 ("[T]here is *no* chance that future elections will be based on these outdated district maps.").)  Defendants argue, however, that the process is on track: Both chambers of the Legislature are currently working to "perform[] their obligations in accordance with the law." (*Id*. at 7.)  They claim, for instance, that the House Redistricting Ad Hoc Committee met on November 10, 2021, and November 12, 2021, to discuss the proposed new district lines, and that a similar process is already underway in the Senate.  (*Id*.)  In light of these facts, House

---

[1] Plaintiffs' Request for Three-Judge Panel (ECF No. 17) remains pending before the court at this time.  Since some of Defendants' objections to Plaintiffs' Request (*see, e.g.,* ECF No. 47 at 1) implicate ripeness and overlap with claims raised in this Motion, the court considers first the jurisdictional issues raised here.

`

Defendants claim Plaintiffs' case is unripe. Senate Defendants raise substantially similar arguments in their Motion, reiterating Plaintiffs' Complaint is "unripe, and therefore not within the [c]ourt's subject matter jurisdiction." (ECF No. 57 at 2.)

Ultimately, both Defendants' arguments rest on the principles of comity and federalism. (*Id.* at 6.) House and Senate Defendants contend federal judicial intervention is appropriate only where the state has "failed to timely perform [its] duty," (ECF No. 51 at 7), after it had "a meaningful opportunity to draw new election lines in accordance with the federal constitution" (*id*. at 6). House Defendants allege they have not had this opportunity. At any rate, House Defendants claim legislative action may yet resolve various issues in the case and "make future litigation unnecessary." (*Id*. at 12.) They contend a stay at this stage may therefore also serve the interests of judicial economy. (*Id*.)

Acknowledging that "redistricting remains the role of the Legislature in South Carolina," Plaintiffs emphasize federal courts nonetheless can play an important role in managing and scheduling this process. (*Id*. at 9.) Without a schedule, Plaintiffs allege "the timeline for redistricting could become so compressed as to render its maps unreviewable . . . before statutory deadlines for the 2022 elections." (*Id*.) Plaintiffs insist South Carolina's electoral districts became unconstitutionally malapportioned when the 2020 census was released. They allege the resulting harms are immediate and ongoing. (*Id*.) With deadlines to register for upcoming elections mere months away, Plaintiffs argue that as the redistricting process stalls in the Legislature, South Carolina voters are deprived of the opportunity to "decide which candidates to support, educate themselves and others about candidates positions who may represent them in their district, and associate with others in their district to advocate and organize for candidates who share their views." (ECF No. 54 at 4.)

`

Plaintiffs claim a long line of cases permits federal courts to retain jurisdiction where parties preemptively challenge expired district lines. (ECF No. 60 at 5-6.) This ensures state actors timely perform their constitutional role and "permit[s] the adoption of redistricting plans before relevant elections." (ECF No. 54 at 4-5.) Plaintiffs cite the lack of transparency surrounding the Legislature's redistricting timeline along with repeated historical failures to redistrict in a timely manner to show their claims are ripe and require federal court intervention at this stage. (ECF No. 54 at 5.)

## II. LEGAL STANDARD

### A. <u>Issuance of Stay</u>

"A trial court may, with propriety, find it is efficient for its own docket and the fairness course for the parties to enter a stay of an action before, it, pending resolution of independent proceedings which bear upon the case." *Leyva v. Certified Grocers of Cal., Ltd.*, 593 F. 2d 857, 862 (9th Cir. 1979). "[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). Generally, the party seeking a stay "must justify it by clear and convincing circumstances outweighing potential harm to the party against whom it is operative." *Williford v. Armstrong World Indus., Inc.*, 715 F.2d 124, 127 (4th Cir. 1983). In other words, the proponent of a stay "bears the burden of establishing its need." *Clinton v. Jones*, 520 U.S. 681, 708 (1997) (citing *Landis*, 299 U.S. at 255).

### B. <u>Ripeness</u>

Article III, Section 2 of the United States Constitution limits the jurisdiction of the federal courts to "[c]ases" and "[c]ontroversies." The Supreme Court of the United States has stressed

`

that "[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 37 (1976).

