## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## COLUMBIA DIVISION

|  |  |
|---|---|
| THE SOUTH CAROLINA STATE CONFERENCE OF THE NAACP, and<br><br>Taiwan Scott, on behalf of himself and all other similarly situated persons,<br><br>        Plaintiffs,<br><br>        v.<br><br>HENRY D. MCMASTER, in his official capacity as Governor of South Carolina; THOMAS C. ALEXANDER, in his official capacity as President of the Senate; LUKE A. RANKIN, in his official capacity as Chairman of the Senate Judiciary Committee; JAMES H. LUCAS, in his official capacity as Speaker of the House of Representatives; CHRIS MURPHY, in his official capacity as Chairman of the House of Representatives Judiciary Committee; WALLACE H. JORDAN, in his official capacity as Chairman of the House of Representatives Elections Law Subcommittee; HOWARD KNAPP, in his official capacity as interim Executive Director of the South Carolina State Election Commission; JOHN WELLS, Chair, JOANNE DAY, CLIFFORD J. EDLER, LINDA MCCALL, and SCOTT MOSELEY, in their official capacities as members of the South Carolina Election Commission,<br><br>        Defendants. | **Case No. 3-21-cv-03302-JMC-TJH-RMG**<br><br>**FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**<br><br>**THREE-JUDGE PANEL** |

## INTRODUCTION

1.      Plaintiffs the South Carolina State Conference of the NAACP ("South Carolina NAACP") and Taiwan Scott originally brought this action as a challenge to South Carolina's malapportioned state House and U.S. Congressional districts. The South Carolina Legislature's inaction after the release of the 2020 decennial Census data threatened to delay the reapportionment and redrawing of these electoral districts until after its regular legislative session began on January 11, 2022. This self-inflicted delay risked making it impossible for courts to adjudicate the legality of those districts before the March 30, 2022 candidate qualifying period ends. Because of the severe population disparities among legislative districts in South Carolina, it also denied constituents equal access to representation and left voters unable to effectively organize going into the 2022 election cycle.

2.      The Legislature passed legislation for new state House districts that Governor McMaster signed into law. But in doing so, Defendants traded one constitutional violation—malapportionment—for two others: racial gerrymandering and intentional racial discrimination. In addition, due to legislative inaction, the U.S. Congressional districts remain malapportioned. This panel must therefore step in to adjudicate and potentially remedy these issues in time to avoid voter confusion and disenfranchisement in the upcoming election cycle.[1]

3.      Defendants' racial gerrymandering and intentional vote dilution in certain state House districts continues South Carolina's shameful history and ongoing record of discrimination. Although South Carolina elected officials have made important progress with

---

[1] Because the Senate is not holding elections until 2024, Plaintiffs in this lawsuit are not currently challenging any Senate districts adopted in H. 4493. Plaintiffs do not waive their right to challenge these districts at a later date.

respect to voting rights over the past fifty years—mostly due to private plaintiffs' lawsuits resulting in court orders and/or the U.S. Department of Justice's intervention—Defendants continue to evade their constitutional obligations for redistricting. For *every* redistricting cycle since Congress enacted the Voting Rights Act of 1965 ("VRA"), courts have needed to adjudicate racial discrimination claims relating to South Carolina state and/or congressional redistricting plans. This post-2020 redistricting cycle is no different.

4.      House Bill 4493 ("H. 4493"), which enacted racially gerrymandered districts into law and was motivated, at least in part, by a discriminatory purpose, is the latest example of a decades-long pattern by the Legislature of proposing or enacting state legislative districts that discriminate against Black voters to maintain the majority's power and deny Black South Carolinian voting power. The Legislature did so by using race as the predominant factor in creating certain state House districts without a legally acceptable justification and having a discriminatory purpose in packing and cracking Black voters to dilute their vote.

5.      The consideration of race in drawing districts lines is permissible and necessary in many areas of South Carolina to ensure compliance with Section 2 of the VRA. But the Legislature's consideration of race in the drawing of districts in H. 4493 was not narrowly tailored for a compelling government interest or to comply with the VRA. Instead, H. 4493 represents the Legislature's intent to use race to maintain political power by unnecessarily packing Black South Carolinians into certain districts and cracking Black voters in other districts.

6.      In Sumter County, for example, Defendants drew the line between Districts 51 and 67 to track almost surgically the areas of the county with a higher population of Black residents. The result is predictable: Black voters are packed into District 51, with a Black voting-

age population ("BVAP") of more than 61%, and cracked in District 67, with a BVAP of around 28%. And, for reasons detailed below, these choices run afoul of the House's purported commitment to respect communities of interests, among other considerations. Moreover, Defendants failed to articulate a legally acceptable justification for doing so.



(*House Districts 51 and 61 H. 4493*)

7.     The Legislature passed H. 4493 in a flawed and nontransparent process that resulted in this and similar outcomes across the challenged districts. The South Carolina House and Senate failed to provide open and transparent practices during the redistricting cycle. Both chambers, and the House in particular, for example, repeatedly provided insufficient time and opportunity for legislative committee members and the public to review their proposed plans before considering amendments and adopting them. Instead, the Legislature repeatedly presented amendments to draft plans without additional opportunities for public consideration or input.

4

8.      Any denial that the Legislature unconstitutionally used race as predominant factor
and to intentionally dilute Black voting strength is belied by how elected officials repeatedly
ignored warnings by the public that the proposed plans would harm Black South Carolinian
voters. There is also no indication that they conducted a racially polarized voting analysis
("RPV") or any other analysis to determine whether the BVAPs present in the challenged
districts were necessary to comply with the VRA and how districts might function for Black
voters.

9.      The Legislature enacted South Carolina House Districts 7, 8, 9, 11, 41, 43, 51, 54,
55, 57, 59, 60, 63, 67, 70, 72, 73, 74, 75, 76, 77, 78, 79, 90, 91, 93, 101, 105 in H. 4493 (the
"Challenged Districts") using race as a predominant factor in a manner not narrowly tailored to
comply with Section 2 of the VRA or any other compelling government interest. These districts
therefore violate the Fourteenth Amendment of the U.S. Constitution and must be enjoined.

10.     H. 4493 is also a product of intentional racial discrimination because passage of
the bill and the resulting Challenged Districts were motivated, at least in part, by a
discriminatory purpose. Accordingly, it violates the Fourteenth and Fifteenth Amendments of the
U.S. Constitution and must be enjoined.

11.     In addition, because Defendants have failed to reapportion and redraw South
Carolina's U.S. Congressional districts, these malapportioned districts continue to violate the
First and Fourteenth Amendments. Accordingly, the use of the current U.S. Congressional
districts must be enjoined.

12.     As noted in Plaintiffs' original complaint, this continued delay poses an
immediate problem. In this very moment, the people of South Carolina (i) do not know whether
their current representatives will be eligible to run in their congressional districts in the

5

upcoming election and whether these representatives can be held accountable at election time for the conduct and policy positions they have advocated for while in office; (ii) cannot identify the proper persons to whom to communicate their concerns effectively because those individuals may or may not be accountable to them in the next election; and (iii) have no prospect of finding out any of this information in time to plan for the upcoming election. The people of South Carolina, including those represented by Plaintiffs, face a substantial and imminent risk that constitutionally compliant U.S. Congressional district lines will not be redrawn in time to cure the current unconstitutional violations for the 2022 elections.

13.    Accordingly, South Carolina must remedy these legislative maps by February 15, 2022, to correct for their constitutional infirmities. Such a deadline will allow time for the court to conduct its own curative process, should the Legislature fail to do so, prior to the candidate declaration deadline of March 30, 2022.

## PARTIES

14.    Plaintiff **THE SOUTH CAROLINA STATE CONFERENCE OF THE NAACP** is a nonprofit, nonpartisan membership organization in South Carolina. The South Carolina NAACP is a state subsidiary of the National Association for the Advancement of Colored People ("NAACP"), a national civil rights organization. The South Carolina NAACP was chartered in 1939 and is the oldest civil rights group in South Carolina.

15.    Consistent with the national NAACP's mission, the South Carolina NAACP, on behalf of its members and the other constituents it serves, seeks to remove all barriers of racial discrimination through democratic processes and the enactment and enforcement of federal, state, and local laws securing civil rights, including laws relating to voting rights. For example, on behalf of its members and other constituents, the South Carolina NAACP has held and has

6

sponsored voter education and voter registration activities for years and has been credited with registering thousands of voters throughout South Carolina.

16.     The South Carolina NAACP has 77 branches comprised of adult members across the state, including at least one branch in each of South Carolina's 46 counties.

17.     Together, the South Carolina NAACP has more than 13,000 members across all 46 counties, who are predominantly but not exclusively Black people. Its membership also includes other racial and ethnic minority residents, as well white South Carolinians.

18.     Its members and constituents currently live in racially gerrymandered and intentionally dilutive state legislative districts. Specifically, members live in the Challenged Districts. These members have been and, if H. 4493 is not enjoined, will continue to be harmed by H. 4493's assignment of them to unconstitutionally racially gerrymandered districts and purposefully dilutive districts. The South Carolina NAACP's members include registered voters in the Challenged Districts.

19.     The South Carolina NAACP also has members who are registered voters and constituents currently living in malapportioned U.S. Congressional districts. Specifically, members live in the severely overpopulated Congressional District ("CD") 1, as compared to its neighboring and severely underpopulated CD 6, where South Carolina NAACP members and constituents also live. These members and constituents also reside in areas of the state that could constitute properly apportioned congressional legislative districts that, if established, would remedy the identified one-person, one-vote violations.

