**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

| | |
|---|---|
| THE SOUTH CAROLINA STATE CONFERENCE OF THE NAACP, <br><br> and <br><br> TAIWAN SCOTT, on behalf of himself and all other similarly situated persons, <br><br>       Plaintiffs, <br><br>     v. <br><br> HENRY D. MCMASTER, in his official capacity as Governor of South Carolina; THOMAS C. ALEXANDER, in his official capacity as President of the Senate; LUKE A. RANKIN, in his official capacity as Chairman of the Senate Judiciary Committee; JAMES H. LUCAS, in his official capacity as Speaker of the House of Representatives; CHRIS MURPHY, in his official capacity as Chairman of the House of Representatives Judiciary Committee; WALLACE H. JORDAN, in his official capacity as Chairman of the House of Representatives Elections Law Subcommittee; HOWARD KNAPP, in his official capacity as interim Executive Director of the South Carolina State Election Commission; JOHN WELLS, Chair, JOANNE DAY, CLIFFORD J. EDLER, LINDA MCCALL, and SCOTT MOSELEY, in their official capacities as members of the South Carolina Election Commission, <br><br>       Defendants. | Civil Action No. 3:21-cv-03302-JMC-TJH-RMG <br><br><br> **MOTION FOR RECONSIDERATION AND RENEWED MOTION TO DISQUALIFY THE HONORABLE RICHARD M. GERGEL** |

Defendants James H. Lucas (in his official capacity as Speaker of the South Carolina House

of Representatives) ("**Defendant Lucas**"), Chris Murphy (in his official capacity as Chairman of

the South Carolina House of Representatives Judiciary Committee), and Wallace H. Jordan (in his

official capacity as Chairman of the South Carolina House of Representatives Redistricting Ad Hoc Committee) (collectively, the "**House Defendants**"), by and through undersigned counsel and pursuant to 28 U.S.C. § 455 and Federal Rules of Civil Procedure 59(e) and 60(b), hereby respectfully submit this Motion for Reconsideration and Renewed Motion to Disqualify the Honorable Richard M. Gergel ("**Motion**"), United States District Judge for the District of South Carolina ("**Judge Gergel**"), from further service on this Panel.

## INTRODUCTION

The House Defendants filed their initial Motion to Disqualify Judge Gergel ("**Motion to Disqualify**") on January 6, 2022.  (ECF No. 90). Two business days later, and without the benefit of briefing by all parties,[1] Judge Gergel issued an Order denying the Motion to Disqualify ("**Order**"). (ECF No. 96). The House Defendants respectfully renew their motion and also seek reconsideration of the Order because the Court "failed to fully consider"[2] at least three important factors when it denied the Motion to Disqualify—at least two before it, and another that arose after the filing of the Motion to Disqualify.

*First*, Judge Gergel's Order failed to fully consider the significance of the fact that Plaintiffs have prominently raised the issues of South Carolina's history of redistricting and history of racial discrimination—histories in which Judge Gergel has been personally involved both before

---

[1] The House Defendants acknowledge that Plaintiffs' counsel indicated to undersigned counsel prior to the filing and review of the Motion to Disqualify that they intended to oppose the same. However, Plaintiffs could have decided, after further consideration, that this alone was not sufficient and they would rather not risk abrogation of this issue in any forthcoming litigation on appeal.  (*See* ECF No. 90 at 8 (citing *Sanders* Disqualification Order); *see also* ECF No. 90-4 (*Sanders* Disqualification Order)). In any event, Judge Gergel issued his Order without giving any of the other parties an opportunity to brief the issue.

[2] *See Washington v. Trident Med. Ctr., LLC*, No. 2:20-CV-00953-RMG-MGB, 2021 WL 398894, at *3 (D.S.C. Jan. 11, 2021), *report and recommendation adopted,* No. 2:20-CV-953-RMG, 2021 WL 287754 (D.S.C. Jan. 28, 2021).

and after his appointment to the bench. It should be noted that after the Motion to Disqualify was filed on January 6, 2022, Plaintiffs submitted several documents to the House Defendants that made clear their intentions to make the history of redistricting in prior cycles an issue in this case. Plaintiffs served their discovery requests on all Defendants on January 7, 2022, one day after Plaintiffs sent their draft Joint Rule 26(f) Report to the House Defendants.[3] *See Ex. A* (Plaintiffs' First Request for Production of Documents to Defendants), *Ex. B* (Plaintiffs' First Set of Interrogatories to Defendants), and *Ex. C* (January 6, 2022 Draft Joint Rule 26(f) Report). As detailed herein, many of the Plaintiffs' discovery requests seek documents, materials, and information from prior redistricting cycles, including those in which Judge Gergel played a critical role as counsel advocating on behalf of various litigants who were opposing the redistricting plan then before the Court.

