**EXHIBIT D**
(*Backus* Motion to Recuse)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| VANDROTH BACKUS, WILLIE HARRISON BROWN, CHARLESANN BUTTONE, BOOKER MANIGAULT, EDWARD MCKNIGHT, MOSES MIMS, JR, ROOSEVELT WALLACE, and WILLIAM G. WILDER, on behalf of themselves and all other similarly situated persons, | ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) | Civil Action No. |
| v. | ) ) | 2:11-cv-03120-RMG-HFF-MBS |
| THE STATE OF SOUTH CAROLINA, NIMRATA "NIKKI" R. HALEY, in her capacity as Governor, KEN ARD, in his capacity as Lieutenant Governor, GLENN F. MCCONNELL, in his capacity as President Pro Tempore of the Senate and Chairman of the Senate Judiciary Committee, ROBERT W. HARRELL, Jr., in his capacity as Speaker of the House of Representatives, JAMES H. HARRISON, in his capacity as Chairman of the House of Representatives' Judiciary Committee, ALAN D. CLEMMONS, in his capacity as Chairman of the House of Representatives' Elections Law Subcommittee, MARCI ANDINO, in her capacity as Executive Director of the Election Commission, JOHN H. HUDGENS, III, Chairman, CYNTHIA M. BENSCH, MARILYN BOWERS, PAMELLA B. PINSON, and THOMAS WARING, in their capacity as Commissioners of the Elections Commission, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

---

**DEFENDANTS' MOTION TO RECUSE THE
HONORABLE RICHARD MARK GERGEL
AND MEMORANDUM IN SUPPORT**

---

Public confidence in the outcome of these proceedings, involving the legality of redistricting plans affecting millions of South Carolinians, is of utmost importance. For this reason, Defendants Glenn F. McConnell, in his capacity as President *Pro Tempore* of the Senate, Robert W. Harrell, Jr., in his capacity as Speaker of the House of Representatives James H. Harrison, in his capacity as Chairman of the House of Representatives' Judiciary Committee, and Alan D. Clemmons, in his capacity as Chairman of the House of Representatives' Elections Law Subcommittee, jointly move to recuse the Honorable Richard Mark Gergel. Recusal is required under 28 U.S.C. § 455 due to the direct relationship between this case and the most recent South Carolina redistricting case, *Colleton County Council v. McConnell*, 201 F. Supp. 2d 618 (D.S.C. 2002), in which Judge Gergel participated as lead counsel for one of the parties.[1]

Defendants wish to call the Court's attention to the fact—which is not apparent on the face of the Complaint—that the *Colleton County* litigation will be central to their defense against Plaintiffs' claims.[2] That fact, coupled with Judge Gergel's service as lead counsel for Governor James H. Hodges in *Colleton County*, implicates two of the mandatory grounds for recusal under 28 U.S.C. § 455(b), regarding a judge's personal knowledge of relevant facts and a judge's prior service "as lawyer in the matter in controversy." The concerns reflected in those provisions are,

---

[1] Undersigned counsel certifies that he has consulted with counsel for Plaintiffs as required by Local Rule 7.02. Counsel for Plaintiffs does not consent to the granting of this motion.

[2] Defendants bring this motion now, before filing their responsive pleadings or taking any other action in this case, in order to make the Court aware of the grounds for recusal "at the earliest moment." *United States v. Owens*, 902 F.2d 1154, 1156 (4th Cir. 1990) (quotation marks omitted). Although the centrality of the *Colleton County* litigation will become even clearer after the responsive pleadings are completed and filed, Defendants thought it most appropriate to raise the recusal issue now, before the scheduling conference to be held on December 13. Defendants will have no objection if Judge Gergel deems it appropriate to conduct the scheduling conference with the recusal issue unresolved. But Defendants would not want either the Court or Plaintiffs to be surprised by a recusal motion filed after the conference.

1

if anything, accentuated by the fact that Plaintiffs' claims in this case depend on many of the identical factual and legal arguments that were advanced—against some of the same Defendants—by Judge Gergel as an attorney in *Colleton County*. And the propriety of recusal is reinforced by the fact that, to Defendants' knowledge, Judge Gergel is the only United States District Judge in South Carolina, in either active or senior status, as to whom there is a ground for disqualification, meaning that the case easily can be reassigned.

