# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# COLUMBIA DIVISION

| | |
|---|---|
| THE SOUTH CAROLINA STATE CONFERENCE OF THE NAACP, <br><br> and <br><br> TAIWAN SCOTT, on behalf of himself and all other similarly situated persons, <br><br>         *Plaintiffs*, <br>   v. <br><br> HENRY D. MCMASTER, in his official capacity as Governor of South Carolina; HARVEY PEELER, in his official capacity as President of the Senate; LUKE A. RANKIN, in his official capacity as Chairman of the Senate Judiciary Committee; JAMES H. LUCAS, in his official capacity as Speaker of the House of Representatives; CHRIS MURPHY, in his official capacity as Chairman of the House of Representatives Judiciary Committee; WALLACE H. JORDAN, in his official capacity as Chairman of the House of Representatives Elections Law Subcommittee; HOWARD KNAPP, in his official capacity as interim Executive Director of the South Carolina State Election Commission; JOHN WELLS, JOANNE DAY, CLIFFORD J. ELDER, LINDA MCCALL, and SCOTT MOSELEY, in their official capacities as members of the South Carolina State Election Commission, <br><br>         *Defendants*. | Case No.: 3:21-cv-3302-JMC-TJH-RMG <br><br><br><br><br><br> **GOVERNOR MCMASTER'S MOTION FOR SUMMARY JUDGMENT** |

**COMES NOW** Defendant Henry D. McMaster, in his official capacity as Governor of

South Carolina ("Governor McMaster" or "Governor"), by and through the undersigned counsel,

and hereby moves for summary judgment on the claims directed against him in Plaintiffs' First

Amended Complaint for Injunctive and Declaratory Relief (ECF No. 84) under Federal Rule of Civil Procedure 56.[1]

## INTRODUCTION

The Governor moved to dismiss the First Amended Complaint almost a month ago. Repeated extensions mean that Plaintiffs have not yet had to respond to that Motion. Yet in the interim, and consistent with the Court's direction that the parties not wait on rulings from the Court to begin discovery given the condensed schedule here, *see, e.g.*, Tr. of Dec. 22, 2021 Hr'g 14:20–17:2; ECF No. 97, the Governor served interrogatories on Plaintiffs pending resolution of his arguments on legislative immunity.

Now, based on Plaintiffs' responses to those interrogatories and the allegations against the Governor in the First Amended Complaint, the Governor moves for summary judgment on some of the same grounds as in his Motion to Dismiss. *First*, the Governor is protected by legislative immunity for signing a bill into law, so the fact that Governor McMaster signed H. 4493 into law cannot give rise to or support any claim against him. In fact, the Governor is entitled to summary dismissal based on this immunity. *Second*, well-established law—including a yet another Fourth Circuit opinion from just days ago—makes clear that the general authority of a State's chief executive is insufficient to make a governor a defendant in a case challenging the constitutionality of a law. *Third*, Plaintiffs lack standing to pursue their claims against the Governor because Plaintiffs' claims are neither traceable to the Governor nor redressable by an injunction against him.

---

[1] In accordance with Rule 7.04 of the Local Civil Rules (D.S.C.), a supporting memorandum is not required because this filing provides a full explanation of the Motion and a separate memorandum would serve no useful purpose.

