## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## COLUMBIA DIVISION

| | |
|---|---|
| THE SOUTH CAROLINA STATE CONFERENCE OF THE NAACP, and<br><br>TAIWAN SCOTT, on behalf of himself and all other similarly situated persons,<br><br>              Plaintiffs,<br><br>        v.<br><br>THOMAS C. ALEXANDER, in his official capacity as President of the Senate; LUKE A. RANKIN, in his official capacity as Chairman of the Senate Judiciary Committee; JAMES H. LUCAS, in his official capacity as Speaker of the House of Representatives; CHRIS MURPHY, in his official capacity as Chairman of the House of Representatives Judiciary Committee; WALLACE H. JORDAN, in his official capacity as Chairman of the House of Representatives Elections Law Subcommittee; HOWARD KNAPP, in his official capacity as interim Executive Director of the South Carolina State Election Commission; JOHN WELLS, Chair, JOANNE DAY, CLIFFORD J. EDLER, LINDA MCCALL, and SCOTT MOSELEY, in their official capacities as members of the South Carolina Election Commission,<br><br>              Defendants. | **Case No. 3-21-cv-03302-JMC-TJH-RMG**<br><br>**SECOND AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**<br><br>**THREE-JUDGE PANEL** |

## INTRODUCTION

1.     The South Carolina Legislature has yet again used its redistricting power to harm South Carolina voters and discriminate against Black voters. First, the Legislature waited months to pass any maps at all, depriving voters of the ability to know which candidates would represent them and organize accordingly. The Legislature's unreasonable postponement of their constitutional duties forced Plaintiffs South Carolina State Conference of the NAACP ("South Carolina NAACP") and Taiwan Scott (collectively, "Plaintiffs") to seek redress in court.

2.     Next, the Legislature finally enacted a racially gerrymandered state House map that also intentionally discriminates against Black voters. Plaintiffs amended their complaint to challenge that map.

3.     Now, having finally redrawn South Carolina's U.S. congressional map, the Legislature again enacted a racially gerrymandered map that, consistent with previous redistricting cycles, discriminates against Black voters. It ignored the many South Carolinians who implored lawmakers to draw fair and nondiscriminatory maps that comply with the U.S. Constitution when redrawing congressional and state legislative maps. Instead, the Legislature chose perhaps the worst option of the available maps in terms of its harmful impact on  Black voters that it proposed or were proposed by members of the public. Accordingly, Plaintiffs are compelled to file this Second Amended Complaint.[1]

4.     Having unnecessarily delayed reapportionment and redrawing—most egregiously, pushing congressional redistricting until after its regular legislative session began on January 11,

---

[1]     Because the Senate is not holding elections until 2024, Plaintiffs in this lawsuit are not currently challenging any Senate districts adopted in H. 4493. Plaintiffs do not waive their right to challenge these districts later.

2022—the Legislature has imperiled adjudication on the two maps' legality before the March 30, 2022 candidate qualifying period ends.

5.    Defendants' racial gerrymandering and intentional vote dilution in certain state House and, now, congressional districts continue South Carolina's persistent legacy of discrimination against Black voters. Although South Carolina has made important progress on voting rights over the past fifty years—in no small part, due to private lawsuits and/or the U.S. Department of Justice's intervention—Defendants continue to evade their constitutional obligations for redistricting. In *every* redistricting cycle since Congress enacted the Voting Rights Act of 1965 ("VRA"), courts have needed to adjudicate racial discrimination claims relating to South Carolina state and/or congressional redistricting plans. This cycle proves no different.

6.    House Bill 4493 ("H. 4493"), which enacted racially gerrymandered state House districts into law was motivated, at least in part, by a discriminatory purpose. It is the latest example of a decades-long pattern by the Legislature of proposing or enacting state legislative districts that discriminate against Black voters to maintain the power of white voters and deny Black South Carolinians' voting power. The Legislature did so by using race as the predominant factor in creating certain state House districts without a legally acceptable justification and having a discriminatory purpose in packing and cracking Black voters to dilute their vote.

7.    Senate Bill 865 ("S. 865"), was enacted on January 26, 2022, after much delay. S. 865 discriminates on the basis of race by appearing to preserve the ability of Black voters to elect in Congressional District 6 ("CD") while working adeptly to deny the ability of Black voters to elect or even influence elections in any of the other six congressional districts. For example, S.865 purposefully moves a disproportionate number of white voters from CD 1 and CD 2 into

3

CD 6, as compared to Black voters from the same areas. In CD 2, for example, the movement of white voters into CD 6 was not driven by pure partisan motivation because the Legislature selected Voting Tabulation Districts ("VTDs") with significant populations of white voters, who in recent elections have voted for Democratic candidates. Conversely, they did not do the same to VTDs comprised of significant populations of Black voters who also have preferred candidates running on the Democratic ticket in recent elections. In this decision and others, the enacted congressional map thus relies on race as the predominant factor over all other considerations.

8.      Black and white voters were sorted among the congressional districts under the guise of correcting for CD 1's significant over population and CD 6's underpopulation. But various alternatives were proposed to the Legislature which reapportioned South Carolina's congressional map without locking in the majority's advantage in six of the seven congressional districts and harming Black voters to achieve that objective. Because of Defendants' unlawful discrimination, S. 865 dilutes the voting strength of Black South Carolinians in CDs 1, 2, and 5.

9.      The consideration of race in drawing districts lines is permissible and necessary in many areas of South Carolina to ensure compliance with Section 2 of the VRA. But the Legislature's consideration of race in the drawing of state House and congressional districts in H. 4493 and S. 865 was not narrowly tailored for a compelling governmental interest such as complying with the VRA. Indeed, there is no indication that the Legislature conducted a racially polarized voting analysis ("RPV") or any other analysis key to compliance with the VRA to determine whether the high Black voting-age populations ("BVAPs") present in the districts that pack Black voters were necessary to comply with the VRA or whether cracking Black voters at

BVAPs too low would render their votes essentially meaningless in the presence of RPV.[2]

Instead, H. 4493 and S. 865 represent the Legislature's intent to use race to maintain political

power by unnecessarily packing Black South Carolinians into certain districts and cracking

Black voters in other districts.

10.     In Sumter County, for example, Defendants drew the line between state House

District ("HD") 51 and HD 67 to almost surgically track areas of the county with a higher

population of Black residents. The result is predictable: Black voters are packed into HD 51,

with a BVAP of more than 61%, and cracked in HD 67, with a BVAP of around 28%. And, for

reasons detailed below, these choices run afoul of the House's redistricting guidelines regarding

its purported commitment to respect communities of interests, among other traditional

redistricting principles. Moreover, Defendants failed to articulate a legally acceptable

justification for doing so.

---

[2]     An RPV analysis considers whether there is a pattern of voting along racial lines in which voters of the same race tend to support the same candidates, which usually differs from the candidates supported by voters of a different race. This is the key consideration in determining whether a redistricting plan dilutes the vote of racial minority voters. *See N. Carolina State Conf. of NAACP v. McCrory*, 831 F.3d 204, 221 (4th Cir. 2016) (noting that RPV is "[o]ne of the critical background facts of which a court must take notice" in Section 2 cases); *Collins v. City of Norfolk*, 816 F.2d 932, 936–38 (4th Cir. 1987) (emphasizing that RPV is a "cardinal factor[]" that "weigh[s] very heavily" in determining whether redistricting plans violate Section 2 by denying Black voters equal access to the political process). As general matter, the U.S. Supreme Court in *Thornburg v. Gingles*, 478 U.S. 30 (1986), found probative for assessing RPV elections in which voters have been presented with a choice between at least one candidate who is a member of the minority group at issue and at least one candidate who is not.



(*House Districts 51 and 61 H. 4493*)

11.    Similar mischief is clear in the Legislature's congressional map. In the downtown and West Ashley areas of Charleston, for example, the Legislature moved a disproportionate share of white voters from CD 1 into CD 6, as compared to Black voters in the same area. The Legislature's line-drawing, as well as an analysis of how Black and white voters in the precincts moved out of CD 1, for example, share party preferences, but were sorted differently between these districts, makes clear that race drove the selection of voters brought into CD 6 over those left in CD 1 from areas of Charleston.

12.    The Legislature enacted South Carolina House Districts 7, 8, 9, 11, 41, 43, 51, 54, 55, 57, 59, 60, 63, 67, 70, 72, 73, 74, 75, 76, 77, 78, 79, 90, 91, 93, 95, 101, 105 in H. 4493 (the "Challenged State House Districts") using race as a predominant factor in a manner not narrowly tailored to comply with Section 2 of the VRA or any other compelling governmental interest.

6

These districts therefore violate the Fourteenth Amendment of the U.S. Constitution and must be enjoined.

13.    Likewise, the Legislature subordinated racially redistricting principles and used race as a predominant factor to enact South Carolina Congressional Districts 1, 2, and 5 (the "Challenged Congressional Districts"). The Challenged Congressional Districts are not narrowly tailored to comply with Section 2 of the VRA or any other compelling governmental interest. They are therefore unlawful.

14.    H. 4493 and S. 865 also result from intentional racial discrimination because they were motivated, at least in part, by a discriminatory purpose. Indeed, the Legislature went forward with the proposed plans even though, during the legislative process, Black legislators and members of the public repeatedly warned that they would harm Black South Carolinian voters. Alternative proposals existed which would satisfy the Legislature's criteria and not dilute Black voting strength, and this post-2020 redistricting for the House and Congress is part of a continuum of using various harmful stratagems over decades to minimize Black voting power in the state.

15.    Accordingly, the Challenged House Districts and the Challenged Congressional Districts violate the Fourteenth and Fifteenth Amendments of the U.S. Constitution and must be enjoined.

16.    And because of Defendants' delay in passing these unconstitutional maps, the Court must adjudicate and remedy those issues in time to avoid voter confusion and disenfranchisement in the upcoming election cycle, or delay election-related deadlines as necessary.

## PARTIES

17.    Plaintiff **THE SOUTH CAROLINA STATE CONFERENCE OF THE NAACP** is a nonprofit, nonpartisan membership organization in South Carolina. The South Carolina NAACP is a state subsidiary of the National Association for the Advancement of Colored People ("NAACP"), a national civil rights organization. The South Carolina NAACP was chartered in 1939 and is the oldest civil rights group in South Carolina.

18.    Consistent with the national NAACP's mission, the South Carolina NAACP, on behalf of its members and the other constituents it serves, seeks to remove all barriers of racial discrimination through democratic processes and the enactment and enforcement of federal, state, and local laws securing civil rights, including laws relating to voting rights. For example, on behalf of its members and other constituents, the South Carolina NAACP has held and has sponsored voter education and voter registration activities for years and has been credited with registering thousands of voters throughout South Carolina.

19.    The South Carolina NAACP has 77 branches comprised of adult members across the state, including at least one branch in each of South Carolina's 46 counties.

20.    Together, the South Carolina NAACP has more than 13,000 members across all 46 counties, who are predominantly but not exclusively Black people. Its membership also includes other racial and ethnic minority residents, as well as white South Carolinians.

21.    Its members and constituents reside in House and congressional legislative districts that the Legislature has racially gerrymandered and intentionally diluted and will be harmed by the Defendants' actions. Specifically, members live in the Challenged State House Districts and Challenged Congressional Districts. These members have been and, if H. 4493 and S. 865 are not enjoined, will continue to be harmed by their assignment to unconstitutionally

8

racially gerrymandered districts and purposefully dilutive districts. The South Carolina NAACP's members include registered voters in the Challenged House and Congressional Districts.

22.     Plaintiff **TAIWAN SCOTT** is a U.S. citizen and Black, registered voter, and resident of Hilton Head in Beaufort County, South Carolina. Specifically, Mr. Scott resides in newly formed CD 1. Mr. Scott and members of his family, who have lived in Hilton Head for seven generations, are Gullah people, descendants of West African people who were enslaved and forcibly brought to America's southeastern coast, including South Carolina's coastal plain and Beaufort Sea Islands. While living and contributing to South Carolina in a myriad of ways, Black South Carolinians, including Gullah community members like Mr. Scott, have endured discrimination and other harms relating to taxation, heirs' property, land seizures, highway construction, lack of business and development opportunities, and many other issues.

23.     The Legislature used race as the predominant factor motivating its decisions to place a significant number of voters, like Mr. Scott, within or outside of the Challenged Congressional Districts. CD 1 is not narrowly tailored to satisfy the VRA or any other compelling interest. Mr. Scott is further harmed by the congressional map that is intentionally designed to dilute Black voting power in South Carolina.

24.     Defendant **THOMAS C. ALEXANDER**, in his official capacity as President of the South Carolina Senate, is a proper defendant as leader of the Senate, which drafts and passes redistricting legislation, including for Congress, for consideration by the General Assembly, such as H. 4493 and S. 865.

25.     Defendant **LUKE A. RANKIN**, in his official capacity as Chairman of the Senate Judiciary Committee, is a proper defendant as leader of the committee responsible for drafting

and passing redistricting legislation, including for Congress, for consideration by the full Senate, such as H. 4493 and S. 865.

26.    Defendant **JAMES H. LUCAS**, in his official capacity as Speaker of the South Carolina House of Representatives, is a proper defendant as leader of the House charged with presiding over the House and ratifying bills upon passage by both houses of the Legislature pursuant to Article III, Section 18 of the South Carolina Constitution, such as H. 4493 and S. 865.

27.    Defendant **CHRIS MURPHY**, in his official capacity as Chairman of the Judiciary Committee of the House of Representatives, is a proper defendant as leader of the committee responsible for drafting and passing redistricting legislation for consideration by the full House, such as H. 4493 and S. 865.

28.    Defendant **WALLACE H. JORDAN**, in his official capacity as Chairman of the Election Laws Subcommittee of the House of Representatives, is a proper defendant as leader of the subcommittee responsible for drafting and passing redistricting legislation for consideration by the Judiciary Committee of the House of Representatives and the full House, such as H. 4493 and S. 865.

