**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

| | |
|---|---|
| THE SOUTH CAROLINA STATE CONFERENCE OF THE NAACP, and<br><br>TAIWAN SCOTT, on behalf of himself and all other similarly situated persons,<br><br>     Plaintiffs,<br><br>  v.<br><br>HENRY D. MCMASTER, in his official capacity as Governor of South Carolina; THOMAS C. ALEXANDER, in his official capacity as President of the Senate; LUKE A. RANKIN, in his official capacity as Chairman of the Senate Judiciary Committee; JAMES H. LUCAS, in his official capacity as Speaker of the House of Representatives; CHRIS MURPHY, in his official capacity as Chairman of the House of Representatives Judiciary Committee; WALLACE H. JORDAN, in his official capacity as Chairman of the House of Representatives Elections Law Subcommittee; HOWARD KNAPP, in his official capacity as interim Executive Director of the South Carolina State Election Commission; JOHN WELLS, Chair, JOANNE DAY, CLIFFORD J. EDLER, LINDA MCCALL, and SCOTT MOSELEY, in their official capacities as members of the South Carolina Election Commission,<br><br>     Defendants. | **Case No. 3-21-cv-03302-JMC-TJH-RMG**<br><br>**THREE-JUDGE PANEL**<br><br>**PLAINTIFFS' RESPONSE TO HOUSE DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' [FIRST] AMENDED COMPLAINT** |

1

Plaintiffs South Carolina Conference of the NAACP ("SC-NAACP") and Taiwan Scott submit this brief in opposition ("Opposition") to the Motion to Dismiss Plaintiffs' [First] Amended Complaint by House Defendants James H. Lucas, Chris Murphy, and Wallace H. Jordan (ECF No. 91).[1]

## **INTRODUCTION**

House Defendants and their co-Defendants have racially gerrymandered South Carolina's state House map and adopted that map with a racially discriminatory intent. Plaintiffs have alleged these violations via a 57-page First Amended Complaint replete with factual allegations spanning 123 paragraphs. The allegations reference multiple types of statistical analyses, precinct-level breakdowns of boundaries between Challenged Districts, and comparisons of the recently enacted map to community-submitted maps that hewed to traditional redistricting principles without committing the constitutional violations that House Defendants' map does. Plaintiffs point to specific facts demonstrating how race-based considerations superseded traditional redistricting principles and even House Defendants' own stated guidelines in drawing the Challenged Districts.

Initially, Defendants paint these allegations as insufficient or "unsupported." ECF No. 91 at 6. However, Defendants then abandon this approach and instead attempt to refute Plaintiffs' allegations district by district, precinct by precinct, line-by-line. As shown below, their analysis is

---

[1] House Defendants' motion to dismiss, filed January 6, 2022, addresses only Plaintiffs' First Amended Complaint, filed December 24, 2021. Since the motion to dismiss was filed, House Defendants and their co-Defendants have passed Senate Bill 865 and Plaintiffs have since filed a Proposed Second Amended Complaint, dated February 1, 2022 ("SAC"), ECF 116-2. Relevant to this Response, the Second Amended Complaint no longer contains a First and Fourteenth Amendment freedom-to-associate claim (Count III) related to South Carolina's U.S. House map. Accordingly, this Response does not address that claim, nor does it assert standing for Mr. Scott with respect to it.

incorrect. But even by engaging in that exercise, House Defendants concede that material facts are disputed, and therefore the case should proceed to trial as scheduled.

Defendants also argue that Plaintiff SC-NAACP lacks standing, but this is equally unavailing. The SC-NAACP has associational standing because, as an organization with 77 branches across South Carolina's 46 counties and over 13,000 members among these branches, it is more than plausible that a member resides in each Challenged District. Controlling case law, including principles protecting the privacy and the freedom of association of individual members, requires no more at this stage.

Finally, House Defendants fail to address Plaintiffs' intentional discrimination allegations, which involve a different standard and burden of proof than racial gerrymandering claims. House Defendants refer to the General Assembly's intent only twice, and never to rebut the legal elements of Plaintiffs' intentional racial discrimination claim. The motion's Rule 12(b)(6) section heading asserts only that "Plaintiffs fail to state a claim for racial gerrymandering." ECF No. 91 at 10. There is no corresponding heading or section for intentional discrimination. This omission is an independent justification to deny the motion to dismiss, at least in part, and keep this case moving to trial.

## LEGAL ARGUMENT

### I.    Standard of Review

In evaluating a motion to dismiss, courts accept all factual allegations in the complaint as true and draw "all reasonable inferences in favor of the plaintiff." *Wright v. North Carolina*, 787 F.3d 256, 263 (4th Cir. 2015) (citation omitted). Plaintiffs' complaint "must contain sufficient facts to state a claim that is plausible on its face," but it "need only give the defendant fair notice of what the claim is and the grounds upon which it rests." *Id.* (citation omitted). Courts view the

complaint with a "forgiving lens" and construe it "liberally so as to do substantial justice" at the motion to dismiss stage. *Id.* at 263, 265.

