<u>SC NAACP v. McMaster, et al</u>

CA No.:  3:21-cv-03302-JMC-TJH-RMG

# EXHIBIT C

*Senate Defendants' Response to Plaintiffs' Motion to Compel Production of Documents and Information Requested from House Defendants*

Amended Complaint (ECF 6)

*Backus, et al v. South Carolina, et al*

*CA No.:  3:11-cv-03120-HFF-MBS-PMD*

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| **VANDROTH BACKUS, WILLIE HARRISON BROWN, CHARLESANN BUTTONE, BOOKER MANIGAULT, EDWARD MCKNIGHT, MOSES MIMS, JR, ROOSEVELT WALLACE**, and **WILLIAM G. WILDER**, on behalf of themselves and all other similarly situated persons**,** | ) ) ) ) ) ) ) ) ) | **Case No.: 2:11-cv-03120-RMG-HFF-MBS** |
| **Plaintiffs,** | ) ) ) | |
| v. | ) ) ) | **PLAINTIFFS' FIRST AMENDED COMPLAINT FOR A DECLARATORY** |
| **THE STATE OF SOUTH CAROLINA**, **NIKKI R. HALEY**, in her capacity as Governor**, KEN ARD**, in his capacity as Lieutenant Governor**, GLENN F. MCCONNELL**, in his capacity as President Pro Tempore of the Senate and Chairman of the Senate Judiciary Committee**, ROBERT W. HARRELL, JR**, in his capacity as Speaker of the House of Representatives, **JAMES H. HARRISON**, in his capacity as Chairman of the House of Representatives' Judiciary Committee, **ALAN D. CLEMMONS**, in his capacity as Chairman of the House of Representatives' Elections Law Subcommittee, **MARCI ANDINO**, in her capacity as Executive Director of the Election Commission, **JOHN H. HUDGENS, III**, Chairman, **CYNTHIA M. BENSCH**, **MARILYN BOWERS**, **PAMELLA B. PINSON**, and **THOMAS WARING**, in their capacity as Commissioners of the Elections Commission, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **JUDGMENT AND INJUNCTIVE RELIEF PURSUANT TO THE FOURTEENTH AND FIFTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND THE VOTING RIGHTS ACT OF 1965** |
| **Defendants.** | ) ) | |

Plaintiffs, as citizens and voters of the State of South Carolina, file this first amended

complaint for declaratory and injunctive relief pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, respectfully would show unto the Court:

**NATURE OF THE ACTION**

1.      Plaintiffs are entitled to a declaratory judgment and injunctive relief to prevent the implementation and enforcement of the **STATE OF SOUTH CAROLINA'S** redistricting law that illegally uses race to draw election districts for the United States House of Representatives (Congressional Districts), the South Carolina House of Representatives (House Districts), and the South Carolina Senate (Senate Districts) in violation of the Constitution and laws of the United States. The **STATE OF SOUTH CAROLINA** and the other above named Defendants passed into law Act 71 of 2011 (Act 71 or Senate Redistricting Plan), Act 72 of 2011 (Act 72 or House Redistricting Plan), and Act 75 of 2011 (Act 75 or Congressional Redistricting Plan). The South Carolina General Assembly was required to pass this legislation drawing new legislative and congressional district lines pursuant to Article I of the United States Constitution and the mandate of one-person, one-vote which requires that election districts give equal representation. Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362 (1964). Congressional districts also needed to be redrawn as a result of the 2010 Census that apportioned a new seventh congressional seat to the **STATE OF SOUTH CAROLINA** for representation in the United States House of Representatives. These redistricting plans became effective following federal administrative preclearance under Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c, as amended.

2.      In debating, drafting, and passing the Congressional, House, and Senate Redistricting Plans, Defendants discriminated on the basis of race for the purpose of determining which voters belong in which districts. Collectively these laws are race-based redistricting schemes that use race as the predominant factor in drawing election district boundaries. These discriminatory redistricting schemes also result in a diminution in the political power of black

2

voters whose influence is diluted by packing them into election districts in concentrations that exceed what is necessary and lawful to give them an equal opportunity to participate in the political process. Defendants have denied black voters excluded from these packed majority black districts any opportunity to elect a candidate of their choosing.

3.    These race-based redistricting schemes also abandon traditional redistricting principles like drawing compact districts, keeping political subdivisions intact, and keeping communities of interest intact. These racially-neutral traditional redistricting principals, if followed, would have afforded black voters an equal opportunity to participate in the political process. Instead, Defendants have created a system of voting apartheid in South Carolina that segregates white and black voters into election districts by using predetermined percentages of black and white voters for each district to assign voters based on race. This racial quota system has resulted in elections that are always or almost always decided by the district's majority race. As such, Defendants' legislative and congressional redistricting schemes unlawfully discriminate against black voters and deny them an equal opportunity to participate in the political process in violation of the United States Constitution and federal law.

