**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | |
|---|---|
| THE SOUTH CAROLINA STATE CONFERENCE OF THE NAACP, <br><br> and <br><br> TAIWAN SCOTT, on behalf of himself and all other similarly situated persons, <br><br>        Plaintiffs, <br><br>    v. <br><br> HENRY D. MCMASTER, in his official capacity as Governor of South Carolina; THOMAS C. ALEXANDER, in his official capacity as President of the Senate; LUKE A. RANKIN, in his official capacity as Chairman of the Senate Judiciary Committee; JAMES H. LUCAS, in his official capacity as Speaker of the House of Representatives; CHRIS MURPHY, in his official capacity as Chairman of the House of Representatives Judiciary Committee; WALLACE H. JORDAN, in his official capacity as Chairman of the House of Representatives Elections Law Subcommittee; HOWARD KNAPP, in his official capacity as interim Executive Director of the South Carolina State Election Commission; JOHN WELLS, Chair, JOANNE DAY, CLIFFORD J. EDLER, LINDA MCCALL, and SCOTT MOSELEY, in their official capacities as members of the South Carolina Election Commission, <br><br>        Defendants. | Civil Action No. 3:21-cv-03302-JMC-TJH-RMG <br><br><br><br> **RESPONSE TO MOTION TO COMPEL BY DEFENDANTS JAMES H. LUCAS, CHRIS MURPHY, AND WALLACE H. JORDAN** |

Defendants James H. Lucas (in his official capacity as Speaker of the South Carolina House of Representatives), Chris Murphy (in his official capacity as Chairman of the South Carolina House of Representatives Judiciary Committee), and Wallace H. Jordan (in his official capacity as

Chairman of the South Carolina House of Representatives Redistricting Ad Hoc Committee) (collectively, the "**House Defendants**"), by and through undersigned counsel, hereby respectfully submit this Response to Motion to Compel ("**Motion**") filed by Plaintiffs The South Carolina State Conference of the NAACP ("**SC NAACP**") and Taiwan Scott, on behalf of himself and all other similarly situated persons ("**Plaintiff Scott**") (collectively at times, "**Plaintiffs**"). For the reasons set forth herein, Plaintiffs' Motion should be denied.

## <u>INTRODUCTION</u>

Plaintiffs' Motion to Compel (ECF No. 119) is both improper and unsupported by the facts or case precedent. Beginning with its Introduction, Plaintiffs offer misinformation while withholding crucial details in the request for relief from this Court. As will be more specifically detailed herein, Plaintiffs misstate the position of the parties on the issue of legislative privilege, fail to fully disclose the timing and extent of discovery to date, and misrepresent the consultations the preceded the surprise filing.

As aptly noted in Governor Henry D. McMaster's Motion to Dismiss nearly three months ago (ECF No. 61), litigation challenging legislative redistricting has become commonplace; so commonplace that Plaintiffs in this case have suggested that the process of redistricting itself should factor in a time period to litigate maps as a matter of course. (ECF No. 1, ¶ 18). While the *pursuit* of such litigation has become commonplace, judicial intervention certainly has not—as suggested by Plaintiffs—been "needed" so much as has been <u>invoked</u>. It is a fundamental truth and foundation of American democracy that the very process of redistricting is an undeniably political one. "From the very outset, we recognized that the apportionment task, dealing as it must with fundamental 'choices about the nature of representation,' is primarily a political and legislative process." *Gaffney v. Cummings*, 412 U.S. 735, 749 (1973) (quoting *Burns v.*

*Richardson*, 384 U.S. 73, 92 (1966); citing *Reynolds v. Sims*, 377 U.S. 533, 586 (1964)). Inexplicably, though Plaintiffs repeatedly criticized the alleged undue delay by the South Carolina Senate and House of Representatives in adopting a redistricting plan following release of the 2020 Census data by the U.S. Census Bureau (ECF No. 1, ¶¶ 6, 8. 10, 11, 15), and demanded federal judicial oversight at the earliest point so as not to further infringe alleged constitutional rights (ECF No. 1, ¶¶ 73-79), Plaintiffs have failed to pursue the discovery rights afforded in this case in a timely manner that is cognizant of the Court's ordered schedule. *See* (ECF No. 97).

