# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# COLUMBIA DIVISION

| | |
|---|---|
| The South Carolina State Conference of the NAACP, and Taiwan Scott, on behalf of himself and all other similarly situated persons, | ) ) ) ) ) |
| Plaintiffs, | Civil Action No.: 3:21-cv-03302-JMC ) ) ) |
| v. | ) ) |
| Henry D. McMaster, *in his official capacity as Governor of South Carolina*; Harvey Peeler, *in his official capacity as President of the Senate*; Luke A. Rankin, *in his official capacity as Chairman of the Senate Judiciary Committee*; James H. Lucas, *in his official capacity as Speaker of the House of Representatives*; Chris Murphy, *in his official capacity as Chairman of the House of Representatives Judiciary Committee*; Wallace H. Jordan, *in his official capacity as Chairman of the House of Representatives Elections Law Subcommittee*; Howard Knabb, *in his official capacity as interim Executive Director of the South Carolina State Election Commission*; John Wells, *Chair*, Joanne Day, Clifford J. Elder, Linda McCall, and Scott Moseley, *in their official capacities as members of the South Carolina State Election Commission*, | ) ) ) ) ) ) ) ) ) **ORDER AND OPINION** ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

Before the court is Plaintiffs' Motion to Compel (ECF No. 119) seeking to compel Defendants James H. Lucas, in his official capacity as Speaker of the South Carolina House of Representatives, Chris Murphy, in his official capacity as Chairman of the South Carolina House of Representatives Judiciary Committee, and Wallace H. Jordan, in his official capacity as

1

Chairman of the South Carolina House of Representatives Redistricting Ad Hoc Committee (the "House Defendants") to respond to certain Requests for Production ("RFPs") and Interrogatories for various documents, information, and communications between legislators and their staff regarding the "circumstances surrounding the enactment" of House Bill 4493 ("H. 4493") and "legislators' motivation for the enactment." (*Id*. at 2-3.) House Defendants issued a blanket objection to Plaintiffs' discovery requests by asserting "legislative privilege." (ECF No. 119 at 4.) Plaintiffs argue the requested documents are "essential to resolving the issues before the court," and seek an order denying the extension of legislative privilege to their disclosure.

House Defendants responded to Plaintiffs' Motion (ECF No. 134). Thomas Alexander, in his official capacity as President of the Senate, and Luke A. Rankin, in his official capacity as Chairman of the Senate Judiciary Committee (the "Senate Defendants"), also filed a response in opposition. (ECF No. 133.) Plaintiffs filed a reply addressing objections raised by both House and Senate Defendants. (ECF No. 135.)

After careful consideration of the record, the court **GRANTS** in part and **DENIES** in part the Motion to Compel (ECF No. 119) as set forth below.

### I.     FACTUAL AND PROCEDURAL BACKGROUND

At the heart of Plaintiffs' Amended Complaint (ECF No. 84) lies the allegation that the district maps enacted by the South Carolina Legislature violate Plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment. Plaintiffs argue that in enacting these maps, legislators were at least partially motivated by an intent to discriminate against Black voters. Their discriminatory intent is central to Plaintiffs' claims. (ECF No. 119 at 3.) Plaintiffs bear the burden of establishing whether race was a "motivating factor" in the bill's enactment, for which they must demonstrate direct or circumstantial "proof of racially discriminatory intent and purpose." (*Id*. at

3 (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977) ("Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.")).) Plaintiffs surmise these documents, communications, and records may yield circumstantial and direct evidence of legislative intent and motivation. (ECF No. 119 at 3.)

In this light, Plaintiffs served a request for production of documents and a first set of interrogatories on the House Defendants on January 7, 2022, seeking "documents available to legislators [regarding] the circumstances surrounding the passage of H. 4493." (*Id*. at 5.)

