# Exhibit 2

Page 1

1                IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF SOUTH CAROLINA

3                         COLUMBIA DIVISION

4

5      CASE NUMBER:  3:21-cv-03302-JMC-TJH-RMG

6

7      THE SOUTH CAROLINA STATE CONFERENCE

8      OF THE NAACP,

9      and TAIWAN SCOTT, on behalf of himself

10     and all similarly situated persons,

11             Plaintiffs,

12     vs.

13     HENRY D. MCMASTER, in his official

14     capacity as Governor of

15     South Carolina, et al.,

16             Defendants.

17

18

19

20

21                       DEPOSITION

22                          OF

23                    BRENDA MURPHY

24          February 4, 2022 at 9:05 a.m.

25

3:21-cv-03302-MBS-TJH-RMG    Date Filed 03/21/22    Entry Number 194-2    Page 3 of 108

Brenda Murphy                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 2

1  REPORTED BY:
2           Jan A. Mann, CSR
3        Veritext Legal Solutions
4        260 North Joachim Street
5          Mobile, Alabama 36603
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1          A P P E A R A N C E S
2
3  APPEARING ON BEHALF OF THE PLAINTIFF:
4     NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC.
5     Mr. Antonio Ingram, II
6     Ms. Leah Aden
7     Mr. John Cusick
8     40 Rector Street, 5th Floor
9     New York, New York  10006
10
11  APPEARING ON BEHALF OF THE HOUSE DEFENDANTS:
12     NEXSEN PRUET, LLC
13     Mr. Mark C. Moore
14     Mr. Michael A. Parente
15     1230 Main Street, Suite 700
16     Columbia, South Carolina  29201
17
18  APPEARING ON BEHALF OF THE DEFENDANT
19  GOVERNOR MCMASTER:
20     OFFICE OF SOUTH CAROLINA GOVERNOR
21     HENRY MCMASTER
22     Mr. Thomas Limehouse
23     Mr. William Grayson Lambert
24     1100 Gervais Street
25     Columbia, South Carolina  29201

Page 3

1          S T I P U L A T I O N S
2
3        IT IS STIPULATED AND AGREED by and between the
4  parties through their respective counsel, that the
5  deposition of BRENDA MURPHY may be taken before Jan A.
6  Mann, Commissioner, via videoconference on the 4th day
7  of February, 2022.
8        IT IS FURTHER STIPULATED AND AGREED that the
9  signature to and the reading of the deposition by the
10  witness is waived, the deposition to have the same force
11  and effect as if full compliance had been had with all
12  laws and rules of Court relating to the taking of
13  depositions.
14        IT IS FURTHER STIPULATED AND AGREED that it
15  shall not be necessary for any objections except as to
16  form or leading questions, and that counsel for the
17  parties may make objections and assign grounds at the
18  time of the trial, or at the time said deposition is
19  offered in evidence or prior thereto.
20        IT IS FURTHER STIPULATED AND AGREED that the
21  notice of filing of the deposition by the Commissioner
22  is waived.
23
24
25

Page 5

1  APPEARING ON BEHALF OF THE SENATE DEFENDANTS:
2     ROBINSON, GRAY, STEPP & LAFFITTEE, LLC
3     Mr. Robert E. Tyson
4     1310 Gadsden Street
5     Columbia, South Carolina  29211
6
7  APPEARING ON BEHALF OF ELECTION DEFENDANTS:
8     Burr & Forman
9     Ms. Jane W. Trinkley
10     1221 Main Street, Suite 1800
11     Columbia, South Carolina  29201
12
13  ALSO PRESENT:
14     Sheree Rabon
15     Cynthia Nygord
16     Melissia Ford
17
18
19
20
21
22
23
24
25

2 (Pages 2 - 5)

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 6

1              I N D E X
2 EXAMINATION BY:                        PAGE
3 Mr. Moore                              7
4 Mr. Tyson                              204
5 Mr. Limehouse                          230
6 Mr. Ingram                             233
7 Mr. Moore                              240
8        INDEX OF EXHIBITS
9 DEFENDANT'S EXHIBITS
10 Exhibit 1  Objection to First Set        39
11         of Request for Admissions
12 Exhibit 2  Report                       44
13 Exhibit 3  Complaint                    66
14 Exhibit 4  Written Testimony 11-10-21   81
15 Exhibit 5  Testimony                    88
16 Exhibit 6  Minutes of Reapportionment   97
17         Committee Meeting
18 Exhibit 7  Behind The Lines Video       106
19 Exhibit 8  Letter                       132
20 Exhibit 9  Map                          165
21 Exhibit 10 Mintues 9-30-21              181
22 Exhibit 11 Agenda 10-7-21               186
23 Exhibit 12 Minutes 11-18-21             189
24 Exhibit 13 Agenda 8-5-21                194
25 Exhibit 14 Minutes 8-26-21              198

Page 7

1        I, Jan A. Mann, CSR, a Court Reporter and
2 Notary Public of the State of Alabama, acting as
3 Commissioner, do certify that on this date, as provided
4 by the Federal Rules of Civil Procedure and the
5 foregoing stipulation of counsel, there came before me
6 via videoconference on February 4, 2022, beginning at
7 9:05 a.m., BRENDA MURPHY, witness in the above cause for
8 oral examination, whereupon the following proceedings
9 were had:
10
11        BRENDA MURPHY,
12 being first duly sworn, was examined and testified as
13 follows:
14
15 EXAMINATION BY MOORE:
16    Q.    So good morning.  I'm ready to proceed.
17 My name is Mark Moore and I am one of the attorneys for
18 the House defendants.  Good morning, Ms. Murphy.  How
19 are you?
20    A.    Good morning.  I'm fine.  Thank you.
21    Q.    It's a rainy day in Columbia.  I'm
22 assuming you're in Columbia as well?
23    A.    I am.
24    Q.    One of our paralegals just mentioned to
25 me that we have a woman who works with us who is also

Page 8

1 named Brenda Murphy so -- and she brings her dog to work
2 and that's one of my favorite parts of the day when I
3 get to see her dog but -- so, Ms. Murphy, have you ever
4 been deposed before?
5    A.    Yes.
6    Q.    Okay.  Can you tell me about that?
7    A.    It was regarding litigation regarding
8 the Black Bikers Week in Myrtle Beach, South Carolina.
9    Q.    Was that the case with that went to trial
10 before Judge Lydon?
11    A.    I don't recall the name of the judge
12 but it was -- I was deposed for that situation.
13    Q.    And is that the only time you -- I'm
14 sorry.  Is that the only time you've ever been deposed?
15    A.    Yes.
16    Q.    And despite the fact that you may have
17 been deposed before, I'm required to go over some of the
18 ground rules of the deposition with you.  First of all,
19 you understand you're under oath today in the federal
20 civil proceeding and you must give truthful answers to
21 all the questions I ask and your answers are subject to
22 the pains and penalties of perjury.  Do you understand
23 that?
24    A.    I do, yes.
25    Q.    Okay.  Is there any reason why you don't

Page 9

1 believe you could testify under oath today?
2    A.    No.
3    Q.    Okay.  And are you taking any medication
4 or anything else that impairs your ability to listen and
5 understand my questions?
6    A.    No.
7    Q.    Thank you so much.  So I'm going to be
8 asking you questions and I'm going to try my best to be
9 clear and concise, but if at any point you don't
10 understand the question, please ask me to rephrase,
11 please tell me you don't understand it, and I'll do my
12 best to rephrase, okay?
13    A.    I will.
14    Q.    And because if I ask a question and you
15 answer it, I'm going to assume that you understood my
16 question.  Do you understand that?
17    A.    Yes.
18    Q.    Okay.  And if you have questions during
19 your deposition, you're required to direct your
20 questions to me and not your counsel.  Please wait until
21 I finish my question before answering so the court
22 reporter has an opportunity to take everything down.
23 It's very important that you and I not try to talk over
24 each other and I'm bad about that and I'm going to try
25 my best not to do it, okay?

3 (Pages 6 - 9)

Brenda Murphy                                February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 10

1    A.    Okay.
2    Q.    And so please wait again until I finish
3  my question before you answer and please give verbal
4  responses because the court reporter is required to take
5  everything down.  So as I understand it, is that
6  Mr. Ingram with you this morning?
7    A.    Yes.
8        MR. INGRAM:  Yes.
9    Q.    Okay.  And Mr. Ingram is going to be
10 defending the deposition.  Is that correct?
11   A.    Yes.
12   Q.    Okay.  And so while Mr. Ingram may object
13 to the form of certain questions, if he makes such an
14 objection, you still have to answer my question unless
15 he instructs you not to answer.  Do you understand?
16   A.    Yes.
17   Q.    Okay.  And if you need to take a break,
18 use the restroom, to go get a glass of water, just ask
19 and we'll take a break.  The only thing I ask is if we
20 take a break, I would need you to answer the question
21 that's pending before we take a break.  Do you
22 understand that?
23   A.    Yes.
24   Q.    Okay.  And when we take a break, if you
25 have any conversations with counsel about the substance

Page 11

1  of your testimony, I'm going to be allowed to ask about
2  those conversations.  Do you understand that?
3    A.    Yes.
4    Q.    And I do want this understood upfront and
5  I may say it again when I get to certain questions but I
6  want to be very clear that I'm not seeking confidential
7  information or communications between you and your
8  counsel.  And so if you can't answer a question without
9  getting into that sort of information, just please let
10 me know, okay?
11   A.    I will.
12   Q.    Okay.  And so where are you located
13 today?  Where are you physically located?
14   A.    At the South Carolina State Conference
15 office in --
16   Q.    Okay.  I'm sorry.
17   A.    In Columbia, South Carolina.
18   Q.    Okay.  And is anyone in the room with you
19 other than Mr. Ingram?
20   A.    No.
21   Q.    Okay.  Do you have any materials in front
22 of you?
23   A.    No.
24   Q.    Okay.  Did you bring any materials to
25 this deposition?

Page 12

1    A.    No.
2    Q.    Is anyone providing input to you by
3  phone, text, email or otherwise during the deposition?
4    A.    No.
5    Q.    And as I noted to counsel, I don't
6  believe that we're going to be able to conclude this
7  deposition today because the plaintiffs have still not
8  produced all of the documents that may be relevant to
9  your deposition.
10       We just received the first production
11 from the plaintiffs last night, and so while I may ask
12 some questions about some documents that were produced
13 last night, we're going to hold this deposition open and
14 we will finish this deposition, if necessary, at a later
15 date after we -- after your document production is
16 complete and after we've had a meaningful opportunity to
17 review those items.  Do you understand that?
18   A.    I do.
19   Q.    Okay.  I intend to ask you questions
20 about your personal knowledge, okay.  If Mr. Ingram
21 objects to my questions, under our rules and under our
22 local rules, he can object but he cannot object in a way
23 that suggests to you an answer.  The extent of his
24 objections other than to the form, if he directs you not
25 to answer on the basis of privilege.  Do you understand

Page 13

1  these instructions?
2    A.    Yes.
3    Q.    And do you have any questions before we
4  get started?
5    A.    I do not.
6    Q.    Okay.  Thank you so much, Ms. Murphy.
7        MR. INGRAM:  One clarification point,
8  Mark.  You are asking questions as to her personal
9  knowledge as president of the NAACP South Carolina
10 chapter and this is not a 30(b)(6) deposition.
11       MR. MOORE:  This is not a 30(b)(6)
12 deposition.  As I mentioned to Mr. Bryant (sic), while
13 we are I guess having a lot of flexibility in terms of
14 scheduling depositions, I believe that a true 30(b)(6)
15 deposition has to be -- notice as to be provided with
16 respect to topics and those topics have to be discussed.
17 This is not a 30(b)(6) deposition.
18       MR. INGRAM:  Thank you.
19       MR. MOORE:  Yes, sir.  And if I ask a
20 question that you think veers into that realm, Mr.
21 Ingram, I'm sure you will object.
22       MR. INGRAM:  Correct.
23   Q.    Okay.  So there are a number of attorneys
24 who I guess are here today for the plaintiffs.  Mr.
25 Ingram, Mr. Cusick, Ms. Aden.  Are all of those your

4 (Pages 10 - 13)

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 14

1 attorneys, Ms. Murphy?
2      A.    They are attorneys but all are from LDF
3 and are part of a coalition that was formed in I think
4 around August of last year.
5      Q.    And so who do you believe represents you
6 in the South Carolina Chapter of the NAACP?
7      A.    For today, Mr. Ingram, Attorney Ingram.
8      Q.    Okay.  What about Mr. Cusick and Ms.
9 Aden?  Do they represent you as well?
10     A.    They are attorneys that are on the
11 coalition, yes.
12     Q.    Okay.  And who else represents you in
13 this lawsuit if you know?
14     A.    There were several members of the
15 coalition.  ACLU was also one of the members, partners
16 in the coalition.
17     Q.    Okay.  And I'm going to ask about the
18 coalition.  I'm going to ask a number of questions later
19 but are you paying anyone to represent you in this case?
20     A.    No.
21     Q.    Okay.  And are you paying Mr. Ingram to
22 be here with you today?
23     A.    No.
24     Q.    Okay.  So none of the attorneys who are
25 representing the NAACP are being paid by the NAACP.  Is

Page 15

1 that right or wrong?
2      A.    That's correct.
3      Q.    Okay.  And so I don't want to go into any
4 conversations you had with your lawyers but could you
5 tell me what you've done to prepare for this deposition
6 today?
7      A.    The only thing that I have done is
8 basically make sure I have a clear understanding of
9 what to expect, and when I say what to expect, that is
10 some of the same things that you talked to me about
11 and that's it basically.
12     Q.    Okay.  So did you meet with someone to
13 prepare yourself for your deposition?
14     A.    Yes, I did.
15     Q.    And who did you meet with and when and
16 for how long?
17     A.    It was the LDF staff, the ones that are
18 online here today.  And basically there were two
19 opportunities for me to ask for clarification in terms
20 of what to expect, not in terms -- just what to
21 expect.
22     Q.    Okay.  So you had two separate meetings.
23 Is that right?
24     A.    Correct.
25     Q.    Were those meetings in person or

Page 16

1 conducted via Zoom or by phone?
2      A.    They were not in person.  They were by
3 Zoom.
4      Q.    And when were they?
5      A.    Those were this week.
6      Q.    Okay.  Can you tell me what days and for
7 how long?
8      A.    One was I think it was Tuesday or
9 Wednesday.  You know, in terms of my schedule, it's
10 been pretty busy.  And then for a period yesterday.
11     Q.    Okay.  About how long was the first one,
12 the first session?
13     A.    I would say approximately an hour.
14     Q.    Okay.  And the second session?
15     A.    Both were about the same.
16     Q.    Okay.  And did you review any documents
17 in those sessions?
18     A.    No.
19     Q.    Okay.  Have you reviewed any documents to
20 prepare yourself for your testimony here today?
21     A.    No, I have not reviewed -- I haven't
22 had time because of the notice given for this
23 deposition today with everything else I had going on.
24     Q.    Okay.  So did you review the complaints
25 that have been filed in federal court?  And I guess now

Page 17

1 there are three, an initial complaint, an amended
2 complaint, and a second amended complaint.  Have you
3 reviewed those documents, Ms. Murphy?
4      A.    I received copies of those complaints,
5 yes.
6      Q.    Okay.  Did you review them?
7      A.    We review and I am speaking on behalf
8 of the South Carolina State Conference.  We have
9 reviewed those documents as a coalition.  In terms of
10 the complaints, we all as a coalition discussed the
11 complaints that -- prior to submission and all were in
12 agreement.
13     Q.    So you reviewed each of these complaints
14 prior to their submission to the federal court?
15     A.    The coalition reviewed them.
16     Q.    Okay.  Were you a part of the coalition
17 that conducted that review I guess is my question?
18     A.    Yes.
19     Q.    Okay.  So did you personally review them
20 is my question?
21     A.    I reviewed them in concert with the
22 coalition.
23     Q.    And did you review any of the discovery
24 that has been submitted in this case?
25     A.    Some of it, not all of it because that

Page 18

1 I received late as well.
2      Q.     And were you asked to produce any
3 documents to your lawyers?
4      A.     We were asked to produce documents and
5 we submitted those documents.
6      Q.     And when were those documents -- what
7 were the documents that were asked to be submitted and
8 when were they submitted?
9      A.     Minutes of our coalition meetings.
10 Well, any meetings regarding redistricting so those
11 included our coalition meetings.  Training, documents
12 regarding training that we had had regarding
13 redistricting, and any minutes that the South Carolina
14 State Conference executive committee may have
15 submitted regarding redistricting.
16      Q.     So were you asked to submit any documents
17 other than the minutes and these training materials that
18 you just mentioned?
19      A.     No.
20      Q.     And when did you submit these documents?
21      A.     I think we began the submission
22 Wednesday.
23      Q.     Okay.  But when were you asked to submit
24 them?  Were you asked to submit them on the day you
25 began the submission?

Page 19

1      A.     I think it was either Monday or -- it
2 was maybe Monday of this week.
3      Q.     Okay.  All right.  So before that time,
4 no one had asked you for any documents?
5      A.     No.
6      Q.     And no one had attempted to collect any
7 documents from you to your knowledge?
8      A.     What was that question again?
9      Q.     No one had collected any documents from
10 you to your knowledge?
11      A.     No.
12      Q.     Okay.  And from your organization.  Is
13 that correct?
14      A.     Yes.
15      Q.     And from this broader coalition?  To your
16 knowledge, were any documents asked to be collected from
17 this broader coalition if you know?
18      A.     I do know that because the minutes are
19 kept by our staff so, no, none were.
20      Q.     Okay.  All right.  And we've talked for a
21 few minutes but I always need to know a little bit about
22 the person I'm talking to.  Can you tell me, Ms. Murphy,
23 where are you from?
24      A.     I am a South Carolinian born in a
25 little town called Ridgeway, South Carolina but

Page 20

1 currently have lived most of my life here in Columbia.
2      Q.     Okay.  And so you were born in Ridgeway.
3 When did you move to Columbia?
4      A.     Six years old.
5      Q.     Okay.  All right.  And where do you
6 reside in Columbia?  What's your address?
7      A.     115 Saxonbury Drive, Columbia, South
8 Carolina.
9      Q.     Okay.  Do you know what House district
10 you reside in?
11      A.     Yes.
12      Q.     And what House district is that?
13      A.     77.
14      Q.     Okay.  And you know who the current
15 representative is for that House district?
16      A.     Yes, I do.
17      Q.     And who is that?
18      A.     Leon Howard.
19      Q.     Okay.  And you know Mr. Howard?
20      A.     Yes, I know him as a representative.  I
21 certainly do.
22      Q.     Okay.  Do you speak to him on a regular
23 basis?
24      A.     I wouldn't say I speak to him on a
25 regular basis.  Only as an as-need basis.

Page 21

1      Q.     Do you know other representatives who are
2 currently in the House of Representatives?
3      A.     Yes.
4      Q.     And who else do you know personally?
5      A.     I don't know any of them personally.
6      Q.     Okay.  Do you socialize with any of them?
7      A.     No.
8      Q.     Okay.  Do you meet with them on occasion?
9      A.     On an as-need basis.
10      Q.     Okay.  So let me ask this question.
11 Prior to the submission of this first complaint in
12 October of 2021, did you meet with any members of the
13 House of Representatives to discuss any redistricting
14 matters?
15      A.     No.
16      Q.     Okay.  All right.  Between the time that
17 that initial complaint was presented and the House and
18 Senate passed a plan, did you meet with any House
19 members of the House of Representatives?
20      A.     No.
21      Q.     Did not meet with them at all to discuss
22 redistricting?
23      A.     The only -- in terms of -- we've had
24 meetings.  I can think of one occasion where perhaps a
25 NAACP member that was a member -- that is also a

6 (Pages 18 - 21)

Brenda Murphy                                          February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 22

1  member of the NAACP participated in one of our
2  community meetings. I would say meetings with
3  presidents and members interested in attending. That
4  was the only occasion.
5      Q.     When you use the term "we", to whom do
6  you refer?
7      A.     I am talking about the coalition.
8      Q.     Okay. And who is this representative to
9  whom you refer?
10     A.     I --
11         MR. INGRAM: Objection. Asking for --
12  I'm going to instruct my client not to answer. That's
13  asking for the identity of a NAACP member.
14         MR. MOORE: I don't believe that's --
15  is that a privileged -- you're instructing your client
16  not to answer when I ask her who she met with. Is
17  that correct?
18         MR. INGRAM: The answer would reveal
19  the name of a member and a partial disclosure of a
20  membership list and we would be happy to submit a
21  motion under Federal Rules of Civil Procedure
22  30(b)(1) and there's Supreme Court case law, NAACP v.
23  Alabama that places precedent as a compelling sort of
24  prevention of this disclosure.
25         MR. MOORE: Well, then you're going to

Page 23

1  need to file a motion for protective order.
2      Q.     And so, Ms. Murphy --
3      A.     Yes.
4      Q.     -- have you met with any member of the
5  House of Representatives or have you been at any meeting
6  where a member of the House of Representatives, whether
7  they are or aren't a member of the NAACP, has attended
8  those meetings prior to the passage of the Senate and
9  House plans?
10     A.     Now, are you asking if I met --
11     Q.     I'm asking if you met or were at a
12  meeting when one of those House of Representatives
13  members attended?
14     A.     He attended -- the person attended as a
15  member of the NAACP. We are a non -- may I make a
16  comment?
17     Q.     Yes, ma'am.
18     A.     We are a nonpartisan organization,
19  nonprofit, and if there's anything that I do is make
20  sure that all discussions are nonpartisan. Any
21  discussion that we have, it is done in such a
22  manner -- we are concerned about the citizens, the
23  black citizens of this state and their -- ensuring
24  justice in terms of their rights.
25         There is no discussion about a

Page 24

1  political -- if somebody is there to talk politics in
2  a way, that is not acceptable. We do not consider it.
3  And the work that we do even in terms of redistricting
4  has been done in such a way that it's for the people
5  and we have not considered an incumbent.
6      Q.     This meeting that you refer to, where was
7  the meeting held?
8      A.     It was a Zoom meeting.
9      Q.     Okay. Were members of the public invited
10  to attend?
11     A.     It was for presidents of -- the
12  leadership of the branches throughout the state. It
13  included presidents and their members who wanted to
14  join the meeting.
15     Q.     And why was this representative there?
16     A.     He's a member of the NAACP.
17     Q.     Was this meeting open to all members of
18  the NAACP?
19     A.     It was.
20     Q.     Okay. Was it announced publicly to all
21  members of the NAACP?
22     A.     It was announced -- it was announced to
23  presidents and secretaries and they were to invite
24  members that wanted to attend.
25     Q.     And how many people attended this

Page 25

1  meeting?
2      A.     If I recall, approximately a hundred.
3  It may have been more but I know -- I know -- I would
4  say approximately a hundred.
5      Q.     And was redistricting discussed?
6      A.     We talked about redistricting, sharing
7  the maps -- mapping that had been done by the House
8  subcommittee, Senate subcommittee and feedback --
9  requested feedback from those individuals that were
10  present.
11     Q.     And when was this meeting?
12     A.     I don't have the minutes in front of
13  me. I don't know.
14     Q.     Were there minutes of that meeting kept?
15     A.     That was a coalition meeting. I
16  don't -- I don't think -- no, minutes were not kept
17  because that was a general meeting and it involved all
18  coalition members and it was basically for the
19  membership, the leadership and membership of the NAACP
20  to provide feedback regarding mapping.
21     Q.     So I've seen -- I saw produced late last
22  night a number of minutes of a number of meetings. Do
23  you keep minutes for all of the meetings of the
24  coalition that you just mentioned?
25     A.     We keep the minutes for our weekly

7 (Pages 22 - 25)

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 26

1 meetings. They are scheduled weekly. Sometimes we do
2 not meet dependent on the need but we have scheduled
3 meetings for the coalition weekly.
4    Q.    Do you keep minutes of those?
5    A.    Yes.
6    Q.    Okay. Were minutes kept of this meeting?
7    A.    No.
8    Q.    Can you tell me why minutes were not kept
9 of this particular meeting?
10   A.    Well, it really wasn't my -- my
11 meeting, the state conference meeting. It was more of
12 a meeting of the coalition to listen to the
13 membership.
14   Q.    What membership?
15   A.    The NAACP leadership, presidents from
16 throughout the state of South Carolina and their
17 members.
18   Q.    Were the members of your coalition also
19 invited? For example, were folks from the ACLU invited?
20   A.    Yes, it was -- yes, they were in
21 attendance as a matter of fact. They were there as --
22 and also receiving feedback because in terms of
23 mapping and recommendations for mappings, we have to
24 use our resources to help us with this because I don't
25 have the luxury of having the staff that can do the

Page 27

1 analytical work that needs to be done. So we have to
2 depend on our partners who have worked with us over
3 the years.
4            Redistricting is not a new initiative
5 for the South Carolina State Conference. It is
6 something that has been happening here for the -- at
7 least I can say the last thirty years. We have always
8 used resources. LDF and ACLU, AFL-CIO, others that I
9 could name that are participants and I think you have
10 a list of who our coalition is. We have worked
11 together for years when it comes to using them,
12 consulting with them as need be. So this is nothing
13 new that has happened this year.
14   Q.    I understand that, ma'am. I'm just
15 trying to figure out how many -- who all was in
16 attendance. For example, were some of the lawyers who
17 are with you today, were they in attendance at that
18 meeting?
19   A.    Yes. I just stated they were.
20   Q.    Okay. And I've seen a number of minutes
21 and we're going to get to those in a little bit. And
22 those minutes reflect everyone who is in attendance
23 whether they are or aren't a member of the NAACP. Is
24 that right?
25   A.    Yes.

Page 28

1    Q.    Okay. I'm wondering why there were no
2 minutes of this particular meeting.
3    A.    Well, I guess, as you asked, were some
4 of the lawyers or I would refer to them as our
5 partners that have been associated with us for years
6 in terms of providing information not only for this,
7 in terms of redistricting but, you know, assisting
8 during the time of COVID in terms of providing
9 supplies to us, providing information to us as we
10 educate our members and communities regarding in this
11 case what redistricting is all about, what it means,
12 the importance of being involved as members of the
13 community.
14           So, yes, they were there and, yes, they
15 have been there since the coalition was formed and
16 they were invited because of their resourcefulness in
17 terms of having some of the tools that we don't have,
18 as I said earlier, in terms of the analytics that
19 relate -- regarding mapping, assisting with the
20 interpretation --
21   Q.    I hate to cut you off but that really
22 isn't responsive to my question. My question was simply
23 this. You have minutes from a number of other meetings.
24 Who made the decision that you weren't going to have
25 minutes for this meeting and who made the decision that

Page 29

1 those minutes would not identify this legislator that
2 you refuse to identify?
3    A.    Minutes were not even discussed as
4 being an option because this was an open forum.
5    Q.    Open to -- when you say it was an open
6 forum, could I have attended?
7    A.    Well, if you wanted to, yes.
8    Q.    Okay. So I could have attended?
9    A.    Yes.
10   Q.    I'll come back to this in a minute. So
11 let me ask you this. Do you vote?
12   A.    Do I what?
13   Q.    Do you vote?
14   A.    Yes, I vote.
15   Q.    Okay. And how many elections would you
16 say you voted for since 2000?
17   A.    I voted in every election.
18   Q.    Okay. And do you make political
19 contributions?
20   A.    No.
21   Q.    Okay. Are you affiliated with a
22 particular political party?
23   A.    Sir, whenever -- do I -- no, I don't
24 say whether I am an affiliate of any party. No, I do
25 not.

8 (Pages 26 - 29)

Brenda Murphy
The South Carolina State Conference vs. McMaste,

Page 30

1　Q.　Okay.　How do you typically tend to vote?
2　Do you tend to vote more for the Democratic Party or the
3　Republican Party?
4　A.　I vote for the person that's going to
5　represent my needs in -- and is reflective of what the
6　needs of my community is.
7　Q.　Okay.　But that doesn't really answer my
8　question.　Do you tend to vote more for candidates of
9　one party over another?
10　MR. INGRAM:　Objection.　Relevance.
11　Q.　Okay.　You may answer.
12　A.　My answer is the same.　I do not vote
13　and I have not counted the number of times that I
14　voted democratic or republic.　My vote is for the best
15　person that serves the needs of the community.
16　Q.　Have you voted for a Republican candidate
17　in any presidential election since 2000?
18　MR. INGRAM:　Objection.　Outside the
19　scope.　She's not a personal plaintiff.　She's a
20　president of NAACP South Carolina branch.
21　Q.　You may answer, Ms. Murphy.　Ms. Murphy,
22　I need an answer from you.
23　A.　My vote for president has been
24　Democratic.
25　Q.　Okay.　Have you voted for any Republican

Page 31

1　candidate for governor since 2000?
2　MR. INGRAM:　Objection.
3　A.　May I ask a question?
4　Q.　No, ma'am.　Oh, you may ask a question to
5　me, yes, ma'am.
6　A.　This hearing is about the South
7　Carolina State Conference and its work regarding
8　redistricting.　How is the way that I vote related to
9　redistricting?
10　Q.　I'm not going to answer that question.
11　You can ask me questions about process.　I posed a
12　question to you.　Have you voted for any Republican
13　candidate for governor since 2000?　Could you please
14　answer --
15　MR. INGRAM:　Objection.　Asked and
16　answered.
17　MR. MOORE:　I've never gotten an answer,
18　Mr. Ingram.
19　Q.　Could you please answer my question,
20　Representative Murphy -- Ms. Murphy?
21　MR. INGRAM:　I'm going to instruct my
22　client not to answer.
23　MR. MOORE:　On what basis?　Are you
24　instructing your client not to answer on the basis that
25　it's privileged?

Page 32

1　MR. INGRAM:　She is a representative in
2　the capacity of the South Carolina State Conference, not
3　individual plaintiff.　Your questions are beyond the
4　scope.
5　MR. MOORE:　Okay.　So you're instructing
6　her not to answer --
7　MR. INGRAM:　Correct.
8　MR. MOORE:　-- so I'm clear?
9　MR. INGRAM:　Correct.　She does not have
10　to disclose her personal political preferences for the
11　scope of this litigation.
12　MR. MOORE:　Well, I guess that's a
13　question the Court will have to answer because you're
14　going to need to file a protective order motion.
15　Q.　So what do you do for a living, Ms.
16　Murphy?
17　A.　I am a retired nurse.
18　Q.　Okay.　And can you tell me a little bit
19　about your educational background?　Where did you go to
20　school?
21　A.　I received my bachelor's degree and my
22　master's degree from the University of South Carolina,
23　the Columbia campus.
24　Q.　And when did you graduate?
25　A.　In --

Page 33

1　Q.　To the best of your recollection.
2　A.　I can tell you when I graduated.
3　Q.　Okay.
4　A.　I graduated in 1975.
5　Q.　Okay.　And as a nurse, did you work --
6　what sort of work -- did you work in a hospital?　Did
7　you work in a doctor's office?　What sort of work did
8　you do?
9　A.　I worked for the veterans of this
10　country.　I am a retired Department of Veterans
11　Affairs nurse working primarily starting as a clinical
12　nurse and my last position was associate chief nurse.
13　Q.　And so did you work at the Veterans
14　Administration Hospital here in Columbia?
15　A.　I worked at the VA hospital here in
16　Columbia, Brooklyn, New York, New York City, and
17　Charleston, South Carolina.
18　Q.　Okay.　And so when you were working in
19　Brooklyn, did you live in Brooklyn, Ms. Murphy?
20　A.　Yes, I did.
21　Q.　And so how long did you live in Brooklyn?
22　A.　I was in Brooklyn I think it was four
23　years.
24　Q.　Okay.　And I hate to ask a lady her age
25　so I'm not going to ask you your age but about how many

9 (Pages 30 - 33)

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 34

1 years would you say you've lived in the state of South
2 Carolina? Just give me a ballpark.
3     A.    Most of my life. All but -- in South
4 Carolina, all but five years.
5     Q.    Okay. And have you lived in any other
6 area of South Carolina other than Columbia? You
7 mentioned Charleston. Did you live in the Charleston
8 area for a time?
9     A.    Yes, I did.
10    Q.    Okay. And how long did you live there?
11    A.    Nine years.
12    Q.    Okay. And are you married, Ms. Murphy?
13    A.    Yes, I'm married. And let me just add
14 also, I served as -- in the U.S. Army Nurse Corps
15 reserve unit.
16    Q.    Yes, ma'am. And what does your husband
17 do? Is he also retired?
18    A.    He's retired.
19    Q.    Okay. And where is he from?
20    A.    Here in Columbia, South Carolina.
21    Q.    Okay. And do you have any children?
22    A.    I have three children. Yes.
23    Q.    Okay. And do they live in the Columbia
24 area or do they live elsewhere?
25          MR. INGRAM: Objection.

Page 35

1     Q.    You may answer, Ms. Murphy.
2     A.    Yes, all in Columbia.
3     Q.    Okay. And so what areas of the state of
4 South Carolina would you say you're familiar with?
5     A.    All of them.
6     Q.    Okay. And how long have you been a
7 member of the NAACP?
8     A.    Since nineteen eighty -- around 1985.
9 I'm thinking '85.
10    Q.    And how long have you been in the role of
11 the president of the NAACP?
12    A.    Four years.
13    Q.    Okay. Prior to that time, did you serve
14 in any sort of leadership role?
15    A.    I was the advisor for the youth and
16 college division.
17    Q.    Okay. Are you a member of any other
18 organizations?
19    A.    I am.
20    Q.    Can you tell me the other organizations
21 that you are a member of?
22    A.    I am a member of (unintelligible).
23          (Court reporter clarification.)
24    A.    The Order of Eastern Stars.
25    Q.    Yes, ma'am. What others?

Page 36

1     A.    The Daughters of South Carolina. The
2 Golden Circle. These are all Prince Hall affiliated
3 Masonic Orders.
4     Q.    Yes, ma'am.
5     A.    I am a member of the American Nurses
6 Association, the South Carolina Nurses Association.
7 Also Chi Eta Phi Nursing Sorority. I'm a founding
8 member of that sorority. Those are the primary ones.
9     Q.    And so do you know how many members the
10 South Carolina State Conference of the NAACP has
11 currently?
12    A.    Approximately thirteen thousand.
13    Q.    Okay. And how does one become a member?
14    A.    You simply become a member by -- if you
15 desire to join, then you just complete an application.
16    Q.    Okay. Do you have to pay dues or
17 anything of that nature?
18    A.    Yes. Dues are required.
19    Q.    Okay. And what are the dues?
20    A.    There is a thirty dollar cost for an
21 annual membership. You can also buy -- purchase a
22 lifetime membership.
23    Q.    Okay. What's the cost of the lifetime
24 membership, Ms. Murphy?
25    A.    There are three different categories.

Page 37

1 Well, Junior Life is one you have to purchase before
2 moving up to Diamond and Silver. I would say the cost
3 would be -- a member without having to pay any other
4 dues is six hundred -- seven hundred and fifty
5 dollars.
6     Q.    Okay. And when you say this approximate
7 thirteen thousand figure, that's -- those are folks who
8 are members of the South Carolina State Conference of
9 the NAACP. Is that right?
10    A.    Yes. We are a conference of branches
11 so the branches make up the membership of the state
12 conference. So branches that are located in the
13 different counties, that's -- our membership comes
14 from those branches. So it's a conference of
15 branches. So within that conference of branches, it's
16 approximately thirteen thousand members, yes.
17    Q.    Is the state conference somehow related
18 to the national conference of the NAACP?
19    A.    Yes, we are.
20    Q.    Okay. And could you explain that
21 relationship to me?
22    A.    Organizationally, they have oversight
23 of the South Carolina State Conference. So is that
24 clear?
25    Q.    Yes, ma'am.

10 (Pages 34 - 37)

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 38

1    A.    Okay.
2    Q.    And what's the relationship between the
3   national conference of the NAACP and the Legal Defense
4   Fund if you know?
5    A.    They are two separate organizations.
6    Q.    Okay.  Do they work together if you know?
7    A.    They do work -- I wouldn't say they
8   work together on everything but they do work together.
9   And I'm not able to say how the national and the
10  national LDF, how they work together.  You know, my
11  association is primarily with the -- here at the state
12  level so that would need to be something that would
13  need to be clarified regarding how they work together
14  by the national and the national office of LDF.
15   Q.    Okay.  And you mentioned earlier that you
16  consider your organization to be nonpartisan.  Is that
17  right?
18   A.    That's right.
19   Q.    Okay.  Explain that.  Why do you consider
20  your organization to be nonpartisan?
21   A.    We do not engage in political
22  activities with one particular party.  We do not
23  advocate for one party or the other.  It's just not a
24  part of our agenda.
25   Q.    Does your organization -- and I'm

Page 39

1   referring to the South Carolina State Conference of the
2   NAACP.  Do you endorse candidates in --
3    A.    No.
4    Q.    You do not?
5    A.    No, we do not.  No.
6    Q.    Have you ever gone to -- do you support
7   particular candidates?
8    A.    No, I do not.
9    Q.    Okay.  Have you ever gone to a campaign
10  rally for a particular candidate?
11       MR. INGRAM:  Objection.
12   A.    No.
13   Q.    You may answer, Ms. Murphy.
14   A.    No.
15   Q.    Okay.  All right.  And so have you
16  reviewed your organization's responses to our -- have
17  you reviewed your objections and responses to our first
18  set of request for admissions?
19   A.    No.
20   Q.    Okay.  So I'm going to put a document up
21  on the screen.
22       (Whereupon, Defendant's
23       Exhibit 1 was marked for
24       identification.)
25       MR. MOORE:  Let's put up Exhibit Number

Page 40

1   1, Ms. Rabon.  I don't see it.  Is it up?
2        MR. INGRAM:  We're refreshing now.  Let's
3   see if it loads on the platform.
4        MR. MOORE:  Who's on for Veritext?
5        MR. INGRAM:  It popped up on our end.
6        MR. MOORE:  It has?  You do have it?
7        MR. INGRAM:  Exhibit 1.
8    Q.    Take a look at that document, Ms. Murphy.
9   Have you ever seen that document before?  Have you seen
10  that document, Ms. Murphy?
11   A.    I'm reviewing it now.
12   Q.    Yes, ma'am.
13   A.    I'm looking at it.  This is request for
14  documents?
15   Q.    It's an objection to a request for
16  documents.
17       MR. PARENTE:  I don't see it on that big
18  screen.
19       MR. INGRAM:  This is actually objection
20  to the first set of request for admissions.
21       MR. MOORE:  That's correct.
22       MR. INGRAM:  Not documents.
23   Q.    Have you seen this document before, Ms.
24  Murphy?
25       MR. MOORE:  You're correct, Mr. Ingram.

Page 41

1   Thank you.
2    A.    Okay.  Now --
3        MR. INGRAM:  Is there a specific portion
4   of the document that Ms. Murphy should be looking at?
5        MR. MOORE:  Well, I've asked the question
6   first of all if she's ever seen the document.  I would
7   like a response to that question and then I will point
8   her to a particular portion.
9    A.    Okay.  I can't say -- I've had so many
10  documents, I can't say that I have not, okay.  So is
11  there a particular area that you want --
12   Q.    I'm about to focus you there as soon as I
13  got a response to my question.  If you could turn to
14  page 8.
15   A.    Page 8.  Okay.  I'm on page 8.
16   Q.    Okay.  Do you see request number six?
17  And are you looking at a hard copy document or are you
18  looking at the document on the screen?
19   A.    On the screen.
20   Q.    Okay.  All right.  And so where it says
21  request number six, do you see that?
22   A.    Yes.
23   Q.    Okay.  It says admit the SCNAACP's
24  federal employee identification number is 23-7028846.
25  And there's an objection.  Do you know if that is the

11 (Pages 38 - 41)

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 42

1  SCNAACP's EIN number?
2      A.    I provided the EIN number.
3      Q.    You provided -- so what is the EIN number
4  that you provided, Ms. Murphy?
5      A.    I don't have that directly in front of
6  me.
7      Q.    Well, if you flip over to the next page,
8  page 9, it says that that is admitted.  Do you see that?
9      A.    Okay.  Just one second.  Page 9?
10     Q.    Yes, ma'am.
11     A.    Okay.
12     Q.    Do you see that?
13     A.    Okay.  Admit -- we submitted it.  Now I
14  see that other number.  That's different, isn't it?
15  I'd have to scroll back to look at that but we
16  provided that number that was requested.
17     Q.    Let me ask you this question.  What's the
18  official name of your organization?
19     A.    The South Carolina State Conference --
20  NAACP South Carolina State Conference of Branches.
21     Q.    Okay.  And where was it established?
22     A.    It was established in 1939.
23     Q.    And when was it established?
24     A.    I think it's April, March or April.
25     Q.    And do you agree that your request for

Page 43

1  admission, it meant that the SC NAACP is unincorporated,
2  it is an association as well as a 501(c)(4 organization
3  and that its employment identification number is the
4  number that we just saw?  You see that on the site.  Is
5  that right, Ms. Murphy?
6      A.    I'm looking at page 9 and what my
7  statement is I can't validate that without looking at
8  the number.  I don't know it by, you know -- I just
9  can't tell you what it is but I will say that we
10  provided the EIN number for the state conference.
11     Q.    Okay.  Well, if you look at page 8 and
12  page 9 together, would you agree with me that it admits
13  that the EIN number is 23-7028846?
14     A.    I will have to validate the number.  I
15  will say this, that our EIN numbers, we don't generate
16  them.  Our EIN numbers are provided to us by the
17  national office.
18     Q.    I understand that, ma'am.  It's a very
19  simple question.  The request to admit that has been
20  filed by your organization admit that that is your EIN
21  number based on this document, correct?
22     A.    I will admit that the number that I
23  gave to -- when it was requested was the EIN number of
24  record.
25     Q.    Well, but you would agree with me that

Page 44

1  this document that I put before you says that the NAACP
2  admits that its EIN number is 23-7028846.  That's what
3  this document says, does it not?
4      A.    The documents states that, yes.
5            (Whereupon, Defendant's
6            Exhibit 2 was marked for
7            identification.)
8      Q.    All right.  So let's put up Exhibit
9  Number 2 and let us know when it's on your screen.  Is
10  it you on your screen yet?
11     A.    No.
12            MR. MOORE:  Erin, are you on?
13            MR. INGRAM:  Give us one second.
14            MR. PARENTE:  You may need to refresh
15  after he introduces it.
16            MS. RABON:  Technical difficulties.  It's
17  showing up in the marked exhibit folder.
18     A.    Okay.  What would you like me to look
19  at it?
20     Q.    Do you see it now?  Is it on your screen?
21     A.    Yes.
22     Q.    Okay.  Have you seen this document
23  before, Ms. Murphy?  It's a document we sent to your
24  counsel several days ago.
25     A.    Okay.  Okay.  What do you want me to

Page 45

1  look at?
2      Q.    Well, do you know if you have seen this
3  document before is my first question?
4      A.    We file this report annually.
5      Q.    Okay.  All right.  And it says South
6  Carolina State Conference of the NAACP and it lists you
7  as the registered agent.  Is that right?
8      A.    Yes, my name is there.
9      Q.    And it lists you at 611 North Main
10  Street.  Is that the office of the South Carolina State
11  Conference of the NAACP?
12     A.    It is.
13     Q.    Okay.  And it lists a federal employers
14  identification number as 57-0327661.  Do you see that?
15     A.    Yes.
16     Q.    Okay.  Can you explain to me why that
17  document lists a different EIN number than the
18  23-7028846 document that your attorneys have admitted is
19  your EIN number?
20     A.    What date is on this report?  I'm
21  looking to see a date.
22     Q.    I believe if you look at the bottom of
23  the page it says filed on 6/10/2021.
24     A.    Okay.  This is a report that our
25  treasurer files.  Now the one thing -- as I have said

12 (Pages 42 - 45)

Brenda Murphy
February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 46

1 before, the number that we gave you was the one that
2 we've been given by the national office, this one,
3 and, you know, I have to defer to the national office
4 in terms of the response to this because I do know
5 there was a change in our EIN number and it may have
6 been after this report was filed. That's the only
7 answer I can give to that.
8    Q.    When was that change?
9    A.    I can't give you an exact date.
10    Q.    Okay. Can you tell me as you sit here
11 today what is the correct EIN number?
12    A.    Yes. The number, the number, most
13 recent number that was given to -- reported as being
14 our EIN number was the most recent number given to us
15 by the national office as our EIN number.
16    Q.    And what number is that? And you keep
17 looking at Mr. Ingram. What number --
18    A.    I'm looking because I think I said
19 several times I cannot confirm which one of those two
20 numbers is -- I know the one that was given is the one
21 that's correct.
22    Q.    But as you sit here today, you can't tell
23 me if the 57 or the 23 number is the correct one. Is
24 that right or wrong?
25        MR. INGRAM: Objection. Asked and

Page 47

1 answered.
2    Q.    Please answer my question, Ms. Murphy.
3    A.    If you will allow me, since I'm in my
4 office, to give you the most recent number we were
5 given, then I can answer that question.
6    Q.    My question to you right now is as you
7 sit here right now, can you tell me if the 57 number is
8 correct or the 23 number --
9        MR. INGRAM: Object to the form.
10    A.    No, I cannot. No, I cannot.
11    Q.    Okay. Thank you. So has your agency
12 previously been involved in a litigation against the
13 House of Representatives or any member or any officer of
14 the House of Representatives?
15    A.    I can't answer that question.
16    Q.    You can't answer it because --
17    A.    Not since I have been president.
18        (Simultaneous crosstalk.)
19    Q.    I'm sorry. I'm sorry. I'm talking over
20 you and I need to stop. Please answer the question.
21    A.    Not as I have been president.
22    Q.    Okay. All right. So I want to talk
23 about this lawsuit. I mean you are the president of
24 this organization. Is that right?
25    A.    Yes.

Page 48

1    Q.    The South Carolina State Conference of
2 the NAACP. Can you tell me why you decided to sue
3 Speaker Lucas, Chairman Murphy, and Chairman Jordan over
4 the House plans?
5    A.    Because of -- and it wasn't just I. It
6 was the coalition's decision that we were very
7 concerned that the mapping that was approved was
8 detrimental to black voters.
9    Q.    How?
10    A.    In terms of representation. In terms
11 of how the vote -- the influence of the vote has been
12 minimized. It has created a situation where there is
13 the potential for less representation by black
14 individuals.
15        When we look at the numbers,
16 potentially we had -- there were opportunity districts
17 that no longer exists. We have black -- where there
18 are black representatives, you know, we have -- we now
19 have -- those have been -- some of those districts
20 have been combined and we're looking at even a further
21 decrease in the opportunity for an African American or
22 a black person to be a representative for their
23 constituents, their communities.
24    Q.    Okay. I'm going to get into the
25 specifics in a moment but you decided to sue before the

Page 49

1 maps were even passed. Is that right?
2    A.    No.
3    Q.    Your organization sued in October of this
4 year before the House and the Senate passed maps in
5 December, correct?
6    A.    That was due to timeliness.
7    Q.    My question was were you involved in that
8 decision to bring that first lawsuit?
9    A.    That was a decision of the coalition.
10    Q.    My question was were you involved in that
11 decision, Ms. Murphy?
12    A.    As a member of the coalition, I was.
13    Q.    Okay. The coalition is not a named
14 plaintiff here. However, it's South Carolina State
15 Conference of the NAACP and Taiwan Scott were the named
16 plaintiffs, correct?
17    A.    That's correct.
18    Q.    Okay. Do you know Taiwan Scott?
19    A.    No, I don't personally.
20    Q.    Okay. And so why was it decided that the
21 South Carolina State Conference of the NAACP was the
22 plaintiff and not this coalition?
23    A.    Well, the South Carolina State
24 Conference was the initiator or first coalition. So
25 in terms of I guess playing a leading role, the South

13 (Pages 46 - 49)

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 50

1 Carolina State Conference did. We have membership
2 throughout the state of South Carolina, and because of
3 the concerns that we heard from our membership
4 throughout the state, it was something we watched very
5 carefully in terms of how mapping was done and the
6 concerns of our membership.
7      Q.   But again you made the decision to file
8 before the mapping was completed, correct?
9           MR. INGRAM: Objection. Asked and
10 answered.
11     Q.   Please answer my question, Ms. Murphy.
12     A.   I repeat the same answer. The filing
13 before the mapping was completed, it was related to a
14 different issue. It was regarding timeliness of the
15 committee to do its work.
16     Q.   Who is funding this litigation for you?
17     A.   No one.
18     Q.   Who is paying for it?
19     A.   There has been no cost associated that
20 I have knowledge of. No one has given me a price or a
21 cost for this litigation.
22     Q.   Well, I mean your organization --
23 and I'm getting there. I'm going to get there in a
24 minute but your organization submitted a number of maps,
25 is that right, for consideration?

Page 51

1      A.   We did submit a map as well as other
2 people. So, you know, our concern is more in terms of
3 the map being reflective of feedback given at the
4 hearings. There were hearings. You know, in terms of
5 individuals being able to participate in the hearings,
6 you know, I have concerns about that but --
7      Q.   But that isn't my question.
8      A.   Okay.
9      Q.   My question is simply this. Someone had
10 to pay for an expert to draw these maps. Who paid for
11 the expert to draw these maps?
12     A.   We did not -- we did not pay for
13 experts to draw these maps. As a matter of fact, I
14 think I shared with you, when we came together, it was
15 basically with our partners, our affiliates that we've
16 been involved in over the years in terms of this
17 redistricting process and we utilize the resources
18 available to assist with the drawing of the maps at no
19 cost to us.
20     Q.   So let me ask you this question. Are you
21 familiar with the fact that there are five experts who
22 have submitted expert reports in this case?
23     A.   I don't know what you mean.
24     Q.   Well, there are five experts who
25 submitted expert reports who apparently plan to be

Page 52

1 expert witnesses in this case. Are you familiar with
2 that?
3      A.   No, I'm not.
4      Q.   Okay. Do you know how much those experts
5 charge?
6      A.   No, I do not.
7      Q.   Okay. And do you know who is paying
8 them?
9      A.   No, I do not.
10     Q.   Okay. It's not your agency? It's not
11 your branch? Is that correct?
12     A.   No. No.
13          MR. MOORE: We've been going for almost
14 an hour and fifteen minutes. Let's take about a
15 five-minute break, okay?
16          MR. INGRAM: Sounds good.
17          (Brief recess.)
18     Q.   (BY MR. MOORE:) Ms. Murphy, did you talk
19 to your counsel during the break?
20     A.   General conversation. Nothing about
21 this.
22     Q.   You didn't talk about the substance of
23 your testimony. Is that right?
24     A.   No, I did not.
25     Q.   So with respect to the timing issues,

Page 53

1 you're aware that the census data came out late. Is
2 that right?
3      A.   Yes, I'm aware of the date that it came
4 out.
5      Q.   And you're aware that the late release of
6 that data, it has affected redistricting. Is that
7 right?
8      A.   That was a factor I'm told.
9      Q.   Okay. And you're aware the Census Bureau
10 releases its data every ten years. Is that right?
11     A.   Yes.
12     Q.   And it releases that data to the state
13 after it conducts its census. Is that right?
14     A.   Yes.
15     Q.   And states must use that data to properly
16 apportion new legislatures. Is that correct?
17     A.   Yes.
18     Q.   Okay. And you understand that the
19 redistricting process takes some period of time to
20 gather public input and have lawmakers propose districts
21 with respect to redistricting. Is that right?
22     A.   Yes.
23     Q.   Okay. And you actually attended several
24 of the public hearings on the House districts. Is that
25 right?

14 (Pages 50 - 53)

Page 54

1    A.    Yes, I did.
2    Q.    How many hearings did you attend?
3    A.    Two -- I think two in person, one
4 virtually.
5    Q.    Okay.  Where were the two in persons?
6    A.    Columbia.
7    Q.    And do you understand that there's a lag
8 period between the release of the census data and the
9 enactment of properly apportioned maps every ten years?
10 Is that right?
11    A.    I understand.  Yes.
12    Q.    Okay.  So would you agree with me that
13 the lawsuit that was brought in October was premature?
14    A.    No, I will not agree with that.
15    Q.    Okay.  What was the purpose of it?
16    A.    As you probably recall, there were --
17 the House was not in session for some periods during
18 that time.
19    Q.    Well, at the time that that lawsuit was
20 filed, the House had begun the process of having public
21 meetings around the state, had it not?
22    A.    It had started but it still was
23 delayed.
24    Q.    Why was the filing of the lawsuit
25 necessary?

Page 55

1    A.    To protect the rights of the people in
2 terms --
3    Q.    I'm sorry.  Please continue.
4    A.    In terms of having adequate time to
5 know who candidates would be for their respective
6 districts and to learn or to understand what their
7 platform is all about, would be all about.
8    Q.    Would you agree that that complaint was
9 mooted by the amended complaint that was filed in
10 December of 2021?
11    A.    It was amended, yes.
12    Q.    Okay.  My question was, was it mooted in
13 your view?
14         MR. INGRAM:  Objection.  Calls for a
15 legal conclusion.
16    Q.    You may answer, Ms. Murphy.
17    A.    Would you -- I'm not an attorney so
18 would you explain what that means, please?
19    Q.    Did you believe that the complaint was
20 any longer operative or needed to be acted on by the
21 Court in any way?
22         MR. INGRAM:  Objection.  Calls for a
23 legal conclusion.
24    Q.    Please continue, Ms. Murphy.
25    A.    I would say no.

Page 56

1    Q.    No relief was granted under that initial
2 complaint, correct?
3    A.    Somebody is talking and I can't
4 understand you.
5         (Off-the-record discussion.)
6    A.    Okay.  Would you restate that, please?
7    Q.    I said there was no relief granted under
8 the initial complaint, right?
9    A.    No.  No.
10    Q.    And so with respect to the amended
11 complaint that was filed on December 23, 2021, did you
12 review that complaint before it was signed?  You
13 personally, Ms. Murphy?
14    A.    We reviewed it as a coalition before
15 any signature was placed on it.
16    Q.    Okay.  Were you one of the people who
17 reviewed it as a coalition?
18    A.    Yes.
19    Q.    Okay.  And do you know about how long
20 after the enactment of Act Number 117 did you file the
21 amended complaint?
22    A.    I'm not looking at the dates.  I can't
23 tell you that.
24    Q.    Would you disagree with me if I told you
25 that the act was signed into law on December 10th and

Page 57

1 you didn't file an amended complaint until December 23rd
2 around midnight?
3    A.    Yes.
4    Q.    You would agree with that?
5    A.    Yes.
6    Q.    Can you tell me why it took so long after
7 the amendment of the new House districts to file an
8 amended complaint?
9    A.    Well, we have to -- we had to evaluate
10 the mapping that had been submitted in terms of were
11 there any -- was there consideration given to
12 testimony that was provided by individuals at the
13 hearings, which was much, and to make an informed
14 decision about was there still impact on those
15 opportunity districts.
16    Q.    Well, so isn't one of your organization's
17 stated concerns about delay in the enactment of maps?
18    A.    Please clarify.
19    Q.    Hasn't your organization taken the
20 position that the map drawing process and then the
21 review of those maps through the litigation period has
22 taken too long?
23         MR. INGRAM:  Objection.  Asked and
24 answered.
25    Q.    You may answer, Ms. Murphy.

15 (Pages 54 - 57)

Brenda Murphy                                February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 58

1    A.    Yes, in terms of the completion of
2  those maps and time to review those maps, that was
3  affected by the delay in the processes of getting
4  those maps -- the maps completed, yes.
5    Q.    Well, but the longer it takes -- your
6  organization was concerned about litigation and the
7  delay that it would take for litigation to be complete.
8  That's one of the positions they took. Is that correct
9  or incorrect?
10    A.    Yes.
11    Q.    Okay. And the longer it takes you to
12  file documents in court means longer delay. Correct or
13  incorrect?
14        MR. INGRAM: Objection. Argumentative.
15    Q.    Please answer, Ms. Murphy.
16    A.    I will answer it takes time for maps to
17  be reviewed after they were completed and submitted in
18  terms of evaluating what has been actually changed
19  about -- what has changed about those maps. It takes
20  time to do that.
21    Q.    Okay.
22    A.    And that's all a part of this process
23  and why it's important that things are done in a
24  timely manner.
25    Q.    All right. So I'm going to -- I'm about

Page 59

1  to ask you a question and I don't want -- I don't want
2  you to share with me any information that your lawyers
3  have provided to you but I want to ask you this
4  question. The amended complaint alleges purposeful
5  racial discrimination on the part of the House of
6  Representatives. Is that right?
7    A.    I will say the outcome of the maps
8  indicate that there was discrimination in terms of
9  black voters and the opportunity for black voters
10  to -- opportunity to be in that process of the
11  districts in terms of it being competitive.
12    Q.    Well, I didn't ask you a question about
13  competitive. Okay. I asked you a very simple question.
14  An allegation in this complaint is that in drawing
15  certain districts, the House of Representatives engaged
16  in purposeful racial discrimination. That's an
17  allegation that your organization has made, is it not?
18    A.    When you look at the outcome of the
19  maps, that would be the opinion.
20    Q.    Ma'am, I asked you a very simple
21  question. Is it a yes or no? You can answer.
22        MR. INGRAM: Objection. Asked and
23  answered.
24    Q.    Did your organization allege --
25    A.    Yes.

Page 60

1    Q.    -- that there was purpose -- all right.
2  So I would like to you to tell me what evidence you had
3  before you when you filed this amended complaint that
4  the House of Representatives had engaged in purposeful
5  racial discrimination?
6        MR. INGRAM: Objection. Asked and
7  answered.
8        MR. MOORE: I don't believe that's been
9  asked and answered, Mr. Ingram.
10    Q.    Can you please answer the question, Ms.
11  Murphy?
12    A.    I will restate what I said previously.
13  When you look at the outcome, the opportunity for
14  black people to have -- at least participate in a
15  district are fewer districts now that actually are
16  competitive was reduced.
17    Q.    Are you telling me that just looking at
18  the outcome is the only evidence that you have in front
19  of you to support the allegation that there was
20  purposeful racial discrimination?
21        MR. INGRAM: Objection. Argumentative.
22    Q.    Please answer my question, Ms. Murphy.
23    A.    There are more factors that we look at,
24  not just in terms of discrimination. When we say
25  discrimination, you have to look at outcomes in terms

Page 61

1  of the overall -- in terms of how the maps was done
2  and the opportunity for black people to at least have
3  an opportunity or be in a competitive district was
4  reduced. That is my answer.
5    Q.    Okay. Well, I'm going to ask it again
6  because you have not answered my question. I would like
7  you to tell me what specific evidence you have in front
8  of you that the members of the House of Representatives
9  who passed this legislation engaged in purposeful,
10  because that's the word that you use, purposeful racial
11  discrimination?
12        MR. INGRAM: Objection. Asked and
13  answered.
14    Q.    Please answer my question, Ms. Murphy.
15    A.    My answer is the same.
16    Q.    Okay. So can you identify any specific
17  evidence that you had in front of you that the House of
18  Representatives engaged in purposeful racial
19  discrimination?
20        MR. INGRAM: Objection. Asked and
21  answered.
22    Q.    Please answer my question, Ms. Murphy.
23    A.    My answer is the same.
24    Q.    Can you -- as we sit here today, can you
25  tell me a specific piece of evidence that you relied on

16 (Pages 58 - 61)

Page 62

1 to make the allegation that the House of Representatives
2 engaged in purposeful racial discrimination?
3          MR. INGRAM:  Objection.  Badgering the
4 witness.  Asked and answered.
5          MR. MOORE:  I'm not getting any answer to
6 my question, Mr. Murphy (sic).  You can object to the
7 form, okay, as is appropriate under our rules.
8     Q.    I'm going to ask the question again.  Ms.
9 Murphy, do you have any specific evidence upon which you
10 relied to make the allegation of purposeful racial
11 discrimination?  I think I've given you several
12 opportunities to provide me with a piece of information.
13 I haven't heard any so I'm going to give you one final
14 opportunity and I'm going to move on.
15          MR. INGRAM:  Objection.  Asked and
16 answered and badgering the witness at this point.
17     Q.    You may answer, Ms. Murphy.
18     A.    I am going to say again we have to look
19 at outcomes, and when you look at the mapping that is
20 present, there is decreased opportunity --
21 opportunities for black people that are black to -- in
22 terms of districts competitive -- to be -- to run
23 competitively in competitive districts.
24     Q.    All right.  Do you know any of the
25 members of the ad hoc committee who served in this

Page 63

1 matter?
2     A.    No, I do not.
3     Q.    Okay.  Do you know --
4     A.    I know -- may I -- I know
5 representatives.
6     Q.    So do you know, for example, Beth
7 Bernstein who is a representative in the Columbia area?
8 Do you know her?
9     A.    No.  Only as a representative.
10     Q.    Okay.  Have you ever spoken to her if you
11 know?
12     A.    No, I have not.
13     Q.    Okay.  Do you know Representative Pat
14 Henegan?
15     A.    Only as a representative.
16     Q.    Okay.  Have you spoken with her?
17     A.    No, I have not.
18     Q.    Okay.  Do you know Representative Justin
19 Bamberg?
20     A.    No, I do not.  Only as a
21 representative.
22     Q.    Have you ever spoken to him?
23     A.    No, I have not.
24     Q.    Okay.  Do you have any information in
25 front of you which would lead you to conclude that those

Page 64

1 three members would be party to engaging in purposeful
2 racial discrimination?
3     A.    Sir, I can't read the minds of those
4 individuals.  I only can look at the outcome in terms
5 of the mapping and the results of who it has -- will
6 impact, not has the potential but will impact and that
7 is people that are black.
8     Q.    And do you know if Representative Henegan
9 is African American?
10     A.    I know she's African American, yes.
11     Q.    Do you know if Mr. Bamberg is African
12 American?
13     A.    I know he's African American.
14     Q.    All right.  And --
15     A.    Also incumbent.
16     Q.    And the person who attended this meeting
17 that you refuse to name, was that person an incumbent?
18     A.    Yes.
19     Q.    Okay.  Is it Representative Jerry Govan?
20          MR. INGRAM:  Objection.  Not going to
21 disclose membership lists or names.
22          MR. MOORE:  Well, Mr. Ingram, just so you
23 know, the documents that you provided us in discovery
24 last night and I'm going over them at the end of this
25 deposition, they provide us names and identifications of

Page 65

1 members of the South Carolina State Conference of the
2 NAACP.  So I do not believe that that is a valid
3 objection.
4          MR. INGRAM:  If there are public
5 documents, you can point to names, by all means, but we
6 will not be confirming or denying any membership names
7 or lists.
8     Q.    I didn't ask you for a list at this
9 point.  I simply asked you if Representative Govan was a
10 person who attended this meeting for which there are no
11 minutes?
12          MR. INGRAM:  I'm instructing my client
13 not to answer.  That is an NAACP meeting and you're
14 asking my client to confirm a membership identity.
15     Q.    Are you a member of the South Carolina
16 Conference of the NAACP, Ms. Murphy?  Are you?  I need
17 an answer, Ms. Murphy.
18     A.    That is a rhetorical question.
19     Q.    Well, it may be a rhetorical question but
20 it's a yes or no.  Are you a member of the South
21 Carolina State Conference of the NAACP?
22     A.    I am sitting before you as a member of
23 the South Carolina State Conference.
24     Q.    And I believe that you have identified
25 yourself publicly in public hearings as a member of the

17 (Pages 62 - 65)

Brenda Murphy
The South Carolina State Conference vs. McMaste,

February 4, 2022

Page 66

1 South Carolina State Conference of the NAACP. Is that
2 right?
3    A.    I identify myself as the president of
4 the South Carolina State Conference NAACP.
5    Q.    Okay. And so in the amended complaint --
6 and have you reviewed that amended complaint in
7 preparation for your testimony here today, Ms. Murphy?
8    A.    No, I have not.
9    Q.    Okay. When is the last time you looked
10 at that document to the best of your recollection?
11    A.    It's been at least a couple of weeks.
12    Q.    Okay. And there are a number of
13 districts that are challenged districts. Is that right?
14    A.    Yes.
15    Q.    Okay. And what was your involvement in
16 choosing the challenged districts?
17    A.    As I stated earlier, we have presidents
18 throughout the state of South Carolina. It is -- in
19 terms of where the challenges were, the presidents
20 from those areas were the individuals that identified
21 areas of concern and their membership.
22        (Whereupon, Defendant's
23        Exhibit 3 was marked for
24        identification.)
25    Q.    Okay. And so I believe that we have

Page 67

1 Exhibit Number 2 up on the screen. Is that right?
2 Excuse me. Exhibit Number 4 up on the screen. Three.
3 I'm sorry. That's why I do not like virtual depositions
4 but so we have Exhibit Number 3 up on the screen -- but
5 we've all had to learn how to do this. Some better than
6 others. I'm a little older. The technology isn't my
7 favorite thing sometimes so I apologize.
8        With respect to Exhibit Number 3, do you
9 recognize that document, Ms. Murphy? I think it's up on
10 your screen now. Is that right?
11    A.    Yes, I'm trying to -- I can't read it.
12    Q.    Well, when I go to a specific section,
13 I'll make sure that we blow it up when I get to a
14 specific page.
15    A.    Okay.
16    Q.    Okay. Because I can't read it either
17 from this distance. And so would you agree with me that
18 the challenged districts were grouped into the areas of
19 Anderson, Chester, Sumter, Dillon, Horry, Lawrence and
20 Williamsburg, Richland and Orangeburg? Would you agree
21 with me that the challenged districts are in those
22 areas?
23    A.    Yes.
24    Q.    Okay. And do you know how your
25 organization chose those challenged districts?

Page 68

1    A.    As was stated, we had meetings with the
2 branch presidents as well as members from those areas.
3 And when I say that, I need to -- you know, is it a
4 meeting? Is it a seminar? When you meet with
5 individuals, you know, and you receive feedback, that
6 information is collected and shared as a whole with
7 the redistricting coalition in terms of the concerns.
8    Q.    Okay. Do you have members that reside --
9 as you sit here today, can you tell me that you have a
10 member that resides in each of the challenged districts?
11    A.    Yes, I can.
12    Q.    Okay. And how is it that you can tell me
13 that you have a member that resides in each of the
14 challenged districts?
15    A.    Because that data was validated by our
16 national office.
17    Q.    Okay. Did you speak to a person from
18 each of the challenged districts before filing this
19 complaint?
20    A.    We have representatives in every county
21 of the state. Presidents from every county of the
22 state. So each of those areas, there is a president.
23    Q.    Well, there might be a president -- for
24 example, are the presidents -- so I live in Columbia
25 like you, okay. And so is there a president for the

Page 69

1 city of Columbia or a president for Richland County?
2    A.    There is a president for Columbia. As
3 a matter of fact, we have more -- in some places, we
4 have more than one president and that's a good example
5 that you're asking about. We have Lower Richland
6 which has a branch and we also have the Columbia
7 branch. So there are two, two in the Columbia area.
8    Q.    And so there would be two presidents for
9 the entire Columbia area, Richland County. Is that
10 right?
11    A.    That's right.
12    Q.    Okay. Do you know how many challenged
13 districts there are in Richland County?
14    A.    I don't have that right in front of me
15 but --
16    Q.    I'm going to help you in a minute.
17    A.    Okay.
18    Q.    But here's my question. Prior to filing
19 this complaint, did you or anyone acting on your
20 direction speak to a member, speak to someone who
21 resided in each and every challenged district and get
22 their input on how they were adversely affected by the
23 drawing of the districts?
24    A.    Yes.
25    Q.    Who did that? Who spoke to a person from

18 (Pages 66 - 69)

Brenda Murphy                                February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 70

1 each of the challenged districts?
2         MR. INGRAM: Objection. I'm instructing
3 my client not to answer as it would disclose
4 confidential membership identity.
5         MR. MOORE: I didn't ask her for the
6 names of anyone, Mr. Ingram. I simply asked the
7 question -- and so I don't believe that objection is
8 well-founded.
9         (Simultaneous crosstalk.)
10    Q.    My question is --
11        MR. MOORE: Are you instructing her not
12 to answer, Mr. Ingram?
13        MR. INGRAM: Correct.
14    Q.    Okay. My question is without identifying
15 any person, okay, who spoke to a person who resided in
16 each of the challenged districts?
17        MR. INGRAM: Objection. I don't know how
18 you respond to that question without identifying a
19 person. Same objection about membership lists.
20    Q.    Did you speak to anyone from any
21 challenged district, Ms. Murphy?
22    A.    I have to answer that with more than
23 just a yes or no.
24    Q.    Please answer my question and then
25 elaborate.

Page 71

1    A.    As the president of the South Carolina
2 State Conference, we coordinated meetings with our --
3 ongoing meetings. That is a standard of practice for
4 us. We meet routinely.
5         So in terms of meeting with leadership
6 from throughout the state, that is a routine. That
7 happens routine, not just regarding redistricting.
8 It's about other issues of concern that are related to
9 justice in all areas. Related to criminal justice,
10 education, et cetera. I won't go through all of them
11 but this is a standard practice.
12        So the question about meeting with
13 leadership in the different areas, that it happens
14 regarding -- and, yes, it does happen. We will not
15 list an area unless there was feedback regarding
16 concern.
17    Q.    I didn't ask you about feedback from an
18 area. I asked you specifically if you can tell me under
19 oath today that either you or your someone from your
20 organization spoke to a person from each and every
21 challenged district before filing this amended
22 complaint?
23    A.    Yes.
24    Q.    And how is it that you can assure me that
25 that happened?

Page 72

1    A.    Because we have members in every area
2 that is identified.
3    Q.    That's not -- my question is not whether
4 you have members in every area that is identified. My
5 question is can you assure me that before this lawsuit
6 was filed, either you or someone from your organization
7 spoke to a person who resided in each of the challenged
8 districts?
9    A.    Yes.
10    Q.    Okay. How can you state that under oath,
11 Ms. Murphy?
12    A.    Because as I just said, we have routine
13 meetings with individuals. We participated in the
14 redistricting process as a state conference. This was
15 not just done by the coalition.
16    Q.    Ms. Murphy --
17    A.    Yes, sir.
18    Q.    -- is there a record that your
19 organization maintains that indicates who spoke to
20 each -- to a person from each of the challenged
21 districts and who was spoken to there? Is there a
22 record of that?
23        MR. INGRAM: Objection. Asked and
24 answered.
25        MR. MOORE: It's not been asked and

Page 73

1 answered, Mr. Ingram.
2    Q.    Please respond, Ms. Murphy. Is there a
3 record of that?
4    A.    I did respond in terms of how we
5 interact with each other as a state conference. We
6 meet regularly, monthly. We review -- the maps were
7 reviewed. Comments were made by those present. So
8 nothing is here that is not known in our different --
9 the listed areas.
10    Q.    My question is very simple. Is there a
11 record that your organization maintains that indicates
12 who spoke to a representative of each of these
13 challenged districts and on what date prior to the
14 filing of this amended complaint? Is there a record of
15 that?
16    A.    There were two forums. I cannot say
17 that we kept minutes because they were forums but
18 there was representation from all of these areas.
19    Q.    You keep using the words "all of these
20 areas". I'm asking about specific challenged districts
21 and I'm not getting --
22    A.    I'm speaking --
23    Q.    I'm asking --
24    A.    I'm speaking on behalf of the listed
25 districts of concern.

19 (Pages 70 - 73)

Brenda Murphy
The South Carolina State Conference vs. McMaste,
February 4, 2022

Page 74

1    Q.    Can you tell me why your organization has
2  not produced a list of the people who reside in each of
3  the challenged districts who were spoken to prior to the
4  filing of this lawsuit?
5    A.    I do not have authorization to provide
6  a listing of anyone that's a member of the NAACP.
7    Q.    Is there a list -- is there a document
8  that indicates that between the time of the passage of
9  this legislation and the time of the filing of the
10  second amended complaint that you or someone else from
11  your agency spoke to a person who resides in each of the
12  challenged districts and those people indicated that
13  they wanted to bring this lawsuit?
14    A.    There is not a list.
15    Q.    Okay.  As you sit here today, can you
16  assure me under oath that between the date this statute
17  was passed, this act was passed and the date of your
18  lawsuit that someone was spoken to from each and every
19  one of these challenged districts and a person from each
20  and every one of those challenged districts said they
21  wanted to go forward with the challenged district?
22         MR. INGRAM:  Objection.  Asked and
23  answered.  It's privileged communication.
24         MR. MOORE:  That was not my specific
25  question, Mr. Ingram.

Page 75

1    Q.    Would you please answer my question, Ms.
2  Murphy?
3    A.    I have answered the question to the
4  best of my ability.
5    Q.    Okay.  Can you confirm under oath that
6  that was done?
7         MR. INGRAM:  Objection.  Asked and
8  answered.
9    Q.    Ms. Murphy, that's a yes or no and then
10  you can explain.
11    A.    I have answered the question to the
12  best of my ability.  There were forums, two forums
13  that were held with members that included -- that
14  involved districts that there was representation.
15    Q.    I'm going to take that as a no.  I'm
16  going to take that as a no and I'm going to move on and
17  I'm going to come back to it.  Do you know the members
18  of your organization that reside in each of the
19  challenged districts?
20    A.    Yes, I know members that reside in the
21  challenged districts.
22    Q.    Did you speak to any of them about this
23  litigation?
24    A.    No.  In terms of this -- in terms of
25  when you say -- you mean what we're doing today?

Page 76

1    Q.    Yes, ma'am.
2    A.    No, I did not.
3    Q.    I'll come back to that in a few minutes.
4  Did you or to your knowledge anyone from the NAACP speak
5  to anyone from any party about the positions that you
6  intended to take in this lawsuit?
7    A.    No.
8    Q.    Did you coordinate with anyone from the
9  South Carolina Democratic or the South Carolina
10  Republican Party?
11    A.    No.
12    Q.    Did you communicate with the League of
13  Women Voters?
14    A.    They were a part of the coalition.
15    Q.    Okay.  And who determined who would be a
16  part of this coalition?
17    A.    We invited members to participate and
18  they agreed to participate based on the fact that they
19  were nonprofit and they were advocacy groups for, you
20  know, for social justice.
21    Q.    When was the coalition formed?
22    A.    September.  I think September.  August,
23  September.
24    Q.    Of what year?
25    A.    Last year.

Page 77

1    Q.    2021?
2    A.    Yes.
3    Q.    And who are the members of the coalition?
4    A.    I don't have all of those in front of
5  me.  I think that they were listed for you.
6    Q.    Okay.  And who decided to form this
7  coalition?
8    A.    We decided as a state conference to
9  invite other advocacy groups and we decided who to ask
10  whether or not they wanted to be a member of the
11  coalition.
12    Q.    Okay.  And who made the determination as
13  to who would and who would not be invited?
14    A.    I don't think we thought about who we
15  would not invite.  If there was someone that wanted to
16  be a part that was an advocacy group, we invited them
17  to participate.
18    Q.    And how did you identify these advocacy
19  groups?
20    A.    The ones that are -- well, there are a
21  number that we know of such as the League of Women
22  Voters we interact with throughout -- you know,
23  routinely.  AFL-CIO, ACLU, the state president.  We
24  had worked together.  And so it was basically
25  individuals that we have worked collaboratively

20 (Pages 74 - 77)

3:21-cv-03302-MBS-TJH-RMG    Date Filed 03/21/22    Entry Number 194-2    Page 22 of 108

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 78

1 together with throughout the years.
2          Now if there was someone that -- a
3 group that wanted to join, then we welcomed them. So
4 we didn't prohibit anyone from joining that was --
5 advocated for the social justice. There was no
6 criteria for eliminating.
7    Q.    Do you know Representative John King?
8    A.    As a representative.
9    Q.    Have you ever spoken to him?
10   A.    Probably before redistricting, yes.
11         (Simultaneous crosstalk.)
12   A.    -- this process, no.
13   Q.    You have not spoken to him about the
14 redistricting process. Is that right?
15   A.    No.
16   Q.    Okay. Do you know Representative Wendy
17 Brawley?
18   A.    Yes.
19   Q.    How do you know Representative Brawley?
20   A.    She's a representative. I know her --
21 I know the representatives for this state.
22   Q.    Do you know all the representatives for
23 this state?
24   A.    I wouldn't say all but I do know the
25 African American ones.

Page 79

1    Q.    Okay. How well do you know
2 Representative Brawley?
3    A.    I just -- I do not know her personally.
4 I know her as a representative.
5    Q.    Okay. Have you ever had any
6 conversations with her?
7    A.    Not as a representative. I will share
8 with you that when I became president, she did -- she
9 had someone from her private business to interview me.
10 That's the only association that I have of really
11 knowing her as a representative.
12   Q.    And so she offered your public submission
13 as an amendment on the House floor to the House map. Do
14 you recall that?
15   A.    Yes. She also offered the League of
16 Women Voters as well.
17   Q.    Okay. And how did she come to do that if
18 you know?
19   A.    Well, the maps were all on display at
20 the State House so I can't say how she came to that in
21 terms of making that recommendation. That's something
22 you will have to ask her. I don't know.
23   Q.    So you don't know how she came to do
24 that. Is that right?
25   A.    I do not.

Page 80

1    Q.    Do you know Jerry Govan?
2    A.    As a representative.
3    Q.    Okay. Have you ever spoken to
4 Representative Govan about redistricting?
5    A.    Not as a representative, no.
6    Q.    I didn't ask you if you had spoken to him
7 as a representative. I asked you have you ever spoken
8 to Representative Govan about any issue related to
9 redistricting?
10        MR. INGRAM: Objection. Asked and
11 answered.
12        MR. MOORE: It hasn't been answered.
13 It's been asked.
14   Q.    Please answer my question.
15   A.    Well, I will answer your question. I
16 have made a statement in the presence -- I think one
17 of the meetings that, that -- I make it very clear in
18 meetings our intent, the intent of this coalition is
19 not to be partisan, not to protect incumbents, and
20 that is very clearly stated.
21        He may have been in my presence when I
22 said that. I can't say that he was but that is
23 something that I make very clear. If the conversation
24 came up about redistricting and whether or not -- and
25 it's just a general conversation regarding -- and it

Page 81

1 wasn't with just Representative Govan. I have
2 intentionally not included representatives in
3 discussions about redistricting.
4    Q.    Why is that?
5    A.    Because I didn't want -- it needed to
6 be about the people, not about the incumbent. When
7 lines are drawn, it's opportunities for individuals,
8 whoever it might be, to have that -- black individuals
9 to have the opportunity to decide whether or not they
10 want to run, campaign for a certain position or be a
11 candidate for a certain position. I take that very
12 seriously.
13   Q.    I'm going to move on for a moment. So
14 you spoke to at least one of the public hearings,
15 correct?
16   A.    Yes.
17   Q.    Okay. And I believe you provided some
18 written testimony. Is that right?
19   A.    Yes.
20        (Whereupon, Defendant's
21        Exhibit 4 was marked for
22        identification.)
23        MR. MOORE: Okay. Let's pull up Exhibit
24 Number 7, Ms. Rabon. Yes, ma'am. What's taking so
25 long?

21 (Pages 78 - 81)

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 82

1    Q.    As she pulls up it, Ms. Murphy, you're
2 familiar with that written testimony. Is that right?
3    A.    Yes.
4    Q.    Did you prepare it yourself?
5    A.    Every document that was submitted was
6 documented -- documents that the coalition reviewed
7 and we agreed upon as a coalition. I was the
8 representative to present the final document.
9    Q.    So my question is did you write it
10 yourself or did someone else write it for you?
11        MR. INGRAM: Objection. Asked and
12 answered.
13        MR. MOORE: It was asked. It wasn't
14 answered.
15    Q.    Did you write it yourself or did someone
16 else write it for you?
17    A.    I think I just answered the question.
18 The coalition developed the written document. We all
19 reviewed it. We all agreed to it and it was signed by
20 me as the representative of the coalition.
21    Q.    Okay. Was there a primary author of it?
22        MR. INGRAM: Objection. Asked and
23 answered.
24    Q.    Was there a primary author of it, Ms.
25 Murphy?

Page 83

1    A.    It was developed by the coalition,
2 reviewed by the coalition, and finalized by the
3 coalition and I presented it at the hearings.
4    Q.    Okay. Do you know why that was emailed
5 instead of -- by the NAACP LDF counsel rather than you
6 sending it in directly? Do you know why it was done?
7    A.    They are part of the coalition. We are
8 not open because of COVID. Most of our meetings were
9 done by Zoom. And in terms of having the resources to
10 type up and get these documents to you, the LDF has
11 the resources to do that.
12    Q.    Okay. And do they represent you in
13 addition to being part of the coalition?
14    A.    They're here today representing me.
15 They're here representing the desires of the coalition
16 because I'm simply here as the president of the NAACP,
17 one of the primary members for this coalition and who
18 spearheaded the initiative but they were a part of the
19 coalition, yes.
20    Q.    Okay. So in this written testimony, you
21 claim that among South Carolinians that are old enough
22 to vote, black voters make up approximately 29 percent.
23 Is that accurate?
24    A.    Yes.
25    Q.    Okay. How did you arrive at that number?

Page 84

1    A.    That's day-to-day data that everybody
2 knows.
3    Q.    How did you arrive at that number?
4        MR. INGRAM: Objection. Asked and
5 answered.
6    Q.    Can you give me a specific answer as to
7 how you arrived at that number, President Murphy?
8    A.    I will. I can give you an answer.
9    A.    Yes, ma'am.
10    A.    I do -- I do -- I do and I have looked
11 at the population throughout the state by county and I
12 know the percentage. That is something I have studied
13 not only for the reasons of this deposition but I have
14 studied intensely during the COVID which we -- still
15 exist so it's something that I typically follow in
16 terms of population, percentages of blacks, percentage
17 of whites and other ethnic groups. So that is
18 something I routinely study, study.
19    Q.    And so you're familiar I guess that there
20 are two different ways to gauge the number of black
21 voters. There's a phrase called any part black and DOJ
22 statistics, correct? Are you familiar with both of
23 those?
24    A.    Excuse me? What's your question again?
25    Q.    Are you familiar with the phrase -- that

Page 85

1 there may be different ways to count whether these
2 percentages -- for example, there's a statistic that
3 uses the DOJ app and there's a statistic that uses the
4 phrase any part black. Are you familiar with those?
5    A.    Let me just say when I study the
6 population, I studied in terms of ethnic groups.
7    Q.    Okay. All right. And have you reviewed
8 the figures based on the 2020 census data?
9    A.    Yes, I have.
10    Q.    Okay. And are you aware that if you look
11 at the figures from the 2020 census data, the figure
12 using the any part black criteria is 25.28 percent? Are
13 you familiar with that?
14    A.    I can't say that I am.
15    Q.    Okay. And are you familiar with the fact
16 that if you use the 2020 census data using the DOJ
17 criteria, the number is actually lower? It's 24.59
18 percent. Are you familiar with that?
19    A.    Any part black?
20    Q.    No, ma'am. I said if you use -- if you
21 use the criteria for any part black, the figure is 25.28
22 percent, and if you use the DOJ criteria, it's 24.59
23 percent. Are you familiar with that?
24    A.    No. I'm familiar with the 27, 28. A
25 higher number.

22 (Pages 82 - 85)

Brenda Murphy
February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 86

1    Q.    Okay.  Do you have any reason as we sit
2  here today to dispute that if you use the 2020 census
3  data that using the criteria for any part black, the
4  figure is 25.28 percent?
5    A.    I'm not going to dispute it but I again
6  state when I look at the data, I'm looking at black
7  and white primarily and other ethnic groups.
8    Q.    And do you have any reason to dispute the
9  figure that when you use the DOJ criteria, black voters
10 of voting age population are actually 24.59 percent of
11 the South Carolina population?  Do you know that?
12   A.    When you're talking black voter
13 population --
14   Q.    Well, you claimed --
15   A.    No.  No, let me clarify it.  I know
16 about black voter population.  Are we talking about
17 black voters that actually -- are we looking at age or
18 are you -- what is it that you're inferring?
19   Q.    Well, you used the words in your
20 testimony among South Carolinians that are old enough to
21 vote, black voters make up approximately 29 percent.
22 That was your testimony delivered on November 10, 2021
23 well after the census data had been published.  Is that
24 right?
25   A.    Yes, and I stand by that.

Page 87

1    Q.    Okay.  All right.  But do you have any
2  reason to disagree with me that when you actually look
3  at the census data numbers that the figures are actually
4  closer to 25 percent, a little over 25 percent if you
5  use the criteria for any part black, and 24.59 percent
6  if you use that criteria?  Do you have any reason to
7  dispute that record, President Murphy?
8    A.    At this point, I would say that I would
9  have to further review that data.
10   Q.    Okay.  All right.  Well, if I'm correct,
11 then the figure is closer to 25 percent than your 29
12 percent in your testimony, right?
13       MR. INGRAM:  Objection.  Argumentative.
14   Q.    Please answer, Ms. Murphy.
15   A.    I am saying at this point -- you had
16 stated what you have reviewed.  I at this point have
17 no reason to dispute what you are saying but I stand
18 beside those numbers in terms of the black voter
19 population at the 28, 29 percent.
20       MR. MOORE:  So let's put up Number 6,
21 Ms. Rabon.
22   Q.    Because you testified at another hearing.
23 Is that right?
24   A.    Yes, I did.
25   Q.    At least one other hearing?

Page 88

1    A.    Yes, I did.
2    Q.    Okay.  All right.  And how did you
3  prepare for that live testimony?
4    A.    How did I prepare?
5    Q.    Yes, ma'am.
6    A.    Basically the same as I did for others
7  in terms of basically the coalition met, the coalition
8  had discussions, and my reports were based on what
9  we -- our decisions regarding what the mapping
10 revealed and the impressions of the coalition.
11       (Whereupon, Defendant's
12        Exhibit 5 was marked for
13        identification.)
14   Q.    Okay.  And so I want to pull up your
15 testimony for a minute.  I believe it's loading and I
16 apologize that it takes so long to load.  Technology is
17 a wonderful thing when it works.
18   A.    I agree.
19   Q.    I'm of an age where we didn't have so
20 much technology and I'm not so sure that all this
21 technology is a good thing but I'm not going to ask you
22 whether you agree or disagree with that statement, Ms.
23 Murphy.
24   A.    I'm not going to tell you my age.
25   Q.    And as I said, I didn't ask.  As I said,

Page 89

1  I always hate to ask a lady her age.  My mama taught me
2  better than that.  Well, while we're trying to pull that
3  up, I'm just going to read you a section.  You use the
4  phrase "but we are at this time dependent on you in
5  terms of drawing maps that are competitive, maps that
6  looks to -- ensures communities of interest, not packing
7  or cracking".  Do you recall saying that?
8    A.    Yes, I do.
9    Q.    Okay.  How do you define the term
10 communities of interest, Ms. Murphy?
11       MR. INGRAM:  Objection.  Calls for a
12 legal conclusion.
13   Q.    Can you please answer the question, Ms.
14 Murphy?  I know you just looked at Mr. Ingram.
15   A.    The communities of interest --
16   Q.    How do you define -- how do you define
17 it?
18   A.    It's defined by those individuals that
19 live within the community that have similar values in
20 terms of ethics.  They're areas contiguous of each
21 other and it's basically decided by those communities.
22   Q.    And I guess you would agree with me like
23 a municipality could have multiple communities of
24 interest, right?
25   A.    Yes.

23 (Pages 86 - 89)

Brenda Murphy                                      February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 90

1    Q.    Okay.  And the larger the municipality,
2  the larger perhaps the number of communities of interest
3  in that municipality, right?
4    A.    You mean may be based on the
5  Constitution there may be more than one?  Is that what
6  you're asking?
7    Q.    I guess maybe that was a bad question so
8  I'll try to rephrase it.
9    A.    Okay.
10    Q.    I believe you told me you lived in
11  Brooklyn once.  Is that right?
12    A.    Yes.
13    Q.    Okay.  And Brooklyn is a part of New York
14  City, right?
15    A.    Yes.
16    Q.    Okay.  There are a number of different
17  communities of interest in Brooklyn.  Is that right or
18  wrong?  Would you agree or disagree?
19    A.    Yeah.  I would agree with that, yes.
20    Q.    And there are also a number of different
21  communities of interest in Manhattan which is right
22  across the river, right?
23    A.    Yes.
24    Q.    Okay.  The larger the municipality, the
25  larger the number of communities of interest generally.

Page 91

1  Would you agree or disagree with that?
2    A.    That may be true but we do have some
3  guidelines that we must follow in terms of numbers
4  that -- constitutional numbers that are -- when we
5  look at numbers in terms of how large a Senate -- the
6  number of people that can be in a Senate district or
7  House district, those are very different.  So, you
8  know, depending on the population, then that may
9  change, yes.
10    Q.    I'm just asking you questions about
11  municipalities so I'm going to get there later.  You
12  also use the phrase -- so after the word communities of
13  interest -- and now this document is up on the screen --
14  you use the words not packing, not cracking.  Do you see
15  that?
16    A.    I can't see it but I recall using those
17  words.
18    Q.    Okay.  What does packing mean to you?
19    A.    Packing means to me having a greater
20  number of -- for example, a district that's composed
21  of 65 percent or 75, maybe even 80 percent of black
22  individuals when that dilutes the voting strength of
23  the black population in an area.
24    Q.    And is there a magic number that gets to
25  packing in your view?

Page 92

1    A.    Well, I'm going to say it becomes
2  questionable when there's no need to when we're
3  greater than fifty percent or greater.
4    Q.    When you say the "we", who is the "we" to
5  whom you refer?
6    A.    Well, I guess what I'm saying fifty
7  percent, when I say we -- I'm saying we have a
8  population for a district that's 65 percent or 70
9  percent black individuals when it could have been
10  configured in another way to allow the opportunity for
11  another individual to represent the community.
12    Q.    Again I guess that depends on one's
13  definition of community, right?
14    A.    Yes.
15    Q.    Okay.  You use the word cracking, okay.
16  What does that term mean to you?
17    A.    Intentionally dividing a district in
18  such a manner that there are -- and really these
19  communities are communities of interest, very similar
20  interests and they're divided.
21        The district is drawn in such a manner
22  and that happens in -- it could happen in cities or
23  counties where they are divided and they have two
24  representatives that may think totally different
25  because they may be paired with someone that's not of

Page 93

1  the same mindset that they are.
2    Q.    You used the word intentional.  Is that
3  right?
4    A.    Did I use that, intentional?  I said --
5    Q.    No.  I believe you used the word -- when
6  I asked you that question, you used the word
7  intentional.  Is that right?
8    A.    I don't know.  Did I -- what I intended
9  to say was that districts, they are drawn that way.
10  Whether it's intentional or not, I can't say but they
11  are drawn in such a manner that it dilutes the black
12  person's ability to vote.  Not ability but in terms of
13  the impact, influence of their vote.
14    Q.    And then you went on to use the phrase,
15  we hope you won't do that and we look to hopefully see
16  more of us sitting in these seats the next time we come
17  around.  What did you mean by that?
18    A.    Well, that was explaining to them what
19  the hope was in terms of redistricting that it would
20  be done in a fair manner and it would be done to
21  reflect constitutional requirements as well as not
22  packing and cracking districts.  That was a request.
23    Q.    When you use the term "us" and then you
24  use the term "we", who is the term "us"?  "Hopefully
25  more of us sitting in these seats."

24 (Pages 90 - 93)

Brenda Murphy    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 94

1    A.    Black people.
2    Q.    Okay. So you're basically saying you
3  would like to see more African Americans or black people
4  serving in the Legislature. Is that right?
5    A.    At least have an opportunity to serve,
6  yes. And with the current plan, that opportunity has
7  decreased.
8    Q.    Do you know -- and how about giving me
9  some specific evidence to back that up?
10    A.    You can look at the Columbia or the
11  Richland County area. It's very evident. It's there.
12    Q.    Give me some specific evidence to back
13  that up.
14    A.    The way the lines are drawn now, we
15  have blacks that are -- will be competing against each
16  other so that's one less representative for those
17  communities.
18    Q.    Are you referring to Representative
19  Brawley and Representative Johnson?
20    A.    No. I'm talking about more than that
21  in the Columbia area.
22    Q.    Elaborate, please.
23    A.    I'm not talking about individuals. I'm
24  talking about opportunities for black people to be
25  able to have the opportunity to decide whether or not

Page 95

1  they want to run for office and that opportunity no
2  longer exists. I'm not talking about individuals and
3  I think I made that very clear from the onset.
4         I have never -- we have never -- we
5  have not considered incumbents and their positions.
6  We've looked at opportunities for representation.
7    Q.    Do you know how many African American
8  representatives currently serve in the House of
9  Representatives after the 2020 election?
10    A.    Yes, I know.
11    Q.    How many?
12    A.    Currently we have twenty-four which
13  will be reduced by three.
14    Q.    Twenty-four or thirty-four?
15    A.    We don't have thirty-four.
16    Q.    I'm asking you.
17    A.    No.
18    Q.    You believe that there are twenty-four
19  African American representatives in the House. Is that
20  right?
21    A.    At least. At least that, yes.
22    Q.    When you say at least that, what do you
23  mean?
24    A.    Well, I am saying I'm not looking at a
25  document right now but I know that looking at those

Page 96

1  districts and there has been a decrease in the number
2  of opportunities for blacks to be represented.
3    Q.    I'm going to look at a document and I'm
4  going to ask Ms. Rabon to pull up a document that we
5  just got last night. Okay. And it's taking us a few
6  minutes, some time to digest them and we're not done
7  digesting.
8         MR. MOORE: Could you pull up Number 23,
9  Ms. Rabon?
10    Q.    And do you recall if you were at a
11  meeting of the SC State Conference of the NAACP
12  reapportionment committee minutes meeting that was on
13  June 21, 2021? Do you recall if you were at that
14  meeting?
15    A.    What minutes are you talking about?
16    Q.    Minutes that were provided to us
17  yesterday. I'm trying to pull them up.
18    A.    Okay.
19    Q.    So take a moment.
20    A.    Okay.
21         MR. MOORE: You have to show her
22  documents through this -- we're probably going to take
23  a lunch break after I get done with these questions.
24         THE DEPONENT: Okay.
25         MR. MOORE: In fact, if you want to

Page 97

1  take -- how long is it going to take for you to get
2  that up, Ms. Rabon? Ms. Rabon, if he clicks to
3  refresh, should it be available to him? Is it
4  available to you, Ms. Mann?
5         THE COURT REPORTER: No.
6         MR. INGRAM: Let me check. What exhibit
7  number is it?
8         MR. MOORE: Twenty-three. What do you
9  mean it's 6 in this? I know but I marked it Exhibit
10  Number 23. So are you telling me now it has to be
11  Exhibit Number 6? Exhibit Number 6 then.
12         MR. INGRAM: Yes, I have it pulled up.
13         (Whereupon, Defendant's
14         Exhibit 6 was marked for
15         identification.)
16    Q.    Have you seen this document before, Ms.
17  Murphy?
18    A.    I'm sure I have.
19    Q.    And so are these minutes of a
20  reapportionment committee meeting?
21    A.    Yes.
22    Q.    Okay. And it lists a number of people in
23  attendance including you. Is that right?
24    A.    Yes.
25    Q.    Okay. It lists Attorney Charles Boykin.

25 (Pages 94 - 97)

Brenda Murphy
February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 98

1 Who is he?
2    A.   He is a member of our executive
3 committee.
4    Q.   Okay. When you say "ours", you mean your
5 branch -- I mean your state conference's executive
6 committee?
7    A.   Yes. Yes.
8    Q.   And who is Amelia Glisson?
9    A.   She is the administrative assistant.
10    Q.   Who is Jennifer Tague?
11    A.   She's from AFL-CIO.
12    Q.   Who is John Ruoff?
13    A.   Ruoff. Dr. John Ruoff is our
14 consultant.
15    Q.   Consultant for whom?
16    A.   For the state conference local
17 redistricting.
18    Q.   Okay. Is he also someone who consults
19 with the League of Women Voters if you know?
20    A.   Yes.
21    Q.   Okay. And there are a number of
22 attorneys listed on here, correct?
23    A.   Yes. Let me see. Yes, there are
24 several. Yes.
25    Q.   Okay. And included in that list is Ms.

Page 99

1 Aden who is in this call or in this deposition and Mr.
2 Cusick, correct?
3    A.   Yes.
4    Q.   Okay. And there's also a person named
5 Adriel Cepeda. Who is Adriel Cepeda?
6    A.   He was with ACLU.
7    Q.   Okay. And so Mr. Cepeda states that
8 their desire is to ensure SC maps that come out of the
9 cycle are as fair and equitable as possible. SC black
10 voter age population, BVAP, is 26.6 percent voting
11 population and desire for representation to be
12 proportional. Do you see that?
13    A.   Yes.
14    Q.   Okay. And that was of course before the
15 census data was released, correct?
16    A.   Yes.
17    Q.   Okay. All right.
18    A.   And may I make a statement?
19    Q.   Yes, ma'am.
20    A.   As I mentioned, we started as a
21 group even before this coalition was formed. We
22 started with our leadership group in terms of training
23 and I think I mentioned this earlier regarding what
24 the -- what redistricting was all about, how -- even
25 to the point of one -- South Carolina Proud (sic)

Page 100

1 Academy. I think you have a list -- I think you do
2 have that -- where we attended BVAPs training where it
3 introduced us to mapping, how to do mapping. Some of
4 our members were very, very interested in doing that,
5 learning how to do that. And it culminated eventually
6 with this group being formed.
7      Now as we look at the populations and
8 the BVAP and as we worked, you know, we have these
9 individuals that are partners and we work to --
10 towards as we work with the different learning how to
11 create maps, how to make sure we're looking at that
12 percentage there that was mentioned by Attorney
13 Cepeda.
14    Q.   Cepeda?
15    A.   Yeah, Cepeda.
16    Q.   And so he used the term BVAP. That's his
17 term. What does it mean to you?
18    A.   Black voters at the age -- at the age
19 to be able to vote.
20    Q.   Okay. All right. So I'm going to ask
21 you to flip over to the second page. So scroll down,
22 Ms. Rabon. Okay. You see at the bottom or close to the
23 bottom that has another statement from Attorney Cepeda
24 and I'll read it.
25      It says we don't see an obvious

Page 101

1 representational gap in the State House. Based on the
2 26.6 percent of black voters, we should have 33 black
3 representatives to be proportional and it has 34. Do
4 you see that?
5    A.   I see that.
6    Q.   Okay. And so Mr. Cepeda is saying, is he
7 not, that after the 2010 election cycle there are 34
8 African American representatives in the State House?
9    A.   I'm going to say that I -- yeah, I
10 don't know if it's a typo. I can't say but I do know
11 that the number is not 34.
12    Q.   Well, he also --
13    A.   Unless he looked at -- unless he was
14 looking at the House and the Senate. That may have
15 been, you know. I'm not sure.
16    Q.   But it says based on -- we don't see an
17 obvious representational gap in the State House, right?
18 He says that?
19    A.   He says that but I would like to
20 comment this, to make a statement regarding whether
21 it's there -- whatever that reference is, that 34 is a
22 combination of the House and representatives. What
23 we're looking now at our representation in the House
24 and that opportunity has decreased.
25      Also I can't -- you know, in terms

26 (Pages 98 - 101)

Brenda Murphy                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 102

1  of -- yes, when we look at population, the current
2  maps, when we look at the population and the number
3  that we will have the opportunity in terms of a black
4  individual being -- running for an office or elected
5  for an office, then that number has decreased.
6          MR. MOORE:  Okay.  So we're going to
7  pause and have a lunch break here.  So Ms. Mann, how
8  long -- how much time has elapsed on our clock?  You
9  can tell me when we come back from the lunch break.
10 Is that right?
11         THE COURT REPORTER:  Yes.
12         MR. MOORE:  Okay.  So how long do y'all
13 need for lunch?
14         THE DEPONENT:  I'm good.  You tell me
15 what you need.
16         MR. MOORE:  Do y'all want to take a
17 thirty minute lunch break?
18         MR. INGRAM:  That works.
19         MR. MOORE:  Okay.  I certainly don't
20 think we need any longer than that, right?
21         THE DEPONENT:  Okay.  No.
22         MR. MOORE:  Okay.  So we will reconvene
23 then at 1:15.
24         THE DEPONENT:  Okay.  Thank you.
25         MR. MOORE:  Thank you.

Page 103

1          (Lunch recess.)
2      Q.    (BY MR. MOORE:)  So Ms. Murphy, during
3  the lunch break, did you consult with either Mr. Ingram
4  or anybody else who is your counsel?
5      A.    No.
6      Q.    Did you have any discussions with them
7  about the substance of this testimony?
8      A.    No.
9      Q.    Okay.  All right.  So I'm going to go
10 back to that document.  Thank you.  And while we do, I'm
11 assuming, Ms. Murphy, that you know Mr. Cepeda, correct?
12     A.    Yes, by virtue of being a part of this
13 coalition.  He was for a while and then he was
14 replaced by someone else in the organization.
15     Q.    But you don't have any reason to believe
16 that his counts would be inaccurate, do you?
17     A.    You know, as I said before, the
18 numbers -- I don't know if he was considering all of
19 the -- you know, the Senate as well as the House.
20     Q.    Okay.  Well, are you absolutely certain
21 that your count is correct because I will tell you that
22 Mr. Parente's count mirrors Mr. Cepeda's count with
23 respect to the number of African Americans who were in
24 the House after 2020 election.  So do you have any
25 reason to doubt Mr. Cepeda's figures?

Page 104

1      A.    You are saying that there are 34
2  African American representatives in the House.  Is
3  that what you're saying?
4      Q.    Well, I'm asking a question.  Mr. Cepeda
5  says that based on the 26 percent of black voters, we
6  should have 33 black representatives which is a
7  representative in the House and it has 34.  His math
8  agrees with mine.  Do you have any reason to dispute
9  that?
10         MR. INGRAM:  Objection.  Argumentative
11 and asked and answered.
12     Q.    Ms. Murphy, you may answer.
13     A.    My answer doesn't change from the
14 previous answer that I gave.
15     Q.    Okay.  Well, would you agree with me that
16 if there are 34 -- if there were 34 African American
17 representatives in the House of Representatives, then
18 that would be a greater proportional number than the
19 26.8 figure that is referenced?  Would you agree with
20 that, Ms. Murphy?  And that's a yes or no.
21     A.    Thirty-four is greater than 26, 28.
22     Q.    Okay.  And it's pretty clear, is it not,
23 if you read the next line that he's only talking -- in
24 subparagraph one in your notes, he's only talking about
25 representatives in the House because he then goes on to

Page 105

1  say the Senate just needs one more seat to be held by a
2  black candidate to be proportional, correct?  He breaks
3  it out in terms of House and Senate, does he not?
4      A.    From what I'm reading, yes.
5      Q.    Okay.  And you told me earlier that you
6  studied the census figures.  Is that right?
7      A.    Yes, I did.
8      Q.    Okay.  And so you are aware that the
9  percentage of African Americans in the 2020 census, the
10 percentage of African Americans with respect to --
11 African Americans over the age to vote has decreased
12 rather than increased since the 2020 census, correct?
13     A.    Yes.
14     Q.    Okay.  And the 2020 census indicates that
15 there are a fewer percentage of African Americans in
16 South Carolina than were in the 2010 census.  Correct or
17 incorrect?
18     A.    Yes.  That's correct.
19     Q.    Okay.  And so if currently there are --
20 if based on the -- well, I'm just going to move on.  I'm
21 going to move on.  I think I've made my point.  Let me
22 ask you this question.  Did you record a video?
23     A.    I recorded -- yes, I have.
24     Q.    All right.
25     A.    It's not regarding redistricting per

27 (Pages 102 - 105)

3:21-cv-03302-MBS-TJH-RMG    Date Filed 03/21/22    Entry Number 194-2    Page 29 of 108

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 106

1 se, no.

2    Q.    Did you record a video saying Behind the
3 Lines, Repercussions of Redistricting, Commentary and
4 Perspectives by Brenda Murphy, the NAACP dated December
5 6, 2021?  Did you record such a video?

6    A.    I would need to see what video you're
7 talking about.

8          (Whereupon, Defendant's
9          Exhibit 7 was marked for
10         identification.)

11   Q.    Put up Number 8 and show her -- what is
12 my Number 8.  I guess this would be Number 7.  Is that
13 right?  And we circulated the link.  Are you going to
14 need me to play this video in order for you to tell me
15 if you recorded a video dated December 6th --

16   A.    I would need to see it, especially if
17 it's regarding redistricting.  Yes, I would.

18   Q.    Okay.  Do you see that video up on the
19 screen?

20   A.    We're trying to find it.

21   Q.    Is it on the screen now?  I believe it's
22 on the screen.  Is that you, Ms. Murphy?

23   A.    Yes.

24   Q.    Okay.  Commentary and Perspectives,
25 Behind the Lines, Repercussions of Redistricting.  Did

Page 107

1 you -- pause the video for a minute.  Okay.  So Ms.
2 Murphy, you see here that it says Behind the Lines,
3 Repercussions of Redistricting, Commentary and
4 Perspective by Brenda Murphy, NAACP, and underneath it
5 shows views, December 6, 2021.  Is that right?

6    A.    I think that's what it says but I think
7 I need to hear the contents because that's the first
8 I've seen it labeled that way.

9          MR. MOORE:  Okay.  How long is it,
10 Mr. Parente?

11   Q.    I'm not going to play the entire nineteen
12 minutes.  I'm going to play a minute or two and then I'm
13 going to ask you some questions.

14         (Video playing.)

15   A.    That is the not same video, sir.

16         (Video playing.)

17   A.    Sir?

18         MR. MOORE:  Pause it.  Pause it.

19         (Video stopped.)

20   A.    Unless you need to play that entire
21 video --

22   Q.    I don't.

23   A.    Okay.  What it said on that video, it's
24 basically what I've said throughout this meeting, that
25 we saw the importance of providing education to our

Page 108

1 members and others interested regarding the
2 redistricting process.  There is nothing in there
3 derogatory about what has -- any outcome or anything
4 else.  It was just basically related to preparing the
5 community to understand what redistricting is all
6 about and how we did that.

7    Q.    That wasn't in response to a question but
8 now are you familiar with the video that I'm talking
9 about, Ms. Murphy?

10   A.    Yes, I am.

11   Q.    Okay.  All right.  And that's you on the
12 video.  Is that right?

13   A.    Yes, it is.

14   Q.    Okay.  All right.  And do you disagree
15 with me you said that there was gerrymandering in the
16 process?  Do you disagree with me that you used those
17 words?

18   A.    I said that here today.

19   Q.    So you say that there's gerrymandering.
20 Is that correct?  In the House districts?

21   A.    Yes.

22   Q.    Okay.  Do you mean political
23 gerrymandering or racial gerrymandering, Ms. Murphy?

24   A.    Racial gerrymandering.

25   Q.    You had to think for a moment.  What does

Page 109

1 the term --

2    A.    No.  I paused -- I paused to give my --
3 to -- I didn't stop to think.  I stopped before I
4 answered because I needed to take a breath before I
5 answered your question because I wanted to answer in a
6 manner that is respective because I have said to you
7 repeatedly over and over and over again that yes, I
8 do believe gerrymandering occurred.  I have defined
9 splitting and gerrymandering so I think I made that
10 clear.

11   Q.    Okay.  Well, here's my question to you,
12 Ms. Murphy.  What does the term racial gerrymandering
13 mean to you?

14   A.    With populations -- well, I'll tell
15 you.  In terms of how neighborhoods have changed, in
16 terms of the population ages and how lines are drawn
17 and -- I'm not going to say intentionally or
18 unintentionally.

19         As I said before, it's what happens,
20 the end result, the outcome in terms of how those
21 lines have been drawn.  Maybe now we have communities
22 drawn in such a way that we are packing black people,
23 too many together in a community which dilutes the
24 potential for individuals to be a part of our
25 political process here in the state of South Carolina.

28 (Pages 106 - 109)

Brenda Murphy
February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 110

1    Q.    Do you believe that the NAACP's proposed
2  maps engage in racial gerrymandering, Ms. Murphy?
3    A.    No, I do not.
4    Q.    And why not?
5    A.    Because I think they were drawn in such
6  a way considering all of the factors that needed to be
7  considered.
8    Q.    Okay.  So I want you to tell me why you
9  believe that the House maps were not drawn in a manner
10  based on considering all the facts that needed to be
11  considered?
12    A.    I think I just answered that.
13    Q.    To use your words.  To use your words.
14    A.    I just answered that.
15    Q.    And I want you to answer it again.  Why
16  do you believe that the House maps failed to consider
17  all of the factors that needed to be considered, to use
18  your words?
19    A.    I'm not able to answer that because I
20  don't know what was in the minds of that committee
21  when they drew the lines.
22    Q.    But you understand that racial
23  gerrymandering has a purposeful connotation, correct?
24    A.    Yes, I do.
25    Q.    Okay.  All right.  So as we sit here

Page 111

1  today and we are in February, your first lawsuit was
2  brought on October the 12th.  Your amended complaint was
3  brought a couple of days before Christmas.  I believe it
4  was brought on December 23rd.
5           As we sit here today, I would like you to
6  tell me as we sit here today what facts or evidence you
7  have to support the allegation that the House engaged in
8  racial gerrymandering to the detriment of minority
9  votes.
10    MR. INGRAM:  Objection.  President Murphy
11  is not a lawyer.  She's merely answering from her own
12  perspective.
13    MR. MOORE:  And I'm asking from her own
14  perspective, Mr. Ingram, so I'm expecting an answer.
15    A.    I am not an attorney but I do know that
16  when you look at the maps in terms of how they are
17  presently drawn, the mapping, that there is packing in
18  some of the areas in terms of the community.
19    Q.    You also said in this video presentation
20  that there was splitting of communities.  Is that right?
21    A.    You know, I think -- I think we do need
22  to listen at the whole -- you need to share that with
23  me because I think what I talked about is we needed to
24  be aware and, you know, we watch for -- you know,
25  gerrymandering could be an issue.  Splitting should

Page 112

1  not occur.  So maybe I do need to hear my own words.
2    Q.    Well, we might do that at the end because
3  I'm going to shift for a moment and I'll give you an
4  opportunity to listen to this entire video but here's my
5  question to you.  Do you believe that communities were
6  split?
7    A.    In my opinion or the opinion of the
8  group?
9    Q.    I'm asking for you --
10    A.    No, I'm not speaking on behalf of
11  myself here today.  I'm speaking on behalf of the
12  coalition so I will say to you the coalition in terms
13  of our meetings, yes.
14    Q.    But you're being deposed individually,
15  okay.  And so my question to you is do you believe that
16  communities were split?
17    MR. INGRAM:  Objection.  Asked and
18  answered.
19    MR. MOORE:  Asked.  Not answered.
20    Q.    Please answer the question, Ms. Murphy.
21  Do you believe communities were split?
22    A.    I am answering this as a member of the
23  coalition, not as Brenda C. Murphy because I was asked
24  to be -- I'm here representing the South Carolina
25  State Conference.

Page 113

1    Q.    Ma'am, you're here because I issued --
2  your lawyers agreed to produce you and we sent a notice.
3  That's why you're here.  And so my question -- and if
4  you're not going to answer my question, just tell me
5  you're not going to answer it.  Do you believe that
6  communities were split?
7    MR. INGRAM:  Objection.  Asked and
8  answered and badgering the witness.
9    Q.    Are you going to answer my question, Ms.
10  Murphy?
11    A.    I've answered your question.
12    Q.    Do you believe that communities were
13  split?
14    A.    I've answered your first question, sir.
15  My answers are based on the coalition.
16    Q.    Okay.  And so if your answers are based
17  on the coalition, which is a little inconsistent with
18  what Mr. Ingram said at the beginning of this
19  deposition, but if your answers are on behalf of the
20  coalition, can you explain exactly which communities the
21  coalition identified prior to the filing of this lawsuit
22  as communities that were split?
23    A.    I'm not -- I'm not prepared to answer
24  that question today.
25    Q.    So you can't answer that question.  Is

29 (Pages 110 - 113)

Brenda Murphy                                      February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 114

1  that right, Ms. Murphy?
2      A.    How many communities do we have listed?
3      Q.    I'm not here to answer questions.
4      A.    Okay.  That's why I'm not going to
5  answer that question today.
6      Q.    Okay.  When will you be able to answer
7  that question, Ms. Murphy?
8          MR. INGRAM:  Objection.  We've already
9  had a discussion about the challenged districts.
10 Overlap of the subject matter so asked and answered
11 objection applies here as well.
12         MR. MOORE:  You are giving speaking
13 objections to give hints to the witness on how to
14 respond, Mr. Ingram.  Please stop it.
15     Q.    Ms. Murphy, can you identify any specific
16 community that you or the coalition contends was
17 inappropriately split today?
18     A.    Of course I can.  Richland County.
19     Q.    Richland County is a community, is that
20 right, to you?
21     A.    There were areas in Richland County
22 that were split.
23     Q.    Okay.  Can you explain all of the
24 communities that you believe were split and how you
25 believe they were split?

Page 115

1      A.    I think that's an unfair question and I
2  will not answer that because you are asking me to
3  respond to information where there is quite a few
4  districts that we're talking about that have already
5  been identified.  I have no access to my notes, no
6  access to any written material, and I'm not going to
7  respond off the top of my head.
8      Q.    How would you be able to respond to that
9  question?  What would it take you to be able to respond
10 to that question, Ms. Murphy?
11     A.    For you to give me -- you want to show
12 the districts that were identified?
13     Q.    I'm going to go over a number of
14 districts, Ms. Murphy.  I'm going to do that.  Yes,
15 ma'am, I am.  You told me a few minutes ago that you
16 weren't prepared to do it today.  So what would it take
17 to allow you to be prepared to identify all of the
18 communities that you believe were split?
19     A.    Review my documents.
20     Q.    What documents are you talking about?
21     A.    I'm talking about the testimony that
22 was given.
23     Q.    Okay.  I believe -- do you agree that you
24 said that the ad hoc committee was not transparent in
25 how they defined communities of interest?

Page 116

1      A.    That they were not transparent?
2      Q.    Yes.  Do you recall saying that you
3  believe that the ad hoc committee was not transparent in
4  how they defined communities of interest?
5      A.    When did I say -- oh, you mean -- you
6  mean ad hoc committee for the House.
7      Q.    Do you recall saying that in the video
8  that the ad hoc committee was not transparent in how
9  they defined communities of interest?  Do you recall
10 saying that?  Yes or no.
11     A.    I recall -- and I probably said this
12 during the hearing as well -- that we needed more
13 transparency in terms of how communities were defined.
14     Q.    How do you define communities of
15 interest?
16     A.    Well, that could be several ways.
17     Q.    Okay.  And different people could define
18 communities of interest in different ways.  Is that
19 right?  Do you agree or disagree with that?
20     A.    I agree with your definition.
21     Q.    Okay.  I don't believe that was a
22 definition.  My question was do you agree or disagree
23 with me that different people can define communities of
24 interest different ways?
25     A.    Yeah, that's true.

Page 117

1      Q.    Okay.  And do you recall saying that the
2  ad hoc committee was not following the law?
3      A.    No.  When I spoke, I always said that
4  the ad hoc committee, we ask that they follow the
5  Constitution and comply with their criteria in terms
6  of defining districts.
7          MR. MOORE:  You know, I hate to do this
8  but I think that we need -- I think she's correct that
9  we need to listen to this video so we're going to
10 listen and then I'm going to pause and ask some
11 questions as we go along.
12         (Video playing.)
13         MR. MOORE:  Can you pause it for a
14 moment, Ms. Rabon?
15         (Video stopped.)
16     Q.    So you said there was gerrymandering.
17 Okay.  Again what evidence did you have to support that
18 when you went on to make this video, Ms. Murphy?
19     A.    Do you know in what context I said
20 there was gerrymandering?
21     Q.    No.  In what context did you say there
22 was gerrymandering?
23     A.    I did not -- I did not reference any
24 House or House maps in terms of gerrymandering during
25 that -- when I did that presentation or that

30 (Pages 114 - 117)

Brenda Murphy
February 4, 2022

The South Carolina State Conference vs. McMaste,

Page 118

1 interview.
2    Q.    Okay.  Well, you --
3    A.    Gerrymandering is based on my general
4 knowledge.  Gerrymandering does occur.  It has
5 occurred in our black community.  We know that it has.
6 And, you know, to even ask that question has
7 gerrymandering occurred, yes, it has.  If you want a
8 yes or no question, yes, it has.
9    Q.    Okay.  My question is I believe you told
10 him in response to a question about the House districts
11 that had been criticized as gerrymandering that they
12 were gerrymandering.  Is that what you were saying?
13    A.    No, that was not what I was saying.
14    Q.    And then I believe -- let's keep going.
15       (Video playing.)
16       MR. MOORE:  Pause it for a moment.
17       (Video stopped.)
18    Q.    I believe that you told him a minute or
19 two ago that you believe that communities had been
20 split.  What communities were you referring to at that
21 time?
22    A.    I was not referring to -- I did not
23 respond House or Senate.
24    Q.    I know, ma'am.  My question is when you
25 said that you believe that communities were split, what

Page 119

1 communities were you referring to when you made that
2 statement to Mr. Bailey?
3    A.    It was an overall statement.
4    Q.    You didn't have any specific community in
5 mind?
6    A.    He didn't ask me for a community.
7    Q.    Okay.  My question to you is did you have
8 a specific community in mind?
9    A.    Let me just say that gerrymandering has
10 been an issue -- it was an issue in the 2010
11 redistricting as well.  So this is not a new idea or a
12 new concept.
13       So when we talk about gerrymandering
14 and when we were talking about gerrymandering in this
15 conversation, it was general -- a general statement
16 that, yes, it has occurred in this state.  It had no
17 relationship to the outcome in terms of what we are
18 dealing with today.
19    Q.    Okay.  So I mean you agree with me that
20 there were allegations made of gerrymandering in 2010
21 and 2010 cycle, correct?
22    A.    In the 2010 cycle?  There were
23 problems.  There were issues.
24    Q.    Okay.  And you recall that portions of
25 that lawsuit were dismissed and the Court, the three

Page 120

1 judge panel in that case, ruled --
2    A.    I don't recall, sir.
3    Q.    And are you -- let me finish.  Are you
4 aware that the Court ruled against those challenges?
5    A.    I don't recall, sir.
6    Q.    Okay.  Are you also aware that in the
7 2010 cycle when pre-clearance was still an issue that
8 the justice department pre-cleared the maps?  Are you
9 aware of that?
10    A.    We have a different situation now.
11    Q.    That wasn't my question, Ms. Murphy.  I
12 would really ask -- you can explain your answer, okay,
13 but an answer is yes or no and then an explanation.  And
14 so I'm going to ask you to answer my question and then
15 explain your answer.  Are you aware that in 2010 the
16 justice department pre-cleared the House district?  Yes
17 or no.
18    A.    Yes.
19    Q.    Okay.  And are you aware that in 2010 the
20 challenged districts were upheld by a federal court?
21 Are you aware of that?  Yes or no.
22    A.    May I answer the question and then make
23 a statement?
24    Q.    You may.
25    A.    Yes, in 2010, that is true but we are

Page 121

1 dealing with a different situation now.  We are
2 dealing with the census that has shifted significantly
3 in certain places.
4    Q.    And when you say that we're dealing with
5 a census that has shifted, we have areas of the state
6 which have lost population, correct?
7    A.    I wouldn't say that they were the same.
8    Q.    I didn't say they were the same, ma'am.
9 I will restate my question.  We have areas of the state
10 that have lost population, correct?
11    A.    Correct.
12    Q.    Okay.  And we have areas of the state
13 that have gained population, correct?
14    A.    Yes.
15    Q.    Okay.  And those losses and gains dictate
16 to a substantial extent where districts need to be drawn
17 or re-drawn, correct?
18    A.    Yes.
19    Q.    And the African American population of
20 South Carolina according to the census is less -- the
21 black voting population is less in the 2010 census than
22 it was in the 2010 (sic) census.  Correct or incorrect?
23    A.    May I answer the question and make a
24 statement?
25    Q.    You may.  Yes, ma'am, you may.

31 (Pages 118 - 121)

Brenda Murphy
February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 122

1    A.    Yes, it has but there are several
2  variables that we need to be aware of.
3    Q.    And what are those variables, ma'am?
4    A.    In terms of the census, is it truly
5  reflective of the numbers of the black population and
6  maybe it's not.  And I'm making a statement here that
7  are we saying -- or a question.  Are we saying that
8  because of the perceived decrease in the black
9  population, we should decrease the number of African
10 American or black representatives in our House or
11 should we do everything we can to maintain at least
12 competitive districts.
13   Q.    Is that a statement?
14   A.    That's a statement.  I'm not asking for
15 an answer.
16   Q.    Okay.  I believe that -- do you recall
17 using the phrase -- and we can listen to this whole
18 recording if we need to.  Do you recall using the phrase
19 we need opportunity districts?
20   A.    I say that often.  I may have.
21   Q.    Okay.  What's an opportunity district?
22   A.    The opportunity for at least candidates
23 of our race, black people at least have the
24 opportunity to be considered as a candidate if they so
25 desire and have the potential of winning.  That does

Page 123

1  not mean that they have to have a fifty plus
2  percentage to win but at least a reasonable
3  opportunity to win.
4    Q.    And I believe -- correct me if I'm
5  wrong -- you said at some point in this video that there
6  were at least four districts where you might lose
7  representation.  Do you recall saying that?
8    A.    Yeah, I did.
9    Q.    Okay.  What are those four districts?
10   A.    I didn't say district.  I said there
11 are four -- that we have the potential of losing four
12 representatives in the current districts that we have.
13   Q.    Who are those four representatives and in
14 which districts?
15   A.    I'm not going to give names of that
16 because I don't deal with names.  I'm dealing with
17 opportunities for individuals to be candidates.
18        (Simultaneous crosstalk.)
19   A.    -- those opportunities.
20   Q.    I believe that you told me that there was
21 four districts where you might lose representation.
22 Okay.  What four districts are you talking about?
23   A.    No, no.
24        MR. INGRAM:  Objection.  Asked and
25 answered.

Page 124

1        MR. MOORE:  Asked again.  Not answered.
2    Q.    What's your response, Ms. Murphy?  Are
3  you going to identify those four districts for me?
4    A.    What I said during this interview was
5  basically there was the potential to lose
6  representation of four -- of four potential
7  opportunities to have representation.
8    Q.    And what are those four opportunities?
9    A.    Well, you know --
10   Q.    Ma'am?
11   A.    When you go through those counties,
12 those areas that have been defined, I will discuss
13 them at that time if it's okay.
14   Q.    So you're not going to answer my question
15 as I sit here and ask you what four areas?  You're not
16 going to answer that?
17        MR. INGRAM:  Asked and answered.
18   Q.    Is that right, Ms. Murphy?  Is that
19 right?  You're not going to identify them for me now?
20   A.    I will identify the counties if you
21 want me to.  Orangeberg County, Richland County, and
22 Florence County.  I think those are the four, four
23 areas -- three areas.
24   Q.    I think that's three.  I'll move on.  Ms.
25 Murphy, you mentioned the coalition and I'm not going

Page 125

1  to -- because I'm not going to take the time to show you
2  each and every one of these letters but you're aware
3  that this coalition that you referred to, the redistrict
4  sent letters to the ad hoc committee.  Is that right?
5    A.    Yes.
6    Q.    Okay.  I believe that there was a
7  letter -- give you the dates.  There's one that's
8  undated.  There's one that's dated August 30, 2021.  One
9  that's dated September 27, 2021.  One that's dated
10 October 8, 2021.  One that's dated November 15, 2021.
11 One that's dated November 19, 2021 and one that's dated
12 November 30th.  Do you recall those letters?
13   A.    Yes, I remember -- I recall the letters
14 being forwarded.
15   Q.    Okay.  And you were a signatory on those.
16 Is that correct?
17   A.    I've explained why I was earlier in
18 testimony.
19   Q.    Okay.  Well, my question is were you?  Do
20 you agree with me you were a signatory on each of those
21 letters?
22   A.    Yes.
23   Q.    Okay.  Did you write any of those
24 letters?
25        MR. INGRAM:  Objection.  Asked and

32 (Pages 122 - 125)

Page 126

1 answered.
2      Q.    Please answer my question, Ms. Murphy.
3      A.    As I explained earlier, the letters
4 were drafted by the coalition.  They were agreed upon.
5 They were edited prior to my signature being placed on
6 it.
7      Q.    Were they drafted by lawyers for the
8 coalition, Ms. Murphy?
9      A.    They were drafted -- well, I think in
10 terms of the letters being -- as I mentioned earlier,
11 the letters were composed by the coalition.  We put
12 our ideas and thoughts together.
13           The actual -- I stated to you earlier
14 our office is closed due to COVID.  I did not have the
15 resources to do those letters so they were done by I
16 think LDF in terms of the actual letter being
17 forwarded to the committee, the committee chair,
18 committee members.
19      Q.    Well, and each of the letters, I guess a
20 signature from one or more lawyers from the LDF is the
21 first signature.  Were they primarily drafted by the
22 LDF?  Just a yes or no and you can explain if you would
23 like.
24           MR. INGRAM:  Objection.  Asked and
25 answered.

Page 127

1      Q.    Can you answer my question, Ms. Murphy?
2      A.    Do you want to know if they typed the
3 letters?  Yes, they typed the letters.
4      Q.    All right.  So are you --
5      A.    And they were again -- and may I add
6 and they were again reviewed by the coalition to make
7 sure that every point that we wanted included was
8 included.
9      Q.    All right.  So are you familiar with the
10 ad hoc committee's redistricting guidelines?
11      A.    You mean -- yes.
12      Q.    Okay.
13      A.    Guidelines.  In terms of compliance
14 with the Constitution, the one man, one vote,
15 communities of interest?  Are you talking about
16 criteria?
17      Q.    Ma'am, are you familiar that the ad
18 hoc -- I mean you studied what the ad hoc redistricting
19 committee put out on its website?  Is that a yes or no?
20      A.    Yes.
21      Q.    And are you familiar with the fact that
22 the ad hoc committee issued guidelines that they
23 intended to follow in performing their duty to comply
24 with the law?  Are you familiar with that?
25      A.    Yeah, I'm familiar with that.

Page 128

1      Q.    Okay.  Have you reviewed those
2 guidelines?
3      A.    Yes, I have.  I wouldn't say that I
4 reviewed them today or this past week, no.
5      Q.    Okay.  Did you review those guidelines
6 before signing on to any of these letters if you know?
7      A.    Yes.
8      Q.    And these letters talk about complying
9 with section -- strike that.  I'm just not going to ask
10 that question.  Your letters raise the issue of
11 transparency.  Is that right?
12      A.    We always encourage transparency.
13      Q.    You are aware that there were at least
14 twelve public hearings across the state.  Is that right?
15      A.    I am aware but I also need to mention
16 that those hearings were held at times that were not
17 convenient for many and there were only two actually
18 scheduled virtuals which was near the end.  When you
19 look at that compared to what the Senate did, it was
20 not as widespread in terms of the community being able
21 to respond.
22      Q.    Well --
23      A.    Many more virtual opportunities for
24 Senate hearings than there was for the House.
25      Q.    Okay.  I don't think that's in response

Page 129

1 at all to my question and you keep adding as we go
2 along.  You didn't answer the question yes or no.
3 Here's my question.  Are you aware that that's more
4 hearings than the House has held in other cycles?  Are
5 you aware of that?  Yes or no.
6      A.    What's your question again?
7      Q.    Are you aware that this is more hearings
8 than the House has held previously?  Are you aware of
9 that?  Yes or no.
10      A.    Ten years ago, I wasn't as involved.
11      Q.    And are you aware that at least two of
12 the hearings included virtual testimony presentation --
13 participation and allowed members of the public to
14 attend virtually for both of those hearings?
15      A.    Yes.
16      Q.    Yes or no.
17      A.    I just stated that.
18      Q.    Okay.  So have you taken the position
19 that public input was not considered in the drafting of
20 these maps?
21      A.    I'm going to answer that public input,
22 yes, it was taken, but in terms of whether or not it
23 was enough, I'm going to say no.
24      Q.    Okay.  And on what do you base that?  On
25 what --

33 (Pages 126 - 129)

Brenda Murphy                                February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 130

1            (Simultaneous crosstalk.)
2    Q.    Let me finish, ma'am.
3    A.    Okay.
4    Q.    On what evidence do you base your
5  position that public input was not appropriately
6  considered if that is in fact your position?
7    A.    Oh, in terms of public input being
8  considered?
9    Q.    Yes.
10   A.    If you look at the outcome of the maps.
11  And that's from testimony given by not only the NAACP
12  but others that were participated, that did
13  participate in the hearings.
14   Q.    Anything else that you have to add to
15  that?
16   A.    Nothing else.
17   Q.    One moment.  In the letter dated November
18  15, 2021, the letter that you signed onto, identified
19  certain districts that you asked the ad hoc committee to
20  reconsider after the release of its plan, right?
21   A.    Sir, would you please not say that I
22  asked.  It was the coalition's overall agreement that
23  those areas be identified.
24   Q.    Okay.  So your letter -- okay.  You
25  signed onto it, correct, ma'am?

Page 131

1    A.    I signed onto it with the input of the
2  coalition.
3    Q.    Okay.  And so District 102, 103 and 111
4  were listed first.  Is that right?  And they were in
5  Berkeley and Charleston Counties, correct?
6    A.    I can't remember.  I don't have the
7  letter in front of me.  I didn't have the opportunity
8  to bring it up for review.
9    Q.    It was provided to your counsel and it
10  was noted for your counsel several days ago that we
11  intended to go over these with you.  So I reject the
12  consideration that you didn't have the opportunity to
13  review it.
14   A.    Yes, sir.
15   Q.    But if you'd like to look at it, I'll be
16  glad to show it to you.
17   A.    Go ahead.  What is your question?
18   Q.    Okay.  So it's the November 15, 2021.
19   A.    Sir, what is your question?
20   Q.    I'm going to put up the document and then
21  I'm going to ask you a question, okay, Ms. Murphy?
22   A.    Okay.
23        MR. MOORE:  It's loading.  It should be
24  in your folder, Mr. Ingram.
25        MR. INGRAM:  One second.

Page 132

1            MR. MOORE:  What exhibit number is it on
2  the PDF list, 7 or 8?
3            MR. PARENTE:  Number 8.
4            (Whereupon, Defendant's
5            Exhibit 8 was marked for
6            identification.)
7            MR. MOORE:  Is it not popping up?  Can
8  you see it, Mr. Ingram?
9            MR. INGRAM:  Yes.
10           MR. MOORE:  You can see it?
11           MR. INGRAM:  Correct.
12   Q.    Okay.  All right.  So on the first page,
13  it says that you asked the committee to reconsider its
14  proposed boundary lines for House Districts 102, 103,
15  and 111.  Is that right?
16   A.    Yes.
17   Q.    Okay.  None of those districts were among
18  the challenged districts.  Is that right?  If you know.
19   A.    No.  No.  I can't -- I don't have my
20  list in here, sir, so I don't want to admit to any one
21  so -- do you have a listing of the districts that we
22  listed?
23   Q.    Yes, ma'am.  There's a complaint and it
24  was drafted by your lawyers and I'm going to go over it
25  in minute.  Do you know if those three districts are the

Page 133

1  in the challenged districts?  As you sit here today, do
2  you know?  Yes or no.
3    A.    Berkeley County -- you said Charleston
4  County?
5    Q.    Those three districts are in Berkeley and
6  Charleston County.  Do you know if you challenged any of
7  the Berkeley or Charleston County districts in your
8  lawsuit, Ms. Murphy?
9    A.    I know of challenges in those areas but
10  I'm not --
11   Q.    I'm going to move on.  I'm going to move
12  on and ask you about -- hold on for one moment.
13   A.    Okay.
14   Q.    I'm not going to spend a whole lot on
15  discussing what she did or didn't do.  So I'm going to
16  move on.  Okay.
17   A.    Okay.
18   Q.    I'm going to move on because I could
19  spend thirty minutes doing this and I don't know that at
20  the end of the day that's the best use of our time.
21   A.    Okay.
22   Q.    So what do you believe are traditional
23  redistricting principles in South Carolina?
24   A.    What they should be?
25   Q.    No.  What are to you traditional

34 (Pages 130 - 133)

Brenda Murphy                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 134

1 redistricting principles? Are you familiar with that
2 phrase?
3      A.    No.
4      Q.    Okay. All right.
5      A.    In terms of traditional redistricting
6 preferences? Is that --
7      Q.    Principles. I used the words traditional
8 redistricting principles. Are you familiar with that
9 phrase?
10     A.    No. No, I'm not.
11     Q.    Okay. Do you have any criticism of the
12 ad hoc committee's redistricting guidelines?
13     A.    The only comment that I said regarding
14 their guidelines was just in terms of being a little
15 bit more in what I say transparent, just more -- being
16 a little bit more clearer in terms of some of the
17 criteria, especially as it related to how communities
18 were identified, communities of interest.
19     Q.    Okay. And I believe we touched on this
20 before but would you agree that a smaller geographic
21 area is more likely to consist of fewer communities of
22 interest?
23     A.    A smaller area?
24     Q.    Yes, ma'am.
25     A.    Now we just -- you know, we have to

Page 135

1 consider not just communities of interest because when
2 we are dealing with criteria, we also have to be aware
3 of the population.
4      Q.    I wasn't asking -- I wasn't asking you
5 about criteria at this point. I'm asking you about
6 communities of interest. Would you agree with me that
7 it's important to keep communities of interest whole?
8 Is that right or wrong?
9      A.    Yes, I agree with that. I do.
10     Q.    All right. And would you agree, for
11 example, that the town of Ridge Spring which has a
12 population of 579 might be a community of interest?
13     A.    There may be -- Ridge Spring. There
14 may be other similar areas around that community. You
15 know, it may be a little bit more widespread. So
16 should a district be composed of -- just because it's
17 579 individuals in Ridge Spring doesn't mean that that
18 community could be larger than that when you look at
19 community of interest.
20     Q.    Okay. Well, but you would agree with me
21 that you should take pains not to split communities of
22 interest. Is that right?
23     A.    Yes.
24     Q.    Okay. And you would agree with me that
25 you shouldn't split voting precincts, right, to the

Page 136

1 greatest extent?
2      A.    Yes.
3      Q.    Okay. Would you agree with me that the
4 map that your organization proposed split way more
5 voting precincts than the map that was ultimately passed
6 by the House? Would you agree or disagree with that
7 proposition?
8      A.    I will agree that there may have been
9 some more splitting but it provided the opportunity
10 for more -- no. In terms of representation for
11 communities, there was an increase of opportunity to
12 do that. So it was done in such a way to provide that
13 opportunity to us as black folk, as black people.
14     Q.    Do you consider the city of Columbia to
15 be one entire community of interest?
16     A.    We have to look -- I think what you
17 have to look at -- when we say a community of
18 interest, when you look at Columbia, South Carolina --
19     Q.    As an entire city, yes, ma'am. Do you
20 consider that to be a community of interest, one entire
21 community of interest? Yes or no.
22     A.    You're talking about the city of
23 Columbia or --
24     Q.    Yes, ma'am. I'm talking about the city
25 of Columbia.

Page 137

1      A.    The city of Columbia, yes.
2      Q.    Okay. Do you consider the city of
3 Anderson to be a community of interest?
4      A.    Yes.
5      Q.    But did your map split the city of
6 Columbia?
7      A.    There was some splitting.
8      Q.    Okay. And on what basis do you claim
9 that the city of Columbia is one solitary community of
10 interest? Please explain that to me.
11     A.    We have to consider population. We
12 cannot consider totally in terms of -- you know, we
13 have to follow the law. We can't just say Columbia
14 has 509 -- a population of 509 so we're going to let
15 that be a district by itself when we know the number
16 is greater in terms of what the law permits.
17     Q.    Ma'am, I'm asking you a very simple
18 question and I would appreciate a simple answer. On
19 what specific facts do you rely on to support your
20 position that the city of Columbia is one community of
21 interest? And if you want to tell me that you no longer
22 take that position, fine, tell me that, but if you're
23 going to take that position, I want to know what
24 specific facts support your assertion that the city of
25 Columbia is one entire community of interest.

35 (Pages 134 - 137)

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 138

1    A.    I need to ask you a question before I
2  answer that.  Do you live in Columbia?
3    Q.    Yes, ma'am, I do.
4    A.    Okay.  The city of Columbia is pretty
5  large in terms of population.  Would you agree to
6  that?
7    Q.    Well, I'm not going to engage in a back
8  and forth do I agree or disagree.
9    A.    Okay.  All right.  Well --
10         (Simultaneous crosstalk.)
11   A.    Let me stop you for a moment.  My
12  question was simply upon what do you rely to support
13  your assertion that you just made a few minutes ago that
14  the city of Columbia is a community of interest?  Just
15  tell me quickly if you can.
16   A.    The resources in the area.  What
17  happens in Columbia is different than what happens say
18  in maybe another part of the county.  Interest,
19  available resources to share.
20   Q.    How much time have you spent in Anderson?
21   A.    Let me -- I'll just share this with you
22  because I think you all need to know this and I think
23  I said this before.  I have traveled the state of
24  South Carolina.  I've gotten to know the presidents in
25  the different areas.  I visited different branches.  I

Page 139

1  have visited Anderson and the president from their
2  membership up there several times, a number of times
3  so I'm very familiar with Anderson.
4    Q.    All right.  And so --
5    A.    Have I visited -- I have visited -- I
6  can frankly say I visited every county in the state.
7    Q.    Okay.  All right.  So upon what specific
8  evidence do you rely to support your assertion that
9  Anderson, the city of Anderson is one unitary community
10  of interest?
11   A.    You're talking the city or the county?
12   Q.    City.  Yes, ma'am.
13   A.    Again the same variables that I
14  mentioned in Columbia that are very different in
15  Anderson but they are similar to those individuals
16  that live in that area.
17   Q.    Okay.  I'm going to shift gears for a
18  moment.  Okay.  I believe that you provided some
19  training.  Is that correct?
20   A.    Training?
21   Q.    Yes, ma'am.
22   A.    Regarding the redistricting process?
23   Q.    Yes, ma'am.
24   A.    Yes.
25   Q.    Okay.  What sort of training did the

Page 140

1  NAACP or its local branches receive on redistricting if
2  you know?
3    A.    I think I said that earlier.  Regarding
4  the process, regarding the importance of us being
5  involved in that process, and the importance of us
6  giving feedback to those that represent us.
7    Q.    And --
8    A.    I did not perform the training.  The
9  training was done by primarily Dr. Ruoff.
10   Q.    Okay.  And so what sort of training did
11  Dr. Ruoff put on?
12   A.    It was a classroom setting in terms of
13  just the redistricting process, those things that I
14  just talked about.
15   Q.    Did you pay him to conduct that training?
16   A.    He's a consultant, not -- he's a
17  consultant for us.  We pay him a minimal fee but just
18  for consultation.
19   Q.    Okay.  So who paid him a fee?
20   A.    We did.
21   Q.    Who is the "we"?
22   A.    The South Carolina State Conference.
23   Q.    Okay.  And when did you begin paying him?
24   A.    Last year in June.
25   Q.    2021?

Page 141

1    A.    Yes.
2    Q.    Was he also paid by the League of Women
3  Voters if you know?
4    A.    I don't know.
5    Q.    I believe you attended public hearings
6  where he has testified alongside Ms. Teague.  Is that
7  right?
8    A.    Yes, I did.
9    Q.    And let me ask you this question.  Was
10  Mr. Ruoff involved at all in the drawing of the maps
11  that you submitted for consideration?
12   A.    No, he was not.
13   Q.    Okay.  Who drew those maps?
14   A.    With our input, they were drawn by the
15  ACLU resource that had expertise in that area.
16   Q.    So who drew them?  Who?
17   A.    ACLU had a resource.
18   Q.    Who was that resource?  Who was the
19  person that did the drawing?
20   A.    I cannot answer that.  All I know is we
21  did not pay anyone for drawing up any lines and we
22  used individuals that had expertise that were on
23  our -- a part of our coalition.
24         You know, we learned the basics about
25  methods, but in terms of that being critiqued and

36 (Pages 138 - 141)

Brenda Murphy
February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 142

1 making us aware of certain variables that needed to be
2 considered and make sure that we were inclusive, that
3 was done by ACLU with someone with expertise in that
4 area.
5    Q.    So the ACLU drew your maps for you. Is
6 that what you're telling me?
7    A.    With our input, yes.
8    Q.    Okay. And do you know the name of the
9 person who was involved in drawing of the maps?
10    A.    I don't -- no, I don't. I can't tell
11 you off the top of my head, no.
12    Q.    Have you ever heard that name?
13    A.    No, not the -- I can't tell you the
14 name of the person. That is someone that has
15 expertise in that area. We did not have the resources
16 or the funding to do that. So you know that you have
17 to have certain programs to assist in that process and
18 so ACLU had that -- had that resource.
19        So with them being a part of coalition,
20 looking at past history, getting information from
21 those our presidents and others, then the maps were
22 drawn. They were critiqued by NAACP members and
23 leadership and they were finalized before submission.
24    Q.    Okay. But you don't know who did the map
25 drawing, right?

Page 143

1    A.    I can't give you a name, no.
2    Q.    Okay. Did you ever meet that person?
3        MR. INGRAM: Objection. Asked and
4 answered.
5    Q.    Did you ever meet that person, Ms.
6 Murphy?
7    A.    No, I did not.
8    Q.    Okay. Did you ever see a resume from
9 that person?
10        MR. INGRAM: Objection. Asked and
11 answered.
12    Q.    Did you ever see a resume from that
13 person?
14    A.    I do not know the person, sir.
15    Q.    Okay. All right. So if you don't know
16 the name of the person and if you've never seen a resume
17 from the person, how can you tell me under oath that
18 that person had expertise in the drawing of maps?
19    A.    Based on the member of our coalition
20 that was ACLU.
21    Q.    You don't have any other evidence to
22 support that. Is that right?
23    A.    No.
24        MR. INGRAM: Objection. Asked and
25 answer.

Page 144

1    Q.    Did you personally participate in the
2 drawing of the maps?
3    A.    Yes. Not putting the pencil to the
4 paper, but in terms of suggestions, what might needed
5 to be changed somewhat, if something was considered,
6 yes, I participated in this way. No, I did not
7 actually draw a map. Were there people that looked at
8 drawing maps during this process? Yes, there were
9 people that looked at drawing maps and commenting
10 about what their thoughts were.
11    Q.    Did you have access to the addresses of
12 incumbents in drawing those maps?
13    A.    No.
14    Q.    Do you know if the members of the ACLU
15 that drew the maps who you can't identify had
16 information about the addresses of incumbents when
17 drawing maps? Do you know? Yes or no.
18    A.    No.
19    Q.    Okay. So you can't tell me that --
20 strike that. Did you have election data available when
21 drawing the maps?
22    A.    No. We didn't per se, no.
23    Q.    Do you know if the people who drew your
24 maps had election data?
25    A.    Sir, that is something you will have to

Page 145

1 ask ACLU.
2    Q.    Okay. Do you know how many incumbents
3 your plan combined?
4    A.    That's public knowledge. It's been in
5 the press.
6    Q.    Okay. So are you aware that your plan
7 combined nineteen incumbents? Are you aware of that?
8    A.    That what, our plan combined nineteen
9 incumbents?
10    Q.    Combined nineteen incumbents. Yes,
11 ma'am.
12    A.    I know our plan -- I think in terms of
13 incumbents, there was greater opportunity for --
14    Q.    Ms. Murphy, Ms. Murphy --
15    A.    Yes.
16    Q.    -- I'm going to stop you. I'm sorry. I
17 asked you a very simple question. I would really
18 appreciate an answer to the question. Do you agree that
19 your plan combined nineteen incumbents? Yes, no or I
20 don't know is an appropriate answer.
21    A.    I will answer but I would like to make
22 a comment.
23    Q.    Well, please do but how about answering
24 the question first and how about keeping the commentary
25 restricted to the subject matter of the question?

37 (Pages 142 - 145)

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 146

1    A.    Okay.
2    Q.    Did your plan combine nineteen
3  incumbents?
4    A.    Yes.
5    Q.    Now what do you want to say about that?
6    A.    What I would like to say is maybe there
7  were less but there was greater opportunity for black
8  people to be involved in the political process or the
9  political decision-making regarding black people.
10   Q.    Okay.  Do you know --
11       MR. INGRAM:  Can we take a break?
12       MR. MOORE:  Excuse me?
13       MR. INGRAM:  We would like a break.
14       MR. MOORE:  Okay.  Well, you're not
15  supposed to discuss her testimony during that break.
16  I'm happy to give you a five-minute break.
17       (Brief recess.)
18   Q.    (BY MR. MOORE:)  Ms. Murphy, did you
19  speak to your counsel while you were away?
20   A.    No, I did not.
21   Q.    Okay.  So I believe we're at three hours
22  and thirty something minutes, and while I want to
23  endeavor to keep my questions under to five hours, it
24  will be a lot easier for me to do that if I get
25  responsive answers to questions rather than

Page 147

1  nonresponsive answers and so I'm going to be a little
2  more stringent perhaps in to trying to police that as we
3  go forward.
4       So I believe that you told me a few
5  minutes ago that you understand -- you understood that
6  nineteen incumbents were in your plan combined.  Is that
7  right, Ms. Murphy?  That's a yes or no.
8       MR. INGRAM:  Objection.  Asked and
9  answered.
10   Q.    Okay.  Could you answer the question, Ms.
11  Murphy?
12   A.    In our plan?
13   Q.    Yes, ma'am.  In the NAACP plan, yes,
14  ma'am.
15   A.    That there were nineteen incumbents?
16   Q.    Yes, ma'am, combined.  Do you agree -- I
17  believe you told me a minute ago that you agreed.  Is
18  that right?
19   A.    No.
20   Q.    You don't agree now?
21   A.    I may be interpreting what you're
22  saying differently.  When I -- when I spoke -- if I
23  can comment, sir.
24   Q.    Ma'am, I'm not -- let me ask the
25  question.

Page 148

1    A.    I need --
2    Q.    No, ma'am.  I'm going to stop you, okay.
3  I'm sorry.  I didn't ask you about when you spoke.  So
4  here's -- I mean if you mean when you spoke to me a few
5  minutes ago, then, yes, explain.  I'm not asking about
6  when you spoke to the House.  I'm not asking --
7    A.    No, no.  I'm not -- that isn't my
8  question.
9    Q.    Okay.  Then what's your question?
10   A.    My question is are you saying that with
11  our plan there -- and this is for -- I'm trying to
12  clarify it.  Are you asking me that our plan has the
13  potential for nineteen incumbents to remain?  Is that
14  your question?
15   Q.    No, ma'am.  Here's my question.
16   A.    Okay.
17   Q.    Are you aware -- and I believe this is
18  the exact question I asked a few minutes ago.  Are you
19  aware that nineteen current incumbents were combined --
20  that is, put against each other -- in your plan?  Were
21  you aware of that?
22   A.    No.
23   Q.    Okay.  And are you aware that of those
24  nineteen, seventeen of those incumbents were Republican?
25  Were you aware of that?

Page 149

1    A.    No.  May I comment?
2    Q.    Go ahead.
3    A.    Our plan was developed without
4  considering incumbents.
5    Q.    Ma'am, are you sure of that because that
6  may contrast with public statements made by your lawyers
7  and other representatives so are you sure of that?
8  Ma'am?
9    A.    I'm thinking, sir.  I don't want to
10  give an incorrect answer.
11   Q.    And I'm trying to be as fair as I can.
12  That's why I'm asking that question.
13   A.    No.  I'm sorry.  I wasn't.  I have to
14  say no.
15   Q.    Okay.  All right.  Do you like that
16  figure, seventeen of nineteen are Republicans?
17   A.    Do I like it?
18   Q.    Yes, ma'am.  Does that sound like
19  something that looks like it was done -- that was not
20  the product of reverse political gerrymandering?
21   A.    Let me say this.  What we as the state
22  conference and our coalition -- our intent was not to
23  consider incumbents but to look at drawing a map that
24  would provide opportunities for competition, okay.
25  And that's all I can say because we didn't consider

38 (Pages 146 - 149)

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 150

1  incumbents.  I'm sorry.
2      Q.    Is it generally preferable to keep
3  smaller counties whole when possible?  Would you
4  agree --
5      A.    Smaller counties?
6      Q.    Yes, ma'am.
7      A.    If it's possible to keep them whole --
8  small counties?  Yes, I think that should be done.
9      Q.    Is avoiding voter confusion one of the
10 goals of your organization?
11     A.    Yes.
12     Q.    Okay.  And does splitting voter precincts
13 increase or decrease voter confusion in your mind?
14         (Phone ringing.)
15     Q.    We're sorry.  My question was does
16 splitting voter precincts increase or decrease voter
17 confusion in your mind?
18     A.    It depends.  It could -- that's a maybe
19 question and I will say that depending on the size of
20 the precinct.
21         MR. MOORE:  Okay.  Can we pause for
22 just one moment and put that on mute for just one
23 second.
24         (Off-the-record discussion.)
25     Q.    So let me ask you this question.  And I'm

Page 151

1  sorry for that interruption.  Are you aware that the
2  number of precincts that were split in Act Number 117,
3  the act that are here to talk about, is 365?  Are aware
4  of that?
5      A.    Which -- it depends on the area.
6  What --
7      Q.    Let me ask this question.  Do you have
8  any reason to doubt that the plan that passed the House
9  and Senate with respect to the House districts only
10 split 365 districts, voting precincts?  Do you have any
11 reason to doubt that figure?
12     A.    No.
13     Q.    Okay.  Do you have any reason to doubt
14 the fact that 628 precincts were split in your plan?
15     A.    I know they were.  May I make a
16 comment?  May I make a comment?
17     Q.    Sure.  Sure, you may.
18     A.    Okay.  There are certain communities
19 greater in number and when you look at the number --
20 when you look at the number of precincts and numbers
21 that precinct may serve, it could contribute to
22 problems in terms of voters being able to cast their
23 vote.
24     Q.    Okay.  Well, let me ask you this, Ms.
25 Murphy.  You would agree with me that the plan, that the

Page 152

1  2011 plan that was upheld by a federal district court
2  split only 500 precincts, correct?  Would you agree or
3  disagree with that?
4      A.    Yes.
5      Q.    Okay.  And you would agree that the
6  number of precincts that were split by 117 was way less
7  than that, 365, correct?
8      A.    You're talking Berkeley?
9      Q.    No, ma'am, I didn't say Berkeley.  I
10 said --
11     A.    What county?
12     Q.    I said --
13     A.    I'm sorry.
14     Q.    I said in 2011, the bill that was enacted
15 into law and upheld by a three judge federal panel split
16 500 precincts.  Do you agree with that?
17     A.    Yes.
18     Q.    Okay.  The bill that was signed into law
19 here, the House plan, improves upon that by only
20 splitting 365 precincts, correct?
21     A.    Yes.
22     Q.    But your proposed plan would split 628
23 precincts, correct?
24     A.    Yes.  May I comment?
25     Q.    Yes, ma'am, you may.

Page 153

1      A.    I'm sorry.  The population in South
2  Carolina has increased significantly, and when you
3  look at the number of precincts back then, it may have
4  been lower but we have a greater number of people to
5  serve as well as even then there were some precincts
6  that were problematic still with numbers increasing
7  since that 2010, 2011 in terms of when the plan --
8  precincts were -- the districts were determined and
9  precincts were determined.  So we had --
10         (Simultaneous crosstalk.)
11     A.    Okay.  That's it.
12     Q.    Okay.  And I believe you agreed with me a
13 few minutes ago that splitting more voter precincts can
14 lead to more voter confusion.  Right or wrong?
15     A.    It can.  May I -- and I'm going to make
16 a statement.  It can if the information does not get
17 to the voters in the manner that it should.
18     Q.    All right.  I want to talk to you about
19 some challenged districts and you mentioned that you
20 were familiar with Anderson.  Is that correct?
21     A.    Yes.
22     Q.    Okay.  All right.  And can you explain
23 the allegations in your complaint with regards to
24 Anderson and splitting the city of Anderson?
25     A.    I think -- and I don't have that right

39 (Pages 150 - 153)

Brenda Murphy
February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 154

1 in front of me but I think it was related to in terms
2 of how that was split, some on one side of the highway
3 and some on the other side of the highway. I mean
4 that contributes to problems itself when someone may
5 be living across the street from each other and
6 they're in different precincts.
7    Q.    Ma'am, are you telling me that your plan
8 doesn't split people across streets and highways and the
9 like? Are you telling me that that doesn't happen in
10 your plan?
11    A.    I'm trying to say that we are doing
12 whatever we can not for it to occur.
13    Q.    Okay. Well, you take issue with the fact
14 that Anderson, the city of Anderson is split between
15 four House districts. Is that right?
16    A.    Yes.
17    Q.    Is that right?
18    A.    Yes.
19    Q.    Okay. And would you agree with me that
20 it was split in a very thorough manner to the way that
21 it was split back in 2011?
22    A.    I'm going to say yes but, you know, I
23 think my comment regarding how our state has changed
24 is not being considered. We have a greater number of
25 people, yes, but in terms of maps, the district should

Page 155

1 be contiguous of each other. We should make every
2 effort for that to be if possible.
3    Q.    Well, and would you agree with me that
4 the plan that was passed in 2011 was upheld by a federal
5 court?
6    A.    I will say yes but the situation is not
7 the same.
8    Q.    How can you tell me that the situation is
9 not the same and requires a radical redrawing of the
10 House districts in Anderson? Explain that to me.
11    A.    Did I say radical? Did we use the term
12 radical?
13    Q.    No, ma'am. I used the term radical.
14    A.    Okay. Well, I did not -- I would not
15 agree with that.
16    Q.    Okay. Are you familiar with District
17 Number 7?
18    A.    Okay. Location just to make sure I'm
19 in the right place. I don't have the list in front of
20 me.
21    Q.    Are you familiar with it?
22    A.    Location. I asked if you would give me
23 the location.
24         MR. MOORE: Should we pull up the
25 complaint or not? One moment.

Page 156

1         MR. INGRAM: If you have the complaint to
2 clarify, that's helpful.
3         MR. MOORE: It just takes a few minutes
4 to load the complaint. Hold on one second.
5         MR. INGRAM: We need to be able to verify
6 your question so we can wait.
7         MR. MOORE: What exhibit -- what was the
8 complaint? The amended. Give me a page, Mr. Parente.
9         (Off-the-record discussion.)
10    Q.    Okay. Can you look page 34? And this is
11 on page 34 of your complaint which lists the map that
12 you submitted --
13         MR. INGRAM: Give me one second. We're
14 scrolling. Give us one second. And just to clarify,
15 when you say 34, UCF 34 or the actual pagination on the
16 document?
17         MR. MOORE: Pagination on this document.
18         MR. INGRAM: Perfect.
19         MR. MOORE: I believe it's the same.
20         MR. INGRAM: It is not. Here you go.
21    Q.    Are you familiar with the district that
22 is drawn here as District Number 7 in your proposed map,
23 Ms. Murphy?
24    A.    I'm looking at this -- I'm looking at
25 it now.

Page 157

1    Q.    Okay.
2    A.    Okay. Your question?
3    Q.    Yes, ma'am. Can you explain to me how
4 this District Number 7 as drawn here is not packing, to
5 borrow the phrase you have used previously? How is it
6 not packing?
7    A.    Considering the population and in terms
8 of that county being -- has a high percentage of white
9 population to a minimal -- when compared, it's very
10 low for a black population and in order to draw an
11 opportunistic or competitive district because of
12 numbers.
13    Q.    Do you agree or disagree that this
14 District Number 7 is surgically drawn around high black
15 voting age population census blocks? Do you agree or
16 disagree with that statement?
17    A.    That's where the black folks live.
18    Q.    Okay. And so was race the predominant
19 factor that you used in drawing that district?
20    A.    That's an opportunistic district.
21         MR. INGRAM: Objection. Calls for a
22 legal conclusion.
23    Q.    You may answer, Ms. Murphy. Was race the
24 predominant factor used to draw that district in your
25 proposed map?

40 (Pages 154 - 157)

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 158

1      A.      I will say race was considered.
2      Q.      That wasn't my question.  Was it the
3  predominant factor used in drawing that district?
4      A.      No.
5      Q.      Why not?
6      A.      We have to consider all factors.  You
7  know, race may in terms of drawing a competitive
8  district with such a low population of black
9  residents.  Then in order for them to be able to be
10  influenced somewhat what happens in that district, it
11  would need to be drawn in such a manner.
12     Q.      Are you familiar with the towns of Belton
13  and Honea Path?
14     A.      Yes, I am.
15     Q.      Okay.  Why did your plan put these two
16  towns in different House districts?
17     A.      Now that's a question that I cannot
18  answer individually because that was a decision made
19  by us as a whole.  And I'm sure if -- Honea Path.
20  Belton, Belton sits -- the intent was to draw a
21  district that could be competitive but not totally
22  packed -- packing an area, any community.
23     Q.      Why did your map split the town of Belton
24  in half if you know?
25     A.      Well, I'd have to -- I can't say that

Page 159

1  right now.  I really can't.  I don't have an answer to
2  that.
3      Q.      Are you familiar with the allegations
4  that your plan has made with respect to Chester?
5      A.      With respect to --
6      Q.      Chester.
7              MR. INGRAM:  Are you referring to the
8  complaint?
9              MR. MOORE:  I'm going to refer to it when
10  I ask a specific question.
11     Q.      My question first is are you familiar
12  with the allegations that your lawsuit makes concerning
13  the county of Chester?  Yes or no, Ms. Murphy.
14     A.      Right now, I can't say because there
15  were so many different areas.  I would hate to say --
16  give an answer not looking at my records.
17     Q.      All right.  Let's look at page 36.
18     A.      Thirty-six?
19     Q.      Yes, ma'am.  This alleges that District
20  41, a majority black district mostly made up of
21  Fairfield County, reaches up past the Fairfield County
22  line to create a bizarrely-shaped bunny ear appendage
23  that grabs the black majority city of Chester as well as
24  other areas comprised heavily of black voters in Chester
25  County.  In the process, defendant split eight precincts

Page 160

1  in Chester County across Districts 41 and 43.  Do you
2  see that allegation?
3      A.      That's based on the fact that, you
4  know, that unusual shape as well as it should be
5  contiguous.  Now and I -- may I make a statement?
6      Q.      Yes, ma'am.
7      A.      It will be brief.  It will be brief.  I
8  promise you.  When we look at how -- such as looking
9  at Chester County and we look back at Anderson, when
10  you look at the populations within those two areas,
11  the populations of -- with the number of blacks are
12  significantly lower than it is -- well, significantly.
13              We are talking maybe 70 percent white,
14  17 percent black.  I'm using that figure.  It may not
15  be exactly right but we have to look at that and in
16  terms of how representation can be done in certain
17  areas and do we have -- is that a factor?  Yes, it is
18  in some situations.
19     Q.      Do you support these allegations as we
20  sit here today, Ms. Murphy?
21     A.      You mean in terms of the lines being
22  drawn in such a way that it's not a situation that
23  could be influential district?
24     Q.      No, ma'am.  No, ma'am.  No, ma'am.  I'm
25  asking a very simple question.  Your complaint -- and

Page 161

1  I'll rephrase it.  Your complaint asks the Court to
2  redraw the lines for Districts 41 and 43.  Is that what
3  you're asking for?
4      A.      Yes.
5      Q.      Okay.  And you want the district that's
6  currently represented by Representative McDaniel to be
7  redrawn.  Is that right?  That's what you want?
8      A.      No, I didn't ask that Ms. McDaniel's
9  line be drawn.  I am asking that the lines be drawn in
10  such a fashion that there is an opportunity for there
11  to be -- an opportunity for competitiveness.
12     Q.      There's a difference between
13  competitiveness and purposeful racial discrimination,
14  right?
15     A.      Yes, I agree to that.
16     Q.      Okay.  And so did you attend the hearing
17  in Columbia where Representative McDaniel spoke in
18  public?
19     A.      Yes, I was there.
20     Q.      Okay.  And do you recall some concerns
21  that she raised about only representing rural areas and
22  concerns about Chester as a city?  Do you recall her
23  raising those concerns that she was only representing
24  rural districts and not -- do you recall any such
25  concern expressed by her?

41 (Pages 158 - 161)

Brenda Murphy
February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 162

1    A.    No, I don't recall that.  That may have
2  been another session.  No, I do not.
3    Q.    All right.  Okay.  Do you see that -- do
4  you understand that the House plan and the House plan
5  that was passed keeps the city of Chester whole and puts
6  it in a district that is currently represented by
7  Representative McDaniel?  Do you understand that?
8    A.    So if I'm interpreting you correct,
9  you're saying -- and I think we need different --
10  let's not talk names.  I would prefer that we not do
11  that.  When we're looking at this in terms of a rural
12  area, you are saying Chester and --
13    Q.    I'm talking about District Number 41,
14  okay.  I'm talking District Number 41, okay.
15    A.    Okay.
16    Q.    And are you telling me that you think it
17  is a bad thing to include the city of Chester as a whole
18  entity in that one district?
19    A.    The intent -- well, the intent is to
20  keep as many counties whole but also the goal is to
21  ensure that we have representatives from that area --
22  if it's a possibility to have a representative from
23  the community of choice, that that is possible, at
24  least an opportunity for that.
25    Q.    Okay.  Let's look on page 37 of that

Page 163

1  document.
2    A.    I'm having --
3    Q.    Because I want to focus on the allegation
4  about the bunny eared appendages.
5    A.    Wait a minute.  Wait a minute.  Okay.
6    Q.    You talked about the shape a few minutes
7  ago, right?
8    A.    I'm sorry.
9    Q.    You talked about the shape.
10    A.    Just a second.
11    MR. INGRAM:  What page should she be on?
12    MR. MOORE:  Thirty-seven.  Can you see
13  page 37, Mr. Ingram?
14    MR. INGRAM:  We're on 37, yes.
15    Q.    Okay.  All right.  You see this so-called
16  bunny eared appendage.  Is that right, Ms. Murphy?
17    A.    Yes.
18    Q.    And that's one of your criticisms.  Is
19  that right?
20    A.    Yes.
21    Q.    Okay.  Are you familiar with your plan
22  for the congressional districts?
23    A.    I don't have those in front of me.
24    Q.    I'm about to put one in front of you,
25  okay?

Page 164

1    MR. INGRAM:  Objection.  This is about
2  the House maps.
3    MR. MOORE:  It is about the House maps,
4  Mr. Ingram, and I'm going to put a document in front of
5  her.  And I'm going to ask a question and I believe
6  you'll see the relevance of it, but if not, you can
7  object.  What is the exhibit, Michael?
8    (Off-the-record discussion.)
9    MR. MOORE:  I am very concerned about
10  Veritext and this Exhibit Share platform today and I
11  apologize for the fact that it's making it way more
12  difficult for us to do this deposition than it should.
13    THE DEPONENT:  Thank you.
14    MR. INGRAM:  Are we waiting for a
15  document to load in the platform?
16    MR. MOORE:  I'm trying to load a
17  document, yes, sir.  I'm trying to load the NAACP's
18  proposed map.
19    Q.    And while I do, I'm going to ask you a
20  question, Ms. Murphy, and you know the answer to it or
21  not, okay.  Do you agree with me or not agree with me
22  that proposed District 6 in your map shares a similar
23  bunny-shaped appendage as the map that you criticize in
24  the House district?  Yes or no.
25    A.    Do you have that up?

Page 165

1    Q.    I'm trying to get it.  I'm trying --
2    MR. INGRAM:  She needs to see the
3  document you're referring to.
4    MR. MOORE:  Okay.  We're going to take a
5  short break so we can see if we can pull up this
6  document.
7    (Brief recess.)
8    (Whereupon, Defendant's
9    Exhibit 9 was marked for
10    identification.)
11    Q.    (BY MR. MOORE:)  Does everyone see the
12  document that's in front of you?  And this would be
13  exhibit number what?  Nine.  Do you see that, Ms.
14  Murphy?
15    A.    Yes, I see it.
16    Q.    Okay.  And do you see the line that's
17  drawn up through Fairfield and into Chester?
18    A.    Yes, I do.
19    Q.    Okay.  Would you agree with me that this
20  is a very similar bunny-eared appendage as the one you
21  criticize in your amended complaint with respect to
22  House District 41?  Would you agree or disagree with me?
23    A.    I think it's similar, yes.
24    Q.    Okay.  And your plan here pairs portions
25  of the county of Chester with Fairfield County and puts

42 (Pages 162 - 165)

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 166

1 it in District 6, correct?
2     A.    Yes, that's District 6 congressional
3 map.
4     Q.    Okay.  Explain to me, given this, what
5 your specific complaint is about the House drawn
6 District 41.  Explain to me -- and I want you to explain
7 to me what is your concern about it now having seen what
8 you guys drew and proposed with respect to the
9 congressional lines.
10          MR. INGRAM:  Objection.  Is this map from
11 the amended complaint?  I don't recognize this map.
12          MR. MOORE:  This map is the map that you
13 submitted in support of your position with respect to
14 the congressional maps.  This is your congressional map
15 proposal.
16          MR. INGRAM:  And this is introduced as an
17 exhibit today?
18          MR. MOORE:  Yes, it is.
19          MR. INGRAM:  For the record, you can't
20 spring last minute exhibits on us without proper
21 preparation.
22          MR. MOORE:  It was sent to you on
23 Tuesday, Mr. Ingram.  It's an attachment to your letter
24 which is identified as Exhibit Number 16 in the batch
25 that you were sent.  So it wasn't sprung on you today

Page 167

1 and I can ask questions about it.  If you feel -- if you
2 had the opportunity to go out and talk to her about it,
3 you could but you don't have the opportunity to go out
4 and talk to her about it because I submitted this to you
5 on Tuesday.
6          MR. INGRAM:  Proceed.
7     A.    I would like to go back to the previous
8 map.
9     Q.    I'd like an answer to my question before
10 you go back to the previous map, ma'am, but --
11    A.    Well, you know, I think what you're
12 asking me or what you're doing is you're comparing
13 drawings for congressional maps with a House map which
14 is very different.  Now you're talking about shape but
15 more than just shape is considered when it comes to
16 maps.  So congressional may be very different than
17 what the House map is but I would like to go back to
18 the House map or the document that you showed me prior
19 to putting up this map.
20          MR. MOORE:  Can you get it, Michael?
21 Do it.
22    A.    It was page -- what are we on, 37?
23          MR. MOORE:  Thirty-six or 37, yes,
24 ma'am.
25    A.    Okay.  Okay.  The comments -- do you

Page 168

1 see the comments?  Bring it down, please, sir.  The
2 figure below reveals how the irregular and noncompact
3 district lines in Chester County were drawn to carve
4 out black communities in a manner that allowed map
5 drawers to maintain black voters -- minimize black
6 voters' influence in neighboring districts.  That's --
7     Q.    That's your allegation, right?
8     A.    Yes.
9     Q.    That's your allegation.  Okay.  I'm
10 asking you today what evidence do you have to support
11 the allegation that irregular noncompact district lines
12 in Chester County were drawn to carve out black
13 communities in a manner that allowed map makers to
14 minimize black voters' influence in neighboring
15 districts?  Explain to me what evidence --
16          (Simultaneous crosstalk.)
17    Q.    Let me finish my question, ma'am.
18 Explain to me what evidence you have to support that
19 specific allegation.
20    A.    The map itself.
21    Q.    Do you have any other evidence other
22 than, as you say, the map itself?
23    A.    The population within those
24 communities.
25    Q.    Okay.  What evidence with respect to the

Page 169

1 population in those communities supports your
2 allegation?
3     A.    Well, if you look at the demographics
4 and I don't have the demographics in front of me.  If
5 you look at the demographics of Chester and where the
6 population white versus black, where the communities
7 are, that needs to be considered as well.
8     Q.    My question again is you're alleging that
9 there was purposeful drawing to carve out black
10 communities to minimize black voters' influence.  Do you
11 have any evidence to support that other than what you
12 just indicated?
13    A.    I am saying -- I don't know what was in
14 the minds of those folks but I'm talking about the
15 outcome in terms of what happened, in terms of how the
16 map's drawn.
17          That's all I can do is looking at
18 demographics, trying to draw maps in a way that there
19 at least may be some influence on the outcome of an
20 election.  Maybe not fully what we want it to be but
21 at least some influence by the black community.  Now
22 that has to be considered and so I'm not reading the
23 minds of the people that drew this map.  I'm looking
24 at what happened.
25    Q.    And you're drawing conclusions but

43 (Pages 166 - 169)

Brenda Murphy                                      February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 170

1  without any evidence for those conclusions other than
2  the alleged evidence that you just gave me.  Is that
3  right or wrong, Ms. Murphy?
4          MR. INGRAM:  Objection.  Argumentative.
5      Q.    Please answer my question, Ms. Murphy.
6      A.    Right now, I don't know exactly what
7  the question was.
8      Q.    I said you're drawing conclusions based
9  on your own suppositions without any actual evidence to
10 support it.  Is that right or wrong?
11     A.    Wrong.
12         MR. INGRAM:  Objection.  Argumentative.
13     Q.    Okay.  And what specific evidence do you
14 have to support that conclusion?  You just told me --
15     A.    I am saying we have to look at
16 demographics for a community.
17     Q.    All right.  Let's go down --
18     A.    In order to create districts at least
19 that black voters may have influence.
20     Q.    So let's look at your allegations
21 concerning Sumter and we're going to stick with this
22 complaint, Mr. Parente.  Okay.  Are you familiar with
23 your allegations concerning Sumter?
24     A.    Sir, I think we're dealing with very
25 similar situations here so my answer will be the same.

Page 171

1      Q.    All right.  So have you done a comparison
2  between the districts that are drawn in the current
3  House plan as enacted and the lines that were drawn in
4  2011?  Have you done that?
5      A.    No, I did not personally do that.
6      Q.    Okay.  Do you think that it might be wise
7  to look at that before making an allegation here?
8      A.    I did not -- this is not a personal
9  plan of Brenda Murphy, sir.  This is a plan that was
10 developed with input from individuals from the Sumter
11 area, from the Chester area, from the Anderson County
12 area.  So this is not a Brenda Murphy plan.
13     Q.    Who are the individuals from Anderson
14 County who gave you the information that --
15     A.    I have said to you as much as I can.
16 The president, the leadership from the branches,
17 members of the branches.  That is all I can say to
18 you, sir.
19     Q.    I'm asking you for names, Ms. Murphy.
20 Can you give me any names?
21         MR. INGRAM:  Objection.  I'm instructing
22 my client not to answer.  We've already been through
23 this.  We're not giving you names of members of the
24 NAACP.
25         MR. MOORE:  Well, you've already given me

Page 172

1  several, Mr. Ingram.
2          MR. INGRAM:  Those are available on
3  public websites and documents.  You're asking for
4  confidential names which she will not provide.
5          MR. MOORE:  Then you're going to need to
6  file a motion for protective order.
7          MR. INGRAM:  I'm aware of the rules.
8      Q.    And I'm going to ask this question again.
9  Can you give me -- and we go back to Anderson.  Can you
10 give me the names of the alleged NAACP members who live
11 in the challenged districts who are challenging those
12 districts?
13         MR. INGRAM:  Asked and answered and
14 objection still stands.
15     Q.    Okay.  Are you going to answer that
16 question, Ms. Murphy?
17         MR. INGRAM:  I'm instructing her not to
18 answer that question.
19     Q.    Okay.  With respect to Chester County,
20 can you give me the name of any person who lives in
21 District Number 41 who alleges that their rights have
22 been violated by the passage of this House plan?  Ms.
23 Murphy?
24     A.    I will not provide names of NAACP
25 members.

Page 173

1      Q.    Okay.  Well, let me ask you this
2  question, Ms. Murphy.  Can you tell me on what date
3  someone from District Number 41 was interviewed or
4  contacted by you or a member of your coalition and who
5  told you that they wanted to challenge House District
6  Number 41?
7      A.    I have not had individual contact with
8  anyone.
9      Q.    Okay.
10         (Simultaneous crosstalk.)
11     Q.    Although -- correct me if I'm wrong -- I
12 believe that you were on a committee that was
13 responsible for recruiting witnesses as plaintiffs, were
14 you not, Ms. Murphy?  I'm going to go over that in a
15 minute but were you not on such committee?
16     A.    No, I was not on a committee that was
17 responsible for recruiting names of witnesses.
18     Q.    Okay.  All right.  So if Brenda -- let me
19 ask you this question, Ms. Murphy.  If Brenda Murphy
20 didn't contact anybody, okay, then how can Brenda Murphy
21 tell me that someone was contacted with respect to House
22 District Number 41 who resides in that district and that
23 person said I want to challenge this district because my
24 rights have been impacted by the passage of this plan?
25 How can Brenda Murphy tell me that today?

44 (Pages 170 - 173)

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 174

1          MR. INGRAM:  Objection.  Misstates
2    testimony.
3      Q.    Can you answer that question, Ms. Murphy?
4      A.    I will not answer that question.
5      Q.    So you cannot or you will not?
6      A.    My contacts are members of the NAACP
7    and I will not reveal the names of anyone.
8      Q.    I didn't ask you to reveal a name, Ms.
9    Murphy, and so I'm going to repeat my question again
10   just so we're crystal clear.
11     A.    Sir, I think I have been clear.  I did
12   not operate independently.  This was a -- and not only
13   a coalition but there was -- there were meetings with
14   presidents and leadership from throughout the state of
15   South Carolina.  I did not contact anyone personally.
16     Q.    So if you didn't contact anyone
17   personally, you cannot attest under oath that someone
18   who resides in each of these challenged districts was
19   contacted and asked you to challenge these districts,
20   can you?
21     A.    I can attest to the fact that someone
22   from all of these counties that are mentioned in -- as
23   being concerned about the lines in their area have
24   stated in one way or another to members of their
25   leadership that they were concerned.

Page 175

1      Q.    Okay.  And you believe that that's
2    sufficient to give standing upon you and your
3    organization to challenge these districts.  Is that
4    right?
5          MR. INGRAM:  Objection.  Calls for a
6    legal conclusion.
7      Q.    You can answer that question, Ms. Murphy.
8      A.    Yes, because their leadership in the
9    NAACP state conference.
10     Q.    And is there a record -- does the NAACP
11   State Conference have any record of any such
12   communication with any such person to your knowledge?
13   Yes or no.
14     A.    To my knowledge?
15     Q.    Yes, ma'am.
16     A.    In a written document?
17     Q.    Yes, ma'am.
18     A.    I don't know.
19     Q.    Okay.  So you can't tell me that there's
20   a record of that.  Is that right?
21          MR. INGRAM:  Objection.  Asked and
22   answered.
23     Q.    Can you tell me if there's a record?
24     A.    I don't know.
25     Q.    You don't know.  Okay.  Who at the South

Page 176

1    Carolina NAACP would know the answer to that question,
2    Ms. Murphy?
3      A.    Presidents throughout the state of
4    South Carolina who are members of the state
5    conference.
6      Q.    So are you telling me that I'd have to
7    talk to each and every one of your presidents to get the
8    answer to that question?
9      A.    You may.  I don't know that they would
10   give you a name.  They would not give you a name of
11   their members.
12     Q.    We'll see if the Court orders you to give
13   us a name of a member, Ms. Murphy.
14          MR. MOORE:  Let's take a short break.
15          (Brief recess.)
16     Q.    (BY MR. MOORE:)  So I'm going to go a few
17   new exhibits and all of these exhibits are exhibits that
18   were provided to us last night, but before I go to the
19   new exhibits, I do want -- on this particular exhibit
20   that's still in front of you, I want you to look at page
21   number 7.
22     A.    It's not on there.
23     Q.    He's trying to pull it up.  Paragraph 18.
24   Okay.  All right.  Do you see this page, Ms. Murphy?
25     A.    I do.

Page 177

1      Q.    Okay.  All right.  I'm going to read
2    paragraph 18.  It says -- and when you use the term
3    "its", it's clearly referring to the South Carolina
4    NAACP.  And it says its member and constituents
5    currently live in racially gerrymandered and
6    intentionally dilutive state legislative districts.
7    Specifically members live in the challenged districts.
8    Okay.  Are you prepared to tell me which members live in
9    the challenged districts?
10     A.    No.
11          MR. INGRAM:  Objection.  We've already
12   discussed this.
13          MR. MOORE:  I'm going to continue to
14   discuss it, Mr. Ingram.  I understand that that's your
15   objection.
16     Q.    You're refusing to answer that question,
17   is that right, which members --
18          MR. INGRAM:  Counsel, you can continue to
19   ask.  We can take it to court, but if you're going to
20   keep asking the witness, she will not provide you names
21   in the NAACP membership list.
22     Q.    Can you tell me what process was used to
23   support the allegation here, Ms. Murphy?
24     A.    Concerns voiced by members of the
25   coalition and NAACP leadership members.

45 (Pages 174 - 177)

Brenda Murphy
The South Carolina State Conference vs. McMaste,
February 4, 2022

Page 178

1    Q.    Okay.  It then says, these members have
2  been and if H4493 is not enjoined will continue to be
3  harmed by H4493's assignment of them to unconstitutional
4  racially gerrymandered districts and purposely dilutive
5  districts.
6          Can you tell me -- and I'm not asking for
7  names at this point but I'm asking you can you tell me
8  if you had a list of members in each of these challenged
9  districts that would be, according to your complaint,
10  continued to be harmed?  Did you have such a list of
11  those people before you filed this complaint?
12          MR. INGRAM:  Objection.  Asked and
13  answered.
14    Q.    Did you have such a list, Ms. Murphy?
15    A.    I don't have a list, sir, but I have
16  members that live in these areas.
17    Q.    Okay.  And you told me that --
18    A.    That have expressed concerns, yes.
19    Q.    Okay.  But you can't tell me specifically
20  the name of a specific member or even the fact that you
21  spoke to a specific member who was allegedly harmed by
22  the passage of the act that relates to this District 41,
23  can you?
24          MR. INGRAM:  Objection.  Asked and
25  answered.

Page 179

1    Q.    Can you, Ms. Murphy?
2    A.    No, I cannot.
3    Q.    Okay.  And you mentioned a few minutes
4  ago that the people who spoke to all of these various
5  people who you refuse to identify were state presidents.
6  Is that right?
7    A.    State presidents or members.
8    Q.    Okay.  And who are those presidents that
9  spoke to these folks and who in turn spoke to you?
10    A.    I can't --
11          MR. INGRAM:  Objection.  At this point,
12  this is badgering the witness.
13    Q.    Is it that you cannot answer or that you
14  will not, Ms. Murphy?
15          MR. INGRAM:  Objection.  Asked and
16  answered.  We already said we will not disclose the
17  names of the members.  Our allegation is there are
18  members in every district.  Asked and answered.
19    Q.    Okay.  My question -- you may answer the
20  question, Ms. Murphy.  Is it that you cannot or you will
21  not because those are two different things?
22          MR. INGRAM:  Objection.  Asked and
23  answered.
24    Q.    Ms. Murphy?
25    A.    I cannot.

Page 180

1    Q.    You cannot.  All right.
2    A.    Now --
3          MR. INGRAM:  Let her finish.
4    Q.    Sure.
5    A.    Let me make sure you understand what
6  I'm saying.  When I say that I cannot, I mean I cannot
7  identify those names for you.
8    Q.    Because you don't know them?  Because you
9  don't know the names or because --
10    A.    No, that's not -- I'm not saying I
11  don't know the names.
12    Q.    Okay.  Do you know the names?  Here's my
13  next question.  Do you know the names of someone who
14  lives in each of those challenged districts who have
15  alleged to you that they have been harmed?  Do you know
16  the names of people from each of those challenged
17  districts that said they've been harmed?
18          MR. INGRAM:  Objection.  Asked and
19  answered.
20    Q.    Ms. Murphy?
21    A.    I will not answer that question.
22    Q.    You will not answer that question.  All
23  right.
24          MR. MOORE:  So let's pull up the next
25  exhibit which is going to be what exhibit, Mr. Parente?

Page 181

1  Exhibit Number 10.  Is that correct?  And we did not
2  send this document to you this morning, Mr. Ingram.  So
3  if you want to take a minute --
4          MR. INGRAM:  I object to a last minute
5  exhibit.
6          MR. MOORE:  Mr. Ingram, we weren't
7  provided these exhibits until yesterday by your group.
8  I can ask her any question about any exhibit.  My point
9  is if you want to pause and talk to her about this
10  exhibit before I proceed to ask her questions, then
11  despite the fact you didn't produce it until yesterday,
12  I'm giving you an opportunity to do that.
13          So if you want to take that opportunity,
14  okay, then we'll stop.  We'll break and you let us know
15  when you're ready to come back on the record, okay?
16          (Brief recess.)
17          (Whereupon, Defendant's
18          Exhibit 10 was marked for
19          identification.)
20    Q.    (BY MR. MOORE:)  I want to look at the
21  second page.  It says update from the desk of president.
22  Do you see that?
23    A.    Yes.
24    Q.    Okay.  It says President Murphy reported
25  she and SC NAACP Political Action Group would go through

46 (Pages 178 - 181)

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 182

1 identified areas to discuss and identify potential
2 plaintiffs from those areas. Attorney Boykin and
3 Attorney Aden with LDF volunteered to work with the
4 plaintiffs to prepare them emotionally for testifying
5 during litigation should it become necessary.
6      So my question is did you along with
7 members of the SC NAACP Political Action Group go
8 through the identified areas to identify potential
9 plaintiffs?
10     A.   I'm going to say there was an effort
11 made to do that but there was concerns voiced. I
12 never received a list, I know that, in terms of
13 identifying plaintiffs. So was that actualized? No.
14     Q.   Okay. So when there was a concern
15 voiced, a concern voiced by whom?
16     A.   About presidents regarding a listing of
17 names.
18     Q.   How many people are members of the
19 SC NAACP Political Action Group?
20     A.   I would say maybe ten.
21     Q.   Okay. And who are those people?
22         MR. INGRAM: Objection insofar as these
23 are members of the NAACP whose names are not publicly
24 available. I'm instructing her not to answer --
25     Q.   I'd also like you to look at the last

Page 183

1 page where you identify a number of people. Meeting
2 attendees and contact information. I take it you
3 identified the members of the NAACP who were involved in
4 these meetings with the other members of your coalition,
5 correct?
6      A.   Yes.
7      Q.   Okay. So, for example, you didn't hide
8 the identities of NAACP members from people from the
9 ACLU, did you?
10     A.   Those were members of the coalition.
11     Q.   Okay. So, for example, when I'm looking
12 at this list, there are a number of people identified.
13 It lists Ms. Elizabeth Kilgore, SC State Conference
14 NAACP. This list which you produced to us identifies
15 her as someone associated with the SC State Conference
16 of the NAACP. Is that right?
17     A.   Yes, it does.
18     Q.   Okay. And it identifies Marvin Neal as
19 the third vice president of the SC State Conference of
20 the NAACP. Is that right?
21     A.   Yes, it does.
22     Q.   Okay. So you are identifying people by
23 producing these documents to us. Is that correct, Ms.
24 Murphy?
25     A.   Well, admitting attendees and then

Page 184

1 minutes were requested, they were not redacted.
2      Q.   Okay. And is Mr. McLawhorn a member of
3 the NAACP?
4      A.   I will not answer that question. You
5 see there who he represents.
6         MR. INGRAM: Objection.
7      Q.   I see a couple of other names here that
8 identifies Eloise Fomby-Denson, Ph.D., SC State
9 Conference NAACP. Is she a member of the South Carolina
10 State Conference of the NAACP?
11     A.   She is identified on the document as a
12 member of the coalition.
13     Q.   Is she a member of the NAACP --
14         MR. INGRAM: Objection. She is not
15 confirming nonpublicly disclosed names of the NAACP.
16 They are publicly posted on websites.
17     Q.   On what publically available websites is
18 the name of Eloise Fomby-Denson disclosed?
19         MR. INGRAM: If you look at leadership --
20         MR. MOORE: Mr. Ingram, the question is
21 directed to her, not you.
22         MR. INGRAM: I'm sorry. I thought you
23 were talking to me.
24     A.   She is the assistant --
25         MR. MOORE: I was not talking to you.

Page 185

1 You made a statement. I'm asking her.
2      Q.   What publicly available website is the
3 name Eloise Fomby-Denson identified as belonging to the
4 SC State Conference of the NAACP?
5      A.   All of our officers are identified.
6 She is --
7      Q.   Is she an officer?
8      A.   She is -- yeah, she's the assistant
9 secretary for the state conference.
10     Q.   Okay. Is Elizabeth Kilgore an officer?
11     A.   Yes, she is.
12     Q.   What's her office?
13     A.   She's the secretary.
14     Q.   Okay. Did you provide a list of members
15 of the SC NAACP to the other members of your coalition?
16     A.   Only on the minutes. Do they have
17 access to the minutes? Yes, they do.
18     Q.   Let me ask you this. Were members of the
19 ACLU or other members of your coalition involved in
20 helping identify plaintiffs?
21         MR. INGRAM: Objection. Privileged
22 communications related to litigation. I'm instructing
23 my client not to answer.
24         MR. MOORE: Okay. You're going to have
25 to file a motion for protective order on that point,

47 (Pages 182 - 185)

Brenda Murphy                                February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 186

1 too. Let's look at the next document which is listed
2 October 7, 2021 and it's the former 49 (sic),
3 Mr. Parente. Bear with us.
4          (Whereupon, Defendant's
5          Exhibit 11 was marked for
6          identification.)
7     Q.    Okay. I'm going to ask you questions.
8 Do you see this document in front of you, Ms. Murphy?
9     A.    Yes.
10    Q.    Okay. And there's an agenda here and it
11 says identification of perspective witnesses and it
12 lists you and Attorney Charles Boykin as the speakers
13 with respect to that topic. Is that right?
14    A.    Yes, it does.
15    Q.    Who is Attorney Charles Boykin?
16    A.    He's a member of the executive
17 committee.
18    Q.    Of what?
19    A.    I identified him previously. He is --
20 he's a member of the South Carolina State Conference
21 executive committee.
22    Q.    Fine. Did you and Mr. Boykin give
23 a presentation on the identification of perspective
24 witnesses on October 7, 2021 as is reflected in your
25 agenda?

Page 187

1     A.    No.
2     Q.    Why not?
3     A.    We didn't have the information.
4     Q.    Then why is it listed as something on an
5 agenda?
6     A.    It's listed there in hopes of being
7 able to complete that task but it was not completed.
8     Q.    Was that task ever completed, Ms. Murphy?
9     A.    No, it was not.
10    Q.    Okay. But you still made that -- you
11 still made that a representation in your amended
12 complaint, correct?
13    A.    Regarding?
14    Q.    Regarding the fact that you have a member
15 who was harmed who resided in each one of the challenged
16 districts?
17         MR. INGRAM: Objection. Misstates
18 testimony.
19    Q.    You may answer my question, Ms. Murphy.
20    A.    Okay. You're asking me in terms of the
21 listing of being able to state that we have witnesses
22 or members within the districts that are mentioned?
23    Q.    Yes, ma'am. And let me just -- so we're
24 clear, you told me a moment ago that this project was
25 never completed with respect to the identification of

Page 188

1 perspective witnesses, correct? You told me that --
2         MR. INGRAM: Objection. Misstates
3 testimony. Misstates testimony.
4     Q.    You may answer, Ms. Murphy.
5     A.    I said this task was not completed by
6 myself or Attorney Boykin.
7     Q.    Was it completed by anyone?
8         MR. INGRAM: Objection. Asked and
9 answered.
10    Q.    Please answer my question, Ms. Murphy.
11 Was it completed by anyone if you know?
12    A.    I think I mentioned earlier that
13 members that were impacted in those areas we
14 could emphatically state could be identified.
15    Q.    Was the project completed by anyone?
16         MR. INGRAM: Objection.
17    Q.    Yes or no. That's a yes or no with an
18 explanation if you want.
19         MR. INGRAM: Objection. Asked and
20 answered. She's already said her answer multiple times.
21 Stop badgering the witness.
22         MR. MOORE: I'm not badgering the
23 witness, Mr. Ingram. I'm trying to get an answer to a
24 simple question.
25    Q.    I'd like a yes or no answer. To your

Page 189

1 knowledge --
2     A.    Repeat the question.
3     Q.    Let me finish. My question is a yes or
4 no question. Was the project to your knowledge ever
5 completed by someone other than you or Mr. Boykin?
6         MR. INGRAM: Objection. Asked and
7 answered.
8         MR. MOORE: Asked but not answered.
9     Q.    What's your answer, Ms. Murphy? Yes or
10 no and explain, please.
11    A.    I don't know.
12    Q.    You don't know. All right.
13         MR. INGRAM: Objection.
14         MR. MOORE: What's your objection?
15         MR. INGRAM: Misstating testimony.
16         MR. MOORE: You could object to the form
17 and stop your speaking objections, please, Mr. Ingram.
18 I think you might need to go read our local rules. I'm
19 about to ask my next question. All right. So
20 Mr. Parente, we are going to turn to the minutes of
21 Thursday, November 18, 2021.
22         (Whereupon, Defendant's
23         Exhibit 12 was marked for
24         identification.)
25    Q.    Do you recognize this document which is

48 (Pages 186 - 189)

Brenda Murphy
February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 190

1 exhibit number what, Mr. Parente? Twelve. Do you
2 recognize Exhibit Number 12, Ms. Murphy?
3    A.    Yes.
4    Q.    Okay. And what is it?
5    A.    Yes.
6    Q.    What is it?
7    A.    They're minutes from the redistricting
8 committee.
9    Q.    Okay. And of course this redistricting
10 committee did not only include members of the SC NAACP,
11 correct?
12    A.    Sir, I have gone over the membership of
13 the committee and they have been identified under
14 attachment in terms of who is present and their
15 specific role.
16    Q.    So you see here where it says update on
17 mapping for redistricting. It says, Dr. Ruoff explained
18 on local redistricting, his focus with branches is on
19 county councils by drawing map proposals before
20 councils. He has been asked if he can draw a fifty
21 percent black district in Kershaw County and said he
22 could draw fifty percent plus two bodies plan. Do you
23 see that?
24    A.    Sir, may I comment?
25    Q.    I'm asking you first of all if you see

Page 191

1 it.
2    A.    I see it. Yes, I do see it.
3    Q.    Okay. Do you know what he was talking
4 about is going to be my question. Do you know what he's
5 talking about?
6    A.    He's talking about local redistricting.
7 Local. County, city, municipalities. This is in no
8 way related to the House.
9    Q.    The next block however says -- is titled
10 update state redistricting, correct?
11    A.    Yes.
12    Q.    Okay. And let's flip to the second page.
13 It appears to be asking some questions. Is he asking
14 questions about the Senate or the House?
15    A.    I don't think he's asking -- I don't
16 know. I'd have to read that.
17    Q.    Why don't you take a minute and read it
18 and I'm going to ask you a question.
19    A.    Sir.
20    Q.    Yes, ma'am.
21    A.    I have to -- I have to defer back to --
22 that question to someone else. I cannot answer that
23 question.
24    Q.    Okay. I understand and I don't want you
25 to answer questions you cannot answer. So I'm going to

Page 192

1 go up to the previous line which says that President
2 Murphy said a meeting would be scheduled with the SC
3 Legislative Black Caucus to get their input. Do you see
4 that?
5    A.    Yes.
6    Q.    Okay. Did you schedule a meeting with
7 the South Carolina Legislative Black Caucus to get
8 input?
9    A.    No, we did not.
10    Q.    Can you tell me why not?
11    A.    Well, at this point and if you look at
12 the date on this -- on these minutes, we were at a
13 point that our mapping had been completed. We never
14 met with the black caucus.
15       (Simultaneous crosstalk.)
16    Q.    I'm sorry.
17    A.    And because they were not met with
18 initially to have input at the beginning, they did not
19 feel it necessary to meet with us.
20    Q.    Was there ever a time when members of the
21 black caucus, any member of the black caucus requested
22 that they come and meet with your committee or your
23 office to discuss redistricting?
24    A.    I think -- and I have to give an
25 historical background on this and I can only say what

Page 193

1 I was told. I don't know how true it was but it was
2 stated to me that they were involved in the process.
3 I don't know if that's true or not true.
4       There was -- you know, I think there
5 were attempts to meet with us but I made it clear from
6 the outset we would not be discussing maps until
7 mapping was done because we were not going to accept I
8 would say feedback or any concerns from the black
9 caucus regarding the mapping because we were doing it
10 without considering incumbents and that wasn't too
11 pleasing to their ears.
12    Q.    To whose ears?
13    A.    The ones that asked to meet.
14    Q.    Who were those -- who were the ones that
15 asked to meet?
16    A.    I will not give those names, sir.
17 That's not important. The thing is the attempt was
18 made and because it was made, I made it very clear
19 from the beginning that they would not be involved as
20 those maps were being -- as the mapping was done.
21    Q.    President Murphy, you can't refuse to
22 give me names just because you don't want to give me
23 names, okay. So you said that there were members of the
24 Legislative Black Caucus who asked to meet with you.
25 What were the names of those people?

49 (Pages 190 - 193)

Brenda Murphy                              February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 194

1        MR. INGRAM:  Objection as far as those
2  names overlap with the membership list of NAACP South
3  Carolina conference.
4        THE DEPONENT:  They do.
5        MR. INGRAM:  I'm instructing her not to
6  answer.
7        MR. MOORE:  All right.  Again that's
8  another issue for your protective order, Mr. Ingram.  I
9  want to go next, Mr. Parente to what's listed as 25 here
10  which is the agenda for August 5, 2021.
11        (Whereupon, Defendant's
12        Exhibit 13 was marked for
13        identification.)
14    Q.    All right.  So at the bottom of the page,
15  there are some statements about Mr. Ruoff.  It says
16  Attorney Teague was present at the House meeting.  Is
17  that a reference to Lynn Teague?
18    A.    Yes, it is.
19    Q.    Okay.  Is Lynn Teague an attorney to your
20  knowledge?
21    A.    I don't really know.  I never -- I
22  don't know.
23    Q.    Okay.  So you don't have any information
24  that suggests that she is actually an attorney, right?
25    A.    I'm saying -- well, he said attorney.

Page 195

1  That may have slipped by me.  Maybe she is.  I
2  don't -- I can't say that I knew that.
3    Q.    But you do know Lynn Teague, right?
4    A.    Yes, I know her.
5    Q.    And --
6    A.    And, you know, as an associate, not
7  personally.
8    Q.    Okay.  And she's done a lot of speaking
9  out in the media about the issues of redistricting, has
10  she not?
11    A.    Yes, she has.
12    Q.    Okay.  And --
13    A.    She provided testimony.
14    Q.    She's provided testimony but she's made a
15  lot of comments to the press.  Is that right?
16    A.    Yes.
17    Q.    Okay.  And at one point, she made a
18  comment indicating that she wasn't going to challenge
19  the maps.  Her role was out vocalizing concerns.  Have
20  you read any such attribution to her, Ms. Murphy?
21    A.    I don't recall.  I didn't read that
22  article, no.
23    Q.    Okay.  All right.  Let me ask you this
24  question.  Did you participate in a discussion with Ms.
25  Teague where it was decided that she would go out and

Page 196

1  raise concerns repeatedly in the media?
2    A.    No.
3    Q.    Okay.  Did you ever discuss with her
4  launching some sort of media or public relations
5  campaign?
6    A.    No.
7    Q.    She's certainly spoken out in the media
8  far more than you.  Is that right, Ms. Murphy?
9    A.    Yes.  And may I make a comment?
10    Q.    Yes, ma'am.
11    A.    Ms. Teague did not join our group until
12  after she completed her mapping so they are not
13  associated with each other.
14    Q.    But Mr. Ruoff was involved in both her
15  map -- the map drawing for her and in consultations with
16  you.  Is that right or wrong?
17    A.    Right.
18    Q.    I'm going to page 2.  Do you see a
19  reference to Attorney Leah Aden who's an attorney of
20  record in this case responding to Mr. Matthew's concern
21  regarding how the House and Senate had different
22  criteria and definitions of communities of interest and
23  how it can be defined uniformly and is there community
24  input and access.  And it says that Ms. Aden concluded
25  by stating it is exceedingly difficult to uniformly

Page 197

1  define communities of interest because of a host of
2  community differences within the state.  Do you recall
3  that?
4    A.    When was this?  What's the date on
5  this?
6    Q.    It's August 5th.  Excuse me.  The one at
7  the top says August 5th.  The one at the bottom says
8  August 12th.  So it's hard for me to tell you what date
9  it is.
10    A.    I'm going to say this.  I was not the
11  chair of this committee nor the co-chair.  There
12  were -- I don't recall those comments and sometimes I
13  may not have been present at all of the meetings.  I
14  do not recall that conversation.
15    Q.    Okay.  All right.  And do you know if you
16  were present for that discussion?
17    A.    No.  I don't know.  I don't know.
18    Q.    I mean it does describe a statement from
19  you about the Senate definition of communities of
20  interest.  Do you see that again on page 2?
21    A.    Where?
22    Q.    Before where I quoted the line that says
23  Attorney Leah Aden, LDF.  It says President Murphy
24  commented.  Do you see that?
25    A.    Okay.  My comment was in response to I

50 (Pages 194 - 197)

Brenda Murphy
The South Carolina State Conference vs. McMaste,

February 4, 2022

Page 198

1 guess Mr. Matthews who commented -- he questioned the
2 legality of the two different housing processes,
3 different redistricting standards defining
4 communities, da-da-da, and whatever I said, it was in
5 relationship to what he had said.
6        MR. MOORE: Okay. All right. So I'm
7 next going to go to August 26th, Mr. Parente, which is
8 Number 27 in here.
9        MR. INGRAM: We need a break.
10        MR. MOORE: Okay.
11        (Brief recess.)
12        (Whereupon, Defendant's
13         Exhibit 14 was marked for
14         identification.)
15        MR. MOORE: All right. So we're back on
16 the record. I just have a couple of more questions, but
17 again before I finish my questions and cede the floor,
18 I'm going to note that we intend to keep this deposition
19 open because we have not received all of the documents
20 that might be relevant to a deposition of Ms. Murphy.
21        We just received a number of the
22 documents. We barely had a chance to go over them last
23 night and I will say that -- we both said this for the
24 record. I do not believe it is appropriate objection
25 and an appropriate position to take that you will not

Page 199

1 reveal information about members of the SC NAACP,
2 particularly when there's a confidentiality order in
3 place in this litigation and -- but we will deal with
4 that at the appropriate time. So I'm going to pull up
5 the next exhibit which is exhibit number what, Mr.
6 Parente? Is it 14? Okay. You can go down for just a
7 moment.
8    Q.    Do you see this document, Ms. Murphy?
9    A.    August the 26th?
10    Q.    Yes, ma'am.
11    A.    Yes, I do.
12    Q.    It's dated at the top August the 26th.
13 It's dated at the bottom September 2nd. I'm assuming --
14 you correct me if I'm wrong -- that the meeting was
15 actually held on the August 26th but maybe the other
16 date is the date the minutes were done. Is that right?
17 Do you know?
18    A.    Yes. The calendar -- I guess you could
19 determine that by looking at the calendar, the day of
20 the week it is. If it's a Thursday, that would be
21 correct.
22    Q.    Okay. And it first says that Attorney
23 Teague identified as an attorney reported attending the
24 SC Democratic caucus meeting as a nonpartisan observer.
25 Is that what it says?

Page 200

1    A.    Where are you at?
2    Q.    Where it says update on mapping for
3 redistricting.
4    A.    Oh, Attorney Lynn Teague?
5    Q.    Yes, ma'am.
6    A.    I see that.
7    Q.    Okay. Again she's identified as an
8 attorney there, correct?
9    A.    I see. Uh-huh.
10    Q.    And it says that she attended the SC
11 State Democratic caucus meeting. Do you know if she --
12 she takes the position that her organization is also
13 nonpartisan. Is that right?
14    A.    That's a question -- we invited
15 nonpartisan participants.
16    Q.    Okay. And do you know if she attended
17 any Republican caucus meetings if you know?
18        MR. INGRAM: Objection.
19    Q.    Please answer.
20    A.    No, I do not know. That's a question
21 you will have to ask Ms. Teague.
22    Q.    Okay. Later it says Dr. Ruoff stated he
23 is working on state maps and his work reveals that
24 Charleston, York, and Myrtle Beach would gain new
25 districts based on population increases. As a result,

Page 201

1 three districts will go away. Do you see that?
2    A.    I see that.
3    Q.    And you understood, did you not,
4 President Murphy, that there were population increases
5 in certain areas of the state like Charleston, York, and
6 Myrtle Beach. Is that right? Did you understand that?
7    A.    Yes.
8    Q.    Okay. And did you also understand that
9 there were population decreases in a number of areas?
10    A.    Yes.
11    Q.    And when you have an increase in
12 population, you sometimes have to draw new districts in
13 relation to that because the map is dictated by the
14 population. Do you agree or disagree with that?
15    A.    Yes.
16    Q.    All right. Now I'm going to ask maybe
17 one or two more questions and then I'm done and I'll
18 cede the floor. Ms. Murphy, could you tell me -- can
19 you identify for me the last time you voted for a
20 Republican candidate for any office?
21        MR. INGRAM: Objection.
22    Q.    Okay. Please answer my question, Ms.
23 Murphy.
24    A.    No.
25    Q.    You cannot identify any such vote?

51 (Pages 198 - 201)

3:21-cv-03302-MBS-TJH-RMG    Date Filed 03/21/22    Entry Number 194-2    Page 53 of 108

Brenda Murphy                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 202

1    A.    No.
2    Q.    Okay.  Do you think you voted for a
3  Republican candidate for office in the last twenty
4  years?
5         MR. INGRAM:  Objection.  I'm instructing
6  her not to answer.  That's not relevant to her testimony
7  as a representative of the South Carolina National
8  Conference of NAACP.
9         MR. MOORE:  You can't instruct her not to
10  answer a question because you don't believe it's
11  relevant, Mr. Ingram, under our rules.  And I believe
12  that a number of your instructions have been
13  inappropriate.
14    Q.    Are you going to answer that question or
15  not, Ms. Murphy?
16    A.    Based on my instructions from the
17  attorney, I am not.
18    Q.    Okay.
19         (Simultaneous crosstalk.)
20         MR. INGRAM:  First amendment
21  constitutional rights, you can't -- especially in this
22  case where it's not even relevant toward the claims of
23  the case.
24         MR. MOORE:  You can take -- you will need
25  to file a motion for protective order with respect to

Page 203

1  that, Mr. Ingram, okay.  So with that, I think I'm done.
2  So who is going next?  Is it going to be counsel for any
3  of the other defendants?  You, Mr. Ingram?  How are we
4  going to proceed?
5         MR. INGRAM:  I need to redirect but first
6  see if there's any other questions from other
7  defendants.
8         MR. TYSON:  I'd like to ask some
9  questions if this is a good time.
10         MR. INGRAM:  Sure.  You know we're
11  already significantly over our five hour time frame
12  but -- and I don't believe you were noticed.  Did you
13  notice that you wanted to ask questions?  We just had a
14  notice from the House defendants.
15         MR. TYSON:  Yeah, he noticed the
16  deposition.  I'm a defendant.  I'm Rob Tyson.  I
17  represent the Senate.  I'm allowed to ask questions.
18         (Audio interference.)
19         MR. TYSON:  Guys, you need to get on
20  mute.  And, Mr. Ingram, since this thing is going to be
21  held open, I think we're okay.  Ms. Murphy, do you have
22  about fifteen minutes for me?  I see you rolling your
23  eyes.
24         MR. INGRAM:  I would prefer we just wait
25  to a later date since they don't seem to be -- we've

Page 204

1  already had a long day today.
2         MR. TYSON:  I don't have a whole lot of
3  questions right now and it would be kind of following
4  up.  It's not going to be on new material.  So Ms.
5  Murphy, if you're okay, I've got some questions I can
6  ask.
7         THE DEPONENT:  Go ahead.
8
9  EXAMINATION BY MR. TYSON:
10    Q.    Ms. Murphy, thank you.  Again I'm Rob
11  Tyson and I represent the Senate defendants in this
12  case.  I just want to -- I have a couple of -- several
13  buckets of questions.
14    A.    Buckets?
15    Q.    But Mr. Moore kind of went from A to B to
16  C to D so I'm going to try to stay in one bucket before
17  I go to another but I'm not promising I'm going to be
18  that organized.
19         Let me just ask you a question to start
20  off.  Mr. Moore asked right off the bat if you had ever
21  been deposed and you said you had been deposed
22  previously one time in some case and I think Mr. Moore
23  asked you about whether Judge Lydon was the judge in
24  that case or something.  Do you remember that?
25    A.    I recall the question.

Page 205

1    Q.    Okay.  And do you recall your answer?
2  That's what I'm interested in.
3    A.    It was about the Myrtle Beach case,
4  yes.
5    Q.    And the question was have you ever been
6  deposed before.  And do you remember you were deposed by
7  me two years ago?
8    A.    What was that in reference to?
9    Q.    Absentee ballot voting when you were a
10  plaintiff, the NAACP was the plaintiff in the Thomas
11  lawsuit?
12    A.    Absentee ballots.  I may have.
13    Q.    It was July the 27th.
14    A.    Okay.
15    Q.    Yes, ma'am.  2020.  I'm not a memorable
16  person but I just wanted to make sure that the record
17  was accurate that you have been deposed before.
18    A.    Thank you.  Thank you for reminding me
19  of that.
20    Q.    Yes, ma'am.  This bucket that I wanted to
21  ask questions about is kind of about process.  And some
22  of the complaints that the NAACP raised -- oh, let me
23  ask you something.  I'm really confused about how your
24  deposition is.
25         Sometimes you say you're representing --

52 (Pages 202 - 205)

Brenda Murphy
February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 206

1 you're there today representing the state conference.
2 Other times -- your attorney started off and said you're
3 just there individually. So I'm trying to figure out --
4 I think these questions are going to be addressed to you
5 individually. Is that okay?
6     A.    How is it relevant to this conversation
7 when we're here about the state conference?
8     Q.    Because there are two types of
9 depositions and your attorney started off making sure --
10 his first question, his first comment that he said was
11 this wasn't a 30(b)(6) where you would be speaking on
12 behalf of the organization. And Mr. Moore said, no, I'm
13 not doing that. If I did that, I'd have to give you the
14 topics. I'd have to do that.
15          And so you're here speaking, testifying
16 individually. I just wanted to make sure that that's
17 clear so when I ask these questions, you're able to
18 answer those?
19          MR. INGRAM: For clarification as I said
20 before, she's here in her personal capacity as the
21 president of the state conference. She is not here as
22 Brenda Murphy. She's not a named plaintiff. She's here
23 representing the state conference. This is not a
24 30(b)(6) deposition.
25     Q.    Okay. So part of the complaint that's

Page 207

1 gone throughout and Mr. Moore asked you some questions
2 was about process and I just wanted to ask some
3 questions about that. Isn't it fair to say that the
4 NAACP has been an active participant in the
5 redistricting process?
6     A.    We have been an active participant in
7 terms of attending sessions. Not to the extent that
8 we would like to be but we have provided testimony
9 that's been -- you know, in terms of the testimony
10 being received, I will say we have been active in that
11 respect, yes.
12    Q.    And I think you testified earlier that
13 you and/or your members participated in a significant
14 number of the meetings that were held across the state,
15 right?
16    A.    Oh, I didn't say that. I said a number
17 was -- in terms of the hearings, yes, they were
18 encouraged to participate but there was difficulty in
19 terms of some attending the meetings because they were
20 during the day. You know, the majority of those
21 sessions were done at the hours that were not good for
22 some of the membership of the NAACP.
23    Q.    And I think in each of those, you could
24 have provided written comments. In fact, I think maybe
25 the NAACP did provide comments on those, correct?

Page 208

1     A.    We did.
2     Q.    So you did participate in a number of the
3 statewide hearings across the state, right?
4     A.    Me personally?
5     Q.    No. The NAACP, your members, you and
6 your members.
7     A.    I can't say what number. I can only
8 say that the time was difficult. In terms of virtual
9 capability because some could not come to the sites
10 where they were being held, they were unable to attend
11 because they were not virtual. There was not the
12 virtual capability.
13    Q.    I understand that. But didn't you say
14 earlier that you attended some of those meetings,
15 correct?
16    A.    Yes, I did.
17    Q.    And didn't you say earlier that you
18 attended some of the meetings held by the redistricting,
19 the ad hoc committee? Not the public meetings held
20 across the state but the ones back in Columbia once they
21 got here.
22    A.    I did. I attended two meetings.
23    Q.    And you testified at both of them?
24    A.    Yes.
25    Q.    And, you know, we've had -- Mr. Moore's

Page 209

1 talked to you for a long time about all the different
2 letters that you and I think you called your
3 coalition -- but y'all wrote a number of letters to the
4 state House of Representatives concerning redistricting,
5 didn't you?
6     A.    The letters were written, yes.
7     Q.    A number of them, correct?
8     A.    The ones that were mentioned today.
9     Q.    I think it was at least a dozen but it
10 might be more.
11    A.    I don't think it was a dozen.
12    Q.    Okay. But it was a lot of letters. You
13 had an opportunity and you did take advantage of that
14 opportunity, correct?
15    A.    I would say me personally as
16 attending -- I attended two. I testified at two.
17    Q.    Yeah, but I'm talking about --
18    A.    Letters were written. Letters were
19 written.
20    Q.    Yes, ma'am.
21    A.    I'm not saying that is adequate
22 representation from the full body. I still as a
23 matter of record say the opportunities were not as
24 great to participate in testimony as was provided by
25 the Senate. It was a difference.

53 (Pages 206 - 209)

Brenda Murphy
February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 210

1    Q.    And as the lawyer for the Senate, I say
2  thank you but today we're here about the House and you
3  did write -- and your group did write a bunch of letters
4  and you also provided a number of maps, correct?
5    A.    Not a number of maps.
6    Q.    How many maps did you provide -- did your
7  organization --
8    A.    That was provided for the House.
9    Q.    Right. More than one?
10    A.    I'm thinking one, maybe one revision.
11    Q.    Yes, ma'am. So at least a couple. And
12  you provided comments on various drafts of the House
13  maps, right?
14    A.    I did. May I comment, sir?
15    Q.    Yes, ma'am.
16    A.    My -- we may have provided comments.
17  The goal, it was not just to make comments but it was
18  for our voices to be heard and at least considered and
19  to see some type of outcome in terms of what we had
20  recommended.
21    Q.    And that was --
22    A.    That was the intent.
23    Q.    And I appreciate that. But my point is
24  just a simple one. You did express your right and you
25  did voice it, right?

Page 211

1    A.    Yes.
2    Q.    And in many ways. From meetings,
3  testimony, letters, letters from your lawyers, legal
4  positions, maps. You did a variety of things to provide
5  input in the process, correct?
6    A.    Yes, we did.
7    Q.    Okay. But that doesn't mean that you
8  always get your way though, does it?
9    A.    It's not just my way. There were many,
10  many concerns that were expressed by many at those
11  hearings.
12    Q.    I understand that but I'm talking about
13  you specifically at the NAACP, your comments.
14    A.    This is not about me specifically or
15  the state conference. It's about outcomes.
16    Q.    Okay. But isn't it fair to say that just
17  generally speaking on legislative actions, the
18  legislative process takes in multiple views, correct?
19    A.    They may. I can't answer that for them
20  but --
21    Q.    Well, you know they do.
22    A.    I cannot speak for the legislators.
23    Q.    You know people have different opinions
24  on different issues, right, Ms. Murphy?
25    A.    Yeah, everybody has different opinions

Page 212

1  but you are there to represent us as citizens of the
2  state. The input that we provide should be not only a
3  consideration --
4    Q.    But --
5      MR. INGRAM: Let her finish.
6    A.    Not only considered but acted upon.
7    Q.    Now what if somebody else said the same
8  thing? What if the ACLU said the same thing or the
9  League of Women Voters said the same thing or the South
10  Carolina Homebuilders said the same thing? If they said
11  we're entitled to have our views heard and you must act
12  on them, how would that work?
13    A.    Sir, you represent us.
14    Q.    Correct. And that's what I'm just trying
15  to make sure that you understand that you are able and
16  were afforded the opportunity to provide in the process
17  and I appreciate you doing that.
18      Okay. Let me ask you questions about
19  your membership. I know we've had a lot of discussion
20  about that and your lawyer there has a whole bunch of
21  motions for protective order that he has to file here
22  shortly but let me ask you something. Mr. Moore asked
23  why did you sue the House? And your answer was
24  opportunity districts are not there but could have been.
25  And so he said why did you sue -- why did you bring the

Page 213

1  suit? And you said we heard from members across the
2  state. Do you remember that?
3      MR. INGRAM: Objection. Misstates --
4      MR. TYSON: For what?
5      MR. INGRAM: Misstates testimony.
6      MR. TYSON: Does she get to answer that
7  before you do?
8      MR. INGRAM: That's how objections work.
9    Q.    Ms. Murphy?
10    A.    Yes.
11      MR. TYSON: I don't think that's how
12  objections work but I appreciate that late on a Friday
13  afternoon.
14      MR. INGRAM: We can read back the
15  testimony if we want to quote what she earlier said in
16  the deposition.
17      MR. TYSON: I'm a pretty good transcriber
18  because it took my attention. I'm glad if you want to
19  go back, Mr. Ingram, and make it -- read it but I want
20  to ask her a question, not talk to you.
21    Q.    Ms. Murphy, do you remember that
22  testimony?
23    A.    I'm not --
24      MR. INGRAM: Objection. She's not going
25  to respond to your summary of her words when there's a

54 (Pages 210 - 213)

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 214

1  record that we can refer to.
2      Q.    Let's try it again, Ms. Murphy.  Do you
3  remember Mr. Moore's question why did you bring this
4  suit?
5      A.    I remember the question but it was much
6  more detailed than what you have just said.
7      Q.    Give me an answer then, whatever you
8  believe the detailed question is.  Why did you bring the
9  suit?
10     A.    Why did I bring the suit?  Why did the
11 state conference bring the suit?
12     Q.    Correct.
13     A.    The suit was brought because of several
14 reasons.  The maps are not representative of districts
15 that provide the opportunity for representation,
16 especially I will note black representation.  There
17 has been -- the numbers have been minimized in terms
18 of potential opportunities for representation.
19     Q.    Did you hear from any members across the
20 state?
21     A.    I think I answered that, too.
22     Q.    And what was your answer?
23     A.    My answer is we have branches
24 throughout the state which we regularly communicate
25 with.

Page 215

1      Q.    And so my question is did you hear from
2  those branches and those members before bringing this
3  lawsuit?
4          MR. INGRAM:  Objection.  Asked and
5  answered.
6      Q.    Go ahead.  You get to answer the
7  question.
8      A.    Let me say again we started planning
9  and talking about redistricting long before the
10 numbers were in.  We encouraged -- we met with our
11 members.  We encouraged them.  We provided information
12 to make them more familiar with the process in order
13 for them to be involved in the redistricting process
14 also because of the importance of that.
15         How districts is drawn we know impacts
16 on our citizens, particularly black citizens.  And so
17 in terms of dilution of the vote, it's very important
18 that they are drawn in such a way that the votes are
19 not diluted and that they are in compliance with the
20 Constitution.  One man, one vote.  What else did I
21 have to say?  Do you want me to repeat everything I
22 said?
23     Q.    No.  I just want you to be responsive to
24 my simple question.  Did you hear from members across
25 the state?

Page 216

1      A.    Of course I did, sir.  I just said I
2  did because we were --
3      Q.    Okay.  How did you hear from them?  Did
4  you get written communications?  Was it --
5      A.    Sir --
6          MR. INGRAM:  Objection.  Asked and
7  answered.
8      A.    Sir --
9          MR. TYSON:  I just got here.  I just
10 started.  Let me finish my question before you yell
11 that.  So let's hold on, Mr. Ingram.  Let me finish my
12 question.  I know you and Mr. Moore didn't gee haw but
13 give me a second here.
14     Q.    The question is how did you hear from
15 those members?  I'm not asking you to identify them.
16 I'm asking, Ms. Murphy --
17     A.    We have --
18     Q.    Hold on.  Let me ask my question.  Did
19 you get emails from them?  Did you get phone calls from
20 them?  Did you get -- were you at meetings?  I'm just
21 asking a simple question.  When you say you heard from
22 members before you bought the suit, what does that
23 process look like?
24     A.    Our membership meets at least monthly.
25 We had symposiums and by virtue of meetings.  And I

Page 217

1  don't know if symposium is the right word but it was
2  where we came together to look at the maps that have
3  been drawn and it was done in such a manner that
4  everyone had input that wanted to have input.  And we
5  had representation from throughout the state and there
6  were at least two of those sessions.  By Zoom meetings
7  if you want to know.
8      Q.    Ms. Murphy, here is just -- I'm sorry.
9  Did I interrupt?
10     A.    No.  I'm listening.
11     Q.    Here's the problem.  You say you heard
12 from your membership and you heard from registered
13 voters.  That's in your complaint.  And you say that
14 you've got specific members in each of these challenged
15 districts.
16         And what you're telling us today is just
17 trust us because you did, you heard from them.  And what
18 we're trying to figure out is there any way, any
19 communication, anybody that can tell us who in the world
20 lives in any of these 29 districts or who in the world
21 wanted to bring this lawsuit.  Is there any way?
22     A.    I cannot give you those names, sir,
23 because they are members of the NAACP so I cannot give
24 you those names.
25     Q.    One of the comments that you responded

55 (Pages 214 - 217)

3:21-cv-03302-MBS-TJH-RMG     Date Filed 03/21/22     Entry Number 194-2     Page 57 of 108

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 218

1 when I was talking about your answer just a second ago,
2 you said that you wanted to -- the opportunity districts
3 are not there that could have been. How many
4 opportunity districts do you think there should have
5 been?
6     A.    Oh, I'm not going to answer that
7 question because I think that was a group discussion
8 about that. I don't have those notes in front of me
9 and I wouldn't attempt to answer it.
10    Q.    So not very much or a whole lot more or
11 just --
12          MR. INGRAM: Objection. Asked and
13 answered.
14    Q.    I'm still waiting for the answer.
15    A.    I don't have an answer for you, sir.
16    Q.    Okay. So when you said that they are not
17 there but could have been, how would we get that answer?
18    A.    They are not there but could have been?
19    Q.    That's what you said. That was your
20 testimony.
21    A.    That's probably a part of a phrase that
22 you took, sir, but I think the opportunity for there
23 to have been more competitive districts does exist.
24    Q.    And I hear you saying that and the
25 question is how many more and what's that based on? How

Page 219

1 do we factor that into --
2     A.    Sir, I can't --
3          MR. INGRAM: Objection. Asked and
4 answered.
5     Q.    Ms. Murphy, I asked a question.
6     A.    Sir?
7     Q.    I asked a question. How would we find
8 that out? You just said -- you just testified --
9     A.    Sir, I'm going to ask a question. Why
10 am I being asked the same questions over and over
11 again when I've answered them?
12    Q.    Well, I'm just asking you is there -- I
13 want to know is there somebody that can testify that can
14 tell us because your testimony was there weren't enough
15 opportunity districts there. I'm just asking is there
16 somebody that can tell us that answer? If it's not you
17 on a Friday afternoon, who else?
18    A.    I don't have -- I was instructed not to
19 bring any notes, any of my documents. I'm in the
20 office which is closed and I came in due to COVID. I
21 do not have access to those records. I cannot speak
22 off the top of my head regarding this.
23          There is -- there is a great deal of
24 information and I think it's very unfair to ask me
25 questions and I not have access to information which

Page 220

1 you all instructed me not to have in front of me,
2 beside me, behind me or whatever.
3          MR. MOORE: Can I interpose a point? Who
4 is the "you all" who instructed you not to have any
5 document in front of you? Because I can tell you that
6 "you all" is not me.
7          MR. TYSON: It's not me. I don't know
8 who she's talking about.
9          MR. MOORE: Who is "you all"?
10    A.    Well, I was asked that question from
11 the beginning, did I have any documents with me.
12    Q.    I'm not asking that. I'm just trying
13 to -- your testimony was there were not enough
14 opportunity districts that were drawn.
15    A.    I can only --
16    Q.    My question is -- and I hear you. I
17 respect your answer. I think what you're saying you
18 have the answer to that but you just don't have it there
19 today with you because you don't have those materials --
20    A.    That's right.
21    Q.    -- that you're able to say that, right?
22    A.    Yes. I can review the documents and
23 provide that information.
24    Q.    Okay. I was just trying to -- the way
25 that you first said it, it was just kind of like a I

Page 221

1 just think there should have been more and I was just
2 trying to find out if there was any documentation to
3 support it. So I appreciate that you don't have them
4 there. So we will figure out how to get that answer
5 from you when you can review your documentation, okay?
6          One of the things that you went through
7 that was kind of a discussion and it rambles throughout
8 the complaint and it was about this -- the prior history
9 of South Carolina redistricting and how it has been
10 unfavorable to black voters. And so I want to make sure
11 that I follow up on some of the questions that Mr. Moore
12 said because that's not true for 2010, correct?
13    A.    The numbers increased in 2010 and we
14 know why it did.
15    Q.    What does that mean, the numbers
16 increased? What numbers?
17    A.    The number of black legislators.
18    Q.    Okay. So there were opportunities for
19 more African American --
20    A.    Because there were even fewer than
21 there are currently.
22    Q.    I'm just trying to ask a question about
23 in 2010. I want to be clear on this. When the
24 complaint makes these assertions about the prior
25 problems with racial gerrymandering in South Carolina,

56 (Pages 218 - 221)

Brenda Murphy                                              February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 222

1  that's not accurate for 2010, correct?
2      A.    I can say and, you know, I base things
3  on how -- and I say this word often -- in terms of
4  outcomes.  The numbers did increase in 2010.  So were
5  they better than before?  Yes.
6      Q.    Well, I'm speaking in legal terms.
7      A.    I'm not an attorney, sir.
8      Q.    But it pre-cleared plans from President
9  Obama's Department of Justice, correct?
10          MR. INGRAM:  Objection.  Calls for legal
11  conclusion.
12          MR. TYSON:  No, it doesn't.
13      Q.    It's just a simple yes or no.  Did these
14  plans, the House, the Senate and the congressional
15  plans, all get pre-cleared by the Department of Justice?
16  You've already testified yes.
17      A.    In 2010.
18      Q.    In 2010.
19      A.    '11.
20      Q.    Right.
21      A.    No.
22      Q.    And then there was a complaint that was
23  brought in the United States District Court of South
24  Carolina claiming that the districts were racially
25  gerrymandered in a section two plan (sic).  Do you know

Page 223

1  anything about the Ficus (sic) case?
2      A.    No, I don't.
3      Q.    Okay.  But --
4      A.    Fifteen minutes, sir.
5      Q.    I might have twenty.  Mr. Moore asked you
6  a question and I think you just kind of spoke on it a
7  few minutes ago.  When you analyze these maps or
8  whatever, you testified -- or let me make sure.  I don't
9  want Mr. Ingram to say that I'm putting words in your
10  mouth.  I think it was something along the lines that --
11  help me if I'm not -- that when you analyzed these maps,
12  you looked at the outcomes.  Do you remember saying
13  anything like that or is that accurate?
14      A.    You mean me, Murphy, or Moore?
15      Q.    You.  You said you looked at the outcome
16  of the maps, how --
17      A.    Yes.
18      Q.    -- they affected black districts and the
19  opportunity for black people to be in competitive
20  districts.
21      A.    Yes.
22      Q.    Okay.  And so did you look at any other
23  factors when you analyzed these before your organization
24  brought the lawsuit?
25      A.    Let me say this.  We looked at data.

Page 224

1  We look -- we had in terms of individuals that could
2  be helpful, in terms of looking at data, looking at
3  the variables that we needed to consider.  It's not
4  that we independently -- we're not attorneys.  We are
5  not demographers and so we had to depend on others
6  with those skills that could do that.
7          So with those skills that we -- that
8  they had that complimented us in terms of knowing how
9  to evaluate these maps, the decision was made that --
10  in relevance to what you're asking me.
11          So it was not an independent decision
12  by the state conference.  We had to use demographers.
13  We had to have individuals with expertise in certain
14  areas.  Legally.  Even in terms of the need for legal
15  guidance, we needed that as well.  We are not
16  attorneys.  There was one -- we have one attorney
17  that's a member of our committee but his expertise is
18  not in redistricting.
19      Q.    But, Ms. Murphy, I just wanted to know --
20  you said that you looked just at the outcomes and my
21  question was did you look at --
22          (Simultaneous crosstalk.)
23      Q.    And did you look at any of the other
24  redistricting criteria or did your consultants --
25      A.    Yes, of course.  That's why I said we

Page 225

1  used demographers.  We used individuals with expertise
2  in terms of redistricting and to ensure that we
3  considered all the factors that needed to be
4  considered.  So this was -- this was a comprehensive
5  look at this with the consultation of individuals that
6  have expertise in the area.
7      Q.    And Mr. Moore asked you about the -- I
8  think he called it redistricting principles and you said
9  you weren't fully aware of that but you understood the
10  criteria, right?
11      A.    Yes.
12      Q.    And you know the House had a whole list
13  of criteria that they use that weren't race-related,
14  traditional redistricting criteria, right?  Compactness.
15  They needed to be contiguous, needed to protect
16  communities, right?  You know about all those, right?
17      A.    Yeah.  Yes, I do.
18      Q.    And so what I'm asking is this.  You
19  know, I know you looked at the numbers to see what the
20  feedback is.  You've got that throughout your complaint.
21  I'm trying to figure out did you look at any of those
22  factors to analyze those specific 29 challenged
23  districts and why they were drawn that way?
24      A.    Of course they were -- we did look at
25  that.  That's why I said this was not looked at just

57 (Pages 222 - 225)

Brenda Murphy
The South Carolina State Conference vs. McMaste,

Page 226

1  as a specific district did one way or the other.
2  Factors were or variables were considered and that was
3  with the expertise of demographers, individuals
4  experienced in mapping.
5        So it's not just a shot in the dark
6  regarding potential for mapping to increase
7  opportunities for representation by black people.
8        Q.    I think Mr. Moore asked you some
9  questions about District 95 which Representative Govan's
10 is a member of that but --
11       A.    He didn't ask me about that, not 95,
12 but what is your question about 95?
13       Q.    So for District 95, there were questions
14 and there is all kinds of data throughout the complaint
15 about the BVAP and I was just wondering what are these
16 other redistricting criteria used by the state
17 conference to analyze whether those were used to draw
18 District 95?
19       A.    Let me just say and I said this before
20 no district was drawn in such a way it was reflective
21 or to ensure an incumbent.  That was not considered as
22 one of the factors that we used.
23       Q.    But what I'm asking about is do you know
24 whether you or your experts analyzed whether the
25 district was compact?  Did you analyze --

Page 227

1        A.    I'm sure that -- well, I'm certain that
2  was considered, yes.
3        Q.    Did they look to see whether it was
4  contiguous?
5        A.    That was one of the consistent
6  criteria.
7        Q.    Did they look to see whether the
8  population fell within the deviation?
9        A.    Sir, I just said to you that all of the
10 variables were considered.
11       Q.    And so who would we ask to determine if
12 these 29 challenged districts that you have said you
13 just looked at the results, who would be able to --
14       A.    I did not say --
15       Q.    Hold on.  Hold on.
16       A.    Well, I just don't want you putting
17 words in my mouth because I did not say that I just
18 looked at results.
19       Q.    I thought we just went through this.  Do
20 you want me to repeat those?
21       A.    We look at outcomes.  Outcomes.
22       Q.    Outcomes.  Okay.  And tell me how outcome
23 is different than results.
24       A.    It may have more variables.  I may -- I
25 know.  Let's just say we looked at it from a

Page 228

1  comprehensive standpoint considering all of the
2  variables that needed to be considered, and if a
3  district could be mapped in such a way that it could
4  be reflective or competitive, then that's the way the
5  mapping was done by our group.
6        Q.    So let me just -- so you recognize that
7  the House used traditional redistricting criteria to
8  draw some of these districts, right?
9        A.    Traditional?
10       Q.    Compactness, continuity, communities of
11 interest, deviation, all of those traditional issues.
12       A.    I hope that was the intent.
13       Q.    I'm sorry?
14       A.    I hope that was the --
15       Q.    Let me ask that question again.  Isn't it
16 clear that the House used those criteria for drawing
17 some of these districts?
18             MR. INGRAM:  Objection.  Asked and
19 answered.
20       A.    I cannot answer that question because
21 it was -- I was not sitting on the committee when they
22 drew the maps.
23       Q.    But somebody in your group has looked at
24 them and they can tell that they're compact, right?
25       A.    Oh, I'm certain, yes.

Page 229

1        Q.    And they can tell that they're
2  contiguous, right?
3        A.    Yes, they are.
4        Q.    And they can tell they preserve
5  communities of interest, right?
6        A.    Yes, they did.
7        Q.    Okay.  That's my point.  Mr. Moore went
8  through a whole bunch of examples of communities of
9  interest so let me try this one last time.  Is it fair
10 to say or accurate to say that the House did follow its
11 criteria when drawing its districts?
12             MR. INGRAM:  Objection.  Asked and
13 answered.
14       Q.    Go ahead and answer that, please.
15       A.    I was not a member of the subcommittee
16 so I don't know if they were consistent or not.
17       Q.    Do you have any reason to think that they
18 weren't?
19       A.    I don't know.
20       Q.    You looked at the maps.  You said you
21 studied them.  They're compact.  You can tell me that,
22 can't you?  You can look at a map and tell me.  We can
23 pull one of those up that's still over there.  We can go
24 back through it ourselves.
25       A.    Sir.  Sir, right now the attorney

58 (Pages 226 - 229)

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 230

1 doesn't have to speak for me but I'm telling you you
2 are badgering me. Would you please be succinct in
3 your questions so we can get on with this and I can go
4 home. We've been at this since 10:00 a.m. It is now
5 five o'clock and I was told this deposition would only
6 take five hours.
7            MR. TYSON: Ms. Murphy, can I just say
8 one thing? I appreciate your patience. This isn't an
9 easy issue. So with that, I will take your advice. I
10 apologize if I was badgering you. I was trying to
11 make sure I understood your answer, but with that, I
12 don't have any more questions. I hope you have a good
13 weekend. Thank you for your time.
14            THE DEPONENT: Thank you.
15            MR. INGRAM: Does counsel for the
16 governor or any other defendants have questions before I
17 redirect?
18            MR. LIMEHOUSE: Yes, I do. This is
19 Thomas Limehouse for Governor McMaster. I have a couple
20 of quick questions.
21
22 EXAMINATION BY MR. LIMEHOUSE:
23    Q.    Good afternoon, Ms. Murphy. My name is
24 Thomas Limehouse. I represent Governor Henry McMaster.
25 I have a few quick questions for you. It shouldn't be

Page 231

1 fifteen. Try to keep it as quick as possible. Are you
2 aware that Governor McMaster is named as a defendant in
3 this lawsuit?
4    A.    Yes.
5    Q.    Both in the original complaint and the
6 amended complaint, right?
7    A.    Yes.
8    Q.    I believe you testified that you were
9 involved in the NAACP's decision to file this lawsuit.
10 Is that correct?
11    A.    Involved in the decision to? Yes.
12    Q.    Who else was involved in the decision, if
13 anyone?
14    A.    The coalition. We made a group
15 decision to do it.
16    Q.    Okay. Who made the decision to sue the
17 governor?
18    A.    The governor has final overall
19 authority, responsibility.
20            MR. TYSON: I was badgering.
21            MR. INGRAM: Can you put it on mute?
22            THE DEPONENT: Yes, you were badgering
23 me.
24            MR. INGRAM: And objection. Objection.
25 Calls for a legal conclusion.

Page 232

1            MR. LIMEHOUSE: I'm sorry. The reference
2 to badgering?
3            MR. INGRAM: No.
4            (Simultaneous crosstalk.)
5            MR. INGRAM: Your question about who made
6 the decision to sue the governor.
7            MR. LIMEHOUSE: I'm sorry. You were
8 speaking over the witness. The witness' reference to
9 badgering.
10    Q.    Ms. Murphy, what were you referring to?
11    A.    The voice in the background, not you.
12    Q.    Okay. Got you. Okay. Try that again.
13 Who made the decision to sue the governor?
14            MR. INGRAM: Objection. Calls for a
15 legal conclusion.
16    Q.    You can answer.
17    A.    The coalition decided.
18    Q.    Which members of the coalition?
19    A.    The coalition that's listed on our
20 correspondence.
21    Q.    Okay. When was the decision made to file
22 this lawsuit?
23            MR. INGRAM: Objection. This is
24 attorney-client privilege. Legal strategy. I'm going
25 to direct my client not to answer.

Page 233

1    Q.    Why did the NAACP sue the governor?
2            MR. INGRAM: Objection. Privileged. I'm
3 going to direct my client not to answer.
4    Q.    What do you or the NAACP claim the
5 governor did or didn't do related to the claims in this
6 lawsuit?
7    A.    The governor has ultimate
8 responsibility for the final House plan which has been
9 signed off.
10    Q.    Anything else?
11    A.    Because the plan as we see it as a
12 coalition still has -- we still have concerns about
13 specific areas and we want our voices to be heard.
14            MR. LIMEHOUSE: All right. Thank you.
15 I have no further questions. Appreciate your time.
16            THE DEPONENT: Thank you.
17            MR. INGRAM: Okay. I need five minutes
18 to clear my thoughts for redirect.
19            (Brief recess.)
20
21 EXAMINATION BY MR. INGRAM:
22    Q.    Ms. Murphy or President Murphy, I have
23 just a few questions for you. First, earlier today, you
24 were asked questions about your preparation for a
25 deposition. You testified to meeting twice. Do you

59 (Pages 230 - 233)

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 234

1  remember if that was once or twice a day on either of
2  those days?
3           MR. MOORE: Object to the form.
4       Q.   You may answer.
5       A.   Twice on one day.
6       Q.   On which day?
7       A.   My days running -- today is Friday?
8  Thursday.
9       Q.   Okay. And I have a couple of questions
10  about discovery. So you were asked about discovery in
11  this case and about your role in discovery. So without
12  disclosing specifically what you discussed, do you
13  recall whether you worked with an attorney in this case
14  to respond to different questions that the defendants
15  were seeking from the South Carolina NAACP?
16          (Audio interference.)
17          THE DEPONENT: Somebody is talking in the
18  background.
19          MR. INGRAM: Can we please go on mute?
20  Someone is speaking.
21      Q.   I'll repeat the question. Without
22  disclosing specifically what you discussed, do you
23  recall when you worked with any attorney in this case to
24  respond to different questions that the defendants were
25  seeking of you?

Page 235

1       A.   No.
2       Q.   Do you remember discussing discovery
3  responses with any of your attorneys?
4       A.   No.
5       Q.   Do you remember your attorneys asking you
6  to collect documents for this case?
7           MR. MOORE: Object to the form.
8       Q.   You may respond.
9       A.   In terms of documents that were needed?
10      Q.   Correct.
11      A.   I was requested by someone by email
12  that the documents were needed and I instructed the
13  staff to send those forms that were requested.
14      Q.   Thank you. I have a couple of questions
15  about the distinction between the coalition and the
16  South Carolina NAACP. President Murphy, you testified
17  about working with the coalition on redistricting or
18  what otherwise may be reapportionment, slash,
19  redistricting committee. Are these one and the same?
20  That is, is the coalition and the reapportionment
21  committee the same thing or are they separate things?
22      A.   They are the same.
23      Q.   Can you describe off the top of your head
24  if you can the various groups who are part of the
25  coalition?

Page 236

1       A.   They are reflected in the minutes. The
2  coalition -- I don't want to miss anybody.
3       Q.   Okay.
4       A.   You know, I would rather you refer to
5  the listings on the minutes to have an accurate
6  membership.
7       Q.   And just to clarify, the coalition is
8  different from the South Carolina NAACP?
9       A.   Yes, it is.
10      Q.   And what role in the coalition would the
11  South Carolina NAACP have?
12      A.   Your question again?
13      Q.   What role in the coalition does the South
14  Carolina NAACP have?
15      A.   Ask that -- could you rephrase it?
16      Q.   The South Carolina NAACP is a part of a
17  broader coalition, correct?
18      A.   That's a different organization.
19      Q.   Correct. You would say the coalition is
20  an umbrella group of different groups, right?
21      A.   That's correct. Yes.
22      Q.   And what role does the South Carolina
23  NAACP have within that larger group?
24      A.   We are participants.
25      Q.   Are you -- would you consider yourself a

Page 237

1  leader of the coalition? Is it a democracy? How does
2  that work?
3       A.   It is a democracy. We spearheaded the
4  initiative but it was a group pulled together to work
5  together on the redistricting process.
6       Q.   Thank you. Now I'm going to turn to a
7  few questions about the legislative cycle to get some
8  clarification. You testified about individuals not
9  being able to participate in legislative proceedings.
10  What do you mean by that?
11      A.   Some were not able to participate
12  because of the scheduled time for the hearing.
13      Q.   What time were the hearings scheduled?
14      A.   During the day.
15      Q.   Do you remember what hours?
16      A.   Ten a.m. Maybe 1:00 p.m.
17      Q.   Does the conflict with many of the
18  schedules of the NAACP members?
19      A.   Yes, it does. Many of them work. The
20  only individuals that were able to attend were those
21  that were retired pretty much.
22      Q.   How many proceedings were at night or on
23  the weekend?
24      A.   None on the weekend. At night? I
25  don't recall any at night.

60 (Pages 234 - 237)

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 238

1    Q.    And did you attend hearings by the House
2  on proposed state House maps?
3    A.    Yes.
4    Q.    What do you recall from those meetings
5  regarding concerns people had about the impact of the
6  maps on black voters?
7    A.    There were many concerns expressed,
8  disagreements in terms of how the maps had been drawn.
9  Not just from the members that did participate that
10  were giving testimony but also from others.  Concerns
11  and disagreements regarding with how lines were drawn.
12    Q.    And did those concerns overlap with some
13  of the challenged House districts in the amended
14  complaint?
15    A.    They did.
16    Q.    And do you recall if your plans combined
17  nineteen incumbents?
18    MR. MOORE:  Objection as to form.
19    Q.    You may respond.
20    A.    Okay.  You're asking me if --
21    Q.    Do you remember if the map submitted by
22  the South Carolina conference combined nineteen
23  incumbents against each other?
24    A.    No.  I think I said no before.  That's
25  something I would have to look at.  I can't -- I can't

Page 239

1  state yes or no on that.
2    Q.    Thank you.  I just have a few last
3  questions about South Carolina NAACP membership.  So
4  you've been asked about the identity of South Carolina
5  NAACP members by Mr. Moore and you stated your
6  unwillingness to disclose names.  Why are you concerned
7  about disclosing the names of your membership?
8    A.    I'm very concerned about disclosing the
9  names because I have to look at the history in this
10  state in terms of what happened to people in past
11  years in some of these counties where their names were
12  disclosed.  They lost their jobs.  Some even had to
13  move out of state so that is a big concern, a great
14  concern for not disclosing the names of our
15  membership.
16    Q.    Thank you.  And do you have concerns
17  today about the same sort of reprisal that you just
18  described?
19    A.    I will and I always will.
20    MR. INGRAM:  Thank you.  That is all I
21  have on redirect.
22    MR. MOORE:  Mr. Tyson, do you have any
23  questions before I begin because I only have one or two?
24    MR. TYSON:  No, I don't have any
25  questions.

Page 240

1    MR. MOORE:  Mr. Lambert.  Excuse me.
2  Mr. Limehouse.
3    MR. LIMEHOUSE:  I do not.
4
5  EXAMINATION BY MR. MOORE:
6    Q.    So Ms. Murphy, do you believe that you
7  shouldn't have to disclose the names of your members in
8  discovery?  Is that correct?
9    A.    Well, not only is it a personal belief,
10  it is a national -- in terms of our constitution and
11  bylaws, we cannot disclose the names of members and
12  it's for a reason such as I have stated that we do
13  not.
14    Q.    You also don't want to disclose the
15  process by which you say trust us, we have people in
16  these challenged districts.  You don't want to disclose
17  that process either, do you, ma'am?
18    MR. INGRAM:  Objection.  Misstating
19  testimony.
20    Q.    Please answer my question, Ms. Murphy.
21    A.    I stated as a requirement of our
22  national office, we are not to disclose the names of
23  our membership.
24    Q.    I didn't ask you a question about names.
25  I asked a question about process because -- I'm going to

Page 241

1  ask you again.  Can you tell me what process and what
2  records there are at the SC NAACP that can identify
3  these members for names in the challenged districts?
4    MR. INGRAM:  Objection.  Asked and
5  answered.
6    Q.    Yes or no.
7    MR. INGRAM:  Objection.  Asked and
8  answered.
9    Q.    The answer is yes or no, ma'am.  Can you
10  describe that for me?
11    A.    No.
12    Q.    Okay.  However --
13    A.    No.  Excuse me.  I cannot answer that
14  because of my restrictions because of policy from the
15  national organization that we do not disclose that
16  information.
17    Q.    But yet you're aware that your counsel
18  has taken the position that the House by virtue of your
19  challenge must subject all of its documents that are
20  arguably shielded by legislative privilege to scrutiny
21  by you.  Is that correct?
22    MR. INGRAM:  Objection.  Objection.
23  Calls for a legal conclusion.
24    Q.    You may answer that question, Ms. Murphy.
25    A.    I would have to refer you to our

61 (Pages 238 - 241)

3:21-cv-03302-MBS-TJH-RMG    Date Filed 03/21/22    Entry Number 194-2    Page 63 of 108

Brenda Murphy                              February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 242

1  general counsel, the NAACP national office.
2      Q.    And, Ms. Murphy, again as we sit here
3  today, you can't give me a bit of evidence that you have
4  to support your claim of purposeful racial
5  discrimination, can you?
6          MR. INGRAM:  Objection.  Asked and
7  answered.
8      Q.    You can answer, Ms. Murphy.
9      A.    I will again say in terms of looking at
10 the districts and how the lines have been drawn and
11 who live in those areas which is the outcome, the vote
12 for black people has been diluted.  That's the outcome
13 statement.
14     Q.    There's a difference between outcome --
15 and that's your opinion that the votes of black people
16 have been diluted, right?  That's an opinion by you?
17     A.    Well --
18         MR. INGRAM:  Objection.
19     A.    I again respond I'm a member of a
20 coalition.  We have evaluated these mappings, the
21 drawings, the mapping that has been done and that is
22 our opinion based on consultation with individuals
23 that have expertise in the area.
24         MR. MOORE:  I don't have any further
25 questions.  Thank you.  As I said earlier, we're

Page 243

1  leaving this deposition open because of the late
2  production of documents.
3          Ms. Murphy, I didn't tell you this
4  deposition would only take five hours.  It was a goal
5  but I will also say that in my opinion the reason this
6  deposition went so long is because instead of giving
7  responses, direct responses to questions, you engaged
8  in soliloquy rather than answering the question.
9  That's my opinion.
10         MR. INGRAM:  This is harassment at this
11 point.
12         MR. MOORE:  I just wanted to say that.
13         MR. INGRAM:  This is harassment at this
14 point.  I want to make a record that you just launched a
15 diatribe at my client.
16         MR. MOORE:  I didn't want to diatribe.
17 This is in response to her comments about the length of
18 the deposition so --
19         MR. INGRAM:  Can I get on the record by
20 the court reporter about how long this deposition has
21 taken?
22         THE COURT REPORTER:  Just a second.  Six
23 hours and six minutes.
24         MR. INGRAM:  Thank you.
25         MR. MOORE:  Again we will leave this

Page 244

1  deposition open provided -- pending resolution by the
2  Court of the issues surrounding the unanswered questions
3  and the providing of other documents.  I don't have
4  anything further.  Mr. Tyson?
5          MR. TYSON:  No.  I'm good.  Thanks,
6  everybody.  It's been a long day.  Thank you.
7          MR. INGRAM:  Thank you.
8
9          FURTHER DEPONENT SAITH NOT
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 245

1          C E R T I F I C A T E
2
3
4  STATE OF ALABAMA)
5  MOBILE COUNTY)
6
7          I hereby certify that the above
8  proceedings were taken down by me and transcribed by me
9  and that the above is a true and correct transcript of
10 the said proceedings given by said witness.
11         I further certify that I am neither of
12 counsel nor of kin to the parties nor in anywise
13 financially interested in the outcome of this case.
14
15
16         *Jan A. Mann*
17
18
19         JAN A. MANN
20         COMMISSIONER - NOTARY PUBLIC
21         ACCR NO. 321
22
23
24
25

62 (Pages 242 - 245)

Brenda Murphy

The South Carolina State Conference vs. McMaste,

February 4, 2022

[& - 6]

Page 1

| & | |
| --- | --- |
| **&** | 4:4 5:2,8 |

| 0 | |
| --- | --- |
| **03302** | 1:5 |

| 1 | |
| --- | --- |
| **1** | 6:10 22:22 39:23 40:1,7 |
| **10** | 6:21 86:22 181:1,18 |
| **10-7-21** | 6:22 |
| **10006** | 4:9 |
| **102** | 131:3 132:14 |
| **103** | 131:3 132:14 |
| **106** | 6:18 |
| **10:00** | 230:4 |
| **10th** | 56:25 |
| **11** | 6:22 186:5 222:19 |
| **11-10-21** | 6:14 |
| **11-18-21** | 6:23 |
| **1100** | 4:24 |
| **111** | 131:3 132:15 |
| **115** | 20:7 |
| **117** | 56:20 151:2 152:6 |
| **12** | 6:23 189:23 190:2 |
| **1221** | 5:10 |
| **1230** | 4:15 |
| **12th** | 111:2 197:8 |
| **13** | 6:24 194:12 |
| **1310** | 5:4 |
| **132** | 6:19 |
| **14** | 6:25 198:13 199:6 |
| **15** | 125:10 130:18 131:18 |
| **16** | 166:24 |
| **165** | 6:20 |

| 17 | 160:14 |
| --- | --- |
| **18** | 176:23 177:2 189:21 |
| **1800** | 5:10 |
| **181** | 6:21 |
| **18286** | 245:17 |
| **186** | 6:22 |
| **189** | 6:23 |
| **19** | 125:11 |
| **1939** | 42:22 |
| **194** | 6:24 |
| **1975** | 33:4 |
| **198** | 6:25 |
| **1985** | 35:8 |
| **1:00** | 237:16 |
| **1:15** | 102:23 |

| 2 | |
| --- | --- |
| **2** | 6:12 44:6,9 67:1 196:18 197:20 |
| **2000** | 29:16 30:17 31:1,13 |
| **2010** | 101:7 105:16 119:10,20,21,22 120:7,15,19,25 121:21,22 153:7 221:12,13,23 222:1,4,17,18 |
| **2011** | 152:1,14 153:7 154:21 155:4 171:4 |
| **2020** | 85:8,11,16 86:2 95:9 103:24 105:9,12,14 205:15 |
| **2021** | 21:12 55:10 56:11 77:1 86:22 96:13 106:5 107:5 125:8,9,10,10,11 130:18 131:18 140:25 186:2,24 189:21 194:10 |

| 2022 | 1:24 3:7 7:6 |
| --- | --- |
| **204** | 6:4 |
| **21** | 96:13 |
| **23** | 46:23 47:8 56:11 96:8 97:10 |
| **23-7028846** | 41:24 43:13 44:2 45:18 |
| **230** | 6:5 |
| **233** | 6:6 |
| **23rd** | 57:1 111:4 |
| **24.59** | 85:17,22 86:10 87:5 |
| **240** | 6:7 |
| **25** | 87:4,4,11 194:9 |
| **25.28** | 85:12,21 86:4 |
| **26** | 104:5,21 |
| **26.6** | 99:10 101:2 |
| **26.8** | 104:19 |
| **260** | 2:4 |
| **26th** | 198:7 199:9 199:12,15 |
| **27** | 85:24 125:9 198:8 |
| **27th** | 205:13 |
| **28** | 85:24 87:19 104:21 |
| **29** | 83:22 86:21 87:11,19 217:20 225:22 227:12 |
| **29201** | 4:16,25 5:11 |
| **29211** | 5:5 |
| **2nd** | 199:13 |

| 3 | |
| --- | --- |
| **3** | 6:13 66:23 67:4 67:8 |
| **30** | 13:10,11,14,17 22:22 125:8 206:11,24 |
| **30th** | 125:12 |

| 321 | 245:21 |
| --- | --- |
| **33** | 101:2 104:6 |
| **34** | 101:3,7,11,21 104:1,7,16,16 156:10,11,15,15 |
| **36** | 159:17 |
| **365** | 151:3,10 152:7 152:20 |
| **36603** | 2:5 |
| **37** | 162:25 163:13 163:14 167:22,23 |
| **39** | 6:10 |
| **3:21** | 1:5 |

| 4 | |
| --- | --- |
| **4** | 1:24 6:14 7:6 43:2 67:2 81:21 |
| **40** | 4:8 |
| **41** | 159:20 160:1 161:2 162:13,14 165:22 166:6 172:21 173:3,6,22 178:22 |
| **43** | 160:1 161:2 |
| **44** | 6:12 |
| **49** | 186:2 |
| **4th** | 3:6 |

| 5 | |
| --- | --- |
| **5** | 6:15 88:12 194:10 |
| **500** | 152:2,16 |
| **501** | 43:2 |
| **509** | 137:14,14 |
| **57** | 46:23 47:7 |
| **57-0327661** | 45:14 |
| **579** | 135:12,17 |
| **5th** | 4:8 197:6,7 |

| 6 | |
| --- | --- |
| **6** | 6:16 13:10,11,14 13:17 87:20 97:9 97:11,11,14 106:5 |

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

**[6 - ago]**

Page 2

107:5 164:22
166:1,2 206:11,24
**6/10/2021**  45:23
**611**  45:9
**628**  151:14 152:22
**65**  91:21 92:8
**66**  6:13
**6th**  106:15

**7**

**7**  6:3,18 81:24
106:9,12 132:2
155:17 156:22
157:4,14 176:21
186:2,24
**70**  92:8 160:13
**700**  4:15
**75**  91:21
**77**  20:13

**8**

**8**  6:19 41:14,15,15
43:11 106:11,12
125:10 132:2,3,5
**8-26-21**  6:25
**8-5-21**  6:24
**80**  91:21
**81**  6:14
**85**  35:9
**88**  6:15

**9**

**9**  6:20 42:8,9 43:6
43:12 165:9
**9-30-21**  6:21
**95**  226:9,11,12,13
226:18
**97**  6:16
**9:05**  1:24 7:7

**a**

**a.m.**  1:24 7:7
230:4 237:16

**ability**  9:4 75:4,12
93:12,12
**able**  12:6 38:9
51:5 94:25 100:19
110:19 114:6
115:8,9 128:20
151:22 156:5
158:9 187:7,21
206:17 212:15
220:21 227:13
237:9,11,20
**absentee**  205:9,12
**absolutely**  103:20
**academy**  100:1
**accept**  193:7
**acceptable**  24:2
**access**  115:5,6
144:11 185:17
196:24 219:21,25
**accr**  245:21
**accurate**  83:23
205:17 222:1
223:13 229:10
236:5
**aclu**  14:15 26:19
27:8 77:23 99:6
141:15,17 142:3,5
142:18 143:20
144:14 145:1
183:9 185:19
212:8
**act**  56:20,25 74:17
151:2,3 178:22
212:11
**acted**  55:20 212:6
**acting**  7:2 69:19
**action**  181:25
182:7,19
**actions**  211:17
**active**  207:4,6,10

**activities**  38:22
**actual**  126:13,16
156:15 170:9
**actualized**  182:13
**ad**  62:25 115:24
116:3,6,8 117:2,4
125:4 127:10,17
127:18,22 130:19
134:12 208:19
**add**  34:13 127:5
130:14
**adding**  129:1
**addition**  83:13
**address**  20:6
**addressed**  206:4
**addresses**  144:11
144:16
**aden**  4:6 13:25
14:9 99:1 182:3
196:19,24 197:23
**adequate**  55:4
209:21
**administration**
33:14
**administrative**
98:9
**admission**  43:1
**admissions**  6:11
39:18 40:20
**admit**  41:23 42:13
43:19,20,22
132:20
**admits**  43:12 44:2
**admitted**  42:8
45:18
**admitting**  183:25
**adriel**  99:5,5
**advantage**  209:13
**adversely**  69:22
**advice**  230:9

**advisor**  35:15
**advocacy**  76:19
77:9,16,18
**advocate**  38:23
**advocated**  78:5
**affairs**  33:11
**affiliate**  29:24
**affiliated**  29:21
36:2
**affiliates**  51:15
**afforded**  212:16
**afl**  27:8 77:23
98:11
**african**  48:21 64:9
64:10,11,13 78:25
94:3 95:7,19
101:8 103:23
104:2,16 105:9,10
105:11,15 121:19
122:9 221:19
**afternoon**  213:13
219:17 230:23
**age**  33:24,25 86:10
86:17 88:19,24
89:1 99:10 100:18
100:18 105:11
157:15
**agency**  47:11
52:10 74:11
**agenda**  6:22,24
38:24 186:10,25
187:5 194:10
**agent**  45:7
**ages**  109:16
**ago**  44:24 115:15
118:19 129:10
131:10 138:13
147:5,17 148:5,18
153:13 163:7
179:4 187:24
205:7 218:1 223:7

Brenda Murphy
The South Carolina State Conference vs. McMaste,

February 4, 2022

[agree - answered]

Page 3

**agree** 42:25 43:12
43:25 54:12,14
55:8 57:4 67:17
67:20 88:18,22
89:22 90:18,19
91:1 104:15,19
115:23 116:19,20
116:22 119:19
125:20 134:20
135:6,9,10,20,24
136:3,6,8 138:5,8
145:18 147:16,20
150:4 151:25
152:2,5,16 154:19
155:3,15 157:13
157:15 161:15
164:21,21 165:19
165:22 201:14
**agreed** 3:3,8,14,20
76:18 82:7,19
113:2 126:4
147:17 153:12
**agreement** 17:12
130:22
**agrees** 104:8
**ahead** 131:17
149:2 204:7 215:6
229:14
**al** 1:15
**alabama** 2:5 7:2
22:23 245:4
**allegation** 59:14
59:17 60:19 62:1
62:10 111:7 160:2
163:3 168:7,9,11
168:19 169:2
171:7 177:23
179:17
**allegations** 119:20
153:23 159:3,12
160:19 170:20,23

**allege** 59:24
**alleged** 170:2
172:10 180:15
**allegedly** 178:21
**alleges** 59:4
159:19 172:21
**alleging** 169:8
**allow** 47:3 92:10
115:17
**allowed** 11:1
129:13 168:4,13
203:17
**alongside** 141:6
**amelia** 98:8
**amended** 17:1,2
55:9,11 56:10,21
57:1,8 59:4 60:3
66:5,6 71:21
73:14 74:10 111:2
156:8 165:21
166:11 187:11
231:6 238:13
**amendment** 57:7
79:13 202:20
**american** 36:5
48:21 64:9,10,12
64:13 78:25 95:7
95:19 101:8 104:2
104:16 121:19
122:10 221:19
**americans** 94:3
103:23 105:9,10
105:11,15
**analytical** 27:1
**analytics** 28:18
**analyze** 223:7
225:22 226:17,25
**analyzed** 223:11
223:23 226:24
**anderson** 67:19
137:3 138:20

139:1,3,9,9,15
153:20,24,24
154:14,14 155:10
160:9 171:11,13
172:9
**announced** 24:20
24:22,22
**annual** 36:21
**annually** 45:4
**answer** 9:15 10:3
10:14,15,20 11:8
12:23,25 22:12,16
22:18 30:7,11,12
30:21,22 31:10,14
31:17,19,22,24
32:6,13 35:1
39:13 46:7 47:2,5
47:15,16,20 50:11
50:12 55:16 57:25
58:15,16 59:21
60:10,22 61:4,14
61:15,22,23 62:5
62:17 65:13,17
70:3,12,22,24 75:1
80:14,15 84:6,8
87:14 89:13
104:12,13,14
109:5 110:15,19
111:14 112:20
113:4,5,9,23,25
114:3,5,6 115:2
120:12,13,14,15
120:22 121:23
122:15 124:14,16
126:2 127:1 129:2
129:21 137:18
138:2 141:20
143:25 145:18,20
145:21 147:10
149:10 157:23
158:18 159:1,16

164:20 167:9
170:5,25 171:22
172:15,18 174:3,4
175:7 176:1,8
177:16 179:13,19
180:21,22 182:24
184:4 185:23
187:19 188:4,10
188:20,23,25
189:9 191:22,25
191:25 194:6
200:19 201:22
202:6,10,14 205:1
206:18 211:19
212:23 213:6
214:7,22,23 215:6
218:1,6,9,14,15,17
219:16 220:17,18
221:4 228:20
229:14 230:11
232:16,25 233:3
234:4 240:20
241:9,13,24 242:8
**answered** 31:16
47:1 50:10 57:24
59:23 60:7,9 61:6
61:13,21 62:4,16
72:24 73:1 74:23
75:3,8,11 80:11,12
82:12,14,17,23
84:5 104:11 109:4
109:5 110:12,14
112:18,19 113:8
113:11,14 114:10
123:25 124:1,17
126:1,25 143:4,11
147:9 172:13
175:22 178:13,25
179:16,18,23
180:19 188:9,20
189:7,8 214:21

Brenda Murphy
The South Carolina State Conference vs. McMaste,

**[answered - attachment]**

Page 4

215:5 216:7
218:13 219:4,11
228:19 229:13
241:5,8 242:7
**answering** 9:21
111:11 112:22
145:23 243:8
**answers** 8:20,21
113:15,16,19
146:25 147:1
**antonio** 4:5
**anybody** 103:4
173:20 217:19
236:2
**anywise** 245:12
**apologize** 67:7
88:16 164:11
230:10
**app** 85:3
**apparently** 51:25
**appearing** 4:3,11
4:18 5:1,7
**appears** 191:13
**appendage** 159:22
163:16 164:23
165:20
**appendages** 163:4
**application** 36:15
**applies** 114:11
**apportion** 53:16
**apportioned** 54:9
**appreciate** 137:18
145:18 210:23
212:17 213:12
221:3 230:8
233:15
**appropriate** 62:7
145:20 198:24,25
199:4
**appropriately**
130:5

**approved** 48:7
**approximate** 37:6
**approximately**
16:13 25:2,4
36:12 37:16 83:22
86:21
**april** 42:24,24
**area** 34:6,8,24
41:11 63:7 69:7,9
71:15,18 72:1,4
91:23 94:11,21
134:21,23 138:16
139:16 141:15
142:4,15 151:5
158:22 162:12,21
171:11,11,12
174:23 225:6
242:23
**areas** 35:3 66:20
66:21 67:18,22
68:2,22 71:9,13
73:9,18,20 89:20
111:18 114:21
121:5,9,12 124:12
124:15,23,23
130:23 133:9
135:14 138:25
159:15,24 160:10
160:17 161:21
178:16 182:1,2,8
188:13 201:5,9
224:14 233:13
242:11
**arguably** 241:20
**argumentative**
58:14 60:21 87:13
104:10 170:4,12
**army** 34:14
**arrive** 83:25 84:3
**arrived** 84:7

**article** 195:22
**asked** 18:2,4,7,16
18:23,24 19:4,16
28:3 31:15 41:5
46:25 50:9 57:23
59:13,20,22 60:6,9
61:12,20 62:4,15
65:9 70:6 71:18
72:23,25 74:22
75:7 80:7,10,13
82:11,13,22 84:4
93:6 104:11
112:17,19,23
113:7 114:10
123:24 124:1,17
125:25 126:24
130:19,22 132:13
143:3,10,24
145:17 147:8
148:18 155:22
172:13 174:19
175:21 178:12,24
179:15,18,22
180:18 188:8,19
189:6,8 190:20
193:13,15,24
204:20,23 207:1
212:22 215:4
216:6 218:12
219:3,5,7,10
220:10 223:5
225:7 226:8
228:18 229:12
233:24 234:10
239:4 240:25
241:4,7 242:6
**asking** 9:8 13:8
22:11,13 23:10,11
65:14 69:5 73:20
73:23 90:6 91:10
95:16 104:4

111:13 112:9
115:2 122:14
135:4,4,5 137:17
148:5,6,12 149:12
160:25 161:3,9
167:12 168:10
171:19 172:3
177:20 178:6,7
185:1 187:20
190:25 191:13,13
191:15 216:15,16
216:21 219:12,15
220:12 224:10
225:18 226:23
235:5 238:20
**asks** 161:1
**assertion** 137:24
138:13 139:8
**assertions** 221:24
**assign** 3:17
**assignment** 178:3
**assist** 51:18
142:17
**assistant** 98:9
184:24 185:8
**assisting** 28:7,19
**associate** 33:12
195:6
**associated** 28:5
50:19 183:15
196:13
**association** 36:6,6
38:11 43:2 79:10
**assume** 9:15
**assuming** 7:22
103:11 199:13
**assure** 71:24 72:5
74:16
**attachment**
166:23 190:14

Brenda Murphy
The South Carolina State Conference vs. McMaste,

February 4, 2022

[attempt - berkeley]

Page 5

attempt 193:17
218:9
attempted 19:6
attempts 193:5
attend 24:10,24
54:2 129:14
161:16 208:10
237:20 238:1
attendance 26:21
27:16,17,22 97:23
attended 23:7,13
23:14,14 24:25
29:6,8 53:23
64:16 65:10 100:2
141:5 200:10,16
208:14,18,22
209:16
attendees 183:2,25
attending 22:3
199:23 207:7,19
209:16
attention 213:18
attest 174:17,21
attorney 14:7
55:17 97:25
100:12,23 111:15
182:2,3 186:12,15
188:6 194:16,19
194:24,25 196:19
196:19 197:23
199:22,23 200:4,8
202:17 206:2,9
222:7 224:16
229:25 232:24
234:13,23
attorneys 7:17
13:23 14:1,2,10,24
45:18 98:22 224:4
224:16 235:3,5
attribution 195:20

audio 203:18
234:16
august 14:4 76:22
125:8 194:10
197:6,7,8 198:7
199:9,12,15
author 82:21,24
authority 231:19
authorization 74:5
available 51:18
97:3,4 138:19
144:20 172:2
182:24 184:17
185:2
avoiding 150:9
aware 53:1,3,5,9
85:10 105:8
111:24 120:4,6,9
120:15,19,21
122:2 125:2
128:13,15 129:3,5
129:7,8,11 135:2
142:1 145:6,7
148:17,19,21,23
148:25 151:1,3
172:7 225:9 231:2
241:17

**b**

b 13:10,11,14,17
22:22 204:15
206:11,24
bachelor's 32:21
back 29:10 42:15
75:17 76:3 94:9
94:12 102:9
103:10 138:7
153:3 154:21
160:9 167:7,10,17
172:9 181:15
191:21 198:15
208:20 213:14,19

229:24
background 32:19
192:25 232:11
234:18
bad 9:24 90:7
162:17
badgering 62:3,16
113:8 179:12
188:21,22 230:2
230:10 231:20,22
232:2,9
bailey 119:2
ballot 205:9
ballots 205:12
ballpark 34:2
bamberg 63:19
64:11
barely 198:22
base 129:24 130:4
222:2
based 43:21 76:18
85:8 88:8 90:4
101:1,16 104:5
105:20 110:10
113:15,16 118:3
143:19 160:3
170:8 200:25
202:16 218:25
242:22
basically 15:8,11
15:18 25:18 51:15
77:24 88:6,7
89:21 94:2 107:24
108:4 124:5
basics 141:24
basis 12:25 20:23
20:25,25 21:9
31:23,24 137:8
bat 204:20
batch 166:24

beach 8:8 200:24
201:6 205:3
bear 186:3
began 18:21,25
beginning 7:6
113:18 192:18
193:19 220:11
begun 54:20
behalf 1:9 4:3,11
4:18 5:1,7 17:7
73:24 112:10,11
113:19 206:12
belief 240:9
believe 9:1 12:6
13:14 14:5 22:14
45:22 55:19 60:8
65:2,24 66:25
70:7 81:17 88:15
90:10 93:5 95:18
103:15 106:21
109:8 110:1,9,16
111:3 112:5,15,21
113:5,12 114:24
114:25 115:18,23
116:3,21 118:9,14
118:18,19,25
122:16 123:4,20
125:6 133:22
134:19 139:18
141:5 146:21
147:4,17 148:17
153:12 156:19
164:5 173:12
175:1 198:24
202:10,11 203:12
214:8 231:8 240:6
belonging 185:3
belton 158:12,20
158:20,23
berkeley 131:5
133:3,5,7 152:8,9

Brenda Murphy
The South Carolina State Conference vs. McMaste,

February 4, 2022

**bernstein** 63:7
**best** 9:8,12,25
  30:14 33:1 66:10
  75:4,12 133:20
**beth** 63:6
**better** 67:5 89:2
  222:5
**beyond** 32:3
**big** 40:17 239:13
**bikers** 8:8
**bill** 152:14,18
**bit** 19:21 27:21
  32:18 134:15,16
  135:15 242:3
**bizarrely** 159:22
**black** 8:8 23:23
  48:8,13,17,18,22
  59:9,9 60:14 61:2
  62:21,21 64:7
  81:8 83:22 84:20
  84:21 85:4,12,19
  85:21 86:3,6,9,12
  86:16,17,21 87:5
  87:18 91:21,23
  92:9 93:11 94:1,3
  94:24 99:9 100:18
  101:2,2 102:3
  104:5,6 105:2
  109:22 118:5
  121:21 122:5,8,10
  122:23 136:13,13
  146:7,9 157:10,14
  157:17 158:8
  159:20,23,24
  160:14 168:4,5,5
  168:12,14 169:6,9
  169:10,21 170:19
  190:21 192:3,7,14
  192:21,21 193:8
  193:24 214:16
  215:16 221:10,17

223:18,19 226:7
  238:6 242:12,15
**blacks** 84:16 94:15
  96:2 160:11
**block** 191:9
**blocks** 157:15
**blow** 67:13
**bodies** 190:22
**body** 209:22
**born** 19:24 20:2
**borrow** 157:5
**bottom** 45:22
  100:22,23 194:14
  197:7 199:13
**bought** 216:22
**boundary** 132:14
**boykin** 97:25
  182:2 186:12,15
  186:22 188:6
  189:5
**branch** 30:20
  52:11 68:2 69:6,7
  98:5
**branches** 24:12
  37:10,11,12,14,15
  37:15 42:20
  138:25 140:1
  171:16,17 190:18
  214:23 215:2
**brawley** 78:17,19
  79:2 94:19
**break** 10:17,19,20
  10:21,24 52:15,19
  96:23 102:7,9,17
  103:3 146:11,13
  146:15,16 165:5
  176:14 181:14
  198:9
**breaks** 105:2
**breath** 109:4

**brenda** 1:23 3:5
  7:7,11 8:1 106:4
  107:4 112:23
  171:9,12 173:18
  173:19,20,25
  206:22
**brief** 52:17 146:17
  160:7,7 165:7
  176:15 181:16
  198:11 233:19
**bring** 11:24 49:8
  74:13 131:8 168:1
  212:25 214:3,8,10
  214:11 217:21
  219:19
**bringing** 215:2
**brings** 8:1
**broader** 19:15,17
  236:17
**brooklyn** 33:16,19
  33:19,21,22 90:11
  90:13,17
**brought** 54:13
  111:2,3,4 214:13
  222:23 223:24
**bryant** 13:12
**bucket** 204:16
  205:20
**buckets** 204:13,14
**bunch** 210:3
  212:20 229:8
**bunny** 159:22
  163:4,16 164:23
  165:20
**bureau** 53:9
**burr** 5:8
**business** 79:9
**busy** 16:10
**buy** 36:21
**bvap** 99:10 100:8
  100:16 226:15

**bvaps** 100:2
**bylaws** 240:11

**c**

**c** 4:1,13 43:2
  112:23 204:16
  245:1,1
**calendar** 199:18
  199:19
**call** 99:1
**called** 19:25 84:21
  163:15 209:2
  225:8
**calls** 55:14,22
  89:11 157:21
  175:5 216:19
  222:10 231:25
  232:14 241:23
**campaign** 39:9
  81:10 196:5
**campus** 32:23
**candidate** 30:16
  31:1,13 39:10
  81:11 105:2
  122:24 201:20
  202:3
**candidates** 30:8
  39:2,7 55:5
  122:22 123:17
**capability** 208:9
  208:12
**capacity** 1:14 32:2
  206:20
**carefully** 50:5
**carolina** 1:2,7,15
  4:16,20,25 5:5,11
  8:8 11:14,17 13:9
  14:6 17:8 18:13
  19:25 20:8 26:16
  27:5 30:20 31:7
  32:2,22 33:17
  34:2,4,6,20 35:4

Brenda Murphy
The South Carolina State Conference vs. McMaste,

February 4, 2022

**[carolina - clear]**

Page 7

36:1,6,10 37:8,23
39:1 42:19,20
45:6,10 48:1
49:14,21,23 50:1,2
65:1,15,21,23 66:1
66:4,18 71:1 76:9
76:9 86:11 99:25
105:16 109:25
112:24 121:20
133:23 136:18
138:24 140:22
153:2 174:15
176:1,4 177:3
184:9 186:20
192:7 194:3 202:7
212:10 221:9,25
222:24 234:15
235:16 236:8,11
236:14,16,22
238:22 239:3,4
**carolinian** 19:24
**carolinians** 83:21
86:20
**carve** 168:3,12
169:9
**case** 1:5 8:9 14:19
17:24 22:22 28:11
51:22 52:1 120:1
196:20 202:22,23
204:12,22,24
205:3 223:1
234:11,13,23
235:6 245:13
**cast** 151:22
**categories** 36:25
**caucus** 192:3,7,14
192:21,21 193:9
193:24 199:24
200:11,17
**cause** 7:7

**cede** 198:17
201:18
**census** 53:1,9,13
54:8 85:8,11,16
86:2,23 87:3
99:15 105:6,9,12
105:14,16 121:2,5
121:20,21,22
122:4 157:15
**cepeda** 99:5,5,7
100:13,14,15,23
101:6 103:11
104:4
**cepeda's** 103:22
103:25
**certain** 10:13 11:5
59:15 81:10,11
103:20 121:3
130:19 142:1,17
151:18 160:16
201:5 224:13
227:1 228:25
**certainly** 20:21
102:19 196:7
**certify** 7:3 245:7
245:11
**cetera** 71:10
**chair** 126:17
197:11,11
**chairman** 48:3,3
**challenge** 173:5,23
174:19 175:3
195:18 241:19
**challenged** 66:13
66:16 67:18,21,25
68:10,14,18 69:12
69:21 70:1,16,21
71:21 72:7,20
73:13,20 74:3,12
74:19,20,21 75:19
75:21 114:9

120:20 132:18
133:1,6 153:19
172:11 174:18
177:7,9 178:8
180:14,16 187:15
217:14 225:22
227:12 238:13
240:16 241:3
**challenges** 66:19
120:4 133:9
**challenging**
172:11
**chance** 198:22
**change** 46:5,8 91:9
104:13
**changed** 58:18,19
109:15 144:5
154:23
**chapter** 13:10
14:6
**charge** 52:5
**charles** 97:25
186:12,15
**charleston** 33:17
34:7,7 131:5
133:3,6,7 200:24
201:5
**check** 97:6
**chester** 67:19
159:4,6,13,23,24
160:1,9 161:22
162:5,12,17
165:17,25 168:3
168:12 169:5
171:11 172:19
**chi** 36:7
**chief** 33:12
**children** 34:21,22
**choice** 162:23
**choosing** 66:16

**chose** 67:25
**christmas** 111:3
**cio** 27:8 77:23
98:11
**circle** 36:2
**circulated** 106:13
**cities** 92:22
**citizens** 23:22,23
212:1 215:16,16
**city** 33:16 69:1
90:14 136:14,19
136:22,24 137:1,2
137:5,9,20,24
138:4,14 139:9,11
139:12 153:24
154:14 159:23
161:22 162:5,17
191:7
**civil** 7:4 8:20
22:21
**claim** 83:21 137:8
233:4 242:4
**claimed** 86:14
**claiming** 222:24
**claims** 202:22
233:5
**clarification** 13:7
15:19 35:23
206:19 237:8
**clarified** 38:13
**clarify** 57:18
86:15 148:12
156:2,14 236:7
**classroom** 140:12
**clear** 9:9 11:6 15:8
32:8 37:24 80:17
80:23 95:3 104:22
109:10 174:10,11
187:24 193:5,18
206:17 221:23
228:16 233:18

Brenda Murphy                                           February 4, 2022
The South Carolina State Conference vs. McMaste,

clearance   120:7
cleared   120:8,16
  222:8,15
clearer   134:16
clearly   80:20
  177:3
clicks   97:2
client   22:12,15
  31:22,24 65:12,14
  70:3 171:22
  185:23 232:24,25
  233:3 243:15
clinical   33:11
clock   102:8
close   100:22
closed   126:14
  219:20
closer   87:4,11
coalition   14:3,11
  14:15,16,18 17:9
  17:10,15,16,22
  18:9,11 19:15,17
  22:7 25:15,18,24
  26:3,12,18 27:10
  28:15 49:9,12,13
  49:22,24 56:14,17
  68:7 72:15 76:14
  76:16,21 77:3,7,11
  80:18 82:6,7,18,20
  83:1,2,3,7,13,15
  83:17,19 88:7,7,10
  99:21 103:13
  112:12,12,23
  113:15,17,20,21
  114:16 124:25
  125:3 126:4,8,11
  127:6 131:2
  141:23 142:19
  143:19 149:22
  173:4 174:13
  177:25 183:4,10

184:12 185:15,19
  209:3 231:14
  232:17,18,19
  233:12 235:15,17
  235:20,25 236:2,7
  236:10,13,17,19
  237:1 242:20
coalition's   48:6
  130:22
collaboratively
  77:25
collect   19:6 235:6
collected   19:9,16
  68:6
college   35:16
columbia   1:3 4:16
  4:25 5:5,11 7:21
  7:22 11:17 20:1,3
  20:6,7 32:23
  33:14,16 34:6,20
  34:23 35:2 54:6
  63:7 68:24 69:1,2
  69:6,7,9 94:10,21
  136:14,18,23,25
  137:1,6,9,13,20,25
  138:2,4,14,17
  139:14 161:17
  208:20
combination
  101:22
combine   146:2
combined   48:20
  145:3,7,8,10,19
  147:6,16 148:19
  238:16,22
come   29:10 75:17
  76:3 79:17 93:16
  99:8 102:9 181:15
  192:22 208:9
comes   27:11 37:13
  167:15

comment   23:16
  101:20 134:13
  145:22 147:23
  149:1 151:16,16
  152:24 154:23
  190:24 195:18
  196:9 197:25
  206:10 210:14
commentary
  106:3,24 107:3
  145:24
commented
  197:24 198:1
commenting   144:9
comments   73:7
  167:25 168:1
  195:15 197:12
  207:24,25 210:12
  210:16,17 211:13
  217:25 243:17
commissioner   3:6
  3:21 7:3 245:20
committee   6:17
  18:14 50:15 62:25
  96:12 97:20 98:3
  98:6 110:20
  115:24 116:3,6,8
  117:2,4 125:4
  126:17,17,18
  127:19,22 130:19
  132:13 173:12,15
  173:16 186:17,21
  190:8,10,13
  192:22 197:11
  208:19 224:17
  228:21 235:19,21
committee's
  127:10 134:12
communicate
  76:12 214:24

communication
  74:23 175:12
  217:19
communications
  11:7 185:22 216:4
communities
  28:10 48:23 89:6
  89:10,15,21,23
  90:2,17,21,25
  91:12 92:19,19
  94:17 109:21
  111:20 112:5,16
  112:21 113:6,12
  113:20,22 114:2
  114:24 115:18,25
  116:4,9,13,14,18
  116:23 118:19,20
  118:25 119:1
  127:15 134:17,18
  134:21 135:1,6,7
  135:21 136:11
  151:18 168:4,13
  168:24 169:1,6,10
  196:22 197:1,19
  198:4 225:16
  228:10 229:5,8
community   22:2
  28:13 30:6,15
  89:19 92:11,13
  108:5 109:23
  111:18 114:16,19
  118:5 119:4,6,8
  128:20 135:12,14
  135:18,19 136:15
  136:17,20,21
  137:3,9,20,25
  138:14 139:9
  158:22 162:23
  169:21 170:16
  196:23 197:2

3:21-cv-03302-MBS-TJH-RMG    Date Filed 03/21/22    Entry Number 194-2    Page 72 of 108

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

[compact - considered]                                    Page 9

compact  226:25 228:24 229:21
compactness 225:14 228:10
compared  128:19 157:9
comparing  167:12
comparison  171:1
compelling  22:23
competing  94:15
competition 149:24
competitive  59:11 59:13 60:16 61:3 62:22,23 89:5 122:12 157:11 158:7,21 218:23 223:19 228:4
competitively 62:23
competitiveness 161:11,13
complaint  6:13 17:1,2,2 21:11,17 55:8,9,19 56:2,8 56:11,12,21 57:1,8 59:4,14 60:3 66:5 66:6 68:19 69:19 71:22 73:14 74:10 111:2 132:23 153:23 155:25 156:1,4,8,11 159:8 160:25 161:1 165:21 166:5,11 170:22 178:9,11 187:12 206:25 217:13 221:8,24 222:22 225:20 226:14 231:5,6 238:14

complaints  16:24 17:4,10,11,13 205:22
complete  12:16 36:15 58:7 187:7
completed  50:8,13 58:4,17 187:7,8,25 188:5,7,11,15 189:5 192:13 196:12
completion  58:1
compliance  3:11 127:13 215:19
complimented 224:8
comply  117:5 127:23
complying  128:8
composed  91:20 126:11 135:16
comprehensive 225:4 228:1
comprised  159:24
concept  119:12
concern  51:2 66:21 71:8,16 73:25 161:25 166:7 182:14,15 196:20 239:13,14
concerned  23:22 48:7 58:6 164:9 174:23,25 239:6,8
concerning  159:12 170:21,23 209:4
concerns  50:3,6 51:6 57:17 68:7 161:20,22,23 177:24 178:18 182:11 193:8 195:19 196:1 211:10 233:12

238:5,7,10,12 239:16
concert  17:21
concise  9:9
conclude  12:6 63:25
concluded  196:24
conclusion  55:15 55:23 89:12 157:22 170:14 175:6 222:11 231:25 232:15 241:23
conclusions 169:25 170:1,8
conduct  140:15
conducted  16:1 17:17
conducts  53:13
conference  1:7 11:14 17:8 18:14 26:11 27:5 31:7 32:2 36:10 37:8 37:10,12,14,15,17 37:18,23 38:3 39:1 42:19,20 43:10 45:6,11 48:1 49:15,21,24 50:1 65:1,16,21,23 66:1,4 71:2 72:14 73:5 77:8 96:11 98:16 112:25 140:22 149:22 175:9,11 176:5 183:13,15,19 184:9,10 185:4,9 186:20 194:3 202:8 206:1,7,21 206:23 211:15 214:11 224:12 226:17 238:22

conference's  98:5
confidential  11:6 70:4 172:4
confidentiality 199:2
configured  92:10
confirm  46:19 65:14 75:5
confirming  65:6 184:15
conflict  237:17
confused  205:23
confusion  150:9 150:13,17 153:14
congressional 163:22 166:2,9,14 166:14 167:13,16 222:14
connotation 110:23
consider  24:2 38:16,19 110:16 135:1 136:14,20 137:2,11,12 149:23,25 158:6 224:3 236:25
consideration 50:25 57:11 131:12 141:11 212:3
considered  24:5 95:5 110:7,11,17 122:24 129:19 130:6,8 142:2 144:5 154:24 158:1 167:15 169:7,22 210:18 212:6 225:3,4 226:2,21 227:2,10 228:2

Brenda Murphy
The South Carolina State Conference vs. McMaste,

February 4, 2022

**[considering - criteria]**

Page 10

considering
103:18 110:6,10
149:4 157:7
193:10 228:1
consist 134:21
consistent 227:5
229:16
constituents 48:23
177:4
constitution 90:5
117:5 127:14
215:20 240:10
constitutional
91:4 93:21 202:21
consult 103:3
consultant 98:14
98:15 140:16,17
consultants
224:24
consultation
140:18 225:5
242:22
consultations
196:15
consulting 27:12
consults 98:18
contact 173:7,20
174:15,16 183:2
contacted 173:4
173:21 174:19
contacts 174:6
contends 114:16
contents 107:7
context 117:19,21
contiguous 89:20
155:1 160:5
225:15 227:4
229:2
continue 55:3,24
177:13,18 178:2

continued 178:10
continuity 228:10
contrast 149:6
contribute 151:21
contributes 154:4
contributions
29:19
convenient 128:17
conversation
52:20 80:23,25
119:15 197:14
206:6
conversations
10:25 11:2 15:4
79:6
coordinate 76:8
coordinated 71:2
copies 17:4
copy 41:17
corps 34:14
correct 10:10
13:22 15:2,24
19:13 22:17 32:7
32:9 40:21,25
43:21 46:11,21,23
47:8 49:5,16,17
50:8 52:11 53:16
56:2 58:8,12
70:13 81:15 84:22
87:10 98:22 99:2
99:15 103:11,21
105:2,12,16,18
108:20 110:23
117:8 119:21
121:6,10,11,13,17
121:22 123:4
125:16 130:25
131:5 132:11
139:19 152:2,7,20
152:23 153:20
162:8 166:1

173:11 181:1
183:5,23 187:12
188:1 190:11
191:10 199:14,21
200:8 207:25
208:15 209:7,14
210:4 211:5,18
212:14 214:12
221:12 222:1,9
231:10 235:10
236:17,19,21
240:8 241:21
245:9
correspondence
232:20
cost 36:20,23 37:2
50:19,21 51:19
councils 190:19,20
counsel 3:4,16 7:5
9:20 10:25 11:8
12:5 44:24 52:19
83:5 103:4 131:9
131:10 146:19
177:18 203:2
230:15 241:17
242:1 245:12
count 85:1 103:21
103:22,22
counted 30:13
counties 37:13
92:23 124:11,20
131:5 150:3,5,8
162:20 174:22
239:11
country 33:10
counts 103:16
county 68:20,21
69:1,9,13 84:11
94:11 114:18,19
114:21 124:21,21
124:22 133:3,4,6,7

138:18 139:6,11
152:11 157:8
159:13,21,21,25
160:1,9 165:25,25
168:3,12 171:11
171:14 172:19
190:19,21 191:7
245:5
couple 66:11
111:3 184:7
198:16 204:12
210:11 230:19
234:9 235:14
course 99:14
114:18 190:9
216:1 224:25
225:24
court 1:1 3:12 7:1
9:21 10:4 16:25
17:14 22:22 32:13
35:23 55:21 58:12
97:5 102:11
119:25 120:4,20
152:1 155:5 161:1
176:12 177:19
222:23 243:20,22
244:2
covid 28:8 83:8
84:14 126:14
219:20
cracking 89:7
91:14 92:15 93:22
create 100:11
159:22 170:18
created 48:12
criminal 71:9
criteria 78:6 85:12
85:17,21,22 86:3,9
87:5,6 117:5
127:16 134:17
135:2,5 196:22

3:21-cv-03302-MBS-TJH-RMG    Date Filed 03/21/22    Entry Number 194-2    Page 74 of 108

Brenda Murphy                                February 4, 2022
The South Carolina State Conference vs. McMaste,

[criteria - deponent]                                                Page 11

224:24 225:10,13
225:14 226:16
227:6 228:7,16
229:11
**criticism** 134:11
**criticisms** 163:18
**criticize** 164:23
165:21
**criticized** 118:11
**critiqued** 141:25
142:22
**crosstalk** 47:18
70:9 78:11 123:18
130:1 138:10
153:10 168:16
173:10 192:15
202:19 224:22
232:4
**crystal** 174:10
**csr** 2:2 7:1
**culminated** 100:5
**current** 20:14 94:6
102:1 123:12
148:19 171:2
**currently** 20:1
21:2 36:11 95:8
95:12 105:19
161:6 162:6 177:5
221:21
**cusick** 4:7 13:25
14:8 99:2
**cut** 28:21
**cv** 1:5
**cycle** 99:9 101:7
119:21,22 120:7
237:7
**cycles** 129:4
**cynthia** 5:15

**d**

**d** 1:13 6:1 204:16
**da** 198:4,4,4
**dark** 226:5
**data** 53:1,6,10,12
53:15 54:8 68:15
84:1 85:8,11,16
86:3,6,23 87:3,9
99:15 144:20,24
223:25 224:2
226:14
**date** 7:3 12:15
45:20,21 46:9
53:3 73:13 74:16
74:17 173:2
192:12 197:4,8
199:16,16 203:25
**dated** 106:4,15
125:8,9,9,10,11,11
130:17 199:12,13
**dates** 56:22 125:7
**daughters** 36:1
**day** 3:6 7:21 8:2
18:24 84:1,1
133:20 199:19
204:1 207:20
234:1,5,6 237:14
244:6
**days** 16:6 44:24
111:3 131:10
234:2,7
**deal** 123:16 199:3
219:23
**dealing** 119:18
121:1,2,4 123:16
135:2 170:24
**december** 49:5
55:10 56:11,25
57:1 106:4,15
107:5 111:4

**decide** 81:9 94:25
**decided** 48:2,25
49:20 77:6,8,9
89:21 195:25
232:17
**decision** 28:24,25
48:6 49:8,9,11
50:7 57:14 146:9
158:18 224:9,11
231:9,11,12,15,16
232:6,13,21
**decisions** 88:9
**decrease** 48:21
96:1 122:8,9
150:13,16
**decreased** 62:20
94:7 101:24 102:5
105:11
**decreases** 201:9
**defendant** 4:18
159:25 203:16
231:2
**defendant's** 6:9
39:22 44:5 66:22
81:20 88:11 97:13
106:8 132:4 165:8
181:17 186:4
189:22 194:11
198:12
**defendants** 1:16
4:11 5:1,7 7:18
203:3,7,14 204:11
230:16 234:14,24
**defending** 10:10
**defense** 4:4 38:3
**defer** 46:3 191:21
**define** 89:9,16,16
116:14,17,23
197:1
**defined** 89:18
109:8 115:25

116:4,9,13 124:12
196:23
**defining** 117:6
198:3
**definition** 92:13
116:20,22 197:19
**definitions** 196:22
**degree** 32:21,22
**delay** 57:17 58:3,7
58:12
**delayed** 54:23
**delivered** 86:22
**democracy** 237:1
237:3
**democratic** 30:2
30:14,24 76:9
199:24 200:11
**demographers**
224:5,12 225:1
226:3
**demographics**
169:3,4,5,18
170:16
**denson** 184:8,18
185:3
**denying** 65:6
**department** 33:10
120:8,16 222:9,15
**depend** 27:2 224:5
**dependent** 26:2
89:4
**depending** 91:8
150:19
**depends** 92:12
150:18 151:5
**deponent** 96:24
102:14,21,24
164:13 194:4
204:7 230:14
231:22 233:16
234:17 244:9

Brenda Murphy
The South Carolina State Conference vs. McMaste,                    February 4, 2022

[deposed - districts]                                                        Page 12

deposed 8:4,12,14
  8:17 112:14
  204:21,21 205:6,6
  205:17
deposition 1:21
  3:5,9,10,18,21
  8:18 9:19 10:10
  11:25 12:3,7,9,13
  12:14 13:10,12,15
  13:17 15:5,13
  16:23 64:25 84:13
  99:1 113:19
  164:12 198:18,20
  203:16 205:24
  206:24 213:16
  230:5 233:25
  243:1,4,6,18,20
  244:1
depositions 3:13
  13:14 67:3 206:9
derogatory 108:3
describe 197:18
  235:23 241:10
described 239:18
desire 36:15 99:8
  99:11 122:25
desires 83:15
desk 181:21
despite 8:16
  181:11
detailed 214:6,8
determination
  77:12
determine 199:19
  227:11
determined 76:15
  153:8,9
detriment 111:8
detrimental 48:8
developed 82:18
  83:1 149:3 171:10

deviation 227:8
  228:11
diamond 37:2
diatribe 243:15,16
dictate 121:15
dictated 201:13
difference 161:12
  209:25 242:14
differences 197:2
different 36:25
  37:13 42:14 45:17
  50:14 71:13 73:8
  84:20 85:1 90:16
  90:20 91:7 92:24
  100:1 116:17,18
  116:23,24 120:10
  121:1 138:17,25
  138:25 139:14
  154:6 158:16
  159:15 162:9
  167:14,16 179:21
  196:21 198:2,3
  209:1 211:23,24
  211:25 227:23
  234:14,24 236:8
  236:18,20
differently 147:22
difficult 164:12
  196:25 208:8
difficulties 44:16
difficulty 207:18
digest 96:6
digesting 96:7
dillon 67:19
diluted 215:19
  242:12,16
dilutes 91:22
  93:11 109:23
dilution 215:17
dilutive 177:6
  178:4

direct 9:19 232:25
  233:3 243:7
directed 184:21
direction 69:20
directly 42:5 83:6
directs 12:24
disagree 56:24
  87:2 88:22 90:18
  91:1 108:14,16
  116:19,22 136:6
  138:8 152:3
  157:13,16 165:22
  201:14
disagreements
  238:8,11
disclose 32:10
  64:21 70:3 179:16
  239:6 240:7,11,14
  240:16,22 241:15
disclosed 184:15
  184:18 239:12
disclosing 234:12
  234:22 239:7,8,14
disclosure 22:19
  22:24
discovery 17:23
  64:23 234:10,10
  234:11 235:2
  240:8
discrimination
  59:5,8,16 60:5,20
  60:24,25 61:11,19
  62:2,11 64:2
  161:13 242:5
discuss 21:13,21
  124:12 146:15
  177:14 182:1
  192:23 196:3
discussed 13:16
  17:10 25:5 29:3
  177:12 234:12,22

discussing 133:15
  193:6 235:2
discussion 23:21
  23:25 56:5 114:9
  150:24 156:9
  164:8 195:24
  197:16 212:19
  218:7 221:7
discussions 23:20
  81:3 88:8 103:6
dismissed 119:25
display 79:19
dispute 86:2,5,8
  87:7,17 104:8
distance 67:17
distinction 235:15
district 1:1,2 20:9
  20:12,15 60:15
  61:3 69:21 70:21
  71:21 74:21 91:6
  91:7,20 92:8,17,21
  120:16 122:21
  123:10 131:3
  135:16 137:15
  152:1 154:25
  155:16 156:21,22
  157:4,11,14,19,20
  157:24 158:3,8,10
  158:21 159:19,20
  160:23 161:5
  162:6,13,14,18
  164:22,24 165:22
  166:1,2,6 168:3,11
  172:21 173:3,5,22
  173:22,23 178:22
  179:18 190:21
  222:23 226:1,9,13
  226:18,20,25
  228:3
districts 48:16,19
  53:20,24 55:6

Brenda Murphy
The South Carolina State Conference vs. McMaste,

February 4, 2022

[districts - eight]

Page 13

| | | | |
|---|---|---|---|
| 57:7,15 59:11,15 | **division** 1:3 35:16 | **dollar** 36:20 | 225:23 226:20 |
| 60:15 62:22,23 | **doctor's** 33:7 | **dollars** 37:5 | 238:8,11 242:10 |
| 66:13,13,16 67:18 | **document** 12:15 | **doubt** 103:25 | **drew** 110:21 |
| 67:21,25 68:10,14 | 39:20 40:8,9,10,23 | 151:8,11,13 | 141:13,16 142:5 |
| 68:18 69:13,23 | 41:4,6,17,18 43:21 | **dozen** 209:9,11 | 144:15,23 166:8 |
| 70:1,16 72:8,21 | 44:1,3,22,23 45:3 | **dr** 98:13 140:9,11 | 169:23 228:22 |
| 73:13,20,25 74:3 | 45:17,18 66:10 | 190:17 200:22 | **drive** 20:7 |
| 74:12,19,20 75:14 | 67:9 74:7 82:5,8 | **drafted** 126:4,7,9 | **due** 49:6 126:14 |
| 75:19,21 93:9,22 | 82:18 91:13 95:25 | 126:21 132:24 | 219:20 |
| 96:1 108:20 114:9 | 96:3,4 97:16 | **drafting** 129:19 | **dues** 36:16,18,19 |
| 115:4,12,14 117:6 | 103:10 131:20 | **drafts** 210:12 | 37:4 |
| 118:10 120:20 | 156:16,17 163:1 | **draw** 51:10,11,13 | **duly** 7:12 |
| 121:16 122:12,19 | 164:4,15,17 165:3 | 144:7 157:10,24 | **duty** 127:23 |
| 123:6,9,12,14,21 | 165:6,12 167:18 | 158:20 169:18 | |
| 123:22 124:3 | 175:16 181:2 | 190:20,22 201:12 | **e** |
| 130:19 132:14,17 | 184:11 186:1,8 | 226:17 228:8 | **e** 4:1,1 5:3 6:1 |
| 132:18,21,25 | 189:25 199:8 | **drawers** 168:5 | 245:1,1 |
| 133:1,5,7 151:9,10 | 220:5 | **drawing** 51:18 | **ear** 159:22 |
| 153:8,19 154:15 | **documentation** | 57:20 59:14 69:23 | **eared** 163:4,16 |
| 155:10 158:16 | 221:2,5 | 89:5 141:10,19,21 | 165:20 |
| 160:1 161:2,24 | **documented** 82:6 | 142:9,25 143:18 | **earlier** 28:18 |
| 163:22 168:6,15 | **documents** 12:8 | 144:2,8,9,12,17,21 | 38:15 66:17 99:23 |
| 170:18 171:2 | 12:12 16:16,19 | 149:23 157:19 | 105:5 125:17 |
| 172:11,12 174:18 | 17:3,9 18:3,4,5,6,7 | 158:3,7 169:9,25 | 126:3,10,13 140:3 |
| 174:19 175:3 | 18:11,16,20 19:4,7 | 170:8 190:19 | 188:12 207:12 |
| 177:6,7,9 178:4,5 | 19:9,16 40:14,16 | 196:15 228:16 | 208:14,17 213:15 |
| 178:9 180:14,17 | 40:22 41:10 44:4 | 229:11 | 233:23 242:25 |
| 187:16,22 200:25 | 58:12 64:23 65:5 | **drawings** 167:13 | **ears** 193:11,12 |
| 201:1,12 212:24 | 82:6 83:10 96:22 | 242:21 | **easier** 146:24 |
| 214:14 215:15 | 115:19,20 172:3 | **drawn** 81:7 92:21 | **eastern** 35:24 |
| 217:15,20 218:2,4 | 183:23 198:19,22 | 93:9,11 94:14 | **easy** 230:9 |
| 218:23 219:15 | 219:19 220:11,22 | 109:16,21,22 | **edited** 126:5 |
| 220:14 222:24 | 235:6,9,12 241:19 | 110:5,9 111:17 | **educate** 28:10 |
| 223:18,20 225:23 | 243:2 244:3 | 121:16,17 141:14 | **education** 71:10 |
| 227:12 228:8,17 | **dog** 8:1,3 | 142:22 156:22 | 107:25 |
| 229:11 238:13 | **doing** 75:25 100:4 | 157:4,14 158:11 | **educational** 4:4 |
| 240:16 241:3 | 133:19 154:11 | 160:22 161:9,9 | 32:19 |
| 242:10 | 167:12 193:9 | 165:17 166:5 | **effect** 3:11 |
| **divided** 92:20,23 | 206:13 212:17 | 168:3,12 169:16 | **effort** 155:2 |
| **dividing** 92:17 | **doj** 84:21 85:3,16 | 171:2,3 215:15,18 | 182:10 |
| | 85:22 86:9 | 217:3 220:14 | **eight** 159:25 |

3:21-cv-03302-MBS-TJH-RMG    Date Filed 03/21/22    Entry Number 194-2    Page 77 of 108

Brenda Murphy                    February 4, 2022
The South Carolina State Conference vs. McMaste,

[eighty - extent]                                    Page 14

eighty 35:8
ein 42:1,2,3 43:10
  43:13,15,16,20,23
  44:2 45:17,19
  46:5,11,14,15
either 19:1 67:16
  71:19 72:6 103:3
  234:1 240:17
elaborate 70:25
  94:22
elapsed 102:8
elected 102:4
election 5:7 29:17
  30:17 95:9 101:7
  103:24 144:20,24
  169:20
elections 29:15
eliminating 78:6
elizabeth 183:13
  185:10
eloise 184:8,18
  185:3
email 12:3 235:11
emailed 83:4
emails 216:19
emotionally 182:4
emphatically
  188:14
employee 41:24
employers 45:13
employment 43:3
enacted 152:14
  171:3
enactment 54:9
  56:20 57:17
encourage 128:12
encouraged
  207:18 215:10,11
endeavor 146:23
endorse 39:2

engage 38:21
  110:2 138:7
engaged 59:15
  60:4 61:9,18 62:2
  111:7 243:7
engaging 64:1
enjoined 178:2
ensure 99:8
  162:21 225:2
  226:21
ensures 89:6
ensuring 23:23
entire 69:9 107:11
  107:20 112:4
  136:15,19,20
  137:25
entitled 212:11
entity 162:18
equitable 99:9
erin 44:12
especially 106:16
  134:17 202:21
  214:16
established 42:21
  42:22,23
et 1:15 71:10
eta 36:7
ethics 89:20
ethnic 84:17 85:6
  86:7
evaluate 57:9
  224:9
evaluated 242:20
evaluating 58:18
eventually 100:5
everybody 84:1
  211:25 244:6
evidence 3:19 60:2
  60:18 61:7,17,25
  62:9 94:9,12
  111:6 117:17

130:4 139:8
  143:21 168:10,15
  168:18,21,25
  169:11 170:1,2,9
  170:13 242:3
evident 94:11
exact 46:9 148:18
exactly 113:20
  160:15 170:6
examination 6:2
  7:8,15 204:9
  230:22 233:21
  240:5
examined 7:12
example 26:19
  27:16 63:6 68:24
  69:4 85:2 91:20
  135:11 183:7,11
examples 229:8
exceedingly
  196:25
excuse 67:2 84:24
  146:12 197:6
  240:1 241:13
executive 18:14
  98:2,5 186:16,21
exhibit 6:10,12,13
  6:14,15,16,18,19
  6:20,21,22,23,24
  6:25 39:23,25
  40:7 44:6,8,17
  66:23 67:1,2,4,8
  81:21,23 88:12
  97:6,9,11,11,14
  106:9 132:1,5
  156:7 164:7,10
  165:9,13 166:17
  166:24 176:19
  180:25,25 181:1,5
  181:8,10,18 186:5
  189:23 190:1,2

194:12 198:13
  199:5,5
exhibits 6:8,9
  166:20 176:17,17
  176:17,19 181:7
exist 84:15 218:23
exists 48:17 95:2
expect 15:9,9,20
  15:21
expecting 111:14
experienced 226:4
expert 51:10,11,22
  51:25 52:1
expertise 141:15
  141:22 142:3,15
  143:18 224:13,17
  225:1,6 226:3
  242:23
experts 51:13,21
  51:24 52:4 226:24
explain 37:20
  38:19 45:16 55:18
  75:10 113:20
  114:23 120:12,15
  126:22 137:10
  148:5 153:22
  155:10 157:3
  166:4,6,6 168:15
  168:18 189:10
explained 125:17
  126:3 190:17
explaining 93:18
explanation
  120:13 188:18
express 210:24
expressed 161:25
  178:18 211:10
  238:7
extent 12:23
  121:16 136:1
  207:7

Brenda Murphy

February 4, 2022

The South Carolina State Conference vs. McMaste,

**[eyes - forward]**

Page 15

| | | | |
|---|---|---|---|
| **eyes** 203:23 | **favorite** 8:2 67:7 | **filed** 16:25 43:20 | **flip** 42:7 100:21 |
| **f** | **february** 1:24 3:7 | 45:23 46:6 54:20 | 191:12 |
| **f** 245:1 | 7:6 111:1 | 55:9 56:11 60:3 | **floor** 4:8 79:13 |
| **fact** 8:16 26:21 | **federal** 7:4 8:19 | 72:6 178:11 | 198:17 201:18 |
| 51:13,21 69:3 | 16:25 17:14 22:21 | **files** 45:25 | **florence** 124:22 |
| 76:18 85:15 96:25 | 41:24 45:13 | **filing** 3:21 50:12 | **focus** 41:12 163:3 |
| 127:21 130:6 | 120:20 152:1,15 | 54:24 68:18 69:18 | 190:18 |
| 151:14 154:13 | 155:4 | 71:21 73:14 74:4 | **folder** 44:17 |
| 160:3 164:11 | **fee** 140:17,19 | 74:9 113:21 | 131:24 |
| 174:21 178:20 | **feedback** 25:8,9 | **final** 62:13 82:8 | **folk** 136:13 |
| 181:11 187:14 | 25:20 26:22 51:3 | 231:18 233:8 | **folks** 26:19 37:7 |
| 207:24 | 68:5 71:15,17 | **finalized** 83:2 | 157:17 169:14 |
| **factor** 53:8 157:19 | 140:6 193:8 | 142:23 | 179:9 |
| 157:24 158:3 | 225:20 | **financially** 245:13 | **follow** 84:15 91:3 |
| 160:17 219:1 | **feel** 167:1 192:19 | **find** 106:20 219:7 | 117:4 127:23 |
| **factors** 60:23 | **fell** 227:8 | 221:2 | 137:13 221:11 |
| 110:6,17 158:6 | **fewer** 60:15 | **fine** 7:20 137:22 | 229:10 |
| 223:23 225:3,22 | 105:15 134:21 | 186:22 | **following** 7:8 |
| 226:2,22 | 221:20 | **finish** 9:21 10:2 | 117:2 204:3 |
| **facts** 110:10 111:6 | **ficus** 223:1 | 12:14 120:3 130:2 | **follows** 7:13 |
| 137:19,24 | **fifteen** 52:14 | 168:17 180:3 | **fomby** 184:8,18 |
| **failed** 110:16 | 203:22 223:4 | 189:3 198:17 | 185:3 |
| **fair** 93:20 99:9 | 231:1 | 212:5 216:10,11 | **force** 3:10 |
| 149:11 207:3 | **fifty** 37:4 92:3,6 | **first** 6:10 7:12 | **ford** 5:16 |
| 211:16 229:9 | 123:1 190:20,22 | 8:18 12:10 16:11 | **foregoing** 7:5 |
| **fairfield** 159:21,21 | **figure** 27:15 37:7 | 16:12 21:11 39:17 | **form** 3:16 10:13 |
| 165:17,25 | 85:11,21 86:4,9 | 40:20 41:6 45:3 | 12:24 47:9 62:7 |
| **familiar** 35:4 | 87:11 104:19 | 49:8,24 107:7 | 77:6 189:16 234:3 |
| 51:21 52:1 82:2 | 149:16 151:11 | 111:1 113:14 | 235:7 238:18 |
| 84:19,22,25 85:4 | 160:14 168:2 | 126:21 131:4 | **forman** 5:8 |
| 85:13,15,18,23,24 | 206:3 217:18 | 132:12 145:24 | **formed** 14:3 28:15 |
| 108:8 127:9,17,21 | 221:4 225:21 | 159:11 190:25 | 76:21 99:21 100:6 |
| 127:24,25 134:1,8 | **figures** 85:8,11 | 199:22 202:20 | **former** 186:2 |
| 139:3 153:20 | 87:3 103:25 105:6 | 203:5 206:10,10 | **forms** 235:13 |
| 155:16,21 156:21 | **file** 23:1 32:14 | 220:25 233:23 | **forth** 138:8 |
| 158:12 159:3,11 | 45:4 50:7 56:20 | **five** 34:4 51:21,24 | **forum** 29:4,6 |
| 163:21 170:22 | 57:1,7 58:12 | 52:15 146:16,23 | **forums** 73:16,17 |
| 215:12 | 172:6 185:25 | 203:11 230:5,6 | 75:12,12 |
| **far** 194:1 196:8 | 202:25 212:21 | 233:17 243:4 | **forward** 74:21 |
| **fashion** 161:10 | 231:9 232:21 | **flexibility** 13:13 | 147:3 |

Brenda Murphy
The South Carolina State Conference vs. McMaste,

February 4, 2022

[forwarded - going]

Page 16

forwarded  125:14
126:17
founded  70:8
founding  36:7
four  33:22 35:12
95:12,14,14,15,18
104:21 123:6,9,11
123:11,13,21,22
124:3,6,6,8,15,22
124:22 154:15
frame  203:11
frankly  139:6
friday  213:12
219:17 234:7
front  11:21 25:12
42:5 60:18 61:7
61:17 63:25 69:14
77:4 131:7 154:1
155:19 163:23,24
164:4 165:12
169:4 176:20
186:8 218:8 220:1
220:5
full  3:11 209:22
fully  169:20 225:9
fund  4:4 38:4
funding  50:16
142:16
further  3:8,14,20
48:20 87:9 233:15
242:24 244:4,9
245:11

g

gadsden  5:4
gain  200:24
gained  121:13
gains  121:15
gap  101:1,17
gather  53:20
gauge  84:20

gears  139:17
gee  216:12
general  25:17
52:20 80:25 118:3
119:15,15 242:1
generally  90:25
150:2 211:17
generate  43:15
geographic  134:20
gerrymandered
177:5 178:4
222:25
gerrymandering
108:15,19,23,23
108:24 109:8,9,12
110:2,23 111:8,25
117:16,20,22,24
118:3,4,7,11,12
119:9,13,14,20
149:20 221:25
gervais  4:24
getting  11:9 50:23
58:3 62:5 73:21
142:20
give  8:20 10:3 34:2
44:13 46:7,9 47:4
62:13 84:6,8
94:12 109:2 112:3
114:13 115:11
123:15 125:7
143:1 146:16
149:10 155:22
156:8,13,14
159:16 171:20
172:9,10,20 175:2
176:10,10,12
186:22 192:24
193:16,22,22
206:13 214:7
216:13 217:22,23
242:3

given  16:22 46:2
46:13,14,20 47:5
50:20 51:3 57:11
62:11 115:22
130:11 166:4
171:25 245:10
giving  94:8 114:12
140:6 171:23
181:12 238:10
243:6
glad  131:16
213:18
glass  10:18
glisson  98:8
go  8:17 10:18 15:3
32:19 67:12 71:10
74:21 103:9
115:13 117:11
124:11 129:1
131:11,17 132:24
147:3 149:2
156:20 167:2,3,7
167:10,17 170:17
172:9 173:14
176:16,18 181:25
182:7 189:18
192:1 194:9
195:25 198:7,22
199:6 201:1 204:7
204:17 213:19
215:6 229:14,23
230:3 234:19
goal  162:20
210:17 243:4
goals  150:10
goes  104:25
going  9:7,8,15,24
10:9 11:1 12:6,13
14:17,18 16:23
22:12,25 27:21
28:24 30:4 31:10

given  31:21 32:14 33:25
39:20 48:24 50:23
52:13 58:25 61:5
62:8,13,14,18
64:20,24 69:16
75:15,16,16,17
81:13 86:5 88:21
88:24 89:3 91:11
92:1 96:3,4,22
97:1 100:20 101:9
102:6 103:9
105:20,21 106:13
107:11,12,13
109:17 112:3
113:4,5,9 114:4
115:6,13,14 117:9
117:10 118:14
120:14 123:15
124:3,14,16,19,25
125:1 128:9
129:21,23 131:20
131:21 132:24
133:11,11,14,15
133:18 137:14,23
138:7 139:17
145:16 147:1
148:2 153:15
154:22 159:9
164:4,5,19 165:4
170:21 172:5,8,15
173:14 174:9
176:16 177:1,13
177:19 180:25
182:10 185:24
186:7 189:20
191:4,18,25 193:7
195:18 196:18
197:10 198:7,18
199:4 201:16
202:14 203:2,2,4
203:20 204:4,16

Brenda Murphy

February 4, 2022

The South Carolina State Conference vs. McMaste,

**[going - house]**

Page 17

204:17 206:4
213:24 218:6
219:9 232:24
233:3 237:6
240:25
**golden** 36:2
**good** 7:16,18,20
52:16 69:4 88:21
102:14 203:9
207:21 213:17
230:12,23 244:5
**gotten** 31:17
138:24
**govan** 64:19 65:9
80:1,4,8 81:1
**govan's** 226:9
**governor** 1:14
4:19,20 31:1,13
230:16,19,24
231:2,17,18 232:6
232:13 233:1,5,7
**grabs** 159:23
**graduate** 32:24
**graduated** 33:2,4
**granted** 56:1,7
**gray** 5:2
**grayson** 4:23
**great** 209:24
219:23 239:13
**greater** 91:19 92:3
92:3 104:18,21
137:16 145:13
146:7 151:19
153:4 154:24
**greatest** 136:1
**ground** 8:18
**grounds** 3:17
**group** 77:16 78:3
99:21,22 100:6
112:8 181:7,25
182:7,19 196:11

210:3 218:7 228:5
228:23 231:14
236:20,23 237:4
**grouped** 67:18
**groups** 76:19 77:9
77:19 84:17 85:6
86:7 235:24
236:20
**guess** 13:13,24
16:25 17:17 28:3
32:12 49:25 84:19
89:22 90:7 92:6
92:12 106:12
126:19 198:1
199:18
**guidance** 224:15
**guidelines** 91:3
127:10,13,22
128:2,5 134:12,14
**guys** 166:8 203:19

**h**

**h4493** 178:2
**h4493's** 178:3
**half** 158:24
**hall** 36:2
**happen** 71:14
92:22 154:9
**happened** 27:13
71:25 169:15,24
239:10
**happening** 27:6
**happens** 71:7,13
92:22 109:19
138:17,17 158:10
**happy** 22:20
146:16
**harassment**
243:10,13
**hard** 41:17 197:8
**harmed** 178:3,10
178:21 180:15,17

187:15
**hate** 28:21 33:24
89:1 117:7 159:15
**haw** 216:12
**head** 115:7 142:11
219:22 235:23
**hear** 107:7 112:1
214:19 215:1,24
216:3,14 218:24
220:16
**heard** 50:3 62:13
142:12 210:18
212:11 213:1
216:21 217:11,12
217:17 233:13
**hearing** 31:6
87:22,25 116:12
161:16 237:12
**hearings** 51:4,4,5
53:24 54:2 57:13
65:25 81:14 83:3
128:14,16,24
129:4,7,12,14
130:13 141:5
207:17 208:3
211:11 237:13
238:1
**heavily** 159:24
**held** 24:7 75:13
105:1 128:16
129:4,8 199:15
203:21 207:14
208:10,18,19
**help** 26:24 69:16
223:11
**helpful** 156:2
224:2
**helping** 185:20
**henegan** 63:14
64:8

**henry** 1:13 4:21
230:24
**hide** 183:7
**high** 157:8,14
**higher** 85:25
**highway** 154:2,3
**highways** 154:8
**hints** 114:13
**historical** 192:25
**history** 142:20
221:8 239:9
**hoc** 62:25 115:24
116:3,6,8 117:2,4
125:4 127:10,18
127:18,22 130:19
134:12 208:19
**hold** 12:13 133:12
156:4 216:11,18
227:15,15
**home** 230:4
**homebuilders**
212:10
**honea** 158:13,19
**hope** 93:15,19
228:12,14 230:12
**hopefully** 93:15,24
**hopes** 187:6
**horry** 67:19
**hospital** 33:6,14
33:15
**host** 197:1
**hour** 16:13 52:14
203:11
**hours** 146:21,23
207:21 230:6
237:15 243:4,23
**house** 4:11 7:18
20:9,12,15 21:2,13
21:17,18,19 23:5,6
23:9,12 25:7
47:13,14 48:4

3:21-cv-03302-MBS-TJH-RMG    Date Filed 03/21/22    Entry Number 194-2    Page 81 of 108

Brenda Murphy                                February 4, 2022
The South Carolina State Conference vs. McMaste,

[house - influenced]                                    Page 18

49:4 53:24 54:17
54:20 57:7 59:5
59:15 60:4 61:8
61:17 62:1 79:13
79:13,20 91:7
95:8,19 101:1,8,14
101:17,22,23
103:19,24 104:2,7
104:17,25 105:3
108:20 110:9,16
111:7 116:6
117:24,24 118:10
118:23 120:16
122:10 128:24
129:4,8 132:14
136:6 148:6 151:8
151:9 152:19
154:15 155:10
158:16 162:4,4
164:2,3,24 165:22
166:5 167:13,17
167:18 171:3
172:22 173:5,21
191:8,14 194:16
196:21 203:14
209:4 210:2,8,12
212:23 222:14
225:12 228:7,16
229:10 233:8
238:1,2,13 241:18
**housing** 198:2
**howard** 20:18,19
**huh** 200:9
**hundred** 25:2,4
37:4,4
**husband** 34:16

**i**

**idea** 119:11
**ideas** 126:12
**identification**
39:24 41:24 43:3

44:7 45:14 66:24
81:22 88:13 97:15
106:10 132:6
165:10 181:19
186:6,11,23
187:25 189:24
194:13 198:14
**identifications**
64:25
**identified** 65:24
66:20 72:2,4
113:21 115:5,12
130:18,23 134:18
166:24 182:1,8
183:3,12 184:11
185:3,5 186:19
188:14 190:13
199:23 200:7
**identifies** 183:14
183:18 184:8
**identify** 29:1,2
61:16 66:3 77:18
114:15 115:17
124:3,19,20
144:15 179:5
180:7 182:1,8
183:1 185:20
201:19,25 216:15
241:2
**identifying** 70:14
70:18 182:13
183:22
**identities** 183:8
**identity** 22:13
65:14 70:4 239:4
**ii** 4:5
**impact** 57:14 64:6
64:6 93:13 238:5
**impacted** 173:24
188:13

**impacts** 215:15
**impairs** 9:4
**importance** 28:12
107:25 140:4,5
215:14
**important** 9:23
58:23 135:7
193:17 215:17
**impressions** 88:10
**improves** 152:19
**inaccurate** 103:16
**inappropriate**
202:13
**inappropriately**
114:17
**include** 162:17
190:10
**included** 18:11
24:13 75:13 81:2
98:25 127:7,8
129:12
**including** 97:23
**inclusive** 142:2
**inconsistent**
113:17
**incorrect** 58:9,13
105:17 121:22
149:10
**increase** 136:11
150:13,16 201:11
222:4 226:6
**increased** 105:12
153:2 221:13,16
**increases** 200:25
201:4
**increasing** 153:6
**incumbent** 24:5
64:15,17 81:6
226:21
**incumbents** 80:19
95:5 144:12,16

145:2,7,9,10,13,19
146:3 147:6,15
148:13,19,24
149:4,23 150:1
193:10 238:17,23
**independent**
224:11
**independently**
174:12 224:4
**index** 6:8
**indicate** 59:8
**indicated** 74:12
169:12
**indicates** 72:19
73:11 74:8 105:14
**indicating** 195:18
**individual** 32:3
92:11 102:4 173:7
**individually**
112:14 158:18
206:3,5,16
**individuals** 25:9
48:14 51:5 57:12
64:4 66:20 68:5
72:13 77:25 81:7
81:8 89:18 91:22
92:9 94:23 95:2
100:9 109:24
123:17 135:17
139:15 141:22
171:10,13 224:1
224:13 225:1,5
226:3 237:8,20
242:22
**inferring** 86:18
**influence** 48:11
93:13 168:6,14
169:10,19,21
170:19
**influenced** 158:10

Brenda Murphy
The South Carolina State Conference vs. McMaste,

[influential - involved]                                                      Page 19

**influential** 160:23
**information** 11:7
  11:9 28:6,9 59:2
  62:12 63:24 68:6
  115:3 142:20
  144:16 153:16
  171:14 183:2
  187:3 194:23
  199:1 215:11
  219:24,25 220:23
  241:16
**informed** 57:13
**ingram** 4:5 6:6
  10:6,8,9,12 11:19
  12:20 13:7,18,21
  13:22,25 14:7,7,21
  22:11,18 30:10,18
  31:2,15,18,21 32:1
  32:7,9 34:25
  39:11 40:2,5,7,19
  40:22,25 41:3
  44:13 46:17,25
  47:9 50:9 52:16
  55:14,22 57:23
  58:14 59:22 60:6
  60:9,21 61:12,20
  62:3,15 64:20,22
  65:4,12 70:2,6,12
  70:13,17 72:23
  73:1 74:22,25
  75:7 80:10 82:11
  82:22 84:4 87:13
  89:11,14 97:6,12
  102:18 103:3
  104:10 111:10,14
  112:17 113:7,18
  114:8,14 123:24
  124:17 125:25
  126:24 131:24,25
  132:8,9,11 143:3
  143:10,24 146:11

146:13 147:8
156:1,5,13,18,20
157:21 159:7
163:11,13,14
164:1,4,14 165:2
166:10,16,19,23
167:6 170:4,12
171:21 172:1,2,7
172:13,17 174:1
175:5,21 177:11
177:14,18 178:12
178:24 179:11,15
179:22 180:3,18
181:2,4,6 182:22
184:6,14,19,20,22
185:21 187:17
188:2,8,16,19,23
189:6,13,15,17
194:1,5,8 198:9
200:18 201:21
202:5,11,20 203:1
203:3,5,10,20,24
206:19 212:5
213:3,5,8,14,19,24
215:4 216:6,11
218:12 219:3
222:10 223:9
228:18 229:12
230:15 231:21,24
232:3,5,14,23
233:2,17,21
234:19 239:20
240:18 241:4,7,22
242:6,18 243:10
243:13,19,24
244:7
**initial** 17:1 21:17
  56:1,8
**initially** 192:18
**initiative** 27:4
  83:18 237:4

**initiator** 49:24
**input** 12:2 53:20
  69:22 129:19,21
  130:5,7 131:1
  141:14 142:7
  171:10 192:3,8,18
  196:24 211:5
  212:2 217:4,4
**insofar** 182:22
**instruct** 22:12
  31:21 202:9
**instructed** 219:18
  220:1,4 235:12
**instructing** 22:15
  31:24 32:5 65:12
  70:2,11 171:21
  172:17 182:24
  185:22 194:5
  202:5
**instructions** 13:1
  202:12,16
**instructs** 10:15
**intend** 12:19
  198:18
**intended** 76:6 93:8
  127:23 131:11
**intensely** 84:14
**intent** 80:18,18
  149:22 158:20
  162:19,19 210:22
  228:12
**intentional** 93:2,4
  93:7,10
**intentionally** 81:2
  92:17 109:17
  177:6
**interact** 73:5
  77:22
**interest** 89:6,10,15
  89:24 90:2,17,21
  90:25 91:13 92:19

115:25 116:4,9,15
116:18,24 127:15
134:18,22 135:1,6
135:7,12,19,22
136:15,18,20,21
137:3,10,21,25
138:14,18 139:10
196:22 197:1,20
228:11 229:5,9
**interested** 22:3
  100:4 108:1 205:2
  245:13
**interests** 92:20
**interference**
  203:18 234:16
**interpose** 220:3
**interpretation**
  28:20
**interpreting**
  147:21 162:8
**interrupt** 217:9
**interruption** 151:1
**interview** 79:9
  118:1 124:4
**interviewed** 173:3
**introduced** 100:3
  166:16
**introduces** 44:15
**invite** 24:23 77:9
  77:15
**invited** 24:9 26:19
  26:19 28:16 76:17
  77:13,16 200:14
**involved** 25:17
  28:12 47:12 49:7
  49:10 51:16 75:14
  129:10 140:5
  141:10 142:9
  146:8 183:3
  185:19 193:2,19
  196:14 215:13

3:21-cv-03302-MBS-TJH-RMG     Date Filed 03/21/22     Entry Number 194-2     Page 83 of 108

Brenda Murphy                                February 4, 2022
The South Carolina State Conference vs. McMaste,

[involved - lawsuit]                                    Page 20

231:9,11,12
**involvement** 66:15
**irregular** 168:2,11
**issue** 50:14 80:8
  111:25 119:10,10
  120:7 128:10
  154:13 194:8
  230:9
**issued** 113:1
  127:22
**issues** 52:25 71:8
  119:23 195:9
  211:24 228:11
  244:2
**items** 12:17

**j**

**jan** 2:2 3:5 7:1
  245:19
**jane** 5:9
**jennifer** 98:10
**jerry** 64:19 80:1
**jmc** 1:5
**joachim** 2:4
**jobs** 239:12
**john** 4:7 78:7
  98:12,13
**johnson** 94:19
**join** 24:14 36:15
  78:3 196:11
**joining** 78:4
**jordan** 48:3
**judge** 8:10,11
  120:1 152:15
  204:23,23
**july** 205:13
**june** 96:13 140:24
**junior** 37:1
**justice** 23:24 71:9
  71:9 76:20 78:5
  120:8,16 222:9,15

**justin** 63:18

**k**

**keep** 25:23,25 26:4
  46:16 73:19
  118:14 129:1
  135:7 146:23
  150:2,7 162:20
  177:20 198:18
  231:1
**keeping** 145:24
**keeps** 162:5
**kept** 19:19 25:14
  25:16 26:6,8
  73:17
**kershaw** 190:21
**kilgore** 183:13
  185:10
**kin** 245:12
**kind** 204:3,15
  205:21 220:25
  221:7 223:6
**kinds** 226:14
**king** 78:7
**knew** 195:2
**know** 11:10 14:13
  16:9 19:17,18,21
  20:9,14,19,20 21:1
  21:4,5 25:3,3,13
  28:7 36:9 38:4,6
  38:10 41:25 43:8
  43:8 44:9 45:2
  46:3,4,20 48:18
  49:18 51:2,4,6,23
  52:4,7 55:5 56:19
  62:24 63:3,4,4,6,8
  63:11,13,18 64:8
  64:10,11,13,23
  67:24 68:3,5
  69:12 70:17 75:17
  75:20 76:20 77:21
  77:22 78:7,16,19

78:20,21,22,24
79:1,3,4,18,22,23
80:1 83:4,6 84:12
86:11,15 89:14
91:8 93:8 94:8
95:7,10,25 97:9
98:19 100:8
101:10,10,15,25
103:11,17,18,19
110:20 111:15,21
111:24,24 117:7
117:19 118:5,6,24
124:9 127:2 128:6
132:18,25 133:2,6
133:9,19 134:25
135:15 137:12,15
137:23 138:22,24
140:2 141:3,4,20
141:24 142:8,16
142:24 143:14,15
144:14,17,23
145:2,12,20
146:10 151:15
154:22 158:7,24
160:4 164:20
167:11 169:13
170:6 175:18,24
175:25 176:1,9
180:8,9,11,12,13
180:15 181:14
182:12 188:11
189:11,12 191:3,4
191:16 193:1,3,4
194:21,22 195:3,4
195:6 197:15,17
197:17 199:17
200:11,16,17,20
203:10 207:9,20
208:25 211:21,23
212:19 215:15
216:12 217:1,7

219:13 220:7
221:14 222:2,25
224:19 225:12,16
225:19,19 226:23
227:25 229:16,19
236:4
**knowing** 79:11
  224:8
**knowledge** 12:20
  13:9 19:7,10,16
  50:20 76:4 118:4
  145:4 175:12,14
  189:1,4 194:20
**known** 73:8
**knows** 84:2

**l**

**l** 3:1
**labeled** 107:8
**lady** 33:24 89:1
**laffittee** 5:2
**lag** 54:7
**lambert** 4:23
  240:1
**large** 91:5 138:5
**larger** 90:1,2,24
  90:25 135:18
  236:23
**late** 18:1 25:21
  53:1,5 213:12
  243:1
**launched** 243:14
**launching** 196:4
**law** 22:22 56:25
  117:2 127:24
  137:13,16 152:15
  152:18
**lawmakers** 53:20
**lawrence** 67:19
**laws** 3:12
**lawsuit** 14:13
  47:23 49:8 54:13

Brenda Murphy                                      February 4, 2022
The South Carolina State Conference vs. McMaste,

**[lawsuit - look]**                                      Page 21

54:19,24 72:5
74:4,13,18 76:6
111:1 113:21
119:25 133:8
159:12 205:11
215:3 217:21
223:24 231:3,9
232:22 233:6
**lawyer** 111:11
210:1 212:20
**lawyers** 15:4 18:3
27:16 28:4 59:2
113:2 126:7,20
132:24 149:6
211:3
**ldf** 14:2 15:17 27:8
38:10,14 83:5,10
126:16,20,22
182:3 197:23
**lead** 63:25 153:14
**leader** 237:1
**leadership** 24:12
25:19 26:15 35:14
71:5,13 99:22
142:23 171:16
174:14,25 175:8
177:25 184:19
**leading** 3:16 49:25
**league** 76:12 77:21
79:15 98:19 141:2
212:9
**leah** 4:6 196:19
197:23
**learn** 55:6 67:5
**learned** 141:24
**learning** 100:5,10
**leave** 243:25
**leaving** 243:1
**legal** 2:3 4:4 38:3
55:15,23 89:12
157:22 175:6

211:3 222:6,10
224:14 231:25
232:15,24 241:23
**legality** 198:2
**legally** 224:14
**legislation** 61:9
74:9
**legislative** 177:6
192:3,7 193:24
211:17,18 237:7,9
241:20
**legislator** 29:1
**legislators** 211:22
221:17
**legislature** 94:4
**legislatures** 53:16
**length** 243:17
**leon** 20:18
**letter** 6:19 125:7
126:16 130:17,18
130:24 131:7
166:23
**letters** 125:2,4,12
125:13,21,24
126:3,10,11,15,19
127:3,3 128:6,8,10
209:2,3,6,12,18,18
210:3 211:3,3
**level** 38:12
**life** 20:1 34:3 37:1
**lifetime** 36:22,23
**limehouse** 4:22
6:5 230:18,19,22
230:24 232:1,7
233:14 240:2,3
**line** 104:23 159:22
161:9 165:16
192:1 197:22
**lines** 6:18 81:7
94:14 106:3,25
107:2 109:16,21

110:21 132:14
141:21 160:21
161:2,9 166:9
168:3,11 171:3
174:23 223:10
238:11 242:10
**link** 106:13
**list** 22:20 27:10
65:8 71:15 74:2,7
74:14 98:25 100:1
132:2,20 155:19
177:21 178:8,10
178:14,15 182:12
183:12,14 185:14
194:2 225:12
**listed** 73:9,24 77:5
98:22 114:2 131:4
132:22 186:1
187:4,6 194:9
232:19
**listen** 9:4 26:12
111:22 112:4
117:9,10 122:17
**listening** 217:10
**listing** 74:6 132:21
182:16 187:21
**listings** 236:5
**lists** 45:6,9,13,17
64:21 65:7 70:19
97:22,25 156:11
183:13 186:12
**litigation** 8:7
32:11 47:12 50:16
50:21 57:21 58:6
58:7 75:23 182:5
185:22 199:3
**little** 19:21,25
27:21 32:18 67:6
87:4 113:17
134:14,16 135:15
147:1

**live** 33:19,21 34:7
34:10,23,24 68:24
88:3 89:19 138:2
139:16 157:17
172:10 177:5,7,8
178:16 242:11
**lived** 20:1 34:1,5
90:10
**lives** 172:20
180:14 217:20
**living** 32:15 154:5
**llc** 4:12 5:2
**load** 88:16 156:4
164:15,16,17
**loading** 88:15
131:23
**loads** 40:3
**local** 12:22 98:16
140:1 189:18
190:18 191:6,7
**located** 11:12,13
37:12
**location** 155:18,22
155:23
**long** 15:16 16:7,11
33:21 34:10 35:6
35:10 56:19 57:6
57:22 81:25 88:16
97:1 102:8,12
107:9 204:1 209:1
215:9 243:6,20
244:6
**longer** 48:17 55:20
58:5,11,12 95:2
102:20 137:21
**look** 40:8 42:15
43:11 44:18 45:1
45:22 48:15 59:18
60:13,23,25 62:18
62:19 64:4 85:10
86:6 87:2 91:5

Brenda Murphy
The South Carolina State Conference vs. McMaste,

February 4, 2022

[look - maps]

Page 22

93:15 94:10 96:3
100:7 102:1,2
111:16 128:19
130:10 131:15
135:18 136:16,17
136:18 149:23
151:19,20 153:3
156:10 159:17
160:8,9,10,15
162:25 169:3,5
170:15,20 171:7
176:20 181:20
182:25 184:19
186:1 192:11
216:23 217:2
223:22 224:1,21
224:23 225:5,21
225:24 227:3,7,21
229:22 238:25
239:9
**looked** 66:9 84:10
89:14 95:6 101:13
144:7,9 223:12,15
223:25 224:20
225:19,25 227:13
227:18,25 228:23
229:20
**looking** 40:13 41:4
41:17,18 43:6,7
45:21 46:17,18
48:20 56:22 60:17
86:6,17 95:24,25
100:11 101:14,23
142:20 156:24,24
159:16 160:8
162:11 169:17,23
183:11 199:19
224:2,2 242:9
**looks** 89:6 149:19
**lose** 123:6,21
124:5

**losing** 123:11
**losses** 121:15
**lost** 121:6,10
239:12
**lot** 13:13 133:14
146:24 195:8,15
204:2 209:12
212:19 218:10
**low** 157:10 158:8
**lower** 69:5 85:17
153:4 160:12
**lucas** 48:3
**lunch** 96:23 102:7
102:9,13,17 103:1
103:3
**luxury** 26:25
**lydon** 8:10 204:23
**lynn** 194:17,19
195:3 200:4

**m**

**ma'am** 23:17
27:14 31:4,5
34:16 35:25 36:4
37:25 40:12 42:10
43:18 59:20 76:1
81:24 84:9 85:20
88:5 99:19 113:1
115:15 118:24
121:8,25 122:3
124:10 127:17
130:2,25 132:23
134:24 136:19,24
137:17 138:3
139:12,21,23
145:11 147:13,14
147:16,24 148:2
148:15 149:5,8,18
150:6 152:9,25
154:7 155:13
157:3 159:19
160:6,24,24,24

167:10,24 168:17
175:15,17 187:23
191:20 196:10
199:10 200:5
205:15,20 209:20
210:11,15 240:17
241:9
**magic** 91:24
**main** 4:15 5:10
45:9
**maintain** 122:11
168:5
**maintains** 72:19
73:11
**majority** 159:20
159:23 207:20
**makers** 168:13
**making** 79:21
122:6 142:1 146:9
164:11 171:7
206:9
**mama** 89:1
**man** 127:14
215:20
**manhattan** 90:21
**mann** 2:2 3:6 7:1
97:4 102:7 245:19
**manner** 23:22
58:24 92:18,21
93:11,20 109:6
110:9 153:17
154:20 158:11
168:4,13 217:3
**map** 6:20 51:1,3
57:20 79:13 136:4
136:5 137:5
142:24 144:7
149:23 156:11,22
157:25 158:23
164:18,22,23
166:3,10,11,12,12

166:14 167:8,10
167:13,17,18,19
168:4,13,20,22
169:23 190:19
196:15,15 201:13
229:22 238:21
**map's** 169:16
**mapped** 228:3
**mapping** 25:7,20
26:23 28:19 48:7
50:5,8,13 57:10
62:19 64:5 88:9
100:3,3 111:17
190:17 192:13
193:7,9,20 196:12
200:2 226:4,6
228:5 242:21
**mappings** 26:23
242:20
**maps** 25:7 49:1,4
50:24 51:10,11,13
51:18 54:9 57:17
57:21 58:2,2,4,4
58:16,19 59:7,19
61:1 73:6 79:19
89:5,5 99:8
100:11 102:2
110:2,9,16 111:16
117:24 120:8
129:20 130:10
141:10,13 142:5,9
142:21 143:18
144:2,8,9,12,15,17
144:21,24 154:25
164:2,3 166:14
167:13,16 169:18
193:6,20 195:19
200:23 210:4,5,6
210:13 211:4
214:14 217:2
223:7,11,16 224:9

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

**[maps - met]**                                           Page 23

228:22 229:20
238:2,6,8
**march** 42:24
**mark** 4:13 7:17
13:8
**marked** 39:23
44:6,17 66:23
81:21 88:12 97:9
97:14 106:9 132:5
165:9 181:18
186:5 189:23
194:12 198:13
**married** 34:12,13
**marvin** 183:18
**masonic** 36:3
**master's** 32:22
**material** 115:6
204:4
**materials** 11:21,24
18:17 220:19
**math** 104:7
**matter** 26:21
51:13 63:1 69:3
114:10 145:25
209:23
**matters** 21:14
**matthew's** 196:20
**matthews** 198:1
**mcdaniel** 161:6,17
162:7
**mcdaniel's** 161:8
**mclawhorn** 184:2
**mcmaster** 1:13
4:19,21 230:19,24
231:2
**mean** 47:23 50:22
51:23 75:25 90:4
91:18 92:16 93:17
95:23 97:9 98:4,5
100:17 108:22
109:13 116:5,6

119:19 123:1
127:11,18 135:17
148:4,4 154:3
160:21 180:6
197:18 211:7
221:15 223:14
237:10
**meaningful** 12:16
**means** 28:11 55:18
58:12 65:5 91:19
**meant** 43:1
**media** 195:9 196:1
196:4,7
**medication** 9:3
**meet** 15:12,15
21:8,12,18,21 26:2
68:4 71:4 73:6
143:2,5 192:19,22
193:5,13,15,24
**meeting** 6:17 23:5
23:12 24:6,7,8,14
24:17 25:1,11,14
25:15,17 26:6,9,11
26:11,12 27:18
28:2,25 64:16
65:10,13 68:4
71:5,12 96:11,12
96:14 97:20
107:24 183:1
192:2,6 194:16
199:14,24 200:11
233:25
**meetings** 15:22,25
18:9,10,11 21:24
22:2,2 23:8 25:22
25:23 26:1,3
28:23 54:21 68:1
71:2,3 72:13
80:17,18 83:8
112:13 174:13
183:4 197:13

200:17 207:14,19
208:14,18,19,22
211:2 216:20,25
217:6 238:4
**meets** 216:24
**melissia** 5:16
**member** 21:25,25
22:1,13,19 23:4,6
23:7,15 24:16
27:23 35:7,17,21
35:22 36:5,8,13,14
37:3 47:13 49:12
65:15,20,22,25
68:10,13 69:20
74:6 77:10 98:2
112:22 143:19
173:4 176:13
177:4 178:20,21
184:2,9,12,13
186:16,20 187:14
192:21 224:17
226:10 229:15
242:19
**members** 14:14,15
21:12,19 22:3
23:13 24:9,13,17
24:21,24 25:18
26:17,18 28:10,12
36:9 37:8,16 61:8
62:25 64:1 65:1
68:2,8 72:1,4
75:13,17,20 76:17
77:3 83:17 100:4
108:1 126:18
129:13 142:22
144:14 171:17,23
172:10,25 174:6
174:24 176:4,11
177:7,8,17,24,25
178:1,8,16 179:7
179:17,18 182:7

182:18,23 183:3,4
183:8,10 185:14
185:15,18,19
187:22 188:13
190:10 192:20
193:23 199:1
207:13 208:5,6
213:1 214:19
215:2,11,24
216:15,22 217:14
217:23 232:18
237:18 238:9
239:5 240:7,11
241:3
**membership**
22:20 25:19,19
26:13,14 36:21,22
36:24 37:11,13
50:1,3,6 64:21
65:6,14 66:21
70:4,19 139:2
177:21 190:12
194:2 207:22
212:19 216:24
217:12 236:6
239:3,7,15 240:23
**memorable**
205:15
**mention** 128:15
**mentioned** 7:24
13:12 18:18 25:24
34:7 38:15 99:20
99:23 100:12
124:25 126:10
139:14 153:19
174:22 179:3
187:22 188:12
209:8
**merely** 111:11
**met** 22:16 23:4,10
23:11 88:7 192:14

Brenda Murphy

February 4, 2022

The South Carolina State Conference vs. McMaste,

**[met - murphy]**

Page 24

192:17 215:10
**methods** 141:25
**michael** 4:14
164:7 167:20
**midnight** 57:2
**mind** 119:5,8
150:13,17
**minds** 64:3 110:20
169:14,23
**mindset** 93:1
**mine** 104:8
**minimal** 140:17
157:9
**minimize** 168:5,14
169:10
**minimized** 48:12
214:17
**minority** 111:8
**mintues** 6:21
**minute** 29:10
50:24 52:15 69:16
88:15 102:17
107:1,12 118:18
132:25 146:16
147:17 163:5,5
166:20 173:15
181:3,4 191:17
**minutes** 6:16,23
6:25 18:9,13,17
19:18,21 25:12,14
25:16,22,23,25
26:4,6,8 27:20,22
28:2,23,25 29:1,3
52:14 65:11 73:17
76:3 96:6,12,15,16
97:19 107:12
115:15 133:19
138:13 146:22
147:5 148:5,18
153:13 156:3
163:6 179:3 184:1

185:16,17 189:20
190:7 192:12
199:16 203:22
223:4,7 233:17
236:1,5 243:23
**mirrors** 103:22
**misstates** 174:1
187:17 188:2,3
213:3,5
**misstating** 189:15
240:18
**mobile** 2:5 245:5
**moment** 48:25
81:13 96:19
108:25 112:3
117:14 118:16
130:17 133:12
138:11 139:18
150:22 155:25
187:24 199:7
**monday** 19:1,2
**monthly** 73:6
216:24
**moore** 4:13 6:3,7
7:15,17 13:11,19
22:14,25 31:17,23
32:5,8,12 39:25
40:4,6,21,25 41:5
44:12 52:13,18
60:8 62:5 64:22
70:5,11 72:25
74:24 80:12 81:23
82:13 87:20 96:8
96:21,25 97:8
102:6,12,16,19,22
102:25 103:2
107:9,18 111:13
112:19 114:12
117:7,13 118:16
124:1 131:23
132:1,7,10 146:12

146:14,18 150:21
155:24 156:3,7,17
156:19 159:9
163:12 164:3,9,16
165:4,11 166:12
166:18,22 167:20
167:23 171:25
172:5 176:14,16
177:13 180:24
181:6,20 184:20
184:25 185:24
188:22 189:8,14
189:16 194:7
198:6,10,15 202:9
202:24 204:15,20
204:22 206:12
207:1 212:22
216:12 220:3,9
221:11 223:5,14
225:7 226:8 229:7
234:3 235:7
238:18 239:5,22
240:1,5 242:24
243:12,16,25
**moore's** 208:25
214:3
**mooted** 55:9,12
**morning** 7:16,18
7:20 10:6 181:2
**motion** 22:21 23:1
32:14 172:6
185:25 202:25
**motions** 212:21
**mouth** 223:10
227:17
**move** 20:3 62:14
75:16 81:13
105:20,21 124:24
133:11,11,16,18
239:13

**moving** 37:2
**multiple** 89:23
188:20 211:18
**municipalities**
91:11 191:7
**municipality**
89:1 90:1,3,24
**murphy** 1:23 3:5
7:7,11,18 8:1,3
13:6 14:1 17:3
19:22 23:2 30:21
30:21 31:20,20
32:16 33:19 34:12
35:1 36:24 39:13
40:8,10,24 41:4
42:4 43:5 44:23
47:2 48:3 49:11
50:11 52:18 55:16
55:24 56:13 57:25
58:15 60:11,22
61:14,22 62:6,9,17
65:16,17 66:7
67:9 70:21 72:11
72:16 73:2 75:2,9
82:1,25 84:7 87:7
87:14 88:23 89:10
89:14 97:17 103:2
103:11 104:12,20
106:4,22 107:2,4
108:9,23 109:12
110:2 111:10
112:20,23 113:10
114:1,7,15 115:10
115:14 117:18
120:11 124:2,18
124:25 126:2,8
127:1 131:21
133:8 143:6
145:14,14 146:18
147:7,11 151:25
156:23 157:23

Brenda Murphy

February 4, 2022

The South Carolina State Conference vs. McMaste,

| | | | |
|---|---|---|---|
| 159:13 160:20 163:16 164:20 165:14 170:3,5 171:9,12,19 172:16,23 173:2 173:14,19,19,20 173:25 174:3,9 175:7 176:2,13,24 177:23 178:14 179:1,14,20,24 180:20 181:24 183:24 186:8 187:8,19 188:4,10 189:9 190:2 192:2 193:21 195:20 196:8 197:23 198:20 199:8 201:4,18,23 202:15 203:21 204:5,10 206:22 211:24 213:9,21 214:2 216:16 217:8 219:5 223:14 224:19 230:7,23 232:10 233:22,22 235:16 240:6,20 241:24 242:2,8 243:3 **mute** 150:22 203:20 231:21 234:19 **myrtle** 8:8 200:24 201:6 205:3 | 37:9,18 38:3 39:2 42:20 43:1 44:1 45:6,11 48:2 49:15,21 65:2,13 65:16,21 66:1,4 74:6 76:4 83:5,16 96:11 106:4 107:4 130:11 140:1 142:22 147:13 171:24 172:10,24 174:6 175:9,10 176:1 177:4,21,25 181:25 182:7,19 182:23 183:3,8,14 183:16,20 184:3,9 184:10,13,15 185:4,15 190:10 194:2 199:1 202:8 205:10,22 207:4 207:22,25 208:5 211:13 217:23 233:1,4 234:15 235:16 236:8,11 236:14,16,23 237:18 239:3,5 241:2 242:1 **naacp's** 110:1 164:17 231:9 **name** 7:17 8:11 22:19 27:9 42:18 45:8 64:17 142:8 142:12,14 143:1 143:16 172:20 174:8 176:10,10 176:13 178:20 184:18 185:3 230:23 **named** 8:1 49:13 49:15 99:4 206:22 231:2 | **names** 64:21,25 65:5,6 70:6 123:15,16 162:10 171:19,20,23 172:4,10,24 173:17 174:7 177:20 178:7 179:17 180:7,9,11 180:12,13,16 182:17,23 184:7 184:15 193:16,22 193:23,25 194:2 217:22,24 239:6,7 239:9,11,14 240:7 240:11,22,24 241:3 **national** 37:18 38:3,9,10,14,14 43:17 46:2,3,15 68:16 202:7 240:10,22 241:15 242:1 **nature** 36:17 **neal** 183:18 **near** 128:18 **necessary** 3:15 12:14 54:25 182:5 192:19 **need** 10:17,20 19:21 20:25 21:9 23:1 26:2 27:12 30:22 32:14 38:12 38:13 44:14 47:20 65:16 68:3 92:2 102:13,15,20 106:6,14,16 107:7 107:20 111:21,22 112:1 117:8,9 121:16 122:2,18 122:19 128:15 138:1,22 148:1 | 156:5 158:11 162:9 172:5 189:18 198:9 202:24 203:5,19 224:14 233:17 **needed** 55:20 81:5 109:4 110:6,10,17 111:23 116:12 142:1 144:4 224:3 224:15 225:3,15 225:15 228:2 235:9,12 **needs** 27:1 30:5,6 30:15 105:1 165:2 169:7 **neighborhoods** 109:15 **neighboring** 168:6 168:14 **neither** 245:11 **never** 31:17 95:4,4 143:16 182:12 187:25 192:13 194:21 **new** 4:9,9 27:4,13 33:16,16 53:16 57:7 90:13 119:11 119:12 176:17,19 200:24 201:12 204:4 **nexsen** 4:12 **night** 12:11,13 25:22 64:24 96:5 176:18 198:23 237:22,24,25 **nine** 34:11 165:13 **nineteen** 35:8 107:11 145:7,8,10 145:19 146:2 147:6,15 148:13 148:19,24 149:16 |

| | |
|---|---|
| **n** | |

| | |
|---|---|
| **n** 3:1 4:1 6:1 **naacp** 1:8 4:4 13:9 14:6,25,25 21:25 22:1,13,22 23:7,15 24:16,18,21 25:19 26:15 27:23 30:20 35:7,11 36:10 | |

Brenda Murphy
The South Carolina State Conference vs. McMaste,                    February 4, 2022

**[nineteen - office]**                                                        Page 26

238:17,22
**non** 23:15
**noncompact** 168:2
168:11
**nonpartisan** 23:18
23:20 38:16,20
199:24 200:13,15
**nonprofit** 23:19
76:19
**nonpublicly**
184:15
**nonresponsive**
147:1
**north** 2:4 45:9
**notary** 7:2 245:20
**note** 198:18
214:16
**noted** 12:5 131:10
**notes** 104:24 115:5
218:8 219:19
**notice** 3:21 13:15
16:22 113:2
203:13,14
**noticed** 203:12,15
**november** 86:22
125:10,11,12
130:17 131:18
189:21
**number** 1:5 13:23
14:18 25:22,22
27:20 28:23 30:13
39:25 41:16,21,24
42:1,2,3,14,16
43:3,4,8,10,13,14
43:21,22,23 44:2,9
45:14,17,19 46:1,5
46:11,12,12,13,14
46:14,15,16,17,23
47:4,7,8 50:24
56:20 66:12 67:1
67:2,4,8 77:21

81:24 83:25 84:3
84:7,20 85:17,25
87:20 90:2,16,20
90:25 91:6,20,24
96:1,8 97:7,10,11
97:11,22 98:21
101:11 102:2,5
103:23 104:18
106:11,12,12
115:13 122:9
132:1,3 137:15
139:2 151:2,2,19
151:19,20 152:6
153:3,4 154:24
155:17 156:22
157:4,14 160:11
162:13,14 165:13
166:24 172:21
173:3,6,22 176:21
181:1 183:1,12
190:1,2 198:8,21
199:5 201:9
202:12 207:14,16
208:2,7 209:3,7
210:4,5 221:17
**numbers** 43:15,16
46:20 48:15 87:3
87:18 91:3,4,5
103:18 122:5
151:20 153:6
157:12 214:17
215:10 221:13,15
221:16 222:4
225:19
**nurse** 32:17 33:5
33:11,12,12 34:14
**nurses** 36:5,6
**nursing** 36:7
**nygord** 5:15

**o**

**o** 3:1
**o'clock** 230:5
**oath** 8:19 9:1
71:19 72:10 74:16
75:5 143:17
174:17
**obama's** 222:9
**object** 10:12 12:22
12:22 13:21 47:9
62:6 164:7 181:4
189:16 234:3
235:7
**objection** 6:10
10:14 22:11 30:10
30:18 31:2,15
34:25 39:11 40:15
40:19 41:25 46:25
50:9 55:14,22
57:23 58:14 59:22
60:6,21 61:12,20
62:3,15 64:20
65:3 70:2,7,17,19
72:23 74:22 75:7
80:10 82:11,22
84:4 87:13 89:11
104:10 111:10
112:17 113:7
114:8,11 123:24
125:25 126:24
143:3,10,24 147:8
157:21 164:1
166:10 170:4,12
171:21 172:14
174:1 175:5,21
177:11,15 178:12
178:24 179:11,15
179:22 180:18
182:22 184:6,14
185:21 187:17
188:2,8,16,19

189:6,13,14 194:1
198:24 200:18
201:21 202:5
213:3,24 215:4
216:6 218:12
219:3 222:10
228:18 229:12
231:24,24 232:14
232:23 233:2
238:18 240:18
241:4,7,22,22
242:6,18
**objections** 3:15,17
12:24 39:17
114:13 189:17
213:8,12
**objects** 12:21
**observer** 199:24
**obvious** 100:25
101:17
**occasion** 21:8,24
22:4
**occur** 112:1 118:4
154:12
**occurred** 109:8
118:5,7 119:16
**october** 21:12 49:3
54:13 111:2
125:10 186:2,24
**offered** 3:19 79:12
79:15
**office** 4:20 11:15
33:7 38:14 43:17
45:10 46:2,3,15
47:4 68:16 95:1
102:4,5 126:14
185:12 192:23
201:20 202:3
219:20 240:22
242:1

Brenda Murphy                                      February 4, 2022
The South Carolina State Conference vs. McMaste,

[officer - opinions]                                      Page 27

| | | | |
|---|---|---|---|
| **officer** 47:13 | 59:13 61:5,16 | 132:12,17 133:13 | 195:8,12,17,23 |
| 185:7,10 | 62:7 63:3,10,13,16 | 133:16,17,21 | 196:3 197:15,25 |
| **officers** 185:5 | 63:18,24 64:19 | 134:4,11,19 | 198:6,10 199:6,22 |
| **official** 1:13 42:18 | 66:5,9,12,15,25 | 135:20,24 136:3 | 200:7,16,22 201:8 |
| **oh** 31:4 116:5 | 67:15,16,24 68:8 | 137:2,8 138:4,9 | 201:22 202:2,18 |
| 130:7 200:4 | 68:12,17,25 69:12 | 139:7,17,18,25 | 203:1,21 204:5 |
| 205:22 207:16 | 69:17 70:14,15 | 140:10,19,23 | 205:1,14 206:5,25 |
| 218:6 228:25 | 72:10 74:15 75:5 | 141:13 142:8,24 | 209:12 211:7,16 |
| **okay** 8:6,25 9:3,12 | 76:15 77:6,12 | 143:2,8,15 144:19 | 212:18 216:3 |
| 9:18,25 10:1,9,12 | 78:16 79:1,5,17 | 145:2,6 146:1,10 | 218:16 220:24 |
| 10:17,24 11:10,12 | 80:3 81:17,23 | 146:14,21 147:10 | 221:5,18 223:3,22 |
| 11:16,18,21,24 | 82:21 83:4,12,20 | 148:2,9,16,23 | 227:22 229:7 |
| 12:19,20 13:6,23 | 83:25 85:7,10,15 | 149:15,24 150:12 | 231:16 232:12,12 |
| 14:8,12,17,21,24 | 86:1 87:1,10 88:2 | 150:21 151:13,18 | 232:21 233:17 |
| 15:3,12,22 16:6,11 | 88:14 89:9 90:1,9 | 151:24 152:5,18 | 234:9 236:3 |
| 16:14,16,19,24 | 90:13,16,24 91:18 | 153:11,12,22 | 238:20 241:12 |
| 17:6,16,19 18:23 | 92:15,15 94:2 | 154:13,19 155:14 | **old** 20:4 83:21 |
| 19:3,12,20 20:2,5 | 96:5,18,20,24 | 155:16,18 156:10 | 86:20 |
| 20:9,14,19,22 21:6 | 97:22,25 98:4,18 | 157:1,2,18 158:15 | **older** 67:6 |
| 21:8,10,16 22:8 | 98:21,25 99:4,7,14 | 161:5,16,20 162:3 | **once** 90:11 208:20 |
| 24:9,20 26:6 | 99:17 100:20,22 | 162:14,14,15,25 | 234:1 |
| 27:20 28:1 29:8 | 101:6 102:6,12,19 | 163:5,15,21,25 | **one's** 92:12 |
| 29:15,18,21 30:1,7 | 102:21,22,24 | 164:21 165:4,16 | **ones** 15:17 36:8 |
| 30:11,25 32:5,18 | 103:9,20 104:15 | 165:19,24 166:4 | 77:20 78:25 |
| 33:3,5,18,24 34:5 | 104:22 105:5,8,14 | 167:25,25 168:9 | 193:13,14 208:20 |
| 34:10,12,19,21,23 | 105:19 106:18,24 | 168:25 170:13,22 | 209:8 |
| 35:3,6,13,17 36:13 | 107:1,9,23 108:11 | 171:6 172:15,19 | **ongoing** 71:3 |
| 36:16,19,23 37:6 | 108:14,22 109:11 | 173:1,9,18,20 | **online** 15:18 |
| 37:20 38:1,6,15,19 | 110:8,25 112:15 | 175:1,19,25 | **onset** 95:3 |
| 39:9,15,20 41:2,9 | 113:16 114:4,6,23 | 176:24 177:1,8 | **open** 12:13 24:17 |
| 41:10,15,16,20,23 | 115:23 116:17,21 | 178:1,17,19 179:3 | 29:4,5,5 83:8 |
| 42:9,11,13,21 | 117:1,17 118:2,9 | 179:8,19 180:12 | 198:19 203:21 |
| 43:11 44:18,22,25 | 119:7,19,24 120:6 | 181:14,15,24 | 243:1 244:1 |
| 44:25 45:5,13,16 | 120:12,19 121:12 | 182:14,21 183:7 | **operate** 174:12 |
| 45:24 46:10 47:11 | 121:15 122:16,21 | 183:11,18,22 | **operative** 55:20 |
| 47:22 48:24 49:13 | 123:9,22 124:13 | 184:2 185:10,14 | **opinion** 59:19 |
| 49:18,20 50:22 | 125:6,15,19,23 | 185:24 186:7,10 | 112:7,7 242:15,16 |
| 51:8 52:4,7,10,15 | 127:12 128:1,5,25 | 186:22 187:10,20 | 242:22 243:5,9 |
| 53:9,18,23 54:5,12 | 129:18,24 130:3 | 190:4,9 191:3,12 | **opinions** 211:23 |
| 54:15 55:12 56:6 | 130:24,24 131:3 | 191:24 192:6 | 211:25 |
| 56:16,19 58:11,21 | 131:18,21,22 | 193:23 194:19,23 | |

Brenda Murphy
The South Carolina State Conference vs. McMaste,

February 4, 2022

[opportunistic - partners]

Page 28

opportunistic
157:11,20
opportunities
15:19 62:12,21
81:7 94:24 95:6
96:2 123:17,19
124:7,8 128:23
149:24 209:23
214:18 221:18
226:7
opportunity 9:22
12:16 48:16,21
57:15 59:9,10
60:13 61:2,3
62:14,20 81:9
92:10 94:5,6,25
95:1 101:24 102:3
112:4 122:19,21
122:22,24 123:3
131:7,12 136:9,11
136:13 145:13
146:7 161:10,11
162:24 167:2,3
181:12,13 209:13
209:14 212:16,24
214:15 218:2,4,22
219:15 220:14
223:19
option 29:4
oral 7:8
orangeberg
124:21
orangeburg 67:20
order 23:1 32:14
35:24 106:14
157:10 158:9
170:18 172:6
185:25 194:8
199:2 202:25
212:21 215:12

orders 36:3
176:12
organization
19:12 23:18 38:16
38:20,25 42:18
43:2,20 47:24
49:3 50:22,24
57:19 58:6 59:17
59:24 67:25 71:20
72:6,19 73:11
74:1 75:18 103:14
136:4 150:10
175:3 200:12
206:12 210:7
223:23 236:18
241:15
organization's
39:16 57:16
organizationally
37:22
organizations
35:18,20 38:5
organized 204:18
original 231:5
outcome 59:7,18
60:13,18 64:4
108:3 109:20
119:17 130:10
169:15,19 210:19
223:15 227:22
242:11,12,14
245:13
outcomes 60:25
62:19 211:15
222:4 223:12
224:20 227:21,21
227:22
outset 193:6
outside 30:18
overall 61:1 119:3
130:22 231:18

overlap 114:10
194:2 238:12
oversight 37:22

p

p 3:1 4:1,1
p.m. 237:16
packed 158:22
packing 89:6
91:14,18,19,25
93:22 109:22
111:17 157:4,6
158:22
page 6:2 41:14,15
41:15 42:7,8,9
43:6,11,12 45:23
67:14 100:21
132:12 156:8,10
156:11 159:17
162:25 163:11,13
167:22 176:20,24
181:21 183:1
191:12 194:14
196:18 197:20
pagination 156:15
156:17
paid 14:25 51:10
140:19 141:2
pains 8:22 135:21
paired 92:25
pairs 165:24
panel 120:1
152:15
paper 144:4
paragraph 176:23
177:2
paralegals 7:24
parente 4:14
40:17 44:14
107:10 132:3
156:8 170:22
180:25 186:3

189:20 190:1
194:9 198:7 199:6
parente's 103:22
part 14:3 17:16
38:24 58:22 59:5
76:14,16 77:16
83:7,13,18 84:21
85:4,12,19,21 86:3
87:5 90:13 103:12
109:24 138:18
141:23 142:19
206:25 218:21
235:24 236:16
partial 22:19
participant 207:4
207:6
participants 27:9
200:15 236:24
participate 51:5
60:14 76:17,18
77:17 130:13
144:1 195:24
207:18 208:2
209:24 237:9,11
238:9
participated 22:1
72:13 130:12
144:6 207:13
participation
129:13
particular 26:9
28:2 29:22 38:22
39:7,10 41:8,11
176:19
particularly 199:2
215:16
parties 3:4,17
245:12
partisan 80:19
partners 14:15
27:2 28:5 51:15

Brenda Murphy
The South Carolina State Conference vs. McMaste,

**[partners - please]**                                                    Page 29

100:9
**parts** 8:2
**party** 29:22,24
　30:2,3,9 38:22,23
　64:1 76:5,10
**passage** 23:8 74:8
　172:22 173:24
　178:22
**passed** 21:18 49:1
　49:4 61:9 74:17
　74:17 136:5 151:8
　155:4 162:5
**pat** 63:13
**path** 158:13,19
**patience** 230:8
**pause** 102:7 107:1
　107:18,18 117:10
　117:13 118:16
　150:21 181:9
**paused** 109:2,2
**pay** 36:16 37:3
　51:10,12 140:15
　140:17 141:21
**paying** 14:19,21
　50:18 52:7 140:23
**pdf** 132:2
**penalties** 8:22
**pencil** 144:3
**pending** 10:21
　244:1
**people** 24:4,25
　51:2 55:1 56:16
　60:14 61:2 62:21
　64:7 74:2,12 81:6
　91:6 94:1,3,24
　97:22 109:22
　116:17,23 122:23
　136:13 144:7,9,23
　146:8,9 153:4
　154:8,25 169:23
　178:11 179:4,5

180:16 182:18,21
　183:1,8,12,22
　193:25 211:23
　223:19 226:7
　238:5 239:10
　240:15 242:12,15
**perceived** 122:8
**percent** 83:22
　85:12,18,22,23
　86:4,10,21 87:4,4
　87:5,11,12,19
　91:21,21 92:3,7,8
　92:9 99:10 101:2
　104:5 160:13,14
　190:21,22
**percentage** 84:12
　84:16 100:12
　105:9,10,15 123:2
　157:8
**percentages** 84:16
　85:2
**perfect** 156:18
**perform** 140:8
**performing**
　127:23
**period** 16:10
　53:19 54:8 57:21
**periods** 54:17
**perjury** 8:22
**permits** 137:16
**person** 15:25 16:2
　19:22 23:14 30:4
　30:15 48:22 54:3
　64:16,17 65:10
　68:17 69:25 70:15
　70:15,19 71:20
　72:7,20 74:11,19
　99:4 141:19 142:9
　142:14 143:2,5,9
　143:13,14,16,17
　143:18 172:20

173:23 175:12
　205:16
**person's** 93:12
**personal** 12:20
　13:8 30:19 32:10
　171:8 206:20
　240:9
**personally** 17:19
　21:4,5 49:19
　56:13 79:3 144:1
　171:5 174:15,17
　195:7 208:4
　209:15
**persons** 1:10 54:5
**perspective** 107:4
　111:12,14 186:11
　186:23 188:1
**perspectives** 106:4
　106:24
**ph.d.** 184:8
**phi** 36:7
**phone** 12:3 16:1
　150:14 216:19
**phrase** 84:21,25
　85:4 89:4 91:12
　93:14 122:17,18
　134:2,9 157:5
　218:21
**physically** 11:13
**piece** 61:25 62:12
**place** 155:19 199:3
**placed** 56:15
　126:5
**places** 22:23 69:3
　121:3
**plaintiff** 4:3 30:19
　32:3 49:14,22
　205:10,10 206:22
**plaintiffs** 1:11
　12:7,11 13:24
　49:16 173:13

182:2,4,9,13
　185:20
**plan** 21:18 51:25
　94:6 130:20 145:3
　145:6,8,12,19
　146:2 147:6,12,13
　148:11,12,20
　149:3 151:8,14,25
　152:1,19,22 153:7
　154:7,10 155:4
　158:15 159:4
　162:4,4 163:21
　165:24 171:3,9,9
　171:12 172:22
　173:24 190:22
　222:25 233:8,11
**planning** 215:8
**plans** 23:9 48:4
　222:8,14,15
　238:16
**platform** 40:3
　55:7 164:10,15
**play** 106:14
　107:11,12,20
**playing** 49:25
　107:14,16 117:12
　118:15
**please** 9:10,11,20
　10:2,3 11:9 31:13
　31:19 47:2,20
　50:11 55:3,18,24
　56:6 57:18 58:15
　60:10,22 61:14,22
　70:24 73:2 75:1
　80:14 87:14 89:13
　94:22 112:20
　114:14 126:2
　130:21 137:10
　145:23 168:1
　170:5 188:10
　189:10,17 200:19

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

**[please - probably]**                                    Page 30

201:22 229:14
230:2 234:19
240:20
**pleasing** 193:11
**plus** 123:1 190:22
**point** 9:9 13:7 41:7
62:16 65:5,9 87:8
87:15,16 99:25
105:21 123:5
127:7 135:5 178:7
179:11 181:8
185:25 192:11,13
195:17 210:23
220:3 229:7
243:11,14
**police** 147:2
**policy** 241:14
**political** 24:1
29:18,22 32:10
38:21 108:22
109:25 146:8,9
149:20 181:25
182:7,19
**politics** 24:1
**popped** 40:5
**popping** 132:7
**population** 84:11
84:16 85:6 86:10
86:11,13,16 87:19
91:8,23 92:8
99:10,11 102:1,2
109:16 121:6,10
121:13,19,21
122:5,9 135:3,12
137:11,14 138:5
153:1 157:7,9,10
157:15 158:8
168:23 169:1,6
200:25 201:4,9,12
201:14 227:8

**populations** 100:7
109:14 160:10,11
**portion** 41:3,8
**portions** 119:24
165:24
**posed** 31:11
**position** 33:12
57:20 81:10,11
129:18 130:5,6
137:20,22,23
166:13 198:25
200:12 241:18
**positions** 58:8
76:5 95:5 211:4
**possibility** 162:22
**possible** 99:9
150:3,7 155:2
162:23 231:1
**posted** 184:16
**potential** 48:13
64:6 109:24
122:25 123:11
124:5,6 148:13
182:1,8 214:18
226:6
**potentially** 48:16
**practice** 71:3,11
**pre** 120:7,8,16
222:8,15
**precedent** 22:23
**precinct** 150:20
151:21
**precincts** 135:25
136:5 150:12,16
151:2,10,14,20
152:2,6,16,20,23
153:3,5,8,9,13
154:6 159:25
**predominant**
157:18,24 158:3

**prefer** 162:10
203:24
**preferable** 150:2
**preferences** 32:10
134:6
**premature** 54:13
**preparation** 66:7
166:21 233:24
**prepare** 15:5,13
16:20 82:4 88:3,4
182:4
**prepared** 113:23
115:16,17 177:8
**preparing** 108:4
**presence** 80:16,21
**present** 5:13 25:10
62:20 73:7 82:8
190:14 194:16
197:13,16
**presentation**
111:19 117:25
129:12 186:23
**presented** 21:17
83:3
**presently** 111:17
**preserve** 229:4
**president** 13:9
30:20,23 35:11
47:17,21,23 66:3
68:22,23,25 69:1,2
69:4 71:1 77:23
79:8 83:16 84:7
87:7 111:10 139:1
171:16 181:21,24
183:19 192:1
193:21 197:23
201:4 206:21
222:8 233:22
235:16
**presidential** 30:17

**presidents** 22:3
24:11,13,23 26:15
66:17,19 68:2,21
68:24 69:8 138:24
142:21 174:14
176:3,7 179:5,7,8
182:16
**press** 145:5 195:15
**pretty** 16:10
104:22 138:4
213:17 237:21
**prevention** 22:24
**previous** 104:14
167:7,10 192:1
**previously** 47:12
60:12 129:8 157:5
186:19 204:22
**price** 50:20
**primarily** 33:11
38:11 86:7 126:21
140:9
**primary** 36:8
82:21,24 83:17
**prince** 36:2
**principles** 133:23
134:1,7,8 225:8
**prior** 3:19 17:11
17:14 21:11 23:8
35:13 69:18 73:13
74:3 113:21 126:5
167:18 221:8,24
**private** 79:9
**privilege** 12:25
232:24 241:20
**privileged** 22:15
31:25 74:23
185:21 233:2
**probably** 54:16
78:10 96:22
116:11 218:21

Brenda Murphy                                February 4, 2022
The South Carolina State Conference vs. McMaste,

[problem - question]                                Page 31

problem 217:11
problematic 153:6
problems 119:23
    151:22 154:4
    221:25
procedure 7:4
    22:21
proceed 7:16
    167:6 181:10
    203:4
proceeding 8:20
proceedings 7:8
    237:9,22 245:8,10
process 31:11
    51:17 53:19 54:20
    57:20 58:22 59:10
    72:14 78:12,14
    108:2,16 109:25
    139:22 140:4,5,13
    142:17 144:8
    146:8 159:25
    177:22 193:2
    205:21 207:2,5
    211:5,18 212:16
    215:12,13 216:23
    237:5 240:15,17
    240:25 241:1
processes 58:3
    198:2
produce 18:2,4
    113:2 181:11
produced 12:8,12
    25:21 74:2 183:14
producing 183:23
product 149:20
production 12:10
    12:15 243:2
programs 142:17
prohibit 78:4
project 187:24
    188:15 189:4

promise 160:8
promising 204:17
proper 166:20
properly 53:15
    54:9
proportional
    99:12 101:3
    104:18 105:2
proposal 166:15
proposals 190:19
propose 53:20
proposed 110:1
    132:14 136:4
    152:22 156:22
    157:25 164:18,22
    166:8 238:2
proposition 136:7
protect 55:1 80:19
    225:15
protective 23:1
    32:14 172:6
    185:25 194:8
    202:25 212:21
proud 99:25
provide 25:20
    62:12 64:25 74:5
    136:12 149:24
    172:4,24 177:20
    185:14 207:25
    210:6 211:4 212:2
    212:16 214:15
    220:23
provided 7:3
    13:15 42:2,3,4,16
    43:10,16 57:12
    59:3 64:23 81:17
    96:16 131:9 136:9
    139:18 176:18
    181:7 195:13,14
    207:8,24 209:24
    210:4,8,12,16

215:11 244:1
providing 12:2
    28:6,8,9 107:25
    244:3
pruet 4:12
public 7:2 24:9
    53:20,24 54:20
    65:4,25 79:12
    81:14 128:14
    129:13,19,21
    130:5,7 141:5
    145:4 149:6
    161:18 172:3
    196:4 208:19
    245:20
publically 184:17
publicly 24:20
    65:25 182:23
    184:16 185:2
published 86:23
pull 81:23 88:14
    89:2 96:4,8,17
    155:24 165:5
    176:23 180:24
    199:4 229:23
pulled 97:12 237:4
pulls 82:1
purchase 36:21
    37:1
purpose 54:15
    60:1
purposeful 59:4
    59:16 60:4,20
    61:9,10,18 62:2,10
    64:1 110:23
    161:13 169:9
    242:4
purposely 178:4
put 39:20,25 44:1
    44:8 87:20 106:11
    126:11 127:19

131:20 140:11
148:20 150:22
158:15 163:24
164:4 231:21
puts 162:5 165:25
putting 144:3
    167:19 223:9
    227:16

q

question 9:10,14
    9:16,21 10:3,14,20
    11:8 13:20 17:17
    17:20 19:8 21:10
    28:22,22 30:8
    31:3,4,10,12,19
    32:13 41:5,7,13
    42:17 43:19 45:3
    47:2,5,6,15,20
    49:7,10 50:11
    51:7,9,20 55:12
    59:1,4,12,13,21
    60:10,22 61:6,14
    61:22 62:6,8
    65:18,19 69:18
    70:7,10,14,18,24
    71:12 72:3,5
    73:10 74:25 75:1
    75:3,11 80:14,15
    82:9,17 84:24
    89:13 90:7 93:6
    104:4 105:22
    108:7 109:5,11
    112:5,15,20 113:3
    113:4,9,11,14,24
    113:25 114:5,7
    115:1,9,10 116:22
    118:6,8,9,10,24
    119:7 120:11,14
    120:22 121:9,23
    122:7 124:14
    125:19 126:2

Brenda Murphy
The South Carolina State Conference vs. McMaste,

February 4, 2022

[question - reconsider]

Page 32

127:1 128:10
129:1,2,3,6 131:17
131:19,21 137:18
138:1,12 141:9
145:17,18,24,25
147:10,25 148:8,9
148:10,14,15,18
149:12 150:15,19
150:25 151:7
156:6 157:2 158:2
158:17 159:10,11
160:25 164:5,20
167:9 168:17
169:8 170:5,7
172:8,16,18 173:2
173:19 174:3,4,9
175:7 176:1,8
177:16 179:19,20
180:13,21,22
181:8 182:6 184:4
184:20 187:19
188:10,24 189:2,3
189:4,19 191:4,18
191:22,23 195:24
200:14,20 201:22
202:10,14 204:19
204:25 205:5
206:10 213:20
214:3,5,8 215:1,7
215:24 216:10,12
216:14,18,21
218:7,25 219:5,7,9
220:10,16 221:22
223:6 224:21
226:12 228:15,20
232:5 234:21
236:12 240:20,24
240:25 241:24
243:8
**questionable**   92:2

**questioned**   198:1
**questions**   3:16
   8:21 9:5,8,18,20
   10:13 11:5 12:12
   12:19,21 13:3,8
   14:18 31:11 32:3
   91:10 96:23
   107:13 114:3
   117:11 146:23,25
   167:1 181:10
   186:7 191:13,14
   191:25 198:16,17
   201:17 203:6,9,13
   203:17 204:3,5,13
   205:21 206:4,17
   207:1,3 212:18
   219:10,25 221:11
   226:9,13 230:3,12
   230:16,20,25
   233:15,23,24
   234:9,14,24
   235:14 237:7
   239:3,23,25
   242:25 243:7
   244:2
**quick**   230:20,25
   231:1
**quickly**   138:15
**quite**   115:3
**quote**   213:15
**quoted**   197:22

---
**r**
---

**r**   4:1 245:1
**rabon**   5:14 40:1
   44:16 81:24 87:21
   96:4,9 97:2,2
   100:22 117:14
**race**   122:23
   157:18,23 158:1,7
   225:13

**racial**   59:5,16 60:5
   60:20 61:10,18
   62:2,10 64:2
   108:23,24 109:12
   110:2,22 111:8
   161:13 221:25
   242:4
**racially**   177:5
   178:4 222:24
**radical**   155:9,11
   155:12,13
**rainy**   7:21
**raise**   128:10 196:1
**raised**   161:21
   205:22
**raising**   161:23
**rally**   39:10
**rambles**   221:7
**reaches**   159:21
**read**   64:3 67:11,16
   89:3 100:24
   104:23 177:1
   189:18 191:16,17
   195:20,21 213:14
   213:19
**reading**   3:9 105:4
   169:22
**ready**   7:16 181:15
**really**   26:10 28:21
   30:7 79:10 92:18
   120:12 145:17
   159:1 194:21
   205:23
**realm**   13:20
**reapportionment**
   6:16 96:12 97:20
   235:18,20
**reason**   8:25 86:1,8
   87:2,6,17 103:15
   103:25 104:8
   151:8,11,13

229:17 240:12
   243:5
**reasonable**   123:2
**reasons**   84:13
   214:14
**recall**   8:11 25:2
   54:16 79:14 89:7
   91:16 96:10,13
   116:2,7,9,11 117:1
   119:24 120:2,5
   122:16,18 123:7
   125:12,13 161:20
   161:22,24 162:1
   195:21 197:2,12
   197:14 204:25
   205:1 234:13,23
   237:25 238:4,16
**receive**   68:5 140:1
**received**   12:10
   17:4 18:1 32:21
   182:12 198:19,21
   207:10
**receiving**   26:22
**recess**   52:17 103:1
   146:17 165:7
   176:15 181:16
   198:11 233:19
**recognize**   67:9
   166:11 189:25
   190:2 228:6
**recollection**   33:1
   66:10
**recommendation**
   79:21
**recommendations**
   26:23
**recommended**
   210:20
**reconsider**   130:20
   132:13

3:21-cv-03302-MBS-TJH-RMG    Date Filed 03/21/22    Entry Number 194-2    Page 96 of 108

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

[reconvene - representation]                              Page 33

**reconvene** 102:22
**record** 43:24 56:5
72:18,22 73:3,11
73:14 87:7 105:22
106:2,5 150:24
156:9 164:8
166:19 175:10,11
175:20,23 181:15
196:20 198:16,24
205:16 209:23
214:1 243:14,19
**recorded** 105:23
106:15
**recording** 122:18
**records** 159:16
219:21 241:2
**recruiting** 173:13
173:17
**rector** 4:8
**redacted** 184:1
**redirect** 203:5
230:17 233:18
239:21
**redistrict** 125:3
**redistricting** 18:10
18:13,15 21:13,22
24:3 25:5,6 27:4
28:7,11 31:8,9
51:17 53:6,19,21
68:7 71:7 72:14
78:10,14 80:4,9,24
81:3 93:19 98:17
99:24 105:25
106:3,17,25 107:3
108:2,5 119:11
127:10,18 133:23
134:1,5,8,12
139:22 140:1,13
190:7,9,17,18
191:6,10 192:23
195:9 198:3 200:3

207:5 208:18
209:4 215:9,13
221:9 224:18,24
225:2,8,14 226:16
228:7 235:17,19
237:5
**redraw** 161:2
**redrawing** 155:9
**redrawn** 161:7
**reduced** 60:16
61:4 95:13
**refer** 22:6,9 24:6
28:4 92:5 159:9
214:1 236:4
241:25
**reference** 101:21
117:23 194:17
196:19 205:8
232:1,8
**referenced** 104:19
**referred** 125:3
**referring** 39:1
94:18 118:20,22
119:1 159:7 165:3
177:3 232:10
**reflect** 27:22 93:21
**reflected** 186:24
236:1
**reflective** 30:5
51:3 122:5 226:20
228:4
**refresh** 44:14 97:3
**refreshing** 40:2
**refuse** 29:2 64:17
179:5 193:21
**refusing** 177:16
**regarding** 8:7,7
18:10,12,12,15
25:20 28:10,19
31:7 38:13 50:14
71:7,14,15 80:25

88:9 99:23 101:20
105:25 106:17
108:1 134:13
139:22 140:3,4
146:9 154:23
182:16 187:13,14
193:9 196:21
219:22 226:6
238:5,11
**regards** 153:23
**registered** 45:7
217:12
**regular** 20:22,25
**regularly** 73:6
214:24
**reject** 131:11
**relate** 28:19
**related** 31:8 37:17
50:13 71:8,9 80:8
108:4 134:17
154:1 185:22
191:8 225:13
233:5
**relates** 178:22
**relating** 3:12
**relation** 201:13
**relations** 196:4
**relationship** 37:21
38:2 119:17 198:5
**release** 53:5 54:8
130:20
**released** 99:15
**releases** 53:10,12
**relevance** 30:10
164:6 224:10
**relevant** 12:8
198:20 202:6,11
202:22 206:6
**relied** 61:25 62:10
**relief** 56:1,7

**rely** 137:19 138:12
139:8
**remain** 148:13
**remember** 125:13
131:6 204:24
205:6 213:2,21
214:3,5 223:12
234:1 235:2,5
237:15 238:21
**reminding** 205:18
**repeat** 50:12 174:9
189:2 215:21
227:20 234:21
**repeatedly** 109:7
196:1
**repercussions**
106:3,25 107:3
**rephrase** 9:10,12
90:8 161:1 236:15
**replaced** 103:14
**report** 6:12 45:4
45:20,24 46:6
**reported** 2:1 46:13
181:24 199:23
**reporter** 7:1 9:22
10:4 35:23 97:5
102:11 243:20,22
**reports** 51:22,25
88:8
**represent** 14:9,19
30:5 83:12 92:11
140:6 203:17
204:11 212:1,13
230:24
**representation**
48:10,13 73:18
75:14 95:6 99:11
101:23 123:7,21
124:6,7 136:10
160:16 187:11
209:22 214:15,16

Brenda Murphy
February 4, 2022
The South Carolina State Conference vs. McMaste,

**[representation - right]**
Page 34

214:18 217:5
226:7
**representational**
101:1,17
**representative**
20:15,20 22:8
24:15 31:20 32:1
48:22 63:7,9,13,15
63:18,21 64:8,19
65:9 73:12 78:7,8
78:16,19,20 79:2,4
79:7,11 80:2,4,5,7
80:8 81:1 82:8,20
94:16,18,19 104:7
161:6,17 162:7,22
202:7 214:14
226:9
**representatives**
21:1,2,13,19 23:5
23:6,12 47:13,14
48:18 59:6,15
60:4 61:8,18 62:1
63:5 68:20 78:21
78:22 81:2 92:24
95:8,9,19 101:3,8
101:22 104:2,6,17
104:17,25 122:10
123:12,13 149:7
162:21 209:4
**represented** 96:2
161:6 162:6
**representing**
14:25 83:14,15
112:24 161:21,23
205:25 206:1,23
**represents** 14:5,12
184:5
**reprisal** 239:17
**republic** 30:14
**republican** 30:3
30:16,25 31:12

76:10 148:24
200:17 201:20
202:3
**republicans**
149:16
**request** 6:11 39:18
40:13,15,20 41:16
41:21 42:25 43:19
93:22
**requested** 25:9
42:16 43:23 184:1
192:21 235:11,13
**required** 8:17 9:19
10:4 36:18
**requirement**
240:21
**requirements**
93:21
**requires** 155:9
**reserve** 34:15
**reside** 20:6,10
68:8 74:2 75:18
75:20
**resided** 69:21
70:15 72:7 187:15
**residents** 158:9
**resides** 68:10,13
74:11 173:22
174:18
**resolution** 244:1
**resource** 141:15
141:17,18 142:18
**resourcefulness**
28:16
**resources** 26:24
27:8 51:17 83:9
83:11 126:15
138:16,19 142:15
**respect** 13:16
52:25 53:21 56:10
67:8 103:23

105:10 151:9
159:4,5 165:21
166:8,13 168:25
172:19 173:21
186:13 187:25
202:25 207:11
220:17
**respective** 3:4
55:5 109:6
**respond** 70:18
73:2,4 114:14
115:3,7,8,9 118:23
128:21 213:25
234:14,24 235:8
238:19 242:19
**responded** 217:25
**responding** 196:20
**response** 41:7,13
46:4 108:7 118:10
124:2 128:25
197:25 243:17
**responses** 10:4
39:16,17 235:3
243:7,7
**responsibility**
231:19 233:8
**responsible**
173:13,17
**responsive** 28:22
146:25 215:23
**restate** 56:6 60:12
121:9
**restricted** 145:25
**restrictions**
241:14
**restroom** 10:18
**result** 109:20
200:25
**results** 64:5
227:13,18,23

**resume** 143:8,12
143:16
**retired** 32:17
33:10 34:17,18
237:21
**reveal** 22:18 174:7
174:8 199:1
**revealed** 88:10
**reveals** 168:2
200:23
**reverse** 149:20
**review** 12:17
16:16,24 17:6,7,17
17:19,23 56:12
57:21 58:2 73:6
87:9 115:19 128:5
131:8,13 220:22
221:5
**reviewed** 16:19,21
17:3,9,13,15,21
39:16,17 56:14,17
58:17 66:6 73:7
82:6,19 83:2 85:7
87:16 127:6 128:1
128:4
**reviewing** 40:11
**revision** 210:10
**rhetorical** 65:18
65:19
**richland** 67:20
69:1,5,9,13 94:11
114:18,19,21
124:21
**ridge** 135:11,13,17
**ridgeway** 19:25
20:2
**right** 15:1,23 19:3
19:20 20:5 21:16
27:24 37:9 38:17
38:18 39:15 41:20
43:5 44:8 45:5,7

Brenda Murphy
February 4, 2022
The South Carolina State Conference vs. McMaste,

**[right - second]**
Page 35

46:24 47:6,7,22,24
49:1 50:25 52:23
53:2,7,10,13,21,25
54:10 56:8 58:25
59:6 60:1 62:24
64:14 66:2,13
67:1,10 69:10,11
69:14 78:14 79:24
81:18 82:2 85:7
86:24 87:1,10,12
87:23 88:2 89:24
90:3,11,14,17,21
90:22 92:13 93:3
93:7 94:4 95:20
95:25 97:23 99:17
100:20 101:17
102:10,20 103:9
105:6,24 106:13
107:5 108:11,12
108:14 110:25
111:20 114:1,20
116:19 124:18,19
125:4 127:4,9
128:11,14 130:20
131:4 132:12,15
132:18 134:4
135:8,10,22,25
138:9 139:4,7
141:7 142:25
143:15,22 147:7
147:18 149:15
153:14,18,22,25
154:15,17 155:19
159:1,14,17
160:15 161:7,14
162:3 163:7,15,16
163:19 168:7
170:3,6,10,17
171:1 173:18
175:4,20 176:24
177:1,17 179:6

180:1,23 183:16
183:20 186:13
189:12,19 194:7
194:14,24 195:3
195:15,23 196:8
196:16,17 197:15
198:6,15 199:16
200:13 201:6,16
204:3,20 207:15
208:3 210:9,13,24
210:25 211:24
217:1 220:20,21
222:20 225:10,14
225:16,16 228:8
228:24 229:2,5,25
231:6 233:14
236:20 242:16
**rights**  23:24 55:1
172:21 173:24
202:21
**ringing**  150:14
**river**  90:22
**rmg**  1:5
**rob**  203:16 204:10
**robert**  5:3
**robinson**  5:2
**role**  35:10,14
49:25 190:15
195:19 234:11
236:10,13,22
**rolling**  203:22
**room**  11:18
**routine**  71:6,7
72:12
**routinely**  71:4
77:23 84:18
**ruled**  120:1,4
**rules**  3:12 7:4 8:18
12:21,22 22:21
62:7 172:7 189:18
202:11

**run**  62:22 81:10
95:1
**running**  102:4
234:7
**ruoff**  98:12,13,13
140:9,11 141:10
190:17 194:15
196:14 200:22
**rural**  161:21,24
162:11

**s**

**s**  3:1,1 4:1
**saith**  244:9
**saw**  25:21 43:4
107:25
**saxonbury**  20:7
**saying**  87:15,17
89:7 92:6,7 94:2
95:24 101:6 104:1
104:3 106:2 116:2
116:7,10 117:1
118:12,13 122:7,7
123:7 147:22
148:10 162:9,12
169:13 170:15
180:6,10 194:25
209:21 218:24
220:17 223:12
**says**  41:20,23 42:8
44:1,3 45:5,23
100:25 101:16,18
101:19 104:5
107:2,6 132:13
177:2,4 178:1
181:21,24 186:11
190:16,17 191:9
192:1 194:15
196:24 197:7,7,22
197:23 199:22,25
200:2,10,22

**sc**  43:1 96:11 99:8
99:9 181:25 182:7
182:19 183:13,15
183:19 184:8
185:4,15 190:10
192:2 199:1,24
200:10 241:2
**schedule**  16:9
192:6
**scheduled**  26:1,2
128:18 192:2
237:12,13
**schedules**  237:18
**scheduling**  13:14
**school**  32:20
**scnaacp's**  41:23
42:1
**scope**  30:19 32:4
32:11
**scott**  1:9 49:15,18
**screen**  39:21 40:18
41:18,19 44:9,10
44:20 67:1,2,4,10
91:13 106:19,21
106:22
**scroll**  42:15
100:21
**scrolling**  156:14
**scrutiny**  241:20
**se**  106:1 144:22
**seat**  105:1
**seats**  93:16,25
**second**  16:14 17:2
42:9 44:13 74:10
100:21 131:25
150:23 156:4,13
156:14 163:10
181:21 191:12
216:13 218:1
243:22

3:21-cv-03302-MBS-TJH-RMG    Date Filed 03/21/22    Entry Number 194-2    Page 99 of 108

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

[secretaries - sitting]                                          Page 36

**secretaries** 24:23
**secretary** 185:9,13
**section** 67:12 89:3
   128:9 222:25
**see** 8:3 40:1,3,17
   41:16,21 42:8,12
   42:14 43:4 44:20
   45:14,21 91:14,16
   93:15 94:3 98:23
   99:12 100:22,25
   101:4,5,16 106:6
   106:16,18 107:2
   132:8,10 143:8,12
   160:2 162:3
   163:12,15 164:6
   165:2,5,11,13,15
   165:16 168:1
   176:12,24 181:22
   184:5,7 186:8
   190:16,23,25
   191:2,2 192:3
   196:18 197:20,24
   199:8 200:6,9
   201:1,2 203:6,22
   210:19 225:19
   227:3,7 233:11
**seeking** 11:6
   234:15,25
**seen** 25:21 27:20
   40:9,9,23 41:6
   44:22 45:2 97:16
   107:8 143:16
   166:7
**seminar** 68:4
**senate** 5:1 21:18
   23:8 25:8 49:4
   91:5,6 101:14
   103:19 105:1,3
   118:23 128:19,24
   151:9 191:14
   196:21 197:19

203:17 204:11
   209:25 210:1
   222:14
**send** 181:2 235:13
**sending** 83:6
**sent** 44:23 113:2
   125:4 166:22,25
**separate** 15:22
   38:5 235:21
**september** 76:22
   76:22,23 125:9
   199:13
**seriously** 81:12
**serve** 35:13 94:5
   95:8 151:21 153:5
**served** 34:14
   62:25
**serves** 30:15
**serving** 94:4
**session** 16:12,14
   54:17 162:2
**sessions** 16:17
   207:7,21 217:6
**set** 6:10 39:18
   40:20
**setting** 140:12
**seven** 37:4 163:12
**seventeen** 148:24
   149:16
**shape** 160:4 163:6
   163:9 167:14,15
**shaped** 159:22
   164:23
**share** 59:2 79:7
   111:22 138:19,21
   164:10
**shared** 51:14 68:6
**shares** 164:22
**sharing** 25:6
**sheree** 5:14

**shielded** 241:20
**shift** 112:3 139:17
**shifted** 121:2,5
**short** 165:5 176:14
**shortly** 212:22
**shot** 226:5
**show** 96:21 106:11
   115:11 125:1
   131:16
**showed** 167:18
**showing** 44:17
**shows** 107:5
**sic** 13:12 62:6
   99:25 121:22
   186:2 222:25
   223:1
**side** 154:2,3
**signatory** 125:15
   125:20
**signature** 3:9
   56:15 126:5,20,21
   245:17
**signed** 56:12,25
   82:19 130:18,25
   131:1 152:18
   233:9
**significant** 207:13
**significantly** 121:2
   153:2 160:12,12
   203:11
**signing** 128:6
**silver** 37:2
**similar** 89:19
   92:19 135:14
   139:15 164:22
   165:20,23 170:25
**similarly** 1:10
**simple** 43:19
   59:13,20 73:10
   137:17,18 145:17
   160:25 188:24

210:24 215:24
   216:21 222:13
**simply** 28:22
   36:14 51:9 65:9
   70:6 83:16 138:12
**simultaneous**
   47:18 70:9 78:11
   123:18 130:1
   138:10 153:10
   168:16 173:10
   192:15 202:19
   224:22 232:4
**sir** 13:19 29:23
   64:3 72:17 107:15
   107:17 113:14
   120:2,5 130:21
   131:14,19 132:20
   143:14 144:25
   147:23 149:9
   164:17 168:1
   170:24 171:9,18
   174:11 178:15
   190:12,24 191:19
   193:16 210:14
   212:13 216:1,5,8
   217:22 218:15,22
   219:2,6,9 222:7
   223:4 227:9
   229:25,25
**sit** 46:10,22 47:7
   61:24 68:9 74:15
   86:1 110:25 111:5
   111:6 124:15
   133:1 160:20
   242:2
**site** 43:4
**sites** 208:9
**sits** 158:20
**sitting** 65:22 93:16
   93:25 228:21

Brenda Murphy

February 4, 2022

The South Carolina State Conference vs. McMaste,

**[situated - state]**

Page 37

situated  1:10
situation  8:12
  48:12 120:10
  121:1 155:6,8
  160:22
situations  160:18
  170:25
six  20:4 37:4 41:16
  41:21 159:18
  167:23 243:22,23
size  150:19
skills  224:6,7
slash  235:18
slipped  195:1
small  150:8
smaller  134:20,23
  150:3,5
social  76:20 78:5
socialize  21:6
soliloquy  243:8
solitary  137:9
solutions  2:3
somebody  24:1
  56:3 212:7 219:13
  219:16 228:23
  234:17
somewhat  144:5
  158:10
soon  41:12
sorority  36:7,8
sorry  8:14 11:16
  47:19,19 55:3
  67:3 145:16 148:3
  149:13 150:1,15
  151:1 152:13
  153:1 163:8
  184:22 192:16
  217:8 228:13
  232:1,7
sort  11:9 22:23
  33:6,7 35:14

139:25 140:10
  196:4 239:17
sound  149:18
sounds  52:16
south  1:2,7,15
  4:16,20,25 5:5,11
  8:8 11:14,17 13:9
  14:6 17:8 18:13
  19:24,25 20:7
  26:16 27:5 30:20
  31:6 32:2,22
  33:17 34:1,3,6,20
  35:4 36:1,6,10
  37:8,23 39:1
  42:19,20 45:5,10
  48:1 49:14,21,23
  49:25 50:2 65:1
  65:15,20,23 66:1,4
  66:18 71:1 76:9,9
  83:21 86:11,20
  99:25 105:16
  109:25 112:24
  121:20 133:23
  136:18 138:24
  140:22 153:1
  174:15 175:25
  176:4 177:3 184:9
  186:20 192:7
  194:2 202:7 212:9
  221:9,25 222:23
  234:15 235:16
  236:8,11,13,16,22
  238:22 239:3,4
speak  20:22,24
  68:17 69:20,20
  70:20 75:22 76:4
  146:19 211:22
  219:21 230:1
speaker  48:3
speakers  186:12

speaking  17:7
  73:22,24 112:10
  112:11 114:12
  189:17 195:8
  206:11,15 211:17
  222:6 232:8
  234:20
spearheaded
  83:18 237:3
specific  41:3 61:7
  61:16,25 62:9
  67:12,14 73:20
  74:24 84:6 94:9
  94:12 114:15
  119:4,8 137:19,24
  139:7 159:10
  166:5 168:19
  170:13 178:20,21
  190:15 217:14
  225:22 226:1
  233:13
specifically  71:18
  177:7 178:19
  211:13,14 234:12
  234:22
specifics  48:25
spend  133:14,19
spent  138:20
split  112:6,16,21
  113:6,13,22
  114:17,22,24,25
  115:18 118:20,25
  135:21,25 136:4
  137:5 151:2,10,14
  152:2,6,15,22
  154:2,8,14,20,21
  158:23 159:25
splitting  109:9
  111:20,25 136:9
  137:7 150:12,16
  152:20 153:13,24

spoke  69:25 70:15
  71:20 72:7,19
  73:12 74:11 81:14
  117:3 147:22
  148:3,4,6 161:17
  178:21 179:4,9,9
  223:6
spoken  63:10,16
  63:22 72:21 74:3
  74:18 78:9,13
  80:3,6,7 196:7
spring  135:11,13
  135:17 166:20
sprung  166:25
staff  15:17 19:19
  26:25 235:13
stand  86:25 87:17
standard  71:3,11
standards  198:3
standing  175:2
standpoint  228:1
stands  172:14
stars  35:24
start  204:19
started  13:4 54:22
  99:20,22 206:2,9
  215:8 216:10
starting  33:11
state  1:7 7:2 11:14
  17:8 18:14 23:23
  24:12 26:11,16
  27:5 31:7 32:2
  34:1 35:3 36:10
  37:8,11,17,23
  38:11 39:1 42:19
  42:20 43:10 45:6
  45:10 48:1 49:14
  49:21,23 50:1,2,4
  53:12 54:21 65:1
  65:21,23 66:1,4,18
  68:21,22 71:2,6

Brenda Murphy

February 4, 2022

The South Carolina State Conference vs. McMaste,

**[state - take]**

Page 38

72:10,14 73:5
77:8,23 78:21,23
79:20 84:11 86:6
96:11 98:5,16
101:1,8,17 109:25
112:25 119:16
121:5,9,12 128:14
138:23 139:6
140:22 149:21
154:23 174:14
175:9,11 176:3,4
177:6 179:5,7
183:13,15,19
184:8,10 185:4,9
186:20 187:21
188:14 191:10
197:2 200:11,23
201:5 206:1,7,21
206:23 207:14
208:3,20 209:4
211:15 212:2
213:2 214:11,20
214:24 215:25
217:5 224:12
226:16 238:2
239:1,10,13 245:4
**stated** 27:19 57:17
66:17 68:1 80:20
87:16 126:13
129:17 174:24
193:2 200:22
239:5 240:12,21
**statement** 43:7
80:16 88:22 99:18
100:23 101:20
119:2,3,15 120:23
121:24 122:6,13
122:14 153:16
157:16 160:5
185:1 197:18
242:13

**statements** 149:6
194:15
**states** 1:1 44:4
53:15 99:7 222:23
**statewide** 208:3
**stating** 196:25
**statistic** 85:2,3
**statistics** 84:22
**statute** 74:16
**stay** 204:16
**stepp** 5:2
**stick** 170:21
**stipulated** 3:3,8,14
3:20
**stipulation** 7:5
**stop** 47:20 109:3
114:14 138:11
145:16 148:2
181:14 188:21
189:17
**stopped** 107:19
109:3 117:15
118:17
**strategy** 232:24
**street** 2:4 4:8,15
4:24 5:4,10 45:10
154:5
**streets** 154:8
**strength** 91:22
**strike** 128:9
144:20
**stringent** 147:2
**studied** 84:12,14
85:6 105:6 127:18
229:21
**study** 84:18,18
85:5
**subcommittee** 25:8,8 229:15
**subject** 8:21
114:10 145:25

241:19
**submission** 17:11
17:14 18:21,25
21:11 79:12
142:23
**submit** 18:16,20
18:23,24 22:20
51:1
**submitted** 17:24
18:5,7,8,15 42:13
50:24 51:22,25
57:10 58:17 82:5
141:11 156:12
166:13 167:4
238:21
**subparagraph** 104:24
**substance** 10:25
52:22 103:7
**substantial** 121:16
**succinct** 230:2
**sue** 48:2,25 212:23
212:25 231:16
232:6,13 233:1
**sued** 49:3
**sufficient** 175:2
**suggestions** 144:4
**suggests** 12:23
194:24
**suit** 213:1 214:4,9
214:10,11,13
216:22
**suite** 4:15 5:10
**summary** 213:25
**sumter** 67:19
170:21,23 171:10
**supplies** 28:9
**support** 39:6
60:19 111:7
117:17 137:19,24
138:12 139:8

143:22 160:19
166:13 168:10,18
169:11 170:10,14
177:23 221:3
242:4
**supports** 169:1
**supposed** 146:15
**suppositions** 170:9
**supreme** 22:22
**sure** 13:21 15:8
23:20 67:13 88:20
97:18 100:11
101:15 127:7
142:2 145:5,7
151:17,17 155:18
158:19 180:4,5
203:10 205:16
206:9,16 212:15
221:10 223:8
227:1 230:11
**surgically** 157:14
**surrounding** 244:2
**sworn** 7:12
**symposium** 217:1
**symposiums** 216:25

**t**

**t** 3:1,1 245:1,1
**tague** 98:10
**taiwan** 1:9 49:15
49:18
**take** 9:22 10:4,17
10:19,20,21,24
40:8 52:14 58:7
75:15,16 76:6
81:11 96:19,22
97:1,1 102:16
109:4 115:9,16
125:1 135:21
137:22,23 146:11

Brenda Murphy

February 4, 2022

The South Carolina State Conference vs. McMaste,

**[take - thank]**

Page 39

154:13 165:4
176:14 177:19
181:3,13 183:2
191:17 198:25
202:24 209:13
230:6,9 243:4
**taken**  3:5 57:19,22
129:18,22 241:18
243:21 245:8
**takes**  53:19 58:5
58:11,16,19 88:16
156:3 200:12
211:18
**talk**  9:23 24:1
47:22 52:18,22
119:13 128:8
151:3 153:18
162:10 167:2,4
176:7 181:9
213:20
**talked**  15:10 19:20
25:6 111:23
140:14 163:6,9
209:1
**talking**  19:22 22:7
47:19 56:3 86:12
86:16 94:20,23,24
95:2 96:15 104:23
104:24 106:7
108:8 115:4,20,21
119:14 123:22
127:15 136:22,24
139:11 152:8
160:13 162:13,14
167:14 169:14
184:23,25 191:3,5
191:6 209:17
211:12 215:9
218:1 220:8
234:17

**task**  187:7,8 188:5
**taught**  89:1
**teague**  141:6
194:16,17,19
195:3,25 196:11
199:23 200:4,21
**technical**  44:16
**technology**  67:6
88:16,20,21
**tell**  8:6 9:11 15:5
16:6 19:22 26:8
32:18 33:2 35:20
43:9 46:10,22
47:7 48:2 56:23
57:6 60:2 61:7,25
68:9,12 71:18
74:1 88:24 102:9
102:14 103:21
106:14 109:14
110:8 111:6 113:4
137:21,22 138:15
142:10,13 143:17
144:19 155:8
173:2,21,25
175:19,23 177:8
177:22 178:6,7,19
192:10 197:8
201:18 217:19
219:14,16 220:5
227:22 228:24
229:1,4,21,22
241:1 243:3
**telling**  60:17 97:10
142:6 154:7,9
162:16 176:6
217:16 230:1
**ten**  53:10 54:9
129:10 182:20
237:16
**tend**  30:1,2,8

**term**  22:5 89:9
92:16 93:23,24,24
100:16,17 109:1
109:12 155:11,13
177:2
**terms**  13:13 15:19
15:20 16:9 17:9
21:23 23:24 24:3
26:22 28:6,7,8,17
28:18 46:4 48:10
48:10 49:25 50:5
51:2,4,16 55:2,4
57:10 58:1,18
59:8,11 60:24,25
61:1 62:22 64:4
66:19 68:7 71:5
73:4 75:24,24
79:21 83:9 84:16
85:6 87:18 88:7
89:5,20 91:3,5
93:12,19 99:22
101:25 102:3
105:3 109:15,16
109:20 111:16,18
112:12 116:13
117:5,24 119:17
122:4 126:10,16
127:13 128:20
129:22 130:7
134:5,14,16
136:10 137:12,16
138:5 140:12
141:25 144:4
145:12 151:22
153:7 154:1,25
157:7 158:7
160:16,21 162:11
169:15,15 182:12
187:20 190:14
207:7,9,17,19
208:8 210:19

214:17 215:17
222:3,6 224:1,2,8
224:14 225:2
235:9 238:8
239:10 240:10
242:9
**testified**  7:12
87:22 141:6
207:12 208:23
209:16 219:8
222:16 223:8
231:8 233:25
235:16 237:8
**testify**  9:1 219:13
**testifying**  182:4
206:15
**testimony**  6:14,15
11:1 16:20 52:23
57:12 66:7 81:18
82:2 83:20 86:20
86:22 87:12 88:3
88:15 103:7
115:21 125:18
129:12 130:11
146:15 174:2
187:18 188:3,3
189:15 195:13,14
202:6 207:8,9
209:24 211:3
213:5,15,22
218:20 219:14
220:13 238:10
240:19
**text**  12:3
**thank**  7:20 9:7
13:6,18 41:1
47:11 102:24,25
103:10 164:13
204:10 205:18,18
210:2 230:13,14
233:14,16 235:14

Brenda Murphy

February 4, 2022

The South Carolina State Conference vs. McMaste,

**[thank - true]**

Page 40

237:6 239:2,16,20
242:25 243:24
244:6,7
**thanks** 244:5
**thereto** 3:19
**thing** 10:19 15:7
45:25 67:7 88:17
88:21 162:17
193:17 203:20
212:8,8,9,10 230:8
235:21
**things** 15:10 58:23
140:13 179:21
211:4 221:6 222:2
235:21
**think** 13:20 14:3
16:8 18:21 19:1
21:24 25:16 27:9
33:22 42:24 46:18
51:14 54:3 62:11
67:9 76:22 77:5
77:14 80:16 82:17
92:24 95:3 99:23
100:1,1 102:20
105:21 107:6,6
108:25 109:3,9
110:5,12 111:21
111:21,23 115:1
117:8,8 124:22,24
126:9,16 128:25
136:16 138:22,22
140:3 145:12
150:8 153:25
154:1,23 162:9,16
165:23 167:11
170:24 171:6
174:11 188:12
189:18 191:15
192:24 193:4
202:2 203:1,21
204:22 206:4

207:12,23,24
209:2,9,11 213:11
214:21 218:4,7,22
219:24 220:17
221:1 223:6,10
225:8 226:8
229:17 238:24
**thinking** 35:9
149:9 210:10
**third** 183:19
**thirteen** 36:12
37:7,16
**thirty** 27:7 36:20
95:14,15 102:17
104:21 133:19
146:22 159:18
163:12 167:23
**thomas** 4:22
205:10 230:19,24
**thorough** 154:20
**thought** 77:14
184:22 227:19
**thoughts** 126:12
144:10 233:18
**thousand** 36:12
37:7,16
**three** 17:1 34:22
36:25 64:1 67:2
95:13 97:8 119:25
124:23,24 132:25
133:5 146:21
152:15 201:1
**thursday** 189:21
199:20 234:8
**time** 3:18,18 8:13
8:14 16:22 19:3
21:16 28:8 34:8
35:13 53:19 54:18
54:19 55:4 58:2
58:16,20 66:9
74:8,9 89:4 93:16

96:6 102:8 118:21
124:13 125:1
133:20 138:20
192:20 199:4
201:19 203:9,11
204:22 208:8
209:1 229:9
230:13 233:15
237:12,13
**timeliness** 49:6
50:14
**timely** 58:24
**times** 30:13 46:19
128:16 139:2,2
188:20 206:2
**timing** 52:25
**titled** 191:9
**tjh** 1:5
**today** 8:19 9:1
11:13 12:7 13:24
14:7,22 15:6,18
16:20,23 27:17
46:11,22 61:24
66:7 68:9 71:19
74:15 75:25 83:14
86:2 108:18 111:1
111:5,6 112:11
113:24 114:5,17
115:16 119:18
128:4 133:1
160:20 164:10
166:17,25 168:10
173:25 204:1
206:1 209:8 210:2
217:16 220:19
233:23 234:7
239:17 242:3
**told** 53:8 56:24
90:10 105:5
115:15 118:9,18
123:20 147:4,17

170:14 173:5
178:17 187:24
188:1 193:1 230:5
**tools** 28:17
**top** 115:7 142:11
197:7 199:12
219:22 235:23
**topic** 186:13
**topics** 13:16,16
206:14
**totally** 92:24
137:12 158:21
**touched** 134:19
**town** 19:25 135:11
158:23
**towns** 158:12,16
**traditional** 133:22
133:25 134:5,7
225:14 228:7,9,11
**training** 18:11,12
18:17 99:22 100:2
139:19,20,25
140:8,9,10,15
**transcribed** 245:8
**transcriber**
213:17
**transcript** 245:9
**transparency**
116:13 128:11,12
**transparent**
115:24 116:1,3,8
134:15
**traveled** 138:23
**treasurer** 45:25
**trial** 3:18 8:9
**trinkley** 5:9
**true** 13:14 91:2
116:25 120:25
193:1,3,3 221:12
245:9

Brenda Murphy
The South Carolina State Conference vs. McMaste,

**[truly - virtual]**                                                    Page 41

truly 122:4
trust 217:17
  240:15
truthful 8:20
try 9:8,23,24 90:8
  204:16 214:2
  229:9 231:1
  232:12
trying 27:15 67:11
  89:2 96:17 106:20
  147:2 148:11
  149:11 154:11
  164:16,17 165:1,1
  169:18 176:23
  188:23 206:3
  212:14 217:18
  220:12,24 221:2
  221:22 225:21
  230:10
tuesday 16:8
  166:23 167:5
turn 41:13 179:9
  189:20 237:6
twelve 128:14
  190:1
twenty 95:12,14
  95:18 97:8 202:3
  223:5
twice 233:25 234:1
  234:5
two 15:18,22 38:5
  46:19 54:3,3,5
  69:7,7,8 73:16
  75:12 84:20 92:23
  107:12 118:19
  128:17 129:11
  158:15 160:10
  179:21 190:22
  198:2 201:17
  205:7 206:8
  208:22 209:16,16

217:6 222:25
  239:23
type 83:10 210:19
typed 127:2,3
types 206:8
typically 30:1
  84:15
typo 101:10
tyson 5:3 6:4
  203:8,15,16,19
  204:2,9,11 213:4,6
  213:11,17 216:9
  220:7 222:12
  230:7 231:20
  239:22,24 244:4,5

**u**

u 3:1
u.s. 34:14
ucf 156:15
uh 200:9
ultimate 233:7
ultimately 136:5
umbrella 236:20
unable 208:10
unanswered 244:2
unconstitutional
  178:3
undated 125:8
underneath 107:4
understand 8:19
  8:22 9:5,10,11,16
  10:5,15,22 11:2
  12:17,25 27:14
  43:18 53:18 54:7
  54:11 55:6 56:4
  108:5 110:22
  147:5 162:4,7
  177:14 180:5
  191:24 201:6,8
  208:13 211:12
  212:15

understanding
  15:8
understood 9:15
  11:4 147:5 201:3
  225:9 230:11
unfair 115:1
  219:24
unfavorable
  221:10
uniformly 196:23
  196:25
unincorporated
  43:1
unintelligible
  35:22
unintentionally
  109:18
unit 34:15
unitary 139:9
united 1:1 222:23
university 32:22
unusual 160:4
unwillingness
  239:6
update 181:21
  190:16 191:10
  200:2
upfront 11:4
upheld 120:20
  152:1,15 155:4
use 10:18 22:5
  26:24 53:15 61:10
  85:16,20,21,22
  86:2,9 87:5,6 89:3
  91:12,14 92:15
  93:4,14,23,24
  110:13,13,17
  133:20 155:11
  177:2 224:12
  225:13

uses 85:3,3
utilize 51:17

**v**

v 22:22
va 33:15
valid 65:2
validate 43:7,14
validated 68:15
values 89:19
variables 122:2,3
  139:13 142:1
  224:3 226:2
  227:10,24 228:2
variety 211:4
various 179:4
  210:12 235:24
veers 13:20
verbal 10:3
verify 156:5
veritext 2:3 40:4
  164:10
versus 169:6
veterans 33:9,10
  33:13
vice 183:19
video 6:18 105:22
  106:2,5,6,14,15,18
  107:1,14,15,16,19
  107:21,23 108:8
  108:12 111:19
  112:4 116:7 117:9
  117:12,15,18
  118:15,17 123:5
videoconference
  3:6 7:6
view 55:13 91:25
views 107:5
  211:18 212:11
violated 172:22
virtual 67:3
  128:23 129:12

Brenda Murphy
The South Carolina State Conference vs. McMaste,

February 4, 2022

**[virtual - word]**

Page 42

208:8,11,12
**virtually** 54:4
129:14
**virtuals** 128:18
**virtue** 103:12
216:25 241:18
**visited** 138:25
139:1,5,5,6
**vocalizing** 195:19
**voice** 210:25
232:11
**voiced** 177:24
182:11,15,15
**voices** 210:18
233:13
**volunteered** 182:3
**vote** 29:11,13,14
30:1,2,4,8,12,14
30:23 31:8 48:11
48:11 83:22 86:21
93:12,13 100:19
105:11 127:14
151:23 201:25
215:17,20 242:11
**voted** 29:16,17
30:14,16,25 31:12
201:19 202:2
**voter** 86:12,16
87:18 99:10 150:9
150:12,13,16,16
153:13,14
**voters** 48:8 59:9,9
76:13 77:22 79:16
83:22 84:21 86:9
86:17,21 98:19
100:18 101:2
104:5 141:3
151:22 153:17
159:24 168:5,6,14
169:10 170:19
212:9 217:13

221:10 238:6
**votes** 111:9 215:18
242:15
**voting** 86:10 91:22
99:10 121:21
135:25 136:5
151:10 157:15
205:9
**vs** 1:12

**w**

**w** 5:9
**wait** 9:20 10:2
156:6 163:5,5
203:24
**waiting** 164:14
218:14
**waived** 3:10,22
**want** 11:4,6 15:3
41:11 44:25 47:22
59:1,1,3 81:5,10
88:14 95:1 96:25
102:16 110:8,15
115:11 118:7
124:21 127:2
132:20 137:21,23
146:5,22 149:9
153:18 161:5,7
163:3 166:6
169:20 173:23
176:19,20 181:3,9
181:13,20 188:18
191:24 193:22
194:9 204:12
213:15,18,19
215:21,23 217:7
219:13 221:10,23
223:9 227:16,20
233:13 236:2
240:14,16 243:14
243:16

**wanted** 24:13,24
29:7 74:13,21
77:10,15 78:3
109:5 127:7 173:5
203:13 205:16,20
206:16 207:2
217:4,21 218:2
224:19 243:12
**watch** 111:24
**watched** 50:4
**water** 10:18
**way** 12:22 24:2,4
31:8 55:21 92:10
93:9 94:14 107:8
109:22 110:6
136:4,12 144:6
152:6 154:20
160:22 164:11
169:18 174:24
191:8 211:8,9
215:18 217:18,21
220:24 225:23
226:1,20 228:3,4
**ways** 84:20 85:1
116:16,18,24
211:2
**we've** 12:16 19:20
21:23 46:2 51:15
52:13 67:5 95:6
114:8 171:22
177:11 203:25
208:25 212:19
230:4
**website** 127:19
185:2
**websites** 172:3
184:16,17
**wednesday** 16:9
18:22
**week** 8:8 16:5 19:2
128:4 199:20

**weekend** 230:13
237:23,24
**weekly** 25:25 26:1
26:3
**weeks** 66:11
**welcomed** 78:3
**wendy** 78:16
**went** 8:9 93:14
117:18 204:15
221:6 227:19
229:7 243:6
**white** 86:7 157:8
160:13 169:6
**whites** 84:17
**widespread**
128:20 135:15
**william** 4:23
**williamsburg**
67:20
**win** 123:2,3
**winning** 122:25
**wise** 171:6
**witness** 3:10 7:7
62:4,16 113:8
114:13 177:20
179:12 188:21,23
232:8,8 245:10
**witnesses** 52:1
173:13,17 186:11
186:24 187:21
188:1
**woman** 7:25
**women** 76:13
77:21 79:16 98:19
141:2 212:9
**wonderful** 88:17
**wondering** 28:1
226:15
**word** 61:10 91:12
92:15 93:2,5,6
217:1 222:3

Brenda Murphy

February 4, 2022

The South Carolina State Conference vs. McMaste,

**[words - zoom]**

Page 43

| | |
|---|---|
| **words**   73:19 86:19 91:14,17 108:17 110:13,13,18 112:1 134:7 213:25 223:9 227:17 | **y** |
| | **y'all**   102:12,16 209:3 |
| | **yeah**   90:19 100:15 101:9 116:25 123:8 127:25 185:8 203:15 209:17 211:25 225:17 |
| **work**   8:1 24:3 27:1 31:7 33:5,6,6 33:7,7,13 38:6,7,8 38:8,10,13 50:15 100:9,10 182:3 200:23 212:12 213:8,12 237:2,4 237:19 | |
| | **year**   14:4 27:13 49:4 76:24,25 140:24 |
| **worked**   27:2,10 33:9,15 77:24,25 100:8 234:13,23 | **years**   20:4 27:3,7 27:11 28:5 33:23 34:1,4,11 35:12 51:16 53:10 54:9 78:1 129:10 202:4 205:7 239:11 |
| **working**   33:11,18 200:23 235:17 | |
| **works**   7:25 88:17 102:18 | **yell**   216:10 |
| | **yesterday**   16:10 96:17 181:7,11 |
| **world**   217:19,20 | **york**   4:9,9 33:16 33:16 90:13 200:24 201:5 |
| **write**   82:9,10,15 82:16 125:23 210:3,3 | |
| | **youth**   35:15 |
| **written**   6:14 81:18 82:2,18 83:20 115:6 175:16 207:24 209:6,18 209:19 216:4 | **z** |
| | **zoom**   16:1,3 24:8 83:9 217:6 |
| **wrong**   15:1 46:24 90:18 123:5 135:8 153:14 170:3,10 170:11 173:11 196:16 199:14 | |
| **wrote**   209:3 | |
| **x** | |
| **x**   6:1 | |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.