**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

THE SOUTH CAROLINA STATE
CONFERENCE OF THE NAACP, *et al.*,

        Plaintiffs,

    v.

THOMAS C. ALEXANDER, *et al.*,

        Defendants.

Case No.  3:21-cv-03302-JMC-TJH-RMG

**THREE-JUDGE PANEL**

**PLAINTIFFS' RESPONSE IN OPPOSITION TO SENATE DEFENDANTS'
MOTION TO DISMISS COUNTS THREE AND FOUR OF PLAINTIFFS' SECOND
AMENDED COMPLAINT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................ii

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................ 2

ARGUMENT ................................................................................................................ 3

    I.   PLAINTIFFS HAVE PLEADED AMPLE FACTS TO STATE THEIR
       RACIAL GERRYMANDERING CLAIM (COUNT 3) .............................................. 4

       A.  Plaintiffs Have Adequately Pleaded That Race Unconstitutionally
           Predominated in the Legislature's Drawing of the Congressional Map. .......... 5

       B.  Defendants Wrongly Elevate Preservation of District Cores Above
           Other Redistricting Criteria and Misguidedly Point to Comparisons
           Between Plans' Performance. .............................................................. 9

       C.  Plaintiffs Properly Allege that Race Predominated in Enacting the
           Challenged Districts. ........................................................................ 14

       D.  Plaintiffs Simply Ask the Court to Remedy Defendants'
           Unconstitutional Conduct. ................................................................. 16

   II.  PLAINTIFFS HAVE PLEADED AMPLE FACTS TO STATE A CLAIM OF
       INTENTIONAL DISCRIMINATION (COUNT 4)................................................. 17

       A.  Plaintiffs Have Sufficiently Alleged A Discriminatory Purpose. .................. 18

       B.  Plaintiffs Have Sufficiently Alleged Discriminatory Effect. .......................... 21

CONCLUSION .............................................................................................................. 23

# TABLE OF AUTHORITIES

**Cases**

*Abbott v. Perez,*
   138 S. Ct. 2305 (2018) .......................................................................................................... 11

*Alabama Legislative Black Caucus v. Alabama,*
   575 U.S. 254 (2015) ...................................................................................................... 5, 10, 15

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ............................................................................................................ 3, 21

*Backus v. South Carolina,*
   857 F. Supp. 2d 553 (D.S.C. 2012) ........................................................................................ 19

*Bell Atlantic Corporation v. Twombly,*
   550 U.S. 544 (2007) ............................................................................................................ 3, 21

*Bethune-Hill v. Virginia State Board of Elections,*
   137 S. Ct. 788 (2017) .................................................................................................. 4, 5, 9, 16

*Burton v. City of Belle Glade,*
   178 F.3d 1175 (11th Cir. 1999) .............................................................................................. 13

*Chisom v. Roemer,*
   501 U.S. 380 (1991) ................................................................................................................ 22

*City of Pleasant Grove v. United States,*
   479 U.S. 462 (1987) ................................................................................................................ 22

*Collins v. City of Norfolk,*
   816 F.2d 932 (4th Cir. 1987) .................................................................................................... 8

*Cooper v. Harris,*
   137 S. Ct. 1455 (2017) ...................................................................................................... passim

*Easley v. Cromartie,*
   532 U.S. 234 (2001) ............................................................................................................ 4, 15

*First Data Merchant Services Corporation v. SecurityMetrics, Inc.,*
   672 F. App'x 229 (4th Cir. 2016) ............................................................................................. 4

*Grand Strand Regional Medical Center, LLC v. Fairpay Solutions, LLC,*
   2008 WL 11349701 (D.S.C. May 13, 2008) ............................................................................ 3

*Harris v. McCrory,*
   159 F. Supp. 3d 600 (M.D.N.C. 2016) ................................................................................... 12

*Houck v. Substitute Trustee Services, Inc.*,
791 F.3d 473 (4th Cir. 2015) ................................................................. 15

*Hunt v. Cromartie*,
526 U.S. 541 (1999).............................................................. 4, 18, 21

*La Unión del Pueblo Entero v. Ross*,
353 F. Supp. 3d 381 (D. Md. 2018) .......................................... 18

*League of United Latin American Citizens v. Abbott*,
2022 WL 174525 (W.D. Tex. Jan. 18, 2022) ........................ 5, 13, 14

*League of United Latin American Citizens v. Perry*,
548 U.S. 399 (2006)............................................................... 22

*Miller v. Johnson*,
515 U.S. 900 (1995)......................................................... 4, 5, 12

*North Carolina State Conference of NAACP v. McCrory*,
831 F.3d 204 (4th Cir. 2016) .......................................... 8, 16, 19, 21

*Page v. Virginia State Board of Elections*,
58 F. Supp. 3d 533 (E.D. Va. 2014) ........................................ 15

*Page v. Virginia State Board. of Elections*,
2015 WL 3604029 (E.D. Va. June 5, 2015) ............................... 10

*Pledger v. Lynch*,
5 F. 4th 511 (4th Cir. 2021) ...................................................... 3

*Republican Party of North Carolina v. Martin*,
980 F.2d 943 (4th Cir. 1992) .................................................... 13

*SD3, LLC v. Black & Decker (U.S.), Inc.*,
801 F.3d 412 (4th Cir. 2015) .................................................... 15

*Shaw v. Hunt*,
517 U.S. 899 (1996)................................................................... 9

*Smith v. Beasley*,
946 F. Supp. 1174 (D.S.C. 1996)............................................. 10

*Veasey v. Abbott*,
830 F.3d 216 (5th Cir. 2016) .................................................... 18

*Village of Arlington Heights v. Metropolitan Housing Development Corporation*,
429 U.S. 252 (1977).................................................... 17, 18, 21

*Washington v. Davis*,
  426 U.S. 229 (1976)..................................................................................................... 4, 18

*Wisconsin Legislature v. Wisconsin Elections Commission*,
  2022 WL 851720 (U.S. Mar. 23, 2022).................................................................. 23

*Wright v. North Carolina*,
  787 F.3d 256 (4th Cir. 2015) ................................................................................ 3, 14

# INTRODUCTION

Defendants violated the Fourteenth and Fifteenth Amendments of the U.S. Constitution by enacting a Congressional map that discriminates against Black voters in South Carolina. Plaintiffs ask this Court to enjoin specific Congressional Districts ("CDs") adopted in Senate Bill 865 ("S. 865") that were (1) drawn using race as a predominate factor in a manner not narrowly tailored to comply with Section 2 of the Voting Rights Act ("VRA") or for any other compelling government interest ("racial gerrymandering" claim) and (2) motivated, at least in part, by a discriminatory purpose ("intentional discrimination" claim). The 86-page Second Amended Complaint ("SAC") (ECF No. 154), is replete with detailed facts that plausibly allege each of these violations. *E.g.*, SAC ¶¶ 3–5, 7–9, 11, 13–15, 21, 23–25, 29–30, 33, 36–38, 43–45, 49, 56, 70, 95–174, 230–46, 261–74.

