IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| THE SOUTH CAROLINA STATE CONFERENCE OF THE NAACP, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> THOMAS C. ALEXANDER, *et al.*, <br><br> Defendants. | Case No.  3:21-cv-03302-JMC-TJH-RMG <br><br> **REPLY IN SUPPORT OF <br> SENATE DEFENDANTS' MOTION <br> TO DISMISS COUNTS THREE AND <br> FOUR OF PLAINTIFFS' SECOND <br> AMENDED COMPLAINT** |

**INTRODUCTION**

Plaintiffs' Opposition to the Senate Defendants' Motion to Dismiss confirms that Plaintiffs have failed to plead sufficient facts to overcome the presumption of the General Assembly's "good faith," *Miller v. Johnson*, 515 U.S. 900, 915 (1995), much less to carry their "demanding" burden of showing that the General Assembly drew South Carolina's Congressional districting lines on the basis of race, *Easley v. Cromartie*, 532 U.S. 234, 241 (2001) (*Cromartie II*).  Plaintiffs acknowledge that their racial gerrymandering claim in count three requires a showing that race was the General Assembly's "dominant and controlling" consideration, such that it "subordinated traditional race-neutral districting principles . . . to racial considerations." *Miller*, 515 U.S. at 913, 916; *see also* Dkt. No. 200 at 4 ("First, a plaintiff must prove that race was the predominant factor in placing voters within or without a particular district.").  Yet as their Opposition underscores, Plaintiffs' allegations amount to nothing more than "legal conclusions" and "naked assertion[s]" that the General Assembly's placement of voters in or out of Congressional districts were motivated by race. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In fact, as the Senate Defendants have explained, the General Assembly's actions are instead fully "compatible with" and "more likely explained by" race-neutral traditional redistricting criteria. *Id.* at 680.  Given this "obvious

1

alternative explanation," Plaintiffs fail to "nudge[]" their racial gerrymandering claim "across the line from conceivable to plausible," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567, 570 (2007).

Plaintiffs' intentional discrimination claim in count four fares no better. Even now, Plaintiffs marshal no plausible allegations that the General Assembly subjected African-American voters to "differential treatment" compared to "similarly situated" voters of another race, *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439–40 (1985); fail to identify an "alternative" plan to support their vote dilution theory, *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 480 (1997) (*Reno I*); and offer no factual allegations sufficient to prove that the General Assembly adopted the Congressional Plan "'because of,' not merely 'in spite of,'" a (non-existent) "adverse effect[]" on African-American voters, *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).

In fact, Plaintiffs' Opposition confirms that their challenges to the Congressional Plan ask the Court to inject *more* race consciousness into South Carolina's redistricting process. Plaintiffs point to a Senator's statement that the Congressional Plan's sponsors "didn't even look at race numbers" or ask about the black voting-age population (BVAP) in any district. Dkt. No. 200 at 8. Plaintiffs make no attempt to square this statement with their theory of the case, much less to explain how the General Assembly could have intentionally *discriminated* on the basis of race if it did not even *consider* race. Instead, Plaintiffs argue that the General Assembly had an *obligation* to redistrict on the basis of race, *see id.*, and to "develop[] the BVAP in CD 1 to as high as 34%," *id.* at 12. But, of course, intentionally increasing a racial group's voting strength is unconstitutional when, as now, it would "subordinate[] traditional race-neutral districting principles . . . to racial considerations" and would not satisfy "strict scrutiny." *Miller*, 515 U.S. at 916, 920. The Court should decline Plaintiffs' invitation to turn the Equal Protection Clause on its head and dismiss counts three and four.

# ARGUMENT

Plaintiffs' Opposition rests on two threshold errors. *First*, Plaintiffs improperly conflate the standard for a motion to dismiss with their burden of proof when they argue that their "burden at the pleadings stage is not 'demanding.'" Dkt. No. 200 at 4. At all times, Plaintiffs bear the "demanding" burden to prove their allegations that the General Assembly unconstitutionally used race to draw the Congressional Plan and the districts Plaintiffs challenge. *Cromartie II*, 532 U.S. at 241. To avoid dismissal, Plaintiffs must offer more than "legal conclusions" and "naked assertion[s]" that they can satisfy that heavy burden. *Iqbal*, 556 U.S. at 678. They must plead facts sufficient to raise their right to relief to a "plausible" level. *Twombly*, 550 U.S. at 556.

