# Exhibit B

```
             IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF SOUTH CAROLINA
                       COLUMBIA DIVISION
             CIVIL ACTION NO. 3:21-cv-03302-JMC-TJH-RMG


THE SOUTH CAROLINA STATE         )
CONFERENCE OF THE NAACP,         )
                                 )
and                              )
                                 )
TAIWAN SCOTT, on behalf of       )
himself and all other similarly  )
situated persons,                )    30(b)(6) DEPOSITION
                Plaintiffs,      )
      v.                         )           OF
                                 )
HENRY D. MCMASTER, in his        )      BRENDA MURPHY
official capacity as Governor    )
of South Carolina; THOMAS C.     )
ALEXANDER, in his official       )
capacity as President of the     )
Senate; LUKE A. RANKIN, in his   )
official capacity as Chairman    )
of the Senate Judiciary          )
Committee; JAMES H. LUCAS, in    )
his official capacity as Speaker )
of the House of Representatives; )
CHRIS MURPHY, in his official    )
capacity as Chairman of the      )
House of Representatives         )
Judiciary Committee; WALLACE     )
H. JORDAN, in his official       )
capacity as Chairman of the      )
House of Representatives         )
Elections Law Subcommittee;      )
HOWARD KNAPP, in his official    )
capacity as interim Executive    )
Director of the South Carolina   )
State Election Commission; JOHN  )
WELLS, Chair, JOANNE DAY,        )
CLIFFORD J. EDLER, LINDA MCCALL, )
and SCOTT MOSELEY, in their      )
official capacities as members   )
of the South Carolina Election   )
Commission,                      )
                                 )
                Defendants.      )
_____)
```

Pursuant to Rule 30 of the Federal Rules of Civil Procedure, the within 30(b)(6) deposition of **Brenda Murphy**, appearing via Zoom, was taken by Counsel for Defendants James H. Lucas, Chris Murphy, and Wallace H. Jordan, at the hour of 11:37 a.m. on Thursday, April 14, 2022, at the law offices of Nexsen Pruet, LLC, 1230 Main Street, Suite 700, Columbia, South Carolina, attended by counsel as follows:

**JAN L. WHITWORTH**
**VERBATIM REPORTER**

**WHITWORTH COURT REPORTING**
POST OFFICE BOX 551
ROEBUCK, S.C.  29376
864-494-2705

```
1         Murphy?
2    A.   1939.
3    Q.   Okay.  And what is the official name of the State
4         Conference?  I think you've told me that before, but
5         I just want to get that clearly.
6    A.   NAACP South Carolina State Conference of Branches.
7    Q.   Okay.  And do you know how many branches are in your
8         conference, President Murphy?
9    A.   Approximately 77.
10   Q.   Okay.  And are those spread throughout the State of
11        South Carolina?
12   A.   They are.
13   Q.   And this may sound like a dumb question, and it
14        might be a dumb question.  I take it you don't have
15        any branches outside the State in your conference, -
16        ---
17   A.   No.
18   Q.   --- is that right?
19   A.   None.
20   Q.   Okay.  All right, do you have any employees?
21   A.   Yes.
22   Q.   Okay.  And how many employees do you have?
23   A.   Three, part-time.
24   Q.   Okay.  We are having ---
25   A.   Part time.
```

```
1    Q.   Okay.  We're having some Zoom timing issues, but
2         that's okay.  And who are those employees, President
3         Murphy?
4    A.   I have an office manager and an assistant and one
5         clerical person.
6    Q.   Okay.  So in discovery documents I have seen, I've
7         seen Amelia Glisson, Dr. Eloise Fomby-Denson and
8         Amber Brooks identified.  Are those those three
9         people that you just ---
10   A.   They're -- they're no longer here.
11   Q.   Okay.  So none of those three are employed with you
12        anymore?
13   A.   No.
14   Q.   Okay.  What was Ms. Glisson's role?
15   A.   She was the office manager.
16   Q.   Okay.  And who is the new office manager, if you
17        have one?
18   A.   Lorrie, Lorrie Gregory.
19   Q.   Lorrie Gregory?
20   A.   That's correct.
21   Q.   Okay.  And so who is Dr. Eloise Fomby-Denson, and I
22        need to make sure I pronounce it correctly, who is
23        she?
24   A.   She was just a temp for a very short period of time
25        until we could get another staff member in, which
```

14
1                    was Ms. Lorrie Gregory, the office manager.
2         Q.         Okay.  So did anybody replace Ms. Fomby-Denson other
3                    than Ms. Gregory?
4         A.         No, no.
5         Q.         And who was Amber Brooks?
6         A.         Amber Brooks, she worked here a brief period of time
7                    as well as the office manager, but then she was able
8                    to find a full-time job, so she left.
9         Q.         Okay.
10        A.         It's kind of difficult retaining employees when you
11                   can only work them part-time with no benefits.
12        Q.         Yes, ma'am, I understand that.  So who are the other
13                   two employees that are currently with you now as you
14                   said part-time?
15        A.         Priscilla Smith.
16        Q.         And what does Ms. Smith do?
17        A.         Primarily the bookkeeping needs for the office,
18                   getting bills paid, getting checks out.  That's it
19                   primarily.  Just administrative things that relates
20                   to the billing and staying on top of things with
21                   that in terms of when assessments come in, anything
22                   --  any kind of payments come in.
23        Q.         And who was the third person?
24        A.         Shirley Able.
25        Q.         And what does Ms. Able do?

