# Exhibit A

Page 1

1              UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF SOUTH CAROLINA

3                  COLUMBIA DIVISION

4    - - - - - - - - - - - - - - +

5    THE SOUTH CAROLINA STATE CONFERENCE

6    OF THE NAACP, et al.

7           Plaintiffs              Case No.

8    V.                            3:21-CV-03302-JMC-

9    THOMAS C. ALEXANDER  et al.       TJH-RMG

10           Defendants

11   - - - - - - - - - - - - - - +

12

13       VIDEOCONFERENCE DEPOSITION OF WALLACE H. JORDAN

14               Columbia, South Carolina

15               Wednesday, April 13, 2022

16                    10:03 a.m.

17

18

19

20

21   Reported by:  Danielle E. Lawrence

Page 2

1          The videoconference deposition of

2    WALLACE H. JORDAN, was held in:

3

4          Columbia, South Carolina

5

6

7

8

9

10

11

12

13       Pursuant to notice, telephonically before

14    Danielle Lawrence, Shorthand Reporter and Notary Public

15    in and for the State of Maryland.

16

17

18

19

20

21

Page 3

1                        A P P E A R A N C E S

2        ON BEHALF OF PLAINTIFFS:

3            JOHN S. CUSICK, ESQUIRE (via video)

4            ANTONIO INGRAM, ESQUIRE (via audio)

5            NAACP Legal Defense & Educational Fund, Inc.

6            40 Rector Street, Fifth Floor

7            New York, New York

8            Telephone: (212) 965-7715

9            jcusick@naacpldf.org

10

11       ON BEHALF OF DEFENDANTS:

12           JENNIFER HOLLINGSWORTH, ESQUIRE (via video)

13           ERICA WELLS, ESQUIRE (via audio)

14           Nexsen Pruett, LLC

15           1230 Main Street, Suite 700

16           Columbia, South Carolina 29201

17           Telephone: (864) 271-0324

18           jhollingsworth@nexsenpruet.com

19

20

21

Page 4

1                    A P P E A R A N C E S (cont.)

2        ON BEHALF OF DEFENDANTS:

3            MICHAEL R. BURCHSTEAD, ESQUIRE (via video)

4            Burr & Forman, LLP

5            1221 Main Street, Suite 1800

6            Columbia, South Carolina 29201

7            Telephone: (803) 799-9800

8            mburchstead@burr.com

9

10       ON BEHALF OF DEFENDANTS:

11           ROB TYSON, ESQUIRE (via audio)

12           Robinson Gray Stepp & Laffitte, LLC

13           1310 Gadsden Street

14           Columbia, South Carolina 29201

15           Telephone: (803) 231-7838

16           rtyson@robinsongray.com

17

18       VIDEOGRAPHER:  Eliza Spikes

19

20       ALSO PRESENT:  J. Lucas

21

Page 5

1                    C O N T E N T S

2    EXAMINATION OF WALLACE H. JORDAN              PAGE

3      By Mr. Cusick                              7

4

5                     E X H I B I T S

6            (Attached to the transcript.)

7    WALLACE H. JORDAN                            PAGE

8      Exhibit 1     House Defendants Responses to    47

9              Plaintiffs 1st Request for Documents

10     Exhibit 2     House Defendants Responses to    48

11                   Plaintiffs Interrogatories

12     Exhibit 3     8-3-21 Meeting Proceedings       72

13     Exhibit 4     8-3-21 Guideline & Criteria      82

14     Exhibit 5     Duty to Comply in               124

15                   S.C. Redistricting Process

16     Exhibit 6     8-30-21 Follow-up Recommendations 124

17                   In S.C. Redistricting Process

18     Exhibit 7     9-27-21 Follow-up Recommendations 125

19                   In S.C. Redistricting Process

20     Exhibit 8     10-8-21 Submitting Proposed      126

21                   Congressional and House Maps

Page 6

1                 E X H I B I T S (cont.)

2               (Attached to the transcript.)

3       WALLACE H. JORDAN                                PAGE

4       Exhibit 9      2021 Redistricting Map Room        138

5                       Policies and Procedures

6       Exhibit 10     2021 Working Draft Website Page     152

7       Exhibit 11     11-10-21 Hearing Transcript         154

8       Exhibit 12     11-16-21 Transcript of              194

9                       Ad Hoc Committee

10      Exhibit 13     11-16-21 Transcript of              198

11                      House Judiciary Committee

12      Exhibit 14     12-2-21 House of Representatives     205

13                      Hearing

14

15

16

17

18

19

20

21

Page 7

1                    P R O C E E D I N G S

2            VIDEOGRAPHER:  Good morning.  We're going on the

3    video record at 10:03 a.m. on Wednesday,

4    April 13, 2022.  This is media unit number 1 in the

5    video-recorded deposition of Mr. Wallace H. Jordan,

6    taken by counsel for Plaintiffs in the matter of the

7    South Carolina State Conference of the NAACP, et al.,

8    versus Alexander C. Thomas, et al., filed in the United

9    States District Court for the District of South

10   Carolina, Columbia Division.  Case number 3:21-CV-03302.

11           This deposition is being held via Zoom.  My

12   name's Eliza Spikes from the firm Veritext, and I'm the

13   videographer.  The court reporter today is

14   Ms. Danielle Lawrence, also from Veritext.  I am not

15   authorized to administer the oath.  I am not related to

16   any party in this action, nor am I financially

17   interested in the outcome.  Counsel and all present in

18   the room and anyone attending remotely will now state

19   their appearances and affiliations for the record.  If

20   there are any objections to this proceeding, please

21   state them at the time of your appearance, beginning

Page 8

```
 1   with the noticing attorney.

 2           MR. CUSICK:  Good morning, my name is

 3   John Cusick.  I am with the NAACP Legal Defense and

 4   Educational Fund on behalf of Plaintiffs, and I'm joined

 5   by my colleague at LDF, Antonio Ingram, who also is on

 6   behalf of Plaintiffs.

 7           MR. TYSON:  Good morning, I'm Rob Tyson.  I'm

 8   here today on behalf of the Senate, Defendants.

 9           MR. BURCHSTEAD:  Michael Burchstead on behalf of

10   the State Election Commission.

11           MS. HOLLINGSWORTH:  This is Jennifer

12   Hollingsworth and with me is Erica Wells.  We're here on

13   behalf of the House Defendants representing -- this

14   morning here in this deposition -- Representative

15   Jordan.  And also with us appearing and defending is

16   Speaker Jay Lucas, a party in this case.

17           VIDEOGRAPHER:  Thank you.  Will the court

18   reporter please swear in the witness.

19           Having been duly sworn, WALLACE H. JORDAN,

20   testifies as follows:

21               EXAMINATION BY COUNSEL FOR PLAINTIFFS
```

Page 9

```
 1   BY MR. CUSICK:

 2   Q.      Good morning, Representative Jordan.  As we just

 3   went around the room, my name is John Cusick, and I'm

 4   one of the Plaintiffs' attorneys in this action.  For

 5   today's deposition, we'll begin by going over a few

 6   basic ground rules so that you and I are on the same

 7   page, and if you have any questions we can talk about

 8   those before we begin.  As you've just heard, you're

 9   testifying under oath, which means you're testifying

10   with the same duty to answer questions truthfully as

11   though you were before a judge in a courtroom.  Do you

12   understand?

13   A.      I do.

14   Q.      A court reporter, Ms. Lawrence, is transcribing

15   this deposition, and with that in mind, if you could

16   please answer questions audibly or clearly and try to

17   refrain from head nodding or shaking.  Let me know if

18   you don't understand a question or need me to repeat

19   part of it.  As Mr. Tyson knows, I've been known in

20   these depositions -- I might not phrase something

21   clearly, so feel free to ask me for clarification, but
```

Page 10

1    if I ask a question and you begin answering it, I'll

2    assume that you understood that question.  Does that

3    work for you, Representative Jordan?

4    A.        Yes, sir.

5    Q.        And you might hear -- the primary people talking

6    today will be you and me, potentially the court reporter

7    and the videographer, who may ask questions.  And you

8    might hear your counsel, Ms. Hollingsworth, object to a

9    question.  If so, the objection will be noted by the

10   court reporter, Ms. Lawrence, but you must still provide

11   an answer unless Ms. Hollingsworth instructs you not to.

12   Do you understand?

13   A.        I do.

14   Q.        Is there any reason why you're unable to

15   understand or answer any questions today?

16   A.        I don't believe so.

17   Q.        If at any time you'd like to take a break, just

18   let us know.  The only thing I'd ask is that if we're in

19   the middle of a question or you're answering, if we

20   could just finish that question before going on break,

21   if that works?

Page 11

```
 1    A.        That's fine.

 2    Q.        Who are you represented by today,

 3    Representative Jordan?

 4    A.        Jennifer Hollingsworth of Nexsen Pruet.

 5              COURT REPORTER:  I'm sorry, there's maybe a

 6    little echo.  I didn't understood what you said after

 7    her name, I apologize.

 8              THE WITNESS:  Of Nexsen Pruet.

 9              COURT REPORTER:  Thanks.

10    BY MR. CUSICK:

11    Q.        And in addition to Nexsen Pruet, and without

12    going into any content of the discussions, have you

13    sought legal advice from any other attorneys about this

14    case?

15    A.        I suppose I would put House attorneys, attorneys

16    for the South Carolina House of Representatives, on that

17    list.  Actually, Dennis and Ms. Dean -- is technically

18    attorney for the -- attorney of the House.  I would at

19    least list those two individuals as counsel.

20              COURT REPORTER:  I apologize again.  Is there

21    any way we could put the speaker closer to him, because
```

Page 12

1    I'm having a hard time understanding him?

2           MS. HOLLINGSWORTH:  Not at the moment, but let

3    me just try to turn things up a little and see if that

4    helps, and if it doesn't, I'll get someone in here to

5    get us an additional speaker.

6           COURT REPORTER:  You can continue.

7    BY MR. CUSICK:

8    Q.      Just so I think I heard you right, you said

9    Mr. Dennis and Ms. Dean were the other two counsel that

10   you have received advice from regarding this case?

11   A.      Yes, I believe that's correct.

12   Q.      And do you remember when you retained

13   Nexsen Pruet for purposes of this litigation?

14   A.      My first meeting with Nexsen Pruet was, if I

15   remember correctly, in the spring or summer of 2021.  I

16   wasn't responsible for retaining Nexsen Pruet.  That was

17   just my first interaction.

18   Q.      And without going into the content of any of

19   those discussions, were they retained for the purpose of

20   redistricting or, I guess, what was the purpose of the

21   retention for that?

Page 13

1    A.       To assist in the process of redistricting.

2    Q.       And this might be some repeat answers, but in

3    addition to Nexsen Pruet, before the scope of this

4    litigation and without going into the content, did you

5    seek any legal advice from attorneys about redistricting

6    in South Carolina?

7    A.       I did not.

8    Q.       I don't see anything in front of you,

9    Representative Jordan, but I just have to ask the

10   question, did you bring any materials with you today?

11   A.       I did not.

12   Q.       And now I want to talk just a little bit about

13   how you prepared for today's deposition, what did you

14   do?

15   A.       I believe I had at least a couple of meetings

16   with counsel.

17   Q.       Do you remember when those meetings were?

18   A.       One was earlier this week, and one was within

19   the last several weeks.  I also tried to refresh my

20   memory by looking back at various pleadings related to

21   the case just so I could hopefully be -- provide the

Page 14

1    information you're asking.

2    Q.      And, again, without going into the substance of

3    any conversations, who was in the room with you for

4    those conversations?

5    A.      The first time, I believe, it was

6    Ms. Hollingsworth.  The second time, I believe it was

7    Ms. Hollingsworth, Mr. Moore.  I believe Mr. Dennis was

8    in and out of the room.

9    Q.      And aside from those three, were there any

10   non-attorneys in the room?

11   A.      I don't believe so.

12   Q.      And did you discuss today's deposition with

13   anyone else besides your counsel in this case?

14   A.      I let my office know I was having my deposition

15   taken, but I did not discuss the nuts and bolts of it.

16   Q.      Yep.  I know you mentioned you reviewed some of

17   those documents in preparation for today.  Do you recall

18   generally what those might have been for pleadings in

19   this case?

20   A.      Various pleadings.  I think the complaint and

21   the answer, some discovery documents, things of that

```
                                               Page 15
 1    nature.
 2    Q.       Are you aware that Representative Brawley has
 3    been deposed in this case?
 4    A.       I am.
 5    Q.       Did you review any portion of her transcript,
 6    her deposition transcript?
 7    A.       I did not.
 8    Q.       Outside of your conversations with counsel and
 9    the pleadings and documents reviewed, is there anything
10    else you did to prepare for today's deposition?
11    A.       I don't believe so.
12    Q.       And now I want to turn a little bit to preview
13    just the lawsuit itself.  Representative Jordan, what's
14    your understanding of this lawsuit?
15    A.       The lawsuit was brought disputing the underlying
16    action of redistricting.
17    Q.       Do you understand what types of claims are being
18    brought by Plaintiffs?
19    A.       Yes -- well, I've read the claims, yes.
20    Understand is a moving target sometimes.
21    Q.       And how would you describe your understanding of
```

Page 16

1     the claims brought?

2     A.      I think the broadest term would be to say I

3     dispute the legality and the process as well as the

4     product.

5     Q.      Are you aware -- my apologies.  Go ahead.

6     A.      I was just going to say how we arrived, I

7     believe, in the process of the lawsuit disputes, the --

8     again, the underlying process by which we arrived at the

9     necessary legislation and then the lividity or legality

10    of the legislation itself.

11    Q.      Is it your understanding that the lawsuit

12    challenges all of the House districts or certain

13    portions that were adopted in House Bill 4493?

14    A.      I believe it's just a portion of the districts.

15    Q.      And have you interacted at all with the South

16    Carolina State Conference of the NAACP?

17    A.      When you say interacted, what do you mean by

18    that?

19    Q.      Have you interacted with any members before in

20    any of your work as a legislator?

21    A.      Various members have attended different

```
 1    subcommittee hearings that I've been in attendance at,

 2    is all.  I would consider that interaction, I suppose.

 3    Q.     And, I guess, outside of the redistricting

 4    hearings, any other interactions with either local

 5    chapters or state conference members in your work as a

 6    legislator?

 7    A.     I can't tell you the specific bill numbers, but

 8    I believe there have been pieces of legislation over my

 9    time in the House in which some representatives from the

10    organization have come to a hearing and testified or

11    offered testimony, I believe.  I believe that's

12    occurred.

13    Q.     Now, I just have a few more questions before I

14    get into the meat of today's deposition.  Have you been

15    deposed before, Representative Jordan?

16    A.     One time.

17    Q.     And was that in your personal or professional

18    capacity?

19    A.     Sort of a mix.  It was a -- it dealt with a

20    business that myself and my father at one time had

21    invested in that ultimately -- we didn't participate in
```

Page 18

```
 1   the business.  We were one of many, many, many
 2   investors, and that business, I believe, went into
 3   bankruptcy, and then I testified and I testified on
 4   behalf of the trust.  My father had passed away, and so
 5   it's holding in the trust, and I testified on behalf of
 6   myself as well as that trust in regards to that business
 7   lawsuit.
 8   Q.      I stayed far away from trust and estate and
 9   bankruptcy law, but is that a fair characterization of
10   what the lawsuit entailed, bankruptcy or trust and
11   estate?
12   A.      Well, we were investors in a business that went
13   into bankruptcy.  Again, we were probably one of, I'm
14   guessing, 50 to 100 investors that -- that business went
15   into bankruptcy and then there were many, many, many
16   depositions, to my understanding, connected to how you
17   became an investor to what you knew about the business,
18   et cetera.  That's been several years ago.
19   Q.      Did you -- did that case go to trial?
20   A.      No, it did not.
21   Q.      Have you ever been a party to any lawsuit?
```

```
                                            Page 19

 1   A.        I don't believe so.

 2   Q.        And have you ever testified in court before?

 3   A.        I've testified one time, if I can remember,

 4   regarding -- it was in a criminal trial years ago.

 5   Q.        I now want to talk just a little bit more about

 6   your background.  Where were you born,

 7   Representative Jordan?

 8   A.        Florence, South Carolina.

 9   Q.        Is that where you grew up?

10   A.        That's right.

11   Q.        Where do you currently live?

12   A.        Florence.

13   Q.        Would it be safe to say you've been there your

14   whole life?

15   A.        Other than approximately eight years, I'm

16   guessing, in Charleston, which I -- for college and law

17   school, yes.

18   Q.        That gets me to my next question, where did you

19   go to college?

20   A.        The College of Charleston.

21   Q.        And I heard you mention law school, and you're
```

```
                                              Page 20
 1    in Charleston.  Where did you go to law school?

 2    A.      Charleston School of Law.

 3    Q.      Now, I'll talk a little bit more in a second

 4    about your employment history, but I first want to talk

 5    about your employment as an elected official in the

 6    House of Representatives.  What district do you

 7    represent?

 8    A.      District 63.

 9    Q.      What political party are you a member of?

10    A.      The Republican Party.

11    Q.      Representative Jordan, when were you first

12    elected to represent House District 63?

13    A.      2015.

14    Q.      And how many terms have you served in that role?

15    A.      I am currently in my fourth term.

16    Q.      Did you have any opposition in, I assume, the

17    Republican primaries in any of those elections?

18    A.      My very first run for the House, I had a primary

19    with two other individuals.

20    Q.      And do you recall those individuals' names?

21    A.      Mr. Robby Hill and Mr. Elijah Jones.
```

Page 21

1    Q.      And do you know if either of those individuals

2    were candidates of color?

3    A.      Sorry, please repeat that.

4    Q.      Were either Mr. Hill -- I don't know -- Elijah,

5    what was the last name?

6    A.      Jones.

7    Q.      Were any of them candidates of color?

8    A.      They were not.

9    Q.      And then, so for the other three -- my

10   apologies.  That was a -- sorry, there's -- I'm sure as

11   some of you know, there was the shooting yesterday and

12   we just -- there's some mass alert right now about -- an

13   emergency alert here with the subways here, so I

14   apologize for that.  I think I was just asking the

15   question, if I heard you right, in the other three most

16   recent elections, would it be fair to say you ran

17   unopposed in the primary?

18   A.      That's correct.

19   Q.      And in the general election, did you face any

20   opposition in any of those four terms?

21   A.      Yes, I believe in my second, third, and fourth

```
                                              Page 22
 1    term I believe I had general opposition.

 2    Q.       Do you recall any of the candidates who ran

 3    against you?

 4    A.       I believe the last candidate was

 5    Mr. Isaac Wilson.  Before that -- I see his face but I

 6    can't remember his name.  Those are the two I can sort

 7    of remember, I guess.

 8    Q.       From your recollection, were any of those

 9    candidates in the general election candidates of color?

10    A.       Mr. Wilson is of color.

11    Q.       Representative Jordan, what's the current racial

12    makeup of House District 63 after House Bill 4493

13    passed?

14    A.       I believe it's in the 26 -- 25 to -8 percentile,

15    somewhere in that ballpark.

16    Q.       And would that be the Black --

17    A.       Less than 30.

18    Q.       That's the Black population?

19    A.       I believe that's correct.

20    Q.       And was it roughly the same before the enactment

21    of House Bill 4493?
```

Page 23

1    A.       I don't believe it changed much at all, if any.

2    Q.       Are you up for reelection this year?

3    A.       I am.

4    Q.       Have you run for any other offices outside of

5    House District 63?

6    A.       I have.

7    Q.       What offices?

8    A.       In 2012, I ran unsuccessfully for the United

9    States House of Representatives in the 7th Congressional

10   District, and then this year, unsuccessfully, for the

11   South Carolina Senate.

12   Q.       And what congressional district would that have

13   been at the time in 2012?

14   A.       The 7th Congressional District.

15   Q.       And what's the senate district that you recently

16   ran for?

17   A.       Senate District 31.

18   Q.       That was a special election?

19   A.       That's correct.

20   Q.       Did you have any -- well, this is repetitive,

21   but who was your opponent in the primary?

Page 24

1    A.      Mr. Mike Reichenbach.

2    Q.      And do you know Mr. Reichenbach's race?

3    A.      He is African American.

4    Q.      Representative Jordan, do you hold any

5    leadership roles in the House?

6    A.      I am the chairman of the House Ethics Committee.

7    Q.      Anything within any caucus or other membership?

8    A.      Nothing within the caucus.  I'm also the

9    subcommittee chairman of the House Judiciary Election

10   Law Subcommittee.  So, nothing -- no technical

11   leadership position within the caucus.

12   Q.      Have you previously held any other roles or

13   chairmanships earlier in your time?

14   A.      No, no chairmanships other than those two.

15   Well, excuse me, and the committee which brings us here,

16   chairman of Judiciary and Ad Hoc Committee.

17   Q.      And we'll talk about that in a moment.

18   Representative Jordan, what do you consider legislative

19   priorities for you and your district?

20   A.      I've always believed in -- sort of the big

21   things I've always pushed would be infrastructure,

Page 25

```
 1    education, economic development, those kind of things.

 2    That's just some highlights, I mean, it's an

 3    all-encompassing kind of -- priorities have to adapt to

 4    the times and the needs of your community.

 5    Q.      As an elected official, do you have any concerns

 6    about racism in South Carolina?

 7    A.      Certainly I want South Carolina to combat that

 8    at every turn and to be known for a state that's against

 9    it.

10    Q.      Have you sponsored any legislation to combat

11    what you understand to be racism in South Carolina?

12            MS. HOLLINGSWORTH:  Object to the form.

13            THE WITNESS:  Sponsor -- my time in the House, I

14    tend to see sponsorship as a -- I'd say it's more

15    important what you vote on than what you sponsor.  I

16    don't recall that I've sponsored any particular

17    legislation that falls in that category.

18    BY MR. CUSICK:

19    Q.      I guess, have you voted for any bills that have

20    combated what you understand to be racism in

21    South Carolina?
```

```
                                              Page 26
 1   A.        Recently, the House passed a ACORN legislation
 2   becoming -- that legislation sits over the Senate, if I
 3   remember correctly; I voted in favor of that.
 4   Q.        Any other bills?
 5   A.        My first term in the House, we dealt with the
 6   removal of the Confederate flag from State House
 7   grounds.  I voted in favor of that proposal.  That
 8   certainly was seen by many as a racially charged
 9   situation.
10   Q.        Why did you vote in favor of removing the
11   Confederate flag from the State House Capitol?
12   A.        Many reasons.  We had just experienced in South
13   Carolina the tremendous tragedy in Charleston of
14   Emanuel; that really was just an awful time for South
15   Carolina.  I mean, people were hurting, and for so many
16   people, having a Confederate flag on the State House
17   grounds, that didn't do anything to help us turn the
18   page and ill winds related to that tragedy.  I'd say
19   that was at the forefront of my personal decision.
20   Q.        Representative Jordan, as an elected official,
21   do you have any concerns about segregated schools in
```

```
                                                      Page 27
 1    South Carolina?

 2    A.      I'd think if you go back, certainly South

 3    Carolina hasn't gotten it perfect in that department

 4    back in history.  But I think -- I certainly think we've

 5    improved in that department over the last few decades,

 6    for sure.

 7    Q.      And even with those improvements, do you still

 8    have any concerns about segregated schools in South

 9    Carolina?

10    A.      When you say concerns, what do you mean by that?

11    Q.      As an elected official, have you read or become

12    aware of concerns voiced by members of the public about

13    segregated schools?

14    A.      I have not.

15    Q.      As an elected official, are there any issues or

16    have you heard of any issues that disproportionately

17    impact Black South Carolinians?

18    A.      I would need -- are you asking me to provide

19    specifics or are you giving me --

20    Q.      I'm just asking if you're aware of any or if

21    there are any that you're concerned about?
```

```
                                             Page 28

 1    A.      I go back to an answer from prior in the

 2    deposition, I mean, certainly I want South Carolina to

 3    be a great place to live for every person in South

 4    Carolina regardless of race, sex, et cetera.

 5    Q.      Are you aware of any issues that have been

 6    voiced about policies that impact, disproportionally

 7    impact, Black South Carolinians?

 8    A.      I've heard testimony over the last couple years

 9    as South Carolina has engaged in -- at least as the

10    Judiciary Committee engaged in various pieces of

11    legislation concerns in various subcommittee hearings.

12    Q.      And what are some of those concerns?

13    A.      I remember during our debate of reforming

14    election laws in South Carolina, some of the concerns

15    were brought to the attention of the committee.

16    Q.      I think I heard you say election laws, is that

17    right?

18    A.      Yes, that's just a bill that we dealt with or a

19    piece of legislation we dealt with in the last couple of

20    years in the House, or at least in the

21    Judiciary Committee, that I remember that I believe
```

Page 29

1   there was testimony in that regard.  I don't remember

2   the specifics, I just remember, you know.

3   Q.      And is there anything else outside of that from

4   your memory?

5   A.      Again, during the course of a legislative

6   session, you go through so many different pieces of

7   legislation, it's hard to pull any particular item out

8   and say specifics from each one or a particular one.

9   Q.      Representative Jordan, are you aware of any

10  history of discrimination against Black South

11  Carolinians?

12  A.      In South Carolina's history, yes.  I've taken

13  South Carolina history and certainly agree it existed in

14  the past.

15  Q.      What about in the voting context?

16  A.      Certainly, if you go far enough back in history,

17  things such as -- I believe laws existed in the past

18  that were racially motivated.

19  Q.      What time periods are you referring to?

20  A.      Pre-segregation era.

21  Q.      What do you consider pre-segregation era?

```
                                                    Page 30
 1    A.       If you go back to South Carolina, Brown versus
 2    Board of Education, and some of those era issues and
 3    lawsuits.
 4    Q.       And what is your understanding of when those
 5    cases were brought for time period purposes?
 6    A.       That would have been in the -- I guess, in the
 7    1950s and perhaps early '60s.
 8    Q.       And do you have any understanding of a history
 9    of discrimination against South Carolinians in the
10    voting context after the 1950s?
11    A.       Again, I should have brushed up on my history
12    before today, but I don't have it off the top of my head
13    specifically.
14    Q.       Are you aware that any of it exists, without
15    knowing the details?
16    A.       I'm not aware of any -- I'm not aware of any in
17    recent history.
18    Q.       What do you define as recent history?
19    A.       Since I've been involved in politics.
20    Q.       So that would be -- would that be when you first
21    ran in 2012 or since you've been elected in 2015?
```

Page 31

1   A.      Since -- I wasn't aware of any in 2012 and

2   nothing forward.

3   Q.      Does the history of discrimination that we

4   talked about in the 1950s at all inform how you assess

5   bills today?

6   A.      I try and approach every piece of -- every bill,

7   every piece of legislation as if -- how does it impact

8   the people of Florence and the people of South Carolina

9   regardless of, again, race, as well as other such

10  criteria.

11  Q.      Does history -- does any history inform your

12  assessment of bills?

13          MS. HOLLINGSWORTH:  Object to the form.

14          THE WITNESS:  I mean, certainly history, for

15  lack of a better description, it's how we got to where

16  we are, so it affects and impacts how we got here and

17  where we're going, so to speak, so in that respect, yes.

18  But specifically talking about legislation, I'd have to

19  have a specific piece of legislation to tell you if it

20  impacted and if so, how.

21  BY MR. CUSICK:

```
                                               Page 32

 1   Q.       In the voting context, do you consider any

 2   history of discrimination?

 3   A.       No, I think the best way to look in the voting

 4   context is, you know, are we providing access to

 5   everyone, and so I suppose it does impact in that

 6   respect, looking back at our history from many, many

 7   years ago.  But I'd say practically and specifically,

 8   we're worried about making sure everyone has the

 9   opportunity to participate in the process.

10   Q.       When you consider legislation, do you ever

11   consider its impact on racial minority groups?

12   A.       I'd say, again, I try and consider it for the

13   people of Florence and, in the broader picture, the

14   people of South Carolina, and obviously racial minority

15   groups are including in those instances so, yes.

16   Q.       Have you conducted -- I guess, do you have any

17   examples of times when you've studied or analyzed the

18   potential impact of a bill on a racial minority group?

19   A.       Again, if you can provide me a specific piece of

20   legislation I can tell you with clarity, but reaching

21   back into the history of four terms in seven years, it's
```

Page 33

1    a little more difficult.

2    Q.      Well, I guess, is there any recollection where

3    you've asked for a study about how a bill might impact a

4    protected class or a racial minority group?

5    A.      I don't think during my time in the House I've

6    asked for a study committee or anything like that, in

7    any piece of legislation.  I know we routinely do that

8    and I've, I'm sure, voted for that during the course of,

9    again, seven years and four terms.

10   Q.      Is the term racial equity impact assessment, is

11   that familiar to you?

12   A.      I've heard that term but not many times.

13   Q.      Are you aware of any of those reports being

14   asked for on voting bills that you've considered

15   recently?

16   A.      I am not.  That's not to say that it didn't

17   occur or wasn't, I just don't recall.

18   Q.      I know you mentioned that for the Black

19   population within Florence that you represent, when

20   you're considering bills as your general practice, is

21   there anything in particular where you seek out input or

Page 34

1  guidance from Black community members on voting bills

2  within your district?

3  A.      Most of the time I've found that your

4  constituents come to you.  You don't have to seek out a

5  whole lot.  They tend to let their voices be heard

6  either through phone, in person, or e-mail during the

7  course of whatever the issue is.  And, yes, I have

8  received input from all sorts of folks during the course

9  of my time as representative.

10  Q.      Have you reviewed any of the expert reports in

11  this case?

12  A.      I have not.

13  Q.      Do you know who Dr. J. David Woodard is?

14  A.      I do not.

15  Q.      Do you know who Sean Trende is?

16  A.      I do not.

17  Q.      I might know the answer to this, but what about

18  Thomas Brunell?

19  A.      I believe I've -- I've never met Mr. Brunell.

20  I've never talked to Mr. Brunell, but I believe he's the

21  defense expert.

Page 35

1        COURT REPORTER:  I'm sorry, he's the what?

2        THE WITNESS:  I believe he's the expert for the

3   defense.

4   BY MR. CUSICK:

5   Q.       In your work as a legislator in South Carolina,

6   are you familiar with the term cultural tradition?

7   A.       I'm aware of cultural traditions.  I don't know

8   that I've ever heard it put in the -- I'm aware of

9   cultural traditions.

10  Q.       And how would you define cultural tradition?

11  A.       I think it varies from culture to culture.  I

12  can give you an example:  I'm a Baptist and we're going

13  to have communion.  That, in my mind, is something of a

14  cultural tradition.  We're going to have that this

15  evening, it's Holy Week.  So it's just an example in my

16  mind of a cultural tradition.

17  Q.       And how do cultural traditions or how did it

18  impact redistricting, from your perspective?

19  A.       I'd say that was best seen during the course of

20  the Ad Hoc Committee public hearing process across the

21  state, which we had many, many, many South Carolinians

Page 36

```
 1   come forward and testify.  Many testified about

 2   communities of interest, and contained within

 3   communities of interest are cultural traditions, I found

 4   to be the case many times.  So, I'd say it probably best

 5   demonstrated itself in that process.

 6   Q.      And staying within the redistricting context,

 7   what does the term political culture mean for you within

 8   the redistricting context?

 9   A.      Political culture, I would suppose I'd define as

10   more along the lines of the process of redistricting, of

11   getting it through the political process of having it

12   approved by the House and Senate and governor.

13   Q.      This is my last question on culture.  Is the

14   term civil culture at all familiar to you in the

15   redistricting context?

16   A.      In the redistricting context, I would probably

17   apply that in terms of, again, connecting it back to

18   those public hearings of individuals coming and

19   testifying --

20   Q.      I don't know if it was just for me.  Did it cut

21   out at all for anyone else?
```

```
                                            Page 37

 1    A.       You blinked for a second.

 2    Q.       Can you hear me now?

 3    A.       Yes.

 4    Q.       Representative Jordan, are you familiar with

 5    statements that race and political affiliation are

 6    correlated in South Carolina?

 7    A.       You say statements.  Just the concept, to see

 8    we're connected?

 9    Q.       Yes, race or party or race and political

10    affiliation.

11    A.       I've heard that, seen -- you know, every

12    election season, you see different polls in the

13    newspapers and things like that, so to that extent, yes.

14    Q.       What do you understand that to mean, that race

15    and party are correlated in South Carolina?

16    A.       That if you were to statistically analyze the

17    party structure, there's going to be a higher percentage

18    -- it's going to have a percentage connection to parties

19    as far as that goes.

20    Q.       Do you, as an elected official, believe that

21    race and party are highly correlated in South Carolina?
```

```
                                                  Page 38
 1    A.       You say correlated, I don't think that one

 2    begets the other, but I would say there is a statistical

 3    connection, yes.

 4    Q.       Do you have any understanding why that might be

 5    to the connection you referenced?

 6    A.       I don't think that has changed in my ten years,

 7    so I can't really give you much by way of background as

 8    to -- so, the answer's no.

 9    Q.       Do you know whether the majority of registered

10    voters in South Carolina are Democrats or Republicans?

11    A.       I believe the majority of registered voters in

12    South Carolina are both.

13    Q.       Do you have any understanding whether White

14    Democrats in the state tend to vote along party lines?

15    A.       I do not know the answer to that.

16    Q.       Do you know what racially polarized voting is?

17    A.       I've heard the term, but I'm not an expert

18    enough to give you a textbook definition.

19    Q.       Is there any way, from what you have heard, how

20    you would describe it?

21    A.       It would be pure speculation on my part.
```

```
                                                       Page 39
 1    Q.      If I explained it that Black voters tend to vote

 2    as a block for a particular candidate and White voters

 3    tend to vote as a block for another candidate, would

 4    that at all help you understand the term?

 5    A.      That would make sense, but I'm basing that

 6    partially on your line of questioning as well.

 7    Q.      Fair enough.  So, then, I guess -- I don't know

 8    if you'd be able to answer this question -- but do you

 9    have any reason or basis to believe that racially

10    polarized voting exists in South Carolina?

11    A.      Again, if you go back to the statistics I was

12    referencing a moment ago that I, again, don't have in

13    front of me, polarized is a big word, but I think you

14    can legitimately make the connection.

15    Q.      During the redistricting process, did you ever

16    seek out, or the Redistricting Committee -- any

17    assessments of racially polarized voting?

18    A.      I would say it was important to me and I would

19    assume leadership, based on the structure of the

20    committee, that we had a good cross section of the House

21    Representatives down in South Carolina.  What I mean by
```

Page 40

1    that is, that it be individuals from different parts of

2    the state but also different individuals with different

3    backgrounds.  And then looking at the committee, I would

4    say it was important that we had voices from all

5    different aspects of race, sex, geography, political

6    party.  So in that context, absolutely.

7    Q.      So, would it be fair to say racially polarized

8    voting mattered in the composition of the Redistricting

9    Committee?

10   A.      Repeat that question.

11   Q.      Would it be fair to say that racially polarized

12   voting mattered in terms of the membership or

13   composition of the Redistricting Committee?

14   A.      I don't know if I would word it exactly like

15   that.  I would say that, again, it was important that we

16   got a broad cross section of people to participate in

17   the process and having the perspective of, again,

18   different folks from different geography, party, race,

19   sex.  All those things were part of that.

20   Q.      And outside of the points you mentioned about

21   participation and viewpoint, was there any other basis

Page 41

1    that racially polarized voting mattered to your work on

2    the Redistricting Committee?

3    A.        I would also point you back again to the public

4    hearings across the state, and we heard testimony from

5    individuals, I believe, from different groups, including

6    the NAACP, that spoke up on that particular concern and

7    we listened and -- or at least I listened -- and took

8    heed that we needed to -- going back to my overarching

9    idea -- we needed to hear from everyone and take into

10   consideration what we were told.

11   Q.        Based on that testimony, do you recall any

12   requests to conduct a racially polarized voting analysis

13   from members of the public?

14   A.        I don't recall, but that doesn't mean that it

15   didn't happen.  I just don't recall.  Again, that was --

16   sometime back, now, it definitely factored into the

17   process, but it was some time back, and it was over ten

18   different stops across the entire state of South

19   Carolina.

20   Q.        And my last line of questions about your

21   employment that is liking taking you from what you would

```
                                              Page 42
 1   otherwise be doing today, outside of your work as a

 2   House of Representatives member, where else are you

 3   employed?

 4   A.      I'm a solo practitioner attorney in Florence.

 5   Q.      How long have you been a solo practitioner?

 6   A.      I've been on my own for, I'm guessing, 12 years.

 7   Q.      And was there anything before that?

 8   A.      I practiced with another lawyer.  We practiced

 9   together for I think two and a half, three years and

10   then he left to take a judicial position, so since that

11   time.

12   Q.      Are you a member of any community groups in

13   Florence?

14   A.      I am.  I'm a member of the Florence Rotary Club,

15   I'm a member of Florence Baptist Temple, I'm a member of

16   the Florence Country Club.  I believe that's it.

17   Q.      Do you sit on any boards of organizations?

18   A.      Well, let me back up.  You mean in the context

19   of my position as a representative or just separate from

20   that?

21   Q.      I was thinking, I guess, both would be covered.
```

```
                                               Page 43
 1    I was initially thinking in your personal capacity, but
 2    if you do sit on boards as an elected official outside
 3    of committees then, you know, that would be included in
 4    the question, then.
 5    A.        In my personal capacity, I used to, but since
 6    becoming a representative, that sort of made that a
 7    little more difficult.  In my -- now in my
 8    representative capacity, I'm also a member of the
 9    Indigent Defense Commission here in South Carolina.  I'm
10    the Judiciary appointee to that comission.
11    Q.        You referenced -- what was the organization that
12    you referenced would be difficult to maintain as an
13    elected official, where you served?
14    A.        I was a member of various groups:  Family
15    Promise of Florence organization that dealt with
16    homelessness.
17    Q.        I see on your personal page for the House of
18    Representatives you list your address; is that right?
19    A.        Yes.
20    Q.        Is it common for other members to list their
21    personal addresses on their web page?
```

Page 44

1    A.      Well, I don't have that in front of me.  Does

2    that have my personal address on that?  I haven't looked

3    at that in quite some time.

4    Q.      It might need to be updated, but it's 1338 Lazar

5    Place?

6    A.      Yes, that's my personal address.

7    Q.      Do you know how many other members include their

8    personal addresses?

9    A.      I do not.

10   Q.      I know there were discussions about incumbency

11   during the redistricting process.  Was there any attempt

12   to provide addresses for all 124 current House of

13   Representatives publicly so that people would know where

14   to include those addresses in the maps they drew?

15   A.      I'm not aware of that.

16   Q.      And I apologize for having to ask this last

17   question, but now that we're in a social media age, I

18   think I found your social media account on Twitter.  Is

19   that -- what's the handle for that?

20   A.      So, I know it exists but I couldn't pull it up

21   or find it if you asked me to.  I believe it's Jordan

Page 45

1   for South Carolina or Jordan for SC, something along

2   those lines.

3   Q.      That's the one I found.  Is there any others

4   outside of that affiliated with you as an elected

5   official?

6   A.      I think there's a Facebook page, if I remember

7   correctly.

8   Q.      And do you use either of those accounts to

9   publicize work around redistricting?

10  A.      I don't recall.  I might have mentioned public

11  hearings but that's, again, that's pure speculation,

12  looking back.  I'm not the most technically

13  sophisticated and that translates into social media.

14  Q.      Fair enough.  My daughter talks about all these

15  different apps every day and I feel older each and every

16  day.  I'll now -- I think we'll finally get to now more

17  questions directly related to this litigation.  If

18  you'll give me a moment, I'm about to try to upload an

19  exhibit that is titled, House Defendants James H. Lucas,

20  Chris Murphy, and Wallace H. Jordan's Response to

21  Plaintiffs' First Request for Production as Plaintiffs'

```
                                                    Page 46
 1    Exhibit 1 into Exhibit Share, though I think I might

 2    have --

 3    A.      Well, before we do that, would it be a

 4    reasonable time to take a break?

 5    Q.      Yes, I'll figure it out on Veritext to get those

 6    uploaded and you want to come back at 11:05?

 7    A.      Five minutes, yeah, that's perfect.

 8    Q.      Or if you want 10, it's totally up to you?

 9    A.      No, I've had too much water and coffee.

10    Q.      Sounds good.  We'll go off the record, then.

11    A.      Thank you.

12            VIDEOGRAPHER:  Off the record at 10:58 a.m.

13            (Short recess was taken.)

14            VIDEOGRAPHER:  This is the beginning of media

15    unit number 2.  Back on the video record at 11:08 a.m.

16    BY MR. CUSICK:

17    Q.      Representative Jordan, I went ahead and marked

18    what is titled as House Defendants James H. Lucas, Chris

19    Murphy, and Wallace H. Jordan's Response to Plaintiffs'

20    First Request for Production of Documents as Plaintiff

21    Exhibit 1, which hopefully now should be in front of
```

```
                                                    Page 47
 1    you.  It's the second actual document listed, beginning

 2    with Exhibit 001.  Let me know if you're able to see

 3    that document.

 4    A.       Yes, I have that document in front of me.

 5             (Exhibit 1 marked for identification and

 6    attached to the transcript.)

 7    Q.       And I'm happy to give you a moment to just look

 8    at it, but I'm wondering if you recognize this document?

 9    A.       I have seen this document before, yes.

10    Q.       Did you review this document or provide any

11    input into it, without going into the actual content or

12    discussion?

13    A.       I believe to some degree, yes.  Not in depth but

14    just to a slight degree, yes.

15    Q.       And I'll just refer to this for shorthand as

16    Plaintiffs' request for production, if that's okay with

17    you?

18    A.       Sure.

19    Q.       Do you plan at all on supplementing or changing

20    any of your answers in this document?

21    A.       Not to my knowledge.
```

Page 48

1    Q.      Now, I'll do a similar set of questions for what

2    I've marked as House Defendants James H. Lucas, Chris

3    Murphy, and Wallace H. Jordan's Response to Plaintiffs'

4    First Request for Interrogatories, which is marked as

5    Plaintiffs' Exhibit 2 and is the third document right

6    now within Exhibit Share.  Let me know if you see that

7    document and are able to pull it up.

8    A.      I don't have that document in front of me, but I

9    think we can access it pretty easily.

10           (Exhibit 2 marked for identification and

11   attached to the transcript.)

12   Q.      Yeah, you also might need to -- I think in other

13   depositions -- refresh the screen and it might pop up.

14   A.      So, yes, I can go back and forth between the two

15   documents.

16   Q.      Yes.  And now -- so that Plaintiff Exhibit 2,

17   which I'll maybe refer to as shorthand as Plaintiffs'

18   interrogatories -- do you recognize this document?

19   A.      I do recognize this document.

20   Q.      And, like I asked before, did you provide any

21   input into it, again without going into the substance of

```
                                              Page 49
 1   the content of those discussions?
 2   A.      I would say some, yes.
 3   Q.      Do you plan on supplementing or changing any of
 4   these answers or responses?
 5   A.      I do not believe so.
 6   Q.      Were you asked by your counsel -- and my next
 7   set of questions won't refer to either of these
 8   documents per se but, you know, feel free to bring them
 9   up if they're helpful --  were you asked at all by your
10   counsel to produce documents related to this case?
11   A.      I don't believe so.
12   Q.      Did you produce any documents related to this
13   litigation?
14   A.      When you say -- you're referring to me
15   personally?
16   Q.      To the extent it overlaps with your
17   redistricting work as a elected official.
18   A.      Not that I recall.
19   Q.      For your redistricting work, what e-mail
20   accounts did you use?
21   A.      So, two e-mail accounts, I would guess.  First
```

```
                                              Page 50
 1    would be the House, my House e-mail account, and then

 2    secondly, I have a personal e-mail account that

 3    sometimes staff will copy on it for purposes of

 4    scheduling and things like that to make sure I show up

 5    where I'm supposed to.  It's my law firm personal

 6    account.

 7    Q.      Is that e-mail wallacejordan2@gmail.com?

 8    A.      Yes.

 9    Q.      So, no other e-mails outside of your House and

10    that Gmail one that were used to discuss redistricting?

11    A.      That's correct.

12    Q.      And who is Linda Anderson?

13    A.      Linda Anderson is the former -- I'm trying to

14    think of her technical title -- she essentially ran the

15    Judiciary Committee administratively.

16    Q.      Would that mean like scheduling purposes and

17    those types of tasks?

18    A.      That's correct.

19    Q.      Would you say one of these e-mails is your

20    primary one as a legislator?

21    A.      Probably my House account.  The .gov account
```

```
                                                       Page 51
 1    would be the primary method of -- that's where

 2    constituents reach out to and things like that.

 3    Q.      And why might you use your personal e-mail

 4    account for work within the scope of legislation or the

 5    legislative process?

 6    A.      Scheduling and things like that, just to make

 7    sure that, again, I show up where I'm supposed to when

 8    I'm supposed to, so it tends to help that my paralegal

 9    occasionally checks that e-mail to verify I'm not

10    missing anything.

11    Q.      And so, it'd be fair to say just for scheduling,

12    then?

13    A.      I'm sure there are sometimes things, you know --

14    I'd say primarily for scheduling.

15    Q.      Do you recall any non-scheduling e-mail

16    exchanges on your Gmail account related to

17    redistricting?

18    A.      I don't recall any.  Not to say it didn't

19    happen, but I don't recall any.

20    Q.      Have you gone back at all to review if there are

21    any e-mails related to redistricting on your Gmail?
```

Page 52

1    A.      I did go back and did a simple search of terms

2    like redistricting, reapportionment, things like that,

3    to see if there was anything that existed, and I didn't

4    find any.

5    Q.      When did you conduct that search?

6    A.      It's been several weeks.  In the last 30 days, I

7    would guess, around that ballpark.

8    Q.      I heard the terms redistricting and

9    reapportionment.  Were there any other search terms that

10   you recall you used?

11   A.      There might of been one or two more, but I don't

12   remember them off the top of my head.

13   Q.      Do you have a work cell phone as an elected

14   official?

15   A.      I do not.

16   Q.      I guess, then, do elected officials use their

17   personal phone or business phone, then, for cell phone

18   use?

19   A.      I do.  I can only assume.  We're not issued -- I

20   mean, we have -- we're issued a workstation at the State

21   House, a computer or a desktop, but other than that, I

```
                                              Page 53
 1   don't think we're issued any type of device.  So,

 2   therefore, practically speaking, my phone is my only

 3   phone.

 4           COURT REPORTER:  Ms. Hollingsworth, did you say

 5   anything?

 6           MS. HOLLINGSWORTH:  I objected to the form of

 7   the last question.

 8           COURT REPORTER:  Thank you.

 9   BY MR. CUSICK:

10   Q.      I guess within what you said, then,

11   Representative Jordan, would it be fair to say, then,

12   you used that personal cell phone to discuss

13   redistricting?

14   A.      I'm sure I have, yes.  I had phone calls with

15   many folks in some form, relating in some form to

16   redistricting, yes.

17   Q.      When you say folks, are you referring to

18   legislators?

19   A.      Legislators would be on that list, constituents

20   would be on that list, an attorney in this capacity

21   would be on that list.
```

Page 54

1  Q.      Anyone else you can think of?  My apologies.

2  A.      I was just going to say I spend a lot of time on

3  the road back and forth from Florence and end up on the

4  phone quite a bit.

5  Q.      What about any text messages?

6  A.      I did text some -- some, if not all, of the

7  members of the Ad Hoc Committee for purposes of

8  scheduling at times, if I remember correctly.  Going

9  back to the beginning of this process, again, we had I

10  believe it was 10 -- 9 or 10 meetings across the state

11  and then multiple meetings in Columbia, and pretty much

12  all of those meetings were, if I remember correctly,

13  outside the confines of what would be our normal session

14  dates, and so trying to coordinate to let folks know

15  when we were having meetings and working around to find

16  meeting dates that would work within their schedules and

17  things like that.  So, yes, in those -- and that's just

18  an example of the primary use, I would say.

19  Q.      Was there any other discussions to your

20  recollection outside of scheduling with Ad Hoc Committee

21  members?

Page 55

1   A.      May have had -- not that I recall.

2   Redistricting is tough to do over the phone.  You have

3   to -- you need to be able to see it to recognize what

4   you're talking about.  So, I'd say primarily, you know,

5   it was more of a face-to-face, screen-to-screen kind of

6   thing, if that makes sense.

7   Q.      Would that include FaceTime or other apps that

8   allow you to be screen-to-screen or face-to-face?

9   A.      I believe we did have a couple of FaceTimes with

10  a couple different members of the Ad Hoc Committee

11  during the course of this process.

12  Q.      And does that include Ad Hoc staff?

13  A.      I believe Ms. Dean would of probably been a part

14  of those meetings.

15  Q.      Have you gone back like you did with your e-mail

16  to search any relevant conversation related to

17  redistricting?

18  A.      What meeting are we talking about?

19  Q.      Just have you gone back to -- similar like you

20  did where you used search terms for your e-mail to

21  understand the full scope of your e-mails, did you do

```
                                              Page 56
```

1    something similar to see the full scope of text messages

2    that were on your personal phone related to

3    redistricting?

4    A.      Yes, I did go back and perform a similar search

5    on my texts, and then I also tried my best to remember

6    if I had any different text communications with members

7    of the Ad Hoc Committee before the House Representatives

8    and based on -- so, yes, is the answer.

9    Q.      And what did that search entail in terms of

10   search terms or just going person by person?

11   A.      A little bit of both.  I used -- similar like I

12   described in the e-mail -- search terms and then I do

13   remember a text or two.  Just kind of as you go along

14   things pop in your head, so I would go back and see if I

15   could search a particular member who had asked a

16   question about the map room or something like that, and

17   I'd go look for that.  And then I did pull up -- I don't

18   know if I did -- I think I did everyone -- but I think I

19   did everyone -- but pulled up every member of the Ad Hoc

20   Committee that I could find there was a text history

21   there to see if it was texting related to redistricting.

```
                                                    Page 57
 1    Q.       Have you provided those texts to your counsel in

 2    this case?

 3    A.       A couple I just remembered, and I don't think

 4    I've given those over yet, but we've made arrangements

 5    for me to do that.

 6    Q.       Got it.  And I know that there's the general

 7    redistricting at southcarolinahouse.gov.  Who controls

 8    access to that e-mail or, I guess, who is looking at

 9    those e-mails coming in?

10    A.       That would be House Judiciary, and I believe

11    Ms. Dean would be the primary there.

12    Q.       Were e-mails that went there forwarded to all

13    Ad Hoc Redistricting Committee members?

14    A.       No, they would not have been forwarded.  Most if

15    not all of those e-mails were made available by print,

16    if I remember correctly.  You could either, A, get a

17    copy if you wish or, B, you could come by House

18    Judiciary and review it, if I remember correctly.

19    Q.       So, if somebody sent written testimony in

20    related to redistricting, what would be the process for

21    it to be received or put in front of the Ad Hoc
```

Page 58

1  Committee?

2  A.     Again, they could request -- I can't say for

3  certain every e-mail was printed for every member of the

4  Ad Hoc Committee.  They could either ask for that to

5  occur, like I did, or they could have access to review

6  if they chose   to go to the front of the screen and

7  look at it.  I know -- I don't believe every e-mail was

8  forwarded on to members.  I chose to have it printed out

9  just so it was easier for me to go through it page by

10 page.

11 Q.     I know there were probably lots of written

12 comments.  Do you have a ballpark of what your process

13 was for determining which ones to print out or to

14 request to review?

15 A.     I just asked for all -- all relevant comments

16 pertaining to redistricting.

17 Q.     And so for your redistricting work outside of

18 fellow legislators, House staff, and members of the

19 public, did you speak to any third-party organizations?

20 A.     No.

21 Q.     Any political organizations?

```
                                                    Page 59
 1    A.        When you say speak to, I think I did get a call
 2    from -- I can't remember who it was now -- someone in
 3    the Republican Party, just congratulations, condolences
 4    on being chairman of the district.  That type of --
 5    nothing pertaining to the process itself.
 6    Q.        Any lobbyists?
 7    A.        No, not that I recall.
 8    Q.        Consultants?
 9    A.        Not that I recall.
10    Q.        Anyone from the governor's office?
11    A.        My nephew works for the governor's office, and I
12    think he -- we talk on a regular basis and I'm sure it
13    came up in conversation, but no one specifically.
14    Q.        And I think I might have the answer to these
15    next set of questions, but if you'll just bear with me
16    for a moment.  Was your primary communication with
17    Mr. Dennis face-to-face?
18    A.        Yes.
19    Q.        Is that true for Speaker Lucas, Representative
20    Murphy, and Ms. Dean?
21    A.        I probably spoke more to Ms. Dean than anyone
```

```
                                                    Page 60
```

1    because she was -- Ms. Anderson retired somewhere in

2    this process, and so she was the primary person for

3    purposes of scheduling and logistics and things like

4    that.  So, I probably spoke on the phone more with her

5    than anyone.  Yes, to the rest, I would say.

6    Q.      As chair of the Redistricting Committee, did you

7    at all regularly have a standing meeting or meet

8    regularly with any House leadership about redistricting?

9    A.      No, when I would -- it was not a standing

10   meeting, no.

11   Q.      I guess how often would you meet, then, with

12   House leadership over redistricting?

13   A.      There really weren't many meetings.  I mean,

14   Speaker Lucas would ask if we were on schedule, you

15   know, making sure that we were -- everyone recognizing

16   that we were doing our best to -- waiting on the census

17   data, and then from that time of receiving the census

18   data, pushing the process forward.  So we would

19   occasionally discuss time lines and things like that.

20   Q.      Now, I'll talk a little bit more -- I know we've

21   been using, and I think we're on the same page, either

Page 61

1    Ad Hoc or Redistricting Committee as shorthand for -- do

2    you understand if I use that as shorthand that we're

3    talking about the same thing?

4    A.      Yes.

5    Q.      Before this redistricting cycle, had you been

6    involved in any redistricting efforts?  I guess that

7    would have been 2010, 2011.

8    A.      That pre-dates me.

9    Q.      And I guess could you talk about the process for

10   the creation of the Ad Hoc Committee?  Who convened it,

11   how members were selected, to the extent you know?

12   A.      That first got on my radar back pretty early in

13   '21 or maybe even as late as end of '20 as we came into

14   another term in the House.  It was time for committee

15   appointments and subcommittee appointments, and my first

16   knowledge that I might be involved was my going on the

17   Election Law Subcommittee that was sort of -- I may be

18   involved in the process.  And I believe I spoke with

19   Speaker Lucas and Chairman Murphy that that was a

20   possibility.

21   Q.      Do you know how members were selected for the Ad

```
                                              Page 62
 1    Hoc Committee?

 2    A.      Like we talked about earlier, it was an effort

 3    to create a statewide geographical committee.

 4    Originally, we had one member from each congressional

 5    district and then the chairman, and then it was --

 6    became clear to me that it was important that -- so that

 7    it'd be geographically diverse that it be diverse as far

 8    as the party goes, not all Republican or all Democrat,

 9    obviously.  A mixture of Republican and Democrat and so

10    too race and sex.

11    Q.      And based on what you testified to, was that

12    discussions with Speaker Lucas, Representative Murphy,

13    and anyone else?

14    A.      I'd say it's a combination of discussions but

15    also me observing and watching these kind of things fall

16    into place and looking how it came to be.

17    Q.      Were you selected as chair before the Ad Hoc

18    Committee membership was fully selected?

19    A.      If I remember correctly, it all kind of came

20    together in a similar time period.

21    Q.      And I think I recall at some point in the
```

```
                                                     Page 63

 1    testimony, one of the members withdrew from the

 2    committee; is that right, at some point?

 3    A.      That's correct, Mr. Brandon Newton had to

 4    withdraw at the last minute.  His wife had just had a

 5    child, a new baby, and I think that they were trying to

 6    get life kind of under control.  That's how he described

 7    it to me when we discussed it.

 8    Q.      I would say that's probably more hectic than the

 9    work on the Redistricting Committee, to try to balance

10    both.

11    A.      I think when he explained back home that he

12    would have to be in nine different places across the

13    state over a two-to-three week period, it became, you

14    know, just a -- too big of a mountain to climb.

15    Q.      Which congressional district would

16    Representative Newton, I guess, represent?

17    A.      So, he lives in the Lancaster area, so that

18    would be the 5th.  I'm trying to see the map in my head.

19    It encompasses essentially York, Lancaster, that part of

20    the state.  I'm blanking on the number.

21    Q.      Was his seat, I guess, filled or replaced by
```

```
                                                    Page 64
 1   someone else?
 2   A.        It was not, due to the timeliness.  We were
 3   literally beginning the process of a statewide tour
 4   within days, and it was such that -- it was a
 5   logistically difficult scenario to put all of this into
 6   place, and given that time line, the position was not
 7   filled.
 8   Q.        And was that a joint decision with you as chair
 9   and other folks, or who made that determination that it
10   would be logistically difficult?
11   A.        I recall that when Mr. Newton informed me he
12   didn't think he could participate, my opinion on the
13   matter was that it would be very difficult to bring
14   someone in at that late date and given the time
15   commitment, so it would be very difficult.  In my
16   opinion, it would be very difficult to fill the
17   position, and we had -- again, we had a committee that I
18   felt like was capable, up to speed, ready to go,
19   represented, you know, all parts of -- the far-reaching
20   parts of South Carolina, maybe not that particular
21   congressional district, but a statewide basis, I guess
```

Page 65

1    I'd say.

2    Q.      Did you reach out to any elected officials to

3    see if they might have any interest?

4    A.      I did not.

5    Q.      Do you know if anyone -- I don't know if

6    volunteer would be the right word -- but expressed

7    interest in filling that seat or spot on the committee?

8    A.      No one did to me.

9    Q.      As chair of the committee, what would be your

10   primary responsibilities, or what were?

11   A.      I'd say it depends on, you know, where you are

12   in the process.  The beginning phases it's, again,

13   making sure everyone -- trying to coordinate with as

14   many people as possible to be present and to participate

15   in the public hearings.  As chair of that committee, it

16   was very important to me that we had a good attendance

17   record, and I think overall we did, by members of the

18   committee.  So, communicating with them the importance

19   of it and where we were going, when we were going, those

20   kind of things, that was a major component of it to

21   begin with.  And then, over time, that transitioned to

Page 66

1   trying to help in the map room to make sure that

2   logistically worked.  And then, ultimately, that sort of

3   changes into passing the legislation.  You know,

4   ultimately this process requires that we pass bills, so

5   to speak.  And now -- that'd be it.

6   Q.      Who -- I guess, as chair, who would determine --

7   I guess who determined the schedule for the initial set

8   of public hearings from September to October?

9   A.      I participated heavily in that, so a lot of that

10  was practical.  Again, we were being driven by trying to

11  -- you know, the late census data, trying to make sure

12  we got it all moving, but also practical in the sense of

13  we were trying to go across the state and finding venues

14  that would accommodate us.  You know, again, that was --

15  there were times in this process where certainly COVID

16  was very real.  And so -- and what I mean by real, spike

17  and whatnot that we had to deal with.  So, finding

18  places that would -- where we could spread out and be

19  welcome was part of that challenge as well.

20  Q.      As chair, did you have the responsibility for

21  when proposed staff maps would be publicized, or who

```
                                        Page 67
```

1    made those determinations for when to publish or

2    publicize proposed maps or amendments?

3    A.        I suppose I had say in that, for sure.  Again,

4    I'd say the primary driver of that was the block.  You

5    know, we had a certain amount of time in which we needed

6    to get hearings done and we had a certain amount of time

7    that we had to open the map room, and then we had a

8    certain amount of time we had to allow for those maps to

9    be made public and then to give opportunity again for

10   folks to weigh in and consider other alternatives.  So,

11   yes, I certainly participated in the creation or -- of

12   that time line but it was practical nature primarily.

13   Q.        I know you mentioned Ms. Dean as playing a role

14   in the redistricting efforts.  Could you describe what

15   her role was to you, as chair, you know, things that she

16   was responsible for or did throughout the process?

17   A.        So, in the beginning of the process, she was

18   instrumental in the logistics of helping me make sure

19   everyone was aware when and where we were meeting and

20   also the public, making sure that the website, you know,

21   information was provided to the technical folks to make

1    sure it was up.  Also, in coordinating when we had

2    meetings in Columbia, that we had a room and we had

3    space and everyone was made available and were aware of

4    it.  When it came time for the map room, she was

5    instrumental in making sure that it was open.  And the

6    way we did the scheduling on that, that flowed through

7    Judiciary so she -- I'm sure we was vital in that.  And

8    then going forward, she was also very instrumental in

9    the legislative process to make sure that we conformed

10   with the law and the process.

11   Q.      When you say conform with the law, and without

12   going into specifics, did she provide any legal advice

13   to you as chair?

14   A.      I'm sure she did.

15   Q.      I want to understand just some of the other

16   committee staff members.  I know we've spoken about

17   Ms.  Dean and while I'm blanking on the names of the

18   other staff counsel, I want to know if there are any

19   other staff members for the Redistricting Committee that

20   were involved in the redistricting process?

21   A.      It was sort of an all-hands-on-deck.  You, so

```
                                                Page 69
 1    had Roland and Jimmy were present at different times,

 2    both during the course of the public hearings, as well

 3    in the map room, as well as in the committee process.

 4    So, I think the three of them were the primary Judiciary

 5    folks.

 6    Q.      And are both attorneys?

 7    A.      Yes.

 8    Q.      Were there any non-attorney staff members for

 9    the Redistricting Committee?

10    A.      Not that I recall.

11    Q.      Did the Redistricting Committee hire any

12    consultants during the redistricting process?

13    A.      The committee itself, not that I recall, no.

14    Q.      If they did, would that be a decision that you

15    had input in or would have oversaw?

16    A.      I would assume so.

17    Q.      Do you know if the House Judiciary hired any

18    consultants during the redistricting process?

19    A.      The only consultant I know of you referenced

20    when you went through your list of names.  I remember

21    the name but I never met with or spoke with -- I can't
```

```
                                                Page 70
 1   remember the name though.

 2   Q.      Thomas Brunell?

 3   A.      So, that would be the only consultant, I think

 4   he was a consultant, that I'm -- have heard about.

 5   Q.      Even though you didn't communicate with him, did

 6   -- I guess what information or consultation did he

 7   provide to the Redistricting Committee or House

 8   Judiciary?

 9   A.      I'm not aware of any direct communication.

10   Q.      So, there weren't any reports that you -- my

11   apologies, I'm sorry.

12   A.      Go ahead.

13   Q.      Oh, no, I was going to ask, were there any

14   reports or findings that you reviewed from Dr. Brunell?

15   A.      Not that I recall.

16   Q.      From your understanding, who would you consider

17   map drawers or drawers during this process for the Ad

18   Hoc Committee?

19   A.      So, once you go into the map room process, is

20   that what you're referring to?

21   Q.      Yes.
```

Page 71

1    A.        Within the map room, you would have Tom Hager.

2    He would be sort of the chief operational computer

3    person, and then within that structure there would be

4    several interns, I guess you could describe as

5    technicians, that would assist members in the map room

6    by navigating the computer for them, for the members

7    when they would go in.  Certainly staff counsel would be

8    available to assist in that process.  Trying to make

9    sure I don't leave anyone out.  That's the general sort

10   of overview.

11   Q.        We'll talk about the map room a little bit more

12   in detail later on, but I first, before we get there, I

13   want to talk a little bit about the House's

14   redistricting criteria and guidelines.

15   A.        Sure.

16   Q.        So, what I hope has been uploaded and I've

17   marked as Plaintiff Exhibit 3, which is the document

18   titled, Meeting Proceedings, August 3, 2021, South

19   Carolina House Judiciary Committee.  This is a

20   transcript of the August 3rd, House Redistricting

21   Committee meeting and is available on the Ad Hoc

```
                                                Page 72
 1    Committee hearings website.  It should be the fourth

 2    document.  I had to refresh within Veritext, and let me

 3    know when you have that up for a moment.

 4            (Exhibit 3 marked for identification and

 5    attached to the transcript.)

 6    A.      I'll tell you, I'm impressed that I was able to

 7    do that.  This is Exhibit 3?

 8    Q.      Correct.  It should be the -- unfortunately,

 9    it's the fourth document, but it's Plaintiffs' Exhibit

10    3.  Fourth document within the listing.

11    A.      All right, I have it.

12    Q.      Do you recall, Representative Jordan, being at

13    this August 3rd House Redistricting Committee meeting?

14    A.      I recall being there, yes.

15    Q.      And I want to turn to page 8, with your remarks

16    beginning on line 20.  Let me know when you have a

17    moment to get there.

18            MS. HOLLINGSWORTH:  And, Mr. Cusick, for the

19    record, how many documents are we going to review today,

20    because I don't want to take up time having to review

21    these with him and taking breaks?  So, nothing was
```

Page 73

```
 1   identified in advance of this deposition, so I kind of
 2   want to be -- don't want to use up time unnecessarily,
 3   but do you have an expectation of how many exhibits are
 4   going to be uploaded and whether that is something we
 5   should go ahead and do so that we have the opportunity
 6   to review them?
 7           MR. CUSICK:  Yes, I mean the sets of documents
 8   are going to be hearing transcripts like this for the
 9   four hearings by the Redistricting Committee and then
10   questions related to just, you know, remarks that
11   Representative Jordan made.  There are a couple of
12   letters that the South Carolina NAACP had shared with
13   the Redistricting Committee, where I'm not going to go
14   into the content of those letters but just asking if
15   Representative Jordan had received them, and then just
16   one other document with a Bates stamp.  So, I don't
17   know, Jennifer.  If it's easiest, I could -- I have no
18   problem uploading them all right now, and I don't want
19   to make anyone work over lunch or add time, but I'm
20   happy to upload them all now if it makes sense for you
21   and Representative Jordan and Ms. Wells to review.
```

Page 74

1   Whatever you think makes sense.

2           MS. HOLLINGSWORTH:  Yes, so I guess what I'll

3   say, I'll kind of reserve judgment for a minute, but it

4   would be good to upload everything, and then whenever we

5   could take a lunch break, I'm happy go look at stuff on

6   the break.  So, again, I'd like to not have us be here

7   any longer than necessary.  So, you can -- let's

8   continue and determine whether we need to break to

9   confer.  I hope not, but I would like to do that over

10  lunch.  So, whenever we break at lunch, if you could

11  just pop those up there and we'll take a look at the

12  time.

13          MR. CUSICK:  Yeah, and if it's easier for you,

14  I'll upload all of them, and then maybe I can send you

15  and Ms. Wells an e-mail just so you have the PDFs as

16  well, just in case that's easier.

17          MS. HOLLINGSWORTH:  That would be helpful, thank

18  you.

19  BY MR. CUSICK:

20  Q.      Representative Jordan, on page 8, line 20, do

21  you see the beginning where it says Chairman Jordan?

Page 75

1    A.      I do.

2    Q.      Do you mind reading that paragraph?

3    A.      "All right, with that, let's turn -- I think the

4    other item we're going to talk about today is our

5    proposed guidelines and criteria.  That was a -- one of

6    the documents that you received in the last week in

7    order to begin to digest just a little bit about that,

8    and then we'll certainly discuss it."

9    Q.      Who prepared the initial draft or proposed

10   guidelines and criteria?

11   A.      That would have been counsel and consulting

12   staff, I believe.

13   Q.      When you say counsel, who are you referring to?

14   A.      I believe -- this was one of the things that

15   sort of everyone reviews.  So, everyone from Dennis and

16   Ms. Dean to Nexsen Pruet folk.  I reviewed it.  Lots of

17   folks had a hand in it.

18   Q.      Got it.  Just to make sure we're on the same

19   page, that would include Speaker Lucas?

20   A.      I don't believe Speaker Lucas was a part of

21   that.  I don't believe he was.

Page 76

```
 1   Q.      I heard you say Mr. Dennis and Ms. Dean.  You
 2   also said Nexsen Pruet?
 3   A.      Yes.
 4   Q.      And then the members of the Ad Hoc Committee?
 5   A.      Yes, they would have -- so, this refreshes my
 6   memory, they were provided sort of a rough draft and had
 7   the opportunity, if they so chose, to weigh in and see
 8   the document.
 9   Q.      Do you recall receiving any feedback on that or,
10   I guess, who would have been in charge of collecting any
11   feedback and putting this document together?
12   A.      My standard practice -- or, excuse me, I
13   shouldn't say standard practice.  I believe prior to
14   this meeting, I sort of called around and just -- making
15   sure everybody was coming and, you know, any concerns or
16   questions that we can be prepared for, and I think -- I
17   don't recall specifically who or what any of the dates
18   were.  I think there were, but I just can't remember who
19   and what.
20   Q.      Did you conduct any research to assess or
21   propose any input into the guidelines?
```

Page 77

```
 1   A.      I looked back -- I got Ms. Dean to help me, and

 2   I looked back at what had been adopted in the prior

 3   redistricting process.  And so that as well as some of

 4   the case law associated with redistricting, I did review

 5   those things, yes.

 6   Q.      Were you provided any additional research

 7   outside of what you worked with with Ms. Dean?

 8   A.      I'm sure I was.  This redistricting process has

 9   been a flood of information.

10   Q.      That is probably an understatement.  Did any

11   members of the public have input into this draft?

12   A.      I don't believe so.

13   Q.      Do you think it would have been beneficial to

14   have any public comment or feedback on the proposed

15   guidelines?

16   A.      No, I think this is primarily legal in nature.

17   And we went to great lengths to make -- to be prepared

18   to do this the right way.  Certainly the public would

19   certainly be entitled to it.  Times, if I remember

20   correctly, during the course of our hearings to comment

21   on the criteria, but I don't believe it was a flaw in
```

Page 78

1    the process that we did not open this up, to my

2    recollection, for public input as part of it.

3    Q.      Did you seek any public input on the guidelines

4    during those hearings from September or October?

5    A.      You know, the public input was really just --

6    was really an opportunity for, we'll listen to whatever

7    you want to tell us.  You know, my opinion of the public

8    input was they got to decide what they thought was

9    important, and as a result of that, we heard everything

10   from testimony related to the criteria to -- I mean, I

11   heard about a tree farm in Chesterfield County, if I

12   remember correctly.  So, the public tends to decide

13   what's -- what's for them to weigh in on and those types

14   of things.

15   Q.      In any of those meetings, did you share the

16   document before there was public comment so people knew

17   what the guidelines were?

18   A.      I believe we made the criteria available but I,

19   again, I can't -- I know it was part of my colloquy at

20   every public hearing.  I referenced it and sort of gave

21   an overview of it; I think we made it available on the

Page 79

1    website.

2    Q.      Do you recall if there were any hard copies of

3    the guidelines to hand out during any of those public

4    hearings?

5    A.      I don't believe so.  And that was -- as chair, I

6    thought about that, but again that was also back in a

7    COVID period and folks were somewhat squeamish at times

8    about personal contact.

9    Q.      And I forgot to ask this on folks involved in

10   the process, did the Senate have any involvement in the

11   drafting of the criteria?

12   A.      They did their own criteria, if I remember

13   correctly.  So the answer is, no, to ours.

14   Q.      And within the statement you read here from your

15   testimony, at the end you state that you received it

16   last week in order to begin to digest a little bit about

17   that.  Why was it important to give the draft document a

18   week ahead of that meeting?

19   A.      Well, number one, at some point in time, and the

20   committee chose that point in time, that August 3rd

21   meeting, the criteria had to be adopted.  We technically

Page 80

1    had to say, this is what we're going to -- the framework

2    in which we're going to operate.  So, I felt like it was

3    important for them to have the ability to review it.

4    Again, digest it, make any suggestions, and be prepared

5    for any discussion on it.

6    Q.      Do you think -- I guess do you think a week

7    would give them sufficient time to meaningfully review

8    the document?

9    A.      I think so.  I mean, this was not a 50-page,

10   100-page document.  This is a pretty straightforward

11   document.  We're going to follow the law and then these

12   principles of redistricting that existed for quite some

13   time; we didn't remake the wheel in this document, so I

14   think so.

15   Q.      I'm now I'm going to ask a question.  I know you

16   referenced the research that you worked with Ms. Dean

17   on, and this is on page 9 and the next page on that

18   Plaintiffs' Exhibit 3, lines 1 through 6, and if you

19   could read just -- I think it's just the first full

20   sentence beginning with the "criteria" and then the last

21   one is "interest" that ends on line 6.

Page 81

1   A.      "The criteria and guidelines in my research

2   doesn't really change from every ten-year period.  As

3   you will see, we will start with the Constitution of the

4   United States, through federal law, state law, all the

5   way down to, you know, including the compactness,

6   communities of interest."

7   Q.      I want to ask you, it's in line -- the first two

8   words or, I guess, three words on line two where you

9   referenced the redistrict criteria doesn't really change

10  from every ten-year period.  What did you mean by that?

11  A.      Kind of what I said a moment ago.  I mean, this

12  is a process that we engage in on a every-ten-year basis

13  and the law, the process itself, doesn't change a whole

14  lot.  The things we consider, while they may -- the

15  communities of interest may change, the compactness may

16  change, the time of duty may change, but those

17  principles don't change.

18          MR. CUSICK:  For a moment, we'll speak to

19  Ms. Hollingsworth.  I'm going to introduce the

20  redistricting guidelines and criteria, that three-page

21  document.  I'm happy to do that and ask the set of

Page 82

1   questions on them and break for lunch, or,

2   Ms. Hollingsworth, would you prefer to break here for me

3   to upload everything, and then we can resume when you've

4   had a chance to review and speak with Representative

5   Jordan?

6           MS. HOLLINGSWORTH:  No, if it's the three-page

7   guidelines and criteria document, I think you can upload

8   that and ask your questions.

9   BY MR. CUSICK:

10  Q.      I'm now marking what is the South Carolina House

11  of Representatives Judiciary Committee Redistricting Ad

12  Hoc Committee's 2021 Guidelines and Criteria for

13  Congressional and Legislative Redistricting, and it's

14  dated as adopted on August 3, 2021, as Plaintiff Exhibit

15  4.  It might take a moment, Representative Jordan, or

16  you might have to refresh the page.  So let me know when

17  that document appears and you've had a chance to look at

18  it.

19  A.      I have it and I'm familiar with it.

20          (Exhibit 4 marked for identification and

21  attached to the transcript.)

Page 83

```
 1    Q.      Would it be fair to say that these guidelines or

 2    criteria guided the committee's assessment of all

 3    proposed maps?

 4    A.      Absolutely.

 5    Q.      As well as the development of all proposed maps?

 6    A.      I can't say the development.  I can say the

 7    development of proposed maps from within the House.  I

 8    mean, obviously there were maps that were created and

 9    provided to us outside -- sort of through that public

10    process that I can't address -- but for purpose of maps

11    that we proposed, yes, I would think so.

12    Q.      You caught me on one of those questions where I

13    was not as sharp as I wanted to be.  But that was the

14    question, on whether the Redistricting Committee guided

15    the proposed maps of the Redistricting Committee?

16    A.      Yes.

17    Q.      Is there any other document that the

18    Redistricting Committee created that supplemented this

19    criteria or was used to guide assessing maps?

20    A.      Not that I recall.

21    Q.      Did you rely upon any other documents to guide
```

```
                                                  Page 84
 1    your assessment of maps that the Redistricting Committee

 2    was drafting and developing?

 3    A.       Not that I recall.

 4    Q.       And so I want to talk about a couple of the

 5    guidelines themselves.  And so under Roman numeral

 6    number II, titled Federal Law, if you could just take a

 7    moment, you can read the full paragraph.  I'm going to

 8    ask you questions about the first three sentences, but

 9    take as long as you need and no need, to read them into

10    the record.

11    A.       Okay.

12    Q.       In the third sentence right in the middle, it

13    begins with "the dilution of racial or ethnic minority

14    voting strength."  Do you see that?

15    A.       I do.

16    Q.       What does the dilution of racial and ethnic

17    minority voting strength mean to you?

18    A.       To separate members of those groups in a way

19    that would minimize their voting ability -- or not

20    ability but their -- basically decreasing the numbers by

21    splitting into different areas.
```

```
                                                    Page 85

 1    Q.       Anything else?

 2    A.       That's a broad sort of definition.

 3    Q.       What are some examples of the dilution of racial

 4    or ethic minority voting strength that you mentioned?

 5             MS. HOLLINGSWORTH:  Object to the form.

 6             THE WITNESS:  Sorry, say that again?

 7    BY MR. CUSICK:

 8    Q.       What would be a hypothetical example of the

 9    dilution of racial or ethic minority voting strength?

10             MS. HOLLINGSWORTH:  Same objection.

11             THE WITNESS:  To single out one particular group

12    based on race and to try and break them into different

13    areas in order so that they're voting for, so a

14    percentage would be decreased.

15    BY MR. CUSICK:

16    Q.       When you mention single out, does there have to

17    be an intentionality behind that, or could it happen as

18    an effect or for unintentional reasons?

19    A.       I'd say it could happen unintentionally if you

20    weren't careful.

21    Q.       Now, under Roman numeral -- I think it's IV,
```

```
                                                   Page 86
 1   yes, it's IV -- subsection C on page 2, if you could
 2   take a moment to read that to yourself.  No need to read
 3   it into the record, and let me know when you've had a
 4   chance to review.  This deals with the total population
 5   deviation standard.
 6   A.      I'm familiar with it.
 7   Q.      Could you explain that -- it begins in the third
 8   line, it's the second full sentence, "in every case,"
 9   and it reads, "efforts should be made to limit the
10   overall range of deviation from the ideal population to
11   less than five percent, or a relative deviation in
12   excess of plus or minus two and one half percent for
13   each South Carolina House district."  Did I read that
14   accurately?
15   A.      I believe so.
16   Q.      What does that mean to you?
17   A.      So, the underlying principle here is one person,
18   one vote, and therefore trying to make the districts in
19   South Carolina, the House districts, as close in
20   proximate population as possible, and in this situation
21   specifically five percent was the deviation.
```

```
                                                      Page 87
 1    Translating that five percent into two and a half

 2    percent alone.  The 41,278 as well as above, created

 3    that five percent range to provide some reasonable

 4    latitude by which districts could be similar in

 5    population.

 6    Q.      Would it be fair to say that the guidelines

 7    prioritized the range that you mentioned of five percent

 8    for a total population deviation standard?

 9    A.      Yes, two and a half on either side.

10    Q.      Right.  Two and a half plus or minus for a total

11    of five percent?

12    A.      Correct.

13    Q.      Why was this standard chosen to prioritize, the

14    five percent or plus or minus 2.5 percent?

15    A.      To start with, it was the prior approved -- or,

16    I said approved, legally upheld standard of

17    redistricting in the prior cycle.  What I mean by that,

18    is that was the deviation that had been used in, I

19    guess, in 2010, and that redistricting process had been

20    litigated and ultimately found appropriate.  So, going

21    back to what we talked about earlier, where time was
```

Page 88

```
 1   important in this process given the delayed census, we
 2   knew that was a legally viable reasonable deviation.
 3   And so, in my mind, that was the primary basis on that
 4   being appropriate.
 5   Q.      Do you recall any concerns or critiques of the
 6   use of that standard during public hearings or among
 7   colleagues on the House Judiciary or Redistricting
 8   Committee?
 9   A.      Yes, this was one of the things, maybe more so
10   than any other thing, that was discussed and brought up
11   during the course of it.  There was some discussion that
12   ten percent was appropriate, but ultimately five percent
13   was found to be more appropriate.
14   Q.      And, you know, in the last portion of that
15   subsection C, it's fair to say that the criteria does
16   allow for a ten percent total population deviation,
17   again plus or minus five, if certain conditions are met?
18   A.      So the way I looked at that was that, you know,
19   yes, there were circumstances in which ten percent could
20   be found to be appropriate or viable.  I use the word
21   could.  But what we knew was what five percent was and
```

Page 89

```
1    that was a big difference, at least in my opinion, going

2    through this process, given that we -- COVID had delayed

3    the census and yet we were trying to, if at all

4    possible, have these lines drawn in accordance with --

5    in a timely fashion.  So, there was a big difference in

6    what we knew was viable and appropriate in the eyes of

7    the law and what could be viable and appropriate in the

8    eyes of the law.

9    Q.      I know you mentioned the way that COVID

10   interacted with the census count and the data being

11   released.  Do you have any opinions whether COVID

12   impacted the total numbers that were reported in South

13   Carolina for population?

14   A.      It would make sense to me that COVID was a

15   factor in that.  Obviously, how could it not be.  The

16   problem I kept coming back to, the COVID and the census,

17   is there's no way to fundamentally prove areas in which

18   -- sort of prove in a negative there.  There was no way

19   to prove that it impacted.  Could I look at it and say

20   COVID impacted everything, absolutely.  But for purposes

21   of being able to adequately demonstrate it legally,
```

```
                                              Page 90

 1    that's a different decision.

 2    Q.      Do you recall any testimony or statements that

 3    there was an undercount in the census?

 4    A.      There were folks that testified during the

 5    course of the public hearings that it was their opinion

 6    that there was an undercount, yes, that is correct.

 7    Q.      Any legislators?

 8    A.      I believe there were at times some legislators

 9    in the process that, again, spoke up that it was their

10    opinion that voting did participate in that as well,

11    yes.

12    Q.      Did you follow up with any of those legislators

13    to understand what the basis was for their statements?

14    A.      We discussed it in the hearing and on the House

15    floor.  I think it probably came up in full Judiciary

16    so, I mean, yes, it was a topic that came up more than

17    once.

18    Q.      Do you have any opinions whether there is or was

19    an undercount in South Carolina for the census data that

20    was released?

21           MS. HOLLINGSWORTH:  Object to the form.
```

```
                                                    Page 91
 1            THE WITNESS:  Again, one of those things, on a

 2   broad sense, COVID impacted everything.  On a particular

 3   sense, which is what we have to operate under, I heard

 4   no testimony that said, here, I can demonstrate to you

 5   in a provable sense, COVID impacted this undercount

 6   here.  It was much more in a broad sense.

 7   BY MR. CUSICK:

 8   Q.      Do you recall receiving any testimony that

 9   pointed to studies related to census undercount?

10   A.      I recall testimony to the issue.  I don't recall

11   specifically when and where and who kind of thing.

12   Q.      So, I guess, what steps did you take to assess

13   those claims about census undercount in South Carolina

14   to verify it or not?  Or to come to an opinion, I should

15   say.

16   A.      Again, it was a topic that came up more than on

17   a few occasions, and in some sense it would have been

18   easier to use a higher percentage for purposes of

19   population.  But from a legal standpoint, I don't think

20   it was the appropriate decision.

21   Q.      When you say a legal standpoint, is that you --
```

Page 92

1   is that your opinion that you're offering as the chair?

2   A.      Yes, I'm going back to -- I know five percent

3   works because it has worked.  Ten percent can work, but

4   will it work.

5   Q.      Earlier in the deposition, you mentioned you

6   reviewing case law related to redistricting.  Do you

7   recall reviewing any case law about whether federal

8   court accepts a ten percent total population deviation?

9   A.      I do recall case law referencing, you know, five

10  percent and ten percent and kind of how do we analyze it

11  here today.  That five percent historically is

12  acceptable, ten percent, if you can establish or under

13  certain cases or situations-type.  That's my

14  recollection.

15  Q.      And within the guideline here in the last --

16  the second-to-last sentence in the middle, it says, "the

17  promotion of constitutionally permissible state policy,"

18  as one potential basis for that higher ten percent total

19  population deviation standard.  What do you understand

20  to be constitutionally permissible state policy that

21  might justify a different total population standard than

Page 93

1    the five percent?

2    A.       I hesitate to speculate and give you a

3    hypothetical.  I can certainly tell you one if you gave

4    me an example; I can tell you my opinion if I thought it

5    fit in the category or not.

6    Q.       Do you recall statements that a higher

7    population deviation standard might be permissible to

8    comply with the Voting Rights Act; do you recall any

9    statements to that end?

10   A.       That sounds familiar but, again, I can't tell

11   you the time and place, who said it kind of thing.  You

12   could establish a list of hypotheticals and potentially

13   that could potentially sit into that box.  But it always

14   came back to me and, again, I only have one vote of that

15   committee and then ultimately one vote on the House

16   floor, but we were dealing with what we could establish

17   versus what we knew would work.

18   Q.       I now want to move to Roman numeral number VI

19   that deals with -- it's titled, Compactness.  And if you

20   don't mind, you can review both paragraphs there or

21   whatever's easier.  You don't have to read them into the

```
                                                Page 94
 1   record but whatever you feel most comfortable?

 2          MS. HOLLINGSWORTH:  Mr. Cusick, while he's

 3   looking at that, I think Mr. Tyson might need PDFs of

 4   these documents.  I don't know that everybody is able to

 5   access Exhibit Share easily.  Can you just circulate

 6   your documents of PDFs to the attorneys?

 7          MR. CUSICK:  Yes.  Right after this, I'll do

 8   that to you, Ms. Wells, Mr. Tyson, and Mr. Burchstead.

 9          MS. HOLLINGSWORTH:  Thank you.

10          MR. TYSON:  Thank you.

11   BY MR. CUSICK:

12   Q.     Okay.  And then in the second paragraph there,

13   it reads, "compactness should not be judged based upon

14   any mathematical, statistical, or formula-based

15   calculation or determination."  Did I read that

16   accurately?

17   A.     Yes.

18   Q.     So, how did the Redistricting Committee measure

19   compactness?

20   A.     I'd refer you to the paragraph above that.  In

21   my mind, this is more of a geographical component, and
```

Page 95

1    kind of like what we talked about earlier when you're

2    looking at the map that compactness would be how does

3    the district relate to a river, a lake, other

4    geographical issues in addition to -- I think it says in

5    the Section A there -- census block geography.  So, it's

6    more of a geographical thing.

7    Q.      Is there anything else beyond the prior plan and

8    geography to measure compactness?

9    A.      I think it spells it out pretty good.  Census

10   block geography, natural geography gets into other

11   aspects of it.

12   Q.      I guess why -- was there a concern about using

13   mathematical, statistical, or formula-based calculations

14   to determine compactness?

15   A.      No, I mean, I don't think so.  I mean,

16   especially when you go back up to Section 4.  That's

17   more of the math, I would say.  The equal population

18   deviation section that takes apart the population of the

19   state and then the districts, that's -- I'd say this

20   document is broken into -- that's more of a math part

21   and this is more of a geographical part.

```
                                              Page 96
 1   Q.       Are you aware that there are ways to measure

 2   compactness for redistricting plans?

 3   A.       That doesn't surprise me.

 4   Q.       Did you or anyone in the committee look to any

 5   mathematical, statistical, or formula-based ways to

 6   assess it?

 7   A.       To assess compactness?

 8   Q.       Yes.

 9   A.       I mean, we looked at -- again, going back to the

10   other section -- we would look at the amount of

11   population obviously in a -- if you look at the map

12   where it sits geographically, so in that extent, yes.

13   Q.       How do you define natural geography, which is

14   the subsection B portion in this definition?

15   A.       Natural geography, I mean, it says including

16   water, so river, lake.  In the upstate it could be -- I

17   guess it could be a mountain.  We don't have many of

18   those in the Pee Dee, you know, contour of the

19   geography.

20   Q.       I know you referenced in the first sentence of

21   the second paragraph about compactness should be judged
```

Page 97

1    in part by the configuration of prior plans.  Why was

2    that determination made?

3    A.      I think it goes back to the -- you have to have

4    a starting point.  The prior plan was, for us, a

5    starting point.  Obviously, we had to deal with changes

6    in population and so forth, but that prior plan of

7    establishing a starting point.  Also, a starting point

8    that we knew had been previously proven to be legally

9    sound.

10   Q.      Was this same definition of measuring

11   compactness identical or the same calculation that was

12   used for the previous plan?

13   A.      I don't recall.

14   Q.      Did you look into it to see if it was the same?

15   A.      I looked back at the previous -- many different

16   things related to the previous process.  I just don't

17   remember specifically as to that particular one.

18   Q.      Did you do any assessment -- I mean, let me

19   rephrase that.  Might there have been districts in the

20   2010 plan that were not as compact for reasons such as

21   compliance with federal law?

Page 98

```
 1            MS. HOLLINGSWORTH:  Object to the form.
 2            THE WITNESS:  You're asking about the 2010 plan?
 3   BY MR. CUSICK:
 4   Q.      Yes.  Well, I guess I can sharpen that,
 5   hopefully, the question a little bit more.  Did you have
 6   any concerns that some of those previous districts that
 7   were adopted in 2010 might not have been as compact or
 8   were not compact?
 9   A.      No.  Again, if it asks the legal standard in
10   2010, to me that was a pretty big deal.  I certainly --
11   I looked at it as, you know, how can we make better what
12   we know previously worked within the more up-to-date
13   present information we have, such as the increase in
14   population in some parts of the state and increase in
15   population in other parts of the state.
16   Q.      I'll now turn to Roman numeral VII, which is
17   Communities of Interest.  And I'll have you, if it's
18   helpful, have you take a moment to review, and then
19   we'll just ask you a few questions about that.
20   A.      Okay.
21   Q.      How would you define communities of interest?
```

```
                                                    Page 99
 1    A.      I think this is a pretty good definition for our
 2    purposes today.  You know, it's a variety of things that
 3    go into common strands that pull together different
 4    groups within our state.
 5    Q.      During the -- I guess part of, from my
 6    understanding of your testimony, the public hearings
 7    from September to October were to help identify
 8    communities of interest; would that be fair?
 9    A.      Yes.
10    Q.      Did the Redistricting Committee compile a list
11    of identifiable communities of interest?
12    A.      There was a, as we've referenced before, many,
13    many, many public comments that came in that identified
14    that, so in a sense that were compiling as was every
15    submission compiled.
16    Q.      Were there any data synthesis that was created
17    to show the mapping of communities of interest?
18    A.      I'm not aware of any specific data.
19    Q.      I guess what factors determined -- let me
20    rephrase that.  If there was a conflict in testimony
21    among communities of interest in a defined area, did the
```

Page 100

1   Redistricting Committee take any steps to probe that

2   further?

3   A.        When you say conflict, what exactly do you mean

4   by that?  You mean competing communities of interest or

5   do you mean --

6   Q.        Yes.  Competing communities of interest within

7   the same geographical area.

8   A.        So, I would say remember this is one element of

9   other elements, so it would be something that was

10   considered but it wouldn't necessarily if you have --

11   just give you an example.  If you had in that scenario

12   where two competing communities of interest, you would

13   also perhaps look at the geographical component as well

14   to determine what made the most amount of sense for

15   purposes of drawing the lines; that's just an example.

16   Q.        And then I'll turn to the next Roman numeral

17   VIII, which is Incumbency Consideration.  Sorry, let me

18   make sure I'm there.  Before I get there, I realize I

19   mislabelled my Roman numerals.  I have a few more

20   questions on communities of interest for some of those

21   factors that would be considered.

```
                                                   Page 101

 1   A.        Sure.

 2   Q.        What does voting behavior mean, Representative

 3   Jordan, which is E under Communities of Interest?

 4   A.        That's one factor in a list of a bunch of

 5   factors that would be, I guess, come together to define

 6   that overall category, if that makes sense.

 7   Q.        I guess what is -- whose voting behaviors?  I

 8   guess what, like, what would be an example of voting

 9   behavior to define a community of interest?

10   A.        You're talking about individuals in that area

11   that -- whether or not they vote, choosing to vote,

12   participating in voting, that sort of thing, in my

13   opinion.

14   Q.        So that includes turnout?

15   A.        I don't know that you'd go as far as to say -- I

16   don't know if I'd go that far.  I don't know how we'd

17   really, in the context of redistricting, even know what

18   the turnout would be.  I don't know how we'd be able to

19   really determine that accurately or thoroughly.

20   Q.        So, when you said that you looked at

21   participation, what did you mean, then, in reference to
```

Page 102

1    voting behavior?

2    A.      Choosing to actually, you know, vote.  We had

3    someone -- and, again, I'm speculating here -- if we had

4    someone show up and say we don't -- for whatever reason,

5    religious or otherwise -- we don't participate in

6    voting, we don't believe we -- we don't vote, then that,

7    I guess, could technically fall into that category.

8    Q.      Does voting behavior encompass voting patterns?

9    A.      Again, I don't know -- in this context, I don't

10   think so because I don't know we'd have a way to really

11   articulate that.

12   Q.      I guess for you as an individual member, not as

13   the redistricting chair, for you in voting for this

14   criteria, does voting behavior include voting patterns?

15   A.      No.  And, again, this is economic, social,

16   cultural, historically, it's one of a bunch of different

17   other factors that go into a very broad definition of

18   what is a community of interest.  Trying to be broad so

19   that -- in order to identify.

20   Q.      Does voting behavior include behavior by

21   political affiliation?

Page 103

1   A.        Not to me.

2   Q.        By race?

3   A.        Not to me.

4   Q.        And then for, as you just referenced, historical

5   influences, what does that mean?  It's C, factor C.

6   A.        There's certain communities that I would say are

7   historical, and I've heard from several of them that

8   said, you know, we're -- if you go back over time and

9   we've been a community, and just jumping out at me, I

10  think an example would be like the Gullah community if

11  there was a particular region in the state of South

12  Carolina, and if a group came in and testified that this

13  is a -- that we're a community of interest, that would

14  just be an example.

15  Q.        Would this encompass what we talked about in the

16  earlier part of this deposition, any history of

17  discrimination?

18  A.        You can put it in that category.

19  Q.        Does economic, which is the first factor, A,

20  does that include income level?

21  A.        Yes, I think economic, again, like all these are

Page 104

1   very broad terms that include a lot of different

2   factors.

3   Q.      Does it include occupation?

4   A.      I don't know; I think you're getting a little

5   too specific with a very broad spectrum, if that makes

6   sense.

7   Q.      Maybe I'll take it the other way, then:  Was

8   occupation considered in the factors for communities of

9   interest?

10  A.      No, I don't believe so.  Again, these are broad

11  terms to help get a sense of a community area as a

12  whole.

13  Q.      Is type of employment within these factors?

14  A.      No, I think you're getting right back to

15  occupation there again.  I think that's a little too

16  specific on a broad spectrum.

17  Q.      How about -- I think I heard you right -- would

18  historical neighborhoods be encompassed within these

19  factors?

20  A.      I would think so.  I mean, you don't want to --

21  one of the underlying concepts in my mind is to make it

Page 105

1    easy and sufficient for people to vote and to take an

2    area that has -- a historic neighborhood business, if

3    they're there for a long time -- and to have a situation

4    where some people within that confines of that

5    neighborhood are in one area and others are in a

6    different, certainly that's unavoidable at times, but

7    that should be considered in the process.

8    Q.      And then at the end of these factors, it begins

9    with the sentence, "County boundaries, municipality

10   boundaries, and precinct lines as represented by Census

11   Bureau's Voting Tabulation District lines may be

12   considered as evidence of communities of interests to be

13   balanced, but will be given no greater weight, as a

14   matter of state policy, than any other identifiable

15   communities of interest."  Did I read that correctly?

16   A.      I believe so.

17   Q.      Why should county boundaries, municipality

18   boundaries, and precinct lines be given no greater

19   weight than other identifiable communities of interest?

20   A.      Well, they're certainly factors, as are many

21   other things.  But at the end of the day, the underlying

Page 106

```
 1   driving engine of this is the population.  And, so I
 2   think the underlying concept here is we're trying to act
 3   to that one person, one vote concept.  Trying to look at
 4   that in a way with a whole bunch of factors to make sure
 5   you hit that goal.
 6   Q.      Would it be fair to say that this is -- I guess,
 7   would the factors that we talked about, A through H in
 8   the beginning part of this, would those be the
 9   priorities for identifying communities of interest?
10   A.      I think this is a -- a very broad but a very
11   balanced or full list of what goes into describing these
12   interests, yes.
13   Q.      Does anywhere within these factors include
14   highways and interstates as a consideration for
15   communities of interest?
16   A.      In my mind, that goes back to the -- yes, it
17   can.  I mean, you have highways that sort of naturally
18   divide up communities, but at the same time, it's also
19   relevant to (inaudible).
20   Q.      Representative Jordan, are you aware of any
21   statements during the redistricting process that
```

Page 107

1    interstate highways might have been built to segregate

2    communities of color?

3    A.     I don't remember that.  I'm not saying it wasn't

4    said, but I don't remember that specifically.

5    Q.     Have you researched that issue before, or has it

6    come across any of your work as an elected official?

7    A.     I have not, has not.

8    Q.     As you were involved in -- I guess, when you

9    were drawing House District 63, in your current

10   district, how did you resolve any competing communities

11   of interest, if there were any?

12   A.     So, I'm not sure -- unfortunately, I'm not sure

13   if House District 63 is a great example because --

14   Q.     It's pretty small from what I see on the -- but

15   largely concentrated, yeah?

16   A.     Correct, and the other side of that is it's grew

17   sort of in proportion population-wise with the average,

18   statewide average.  So, therefore, it didn't need to

19   change a whole lot.  I certainly looked at it, but it

20   didn't need to change a whole lot to be compliant within

21   the deviation population lines.

Page 108

1    Q.      How did the Ad Hoc Committee resolve, I guess,

2    times when criteria might have been in conflict or

3    tension with each other?  For example, something could

4    be compact but it might mean it's less contiguous?

5    A.      Sure.  You know, I point you back to the sort of

6    the balancing test, I guess you'd say.  You can't have

7    it all.  You know, you definitely want to make sure you

8    comply with the law and with the population first, and

9    from there sometimes you have to make tough choices.

10   Sometimes you have to, you know, put a line where you

11   wish that line could be just a little further over for

12   one reason or another.  But ultimately, you know, you

13   have to look at the entire criteria and come to a

14   conclusion of what's the best of the bad choices

15   sometimes.

16   Q.      And then in Roman numeral II, back again to the

17   top for federal law, the first sentence says,

18   "Redistricting plans shall also comply with federal law

19   and the Voting Rights Act of 1965 as amended."  Based on

20   this criteria, what do you understand as compliance with

21   the Voting Rights Act to entail?

Page 109

1          MS. HOLLINGSWORTH:  Objection to form.

2          THE WITNESS:  I'd say it's twofold -- well, or

3     most specifically, it's we're not going out and

4     creating, the race being the driver in the decision of

5     drawing the line.

6     BY MR. CUSICK:

7     Q.      So, if race is not the driving factor, that

8     would mean a redistricting plan complies with the Voting

9     Rights Act?

10    A.      Well, I mean, I can read it to you.  I think it

11    does a good job of explaining it: "Race may be a factor

12    considered in the creation of redistricting plans but it

13    shall not be the predominant factor motivating.  "I

14    think that paragraph does a good job of explaining what

15    compliance in the eyes of the Voting Rights Act of '65

16    looks like.

17    Q.      So, it reads at the second portion, "shall not

18    unconstitutionally predominate."  What would be a

19    constitutionally permissible way for race to

20    predominate?

21          MS. HOLLINGSWORTH:  Object to form.

Page 110

```
 1            THE WITNESS:  You know, it'd be difficult for me

 2    to come up with a hypothetical.  Certainly, if you

 3    wanted to give me a hypothetical, I can attempt to tell

 4    you, but I'm not a constitutional lawyer by any stretch

 5    of the imagination, myself, in practice.

 6    BY MR. CUSICK:

 7    Q.       Do you recall any statements that compliance

 8    with the Voting Rights Act might be a compelling reason

 9    for race to predominate and be constitutionally

10    permissible?

11    A.       I do not recall such a thing.

12            MR. CUSICK:  I think I'll take a moment here,

13    Ms. Hollingsworth, and have a natural break.  I know

14    we're up at 12:40 right now and, you know, happy if we

15    want to break here.  I'm happy to still go.  I don't

16    have any exhibits for the next set of questions, but

17    also I know that Representative Jordan has been going at

18    this for some time.  So, it's whatever you think makes

19    more sense.

20            MS. HOLLINGSWORTH:  Yeah, I think now is fine to

21    take a lunch break.
```

```
                                          Page 111

 1            MR. CUSICK:  Sure, and we can go off record.

 2            VIDEOGRAPHER:  Okay.  Off the record at

 3    12:41 p.m.

 4            (Lunch recess was taken.)

 5            VIDEOGRAPHER:  This is the beginning of media

 6    unit number 3.  Back on the video record at 1:30 p.m.

 7    BY MR. CUSICK:

 8    Q.      Hey, Representative Jordan, it's good to see you

 9    back from break.  I now want to talk just a little bit

10    about the redistricting committee's public hearings.

11    We'd talked in broad strokes about them from September

12    8th, which was the first one, to the October 4th final

13    two in Columbia.  Do you recall those hearings

14    generally?

15    A.      I do.

16    Q.      Before -- between the adoption of the criteria

17    that we talked about just before we broke for lunch, on

18    August 3rd, and the first meeting on September 8th, did

19    the Redistricting Committee create any public education

20    materials about redistricting?

21    A.      No, I don't believe so.  I do recall talking to
```

Page 112

1  a few different representatives who were going to

2  encourage people in their area to let people know that

3  there was an opportunity for a public hearing.  But, no,

4  the answer to your question is, not to my knowledge.

5  Q.      And was -- during that same time period from

6  August 3rd to September 8th, were there any efforts by

7  the Redistricting Committee to advertise the hearings or

8  publicize them in forums or newspapers or social media?

9  A.      I don't believe there were any -- you know, I

10  think we put them on the website and we sent e-mails to

11  House members to let them know, and the idea, if I

12  remember correctly, was to use the members of the House

13  as sort of a vehicle to help with that.  Also, I think

14  we received inquiries from folks during that time about

15  different things and, of course, we would respond to

16  those and let those folks know.

17  Q.      Now, I know initially, from my recollection, the

18  10 or 11 meetings, there was only going to be one option

19  that had remote testimony; do you recall that?

20  A.      That's a good question.  Would it be possible to

21  get Mr. Cusick back on the screen so I can see him?

Page 113

```
 1          MS. HOLLINGSWORTH:  John, we don't have you on
 2   video.
 3          THE WITNESS:  It's just easier to see and hear
 4   the question.
 5          MR. CUSICK:  Oh, that's weird.  Am I not on
 6   video for others?
 7          COURT REPORTER:  You are.  You might just need
 8   to change your view to gallery.
 9          MR. CUSICK:  At least for me it's on gallery.
10          COURT REPORTER:  Correct for me as well.  I can
11   see you.
12          MR. BURCHSTEAD:  I see you on video.
13          MS. HOLLINGSWORTH:  I don't know how it's
14   changed from earlier.  It doesn't show -- it only shows
15   the two participants.
16          MR. CUSICK:  We can go off record for a moment.
17          VIDEOGRAPHER:  Off the record at 1:35 p.m.
18          (Off the record discussion was had.)
19          VIDEOGRAPHER:  Back on the record at 1:36 p.m.
20   BY MR. CUSICK:
21   Q.     Representative Jordan, I'll repeat the question.
```

Page 114

1    We were talking about those public hearings from the 8th

2    to October 4th, and do you recall that initially only

3    one of those hearings was going to have remote testimony

4    options for folks to testify at?

5    A.      I do.

6    Q.      Why did only one of the hearings initially have

7    an option for remote testimony?

8    A.      My thought, honestly, was it would be adding a

9    layer of technical issues, and my experience has been

10   that's usually a recipe for a mess when you try to do it

11   on the road, so to speak.  By allowing folks the

12   opportunity to come out in person by literally going all

13   across the state, that would provide sort of an

14   in-person opportunity.  And then for anyone and everyone

15   who either wasn't available on that particular night in

16   their area or couldn't get out and come to a meeting,

17   then we would provide another opportunity for those

18   folks to participate through another medium.

19   Q.      Do you think remote testimony options are a

20   useful tool generally?

21   A.      I do.

Page 115

1    Q.      I know that I might mess up the name, is it the

2    Election Law Subcommittee?  Is that the other one you're

3    a member of?

4    A.      That's right.

5    Q.      And do they use remote options for testimony?

6    A.      At times we have.  Not all the time but at

7    times.

8    Q.      I know you mentioned a concern about the

9    technological aspect.  Did you, at all, assess whether

10   it would have been feasible to set up remote options at

11   any of the other physical locations where the meetings

12   were held?

13   A.      Well, yes and no.  It was -- I definitely

14   considered it and discussed it with some folks.  I'll

15   point you back to my prior testimony when establishing

16   every location was a moving target.  I think we got --

17   even a couple of the locations weren't finalized until

18   we were pretty close to the beginning of the tour.  So,

19   I think that moving target, so to speak, played a factor

20   in it, and I can give you an example too.  The very

21   first meeting the Ad Hoc Committee had, we were delayed

Page 116

1  by about 30 minutes because of a technology issue.  So,

2  all those things kind of put together, in my mind, made

3  it feasible to, again, have these multitude of meetings

4  in person across the state and then provide another

5  remote meeting.

6  Q.     I know you referred to yourself in that

7  decision.  Was that your decision as chair, or did other

8  committee members have a say or influence the decision?

9  A.     I discussed it and I think we even discussed it

10 on the record at least on one occasion, but ultimately I

11 believe it was my decision.

12 Q.     Do you agree that having only an in-person

13 option for concern meetings would limit participation

14 for those who couldn't attend in the physical location?

15 A.     I would agree with that if there were not remote

16 sessions offered, yes.

17 Q.     Who made the determination that some of the

18 meetings would be held from 6:00 to 8:00 p.m.?

19 A.     I'd say that was very similar to the technology

20 aspect of it.  I mean, I probably talked it over but,

21 ultimately, I think the final decision -- you know, I

Page 117

```
 1   certainly consulted several people -- but I think the

 2   final decision probably rested with me.

 3   Q.      Do you recall any oral or written feedback that

 4   you received during these hearings about people being

 5   unable to attend in person?

 6   A.       I think I could probably say I got feedback on

 7   -- I probably got feedback during the course of this

 8   thing for every way we did it and against every way we

 9   did it, so, yes.

10   Q.       I know you've talked about some of the

11   constraints with COVID on locations for where you could

12   hold the hearings.  But, I guess, before that

13   determination, what factors went into what cities or

14   counties the hearings would be physically held in?

15   A.       So, I looked back at the locations of the prior

16   redistricting.  For 2010, there was, in fact, public

17   hearings offered across the state.  I also looked at the

18   Senate, you know, they were a little bit ahead of us on

19   a time line.  They actually chose to begin their tour

20   prior to we did by just a little bit.  So I looked at

21   where the House had been previously, where the Senate
```

Page 118

1   was going, their schedule, and then tried to make sure

2   we were in enough places that were geographically spread

3   apart but also near places where people could get to, if

4   that makes sense.

5   Q.      Were you aware that the Senate had remote

6   options for their public hearings?

7   A.      Yes.

8   Q.      Did you at all ever discuss or talk about how

9   they went about doing that?

10  A.      Did I discuss with the Senate?

11  Q.      Any of the folks who were involved on the Senate

12  side with, you know, coordinating those public hearings.

13  A.      I did not.

14  Q.      From your side who -- I think I might have heard

15  this before -- would Ms. Dean be the primary person that

16  would have information on the coordination of the

17  physical locations, or would that be someone else within

18  -- another staff member?

19  A.      That would be Ms. Dean.  She was the primary

20  person for purposes, you know, I would say of -- if we

21  looked at and said we want to go to Florence, then she

Page 119

1    would look and say, all right, this is where we went in

2    Florence, and she'll communicate with that venue to see

3    if they were available and would let us come.

4    Q.        You mentioned looking back at -- did I hear you

5    right, there were public hearings during the 2010-2011

6    redistricting cycle on the House side?

7    A.        That's right.

8    Q.        Did you look at any -- I guess, or was there any

9    record of public testimony that was available to review

10   from that cycle?

11   A.        I'm not aware if there was or not.  I did not

12   see any.

13   Q.        Did you review any other documents related to

14   redistricting in 2010, in that redistricting cycle, that

15   impact or relate to the House districts from 2010?

16            MS. HOLLINGSWORTH:  Object to the form.

17            THE WITNESS:  You know, much of the case law I

18   would -- pertaining to 2010, as it was in existence

19   prior to that so, I guess that -- I mean, if you're

20   asking specifically to, you know, the 2010 process, I

21   did not look at a great deal of information directly

Page 120

1    connected to how the House did it then.

2    BY MR. CUSICK:

3    Q.    Did you at all review the pre-clearance

4    submission from 2010?

5    A.    I'm aware of its existence, but I did not review

6    it specifically.

7    Q.    Do you know if it was available publicly online

8    anywhere?

9    A.    I do not know.

10    Q.    During the -- I'll jump back now to the

11    September 8th to October hearings.  During the physical

12    hearings, did you at all, or the committee, collect

13    written testimony?

14    A.    Yes, we requested or, you know, I encouraged it

15    in the meetings.  I think at every meeting I would say,

16    if you would like to submit written testimony, the

17    committee would be glad to take it.  There were many

18    people that took the time to prepare their comments in

19    writing and would come to the meeting.  And from my

20    perspective, that would make it easier to go back and

21    look at those once we got further down the road.  So,

Page 121

1    yes, that did take place and we did encourage that.

2    Q.       Where were all the written testimony and those

3    documents stored or housed that you collected during

4    those meetings, or was that submitted?

5    A.       It would be submitted and then it would be in

6    the care of the Judiciary Committee.

7    Q.       Were those written comments ever publicly shared

8    or publicly posted?

9    A.       I don't think they were publicly posted.  They

10   were available to the members of the committee.

11   Q.       Do you think there would have been any benefit

12   to including those on the Ad Hoc committee's website,

13   public and written testimony?

14   A.       As I look back, I don't know that it would have

15   been helpful or harmful.

16   Q.       Are you aware whether the Senate published

17   written comments that it received with redistricting

18   plans and feedback?

19   A.       I'm not.

20   Q.       After you received all of the written comments

21   and oral testimony during these hearings, what did the

```
                                              Page 122
```

 1   Redistricting Committee do with the transcripts and the

 2   written documents?

 3   A.        The comments were compiled and are in the

 4   possession of the House Judiciary Committee from when

 5   they came in.  Members of the committee had the

 6   opportunity to go and review or see those comments for

 7   review and consideration moving forward.

 8   Q.        Did any staff members synthesize those comments

 9   or provide key themes that were raised?

10   A.        No, I don't think it was any kind of summary or

11   anything like that.  I will say, when you go around the

12   state, you hear the same thing repeatedly sometimes.

13   But nothing was done by staff to synthesize

14   particularly.

15   Q.        I won't hold you to knowing what other members

16   reviewed, but did you review all the comments that were

17   submitted during those hearings?

18   A.        I hesitate to say all just because, you know,

19   but I reviewed hundreds and hundreds of submissions,

20   yes.

21   Q.        Was the storage of those documents, were those

Page 123

1  ever shared or accessible to members outside of the

2  Redistricting Committee?

3  A.      I don't know the answer to that, I don't recall.

4  Q.      Might that be a question that Ms. Dean would

5  know?

6  A.      She would probably be able to tell you who had

7  access to reviewing those documents.

8  Q.      Were any of those documents available in the map

9  room?

10 A.      I don't believe they were in the map room.  I

11 think if you didn't get a hard copy like I did, then you

12 would need to go to the Judiciary Committee, which was

13 not in the map room, obviously.

14 Q.      I'm now going to just briefly ask you a couple

15 of questions about letters that were sent to the

16 Redistricting Ad Hoc Committee and House Judiciary

17 Committees.  I have uploaded these in Veritext, the

18 Exhibit Share, and the first one's marked as Exhibit 5,

19 and the heading is, Duty to Comply with U.S.

20 Constitution and Voting Rights Act and Recommendations

21 for Transparency, Public Involvement, and Fair

Page 124

1    Representation in South Carolina's Redistricting Process

2    as Plaintiffs' Exhibit 5.  I'm not going to ask you

3    about the specific content in here, Representative

4    Jordan, but please feel free to review it just to see if

5    it at all helps refresh your recollection if you

6    remember reviewing this document at some point.

7    A.      Yes, I remember this document.

8            (Exhibit 5 marked for identification and

9    attached to the transcript.)

10   Q.      And you'll have to bear with me because I'm

11   going to do this for three more letters.  So this is

12   what I've marked as Exhibit 6, which is another letter

13   titled, Follow-up Recommendations for Transparency,

14   Public Involvement, and Fair Representation in South

15   Carolina's Redistricting Process, which was sent to the

16   Redistricting Ad Hoc Committee, Judiciary Committee on

17   August 30, 2021, and this is Plaintiffs' Exhibit 6.

18   Again, Representative Jordan, take a moment to review

19   this document to see if this is something that you

20   remember at some point receiving or reviewing?

21   A.      Yes, I remember this document as well.

Page 125

1    (Exhibit 6 marked for identification and

2    attached to the transcript.)

3    Q.    We're more than halfway there, so here's the

4    third one that I'll have to do, but I feel like at least

5    I'm not asking questions about the document itself.

6    This is marked as Plaintiffs' Exhibit 7 and the letter's

7    titled, Follow-up on Recommendations for Transparency,

8    Public Involvement, and Fair Representation in South

9    Carolina's Redistricting Process and was sent to the

10    Redistricting Ad Hoc and the House Judiciary Committees

11    on September 27, 2021.  Representative Jordan, take a

12    moment to review this document to see if you recall at

13    some point receiving and reviewing it?

14    A.    Yes, this feels familiar as well.

15    (Exhibit 7 marked for identification and

16    attached to the transcript.)

17    Q.    And the final one, which is Plaintiffs' Exhibit

18    8, this document is labeled, Submitting Proposed

19    Congressional and House Maps, and it was sent to the

20    Redistricting Ad Hoc and House Judiciary Committees on

21    October 8, 2021.  I'll let you take a moment to review

Page 126

1    this, Representative Jordan, just to see if you remember

2    receiving and reviewing these documents.

3    A.      Yes, this feels familiar as well.

4            (Exhibit 8 marked for identification and

5    attached to the transcript.)

6    Q.      And do you recall at some point reviewing a

7    state legislative House map that was proposed by the

8    South Carolina State Conference of the NAACP?

9    A.      I do.

10   Q.      I now want to get to questions about the map

11   room to help me understand just a little bit more about

12   what it means, and we're done with those four exhibits.

13   So, I'm wondering if you could tell me what is the map

14   room, Representative Jordan; how would you describe it?

15   A.      The map room is the area in which computers are

16   located so that members can go in and see on a screen

17   where the population of -- where the people of South

18   Carolina live and see -- I'm going back in time now, but

19   the process of going in the map room is to see what

20   their districts that they represented looked like and

21   where the population was and is currently in order to be

Page 127

1    able to then make or draft a district proposed -- in

2    order to propose a district.

3    Q.      So who, I guess, who oversaw or who was

4    responsible for overseeing the map room or the processes

5    within the map room?

6    A.      So, the Ad Hoc Committee, just like we adopted

7    criteria, we adopted map room procedures in order so

8    that the map room process could flow efficiently.  So, I

9    guess I'd start with those procedures were established

10   by the Ad Hoc Committee, and then primarily staff would

11   be in charge of kind of conducting the day-to-day,

12   making sure the map room was open and appointments, you

13   know, take place, et cetera.

14   Q.      And would it be fair to say all 124 legislators

15   had access to the map room, House Representative

16   legislators, had access to the map room if they so

17   requested?

18   A.      Absolutely.

19   Q.      Was there anyone outside of the House or the

20   Redistricting Committee staff and representatives who

21   had access to the map room?

Page 128

1    A.       Run through that list again, members of the

2    House, staff?

3    Q.       Yep, just those two buckets.

4    A.       Not that I can think of.

5    Q.       And I've seen -- well, hopefully you can correct

6    me -- I've seen the name Thomas, is it Hager or Hager?

7    A.       Close enough.

8    Q.       First, Hager or Hager?

9    A.       I've heard it said many, many, many different

10   ways.

11   Q.       Fair enough.

12   A.       And he doesn't usually correct anyone.

13   Q.       What was his role within the map room?

14   A.       I would refer to him as sort of the chief

15   technical person.  He would be the person in the room

16   with the skill set to operate the equipment.  It's not

17   unsophisticated.

18   Q.       What's his title?

19   A.       I don't have it in front of me.  Again he'd be,

20   in my mind, the chief technical person.

21   Q.       From your understanding and interactions in the

Page 129

1   map room, was he providing any input into drawing maps,

2   or was he solely drawing the maps from a technical

3   perspective at the direction of House Representatives?

4   A.      The latter, he would obviously tell a member

5   you've drawn out a deviation, that sort of thing, but

6   for purposes of drawing a district, he was there simply

7   to assist a member to do what they directed him to do.

8   Q.      Got it.  So, he would primarily offer, to the

9   extent as we talked about earlier, the standard

10  population deviation, if there were any concerns within

11  the proposed map?

12  A.      Correct, and, I guess, he could assist in the

13  sense of -- bear in mind I include myself in this -- if

14  an individual member goes in, they might say put that

15  block here.  Well, that's 10,000 people in that block,

16  that's not going to work.  So, he could assist in that

17  respect, but not telling them do this, do that, so to

18  speak.

19  Q.      I'm going to go through a couple of other names

20  and please correct me if I pronounce anything wrong, but

21  do you know who Sarah Grace Williamson is?

```
                                                    Page 130

 1    A.       I believe she was one of the interns.

 2    Q.       An intern that -- I guess, what would her role

 3    have been within map room processes or procedures?

 4    A.       So in the map room, if I remember correctly,

 5    there was three stations.  So, Thomas is obviously, like

 6    I said, sort of the chief technical person, but he had

 7    interns that would assist and then would -- he couldn't

 8    sit with everyone all the time, obviously, either.  So

 9    the intern would sit with the member and, you know, the

10    member would say click here, click there, and they would

11    operate the equipment.

12    Q.       Got it.  Do you know where -- were the interns

13    in college, grad school?

14    A.       I believe most were in college.

15    Q.       Do you know who Jolie Eliza Dequit is?

16    A.       Intern as well.

17    Q.       Intern?

18    A.       I believe intern.

19    Q.       And then Megan Goyak or Goyak?

20    A.       I believe intern.

21    Q.       Daniel Englee, Englea?
```

Page 131

1   A.      That doesn't jump out to me.

2   Q.      Sebastian Bass?

3   A.      I believe intern.

4   Q.      Did anyone from the governor's office have

5   access to the map room related to the House districts?

6   A.      No, I do not believe so.

7   Q.      Did Mr. Dennis have access to the map room?

8   A.      He did.

9   Q.      How would you describe his role within the map

10  room?

11  A.      I'd say within the confines of the map room, I

12  think one of his titles is chief legal counsel to the

13  House.  So, as an attorney to essentially every member

14  of the House, he would be -- he would have access in

15  that respect.

16  Q.      I guess from your interactions in the map room

17  and, again, not going into any of the content of the

18  discussions, did he provide any feedback or guidance on

19  maps that you proposed for House District 63?

20  A.      I don't believe he did for 63, no.  Again, I'll

21  point you back to my prior testimony:  63 is a small

Page 132

1    geographic area to start with.  The population kept up,

2    essentially, with the average pace of South Carolina.

3    My time working on 63 was pretty limited.  I think I met

4    one time with -- I might have looked at it maybe two or

5    three times.

6    Q.      Was there a process for signing up to the map

7    room?

8    A.      There was.

9    Q.      Was that another responsibility that Ms. Dean

10   would have been in charge of?

11   A.      It would have floated -- that process would have

12   floated through the Judiciary Committee, so to that

13   extent, yes.

14   Q.      I know that you mentioned you did not maybe

15   spend a lot of time in the map room, but how many times

16   did you visit it to draw maps that you proposed?

17   A.      I was in the map room a fair amount.  My

18   testimony was, or was meant to be just for District 63,

19   I wasn't there a ton, but I was in the map room a fair

20   amount.

21   Q.      I guess, what was your role within the map room

Page 133

1    outside of proposing any maps for House District 63?

2    A.      Just as the chair of the committee and make sure

3    everything was flowing like it should, you know, people

4    -- efficiency.  And I'm sure we'll get to this in a

5    little bit, but this was sort of a tiered process.  As

6    members would come in and draw drafts of districts,

7    eventually, you have to connect that district to other

8    districts and those areas of the state to other parts of

9    the state, and I participated in that as well.

10   Q.      I guess to the extent you recall, do you know

11   how many interactions or how many days you were

12   interacting with folks in the map room during the

13   process?

14   A.      I mean, it'd be speculation.  If the map room

15   was open for, let's say, 30 days, I was probably in

16   there 7 or 8 of those days, maybe a little more.

17   Q.      Did you offer at all any feedback or guidance on

18   how proposed maps might comply with the redistricting

19   criteria or guidelines?

20   A.      Well, bear in mind that, again, back at that

21   starting point, for the most part, districts started

Page 134

1     from where they were drawn ten years ago, and then

2     members would draw their -- sort of draw their districts

3     or draw the district they represented in ways to comply

4     so -- within the deviation -- so at times, yes.

5     Q.     Do you recall, were there any concerns or

6     complaints about the map room process that were brought

7     to your attention?

8     A.     Not that I recall.

9     Q.     I guess, if you could walk me through, you know,

10    if you were a legislator that was just going for the

11    purpose of drawing your House district, what would that

12    process -- you've already signed up, you're going into

13    the map room -- what would that entail?

14    A.     You show up at your appointed time, you sign in,

15    you sit with a technician, could be an intern, could be

16    Thomas.  They pull up on the screen the district,

17    essentially, and then from there you're looking at

18    really a point-and-click kind of thing to either remove

19    population out of your area to get yourself into a

20    compliance as far as a deviation goes, or you're

21    clicking population into your area to try and increase

Page 135

1  your population into compliance.  And then during the

2  course of that process, you have the opportunity, when

3  you so choose, if you so choose, to say, all right, I

4  want to save this version as something to hold on to and

5  consider.  Some members might save one, some might save

6  five or six, that's kind of a standard meeting -- or

7  attendance, if that makes sense.

8  Q.     Yes, I just want to make sure there wasn't

9  anything else.  When folks were in the map room and

10  drawing these or asking for assistance to draw maps, was

11  the primary consideration whether it complied with the

12  total population standard, at least for the initial

13  proposed maps?

14  A.     That was certainly at the core of it.  Again, we

15  have that criteria, but remember also you're starting

16  from a place that complied with the criteria.  So, I'd

17  say it's all baked in the cake.

18         COURT REPORTER:  I'm sorry, it's all based on

19  what?

20         THE WITNESS:  Baked in the cake.

21  BY MR. CUSICK:

Page 136

1    Q.      Did -- in the maps that were drawn by each

2    member initially, were there opportunities to include

3    notes or explanations for why a district might be drawn

4    a certain way?

5    A.      I don't believe so.  I think it was just, you

6    could say, the technical version of the map.

7    Q.      Was there -- I guess, did -- was there anything

8    where folks could identify communities of interest that

9    they were trying to preserve in the drafts that they

10   drew?

11   A.      Well, bear in mind most of these folks were --

12   or all these folks were current representatives, so they

13   knew their area, for the most part, pretty good.  Most

14   of the meetings as I can recall sitting in on or being

15   in the room, a member could look at a map and say, well,

16   the so-and-so community or that's -- there's a lot of

17   institutional knowledge with the minds of the member as

18   to the geographical footprint of the district they

19   represent.

20   Q.      And I know you mentioned -- we'll talk about the

21   tiered process, but for the initial maps that were

Page 137

1    drawn, did legislators all have access to review ones

2    that other legislators drew, or was there -- I guess,

3    let me rephrase that.  Was there, like, a place where

4    all the maps were housed that legislators could look to

5    draw House district maps?

6    A.      You really -- you had access to your map.  Now,

7    many, many legislators would come with either members of

8    their delegation or their entire deligation on a few

9    occasions or perhaps their neighboring -- wasn't a whole

10   deligation, might perhaps be their neighboring district

11   member, so to speak.  So, you know, some of this, a lot

12   of things happen in concert in that context.  So, to

13   that degree, you would have access to the other

14   versions, but not if -- not unless you basically said it

15   was okay to share your work product.

16   Q.      Did you, for your delegation in the districts

17   that neighbored yours, did you go to the map room with

18   those representatives to talk about it?

19   A.      I had several conversations during the course of

20   it.  I don't think we were -- I can't remember if we

21   were all there together or not, to be honest with you.

Page 138

1    But I know for -- in my delegation, it would be Philip

2    Loe, Roger Kurby, and Terry Alexander.  And I had

3    communications with all those individuals related to

4    Florence County.

5    Q.      Do you recall when the map room process ended or

6    -- I guess, let me rephrase that.  How long did the map

7    room process take place over the course of -- generally?

8    A.      It was about a month.

9    Q.      I'm now going to pull up, and hopefully it

10   should be in Exhibit Share, what's marked as 2021

11   Redistricting Map Room Policies and Procedures, which

12   has a Bates stamp numbering of SC_HOUSE_0091425 through

13   0091426 as Plaintiff Exhibit 6.  Let me know if you were

14   able to pull that document up, Representative Jordan?

15   A.      Yes.

16          (Exhibit 9 marked for identification and

17   attached to the transcript.)

18   Q.      Is this the document you referred to before

19   about the policies and procedures that the Redistricting

20   Committee created for the map room?

21   A.      Yes.

Page 139

1    Q.      I'd like to turn to what's marked as, I guess,

2    paragraph or bullet 11, which carries over on pages 1

3    and 2.  Let me know when you -- if you want to have a

4    chance just to review that real quickly.

5    A.      Okay.

6    Q.      So, in the -- I think it's the last sentence.

7    It beings with, "Although any demographic or political

8    data."  Do you see that, the last full sentence?

9    A.      Yes.

10   Q.      What demographic data was available through the

11   redistricting software?

12   A.      Honestly, I can't tell you the total -- that'd

13   probably be a better question for someone with a little

14   more technical skill than me.  When I was in the map

15   room, I don't recall that question being answered or

16   being asked in front of me.

17   Q.      And maybe you'll have the same answer but, do

18   you know what political data is referenced here in the

19   next one?

20   A.      I don't.

21   Q.      And then in the last portion of this sentence,

Page 140

1    it says that, "Printed maps reflecting racial,

2    political, or other demographic data will not be made

3    available."  Do you see that?

4    A.      Yes.

5    Q.      What does that refer to when it says racial

6    demographic data would not be made available on printed

7    maps?

8    A.      So, when you draw a proposed district then you

9    can print out -- you say I want to save that district,

10    you could have it printed.  And, so I'm assuming that's

11    to mean that data would not be available in print form

12    on that map.

13    Q.      When you were reviewing proposed maps, could you

14    see any data about the Black population or Black voting

15    age population in the software?

16    A.      I believe the software had the capability, but

17    most of the time when I was in there, folks focused on

18    deviation of the overall population.

19    Q.      And then in the second full sentence in this

20    paragraph, it states, "Additional copies will be

21    available if approved by Speaker Lucas or Chairman

Page 141

1    Murphy."  Did I read that correctly?

2    A.      You did.

3    Q.      Do you know what it means here by approved?

4    A.      If I remember correctly, this was just a way --

5    we didn't want folks coming in and saying I want 1,000

6    copies.  This was an efficiency kind of thing.

7    Q.      Got it.  So, it's mainly just to avoid having

8    many maps that were drawn and printed out?

9    A.      Correct.

10   Q.      Okay.  I guess now maybe -- and I know you

11   referenced earlier about the tier process.  So, the map

12   room process ends, I think it was sometime in the first

13   week of November.  What happened with all the proposed

14   maps that were drawn and saved?

15   A.      So, those were essentially compiled.  From

16   there, we have to get to a working sort of -- again,

17   sort of another -- a starting point for the next phase.

18   Once that map room closes, then you -- I think the next

19   thing to pop up would have been the staff plan, staff

20   House plan.  That would be the next thing, if I remember

21   correctly, in the time line.

Page 142

1  Q.     Got it.  So, would it be fair to say that tier 1

2  was the map room, in the sense of all potential maps

3  were drawn there?

4  A.     Yes.

5  Q.     And then the tier 2 process involved creating an

6  initial working draft of a full map?

7  A.     Yes, but I'm leaving out one part in there.  So,

8  part of piecing it all together was also folks would

9  draw their districts, and many times they would take

10 into consideration or, as I said, work in concert with

11 their neighbors or delegations.  But you still have to

12 sort of fine-tune connecting points.  I'd say that was

13 sort of done in two phases.  Thomas, as the most

14 technically sophisticated, was able to do much of that,

15 and then the Ad Hoc Committee also helped participate in

16 that part of the process as well.

17 Q.     And were those two sub-phases, if you will, were

18 those -- those were parts after the map room process

19 closed?

20 A.     Yes.  Yes.

21 Q.     And, I guess, as the maps were being compiled,

Page 143

1    who oversaw that process of putting together a working

2    draft, or who was responsible for organizing,

3    facilitating that initial draft?

4    A.      You know, again, I think it's sort of two parts.

5    On the one hand, I would communicate with the Ad Hoc

6    Committee member in that area of the state.  It'd help

7    in connecting the sort of -- I guess the joints of the

8    map, so to speak.  So, on more than a few occasions,

9    you'd get two members of the Ad Hoc Committee whose

10   areas connected up, and they would sit down and sort of

11   see how the points on the map would connect to each

12   other.  And then also, you also have going on

13   simultaneously, or in addition to that, staff

14   fine-tuning that as well.  I mean, it's a lot of moving

15   parts.  It's not -- it's just a lot happens, kind of

16   thing.  It's got a lot of moving parts.

17   Q.      So in this tier 2 phase of creating the map,

18   I've heard Mr. Hager, Ad Hoc Committee folks and stuff.

19   Was anyone else outside of the Ad Hoc Committee involved

20   in pulling together the initial plan working draft?

21   A.      I'd say that the staff and Ad Hoc Committee

Page 144

1    would be the primary components, yes.

2    Q.      Who else outside of that would -- who outside of

3    that was involved?

4    A.      That's essentially it.

5    Q.      Did -- I guess, Representative Murphy have any

6    role in developing that initial plan?

7    A.      No, I don't think -- at that juncture,

8    Chairman Murphy didn't really have much to do with that

9    part of it.

10   Q.      Speaker Lucas?

11   A.      I think the speaker did help a little bit in his

12   part of the state, but not necessarily on the whole.

13   Q.      Mr. Dennis?

14   A.      I believe he was in and out of the process at

15   times.

16   Q.      What about Nexsen Pruet?

17   A.      As counsel, legal counsel, they were really in

18   and out of the entire process, so that's the easiest way

19   to say that.

20   Q.      Got it.  So, I'm just trying to figure out the

21   process point.  So, all the maps were there, the group

Page 145

1    of people you listed was working through an initial

2    draft plan.  Were legislators notified on the status of

3    their proposed maps, on which ones either had been

4    accepted, or were there any questions about proposed

5    maps that the committee reached out to folks about?

6    A.      I don't remember, myself, getting any specific

7    questions.  I mean, I think the more you work with your

8    neighbor or your delegation, the more you probably had

9    an understanding of where -- I can give you -- Horry

10   County, for example, their delegation came in and met,

11   and I don't think really anything was done to that

12   corner of the state after their working together on it.

13   It fit within the parameters and so didn't really need

14   any fine-tuning, if that makes sense.  If you didn't

15   communicate with your neighbor or your delegation, then

16   that made it a little more difficult to make everything

17   match up within the deviation.

18   Q.      Did any of the public proposed maps influence

19   the initial working draft?

20   A.      You mean the maps or the comments?

21   Q.      For public maps that were submitted by members

Page 146

1   of the public.

2   A.      So, I can only speak to me but, yes, I reviewed

3   those maps and took into consideration different aspects

4   that they brought to the table, I'm sure.

5   Q.      If there were disagreements or a delegation

6   among its members couldn't resolve district lines, what

7   was the process or who made determinations to resolve

8   those conflicts?

9   A.      I don't know.  Again, if you're talking about,

10  like, for instance, like (inaudible) they worked it out

11  amongst themselves, essentially, by communicating and

12  drawing.  And I'm not aware off the top of my head of a

13  specific example of having to say, you know -- choosing

14  an A or a B.  I'd point you back to the process.  Once

15  the staff proposal is out there, then the committee had

16  to adopt it, and amendments are available to the members

17  of the Ad Hoc Committee, and then as the process goes

18  forward, the full Judiciary -- a member of Judiciary has

19  the opportunity to offer an amendment, and then as we go

20  forward, a member of the House of Representatives has

21  the ability to offer an amendment to the process.  So,

Page 147

1    if anyone -- at some point in time, anyone in the House

2    has the opportunity to offer an amendment to that

3    process.

4    Q.      So, I'll try to -- just to make sure we're on

5    the same page because it will help me form the next set

6    of questions -- so, we've talked about, if you'll bear

7    with me, the tier 1 about the map room.  We have tier 2

8    that includes working on a draft proposal that included

9    input from Mr. Hager, the Ad Hoc Committee, staff, and

10   you know, counsel in developing an initial staff working

11   plan.  That's kind of tier 2, if you will?

12   A.      That's a broad but fair description.

13   Q.      And then was that initial -- once the -- it's

14   hard because it's draft -- but once the initial draft

15   was there, you know, an initial working draft with all

16   124 districts in place, what was the next step once they

17   were all pieced together?

18   A.      So the next step, then it goes before -- well, I

19   take that back.  The next step -- and forgive me, I

20   don't have the time line, so I'm going off of memory.  I

21   think we had additional public input opportunities, if

Page 148

1    I'm not mistaken, and so we had that opportunity next in

2    Columbia.

3    Q.    I know we've talked about population equity and

4    the redistricting criteria.  Would it be fair to say

5    that the Redistricting Committee relied on House members

6    in drawing their district to assess whether those maps

7    either complied or didn't comply with the criteria?

8    A.    I'd say they're a piece of the puzzle.  They're

9    not -- I wouldn't say that's a whole 100 percent of it,

10   but that's a component in it, for sure.

11   Q.    I guess, and maybe this is -- I don't know if

12   this is tier 3 -- but once you have the initial working

13   map or the draft before it's publicized on November 8th,

14   did anyone from the Redistricting Committee or staff

15   conduct a district-by-district analysis to ensure that

16   each district complied with the criteria?

17        MS. HOLLINGSWORTH:  Object to the form.

18        THE WITNESS:  So, I would say you just gave an

19   explanation of all the different groups involved in the

20   process.  My point would be that's going on along and

21   along and along at every layer of the process.  So, I

Page 149

1    don't think you could say, this is where that occurs; it

2    occurs throughout the process.

3    BY MR. CUSICK:

4    Q.     Got it.  So, I guess, who would you say was

5    conducting a district-by-district analysis of whether a

6    proposed House district complied with the redistricting

7    criteria?

8            MS. HOLLINGSWORTH:  Object to the form.

9            THE WITNESS:  I would say we relied on members'

10   ability in that respect, staff and counsel all in

11   conjunction, to meet that requirement.

12   BY MR. CUSICK:

13   Q.     Was there any document produced or report that

14   assessed how each district complied with the

15   redistricting criteria?

16   A.     Not aware of such a document.

17   Q.     Did you at one point review the entire map, the

18   initial draft map, before it was publicly posted?

19   A.     Yes, I believe so.

20   Q.     And did you undertake any steps to assess

21   compactness in the 124 districts?

Page 150

1    A.      You know, again, I think that's going on all

2    along in the process.  Compactness, I think I can use

3    that as an example, I think that -- number one, relying

4    on in part from the starting point of the prior district

5    and, number two, I'd say the member has a -- is a key

6    asset in that as well as of determining it, but they

7    know that district better in theory than anyone else in

8    the building.  So, again, that's happening along and

9    along.

10   Q.      Who within the Redistricting Committee was

11   assessing whether a map complied with the Voting Rights

12   Act?

13   A.      I would say we would chiefly rely on counsel for

14   that.

15   Q.      That includes Nexsen Pruet?

16   A.      Yes.

17   Q.      Mr. Dennis?

18   A.      Yes.

19   Q.      Ms. Dean?

20   A.      No, I don't know that I would -- Ms. Dean, she

21   was wearing a lot of hats, especially, again, due to

```
                                              Page 151

 1    Ms. Anderson's retirement.  I don't know that I would

 2    say she was in the discussions as much as she was the

 3    logistics, again, of the tour, and then the map room,

 4    and then the legislation, making sure it got from A to

 5    B.  I don't know that I would put that squarely on her

 6    as others.

 7    Q.      Were there any conflicts that you remember about

 8    competing communities of interest that were not resolved

 9    that required discussion from the Redistricting

10    Committee?

11    A.      I remember during different public comments we

12    had testimony and e-mailed comments from situations like

13    that.  I don't remember off the top of my head

14    specifics, but I do remember a few of those did arise,

15    yes.

16    Q.      And so I'll turn to, if you will, tier 3, which

17    was -- let's say, the working draft map was finalized

18    and published on November 8th; do you recall that?

19    A.      Yes.

20    Q.      And so do you remember when the first hearing

21    was on that proposed map?
```

Page 152

1    A.      Not off the top of my head.

2    Q.      I'm going to pull up what's marked as Exhibit

3    10, and this is titled, The 2021 Working Draft, and it's

4    a screenshot taken yesterday on April 11, 2022, of the

5    South Carolina House Representatives Redistricting 2021

6    Landing Page.  And I don't know if you can zoom in or

7    see it okay.  I'm now looking at it, it might not be

8    that visible, or it's not for me.  Is it for you,

9    Representative Jordan?

10   A.      It gets blurry the more you -- blurrier the more

11   you zoom in.

12          (Exhibit 10 marked for identification and

13   attached to the transcript.)

14          MR. CUSICK:  Ms. Hollingsworth, if it's okay, I

15   could screen share if that's helpful, just to see if the

16   PDF doesn't work as well.

17          THE WITNESS:  I can make it out for the most

18   part.

19   BY MR. CUSICK:

20   Q.      Yes, so do you see that first -- I guess it's

21   the only sentence there that has a star or an asterisk

Page 153

1    that begins with, "The draft statewide map?"

2    A.      I can see it, I can see the star, but it's -- I

3    can read the blue easier than I can read the black small

4    print.

5    Q.      Right.

6            MR. CUSICK:  Ms. Hollingsworth, would it be okay

7    if I screen share?  I'm on the site right now, and if

8    that isn't too complicated?

9            MS. HOLLINGSWORTH:  Sure.

10   BY MR. CUSICK:

11   Q.      Does this work any better, Representative

12   Jordan?

13   A.      Much better.

14   Q.      Do you want to take a moment just to read that

15   sentence?

16   A.      Yes.

17   Q.      It said that there are some technical issues

18   with the initial draft that was uploaded on

19   November 8th; do you remember that?

20   A.      I don't remember when it occurred.  It was

21   brought to my attention during one of our meetings that

Page 154

1    happened after it occurred.

2    Q.      And then the second sentence here essentially

3    says that maps that are downloaded after 6:30 resolved

4    any of the discrepancies; would that be fair?

5    A.      I believe that's correct.  Again, it was an

6    issue that was resolved within a few hours, and I wasn't

7    aware it occurred until much later.

8    Q.      I'm going to pull down this screen share because

9    I don't have any other questions, but I just want to

10   keep it up just to make sure if there's anything else

11   that you wanted to just look at, but I'll pull it down

12   otherwise.  And so I'm now going to turn to what is

13   marked as Exhibit 11, which is video transcript from the

14   November 10, 2021, South Carolina House Judiciary Ad Hoc

15   Committee, which is a transcript that is available on

16   the Redistricting Committee website of a hearing that

17   started at 12 p.m. noon.  Let me know when you have that

18   document opened, Representative Jordan.

19   A.      I have it.

20          (Exhibit 11 marked for identification and

21   attached to the transcript.)

Page 155

1    Q.      Would you agree that members of the public had

2    less than 48 hours to review the House's first draft of

3    its map before this November 10th hearing?

4    A.      Yes, I believe that's correct.

5    Q.      Did you have any concerns that that wouldn't

6    provide sufficient time to review the map?

7    A.      No, given that, you know, we were trying to move

8    as swiftly as we could and knowing that this was a -- it

9    was a quick turn, but I don't think it was overly such.

10   Q.      You testified before that during that tier 2

11   stage, the groups that we identified were constantly

12   reviewing the map.  Do you know how long it took to

13   create the first draft map after the House room process

14   ended?

15   A.      Several days.

16   Q.      Do you recall any testimony during the November

17   10th hearing raising concerns about members of the

18   public having limited time to review the draft map?

19   A.      I do recall that being expressed by a few folks,

20   that they felt like it was quick.

21   Q.      What did you think of those opinions?

Page 156

1    A.      If I remember correctly, that was one of the

2    reasons why we certainly didn't take any action.   I

3    don't think we took action at that meeting and I

4    specifically, you know, left the public input period

5    opportunity open for folks to weigh in, to send comments

6    for, you know, additional time so that it could give

7    folks an opportunity to, number one, realize that there

8    was a plan on the table and, number two, an opportunity

9    to be heard on that.

10   Q.      So, for shorthand I'll use the initial House

11   draft plan, if that works for you, to refer to the one

12   that was posted on November 8th at 6:30 or after 6:30.

13   Who would you say was the full extent of folks that

14   oversaw the final drawing of that map just before it was

15   publicly posted?

16   A.      You're talking about the original staff House

17   plan?

18   Q.      Yes, the initial one that was posted before any

19   amendments.

20   A.      I would say that's a combination of that process

21   we've talked about where members came in and

Page 157

1    participated and brought in their knowledge and, of

2    course, certainly we molded it together, and then, if I

3    remember correctly, I think I gave the final say to post

4    the map, so to speak.

5    Q.        During the consultation before the map was --

6    the initial map was proposed -- did the Redistricting

7    Committee contact every member to give them a status

8    update of where their district was and what lines were

9    drawn?

10   A.        I don't believe so.

11   Q.        Would it be fair to say that the initial House

12   draft plan that was published was the first time that

13   some members saw the way that their districts were drawn

14   after the map room?

15   A.        Well, yes, I'd say -- I'm guessing there'd be a

16   handful of folks in that category, yes.

17   Q.        I know you've talked about the Redistricting

18   Committee, you know, trying to resolve conflicts with

19   delegations and their input.  Is there a quantifiable

20   number of how many House members were consulted in the

21   final stage of piecing together that initial draft map?

Page 158

1    A.      It's hard to say because remember in that tiered

2    process, you have members of the Ad Hoc Committee

3    communicating back, I'm sure, with members of their

4    region of the state.  Some of -- and some of that's

5    easier than others.  If you live in an area that grew

6    pretty heavily, it's a little more complicated.  If you

7    live in an area that lost population, it's a little more

8    complicated.  So, it's hard for me to quantify or

9    guesstimate how many members were consulted in that

10   process.

11   Q.      I know we talked about Representative Newton as

12   Congressional District 5 and under the old map that he

13   would have been represented.  Does that include Richland

14   County?

15   A.      I believe that -- I know it comes down and

16   touches a little bit of Sumter.  I can't remember if it

17   grabs just a portion of Richland or not.  If it does,

18   it's a small piece.

19   Q.      Okay.  And so I apologize for the many

20   questions.  I'm just trying to piece everything

21   together.  So, as the Redistricting Committee members

Page 159

1    were talking to delegations with the draft map, was the

2    Redistricting Committee then meeting and talking about

3    updates from the delegations about what they were

4    receiving or feedback?

5    A.       Not at that point, no.  Again, I found it was

6    easier to -- kind of that pod system, where you bring in

7    the Ad Hoc Committee not as a whole but in pairs of two

8    from parts of the state where they connected to each

9    other.  So, you could sort of smooth out those, what I

10   would kind of classify as, how the joints connected up

11   by having those two individuals in the room.  Is that a

12   perfect process, no, but I think it worked okay.

13   Q.       Before publicizing the initial House draft plan,

14   the one that was -- you know, just before it was

15   published -- who saw that plan in its last iteration

16   before it was publicly posted:  Just Redistricting

17   Committee members, or did anyone else have review of it?

18   A.       Members of the Ad Hoc Committee would have seen

19   it, I believe.  Certain members of the staff, we

20   discussed counsel.  I'm guessing that same type of

21   circle would have seen it.

Page 160

1    Q.       Did you -- I guess, when members were drawing

2    the maps in the map room, do you have any sense whether

3    they were looking -- could they compare districts that

4    they drew to ones that their colleagues drew, or was it

5    only you could focus on one district at a time?

6    A.       It would depend on sort of your approach.  If

7    you came in there by yourself and didn't consult your

8    neighbor or your delegation, then you just focused on

9    your district.  If you collaborated with your

10   neighboring districts or delegation members, then you

11   could work together and see everything.  I saw it

12   approached both ways.

13   Q.       Did you hear any concerns about the pairing of

14   incumbents in the map that was initially proposed?

15   A.       Yes, I did get some feedback, two phone calls

16   saying that folks were unhappy with the --

17   Q.       Do you remember who those representatives were?

18   A.       I'm thinking I heard from Representative Kirby,

19   my part of the state.  I ran into Representative Govan

20   at one point in time, who expressed that he wasn't happy

21   with his part of the state.  I think I had a phone call,

Page 161

1    if I remember correctly, from Representative Davney,

2    that he wasn't happy with his part of the state, and

3    then I was made aware by a couple members of the Ad Hoc

4    Committee that they received similar type of

5    communications.

6            COURT REPORTER:  I'm sorry, you're saying they

7    weren't happy with?  It sounds like -- I don't know what

8    you're saying.  Sounded like you said present day but I

9    know that wasn't it.

10           THE WITNESS:  Happy with their part of the

11   state.

12           COURT REPORTER:  Okay.  Thank you.

13   BY MR. CUSICK:

14   Q.      Do you have any understanding of why

15   Representative Govan's district, what his concerns were

16   with what happened with his district?

17   A.       From what I remember, he just expressed that he

18   was unhappy about it.  You know, at the end of the day,

19   population drives the train in this process, and if

20   you've got an area of the state, like Pee Dee where I

21   lived, that didn't keep up with growth, then you're

Page 162

1    going to have a difficult time maintaining districts.

2    So, in Representative Govan's part of the state, down

3    around Orangeburg, in that area, and south of there.

4    So, also you could have issues when you have parts of

5    the state that are growing and it forces you to -- not

6    to displace, but districts have to adjust to keep up

7    that population.  So, those were the parts of the --

8    those are the issues, I guess, you see as a result of

9    the changes in population.

10   Q.      I guess, who was involved in determining that

11   his district would be drawn out?

12   A.      So, I go back to that tiered system.

13   Ultimately, you kind of get input from members of a

14   region depending on what the struggle is, whether it's a

15   high population, members are going to have them put on

16   where that new district needs to go, if you need a new

17   district.  Members are going to have -- conversing

18   members are going to have input if they're in an area,

19   say like that, that a population has shrunk.  So, I'd

20   say it's a combination of different -- you know, looking

21   at many different versions of that area of the state.

Page 163

1   That was one of the common things of districts coming

2   together around his area.

3   Q.      So, that would include the set of folks we

4   talked about before, Ad Hoc Redistricting Committee

5   members?

6   A.      Yes.

7   Q.      Mr. Dennis?

8   A.      I don't know that Mr. Dennis participated in

9   that part of the discussion.  I think that was primarily

10  an area -- members from that part of the state

11  recognizing that there's -- if you draw your district,

12  you've got to get to a number that's within that

13  deviation.  There's just so many people.  Again, this is

14  population driven.  So, as far as where districts are

15  combined or added to, members of that region of the

16  state have a lot to say about it.

17  Q.      And now I'm going to focus on just a couple of

18  your remarks at this November 10th hearing that's

19  Plaintiffs' Exhibit 11.  And just so we're on the same

20  page, I first just want you to begin on page 4 in line

21  2, where you see "Representative Jordan" there.

Page 164

1    A.       Okay.

2    Q.       And then just to make sure, I want you to scroll

3    down to page 9.  As you can see, this is, my

4    understanding, to be your introductory remarks for this

5    hearing, and when you get to page 9, let me know.

6    A.       I'm here.

7    Q.       And then if you could read lines 11 through 16

8    and beginning on line 11, "the working plan."

9    A.       "The working plan incorporates the process I

10   just discussed including public input as well as input

11   from the members of the House, and is informed by -- and

12   is informed by South Carolina's voting patterns,

13   history, and other relevant data and information."

14   Q.       So, here in line 15, you say, South Carolina's

15   voting patterns.  What do you mean by that?

16   A.       Again, I think that connects with population and

17   growth and lack of growth, and those kind of things.

18   Q.       Are you saying population growth?

19   A.       I'm saying that's part of it.

20   Q.       So population growth is part of South Carolina's

21   voting patterns?

Page 165

1   A.      It's part of the -- where the people are is

2   where they vote.

3   Q.      Is there anything else outside of population

4   growth for voting patterns?

5   A.      Not off the top of my head.

6   Q.      In that same -- the next one is South Carolina's

7   voting patterns -- and then the second one here is

8   history.  What history do you mean here?

9   A.      We would take into consideration all kinds of

10  history.  You referenced some of the civil rights

11  history.  When you showed me the slide a minute ago

12  where the site was up and then down and back up again in

13  a short period of time, one of the issues, if I remember

14  correctly, there was -- because we had to condense or

15  consolidate districts, we sent number 95, District 95,

16  to Charleston County to Mount Pleasant, and one of the

17  things that came up in that discussion was that's a

18  historically relevant district number.  It has a

19  significance.  That number, that district has historical

20  civil rights significance, so taking that into

21  consideration and one of the reasons why we wanted to

Page 166

1    keep that number in the geographic region where it had

2    been.  So, in that final draft was one of a few minor

3    changes, that it was putting that number back over in

4    the Orangeburg area.  That's just an example of the

5    historical significance of a broad spectrum, so to

6    speak.

7    Q.      And the last portion of that says, other

8    relevant data and information.  What are you referring

9    to here?

10   A.      I'd have to go back and read -- I'm assuming

11   that means population or something connected to that.

12   When we talk about data, typically, that's numbers,

13   people.

14   Q.      And now I want you to, if you can for a moment,

15   just scroll to the next page on page 10, and then to

16   line 21, and let me know when you get there.

17   A.      Okay.

18   Q.      And you see in the sentence on the latter half,

19   is says, "We believe"?

20   A.      Okay.

21   Q.      And I'll give you a moment just to read that

Page 167

1    full sentence because my question is, who does "we"

2    refer to here?  But I'll let you have a moment to read

3    that in case it's helpful.

4    A.       I probably should have said, I believe.  I don't

5    think anyone on the committee who's worked with me would

6    accuse me of getting my verbiage right.  On a high

7    percentage basis, essentially I'm communicating on

8    behalf of the committee with that.

9    Q.       Would it be fair to say that this initial -- the

10   initial House draft plan before amendments was a product

11   of the Redistricting Committee?

12   A.       I think, yes, that's fair.  Because, again, they

13   all had knowledge and participation in it along with the

14   process I sort of outlined earlier.  It's a staff plan,

15   that's how it's described, but they all had their hand

16   in it to some degree, as did the members of the House,

17   as did the public input individuals, as did the 2010

18   plans.  Again, it's a lot of different components.

19   Q.       I want to now turn to just the next page, page

20   11, beginning on line 1 with the sentence, "And that

21   working plan."  Do you see that for a moment?

Page 168

1    A.      Yes.

2    Q.      If you could read for me beginning with "and"

3    all the way to line 8 that ends with "congressional

4    plans."

5    A.      "And that working plan complies with the United

6    States Constitution, the South Carolina Constitution,

7    federal and state law, and is contiguous, compact, and

8    properly considers communities of interest and

9    encompassing.  In all, we received 11 proposed

10   redistricting plans from the public, 7 State House

11   plans, and 4 congressional plans."

12   Q.      So, when you say federal law here, does that

13   include the Voting Rights Act?

14   A.      Yes.

15   Q.      Do you have an understanding on what Section 2

16   of the Voting Rights Act is?

17   A.      Again, limited.  I would never claim to be a --

18   as a lawyer, I always equated to folks, you know, it's

19   like medicine.  There's general practice doctors and

20   brain surgeons and I'm certainly more of a general

21   practice.

Page 169

1    Q.      Were you at all briefed or did you have any

2    understanding of whether Section 2 proposed any

3    affirmative obligations on the Redistricting Committee?

4    A.      I have -- if I remember correctly, conversations

5    related to that with counsel.

6    Q.      And that means Nexsen Pruet?

7    A.      Correct.

8    Q.      Mr. Dennis?

9    A.      I don't believe Mr. Dennis was in those

10   conversations.  I think that was primarily Nexsen Pruet.

11           COURT REPORTER:  I'm sorry, that was primarily?

12           THE WITNESS:  Primarily Nexsen Pruet.

13           COURT REPORTER:  Thank you.

14           THE WITNESS:  I'm going to get rid of this

15   Southern accent one day, I promise.

16   BY MR. CUSICK:

17   Q.      What's your understanding of some of those

18   obligations under Section 2 of the Voting Rights Act?

19           MS. HOLLINGSWORTH:  Object to the form.  And I

20   want to make sure we're not asking him to discuss the

21   things that he -- information that he obtained in

Page 170

1    discussions with counsel, which is what he just

2    described.

3    BY MR. CUSICK:

4    Q.        Definitely, and to be clear, your understanding

5    on what you would share publicly as redistricting chair.

6    A.        So, in referring back to kind of how I described

7    my knowledge of the law in this particular field, this

8    is an area in particular I would rely heavily on

9    counsel.  And, so in this particular area, whatever I

10   got was primarily -- 99 percent would come directly from

11   counsel in that respect.

12   Q.        Are you familiar with the term majority-minority

13   district -- sorry, might have said that wrong --

14   majority-minority district?

15   A.        I am.

16   Q.        What does it mean?

17   A.        A district in which the percentage of minority

18   is a majority within the district.

19   Q.        As redistricting chair, do you have any

20   understanding whether the Voting Rights Act imposes a

21   requirement to draw majority-minority districts?

Page 171

1    A.        Again, I would have gone to counsel on that, but

2    my understanding was, it's to be given deference and to

3    be looked at very carefully.  I wouldn't say there's a

4    fundamental absolute requirement there, but it's

5    something to be addressed and looked at.

6    Q.        Do you have any understanding on how you would

7    make that assessment on whether to draw a

8    majority-minority district?

9    A.        Well, in this case, we had the ability to look

10   at, coming into the process, so back to 2010.  So, we

11   could see how many majority-minority districts existed

12   leading up to, and then see -- so you could see how many

13   existed in 2010, how many without any changing of any

14   lines would exist based on population changes presently

15   in South Carolina.  When I say presently, at the

16   beginning of the redistricting process, so you could

17   view it through that lens, I guess you could say.

18   Q.        So, I understand this, was it your

19   understanding --

20           MR. CUSICK:  Sorry.  I think that might be --

21   Rob, you might be off mute maybe.

Page 172

1          MR. TYSON:  Sorry about that.  I fell offline

2     and just called back.  Thank you.

3          MR. CUSICK:  No worries.

4     BY MR. CUSICK:

5     Q.     I guess, based on what you just said,

6     Representative Jordan, is it your understanding that

7     there was an obligation to maintain the same number of

8     majority-minority districts compared to a previous plan?

9          MS. HOLLINGSWORTH:  Objection to form.

10          THE WITNESS:  No. I don't think there's an

11     obligation necessarily to maintain.  Again, we're driven

12     by the population, but there's certainly a necessity to

13     look at that issue.

14     BY MR. CUSICK:

15     Q.     Are you familiar with the term an effective

16     minority opportunity district?

17     A.     I am.

18     Q.     What do you understand that to be?

19     A.     Well, it might not be a majority-minority

20     percentage-wise district.  It's a district, in my mind,

21     that would provide an opportunity.  So, it's not over

Page 173

1    the 50 percent mark, but it would be not too far from

2    that mark, if that makes sense.

3    Q.      Would that opportunity be to -- for Black voters

4    to elect a Black-preferred candidate?

5    A.      In the context of minority, yes, I'd say that's

6    a fair statement.

7    Q.      Yes.  And to be clear, in the context of a

8    effective minority opportunity district, if we're

9    talking about Black voters having effective minority

10   opportunity districts.

11   A.      I'd say that's fair.

12   Q.      Did the Redistricting Committee have any

13   understanding whether a House district needed to be

14   drawn at a certain Black voting age population in order

15   for it to perform for Black voters?

16   A.      I'm sorry, did you say the Judiciary Committee

17   or the Ad Hoc Committee?

18   Q.      Ad Hoc Committee.

19   A.      Ad Hoc Committee.  Again, I can only speak for

20   me.  I would think that would be something that the

21   members of the committee would understand.

```
                                                Page 174
 1    Q.       I hope I didn't mishear you, but I just want to

 2    clarify.   Did you testify before that an effective

 3    minority opportunity district might have a, in the

 4    context of Black voters, a BVAP below 50 percent?

 5    A.       A minority-majority or an opportunity?

 6    Q.       Opportunity district, effective opportunity

 7    district.

 8    A.       Yes, it would have a percentage below 50

 9    percent.

10    Q.       Are you aware of any effective minority

11    opportunity districts for Black representatives in South

12    Carolina with a BVAP below 45 percent?

13    A.       I believe several exist.  I don't have the map

14    in front of me, but I believe there are several.

15    Q.       Did the Redistricting Committee have any

16    threshold for BVAP as it was considering districts, of

17    what it should be?

18    A.       Again, I can only speak for me as a member,

19    single voting member, but looking at the issue as a

20    whole, so to speak, and understanding that it's

21    important to have -- to preserve minority-majority
```

Page 175

1   districts and to have opportunity districts.

2   Q.      Did the Redistricting Committee conduct any

3   analysis to determine how districts would perform for

4   Black voters with BVAPs below 50 percent?

5   A.      I don't believe such analysis was done by the

6   committee.

7   Q.      Were you aware of any analysis that you received

8   by the House Judiciary?

9   A.      Not that I recall.

10  Q.      I guess for a hypothetical, if a House district

11  in the previous lines had a 60 percent BVAP, was there

12  anything done by the Redistricting Committee to

13  determine whether that BVAP should increase, decrease,

14  or be maintained?

15  A.      I think that would depend on the population

16  growth or lack of growth in the area surrounding the

17  district.

18  Q.      And, I guess, what was your understanding of

19  what analysis would need to be done to determine whether

20  -- or what the BVAP would need to be to perform in a

21  district?

Page 176

1              MS. HOLLINGSWORTH:  Object to the form.

2              THE WITNESS:  You mean in an opportunity

3    district?

4    BY MR. CUSICK:

5    Q.     Yes.

6    A.     I don't -- I hesitate to give a number off the

7    top of my head.  Again, that was sort of in concert with

8    staff and counsel.  The existence -- again, out of that

9    population, like, if you -- like at an area like

10   Charleston, where it had -- just in my mind I can see on

11   the map -- several minority-majority districts where the

12   population shifted over a period of time.  So, now you

13   might have one majority-minority and two opportunity

14   districts as a result of the change in population.

15   Q.     Now, without going into the content of any

16   discussions, to the extent you can, did the

17   Redistricting Committee take on any analysis to

18   understand its compliance with Section 2 of the Voting

19   Rights Act?

20             MS. HOLLINGSWORTH:  Object to the form.

21             THE WITNESS:  The committee would have relied

Page 177

1    upon counsel for that.  I'm not trying to under- or

2    overestimate, but there's several lawyers on the

3    committee, and I don't think any of them would hold

4    themselves out to be constitutional lawyers in that

5    particular field as well.

6    BY MR. CUSICK:

7    Q.     I know we talked about data that was reviewed,

8    you know, during the initial draft plan.  Do you recall

9    whether the Redistricting Committee looked at

10   participation rates for voters throughout the state as

11   it was assessing the initial draft?

12   A.     I don't recall.

13   Q.     What about degree of cohesion among voters?

14   A.     I don't recall.

15   Q.     Are you familiar with the concept of crossover

16   voting?

17   A.     I've heard the term.

18   Q.     Was there any analysis of crossover voting by

19   the committee?

20          COURT REPORTER:  I'm sorry, I didn't get his

21   answer.  Was there any analysis of crossover voting, I

Page 178

1    didn't hear the answer.

2            THE WITNESS:  I don't believe there was.

3            COURT REPORTER:  Thank you.

4    BY MR. CUSICK:

5    Q.      I know we talked about, at the beginning of the

6    deposition, racially polarized voting and talked about

7    it in the context of the committee composition and

8    participation, but just to make sure I don't miss it,

9    did the Redistricting Committee conduct any racially

10   polarized voting analysis of the 124 districts?

11   A.      No, I do not believe -- no, it did not.

12   Q.      Do you have any understanding of whether

13   compliance with the Voting Rights Act involves a fact,

14   intensive analysis?

15   A.      Again, we're getting outside of my scope a

16   little bit.

17   Q.      Was there any district-by-district analysis that

18   was conducted of the initial House draft map about

19   whether each district complied with the Voting Rights

20   Act?

21   A.      That would be something I would rely on counsel

Page 179

1    to determine if necessary and, if so, to make sure we

2    did it.

3    Q.      Was any report created of district-by-district

4    analysis?

5    A.      Not that I can remember.

6    Q.      I now want to -- I think you still might still

7    have up Plaintiffs' Exhibit 11, which is the

8    November 10th hearing, and hopefully you might still be

9    on page 11.  And if you don't mind, if you could read

10   lines 8 through 12, beginning with "all," and then the

11   end of that sentence that beings with "member input."

12   A.      "All of the proposed redistricting plans that

13   were submitted to this committee were reviewed and

14   analyzed based on our redistricting guidelines and

15   criteria, as well as public and member input."

16   Q.      Were all the maps that were submitted to the

17   Redistricting Committee publicly posted?

18   A.      I don't remember.

19   Q.      Would that be maybe something that Ms. Dean or

20   another staff member would have a recollection of?

21   A.      Yes, and I don't think -- yes, that is the

Page 180

1    answer.

2    Q.      And so here, you talk -- discuss about in the

3    preceding line on line 7, there were seven State House

4    map plans that you referenced that were publicly

5    submitted.  And in the line you just read, you said that

6    the committee reviewed and analyzed based on the

7    redistricting guidelines and criteria.  Could you

8    explain what analysis was conducted on each of the seven

9    State House map plans?

10   A.      So, when you look at all the different plans,

11   obviously, they vary in nature.  Some created -- just an

12   example, I think our plan had more majority-minority

13   districts than the NAACP might have had, but it had more

14   opportunity districts than the original staff House

15   plan.  So, all the plans were sort of taken in,

16   consumed, and so we could see the pros and cons of the

17   differences -- not pros and cons -- but show the

18   differences between them in that respect.

19   Q.      And I'll first ask the question about what you

20   just said there.  You said you compared the number of

21   majority-minority districts that the initial House plan

Page 181

1  had versus the State Conference's plan; did I hear that

2  right?

3  A.      That was just an example of how the plans might

4  differ.  The League of Women Voters submitted a plan and

5  it looked different than -- in some way, shape, or form

6  -- than the State Conference plan, which would look

7  different than the staff plan.

8  Q.      Did you assess whether the State Conference's

9  plan provided more opportunity for Black voters in terms

10 of overall districts that effectively performed?

11          MS. HOLLINGSWORTH:  Objection to the form.

12          THE WITNESS:  Again, I'm going back on my

13 memory.  It's a good ways back, but I do remember

14 looking at -- yes.  And, again, if I remember correctly,

15 some plans had more majority-minority and some had more

16 opportunity in some kind of version of those things.

17 So, yes, they were -- all of them brought something

18 slightly different, you know, to fruition.  Looking at

19 them and their differences was part of the process.

20 BY MR. CUSICK:

21 Q.      If a plan had more combined majority-minority

Page 182

1  districts and effective opportunity districts for Black

2  voters compared to another plan, would that first plan

3  provide greater opportunity for Black voters in the

4  state?

5           MS. HOLLINGSWORTH:  Object to the form.

6           THE WITNESS:  That's hard to say because you

7  don't know, again, how practically these things are

8  going to play out at the polls either.  It's a

9  hypothesis, I guess, to some degree.

10 BY MR. CUSICK:

11 Q.     Are you aware of any methods for testing whether

12 a district will perform for Black voters?

13 A.     Yes, I know it exists and, again, that's one of

14 the things I'd rely on counsel and staff to help analyze

15 the different plans on the table.

16 Q.     Is it your testimony that Nexsen Pruet analyzed

17 the State Conference's plan?

18 A.     They would have been aware of it.  I don't know

19 -- I'm not sure who analyzed what, looking back that

20 far.

21 Q.     Who would have that information for who analyzed

Page 183

1    the seven plans?

2    A.       I'm guessing Nexsen Pruet would of probably had

3    the summary of all that.

4    Q.       Did the Redistricting Committee do any analysis

5    to determine whether any of the proposed maps that drew

6    BVAPs below 50 percent effectively performed for Black

7    voters?

8    A.       I do not believe the committee did such

9    analysis.  Now, certainly we had a lot of things

10   provided to us and had the ability to review.  I don't

11   remember -- there's a difference too in, I guess, in

12   going out and reviewing information that's accessible

13   and commissioning a study, for instance, too.

14   Q.       Was there any analysis of proposed maps versus

15   the initial draft plans on which one was more compact?

16   A.       So, I would say every map, every proposal,

17   including the House staff plan, went through -- we

18   looked at it through the lens of compactness,

19   contiguity, communities of interest.  I mean, those are

20   all part of the analysis on how we determined what

21   pieces of each map to incorporate into what we believed

Page 184

1   was the best version to push forward to the House

2   Judiciary.

3   Q.     And when you say we, for just the analysis of

4   the publicly submitted maps, that includes Redistricting

5   Committee members and staff?

6   A.     So, once we receive those proposed submitted

7   maps, you know, the committee obviously had access to

8   that to review, and through the assistance of staff and

9   counsel, we were able to, you know, compare and contrast

10  the differences contained within all the different maps.

11  And then at that point, the committee had the

12  opportunity through the hearing process to think and

13  consider the staff plan and could certainly amend to

14  whatever version the committee so chose.

15  Q.     Were the analyses ever put in written form for

16  the seven House plans that were reviewed?

17  A.     I know there were work products, I guess I would

18  describe it as, that helped to delineate the differences

19  of the different maps.

20  Q.     Got it.  So, I guess, if there were any analyses

21  or written documents, where would those be stored or who

Page 185

1    would have access to them, on the comparison or the

2    analysis of the seven publicly proposed maps?

3    A.        Either the House Judiciary or Nexsen Pruet, I

4    think have assisted and, therefore, have the product.

5    Q.        I know at the November 10th hearing, you

6    referenced both, obviously, oral and received written

7    testimony.  Was the written testimony uploaded anywhere

8    after the hearing, publicly?

9    A.        I don't believe so.

10   Q.        This one will be a quick scroll down to page 70

11   in the document.

12   A.        Okay.

13   Q.        And then do you see line 24 that says,

14   "Representative Jordan"?

15   A.        Yes.

16   Q.        And on lines 1 and 2 on page 71, you state,

17   "thank you for coming, I can tell you this is a work in

18   progress".  Do you see that?

19   A.        Yes, I do.

20   Q.        What did you mean by it's a work in progress?

21   A.        What I described earlier that, again, with a

Page 186

1    committee that went around the state, and then opened

2    the map room, and then had a plan, and then had more

3    public input related to the plan, and then the

4    membership of the Ad Hoc would have the opportunity to

5    offer amendments to the plan, and then after that the

6    members of the Judiciary Committee would have

7    opportunities to offer amendments to the plan, and then

8    after that the House of Representatives would have the

9    ability to offer amendments to the plan.  So, in that

10   sense, it's very much a work in progress.

11   Q.      At this stage, you know, after the public

12   hearing -- and, if it's helpful, I'm conceptualizing

13   this is still tier 3, so it's the initial plan before

14   amendments -- who is -- I guess, after the committee

15   heard public testimony on November 10th, who was

16   involved in discussing that public input and considering

17   changes that might be made to the initial House staff

18   plan?

19   A.      Well, the map room, if I remember correctly, you

20   could still get access.  So, if you wanted to go create

21   an amendment, for instance, if you were a member of the

1  Ad Hoc Committee, if you wanted to go prepare an

2  amendment, or if you were just a member of the House and

3  wanted to go prepare an amendment and have it ready or

4  give it to a member of the Ad Hoc Committee, you could

5  certainly do that.  So, there's a variety of people that

6  would be part of that process in theory.

7  Q.      And who was involved in piecing together

8  amendments that were going to be proposed at the next

9  iteration of the plan?

10  A.      So, if you're a member of the Ad Hoc Committee,

11  you would be capable of proposing an amendment.  Then

12  after that, if you were a member of the full Judiciary,

13  you would then have the opportunity to propose an

14  amendment.  And then after that, full House body would

15  have the ability to propose an amendment.

16  Q.      Do you recall -- I think you testified to this

17  before -- that initially the Redistricting Committee had

18  anticipated a second public hearing on November 12th?

19  A.      I don't have the time line in front of me.  I

20  know we -- seems like we had -- I think we had two

21  public hearings after the plan was unrolled, and then we

Page 188

1    came back, and I don't remember the time line

2    completely.  Seems like there were a couple of different

3    opportunities.

4    Q.       This is all the way down to page 168.

5    A.       This was a long hearing.  Okay.

6    Q.       And then if you see on line 9, you see that

7    you're referenced there as Representative Jordan?

8    A.       I see that.

9    Q.       And then if you scroll down to line 5 on the

10   next page on 169, and if you could read to yourself and

11   let me know if this refreshes your recollection, lines 6

12   through 15.

13   A.       Yes, okay, so I remember this now.  Originally,

14   we had two days set aside, but we were essentially able

15   to work through everyone that signed up to participate

16   and, therefore, from a practical standpoint, we

17   determined that we would leave the public input period

18   open.  Meaning, if anyone wanted to submit anything, we

19   would do that, but we didn't feel we had the need for

20   the second day, given that we had gotten through

21   essentially everyone that had signed up.

Page 189

1    Q.      Would it -- if you had kept the second day,

2    would that have addressed concerns about giving people

3    more time to review the map and voice their concerns

4    orally?

5    A.      I mean, I can only speak to what -- we made it a

6    date available and offered sign-up and I essentially

7    took everyone -- or, not essentially, but everyone who

8    signed up, you know, spoke.  So, I think we'd

9    accomplished the task at hand, which was to receive

10   public input.

11   Q.      Was this the only hearing where the

12   Redistricting Committee sought public hearing, either

13   public comments directly during a hearing on the initial

14   plan or any subsequent plans?

15          MS. HOLLINGSWORTH:  Object to the form.

16          THE WITNESS:  So this is -- again, if I remember

17   correctly, we took public testimony, and then we left

18   the public input period open until we came back for the

19   committee to, for lack of a better description, digest

20   the public testimony as well as the submissions and come

21   back and deal with it at a later date.

Page 190

1  BY MR. CUSICK:

2  Q.      And then I have a couple of process-related

3  questions for next steps here.  If you look at line 18

4  on the same page it begins with "and", and then if you

5  could read to yourself to line 25 ending with "today"?

6  A.      Is this on page 169?

7  Q.      Correct.

8  A.      Okay.

9  Q.      So, I guess, what was the purpose of, you know,

10  scheduling a meeting two hours before the House

11  Judiciary Committee to take into consideration all the

12  information you received?

13  A.      So, wanting to give members of the Ad Hoc

14  Committee as much time as possible if they chose to

15  draft amendments for the Ad Hoc Committee to consider,

16  and then to -- but also taking into consideration that

17  if we had the whole House Judiciary coming in, members

18  of the Ad Hoc Committee were also members of that

19  committee.  So, I didn't want to create multiple travel

20  days for the Ad Hoc Committee.  I could have done it on

21  a different day or two, I guess, a day prior, but

Page 191

1    scheduling it two hours prior, I felt gave them more

2    opportunity, should they so desire, to draft amendments

3    but also it didn't create a travel day for them,

4    practically speaking.

5    Q.      Did the Redistricting Committee have any

6    intentions to seek public input at that hearing?

7    A.      No, I think the way I kind of planned it was you

8    would have the opportunity for folks to come testify the

9    week prior, and then we'd leave that record open so that

10   someone that couldn't be there for whatever reason could

11   submit public input for the committee to then address it

12   if so desired at that next meeting, two hours before

13   full Judiciary.

14   Q.      And then the next -- and I'm at line 25 and it

15   goes down to the next page, 170, to line 5.  If you

16   could just take a moment to review that, lines 25

17   through 5 on page 170.

18   A.      Okay.

19   Q.      I guess, my question, what are the benefits of

20   issuing a favorable report, as you stated is normally

21   what you would do for a piece of legislation?

Page 192

1   A.        So, while this was the Ad Hoc Committee, it

2   essentially operates in the form of a subcommittee, for

3   lack of a better description.  For a piece of

4   legislation to advance from, in this case, the Ad Hoc

5   Committee to the full Judiciary Committee, it would need

6   to be given a favorable report.  And so in order to keep

7   the record open and in case there may be information

8   that comes by way of that opportunity for submission,

9   and then for a member of the Ad Hoc Committee to, in

10  theory, propose an amendment, I thought it best to leave

11  that until we met again, two hours prior to full

12  Judiciary.

13  Q.        Between the end of this meeting on November 10th

14  and then when the Redistricting Committee met again on

15  November 16th, do you recall who you met with to talk

16  about amendments or public input?

17  A.        I received -- same type process.  We received

18  some submissions that I reviewed.  I think, if I

19  remember correctly, I communicated with members of the

20  Ad Hoc Committee just to make sure that they were, if

21  they were going to propose an amendment, that they were

Page 193

1    getting everything they needed to do that.  And then I

2    think I also wanted to know because I wanted to make

3    sure that we had enough time.  There were going to be

4    amendments that were going to take longer than the two

5    hours.  I wanted to let Chairman Murphy know that they

6    may need to push back the full Judiciary time if that

7    came to fruition.  So, I contacted various members of

8    the Ad Hoc Committee in that respect.

9    Q.      Wanted to just take a moment here to see if it

10   makes sense to just take a quick five-minute break, if

11   that works?

12           MS. HOLLINGSWORTH:  Yes, that'd be great.  We've

13   gone about two hours.

14           MR. CUSICK:  If we could go off record for a

15   moment.

16           VIDEOGRAPHER:  Off the record at 3:31 p.m.

17           (Short recess was taken.)

18           VIDEOGRAPHER:  This is the beginning of media

19   unit number 4.  Back on the video record at 3:40 p.m.

20   BY MR. CUSICK:

21   Q.      Representative Jordan, I'm now going to look to

Page 194

```
 1   what is marked as Plaintiffs' Exhibit 13, which is a

 2   video transcript of the November 16th Ad Hoc Committee

 3   that we have been discussing before.  My apologies, I

 4   might have said 13, it should be actually 12.  It should

 5   be about 16 pages, if that's helpful, Representative

 6   Jordan.

 7   A.      I believe I've located it.

 8           (Exhibit 12 marked for identification and

 9   attached to the transcript.)

10   Q.      Yep.  Give me one second.  If you could go to

11   page 9.  I guess I should say page 8 because it carries

12   over, and if you could just read to yourself for a

13   moment lines 24 through 5 that go onto page 9 and ending

14   with, "as I said".

15   A.      Okay.

16   Q.      So, would it be fair to say that at this point,

17   you were aware of forthcoming amendments that would be

18   introduced at the House Judiciary Committee?

19   A.      Yes.

20   Q.      And were you aware of all amendments that were

21   going to be introduced at that point?
```

Page 195

1   A.      I don't remember if I was aware of all of them,

2   but probably so.

3   Q.      And aside from ones that you might have

4   introduced, were you involved with discussions with any

5   of the Ad Hoc members on amendments that they were

6   considering?

7   A.      Yes, I believe that's correct.

8   Q.      I know that there isn't an explanation of any of

9   the amendments at this meeting.  Was it the expectation

10  to have that discussion only in House Judiciary as

11  opposed to the Ad Hoc Committee?

12  A.      Yes.  After reading that, I seem to recollect

13  that the idea was there were amendments and given the

14  full Judiciary was meeting very soon, why not go ahead

15  and include or allow inclusion of the other members of

16  the full Judiciary Committee to, perhaps if they chose

17  to, weigh in on said amendments.

18  Q.      Just for my understanding from the process,

19  staying on page 9, if you could just review for a moment

20  lines 12 through 17.

21  A.      Okay.

Page 196

1    Q.      So, at this point, the Ad Hoc Committee adopted

2    the initial staff plan, right?

3    A.      Yes, this goes back to your question earlier

4    about a favorable report.  This is where we transitioned

5    in that respect.

6    Q.      Yep.  And, so at this point, it's fair to say

7    that this is before any amendments were introduced.

8    It's just the initial working draft plan?

9    A.      Correct.

10   Q.      And then I know we've talked tiers, and so would

11   the next tier, if we will, for tier 4, would that be

12   going to House Judiciary?

13   A.      Yes, that would be the next step in the process.

14   Q.      And, you know, from a process point, the initial

15   House draft plan was shared with the full House

16   Judiciary?

17   A.      Yes.

18   Q.      Was anything else included -- or I'll take a

19   step back.  How is it transmitted to the full House

20   Judiciary Committee?

21   A.      So, that's a good question because while it fits

Page 197

1  in the traditional path of legislation, it's obviously

2  not traditional legislation.  It's in the form of a map

3  and district and so forth.  So, at this point, it goes

4  from a staff plan to the Ad Hoc Committee proposal, and

5  at this point, it can be amended by the full Judiciary.

6  Q.      Got it.  Was there any data or analyses that

7  were conveyed to the full House as well with the draft

8  plan?

9  A.      They would have had access to -- well, let me

10  back up.  They would have -- many of those full

11  Judiciary and House members attended some of those

12  public hearings, so they would have had access to that.

13  The Judiciary members obviously would have had access to

14  the comments if you wanted to come by and get copies or

15  see those.  Is that what you're referring to?

16  Q.      That's right.

17  A.      So, yes, they would have had access.

18  Q.      Got it.  So, I'll now turn to -- this is marked

19  -- this is the right Plaintiffs' Exhibit 13, and this is

20  a video transcript of the November -- or a transcript of

21  the November 16, 2021, House Judiciary Committee.  Do

Page 198

1    you see that, Representative Jordan?

2    A.      I do.

3            (Exhibit 13 marked for identification and

4    attached to the transcript.)

5    Q.      And otherwise, did you have any other role?

6    Were you just a member of the House Judiciary Committee,

7    or do you hold any other titles or roles?

8    A.      Well, I guess, technically I'm a member of the

9    Election Law Subcommittee, I'm the chairman of that.

10   For context of this hearing, I would be chairman of the

11   Ad Hoc Committee, so I'd be the responsible person for

12   purposes of summarizing and laying out the Ad Hoc

13   Committee plan and speaking on behalf of that plan.

14   Although, certainly every member of the Ad Hoc Committee

15   as well as the full Judiciary Committee would be able or

16   allowed to speak if they so chose.

17   Q.      Who would determine whether there'd be public

18   input at a House Judiciary Committee hearing?

19   A.      I suppose that would be the chairman, although

20   that would be -- I don't think I've ever seen that, once

21   you get through the subcommittee or, in this case, the

Page 199

1    Ad Hoc Committee process.  But in practical terms, the

2    subcommittee is where that public hearing opportunity

3    typically occurs.

4    Q.      Are there any rules for getting public input in

5    front of the full Judiciary, to the extent you know?

6    A.      I don't think so.  I think that can be done, I

7    just -- I've never -- in my experience, I've never seen

8    that done.  But I'm sure there's -- I believe there

9    could be or perhaps is a way to do that.

10   Q.      Do you think it would have been important for

11   members of the public to weigh in on any of the proposed

12   amendments that were considered at that hearing?

13   A.      Yes, I think it was important.  Are you talking

14   about amendments or are you talking about the proposed

15   plans?

16   Q.      The amendments that were introduced for the

17   first time at the November 16th hearing.

18   A.      You know, I think given that there had been so

19   many public hearings and public input opportunities,

20   most of everything that probably could have been said

21   was said in some form or fashion.  So, I don't know that

Page 200

1   it would have been a necessary component in that

2   setting.

3   Q.      And do you recall any amendments that were

4   offered outside of the one you introduced?

5   A.      Seems like there was another amendment or two,

6   if I remember, but I don't remember the substance.

7   Q.      I will not hold you to remembering every

8   amendment that was offered.  If helpful, I'll direct you

9   to page 17, and it's lines 13 to line 5 on page 18.  Do

10  you see that, it's Representative Wheeler talking, if

11  you just want to take a moment to review that.

12  A.      Okay.  I've reviewed that.

13  Q.      Do you recall if you supported this amendment?

14  A.      I believe I did.

15  Q.      Did you do any -- did you review the amendment

16  before it was proposed by Representative Wheeler?

17  A.      If I remember correctly, Mr. Wheeler did talk to

18  me about it.  This is an example of kind of what I was

19  referencing earlier where neighbors, so to speak,

20  represent districts contiguous to each other, may have a

21  reason based on -- they would have more knowledge, kind

```
                                            Page 201
 1    of going back to that compactness, you know.  There's an

 2    area that in this part of the district that's always

 3    been in this district and is more aligned, you know,

 4    with this district because of that and so, therefore, it

 5    should probably switch.  And as long as you can offset

 6    populations within those connected districts and it's

 7    not -- you know, if you can tell the committee and the

 8    body why it makes sense, there really would be just

 9    reason, in my mind, to oppose it.

10    Q.      Do you recall any amendments offered by

11    Representative Bamberg?

12    A.      Yes, I believe came next.

13    Q.      Do you recall if you supported Representative

14    Bamberg's amendment?

15    A.      I believe I did.

16    Q.      So, after all the amendments that were

17    introduced, some were adopted.  Do you remember any that

18    were not adopted?  I think it might be more helpful if I

19    start with an initial question.  Do you remember an

20    amendment introduced by Representative King on behalf of

21    Representative Govan?
```

Page 202

1    A.       I do, and I think that committee -- or I believe

2    that amendment failed.

3            COURT REPORTER:  I'm sorry.  You said you

4    believe that what?

5            THE WITNESS:  That amendment failed.

6            COURT REPORTER:  Thank you.

7    BY MR. CUSICK:

8    Q.       Yep.  And so after all the amendments were

9    considered, those that were adopted or not, the

10   committee voted on a House redistricting plan as

11   amended, correct?

12   A.       Correct.

13   Q.       And so, still within this tier 4, if you will,

14   process of now it's in front of the House Judiciary, are

15   you aware of whether the House Judiciary Committee

16   conducted any analysis on whether that as-amended map

17   complied with the Voting Rights Act?

18   A.       So, I would say at this point, we're making

19   changes, as you can tell, to pieces of the map, not

20   wholesale, broad-stroke changes.  These are more nuanced

21   changes, and it would be hard to see how that would be

Page 203

1    the case, so that I don't know that it would be

2    necessary to stop and do an analysis there.  Also, I

3    would say there's one of the things we depend on counsel

4    to say, stop, you're about to make a mistake, legally

5    speaking, and I don't believe that occurred.

6    Q.      Did anybody to your knowledge -- and this might

7    be something within your knowledge -- were you involved

8    in any discussions with Mr. Dennis or Ms. Dean

9    evaluating the proposed amendments?

10   A.      I don't think I had conversations with either of

11   them concerning the amendments.  I think I had

12   conversations with the people proposing the amendments,

13   and that's not unusual in legislation.  You would

14   typically, if you were going to make an amendment, the

15   folks on the committee are going to look to the

16   subcommittee chairman to tell you why it's a good

17   amendment or a bad amendment.  So, you typically, if

18   you're doing your due diligence, you would go to the

19   subcommittee and tell them, look, this is what I'd like

20   to do, typically in advance of the amendment.

21   Q.      Do you know if the House Judiciary Committee

Page 204

1    members had conversations with Nexsen Pruet about the

2    as-amended map?

3    A.      I don't know the answer to that.

4    Q.      Did you receive any analyses of the as-amended

5    map on how it complied with or compared to other

6    proposed maps?

7    A.      I don't believe I did at that time.  Again,

8    these are small changes, essentially, where districts

9    are bouncing off each other, for lack of a better

10   description.

11   Q.      Then, so after the House Judiciary Committee

12   votes out the plan as amended, it's then transmitted to

13   the full House; is that right?

14   A.      Correct.

15   Q.      And I know we've talked about House Judiciary

16   members having access to some of the data, public

17   comments, and other things we've discussed.  Would the

18   full House also have access to those forms of data?

19   A.      I would think so.  I mean, at that point, if

20   you've got something that could go to the

21   Judiciary Committee and review those comments, et

Page 205

1    cetera.

2    Q.      So this is the last exhibit with just a few

3    questions.  This is Plaintiffs' Exhibit 14, and it's a

4    transcription of the December 2, 2021, House of

5    Representatives hearing, which was transcribed by TSG

6    Reporting Worldwide, as contracted by Plaintiffs'

7    counsel.  And then I'm going to have you turn to page 5

8    for a moment just to show where your remarks begin on

9    line 17, when you have a moment to get there.

10   A.      I have it.

11           (Exhibit 14 marked for identification and

12   attached to the transcript.)

13   Q.      And then if you follow that down to page 10,

14   just give you an opportunity to see that these are

15   continuous.

16   A.      Okay.

17   Q.      And then could you read to yourself lines 20 to

18   line 1 on page 11?

19   A.      Okay.

20   Q.      Now, I want to ask you what you mean by, on

21   lines 21 to 20, where it says, "Invites us to weaken the

Page 206

1    one person one vote standard?"

2    A.      I believe I'm referring to the deviation that we

3    talked about a few times.

4    Q.      I know you testified before or earlier today

5    about case law, that federal courts allow up to a 10

6    percent total population deviation.  Are you also

7    familiar with the Senate redistricting guidelines

8    regarding their total population deviation standard?

9    A.      I'd say I'm loosely familiar, yes.

10   Q.      Would -- if they have a total population

11   standard that is 10 percent or plus or minus 5, in your

12   opinion, is that a weakened standard for one person, one

13   vote?

14   A.      You're saying the 10 percent versus the 5, I

15   mean, yes, I think that is a weakened standard.

16   Q.      And then I want you to review on page 11 the

17   lines 2 through 3, ending in line 3, "where possible".

18   A.      Okay.

19   Q.      Is this the first time that you explain the

20   concept of keeping existing districts intact?

21   A.      You mean explain to the body or explain to the

Page 207

```
 1   general public or?

 2   Q.      Generally.

 3   A.      No, I don't think so.  I think when I'm talking

 4   about -- kind of like we talked about earlier -- a

 5   starting point and using 2010 as that starting point.

 6   That's essentially another way of saying that.

 7   Q.      Do you understand this as what might be

 8   associated with core retention?

 9   A.      You're talking about core retention of the

10   districts?

11   Q.      Yes.

12   A.      No, I'm using that as a -- I'm more connecting

13   that, I think, with the connecting back of, we need a

14   starting point.  I could use District 63 as an example:

15   It was found to be a viable legal district in 2010, so

16   that's -- the core of it is essentially a starting point

17   for 2020.

18   Q.      Was core retention a redistricting guideline for

19   the House?

20   A.      I don't believe so.  No, I'm thinking back over

21   different criterias, it was not.
```

Page 208

1    Q.     Give me one second.  I accidently clicked out of

2    the page, I'm now back.  Then, if you could review lines

3    10 through 15 on that same page?

4    A.     Okay.

5    Q.     Is this the first time you mention a guiding

6    principle to keep smaller rural counties whole?

7    A.     I don't know -- I'm reading here, I don't know

8    if I'd call it a guiding principle.  It's certainly

9    something that, I think, has come up on more than a few

10   occasions in my involvement in districting, in that

11   smaller rural counties, dividing them up lessens their

12   impact or voice, so to speak.  And therefore, if we can

13   present a proposal that doesn't divide them up, then

14   that's not a bad thing.

15   Q.     I know we talked about the redistricting

16   guidelines before.  Do you recall if there's anything in

17   the guidelines that talk about keeping small rural

18   counties whole?

19   A.     No, I don't believe that's a particular

20   criteria.

21   Q.     On lines 18 beginning at -- and I think you just

Page 209

1    talked about this for a moment, but I'll just have you

2    review -- 18 through 23, if you just want to review that

3    for a moment.

4    A.      Sure.   Okay.

5    Q.      And so here, and you just testified about

6    "keeping smaller counties whole may necessitate

7    increasing number of splits".  What do you mean by

8    number of splits here?

9    A.      If I remember correctly, I haven't read through

10   the whole thing, but I'm either talking about splitting

11   -- again, going back to what I was testifying a minute

12   ago -- splitting a county.  If you give a piece of a

13   county to another larger county, it diminishes

14   essentially their, for lack of a better description,

15   their voice in the process.  By keeping them whole

16   allows them to have a clearer voice.

17   Q.      During this hearing, and I can bring you to it

18   in a moment, do you recall Representative Brawley

19   introducing any amendments?

20   A.      I believe she did introduce a couple, at least a

21   couple ones that were amendments.

```
                                            Page 210

 1    Q.      Was one of those amendments, to your

 2    recollection, the map that was proposed by the South

 3    Carolina State Conference of the NAACP?

 4    A.      I believe it was.

 5    Q.      And another, the one that the League of Women

 6    Voters of South Carolina had publicly proposed?

 7    A.      I believe that's correct.

 8    Q.      And if you could go to page 19 lines 17 through

 9    23 and just review those for a moment.

10    A.      Direct me again which lines?

11    Q.      Sorry, give me one moment.  This is lines 17

12    through 23.

13    A.      On page 19?

14    Q.      Yes.  This is essentially speaker -- the speaker

15    recognizing you in response to Representative Brawley's

16    amendment.

17    A.      Okay.  I'm there.

18    Q.      And then just for continuity, the reason -- I

19    just wanted to make sure we're on the same page, because

20    then if you look at line 24 on that same page, and then

21    if you want for a moment just to read through line 15 on
```

Page 211

1    page 20, just so it might refresh your recollection

2    about your comments related to Representative Brawley's

3    amendment.

4    A.      Okay.

5    Q.      So, here you identify concerns about incumbency

6    pairings as one primary concern?

7    A.      I believe this was the League of Women Voters'

8    plan, if I remember correctly.

9    Q.      I want to make sure I can -- maybe I'll go back

10   up to Representative Brawley's initial one, just so you

11   know I'm asking -- if you go up to page 15, and then

12   lines 14 through 21, you'll see that this one references

13   the State Conference's map.

14   A.      Okay.

15   Q.      And then, so back to those moments we just

16   discussed on page 20, you had a concern about incumbency

17   pairings, that there were 13 to 14 -- up to 13 to 14

18   incumbents paired with the State Conference's map?

19   A.      So, in reviewing the transcript, my recollection

20   was, the issue, the incumbency issue, was not the

21   Conference's plan but the League of Women Voters' plan,

Page 212

1    but I'll trust the transcript.  And at this juncture,

2    I'm on the House floor and I have my notebook with the

3    legislation and different comparisons between plans.

4    So, my job on the floor at that point is to sort of

5    point out the differences within the different

6    proposals, so, again, I don't specifically have

7    everything I had in front of me at the time, so I'm

8    trusting the transcript essentially.

9    Q.      So, on lines 11 and 12, you say that there's an

10   excessive amount of splits?

11   A.      I'm assuming that would either be, if I remember

12   correctly, that's county splits.  That could be precinct

13   or census blocks or whatever, but I'm assuming that's

14   county.

15   Q.      I guess, who created -- I guess, did you have an

16   analysis of the map that you were looking to in drafting

17   these remarks or talking points about the State

18   Conference plan?

19   A.      Yes, I would of had -- going back, I think we

20   talked about this a while back -- once we received the

21   however many different submitted plans, we then began

Page 213

1    the process of comparing and contrasting those plans to

2    each other as well as the House plan.  And so, with the

3    assistance of staff and counsel, I had documents that

4    would allow me to help -- to help me compare and

5    contrast those districts, to summarize the difference

6    between the two.

7    Q.      And those were the documents, the analysis, we

8    talked about before that might be either with staff

9    counsel or Nexsen Pruet?

10   A.      Correct.

11   Q.      If you go up for a moment on page 16, and this

12   is lines 9 through 17, this is Representative Brawley.

13   If you could just take a moment to review that for a

14   second.

15   A.      Which lines again on page 16, lines?

16   Q.      9 through 17.

17   A.      Okay.

18   Q.      In the analysis that you had for the talking

19   points that you had in front of you, was there anything

20   to rebut Representative Brawley's contention that the

21   State Conference map draws more viable electability

Page 214

1    opportunity districts for Black voters?

2    A.      Yes, I believe so.  This goes back to

3    majority-minority districts and opportunity districts

4    and how -- again, I'm remembering now or trying to

5    remember -- I believe the House plan had more

6    minority-majority but yet a little bit fewer opportunity

7    or some combination in there.  So, yes, I would have had

8    analysis to help me articulate that.

9    Q.      Okay.  I have one final set just to make sure I

10   understand these tiers that we've talked about, and then

11   just two or three final questions, at least from my end.

12   Just so -- and I just want to make sure, you can correct

13   me if I'm wrong on this, but the tiers that we talked

14   about today, tier 1 and the map room?

15   A.      I would go back further than that, honestly.  I

16   would say public testimonies.

17   Q.      Got it.  I should say -- maybe I can clarify.

18   In terms of maps being drawn, a tier process that way.

19   A.      Sure.

20   Q.      So the map room is tier 1 for the points that

21   we've discussed?

Page 215

1    A.      Yes.

2    Q.      At tier 2, it's after the map room, that first

3    time closes and there's a combination of -- Hager, I

4    keep forgetting to stick with one way or another -- Ad

5    Hoc Committee members and staff, and then counsel,

6    whether that be Mr. Dennis or Nexsen Pruet, are working

7    on putting together a initial working draft plan?

8    A.      Yes, I believe that's all correct.

9    Q.      And as they're putting that together, they're

10   also assessing some of the criteria that we've spoken

11   about that are those guidelines, compliance with Voting

12   Rights Act to make sure, as you said, there's nothing to

13   flag that might be concerning?

14   A.      Correct.

15   Q.      And then in that same stage, Ad Hoc Committee

16   members are speaking with delegations that they're in

17   contact with or that might be neighboring with them to

18   resolve any disputes or, you know, changes, agreements,

19   what have you?

20           MS. HOLLINGSWORTH:  Object to the form.

21           THE WITNESS:  Essentially, yes.  They're

Page 216

1    communicating with members in that area in the state,

2    you know, depending on whether you're in an area of

3    population that's above or below the average.

4    BY MR. CUSICK:

5    Q.      And then, you know, a working draft plan is

6    publicly shared, and we've said tier 3 is kind of that

7    plan being shared and public input, you know, from

8    November 10th?

9    A.      Yes.  So another set of public input to weigh in

10    on what we've rolled out.

11    Q.      And then the same set of folks, you know, Ad Hoc

12    Committee members, the counsel, staff, Mr. Hager, are

13    working on what might be amendments that they're

14    considering to that plan?

15    A.      Yes, I believe that's correct.

16    Q.      And then tier 4 is when it's amendments that are

17    being offered and voted on by the House

18    Judiciary Committee?

19    A.      Correct.

20    Q.      And then the final tier in just the map-drawing,

21    map-composition portion of that is when it goes to the

Page 217

1    full House?

2    A.       Yes, as you can see, amendments could -- were or

3    could have been proposed at that level as well, yes.

4    Q.       And we've spoken a little bit about some of the

5    delegations.  Would it be fair to say that delegations

6    worked out deals among themselves for districts that

7    were neighboring each other?

8              MS. HOLLINGSWORTH:  Object to the form.

9              THE WITNESS:  I don't know if I'd say worked out

10   deals.  I mean, they had to work together if they wanted

11   to come to a -- if they wanted to -- certainly, they

12   could disagree, as did happen in the process, and

13   ultimately, you know, the Ad Hoc and full Judicial and

14   ultimately the full body would make the decision on it.

15   But they certainly had the opportunity, should they

16   attempt to, to work together to resolve any differences

17   of opinions they might have within their neighboring

18   districts.

19   BY MR. CUSICK:

20   Q.       Then, I know that this is a separate question

21   just to close out a thread.  I know you talked about the

Page 218

1    interns that helped out in the map room.  Did you at all

2    have any communications with them?

3    A.      I had communication when I'd be in the map room.

4    I mean, anywhere from good morning, have a good evening,

5    and click here, click there, but I didn't have any

6    communications with them regarding, for instance, what

7    their work days, hours, things of that nature.

8    Q.      And that's why as it gets later in the day you

9    sharpen that question, because what I really should have

10   asked is, did you have any e-mails or text messages or

11   any written communications with any of the interns?

12   A.      No, I did not.

13           MR. CUSICK:  I think otherwise, for now, I don't

14   have any other questions.  I think, Ms. Hollingsworth,

15   just for the record, I know that at least from my

16   understanding, there might be forthcoming -- I can't

17   recall if it's text messages or e-mails that

18   Representative Jordan had mentioned that were identified

19   and sent to you; is that right?

20           MS. HOLLINGSWORTH:  No, they're not sent to me,

21   but we've gotten the order from the court and so we, as

Page 219

1    of yesterday, are working hard to accommodate.

2         MR. CUSICK:  And just for record purposes, we'll

3    continuing speaking with you, Ms. Hollingsworth, about

4    those productions or any others in light of the panel's

5    discovery order about whether there might be a need to

6    reopen if there's any relevant documents for this

7    deposition.  But, otherwise, I have no other questions

8    on my end, and thank you, Representative Jordan.  I know

9    it's been a long day so I appreciate it.

10   A.       Absolutely.

11        MS. HOLLINGSWORTH:  Are there any questions from

12   the election commission?

13        MR. BURCHSTEAD:  No questions from the election

14   commission.

15        MS. HOLLINGSWORTH:  Any question from the

16   Senate?  He might have gone on to more important things.

17   All right, well, last chance, hearing none, then we are

18   good.

19        VIDEOGRAPHER:  Okay.  This concludes today's

20   video-recorded deposition.  We are going off the video

21   record at 4:21 p.m.

Page 220

1          (Video-recorded deposition of WALLACE H. JORDAN,

2    adjourned at 4:21 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

Page 221

1                    ACKNOWLEDGMENT OF DEPONENT

2

3

4            I, WALLACE H. JORDAN, do hereby acknowledge that

5    I have read and examined the foregoing testimony, and

6    the same is a true, correct and complete transcription

7    of the testimony given by me and any corrections appear

8    on the attached Errata sheet signed by me.

9

10

11

12

13    _____        _____

14         (SIGNATURE)                     (DATE)

15

16

17

18

19

20

21

Page 222

```
1                    E R R A T A   S H E E T

2       IN RE:   The South Carolina State Conference of the

3                NAACP, et al. V. Thomas C. Alexander, et al.

4       RETURN BY: _____

5       PAGE      LINE        CORRECTION AND REASON

6       _____     _____        _____

7       _____     _____        _____

8       _____     _____        _____

9       _____     _____        _____

10      _____     _____        _____

11      _____     _____        _____

12      _____     _____        _____

13      _____     _____        _____

14      _____     _____        _____

15      _____     _____        _____

16      _____     _____        _____

17      _____     _____        _____

18      _____     _____        _____

19      _____     _____        _____

20      _____        _____

21         (DATE)                    (SIGNATURE)
```

Page 223

1                        E R R A T A   S H E E T

2       IN RE:   The South Carolina State Conference of the

3                NAACP, et al. V. Thomas C. Alexander, et al.

4       RETURN BY: _____

5       PAGE      LINE      CORRECTION AND REASON

6       _____     _____     _____

7       _____     _____     _____

8       _____     _____     _____

9       _____     _____     _____

10      _____     _____     _____

11      _____     _____     _____

12      _____     _____     _____

13      _____     _____     _____

14      _____     _____     _____

15      _____     _____     _____

16      _____     _____     _____

17      _____     _____     _____

18      _____     _____     _____

19      _____     _____     _____

20      _____      _____

21          (DATE)                        (SIGNATURE)

Page 224

1        CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

2

3            I, Danielle Lawrence, court reporter, the

4    officer before whom the foregoing proceedings were

5    heard, do hereby certify that the foregoing transcript

6    and said proceedings were taken by me stenographically

7    and thereafter reduced to typewriting under my

8    supervision; and that I am neither counsel for, related

9    to, nor employed by any of the parties to this case and

10   have no interest, financial or otherwise, in its

11   outcome.

12            IN WITNESS WHEREOF, I have hereunto set my

13   hand and affixed my notarial seal this 25th day of April

14   2022.

15

16

17

18

19            *Danielle Lawrence* (signature)

20        NOTARY PUBLIC IN AND FOR THE

21        STATE OF MARYLAND

**[& - 4]**                                                          Page 1

| & |
| --- |
| **&**   3:5 4:4,12 5:13 |

| 0 |
| --- |
| **001**   47:2 |
| **0091425**   138:12 |
| **0091426**   138:13 |
| **03302**   1:8 7:10 |

| 1 |
| --- |

**1**   5:8 7:4 46:1,21
  47:5 80:18 139:2
  142:1 147:7
  167:20 185:16
  205:18 214:14,20
**1,000**   141:5
**10**   6:6 46:8 54:10
  54:10 112:18
  152:3,12 154:14
  166:15 205:13
  206:5,11,14 208:3
**10,000**   129:15
**10-8-21**   5:20
**100**   18:14 80:10
  148:9
**10:03**   1:16 7:3
**10:58**   46:12
**10th**   155:3,17
  163:18 179:8
  185:5 186:15
  192:13 216:8
**11**   6:7 112:18
  139:2 152:4
  154:13,20 163:19
  164:7,8 167:20
  168:9 179:7,9
  205:18 206:16
  212:9
**11-10-21**   6:7
**11-16-21**   6:8,10
**11:05**   46:6

**11:08**   46:15
**12**   6:8 42:6 154:17
  179:10 194:4,8
  195:20 212:9
**12-2-21**   6:12
**1221**   4:5
**1230**   3:15
**124**   5:14,16 44:12
  127:14 147:16
  149:21 178:10
**125**   5:18
**126**   5:20
**12:40**   110:14
**12:41**   111:3
**12th**   187:18
**13**   1:15 6:10 7:4
  194:1,4 197:19
  198:3 200:9
  211:17,17
**1310**   4:13
**1338**   44:4
**138**   6:4
**14**   6:12 205:3,11
  211:12,17,17
**15**   164:14 188:12
  208:3 210:21
  211:11
**152**   6:6
**154**   6:7
**16**   164:7 194:5
  197:21 213:11,15
**168**   188:4
**169**   188:10 190:6
**16th**   192:15 194:2
  199:17
**17**   195:20 200:9
  205:9 210:8,11
  213:12,16
**170**   191:15,17
**18**   190:3 200:9
  208:21 209:2

**1800**   4:5
**19**   210:8,13
**194**   6:8
**1950s**   30:7,10 31:4
**1965**   108:19
**198**   6:10
**1:30**   111:6
**1:35**   113:17
**1:36**   113:19
**1st**   5:9

| 2 |
| --- |

**2**   5:10 46:15 48:5
  48:10,16 86:1
  139:3 142:5
  143:17 147:7,11
  155:10 163:21
  168:15 169:2,18
  176:18 185:16
  205:4 206:17
  215:2
**2.5**   87:14
**20**   61:13 72:16
  74:20 205:17,21
  211:1,16
**2010**   61:7 87:19
  97:20 98:2,7,10
  117:16 119:14,15
  119:18,20 120:4
  167:17 171:10,13
  207:5,15
**2010-2011**   119:5
**2011**   61:7
**2012**   23:8,13 30:21
  31:1
**2015**   20:13 30:21
**2020**   207:17
**2021**   6:4,6 12:15
  71:18 82:12,14
  124:17 125:11,21
  138:10 152:3,5
  154:14 197:21

**205:4**
**2022**   1:15 7:4
  152:4 224:14
**20458**   224:19
**205**   6:12
**21**   61:13 166:16
  205:21 211:12
**212**   3:8
**23**   209:2 210:9,12
**231-7838**   4:15
**24**   185:13 194:13
  210:20
**25**   22:14 190:5
  191:14,16
**25th**   224:13
**26**   22:14
**27**   125:11
**271-0324**   3:17
**29201**   3:16 4:6,14

| 3 |
| --- |

**3**   5:12 71:17,18
  72:4,7,10 80:18
  82:14 111:6
  148:12 151:16
  186:13 206:17,17
  216:6
**30**   22:17 52:6
  116:1 124:17
  133:15
**31**   23:17
**3:21**   1:8 7:10
**3:31**   193:16
**3:40**   193:19
**3rd**   71:20 72:13
  79:20 111:18
  112:6

| 4 |
| --- |

**4**   5:13 82:15,20
  95:16 163:20
  168:11 193:19

**[4 - add]**

196:11 202:13
216:16
**40** 3:6
**41,278** 87:2
**4493** 16:13 22:12
22:21
**45** 174:12
**47** 5:8
**48** 5:10 155:2
**4:21** 219:21 220:2
**4th** 111:12 114:2

**5**

**5** 5:14 123:18
124:2,8 158:12
188:9 191:15,17
194:13 200:9
205:7 206:11,14
**50** 18:14 80:9
173:1 174:4,8
175:4 183:6
**5th** 63:18

**6**

**6** 5:16 80:18,21
124:12,17 125:1
138:13 188:11
**60** 175:11
**60s** 30:7
**63** 20:8,12 22:12
23:5 107:9,13
131:19,20,21
132:3,18 133:1
207:14
**65** 109:15
**6:00** 116:18
**6:30** 154:3 156:12
156:12

**7**

**7** 5:3,18 125:6,15
133:16 168:10
180:3

**70** 185:10
**700** 3:15
**71** 185:16
**72** 5:12
**799-9800** 4:7
**7th** 23:9,14

**8**

**8** 5:20 22:14 72:15
74:20 125:18,21
126:4 133:16
168:3 179:10
194:11
**8-3-21** 5:12,13
**8-30-21** 5:16
**803** 4:7,15
**82** 5:13
**864** 3:17
**8:00** 116:18
**8th** 111:12,18
112:6 114:1
120:11 148:13
151:18 153:19
156:12

**9**

**9** 6:4 54:10 80:17
138:16 164:3,5
188:6 194:11,13
195:19 213:12,16
**9-27-21** 5:18
**95** 165:15,15
**965-7715** 3:8
**99** 170:10

**a**

**a.m.** 1:16 7:3
46:12,15
**ability** 80:3 84:19
84:20 146:21
149:10 171:9
183:10 186:9
187:15

**able** 39:8 47:2
48:7 55:3 72:6
89:21 94:4 101:18
123:6 127:1
138:14 142:14
184:9 188:14
198:15
**absolute** 171:4
**absolutely** 40:6
83:4 89:20 127:18
219:10
**accent** 169:15
**acceptable** 92:12
**accepted** 145:4
**accepts** 92:8
**access** 32:4 48:9
57:8 58:5 94:5
123:7 127:15,16
127:21 131:5,7,14
137:1,6,13 184:7
185:1 186:20
197:9,12,13,17
204:16,18
**accessible** 123:1
183:12
**accidently** 208:1
**accommodate**
66:14 219:1
**accomplished**
189:9
**account** 44:18
50:1,2,6,21,21
51:4,16
**accounts** 45:8
49:20,21
**accurately** 86:14
94:16 101:19
**accuse** 167:6
**acknowledge**
221:4

**acknowledgment**
221:1
**acorn** 26:1
**act** 93:8 106:2
108:19,21 109:9
109:15 110:8
123:20 150:12
168:13,16 169:18
170:20 176:19
178:13,20 202:17
215:12
**action** 7:16 9:4
15:16 156:2,3
**actual** 47:1,11
**ad** 6:9 24:16 35:20
54:7,20 55:10,12
56:7,19 57:13,21
58:4 61:1,10,21
62:17 70:17 71:21
76:4 82:11 108:1
115:21 121:12
123:16 124:16
125:10,20 127:6
127:10 142:15
143:5,9,18,19,21
146:17 147:9
154:14 158:2
159:7,18 161:3
163:4 173:17,18
173:19 186:4
187:1,4,10 190:13
190:15,18,20
192:1,4,9,20 193:8
194:2 195:5,11
196:1 197:4
198:11,12,14
199:1 215:4,15
216:11 217:13
**adapt** 25:3
**add** 73:19

| | | | |
|---|---|---|---|
| **added** 163:15 | **ago** 18:18 19:4 | 190:15 191:2 | **answer's** 38:8 |
| **adding** 114:8 | 32:7 39:12 81:11 | 192:16 193:4 | **answered** 139:15 |
| **addition** 11:11 | 134:1 165:11 | 194:17,20 195:5,9 | **answering** 10:1,19 |
| 13:3 95:4 143:13 | 209:12 | 195:13,17 196:7 | **answers** 13:2 |
| **additional** 12:5 | **agree** 29:13 | 199:12,14,16 | 47:20 49:4 |
| 77:6 140:20 | 116:12,15 155:1 | 200:3 201:10,16 | **anticipated** 187:18 |
| 147:21 156:6 | **agreements** | 202:8 203:9,11,12 | **antonio** 3:4 8:5 |
| **address** 43:18 | 215:18 | 209:19,21 210:1 | **anybody** 203:6 |
| 44:2,6 83:10 | **ahead** 16:5 46:17 | 216:13,16 217:2 | **apart** 95:18 118:3 |
| 191:11 | 70:12 73:5 79:18 | **american** 24:3 | **apologies** 16:5 |
| **addressed** 171:5 | 117:18 195:14 | **amount** 67:5,6,8 | 21:10 54:1 70:11 |
| 189:2 | **al** 1:6,9 7:7,8 | 96:10 100:14 | 194:3 |
| **addresses** 43:21 | 222:3,3 223:3,3 | 132:17,20 212:10 | **apologize** 11:7,20 |
| 44:8,12,14 | **alert** 21:12,13 | **analyses** 184:15 | 21:14 44:16 |
| **adequately** 89:21 | **alexander** 1:9 7:8 | 184:20 197:6 | 158:19 |
| **adjourned** 220:2 | 138:2 222:3 223:3 | 204:4 | **appear** 221:7 |
| **adjust** 162:6 | **aligned** 201:3 | **analysis** 41:12 | **appearance** 7:21 |
| **administer** 7:15 | **allow** 55:8 67:8 | 148:15 149:5 | **appearances** 7:19 |
| **administratively** | 88:16 195:15 | 175:3,5,7,19 | **appearing** 8:15 |
| 50:15 | 206:5 213:4 | 176:17 177:18,21 | **appears** 82:17 |
| **adopt** 146:16 | **allowed** 198:16 | 178:10,14,17 | **apply** 36:17 |
| **adopted** 16:13 | **allowing** 114:11 | 179:4 180:8 183:4 | **appointed** 134:14 |
| 77:2 79:21 82:14 | **allows** 209:16 | 183:9,14,20 184:3 | **appointee** 43:10 |
| 98:7 127:6,7 | **alternatives** 67:10 | 185:2 202:16 | **appointments** |
| 196:1 201:17,18 | **amend** 184:13 | 203:2 212:16 | 61:15,15 127:12 |
| 202:9 | **amended** 108:19 | 213:7,18 214:8 | **appreciate** 219:9 |
| **adoption** 111:16 | 197:5 202:11,16 | **analyze** 37:16 | **approach** 31:6 |
| **advance** 73:1 | 204:2,4,12 | 92:10 182:14 | 160:6 |
| 192:4 203:20 | **amendment** | **analyzed** 32:17 | **approached** |
| **advertise** 112:7 | 146:19,21 147:2 | 179:14 180:6 | 160:12 |
| **advice** 11:13 12:10 | 186:21 187:2,3,11 | 182:16,19,21 | **appropriate** 87:20 |
| 13:5 68:12 | 187:14,15 192:10 | **anderson** 50:12,13 | 88:4,12,13,20 89:6 |
| **affiliated** 45:4 | 192:21 200:5,8,13 | 60:1 | 89:7 91:20 |
| **affiliation** 37:5,10 | 200:15 201:14,20 | **anderson's** 151:1 | **approved** 36:12 |
| 102:21 | 202:2,5 203:14,17 | **answer** 9:10,16 | 87:15,16 140:21 |
| **affiliations** 7:19 | 203:17,20 210:16 | 10:11,15 14:21 | 141:3 |
| **affirmative** 169:3 | 211:3 | 28:1 34:17 38:15 | **approximately** |
| **affixed** 224:13 | **amendments** 67:2 | 39:8 56:8 59:14 | 19:15 |
| **african** 24:3 | 146:16 156:19 | 79:13 112:4 123:3 | **apps** 45:15 55:7 |
| **age** 44:17 140:15 | 167:10 186:5,7,9 | 139:17 177:21 | **april** 1:15 7:4 |
| 173:14 | 186:14 187:8 | 178:1 180:1 204:3 | 152:4 224:13 |

**area** 63:17 99:21
100:7 101:10
104:11 105:2,5
112:2 114:16
126:15 132:1
134:19,21 136:13
143:6 158:5,7
161:20 162:3,18
162:21 163:2,10
166:4 170:8,9
175:16 176:9
201:2 216:1,2
**areas** 84:21 85:13
89:17 133:8
143:10
**arrangements**
57:4
**arrived** 16:6,8
**articulate** 102:11
214:8
**aside** 14:9 188:14
195:3
**asked** 33:3,6,14
44:21 48:20 49:6
49:9 56:15 58:15
139:16 218:10
**asking** 14:1 21:14
27:18,20 73:14
98:2 119:20 125:5
135:10 169:20
211:11
**asks** 98:9
**aspect** 115:9
116:20
**aspects** 40:5 95:11
146:3
**assess** 31:4 76:20
91:12 96:6,7
115:9 148:6
149:20 181:8

**assessed** 149:14
**assessing** 83:19
150:11 177:11
215:10
**assessment** 31:12
33:10 83:2 84:1
97:18 171:7
**assessments** 39:17
**asset** 150:6
**assist** 13:1 71:5,8
129:7,12,16 130:7
**assistance** 135:10
184:8 213:3
**assisted** 185:4
**associated** 77:4
207:8
**assume** 10:2 20:16
39:19 52:19 69:16
**assuming** 140:10
166:10 212:11,13
**asterisk** 152:21
**attached** 5:6 6:2
47:6 48:11 72:5
82:21 124:9 125:2
125:16 126:5
138:17 152:13
154:21 194:9
198:4 205:12
221:8
**attempt** 44:11
110:3 217:16
**attend** 116:14
117:5
**attendance** 17:1
65:16 135:7
**attended** 16:21
197:11
**attending** 7:18
**attention** 28:15
134:7 153:21

**attorney** 8:1 11:18
11:18 42:4 53:20
69:8 131:13
**attorneys** 9:4
11:13,15,15 13:5
14:10 69:6 94:6
**audibly** 9:16
**audio** 3:4,13 4:11
**august** 71:18,20
72:13 79:20 82:14
111:18 112:6
124:17
**authorized** 7:15
**available** 57:15
68:3 71:8,21
78:18,21 114:15
119:3,9 120:7
121:10 123:8
139:10 140:3,6,11
140:21 146:16
154:15 189:6
**average** 107:17,18
132:2 216:3
**avoid** 141:7
**aware** 15:2 16:5
27:12,20 28:5
29:9 30:14,16,16
31:1 33:13 35:7,8
44:15 67:19 68:3
70:9 96:1 99:18
106:20 118:5
119:11 120:5
121:16 146:12
149:16 154:7
161:3 174:10
175:7 182:11,18
194:17,20 195:1
202:15
**awful** 26:14

**b**

**b** 5:5 6:1 57:17
96:14 146:14
151:5
**baby** 63:5
**back** 13:20 27:2,4
28:1 29:16 30:1
32:6,21 36:17
39:11 41:3,8,16,17
42:18 45:12 46:6
46:15 48:14 51:20
52:1 54:3,9 55:15
55:19 56:4,14
61:12 63:11 77:1
77:2 79:6 87:21
89:16 92:2 93:14
95:16 96:9 97:3
97:15 103:8
104:14 106:16
108:5,16 111:6,9
112:21 113:19
115:15 117:15
119:4 120:10,20
121:14 126:18
131:21 133:20
146:14 147:19
158:3 162:12
165:12 166:3,10
170:6 171:10
172:2 181:12,13
182:19 188:1
189:18,21 193:6
193:19 196:3,19
197:10 201:1
207:13,20 208:2
209:11 211:9,15
212:19,20 214:2
214:15
**background** 19:6
38:7

**backgrounds** 40:3
**bad** 108:14 203:17
  208:14
**baked** 135:17,20
**balance** 63:9
**balanced** 105:13
  106:11
**balancing** 108:6
**ballpark** 22:15
  52:7 58:12
**bamberg** 201:11
**bamberg's** 201:14
**bankruptcy** 18:3,9
  18:10,13,15
**baptist** 35:12
  42:15
**based** 39:19 41:11
  56:8 62:11 85:12
  94:13,14 95:13
  96:5 108:19
  135:18 171:14
  172:5 179:14
  180:6 200:21
**basic** 9:6
**basically** 84:20
  137:14
**basing** 39:5
**basis** 39:9 40:21
  59:12 64:21 81:12
  88:3 90:13 92:18
  167:7
**bass** 131:2
**bates** 73:16 138:12
**bear** 59:15 124:10
  129:13 133:20
  136:11 147:6
**becoming** 26:2
  43:6
**began** 212:21
**begets** 38:2

**beginning** 7:21
  46:14 47:1 54:9
  64:3 65:12 67:17
  72:16 74:21 80:20
  106:8 111:5
  115:18 164:8
  167:20 168:2
  171:16 178:5
  179:10 193:18
  208:21
**begins** 84:13 86:7
  105:8 153:1 190:4
**behalf** 3:2,11 4:2
  4:10 8:4,6,8,9,13
  18:4,5 167:8
  198:13 201:20
**behavior** 101:2,9
  102:1,8,14,20,20
**behaviors** 101:7
**beings** 139:7
  179:11
**believe** 10:16
  12:11 13:15 14:5
  14:6,7,11 15:11
  16:7,14 17:8,11,11
  18:2 19:1 21:21
  22:1,4,14,19 23:1
  28:21 29:17 34:19
  34:20 35:2 37:20
  38:11 39:9 41:5
  42:16 44:21 47:13
  49:5,11 54:10
  55:9,13 57:10
  58:7 61:18 75:12
  75:14,20,21 76:13
  77:12,21 78:18
  79:5 86:15 90:8
  102:6 104:10
  105:16 111:21
  112:9 116:11
  123:10 130:1,14

130:18,20 131:3,6
131:20 136:5
140:16 144:14
149:19 154:5
155:4 157:10
158:15 159:19
166:19 167:4
169:9 174:13,14
175:5 178:2,11
183:8 185:9 194:7
195:7 199:8
200:14 201:12,15
202:1,4 203:5
204:7 206:2
207:20 208:19
209:20 210:4,7
211:7 214:2,5
215:8 216:15
**believed** 24:20
  183:21
**beneficial** 77:13
**benefit** 121:11
**benefits** 191:19
**best** 32:3 35:19
  36:4 56:5 60:16
  108:14 184:1
  192:10
**better** 31:15 98:11
  139:13 150:7
  153:11,13 189:19
  192:3 204:9
  209:14
**beyond** 95:7
**big** 24:20 39:13
  63:14 89:1,5
  98:10
**bill** 16:13 17:7
  22:12,21 28:18
  31:6 32:18 33:3
**bills** 25:19 26:4
  31:5,12 33:14,20

34:1 66:4
**bit** 13:12 15:12
  19:5 20:3 54:4
  56:11 60:20 71:11
  71:13 75:7 79:16
  98:5 111:9 117:18
  117:20 126:11
  133:5 144:11
  158:16 178:16
  214:6 217:4
**black** 22:16,18
  27:17 28:7 29:10
  33:18 34:1 39:1
  140:14,14 153:3
  173:3,4,9,14,15
  174:4,11 175:4
  181:9 182:1,3,12
  183:6 214:1
**blanking** 63:20
  68:17
**blinked** 37:1
**block** 39:2,3 67:4
  95:5,10 129:15,15
**blocks** 212:13
**blue** 153:3
**blurrier** 152:10
**blurry** 152:10
**board** 30:2
**boards** 42:17 43:2
**body** 187:14 201:8
  206:21 217:14
**bolts** 14:15
**born** 19:6
**bouncing** 204:9
**boundaries** 105:9
  105:10,17,18
**box** 93:13
**brain** 168:20
**brandon** 63:3
**brawley** 15:2
  209:18 213:12

**brawley's** 210:15 211:2,10 213:20
**break** 10:17,20 46:4 74:5,6,8,10 82:1,2 85:12 110:13,15,21 111:9 193:10
**breaks** 72:21
**briefed** 169:1
**briefly** 123:14
**bring** 13:10 49:8 64:13 159:6 209:17
**brings** 24:15
**broad** 40:16 85:2 91:2,6 102:17,18 104:1,5,10,16 106:10 111:11 147:12 166:5 202:20
**broader** 32:13
**broadest** 16:2
**broke** 111:17
**broken** 95:20
**brought** 15:15,18 16:1 28:15 30:5 88:10 134:6 146:4 153:21 157:1 181:17
**brown** 30:1
**brunell** 34:18,19 34:20 70:2,14
**brushed** 30:11
**buckets** 128:3
**building** 150:8
**built** 107:1
**bullet** 139:2
**bunch** 101:4 102:16 106:4
**burchstead** 4:3 8:9,9 94:8 113:12

219:13
**bureau's** 105:11
**burr** 4:4
**burr.com** 4:8
**business** 17:20 18:1,2,6,12,14,17 52:17 105:2
**bvap** 174:4,12,16 175:11,13,20
**bvaps** 175:4 183:6

**c**

**c** 1:9 3:1 4:1 5:1 7:1,8 86:1 88:15 103:5,5 222:3 223:3
**cake** 135:17,20
**calculation** 94:15 97:11
**calculations** 95:13
**call** 59:1 160:21 208:8
**called** 76:14 172:2
**calls** 53:14 160:15
**candidate** 22:4 39:2,3 173:4
**candidates** 21:2,7 22:2,9,9
**capability** 140:16
**capable** 64:18 187:11
**capacity** 17:18 43:1,5,8 53:20
**capitol** 26:11
**care** 121:6
**careful** 85:20
**carefully** 171:3
**carolina** 1:2,5,14 2:4 3:16 4:6,14 7:7,10 11:16 13:6 16:16 19:8 23:11 25:6,7,11,21 26:13

26:15 27:1,3,9 28:2,4,9,14 29:13 30:1 31:8 32:14 35:5 37:6,15,21 38:10,12 39:10,21 41:19 43:9 45:1 64:20 71:19 73:12 82:10 86:13,19 89:13 90:19 91:13 103:12 126:8,18 132:2 152:5 154:14 168:6 171:15 174:12 210:3,6 222:2 223:2
**carolina's** 29:12 124:1,15 125:9 164:12,14,20 165:6
**carolinians** 27:17 28:7 29:11 30:9 35:21
**carries** 139:2 194:11
**case** 1:7 7:10 8:16 11:14 12:10 13:21 14:13,19 15:3 18:19 34:11 36:4 49:10 57:2 74:16 77:4 86:8 92:6,7,9 119:17 167:3 171:9 192:4,7 198:21 203:1 206:5 224:9
**cases** 30:5 92:13
**category** 25:17 93:5 101:6 102:7 103:18 157:16
**caucus** 24:7,8,11
**caught** 83:12

**cell** 52:13,17 53:12
**census** 60:16,17 66:11 88:1 89:3 89:10,16 90:3,19 91:9,13 95:5,9 105:10 212:13
**certain** 16:12 58:3 67:5,6,8 88:17 92:13 103:6 136:4 159:19 173:14
**certainly** 25:7 26:8 27:2,4 28:2 29:13,16 31:14 66:15 67:11 71:7 75:8 77:18,19 93:3 98:10 105:6 105:20 107:19 110:2 117:1 135:14 156:2 157:2 168:20 172:12 183:9 184:13 187:5 198:14 208:8 217:11,15
**certificate** 224:1
**certify** 224:5
**cetera** 18:18 28:4 127:13 205:1
**chair** 60:6 62:17 64:8 65:9,15 66:6 66:20 67:15 68:13 79:5 92:1 102:13 116:7 133:2 170:5 170:19
**chairman** 24:6,9 24:16 59:4 61:19 62:5 74:21 140:21 144:8 193:5 198:9 198:10,19 203:16
**chairmanships** 24:13,14

challenge 66:19
challenges 16:12
chance 82:4,17
  86:4 139:4 219:17
change 81:2,9,13
  81:15,16,16,17
  107:19,20 113:8
  176:14
changed 23:1 38:6
  113:14
changes 66:3 97:5
  162:9 166:3
  171:14 186:17
  202:19,20,21
  204:8 215:18
changing 47:19
  49:3 171:13
chapters 17:5
characterization
  18:9
charge 76:10
  127:11 132:10
charged 26:8
charleston 19:16
  19:20 20:1,2
  26:13 165:16
  176:10
checks 51:9
chesterfield 78:11
chief 71:2 128:14
  128:20 130:6
  131:12
chiefly 150:13
child 63:5
choices 108:9,14
choose 135:3,3
choosing 101:11
  102:2 146:13
chose 58:6,8 76:7
  79:20 117:19
  184:14 190:14

195:16 198:16
chosen 87:13
chris 45:20 46:18
  48:2
circle 159:21
circulate 94:5
circumstances
  88:19
cities 117:13
civil 36:14 165:10
  165:20
claim 168:17
claims 15:17,19
  16:1 91:13
clarification 9:21
clarify 174:2
  214:17
clarity 32:20
class 33:4
classify 159:10
clear 62:6 170:4
  173:7
clearance 120:3
clearer 209:16
clearly 9:16,21
click 130:10,10
  134:18 218:5,5
clicked 208:1
clicking 134:21
climb 63:14
close 86:19 115:18
  128:7 217:21
closed 142:19
closer 11:21
closes 141:18
  215:3
club 42:14,16
coffee 46:9
cohesion 177:13
collaborated
  160:9

colleague 8:5
colleagues 88:7
  160:4
collect 120:12
collected 121:3
collecting 76:10
college 19:16,19
  19:20 130:13,14
colloquy 78:19
color 21:2,7 22:9
  22:10 107:2
columbia 1:3,14
  2:4 3:16 4:6,14
  7:10 54:11 68:2
  111:13 148:2
combat 25:7,10
combated 25:20
combination
  62:14 156:20
  162:20 214:7
  215:3
combined 163:15
  181:21
come 17:10 34:4
  36:1 46:6 57:17
  91:14 101:5 107:6
  108:13 110:2
  114:12,16 119:3
  120:19 133:6
  137:7 170:10
  189:20 191:8
  197:14 208:9
  217:11
comes 158:15
  192:8
comfortable 94:1
coming 36:18 57:9
  76:15 89:16 141:5
  163:1 171:10
  185:17 190:17

comission 43:10
comment 77:14,20
  78:16
comments 58:12
  58:15 99:13
  120:18 121:7,17
  121:20 122:3,6,8
  122:16 145:20
  151:11,12 156:5
  189:13 197:14
  204:17,21 211:2
commission 8:10
  43:9 219:12,14
commissioning
  183:13
commitment
  64:15
committee 6:9,11
  24:6,15,16 28:10
  28:15,21 33:6
  35:20 39:16,20
  40:3,9,13 41:2
  50:15 54:7,20
  55:10 56:7,20
  57:13 58:1,4 60:6
  61:1,10,14 62:1,3
  62:18 63:2,9
  64:17 65:7,9,15,18
  68:16,19 69:3,9,11
  69:13 70:7,18
  71:19,21 72:1,13
  73:9,13 76:4
  79:20 82:11 83:14
  83:15,18 84:1
  88:8 93:15 94:18
  96:4 99:10 100:1
  108:1 111:19
  112:7 115:21
  116:8 120:12,17
  121:6,10 122:1,4,5
  123:2,12,16

124:16,16 127:6
127:10,20 132:12
133:2 138:20
142:15 143:6,9,18
143:19,21 145:5
146:15,17 147:9
148:5,14 150:10
151:10 154:15,16
157:7,18 158:2,21
159:2,7,17,18
161:4 163:4 167:5
167:8,11 169:3
173:12,16,17,18
173:19,21 174:15
175:2,6,12 176:17
176:21 177:3,9,19
178:7,9 179:13,17
180:6 183:4,8
184:5,7,11,14
186:1,6,14 187:1,4
187:10,17 189:12
189:19 190:11,14
190:15,18,19,20
191:5,11 192:1,5,5
192:9,14,20 193:8
194:2,18 195:11
195:16 196:1,20
197:4,21 198:6,11
198:13,14,15,18
199:1 201:7 202:1
202:10,15 203:15
203:21 204:11,21
215:5,15 216:12
216:18
**committee's**  82:12
83:2 111:10
121:12
**committees**  43:3
123:17 125:10,20
**common**  43:20
99:3 163:1

**communicate**  70:5
119:2 143:5
145:15
**communicated**
192:19
**communicating**
65:18 146:11
158:3 167:7 216:1
**communication**
59:16 70:9 218:3
**communications**
56:6 138:3 161:5
218:2,6,11
**communion**  35:13
**communities**  36:2
36:3 81:6,15
98:17,21 99:8,11
99:17,21 100:4,6
100:12,20 101:3
103:6 104:8
105:12,15,19
106:9,15,18 107:2
107:10 136:8
151:8 168:8
183:19
**community**  25:4
34:1 42:12 101:9
102:18 103:9,10
103:13 104:11
136:16
**compact**  97:20
98:7,8 108:4
168:7 183:15
**compactness**  81:5
81:15 93:19 94:13
94:19 95:2,8,14
96:2,7,21 97:11
149:21 150:2
183:18 201:1
**compare**  160:3
184:9 213:4

**compared**  172:8
180:20 182:2
204:5
**comparing**  213:1
**comparison**  185:1
**comparisons**
212:3
**compelling**  110:8
**competing**  100:4,6
100:12 107:10
151:8
**compile**  99:10
**compiled**  99:15
122:3 141:15
142:21
**compiling**  99:14
**complaint**  14:20
**complaints**  134:6
**complete**  221:6
**completely**  188:2
**compliance**  97:21
108:20 109:15
110:7 134:20
135:1 176:18
178:13 215:11
**compliant**  107:20
**complicated**  153:8
158:6,8
**complied**  135:11
135:16 148:7,16
149:6,14 150:11
178:19 202:17
204:5
**complies**  109:8
168:5
**comply**  5:14 93:8
108:8,18 123:19
133:18 134:3
148:7
**component**  65:20
94:21 100:13

148:10 200:1
**components**  144:1
167:18
**composition**  40:8
40:13 178:7
216:21
**computer**  52:21
71:2,6
**computers**  126:15
**concentrated**
107:15
**concept**  37:7
106:2,3 177:15
206:20
**concepts**  104:21
**conceptualizing**
186:12
**concern**  41:6
95:12 115:8
116:13 211:6,16
**concerned**  27:21
**concerning**  203:11
215:13
**concerns**  25:5
26:21 27:8,10,12
28:11,12,14 76:15
88:5 98:6 129:10
134:5 155:5,17
160:13 161:15
189:2,3 211:5
**concert**  137:12
142:10 176:7
**concludes**  219:19
**conclusion**  108:14
**condense**  165:14
**conditions**  88:17
**condolences**  59:3
**conduct**  41:12
52:5 76:20 148:15
175:2 178:9

conducted  32:16
178:18 180:8
202:16
conducting  127:11
149:5
confederate  26:6
26:11,16
confer  74:9
conference  1:5 7:7
16:16 17:5 126:8
181:6 210:3
212:18 213:21
222:2 223:2
conference's  181:1
181:8 182:17
211:13,18,21
configuration  97:1
confines  54:13
105:4 131:11
conflict  99:20
100:3 108:2
conflicts  146:8
151:7 157:18
conform  68:11
conformed  68:9
congratulations
59:3
congressional  5:21
23:9,12,14 62:4
63:15 64:21 82:13
125:19 158:12
168:3,11
conjunction
149:11
connect  133:7
143:11
connected  18:16
37:8 120:1 143:10
159:8,10 166:11
201:6

connecting  36:17
142:12 143:7
207:12,13
connection  37:18
38:3,5 39:14
connects  164:16
cons  180:16,17
consider  17:2
24:18 29:21 32:1
32:10,11,12 67:10
70:16 81:14 135:5
184:13 190:15
consideration
41:10 100:17
106:14 122:7
135:11 142:10
146:3 165:9,21
190:11,16
considered  33:14
100:10,21 104:8
105:7,12 109:12
115:14 199:12
202:9
considering  33:20
174:16 186:16
195:6 216:14
considers  168:8
consolidate  165:15
constantly  155:11
constituents  34:4
51:2 53:19
constitution  81:3
123:20 168:6,6
constitutional
110:4 177:4
constitutionally
92:17,20 109:19
110:9
constraints  117:11
consult  160:7

consultant  69:19
70:3,4
consultants  59:8
69:12,18
consultation  70:6
157:5
consulted  117:1
157:20 158:9
consulting  75:11
consumed  180:16
cont  4:1 6:1
contact  79:8 157:7
215:17
contacted  193:7
contained  36:2
184:10
content  11:12
12:18 13:4 47:11
49:1 73:14 124:3
131:17 176:15
contention  213:20
context  29:15
30:10 32:1,4 36:6
36:8,15,16 40:6
42:18 101:17
102:9 137:12
173:5,7 174:4
178:7 198:10
contiguity  183:19
contiguous  108:4
168:7 200:20
continue  12:6 74:8
continuing  219:3
continuity  210:18
continuous  205:15
contour  96:18
contracted  205:6
contrast  184:9
213:5
contrasting  213:1

control  63:6
controls  57:7
convened  61:10
conversation
55:16 59:13
conversations
14:3,4 15:8
137:19 169:4,10
203:10,12 204:1
conversing  162:17
conveyed  197:7
coordinate  54:14
65:13
coordinating  68:1
118:12
coordination
118:16
copies  79:2 140:20
141:6 197:14
copy  50:3 57:17
123:11
core  135:14 207:8
207:9,16,18
corner  145:12
correct  12:11
21:18 22:19 23:19
50:11,18 63:3
72:8 87:12 90:6
107:16 113:10
128:5,12 129:12
129:20 141:9
154:5 155:4 169:7
190:7 195:7 196:9
202:11,12 204:14
210:7 213:10
214:12 215:8,14
216:15,19 221:6
correction  222:5
223:5
corrections  221:7

**correctly** 12:15
26:3 45:7 54:8,12
57:16,18 62:19
77:20 78:12 79:13
105:15 112:12
130:4 141:1,4,21
156:1 157:3 161:1
165:14 169:4
181:14 186:19
189:17 192:19
200:17 209:9
211:8 212:12
**correlated** 37:6,15
37:21 38:1
**counsel** 7:6,17
8:21 10:8 11:19
12:9 13:16 14:13
15:8 49:6,10 57:1
68:18 71:7 75:11
75:13 131:12
144:17,17 147:10
149:10 150:13
159:20 169:5
170:1,9,11 171:1
176:8 177:1
178:21 182:14
184:9 203:3 205:7
213:3,9 215:5
216:12 224:8
**count** 89:10
**counties** 117:14
208:6,11,18 209:6
**country** 42:16
**county** 78:11
105:9,17 138:4
145:10 158:14
165:16 209:12,13
209:13 212:12,14
**couple** 13:15 28:8
28:19 55:9,10
57:3 73:11 84:4

115:17 123:14
129:19 161:3
163:17 188:2
190:2 209:20,21
**course** 29:5 33:8
34:7,8 35:19
55:11 69:2 77:20
88:11 90:5 112:15
117:7 135:2
137:19 138:7
157:2
**court** 1:1 7:9,13
8:17 9:14 10:6,10
11:5,9,20 12:6
19:2 35:1 53:4,8
92:8 113:7,10
135:18 161:6,12
169:11,13 177:20
178:3 202:3,6
218:21 224:3
**courtroom** 9:11
**courts** 206:5
**covered** 42:21
**covid** 66:15 79:7
89:2,9,11,14,16,20
91:2,5 117:11
**create** 62:3 111:19
155:13 186:20
190:19 191:3
**created** 83:8,18
87:2 99:16 138:20
179:3 180:11
212:15
**creating** 109:4
142:5 143:17
**creation** 61:10
67:11 109:12
**criminal** 19:4
**criteria** 5:13 31:10
71:14 75:5,10
77:21 78:10,18

79:11,12,21 80:20
81:1,9,20 82:7,12
83:2,19 88:15
102:14 108:2,13
108:20 111:16
127:7 133:19
135:15,16 148:4,7
148:16 149:7,15
179:15 180:7
208:20 215:10
**criterias** 207:21
**critiques** 88:5
**cross** 39:20 40:16
**crossover** 177:15
177:18,21
**cultural** 35:6,7,9
35:10,14,16,17
36:3 102:16
**culture** 35:11,11
36:7,9,13,14
**current** 22:11
44:12 107:9
136:12
**currently** 19:11
20:15 126:21
**cusick** 3:3 5:3 8:2
8:3 9:1,3 11:10
12:7 25:18 31:21
35:4 46:16 53:9
72:18 73:7 74:13
74:19 81:18 82:9
85:7,15 91:7 94:2
94:7,11 98:3
109:6 110:6,12
111:1,7 112:21
113:5,9,16,20
120:2 135:21
149:3,12 152:14
152:19 153:6,10
161:13 169:16
170:3 171:20

172:3,4,14 176:4
177:6 178:4
181:20 182:10
190:1 193:14,20
202:7 216:4
217:19 218:13
219:2
**cut** 36:20
**cv** 1:8 7:10
**cycle** 61:5 87:17
119:6,10,14

### d

**d** 7:1
**daniel** 130:21
**danielle** 1:21 2:14
7:14 224:3
**data** 60:17,18
66:11 89:10 90:19
99:16,18 139:8,10
139:18 140:2,6,11
140:14 164:13
166:8,12 177:7
197:6 204:16,18
**date** 64:14 98:12
189:6,21 221:14
222:21 223:21
**dated** 82:14
**dates** 54:14,16
61:8 76:17
**daughter** 45:14
**david** 34:13
**davney** 161:1
**day** 45:15,16
105:21 127:11,11
161:8,18 169:15
188:20 189:1
190:21,21 191:3
218:8 219:9
224:13
**days** 52:6 64:4
133:11,15,16

155:15 188:14
190:20 218:7
**deal** 66:17 97:5
98:10 119:21
189:21
**dealing** 93:16
**deals** 86:4 93:19
217:6,10
**dealt** 17:19 26:5
28:18,19 43:15
**dean** 11:17 12:9
55:13 57:11 59:20
59:21 67:13 68:17
75:16 76:1 77:1,7
80:16 118:15,19
123:4 132:9
150:19,20 179:19
203:8
**debate** 28:13
**decades** 27:5
**december** 205:4
**decide** 78:8,12
**decision** 26:19
64:8 69:14 90:1
91:20 109:4 116:7
116:7,8,11,21
117:2 217:14
**deck** 68:21
**decrease** 175:13
**decreased** 85:14
**decreasing** 84:20
**dee** 96:18 161:20
**defendants** 1:10
3:11 4:2,10 5:8,10
8:8,13 45:19
46:18 48:2
**defending** 8:15
**defense** 3:5 8:3
34:21 35:3 43:9
**deference** 171:2

**define** 30:18 35:10
36:9 96:13 98:21
101:5,9
**defined** 99:21
**definitely** 41:16
108:7 115:13
170:4
**definition** 38:18
85:2 96:14 97:10
99:1 102:17
**degree** 47:13,14
137:13 167:16
177:13 182:9
**delayed** 88:1 89:2
115:21
**delegation** 137:8
137:16 138:1
145:8,10,15 146:5
160:8,10
**delegations** 142:11
157:19 159:1,3
215:16 217:5,5
**deligation** 137:8
137:10
**delineate** 184:18
**democrat** 62:8,9
**democrats** 38:10
38:14
**demographic**
139:7,10 140:2,6
**demonstrate**
89:21 91:4
**demonstrated**
36:5
**dennis** 11:17 12:9
14:7 59:17 75:15
76:1 131:7 144:13
150:17 163:7,8
169:8,9 203:8
215:6

**department** 27:3,5
**depend** 160:6
175:15 203:3
**depending** 162:14
216:2
**depends** 65:11
**deponent** 221:1
**deposed** 15:3
17:15
**deposition** 1:13
2:1 7:5,11 8:14
9:5,15 13:13
14:12,14 15:6,10
17:14 28:2 73:1
92:5 103:16 178:6
219:7,20 220:1
**depositions** 9:20
18:16 48:13
**depth** 47:13
**dequit** 130:15
**describe** 15:21
38:20 67:14 71:4
126:14 131:9
184:18
**described** 56:12
63:6 167:15 170:2
170:6 185:21
**describing** 106:11
**description** 31:15
147:12 189:19
192:3 204:10
209:14
**desire** 191:2
**desired** 191:12
**desktop** 52:21
**detail** 71:12
**details** 30:15
**determination**
64:9 94:15 97:2
116:17 117:13

**determinations**
67:1 146:7
**determine** 66:6
74:8 95:14 100:14
101:19 175:3,13
175:19 179:1
183:5 198:17
**determined** 66:7
99:19 183:20
188:17
**determining** 58:13
150:6 162:10
**developing** 84:2
144:6 147:10
**development** 25:1
83:5,6,7
**deviation** 86:5,10
86:11,21 87:8,18
88:2,16 92:8,19
93:7 95:18 107:21
129:5,10 134:4,20
140:18 145:17
163:13 206:2,6,8
**device** 53:1
**differ** 181:4
**difference** 89:1,5
183:11 213:5
**differences** 180:17
180:18 181:19
184:10,18 212:5
217:16
**different** 16:21
29:6 37:12 40:1,2
40:2,5,18,18 41:5
41:18 45:15 55:10
56:6 63:12 69:1
84:21 85:12 90:1
92:21 97:15 99:3
102:16 104:1
105:6 112:1,15
128:9 146:3

[different - draft]                                                    Page 12

148:19 151:11
162:20,21 167:18
180:10 181:5,7,18
182:15 184:10,19
188:2 190:21
207:21 212:3,5,21
**difficult** 33:1 43:7
43:12 64:5,10,13
64:15,16 110:1
145:16 162:1
**digest** 75:7 79:16
80:4 189:19
**diligence** 203:18
**dilution** 84:13,16
85:3,9
**diminishes** 209:13
**direct** 70:9 200:8
210:10
**directed** 129:7
**direction** 129:3
**directly** 45:17
119:21 170:10
189:13
**disagree** 217:12
**disagreements**
146:5
**discovery** 14:21
219:5
**discrepancies**
154:4
**discrimination**
29:10 30:9 31:3
32:2 103:17
**discuss** 14:12,15
50:10 53:12 60:19
75:8 118:8,10
169:20 180:2
**discussed** 63:7
88:10 90:14
115:14 116:9,9
159:20 164:10

204:17 211:16
214:21
**discussing** 186:16
194:3
**discussion** 47:12
80:5 88:11 113:18
151:9 163:9
165:17 195:10
**discussions** 11:12
12:19 44:10 49:1
54:19 62:12,14
131:18 151:2
170:1 176:16
195:4 203:8
**displace** 162:6
**disproportionally**
28:6
**disproportionately**
27:16
**dispute** 16:3
**disputes** 16:7
215:18
**disputing** 15:15
**district** 1:1,2 7:9,9
20:6,8,12 22:12
23:5,10,12,14,15
23:17 24:19 34:2
59:4 62:5 63:15
64:21 86:13 95:3
105:11 107:9,10
107:13 127:1,2
129:6 131:19
132:18 133:1,7
134:3,11,16 136:3
136:18 137:5,10
140:8,9 146:6
148:6,15,15,16
149:5,5,6,14 150:4
150:7 157:8
158:12 160:5,9
161:15,16 162:11

162:16,17 163:11
165:15,18,19
170:13,14,17,18
171:8 172:16,20
172:20 173:8,13
174:3,6,7 175:10
175:17,21 176:3
178:17,17,19
179:3,3 182:12
197:3 201:2,3,4
207:14,15
**districting** 208:10
**districts** 16:12,14
86:18,19 87:4
95:19 97:19 98:6
119:15 126:20
131:5 133:6,8,21
134:2 137:16
142:9 147:16
149:21 157:13
160:3,10 162:1,6
163:1,14 165:15
170:21 171:11
172:8 173:10
174:11,16 175:1,1
175:3 176:11,14
178:10 180:13,14
180:21 181:10
182:1,1 200:20
201:6 204:8
206:20 207:10
213:5 214:1,3,3
217:6,18
**diverse** 62:7,7
**divide** 106:18
208:13
**dividing** 208:11
**division** 1:3 7:10
**doctors** 168:19
**document** 47:1,3,4
47:8,9,10,20 48:5

48:7,8,18,19 71:17
72:2,9,10 73:16
76:8,11 78:16
79:17 80:8,10,11
80:13 81:21 82:7
82:17 83:17 95:20
124:6,7,19,21
125:5,12,18
138:14,18 149:13
149:16 154:18
185:11
**documents** 5:9
14:17,21 15:9
46:20 48:15 49:8
49:10,12 72:19
73:7 75:6 83:21
94:4,6 119:13
121:3 122:2,21
123:7,8 126:2
184:21 213:3,7
219:6
**doing** 42:1 60:16
118:9 203:18
**downloaded** 154:3
**dr** 34:13 70:14
**draft** 6:6 75:9 76:6
77:11 79:17 127:1
142:6 143:2,3,20
145:2,19 147:8,14
147:14,15 148:13
149:18 151:17
152:3 153:1,18
155:2,13,18
156:11 157:12,21
159:1,13 166:2
167:10 177:8,11
178:18 183:15
190:15 191:2
196:8,15 197:7
215:7 216:5

drafting  79:11
  84:2 212:16
drafts  133:6 136:9
draw  132:16 133:6
  134:2,2,3 135:10
  137:5 140:8 142:9
  163:11 170:21
  171:7
drawers  70:17,17
drawing  100:15
  107:9 109:5 129:1
  129:2,6 134:11
  135:10 146:12
  148:6 156:14
  160:1 216:20
drawn  89:4 129:5
  134:1 136:1,3
  137:1 141:8,14
  142:3 157:9,13
  162:11 173:14
  214:18
draws  213:21
drew  44:14 136:10
  137:2 160:4,4
  183:5
driven  66:10
  163:14 172:11
driver  67:4 109:4
drives  161:19
driving  106:1
  109:7
due  64:2 150:21
  203:18
duly  8:19
duty  5:14 9:10
  81:16 123:19

**e**

e  1:21 3:1,1 4:1,1
  5:1,5 6:1 7:1,1
  34:6 49:19,21
  50:1,2,7,9,19 51:3

51:9,15,21 55:15
  55:20,21 56:12
  57:8,9,12,15 58:3
  58:7 74:15 101:3
  112:10 151:12
  218:10,17 222:1,1
  222:1 223:1,1,1
earlier  13:18
  24:13 62:2 87:21
  92:5 95:1 103:16
  113:14 129:9
  141:11 167:14
  185:21 196:3
  200:19 206:4
  207:4
early  30:7 61:12
easier  58:9 74:13
  74:16 91:18 93:21
  113:3 120:20
  153:3 158:5 159:6
easiest  73:17
  144:18
easily  48:9 94:5
easy  105:1
echo  11:6
economic  25:1
  102:15 103:19,21
education  25:1
  30:2 111:19
educational  3:5
  8:4
effect  85:18
effective  172:15
  173:8,9 174:2,6,10
  182:1
effectively  181:10
  183:6
efficiency  133:4
  141:6
efficiently  127:8

effort  62:2
efforts  61:6 67:14
  86:9 112:6
eight  19:15
either  17:4 21:1,4
  34:6 45:8 49:7
  57:16 58:4 60:21
  87:9 114:15 130:8
  134:18 137:7
  145:3 148:7 182:8
  185:3 189:12
  203:10 209:10
  212:11 213:8
elect  173:4
electability  213:21
elected  20:5,12
  25:5 26:20 27:11
  27:15 30:21 37:20
  43:2,13 45:4
  49:17 52:13,16
  65:2 107:6
election  8:10
  21:19 22:9 23:18
  24:9 28:14,16
  37:12 61:17 115:2
  198:9 219:12,13
elections  20:17
  21:16
element  100:8
elements  100:9
elijah  20:21 21:4
eliza  4:18 7:12
  130:15
emanuel  26:14
emergency  21:13
employed  42:3
  224:9
employment  20:4
  20:5 41:21 104:13
enactment  22:20

encompass  102:8
  103:15
encompassed
  104:18
encompasses
  63:19
encompassing
  25:3 168:9
encourage  112:2
  121:1
encouraged
  120:14
ended  138:5
  155:14
ends  80:21 141:12
  168:3
engage  81:12
engaged  28:9,10
engine  106:1
englea  130:21
englee  130:21
ensure  148:15
entail  56:9 108:21
  134:13
entailed  18:10
entire  41:18
  108:13 137:8
  144:18 149:17
entitled  77:19
equal  95:17
equated  168:18
equipment  128:16
  130:11
equity  33:10 148:3
era  29:20,21 30:2
erica  3:13 8:12
errata  221:8
especially  95:16
  150:21
esquire  3:3,4,12
  3:13 4:3,11

essentially 50:14
63:19 131:13
132:2 134:17
141:15 144:4
146:11 154:2
167:7 188:14,21
189:6,7 192:2
204:8 207:6,16
209:14 210:14
212:8 215:21
establish 92:12
93:12,16
established 127:9
establishing 97:7
115:15
estate 18:8,11
et 1:6,9 7:7,8
18:18 28:4 127:13
204:21 222:3,3
223:3,3
ethic 85:4,9
ethics 24:6
ethnic 84:13,16
evaluating 203:9
evening 35:15
218:4
eventually 133:7
everybody 76:15
94:4
evidence 105:12
exactly 40:14
100:3
examination 5:2
8:21
examined 221:5
example 35:12,15
54:18 85:8 93:4
100:11,15 101:8
103:10,14 107:13
108:3 115:20
145:10 146:13

150:3 166:4
180:12 181:3
200:18 207:14
examples 32:17
85:3
excess 86:12
excessive 212:10
exchanges 51:16
excuse 24:15
76:12
exhibit 5:8,10,12
5:13,14,16,18,20
6:4,6,7,8,10,12
45:19 46:1,1,21
47:2,5 48:5,6,10
48:16 71:17 72:4
72:7,9 80:18
82:14,20 94:5
123:18,18 124:2,8
124:12,17 125:1,6
125:15,17 126:4
138:10,13,16
152:2,12 154:13
154:20 163:19
179:7 194:1,8
197:19 198:3
205:2,3,11
exhibits 73:3
110:16 126:12
exist 171:14
174:13
existed 29:13,17
52:3 80:12 171:11
171:13
existence 119:18
120:5 176:8
existing 206:20
exists 30:14 39:10
44:20 182:13
expectation 73:3
195:9

experience 114:9
199:7
experienced 26:12
expert 34:10,21
35:2 38:17
explain 86:7 180:8
206:19,21,21
explained 39:1
63:11
explaining 109:11
109:14
explanation
148:19 195:8
explanations
136:3
expressed 65:6
155:19 160:20
161:17
extent 37:13 49:16
61:11 96:12 129:9
132:13 133:10
156:13 176:16
199:5
eyes 89:6,8 109:15

## f

face 21:19 22:5
55:5,5,8,8 59:17
59:17
facebook 45:6
facetime 55:7
facetimes 55:9
facilitating 143:3
fact 117:16 178:13
factor 89:15 101:4
103:5,19 109:7,11
109:13 115:19
factored 41:16
factors 99:19
100:21 101:5
102:17 104:2,8,13
104:19 105:8,20

106:4,7,13 117:13
failed 202:2,5
fair 18:9 21:16
39:7 40:7,11
45:14 51:11 53:11
83:1 87:6 88:15
99:8 106:6 123:21
124:14 125:8
127:14 128:11
132:17,19 142:1
147:12 148:4
154:4 157:11
167:9,12 173:6,11
194:16 196:6
217:5
fall 62:15 102:7
falls 25:17
familiar 33:11
35:6 36:14 37:4
82:19 86:6 93:10
125:14 126:3
170:12 172:15
177:15 206:7,9
family 43:14
far 18:8 29:16
37:19 62:7 64:19
101:15,16 134:20
163:14 173:1
182:20
farm 78:11
fashion 89:5
199:21
father 17:20 18:4
favor 26:3,7,10
favorable 191:20
192:6 196:4
feasible 115:10
116:3
federal 81:4 84:6
92:7 97:21 108:17
108:18 168:7,12

[federal - full]    Page 15

206:5

**feedback** 76:9,11
77:14 117:3,6,7
121:18 131:18
133:17 159:4
160:15

**feel** 9:21 45:15
49:8 94:1 124:4
125:4 188:19

**feels** 125:14 126:3

**fell** 172:1

**fellow** 58:18

**felt** 64:18 80:2
155:20 191:1

**fewer** 214:6

**field** 170:7 177:5

**fifth** 3:6

**figure** 46:5 144:20

**filed** 7:8

**fill** 64:16

**filled** 63:21 64:7

**filling** 65:7

**final** 111:12
116:21 117:2
125:17 156:14
157:3,21 166:2
214:9,11 216:20

**finalized** 115:17
151:17

**finally** 45:16

**financial** 224:10

**financially** 7:16

**find** 44:21 52:4
54:15 56:20

**finding** 66:13,17

**findings** 70:14

**fine** 11:1 110:20
142:12 143:14
145:14

**finish** 10:20

**firm** 7:12 50:5

**first** 12:14,17 14:5
20:4,11,18 26:5
30:20 45:21 46:20
48:4 49:21 61:12
61:15 71:12 80:19
81:7 84:8 96:20
103:19 108:8,17
111:12,18 115:21
123:18 128:8
141:12 151:20
152:20 155:2,13
157:12 163:20
180:19 182:2
199:17 206:19
208:5 215:2

**fit** 93:5 145:13

**fits** 196:21

**five** 46:7 86:11,21
87:1,3,7,11,14
88:12,17,21 92:2,9
92:11 93:1 135:6
193:10

**flag** 26:6,11,16
215:13

**flaw** 77:21

**floated** 132:11,12

**flood** 77:9

**floor** 3:6 90:15
93:16 212:2,4

**florence** 19:8,12
31:8 32:13 33:19
42:4,13,14,15,16
43:15 54:3 118:21
119:2 138:4

**flow** 127:8

**flowed** 68:6

**flowing** 133:3

**focus** 160:5 163:17

**focused** 140:17
160:8

**folk** 75:16

**folks** 34:8 40:18
53:15,17 54:14
64:9 67:10,21
69:5 75:17 79:7,9
90:4 112:14,16
114:4,11,18
115:14 118:11
133:12 135:9
136:8,11,12
140:17 141:5
142:8 143:18
145:5 155:19
156:5,7,13 157:16
160:16 163:3
168:18 191:8
203:15 216:11

**follow** 5:16,18
80:11 90:12
124:13 125:7
205:13

**follows** 8:20

**footprint** 136:18

**forces** 162:5

**forefront** 26:19

**foregoing** 221:5
224:4,5

**forgetting** 215:4

**forgive** 147:19

**forgot** 79:9

**form** 25:12 31:13
53:6,15,15 85:5
90:21 98:1 109:1
109:21 119:16
140:11 147:5
148:17 149:8
169:19 172:9
176:1,20 181:5,11
182:5 184:15
189:15 192:2
197:2 199:21

215:20 217:8

**forman** 4:4

**former** 50:13

**forms** 204:18

**formula** 94:14
95:13 96:5

**forth** 48:14 54:3
97:6 197:3

**forthcoming**
194:17 218:16

**forums** 112:8

**forward** 31:2 36:1
60:18 68:8 122:7
146:18,20 184:1

**forwarded** 57:12
57:14 58:8

**found** 34:3 36:3
44:18 45:3 87:20
88:13,20 159:5
207:15

**four** 21:20 32:21
33:9 73:9 126:12

**fourth** 20:15 21:21
72:1,9,10

**framework** 80:1

**free** 9:21 49:8
124:4

**front** 13:8 39:13
44:1 46:21 47:4
48:8 57:21 58:6
128:19 139:16
174:14 187:19
199:5 202:14
212:7 213:19

**fruition** 181:18
193:7

**full** 55:21 56:1
80:19 84:7 86:8
90:15 106:11
139:8 140:19
142:6 146:18

**[full - groups]**                                                                 Page 16

156:13 167:1
187:12,14 191:13
192:5,11 193:6
195:14,16 196:15
196:19 197:5,7,10
198:15 199:5
204:13,18 217:1
217:13,14
**fully** 62:18
**fund** 3:5 8:4
**fundamental**
171:4
**fundamentally**
89:17
**further** 100:2
108:11 120:21
214:15

**g**

**g** 7:1
**gadsden** 4:13
**gallery** 113:8,9
**general** 21:19 22:1
22:9 33:20 57:6
71:9 168:19,20
207:1
**generally** 14:18
111:14 114:20
138:7 207:2
**geographic** 132:1
166:1
**geographical** 62:3
94:21 95:4,6,21
100:7,13 136:18
**geographically**
62:7 96:12 118:2
**geography** 40:5,18
95:5,8,10,10 96:13
96:15,19
**getting** 36:11
104:4,14 145:6
167:6 178:15

193:1 199:4
**give** 35:12 38:7,18
45:18 47:7 67:9
79:17 80:7 93:2
100:11 110:3
115:20 145:9
156:6 157:7
166:21 176:6
187:4 190:13
194:10 205:14
208:1 209:12
210:11
**given** 57:4 64:6,14
88:1 89:2 105:13
105:18 155:7
171:2 188:20
192:6 195:13
199:18 221:7
**giving** 27:19 189:2
**glad** 120:17
**gmail** 50:10 51:16
51:21
**gmail.com** 50:7
**go** 16:5 18:19
19:19 20:1 27:2
28:1 29:6,16 30:1
39:11 46:10 48:14
52:1 56:4,13,14,17
58:6,9 64:18
66:13 70:12,19
71:7 73:5,13 74:5
95:16 99:3 101:15
101:16 102:17
103:8 110:15
111:1 113:16
118:21 120:20
122:6,11 123:12
126:16 129:19
137:17 146:19
162:12,16 166:10
186:20 187:1,3

193:14 194:10,13
195:14 203:18
204:20 210:8
211:9,11 213:11
214:15
**goal** 106:5
**goes** 37:19 62:8
97:3 106:11,16
129:14 134:20
146:17 147:18
191:15 196:3
197:3 214:2
216:21
**going** 7:2 9:5
10:20 11:12 12:18
13:4 14:2 16:6
31:17 35:12,14
37:17,18 41:8
47:11 48:21 54:2
54:8 56:10 61:16
65:19,19 68:8,12
70:13 72:19 73:4
73:8,13 75:4 80:1
80:2,11,15 81:19
84:7 87:20 89:1
92:2 96:9 109:3
110:17 112:1,18
114:3,12 118:1
123:14 124:2,11
126:18,19 129:16
129:19 131:17
134:10,12 138:9
143:12 147:20
148:20 150:1
152:2 154:8,12
162:1,15,17,18
163:17 169:14
176:15 181:12
182:8 183:12
187:8 192:21
193:3,4,21 194:21

196:12 201:1
203:14,15 205:7
209:11 212:19
219:20
**good** 7:2 8:2,7 9:2
39:20 46:10 65:16
74:4 95:9 99:1
109:11,14 111:8
112:20 136:13
181:13 196:21
203:16 218:4,4
219:18
**gotten** 27:3 188:20
218:21
**gov** 50:21
**govan** 160:19
201:21
**govan's** 161:15
162:2
**governor** 36:12
**governor's** 59:10
59:11 131:4
**goyak** 130:19,19
**grabs** 158:17
**grace** 129:21
**grad** 130:13
**gray** 4:12
**great** 28:3 77:17
107:13 119:21
193:12
**greater** 105:13,18
182:3
**grew** 19:9 107:16
158:5
**ground** 9:6
**grounds** 26:7,17
**group** 32:18 33:4
85:11 103:12
144:21
**groups** 32:11,15
41:5 42:12 43:14

[groups - helpful]

84:18 99:4 148:19
155:11
**growing** 162:5
**growth** 161:21
164:17,17,18,20
165:4 175:16,16
**guess** 12:20 17:3
22:7 25:19 30:6
32:16 33:2 39:7
42:21 49:21 52:7
52:16 53:10 57:8
60:11 61:6,9
63:16,21 64:21
66:6,7 70:6 71:4
74:2 76:10 80:6
81:8 87:19 91:12
95:12 96:17 98:4
99:5,19 101:5,7,8
102:7,12 106:6
107:8 108:1,6
117:12 119:8,19
127:3,9 129:12
130:2 131:16
132:21 133:10
134:9 136:7 137:2
138:6 139:1
141:10 142:21
143:7 144:5
148:11 149:4
152:20 160:1
162:8,10 171:17
172:5 175:10,18
182:9 183:11
184:17,20 186:14
190:9,21 191:19
194:11 198:8
212:15,15
**guessing** 18:14
19:16 42:6 157:15
159:20 183:2

**guesstimate** 158:9
**guidance** 34:1
131:18 133:17
**guide** 83:19,21
**guided** 83:2,14
**guideline** 5:13
92:15 207:18
**guidelines** 71:14
75:5,10 76:21
77:15 78:3,17
79:3 81:1,20 82:7
82:12 83:1 84:5
87:6 133:19
179:14 180:7
206:7 208:16,17
215:11
**guiding** 208:5,8
**gullah** 103:10

**h**

**h** 1:13 2:2 5:2,5,7
6:1,3 7:5 8:19
45:19,20 46:18,19
48:2,3 106:7
220:1 221:4 222:1
223:1
**hager** 71:1 128:6,6
128:8,8 143:18
147:9 215:3
216:12
**half** 42:9 86:12
87:1,9,10 166:18
**halfway** 125:3
**hand** 75:17 79:3
143:5 167:15
189:9 224:13
**handful** 157:16
**handle** 44:19
**hands** 68:21
**happen** 41:15
51:19 85:17,19
137:12 217:12

**happened** 141:13
154:1 161:16
**happening** 150:8
**happens** 143:15
**happy** 47:7 73:20
74:5 81:21 110:14
110:15 160:20
161:2,7,10
**hard** 12:1 29:7
79:2 123:11
147:14 158:1,8
182:6 202:21
219:1
**harmful** 121:15
**hats** 150:21
**head** 9:17 30:12
52:12 56:14 63:18
146:12 151:13
152:1 165:5 176:7
**heading** 123:19
**hear** 10:5,8 37:2
41:9 113:3 119:4
122:12 160:13
178:1 181:1
**heard** 9:8 12:8
19:21 21:15 27:16
28:8,16 33:12
34:5 35:8 37:11
38:17,19 41:4
52:8 70:4 76:1
78:9,11 91:3
103:7 104:17
118:14 128:9
143:18 156:9
160:18 177:17
186:15 224:5
**hearing** 6:7,13
17:10 35:20 73:8
78:20 90:14 112:3
151:20 154:16
155:3,17 163:18

164:5 179:8
184:12 185:5,8
186:12 187:18
188:5 189:11,12
189:13 191:6
198:10,18 199:2
199:12,17 205:5
209:17 219:17
**hearings** 17:1,4
28:11 36:18 41:4
45:11 65:15 66:8
67:6 69:2 72:1
73:9 77:20 78:4
79:4 88:6 90:5
99:6 111:10,13
112:7 114:1,3,6
117:4,12,14,17
118:6,12 119:5
120:11,12 121:21
122:17 187:21
197:12 199:19
**heavily** 66:9 158:6
170:8
**hectic** 63:8
**heed** 41:8
**held** 2:2 7:11
24:12 115:12
116:18 117:14
**help** 26:17 39:4
51:8 66:1 77:1
99:7 104:11
112:13 126:11
143:6 144:11
147:5 182:14
213:4,4 214:8
**helped** 142:15
184:18 218:1
**helpful** 49:9 74:17
98:18 121:15
152:15 167:3
186:12 194:5

200:8 201:18
**helping** 67:18
**helps** 12:4 124:5
**hereunto** 224:12
**hesitate** 93:2
  122:18 176:6
**hey** 111:8
**high** 162:15 167:6
**higher** 37:17
  91:18 92:18 93:6
**highlights** 25:2
**highly** 37:21
**highways** 106:14
  106:17 107:1
**hill** 20:21 21:4
**hire** 69:11
**hired** 69:17
**historic** 105:2
**historical** 103:4,7
  104:18 165:19
  166:5
**historically** 92:11
  102:16 165:18
**history** 20:4 27:4
  29:10,12,13,16
  30:8,11,17,18 31:3
  31:11,11,14 32:2,6
  32:21 56:20
  103:16 164:13
  165:8,8,10,11
**hit** 106:5
**hoc** 6:9 24:16
  35:20 54:7,20
  55:10,12 56:7,19
  57:13,21 58:4
  61:1,10 62:1,17
  70:18 71:21 76:4
  82:12 108:1
  115:21 121:12
  123:16 124:16
  125:10,20 127:6

127:10 142:15
143:5,9,18,19,21
146:17 147:9
154:14 158:2
159:7,18 161:3
163:4 173:17,18
173:19 186:4
187:1,4,10 190:13
190:15,18,20
192:1,4,9,20 193:8
194:2 195:5,11
196:1 197:4
198:11,12,14
199:1 215:5,15
216:11 217:13
**hold** 24:4 117:12
  122:15 135:4
  177:3 198:7 200:7
**holding** 18:5
**hollingsworth**
  3:12 8:11,12 10:8
  10:11 11:4 12:2
  14:6,7 25:12
  31:13 53:4,6
  72:18 74:2,17
  81:19 82:2,6 85:5
  85:10 90:21 94:2
  94:9 98:1 109:1
  109:21 110:13,20
  113:1,13 119:16
  148:17 149:8
  152:14 153:6,9
  169:19 172:9
  176:1,20 181:11
  182:5 189:15
  193:12 215:20
  217:8 218:14,20
  219:3,11,15
**holy** 35:15
**home** 63:11

**homelessness**
  43:16
**honest** 137:21
**honestly** 114:8
  139:12 214:15
**hope** 71:16 74:9
  174:1
**hopefully** 13:21
  46:21 98:5 128:5
  138:9 179:8
**horry** 145:9
**hours** 154:6 155:2
  190:10 191:1,12
  192:11 193:5,13
  218:7
**house** 5:8,10,21
  6:11,12 8:13
  11:15,16,18 16:12
  16:13 17:9 20:6
  20:12,18 22:12,12
  22:21 23:5,9 24:5
  24:6,9 25:13 26:1
  26:5,6,11,16 28:20
  33:5 36:12 39:20
  42:2 43:17 44:12
  45:19 46:18 48:2
  50:1,1,9,21 52:21
  56:7 57:10,17
  58:18 60:8,12
  61:14 69:17 70:7
  71:19,20 72:13
  82:10 83:7 86:13
  86:19 88:7 90:14
  93:15 107:9,13
  112:11,12 117:21
  119:6,15 120:1
  122:4 123:16
  125:10,19,20
  126:7 127:15,19
  128:2 129:3 131:5
  131:13,14,19

133:1 134:11
137:5 138:12
141:20 146:20
147:1 148:5 149:6
152:5 154:14
155:13 156:10,16
157:11,20 159:13
164:11 167:10,16
168:10 173:13
175:8,10 178:18
180:3,9,14,21
183:17 184:1,16
185:3 186:8,17
187:2,14 190:10
190:17 194:18
195:10 196:12,15
196:15,19 197:7
197:11,21 198:6
198:18 202:10,14
202:15 203:21
204:11,13,15,18
205:4 207:19
212:2 213:2 214:5
216:17 217:1
**house's** 71:13
  155:2
**housed** 121:3
  137:4
**hundreds** 122:19
  122:19
**hurting** 26:15
**hypothesis** 182:9
**hypothetical** 85:8
  93:3 110:2,3
  175:10
**hypotheticals**
  93:12

**i**

**idea** 41:9 112:11
  195:13

**ideal** 86:10
**identical** 97:11
**identifiable** 99:11
  105:14,19
**identification** 47:5
  48:10 72:4 82:20
  124:8 125:1,15
  126:4 138:16
  152:12 154:20
  194:8 198:3
  205:11
**identified** 73:1
  99:13 155:11
  218:12
**identify** 99:7
  102:19 136:8
  211:5
**identifying** 106:9
**ii** 84:6 108:16
**imagination** 110:5
**impact** 27:17 28:6
  28:7 31:7 32:5,11
  32:18 33:3,10
  35:18 119:15
  208:12
**impacted** 31:20
  89:12,19,20 91:2,5
**impacts** 31:16
**importance** 65:18
**important** 25:15
  39:18 40:4,15
  62:6 65:16 78:9
  79:17 80:3 88:1
  174:21 199:10,13
  219:16
**imposes** 170:20
**impressed** 72:6
**improved** 27:5
**improvements**
  27:7

**inaudible** 106:19
  146:10
**include** 44:7,14
  55:7,12 75:19
  102:14,20 103:20
  104:1,3 106:13
  129:13 136:2
  158:13 163:3
  168:13 195:15
**included** 43:3
  147:8 196:18
**includes** 101:14
  147:8 150:15
  184:4
**including** 32:15
  41:5 81:5 96:15
  121:12 164:10
  183:17
**inclusion** 195:15
**income** 103:20
**incorporate**
  183:21
**incorporates**
  164:9
**increase** 98:13,14
  134:21 175:13
**increasing** 209:7
**incumbency** 44:10
  100:17 211:5,16
  211:20
**incumbents**
  160:14 211:18
**indigent** 43:9
**individual** 102:12
  129:14
**individuals** 11:19
  20:19,20 21:1
  36:18 40:1,2 41:5
  101:10 138:3
  159:11 167:17

**influence** 116:8
  145:18
**influences** 103:5
**inform** 31:4,11
**information** 14:1
  67:21 70:6 77:9
  98:13 118:16
  119:21 164:13
  166:8 169:21
  182:21 183:12
  190:12 192:7
**informed** 64:11
  164:11,12
**infrastructure**
  24:21
**ingram** 3:4 8:5
**initial** 66:7 75:9
  135:12 136:21
  142:6 143:3,20
  144:6 145:1,19
  147:10,13,14,15
  148:12 149:18
  153:18 156:10,18
  157:6,11,21
  159:13 167:9,10
  177:8,11 178:18
  180:21 183:15
  186:13,17 189:13
  196:2,8,14 201:19
  211:10 215:7
**initially** 43:1
  112:17 114:2,6
  136:2 160:14
  187:17
**input** 33:21 34:8
  47:11 48:21 69:15
  76:21 77:11 78:2
  78:3,5,8 129:1
  147:9,21 156:4
  157:19 162:13,18
  164:10,10 167:17

  179:11,15 186:3
  186:16 188:17
  189:10,18 191:6
  191:11 192:16
  198:18 199:4,19
  216:7,9
**inquiries** 112:14
**instance** 146:10
  183:13 186:21
  218:6
**instances** 32:15
**institutional**
  136:17
**instructs** 10:11
**instrumental**
  67:18 68:5,8
**intact** 206:20
**intensive** 178:14
**intentionality**
  85:17
**intentions** 191:6
**interacted** 16:15
  16:17,19 89:10
**interacting** 133:12
**interaction** 12:17
  17:2
**interactions** 17:4
  128:21 131:16
  133:11
**interest** 36:2,3
  65:3,7 80:21 81:6
  81:15 98:17,21
  99:8,11,17,21
  100:4,6,12,20
  101:3,9 102:18
  103:13 104:9
  105:15,19 106:9
  106:15 107:11
  136:8 151:8 168:8
  183:19 224:10

interested  7:17
interests  105:12
  106:12
intern  130:2,9,16
  130:17,18,20
  131:3 134:15
interns  71:4 130:1
  130:7,12 218:1,11
interrogatories
  5:11 48:4,18
interstate  107:1
interstates  106:14
introduce  81:19
  209:20
introduced  194:18
  194:21 195:4
  196:7 199:16
  200:4 201:17,20
introducing
  209:19
introductory
  164:4
invested  17:21
investor  18:17
investors  18:2,12
  18:14
invites  205:21
involved  30:19
  61:6,16,18 68:20
  79:9 107:8 118:11
  142:5 143:19
  144:3 148:19
  162:10 186:16
  187:7 195:4 203:7
involvement  79:10
  123:21 124:14
  125:8 208:10
involves  178:13
isaac  22:5
issue  34:7 91:10
  107:5 116:1 154:6

172:13 174:19
  211:20,20
issued  52:19,20
  53:1
issues  27:15,16
  28:5 30:2 95:4
  114:9 153:17
  162:4,8 165:13
issuing  191:20
it'd  51:11 62:7
  110:1 133:14
  143:6
item  29:7 75:4
iteration  159:15
  187:9
iv  85:21 86:1

### j

j  4:20 34:13
james  45:19 46:18
  48:2
jay  8:16
jcusick  3:9
jennifer  3:12 8:11
  11:4 73:17
jhollingsworth
  3:18
jimmy  69:1
jmc  1:8
job  109:11,14
  212:4
john  3:3 8:3 9:3
  113:1
joined  8:4
joint  64:8
joints  143:7
  159:10
jolie  130:15
jones  20:21 21:6
jordan  1:13 2:2
  5:2,7 6:3 7:5 8:15
  8:19 9:2 10:3 11:3

13:9 15:13 17:15
  19:7 20:11 22:11
  24:4,18 26:20
  29:9 37:4 44:21
  45:1 46:17 53:11
  72:12 73:11,15,21
  74:20,21 82:5,15
  101:3 106:20
  110:17 111:8
  113:21 124:4,18
  125:11 126:1,14
  138:14 152:9
  153:12 154:18
  163:21 172:6
  185:14 188:7
  193:21 194:6
  198:1 218:18
  219:8 220:1 221:4
jordan's  45:20
  46:19 48:3
judge  9:11
judged  94:13
  96:21
judgment  74:3
judicial  42:10
  217:13
judiciary  6:11
  24:9,16 28:10,21
  43:10 50:15 57:10
  57:18 68:7 69:4
  69:17 70:8 71:19
  82:11 88:7 90:15
  121:6 122:4
  123:12,16 124:16
  125:10,20 132:12
  146:18,18 154:14
  173:16 175:8
  184:2 185:3 186:6
  187:12 190:11,17
  191:13 192:5,12
  193:6 194:18

195:10,14,16
  196:12,16,20
  197:5,11,13,21
  198:6,15,18 199:5
  202:14,15 203:21
  204:11,15,21
  216:18
jump  120:10
  131:1
jumping  103:9
juncture  144:7
  212:1
justify  92:21

### k

keep  154:10
  161:21 162:6
  166:1 192:6 208:6
  215:4
keeping  206:20
  208:17 209:6,15
kept  89:16 132:1
  189:1
key  122:9 150:5
kind  25:1,3 55:5
  56:13 62:15,19
  63:6 65:20 73:1
  74:3 81:11 91:11
  92:10 93:11 95:1
  116:2 122:10
  127:11 134:18
  135:6 141:6
  143:15 147:11
  159:6,10 162:13
  164:17 170:6
  181:16 191:7
  200:18,21 207:4
  216:6
kinds  165:9
king  201:20
kirby  160:18

**knew** 18:17 78:16
88:2,21 89:6
93:17 97:8 136:13
**know** 9:17 10:18
14:14,16 21:1,4,11
24:2 29:2 32:4
33:7,18 34:13,15
34:17 35:7 36:20
37:11 38:9,15,16
39:7 40:14 43:3
44:7,10,13,20 47:2
48:6 49:8 51:13
54:14 55:4 56:18
57:6 58:7,11
60:15,20 61:11,21
63:14 64:19 65:5
65:5,11 66:3,11,14
67:5,13,15,20
68:16,18 69:17,19
72:3,16 73:10,17
76:15 78:5,7,19
80:15 81:5 82:16
86:3 88:14,18
89:9 92:2,9 94:4
96:18,20 98:11,12
99:2 101:15,16,16
101:17,18 102:2,9
102:10 103:8
104:4 108:5,7,10
108:12 110:1,13
110:14,17 112:2,9
112:11,16,17
113:13 115:1,8
116:6,21 117:10
117:18 118:12,20
119:17,20 120:7,9
120:14 121:14
122:18 123:3,5
127:13 129:21
130:9,12,15
132:14 133:3,10

134:9 136:20
137:11 138:1,13
139:3,18 141:3,10
143:4 146:9,13
147:10,15 148:3
148:11 150:1,7,20
151:1,5 152:6
154:17 155:7,12
156:4,6 157:17,18
158:11,15 159:13
161:7,9,18 162:20
163:8 164:5
166:16 168:18
177:7,8 178:5
181:18 182:7,13
182:18 184:7,9,17
185:5 186:11
187:20 188:11
189:8 190:9 193:2
193:5 195:8
196:10,14 199:5
199:18,21 201:1,3
201:7 203:1,21
204:3,15 206:4
208:7,7,15 211:11
215:18 216:2,5,7
216:11 217:9,13
217:20,21 218:15
219:8
**knowing** 30:15
122:15 155:8
**knowledge** 47:21
61:16 112:4
136:17 157:1
167:13 170:7
200:21 203:6,7
**known** 9:19 25:8
**knows** 9:19
**kurby** 138:2

**l**

**labeled** 125:18
**lack** 31:15 164:17
175:16 189:19
192:3 204:9
209:14
**laffitte** 4:12
**lake** 95:3 96:16
**lancaster** 63:17,19
**landing** 152:6
**largely** 107:15
**larger** 209:13
**late** 61:13 64:14
66:11
**latitude** 87:4
**law** 18:9 19:16,21
20:1,2 24:10 50:5
61:17 68:10,11
77:4 80:11 81:4,4
81:13 84:6 89:7,8
92:6,7,9 97:21
108:8,17,18 115:2
119:17 168:7,12
170:7 198:9 206:5
**lawrence** 1:21
2:14 7:14 9:14
10:10 224:3
**laws** 28:14,16
29:17
**lawsuit** 15:13,14
15:15 16:7,11
18:7,10,21
**lawsuits** 30:3
**lawyer** 42:8 110:4
168:18
**lawyers** 177:2,4
**layer** 114:9 148:21
**laying** 198:12
**lazar** 44:4
**ldf** 8:5

**leadership** 24:5,11
39:19 60:8,12
**leading** 171:12
**league** 181:4 210:5
211:7,21
**leave** 71:9 188:17
191:9 192:10
**leaving** 142:7
**left** 42:10 156:4
189:17
**legal** 3:5 8:3 11:13
13:5 68:12 77:16
91:19,21 98:9
131:12 144:17
207:15
**legality** 16:3,9
**legally** 87:16 88:2
89:21 97:8 203:4
**legislation** 16:9,10
17:8 25:10,17
26:1,2 28:11,19
29:7 31:7,18,19
32:10,20 33:7
51:4 66:3 151:4
191:21 192:4
197:1,2 203:13
212:3
**legislative** 24:18
29:5 51:5 68:9
82:13 126:7
**legislator** 16:20
17:6 35:5 50:20
134:10
**legislators** 53:18
53:19 58:18 90:7
90:8,12 127:14,16
137:1,2,4,7 145:2
**legitimately** 39:14
**lengths** 77:17
**lens** 171:17 183:18

**lessens** 208:11
**letter** 124:12
**letter's** 125:6
**letters** 73:12,14
  123:15 124:11
**level** 103:20 217:3
**life** 19:14 63:6
**light** 219:4
**liking** 41:21
**limit** 86:9 116:13
**limited** 132:3
  155:18 168:17
**linda** 50:12,13
**line** 39:6 41:20
  64:6 67:12 72:16
  74:20 80:21 81:7
  81:8 86:8 108:10
  108:11 109:5
  117:19 141:21
  147:20 163:20
  164:8,14 166:16
  167:20 168:3
  180:3,3,5 185:13
  187:19 188:1,6,9
  190:3,5 191:14,15
  200:9 205:9,18
  206:17 210:20,21
  222:5 223:5
**lines** 36:10 38:14
  45:2 60:19 80:18
  89:4 100:15
  105:10,11,18
  107:21 146:6
  157:8 164:7
  171:14 175:11
  179:10 185:16
  188:11 191:16
  194:13 195:20
  200:9 205:17,21
  206:17 208:2,21
  210:8,10,11

211:12 212:9
  213:12,15,15
**list** 11:17,19 43:18
  43:20 53:19,20,21
  69:20 93:12 99:10
  101:4 106:11
  128:1
**listed** 47:1 145:1
**listen** 78:6
**listened** 41:7,7
**listing** 72:10
**literally** 64:3
  114:12
**litigated** 87:20
**litigation** 12:13
  13:4 45:17 49:13
**little** 11:6 12:3
  13:12 15:12 19:5
  20:3 33:1 43:7
  56:11 60:20 71:11
  71:13 75:7 79:16
  98:5 104:4,15
  108:11 111:9
  117:18,20 126:11
  133:5,16 139:13
  144:11 145:16
  158:6,7,16 178:16
  214:6 217:4
**live** 19:11 28:3
  126:18 158:5,7
**lived** 161:21
**lives** 63:17
**lividity** 16:9
**llc** 3:14 4:12
**llp** 4:4
**lobbyists** 59:6
**local** 17:4
**located** 126:16
  194:7
**location** 115:16
  116:14

**locations** 115:11
  115:17 117:11,15
  118:17
**loe** 138:2
**logistically** 64:5
  64:10 66:2
**logistics** 60:3
  67:18 151:3
**long** 42:5 84:9
  105:3 138:6
  155:12 188:5
  201:5 219:9
**longer** 74:7 193:4
**look** 32:3 47:7
  56:17 58:7 74:5
  74:11 82:17 89:19
  96:4,10,11 97:14
  100:13 106:3
  108:13 119:1,8,21
  120:21 121:14
  136:15 137:4
  154:11 171:9
  172:13 180:10
  181:6 190:3
  193:21 203:15,19
  210:20
**looked** 44:2 77:1,2
  88:18 96:9 97:15
  98:11 101:20
  107:19 117:15,17
  117:20 118:21
  126:20 132:4
  171:3,5 177:9
  181:5 183:18
**looking** 13:20 32:6
  40:3 45:12 57:8
  62:16 94:3 95:2
  119:4 134:17
  152:7 160:3
  162:20 174:19
  181:14,18 182:19

212:16
**looks** 109:16
**loosely** 206:9
**lost** 158:7
**lot** 34:5 54:2 66:9
  81:14 104:1
  107:19,20 132:15
  136:16 137:11
  143:14,15,16
  150:21 163:16
  167:18 183:9
**lots** 58:11 75:16
**lucas** 4:20 8:16
  45:19 46:18 48:2
  59:19 60:14 61:19
  62:12 75:19,20
  140:21 144:10
**lunch** 73:19 74:5
  74:10,10 82:1
  110:21 111:4,17

**m**

**mail** 34:6 49:19,21
  50:1,2,7 51:3,9,15
  55:15,20 56:12
  57:8 58:3,7 74:15
**mailed** 151:12
**mails** 50:9,19
  51:21 55:21 57:9
  57:12,15 112:10
  218:10,17
**main** 3:15 4:5
**maintain** 43:12
  172:7,11
**maintained**
  175:14
**maintaining** 162:1
**major** 65:20
**majority** 38:9,11
  170:12,14,18,21
  171:8,11 172:8,19
  174:5,21 176:11

176:13 180:12,21
181:15,21 214:3,6
**makeup** 22:12
**making** 32:8 60:15
65:13 67:20 68:5
76:14 127:12
151:4 202:18
**map** 6:4 56:16
63:18 66:1 67:7
68:4 69:3 70:17
70:19 71:1,5,11
95:2 96:11 123:8
123:10,13 126:7
126:10,13,15,19
127:4,5,7,8,12,15
127:16,21 128:13
129:1,11 130:3,4
131:5,7,9,11,16
132:6,15,17,19,21
133:12,14 134:6
134:13 135:9
136:6,15 137:6,17
138:5,6,11,20
139:14 140:12
141:11,18 142:2,6
142:18 143:8,11
143:17 147:7
148:13 149:17,18
150:11 151:3,17
151:21 153:1
155:3,6,12,13,18
156:14 157:4,5,6
157:14,21 158:12
159:1 160:2,14
174:13 176:11
178:18 180:4,9
183:16,21 186:2
186:19 189:3
197:2 202:16,19
204:2,5 210:2
211:13,18 212:16

213:21 214:14,20
215:2 216:20,21
218:1,3
**mapping** 99:17
**maps** 5:21 44:14
66:21 67:2,8 83:3
83:5,7,8,10,15,19
84:1 125:19 129:1
129:2 131:19
132:16 133:1,18
135:10,13 136:1
136:21 137:4,5
140:1,7,13 141:8
141:14 142:2,21
144:21 145:3,5,18
145:20,21 146:3
148:6 154:3 160:2
179:16 183:5,14
184:4,7,10,19
185:2 204:6
214:18
**mark** 173:1,2
**marked** 46:17
47:5 48:2,4,10
71:17 72:4 82:20
123:18 124:8,12
125:1,6,15 126:4
138:10,16 139:1
152:2,12 154:13
154:20 194:1,8
197:18 198:3
205:11
**marking** 82:10
**maryland** 2:15
224:21
**mass** 21:12
**match** 145:17
**materials** 13:10
111:20
**math** 95:17,20

**mathematical**
94:14 95:13 96:5
**matter** 7:6 64:13
105:14
**mattered** 40:8,12
41:1
**mburchstead** 4:8
**mean** 16:17 25:2
26:15 27:10 28:2
31:14 36:7 37:14
39:21 41:14 42:18
50:16 52:20 60:13
66:16 73:7 78:10
80:9 81:10,11
83:8 84:17 86:16
87:17 90:16 95:15
95:15 96:9,15
97:18 100:3,4,5
101:2,21 103:5
104:20 106:17
108:4 109:8,10
116:20 119:19
133:14 140:11
143:14 145:7,20
164:15 165:8
170:16 176:2
183:19 185:20
189:5 204:19
205:20 206:15,21
209:7 217:10
218:4
**meaning** 188:18
**meaningfully** 80:7
**means** 9:9 126:12
141:3 166:11
169:6
**meant** 132:18
**measure** 94:18
95:8 96:1
**measuring** 97:10

**meat** 17:14
**media** 7:4 44:17
44:18 45:13 46:14
111:5 112:8
193:18
**medicine** 168:19
**medium** 114:18
**meet** 60:7,11
149:11
**meeting** 5:12
12:14 54:16 55:18
60:7,10 67:19
71:18,21 72:13
76:14 79:18,21
111:18 114:16
115:21 116:5
120:15,19 135:6
156:3 159:2
190:10 191:12
192:13 195:9,14
**meetings** 13:15,17
54:10,11,12,15
55:14 60:13 68:2
78:15 112:18
115:11 116:3,13
116:18 120:15
121:4 136:14
153:21
**megan** 130:19
**member** 20:9 42:2
42:12,14,15,15
43:8,14 56:15,19
58:3 62:4 102:12
115:3 118:18
129:4,7,14 130:9
130:10 131:13
136:2,15,17
137:11 143:6
146:18,20 150:5
157:7 174:18,19
179:11,15,20

186:21 187:2,4,10
187:12 192:9
198:6,8,14
**members** 16:19,21
17:5 27:12 34:1
41:13 43:20 44:7
54:7,21 55:10
56:6 57:13 58:8
58:18 61:11,21
63:1 65:17 68:16
68:19 69:8 71:5,6
76:4 77:11 84:18
112:11,12 116:8
121:10 122:5,8,15
123:1 126:16
128:1 133:6 134:2
135:5 137:7 143:9
145:21 146:6,16
148:5 149:9 155:1
155:17 156:21
157:13,20 158:2,3
158:9,21 159:17
159:18,19 160:1
160:10 161:3
162:13,15,17,18
163:5,10,15
164:11 167:16
173:21 184:5
186:6 190:13,17
190:18 192:19
193:7 195:5,15
197:11,13 199:11
204:1,16 215:5,16
216:1,12
**membership** 24:7
40:12 62:18 186:4
**memory** 13:20
29:4 76:6 147:20
181:13
**mention** 19:21
85:16 208:5

**mentioned** 14:16
33:18 40:20 45:10
67:13 85:4 87:7
89:9 92:5 115:8
119:4 132:14
136:20 218:18
**mess** 114:10 115:1
**messages** 54:5
56:1 218:10,17
**met** 34:19 69:21
88:17 132:3
145:10 192:11,14
192:15
**method** 51:1
**methods** 182:11
**michael** 4:3 8:9
**middle** 10:19
84:12 92:16
**mike** 24:1
**mind** 9:15 35:13
35:16 75:2 88:3
93:20 94:21
104:21 106:16
116:2 128:20
129:13 133:20
136:11 172:20
176:10 179:9
201:9
**minds** 136:17
**minimize** 84:19
**minor** 166:2
**minority** 32:11,14
32:18 33:4 84:13
84:17 85:4,9
170:12,14,17,21
171:8,11 172:8,16
172:19 173:5,8,9
174:3,5,10,21
176:11,13 180:12
180:21 181:15,21
214:3,6

**minus** 86:12 87:10
87:14 88:17
206:11
**minute** 63:4 74:3
165:11 193:10
209:11
**minutes** 46:7
116:1
**mishear** 174:1
**mislabelled**
100:19
**missing** 51:10
**mistake** 203:4
**mistaken** 148:1
**mix** 17:19
**mixture** 62:9
**molded** 157:2
**moment** 12:2
24:17 39:12 45:18
47:7 59:16 72:3
72:17 81:11,18
82:15 84:7 86:2
98:18 110:12
113:16 124:18
125:12,21 153:14
166:14,21 167:2
167:21 191:16
193:9,15 194:13
195:19 200:11
205:8,9 209:1,3,18
210:9,11,21
213:11,13
**moments** 211:15
**month** 138:8
**moore** 14:7
**morning** 7:2 8:2,7
8:14 9:2 218:4
**motivated** 29:18
**motivating** 109:13
**mount** 165:16

**mountain** 63:14
96:17
**move** 93:18 155:7
**moving** 15:20
66:12 115:16,19
122:7 143:14,16
**multiple** 54:11
190:19
**multitude** 116:3
**municipality**
105:9,17
**murphy** 45:20
46:19 48:3 59:20
61:19 62:12 141:1
144:5,8 193:5
**mute** 171:21

## n

**n** 3:1 4:1 5:1,1 7:1
**naacp** 1:6 3:5 7:7
8:3 16:16 41:6
73:12 126:8
180:13 210:3
222:3 223:3
**naacpldf.org** 3:9
**name** 8:2 9:3 11:7
21:5 22:6 69:21
70:1 115:1 128:6
**name's** 7:12
**names** 20:20 68:17
69:20 129:19
**natural** 95:10
96:13,15 110:13
**naturally** 106:17
**nature** 15:1 67:12
77:16 180:11
218:7
**navigating** 71:6
**near** 118:3
**necessarily** 100:10
144:12 172:11

**necessary** 16:9
74:7 179:1 200:1
203:2
**necessitate** 209:6
**necessity** 172:12
**need** 9:18 27:18
44:4 48:12 55:3
74:8 84:9,9 86:2
94:3 107:18,20
113:7 123:12
145:13 162:16
175:19,20 188:19
192:5 193:6
207:13 219:5
**needed** 41:8,9 67:5
173:13 193:1
**needs** 25:4 162:16
**negative** 89:18
**neighbor** 145:8,15
160:8
**neighbored**
137:17
**neighborhood**
105:2,5
**neighborhoods**
104:18
**neighboring** 137:9
137:10 160:10
215:17 217:7,17
**neighbors** 142:11
200:19
**neither** 224:8
**nephew** 59:11
**never** 34:19,20
69:21 168:17
199:7,7
**new** 3:7,7 63:5
162:16,16
**newspapers** 37:13
112:8

**newton** 63:3,16
64:11 158:11
**nexsen** 3:14 11:4,8
11:11 12:13,14,16
13:3 75:16 76:2
144:16 150:15
169:6,10,12
182:16 183:2
185:3 204:1 213:9
215:6
**nexsenpruet.com**
3:18
**night** 114:15
**nine** 63:12
**nodding** 9:17
**non** 14:10 51:15
69:8
**noon** 154:17
**normal** 54:13
**normally** 191:20
**notarial** 224:13
**notary** 2:14 224:1
224:17
**notebook** 212:2
**noted** 10:9
**notes** 136:3
**notice** 2:13
**noticing** 8:1
**notified** 145:2
**november** 141:13
148:13 151:18
153:19 154:14
155:3,16 156:12
163:18 179:8
185:5 186:15
187:18 192:13,15
194:2 197:20,21
199:17 216:8
**nuanced** 202:20
**number** 7:4,10
46:15 63:20 79:19

84:6 93:18 111:6
150:3,5 156:7,8
157:20 163:12
165:15,18,19
166:1,3 172:7
176:6 180:20
193:19 209:7,8
**numbering** 138:12
**numbers** 17:7
84:20 89:12
166:12
**numeral** 84:5
85:21 93:18 98:16
100:16 108:16
**numerals** 100:19
**nuts** 14:15

## o

**o** 5:1 7:1
**oath** 7:15 9:9
**object** 10:8 25:12
31:13 85:5 90:21
98:1 109:21
119:16 148:17
149:8 169:19
176:1,20 182:5
189:15 215:20
217:8
**objected** 53:6
**objection** 10:9
85:10 109:1 172:9
181:11
**objections** 7:20
**obligation** 172:7
172:11
**obligations** 169:3
169:18
**observing** 62:15
**obtained** 169:21
**obviously** 32:14
62:9 83:8 89:15
96:11 97:5 123:13

129:4 130:5,8
180:11 184:7
185:6 197:1,13
**occasion** 116:10
**occasionally** 51:9
60:19
**occasions** 91:17
137:9 143:8
208:10
**occupation** 104:3
104:8,15
**occur** 33:17 58:5
**occurred** 17:12
153:20 154:1,7
203:5
**occurs** 149:1,2
199:3
**october** 66:8 78:4
99:7 111:12 114:2
120:11 125:21
**offer** 129:8 133:17
146:19,21 147:2
186:5,7,9
**offered** 17:11
116:16 117:17
189:6 200:4,8
201:10 216:17
**offering** 92:1
**office** 14:14 59:10
59:11 131:4
**officer** 224:4
**offices** 23:4,7
**official** 20:5 25:5
26:20 27:11,15
37:20 43:2,13
45:5 49:17 52:14
107:6
**officials** 52:16
65:2
**offline** 172:1

[offset - paragraph]                                                           Page 26

**offset** 201:5
**oh** 70:13 113:5
**okay** 47:16 84:11
  94:12 98:20 111:2
  137:15 139:5
  141:10 152:7,14
  153:6 158:19
  159:12 161:12
  164:1 166:17,20
  185:12 188:5,13
  190:8 191:18
  194:15 195:21
  200:12 205:16,19
  206:18 208:4
  209:4 210:17
  211:4,14 213:17
  214:9 219:19
**old** 158:12
**older** 45:15
**once** 70:19 90:17
  120:21 141:18
  146:14 147:13,14
  147:16 148:12
  184:6 198:20
  212:20
**one's** 123:18
**ones** 58:13 137:1
  145:3 160:4 195:3
  209:21
**online** 120:7
**open** 67:7 68:5
  78:1 127:12
  133:15 156:5
  188:18 189:18
  191:9 192:7
**opened** 154:18
  186:1
**operate** 80:2 91:3
  128:16 130:11
**operates** 192:2

**operational** 71:2
**opinion** 64:12,16
  78:7 89:1 90:5,10
  91:14 92:1 93:4
  101:13 206:12
**opinions** 89:11
  90:18 155:21
  217:17
**opponent** 23:21
**opportunities**
  136:2 147:21
  186:7 188:3
  199:19
**opportunity** 32:9
  67:9 73:5 76:7
  78:6 112:3 114:12
  114:14,17 122:6
  135:2 146:19
  147:2 148:1 156:5
  156:7,8 172:16,21
  173:3,8,10 174:3,5
  174:6,6,11 175:1
  176:2,13 180:14
  181:9,16 182:1,3
  184:12 186:4
  187:13 191:2,8
  192:8 199:2
  205:14 214:1,3,6
  217:15
**oppose** 201:9
**opposed** 195:11
**opposition** 20:16
  21:20 22:1
**option** 112:18
  114:7 116:13
**options** 114:4,19
  115:5,10 118:6
**oral** 117:3 121:21
  185:6
**orally** 189:4

**orangeburg** 162:3
  166:4
**order** 75:7 79:16
  85:13 102:19
  126:21 127:2,7
  173:14 192:6
  218:21 219:5
**organization**
  17:10 43:11,15
**organizations**
  42:17 58:19,21
**organizing** 143:2
**original** 156:16
  180:14
**originally** 62:4
  188:13
**outcome** 7:17
  224:11
**outlined** 167:14
**outside** 15:8 17:3
  23:4 29:3 40:20
  42:1 43:2 45:4
  50:9 54:13,20
  58:17 77:7 83:9
  123:1 127:19
  133:1 143:19
  144:2,2 165:3
  178:15 200:4
**overall** 65:17
  86:10 101:6
  140:18 181:10
**overarching** 41:8
**overestimate**
  177:2
**overlaps** 49:16
**overly** 155:9
**oversaw** 69:15
  127:3 143:1
  156:14
**overseeing** 127:4

**overview** 71:10
  78:21

**p**

**p** 3:1,1 4:1,1 7:1
**p.m.** 111:3,6
  113:17,19 116:18
  154:17 193:16,19
  219:21 220:2
**pace** 132:2
**page** 5:2,7 6:3,6
  9:7 26:18 43:17
  43:21 45:6 58:9
  58:10 60:21 72:15
  74:20 75:19 80:9
  80:10,17,17 81:20
  82:6,16 86:1
  147:5 152:6
  163:20,20 164:3,5
  166:15,15 167:19
  167:19 179:9
  185:10,16 188:4
  188:10 190:4,6
  191:15,17 194:11
  194:11,13 195:19
  200:9,9 205:7,13
  205:18 206:16
  208:2,3 210:8,13
  210:19,20 211:1
  211:11,16 213:11
  213:15 222:5
  223:5
**pages** 139:2 194:5
**paired** 211:18
**pairing** 160:13
**pairings** 211:6,17
**pairs** 159:7
**panel's** 219:4
**paragraph** 75:2
  84:7 94:12,20
  96:21 109:14
  139:2 140:20

paragraphs 93:20
paralegal 51:8
parameters 145:13
part 9:19 38:21 40:19 55:13 63:19 66:19 75:20 78:2 78:19 95:20,21 97:1 99:5 103:16 106:8 133:21 136:13 142:7,8,16 144:9,12 150:4 152:18 160:19,21 161:2,10 162:2 163:9,10 164:19 164:20 165:1 181:19 183:20 187:6 201:2
partially 39:6
participants 113:15
participate 17:21 32:9 40:16 64:12 65:14 90:10 102:5 114:18 142:15 188:15
participated 66:9 67:11 133:9 157:1 163:8
participating 101:12
participation 40:21 101:21 116:13 167:13 177:10 178:8
particular 25:16 29:7,8 33:21 39:2 41:6 56:15 64:20 85:11 91:2 97:17 103:11 114:15 170:7,8,9 177:5

208:19
particularly 122:14
parties 37:18 224:9
parts 40:1 64:19 64:20 98:14,15 133:8 142:18 143:4,15,16 159:8 162:4,7
party 7:16 8:16 18:21 20:9,10 37:9,15,17,21 38:14 40:6,18 58:19 59:3 62:8
pass 66:4
passed 18:4 22:13 26:1
passing 66:3
path 197:1
patterns 102:8,14 164:12,15,21 165:4,7
pdf 152:16
pdfs 74:15 94:3,6
pee 96:18 161:20
people 10:5 26:15 26:16 31:8,8 32:13,14 40:16 44:13 65:14 78:16 105:1,4 112:2,2 117:1,4 118:3 120:18 126:17 129:15 133:3 145:1 163:13 165:1 166:13 187:5 189:2 203:12
percent 86:11,12 86:21 87:1,2,3,7 87:11,14,14 88:12

88:12,16,19,21 92:2,3,8,10,10,11 92:12,18 93:1 148:9 170:10 173:1 174:4,9,12 175:4,11 183:6 206:6,11,14
percentage 37:17 37:18 85:14 91:18 167:7 170:17 172:20 174:8
percentile 22:14
perfect 27:3 46:7 159:12
perform 56:4 173:15 175:3,20 182:12
performed 181:10 183:6
period 30:5 62:20 63:13 79:7 81:2 81:10 112:5 156:4 165:13 176:12 188:17 189:18
periods 29:19
permissible 92:17 92:20 93:7 109:19 110:10
person 28:3 34:6 56:10,10 60:2 71:3 86:17 106:3 114:12,14 116:4 116:12 117:5 118:15,20 128:15 128:15,20 130:6 198:11 206:1,12
personal 17:17 26:19 43:1,5,17,21 44:2,6,8 50:2,5 51:3 52:17 53:12 56:2 79:8

personally 49:15
perspective 35:18 40:17 120:20 129:3
pertaining 58:16 59:5 119:18
phase 141:17 143:17
phases 65:12 142:13,17
philip 138:1
phone 34:6 52:13 52:17,17,17 53:2,3 53:12,14 54:4 55:2 56:2 60:4 160:15,21
phrase 9:20
physical 115:11 116:14 118:17 120:11
physically 117:14
picture 32:13
piece 28:19 31:6,7 31:19 32:19 33:7 148:8 158:18,20 191:21 192:3 209:12
pieced 147:17
pieces 17:8 28:10 29:6 183:21 202:19
piecing 142:8 157:21 187:7
place 28:3 44:5 62:16 64:6 93:11 121:1 127:13 135:16 137:3 138:7 147:16
places 63:12 66:18 118:2,3

[plaintiff - preferred]                                                        Page 28

plaintiff   46:20
  48:16 71:17 82:14
  138:13
plaintiffs   1:7 3:2
  5:9,11 7:6 8:4,6
  8:21 9:4 15:18
  45:21,21 46:19
  47:16 48:3,5,17
  72:9 80:18 124:2
  124:17 125:6,17
  163:19 179:7
  194:1 197:19
  205:3,6
plan   47:19 49:3
  95:7 97:4,6,12,20
  98:2 109:8 141:19
  141:20 143:20
  144:6 145:2
  147:11 156:8,11
  156:17 157:12
  159:13,15 164:8,9
  167:10,14,21
  168:5 172:8 177:8
  180:12,15,21
  181:1,4,6,7,9,21
  182:2,2,17 183:17
  184:13 186:2,3,5,7
  186:9,13,18 187:9
  187:21 189:14
  196:2,8,15 197:4,8
  198:13,13 202:10
  204:12 211:8,21
  211:21 212:18
  213:2 214:5 215:7
  216:5,7,14
planned   191:7
plans   96:2 97:1
  108:18 109:12
  121:18 167:18
  168:4,10,11,11
  179:12 180:4,9,10

180:15 181:3,15
  182:15 183:1,15
  184:16 189:14
  199:15 212:3,21
  213:1
play   182:8
played   115:19
playing   67:13
pleadings   13:20
  14:18,20 15:9
pleasant   165:16
please   7:20 8:18
  9:16 21:3 124:4
  129:20
plus   86:12 87:10
  87:14 88:17
  206:11
pod   159:6
point   41:3 62:21
  63:2 79:19,20
  97:4,5,7,7 108:5
  115:15 124:6,20
  125:13 126:6
  131:21 133:21
  134:18 141:17
  144:21 146:14
  147:1 148:20
  149:17 150:4
  159:5 160:20
  184:11 194:16,21
  196:1,6,14 197:3,5
  202:18 204:19
  207:5,5,14,16
  212:4,5
pointed   91:9
points   40:20
  142:12 143:11
  212:17 213:19
  214:20
polarized   38:16
  39:10,13,17 40:7

40:11 41:1,12
  178:6,10
policies   6:5 28:6
  138:11,19
policy   92:17,20
  105:14
political   20:9 36:7
  36:9,11 37:5,9
  40:5 58:21 102:21
  139:7,18 140:2
politics   30:19
polls   37:12 182:8
pop   48:13 56:14
  74:11 141:19
population   22:18
  33:19 86:4,10,20
  87:5,8 88:16
  89:13 91:19 92:8
  92:19,21 93:7
  95:17,18 96:11
  97:6 98:14,15
  106:1 107:17,21
  108:8 126:17,21
  129:10 132:1
  134:19,21 135:1
  135:12 140:14,15
  140:18 148:3
  158:7 161:19
  162:7,9,15,19
  163:14 164:16,18
  164:20 165:3
  166:11 171:14
  172:12 173:14
  175:15 176:9,12
  176:14 206:6,8,10
  216:3
populations   201:6
portion   15:5 16:14
  88:14 96:14
  109:17 139:21
  158:17 166:7

216:21
portions   16:13
position   24:11
  42:10,19 64:6,17
possession   122:4
possibility   61:20
possible   65:14
  86:20 89:4 112:20
  190:14 206:17
post   157:3
posted   121:8,9
  149:18 156:12,15
  156:18 159:16
  179:17
potential   32:18
  92:18 142:2
potentially   10:6
  93:12,13
practical   66:10,12
  67:12 188:16
  199:1
practically   32:7
  53:2 182:7 191:4
practice   33:20
  76:12,13 110:5
  168:19,21
practiced   42:8,8
practitioner   42:4
  42:5
pre   29:20,21 61:8
  120:3
preceding   180:3
precinct   105:10,18
  212:12
predominant
  109:13
predominate
  109:18,20 110:9
prefer   82:2
preferred   173:4

**preparation** 14:17
**prepare** 15:10
  120:18 187:1,3
**prepared** 13:13
  75:9 76:16 77:17
  80:4
**present** 4:20 7:17
  65:14 69:1 98:13
  161:8 208:13
**presently** 171:14
  171:15
**preserve** 136:9
  174:21
**pretty** 48:9 54:11
  61:12 80:10 95:9
  98:10 99:1 107:14
  115:18 132:3
  136:13 158:6
**preview** 15:12
**previous** 97:12,15
  97:16 98:6 172:8
  175:11
**previously** 24:12
  97:8 98:12 117:21
**primaries** 20:17
**primarily** 51:14
  55:4 67:12 77:16
  127:10 129:8
  163:9 169:10,11
  169:12 170:10
**primary** 10:5
  20:18 21:17 23:21
  50:20 51:1 54:18
  57:11 59:16 60:2
  65:10 67:4 69:4
  88:3 118:15,19
  135:11 144:1
  211:6
**principle** 86:17
  208:6,8

**principles** 80:12
  81:17
**print** 57:15 58:13
  140:9,11 153:4
**printed** 58:3,8
  140:1,6,10 141:8
**prior** 28:1 76:13
  77:2 87:15,17
  95:7 97:1,4,6
  115:15 117:15,20
  119:19 131:21
  150:4 190:21
  191:1,9 192:11
**priorities** 24:19
  25:3 106:9
**prioritize** 87:13
**prioritized** 87:7
**probably** 18:13
  36:4,16 50:21
  55:13 58:11 59:21
  60:4 63:8 77:10
  90:15 116:20
  117:2,6,7 123:6
  133:15 139:13
  145:8 167:4 183:2
  195:2 199:20
  201:5
**probe** 100:1
**problem** 73:18
  89:16
**procedures** 6:5
  127:7,9 130:3
  138:11,19
**proceeding** 7:20
**proceedings** 5:12
  71:18 224:4,6
**process** 5:15,17,19
  13:1 16:3,7,8 32:9
  35:20 36:5,10,11
  39:15 40:17 41:17
  44:11 51:5 54:9

55:11 57:20 58:12
  59:5 60:2,18 61:9
  61:18 64:3 65:12
  66:4,15 67:16,17
  68:9,10,20 69:3,12
  69:18 70:17,19
  71:8 77:3,8 78:1
  79:10 81:12,13
  83:10 87:19 88:1
  89:2 90:9 97:16
  105:7 106:21
  119:20 124:1,15
  125:9 126:19
  127:8 132:6,11
  133:5,13 134:6,12
  135:2 136:21
  138:5,7 141:11,12
  142:5,16,18 143:1
  144:14,18,21
  146:7,14,17,21
  147:3 148:20,21
  149:2 150:2
  155:13 156:20
  158:2,10 159:12
  161:19 164:9
  167:14 171:10,16
  181:19 184:12
  187:6 190:2
  192:17 195:18
  196:13,14 199:1
  202:14 209:15
  213:1 214:18
  217:12
**processes** 127:4
  130:3
**produce** 49:10,12
**produced** 149:13
**product** 16:4
  137:15 167:10
  185:4

**production** 45:21
  46:20 47:16
**productions** 219:4
**products** 184:17
**professional** 17:17
**progress** 185:18
  185:20 186:10
**promise** 43:15
  169:15
**promotion** 92:17
**pronounce** 129:20
**properly** 168:8
**proportion** 107:17
**proposal** 26:7
  146:15 147:8
  183:16 197:4
  208:13
**proposals** 212:6
**propose** 76:21
  127:2 187:13,15
  192:10,21
**proposed** 5:20
  66:21 67:2 75:5,9
  77:14 83:3,5,7,11
  83:15 125:18
  126:7 127:1
  129:11 131:19
  132:16 133:18
  135:13 140:8,13
  141:13 145:3,4,18
  149:6 151:21
  157:6 160:14
  168:9 169:2
  179:12 183:5,14
  184:6 185:2 187:8
  199:11,14 200:16
  203:9 204:6 210:2
  210:6 217:3
**proposing** 133:1
  187:11 203:12

**pros** 180:16,17
**protected** 33:4
**provable** 91:5
**prove** 89:17,18,19
**proven** 97:8
**provide** 10:10
13:21 27:18 32:19
44:12 47:10 48:20
68:12 70:7 87:3
114:13,17 116:4
122:9 131:18
155:6 172:21
182:3
**provided** 57:1
67:21 76:6 77:6
83:9 181:9 183:10
**providing** 32:4
129:1
**proximate** 86:20
**pruet** 11:4,8,11
12:13,14,16 13:3
75:16 76:2 144:16
150:15 169:6,10
169:12 182:16
183:2 185:3 204:1
213:9 215:6
**pruett** 3:14
**public** 2:14 27:12
35:20 36:18 41:3
41:13 45:10 58:19
65:15 66:8 67:9
67:20 69:2 77:11
77:14,18 78:2,3,5
78:7,12,16,20 79:3
83:9 88:6 90:5
99:6,13 111:10,19
112:3 114:1
117:16 118:6,12
119:5,9 121:13
123:21 124:14
125:8 145:18,21

146:1 147:21
151:11 155:1,18
156:4 164:10
167:17 168:10
179:15 186:3,11
186:15,16 187:18
187:21 188:17
189:10,12,13,17
189:18,20 191:6
191:11 192:16
197:12 198:17
199:2,4,11,19,19
204:16 207:1
214:16 216:7,9
224:1,20
**publicize** 45:9
67:2 112:8
**publicized** 66:21
148:13
**publicizing** 159:13
**publicly** 44:13
120:7 121:7,8,9
149:18 156:15
159:16 170:5
179:17 180:4
184:4 185:2,8
210:6 216:6
**publish** 67:1
**published** 121:16
151:18 157:12
159:15
**pull** 29:7 44:20
48:7 56:17 99:3
134:16 138:9,14
152:2 154:8,11
**pulled** 56:19
**pulling** 143:20
**pure** 38:21 45:11
**purpose** 12:19,20
83:10 134:11
190:9

**purposes** 12:13
30:5 50:3,16 54:7
60:3 89:20 91:18
99:2 100:15
118:20 129:6
198:12 219:2
**pursuant** 2:13
**push** 184:1 193:6
**pushed** 24:21
**pushing** 60:18
**put** 11:15,21 35:8
57:21 64:5 103:18
108:10 112:10
116:2 129:14
151:5 162:15
184:15
**putting** 76:11
143:1 166:3 215:7
215:9
**puzzle** 148:8

**q**

**quantifiable**
157:19
**quantify** 158:8
**question** 9:18 10:1
10:2,9,19,20 13:10
19:18 21:15 36:13
39:8 40:10 43:4
44:17 53:7 56:16
80:15 83:14 98:5
112:4,20 113:4,21
123:4 139:13,15
167:1 180:19
191:19 196:3,21
201:19 217:20
218:9 219:15
**questioning** 39:6
**questions** 9:7,10
9:16 10:7,15
17:13 41:20 45:17
48:1 49:7 59:15

73:10 76:16 82:1
82:8 83:12 84:8
98:19 100:20
110:16 123:15
125:5 126:10
145:4,7 147:6
154:9 158:20
190:3 205:3
214:11 218:14
219:7,11,13
**quick** 155:9,20
185:10 193:10
**quickly** 139:4
**quite** 44:3 54:4
80:12

**r**

**r** 3:1 4:1,3 7:1
222:1,1 223:1,1
**race** 24:2 28:4
31:9 37:5,9,9,14
37:21 40:5,18
62:10 85:12 103:2
109:4,7,11,19
110:9
**racial** 22:11 32:11
32:14,18 33:4,10
84:13,16 85:3,9
140:1,5
**racially** 26:8 29:18
38:16 39:9,17
40:7,11 41:1,12
178:6,9
**racism** 25:6,11,20
**radar** 61:12
**raised** 122:9
**raising** 155:17
**ran** 21:16 22:2
23:8,16 30:21
50:14 160:19
**range** 86:10 87:3,7

**rates** 177:10
**reach** 51:2 65:2
**reached** 145:5
**reaching** 32:20
64:19
**read** 15:19 27:11
79:14 80:19 84:7
84:9 86:2,2,13
93:21 94:15
105:15 109:10
141:1 153:3,3,14
164:7 166:10,21
167:2 168:2 179:9
180:5 188:10
190:5 194:12
205:17 209:9
210:21 221:5
**reading** 75:2
195:12 208:7
**reads** 86:9 94:13
109:17
**ready** 64:18 187:3
**real** 66:16,16
139:4
**realize** 100:18
156:7
**really** 26:14 38:7
60:13 78:5,6 81:2
81:9 101:17,19
102:10 134:18
137:6 144:8,17
145:11,13 201:8
218:9
**reapportionment**
52:2,9
**reason** 10:14 39:9
102:4 108:12
110:8 191:10
200:21 201:9
210:18 222:5
223:5

**reasonable** 46:4
87:3 88:2
**reasons** 26:12
85:18 97:20 156:2
165:21
**rebut** 213:20
**recall** 14:17 20:20
22:2 25:16 33:17
41:11,14,15 45:10
49:18 51:15,18,19
52:10 55:1 59:7,9
62:21 64:11 69:10
69:13 70:15 72:12
72:14 76:9,17
79:2 83:20 84:3
88:5 90:2 91:8,10
91:10 92:7,9 93:6
93:8 97:13 110:7
110:11 111:13,21
112:19 114:2
117:3 123:3
125:12 126:6
133:10 134:5,8
136:14 138:5
139:15 151:18
155:16,19 175:9
177:8,12,14
187:16 192:15
200:3,13 201:10
201:13 208:16
209:18 218:17
**receive** 184:6
189:9 204:4
**received** 12:10
34:8 57:21 73:15
75:6 79:15 112:14
117:4 121:17,20
161:4 168:9 175:7
185:6 190:12
192:17,17 212:20

**receiving** 60:17
76:9 91:8 124:20
125:13 126:2
159:4
**recess** 46:13 111:4
193:17
**recipe** 114:10
**recognize** 47:8
48:18,19 55:3
**recognizing** 60:15
163:11 210:15
**recollect** 195:12
**recollection** 22:8
33:2 54:20 78:2
92:14 112:17
124:5 179:20
188:11 210:2
211:1,19
**recommendations**
5:16,18 123:20
124:13 125:7
**record** 7:3,19
46:10,12,15 65:17
72:19 84:10 86:3
94:1 111:1,2,6
113:16,17,18,19
116:10 119:9
191:9 192:7
193:14,16,19
218:15 219:2,21
**recorded** 7:5
219:20 220:1
**rector** 3:6
**redistrict** 81:9
**redistricting** 5:15
5:17,19 6:4 12:20
13:1,5 15:16 17:3
35:18 36:6,8,10,15
36:16 39:15,16
40:8,13 41:2
44:11 45:9 49:17

49:19 50:10 51:17
51:21 52:2,8
53:13,16 55:2,17
56:3,21 57:7,13,20
58:16,17 60:6,8,12
61:1,5,6 63:9
67:14 68:19,20
69:9,11,12,18 70:7
71:14,20 72:13
73:9,13 77:3,4,8
80:12 81:20 82:11
82:13 83:14,15,18
84:1 87:17,19
88:7 92:6 94:18
96:2 99:10 100:1
101:17 102:13
106:21 108:18
109:8,12 111:10
111:19,20 112:7
117:16 119:6,14
119:14 121:17
122:1 123:2,16
124:1,15,16 125:9
125:10,20 127:20
133:18 138:11,19
139:11 148:4,5,14
149:6,15 150:10
151:9 152:5
154:16 157:6,17
158:21 159:2,16
163:4 167:11
168:10 169:3
170:5,19 171:16
173:12 174:15
175:2,12 176:17
177:9 178:9
179:12,14,17
180:7 183:4 184:4
187:17 189:12
191:5 192:14
202:10 206:7

**[redistricting - representative]**                                    Page 32

207:18 208:15
**reduced** 224:7
**reelection** 23:2
**refer** 47:15 48:17
  49:7 94:20 128:14
  140:5 156:11
  167:2
**reference** 101:21
**referenced** 38:5
  43:11,12 69:19
  78:20 80:16 81:9
  96:20 99:12 103:4
  139:18 141:11
  165:10 180:4
  185:6 188:7
**references** 211:12
**referencing** 39:12
  92:9 200:19
**referred** 116:6
  138:18
**referring** 29:19
  49:14 53:17 70:20
  75:13 166:8 170:6
  197:15 206:2
**reflecting** 140:1
**reforming** 28:13
**refrain** 9:17
**refresh** 13:19
  48:13 72:2 82:16
  124:5 211:1
**refreshes** 76:5
  188:11
**regard** 29:1
**regarding** 12:10
  19:4 206:8 218:6
**regardless** 28:4
  31:9
**regards** 18:6
**region** 103:11
  158:4 162:14
  163:15 166:1

**registered** 38:9,11
**regular** 59:12
**regularly** 60:7,8
**reichenbach** 24:1
**reichenbach's**
  24:2
**relate** 95:3 119:15
**related** 7:15 13:20
  26:18 45:17 49:10
  49:12 51:16,21
  55:16 56:2,21
  57:20 73:10 78:10
  91:9 92:6 97:16
  119:13 131:5
  138:3 169:5 186:3
  190:2 211:2 224:8
**relating** 53:15
**relative** 86:11
**released** 89:11
  90:20
**relevant** 55:16
  58:15 106:19
  164:13 165:18
  166:8 219:6
**relied** 148:5 149:9
  176:21
**religious** 102:5
**rely** 83:21 150:13
  170:8 178:21
  182:14
**relying** 150:3
**remake** 80:13
**remarks** 72:15
  73:10 163:18
  164:4 205:8
  212:17
**remember** 12:12
  12:15 13:17 19:3
  22:6,7 26:3 28:13
  28:21 29:1,2 45:6
  52:12 54:8,12

56:5,13 57:16,18
59:2 62:19 69:20
70:1 76:18 77:19
78:12 79:12 97:17
100:8 107:3,4
112:12 124:6,7,20
124:21 126:1
130:4 135:15
137:20 141:4,20
145:6 151:7,11,13
151:14,20 153:19
153:20 156:1
157:3 158:1,16
160:17 161:1,17
165:13 169:4
179:5,18 181:13
181:14 183:11
186:19 188:1,13
189:16 192:19
195:1 200:6,6,17
201:17,19 209:9
211:8 212:11
214:5
**remembered** 57:3
**remembering**
  200:7 214:4
**remote** 112:19
  114:3,7,19 115:5
  115:10 116:5,15
  118:5
**remotely** 7:18
**removal** 26:6
**remove** 134:18
**removing** 26:10
**reopen** 219:6
**repeat** 9:18 13:2
  21:3 40:10 113:21
**repeatedly** 122:12
**repetitive** 23:20
**rephrase** 97:19
  99:20 137:3 138:6

**replaced** 63:21
**report** 149:13
  179:3 191:20
  192:6 196:4
**reported** 1:21
  89:12
**reporter** 2:14 7:13
  8:18 9:14 10:6,10
  11:5,9,20 12:6
  35:1 53:4,8 113:7
  113:10 135:18
  161:6,12 169:11
  169:13 177:20
  178:3 202:3,6
  224:1,3
**reporting** 205:6
**reports** 33:13
  34:10 70:10,14
**represent** 20:7,12
  33:19 63:16
  136:19 200:20
**representation**
  124:1,14 125:8
**representative**
  8:14 9:2 10:3 11:3
  13:9 15:2,13
  17:15 19:7 20:11
  22:11 24:4,18
  26:20 29:9 34:9
  37:4 42:19 43:6,8
  46:17 53:11 59:19
  62:12 63:16 72:12
  73:11,15,21 74:20
  82:4,15 101:2
  106:20 110:17
  111:8 113:21
  124:3,18 125:11
  126:1,14 127:15
  138:14 144:5
  152:9 153:11
  154:18 158:11

160:18,19 161:1
161:15 162:2
163:21 172:6
185:14 188:7
193:21 194:5
198:1 200:10,16
201:11,13,20,21
209:18 210:15
211:2,10 213:12
213:20 218:18
219:8
**representatives**
6:12 11:16 17:9
20:6 23:9 39:21
42:2 43:18 44:13
56:7 82:11 112:1
127:20 129:3
136:12 137:18
146:20 152:5
160:17 174:11
186:8 205:5
**represented**  11:2
64:19 105:10
126:20 134:3
158:13
**representing**  8:13
**republican**  20:10
20:17 59:3 62:8,9
**republicans**  38:10
**request**  5:9 45:21
46:20 47:16 48:4
58:2,14
**requested**  120:14
127:17
**requests**  41:12
**required**  151:9
**requirement**
149:11 170:21
171:4
**requires**  66:4

**research**  76:20
77:6 80:16 81:1
**researched**  107:5
**reserve**  74:3
**resolve**  107:10
108:1 146:6,7
157:18 215:18
217:16
**resolved**  151:8
154:3,6
**respect**  31:17 32:6
129:17 131:15
149:10 170:11
180:18 193:8
196:5
**respond**  112:15
**response**  45:20
46:19 48:3 210:15
**responses**  5:8,10
49:4
**responsibilities**
65:10
**responsibility**
66:20 132:9
**responsible**  12:16
67:16 127:4 143:2
198:11
**rest**  60:5
**rested**  117:2
**result**  78:9 162:8
176:14
**resume**  82:3
**retained**  12:12,19
**retaining**  12:16
**retention**  12:21
207:8,9,18
**retired**  60:1
**retirement**  151:1
**return**  222:4
223:4

**review**  15:5 47:10
51:20 57:18 58:5
58:14 72:19,20
73:6,21 77:4 80:3
80:7 82:4 86:4
93:20 98:18 119:9
119:13 120:3,5
122:6,7,16 124:4
124:18 125:12,21
137:1 139:4
149:17 155:2,6,18
159:17 183:10
184:8 189:3
191:16 195:19
200:11,15 204:21
206:16 208:2
209:2,2 210:9
213:13
**reviewed**  14:16
15:9 34:10 70:14
75:16 122:16,19
146:2 177:7
179:13 180:6
184:16 192:18
200:12
**reviewing**  92:6,7
123:7 124:6,20
125:13 126:2,6
140:13 155:12
183:12 211:19
**reviews**  75:15
**richland**  158:13
158:17
**rid**  169:14
**right**  12:8 19:10
21:12,15 28:17
43:18 48:5 63:2
65:6 72:11 73:18
75:3 77:18 84:12
87:10 94:7 104:14
104:17 110:14

115:4 119:1,5,7
135:3 153:5,7
167:6 181:2 196:2
197:16,19 204:13
218:19 219:17
**rights**  93:8 108:19
108:21 109:9,15
110:8 123:20
150:11 165:10,20
168:13,16 169:18
170:20 176:19
178:13,19 202:17
215:12
**river**  95:3 96:16
**rmg**  1:9
**road**  54:3 114:11
120:21
**rob**  4:11 8:7
171:21
**robby**  20:21
**robinson**  4:12
**robinsongray.com**
4:16
**roger**  138:2
**roland**  69:1
**role**  20:14 67:13
67:15 128:13
130:2 131:9
132:21 144:6
198:5
**roles**  24:5,12
198:7
**rolled**  216:10
**roman**  84:5 85:21
93:18 98:16
100:16,19 108:16
**room**  6:4 7:18 9:3
14:3,8,10 56:16
66:1 67:7 68:2,4
69:3 70:19 71:1,5
71:11 123:9,10,13

126:11,14,15,19
127:4,5,7,8,12,15
127:16,21 128:13
128:15 129:1
130:3,4 131:5,7,10
131:11,16 132:7
132:15,17,19,21
133:12,14 134:6
134:13 135:9
136:15 137:17
138:5,7,11,20
139:15 141:12,18
142:2,18 147:7
151:13 155:13
157:14 159:11
160:2 186:2,19
214:14,20 215:2
218:1,3
**rotary** 42:14
**rough** 76:6
**roughly** 22:20
**routinely** 33:7
**rtyson** 4:16
**rules** 9:6 199:4
**run** 20:18 23:4
128:1
**rural** 208:6,11,17

**s**

**s** 3:1,3 4:1 5:1,5
6:1 7:1 222:1
223:1
**s.c.** 5:15,17,19
**safe** 19:13
**sarah** 129:21
**save** 135:4,5,5
140:9
**saved** 141:14
**saw** 157:13 159:15
160:11
**saying** 107:3 141:5
160:16 161:6,8

164:18,19 206:14
207:6
**says** 74:21 92:16
95:4 96:15 108:17
140:1,5 154:3
166:7,19 185:13
205:21
**sc** 45:1 138:12
**scenario** 64:5
100:11
**schedule** 60:14
66:7 118:1
**schedules** 54:16
**scheduling** 50:4
50:16 51:6,11,14
51:15 54:8,20
60:3 68:6 190:10
191:1
**school** 19:17,21
20:1,2 130:13
**schools** 26:21 27:8
27:13
**scope** 13:3 51:4
55:21 56:1 178:15
**screen** 48:13 55:5
55:5,8,8 58:6
112:21 126:16
134:16 152:15
153:7 154:8
**screenshot** 152:4
**scroll** 164:2
166:15 185:10
188:9
**se** 49:8
**seal** 224:13
**sean** 34:15
**search** 52:1,5,9
55:16,20 56:4,9,10
56:12,15
**season** 37:12

**seat** 63:21 65:7
**sebastian** 131:2
**second** 14:6 20:3
21:21 37:1 47:1
86:8 92:16 94:12
96:21 109:17
140:19 154:2
165:7 187:18
188:20 189:1
194:10 208:1
213:14
**secondly** 50:2
**section** 39:20
40:16 95:5,16,18
96:10 168:15
169:2,18 176:18
**see** 12:3 13:8 22:5
25:14 37:7,12
43:17 47:2 48:6
52:3 55:3 56:1,14
56:21 63:18 65:3
74:21 76:7 81:3
84:14 97:14
107:14 111:8
112:21 113:3,11
113:12 119:2,12
122:6 124:4,19
125:12 126:1,16
126:18,19 139:8
140:3,14 143:11
152:7,15,20 153:2
153:2 160:11
162:8 163:21
164:3 166:18
167:21 171:11,12
171:12 176:10
180:16 185:13,18
188:6,6,8 193:9
197:15 198:1
200:10 202:21
205:14 211:12

217:2
**seek** 13:5 33:21
34:4 39:16 78:3
191:6
**seen** 26:8 35:19
37:11 47:9 128:5
128:6 159:18,21
198:20 199:7
**segregate** 107:1
**segregated** 26:21
27:8,13
**segregation** 29:20
29:21
**selected** 61:11,21
62:17,18
**senate** 8:8 23:11
23:15,17 26:2
36:12 79:10
117:18,21 118:5
118:10,11 121:16
206:7 219:16
**send** 74:14 156:5
**sense** 39:5 55:6
66:12 73:20 74:1
89:14 91:2,3,5,6
91:17 99:14
100:14 101:6
104:6,11 110:19
118:4 129:13
135:7 142:2
145:14 160:2
173:2 186:10
193:10 201:8
**sent** 57:19 112:10
123:15 124:15
125:9,19 165:15
218:19,20
**sentence** 80:20
84:12 86:8 92:16
96:20 105:9
108:17 139:6,8,21

140:19 152:21
153:15 154:2
166:18 167:1,20
179:11
**sentences** 84:8
**separate** 42:19
84:18 217:20
**september** 66:8
78:4 99:7 111:11
111:18 112:6
120:11 125:11
**served** 20:14
43:13
**session** 29:6 54:13
**sessions** 116:16
**set** 48:1 49:7 59:15
66:7 81:21 110:16
115:10 128:16
147:5 163:3
188:14 214:9
216:9,11 224:12
**sets** 73:7
**setting** 200:2
**seven** 32:21 33:9
180:3,8 183:1
184:16 185:2
**sex** 28:4 40:5,19
62:10
**shaking** 9:17
**shape** 181:5
**share** 46:1 48:6
78:15 94:5 123:18
137:15 138:10
152:15 153:7
154:8 170:5
**shared** 73:12
121:7 123:1
196:15 216:6,7
**sharp** 83:13
**sharpen** 98:4
218:9

**she'll** 119:2
**sheet** 221:8
**shifted** 176:12
**shooting** 21:11
**short** 46:13 165:13
193:17
**shorthand** 2:14
47:15 48:17 61:1
61:2 156:10 224:1
**show** 50:4 51:7
99:17 102:4
113:14 134:14
180:17 205:8
**showed** 165:11
**shows** 113:14
**shrunk** 162:19
**side** 87:9 107:16
118:12,14 119:6
**sign** 134:14 189:6
**signature** 221:14
222:21 223:21
224:19
**signed** 134:12
188:15,21 189:8
221:8
**significance**
165:19,20 166:5
**signing** 132:6
**similar** 48:1 55:19
56:1,4,11 62:20
87:4 116:19 161:4
**simple** 52:1
**simply** 129:6
**simultaneously**
143:13
**single** 85:11,16
174:19
**sir** 10:4
**sit** 42:17 43:2
93:13 130:8,9
134:15 143:10

**site** 153:7 165:12
**sits** 26:2 96:12
**sitting** 136:14
**situation** 26:9
86:20 105:3
**situations** 92:13
151:12
**six** 135:6
**skill** 128:16
139:14
**slide** 165:11
**slight** 47:14
**slightly** 181:18
**small** 107:14
131:21 153:3
158:18 204:8
208:17
**smaller** 208:6,11
209:6
**smooth** 159:9
**social** 44:17,18
45:13 102:15
112:8
**software** 139:11
140:15,16
**solely** 129:2
**solo** 42:4,5
**somebody** 57:19
**somewhat** 79:7
**soon** 195:14
**sophisticated**
45:13 142:14
**sorry** 11:5 21:3,10
35:1 70:11 85:6
100:17 135:18
161:6 169:11
170:13 171:20
172:1 173:16
177:20 202:3
210:11

**sort** 17:19 22:6
24:20 43:6 61:17
66:2 68:21 71:2,9
75:15 76:6,14
78:20 83:9 85:2
89:18 101:12
106:17 107:17
108:5 112:13
114:13 128:14
129:5 130:6 133:5
134:2 141:16,17
142:12,13 143:4,7
143:10 159:9
160:6 167:14
176:7 180:15
212:4
**sorts** 34:8
**sought** 11:13
189:12
**sound** 97:9
**sounded** 161:8
**sounds** 46:10
93:10 161:7
**south** 1:2,5,14 2:4
3:16 4:6,14 7:7,9
11:16 13:6 16:15
19:8 23:11 25:6,7
25:11,21 26:12,14
27:1,2,8,17 28:2,3
28:7,9,14 29:10,12
29:13 30:1,9 31:8
32:14 35:5,21
37:6,15,21 38:10
38:12 39:10,21
41:18 43:9 45:1
64:20 71:18 73:12
82:10 86:13,19
89:12 90:19 91:13
103:11 124:1,14
125:8 126:8,17
132:2 152:5

154:14 162:3
164:12,14,20
165:6 168:6
171:15 174:11
210:2,6 222:2
223:2
**southcarolinaho...**
57:7
**southern** 169:15
**space** 68:3
**speak** 31:17 58:19
59:1 66:5 81:18
82:4 114:11
115:19 129:18
137:11 143:8
146:2 157:4 166:6
173:19 174:18,20
189:5 198:16
200:19 208:12
**speaker** 8:16
11:21 12:5 59:19
60:14 61:19 62:12
75:19,20 140:21
144:10,11 210:14
210:14
**speaking** 53:2
191:4 198:13
203:5 215:16
219:3
**special** 23:18
**specific** 17:7 31:19
32:19 99:18 104:5
104:16 124:3
145:6 146:13
**specifically** 30:13
31:18 32:7 59:13
76:17 86:21 91:11
97:17 107:4 109:3
119:20 120:6
156:4 212:6

**specifics** 27:19
29:2,8 68:12
151:14
**spectrum** 104:5,16
166:5
**speculate** 93:2
**speculating** 102:3
**speculation** 38:21
45:11 133:14
**speed** 64:18
**spells** 95:9
**spend** 54:2 132:15
**spike** 66:16
**spikes** 4:18 7:12
**splits** 209:7,8
212:10,12
**splitting** 84:21
209:10,12
**spoke** 41:6 59:21
60:4 61:18 69:21
90:9 189:8
**spoken** 68:16
215:10 217:4
**sponsor** 25:13,15
**sponsored** 25:10
25:16
**sponsorship** 25:14
**spot** 65:7
**spread** 66:18
118:2
**spring** 12:15
**squarely** 151:5
**squeamish** 79:7
**staff** 50:3 55:12
58:18 66:21 68:16
68:18,19 69:8
71:7 75:12 118:18
122:8,13 127:10
127:20 128:2
141:19,19 143:13
143:21 146:15

147:9,10 148:14
149:10 156:16
159:19 167:14
176:8 179:20
180:14 181:7
182:14 183:17
184:5,8,13 186:17
196:2 197:4 213:3
213:8 215:5
216:12
**stage** 155:11
157:21 186:11
215:15
**stamp** 73:16
138:12
**standard** 76:12,13
86:5 87:8,13,16
88:6 92:19,21
93:7 98:9 129:9
135:6,12 206:1,8
206:11,12,15
**standing** 60:7,9
**standpoint** 91:19
91:21 188:16
**star** 152:21 153:2
**start** 81:3 87:15
127:9 132:1
201:19
**started** 133:21
154:17
**starting** 97:4,5,7,7
133:21 135:15
141:17 150:4
207:5,5,14,16
**state** 1:5 2:15 7:7
7:18,21 8:10
16:16 17:5 25:8
26:6,11,16 35:21
38:14 40:2 41:4
41:18 52:20 54:10
63:13,20 66:13

79:15 81:4 92:17
92:20 95:19 98:14
98:15 99:4 103:11
105:14 114:13
116:4 117:17
122:12 126:7,8
133:8,9 143:6
144:12 145:12
158:4 159:8
160:19,21 161:2
161:11,20 162:2,5
162:21 163:10,16
168:7,10 177:10
180:3,9 181:1,6,8
182:4,17 185:16
186:1 210:3
211:13,18 212:17
213:21 216:1
222:2 223:2
224:21
**stated** 191:20
**statement** 79:14
173:6
**statements** 37:5,7
90:2,13 93:6,9
106:21 110:7
**states** 1:1 7:9 23:9
81:4 140:20 168:6
**statewide** 62:3
64:3,21 107:18
153:1
**stations** 130:5
**statistical** 38:2
94:14 95:13 96:5
**statistically** 37:16
**statistics** 39:11
**status** 145:2 157:7
**stayed** 18:8
**staying** 36:6
195:19

stenographically
  224:6
step  147:16,18,19
  196:13,19
stepp  4:12
steps  91:12 100:1
  149:20 190:3
stick  215:4
stop  203:2,4
stops  41:18
storage  122:21
stored  121:3
  184:21
straightforward
  80:10
strands  99:3
street  3:6,15 4:5
  4:13
strength  84:14,17
  85:4,9
stretch  110:4
stroke  202:20
strokes  111:11
structure  37:17
  39:19 71:3
struggle  162:14
studied  32:17
studies  91:9
study  33:3,6
  183:13
stuff  74:5 143:18
sub  142:17
subcommittee
  17:1 24:9,10
  28:11 61:15,17
  115:2 192:2 198:9
  198:21 199:2
  203:16,19
submission  99:15
  120:4 192:8

submissions
  122:19 189:20
  192:18
submit  120:16
  188:18 191:11
submitted  121:4,5
  122:17 145:21
  179:13,16 180:5
  181:4 184:4,6
  212:21
submitting  5:20
  125:18
subsection  86:1
  88:15 96:14
subsequent  189:14
substance  14:2
  48:21 200:6
subways  21:13
sufficient  80:7
  105:1 155:6
suggestions  80:4
suite  3:15 4:5
summarize  213:5
summarizing
  198:12
summary  122:10
  183:3
summer  12:15
sumter  158:16
supervision  224:8
supplemented
  83:18
supplementing
  47:19 49:3
supported  200:13
  201:13
suppose  11:15
  17:2 32:5 36:9
  67:3 198:19
supposed  50:5
  51:7,8

sure  21:10 27:6
  32:8 33:8 47:18
  50:4 51:7,13
  53:14 59:12 60:15
  65:13 66:1,11
  67:3,18,20 68:1,5
  68:7,9,14 71:9,15
  75:18 76:15 77:8
  100:18 101:1
  106:4 107:12,12
  108:5,7 111:1
  118:1 127:12
  133:2,4 135:8
  146:4 147:4
  148:10 151:4
  153:9 154:10
  158:3 164:2
  169:20 178:8
  179:1 182:19
  192:20 193:3
  199:8 209:4
  210:19 211:9
  214:9,12,19
  215:12
surgeons  168:20
surprise  96:3
surrounding
  175:16
swear  8:18
swiftly  155:8
switch  201:5
sworn  8:19
synthesis  99:16
synthesize  122:8
  122:13
system  159:6
  162:12

**t**

t  5:1,1,5 6:1 222:1
  222:1 223:1,1

table  146:4 156:8
  182:15
tabulation  105:11
take  10:17 41:9
  42:10 46:4 72:20
  74:5,11 82:15
  84:6,9 86:2 91:12
  98:18 100:1 104:7
  105:1 110:12,21
  120:17 121:1
  124:18 125:11,21
  127:13 138:7
  142:9 147:19
  153:14 156:2
  165:9 176:17
  190:11 191:16
  193:4,9,10 196:18
  200:11 213:13
taken  7:6 14:15
  29:12 46:13 111:4
  152:4 180:15
  193:17 224:6
takes  95:18
talk  9:7 13:12 19:5
  20:3,4 24:17
  59:12 60:20 61:9
  71:11,13 75:4
  84:4 111:9 118:8
  136:20 137:18
  166:12 180:2
  192:15 200:17
  208:17
talked  31:4 34:20
  62:2 87:21 95:1
  103:15 106:7
  111:11,17 116:20
  117:10 129:9
  147:6 148:3
  156:21 157:17
  158:11 163:4
  177:7 178:5,6

196:10 204:15
206:3 207:4
208:15 209:1
212:20 213:8
214:10,13 217:21
**talking** 10:5 31:18
55:4,18 61:3
101:10 111:21
114:1 146:9
156:16 159:1,2
173:9 199:13,14
200:10 207:3,9
209:10 212:17
213:18
**talks** 45:14
**target** 15:20
115:16,19
**task** 189:9
**tasks** 50:17
**technical** 24:10
50:14 67:21 114:9
128:15,20 129:2
130:6 136:6
139:14 153:17
**technically** 11:17
45:12 79:21 102:7
142:14 198:8
**technician** 134:15
**technicians** 71:5
**technological**
115:9
**technology** 116:1
116:19
**telephone** 3:8,17
4:7,15
**telephonically**
2:13
**tell** 17:7 31:19
32:20 72:6 78:7
93:3,4,10 110:3
123:6 126:13

129:4 139:12
185:17 201:7
202:19 203:16,19
**telling** 129:17
**temple** 42:15
**ten** 38:6 41:17
81:2,10,12 88:12
88:16,19 92:3,8,10
92:12,18 134:1
**tend** 25:14 34:5
38:14 39:1,3
**tends** 51:8 78:12
**tension** 108:3
**term** 16:2 20:15
22:1 26:5 33:10
33:12 35:6 36:7
36:14 38:17 39:4
61:14 170:12
172:15 177:17
**terms** 20:14 21:20
32:21 33:9 36:17
40:12 52:1,8,9
55:20 56:9,10,12
104:1,11 181:9
199:1 214:18
**terry** 138:2
**test** 108:6
**testified** 17:10
18:3,3,5 19:2,3
36:1 62:11 90:4
103:12 155:10
187:16 206:4
209:5
**testifies** 8:20
**testify** 36:1 114:4
174:2 191:8
**testifying** 9:9,9
36:19 209:11
**testimonies** 214:16
**testimony** 17:11
28:8 29:1 41:4,11

57:19 63:1 78:10
79:15 90:2 91:4,8
91:10 99:6,20
112:19 114:3,7,19
115:5,15 119:9
120:13,16 121:2
121:13,21 131:21
132:18 151:12
155:16 182:16
185:7,7 186:15
189:17,20 221:5,7
**testing** 182:11
**text** 54:5,6 56:1,6
56:13,20 218:10
218:17
**textbook** 38:18
**texting** 56:21
**texts** 56:5 57:1
**thank** 8:17 46:11
53:8 74:17 94:9
94:10 161:12
169:13 172:2
178:3 185:17
202:6 219:8
**thanks** 11:9
**that'd** 66:5 139:12
193:12
**themes** 122:9
**theory** 150:7
187:6 192:10
**thing** 10:18 55:6
61:3 88:10 91:11
93:11 95:6 101:12
110:11 117:8
122:12 129:5
134:18 141:6,19
141:20 143:16
208:14 209:10
**things** 12:3 14:21
24:21 25:1 29:17
37:13 40:19 50:4

51:2,6,13 52:2
54:17 56:14 60:3
60:19 62:15 65:20
67:15 75:14 77:5
78:14 81:14 88:9
91:1 97:16 99:2
105:21 112:15
116:2 137:12
163:1 164:17
165:17 169:21
181:16 182:7,14
183:9 203:3
204:17 218:7
219:16
**think** 12:8 14:20
16:2 21:14 27:2,4
27:4 28:16 32:3
33:5 35:11 38:1,6
39:13 42:9 44:18
45:6,16 46:1 48:9
48:12 50:14 53:1
54:1 56:18,18
57:3 59:1,12,14
60:21 62:21 63:5
63:11 64:12 65:17
69:4 70:3 74:1
75:3 76:16,18
77:13,16 78:21
80:6,6,9,14,19
82:7 83:11 85:21
90:15 91:19 94:3
95:4,9,15 97:3
99:1 102:10
103:10,21 104:4
104:14,15,17,20
106:2,10 109:10
109:14 110:12,18
110:20 112:10,13
114:19 115:16,19
116:9,21 117:1,6
118:14 120:15

[think - transitioned]

121:9,11 122:10
123:11 128:4
131:12 132:3
136:5 137:20
139:6 141:12,18
143:4 144:7,11
145:7,11 147:21
149:1 150:1,2,3
155:9,21 156:3
157:3 159:12
160:21 163:9
164:16 167:5,12
169:10 171:20
172:10 173:20
175:15 177:3
179:6,21 180:12
184:12 185:4
187:16,20 189:8
191:7 192:18
193:2 198:20
199:6,6,10,13,18
201:18 202:1
203:10,11 204:19
206:15 207:3,3,13
208:9,21 212:19
218:13,14
**thinking** 42:21
43:1 160:18
207:20
**third** 21:21 48:5
58:19 84:12 86:7
125:4
**thomas** 1:9 7:8
34:18 70:2 128:6
130:5 134:16
142:13 222:3
223:3
**thoroughly** 101:19
**thought** 78:8 79:6
93:4 114:8 192:10

**thread** 217:21
**three** 14:9 21:9,15
42:9 63:13 69:4
81:8,20 82:6 84:8
124:11 130:5
132:5 214:11
**threshold** 174:16
**tier** 141:11 142:1,5
143:17 147:7,7,11
148:12 151:16
155:10 186:13
196:11,11 202:13
214:14,18,20
215:2 216:6,16,20
**tiered** 133:5
136:21 158:1
162:12
**tiers** 196:10
214:10,13
**time** 7:21 10:17
12:1 14:5,6 17:9
17:16,20 19:3
23:13 24:13 25:13
26:14 29:19 30:5
33:5 34:3,9 41:17
42:11 44:3 46:4
54:2 60:17,19
61:14 62:20 64:6
64:14 65:21 67:5
67:6,8,12 68:4
72:20 73:2,19
74:12 79:19,20
80:7,13 81:16
87:21 93:11 103:8
105:3 106:18
110:18 112:5,14
115:6 117:19
120:18 126:18
130:8 132:3,4,15
134:14 140:17
141:21 147:1,20

155:6,18 156:6
157:12 160:5,20
162:1 165:13
176:12 187:19
188:1 189:3
190:14 193:3,6
199:17 204:7
206:19 208:5
212:7 215:3
**timeliness** 64:2
**timely** 89:5
**times** 25:4 32:17
33:12 36:4 54:8
66:15 69:1 77:19
79:7 90:8 105:6
108:2 115:6,7
132:5,15 134:4
142:9 144:15
206:3
**title** 50:14 128:18
**titled** 45:19 46:18
71:18 84:6 93:19
124:13 125:7
152:3
**titles** 131:12 198:7
**tjh** 1:9
**today** 7:13 8:8
10:6,15 11:2
13:10 14:17 30:12
31:5 42:1 72:19
75:4 92:11 99:2
190:5 206:4
214:14
**today's** 9:5 13:13
14:12 15:10 17:14
219:19
**told** 41:10
**tom** 71:1
**ton** 132:19
**tool** 114:20

**top** 30:12 52:12
108:17 146:12
151:13 152:1
165:5 176:7
**topic** 90:16 91:16
**total** 86:4 87:8,10
88:16 89:12 92:8
92:18,21 135:12
139:12 206:6,8,10
**totally** 46:8
**touches** 158:16
**tough** 55:2 108:9
**tour** 64:3 115:18
117:19 151:3
**tradition** 35:6,10
35:14,16
**traditional** 197:1
197:2
**traditions** 35:7,9
35:17 36:3
**tragedy** 26:13,18
**train** 161:19
**transcribed** 205:5
**transcribing** 9:14
**transcript** 5:6 6:2
6:7,8,10 15:5,6
47:6 48:11 71:20
72:5 82:21 124:9
125:2,16 126:5
138:17 152:13
154:13,15,21
194:2,9 197:20,20
198:4 205:12
211:19 212:1,8
224:5
**transcription**
205:4 221:6
**transcripts** 73:8
122:1
**transitioned** 65:21
196:4

translates  45:13
translating  87:1
transmitted
  196:19 204:12
transparency
  123:21 124:13
  125:7
travel  190:19
  191:3
tree  78:11
tremendous  26:13
trende  34:15
trial  18:19 19:4
tried  13:19 56:5
  118:1
true  59:19 221:6
trust  18:4,5,6,8,10
  212:1
trusting  212:8
truthfully  9:10
try  9:16 12:3 31:6
  32:12 45:18 63:9
  85:12 114:10
  134:21 147:4
trying  50:13 54:14
  63:5,18 65:13
  66:1,10,11,13 71:8
  86:18 89:3 102:18
  106:2,3 136:9
  144:20 155:7
  157:18 158:20
  177:1 214:4
tsg  205:5
tune  142:12
tuning  143:14
  145:14
turn  12:3 15:12
  25:8 26:17 72:15
  75:3 98:16 100:16
  139:1 151:16
  154:12 155:9

167:19 197:18
  205:7
turnout  101:14,18
twitter  44:18
two  11:19 12:9
  20:19 22:6 24:14
  42:9 48:14 49:21
  52:11 56:13 63:13
  81:7,8 86:12 87:1
  87:9,10 100:12
  111:13 113:15
  128:3 132:4
  142:13,17 143:4,9
  150:5 156:8 159:7
  159:11 160:15
  176:13 187:20
  188:14 190:10,21
  191:1,12 192:11
  193:4,13 200:5
  213:6 214:11
twofold  109:2
type  53:1 59:4
  92:13 104:13
  159:20 161:4
  192:17
types  15:17 50:17
  78:13
typewriting  224:7
typically  166:12
  199:3 203:14,17
  203:20
tyson  4:11 8:7,7
  9:19 94:3,8,10
  172:1

**u**

u.s.  123:19
ultimately  17:21
  66:2,4 87:20
  88:12 93:15
  108:12 116:10,21
  162:13 217:13,14

unable  10:14
  117:5
unavoidable  105:6
unconstitutionally
  109:18
undercount  90:3,6
  90:19 91:5,9,13
underlying  15:15
  16:8 86:17 104:21
  105:21 106:2
understand  9:12
  9:18 10:12,15
  15:17,20 25:11,20
  37:14 39:4 55:21
  61:2 68:15 90:13
  92:19 108:20
  126:11 171:18
  172:18 173:21
  176:18 207:7
  214:10
understanding
  12:1 15:14,21
  16:11 18:16 30:4
  30:8 38:4,13
  70:16 99:6 128:21
  145:9 161:14
  164:4 168:15
  169:2,17 170:4,20
  171:2,6,19 172:6
  173:13 174:20
  175:18 178:12
  195:18 218:16
understatement
  77:10
understood  10:2
  11:6
undertake  149:20
unfortunately
  72:8 107:12
unhappy  160:16
  161:18

unintentional
  85:18
unintentionally
  85:19
unit  7:4 46:15
  111:6 193:19
united  1:1 7:8 23:8
  81:4 168:5
unnecessarily
  73:2
unopposed  21:17
unrolled  187:21
unsophisticated
  128:17
unsuccessfully
  23:8,10
unusual  203:13
update  157:8
updated  44:4
updates  159:3
upheld  87:16
upload  45:18
  73:20 74:4,14
  82:3,7
uploaded  46:6
  71:16 73:4 123:17
  153:18 185:7
uploading  73:18
upstate  96:16
use  45:8 49:20
  51:3 52:16,18
  54:18 61:2 73:2
  88:6,20 91:18
  112:12 115:5
  150:2 156:10
  207:14
useful  114:20
usually  114:10
  128:12

**v**

**v** 1:8 222:3 223:3
**varies** 35:11
**variety** 99:2 187:5
**various** 13:20
14:20 16:21 28:10
28:11 43:14 193:7
**vary** 180:11
**vehicle** 112:13
**venue** 119:2
**venues** 66:13
**verbiage** 167:6
**verify** 51:9 91:14
**veritext** 7:12,14
46:5 72:2 123:17
**version** 135:4
136:6 181:16
184:1,14
**versions** 137:14
162:21
**versus** 7:8 30:1
93:17 181:1
183:14 206:14
**vi** 93:18
**viable** 88:2,20
89:6,7 207:15
213:21
**video** 3:3,12 4:3
7:3,5 46:15 111:6
113:2,6,12 154:13
193:19 194:2
197:20 219:20,20
220:1
**videoconference**
1:13 2:1
**videographer** 4:18
7:2,13 8:17 10:7
46:12,14 111:2,5
113:17,19 193:16
193:18 219:19

**view** 113:8 171:17
**viewpoint** 40:21
**vii** 98:16
**viii** 100:17
**visible** 152:8
**visit** 132:16
**vital** 68:7
**voice** 189:3 208:12
209:15,16
**voiced** 27:12 28:6
**voices** 34:5 40:4
**volunteer** 65:6
**vote** 25:15 26:10
38:14 39:1,3
86:18 93:14,15
101:11,11 102:2,6
105:1 106:3 165:2
206:1,13
**voted** 25:19 26:3,7
33:8 202:10
216:17
**voters** 38:10,11
39:1,2 173:3,9,15
174:4 175:4
177:10,13 181:4,9
182:2,3,12 183:7
210:6 211:7,21
214:1
**votes** 204:12
**voting** 29:15 30:10
32:1,3 33:14 34:1
38:16 39:10,17
40:8,12 41:1,12
84:14,17,19 85:4,9
85:13 90:10 93:8
101:2,7,8,12 102:1
102:6,8,8,13,14,14
102:20 105:11
108:19,21 109:8
109:15 110:8
123:20 140:14

150:11 164:12,15
164:21 165:4,7
168:13,16 169:18
170:20 173:14
174:19 176:18
177:16,18,21
178:6,10,13,19
202:17 215:11

**w**

**waiting** 60:16
**walk** 134:9
**wallace** 1:13 2:2
5:2,7 6:3 7:5 8:19
45:20 46:19 48:3
220:1 221:4
**wallacejordan2**
50:7
**want** 13:12 15:12
19:5 20:4 25:7
28:2 46:6,8 68:15
68:18 71:13 72:15
72:20 73:2,2,18
78:7 81:7 84:4
93:18 104:20
108:7 110:15
111:9 118:21
126:10 135:4,8
139:3 140:9 141:5
141:5 153:14
154:9 163:20
164:2 166:14
167:19 169:20
174:1 179:6
190:19 200:11
205:20 206:16
209:2 210:21
211:9 214:12
**wanted** 83:13
110:3 154:11
165:21 186:20
187:1,3 188:18

193:2,2,5,9 197:14
210:19 217:10,11
**wanting** 190:13
**watching** 62:15
**water** 46:9 96:16
**way** 11:21 32:3
38:7,19 68:6
77:18 81:5 84:18
88:18 89:9,17,18
102:10 104:7
106:4 109:19
117:8,8 136:4
141:4 144:18
157:13 168:3
181:5 188:4 191:7
192:8 199:9 207:6
214:18 215:4
**ways** 96:1,5
128:10 134:3
160:12 181:13
**we've** 27:4 57:4
60:20 68:16 99:12
103:9 147:6 148:3
156:21 193:12
196:10 204:15,17
214:10,21 215:10
216:6,10 217:4
218:21
**weaken** 205:21
**weakened** 206:12
206:15
**wearing** 150:21
**web** 43:21
**website** 6:6 67:20
72:1 79:1 112:10
121:12 154:16
**wednesday** 1:15
7:3
**week** 13:18 35:15
63:13 75:6 79:16
79:18 80:6 141:13

[week - zoom]                                                                     Page 42

191:9
**weeks** 13:19 52:6
**weigh** 67:10 76:7
  78:13 156:5
  195:17 199:11
  216:9
**weight** 105:13,19
**weird** 113:5
**welcome** 66:19
**wells** 3:13 8:12
  73:21 74:15 94:8
**went** 9:3 18:2,12
  18:14 46:17 57:12
  69:20 77:17
  117:13 118:9
  119:1 183:17
  186:1
**whatever's** 93:21
**whatnot** 66:17
**wheel** 80:13
**wheeler** 200:10,16
  200:17
**whereof** 224:12
**white** 38:13 39:2
**wholesale** 202:20
**wife** 63:4
**williamson** 129:21
**wilson** 22:5,10
**winds** 26:18
**wise** 107:17
  172:20
**wish** 57:17 108:11
**withdraw** 63:4
**withdrew** 63:1
**witness** 8:18 11:8
  25:13 31:14 35:2
  85:6,11 91:1 98:2
  109:2 110:1 113:3
  119:17 135:20
  148:18 149:9
  152:17 161:10

169:12,14 172:10
176:2,21 178:2
181:12 182:6
189:16 202:5
215:21 217:9
224:12
**women** 181:4
  210:5 211:7,21
**wondering** 47:8
  126:13
**woodard** 34:13
**word** 39:13 40:14
  65:6 88:20
**words** 81:8,8
**work** 10:3 16:20
  17:5 35:5 41:1
  42:1 45:9 49:17
  49:19 51:4 52:13
  54:16 58:17 63:9
  73:19 92:3,4
  93:17 107:6
  129:16 137:15
  142:10 145:7
  152:16 153:11
  160:11 184:17
  185:17,20 186:10
  188:15 217:10,16
  218:7
**worked** 66:2 77:7
  80:16 92:3 98:12
  146:10 159:12
  167:5 217:6,9
**working** 6:6 54:15
  132:3 141:16
  142:6 143:1,20
  145:1,12,19 147:8
  147:10,15 148:12
  151:17 152:3
  164:8,9 167:21
  168:5 196:8 215:6
  215:7 216:5,13

219:1
**works** 10:21 59:11
  92:3 156:11
  193:11
**workstation** 52:20
**worldwide** 205:6
**worried** 32:8
**worries** 172:3
**writing** 120:19
**written** 57:19
  58:11 117:3
  120:13,16 121:2,7
  121:13,17,20
  122:2 184:15,21
  185:6,7 218:11
**wrong** 129:20
  170:13 214:13

---

**x**

---

**x** 5:5 6:1

---

**y**

---

**yeah** 46:7 48:12
  74:13 107:15
  110:20
**year** 23:2,10 81:2
  81:10,12
**years** 18:18 19:4
  19:15 28:8,20
  32:7,21 33:9 38:6
  42:6,9 134:1
**yep** 14:16 128:3
  194:10 196:6
  202:8
**yesterday** 21:11
  152:4 219:1
**york** 3:7,7 63:19

---

**z**

---

**zoom** 7:11 152:6
  152:11

Maryland Rules of Procedure

Title 2, Chapter 400, Rule 2-415

(D) Signature and Changes

Unless changes and signing are waived by the
deponent and the parties, the officer shall submit
the transcript to the deponent, accompanied by a
notice in substantially the following form:
[Caption of case], NOTICE TO [name of deponent].
The enclosed transcript of your deposition in the
above-captioned case is submitted to you on [date
of submission of the transcript to the deponent]
for your signature and any corrections or other
changes you wish to make. All corrections and other
changes will become part of your sworn testimony.
After you have read the transcript, sign it and, if
you are making changes, attach to the transcript a
separate correction sheet stating the changes and
the reason why each change is being made. Return
the signed transcript and any correction sheet to
[name and address of officer before whom the
deposition was taken] no later than 30 days after
the date stated above. If you fail to return the
signed transcript and any correction sheet within
the time allowed, the transcript may be used

As if signed by you. See Rules 2-415 and 2-501 of
the Maryland Rules of Procedure.

Within 30 days after the date the officer mails or
otherwise submits the transcript to the
Deponent, the deponent shall (1) sign the
transcript and (2) note any changes to the form or
substance of the testimony in the transcript on a
separate correction sheet, stating the reason why
each change is being made. The officer promptly
shall serve a copy of the correction sheet on the
parties and attach the correction sheet to the
transcript. The changes contained on the correction
sheet become part of the transcript. If the
deponent does not timely sign the transcript, the
officer shall sign the transcript, certifying the
date that the transcript was submitted to the
deponent with the notice required by this section
and that the transcript was not signed and returned
within the time allowed. The transcript may then be
used as if signed by the deponent, unless the court
finds, on a motion to suppress under section (i)
(j) of this Rule, that the reason for the failure
to sign requires rejection of all or part of the
transcript.

(I) Further Deposition Upon Substantive Changes to Transcript

If a correction sheet contains substantive changes, any party may serve notice of a further deposition of the deponent limited to the subject matter of the substantive changes made by the deponent unless the court, on motion of a party pursuant to Rule 2-403, enters a protective order precluding the further deposition.

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

# VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.