# Exhibit D

Page 1

1              UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF SOUTH CAROLINA

3                  COLUMBIA DIVISION

4     - - - - - - - - - - - - - - - - - - -x

5   THE SOUTH CAROLINA

    STATE CONFERENCE OF

6   THE NAACP, et al.,

7                         Plaintiffs,

8          Case No. 3:21-CV-03302-JMC-TJH-RMG

9

            -against-

10

    THOMAS C.

11  ALEXANDER, et al.,

12                        Defendants.

13    - - - - - - - - - - - - - - - - - - -x

14                     April 13, 2022

                       10:31 a.m. (EST)

15

16

17      DEPOSITION of Wm. Weston J. Newton,

18   the Witness in the above-entitled action,

19   held at the above time and place, taken

20   before Garry J. Torres, a Stenographer and

21   Notary Public of the State of New York,

22   pursuant to the Federal Rules of Civil

23   Procedure, Notice and stipulations between

24   Counsel.

25              *      *      *

**Page 2**

1  APPEARANCES:
2
   AMERICAN CIVIL LIBERTIES UNION
3  FOUNDATION
       Attorneys for the ACLU
4      915 15th St., NW
       Washington, DC 20005
5      TEL: (202) 457-0800
       EMAIL: pyan@aclu.org
6      EMAIL: strivedi@aclu.org
7  BY: PATRICIA YAN, ESQ.
       SOMIL B. TRIVEDI, ESQ.
8
9
   NEXSEN PRUET LLC
10     Attorney for Defendants
       HOUSE DEFENDANTS
11     104 South Main Street, Suite 900
       Greenville, South Carolina 29601
12     TEL: Not provided
       EMAIL: amathias@nexsenpruet.com
13
   BY: ANDREW MATHIAS, ESQ.
14
15
   ROBINSON GRAY LLC
16     Attorneys for Defendants
       SENATE PRESIDENT ALEXANDER AND
17     SENATOR LUKE RANKIN
       1310 Gadsden Street
18     Columbia, South Carolina 29201
       TEL: (803) 231-7810
19     EMAIL: ltraywick@robinsongray.com
20 BY: VORDMAN CARLISLE TRAYWICK III,
       ESQ.
21
22
23
24
25 APPEARANCE CONTINUED ON NEXT PAGE

**Page 3**

1         I N D E X (cont'd)
2
3  BURR & FORMAN LLP
       Attorneys for Defendants
4  ELECTION DEFENDANTS
       1221 Main Street, Suite 1800
5      Columbia, South Carolina 29201
       TEL: Not provided
6      EMAIL: jtrinkley@burr.com
7  BY: JANE W. TRINKLEY, ESQ.
8
9  AMERICAN CIVIL LIBERTIES UNION
   FOUNDATION
10     Attorneys for Unknown
       125 Broad Street, 18th Floor
11     New York, New York 10004
       TEL: (212) 549-2500
12
   BY: SAMANTHA OSAKI, ESQ
13
14
   ARNOLD & PORTER KAYE SCHOLER LLP
15     Attorneys for Plaintiffs
       601 Massachusetts Ave., N.W.
16     Washington, DC 20001
       TEL: (202) 942-5000
17
   BY: JOHN M. HINDLEY, ESQ.
18
19
   ALSO APPEARING:
20
       RICK ROZOS
21     TOM DEVINE, VIDEOGRAPHER
22         *    *    *
23
24
25

**Page 4**

1         STIPULATIONS
2     IT IS HEREBY STIPULATED AND AGREED, by
3  and among counsel for the respective
4  parties hereto, that the filing, sealing
5  and certification of the within deposition
6  shall be and the same are hereby waived;
7     IT IS FURTHER STIPULATED AND AGREED
8  that all objections, except as to form of
9  the question, shall be reserved to the
10 time of the trial;
11    IT IS FURTHER STIPULATED AND AGREED
12 that the within deposition may be signed
13 before any Notary Public with the same
14 force and effect as if signed and sworn to
15 before the Court.
16     *    *    *
17
18
19
20
21
22
23
24
25

**Page 5**

1         THE VIDEOGRAPHER:  Good morning.
2  We're going on the record at
3  10:32 a.m. on April 13, 2022.
4     This is media unit one of the
5  video recorded deposition of Wiilliam
6  Weston J. Newton taken by counsel for
7  the plaintiffs in the matter of the
8  South Carolina State Conference for
9  the NAACP -v- Thomas C. Alexander et
10 al. filed in the U.S. District Court
11 for the District of South Carolina
12 Columbia Division Civil Action Number
13 3:21-CV-03302-JMC-TJH-RMT.
14    This deposition is being held
15 online as a Zoom videoconference with
16 all parties appearing remotely.  My
17 name is Thomas Devine from Veritext
18 New York and I am the videographer.
19 The court reporter is Garry J. Torres
20 also with Veritext New York.
21    I am not authorized to
22 administer an oath, I am not related
23 to any party in this action nor am I
24 financially interested in the outcome.
25    Counsel appearing remotely will

Page 6

1  now please state their appearances and
2  affiliations for record. If there are
3  any objections to proceeding please
4  state them at the time of your
5  appearance beginning with the noticing
6  attorney.
7      After appearances have been
8  noted the court reporter will swear in
9  the witness and we may proceed.
10      MS. YAN: Hello. My name is
11  Patricia Yan. I am an attorney with
12  the ACLU and I represent plaintiffs in
13  this case.
14      MR. MATHIAS: My name is Andrew
15  Mathias. I'm an attorney with Nexsen
16  Pruet and I represent the House
17  defendants.
18      MS. TRINKLEY: This is Jane
19  Trinkley with Burr & Forman. I
20  represent the election defendants.
21      MR. TRAYWICK: This is Lisle
22  Traywick of Robinson Gray Stepp &
23  Laffitte and I represent the Senate
24  defendants.
25      MR. TRIVEDI: Somil Trivedi with

Page 7

1  the ACLU for the plaintiff.
2      MS. OSAKI: Samantha Osaki with
3  the ACLU for the plaintiff.
4      MR. HINDLEY: John Hindley of
5  Arnold & Porter on behalf of the
6  plaintiffs.
7      THE VIDEOGRAPHER: Okay. If all
8  attorneys have introduced themselves I
9  would ask the court reporter to please
10  swear in the witness.
11 W M.  W E S T O N  J.  N E W T O N,
12      having first been duly sworn by
13      Garry J. Torres, the Notary
14      Public, was examined and
15      testified as follows:
16      MS. YAN: Thank you. Good
17  morning, Representative Newton and
18  thank you for being here. My name is
19  Patricia Yan. I'm an attorney with
20  the ACLU Voting Rights Project and I
21  represent plaintiffs in this case.
22 EXAMINATION
23 BY MS. YAN:
24  Q.  Can you please state and spell
25  your full name for the record?

Page 8

1  A.  Sure. Wiilliam, W-I-I-L-L-I-A-M
2  (sic) Weston; W-E-S-T-O-N; Jones,
3  J-O-N-E-S; Newton, N-E-W-T-O-N.
4  Q.  Thank you. Representative
5  Newton, do you understand that you are
6  testifying under oath today?
7  A.  I do.
8  Q.  And do you understand that you
9  must testify truthfully and as completely
10  as possible as though we were before a
11  judge in a courtroom?
12  A.  I do.
13  Q.  Is there anything that might
14  prevent you from understanding my
15  questions or answering truthfully today?
16  A.  I don't believe so, no.
17  Q.  Are you taking any drugs or
18  medications that may affect your ability
19  to understand the questions --
20  A.  No.
21  Q.  -- I ask? Thank you. So
22  Representative Newton, I imagine you're
23  familiar with this, but I'll go over some
24  ground rules now.
25      So in this deposition I will be

Page 9

1  asking you some questions. My questions
2  and your answers will be recorded by the
3  videographer and the court reporter,
4  Mr. Torres; do you understand?
5  A.  I do.
6  Q.  And so you will to speak up and
7  answer clearly so that the court reporter
8  can take down your responses. The court
9  reporter will not be able to record
10  non-verbal responses like a nod or a shake
11  of your head; do you understand?
12  A.  I do.
13  Q.  And as mentioned, the court
14  reporter will also have trouble if we talk
15  over each other so it's important that you
16  wait for me to finish my question entirely
17  before you begin answering even if you
18  think you may know what the rest of the
19  question will be. This is especially
20  important because we are conducting this
21  deposition remotely. There may be lag or
22  other tech issues. Does that work?
23  A.  It does.
24  Q.  And I will also do my best to
25  make sure that I give you a chance to

3 (Pages 6 - 9)

1 completely answer the questions that I ask
2 before asking another.
3        So if I ask you any questions
4 that you don't understand please just ask
5 me for clarification and I can rephrase.
6 If at any point you recall additional
7 information that is responsive to a
8 question that I previously asked you
9 please let me know and I will allow you to
10 clarify the record. Does that work?
11    A.   It does.
12    Q.   And if you would like to take a
13 break at any time please just let me know.
14 The only thing I ask is that if there is a
15 pending question you will finish that
16 question or possibly that short line of
17 questions, but then we can take that
18 break. Does that work?
19    A.   It does.
20    Q.   Great. Similarly if you
21 experience any technical issues with the
22 audio or video during the deposition
23 please let us know and we can go off the
24 record and try to fix the issue. Does
25 that work?

1    A.   It does.
2    Q.   And throughout the deposition
3 you may also hear your attorney object to
4 a question from time to time. Some of
5 those objections may be made only for the
6 record so in those cases you would still
7 be required to answer the question unless
8 you are instructed not to. Do you
9 understand that?
10    A.   I do.
11    Q.   Okay. So in addition to your
12 attorney at Nexsen Pruet and without going
13 into any content of discussion, have you
14 sought legal advice from any attorneys
15 about this case?
16    A.   No. I mean obviously we
17 are -- there are some in-house attorneys
18 with the House of Representatives, Patrick
19 Dennis and Emma Dean, but as long as your
20 question involves and includes them as
21 well as the Nexsen Pruet lawyers, no.
22    Q.   Okay. Thank you. So now,
23 turning to this case, plaintiffs are
24 challenging the State House redistricting
25 maps under the U.S. Constitution, do you

1 understand that?
2    A.   I do.
3    Q.   And do you understand why you
4 are here today?
5    A.   I do.
6    Q.   Do you remember when you first
7 learned about this lawsuit?
8    A.   I do not. I mean sometime
9 obviously shortly after it was filed. So
10 it would have been -- you know, sometime
11 in January or February.
12    Q.   Okay. And do you know who the
13 defendants in this lawsuit are?
14    A.   You know, I'm not -- I don't
15 think I've seen a copy of the pleadings
16 action, but from the discussion a minute
17 ago I understand that Lucas, Jordan and
18 Murphy are the named defendants, but no.
19 I have a general understanding of who the
20 plaintiffs and who the parties are, but I
21 couldn't rattle off to you who all the
22 parties involved in the lawsuit are.
23    Q.   Okay. So you mentioned you have
24 not seen the pleadings in this case --
25    A.   I hadn't focused on the caption

1 of the case in any way.
2    Q.   Okay. But are you familiar with
3 the allegations of the case?
4    A.   Generally, yes, ma'am.
5    Q.   What do you understand them to
6 be?
7    A.   Ultimately that there's a
8 contingent that the process was flawed in
9 drawing the new lines based on the most
10 recent decennial census and as it relates
11 to the specific allegations of what
12 specifically was done and I haven't paid
13 that close attention to the pleadings.
14    Q.   Understood. And have
15 you -- again other than your attorneys
16 have you discussed this lawsuit with
17 anyone?
18    A.   No. My wife obviously knows I'm
19 being deposed today and people in the
20 office know I'm being deposed today so not
21 to bother me, but other than that, no.
22    Q.   No other legislators?
23    A.   You know, obviously members of
24 my delegation know that I'm being deposed
25 today just because of scheduling issues

Page 14

1 relative to a delegation meeting, but
2 other than that, no.
3      I think Representative Jordan
4 and I talked when we were in the State
5 House last week that we understood we were
6 being deposed this week, but beyond that,
7 no.
8   Q.  Understood. Thank you. So are
9 you familiar with the plaintiffs in this
10 case?
11   A.  Generally.
12   Q.  Do you -- so one of the
13 plaintiffs in this case is the South
14 Carolina State Conference of the NAACP.
15 Do you know Ms. Brenda Murphy, the
16 president of that NAACP branch?
17   A.  I don't know her personally, but
18 from recall she I believe appeared either
19 in person or virtually at some of our
20 public hearings.
21   Q.  So prior to this redistricting
22 cycle had not met or interacted with
23 President Murphy?
24   A.  Not that I recall.
25   Q.  Have you had interactions with

Page 15

1 the South Carolina NAACP?
2   A.  You know, I'm sure that I have
3 in my tenure as a public official in some
4 shape or form, but I couldn't tell you
5 what and when those occasions might have
6 been or what they may have been related
7 to.
8   Q.  Okay. Thank you. So moving on
9 to today's deposition. How did you learn
10 about this?
11   A.  I think one of the attorneys at
12 Nexsen Pruet contacted me and told me that
13 the plaintiffs wanted to take my
14 deposition this week.
15   Q.  Okay. And I believe I have
16 entered an exhibit in Exhibit Share. If
17 you could pull that up and let me know if
18 you see it?
19   A.  Okay.
20   Q.  Do you see Exhibit 0001?
21   A.  I do.
22   Q.  Do you recognize this document?
23   A.  I mean it's the notice of my
24 deposition.
25   Q.  Yes. So is this how you learned

Page 16

1 that plaintiffs wished to depose you?
2   A.  No, I think I got a telephone
3 call from Mr. Moore to try to help
4 coordinate my schedule and to talk about
5 when that -- what my availability looked
6 like and then obviously he confirmed we
7 are going to do it today so I think that's
8 how I got it, not necessarily looking at
9 this piece of paper.
10   Q.  So for today's deposition where
11 are you physically located?
12   A.  In my law firm in Bluffton,
13 South Carolina.
14   Q.  Okay. I see that Mr. Mathias is
15 in the room with you. Is anyone else in
16 the room with you today?
17   A.  No, ma'am.
18   Q.  And did you bring any materials
19 with you today to the deposition?
20   A.  I did not.
21   Q.  And you don't have any documents
22 in front of you?
23   A.  No, ma'am. Other than what you
24 sent on this computer.
25   Q.  Sure. So to prepare for today's

Page 17

1 deposition did you review any documents?
2   A.  No. I mean I had my notes from
3 the public hearings that were just my
4 shorthand notes on some legal pads. I
5 gave those to Andrew, but beyond that I
6 mean I didn't -- I didn't go through and
7 review any of them, but I mean obviously I
8 had to touch them and see them when I gave
9 them to him.
10   Q.  So did you speak or otherwise
11 communicate with anyone to prepare for
12 your deposition today?
13   A.  Just talked to my lawyers.
14   Q.  Could you tell us which lawyers?
15   A.  Andrew and Mr. Moore and --
16   Q.  And for the record, who -- could
17 you please say Mr. Moore's full name?
18   A.  Mark Moore.
19   Q.  Mark Moore?
20   A.  Yep. And let me think, somebody
21 else from Nexsen Pruet was on a Zoom call
22 for part of our discussion, Jennifer, I'm
23 not sure of her last name and there's
24 another gentleman who's one of the lawyers
25 with Mark at Nexsen Pruet, but his name

Page 18

1 escapes me at the moment.
2    Q.   And when did you speak with them
3 to prepare for this deposition?
4    A.   Yesterday.
5    Q.   Just yesterday. Were there any
6 other occasions?
7    A.   Other than the maybe a month ago
8 Mark Moore and I had an initial brief
9 discussion about that it would likely my
10 deposition -- the plaintiffs would want to
11 take my deposition.
12    Q.   So you mentioned that you had
13 met yesterday. For approximately how long
14 did you meet?
15    A.   Couple of hours. I mean it was
16 on a Zoom call when Mr. Mathias was here
17 in the office.
18    Q.   Was anyone else present other
19 than yourself and the attorneys?
20    A.   No, ma'am.
21    Q.   So in preparing for this
22 deposition did you communicate with anyone
23 else besides your attorneys in this case?
24      MR. TRAYWICK: Objection. Asked
25   and answered.

Page 19

1      THE VIDEOGRAPHER: The time is
2 approximately 10:49 we're going off
3 the record without objection.
4      (Whereupon, an off-the-record
5   discussion was held.)
6      THE VIDEOGRAPHER: The time is
7 approximately 10:55 -- make that
8 10:56. We're back on the record.
9      MS. YAN: Thank you.
10    Q.   So Representative Newton, have
11 you ever been deposed before whether in
12 your personal or professional capacity?
13    A.   I have.
14    Q.   How many times?
15    A.   In the subject of a deposition
16 only once that I can recall.
17    Q.   What was the case in which you
18 were deposed?
19    A.   It was a real estate dispute,
20 malpractice issues.
21    Q.   And what was your role in the
22 case?
23    A.   I was a party and a witness. My
24 law firm was a party.
25    Q.   What was the resolution of the

Page 20

1 case?
2    A.   It settled.
3    Q.   So you mentioned that you were a
4 party. Have you ever been a party to any
5 other lawsuit other than -- well, have you
6 ever been a party to any other lawsuit?
7    A.   I'm comfortable that as chairman
8 of County Counsel for ten years in Buford
9 I was probably named in a number of
10 lawsuits, but none that I can recall,
11 nothing individually or nothing
12 professionally other than the one case
13 that I mentioned.
14    Q.   Okay. Have you ever testified
15 in court whether in your personal or
16 professional capacity?
17    A.   No.
18    Q.   Okay. Thank you. And to ask
19 some background questions now, when were
20 you born?
21    A.   1967.
22    Q.   Could you provide your date of
23 birth?
24    A.   February 22, 1967.
25    Q.   And what was your place of

Page 21

1 birth?
2    A.   Greenville, South Carolina.
3    Q.   What is your current address?
4    A.   83 Myrtle Island Road, Bluffton,
5 South Carolina.
6    Q.   Are you currently registered to
7 vote at that address?
8    A.   I am.
9    Q.   And so have you ever lived
10 outside of your current city and if so
11 where?
12    A.   Well, obviously I was born and
13 raised in Greenville. I went to college
14 in Lexington, Virginia obviously in law
15 school, then I lived in Florence, South
16 Carolina, then I lived in Charleston,
17 South Carolina, but sort of temporarily I
18 worked for a federal judge and split my
19 time between the two cities, but had a
20 house in one and apartment in the other
21 and then Buford County since 1996.
22    Q.   Okay. So just briefly to go
23 through the education. Where did you go
24 to high school?
25    A.   J L Mann.

6 (Pages 18 - 21)

Page 22

1    Q.    And where did you go to college?
2    A.    Washington and Lee.
3    Q.    And when did you graduate?
4    A.    Washington and Lee in 1989.
5  USC -- University of South Carolina Law
6  School 1993.
7    Q.    Okay.  So what did you study in
8  college?
9    A.    History.
10    Q.    You mentioned that you went to
11  law school.  Did you go to any other
12  graduate schools?
13    A.    Other than law school, no,
14  ma'am.
15    Q.    So getting into what you did
16  after you graduated from law school and
17  your employment history what was your next
18  job or position?
19    A.    I worked for Johnny Waller as a
20  law clerk in his town finishing up on the
21  trial bench and starting on the Supreme
22  Court in South Carolina.  You want me to
23  keep going?
24    Q.    Well, at that role did you work
25  on any cases relating to voting rights?

Page 23

1    A.    None that I'm aware of, no.
2    Q.    Anything related to racial
3  discrimination?
4    A.    None that I'm aware of, no.
5    Q.    Okay.  Please continue to your
6  next position.
7    A.    Then I worked with Judge Halk
8  (phonetic) in the federal district court
9  and then came here to work for this law
10  firm in 1996.
11    Q.    And for the record, what is this
12  law firm?
13    A.    Jones, Simpson & Newton.
14  Obviously in 1996 it was known by a
15  different name, but...
16    Q.    And you are currently still
17  working at Jones, Simpson and Newton,
18  correct?
19    A.    I am.
20    Q.    Do you have any other current
21  jobs or positions?
22    A.    I'm a member of the South
23  Carolina House of Representatives.  No, I
24  mean I serve on a bank board, but that's
25  not a job unfortunately.

Page 24

1    Q.    Just for the record, what is
2  that bank?
3    A.    The Bank of Clarendon.
4    Q.    Approximately how much of your
5  time is spent working at your law firm
6  versus as a State House Representative?
7    A.    In the 40 hours a week or more
8  are devoted to the law firm.
9    Q.    And as a representative?
10    A.    It varies week to week.
11  Obviously during session we're there
12  Tuesday, Wednesday and Thursday.  If we're
13  not in committee meetings or on the House
14  floor I'm back at my apartment doing law
15  firm work generally until 1 or 2 in the
16  morning.  So -- you know, I don't know how
17  to break that down, January to June.
18  Probably 24 hours a week and then
19  throughout the rest of the year they're
20  either committee meetings that may take me
21  to Columbia or on constituent matters as
22  the needs arise.
23    Q.    And Representative Newton, do
24  you have any email addresses?
25    A.    I do, wnewton@jsplaw.net.

Page 25

1    Q.    Thank you.  And --
2    A.    Go ahead.
3    Q.    Go ahead.
4    A.    There's a State House address.
5    Q.    And what is that?
6    A.    I think it's -- I believe it's
7  westonnewton@sehouse.gov.
8    Q.    And do you have any personal
9  email addresses?
10    A.    I've got a campaign email
11  address that I think is maybe
12  westonnewton@hargray.com and an inactive
13  Gmail account at least nothing that I
14  check.  I think I still have it, but I
15  don't think it's used.
16    Q.    Okay.  And have you ever used
17  any -- sorry.  Which of those email
18  addresses do you use primarily for your
19  work as a legislator?
20    A.    The State House email address is
21  used to receive and communicate with
22  involving House of Representatives
23  activities.
24    Q.    Have you ever used any of the
25  other email addresses you listed to send

7 (Pages 22 - 25)

Page 26

1 or receive anything related to your work
2 as a legislator?
3     A.   The JSPLAW address is my primary
4 email address so I'm certain from time to
5 time I receive email addresses -- receive
6 email there or if I -- if I'm here and
7 send email out from my office computer it
8 would be from that address, but as a
9 matter of course I would defer people to
10 the State House address.
11     Q.   Understood and but for those
12 other addresses, the one that you do not
13 primarily use -- sorry.  For the email
14 addresses other than the one that you do
15 not primarily use have you used that at
16 all during this round of redistricting?
17     A.   I'm not sure I understand your
18 question.  I did and then it sounded like
19 there was a double negative in it.  Just
20 so we're clear you can restate it or I'll
21 tell you what I think you asked me.
22     Q.   Sure.  So for the jsplaw.net
23 email address or the campaign address have
24 you used that at all during this round of
25 redistricting?

Page 27

1     A.   I don't believe so.  The
2 campaign email address is tied to a
3 Facebook page I think is the one that
4 things -- if somebody sent me.  I would
5 not have used that email address to send
6 anything else.  I don't believe that my
7 JSP law email address was used to send
8 anything out with regard to redistricting.
9 So it would -- all communications would
10 have been through my State House address.
11         Now, I mean there could have
12 been a scheduling email of where I'm going
13 to be relative to when we were trying to
14 put together a redistricting schedule, but
15 not -- no communications with regard to
16 redistricting itself.
17     Q.   Is it possible you may have
18 received emails relating to redistricting
19 at the JSP email address?
20     A.   I don't believe so, but -- you
21 know, I get a hundred-plus probably emails
22 a day so I'm -- there are few things that
23 I'm absolutely certain about.  That's
24 probably one of them that I'm not.
25     Q.   So as an elected official do you

Page 28

1 have a separate work phone?
2     A.   I do not.
3     Q.   You do not.  So do you have a
4 personal phone?
5     A.   I do.
6     Q.   Have you ever used that personal
7 phone to discuss issues relating to your
8 work as a legislator?
9     A.   Of course.
10     Q.   And have you used that phone to
11 discuss redistricting?
12     A.   I would think, yes.
13     Q.   Okay.  And Representative
14 Newton, do you -- I think you mentioned a
15 Facebook account.  Do you have any other
16 social media accounts?
17     A.   Yes.  I don't know that I can
18 tell you much more than that.
19     Q.   You don't know what they are?
20     A.   I think there's a Twitter
21 account that might be tied to Facebook
22 that I see pop up from time to time and I
23 think that's it.
24     Q.   So do you remember the account
25 names or handles?

Page 29

1     A.   I think there's something that's
2 at 120 or maybe it's at Weston Newton at
3 House District 120.
4     Q.   Okay.  Thank you.  So I am going
5 to -- well, actually, did you -- on your
6 personal cell phone did you receive any
7 texts relating to redistricting?
8     A.   Yes.
9     Q.   Have you used any other apps,
10 messaging apps and received messages
11 relating to redistricting?
12     A.   No.  Not -- I don't -- I don't
13 know what other messaging apps necessarily
14 means, but I do text messages.
15     Q.   Okay.  Understood.  And who did
16 you receive messages from relating to
17 redistricting?
18     A.   Representative Jeff Bradley.
19     Q.   Anyone else?
20     A.   Chip Camp.  Senator Camp and I
21 may have exchanged text messages, but I
22 believe that's it.
23     Q.   So no other staff at the House
24 of Representatives?
25     A.   I mean I -- there could have

Page 30

1 been a can you do a public hearing on X
2 day.  That could have been done through
3 text, but I don't recall that.
4     Q.   Okay.  Any messages with the map
5 drawers for the South Carolina State
6 House --
7     A.   No.
8     Q.   -- redistricting plan?
9     A.   No.
10    Q.   Okay.  And have you turned over
11 those documents to your attorneys?
12    A.   I think I have.  Yes, ma'am or
13 forwarded them.
14    Q.   Thank you.  And I am now going
15 to enter another exhibit as Exhibit 2.
16 Just one moment.  Please let me know if
17 it's showing up for you.
18    A.   It is.
19    Q.   Okay.  Do you recognize this
20 document?
21    A.   I do.
22    Q.   What is it?
23    A.   A subpoena.
24    Q.   And have you responded to the
25 subpoena?

Page 31

1        MR. MATHIAS:  Objection.
2     A.   I haven't.
3     Q.   And so to clarify, you have not
4 produced any documents in response to this
5 subpoena?
6     A.   Well, I -- the lawyers would do
7 that, not me.  So whether they've
8 done -- whether they have responded to the
9 subpoena or not I don't know, but I have
10 given my lawyers documents.  I note that
11 the response date on it looks like it's
12 next -- later this week so I -- I don't
13 know whether the -- they've provided you
14 this material or not.
15    Q.   Okay.  Thank you, Representative
16 Newton.  So now, I'd like to talk about
17 your time on the Buford County Counsel.
18        So were you elected to this
19 position?
20    A.   I was.
21    Q.   And when were you first elected?
22    A.   1999.
23    Q.   Representative Newton, you're a
24 member of the Republican party; is that
25 correct?

Page 32

1     A.   I am.
2     Q.   Have you always run for office
3 as a Republican?
4     A.   I have.
5     Q.   When you ran for Buford County
6 Counsel did you run opposed?
7     A.   I did.
8        MR. MATHIAS:  And for the record
9 it's Buford in North Carolina.  It's
10 Buford in South Carolina.
11        MS. YAN:  I'm so sorry.  Buford.
12 Thank you.
13    Q.   So did you ever run against any
14 candidates who were people of color?
15    A.   No.
16    Q.   So why did you decide to run for
17 Buford County Counsel?
18    A.   One of my first employers told
19 me that as a lawyer educated at the
20 university the State's only law school at
21 the time and public school we had a
22 responsibility to offer our time in public
23 service.  That's -- and I made that
24 decision in the late '90s and here I am
25 today.

Page 33

1     Q.   So with the Buford County
2 Counsel did you serve for multiple terms?
3     A.   I served from 1999 to 2012.
4     Q.   So how many times did you run
5 for this office?
6     A.   '99 was a special election.  I
7 would have been I guess either three or
8 four, they're four-year terms so whatever
9 that election cycle is I guess it was '99,
10 2004, '8 and then no, because I would have
11 been in the middle of a cycle and when I
12 resigned to run for the State House so
13 three -- I guess probably three times,
14 maybe four.
15    Q.   And did you always run opposed?
16    A.   No, I did not.
17    Q.   So what was your role in the
18 Buford County Counsel?
19    A.   I mean I had various committee
20 assignments, but from 2002 to 2012 I was
21 chairman.
22    Q.   And what types of work did you
23 do?
24    A.   I don't understand the question.
25 As chairman or as a member of County

Page 34

1 Counsel?
2    Q.   I guess first as a member and
3 then as chairman?
4    A.   Well, those decisions that are
5 made by local government; zoning, ad
6 valorem taxes, development codes, trash,
7 you know, all the public infrastructure
8 that's local; parks, recreation and as
9 chairman -- you know, as the title
10 describes I mean you're the shepherd so to
11 speak and -- you know, you help move the
12 body forward and run the meetings and that
13 sort of thing.
14    Q.   So during your time in the
15 Buford County Counsel did you have any
16 experience with voting-related work?
17    A.   Yes, ma'am.
18    Q.   And what was that?
19    A.   We went through redistricting of
20 the 11 County Counsel districts twice
21 while I was there.
22    Q.   What was your role there in that
23 local redistricting?
24    A.   One time I was chairman of
25 County Counsel when we went through it one

Page 35

1 time.  One time I don't know if I was
2 chairman of the ad hoc committee or
3 whether I just served on the ad hoc
4 committee, but I was among a subset group
5 of County Counsel persons that went
6 through the redistricting activities for
7 local government.
8    Q.   And did you hold public hearings
9 for -- during the redistricting cycle?
10    A.   Absolutely.
11    Q.   So can you tell me,
12 Representative Newton, a bit about the
13 demographics of your constituents at that
14 time for the Buford County Counsel?
15        MR. MATHIAS:  Objection to form.
16    A.   I probably need more detailed
17 information.  What -- are you looking for
18 percentages, Are you just looking for
19 general terms, the trends?  Tell me what
20 your question is.
21    Q.   Sure.  Is there anything you can
22 tell me about racial breakdown --
23        (Whereupon, simultaneous
24        conversation took place disrupting the
25        record and the court reporter

Page 36

1 requested one person speak at a time
2 without interruption from anyone
3 else.)
4    Q.   -- income, et cetera?
5    A.   Sure.  So Buford County from
6 1990 to 2000 doubled in population.  From
7 1990 -- I mean from 2000 to 2010 it almost
8 doubled again.  I think it was about
9 38 percent the second time.  The change in
10 demographics during the period of time
11 were -- was heavy with Caucasian folks
12 moving into Buford County.  Primarily
13 that's retirees from elsewhere in the
14 country.  The growth in our African
15 American minority population was not as
16 significant.  From 1990 to 2000 the
17 Hispanic growth to the best of my recall
18 was not significant.  From 2000 to 2010
19 and beyond obviously that growth has been
20 fairly significant.
21        In most of the charts that
22 are -- and I've not seen one lately -- but
23 the average income in Buford County was
24 some of the highest in the State.  The
25 average weekly wage in Buford County was

Page 37

1 lower than the State average and I believe
2 those statistics are -- continue to be
3 accurate today.
4    Q.   Thank you, Representative
5 Newton.  So you mentioned that you had
6 done redistricting work during your time
7 on the Buford County Counsel.  Any other
8 voting-related work?
9    A.   Yes.  Obviously the entire time
10 I was on County Counsel if we did anything
11 with regard to referendum questions we had
12 to get those issues pre-cleared and so --
13 you know, there were questions about
14 adding different taxation, different
15 balance lot initiates that would have been
16 -- that would have gone through that
17 process.
18        Additionally, shortly after
19 being elected to the House of
20 Representatives in 2012 I'm also a member
21 of the Jasper County delegation and the
22 Jasper County delegation was sued because
23 it had not redistrict -- there had been no
24 redistricting activities with regard to
25 the school board in perhaps two cycles.

