# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# COLUMBIA DIVISION

| | |
|---|---|
| THE SOUTH CAROLINA STATE CONFERENCE OF THE NAACP, and<br><br>TAIWAN SCOTT, on behalf of himself and all other similarly situated persons,<br><br>Plaintiffs,<br><br>v.<br><br>THOMAS C. ALEXANDER, in his official capacity as President of the Senate; LUKE A. RANKIN, in his official capacity as Chairman of the Senate Judiciary Committee; JAMES H. LUCAS, in his official capacity as Speaker of the House of Representatives; CHRIS MURPHY, in his official capacity as Chairman of the House of Representatives Judiciary Committee; WALLACE H. JORDAN, in his official capacity as Chairman of the House of Representatives Elections Law Subcommittee; HOWARD KNAPP, in his official capacity as interim Executive Director of the South Carolina State Election Commission; JOHN WELLS, Chair, JOANNE DAY, CLIFFORD J. EDLER, LINDA MCCALL, and SCOTT MOSELEY, in their official capacities as members of the South Carolina Election Commission,<br><br>Defendants. | Civil Action No. 3:21-cv-03302-MBS-TJH-RMG<br><br>**RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL PRODUCTION BY DEFENDANTS JAMES H. LUCAS, CHRIS MURPHY, AND WALLACE H. JORDAN** |

Defendants James H. Lucas (in his official capacity as Speaker of the South Carolina House of Representatives), Chris Murphy (in his official capacity as Chairman of the South Carolina House of Representatives Judiciary Committee), and Wallace H. Jordan (in his official capacity as Chairman of the South Carolina House of Representatives Redistricting Ad Hoc Committee) (collectively, the "**House Defendants**"), by and through undersigned counsel, hereby respectfully

respond in opposition to Plaintiffs' Motion to Compel Production and For Further Relief [ECF No. 249] ("**Plaintiffs' Motion**") from Plaintiffs The South Carolina State Conference of the NAACP ("**SC NAACP**") and Taiwan Scott, on behalf of himself and all other similarly situated persons ("**Scott**") (collectively, "**Plaintiffs**").

### RESPONSE TO INTRODUCTION

Unfortunately, House Defendants are compelled to respond to the introduction and background set forth by Plaintiffs, as these sections are—once again—replete with misrepresentations and omissions. The first such is the first sentence of their Introduction, where Plaintiffs fail to disclose discussions between House Defendants' outside counsel (Nexsen Pruet) and Plaintiffs' local counsel in late January and early February 2022, during which Nexsen Pruet made known that their representation preceded the filing of the lawsuit. Nexsen Pruet clearly communicated to Plaintiffs' local counsel that the representation began well prior to filing of this litigation[1], and described as occurring in "phases" both planning for the legislative process and later in advising during the legislative process. During a telephone call on February 2, 2022, it was specifically discussed between House Defendants' counsel and Plaintiffs' local counsel the burden for both sides of logging individual communications between outside counsel and their clients, and House Defendants proposed preparation of a summary log describing general categories of communications by relevant time period (or phase)[2]. House Defendants' Summary Privilege Log is attached as **Exhibit A**.

---

[1] This earlier engagement should not be surprising to Plaintiffs, as historically the decennial Census data was released much earlier—reapportionment data in late December and P.L. 94-171 data in mid-late March.

[2] House Defendants can make available to the Panel for *in camera* review an internal communication memorializing this agreement with Plaintiffs' counsel that was drafted contemporaneously with the telephone call.

Separately, House Defendants understand that Plaintiffs' counsel was in agreement with counsel for all of the Defendants that no party was expected to log individual communications involving outside counsel after the date of filing of the lawsuit. That this agreement related to defense counsels' privileged communications in fact existed is best demonstrated by the fact that no party has logged individual communications on any privilege log, including Plaintiffs' local counsel or national counsel, the Senate Defendants, or the Election Commission Defendants. In fact, further discussed below, Plaintiff SC NAACP has logged only three (3) total communications with defense counsel, despite having some 40 attorneys of record and representation spanning back to at least mid-2021. (Plaintiffs' Privilege Log attached as **Exhibit B**).

