# Exhibit C
## (April 14, 2022 Meet and Confer Transcript)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION
CIVIL ACTION NO. 3:21-cv-03302-JMC-TJH-RMG

THE SOUTH CAROLINA STATE                )
CONFERENCE OF THE NAACP,                 )
                                         )
and                                      )
                                         )
TAIWAN SCOTT, on behalf of              )
himself and all other similarly         )
situated persons,                        )
                    Plaintiffs,          )
        v.                               )        **MEET AND CONFER**
                                         )
HENRY D. MCMASTER, in his               )
official capacity as Governor            )
of South Carolina; THOMAS C.            )
ALEXANDER, in his official              )
capacity as President of the            )
Senate; LUKE A. RANKIN, in his          )
official capacity as Chairman           )
of the Senate Judiciary                  )
Committee; JAMES H. LUCAS, in           )
his official capacity as Speaker        )
of the House of Representatives;        )
CHRIS MURPHY, in his official           )
capacity as Chairman of the             )
House of Representatives                 )
Judiciary Committee; WALLACE            )
H. JORDAN, in his official              )
capacity as Chairman of the             )
House of Representatives                 )
Elections Law Subcommittee;             )
HOWARD KNAPP, in his official           )
capacity as interim Executive           )
Director of the South Carolina          )
State Election Commission; JOHN         )
WELLS, Chair, JOANNE DAY,               )
CLIFFORD J. EDLER, LINDA MCCALL,        )
and SCOTT MOSELEY, in their             )
official capacities as members          )
of the South Carolina Election          )
Commission,                              )
                                         )
                    Defendants.          )
_____)

The within Meet and Confer held via speaker phone was recorded by the court reporter listed below on April 14, 2022, at the hour of 9:36 a.m. at the law offices of Nexsen Pruet, LLC, 1230 Main Street, Suite 700, Columbia, South Carolina, attended by counsel as follows:

**JAN L. WHITWORTH**
**VERBATIM REPORTER**

_____

# WHITWORTH COURT REPORTING
**POST OFFICE BOX 551**
**ROEBUCK, S.C.  29376**
**864-494-2705**

**APPEARANCES**

**PARTICIPANTS VIA SPEAKER PHONE**

      **CHRISTOPHER JAMES BRYANT, ESQUIRE**
BOROUGHS BRYANT, LLC
1122 LADY STREET, SUITE 208
COLUMBIA, SOUTH CAROLINA 29201

      **SOMIL B. TRIVEDI,** ESQUIRE
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
915 15TH STREET, NW
WASHINGTON, DC 20005
strivedi@aclu.org

      **JOHN M. HINDLEY,** ESQUIRE
ARNOLD & PORTER KAYE SCHOLER, LLP
601 MASSACHUSETTS AVENUE, NW
WASHINGTON, DC 20001

      **JOHN C. CUSICK, ESQUIRE**
NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC.
40 RECTOR STREET, 5TH FLOOR
NEW YORK, NY 10006

      **DAVID ALLEN CHANEY, JR., ESQUIRE**
ACLU OF SOUTH CAROLINA
1220 LAURENS ROAD, STE. B
GREENVILLE, SOUTH CAROLINA 29607
achaney@aclusc.org

            **ATTORNEYS FOR PLAINTIFFS,**


      **MARK C. MOORE, ESQUIRE**
**JENNIFER HOLLINGSWORTH, ESQUIRE**
**MICHAEL A. PARENTE, ESQUIRE**
**HAMILTON B. BARBER, ESQUIRE**
NEXSEN PRUET, LLC
1230 MAIN STREET, SUITE 700
COLUMBIA, SOUTH CAROLINA 29201

      **KONSTANTINE DIAMADUROS,** ESQUIRE
NEXSEN PRUET, LLC
104 S. MAIN STREET, SUITE 900
GREENVILLE, SOUTH CAROLINA 29601

            **ATTORNEYS FOR JAMES H. LUCAS, CHRIS**
            **MURPHY, AND WALLACE H. JORDAN.**

4

1              *  *  *  *     *  *  *  *     *  *  *  *     *  *  *  *

2    **BY MS. HOLLINGSWORTH**:

3              As Judge Gergel -- as we spoke about with the

4    panel and Judge Gergel two days on the privilege

5    log, I wanted just the opportunity for us to touch

6    base before we submit documents for the in-camera

7    review, because I am hoping that we will be able to

8    clear up a few of these items on the log.  The

9    first, gosh, I guess it's like almost three pages.