Ripeness is a related concept, borne from the same jurisdictional "case or controversy" limitation. It "presents a 'threshold question of justiciability'" for a federal court. *Scoggins v. Lee's Crossing Homeowners Ass'n*, 718 F.3d 262, 269 (4th Cir. 2013) (citing *Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand at Lansdowne, LLC*, 713 F.3d 187, 195 (4th Cir. 2013)). The ripeness doctrine requires a controversy to be "presented in clean-cut and concrete form." *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006). The doctrine serves the goals of judicial economy because it requires the court to refrain from issuing a decision before the record is fully developed and the action underlying the harm is "formalized." *Id.*

Therefore, the court must look first to the timing of the injury. Even if the timing requirements are met, however, the court must still consider two additional "prudential" factors: (1) "the hardship to the parties of withholding court consideration, and (2) "the fitness of the issue for judicial decision." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977). The hardship prong is satisfied when the harm alleged has already occurred, or when plaintiffs allege a realistic threat of occurrence. *See, e.g., Abbott Labs.*, 387 U.S. at 152-153 (plaintiffs lack of compliance could result in criminal and civil penalties*); Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (plaintiffs had alleged "credible threat of prosecution"). To decide whether a case is "fit" for judicial decision, the court must consider whether the harm alleged is "purely legal," or whether "further factual development could help the court resolve the issues in the case." *See Susan B. Anthony List*, 573 U.S. at 168-69.

`

### III.    ANALYSIS

A. **Plaintiffs' Injuries**

Before the court identifies the relief Plaintiffs have requested in this case, it is helpful to consider what they have *not* requested. Here, Plaintiffs do not prospectively challenge the constitutionality of districting plans which the Legislature has yet to create. Nor do they request that this court step into the shoes of the Legislature at this time to take over the redistricting process.

Instead, Plaintiffs' alleged harms can be grouped into two analytical categories. The first category of harms alleges present, ongoing injuries to Plaintiffs' First and Fourteenth Amendment rights to associate and communicate with their desired electoral candidates. (ECF No. 1 at 4-5, ¶¶ 6-10). For these Motions, the court assumes the facts pleaded in the Complaint are true without delving into the underlying merits.[2] Plaintiffs claim South Carolina voters are harmed because, as

---

[2] Defendant Governor McMaster's Motion to Dismiss (ECF No. 61 at 16-17) argues Plaintiffs' freedom of association claims do not survive under the Supreme Court's decision in *Rucho v. Common Cause*, 139 S. Ct. 2484, 2504 (2019). *Rucho* considered a First Amendment-based challenge by Republican voters in Maryland and Democratic voters in North Carolina to partisan gerrymandering, not unconstitutional malapportionment. The Court concluded that the factual record and testimony provided did not support a finding that the "districting plans *at issue*" in the case interfered with the plaintiffs' First Amendment rights. *Id*. at 2504 (emphasis added). The Court therefore refuted the plaintiffs' purported argument that "any level of partisanship in districting would constitute an infringement of their First Amendment rights." *Id.* The decision was fact-bound. It did not categorically bar First Amendment claims in *all* cases that could fit under the districting umbrella. Moreover, it is not clear how *Rucho* applies to the harms at issue in this case, which stem, in part, from an alleged lack of clarity and urgency by the Legislature to complete redistricting. For instance, *Rucho* does not address the harms to political candidates who may not know which district to run in before impending qualification deadlines for the 2022 elections. Nor does it address the harm to voters who may not know which district they reside in and whether their district may be reconstituted substantially ahead of the 2022 primary elections. Instead, *Rucho* considers alleged declines in voter involvement and difficulties in fundraising and mobilizing voters after the partisan districting lines were put into place. Here, Plaintiffs allege First Amendment burdens from a lack of information about the operative district lines. Further, Defendant Governor's challenge on this ground is merit-based. The court need not, and does not, decide the merits of Plaintiffs First Amendment claims at this stage. The court concludes only that

`

things stand, they do not know whether their current representatives "will still be eligible to run in their districts" in the upcoming election. (*Id*. at 5, ¶ 10.) Voters do not know who to hold accountable and to whom they can communicate concerns. (*Id*.) They cannot organize, campaign, or contribute to candidates in anticipation of upcoming election deadlines. (*Id*. at 5-6, ¶¶ 10, 12.) Plaintiff organizations, such as the South Carolina NAACP, claim they cannot campaign on behalf of candidates and cannot educate voters. (*Id*. at 6, ¶14.)