20.     The current absence of a constitutionally and legally compliant Congressional redistricting plan and the Legislature's apparent refusal to pass one before January 2022 also harms Plaintiff South Carolina NAACP as an organization because it engages in accountability

and voter education efforts that are hindered by the lack of a valid redistricting plan in the following ways:

    a.   Its members and constituents who desire to influence the views of their representatives in Congress or candidates for Congress are not able to communicate their concerns effectively because current members of Congress or congressional candidates may not be held accountable to those citizens as voters in the next election;

    b.   Potential candidates for Congress will not be able to come forward and the policy platforms those candidates advance be supported or opposed by Plaintiff South Carolina NAACP or its members and constituents, until potential candidates know the borders of the districts in which they, as residents of the district, could seek office; and

    c.   Plaintiff's members and constituents who desire to communicate with and contribute financially to candidates for Congress who will represent them—a right guaranteed by the First Amendment—are hindered from doing so until districts are correctly apportioned.

21. South Carolina NAACP's members and constituents are also harmed by the inability of candidates to campaign effectively and provide a meaningful election choice to voters.

22. Plaintiff **TAIWAN SCOTT** is a U.S. citizen and Black, registered voter, and resident of Hilton Head in Beaufort County, South Carolina. Specifically, Mr. Scott resides in CD 1, which is overpopulated based on the 2020 Census data. Mr. Scott and members of his family, who have lived in Hilton Head for seven generations, are Gullah people, descendants of

West African people who were enslaved and forcibly brought to America's southeastern coast, including South Carolina's coastal plain and Beaufort Sea Islands. While living and contributing to South Carolina in a myriad of ways, Black South Carolinians, including Gullah community members like Mr. Scott, have endured discrimination and other harms relating to taxation, heirs' property, land seizures, highway construction, lack of business and development opportunities, and many other issues.

23. Defendant **HENRY D. MCMASTER**, in his official capacity as Governor of South Carolina, is a proper defendant because, under Article IV, Section 21 of the South Carolina Constitution, he possesses the authority to sign, as he did, or veto any redistricting plan passed by the Legislature like H. 4493.

24. Defendant **THOMAS C. ALEXANDER**, in his official capacity as President of the South Carolina Senate, is a proper defendant as leader of the Senate, which drafts and passes redistricting legislation, including for Congress, for consideration by the General Assembly.

25. Defendant **LUKE A. RANKIN**, in his official capacity as Chairman of the Senate Judiciary Committee, is a proper defendant as leader of the committee responsible for drafting and passing redistricting legislation, including for Congress, for consideration by the full Senate.

26. Defendant **JAMES H. LUCAS**, in his official capacity as Speaker of the South Carolina House of Representatives, is a proper defendant as leader of the House charged with presiding over the House and ratifying bills upon passage by both houses of the Legislature pursuant to Article III, Section 18 of the South Carolina Constitution, such as H. 4493.

27. Defendant **CHRIS MURPHY**, in his official capacity as Chairman of the Judiciary Committee of the House of Representatives, is a proper defendant as leader of the

committee responsible for drafting and passing redistricting legislation for consideration by the full House, such as H. 4493.

28.     Defendant **WALLACE H. JORDAN**, in his official capacity as Chairman of the Election Laws Subcommittee of the House of Representatives, is a proper defendant as leader of the subcommittee responsible for drafting and passing redistricting legislation for consideration by the Judiciary Committee of the House of Representatives and the full House, such as H. 4493.

29.     Defendant **HOWARD KNAPP**, in his official capacity as the interim Executive Director of the South Carolina State Election Commission, is a proper defendant as the head of the South Carolina agency responsible for implementing and conducting elections pursuant to S.C. Code Ann. §§ 7-3-10, et seq. and 7-13-10, et seq., as amended. Specifically, S.C. Code Ann. § 7-13-45 requires the Executive Director of the State Election Commission to administer H. 4493 by (1) accepting filings for state House and U.S. Congressional candidates and (2) publicizing certain details related to the filing period. In practice, the Executive Director also provides guidance to the 46 directors of the county boards of voter registration and election regarding their acceptance of filings for state House and U.S. Congressional candidates, as well as their publicization of details related to the filing period, including to implement H. 4493.

30.     Defendants **JOHN WELLS, JOANNE DAY, CLIFFORD J. EDLER, LINDA MCCALL**, and **SCOTT MOSELEY**, in their official capacities as members of the South Carolina State Election Commission, are proper defendants as persons charged with the powers and duties of the South Carolina State Election Commission pursuant to S.C. Code Ann. §§ 7-3-10, et seq. and 7-13-10, et seq., as amended. In addition, S.C. Code Ann. § 7-11-15 requires the State Election Commission to design, distribute, and process forms for the statement of intention

10

of candidacy, which candidates for state House seats under H. 4493 and U.S. Congressional

candidates must file during a specified time period.

## JURISDICTION AND VENUE

31.     This action arises under the First, Fourteenth, and Fifteenth Amendments of the

U.S. Constitution.

32.     This court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(3)

and (4), 2201, 2202, and 2284, as well as 42 U.S.C. §§ 1981, 1983, and 1988.

33.     A three-judge panel has been properly appointed pursuant to 28 U.S.C. § 2284(a)

because this action challenges "the constitutionality of the apportionment of congressional

districts" and "the apportionment of any statewide legislative body."

34.     Venue is proper pursuant to 28 U.S.C. § 1391(b) and 28 U.S.C. § 2284.

35.     This Court has personal jurisdiction over Defendants, who are sued in their

official capacities as state officials. The violations complained of concern their conduct in such

capacities.

## STATEMENT OF FACTS

36.     On December 10, 2021, Governor Henry McMaster signed into law H. 4493,

which redistricted the South Carolina House of Representatives and State Senate for the next

decade as Act 117. Before turning to these enactments directly, discussion of the background and

circumstances surrounding H. 4493's enactment are warranted.

### History of State Legislative Redistricting in South Carolina

37.     H. 4493 is the latest iteration of South Carolina's long pattern of official acts of

racial discrimination including its enactment of various discriminatory voting rules that deny and

abridge the voting rights of Black South Carolinians. Of the many examples, an 1892 South

Carolina voter registration law "is estimated to have disfranchised 75 percent of South Carolina's [B]lack voters."[2] Three years later, South Carolina "was a leader in the widespread movement to disenfranchise [eligible Black citizens]."[3] Lynching of Black people and other acts of racial violence also served as impediments to Black voters as they attempted to exercise their right to vote. Until the historic passage of the VRA in 1965, South Carolina enforced both a literacy test and a property test that were "specifically designed to prevent [Black people] from voting."[4] South Carolina promptly challenged the VRA's constitutionality as part of its effort to deny equal voting rights to Black people.

38.     Racial discrimination against Black South Carolinians has diminished their ability to participate politically and elect their preferred candidates up to the present day. Since 1982, Black candidates have run for statewide offices, including for Governor, Attorney General, Secretary of State, and Treasurer. Yet South Carolina failed to elect a single Black official to a statewide office in the twentieth century. Prior to the 1992 creation of a district comprised of a majority of Black voters ("majority-Black district") for the Sixth U.S. Congressional District, *no* Black candidate served in Congress from South Carolina in the twentieth century. And before Senator Tim Scott's historic election in 2014, *no* Black candidate had been elected to statewide office since Reconstruction.

39.     Up until the U.S. Supreme Court's decision in *Shelby County, Alabama v. Holder* on June 25, 2013, Section 5 of the VRA played a vital role in safeguarding against proposed

---

[2] *Condon v. Reno*, 913 F. Supp. 946, 949 (D.S.C. 1995) (citing J. Morgan Kousser, *The Shaping of Southern Politics: Suffrage Restrictions and the Establishment of the One Party South*, 1880–1910, p. 49 (New Haven: Yale University Press 1974)).

[3] *South Carolina v. Katzenbach*, 383 U.S. 301, 310 n.9 (1966).

[4] Tom Henderson Wells, *The Phoenix Election Riot,* 31 Phylon 58 (1970).

retrogressive voting plans—that is, plans that weakened the ability of racial and ethnic minority voters to participate politically. With this preclearance requirement in place for South Carolina and its sub-jurisdictions, the U.S. Department of Justice ("DOJ") objected 120 times between 1971 and 2013 to proposed racially discriminatory changes in voting practices or procedures in South Carolina. The DOJ has objected to proposed discriminatory practices that would have affected nearly every aspect of Black voters' participation in South Carolina's electoral processes, including discriminatory redistricting, annexations, voter assistance regulations, changing county boundaries, eliminating offices, reducing the number of seats on a public body, majority vote requirements, changing to at-large elections, using numbered posts or residency requirements, staggering terms, and the schedule of elections.

40.     Of these DOJ objections, at least 27 of them involved a proposed state or local redistricting plan that "ha[d] the purpose of or w[ould] have the effect of diminishing the ability of . . . citizens of the United States on account of race or color . . . to elect their preferred candidates of choice."[5] Three objections specifically challenged post-census House redistricting plans in three redistricting cycles in 1971, 1981, and 1994, including maps that would have resulted in the fragmentation and dilution of Black voting strength.