*Second*, Judge Gergel's Order specifically failed to address – which, respectfully, indicates that he failed to fully consider – the significance of the fact that he, prior to becoming a district judge, to borrow Judge Gergel's language from his January 10, 2022 Order, "vigorously deposed" Defendant Lucas in the prior redistricting matter of *Colleton Cty. Council v. McConnell*, 201 F. Supp. 2d 618, 622 (D.S.C. 2002). (*See* ECF No. 96 at 3 (noting that Judge Gergel was persuaded that his recusal was proper in *Backus* because he had "vigorously deposed and cross-examined" the House's two key witnesses[4] in prior litigation)). Defendant Lucas is currently the Speaker of

---

[3] Plaintiffs sent their draft Joint Rule 26(f) Report to the House Defendants at 9:20:26 PM EST, which was subsequent to the House Defendants' filing of the Motion to Disqualify.

[4] One of the "key witnesses" mentioned in the Order was Bobby Harrell. It bears mentioning that there was no mention of Mr. Harrell being a potential witness in the Motion to Recuse filed in the *Backus* case, *see Ex. D* (*Backus* Motion to Recuse) nor did Judge Gergel mention his deposing of Mr. Harrell as a basis for disqualification in the *Backus* Disqualification Order, (*see* ECF No. 90-2, attached as *Ex. E*). Finally, while the House Defendants raised the issue of Judge Gergel's prior deposition of Defendant Lucas in their original Motion to Disqualify, the House Defendants did

the House, an indispensable party in this case, and, as evidenced by the parties' Rule 26(a)(1) Initial Disclosures, is anticipated to testify at trial as a key witness for the House Defendants.[5]

**Third**, Judge Gergel failed to fully consider the fact that a number of witnesses in this litigation will be identical to those in prior redistricting litigation in which he was involved as a lawyer.

Each of these facts (as well as other facts outlined in the House Defendants' initial Motion to Disqualify) independently mandate Judge Gergel's disqualification.

## <u>ARGUMENT</u>

**I.     Judge Gergel Failed to Fully Consider the Fact that He Has Been Personally Involved in the Prior Litigation That Plaintiffs Place Directly at Issue in This Litigation**

In the Order, Judge Gergel stated that "the present reapportionment challenge is plainly not the same matter as was litigated two decades or more ago." (ECF No. 96 at 4-5). The House Defendants respectfully submit that this view misses the point. As an initial matter, the House Defendants reiterate that several of the allegations in Plaintiffs' Amended Complaint are strikingly similar to the allegations contained in the *Colleton County* Complaint. And, most notably, many of these allegations were asserted by Governor James H. Hodges, whom Judge Gergel represented

---

not raise any issues related to Judge Gergel's "vigorous" examination(s) (per Judge Gergel's January 10, 2022 Order) of former Speaker Harrell in the *Colleton County* litigation. In addition, when he was deposed by Judge Gergel in *Colleton County*, Mr. Harrell was the Chairman of the House Ways and Means Committee—not the Speaker of the House. *See id.* If Judge Gergel's deposition of Mr. Harrell mandated Judge Gergel's disqualification in *Backus*, his deposing the **current** Speaker of the House (Defendant Lucas) in that same litigation mandates his disqualification now.