Most important, these factors also warrant recusal under the expansive, "catch-all" provision of § 455(a). The inquiry under this provision is not whether the judge actually harbors any bias. Instead, this provision avoids even the *appearance* of impropriety, disqualifying a judge whenever his impartiality "might reasonably be questioned" by an observer outside the judicial system. Given that this high-profile litigation will resolve a matter of significant public concern, this case is "too important to be decided under a cloud." *United States v. Alabama*, 828 F.2d 1532, 1546 (11th Cir. 1987) (per curiam).[3] "In a decision such as this one, a decision which will affect millions [of voters], public confidence in the judicial system demands" a suit free from any appearance of partiality. *Id.*

## BACKGROUND

During the 2000 redistricting cycle, the Republican-controlled House and Senate passed redistricting plans for the General Assembly and Congress, but Governor Hodges, a Democrat, vetoed them. Impasse suits were filed, and the United States District Court for the District of South Carolina was required to draw redistricting plans for the General Assembly and Congress.

---

[3] *Superseded by statute on other grounds*, Civil Rights Restoration Act of 1987, Pub. L. No. 100-259, 102 Stat. 29, *as recognized in Lussier v. Dugger*, 904 F.2d 661, 664 (11th Cir. 1990).

*See Colleton County Council v. McConnell*, 201 F. Supp. 2d 618 (D.S.C. 2002). The principal litigants in the case were the Senate and the House (which advocated for the plans they had passed) and the Governor (who advocated for competing plans). Judge Gergel, who at that time was in private practice, served as lead counsel for the Governor.

In March 2002, the court issued an order setting forth the remedial redistricting plans. *Id.* Then, in 2003, the General Assembly enacted legislation, S. 591, Act 55 of 2003, that made limited changes to the court-ordered plans for the state House and Senate. *See, e.g.*, 2003 Senate Preclearance Submission Cover Letter at 2 ("This Senate redistricting plan is largely based on an interim redistricting plan ordered by" the court in *Colleton County*.) (attached as Exhibit A); *see also* 2003 House Preclearance Submission Cover Letter at 3 (attached as Exhibit B). The *Colleton County* plan for Congress, and the 2003 legislative plans for the General Assembly, remained in place through the 2010 elections.

In mid-2011, the General Assembly enacted redistricting legislation for Congress and the state House and Senate in the wake of the 2010 Census. The House and Senate sought and obtained administrative preclearance of the new plans from the United States Department of Justice under Section 5 of the Voting Rights Act.

In November 2011, Plaintiffs filed the complaint in the present case, alleging that the 2011 redistricting plans for the General Assembly and Congress violate the Constitution and the Voting Rights Act. The case was docketed and assigned to Judge Gergel.

Beyond the basic fact that both cases concern redistricting plans for the General Assembly and Congress, the present case and the *Colleton County* case are closely connected:

- The central issues in both cases concern the requirements of the Voting Rights Act and the constitutional prohibition against racial gerrymandering.

- In particular, "the number and composition of majority-minority districts in each proposed plan accounted for the lion's share of the evidence in every phase" of the *Colleton County* case. 201 F. Supp. 2d at 631.

- Similarly, Plaintiffs' challenge in this case focuses on the composition of majority-minority or near-majority districts in the enacted plans, as well as the effect of those districts on the composition of other districts.

- The specific districts at issue in the two cases are analogous as well.

  - For example, the Sixth Congressional District, which has been represented by Congressman James Clyburn since 1993, was the majority-minority congressional district under the *Colleton County* court's plan and is the majority-minority congressional district under the plan challenged here.

  - Similarly, the *Colleton County* court's plan for the South Carolina Senate had nine majority-minority districts: 19, 21, 30, 32, 36, 39, 40, 42, and 45. The nine majority-minority districts under the challenged Senate Plan (eight of which appear to be challenged by Plaintiffs here) are the same.