Before going further, it's worth addressing the proverbial elephant in the room: Plaintiffs have announced that they intend to seek leave to amend their First Amended Complaint. *See* ECF No. 111, at 2. Plaintiffs have indicated that their forthcoming proposed second amended complaint may attempt to drop the Governor as a defendant. Yet they have insisted that the Governor must "be involved in the compliance and enforcement of any remedial map," to include exercising his "authority under the South Carolina Constitution to sign or veto" any "remedial map in response to a Court ruling." Ex. 1, at 7 (Plaintiffs' Interrogatory Responses). In fact, they apparently thought the Governor was important enough to this case to name him (on two occasions) as the lead defendant. Given the condensed timeframe of this litigation and the approaching deadlines, final resolution of any claims against the Governor is needed now. There is not time to wait on another lawsuit or on what the relief Plaintiffs ultimately seek precisely looks like. It would violate due process to award Plaintiffs any relief that implicated the Governor without the Governor being a party with the right to appeal that order. Thus, Plaintiffs should not be permitted—in the relative anonymity of a motion to amend their complaint after broadcasting to the world that they had brought this case against the Governor, *see Civil Rights Groups File Federal Lawsuit Over South Carolina Redistricting Failures*, NAACP Legal Defense Fund (Oct. 12, 2021), https://tinyurl.com/yckpsmxy—to drop the Governor as a defendant without the Court resolving the issues raised here. Indeed, to do so would be for Plaintiffs to either recant their recent responses to the Governor's interrogatories or implicitly acknowledge that they all along lacked any basis to have included the Governor as a defendant.

## BACKGROUND

### A. The General Assembly has adopted new maps.

Every ten years, the State redraws congressional and legislative districts after the Census Bureau finalizes and releases the requisite census data. *See* S.C. Code Ann. § 7-19-50. Due in large part to COVID-19, the Census Bureau did not provide the data for the 2020 census in its final format until September 16, 2021, months later than usual. *See* Press Release, U.S. Census Bureau, *Census Bureau Delivers 2020 Redistricting Data in Easier-to-Use Format* (Sept. 16, 2021), https://tinyurl.com/a7esca9v. Notwithstanding this delay, the redistricting process is now complete.

In December 2021, the General Assembly passed, and the Governor signed into law, legislation reapportioning both houses of the state legislature. *See* 2021 S.C. Acts No. 117 ("H. 4493"). On January 26, 2022, the General Assembly passed, and again the Governor signed into law, legislation reapportioning the State's congressional districts. *See* 2022 S.C. Acts No. 118 ("S. 865").

Plaintiffs' First Amended Complaint challenges 28 of the 124 recently reapportioned districts in the House of Representatives as violating the Fourteenth and Fifteenth Amendments. *See* ECF No. 84, at 5 (¶ 9), 51–53 (¶¶ 160–73). Plaintiffs also assert a First Amendment claim based on the fact that congressional maps had not yet been enacted when they filed their First Amended Complaint. *See* ECF No. 84, at 5 (¶ 9), 51–53 (¶¶ 160–73). Plaintiffs seek various declaratory and injunctive relief. ECF No. 84, at 54–55.

### B. Procedural history.

Unsatisfied with the General Assembly's prompt action following the Census Bureau's significant delay in releasing key data, Plaintiffs sued. *See* ECF No. 1. They contended that the

redistricting process was not moving quickly enough and asserted that the new maps would not be finalized in time for them to challenge them before the 2022 election cycle. They initially wanted both a declaration that the 2010 maps were malapportioned based on the 2020 census and an injunction prohibiting those maps from being used in the 2022 election cycle. *See* ECF No. 1, at 24–27. Plaintiffs also asserted a freedom of association claim, alleging that without new maps, they could not associate with others and advocate for candidates. *See* ECF No. 1, at 27. Plaintiffs finally demanded that this Court supervise the redistricting process itself and impose deadlines on Defendants while this work remained ongoing. *See* ECF No. 1, at 28.

This case quickly developed a peculiar procedural history. Plaintiffs moved for a three-judge court under 28 U.S.C. § 2284. *See* ECF No. 17. Defendants opposed that premature request. *See* ECF Nos. 18, 45, 47. Additionally, the House Defendants moved to stay. *See* ECF No. 51. The Senate Defendants moved to dismiss or alternatively to stay, *see* ECF No. 57, and the Governor moved to dismiss, *see* ECF No. 61. Then, on November 9, 2021, nearly a month after filing their Complaint, Plaintiffs moved for a preliminary injunction based solely on their freedom of association claim. *See* ECF No. 59.