29.    Defendant **HOWARD KNAPP**, in his official capacity as the interim Executive Director of the South Carolina State Election Commission ("SEC"), is a proper defendant as the head of the South Carolina agency responsible for implementing and conducting elections pursuant to S.C. Code Ann. §§ 7-3-10, et seq. and 7-13-10, et seq., as amended. Specifically, S.C. Code Ann. § 7-13-45 requires the SEC Executive Director to administer H. 4493 by (1) accepting filings for state House and U.S. Congressional candidates and (2) publicizing certain details related to the filing period. In practice, the Executive Director also provides guidance to

10

the 46 directors of the county boards of voter registration and election regarding their acceptance of filings for state House and U.S. Congressional candidates, as well as their publicization of details related to the filing period, including to implement H. 4493 and S. 865.

30.     Defendants **JOHN WELLS, JOANNE DAY, CLIFFORD J. EDLER, LINDA MCCALL**, and **SCOTT MOSELEY**, in their official capacities as SEC members, are proper defendants as persons charged with the powers and duties of the SEC pursuant to S.C. Code Ann. §§ 7-3-10, et seq. and 7-13-10, et seq., as amended. In addition, S.C. Code Ann. § 7-11-15 requires the SEC to design, distribute, and process forms for the statement of intention of candidacy, which candidates for state House seats under H. 4493 and U.S. Congressional under S. 865 candidates must file during a specified time period.

## JURISDICTION AND VENUE

31.     This action arises under the Fourteenth and Fifteenth Amendments of the U.S. Constitution.

32.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(3) and (4), 2201, 2202, and 2284, as well as 42 U.S.C. §§ 1981, 1983, and 1988.

33.     A three-judge panel has been properly appointed pursuant to 28 U.S.C. § 2284(a) because this action challenges "the constitutionality of the apportionment of congressional districts" and "the apportionment of any statewide legislative body."

34.     Venue is proper pursuant to 28 U.S.C. § 1391(b) and 28 U.S.C. § 2284.

35.     This Court has personal jurisdiction over Defendants, who are sued in their official capacities as state officials. The violations complained of concern their conduct in such capacities.

## STATEMENT OF FACTS

36.    On December 10, 2021, Governor Henry McMaster signed into law H. 4493, which redistricted the South Carolina House of Representatives and State Senate for the next decade as Act 117. On January 26, 2022, Governor McMaster signed into law S. 865, which redistricted the South Carolina congressional districts for the next decade as Act 117. Before turning to these enactments, discussion of the background and circumstances surrounding H. 4493's and S. 865's enactment are warranted.

### Brief History of State Legislative Redistricting in South Carolina

37.    H. 4493 and S. 865 are the latest iteration of South Carolina's long pattern of official acts of racial discrimination including its enactment of various discriminatory voting rules that deny and abridge the voting rights of Black South Carolinians. One of many examples, an 1892 South Carolina voter registration law "is estimated to have disfranchised 75 percent of South Carolina's [B]lack voters."[3] Three years later, South Carolina "was a leader in the widespread movement to disenfranchise [eligible Black citizens]."[4] Lynching of Black people and other acts of racial violence also served as impediments to Black voters as they attempted to exercise their right to vote. Until the VRA's historic passage in 1965, South Carolina enforced both a literacy test and a property test that were "specifically designed to prevent [Black people] from voting."[5] South Carolina promptly challenged the VRA's constitutionality as part of its effort to deny equal voting rights to Black people.

---

[3]    *Condon v. Reno*, 913 F. Supp. 946, 949 (D.S.C. 1995) (citing J. Morgan Kousser, *The Shaping of Southern Politics: Suffrage Restrictions and the Establishment of the One Party South*, 1880–1910, p. 49 (New Haven: Yale University Press 1974)).

[4]    *South Carolina v. Katzenbach*, 383 U.S. 301, 310 n.9 (1966).

[5]    Tom Henderson Wells, *The Phoenix Election Riot*, 31 Phylon 58 (1970).

38.     Racial discrimination against Black South Carolinians has diminished their ability to participate politically and elect their preferred candidates up to the present day. Since 1982, Black candidates have run for statewide offices, including for Governor, Attorney General, Secretary of State, and Treasurer. Yet South Carolina failed to elect a single Black official to a statewide office in the twentieth century. Prior to the 1992 creation of a district comprised of a majority of Black voters ("majority-Black district") for the Sixth U.S. Congressional District, *no* Black candidate served in Congress from South Carolina in the twentieth century. And before Senator Tim Scott's historic election in 2014, *no* Black candidate had been elected to statewide office since Reconstruction.

39.     Until the U.S. Supreme Court's decision in *Shelby County, Alabama v. Holder*, 570 U.S. 529 (2013), Section 5 of the VRA played a vital role in safeguarding against proposed retrogressive voting plans—that is, plans that weakened the ability of racial and ethnic minority voters to participate politically. With this preclearance requirement in place for South Carolina and its sub-jurisdictions, the U.S. Department of Justice ("DOJ") objected 120 times between 1971 and 2013 to proposed racially discriminatory changes in voting practices or procedures in South Carolina. The DOJ has objected to proposed practices that would have affected nearly every aspect of Black voters' participation in South Carolina's electoral processes, including discriminatory redistricting, annexations, voter assistance regulations, changing county boundaries, eliminating offices, reducing the number of seats on a public body, majority vote requirements, changing to at-large elections, using numbered posts or residency requirements, staggering terms, and the schedule of elections.

40.     Of these DOJ objections, at least 27 of them involved a proposed state or local redistricting plan that "ha[d] the purpose of or w[ould] have the effect of diminishing the ability

of . . . citizens of the United States on account of race or color . . . to elect their preferred candidates of choice."[6] Three objections specifically challenged post-census House redistricting plans in three redistricting cycles in 1971, 1981, and 1994, including maps that would have resulted in the fragmentation and dilution of Black voting strength.

41.    From 1996 until *Shelby County*, DOJ interposed a total of 13 Section 5 objections, 12 of which concerned voting changes that had the effect, and sometimes also the purpose, of minimizing the opportunity of Black citizens to elect their preferred candidates. In addition, four lawsuits under Section 2 of the VRA were brought to challenge discriminatory at-large election schemes, all of which led to the adoption of single-member district election systems to provide Black voters with equal electoral opportunities.

42.    In the past 25 years, South Carolina has continued to implement or seek to implement at-large election systems, redistricting plans, and municipal annexations that minimize and dilute Black voters' electoral opportunities in the State's "long and well-documented" context of racially polarized voting, or "RPV."[7] As a few examples, public officials in Charleston, Cherokee, Greenville, Lexington, Richland, Spartanburg, Sumter, and Union Counties have changed district lines or voting rules in ways that would diminish the ability of Black voters to elect candidates of their choice. Some of the lines in these counties are at issue in this suit.

---

[6]    *Voting Determination Letters for South Carolina*, U.S. Department of Justice, https://www.justice.gov/crt/voting-determination-letters-south-carolina (last updated: Aug. 7, 2015); John C. Ruoff & Herbert E. Buhl, *Voting Rights in South Carolina: 1982–2006*, 17 S. Cal. Rev. L. & Soc. Just. 645, 655–57 (Spring 2008); 52 U.S.C. § 10304(b).

[7]    *Colleton Cnty. Council v. McConnell*, 201 F. Supp. 2d 618, 640–41 (D.S.C. 2002).

43.     South Carolina also has discriminated against Black voters by drawing malapportioned maps. And for the last five redistricting cycles—*every* cycle since Congress enacted the VRA—courts have needed to adjudicate racial discrimination claims relating to South Carolina's state legislative and/or congressional redistricting plans. *Backus v. South Carolina*, 857 F. Supp. 2d 553 (D.S.C. 2012), *aff'd*, 568 U.S. 801 (2012); *Colleton Cnty. Council*, 201 F. Supp. 2d at 618, *opinion clarified* (Apr. 18, 2002); *Burton v. Sheheen*, 793 F. Supp. 1329, 1337 (D.S.C. 1992); *S.C. State Conf. of Branches of the NAACP v. Riley*, 533 F. Supp. 1178 (D.S.C. 1982), *aff'd* 459 U.S. 1025 (1982); *Twigg v. West*, No. 71-1211 (D.S.C. Apr. 7, 1972). More often than not, courts have found that South Carolina broke the law.

44.     Because of South Carolina's record of malapportionment and racial discrimination across numerous redistricting cycles, this Court has acknowledged that "judicial intervention in the South Carolina redistricting process has been frequently unavoidable." *Burton*, 793 F. Supp. at 1337.

### South Carolina's Redistricting Criteria

The House's Redistricting Criteria

45.     On August 3, 2021, the South Carolina House's Redistricting Ad Hoc Committee ("House Redistricting Committee")—the body responsible for preparing and developing redistricting plans for the House for the post-2020 redistricting cycle—adopted its guidelines and criteria for U.S. Congressional and state legislative redistricting.[8] The Committee did not hold

---

[8]     S.C. House of Rep. Judiciary Comm. Redistricting Ad Hoc Comm., *2021 Guidelines and Criteria for Congressional and Legislative Redistricting* (Aug. 3, 2021), *available at* https://redistricting.schouse.gov/docs/2021%20Redistricting%20Guidelines.pdf.

*any* public hearing to receive feedback and public comment on guidelines or criteria before any were adopted.

46.    These guidelines begin by listing requirements under the U.S. Constitution, other federal law, and state law.

47.    In discussing federal requirements, the House Redistricting Committee's guidelines state that "race may be a factor considered in the creation of redistricting plans, but it shall not be the predominant factor motivating the legislature's decisions concerning the redistricting plan and shall not unconstitutionally predominate over other criteria set forth in these guidelines."

48.    The guidelines further state that "[a]ny proposed redistricting plan that is demonstrated to have the intent or effect of dispersing or concentrating minority population in a manner that prevents minorities from electing their candidates of choice will neither be accepted nor approved."

49.    In addition to listing legal compliance, the guidelines identify five criteria for redistricting. The first guideline listed is "equal population/deviation," which states that Congressional districts "shall be as nearly equal in population as is practicable," and that state legislative districts "shall have substantial equality of population." The guidelines further instruct that those state legislative districts may have population deviations within plus or minus 2.5% of the mathematical mean or 5% overall of the total population. Any overall total population deviation "greater than five percent from equality of population among South Carolina House districts shall be justified when it is the result of geographic limitations, the promotion of a constitutionally permissible state policy, or to otherwise comply with the criteria identified in these guidelines."

50.     As discussed more below, the Committee rejected amendments and requests from members of the public to amend its criteria to allow more flexibility by tolerating population deviations within a range of plus or minus 5% of the mathematical mean, or 10% overall of the total population, consistent with federal case law.[9]

51.     The next guideline is "contiguity." This states that each district must be "comprised of contiguous territory," and although contiguity "by water is sufficient," areas that "meet only at the points of adjoining corners are not considered contiguous."

52.     The next guideline is "compactness" and states that each district must also be "reasonably compact in form and should follow census geography" under the criteria.

53.     The next guideline is "communities of interest." That guideline states that these communities should be "considered and balanced." Under the criteria, "[c]ounty boundaries, municipality boundaries, and precinct lines (as represented by the Census Bureau's Voting Tabulation District lines) may be considered as evidence of communities of interest to be balanced, but will be given no greater weight, as a matter of state policy, than other identifiable communities of interest." The House Committee provides that the following factors may contribute to a community of interest, "including, but not limited to the following: (a) economic; (b) social and cultural; (c) historic influences; (d) political beliefs; (e) voting behavior; (f) governmental services; (g) commonality of communications; and (h) geographic location and features."

54.     The guidelines also allow "incumbency considerations" to be considered and instruct that "[r]easonable efforts may be made to ensure that incumbent legislators are not

_____

[9]     *See, e.g.*, *Brown v. Thomson*, 462 U.S. 835, 842 (1983) (+/-5% (or 10% overall) deviation from ideal generally permissible).

placed into districts where they will be compelled to run against other incumbent members of the South Carolina House of Representatives. The guidelines are clear that "incumbency considerations shall not influence the redistricting plan to such an extent as to overtake other redistricting principles."

55.    The guidelines end with an instruction that the House Redistricting Committee "should make reasonable efforts to be transparent and allow public input into the redistricting process." Moreover, "any deviation from the criteria shall not be any more than necessary to avoid the violation of law, and the remainder of the redistricting plan shall remain faithful to the criteria."

Senate's Redistricting Criteria

56.    On September 17, 2021, the South Carolina Senate Judiciary Redistricting Subcommittee ("Senate Redistricting Subcommittee")—the Senate's body responsible for preparing and developing redistricting plans for the post-2020 redistricting cycle—adopted its guidelines and criteria for U.S. Congressional and state legislative redistricting.[10]

57.    These guidelines begin by listing requirements under the U.S. Constitution and federal law.

58.    In discussing the requirements of federal law, the Senate guidelines state a "redistricting plan for the General Assembly or Congress must not have either the purpose or the effect of diluting minority voting strength and must otherwise comply with Section 2 of the

---

[10]    S.C. Senate Judiciary Comm. Redistricting Subcomm., *2021 Redistricting Guidelines* (Sep. 17, 2021), https://redistricting.scsenate.gov/ (document available via "2021 Senate Redistricting Guidelines" hyperlink).

Voting Rights Act, as expressed through *Thornburg v. Gingles* and its progeny, and the Fourteenth and Fifteenth Amendments to the U.S. Constitution."

59.    The guidelines further state that "race must not be the predominant factor in that race-neutral considerations are subordinated to racial considerations, unless that subordination is narrowly tailored to serve a compelling state interest."

60.    The next guideline is "contiguity." It states that each district must be "composed of contiguous geography," which may include point-to-point contiguity "so long as adjacent districts do not use the same vertex as points of transversal."

61.    The guidelines also identify additional considerations that "should be given consideration, where practical and appropriate, in no particular order of preference." The first additional consideration is "communities of interest." Under the guidelines, "[a]reas defined by geographic, demographic, historic or other characteristics that cause people to identify with one another, including economic, social, cultural, language, political, and recreational activity interests common to the area's population may constitute communities of interest." And communities of interest "may be overlapping and may consist of one or more formally, or informally, defined geographic areas with unifying common interests."