## II.    Plaintiff SC-NAACP Has Associational Standing

A group establishes associational standing when: "a) its members would otherwise have the standing to sue in their own right; b) the interest it seeks to protect are germane to the organization's purpose; c) neither the claim asserted, nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Where an association has "members in almost every county" in a state, the "common sense inference" that members reside in each challenged district is "strong enough" to defeat a motion to dismiss based on lack of standing. *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 270 (2015); *see also Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1160 (11th Cir. 2008) (in cases alleging future, imminent harm to voting rights, "we have not required that the organizational plaintiffs name names because every member faces a probability of harm in the near and definite future"). Where compelled membership disclosure could violate individual members' freedom of association and right to privacy, "particularly where a group espouses dissident beliefs," associational standing is also appropriate. *Nat'l Ass'n for Advancement of Colored People v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 462 (1958).

Plaintiff SC-NAACP meets this standard. It alleges that it has 13,000 members across 77 branches, including at least one branch in every county in South Carolina. ECF 84 ¶¶ 16-17. It has also alleged that its members live in each of the Challenged Districts, and registered voters who live in each of the Challenged Districts, and that all members will be imminently harmed if the racial gerrymandering and discrimination present in H. 4493 is not enjoined. *Id.* ¶ 18. And, of

4

course, the SC-NAACP's members are in the same position as those of the Alabama state conference, whose identities were protected in *Patterson*.

House Defendants claim that *Alabama Legislative Black Caucus* supports their argument because the Supreme Court ultimately remanded the case and allowed plaintiffs to submit a membership list to establish member harm. ECF No. 91 at 9; 575 U.S. 254 (2015). But that accommodation took place after the motion to dismiss. It was not required as part of the First Amended Complaint itself. *Id.* at 279; *Cf. Hancock County Bd. of Sup'rs v. Ruhr*, 487 Fed. Appx. 189, 198 (5th Cir. 2012) (unpublished) ("[A]ppellees offer no authority for the proposition that an NAACP branch must identify a particular NAACP member at the pleading stage. We are aware of no precedent holding that an association must set forth the name of a particular member in its complaint in order to survive a Rule 12(b)(1) motion to dismiss based on a lack of associational standing."); *Perez v. Abbott*, 253 F. Supp. 3d 864, 930-31 (W.D. Tex. 2017) (denying motion to dismiss for lack of associational standing because "[t]he State asks for more factual specificity than is required at this stage of the litigation") (internal quotations omitted).

Indeed, under *Alabama Legislative Black Caucus*, allegations in a complaint that an organization operates statewide and has a purpose related to voting, alongside testimony to that effect after a motion dismiss, all "support an inference that the organization has members in all of the State's [challenged] districts, other things being equal, which is sufficient to meet the Conference's burden of establishing standing. That is to say, it seems highly likely that a 'statewide' organization with members in 'almost every county,' the purpose of which is to help 'blacks and other minorities and poor people,' will have members in each [challenged] district." 575 U.S. at 255.

5

Defendants' reliance on *Hanover County Unit of the NAACP v. Hanover County*, 461 F. Supp. 3d 280 (E.D. Va. 2020) is also misplaced. ECF No. 91 at 10. There, the question was whether Confederate names and imagery in a school amounted to compelled speech by NAACP members and their children, and the court held that this would require "individualized proof" and participation of "individual members." *Id.* at 289. But this is not a compelled speech case requiring the participation of individual members, because voting discrimination impacts each impacted voter in substantially the same way. *Cf. Louisiana State Conf. of Nat'l Ass'n for Advancement of Colored People v. Louisiana*, 490 F. Supp. 3d 982, 1012 (M.D. La. 2020)*, motion to certify appeal granted sub nom. Louisiana State Conf. of Nat'l Ass'n for the Advancement of Colored People v. Louisiana*, 495 F. Supp. 3d 400 (M.D. La. 2020)*, and aff'd sub nom. Allen v. Louisiana*, 14 F.4th 366 (5th Cir. 2021) (rejecting state's argument that plaintiff lacked associational standing based on failure to "name specific members" because "the Section 2 dilution claim and the relief sought (a redrawing of the districts to create a majority-minority district in District 5) do not require the participation of individual members of the suit")*.

*Hanover* also recognized that associational standing would be appropriate if the "defendant's conduct is the primary subject of inquiry." 461 F. Supp. 3d at 280 (quotations omitted). Here, House Defendants' conduct—namely, whether they engaged in illegal gerrymandering and intentional race discrimination when drawing H. 4493—is the primary subject of inquiry. House Defendants' own MTD proves it; the brief spends pages justifying their redistricting choices, but never once mentions the relevance of SC-NAACP's members to those choices.