4.    Plaintiffs, who are all black or African-American voters (hereinafter "black voters"), seek a Declaratory Judgment on behalf of themselves and all similarly situated persons, that Acts 71, 72, and 75 violate their civil rights protected by the Fourteenth Amendment, the Fifteenth Amendment, and the Voting Rights Act of 1965, 42 U.S.C. § 1973, et seq. Plaintiffs seek a temporary injunction preventing the irreparable harm that will result from the implementation of these laws pending the outcome of this litigation. Plaintiffs also seek a permanent injunction enjoining Defendants from implementing and enforcing these laws and directing Defendants to enact new redistricting plans that adhere to traditional, racially-neutral redistricting principles rather than illegal race-based classifications.

3

## JURISDICTION AND VENUE

5.      This action arises under Article I, §§ 2 and 4 and the Fourteenth and Fifteenth Amendments of the United States Constitution and the Voting Rights Act of 1965, 42 U.S.C. § 1973, et seq.

6.      This court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(3) and (4), 2201, and 2284, as well as, 42 U.S.C. §§ 1973, 1981, and 1983.

7.      Venue is proper pursuant to 28 U.S.C. § 1391(b) and 28 U.S.C. § 2284.

## PARTIES

8.      Plaintiff, **VANDROTH BACKUS**, is a registered voter and a resident of Florence County, South Carolina. Under the new Redistricting Plans, **REV. BACKUS** resides in Congressional District Seven, House District 59, and Senate District 30. These Redistricting Plans harm **REV. BACKUS**, a black voter, by discriminating against him on the basis of race for the purpose of including or excluding him from election districts.

9.      Plaintiff, **WILLIE HARRISON BROWN**, is a registered voter and a resident of Sumter County, South Carolina. Under the new Redistricting Plans, **MR. BROWN** resides in Congressional District Five, House District 67, and Senate District 35. These Redistricting Plans harm **MR. BROWN**, a black voter, by discriminating against him on the basis of race for the purpose of including or excluding him from election districts.

10.      Plaintiff, **CHARLESANN BUTTONE**, is a registered voter and a resident of Georgetown County, South Carolina. Under the new Redistricting Plans, **MS. BUTTONE** resides in Congressional District Seven, House District 103, and Senate District 32. These Redistricting Plans harm **MS. BUTTONE**, a black voter, by discriminating against her on the basis of race for the purpose of including or excluding her from election districts.

11.      Plaintiff, **BOOKER MANIGAULT**, is a registered voter and a resident of

4

Berkeley County, South Carolina. Under the new Redistricting Plans, **MR. MANIGAULT** resides in Congressional District One, House District 102, and Senate District 37. These Redistricting Plans harm **MR. MANIGAULT**, a black voter, by discriminating against him on the basis of race for the purpose of including or excluding him from election districts.

12.     Plaintiff, **EDWARD MCKNIGHT**, is a registered voter and a resident of Williamsburg County, South Carolina. Under the new Redistricting Plans, **MR. MCKNIGHT** resides in Congressional District Six, House District 101, and Senate District 32. These Redistricting Plans harm **MR. MCKNIGHT**, a black voter, by discriminating against him on the basis of race for the purpose of including or excluding him from election districts.

13.     Plaintiff, **MOSES MIMS, JR**, is a registered voter and a resident of Aiken County, South Carolina. Under the new Redistricting Plans, **MR. MIMS** resides in Congressional District 2, House District 82, and Senate District 25. These Redistricting Plans harm **MR. MIMS**, a black voter, by discriminating against him on the basis of race for the purpose of including or excluding him from election districts.

14.     Plaintiff, **ROOSEVELT WALLACE**, is a registered voter and a resident of Darlington County, South Carolina. Under the new Redistricting Plans, **MR. WALLACE** resides in Congressional District Seven, House District 62, and Senate District 29. These Redistricting Plans harm **MR. WALLACE**, a black voter, by discriminating against him on the basis of race for the purpose of including or excluding him from election districts.

15.     Plaintiff, **WILLIAM G. WILDER**, is a registered voter and a resident of Charleston County, South Carolina. Under the new Redistricting Plans, **MR. WILDER** resides in Congressional District One, House District 119, and Senate District 43. These Redistricting Plans harm **MR. WILDER**, a black voter, by discriminating against him on the basis of race for the purpose of including or excluding him from election districts.

16. Plaintiffs and all other similarly situated black voters were assigned to their new legislative and congressional districts as a result of being subjected to a racial classification. Plaintiffs and all other black voters are personally injured by being subjected to an illegal racial classification and by being placed into election districts in accordance with this race-based scheme rather than in accordance with traditional, race-neutral redistricting principles that require drawing geographically compact districts, keeping political subdivisions intact, and keeping communities of interest intact. These traditional, racially-neutral redistricting principles denied to Plaintiffs in passing these redistricting laws would have facilitated equal participation in the political process.

17. Defendant, the **STATE OF SOUTH CAROLINA**, is a proper defendant as a state subject to the limitations of the Fourteenth Amendment and Fifteenth Amendments of the United States Constitution and Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973, et seq.

18. Defendant, **NIKKI R. HALEY**, in her official capacity as Governor of South Carolina, is a proper defendant as the Chief Executive of the State of South Carolina charged with the enforcement of the state's laws under Article IV, Section 15 of the South Carolina Constitution.