In this case at bar, Plaintiffs have asked the Court to find that 27 of the 124 House Districts established by the enactment of H. 4493, which was approved by the House of Representatives, the Senate, and signed into law by Governor McMaster on December 10, 2021, are unconstitutional gerrymanders on the basis of race[1]. (ECF No. 84). In pursuit of these claims, Plaintiffs have served very broad (nearly limitless) discovery demands on all Defendants, and fact witness depositions have commenced as of February 4, 2022, with the deposition of Brenda Murphy, President of Plaintiff SC NAACP. On the eve of the depositions planned two currently serving Representatives and after having coordinated the Saturday availability for the General Counsel of the House of Representatives, Plaintiffs manufactured a "disagreement" as to legislative privilege and cancelled the depositions, notwithstanding their complete failure to follow the discovery rules and engage counsel in consultation on the Motion prior to filing. As demonstrated herein, Plaintiffs' Motion is improperly asserted and fundamentally unsound, such that denial is clearly warranted.

---

[1] Plaintiffs repeatedly reference their Second Amended Complaint that was submitted to this Court by Motion to Amend (ECF No. 84) on February 1, 2022, to which the Governor has objected (ECF No. 117). To date there has been no ruling on Plaintiffs' Motion and the operative pleading remains the First Amended Complaint (ECF No. 84).

## RELEVANT FACTUAL BACKGROUND

On October 12, 2021, the South Carolina State Conference of the NAACP and Taiwan Scott, on behalf of himself and all other similarly situated persons, filed their Complaint in this Court alleging three causes of action: (1) congressional malapportionment in violation of Article I, § 2 of the United States Constitution; (2) legislative malapportionment in violation of the Fourteenth Amendment of the United States Constitution; and (3) deprivation of the freedom of association in violation of the First and Fourteenth Amendments of the United States Constitution. (ECF No. 1). Following appointment of a Three-Judge Panel on December 16, 2021 (ECF No. 76), a status conference was convened on December 22, 2021 to address, among other things, the manner and means by which efficiency could be brought to bear on the many tasks necessary to prepare this case for trial in the near term.

On December 23, 2021, Plaintiffs filed their Amended Complaint, alleging three causes of action: (1) racial gerrymandering in violation of Article I, § 2 of the United States Constitution; (2) intentional discrimination in violation of the Fourteenth Amendment of the United States Constitution; and (3) deprivation of the freedom of association in violation of the First and Fourteenth Amendments to the United States Constitution. (ECF No. 84). A full two weeks later, on January 7, 2022, Plaintiffs served their First Requests for Production and First Set of Interrogatories to all Defendants, followed by a Second Set of Interrogatories on January 13, 2022. Pursuant to the Joint 26(f) Report and in recognition of the very truncated timeline for discovery in this case, objections and responses must be served within 10 business days. (ECF No. 109). House Defendants timely served their written responses (**Exhibit A**) and began a rolling document production on January 24, 2022, with additional productions made on January 25, January 27, January 28, and February 1, 2022. **Exhibit B** (House Defs' production letters). To date, House

Defendants have produced approximately 4,500 documents and files Bates labeled SC_HOUSE_0000001 to SC_HOUSE_0062043. By brief comparison, Plaintiffs offered written objections and some responses to House Defendants' requests for admission, interrogatories, and requests for production on February 2, 2022, but failed to produce a single document on the date due and failed to provide a privilege log (preliminary or otherwise). **Exhibit C** (Pls' Resp. to Req. for Prod.). Late on February 3, 2022[2], Plaintiffs produced approximately 400 pages of documents (half of which were duplicates), with no identification of the corresponding responsive request and—still—no privilege log. **Exhibit D** (C. Bryant e-mails, 2/3/22).

The very high speed with which this matter must be prepared for trial has been acknowledged by all parties, and the discovery period is a matter of weeks, not months.[3] If candid with the Court, Plaintiffs' counsel should concede and agree that House Defendants have worked diligently to propose agreements where possible and proactively pursued opportunities to minimize discovery burdens through consensus in lieu of motion practice. For example, at the suggestion of House Defendants, the parties entered a joint stipulation agreeing to forgo the formality of records custodians (ECF No. 113) and modified deposition procedures to minimize disruption and delay (ECF No. 118). House Defendants also initiated the circulation of a proposed confidentiality order, incorporating Plaintiffs' proposed edits without objection. *See* (ECF No. 122). Although the confidentiality agreement was not yet entered by the time discovery responses

---

[2] Notably, the production came less than 16 hours before House Defendants have been scheduled to commence the deposition of Brenda Murphy, President of Plaintiff SC NAACP.