Plaintiffs requested the following documents, communications, and information:

- documents and communications between legislative Defendants, members of the South Carolina General Assembly and their staff or employees, and organizations and third parties related to H. 4493, Predecessor Maps, and redistricting in South Carolina, *see* RFPs 1 and 17;
- analysis, maps, memorandum, expert reports or analyses concerning the drawing of the districts adopted in H. 4493, Predecessor Maps, and redistricting in South Carolina, *see* RFPs 1 and 3;
- documents and communications concerning the rationale(s) and purpose(s) behind the Challenged Districts and the Districts Bordering the Challenged Districts adopted in H. 4493 and any Predecessor Maps, *see* RFP 11;
- and documents and communications between House Defendants and other individuals, including members of the South Carolina General Assembly and their staff or employees concerning the Map Room, *see* RFP 18.

(*Id*.) (bullet points added). Likewise, the Interrogatories requested information related to the process of drawing and adopting maps in H. 4493. For example, Plaintiffs requested that House Defendants "describe the process for how information and proposed maps and amendments to maps adopted in H. 4493 and Predecessor Maps were conveyed to You in the Map Room." *See* Interrogatory 12. Interrogatory 17 asked House Defendants to "[i]dentify any racially polarized voting analysis conducted by You and any persons who conducted it." (*Id*.)

On January 24, 2022, the House Defendants responded to Plaintiffs' discovery requests, lodging a common objection by asserting "legislative privilege."[1] Specifically, House Defendants asserted privilege over "(1) all non-public documents, communications, information, and analyses within the possession or knowledge of house legislators and their staff concerning drawn maps; (2) all non-public documents, information, and communications between legislators and their staff regarding the process for drawing maps and the districts adopted in H. 4493; and (3) all non-public documentation, information, and communications between legislators and their staff concerning the Map Room. Moreover, House Defendants stated that the privilege covers all documents, information, and communications exchanged throughout the entire redistricting process, from its inception to the adoption of H. 4493." (*Id*. at 7-9). House Defendants acknowledged, however, that they would not assert legislative privilege over documents and communications between legislators and third-party non-legislators. (*Id*. at 7 n.3.)

Plaintiffs primarily argue that the legislative privilege is qualified, not absolute – a premise House Defendants concede. (ECF No. 134 at 12 ("Plaintiffs are correct that legislative privilege is not absolute. . .").) (*Id*. at 9.) Invoking the five-factor balancing test articulated in *Bethune-Hill v. Va. State Bd. Of Elections*, 114 F. Supp. 3d 323, 337 (E.D. Va. 2015) (the "*Bethune-Hill* factors"), Plaintiffs assert that each factor weighs in favor of compelled disclosure due to the substantial, weighty federal interests at issue in this case. (ECF No. 119 at 10-15.)

---

[1] The court notes that House Defendants also objected to Plaintiffs' discovery requests on the basis of overbreadth, which they reiterated in their Response to Plaintiffs' Motion. (ECF No. 119 at 7 n.2; ECF No. 134 at 3.) While these concerns regarding the scope of discovery are significant, the court notes Plaintiffs' Motion is solely directed to the question of whether legislative privilege applies to the requested documents. This order resolves that question. Concerns regarding overbreadth should be resolved in accordance with the discovery process outlined within the Federal Rules of Civil Procedure and the principles articulated in this order.

Senate Defendants assert that the legislative privilege is absolute rather than qualified, stemming from the constitutionally rooted concept of legislative immunity. (ECF No. 133 at 1-4.) They argue South Carolina legislators are thereby shielded from any compelled production of documents and communications regarding "their motives in enacting legislation." (*Id*.) In their view, the court must disregard caselaw that concedes the qualified nature of the privilege or attempts to discern its contours through any balancing test. On the other hand, House Defendants concede that in applying the privilege, a court must test the balance of interests at issue. (ECF No. 134 at 13 (citing *Bethune-Hill*, 114 F. Supp. 3d at 336-37).) They argue instead that an interest-balancing analysis may warrant, at best, "the selective disclosure of the assertedly privileged documents," and at any rate, the qualified privilege does not yield to the asserted interests in this case under the *Bethune-Hill* factors. (*Id*. at 14-17.)

## II.     LEGAL STANDARDS

### A. Motions to Compel

Rule 26 of the Federal Rules of Civil Procedure provides that "[p]arties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case[.]" Fed. R. Civ. P. 26(b)(1). The scope of discovery under Rule 26 is defined by whether the information sought is (1) privileged, (2) relevant to a claim or defense, and (3) proportional to the needs of the case. *See*, *e.g.*, *Gordon v. T.G.R. Logistics, Inc.*, No. 16-cv-00238-NDF, 2017 WL 1947537, at *2 (D. Wyo. May 10, 2017).