The Senate Defendants disregard these allegations in their Motion to Dismiss ("Motion") (ECF No. 178) by ignoring whole swaths of factual claims and repeatedly mischaracterizing Plaintiffs' arguments, applicable case-law, and Plaintiffs' burden of proof at this stage. For example, Senate Defendants fail to acknowledge the district-by-district allegations describing the cracking of Black communities—and in some cases the differing treatment of white and Black voters who participate in Democratic primaries—in support of Plaintiffs' racial gerrymandering and intentional racial vote dilution claims. SAC ¶¶ 237–45. Instead, they cherry-pick two traditional redistricting principles ("core retention" and "subdivision splits") that purportedly explain voters' placement within and outside of districts, even though the law is clear that racial gerrymandering can occur even when those principles are considered; notably, the Defendants cite no cases—none—where a court has ever held on a Rule 12 motion that either of these metrics has warranted dismissal at the pleadings. Defendants also ignore significant portions of the SAC

describing the sequence of events that included various members of the public—not just Plaintiff South Carolina State Conference of the NAACP ("SC NAACP")—proposing non-gerrymandered and non-dilutive alternative Congressional maps.  And they neglect procedural flaws that led to the map's adoption despite being confronted with unmistakable evidence of how the maps would prevent Black voters from having fair opportunities to elect candidates of choice.

The Senate Defendants also breeze past the fact that S. 865's enactment follows redistricting fights over South Carolina's legislative maps for their impact on Black voters after each cycle since 1965.  They ask this Court to prematurely act as a factfinder and improperly weigh the facts on a motion to dismiss, when the cases that they cite—all of them—involved adjudication on the merits, typically after summary judgment or trial.  They entreat the panel to evaluate their expert evidence and statistics now and resolve complex issues on their theory of the case.  What they fail to offer is any law that undercuts the plausibility of allegations in the SAC or allowed obviously contested issues to be resolved at the pleading stage.  Their Motion must accordingly fail.  The Court should find yet again that "Defendants have provided no basis for dismissing Plaintiffs' serious allegations at this early stage."  Order and Op., ECF No. 161, at 7.

## BACKGROUND

In South Carolina, the 2020 Census revealed "significant population disparities between legislative districts[.]" SAC ¶ 176.  These "changes created unequal apportionment among South Carolina's seven congressional districts."  *Id.* ¶ 230.  Most notably, CD 1 was nearly 12% overpopulated, while CD 6 was 11.59% underpopulated.  *Id.*  These population and demographic shifts "needed to be addressed to ensure equality of access to representatives to all people and voters in the state, as well as the non-dilution of the vote of protected citizens."  *Id.* ¶ 176.

2

Having finally redrawn South Carolina's U.S. Congressional map—which was signed into law on January 26, 2022—the Legislature enacted a racially gerrymandered map that, consistent with previous redistricting cycles, discriminates against Black voters. *Id.* ¶ 36. It ignored the many South Carolinians who implored lawmakers to draw fair and nondiscriminatory maps that comply with the U.S. Constitution. *Id.* ¶ 231–34. Instead, the Legislature chose perhaps the worst option of the available maps—of those that had been proposed either by the Legislature or by members of the public—in terms of its harmful impact on Black voters. Accordingly, Plaintiffs filed a Second Amended Complaint.

## ARGUMENT

A motion to dismiss asks the Court to determine whether the complaint alleges a valid cause of action. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007). It "should not be granted unless it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitle [them] to relief." *Grand Strand Reg'l Med. Ctr., LLC v. Fairpay Solutions, LLC*, No. 4:08-cv-00952, 2008 WL 11349701, at *1 (D.S.C. May 13, 2008). Under Rule 8, a Plaintiff must only allege a "short and plain statement of" the claim. *Pledger v. Lynch*, 5 F. 4th 511, 519 (4th Cir. 2021) (quotation marks omitted). Courts accept all factual allegations in the complaint as true and draw "all reasonable inferences in favor of the plaintiff." *Wright v. North Carolina*, 787 F.3d 256, 263 (4th Cir. 2015) (citation omitted).

The complaint need only "contain sufficient facts to state a claim that is plausible on its face," and Plaintiffs "need only give the defendant fair notice of what the claim is and the grounds upon which it rests." *Id.* (citation omitted); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). Courts view the complaint with a "forgiving lens" and construe it "liberally so as to do substantial justice" at the motion to dismiss stage. *Wright*, 787 F.3d at 263, 265.

3

## I.    PLAINTIFFS HAVE PLEADED AMPLE FACTS TO STATE THEIR RACIAL GERRYMANDERING CLAIM (COUNT 3)

Racial gerrymandering claims ultimately require courts to determine whether race was a predominant factor in redistricting without legitimate justification (such as VRA Section 2 compliance). Given the fact-intensive nature of this inquiry, such cases are rarely decided pre-trial. *See, e.g.*, *Bethune-Hill v. Va. State Bd. of Elections*, 137 S. Ct. 788, 795 (2017); *Hunt v. Cromartie*, 526 U.S. 541, 552–54 (1999); *see generally Washington v. Davis*, 426 U.S. 229, 242 (1976) ("invidious discriminatory purpose may often be inferred from the totality of the relevant facts"). Contrary to the Motion's refrain,[1] Plaintiffs' burden at the pleadings stage is not "demanding" because much of the evidence that supports (or would undercut) their claim must be properly tested at trial. *See Miller v. Johnson*, 515 U.S. 900, 916 (1995) (adherence to race-neutral redistricting principles "inform[s] the plaintiff's burden of proof *at trial*" (emphasis added)). The Senate Defendants' suggestions otherwise necessarily fail.