*Second*, Plaintiffs assert that the Senate Defendants "entreat the panel to evaluate their expert evidence and statistics now and resolve complex issues on their theory of the case." Dkt. No. 200 at 2. This assertion is baffling: the Senate Defendants have not offered even a shred of expert evidence. Instead, the Senate Defendants have pointed to maps, data, and statistics that "are publicly available on the [Senate's] official redistricting website"—of which the Court may take judicial notice, *Hall v. Virginia*, 385 F.3d 421, 424 n.3 (4th Cir. 2004), and on which it may rely to grant "a motion to dismiss," *Briggs v. Newberry Cnty. Sch. Dist.*, 838 F. Supp. 232, 234 (D.S.C. 1992). Plaintiffs do not dispute the accuracy or authenticity of any of the maps, data, or statistics the Senate Defendants have cited. Instead, they dispute only the legal significance of those objective and undisputed facts regarding the Congressional Plan.

As explained more fully below, however, Plaintiffs' various arguments do not transform their allegations "from conceivable to plausible." *Twombly*, 550 U.S. at 570. Plaintiffs therefore have failed to show that the Court should abandon "extraordinary caution" and "adjudicat[e] [their] claims that [the General Assembly] has drawn district lines on the basis of race." *Miller*, 515 U.S.

at 915–16; *see also Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018).  The Court should dismiss counts three and four.

## I.   COUNT THREE FAILS TO STATE A RACIAL GERRYMANDERING CLAIM

The Court should dismiss count three because the Second Amended Complaint fails to plead sufficient facts to show that the General Assembly "subordinated traditional race-neutral districting principles . . . to racial considerations." *Miller*, 515 U.S. at 916; *see also* Dkt. No. 178 at 10–18.  Plaintiffs' primary response is to recite the very allegations from the Second Amended Complaint that the Senate Defendants already have shown are inadequate to meet their burden. *Compare* Dkt. No. 200 at 6, *with* Dkt. No. 178 at 10–18.  Indeed, those allegations state only "legal conclusions" and "naked assertion[s]," *Iqbal*, 556 U.S. at 678, not a "plausible" racial gerrymandering claim, *Twombly*, 550 U.S. at 556; *see also* Dkt. No. 178 at 10–18.

Plaintiffs' other attempts to manufacture sufficient pleadings in support of count three fare no better.  For example, Plaintiffs invoke various "district-specific" allegations in Districts 1, 2, and 5, *see, e.g.*, Dkt. No. 200 at 5, 7–8, but they nowhere explain the various inconsistencies in those allegations, *see* Dkt. No. 178 at 11.  Plaintiffs also complain that the General Assembly "surgically left behind parts of the overpopulated CD 6 with high Black voter concentrations," Dkt. No. 200 at 7—but District 6 was severely *underpopulated* in the Benchmark Plan, not overpopulated, and Plaintiffs notably have not challenged District 6 as a racial gerrymander, *see id.* at 2, 5.  Finally, Plaintiffs point to splits in "Florence, Orangeburg, Richland, and Sumter Counties" in "CDs 2, 5, and 7."  *Id.*  Plaintiffs have not challenged District 7, however, and they fail to inform the Court that all of those counties (like Charleston) already were split in the Benchmark Plan.  *See* S.C. Redistricting 2021 - Senate Judiciary Committee, *Benchmark*

4

*Congressional Districts with 2020 Data: Political Subdivision Splits Report* (Jan. 13, 2022), https://tinyurl.com/2p9fwpt2.

Plaintiffs' remaining arguments in support of count three attempt to explain away the legal significance of the Congressional Plan's compliance with traditional districting principles. Those arguments fail as well, and the Court should dismiss count three.

### A. Plaintiffs Fail Plausibly To Plead That The General Assembly Subordinated Traditional Principles To Race

Plaintiffs' racial gerrymandering claim fails because the Congressional Plan outperforms their proposed alternatives on traditional redistricting principles, including Plaintiffs' own preferred criteria of "respecting county and municipal boundaries" and "maintaining communities of interest." Dkt. No. 154 ¶ 265; *see also* Dkt. No. 178 at 11–15.