3:21-cv-03302-MBS-TJH-RMG    Date Filed 04/29/22    Entry Number 248-2    Page 6 of 14

15
1     A.   Primarily answering the phone, filing, making calls
2          that might need to be made.
3     Q.   Okay. And so there's an email account -- so let me
4          go back to the folks who were in your office during
5          the time period that ran up to this litigation and
6          during the time period that these meeting minutes
7          that we've all discussed in previous depositions
8          were discussed, did Ms. Glisson, Dr. Fomby-Denson
9          and Amber Brooks each have an NAACP email address,
10         if you know?
11    A.   I'm not sure. I don't think she did. Now, Amber
12         did; she had an email address.
13    Q.   And did Ms. Glisson ---
14    A.   And.
15    Q.   I'm sorry.
16    A.   Ms. Glisson, she was -- she worked with us, yeah,
17         she was -- she did have an email address, yes.
18    Q.   Okay. Do you know if Ms. Glisson also used her
19         BellSouth email address for organizational purposes
20         when she worked for you?
21    A.   Not to my knowledge. I'm not sure.
22    Q.   And did Dr. Fomby-Denson use her gmail email address
23         for organizational purposes, if you know, during the
24         time period that she was employed?
25    A.   The only -- she was the secretary for the coalition.

```
                                                    16
1      Q.   Yes, ma'am.
2      A.   So she would have forwarded minutes out.
3      Q.   Okay.  So, ---
4      A.   Now, ---
5      Q.   I'm sorry.
6      A.   Glisson forwarded the Zoom links out.
7      Q.   Okay.  So let me ask you this question, President
8           Murphy: there's an email address called
9           scofficemanager@scncaap.org.  Do you know who has
10          access to that account?
11     A.   Lorrie Gregory.
12     Q.   Okay.  And I take it that during the time period
13          that Amelia Glisson was your office manager, she had
14          access to that account, is that right?
15     A.   Her email was aglisson@scnaacp.
16     Q    Okay.  Do you know who would have had access to the
17          scofficemanager@scnaacp.org prior to Lorrie Gregory
18          coming on board with you?  Do you know who would
19          have?  Like, did you have access to that, or did
20          anyone else, if you know?
21     A.   I didn't.  I'm not sure if Amelia had access to it
22          or not.
23     Q.   Okay.  All right.  Does the State Conference have an
24          executive committee?
25     A.   Have an executive list?
```

3:21-cv-03302-MBS-TJH-RMG   Date Filed 04/29/22   Entry Number 248-2   Page 8 of 14

17

```
1    Q.    An executive committee?
2    A.    Yes, we do.
3    Q.    Okay.  All right, and what is the purpose of the
4          executive committee?
5    A.    The executive committee is responsible for overall
6          planning for the State Conference, deciding, you
7          know, what the priorities will be for -- that we
8          need to address.
9    Q.    Okay.  And how many members does the executive
10         committee have?
11   A.    Oh, let's see, maybe 26.  I think you have a listing
12         in the packet that I received.
13   Q.    Okay.
14   A.    You have a listing.
15   **BY MR. MOORE**:
16             So, why don't we show them Exhibit Number 1,
17         which is SCNAACP_002837 Bates Number.  And Michael
18         you're going to need to blow that up for me as well
19         as for President Murphy, I imagine.
20   **BY PRESIDENT MURPHY**:
21             Yes.
22             (WHEREUPON, HOUSE DEFENDANTS EXHIBIT 1 WAS MARKED
23   FOR IDENTIFICATION PURPOSES, LIST OF EXECUTIVE COMMITTEE
24   MEMBERS, ATTACHED.)
25   **EXAMINATION RESUMED BY MR. MOORE**:
```

```
1           Legislator driven, correct?
2    A.     Some of it, and when you say Legislative driven, you
3           know, I can only speak in terms of the task force
4           and when they begin their hearings, how their
5           hearings were conducted.  Not everybody has access
6           to Zoom, so there were some communities that didn't
7           have opportunity to even provide input.  So the
8           process, I guess when I do a comparison, I think the
9           process was not as well done as the Senate was.
10   Q.     Okay.  But you sued the Senate too, right, in the
11          original complaint you sued the House, the Senate,
12          the Governor, and the Election Commission, right?
13   A.     Yes, but the second was modified.  We're not talking
14          about Senate today, are we?
15   Q.     No, ma'am, I wasn't planning on it.  But I'm talking
16          right now about the initial complaint, okay, because
17          I'm going to get to the amended complaint in a
18          moment, okay, but with the initial complaint, did
19          you review the complaint before it was filed, the
20          initial complaint?
21   A.     Yes, I did.
22   Q.     Okay.  Did the Executive Committee or Executive
23          Committee review the initial complaint before it was
24          filed?
25   A.     Yes, they did.
```