10 (Pages 34 - 37)

1 So as a member of the delegation in Jasper
2 County we were sued and to force the
3 redistricting, which had not taken place
4 as it should have in the regular course of
5 a cycle.
6    Q.   Why did it not take place?
7    A.   I wasn't a member of the House
8 of Representatives.  I couldn't tell you
9 that.  I can speculate, but that's not
10 what we're here to do.
11    Q.   Do you know the resolution of
12 that case?
13    A.   Absolutely.  The -- ultimately
14 there was a lawsuit filed.  I believe that
15 the NAACP may have been involved.  I don't
16 recall the parties, but we went to a
17 mediation.  There were some differences
18 between the House and the Senate
19 approaches to redrawing the school
20 district lines and ultimately the court
21 redrew those lines.
22    Q.   Okay.  Thank you.  So now moving
23 to your time at the State House of
24 Representatives.  Are you elected by
25 district?

1    A.   I am.
2    Q.   Which district?
3    A.   120.
4    Q.   And what counties were included
5 in your State House district prior to the
6 current redistricting cycle?
7    A.   Buford and Jasper counties.
8    Q.   Has that changed with the new
9 enacted map?
10    A.   It has not.
11    Q.   When you were first elected?
12 You may have mentioned this before, but
13 when were first elected to the State House
14 of Representatives?
15    A.   2012.
16    Q.   Representative Newton, have you
17 served for multiple terms in the State
18 House?
19    A.   I have.
20    Q.   And how many times have you run
21 for this office?
22    A.   So it's a two-year term.
23 Obviously '12, '14, '16, '18, '20 and now
24 I'm running for re-election in '22.
25    Q.   And for the State House have you

1 always run opposed?
2    A.   No.
3    Q.   When have you not?
4    A.   I'm not opposed in this cycle.
5 I was not opposed in '20.  I was opposed
6 in '18.  I was opposed in '12.
7    Q.   Okay.  And did you ever run
8 against any candidates who were people of
9 color?
10    A.   No, ma'am.
11    Q.   So again, I asked you about the
12 demographics of your district before.  Can
13 you tell me a bit about the demographics
14 of your State House district?
15    A.   It's not dissimilar from Buford
16 County that we talked about.  This part of
17 South Carolina hs experienced significant
18 growth of retirees and that growth
19 primarily is white and Caucasian.
20    Q.   Thank you.  And why did you
21 decide to run for the South Carolina State
22 House of Representatives?
23    A.   I'd been on County Counsel for a
24 decade as chairman and it was -- I thought
25 it was time to go do something else.  I

1 had run for the Senate in 2007, ended up
2 in a runoff and lost the runoff and so I
3 then waited a handful of years and ran for
4 the House in '12.
5    Q.   And who did you lose to in the
6 runoff?
7    A.   Representative Catherine Sykes
8 who then obviously became Senator
9 Catherine Sykes.
10    Q.   So what are your duties as a
11 State House Representative?
12    A.   You know, consider legislation,
13 vote on that legislation, I'm not -- I
14 mean are you interested in my committee
15 assignments or did I answer your question?
16    Q.   Sure.  We will get to the
17 committee assignments shortly.  I guess
18 before that have you been part of any
19 caucuses?
20    A.   I'm a member obviously of the
21 Republican caucus.
22    Q.   Any others?
23    A.   The military caucus.  I think
24 there's an outdoor caucus.  I think that's
25 it.

11 (Pages 38 - 41)

1    Q.    So now have you served on any
2  committees?
3    A.    Yes.
4    Q.    Which ones?
5    A.    The Judiciary Committee and the
6  legislative oversight.
7    Q.    So with the Legislative
8  Oversight Committee when did you join?
9    A.    I believe that was 2014.  I am
10  the -- it was the year that the committee
11  was formed and I am the first chairman of
12  that committee and have served in that
13  role since the committee was formed.
14    Q.    So what are your
15  responsibilities as part of that committee
16  or what were?
17    A.    The statute that provides that
18  the function of oversight by the
19  legislature is to review of the state
20  agencies on a seven-year recurring cycle
21  and make recommendations as to whether the
22  agency and its program activity should be,
23  continued, curtailed or eliminated.  It is
24  not a policy making committee.  It's an
25  investigatory committee.

1    Q.    So why did you join the
2  Legislative Oversight Committee?
3    A.    Because Speaker Lucas called me
4  in my second year there.  The then speaker
5  had resigned and told me that by
6  reputation I was supposedly a bright
7  lawyer on the Judiciary Committee and he
8  wanted me to serve on oversight and wanted
9  me to be the chairman.
10    Q.    And does the Legislative
11  Oversight Committee have a role in voting
12  or electoral issues in South Carolina?
13    A.    Other than in terms of oversight
14  of the State agencies or purposes of an
15  agency study.  So the election commission
16  has been through the oversight process and
17  through that questioning, yes.
18        And in fact last year the
19  oversight committee was asked to
20  investigate or make inquiry as it relates
21  to the maintenance of voting rolls in
22  South Carolina and how dead people were
23  removed from those rolls.
24    Q.    And is that investigation still
25  ongoing?

1    A.    No.  I mean all of the oversight
2  committee's activities, hearings,
3  documents, material are all online on the
4  House Legislative Oversight Committee's
5  website.  So, no, that's not -- I mean if
6  issues arose and the speaker asked us to
7  go find answers to those questions then
8  obviously we'd still have the ability to
9  go bring any of the State agencies in
10  front of the committee to ask questions
11  should we be directed to do so or should
12  the need arise.
13    Q.    And does the Legislative
14  Oversight Committee have a direct role in
15  the redistricting process?
16    A.    Has no role whatsoever.
17    Q.    So moving on to the Judiciary
18  Committee, when did you join that?
19    A.    2000 -- when I first got
20  elected, January of 2000 -- November of
21  '12 is I guess is when we technically went
22  in, but I was assigned to the Judiciary
23  Committee when I first got to the State
24  House.
25    Q.    How many members are in the

1  Judiciary Committee?
2    A.    I think 24 maybe.
3    Q.    And why did you join the
4  Judiciary Committee?
5    A.    I was -- that's the assignment I
6  got from the State.
7    Q.    So does the Judiciary Committee
8  have a role in the voting or electoral
9  process in South Carolina?
10    A.    Absolutely.
11    Q.    And could you tell me about
12  that?
13    A.    Obviously voting law changes
14  that procedurally move through the House
15  would typically be assigned to the
16  Judiciary Committee.  I'm not chairman of
17  the subcommittee that deals with those
18  issues, but I am on obviously judiciary.
19        With redistricting I was one of
20  a handful of people on the ad hoc
21  committee dealing with redistricting.
22    Q.    Thank you.  And we will
23  certainly come back to the ad hoc
24  committee a little later, but first just
25  with the Judiciary Committee to better

Page 46

1 understand this, the Judiciary Committee
2 has a chairman; is that correct?
3    A.   It is.
4    Q.   And who was or who is the
5 chairman?
6    A.   Currently the chairman is Chris
7 Murphy.
8    Q.   And how is the chairman of the
9 Judiciary Committee chosen?
10    A.   By the members of the Judiciary
11 Committee.
12    Q.   By an election?
13    A.   Oh, yeah.  I'm sorry.  Yes.
14    Q.   Does the Judiciary Committee
15 have a vice chairman?
16    A.   It does.
17    Q.   Any other leadership positions
18 within the committee?
19    A.   There may be a first and a
20 second vice chairman and then there are
21 subcommittee chairmen.  The committee
22 itself would elect its chairman and vice
23 chairman and the subcommittee chairmen are
24 appointed by the chairman.
25    Q.   And who is the vice chairman?

Page 47

1    A.   John King and I think the second
2 vice chairman is Neil Collins.
3    Q.   And does that House Judiciary
4 Committee have any procedural rules?
5    A.   We do.
6    Q.   Are these pubically available?
7    A.   I'm sure.
8    Q.   Are you able to provide a copy?
9    A.   I mean I can go to the website
10 and pull them up.  I don't have a copy,
11 but I'm sure we can find those.  My belief
12 is they're probably published on the
13 committee's website.
14    Q.   Do you know if these rules
15 describe the roles of the chairman and the
16 vice chairman?
17    A.   I believe they do.
18    Q.   So what happens if the -- these
19 rules of procedure are not followed?
20        MR. MATHIAS:  Objection.
21    A.   Good question.  I mean obviously
22 someone could object to the activity that
23 would be taking place.  The rules I
24 believe have a mechanism for that within
25 the rules and -- you know, it is I think

Page 48

1 early -- there was an objection in January
2 of this year.  We had a committee meeting,
3 the chairman was ill, did not make it to
4 the meeting.  There's a provision of the
5 rules that provides essentially that in
6 the chairman's absence and under during
7 extraordinary times he can prescribe
8 different procedures and processes for the
9 committee IE, COVID activities.
10        I was asked to chair a meeting
11 by the letter of the chairman in January.
12 A member of the committee objected to
13 that.  I recited the appropriate Rule
14 under which the authority of the chairman
15 identified his appointment of my service
16 in that capacity for that meeting and that
17 was it.  There was no further pursuit of
18 the -- my ruling as acting chairman based
19 on our sitting chairman's designation of
20 extraordinary procedures in the face of
21 quite frankly a COVID exposure and
22 illness.
23    Q.   Who was the representative who
24 objected?
25    A.   John King, the vice chairman.

Page 49

1    Q.   Did Representative King ever
2 file a formal complaint?
3    A.   None that I'm aware of, no.
4    Q.   Can you remember any other
5 instances where rules of procedure were --
6 where someone objected that rules of
7 procedure were not followed?
8    A.   None that I'm aware of, but let
9 me make sure I understand.  Your question
10 is am I aware of any other instances of
11 objections that procedures were not
12 followed, is that correctly --
13    Q.   That's correct.
14    A.   Yeah, the answer to that is, no.
15    Q.   Well, regardless of whether
16 there was an objection can you remember
17 instances where the procedural rules were
18 not followed?
19    A.   Well, your question assumes that
20 the procedural rules weren't followed when
21 I was asked to be chairman and according
22 to the chairman's -- to preside as
23 chairman of a meeting, his letter was
24 cited the Rule by which he was asking me
25 to serve in that capacity so I'm not sure

13 (Pages 46 - 49)

Page 50

1 that I would agree that the committee's
2 rules were not being followed as that
3 designation was presented pursuant to the
4 rules.
5    Q.   Okay.  And do you have the copy
6 of the letter designating you as acting
7 chairman?
8    A.   I do not.  It's in the record of
9 the committee meeting as it was handed to
10 me when I walked into the room.
11    Q.   Are you able to provide that
12 letter?
13    A.   I'm not because I don't have a
14 copy, but I'm certain that the House
15 Judiciary Committee has and can.
16    Q.   Thank you.  So now going to the
17 redistricting ad hoc committee.  How does
18 this relate to the Judiciary
19 Committee?
20       MR. MATHIAS:  Objection.
21    A.   When you say relate I mean it
22 acts as a -- as one of the subcommittees
23 that makes a report back to the full
24 Judiciary Committee.
25    Q.   Okay.  And when did you join the

Page 51

1 redistricting ad hoc committee?
2    A.   I would have been assigned to
3 that committee sometime last spring I
4 guess.
5    Q.   You mentioned that you were
6 assigned.  Did you express any interest in
7 joining?
8    A.   I mean I would have had to have
9 said I'm willing to do it, but I can't say
10 that I lobbied for the opportunity to do
11 so.
12    Q.   How many --
13    A.   -- discussion about whether I
14 was willing to serve on that committee or
15 not and I -- you know, obviously said of
16 course.
17    Q.   How many members are on the
18 redistricting ad hoc committee?
19    A.   It's either seven or nine I
20 think.
21    Q.   Can you name them?
22    A.   I mean I could if I brought it
23 up on the website, but I mean from memory
24 I think Neil Collins, Beth Bernstein,
25 Justin Bamberg (phonetic throughout), Jay

Page 52

1 Jordan, me, Pat Hennigan (phonetic), Jason
2 Elliot, that's seven.  Brandon Newton was
3 on the committee for a period of time
4 until he had a baby, that's eight.  I feel
5 like I'm missing somebody, but I don't
6 want to overlook them, but I can't
7 remember who else may have been there.
8    Q.   Understood.  You mentioned that
9 Representative Newton left because he was
10 having a baby.  Was he replaced on the
11 committee?
12    A.   No, ma'am.
13    Q.   And why not?
14    A.   That's a question for the
15 speaker.  I mean I -- I don't know.  I
16 mean our process had already started.  We
17 were in the middle of conducting public
18 hearings and my understanding was having
19 just had a baby having to travel all over
20 the State multiple days in a row was not
21 something he was going to be able to
22 accommodate.
23    Q.   And does the redistricting ad
24 hoc committee operate under the same rules
25 of procedure as the Judiciary Committee?

Page 53

1    A.   I believe so, yes.  I mean we
2 don't have an independent set of rules.
3 Obviously we adopted criteria for the
4 process, but it's not an ongoing standing
5 committee.  It was an ad hoc committee.
6    Q.   Could you tell me more about the
7 redistricting ad hoc committee's role in
8 this redistricting process?
9    A.   Ultimately we held public
10 hearings all over the State as well as in
11 Columbia both in person and virtually.
12 The committee operated like one of the
13 regular standing subcommittees in that we
14 had meetings, received public input,
15 advanced legislation, amended legislation
16 at the subcommittee level, made a
17 recommendation to the full committee for
18 legislation then to be amended there and
19 ultimately passed and sent to the floor of
20 the house.
21       So it's sort of the first
22 committee activity of where the
23 legislation was approved.  You know,
24 obviously the members of the committee had
25 input into the drawing of the maps and the

14 (Pages 50 - 53)

Page 54

1　lines, not as a group of committee
2　members, but as members of the committee
3　from various parts of the State.
4　　Q.　Okay. Thank you. So you've
5　mentioned your work with the Judiciary
6　Committee and the redistricting ad hoc
7　committee. Do you have other issues that
8　you focused your legislative efforts
9　around?
10　　A.　You know, probably the hallmark
11　of my time in public service is
12　transparency and accountability and that's
13　I think probably why I was identified for
14　to start the oversight committee in the
15　House and -- you know, those are things
16　that during my entire tenure in government
17　both local government and Columbia have
18　been basic tenants that I have advanced in
19　every way, shape and form that I can and
20　our oversight committee has received
21　national awards for our work that's
22　grounded in those areas.
23　　Q.　Okay. Thank you. So I see that
24　we're getting close to noon and I'm kind
25　of at a stopping point. Would this be an

Page 55

1　okay time for a break, perhaps a lunch
2　break or do you have any preferences,
3　Representative Newton, on timing?
4　　A.　Well, I'm giving an idea -- I
5　mean I -- I'm just looking for a window,
6　an idea of how much longer we're talking
7　about. Obviously since we're on furlough
8　this week it's also my time to earn a
9　living so I'm -- if we were -- if we
10　weren't doing this there would be no lunch
11　break. I would just work through it, but
12　I'm sure others may want so I'm okay
13　taking a quick 15-minute break and getting
14　right back to it. If y'all want to take a
15　longer break then I'm okay. I would hope
16　that we keep it to a minimum. Obviously
17　just in my private life I do have folks
18　that want and demand attention. So I'm
19　available for you to tell me what your
20　preference is.
21　　THE VIDEOGRAPHER: I suggest we
22　go off the record and talk about this.
23　　MS. YAN: Sure. Sorry about
24　that.
25　　THE VIDEOGRAPHER: That's okay.

Page 56

1　I'm worried the stenographer is taking
2　all of this down. All right. The
3　time is 11:49. We're going off the
4　record.
5　　(Wherefore, an off-the-record
6　discussion was held.)
7　　(Whereupon, a lunch break was
8　taken at 11:50 a.m.)
9　　THE VIDEOGRAPHER: The time is
10　approximately 12:46 p.m. We're back
11　on the record.
12　　Q.　Representative Newton, did you
13　speak with your attorneys at all during
14　that break?
15　　A.　I did.
16　　Q.　Did you speak about any
17　substantive issues?
18　　A.　Nothing to do with the case, no,
19　ma'am.
20　　Q.　So I'd like to talk about the
21　map room. Representative Newton, are you
22　familiar with this term?
23　　A.　I am.
24　　Q.　And what is the map room?
25　　A.　It was a conference room in the

Page 57

1　block building that was established with
2　the computers and monitors and screens for
3　the redistricting process. House staff
4　was there, House counsel would be in there
5　and the demographers or the folks working
6　the machines with the maps. So it was
7　what it's name is. During the rest of the
8　time I think it's just a conference room
9　in the House. I mean I've never had any
10　meeting there, but I think it's just
11　another conference room in the House.
12　　Q.　And did you ever refer to this
13　map room by any other names?
14　　A.　No.
15　　Q.　No nicknames?
16　　A.　No.
17　　Q.　So who was in charge of the map
18　room?
19　　MR. MATHIAS: Objection.
20　　A.　I never asked the question, but
21　the Judiciary Committee was responsible
22　for -- in the ad hoc committee for
23　redistricting so it would have been House
24　counsel, Mr. Jordan and Mr. Murphy may
25　have had some formal assignment as

15 (Pages 54 - 57)

Page 58

1  to -- when you say who was in charge I
2  mean I -- you know, my first reaction
3  would be the House of Representatives.
4  Who was coordinating access to the rooms I
5  would have said Judiciary Committee staff
6  that may have been in concert with
7  Mr. Murphy and Mr. Jordan as chairman of
8  the redistricting ad hoc committee and
9  maybe the speaker had some involvement.  I
10  don't know.
11     Q.   So you mentioned that staff and
12  counsel would be in or around the map
13  room.  Who specifically are you referring
14  to for staff?
15     A.   The gentleman's name is Thomas,
16  but I can't tell you his last name.
17     Q.   Is it H-A-U-G-E-R?  Does that
18  sound familiar?
19     A.   He wears glasses.
20     Q.   I'm not sure about that, but
21  okay.
22     A.   I don't know his last name, but
23  Ms. Dean obviously -- Emma Dean, lawyer to
24  the Judiciary Committee, Patrick Dennis,
25  lawyer to the House, the -- I think I

Page 59

1  probably saw one of the other Judiciary
2  Committee lawyers in there, Jimmy.
3     Q.   I'm sorry.  Could you say
4  Jimmy's full name for the record?
5     A.   No.  Only because I don't know
6  his last name.  I mean I can look up on
7  the website, but there's Emma, Jimmy and
8  Roland are three of the lawyers on the
9  Judiciary Committee and I can't tell you
10  his last name unfortunately.
11        And then Mark Moore or one or
12  more of the outside counsel may have been
13  in there.  You know, I was in there I
14  think three or four occasions.  I'm sure
15  there was another House staff demographer
16  in there because Thomas wasn't the only
17  one working the monitors, but I never
18  worked with anybody but him so I don't
19  know who that other person was.
20     Q.   So there were other
21  demographers?
22     A.   I mean demographer may be the
23  wrong title.  There was somebody else,
24  some other staff member than just Thomas
25  who was capable of working and I believe

Page 60

1  not with me, but worked the monitors and
2  the computer programs relative to the map
3  drawing exercise.
4     Q.   Do you know any of their names?
5     A.   I don't.  I don't.  And quite
6  frankly it could have been a member of the
7  outside counsel's team.  I just know I
8  watched somebody else working on a map on
9  a different terminal than when I was with
10  Thomas.
11     Q.   So you mentioned a terminal.
12  Are there multiple terminals?
13     A.   Well, a computer and a monitor,
14  yeah.  There are a couple of them.
15     Q.   Did you have any formal rules or
16  procedures governing the use of this map
17  room?
18     A.   I think there were some formal
19  rules.  I don't have them.  I'm not sure
20  whether the ad hoc committee approved them
21  or they were just here are the rules
22  relative to the map room, but I mean --
23  you know, it required -- you know, no cell
24  phones, the -- I mean there was a
25  scheduling methodology to it so you didn't

Page 61

1  just have 124 people show up all at one
2  time and overwhelm what was going on and
3  if you weren't signed up for a time slot
4  you couldn't come.  So you couldn't just
5  show up.
6     Q.   Okay.  Could you tell me more
7  about that scheduling or sign-up process?
8     A.   You know, as a member of the ad
9  hoc committee -- so there were two
10  different methods I guess or two different
11  pathways.
12        One, every member of the House
13  was provided the opportunity to pick a
14  time slot or slots and come spend time in
15  the map room looking at the -- their
16  representative district, existing lines
17  with the new decennial census information
18  provided in that and working to see what
19  modifications to that based on the
20  computer programs looked like.  That was
21  as individual members of the House and I
22  availed myself of that perhaps one or
23  maybe two times, but also as a member of
24  that ad hoc committee there were members
25  of the ad hoc committee that came in

16 (Pages 58 - 61)

Page 62

1  groupings. So for instance when I was
2  there I was there with Representative
3  Bamberg, my district in this part of South
4  Carolina I got the ocean on one side and
5  I've got the Georgia line on the other so
6  obviously much of anything that happens in
7  this part of the State has a cascading
8  effect up into the area of the State that
9  Representative Bamberg is from and so
10  Representative Bamberg and I were there on
11  a couple of occasions together as members
12  of the ad hoc committee.
13     Q.   So there are different rules for
14  members of the ad hoc committee by which
15  you can -- multiple members of the ad hoc
16  committee can be in the map room at the
17  same time, is that --
18     A.   Well, I mean I think they're
19  all -- yes and no. I think the only
20  difference was as members of the ad hoc
21  committee -- as an individual member of
22  the House I was there looking at my
23  individual district and I was there with
24  Representative Herbkerman on at least one
25  occasion. Representative Herbkerman's

Page 63

1  district backs up to mine so we were not
2  there as a Buford delegation, but we were
3  there as two members whose districts
4  touched each other to look at the issues
5  of population growth and what changing
6  lines looked like as between our two
7  districts again, constrained with ocean
8  and Georgia line. So we had a time slot
9  that we signed up for.
10        Members of the ad hoc committee
11  also had time slots. I don't know whether
12  we signed up for them or we were told this
13  is the time for you and Bamberg to be up
14  there, but in our review was not just his
15  single district and my single district, it
16  was also what other representatives may
17  have suggested, looked at, offered input
18  as to how those districts might look sort
19  of like a mosaic. I mean we weren't just
20  looking at our individual districts or in
21  the case of Representative Herbkerman and
22  I looking at just what our two districts
23  looked like. We were as members of the ad
24  hoc committee looking at a portion of the
25  State sort of his area and my area -- you

Page 64

1  know, from sort of the I-95 corridor down
2  to the ocean and to the Georgia line.
3     Q.   So in your experience was it
4  common for non-ad hoc committee members to
5  be in the map room with other
6  representatives at the same time?
7     A.   Well, my experience obviously I
8  was in there with Herbkersman. I think
9  Mr. Jordan may have been in there. I
10  don't know if it was when I was with
11  Herbkersman or when Bamberg and I were in
12  there.
13        I'm aware that some groups came
14  in as a delegation. I think the
15  Greenville folks perhaps came in at that.
16  I know at one point when I was leaving the
17  I think the Greenville delegation was
18  coming in behind me.
19        My Buford delegation never met
20  as a whole in the map room, but I believe
21  that Erickson and Bradley may have been in
22  there together, but I don't know that. I
23  know that all of us, Rivers, Williams,
24  Herbkersman, me, Bradley and Erickson we
25  didn't all go in there collectively as a

Page 65

1  delegation, but I believe that some did.
2     Q.   When you refer to a delegation,
3  does that tend to be a regional delegation
4  of neighboring districts?
5     A.   It does. I mean when I say the
6  word "Buford delegation" or "Buford" or
7  "Jasper delegation" it's those members of
8  the House that represent some portion of
9  that county so we have delegation
10  meetings. In fact, I think earlier in the
11  day I referred to we had a delegation
12  meeting Monday and I mentioned to my House
13  colleagues that I was being deposed later
14  in the week. That was a Buford delegation
15  meeting.
16     Q.   And back to the sign-up process,
17  was that just a first-come-first-serve
18  process?
19     A.   I don't think so. Yes, ma'am.
20  I don't know of anybody who -- I never
21  received any complaints from anybody that
22  they couldn't get in. It was open to
23  everybody to sign up to avail themselves
24  and it was open for a number of weeks. I
25  couldn't tell you how many and I couldn't

17 (Pages 62 - 65)

Page 66

1 tell you how many weeks, but it was my --
2 you know, I never heard anybody that
3 didn't have the opportunity to get in
4 there.
5     Q.   Do you know who arranged the
6 sign-up process?
7     A.   I don't.  I have some level of
8 recall that it would have been a
9 notification by the Judiciary Committee
10 that the map room was open and for people
11 to come -- pick a time slot and come sign
12 up and start -- you know, looking at the
13 district lines with the new census
14 information.
15     Q.   Thank you.  So you mentioned
16 that delegates or representatives could go
17 into the map room as the delegation or
18 just alone; is that correct?
19     A.   Yes.
20     Q.   And when a representative goes
21 into the map room alone what would you do?
22     A.   Sit at the terminal with Thomas
23 in my case.  He would show me my -- it's
24 not mine.  He would show me the lines for
25 district 120 and then show me what the

Page 67

1 population numbers were, the new census
2 data for that district and then we would
3 look at that and understand what the ideal
4 size district is and then begin to start
5 adjusting that line based on census blocks
6 to bring that district in to compliance
7 with the population numbers.
8     Q.   But would you only have access
9 to a single district?
10     A.   Well, as a member of the ad hoc
11 committee obviously I had access to all of
12 the other areas, but the only district
13 when I went in as a -- to look at district
14 120 was my district.
15         Now, as I mentioned and -- you
16 know, obviously it's like a puzzle or a
17 balloon or a mosaic.  I mean when you push
18 one boundary or restrict one boundary it
19 has a cascading effect on the ones that it
20 borders.
21         So obviously I saw what was
22 happening to those other districts.  I
23 didn't necessarily go into those districts
24 to start seeing how they needed to be
25 modified, keep working up until

Page 68

1 Representative Bamberg and I were in there
2 sort of at the same time on a regional
3 basis taking a look, but when I was
4 looking at district 120, I apologize,
5 that's an accurate description, none of us
6 own those districts, but -- you know,
7 obviously with water and the Georgia line
8 as some of our restrictions in this part
9 of the world I was aware of what changes
10 in my district might be doing to the
11 others around me.
12     Q.   So did other legislators who
13 were not ad hoc committee members have
14 access to other district information?
15     A.   The same way, yes.  You know,
16 obviously if you're in there looking at
17 the map and understanding what your border
18 or a respective district line border
19 looked like and you made that change
20 it -- I would push into that district.  I
21 didn't explore what limits might have been
22 on other House members beyond my
23 individual experience.
24         I mean for instance -- you know,
25 I wasn't particularly interested in what

Page 69

1 was happening in the Greenville or Rock
2 Hill areas -- you know, my timing there as
3 an individual was what was happening to
4 the low country and then the low country
5 as it connected up the I-95 corridor.
6     Q.   So for district 120 did you draw
7 proposed maps for that district?
8     A.   Yes.
9     Q.   And how many maps -- if you
10 remember, how many maps did you propose?
11     A.   Just one.
12     Q.   And did you view -- well, I'll
13 take that back.
14         So in the map room what kinds of
15 resources were there?  You mentioned these
16 terminals and the software, but could you
17 explain a little more?
18     A.   Yeah.  I don't know the name of
19 the software.  When I did this on County
20 Counsel I probably had a better
21 familiarity with the brand of software
22 that was being run, but -- you know,
23 obviously the computer program shows you
24 when you move and modify to follow the
25 census blocks, then there's a chart that

18 (Pages 66 - 69)

Page 70

1  shows all of the population within that
2  area, the percentages of voting age,
3  race -- you know, all the demographic
4  information from the census as to what's
5  inside the boundaries as those boundaries
6  are being adjusted.
7      Q.   When you discussed the rules for
8  the map room you mentioned I believe that
9  you could not bring phones in; is that
10 correct?
11     A.   Yeah.
12     Q.   Would someone take your phone?
13     A.   No.  I don't know that anybody
14 would have taken it from me.  They may
15 have, but I didn't push the envelope.
16     Q.   So Representative Newton,
17 when -- do you remember when the map room
18 opened for use?
19     A.   I do not.  I mean I know it was
20 with great anticipation that we waited on
21 the numbers to come from the census folks
22 and I remember being told that will be the
23 map room, but I -- in terms of timing I
24 don't know that I could identify when that
25 happened.  I mean obviously it was

Page 71

1  sometime last fall.
2      Q.   So do you have a sense of when
3  you first visited the map room in your
4  capacity as an individual legislator?
5      A.   Probably September or October.
6      Q.   And you mentioned that you only
7  went in -- well, how many times?
8  Approximately how many times?
9      A.   Either three of four.  So I
10 think I was there once by myself, Bamberg
11 and I may have been there at the same time
12 so I may have done dual duty.
13 Representative Herbkersman and I, I know
14 were there at the same time because either
15 he rode up with me or I caught a ride with
16 him afterwards and met my wife and we went
17 up to the mountains so I remember that
18 time and Representative Bamberg were
19 either there then or he and I had a time
20 as members of the ad hoc committee that
21 was separate from that.
22          So I have a recall of being
23 there one time without Mr. Herbkersman
24 again focussed on district 120, I have a
25 recall of being there with Herbkersman

Page 72

1  when we were focussed on district -- his
2  number and mine 120 and then on two
3  occasions with Representative Bamberg.  I
4  just don't know whether any of those
5  overlapped or not so it's between three
6  and four.
7      Q.   Thank you.  So who else was
8  allowed to access the map room?
9      A.   Every member of the House, the
10 lawyers, judiciary staff that was working
11 on it.  Beyond that I wouldn't think
12 anybody.  Of course I wasn't there, but I
13 mean obviously the people who had to hook
14 up the computers and do all that.  I
15 suspect that's the IT folks, but the only
16 people that were in there when I was there
17 were either lawyers or House staff.
18     Q.   And do you know if staff does
19 that include interns?
20     A.   I wouldn't think that -- I never
21 recall seeing any intern in there and I
22 would have been surprised if they were.
23 During my visits I don't believe there
24 were any interns.  I believe everybody was
25 lawyers or staff.