At best, it appears certain of Plaintiffs' legal team misunderstood or were unaware of the scope of the agreement with Plaintiffs' South Carolina counsel, perhaps attributable to the large number of lawyers from several national firms and advocacy groups representing Plaintiffs and their communication processes. Notwithstanding their confusion or internal miscommunications, House Defendants' counsel acted in good faith in pursuing the mutually beneficial agreement three months ago and have proceeded as collaboratively as possible with Plaintiffs' South Carolina counsel on this and other discovery issues accordingly.

In addition, and contrary to the representations in the Motion, House Defendants clearly stated at the meet and confer held April 14, 2022 (transcript attached as **Exhibit C**)[3], in a letter dated April 18, 2022 (attached as **Exhibit D**), and at yet another meet and confer held April 26, 2022, that Nexsen Pruet *did not draw* the maps enacted by H. 4493. Nexsen Pruet did not have a

---

[3] While unusual, undersigned counsel engaged a court reporter to transcribe this meet and confer because on multiple prior occasions, Plaintiffs' discovery counsel engaged in a troubling pattern of transmitting purported "confirmatory" e-mails following telephonic discussions that materially mischaracterized the discussions and specifically misrepresented House Defendants' statements. All counsel participating in the call were aware the conversation was being transcribed.

3

"substantive role in the map drawing process" and Nexsen Pruet did not wear "multiple hats" in this matter. *See* ECF No. 249 at 2. Nexsen Pruet wore a single "hat" and it was that of outside counsel. Nexsen Pruet lawyers did what lawyers do: provide legal counsel and advice to their client. To be clear, the fact that a Nexsen Pruet associate learned to operate Maptitude for Redistricting, the most common redistricting software package that is available to the public,[4] is neither some sinister act nor does it warrant a conclusion that Nexsen Pruet necessarily drew the maps enacted by H. 4493. As has been repeatedly noted by the Panel, what matters in this case in the intent of the General Assembly (the elected Senators and Representatives), who approved the maps enacted by H. 4493, not the lawyers who were engaged to provide legal advice during the process.[5]

Finally, the Motion erroneously asserts that House Defendants failed to identify "the mapdrawing consultant whom legislative leadership hired in June 2021 or earlier," misrepresenting the appended e-mail communication (ECF No. 249 at 4; ECF No. 249-3) and without disclosing or providing the Panel with the complete discussion. *See* **Exhibit E** (Hauger e-mail with Caliper). As demonstrated by the e-mail, Nexsen Pruet (not "legislative leadership"[6])

---

[4] This is the same mapping software that House Defendants hired several University of South Carolina students to learn and operate in order to assist House Members in the Map Room.

[5] This Panel has clearly expressed reluctance to make any attorneys witnesses in this case. This reluctance is likely in part informed by the vehement objections by non-parties American Civil Liberties Union and NAACP Legal Defense and Educational Fund to third party subpoenas, whose refusal to comply is premised on the fact that these organizations are providing legal counsel to Plaintiff SC NAACP in this case and thus the subpoenas purportedly (and impermissibly) represent efforts to obtain "discovery from opposing counsel of record." *See* ECF No. 201-4. Nonetheless, Plaintiffs' counsel now chooses to "chase yet another rabbit" just two weeks before trial—seeking to infiltrate the files of outside counsel specifically retained for litigation.

[6] Representative Jordan specifically testified that the only consultant engaged by the House during the redistricting cycle was Thomas Brunell, a fact already known to Plaintiffs as they have already

engaged a consulting expert in anticipation of litigation for the purpose of assisting Nexsen Pruet with the provision of legal advice to its clients—a common practice that conformed with the procedural rules. The Federal Rules of Civil Procedure state that "a party may not, by interrogatories or deposition, discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or to prepare for trial and who is not expected to be called as a witness at trial." Rule 26(b)(4)(D), FRCP. Here, the consultant's involvement was extremely minimal, but still even the identity of the consulting expert should be privileged.