10   It's really just a handful of emails, but they have

11   attachments, but it's the first page starting with

12   REL11642 going through on the third page, second to

13   last, and it's REL11647, but those emails, those are

14   emails from Emma Dean forwarding materials that

15   Nexsen Pruet prepared and sent to Emma Dean to

16   forward to members of the Ad-Hoc Committee.  And so,

17   based on the sort of agreements that had been in

18   place among the attorneys prior to or sort of during

19   the discovery components and the agreement not to --

20   not to be individually logging outside counsel to

21   client emails, I wanted to raise this issue with you

22   all that I think these -- these items, those REL

23   numbers, and again, it's really actually just a

24   couple of emails.  They just have a number of

25   attachments on them.  That those would -- we would

5

 1          agree that those are the privileged and protected

 2          communications and not have to sort of continue in

 3          argument, so to speak, on those -- those

 4          communications and the work product.  So, first --

 5          this is sort of the first issue we can discuss.

 6     **BY MR. CUSICK:**

 7               And, Jennifer, this is John Cusick.  I think we

 8          wanted to raise because of an issue that came up in

 9          some of the depositions yesterday, and I think as

10          you flag here, will implicate or could implicate

11          some of the privilege log but also discovery

12          responses, and we were hoping to just first kind of

13          to the extent you, Mark, and I think Constantine and

14          others are on, kind of determine the scope of Nexsen

15          Pruet's involvement with the Ad-Hoc Committee or the

16          House Judiciary in terms of, you know, -- and I hope

17          I am remembering this correctly, but Representative

18          Jordan said it was some time in the summer that

19          Nexsen Pruet was first retained, and then we were

20          hoping to have a little more insight into what the

21          involvement in not related to the litigation per se

22          at the time when it first started dealing with just

23          the One-Person One-Vote First Amendment claim, but

24          what involvement Nexsen Pruet had in the map room

25          and the population and understanding of maps that

6

1           were drawn for legislatures and, you know, was

2           hoping that we could get a little bit more insight

3           into that, because that will help us inform or maybe

4           clear up some of the things that Representative

5           Jordan was discussing yesterday.

6   **BY MR. MOORE**:

7               And so, I think that I should handle this one.

8           You know, I can't remember every discussion that

9           I've had with Chris, and I've had more discussions

10          with Chris than sort of anybody else on this call

11          about our representation, but -- and Chris did

12          thankfully flag for me that this might be a subject

13          that we might have to discuss this morning, which I

14          very much appreciate, and I also hope that this is -

15          - it sounds like this is going to be a Meet and

16          Confer where we talk to each other rather than we

17          are talked at.  So, and I appreciate that.  So, with

18          respect to, I mean, we were engaged, and we were

19          engaged in stages.  I guess, we were engaged -- we

20          were engaged to give preplanning advice.  We were

21          engaged to advise during the actual redistricting

22          process, and then we were engaged to defend any

23          actual litigation.  And so, we really didn't have

24          much of an active role, and the role in the summer

25          was, I don't know that I would describe that as

7

1        active, John.  I think it was fairly passive, but we
2        -- we were retained well before that.  I think that
3        the House talked to several different law firms, and
4        they retained us.  And at the time that the House
5        retained us, while we did almost nothing, we were
6        expecting the Census to come out way earlier than it
7        did, right?  And so, after the delays in the Census,
8        that sort of delayed our active involvement with the
9        House, but we have been retained for some time.

10   **BY MR. CUSICK:**

11        And that's helpful, and I think I heard you say
12        about that Nexus Pruet was involved in the
13        redistricting process after the release of the
14        Censes.  Did that include, you know, advising or
15        analyses or reports that were completed about maps,
16        potential maps, compliance with federal laws, state
17        law?