The second category of harms includes those arising from the risk that redistricting will not be timely completed. This category alleges a future harm: the danger that in the absence of a new districting plan, upcoming elections may be conducted under unconstitutional maps, and Plaintiffs' votes will be diluted. (ECF No. 60 at 2-3.)

Again, the court does not consider the merits of Plaintiffs' claims nor decide if their allegations will "ultimately[] entitle them to any relief." *Baker v. Carr*, 369 U.S. 186, 208 (1962). Assuming without deciding that Plaintiffs have standing to bring their claim, the court concludes nonetheless that Plaintiffs' claims are not yet ripe and stays the proceedings to give the Legislature the opportunity to timely perform its redistricting duties.

### B. Timeliness

As all parties acknowledge, the state legislature has the primary responsibility to redistrict and apportion representatives, *Growe v. Emison*, 507 U.S. 25, 36-37 (1993), and the court must defer its involvement in this matter to give state institutions a chance to act. *Id.*; (*see also* ECF No. 60 at 2.) Emphasizing the importance of the state interest at issue, the Supreme Court has instructed that "absent evidence that these state branches will fail timely to perform that duty, a

---

it can conduct the fundamental jurisdictional analysis by considering the harms alleged in Plaintiffs' Complaint.

`

federal court must neither affirmatively obstruct state reapportionment nor permit federal litigation to be used to impede it." *Growe*, 507 U.S. at 34.

A judicial decision is therefore not appropriate without allowing the state enough time to perform its duties. Moreover, it is clear that "further factual development could help the court resolve the issues in the case." *Susan B. Anthony List*, 573 U.S. at 168-69. As redistricting continues in the Legislature, the court will benefit from a more developed record down the road when it must decide the weighty issues in this case.

Turning to the question of timeliness, the court notes it must "stay[] its hand" and await action (or inaction) by the state. *Scott v. Germano*, 381 U.S. 407, 409 (1965). Pursuant to this duty, the court can "fix[] a reasonable time" for state officials to enact a viable district plan, such that there is "ample time to permit such a plan to be utilized in the [upcoming] election." *Id*. In similar cases, the Supreme Court has affirmed the district court's retention of jurisdiction over the case and concluded the district court "would have been justified in adopting its own plan if it had been apparent that the state court . . . would not develop a redistricting plan in time for the primaries." *Growe*, 507 U.S. at 36.

On the other hand, the first category of present day, ongoing harms, are not yet "fit for judicial decision," and therefore unripe under the second prudential factor. Even if the associational harms Plaintiffs allege are presently occurring and therefore not speculative, the principles of comity counsel the court to "stay its hand" while the Legislature acts. On these issues too, all parties would benefit from further factual development to help the court resolve the ultimate merits of Plaintiffs' claims.

Defendants argue *Growe* requires outright dismissal (ECF No. 57 at 2), or a stay until the "Governor has signed [the bill enacting new district lines] into law" (ECF No. 51 at 2.) This

`

argument misses the mark.  Applying *Germano* as precedent, *Growe*, 507 U.S. at 36, ostensibly noted that "*Germano* requires deferral, not abstention."  Ten years later, the Supreme Court reaffirmed this guidance in *Branch v. Smith*, 538 U.S. 254, 259 (2003), explaining that the district court properly "stayed its hand," gave the state legislature an opportunity complete redistricting, and did not err in holding "that 'if it is not clear to this court by January 7, 2002 that the State authorities can have a redistricting plan in place by March 1, [the court] will assert [its] jurisdiction . . . and if necessary, [] draft and implement a plan for reapportioning the state congressional districts.'"  District courts have adopted this guidance in several illustrative cases.[3]

While the factual permutations and underlying state processes will differ in every case, it is clear that federal courts routinely manage the state legislative redistricting process and set

---

[3] In *Arrington v. Elections Bd.*, 173 F. Supp. 2d 856, 862 (E.D. Wis. 2001), for example, the court concluded it could "retain jurisdiction but merely stay proceedings, [and] establish, under its docket-management powers, a time when it would take evidence and adopt its own plan if the legislature had by then failed to act." *Id*. at 865.