41.     From 1996 until the *Shelby County* decision in 2013, DOJ interposed a total of 13 Section 5 objections, 12 of which concerned voting changes that had the effect, and sometimes also the purpose, of minimizing the opportunity of Black citizens to elect their preferred candidates. In addition, four lawsuits under Section 2 of the VRA were brought to challenge

---

[5] *Voting Determination Letters for South Carolina*, U.S. Department of Justice, https://www.justice.gov/crt/voting-determination-letters-south-carolina (last updated: Aug. 7, 2015); John C. Ruoff & Herbert E. Buhl, *Voting Rights in South Carolina: 1982-2006*, 17 S.Cal. Rev. L. & Soc. Just. 645, 655-57 (Spring 2008); 52 U.S.C. § 10304(b).

discriminatory at-large election schemes, all of which led to the adoption of single-member district election systems to provide Black voters with equal electoral opportunities.

42.     In the past 25 years, South Carolina has continued to implement or seek to implement at-large election systems, redistricting plans, and municipal annexations that minimize and dilute Black voters' electoral opportunities in the context of RPV. As a few examples, public officials in Charleston, Cherokee, Greenville, Lexington, Richland, Spartanburg, Sumter, and Union counties have changed district lines or voting rules in ways that would diminish the ability of Black voters to elect candidates of their choice. Some of the lines in these counties are at issue in this suit.

43.     In the redistricting context, South Carolina also has discriminated against Black voters through drawing malapportioned redistricting maps. And for the last five redistricting cycles—*every* cycle since Congress enacted the VRA—courts have needed to adjudicate racial discrimination claims relating to South Carolina's state legislative and/or congressional redistricting plans. *Backus v. South Carolina*, 857 F. Supp. 2d 553 (D.S.C. 2012), *aff'd*, 568 U.S. 801 (2012); *Colleton Cnty. Council v. McConnell*, 201 F. Supp. 2d 618 (D.S.C. 2002), opinion clarified (Apr. 18, 2002); *Burton v. Sheheen*, 793 F. Supp. 1329, 1337 (D. S.C. 1992); *S.C. State Conf. of Branches of the NAACP v. Riley*, 533 F. Supp. 1178 (D.S.C. 1982), *aff'd* 459 U.S. 1025 (1982); *Twigg v. West*, No. 71-1211 (D.S.C. Apr. 7, 1972).

44.     Because of South Carolina's record of malapportionment and racial discrimination across numerous redistricting cycles, as this Court acknowledged, "judicial intervention in the South Carolina redistricting process has been frequently unavoidable." *Burton*, 793 F. Supp. at 1337.

**The Process Leading to the Enactment of H. 4493**

<u>South Carolina House of Representatives Redistricting Criteria</u>

45.     On August 3, 2021, the South Carolina House's Redistricting Ad Hoc Committee ("House Committee")—the House's body responsible for preparing and developing redistricting plans for the House for the post-2020 redistricting cycle—adopted its guidelines and criteria for U.S. Congressional and state legislative redistricting.[6] The Committee did not hold *any* public hearing to receive feedback and public comment on guidelines or criteria before any were adopted.

46.     These guidelines begin by listing requirements under the U.S. Constitution, other federal law, and state law.

47.     In discussing the requirements of federal law, the House Committee's guidelines state that "race may be a factor considered in the creation of redistricting plans, but it shall not be the predominant factor motivating the legislature's decisions concerning the redistricting plan and shall not unconstitutionally predominate over other criteria set forth in these guidelines."

48.     The guidelines further state that "[a]ny proposed redistricting plan that is demonstrated to have the intent or effect of dispersing or concentrating minority population in a manner that prevents minorities from electing their candidates of choice will neither be accepted nor approved."

49.     In addition to listing legal compliance, the guidelines identify five criteria for redistricting. The first guideline listed is "equal population/deviation" and states that

---

[6] S.C. House of Representatives Judiciary Committee Redistricting Ad Hoc Committee, *2021 Guidelines and Criteria for Congressional and Legislative Redistricting* (Aug. 3, 2021), *available at* https://redistricting.schouse.gov/docs/2021%20Redistricting%20Guidelines.pdf.

15

Congressional districts "shall be as nearly equal in population as is practicable," and that state legislative districts "shall have substantial equality of population." The guidelines further instruct that those state legislative districts may have population deviations within plus or minus 2.5% of the mathematical mean or 5% overall of the total population. Any overall total population deviation "greater than five percent from equality of population among South Carolina House districts shall be justified when it is the result of geographic limitations, the promotion of a constitutionally permissible state policy, or to otherwise comply with the criteria identified in these guidelines."

50.    As discussed more below, the Committee rejected amendments and requests from members of the public to amend its criteria to allow more flexibility by tolerating population deviations within a range of plus or minus 5% of the mathematical mean, or 10% overall of the total population, consistent with federal case law.[7]

51.    The next guideline is "contiguity" and states that each district must be "comprised of contiguous territory," and although contiguity "by water is sufficient," areas that "meet only at the points of adjoining corners are not considered contiguous."

52.    The next guideline is "compactness" and states that each district must also be "reasonably compact in form and should follow census geography" under the criteria.

_____

[7] *See*, *e.g.*, *Brown v. Thomson*, 462 U.S. 835, 842 (1983) (+/-5% (or 10% overall) deviation from ideal generally permissible). By comparison to the House's Guidelines, the Senate adopted guidelines for legislative districts that are consistent with federal law, instructing that "population deviations of individual districts shall be within plus (+) or minus (-) five percent (5%) of the ideal population and within an overall range of less than ten percent (10%)." S.C. Senate Judiciary Committee Redistricting Subcommittee, *2021 Redistricting Guidelines* (Sep. 17, 2021), available at https://redistricting.scsenate.gov/ (document available via "2021 Senate Redistricting Guidelines" hyperlink) The Senate also represented that its criteria are drawn "in part from the guidelines adopted for prior redistricting, the 2002 opinion of the three-judge court in *Colleton County Council v. McConnell*, the 2012 opinion of the three-judge court in *Backus v. South Carolina*, other court decisions, and input received in public hearings across the State."

16

53.    The next guideline is "communities of interest" and states that these should be "considered and balanced." Under the criteria, "[c]ounty boundaries, municipality boundaries, and precinct lines (as represented by the Census Bureau's Voting Tabulation District lines) may be considered as evidence of communities of interest to be balanced, but will be given no greater weight, as a matter of state policy, than other identifiable communities of interest." The House Committee provides that the following factors may contribute to a community of interest, "including, but not limited to the following: (a) economic; (b) social and cultural; (c) historic influences; (d) political beliefs; (e) voting behavior; (f) governmental services; (g) commonality of communications; and (h) geographic location and features."

54.    The guidelines also allow "incumbency considerations" to be considered and instruct that "[r]easonable efforts may be made to ensure that incumbent legislators are not placed into districts where they will be compelled to run against other incumbent members of the South Carolina House of Representatives. However, incumbency considerations shall not influence the redistricting plan to such an extent as to overtake other redistricting principles."

55.    The guidelines end with an instruction that the House Committee "should make reasonable efforts to be transparent and allow public input into the redistricting process." Moreover, "any deviation from the criteria shall not be any more than necessary to avoid the violation of law, and the remainder of the redistricting plan shall remain faithful to the criteria."

**The 2021 South Carolina Senate Legislative Process for Congressional Redistricting**

56.    On August 2, Plaintiff South Carolina NAACP, along with other advocacy organizations, sent a letter to the Senate Subcommittee reminding members of their affirmative obligations under the U.S. Constitution and Section 2 of the VRA, highlighting the

17

Subcommittee's obligation to conduct RPV analyses to ensure compliance with Section 2 of the VRA.[8]

57.     The letter also provided recommendations for ensuring transparency and opportunities for public input during all stages of the redistricting process.

58.     On September 17, 2021, the Senate Subcommittee met and adopted its redistricting criteria and guidelines without any public input. The criteria and guidelines were available only to Senate Subcommittee members before the meeting.

59.     On October 8, Plaintiff South Carolina NAACP, along with other advocacy organizations, submitted proposed U.S. Congressional redistricting plans, along with a submission letter. These proposed plans corrected for population disparities between districts following the 2020 Census data results and preserved majority-Black districts or otherwise developed districts that should have continued to be effective for Black voters to elect candidates of their choice, among other considerations and requirements that complied with the Senate Subcommittee's criteria, the U.S. Constitution, and other federal law. In the submission letter, the groups further reiterated the Senate Subcommittee's affirmative obligations to comply with

---

[8] An RPV analysis considers whether there is a pattern of voting along racial lines in which voters of the same race tend to support the same candidates, which usually differs from the candidates supported by voters of a different race. This is the key consideration in determining whether a redistricting plan dilutes the vote of racial minority voters. *N. Carolina State Conf. of NAACP v. McCrory*, 831 F.3d 204, 221 (4th Cir. 2016) (noting that RPV is "[o]ne of the critical background facts of which a court must take notice" in Section 2 cases); *Collins v. City of Norfolk,* 816 F.2d 932, 936-38 (4th Cir. 1987) (emphasizing that RPV is a "cardinal factor[]" that "weigh[s] very heavily" in determining whether redistricting plans violate Section 2 by denying Black voters equal access to the political process). As general matter, the U.S. Supreme Court in *Thornburg v. Gingles,* 478 U.S. 30 (1986), found probative for assessing RPV elections in which voters have been presented with a choice between at least one candidate who is a member of the minority group at issue and at least one candidate who is not.

18

the U.S. Constitution and Section 2 of the VRA, as well as reminded the Subcommittee that it must conduct an RPV analysis.

60.    On October 19, 2021, the Senate Subcommittee announced that it was actively soliciting members of the public to submit proposed Congressional maps.