[5] Plaintiffs' Rule 26(a)(1) Initial Disclosures – which were also received one day **after** the filing of the Motion to Disqualify – specifically list Defendant Lucas as an individual likely to have discoverable information that Plaintiffs may use to support their claims in this action. *See **Ex. F*** at 3. Similarly, the House Defendants' Rule 26(a)(1) Initial Disclosures likewise list Defendant Lucas as an individual likely to have discoverable information that they may use to support their defenses. *See **Ex. G*** at 2.

in *Colleton County*. (*See generally* ECF No. 90 at 19-22).[6] The House Defendants incorporate by reference the entire chart included in their initial Motion to Disqualify, which summarizes the striking similarities between these allegations, but specifically reiterate the most noteworthy similarities between the allegations in the *Colleton County* complaint and those here: (1) both complaints allege "malapportionment" of South Carolina's existing state House districts and "racial gerrymandering" (ECF No. 90 at 20); (2) both allege that the plaintiffs' right to vote was diluted as a result of "packing" or "cracking"/"fragmenting" Black voters (*id.* at 21); (3) both contain allegations regarding the subordination of traditional redistricting principles in the challenged districts at issue (*id.*); (4) both contain allegations of an unreasonably or unusually high BVAP in certain districts (*id.* at 22); and (5) both allege that Black voters demonstrate an overwhelming preference for Black Democratic candidates (*id.*).

Furthermore, in their initial draft Joint Rule 26(f) Report, Plaintiffs list the following "Subjects of Discovery":

> Plaintiffs anticipate that discovery is necessary on at least the following subjects: data considered and used in the redistricting process; the consideration and development of criteria used for drawing House maps; the process of drawing House maps, including any communications or directions provided to the mapmakers, draft maps developed or considered, data analyzed, and communications (including with external parties) about the redistricting process, draft maps, criteria, or South Carolina's history of redistricting since passage of the Voting Rights Act; the process of receiving and incorporating public input during the redistricting process; South Carolina's history of discrimination against Black

---

[6] As the Amended Complaint makes clear, Plaintiffs seek more opportunity districts. (*See* ECF No. 84 at ¶ 77). They challenge districts that are over 55% BVAP or below 25% BVAP, without regard to other factors, such as community of interest or population shifts. They seek more Democratic seats, using race as a proxy for politics. While the Voting Rights Act and *Gingles* deal with majority-minority districts (>50% BVAP), Plaintiffs look to >40% BVAP districts, *see id.*, without citing any support for that threshold. A strikingly similar theory was advanced in *Colleton County*, primarily by Judge Gergel.

people and other minority groups,[7] including but not limited to the redistricting context; any analysis prepared or considered during development of the plan or the redistricting process, including but not limited to any analysis of racially polarized voting, performance, compactness, jurisdiction or precinct splits, location of incumbents. In addition to these subjects, Plaintiffs require discovery on the subjects listed in their First Sets of Requests for Production, First Set of Interrogatories, and subpoenas, as well as future discovery requests. Plaintiffs also anticipate depositions to further develop the factual record for trial. Some of the information sought via discovery may also be addressed via stipulations between the Parties.

*Ex. C* at 4-5; *see also* ECF No. 84 at ¶ 3 (alleging South Carolina's "shameful history and ongoing record of discrimination"); *id.* at ¶¶ 37-44 (section titled, "History of State Legislative Redistricting in South Carolina"); *id.* at ¶¶ 115, 132, 137 (mentioning a "shared history" of Black voters); *id.* at ¶ 172 (alleging "South Carolina's well-documented history and ongoing record of

---

[7] In addition to the fact that Judge Gergel has been directly and prominently involved in the history of redistricting in South Carolina as counsel for various litigants, he has also been a chronicler of South Carolina's history of racial discrimination since taking the bench. Subsequent to his appointment to the district court, Judge Gergel authored a book that focused on incidents related to South Carolina's history of discrimination. In addition, publicly available data in his financial disclosures indicate that the sales of that book might be considered significant to a reasonable outside observer, as Judge Gergel clearly profited from the sales. *See* Richard Gergel, *Unexampled Courage: The Blinding of Sgt. Isaac Woodard and the Awakening of President Harry S. Truman and Judge J. Waties Waring* (2019); *see also* Financial Disclosures for J. Richard Mark Gergel, available at https://www.courtlistener.com/person/1175/disclosure/18710/richard-mark-gergel/ (disclosing $50,000.00 (2017), $25,000.00 (2018), and $25,000.00 (2019) in non-investment income from "Farrar, Straus and Giroux, book royalties"); *see also id.* (financial disclosures for 2020 and 2021 not yet disclosed). In addition, Judge Gergel has lectured at numerous events about this book. *See, e.g., id.* (2019 disclosures indicating that Judge Gergel was reimbursed by Farrar, Straus and Giroux (publisher) for speeches in New York City, Washington, D.C., Boston, and Charlottesville); *see also, e.g.,* https://judicialstudies.duke.edu/2019/11/judge-richard-gergel-discusses-new-book-unexampled-courage/; https://bluebicyclebooks.com/2019/04/25/author-luncheon-with-judge-richard-gergel-unexampled-courage-fri-may-17-12-pm/; https://visitingmontgomery.com/convention-district/detail/clifford-virginia-durr-lecture-series/events. The House Defendants respectfully submit that a reasonable observer could – and likely would – question whether Judge Gergel could remain impartial and unbiased in a matter that places under a microscope an issue from which he has written and lectured extensively—and from which he has personally profited.