  - The Senate districts that "generated the greatest amount of discussion" in the *Colleton County* case were Districts 30, 32, and 36. 201 F. Supp. 2d at 661. Judge Gergel on behalf of Governor Hodges advocated drawing each of these districts with black voting-age population ("BVAP") several percentage points lower than in the plan advocated by the Senate, while drawing a neighboring minority-black district with a BVAP nearly ten percentage points higher. *Id.* Districts 30, 32 and 36 are among those now being challenged as allegedly having "artificially high black VAP percentages" that result in lower BVAP percentages for neighboring minority-black districts. Am. Compl. ¶¶ 75, 79-80. Another district now being challenged on the same ground, District 40, was drawn by the court with a majority BVAP—consistent with the Senate's proposal but contrary to the Governor's proposal of a minority-black district. 201 F. Supp. 2d at 660, 662.

  - The *Colleton County* court's plan for the South Carolina House had 29 majority-minority districts. The current House plan has 30, of which 17 are challenged by Plaintiffs. Twelve of these were majority-minority districts under *Colleton County*.

- The parties in this case may seek to depose and/or call to testify at trial several of the witnesses who were deposed and/or called to testify at trial in the *Colleton County* case.

  - For example, the *Colleton County* court, in explaining why it drew a congressional district with 53.75% BVAP, stated: "Congressman James Clyburn testified that a BVAP of 53% or above would be sufficient to allow the minority constituency a fair opportunity to elect a non-incumbent black candidate of choice in the district." 201 F. Supp. 2d at 666. Plaintiffs in this case claim that the challenged plan, in which Congressman Clyburn's district has a BVAP of 55.18%, is unlawfully gerrymandered and "packed" because black voters "have

4

demonstrated an overwhelming ability to elect a candidate of choice in" the *Colleton County* court's district. Am. Compl. ¶ 77.

o   Similarly, the incumbents in seven of the nine majority-minority Senate districts and thirteen of the thirty majority-minority House districts, several of whom testified at deposition and/or trial in the *Colleton County* case, remain the same.

•   Senator Glenn McConnell, President *Pro Tempore* of the South Carolina Senate, was one of the principal litigants in the *Colleton County* case and testified at both deposition and trial. Senator McConnell remains President *Pro Tempore* (and also remains Chairman of the Senate Judiciary Committee and Redistricting Subcommittee), and he is a principal defendant in this case.

•   Representative James H. Harrison, Chairman of the House Judiciary Committee, also testified at both deposition and trial in the *Colleton County* case. Representative Harrison remains Chairman of the House Judiciary Committee, and is a defendant in this case.

Moreover, many of the same charges made by the Governor against the General

Assembly's plans in *Colleton County* are raised by Plaintiffs in their Amended Complaint here:

| *Colleton County* | *Backus* |
|---|---|
| "The Governor charges . . . that H.3003's version of the House plan was intentionally drafted to 'racially polarize' the state. . . . The effect, the Governor charges, was the intentional '***bleaching***' of Republican districts at the expense of existing minority influence districts." 201 F. Supp. 2d at 651 (emphasis added). | "Defendants' Redistricting Plan packs black voters into a few districts making them 'blacker' while also '***bleaching out***' all of the surrounding election districts." Am. Compl. ¶ 42 (emphasis added). |
| The Governor alleges that "[b]y ***increasing the BVAP in current majority-minority districts***, the Senate Republicans . . . make the adjoining 'superwhite' districts Republican strongholds." 201 F. Supp. 2d at 659 (emphasis added). | "These discriminatory redistricting schemes also result in a diminution in the political power of black voters whose influence is diluted by ***packing*** them into election districts in concentrations that exceed what is necessary and lawful to give them an equal opportunity to participate in the political process." Am. Compl. ¶ 2 (emphasis added). |

| *Colleton County* | *Backus* |
|---|---|
| "[T]he resulting '***racial apartheid***' of the House redistricting plan could have been avoided." Governor's Veto Letter at 3, Exhibit A of *Colleton County* Governor's Trial Brief For House Redistricting Case (emphasis added) (attached as Exhibit C). | "These redistricting laws create a system of ***electoral apartheid*** by segregating voters into election districts . . . ." Am. Compl. ¶ 42 (emphasis added). |
| "The Governor, for his part, charges that the Senate plan is racially and politically gerrymandered for the purpose of '***bleaching***' Republican-held districts and rendering them 'safe' Republican districts." 201 F. Supp. 2d at 659 (emphasis added). | "Since black voters continue to overwhelmingly prefer Democratic candidates in South Carolina, Republican leaders in the General Assembly sought to make the Democratic Party the 'black party' by ***packing as many black voters as possible into a few election districts***." Am. Compl. ¶ 41 (emphasis added). |
| "Governor Hodges vetoed H.3003 because the election districts drawn by the Republican majority in the General Assembly ***failed to adhere to traditional districting principles*** and racially polarized the State's electorate." *Colleton County* Governor's Trial Brief For House at 2 (emphasis added) (attached as Exhibit C). | "These race-based redistricting schemes also ***abandon traditional redistricting principles*** like drawing compact districts, keeping political subdivisions intact, and keeping communities of interest intact." Am. Compl. ¶ 3 (emphasis added). |