On November 12, 2021, before Plaintiffs' Motion for Preliminary Injunction was fully briefed, and despite expressly finding Plaintiffs' allegations and claims were "speculative" and "not yet ripe," the Court stayed the case and denied the Senate Defendants' Motion. ECF No. 63, at 12–13. After noting that the General Assembly would reconvene in regular session on January 11, 2022, the Court stayed the case, "giv[ing] the Legislature until the following Tuesday, January 18, 2022, to enact new district maps." ECF No. 63, at 12–13. At that point, the Court indicated, it would consider whether Plaintiffs' claims had "become ripe." ECF No. 63, at 12.

5

While the case was stayed, the Court granted Plaintiffs' Request for a Three-Judge Court Pursuant to 28 U.S.C. § 2284(a). *See* ECF No. 70; *see also* ECF No. 76 (Order appointing three-judge court). And the Court ordered the parties to finish briefing Plaintiffs' Motion for Preliminary Injunction and the Governor's Motion to Dismiss. *See* ECF No. 69.

After Plaintiffs noted they intended to amend their Complaint based on the then-recent reapportionment of the State's legislative districts, the parties asked the Court to extend the existing briefing deadlines because any such amendment would moot the pending motions. *See* ECF Nos. 73, 77. The Court ultimately adopted the current schedule and convened an informational session and status conference on December 22, 2021. *See* ECF Nos. 80–83. The following day, Plaintiffs filed their First Amended Complaint, which principally challenges 28 of the 124 recently reapportioned House districts under the Fourteenth and Fifteenth Amendments and claims that the lack of a congressional redistricting plan violated Plaintiffs' First Amendment associational rights. *See* ECF No. 84.

On January 6, 2022, Governor McMaster again filed a Motion to Dismiss, this time directed at Plaintiffs' First Amended Complaint. *See* ECF No. 94. Despite their initial urgency, Plaintiffs have now requested and received two extensions to respond, and their response is not due until February 3. *See* ECF Nos. 107, 112. Moreover, now that a new congressional map has been enacted, Plaintiffs have indicated they intend to seek leave to amend their claims yet again,[2] which would moot the Governor's Motion to Dismiss.

---

[2] Having to seek leave to amend once again is the result of Plaintiffs filing this case when their claims were "not yet ripe." ECF No. 63, at 12.

### C. Allegations and facts related to Governor McMaster.

For all 178 paragraphs in their First Amended Complaint, Plaintiffs actually allege very little related to the Governor. Plaintiffs allege that the Governor has the authority to sign or veto any reapportionment plan passed by the General Assembly. ECF No. 84, at 9 (¶ 23). They also allege that the Governor has the constitutional power to convene the General Assembly in extra session. ECF No. 84, at 20 (¶ 66). The only other allegation pertaining to the Governor is that he signed into law the legislation reapportioning the House and Senate districts. *See* ECF No. 84, at 1 (¶ 2), 9 (¶ 23), 11 (¶ 36), & 29 (¶ 95). Plaintiffs' First Amended Complaint is devoid of any other allegations related to Governor McMaster.

Plaintiffs have also responded to Governor McMaster's interrogatories.[3] *See* Ex. 1. When asked to identify the facts on which their claims against the Governor are based, Plaintiffs identified nothing beyond what was in their First Amended Complaint. *See id.* at 6–7. When asked to identify what relief they wanted specific to the Governor, Plaintiffs merely regurgitated the relief they have demanded in their First Amended Complaint against all Defendants, *see id.* at 9–11, while claiming that the Governor "would likely be involved in the compliance with and enforcement of any remedial map," *id.* at 7.