62.    The next additional consideration is "constituent consistency," which the guidelines define as "[p]reserving the cores of existing districts, keeping incumbents' residences in districts with their core constituents, and avoiding contests between incumbent legislators."

63.    The next two additional considerations are "minimizing divisions of county boundaries" and "minimizing divisions of cities and towns."

64.    These additional considerations also include "minimizing divisions of voting precinct boundaries." The guidelines state that "[b]oth existing lines and pending precinct

boundary realignments should be considered." But if "precincts are split, every effort should be made to divide precincts along recognizable and demonstrable boundaries."

65.     The final additional consideration is "district compactness." The guidelines state that to determine "the relative compactness of a district, consideration should be given to geography, demography, communities of interest, and the extent to which parts of the district are joined by roads, media outlets, or other means for constituents to communicate effectively with each other and with their representative."

## The Process Leading to the Enactment of H. 4493

The House Legislative Process

66.     The House Redistricting Committee's redistricting hearings were largely inaccessible to members of the public. Prior to the release of U.S. Census data in August and September 2021, meetings were announced with less than a week's notice. From September 8 through October 4, 2021, the Committee held eleven public hearings on redistricting before proposing any congressional plans.[11] But these meetings were largely inaccessible to the public. The first few meetings were announced with less than a week's notice, which left insufficient time for community members to adjust their schedules and prepare meaningful testimony. Moreover, the first ten meetings did not offer any opportunities for remote testimony, which excluded community members who could not attend meetings in person or did not live close enough to the meeting to attend in-person. These hearings, which had the purported goal of gathering public input on the redistricting process, were scheduled during a resurgence of COVID-19 cases in South Carolina, yet only the last two hearings (on September 28 and October

---

[11]     S.C. House of Rep. Judiciary Comm. Redistricting Ad Hoc Comm., *Public Hearings*, https://redistricting.schouse.gov/publichearing.html.

4) had a remote-testimony option. But these two hearings were still scheduled on weekdays and started during normal business hours at 4:30 p.m.

67.     These choices effectively limited participation to those who lived near the location, had access to transportation, and were willing to chance the potential risk of exposure to COVID-19. If people could not attend these sessions, they could not testify or meaningfully engage with other people's testimony during most of the House Redistricting Committee's public hearings. Similarly, the two hearings at which a remote testimony option was available began at 4:30 p.m. and ended at 6:30 p.m. on weekdays, making it unlikely that working people and people with children or other family obligations could attend.

68.     On August 9, 2021, Plaintiff South Carolina NAACP, along with other advocacy organizations, sent a letter to the House Committee reminding them of their affirmative obligations under the U.S. Constitution and Section 2 of the VRA, highlighting the House Committee's obligation to conduct an RPV analysis and to refrain from developing maps that unnecessarily "pack" Black voters into districts with high Black populations or "crack" them into districts with unnecessarily low ones, explaining that both stratagems can illegitimately elevate race over other considerations and diminish the political power of Black voters.[12] The letter also recommended ways to ensure transparency and opportunities for public input during all stages of the redistricting process—before, during, and after proposing maps.

69.     On August 30, 2021, Plaintiff South Carolina NAACP, along with other advocacy organizations, sent a follow-up letter to the House Redistricting Committee reiterating concerns

---

[12]     Letter from the South Carolina NAACP, et al., to the S.C. House of Rep. Judiciary Comm.'s Redistricting Ad Hoc Comm. (Aug. 9, 2021), https://www.naacpldf.org/wp-content/uploads/Letter-to-SC-HouseRedistricting-Ad-Hoc-Committee_08.09.2021_final.pdf.

about the House Committee's failure to transparently conduct its redistricting process and

provide opportunities for meaningful public participation.[13]

70.      On October 8, 2021, Plaintiff South Carolina NAACP, along with other advocacy

organizations, proposed two U.S. Congressional plans and a state House redistricting plan to the

House Committee, along with a submission letter.[14] These proposed plans corrected for

population disparities between districts following the 2020 decennial Census and preserved

majority-Black districts or otherwise developed districts that would have continued to be

effective for Black voters (that is, enable them to elect candidates of their choice), among other

considerations and requirements that complied with the House Redistricting Committee's criteria

and the U.S. Constitution and other federal law. In the submission letter, the groups further

reiterated the House Committee's affirmative obligations to comply with the U.S. Constitution

and Section 2 of the VRA, as well as reminded the Committee that it must conduct an RPV

analysis to determine its compliance with the VRA.

71.      In particular, the letter detailed how RPV patterns persist in various parts of

South Carolina. On the state level, for example, according to an RPV analysis of the 2020

election for U.S. Senate, Jamie Harrison, the candidate of choice of Black voters across South

Carolina, received only approximately 25% of white voter support and lost, despite receiving

approximately 98% of Black voter support. Similar patterns were present in elections featuring

---

[13]    Letter from the South Carolina NAACP, et al., to the S.C. House Judiciary Comm.'s Redistricting Ad Hoc Comm. (Aug. 30, 2021), https://www.naacpldf.org/wp-content/uploads/Follow-Up-Letter-to-SCHouse-Redistricting-Ad-Hoc-Committee-8-30-21.pdf

[14]    Letter from the South Carolina NAACP, et al., to the S.C. House Judiciary Comm.'s Redistricting Ad Hoc Comm. (Oct. 8, 2021), https://www.naacpldf.org/press-release/ldf-submits-proposed-submitting-proposed-congressional-and-senate-maps-to-the-south-carolina-senate-judiciary-redistricting-subcommittee-and-the-house-redistricting-ad-hoc-committee/ (documents available via hyperlinks).

22

Black-preferred candidates in other key elections, including in the 2018 elections for the

Secretary of State and State Treasurer. For example, in the 2018 election for Secretary of State,

Melvin Whittenburg, the candidate of choice of Black voters across South Carolina, received

only approximately 23% of white voter support and lost with approximately 95% of Black voter

support. In the 2018 election for State Treasurer, Rosalyn Glenn, the candidate of choice of

Black voters across South Carolina, received only approximately 21% of white voter support and

lost, despite receiving 95% of Black voter support.

72.    An RPV analysis demonstrates that similar patterns also exist at the county level

in most parts of the state for these elections. That is, Black voter-supported candidates have been

defeated because of insufficient white cross-over voting for those candidates in counties across

the state from Anderson to Greenville, to York, to Berkeley, Georgetown, and Charleston.

73.    After this October 8 submission deadline, the House Redistricting Committee

gave no information about when it would release maps or deliberate further, until November 8,

when it released a state "House Staff Plan" and announced that it would hold a public hearing on

it less than 48 hours later, on November 10, 2021, with the option for another hearing on

November 12, 2021. In reality, the public had less time to prepare because on November 8 at

6:30 p.m., the House Redistricting Committee released a revised state House working draft to

address discrepancies in the previously released files.

74.    On November 10, the House Redistricting Committee invited members of the

public to testify on its state House Staff Plan. To begin, Rep. Jordan asserted that the state House

Staff Plan complied with the U.S. Constitution and other federal law, but he did not explain what

analysis had been undertaken to reach that conclusion, and gave no indicia that the Committee

had conducted an RPV analysis. During the hearing, several members of the public asked

23

whether the Committee conducted any RPV analysis, explaining that such an analysis is necessary for compliance with the U.S. Constitution and Section 2 of the VRA and to avoid racially gerrymandering. In explaining these concerns, some members of the public discussed how RPV patterns exist statewide. The Committee did not address or answer these questions or give any indicia that it had conducted an RPV analysis. Nor did the Committee directly address repeated concerns raised by members of the public that the state House Staff Plan unnecessarily cracked and packed Black communities and split communities of interest.

75. Instead, Rep. Wm. Weston J. Newton attempted to cast doubt on these concerns by claiming that it was "noteworthy" that the previous set of redistricting plans were precleared by the DOJ under Section 5 of the VRA under a non-retrogression standard (i.e., whether the plan weakened the ability of Black voters to participate in the process when compared to the benchmark map). Representative Jason Elliott also claimed that the non-retrogression standard is the same one that applies for consideration of maps today. But multiple members of the public corrected this misstatement, explaining that DOJ preclearance determinations did not include an analysis of whether the maps comply with Section 2, for example. In contrast, as Plaintiff South Carolina NAACP and other organizations repeatedly conveyed in correspondence and testimony, Section 2 prohibits maps that dilute minority voting strength based on the U.S. Supreme Court's framework in *Thornburg v. Gingles*, 478 U.S. 30 (1986), regardless of whether the challenged map is retrogressive when compared to the benchmark map. As members of the public explained, this means a precleared plan could still run afoul of the U.S. Constitution and Section 2 of the VRA because they involve different standards than what was used for preclearance determinations.

76.     Representative Newton also attempted to downplay concerns about the dilution of Black voters' voting strength by claiming that the state House Staff Plan included more districts comprised of a majority of minority districts ("majority-minority districts") than Plaintiff South Carolina NAACP's proposed state House map. In addition to addressing this point during the hearing, Plaintiff South Carolina NAACP also wrote to the House Redistricting Committee on November 15.[15] In that letter, Plaintiff South Carolina NAACP and other groups explained to the Committee that, although the House's proposed staff map had one more majority-Black district than its proposed House map, the House map proposed by the South Carolina NAACP and its coalition had more opportunity districts in which Black voters would be between 40-50% of the voting-age population ("VAP") and, thus, could influence elections.

77.     During the hearing, Rep. John Richard C. King, a Black legislator, also reiterated his concerns about the House's arbitrary designation to use a total population deviation of +/- 2.5% (or 5% overall total deviation). He explained that this standard could be detrimental to racial minorities and rural communities and asked the Committee to reconsider using a 10% total population deviation standard. But the Committee did not amend its criteria; Rep. Newton incorrectly asserted that state legislative maps cannot have a total population exceeding 5% of the total population.

78.     Members of the public also raised concerns about transparency and meaningful opportunities for public review of maps. One member of the public, for example, explained that the House Redistricting Committee's decision to make its proposed map public less than 48

---

[15]     Letter from the South Carolina NAACP, et al, to the House of Rep. Judiciary Comm.'s Redistricting Ad Hoc Comm. (Nov. 15, 2021), https://www.naacpldf.org/wp-content/uploads/Supplemental-Comments-on-House-2021-Working-Draft-Plan-11-15-21.pdf.

hours before a hearing on it gave inadequate time for members of the public to conduct meaningful analyses. In addition, members of the public posed several questions to the Committee, including as described above, whether any RPV analysis was completed. Representative Beth Bernstein inquired whether the Committee would respond to these questions before adopting any map. Representative Jordan declined to commit that the House Committee would answer any specific questions.

79.     At the end of the hearing, Rep. Jordan also announced that, because members of the public testified during its hearing, the House Committee did not need to hold a second hearing on November 12 to give members of the public additional opportunity to testify.

80.     On November 16, 2021, the House Redistricting Committee met again to discuss its state House Staff Plan without *any* further public input or testimony. This hearing lasted less than ten minutes.

81.     After a brief overview of the redistricting process, during which the House Committee acknowledged having received oral and written testimony, and without any additional consideration of the state House Staff Plan, the House Committee approved an amendment to H. 4493 to incorporate its amended plan and issued favorable report. There was no public discussion during this hearing about how the plan had been changed following the November 10 hearing. As the House Redistricting Committee Chair, Rep. Jordan also stated his expectation that the House Judiciary Committee would consider "necessary" additional amendments to the working draft plan. As a result, members of the public were not given an opportunity to give additional input and review of the amendments to the plan.

82.     Less than two hours after the House Redistricting Committee hearing ended, the House Judiciary Committee met to consider the amended state House Staff Plan, hear testimony

from only House Judiciary Committee members, and consider any amendments to its plan. No public testimony was allowed at this hearing. After the Judiciary Committee voted to adopt the amended state House Staff Plan, it considered eight amendments, approving six amendments and tabling the other two.

83.     One of the tabled amendments proposed amending the House Redistricting Committee's criteria to permit population deviations within a range of plus or minus 5% of the mathematical mean (or 10% overall of the total population). To support this amendment, Rep. King once again explained how this permissible standard would assist in the preservation of majority-minority districts. At the end of the meeting, the Judiciary Committee voted to adopt the state House Staff Plan as amended within H. 4493.

84.     The House Judiciary Committee did not invite members of the public to provide oral or written comments on the state House Staff Plan as amended or before it was voted out of Committee and sent it to the full House.

85.     The full House reconvened on December 1, 2021, and conducted a first reading of H. 4493 without any debate or discussion.

86.     The next day the House conducted a reading of H. 4493. To begin, Rep. Jordan testified on the process leading to the creation of the House map and a brief overview of the map. Afterwards, the House considered several amendments and either adopted or tabled them. The House, for example, voted to table two amendments that Rep. Wendy Brawley, a Black legislator, proposed. The first, substituted the plan submitted by Plaintiff South Carolina NAACP for the working plan. During debate, Rep. Brawley explained that she had no indication that the House Committee conducted any analysis of racial minority voting patterns (that is, RPV), even though members of the public had repeatedly requested that such analysis be performed.

27

87.    Rep. Jordan claimed that the Plaintiff South Carolina NAACP's proposed state House map appears to have "systematic partisan gerrymandering" based on the number of paired incumbents and purported "excessive amounts of splits."

88.    The second amendment proposed substituting a House plan submitted by the League of Women Voters of South Carolina (the "League") for the working draft plan. In explaining Rep. Jordan's motion to table the amendment, he claimed the "big issue" with the League's map is population deviation because it used a 10% overall of the total population standard (i.e., the same standard used in the Senate Guidelines and accepted by federal courts) instead of the House Redistricting Committee's 5% (overall) total population standard.

89.    During this debate, Rep. Brawley also characterized the House Redistricting Committee's process for creating and developing maps as "shrouded in secrecy." Representative Hosey, a Black legislator, echoed a similar concern, explaining during discussion on another amendment that he had not been consulted about changes to district boundaries of the areas that he represents.