### III.    Plaintiffs Have Pleaded Ample Facts to State Their Claims of Racial Gerrymandering and Intentional Discrimination

Fourteenth Amendment racial gerrymandering claims require courts to determine whether race was a predominant factor in redistricting; if it was, they apply strict scrutiny. *See Raleigh Wake Citizens Ass'n v. Wake Cnty. Bd. of Elections*, 827 F.3d 333, 352–53 (4th Cir. 2016). Plaintiffs do not need to allege that race was the only motive, but rather that it predominated in the "legislature's decision to place a significant number of voters within or without a particular district." *See Miller v. Johnson*, 515 U.S. 900, 916 (1995); *see also Ala. Legis. Black Caucus*, 575 U.S. at 262–63 (describing "a claim of racial gerrymandering as a claim that race was improperly used in the drawing of the boundaries of one or more *specific electoral districts*") (emphasis in original).

Evidence that race predominated may include "circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose." *Miller*, 515 U.S. at 916. Among other things, racial gerrymandering claims may be supported by "direct and circumstantial evidence of legislative intent . . . bizarre or non-compact district shapes, and district lines that cut through traditional geographic boundaries or election precincts." *Raleigh Wake Citizens Ass'n*, 827 F.3d at 352. If the plaintiff demonstrates that race predominated in the drawing of district lines, the state's line drawing is subject to the same strict scrutiny given to other state laws that classify citizens by race. *Shaw v. Reno*, 509 U.S. 630, 644 (1993). In redistricting, strict scrutiny means the state must show not only that its districting legislation was passed in pursuit of a compelling state interest, but also that the legislation was narrowly tailored to achieve that interest. *Id.* at 643. Courts have recognized that compliance with Section 2 of the Voting Rights Act ("VRA") can satisfy strict scrutiny; but defendants must satisfy their burden and show "that [they]

had 'a strong basis in evidence' for concluding that the statute required its action." *Cooper v. Harris*, 137 S. Ct. 1455, 1464 (2017) (citing *Ala. Legis. Black Caucus*, 575 U.S. at 278-79).

With respect to intentional discrimination, *Arlington Heights* established a nonexhaustive list of relevant factors, including: "[t]he historical background of the [challenged] decision"; "[t]he specific sequence of events leading up to the challenged decision"; "[d]epartures from normal procedural sequence"; the legislative history of the decision; and of course, the disproportionate "impact of the official action—whether it bears more heavily on one race than another." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266–67 (1977). This is a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available," and challengers need not show that discriminatory purpose was the "sole[]" or even a "primary" motive for the legislation, just that it was "a motivating factor." *Id.* at 265–66.

As this suggests, Plaintiffs "are not required to produce a 'smoking gun,' *especially not in their initial complaint*, to make a plausible allegation of racial intent." *League of United Latin Am. Citizens ("LULAC") v. Abbott*, No. 1:21-CV-00991, 2022 WL 174525, at *3 (W.D. Tex. Jan. 18, 2022) (emphasis added). Once a plaintiff has shown that racial discrimination was a substantial or motivating factor, "the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." *Hunter v. Underwood*, 471 U.S. 222, 228 (1985). Purported partisan motivations that merely mask a racial classification will not suffice:  "Using race as a proxy for party may be an effective way to win an election. But intentionally targeting a particular race's access to the franchise because its members vote for a particular party, in a predictable manner, constitutes discriminatory purpose." *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 221–23 (4th Cir. 2016).

As detailed in the district-cluster analysis below, Plaintiffs have pleaded facts that more than sufficiently state a racial gerrymandering claim. Plaintiffs specifically identify State House Districts and allege facts indicative of legislative intent to use race as the predominant redistricting criterion, including bizarre district lines that split precincts and communities of interest, statistically non-compact and irregularly shaped districts, districts that pit Black incumbents against one another, and facts about the legislative process, including that alternative maps that did not cast aside TRPs were proposed and defendants did not do a Section 2 analysis, including RPV, during the development of the House map. Plaintiffs allege that these tactics served to "crack" and "pack" voters along clear racial lines and are not justified by a compelling governmental interest.

Moreover, contrary to Defendants' mischaracterizations, Plaintiffs do not ignore the multiple considerations that may impact districting decisions, but rather allege that Defendants subordinated the traditional criteria contained in the Ad Hoc Committee's guidelines to racial considerations. *See* ECF No. 84 ¶ 6, ECF No. 91 at 11–13.

House Defendants' arguments miss the mark and demonstrate disputes of fact appropriate for trial. First, Defendants emphasize that adjustments to district boundaries were necessary to accommodate population changes across the state. *See* ECF No. 91 at 16–17. Defendants make similar allegations in defense of multiple Challenged Districts. *See* ECF No. 91 at 21–23, 26–27. However, courts consider the motivation of equalizing population as simply a "background rule" and not a factor to be considered when determining whether race predominated a legislature's decision making. *Ala. Legis. Black Caucus*, 575 U.S. at 273.