19. Defendant, **KEN ARD**, in his official capacity as Lieutenant Governor of South Carolina, is a proper defendant as the President of the South Carolina Senate charged with presiding over the Senate and ratifying bills upon passage by both houses of the General Assembly pursuant to Article III, Section 18 of the South Carolina Constitution.

20. Defendant, **GLEN F. MCCONNELL**, in his official capacity as President Pro Tempore of the South Carolina Senate and Chairman of the Senate Judiciary Committee, is a proper defendant as leader of the Senate and Chairman of the Judiciary Committee responsible

for drafting and passing reapportionment legislation for consideration by the full Senate.

21.     Defendant, **ROBERT W. HARRELL, JR.**, in his official capacity as Speaker of the South Carolina House of Representatives, is a proper defendant as leader of the House charged with presiding over the House and ratifying bills upon passage by both houses of the General Assembly pursuant to Article III, Section 18 of the South Carolina Constitution. Speaker **HARRELL** is also the state official authorized by Act 75 to seek preclearance as required by Section 5.

22.     Defendant, **JAMES H. HARRISON**, in his official capacity as a member of the South Carolina House of Representatives, is a proper defendant as Chairman of the Judiciary Committee responsible for drafting and passing reapportionment legislation for consideration by the full House.

23.     Defendant, **ALAN D. CLEMMONS**, in his official capacity as a member of the South Carolina House of Representatives, is a proper defendant as Chairman of the Election Laws Subcommittee responsible for drafting and passing reapportionment legislation for consideration by the Judiciary Committee and the full House.

24.     Defendant, **MARCI ANDINO**, in her official capacity as the Executive Director of the South Carolina Elections Commission, is a proper defendant as the head of the South Carolina agency responsible for implementing and conducting elections pursuant to S.C. Code Ann. §§ 7-3-10, et seq. and 7-13-10, et seq., as amended.

25.     Defendants, **JOHN H. HUDGENS, III**, Chair, **CYNTHIA M. BENSCH**, **MARILYN BOWERS**, **PAMELLA B. PINSON**, and **THOMAS WARING**, in their official capacity, are members of the South Carolina Elections Commission Board. All Defendants are proper defendants as persons charged with the powers and duties of the South Carolina Elections Commission pursuant to S.C. Code Ann. §§ 7-3-10, et seq. and 7-13-10, et seq., as amended.

## STATEMENT OF FACTS

26.     The South Carolina General Assembly is comprised of two bodies: the Senate, which has forty-six (46) single-member districts, and the House of Representatives (House), which has one hundred and twenty-four (124) single-member districts. S.C. Const. art. III, §§ 1, 3, 6. Members of the Senate are elected to four-year terms every other even-numbered year during the general election. Id. § 6. Members of the House are elected to two-year terms every even-numbered year during the general election. Id. § 3. Representation in the United States House of Representatives is apportioned in accordance with the United States Census. U.S. Const. art. I § 2, cl. 3. Prior to 2010, South Carolina was entitled to elect representatives to six (6) seats in the United States House of Representatives. Due to population growth, South Carolina was apportioned one additional seat following the 2010 Census for a total of seven (7) seats.

27.     The **STATE OF SOUTH CAROLINA** must draw legislative and congressional election districts on an equi-populous basis in accordance with the Census. See Reynolds, supra.

28.     South Carolina's previous redistricting plans, or "Benchmark Plans," were enacted pursuant to litigation resulting from impasse and malapportionment. In 2001, the South Carolina General Assembly passed redistricting plans for the House, Senate, and Congress. Then-Governor James H. Hodges vetoed the bill and the General Assembly failed to override his veto. A malapportionment lawsuit was filed in the United States District Court for the District of South Carolina under the caption Colleton County Council v. McConnell. On March 20, 2002, the three-judge Court issued an order drawing districts for the House, Senate, and six Congressional districts. Colleton County Council v. McConnell, 201 F.Supp.2d 618 (D.S.C. 2002).

29.     The General Assembly subsequently modified the Court's plan for the House and

Senate. Act No. 55, 2003 S.C. Laws 255.  Act 55 of 2003 (Benchmark House Plan and/or Benchmark Senate Plan) was subsequently precleared by the Department of Justice pursuant to administrative preclearance under Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c.

30.     No legislation was passed to modify the court-drawn congressional districts (Benchmark Congressional Plan).

31.      The Benchmark Plans were in effect until 2011 when modified by the General Assembly pursuant to the results of the 2010 Census.

## A.     CHANGES IN DEMOGRAPHICS AS REPORTED BY THE 2010 CENSUS

32.     According to the 2010 Census, South Carolina's population has grown from 4,012,012 persons to 4,625,364 persons over the last ten years. This constitutes an increase of more than fifteen (15%) percent.

33.     South Carolina has a large black minority population that has grown proportionally to the State's overall growth. The non-Hispanic black population (hereinafter simply "black population") is relatively equal as a percentage of the overall population compared to ten years ago. Presently South Carolina's black population is 1,290,684, or almost twenty-eight (27.9%) percent of the overall population. In 2000, the black population was 1,186,071, or twenty-nine (29.6%) percent of the overall population.