[3] To this point, House Defendants file this response within forty-eight hours of the surprise filing from Plaintiffs, which is the truncated timeline set forth in the Joint 26(f) Report. Given this short time for responding to such a significant discovery issue, House Defendants reserve the right to offer further evidence and argument in opposition to the relief sought by Plaintiffs, including by way of affidavit testimony.

were due, House Defendants nonetheless began producing documents to Plaintiffs. Inexplicably, Plaintiffs did not do the same.

## **STANDARD OF REVIEW**

Federal Rule of Civil Procedure 26(b)(2)(C) provides that "[u]nless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties relative access to relevant information, the parties resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."

"While the Federal Rules of Civil Procedure do not define relevance, the Federal Rules of Evidence do, as 'evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *United Oil Co., Inc. v. Parts Assoc., Inc.*, 227 F.R.D.404, 409 (D. Md. 2005) (quoting Fed.R.Evid. 401). "The commentary to the 2000 amendments to Fed.R.Civ.P. 26 admonishes courts to focus on the actual claims and defenses involved in the action in determining relevance." *Id.* at 410 (quotation omitted). The scope and conduct of discovery are both within the sound discretion of the district court. *See Columbus-Am. Discovery Grp. v. Atl. Mut. Ins. Co.*, 56 F. 3d 556, 568 n. 16 (4th Cir. 1995) (citing *Erdmann v. Preferred Research, Inc. of Georgia*, 852 F.2d 788 (4th Cir. 1988).

**DISCUSSION**

A.    **Plaintiffs' Failure to Consult Should be Fatal to the Motion**

Plaintiffs' Motion is at best inadequate in describing the events surrounding and immediately preceding its filing. First and foremost, it was at the behest of the Senate Defendants that a telephone consultation was held among the parties on January 26, 2022, to discuss a myriad of issues such as "scheduling, depositions, discovery issues, and any other topics necessary to move the case forward." *See* **Exhibit E**, L. Traywick e-mail of 1/23/22. House Defendants in response *specifically asked* the issue of privilege be discussed during the call. *See id.* at M. Moore e-mail of 1/24/22. Despite this specific request to discuss the issue of privilege in advance of the call, Plaintiffs asserted for the first time during the January 26, 2022, conference that a discussion of privilege could not be held because the attorney on the file with knowledge of the issue was not in attendance on the call.[4] Thereafter, Plaintiffs circulated available times for this discussion, the earliest of which was *five days later*. **Exhibit F**, G. Colarusso e-mail of 1/27/22. House Defendants made themselves available at the first opportunity offered, which was February 1, 2022.

Also glaringly omitted from Plaintiffs' background recitation is the fact that House Defendants' privilege log was <u>specifically</u> <u>discussed</u> during the January 26, 2022 call. Indeed, when Plaintiffs' counsel noted his observation that House Defendants had not produced a privilege log with the written responses and initial productions, counsel for House Defendants explained that in his experience and practice a privilege log was not provided until completion of a rolling production. Whether right or wrong and even if reasonable minds differ, *at no point during the*

---

[4] This claim was peculiar given that at least <u>23</u> attorneys have appeared as counsel for Plaintiffs in this proceeding, and two of the primary lawyers leading this litigation and similar litigation across the country, for NAACP Legal Defense and Educational Fund (Leah Aden) and American Civil Liberties Union (Somil Trivedi), were both on the January 26, 2022, counsel call.

*January 26, 2022 discussion did Plaintiffs request or suggest a preliminary privilege log from House Defendants*. It is arguably disingenuous of Plaintiffs to overlook this fact, as well as the fact that it was <u>agreed to by Plaintiffs</u> during the subsequent call on February 1, 2022, that House Defendants would provide a *preliminary* privilege log by Friday, February 4, 2022. Despite not having asked for a privilege log during the rolling production, and in facts agreeing to House Defendants' offer to provide a preliminary one within three days, Plaintiffs' Motion instead summarily tells the Court: "This date is too late." (ECF No. 119, p. 7).