If a party fails to make a disclosure required by Rule 26, "any other party may move to compel disclosure and for appropriate sanction" after it has "in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action." Fed. R. Civ. P. 37(a). Specifically, a party "may move for an order

compelling an answer, designation, production, or inspection." Fed. R. Civ. P. 37(a)(3)(B).

"[T]he party or person resisting discovery, not the party moving to compel discovery, bears the burden of persuasion." *Oppenheimer v. Episcopal Communicators, Inc.*, No. 1:19-cv-00282-MR, 2020 WL 4732238, at *2 (W.D.N.C. Aug. 14, 2020); *see Basf Plant Sci., LP v. Commonwealth Sci. & Indus. Rsch. Org.*, No. 2:17-cv-503, 2019 WL 8108060, at *2 (E.D. Va. July 3, 2019) (citation omitted).

The court has broad discretion in deciding to grant or deny a motion to compel. *See, e.g.*, *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.*, 43 F.3d 922, 929 (4th Cir. 1995) ("This Court affords a district court substantial discretion in managing discovery and reviews the denial or granting of a motion to compel discovery for abuse of discretion.") (internal citation omitted); *Erdmann v. Preferred Research Inc.*, 852 F.2d 788, 792 (4th Cir. 1988); *LaRouche v. Nat'l Broad. Co.*, 780 F.2d 1134, 1139 (4th Cir. 1986) ("A motion to compel discovery is addressed to the sound discretion of the district court."); *Mach. Sols., Inc. v. Doosan Infracore Am. Corp.*, No. 3:15-cv-03447-JMC, 2018 WL 573158, at *2 (D.S.C. Jan. 26, 2018).

### B. Legislative Privilege Generally

The federal system "has broadly recognized the right 'of legislators to be free from arrest or civil process for what they do or say in legislative proceedings.'" *EEOC v. Wash. Suburban Sanitary Comm'n* ("*WSSC*"), 631 F.3d 174, 180 (4th Cir. 2011) (quoting *Tenney v. Brandhove*, 341 U.S. 367, 372 (1951)). Legislative immunity for U.S. Senators and Representatives derives from the Speech and Debate Clause, U.S. Const., Art. I, § 6, and extends broadly to bar criminal prosecution or civil suit based on "anything 'generally done in a session of the House [or Senate]

6

by one of its members in relation to the business before it.'" *Gravel v. United States*, 408 U.S. 606, 624 (1972) (quoting *Kilbourn v. Thompson*, 103 U.S. 168 (1880)).

While the Speech and Debate Clause by its terms protects only federal officials, the Supreme Court has developed a similar doctrine of immunity that shields state, regional, and local officials from civil liability based on their actions taken "in the sphere of legitimate legislative activity." *Tenney*, 341 U.S. at 376; *see also Bogan v. Scott-Harris*, 523 U.S. 44, 54-55 (1998) (holding that the doctrine protects local officials); *Lake Country Estates v. Tahoe Reg'l Planning Agency*, 440 U.S. 391, 405 (1979) (same for regional officials); *Supreme Court of Va. v. Consumers Union of U.S., Inc.*, 446 U.S. 719, 732-33 (1980) (same for suits seeking injunctive relief). This common law doctrine is rooted in principles of comity and in a history of immunity for state legislators that predates the Constitution. *See Spallone v. United States*, 493 U.S. 265, 279 (1990) ("[A]ny restriction on a legislator's freedom undermines the 'public good' by interfering with the rights of the people to representation in the democratic process"); *Tenney*, 341 U.S. at 372 ("Freedom of speech and action in the legislature was taken as a matter of course by those who severed the Colonies from the Crown and founded our Nation").

Moreover, in order to "safeguard this [state] legislative immunity and to further encourage the republican values it promotes," courts have recognized a corresponding privilege "against compulsory evidentiary process" that can apply "whether or not the legislators themselves have been sued." *WSSC*, 631 F.3d at 181. Because legislative immunity and legislative privilege are motivated by the same policy of comity, courts apply them in a parallel manner. *See*, *e.g.*, *Gravel*, 408 U.S. at 608 (declining to quash grand jury subpoena for Senator's aide, relying on cases establishing legislative immunity from suit).