On the merits, courts employ a two-step inquiry to determine whether a districting plan is an unlawful racial gerrymander. First, a plaintiff must prove that race was the predominant factor in placing voters within or without a particular district. *Cooper v. Harris*, 137 S. Ct. 1455, 1463–64 (2017). Second, if race did predominate, then courts apply strict scrutiny and defendants bear the burden of proving that the use of race was "narrowly tailored" to satisfying a "compelling interest." *Id.* While compliance with the VRA may be enough to meet strict scrutiny in some

---

[1]    Mot. at 1, 10, 15, 16. Notably, *Easley v. Cromartie*, 532 U.S. 234 (2001) ("*Cromartie II*"), the case on which the Motion repeatedly relies for the proposition that Plaintiffs' burden is "demanding," is inapposite. That case reached the Supreme Court on appeal from summary judgment. *See id.*; *see also id.* at 241 ("The issue in this case is evidentiary. We must determine whether there is adequate support for the District Court's key findings . . . ."). Senate Defendants either ignore or conflate "fundamental difference[s] between attacking a claim on a motion to dismiss and at the summary judgment stage." *First Data Merch. Servs. Corp. v. SecurityMetrics, Inc.*, 672 F. App'x 229, 235 n.5 (4th Cir. 2016).

circumstances, defendants must satisfy their burden to show "that [they] had 'a strong basis in evidence,'" *id.*, when they considered the redistricting plan, to conclude "that the statute required its action," *id.* The inquiry disregards "*post hoc* justifications the legislature in theory could have used but in reality did not." *Bethune-Hill*, 137 S. Ct. at 799.

The Court's analysis is district-specific, though statewide evidence may be relevant. *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 262–63 (2015) ("*ALBC*"). Plaintiffs need not "produce a 'smoking gun,' especially not in their initial complaint, to make a plausible allegation of racial intent." *League of United Latin Am. Citizens v. Abbott*, No. 1:21-cv-00991, 2022 WL 174525, at *3 (W.D. Tex. Jan. 18, 2022). And they may rely on evidence that race predominated by proffering "circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose." *Miller*, 515 U.S. at 916. An alternative map of what a legislature could have done if it had not used race as a predominant factor is unnecessary to prove a racial gerrymandering claim. *See Cooper*, 137 S. Ct. at 1480 ("[N]either [an alternative map's] presence nor its absence can itself resolve a racial gerrymandering claim.").

A.     **Plaintiffs Have Adequately Pleaded That Race Unconstitutionally Predominated in the Legislature's Drawing of the Congressional Map.**

Plaintiffs sufficiently allege that race predominated in the Legislature's decision to move specific voters into or out of CDs 1, 2, and 5 (the "Challenged Districts"). Specifically, the SAC contains numerous well-pleaded allegations that the Challenged Districts subordinate traditional race-neutral redistricting principles to race. *See* SAC ¶¶ 230–54. It also alleges that the record is devoid of any pre-enactment legislative analysis, including of racially polarized voting, to demonstrate that the Legislature's decisions were narrowly tailored to comply with Section 2, a compelling governmental interest. *Id.* Indeed, the SAC includes specific allegations that the

legislative sponsors affirmatively decided not to conduct a racially polarized voting analysis. *See* SAC ¶¶ 9, 160, 165.

Among other allegations, Plaintiffs have alleged that South Carolina voters were sorted into or left out of Challenged Districts for race-predominant reasons, *id.* ¶¶ 7, 11, 13, 23, 237, 264 –66; that white and Black voters likely of the same political party were treated differently under the map, *id.* ¶¶ 234–37, 239–40, 242; that the Legislature eschewed traditional redistricting principles to enact S. 865, *id.* ¶¶ 112, 152, 243; that it was on notice that it could easily have avoided the cracking of Black voters across Congressional districts, *id.* ¶¶ 95–174, 231–34; that given patterns of racially polarized voting which members of the public brought to light through the legislative process, *id.* ¶ 74, legislative choices to crack voters and subsume them in districts in which white voters are the majority—and in some cases supermajority—limit or deny entirely the ability of Black voters to impact elections in the Challenged Districts, *id.* ¶¶ 240, 242, 245 (detailing the ways in which Black voters were moved out of CD 1 as well as "dispersed among CDs 2, 5, and 7"); that the Legislature engaged in exclusionary, non-transparent, and irregular procedures to enact S. 865, *id.* ¶¶ 95, 100–01, 123, 273, including, defying rules to permit a Black legislative member to lead in legislative proceedings, *id.* ¶ 127; and that these legislative choices occurred against the backdrop of a history of discrimination against Black voters in South Carolina that includes the use of redistricting schemes to dilute Black voting power, *id.* ¶¶ 42–44. These specific allegations, which the Senate Defendants overlook or wave away, plead the constitutional violations alleged and confirm that the enacted map will need to be evaluated under strict scrutiny.

Indeed, the SAC describes these allegations in detail, including, by pointing to the way in which the Legislature moved a disproportionate number of white voters who have preferred Democratic candidates in recent elections from CD 2 into CD 6. *Id.* ¶ 237. Conversely, the

6

enacted plan *left* areas with high concentrations of Black voters who have recently preferred Democratic candidates in CD 2. *Id.* These legislative choices support Plaintiffs' allegation that it is reasonable to infer that race, not partisan affiliation, drove the sorting of voters into districts in the enacted plan. By showing that the Legislature surgically left behind parts of the overpopulated CD 6 with high Black voter concentrations, the SAC plausibly alleges that the enacted plan set out to correct the state's malapportionment while ensuring that Black voters could either not elect a candidate of their choice or impact elections in any district *other than* CD 6. *Id.* ¶ 235.

This strategy of disadvantaging Black voters is particularly evident in the way the Legislature split Black communities in Florence, Orangeburg, Richland, and Sumter Counties with the result of dispersing Black voters across CDs 2, 5, and 7, which are historically—and continue to be—overwhelmingly white-majority districts. *Id.* ¶¶ 238, 240. By "cracking" these communities into predominantly white districts, the Legislature has drastically reduced the impact Black voters can have on Congressional elections in those districts. *See id.* ¶ 240. In CD 5, the enacted plan went further, moving a disproportionate number of white voters into the redrawn district, driving down the percentage of Black voters in that district and making it even more unlikely that Black communities are able to help choose their elected representatives.

Similarly, the Legislature ignored the pleas of the public and various legislators to keep Charleston County whole in CD 1, instead splitting it between CDs 1 and 6 along racial lines and fracturing a community of interest of Black voters. *See id.* ¶¶ 105, 110, 112, 115, 118, 131, 140, 143, 152, 154, 158, 159, 166, 231–32, 239, 241. The Legislature "cracked" historically-Black areas in West Ashley and split the cities of North Charleston and Charleston, which "form a single community of interest based on shared history, voting patterns, and socioeconomic realities." *Id.* ¶¶ 11, 232, 239. And while the Senate Defendants claim that Charleston had been similarly split

7

in previous maps, Mot. at 13–14, in the legislative session at issue, Representative Jordan "conceded that Charleston County is being split differently than under current district boundaries." SAC ¶ 143.