#### 1. The Congressional Plan Preserves The Cores Of Districts

Plaintiffs acknowledge that "[p]reserving the cores of existing districts" is a traditional districting principle incorporated in the Senate Redistricting Guidelines. Dkt. No. 154 ¶ 62. Plaintiffs also do not dispute that the Congressional Plan scores extremely highly on this criterion and outperforms the two alternative plans they proposed to the General Assembly. *Compare* Dkt. No. 200 at 9–14, *with* Dkt. No. 178 at 11–12. Instead, Plaintiffs attempt to minimize the Congressional Plan's high performance on core preservation with five arguments, all of which fail.

*First*, Plaintiffs assert that the Senate Defendants "elevate consideration" of this criterion "above all others, notwithstanding that core preservation was not prioritized as a criterion under the Legislature's own guidelines." Dkt. No. 200 at 9. But both parts of this assertion are faulty. The Senate Defendants have not "elevated" consideration of this criterion; rather, they have shown that the Congressional Plan (indisputably) satisfies this criterion *and* others, including Plaintiffs' preferred criteria. *See* Dkt. No. 178 at 11–15. Moreover, in all events, the General Assembly

5

would have been free to elevate this criterion over others *regardless* of where it was listed in the Senate Redistricting Guidelines. That is because the General Assembly retains the "political judgment necessary to balance competing interests," including any competing interests between traditional districting criteria. *Miller*, 515 U.S. at 915.

*Second*, Plaintiffs again err when they suggest that the Court can ignore preservation of cores as a "*post hoc* justification[]" for the Congressional Plan. Dkt. No. 200 at 9. There is nothing *post hoc* about the General Assembly utilizing a criterion listed in the *pre-enactment* Senate Redistricting Guidelines. *Bethune-Hill v. Va. State Bd. of Elecs.*, 137 S. Ct. 788, 799 (2017) (criterion is not a "*post hoc* justification[]" when it was an "actual consideration[]" in how the lines were drawn) (cited at Dkt. No. 200 at 9). The other case cited by Plaintiffs, *Shaw v. Hunt*, 517 U.S. 899 (1996) (cited at Dkt. No. 200 at 9), is also inapposite: the Senate Defendants have pointed to preservation of cores as a traditional districting principle that forecloses a showing of racial predominance at the first step of the racial gerrymandering analysis, not as a "compelling state interest" to justify a predominant use of race at the second step of that analysis. *Id.* at 908 n.4 (cited at Dkt. No. 200 at 9); *see also* Dkt. No. 178 at 11–12.

*Third*, Plaintiffs selectively quote *Bethune-Hill* for the notion that "[r]ace may predominate even when a reapportionment plan respects traditional principles." 137 S. Ct. at 798 (cited at Dkt. No. 200 at 9). As the full quote makes clear, that theory requires Plaintiffs to show that "[r]ace was the criterion that, in the State's view, could not be compromised" and that race-neutral considerations "came into play only after the race-based decision had been made," such as when a legislature draws a plan with a racial target or floor. *Id.* Here, however, Plaintiffs have not pled the existence of a BVAP floor, much less that "race for its own sake is the overriding reason for choosing [the Congressional Plan] over other[]" maps. *Id.* at 799; *see also* Dkt. No. 178 at 10–18.

6

Nor could they, since the General Assembly did not use a BVAP floor and chose the plan that *best* complies with traditional districting principles. *See* Dkt. No. 178 at 10–18.

*Fourth*, Plaintiffs argue that "preserving the *status quo* is not a defense when . . . population shifts demand new districts." Dkt. No. 200 at 9. But the Senate Defendants have never used the phrase "status quo," and it is unclear what Plaintiffs mean by it here. To the extent Plaintiffs suggest that preservation of cores is not an applicable traditional districting principle "when . . . population shifts demand new districts," *id.*, that suggestion is wrong as a matter of Plaintiffs' own pleading, *see* Dkt. No. 154 ¶ 62, and black-letter law, *see Backus v. South Carolina*, 857 F. Supp. 2d 553, 560 (D.S.C. 2012) ("preserving the cores of existing districts" is a "race-neutral principle[] traditionally adhered to in South Carolina"), *aff'd*, 568 U.S. 801 (2012).

*Finally*, Plaintiffs argue that "core preservation[] is not directly relevant to the origin of the *new* district inhabitants." *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 274 (2015) (cited at Dkt. No. 200 at 10). But as explained, Plaintiffs' district-specific allegations regarding new inhabitants in the Challenged Districts fail. *See supra* pp. 4–5. And Plaintiffs offer no explanation as to how "the movement of Black people to the South Carolina coast," Dkt. No. 200 at 10, has any bearing on inland Districts 2 and 5. The Court should dismiss count three.