41

```
1    Q.   Okay.  And did they approve the filing of the suit?
2    A.   They certainly did.
3    Q.   Okay.  All right.  So then we have, you file your
4         initial complaint.  Redistricting occurs.
5         Legislation is passed, and then you filed an amended
6         complaint, which challenged the House Districts but
7         did not challenge the Senate Districts, is that
8         right?
9    A.   The House in terms of timeliness, it's more
10        critical, because the Senate is not, you know, that
11        election is not this year.
12   Q.   I'm not asking about whether you do or don't intend
13        to file something at some point with respect to the
14        Senate.  My point is that you filed a lawsuit in
15        December of this year that only challenged House
16        Districts, and then you subsequently moved to amend
17        it to add the Congressional Districts after those
18        were enacted, correct?
19   A.   Yes.
20   Q.   Okay.  All right, so in the amended complaint that
21        focused on the House Districts, there were a number
22        of House Districts which were challenged districts;
23        is that correct?
24   A.   Yes.
25   Q.   Okay.  And did you review that complaint before it
```

```
 1             drawings, the mapping, and sharing the maps even
 2             though, you know, they had copies, but you know,
 3             putting it on screen and screen sharing and getting
 4             feedback regarding from the presidents.  Because,
 5             you know, if this -- this is a democracy.  We wanted
 6             everybody involved.  Not we as a State Conference
 7             could make decisions for the entire state.
 8        Q.   Okay.  But so, you know, and I guess a map has to
 9             start somewhere, so please correct me if I'm wrong,
10             did you -- you mentioned that you circulated these
11             maps to your state presidents, is that right?
12        A.   Yes.
13        Q.   Did you circulate those maps to your state
14             presidents through email?
15        A.   I think they may have been circulated by the
16             secretary or Ms. Glisson.
17        Q.   Ms. Glisson?
18        A.   Yes, sir, Amelia Glisson.
19        Q.   Okay.
20        A.   Her name I couldn't remember.
21        Q.   And do you know why the emails from Ms. Glisson
22             circulating these maps have not been provided to us
23             in discovery?
24        A.   As I said before, I don't know.
25        Q.   Okay.
```

1  A.  I do not know.
2  Q.  Okay. But you agree with me that emails from Ms.
3      Glisson should be emails that are under the control
4      and custody of your organization, correct?
5  A.  Yes.
6  Q.  Okay. And so I take it you received -- you had to
7      receive the initial draft map from someone; is that
8      right, President Murphy?
9  A.  Yes, and we have. Yes.
10 Q.  Who did you receive the original draft maps from?
11 A.  I may have -- primarily I think at least the mapping
12     I got from ACLU, because they were, you know, they
13     had the demographers and had people doing analytics.
14     So that's where we -- that's who we depended upon to
15     clarify information or questions that we may have
16     had.
17 Q.  Okay. And do you know if you received those maps on
18     your personal email account or on your SCNAACP email
19     account?
20 A.  I don't know. I've gotten so many emails I don't
21     even know where -- they have been at the office, I'm
22     not sure. I know my emails from the office were
23     sent, and my emails were sent from -- my personal
24     emails were reviewed. So I can't say.
25 Q.  So, are you telling me you that you sometimes use

| | | |
|---|---|---|
| 1 | | your personal email account to conduct SCNAACP |
| 2 | | business? |
| 3 | A. | During the COVID, yes. |
| 4 | Q. | Okay. All right, and so --- |
| 5 | A. | Our office was closed, sir. |
| 6 | Q. | Yes, ma'am. So I take it that means -- I mean, my |
| 7 | | office was closed, too, but I can sort of remote in |
| 8 | | and access my office email account. You might not |
| 9 | | be able to do that, is that right? |
| 10 | A. | Yes, I learned -- I'm going to do it from now on, |
| 11 | | but I really don't appreciate my personal email |
| 12 | | being, you know -- but yes, I learned that I can do |
| 13 | | it remotely now. So, I will whenever I have to in |
| 14 | | the future. |
| 15 | Q. | I mean, I'm not the most technologically savvy |
| 16 | | person in the world either, President Murphy. But |
| 17 | | so, but luckily I have people who can help me make |
| 18 | | sure that I don't screw things up. So when did you |
| 19 | | provide your personal -- access to your personal |
| 20 | | email account to Mr. Pergament? Do you remember? |
| 21 | A. | Seems like maybe two weeks ago. |
| 22 | Q. | Okay. |
| 23 | A. | About two weeks ago. |
| 24 | Q. | Okay. Can you tell me why the emails that you |
| 25 | | received from either on your gmail account or on |