Page 73

1      Q.   Were any other third parties
2  allowed access to the map room?
3      A.   Not that I'm aware of and they
4  weren't there when I was there.
5      Q.   So anyone, legislator, staffers,
6  attorneys, would there be records of all
7  these people going into the map room?
8      A.   I wasn't in charge of that, but
9  I -- you know, there was obviously a
10 sign-up process to identify and pick time
11 slots.  I know when they were doing that.
12 I think there may have been some sign-in
13 sheets of some kind.  You know, I want to
14 say I have some vague recall about -- as
15 individuals we had to sign in.  If you're
16 on the ad hoc committee you were assigned
17 a time so it was different than signing
18 in, but I wasn't in charge of any of that
19 and never had the occasion to run that
20 down in detail other than that I knew
21 access was regulated and organized.
22     Q.   So I'm going to ask about a few
23 specific people now.  First, do you know
24 who Thomas Hauger is, H-A-U-G-E-R?
25     A.   I believe that's the -- or the

19 (Pages 70 - 73)

Page 74

1 label I would give him would be
2 demographer. I think that's -- I think
3 we're talking about the same person.
4 I'm -- if you had a picture of him I could
5 tell you for certain. He's a House staff
6 person who operated the terminal, knew how
7 to work the program in adjusting the maps.
8 I'm just not certain if that's his last
9 name, but I think it is.
10    Q.   Okay. Did Mr. Hauger have any
11 roles in the map room?
12    A.   Not that I'm aware of.
13    Q.   Did you ever communicate with
14 Thomas by email or by phone?
15    A.   I did not.
16    Q.   Do you know who Sarah Grace
17 Williamson is?
18    A.   No. I do not.
19    Q.   Do you know who Joleigh Eliza
20 Deguit is and I can spell that,
21 J-O-L-E-I-G-H, Eliza then D-E-G-U-I-T?
22    A.   I do not.
23    Q.   Do you know who Megan Goyak is,
24 G-O-Y-A-K?
25    A.   I do not. Trick question coming

Page 75

1 that I should and I'm ignorant for not,
2 but unfortunately I don't.
3    Q.   Do you know who Daniel Ingley
4 is? That's I-N-G-L-E-Y.
5    A.   I do not.
6    Q.   Okay. And do you know who
7 Sebastian Bass is?
8    A.   I do not. Are you going to tell
9 me all these people work in the House and
10 I'm ignorant for not knowing them?
11    Q.   I'm trying to learn more about
12 them.
13    A.   Okay.
14    Q.   Thank you. So for the maps, the
15 proposed maps that individual legislators
16 drew who -- do you know who collected
17 these or how they were collected?
18    A.   I assume they would have been
19 stored on the computer.
20    Q.   Okay. So just to clarify, the
21 outside parties like the governor and the
22 governor's office, they did not have
23 access to the map room?
24    A.   Not while I was there and that
25 would have been news to me if they did

Page 76

1 have access.
2    Q.   Okay. So I'm going to mark
3 another exhibit now. Just give me a
4 moment. Just to let you know, this will
5 be the -- well, I'll just do it now. One
6 moment.
7        (Pause in proceedings)
8        MS. YAN:  And apologies. If you
9 could bear with me a moment. I'm
10 having a tech issue. Okay. I believe
11 an exhibit should have been just
12 introduced.
13    Q.   Do you see it?
14    A.   I do.
15    Q.   Do you recognize this document?
16    A.   I do. That's the -- without
17 taking time to read the whole thing it
18 appears to be the criteria that the ad hoc
19 committee adopted for purposes of the
20 redistricting exercise.
21    Q.   And it says at the top that it
22 was adopted 8/3/2021. Does that sound
23 correct that it would have been adopted on
24 August 3, 2021?
25    A.   Yes. I believe that's correct.

Page 77

1    Q.   So Representative Newton, is
2 this what you relied upon or you and the
3 redistricting committee relied upon for
4 developing proposed maps?
5    A.   It is. Essentially it was our
6 criteria or guidelines.
7    Q.   Are there any other documents or
8 guidelines outside of these that the
9 redistricting committee relied upon?
10    A.   No. Not that I'm aware of. Not
11 that I relied on.
12    Q.   Understood. So if I could
13 direct you to Roman Numeral II federal law
14 and a few sentences down it starts to say,
15 the dilution of racial or ethnic minority
16 voting strength is contrary to the laws of
17 the United States and of the State of
18 South Carolina and also is against the
19 public policy of this state. Is that
20 correct?
21    A.   Yes, ma'am. That's what it
22 says.
23    Q.   So can you read aloud the next
24 sentence after that?
25    A.   Any proposed redistricting plan

20 (Pages 74 - 77)

Page 78

1 that has demonstrated to have the intent
2 or effect of dispersing or concentrating
3 minority population in a manner that
4 prevents minorities from electing the
5 candidates of their choice will neither be
6 accepted nor approved.
7    Q.   Thank you.  Did you ever receive
8 any public testimony that your proposed
9 redistricting plan would have the effect
10 of preventing minorities from electing
11 their candidates of choice?
12    A.   I'm certain that there were
13 input from people that didn't like various
14 pieces or parts of the proposed plans,
15 yes.  But -- you know, we talked about the
16 growth earlier.  The terminology I first
17 learned when I was on County Counsel is
18 the difference of retrogression, natural
19 retrogression or intentional
20 retrogression.  So I mean there were
21 obviously folks that didn't like various
22 maps or portions of the state for a host
23 of reasons and certainly there were some
24 that would make these suggestions.
25    Q.   And to be clear, these

Page 79

1 suggestions what are you referring to?
2    A.   Well, what you just had me read
3 that people would contend that the maps
4 had the effect of dispersing or
5 concentrating minority population in a
6 manner that prevents minorities from
7 electing the candidates of their choice
8 and were there people that said that in
9 the process that is what we were doing,
10 yes, there were.
11    Q.   Thank you.  And I'll direct you
12 now to Roman Numeral IV equal population,
13 slash, deviation, do you see that?
14    A.   I do.  Yes, ma'am.
15    Q.   And then section C below that if
16 you could take a moment to look at that
17 and read that to yourself.  If you see a
18 portion that begins, efforts should be
19 made to limit the overall range of
20 deviation, do you see that?
21    A.   I do.
22    Q.   Could you please read beginning
23 there for the record?
24    A.   Efforts through the end of the
25 provision?

Page 80

1    Q.   Yes, please.
2    A.   In every case efforts should be
3 made to limit the overall range of
4 deviation from the ideal population to
5 less than five percent or a relative
6 deviation in excess of plus or minus two
7 and a half percent for each House
8 district.
9       Nevertheless any overall
10 deviation greater than five percent from
11 equality or population among South
12 Carolina House districts shall be
13 justified when it is the result of
14 geographic limitations, the promotion of a
15 constitutionally permissible State policy
16 or to otherwise comply with the criteria
17 identified in these guidelines.
18    Q.   Thank you.  So why was this
19 population deviation standard chosen?
20    A.   Well --
21       MR. MATHIAS:  Objection.  Go
22 ahead.
23    A.   Obviously the ideal number
24 mathematically is 41,278.  The
25 constitutional principle of one man, one

Page 81

1 vote means that we would ultimately have
2 districts of 41,278.
3       So in recognizing those
4 parameters we were establishing a five
5 percent deviation or two and a half up,
6 two and a half down number which was in
7 the last reapportionment redistricting
8 process in South Carolina and a number
9 determined to be appropriate in this
10 year's process as well.
11    Q.   Did you receive any criticism
12 regarding this choice of population
13 deviation?
14    A.   We did.
15    Q.   And what did you understand were
16 the concerns?
17    A.   There were some people that
18 thought we ought to go to ten percent.
19 I'm sure there were some that probably
20 thought we should go higher than that.
21    Q.   Did anyone ever ask to go higher
22 than ten percent?
23    A.   I can't recall specifically that
24 the ad hoc committee did deal with a
25 motion after having adopted this criteria

Page 82

1  to go to ten percent, but that motion was
2  not successful and we did not do so.
3      Q.   So for the concerns motivating
4  this motion to go to ten percent do you
5  remember any references to effects on
6  minority communities?
7      A.   Not specifically.  I'm sure
8  there probably were.  I mean what I recall
9  is the suggestion that it had an impact on
10  rural areas of the county more so than
11  others, but I don't have necessarily
12  specific recall that it had a different
13  effect on just minorities and I would tell
14  you that I think all of comments were
15  probably anecdotal.  I'm not sure that
16  anybody had any hard fast information at
17  the point in time certainly when we were
18  talking about the criteria adopting it or
19  at the time that we were -- that we
20  entertained the motion to do so.
21          As one of the members of the
22  committee -- you know, again the ideal
23  population being 41,278 and the
24  constitutional principle of one man, one
25  vote you're getting farther and farther

Page 83

1  away from that constitutional principle
2  with the larger deviation.
3      Q.   Are you familiar with any
4  concerns that were raised about the U.S.
5  census data itself resulting in an
6  undercount?
7      A.   Just anecdotal.
8      Q.   And when people refer to that
9  concern did they mention how that
10  undercount would affect the minority
11  community?
12      A.   I don't specifically recall
13  limited to just minority communities.  I
14  mean the suggestion was there's no
15  internet access in rural areas which I
16  mean I can remember people saying that,
17  even the governor has highlighted that and
18  as a consequence we think that there may
19  have been an undercount in terms of the
20  census data.
21      Q.   So what did you think of those
22  concerns?
23      A.   Obviously there are issues
24  relative to the internet.  I don't believe
25  that the census activities however were

Page 84

1  restricted to the internet so while those
2  comments were not lost on me the ideal
3  population again one man, one vote is
4  41,278 so we were trying to set a number
5  that allowed flexibility and deviation
6  within those parameters and within a
7  parameter of district lines that had been
8  challenged in the court and had gone
9  through pre-clearance in the last
10  redistricting effort in South Carolina and
11  had been acknowledged as not being
12  inappropriate in that exercise.
13      Q.   So I guess we can move on to
14  section six, compactness, do you see that?
15      A.   I do.
16      Q.   Could you read the second
17  paragraph under that section?
18      A.   Compactness should be judged in
19  part by the configuration of prior plans.
20      Q.   Could you continue?
21      A.   Oh, compactness should not be
22  judged based upon any mathematical,
23  statistical or formula-based calculation
24  or determination.
25      Q.   So why did the redistricting

Page 85

1  committee specify that compactness should
2  not be based on any mathematical,
3  statistical or formula-based calculation?
4      A.   Well, recognizing I think that
5  in South Carolina again as a rural
6  community you may have one district that's
7  a handful of miles from end to end and in
8  other rural parts of the state you may
9  have to stretch an awful long way in order
10  to come up with 41,278 people plus or
11  minus two and a half percent.
12      Q.   So then how did you assess this
13  criterion of compactness?
14      A.   In -- well, you mean outside of
15  a mathematical formula?  To try to look at
16  a district that recognized you might have
17  to have larger boundaries in order to get
18  to the population necessary, but this was
19  not -- well, quite frankly, that you
20  weren't going to have some really strange
21  looking district that wrapped around
22  narrow corridors in order to artificially
23  sort of create an area.
24          I'm -- I guess that's -- you
25  know, sort of in just layman terms,

22 (Pages 82 - 85)

Page 86

1  compactness means trying to keep the area
2  in a shape and size that represents the
3  population numbers that you're trying to
4  get to without having to or without
5  drawing something that looks very abnormal
6  or unusual in doing so.
7      Q.   Thank you.  So now if we can
8  look at section seven, communities of
9  interest.  Well, if you don't mind could
10  you please read that first paragraph into
11  the record?
12     A.   Sure.  Communities of interest
13  should be considered in the redistricting
14  process.  A variety of factors may
15  contribute to a community of interest
16  including but not limited to the
17  following:  Economy, social and cultural,
18  historic influences, political beliefs,
19  voting behavior, government services,
20  commonality of communications, geographic
21  location and features.  Communities of
22  interest should be considered and balanced
23  by the redistricting ad hoc committee, the
24  House Judiciary Committee and the South
25  Carolina House of Representatives, county

Page 87

1  boundaries, municipality boundaries and
2  precinct lines as represented by the
3  census bureau's tabulation district lines
4  may be considered as evidence of
5  communities of interest to be balanced,
6  but will be given no greater weight as a
7  matter of state policy than other
8  identifiable communities of interest.
9          It is possible that competing
10  communities of interest will be identified
11  during the redistricting process although
12  it may not be possible to accommodate all
13  communities of interest, the redistricting
14  ad hoc committee, the House Judiciary
15  Committee and the South Carolina House of
16  Representatives will attempt to
17  accommodate diverse communities of
18  interest to the extent possible.
19     Q.   Thank you.  So how did you
20  resolve instances where there were
21  competing communities of interest?
22     A.   I don't know that you ever
23  resolve it.  I mean you try to do the best
24  that you can in recognizing and not
25  intentionally split up those districts,

Page 88

1  but or split up those communities of
2  interest, but try to be in looking at the
3  lines that which was approved before, but
4  that also which -- you know, nature
5  barriers are often boundary lines in terms
6  of districts, but commonality of concerns
7  of people within certain areas.  You know,
8  in my part of the world everybody is close
9  to the ocean, close to -- everybody in
10  this county in the low country of South
11  Carolina is impacted by certain things in
12  a way that people in inland Jasper,
13  Hampton, Allendale, Bamberg all the way up
14  to Greenville would not have the same
15  types of concerns.
16     Q.   You mentioned natural
17  boundaries.  Could you explain what you
18  mean?
19     A.   Yes, sometimes rivers, streams,
20  even municipal boundaries are considered.
21  Obviously the ocean and Georgia line are
22  constraints as well.
23     Q.   Representative Newton, did you
24  see anywhere in this paragraph or
25  throughout the criteria any reference to

Page 89

1  the use of highways or roads as a
2  consideration for redistricting?
3      A.   County boundaries not as I
4  specifically delineated, but -- you know,
5  commonality, government services, I mean
6  you know obviously there may have
7  some -- that may be associated or
8  connected with highway boundaries or
9  roadways.
10     Q.   Is it possible that highways may
11  have been built in a way that segregated
12  different racial communities?
13          MR. MATHIAS:  Objection.
14     A.   I have no idea.
15     Q.   Okay.  I am done with this
16  exhibit and I'm going to enter another
17  exhibit into the record now.  Just a
18  moment.  Can you let me know if you see
19  the new exhibit?
20     A.   Is this our schedule of or at
21  least a schedule of public hearings?
22     Q.   I believe so.  Do you recognize
23  it?
24     A.   I do.  I mean it says subject to
25  change.  I don't know whether this was the

23 (Pages 86 - 89)

1 final schedule or not, but it looks like
2 it.
3     Q.   As you look through these
4 different locations for the public
5 hearings does this look familiar?
6     A.   It does.
7     Q.   How were these locations chosen
8 for these public hearings?
9     A.   I wasn't involved in that. I
10 couldn't tell you.
11    Q.   Do you know --
12    A.   I would tell you that with
13 regard to Bluffton I made it clear that
14 Bluffton was a centralized location in
15 this part of the low country. You know,
16 not -- I made sure that the judiciary
17 staff were aware of that and in fact
18 suggested that the Bluffton High School
19 would be an appropriate location simply
20 because I don't know how familiar they
21 were or are with Buford County or the
22 greater Bluffton area, but Bluffton is
23 generally recognized as being a fairly
24 center place in the low country not just
25 for Buford Hilton Head the Bluffton area,

1 but also for Jasper area.
2     Q.   Understood. Thank you. And do
3 you know how these dates and times were
4 chosen?
5     A.   I do not.
6     Q.   Do you know who would have made
7 these decisions?
8     A.   I would guess they were made by
9 Mr. Jordan, Mr. Murphy and probably in
10 concert with counsel; Ms. Dean and
11 Mr. Dennis.
12    Q.   So looking at these dates does
13 it sound correct to you that September 8th
14 would have been the first public hearing?
15    A.   I believe so.
16    Q.   And that the last public hearing
17 would have been on October 4th?
18    A.   I believe that's correct.
19    Q.   Does it also sound correct that
20 October 4th, the date of the last public
21 hearing was also the first day that the
22 map room opened?
23    A.   I think that's correct, yes. I
24 think that it coincided with the public
25 hearings concluding.

1     Q.   So the -- between the adoption
2 of your criteria for redistricting which
3 we had discussed was updated on August 3,
4 2021, and this first meeting or this first
5 public hearing on September 8th did the
6 redistricting committee create any public
7 education materials about redistricting?
8     A.   Not that I'm aware of, no.
9     Q.   During that time did the
10 redistricting committee advertise the
11 hearings?
12    A.   I'm sure the hearing schedule
13 and hearings were advertised, yes.
14    Q.   Do you know how so?
15    A.   I do not. I mean if I would
16 guess they were probably sent to local
17 newspapers, House members been aware, I
18 could have even published a schedule on a
19 Facebook page, but in terms of -- you
20 know, knowing what day a notice may have
21 run in the paper or who it went to or what
22 local government may have put it on their
23 website I don't know that.
24         I seem to recall the Island
25 Packet newspaper here having a schedule or

1 reporting on redistricting activities. My
2 guess would be they made reference to
3 scheduling that.
4     Q.   Thank you. Do you remember how
5 much advance notice was given to the
6 public when you announced the schedule of
7 public hearings?
8     A.   I do not.
9     Q.   Would it surprise you if it were
10 about a week?
11    A.   No, not necessarily. I mean I
12 know that they were trying to pin
13 locations down and make those
14 coordinations as to when and where a
15 public hearing could be held, but that --
16 you know, I don't -- if you told me it was
17 three weeks, two weeks, ten days I
18 couldn't question it one way or the other.
19 I just don't know.
20    Q.   And did you offer a virtual
21 testimony option at all of these public
22 hearings?
23    A.   I don't believe at all of them,
24 no. There were virtual options that were
25 held from Columbia.

24 (Pages 90 - 93)

Page 94

1    Q.   And initially only one of these
2 hearings was scheduled to have that
3 virtual testimony option; is that correct?
4    A.   I remember that there was
5 another one that was added, but I don't
6 know whether it was intended to just be a
7 virtual or another in-person.  You know,
8 we were still holding open public
9 hearings.  Some people would come, some
10 people obviously expressed concerns about
11 COVID so I know that there were another
12 one or another meeting on the schedule.
13 Whether that was originally intended, but
14 had not been identified as one of the
15 public hearings.  That I don't know.  I
16 wasn't in charge of that.  I was told
17 where to be and what day and I was there.
18    Q.   So you don't know why virtual
19 testimony options were not offered at all
20 the public hearings?
21    A.   Well, no, I don't.  I mean I
22 would perhaps speculate that in some
23 locations trying to coordinate that might
24 have been more difficult, but if you were
25 going to do it virtually it would beg the

Page 95

1 question as to -- you know, what was the
2 need of going out into all the areas of
3 the State.  Why not just hold ten virtual
4 hearings in Columbia and call it a day.
5 And so I don't -- I don't.  I mean I --
6 having done virtual hearings both with
7 other activities with the Judiciary
8 Committee and with the oversight committee
9 they were always held, the ones I've been
10 involved with, at the State House block
11 building where we had the capability of
12 doing so.
13        And whether that had an
14 involvement in identifying these locations
15 where we were on the road so to speak and
16 going to the backyards of all the four
17 corners of the State and offering people a
18 way to come to be face to face as well as
19 in the process of offering an opportunity
20 to provide input virtually at some point
21 in the process -- you know, I can't tell
22 you why they -- the -- it was not in every
23 location, but I know that there was
24 virtual options offered as well as the
25 in-person.

Page 96

1    Q.   Does the legislature utilize
2 virtual testimony options for other
3 hearings?
4    A.   We did during the
5 COVID -- during the pandemic for certain
6 subcommittees or public hearings attended
7 to subcommittee hearings that were virtual
8 options again from the block building in
9 Columbia.
10    Q.   You referenced the COVID
11 pandemic so that would have started around
12 March of 2020; is that correct?
13    A.   Yeah, and I don't think we
14 started doing any hearings using that
15 stuff until maybe early '21.  Could have
16 been the fall of '20, but I don't think
17 so.  I mean I -- I think I'm fairly
18 certain of that.
19        I don't think we had
20 the -- either the know how institutionally
21 or flexibility in any of our rules to do
22 so and but obviously we needed to get back
23 to business and there were concerns about
24 having people be exposed and assemble in
25 groups and so we sort of adapted with

Page 97

1 technology and virtual participations with
2 an option that was added.
3    Q.   Okay.  Thank you.  I am about to
4 mark a few more exhibits.  It's a series
5 of exhibits that I will just mark --
6    A.   Can I have three minutes while
7 you're doing that?
8    Q.   Sure.  Sure.
9        MR. MATHIAS:  Okay.
10        THE VIDEOGRAPHER:  So we're
11 going off the record?
12        MS. YAN:  Yes.
13        THE VIDEOGRAPHER:  Okay.  Sure.
14 Thank you.  The time is approximately
15 1:48.  We're going off the record.
16 It's the end of media two.
17        (Whereupon, an off-the-record
18 discussion was held.)
19        (Whereupon, a recess was taken.)
20        THE VIDEOGRAPHER:  The time is
21 approximately 1:52 p.m.  We're back on
22 the record.  This is the beginning of
23 media unit three.
24    Q.   Representative Newton, do you
25 see four new exhibits in Exhibit Share?

25 (Pages 94 - 97)

Page 98

1    A.   Yeah.  4, 5, 6 -- 5, 6, 7, 8.  I
2 do.
3    Q.   Could you please take a look at
4 Exhibit 5?
5    A.   Yeah.  Okay.
6    Q.   Do you recognize this document?
7    A.   I do.
8    Q.   Do you recall reviewing it at
9 some point?
10    A.   I do.
11    Q.   Okay.  That's all and then
12 Exhibit 6?
13    A.   An August 30th letter.  Is that
14 6?
15    A.   Yes.
16    A.   I do.
17    Q.   Correct.  Do you recall
18 receiving this document?
19    A.   I do.
20    Q.   Did you review it at some point?
21    A.   I did.
22    Q.   Okay.  And Exhibit 7?
23    A.   August -- excuse me.
24 September 27th letter?
25    Q.   Yes.

Page 99

1    A.   I recall having seen it and
2 reviewing it at some point and the last
3 one October the 8th.
4    Q.   Yes, and to clarify that is
5 Exhibit 8?
6    A.   Exhibit 8, correct.
7    Q.   You recall receiving this
8 document?
9    A.   I -- the -- coming to the
10 committee, yes, ma'am.
11    Q.   And did you review this
12 document?
13    A.   At the time it would have been
14 submitted, yes, ma'am, as part of the
15 process.
16    Q.   Okay.  All right.  Thank you.
17         So now moving on to later on in
18 the hearing process.  Do you recall when
19 the first hearing was where the
20 redistricting committee had proposed State
21 House maps to consider?
22    A.   No.  I'm thinking about the
23 schedule -- the hearings you just showed
24 me a minute ago.  It would have been
25 sometime after that October date, but I

Page 100

1 don't know that I can tell you when.
2    Q.   Does November 10, 2021, sound
3 familiar as a hearing date?
4    A.   Without having my schedule in
5 front of me I know it was sometime late
6 last fall.
7    Q.   Okay.  Do you recall when the
8 redistricting committee released its first
9 proposed map?
10    A.   I do not.  In some level of
11 proximity to the -- to our committee
12 meeting, subcommittee meeting, ad hoc
13 committee meeting.
14    Q.   I'm sorry.  What was that?
15    A.   Well, I've said committee
16 meeting and then clarified that we were
17 talking about ad hoc committee.  It would
18 have been in proximity to that, a few days
19 before, but whether it was two days or six
20 days or eight days I don't recall that.
21    Q.   Who was involved in the
22 development of this proposed map which
23 I'll call the initial House draft plan?
24         MR. MATHIAS:  Objection.
25    A.   I mean I'm not -- I don't know

Page 101

1 that I can identify what you're calling
2 the initial House draft plan.
3         You know, obviously in the
4 preparation of the maps as I mentioned
5 individual members looked at their
6 individual district.  The ad hoc committee
7 not as a body, but as groups of members of
8 that committee looked at regions of the
9 State then those region efforts would have
10 been put together and brought forward
11 as -- you know, here's this work in
12 progress.
13    Q.   So once you received the first
14 draft, the work in progress, what was the
15 process?
16         MR. MATHIAS:  Objection.
17    A.   I mean I think we had a
18 committee meeting looking at what we had.
19 I mean I can't recall the specifics of
20 amendments at that meeting and then
21 following judiciary, but I mean obviously
22 there were amendments and then a product
23 approved and recommended by the ad hoc
24 committee.
25    Q.   So before you shared the initial

26 (Pages 98 - 101)

Page 102

```
 1  -- this initial draft plan pubically when
 2  you had a working draft did you share it
 3  with anyone else to seek feedback?
 4       MR. MATHIAS:  Objection.
 5       A.   I didn't share anything with
 6  anybody.  I mean it would have been
 7  released by the House attendant to our
 8  schedule process or Judiciary Committee.
 9           Until the ad hoc committee
10  actually met and approved I mean we would
11  not have had something that would have
12  been -- that we would have said or would
13  be described as this is the ad hoc
14  committee's map until the committee itself
15  actually loaded and approved something to
16  then -- and amended it or not to go on to
17  the full Judiciary Committee.
18       Q.   Okay.  So we had previously
19  discussed the map room and how individual
20  legislatures drew their own proposed
21  district maps.  So after that map room
22  process ended what happened next?  Who
23  oversaw the process of combining the maps
24  or aggregating them?
25       A.   I wouldn't know.  Not me.  I
```

Page 103

```
 1  mean I would have guessed it would have
 2  been the chairman of the redistricting
 3  committee and the demographers and counsel
 4  of saying -- you know, now we need to
 5  amalgamate all this discussion and move
 6  forward with a schedule process to get
 7  this in front of the committee.
 8       Q.   So you mentioned the chairman
 9  and for the record who is that?
10       A.   I'm sorry.  The chairman of the
11  ad hoc committee would have been
12  Mr. Jordan and then the chairman of the
13  Judiciary Committee is Chris Murphy.
14       Q.   So you were also a member of the
15  ad hoc committee, correct?
16       A.   I was.  Yes, ma'am.
17       Q.   But you were not involved in the
18  aggregation process to form the statewide
19  map?
20       A.   Well, we were -- as I mentioned
21  earlier Representative Bamberg and I were
22  involved in looking at our area of the
23  state if you will.  That sort of I-95 area
24  mid to low country come up further in, but
25  no.  There were -- we had our input into
```

Page 104

```
 1  the activity.  Those were pieces of the
 2  mosaic which were put together in the
 3  puzzle and then there were the puzzle
 4  pushed out, however, printed out,
 5  whatever, for the entire committee who
 6  then looked at that and if my recall is
 7  correct made amendments or modifications
 8  however procedurally and then made a
 9  recommendation to the judiciary.
10           So there were -- I mean never
11  did the ad hoc committee meet in the map
12  room and say let's move this line or that
13  line or this line.  That was all
14  done -- our meetings were all done as part
15  of our published transparent whatever
16  televised process.
17       Q.   So as far as the people who did
18  work on combining the maps can you provide
19  their names?
20       MR. MATHIAS:  Objection.
21       A.   Again, I wouldn't know.  I mean
22  I would think it would have been Thomas
23  who I was working with.  The demographer
24  who Mr. Bamberg and I who at least as
25  representatives of that committee worked
```

Page 105

```
 1  with.  It would have been any other staff
 2  that would have been in there and helping
 3  work the computer program and legal
 4  counsel.  So I mean I -- I mean I could
 5  say all 124, but I mean obviously there
 6  were 124 or as many as House members
 7  participated, but I know you didn't take
 8  124 individual maps and they all perfectly
 9  lined up.
10           So I mean obviously work was
11  broken up done in regions and then those
12  regions had to be sort of pushed together
13  and a product printed and produced for the
14  ad hoc committee to take a look at and
15  then advance a drawing or a map.
16       Q.   So the 124 legislators who came
17  and drew their proposed maps, were they
18  notified about the status of their
19  proposed maps?
20       A.   They would have been notified of
21  the process so I mean I don't know that
22  they would have received individual
23  communication -- you know, hey, we
24  adjusted Elm Street in your district
25  because again they would have provided
```