As this Panel directed, House Defendants have tried diligently to address Plaintiffs' newest issues despite the late raising of concerns. During the April 26, 2022 meet and confer, House Defendants' counsel shared a lengthy substantive explanation of the activities and timing underlying Nexsen Pruet's engagement and also offered to supplement their interrogatory answers and request for production responses in order to alleviate any continuing concerns. Notably, during the April 26 meet and confer, Plaintiffs' counsel expressed that Plaintiffs were only interested in "communications that may bear on discrimination, communications that may bear on legislative intent" as opposed to seeking inventory of each and every communication from the entire course of Nexsen Pruet's engagement. After the two meet and confers on these questions (and prior to the Motion's filing), House Defendants informed Plaintiffs that they were in the process of drafting the supplemental written responses and agreeable to preparing a privilege log for Nexsen Pruet communications with the three named House Defendants, as well as communications with the Ad

---

deposed Mr. Brunell and are in possession of his initial and rebuttal expert reports. Representative Jorden denied any other consultant being engaged by the House. *See* ECF Nos. 249-1 at 70-71.

5

Hoc Committee members[7]. Unfortunately, Plaintiffs rejected House Defendants' proposals aimed to answer any questions in favor of motion practice, notwithstanding this Panel's previous statements relevant to these issues and despite House Defendants' willingness to find common ground acceptable to Plaintiffs. *See Network Computing Servs. Corp. v. Cisco Sys., Inc.*, 223 F.R.D. 392, 395 (D.S.C. 2004) (noting that "hardball discovery" such as continued discovery disputes on matters already ruled upon by the court are "costly to our system and consumes an inordinate amount of judicial resources"). Still, House Defendants provide herewith supplemental responses to certain interrogatories (**Exhibit F**) and supplemental responses to certain requests for production (**Exhibit G**)[8]. House Defendants are also preparing for production non-privileged communications involving Nexsen Pruet responsive to Plaintiffs' requests, and remains willing to prepare a privilege log of communications between Nexsen Pruet attorneys and their client-legislators from January 1, 2021 to December 6, 2021, the date the House passed H. 4493, if directed by the Court notwithstanding the prior agreement reached between counsel and Plaintiffs' failure to date to log any privileged communications with defense counsel.[9]

---

[7] As explained to Plaintiffs, House Defendants believe that the communications between Nexsen Pruet and its legislator clients include the emails that *might* touch on the intent of the General Assembly, which is what this Panel has repeatedly stated is the focus of this litigation.

[8] While Plaintiffs' April 15, 2022 letter stated concerns about certain Interrogatory and Request for Production Responses and Objections served by House Defendants, Plaintiffs have not previously filed any challenge to the sufficiency of those responses or to the assertion of privilege made therein. In fact, and despite the problematic scope of Plaintiffs' discovery demands having been noted by House Defendants since January 24, 2022, Plaintiffs never inquired as to the nature of the assertions prior to the filing on their Motion.

[9] To be clear, undersigned counsel do not concede that they are obligated to do any of the things they have done and are preparing to do as stated herein, but are doing these things in an attempt to resolve a dispute and avoid wasting any more of the Panel's time on the issue.

## ARGUMENT

### I. Nexsen Pruet Provided Legal Services and Advice.

Despite Plaintiffs' accusations and as explained above, Nexsen Pruet did not have "substantive involvement in mapmaking." ECF No. 249 at 8. Instead as repeatedly and consistently disclosed to Plaintiffs' counsel, beginning with specific discussions with Plaintiffs' local South Carolina counsel in late January 2022, Nexsen Pruet provided legal services to its clients in several phases related to the redistricting process. Again noted earlier, it should come as no surprise that the undersigned lawyers were engaged well prior to the delayed release of the Census data and provided legal advice both prior to and during the redistricting process—a process that modern history assured House Defendants would surely be litigated in one or more forums. Plaintiffs' initial Complaint in fact makes note of what they describe as a "troubling record" that "has taken significant time to resolve in the courts." ECF No. 1 at 4. However, Nexsen Pruet did not decide where to draw House District lines and did not serve as a "mapmaker" for the House. Despite the conspiracy theories espoused by Plaintiffs, the House Districts as enacted by H. 4493 were drawn by Members of the House and sewn together by the Redistricting Ad Hoc Committee under the oversight of Chairman Jordan with the assistance of House staff and House counsel. *See* Depo. Tr. W. Jordan, pp. 155-58 (ECF No. 249-1) The map was not drawn by Nexsen Pruet, Nexsen Pruet's non-testifying consultant, nor any other outside individual or organization.