18   **BY MR. MOORE:**

19        I am not going to get into the specifics of
20        what we advised on, because I'm not going to breach
21        privilege, okay, but were we advising the -- your
22        three named defendants, because you -- as you know,
23        you brought an action fairly early.  Were we
24        involved in advising them and advising the members
25        of the Ad-Hoc Committee through the process, to some

8

1          extent, yes, we were.

2     **BY MR. CUSICK:**

3              Yes.  And that's ---

4     **BY MR. TRIVEDI:**

5              So, Mark, ---

6     **BY MR. CUSICK:**

7              Sorry.

8     **BY MR. TRIVEDI:**

9              Sorry, I just wanted to jump in, Mark.  So,

10         these are communications about redistricting that

11         you are obviously claiming privilege over that

12         occurred before we ever filed a lawsuit.  I'm just

13         wondering why those aren't on a log somewhere.

14    **BY MR. MOORE:**

15             Well, ---

16    **BY MR. TRIVEDI:**

17             We are not necessarily saying that we would

18         want to pierce that privilege, but it is -- it does

19         seem a little odd that it wouldn't have shown up in

20         that form.

21    **BY MR. MOORE:**

22             Well, Somil, I think there has been some

23         confusion, because we've never -- we've never had

24         this discussion as a group about what does and does

25         not go on a log from our standpoint or from yours,

9

1      and so, for example, I think that there have been a

2      ton of communications between your side and your

3      clients that were -- that was pre-filing of the

4      litigation that we haven't seen on a log either,

5      okay?  And so if you want -- if you are telling us

6      that what you think we need to do is we need to

7      individually log communications between us and our

8      client before the litigation started, then I think

9      we can do that, so long as you agree to do that,

10     because what is good for the goose is good for the

11     gander.  Okay, if we have to do it, so do you, and

12     we haven't seen that from you either, okay?  And you

13     know, it's a little difficult to be having that

14     discussion now, okay, you know, a week before

15     discovery is about to close.  But are you telling us

16     that you believe that you should have to log that as

17     well as us, and then we are only going to -- we are

18     going to group log, for example, everything that

19     post dated the filing of the litigation, because I

20     believe that all of these communications that

21     Jennifer just went over, and she will correct me if

22     I'm wrong, occurred post filing of litigation.  They

23     didn't even have to be on an individual log per our

24     agreement, right?  So, I mean, we are not trying to

25     play hide the ball with you, Somil, but if you

10

1          believe that Nexsen Pruet has to log its individual

2          communications with our clients pre -- pre your

3          filing of your lawsuit, then we are going to need

4          you to do the same.

5    **BY MR. TRIVEDI:**

6               So, let's leave aside what we think is a false

7          equivalent because I think -- I think you all are

8          saying that you participated in advice regarding the

9          maps that are at issue, and I think Judge Gergel

10         made it pretty clear that that is the issue in this

11         case and not anything that we did, but forget the

12         logs for now.  Let's start with the interrogatory

13         responses.  So, interrogatory -- interrogatory one

14         said "Everybody involved in the making of maps."

15         Would you all update your discovery responses, or is

16         your position that you don't have to because you

17         weren't substantively involved?

18   **BY MR. MOORE:**

19              well, were we involved in the making of maps, I

20         mean, when I -- Chris has raised this issue for me

21         this morning, okay?  So, I'm going to tell you that

22         we are going to go back, and we are going to look at

23         our discovery responses, and if we think that they

24         need to be updated, they will.  Advising someone on

25         how their maps are done is not necessarily

11

1           involvement in the making of maps.