Following *Arrington*, a three-court panel considered plaintiffs' malapportionment claims in Wisconsin after 2020 census results were published.  *Hunter v. Bostelmann*, C/A No. 21-cv-512-JDP-AJS-EEC, 2021 WL 4206654, at *4 (W.D. Wis. Sept. 16, 2021).  The three-judge panel stayed proceedings "[t]o avoid interfering with state processes," *id*. at *3, but "set a schedule that will allow for the timely resolution of the case should the state process languish or fail," *id*. at *4.

In *Favors v. Cuomo*, 866 F. Supp. 2d 176, 184 (E.D.N.Y. 2012), the court considered plaintiffs' allegation that it was "increasingly unlikely" for a redistricting plan based on the 2010 census to be enacted.  *Id*. at 185.  The court rejected defendants' argument that these actions could not be deemed ripe "until approximately four months before the next primary elections."  Seeking guideposts to create an appropriate timeline to resume proceedings, the court identified the start of the "qualification period for candidates and parties for the primary election ballot" on March 20, 2012 as "a critical trigger[] for assessing the time required."  *Id*. (citation omitted).  The court concluded the case was ripe.  *Id*.

Notably, this court retained jurisdiction in a similar case brought after the 1990 census, where the South Carolina Legislature and the Governor were at an impasse.  *Burton on Behalf of Republican Party v. Sheheen*, 793 F. Supp. 1329 (D.S.C. 1992).  While the court's order does not discuss these early issues in the case, it acknowledges that "[m]otions to dismiss and to stay the proceedings were filed by various parties throughout the pre-trial stage on grounds the controversy was not ripe" because "hope remained that plans acceptable to both the General Assembly and the Governor might yet be passed." *Id.* at 1339.

11

`

deadlines by which state institutions must put forth their new district plans. Especially where the state legislature has not convened in a regular or special session and where election deadlines loom over the case, the federal court can set a deadline for action while "staying its hand" to permit the state to take the first step. *See Germano*, 381 U.S. at 409; *Growe*, 507 U.S. at 36; *Branch*, 538 U.S. at 259.

Here, Plaintiffs argue the Legislature is currently *sine die* adjourned with no special session in the works. On the other hand, House Defendants' Motion assures the court that both House and Senate Subcommittees are "actively engaged in and faithfully performing their obligations in accordance with the law." (ECF No. 51 at 7.) The court also recognizes the ongoing effect of the COVID-19 pandemic, which represents a unique exigency and further constrains the Legislature's timeframe to act.

At this point, the court finds the threat that the districting process will not be completed before the January Regular Session remains speculative and Plaintiffs' claims are not yet ripe. Come January, with only sixty-four (64) days between the start of the Legislature's 2022 Regular Session on January 11, 2022, and the statutory filing period for prospective primary election candidates on March 16, 2022, the threat of vote dilution will most probably be more imminent. Importantly, the court will be able to make this determination on the basis of a more developed record at that time.

The court elects to follow robust precedent and stays the case until January 18, 2021.[4] Setting a specific date on which Plaintiffs' claims become ripe is always an uncertain task. The

---

[4] Despite the significant factual disagreements between the parties, the court notes all parties want substantially similar outcomes on this issue. Defendants, at a minimum, ask that the case be stayed. (ECF No. 51 at 2; ECF No. 57 at 1; ECF No. 61 at 18.) Plaintiffs facially oppose the stay, but seek a "concrete, publicized schedule for state actors to complete [] redistricting." (ECF No. 60 at 2.) These requests overlap in spirit: the issuance of a stay freezes the case until it becomes clear the

`

probability that redistricting will not be completed by the qualification deadline period starting March 16 increases as that date draws nearer. The start of the Regular Session marks a discrete event on this spectrum. Using its "sound discretion" on this issue, the court stays the case and gives the Legislature until the following Tuesday, January 18, 2022, to enact new district maps. *See Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

## IV.     CONCLUSION

The court finds Plaintiffs' allegations are not yet ripe. Therefore, the court (1) **GRANTS IN PART** House Defendants' Motion to Stay (ECF No. 51 at 1); (2) **DENIES** Senate Defendants' Motion to Dismiss (ECF No. 57); and (3) **STAYS** the case until January 18, 2022.

**IT IS SO ORDERED.**

*J. Michelle Childs*
United States District Judge

November 12, 2021
Columbia, South Carolina

---

legislative process has stalled. It also sets a deadline such that judicial intervention may not be necessary.

13

`