61.    It was not until a November 12, 2021 meeting when the Senate Subcommittee received public testimony on Congressional maps that were submitted by members of the public. During the hearing, members of the public, among other points, reiterated to the Senate Subcommittee that it has an obligation to conduct an RPV analysis for any redistricting plans, especially because federal courts have repeatedly found RPV patterns existing throughout South Carolina. *See*, *e.g.*, *Colleton Cnty. Council*, 201 F. Supp. 2d at 643 ("Voting in South Carolina continues to be racially polarized to a very high degree . . . in all regions of the state and in both primary elections and general elections."); *see also*, *e.g.*, *United States v. Charleston Cnty.*, 365 F.3d 341, 350 (4th Cir. 2004) (county voting "is severely and characteristically polarized along racial lines"); *Jackson v. Edgefield Cnty., S.C. Sch. Dist.*, 650 F. Supp. 1176, 1196 (D.S.C. 1986) (observing that "the outcome of each [election] could be statistically predicted and reasonably explained by the race of the voters"); *id.* at 1198 ("The tenacious strength of white bloc voting usually is sufficient to overcome an electoral coalition of black votes and white 'crossover' votes.").

62.    Consistent with previous correspondence, Plaintiff South Carolina NAACP also urged the Senate Subcommittee during the November 12 hearing to not "pack" Black voters into districts with unnecessarily high Black populations or "crack" them into districts with populations that are insufficient to provide Black voters with an opportunity to elect candidates of their choice.

63.     At the end of the November 12 hearing, the Senate Subcommittee approved a motion for its staff to begin drawing a Congressional redistricting plan.

64.     On November 23, 2021—the Tuesday before Thanksgiving—the Senate Subcommittee announced in a press statement that it had released its Staff Congressional Plan and would hold a further hearing on the Staff Senate Congressional Plan at 10:30 a.m. on Monday, November 29, 2021.

65.     On November 29, the Senate Subcommittee received public testimony on its Staff Congressional Plan. After the public-comment portion of the meeting, the Senate Subcommittee considered and approved an amendment to that Senate Staff Congressional plan. Next, the Subcommittee approved a motion to report that plan as amended out of the Subcommittee.

66.     At the end of a December 7 hearing, Senator Rankin asserted that redistricting was done in the Senate for 2021. Absent a special session, the soonest a Congressional redistricting plan could be considered is during the next regular legislative session, which begins on January 11, 2022. Both the Legislature and Governor have the power to call a special session before then, but neither has committed to doing so.

**The 2021 House Legislative Process for Redistricting**

67.     The House Committee's redistricting hearings were largely inaccessible to members of the public. Prior to the release of U.S. Census data in August and September 2021, the first meetings were announced with less than a week's notice, were all scheduled from 600 p.m. to 8:00 p.m. on weeknights, and only one of these initial hearings had a remote testimony option, which left insufficient time for community members to adjust their schedules and prepare meaningful testimony. These hearings, which had the purported goal of gathering public input on the redistricting process, were scheduled during a resurgence of COVID-19 cases in the State,

but only the last two hearings (on September 28 and October 4) ultimately provided a remote

testimony option.

68.    These choices effectively limited participation to those who lived near the

location, had access to transportation, and were willing to chance the potential risk of exposure

to COVID-19. If people could not attend these sessions, they could not provide oral testimony or

meaningfully engage with other people's testimony during most of the House Committee's

public hearings. Similarly, the two hearings at which a remote testimony option was available

began at 4:30 p.m. and ended at 6:30 p.m. on weekdays, making it unlikely that working people

and people with children or other family obligations could attend.

69.    On August 9, 2021, Plaintiff South Carolina NAACP, along with other advocacy

organizations, sent a letter to the House Committee reminding them of their affirmative

obligations under the U.S. Constitution and Section 2 of the VRA, highlighting the House

Committee's obligation to conduct an RPV analysis and to refrain from developing maps that

unnecessarily "pack" Black voters into districts with high Black populations or "crack" them into

districts with unnecessarily low ones, explaining that both stratagems can illegitimately elevate

race over other considerations and diminish the political power of Black voters. The letter also

provided recommendations for ensuring transparency and opportunities for public input during

all stages of the redistricting process—before, during, and after proposing maps.

70.    On August 30, 2021, Plaintiff South Carolina NAACP, along with other advocacy

organizations, sent a follow-up letter to the House Committee reiterating concerns about the

House Committee's failure to transparently conduct its redistricting process and provide

opportunities for meaningful public participation.

71.     On October 8, 2021, Plaintiff South Carolina NAACP, along with other advocacy organizations, submitted on the House side proposed U.S. Congressional and state House redistricting plans, along with a submission letter. These proposed plans corrected for population disparities between districts following the 2020 decennial Census and preserved majority-Black districts or otherwise developed districts that would have continued to be effective for Black voters (that is, enable them to elect candidates of their choice), among other considerations and requirements that complied with the House Committee's criteria and the U.S. Constitution and other federal law. In the submission letter, the groups further reiterated the House Committee's affirmative obligations to comply with the U.S. Constitution and Section 2 of the VRA, as well as reminded the Committee that it must conduct an RPV analysis to determine its compliance with the VRA.

72.     In particular, the letter detailed how RPV patterns continue to exist in various parts of South Carolina. On the state level, for example, according to an RPV analysis of the 2020 election for U.S. Senate, Jamie Harrison, the candidate of choice of Black voters across South Carolina, received only 25% of white voter support and was defeated, despite receiving 98% of Black voter support. Similar patterns were present in elections featuring Black-preferred candidates in other key elections, including in the 2018 elections for the Secretary of State and State Treasurer. For example, in the 2018 election for Secretary of State, Melvin Whittenburg, the candidate of choice of Black voters across South Carolina, received only 23% of white voter support and was defeated, despite receiving 95% of Black voter support. In the 2018 election for State Treasurer, Rosalyn Glenn, the candidate of choice of Black voters across South Carolina, received only 21% of white voter support and was defeated, despite receiving 95% of Black voter support.

73.     An RPV analysis demonstrates that similar patterns also exist at the county-level in most parts of the state for these elections. That is, Black voter-supported candidates have been defeated because of insufficient white cross-over voting for those candidates in counties across the state from Anderson and Greenville, to York, to Berkeley, Georgetown, and Charleston.

74.     After this October 8 submission deadline, the House Committee provided no information about when it would release maps or deliberate further, until November 8, when the House Committee released a state House Staff Plan and announced that it would have a public hearing on that plan less than 48 hours later, on November 10, 2021, with the option for another hearing on November 12, 2021. In reality, the public had less time to prepare because on November 8 at 6:30 p.m., the House Committee released a revised state House working draft to address discrepancies in the previously released files.

75.     On November 10, the House Committee invited members of the public to provide testimony on its state House Staff Plan. To begin, Rep. Jordan asserted that the state House Staff Plan complied with the U.S. Constitution and other federal law, but he did not explain what analysis had been undertaken to reach that conclusion, including providing any indicia that the House Committee had conducted an RPV analysis. During the hearing, several members of the public inquired whether the House Committee conducted any RPV analysis, explaining that such an analysis is necessary for compliance with the U.S. Constitution and Section 2 of the VRA and to avoid racially gerrymandering. In explaining these concerns, some members of the public discussed how RPV patterns exist statewide. The House Committee did not address or answer these questions or provide any indicia that it had conducted an RPV analysis. Nor did the House Committee directly address repeated concerns raised by members of the public that the state

House Staff Plan unnecessarily cracked and packed Black communities and split communities of interest.

76.    Instead, Rep. Wm. Weston J. Newton attempted to cast doubt on these concerns by claiming that it was "noteworthy" that the previous set of redistricting plans were precleared by the DOJ under Section 5 of the VRA under a non-retrogression standard (i.e., whether the plan weakened the ability of Black voters to participate in the process when compared to the benchmark map). Representative Jason Elliott also claimed that the non-retrogression standard is the same one that applies for consideration of maps today. But multiple members of the public corrected this misstatement, explaining that DOJ preclearance determinations did not include an analysis of whether the maps comply with Section 2, for example. In contrast, as Plaintiff South Carolina NAACP and other organizations repeatedly conveyed in correspondence and testimony, Section 2 prohibits maps that dilute minority voting strength based on the U.S. Supreme Court's framework in *Thornburg v. Gingles*, 478 U.S. 30 (1986), regardless of whether the challenged map is retrogressive when compared to the benchmark map. As members of the public explained, this means a precleared plan could still run afoul of the U.S. Constitution and Section 2 of the VRA because they involve different standards than what was used for preclearance determinations.

77.    Representative Newton also attempted to downplay concerns about the dilution of Black voters' voting strength by claiming that the state House Staff Plan included more districts comprised of a majority of minority districts ("majority-minority districts") than Plaintiff South Carolina NAACP's proposed state House map. In addition to addressing this point during the hearing, Plaintiff South Carolina NAACP also wrote to the Judiciary Committee on November 15. In that letter, Plaintiff South Carolina NAACP and other groups explained to the House

24

Committee that, although the House Committee's proposed state House Staff Plan had one more

majority-Black district than its proposed House plan, the House map proposed by the South

Carolina NAACP and its coalition had more opportunity districts in which Black voters would be

between 40-50% of the voting-age population ("VAP") and, thus, have the ability to influence

elections.