6

discrimination against Black South Carolinians in redistricting, particularly state legislative redistricting, and other voting practices").

Plaintiffs' discovery requests are consistent with the "Subjects of Discovery" included by Plaintiffs in their initial draft of the Joint Rule 26(f) Report. On January 7, 2022 – the day *after* the filing of the Motion to Disqualify – Plaintiffs served their first sets of discovery requests on all Defendants. Notably, several of these discovery requests place the "history of redistricting" and "history of discrimination" squarely at issue. *See generally Ex. A* and *Ex. B*. Indeed, Plaintiffs' very first Request for Production asks for:

> All documents, communications, maps, memoranda, expert reports or analyses, Racially Polarized voting analyses, or other documents and communications related to South Carolina's submission of state legislative maps in the *1990, 2000*, and 2010[8] redistricting cycles for Preclearance review pursuant to Section 5 of the Voting Rights Act. This Request includes, but is not limited to, any correspondence with the U.S. Department of Justice for the *1990, 2000*, and 2010 redistricting cycles.

*Ex. A* at 10, Request No. 1 (emphasis added). This Request specifically includes documents, communications, and other materials from the 1990 and 2000 redistricting cycles, in which Judge Gergel was prominently involved as counsel advocating for certain litigants who were inextricably tethered to one side of the litigation.[9] Moreover, Plaintiffs' third Interrogatory specifically requests that the House Defendants "[i]dentify each of the Black candidates elected to serve in the South Carolina State House since January 1, 1980 to the present, including their names, positions, date

---

[8] After being appointed to serve on the panel in *Backus*, Judge Gergel disqualified himself after a motion was filed seeking his disqualification.

[9] In *Smith v. Beasley*, 946 F. Supp. 1174 (D.S.C. 1996) (1990 redistricting cycle), Judge Gergel represented a group of plaintiffs "who challenged the South Carolina House legislative reapportionment plan." (ECF No. 96 at 3). In *Colleton County* (2000 redistricting cycle), Judge Gergel represented Governor Hodges "after the State failed to adopt a reapportionment plan." *Id.* In both of these cases, the interests of Judge Gergel's clients were adverse to those of the House Defendants.

of election, and the demographics of the district from which they were elected." ***Ex. B*** at 9, Interrogatory No. 3.[10] Of course, the demographics of a number of those districts were at issue in both *Smith* and *Colleton County*, which again, were cases involving Judge Gergel as a vigorous advocate for causes advanced by the Plaintiffs in this litigation. (*See* ECF No. 90 at 24 (House Defendants' initial Motion to Disqualify noting that in addition to BVAP percentages, other statistical evidence in this case will be similar to that considered in *Colleton County*, such as population growth and shifts, population deviation between districts, Black voter preference percentages, and crossover percentages); *see also id.* (initial Motion to Disqualify noting that the House Districts at issue in this litigation are similar to those at issue in *Colleton County*, as at least three of the seven sets of Challenged Districts (i.e., Sumter, Horry/Dillon, and Richland Counties), which comprise at least 15 of the 28 currently-Challenged Districts, cover the same counties that were in dispute in *Colleton County*).