In addition to involving the same issues, the analogous districts, potentially the same witnesses, and many of the same arguments, the *Colleton County* case is itself part of the redistricting history that is relevant here. One round of redistricting and related litigation commonly is relevant to the legislative and judicial proceedings in the next cycle. For example, witnesses often are asked about the testimony that they gave in past redistricting litigation.

The relevance of prior redistricting litigation is illustrated by the *Colleton County* opinion itself, which repeatedly referenced earlier cases:

- In determining what traditional redistricting principles it should apply, the court "look[ed] to the historical redistricting policies of the state." *Colleton County*, 201 F. Supp. 2d at 628. As part of that analysis, the court examined the degree to which maintaining county boundaries had been a principle emphasized by the courts that drew impasse plans in 1982 and 1992. *Id.* at 647-48.

6

- In deciding whether portions of two counties were part of the "core" of a district, the court looked to the reasons why other portions of those counties had been removed from the district by the court that drew the impasse plan in 1992. *Id.* at 667.

- In assessing whether reductions in the BVAP of certain majority-minority districts were retrogressive under Section 5, the court determined that the "well-documented use of racial gerrymandering during the 1990s round of redistricting to maximize black representation" could "require us to 'clean up' cores of existing majority-minority districts" and could "explain, at least in part, why the court, operating under its currently known constraints, cannot constitutionally achieve the existing BVAP in a fairly-drawn district." *Id.* at 644 (citing *Smith v. Beasley*, 946 F. Supp. 1174, 1185 (D.S.C. 1996)); *id.* at 646.

Prior redistricting, especially by the *Colleton County* court in the last cycle, likewise was

relevant in the redistricting process leading up to this lawsuit. For example, legislators and

legislative staff relied on *Colleton County* as they decided how redistricting plans should be

drawn in 2011:

- The 2011 Redistricting Guidelines adopted by the Senate Judiciary Committee's bi-partisan Redistricting Subcommittee state that they "are drawn in part [from] the 2002 opinion of the three-judge court in *Colleton County Council v. McConnell*." *See* 2011 Senate Preclearance Submission Exhibit 4 (attached as Exhibit E); 2011 Senate Preclearance Submission Cover Letter (attached as Exhibit D).

- Discussion of the Sixth Congressional District during public meetings of the Senate Judiciary Committee and Redistricting Subcommittee included repeated comparisons between potential new configurations and the existing district, with emphasis on the fact that the existing district had been drawn by the court in *Colleton County*. *See* Senate Redistricting Subcommittee Hearing (June 21, 2011) at 5, 14-15, 17 (attached as Exhibit F); Senate Judiciary Committee Hearing (June 21, 2011) at 12, 18, 33 (attached as Exhibit G).

- In discussing Senate District 17 at a public meeting of the Senate Judiciary Committee's Redistricting Subcommittee, the Subcommittee's Chief Counsel emphasized the *Colleton County* court's finding that Senate District 17 "ha[d] been a historically nonperforming district when it was a minority-majority district." Redistricting Subcommittee Hearing (June 8, 2011) at 35 (attached as Exhibit H).