---

[3] These responses suffer from myriad deficiencies. For example, they include the type of general objections that "preserve[] nothing and serve[] only to waste the time and resources of both the parties and the court." *Curtis v. Time Warner Entertainment*, No. 3:12-cv-2370, 2013 WL 2099496, at *3 (D.S.C. May 14, 2013). And Plaintiffs refused to answer contention interrogatories, despite serving those same types of interrogatories on all Defendants. *See* Fed. R. Civ. P. 33(a)(2) (recognizing contention interrogatories are proper). But given the condensed timeframe of this case and the fact that nothing Plaintiffs could say in response to the interrogatories changes the analysis of the legal issues in this Motion, Governor McMaster has declined (at least for now) to pursue a motion to compel or discovery sanctions.

## **LEGAL STANDARD**

"Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." *Seastrunk v. United States*, 25 F. Supp. 3d 812, 814 (D.S.C. 2014). "A material fact is one that might affect the outcome of the suit under the governing law," and a dispute is "genuine" "if sufficient evidence favoring the non-moving party exists for the trier of fact to return a verdict for that party." *Id.* (cleaned up).

## **ARGUMENT**

All of Plaintiffs' claims against the Governor are now premised upon the Governor's exercise of his discretionary authority to approve legislation presented to him. For three reasons, Plaintiffs' claims against the Governor fail as a matter of law.[4]

### A.     **The Governor is protected by legislative immunity.**

Although an executive branch official, a governor is nevertheless protected by legislative immunity when he takes an action that is an "integral step[] in the legislative process." *Bogan v. Scott-Harris*, 523 U.S. 44, 55 (1998). Presentment of an act approved by the General Assembly to the Governor for his signature or veto is a constitutionally required (and thus integral) part of the legislative process. *See* S.C. Const. art. IV, § 21. Indeed, both the United States Supreme Court and the South Carolina Supreme Court have said as much. *See Smiley v. Holm*, 285 U.S. 355, 372–

---

[4] Plaintiffs' First Amendment claim was premised on the lack of a new congressional map. Now that S. 865 has been signed into law, that claim is moot. *See Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (claims are moot when "issues presented are no longer live" (cleaned up)). Plaintiffs have indicated that they intend to drop this First Amendment claim if they are granted leave to amend a second time, and no party can credibly insist now that Plaintiffs' First Amendment claim remains viable. Therefore, the Governor does not separately address that claim here but incorporates the arguments raised in Part II of his Motion to Dismiss. *See* ECF No. 94, at 14–24. And in any event, the Governor's other arguments here mean that Plaintiffs could not prevail against the Governor on their First Amendment claim even if it were not moot.

73 (1932) (recognizing that a governor's signing or vetoing of a bill constitutes part of the legislative process); *Williams v. Morris*, 320 S.C. 196, 206, 464 S.E.2d 97, 102 (1995) (noting that the state constitution "clearly envisions gubernatorial participation in the legislative process" and "require[es] the Governor's participation in enacting statutes"); *Parker v. Bates*, 216 S.C. 52, 58, 56 S.E.2d 723, 725 (1949) ("The veto power is a part of the legislative process." (citing *Doran v. Robertson*, 203 S.C. 434, 27 S.E.2d 714 (1943))); *cf. I.N.S. v. Chadha*, 462 U.S. 919, 946–51 (1983) (discussing the role of the President in the lawmaking process, describing the "important purpose" of the Presentment Clauses of the Constitution, and noting that "the Framers were acutely conscious that . . . the Presentment Clauses would serve [an] essential constitutional function[]").