90.    Following consideration of amendments, Rep. Robinson, another Black legislator, made a motion to table consideration of H. 4493. Supporting this motion, Rep. Robinson explained that the state amended House Staff Plan would result in Black voters' candidates of choice, who were Black representatives, losing their seats, in part because several Black incumbents would be paired with each other and forced to compete against each other in primary

elections. The House rejected this motion. It then proceeded to vote in favor of the working draft as amended.

91.     At no point during the hearing did any member indicate that either the House or the Judiciary or House Committees conducted an RPV analysis to inform development of its map.

92.     On December 6, 2021, the House reconvened and conducted a second reading of H. 4493. In opposition to H. 4493, Rep. Govan, a Black legislator, reiterated concerns that Black incumbents were being paired in the same districts under the House Staff Plan as amended, thereby forcing them to compete against each other. As one example, he explained how Rep. Johnson, a Black legislator, and Rep. Brawley are included in the same district under the State House Plan as amended. His opposition was also rooted in the House Redistricting Committee's refusal to amend its criteria to change its total population deviation standard, which would be detrimental to racial minority voters. Following Rep. Govan's remarks, the House voted to approve H. 4493 and sent it to the Senate for consideration.

93.     On December 9, 2021, the House voted to concur with the Senate amendments to H. 4493, which included the addition of the state Senate Plan.

94.     The next day, Gov. McMaster signed H. 4493 into law.

## The Process Leading to the Enactment of S. 865

95.     The Legislature's process for enacting a map for South Carolina's seven congressional districts is marked the same lack of transparency and limited opportunities for public input that defined its process for enacting state House and Senate maps. Moreover, the Legislature also unnecessarily delayed and postponed proposing and then adopting a congressional map to the point where South Carolina is among the last set of states to enact such

29

a plan. Indeed, as described below, both the House and Senate proposed maps and then enacted

S. 865 within a six-week timeline. Yet the Legislature waited until mid-December 2021 to begin

publicly posting maps and holding relevant hearings on those maps.

96.    On July 23, 2021, the Senate Redistricting Subcommittee announced that it would

hold ten public hearings to receive public testimony about interests to be considered in redrawing

Congressional and state legislative districts. The first hearing was held on July 27 and the last on

August 12. Each hearing was held on weekday nights from 6:30 p.m. until 8:30 p.m. with

opportunities for in-person and remote testimony.[16] No congressional maps were considered or

proposed during the hearings.

97.    On August 2, 2021, Plaintiff South Carolina NAACP, along with other advocacy

organizations, sent a letter to the Senate Redistricting Subcommittee reminding members of their

affirmative obligations under the U.S. Constitution and Section 2 of the VRA.[17] The August 2

letter highlighted the Subcommittee's obligation to conduct RPV analyses to ensure compliance

with Section 2 of the VRA. The letter also provided recommendations for ensuring transparency

and opportunities for public input during all stages of the redistricting process.

98.    A week later, as described above in ¶ 68, Plaintiff South Carolina NAACP, along

with other advocacy organizations, sent a similar letter to the House Redistricting Committee.

99.    On August 30, 2021, Plaintiff South Carolina NAACP, along with other advocacy

organizations, sent a follow-up letter to the House Redistricting Committee reiterating concerns

---

[16]    S.C. Senate Judiciary Comm., *Meeting Information – Public Hearings*,
https://redistricting.scsenate.gov/meetinginfo.html.

[17]    Letter from the South Carolina NAACP, et al., to the S.C. Senate Judiciary Comm.'s
Redistricting Subcomm. (Aug. 2, 2021), https://www.naacpldf.org/wp-content/uploads/Letter-to-
South-Carolina-Senate-Judiciary-Redistricting-Subcommittee-8-2-21.pdf.

about the Committee's failure to transparently conduct its redistricting process and provide opportunities for meaningful public participation.

100.    From September 8 until October 4, 2021, the House Redistricting Committee conducted eleven public hearings on redistricting before any Congressional plans were proposed. But as described above in ¶ 66, these meetings were largely inaccessible to members of the public.

101.    On September 17, 2021, as described above in ¶ 56, the Senate Redistricting Subcommittee met and adopted its redistricting criteria and guidelines without any public input. The criteria and guidelines were available only to Subcommittee members before the meeting.

102.    On October 8, 2021, Plaintiff South Carolina NAACP, along with other advocacy organizations, proposed two U.S. Congressional redistricting plans, along with a submission letter to the House and Senate, which, among other points, reiterated the House Redistricting Committee and Senate Redistricting Subcommittee's affirmative obligations to comply with the U.S. Constitution and Section 2 of the VRA, as well as reminded each body that it must conduct RPV analyses.[18]

103.    On October 19, 2021, the Senate Redistricting Subcommittee announced that it was actively soliciting proposed congressional maps from members of the public.

---

[18]    Letter from the South Carolina NAACP, et al., to the S.C. House Judiciary Comm.'s Redistricting Ad Hoc Comm. (Oct. 8, 2021), https://www.naacpldf.org/press-release/ldf-submits-proposed-submitting-proposed-congressional-and-senate-maps-to-the-south-carolina-senate-judiciary-redistricting-subcommittee-and-the-house-redistricting-ad-hoc-committee/ (documents available via hyperlinks); Letter from the South Carolina NAACP, et al., to the S.C. Senate Judiciary Comm.'s Redistricting Subcomm. (Oct. 8, 2021), https://www.naacpldf.org/press-release/ldf-submits-proposed-submitting-proposed-congressional-and-senate-maps-to-the-south-carolina-senate-judiciary-redistricting-subcommittee-and-the-house-redistricting-ad-hoc-committee/ (documents available via hyperlinks).

104.    Almost a month later, on November 12, 2021, the Senate Redistricting Subcommittee met to receive public testimony on congressional maps that were submitted by members of the public. During this hearing, members of the public, among other points, reiterated that the Subcommittee has an obligation to conduct a RPV analysis for any redistricting plans, especially because federal courts have repeatedly found RPV patterns existing throughout South Carolina.[19]

105.    Consistent with previous correspondence, Plaintiff South Carolina NAACP also urged the Senate Redistricting Subcommittee during the November 12 hearing to not "pack" Black voters into districts with unnecessarily high Black populations or "crack" them into districts with populations that are insufficient to provide Black voters an opportunity to elect candidates of their choice or even influence elections. Members of the public also urged the Subcommittee that Charleston County must remain whole in CD 1 because of shared communities of interest.

106.    At the end of the November 12 hearing, the Senate Redistricting Subcommittee approved a motion for its staff to begin drawing a congressional redistricting map.

---

[19]    *See, e.g.*, *Colleton Cnty. Council*, 201 F. Supp. 2d at 643 ("Voting in South Carolina continues to be racially polarized to a very high degree . . . in all regions of the state and in both primary elections and general elections."); *see also, e.g.*, *United States v. Charleston Cnty.*, 365 F.3d 341, 350 (4th Cir. 2004) (county voting "is severely and characteristically polarized along racial lines"); *Jackson v. Edgefield Cnty., S.C. Sch. Dist.*, 650 F. Supp. 1176, 1196 (D.S.C. 1986) (observing that "the outcome of each [election] could be statistically predicted and reasonably explained by the race of the voters"); *id.* at 1198 ("The tenacious strength of white bloc voting usually is sufficient to overcome an electoral coalition of black votes and white 'crossover' votes.").

107.    On November 23, 2021—the Tuesday before Thanksgiving—the Senate

Redistricting Subcommittee announced that it had released its "Staff Senate Congressional Plan"

and would hold a hearing on it at 10:30 a.m. on Monday, November 29, 2021.

108.    On November 29, the Senate Redistricting Subcommittee received public

testimony on its Staff Senate Congressional Plan. To begin, the Senate Redistricting

Subcommittee's cartographer, Will Roberts, provided a brief description of the proposed

congressional map.

109.    Next, Sen. Harpootlian raised a concern about a lack of transparency, explaining

that he had only received the proposed map the Tuesday before Thanksgiving. He then referred

to proposed CD 6 as being next to the definition of gerrymander in the dictionary, explaining that

it represented a "racial overlay" and warned the Subcommittee that it should "be very conscious

about the fact of—about the issue of packing African Americans into one district."

110.    During public comment, former CD 1 Congressman Joe Cunningham testified that

the proposed map made sure that significant "Black population would be packed into the Sixth

Congressional District" and asserted that the Subcommittee "made sure that the first [CD] was

almost entirely white." He further described proposed CD 1 by saying how he "saw up close and

personal how the district was just chopped up, based upon one thing, race. You could drive down

Chapel Street . . . —the current district boundary right now and look on one side and see the

African American community, and the other side and see a white community. The white

community was in the First Congressional District, and the Black community was in the Sixth

Congressional District." He questioned "why is Charleston County split into two different

districts" with "one for white residents and one for black residents." He implored the Senate to

draw "fair maps, keeping communities of interest together and not dividing communities based

on the color of their skin." Senator Bright Matthews, a Black legislator, replied, "I don't understand why on this map, those Black voters in Charleston County were carved out." Mr. Cunningham also questioned why proposed CD 1 had the lowest Black population of any proposed CD in the Staff Senate Congressional map.

111.    Senator Harpootlian also remarked that members of the Subcommittee, including himself, were not consulted before the Staff Senate Congressional Plan was published.

112.    Next, testifying on behalf of the League, Ms. Teague and Dr. John Ruoff explained that the proposed map packed and cracked Black communities. As one example, Ms. Teague explained how the map unnecessarily cracked Charleston County by moving the city of North Charleston into proposed CD 6, which did not adhere to communities of interest principles. Ms. Teague also said the proposed map split Black communities in Northwest Richland County to keep Fort Jackson within proposed CD 2, which Dr. Ruoff testified achieved a goal that appears unclear to him to be based on traditional redistricting principles.

113.    After public testimony on the Staff Senate Congressional Plan, the Senate Redistricting Subcommittee took no further action.

114.    More than two months after some members of the public submitted proposed congressional maps, the House Redistricting Committee finally released its proposed "Staff House Congressional Plan" on December 13, 2021. At approximately 4:54 p.m. the same day, the Committee announced that it would hold a hearing on December 16 at 12:00 p.m., less than 72 hours after releasing its map.

115.    During the December 16 hearing, the House Redistricting Committee received public comment on its proposed congressional map. Members of the public affirmed the need to keep Charleston County whole, explaining that it is an important community of interest. Other

members of the public testified that Beaufort County should remain in CD 1, claiming that it is very similar to Charleston County.

116.    On December 22, 2021, the House Redistricting Committee posted an alternative congressional map ("Congressional House Staff Plan Alternative 1") map on its website, as well as provided public notice that it would conduct a hearing on December 29, 2021.

117.    On December 29, the House Redistricting Committee received public testimony on its original and alternative congressional maps, as well as the Senate's proposed Staff Senate Congressional Plan. To begin the hearing, Rep. Jordan explained that the Committee received oral and written feedback on its original House Staff Congressional Plan. Representative Jordan stated that Committee created the alternative map because of concerns about Beaufort County being included in CD 2 under its original map. He also claimed that the alternative map included "some positive features" from the Senate's proposed map.

118.    During the hearing, the House Redistricting Committee heard that its alternative congressional map unnecessarily splits Black communities in northern Richland County and parts of Sumter County, among other areas. Along the same lines, members of the public, including Plaintiff South Carolina NAACP, repeated concerns about splitting Charleston County, including explaining why it is important to keep the cities of Charleston and North Charleston together. And members of the public voiced concern that the proposed CD 1 in the alternative map also unnecessarily reduced the BVAP by splitting Black communities.

119.    Plaintiff South Carolina NAACP also reiterated concerns that Congressional House Staff Plan Alternative 1—like the Staff Senate Congressional Plan—ended CD 6's status as a district where a majority of Black voters reside. Plaintiff South Carolina NAACP reminded the Committee that it received proposed congressional maps from that organization and other

members of the public that maintained CD 6 as a majority-minority district, while also correcting for malapportionment, respecting communities of interest, and following other criteria.

120.    After the public-comment portion, Rep. Bernstein stated that the Congressional House Staff Plan Alternative 1 was drafted "unbeknownst" to her. She also explained that she was unsure why the Committee was even considering the alternative map because it replicated the Senate Staff Congressional map, "which received numerous complaints" and "vocalized concerns."

121.    In response to a question from Rep. Bernstein, Rep. Jordan said that national partisan groups' "plans and inputs were received, and as a result, were available for consideration." But the House Redistricting Committee only posted four plans submitted by members of the public, including two by Plaintiff South Carolina NAACP, one by the non-partisan organization League of Women Voters of South Carolina, and one by an individual named Michael Roberts.

122.    Representative Jordan also could not answer whether any current Congressmember submitted plans or provided input into the creation of Committee's two congressional maps. Instead, he claimed that "staff can probably get us to the bottom of that at an appropriate time." But he did not offer any more details or timelines, including whether such information would be publicly shared.

123.    On January 5, 2022, the House Redistricting Committee gave public notice that it would hold a hearing on January 10, 2022 at 1:00 p.m. Although the Committee invited members of the public to submit written testimony and other relevant information up until January 9, it did not indicate that there would be any public-comment portion for the January 10 meeting. The

36

same notice also stated that there would be a House Judiciary Committee on January 10 at 3:00 p.m.

124.    On January 10, 2022, the House Redistricting Committee met to consider congressional maps. During the meeting, Rep. Henegan, a Black legislator, asserted that Black voters only have the possibility to elect their preferred candidate in proposed CD 6.

125.    In response to a question by Rep. Bernstein, Rep. Jordan said that he did not think the "math works" to keep Beaufort and Charleston Counties whole in a proposed CD 1. Representative Bernstein also reiterated concerns that the Congressional House Staff Plan Alternative 1 packs Black voters in Charleston County into proposed CD 6 by carving out Black communities in proposed CD 1, particularly in the city of North Charleston.

126.    After testimony by just Committee members, the Committee voted to amend S. 865 and H. 4492 to include Congressional House Staff Plan Alternative 1 and gave the map a favorable report.