Second, Defendants repeatedly invoke the fact that the state House map created after the 2011 Census was precleared by the Department of Justice and upheld by federal courts, implying

that the current map should therefore receive some sort of immunity or presumption of validity. ECF No. 91 at 15-16, 18, 21. Defendants provide no authority for this proposition, nor could they. The very case they rely on for safe harbor makes plain that preclearance does not preclude later adjudication of *constitutional* redistricting claims. *Backus v. South Carolina*, 857 F. Supp. 2d 553, 557–58 (D.S.C. 2012), *aff'd*, 568 U.S. 801 (2012) ("While preclearance is a necessary and important step for those jurisdictions covered under section 5, it is limited in scope to administrative approval that the particular redistricting plan is not retrogressive under section 5 of the Voting Rights Act."); *Cf. LULAC v. Perry*, 548 U.S. 399, 480 (2006) (holding that Texas's congressional redistricting plan violated Section 2 of the VRA, notwithstanding the fact that the plan had been precleared by DOJ under Section 5 following the 2000 Census).

As an initial matter, Defendants cannot claim that significant population shifts necessitated the drawing of new district lines, on the one hand, and that the current map is effectively indistinguishable from the prior map, on the other. ECF No, 91 at 16. Plaintiffs are only challenging particular districts enacted in H. 4493, not districts enacted in 2011 or any "benchmark" created by Defendants. Further, the fact that one former districting plan was upheld does not give Defendants a blank check to racially gerrymander State House districts in perpetuity, so long as they purportedly maintain a vague, general core of certain existing districts.

Third, Defendants assert that illustrative maps offered by Plaintiffs and others during the legislative process suffer from failures of their own, ECF No. 91 at 18, 20, or that Plaintiffs have not themselves cured Defendants' violations via "reasonable alternative[s], *id.* at 23. As an initial matter, Defendants are well aware from letters and other public communications that Plaintiffs' maps are merely intended as exemplars. ECF No. 84 ¶ 71 (twice describing the submission as "proposed" plans and reiterating that constitutional obligations remained with the state); *see also,*

*e.g.*, Letter from the South Carolina NAACP, et al., to the S.C. House of Rep. Judiciary Comm.'s Redistricting Ad Hoc Comm. (Oct. 8, 2021), https://www.naacpldf.org/wp-content/uploads/Letter-to-H-Redistricting-Ad-Hoc-Comm-Submitting-Congressional-and-House-Maps-10-8-21.pdf. But, more importantly, these arguments are immaterial and dodge the issue at hand, which is whether *House Defendants*, not anyone else, engaged in unconstitutional racial gerrymandering or intentional discrimination. In other words, even if alternative proposals were somehow unconstitutional—which they are not—this would not and cannot absolve Defendants of their own violations, particularly on a motion to dismiss.

Fourth, House Defendants spend pages justifying the redistricting choices they made and listing the "many legitimate reasons" for those choices. ECF No. 91 at 10-27. Plaintiffs rebut many of those justifications below, showing exactly how House Defendants' choices evince racial discrimination. More importantly, however, House Defendants' assertions "do not on their own render Plaintiffs' allegations implausible," *LULAC*, 2022 WL 174525, at *4, and instead only raise factual disputes that cannot be decided on a motion to dismiss, *see Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) ("A motion to dismiss . . . does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.") (citations and quotations omitted) (denying motion to dismiss in gerrymandering case where complaint "include[d] numerous specific allegations of discriminatory intent"). Indeed, Defendants claim that their race-neutral justifications are akin to those that led to a successful motion to dismiss a decade ago in *Backus v. South Carolina*, 857 F. Supp. 2d 553 (D.S.C. 2012). But Defendants get *Backus* wrong. That case was *not* dismissed on a 12(b)(6) motion; rather, it was denied, and the parties had the opportunity to prove their case at trial. *See Backus*, 857 F. Supp. 2d at 558 ("At the hearing, the Court granted several of the motions, but denied the motions to dismiss for failure to

state a claim."). If anything, *Backus* lends further support to Plaintiffs' argument that their claims must be permitted to undergo further factual development.

### State House Districts 7, 8, 9, and 11 (Anderson County)

For Anderson County, House Defendants first argue that HDs 7, 8, 9, and 11 are "the same four districts" that covered Anderson County under the pre-cleared 2010 map, ECF No. 91 at 18. But they fail to mention that (a) the contours of these districts are far different than the prior map, and (b) as noted above, any prior preclearance by a court or the Department of Justice has no bearing on whether those new contours pass constitutional muster. Second, House Defendants engage in a thoroughly fact-bound justification of particular city and precinct splits, including comparing it to the plan Plaintiffs submitted to the Legislature (which is, of course, intended only as an illustrative example). ECF No. 91 at 18–19. A motion to dismiss, however, is not the appropriate vehicle to weigh the strength of competing district plans, nor to litigate minute factual disputes at the level of individual precinct splits.

In any case, Plaintiffs plead facts sufficient to allege that Defendants had a predominantly racial motive in drawing district lines that shattered the community of interest in the City of Anderson across four State House Districts. ECF No. 84 ¶¶ 112–23. District lines that slice through the Black population of Anderson while splitting precincts and creating relatively non-compact districts along the way support an inference that race predominated the redistricting process. ECF No. 84 ¶¶ 113–15, 120. The mere fact that Defendants chose to divvy up *this* community of interest—which includes largely Black precincts in the heart of Anderson—is probative of racial motivation. *See Miller*, 515 U.S. at 916 ("[C]ircumstantial evidence of a district's shape and demographics" can be used to show "that race was the predominant factor motivating the legislature's decision to place a significant numberer of voters within or without a particular

12

district"). It is indisputable that this community of Black voters was split, even if some precincts within the city were kept whole. *See* ECF No. 91 at 18.