34.     Despite overall population growth in South Carolina, this growth was not uniform across the State's forty-six (46) counties. Thirty-four (34) counties increased population while twelve (12) counties lost population. Of the twelve (12) counties that lost population, six (6) of those counties are small rural counties with a majority black population.[1] The other six (6)

---

[1] Allendale (73.6% black population), Bamberg (61.5%), Hampton (53.9%), Lee (64.3%), Marion (55.9%), and Williamsburg (65.8%)

9

counties that lost population have a significant black population.[2] Districts representing urban and suburban areas saw the greatest growth during this period.[3]

35.　　As a result of these population shifts over the last ten years the black population in South Carolina has naturally shifted from rural and urban areas to become increasingly integrated with the white population in suburban areas. The white population has also shifted back to the cities resulting in increasingly integrated urban areas.

36.　　While communities in South Carolinian are increasingly integrated—with white and black citizens living in the same neighborhoods, working at the same businesses, and attending the same schools—our election districts have become increasingly segregated. Defendants' Redistricting Plans further segregate voters into a system of electoral apartheid.

37.　　Pursuant to the results of the 2010 Census, all of the Benchmark Plans were malapportioned and needed to be redrawn. The Benchmark Congressional Plan also did not draw a sufficient number of congressional districts to afford South Carolina adequate representation in the United States House of Representatives and needed to be redrawn to create a new seventh congressional district.

## B.　PASSAGE OF THE LEGISLATIVE AND CONGRESIONAL REDISTRICTING PLANS BY THE GENERAL ASSEMBLY

38.　　In April 2011, the General Assembly began drafting legislation to redraw South Carolina's legislative and congressional districts. The General Assembly used three separate bills—Senate Bill 815 (S. 815), House Bill 3001 (H. 3001), and House Bill 3002 (H. 3002)—as the legislative vehicle for House, Senate, and Congressional redistricting legislation, respectively. These bills became Acts 71, 72, and 75, respectively, upon passage into law.

---

[2] Abbeville (28.3% black population), Barnwell (44.3%), Calhoun (42.6%), Chester (37.4%), Laurens (25.4%), and Union (31.3%)
[3] E.g., Beaufort, Berkeley, Dorchester, Greenville, Horry, Lancaster, Lexington, Richland, York.

39.     During the debate and passage of all of these plans, members of the General Assembly claimed they were drawing a redistricting plan motivated by traditional redistricting principles and mandates imposed by federal law. Traditional redistricting principles in South Carolina include drawing geographically compact districts, keeping county and municipal boundaries intact, and keeping communities of interest intact. See Colleton Co., supra.

40.     In actuality, the General Assembly drew maps that artificially manipulated percentage of black voting age population (VAP) for each House, Senate, and Congressional District as previously decided by leaders in the General Assembly.

41.     The goal of the General Assembly's leadership in adopting a race-based redistricting scheme was to diminish the political power of black voters by making political party synonymous with race. Since black voters continue to overwhelmingly prefer Democratic candidates in South Carolina, Republican leaders in the General Assembly sought to make the Democratic Party the "black party" by packing as many black voters as possible into a few election districts.

42.     Defendants' Redistricting Plan packs black voters into a few districts making them "blacker" while also "bleaching out" all of the surrounding election districts. This concentration and disbursement scheme ensures that black voters in majority black districts will overwhelmingly decide the outcome in a few election districts but that black voters in majority white districts, the vast majority of election districts, have no opportunity to participate in the political process. These redistricting laws create a system of electoral apartheid by segregating voters into election districts contrary to natural population shifts that demonstrate that white and black voters in South Carolina are increasingly integrated—choosing to live side by side one another.

43.     In passing the House Redistricting Plan, Act 72, the General Assembly adopted a

redistricting plan that:

(a)     Packs black voters into House Districts in order to create nine (9) new majority-minority seats with no justification as to why it was necessary to add black VAP percentage to these seats;

(b)     Ignores racially-neutral, traditional redistricting principles in order to preserve the twenty-one (21) majority-minority seats that previously existed under the Benchmark House Plan with no justification for maintaining artificially high black VAP percentages;

(c)     Reduces the black VAP percentage in all or almost all of the House Districts where black voters were able to elect a candidate of choice with the support of part of the white community, making cooperation between blacks and whites less likely or impossible; and

(d)     Disproportionately diminishes the political power of black voters in poor, rural counties which were carved up among several different House Districts ensuring that no single House member will have the primary interest of these poor, rural communities in mind since the majority of their constituency resides in another county.

44.     The General Assembly passed and enrolled the House Redistricting Plan, Act 72, and Governor **NIKKI R. HALEY** signed the bill into law on June 28, 2011.

45.     In passing the Senate Redistricting Plan, Act 71, the General Assembly adopted a redistricting plan that:

(a)      Ignores racially-neutral, traditional redistricting principles in order to maintain artificially high black VAP percentages;

(b)     Reduces the black VAP percentage in several Senate Districts where black

voters were able to elect a candidate of choice with the support of part of the white community, making cooperation between blacks and whites less likely or impossible in these districts; and

(c)     Disproportionately diminishes the political power of black voters in poor, rural counties which were carved up among several different Senate Districts ensuring that no single Senator will have the primary interest of these poor, rural communities in mind.