Also concerning about the Plaintiffs' portrayal of the discussions held on January 26 and February 1 is the false representations made about House Defendants' position on legislative privilege and the complete disregard of Plaintiffs' obligation to consult in good faith before filing the Motion with the Court. *See* Local Civ. Rule 7.02 (D.S.C.). While it is true the parties were able to discuss legislative privilege during the February 1 call, Plaintiffs have entirely ignored Defendants' position that the burden is on Plaintiffs to address the properly interposed objections on breadth, burden, scope and proportionality. *See* Fed.R.Civ.P. 26(b) (limiting discovery to "nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case"). Instead, Plaintiffs suggested the threshold objections were "just general" and proceeded to poll the Defendants[5] on "categories of information" for which legislative privilege or immunity could possibly be claimed—and in doing so *expressly stated the questions sought*

---

[5] For further context, Attorney Leah Aden questioned Defendants' counsel on four general categories of documents or information "to get a sense" of their position on privilege: (1) public testimony, statements, and comments in support of or opposition to proposed maps; (2) publicly released documents, studies, reports, other materials not draft form; (3) opinions on process or procedures that may be asked of deponents—both legislators and legislative aides; and (4) earlier preclearance process, documents from earlier redistricting cycles. In every regard, the only "hard line" taken by House Defendants was, "If it's public, it's not privileged."

*informal and unofficial response*—indeed, Plaintiffs' counsel stated words to the effect of, "we won't hold you to it." That was apparently quite false.

Instead, it is apparent Plaintiffs engaged in subterfuge during the discussion given the allegations of the Motion, with the "informal poll" translating to formal "positions" according to Plaintiffs. (ECF No. 119, pp. 6-8). It should not escape notice that nowhere among Plaintiffs many affirmative statements of House Defendants' position is there a single supporting exhibit—no e-mail, no letter, no documentation of any kind. Indeed, the categories of information outlined in the Motion are not the categories questioned by Attorney Aden during the call. *See infra*, n.4. Moreover, Plaintiffs' assertions are *unequivocally disputed* by the substantive productions made by House Defendants to date, which contrary to Plaintiffs' allegation are well more than "thousands of pages of public information, which is partially responsive . . . ." (ECF No. 119, p. 6). Quite the contrary, House Defendants produced tens of thousands of documents that include the submissions and communications sent to and from the House Redistricting Website and the House e-mail address dedicated to redistricting (Redistricting@schouse.gov), as well as the written submissions and sign-in sheets for every public hearing held by the House Redistricting Ad Hoc Committee. House Defendants also produced the internal documentation demonstrating when legislators used the Map Room during the map drawing process. Discussed further herein, this voluminous amount of information is a robust record of "what was in the contemporaneous record in the redistricting process." *Bethune-Hill v. Virginia State Bd. Of Elections*, 114 F.Supp.3d 323, 341 (E.D. Va. 2015).

Furthermore, and further evidencing that House Defendants have not asserted some steadfast refusal of any discovery for traditionally privileged legislative materials, just hours before being blindsided with this imprudent Motion, House Defendants had asked Plaintiffs to consider

the possible production of additional internal documents if Plaintiff would agree the production was without waiver or compromise of House Defendants' ability to assert legislative privilege in the case. Rather than pursue this discussion, Plaintiffs notified counsel for House Defendants that "the parties are too far apart" and a motion would be filed—just three hours later[6], Plaintiffs moved to compel. Quite frankly, given the extreme position taken <u>by Plaintiffs</u> in the Motion, it would seem inexcusable that the prosecuting parties waited to this late date to file this Motion; this extreme view of legislative privilege and immunity could have been asserted as early as the filing of responsive pleadings or certainly service of House Defendants' discovery responses.

Finally, an insurmountable flaw with the posture of this dispute remains Plaintiffs' unilateral rejection of the threshold objections to Plaintiffs' requests interposed by House Defendants. Such cavalier disregard of the limitations established by Federal Rule 26(b) leads to an inaccurate and unsustainable view: A party faced with improper discovery requests must nonetheless undertake an exhaustive search for documents and information in a limitless universe of time in order to prepare a privilege log—meaning the time, expense and burden constraints contained in the proportionality requirements of Rule 26(b) are meaningless because a privilege log must accompany responses even when a court may (and likely would) limit the breadth of the demands. This is not and cannot be the law.

---

[6] Contrary to Footnote 2 of the Motion, Plaintiffs have <u>not</u> sought to address the objections to scope, burden or proportionality raised in the discovery responses served by House Defendants on January 24, 2022. At best, Plaintiffs' counsel dismissed as inconsequential the concerns with scope raised by House Defendants on the January 26 and February 2 conference calls. House Defendants remain open to exploring with Plaintiffs the possibility of additional documents or information that could be produced so long as such production is not deemed a waiver or compromise of legislative privilege or immunity.