Still, the Supreme Court recognized that "[w]here important federal interests are at stake, . . . comity yields." *United States v. Gillock*, 445 U.S. 360, 373 (1980). In certain cases, therefore, the court found the "recognition of an evidentiary privilege for state legislators for their legislative acts would impair the legitimate interest of the Federal Government . . . with only speculative benefit to the state legislative process." *Id*. at 373. Applying the Supreme Court's guidance, district courts, including several in the Fourth Circuit, have held that "[w]hile legislative privilege is undoubtedly robust, the Supreme Court's decisions make clear that the privilege does not *absolutely* protect state legislative officials from discovery into communications made in their legislative capacity." *Benisek v. Lamone*, 241 F. Supp. 3d 566, 574 (D. Md. 2017); *see also Bethune-Hill*, 114 F. Supp. 3d at 336. "Drawing on these principles, courts ruling on claims of legislative privilege in redistricting cases have frequently adopted a five-factor standard that facilitates case-by-case evaluation of the competing interests at stake. This standard, which derives from cases on deliberative-process privilege for executive actors, requires a court evaluating a claim of legislative privilege to take into account the relative weight of: (1) the relevance of the evidence sought, (2) the availability of other evidence, (3) the seriousness of the litigation, (4) the role of the State, as opposed to individual legislators, in the litigation, and (5) the extent to which the discovery would impede legislative action." *Benisek*, 241 F. Supp. 3d at 575; *Bethune-Hill*, 114 F. Supp. 3d at 337-38 (characterizing the last factor as an inquiry into how discovery would affect the purpose of the privilege).

### III.    ANALYSIS

#### A. <u>Qualified Nature of the Privilege</u>

Shielding lawmaking branches of government from unwarranted judicial interference, legislative immunity is vital to the separation of powers and embedded in the history and traditions

of this nation. *Bogan v. Scott-Harris*, 523 U.S. 44, 52 (1998). Immunity permits representatives of the public "to discharge [their] public trust with firmness and success," with "the fullest liberty of speech," regardless of whom that speech may, on occasion, offend. *Tenney v. Brandhove*, 341 U.S. 367, 373 (1951). To achieve this vital purpose, this immunity must be absolute – not to "protect[] the members against prosecutions for their own benefit, but to support the rights of the people, by enabling their representatives to execute the functions of their office without fear of prosecutions, civil or criminal." *Id*. at 373-74. This "venerable tradition" serves, at bottom, a public function. *Bogan*, 523 U.S. at 49. In this light, absolute legislative immunity must be construed broadly and liberally, extending "to every act resulting from the nature, and in the execution, of the office." *Id*. at 374. Practically speaking, this doctrine protects lawmakers from "compulsory evidentiary process[es]," including orders to participate in discovery or provide testimony in court. *EEOC v. Wash. Suburban Sanitary Comm'n* ("*WSSC*"), 631 F.3d 174, 181 (4th Cir. 2011).

Senate Defendants object that absolute immunity bars any compelled production of documents, information, or testimony concerning legislative motivation in enacting the district maps. In essence, they assume absolute legislative immunity is co-extensive with an absolute evidentiary privilege which blocks any compulsory production of such legislative documents or communications. The Supreme Court, however, has rejected this notion in broad terms: "where important federal interests are at stake," principles of comity which would ordinarily require federal courts to uphold state legislative privileges, must yield.[2] *Gillock*, 445 U.S. at 373. This

---

[2] In a technical sense, *Gillock* addressed the abrogation of both legislative immunity and legislative privilege. As applied to state lawmakers, both legislative immunity and privilege are grounded in federal common law rather than federal constitutional or statutory law. *Bethune-Hill*, 114 F. Supp. 3d at 334. Thus, both are "necessarily abrogated" when they conflict with federal statutes or the

outcome follows naturally from the supremacy of federal constitutional and statutory law. Thus, *Tenney* and its progeny,[3] involving civil suits "brought by a private plaintiff [against legislators] to vindicate private rights," *id*. at 372, are distinguishable from cases involving public rights secured by federal law. *Gillock* recognized this distinction, emphasizing that the Court has "never held that the performance of the duties of judicial, legislative, or executive officers, requires or contemplates the immunization of otherwise criminal deprivations of constitutional rights." *Id.* at 373. "On the contrary, the judicially fashioned doctrine of official immunity does not reach 'so far as to immunize criminal conduct proscribed by an Act of Congress.'" *Id.* (citing *Gravel v. United States,* 408 U.S. 606, 627 (1972)).