This race-based sorting of voters has no legitimate justification and raises questions that cannot be resolved on a motion to dismiss. Starkly, the SAC alleges that one of the bill's sponsors failed to conduct a functional Section 2 analysis prior to or during consideration of the congressional map. *See id.* ¶¶ 160, 165; *see also id.* ¶¶ 9, 74. That fact is crucial, because a racially polarized voting analysis ("RPV")—*i.e.*, racial bloc voting by Black and white voters and the degree of any white cross-over voting for the candidates preferred by Black voters—is a key consideration in determining whether a redistricting plan complies with the VRA. *See N. Carolina State Conf. of NAACP v. McCrory*, 831 F.3d 204, 221 (4th Cir. 2016) (RPV is "[o]ne of the critical background facts of which a court must take notice" in Section 2 cases); *Collins v. City of Norfolk*, 816 F.2d 932, 936–38 (4th Cir. 1987) (RPV is a "cardinal factor" in determining Section 2 liability). And "a legislature undertaking a redistricting must assess whether the new districts it contemplates . . . conform to the VRA's requirements." *Cooper*, 137 S. Ct. at 1471. Yet in response to a question by Sen. Harpootlian, Sen. Campsen confirmed for the full Senate that his plan did not include a RPV analysis. SAC ¶ 165. According to Sen. Campsen, the sponsors "didn't even look at race numbers" or even ask "what's the BVAP"[2] of any given district. *Id.*

---

[2]     "BVAP" refers to Black voting-age population in a given district. *See* SAC ¶ 9.

8

**B.    Defendants Wrongly Elevate Preservation of District Cores Above Other Redistricting Criteria and Misguidedly Point to Comparisons Between Plans' Performance.**

As House Defendants unavailingly did before (*see* Mots. to Dismiss, ECF Nos. 91, 158; Order and Op., ECF No. 161), Senate Defendants now try to rebut Plaintiffs' well-pleaded operative complaint with disputed factual allegations.

As an initial matter, the Senate Defendants fail to address Plaintiffs' detailed allegations that the Legislature subordinated *many* traditional redistricting principles to race, including but not limited to "compactness, respecting county and municipal boundaries, and respecting communities of actual shared interests." SAC ¶ 243; *see also id.* ¶¶ 231, 239–41, 244–46, 265. Unable to rebut these allegations, the Senate Defendants instead elevate consideration of "[p]reserving the cores of existing districts," Mot. at 11—above all others, notwithstanding that core preservation was not prioritized as a criterion under the Legislature's own guidelines. SAC ¶ 45 n.8 (citing House 2021 Guidelines), ¶ 56 n.10 (citing Senate 2021 Guidelines). Elevating that lone principle for the first time now should be rejected as a "*post hoc* justification[]" because it was not advanced as the actual top priority during the redistricting process. *Bethune-Hill*, 137 S. Ct. at 799; *see generally Shaw v. Hunt*, 517 U.S. 899, 908 n.4 (1996) ("To be a compelling interest, the State must show that the alleged objective was the legislature's 'actual purpose' for the discriminatory classification").

In any event, as the Supreme Court has explained, "[r]ace may predominate even when a reapportionment plan respects traditional principles." *Bethune-Hill*, 137 S. Ct. at 789. That is because review of the role that race played in developing and enacting districting maps compels a "holistic analysis." *Id.* at 800. In that analysis, preserving the *status quo* is not a defense when, as Defendants concede (Mot. at 5, 14), population shifts demand new districts that reflect the

changed demographics and distribution of South Carolina residents. Put simply, "core preservation[] is not directly relevant to the origin of the *new* district inhabitants." *ALBC*, 575 U.S. at 274. Accordingly, Plaintiffs allege that "S. 865 flies in the face of the geography of the state post-2020 which reflects the movement of Black people to the South Carolina coast," among other areas of the state. SAC ¶ 241.

Defendants also discount Plaintiffs' well-pleaded SAC by making unfounded comparisons between the enacted map and maps offered for consideration by the SC NAACP during the legislative process on two narrow metrics: "respecting county and municipal boundaries" and "maintaining communities of interest." Mot. at 13. In addition to applying an inappropriate level of analysis at the pleadings stage, Defendants cherry-pick and mischaracterize "traditional redistricting principles" to level factual allegations that are not only misleading, but wrong for at least three reasons.

*First*, the Senate Defendants' focus on alternative proposals is predicated on the incorrect assumption that there is some requirement that Plaintiffs put forth a constitutionally compliant map. As the Court has said, the claims here "turn on the intent and actions of the *legislators*" responsible for enacting maps that affect every voter in South Carolina. Order and Op., ECF No. 161, at 4. It is thus *Defendants'* map that matters, standing on its own, and not in relation to any other hypothetical proposals. "An alternative map is merely an evidentiary tool to show that [] a substantive violation has occurred . . . ." *Cooper*, 137 S. Ct. at 1480. And contrary to the Senate Defendants' suggestion, (*see* Mot. at 1), any presumption that the Legislature has acted in "good faith" cannot "excuse or cure the constitutional violation of separating voters according to race." *Page v. Va. State Bd. of Elections*, No. 3:13-cv-00678, 2015 WL 3604029, at *7–8 (E.D. Va. June 5, 2015) (quoting *Smith v. Beasley*, 946 F. Supp. 1174, 1208 (D.S.C. 1996)); *see also*

*Abbott v. Perez*, 138 S. Ct. 2305, 2324–27, 2333–35 (2018) (recognizing good faith presumption in redistricting, but assessing factual evidence of discriminatory intent and finding racial gerrymander).

So while Plaintiffs bear the initial burden to prove that the enacted plan impermissibly relies on race, their claim does not (and could not) depend on their proposed maps, because "neither [an alternative map's] presence nor its absence can itself resolve a racial gerrymandering claim." *Cooper*, 137 S. Ct. at 1480. Consistently, Plaintiffs have emphasized that their "map is merely an exemplar, among other exemplars available to the Legislature offered by other members of the public." Opp. to House Defs.' Mot. to Dismiss, ECF No. 124, at 15. Indeed, "[w]hether it or another districting plan is constitutionally required is a matter for further development in litigation," *id.*, and not something that the Court could resolve one way or the other at the pleadings.

*Second*, the Senate Defendants' comparisons of the enacted map to the SC NAACP legislative maps along one criterion—*i.e.*, adherence to county and municipal boundaries—in no way disprove robust allegations of impermissible racial motive in the enacted map. To start, even if the Senate Defendants can show that S. 865 outperforms the SC NAACP-submitted legislative exemplars—which Plaintiffs do not concede—comparing S. 865 to SC NAACP-submitted maps does not foreclose the possibility that S. 865 had a discriminatory purpose. The Supreme Court rejected these types of comparisons in *Cooper*, which would treat exemplar maps, "a mere form of evidence[,] as the very substance of a constitutional claim." 137 S. Ct. at 1481.