### 2. The Congressional Plan Outperforms Plaintiffs' Alternative Plans On Respecting Political Subdivisions And Maintaining Communities Of Interest

Plaintiffs' racial gerrymandering claim also fails because the Congressional Plan outperforms Plaintiffs' alternative plans on Plaintiffs' two principal preferred criteria: "respecting county and municipal boundaries" and "maintaining communities of interest." Dkt. No. 154 ¶ 265; *see also* Dkt. No. 178 at 13–17. Plaintiffs do not dispute that the Congressional Plan splits fewer counties and voting districts than both NAACP Congressional Submission 1 and NAACP Congressional Submission 2. *See* Dkt. No. 178 at 13–14. Rather, Plaintiffs attempt to explain

7

away the Congressional Plan's compliance with this criterion by advancing four arguments, none of which is persuasive.

*First*, Plaintiffs accuse the Senate Defendants of "cherry-pick[ing] and mischaracteriz[ing] 'traditional redistricting principles'" by focusing on the "two narrow metrics" of respecting county and municipal boundaries and maintaining communities of interest. Dkt. No. 200 at 10.  But it was *Plaintiffs* who picked those criteria when they alleged in count three that "[r]ace predominated over traditional redistricting principles such as maintaining communities of interest [and] respecting county and municipal boundaries." Dkt. No. 154 ¶ 265.  The Senate Defendants have simply shown that this allegation is false because the Congressional Plan outperforms Plaintiffs' proposed alternatives on their chosen metrics.  Dkt. No. 200 at 10; *see also* Dkt. No. 178 at 13–15.

*Second*, Plaintiffs contend that there is no "requirement" for challengers to "put forth a constitutionally compliant map" to prove a racial gerrymandering claim. Dkt. No. 200 at 10.  To be sure, the five-justice majority in *Cooper v. Harris* opined, as a general matter, that "[a]n alternative map is merely an evidentiary tool to show that [a racial gerrymander] has occurred[.]" 137 S. Ct. 1455, 1480 (2017).  But even the majority recognized that "a plaintiff will sometimes need an alternative map, as a practical matter, to make his case," and must provide an alternative map in any case where "the plaintiffs ha[ve] meager direct evidence of a racial gerrymander and need[] to rely on evidence of forgone alternatives." *Id.* at 1479, 1481.  And the dissenting justices in *Cooper* thought that an alternative map *is* required to prove a racial gerrymander. *See id.* at 1488–91 (Alito, J., joined by Roberts, C.J., & Kennedy, J., dissenting in part).

In all events, Plaintiffs *have* put forth two alternative plans: they mention those alternatives in the Second Amended Complaint and point to them as support for their claim.  *See, e.g.*, Dkt. No. 154 ¶ 241.  Plaintiffs cannot rely on the alternative plans when it suits and disavow them when

it does not. Even under the majority's opinion in *Cooper*, an alternative plan is probative only where it shows that the legislature could have achieved its race-neutral goals through a map that was less race-conscious than the map it adopted. *See Cooper*, 137 S. Ct. at 1479. Here, however, *both* of Plaintiffs' proposed alternative maps are *less* compliant with traditional districting principles and the General Assembly's political goals than the Congressional Plan. *See* Dkt. No. 178 at 11–18. Thus, the alternative plans Plaintiffs interjected into the case underscore Plaintiffs' failure to plead sufficient facts to show that the General Assembly "subordinated traditional race-neutral districting principles" to race. *Miller*, 515 U.S. at 916; *see also* Dkt. No. 178 at 11–18.

*Third*, Plaintiffs contend that their alternative plans "outperform the enacted plan on various other traditional redistricting criteria." Dkt. No. 200 at 11–12. But the criteria Plaintiffs identify—"one person, one vote," "preserving the ability of Black voters to continue to elect candidates of their choice in CD 6, respecting communities of interest in CD 1, and developing the BVAP in CD 1 to as high as 34%"—prove just the opposite. *Id.* at 12. In the first place, Plaintiffs *concede* that the Congressional Plan complies with one person, one vote and preserves the ability of African-American voters to elect candidates of their choice in District 6. *See* Dkt. No. 154 ¶ 237. Moreover, as the Senate Defendants have explained, the Congressional Plan outperforms the alternative plans on maintaining communities of interest. *See* Dkt. No. 178 at 14–15. And doubling the BVAP in District 1 "to as high as 34%," Dkt. No. 200 at 12, is not a traditional districting principle. It is an intentional use of race that does not satisfy "strict scrutiny"—or, in other words, a racial gerrymander. *Miller*, 515 U.S. at 920; *see also* Dkt. No. 178 at 15, 17–18.