27 (Pages 102 - 105)

Page 106

1  input. That input would have been looked
2  at in the -- on sort of a regional-type
3  basis then and a statewide basis
4  production of a map of all 124 to look at,
5  comment on and ultimately vote on.
6      Q.   So what happened to proposed
7  maps that were submitted by members of the
8  public?
9          MR. MATHIAS: Objection.
10     Q.   Did any of those proposed maps
11  by members of the public influence your
12  proposed maps?
13     A.   The only map I individually
14  proposed was district 120 -- 120. The
15  proposed maps would have been, I'm
16  assuming, individual members of the ad hoc
17  committee saw those maps, reviewed those
18  maps, compared those maps to what was
19  moving forward through the committee work
20  process and then ultimately were
21  influenced or not a vote of all of the
22  members of the body one way or the other.
23         So I can't speak to how other
24  people may or may not have used that
25  information or reviewed it, but presumably

Page 107

1  they saw it and perhaps looked to see what
2  that did or didn't do relative to what was
3  being proposed by the committee.
4      Q.   Thank you.
5      A.   I mean we had some level of
6  discussion at the committee about some of
7  those maps and had -- and we talked
8  through some comparisons about some of
9  those proposals had fewer minority
10  majority districts than others. I can't
11  recall at which one of those public
12  meetings that the ad hoc committee had,
13  but we had a level of discussion of
14  comparisons of what those proposals looked
15  like versus what was -- we were working on
16  and was moving through the process.
17     Q.   So going back to the process of
18  putting the maps together, how long did
19  this take?
20     A.   You know, I think we've honed in
21  on one of the -- it was early October when
22  the process or late September spot, the
23  map room opened. I'm not even sure I can
24  tell you the day when this thing was
25  finally approved on the House floor other

Page 108

1  than I think it was the first week of
2  December just because I was absent with
3  illness when it was approved, but I was
4  obviously through the ad hoc committee
5  process and the committee process. So
6  late last fall, October to December is the
7  time frame I think you're talking about
8  now.
9      Q.   Are you referring to the time it
10  took after the individual legislators drew
11  their proposed maps --
12     A.   Yes. General time frame as to
13  when that map room opened and the process
14  started to the point that the Judiciary
15  Committee had a recommendation for the
16  House.
17         So I think your question was do
18  you know how much time there was. I
19  don't. I don't know whether it was three
20  weeks or four weeks or two weeks of those
21  particular. I just -- it was in that
22  October/November time frame and the public
23  hearings had been -- you know the process
24  started in August. Census numbers come
25  out public hearings and sort of that

Page 109

1  September/early October time frame map
2  rooms opened in that area and then final
3  approval on the House was I think that
4  first week of December.
5      Q.   So after the individual
6  districts were combined into a statewide
7  draft map and sent to the ad hoc
8  redistricting committee how long did it
9  take for you to assess this map before
10  presenting it pubically?
11         MR. MATHIAS: Objection.
12     A.   I don't -- I'm not sure that I
13  know what that time frame is. That
14  map -- my recall is that map was released
15  to everybody as part of the meeting
16  notification and then we had the meeting
17  sometime thereafter that, a handful of
18  days perhaps.
19     Q.   Okay. I think would it work to
20  take a short break and we can go off the
21  record to discuss this?
22         THE VIDEOGRAPHER: Okay.
23  Without objection we're going off the
24  record at 2:10 p.m.
25         (Whereupon, an off-the-record

28 (Pages 106 - 109)

Page 110

1 discussion was held.)
2      (Whereupon, a recess was taken.)
3      THE VIDEOGRAPHER:  And the time
4 is approximately 2:27 p.m.  We're back
5 on the record.
6      MS. YAN:  Thank you.
7   Q.   So Representative Newton, we
8 spoke about the map room process and how
9 individual legislators propose their
10 districts.  To the extent there were
11 disagreements would legislators
12 communicate with each other about their
13 disagreements?
14      MR. MATHIAS:  Objection.
15   A.   I assume so.  I mean obviously
16 there were individual House members who
17 came to the hearing process and the
18 committee process and who may have voiced
19 their concerns or objections to members of
20 the Judiciary Committee or the ad hoc or
21 presumably at the House.  I wouldn't know
22 the day it was finally approved.
23   Q.   And would any -- would
24 legislators be able to make one-on-one
25 deals with each other regarding disputes

Page 111

1 for districts?
2      MR. MATHIAS:  Objection.
3   A.   I don't know necessarily what
4 a -- I mean if members of a delegation
5 went in together whether it was two
6 members or four members or six members and
7 were looking at lines that affected both
8 of them I suspect I mean they would have
9 suggested as part of their suggestions to
10 the process that would be what the lines
11 look like.
12      Now, was that what was finally
13 approved.  Did it have some level of
14 potential adjust, it may have.  So I don't
15 know that outside of the formal process of
16 the committee being involved that any two
17 members could have gone in together and
18 said let's you and I just decide to do X,
19 Y and Z without it being part of the
20 overall process.
21   Q.   Would legislators have been able
22 to speak with map drawers such as Thomas
23 Hauger about their ideas for how to
24 aggregate districts?
25   A.   The members of the committee

Page 112

1 were there to talk about and look at
2 regional approaches.  Individuals could
3 have offered adjustments, modifications to
4 their maps or to the extent they were
5 there.  As I mentioned I think the
6 Greenville delegation or multiple members
7 of the Greenville delegation came in
8 together so they could have talked to
9 Thomas and others about their lines and
10 how that looked, but they would not have
11 been there to talk about lines beyond the
12 districts that they themselves would have
13 been involved with.
14   Q.   And did you speak much with
15 Thomas Hauger?
16   A.   I mean just during those
17 occasions when I was in the map room.
18   Q.   To the extent that legislators
19 might have input to provide to Thomas
20 Hauger or other map drawers was there a
21 process or how to communicate with the map
22 drawers?
23   A.   I'm assuming in their individual
24 sessions when members of the legislature
25 went in to look at their lines, new

Page 113

1 numbers, what they thought could be
2 adjusted or modified with Thomas that
3 would have been their methodology of
4 communicating.  I mean I'm unaware of any
5 other way they would have perhaps
6 communicated.
7   Q.   So these would have been
8 in-person meetings with Thomas or other
9 map drawers?
10   A.   Yeah, I was a member of the
11 committee and was not made aware if there
12 was another way to communicate with him.
13 My communications were when I was in the
14 map room so I'm assuming that's the same
15 for everybody.  Certainly everybody else
16 on the committee and I know that the
17 process was opened to the individual
18 members to come in and meet as well.
19   Q.   Thank you.  So I'll direct you
20 now to another exhibit.  Can you let me
21 know if you see Exhibit 9 marked?
22   A.   Garber Court Reporting?
23   Q.   Yes.  That's correct?
24   A.   Okay.  November 10th ad hoc
25 committee.  Okay.

29 (Pages 110 - 113)

Page 114

1    Q.   Yes.  Do you recognize this
2  document?
3    A.   I've never seen it before, but I
4  mean I can tell you what the title says.
5    Q.   Well, I will represent that I
6  got this document from the South Carolina
7  legislature's page with transcript from
8  the ad hoc committee meeting.
9    A.   Okay.
10    Q.   So again the date is
11  November 10, 2021.  Were you at this
12  meeting?
13    A.   I think I was, yeah.
14    Q.   If I could direct you to page
15  23.  Let me know when you're there.
16    A.   Okay.  I'm at 23.
17    Q.   So you've previously referred to
18  the maps from the previous round of
19  redistricting which were pre-cleared under
20  the Voting Rights Act; is that correct?
21    A.   Yes, ma'am.  And they were the
22  subject of three or four lawsuits.  So
23  they were challenged and upheld.
24    Q.   So do you see on this page
25  Representative King where he begins

Page 115

1  speaking?
2    A.   I do.
3    Q.   Could you please read his
4  portion into the record?
5    A.   On page 23.  I appreciate you
6  all accepting my testimony.  I previously
7  submitted these statements and I would
8  like to resubmit these statements back to
9  you all and my other concern is as we have
10  collapsed some four or five districts and
11  you stated earlier in your written
12  statement that you read that we had a
13  blueprint to go by.  The blueprint
14  safeguarded our minority districts and in
15  this map that you all have done that will
16  be submitted to the full committee has
17  collapsed a few minority districts or
18  combined those districts.
19        And so I would hope you all
20  would look at if that blueprint that you
21  spoke of earlier had we still had to go
22  through pre-clearance those districts
23  would not have been combined or collapsed
24  and so I would like for you all to take
25  that into consideration as you finalize

Page 116

1  the matter.  Thank you.
2    Q.   Thank you.  And Representative
3  Newton, do you know what Representative
4  King is referring to when he discusses
5  combined or collapsed districts?
6    A.   I understand the concept.
7  Without reading this whole transcript I
8  wouldn't be able to identify what
9  districts you're talking about.
10    Q.   Okay.  Well, let me direct you
11  then to page 152 and just let me know when
12  you've gotten there.
13    A.   Sorry.  I'm getting there.
14    Q.   No problem.
15    A.   Okay.  152.
16    Q.   Great.  So this -- if you scroll
17  up a few pages you'll see that this is
18  Representative Govan speaking.
19    A.   Okay.
20    Q.   So here and -- okay.  Beginning
21  at the bottom of page 152.
22    A.   Okay.
23    Q.   He -- I guess could you please
24  read into the record beginning -- well,
25  beginning at line 14 on page 152 and then

Page 117

1  down to line 15 of the next page so about
2  one page?
3    A.   So it was really with very deep
4  concern and regret in which we found this
5  out that this district which existed along
6  the original districts that were created
7  the first that provided for the first
8  African Americans to be elected to the
9  South Carolina general assembly since
10  reconstruction in terms of single member
11  district lines.
12        There were a couple of people
13  that were elected in '72 that this map
14  basically eliminated one of the original
15  districts.  So with all due respect -- you
16  know, I think that Representative Newton
17  my good friend alluded to earlier when he
18  was addressing a question by one of the
19  presenters here was talking about the
20  draft that y'all had put on the table
21  basically was approved under the most
22  rigorous pass of criteria, et cetera, and
23  guidelines.
24        I was just taken aback by the
25  fact that a district that was created and

30 (Pages 114 - 117)

Page 118

1 has been in existence since 1974 was
2 completely removed off the map and
3 assigned to the Mount Pleasant Charleston
4 area of the State as South Carolina -- or
5 the State of South Carolina and that it
6 had been divided as community of interest
7 had been divided amongst three rural
8 areas, actually four rural areas and that
9 Orangeburg County had been split up like a
10 pie.
11     Q.    Thank you, Representative
12 Newton.  Does this help refresh your
13 recollection about the collapsed districts
14 that you referred to?
15     A.    So in the area of the State
16 you're talking about was the Orangeburg
17 area in general, correct?
18     Q.    So that's one of them, but does
19 it sound familiar that the other districts
20 you're talking about that was moved to the
21 Charleston area that that was in Richland
22 in the last cycle?
23     A.    Yeah, I mean I thought what he
24 was talking about here was the Orangeburg
25 area, but I understand the context now

Page 119

1 that we're talking about so tell me what
2 the question is.
3     Q.    So the question is:  If you
4 refer to these previous maps being upheld
5 or pre-cleared wouldn't the -- wouldn't
6 the collapse of a district or the complete
7 moving of a district to a completely
8 different area of the State significantly
9 change that map?
10     A.    Well, obviously -- I mean any
11 adjustment in the lines change the map,
12 but if the population isn't there
13 to -- because of growth to support an
14 equal size district it doesn't matter what
15 the previous map looked like.  You don't
16 have enough numbers.
17         I mean if your population has
18 shifted in this state which it has and is
19 continuing to do along the coast at 41,000
20 some odd you may have had enough
21 population to have four districts ten
22 years ago, but not enough to have four
23 today.
24     Q.    And just to confirm -- well, no.
25 I'll withdraw that.

Page 120

1         So Representative Newton, if I
2 can direct you back now to the bottom of
3 page 23 again.
4     A.    Yes, unfortunately I got scroll
5 all the way back through.  There's no way
6 to get directly to it.
7     Q.    Sorry about that.
8     A.    No, that's all right.  All
9 right.  Go ahead.  I'm there now.
10     Q.    So you see your name at the
11 bottom of that page?
12     A.    I do.
13     Q.    And you -- going to the next
14 page you are talking about majority
15 minority districts; is that correct?
16     A.    Yes, ma'am.
17     Q.    So I guess what is your
18 understanding of the term majority
19 minority district?
20     A.    That minority majority district
21 or majority minority district or however
22 you want to say them.  The language here
23 talks about minority majority district and
24 it means the majority of the population
25 is -- are a minority.  So that in essence

Page 121

1 a minority member can be elected with a
2 majority of that population in that
3 district.
4     Q.    And do you know is this a term
5 that comes up in the context of section
6 two of the Voting Rights Act?
7     A.    I don't know where the specific
8 legal reference from the term comes from.
9 It's a term that I have been familiar with
10 since my first exposure to any
11 redistricting reapportionment and the
12 whole notion that we talked about earlier
13 today of retrogression and natural
14 retrogression and intentional
15 retrogression.
16     Q.    I guess coming back to section
17 two of the Voting Rights Act are you
18 familiar with it?
19     A.    I'm certainly not an expert, no.
20     Q.    Isn't that when you talk about
21 retrogression?
22     A.    Yeah, I'm just -- I'm not going
23 to hold myself out as an expert of the
24 law.  I mean generally under the concepts
25 of criteria we looked at this morning

31 (Pages 118 - 121)

Page 122

1 intentionally diluting a minority's
2 representation is inappropriate and
3 illegal whether it's a precise provision
4 of section two of the Voting Rights Act,
5 but, yes.
6      Q.   So do you know if the Voting
7 Rights Act imposes any requirements
8 regarding any drawing of majority and
9 minority districts?
10          MR. MATHIAS:  Objection.
11     A.   I don't know if it imposes any
12 specific requirements, no, but I know that
13 if you -- I'm comfortable that if we drew
14 districts intended purely to dilute that
15 population as opposed to natural
16 population shifts that that is against the
17 law.
18     Q.   So and going back to the
19 redistricting guidelines that we had
20 looked at, one of the criterion is to
21 comply with federal law including the
22 Voting Rights Act, correct?
23     A.   Yes, ma'am.
24     Q.   So how do you as the legislature
25 conduct an assessment of whether you are

Page 123

1 complying with the Voting Rights Act?
2      A.   One, we rely on the input of
3 counsel to us as we're doing that, but I'm
4 confident that we all could agree that if
5 we took the district from the last go
6 around and intentionally diluted the
7 minority participation and representation
8 in each of those districts that is against
9 the law.  And so to as much as we might
10 like it to be this is not a color blind
11 process.
12          So protecting the minority
13 communities and their ability to elect a
14 person of their choosing, one of their
15 peers, to office is one of the
16 requirements I believe of the
17 reapportionment and redistricting process
18 and the law.
19     Q.   So is your understanding that
20 compliance with the Voting Rights Act
21 focuses solely on intent?
22     A.   No, ma'am.
23     Q.   Does it look at anything else?
24     A.   Yeah.  But I also believe that
25 if there is -- if there is an effort -- if

Page 124

1 there is an intentional effort to dilute
2 that ability of having a minority majority
3 district that that's against the law and
4 we may not be in the pre-clearance
5 requirements anymore, but I'm comfortable
6 that if in the process of drawing these
7 lines we had intentionally said well,
8 we're not going to do that because of that
9 racial community then the challenge would
10 look a lot different than it is today and
11 that's why I say it's not a color blind
12 process.
13          I think one our responsibilities
14 I think the law requires that we are to
15 try to the greatest extent we can to
16 protect those minority majority districts.
17          I mean I don't think anybody has
18 suggested that intentional retrogression
19 is now okay regardless of what has
20 happened with pre-clearance.
21     Q.   So you've listed an instance of
22 intentional retrogression that would be a
23 violation of the Voting Rights Act, but
24 beyond that how do you assess whether you
25 are affirmatively complying with the

Page 125

1 Voting Rights Act?
2          MR. MATHIAS:  Objection.
3      A.   Try to develop the maps in
4 accordance with the guidelines
5 with -- based on the new change and
6 population numbers that have existed.  You
7 know, I've mentioned earlier and we've
8 discussed we deferred to the lines that
9 previously had been approved to the extent
10 that they were still there.
11     Q.   Representative Newton, are you
12 familiar with the term effective minority
13 opportunity districts?
14     A.   I am.  I don't think that's
15 minority majority, but it's getting close
16 to that level.
17     Q.   Could you elaborate on your
18 understanding of what an opportunity
19 district would be?
20     A.   While it may not be a majority
21 of the minority population in that
22 district there would still be an
23 opportunity for a minority to get elected.
24 It's not -- the district is so not
25 lopsided in one way or the other that it

32 (Pages 122 - 125)

Page 126

1 would be impossible or unlikely for a
2 minority to get elected in that particular
3 district.
4 　　Q.　And in South Carolina in these
5 districts do you know what that level
6 would be -- well, I'll rephrase.  Does a
7 House district need to be drawn at a
8 certain black voting age population
9 percentage for voters to be able to elect
10 a candidate of their choice?
11 　　MR. MATHIAS:  Objection.
12 　　A.　No, not necessarily.  I mean I
13 think -- obviously it's -- the ideal
14 district is 41,278 and both of those terms
15 have a meaning that can be applied with
16 that population.
17 　　Q.　And just to clarify, so with
18 black voting age population I'm talking
19 about what percent of the overall voting
20 age population is black?  So did you --
21 　　A.　Well, obviously majority
22 minority of BVAP is what you're talking
23 about would be more than 50 percent.
24 　　Q.　Have you conducted any
25 assessments of what BVAP percentage in

Page 127

1 South Carolina would lead to -- would be
2 considered an opportunity district?
3 　　MR. MATHIAS:  Objection.
4 　　A.　Not -- I've not done any
5 independent research, no.  Obviously in
6 the course of developing our district
7 those demographic numbers correspond to
8 the lines and the district map.
9 　　Q.　Okay.
10 　　A.　I mean if you're asking me is an
11 opportunity district less than 50, but
12 more than 35 I don't know that -- if there
13 is a mathematical percentage assigned to
14 that, but obviously it's something perhaps
15 less than 50, but more than 25 or
16 30 percent.  Maybe it would be as high as
17 40 or 45 percent.
18 　　Q.　So to figure this out did you
19 review any data, did you review voter
20 participation rates for example.
21 　　A.　No.  Not voter participation
22 rates.
23 　　Q.　Did you review data about
24 cohesion among different racial groups of
25 voters?

Page 128

1 　　A.　No.
2 　　Q.　Did you review data on crossover
3 voting --
4 　　A.　No.
5 　　Q.　-- between -- okay.
6 　　A.　Population information and from
7 the census is the only information.
8 　　Q.　So -- but to clarify, so did you
9 review any statewide and county level
10 voting patterns?
11 　　A.　No.
12 　　Q.　Did you conduct any performance
13 analyses of how districts would perform
14 for minority voters?
15 　　A.　I'm not even sure I know what
16 that term -- what that would mean, but,
17 no.
18 　　Q.　Well, to clarify what I meant
19 there is performance in that -- the
20 district would allow the voters to elect a
21 candidate of their choice?
22 　　A.　No.  My analysis as a member of
23 the committee was based on the population
24 information that was through the census
25 bureau provided to us as it related to the

Page 129

1 districts and the population increases in
2 South Carolina.
3 　　Q.　Okay.  And are you familiar with
4 the term racially polarized voting?
5 　　A.　Generally yes, ma'am.
6 　　Q.　What does it mean?
7 　　A.　Well, I mean polarizing
8 obviously is two different extremes and
9 racial polarizing I would generally
10 understand to be just that.
11 　　Q.　For whom?
12 　　A.　Well, depending on the context
13 that it was used in.
14 　　Q.　So did you ever hear from the
15 public or advocates about the need to
16 conduct a racialized -- a racially
17 polarized voting analysis?
18 　　A.　I can't recall if it was that
19 specific analysis.  There were certainly
20 those folks that we would hear from from
21 time to time that would suggest we needed
22 more information to do more relative to
23 the process.  At the same time we were
24 being told to hurry up and get the process
25 completed by others -- you know, obviously

33 (Pages 126 - 129)

Page 130

1  getting the census data late put us in a
2  position where we were -- we couldn't do
3  it fast enough and if we were doing it at
4  the pace in which we were doing others
5  criticized us for doing it too fast and
6  not getting it done.  So I'm familiar with
7  the term, but we did not do that.
8      Q.   So just to clarify for the
9  record, did you not conduct any racially
10  polarized voting analyses?
11     A.   I did not and I'm unfamiliar
12  that the ad hoc committee did any sort of
13  that activity as well.
14     Q.   You mentioned earlier that
15  because of the Voting Rights Act the
16  redistricting process is not a color blind
17  process; is that correct?
18     A.   Yes, ma'am.
19     Q.   So if you were not -- if you did
20  not do any racially polarized voting
21  analyses and just looked at previous
22  district lines, population changes
23  how -- what do you mean when you say it
24  was not color blind --
25     A.   Obviously the census data gives

Page 131

1  us racial information, right?  I mean we
2  talked about BVAP.  We talked about
3  population.  I mean that's the information
4  that comes from the census data.
5      Q.   Right.  So how did you use that
6  then if it was not a color blind process?
7      A.   Obviously in drawing my district
8  in looking at the growth that I had in my
9  district and knowing that I needed to shed
10 people if you will or change the lines,
11 excuse me, district 120, my district, I
12 was mindful of what those modifications
13 looked like to minority representatives
14 that were adjacent to my district lines.
15        If that population was moved to
16 the district that is currently
17 Representative Shedron Williams or was
18 Representative Michael Rivers versus
19 representative Shannon Erickson what that
20 was doing to their population numbers.  So
21 I was mindful of the diluted effect that
22 it may have on their African American
23 minority population on those two gentlemen
24 that I just spoke of district.  So that's
25 what I mean in terms of not being color

Page 132

1  blind.
2         Obviously and that ties to the
3  concept of I think intentional
4  retrogression.  You know, we went back in
5  my experience as chairman of County
6  Counsel.  I mean we went from a point in
7  time where the demographics in Buford
8  County changed dramatically in terms of
9  the minority representation on the 11
10 single members districts on County Counsel
11 purely because the population was growing
12 with folks moving here from elsewhere and
13 so that's an issue that during my tenure
14 in public office I'm mindful of and I
15 think as a requirement as to part of the
16 process.
17        So -- you know, there's probably
18 a fancier term you can put on it, but in
19 simple terms saying it's not color blind
20 ties directly to the notion of intentional
21 retrogression, but in drawing these
22 districts we've got to be mindful on
23 what's happening to those minority
24 districts because I know that if we were
25 not mindful of that and the result was the

Page 133

1  population could have gone to this
2  district and it would not have made an
3  impact in what was not a minority majority
4  district, but instead we put in the
5  minority majority district for purpose of
6  diluting that so that it was no longer a
7  minority majority district that is
8  inappropriate and illegal.
9      Q.   Thank you, Representative
10 Newton.  So you mentioned that you
11 do -- you had considered BVAP in terms of
12 what that would look like and please
13 correct me if I'm misstating, but in other
14 districts or in your district and the
15 black population numbers; is that correct?
16     A.   It is, yeah.
17     Q.   But if you did not conduct any
18 kind of racialized -- racially, excuse me,
19 polarized voting analyses or performance
20 analyses how did you know what numbers of
21 black voters?  Like what was an
22 appropriate number?
23     A.   Again we're looking at census
24 numbers and the black voting age
25 population numbers.  So I mean I

34 (Pages 130 - 133)

Page 134

1 understand your suggestion. We didn't do
2 that kind of analysis. We used the data
3 from the census which is the same
4 information in the redistricting processes
5 that I've been through both at the county
6 level that which the State -- I mean and
7 that -- on those two cycles my experience
8 now in the House of Representatives and
9 there was none of that kind of analysis
10 conducted by the court when as an early
11 member of the House Jasper County had
12 never redistricted the school. I mean
13 there was no suggestion that the court who
14 then redrew the districts was conducting
15 something other than the use of the census
16 data in drawing and establishing the lines
17 for the school districts in Jasper County.
18       So I understand that that
19 information might be useful, but it's not
20 information that I've been exposed to
21 during the -- my involvement with
22 redistricting and reapportionment.
23    Q.   Understood. Thank you. Did you
24 or the legislature reach out to any black
25 or other minority groups to get more input

Page 135

1 as to whether -- I guess as to what would
2 dilute their vote?
3    A.   Obviously I can't speak to what
4 123 other people may or may not have done.
5 I'm not aware of any organized effort from
6 the committee that only went to one
7 particular segment or group of the
8 population versus others. Obviously the
9 public hearings were notified and
10 announced for everybody to participate --
11 you know, in the challenges that existed
12 in the Orangeburg area. Obviously I was
13 with Representative Bamberg and in -- you
14 know, we were talking about those
15 districts being one of the areas where
16 there was a collapse earlier -- you know,
17 obviously I sought his guidance and
18 thoughts as being the representative in
19 that area and quite frankly I watched him
20 labor significantly over what the
21 population numbers dictated and how
22 he -- and what those collapses would look
23 like including the racial -- the race of
24 those individuals that would be in those
25 districts that could have been combined to

Page 136

1 be collapsed.
2    Q.   So how did you consider the
3 racial make up of those districts that
4 could have been collapsed?
5    A.   I mean obviously looking at the
6 minority majority numbers that were in
7 those areas and the population, but I mean
8 just quite simply we discussed the
9 population numbers of where we were in
10 those districts in the old lines, what
11 they looked like and quite frankly the
12 optics of what particular collapses would
13 look like.
14       For instance, Mr. Hosie is one
15 of the African American members of the
16 general assembly, a highly decorated
17 veteran. I mean when you look at that
18 area there were no good solutions because
19 of the population growth being elsewhere
20 and -- you know, Representative Govan and
21 Representative Cobb-Hunter are two of some
22 of the longest serving African Americans
23 in the House.
24       It was described and sort of
25 talked about and you could see that Justin

Page 137

1 toiled over. He would leave the map room
2 and get his phone and go call members from
3 the House from that area and come back in
4 and work more on the maps and leave and
5 come back and I mean he was trying to find
6 the best solution of a problem that didn't
7 have any great solutions because of where
8 it was in the State and because of the
9 lack of population growth.
10    Q.   Okay. Thank you, Representative
11 Newton. Sort of a general question, would
12 you agree that assessing compliance with
13 the Voting Rights Act involves a fact
14 intensive analysis?
15       MR. MATHIAS: Objection.
16    A.   I'm not sure again what's
17 necessarily meant by fact intensive
18 analysis. You know, I can look back to my
19 experience dating back to the over
20 20 years in reapportionment redistricting
21 processes both by the legislative branch
22 at the local level at the State level, but
23 also by the judicial branch and the
24 information that was available to the
25 judicial branch is no different than the

35 (Pages 134 - 137)

Page 138

1 information that was utilized and used in
2 the processes that I've been involved with
3 which is the census data information.
4      So -- you know, probably in a
5 perfect world more information can always
6 help do certain things, but that also begs
7 the question of luxury of time and
8 again -- you know, you can probably always
9 use more information. The information
10 that I've been involved with is from the
11 census data and quite frankly if it was
12 deficient information with or without
13 pre-clearance still being required I would
14 have thought that the federal district
15 court when they drew the lines for the
16 Jasper County schools would have said that
17 information is lacking and that kind of
18 analysis must be conducted in order for us
19 to move forward with drawing these lines.
20     Q.   Are you referring to the
21 pre-clearance process?
22     A.   The voting analysis data that
23 you're talking about is what I'm referring
24 to.
25         Your question ultimately was do

Page 139

1 I think it's a fact intensive process and
2 my response to you is, yes, the
3 information that I have been exposed to is
4 census data information. You can always
5 get more analysis or more data of some
6 kind. I would never say that that's not a
7 good thing. I just don't know that that
8 information is necessarily required in
9 this process and certainly from my history
10 and involvement in reapportionment and
11 redistricting including the exposure to
12 the federal district court drawing lines
13 none of that type information was involved
14 in those previous activities.
15     Q.   Okay. Thank you, Representative
16 Newton. So just a few more questions.
17         So I guess going back to the
18 proposed maps and just to clarify, are you
19 familiar with HB4493?
20     A.   That number doesn't mean
21 anything to me unfortunately. If you tell
22 me what it is I'll respond.
23     Q.   Does it sound like it could be
24 the --
25     A.   It's a House Bill number, but is

Page 140

1 it the House map that ultimately came
2 forward and was approved?
3     Q.   Yes.
4     A.   Okay. So am I familiar with the
5 map that was ultimately approved, I am.
6 I'm familiar. That was what we
7 recommended out of judiciary. As I
8 mentioned I was not at -- in the House of
9 Representatives when it was voted on
10 finally in the House floor. I had just
11 been discharged or was being discharged
12 from the hospital that day for an accident
13 that -- a choking incident that I was
14 involved with a few days prior so I was
15 not in the House chamber when that HB
16 whatever the redistricting map that was
17 finally approved was adopted.
18     Q.   Understood and sorry to hear
19 about your choking incident and glad to
20 see that you're doing well.
21     A.   Thank you.
22     Q.   So for the -- I guess to the
23 extent that you know having not been there
24 for the whole process do you know if there
25 were proposed amendments to the initial

Page 141

1 draft plan?
2     A.   On the House floor? I mean
3 there were amendments obviously in the
4 committee subcommittee process.
5     Q.   Yes. Yes. But on the House
6 floor?
7     A.   I don't. I tried to cut it on
8 on the radio and my wife would not allow
9 it. I mean I had heard that there were
10 amendments that were attempted or offered
11 I think that there may have been some
12 minor adjustments that were made, but I
13 did not try to go back and analyze those
14 in any sort of detail.
15     Q.   Understood. So going back to
16 when the draft maps were still in the
17 committee you mentioned there were
18 amendments offered then?
19     A.   To my recall, yes, but I don't
20 know that I can give you any of the
21 specifics about that.
22     Q.   Do you remember generally what
23 kind of research went into coming up with
24 these proposed amendments?
25     A.   Without looking at the documents

Page 142

1 in front of me without looking at the
2 potential amendments, no. I don't -- I
3 wouldn't be able to answer that, no.
4    Q. Did you offer any amendments?
5    A. I don't think so. You know, I
6 have no recall of offering one, but if you
7 told me hey, by the way you offered a
8 technical amendment that did X, Y and Z I
9 wouldn't disagree with you, but I don't
10 believe I did. No, ma'am.
11    Q. And I guess during this process
12 in committee offering amendments before
13 bringing the map to the House floor was
14 anyone else consulted regarding the
15 amendments other than the legislators?
16    A. Not that I'm aware of. Now --
17 you know, obviously counsel both for the
18 committee and outside counsel were
19 involved in discussions about the process
20 and the way that these amendments, the
21 effect of what these amendments may have.
22    Q. But no one else?
23    A. Not to my knowledge. I
24 certainly didn't, but not to my knowledge.
25    Q. Was this a process? Was it a

Page 143

1 back and forth process with the
2 demographers?
3    A. Well, I mean I had three or four
4 sessions in the map room. That was the
5 extent of my interaction with him.
6    Q. Did the demographers attend any
7 of the meetings of the committee?
8    A. I don't believe so. I mean they
9 could have been back somewhere in the
10 audience, but, no. Not to my knowledge.
11    Q. I think that may be about it for
12 me sorry. If you could just give me one
13 moment.
14    A. Sure.
15    THE VIDEOGRAPHER: You want to
16 go off the record?
17    MS. YAN: Yes, that would be
18 great. Thank you.
19    THE VIDEOGRAPHER: Okay. Thanks
20 everyone. The time is 3:18. We're
21 going off the record.
22    (Whereupon, an off-the-record
23 discussion was held.)
24    THE VIDEOGRAPHER: The time is
25 approximately 3:19 p.m. We're back on

Page 144

1 the record. This is the beginning of
2 media four.
3    MS. YAN: So no further
4 questions from me at the moment. I
5 just want to note for the record that
6 we would like to reserve the right to
7 potentially hold open the deposition
8 pending some potential
9 productions -- forthcoming
10 productions, discovery orders so just
11 noting that for the record. Thank
12 you.
13    MR. MATHIAS: Thank you,
14 Patricia. Andrew Mathias on behalf of
15 the House defendants. At this time we
16 don't agree that the deposition will
17 be reopened, but obviously changes in
18 circumstance that you've described
19 we'll address those issues when they
20 arise.
21 EXAMINATION
22 BY MR. MATHIAS:
23    Q. Mr. Newton, is your job as a
24 representative a part-time job?
25    A. It is.