Plaintiffs' Motion casts as nefarious that Nexsen Pruet had associates capable of operating the Maptitude for Redistricting software, asserting that Nexsen Pruet had "its associates trained on the mapmaking software used to draw the maps; this is not an activity one would normally consider giving legal advice." ECF No. 249 at 10. In fact, Maptitude for Redistricting is likely the most popular software used for redistricting across the country and is a very user-friendly and intuitive

7

software that does not require specific training. Yet Plaintiffs suggest that counsel in a redistricting case would not familiarize themselves with the software used to make the maps at issue in order to most effectively analyze maps and engage in legal analysis and advice.[10] However, the Supreme Court of the United States has stated that the first prong of its classic test involves exploring the possibility of drawing a sufficiently compact majority-minority district. *Thornburg v. Gingles*, 478 U.S. 30, 50 (1986) ("First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district."). Thus, it is perplexing that Plaintiffs would paint Nexsen Pruet's ability to operate software that allows such an analysis as somehow improper or indicative that Nexsen Pruet drew legislative maps for its clients. This is simply not so.

As shown in the summary privilege log (**Exhibit A**), Nexsen Pruet provided legal services prior to and during the redistricting process—a once-in-a-decade process that House Defendants were well aware would be subject to litigation[11] in one forum or another. Nexsen Pruet had three distinct phases of representation: (1) preparation for the redistricting process and analysis on the current state of redistricting law; (2) legal services and advice throughout the Ad Hoc Committee process; and (3) litigation defense. The activities of Nexsen Pruet's engagement began in late 2020, not long before the time when the Census had historically released reapportionment data in late

---

[10] One doubts that Plaintiffs would not accuse a lawyer of untoward or inappropriate acts if he or she became familiar with computer software such as Excel or QuickBooks in conjunction with representation in a business dispute, or AutoCAD in a construction defect case. Nonetheless, this is exactly the type of reasonable practice that precipitates the meritless accusations levied by Plaintiffs here.

[11] Evidenced by documents produced by the League of Women Voters of South Carolina, national civil rights organizations "had their eyes" on litigating racial discrimination claims in South Carolina by February 2021—obviously devoting attorney resources to redistricting in South Carolina close in time to when Nexsen Pruet began assisting House Defendants in anticipation of such litigation. *See* ECF No. 248-3.

December. However, as is now well-known, the release of the Census data was greatly delayed by the COVID-19 pandemic and for long periods of time little to no activity was undertaken by Nexsen Pruet while waiting for the redistricting process to begin.

**II.   Nexsen Pruet Had an Agreement with Plaintiffs' Counsel on Logging Outside Counsel Communications.**

Plaintiffs appear by this Motion to rescind the agreement between Plaintiffs' local South Carolina counsel and Nexsen Pruet since late January/early February regarding the logging of emails between clients and outside counsel. This is a stark departure from the discussions from late January, which House Defendants understand each of the Defendants engaged with Plaintiffs' counsel on the issue of privilege logs—agreeing at minimum that post-October 12, 2021 communications with litigation counsel need not be logged. In further discussing the burden of itemization directly with Plaintiffs' South Carolina local counsel, House Defendants suggested addressing pre-date of filing communications in a summary log with descriptions of the nature of the communications and activities separately by relevant time period (*see* **Exhibit A**; *see also infra*, n.2). Plaintiffs appear to have abandoned or would ignore this part of the earlier agreement, claiming to the Panel that the parties' agreement had no bearing on communications prior to October 12, 2021. Plaintiffs' position is a curious one given that Plaintiff SC NAACP has a total of three (3) communications on its privilege log (**Exhibit B**) and, in fact, two (2) of those entries were ordered to be produced by this Panel (ECF No. 244 at 13). In the end, Plaintiff SC NAACP has just one privileged communication that has been logged thus far—but not a single communication with local counsel much less communications that would have taken place with any one of the dozens of lawyers appearing for Plaintiffs here. Given the volume of emails between litigation counsel and members of the SC NAACP that have been produced by the League of

9

Women Voters of South Carolina, it is apparent such communications exist and have never been logged. (*See, e.g.,* SCLWV_SUB_0045555, attached as **Exhibit H**).