2      **BY MR. HINDLEY**:

3           And, Mark, ---

4      **BY MR. TRIVEDI**:

5           Okay.

6      **BY MR. HINDLEY**:

7           This is John.  Sorry, go ahead.

8      **BY MR. TRIVEDI**:

9           No, go ahead, John.

10     **BY MR. HINDLEY**:

11          No, I was going to say -- I think that -- I

12          know, Mark, you raised the timing issue about this,

13          and I think, you know, one of the reasons that Somil

14          flagged that, you know, both with the RFPs and the

15          interrogatory, it wasn't clear to us that Nexsen

16          Pruet played a role in the -- I know we used the

17          term map room.  From my understanding as

18          Representative Jordan mentioned yesterday, it was

19          this tiered process that involved the compiling of

20          maps, the drawing of maps, you know, analysis of the

21          maps, which he said was an iteration that included

22          counsel both from the House side but also with

23          Nexsen Pruet attorneys, and so, you know, there are

24          -- I think there are a number of interrogatories

25          18915, that if there were reports or analyses or

12

1    evaluations that were being done, not only to the

2    maps that were being proposed by the House, but it

3    also seemed that Representative Jordan said counsel

4    including evaluating other maps that were submitted

5    as part of the scope of the work.  You know, to us,

6    that seems like a different substantive role than,

7    you know, retention, or at that time, it was just a

8    One-Person One-Vote lawsuit and the First Amendment,

9    not -- it didn't have anything to do with claims the

10   racial gerrymandering or potential discrimination,

11   and so that's why we wanted to flag this now,

12   because we would also expect with some of these

13   privilege laws that -- I know you said earlier, you

14   know, rightly you won't break privilege, but we

15   would also expect then that if there were reports or

16   analyses conducted or produced, that they would also

17   be captured in some of the RFPs but in a privilege

18   log, and so I think that's Somil's more over arching

19   point that I think we have a little bit more clarity

20   now between that deposition, also with

21   Representative Newton's yesterday and some of the

22   points we've set today, and, you know, are hoping

23   that you might be able to go back and see if you

24   plan on updating any of the interrogatory or RFP

25   responses based on that.

13

**BY MR. MOORE:**

I mean, so, as -- and, John, as I told Chris
this morning, I appreciate the fact you've raised
these issues for us.  We are going -- after we get
through this deposition, after I get through this
deposition today, I will sit down with our folks,
and we will take a look at these responses, and if
we think we need to update them, we will, but when
you say on a privilege log, okay, the agreement that
I understood we had was that you didn't have to log
individual entries on the priv log after the filing
of the lawsuit just like we didn't, okay?  I think
Jennifer may have thought that it was broader, and
again, it would have -- you know, if we had had a
discovery conference where we discussed that a long
time ago, that would have been helpful, but in any
event, I don't think that per the agreement between
the parties that we have an obligation to go back
and do individual -- log individual communications
that we had with our clients after the filing of the
lawsuit, because that's been an agreement between
the parties, and I don't think you guys get to
revisit that at this stage.

**BY MR. CUSICK:**

I'll say one thing on that just real quickly,

14

1          Mark, and I don't know if I -- I know I was probably

2          on some of these calls and, you know, Chris and

3          other folks can weigh in on this, but I think that

4          that understanding based on this new information

5          that the expectation was at that time whatever

6          agreement, it wasn't clear in the discovery

7          responses or any otherwise that Nexsen Pruet was

8          involved in the actual evaluation map drawing

9          process, and I think that's a different set of

10         consideration as opposed to Nexsen Pruet's

11         involvement in again, that One-Person One-Vote and

12         First Amendment claim, as opposed to the actual

13         drawing of the maps.

14    **BY MR. MOORE:**

15         Well, I mean ---

16    **BY MR. CUSICK:**

17         We know that ---

18    **BY MR. MOORE:**

19         I'm sorry, John, I'll let you finish.

20    **BY MR. CUSICK:**

21         No, no, I was just going to say I don't know if

22         other folks 'cause I don't -- I wasn't -- I don't

23         remember the full scope of that agreement.  So, I

24         don't know if Chris or other folks can -- might be -

25         - might have a better sense just so I don't misstate

15

1          anything.

2     **BY MR. TRIVEDI:**

3               No, John, this is Somil.  I don't think you are

4          misstating anything.  I think we all agree that

5          there was an agreement that we didn't have to log

6          communications with our clients post filing of the

7          first complaint, but that agreement was made without

8          the understanding that lawyers on your side were

9          involved in advising or making or whatever verb you

10         want to use, the substantive maps, which is just a

11         qualitative difference.  We didn't know that.  We

12         think that Nexsen Pruet had every opportunity to

13         tell us that before now, but be that as it may, we

14         found out yesterday, and we are raising it today.