78.    During the hearing, Rep. John Richard C. King also reiterated his concerns about

the House Committee's arbitrary designation to use a total population deviation of +/-2.5% (or

5% overall total deviation). He explained that this standard could be detrimental to racial

minorities and rural communities and asked the House Committee to reconsider using a 10%

total population deviation standard. But the House Committee did not amend its criteria; Rep.

Newton incorrectly asserted that state legislative plans cannot have a total population exceeding

5% of the total population.

79.    Members of the public also raised concerns about transparency and meaningful

opportunities for public review of maps. One member of the public, for example, explained that

the House Committee's decision to provide its House Staff Plan 48 hours before the hearing

provided inadequate time for members of the public to conduct meaningful analyses. In addition,

members of the public posed several questions to the House Committee, including as described

above, whether any RPV analysis was completed. Representative Beth Bernstein inquired

whether the House Committee would provide responses to these questions before adoption of

any map. Representative Jordan declined to commit that the House Committee would provide

answers to any specific questions.

80.    At the end of the hearing, Rep. Jordan also announced that, because all members

of the public testified during its hearing, the House Committee did not need to hold a second

25

hearing on November 12 to provide an additional opportunity for oral testimony from members of the public.

81.     On November 16, 2021, the House Committee met again to discuss its state House Staff Plan without *any* further public input or testimony. This hearing lasted less than ten minutes.

82.     After a brief overview of the redistricting process, during which the House Committee acknowledged having received oral and written testimony, and without any additional consideration of the state House Staff Plan, the House Committee approved an amendment to H. 4493 to incorporate its amended plan and voted to give the plan a favorable report. There was no public discussion during this hearing about how the plan had been changed following the November 10 hearing. As the House Committee Chair, Rep. Jordan also stated his expectation that the House Judiciary Committee would consider "necessary" additional amendments to the working draft plan. As a result, members of the public were *not* given an opportunity to provide additional input and review of the amendments to the plan.

83.     Less than two hours after the House Committee hearing ended, the House Judiciary Committee met to consider the amended state House Staff Plan, hear testimony from only House Judiciary Committee members, and consider any amendments to its plan. *No* testimony from the public was allowed at this hearing. After the Judiciary Committee voted to adopt the amended state House Staff Plan, it considered eight amendments, approving six amendments and tabling the other two.

84.     One of the tabled amendments proposed amending the House Committee's criteria to permit population deviations within a range of plus or minus 5% of the mathematical mean (or 10% overall of the total population). To support this amendment, Rep. King once

again, as mentioned above, explained how this permissible standard would assist in the preservation of majority-minority districts. At the end of the meeting, the Judiciary Committee voted to adopt the state House Staff Plan as amended within H. 4493.

85.    The House Judiciary Committee did not invite members of the public to provide oral or written comments on the state House Staff Plan following the adoptions of these amendments or before it was voted out of Committee and sent to the full House.

86.    The full House reconvened on December 1, 2021, and conducted a first reading of H. 4493 without *any* debate or discussion.

87.    The next day the House conducted a reading of H. 4493. To begin, Rep. Jordan provided testimony discussing the process leading to the creation of the House map and a brief overview of the map. Afterwards, the House considered several amendments and either adopted or tabled them. The House, for example, voted to table two amendments proposed by Rep. Wendy Brawley. The first amendment proposed substituting the plan submitted by Plaintiff South Carolina NAACP for the working plan. During debate, Rep. Brawley explained that she had no indication that the House Committee conducted any analysis of racial minority voting patterns (that is, RPV), even though members of the public had repeatedly requested that such analysis be performed.

88.    Rep. Jordan claimed that the Plaintiff South Carolina NAACP's proposed state House plan appears to have "systematic partisan gerrymandering" based on the number of paired incumbents and purported "excessive amounts of splits."[9]

---

[9] *Tuesday, December 2, 2021 10:00 am, House of Representatives - House of Representatives*, South Carolina Legislature, 1:00:20-1:01:00, https://www.scstatehouse.gov/video/archives.php (last accessed Dec. 22, 2021).

89.    The second amendment proposed substituting a House plan submitted by the League of Women Voters of South Carolina ("the League") for the working draft plan. In explaining Rep. Jordan's motion to table the amendment, he claimed the "big issue" with the League's map is population deviation because it used a 10% overall of the total population standard (i.e., the same standard used in the Senate Guidelines and accepted by federal courts) instead of the House Committee's 5% total population standard.

90.    During this debate, Rep. Brawley also characterized the House Committee's process for creating and developing maps as "shrouded in secrecy."[10] Rep. Lonnie Hosey echoed a similar concern, explaining during discussion on another amendment that he had not been consulted about changes to district boundaries of the areas that he represents.

91.    Following consideration of amendments, Rep. Leola C. Robinson made a motion to table consideration of H. 4493. In support of this motion, Rep. Robinson explained that the state House Staff Plan as amended would result in Black voters' candidates of choice, who were Black representatives, losing their seats, in part because several Black incumbents would be paired with each other and forced to compete against each other in primary elections. The House rejected this motion. It then proceeded to vote in favor of the working draft as amended.

92.    At no point during the hearing did any member indicate that either the House or the Judiciary or House Committees conducted an RPV analysis to inform development of its map.

93.    On December 6, 2021, the House reconvened and conducted a second reading of H. 4493. In opposition to H. 4493, Rep. Jerry Govan, a Black representative, reiterated concerns

---

[10] *Id*. at 1:06:17-1:06:50.

that Black incumbents were being paired in the same districts under the State House Plan,

thereby forcing them to compete against each other. As one example, he explained how Rep.

Jermaine L. Johnson, Sr. and Rep. Brawley are included in the same district under the State

House Plan. His opposition was also rooted in the House Committee's refusal to amend its

criteria to change its total population deviation standard, which would be detrimental to racial

minority voters. Following Rep. Govan's remarks, the House voted to approve H. 4493 and sent

it to the Senate for consideration.

94.    On December 9, 2021, the House voted to concur with the Senate amendments to

H. 4493, which included the addition of the state Senate Plan.

95.    The next day, Gov. McMaster signed H. 4493 into law.

**The House's Role in the Continued Delay on Passing a U.S. Congressional Map**

96.    The Legislature still has not passed a U.S. Congressional map. To date, the House

has held one hearing on December 16 on its proposed U.S. Congressional map that it released on

December 10. As mentioned above, Plaintiff South Carolina NAACP and other members of the

public began submitting proposed congressional plans to the Legislature beginning on October 8.

The House has scheduled another hearing on proposed congressional plans on December 29. The

Legislature, however, has not committed to a date by which it will enact a Congressional map,

despite vital election-season deadlines rapidly approaching.

97.    The next primary election in South Carolina is scheduled for June 14, 2022, and

the next general election is scheduled for November 8, 2022. Candidate filing for these state

House and U.S. Congressional primary elections has a deadline of noon on March 30, 2022.

98.     Over the last 50 years of redistricting cycles in South Carolina, federal courts have needed months—sometimes many months—to assess the validity and constitutionality of proposed plans.

99.     Absent convening another special session, it will not begin consideration of a U.S. Congressional map until January 11, 2022 at the earliest.

100.    Even if a congressional plan is signed by the Governor on this earliest possible date after the Legislature passes one, there will not be sufficient time to adjudicate the plans for constitutional and legal compliance in time for the 2022 elections.

101.    The current timeline deprives Plaintiffs and other South Carolinians of the ability to conduct meaningful review of the maps and, if necessary, seek judicial review in advance of the 2022 filing deadlines and elections. Potential candidates benefit from district lines being in place well before elections, enabling them to decide where, whether, and how to run their campaigns. Voters are severely burdened by not knowing the details of the district in which they reside in advance of elections because they cannot engage in candidate advocacy and recruitment, know which candidates are running to represent them, hold their representatives accountable, or associate and organize with others who share their favored candidates.

102.    Without districts in place, people will be unable to associate with like-minded citizens, educate themselves on the positions of candidates, or organize and advocate for their candidates of choice.

103.    In addition, the Legislature's unexplained and inexplicable choice to effectively leave U.S. Congressional redistricting until 2022, precludes sufficient time for public input, judicial review, or for the enactment of maps that comply with federal law sufficiently in advance of the elections.

30

104.    Unless this court creates a schedule itself, Plaintiffs will be deprived of their constitutional rights in the upcoming 2022 election cycle, beginning as early as March.

**The House Map Violates the Constitution**

105.    Defendants racially gerrymandered at least 28 districts, in contravention of the U.S. Constitution.

106.    South Carolina's population grew by 10.7% between 2010 and 2020. Although the Black population grew only slightly over the last decade, it shifted within the State, leading to significant population disparities between legislative districts that needed to be addressed to ensure equality of access to representatives to all people and voters in the state, as well as the non-dilution of the vote of protected citizens.

107.    The House purportedly endeavored to balance the populations (within its criteria of plus or minus 2.5% of the mathematical mean or 5% of the total population), comply with the VRA and not racially gerrymander in contravention of the U.S. Constitution, and adhere to state criteria based on its guidelines (e.g., keep districts contiguous and compact; and consider communities of interest and incumbency protection).

108.    Yet the House enacted a plan that overall dilutes South Carolinian Black voting power by (i) packing Black voters in certain districts at unnecessarily high concentrations without any indicia that they conducted an analysis that these populations were necessary to satisfy the VRA, while also (ii) cracking Black voters in certain districts by increasing the number of districts in which Black voters are kept at unnecessarily low populations, rendering their voice ineffective in elections.