     As Plaintiffs' discovery requests clearly indicate, Plaintiffs desire for South Carolina's "history of redistricting" and "history of discrimination" to be front and center throughout this litigation. It is indisputable that Judge Gergel has been prominently involved in these histories,

---

[10] While the House Defendants have only expounded upon two of Plaintiffs' most noteworthy discovery requests, several of Plaintiffs' other requests could very well place the facts and circumstances related to the 1990 and 2000 redistricting cycles at issue. *See, e.g., **Ex. A*** at 11-15, (Request Nos. 2, 4, 5, 6, 11, 16, and 21); *see also **Ex. B*** at 10-11, Interrogatory Nos. 8, 9, 10, 14, and 15; ***Ex. A*** at 5 (defining "Predecessor Maps" as "***any previous*** South Carolina House of Representatives redistricting map in whole or in part that were considered, created, developed, and/or proposed by Defendants," which would necessarily include maps related to the 1990, 2000 and 2010 redistricting cycles) (emphasis added); ***Ex. B***. at 6, Instruction No. 1 ("Each Interrogatory shall be construed according to its ***most inclusive*** meaning so that if information or a document is responsive to any reasonable interpretation of the Interrogatory, the information or document is responsive." (emphasis added). Although the House Defendants intend to object to the scope of several of these requests, they are included herein for the purpose of showing what information Plaintiffs have placed directly at issue.

both as an advocate in prior redistricting litigation and as an author and lecturer. And, the Court in this case may well be called upon to make decisions about not only the discoverability, but also the admissibility of evidence related to Plaintiffs' discovery requests.  As such, there is notable discord between the circumstances of this case and Judge Gergel's statement that "the present reapportionment challenge is plainly not the same matter as was litigated two decades or more ago." (ECF No. 96 at 4-5). Notwithstanding the passage of time, a reasonable observer could certainly view this dissonance as creating the ***appearance*** of partiality, thus mandating disqualification. *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 860 (1988).

## II.    Judge Gergel Failed to Fully Consider the Fact that He Vigorously Deposed and Cross-Examined Defendant Lucas in Prior Redistricting Litigation

According to Judge Gergel's Order issued on January 10, 2022, he was disqualified in *Backus* because he had "vigorously deposed and cross examined" the House's "two key witnesses" in prior redistricting litigation. (*See* ECF No. 96 at 3). Yet, Judge Gergel has failed to apply the same reasoning here, despite the fact that he "vigorously deposed" Defendant Lucas in *Colleton County*.  As noted above, one of the "key witnesses" mentioned by Judge Gergel in his Order was Bobby Harrell. When Mr. Harrell was deposed by Judge Gergel in *Colleton County*, Mr. Harrell was the Chairman of the House Ways and Means Committee—not the Speaker of the House. Mr. Harrell was, however, the Speaker of the House at the time of the *Backus* litigation. Thus, if Judge Gergel's "vigorous" deposition and cross-examination of Mr. Harrell in *Colleton County* mandated his disqualification in *Backus*, the same logic applies with equal force here. Put simply, the mere passage of time does not change the fact that in *Colleton County* Judge Gergel "vigorously deposed" the current Speaker of the House (Defendant Lucas), who will undoubtedly be a ***key*** witness at this trial. Accordingly, if Judge Gergel's prior deposing of witnesses mandated his disqualification in *Backus*, so too here. *See* Ronald J. Krotoszynski, Jr., *An Epitaphios for Neutral*

*Principles in Constitutional Law: Bush v. Gore and the Emerging Jurisprudence of Oprah!*, 90 Geo. L.J. 2087, 2141 (2002) ("Reasonable observers of the process of constitutional adjudication should agree that **consistency** in constitutional law is no vice and that abrupt departures on the part of Justices from previous positions without persuasive explanations are no virtue (and should be avoided)." (emphasis added)).[11]

While the House Defendants have not been able to locate a transcript of Defendant Lucas's prior deposition in *Colleton County*, 20 years later, Defendant Lucas still vividly recalls being vigorously and aggressively deposed by Judge Gergel in that case. ***Ex. H*** (Affidavit of James H. Lucas) at ¶ 6; *see also **Ex. I*** (Affidavit of Charles F. Reid) at ¶ 7. This is not surprising, as the interests of Governor Hodges – Judge Gergel's client in that case – were adverse to those of Defendant Lucas. ***Ex. I*** at ¶ 7.[12]