And when the Senate sought preclearance of its 2011 redistricting plan, it relied on

*Colleton County* to prove that the plans complied with Section 5 of the Voting Rights Act. For

example, the Section 5 Submission for the Senate plan argued,

- "[T]he 2011 Plan achieves nearly the same BVAP as the current benchmark and the plan drawn by the court in *Colleton County*." 2011 Senate Preclearance Submission Cover Letter at 7 (Exhibit D).[4]

- "As the *Colleton County* court found, reduction of BVAP due to underpopulation in District 36 is appropriate even if the white incumbent is likely to continue winning re-election." *Id.*

- "In District 40, the 2011 Plan achieves roughly the same BVAP as the plan drawn by the court in *Colleton County* and the subsequent plan precleared by the Attorney General." *Id.*

- "The current situation in District 7 is effectively the same as the situation ten years ago when the three-judge court [in *Colleton County*] adopted an impasse plan and the Attorney General precleared a subsequently enacted plan." *Id.* at 8.

- "Section 5 does not require that District 17 be maintained at the same non-performing level under the 2011 Plan" because *inter alia* District 17 "was not presented as performing in either the [*Colleton County*] court's opinion or the preclearance submission." *Id.*

Similarly, *Colleton County* will be central to the General Assembly's defense in the present case, as Defendants' December 19 responsive pleading will demonstrate. For example, Defendants will argue that Plaintiffs' claims of vote-dilution under Section 2 and purposeful discrimination under the Fourteenth Amendment, based on alleged "packing" of majority-minority districts, are directly refuted by the fact that the challenged Senate Plan has the same number of majority-minority districts as the *Colleton County* plan, with a *lower* average BVAP. In addition, Defendants will argue that Plaintiffs' claims regarding the potential for so-called "crossover" districts, *see* Am. Compl. ¶¶ 79-80, conflicts with the *Colleton County* court's determination of the BVAP needed for black voters to elect their candidates of choice. 201 F. Supp. 2d at 643 ("find[ing] that in order to give minority voters an equal opportunity to elect a minority candidate of choice as well as an equal opportunity to elect a white candidate of

---

[4] As noted above, the benchmark plan for purposes of preclearance was the 2003 enacted plan, which closely resembled the *Colleton County* plan. *See supra* p. 3.

choice in a primary election in South Carolina, *a majority-minority or very near majority-minority black voting age population in each district remains a minimum requirement*" (emphasis added)). A likely issue here, therefore, is whether the evidence that supported the *Colleton County* finding differs from other evidence that may be presented in this case.

Another highly relevant aspect of the *Colleton County* case is reflected in the court's discussion of how minority-black districts can reflect a gerrymander for *white* Democrats:

> Because of the high level of racial polarization in the voting process in South Carolina, "influence districts" allow the Democratic Party the opportunity to gain control of the General Assembly. It is, therefore, an inherently politically based policy. With the aid of a substantial (but not majority) black population that votes nearly exclusively for a Democratic candidate, a white Democrat can usually defeat a black Democrat in the primary election and then use the black vote to defeat any Republican challenger in the general election. Although the Governor asserts that a draw based on "traditional districting principles" will naturally lead to the creation of such districts, he does not advance a claim that this court can or should consider race to intentionally draw such "influence districts."

*Id.* at 643 n.22. Defendants will argue here that the essence of Plaintiffs' claims is the erroneous notion that the Constitution and the Voting Rights Act mandate the very same "inherently politically based policy." Defendants also will argue that "a draw based on 'traditional districting principles'" in *Colleton County* did *not* result in the creation of "influence" districts—and, moreover, resulted in nine majority-minority districts with an average BVAP *higher* than the analogous districts in the challenged Senate plan. This bears directly on Plaintiffs' claim that the challenged plan's inclusion of majority-minority districts, and its alleged failure to include "crossover" districts, reflects the subordination of traditional redistricting principles. Am. Compl. ¶ 81.

Given the extensive and significant interplay between *Colleton County* and this case, Judge Gergel's role as former lead counsel for the Governor in *Colleton County* means that he has personal knowledge of material facts that might be disputed here. For the reasons explained

above, the allegations, theories, arguments, witness testimony, and documentary evidence presented in the *Colleton County* case, as well as the court's findings, conclusions, reasoning, and remedial redistricting plans, all are at least potentially relevant in this case. Judge Gergel also may be aware of non-public facts that bear on these matters, such as deposition testimony and other discovery material never filed in court. In addition, Judge Gergel likely gained knowledge of facts through preparation of witnesses and consultation with sympathetic members of the General Assembly, some of whom might testify in this case.