In recognition of the fact that the chief executive plays an integral role in the legislative process, courts have consistently and unsurprisingly held that legislative immunity applies to gubernatorial decisions to sign or veto legislation. *See, e.g.*, *Bagley v. Blagojevich*, 646 F.3d 378, 391 (7th Cir. 2011) ("Legislative acts include signing and vetoing bills because they are integral steps in the legislative process." (internal quotation mark omitted)); *Torres Rivera v. Calderon Serra*, 412 F.3d 205, 213 (1st Cir. 2005) ("a governor who signs into law or vetoes legislation passed by the legislature is also entitled to absolute legislative immunity for that act"); *Women's Emergency Network v. Bush*, 323 F.3d 937, 950 (11th Cir. 2003) ("Under the doctrine of absolute legislative immunity, a governor cannot be sued for signing a bill into law."); *Cates v. Baltimore City Cir. Ct.*, No. CV ELH-18-1398, 2018 WL 2321121, at *3 (D. Md. May 22, 2018) ("Governor Hogan is entitled to absolute legislative immunity for any constitutionally authorized activities as whether to sign or veto a particular bill . . . ."), *aff'd*, 735 F. App'x 101 (4th Cir. 2018); *Smith v. Beasley*, No. 0:07-cv-1641-HFF-BM, 2007 WL 2156632, at *2 (D.S.C. July 25, 2007) ("As for the Defendant former Governor David Beasley, he has legislative immunity for his signing of Act

No. 83."); *cf. Peter B. v. Sanford*, No. 6:10-cv-767-TMC, 2012 WL 2149784, at *8 (D.S.C. June 13, 2012) (granting legislative immunity to Governor Sanford in a § 1983 claim involving allocation of state funds). This well-established case law precludes Plaintiffs from relying on the Governor's decision to sign H. 4493 (or S. 865) as the basis for any claims against the Governor.

Moreover, Supreme Court precedent requires the Governor be dismissed now—not after trial. Under the doctrine of legislative immunity, a person "should be protected not only from the consequences of litigation's results but also from the burden of defending [himself]." *Dombrowski v. Eastland*, 387 U.S. 82, 85 (1967). Thus, when legislative immunity protects a defendant, that defendant is entitled "to summary dismissal." *Crawford v. S.C. Dep't of Corr.*, No. CV 9:18-1408-TLW-BM, 2018 WL 9662788, at *4 (D.S.C. Oct. 16, 2018), *report and recommendation adopted,* No. 9:18-CV-01408-TLW, 2019 WL 4640970 (D.S.C. Sept. 24, 2019).

**B.    The Governor cannot be sued about state law simply because he is the Governor.**

Governor McMaster is the State's "Chief Magistrate," S.C. Const. art. IV, § 1, but that does not, without more, make him a proper defendant subject to being sued about any and every state law that a plaintiff does not like. When a governor "lack[s] the power to enforce, or direct the enforcement of, [a law]," a plaintiff "cannot sue the Governor" about it. *Doyle v. Hogan*, 1 F.4th 249, 255 (4th Cir. 2021); *see also Charleston Cty. Sch. Dist. v. Harrell*, 393 S.C. 552, 561, 713 S.E.2d 604, 609 (2011) ("[W]e affirm the dismissal of the Governor as a party to this action. Nothing in School District's complaint demonstrates a nexus between Governor or his authority and Act 189. Instead, School District only alleges that the Governor's ample executive powers render him an appropriate defendant in any suit where the constitutionality of a statute is challenged. This is an insufficient reason to name the Governor as a party defendant."). As the Fourth Circuit held just days ago, "the mere fact that a governor is under a general duty to enforce

10

state laws does not make him a proper defendant in every action attacking the constitutionality of a state statute." *Disability Rights S.C. v. McMaster*, ___ F.4th ___, No. 21-2070, 2022 WL 214094, at *3 (4th Cir. Jan. 25, 2022) (cleaned up). Without a "specific duty to enforce" a law, the Governor cannot be sued just because a state law is challenged. *Id.*

The Fourth Circuit's recent decisions in *Disability Rights* and *Doyle* follow from Supreme Court case law. *Ex parte Young*, 209 U.S. 123 (1908), also illustrates the flaws in Plaintiffs' effort to reach the Governor. Only when an official has "some connection with the enforcement of the act" does that doctrine provide an exception to sovereign immunity and permit a federal court to enjoin a state official. *Id.* at 157. And the Supreme Court has just reaffirmed black-letter law that an official who is not charged with enforcing a state law cannot be enjoined regarding that law. *See Whole Women's Health v. Jackson*, 142 S. Ct. 522, 534–36 (2021) (refusing to permit injunctive relief against the state attorney general who was not charged with enforcing Texas's new abortion statute).