127.    Less than two hours later, the House Judiciary Committee met to discuss the Congressional House Staff Plan Alternative 1. To begin the meeting, Rep. Newton stated that he would be serving as Chair because Rep. Murphy could not attend. He explained that he had just received a letter from Rep. Murphy designating him to serve as Chair during the meeting due to purported "extraordinary circumstances." In response, Rep. King, a Black legislator, asked for a point of order to understand why he, as House Judiciary Vice Chair, would not serve as Chair in Rep. Murphy's absence as prescribed under the House Judiciary Committee's rules. Because of

this alleged rule deviation, Rep. King formally objected to the meeting moving forward without him serving as Chair. The meeting proceeded.

128.    Next, Rep. Jordan offered a strike-all amendment to S. 865 and H. 4492 that would replace each bill's previous text with Congressional House Staff Plan Alternative 1. In doing so, he summarized the House Redistricting Committee's efforts to date. He explained why the Committee recommended Congressional House Staff Plan Alternative 1, including because it attempted to address concerns raised by Beaufort County residents, shared features with the Senate's Congressional map, and aligned with the configuration of district lines that were "approved by the Department of Justice and passed judicial scrutiny in 2011." This map, he also said, complied with the House Redistricting Committee's redistricting guidelines and criteria. Following Rep. Jordan's remarks, Rep. King raised concerns that Congressional House Staff Plan Alternative 1 cracked Black voters in Charleston County by removing them from proposed CD 1 and unnecessarily packing them into proposed CD 6. He argued that communities in Charleston and Richland Counties do not have shared interests. He asked why the BVAP in other proposed CDs could not be higher.

129.    Next, Rep. Bernstein reiterated concerns about Congressional House Staff Plan Alternative 1. Because this plan is "very similar to the Senate map," she reminded the House Judiciary Committee that the Senate's map had been highly criticized during a recent Senate Redistricting Subcommittee meeting. She further explained that members of the public expressed those concerns to the House Redistricting Committee during recent hearings. In addition to these concerns, she also expressed reservations about the process for recommending Congressional House Staff Plan Alternative 1, which she explained was presented to the public at the same time it was presented to House Redistricting Committee members. She questioned why the House

38

Redistricting Committee could not have just continued its process with its initially proposed congressional map and amend that map based on continued public feedback and input.

130.    After Rep. Bernstein's testimony, Rep. Thigpen, a Black legislator, raised concerns about characterizations that there were "many" responses by community members in Beaufort County. He asked why input by community members from one county were considered so weighty that it generated the creation of an entirely new proposed congressional map. More specifically, he asked, "what about the information, input, and feedback made it rise to the level that we would draw another map." In response, Rep. Jordan claimed the points made by Beaufort County community members were "well taken" and that the House Redistricting Committee was trying to "get this done as quickly as possible."

131.    Representative Wetmore then asked if the House Redistricting Committee received feedback from Charleston County community members, and if so, how that feedback was weighed compared to feedback from Beaufort County community members. Representative Jordan acknowledged that the House Redistricting Committee "did hear from folks in Charleston that expressed displeasure" with the Congressional House Staff Plan Alternative 1. But he claimed it was not the same "number-wise degree" and the "volume wasn't quite as high perhaps."

132.    Afterwards, Rep. Thigpen again reiterated concerns about the process leading to the creation of Congressional House Staff Plan Alternative 1, explaining that he was not sure the concerns by Beaufort County community members were weighty enough or outweighed complaints from other South Carolina community members to trigger the creation of a new proposed congressional map.

133.    Despite the reservations discussed above, the House Judiciary Committee voted to pass the strike-all amended incorporating Congressional House Staff Plan Alternative 1 into S. 865 and H. 4492 and issued a favorable report.

134.    On January 11, 2022 at approximately 4:20 p.m., the Senate Redistricting Subcommittee announced that it posted two more proposed Congressional maps. The notice said the Subcommittee would hold a hearing on those maps at a meeting scheduled for January 13, 2022 at 12:00 p.m.

135.    On January 12, 2022, the House did a first reading of S. 865 and H. 4492.

136.    The next day, the House reconvened to debate S. 865 and H. 4492. To begin, Rep. Jordan gave an overview of the House Redistricting Committee's work and the Congressional House Staff Plan Alternative 1 map, which was being considered as an amendment to S. 865 and S. 4492. In doing so, he referred only to public feedback about keeping Beaufort County within CD 1. In closing, he claimed that maps submitted by the public "d[id] not offer superior alternatives."

137.    Rep. King then testified that nobody spoke for CD 5 on the Ad Hoc Committee because the Representative assigned to the Committee withdrew because of an important familial obligation. Representative King explained that the Committee could have assigned another Representative within CD 5 to ensure its representation.

138.    Representative Brawley, a Black legislator, explained that the House Judiciary Committee did not follow its rules when it voted to approve the Congressional House Staff Plan Alternative 1 map. Representative King concurred, explaining that the vote "constituted a breach of decorum in the House of Representatives" by not having the first Vice Chair preside over the meeting the Chair's absence.

40

139.    Representative Garvin, a Black legislator, explained that he watched all the House Redistricting Committee hearings. Based on those, Rep. Garvin asked Rep. Jordan whether he knew that many people were pleased with the House Redistricting Committee's initial proposed map. Representative Jordan said: "we heard from some folks that said it was not that bad." Then he remarked that people who gave feedback on Beaufort County described that initial map as "awful." In response, Rep. Garvin asked "what made the concerns of the Beaufort folks more prevalent to change the action of a committee, versus the folks in Charleston." Speaking only for his vote, Rep. Jordan responded by asserting that the concerns raised about Beaufort County were "compelling" because "it wasn't fair to ping pong them back and forth" between two CDs.

140.    Throughout the debate, several Representatives reminded the full House that it was possible to keep Beaufort and Charleston Counties whole, as some proposed maps did. Others reminded the full House that this was a point the House Redistricting Committee repeatedly heard through public testimony.

141.    Representative Garvin also reiterated that Congressional House Staff Plan Alternative 1 "mirrors" the Senate's Congressional map with a "few minor tweaks." He explained that the Senate map was "wildly criticized."

142.    During the session, several Representatives voiced opposition to Congressional House Staff Plan Alternative 1 because it, among other issues, "cracks" and "packs" Black voters throughout the state. Others voiced concerns that the proposed CDs in the Congressional House Staff Plan Alternative 1 were designed to ensure districts were not politically competitive.

143.    Responding to these concerns, Rep. Jordan repeated that the district lines look "very, very similar" to the 2010 Congressional district lines, which he said were approved by the U.S. Department of Justice. During an exchange with Rep. Matthews, however, Rep. Jordan

conceded that Charleston County is being split differently than under current district boundaries. Then, Rep. Matthews, a Black legislator, asserted that proposed CD 1 is being given "the white areas" and that CD 6 will keep Charleston County's predominantly Black areas. To explain these splits, she directed the chamber to visual representation of Census tracts 51 and 54. She also said that she did not understand why the area of West Ashley was cut in half or Johns Island put in CD 6, because this would not keep communities of interest together. Representative McDaniel, a Black legislator, echoed similar concerns, noting that North Charleston and Charleston are communities that should remain together.

144.    Next, Representative Cobb-Hunter, a Black legislator, asked Rep. Jordan whether the House's criteria was applied "uniformly across the board at all levels" or whether there were different applications depending on districts. Without a direct response from Rep. Jordan, Rep. Cobb-Hunter posed the question again, asking whether criteria was similarly weighted and applied consistently from one district to another. In response, Rep Jordan said, "I would say, the criteria is the criteria. I don't mean to be trying to avoid the question, but we put that before the Ad Hoc Committee."

145.    Representative Cobb-Hunter then asked whether the House Redistricting Committee did any VRA Section 2 analysis on the proposed maps. Rep. Jordan answered: "we did everything in compliance with the law that we were told and required to do." Based on that answer, Rep. Cobb-Hunter asked Rep. Jordan for a yes or no response. Again, Rep. Jordan stated, "to my knowledge, we did everything possibly needed to do under the terms of the law." Representative Jordan never responded to Rep. Cobb-Hunter's question whether she could see a Section 2 analysis. Later, Rep. Cobb-Hunter reiterated her concern that she never received a yes or no answer on whether a Section 2 analysis had been conducted. That analysis, she explained,

was necessary to ensure that communities of color are not "cracked" and "packed" into districts. She ended by saying that neither the House nor the House Redistricting Committee could sign off on a proposed Congressional map without a Section 2 analysis.

146.    Representative Jordan also disclaimed that any "outside partisan stuff took place" during the House Redistricting Committee's process for drawing proposed Congressional maps.

147.    The House voted to adopt S. 865 as amended with Congressional House Staff Plan Alternative 1.

148.    Afterward, Rep. Govan provided a brief overview of the history of racial discrimination in South Carolina and repeated concerns about the state's failure to comply with the U.S. Constitution and Voting Rights Act in previous redistricting cycles by proposing and enacting maps that diluted Black voting rights.

149.    After Rep. Govan's testimony, the House conducted a second reading of S. 865 as amended.

150.    On January 13, the House conducted a final reading of S. 865 as amended, which it passed and transmitted to the Senate.

151.    On January 13, the Senate Redistricting Subcommittee held a hearing on Congressional maps, less than 48 hours after publicly disclosing two new proposed maps. To begin, Sen. Rankin acknowledged that the Subcommittee just posted two proposals—House Congressional Plan 2 Senate Amendment 1 ("Senate Amendment 1 Plan") and House Congressional Plan 2 Senate Amendment 2 ("Senate Amendment 2 Plan")—less than 48 hours before the hearing. He also stated that the House voted to amend S. 865 with the House redistricting map.

152.    During public testimony, Joey Opperman testified that he had been hired by Sen. Harpootlian to draw the Senate Amendment 2 Plan. He then explained the map's details, including by noting that it complies with the Senate's redistricting criteria and does better on certain criteria than the Senate Amendment 1 Plan. In the Senate Amendment 2 Plan, Mr. Opperman explained that Charleston County remained whole. Splitting Charleston County, he explained, did not follow traditional redistricting criteria.

153.    Mr. Opperman also testified that proposed CDs in the Senate Amendment 1 Plan suggest that race may have been a predominate factor, which he explained is unconstitutional.

154.    Ms. Teague of the League raised concerns that proposed CD 1 in the Senate Amendment 1 Plan received poor ratings for proportionality, compactness, efficiency, and other standard redistricting measures. She then voiced support for the Senate Amendment 2 Plan, explaining that proposed CD 1 is "consistent with real regional relationships in" the state. More than two-thirds of the remaining members of the public who testified supported Amendment 2 for similar reasons. Witnesses testified that keeping Charleston County whole is important and explained that splitting cities like North Charleston would harm Black communities.

155.    Less than a third of the remaining members of the public supported the Senate Amendment 1 Plan. A delegation of elected city and county council members justified their support for Amendment 1 because it kept their respected bodies in either Berkeley or Dorchester Counties within CD 1. About four members stated their support for Amendment 1 because it kept Beaufort County within proposed CD 1. But they did not address the fact that, as other members of the public pointed out, the Senate Amendment 2 Plan also kept Beaufort County whole within proposed CD 1. After the public-comment portion, the Senate Redistricting

Subcommittee voted to approve both the Senate Amendment 1 and Senate Amendment 2 Plans and send them to the full Senate Judiciary Committee for debate and consideration.

156. On January 19, 2022, the Senate Judiciary Committee met to consider the Senate Amendment 1 and Senate Amendment 2 Plans. To begin, Sen. Rankin explained that "there does not appear" to be a court deadline "hanging over" the Committee to resolve the congressional map.

157. Then Sen. Campsen provided an overview of the Senate Amendment 1 Map, which he authored. At a general level, according to Sen. Campsen, it "restores key aspects of the Senate Staff plan and is intended to be responsive to some of the public input received by the subcommittee." Senator Campsen, however, did not provide any other information about how the map responded to public input, or whose public input.

158. Senator Bright Matthews, a Black legislator, explained to the Senate Judiciary Committee members that "speaker after speaker" at the Senate Redistricting Subcommittee public hearings wanted to keep Charleston County whole because it aligned with the principles of keeping communities of interest together. Senator Bright Matthews also explained that Senate Amendment 1 led to pulling out Black communities in West Ashley and other areas in the city of North Charleston to pack them into proposed CD 6. Echoing similar concerns, Sen. Kimpson, a Black legislator, also explained that the people of Charleston County want their community to be kept whole, explaining that she represents more people from Charleston County than anyone else in the Legislature.

159. According to Sen. Campsen, the pieces of Charleston County being moved into proposed CD 6 are comprised of roughly a 50% BVAP, though Sen. Kimpson stated that the BVAP in Charleston County is about 30%.

160.    During an exchange with Sen. Harpootlian, Sen. Campsen acknowledged that any redistricting map must comply with a VRA Section 2 analysis. But he conceded that neither he nor the Senate Redistricting Subcommittee conducted an RPV analysis in compiling the Senate Amendment 1 map, claiming the Subcommittee "decided not to do that." Instead, Sen. Campsen claimed that an RPV analysis would have "happened if and when a plan is litigated," claiming that this is something a plaintiff would do if they filed a lawsuit. In response to a follow-up question about whether an RPV analysis would be productive to avoid a lawsuit, Sen. Campsen responded that such an analysis "would have resulted in us perhaps taking race into account and having racial targets."

161.    At the end of the meeting, the Senate Judiciary Committee voted down a motion that would have carried both the Senate Amendment 1 and Senate Amendment 2 Plans to the full Senate for debate. Then the Committee voted in favoring of adopting the Senate Amendment 1 Plan and issued a favorable report.

162.    On January 20, 2022, the Senate reconvened to consider a strike-all amendment that would incorporate the Senate Amendment 1 Plan into S. 865. To begin, Sen. Rankin provided an overview of the Senate Redistricting Subcommittee's plan and a brief overview of the Senate's redistricting criteria.