Moreover, Plaintiffs make factual allegations based on RPV analysis across the state and in Anderson County specifically that the plan significantly drives down BVAP in Districts 7, 8, 9, and 11 and drastically reduces the chances that Black voters will have the opportunity to elect a candidate of their choice. ECF No. 84 ¶¶ 113, 116–17, 120–22. Plaintiffs also allege that the legislature was aware of these deficiencies and proceeded with a plan that diluted Black voting strength. ECF No. 84 ¶¶ 115, 117–18.

Plaintiffs also presented an alternative map that largely preserves the significant community of interest in the City of Anderson while addressing additional deviations from traditional redistricting criteria in Defendants' map, including by making districts more compact. ECF No. 84 ¶ 120. There is no compelling governmental interest that justifies the use of race to crack Anderson between Districts 7, 8, 9, and 11. ECF No. 84 ¶ 123. Plaintiffs have pled adequate facts to state claims of unconstitutional racial gerrymandering and intentional discrimination in the Challenged Districts in Anderson County.

### State House Districts 41 and 43 (Chester County)

With no basis in fact, Defendants claim that Plaintiffs' racial gerrymandering claims in Chester County are "conclusory and speculative," and that Defendants' choices can be justified by race-neutral considerations. ECF No. 91 at 20 (citation omitted). But Plaintiffs' allege the exact kind of facts that have long supported a racial gerrymandering claim. For example, factual allegations of "bizarre or non-compact district shapes" and "district lines that cut through traditional geographic boundaries or election precincts" can support a claim that race predominated in districting decisions. *Raleigh Wake Citizens Ass'n*, 827 F.3d at 352; *see also Miller*, 515 U.S. at

916. Plaintiffs alleged exactly this: State House District 41 is bizarrely shaped, with "bunny ears" that reach out to grab Black voters while crossing county lines and splitting eight precincts. ECF No. 84 ¶¶ 125, 127. Plaintiffs also allege that irregular lines dilute Black voting strength in neighboring District 43. ECF No. 84 ¶¶ 126–27. Defendants were on notice of these issues and proceeded to enact districts motivated by racial considerations. ECF No. 84 ¶ 126. Plaintiffs have alleged ample facts to support a claim that State House Districts 41 and 43 are the product of an unconstitutional racial gerrymander, and alternative explanations put forward by Defendants cannot be considered at this stage of litigation. *See* ECF No. 84 ¶¶ 124, 128.

### State House Districts 51 and 67 (Sumter County)

Defendants refute Plaintiffs' allegations related to Districts 51 and 67 by arguing once again that the predominant redistricting factor considered in Sumter County was population. ECF No. 91 at 22. But, as noted above, Defendants fail to recognize that population equality is considered a "background rule" in drawing district lines and "is not a factor to be treated like other nonracial factors when a court determines whether race predominated." *Ala. Legis. Black Caucus*, 575 U.S. at 273 (citation omitted). Defendants' last-ditch effort to compare newly enacted districts to those enacted in 2011 also simply suggest a possible basis for a factual dispute in later stages of litigation. Once again, Plaintiffs have alleged facts that, when taken as true, support an undeniable inference of racial gerrymandering in Sumter County. An irregularly-shaped border divides the City of Sumter between Districts 51 and 67 on clear racial lines, dividing a community of interest of Black voters. ECF No. 84 ¶¶ 130, 132. These lines appear to be carefully drawn with a racial motivation and also create "one of the least compact districts in the entire state House using statistical measures of compactness." ECF No. 84 ¶ 130.

**State House Districts 54, 55, 57, and 105 (Dillon County and Horry County)**

Defendants again rely on the misplaced argument that Challenged Districts—this time in Dillon County and Horry County—were drawn to accommodate population changes. ECF No. 91 at 22–23. Again, this is no answer to Plaintiffs' claim that race predominated in determining how the lines were drawn. *See Ala. Legis. Black Caucus*, 575 U.S. at 273. Plaintiffs' factual allegations support a claim that race was the predominate factor that the legislature used to decide *which voters* to include and exclude from State House Districts 54, 55, 57, and 105, while balancing population. *See Miller*, 515 U.S. at 916 (explaining that racial gerrymandering claims require a showing "that race was the predominant factor motivating the legislature's decision to place a significant number of voters *within or without a particular district*") (emphasis added).

Defendants also contend that Plaintiff SC NAACP's plan is "not an acceptable alternative." ECF No. 91 at 23. Of course, Plaintiff's map is merely an exemplar, among other exemplars available to the Legislature offered by other members of the public. Whether it or another districting plan is constitutionally required is a matter for further development in litigation. In fact, Defendants' argument appears to concede that Plaintiffs are correct and House District 55 could have been drawn in a way that addresses constitutional concerns, but Defendants' were motivated by race and chose a different route.