46.     The General Assembly passed and enrolled the Senate Redistricting Plan, Act 71, and Governor **HALEY** signed the bill into law on June 28, 2011.

47.     In passing the Congressional Redistricting Plan, Act 75, the General Assembly adopted a redistricting plan that:

(a)     Unnecessarily added black VAP percentage to the Sixth Congressional District. Under the Benchmark Plan, the Sixth District when drawn in 2002 had a black VAP of fifty-three (53.55%) percent. Natural population shift over the last ten years lowered the black VAP percentage under the Benchmark Plan to fifty-two (52.08%) percent – the largest natural decrease per capita of black VAP. Act 75 raises the black VAP to fifty-five (55.18%) percent of the new Sixth District;

(b)     Reduced the black VAP percentage in all or almost all of the other existing districts reducing or eliminating the possibility that black voters in these districts could work together with part of the white community to elect a candidate of choice. For example, the Second District saw the largest increase in black VAP under the Benchmark Plan due to natural population shift from twenty-three (23.95%) percent to twenty-five (25.43%) percent. The new Congressional Redistricting Plan lowers the black VAP percentage in the Second

13

District to twenty-one (21.48%) percent. With the exception of the Fourth[4] and Sixth Districts, the black VAP percentage in all of the other districts—the First, Second, Third, and Fifth—decreases compared to the Benchmark Plan; and

(c)     Created a new Seventh Congressional District with a black VAP percentage low enough to make it unlikely black voters would have an equal opportunity to elect a candidate of choice by joining together with part of the white community.

48.     The General Assembly passed and enrolled the Congressional Redistricting Plan, Act 75, and Governor **HALEY** signed the bill into law on August 1, 2011.

49.     It was not necessary to pack black voters into election districts to reach arbitrary black VAP percentages decided on by Defendants in order to give minority voters in these districts an opportunity to elect a candidate of their choosing. Consequently, Defendants' legislative and congressional Redistricting Plans dilute black voting power by packing black voters into a few districts and dispersing those excluded from the packed districts among the remaining districts in a low enough concentration to be irrelevant to the political process.

50.     In order to draw districts that met the arbitrary racial quota adopted by Defendants, it was required to abandon traditional redistricting principals like drawing geographically compact districts, keeping political subdivisions like counties and municipalities intact, and keeping communities of interest intact.

## C.     SUIT IS TIMELY TO CHALLENGE DISCRIMINATORY STATE ACTION UNDER THE CONSTITUTION AND THE VOTING RIGHTS ACT OF 1965

51.     The **STATE OF SOUTH CAROLINA** is a "covered jurisdiction" under Section 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c, as amended. As such, the State is

---

[4] The Fourth District increases only nominally from 18.19% to 18.23%.

14

required to obtain either judicial or administrative preclearance prior to enacting any change in voting law. Id.

52.     On July 27, 2011, Senator **GLENN F. MCCONNELL** submitted Act 71, the Senate Redistricting Plan, to the United States Attorney General for administrative preclearance. On September 26, 2011, the Attorney General, through his agent, wrote to Senator **MCCONNELL** requesting additional information about the Senate Redistricting Plan. Senator **MCCONNELL** replied to the Attorney General and also filed suit in the United States District Court for the District of Columbia seeking judicial preclearance. See McConnell v. United States of America, 1:11-cv-01794-HHK (D.D.C. 2011).

53.     On November 14, 2011, the Attorney General, through his agent, notified Senator **MCCONNELL** that he would not object to the Senate Redistricting Plan, Act 71, mooting the pending lawsuit seeking preclearance.

54.     On August 9, 2011, Speaker **ROBERT W. HARRELL, JR.** and Senator **MCCONNELL** submitted the House Redistricting Plan, Act 72, to the Attorney General for administrative preclearance. Contemporaneous with this submission, Defendants filed suit in the United States District Court for the District of Columbia seeking judicial preclearance. See Harrell v. United States of America, 1:11-cv-01454-HHK (D.D.C. 2011).

55.     On October 11, 2011, the Attorney General, notified Speaker **HARRELL** and Senator **MCCONNELL** that he would not object to the House Redistricting Plan, Act 72, mooting the pending lawsuit seeking preclearance.

56.     On August 30, 2011, Speaker **HARRELL** and Senator **MCCONNELL** submitted the Congressional Redistricting Plan, Act 75, to the Attorney General for administrative preclearance and filed a contemporaneous lawsuit seeking judicial preclearance by the District Court for the District of Columbia. See Harrell v. United States of America, 1:11-

cv-01566-EGS (D.D.C. 2011).

57.    On October 28, 2011, the Attorney General notified Speaker **HARRELL** and Senator **MCCONNELL** that he would not object to the Congressional Redistricting Plan, Act 75, mooting the pending lawsuit seeking preclearance.