B.   **The Legislative Privilege and Immunity**

Turning to the broader issue of legislative privilege and immunity in redistricting litigation, House Defendants submit Plaintiffs misconstrue and misapply the applicable jurisprudence. "The principle that legislators are absolutely immune from liability for their legislative activities has long been recognized in Anglo–American law." *Bogan v. Scott-Harris*, 523 U.S. 44, 48 (1998). "The Federal Constitution, the Constitutions of many of the newly independent States, and the common law thus protected legislators from liability for their legislative activities." *Id.* at 48-49 (citing U.S. Const., Art. I, § 6; *Tenny v. Brandhove*, 341 U.S. 367, 372–375 (1951)). Derived from this legislative immunity is the legislative evidentiary privilege. *EEOC v. Wash. Suburban Sanitary Comm'n*, 666 F.Supp.2d 526, 531 (D.S.C. 2009). This Court has defined the privilege as "an evidentiary and testimonial privilege that prohibits evidence of legislative acts from being used against legislators in proceedings." *Id.* at 531. The reasoning that underlies the analogous concept of the deliberative process privilege has been used by many courts "to prevent disclosure of communications involving opinions, recommendations, or advise about legislative decisions." *Id.* (quotation omitted).

Thus, under clear precedent of the United States Supreme Court and the Fourth Circuit, state legislators and their agents possess a privilege against being questioned on deliberations and communications regarding legislative activity. *See, e.g.*, *Tenney*, 341 U.S. at 372-75; *Wash. Suburban*, 631 F.3d at 180-81. This legislative privilege is firmly rooted in history and tradition, and is incorporated into federal law through Rule 501 of the Federal Rules of Evidence. *See, e.g., Tenney*, 341 U.S. at 372; *Lake Country Estates v. Tahoe Planning Agency*, 440 U.S. 391, 403 (1979); *Sup. Ct. of Va. v. Consumers Union of the U.S., Inc.*, 446 U.S. 719, 732 (1980); *Bogan v. Scott-Harris*, 523 U.S. 44, 49 (1998); *Wash. Suburban*, 631 F.3d at 181 (citing *Burtnick v. McLean*,

76 F.3d 611, 613 (4th Cir. 1996)); Fed. R. Evid. 501 ("[T]he privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience."). This robust protection is premised on the bedrock principle that "the exercise of legislative discretion should not be inhibited by judicial interference." *Bogan*, 523 U.S. at 52. Indeed, the South Carolina Supreme Court has explicitly stated, "South Carolina recognizes the longstanding doctrine of legislative immunity for legislators carrying on their legislative duties." *S.C. Pub. Int. Found. v. Courson*, 420 S.C. 120, 125 (2017). "Legislative immunity protects legislators from 'deterrents to the uninhibited discharge of their legislative duty, not for their private indulgence, but for the public good.'" *Id.* (quoting *Tenney* at 377).

Plaintiffs are correct that legislative privilege is not absolute, but rather requires "a flexible approach that considers the need for the information while still protecting legislative sovereignty and minimizing any direct intrusion into the legislative process." *N. Carolina State Conference of the NAACP v. McCrory*, No. 1:13CV658, 2014 WL 12526799, at *2 (M.D.N.C. Nov. 20, 2014); *see also N. Carolina State Conference of NAACP v. McCrory*, 831 F.3d 204, 229 (4th Cir. 2016) ("testimony as to the purpose of challenged legislation 'frequently will be barred by [legislative] privilege.'") (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 (1977)). "A proper analysis of privilege questions must begin with a determination of the applicable law." *Hawkins v. Stables*, 148 F.3d 379, 382-83 (4th Cir. 1998). Plaintiffs seemingly suggest that when the protection is deemed "qualified" in a case such as this, it necessarily "must yield" to discovery demands such that the privilege and immunity afforded to legislators simply evaporates. (ECF No. 119, pp. 9-14). This is not so; although the protections are qualified in

redistricting litigation, the resulting balancing of interests does not necessarily equate to unfettered intrusion into the affairs of legislators. *See Bethune-Hill*, 114 F.Supp.3d at 336-37.