Senate Defendants attempt to limit *Gillock* to its facts (or at best, to federal criminal prosecutions), arguing "*Gillock* was a criminal prosecution brought by the federal government, not a 'civil action brought by a private plaintiff.'" (ECF No. 133 at 5.) This argument misses the forest for the trees. The thrust of *Gillock* is that official privilege is not without limit. When in conflict, the weighty federal interests embedded in the Constitution and laws of this nation require these privileges to yield. In this context, federal interests are public interests: at a basic level, the government prosecutes crime to vindicate the public, restore justice, and maintain the rule of law. Nothing in *Gillock* suggests these federal interests end there. It is not the simple distinction between "criminal" and "civil" cases which determines the availability of this evidentiary privilege, but rather, the importance of the federally created public rights at issue. And when

---

Constitution. *Id*. (citing *Owen v. City of Independence,* 445 U.S. 622, 647 (1980) ("Congress [is] the supreme sovereign on matters of federal law [.]")).

[3] *See, e.g.*, *Burtnick v. McLean*, 76 F.3d 611 (4th Cir. 1996) cited by Senate Defendants in support of their "absolute" conception of legislative privilege, which similarly involved a private § 1983 action against city officials acting in a legislative capacity, and is distinguishable from a case involving federal interests protecting public rights.

cherished and constitutionally rooted public rights are at stake, legislative evidentiary privileges must yield.[4]

### B. <u>Balance of Interests</u>

The court must now consider how the contours of the qualified privilege are defined. Certainly, the qualified nature of the privilege does not permit "unfettered intrusion into the affairs of legislators." (ECF No. 134 at 19.) The five *Bethune-Hill* factors, applied by several district courts in similar cases, provide an "analytical framework" to balance the substantial interests at issue. *See Bethune-Hill*, 114 F. Supp. 3d at 339-42; *Page v. Virginia State Bd. of Elections*, 15 F.

---

[4] Numerous circuit and district courts reached a similar interpretation of *Gillock*, relying on the distinctions between public and private rights and concluding that the legislative privilege is limited by important federal interests. *See, e.g., In re Grand Jury*, 821 F.2d 946, 957 (3d Cir. 1987) ("Neither the threat of harassment, the dangers of distraction, nor the potential disruption of confidential communications justifies a qualified privilege for the full range of legislative activities normally protected by the Speech or Debate Clause."); *In re Hubbard*, 803 F.3d 1298, 1311 (11th Cir. 2015) (explaining that "a state lawmaker's legislative privilege must yield in some circumstances where necessary to vindicate important federal interests such as the enforcement of federal criminal statutes," but concluding that the rights asserted by the plaintiffs in that case were not supported by the First Amendment); *Jefferson Cmty. Health Care Centers, Inc. v. Jefferson Par. Gov't*, 849 F.3d 615, 624 (5th Cir. 2017) (non-redistricting case stating that "[w]hile the common-law legislative immunity for state legislators is absolute, the legislative privilege for state lawmakers is, at best, one which is qualified."); *Benisek v. Lamone*, 241 F. Supp. 3d 566, 574 (D. Md. 2017) (unequivocally reading *Gillock* as a repudiation of the "absolute nature of the privilege," and recognizing that despite the fact that the "denial of a privilege to a state legislator may have some minimal impact on the exercise of his legislative function," such considerations give way to the enforcement of important federal interests); *Bethune-Hill v. Virginia State Board of Elections*, 114 F. Supp. 3d 323, 336 (E.D. Va. 2015) (stating, in the context of a redistricting case, that "state legislative privilege is a qualified one when . . . a plaintiff proceeds against the *State* and seeks evidence to vindicate important *public* rights guaranteed by federal law."); *Comm. for a Fair & Balanced Map v. Illinois State Bd. of Elections*, No. 11-c-5065, 2011 WL 4837508, at *6 (N.D. Ill. Oct. 12, 2011) ("Given the federal interests at stake in redistricting cases, this court concludes that common law legislative immunity does not entirely shield [non-party lawmakers] here.")