Regardless, the Senate Defendants highlight that the enacted plan splits 10 counties whereas Plaintiff SC NAACP's submissions split 11 and 14. Mot. at 13. But that ignores that Plaintiffs allege that when looked at *holistically*, their proposals outperform the enacted plan on

various other traditional redistricting criteria while meeting redistricting's essential requirements—complying with the constitutional principle of one person, one vote and the commitment to non-dilution of minority voting strength. *See* SAC ¶ 241 (alleging "various alternative plans [] showed that the severe imbalance in population between CD 1 and CD 6 could be corrected, while . . . preserving the ability of Black voters to continue to elect candidates of their choice in CD 6, respecting communities of interest in CD 1, and developing the BVAP in CD 1 to as high as 34%."). Again, Plaintiffs' burden at this stage is to state plausible allegations of impermissible racial motivations in S. 865's enactment; comparing some aspects of the enacted map to submitted alternative maps cannot negate the allegations supporting Plaintiffs' racial discrimination claims.

*Third*, the enacted map cannot "be rescued by mere recitation of purported communities of interest." *Miller*, 515 U.S. at 919. Specifically, the Senate Defendants cannot just redefine "communities of interest" as those built around Congressional districts enacted "in the prior three decades," jettisoning their obligation in this round of redistricting to respect historically-Black communities of interest. Mot. at 14. This emphasis on "preserv[ing] the communities of interest . . . formed around Congressional districts," *id.*, is circular and suggests a pretextual "post-hoc rationalization [rather] than an initial aim." *Harris v. McCrory*, 159 F. Supp. 3d 600, 620 (M.D.N.C. 2016). Importantly, the Senate Defendants' view conflates district preservation with the preservation of communities of interest, which the Legislature's own redistricting criteria treats as *two* separate considerations.[3] And it would subordinate all other "characteristics that cause

---

[3] The Senate's Redistricting Guidelines distinguish "Communities of Interest," 2021 Senate Redistricting Guidelines III.A, from "Constituent Consistency," which states that "[p]reserving the cores of existing districts, keeping incumbents' residences in districts with their core constituents, and avoiding contests between incumbent legislators should be considered," 2021 Senate

people to identify with one another," Mot. at 14—*e.g.*, "economic, social, cultural, language, political," *id.*—to the Legislature's past line drawing, implying that a legislature need not revisit its understanding of the state's communities because it considered them at some point in the past thirty years.

That cannot be, and Plaintiffs specifically allege that maintaining the *status quo* is not a defense to their claims because South Carolina's communities of interest are in no way inert. *See* SAC ¶¶ 8, 176, 230, 241. Demographic shifts demand that lines change accordingly and "jurisdictions are under an affirmative legal duty to alter their boundaries to reflect . . . alterations in populations." *Burton v. City of Belle Glade*, 178 F.3d 1175, 1192 (11th Cir. 1999). Senate Defendants concede that Congressional boundaries needed to change to accommodate population shifts (Mot. at 5, 14), and Plaintiffs' racial gerrymandering claims rest on the impermissible use of race in *how* these lines were redrawn. Conclusory assertions do not render the facts pled in Plaintiffs' complaint implausible at this stage.

At bottom, the Senate Defendants' attempts to undercut the factual sufficiency of Plaintiffs' allegations rest on improper comparisons to Plaintiffs' exemplar maps that cannot be tested on a motion to dismiss. The Senate Defendants' assertions "do not on their own render Plaintiffs' allegations implausible." *League of United Latin Am. Citizens*, 2022 WL 174525, at *4. They only raise factual disputes that cannot be decided at this stage, because "[a] motion to dismiss . . . does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citations and

---

Redistricting Guidelines III.B. It defines communities of interest separately, as areas "defined by geographic, demographic, historic or other characteristics that cause people to identify with one another, including economic, social, cultural, language, political, and recreational activity interests common to the area's population." III. A.

quotations omitted); *see also id.* at 955 (denying motion to dismiss in gerrymandering case where complaint "include[d] numerous specific allegations of discriminatory intent"). Plaintiffs have clearly made out a plausible racial gerrymandering claim against the Challenged Districts that should proceed to trial as scheduled.

### C.  Plaintiffs Properly Allege that Race Predominated in Enacting the Challenged Districts.

Plaintiffs need only "give the defendant fair notice of what the claim is and the grounds upon which it rests" at this stage. *Wright*, 787 F.3d at 263. They are not required to disentangle race and party in the SAC, and must only make plausible allegations of racial gerrymandering. *See League of United Latin Am. Citizens*, 2022 WL 174525, at *3; *see also* Order and Op., ECF No. 161, at 7.

Plaintiffs plead ample facts supporting an inference that race predominated in the Legislature's plan for the Challenged Districts. For example, Plaintiffs allege that "keeping partisan affiliation constant, the probability that [Voting Districts ('VTDs')] were moved into or kept inside CD 6 increased as [the Black Voting-Age Population ('BVAP')] increased. On the other hand, the probability that VTDs were moved into or kept inside CD 1 increased as BVAP *decreased*." SAC ¶ 246; *see also id.* ¶¶ 244–45. Similarly, though both VTDs with a majority of Black voters and those with a majority of white voters could have been moved from CD 2 into CD 6, the Legislature moved a disproportionate number of white-majority VTDs. This supports an "inference that race, not party, drove the selection of voters that were moved into CD 6 and [those that were] left in CD 2." *Id.* ¶ 237.

The Senate Defendants try to counter these well-pleaded allegations by arguing that Black Democrats and white Democrats' voting preferences "*may* vary" and that "one group *may* cross over to vote for non-Democratic candidates more frequently than another." Mot. at 17 (emphasis

added). Maybe so. But Defendants make no claim that this is the case in any Congressional District in South Carolina. In any event, that would merely be an evidentiary dispute ripe for consideration by the Court at trial. Senate Defendants just observe that "such variations were fatal to the racial gerrymandering claim in *Cromartie II*," a case decided *after* evidence was presented at trial. Mot. at 17 (citing *Cromartie II*, 532 U.S. at 243). But even if the Senate Defendants had evidence to support that observation, it would not inform the adequacy of Plaintiffs' pleadings. Competing answers to well-plead factual issues are not resolved on a Rule 12 motion. *See SD3, LLC v. Black & Decker (U.S.), Inc.*, 801 F.3d 412, 425 (4th Cir. 2015) (noting court's task is not "to determine 'whether a lawful alternative explanation appears more likely' from the facts of the complaint'" (quoting *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015)).