*Fourth*, Plaintiffs take issue with the General Assembly's preservation of communities of interest formed around the congressional districts that have existed in South Carolina for "three decades," suggesting that communities of interest can only be formed around other

9

"characteristics." Dkt. No. 200 at 12. But as this Court observed in drawing South Carolina's redistricting plans in 2002:

> Generally speaking, however, *we find that the cores in existing districts are the clearest expression of the legislature's intent to group persons on a "community of interest" basis*, and because the cores are drawn with other traditional districting principles in mind, they will necessarily incorporate the state's other recognized interests in maintaining political boundaries, such as county and municipal lines, as well as other natural and historical communities of interest.

*Colleton Cnty. Council v. McConnell*, 201 F. Supp. 2d 618, 649 (D.S.C. 2002) (three-judge court) (emphasis added). Thus, far from constituting a "pretext[]" or subordinating communities of interest around other "characteristics," Dkt. No. 200 at 12, the General Assembly's respect of communities of interest around existing districts is the "clearest" possible application of this criterion, *Colleton Cnty.*, 201 F. Supp. 2d at 649, and a proper exercise of its "political judgment" in redistricting, *Miller*, 515 U.S. at 915.

Nor is it of any moment that the Senate Redistricting Guidelines recognized core preservation and maintaining communities of interest as "separate" principles. Dkt. No. 200 at 12. So, too, did this Court in *Colleton County*. *See, e.g.*, 201 F. Supp. 2d at 647. And as the Court recognized, it is not uncommon for multiple traditional districting principles to point in the same direction: for example, preserving cores of districts tends to maintain communities of interest and to respect "political boundaries" such as county lines. *Id.* In fact, if anything, that the General Assembly drew a Congressional Plan that comports with *multiple* traditional principles only further underscores that count three fails plausibly to plead that the General Assembly subordinated such principles to race.[1] The Court should dismiss count three.

---

[1] Plaintiffs' three cited cases also are inapposite. *Harris v. McCrory*, 159 F. Supp. 3d 600, 620 (M.D.N.C. 2016) (cited at Dkt. No. 200 at 12), and *Burton v. City of Belle Glade*, 178 F.3d 1175, 1192 (11th Cir. 1999) (cited at Dkt. No. 200 at 13), had nothing to do with maintaining

### B. Plaintiffs Do Not Plausibly Allege That Race Rather Than Politics Explains The Congressional Plan.

Count three fails for the independent reason that Plaintiffs have failed plausibly to plead that "race *rather than* politics *predominantly* explains" the Congressional Plan. *Cromartie II*, 532 U.S. at 243 (emphases original). Plaintiffs concede that, within the population shifts they challenge, "Black Democrats and white Democrats' voting preferences '*may* vary' and that 'one group *may* cross over to vote for non-Democratic candidates more frequently than another.'" Dkt. No. 200 at 14. That concession proves the Senate Defendants' point: because of that possible variance in political and voting behavior, Plaintiffs' allegations of disparate treatment of African-American and white Democrats do not "nudge[]" their racial gerrymandering claim "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 567, 570; Dkt. No. 178 at 15–17.

Plaintiffs thus fall back on arguing that they "are not required to disentangle race and party" or to "present a plan that maintains a 6-1 partisan split that favors Republicans while adhering to traditional districting principles." Dkt. No. 200 at 15. In fact, Plaintiffs are required to do precisely that. *See Cromartie II*, 243, 258; *Cooper*, 137 S. Ct. at 1473, 1479. Plaintiffs' failure even to engage that burden requires dismissal of count three. *See* Dkt. No. 178 at 15–17.

## II. COUNT FOUR FAILS TO STATE AN INTENTIONAL DISCRIMINATION CLAIM

Plaintiffs' intentional discrimination claim in count four also fails because Plaintiffs have not plausibly pled that the General Assembly subjected African-American voters to "differential treatment" compared to "similarly situated" voters of another race, *City of Cleburne*, 473 U.S. at 439–40, much less that it adopted the Congressional Plan "'because of,' not merely 'in spite of,'"

---

communities of interest. And in *Miller*, the legislature *subordinated*, rather than complied with, the communities-of-interest criterion. *See Miller*, 515 U.S. at 919 (cited at Dkt. No. 200 at 12).