Page 145

1    Q. And you have another full-time
2 job; is that right?
3    A. I do, yes.
4    Q. Notwithstanding the fact that
5 this is a part-time job have you ever
6 looked at how much you would -- how much
7 you get paid per hour as a Representative?
8    A. I would be afraid to do so and
9 what my wife might say.
10    Q. Okay. And so as a part-time
11 Representative in South Carolina you -- is
12 it true that you rely upon committee and
13 House staff to do certain work on your
14 behalf and give you guidance?
15    A. Absolutely.
16    Q. Is it true that they most likely
17 if not certainly do work and analysis to
18 support you in your job that you are
19 unaware of?
20    A. Of course, yes.
21    Q. So just because you didn't
22 conduct certain analysis does not mean
23 that that analysis was not conducted?
24    A. That's correct.
25    Q. In the redistricting process you

37 (Pages 142 - 145)

Page 146

1  mentioned a map room and how there were
2  other people in there.  You noted that I
3  guess the suggestion there were interns
4  in -- working in that room you did not
5  think that was true.
6      A.   I mean there were people in
7  there that I did not recognize.  Quite
8  frankly I thought that they were folks
9  that worked with outside counsel.  So I
10 recognize the Judiciary Committee lawyers
11 that were in there, I recognize the staff
12 person Thomas that was working with me,
13 there were some other faces in there, but
14 I didn't ask who are you.  I believe that
15 they were outside counsel clerks.
16     Q.   But if I or someone else were to
17 tell you that they were in fact
18 temporarily hired interns would that
19 surprise you --
20     A.   No, it wouldn't surprise me.  If
21 they were folks that worked for the
22 Judiciary Committee or worked for outside
23 counsel that wouldn't surprise me.
24     Q.   Okay.  And the individuals who
25 the members sat down at the computer who

Page 147

1  made changes to the maps was that more of
2  a functionary role or was that a decision
3  making role?
4      A.   Functionary.  I mean they didn't
5  make any adjustments in drawing that we
6  didn't ask them to.  I mean they would --
7  you know, that program as you move the
8  mouse and the cursor it moves the lines
9  and then moves all the charts and then you
10 follow the census block and say, okay.
11 Let's go over there and see what that
12 census block.  And there's interaction
13 back and forth.
14         I mean they would say well --
15 you know, if you look that census block
16 has 800 people in it and if you're trying
17 to shed to get to an ideal number that's
18 probably a larger one that you might be
19 able to leave out and let's see what
20 happens when you move it over in that
21 district or let's see what happens when
22 you move it over in that district so
23 you're interactive as you're moving the
24 line and the numbers.
25     Q.   You did not walk in and have

Page 148

1  someone tell you Mr. Newton, this is the
2  new district 120, right?
3      A.   No.  Absolutely not.
4      Q.   Are you aware of the fact that
5  the NAACP has not brought a Voting Rights
6  Act in section two challenge?
7      A.   I'm not familiar enough with the
8  pleadings to be able to give any level of
9  analysis like that.  I mean I quite
10 frankly didn't pay attention to what the
11 various causes of action are.
12     Q.   Are you aware that the crux of
13 the plaintiff's complaint is an allegation
14 of intentional racial discrimination?
15         MS. YAN:  Objection.
16     A.   I would -- am I aware of that?
17 I have not studied the pleadings so I'm
18 not sure that I would say that I have a
19 high level of awareness of the particular
20 challenges that have been raised or
21 specifically identified challenges to our
22 process, but that does not -- I mean
23 that's in keeping with my general
24 understanding.
25     Q.   Okay.  In the redistricting

Page 149

1  process did you engage in any intentional
2  racial discrimination?
3      A.   Absolutely not.
4      Q.   Are you aware of anyone else on
5  the ad hoc committee that engaged in
6  intentional racial discrimination?
7      A.   Absolutely not and I would be
8  shocked if any member of the committee
9  believed otherwise.  I mean -- you know,
10 there were some during the public hearing
11 process that suggested a level of
12 criticism that was not supported by any of
13 the facts or any of the discussion and it
14 was noted by essentially all of us on that
15 committee.
16     Q.   And final question, had you
17 observed any intentional racial
18 discrimination would you have tolerated
19 it?
20     A.   No.
21         MR. MATHIAS:  That's all I got.
22         MR. TRAYWICK:  Representative
23 Newton, my name is Lisle Traywick and
24 I'm representing Senate defendants.  I
25 just wanted to thank you for your time

38 (Pages 146 - 149)

Page 150

1  today.  I don't have any questions for
2  you.
3      THE WITNESS:  Thank you.
4      THE VIDEOGRAPHER:  Okay.  Does
5  anybody else?
6      MS. TRINKLEY:  Jane Trinkley on
7  behalf of the election commission.  We
8  have no questions.  Thank you,
9  Representative Newton.
10     MS. YAN:  Representative Newton,
11 if I can just ask a couple quick
12 follow-up questions relating to what
13 you just said?
14     THE WITNESS:  Sure.
15 EXAMINATION
16 BY MS. YAN:
17   Q.   So you mentioned that it's
18 possible that there was analysis conducted
19 that you just didn't know about; is that
20 correct?
21   A.   Sure.  Absolutely.  I mean the
22 lawyers could have conducted some level of
23 analysis or the Judiciary Committee
24 counsel could have some level of analysis,
25 yeah.

Page 151

1   Q.   So who would know for sure
2  whether or not the analysis was conducted?
3   A.   Well, there was no analysis done
4  that was given to the committee as a whole
5  either the ad hoc committee or the
6  Judiciary Committee.  I guess the lawyers
7  could have received information that the
8  judiciary staff prepared, but or
9  conducted, but I'm unaware of that.
10   Q.   Okay.
11   A.   You're asking me a question of
12 who would be aware of what I know nothing
13 about so I can't answer that question is
14 probably the most accurate response.
15 Could it have been done, sure.  Was it
16 done, was it provided to me on either the
17 ad hoc committee or the full committee,
18 no.
19   Q.   So it was not conducted in any
20 kind of -- on any kind of official basis;
21 is that correct?
22     MR. MATHIAS:  Objection.
23   A.   Not that any official basis that
24 was shared with me or with my ad hoc
25 committee or the committee.

Page 152

1   Q.   Okay.  All right.  Thank you
2  very much, Representative Newton.  That's
3  all from me.
4      MR. MATHIAS:  One final
5  question.
6  EXAMINATION
7  BY MR. MATHIAS:
8   Q.   Did you order anyone not to
9  conduct certain analysis?
10   A.   Absolutely not.
11   Q.   Thank you.
12     THE VIDEOGRAPHER:  All right.
13 Thanks everyone.  May I close out the
14 deposition for today or does anybody
15 else have any questions?
16     All right without objection
17 we're going off the record at
18 3:29 p.m. and this concludes today's
19 testimony given by Wiilliam Weston J.
20 Newton.  The total number of media
21 units used was three, excuse me, four
22 and will be retained by Veritext New
23 York.  Thanks everyone.
24
25

Page 153

1  I have read the foregoing transcript
2  of my deposition, and find it to be
3  true and accurate to the best of my
4  knowledge and belief.
5
6
7  _____
8  WM. WESTON J. NEWTON
9
10 Sworn and subscribed to before me,
11 On this _____ day
12 of _____ 2022.
13
14
15
16 Notary_____
17 My Commission Expires_____
18
19
20
21
22
23
24
25

39 (Pages 150 - 153)

Page 154

I N D E X

WITNESS    EXAMINATION BY        PAGE

WM. WESTON J. NEWTON   MS. YAN    7/150

WM. WESTON J. NEWTON   MR. MATHIAS   144/152

E X H I B I T S
PLAINTIFF'S   DESCRIPTION        PAGE
Exhibit 1    Notice         15
Exhibit 2    Subpoena       30
Exhibit 3    Ad hoc committee    76
             criteria
Exhibit 4    Schedule of public   89
             hearings
Exhibit 5    Unknown exhibit    97
Exhibit 6    August 30th letter   97
Exhibit 7    September 27th letter  97
Exhibit 8    October the 8th    97
Exhibit 9    Document       113

(Exhibits attached.)

INDEX CONTINUED ON NEXT PAGE

Page 156

CERTIFICATION

    I, Garry J. Torres, a Notary Public for and within the State of New York, do hereby certify:
    That, WM. Weston J. Newton, the witness whose testimony as herein set forth, was duly sworn by me; and that the within transcript is a true record of the testimony given by said witness.
    I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.
    IN WITNESS WHEREOF, I have hereunto set _____ April, 2022.

    _____
    GARRY J. TORRES
        *    *    *

Page 155

I N D E X (cont'd)

    INSERTIONS
    Page       Line
None

    REQUESTS
    Page       Line
None

Page 157

ERRATA SHEET
VERITEXT/NEW YORK REPORTING, LLC

CASE NAME: THE SOUTH CAROLINA STATE CONFERENCE OF THE NAACP, et al. -v- THOMAS C. ALEXANDER, et al.
DATE OF DEPOSITION: APRIL 13, 2022
WITNESS' NAME: WM. WESTON J. NEWTON

PAGE/LINE(S)/   CHANGE        REASON

_____
WM. WESTON J. NEWTON
SUBSCRIBED AND SWORN TO
BEFORE ME THIS_____DAY
OF_____, 2022.
_____
NOTARY PUBLIC
MY COMMISSION EXPIRES_____

[& - able]                                                                 Page 1

| & |
| --- |

**&**  3:3,14 6:19,22
7:5 23:13

| 0 |
| --- |

**0001**  15:20
**03302**  1:8 5:13

| 1 |
| --- |

**1**  24:15 154:12
**10**  100:2 114:11
**10004**  3:11
**104**  2:11
**10:31**  1:14
**10:32**  5:3
**10:49**  19:2
**10:55**  19:7
**10:56**  19:8
**10th**  113:24
**11**  34:20 132:9
**113**  154:21
**11:49**  56:3
**11:50**  56:8
**12**  39:23 40:6 41:4
44:21
**120**  29:2,3 39:3
66:25 67:14 68:4
69:6 71:24 72:2
106:14,14 131:11
148:2
**1221**  3:4
**123**  135:4
**124**  61:1 105:5,6,8
105:16 106:4
**125**  3:10
**12:46**  56:10
**13**  1:14 5:3 157:4
**1310**  2:17
**14**  39:23 116:25
**144**  154:6
**14994**  156:18

**15**  55:13 117:1
154:12
**152**  116:11,15,21
116:25 154:7
**15th**  2:4
**16**  39:23
**18**  39:23 40:6
**1800**  3:4
**18th**  3:10
**1967**  20:21,24
**1974**  118:1
**1989**  22:4
**1990**  36:6,7,16
**1993**  22:6
**1996**  21:21 23:10
23:14
**1999**  31:22 33:3
**1:48**  97:15
**1:52**  97:21

| 2 |
| --- |

**2**  24:15 30:15
154:13
**20**  39:23 40:5
96:16 137:20
**2000**  36:6,7,16,18
44:19,20
**20001**  3:16
**20005**  2:4
**2002**  33:20
**2004**  33:10
**2007**  41:1
**2010**  36:7,18
**2012**  33:3,20 37:20
39:15
**2014**  42:9
**202**  2:5 3:16
**2020**  96:12
**2021**  76:24 92:4
100:2 114:11
**2022**  1:14 5:3
153:12 156:17

**15**  157:4,22
**21**  96:15
**212**  3:11
**22**  20:24 39:24
**23**  114:15,16 115:5
120:3
**231-7810**  2:18
**24**  24:18 45:2
**25**  127:15
**27th**  98:24 154:19
**29201**  2:18 3:5
**29601**  2:11
**29th**  156:17
**2:10**  109:24
**2:27**  110:4

| 3 |
| --- |

**3**  76:24 92:3
154:14
**30**  127:16 154:13
**30th**  98:13 154:18
**35**  127:12
**38**  36:9
**3:18**  143:20
**3:19**  143:25
**3:21**  1:8 5:13
**3:29**  152:18

| 4 |
| --- |

**4**  98:1 154:15
**40**  24:7 127:17
**41,000**  119:19
**41,278**  80:24 81:2
82:23 84:4 85:10
126:14
**45**  127:17
**457-0800**  2:5
**4th**  91:17,20

| 5 |
| --- |

**5**  98:1,1,4 154:17
**50**  126:23 127:11
127:15

**549-2500**  3:11

| 6 |
| --- |

**6**  98:1,1,12,14
154:18
**601**  3:15

| 7 |
| --- |

**7**  98:1,22 154:19
**7/150**  154:5
**72**  117:13
**76**  154:14

| 8 |
| --- |

**8**  33:10 98:1 99:5
99:6 154:20
**8/3/2021**  76:22
**800**  147:16
**803**  2:18
**83**  21:4
**89**  154:15
**8th**  91:13 92:5
99:3 154:20

| 9 |
| --- |

**9**  113:21 154:21
**900**  2:11
**90s**  32:24
**915**  2:4
**942-5000**  3:16
**95**  64:1 69:5
103:23
**97**  154:17,18,19,20
**99**  33:6,9

| a |
| --- |

**a.m.**  1:14 5:3 56:8
**aback**  117:24
**ability**  8:18 44:8
123:13 124:2
**able**  9:9 47:8
50:11 52:21
110:24 111:21
116:8 126:9 142:3

**[able - americans]**

147:19 148:8
**abnormal** 86:5
**absence** 48:6
**absent** 108:2
**absolutely** 27:23
  35:10 38:13 45:10
  145:15 148:3
  149:3,7 150:21
  152:10
**accepted** 78:6
**accepting** 115:6
**access** 58:4 67:8
  67:11 68:14 72:8
  73:2,21 75:23
  76:1 83:15
**accident** 140:12
**accommodate**
  52:22 87:12,17
**account** 25:13
  28:15,21,24
**accountability**
  54:12
**accounts** 28:16
**accurate** 37:3 68:5
  151:14 153:3
**acknowledged**
  84:11
**aclu** 2:3 6:12 7:1,3
  7:20
**aclu.org** 2:5,6
**act** 114:20 121:6
  121:17 122:4,7,22
  123:1,20 124:23
  125:1 130:15
  137:13 148:6
**acting** 48:18 50:6
**action** 1:18 5:12
  5:23 12:16 148:11
  156:13
**activities** 25:23
  35:6 37:24 44:2

48:9 83:25 93:1
  95:7 139:14
**activity** 42:22
  47:22 53:22 104:1
  130:13
**acts** 50:22
**ad** 34:5 35:2,3
  45:20,23 50:17
  51:1,18 52:23
  53:5,7 54:6 57:22
  58:8 60:20 61:8
  61:24,25 62:12,14
  62:15,20 63:10,23
  64:4 67:10 68:13
  71:20 73:16 76:18
  81:24 86:23 87:14
  100:12,17 101:6
  101:23 102:9,13
  103:11,15 104:11
  105:14 106:16
  107:12 108:4
  109:7 110:20
  113:24 114:8
  130:12 149:5
  151:5,17,24
  154:14
**adapted** 96:25
**added** 94:5 97:2
**adding** 37:14
**addition** 11:11
**additional** 10:6
**additionally** 37:18
**address** 21:3,7
  25:4,11,20 26:3,4
  26:8,10,23,23 27:2
  27:5,7,10,19
  144:19
**addresses** 24:24
  25:9,18,25 26:5,12
  26:14

**addressing** 117:18
**adjacent** 131:14
**adjust** 111:14
**adjusted** 70:6
  105:24 113:2
**adjusting** 67:5
  74:7
**adjustment**
  119:11
**adjustments** 112:3
  141:12 147:5
**administer** 5:22
**adopted** 53:3
  76:19,22,23 81:25
  140:17
**adopting** 82:18
**adoption** 92:1
**advance** 93:5
  105:15
**advanced** 53:15
  54:18
**advertise** 92:10
**advertised** 92:13
**advice** 11:14
**advocates** 129:15
**affect** 8:18 83:10
**affiliations** 6:2
**affirmatively**
  124:25
**afraid** 145:8
**african** 36:14
  117:8 131:22
  136:15,22
**age** 70:2 126:8,18
  126:20 133:24
**agencies** 42:20
  43:14 44:9
**agency** 42:22
  43:15
**aggregate** 111:24

**aggregating**
  102:24
**aggregation**
  103:18
**ago** 12:17 18:7
  99:24 119:22
**agree** 50:1 123:4
  137:12 144:16
**agreed** 4:2,7,11
**ahead** 25:2,3
  80:22 120:9
**al** 1:6,11 5:10
  157:3,3
**alexander** 1:11
  2:16 5:9 157:3
**allegation** 148:13
**allegations** 13:3
  13:11
**allendale** 88:13
**allow** 10:9 128:20
  141:8
**allowed** 72:8 73:2
  84:5
**alluded** 117:17
**aloud** 77:23
**amalgamate** 103:5
**amathias** 2:12
**amended** 53:15,18
  102:16
**amendment** 142:8
**amendments**
  101:20,22 104:7
  140:25 141:3,10
  141:18,24 142:2,4
  142:12,15,20,21
**american** 2:2 3:9
  36:15 131:22
  136:15
**americans** 117:8
  136:22

[analyses - back]                                                      Page 3

**analyses** 128:13 130:10,21 133:19 133:20

**analysis** 128:22 129:17,19 134:2,9 137:14,18 138:18 138:22 139:5 145:17,22,23 148:9 150:18,23 150:24 151:2,3 152:9

**analyze** 141:13

**andrew** 2:13 6:14 17:5,15 144:14

**anecdotal** 82:15 83:7

**announced** 93:6 135:10

**answer** 9:7 10:1 11:7 41:15 49:14 142:3 151:13

**answered** 18:25

**answering** 8:15 9:17

**answers** 9:2 44:7

**anticipation** 70:20

**anybody** 59:18 65:20,21 66:2 70:13 72:12 82:16 102:6 124:17 150:5 152:14

**anymore** 124:5

**apartment** 21:20 24:14

**apologies** 76:8

**apologize** 68:4

**appearance** 2:25 6:5

**appearances** 2:1 6:1,7

**appeared** 14:18

**appearing** 3:19 5:16,25

**appears** 76:18

**applied** 126:15

**appointed** 46:24

**appointment** 48:15

**appreciate** 115:5

**approaches** 38:19 112:2

**appropriate** 48:13 81:9 90:19 133:22

**approval** 109:3

**approved** 53:23 60:20 78:6 88:3 101:23 102:10,15 107:25 108:3 110:22 111:13 117:21 125:9 140:2,5,17

**approximately** 18:13 19:2,7 24:4 56:10 71:8 97:14 97:21 110:4 143:25

**apps** 29:9,10,13

**april** 1:14 5:3 156:17 157:4

**area** 62:8 63:25,25 70:2 85:23 86:1 90:22,25 91:1 103:22,23 109:2 118:4,15,17,21,25 119:8 135:12,19 136:18 137:3

**areas** 54:22 67:12 69:2 82:10 83:15 88:7 95:2 118:8,8 135:15 136:7

**arnold** 3:14 7:5

**arose** 44:6

**arranged** 66:5

**artificially** 85:22

**asked** 10:8 18:24 26:21 40:11 43:19 44:6 48:10 49:21 57:20

**asking** 9:1 10:2 49:24 127:10 151:11

**assemble** 96:24

**assembly** 117:9 136:16

**assess** 85:12 109:9 124:24

**assessing** 137:12

**assessment** 122:25

**assessments** 126:25

**assigned** 44:22 45:15 51:2,6 73:16 118:3 127:13

**assignment** 45:5 57:25

**assignments** 33:20 41:15,17

**associated** 89:7

**assume** 75:18 110:15

**assumes** 49:19

**assuming** 106:16 112:23 113:14

**attached** 154:23

**attempt** 87:16

**attempted** 141:10

**attend** 143:6

**attendant** 102:7

**attended** 96:6

**attention** 13:13 55:18 148:10

**attorney** 2:10 6:6 6:11,15 7:19 11:3 11:12

**attorneys** 2:3,16 3:3,10,15 7:8 11:14,17 13:15 15:11 18:19,23 30:11 56:13 73:6

**audience** 143:10

**audio** 10:22

**august** 76:24 92:3 98:13,23 108:24 154:18

**authority** 48:14

**authorized** 5:21

**avail** 65:23

**availability** 16:5

**available** 47:6 55:19 137:24

**availed** 61:22

**ave** 3:15

**average** 36:23,25 37:1

**awards** 54:21

**aware** 23:1,4 49:3 49:8,10 64:13 68:9 73:3 74:12 77:10 90:17 92:8 92:17 113:11 135:5 142:16 148:4,12,16 149:4 151:12

**awareness** 148:19

**awful** 85:9

### b

**b** 2:7 154:10

**baby** 52:4,10,19

**back** 19:8 24:14 45:23 50:23 55:14

56:10 65:16 69:13
96:22 97:21
107:17 110:4
115:8 120:2,5
121:16 122:18
132:4 137:3,5,18
137:19 139:17
141:13,15 143:1,9
143:25 147:13
**background** 20:19
**backs** 63:1
**backyards** 95:16
**balance** 37:15
**balanced** 86:22
87:5
**balloon** 67:17
**bamberg** 51:25
62:3,9,10 63:13
64:11 68:1 71:10
71:18 72:3 88:13
103:21 104:24
135:13
**bank** 23:24 24:2,3
**barriers** 88:5
**based** 13:9 48:18
61:19 67:5 84:22
84:23 85:2,3
125:5 128:23
**basic** 54:18
**basically** 117:14
117:21
**basis** 68:3 106:3,3
151:20,23
**bass** 75:7
**bear** 76:9
**beg** 94:25
**beginning** 6:5
79:22 97:22
116:20,24,25
144:1

**begins** 79:18
114:25
**begs** 138:6
**behalf** 7:5 144:14
145:14 150:7
**behavior** 86:19
**belief** 47:11 153:4
**beliefs** 86:18
**believe** 8:16 14:18
15:15 25:6 27:1,6
27:20 29:22 37:1
38:14 42:9 47:17
47:24 53:1 59:25
64:20 65:1 70:8
72:23,24 73:25
76:10,25 83:24
89:22 91:15,18
93:23 123:16,24
142:10 143:8
146:14
**believed** 149:9
**bench** 22:21
**bernstein** 51:24
**best** 9:24 36:17
87:23 137:6 153:3
**beth** 51:24
**better** 45:25 69:20
**beyond** 14:6 17:5
36:19 68:22 72:11
112:11 124:24
**bill** 139:25
**birth** 20:23 21:1
**bit** 35:12 40:13
**black** 126:8,18,20
133:15,21,24
134:24
**blind** 123:10
124:11 130:16,24
131:6 132:1,19
**block** 57:1 95:10
96:8 147:10,12,15

**blocks** 67:5 69:25
**blood** 156:13
**blueprint** 115:13
115:13,20
**bluffton** 16:12
21:4 90:13,14,18
90:22,22,25
**board** 23:24 37:25
**body** 34:12 101:7
106:22
**border** 68:17,18
**borders** 67:20
**born** 20:20 21:12
**bother** 13:21
**bottom** 116:21
120:2,11
**boundaries** 70:5,5
85:17 87:1,1
88:17,20 89:3,8
**boundary** 67:18
67:18 88:5
**bradley** 29:18
64:21,24
**branch** 14:16
137:21,23,25
**brand** 69:21
**brandon** 52:2
**break** 10:13,18
24:17 55:1,2,11,13
55:15 56:7,14
109:20
**breakdown** 35:22
**brenda** 14:15
**brief** 18:8
**briefly** 21:22
**bright** 43:6
**bring** 16:18 44:9
67:6 70:9
**bringing** 142:13
**broad** 3:10

**broken** 105:11
**brought** 51:22
101:10 148:5
**buford** 20:8 21:21
31:17 32:5,9,10,11
32:17 33:1,18
34:15 35:14 36:5
36:12,23,25 37:7
39:7 40:15 63:2
64:19 65:6,6,14
90:21,25 132:7
**building** 57:1
95:11 96:8
**built** 89:11
**bureau** 128:25
**bureau's** 87:3
**burr** 3:3 6:19
**burr.com** 3:6
**business** 96:23
**bvap** 126:22,25
131:2 133:11

**c**

**c** 1:10 5:9 79:15
157:3
**calculation** 84:23
85:3
**call** 16:3 17:21
18:16 95:4 100:23
137:2
**called** 43:3
**calling** 101:1
**camp** 29:20,20
**campaign** 25:10
26:23 27:2
**candidate** 126:10
128:21
**candidates** 32:14
40:8 78:5,11 79:7
**capability** 95:11
**capable** 59:25

**capacity** 19:12 20:16 48:16 49:25 71:4
**caption** 12:25
**carlisle** 2:20
**carolina** 1:2,5 2:11 2:18 3:5 5:8,11 14:14 15:1 16:13 21:2,5,16,17 22:5 22:22 23:23 30:5 32:9,10 40:17,21 43:12,22 45:9 62:4 77:18 80:12 81:8 84:10 85:5 86:25 87:15 88:11 114:6 117:9 118:4 118:5 126:4 127:1 129:2 145:11 157:2
**cascading** 62:7 67:19
**case** 1:8 6:13 7:21 11:15,23 12:24 13:1,3 14:10,13 18:23 19:17,22 20:1,12 38:12 56:18 63:21 66:23 80:2 157:2
**cases** 11:6 22:25
**catherine** 41:7,9
**caucasian** 36:11 40:19
**caucus** 41:21,23 41:24
**caucuses** 41:19
**caught** 71:15
**causes** 148:11
**cell** 29:6 60:23
**census** 13:10 61:17 66:13 67:1 67:5 69:25 70:4

70:21 83:5,20,25 87:3 108:24 128:7 128:24 130:1,25 131:4 133:23 134:3,15 138:3,11 139:4 147:10,12 147:15
**center** 90:24
**centralized** 90:14
**certain** 26:4 27:23 50:14 74:5,8 78:12 88:7,11 96:5,18 126:8 138:6 145:13,22 152:9
**certainly** 45:23 78:23 82:17 113:15 121:19 129:19 139:9 142:24 145:17
**certification** 4:5 156:1
**certify** 156:5,11
**cetera** 36:4 117:22
**chair** 48:10
**chairman** 20:7 33:21,25 34:3,9,24 35:2 40:24 42:11 43:9 45:16 46:2,5 46:6,8,15,20,22,23 46:24,25 47:2,15 47:16 48:3,11,14 48:18,25 49:21,23 50:7 58:7 103:2,8 103:10,12 132:5
**chairman's** 48:6 48:19 49:22
**chairmen** 46:21 46:23
**challenge** 124:9 148:6

challenged 84:8 114:23
**challenges** 135:11 148:20,21
**challenging** 11:24
**chamber** 140:15
**chance** 9:25
**change** 36:9 68:19 89:25 119:9,11 125:5 131:10 157:5
**changed** 39:8 132:8
**changes** 45:13 68:9 130:22 144:17 147:1
**changing** 63:5
**charge** 57:17 58:1 73:8,18 94:16
**charleston** 21:16 118:3,21
**chart** 69:25
**charts** 36:21 147:9
**check** 25:14
**chip** 29:20
**choice** 78:5,11 79:7 81:12 126:10 128:21
**choking** 140:13,19
**choosing** 123:14
**chosen** 46:9 80:19 90:7 91:4
**chris** 46:6 103:13
**circumstance** 144:18
**cited** 49:24
**cities** 21:19
**city** 21:10
**civil** 1:22 2:2 3:9 5:12