Indeed, in the League of Women Voters' subpoena production, attorney John Cusick is party to 260 emails, attorney Leah Aden is party to 163 emails, attorney Allen Chaney is party to 28 emails, attorney Chris Bryant is party to 26 emails, and attorney Somil Trivedi is party to 11 emails. Brenda Murphy, President of the SC NAACP, is party to most of these communications on her personal email account, yet not one of these communications has been produced by Plaintiff SC NAACP nor logged on any privilege log prepared by Plaintiffs in this case. The active participation of defense counsel with SC NAACP is also demonstrated by the Reapportionment Coalition Meeting minutes discussed with the Panel in earlier motions, activities that also predated the filing of litigation. *See* ECF No. 244. The evidence of these communications and activities demonstrates the unreliability of representations made by Plaintiffs' counsel during the April 28, 2022 meet and confer asserting that all communications between Plaintiffs' counsel and their clients have been logged. Again, *only one* email has been logged between Plaintiffs' counsel and SC NAACP for any time period. In light of all of the foregoing facts and circumstances, it is clear that House Defendants have proceeded in good faith and in furtherance of a long-standing agreement of the parties that was of mutual benefit in operation. Moreover, House Defendants have meaningfully engaged in hopes to address Plaintiffs' concerns since the issue of Plaintiffs' counsel misunderstanding of the agreement came to light, despite the lateness in time—quite simply, these overtures have been unreasonably refused.

## CONCLUSION

Based on the foregoing, House Defendants oppose Plaintiffs' unreasonable, and unlimited, demand for attorney-client privileged communications and attorney work product of outside counsel, and submit that Plaintiffs' Motion should be denied. House Defendants have agreed to undertake several reasonable steps as noted above and have attached portions of such efforts to this Response. House Defendants nevertheless submit that Plaintiffs' Motion is an unwarranted distraction from trial preparation and no more than another fishing expedition just two weeks before trial. House Defendants will do as directed by the Panel as to additional privilege logs, *in camera* reviews, and additional productions, although they specifically request the Panel consider Plaintiffs' conduct and actions (or inactions) as relative to the logging of privileged materials.

[S<small>IGNATURE</small> P<small>AGE</small> F<small>OLLOWS</small>]

Respectfully submitted,

*/s/ Mark C. Moore*
Mark C. Moore (Fed. ID No. 4956)
Jennifer J. Hollingsworth (Fed. ID No. 11704)
Erica H. Wells (Fed. ID No. 13206)
Hamilton B. Barber (Fed. ID No. 13306)
Michael A. Parente (Fed. ID No. 13358)
NEXSEN PRUET, LLC
1230 Main Street, Suite 700
Columbia, SC 29201
Telephone: 803.771.8900
MMoore@nexsenpruet.com
JHollingsworth@nexsenpruet.com
EWells@nexsenpruet.com
HBarber@nexsenpruet.com
MParente@nexsenpruet.com

William W. Wilkins (Fed. ID No. 4662)
Andrew A. Mathias (Fed. ID No. 10166)
Konstantine P. Diamaduros (Fed. ID No. 12368)
NEXSEN PRUET, LLC
104 S. Main Street, Suite 900
Greenville, SC 29601
Telephone: 864.370.2211
BWilkins@nexsenpruet.com
AMathias@nexsenpruet.com
KDiamaduros@nexsenpruet.com

Rhett D. Ricard (Fed. ID No. 13549)
NEXSEN PRUET, LLC
205 King Street, Suite 400
Charleston, SC 29401
Telephone: 843.720.1707
RRicard@nexsenpruet.com

May 2, 2022
Columbia, South Carolina

*Attorneys for James H. Lucas, Chris Murphy, and Wallace H. Jordan*