15    **BY MR. MOORE:**

16              Well, I mean, I ---

17    **BY MR. TRIVEDI:**

18              And not the day in court.

19    **BY MR. MOORE:**

20              And I would disagree with you on that, Somil,

21         but again, we will take a look at our discovery

22         responses, and we will consult with our client, and

23         if we need to amend those discovery responses, we

24         will amend them.  As I told Chris this morning, so

25         he is not going to be shocked to hear me say this,

16

1          you know, had you guys done what Judge Gergel pretty

2          much told you you should have done at the hearing is

3          taking some depositions a long time ago, then we

4          might not be where we are today.  But we can't ---

5     **BY MR. TRIVEDI:**

6               And if you had just told us you were involved

7          in advising on the maps, we wouldn't be here.  So,

8          let's let bygones be bygones.  We really appreciate

9          you offering to update your discovery responses.  We

10         will be in touch about that over the next couple of

11         days, fair?

12    **BY MR. MOORE:**

13              That's fair.  But we still have to resolve --

14         this court expects us to get them something on this

15         privilege log by tomorrow, correct?

16    **BY MR. TRIVEDI:**

17              That's true, yep.

18    **BY MR. MOORE:**

19              But I agree with you, you can't put the

20         toothpaste back in the bottle.  We can only move

21         forward from here.

22    **BY MR. TRIVEDI:**

23              So, should we go back to Jennifer's ---

24    **BY MR. MOORE:**

25              I do think we should.

17

1    **BY MR. TRIVEDI:**

2            --- accounting of the particular things on the

3        log?  Yeah.

4    **BY MR. MOORE:**

5            I do think we should.  And I will also say,

6        before Jennifer starts, I just want to say I think

7        you will get a lot more clarity on Nexsen Pruet's

8        involvement when you depose Patrick Dennis, but keep

9        going.

10   **BY MS. HOLLINGSWORTH:**

11           Well, I mean, I think it -- at this point, it's

12       unclear to me then what the position is going to be,

13       because kind of my expectation of the call or our

14       discussion here was because, I think, again roughly

15       half of these items is -- would fall within the

16       agreement, like I said, it's kind of the first three

17       pages -- well, I guess I don't know how you have it

18       printed, but it's REL11642 through 11647, which is

19       really just a handful of emails with attachments are

20       the Nexsen Pruet materials, the communication and

21       work product.  And so under, again what I had

22       understood to be the agreement, wouldn't be logged

23       because we agreed that it's post litigation and it's

24       outside counsel, so...

25   **BY MR. TRIVEDI:**

18

1              You're right.  You are right, Jennifer.  We
2       should probably proceed with what we were going to
3       do under the terms of our agreement for purposes of
4       the priv log submission and the in-camera submission
5       to Judge Gergel, just 'cause we wouldn't make his
6       deadline otherwise.  So, yeah, let's step through
7       the conversation you were going to have before this
8       conversation about Nexsen Pruet's involvement.  We
9       will wait for the updated discovery responses, and
10      we will keep talking about that issue, and if we
11      need to update Judge Gergel or send updated
12      discovery -- I mean, sorry, privilege logs after
13      that, we will.  Is that fair?

14  **BY MR. MOORE**:

15              That sounds like that makes perfect sense.

16  **BY MS. HOLLINGSWORTH**:

17              Yeah, I think that does -- that would be
18      helpful, I think, and gets us kind of moving as
19      efficiently forward as we can.

20  **BY MR. TRIVEDI**:

21              Right, okay, great.

22  **BY MS. HOLLINGSWORTH**:

23              So, what I would like to suggest is that again,
24      sort of at least for now working from what we -- the
25      agreement that we had had, that we would agree that

19

1      those REL numbers that I just read through do not

2      have to be submitted for in-camera review at least

3      at this time, because they would be -- we would

4      agree that those are privileged and not subject to

5      sort of -- we wouldn't challenge them at this point,

6      I guess is what I'm trying to get at, 'cause it's --

7      it saves like half of the documents from having to

8      go through this process, because like I said, it's a

9      few emails and then those attachments.  And based on

10     the agreement, at least as it stands until we revise

11     it, I would suggest or ask, you know, do plaintiffs

12     agree that we don't need -- there won't be a

13     challenge to that at this time.  So, we don't need

14     to submit those to the court for review at this

15     time.