109.    Indeed, the House drew very few districts in which Black voters comprise 30-50% of the BVAP, which would provide them with the opportunity to influence elections for the House.

110.    This is despite the fact that Plaintiff South Carolina NAACP and its coalition produced a map that, in balancing redistricting criteria and taking into account the State's 27% BVAP, developed more opportunity districts in which Black voters would be between 30-50% of the VAP and, thus, have the ability to elect their candidates of choice.

111.    In prioritizing race-based considerations, the House ignored its own redistricting criteria. It ignored incumbent considerations by pitting Black representatives in House District 70 against one another. Where doing so allowed it to pack or crack Black voters, it ignored its own criterion to keep districts compact and avoid slicing through communities of interest.

***Challenged Districts***

**State House Districts 7, 8, 9, and 11 (Anderson County)**

112.    Race was the predominant factor in drawing State House Districts 7, 8, 9, and 11 in Anderson County, and it was not employed in a narrowly tailored manner to comply with Section 2 of the VRA or any other compelling governmental interest.

113.    A significant cluster of precincts with high BVAPs in the center of Anderson County—which could have been combined to form one or more districts in which Black voters form an influential voting bloc—are instead cracked into these four districts, in which BVAP is driven down to around 20% or below. To effectuate this cracking, these district lines also split multiple precincts, including splitting one precinct between Districts 7 and 11, one precinct between Districts 8 and 11, and at least two precincts between Districts 7 and 9.

114.    The figure below reveals how these district lines knife through the center of the

City of Anderson, unnecessarily splitting the area into four districts like a shattered mirror.[11]



115.    Defendants were on notice that this cracking of Black voters, who form a

community of interest ("COI") because of shared history, including the above-mentioned voting

discrimination in South Carolina, and shared voting patterns in Anderson, was unnecessary.

116.    Cracking and submerging Black voters in these districts ensure that their voices

will be diluted given RPV patterns present in Anderson as in other parts of the state. According

to an RPV analysis of the 2020 election for U.S. Senate in Anderson County, Mr. Harrison

received only 19% of white voter support, despite receiving 92% of Black voter support.

---

[11] In this and other figures, district lines appear in yellow, counties in dotted red lines, and municipalities in dotted gray lines. Green shading indicates the concentration of the BVAP, with darker areas indicating a higher BVAP percentage. District numbers appear in black boxes, with the number below the district number showing BVAP for that district and the number below that showing the population deviation of the district.

Similarly, in the 2018 election for the Secretary of State, in Anderson County, the candidate of choice of Black voters only received 17% of white voter support, despite receiving 93% of Black voter support. Likewise in Anderson County, the candidate of choice of Black voters for State Treasurer only received 16% of white voter support, despite receiving 88% of Black voter support.

117.    Moreover, the map that Plaintiff South Carolina NAACP submitted on October 8, 2021 (below) keeps the Anderson community of interest largely whole, creating a single district which, based on an analysis of RPV patterns, provides that Black voters have a chance of electing or influencing the election of the candidate of their choice. By comparison, none of Districts 7, 8, 9, or 11 in Defendants' map has any realistic chance of doing so.[12]



---

[12] In this and other figures, district lines appear in yellow, counties in dotted red lines, and municipalities in dotted gray lines. Green shading indicates the concentration of the BVAP, with darker areas indicating a higher BVAP percentage. District numbers appear in black boxes, with the number below the district number showing BVAP for that district and the number below that showing the population deviation of the district.

118.    On November 30, 2021, Plaintiff South Carolina NAACP warned that failure "to make necessary changes [to these districts] [would] continue to crack Black voters in the communities . . . particularly in the City of Anderson in Anderson County[,] [thereby] render[ing] Black voters with little to no ability to influence elections in these areas of the State."[13]

119.    Indeed, shattering this community of interest violates the House's own redistricting criteria, in addition to the Equal Protection Clause of the Fourteenth Amendment and is probative of the intentional dilution of Black voting strength in Anderson.

120.    Forcing these districts into the heart of Anderson also makes them relatively non-compact. Districts 9 and 11, in particular, are over twice as non-compact using statistical measures of compactness as the corresponding districts that Plaintiffs submitted to the Legislature.

121.    Moreover, based on a statewide analysis of the probability of electing a Black-preferred candidate in South Carolina at different levels of BVAP, the reduction from an approximately 38% BVAP district (as in the above proposed plan) to an approximately 21% BVAP district, or even lower (as in Districts 7, 8, 9, and 11 in the adopted plan) can be very significant.

122.    Though estimates would vary somewhat by region, at approximately 38% BVAP, there may be almost a 50% chance of electing a Black-preferred candidate. When a district is forced down to approximately 21% BVAP—as in adopted District 11—this chance of electing a

_____

[13] NAACP LDF, S.C. NAACP, ACLU, and ACLU S.C., *Supplemental Comments on the House Judiciary Committee's Proposed State House Redistricting Plan,* 8, https://www.naacpldf.org/wp-content/uploads/Second-Set-of-Supplemental-Comments-on-House-Judiciary-Committees-Proposed-House-Plan-11-30-21.final_.pdf.

candidate of choice of Black voters falls precipitously: down to about 3%. At around 16% BVAP—as in adopted District 9—the chance of electing a Black-preferred candidate is even lower: approximately 1%.

123.    No compelling governmental interest, including compliance with Section 2 of the VRA, justifies the use of race to crack Anderson into these four districts. And Defendants should cure the intentional dilution of Black voting strength through cracking in this area of the state.

**State House Districts 41 and 43 (Chester County)**

124.    Race was the predominant factor in drawing State House Districts 41 and 43 in Chester County, and it was not employed in a narrowly tailored manner to advance compliance with Section 2 of the VRA or any other compelling governmental interest.

125.    District 41, a majority-Black district mostly made up of Fairfield County, reaches up past the Fairfield County line to create a bizarrely shaped, bunny-eared appendage that grabs the Black-majority City of Chester, as well as other areas comprised heavily of Black voters in Chester County. In the process, Defendants split eight precincts in Chester County across Districts 41 and 43.

126.    Defendants were on notice, via the map Plaintiffs submitted on October 8, that neighboring District 43 could have been drawn more compactly to include Chester County, the city of Chester, and potentially nearby Lancaster, to create a district in which Black voters would have greater influence.

127.    The figure below reveals how the irregular and non-compact district lines in

Chester County were drawn to carve out Black communities in a manner that allowed map-

drawers to minimize Black voters' influence in neighboring districts.[14]



128.    No compelling governmental interest, including compliance with Section 2 of the

VRA, justifies the use of race in drawing Districts 41 and 43.

**State House Districts 51 and 67 (Sumter County)**

129.    Race was the predominant factor in drawing State House Districts 51 and

67 in Sumter County, and it was not employed to comply with Section 2 of the VRA or in a

narrowly tailored manner to advance any other compelling governmental interest.

---

[14] In this and other figures, district lines appear in yellow, counties in dotted red lines, and municipalities in dotted gray lines. Green shading indicates the concentration of the BVAP, with darker areas indicating a higher BVAP percentage. District numbers appear in black boxes, with the number below the district number showing BVAP for that district and the number below that showing the population deviation of the district.

130.   The border between majority-Black District 51 and District 67 cuts through the city of Sumter on clear racial lines. As a result of this irregular border, District 67 is also one of the least compact districts in the entire state House using statistical measures of compactness, and its shape is particularly irregular. These erratic district lines leave District 51 with a BVAP of 61.2%, and District 67 with BVAP of only 28.1%.

131.   The figure below reveals how district lines in Sumter County carefully carve out Black populations around Sumter to pack Black voters into District 51.[15]



---

[15] In this and other figures, district lines appear in yellow, counties in dotted red lines, and municipalities in dotted gray lines. Green shading indicates the concentration of the BVAP, with darker areas indicating a higher BVAP percentage. District numbers appear in black boxes, with the number below the district number showing BVAP for that district and the number below that showing the population deviation of the district.

132.    Black voters in Sumter form a community of interest because of, among other things, voting patterns and the above-mentioned shared history.

133.    No compelling governmental interest, including compliance with Section 2 of the VRA, justifies the use of race to unnecessarily pack Black voters into District 51 and to intentionally dilute Black voting strength through the packing and cracking in these districts.

**State House Districts 54, 55, 57, and 105 (Dillon County and Horry County)**

134.    Race was the predominant factor in drawing State House Districts 54, 55, 57, and 105 in northeastern South Carolina, including Marlboro County, Dillon County, Horry County, and Marion County, and it was not employed to comply with Section 2 of the VRA or in a narrowly tailored manner to advance any other compelling governmental interest.

135.    District 55, largely based in Dillon County, reaches out and extends far past the Dillon County line and into areas with large white voters in Horry County. This brings the BVAP of District 55 down to 39.4%. Meanwhile, there are three majority-Black districts that surround District 55, and District 55 could have been drawn much more compactly by pulling, in part, from these nearby areas, rather than stretching all the way out to (select parts of) the city of Loris in Horry County. Indeed, District 55 is one of the least compact districts in the state House using statistical measures of compactness.

136.    The figure below reveals how these district lines around Marlboro County, Dillon County, Marion County, and Horry County are drawn to create a long and irregularly shaped District 55 that needlessly caps BVAP at 39.4%.[16]

---

[16] In this and other figures, district lines appear in yellow, counties in dotted red lines, and municipalities in dotted gray lines. Green shading indicates the concentration of the BVAP, with darker areas indicating a higher BVAP percentage. District numbers appear in black boxes, with



137.    The portion of the border between District 55 and District 105 around the city of

Loris cracks the Black population in this area by not only splitting the city of Loris, but also

splitting seven nearby precincts. This district line needlessly divides these communities of

interest in Horry based on voting patterns and the above-mentioned shared history and leaves

District 55 with 39.4% BVAP.