### III. Judge Gergel Failed to Fully Consider the Fact that a Number of Witnesses in this Litigation Will Be Identical to Those in Prior Redistricting Litigation

As noted in the House Defendants' initial Motion to Disqualify, it is reasonably foreseeable that at least some number of witnesses in this litigation will be identical to those in prior redistricting litigation. For example, Congressman James Clyburn testified in *Colleton County* and,

---

[11] In his Order, while Judge Gergel criticized the House Defendants for failing to more fully describe the facts of *United States v. Jian-Yun Dong*, No. 2:11-CR-510 (D.S.C. 2012), he failed to apply the analysis of *United States v. Black*, 490 F. Supp. 2d 630 (E.D.N.C. 2007), which he found especially persuasive when he recused himself in *Dong*. As noted in the Motion to Disqualify, (ECF No. 90 at 28), Judge Gergel's prior citation to *Black* is notable because, much like this case, the judge in *Black* found that a public appearance issue would arise if he were to hear a high-profile case involving the Speaker of the House when the judge had a history of representing litigants in reapportionment cases on the **opposite** side of the Speaker of the House. The facts of this case are much closer to the facts of *Black* than were the facts of *Dong* (as Judge Gergel's citation of additional facts makes crystal clear), yet his Order fails to apply the rationale of *Black* to this case.

[12] While the House Defendants have not seen transcripts of Judge Gergel's prior depositions of Messrs. Harrison and Harrell, Defendant Lucas is confident that Judge Gergel's prior deposition of him was likely as vigorous as the depositions of Messrs. Harrison and Harrell. ***Ex. I*** at ¶ 6.

as the longest serving member in the state's Congressional delegation, was identified as a witness in the *Backus* disqualification motion that resulted in Judge Gergel's disqualification. (ECF No. 90 at 25). Here, Congressman Clyburn will almost certainly be a witness deposed or called at trial by one of the parties during any phase of this litigation that deals with the Congressional maps. Furthermore, other witnesses who testified in *Colleton County* and/or *Backus* will likely testify in this case, including at least one expert witness.

In his *Backus* disqualification order, Judge Gergel highlighted the commonality of witnesses as a reason for disqualification, acknowledging that a number of likely witnesses in *Backus* played key roles in the plans under consideration in *Colleton County* and were extensively deposed or cross-examined by Judge Gergel himself. (ECF No. 90-2 at 4, n.2) ("[A] reasonable person outside the judiciary might conclude that service of the former adversarial attorney in the 2002 reapportionment litigation in the present legislative reapportionment case on the three judge panel would create an ***appearance*** of partiality.") (emphasis in original). Judge Gergel ultimately agreed that the extensive interactions between himself and the similar witnesses created a public appearance issue that required disqualification. *Id.* at 4. Yet, Judge Gergel's Order indicates that he failed to fully consider the fact that the same issue that existed in *Backus* still exists today.

**IV.    The Motion to Disqualify Was Made For a Proper Purpose**

In his Order, Judge Gergel, without citing any objective facts in support, noted that "§ 455 is not designed to be a sword with which litigants can pick and choose their judges." (ECF No. 96 at 6 (citing *Bivens Gardens Office Building Inc. v. Barnett Banks of Florida, Inc.*, 140 F.3d 898, 913 (11th Cir. 1998)).[13]    This unfortunate and unnecessary comment – which, the House

---

[13] The facts of this case bear no resemblance to the case cited in Judge Gergel's Order dated January 10, 2022. Thus, any reference to and reliance on *Bivens* is, respectfully, misplaced. In *Bivens*, the plaintiffs' attorneys were aware a full three months before the case went to trial that