Judge Gergel, if he remains in the case, will be asked to decide issues identical or closely analogous to those that he previously litigated, against some of the same adverse parties, in South Carolina's most recent statewide redistricting case. It therefore is reasonably possible that facts learned in Judge Gergel's prior role as lead counsel will be material to the outcome.

## ARGUMENT

Judge Gergel should disqualify himself from participating in the present case due to the direct relationship between this case and *Colleton County Council v. McConnell*, 201 F. Supp. 2d 618 (D.S.C. 2002), a suit he previously litigated as lead counsel for one of the parties.

Congress enacted 28 U.S.C. § 455 "to promote public confidence in the impartiality of the courts by eliminating even the appearance of impropriety." *Alabama*, 828 F.2d at 1541. Consistent with this goal, § 455(b) contains "a number of bright line rules for disqualification." *Id.* These bright-line rules involve "certain situations where the potential for conflicts of interest are readily apparent." *Id.* For example, a judge must be disqualified "[w]here he has … personal knowledge of disputed evidentiary facts concerning the proceeding," 28 U.S.C. § 455(b)(1), and where "he served as lawyer in the matter in controversy," *id.* § 455(b)(2).

10

Moreover, § 455(a) contains a "'catchall' recusal provision." *Liteky v. United States*, 510 U.S. 540, 548 (1994). Pursuant to this provision, a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). This broadly sweeping language "expands the protection of § 455(b)." *Liteky*, 510 U.S. at 552. "Obviously, it is possible for facts to indicate that a judge *might* be biased such that recusal is required under § 455(a) even though none of those facts indicate actual bias necessitating recusal under § 455(b)." *United States v. DeTemple*, 162 F.3d 279, 286 (4th Cir. 1998).

Significantly, "[t]he goal of section 455(a) is to avoid even the appearance of partiality." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 860 (1988) (quotation marks omitted). "The critical question presented by this statute," then, "is not whether the judge is impartial in fact." *DeTemple*, 162 F.3d at 286 (quotation marks omitted). "It is simply whether another, not knowing whether or not the judge is actually impartial, might reasonably question his impartiality on the basis of all the circumstances." *Id.*

In applying this statute, the court "must keep in mind that the hypothetical reasonable observer is not the judge himself or a judicial colleague but a person outside the judicial system." *Id.* at 287. "Judges, accustomed to the process of dispassionate decision making and keenly aware of their Constitutional and ethical obligations to decide matters solely on the merits, may regard asserted conflicts to be more innocuous than an outsider would." *Id.* And especially because the concerns underlying § 455 have "constitutional dimensions," *Liljeberg*, 486 U.S. at 865 n.12, "the benefit of the doubt is . . . to be resolved in favor of recusal," *Alabama*, 828 F.2d at 1540.

Here, Judge Gergel litigated in private practice the same issues that arise in this case. That, by itself, does not require recusal. *See, e.g.*, *Wessman v. Boston Sch. Comm.*, 979 F. Supp.

11

915, 916 (D. Mass. 1997) (holding a judge is not disqualified from participating in a civil rights case merely because she was a civil rights attorney prior to appointment).

Recusal is required here because there is a "direct relationship," *Wessman*, 979 F. Supp. at 918, between the earlier *Colleton County* case and the present case. A "direct relationship" exists because 1) "the litigation may involve disputed facts with which [he] may have personal knowledge by virtue of [his] prior representation," *Wessman*, 979 F. Supp. 918; and 2) Defendants rely on the *Colleton County* case to support their defense in the present case, *e.g.*, *id.; see also In re Rodgers*, 537 F.2d 1196, 1198 (4th Cir. 1976) (per curiam). This direct relationship implicates Congress's concerns about judges having "personal knowledge of disputed evidentiary facts," 28 U.S.C. § 455(b)(1), or "serv[ing] as a lawyer in the matter in controversy," *id* § 455(b)(2), and also implicates Congress's concerns about the appearance of partiality, *see id.* § 455(a). As a consequence, it is well-established that when such a direct relationship exists, recusal is required. *See, e.g., Alabama*, 828 F.2d at 1545-46; *Rodgers*, 537 F.2d at 1197-98; *Wessman*, 979 F. Supp. at 918.