Plaintiffs never allege any particular duty or obligation the Governor has when it comes to the recently reapportioned House districts separate and apart from the legislative process of adopting them. Nor do they identify any in their interrogatory responses. *See* Ex. 1, at 7–9. Indeed, they don't for good reason: Nothing in South Carolina law imposes on the Governor any responsibility for administering elections. Therefore, the Governor is not a proper defendant in this case.

      **C.**    **Plaintiffs lack standing to sue the Governor.**

It is axiomatic that federal courts may decide only "Cases" and "Controversies." U.S. Const. art. III, § 2. The case-and-controversy requirement means that a plaintiff must have standing. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). Standing requires a plaintiff

to show "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *Id.* This "standing inquiry must be evaluated separately as to each defendant." *Disability Rights*, 2022 WL 214094, at *3.

Even assuming Plaintiffs have alleged and could establish an injury in fact, the second and third elements of standing present insurmountable hurdles for Plaintiffs here. Traceability "means it must be likely that the injury was caused by the conduct complained of and not by the independent action of some third party not before the court." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 154 (4th Cir. 2000). And redressability means "that it must be likely, and not merely speculative, that a favorable decision will remedy the injury." *Id.*

Any harm alleged by Plaintiffs related to the recently reapportioned House districts or the General Assembly's recently completed redistricting process for the State's congressional districts is not traceable to the Governor or redressable by any injunction or judgment against him. And to the extent Plaintiffs principally take issue with the fact that the Governor signed H. 4493 (and now S. 865) into law, he enjoys legislative immunity for that act. *See Smiley*, 285 U.S. at 372–73. Likewise, the Governor cannot be ordered to sign or veto any congressional map that the General Assembly enacts, as such an order would violate both legislative immunity and the fundamental principles of federalism and the separation of powers. No possible injunction could be entered against him that would redress any of Plaintiffs' alleged harm. The Governor does not regulate, conduct, or oversee elections held based on the challenged districts; the State Election Commission and county boards of voter registration and elections do. *See* S.C. Code Ann. § 7-13-10 *et seq.* (establishing how elections are conducted in South Carolina). Nor does he make the rules for elections. *See* S.C. Const. art. II, § 10 ("The General Assembly shall provide for the nomination

of candidates, regulate the time, place and manner of elections, provide for the administration of elections and for absentee voting, insure secrecy of voting, establish procedures for contested elections, and enact other provisions necessary to the fulfillment and integrity of the election process."). In other words, a decision in Plaintiffs' favor with respect to the Governor would not address Plaintiffs' concerns. Plaintiffs therefore do not have standing to maintain this action against the Governor.

## **CONCLUSION**

For the foregoing reasons, the Court should grant Governor McMaster's Motion for Summary Judgment.

Respectfully submitted,

s/Wm. Grayson Lambert
Thomas A. Limehouse, Jr. (Fed. Bar No. 12148)
*Chief Legal Counsel*
Wm. Grayson Lambert (Fed. Bar No. 11761)
*Senior Legal Counsel*
Michael G. Shedd (Fed. Bar No. 13314)
*Deputy Legal Counsel*
OFFICE OF THE GOVERNOR
South Carolina State House
1100 Gervais Street
Columbia, South Carolina 29201
(803) 734-2100
tlimehouse@governor.sc.gov
glambert@governor.sc.gov
mshedd@governor.sc.gov

Christopher E. Mills (Fed. Bar No. 13432)
SPERO LAW LLC
557 East Bay Street #22251
Charleston, South Carolina 29413
(843) 606-0640
cmills@spero.law

*Counsel for Governor McMaster*

February 1, 2022
Columbia, South Carolina