163.    Then, Sens. Rankin, Massey, Talley, and Campsen gave an overview of the Senate Amendment 1 Plan. Following this presentation, Sen. Scott asked Sen. Campsen to provide a working document because he explained it was hard to follow the presentation without one. Senator Bright Matthews also moved for unanimous consent to pass out the Senate's redistricting guidelines because she explained that "quite a few members in the chamber do not have the guidelines."

46

164.     Sen. Campsen claimed that the Senate could not gerrymander if it created "very little change on the existing map" because that is a legitimate reapportionment principle. But he conceded that the Senate's criteria do not mention any principle that the Senate should begin with the benchmark or existing map.

165.     In response to a question by Sen. Harpootlian, Sen. Campsen confirmed for the full Senate that his plan did not include any RPV analysis. According to Sen. Campsen, he "didn't even look at race numbers" or even ask for "what's the BVAP" of this or that district. Senator Harpootlian also noted during the floor session that even state agencies like the South Carolina Revenue and Fiscal Affairs Office advises counties, cities, and school boards to conduct an RPV analysis as part of their redistricting processes.

166.     Senator Bright Matthews reminded the full Senate that 90% of the public testimony the Senate Redistricting Committee received at its last meeting were to keep Charleston County whole. Along the same lines, based on his representation of the majority of residents in Charleston County, he explained that the majority of his constituents want Charleston County to remain whole.

167.     Several Senators repeatedly characterized the Senate Amendment 1 Plan as being designed to limit political competition by cracking and packing Black communities into CDs.

168.     Senator Harpootlian questioned the process leading to the creation of the Senate Amendment 1 Plan. As one example, he explained that, even as members of the Senate Redistricting Subcommittee, neither he nor Sens. Bright Matthews or Saab, both Black legislators, saw the plan before it was publicly shared. He also explained that he never had any input into the plan, discussed it, or was called back into the "map room."

169.     Following debate, the Senate adopted the Senate Amendment 1 map.

170.    Next, the Senate considered a strike-all amendment by Sen. Harpootlian that proposed a map like the Senate Amendment 2 map. Before explaining the map, Sen. Harpootlian outlined parts of the state redistricting history, as well as its history of racial voter suppression. In this map, Sen. Harpootlian, among other points, confirmed that Beaufort and Charleston Counties remain whole.

171.    The Senate voted to table this amendment. The Senate then voted to table another amendment, which, according to Sen. Harpootlian, was the League of Women Voters of South Carolina's map with some slight tweaks that would have allowed Dorchester, Berkeley, and Charleston Counties to remain whole. To close, the Senate voted to table five additional strike-all amendments to amend S. 865 with a new proposed Congressional map—one amendment offered by Sen. Martin and four by Sen. Hutto.

172.    To close, the Senate approved S. 865 as amended and transmitted it back to the House.

173.    On January 25, 2022, the House reconvened without considering S. 865 as amended by the Senate.

174.    The next day, January 26, the House reconvened and voted to concur with S. 865 as amended by the Senate. Hours later, Gov. McMaster signed S. 865 into law.

**State House Districts 7–9, 11, 41, 43, 51, 54–55, 57, 59–60, 63, 67, 70, 72–79, 90, 91, 93, 95, 101, and 105 are Racially Gerrymandered**

175.    Defendants racially gerrymandered at least 29 state House districts, in contravention of the U.S. Constitution.

48

176.    South Carolina's population grew by 10.7% between 2010 and 2020. Although the BVAP grew only slightly over the last decade,[20] it shifted within the state, leading to significant population disparities between legislative districts that needed to be addressed to ensure equality of access to representatives to all people and voters in the state, as well as the non-dilution of the vote of protected citizens.

177.    The House purportedly endeavored to balance the populations (within its criteria of plus or minus 2.5% of the mathematical mean or 5% of the total population), comply with the VRA and not racially gerrymander in contravention of the U.S. Constitution, and adhere to state criteria based on its guidelines (e.g., keep districts contiguous and compact; and consider communities of interest and incumbency protection).

178.    Yet the House enacted a plan that overall dilutes South Carolinian Black voting power by (i) packing Black voters in certain districts at unnecessarily high concentrations without any indicia that they conducted an analysis that these populations were necessary to satisfy the VRA, while also (ii) cracking Black voters in certain districts by increasing the number of districts in which Black voters are kept at unnecessarily low populations, rendering their voice ineffective in elections.

179.    Indeed, the House drew very few districts in which Black voters comprise 30-50% of the BVAP, which would provide them with the opportunity to influence elections for the House.

180.    This is despite the fact that Plaintiff South Carolina NAACP and its coalition produced a map that, in balancing redistricting criteria and taking into account the State's 27%

---

[20]    Unless otherwise indicated in this second amended complaint, BVAP uses the Census Bureau's Any Part Black or "AP Black" category for all districts.

BVAP, developed more opportunity districts in which Black voters would be between 30–50% of the VAP and, thus, have the ability to elect their candidates of choice.

181.    In prioritizing race-based considerations, the House ignored its own redistricting criteria. It ignored incumbent considerations by pitting Black representatives in House District 70 against one another. Where doing so allowed it to pack or crack Black voters, it ignored its own criterion to keep districts compact and avoid slicing through communities of interest.

State House Districts 7, 8, 9, and 11 (Anderson County)

182.    Race was the predominant factor in drawing State House Districts 7, 8, 9, and 11 in Anderson County, and it was not employed in a narrowly tailored manner to comply with Section 2 of the VRA or any other compelling governmental interest.

183.    A significant cluster of precincts with high BVAPs in the center of Anderson County—which could have been combined to form one or more districts in which Black voters form an influential voting bloc—are instead cracked into these four districts, in which BVAP is driven down to around 20% or below. To effectuate this cracking, these district lines also split multiple precincts, including splitting one precinct between Districts 7 and 11, one precinct between Districts 8 and 11, and at least two precincts between Districts 7 and 9.

184.    The figure below shows how these district lines knife through the center of the City of Anderson, unnecessarily splitting the area into four districts like a shattered mirror.[21]

---

[21]    In this and other figures, district lines appear in yellow, counties in dotted red lines, and municipalities in dotted gray lines. Green shading indicates the concentration of the BVAP, with darker areas indicating a higher BVAP percentage. District numbers appear in black boxes, with the number below the district number showing BVAP for that district and the number below that showing the population deviation of the district.



185.    Defendants knew that this cracking of Black voters, who form a community of interest ("COI") because of shared history, including the above-mentioned voting discrimination in South Carolina, and shared voting patterns in Anderson, was unnecessary.

186.    Cracking and submerging Black voters in these districts ensure that their voices will be diluted given RPV patterns present in Anderson as in other parts of the state. According to an analysis of the 2020 election for U.S. Senate in Anderson County, Mr. Harrison received only 19% of white voter support, despite receiving 92% of Black voter support. Similarly, in the 2018 election for the Secretary of State, in Anderson County, the candidate of choice of Black voters only received 17% of white voter support, despite receiving 93% of Black voter support. Likewise in Anderson County, the candidate of choice of Black voters for State Treasurer only received 16% of white voter support, despite receiving 88% of Black voter support.

187.    Moreover, the map that Plaintiff South Carolina NAACP submitted on October 8, 2021 (below) keeps the Anderson community of interest largely whole, creating a single district

which, based on an analysis of RPV patterns, provides that Black voters have a chance of electing or influencing the election of the candidate of their choice. By comparison, none of Districts 7, 8, 9, or 11 in Defendants' map has any realistic chance of doing so.[22]



188.    On November 30, 2021, Plaintiff South Carolina NAACP warned that failure "to make necessary changes [to these districts] [would] continue to crack Black voters in the communities . . . particularly in the City of Anderson in Anderson County[,] [thereby] render[ing] Black voters with little to no ability to influence elections in these areas of the State."[23]

---

[22]    In this and other figures, district lines appear in yellow, counties in dotted red lines, and municipalities in dotted gray lines. Green shading indicates the concentration of the BVAP, with darker areas indicating a higher BVAP percentage. District numbers appear in black boxes, with the number below the district number showing BVAP for that district and the number below that showing the population deviation of the district.

[23]    NAACP LDF, S.C. NAACP, ACLU, and ACLU S.C., *Supplemental Comments on the House Judiciary Committee's Proposed State House Redistricting Plan*, 8, https://www.naacpldf.org/wp-content/uploads/Second-Set-of-Supplemental-Comments-on-House-Judiciary-Committees-Proposed-House-Plan-11-30-21.final_.pdf.

189.    Indeed, shattering this community of interest violates the House's own redistricting criteria, in addition to the Equal Protection Clause of the Fourteenth Amendment and is probative of the intentional dilution of Black voting strength in Anderson.

190.    Forcing these House districts into the heart of Anderson also makes them relatively non-compact. House Districts 9 and 11, in particular, are over twice as non-compact using statistical measures of compactness as the corresponding districts that Plaintiffs submitted to the Legislature.

191.    Moreover, based on a statewide analysis of the probability of electing a Black-preferred candidate in South Carolina at different levels of BVAP, the reduction from an approximately 38% BVAP district (as in the above proposed plan) to an approximately 21% BVAP district, or even lower (as in Districts 7, 8, 9, and 11 in the adopted plan) can be very significant.

192.    Though estimates would vary somewhat by region, at approximately 38% BVAP, there may be almost a 50% chance of electing a Black-preferred candidate. When a district is forced down to approximately 21% BVAP—as in adopted State House District 11—this chance of electing a candidate of choice of Black voters falls precipitously: down to about 3%. At around 16% BVAP—as in adopted State House District 9—the chance of electing a Black-preferred candidate is even lower: approximately 1%.

193.    No compelling governmental interest, including compliance with Section 2 of the VRA, justifies the use of race to crack Anderson into these four districts.

State House Districts 41 and 43 (Chester County)

194.    Race was the predominant factor in drawing State House Districts 41 and 43 in Chester County. Race was not employed in a narrowly tailored manner to advance compliance with Section 2 of the VRA or any other compelling governmental interest.

195.    State House District 41, a majority-Black district mostly made up of Fairfield County, reaches up past the Fairfield County line to create a bizarrely shaped, bunny-eared appendage that grabs the Black-majority City of Chester, as well as other areas comprised heavily of Black voters in Chester County. In the process, Defendants split eight precincts in Chester County across State House Districts 41 and 43.

196.    Defendants were on notice, via the map Plaintiffs submitted on October 8, that neighboring State House District 43 could have been drawn more compactly to include Chester County, the city of Chester, and potentially nearby Lancaster, to create a district in which Black voters would have greater influence.

197.    The figure below reveals how the irregular and non-compact district lines in Chester County were drawn to carve out Black communities in a manner that allowed map-drawers to minimize Black voters' influence in neighboring districts.[24]

---

[24]    In this and other figures, district lines appear in yellow, counties in dotted red lines, and municipalities in dotted gray lines. Green shading indicates the concentration of the BVAP, with darker areas indicating a higher BVAP percentage. District numbers appear in black boxes, with the number below the district number showing BVAP for that district and the number below that showing the population deviation of the district.



198.    No compelling governmental interest, including compliance with Section 2 of the

VRA, justifies the use of race in drawing Districts 41 and 43.

State House Districts 51 and 67 (Sumter County)

199.    Race was the predominant factor in drawing State House Districts 51 and

67 in Sumter County, and it was not employed to comply with Section 2 of the VRA or in a

narrowly tailored manner to advance any other compelling governmental interest.

200.    The border between majority-Black State House District 51 and District 67 cuts

through the city of Sumter on clear racial lines. As a result of this irregular border, District 67 is

also one of the least compact districts in the entire state House using statistical measures of

compactness, and its shape is particularly irregular. These erratic district lines leave District 51

with a BVAP of 61.2%, and District 67 with BVAP of only 28.1%.

201.    The figure below reveals how district lines in Sumter County carefully carve out Black populations around Sumter to pack Black voters into District 51.[25]



202.    Black voters in Sumter form a community of interest because of, among other things, voting patterns and shared history.

203.    No compelling governmental interest, including compliance with Section 2 of the VRA, justifies the use of race to unnecessarily pack Black voters into District 51 and to intentionally dilute Black voting strength through the packing and cracking in these districts.

---

[25]    In this and other figures, district lines appear in yellow, counties in dotted red lines, and municipalities in dotted gray lines. Green shading indicates the concentration of the BVAP, with darker areas indicating a higher BVAP percentage. District numbers appear in black boxes, with the number below the district number showing BVAP for that district and the number below that showing the population deviation of the district.

State House Districts 54, 55, 57, and 105 (Dillon County and Horry County)

204.    Race was the predominant factor in drawing State House Districts 54, 55, 57, and

105 in northeastern South Carolina, including Marlboro County, Dillon County, Horry County,

and Marion County, and it was not employed to comply with Section 2 of the VRA or in a

narrowly tailored manner to advance any other compelling governmental interest.

205.    State House District 55, largely based in Dillon County, reaches out and extends

far past the Dillon County line and into areas with large white voters in Horry County. This

brings the BVAP of District 55 down to 39.4%. Meanwhile, there are three majority-Black

districts that surround District 55, and District 55 could have been drawn much more compactly

by pulling, in part, from these nearby areas, rather than stretching all the way out to (select parts

of) the city of Loris in Horry County. Indeed, District 55 is one of the least compact districts in

the state House using statistical measures of compactness.

206.    The figure below reveals how these district lines around Marlboro County, Dillon

County, Marion County, and Horry County are drawn to create a long and irregularly shaped

District 55 that needlessly caps BVAP at 39.4%.[26]

---

[26]    In this and other figures, district lines appear in yellow, counties in dotted red lines, and
municipalities in dotted gray lines. Green shading indicates the concentration of the BVAP, with
darker areas indicating a higher BVAP percentage. District numbers appear in black boxes, with
the number below the district number showing BVAP for that district and the number below that
showing the population deviation of the district.



207.    The portion of the border between State House District 55 and District 105 around the city of Loris cracks the Black population in this area by not only splitting the city of Loris, but also splitting seven nearby precincts. This district line needlessly divides these communities of interest in Horry based on voting patterns and the above-mentioned shared history and leaves District 55 with 39.4% BVAP.