Plaintiffs have alleged that District 55 unnecessarily reaches far past Dillon County lines to pull in areas of Horry County with large numbers of white voters that significantly decrease the BVAP of the district. ECF No. 84 ¶¶ 135–36. The irregularly shaped District 55 further cracks the Black community of interest in the City of Loris and splits seven nearby precincts. ECF No. 84 ¶ 137. In fact, "District 55 is one of the least compact districts in the state House using statistical measures of compactness." ECF No. 84 ¶ 135. Plaintiffs allege that District 55 has an artificially

low BVAP and claim, using RPV analysis, that the irregular district lines in this area of the state likely diminish Black voters' voting power. ECF No. 84 ¶¶ 136–38. Plaintiffs also provided during the legislative process an alternative plan that maintains communities of interest, improves compactness, and enhances the ability of Black voters to meaningfully impact elections. ECF No. 84 ¶¶ 135, 139. No compelling governmental interest justifies the use of race to draw these lines in Dillon and Horry Counties. ECF No. 84 ¶ 140. These factual allegations are more than sufficient to state a claim of racial gerrymandering. At best, all Defendants accomplish is to levy factual allegations that must be aired outside of a motion to dismiss.

### State House Districts 59, 60, 63, and 101 (Florence County and Williamsburg County)

Defendants once again accuse Plaintiffs of making "conclusory" allegations related to Challenged Districts in Florence County and Williamsburg County and make factual contentions of their own that have no place in a motion to dismiss. ECF No. 91 at 23. Defendants ultimately argue that factors other than race predominated redistricting decisions in this part of the state. ECF No. 91 at 23–25.

Plaintiffs allege that the City of Florence is split among three districts along clear racial lines in a manner that packs Black voters into District 59 (60.8% BVAP) while cracking District 60 (30.5% BVAP) and District 63 (25.6% BVAP). ECF No. 84 ¶¶ 142–43. Plaintiffs also allege that, despite House Defendants' alleged commitment to compactness, Districts 59 and 60 are "relatively non-compact using statistical measures." ECF No. 84 ¶ 142. Defendants also violated other stated redistricting principles when, after being put on notice by Plaintiff South Carolina NAACP and other organizations, they proceeded with a plan that pit Black incumbent legislators against one another. ECF No. 84 ¶ 144.

Plaintiffs also allege that State House District 101 was drawn with predominantly racial motivations, as indicated by the way that its boundaries surgically cut into Florence County to grab areas with heavy BVAPs. ECF No. 84 ¶ 146. In defending this plan, Defendants misunderstand the nature of packing, which is that it ensures that elevated BVAP in one district (District 101) serves to dilute the voting power of Black voters in neighboring districts. ECF No. 91 at 24–25. Keeping in mind that it is Plaintiffs,' and not Defendants,' allegations that must be accepted as true on a motion to dismiss, even if it were true that including Lake City precincts in District 101 slightly lowers the (still elevated) BVAP of that district, Plaintiffs allegations are that drawing lines with predominately racial motivation in this way lowers Black voting strength in the *neighboring districts*, of which those precincts could have been part. *See* ECF No. 91 at 25, ECF No. 84 ¶ 146. Plaintiffs have made more than sufficient factual allegations to support a claim that race predominated in the Challenged Districts without a constitutional justification.

### State House Districts 70, 72, 73, 74, 75, 76, 77, 78, and 79 (Richland County)

Once again, Defendants argue that Plaintiffs have not stated a claim with respect to Challenged Districts in Richland County by merely raising factual allegations of their own that cannot be decided on a motion to dismiss. ECF No. 91 at 25–26. Defendants put forth alternative motivations (including irrelevant "population considerations") that they argue explain the district lines in Richland County, but they never demonstrate why Plaintiffs' allegations are insufficient to survive a motion to dismiss. *Id.*

Plaintiffs have alleged in detail how the districting plan packs Black voters into Districts 70, 73, 74, 76, 77, and 79 while reducing the influence of Black voters in neighboring Districts 72, 75, and 78. ECF No. 84 ¶¶ 148–54. For example, the First Amended Complaint alleges that the district plan packs Black voters into District 70, thereby drastically diminishing their influence in

17

surrounding districts 72, 75, and 78. ECF No. 84 ¶ 151. Relatedly, District 78 (BVAP 33.0%) strategically swallows populations of white voters to pack Black voters into the (highly non-compact) District 76 (BVAP 66.6%). ECF No. 84 ¶ 152. Districts 72 (BVAP 26.7%) and 74 (55.65%) reflect a similar pattern of unnecessary packing and cracking that indicates race predominated in the legislature's line drawing. ECF No. 84 ¶ 153. These district boundaries in Richland County follow obvious racial lines, creating a clear inference that race predominated with no accompanying compelling governmental interest. ECF No. 84 ¶ 154. Once again, Defendants' invocation of previous district plans and alternative motivations are a distraction from Plaintiffs factual allegations at this stage of the litigation and simply suggest a factual dispute for further development.