58.    Pursuant to 42 U.S.C. § 1973c(a), Plaintiffs' action against Defendants for declaratory and injunctive relief is now timely to enforce their rights under the United States Constitution and the Voting Rights Act of 1965.

59.    At all times relevant herein, Defendants acted under color of state law.

60.    Defendants' race-based scheme denies Plaintiffs the equal protection of law, abridges their right to vote, and violates the protection afforded them by the Voting Rights Act of 1965, 42 U.S.C. § 1973, et seq.

## FIRST CAUSE FOR DECLARATORY AND INJUNCTIVE RELIEF: LEGISLATIVE AND CONGRESSIONAL REDISTRICTING PLANS DENY BLACK VOTERS EQUAL PROTECTION UNDER THE LAW

61.    Plaintiffs incorporate Paragraphs 1-60 as if set forth verbatim herein.

62.    Plaintiffs and all other black voters are entitled to the equal protection of law under the Fourteenth Amendment of the United States Constitution.

63.    The House Redistricting Plan, Act 72, discriminates against Plaintiffs and all other black voters on the basis of race in one of more of the ways set forth below, each sufficient to demonstrate race-based discrimination used to include or exclude voters from House election districts:

    (a)    Act 72 has a discriminatory purpose evidenced by the demographics of the plan as a whole;

    (b)    Act 72 has a discriminatory purpose evidenced by the demographics of specific districts. Defendants discriminated on the basis of race for the purpose of

16

packing black voters into House Districts 12, 23, 49, 61, 64, 79, 82, 93, 102, 103, 111, 121, and 122, and for the purpose of maintaining an artificially high black VAP percentages in districts like House Districts 25, 55, 66, and 70 contrary to population shift and traditional redistricting principles;

(c)     Act 72 has a discriminatory purpose evidenced by the irregular shape of its districts that ignore traditional redistricting principles and natural population shifts in favor of a racial classification used to artificially manipulate the black VAP of each district;

(d)     Defendants' purpose in passing Act 72, either in whole or in part, was motivated by race and/or the goal of drawing districts with specific racial composition in each district;

(e)     Defendants' purpose in passing Act 72, either in whole or in part, was to reduce the number of election districts where black voters could determine or could help determine the winner;

(f)     The shape of the districts drawn by Act 72 are so irrational that they can only be explained as a race-based gerrymander; and

(g)     In other ways as proven during the trial of this matter.

64.     The Senate Redistricting Plan, Act 71, discriminates against Plaintiffs and all other black voters on the basis of race in one of more of the ways set forth below, each sufficient to demonstrate race-based discrimination used to include or exclude voters from Senate election districts:

(a)     Act 71 has a discriminatory purpose evidenced by the demographics of the plan as a whole;

(b)     Act 71 has a discriminatory purpose evidenced by the demographics of

17

specific districts. Defendants discriminated on the basis of race for the purpose of packing black voters into Senate Districts 19, 22, and 29, and for the purpose of maintaining an artificially high black VAP percentages in districts like Senate Districts 21, 30, 32, 36, 39, 40, and 42 contrary to population shift and traditional redistricting principles;

(c)     Act 71 has a discriminatory purpose evidenced by the irregular shape of its districts that ignore traditional redistricting principles and natural population shifts in favor of a racial classification used to artificially manipulate the black VAP of each district;

(d)     Defendants' purpose in passing Act 71, either in whole or in part, was motivated by race and/or the goal of drawing districts with specific racial composition in each district;

(e)     Defendants' purpose in passing Act 71, either in whole or in part, was to reduce the number of election districts where black voters could determine or could help determine the winner;

(f)     The shape of the districts drawn by Act 71 are so irrational that they can only be explained as a race-based gerrymander; and

(g)     In other ways as proven during the trial of this matter.

65.     Congressional Redistricting Plan, Act 75, discriminates against Plaintiffs and all other black voters on the basis of race in one of more of the ways set forth below, each sufficient to demonstrate race-based discrimination used to include or exclude voters from congressional election districts:

(a)     Act 75 has a discriminatory purpose evidenced by the demographics of the plan as a whole;

18

(b)     Act 75 has a discriminatory purpose evidenced by the demographics of specific districts, particularly the First, Second, Fifth, Sixth, and Seventh Districts. Act 75 unnecessarily packs black voters into the Sixth District with the effect of diluting black voting power by limiting the number of districts where they have an equal opportunity to participate in electing a candidate of their choosing;

(c)     Act 75 has a discriminatory purpose evidenced by the irregular shape of its districts that ignore traditional redistricting principles and natural population shifts in favor of a racial classification used to artificially manipulate the black VAP of each district;

(d)     Defendants' purpose in passing Act 75, either in whole or in part, was motivated by race and/or the goal of drawing districts with specific racial composition in each district;

(e)     Defendants' purpose in passing Act 75, either in whole or in part, was to reduce the number of election districts where black voters determine or could determine the winner;

(f)     The shape of the districts drawn by Act 75 are so irrational that they can only be explained as a race-based gerrymander; and

(g)     In other ways as proven during the trial of this matter.

66.     Defendants' use of race in drawing legislative and congressional election district lines is not strictly necessary to serve a compelling governmental purpose.