Plaintiffs' Motion purports to weigh the five factors used by the Eastern District of Virginia in *Bethune-Hill* in assessing a request to compel documents withheld as legislatively privileged in a racial gerrymandering case. *See id.* at 329. In that case, the district court followed a five-factor balancing test employed by other courts in the redistricting context to assess whether the legislative privilege should be curtailed, which are: (i) the relevance of the evidence sought to be protected; (ii) the availability of other evidence; (iii) the 'seriousness' of the litigation and the issues involved; (iv) the role of government in the litigation; and (v) the purposes of the privilege. *Id.* at 338.

Contrary to the implications of the Motion, even where the factors might weigh more heavily in favor of discovery, the result is not unrestrained invasion into the internal affairs of a legislative body. The *Bethune-Hill* court found "the totality of circumstances warrant the *selective disclosure* of the assertedly privileged documents in the House's possession." *Id.* at 342-43 (emphasis added). The House Intervenors were ordered, *inter alia*, to (1) "produce any documents or communications created after the redistricting legislation's date of enactment" as the "privilege only protects 'integral steps' in the legislative process and does not extend to commentary or analysis following the legislation's enactment;" (2) "any documents or communications shared with, or received from, any individual or organization outside the employ of the legislature;" and (3) "strictly factual information" and "documents or communications produced by committee, technical, or professional staff for the House [Intervenors] (excluding the personal staff of legislators) that reflect opinions, recommendations, or advice." *Id*. To be clear, none of these categories addressed in *Bethune-Hill* include documents that House Defendants believe should not be produced on the basis of legislative privilege in this case.

Also notable about Plaintiffs' recitation of the law is what is not included—arguably the most important precedent on this specific legal issue—this Court's decision in *Backus v. South Carolina*, No. 3:11-cv-03120-HFF-MBS-PMD (D.S.C. Feb. 9, 2012), attached as **Exhibit G**. Not only do Plaintiffs make no mention of the prior decision of the Three Judge Panel assigned to the redistricting litigation challenging South Carolina's 2011 maps, but indeed relies on and repeatedly cites the decision of another District Court that rejected the decision as "perfunctory" and not persuasive. *Favors v. Cuomo*, 285 F.R.D. 187, 214 (E.D.N.Y. 2012). House Defendants submit this Court should have greater regard for the decision of that panel, which rather than "perfunctory" clearly states the reasoning for the ruling is set forth in the relevant filings of then-Senate President Pro Tempore Glenn F. McConnell. *See* **Ex. G**, p. 1.

Regardless of the applicable precedent of this Court in *Backus*, the Court here should nonetheless deny Plaintiffs' demand for a blanket disregard for any privilege or protection for the legislative parties in this case. Looking at the totality of the circumstances and balancing interests using the five factors discussed above, the qualified privilege does not yield so far as Plaintiffs suggest. Assuming a reasonable scope to Plaintiffs' requests (which presently are unreasonable in scope), House Defendants recognize legislative materials are important to the constitutional claims, but Plaintiffs' own discovery responses assert they are in possession of documents evidencing proof of their racial discrimination claims. *See e.g.* **Ex. C**, Pls' Resp. to RFP Nos. 19, 20 & 21. Moreover, the Supreme Court has said there is no specific measure of proof required to prove claims of the type asserted by Plaintiffs. "A plaintiff's task, in other words, is simply to persuade the trial court—without any special evidentiary prerequisite—that race (not politics) was the 'predominant consideration in deciding to place a significant number of voters within or

without a particular district.'" *Cooper v. Harris*, 37 S.Ct. 1455, 1479 (2017). Consequently, it is not clear that the first or second factors weigh in favor of Plaintiffs.

As to the third factor of the importance of the constitutional issues, while it is undeniably true that the *types* of claims made are of the utmost importance, that significance is suspect here where the only named individual Plaintiff has abandoned his constitutional challenge to the House Districts and the associational Plaintiff SC NAACP has and continues to refuse to identify *a single individual* in any Challenged House District[7] that has been personally harmed. Given Plaintiffs' unwillingness and refusal to demonstrate a threshold standing for the racial gerrymandering claims, the third factor weighs against disclosure. And while the fourth factor addressing legislative "direct, central, and essential role" in the redistricting process may favor disclosure, the fifth factor's concern with future timidity is overwhelming and necessitates appropriate protection.