In particular, *Bethune-Hill* distinguished civil suits against individual legislators, where the privilege was close to absolute, from those "against the *State* [where Plaintiffs seek] evidence to vindicate important *public* rights guaranteed by federal law, where the privilege was qualified. *Bethune-Hill*, 114 F. Supp. 3d at 334 (emphasis added).

Supp. 3d 657, 666-68 (E.D. Va. 2014); *Rodriguez v. Pataki,* 280 F.Supp.2d 89 (S.D.N.Y.2003); *Comm. for a Fair & Balanced Map v. Ill. State Bd. of Elecs.*, No. 11-c-5065, 2011 WL 4837508, at *7-*10 (N.D.Ill. Oct. 12, 2011); *Favors v. Cuomo,* 285 F.R.D. 187, 217-21 (E.D.N.Y.2012); *Benisek v. Lamone*, 241 F. Supp. 3d 566, 574 (D. Md. 2017).

Plaintiffs argue all five factors weigh in favor of disclosure. (ECF No. 119 at 10-15.) House Defendants concede that the *Bethune-Hill* factors are instructive, but argue they permit, at best, selective disclosure of certain legislative records. (ECF No. 134 at 13.) The court considers the five factors in turn.

1. Relevance

The evidence sought by Plaintiffs is highly relevant to the intentional discrimination claims at the heart of the complaint, because the Legislature's "decision making process itself 'is the case.'" *Bethune-Hill*, 114 F. Supp. 3d at 339; (ECF No. 119 at 11.) It is undisputed that Equal Protection cases require proof of discriminatory intent, and "documents containing the opinions and subjective beliefs of legislators or their key advisors [are] relevant to the broader inquiry into legislative intent and the possibility of racially motivated decisions that were not adequately tailored to a compelling government interest." *Page*, 15 F. Supp. 3d at 666. Of course, the motivations of individual legislators in supporting a particular law are not necessarily representative of those of the entire Legislature. *See Palmer v. Thompson,* 403 U.S. 217, 224 (1971) (stating broadly that the Supreme Court has never held that "a legislative act may violate equal protection solely because of the motivations of the men who voted for it"); (*see also* ECF No. 133 at 7.) But any inquiry into the weight of such evidence is premature at this stage. The scope of discovery under the Federal Rules is intentionally broad, and here, it is clear discriminatory intent contained within legislative documents and communications is relevant to

12

the intentional discrimination element of Plaintiffs' *prima facie* case.

House Defendants concede that the "legislative materials are important to the constitutional claims," but argue that it is Plaintiffs' burden to "persuade the trial court – without any evidentiary prerequisite – that race (not politics) was the 'predominant consideration in deciding to place a significant number of voters within or without a particular district.'" (ECF No. 134 at 15 (citing *Cooper v. Harris*, 137 S. Ct. 1455, 1479 (2017)).) If anything, this statement of Plaintiffs' burden underscores the relevance of the requested materials. Though Plaintiffs have the burden of persuasion here, they cannot be expected to make this showing in the dark. Thus, Plaintiffs' request for documents and communications which may demonstrate discriminatory intent by legislators or their key agents is, at a minimum, relevant under the first factor.

At the same time, however, the relevance prong may also limit the scope of Plaintiffs' requests. For instance, Plaintiffs' request for records from past redistricting cycles, which do not "bear on the intent of any legislator [or] the South Carolina General Assembly as a whole[] in enacting [H. 4439]," are less relevant to the discriminatory intent element in this case. (ECF No. 133 at 8.) For such claims, the relevance factor may weigh against disclosure.