Nor is there merit to the Senate Defendants' claim that Plaintiffs bear a burden at the pleadings stage to present a plan that maintains a 6-1 partisan split that favors Republicans while adhering to traditional districting principles in order to demonstrate that race predominates. Mot. at 10, 16. Contrary to that suggestion, no "area of [] equal protection law . . . force[s] plaintiffs to submit one particular form of proof to prevail." *Cooper*, 137 S. Ct. at 1479–80. As noted, "'the attacking party is not confined in its form of proof to submitting an alternative plan.'" *Page v. Va. State Bd. of Elections*, 58 F. Supp. 3d 533, 541 n.9 (E.D. Va. 2014) (quoting dissenting panel member; highlighting panel's agreement on this point), *vacated on other grounds*, *ALBC*, 575 U.S. at 254. And to the extent Defendants are suggesting that entrenching "a 6-1 Republican-to-Democratic split" (Mot. at 16) was the Legislature's "legitimate political objective" as that term was used in *Cromartie II*,[4] that is—again—a claim that must be weighed at a later time. *See* Order

---

[4]    To be sure, "maintain[ing] the 6-1 Republican-Democratic split" (Mot. at 16), is not listed as a districting criterion within either the House or Senate's Redistricting Guidelines. *See* SAC

and Op., ECF No. 161, at 8 ("[I]f Defendants wish to argue the districts they have drawn are a race-neutral partisan gerrymander, they can attempt to do so at trial.").  Moreover, even if the Legislature sought to achieve that political goal, Plaintiffs would then have the right to inform the Court's "'sensitive inquiry' into all 'circumstantial and direct evidence of intent" and show whether Black voters were harmed in its pursuit.  *Cooper*, 137 S. Ct. at 1473.  "'Politics as usual' . . . cannot be accepted where politics as usual translates into race-based discrimination." *McCrory*, 831 F.3d at 226–27.[5]

The Senate Defendants' position is also simply not the law, as the Supreme Court explained in *Cooper*.  137 S. Ct. at 1481.  Rather, the notion that Plaintiffs in *Cromartie II* had to present alternatives showing defendants could have achieved their political goals by race-neutral means was a "narrow[]" one, "arising from and reflecting the evidence offered," at trial, "*in* [*Cromartie II*]."  *Id.* (emphasis added).  Indeed, the Court's opinion in *Cromartie II*, *Cooper* explained, "nowhere attempt[ed] to explicate or justify the categorical rule that [Defendants] claim[] to find there."  *Id.* at 1480–81.  Thus, Defendants again mischaracterize Plaintiffs' burden to allege plausible facts and ignore well-plead facts that would show the Legislature subordinated traditional districting principles to race.

### D. Plaintiffs Simply Ask the Court to Remedy Defendants' Unconstitutional Conduct.

Lastly, Defendants fare no better in claiming "Plaintiffs ask the Court to impose a racial gerrymander in South Carolina's Congressional districts," by pointing to an exemplar map that

---

¶ 45 n.8 (citing House 2021 Guidelines), ¶ 56 n.10 (citing Senate 2021 Guidelines).  Because this purported objective was also not advanced during the legislative process, it should be rejected as a *post-hoc* justification, in any event.  *See Bethune-Hill*, 137 S. Ct. at 799.

[5]    *See also Cooper*, 137 S. Ct. at 1474 n.7 ("[I]f legislators use race as their predominant districting criterion with the end goal of advancing their partisan interests . . . their action still triggers strict scrutiny.").

showed CD 1 could be workably drawn to have 34% BVAP. Mot. at 17. In fact, Plaintiffs want South Carolina's congressional map to appropriately reflect its demographic realities, *see* SAC ¶¶ 230–31; ask the Court to enjoin Defendants' unconstitutional plan, *id.* ¶ 268; and seek relief in the form of a Congressional plan that complies with the U.S. Constitution and the VRA. *See id.* ¶¶ 82–83. Plaintiffs do not demand adoption of any particular alternative plan, and have offered illustrative maps only as "evidentiary tool[s]," *Cooper*, 137 S. Ct. at 1480, to show that the Legislature could have enacted legally compliant, non-dilutive maps, and at no particular BVAP level. Plaintiffs would only fix how the Legislature's plan impermissibly dilutes Black voting strength in a manner that would not occur if the Legislature enacted its plans following race-neutral traditional redistricting principles. *See* SAC ¶¶ 231–32.

## II. PLAINTIFFS HAVE PLEADED AMPLE FACTS TO STATE A CLAIM OF INTENTIONAL DISCRIMINATION (COUNT 4)

A law is unconstitutional under the Fourteenth and Fifteenth Amendments when race is shown as *a* "motivating" factor in its enactment; Plaintiffs need not allege that "a particular purpose was the 'dominant' or 'primary' one." *Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 265–68 (1977). In *Arlington Heights*, the U.S. Supreme Court articulated guidance for courts in this inquiry. *Arlington Heights* specifies that "an important starting point" for assessing discriminatory purpose is "the impact of the official action"—that is, "whether it bears more heavily on one race than another." *Id.* at 266 (quotation marks omitted).

The Supreme Court has emphasized that "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available," and has identified certain "evidentiary source[s]" that should be considered in the "evidentiary inquiry." *Id.* at 266–67. Additional evidentiary sources include, but are not limited to: [1] "[t]he historical background of the [challenged] decision;" [2]

17

"[t]he specific sequence of events leading up to the challenged decision"; [3] "[d]epartures from normal procedural sequence"; [and] [4] the legislative history of the decision . . . ." *Id.*

Once again, consistent with the Supreme Court's emphasis on analysis of facts and evidence before deciding intentional discrimination claims, such cases are rarely decided pre-trial. *See, e.g.*, *Hunt*, 526 U.S. at 552–54; *see generally Washington*, 426 U.S. at 242 ("invidious discriminatory purpose may often be inferred from the totality of the relevant facts"). "[A] plaintiff can survive a motion to dismiss without independently establishing that each factor weighs in the plaintiff's favor." *La Unión del Pueblo Entero v. Ross*, 353 F. Supp. 3d 381, 394 (D. Md. 2018). Here, Plaintiffs have alleged facts sufficient to state a claim of intentional discrimination consistent with *Arlington Heights*.

### A.    Plaintiffs Have Sufficiently Alleged A Discriminatory Purpose.

This Court should reject the Senate Defendants' invitation to redefine the *Arlington Heights* standard into a single requirement that Plaintiffs must "identify [racist] statements" by legislators to allege discriminatory purpose. Mot. at 20 (citation omitted). Plaintiffs do not need to identify those or other direct evidence to establish discriminatory purpose. *Arlington Heights*, 429 U.S. at 266. Requiring otherwise "would essentially give legislat[ive bodies] free rein to racially discriminate so long as they do not overtly state discrimination as their purpose . . . ." *Veasey v. Abbott*, 830 F.3d 216, 235–36 (5th Cir. 2016) (en banc). Consistent with the *Arlington Heights* framework, Plaintiffs have pleaded facts sufficient to state a claim that S.865 "results from intentional racial discrimination because [it was] motivated, at least in part, by a discriminatory purpose." SAC ¶ 14.