11

an "adverse effect[]" on African-American voters, *Pers. Adm'r*, 442 U.S. at 279; *see also* Dkt. No. 178 at 18–23.

### A. Plaintiffs Do Not Adequately Allege A Discriminatory Effect

Count four alleges "intentional vote dilution," Dkt. No. 154 ¶ 5, but that allegation fails as a matter of law because Plaintiffs have not pointed to "a reasonable alternative voting practice to serve as the benchmark 'undiluted' voting practice." *Reno I*, 520 U.S. at 480; *Backus*, 857 F. Supp. 2d at 568. In other words, a vote dilution claim is comparative: it requires Plaintiffs to produce a plan that would have existed but for the alleged dilution. *See, e.g.*, *Reno I*, 520 U.S. at 480; *Backus*, 857 F. Supp. 2d at 568. Plaintiffs' failure to do so thus dooms their intentional discrimination claim. *See* Dkt. No. 178 at 19–20.

Plaintiffs' Opposition attempts to repackage their allegation of discriminatory effect, but these efforts fail. *First*, Plaintiffs suggest that they need not show "a threshold minimum number of impacted voters" to prevail on their intentional discrimination claim. Dkt. No. 200 at 22. Even so, they must show that African-American voters are "impacted" by a discriminatory effect, *id.*— and they have failed plausibly to plead such an effect, *see* Dkt. No. 178 at 19–20.

*Second*, Plaintiffs assert that the Second Amended Complaint pleads "the myriad ways in which Black South Carolinians bear the brunt of" the alleged discrimination in the Congressional Plan. Dkt. No. 200 at 22. But the allegations they point to predominantly relate to District 6— which Plaintiffs have *not* challenged—and the General Assembly's decision not to double District 1's BVAP to 34%. *See id.* (citing Dkt. No. 154 ¶¶ 11, 233–35, 237, 241 244–46). Moreover, Plaintiffs nowhere explain how declining to double District 1's BVAP (which would have constituted a racial gerrymander, *see supra* p. 9) somehow *dilutes* voting strength compared to the constitutional Benchmark Plan or any constitutional "reasonable alternative." *Reno I*, 520 U.S. at

480. And an alleged lack of voting strength proportional to a group constituting "approximately 30% of South Carolina's population," Dkt. No. 200 at 22, does not amount to a discriminatory effect, just as it did not in the Benchmark Plan, *see Backus*, 857 F. Supp. 2d at 568–69.

*Third*, Plaintiffs attempt to recast the alleged discriminatory effect as "the sorting of 'voters on the basis of race.'" Dkt. No. 200 at 23. But unconstitutional sorting on the basis of race is the harm in racial gerrymandering cases, as Plaintiffs' cited cases confirm. *Id.* (citing *Wis. Legislature v. Wis. Elections Comm'n*, No. 21A471, 2022 WL 851720, at *2 (U.S. Mar. 23, 2022) and *Shaw v. Reno*, 509 U.S. 630, 643 (1993)). For the reasons explained, *see supra* Part I, Plaintiffs' racial gerrymandering claim fails, and Plaintiffs cannot salvage that claim by recycling it as an intentional discrimination claim. The Court should dismiss count four.

### B. Plaintiffs Do Not Adequately Allege A Discriminatory Purpose

Finally, count four fails because Plaintiffs do not adequately allege that the General Assembly acted with a discriminatory purpose in enacting the Congressional Plan. *See* Dkt. No. 178 at 20–23. Plaintiffs invoke the *Arlington Heights* framework and argue that "the impact of the official action" is "an important starting point" for assessing discriminatory purpose allegations. Dkt. No. 200 at 17 (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)). Yet Plaintiffs have not plausibly pled a discriminatory effect, *see supra* Part II.A, so this factor dooms rather than saves count four.

Plaintiffs' arguments under other *Arlington Heights* factors fare no better. For example, Plaintiffs double down on the "long history of racial discrimination in the political process in South Carolina against Black voters," but even Plaintiffs implicitly concede that such evidence is not sufficient to prove intentional discrimination now, just as it failed to do so in *Backus*. Dkt. No. 200 at 18–19. And the fact that this Court "needed to adjudicate racial discrimination claims

relating to" the Benchmark Plan, Dkt. No. 154 ¶¶ 5, 43, *contradicts* Plaintiffs' allegation that historical discrimination still motivates the General Assembly in modern times because the Court *rejected* those claims in *Backus*, *see* Dkt. No. 178 at 20–23.