**clarendon** 24:3
**clarification** 10:5
**clarified** 100:16
**clarify** 10:10 31:3 75:20 99:4 126:17 128:8,18 130:8 139:18
**clear** 26:20 78:25 90:13
**clearance** 84:9 115:22 124:4,20 138:13,21
**cleared** 37:12 114:19 119:5
**clearly** 9:7
**clerk** 22:20
**clerks** 146:15
**close** 13:13 54:24 88:8,9 125:15 152:13
**coast** 119:19
**cobb** 136:21
**codes** 34:6
**cohesion** 127:24
**coincided** 91:24
**collapse** 119:6 135:16
**collapsed** 115:10 115:17,23 116:5 118:13 136:1,4
**collapses** 135:22 136:12
**colleagues** 65:13
**collected** 75:16,17
**collectively** 64:25
**college** 21:13 22:1 22:8
**collins** 47:2 51:24
**color** 32:14 40:9 123:10 124:11 130:16,24 131:6

[color - connected]                                                    Page 6

131:25 132:19
**columbia**  1:3 2:18
  3:5 5:12 24:21
  53:11 54:17 93:25
  95:4 96:9
**combined**  109:6
  115:18,23 116:5
  135:25
**combining**  102:23
  104:18
**come**  45:23 61:4
  61:14 65:17 66:11
  66:11 70:21 85:10
  94:9 95:18 103:24
  108:24 113:18
  137:3,5
**comes**  121:5,8
  131:4
**comfortable**  20:7
  122:13 124:5
**coming**  64:18
  74:25 99:9 121:16
  141:23
**comment**  106:5
**comments**  82:14
  84:2
**commission**  43:15
  150:7 153:17
  157:25
**committee**  24:13
  24:20 33:19 35:2
  35:4 41:14,17
  42:5,8,10,12,13,15
  42:24,25 43:2,7,11
  43:19 44:10,14,18
  44:23 45:1,4,7,16
  45:21,24,25 46:1,9
  46:11,14,18,21
  47:4 48:2,9,12
  50:9,15,17,18,19
  50:24 51:1,3,14,18

52:3,11,24,25 53:5
53:5,12,17,22,24
54:1,2,6,7,14,20
57:21,22 58:5,8,24
59:2,9 60:20 61:9
61:24,25 62:12,14
62:16,21 63:10,24
64:4 66:9 67:11
68:13 71:20 73:16
76:19 77:3,9
81:24 82:22 85:1
86:23,24 87:14,15
92:6,10 95:8,8
99:10,20 100:8,11
100:13,15,17
101:6,8,18,24
102:8,9,14,17
103:3,7,11,13,15
104:5,11,25
105:14 106:17,19
107:3,6,12 108:4,5
108:15 109:8
110:18,20 111:16
111:25 113:11,16
113:25 114:8
115:16 128:23
130:12 135:6
141:4,17 142:12
142:18 143:7
145:12 146:10,22
149:5,8,15 150:23
151:4,5,6,17,17,25
151:25 154:14
**committee's**  44:2
  44:4 47:13 50:1
  53:7 102:14
**committees**  42:2
**common**  64:4
**commonality**
  86:20 88:6 89:5

**communicate**
  17:11 18:22 25:21
  74:13 110:12
  112:21 113:12
**communicated**
  113:6
**communicating**
  113:4
**communication**
  105:23
**communications**
  27:9,15 86:20
  113:13
**communities**  82:6
  83:13 86:8,12,21
  87:5,8,10,13,17,21
  88:1 89:12 123:13
**community**  83:11
  85:6 86:15 118:6
  124:9
**compactness**
  84:14,18,21 85:1
  85:13 86:1
**compared**  106:18
**comparisons**
  107:8,14
**competing**  87:9,21
**complaint**  49:2
  148:13
**complaints**  65:21
**complete**  119:6
**completed**  129:25
**completely**  8:9
  10:1 118:2 119:7
**compliance**  67:6
  123:20 137:12
**comply**  80:16
  122:21
**complying**  123:1
  124:25

**computer**  16:24
  26:7 60:2,13
  61:20 69:23 75:19
  105:3 146:25
**computers**  57:2
  72:14
**concentrating**
  78:2 79:5
**concept**  116:6
  132:3
**concepts**  121:24
**concern**  83:9
  115:9 117:4
**concerns**  81:16
  82:3 83:4,22 88:6
  88:15 94:10 96:23
  110:19
**concert**  58:6 91:10
**concludes**  152:18
**concluding**  91:25
**conduct**  122:25
  128:12 129:16
  130:9 133:17
  145:22 152:9
**conducted**  126:24
  134:10 138:18
  145:23 150:18,22
  151:2,9,19
**conducting**  9:20
  52:17 134:14
**conference**  1:5 5:8
  14:14 56:25 57:8
  57:11 157:3
**confident**  123:4
**configuration**
  84:19
**confirm**  119:24
**confirmed**  16:6
**connected**  69:5
  89:8

**consequence**
83:18
**consider** 41:12
99:21 136:2
**consideration** 89:2
115:25
**considered** 86:13
86:22 87:4 88:20
127:2 133:11
**constituent** 24:21
**constituents** 35:13
**constitution** 11:25
**constitutional**
80:25 82:24 83:1
**constitutionally**
80:15
**constrained** 63:7
**constraints** 88:22
**consulted** 142:14
**cont'd** 3:1 155:1
**contacted** 15:12
**contend** 79:3
**content** 11:13
**context** 118:25
121:5 129:12
**contingent** 13:8
**continue** 23:5 37:2
84:20
**continued** 2:25
42:23 154:25
**continuing** 119:19
**contrary** 77:16
**contribute** 86:15
**conversation**
35:24
**coordinate** 16:4
94:23
**coordinating** 58:4
**coordinations**
93:14

**copy** 12:15 47:8
47:10 50:5,14
**corners** 95:17
**correct** 23:18
31:25 46:2 49:13
66:18 70:10 76:23
76:25 77:20 91:13
91:18,19,23 94:3
96:12 98:17 99:6
103:15 104:7
113:23 114:20
118:17 120:15
122:22 130:17
133:13,15 145:24
150:20 151:21
**correctly** 49:12
**correspond** 127:7
**corridor** 64:1 69:5
**corridors** 85:22
**counsel** 1:24 4:3
5:6,25 20:8 31:17
32:6,17 33:2,18
34:1,15,20,25 35:5
35:14 37:7,10
40:23 57:4,24
58:12 59:12 69:20
78:17 91:10 103:3
105:4 123:3 132:6
132:10 142:17,18
146:9,15,23
150:24
**counsel's** 60:7
**counties** 39:4,7
**country** 36:14
69:4,4 88:10
90:15,24 103:24
**county** 20:8 21:21
31:17 32:5,17
33:1,18,25 34:15
34:20,25 35:5,14
36:5,12,23,25 37:7

37:10,21,22 38:2
40:16,23 65:9
69:19 78:17 82:10
86:25 88:10 89:3
90:21 118:9 128:9
132:5,8,10 134:5
134:11,17 138:16
**couple** 18:15
60:14 62:11
117:12 150:11
**course** 26:9 28:9
38:4 51:16 72:12
127:6 145:20
**court** 1:1 4:15
5:10,19 6:8 7:9
9:3,7,8,13 20:15
22:22 23:8 35:25
38:20 84:8 113:22
134:10,13 138:15
139:12
**courtroom** 8:11
**covid** 48:9,21
94:11 96:5,10
**create** 85:23 92:6
**created** 117:6,25
**criteria** 53:3 76:18
77:6 80:16 81:25
82:18 88:25 92:2
117:22 121:25
154:14
**criterion** 85:13
122:20
**criticism** 81:11
149:12
**criticized** 130:5
**crossover** 128:2
**crux** 148:12
**cultural** 86:17
**current** 21:3,10
23:20 39:6

**currently** 21:6
23:16 46:6 131:16
**cursor** 147:8
**curtailed** 42:23
**cut** 141:7
**cv** 1:8 5:13
**cycle** 14:22 33:9
33:11 35:9 38:5
39:6 40:4 42:20
118:22
**cycles** 37:25 134:7

### d

**d** 3:1 74:21 154:1
155:1
**d.c.** 3:16
**daniel** 75:3
**data** 67:2 83:5,20
127:19,23 128:2
130:1,25 131:4
134:2,16 138:3,11
138:22 139:4,5
**date** 20:22 31:11
91:20 99:25 100:3
114:10 157:4
**dates** 91:3,12
**dating** 137:19
**day** 27:22 30:2
65:11 91:21 92:20
94:17 95:4 107:24
110:22 140:12
153:11 156:17
157:22
**days** 52:20 93:17
100:18,19,20,20
109:18 140:14
**dc** 2:4
**dead** 43:22
**deal** 81:24
**dealing** 45:21
**deals** 45:17 110:25

**dean** 11:19 58:23
58:23 91:10
**decade** 40:24
**december** 108:2,6
109:4
**decennial** 13:10
61:17
**decide** 32:16 40:21
111:18
**decision** 32:24
147:2
**decisions** 34:4
91:7
**decorated** 136:16
**deep** 117:3
**defendants** 1:12
2:10,10,16 3:3,4
6:17,20,24 12:13
12:18 144:15
149:24
**defer** 26:9
**deferred** 125:8
**deficient** 138:12
**deguit** 74:20
**delegates** 66:16
**delegation** 13:24
14:1 37:21,22
38:1 63:2 64:14
64:17,19 65:1,2,3
65:6,7,9,11,14
66:17 111:4 112:6
112:7
**delineated** 89:4
**demand** 55:18
**demographer**
59:15,22 74:2
104:23
**demographers**
57:5 59:21 103:3
143:2,6

**demographic** 70:3
127:7
**demographics**
35:13 36:10 40:12
40:13 132:7
**demonstrated**
78:1
**dennis** 11:19
58:24 91:11
**depending** 129:12
**depose** 16:1
**deposed** 13:19,20
13:24 14:6 19:11
19:18 65:13
**deposition** 1:17
4:5,12 5:5,14 8:25
9:21 10:22 11:2
15:9,14,24 16:10
16:19 17:1,12
18:3,10,11,22
19:15 144:7,16
152:14 153:2
157:4
**describe** 47:15
**described** 102:13
136:24 144:18
**describes** 34:10
**description** 68:5
154:11
**designating** 50:6
**designation** 48:19
50:3
**detail** 73:20
141:14
**detailed** 35:16
**determination**
84:24
**determined** 81:9
**develop** 125:3
**developing** 77:4
127:6

**development** 34:6
100:22
**deviation** 79:13,20
80:4,6,10,19 81:5
81:13 83:2 84:5
**devine** 3:21 5:17
**devoted** 24:8
**dictated** 135:21
**difference** 62:20
78:18
**differences** 38:17
**different** 23:15
37:14,14 48:8
60:9 61:10,10
62:13 73:17 82:12
89:12 90:4 119:8
124:10 127:24
129:8 137:25
**difficult** 94:24
**dilute** 122:14
124:1 135:2
**diluted** 123:6
131:21
**diluting** 122:1
133:6
**dilution** 77:15
**direct** 44:14 77:13
79:11 113:19
114:14 116:10
120:2
**directed** 44:11
**directly** 120:6
132:20
**disagree** 142:9
**disagreements**
110:11,13
**discharged** 140:11
140:11
**discovery** 144:10
**discrimination**
23:3 148:14 149:2

149:6,18
**discuss** 28:7,11
109:21
**discussed** 13:16
70:7 92:3 102:19
125:8 136:8
**discusses** 116:4
**discussion** 11:13
12:16 17:22 18:9
19:5 51:13 56:6
97:18 103:5 107:6
107:13 110:1
143:23 149:13
**discussions** 142:19
**dispersing** 78:2
79:4
**dispute** 19:19
**disputes** 110:25
**disrupting** 35:24
**dissimilar** 40:15
**district** 1:1,2 5:10
5:11 23:8 29:3
38:20,25 39:2,5
40:12,14 61:16
62:3,23 63:1,15,15
66:13,25 67:2,4,6
67:9,12,13,14 68:4
68:10,14,18,20
69:6,7 71:24 72:1
80:8 84:7 85:6,16
85:21 87:3 101:6
102:21 105:24
106:14 117:5,11
117:25 119:6,7,14
120:19,20,21,23
121:3 123:5 124:3
125:19,22,24
126:3,7,14 127:2,6
127:8,11 128:20
130:22 131:7,9,11
131:11,14,16,24

133:2,4,5,7,14
138:14 139:12
147:21,22 148:2
**districts** 34:20
63:3,7,18,20,22
65:4 67:22,23
68:6 80:12 81:2
87:25 88:6 107:10
109:6 110:10
111:1,24 112:12
115:10,14,17,18
115:22 116:5,9
117:6,15 118:13
118:19 119:21
120:15 122:9,14
123:8 124:16
125:13 126:5
128:13 129:1
132:10,22,24
133:14 134:14,17
135:15,25 136:3
136:10
**diverse** 87:17
**divided** 118:6,7
**division** 1:3 5:12
**document** 15:22
30:20 76:15 98:6
98:18 99:8,12
114:2,6 154:21
**documents** 16:21
17:1 30:11 31:4
31:10 44:3 77:7
141:25
**doing** 24:14 55:10
68:10 73:11 79:9
86:6 95:12 96:14
97:7 123:3 130:3
130:4,5 131:20
140:20
**double** 26:19

**doubled** 36:6,8
**draft** 100:23 101:2
101:14 102:1,2
109:7 117:20
141:1,16
**dramatically**
132:8
**draw** 69:6
**drawers** 30:5
111:22 112:20,22
113:9
**drawing** 13:9
53:25 60:3 86:5
105:15 122:8
124:6 131:7
132:21 134:16
138:19 139:12
147:5
**drawn** 126:7
**drew** 75:16 102:20
105:17 108:10
122:13 138:15
**drugs** 8:17
**dual** 71:12
**due** 117:15
**duly** 7:12 156:8
**duties** 41:10
**duty** 71:12

**e**

**e** 3:1 7:11,11 8:2,3
8:3 58:17 73:24
74:21,21 75:4
154:1,10 155:1
**earlier** 65:10
78:16 103:21
115:11,21 117:17
121:12 125:7
130:14 135:16
**early** 48:1 96:15
107:21 109:1
134:10

**earn** 55:8
**economy** 86:17
**educated** 32:19
**education** 21:23
92:7
**effect** 4:14 62:8
67:19 78:2,9 79:4
82:13 131:21
142:21
**effective** 125:12
**effects** 82:5
**effort** 84:10
123:25 124:1
135:5
**efforts** 54:8 79:18
79:24 80:2 101:9
**eight** 52:4 100:20
**either** 14:18 24:20
33:7 51:19 71:9
71:14,19 72:17
96:20 151:5,16
**elaborate** 125:17
**elect** 46:22 123:13
126:9 128:20
**elected** 27:25
31:18,21 37:19
38:24 39:11,13
44:20 117:8,13
121:1 125:23
126:2
**electing** 78:4,10
79:7
**election** 3:4 6:20
33:6,9 39:24
43:15 46:12 150:7
**electoral** 43:12
45:8
**eliminated** 42:23
117:14
**eliza** 74:19,21

**elliot** 52:2
**elm** 105:24
**email** 2:5,6,12,19
3:6 24:24 25:9,10
25:17,20,25 26:4,5
26:6,7,13,23 27:2
27:5,7,12,19 74:14
**emails** 27:18,21
**emma** 11:19 58:23
59:7
**employers** 32:18
**employment** 22:17
**enacted** 39:9
**ended** 41:1 102:22
**engage** 149:1
**engaged** 149:5
**enter** 30:15 89:16
**entered** 15:16
**entertained** 82:20
**entire** 37:9 54:16
104:5
**entirely** 9:16
**entitled** 1:18
**envelope** 70:15
**equal** 79:12
119:14
**equality** 80:11
**erickson** 64:21,24
131:19
**errata** 157:1
**escapes** 18:1
**especially** 9:19
**esq** 2:7,7,13,20 3:7
3:12,17
**essence** 120:25
**essentially** 48:5
77:5 149:14
**est** 1:14
**established** 57:1
**establishing** 81:4
134:16

estate 19:19
et 1:6,11 5:9 36:4
  117:22 157:3,3
ethnic 77:15
everybody 65:23
  72:24 88:8,9
  109:15 113:15,15
  135:10
evidence 87:4
examination 7:22
  144:21 150:15
  152:6 154:4
examined 7:14
example 127:20
excess 80:6
exchanged 29:21
excuse 98:23
  131:11 133:18
  152:21
exercise 60:3
  76:20 84:12
exhibit 15:16,16
  15:20 30:15,15
  76:3,11 89:16,17
  89:19 97:25 98:4
  98:12,22 99:5,6
  113:20,21 154:12
  154:13,14,15,17
  154:17,18,19,20
  154:21
exhibits 97:4,5,25
  154:23
existed 117:5
  125:6 135:11
existence 118:1
existing 61:16
experience 10:21
  34:16 64:3,7
  68:23 132:5 134:7
  137:19

experienced 40:17
expert 121:19,23
expires 153:17
  157:25
explain 69:17
  88:17
explore 68:21
exposed 96:24
  134:20 139:3
exposure 48:21
  121:10 139:11
express 51:6
expressed 94:10
extent 87:18
  110:10 112:4,18
  124:15 125:9
  140:23 143:5
extraordinary
  48:7,20
extremes 129:8

**f**

face 48:20 95:18
  95:18
facebook 27:3
  28:15,21 92:19
faces 146:13
fact 43:18 65:10
  90:17 117:25
  137:13,17 139:1
  145:4 146:17
  148:4
factors 86:14
facts 149:13
fairly 36:20 90:23
  96:17
fall 71:1 96:16
  100:6 108:6
familiar 8:23 13:2
  14:9 56:22 58:18
  83:3 90:5,20
  100:3 118:19

121:9,18 125:12
  129:3 130:6
  139:19 140:4,6
  148:7
familiarity 69:21
fancier 132:18
far 104:17
farther 82:25,25
fast 82:16 130:3,5
features 86:21
february 12:11
  20:24
federal 1:22 21:18
  23:8 77:13 122:21
  138:14 139:12
feedback 102:3
feel 52:4
fewer 107:9
figure 127:18
file 49:2
filed 5:10 12:9
  38:14
filing 4:4
final 90:1 109:2
  149:16 152:4
finalize 115:25
finally 107:25
  110:22 111:12
  140:10,17
financially 5:24
find 44:7 47:11
  137:5 153:2
finish 9:16 10:15
finishing 22:20
firm 16:12 19:24
  23:10,12 24:5,8,15
first 7:12 12:6
  31:21 32:18 34:2
  39:11,13 42:11
  44:19,23 45:24
  46:19 53:21 58:2

65:17,17 71:3
  73:23 78:16 86:10
  91:14,21 92:4,4
  99:19 100:8
  101:13 108:1
  109:4 117:7,7
  121:10
five 80:5,10 81:4
  115:10
fix 10:24
flawed 13:8
flexibility 84:5
  96:21
floor 3:10 24:14
  53:19 107:25
  140:10 141:2,6
  142:13
florence 21:15
focused 12:25 54:8
focuses 123:21
focussed 71:24
  72:1
folks 36:11 55:17
  57:5 64:15 70:21
  72:15 78:21
  129:20 132:12
  146:8,21
follow 69:24
  147:10 150:12
followed 47:19
  49:7,12,18,20 50:2
following 86:17
  101:21
follows 7:15
force 4:14 38:2
foregoing 153:1
form 4:8 15:4
  35:15 54:19
  103:18
formal 49:2 57:25
  60:15,18 111:15

**forman** 3:3 6:19
**formed** 42:11,13
**formula** 84:23
  85:3,15
**forth** 143:1 147:13
  156:8
**forthcoming** 144:9
**forward** 34:12
  101:10 103:6
  106:19 138:19
  140:2
**forwarded** 30:13
**found** 117:4
**foundation** 2:3 3:9
**four** 33:8,8,14
  59:14 71:9 72:6
  95:16 97:25
  108:20 111:6
  114:22 115:10
  118:8 119:21,22
  143:3 144:2
  152:21
**frame** 108:7,12,22
  109:1,13
**frankly** 48:21 60:6
  85:19 135:19
  136:11 138:11
  146:8 148:10
**friend** 117:17
**front** 16:22 44:10
  100:5 103:7 142:1
**full** 7:25 17:17
  50:23 53:17 59:4
  102:17 115:16
  145:1 151:17
**function** 42:18
**functionary** 147:2
  147:4
**furlough** 55:7
**further** 4:7,11
  48:17 103:24

144:3 156:11

**g**

**g** 58:17 73:24
  74:21,21,24 75:4
**gadsden** 2:17
**garber** 113:22
**garry** 1:20 5:19
  7:13 156:3,20
**general** 12:19
  35:19 108:12
  117:9 118:17
  136:16 137:11
  148:23
**generally** 13:4
  14:11 24:15 90:23
  121:24 129:5,9
  141:22
**gentleman** 17:24
**gentleman's** 58:15
**gentlemen** 131:23
**geographic** 80:14
  86:20
**georgia** 62:5 63:8
  64:2 68:7 88:21
**getting** 22:15
  54:24 55:13 82:25
  116:13 125:15
  130:1,6
**give** 9:25 74:1 76:3
  141:20 143:12
  145:14 148:8
**given** 31:10 87:6
  93:5 151:4 152:19
  156:10
**gives** 130:25
**giving** 55:4
**glad** 140:19
**glasses** 58:19
**gmail** 25:13
**go** 8:23 10:23 17:6
  21:22,23 22:1,11

25:2,3 40:25 44:7
44:9 47:9 55:22
64:25 66:16 67:23
80:21 81:18,20,21
82:1,4 102:16
109:20 115:13,21
120:9 123:5 137:2
141:13 143:16
147:11
**goes** 66:20
**going** 5:2 11:12
  16:7 19:2 22:23
  27:12 29:4 30:14
  50:16 52:21 56:3
  61:2 73:7,22 75:8
  76:2 85:20 89:16
  94:25 95:2,16
  97:11,15 107:17
  109:23 120:13
  121:22 122:18
  124:8 139:17
  141:15 143:21
  152:17
**good** 5:1 7:16
  47:21 117:17
  136:18 139:7
**gotten** 116:12
**govan** 116:18
  136:20
**governing** 60:16
**government** 34:5
  35:7 54:16,17
  86:19 89:5 92:22
**governor** 75:21
  83:17
**governor's** 75:22
**goyak** 74:23
**grace** 74:16
**graduate** 22:3,12
**graduated** 22:16

**gray** 2:15 6:22
**great** 10:20 70:20
  116:16 137:7
  143:18
**greater** 80:10 87:6
  90:22
**greatest** 124:15
**greenville** 2:11
  21:2,13 64:15,17
  69:1 88:14 112:6
  112:7
**ground** 8:24
**grounded** 54:22
**group** 35:4 54:1
  135:7
**groupings** 62:1
**groups** 64:13
  96:25 101:7
  127:24 134:25
**growing** 132:11
**growth** 36:14,17
  36:19 40:18,18
  63:5 78:16 119:13
  131:8 136:19
  137:9
**guess** 33:7,9,13
  34:2 41:17 44:21
  51:4 61:10 84:13
  85:24 91:8 92:16
  93:2 116:23
  120:17 121:16
  135:1 139:17
  140:22 142:11
  146:3 151:6
**guessed** 103:1
**guidance** 135:17
  145:14
**guidelines** 77:6,8
  80:17 117:23
  122:19 125:4

**h**

**h**  58:17 73:24
  74:21 154:10
**half**  80:7 81:5,6
  85:11
**halk**  23:7
**hallmark**  54:10
**hampton**  88:13
**hand**  156:17
**handed**  50:9
**handful**  41:3
  45:20 85:7 109:17
**handles**  28:25
**happened**  70:25
  102:22 106:6
  124:20
**happening**  67:22
  69:1,3 132:23
**happens**  47:18
  62:6 147:20,21
**hard**  82:16
**hargray.com**
  25:12
**hauger**  73:24
  74:10 111:23
  112:15,20
**hb**  140:15
**hb4493**  139:19
**head**  9:11 90:25
**hear**  11:3 129:14
  129:20 140:18
**heard**  66:2 141:9
**hearing**  30:1
  91:14,16,21 92:5
  92:12 93:15 99:18
  99:19 100:3
  110:17 149:10
**hearings**  14:20
  17:3 35:8 44:2
  52:18 53:10 89:21
  90:5,8 91:25

92:11,13 93:7,22
94:2,9,15,20 95:4
95:6 96:3,6,7,14
99:23 108:23,25
135:9 154:16
**heavy**  36:11
**held**  1:19 5:14
  19:5 53:9 56:6
  93:15,25 95:9
  97:18 110:1
  143:23
**hello**  6:10
**help**  16:3 34:11
  118:12 138:6
**helping**  105:2
**hennigan**  52:1
**herbkersman**
  62:24 63:21 64:8
  64:11,24 71:13,23
  71:25
**herbkersman's**
  62:25
**hereto**  4:4
**hereunto**  156:16
**hey**  105:23 142:7
**high**  21:24 90:18
  127:16 148:19
**higher**  81:20,21
**highest**  36:24
**highlighted**  83:17
**highly**  136:16
**highway**  89:8
**highways**  89:1,10
**hill**  69:2
**hilton**  90:25
**hindley**  3:17 7:4,4
**hired**  146:18
**hispanic**  36:17
**historic**  86:18
**history**  22:9,17
  139:9

**hoc**  35:2,3 45:20
  45:23 50:17 51:1
  51:18 52:24 53:5
  53:7 54:6 57:22
  58:8 60:20 61:9
  61:24,25 62:12,14
  62:15,20 63:10,24
  64:4 67:10 68:13
  71:20 73:16 76:18
  81:24 86:23 87:14
  100:12,17 101:6
  101:23 102:9,13
  103:11,15 104:11
  105:14 106:16
  107:12 108:4
  109:7 110:20
  113:24 114:8
  130:12 149:5
  151:5,17,24
  154:14
**hold**  35:8 95:3
  121:23 144:7
**holding**  94:8
**honed**  107:20
**hook**  72:13
**hope**  55:15 115:19
**hosie**  136:14
**hospital**  140:12
**host**  78:22
**hour**  145:7
**hours**  18:15 24:7
  24:18
**house**  2:10 6:16
  11:17,18,24 14:5
  21:20 23:23 24:6
  24:13 25:4,20,22
  26:10 27:10 29:3
  29:23 30:6 33:12
  37:19 38:7,18,23
  39:5,13,18,25
  40:14,22 41:4,11

44:4,24 45:14
47:3 50:14 53:20
54:15 57:3,4,9,11
57:23 58:3,25
59:15 61:12,21
62:22 65:8,12
68:22 72:9,17
74:5 75:9 80:7,12
86:24,25 87:14,15
92:17 95:10 99:21
100:23 101:2
102:7 105:6
107:25 108:16
109:3 110:16,21
126:7 134:8,11
136:23 137:3
139:25 140:1,8,10
140:15 141:2,5
142:13 144:15
145:13
**hs**  40:17
**hundred**  27:21
**hunter**  136:21
**hurry**  129:24

**i**

**idea**  55:4,6 89:14
**ideal**  67:3 80:4,23
  82:22 84:2 126:13
  147:17
**ideas**  111:23
**identifiable**  87:8
**identified**  48:15
  54:13 80:17 87:10
  94:14 148:21
**identify**  70:24
  73:10 101:1 116:8
**identifying**  95:14
**ignorant**  75:1,10
**ii**  77:13
**iii**  2:20

**illegal** 122:3 133:8
**illness** 48:22 108:3
**imagine** 8:22
**impact** 82:9 133:3
**impacted** 88:11
**important** 9:15,20
**imposes** 122:7,11
**impossible** 126:1
**inactive** 25:12
**inappropriate**
 84:12 122:2 133:8
**incident** 140:13,19
**include** 72:19
**included** 39:4
**includes** 11:20
**including** 86:16
 122:21 135:23
 139:11
**income** 36:4,23
**increases** 129:1
**independent** 53:2
 127:5
**index** 154:25
**individual** 61:21
 62:21,23 63:20
 68:23 69:3 71:4
 75:15 101:5,6
 102:19 105:8,22
 106:16 108:10
 109:5 110:9,16
 112:23 113:17
**individually** 20:11
 106:13
**individuals** 73:15
 112:2 135:24
 146:24
**influence** 106:11
**influenced** 106:21
**influences** 86:18
**information** 10:7
 35:17 61:17 66:14

68:14 70:4 82:16
 106:25 128:6,7,24
 129:22 131:1,3
 134:4,19,20
 137:24 138:1,3,5,9
 138:9,12,17 139:3
 139:4,8,13 151:7
**infrastructure**
 34:7
**ingley** 75:3
**initial** 18:8 100:23
 101:2,25 102:1
 140:25
**initially** 94:1
**initiates** 37:15
**inland** 88:12
**input** 53:14,25
 63:17 78:13 95:20
 103:25 106:1,1
 112:19 123:2
 134:25
**inquiry** 43:20
**insertions** 155:3
**inside** 70:5
**instance** 62:1
 68:24 124:21
 136:14
**instances** 49:5,10
 49:17 87:20
**institutionally**
 96:20
**instructed** 11:8
**intended** 94:6,13
 122:14
**intensive** 137:14
 137:17 139:1
**intent** 78:1 123:21
**intentional** 78:19
 121:14 124:1,18
 124:22 132:3,20
 148:14 149:1,6,17

**intentionally**
 87:25 122:1 123:6
 124:7
**interacted** 14:22
**interaction** 143:5
 147:12
**interactions** 14:25
**interactive** 147:23
**interest** 51:6 86:9
 86:12,15,22 87:5,8
 87:10,13,18,21
 88:2 118:6
**interested** 5:24
 41:14 68:25
 156:14
**intern** 72:21
**internet** 83:15,24
 84:1
**interns** 72:19,24
 146:3,18
**interruption** 36:2
**introduced** 7:8
 76:12
**investigate** 43:20
**investigation**
 43:24
**investigatory**
 42:25
**involved** 12:22
 38:15 90:9 95:10
 100:21 103:17,22
 111:16 112:13
 138:2,10 139:13
 140:14 142:19
**involvement** 58:9
 95:14 134:21
 139:10
**involves** 11:20
 137:13
**involving** 25:22

**island** 21:4 92:24
**issue** 10:24 76:10
 132:13
**issues** 9:22 10:21
 13:25 19:20 28:7
 37:12 43:12 44:6
 45:18 54:7 56:17
 63:4 83:23 144:19
**iv** 79:12