16   **BY MR. BRYANT**:

17     Jennifer, this is Chris, and I think that the

18     answer is yes, that it's not agreeing that it

19     necessarily is privileged but based on the

20     agreement, you know, that we had, it's not the

21     (inaudible) now.

22   **BY MS. HOLLINGSWORTH**:

23     Right.  But we have a path forward, and we can

24     -- if that needs to be revisited and part of how we

25     rework the privilege log process, then we would deal

20

1          with it at that time.

2     **BY MR. BRYANT:**

3          Exactly.

4     **BY MS. HOLLINGSWORTH:**

5          Okay.  And then that really -- I mean, we've

6          done all of this on the call, but that was the

7          extent of it, I mean, of the remaining items.  I

8          think we found one duplicate and then I think we

9          found one that we are going to take off and produce,

10         but otherwise, you know, the rest we will submit for

11         the in-camera review, but I just wanted the

12         opportunity to speak with you all to get some

13         clarity on the agreement at least as it existed, and

14         then we will -- it looks like we've got a path

15         forward, and we will work with you all on that in

16         the coming days.

17    **BY MR. MOORE:**

18         Do we need to have any discussion with them

19         about their privilege log, or are we good on that?

20    **BY MS. HOLLINGSWORTH:**

21         I didn't have any, but of course, if there's

22         anything that plaintiffs want to raise, I have no

23         problem talking about it.

24    **BY MR. CHANEY:**

25         Yeah, I think -- this is Allen.  We've got some

21

1          updates on ours.  We went back in and kind of re-

2          scrutinized it after the call with the panel, and I

3          think John was on the call and can jump in with

4          that.

5    **BY MR. HINDLEY:**

6          Yep, thank you, Allen.  Jennifer, just a quick

7          question.  Which document on the priv log are you

8          downgrading and producing, just so I can have it

9          written down?

10   **BY MS. HOLLINGSWORTH:**

11          Oh, let me see.  11667.

12   **BY MR. HINDLEY:**

13          And does that include the attachment?

14   **BY MS. HOLLINGSWORTH:**

15          It does.

16   **BY MR. HINDLEY:**

17          Okay, thank you.  And I'm looking at our

18          amended privilege log that we submitted as a part of

19          our -- that we served as pleas last Monday.

20          Regarding seven and nine, after reviewing the logs,

21          we determined that the items are not relevant.  They

22          do not relate to State House redistricting.  So, we

23          are going to take them off the log but not produce

24          them.  Items 15 and 16, we are prepared to downgrade

25          and produce them to you, but with the understanding

22

1          that doesn't represent a larger waiver.  These are

2          just discussions regarding a Zoom meeting.

3     BY MR. CUSICK:

4              And, sorry, John, just to be clear, you are

5          talking about the NAACP tab?

6     BY MR. HINDLEY:

7              Sorry, yeah, and the NAACP privilege log.

8     BY MS. HOLLINGSWORTH:

9              Okay.

10    BY MR. MOORE:

11             Okay.

12    BY MR. HINDLEY:

13             And then turning to Taiwan Scott's privilege

14         log, we are prepared to produce the email

15         communications with Don Brashears knowing that they

16         are not -- producing these -- downgrading and

17         producing these does not represent a larger waiver

18         of attorney/client privilege.

19    BY MR. MOORE:

20             Understood.

21    BY MR. HINDLEY:

22             And for both privilege logs, we are also

23         prepared to take off documents and communications

24         that are after the October 12th filing date for both

25         sides, which will significantly reduce the size of

23

1      both logs.  So, those are the updates we have on our

2      end.

**BY MR. MOORE:**

4           That sounds like a reciprocal agreement, and

5      that sounds great, all right.

6           They are taking off their communications that

7      they have logged that post date the filing of the

8      lawsuit.