138.    Submerging Black voters among white voters in the redrawing of the lines in

these areas of the state is likely to diminish Black voters' voting power given the above-

the number below the district number showing BVAP for that district and the number below that
showing the population deviation of the district.

mentioned RPV voting patterns at the state and county level across South Carolina. For example, in the 2020 election for U.S. Senate in Horry County, Mr. Harrison received only 23% of white voter support, while receiving 87% of Black voter support. In the 2018 election for Secretary of State in Horry County, the candidate of choice of Black voters only received 27% of white voter support, despite receiving 81% of Black voter support. And in the 2018 election for State Treasurer in Horry County, the candidate of choice of Black voters only received 26% of white voter support, despite receiving 79% of Black voter support.

139.    The figure below reveals how, after unnecessarily extending District 55 deep down into heavily white Horry County, all the way to the city of Loris, the district lines in Horry County then proceed to crack the Black community around Loris and impair the ability of these voters to have a meaningful opportunity to impact elections in their assigned district.[17]

---

[17] Although other figures throughout the complaint generally show municipalities in dotted gray lines, this figure shows the city of Loris in dotted blue lines for visual clarity. The other elements of the figure remain the same: district lines appear in yellow, and counties in dotted red lines. Green shading indicates the concentration of the BVAP, with darker areas indicating a higher BVAP percentage. District numbers appear in black boxes, with the number below the district number showing BVAP for that district, and the number below that showing the population deviation of the district.



140.     No compelling governmental interest, including compliance with Section 2 of the VRA, justifies the use of race to produce these lines and intentionally pack and crack Black voters in these districts.

**State House Districts 59, 60, 63, and 101 (Florence County and Williamsburg County)**

141.     Race was the predominant factor in drawing State House Districts 59, 60, and 63 in Florence County, as well as District 101 in neighboring Williamsburg County, and it was not employed to comply with Section 2 of the VRA or in a narrowly tailored manner to advance any other compelling governmental interest.

142.     The city of Florence is split among three districts: District 59, 60, and 63. The border between these districts follows clear racial lines, and the border between Districts 59 and 60 splits one precinct, the border between Districts 60 and 63 splits at least three precincts, and the border between Districts 59 and 63 splits at least seven precincts. As a result, District 59 has

60.8% BVAP, while District 60 has 30.5% BVAP, and District 63 has 25.6% BVAP. Compared

to the rest of the adopted state House districts, Districts 59 and 60 are also both relatively non-

compact using statistical measures of compactness.

143.    The figure below reveals how district lines in Florence unnecessarily pack Black

voters into District 59.[18]



---

[18] In this and other figures, district lines appear in yellow, counties in dotted red lines, and
municipalities in dotted gray lines. Green shading indicates the concentration of the BVAP, with
darker areas indicating a higher BVAP percentage. District numbers appear in black boxes, with
the number below the district number showing BVAP for that district and the number below that
showing the population deviation of the district.

144.    Defendants also were on notice, via letters submitted by Plaintiff South Carolina NAACP and other organizations on October 8, November 15, and November 30, that Black incumbent legislators in District 59 had "been paired and will be forced to compete against one another," despite their own criteria that "[r]easonable efforts may be made to ensure that incumbent legislators are not placed into districts where they will be compelled to run against other incumbent members of the South Carolina House"[19] and the fact that Plaintiff South Carolina NAACP's proposed plan showed the legislature "a way to meet its constitutional and statutory obligations and respect other redistricting principles *without* pairing such incumbents."[20] Despite this notice, Defendants persisted in using race as a predominant factor in its redistricting process.

145.    No compelling governmental interest, including compliance with Section 2 of the VRA, justifies the use of race to pack Black voters into District 59 and to intentionally dilute Black voting strength through the packing and cracking in these districts.

146.    On the other side of District 60, majority-Black District 101 extends past the Williamsburg County line to grab areas of Lake City that have heavy BVAPs, splitting and excising these areas from the rest of Florence County. As a result, District 101 is packed with

---

[19] S.C. House of Representatives Judiciary Committee Redistricting Ad Hoc Committee, *2021 Guidelines and Criteria for Congressional and Legislative Redistricting* (Aug. 3, 2021), *available at* https://redistricting.schouse.gov/docs/2021%20Redistricting%20Guidelines.pdf.

[20] NAACP LDF, S.C. NAACP, ACLU, and ACLU S.C., *Supplemental Comments on the House Judiciary Committee's Proposed State House Redistricting Plan,* 8, https://www.naacpldf.org/wp-content/uploads/Second-Set-of-Supplemental-Comments-on-House-Judiciary-Committees-Proposed-House-Plan-11-30-21.final_.pdf.

59.0% BVAP, while District 60 is left with only 30.5% BVAP. The figure below reveals how these district lines pack Black voters into District 101.[21]



---

[21] In this and other figures, district lines appear in yellow, counties in dotted red lines, and municipalities in dotted gray lines. Green shading indicates the concentration of the BVAP, with darker areas indicating a higher BVAP percentage. District numbers appear in black boxes, with the number below the district number showing BVAP for that district and the number below that showing the population deviation of the district.

147.    No compelling governmental interest, including compliance with Section 2 of the VRA, justifies the use of race to unnecessarily pack Black voters into District 101 and to intentionally dilute Black voting strength in the manner described above.

**State House Districts 70, 72, 73, 74, 75, 76, 77, 78, and 79 (Richland County)**

148.    Race was the predominant factor in drawing State House Districts 70, 72, 73, 74, 75, 76, 78, and 79 in Richland County, and it was not employed to comply with Section 2 of the VRA or in a narrowly tailored manner to advance any other compelling governmental interest.

149.    The figure below reveals how district lines throughout Richland County pack Black voters into Districts 70, 73, 74, 76, 77, and 79, with BVAP ranging from 55.7% to 66.6%. By packing these districts, the map also reduces the influence of Black voters in neighboring Districts 72, 75, and 78.



150.    District 70 includes the area of Richland County southeast of Columbia (formerly District 80). By combining previous Districts 70 and 80 into a single new District 70, Richland County will lose a state House seat, with the new district now pitting current Black incumbents Wendy Brawley and Jermaine Johnson against one another. By eliminating former District 80 and moving it to become a new district in Charleston, this also left District 70 packed, with BVAP of 66.3%.

151.    The border between majority-Black District 70 and Districts 72, 75, and 78 clearly follows racial lines. As a result, District 72 only has 26.7% BVAP, District 75 has 17.9% BVAP, and District 78 has 33.0% BVAP. The figure below reveals how these district lines pack Black voters into District 70.



152.    The western side of District 78 includes an appendage that reaches out to grab the areas of Arcadia Lakes that are comprised of heavy populations of white voters, while leaving

out all the areas that are comprised of significant populations of Black voters in neighboring

District 76. This leaves District 76—which is one of the least compact districts in the state House

using statistical measures of compactness—with a BVAP of 66.6%, while bringing District 78's

BVAP down to 33.0%. The figure below reveals how these district lines pack Black voters into

District 76 and reduce Black voters' influence in District 78.[22]



153.     District 72, another of the very least compact districts in the state House using

statistical measures of compactness, is drawn with an irregular shape and a BVAP of only

26.7%, when it could easily be drawn to give Black voters greater influence in elections in this

district. Meanwhile, neighboring majority-Black district 74 is packed with 55.65% BVAP. The

---

[22] In this and other figures, district lines appear in yellow, counties in dotted red lines, and
municipalities in dotted gray lines. Green shading indicates the concentration of the BVAP, with
darker areas indicating a higher BVAP percentage. District numbers appear in black boxes, with
the number below the district number showing BVAP for that district and the number below that
showing the population deviation of the district.

border between Districts 72 and 74 splits three precincts. The figure below reveals how district

lines in Richland County pack Black voters into District 74.[23]



154.    No compelling governmental interest, including compliance with Section 2 of the

VRA, justifies the use of race to unnecessarily pack Black voters into Districts 70, 73, 74, 76, 77,

and 79 and reduce the influence of Black voters in Districts 72, 75, and 78 and to intentionally

dilute Black voting strength through the packing and cracking in these districts.

---

[23] In this and other figures, district lines appear in yellow, counties in dotted red lines, and
municipalities in dotted gray lines. Green shading indicates the concentration of the BVAP, with
darker areas indicating a higher BVAP percentage. District numbers appear in black boxes, with
the number below the district number showing BVAP for that district and the number below that
showing the population deviation of the district.

**State House Districts 90, 91, 93, and 95 (Orangeburg County)**

155.    Race was the predominant factor in drawing State House Districts 90, 91, 93, and 95 in Orangeburg County, and it was not employed to comply with Section 2 of the VRA or in a narrowly tailored manner to advance any other compelling governmental interest.

156.    District 90 crosses county lines to pull in voters from the City of Orangeburg, which has a Black population of 76%, and pack the district at 56% BVAP. By contrast, for example, Plaintiffs' October 8 map demonstrates that District 90 can be drawn in such a way as to respect county lines and avoid extending upward into Orangeburg.

157.    Defendants increased District 93's BVAP an unusually high amount, from 43% to 51%, unnecessarily moving a large number of BVAP precincts into the area. By contrast, for example, Plaintiff South Carolina NAACP's October 8 map demonstrates that this district could easily be drawn in such a way as to avoid packing Black voters.