Defendants respectfully submit cannot be characterized as "innocuous," as Judge Gergel described his "attack"[14] comment about the House and Senate –  adds to the appearance issue here. The House Defendants did not file their Motion to Disqualify for any improper purpose.  Indeed, the purpose behind that filing – as well as this filing – comports with the true spirit of § 455: ensuring that the public has the utmost confidence in the integrity and impartiality of the federal judiciary throughout this critically important process. (*See, e.g.,* ECF No. 90-2 at 5 (citing *United States v. DeTemple*, 162 F.3d 279, 286 (4th Cir. 1998), and recognizing "the need to preserve the public's confidence in the integrity and impartiality of the judiciary"); *see also id.* (Judge Gergel noting that it was "particularly important that all participants and the public have confidence in the fairness of the judicial process"); *United States v. Alabama*, 828 F.2d 1532, 1546 (11th Cir. 1987) ("In a decision such as this one, a decision which will affect millions [of voters], public confidence in the judicial system demands" a suit free from any appearance of partiality)). As recognized by Chief Justice John Roberts in reference to a federal judge's recusal obligations, "We are duty-bound to strive for 100% compliance because ***public trust is essential***, not incidental, to our function. Individually, judges must be scrupulously attentive to both the letter and spirit of our

---

the Judge had employed the defendants' counsel as a law clerk while the case was pending before him. 140 F. 3d at 913. In holding that the plaintiffs waived the recusal issue, the Court explained that the plaintiffs' attorneys "recognized the recusal issue from the start of that three-month period[,] [y]et they made a strategic decision not to raise the issue until they saw how the trial came out." *Id.* "In other words, they made a carefully thought out, coldly calculated, eyes open decision not to raise the issue and instead to gamble on winning anyway." *Id.* In essence, the plaintiffs in *Bivens* tried to use recusal "as an insurance policy to be cashed in" after they lost at trial. *Id.*

[14] We accept Judge Gergel's explanation that his comment was indeed intended to be innocuous—however, a reasonable outside observer, understanding Judge Gergel's history as an advocate in prior redistricting cases, could view this comment as an exhibition of a subconscious desire to attack the institutions and offices who have been on the other side of his clients in prior redistricting cases.

rules, as most are." Chief Justice John Roberts, *2021 Year-End Report on the Federal Judiciary 3-4* (Dec. 31, 2021), available at https://www.supremecourt.gov/publicinfo/year-end/2021year-endreport.pdf (emphasis added).

Notwithstanding Judge Gergel's unsupported and unfortunate characterization of the House Defendants' motives, the Motion to Disqualify was not about certain parties' preferences regarding who should serve on the Panel. It was about the true "spirit" of § 455, which is to ensure public trust and confidence in the integrity and impartiality of the judiciary. After all, this case, which will affect millions of South Carolina citizens, is far too important for there to be any question – no matter how small – regarding whether any member of this Panel can remain impartial and unbiased throughout the entirety of this process. Unfortunately, Judge Gergel's Order of January 10, 2022 adds to the appearance issue here. Accordingly, just as Judge Gergel's disqualification was mandated in *Backus*, his disqualification is mandated here.

## CONCLUSION

This case is far "too important to be decided under a cloud." *Alabama*, 828 F.2d at 1546. Therefore, based on the foregoing (and the House Defendants' initial Motion to Disqualify, which is incorporated by reference herein), the House Defendants respectfully request that this Motion be granted and that Judge Gergel disqualify himself. [15]

*[SIGNATURE PAGE FOLLOWS]*

---

[15] Based on conversations with Plaintiffs' counsel, while Plaintiffs' counsel has not reviewed this Motion prior to its filings, undersigned counsel expects that Plaintiffs will oppose this Motion.

*s/ William W. Wilkins*

William W. Wilkins (Fed. ID No. 4662)
Andrew A. Mathias (Fed. ID No. 10166)
NEXSEN PRUET, LLC
104 S. Main Street, Suite 900 (29601)
Post Office Box 10648
Greenville, SC 29603-0648
Telephone: 864.370.2211
bwilkins@nexsenpruet.com
amathias@nexsenpruet.com


Mark C. Moore (Fed. ID No. 4956)
Jennifer J. Hollingsworth (Fed. ID No. 11704)
Hamilton B. Barber (Fed. ID No. 13306)
NEXSEN PRUET, LLC
1230 Main Street, Suite 700 (29201)
Post Office Drawer 2426
Columbia, SC 29202
Telephone: 803.771.8900
MMoore@nexsenpruet.com
JHollingsworth@nexsenpruet.com
HBarber@nexsenpruet.com

*Attorneys for James H. Lucas, Chris Murphy, and Wallace H. Jordan*

January 18, 2022
Greenville, South Carolina