For example, the *Wessman* case involved a white high school student challenging the constitutionality of the policy governing admissions to certain schools in the Boston public school system. *See Wessman v. Boston Sch. Comm.*, 996 F. Supp. 120, 121 (D. Mass. 1998) (Tauro, J.). Judge Nancy Gertner granted the plaintiff's motion to recuse due to her representation of a civil rights group in a prior desegregation case involving the same school system. She concluded that recusal was necessary because there was a "direct relationship between the earlier case and the *Wessman* matter." *Wessman*, 979 F. Supp. at 918. That relationship was evidenced by the possibility that the defendants would rely on the prior case to support their defense of the admissions policy. *See, e.g., id.* ("the City 'may' argue that the

12

current admissions policy is justified by the 'remediation of the lingering effects of discrimination,'" which was a "key issue" in the prior case). This direct relationship between the two cases, Judge Gertner explained, mandated recusal: "[T]he litigation may involve disputed facts with which I may have personal knowledge by virtue of my prior representation." *Id.*

Similarly, in another civil rights case, a trial judge previously had represented a client in an earlier, related case. *Alabama*, 828 F.2d at 1545. Due to the relationship between the two cases, the judge had personal knowledge of alleged racially discriminatory employment practices that were relevant to the case over which he presided. *Id.* Because such personal knowledge had the potential to "vitiate[] the carefully constructed rules of procedure and evidence that ensure deliberate, unbiased fact finding," the Eleventh Circuit concluded recusal was required. *Id.* at 1546.

And in *Rodgers*, the Fourth Circuit concluded that the "connection between the Judge's prior professional associations and the case before him" required recusal. *DeTemple*, 162 F.3d at 284 (discussing *Rodgers*, 537 F.2d at 1198). In particular, the defendants in *Rodgers* planned to "prove that the conduct for which they have been indicted was no more culpable than the conduct of the client represented by the judge's former law partner." *Rodgers*, 537 F.2d at 1198.[5] *Cf. DeTemple*, 162 F.3d at 284 (recusal unwarranted because the prior matter involving the judge "played no role in either the defense or the prosecution of" the present case).

Here, there is a "direct relationship" between the *Colleton County* case and the present case. As explained above, these cases involve many of the same witnesses, same factual issues,

---

[5] The defendants in *Rodgers* were charged with using unlawful means to secure the passage of a bill in the state legislature. They alleged that another company—represented by the judge's law partner when the judge was still in private practice—had engaged in the same conduct. *Rodgers*, 537 F.2d at 1197-98.

and same allegations. Legislators and legislative staff relied on the court's findings in *Colleton County* to determine how plans should be drawn in the present redistricting cycle. And when Defendants sought preclearance of the redistricting plans, they relied on *Colleton County* to establish that the plans complied with Section 5 of the Voting Rights Act. Most importantly, Defendants in this case will rely on the *Colleton County* case to support their defense, just as the defendants in *Wessman* and *Rodgers* relied on aspects of the prior matters at issue there.

Due to the direct relationship between *Colleton County* and this case, Judge Gergel has personal knowledge of material facts that may be at issue in this case. As explained above, the allegations, theories, arguments, witness testimony, and documentary evidence presented in the *Colleton County* case all are at least potentially relevant in this case. The potentially overlapping material facts relate to, for example, the identity and priority of traditional redistricting principles, the location and nature of historical district "cores" and communities of interest, and the effect of various circumstances on the ability of minority voters to elect their candidates of choice. Judge Gergel also may be aware of non-public facts that bear on these matters, such as discovery never filed in court and knowledge acquired through consultation with experts and members of the General Assembly, some of whom might testify in the present case.

Because such personal knowledge has the potential to "vitiate[] the carefully constructed rules of procedure and evidence that ensure deliberate, unbiased fact finding," *Alabama*, 828 F.2d at 1546, recusal is required under § 455(b)(1). Moreover, it creates an appearance of partiality requiring recusal under § 455(a). And this need for recusal under § 455(a) is only heightened by the fact that Judge Gergel acquired his personal knowledge of the facts by acting as lead counsel for a party making many of the same arguments in a closely related case. *Cf.* 28 U.S.C. § 455(b)(2).