208.    Submerging Black voters among white voters in the redrawing of the lines in these areas of the state is likely to diminish Black voters' voting power given the above-mentioned RPV voting patterns at the state and county level across South Carolina. For example, in the 2020 election for U.S. Senate in Horry County, Mr. Harrison received only 23% of white

voter support, while receiving 87% of Black voter support. In the 2018 election for Secretary of State in Horry County, the candidate of choice of Black voters only received 27% of white voter support, despite receiving 81% of Black voter support. And in the 2018 election for State Treasurer in Horry County, the candidate of choice of Black voters only received 26% of white voter support, despite receiving 79% of Black voter support.

209.    The figure below reveals how, after unnecessarily extending State House District 55 deep down into heavily white Horry County, all the way to the city of Loris, the district lines in Horry County then proceed to crack the Black community around Loris and impair the ability of these voters to have a meaningful opportunity to impact elections in their assigned district.[27]

---

[27]    Although other figures throughout the complaint generally show municipalities in dotted gray lines, this figure shows the city of Loris in dotted blue lines for visual clarity. The other elements of the figure remain the same: district lines appear in yellow, and counties in dotted red lines. Green shading indicates the concentration of the BVAP, with darker areas indicating a higher BVAP percentage. District numbers appear in black boxes, with the number below the district number showing BVAP for that district, and the number below that showing the population deviation of the district.



210.    No compelling governmental interest, including compliance with Section 2 of the VRA, justifies the use of race to produce these lines and intentionally pack and crack Black voters in these districts.

State House Districts 59, 60, 63, and 101 (Florence County and Williamsburg County)

211.    Race was the predominant factor in drawing State House Districts 59, 60, and 63 in Florence County, as well as District 101 in neighboring Williamsburg County, and it was not employed to comply with Section 2 of the VRA or in a narrowly tailored manner to advance any other compelling governmental interest.

212.    The city of Florence is split among three districts: District 59, 60, and 63. The border between these districts follows clear racial lines, and the border between Districts 59 and 60 splits one precinct, the border between Districts 60 and 63 splits at least three precincts, and the border between Districts 59 and 63 splits at least seven precincts. As a result, District 59 has

60.8% BVAP, while District 60 has 30.5% BVAP, and District 63 has 25.6% BVAP. Compared to the rest of the adopted state House districts, Districts 59 and 60 are also both relatively non-compact using statistical measures of compactness.

213.    The figure below reveals how district lines in Florence unnecessarily pack Black voters into District 59.[28]



_____

[28]    In this and other figures, district lines appear in yellow, counties in dotted red lines, and municipalities in dotted gray lines. Green shading indicates the concentration of the BVAP, with darker areas indicating a higher BVAP percentage. District numbers appear in black boxes, with the number below the district number showing BVAP for that district and the number below that showing the population deviation of the district.

214.    Defendants also were on notice, via letters submitted by Plaintiff South Carolina NAACP and other organizations on October 8, November 15, and November 30, that Black incumbent legislators in District 59 had "been paired and will be forced to compete against one another," despite their own criteria that "[r]easonable efforts may be made to ensure that incumbent legislators are not placed into districts where they will be compelled to run against other incumbent members of the South Carolina House"[29] and the fact that Plaintiff South Carolina NAACP's proposed plan showed the legislature "a way to meet its constitutional and statutory obligations and respect other redistricting principles *without* pairing such incumbents."[30] Despite this notice, Defendants persisted in using race as a predominant factor in its redistricting process.

215.    No compelling governmental interest, including compliance with Section 2 of the VRA, justifies the use of race to pack Black voters into District 59 and to intentionally dilute Black voting strength through the packing and cracking in these districts.

216.    On the other side of District 60, majority-Black District 101 extends past the Williamsburg County line to grab areas of Lake City that have heavy BVAPs, splitting and excising these areas from the rest of Florence County. As a result, District 101 is packed with

---

[29]    S.C. House of Rep. Judiciary Comm. Redistricting Ad Hoc Committee, *2021 Guidelines and Criteria for Congressional and Legislative Redistricting* (Aug. 3, 2021), *available at* https://redistricting.schouse.gov/docs/2021%20Redistricting%20Guidelines.pdf.

[30]    NAACP LDF, S.C. NAACP, ACLU, and ACLU S.C., *Supplemental Comments on the House Judiciary Committee's Proposed State House Redistricting Plan*, 8, https://www.naacpldf.org/wp-content/uploads/Second-Set-of-Supplemental-Comments-on-House-Judiciary-Committees-Proposed-House-Plan-11-30-21.final_.pdf.

59.0% BVAP, while District 60 is left with only 30.5% BVAP. The figure below reveals how

these district lines pack Black voters into District 101.[31]



---

[31]    In this and other figures, district lines appear in yellow, counties in dotted red lines, and municipalities in dotted gray lines. Green shading indicates the concentration of the BVAP, with darker areas indicating a higher BVAP percentage. District numbers appear in black boxes, with the number below the district number showing BVAP for that district and the number below that showing the population deviation of the district.

217.     No compelling governmental interest, including compliance with Section 2 of the VRA, justifies the use of race to unnecessarily pack Black voters into District 101 and to intentionally dilute Black voting strength in the manner described above.

State House Districts 70, 72, 73, 74, 75, 76, 77, 78, and 79 (Richland County)

218.     Race was the predominant factor in drawing State House Districts 70, 72, 73, 74, 75, 76, 78, and 79 in Richland County, and it was not employed to comply with Section 2 of the VRA or in a narrowly tailored manner to advance any other compelling governmental interest.

219.     The figure below reveals how district lines throughout Richland County pack Black voters into Districts 70, 73, 74, 76, 77, and 79, with BVAP ranging from 55.7% to 66.6%. By packing these districts, the map also reduces the influence of Black voters in neighboring Districts 72, 75, and 78.



220.    District 70 includes the area of Richland County southeast of Columbia (formerly District 80). By combining previous Districts 70 and 80 into a single new District 70, Richland County will lose a state House seat, with the new district now pitting current Black incumbents Wendy Brawley and Jermaine Johnson against one another. By eliminating former District 80 and moving it to become a new district in Charleston, this also left District 70 packed, with BVAP of 66.3%.

221.    The border between majority-Black District 70 and Districts 72, 75, and 78 clearly follows racial lines. As a result, District 72 only has 26.7% BVAP, District 75 has 17.9% BVAP, and District 78 has 33.0% BVAP. The figure below reveals how these district lines pack Black voters into District 70.



222.    The western side of District 78 includes an appendage that reaches out to grab the areas of Arcadia Lakes that are comprised of heavy populations of white voters, while leaving

out all the areas that are comprised of significant populations of Black voters in neighboring District 76. This leaves District 76—which is one of the least compact districts in the state House using statistical measures of compactness—with a BVAP of 66.6%, while bringing District 78's BVAP down to 33.0%. The figure below reveals how these district lines pack Black voters into District 76 and reduce Black voters' influence in District 78.[32]



223.    District 72, another of the very least compact districts in the state House using statistical measures of compactness, is drawn with an irregular shape and a BVAP of only 26.7%, when it could easily be drawn to give Black voters greater influence in elections in this district. Meanwhile, neighboring majority-Black district 74 is packed with 55.65% BVAP. The

---

[32]    In this and other figures, district lines appear in yellow, counties in dotted red lines, and municipalities in dotted gray lines. Green shading indicates the concentration of the BVAP, with darker areas indicating a higher BVAP percentage. District numbers appear in black boxes, with the number below the district number showing BVAP for that district and the number below that showing the population deviation of the district.

border between Districts 72 and 74 splits three precincts. The figure below reveals how district lines in Richland County pack Black voters into District 74.[33]



224.    No compelling governmental interest, including compliance with Section 2 of the VRA, justifies the use of race to unnecessarily pack Black voters into Districts 70, 73, 74, 76, 77, and 79 and reduce the influence of Black voters in Districts 72, 75, and 78 and to intentionally dilute Black voting strength through the packing and cracking in these districts.

---

[33]    In this and other figures, district lines appear in yellow, counties in dotted red lines, and municipalities in dotted gray lines. Green shading indicates the concentration of the BVAP, with darker areas indicating a higher BVAP percentage. District numbers appear in black boxes, with the number below the district number showing BVAP for that district and the number below that showing the population deviation of the district.

State House Districts 90, 91, 93, and 95 (Orangeburg County)

225.    Race was the predominant factor in drawing State House Districts 90, 91, 93, and 95 in Orangeburg County, and it was not employed to comply with Section 2 of the VRA or in a narrowly tailored manner to advance any other compelling governmental interest.

226.    District 90 crosses county lines to pull in voters from the City of Orangeburg, which has a Black population of 76%, and pack the district at 56% BVAP. By contrast, for example, Plaintiffs' October 8 map demonstrates that District 90 can be drawn in such a way as to respect county lines and avoid extending upward into Orangeburg.

227.    Defendants increased District 93's BVAP an unusually high amount, from 43% to 51%, unnecessarily moving a large number of BVAP precincts into the area. By contrast, for example, Plaintiff South Carolina NAACP's October 8 map demonstrates that this district could easily be drawn in such a way as to avoid packing Black voters.



228.    By slicing through Orangeburg County, including the City of Orangeburg, along racial lines, the House contravenes its own criterion to avoid "[b]izarrely-shaped districts,"

identifying and sorting voters with the purpose of harming voters of color. Members of the public put the House Committee on notice of how these splits would negatively harm Black communities and split communities of interest.

229.    No compelling governmental interest, including compliance with Section 2 of the VRA, justifies the use of race to carve up Orangeburg and ignore vital community interests at stake.[34]

### Congressional Districts 1, 2, and 5 are Racially Gerrymandered

230.    As noted above, recent Census results show that South Carolina experienced significant population shifts and growth in the past decade. These changes created unequal apportionment among South Carolina's seven congressional districts. Most significantly, CD 1 was nearly 12% overpopulated, while CD 6 was 11.59% underpopulated. Below are the population shifts in all seven congressional districts.

| District | 2010 Population | 2020 Population | Shift | Deviation from Ideal 2020 Population | Percent Deviation |
|---|---|---|---|---|---|
| 1 | 660,766 | 818,893 | +158,127 | +87,689 | 11.99% |
| 2 | 660,766 | 721,829 | +61,063 | -9,375 | -1.28% |
| 3 | 660,767 | 706,785 | +46,018 | -24,419 | -3.34% |
| 4 | 660,766 | 760,233 | +99,467 | +29,029 | 3.97% |
| 5 | 660,766 | 736,286 | +75,520 | +5,082 | 0.70% |
| 6 | 660,766 | 646,463 | -14,303 | -84,741 | -11.59% |
| 7 | 660,767 | 727,936 | +67,169 | -3,268 | -0.45% |

231.    The Legislature repeatedly heard from members of the public and legislators that any lawful congressional map must preserve CD 6 as a district that provides Black voters with an

---

[34]    During the December 2, 2021 House debate, Rep. Govan (also a South Carolina NAACP member) conveyed that Orangeburg County Council and leadership in the City of Orangeburg are concerned about cracking communities of interest and combining communities in Bamberg, Barnwell, and Allendale "that have nothing in common with Orangeburg."

effective opportunity to elect their preferred candidates—that is, an effective minority-opportunity district—consistent with Section 2 of the VRA. The Legislature was also repeatedly reminded that it could not needlessly pack Black voters into CD 6 from CD 1 or any other district to correct for malapportionment in CDs 1 and 6. More specifically, as described in ¶¶ 95–174, members of the public and legislators warned against splitting Black voters from their communities of interest in Charleston, Richland, and Sumter Counties to correct the population disparities among the districts.

232.    Members of the public and legislators, for example, repeatedly urged legislators not to crack Black communities of interest in CD 1, including the areas in which Black people have historically lived in West Ashley, or split the cities of North Charleston and Charleston because these cities form a single community of interest based on shared history, voting patterns, and socioeconomic realities. Public testimony also emphasized a strong preference by residents to keep Charleston Counties whole in CD 1.

233.    Members of the public and legislators also urged legislators to ensure that Black voters, who represent 29% of voters statewide, had an opportunity to elect candidates of choice or at minimum influence elections outside of just CD 6, the sole majority-Black district in the state. In one of Plaintiff South Carolina NAACP's proposed maps, for example, the BVAP in CD 1 was 34%.

234.    But the Legislature discounted and ignored this testimony. Instead, it enacted a map that does the bare minimum to correct for population deviations, particularly in CDs 1 and 6, while harming Black voters not only in those two districts, but in almost all of the other ones.

235.    The Legislature significantly dropped the BVAP in CD 6, and, given RPV patterns, also ensured that *no* other district would have a meaningful opportunity for Black voters

to elect candidates of their choice. These changes result in a significantly reduced BVAP in CD 6, but *no* benefit of increasing Black voters' ability to meaningfully elect or even influence the election of candidates of choice in other CDs—benefits which various maps submitted by members of the public did provide.

236.    While CD 6 now has a 46.9% BVAP that may still be an effective district for Black voters, the Legislature used race as a predominate factor to draw the Challenged Congressional Districts in a way that was not narrowly tailored to comply with Section 2 of the VRA or any other compelling governmental interest.

237.    The Legislature moved a disproportionate number of the white VAP ("WVAP") from CD 2, particularly in Richland County, into CD6. More specifically, based on an analysis, the Legislature moved VTDs with a significant majority of white voters, who have preferred Democratic candidates in recent elections from Richland County in CD2 and brought them into CD 6 from Richland County. At the same time, it left VTDs with a majority of Black voters who prefer Democratic candidates in recent elections in Richland in CD2, though those VTDs were available to be moved into CD 6. There is thus an inference that race, not party, drove the selection of voters that were moved into CD 6 and left in CD 2.

Richland



238.    Under S. 865, the Legislature also moved Black voters out of CD 6, including

from Berkeley, Orangeburg, and Richland Counties. Based on the level of RPV discussed above

in ¶¶ 186–87, 208, the Legislature's actions here will result in subsuming Black voters in the

minority among a majority of white voters, who, based on an analysis of recent elections,

consistently vote against Black-preferred candidates in congressional and other elections.