### State House Districts 90, 91, 93, and 95 (Orangeburg County)

Yet again, Defendants' main defense to Plaintiffs' challenge to districts in Orangeburg County is that population changes necessitated redrawing district lines. ECF No. 91 at 27. This does not rebut Plaintiffs' racial gerrymandering allegations at any stage of litigation, let alone on a motion to dismiss. Defendants also rely on past district lines to defend newly enacted State House Districts without directly engaging with Plaintiffs' factual allegations. ECF No. 91 at 27. Plaintiffs have made allegations sufficient to support a claim that race unconstitutionally predominated in drawing Districts 90, 91, 93, and 95 in Orangeburg County. ECF No. 84 ¶¶ 155–59. For example, Plaintiffs allege that the legislature deliberately and unnecessarily moved a large number of high BVAP precincts into District 93 for predominantly racial reasons, packing Black voters and contributing to oddly shaped districts in Orangeburg County. ECF No. 84 ¶¶ 157–58. Defendants were on notice of these problems and proceeded to enact a plan driven predominately by race that

broke apart communities of interest. ECF No. 84 ¶ 158. Defendants' Motion to Dismiss does not

explain why these allegations, taken as true, are inadequate. Plaintiffs' claims should proceed.

IV.     **Plaintiffs' First Amended Complaint makes sufficient allegations of racial gerrymandering, and Defendants make only a baseless assertion that Plaintiffs are attempting to subvert the judicial process by asserting partisan gerrymandering claims.**

Defendants make a conclusory argument that Plaintiffs' detailed racial gerrymandering

claims are instead partisan gerrymandering claims in disguise. They dedicate three pages of their

brief to reciting the facts and findings of two cases that turned on partisan gerrymandering, but

they do not provide any reason at all to believe that Plaintiffs' claims in the instant case are

disingenuous. ECF No. 91 at 28–30 (citing *Rucho v. Common Cause*, 139 S. Ct. 2484 (2019) and

*McConchie v. Scholz*, No. 21-CV-3091, 2021 WL 6197318 (N.D. Ill. Dec. 30, 2021)).

Plaintiffs have clearly and robustly alleged racial gerrymandering and intentional racial

discrimination, which require a highly local and fact-based analysis. Whether race or partisanship

(if that is Defendants' argument) predominated is a dispute for trial.[2] A trial court must "make 'a

sensitive inquiry' into all 'circumstantial and direct evidence of intent' to assess whether the

plaintiffs have managed to disentangle race from politics and prove that the former drove a

district's lines." *Cooper v. Harris*, 137 S. Ct. 1455, 1473 (2017) (quoting *Hunt v. Cromartie*, 526

U.S. 541, 546 (1999) (*Cromartie I*)); *see also Easley v. Cromartie*, 532 U.S. 234, 243–44 (2001)

(Cromartie II) (carefully evaluating evidence presented at trial to determine whether race rather

than partisanship predominated). Indeed, the Illinois District Court case on which Defendants

---

[2]     It does not appear from Defendants' Motion to Dismiss that they are asserting a partisanship defense to South Carolina's State House District plan or the Challenged Districts. For the purposes of this motion to dismiss, it is only relevant that Plaintiffs have plead facts sufficient to state a plausible claim of racial gerrymandering.

heavily rely was itself decided only following "extensive fact and expert discovery" and oral argument. *McConchie*, 2021 WL 6197318, at *3–4, *24–28.

In denying a motion to dismiss just last month, a federal District Court in Texas agreed that race and partisanship could be difficult to disentangle, but emphasized that "Plaintiffs are not required to produce a 'smoking gun,' especially not in their initial complaint, to make a plausible allegation of racial intent. Rather, Plaintiffs may point to circumstantial evidence including recent history, departures from normal procedure, and legislative history to infer racially discriminatory intent." *LULAC*, 2022 WL 174525 at *3–4. Plaintiffs' First Amended Complaint does just that: it includes ample factual allegations of bizarre district lines, divided precincts and communities of interest, and statistically non-compact and irregularly shaped districts, as well RPV analysis and legislative process defects that together state a claim for unconstitutional racial gerrymandering under the prevailing legal standards. Defendants do not and cannot explain why Plaintiffs' claims should be recast as partisan gerrymandering claims.

**V. Though House Defendants Have Failed to Move for Dismissal of Plaintiffs' Intentional Discrimination Claim, Plaintiffs Have Pleaded Sufficient Facts for that Claim As Well.**

As noted above, House Defendants have failed to address Plaintiffs' intentional discrimination claim; this should permit at least that claim to proceed to trial as scheduled. Nevertheless, Plaintiffs have alleged facts sufficient to state a claim of intentional discrimination in violation of the Fourteenth and Fifteenth Amendments. *Arlington Heights* establishes a non-exhaustive list of relevant factors that can be probative of intentional discrimination, including: (1) "[t]he historical background of the [challenged] decision"; (2) "[t]he specific sequence of events leading up to the challenged decision"; (3) "[d]epartures from normal procedural sequence"; (4) the legislative history of the decision; (5) the disproportionate "impact of the official action—

20

whether it bears more heavily on one race than another." *Vill. of Arlington Heights*, 429 U.S. at 266–67 (1977). Plaintiffs need not prove each of these factors and are not required to prove that racial discrimination was the sole driver of the official action, only that it was "a motivating factor" in the decision. *Id.* at 265–66.