67.     Defendants have offered no adequate justification for discriminating on the basis of race for the purpose of drawing legislative and congressional election districts.

68.     Defendants' use of race is not the least restrictive means available to give black voters an opportunity to participate equally in the political process.

69.     Plaintiffs and all black voters are denied equal protection under the law and injured by the **STATE OF SOUTH CAROLINA**, and her agents, the other above-named defendants, when the State uses race-based discrimination without a compelling governmental purpose or where less restrictive means are available.

70.      Plaintiffs have no adequate remedy at law other than the judicial relief sought here. The failure to temporarily and permanently enjoin enforcement of the House, Senate, and Congressional Redistricting Plans will irreparably harm Plaintiffs' by violating their constitutional and statutory rights.

## SECOND CAUSE FOR DECLARATORY AND INJUNCTIVE RELIEF: THE LEGISLATIVE AND CONGRESSIONAL REDISTRICTING PLANS VIOLATE SECTION TWO OF THE VOTING RIGHTS ACT OF 1965

71.     Plaintiffs incorporate Paragraphs 1-70 as if set forth verbatim herein.

72.     Section 2 of the Voting Rights Act of 1965, prohibits the abridgement of the right to vote on account of race, color, or language minority. 42 U.S.C. § 1972(a).

73.     Diluting minority-voting power constitutes an abridgement of the right to vote for the purpose of Section 2. Voinovich v. Quilter, 507 U.S. 146, 154, 113 S. Ct. 1149, 1155 (1993). "Dilution of racial minority group voting strength may be caused" either "by the dispersal of blacks into districts in which they constitute an ineffective minority of voters or from the concentration of blacks into districts where they constitute an excessive majority." Id.

74.     The House Redistricting Plan, Act 72, dilutes minority voting strength by packing black voters into House Districts 12, 23, 49, 61, 64, 79, 82, 93, 102, 103, 111, 121, and 122, and maintaining artificially high black VAP percentages in districts like House Districts 25, 55, 66, and 70 contrary to population shift and traditional redistricting principles.

75.     The Senate Redistricting Plan, Act 71, dilutes minority voting strength by packing black voters into Senate Districts 19, 22, and 29, and maintaining artificially high black VAP

percentages in districts like Senate Districts 21, 30, 32, 36, 39, 40, and 42 contrary to population shift and traditional redistricting principles.

76.     Black voters in the above-named districts already demonstrated an overwhelming ability to elect candidates of choice so that additional packing or artificial manipulation of the district lines contrary to traditional redistricting principles was unnecessary to continue to allow black voters in these districts to elect candidates of choice.

77.     The Congressional Redistricting Plan, Act 75, dilutes minority voting strength by packing black voters into the Sixth Congressional District even though black voters in the Sixth Congressional District have demonstrated an overwhelming ability to elect a candidate of choice in a district where, prior to the new Congressional Redistricting Plan, the black VAP percentage declined over time to fifty-two (52.08%) percent through natural population shift.

78.     By packing the Sixth Congressional District, Defendants have diluted black voting strength in all other election districts, particularly the First, Second, Fifth, and Seventh Districts.

79.     The legislative and congressional Redistricting Plans all dilute the voting power of black voters outside of packed districts. Defendants' packing schemes deliberately reduce the number of "crossover" districts or prevent them from emerging over time through natural population shifts.

80.     Crossover districts are districts where white voters join together with black voters to help them elect a candidate of choice.

81.     Defendants' Redistricting Plan uses unusual and irrational shapes to draw election districts that violate traditional redistricting principles. Had Defendants followed traditional redistricting principles—which require drawing geographically compact districts, keeping political subdivisions like counties and municipalities intact, and keeping communities of interest

21

intact—they would have drawn racially integrated election districts that reflect the communities they represent.

82.     Under the legislative and congressional Redistricting Plans, black voters excluded from majority-minority districts are disbursed in small enough numbers to deny them any opportunity to elect a candidate of choice through crossover voting.

83.     Defendants' packing scheme also prevents new crossover districts from naturally emerging through population shift. If Defendants had instead drawn legislative and congressional districts using traditional redistricting principles, then additional crossover districts would continue to emerge naturally over time through population shift.

84.     By destroying existing crossover districts and blocking the emergence of new crossover districts, Defendants have denied black voters an equal opportunity to participate in the political process and relegated them to only participating in electing a candidate of choice in the handful of districts Defendants have packed with black voters.

85.     Consequently, the legislative and congressional Redistricting Plans abridge Plaintiffs' and all black voters' right to vote by resegregating electoral politics in South Carolina. Black voters in black districts are guaranteed to elect a candidate of choice, while black voters in white districts are virtually irrelevant.

86.      Plaintiffs have no adequate remedy at law other than the judicial relief sought here. The failure to temporarily and permanently enjoin enforcement of the legislative and congressional Redistricting Plans, Acts 71, 72, and 75, will irreparably harm Plaintiffs by violating their constitutional and statutory rights.