The Fourth Circuit has observed that the "practical import" of the legislative privilege "is difficult to overstate." *Wash. Suburban*, 631 F.3d at 181. The privilege enables legislators and those who assist them "to focus on their public duties by removing the costs and distractions attending lawsuits." *Id.* The privilege further serves as bulwark against "political wars of attrition in which [legislators'] opponents try to defeat them through litigation rather than at the ballot box." *Id*. Indeed, "The distraction interest is not one to be taken lightly," *Bethune-Hill*, 114 F. Supp. 3d at 342, especially as against active attorney-legislators during a rather active legislative session.

---

[7] During President Murphy's deposition on February 4, 2022, she was repeatedly instructed not to answer questions seeking the identity of or information about any individual member of SC NAACP that would have standing to bring the racial gerrymandering claims against the Challenged Districts. *See Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 271 (2015) (remanding case to allow associational plaintiff to file list of members in order to establish standing necessary for each district challenged in order to avoid dismissal).

15

And the same privilege enjoyed by legislators extends to their "aides and assistants,"[8] who are "treated as one" with the legislators they serve. *Gravel v. United States*, 408 U.S. 606, 616 (1972) (internal quotation marks omitted).

Again it should not be overlooked the present posture of this case and the continued backtracking by Plaintiffs in this first phase of the case—Plaintiff Scott has apparently abandoned his role in challenging House Districts and Plaintiff SC NAACP refuses to identify one (much less 29) members that reside in each Challenged District that would have standing to assert these claims. In *Citizens Union of City of New York v. Attorney General of the State of New York*, a district court considered demands for non-public documents of the Governor of New York and reminded plaintiffs:

> While a sparse legislative record, if proven, may be relevant to [the judicial] determination on the merits, it does not justify turning discovery into a fishing expedition into non-public information that may or may not have been considered by individual legislators and the Governor in connection with the passage of the [law]; nor does it warrant the disclosure of privileged materials.

269 F.Supp.3d 124, 141 (S.D.N.Y. 2017); *see also Rich v. KIS Calif., Inc.*, 121 F.R.D. 254, 259 (M.D.N.C. 1988) (considering even limited discovery a fishing expedition where jurisdictional claim appears attenuated and based on bare allegations, with specific denials lodged by defendants). House Defendants submit such is the case here should the Plaintiffs be permitted unfettered intrusion into the privileged documents and information of the legislative body—a fishing expedition.

---

[8] This extension of the privilege to formal legislative staff members, including legislative aides and staff members, is because "the day-to-day work of such aides is so critical" to the legislators' performance that they must be treated as the legislators' "alter egos." *Page v. Virginia State Bd. of Elections*, 15 F. Supp. 3d 657, 664 (E.D. Va. 2014) (quoting *Gravel v. United States*, 408 U.S. at 617).

### C.     The Plaintiffs' Requests for Production are Improper as Propounded

As explained herein, Plaintiffs' Motion makes no attempt to establish that the breadth of

their demands falls within the scope of discovery allowed by the Federal Rules of Civil Procedure.

Instead, it is <u>Plaintiffs</u> that make a blanket assumption that legislative privilege ***cannot apply*** in

this case <u>at all</u>, regardless of the propriety of the requests. Indeed, an example of the absurdity of

Plaintiffs' position is exemplified by Request for Production No. 3, a request specifically raised

by House Defendants to Plaintiffs during the discussion held among counsel on February 1, 2022:

> **RFP No. 3**: ***All maps, draft maps, memoranda, reports, analyses, correspondence, or other documents concerning the drawing of the districts adopted in H. 4493 and Predecessor Maps***. This Request <u>includes, but is not limited to,</u> documents concerning the racial polarization in the South Carolina electorate, state legislative districts, the role of race in drawing districts, and ***correspondence between or among you,*** individuals on the committee, any map drawers, experts, legislators, members of the South Carolina Legislature, ***or anyone else*** concerning the drawing of the districts or any draft maps of the districts considered but not adopted.