### 2. Availability of Other Evidence

Here, no other evidence would be as probative of an unlawful legislative motive as potential direct or circumstantial evidence which could be obtained through the disclosure of the requested legislative materials. (ECF No. 119 at 12.) Plaintiffs certainly have other avenues to make their case, and a robust body of equal protection caselaw illustrates which circumstantial factors may permit courts to infer discriminatory intent. Yet, these circumstantial sources of information exist precisely because direct evidence of discriminatory intent is, for obvious reasons, often difficult to obtain. And while circumstantial evidence "is valuable, it is not a substitute for

the ability to depose a witness and obtain *direct* evidence of motive and intent, thus avoiding the potential ambiguity of circumstantial evidence." *Benisek*, 241 F. Supp. at 576.  In the event direct evidence exists and is produced in discovery, it may be highly probative of Plaintiff's claims. Thus, "Plaintiffs need not 'confine their proof' to circumstantial evidence" alone. *Page*, 15 F. Supp. 3d at 667.  House Defendants' sole objection to Plaintiffs' argument as to this factor, therefore, is without merit.  Senate Defendants add that Plaintiffs should "explain why the available evidence is insufficient to prove their claims before they ask the [c]ourt to 'intrude into the workings' of the South Carolina General Assembly." (ECF No. 133 at 8 (citing *Arlington Heights*, 429 U.S. at 268 n.18)).)  But Defendants themselves have challenged the sufficiency of Plaintiffs' evidence in this case in multiple motions to dismiss and motions for summary judgment. These arguments ignore that the discovery sought is likely the only way to obtain direct evidence of discrimination.  *Benisek*, 241 F. Supp. at 576.

The court agrees with Defendants to the extent they argue this factor requires scope of the discovery to be limited to evidence that is not duplicative and is somewhat probative of Plaintiffs' claims.  Defendants demonstrated, for instance, that Plaintiffs conceded the broad request within RFP No. 3 was "really about racially polarized voting documents."  (ECF No. 134 at 17.)  This limited scope strikes the proper balance and does not intrude into legislative affairs beyond what is necessary to support Plaintiffs' intentional racial discrimination claim.

3. <u>Seriousness of Litigation</u>

It is beyond dispute that the allegations in Plaintiffs' complaint allege serious issues of constitutional law.  The right to have one's vote counted is indispensable to individual liberty and enshrined within our Constitution.  The erosion of that right takes aim at the very heart of our democracy.  At the very least, the maps promulgated in this redistricting cycle will inform how

14

South Carolina citizens vote for the next ten years. It is difficult to overstate the importance of securing the fundamental right to vote for every South Carolina citizen in the coming decade.

House and Senate Defendants admit that the issues in the case are significant (ECF Nos. 134 at 15 & 133 at 9) but appear to focus on the importance of redistricting to state sovereignty. The allocation of power in a federalist system is vital to our form of government. Yet, every redistricting case litigated in the federal courts demonstrates that at some juncture, state interests give way when they conflict with the constitutionally guaranteed fundamental right to vote free from racial discrimination. The third factor thus weighs in favor of disclosure.

4. Role of the Legislature in the Alleged Constitutional Violations

Similarly, the fourth factor looks to the role of the Legislature in effecting the alleged constitutional violations in the case. It is undisputed that the Legislature enacted the district maps at issue. (ECF No. 134 at 15.) While "every constitutional challenge necessarily involves the government," (ECF No. 133 at 9), this factor looks beyond mere "state action" and requires the court to consider whether "the legislature – rather than the legislators – are the target of the remedy and legislative immunity is not under threat." *Bethune-Hill*, 114 F. Supp. 3d at 341. This is not a case where individual legislators are targeted by a private plaintiff seeking damages. Plaintiffs' stated purpose is to overturn legislative action on constitutional grounds. This factor suggests the legislative privilege ought to yield to Plaintiffs' attempt to enforce a substantial public right.