For example, Plaintiffs have alleged that S. 865 is the latest example in a long history of racial discrimination in the political process in South Carolina against Black voters, including a

18

recent history of implementing or seeking to implement "at-large election systems, redistricting plans, and municipal annexations that minimize and dilute Black voters' electoral opportunities in the State's 'long and well-documented' context of . . . 'RPV.'"  SAC ¶¶ 37–44.  The Senate Defendants say this history is "too remote."  Mot. at 21.  But they acknowledge Plaintiffs' recitation only "*start[s]* in the year 1892," *id.* (emphasis added)—indeed, Plaintiffs' description of South Carolina's history of race discrimination goes well into the past ten years.  *See* SAC ¶¶ 5, 38, 39, 41–43.

In any event, "*Arlington Heights* directs . . . consider[ation] [of] 'the historical background of the decision' challenged . . . .'" *McCrory*, 831 F.3d at 223.  Even "long-ago history" cannot be ignored at the "risk [of] allowing that troubled history to pick up where it left off . . . to the detriment of African American voters[.]"  *Id.* (cleaned up).  And *Backus v. South Carolina*, 857 F. Supp. 2d 553 (D.S.C. 2012), does not suggest otherwise.  In fact, reliance on *Backus* at this posture is doubly misplaced because the Court there only found against plaintiffs after evidence was presented *at trial*.  *See* 857 F. Supp. 2d 553, 559, 561–65 (D.S.C.) (discussing trial evidence; finding Plaintiffs failed to allege a discriminatory purpose "*after* reviewing all of the testimony and evidence offered by Plaintiffs" (emphasis added)), *aff'd*, 568 U.S. 801 (2012).  Consequently, *Backus* is inapposite at this juncture.

On the second and fourth *Arlington Heights* factors, Plaintiffs have outlined in great detail the opaque process through which the Legislature enacted S. 865.  *See* SAC ¶¶ 56–65, 95–174.  The SAC alleges that the "Legislature went forward with the proposed plans even though, during the legislative process, Black legislators and members of the public repeatedly warned that they would harm Black South Carolinian voters."  *Id.* ¶ 14.  Plaintiffs point to "[a]lternative proposals" that Legislators ignored, "which would [have] satisf[ied] the Legislature's criteria [while avoiding

the dilution of] Black voting strength." *Id*. And they outline numerous instances in the runup to enactment when Defendants sidestepped strong public support for making CD 1 more competitive and for avoiding splits to Black communities in the Charleston area.[6]

On the third *Arlington Heights* factor, far from "offer[ing] no factual allegations that the General Assembly deviated from established procedures to accomplish a discriminatory goal or in a way that targeted a minority group," Mot. at 22, Plaintiffs allege extensive departures from the norm. Indeed, as just one example, Plaintiffs directly point to marked irregularities that led to the Judiciary Committee's approval of CD 1. At a January 10, 2022 meeting of the House Redistricting Committee that was rife with recorded deviations from procedure and fraught exchanges between Black and white legislators,

> Rep. Newton stated that he would be serving as Chair because Rep. Murphy could not attend. He explained that he had just received a letter from Rep. Murphy designating him to serve as Chair during the meeting due to purported "extraordinary circumstances." In response, Rep. King, a Black legislator, asked for a point of order to understand why he, as House Judiciary Vice Chair, would not serve as Chair in Rep. Murphy's absence as prescribed under the House Judiciary Committee's rules. Because of this alleged rule deviation, Rep. King formally objected to the meeting moving forward without him serving as Chair. The meeting proceeded. *SAC* ¶ 127.

The Complaint alleges that three days later,

---

[6]    *See, e.g.*, SAC ¶ 105 (members of public "urged the Subcommittee that Charleston County must remain whole in CD 1 because of shared communities of interest."); *id.* ¶ 118 (members of public "repeated concerns about splitting Charleston County . . . [and] voiced concern that the proposed CD 1 in the alternative map also unnecessarily reduced the BVAP by splitting Black communities"); *id.* ¶ 128 (noting "Rep. King raised concerns that Congressional House Staff Plan Alternative 1 cracked Black voters in Charleston County by removing them from proposed CD 1 and unnecessarily packing them into proposed CD 6."); *id.* ¶ 158 ("Senator Bright Matthews, a Black legislator, explained to the Senate Judiciary Committee members that 'speaker after speaker' at the Senate Redistricting Subcommittee public hearings wanted to keep Charleston County whole because it aligned with the principles of keeping communities of interest together . . . Echoing similar concerns, Sen. Kimpson, a Black legislator, also explained that the people of Charleston County want their community to be kept whole, explaining that she represents more people from Charleston County than anyone else in the Legislature.").

Representative Brawley, a Black legislator, explained that the House Judiciary Committee did not follow its rules when it voted to approve the Congressional House Staff Plan Alternative 1 map. Representative King concurred, explaining that the vote 'constituted a breach of decorum in the House of Representatives' by not having the first Vice Chair preside over the meeting the Chair's absence. *Id.* ¶ 138.

Plaintiffs also point to instances when the Legislature, without justification, "unnecessarily delayed and postponed proposing and then adopting a congressional map[.]" *Id.* ¶ 95. And they allege that Defendants departed from standard procedure by ignoring public input, opting instead to enact maps that dilute Black voting strength. *See, e.g.*, *id.* ¶¶ 166–67. These procedural deviations support Plaintiffs' allegations that race, not traditional redistricting principles, was a predominant factor driving the Legislature to enact S. 865. *See McCrory*, 831 F.3d at 228, 229 (facts suggestive of "attempt to avoid in-depth scrutiny" of legislation a "piece of the puzzle" for *Arlington Heights* purposes).

Taken together, this "circumstantial evidence raises a strong inference of a discriminatory purpose motivating the enactment of S. 865." SAC ¶ 273. It is also more than sufficient to defeat the Senate Defendants' request to resolve, on a motion to dismiss, claims that demand a sensitive and fact intensive inquiry. *See Hunt*, 526 U.S. at 546 ("The task of assessing a jurisdiction's motivation [] is not a simple matter; on the contrary, it is an inherently complex endeavor.").