Plaintiffs also point to the alleged "opaque process through which the Legislature enacted" the Congressional Plan. Dkt. No. 200 at 19. Plaintiffs' own pleading, however, demonstrates that the General Assembly engaged in a robust and transparent public process in considering and enacting the Congressional Plan. That process included numerous public hearings—all of which were preceded by at least 24 hours' notice and attended by at least one representative of Plaintiff SC NAACP—and consideration of testimony, comments, and submissions by the public. *See, e.g.*, Dkt. No. 154 ¶¶ 96–174. Moreover, S. 865 went through the same process of subcommittee hearings and review, committee hearings and review, amendments, floor debates and vote as every other piece of legislation that the General Assembly enacts. *See, e.g.*, S. 865, 124th Gen. Assemb. (S.C. 2022), https://www.scstatehouse.gov/sess124_2021-2022/bills/865.htm.

Plaintiffs nonetheless highlight statements and objections by opponents of the Congressional Plan, suggesting that the General Assembly must have been motivated by discriminatory animus because it did not incorporate or act upon all comments received by the public. *See* Dkt. No. 200 at 19–21. But there is nothing discriminatory about rejecting "[a]lternative proposals" or not changing the Congressional Plan based upon every shred of "public input." *Id.* at 19, 21. To the contrary, in redistricting as in other contexts, the General Assembly retains the "political judgment necessary to balance competing interests," including any competing or contradictory public proposals and input. *Miller*, 515 U.S. at 915. Thus, Plaintiffs' allegations indicate a robust process resulting from the determined views of the Congressional Plan's proponents and opponents, but they are devoid of any allegations sufficient to show that the

General Assembly acted with a discriminatory purpose. *See Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2350 (2021).

Moreover, in any event, statements of a law's opponents "are generally not appropriate evidence of [a legislature's] motive[s] for enacting [it]." *United States v. Machic-Xiap*, 552 F. Supp. 3d 1055, 1075 (D. Or. 2021); *compare also NLRB v. Fruit & Vegetable Packers & Warehousemen, Loc. 760*, 377 U.S. 58, 66 (1964). Plaintiffs' Second Amended Complaint and Opposition demonstrate precisely why: Plaintiffs seeded the legislative record with statements opposing the Congressional Plan and now point back to those statements in an attempt to bolster their allegations of discriminatory intent in this Court. *See* Dkt. No. 200 at 19–21. But overcoming the "presumption of legislative good faith" requires evidence of invidious intent by the General Assembly, not Plaintiffs' repetition of their own manufactured allegations against the Congressional Plan. *Abbott*, 138 S. Ct. at 2324.

Finally, Plaintiffs point to alleged "deviations from procedure" in designating a chair in a House Redistricting Committee hearing. Dkt. No. 200 at 20. Plaintiffs, however, offer no facts to show that this purported deviation was racially rather than politically motivated, as they must to prove their intentional discrimination claim. *See Brnovich*, 141 S. Ct. at 2349 ("partisan motives are not the same as racial motives"). Indeed, Plaintiffs' own allegations suggest that this purported deviation was a "breach of decorum," not intentional discrimination. Dkt. No. 200 at 21 (quoting Dkt. No. 154 ¶ 138). The Court should dismiss count four.

## CONCLUSION

The Court should dismiss counts three and four.

April 5, 2022                                              Respectfully submitted,

/s/Robert E. Tyson Jr.
Robert E. Tyson, Jr. (7815)
Vordman Carlisle Traywick, III (12483)
La'Jessica Stringfellow (13006)
ROBINSON GRAY STEPP & LAFFITTE, LLC
1310 Gadsden Street
Post Office Box 11449 (29211)
Columbia, South Carolina 29201
(803) 929-1400
rtyson@robinsongray.com
ltraywick@robinsongray.com
lstringfellow@robinsongray.com

John M. Gore (admitted *pro hac vice*)
Stephen J. Kenny (admitted *pro hac vice*)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Phone: (202) 879-3939
Fax: (202) 626-1700
jmgore@jonesday.com
skenny@jonesday.com

*Counsel for Senate Defendants*