**j**

**j** 1:17,20 5:6,19
 7:11,13 8:3 21:25
 74:21 152:19
 153:8 154:5,6
 156:3,6,20 157:4
 157:20
**jane** 3:7 6:18
 150:6
**january** 12:11
 24:17 44:20 48:1
 48:11
**jason** 52:1
**jasper** 37:21,22
 38:1 39:7 65:7
 88:12 91:1 134:11
 134:17 138:16
**jay** 51:25
**jeff** 29:18
**jennifer** 17:22
**jimmy** 59:2,7
**jimmy's** 59:4
**jmc** 1:8 5:13
**job** 22:18 23:25
 144:23,24 145:2,5
 145:18
**jobs** 23:21
**john** 3:17 7:4 47:1
 48:25
**johnny** 22:19
**join** 42:8 43:1
 44:18 45:3 50:25

**joining** 51:7
**joleigh** 74:19
**jones** 8:2 23:13,17
**jordan** 12:17 14:3
  52:1 57:24 58:7
  64:9 91:9 103:12
**jsp** 27:7,19
**jsplaw** 26:3
**jsplaw.net** 26:22
**jsplaw.net.** 24:25
**jtrinkley** 3:6
**judge** 8:11 21:18
  23:7
**judged** 84:18,22
**judicial** 137:23,25
**judiciary** 42:5
  43:7 44:17,22
  45:1,4,7,16,18,25
  46:1,9,10,14 47:3
  50:15,18,24 52:25
  54:5 57:21 58:5
  58:24 59:1,9 66:9
  72:10 86:24 87:14
  90:16 95:7 101:21
  102:8,17 103:13
  104:9 108:14
  110:20 140:7
  146:10,22 150:23
  151:6,8
**june** 24:17
**justified** 80:13
**justin** 51:25
  136:25

**k**

**k** 74:24
**kaye** 3:14
**keep** 22:23 55:16
  67:25 86:1
**keeping** 148:23
**kind** 54:24 73:13
  133:18 134:2,9

138:17 139:6
141:23 151:20,20
**kinds** 69:14
**king** 47:1 48:25
  49:1 114:25 116:4
**knew** 73:20 74:6
**know** 9:18 10:9,13
  10:23 12:10,12,14
  13:20,23,24 14:15
  14:17 15:2,17
  24:16,16 27:21
  28:17,19 29:13
  30:16 31:9,13
  34:7,9,11 35:1
  37:13 38:11 41:12
  47:14,25 51:15
  52:15 53:23 54:10
  54:15 58:2,10,22
  59:5,13,19 60:4,7
  60:23,23 61:8
  63:11 64:1,10,16
  64:22,23 65:20
  66:2,5,12 67:16
  68:6,15,24 69:2,18
  69:22 70:3,13,19
  70:24 71:13 72:4
  72:18 73:9,11,13
  73:23 74:16,19,23
  75:3,6,16 76:4
  78:15 82:22 85:25
  87:22 88:4,7 89:4
  89:6,18,25 90:11
  90:15,20 91:3,6
  92:14,20,23 93:12
  93:16,19 94:6,7,11
  94:15,18 95:1,21
  95:23 96:20 100:1
  100:5,25 101:3,11
  102:25 103:4
  104:21 105:7,21
  105:23 107:20

108:18,19,23
109:13 110:21
111:3,15 113:16
113:21 114:15
116:3,11 117:16
121:4,7 122:6,11
122:12 125:7
126:5 127:12
128:15 129:25
132:4,17,24
133:20 135:11,14
135:16 136:20
137:18 138:4,8
139:7 140:23,24
141:20 142:5,17
147:7,15 149:9
150:19 151:1,12
**knowing** 75:10
  92:20 131:9
**knowledge** 142:23
  142:24 143:10
  153:4
**known** 23:14
**knows** 13:18

**l**

**l** 8:1,1 21:25 74:21
  75:4
**label** 74:1
**labor** 135:20
**lack** 137:9
**lacking** 138:17
**laffitte** 6:23
**lag** 9:21
**language** 120:22
**larger** 83:2 85:17
  147:18
**late** 32:24 100:5
  107:22 108:6
  130:1
**lately** 36:22

**law** 16:12 19:24
  21:14 22:5,11,13
  22:16,20 23:9,12
  24:5,8,14 27:7
  32:20 45:13 77:13
  121:24 122:17,21
  123:9,18 124:3,14
**laws** 77:16
**lawsuit** 12:7,13,22
  13:16 20:5,6
  38:14
**lawsuits** 20:10
  114:22
**lawyer** 32:19 43:7
  58:23,25
**lawyers** 11:21
  17:13,14,24 31:6
  31:10 59:2,8
  72:10,17,25
  146:10 150:22
  151:6
**layman** 85:25
**lead** 127:1
**leadership** 46:17
**learn** 15:9 75:11
**learned** 12:7 15:25
  78:17
**leave** 137:1,4
  147:19
**leaving** 64:16
**lee** 22:2,4
**left** 52:9
**legal** 11:14 17:4
  105:3 121:8
**legislation** 41:12
  41:13 53:15,15,18
  53:23
**legislative** 42:6,7
  43:2,10 44:4,13
  54:8 137:21

legislator 25:19
26:2 28:8 71:4
73:5
legislators 13:22
68:12 75:15
105:16 108:10
110:9,11,24
111:21 112:18
142:15
legislature 42:19
96:1 112:24
122:24 134:24
legislature's 114:7
legislatures
102:20
letter 48:11 49:23
50:6,12 98:13,24
154:18,19
level 53:16 66:7
100:10 107:5,13
111:13 125:16
126:5 128:9 134:6
137:22,22 148:8
148:19 149:11
150:22,24
lexington 21:14
liberties 2:2 3:9
life 55:17
limit 79:19 80:3
limitations 80:14
limited 83:13
86:16
limits 68:21
line 10:16 62:5
63:8 64:2 67:5
68:7,18 88:21
104:12,13,13
116:25 117:1
147:24 155:4,8
157:5

lined 105:9
lines 13:9 38:20,21
54:1 61:16 63:6
66:13,24 84:7
87:2,3 88:3,5
111:7,10 112:9,11
112:25 117:11
119:11 124:7
125:8 127:8
130:22 131:10,14
134:16 136:10
138:15,19 139:12
147:8
lisle 6:21 149:23
listed 25:25
124:21
little 45:24 69:17
lived 21:9,15,16
living 55:9
llc 2:9,15 157:1
llp 3:3,14
loaded 102:15
lobbied 51:10
local 34:5,8,23
35:7 54:17 92:16
92:22 137:22
located 16:11
location 86:21
90:14,19 95:23
locations 90:4,7
93:13 94:23 95:14
long 11:19 18:13
85:9 107:18 109:8
longer 55:6,15
133:6
longest 136:22
look 59:6 63:4,18
67:3,13 68:3
79:16 85:15 86:8
90:3,5 98:3
105:14 106:4

111:11 112:1,25
115:20 123:23
124:10 133:12
135:22 136:13,17
137:18 147:15
looked 16:5 61:20
63:6,17,23 68:19
101:5,8 104:6
106:1 107:1,14
112:10 119:15
121:25 122:20
130:21 131:13
136:11 145:6
looking 16:8 35:17
35:18 55:5 61:15
62:22 63:20,22,24
66:12 68:4,16
85:21 88:2 91:12
101:18 103:22
111:7 131:8
133:23 136:5
141:25 142:1
looks 31:11 86:5
90:1
lopsided 125:25
lose 41:5
lost 41:2 84:2
lot 37:15 124:10
low 69:4,4 88:10
90:15,24 103:24
lower 37:1
ltraywick 2:19
lucas 12:17 43:3
luke 2:17
lunch 55:1,10 56:7
luxury 138:7

m

m 3:17 7:11 8:1
ma'am 13:4 16:17
16:23 18:20 22:14
30:12 34:17 40:10

52:12 56:19 65:19
77:21 79:14 99:10
99:14 103:16
114:21 120:16
122:23 123:22
129:5 130:18
142:10
machines 57:6
main 2:11 3:4
maintenance
43:21
majority 107:10
120:14,18,20,21
120:23,24 121:2
122:8 124:2,16
125:15,20 126:21
133:3,5,7 136:6
making 42:24
147:3
malpractice 19:20
man 80:25 82:24
84:3
mann 21:25
manner 78:3 79:6
map 30:4 39:9
56:21,24 57:13,17
58:12 60:2,8,16,22
61:15 62:16 64:5
64:20 66:10,17,21
68:17 69:14 70:8
70:17,23 71:3
72:8 73:2,7 74:11
75:23 91:22 100:9
100:22 102:14,19
102:21 103:19
104:11 105:15
106:4,13 107:23
108:13 109:1,7,9
109:14,14 110:8
111:22 112:17,20
112:21 113:9,14

115:15 117:13
118:2 119:9,11,15
127:8 137:1 140:1
140:5,16 142:13
143:4 146:1
**maps**   11:25 53:25
57:6 69:7,9,10
74:7 75:14,15
77:4 78:22 79:3
99:21 101:4
102:21,23 104:18
105:8,17,19 106:7
106:10,12,15,17
106:18,18 107:7
107:18 108:11
112:4 114:18
119:4 125:3 137:4
139:18 141:16
147:1
**march**   96:12
**mark**   17:18,19,25
18:8 59:11 76:2
97:4,5
**marked**   113:21
**marriage**   156:13
**massachusetts**
3:15
**material**   31:14
44:3
**materials**   16:18
92:7
**mathematical**
84:22 85:2,15
127:13
**mathematically**
80:24
**mathias**   2:13 6:14
6:15 16:14 18:16
31:1 32:8 35:15
47:20 50:20 57:19
80:21 89:13 97:9

100:24 101:16
102:4 104:20
106:9 109:11
110:14 111:2
122:10 125:2
126:11 127:3
137:15 144:13,14
144:22 149:21
151:22 152:4,7
154:6
**matter**   5:7 26:9
87:7 116:1 119:14
156:15
**matters**   24:21
**mean**   11:16 12:8
15:23 17:2,6,7
18:15 23:24 27:11
29:25 33:19 34:10
36:7 41:14 44:1,5
47:9,21 50:21
51:8,22,23 52:15
52:16 53:1 55:5
57:9 58:2 59:6,22
60:22,24 62:18
63:19 65:5 67:17
68:24 70:19,25
72:13 78:20 82:8
83:14,16 85:14
87:23 88:18 89:5
89:24 92:15 93:11
94:21 95:5 96:17
100:25 101:17,19
101:21 102:6,10
103:1 104:10,21
105:4,4,5,10,21
107:5 110:15
111:4,8 112:16
113:4 114:4
118:23 119:10,17
121:24 124:17
126:12 127:10

128:16 129:6,7
130:23 131:1,3,25
132:6 133:25
134:6,12 136:5,7
136:17 137:5
139:20 141:2,9
143:3,8 145:22
146:6 147:4,6,14
148:9,22 149:9
150:21
**meaning**   126:15
**means**   29:14 81:1
86:1 120:24
**meant**   128:18
137:17
**mechanism**   47:24
**media**   5:4 28:16
97:16,23 144:2
152:20
**mediation**   38:17
**medications**   8:18
**meet**   18:14 104:11
113:18
**meeting**   14:1 48:2
48:4,10,16 49:23
50:9 57:10 65:12
65:15 92:4 94:12
100:12,12,13,16
101:18,20 109:15
109:16 114:8,12
**meetings**   24:13,20
34:12 53:14 65:10
104:14 107:12
113:8 143:7
**megan**   74:23
**member**   23:22
31:24 33:25 34:2
37:20 38:1,7
41:20 48:12 59:24
60:6 61:8,12,23
62:21 67:10 72:9

103:14 113:10
117:10 121:1
128:22 134:11
149:8
**members**   13:23
44:25 46:10 51:17
53:24 54:2,2
61:21,24 62:11,14
62:15,20 63:3,10
63:23 64:4 65:7
68:13,22 71:20
82:21 92:17 101:5
101:7 105:6 106:7
106:11,16,22
110:16,19 111:4,6
111:6,6,17,25
112:6,24 113:18
132:10 136:15
137:2 146:25
**memory**   51:23
**mention**   83:9
**mentioned**   9:13
12:23 18:12 20:3
20:13 22:10 28:14
37:5 39:12 51:5
52:8 54:5 58:11
60:11 65:12 66:15
67:15 69:15 70:8
71:6 88:16 101:4
103:8,20 112:5
125:7 130:14
133:10 140:8
141:17 146:1
150:17
**messages**   29:10,14
29:16,21 30:4
**messaging**   29:10
29:13
**met**   14:22 18:13
64:19 71:16
102:10

**methodology** 60:25 113:3
**methods** 61:10
**michael** 131:18
**mid** 103:24
**middle** 33:11 52:17
**miles** 85:7
**military** 41:23
**mind** 86:9
**mindful** 131:12,21 132:14,22,25
**mine** 63:1 66:24 72:2
**minimum** 55:16
**minor** 141:12
**minorities** 78:4,10 79:6 82:13
**minority** 36:15 77:15 78:3 79:5 82:6 83:10,13 107:9 115:14,17 120:15,19,20,21 120:23,25 121:1 122:9 123:7,12 124:2,16 125:12 125:15,21,23 126:2,22 128:14 131:13,23 132:9 132:23 133:3,5,7 134:25 136:6
**minority's** 122:1
**minus** 80:6 85:11
**minute** 12:16 55:13 99:24
**minutes** 97:6
**missing** 52:5
**misstating** 133:13
**modifications** 61:19 104:7 112:3 131:12

**modified** 67:25 113:2
**modify** 69:24
**moment** 18:1 30:16 76:4,6,9 79:16 89:18 143:13 144:4
**monday** 65:12
**monitor** 60:13
**monitors** 57:2 59:17 60:1
**month** 18:7
**moore** 16:3 17:15 17:18,19 18:8 59:11
**moore's** 17:17
**morning** 5:1 7:17 24:16 121:25
**mosaic** 63:19 67:17 104:2
**motion** 81:25 82:1 82:4,20
**motivating** 82:3
**mount** 118:3
**mountains** 71:17
**mouse** 147:8
**move** 34:11 45:14 69:24 84:13 103:5 104:12 138:19 147:7,20,22
**moved** 118:20 131:15
**moves** 147:8,9
**moving** 15:8 36:12 38:22 44:17 99:17 106:19 107:16 119:7 132:12 147:23
**multiple** 33:2 39:17 52:20 60:12 62:15 112:6

**municipal** 88:20
**municipality** 87:1
**murphy** 12:18 14:15,23 46:7 57:24 58:7 91:9 103:13
**myrtle** 21:4

**n**

**n** 3:1 7:11,11,11 8:2,3,3,3 75:4 154:1 155:1
**n.w.** 3:15
**naacp** 1:6 5:9 14:14,16 15:1 38:15 148:5 157:3
**name** 5:17 6:10,14 7:18,25 17:17,23 17:25 23:15 51:21 57:7 58:15,16,22 59:4,6,10 69:18 74:9 120:10 149:23 157:2,4
**named** 12:18 20:9
**names** 28:25 57:13 60:4 104:19
**narrow** 85:22
**national** 54:21
**natural** 78:18 88:16 121:13 122:15
**nature** 88:4
**necessarily** 16:8 29:13 67:23 82:11 93:11 111:3 126:12 137:17 139:8
**necessary** 85:18
**need** 35:16 44:12 95:2 103:4 126:7 129:15

**needed** 67:24 96:22 129:21 131:9
**needs** 24:22
**negative** 26:19
**neighboring** 65:4
**neil** 47:2 51:24
**neither** 78:5
**never** 57:9,20 59:17 64:19 65:20 66:2 72:20 73:19 104:10 114:3 134:12 139:6
**nevertheless** 80:9
**new** 1:21 3:11,11 5:18,20 13:9 39:8 61:17 66:13 67:1 89:19 97:25 112:25 125:5 148:2 152:22 156:4 157:1
**news** 75:25
**newspaper** 92:25
**newspapers** 92:17
**newton** 1:17 5:6 7:17 8:3,5,22 19:10 23:13,17 24:23 28:14 29:2 31:16,23 35:12 37:5 39:16 52:2,9 55:3 56:12,21 70:16 77:1 88:23 97:24 110:7 116:3 117:16 118:12 120:1 125:11 133:10 137:11 139:16 144:23 148:1 149:23 150:9,10 152:2,20 153:8 154:5,6 156:6 157:4,20

**nexsen** 2:9 6:15
11:12,21 15:12
17:21,25
**nexsenpruet.com**
2:12
**nicknames** 57:15
**nine** 51:19
**nod** 9:10
**non** 9:10 64:4
**noon** 54:24
**north** 32:9
**notary** 1:21 4:13
7:13 153:16 156:3
157:24
**note** 31:10 144:5
**noted** 6:8 146:2
149:14
**notes** 17:2,4
**notice** 1:23 15:23
92:20 93:5 154:12
**noticing** 6:5
**notification** 66:9
109:16
**notified** 105:18,20
135:9
**noting** 144:11
**notion** 121:12
132:20
**notwithstanding**
145:4
**november** 44:20
100:2 108:22
113:24 114:11
**number** 5:12 20:9
65:24 72:2 80:23
81:6,8 84:4
133:22 139:20,25
147:17 152:20
**numbers** 67:1,7
70:21 86:3 108:24
113:1 119:16

125:6 127:7
131:20 133:15,20
133:24,25 135:21
136:6,9 147:24
**numeral** 77:13
79:12
**nw** 2:4

**o**

**o** 7:11,11 8:2,3,3
74:21,24
**oath** 5:22 8:6
**object** 11:3 47:22
**objected** 48:12,24
49:6
**objection** 18:24
19:3 31:1 35:15
47:20 48:1 49:16
50:20 57:19 80:21
89:13 100:24
101:16 102:4
104:20 106:9
109:11,23 110:14
111:2 122:10
125:2 126:11
127:3 137:15
148:15 151:22
152:16
**objections** 4:8 6:3
11:5 49:11 110:19
**observed** 149:17
**obviously** 11:16
12:9 13:18,23
16:6 17:7 21:12
21:14 23:14 24:11
36:19 37:9 39:23
41:8,20 44:8
45:13,18 47:21
51:15 53:3,24
55:7,16 58:23
62:6 64:7 67:11
67:16,21 68:7,16

69:23 70:25 72:13
73:9 78:21 80:23
83:23 88:21 89:6
94:10 96:22 101:3
101:21 105:5,10
108:4 110:15
119:10 126:13,21
127:5,14 129:8,25
130:25 131:7
132:2 135:3,8,12
135:17 136:5
141:3 142:17
144:17
**occasion** 62:25
73:19
**occasions** 15:5
18:6 59:14 62:11
72:3 112:17
**ocean** 62:4 63:7
64:2 88:9,21
**october** 71:5 91:17
91:20 99:3,25
107:21 108:6,22
109:1 154:20
**odd** 119:20
**offer** 32:22 93:20
142:4
**offered** 63:17
94:19 95:24 112:3
141:10,18 142:7
**offering** 95:17,19
142:6,12
**office** 13:20 18:17
26:7 32:2 33:5
39:21 75:22
123:15 132:14
**official** 15:3 27:25
151:20,23
**oh** 46:13 84:21
**okay** 7:7 11:11,22
12:12,23 13:2

15:8,15,19 16:14
20:14,18 21:22
22:7 23:5 25:16
28:13 29:4,15
30:4,10,19 31:15
38:22 40:7 50:5
50:25 54:4,23
55:1,12,15,25
58:21 61:6 74:10
75:6,13,20 76:2,10
89:15 97:3,9,13
98:5,11,22 99:16
100:7 102:18
109:19,22 113:24
113:25 114:9,16
116:10,15,19,20
116:22 124:19
127:9 128:5 129:3
137:10 139:15
140:4 143:19
145:10 146:24
147:10 148:25
150:4 151:10
152:1
**old** 136:10
**once** 19:16 71:10
101:13
**ones** 42:4 67:19
95:9
**ongoing** 43:25
53:4
**online** 5:15 44:3
**open** 65:22,24
66:10 94:8 144:7
**opened** 70:18
91:22 107:23
108:13 109:2
113:17
**operate** 52:24
**operated** 53:12
74:6

**opportunity** 51:10 61:13 66:3 95:19 125:13,18,23 127:2,11
**opposed** 32:6 33:15 40:1,4,5,5,6 122:15
**optics** 136:12
**option** 93:21 94:3 97:2
**options** 93:24 94:19 95:24 96:2 96:8
**orangeburg** 118:9 118:16,24 135:12
**order** 85:9,17,22 138:18 152:8
**orders** 144:10
**organized** 73:21 135:5
**original** 117:6,14
**originally** 94:13
**osaki** 3:12 7:2,2
**ought** 81:18
**outcome** 5:24 156:14
**outdoor** 41:24
**outside** 21:10 59:12 60:7 75:21 77:8 85:14 111:15 142:18 146:9,15 146:22
**overall** 79:19 80:3 80:9 111:20 126:19
**overlapped** 72:5
**overlook** 52:6
**oversaw** 102:23
**oversight** 42:6,8 42:18 43:2,8,11,13 43:16,19 44:1,4,14

54:14,20 95:8
**overwhelm** 61:2

**p**

**p.m.** 56:10 97:21 109:24 110:4 143:25 152:18
**pace** 130:4
**packet** 92:25
**pads** 17:4
**page** 2:25 27:3 92:19 114:7,14,24 115:5 116:11,21 116:25 117:1,2 120:3,11,14 154:4 154:11,25 155:4,8 157:5
**pages** 116:17
**paid** 13:12 145:7
**pandemic** 96:5,11
**paper** 16:9 92:21
**paragraph** 84:17 86:10 88:24
**parameter** 84:7
**parameters** 81:4 84:6
**parks** 34:8
**part** 17:22 40:16 41:18 42:15 62:3 62:7 68:8 84:19 88:8 90:15 99:14 104:14 109:15 111:9,19 132:15 144:24 145:5,10
**participate** 135:10
**participated** 105:7
**participation** 123:7 127:20,21
**participations** 97:1
**particular** 108:21 126:2 135:7

136:12 148:19
**particularly** 68:25
**parties** 4:4 5:16 12:20,22 38:16 73:1 75:21 156:12
**parts** 54:3 78:14 85:8
**party** 5:23 19:23 19:24 20:4,4,6 31:24
**pass** 117:22
**passed** 53:19
**pat** 52:1
**pathways** 61:11
**patricia** 2:7 6:11 7:19 144:14
**patrick** 11:18 58:24
**patterns** 128:10
**pause** 76:7
**pay** 148:10
**peers** 123:15
**pending** 10:15 144:8
**people** 13:19 26:9 32:14 40:8 43:22 45:20 61:1 66:10 72:13,16 73:7,23 75:9 78:13 79:3,8 81:17 83:8,16 85:10 88:7,12 94:9,10 95:17 96:24 104:17 106:24 117:12 131:10 135:4 146:2,6 147:16
**percent** 36:9 80:5 80:7,10 81:5,18,22 82:1,4 85:11 126:19,23 127:16 127:17

**percentage** 126:9 126:25 127:13
**percentages** 35:18 70:2
**perfect** 138:5
**perfectly** 105:8
**perform** 128:13
**performance** 128:12,19 133:19
**period** 36:10 52:3
**permissible** 80:15
**person** 14:19 36:1 53:11 59:19 74:3 74:6 94:7 95:25 113:8 123:14 146:12
**personal** 19:12 20:15 25:8 28:4,6 29:6
**personally** 14:17
**persons** 35:5
**phone** 28:1,4,7,10 29:6 70:12 74:14 137:2
**phones** 60:24 70:9
**phonetic** 23:8 51:25 52:1
**physically** 16:11
**pick** 61:13 66:11 73:10
**picture** 74:4
**pie** 118:10
**piece** 16:9
**pieces** 78:14 104:1
**pin** 93:12
**place** 1:19 20:25 35:24 38:3,6 47:23 90:24
**plaintiff** 7:1,3
**plaintiff's** 148:13 154:11

**plaintiffs** 1:7 3:15
5:7 6:12 7:6,21
11:23 12:20 14:9
14:13 15:13 16:1
18:10
**plan** 30:8 77:25
78:9 100:23 101:2
102:1 141:1
**plans** 78:14 84:19
**pleadings** 12:15
12:24 13:13 148:8
148:17
**pleasant** 118:3
**please** 6:1,3 7:9,24
10:4,9,13,23 17:17
23:5 30:16 79:22
80:1 86:10 98:3
115:3 116:23
133:12
**plus** 27:21 80:6
85:10
**point** 10:6 54:25
64:16 82:17 95:20
98:9,20 99:2
108:14 132:6
**polarized** 129:4,17
130:10,20 133:19
**polarizing** 129:7,9
**policy** 42:24 77:19
80:15 87:7
**political** 86:18
**pop** 28:22
**population** 36:6
36:15 63:5 67:1,7
70:1 78:3 79:5,12
80:4,11,19 81:12
82:23 84:3 85:18
86:3 119:12,17,21
120:24 121:2
122:15,16 125:6
125:21 126:8,16

126:18,20 128:6
128:23 129:1
130:22 131:3,15
131:20,23 132:11
133:1,15,25 135:8
135:21 136:7,9,19
137:9
**porter** 3:14 7:5
**portion** 63:24 65:8
79:18 115:4
**portions** 78:22
**position** 22:18
23:6 31:19 130:2
**positions** 23:21
46:17
**possible** 8:10
27:17 87:9,12,18
89:10 150:18
**possibly** 10:16
**potential** 111:14
142:2 144:8
**potentially** 144:7
**pre** 37:12 84:9
114:19 115:22
119:5 124:4,20
138:13,21
**precinct** 87:2
**precise** 122:3
**preference** 55:20
**preferences** 55:2
**preparation** 101:4
**prepare** 16:25
17:11 18:3
**prepared** 151:8
**preparing** 18:21
**prescribe** 48:7
**present** 18:18
**presented** 50:3
**presenters** 117:19
**presenting** 109:10

**preside** 49:22
**president** 2:16
14:16,23
**presumably**
106:25 110:21
**prevent** 8:14
**preventing** 78:10
**prevents** 78:4 79:6
**previous** 114:18
119:4,15 130:21
139:14
**previously** 10:8
102:18 114:17
115:6 125:9
**primarily** 25:18
26:13,15 36:12
40:19
**primary** 26:3
**principle** 80:25
82:24 83:1
**printed** 104:4
105:13
**prior** 14:21 39:5
84:19 140:14
**private** 55:17
**probably** 20:9
24:18 27:21,24
33:13 35:16 47:12
54:10,13 59:1
69:20 71:5 81:19
82:8,15 91:9
92:16 132:17
138:4,8 147:18
151:14
**problem** 116:14
137:6
**procedural** 47:4
49:17,20
**procedurally**
45:14 104:8

**procedure** 1:23
47:19 49:5,7
52:25
**procedures** 48:8
48:20 49:11 60:16
**proceed** 6:9
**proceeding** 6:3
**proceedings** 76:7
**process** 13:8 37:17
43:16 44:15 45:9
52:16 53:4,8 57:3
61:7 65:16,18
66:6 73:10 79:9
81:8,10 86:14
87:11 95:19,21
99:15,18 101:15
102:8,22,23 103:6
103:18 104:16
105:21 106:20
107:16,17,22
108:5,5,13,23
110:8,17,18
111:10,15,20
112:21 113:17
123:11,17 124:6
124:12 129:23,24
130:16,17 131:6
132:16 138:21
139:1,9 140:24
141:4 142:11,19
142:25 143:1
145:25 148:22
149:1,11
**processes** 48:8
134:4 137:21
138:2
**produced** 31:4
105:13
**product** 101:22
105:13

**production** 106:4
**productions** 144:9
  144:10
**professional** 19:12
  20:16
**professionally**
  20:12
**program** 42:22
  69:23 74:7 105:3
  147:7
**programs** 60:2
  61:20
**progress** 101:12
  101:14
**project** 7:20
**promotion** 80:14
**proposals** 107:9
  107:14
**propose** 69:10
  110:9
**proposed** 69:7
  75:15 77:4,25
  78:8,14 99:20
  100:9,22 102:20
  105:17,19 106:6
  106:10,12,14,15
  107:3 108:11
  139:18 140:25
  141:24
**protect** 124:16
**protecting** 123:12
**provide** 20:22
  47:8 50:11 95:20
  104:18 112:19
**provided** 2:12 3:5
  31:13 61:13,18
  105:25 117:7
  128:25 151:16
**provides** 42:17
  48:5

**provision** 48:4
  79:25 122:3
**proximity** 100:11
  100:18
**pruet** 2:9 6:16
  11:12,21 15:12
  17:21,25
**pubically** 47:6
  102:1 109:10
**public** 1:21 4:13
  7:14 14:20 15:3
  17:3 30:1 32:21
  32:22 34:7 35:8
  52:17 53:9,14
  54:11 77:19 78:8
  89:21 90:4,8
  91:14,16,20,24
  92:5,6 93:6,7,15
  93:21 94:8,15,20
  96:6 106:8,11
  107:11 108:22,25
  129:15 132:14
  135:9 149:10
  154:15 156:3
  157:24
**published** 47:12
  92:18 104:15
**pull** 15:17 47:10
**purely** 122:14
  132:11
**purpose** 133:5
**purposes** 43:14
  76:19
**pursuant** 1:22
  50:3
**pursuit** 48:17
**push** 67:17 68:20
  70:15
**pushed** 104:4
  105:12

**put** 27:14 92:22
  101:10 104:2
  117:20 130:1
  132:18 133:4
**putting** 107:18
**puzzle** 67:16 104:3
  104:3
**pyan** 2:5

**q**

**question** 4:9 9:16
  9:19 10:8,15,16
  11:4,7,20 26:18
  33:24 35:20 41:15
  47:21 49:9,19
  52:14 57:20 74:25
  93:18 95:1 108:17
  117:18 119:2,3
  137:11 138:7,25
  149:16 151:11,13
  152:5
**questioning** 43:17
**questions** 8:15,19
  9:1,1 10:1,3,17
  20:19 37:11,13
  44:7,10 139:16
  144:4 150:1,8,12
  152:15
**quick** 55:13
  150:11
**quite** 48:21 60:5
  85:19 135:19
  136:8,11 138:11
  146:7 148:9