**BY MS. HOLLINGSWORTH:**

10          But just communications with your client.  So,

11     if it's communications where there's a privilege or

12     a protection claim with a third party, that would

13     still be logged, right?

**BY MR. HINDLEY:**

15          Absolutely.

**BY MS. HOLLINGSWORTH:**

17          Okay.

**BY MR. MOORE:**

19          And, Chris, you were not here for this

20     discussion, but I raised the issue of whether we

21     were going to have a settlement today.  I just got a

22     text from Judge Baker.  She obviously sent it ---

**BY MR. BRYANT:**

24          Yeah, she copies me on that.

**BY MR. MOORE:**

24

1             --- to someone on your side.  I don't know.

2        It's not a number I recognize, but maybe it's a

3        different number that you have, Chris.

4   BY MR. BRYANT:

5             The 847 is my personal number.  Yeah.

6   BY MR. MOORE:

7             So, we need to let her know something as you

8        can tell.  What I suggested is that after this --

9        after President Murphy's deposition, perhaps we

10        schedule a time today for a call.  I'm actually

11        happy to do it now and if you think that that's - if

12        you think that's better for us, and have the court

13        reporter stop recording that session, and we just

14        wait for a few minutes for President Murphy, but you

15        tell me what you want to do.  I don't like to keep

16        Judge Baker waiting.

17   BY MR. BRYANT:

18             Yeah.  John -- John Cusick, this might sort of

19        be in your court, because I'm not sure, you know,

20        what communications you've had or been able to have

21        with President Murphy and the (inaudible).

22   BY MR. MOORE:

23             So, let's end this.

24   BY MS. HOLLINGSWORTH:

25             Yeah, are we good on the -- have we finished

25

1          our discussions with regard to the privilege -- the

2          meet and confer as just for purposes of the court

3          reporter.

4      **BY MR. CUSICK:**

5          Let me jump in with one thing on that really

6          quick and just say that ---

7      **BY MS. HOLLINGSWORTH:**

8          Yes.

9      **BY MR. CUSICK:**

10         --- pursuant to the order that the panel filed

11         yesterday, we will get you guys a confidentiality

12         agreement for the exchange of member information.

13     **BY MS. HOLLINGSWORTH:**

14         Okay.

15     **BY MR. CUSICK:**

16         We will get you that today, so that we can

17         produce that information tomorrow.

18     **BY MS HOLLINGSWORTH:**

19         Okay.  That sounds good.

20     **BY MR. MOORE:**

21         That would be great.  Thank you.  Constantine

22         will be able to look at that while I'm otherwise

23         occupied and while Jennifer starts to try to take

24         some well deserved time off with her family.

25     **BY MR. CUSICK:**

26

1          I will reach out to Constantine then.

2    **BY MR. MOORE**:

3          I mean, send it to all of us, but Constantine

4      is going to take the lead on looking at it.  He – I

5      belieev that he is skilled enough to do that.

6    **BY MS. HOLLINSWORTH**:

7          Anything else for the good of the order on the

8      conferral issues?

9    **BY MR. CUSICK**:

10          That's it.  The plaintiffs are ready to go off

11      the record with the court reporter.

12    **(CONCLUDED AT THE HOUR OF 10:18 A.M.)**

13

14

15

16

17

18

19

20

21

22

23

24

25

27

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**
**Civil Action No.: 3:21-cv-03302-JMC-TJH-RMG**


          I, JAN L. WHITWORTH, A NOTARY PUBLIC FOR THE STATE OF
SOUTH CAROLINA, DULY COMMISSIONED AND QUALIFIED AS SUCH, DO
HEREBY CERTIFY THAT THE FOREGOING **26** PAGES REPRESENTS A TRUE
AND ACCURATE TRANSCRIPT OF THE FOREGOING MEET AND CONFER TAKEN
ON THE 14TH DAY OF APRIL, 2022.
          IN WITNESS WHEREOF, I HAVE SET MY HAND THIS 18TH DAY OF
APRIL, 2022.


                    _____
                         JAN L. WHITWORTH
                         NOTARY PUBLIC FOR SOUTH CAROLINA
                         MY COMMISSION EXPIRES: 02/04/2024