158.    By slicing through Orangeburg County, including the City of Orangeburg, along racial lines, the House contravenes its own criterion to avoid "[b]izarrely-shaped districts,"

identifying and sorting voters with the purpose of harming voters of color. Members of the public put the House Committee on notice of how these splits would negatively harm Black communities and split communities of interest.

159.     No compelling governmental interest, including compliance with Section 2 of the VRA, justifies the use of race to carve up Orangeburg and ignore vital community interests at stake.[24]

## CAUSES OF ACTION

### COUNT ONE

### (Racial Gerrymandering in Violation of the Fourteenth Amendment)

160.     Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

161.     The Fourteenth Amendment of the U.S. Constitution provides in relevant part: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 2.

162.     Under the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution, racial classifications are prohibited unless narrowly tailored to serve a compelling state interest.

---

[24] During the December 2 House debate, Rep. Govan (also a South Carolina NAACP member) conveyed that Orangeburg County Council and leadership in the City of Orangeburg are concerned about cracking communities of interest and combined communities in Bamberg, Barnwell, and Allendale "that have nothing in common with Orangeburg." House of Representatives Cong. Deb., *Transcription of Audio Files 20211202HHouseofRepresentatives11587_1,* 33:16-17 (Dec. 2, 2021).

163.    Race was the predominant factor in the creation of Districts 7, 8, 9, 11, 41, 43, 51, 54, 55, 57, 59, 60, 63, 67, 70, 72, 73, 74, 75, 76, 77, 78, 79, 90, 91, 93, 101, 105 in H. 4493.

164.    Race predominated over traditional redistricting principles such as maintaining communities of interest, respecting county and municipal boundaries, having compact districts, and protecting incumbents.

165.    The use of race as the predominant factor with respect to of Districts 7, 8, 9, 11, 41, 43, 51, 54, 55, 57, 59, 60, 63, 67, 70, 72, 73, 74, 75, 76, 77, 78, 79, 90, 91, 93, 101, 105 in H. 4493 is not narrowly tailored to serve a compelling state interest, including compliance with the VRA.

166.    Thus, H. 4493 violates Plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

167.    Plaintiffs have no adequate remedy at law other than the judicial relief sought here. The failure to temporarily and permanently enjoin enforcement of H. 4493 will irreparably harm Plaintiffs' constitutional rights.

## COUNT TWO

### (Intentional Discrimination in Violation of the Fourteenth and Fifteenth Amendments of the U.S. Constitution)

168.    The relevant allegations contained in the preceding paragraphs are alleged as if fully set forth herein.

169.    The Equal Protection Clause of the Fourteenth Amendment and the Fifteenth Amendments of the U.S. Constitution forbids states from enacting laws for which a racially discriminatory intent or purpose is a motivating factor.

170.    The facts alleged herein reveal that the Challenged Districts in H. 4493 were adopted, at least in part, with a racially discriminatory intent to discriminate against Black voters in violation of the U.S. Constitution.

171.    H. 4493 will have a discriminatory impact on Black South Carolinians—a fact that was foreseeable when Defendants drafted and passed the Challenged Districts adopted in H. 4493. Elected officials in South Carolina have limited the influence of Black voters through the purposeful cracking and packing of Black voters.

172.    Moreover, other circumstantial evidence raises a strong inference of a discriminatory purpose motivating the enactment of H. 4493, such as: South Carolina's well-documented history and ongoing record of discrimination against Black South Carolinians in redistricting, particularly state legislative redistricting, and other voting practices; and the sequences of events and flawed and non-transparent process which resulted in the enactment of H. 4493, including the disregard for constitutionally-compliant alternative maps offered by the public and amendments offered by legislative members.

173.    Plaintiffs have no adequate remedy at law other than the judicial relief sought in this case. The failure to enjoin the conduct of elections under H. 4493 and ordering of remedial maps will irreparably harm Plaintiffs by subjecting them to intentionally racially discriminatory districts for the next decade.

## COUNT THREE

### (Violation of the First and Fourteenth Amendments of the U.S. Constitution)

174.    The First Amendment of the U.S. Constitution protects the freedom of association and applies to the states via the Fourteenth Amendment. U.S. Const. amends. I, XIV; *Preston v. Leake*, 660 F.3d 726, 729 (4th Cir. 2011).

175.    Unduly prolonged uncertainty about the district boundaries impedes candidates' ability to effectively run for office. This infringes upon Plaintiff Scott's First Amendment right to association because it restricts an individual's ability to assess candidate positions and

qualifications, advocate for their preferred candidates, and associate with like-minded voters.

176.    Plaintiff South Carolina NAACP's members—voters and organizers in South Carolina—and the constituents the organization serves are also directly harmed in the same ways that voters like individual Plaintiff Scott are, as listed in the paragraph above.

177.    The Legislature's inaction also creates the imminent risk of confusion prior to the current candidate declaration deadline in March 2022 and possibly the June 2022 primaries.

178.    Plaintiffs are suffering these harms on a current and ongoing basis.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiffs respectfully requests that this Court:

i.    Declare the challenged state House districts adopted in H. 4493 to be unconstitutional as violating the Fourteenth and Fifteenth Amendments of the U.S. Constitution as racial gerrymandered districts and as passed with discriminatory intent as a motivating factor;

ii.    Declare the current configuration of South Carolina's U.S. Congressional districts in violation of the First and Fourteenth Amendments of the U.S. Constitution;

iii.    Temporarily and permanently enjoin Defendants from calling, holding, supervising or certifying any elections under H. 4493 until a constitutionally compliant remedial plan is adopted for the 2022 elections;

iv.    Temporarily and permanently enjoin Defendants from calling, holding, supervisions, or certifying any elections under the current configuration of South Carolina's U.S. Congressional districts until a constitutionally compliant remedial plan is adopted for the 2022 elections;

v.    Set a deadline of February 15, 2022 or earlier for Defendants to enact and adopt a redistricting plan for state House and U.S. Congressional districts that do not violate Plaintiffs' constitutional or statutory rights;

vi.    Order new redistricting plans in the event that Defendants fail to adopt plans at all, or fail to adopt a plan that conforms with this Court's judgment;

vii.    Retain jurisdiction over this matter until Defendants enact compliant plans by this Court's deadline;

viii.    Retain jurisdiction over this matter for such a period it deems appropriate and require Defendants to submit future congressional and state legislative redistricting plans for preclearance review from this court or the U.S. Attorney General under Section 3(c) of the VRA, 52 U.S.C. § 10302(c);

ix.    Award Plaintiffs' attorneys' fees and costs in this action; and

x.    Grant such other and further relief as this Court deems just and proper in the circumstances.

Dated: December 23, 2021

Leah C. Aden\*\*
Stuart Naifeh\*\*
Raymond Audain\*\*
John S. Cusick\*\*
NAACP Legal Defense & Educational Fund,
Inc.
40 Rector St, 5th Fl.
NY, NY 10006
Tel.: (212) 965-7715
laden@naacpldf.org

Antonio L. Ingram II\*
NAACP Legal Defense & Educational Fund,
Inc.
700 14th St, Ste. 600
Washington, D.C. 20005
Tel.: (202) 682-1300
aingram@naacpldf.org

Samantha Osaki\*\*
Adriel I. Cepeda-Derieux \*\*
Sophia Lin Lakin \*
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: (212) 549-2500
sosaki@aclu.org

John A. Freedman\*
Elisabeth S. Theodore\*
Gina M. Colarusso\*
John "Jay" B. Swanson\*
ARNOLD & PORTER KAYE SCHOLER
LLP
601 Massachusetts Ave., N.W.
Washington, D.C. 20001
Tel: (202) 942-5000

Jeffrey A. Fuisz\*
Paula Ramer\*
Jonathan I. Levine\*
Theresa M. House\*
ARNOLD & PORTER KAYE SCHOLER
LLP

Respectfully submitted,

*/s/ Christopher J. Bryant*
Christopher J. Bryant, Fed. ID 12538
Boroughs Bryant, LLC
1122 Lady St., Ste. 208
Columbia, SC 29201
Tel.: (843) 779-5444
chris@boroughsbryant.com

Somil B. Trivedi\*\*
Patricia Yan\*\*
American Civil Liberties Union Foundation
915 15th St., NW
Washington, DC 20005
Tel.: (202) 457-0800
strivedi@aclu.org
pyan@aclu.org

Allen Chaney, Fed. ID 13181
American Civil Liberties Union
of South Carolina
Charleston, SC 29413-0998
Tel.: (843) 282-7953
Fax: (843) 720-1428
achaney@aclusc.org

Janette M. Louard\*
Anthony P. Ashton\*
Anna Kathryn Barnes\*
NAACP OFFICE OF THE GENERAL COUNSEL
4805 Mount Hope Drive
Baltimore, MD 21215
Tel: (410) 580-5777
jlouard@naacpnet.org
aashton@naacpnet.org
abarnes@naacpnet.org

*Attorneys for Plaintiffs*

\* Motion for admission *Pro Hac Vice* forthcoming
\*\* Admitted *Pro Hac Vice*

56

250 West 55th Street
New York, NY 10019
Tel: (212) 836-8000

Sarah Gryll**
ARNOLD & PORTER KAYE SCHOLER
LLP
70 West Madison Street, Suite 4200
Chicago, IL 60602-4231
Tel: (312) 583-2300