Additional factors militate in favor of recusal as well. "As Justice (then Judge) Breyer, noted in another § 455(a) case, 'other things being equal, the more common a potentially biasing circumstance and the less easily avoidable it seems, the less that circumstance will appear to a knowledgeable observer as a sign of partiality.'" *DeTemple*, 162 F.3d at 287 (quoting *In re Allied-Signal Inc.*, 891 F.2d 967, 971 (1st Cir. 1989)). In *DeTemple*, the Fourth Circuit concluded that in a small town in West Virginia that has "fewer than 300 lawyers and one federal district judge," "[i]t is far more likely . . . than it would be in a metropolitan area, that a judge, prior to his appointment, might represent a party with some tangential connection to a case subsequently assigned to him." *Id.* Because such a connection is common and unavoidable under these circumstances, it is unlikely to create an appearance of partiality. *See id.*

Under the circumstances here, by contrast, a judge's service as an attorney and then judge in directly related cases is extremely unusual and easily avoidable. Because litigation over statewide redistricting plans is infrequent, it is rare for an attorney in one such case to be a sitting United States District Judge at the time the next one is filed. Also, cases involving statewide redistricting plans traditionally are filed in the Columbia Division and not the Charleston Division, where Judge Gergel sits. *E.g., Colleton County*, 201 F. Supp. 2d at 618; *Smith v. Beasley*, 946 F. Supp. 1174 (D.S.C. 1996); *Burton v. Sheheen*, 793 F. Supp 1329 (D.S.C. 1992); *SC State Conference of Branches of NAACP v. Riley*, 533 F. Supp. 1178 (D.S.C. 1982). It therefore is unlikely that the circumstances requiring recusal here will arise again. Importantly, because Judge Gergel is one of fourteen active and senior federal district judges in South Carolina, five of whom are resident judges of the Charleston Division, this case can be reassigned without difficulty. The fact that the "potentially biasing circumstance[s]" are far from "common" and are "easily avoidable" means that, "other things being equal," it is *more* likely

15

that the "circumstance[s] will appear to a knowledgeable observer as a sign of partiality.'"

*DeTemple*, 162 F.3d at 287 (quoting *In re Allied-Signal Inc.*, 891 F.2d at 971).

Litigation over the legality of statewide redistricting plans may occur only once per decade, affecting millions of South Carolinians. Moreover, "[f]ederal-court review of districting legislation represents a serious intrusion on the most vital of local functions." *Miller v. Johnson*, 515 U.S. 900, 915-16 (1995). As a consequence, "public confidence in the judicial system" may be undermined if such a case is "decided under a cloud." *Alabama*, 828 F.2d at 1546. It is therefore particularly important here that any doubt "be resolved in favor of recusal," *id.* at 1540, so that any appearance of partiality can scrupulously be avoided.

## CONCLUSION

For the foregoing reasons, Defendants' recusal motion should be **GRANTED**.

*(Signature Page Follows)*

Respectfully submitted,

s/ William W. Wilkins

William W. Wilkins          Fed ID No. 4662
Kirsten E. Small            Fed ID No. 10005
NEXSEN PRUET, LLC
55 East Camperdown Way (29601)
Post Office Drawer 10648
Greenville, SC  29603-0648
PHONE:  864.370.2211
BWilkins@nexsenpruet.com

Michael A. Carvin (*pro hac vice* application
pending)
Louis K. Fisher (*pro hac vice* application
pending)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C.  20001-2113
PHONE:  202.879.3637
MACarvin@jonesday.com

*Attorneys for Defendant*
*Glenn F. McConnell*

Robert Erving Stepp         Fed ID No. 4302
Robert E. Tyson, Jr.        Fed ID No. 7815
SOWELL GRAY STEPP
   & LAFITTE, LLC
P.O. Box 11449
Columbia, SC 29211
PHONE: 803.929.1400
RStepp@sowellgray.com

Benjamin Parker Mustian     Fed ID No. 9615
Tracey Colton Green         Fed ID No. 6644
WILLOUGHBY & HOEFER, P.A.
P.O. Box 8416
Columbia, SC 29202
PHONE: 803.252.3300
BMustian@willoughbyhoefer.com

*Attorneys for Robert W. Harrell, Jr., James H.*
*Harrison, and Alan D. Clemmons*

December 9, 2011
Greenville, South Carolina

17