239.    Under S. 865, despite a purported concern in the redistricting criteria for keeping

municipal boundaries whole, the Legislature also split the municipal boundaries of Charleston

between CDs 1 and 6. This deviation from the Legislature's own redistricting principles was

done to grab Black voters from CD 1, such as the Black population of West Ashley, and bring

them into CD 6. As a result, CD 1 now has a disproportionately small portion of the Black

population of Charleston County, limiting the ability of Black voters to influence elections in

CD 1.



No compelling governmental interest, including compliance with Section 2 of the VRA, justifies the use of race to move Black voters into CD 6 by cracking communities of interest CD 1.

240.    Under S. 865, despite a purported concern for keeping counties and municipalities whole according to its criteria, the Legislature unnecessarily splits Florence, Orangeburg, Richland, and Sumter Counties and, in at least one case, a municipality within Sumter County. In so doing, Black communities within these areas are dispersed among CDs 2, 5, and 7, purposefully subsumed in congressional districts with a majority of white voters, which, in the presence of RPV patterns, will render Black voters unable to meaningfully influence congressional elections in those districts.

**Florence**



**Orangeburg**



**Richland**



As one example, under S. 865, CD 6 reaches into Sumter County to grab VTDs with significant populations of Black voters in the city of Sumter. In so doing, the Legislature left other Black voters in Sumter in CD5 where they lack any opportunity to elect given the known voting patterns in congressional and other elections. No compelling governmental interest, including compliance with Section 2 of the VRA, justifies the use of race to crack Black voters in CDs 2, 5, and 7.

**Sumter**



241.    In comparison to S. 865, Plaintiff South Carolina NAACP proposed two plans to the Legislature. One of them kept Charleston County whole within CD 1, like other maps proposed to the Legislature. The other map split Charleston between CDs 1 and 7 to allow the creation of a second minority-opportunity district for Black voters. However, as enacted, CD 1 splits Charleston while developing *no* new opportunity and maintaining approximately the same level of BVAP in CD 1 as under the benchmark plan. S. 865 flies in the face of the geography of the state post-2020 which reflects the movement of Black people to the South Carolina coast. It also disregards the various alternative plans that showed that the severe imbalance in population between CD 1 and CD6 could be corrected, while at the same time preserving the ability of Black voters to continue to elect candidates of their choice in CD 6, respecting communities of interest in CD 1, and developing the BVAP in CD 1 to as high as 34%.

242.    Although the Legislature did not significantly change CDs 3, 4, and 7, notably it did design a CD 5 that disproportionately moved white voters in and Black voters out. The result is that the Legislature slightly decreased the BVAP of CD 5 to even lower than it had been under the post-2011 benchmark plan.

243.    S. 865 subordinated public input and made race the predominate factor in drawing CDs 1, 2, and 5. The use of race was not narrowly tailored to comply with Section 2 of the VRA or any other compelling governmental interest. The Legislature also subordinated traditional race-neutral redistricting principles, including but not limited to, compactness, respecting county and municipal boundaries, and respecting communities of actual shared interests.

244.    For example, out of all voters in the "envelope" of possible counties in which CD 6 includes at least a part, Defendants chose to keep the majority of Black voters—whether Democrats or Republicans—inside CD 6, while keeping a much smaller percentage of white voters—also whether Democrats or Republicans.

245.    Defendants did the opposite in CD 1. There, out of all voters in the envelope of possible counties, Defendants kept the vast majority of white voters inside CD 1, regardless of partisan affiliation. Conversely, Defendants only kept a much smaller percentage of possible Black voters in CD 1, again regardless of partisan affiliation.

246.    In other words, keeping partisan affiliation constant, the probability that VTDs were moved into or kept inside CD 6 increased as BVAP increased. On the other hand, the probability that VTDs were moved into or kept inside CD 1 increased as BVAP *decreased*.

## CAUSES OF ACTION

### COUNT ONE
### H. 4493's violations of the Fourteenth Amendment of the U.S. Constitution
### U.S. Const. amend. XIV; 42 U.S.C §1983
### (Racial Gerrymandering)

247.     Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

248.     The Fourteenth Amendment of the U.S. Constitution provides in relevant part: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 2.

249.     Under the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution, racial classifications are prohibited unless narrowly tailored to serve a compelling state interest.

250.     Race was the predominant factor in the creation of Challenged State House Districts adopted in H. 4493.

251.     Race predominated over traditional redistricting principles such as maintaining communities of interest, respecting county and municipal boundaries, having compact districts, and protecting incumbents.

252.     The use of race as the predominant factor with respect to of the Challenged State House Districts in H. 4493 is not narrowly tailored to serve a compelling state interest, including compliance with the VRA.

253.     Thus, H. 4493 violates Plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

78

254.    Plaintiffs have no adequate remedy at law other than the judicial relief sought here. The failure to temporarily and permanently enjoin enforcement of H. 4493 will irreparably harm Plaintiffs' constitutional rights.

**COUNT TWO**
**H. 4493's violations of the Fourteenth and Fifteenth Amendments of the U.S. Constitution**
**U.S. Const. amends. XIV and XV; 42 U.S.C §1983**
**(Intentional Discrimination)**

255.    The relevant allegations contained in the preceding paragraphs are alleged as if fully set forth herein.

256.    The Equal Protection Clause of the Fourteenth Amendment and the Fifteenth Amendments of the U.S. Constitution forbids states from enacting laws for which a racially discriminatory intent or purpose is a motivating factor.

257.    The facts alleged herein reveal that the Challenged State House Districts in H. 4493 were adopted, at least in part, with a racially discriminatory intent to discriminate against Black voters in violation of the U.S. Constitution.

258.    H. 4493 will have a discriminatory impact on Black South Carolinians—a fact that was foreseeable when Defendants drafted and passed the Challenged State House Districts adopted in H. 4493. Elected officials in South Carolina have limited the influence of Black voters through the purposeful cracking and packing of Black voters.

259.    Moreover, other circumstantial evidence raises a strong inference of a discriminatory purpose motivating the enactment of H. 4493, such as: South Carolina's well-documented history and ongoing record of discrimination against Black South Carolinians in redistricting, particularly state legislative redistricting, and other voting practices; and the sequences of events and flawed and non-transparent process which resulted in the enactment of

H. 4493, including the disregard for constitutionally-compliant alternative maps offered by the public and amendments offered by legislative members.

260.    Plaintiffs have no adequate remedy at law other than the judicial relief sought in this case. The failure to enjoin the conduct of elections under H. 4493 and ordering of remedial maps will irreparably harm Plaintiffs by subjecting them to intentionally racially discriminatory districts for the next decade.

**COUNT THREE**
**S. 865's violations of the Fourteenth Amendment of the U.S. Constitution**
**U.S. Const. amend. XIV; 42 U.S.C §1983**
**(Racial Gerrymandering)**

261.    Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

262.    The Fourteenth Amendment of the U.S. Constitution provides in relevant part: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 2.

263.    Under the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution, racial classifications are prohibited unless narrowly tailored to serve a compelling state interest.

264.    Race was the predominant factor in the creation of CDs 1, 2, and 5.

265.    Race predominated over traditional redistricting principles such as maintaining communities of interest, respecting county and municipal boundaries, and having compact districts.

80

266.    The use of race as the predominant factor concerning CDs 1, 2 and 5 is not narrowly tailored to serve a compelling state interest, including compliance with the VRA.

267.    Thus, S. 865 violates Plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution.

268.    Plaintiffs have no adequate remedy at law other than the judicial relief sought here. The failure to temporarily and permanently enjoin enforcement of S. 865 will irreparably harm Plaintiffs' constitutional rights.

**COUNT FOUR**
**S. 865's violations of the Fourteenth and Fifteenth Amendments of the U.S. Constitution**
**U.S. Const. amends. XIV and XV; 42 U.S.C §1983**
**(Intentional Discrimination)**

269.    The relevant allegations contained in the preceding paragraphs are alleged as if fully set forth herein.

270.    The Equal Protection Clause of the Fourteenth Amendment and the Fifteenth Amendments of the U.S. Constitution forbid states from enacting laws for which a racially discriminatory intent or purpose is a motivating factor.

271.    The facts alleged herein reveal that the Challenged Congressional Districts were adopted, at least in part, with a racially discriminatory intent to discriminate against Black voters in violation of the U.S. Constitution.

272.    S. 865 will have a discriminatory impact on Black South Carolinians—a fact that was foreseeable when Defendants drafted and passed the Challenged Congressional Districts. Elected officials in South Carolina have limited Black voters' ability to elect or even influence elections through the purposeful cracking and packing of Black voters.

273.    Moreover, other circumstantial evidence raises a strong inference of a discriminatory purpose motivating the enactment of S. 865, such as: South Carolina's well-

documented history and ongoing record of discrimination against Black South Carolinians in redistricting, particularly state legislative redistricting, and other voting practices; and the sequences of events and flawed and non-transparent process which resulted in the enactment of S. 865, including the disregard for constitutionally-compliant alternative maps offered by the public and amendments offered by legislative members.

274.    Plaintiffs have no adequate remedy at law other than the judicial relief sought in this case. The failure to enjoin the conduct of elections under S. 865 and ordering of remedial maps will irreparably harm Plaintiffs by subjecting them to intentionally racially discriminatory districts for the next decade.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiffs respectfully requests that this Court:

i.    Declare the Challenged State House Districts adopted in H. 4493 to be unconstitutional as violating the Fourteenth Amendment of the U.S. Constitution as racially gerrymandered districts;

ii.    Declare the Challenged Congressional Districts adopted in S. 865 to be unconstitutional as violating the Fourteenth Amendment of the U.S. Constitution as racially gerrymandered districts;

iii.    Declare the Challenged State House Districts adopted in H. 4493 to be unconstitutional as violating the Fourteenth and Fifteenth Amendments of the U.S. Constitution as passed with discriminatory intent as a motivating factor;

iv.    Declare the Challenged Congressional Districts adopted in S. 865 to be unconstitutional as violating the Fourteenth and Fifteenth Amendments of the U.S. Constitution as passed with discriminatory intent as a motivating factor;

v.      Preliminary and permanently enjoin Defendants and their agents from calling, holding, supervising or certifying any elections under H. 4493 and S. 865 until a constitutionally and VRA-complaint remedial plan is adopted for the 2022 elections;

vi.     Order expedited hearings and briefing, consider evidence, and take any other action necessary for the Court to order a VRA-complaint for new South Carolina state House and Congressional districts;

vii.    Set an immediate and reasonable deadline for Defendants to adopt and enact a congressional redistricting plan that (1) does not dilute, cancel out, or minimize the voting strength of Black South Carolinian voters or subject them to intentionally discriminatory districts, and (2) does not violate the VRA, federal and state constitutions, and other applicable law;

viii.   Order new redistricting maps if Defendants fail to adopt maps that conforms with this Court's judgment;

ix.     Order changes to any relevant 2022 election-related deadlines to allow the adoption of congressional and state legislative maps that conform with this Court's judgment;

x.      Retain jurisdiction over this matter until Defendants enact compliant maps by this Court's deadline;

xi.     Retain jurisdiction over this matter for such a period it deems appropriate and require Defendants to submit future congressional and state legislative redistricting plans for preclearance review from this court or the U.S. Attorney General under Section 3(c) of the VRA, 52 U.S.C. § 10302(c);

xii.      Award Plaintiffs' attorneys' fees and costs in this action; and

xiii.     Grant such other and further relief as this Court deems just and proper in the circumstances.

Dated: February 1, 2022

Respectfully submitted,

Leah C. Aden**
Stuart Naifeh**
Raymond Audain**
John S. Cusick**
NAACP Legal Defense & Educational Fund, Inc.
40 Rector St, 5th Fl.
NY, NY 10006
Tel.: (212) 965-7715
laden@naacpldf.org

Antonio L. Ingram II**
NAACP Legal Defense & Educational Fund, Inc.
700 14th St, Ste. 600
Washington, D.C. 20005
Tel.: (202) 682-1300
aingram@naacpldf.org

Adriel I. Cepeda Derieux**
Samantha Osaki**
Sophia Lin Lakin*
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: (212) 549-2500
acepedaderieux@aclu.org

John A. Freedman*
Elisabeth S. Theodore*
Gina M. Colarusso*
John "Jay" B. Swanson*
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., N.W.
Washington, D.C. 20001
Tel: (202) 942-5000

Jeffrey A. Fuisz*
Paula Ramer*
Jonathan I. Levine*
Theresa M. House*
ARNOLD & PORTER KAYE SCHOLER LLP

*/s/ Christopher J. Bryant*
Christopher J. Bryant, Fed. ID 12538
Boroughs Bryant, LLC
1122 Lady St., Ste. 208
Columbia, SC 29201
Tel.: (843) 779-5444
chris@boroughsbryant.com

Somil B. Trivedi**
Patricia Yan**
American Civil Liberties Union Foundation
915 15th St., NW
Washington, DC 20005
Tel.: (202) 457-0800
strivedi@aclu.org

Allen Chaney, Fed. ID 13181
American Civil Liberties Union
of South Carolina
Charleston, SC 29413-0998
Tel.: (843) 282-7953
Fax: (843) 720-1428
achaney@aclusc.org

Janette M. Louard*
Anthony P. Ashton*
Anna Kathryn Barnes*
NAACP OFFICE OF THE GENERAL COUNSEL
4805 Mount Hope Drive
Baltimore, MD 21215
Tel: (410) 580-5777
jlouard@naacpnet.org
aashton@naacpnet.org
abarnes@naacpnet.org

*Attorneys for Plaintiffs*

* Motion for admission *Pro Hac Vice* forthcoming
** Admitted *Pro Hac Vice*

85

250 West 55th Street
New York, NY 10019
Tel: (212) 836-8000

Sarah Gryll**
ARNOLD & PORTER KAYE SCHOLER
LLP
70 West Madison Street, Suite 4200
Chicago, IL 60602-4231
Tel: (312) 583-2300