With respect to the first of the *Arlington Heights* factor described above, Plaintiffs have alleged that H. 4493 is the latest example in a long history of discrimination in the South Carolina electoral process, including a recent history of implementing or seeking to implement "at-large election systems, redistricting plans, and municipal annexations that minimize and dilute Black voters' electoral opportunities in the context of RPV." ECF No. 84 ¶¶ 4, 37–44.

Under the second and third *Arlington Heights* factors, Plaintiffs allege that H. 4493 was passed in a "flawed and nontransparent process" that "repeatedly provided insufficient time and opportunity for legislative committee members and the public to review their proposed plans." ECF No. 84 ¶¶ 7-8. Among other factual allegations, Plaintiffs allege that the House Committee did not hold any public hearings on redistricting guidelines prior to their adoption and rejected requests from the public to allow more population flexibility in the guidelines consistent with federal case law. *See* ECF No, 84 ¶¶ 45, 50. Similarly, Plaintiffs allege that the House Committee's redistricting hearings were largely inaccessible to the public, scheduled last minute, and ultimately ignored public input. *See* ECF No. 84 ¶¶ 67–74. The legislative history of the act is also strongly indicative of discriminatory intent. Plaintiffs have alleged facts, including statements from legislators "downplay[ing] concerns about the dilution of Black voters' voting strength;" truncated opportunities for public feedback, and an apparent failure to consider necessary evidence of RPV. ECF No. 84 ¶¶ 67–95.

Finally, with respect to the fifth *Arlington Heights* factor, Plaintiffs have made ample allegations that specific State House Districts are drawn in a way that dilutes the voting strength of Black voters, and that Defendants were aware of these deficiencies. *See* ECF No. 84 ¶¶ 1–13, 64–159. For example, Plaintiffs allege that Black voters are packed into Districts 70, 73, 74, 76, 77, and 79, while their influence is reduced in neighboring Districts 72, 75, and 78. ECF No. ¶¶ 148–54. Here and in the other Challenged Districts, the "packing" and "cracking" of Black voters dilutes the ability of Black voters to elect candidates of their choice.

Accordingly, Plaintiffs have sufficiently alleged intentional discrimination under *Arlington Heights* despite House Defendants telling failure to challenge it.

## CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that this court deny House Defendants' motion to dismiss (ECF No. 91).

Dated: February 3, 2022

Respectfully submitted,

Leah C. Aden**
Stuart Naifeh**
Raymond Audain**
John S. Cusick**
NAACP Legal Defense & Educational Fund, Inc.
40 Rector St, 5th Fl.
NY, NY 10006
Tel.: (212) 965-7715
laden@naacpldf.org

Antonio L. Ingram II**
NAACP Legal Defense & Educational Fund, Inc.
700 14th St, Ste. 600
Washington, D.C. 20005
Tel.: (202) 682-1300
aingram@naacpldf.org

Adriel I. Cepeda-Derieux **
Samantha Osaki**
Sophia Lin Lakin *

*/s/ Christopher J. Bryant*
Christopher J. Bryant, Fed. ID 12538
Boroughs Bryant, LLC
1122 Lady St., Ste. 208
Columbia, SC 29201
Tel.: (843) 779-5444
chris@boroughsbryant.com

Somil B. Trivedi**
Patricia Yan**
American Civil Liberties Union Foundation
915 15th St., NW
Washington, DC 20005
Tel.: (202) 457-0800
strivedi@aclu.org
pyan@aclu.org

Allen Chaney, Fed. ID 13181
American Civil Liberties Union
of South Carolina

American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: (212) 549-2500
sosaki@aclu.org

John A. Freedman**
Elisabeth S. Theodore*
Gina M. Colarusso*
John "Jay" B. Swanson*
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., N.W.
Washington, D.C. 20001
Tel: (202) 942-5000

Jeffrey A. Fuisz*
Paula Ramer*
Jonathan I. Levine*
Theresa M. House*
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
Tel: (212) 836-8000

Sarah Gryll**
ARNOLD & PORTER KAYE SCHOLER LLP
70 West Madison Street, Suite 4200
Chicago, IL 60602-4231
Tel: (312) 583-2300

Charleston, SC 29413-0998
Tel.: (843) 282-7953
Fax: (843) 720-1428
achaney@aclusc.org

Janette M. Louard*
Anthony P. Ashton*
Anna Kathryn Barnes*
NAACP OFFICE OF THE GENERAL COUNSEL
4805 Mount Hope Drive
Baltimore, MD 21215
Tel: (410) 580-5777
jlouard@naacpnet.org
aashton@naacpnet.org
abarnes@naacpnet.org

*Attorneys for Plaintiffs*

* Motion for admission *Pro Hac Vice* forthcoming
** Admitted *Pro Hac Vice*