## THIRD CAUSE FOR DECLARATORY AND INJUNCTIVE RELIEF: THE REDISTRICTING PLANS VIOLATE THE FIFTEENTH AMENDMENT

87.     Plaintiffs incorporate Paragraphs 1-86 as if set forth verbatim herein.

88. The Fifteenth Amendment of the United States Constitution prohibits the denial or abridgement of the right to vote on account of race, color, or previous condition of servitude. U.S. Const. amend XV.

89. The Fifteenth Amendment protects minority voters from being disenfranchised by race-based gerrymanders. Gomillion v. Lightfoot, 364 U.S. 339, 341, 81 S. Ct. 125, 127 (1960).

90. The legislative and congressional Redistricting Plans, Acts 71, 72, and 75, use race to dilute black voting power in one or more of the manners stated above, incorporated here as if set forth verbatim.

91. Consequently, the Redistricting Plans deny black voters an equal opportunity to participate in the political process that could have been achieved by adopting racially-neutral redistricting principles that would give Plaintiffs and all black voters an equal opportunity to elect candidates of choice.

92. Plaintiffs have no adequate remedy at law other than the judicial relief sought here. The failure to temporarily and permanently enjoin enforcement of Acts 71, 72, and 75 will irreparably harm Plaintiffs' constitutional and statutory rights.

## REQUEST FOR A THREE-JUDGE COURT

93. Plaintiffs request trial of this case by a three-judge court pursuant to 42 U.S.C. § 1973c(a) and 28 U.S.C. § 2284.

## PRAYER FOR RELIEF

WHEREFORE, having fully set forth their allegations against Defendants, Plaintiffs respectfully request that this Court:

      (i)      Assume jurisdiction of this case and try it before a three-judge court;

      (ii)      Temporarily enjoin Defendants from calling, holding, supervising, or certifying any elections under Acts 71, 72, and 75 pending the outcome of this

litigation;

(iii)     Issue a declaratory judgment that Acts 71, 72, and 75 are illegal for one or more of the reasons set forth above;

(iv)     Permanently enjoin Defendants from calling, holding, supervising, or certifying any elections under Acts 71, 72, and 75;

(v)     Set a reasonable deadline for Defendants to enact and adopt legislative and congressional redistricting plan for House, Senate, and Congressional Districts that do not violate Plaintiffs' constitutional or statutory rights;

(vi)     Retain jurisdiction while Defendants enact these plans by this Court's deadline;

(vii)     Order new redistricting plans in the event that Defendants fail to adopt new plans or fail to adopt plans that conform with this Court's judgment;

(viii)     Adjudge all reasonable attorneys' fees, costs, and expenses against Defendants in favor of Plaintiffs pursuant to 42 U.S.C. §§ 1973l(e) and 1988(b), as amended; and

(ix)     Grant other such relief as this Court deems just and proper.

[SIGNATURE PAGE FOLLOWS]

Respectfully submitted by:


s/Richard A. Harpootlian
Richard A. Harpootlian (Fed. ID # 1730)
rah@harpootlianlaw.com
Graham L. Newman (Fed. ID # 9746)
gln@harpootlianlaw.com
M. David Scott (Fed. ID # 8000)
mds@harpootlianlaw.com
RICHARD A. HARPOOTLIAN, P.A.
1410 Laurel Street
Post Office Box 1090
Columbia, SC 29202
Telephone: (803) 252-4848
Facsimile: (803) 252-4810

ATTORNEYS FOR PLAINTIFF

Columbia, South Carolina
November 23, 2011

# EXHIBIT A TO AMENDED SUMMONS

Defendants:

1) The State of South Carolina
   Attorney General Alan Wilson
   Attorney General's Office
   Rembert Dennis Building
   1000 Assembly Street, Room 519
   Columbia, SC 29201

2) Governor Nimrata "Nikki" Haley
   Office of the Governor
   State House, 1st Floor
   Columbia, SC 29201

3) Lt. Governor Ken Ard
   Office of the Lt. Governor
   State House, 1st Floor
   Columbia, SC 29201

4) Senator Glenn F. McConnell, President Pro Tempore
   101 Gressette Building
   Columbia, SC 29201

5) Representative Robert W. Harrell, Jr., Speaker
   506 Blatt Building
   Columbia, SC 29211

6) Representative James H. Harrison
   512 Blatt Building
   Columbia, SC 29201

7) Representative Alan D. Clemmons
   519-C Blatt Building
   Columbia, SC 29201

8) Ms. Marci Andino, Executive Director
   State Election Commission
   2221 Devine Street, Suite 105
   Columbia, SC 29205

9) Commissioner John H. Hudgens, III, Chair
   State Election Commission

2221 Devine Street, Suite 105
Columbia, SC 29205

10) Commissioner Cynthia M. Bensch
State Election Commission
2221 Devine Street, Suite 105
Columbia, SC 29205

11) Commissioner Marilyn Bowers
State Election Commission
2221 Devine Street, Suite 105
Columbia, SC 29205

12) Commissioner Pamella B. Pinson
State Election Commission
2221 Devine Street, Suite 105
Columbia, SC 29205

13) Commissioner Thomas Waring
State Election Commission
2221 Devine Street, Suite 105
Columbia, SC 29205