**Ex. A**, RFP No. 3 (emphasis added). In the brief discussion among counsel about House

Defendants' response to this Request, Plaintiffs summarily dismissed the overbreadth concerns

stating to the effect "this request is really about racially polarized voting documents." If Plaintiffs

believe the scope is so properly stated, it is incumbent on Plaintiffs to address the objection by

consultation with House Defendants—Plaintiffs have simply failed to do so. This same deficiency

exists with numerous of Plaintiffs' demands, none of which Plaintiffs have attempted to curtail,

but instead turn here demanding a ruling from this Court requiring House Defendants to produce

"[a]ll documents responsive to Plaintiffs' requests for production" and interrogatories, with

legislative privilege carelessly tossed aside. (ECF No. 119, p. 17). Additional examples of

exceedingly expansive and disproportional requests include:

> RFP No. 2: All documents and communications concerning the districts adopted in H. 4493 and Predecessor Maps, including but not limited to all communications with and documents or data provided to, considered, or relied upon by persons who

drew, reviewed, approved, or adopted the determination to draw districts as reflected in H. 4493 and Predecessor Maps.

RFP No. 11: All documents and communications concerning the rationale(s) or purpose(s) behind the Challenged Districts and Districts Bordering the Challenged Districts adopted in H. 4493 and any Predecessor Maps.

RFP No. 12: All documents and communications concerning statements support of or opposition to H. 4493 and any Predecessor Maps, including in support of or opposition to any proposed amendments.

RFP No. 13: All documents and communications concerning the impact or potential impact of H. 4493 and any Predecessor Maps on voters of color.

RFP No 17: All documents and communications between You and other individuals, including members of the South Carolina General Assembly and their staff or employees, and organizations and third parties related to H. 4493, Predecessor Maps, and redistricting in South Carolina.

RFP No. 18: All documents and communications between You and other individuals, including members of the South Carolina General Assembly and their staff or employees, concerning the Map Room.

*See* **Ex. A**.

The House Defendants understand the importance of the types of claims asserted in the complaint, and recognize where properly invoked that challenges to redistricting plans present unique and difficult circumstances for the Court. "Determining the subjective intent of legislators and the collective motivation of legislatures is a perilous enterprise indeed." *S.C. Educ. Ass'n v. Campbell*, 883 F.2d 1251, 1262 (4th Cir. 1989). Given the totality of these circumstances, including the excessive discovery demands made by these Plaintiffs with tenuous and attenuated (at best) indicia of standing,[9] the Court should refuse to depart from precedent and reject Plaintiffs' requests for such extraordinary relief.

---

[9] Plaintiff Scott has admitted that he does not reside in any of the House Districts challenged in this case. **Exhibit H**, Pls' Ans. to Req. for Adm. at No 9; *see also Ala. Legis. Black Caucus*, 575 U.S. at 263 (explaining that racial gerrymandering claims represent an individual harm that "directly threaten[s] a voter who lives in the *district* attacked" and a voter that lives elsewhere in the State "normally lacks standing to pursue a racial gerrymandering claim").

## **CONCLUSION**

Based on the foregoing, House Defendants ask this Court to deny Plaintiffs' Motion to Compel and order the parties to engage in meaningful consultation on the scope of Plaintiffs' discovery requests so as to allow for resolution and production of any remaining responsive, non-privileged documents. House Defendants respectfully request oral argument on Plaintiffs' Motion.

*s/ Mark C. Moore*
William W. Wilkins (Fed. ID No. 4662)
Andrew A. Mathias (Fed. ID No. 10166)
Konstantine P. Diamaduros (Fed. ID No. 12368)
NEXSEN PRUET, LLC
104 S. Main Street, Suite 900
Greenville, SC 29601
Telephone: 864.370.2211
BWilkins@nexsenpruet.com
AMathias@nexsenpruet.com
KDiamaduros@nexsenpruet.com

Mark C. Moore (Fed. ID No. 4956)
Jennifer J. Hollingsworth (Fed. ID No. 11704)
Erica H. Wells (Fed. ID No. 13206
Hamilton B. Barber (Fed. ID No. 13306)
Michael A. Parente (Fed. ID No. 13358)
NEXSEN PRUET, LLC
1230 Main Street, Suite 700
Columbia, SC 29201
Telephone: 803.771.8900
MMoore@nexsenpruet.com
JHollingsworth@nexsenpruet.com
EWells@nexsenpruet.com
HBarber@nexsenpruet.com
MParente@nexsenpruet.com

Rhett D. Ricard (Fed. ID No. 13549)
NEXSEN PRUET, LLC
205 King Street, Suite 400
Charleston, SC 29401
Telephone: 843.720.1707
RRicard@nexsenpruet.com

February 4, 2022
Columbia, South Carolina

*Attorneys for James H. Lucas, Chris Murphy, and Wallace H. Jordan*