5. Purpose of the Privilege

The privilege "guard[s] legislators from the burdens of compulsory process" and protects their independence. *Bethune-Hill*, 114 F. Supp. 3d at 341. The court must be wary of any intrusion which subjects legislators to unnecessary and burdensome disclosure requirements and detracts from their representative functions. While the "detraction" purpose of the privilege may militate

15

against disclosure, it is still necessary to distinguish between the effects of various discovery requests upon legislative functions.  Plaintiffs seek the production of documentary evidence rather than testimony here, and such requests are considered to be "less burdensome" than requirements to testify.  *Id.*  Especially where the court may already need to ascertain whether the documents at issue are "legislative in nature" before the legislative privilege can be invoked,  "some degree of documentary review is necessary for the privilege to be claimed in the first place." *Id.*  (citing *Gov't of Virgin Islands v. Lee*, 775 F.2d 514, 517 (1985)).  Similarly, the legislative independence interest and the risk of chilling legislative functions "is significantly reduced, if not eliminated, [] when the threat of personal liability is removed." *Owen*, 445 U.S. at 656.  Still, "[i]t is no doubt true that conversations between and among legislators play a vital role in crafting the substance of legislation," *Benisek*, 241 F. Supp. 3d at 576, and the privilege exists to prevent such conversations from becoming chilled.

Here too, it is important to note that different types of documents or communications implicate the independence interest in different ways.  Communications between staff and legislators are particularly sensitive because they "are often devoted to discussing ideas to which neither party to the communication is committed for purposes of legislative action – such as testing the soundness of ideas by positing wide-ranging positions." *Id.*  Nonetheless, such communications may also provide "direct evidence of specific intent," and cannot be completely shielded from discovery when the federal interests at stake are substantial. *Id.*  The court will limit the disclosure of such documents, however, to those which provide direct evidence of specific intent.

Because each factor weighs in favor of at least some degree of disclosure, the court rejects Defendants' broad conception of the legislative privilege, and orders Defendants to produce

16

requested documents, communications, and information which are relevant to the broad issue of legislative motivation in the enactment of H. 4493, subject to the limitations discussed in this order.

### C. Conferral Requirement and Scope of Discovery

House Defendants allege that Plaintiffs failed to "consult in good faith" prior to filing this motion, in violation of Local Civ. Rule 7.02 (D.S.C.). (ECF No. 134 at 8.) Defendants additionally object to the "breadth, burden, scope, and proportionality" of Plaintiffs' requests. (*Id.*) At this stage, the court declines to address these claims, but directs the parties to consult in good faith and resolve the overbreadth issues in a timely manner. The parties should refer to this order to clarify the permissible scope of discovery, which is hereby limited to documents, communications, and information which broadly address the issue of discriminatory intent in the present redistricting cycle, by individual legislators or the Legislature as a whole.

Based on the foregoing, Plaintiffs, at a minimum, are entitled to the following discovery:

1. Depositions of all legislators, staff (including Map Room staff) and consultants involved in the development, design and/or revisions of H. 4493:

2. All versions of maps and related documents produced during the course of the development, design, and/or revisions of H. 4493 and sufficient data to determine the date and time such maps were produced and the persons involved in submitting and reviewing them;

3. All documents which relate in any manner to the intent behind any proposed design and/or revision of the H. 4493 or any individual district referenced in Plaintiffs' Amended Complaint;

4. All documents related to any racially polarized voting analysis utilized in the development, design and/or revision of H. 4493;

5. Documents which identify and/or describe any computer software utilized in the development, design and/or revising of H. 4493;

6. Any documents produced and/or provided by persons not legislators or staff which relate to the development, design and/or revision of H. 4493; and

17

7. All documents which address any changes in districts from the existing House Plan to H. 4493.

The documents referenced above shall be produced by House Defendants by 5:00 p.m. on February 14, 2022. Further, the parties shall promptly meet and confer regarding the production of any documents or other discovery in which House Defendants have asserted a privilege claim in their privilege log (ECF No. 145) and in which Plaintiffs have objected. The parties shall submit to the Court by 5:00 p.m. on February 14, 2022, a listing of all documents on House Defendants' privilege log in which there remains a dispute regarding production. The Panel will conduct a hearing on February 15, 2022, at 1:00 p.m. regarding any of those disputed documents.

## IV.     CONCLUSION

After careful consideration, the court **GRANTS** in part and **DENIES** in part Plaintiffs' Motion to Compel as set forth herein. (ECF No. 119.) Defendants shall provide responses by 5:00 p.m. on February 14, 2022.

**IT IS SO ORDERED.**

J. Michelle Childs
United States District Judge

February 10, 2022
Columbia, South Carolina