### B.     Plaintiffs Have Sufficiently Alleged Discriminatory Effect.

Defendants erroneously allege that Plaintiffs must offer a "non-dilutive alternative" to the enacted map to establish discriminatory effect. Mot. at 19. *First*, once again, Plaintiffs need only allege facts that, if true, would support a need for relief at the pleadings stage. *Ashcroft*, 556 U.S. at 678 (quoting *Twombly*, 127 S. Ct. at 1955).

*Second*, the correct inquiry under well-established case-law is "whether [the allegedly discriminatory act] bears more heavily on one race than another." *Arlington Heights*, 429 U.S. at

267. The inquiry is *not* whether Plaintiffs' are able to propose a "better" map. And even if it were, Plaintiffs have clearly alleged that other maps in the legislative record—including Plaintiffs'— avoided the dilutive effects that S. 865 enacted into law. *See, e.g.*, SAC ¶¶ 152, 154, 155, 170– 171, 233, 241. At any rate, requiring a threshold minimum number of impacted voters or a specific degree of impact "is unquestionably wrong." *Chisom v. Roemer*, 501 U.S. 380, 403, 409 (1991) (Scalia, J. dissenting). Any amount of discriminatory impact—is sufficient to show that an intentionally discriminatory law violates the Constitution. *See*, *e.g.*, *City of Pleasant Grove v. United States*, 479 U.S. 462, 471–72 n.11 (1987); *see also League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 438–40 (2006) ("Even if [the challenged plan's] disproportionality were deemed insubstantial, that consideration would not overcome the other evidence of vote dilution," including evidence that bore "the mark of intentional discrimination").

Plaintiffs easily meet this standard because the Complaint identifies specific places where Black communities have been cracked and Black voters have been moved in and out of congressional districts in ways that white voters have not in the Challenged Districts. *See* SAC ¶¶ 11, 237, 244–46. The impact is to render Black voters unable to elect or even influence elections in six out of seven congressional districts, despite the fact that Black voters are approximately 30% of South Carolina's population and require responsive representatives to address policy concerns that impact the Black community. *Id.* ¶¶ 233–35, 241. As described *supra*, Plaintiffs demonstrate the myriad ways in which Black South Carolinians bear the brunt of Defendants' discriminatory map. Plaintiffs have sufficiently alleged indicia of discriminatory intent by citing the ways in which Black voters were cracked and traditional redistricting principles were disregarded. *Id.* ¶¶ 234–35, 238–40–99.

*Third*, Defendants are wrong to argue that Plaintiffs fail to state a claim because they do not allege the *Gingles* preconditions for a vote dilution claim under Section 2 of the VRA. Mot. at 19. A showing that it is possible to draw another majority-minority district is the threshold injury necessary to make out a discriminatory *results* claim under Section 2 of the VRA. There is no authority that plaintiffs alleging discriminatory *intent* under the Fourteenth and Fifteenth Amendments need to satisfy that requirement. In these cases, it is the sorting of "voters on the basis of race," that is "'by [its] very nature odious.'" *Wis. Legislature v. Wis. Elections Comm'n*, No. 21A471, 2022 WL 851720, at *2 (U.S. Mar. 23, 2022) (quoting *Shaw*, 509 U.S. at 643). While compliance with the VRA might be a potential defense to a racial gerrymandering claim—a burden Defendants bear—it does not logically follow that a Section 2 violation must be present for an Equal Protection claim to succeed. *See Cooper*, 137 S. Ct. at 1469–70 (rejecting Section 2 defense; finding racial gerrymander because traditional districting criteria were subordinated to race). That makes sense: the case law has never suggested that intentionally discriminatory districting schemes are lawful so long as the defendants do not deprive minority voters of a majority-minority district.[7] The Senate Defendants cannot cite case law to support this novel rule, which fails.

## CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that this court deny the Senate Defendants' Motion to Dismiss.

---

[7] Even if Plaintiffs were required to provide Defendants with a non-dilutive alternative, they have clearly met that burden by submitting and pointing to legislative maps showing that Defendants could have enacted maps that do not dilute Black voting strength. SAC ¶ 68.

Dated: March 24, 2022

Respectfully Submitted,

Leah C. Aden**
Stuart Naifeh**
Raymond Audain**
John S. Cusick**
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector St, 5th Fl.
NY, NY 10006
Tel.: (212) 965-7715
laden@naacpldf.org

Antonio L. Ingram II**
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
700 14th St, Ste. 600
Washington, D.C. 20005
Tel.: (202) 682-1300
aingram@naacpldf.org

Adriel I. Cepeda Derieux**
Samantha Osaki**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: (212) 549-2500
acepedaderieux@aclu.org

John A. Freedman**
Elisabeth S. Theodore*
Adam Pergament**
Gina M. Colarusso**
John M. Hindley**
ARNOLD & PORTER KAYE SCHOLER
LLP
601 Massachusetts Ave., N.W.
Washington, D.C. 20001
Tel: (202) 942-5000
john.freedman@arnoldporter.com

*Motion for admission Pro Hac Vice
forthcoming
**Admitted Pro Hac Vice

/s/ Christopher J. Bryant
Christopher J. Bryant, Fed. ID 12538
BOROUGHS BRYANT, LLC
1122 Lady St., Ste. 208
Columbia, SC 29201
Tel.: (843) 779-5444
chris@boroughsbryant.com

Somil B. Trivedi**
Patricia Yan**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th St., NW
Washington, DC 20005
Tel.: (202) 457-0800
strivedi@aclu.org

Allen Chaney, Fed. ID 13181
AMERICAN CIVIL LIBERTIES UNION
OF SOUTH CAROLINA
Charleston, SC 29413-0998
Tel.: (843) 282-7953
Fax: (843) 720-1428
achaney@aclusc.org

Jeffrey A. Fuisz**
Paula Ramer**
ARNOLD & PORTER KAYE SCHOLER
LLP
250 West 55th Street
New York, NY 10019
Tel: (212) 836-8000
jeffrey.fuisz@arnoldporter.com

Sarah Gryll**
ARNOLD & PORTER KAYE SCHOLER
LLP
70 West Madison Street, Suite 4200
Chicago, IL 60602-4231
Tel: (312) 583-2300
sarah.gryll@arnoldporter.com

Counsel for Plaintiffs the South Carolina
Conference of the NAACP and Taiwan Scott

24

Janette M. Louard*
Anthony P. Ashton*
Anna Kathryn Barnes*
NAACP OFFICE OF THE GENERAL
COUNSEL
4805 Mount Hope Drive
Baltimore, MD 21215
Tel: (410) 580-5777
jlouard@naacpnet.org

* Motion for admission *Pro Hac Vice*
forthcoming
** Admitted *Pro Hac Vice*

*Counsel for Plaintiff the South Carolina*
*Conference of the NAACP*