**r**

**r** 58:17 73:24
**race** 70:3 135:23
**racial** 23:2 35:22
  77:15 89:12 124:9
  127:24 129:9
  131:1 135:23

136:3 148:14
  149:2,6,17
**racialized** 129:16
  133:18
**racially** 129:4,16
  130:9,20 133:18
**radio** 141:8
**raised** 21:13 83:4
  148:20
**ran** 32:5 41:3
**range** 79:19 80:3
**rankin** 2:17
**rates** 127:20,22
**rattle** 12:21
**reach** 134:24
**reaction** 58:2
**read** 76:17 77:23
  79:2,17,22 84:16
  86:10 115:3,12
  116:24 153:1
**reading** 116:7
**real** 19:19
**really** 85:20 117:3
**reapportionment**
  81:7 121:11
  123:17 134:22
  137:20 139:10
**reason** 157:5
**reasons** 78:23
**recall** 10:6 14:18
  14:24 19:16 20:10
  30:3 36:17 38:16
  66:8 71:22,25
  72:21 73:14 81:23
  82:8,12 83:12
  92:24 98:8,17
  99:1,7,18 100:7,20
  101:19 104:6
  107:11 109:14
  129:18 141:19
  142:6

**receive**  25:21 26:1
  26:5,5 29:6,16
  78:7 81:11
**received**  27:18
  29:10 53:14 54:20
  65:21 101:13
  105:22 151:7
**receiving**  98:18
  99:7
**recess**  97:19 110:2
**recited**  48:13
**recognize**  15:22
  30:19 76:15 89:22
  98:6 114:1 146:7
  146:10,11
**recognized**  85:16
  90:23
**recognizing**  81:3
  85:4 87:24
**recollection**
  118:13
**recommendation**
  53:17 104:9
  108:15
**recommendations**
  42:21
**recommended**
  101:23 140:7
**reconstruction**
  117:10
**record**  5:2 6:2
  7:25 9:9 10:10,24
  11:6 17:16 19:3,4
  19:8 23:11 24:1
  32:8 35:25 50:8
  55:22 56:4,5,11
  59:4 79:23 86:11
  89:17 97:11,15,17
  97:22 103:9
  109:21,24,25
  110:5 115:4

116:24 130:9
  143:16,21,22
  144:1,5,11 152:17
  156:9
**recorded**  5:5 9:2
**records**  73:6
**recreation**  34:8
**recurring**  42:20
**redistrict**  37:23
**redistricted**
  134:12
**redistricting**  11:24
  14:21 26:16,25
  27:8,14,16,18
  28:11 29:7,11,17
  30:8 34:19,23
  35:6,9 37:6,24
  38:3 39:6 44:15
  45:19,21 50:17
  51:1,18 52:23
  53:7,8 54:6 57:3
  57:23 58:8 76:20
  77:3,9,25 78:9
  81:7 84:10,25
  86:13,23 87:11,13
  89:2 92:2,6,7,10
  93:1 99:20 100:8
  103:2 109:8
  114:19 121:11
  122:19 123:17
  130:16 134:4,22
  137:20 139:11
  140:16 145:25
  148:25
**redrawing**  38:19
**redrew**  38:21
  134:14
**refer**  57:12 65:2
  83:8 119:4
**reference**  88:25
  93:2 121:8

**referenced**  96:10
**references**  82:5
**referendum**  37:11
**referred**  65:11
  114:17 118:14
**referring**  58:13
  79:1 108:9 116:4
  138:20,23
**refresh**  118:12
**regard**  27:8,15
  37:11,24 90:13
**regarding**  81:12
  110:25 122:8
  142:14
**regardless**  49:15
  124:19
**region**  101:9
**regional**  65:3 68:2
  106:2 112:2
**regions**  101:8
  105:11,12
**registered**  21:6
**regret**  117:4
**regular**  38:4 53:13
**regulated**  73:21
**relate**  50:18,21
**related**  5:22 15:6
  23:2 26:1 34:16
  37:8 128:25
  156:12
**relates**  13:10
  43:20
**relating**  22:25
  27:18 28:7 29:7
  29:11,16 150:12
**relative**  14:1 27:13
  60:2,22 80:5
  83:24 107:2
  129:22
**released**  100:8
  102:7 109:14

**relied**  77:2,3,9,11
**rely**  123:2 145:12
**remember**  12:6
  28:24 49:4,16
  52:7 69:10 70:17
  70:22 71:17 82:5
  83:16 93:4 94:4
  141:22
**remotely**  5:16,25
  9:21
**removed**  43:23
  118:2
**reopened**  144:17
**rephrase**  10:5
  126:6
**replaced**  52:10
**report**  50:23
**reporter**  5:19 6:8
  7:9 9:3,7,9,14
  35:25
**reporting**  93:1
  113:22 157:1
**represent**  6:12,16
  6:20,23 7:21 65:8
  114:5
**representation**
  122:2 123:7 132:9
**representative**
  7:17 8:4,22 14:3
  19:10 24:6,9,23
  28:13 29:18 31:15
  31:23 35:12 37:4
  39:16 41:7,11
  48:23 49:1 52:9
  55:3 56:12,21
  61:16 62:2,9,10,24
  62:25 63:21 66:20
  68:1 70:16 71:13
  71:18 72:3 77:1
  88:23 97:24
  103:21 110:7

114:25 116:2,3,18
117:16 118:11
120:1 125:11
131:17,18,19
133:9 135:13,18
136:20,21 137:10
139:15 144:24
145:7,11 149:22
150:9,10 152:2
**representatives**
11:18 23:23 25:22
29:24 37:20 38:8
38:24 39:14 40:22
58:3 63:16 64:6
66:16 86:25 87:16
104:25 131:13
134:8 140:9
**represented**  87:2
**representing**
149:24
**represents**  86:2
**republican**  31:24
32:3 41:21
**reputation**  43:6
**requested**  36:1
**requests**  155:7
**required**  11:7
60:23 138:13
139:8
**requirement**
132:15
**requirements**
122:7,12 123:16
124:5
**requires**  124:14
**research**  127:5
141:23
**reserve**  144:6
**reserved**  4:9
**resigned**  33:12
43:5

**resolution**  19:25
38:11
**resolve**  87:20,23
**resources**  69:15
**respect**  117:15
**respective**  4:3
68:18
**respond**  139:22
**responded**  30:24
31:8
**response**  31:4,11
139:2 151:14
**responses**  9:8,10
**responsibilities**
42:15 124:13
**responsibility**
32:22
**responsible**  57:21
**responsive**  10:7
**rest**  9:18 24:19
57:7
**restate**  26:20
**restrict**  67:18
**restricted**  84:1
**restrictions**  68:8
**resubmit**  115:8
**result**  80:13
132:25
**resulting**  83:5
**retained**  152:22
**retirees**  36:13
40:18
**retrogression**
78:18,19,20
121:13,14,15,21
124:18,22 132:4
132:21
**review**  17:1,7
42:19 63:14 98:20
99:11 127:19,19
127:23 128:2,9

**reviewed**  106:17
106:25
**reviewing**  98:8
99:2
**richland**  118:21
**rick**  3:20
**ride**  71:15
**right**  55:14 56:2
99:16 120:8,9
131:1,5 144:6
145:2 148:2 152:1
152:12,16
**rights**  7:20 22:25
114:20 121:6,17
122:4,7,22 123:1
123:20 124:23
125:1 130:15
137:13 148:5
**rigorous**  117:22
**rivers**  64:23 88:19
131:18
**rmg**  1:8
**rmt**  5:13
**road**  21:4 95:15
**roads**  89:1
**roadways**  89:9
**robinson**  2:15
6:22
**robinsongray.com**
2:19
**rock**  69:1
**rode**  71:15
**roland**  59:8
**role**  19:21 22:24
33:17 34:22 42:13
43:11 44:14,16
45:8 53:7 147:2,3
**roles**  47:15 74:11
**rolls**  43:21,23
**roman**  77:13
79:12

**room**  16:15,16
50:10 56:21,24,25
57:8,11,13,18
58:13 60:17,22
61:15 62:16 64:5
64:20 66:10,17,21
69:14 70:8,17,23
71:3 72:8 73:2,7
74:11 75:23 91:22
102:19,21 104:12
107:23 108:13
110:8 112:17
113:14 137:1
143:4 146:1,4
**rooms**  58:4 109:2
**round**  26:16,24
114:18
**row**  52:20
**rozos**  3:20
**rule**  48:13 49:24
**rules**  1:22 8:24
47:4,14,19,23,25
48:5 49:5,6,17,20
50:2,4 52:24 53:2
60:15,19,21 62:13
70:7 96:21
**ruling**  48:18
**run**  32:2,6,13,16
33:4,12,15 34:12
39:20 40:1,7,21
41:1 69:22 73:19
92:21
**running**  39:24
**runoff**  41:2,2,6
**rural**  82:10 83:15
85:5,8 118:7,8

**s**

**s**  7:11 8:2,3 154:10
157:5
**safeguarded**
115:14

**samantha** 3:12 7:2
**sarah** 74:16
**sat** 146:25
**saw** 59:1 67:21
  106:17 107:1
**saying** 83:16 103:4
  132:19
**says** 76:21 77:22
  89:24 114:4
**schedule** 16:4
  27:14 89:20,21
  90:1 92:12,18,25
  93:6 94:12 99:23
  100:4 102:8 103:6
  154:15
**scheduled** 94:2
**scheduling** 13:25
  27:12 60:25 61:7
  93:3
**scholer** 3:14
**school** 21:15,24
  22:6,11,13,16
  32:20,21 37:25
  38:19 90:18
  134:12,17
**schools** 22:12
  138:16
**screens** 57:2
**scroll** 116:16
  120:4
**sealing** 4:4
**sebastian** 75:7
**second** 36:9 43:4
  46:20 47:1 84:16
**section** 79:15
  84:14,17 86:8
  121:5,16 122:4
  148:6
**see** 15:18,20 16:14
  17:8 28:22 54:23
  61:18 76:13 79:13

79:17,20 84:14
  88:24 89:18 97:25
  107:1 113:21
  114:24 116:17
  120:10 136:25
  140:20 147:11,19
  147:21
**seeing** 67:24 72:21
**seek** 102:3
**seen** 12:15,24
  36:22 99:1 114:3
**segment** 135:7
**segregated** 89:11
**sehouse.gov.** 25:7
**senate** 2:16 6:23
  38:18 41:1 149:24
**senator** 2:17 29:20
  41:8
**send** 25:25 26:7
  27:5,7
**sense** 71:2
**sent** 16:24 27:4
  53:19 92:16 109:7
**sentence** 77:24
**sentences** 77:14
**separate** 28:1
  71:21
**september** 71:5
  91:13 92:5 98:24
  107:22 109:1
  154:19
**series** 97:4
**serve** 23:24 33:2
  43:8 49:25 51:14
  65:17
**served** 33:3 35:3
  39:17 42:1,12
**service** 32:23
  48:15 54:11
**services** 86:19
  89:5

**serving** 136:22
**session** 24:11
**sessions** 112:24
  143:4
**set** 53:2 84:4 156:7
  156:17
**settled** 20:2
**seven** 42:20 51:19
  52:2 86:8
**shake** 9:10
**shannon** 131:19
**shape** 15:4 54:19
  86:2
**share** 15:16 97:25
  102:2,5
**shared** 101:5
  151:24
**shed** 131:9 147:17
**shedron** 131:17
**sheet** 157:1
**sheets** 73:13
**shepherd** 34:10
**shifted** 119:18
**shifts** 122:16
**shocked** 149:8
**short** 10:16 109:20
**shorthand** 17:4
**shortly** 12:9 37:18
  41:17
**show** 61:1,5 66:23
  66:24,25
**showed** 99:23
**showing** 30:17
**shows** 69:23 70:1
**sic** 8:2
**side** 62:4
**sign** 61:7 65:16,23
  66:6,11 73:10,12
  73:15
**signature** 156:18

**signed** 4:12,14
  61:3 63:9,12
**significant** 36:16
  36:18,20 40:17
**significantly** 119:8
  135:20
**signing** 73:17
**similarly** 10:20
**simple** 132:19
**simply** 90:19
  136:8
**simpson** 23:13,17
**simultaneous**
  35:23
**single** 63:15,15
  67:9 117:10
  132:10
**sit** 66:22
**sitting** 48:19
**six** 84:14 100:19
  111:6
**size** 67:4 86:2
  119:14
**slash** 79:13
**slot** 61:3,14 63:8
  66:11
**slots** 61:14 63:11
  73:11
**social** 28:16 86:17
**software** 69:16,19
  69:21
**solely** 123:21
**solution** 137:6
**solutions** 136:18
  137:7
**somebody** 17:20
  27:4 52:5 59:23
  60:8
**somil** 2:7 6:25
**sorry** 25:17 26:13
  32:11 46:13 55:23

[sorry - supposedly]

59:3 100:14
103:10 116:13
120:7 140:18
143:12
**sort** 21:17 34:13
53:21 63:18,25
64:1 68:2 85:23
85:25 96:25
103:23 105:12
106:2 108:25
130:12 136:24
137:11 141:14
**sought** 11:14
135:17
**sound** 58:18 76:22
91:13,19 100:2
118:19 139:23
**sounded** 26:18
**south** 1:2,5 2:11
2:11,18 3:5 5:8,11
14:13 15:1 16:13
21:2,5,15,17 22:5
22:22 23:22 30:5
32:10 40:17,21
43:12,22 45:9
62:3 77:18 80:11
81:8 84:10 85:5
86:24 87:15 88:10
114:6 117:9 118:4
118:5 126:4 127:1
129:2 145:11
157:2
**speak** 9:6 17:10
18:2 34:11 36:1
56:13,16 95:15
106:23 111:22
112:14 135:3
**speaker** 43:3,4
44:6 52:15 58:9
**speaking** 115:1
116:18

**special** 33:6
**specific** 13:11
73:23 82:12 121:7
122:12 129:19
**specifically** 13:12
58:13 81:23 82:7
83:12 89:4 148:21
**specifics** 101:19
141:21
**specify** 85:1
**speculate** 38:9
94:22
**spell** 7:24 74:20
**spend** 61:14
**spent** 24:5
**split** 21:18 87:25
88:1 118:9
**spoke** 110:8
115:21 131:24
**spot** 107:22
**spring** 51:3
**st** 2:4
**staff** 29:23 57:3
58:5,11,14 59:15
59:24 72:10,17,18
72:25 74:5 90:17
105:1 145:13
146:11 151:8
**staffers** 73:5
**standard** 80:19
**standing** 53:4,13
**start** 54:14 66:12
67:4,24
**started** 52:16
96:11,14 108:14
108:24
**starting** 22:21
**starts** 77:14
**state** 1:5,21 5:8
6:1,4 7:24 11:24
14:4,14 24:6 25:4

25:20 26:10 27:10
30:5 33:12 36:24
37:1 38:23 39:5
39:13,17,25 40:14
40:21 41:11 42:19
43:14 44:9,23
45:6 52:20 53:10
54:3 62:7,8 63:25
77:17,19 78:22
80:15 85:8 87:7
95:3,10,17 99:20
101:9 103:23
118:4,5,15 119:8
119:18 134:6
137:8,22 156:4
157:2
**state's** 32:20
**stated** 115:11
**statement** 115:12
**statements** 115:7
115:8
**states** 1:1 77:17
**statewide** 103:18
106:3 109:6 128:9
**statistical** 84:23
85:3
**statistics** 37:2
**status** 105:18
**statute** 42:17
**stenographer** 1:20
56:1
**stepp** 6:22
**stipulated** 4:2,7,11
**stipulations** 1:23
4:1
**stopping** 54:25
**stored** 75:19
**strange** 85:20
**streams** 88:19
**street** 2:11,17 3:4
3:10 105:24

**strength** 77:16
**stretch** 85:9
**strivedi** 2:6
**studied** 148:17
**study** 22:7 43:15
**stuff** 96:15
**subcommittee**
45:17 46:21,23
53:16 96:7 100:12
141:4
**subcommittees**
50:22 53:13 96:6
**subject** 19:15
89:24 114:22
**submitted** 99:14
106:7 115:7,16
**subpoena** 30:23
30:25 31:5,9
154:13
**subscribed** 153:10
157:21
**subset** 35:4
**substantive** 56:17
**successful** 82:2
**sued** 37:22 38:2
**suggest** 55:21
129:21
**suggested** 63:17
90:18 111:9
124:18 149:11
**suggestion** 82:9
83:14 134:1,13
146:3
**suggestions** 78:24
79:1 111:9
**suite** 2:11 3:4
**support** 119:13
145:18
**supported** 149:12
**supposedly** 43:6

supreme  22:21
sure   8:1 9:25 15:2
  16:25 17:23 26:17
  26:22 35:21 36:5
  41:16 47:7,11
  49:9,25 55:12,23
  58:20 59:14 60:19
  81:19 82:7,15
  86:12 90:16 92:12
  97:8,8,13 107:23
  109:12 128:15
  137:16 143:14
  148:18 150:14,21
  151:1,15
surprise  93:9
  146:19,20,23
surprised  72:22
suspect  72:15
  111:8
swear  6:8 7:10
sworn  4:14 7:12
  153:10 156:8
  157:21
sykes  41:7,9

t

t  7:11,11 8:2,3
  74:21 154:10
table  117:20
tabulation  87:3
take  9:8 10:12,17
  15:13 18:11 24:20
  38:6 55:14 69:13
  70:12 79:16 98:3
  105:7,14 107:19
  109:9,20 115:24
taken  1:19 5:6
  38:3 56:8 70:14
  97:19 110:2
  117:24
talk  9:14 16:4
  31:16 55:22 56:20

112:1,11 121:20
talked  14:4 17:13
  40:16 78:15 107:7
  112:8 121:12
  131:2,2 136:25
talking  55:6 74:3
  82:18 100:17
  108:7 116:9
  117:19 118:16,20
  118:24 119:1
  120:14 126:18,22
  135:14 138:23
talks  120:23
taxation  37:14
taxes  34:6
team  60:7
tech  9:22 76:10
technical  10:21
  142:8
technically  44:21
technology  97:1
tel  2:5,12,18 3:5
  3:11,16
telephone  16:2
televised  104:16
tell  15:4 17:14
  26:21 28:18 35:11
  35:19,22 38:8
  40:13 45:11 53:6
  55:19 58:16 59:9
  61:6 65:25 66:1
  74:5 75:8 82:13
  90:10,12 95:21
  100:1 107:24
  114:4 119:1
  139:21 146:17
  148:1
temporarily  21:17
  146:18
ten  20:8 81:18,22
  82:1,4 93:17 95:3

119:21
tenants  54:18
tend  65:3
tenure  15:3 54:16
  132:13
term  39:22 56:22
  120:18 121:4,8,9
  125:12 128:16
  129:4 130:7
  132:18
terminal  60:9,11
  66:22 74:6
terminals  60:12
  69:16
terminology  78:16
terms  33:2,8 35:19
  39:17 43:13 70:23
  83:19 85:25 88:5
  92:19 117:10
  126:14 131:25
  132:8,19 133:11
testified  7:15
  20:14
testify  8:9
testifying  8:6
testimony  78:8
  93:21 94:3,19
  96:2 115:6 152:19
  156:7,10
text  29:14,21 30:3
texts  29:7
thank  7:16,18 8:4
  8:21 11:22 14:8
  15:8 19:9 20:18
  25:1 29:4 30:14
  31:15 32:12 37:4
  38:22 40:20 45:22
  50:16 54:4,23
  66:15 72:7 75:14
  78:7 79:11 80:18
  86:7 87:19 91:2

93:4 97:3,14
  99:16 107:4 110:6
  113:19 116:1,2
  118:11 133:9
  134:23 137:10
  139:15 140:21
  143:18 144:11,13
  149:25 150:3,8
  152:1,11
thanks  143:19
  152:13,23
thing  10:14 34:13
  76:17 107:24
  139:7
things  27:4,22
  54:15 88:11 138:6
think  9:18 12:15
  14:3 15:11 16:2,7
  17:20 25:6,11,14
  25:15 26:21 27:3
  28:12,14,20,23
  29:1 30:12 36:8
  41:23,24 45:2
  47:1,25 51:20,24
  54:13 57:8,10
  58:25 59:14 60:18
  62:18,19 64:8,14
  64:17 65:10,19
  71:10 72:11,20
  73:12 74:2,2,9
  82:14 83:18,21
  85:4 91:23,24
  96:13,16,17,19
  101:17 104:22
  107:20 108:1,7,17
  109:3,19 112:5
  114:13 117:16
  124:13,14,17
  125:14 126:13
  132:3,15 139:1
  141:11 142:5

**[think - unfortunately]**

143:11 146:5
**thinking** 99:22
**third** 73:1
**thomas** 1:10 5:9
5:17 58:15 59:16
59:24 60:10 66:22
73:24 74:14
104:22 111:22
112:9,15,19 113:2
113:8 146:12
157:3
**thought** 40:24
81:18,20 113:1
118:23 138:14
146:8
**thoughts** 135:18
**three** 33:7,13,13
59:8,14 71:9 72:5
93:17 97:6,23
108:19 114:22
118:7 143:3
152:21
**thursday** 24:12
**tied** 27:2 28:21
**ties** 132:2,20
**time** 1:19 4:10 6:4
10:13 11:4,4 19:1
19:6 21:19 24:5
26:4,5 28:22,22
31:17 32:21,22
34:14,24 35:1,1,14
36:1,9,10 37:6,9
38:23 40:25 52:3
54:11 55:1,8 56:3
56:9 57:8 61:2,3
61:14,14 62:17
63:8,11,13 64:6
66:11 68:2 71:11
71:14,18,19,23
73:10,17 76:17
82:17,19 92:9

97:14,20 99:13
108:7,9,12,18,22
109:1,13 110:3
129:21,21,23
132:7 138:7
143:20,24 144:15
144:24 145:1,5,10
149:25
**times** 19:14 33:4
33:13 39:20 48:7
61:23 71:7,8 91:3
**timing** 55:3 69:2
70:23
**title** 34:9 59:23
114:4
**tjh** 1:8 5:13
**today** 8:6,15 12:4
13:19,20,25 16:7
16:16,19 17:12
32:25 37:3 119:23
121:13 124:10
150:1 152:14
**today's** 15:9 16:10
16:25 152:18
**toiled** 137:1
**told** 15:12 32:18
43:5 63:12 70:22
93:16 94:16
129:24 142:7
**tolerated** 149:18
**tom** 3:21
**top** 76:21
**torres** 1:20 5:19
7:13 9:4 156:3,20
**total** 152:20
**touch** 17:8
**touched** 63:4
**town** 22:20
**transcript** 114:7
116:7 153:1 156:9

**transparency**
54:12
**transparent**
104:15
**trash** 34:6
**travel** 52:19
**traywick** 2:20
6:21,22 18:24
149:22,23
**trends** 35:19
**trial** 4:10 22:21
**trick** 74:25
**tried** 141:7
**trinkley** 3:7 6:18
6:19 150:6,6
**trivedi** 2:7 6:25,25
**trouble** 9:14
**true** 145:12,16
146:5 153:3 156:9
**truthfully** 8:9,15
**try** 10:24 16:3
85:15 87:23 88:2
124:15 125:3
141:13
**trying** 27:13 75:11
84:4 86:1,3 93:12
94:23 137:5
147:16
**tuesday** 24:12
**turned** 30:10
**turning** 11:23
**twice** 34:20
**twitter** 28:20
**two** 21:19 37:25
39:22 61:9,10,23
63:3,6,22 72:2
80:6 81:5,6 85:11
93:17 97:16
100:19 108:20
111:5,16 121:6,17
122:4 129:8

131:23 134:7
136:21 148:6
**type** 106:2 139:13
**types** 33:22 88:15
**typically** 45:15

**u**

**u** 58:17 73:24
74:21
**u.s.** 5:10 11:25
83:4
**ultimately** 13:7
38:13,20 53:9,19
81:1 106:5,20
138:25 140:1,5
**unaware** 113:4
145:19 151:9
**undercount** 83:6
83:10,19
**understand** 8:5,8
8:19 9:4,11 10:4
11:9 12:1,3,17
13:5 26:17 33:24
46:1 49:9 67:3
81:15 116:6
118:25 129:10
134:1,18
**understanding**
8:14 12:19 52:18
68:17 120:18
123:19 125:18
148:24
**understood** 13:14
14:5,8 26:11
29:15 52:8 77:12
91:2 134:23
140:18 141:15
**unfamiliar** 130:11
**unfortunately**
23:25 59:10 75:2
120:4 139:21

**[union - word]**

**union** 2:2 3:9
**unit** 5:4 97:23
**united** 1:1 77:17
**units** 152:21
**university** 22:5
  32:20
**unknown** 3:10
  154:17
**unusual** 86:6
**updated** 92:3
**upheld** 114:23
  119:4
**usc** 22:5
**use** 25:18 26:13,15
  60:16 70:18 89:1
  131:5 134:15
  138:9
**useful** 134:19
**utilize** 96:1
**utilized** 138:1

**v**

**v** 5:9 157:3
**vague** 73:14
**valorem** 34:6
**varies** 24:10
**variety** 86:14
**various** 33:19 54:3
  78:13,21 148:11
**verbal** 9:10
**veritext** 5:17,20
  152:22 157:1
**versus** 24:6 107:15
  131:18 135:8
**veteran** 136:17
**vice** 46:15,20,22
  46:25 47:2,16
  48:25
**video** 5:5 10:22
**videoconference**
  5:15

**videographer** 3:21
  5:1,18 7:7 9:3
  19:1,6 55:21,25
  56:9 97:10,13,20
  109:22 110:3
  143:15,19,24
  150:4 152:12
**view** 69:12
**violation** 124:23
**virginia** 21:14
**virtual** 93:20,24
  94:3,7,18 95:3,6
  95:24 96:2,7 97:1
**virtually** 14:19
  53:11 94:25 95:20
**visited** 71:3
**visits** 72:23
**voiced** 110:18
**vordman** 2:20
**vote** 21:7 41:13
  81:1 82:25 84:3
  106:5,21 135:2
**voted** 140:9
**voter** 127:19,21
**voters** 126:9
  127:25 128:14,20
  133:21
**voting** 7:20 22:25
  34:16 37:8 43:11
  43:21 45:8,13
  70:2 77:16 86:19
  114:20 121:6,17
  122:4,6,22 123:1
  123:20 124:23
  125:1 126:8,18,19
  128:3,10 129:4,17
  130:10,15,20
  133:19,24 137:13
  138:22 148:5

**w**

**w** 3:7 7:11,11,11
  8:1,2,3
**wage** 36:25
**wait** 9:16
**waited** 41:3 70:20
**waived** 4:6
**walk** 147:25
**walked** 50:10
**waller** 22:19
**want** 18:10 22:22
  52:6 55:12,14,18
  73:13 120:22
  143:15 144:5
**wanted** 15:13 43:8
  43:8 149:25
**washington** 2:4
  3:16 22:2,4
**watched** 60:8
  135:19
**water** 68:7
**way** 13:1 54:19
  68:15 85:9 88:12
  88:13 89:11 93:18
  95:18 106:22
  113:5,12 120:5,5
  125:25 142:7,20
  156:14
**we've** 107:20
  125:7 132:22
**wears** 58:19
**website** 44:5 47:9
  47:13 51:23 59:7
  92:23
**wednesday** 24:12
**week** 14:5,6 15:14
  24:7,10,10,18
  31:12 55:8 65:14
  93:10 108:1 109:4
**weekly** 36:25

**weeks** 65:24 66:1
  93:17,17 108:20
  108:20,20
**weight** 87:6
**went** 21:13 22:10
  34:19,25 35:5
  38:16 44:21 67:13
  71:7,16 92:21
  111:5 112:25
  132:4,6 135:6
  141:23
**weston** 1:17 5:6
  8:2 29:2 152:19
  153:8 154:5,6
  156:6 157:4,20
**westonnewton**
  25:7,12
**whatsoever** 44:16
**whereof** 156:16
**white** 40:19
**wife** 13:18 71:16
  141:8 145:9
**wiilliam** 5:5 8:1
  152:19
**williams** 64:23
  131:17
**williamson** 74:17
**willing** 51:9,14
**window** 55:5
**wished** 16:1
**withdraw** 119:25
**witness** 1:18 6:9
  7:10 19:23 150:3
  150:14 154:4
  156:7,10,16 157:4
**wm** 1:17 153:8
  154:5,6 156:6
  157:4,20
**wnewton** 24:25
**word** 65:6

**work**  9:22 10:10
  10:18,25 22:24
  23:9 24:15 25:19
  26:1 28:1,8 33:22
  34:16 37:6,8 54:5
  54:21 55:11 74:7
  75:9 101:11,14
  104:18 105:3,10
  106:19 109:19
  137:4 145:13,17
**worked**  21:18
  22:19 23:7 59:18
  60:1 104:25 146:9
  146:21,22
**working**  23:17
  24:5 57:5 59:17
  59:25 60:8 61:18
  67:25 72:10 102:2
  104:23 107:15
  146:4,12
**world**  68:9 88:8
  138:5
**worried**  56:1
**wrapped**  85:21
**written**  115:11
**wrong**  59:23

| x |
| --- |

**x**  1:4,13 3:1 30:1
  111:18 142:8
  154:1,10 155:1

| y |
| --- |

**y**  74:24 75:4
  111:19 142:8
**y'all**  55:14 117:20
**yan**  2:7 6:10,11
  7:16,19,23 19:9
  32:11 55:23 76:8
  97:12 110:6
  143:17 144:3
  148:15 150:10,16

  154:5
**yeah**  46:13 49:14
  60:14 69:18 70:11
  96:13 98:1,5
  113:10 114:13
  118:23 121:22
  123:24 133:16
  150:25
**year**  24:19 33:8
  39:22 42:10,20
  43:4,18 48:2
**year's**  81:10
**years**  20:8 41:3
  119:22 137:20
**yep**  17:20
**yesterday**  18:4,5
  18:13
**york**  1:21 3:11,11
  5:18,20 152:23
  156:4 157:1

| z |
| --- |

**z**  111:19 142:8
**zoning**  34:5
**zoom**  5:15 17:21
  18:16

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.