# Exhibit A

Page 1

1                IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF SOUTH CAROLINA

3                        COLUMBIA DIVISION

4

5    CASE NUMBER:  3:21-cv-03302-JMC-TJH-RMG

6

7    THE SOUTH CAROLINA STATE CONFERENCE

8    OF THE NAACP,

9    and TAIWAN SCOTT, on behalf of himself

10   and all similarly situated persons,

11              Plaintiffs,

12   vs.

13   HENRY D. MCMASTER, in his official

14   capacity as Governor of

15   South Carolina, et al.,

16              Defendants.

17

18

19

20

21                     DEPOSITION

22                        OF

23                  BRENDA MURPHY

24         February 4, 2022 at 9:05 a.m.

25

Brenda Murphy                                           February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 2

1    REPORTED BY:

2                        Jan A. Mann, CSR

3                Veritext Legal Solutions

4                260 North Joachim Street

5                   Mobile, Alabama 36603

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1              S T I P U L A T I O N S

2

3              IT IS STIPULATED AND AGREED by and between the

4       parties through their respective counsel, that the

5       deposition of BRENDA MURPHY may be taken before Jan A.

6       Mann, Commissioner, via videoconference on the 4th day

7       of February, 2022.

8              IT IS FURTHER STIPULATED AND AGREED that the

9       signature to and the reading of the deposition by the

10      witness is waived, the deposition to have the same force

11      and effect as if full compliance had been had with all

12      laws and rules of Court relating to the taking of

13      depositions.

14             IT IS FURTHER STIPULATED AND AGREED that it

15      shall not be necessary for any objections except as to

16      form or leading questions, and that counsel for the

17      parties may make objections and assign grounds at the

18      time of the trial, or at the time said deposition is

19      offered in evidence or prior thereto.

20             IT IS FURTHER STIPULATED AND AGREED that the

21      notice of filing of the deposition by the Commissioner

22      is waived.

23

24

25

Page 4

1                A P P E A R A N C E S

2

3    APPEARING ON BEHALF OF THE PLAINTIFF:

4        NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC.

5        Mr. Antonio Ingram, II

6        Ms. Leah Aden

7        Mr. John Cusick

8        40 Rector Street, 5th Floor

9        New York, New York   10006

10

11   APPEARING ON BEHALF OF THE HOUSE DEFENDANTS:

12       NEXSEN PRUET, LLC

13       Mr. Mark C. Moore

14       Mr. Michael A. Parente

15       1230 Main Street, Suite 700

16       Columbia, South Carolina   29201

17

18   APPEARING ON BEHALF OF THE DEFENDANT

19   GOVERNOR MCMASTER:

20       OFFICE OF SOUTH CAROLINA GOVERNOR

21       HENRY MCMASTER

22       Mr. Thomas Limehouse

23       Mr. William Grayson Lambert

24       1100 Gervais Street

25       Columbia, South Carolina   29201

Page 5

1    APPEARING ON BEHALF OF THE SENATE DEFENDANTS:

2        ROBINSON, GRAY, STEPP & LAFFITTEE, LLC

3        Mr. Robert E. Tyson

4        1310 Gadsden Street

5        Columbia, South Carolina   29211

6

7    APPEARING ON BEHALF OF ELECTION DEFENDANTS:

8        Burr & Forman

9        Ms. Jane W. Trinkley

10       1221 Main Street, Suite 1800

11       Columbia, South Carolina   29201

12

13   ALSO PRESENT:

14       Sheree Rabon

15       Cynthia Nygord

16       Melissia Ford

17

18

19

20

21

22

23

24

25

```
                                               Page 6

 1                      I N D E X

 2   EXAMINATION BY:                              PAGE

 3   Mr. Moore                                       7

 4   Mr. Tyson                                     204

 5   Mr. Limehouse                                 230

 6   Mr. Ingram                                    233

 7   Mr. Moore                                     240

 8                   INDEX OF EXHIBITS

 9   DEFENDANT'S EXHIBITS

10   Exhibit 1   Objection to First Set            39

11               of Request for Admissions

12   Exhibit 2   Report                            44

13   Exhibit 3   Complaint                         66

14   Exhibit 4   Written Testimony 11-10-21        81

15   Exhibit 5   Testimony                         88

16   Exhibit 6   Minutes of Reapportionment        97

17               Committee Meeting

18   Exhibit 7   Behind The Lines Video           106

19   Exhibit 8   Letter                           132

20   Exhibit 9   Map                              165

21   Exhibit 10  Mintues 9-30-21                  181

22   Exhibit 11  Agenda 10-7-21                   186

23   Exhibit 12  Minutes 11-18-21                 189

24   Exhibit 13  Agenda 8-5-21                    194

25   Exhibit 14  Minutes 8-26-21                  198
```

Page 7

```
 1              I, Jan A. Mann, CSR, a Court Reporter and

 2    Notary Public of the State of Alabama, acting as

 3    Commissioner, do certify that on this date, as provided

 4    by the Federal Rules of Civil Procedure and the

 5    foregoing stipulation of counsel, there came before me

 6    via videoconference on February 4, 2022, beginning at

 7    9:05 a.m., BRENDA MURPHY, witness in the above cause for

 8    oral examination, whereupon the following proceedings

 9    were had:

10

11                     BRENDA MURPHY,

12    being first duly sworn, was examined and testified as

13    follows:

14

15    EXAMINATION BY MOORE:

16         Q.     So good morning.  I'm ready to proceed.

17    My name is Mark Moore and I am one of the attorneys for

18    the House defendants.  Good morning, Ms. Murphy.  How

19    are you?

20         A.     Good morning.  I'm fine.  Thank you.

21         Q.     It's a rainy day in Columbia.  I'm

22    assuming you're in Columbia as well?

23         A.     I am.

24         Q.     One of our paralegals just mentioned to

25    me that we have a woman who works with us who is also
```

Brenda Murphy                                        February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 8

1    named Brenda Murphy so -- and she brings her dog to work

2    and that's one of my favorite parts of the day when I

3    get to see her dog but -- so, Ms. Murphy, have you ever

4    been deposed before?

5            A.      Yes.

6            Q.      Okay.  Can you tell me about that?

7            A.      It was regarding litigation regarding

8    the Black Bikers Week in Myrtle Beach, South Carolina.

9            Q.      Was that the case with that went to trial

10   before Judge Lydon?

11           A.      I don't recall the name of the judge

12   but it was -- I was deposed for that situation.

13           Q.      And is that the only time you -- I'm

14   sorry.  Is that the only time you've ever been deposed?

15           A.      Yes.

16           Q.      And despite the fact that you may have

17   been deposed before, I'm required to go over some of the

18   ground rules of the deposition with you.  First of all,

19   you understand you're under oath today in the federal

20   civil proceeding and you must give truthful answers to

21   all the questions I ask and your answers are subject to

22   the pains and penalties of perjury.  Do you understand

23   that?

24           A.      I do, yes.

25           Q.      Okay.  Is there any reason why you don't

Page 9

1   believe you could testify under oath today?

2          A.      No.

3          Q.      Okay.  And are you taking any medication

4   or anything else that impairs your ability to listen and

5   understand my questions?

6          A.      No.

7          Q.      Thank you so much.  So I'm going to be

8   asking you questions and I'm going to try my best to be

9   clear and concise, but if at any point you don't

10  understand the question, please ask me to rephrase,

11  please tell me you don't understand it, and I'll do my

12  best to rephrase, okay?

13         A.      I will.

14         Q.      And because if I ask a question and you

15  answer it, I'm going to assume that you understood my

16  question.  Do you understand that?

17         A.      Yes.

18         Q.      Okay.  And if you have questions during

19  your deposition, you're required to direct your

20  questions to me and not your counsel.  Please wait until

21  I finish my question before answering so the court

22  reporter has an opportunity to take everything down.

23  It's very important that you and I not try to talk over

24  each other and I'm bad about that and I'm going to try

25  my best not to do it, okay?

Brenda Murphy                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 10

1          A.      Okay.

2          Q.      And so please wait again until I finish

3   my question before you answer and please give verbal

4   responses because the court reporter is required to take

5   everything down.  So as I understand it, is that

6   Mr. Ingram with you this morning?

7          A.      Yes.

8                  MR. INGRAM:  Yes.

9          Q.      Okay.  And Mr. Ingram is going to be

10  defending the deposition.  Is that correct?

11         A.      Yes.

12         Q.      Okay.  And so while Mr. Ingram may object

13  to the form of certain questions, if he makes such an

14  objection, you still have to answer my question unless

15  he instructs you not to answer.  Do you understand?

16         A.      Yes.

17         Q.      Okay.  And if you need to take a break,

18  use the restroom, to go get a glass of water, just ask

19  and we'll take a break.  The only thing I ask is if we

20  take a break, I would need you to answer the question

21  that's pending before we take a break.  Do you

22  understand that?

23         A.      Yes.

24         Q.      Okay.  And when we take a break, if you

25  have any conversations with counsel about the substance

Page 11

1    of your testimony, I'm going to be allowed to ask about

2    those conversations.  Do you understand that?

3           A.      Yes.

4           Q.      And I do want this understood upfront and

5    I may say it again when I get to certain questions but I

6    want to be very clear that I'm not seeking confidential

7    information or communications between you and your

8    counsel.  And so if you can't answer a question without

9    getting into that sort of information, just please let

10   me know, okay?

11          A.      I will.

12          Q.      Okay.  And so where are you located

13   today?  Where are you physically located?

14          A.      At the South Carolina State Conference

15   office in --

16          Q.      Okay.  I'm sorry.

17          A.      In Columbia, South Carolina.

18          Q.      Okay.  And is anyone in the room with you

19   other than Mr. Ingram?

20          A.      No.

21          Q.      Okay.  Do you have any materials in front

22   of you?

23          A.      No.

24          Q.      Okay.  Did you bring any materials to

25   this deposition?

Page 12

1          A.      No.

2          Q.      Is anyone providing input to you by

3    phone, text, email or otherwise during the deposition?

4          A.      No.

5          Q.      And as I noted to counsel, I don't

6    believe that we're going to be able to conclude this

7    deposition today because the plaintiffs have still not

8    produced all of the documents that may be relevant to

9    your deposition.

10               We just received the first production

11   from the plaintiffs last night, and so while I may ask

12   some questions about some documents that were produced

13   last night, we're going to hold this deposition open and

14   we will finish this deposition, if necessary, at a later

15   date after we -- after your document production is

16   complete and after we've had a meaningful opportunity to

17   review those items.  Do you understand that?

18         A.      I do.

19         Q.      Okay.  I intend to ask you questions

20   about your personal knowledge, okay.  If Mr. Ingram

21   objects to my questions, under our rules and under our

22   local rules, he can object but he cannot object in a way

23   that suggests to you an answer.  The extent of his

24   objections other than to the form, if he directs you not

25   to answer on the basis of privilege.  Do you understand

Page 13

1   these instructions?

2        A.      Yes.

3        Q.      And do you have any questions before we

4   get started?

5        A.      I do not.

6        Q.      Okay.  Thank you so much, Ms. Murphy.

7               MR. INGRAM:  One clarification point,

8   Mark.  You are asking questions as to her personal

9   knowledge as president of the NAACP South Carolina

10  chapter and this is not a 30(b)(6) deposition.

11              MR. MOORE:  This is not a 30(b)(6)

12  deposition.  As I mentioned to Mr. Bryant (sic), while

13  we are I guess having a lot of flexibility in terms of

14  scheduling depositions, I believe that a true 30(b)(6)

15  deposition has to be -- notice as to be provided with

16  respect to topics and those topics have to be discussed.

17  This is not a 30(b)(6) deposition.

18              MR. INGRAM:  Thank you.

19              MR. MOORE:  Yes, sir.  And if I ask a

20  question that you think veers into that realm, Mr.

21  Ingram, I'm sure you will object.

22              MR. INGRAM:  Correct.

23       Q.      Okay.  So there are a number of attorneys

24  who I guess are here today for the plaintiffs.  Mr.

25  Ingram, Mr. Cusick, Ms. Aden.  Are all of those your

3:21-cv-03302-MBS-TJH-RMG     Date Filed 05/02/22     Entry Number 254-1     Page 15 of 291

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 14

1    attorneys, Ms. Murphy?

2         A.     They are attorneys but all are from LDF

3    and are part of a coalition that was formed in I think

4    around August of last year.

5         Q.     And so who do you believe represents you

6    in the South Carolina Chapter of the NAACP?

7         A.     For today, Mr. Ingram, Attorney Ingram.

8         Q.     Okay.  What about Mr. Cusick and Ms.

9    Aden?  Do they represent you as well?

10        A.     They are attorneys that are on the

11   coalition, yes.

12        Q.     Okay.  And who else represents you in

13   this lawsuit if you know?

14        A.     There were several members of the

15   coalition.  ACLU was also one of the members, partners

16   in the coalition.

17        Q.     Okay.  And I'm going to ask about the

18   coalition.  I'm going to ask a number of questions later

19   but are you paying anyone to represent you in this case?

20        A.     No.

21        Q.     Okay.  And are you paying Mr. Ingram to

22   be here with you today?

23        A.     No.

24        Q.     Okay.  So none of the attorneys who are

25   representing the NAACP are being paid by the NAACP.  Is

Page 15

1    that right or wrong?

2         A.      That's correct.

3         Q.      Okay.  And so I don't want to go into any

4    conversations you had with your lawyers but could you

5    tell me what you've done to prepare for this deposition

6    today?

7         A.      The only thing that I have done is

8    basically make sure I have a clear understanding of

9    what to expect, and when I say what to expect, that is

10   some of the same things that you talked to me about

11   and that's it basically.

12        Q.      Okay.  So did you meet with someone to

13   prepare yourself for your deposition?

14        A.      Yes, I did.

15        Q.      And who did you meet with and when and

16   for how long?

17        A.      It was the LDF staff, the ones that are

18   online here today.  And basically there were two

19   opportunities for me to ask for clarification in terms

20   of what to expect, not in terms -- just what to

21   expect.

22        Q.      Okay.  So you had two separate meetings.

23   Is that right?

24        A.      Correct.

25        Q.      Were those meetings in person or

Page 16

1    conducted via Zoom or by phone?

2         A.       They were not in person.  They were by

3    Zoom.

4         Q.       And when were they?

5         A.       Those were this week.

6         Q.       Okay.  Can you tell me what days and for

7    how long?

8         A.       One was I think it was Tuesday or

9    Wednesday.  You know, in terms of my schedule, it's

10   been pretty busy.  And then for a period yesterday.

11        Q.       Okay.  About how long was the first one,

12   the first session?

13        A.       I would say approximately an hour.

14        Q.       Okay.  And the second session?

15        A.       Both were about the same.

16        Q.       Okay.  And did you review any documents

17   in those sessions?

18        A.       No.

19        Q.       Okay.  Have you reviewed any documents to

20   prepare yourself for your testimony here today?

21        A.       No, I have not reviewed -- I haven't

22   had time because of the notice given for this

23   deposition today with everything else I had going on.

24        Q.       Okay.  So did you review the complaints

25   that have been filed in federal court?  And I guess now

Page 17

1   there are three, an initial complaint, an amended

2   complaint, and a second amended complaint.  Have you

3   reviewed those documents, Ms. Murphy?

4        A.      I received copies of those complaints,

5   yes.

6        Q.      Okay.  Did you review them?

7        A.      We review and I am speaking on behalf

8   of the South Carolina State Conference.  We have

9   reviewed those documents as a coalition.  In terms of

10  the complaints, we all as a coalition discussed the

11  complaints that -- prior to submission and all were in

12  agreement.

13       Q.      So you reviewed each of these complaints

14  prior to their submission to the federal court?

15       A.      The coalition reviewed them.

16       Q.      Okay.  Were you a part of the coalition

17  that conducted that review I guess is my question?

18       A.      Yes.

19       Q.      Okay.  So did you personally review them

20  is my question?

21       A.      I reviewed them in concert with the

22  coalition.

23       Q.      And did you review any of the discovery

24  that has been submitted in this case?

25       A.      Some of it, not all of it because that

Page 18

1    I received late as well.

2            Q.        And were you asked to produce any

3    documents to your lawyers?

4            A.        We were asked to produce documents and

5    we submitted those documents.

6            Q.        And when were those documents -- what

7    were the documents that were asked to be submitted and

8    when were they submitted?

9            A.        Minutes of our coalition meetings.

10   Well, any meetings regarding redistricting so those

11   included our coalition meetings.  Training, documents

12   regarding training that we had had regarding

13   redistricting, and any minutes that the South Carolina

14   State Conference executive committee may have

15   submitted regarding redistricting.

16           Q.        So were you asked to submit any documents

17   other than the minutes and these training materials that

18   you just mentioned?

19           A.        No.

20           Q.        And when did you submit these documents?

21           A.        I think we began the submission

22   Wednesday.

23           Q.        Okay.  But when were you asked to submit

24   them?  Were you asked to submit them on the day you

25   began the submission?

Page 19

1           A.      I think it was either Monday or -- it

2    was maybe Monday of this week.

3           Q.      Okay.  All right.  So before that time,

4    no one had asked you for any documents?

5           A.      No.

6           Q.      And no one had attempted to collect any

7    documents from you to your knowledge?

8           A.      What was that question again?

9           Q.      No one had collected any documents from

10   you to your knowledge?

11          A.      No.

12          Q.      Okay.  And from your organization.  Is

13   that correct?

14          A.      Yes.

15          Q.      And from this broader coalition?  To your

16   knowledge, were any documents asked to be collected from

17   this broader coalition if you know?

18          A.      I do know that because the minutes are

19   kept by our staff so, no, none were.

20          Q.      Okay.  All right.  And we've talked for a

21   few minutes but I always need to know a little bit about

22   the person I'm talking to.  Can you tell me, Ms. Murphy,

23   where are you from?

24          A.      I am a South Carolinian born in a

25   little town called Ridgeway, South Carolina but

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 20

1    currently have lived most of my life here in Columbia.

2        Q.      Okay.  And so you were born in Ridgeway.

3    When did you move to Columbia?

4        A.      Six years old.

5        Q.      Okay.  All right.  And where do you

6    reside in Columbia?  What's your address?

7        A.      115 Saxonbury Drive, Columbia, South

8    Carolina.

9        Q.      Okay.  Do you know what House district

10   you reside in?

11       A.      Yes.

12       Q.      And what House district is that?

13       A.      77.

14       Q.      Okay.  And you know who the current

15   representative is for that House district?

16       A.      Yes, I do.

17       Q.      And who is that?

18       A.      Leon Howard.

19       Q.      Okay.  And you know Mr. Howard?

20       A.      Yes, I know him as a representative.  I

21   certainly do.

22       Q.      Okay.  Do you speak to him on a regular

23   basis?

24       A.      I wouldn't say I speak to him on a

25   regular basis.  Only an as-need basis.

Brenda Murphy                              February 4, 2022
The South Carolina State Conference vs. McMaste,

                                                    Page 21

1        Q.        Do you know other representatives who are

2   currently in the House of Representatives?

3        A.        Yes.

4        Q.        And who else do you know personally?

5        A.        I don't know any of them personally.

6        Q.        Okay.  Do you socialize with any of them?

7        A.        No.

8        Q.        Okay.  Do you meet with them on occasion?

9        A.        On an as-need basis.

10       Q.        Okay.  So let me ask this question.

11  Prior to the submission of this first complaint in

12  October of 2021, did you meet with any members of the

13  House of Representatives to discuss any redistricting

14  matters?

15       A.        No.

16       Q.        Okay.  All right.  Between the time that

17  that initial complaint was presented and the House and

18  Senate passed a plan, did you meet with any House

19  members of the House of Representatives?

20       A.        No.

21       Q.        Did not meet with them at all to discuss

22  redistricting?

23       A.        The only -- in terms of -- we've had

24  meetings.  I can think of one occasion where perhaps a

25  NAACP member that was a member -- that is also a

Page 22

1   member of the NAACP participated in one of our

2   community meetings.  I would say meetings with

3   presidents and members interested in attending.  That

4   was the only occasion.

5           Q.      When you use the term "we", to whom do

6   you refer?

7           A.      I am talking about the coalition.

8           Q.      Okay.  And who is this representative to

9   whom you refer?

10          A.      I --

11                  MR. INGRAM:  Objection.  Asking for --

12  I'm going to instruct my client not to answer.  That's

13  asking for the identity of a NAACP member.

14                  MR. MOORE:  I don't believe that's --

15  is that a privileged -- you're instructing your client

16  not to answer when I ask her who she met with.  Is

17  that correct?

18                  MR. INGRAM:  The answer would reveal

19  the name of a member and a partial disclosure of a

20  membership list and we would be happy to submit a

21  motion under Federal Rules of Civil Procedure

22  30(b)(1) and there's Supreme Court case law, NAACP v.

23  Alabama that places precedent as a compelling sort of

24  prevention of this disclosure.

25                  MR. MOORE:  Well, then you're going to

Page 23

1    need to file a motion for protective order.

2            Q.      And so, Ms. Murphy --

3            A.      Yes.

4            Q.      -- have you met with any member of the

5    House of Representatives or have you been at any meeting

6    where a member of the House of Representatives, whether

7    they are or aren't a member of the NAACP, has attended

8    those meetings prior to the passage of the Senate and

9    House plans?

10           A.      Now, are you asking if I met --

11           Q.      I'm asking if you met or were at a

12   meeting when one of those House of Representatives

13   members attended?

14           A.      He attended -- the person attended as a

15   member of the NAACP.  We are a non -- may I make a

16   comment?

17           Q.      Yes, ma'am.

18           A.      We are a nonpartisan organization,

19   nonprofit, and if there's anything that I do is make

20   sure that all discussions are nonpartisan.  Any

21   discussion that we have, it is done in such a

22   manner -- we are concerned about the citizens, the

23   black citizens of this state and their -- ensuring

24   justice in terms of their rights.

25                   There is no discussion about a

Page 24

1    political -- if somebody is there to talk politics in
2    a way, that is not acceptable.  We do not consider it.
3    And the work that we do even in terms of redistricting
4    has been done in such a way that it's for the people
5    and we have not considered an incumbent.
6            Q.      This meeting that you refer to, where was
7    the meeting held?
8            A.      It was a Zoom meeting.
9            Q.      Okay.  Were members of the public invited
10   to attend?
11           A.      It was for presidents of -- the
12   leadership of the branches throughout the state.  It
13   included presidents and their members who wanted to
14   join the meeting.
15           Q.      And why was this representative there?
16           A.      He's a member of the NAACP.
17           Q.      Was this meeting open to all members of
18   the NAACP?
19           A.      It was.
20           Q.      Okay.  Was it announced publicly to all
21   members of the NAACP?
22           A.      It was announced -- it was announced to
23   presidents and secretaries and they were to invite
24   members that wanted to attend.
25           Q.      And how many people attended this

Page 25

1    meeting?

2           A.        If I recall, approximately a hundred.

3    It may have been more but I know -- I know -- I would

4    say approximately a hundred.

5           Q.        And was redistricting discussed?

6           A.        We talked about redistricting, sharing

7    the maps -- mapping that had been done by the House

8    subcommittee, Senate subcommittee and feedback --

9    requested feedback from those individuals that were

10   present.

11          Q.        And when was this meeting?

12          A.        I don't have the minutes in front of

13   me.  I don't know.

14          Q.        Were there minutes of that meeting kept?

15          A.        That was a coalition meeting.  I

16   don't -- I don't think -- no, minutes were not kept

17   because that was a general meeting and it involved all

18   coalition members and it was basically for the

19   membership, the leadership and membership of the NAACP

20   to provide feedback regarding mapping.

21          Q.        So I've seen -- I saw produced late last

22   night a number of minutes of a number of meetings.  Do

23   you keep minutes for all of the meetings of the

24   coalition that you just mentioned?

25          A.        We keep the minutes for our weekly

Page 26

1   meetings.  They are scheduled weekly.  Sometimes we do

2   not meet dependent on the need but we have scheduled

3   meetings for the coalition weekly.

4        Q.    Do you keep minutes of those?

5        A.    Yes.

6        Q.    Okay.  Were minutes kept of this meeting?

7        A.    No.

8        Q.    Can you tell me why minutes were not kept

9   of this particular meeting?

10        A.    Well, it really wasn't my -- my

11   meeting, the state conference meeting.  It was more of

12   a meeting of the coalition to listen to the

13   membership.

14        Q.    What membership?

15        A.    The NAACP leadership, presidents from

16   throughout the state of South Carolina and their

17   members.

18        Q.    Were the members of your coalition also

19   invited?  For example, were folks from the ACLU invited?

20        A.    Yes, it was -- yes, they were in

21   attendance as a matter of fact.  They were there as --

22   and also receiving feedback because in terms of

23   mapping and recommendations for mappings, we have to

24   use our resources to help us with this because I don't

25   have the luxury of having the staff that can do the

Page 27

1    analytical work that needs to be done.  So we have to

2    depend on our partners who have worked with us over

3    the years.

4              Redistricting is not a new initiative

5    for the South Carolina State Conference.  It is

6    something that has been happening here for the -- at

7    least I can say the last thirty years.  We have always

8    used resources.  LDF and ACLU, AFL-CIO, others that I

9    could name that are participants and I think you have

10   a list of who our coalition is.  We have worked

11   together for years when it comes to using them,

12   consulting with them as need be.  So this is nothing

13   new that has happened this year.

14        Q.     I understand that, ma'am.  I'm just

15   trying to figure out how many -- who all was in

16   attendance.  For example, were some of the lawyers who

17   are with you today, were they in attendance at that

18   meeting?

19        A.     Yes.  I just stated they were.

20        Q.     Okay.  And I've seen a number of minutes

21   and we're going to get to those in a little bit.  And

22   those minutes reflect everyone who is in attendance

23   whether they are or aren't a member of the NAACP.  Is

24   that right?

25        A.     Yes.

Page 28

1          Q.        Okay.  I'm wondering why there were no

2     minutes of this particular meeting.

3          A.        Well, I guess, as you asked, were some

4     of the lawyers or I would refer to them as our

5     partners that have been associated with us for years

6     in terms of providing information not only for this,

7     in terms of redistricting but, you know, assisting

8     during the time of COVID in terms of providing

9     supplies to us, providing information to us as we

10    educate our members and communities regarding in this

11    case what redistricting is all about, what it means,

12    the importance of being involved as members of the

13    community.

14              So, yes, they were there and, yes, they

15    have been there since the coalition was formed and

16    they were invited because of their resourcefulness in

17    terms of having some of the tools that we don't have,

18    as I said earlier, in terms of the analytics that

19    relate -- regarding mapping, assisting with the

20    interpretation --

21         Q.        I hate to cut you off but that really

22    isn't responsive to my question.  My question was simply

23    this.  You have minutes from a number of other meetings.

24    Who made the decision that you weren't going to have

25    minutes for this meeting and who made the decision that

Page 29

1    those minutes would not identify this legislator that

2    you refuse to identify?

3          A.      Minutes were not even discussed as

4    being an option because this was an open forum.

5          Q.      Open to -- when you say it was an open

6    forum, could I have attended?

7          A.      Well, if you wanted to, yes.

8          Q.      Okay.  So I could have attended?

9          A.      Yes.

10         Q.      I'll come back to this in a minute.  So

11   let me ask you this.  Do you vote?

12         A.      Do I what?

13         Q.      Do you vote?

14         A.      Yes, I vote.

15         Q.      Okay.  And how many elections would you

16   say you voted for since 2000?

17         A.      I voted in every election.

18         Q.      Okay.  And do you make political

19   contributions?

20         A.      No.

21         Q.      Okay.  Are you affiliated with a

22   particular political party?

23         A.      Sir, whenever -- do I -- no, I don't

24   say whether I am an affiliate of any party.  No, I do

25   not.

Brenda Murphy                         February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 30

1          Q.       Okay.  How do you typically tend to vote?
2    Do you tend to vote more for the Democratic Party or the
3    Republican Party?
4          A.       I vote for the person that's going to
5    represent my needs in -- and is reflective of what the
6    needs of my community is.
7          Q.       Okay.  But that doesn't really answer my
8    question.  Do you tend to vote more for candidates of
9    one party over another?
10                   MR. INGRAM:  Objection.  Relevance.
11         Q.       Okay.  You may answer.
12         A.       My answer is the same.  I do not vote
13   and I have not counted the number of times that I
14   voted democratic or republic.  My vote is for the best
15   person that serves the needs of the community.
16         Q.       Have you voted for a Republican candidate
17   in any presidential election since 2000?
18                   MR. INGRAM:  Objection.  Outside the
19   scope.  She's not a personal plaintiff.  She's a
20   president of NAACP South Carolina branch.
21         Q.       You may answer, Ms. Murphy.  Ms. Murphy,
22   I need an answer from you.
23         A.       My vote for president has been
24   Democratic.
25         Q.       Okay.  Have you voted for any Republican

Page 31

1    candidate for governor since 2000?

2              MR. INGRAM:  Objection.

3        A.      May I ask a question?

4        Q.      No, ma'am.  Oh, you may ask a question to

5    me, yes, ma'am.

6        A.      This hearing is about the South

7    Carolina State Conference and its work regarding

8    redistricting.  How is the way that I vote related to

9    redistricting?

10       Q.      I'm not going to answer that question.

11   You can ask me questions about process.  I posed a

12   question to you.  Have you voted for any Republican

13   candidate for governor since 2000?  Could you please

14   answer --

15             MR. INGRAM:  Objection.  Asked and

16   answered.

17             MR. MOORE:  I've never gotten an answer,

18   Mr. Ingram.

19       Q.      Could you please answer my question,

20   Representative Murphy -- Ms. Murphy?

21             MR. INGRAM:  I'm going to instruct my

22   client not to answer.

23             MR. MOORE:  On what basis?  Are you

24   instructing your client not to answer on the basis that

25   it's privileged?

Page 32

```
 1              MR. INGRAM:  She is a representative in

 2    the capacity of the South Carolina State Conference, not

 3    individual plaintiff.  Your questions are beyond the

 4    scope.

 5              MR. MOORE:  Okay.  So you're instructing

 6    her not to answer --

 7              MR. INGRAM:  Correct.

 8              MR. MOORE:  -- so I'm clear?

 9              MR. INGRAM:  Correct.  She does not have

10    to disclose her personal political preferences for the

11    scope of this litigation.

12              MR. MOORE:  Well, I guess that's a

13    question the Court will have to answer because you're

14    going to need to file a protective order motion.

15        Q.      So what do you do for a living, Ms.

16    Murphy?

17        A.      I am a retired nurse.

18        Q.      Okay.  And can you tell me a little bit

19    about your educational background?  Where did you go to

20    school?

21        A.      I received my bachelor's degree and my

22    master's degree from the University of South Carolina,

23    the Columbia campus.

24        Q.      And when did you graduate?

25        A.      In --
```

Brenda Murphy                           February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 33

1          Q.       To the best of your recollection.

2          A.       I can tell you when I graduated.

3          Q.       Okay.

4          A.       I graduated in 1975.

5          Q.       Okay.  And as a nurse, did you work --

6   what sort of work -- did you work in a hospital?  Did

7   you work in a doctor's office?  What sort of work did

8   you do?

9          A.       I worked for the veterans of this

10  country.  I am a retired Department of Veterans

11  Affairs nurse working primarily starting as a clinical

12  nurse and my last position was associate chief nurse.

13         Q.       And so did you work at the Veterans

14  Administration Hospital here in Columbia?

15         A.       I worked at the VA hospital here in

16  Columbia, Brooklyn, New York, New York City, and

17  Charleston, South Carolina.

18         Q.       Okay.  And so when you were working in

19  Brooklyn, did you live in Brooklyn, Ms. Murphy?

20         A.       Yes, I did.

21         Q.       And so how long did you live in Brooklyn?

22         A.       I was in Brooklyn I think it was four

23  years.

24         Q.       Okay.  And I hate to ask a lady her age

25  so I'm not going to ask you your age but about how many

Page 34

1  years would you say you've lived in the state of South

2  Carolina?  Just give me a ballpark.

3        A.      Most of my life.  All but -- in South

4  Carolina, all but five years.

5        Q.      Okay.  And have you lived in any other

6  area of South Carolina other than Columbia?  You

7  mentioned Charleston.  Did you live in the Charleston

8  area for a time?

9        A.      Yes, I did.

10        Q.      Okay.  And how long did you live there?

11        A.      Nine years.

12        Q.      Okay.  And are you married, Ms. Murphy?

13        A.      Yes, I'm married.  And let me just add

14  also, I served as -- in the U.S. Army Nurse Corps

15  reserve unit.

16        Q.      Yes, ma'am.  And what does your husband

17  do?  Is he also retired?

18        A.      He's retired.

19        Q.      Okay.  And where is he from?

20        A.      Here in Columbia, South Carolina.

21        Q.      Okay.  And do you have any children?

22        A.      I have three children.  Yes.

23        Q.      Okay.  And do they live in the Columbia

24  area or do they live elsewhere?

25                MR. INGRAM:  Objection.

Page 35

1          Q.        You may answer, Ms. Murphy.

2          A.        Yes, all in Columbia.

3          Q.        Okay.  And so what areas of the state of

4    South Carolina would you say you're familiar with?

5          A.        All of them.

6          Q.        Okay.  And how long have you been a

7    member of the NAACP?

8          A.        Since nineteen eighty -- around 1985.

9    I'm thinking '85.

10         Q.        And how long have you been in the role of

11   the president of the NAACP?

12         A.        Four years.

13         Q.        Okay.  Prior to that time, did you serve

14   in any sort of leadership role?

15         A.        I was the advisor for the youth and

16   college division.

17         Q.        Okay.  Are you a member of any other

18   organizations?

19         A.        I am.

20         Q.        Can you tell me the other organizations

21   that you are a member of?

22         A.        I am a member of (unintelligible).

23                   (Court reporter clarification.)

24         A.        The Order of Eastern Stars.

25         Q.        Yes, ma'am.  What others?

Page 36

1          A.       The Daughters of South Carolina.  The

2    Golden Circle.  These are all Prince Hall affiliated

3    Masonic Orders.

4          Q.       Yes, ma'am.

5          A.       I am a member of the American Nurses

6    Association, the South Carolina Nurses Association.

7    Also Chi Eta Phi Nursing Sorority.  I'm a founding

8    member of that sorority.  Those are the primary ones.

9          Q.       And so do you know how many members the

10   South Carolina State Conference of the NAACP has

11   currently?

12         A.       Approximately thirteen thousand.

13         Q.       Okay.  And how does one become a member?

14         A.       You simply become a member by -- if you

15   desire to join, then you just complete an application.

16         Q.       Okay.  Do you have to pay dues or

17   anything of that nature?

18         A.       Yes.  Dues are required.

19         Q.       Okay.  And what are the dues?

20         A.       There is a thirty dollar cost for an

21   annual membership.  You can also buy -- purchase a

22   lifetime membership.

23         Q.       Okay.  What's the cost of the lifetime

24   membership, Ms. Murphy?

25         A.       There are three different categories.

Page 37

1    Well, Junior Life is one you have to purchase before

2    moving up to Diamond and Silver.  I would say the cost

3    would be -- a member without having to pay any other

4    dues is six hundred -- seven hundred and fifty

5    dollars.

6          Q.     Okay.  And when you say this approximate

7    thirteen thousand figure, that's -- those are folks who

8    are members of the South Carolina State Conference of

9    the NAACP.  Is that right?

10         A.     Yes.  We are a conference of branches

11   so the branches make up the membership of the state

12   conference.  So branches that are located in the

13   different counties, that's -- our membership comes

14   from those branches.  So it's a conference of

15   branches.  So within that conference of branches, it's

16   approximately thirteen thousand members, yes.

17         Q.     Is the state conference somehow related

18   to the national conference of the NAACP?

19         A.     Yes, we are.

20         Q.     Okay.  And could you explain that

21   relationship to me?

22         A.     Organizationally, they have oversight

23   of the South Carolina State Conference.  So is that

24   clear?

25         Q.     Yes, ma'am.

Page 38

1        A.        Okay.

2        Q.        And what's the relationship between the

3    national conference of the NAACP and the Legal Defense

4    Fund if you know?

5        A.        They are two separate organizations.

6        Q.        Okay.  Do they work together if you know?

7        A.        They do work -- I wouldn't say they

8    work together on everything but they do work together.

9    And I'm not able to say how the national and the

10   national LDF, how they work together.  You know, my

11   association is primarily with the -- here at the state

12   level so that would need to be something that would

13   need to be clarified regarding how they work together

14   by the national and the national office of LDF.

15       Q.        Okay.  And you mentioned earlier that you

16   consider your organization to be nonpartisan.  Is that

17   right?

18       A.        That's right.

19       Q.        Okay.  Explain that.  Why do you consider

20   your organization to be nonpartisan?

21       A.        We do not engage in political

22   activities with one particular party.  We do not

23   advocate for one party or the other.  It's just not a

24   part of our agenda.

25       Q.        Does your organization -- and I'm

Page 39

```
 1   referring to the South Carolina State Conference of the
 2   NAACP.  Do you endorse candidates in --
 3        A.      No.
 4        Q.      You do not?
 5        A.      No, we do not.  No.
 6        Q.      Have you ever gone to -- do you support
 7   particular candidates?
 8        A.      No, I do not.
 9        Q.      Okay.  Have you ever gone to a campaign
10   rally for a particular candidate?
11              MR. INGRAM:  Objection.
12        A.      No.
13        Q.      You may answer, Ms. Murphy.
14        A.      No.
15        Q.      Okay.  All right.  And so have you
16   reviewed your organization's responses to our -- have
17   you reviewed your objections and responses to our first
18   set of request for admissions?
19        A.      No.
20        Q.      Okay.  So I'm going to put a document up
21   on the screen.
22              (Whereupon, Defendant's
23              Exhibit 1 was marked for
24              identification.)
25              MR. MOORE:  Let's put up Exhibit Number
```

Page 40

```
 1    1, Ms. Rabon.  I don't see it.  Is it up?
 2                  MR. INGRAM:  We're refreshing now.  Let's
 3    see if it loads on the platform.
 4                  MR. MOORE:  Who's on for Veritext?
 5                  MR. INGRAM:  It popped up on our end.
 6                  MR. MOORE:  It has?  You do have it?
 7                  MR. INGRAM:  Exhibit 1.
 8         Q.     Take a look at that document, Ms. Murphy.
 9    Have you ever seen that document before?  Have you seen
10    that document, Ms. Murphy?
11         A.     I'm reviewing it now.
12         Q.     Yes, ma'am.
13         A.     I'm looking at it.  This is request for
14    documents?
15         Q.     It's an objection to a request for
16    documents.
17                  MR. PARENTE:  I don't see it on that big
18    screen.
19                  MR. INGRAM:  This is actually objection
20    to the first set of request for admissions.
21                  MR. MOORE:  That's correct.
22                  MR. INGRAM:  Not documents.
23         Q.     Have you seen this document before, Ms.
24    Murphy?
25                  MR. MOORE:  You're correct, Mr. Ingram.
```

Page 41

1    Thank you.

2          A.      Okay.  Now --

3                  MR. INGRAM:  Is there a specific portion

4    of the document that Ms. Murphy should be looking at?

5                  MR. MOORE:  Well, I've asked the question

6    first of all if she's ever seen the document.  I would

7    like a response to that question and then I will point

8    her to a particular portion.

9          A.      Okay.  I can't say -- I've had so many

10   documents, I can't say that I have not, okay.  So is

11   there a particular area that you want --

12         Q.      I'm about to focus you there as soon as I

13   got a response to my question.  If you could turn to

14   page 8.

15         A.      Page 8.  Okay.  I'm on page 8.

16         Q.      Okay.  Do you see request number six?

17   And are you looking at a hard copy document or are you

18   looking at the document on the screen?

19         A.      On the screen.

20         Q.      Okay.  All right.  And so where it says

21   request number six, do you see that?

22         A.      Yes.

23         Q.      Okay.  It says admit the SCNAACP's

24   federal employee identification number is 23-7028846.

25   And there's an objection.  Do you know if that is the

Page 42

1    SCNAACP's EIN number?

2           A.      I provided the EIN number.

3           Q.      You provided -- so what is the EIN number

4    that you provided, Ms. Murphy?

5           A.      I don't have that directly in front of

6    me.

7           Q.      Well, if you flip over to the next page,

8    page 9, it says that that is admitted.  Do you see that?

9           A.      Okay.  Just one second.  Page 9?

10          Q.      Yes, ma'am.

11          A.      Okay.

12          Q.      Do you see that?

13          A.      Okay.  Admit -- we submitted it.  Now I

14   see that other number.  That's different, isn't it?

15   I'd have to scroll back to look at that but we

16   provided that number that was requested.

17          Q.      Let me ask you this question.  What's the

18   official name of your organization?

19          A.      The South Carolina State Conference --

20   NAACP South Carolina State Conference of Branches.

21          Q.      Okay.  And where was it established?

22          A.      It was established in 1939.

23          Q.      And when was it established?

24          A.      I think it's April, March or April.

25          Q.      And do you agree that your request for

Page 43

1   admission, it meant that the SC NAACP is unincorporated,

2   it is an association as well as a 501(c)(4 organization

3   and that its employment identification number is the

4   number that we just saw?  You see that on the site.  Is

5   that right, Ms. Murphy?

6        A.     I'm looking at page 9 and what my

7   statement is I can't validate that without looking at

8   the number.  I don't know it by, you know -- I just

9   can't tell you what it is but I will say that we

10  provided the EIN number for the state conference.

11       Q.     Okay.  Well, if you look at page 8 and

12  page 9 together, would you agree with me that it admits

13  that the EIN number is 23-7028846?

14       A.     I will have to validate the number.  I

15  will say this, that our EIN numbers, we don't generate

16  them.  Our EIN numbers are provided to us by the

17  national office.

18       Q.     I understand that, ma'am.  It's a very

19  simple question.  The request to admit that has been

20  filed by your organization admit that that is your EIN

21  number based on this document, correct?

22       A.     I will admit that the number that I

23  gave to -- when it was requested was the EIN number of

24  record.

25       Q.     Well, but you would agree with me that

Page 44

1   this document that I put before you says that the NAACP

2   admits that its EIN number is 23-7028846.  That's what

3   this document says, does it not?

4          A.      The documents states that, yes.

5                  (Whereupon, Defendant's

6                  Exhibit 2 was marked for

7                  identification.)

8          Q.      All right.  So let's put up Exhibit

9   Number 2 and let us know when it's on your screen.  Is

10  it your on your screen yet?

11         A.      No.

12                 MR. MOORE:  Erin, are you on?

13                 MR. INGRAM:  Give us one second.

14                 MR. PARENTE:  You may need to refresh

15  after he introduces it.

16                 MS. RABON:  Technical difficulties.  It's

17  showing up in the marked exhibit folder.

18         A.      Okay.  What would you like me to look

19  at it?

20         Q.      Do you see it now?  Is it on your screen?

21         A.      Yes.

22         Q.      Okay.  Have you seen this document

23  before, Ms. Murphy?  It's a document we sent to your

24  counsel several days ago.

25         A.      Okay.  Okay.  What do you want me to

Page 45

```
 1   look at?

 2        Q.      Well, do you know if you have seen this

 3   document before is my first question?

 4        A.      We file this report annually.

 5        Q.      Okay.  All right.  And it says South

 6   Carolina State Conference of the NAACP and it lists you

 7   as the registered agent.  Is that right?

 8        A.      Yes, my name is there.

 9        Q.      And it lists you at 611 North Main

10   Street.  Is that the office of the South Carolina State

11   Conference of the NAACP?

12        A.      It is.

13        Q.      Okay.  And it lists a federal employers

14   identification number as 57-0327661.  Do you see that?

15        A.      Yes.

16        Q.      Okay.  Can you explain to me why that

17   document lists a different EIN number than the

18   23-7028846 document that your attorneys have admitted is

19   your EIN number?

20        A.      What date is on this report?  I'm

21   looking to see a date.

22        Q.      I believe if you look at the bottom of

23   the page it says filed on 6/10/2021.

24        A.      Okay.  This is a report that our

25   treasurer files.  Now the one thing -- as I have said
```

Page 46

1    before, the number that we gave you was the one that

2    we've been given by the national office, this one,

3    and, you know, I have to defer to the national office

4    in terms of the response to this because I do know

5    there was a change in our EIN number and it may have

6    been after this report was filed.  That's the only

7    answer I can give to that.

8            Q.      When was that change?

9            A.      I can't give you an exact date.

10           Q.      Okay.  Can you tell me as you sit here

11   today what is the correct EIN number?

12           A.      Yes.  The number, the number, most

13   recent number that was given to -- reported as being

14   our EIN number was the most recent number given to us

15   by the national office as our EIN number.

16           Q.      And what number is that?  And you keep

17   looking at Mr. Ingram.  What number --

18           A.      I'm looking because I think I said

19   several times I cannot confirm which one of those two

20   numbers is -- I know the one that was given is the one

21   that's correct.

22           Q.      But as you sit here today, you can't tell

23   me if the 57 or the 23 number is the correct one.  Is

24   that right or wrong?

25                   MR. INGRAM:  Objection.  Asked and

Page 47

1   answered.

2        Q.     Please answer my question, Ms. Murphy.

3        A.     If you will allow me, since I'm in my

4   office, to give you the most recent number we were

5   given, then I can answer that question.

6        Q.     My question to you right now is as you

7   sit here right now, can you tell me if the 57 number is

8   correct or the 23 number --

9             MR. INGRAM:  Object to the form.

10       A.     No, I cannot.  No, I cannot.

11       Q.     Okay.  Thank you.  So has your agency

12  previously been involved in a litigation against the

13  House of Representatives or any member or any officer of

14  the House of Representatives?

15       A.     I can't answer that question.

16       Q.     You can't answer it because --

17       A.     Not since I have been president.

18             (Simultaneous crosstalk.)

19       Q.     I'm sorry.  I'm sorry.  I'm talking over

20  you and I need to stop.  Please answer the question.

21       A.     Not as I have been president.

22       Q.     Okay.  All right.  So I want to talk

23  about this lawsuit.  I mean you are the president of

24  this organization.  Is that right?

25       A.     Yes.

Brenda Murphy                                February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 48

1       Q.      The South Carolina State Conference of

2    the NAACP.  Can you tell me why you decided to sue

3    Speaker Lucas, Chairman Murphy, and Chairman Jordan over

4    the House plans?

5       A.      Because of -- and it wasn't just I.  It

6    was the coalition's decision that we were very

7    concerned that the mapping that was approved was

8    detrimental to black voters.

9       Q.      How?

10      A.      In terms of representation.  In terms

11   of how the vote -- the influence of the vote has been

12   minimized.  It has created a situation where there is

13   the potential for less representation by black

14   individuals.

15              When we look at the numbers,

16   potentially we had -- there were opportunity districts

17   that no longer exists.  We have black -- where there

18   are black representatives, you know, we have -- we now

19   have -- those have been -- some of those districts

20   have been combined and we're looking at even a further

21   decrease in the opportunity for an African American or

22   a black person to be a representative for their

23   constituents, their communities.

24      Q.      Okay.  I'm going to get into the

25   specifics in a moment but you decided to sue before the

Page 49

1    maps were even passed.  Is that right?

2            A.        No.

3            Q.        Your organization sued in October of this

4    year before the House and the Senate passed maps in

5    December, correct?

6            A.        That was due to timeliness.

7            Q.        My question was were you involved in that

8    decision to bring that first lawsuit?

9            A.        That was a decision of the coalition.

10           Q.        My question was were you involved in that

11   decision, Ms. Murphy?

12           A.        As a member of the coalition, I was.

13           Q.        Okay.  The coalition is not a named

14   plaintiff here.  However, it's South Carolina State

15   Conference of the NAACP and Taiwan Scott were the named

16   plaintiffs, correct?

17           A.        That's correct.

18           Q.        Okay.  Do you know Taiwan Scott?

19           A.        No, I don't personally.

20           Q.        Okay.  And so why was it decided that the

21   South Carolina State Conference of the NAACP was the

22   plaintiff and not this coalition?

23           A.        Well, the South Carolina State

24   Conference was the initiator or first coalition.  So

25   in terms of I guess playing a leading role, the South

Page 50

1    Carolina State Conference did.  We have membership

2    throughout the state of South Carolina, and because of

3    the concerns that we heard from our membership

4    throughout the state, it was something we watched very

5    carefully in terms of how mapping was done and the

6    concerns of our membership.

7            Q.      But again you made the decision to file

8    before the mapping was completed, correct?

9                    MR. INGRAM:  Objection.  Asked and

10   answered.

11           Q.      Please answer my question, Ms. Murphy.

12           A.      I repeat the same answer.  The filing

13   before the mapping was completed, it was related to a

14   different issue.  It was regarding timeliness of the

15   committee to do its work.

16           Q.      Who is funding this litigation for you?

17           A.      No one.

18           Q.      Who is paying for it?

19           A.      There has been no cost associated that

20   I have knowledge of.  No one has given me a price or a

21   cost for this litigation.

22           Q.      Okay.  Well, I mean your organization --

23   and I'm getting there.  I'm going to get there in a

24   minute but your organization submitted a number of maps,

25   is that right, for consideration?

Page 51

1        A.       We did submit a map as well as other

2   people.  So, you know, our concern is more in terms of

3   the map being reflective of feedback given at the

4   hearings.  There were hearings.  You know, in terms of

5   individuals being able to participate in the hearings,

6   you know, I have concerns about that but --

7        Q.       But that isn't my question.

8        A.       Okay.

9        Q.       My question is simply this.  Someone had

10   to pay for an expert to draw these maps.  Who paid for

11   the expert to draw these maps?

12        A.       We did not -- we did not pay for

13   experts to draw these maps.  As a matter of fact, I

14   think I shared with you, when we came together, it was

15   basically with our partners, our affiliates that we've

16   been involved in over the years in terms of this

17   redistricting process and we utilize the resources

18   available to assist with the drawing of the maps at no

19   cost to us.

20        Q.       So let me ask you this question.  Are you

21   familiar with the fact that there are five experts who

22   have submitted expert reports in this case?

23        A.       I don't know what you mean.

24        Q.       Well, there are five experts who

25   submitted expert reports who apparently plan to be

Page 52

1    expert witnesses in this case.  Are you familiar with

2    that?

3            A.      No, I'm not.

4            Q.      Okay.  Do you know how much those experts

5    charge?

6            A.      No, I do not.

7            Q.      Okay.  And do you know who is paying

8    them?

9            A.      No, I do not.

10           Q.      Okay.  It's not your agency?  It's not

11   your branch?  Is that correct?

12           A.      No.  No.

13                   MR. MOORE:  We've been going for almost

14   an hour and fifteen minutes.  Let's take about a

15   five-minute break, okay?

16                   MR. INGRAM:  Sounds good.

17                   (Brief recess.)

18           Q.      (BY MR. MOORE:)  Ms. Murphy, did you talk

19   to your counsel during the break?

20           A.      General conversation.  Nothing about

21   this.

22           Q.      You didn't talk about the substance of

23   your testimony.  Is that right?

24           A.      No, I did not.

25           Q.      So with respect to the timing issues,

Page 53

```
 1    you're aware that the census data came out late.  Is
 2    that right?
 3           A.      Yes, I'm aware of the date that it came
 4    out.
 5           Q.      And you're aware that the late release of
 6    that data, it has affected redistricting.  Is that
 7    right?
 8           A.      That was a factor I'm told.
 9           Q.      Okay.  And you're aware the Census Bureau
10    releases its data every ten years.  Is that right?
11           A.      Yes.
12           Q.      And it releases that data to the state
13    after it conducts its census.  Is that right?
14           A.      Yes.
15           Q.      And states must use that data to properly
16    apportion new legislatures.  Is that correct?
17           A.      Yes.
18           Q.      Okay.  And you understand that the
19    redistricting process takes some period of time to
20    gather public input and have lawmakers propose districts
21    with respect to redistricting.  Is that right?
22           A.      Yes.
23           Q.      Okay.  And you actually attended several
24    of the public hearings on the House districts.  Is that
25    right?
```

Brenda Murphy                         February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 54

1          A.        Yes, I did.

2          Q.        How many hearings did you attend?

3          A.        Two -- I think two in person, one

4   virtually.

5          Q.        Okay.  Where were the two in persons?

6          A.        Columbia.

7          Q.        And do you understand that there's a lag

8   period between the release of the census data and the

9   enactment of properly apportioned maps every ten years?

10  Is that right?

11         A.        I understand.  Yes.

12         Q.        Okay.  So would you agree with me that

13  the lawsuit that was brought in October was premature?

14         A.        No, I will not agree with that.

15         Q.        Okay.  What was the purpose of it?

16         A.        As you probably recall, there were --

17  the House was not in session for some periods during

18  that time.

19         Q.        Well, at the time that that lawsuit was

20  filed, the House had begun the process of having public

21  meetings around the state, had it not?

22         A.        It had started but it still was

23  delayed.

24         Q.        Why was the filing of the lawsuit

25  necessary?

Page 55

1          A.       To protect the rights of the people in

2    terms --

3          Q.       I'm sorry.  Please continue.

4          A.       In terms of having adequate time to

5    know who candidates would be for their respective

6    districts and to learn or to understand what their

7    platform is all about, would be all about.

8          Q.       Would you agree that that complaint was

9    mooted by the amended complaint that was filed in

10   December of 2021?

11         A.       It was amended, yes.

12         Q.       Okay.  My question was, was it mooted in

13   your view?

14                  MR. INGRAM:  Objection.  Calls for a

15   legal conclusion.

16         Q.       You may answer, Ms. Murphy.

17         A.       Would you -- I'm not an attorney so

18   would you explain what that means, please?

19         Q.       Did you believe that the complaint was

20   any longer operative or needed to be acted on by the

21   Court in any way?

22                  MR. INGRAM:  Objection.  Calls for a

23   legal conclusion.

24         Q.       Please continue, Ms. Murphy.

25         A.       I would say no.

Page 56

1      Q.      No relief was granted under that initial

2    complaint, correct?

3      A.      Somebody is talking and I can't

4    understand you.

5              (Off-the-record discussion.)

6      A.      Okay.  Would you restate that, please?

7      Q.      I said there was no relief granted under

8    the initial complaint, right?

9      A.      No.  No.

10     Q.      And so with respect to the amended

11   complaint that was filed on December 23, 2021, did you

12   review that complaint before it was signed?  You

13   personally, Ms. Murphy?

14     A.      We reviewed it as a coalition before

15   any signature was placed on it.

16     Q.      Okay.  Were you one of the people who

17   reviewed it as a coalition?

18     A.      Yes.

19     Q.      Okay.  And do you know about how long

20   after the enactment of Act Number 117 did you file the

21   amended complaint?

22     A.      I'm not looking at the dates.  I can't

23   tell you that.

24     Q.      Would you disagree with me if I told you

25   that the act was signed into law on December 10th and

Page 57

1    you didn't file an amended complaint until December 23rd

2    around midnight?

3         A.      Yes.

4         Q.      You would agree with that?

5         A.      Yes.

6         Q.      Can you tell me why it took so long after

7    the amendment of the new House districts to file an

8    amended complaint?

9         A.      Well, we have to -- we had to evaluate

10   the mapping that had been submitted in terms of were

11   there any -- was there consideration given to

12   testimony that was provided by individuals at the

13   hearings, which was much, and to make an informed

14   decision about was there still impact on those

15   opportunity districts.

16        Q.      Well, so isn't one of your organization's

17   stated concerns about delay in the enactment of maps?

18        A.      Please clarify.

19        Q.      Hasn't your organization taken the

20   position that the map drawing process and then the

21   review of those maps through the litigation period has

22   taken too long?

23               MR. INGRAM:  Objection.  Asked and

24   answered.

25        Q.      You may answer, Ms. Murphy.

Page 58

```
 1        A.       Yes, in terms of the completion of

 2    those maps and time to review those maps, that was

 3    affected by the delay in the processes of getting

 4    those maps -- the maps completed, yes.

 5        Q.       Well, but the longer it takes -- your

 6    organization was concerned about litigation and the

 7    delay that it would take for litigation to be complete.

 8    That's one of the positions they took.  Is that correct

 9    or incorrect?

10        A.       Yes.

11        Q.       Okay.  And the longer it takes you to

12    file documents in court means longer delay.  Correct or

13    incorrect?

14                MR. INGRAM:  Objection.  Argumentative.

15        Q.       Please answer, Ms. Murphy.

16        A.       I will answer it takes time for maps to

17    be reviewed after they were completed and submitted in

18    terms of evaluating what has been actually changed

19    about -- what has changed about those maps.  It takes

20    time to do that.

21        Q.       Okay.

22        A.       And that's all a part of this process

23    and why it's important that things are done in a

24    timely manner.

25        Q.       All right.  So I'm going to -- I'm about
```

Page 59

1  to ask you a question and I don't want -- I don't want

2  you to share with me any information that your lawyers

3  have provided to you but I want to ask you this

4  question.  The amended complaint alleges purposeful

5  racial discrimination on the part of the House of

6  Representatives.  Is that right?

7       A.    I will say the outcome of the maps

8  indicate that there was discrimination in terms of

9  black voters and the opportunity for black voters

10 to -- opportunity to be in that process of the

11 districts in terms of it being competitive.

12      Q.    Well, I didn't ask you a question about

13 competitive.  Okay.  I asked you a very simple question.

14 An allegation in this complaint is that in drawing

15 certain districts, the House of Representatives engaged

16 in purposeful racial discrimination.  That's an

17 allegation that your organization has made, is it not?

18      A.    When you look at the outcome of the

19 maps, that would be the opinion.

20      Q.    Ma'am, I asked you a very simple

21 question.  Is it a yes or no?  You can answer.

22           MR. INGRAM:  Objection.  Asked and

23 answered.

24      Q.    Did your organization allege --

25      A.    Yes.

Page 60

1    Q.      -- that there was purpose -- all right.

2    So I would like you to tell me what evidence you had

3    before you when you filed this amended complaint that

4    the House of Representatives had engaged in purposeful

5    racial discrimination?

6              MR. INGRAM:   Objection.  Asked and

7    answered.

8              MR. MOORE:   I don't believe that's been

9    asked and answered, Mr. Ingram.

10   Q.      Can you please answer the question, Ms.

11   Murphy?

12   A.      I will restate what I said previously.

13   When you look at the outcome, the opportunity for

14   black people to have -- at least participate in a

15   district are fewer districts now that actually are

16   competitive was reduced.

17   Q.      Are you telling me that just looking at

18   the outcome is the only evidence that you have in front

19   of you to support the allegation that there was

20   purposeful racial discrimination?

21             MR. INGRAM:   Objection.  Argumentative.

22   Q.      Please answer my question, Ms. Murphy.

23   A.      There are more factors that we look at,

24   not just in terms of discrimination.  When we say

25   discrimination, you have to look at outcomes in terms

Page 61

1    of the overall -- in terms of how the maps was done

2    and the opportunity for black people to at least have

3    an opportunity or be in a competitive district was

4    reduced.  That is my answer.

5         Q.     Okay.  Well, I'm going to ask it again

6    because you have not answered my question.  I would like

7    you to tell me what specific evidence you have in front

8    of you that the members of the House of Representatives

9    who passed this legislation engaged in purposeful,

10   because that's the word that you use, purposeful racial

11   discrimination?

12              MR. INGRAM:  Objection.  Asked and

13   answered.

14        Q.     Please answer my question, Ms. Murphy.

15        A.     My answer is the same.

16        Q.     Okay.  So can you identify any specific

17   evidence that you had in front of you that the House of

18   Representatives engaged in purposeful racial

19   discrimination?

20              MR. INGRAM:  Objection.  Asked and

21   answered.

22        Q.     Please answer my question, Ms. Murphy.

23        A.     My answer is the same.

24        Q.     Can you -- as we sit here today, can you

25   tell me a specific piece of evidence that you relied on

Page 62

1    to make the allegation that the House of Representatives

2    engaged in purposeful racial discrimination?

3                    MR. INGRAM:  Objection.  Badgering the

4    witness.  Asked and answered.

5                    MR. MOORE:  I'm not getting any answer to

6    my question, Mr. Murphy (sic).  You can object to the

7    form, okay, as is appropriate under our rules.

8         Q.       I'm going to ask the question again.  Ms.

9    Murphy, do you have any specific evidence upon which you

10   relied to make the allegation of purposeful racial

11   discrimination?  I think I've given you several

12   opportunities to provide me with a piece of information.

13   I haven't heard any so I'm going to give you one final

14   opportunity and I'm going to move on.

15                   MR. INGRAM:  Objection.  Asked and

16   answered and badgering the witness at this point.

17        Q.       You may answer, Ms. Murphy.

18        A.       I am going to say again we have to look

19   at outcomes, and when you look at the mapping that is

20   present, there is decreased opportunity --

21   opportunities for black people that are black to -- in

22   terms of districts competitive -- to be -- to run

23   competitively in competitive districts.

24        Q.       All right.  Do you know any of the

25   members of the ad hoc committee who served in this

Page 63

1    matter?

2          A.      No, I do not.

3          Q.      Okay.  Do you know --

4          A.      I know -- may I -- I know

5    representatives.

6          Q.      So do you know, for example, Beth

7    Bernstein who is a representative in the Columbia area?

8    Do you know her?

9          A.      No.  Only as a representative.

10         Q.      Okay.  Have you ever spoken to her if you

11   know?

12         A.      No, I have not.

13         Q.      Okay.  Do you know Representative Pat

14   Henegan?

15         A.      Only as a representative.

16         Q.      Okay.  Have you spoken with her?

17         A.      No, I have not.

18         Q.      Okay.  Do you know Representative Justin

19   Bamberg?

20         A.      No, I do not.  Only as a

21   representative.

22         Q.      Have you ever spoken to him?

23         A.      No, I have not.

24         Q.      Okay.  Do you have any information in

25   front of you which would lead you to conclude that those

Page 64

1    three members would be party to engaging in purposeful

2    racial discrimination?

3          A.      Sir, I can't read the minds of those

4    individuals.  I only can look at the outcome in terms

5    of the mapping and the results of who it has -- will

6    impact, not has the potential but will impact and that

7    is people that are black.

8          Q.      And do you know if Representative Henegan

9    is African American?

10          A.      I know she's African American, yes.

11          Q.      Do you know if Mr. Bamberg is African

12    American?

13          A.      I know he's African American.

14          Q.      All right.  And --

15          A.      Also incumbent.

16          Q.      And the person who attended this meeting

17    that you refuse to name, was that person an incumbent?

18          A.      Yes.

19          Q.      Okay.  Is it Representative Jerry Govan?

20          MR. INGRAM:  Objection.  Not going to

21    disclose membership lists or names.

22          MR. MOORE:  Well, Mr. Ingram, just so you

23    know, the documents that you provided us in discovery

24    last night and I'm going over them at the end of this

25    deposition, they provide us names and identifications of

Page 65

1    members of the South Carolina State Conference of the

2    NAACP.  So I do not believe that that is a valid

3    objection.

4              MR. INGRAM:  If there are public

5    documents, you can point to names, by all means, but we

6    will not be confirming or denying any membership names

7    or lists.

8         Q.      I didn't ask you for a list at this

9    point.  I simply asked you if Representative Govan was a

10   person who attended this meeting for which there are no

11   minutes?

12             MR. INGRAM:  I'm instructing my client

13   not to answer.  That is an NAACP meeting and you're

14   asking my client to confirm a membership identity.

15        Q.      Are you a member of the South Carolina

16   Conference of the NAACP, Ms. Murphy?  Are you?  I need

17   an answer, Ms. Murphy.

18        A.      That is a rhetorical question.

19        Q.      Well, it may be a rhetorical question but

20   it's a yes or no.  Are you a member of the South

21   Carolina State Conference of the NAACP?

22        A.      I am sitting before you as a member of

23   the South Carolina State Conference.

24        Q.      And I believe that you have identified

25   yourself publicly in public hearings as a member of the

Page 66

1    South Carolina State Conference of the NAACP.  Is that

2    right?

3           A.      I identify myself as the president of

4    the South Carolina State Conference NAACP.

5           Q.      Okay.  And so in the amended complaint --

6    and have you reviewed that amended complaint in

7    preparation for your testimony here today, Ms. Murphy?

8           A.      No, I have not.

9           Q.      Okay.  When is the last time you looked

10   at that document to the best of your recollection?

11          A.      It's been at least a couple of weeks.

12          Q.      Okay.  And there are a number of

13   districts that are challenged districts.  Is that right?

14          A.      Yes.

15          Q.      Okay.  And what was your involvement in

16   choosing the challenged districts?

17          A.      As I stated earlier, we have presidents

18   throughout the state of South Carolina.  It is -- in

19   terms of where the challenges were, the presidents

20   from those areas were the individuals that identified

21   areas of concern and their membership.

22                        (Whereupon, Defendant's

23                        Exhibit 3 was marked for

24                        identification.)

25          Q.      Okay.  And so I believe that we have

Page 67

1    Exhibit Number 2 up on the screen.  Is that right?

2    Excuse me.  Exhibit Number 4 up on the screen.  Three.

3    I'm sorry.  That's why I do not like virtual depositions

4    but so we have Exhibit Number 3 up on the screen -- but

5    we've all had to learn how to do this.  Some better than

6    others.  I'm a little older.  The technology isn't my

7    favorite thing sometimes so I apologize.

8                    With respect to Exhibit Number 3, do you

9    recognize that document, Ms. Murphy?  I think it's up on

10   your screen now.  Is that right?

11        A.      Yes, I'm trying to -- I can't read it.

12        Q.      Well, when I go to a specific section,

13   I'll make sure that we blow it up when I get to a

14   specific page.

15        A.      Okay.

16        Q.      Okay.  Because I can't read it either

17   from this distance.  And so would you agree with me that

18   the challenged districts were grouped into the areas of

19   Anderson, Chester, Sumter, Dillon, Horry, Lawrence and

20   Williamsburg, Richland and Orangeburg?  Would you agree

21   with me that the challenged districts are in those

22   areas?

23        A.      Yes.

24        Q.      Okay.  And do you know how your

25   organization chose those challenged districts?

Page 68

1          A.      As was stated, we had meetings with the

2    branch presidents as well as members from those areas.

3    And when I say that, I need to -- you know, is it a

4    meeting?  Is it a seminar?  When you meet with

5    individuals, you know, and you receive feedback, that

6    information is collected and shared as a whole with

7    the redistricting coalition in terms of the concerns.

8          Q.      Okay.  Do you have members that reside --

9    as you sit here today, can you tell me that you have a

10   member that resides in each of the challenged districts?

11         A.      Yes, I can.

12         Q.      Okay.  And how is it that you can tell me

13   that you have a member that resides in each of the

14   challenged districts?

15         A.      Because that data was validated by our

16   national office.

17         Q.      Okay.  Did you speak to a person from

18   each of the challenged districts before filing this

19   complaint?

20         A.      We have representatives in every county

21   of the state.  Presidents from every county of the

22   state.  So each of those areas, there is a president.

23         Q.      Well, there might be a president -- for

24   example, are the presidents -- so I live in Columbia

25   like you, okay.  And so is there a president for the

Page 69

1    city of Columbia or a president for Richland County?

2           A.       There is a president for Columbia.  As

3    a matter of fact, we have more -- in some places, we

4    have more than one president and that's a good example

5    that you're asking about.  We have Lower Richland

6    which has a branch and we also have the Columbia

7    branch.  So there are two, two in the Columbia area.

8           Q.       And so there would be two presidents for

9    the entire Columbia area, Richland County.  Is that

10   right?

11          A.       That's right.

12          Q.       Okay.  Do you know how many challenged

13   districts there are in Richland County?

14          A.       I don't have that right in front of me

15   but --

16          Q.       I'm going to help you in a minute.

17          A.       Okay.

18          Q.       But here's my question.  Prior to filing

19   this complaint, did you or anyone acting on your

20   direction speak to a member, speak to someone who

21   resided in each and every challenged district and get

22   their input on how they were adversely affected by the

23   drawing of the districts?

24          A.       Yes.

25          Q.       Who did that?  Who spoke to a person from

Page 70

1    each of the challenged districts?

2                    MR. INGRAM:  Objection.  I'm instructing

3    my client not to answer as it would disclose

4    confidential membership identity.

5                    MR. MOORE:  I didn't ask her for the

6    names of anyone, Mr. Ingram.  I simply asked the

7    question -- and so I don't believe that objection is

8    well-founded.

9                    (Simultaneous crosstalk.)

10        Q.      My question is --

11                    MR. MOORE:  Are you instructing her not

12   to answer, Mr. Ingram?

13                    MR. INGRAM:  Correct.

14        Q.      Okay.  My question is without identifying

15   any person, okay, who spoke to a person who resided in

16   each of the challenged districts?

17                    MR. INGRAM:  Objection.  I don't know how

18   you respond to that question without identifying a

19   person.  Same objection about membership lists.

20        Q.      Did you speak to anyone from any

21   challenged district, Ms. Murphy?

22        A.      I have to answer that with more than

23   just a yes or no.

24        Q.      Please answer my question and then

25   elaborate.

Page 71

1          A.        As the president of the South Carolina

2     State Conference, we coordinated meetings with our --

3     ongoing meetings.  That is a standard of practice for

4     us.  We meet routinely.

5               So in terms of meeting with leadership

6     from throughout the state, that is a routine.  That

7     happens routine, not just regarding redistricting.

8     It's about other issues of concern that are related to

9     justice in all areas.  Related to criminal justice,

10    education, et cetera.  I won't go through all of them

11    but this is a standard practice.

12              So the question about meeting with

13    leadership in the different areas, that it happens

14    regarding -- and, yes, it does happen.  We will not

15    list an area unless there was feedback regarding

16    concern.

17         Q.        I didn't ask you about feedback from an

18    area.  I asked you specifically if you can tell me under

19    oath today that either you or your someone from your

20    organization spoke to a person from each and every

21    challenged district before filing this amended

22    complaint?

23         A.        Yes.

24         Q.        And how is it that you can assure me that

25    that happened?

Page 72

1          A.      Because we have members in every area

2     that is identified.

3          Q.      That's not -- my question is not whether

4     you have members in every area that is identified.  My

5     question is can you assure me that before this lawsuit

6     was filed, either you or someone from your organization

7     spoke to a person who resided in each of the challenged

8     districts?

9          A.      Yes.

10         Q.      Okay.  How can you state that under oath,

11    Ms. Murphy?

12         A.      Because as I just said, we have routine

13    meetings with individuals.  We participated in the

14    redistricting process as a state conference.  This was

15    not just done by the coalition.

16         Q.      Ms. Murphy --

17         A.      Yes, sir.

18         Q.      -- is there a record that your

19    organization maintains that indicates who spoke to

20    each -- to a person from each of the challenged

21    districts and who was spoken to there?  Is there a

22    record of that?

23              MR. INGRAM:  Objection.  Asked and

24    answered.

25              MR. MOORE:  It's not been asked and

Page 73

1    answered, Mr. Ingram.

2         Q.      Please respond, Ms. Murphy.  Is there a

3    record of that?

4         A.      I did respond in terms of how we

5    interact with each other as a state conference.  We

6    meet regularly, monthly.  We review -- the maps were

7    reviewed.  Comments were made by those present.  So

8    nothing is here that is not known in our different --

9    the listed areas.

10        Q.      My question is very simple.  Is there a

11   record that your organization maintains that indicates

12   who spoke to a representative of each of these

13   challenged districts and on what date prior to the

14   filing of this amended complaint?  Is there a record of

15   that?

16        A.      There were two forums.  I cannot say

17   that we kept minutes because they were forums but

18   there was representation from all of these areas.

19        Q.      You keep using the words "all of these

20   areas".  I'm asking about specific challenged districts

21   and I'm not getting --

22        A.      I'm speaking --

23        Q.      I'm asking --

24        A.      I'm speaking on behalf of the listed

25   districts of concern.

Page 74

1          Q.      Can you tell me why your organization has

2    not produced a list of the people who reside in each of

3    the challenged districts who were spoken to prior to the

4    filing of this lawsuit?

5          A.      I do not have authorization to provide

6    a listing of anyone that's a member of the NAACP.

7          Q.      Is there a list -- is there a document

8    that indicates that between the time of the passage of

9    this legislation and the time of the filing of the

10   second amended complaint that you or someone else from

11   your agency spoke to a person who resides in each of the

12   challenged districts and those people indicated that

13   they wanted to bring this lawsuit?

14         A.      There is not a list.

15         Q.      Okay.  As you sit here today, can you

16   assure me under oath that between the date this statute

17   was passed, this act was passed and the date of your

18   lawsuit that someone was spoken to from each and every

19   one of these challenged districts and a person from each

20   and every one of those challenged districts said they

21   wanted to go forward with the challenged district?

22                 MR. INGRAM:  Objection.  Asked and

23   answered.  It's privileged communication.

24                 MR. MOORE:  That was not my specific

25   question, Mr. Ingram.

Page 75

1        Q.        Would you please answer my question, Ms.

2    Murphy?

3        A.        I have answered the question to the

4    best of my ability.

5        Q.        Okay.  Can you confirm under oath that

6    that was done?

7                  MR. INGRAM:  Objection.  Asked and

8    answered.

9        Q.        Ms. Murphy, that's a yes or no and then

10   you can explain.

11       A.        I have answered the question to the

12   best of my ability.  There were forums, two forums

13   that were held with members that included -- that

14   involved districts that there was representation.

15       Q.        I'm going to take that as a no.  I'm

16   going to take that as a no and I'm going to move on and

17   I'm going to come back to it.  Do you know the members

18   of your organization that reside in each of the

19   challenged districts?

20       A.        Yes, I know members that reside in the

21   challenged districts.

22       Q.        Did you speak to any of them about this

23   litigation?

24       A.        No.  In terms of this -- in terms of

25   when you say -- you mean what we're doing today?

Page 76

1          Q.      Yes, ma'am.

2          A.      No, I did not.

3          Q.      I'll come back to that in a few minutes.

4   Did you or to your knowledge anyone from the NAACP speak

5   to anyone from any party about the positions that you

6   intended to take in this lawsuit?

7          A.      No.

8          Q.      Did you coordinate with anyone from the

9   South Carolina Democratic or the South Carolina

10  Republican Party?

11         A.      No.

12         Q.      Did you communicate with the League of

13  Women Voters?

14         A.      They were a part of the coalition.

15         Q.      Okay.  And who determined who would be a

16  part of this coalition?

17         A.      We invited members to participate and

18  they agreed to participate based on the fact that they

19  were nonprofit and they were advocacy groups for, you

20  know, for social justice.

21         Q.      When was the coalition formed?

22         A.      September.  I think September.  August,

23  September.

24         Q.      Of what year?

25         A.      Last year.

Page 77

1          Q.       2021?

2          A.       Yes.

3          Q.       And who are the members of the coalition?

4          A.       I don't have all of those in front of

5     me.  I think that they were listed for you.

6          Q.       Okay.  And who decided to form this

7     coalition?

8          A.       We decided as a state conference to

9     invite other advocacy groups and we decided who to ask

10    whether or not they wanted to be a member of the

11    coalition.

12         Q.       Okay.  And who made the determination as

13    to who would and who would not be invited?

14         A.       I don't think we thought about who we

15    would not invite.  If there was someone that wanted to

16    be a part that was an advocacy group, we invited them

17    to participate.

18         Q.       And how did you identify these advocacy

19    groups?

20         A.       The ones that are -- well, there are a

21    number that we know of such as the League of Women

22    Voters we interact with throughout -- you know,

23    routinely.  AFL-CIO, ACLU, the state president.  We

24    had worked together.  And so it was basically

25    individuals that we have worked collaboratively

Page 78

1    together with throughout the years.

2                    Now if there was someone that -- a

3    group that wanted to join, then we welcomed them.  So

4    we didn't prohibit anyone from joining that was --

5    advocated for the social justice.  There was no

6    criteria for eliminating.

7        Q.       Do you know Representative John King?

8        A.       As a representative.

9        Q.       Have you ever spoken to him?

10       A.       Probably before redistricting, yes.

11                (Simultaneous crosstalk.)

12       A.       -- this process, no.

13       Q.       You have not spoken to him about the

14   redistricting process.  Is that right?

15       A.       No.

16       Q.       Okay.  Do you know Representative Wendy

17   Brawley?

18       A.       Yes.

19       Q.       How do you know Representative Brawley?

20       A.       She's a representative.  I know her --

21   I know the representatives for this state.

22       Q.       Do you know all the representatives for

23   this state?

24       A.       I wouldn't say all but I do know the

25   African American ones.

Page 79

1      Q.      Okay.  How well do you know
2  Representative Brawley?
3      A.      I just -- I do not know her personally.
4  I know her as a representative.
5      Q.      Okay.  Have you ever had any
6  conversations with her?
7      A.      Not as a representative.  I will share
8  with you that when I became president, she did -- she
9  had someone from her private business to interview me.
10 That's the only association that I have of really
11 knowing her as a representative.
12     Q.      And so she offered your public submission
13 as an amendment on the House floor to the House map.  Do
14 you recall that?
15     A.      Yes.  She also offered the League of
16 Women Voters as well.
17     Q.      Okay.  And how did she come to do that if
18 you know?
19     A.      Well, the maps were all on display at
20 the State House so I can't say how she came to that in
21 terms of making that recommendation.  That's something
22 you will have to ask her.  I don't know.
23     Q.      So you don't know how she came to do
24 that.  Is that right?
25     A.      I do not.

Page 80

1          Q.       Do you know Jerry Govan?

2          A.       As a representative.

3          Q.       Okay.  Have you ever spoken to

4     Representative Govan about redistricting?

5          A.       Not as a representative, no.

6          Q.       I didn't ask you if you had spoken to him

7     as a representative.  I asked you have you ever spoken

8     to Representative Govan about any issue related to

9     redistricting?

10                   MR. INGRAM:  Objection.  Asked and

11    answered.

12                   MR. MOORE:  It hasn't been answered.

13    It's been asked.

14         Q.       Please answer my question.

15         A.       Well, I will answer your question.  I

16    have made a statement in the presence -- I think one

17    of the meetings that, that -- I make it very clear in

18    meetings our intent, the intent of this coalition is

19    not to be partisan, not to protect incumbents, and

20    that is very clearly stated.

21                   He may have been in my presence when I

22    said that.  I can't say that he was but that is

23    something that I make very clear.  If the conversation

24    came up about redistricting and whether or not -- and

25    it's just a general conversation regarding -- and it

Page 81

1    wasn't with just Representative Govan.  I have

2    intentionally not included representatives in

3    discussions about redistricting.

4         Q.     Why is that?

5         A.     Because I didn't want -- it needed to

6    be about the people, not about the incumbent.  When

7    lines are drawn, it's opportunities for individuals,

8    whoever it might be, to have that -- black individuals

9    to have the opportunity to decide whether or not they

10   want to run, campaign for a certain position or be a

11   candidate for a certain position.  I take that very

12   seriously.

13        Q.     I'm going to move on for a moment.  So

14   you spoke at at least one of the public hearings,

15   correct?

16        A.     Yes.

17        Q.     Okay.  And I believe you provided some

18   written testimony.  Is that right?

19        A.     Yes.

20               (Whereupon, Defendant's

21               Exhibit 4 was marked for

22               identification.)

23               MR. MOORE:  Okay.  Let's pull up Exhibit

24   Number 7, Ms. Rabon.  Yes, ma'am.  What's taking so

25   long?

Brenda Murphy                           February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 82

1          Q.      As she pulls up it, Ms. Murphy, you're

2     familiar with that written testimony.  Is that right?

3          A.      Yes.

4          Q.      Did you prepare it yourself?

5          A.      Every document that was submitted was

6     documented -- documents that the coalition reviewed

7     and we agreed upon as a coalition.  I was the

8     representative to present the final document.

9          Q.      So my question is did you write it

10    yourself or did someone else write it for you?

11                 MR. INGRAM:  Objection.  Asked and

12    answered.

13                 MR. MOORE:  It was asked.  It wasn't

14    answered.

15         Q.      Did you write it yourself or did someone

16    else write it for you?

17         A.      I think I just answered the question.

18    The coalition developed the written document.  We all

19    reviewed it.  We all agreed to it and it was signed by

20    me as the representative of the coalition.

21         Q.      Okay.  Was there a primary author of it?

22                 MR. INGRAM:  Objection.  Asked and

23    answered.

24         Q.      Was there a primary author of it, Ms.

25    Murphy?

Page 83

1          A.          It was developed by the coalition,

2     reviewed by the coalition, and finalized by the

3     coalition and I presented it at the hearings.

4          Q.          Okay.  Do you know why that was emailed

5     instead of -- by the NAACP LDF counsel rather than you

6     sending it in directly?  Do you know why it was done?

7          A.          They are part of the coalition.  We are

8     not open because of COVID.  Most of our meetings were

9     done by Zoom.  And in terms of having the resources to

10    type up and get these documents to you, the LDF has

11    the resources to do that.

12         Q.          Okay.  And do they represent you in

13    addition to being part of the coalition?

14         A.          They're here today representing me.

15    They're here representing the desires of the coalition

16    because I'm simply here as the president of the NAACP,

17    one of the primary members for this coalition and who

18    spearheaded the initiative but they were a part of the

19    coalition, yes.

20         Q.          Okay.  So in this written testimony, you

21    claim that among South Carolinians that are old enough

22    to vote, black voters make up approximately 29 percent.

23    Is that accurate?

24         A.          Yes.

25         Q.          Okay.  How did you arrive at that number?

Page 84

1          A.        That's day-to-day data that everybody

2     knows.

3          Q.        How did you arrive at that number?

4                    MR. INGRAM:  Objection.  Asked and

5     answered.

6          Q.        Can you give me a specific answer as to

7     how you arrived at that number, President Murphy?

8          A.        I will.  I can give you an answer.

9          Q.        Yes, ma'am.

10         A.        I do -- I do -- I do and I have looked

11    at the population throughout the state by county and I

12    know the percentage.  That is something I have studied

13    not only for the reasons of this deposition but I have

14    studied intensely during the COVID which we -- still

15    exist so it's something that I typically follow in

16    terms of population, percentages of blacks, percentage

17    of whites and other ethnic groups.  So that is

18    something I routinely study, study.

19         Q.        And so you're familiar I guess that there

20    are two different ways to gauge the number of black

21    voters.  There's a phrase called any part black and DOJ

22    statistics, correct?  Are you familiar with both of

23    those?

24         A.        Excuse me?  What's your question again?

25         Q.        Are you familiar with the phrase -- that

Page 85

1    there may be different ways to count whether these

2    percentages -- for example, there's a statistic that

3    uses the DOJ app and there's a statistic that uses the

4    phrase any part black.  Are you familiar with those?

5         A.      Let me just say when I study the

6    population, I studied in terms of ethnic groups.

7         Q.      Okay.  All right.  And have you reviewed

8    the figures based on the 2020 census data?

9         A.      Yes, I have.

10        Q.      Okay.  And are you aware that if you look

11   at the figures from the 2020 census data, the figure

12   using the any part black criteria is 25.28 percent?  Are

13   you familiar with that?

14        A.      I can't say that I am.

15        Q.      Okay.  And are you familiar with the fact

16   that if you use the 2020 census data using the DOJ

17   criteria, the number is actually lower?  It's 24.59

18   percent.  Are you familiar with that?

19        A.      Any part black?

20        Q.      No, ma'am.  I said if you use -- if you

21   use the criteria for any part black, the figure is 25.28

22   percent, and if you use the DOJ criteria, it's 24.59

23   percent.  Are you familiar with that?

24        A.      No.  I'm familiar with the 27, 28.  A

25   higher number.

Page 86

1          Q.        Okay.  Do you have any reason as we sit

2    here today to dispute that if you use the 2020 census

3    data that using the criteria for any part black, the

4    figure is 25.28 percent?

5          A.        I'm not going to dispute it but I again

6    state when I look at the data, I'm looking at black

7    and white primarily and other ethnic groups.

8          Q.        And do you have any reason to dispute the

9    figure that when you use the DOJ criteria, black voters

10   of voting age population are actually 24.59 percent of

11   the South Carolina population?  Do you know that?

12         A.        When you're talking black voter

13   population --

14         Q.        Well, you claimed --

15         A.        No.  No, let me clarify it.  I know

16   about black voter population.  Are we talking about

17   black voters that actually -- are we looking at age or

18   are you -- what is it that you're inferring?

19         Q.        Well, you used the words in your

20   testimony among South Carolinians that are old enough to

21   vote, black voters make up approximately 29 percent.

22   That was your testimony delivered on November 10, 2021

23   well after the census data had been published.  Is that

24   right?

25         A.        Yes, and I stand by that.

Page 87

1          Q.        Okay.  All right.  But do you have any

2     reason to disagree with me that when you actually look

3     at the census data numbers that the figures are actually

4     closer to 25 percent, a little over 25 percent if you

5     use the criteria for any part black, and 24.59 percent

6     if you use that criteria?  Do you have any reason to

7     dispute that record, President Murphy?

8          A.        At this point, I would say that I would

9     have to further review that data.

10         Q.        Okay.  All right.  Well, if I'm correct,

11    then the figure is closer to 25 percent than your 29

12    percent in your testimony, right?

13                   MR. INGRAM:  Objection.  Argumentative.

14         Q.        Please answer, Ms. Murphy.

15         A.        I am saying at this point -- you had

16    stated what you have reviewed.  I at this point have

17    no reason to dispute what you are saying but I stand

18    beside those numbers in terms of the black voter

19    population at the 28, 29 percent.

20                   MR. MOORE:  So let's put up Number 6,

21    Ms. Rabon.

22         Q.        Because you testified at another hearing.

23    Is that right?

24         A.        Yes, I did.

25         Q.        At least one other hearing?

Page 88

1          A.       Yes, I did.

2          Q.       Okay.  All right.  And how did you

3    prepare for that live testimony?

4          A.       How did I prepare?

5          Q.       Yes, ma'am.

6          A.       Basically the same as I did for others

7    in terms of basically the coalition met, the coalition

8    had discussions, and my reports were based on what

9    we -- our decisions regarding what the mapping

10   revealed and the impressions of the coalition.

11                    (Whereupon, Defendant's

12                    Exhibit 5 was marked for

13                    identification.)

14         Q.       Okay.  And so I want to pull up your

15   testimony for a minute.  I believe it's loading and I

16   apologize that it takes so long to load.  Technology is

17   a wonderful thing when it works.

18         A.       I agree.

19         Q.       I'm of an age where we didn't have so

20   much technology and I'm not so sure that all this

21   technology is a good thing but I'm not going to ask you

22   whether you agree or disagree with that statement, Ms.

23   Murphy.

24         A.       I'm not going to tell you my age.

25         Q.       And as I said, I didn't ask.  As I said,

Page 89

1    I always hate to ask a lady her age.  My mama taught me

2    better than that.  Well, while we're trying to pull that

3    up, I'm just going to read you a section.  You use the

4    phrase "but we are at this time dependent on you in

5    terms of drawing maps that are competitive, maps that

6    looks to -- ensures communities of interest, not packing

7    or cracking".  Do you recall saying that?

8         A.     Yes, I do.

9         Q.     Okay.  How do you define the term

10   communities of interest, Ms. Murphy?

11              MR. INGRAM:  Objection.  Calls for a

12   legal conclusion.

13        Q.     Can you please answer the question, Ms.

14   Murphy?  I know you just looked at Mr. Ingram.

15        A.     The communities of interest --

16        Q.     How do you define -- how do you define

17   it?

18        A.      It's defined by those individuals that

19   live within the community that have similar values in

20   terms of ethics.  They're areas contiguous of each

21   other and it's basically decided by those communities.

22        Q.     And I guess you would agree with me like

23   a municipality could have multiple communities of

24   interest, right?

25        A.     Yes.

Page 90

1        Q.      Okay.  And the larger the municipality,

2   the larger perhaps the number of communities of interest

3   in that municipality, right?

4        A.      You mean may be based on the

5   Constitution there may be more than one?  Is that what

6   you're asking?

7        Q.      I guess maybe that was a bad question so

8   I'll try to rephrase it.

9        A.      Okay.

10       Q.      I believe you told me you lived in

11  Brooklyn once.  Is that right?

12       A.      Yes.

13       Q.      Okay.  And Brooklyn is a part of New York

14  City, right?

15       A.      Yes.

16       Q.      Okay.  There are a number of different

17  communities of interest in Brooklyn.  Is that right or

18  wrong?  Would you agree or disagree?

19       A.      Yeah.  I would agree with that, yes.

20       Q.      And there are also a number of different

21  communities of interest in Manhattan which is right

22  across the river, right?

23       A.      Yes.

24       Q.      Okay.  The larger the municipality, the

25  larger the number of communities of interest generally.

Page 91

1     Would you agree or disagree with that?

2          A.     That may be true but we do have some

3     guidelines that we must follow in terms of numbers

4     that -- constitutional numbers that are -- when we

5     look at numbers in terms of how large a Senate -- the

6     number of people that can be in a Senate district or

7     House district, those are very different.  So, you

8     know, depending on the population, then that may

9     change, yes.

10         Q.     I'm just asking you questions about

11    municipalities so I'm going to get there later.  You

12    also use the phrase -- so after the word communities of

13    interest -- and now this document is up on the screen --

14    you use the words not packing, not cracking.  Do you see

15    that?

16         A.     I can't see it but I recall using those

17    words.

18         Q.     Okay.  What does packing mean to you?

19         A.     Packing means to me having a greater

20    number of -- for example, a district that's composed

21    of 65 percent or 75, maybe even 80 percent of black

22    individuals when that dilutes the voting strength of

23    the black population in an area.

24         Q.     And is there a magic number that gets to

25    packing in your view?

Page 92

```
 1        A.       Well, I'm going to say it becomes

 2   questionable when there's no need to when we're

 3   greater than fifty percent or greater.

 4        Q.       When you say the "we", who is the "we" to

 5   whom you refer?

 6        A.       Well, I guess what I'm saying fifty

 7   percent, when I say we -- I'm saying we have a

 8   population for a district that's 65 percent or 70

 9   percent black individuals when it could have been

10   configured in another way to allow the opportunity for

11   another individual to represent the community.

12        Q.       Again I guess that depends on one's

13   definition of community, right?

14        A.       Yes.

15        Q.       Okay.  You use the word cracking, okay.

16   What does that term mean to you?

17        A.       Intentionally dividing a district in

18   such a manner that there are -- and really these

19   communities are communities of interest, very similar

20   interests and they're divided.

21             The district is drawn in such a manner

22   and that happens in -- it could happen in cities or

23   counties where they are divided and they have two

24   representatives that may think totally different

25   because they may be paired with someone that's not of
```

Page 93

 1    the same mindset that they are.

 2         Q.        You used the word intentional.  Is that

 3    right?

 4         A.        Did I use that, intentional?  I said --

 5         Q.        No.  I believe you used the word -- when

 6    I asked you that question, you used the word

 7    intentional.  Is that right?

 8         A.        I don't know.  Did I -- what I intended

 9    to say was that districts, they are drawn that way.

10    Whether it's intentional or not, I can't say but they

11    are drawn in such a manner that it dilutes the black

12    person's ability to vote.  Not ability but in terms of

13    the impact, influence of their vote.

14         Q.        And then you went on to use the phrase,

15    we hope you won't do that and we look to hopefully see

16    more of us sitting in these seats the next time we come

17    around.  What did you mean by that?

18         A.        Well, that was explaining to them what

19    the hope was in terms of redistricting that it would

20    be done in a fair manner and it would be done to

21    reflect constitutional requirements as well as not

22    packing and cracking districts.  That was a request.

23         Q.        When you use the term "us" and then you

24    use the term "we", who is the term "us"?  "Hopefully

25    more of us sitting in these seats."

Page 94

1          A.      Black people.

2          Q.      Okay.  So you're basically saying you

3     would like to see more African Americans or black people

4     serving in the Legislature.  Is that right?

5          A.      At least have an opportunity to serve,

6     yes.  And with the current plan, that opportunity has

7     decreased.

8          Q.      Do you know -- and how about giving me

9     some specific evidence to back that up?

10         A.      You can look at the Columbia or the

11    Richland County area.  It's very evident.  It's there.

12         Q.      Give me some specific evidence to back

13    that up.

14         A.      The way the lines are drawn now, we

15    have blacks that are -- will be competing against each

16    other so that's one less representative for those

17    communities.

18         Q.      Are you referring to Representative

19    Brawley and Representative Johnson?

20         A.      No.  I'm talking about more than that

21    in the Columbia area.

22         Q.      Elaborate, please.

23         A.      I'm not talking about individuals.  I'm

24    talking about opportunities for black people to be

25    able to have the opportunity to decide whether or not

Page 95

1    they want to run for office and that opportunity no

2    longer exists.  I'm not talking about individuals and

3    I think I made that very clear from the onset.

4              I have never -- we have never -- we

5    have not considered incumbents and their positions.

6    We've looked at opportunities for representation.

7         Q.     Do you know how many African American

8    representatives currently serve in the House of

9    Representatives after the 2020 election?

10        A.     Yes, I know.

11        Q.     How many?

12        A.     Currently we have twenty-four which

13   will be reduced by three.

14        Q.     Twenty-four or thirty-four?

15        A.     We don't have thirty-four.

16        Q.     I'm asking you.

17        A.     No.

18        Q.     You believe that there are twenty-four

19   African American representatives in the House.  Is that

20   right?

21        A.     At least.  At least that, yes.

22        Q.     When you say at least that, what do you

23   mean?

24        A.     Well, I am saying I'm not looking at a

25   document right now but I know that looking at those

Page 96

1    districts and there has been a decrease in the number

2    of opportunities for blacks to be represented.

3         Q.       I'm going to look at a document and I'm

4    going to ask Ms. Rabon to pull up a document that we

5    just got last night.  Okay.  And it's taking us a few

6    minutes, some time to digest them and we're not done

7    digesting.

8              MR. MOORE:  Could you pull up Number 23,

9    Ms. Rabon?

10        Q.       And do you recall if you were at a

11   meeting of the SC State Conference of the NAACP

12   reapportionment committee minutes meeting that was on

13   June 21, 2021?  Do you recall if you were at that

14   meeting?

15        A.       What minutes are you talking about?

16        Q.       Minutes that were provided to us

17   yesterday.  I'm trying to pull them up.

18        A.       Okay.

19        Q.       So take a moment.

20        A.       Okay.

21             MR. MOORE:  You have to show her

22   documents through this -- we're probably going to take

23   a lunch break after I get done with these questions.

24             THE DEPONENT:  Okay.

25             MR. MOORE:  In fact, if you want to

Page 97

1    take -- how long is it going to take for you to get

2    that up, Ms. Rabon?  Ms. Rabon, if he clicks to

3    refresh, should it be available to him?  Is it

4    available to you, Ms. Mann?

5                  THE COURT REPORTER:  No.

6                  MR. INGRAM:  Let me check.  What exhibit

7    number is it?

8                  MR. MOORE:  Twenty-three.  What do you

9    mean it's 6 in this?  I know but I marked it Exhibit

10   Number 23.  So are you telling me now it has to be

11   Exhibit Number 6?  Exhibit Number 6 then.

12                  MR. INGRAM:  Yes, I have it pulled up.

13                  (Whereupon, Defendant's

14                  Exhibit 6 was marked for

15                  identification.)

16       Q.      Have you seen this document before, Ms.

17   Murphy?

18       A.      I'm sure I have.

19       Q.      And so are these minutes of a

20   reapportionment committee meeting?

21       A.      Yes.

22       Q.      Okay.  And it lists a number of people in

23   attendance including you.  Is that right?

24       A.      Yes.

25       Q.      Okay.  It lists Attorney Charles Boykin.

Page 98

```
 1    Who is he?

 2         A.      He is a member of our executive

 3    committee.

 4         Q.      Okay.  When you say "ours", you mean your

 5    branch -- I mean your state conference's executive

 6    committee?

 7         A.      Yes.  Yes.

 8         Q.      And who is Amelia Glisson?

 9         A.      She is the administrative assistant.

10         Q.      Who is Jennifer Tague?

11         A.      She's from AFL-CIO.

12         Q.      Who is John Ruoff?

13         A.      Ruoff.  Dr. John Ruoff is our

14    consultant.

15         Q.      Consultant for whom?

16         A.      For the state conference local

17    redistricting.

18         Q.      Okay.  Is he also someone who consults

19    with the League of Women Voters if you know?

20         A.      Yes.

21         Q.      Okay.  And there are a number of

22    attorneys listed on here, correct?

23         A.      Yes.  Let me see.  Yes, there are

24    several.  Yes.

25         Q.      Okay.  And included in that list is Ms.
```

Page 99

1   Aden who is in this call or in this deposition and Mr.

2   Cusick, correct?

3        A.      Yes.

4        Q.      Okay.  And there's also a person named

5   Adriel Cepeda.  Who is Adriel Cepeda?

6        A.      He was with ACLU.

7        Q.      Okay.  And so Mr. Cepeda states that

8   their desire is to ensure SC maps that come out of the

9   cycle are as fair and equitable as possible.  SC black

10  voter age population, BVAP, is 26.6 percent voting

11  population and desire for representation to be

12  proportional.  Do you see that?

13       A.      Yes.

14       Q.      Okay.  And that was of course before the

15  census data was released, correct?

16       A.      Yes.

17       Q.      Okay.  All right.

18       A.      And may I make a statement?

19       Q.      Yes, ma'am.

20       A.      As I mentioned, we started as a

21  group even before this coalition was formed.  We

22  started with our leadership group in terms of training

23  and I think I mentioned this earlier regarding what

24  the -- what redistricting was all about, how -- even

25  to the point of one -- South Carolina Proud (sic)

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 100

1    Academy.  I think you have a list -- I think you do

2    have that -- where we attended BVAPs training where it

3    introduced us to mapping, how to do mapping.  Some of

4    our members were very, very interested in doing that,

5    learning how to do that.  And it culminated eventually

6    with this group being formed.

7                Now as we look at the populations and

8    the BVAP and as we worked, you know, we have these

9    individuals that are partners and we work to --

10   towards as we work with the different learning how to

11   create maps, how to make sure we're looking at that

12   percentage there that was mentioned by Attorney

13   Cepeda.

14        Q.     Cepeda?

15        A.     Yeah, Cepeda.

16        Q.     And so he used the term BVAP.  That's his

17   term.  What does it mean to you?

18        A.     Black voters at the age -- at the age

19   to be able to vote.

20        Q.     Okay.  All right.  So I'm going to ask

21   you to flip over to the second page.  So scroll down,

22   Ms. Rabon.  Okay.  You see at the bottom or close to the

23   bottom that has another statement from Attorney Cepeda

24   and I'll read it.

25                It says we don't see an obvious

Brenda Murphy                                February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 101

1    representational gap in the State House.  Based on the

2    26.6 percent of black voters, we should have 33 black

3    representatives to be proportional and it has 34.  Do

4    you see that?

5         A.      I see that.

6         Q.      Okay.  And so Mr. Cepeda is saying, is he

7    not, that after the 2010 election cycle there are 34

8    African American representatives in the State House?

9         A.      I'm going to say that I -- yeah, I

10   don't know if it's a typo.  I can't say but I do know

11   that the number is not 34.

12        Q.      Well, he also --

13        A.      Unless he looked at -- unless he was

14   looking at the House and the Senate.  That may have

15   been, you know.  I'm not sure.

16        Q.      But it says based on -- we don't see an

17   obvious representational gap in the State House, right?

18   He says that?

19        A.      He says that but I would like to

20   comment this, to make a statement regarding whether

21   it's there -- whatever that reference is, that 34 is a

22   combination of the House and representatives.  What

23   we're looking now at our representation in the House

24   and that opportunity has decreased.

25               Also I can't -- you know, in terms

Page 102

1    of -- yes, when we look at population, the current

2    maps, when we look at the population and the number

3    that we will have the opportunity in terms of a black

4    individual being -- running for an office or elected

5    for an office, then that number has decreased.

6                    MR. MOORE:  Okay.  So we're going to

7    pause and have a lunch break here.  So Ms. Mann, how

8    long -- how much time has elapsed on our clock?  You

9    can tell me when we come back from the lunch break.

10   Is that right?

11                   THE COURT REPORTER:  Yes.

12                   MR. MOORE:  Okay.  So how long do y'all

13   need for lunch?

14                   THE DEPONENT:  I'm good.  You tell me

15   what you need.

16                   MR. MOORE:  Do y'all want to take a

17   thirty minute lunch break?

18                   MR. INGRAM:  That works.

19                   MR. MOORE:  Okay.  I certainly don't

20   think we need any longer than that, right?

21                   THE DEPONENT:  Okay.  No.

22                   MR. MOORE:  Okay.  So we will reconvene

23   then at 1:15.

24                   THE DEPONENT:  Okay.  Thank you.

25                   MR. MOORE:  Thank you.

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 103

1              (Lunch recess.)

2        Q.        (BY MR. MOORE:)  So Ms. Murphy, during

3    the lunch break, did you consult with either Mr. Ingram

4    or anybody else who is your counsel?

5        A.        No.

6        Q.        Did you have any discussions with them

7    about the substance of this testimony?

8        A.        No.

9        Q.        Okay.  All right.  So I'm going to go

10   back to that document.  Thank you.  And while we do, I'm

11   assuming, Ms. Murphy, that you know Mr. Cepeda, correct?

12       A.        Yes, by virtue of being a part of this

13   coalition.  He was for a while and then he was

14   replaced by someone else in the organization.

15       Q.        But you don't have any reason to believe

16   that his counts would be inaccurate, do you?

17       A.        You know, as I said before, the

18   numbers -- I don't know if he was considering all of

19   the -- you know, the Senate as well as the House.

20       Q.        Okay.  Well, are you absolutely certain

21   that your count is correct because I will tell you that

22   Mr. Parente's count mirrors Mr. Cepeda's count with

23   respect to the number of African Americans who were in

24   the House after 2020 election.  So do you have any

25   reason to doubt Mr. Cepeda's figures?

Page 104

1          A.        You are saying that there are 34

2     African American representatives in the House.  Is

3     that what you're saying?

4          Q.        Well, I'm asking a question.  Mr. Cepeda

5     says that based on the 26 percent of black voters, we

6     should have 33 black representatives which is a

7     representative in the House and it has 34.  His math

8     agrees with mine.  Do you have any reason to dispute

9     that?

10               MR. INGRAM:  Objection.  Argumentative

11    and asked and answered.

12         Q.        Ms. Murphy, you may answer.

13         A.        My answer doesn't change from the

14    previous answer that I gave.

15         Q.        Okay.  Well, would you agree with me that

16    if there are 34 -- if there were 34 African American

17    representatives in the House of Representatives, then

18    that would be a greater proportional number than the

19    26.8 figure that is referenced?  Would you agree with

20    that, Ms. Murphy?  And that's a yes or no.

21         A.        Thirty-four is greater than 26, 28.

22         Q.        Okay.  And it's pretty clear, is it not,

23    if you read the next line that he's only talking -- in

24    subparagraph one in your notes, he's only talking about

25    representatives in the House because he then goes on to

Brenda Murphy                           February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 105

1    say the Senate just needs one more seat to be held by a

2    black candidate to be proportional, correct?  He breaks

3    it out in terms of House and Senate, does he not?

4           A.      From what I'm reading, yes.

5           Q.      Okay.  And you told me earlier that you

6    studied the census figures.  Is that right?

7           A.      Yes, I did.

8           Q.      Okay.  And so you are aware that the

9    percentage of African Americans in the 2020 census, the

10   percentage of African Americans with respect to --

11   African Americans over the age to vote has decreased

12   rather than increased since the 2020 census, correct?

13          A.      Yes.

14          Q.      Okay.  And the 2020 census indicates that

15   there are a fewer percentage of African Americans in

16   South Carolina than were in the 2010 census.  Correct or

17   incorrect?

18          A.      Yes.  That's correct.

19          Q.      Okay.  And so if currently there are --

20   if based on the -- well, I'm just going to move on.  I'm

21   going to move on.  I think I've made my point.  Let me

22   ask you this question.  Did you record a video?

23          A.      I recorded -- yes, I have.

24          Q.      All right.

25          A.      It's not regarding redistricting per

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 106

1    se, no.

2         Q.        Did you record a video saying Behind the

3    Lines, Repercussions of Redistricting, Commentary and

4    Perspectives by Brenda Murphy, the NAACP dated December

5    6, 2021?  Did you record such a video?

6         A.        I would need to see what video you're

7    talking about.

8                        (Whereupon, Defendant's

9                        Exhibit 7 was marked for

10                       identification.)

11        Q.        Put up Number 8 and show her -- what is

12   my Number 8.  I guess this would be Number 7.  Is that

13   right?  And we circulated the link.  Are you going to

14   need me to play this video in order for you to tell me

15   if you recorded a video dated December 6th --

16        A.        I would need to see it, especially if

17   it's regarding redistricting.  Yes, I would.

18        Q.        Okay.  Do you see that video up on the

19   screen?

20        A.        We're trying to find it.

21        Q.        Is it on the screen now?  I believe it's

22   on the screen.  Is that you, Ms. Murphy?

23        A.        Yes.

24        Q.        Okay.  Commentary and Perspectives,

25   Behind the Lines, Repercussions of Redistricting.  Did

Brenda Murphy                                February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 107

1   you -- pause the video for a minute.  Okay.  So Ms.

2   Murphy, you see here that it says Behind the Lines,

3   Repercussions of Redistricting, Commentary and

4   Perspective by Brenda Murphy, NAACP, and underneath it

5   shows views, December 6, 2021.  Is that right?

6        A.     I think that's what it says but I think

7   I need to hear the contents because that's the first

8   I've seen it labeled that way.

9             MR. MOORE:  Okay.  How long is it,

10  Mr. Parente?

11       Q.     I'm not going to play the entire nineteen

12  minutes.  I'm going to play a minute or two and then I'm

13  going to ask you some questions.

14            (Video playing.)

15       A.     That is the not same video, sir.

16            (Video playing.)

17       A.     Sir?

18            MR. MOORE:  Pause it.  Pause it.

19            (Video stopped.)

20       A.     Unless you need to play that entire

21  video --

22       Q.     I don't.

23       A.     Okay.  What it said on that video, it's

24  basically what I've said throughout this meeting, that

25  we saw the importance of providing education to our

Page 108

1    members and others interested regarding the

2    redistricting process.  There is nothing in there

3    derogatory about what has -- any outcome or anything

4    else.  It was just basically related to preparing the

5    community to understand what redistricting is all

6    about and how we did that.

7           Q.      That wasn't in response to a question but

8    now are you familiar with the video that I'm talking

9    about, Ms. Murphy?

10          A.      Yes, I am.

11          Q.      Okay.  All right.  And that's you on the

12   video.  Is that right?

13          A.      Yes, it is.

14          Q.      Okay.  All right.  And do you disagree

15   with me you said that there was gerrymandering in the

16   process?  Do you disagree with me that you used those

17   words?

18          A.      I said that here today.

19          Q.      So you say that there's gerrymandering.

20   Is that correct?  In the House districts?

21          A.      Yes.

22          Q.      Okay.  Do you mean political

23   gerrymandering or racial gerrymandering, Ms. Murphy?

24          A.      Racial gerrymandering.

25          Q.      You had to think for a moment.  What does

Brenda Murphy                           February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 109

1   the term --

2         A.      No.  I paused -- I paused to give my --

3   to -- I didn't stop to think.  I stopped before I

4   answered because I needed to take a breath before I

5   answered your question because I wanted to answer in a

6   manner that is respective because I have said to you

7   repeatedly over and over and over again that, yes, I

8   do believe gerrymandering occurred.  I have defined

9   splitting and gerrymandering so I think I made that

10  clear.

11        Q.      Okay.  Well, here's my question to you,

12  Ms. Murphy.  What does the term racial gerrymandering

13  mean to you?

14        A.      With populations -- well, I'll tell

15  you.  In terms of how neighborhoods have changed, in

16  terms of the population ages and how lines are drawn

17  and -- I'm not going to say intentionally or

18  unintentionally.

19              As I said before, it's what happens,

20  the end result, the outcome in terms of how those

21  lines have been drawn.  Maybe now we have communities

22  drawn in such a way that we are packing black people,

23  too many together in a community which dilutes the

24  potential for individuals to be a part of our

25  political process here in the state of South Carolina.

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 110

1        Q.        Do you believe that the NAACP's proposed
2   maps engage in racial gerrymandering, Ms. Murphy?
3        A.        No, I do not.
4        Q.        And why not?
5        A.        Because I think they were drawn in such
6   a way considering all of the factors that needed to be
7   considered.
8        Q.        Okay.  So I want you to tell me why you
9   believe that the House maps were not drawn in a manner
10  based on considering all the facts that needed to be
11  considered?
12       A.        I think I just answered that.
13       Q.        To use your words.  To use your words.
14       A.        I just answered that.
15       Q.        And I want you to answer it again.  Why
16  do you believe that the House maps failed to consider
17  all of the factors that needed to be considered, to use
18  your words?
19       A.        I'm not able to answer that because I
20  don't know what was in the minds of that committee
21  when they drew the lines.
22       Q.        But you understand that racial
23  gerrymandering has a purposeful connotation, correct?
24       A.        Yes, I do.
25       Q.        Okay.  All right.  So as we sit here

Page 111

1    today and we are in February, your first lawsuit was

2    brought on October the 12th.  Your amended complaint was

3    brought a couple of days before Christmas.  I believe it

4    was brought on December 23rd.

5                As we sit here today, I would like you to

6    tell me as we sit here today what facts or evidence you

7    have to support the allegation that the House engaged in

8    racial gerrymandering to the detriment of minority

9    votes.

10                MR. INGRAM:  Objection.  President Murphy

11   is not a lawyer.  She's merely answering from her own

12   perspective.

13                MR. MOORE:  And I'm asking from her own

14   perspective, Mr. Ingram, so I'm expecting an answer.

15        A.      I am not an attorney but I do know that

16   when you look at the maps in terms of how they are

17   presently drawn, the mapping, that there is packing in

18   some of the areas in terms of the community.

19        Q.      You also said in this video presentation

20   that there was splitting of communities.  Is that right?

21        A.      You know, I think -- I think we do need

22   to listen at the whole -- you need to share that with

23   me because I think what I talked about is we needed to

24   be aware and, you know, we watch for -- you know,

25   gerrymandering could be an issue.  Splitting should

Page 112

1    not occur.  So maybe I do need to hear my own words.

2            Q.      Well, we might do that at the end because

3    I'm going to shift for a moment and I'll give you an

4    opportunity to listen to this entire video but here's my

5    question to you.  Do you believe that communities were

6    split?

7            A.      In my opinion or the opinion of the

8    group?

9            Q.      I'm asking for you --

10           A.      No, I'm not speaking on behalf of

11   myself here today.  I'm speaking on behalf of the

12   coalition so I will say to you the coalition in terms

13   of our meetings, yes.

14           Q.      But you're being deposed individually,

15   okay.  And so my question to you is do you believe that

16   communities were split?

17                   MR. INGRAM:  Objection.  Asked and

18   answered.

19                   MR. MOORE:  Asked.  Not answered.

20           Q.      Please answer the question, Ms. Murphy.

21   Do you believe communities were split?

22           A.      I am answering this as a member of the

23   coalition, not as Brenda C. Murphy because I was asked

24   to be -- I'm here representing the South Carolina

25   State Conference.

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 113

1        Q.      Ma'am, you're here because I issued --
2   your lawyers agreed to produce you and we sent a notice.
3   That's why you're here.  And so my question -- and if
4   you're not going to answer my question, just tell me
5   you're not going to answer it.  Do you believe that
6   communities were split?
7               MR. INGRAM:  Objection.  Asked and
8   answered and badgering the witness.
9        Q.      Are you going to answer my question, Ms.
10  Murphy?
11       A.      I've answered your question.
12       Q.      Do you believe that communities were
13  split?
14       A.      I've answered your first question, sir.
15  My answers are based on the coalition.
16       Q.      Okay.  And so if your answers are based
17  on the coalition, which is a little inconsistent with
18  what Mr. Ingram said at the beginning of this
19  deposition, but if your answers are on behalf of the
20  coalition, can you explain exactly which communities the
21  coalition identified prior to the filing of this lawsuit
22  as communities that were split?
23       A.      I'm not -- I'm not prepared to answer
24  that question today.
25       Q.      So you can't answer that question.  Is

Page 114

1    that right, Ms. Murphy?

2          A.      How many communities do we have listed?

3          Q.      I'm not here to answer questions.

4          A.      Okay.  That's why I'm not going to

5    answer that question today.

6          Q.      Okay.  When will you be able to answer

7    that question, Ms. Murphy?

8                  MR. INGRAM:  Objection.  We've already

9    had a discussion about the challenged districts.

10   Overlap of the subject matter so asked and answered

11   objection applies here as well.

12                 MR. MOORE:  You are giving speaking

13   objections to give hints to the witness on how to

14   respond, Mr. Ingram.  Please stop it.

15         Q.      Ms. Murphy, can you identify any specific

16   community that you or the coalition contends was

17   inappropriately split today?

18         A.      Of course I can.  Richland County.

19         Q.      Richland County is a community, is that

20   right, to you?

21         A.      There were areas in Richland County

22   that were split.

23         Q.      Okay.  Can you explain all of the

24   communities that you believe were split and how you

25   believe they were split?

Brenda Murphy                                      February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 115

1          A.      I think that's an unfair question and I

2    will not answer that because you are asking me to

3    respond to information where there is quite a few

4    districts that we're talking about that have already

5    been identified.  I have no access to my notes, no

6    access to any written material, and I'm not going to

7    respond off the top of my head.

8          Q.      How would you be able to respond to that

9    question?  What would it take you to be able to respond

10   to that question, Ms. Murphy?

11         A.      For you to give me -- you want to show

12   the districts that were identified?

13         Q.      I'm going to go over a number of

14   districts, Ms. Murphy.  I'm going to do that.  Yes,

15   ma'am, I am.  You told me a few minutes ago that you

16   weren't prepared to do it today.  So what would it take

17   to allow you to be prepared to identify all of the

18   communities that you believe were split?

19         A.      Review my documents.

20         Q.      What documents are you talking about?

21         A.      I'm talking about the testimony that

22   was given.

23         Q.      Okay.  I believe -- do you agree that you

24   said that the ad hoc committee was not transparent in

25   how they defined communities of interest?

Brenda Murphy                                February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 116

1          A.     That they were not transparent?

2          Q.     Yes.  Do you recall saying that you

3     believe that the ad hoc committee was not transparent in

4     how they defined communities of interest?

5          A.     When did I say -- oh, you mean -- you

6     mean ad hoc committee for the House.

7          Q.     Do you recall saying that in the video

8     that the ad hoc committee was not transparent in how

9     they defined communities of interest?  Do you recall

10    saying that?  Yes or no.

11         A.     I recall -- and I probably said this

12    during the hearing as well -- that we needed more

13    transparency in terms of how communities were defined.

14         Q.     How do you define communities of

15    interest?

16         A.     Well, that could be several ways.

17         Q.     Okay.  And different people could define

18    communities of interest in different ways.  Is that

19    right?  Do you agree or disagree with that?

20         A.     I agree with your definition.

21         Q.     Okay.  I don't believe that was a

22    definition.  My question was do you agree or disagree

23    with me that different people can define communities of

24    interest different ways?

25         A.     Yeah, that's true.

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 117

1        Q.      Okay.  And do you recall saying that the
2    ad hoc committee was not following the law?
3        A.      No.  When I spoke, I always said that
4    the ad hoc committee, we ask that they follow the
5    Constitution and comply with their criteria in terms
6    of defining districts.
7                MR. MOORE:  You know, I hate to do this
8    but I think that we need -- I think she's correct that
9    we need to listen to this video so we're going to
10   listen and then I'm going to pause and ask some
11   questions as we go along.
12               (Video playing.)
13               MR. MOORE:  Can you pause it for a
14   moment, Ms. Rabon?
15               (Video stopped.)
16       Q.      So you said there was gerrymandering.
17   Okay.  Again what evidence did you have to support that
18   when you went on to make this video, Ms. Murphy?
19       A.      Do you know in what context I said
20   there was gerrymandering?
21       Q.      No.  In what context did you say there
22   was gerrymandering?
23       A.      I did not -- I did not reference any
24   House or House maps in terms of gerrymandering during
25   that -- when I did that presentation or that

Brenda Murphy                          February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 118

1    interview.

2          Q.      Okay.  Well, you --

3          A.      Gerrymandering is based on my general

4    knowledge.  Gerrymandering does occur.  It has

5    occurred in our black community.  We know that it has.

6    And, you know, to even ask that question has

7    gerrymandering occurred, yes, it has.  If you want a

8    yes or no question, yes, it has.

9          Q.      Okay.  My question is I believe you told

10   him in response to a question about the House districts

11   that had been criticized as gerrymandering that they

12   were gerrymandering.  Is that what you were saying?

13         A.      No, that was not what I was saying.

14         Q.      And then I believe -- let's keep going.

15                 (Video playing.)

16                 MR. MOORE:  Pause it for a moment.

17                 (Video stopped.)

18         Q.      I believe that you told him a minute or

19   two ago that you believe that communities had been

20   split.  What communities were you referring to at that

21   time?

22         A.      I was not referring to -- I did not

23   respond House or Senate.

24         Q.      I know, ma'am.  My question is when you

25   said that you believe that communities were split, what

Page 119

1    communities were you referring to when you made that

2    statement to Mr. Bailey?

3          A.       It was an overall statement.

4          Q.       You didn't have any specific community in

5    mind?

6          A.       He didn't ask me for a community.

7          Q.       Okay.  My question to you is did you have

8    a specific community in mind?

9          A.       Let me just say that gerrymandering has

10   been an issue -- it was an issue in the 2010

11   redistricting as well.  So this is not a new idea or a

12   new concept.

13                  So when we talk about gerrymandering

14   and when we were talking about gerrymandering in this

15   conversation, it was general -- a general statement

16   that, yes, it has occurred in this state.  It had no

17   relationship to the outcome in terms of what we are

18   dealing with today.

19         Q.       Okay.  So I mean you agree with me that

20   there were allegations made of gerrymandering in 2010

21   and 2010 cycle, correct?

22         A.       In the 2010 cycle?  There were

23   problems.  There were issues.

24         Q.       Okay.  And you recall that portions of

25   that lawsuit were dismissed and the Court, the three

Brenda Murphy                                February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 120

1    judge panel in that case, ruled --

2            A.      I don't recall, sir.

3            Q.      And are you -- let me finish.  Are you

4    aware that the Court ruled against those challenges?

5            A.      I don't recall, sir.

6            Q.      Okay.  Are you also aware that in the

7    2010 cycle when pre-clearance was still an issue that

8    the justice department pre-cleared the maps?  Are you

9    aware of that?

10           A.      We have a different situation now.

11           Q.      That wasn't my question, Ms. Murphy.  I

12   would really ask -- you can explain your answer, okay,

13   but an answer is yes or no and then an explanation.  And

14   so I'm going to ask you to answer my question and then

15   explain your answer.  Are you aware that in 2010 the

16   justice department pre-cleared the House district?  Yes

17   or no.

18           A.      Yes.

19           Q.      Okay.  And are you aware that in 2010 the

20   challenged districts were upheld by a federal court?

21   Are you aware of that?  Yes or no.

22           A.      May I answer the question and then make

23   a statement?

24           Q.      You may.

25           A.      Yes, in 2010, that is true but we are

Brenda Murphy                          February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 121

1    dealing with a different situation now.  We are

2    dealing with the census that has shifted significantly

3    in certain places.

4          Q.      And when you say that we're dealing with

5    a census that has shifted, we have areas of the state

6    which have lost population, correct?

7          A.      I wouldn't say that they were the same.

8          Q.      I didn't say they were the same, ma'am.

9    I will restate my question.  We have areas of the state

10   that have lost population, correct?

11         A.      Correct.

12         Q.      Okay.  And we have areas of the state

13   that have gained population, correct?

14         A.      Yes.

15         Q.      Okay.  And those losses and gains dictate

16   to a substantial extent where districts need to be drawn

17   or re-drawn, correct?

18         A.      Yes.

19         Q.      And the African American population of

20   South Carolina according to the census is less -- the

21   black voting population is less in the 2010 census than

22   it was in the 2010 (sic) census.  Correct or incorrect?

23         A.      May I answer the question and make a

24   statement?

25         Q.      You may.  Yes, ma'am, you may.

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 122

1        A.        Yes, it has but there are several

2   variables that we need to be aware of.

3        Q.        And what are those variables, ma'am?

4        A.        In terms of the census, is it truly

5   reflective of the numbers of the black population and

6   maybe it's not.  And I'm making a statement here that

7   are we saying -- or a question.  Are we saying that

8   because of the perceived decrease in the black

9   population, we should decrease the number of African

10  American or black representatives in our House or

11  should we do everything we can to maintain at least

12  competitive districts.

13       Q.        Is that a statement?

14       A.        That's a statement.  I'm not asking for

15  an answer.

16       Q.        Okay.  I believe that -- do you recall

17  using the phrase -- and we can listen to this whole

18  recording if we need to.  Do you recall using the phrase

19  we need opportunity districts?

20       A.        I say that often.  I may have.

21       Q.        Okay.  What's an opportunity district?

22       A.        The opportunity for at least candidates

23  of our race, black people at least have the

24  opportunity to be considered as a candidate if they so

25  desire and have the potential of winning.  That does

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 123

1   not mean that they have to have a fifty plus

2   percentage to win but at least a reasonable

3   opportunity to win.

4         Q.     And I believe -- correct me if I'm

5   wrong -- you said at some point in this video that there

6   were at least four districts where you might lose

7   representation.  Do you recall saying that?

8         A.     Yeah, I did.

9         Q.     Okay.  What are those four districts?

10        A.     I didn't say district.  I said there

11  are four -- that we have the potential of losing four

12  representatives in the current districts that we have.

13        Q.     Who are those four representatives and in

14  which districts?

15        A.     I'm not going to give names of that

16  because I don't deal with names.  I'm dealing with

17  opportunities for individuals to be candidates.

18               (Simultaneous crosstalk.)

19        A.     -- those opportunities.

20        Q.     I believe that you told me that there was

21  four districts where you might lose representation.

22  Okay.  What four districts are you talking about?

23        A.     No, no.

24               MR. INGRAM:  Objection.  Asked and

25  answered.

Brenda Murphy                                February 4, 2022
The South Carolina State Conference vs. McMaste,

                                                    Page 124

1                MR. MOORE:  Asked again.  Not answered.

2        Q.      What's your response, Ms. Murphy?  Are

3    you going to identify those four districts for me?

4        A.      What I said during this interview was

5    basically there was the potential to lose

6    representation of four -- of four potential

7    opportunities to have representation.

8        Q.      And what are those four opportunities?

9        A.      Well, you know --

10       Q.      Ma'am?

11       A.      When you go through those counties,

12   those areas that have been defined, I will discuss

13   them at that time if it's okay.

14       Q.      So you're not going to answer my question

15   as I sit here and ask you what four areas?  You're not

16   going to answer that?

17               MR. INGRAM:  Asked and answered.

18       Q.      Is that right, Ms. Murphy?  Is that

19   right?  You're not going to identify them for me now?

20       A.      I will identify the counties if you

21   want me to.  Orangeberg County, Richland County, and

22   Florence County.  I think those are the four, four

23   areas -- three areas.

24       Q.      I think that's three.  I'll move on.  Ms.

25   Murphy, you mentioned the coalition and I'm not going

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 125

1    to -- because I'm not going to take the time to show you

2    each and every one of these letters but you're aware

3    that this coalition that you referred to, the redistrict

4    sent letters to the ad hoc committee.  Is that right?

5              A.     Yes.

6              Q.     Okay.  I believe that there was a

7    letter -- give you the dates.  There's one that's

8    undated.  There's one that's dated August 30, 2021.  One

9    that's dated September 27, 2021.  One that's dated

10   October 8, 2021.  One that's dated November 15, 2021.

11   One that's dated November 19, 2021 and one that's dated

12   November 30th.  Do you recall those letters?

13             A.     Yes, I remember -- I recall the letters

14   being forwarded.

15             Q.     Okay.  And you were a signatory on those.

16   Is that correct?

17             A.     I've explained why I was earlier in

18   testimony.

19             Q.     Okay.  Well, my question is were you?  Do

20   you agree with me you were a signatory on each of those

21   letters?

22             A.     Yes.

23             Q.     Okay.  Did you write any of those

24   letters?

25                    MR. INGRAM:  Objection.  Asked and

Page 126

1    answered.

2          Q.       Please answer my question, Ms. Murphy.

3          A.       As I explained earlier, the letters

4    were drafted by the coalition.  They were agreed upon.

5    They were edited prior to my signature being placed on

6    it.

7          Q.       Were they drafted by lawyers for the

8    coalition, Ms. Murphy?

9          A.       They were drafted -- well, I think in

10   terms of the letters being -- as I mentioned earlier,

11   the letters were composed by the coalition.  We put

12   our ideas and thoughts together.

13               The actual -- I stated to you earlier

14   our office is closed due to COVID.  I did not have the

15   resources to do those letters so they were done by I

16   think LDF in terms of the actual letter being

17   forwarded to the committee, the committee chair,

18   committee members.

19         Q.       Well, and each of the letters, I guess a

20   signature from one or more lawyers from the LDF is the

21   first signature.  Were they primarily drafted by the

22   LDF?  Just a yes or no and you can explain if you would

23   like.

24               MR. INGRAM:  Objection.  Asked and

25   answered.

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 127

1        Q.        Can you answer my question, Ms. Murphy?
2        A.        Do you want to know if they typed the
3    letters?  Yes, they typed the letters.
4        Q.        All right.  So are you --
5        A.        And they were again -- and may I add
6    and they were again reviewed by the coalition to make
7    sure that every point that we wanted included was
8    included.
9        Q.        All right.  So are you familiar with the
10    ad hoc committee's redistricting guidelines?
11        A.        You mean -- yes.
12        Q.        Okay.
13        A.        Guidelines.  In terms of compliance
14    with the Constitution, the one man, one vote,
15    communities of interest?  Are you talking that
16    criteria?
17        Q.        Ma'am, are you familiar that the ad
18    hoc -- I mean you studied what the ad hoc redistricting
19    committee put out on its website?  Is that a yes or no?
20        A.        Yes.
21        Q.        And are you familiar with the fact that
22    the ad hoc committee issued guidelines that they
23    intended to follow in performing their duty to comply
24    with the law?  Are you familiar with that?
25        A.        Yeah, I'm familiar with that.

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 128

1          Q.      Okay.  Have you reviewed those

2     guidelines?

3          A.      Yes, I have.  I wouldn't say that I

4     reviewed them today or this past week, no.

5          Q.      Okay.  Did you review those guidelines

6     before signing on to any of these letters if you know?

7          A.      Yes.

8          Q.      And these letters talk about complying

9     with section -- strike that.  I'm just not going to ask

10    that question.  Your letters raise the issue of

11    transparency.  Is that right?

12         A.      We always encourage transparency.

13         Q.      You are aware that there were at least

14    twelve public hearings across the state.  Is that right?

15         A.      I am aware but I also need to mention

16    that those hearings were held at times that were not

17    convenient for many and there were only two actually

18    scheduled virtuals which was near the end.  When you

19    look at that compared to what the Senate did, it was

20    not as widespread in terms of the community being able

21    to respond.

22         Q.      Well --

23         A.      Many more virtual opportunities for

24    Senate hearings than there was for the House.

25         Q.      Okay.  I don't think that's in response

Page 129

1    at all to my question and you keep adding as we go

2    along.  You didn't answer the question yes or no.

3    Here's my question.  Are you aware that that's more

4    hearings than the House has held in other cycles?  Are

5    you aware of that?  Yes or no.

6            A.      What's your question again?

7            Q.      Are you aware that this is more hearings

8    than the House has held previously?  Are you aware of

9    that?  Yes or no.

10           A.      Ten years ago, I wasn't as involved.

11           Q.      And are you aware that at least two of

12   the hearings included virtual testimony presentation --

13   participation and allowed members of the public to

14   attend virtually for both of those hearings?

15           A.      Yes.

16           Q.      Yes or no.

17           A.      I just stated that.

18           Q.      Okay.  So have you taken the position

19   that public input was not considered in the drafting of

20   these maps?

21           A.      I'm going to answer that public input,

22   yes, it was taken, but in terms of whether or not it

23   was enough, I'm going to say no.

24           Q.      Okay.  And on what do you base that?  On

25   what --

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 130

1              (Simultaneous crosstalk.)

2        Q.     Let me finish, ma'am.

3        A.     Okay.

4        Q.     On what evidence do you base your

5    position that public input was not appropriately

6    considered if that is in fact your position?

7        A.     Oh, in terms of public input being

8    considered?

9        Q.     Yes.

10       A.     If you look at the outcome of the maps.

11   And that's from testimony given by not only the NAACP

12   but others that were participated, that did

13   participate in the hearings.

14       Q.     Anything else that you have to add to

15   that?

16       A.     Nothing else.

17       Q.     One moment.  In the letter dated November

18   15, 2021, the letter that you signed onto, identified

19   certain districts that you asked the ad hoc committee to

20   reconsider after the release of its plan, right?

21       A.     Sir, would you please not say that I

22   asked.  It was the coalition's overall agreement that

23   those areas be identified.

24       Q.     Okay.  So your letter -- okay.  You

25   signed onto it, correct, ma'am?

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 131

1        A.        I signed onto it with the input of the

2   coalition.

3        Q.        Okay.  And so District 102, 103 and 111

4   were listed first.  Is that right?  And they were in

5   Berkeley and Charleston Counties, correct?

6        A.        I can't remember.  I don't have the

7   letter in front of me.  I didn't have the opportunity

8   to bring it up for review.

9        Q.        It was provided to your counsel and it

10  was noted for your counsel several days ago that we

11  intended to go over these with you.  So I reject the

12  consideration that you didn't have the opportunity to

13  review it.

14       A.        Yes, sir.

15       Q.        But if you'd like to look at it, I'll be

16  glad to show it to you.

17       A.        Go ahead.  What is your question?

18       Q.        Okay.  So it's the November 15, 2021.

19       A.        Sir, what is your question?

20       Q.        I'm going to put up the document and then

21  I'm going to ask you a question, okay, Ms. Murphy?

22       A.        Okay.

23                 MR. MOORE:  It's loading.  It should be

24  in your folder, Mr. Ingram.

25                 MR. INGRAM:  One second.

Brenda Murphy                                February 4, 2022
The South Carolina State Conference vs. McMaste,

                                                   Page 132

 1                  MR. MOORE:  What exhibit number is it on

 2      the PDF list, 7 or 8?

 3                  MR. PARENTE:  Number 8.

 4                  (Whereupon, Defendant's

 5                   Exhibit 8 was marked for

 6                   identification.)

 7                  MR. MOORE:  Is it not popping up?  Can

 8      you see it, Mr. Ingram?

 9                  MR. INGRAM:  Yes.

10                  MR. MOORE:  You can see it?

11                  MR. INGRAM:  Correct.

12          Q.      Okay.  All right.  So on the first page,

13      it says that you asked the committee to reconsider its

14      proposed boundary lines for House Districts 102, 103,

15      and 111.  Is that right?

16          A.      Yes.

17          Q.      Okay.  None of those districts were among

18      the challenged districts.  Is that right?  If you know.

19          A.      No.  No.  I can't -- I don't have my

20      list in here, sir, so I don't want to admit to any one

21      so -- do you have a listing of the districts that we

22      listed?

23          Q.      Yes, ma'am.  There's a complaint and it

24      was drafted by your lawyers and I'm going to go over it

25      in minute.  Do you know if those three districts are the

Brenda Murphy                              February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 133

1    in the challenged districts?  As you sit here today, do

2    you know?  Yes or no.

3           A.      Berkeley County -- you said Charleston

4    County?

5           Q.      Those three districts are in Berkeley and

6    Charleston County.  Do you know if you challenged any of

7    the Berkeley or Charleston County districts in your

8    lawsuit, Ms. Murphy?

9           A.      I know of challenges in those areas but

10   I'm not --

11          Q.      I'm going to move on.  I'm going to move

12   on and ask you about -- hold on for one moment.

13          A.      Okay.

14          Q.      I'm not going to spend a whole lot on

15   discussing what she did or didn't do.  So I'm going to

16   move on.  Okay.

17          A.      Okay.

18          Q.      I'm going to move on because I could

19   spend thirty minutes doing this and I don't know that at

20   the end of the day that's the best use of our time.

21          A.      Okay.

22          Q.      So what do you believe are traditional

23   redistricting principles in South Carolina?

24          A.      What they should be?

25          Q.      No.  What are to you traditional

                                             Page 134

1    redistricting principles?  Are you familiar with that

2    phrase?

3         A.      No.

4         Q.      Okay.  All right.

5         A.      In terms of traditional redistricting

6    preferences?  Is that --

7         Q.      Principles.  I used the words traditional

8    redistricting principles.  Are you familiar with that

9    phrase?

10        A.      No.  No, I'm not.

11        Q.      Okay.  Do you have any criticism of the

12   ad hoc committee's redistricting guidelines?

13        A.      The only comment that I said regarding

14   their guidelines was just in terms of being a little

15   bit more in what I say transparent, just more -- being

16   a little bit more clearer in terms of some of the

17   criteria, especially as it related to how communities

18   were identified, communities of interest.

19        Q.      Okay.  And I believe we touched on this

20   before but would you agree that a smaller geographic

21   area is more likely to consist of fewer communities of

22   interest?

23        A.      A smaller area?

24        Q.      Yes, ma'am.

25        A.      Now we just -- you know, we have to

Page 135

1  consider not just communities of interest because when

2  we are dealing with criteria, we also have to be aware

3  of the population.

4       Q.     I wasn't asking -- I wasn't asking you

5  about criteria at this point.  I'm asking you about

6  communities of interest.  Would you agree with me that

7  it's important to keep communities of interest whole?

8  Is that right or wrong?

9       A.     Yes, I agree with that.  I do.

10      Q.     All right.  And would you agree, for

11 example, that the town of Ridge Spring which has a

12 population of 579 might be a community of interest?

13      A.     There may be -- Ridge Spring.  There

14 may be other similar areas around that community.  You

15 know, it may be a little bit more widespread.  So

16 should a district be composed of -- just because it's

17 579 individuals in Ridge Spring doesn't mean that that

18 community could be larger than that when you look at

19 community of interest.

20      Q.     Okay.  Well, but you would agree with me

21 that you should take pains not to split communities of

22 interest.  Is that right?

23      A.     Yes.

24      Q.     Okay.  And you would agree with me that

25 you shouldn't split voting precincts, right, to the

Page 136

1    greatest extent?

2           A.      Yes.

3           Q.      Okay.  Would you agree with me that the

4    map that your organization proposed split way more

5    voting precincts than the map that was ultimately passed

6    by the House?  Would you agree or disagree with that

7    proposition?

8           A.      I will agree that there may have been

9    some more splitting but it provided the opportunity

10   for more -- no.  In terms of representation for

11   communities, there was an increase of opportunity to

12   do that.  So it was done in such a way to provide that

13   opportunity to us as black folk, as black people.

14          Q.      Do you consider the city of Columbia to

15   be one entire community of interest?

16          A.      We have to look -- I think what you

17   have to look at -- when we say a community of

18   interest, when you look at Columbia, South Carolina --

19          Q.      As an entire city, yes, ma'am.  Do you

20   consider that to be a community of interest, one entire

21   community of interest?  Yes or no.

22          A.      You're talking about the city of

23   Columbia or --

24          Q.      Yes, ma'am.  I'm talking about the city

25   of Columbia.

Brenda Murphy                                   February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 137

1          A.      The city of Columbia, yes.

2          Q.      Okay.  Do you consider the city of

3     Anderson to be a community of interest?

4          A.      Yes.

5          Q.      But did your map split the city of

6     Columbia?

7          A.      There was some splitting.

8          Q.      Okay.  And on what basis do you claim

9     that the city of Columbia is one solitary community of

10    interest?  Please explain that to me.

11         A.      We have to consider population.  We

12    cannot consider totally in terms of -- you know, we

13    have to follow the law.  We can't just say Columbia

14    has 509 -- a population of 509 so we're going to let

15    that be a district by itself when we know the number

16    is greater in terms of what the law permits.

17         Q.      Ma'am, I'm asking you a very simple

18    question and I would appreciate a simple answer.  On

19    what specific facts do you rely on to support your

20    position that the city of Columbia is one community of

21    interest?  And if you want to tell me that you no longer

22    take that position, fine, tell me that, but if you're

23    going to take that position, I want to know what

24    specific facts support your assertion that the city of

25    Columbia is one entire community of interest.

Brenda Murphy                                February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 138

1          A.      I need to ask you a question before I

2    answer that.  Do you live in Columbia?

3          Q.      Yes, ma'am, I do.

4          A.      Okay.  The city of Columbia is pretty

5    large in terms of population.  Would you agree to

6    that?

7          Q.      Well, I'm not going to engage in a back

8    and forth do I agree or disagree.

9          A.      Okay.  All right.  Well --

10                 (Simultaneous crosstalk.)

11         Q.      Let me stop you for a moment.  My

12   question was simply upon what do you rely to support

13   your assertion that you just made a few minutes ago that

14   the city of Columbia is a community of interest?  Just

15   tell me quickly if you can.

16         A.      The resources in the area.  What

17   happens in Columbia is different than what happens say

18   in maybe another part of the county.  Interest,

19   available resources to share.

20         Q.      How much time have you spent in Anderson?

21         A.      Let me -- I'll just share this with you

22   because I think you all need to know this and I think

23   I said this before.  I have traveled the state of

24   South Carolina.  I've gotten to know the presidents in

25   the different areas.  I visited different branches.  I

Page 139

1    have visited Anderson and the president from their

2    membership up there several times, a number of times

3    so I'm very familiar with Anderson.

4          Q.      All right.  And so --

5          A.      Have I visited -- I have visited -- I

6    can frankly say I visited every county in the state.

7          Q.      Okay.  All right.  So upon what specific

8    evidence do you rely on to support your assertion that

9    Anderson, the city of Anderson is one unitary community

10   of interest?

11         A.      You're talking the city or the county?

12         Q.      City.  Yes, ma'am.

13         A.      Again the same variables that I

14   mentioned in Columbia that are very different in

15   Anderson but they are similar to those individuals

16   that live in that area.

17         Q.      Okay.  I'm going to shift gears for a

18   moment.  Okay.  I believe that you provided some

19   training.  Is that correct?

20         A.      Training?

21         Q.      Yes, ma'am.

22         A.      Regarding the redistricting process?

23         Q.      Yes, ma'am.

24         A.      Yes.

25         Q.      Okay.  What sort of training did the

Brenda Murphy                                         February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 140

1    NAACP or its local branches receive on redistricting if

2    you know?

3          A.      I think I said that earlier.  Regarding

4    the process, regarding the importance of us being

5    involved in that process, and the importance of us

6    giving feedback to those that represent us.

7          Q.      And --

8          A.      I did not perform the training.  The

9    training was done by primarily Dr. Ruoff.

10         Q.      Okay.  And so what sort of training did

11   Dr. Ruoff put on?

12         A.      It was a classroom setting in terms of

13   just the redistricting process, those things that I

14   just talked about.

15         Q.      Did you pay him to conduct that training?

16         A.      He's a consultant, not -- he's a

17   consultant for us.  We pay him a minimal fee but just

18   for consultation.

19         Q.      Okay.  So who paid him a fee?

20         A.      We did.

21         Q.      Who is the "we"?

22         A.      The South Carolina State Conference.

23         Q.      Okay.  And when did you begin paying him?

24         A.      Last year in June.

25         Q.      2021?

Brenda Murphy                                February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 141

1          A.      Yes.

2          Q.      Was he also paid by the League of Women

3    Voters if you know?

4          A.      I don't know.

5          Q.      I believe you attended public hearings

6    where he has testified alongside Ms. Teague.  Is that

7    right?

8          A.      Yes, I did.

9          Q.      And let me ask you this question.  Was

10   Mr. Ruoff involved at all in the drawing of the maps

11   that you submitted for consideration?

12         A.      No, he was not.

13         Q.      Okay.  Who drew those maps?

14         A.      With our input, they were drawn by the

15   ACLU resource that had expertise in that area.

16         Q.      So who drew them?  Who?

17         A.      ACLU had a resource.

18         Q.      Who was that resource?  Who was the

19   person that did the drawing?

20         A.      I cannot answer that.  All I know is we

21   did not pay anyone for drawing up any lines and we

22   used individuals that had expertise that were on

23   our -- a part of our coalition.

24                 You know, we learned the basics about

25   methods, but in terms of that being critiqued and

Page 142

1    making us aware of certain variables that needed to be

2    considered and make sure that we were inclusive, that

3    was done by ACLU with someone with expertise in that

4    area.

5         Q.      So the ACLU drew your maps for you.  Is

6    that what you're telling me?

7         A.      With our input, yes.

8         Q.      Okay.  And do you know the name of the

9    person who was involved in drawing of the maps?

10        A.      I don't -- no, I don't.  I can't tell

11   you off the top of my head, no.

12        Q.      Have you ever heard that name?

13        A.      No, not the -- I can't tell you the

14   name of the person.  That is someone that has

15   expertise in that area.  We did not have the resources

16   or the funding to do that.  So you know that you have

17   to have certain programs to assist in that process and

18   so ACLU had that -- had that resource.

19              So with them being a part of coalition,

20   looking at past history, getting information from

21   those our presidents and others, then the maps were

22   drawn.  They were critiqued by NAACP members and

23   leadership and they were finalized before submission.

24        Q.      Okay.  But you don't know who did the map

25   drawing, right?

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 143

1          A.       I can't give you a name, no.

2          Q.       Okay.  Did you ever meet that person?

3                   MR. INGRAM:  Objection.  Asked and

4      answered.

5          Q.       Did you ever meet that person, Ms.

6      Murphy?

7          A.       No, I did not.

8          Q.       Okay.  Did you ever see a resume from

9      that person?

10                  MR. INGRAM:  Objection.  Asked and

11     answered.

12         Q.       Did you ever see a resume from that

13     person?

14         A.       I do not know the person, sir.

15         Q.       Okay.  All right.  So if you don't know

16     the name of the person and if you've never seen a resume

17     from the person, how can you tell me under oath that

18     that person had expertise in the drawing of maps?

19         A.       Based on the member of our coalition

20     that was ACLU.

21         Q.       You don't have any other evidence to

22     support that.  Is that right?

23         A.       No.

24                  MR. INGRAM:  Objection.  Asked and

25     answer.

Brenda Murphy                                February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 144

1      Q.      Did you personally participate in the
2    drawing of the maps?
3      A.      Yes.  Not putting the pencil to the
4    paper, but in terms of suggestions, what might needed
5    to be changed somewhat, if something was considered,
6    yes, I participated in this way.  No, I did not
7    actually draw a map.  Were there people that looked at
8    drawing maps during this process?  Yes, there were
9    people that looked at drawing maps and commenting
10   about what their thoughts were.
11     Q.      Did you have access to the addresses of
12   incumbents in drawing those maps?
13     A.      No.
14     Q.      Do you know if the members of the ACLU
15   that drew the maps who you can't identify had
16   information about the addresses of incumbents when
17   drawing maps?  Do you know?  Yes or no.
18     A.      No.
19     Q.      Okay.  So you can't tell me that --
20   strike that.  Did you have election data available when
21   drawing the maps?
22     A.      No.  We didn't per se, no.
23     Q.      Do you know if the people who drew your
24   maps had election data?
25     A.      Sir, that is something you will have to

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 145

1    ask ACLU.

2         Q.     Okay.  Do you know how many incumbents

3    your plan combined?

4         A.     That's public knowledge.  It's been in

5    the press.

6         Q.     Okay.  So are you aware that your plan

7    combined nineteen incumbents?  Are you aware of that?

8         A.     That what, our plan combined nineteen

9    incumbents?

10        Q.     Combined nineteen incumbents.  Yes,

11   ma'am.

12        A.     I know our plan -- I think in terms of

13   incumbents, there was greater opportunity for --

14        Q.     Ms. Murphy, Ms. Murphy --

15        A.     Yes.

16        Q.     -- I'm going to stop you.  I'm sorry.  I

17   asked you a very simple question.  I would really

18   appreciate an answer to the question.  Do you agree that

19   your plan combined nineteen incumbents?  Yes, no or I

20   don't know is an appropriate answer.

21        A.     I will answer but I would like to make

22   a comment.

23        Q.     Well, please do but how about answering

24   the question first and how about keeping the commentary

25   restricted to the subject matter of the question?

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 146

1          A.      Okay.

2          Q.      Did your plan combine nineteen

3     incumbents?

4          A.      Yes.

5          Q.      Now what do you want to say about that?

6          A.      What I would like to say is maybe there

7     were less but there was greater opportunity for black

8     people to be involved in the political process or the

9     political decision-making regarding black people.

10         Q.      Okay.  Do you know --

11                 MR. INGRAM:  Can we take a break?

12                 MR. MOORE:  Excuse me?

13                 MR. INGRAM:  We would like a break.

14                 MR. MOORE:  Okay.  Well, you're not

15    supposed to discuss her testimony during that break.

16    I'm happy to give you a five-minute break.

17                 (Brief recess.)

18         Q.      (BY MR. MOORE:)  Ms. Murphy, did you

19    speak to your counsel while you were away?

20         A.      No, I did not.

21         Q.      Okay.  So I believe we're at three hours

22    and thirty something minutes, and while I want to

23    endeavor to keep my questions under to five hours, it

24    will be a lot easier for me to do that if I get

25    responsive answers to questions rather than

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 147

1    nonresponsive answers and so I'm going to be a little

2    more stringent perhaps in to trying to police that as we

3    go forward.

4              So I believe that you told me a few

5    minutes ago that you understand -- you understood that

6    nineteen incumbents were in your plan combined.  Is that

7    right, Ms. Murphy?  That's a yes or no.

8              MR. INGRAM:  Objection.  Asked and

9    answered.

10        Q.    Okay.  Could you answer the question, Ms.

11   Murphy?

12        A.    In our plan?

13        Q.    Yes, ma'am.  In the NAACP plan, yes,

14   ma'am.

15        A.    That there were nineteen incumbents?

16        Q.    Yes, ma'am, combined.  Do you agree -- I

17   believe you told me a minute ago that you agreed.  Is

18   that right?

19        A.    No.

20        Q.    You don't agree now?

21        A.    I may be interpreting what you're

22   saying differently.  When I -- when I spoke -- if I

23   can comment, sir.

24        Q.    Ma'am, I'm not -- let me ask the

25   question.

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 148

1          A.      I need --

2          Q.      No, ma'am.  I'm going to stop you, okay.

3    I'm sorry.  I didn't ask you about when you spoke.  So

4    here's -- I mean if you mean when you spoke to me a few

5    minutes ago, then, yes, explain.  I'm not asking about

6    when you spoke to the House.  I'm not asking --

7          A.      No, no.  I'm not -- that isn't my

8    question.

9          Q.      Okay.  Then what's your question?

10         A.      My question is are you saying that with

11   our plan there -- and this is for -- I'm trying to

12   clarify it.  Are you asking me that our plan has the

13   potential for nineteen incumbents to remain?  Is that

14   your question?

15         Q.      No, ma'am.  Here's my question.

16         A.      Okay.

17         Q.      Are you aware -- and I believe this is

18   the exact question I asked a few minutes ago.  Are you

19   aware that nineteen current incumbents were combined --

20   that is, put against each other -- in your plan?  Were

21   you aware of that?

22         A.      No.

23         Q.      Okay.  And are you aware that of those

24   nineteen, seventeen of those incumbents were Republican?

25   Were you aware of that?

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 149

1          A.      No.  May I comment?

2          Q.      Go ahead.

3          A.      Our plan was developed without

4     considering incumbents.

5          Q.      Ma'am, are you sure of that because that

6     may contrast with public statements made by your lawyers

7     and other representatives so are you sure of that?

8     Ma'am?

9          A.      I'm thinking, sir.  I don't want to

10    give an incorrect answer.

11         Q.      And I'm trying to be as fair as I can.

12    That's why I'm asking that question.

13         A.      No.  I'm sorry.  I wasn't.  I have to

14    say no.

15         Q.      Okay.  All right.  Do you like that

16    figure, seventeen of nineteen are Republicans?

17         A.      Do I like it?

18         Q.      Yes, ma'am.  Does that sound like

19    something that looks like it was done -- that was not

20    the product of reverse political gerrymandering?

21         A.      Let me say this.  What we as the state

22    conference and our coalition -- our intent was not to

23    consider incumbents but to look at drawing a map that

24    would provide opportunities for competition, okay.

25    And that's all I can say because we didn't consider

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

                                                    Page 150

1    incumbents.  I'm sorry.

2         Q.      Is it generally preferable to keep

3    smaller counties whole when possible?  Would you

4    agree --

5         A.      Smaller counties?

6         Q.      Yes, ma'am.

7         A.      If it's possible to keep them whole --

8    small counties?  Yes, I think that should be done.

9         Q.      Is avoiding voter confusion one of the

10   goals of your organization?

11        A.      Yes.

12        Q.      Okay.  And does splitting voter precincts

13   increase or decrease voter confusion in your mind?

14               (Phone ringing.)

15        Q.      We're sorry.  My question was does

16   splitting voter precincts increase or decrease voter

17   confusion in your mind?

18        A.      It depends.  It could -- that's a maybe

19   question and I will say that depending on the size of

20   the precinct.

21               MR. MOORE:  Okay.  Can we pause for

22   just one moment and put that on mute for just one

23   second.

24               (Off-the-record discussion.)

25        Q.      So let me ask you this question.  And I'm

Page 151

1    sorry for that interruption.  Are you aware that the

2    number of precincts that were split in Act Number 117,

3    the act that are here to talk about, is 365?  Are aware

4    of that?

5         A.      Which -- it depends on the area.

6    What --

7         Q.      Let me ask this question.  Do you have

8    any reason to doubt that the plan that passed the House

9    and Senate with respect to the House districts only

10   split 365 districts, voting precincts?  Do you have any

11   reason to doubt that figure?

12        A.      No.

13        Q.      Okay.  Do you have any reason to doubt

14   the fact that 628 precincts were split in your plan?

15        A.      I know they were.  May I make a

16   comment?  May I make a comment?

17        Q.      Sure.  Sure, you may.

18        A.      Okay.  There are certain communities

19   greater in number and when you look at the number --

20   when you look at the number of precincts and numbers

21   that precinct may serve, it could contribute to

22   problems in terms of voters being able to cast their

23   vote.

24        Q.      Okay.  Well, let me ask you this, Ms.

25   Murphy.  You would agree with me that the plan, that the

Page 152

1    2011 plan that was upheld by a federal district court

2    split only 500 precincts, correct?  Would you agree or

3    disagree with that?

4          A.    Yes.

5          Q.    Okay.  And you would agree that the

6    number of precincts that were split by 117 was way less

7    than that, 365, correct?

8          A.    You're talking Berkeley?

9          Q.    No, ma'am, I didn't say Berkeley.  I

10   said --

11         A.    What county?

12         Q.    I said --

13         A.    I'm sorry.

14         Q.    I said in 2011, the bill that was enacted

15   into law and upheld by a three judge federal panel split

16   500 precincts.  Do you agree with that?

17         A.    Yes.

18         Q.    Okay.  The bill that was signed into law

19   here, the House plan, improves upon that by only

20   splitting 365 precincts, correct?

21         A.    Yes.

22         Q.    But your proposed plan would split 628

23   precincts, correct?

24         A.    Yes.  May I comment?

25         Q.    Yes, ma'am, you may.

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 153

1          A.        I'm sorry.  The population in South

2     Carolina has increased significantly, and when you

3     look at the number of precincts back then, it may have

4     been lower but we have a greater number of people to

5     serve as well as even then there were some precincts

6     that were problematic still with numbers increasing

7     since that 2010, 2011 in terms of when the plan --

8     precincts were -- the districts were determined and

9     precincts were determined.  So we had --

10                   (Simultaneous crosstalk.)

11         A.        Okay.  That's it.

12         Q.        Okay.  And I believe you agreed with me a

13    few minutes ago that splitting more voter precincts can

14    lead to more voter confusion.  Right or wrong?

15         A.        It can.  May I -- and I'm going to make

16    a statement.  It can if the information does not get

17    to the voters in the manner that it should.

18         Q.        All right.  I want to talk to you about

19    some challenged districts and you mentioned that you

20    were familiar with Anderson.  Is that correct?

21         A.        Yes.

22         Q.        Okay.  All right.  And can you explain

23    the allegations in your complaint with regards to

24    Anderson and splitting the city of Anderson?

25         A.        I think -- and I don't have that right

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 154

1     in front of me but I think it was related to in terms

2     of how that was split, some on one side of the highway

3     and some on the other side of the highway.  I mean

4     that contributes to problems itself when someone may

5     be living across the street from each other and

6     they're in different precincts.

7          Q.      Ma'am, are you telling me that your plan

8     doesn't split people across streets and highways and the

9     like?  Are you telling me that that doesn't happen in

10    your plan?

11         A.      I'm trying to say that we are doing

12    whatever we can not for it to occur.

13         Q.      Okay.  Well, you take issue with the fact

14    that Anderson, the city of Anderson is split between

15    four House districts.  Is that right?

16         A.      Yes.

17         Q.      Is that right?

18         A.      Yes.

19         Q.      Okay.  And would you agree with me that

20    it was split in a very thorough manner to the way that

21    it was split back in 2011?

22         A.      I'm going to say yes but, you know, I

23    think my comment regarding how our state has changed

24    is not being considered.  We have a greater number of

25    people, yes, but in terms of maps, the district should

Page 155

1    be contiguous of each other.  We should make every

2    effort for that to be if possible.

3          Q.      Well, and would you agree with me that

4    the plan that was passed in 2011 was upheld by a federal

5    court?

6          A.      I will say yes but the situation is not

7    the same.

8          Q.      How can you tell me that the situation is

9    not the same and requires a radical redrawing of the

10   House districts in Anderson?  Explain that to me.

11         A.      Did I say radical?  Did we use the term

12   radical?

13         Q.      No, ma'am.  I used the term radical.

14         A.      Okay.  Well, I did not -- I would not

15   agree with that.

16         Q.      Okay.  Are you familiar with District

17   Number 7?

18         A.      Okay.  Location just to make sure I'm

19   in the right place.  I don't have the list in front of

20   me.

21         Q.      Are you familiar with it?

22         A.      Location.  I asked if you would give me

23   the location.

24                 MR. MOORE:  Should we pull up the

25   complaint or not?  One moment.

Page 156

1            MR. INGRAM:  If you have the complaint to

2      clarify, that's helpful.

3            MR. MOORE:  It just takes a few minutes

4      to load the complaint.  Hold on one second.

5            MR. INGRAM:  We need to be able to verify

6      your question so we can wait.

7            MR. MOORE:  What exhibit -- what was the

8      complaint?  The amended.  Give me a page, Mr. Parente.

9            (Off-the-record discussion.)

10      Q.     Okay.  Can you look page 34?  And this is

11      on page 34 of your complaint which lists the map that

12      you submitted --

13            MR. INGRAM:  Give me one second.  We're

14      scrolling.  Give us one second.  And just to clarify,

15      when you say 34, UCF 34 or the actual pagination on the

16      document?

17            MR. MOORE:  Pagination on this document.

18            MR. INGRAM:  Perfect.

19            MR. MOORE:  I believe it's the same.

20            MR. INGRAM:  It is not.  Here you go.

21      Q.     Are you familiar with the district that

22      is drawn here as District Number 7 in your proposed map,

23      Ms. Murphy?

24      A.     I'm looking at this -- I'm looking at

25      it now.

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 157

1          Q.        Okay.

2          A.        Okay.  Your question?

3          Q.        Yes, ma'am.  Can you explain to me how

4     this District Number 7 as drawn here is not packing, to

5     borrow the phrase you have used previously?  How is it

6     not packing?

7          A.        Considering the population and in terms

8     of that county being -- has a high percentage of white

9     population to a minimal -- when compared, it's very

10    low for a black population and in order to draw an

11    opportunistic or competitive district because of

12    numbers.

13         Q.        Do you agree or disagree that this

14    District Number 7 is surgically drawn around high black

15    voting age population census blocks?  Do you agree or

16    disagree with that statement?

17         A.        That's where the black folks live.

18         Q.        Okay.  And so was race the predominant

19    factor that you used in drawing that district?

20         A.        That's an opportunistic district.

21                   MR. INGRAM:  Objection.  Calls for a

22    legal conclusion.

23         Q.        You may answer, Ms. Murphy.  Was race the

24    predominant factor used to draw that district in your

25    proposed map?

Brenda Murphy                              February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 158

1          A.        I will say race was considered.

2          Q.        That wasn't my question.  Was it the

3     predominant factor used in drawing that district?

4          A.        No.

5          Q.        Why not?

6          A.        We have to consider all factors.  You

7     know, race may in terms of drawing a competitive

8     district with such a low population of black

9     residents.  Then in order for them to be able to be

10    influenced somewhat what happens in that district, it

11    would need to be drawn in such a manner.

12         Q.        Are you familiar with the towns of Belton

13    and Honea Path?

14         A.        Yes, I am.

15         Q.        Okay.  Why did your plan put these two

16    towns in different House districts?

17         A.        Now that's a question that I cannot

18    answer individually because that was a decision made

19    by us as a whole.  And I'm sure if -- Honea Path.

20    Belton, Belton sits -- the intent was to draw a

21    district that could be competitive but not totally

22    packed -- packing an area, any community.

23         Q.        Why did your map split the town of Belton

24    in half if you know?

25         A.        Well, I'd have to -- I can't say that

Brenda Murphy                                February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 159

1    right now.  I really can't.  I don't have an answer to
2    that.
3          Q.      Are you familiar with the allegations
4    that your plan has made with respect to Chester?
5          A.      With respect to --
6          Q.      Chester.
7                  MR. INGRAM:  Are you referring to the
8    complaint?
9                  MR. MOORE:  I'm going to refer to it when
10   I ask a specific question.
11         Q.      My question first is are you familiar
12   with the allegations that your lawsuit makes concerning
13   the county of Chester?  Yes or no, Ms. Murphy.
14         A.      Right now, I can't say because there
15   were so many different areas.  I would hate to say --
16   give an answer not looking at my records.
17         Q.      All right.  Let's look at page 36.
18         A.      Thirty-six?
19         Q.      Yes, ma'am.  This alleges that District
20   41, a majority black district mostly made up of
21   Fairfield County, reaches up past the Fairfield County
22   line to create a bizarrely-shaped bunny ear appendage
23   that grabs the black majority city of Chester as well as
24   other areas comprised heavily of black voters in Chester
25   County.  In the process, defendant split eight precincts

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 160

1     in Chester County across Districts 41 and 43.  Do you

2     see that allegation?

3          A.     That's based on the fact that, you

4     know, that unusual shape as well as it should be

5     contiguous.  Now and I -- may I make a statement?

6          Q.     Yes, ma'am.

7          A.     It will be brief.  It will be brief.  I

8     promise you.  When we look at how -- such as looking

9     at Chester County and we look back at Anderson, when

10    you look at the populations within those two areas,

11    the populations of -- with the number of blacks are

12    significantly lower than it is -- well, significantly.

13              We are talking maybe 70 percent white,

14    17 percent black.  I'm using that figure.  It may not

15    be exactly right but we have to look at that and in

16    terms of how representation can be done in certain

17    areas and do we have -- is that a factor?  Yes, it is

18    in some situations.

19         Q.     Do you support these allegations as we

20    sit here today, Ms. Murphy?

21         A.     You mean in terms of the lines being

22    drawn in such a way that it's not a situation that

23    could be influential district?

24         Q.     No, ma'am.  No, ma'am.  No, ma'am.  I'm

25    asking a very simple question.  Your complaint -- and

Brenda Murphy                        February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 161

1    I'll rephrase it.  Your complaint asks the Court to

2    redraw the lines for Districts 41 and 43.  Is that what

3    you're asking for?

4         A.     Yes.

5         Q.     Okay.  And you want the district that's

6    currently represented by Representative McDaniel to be

7    redrawn.  Is that right?  That's what you want?

8         A.     No, I didn't ask that Ms. McDaniel's

9    line be drawn.  I am asking that the lines be drawn in

10   such a fashion that there is an opportunity for there

11   to be -- an opportunity for competitiveness.

12        Q.     There's a difference between

13   competitiveness and purposeful racial discrimination,

14   right?

15        A.     Yes, I agree to that.

16        Q.     Okay.  And so did you attend the hearing

17   in Columbia where Representative McDaniel spoke in

18   public?

19        A.     Yes, I was there.

20        Q.     Okay.  And do you recall some concerns

21   that she raised about only representing rural areas and

22   concerns about Chester as a city?  Do you recall her

23   raising those concerns that she was only representing

24   rural districts and not -- do you recall any such

25   concern expressed by her?

Brenda Murphy                                              February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 162

1       A.      No, I don't recall that.  That may have

2   been another session.  No, I do not.

3       Q.      All right.  Okay.  Do you see that -- do

4   you understand that the House plan and the House plan

5   that was passed keeps the city of Chester whole and puts

6   it in a district that is currently represented by

7   Representative McDaniel?  Do you understand that?

8       A.      So if I'm interpreting you correct,

9   you're saying -- and I think we need different --

10  let's not talk names.  I would prefer that we not do

11  that.  When we're looking at this in terms of a rural

12  area, you are saying Chester and --

13      Q.      I'm talking about District Number 41,

14  okay.  I'm talking District Number 41, okay.

15      A.      Okay.

16      Q.      And are you telling me that you think it

17  is a bad thing to include the city of Chester as a whole

18  entity in that one district?

19      A.      The intent -- well, the intent is to

20  keep as many counties whole but also the goal is to

21  ensure that we have representatives from that area --

22  if it's a possibility to have a representative from

23  the community of choice, that that is possible, at

24  least an opportunity for that.

25      Q.      Okay.  Let's look on page 37 of that

Page 163

1    document.

2           A.      I'm having --

3           Q.      Because I want to focus on the allegation

4    about the bunny eared appendages.

5           A.      Wait a minute.  Wait a minute.  Okay.

6           Q.      You talked about the shape a few minutes

7    ago, right?

8           A.      I'm sorry.

9           Q.      You talked about the shape.

10          A.      Just a second.

11                  MR. INGRAM:  What page should she be on?

12                  MR. MOORE:  Thirty-seven.  Can you see

13   page 37, Mr. Ingram?

14                  MR. INGRAM:  We're on 37, yes.

15          Q.      Okay.  All right.  You see this so-called

16   bunny eared appendage.  Is that right, Ms. Murphy?

17          A.      Yes.

18          Q.      And that's one of your criticisms.  Is

19   that right?

20          A.      Yes.

21          Q.      Okay.  Are you familiar with your plan

22   for the congressional districts?

23          A.      I don't have those in front of me.

24          Q.      I'm about to put one in front of you,

25   okay?

Page 164

1              MR. INGRAM:  Objection.  This is about

2     the House maps.

3              MR. MOORE:  It is about the House maps,

4     Mr. Ingram, and I'm going to put a document in front of

5     her.  And I'm going to ask a question and I believe

6     you'll see the relevance of it, but if not, you can

7     object.  What is the exhibit, Michael?

8              (Off-the-record discussion.)

9              MR. MOORE:  I am very concerned about

10    Veritext and this Exhibit Share platform today and I

11    apologize for the fact that it's making it way more

12    difficult for us to do this deposition than it should.

13              THE DEPONENT:  Thank you.

14              MR. INGRAM:  Are we waiting for a

15    document to load in the platform?

16              MR. MOORE:  I'm trying to load a

17    document, yes, sir.  I'm trying to load the NAACP's

18    proposed map.

19         Q.      And while I do, I'm going to ask you a

20    question, Ms. Murphy, and you know the answer to it or

21    not, okay.  Do you agree with me or not agree with me

22    that proposed District 6 in your map shares a similar

23    bunny-shaped appendage as the map that you criticize in

24    the House district?  Yes or no.

25         A.      Do you have that up?

Page 165

1          Q.      I'm trying to get it.  I'm trying --

2                  MR. INGRAM:  She needs to see the

3     document you're referring to.

4                  MR. MOORE:  Okay.  We're going to take a

5     short break so we can see if we can pull up this

6     document.

7                  (Brief recess.)

8                   (Whereupon, Defendant's

9                   Exhibit 9 was marked for

10                  identification.)

11         Q.      (BY MR. MOORE:)  Does everyone see the

12    document that's in front of you?  And this would be

13    exhibit number what?  Nine.  Do you see that, Ms.

14    Murphy?

15         A.      Yes, I see it.

16         Q.      Okay.  And do you see the line that's

17    drawn up through Fairfield and into Chester?

18         A.      Yes, I do.

19         Q.      Okay.  Would you agree with me that this

20    is a very similar bunny-eared appendage as the one you

21    criticize in your amended complaint with respect to

22    House District 41?  Would you agree or disagree with me?

23         A.      I think it's similar, yes.

24         Q.      Okay.  And your plan here pairs portions

25    of the county of Chester with Fairfield County and puts

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 166

1    it in District 6, correct?

2         A.    Yes, that's District 6 congressional

3    map.

4         Q.    Okay.  Explain to me, given this, what

5    your specific complaint is about the House drawn

6    District 41.  Explain to me -- and I want you to explain

7    to me what is your concern about it now having seen what

8    you guys drew and proposed with respect to the

9    congressional lines.

10              MR. INGRAM:  Objection.  Is this map from

11   the amended complaint?  I don't recognize this map.

12              MR. MOORE:  This map is the map that you

13   submitted in support of your position with respect to

14   the congressional maps.  This is your congressional map

15   proposal.

16              MR. INGRAM:  And this is introduced as an

17   exhibit today?

18              MR. MOORE:  Yes, it is.

19              MR. INGRAM:  For the record, you can't

20   spring last minute exhibits on us without proper

21   preparation.

22              MR. MOORE:  It was sent to you on

23   Tuesday, Mr. Ingram.  It's an attachment to your letter

24   which is identified as Exhibit Number 16 in the batch

25   that you were sent.  So it wasn't sprung on you today

Brenda Murphy                                February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 167

1    and I can ask questions about it.  If you feel -- if you

2    had the opportunity to go out and talk to her about it,

3    you could but you don't have the opportunity to go out

4    and talk to her about it because I submitted this to you

5    on Tuesday.

6                    MR. INGRAM:  Proceed.

7         A.     I would like to go back to the previous

8    map.

9         Q.     I'd like an answer to my question before

10   you go back to the previous map, ma'am, but --

11        A.     Well, you know, I think what you're

12   asking me or what you're doing is you're comparing

13   drawings for congressional maps with a House map which

14   is very different.  Now you're talking about shape but

15   more than just shape is considered when it comes to

16   maps.  So congressional may be very different than

17   what the House map is but I would like to go back to

18   the House map or the document that you showed me prior

19   to putting up this map.

20                   MR. MOORE:  Can you get it, Michael?

21   Do it.

22        A.     It was page -- what are we on, 37?

23                   MR. MOORE:  Thirty-six or 37, yes,

24   ma'am.

25        A.     Okay.  Okay.  The comments -- do you

Page 168

1    see the comments?  Bring it down, please, sir.  The

2    figure below reveals how the irregular and noncompact

3    district lines in Chester County were drawn to carve

4    out black communities in a manner that allowed map

5    drawers to maintain black voters -- minimize black

6    voters' influence in neighboring districts.  That's --

7            Q.     That's your allegation, right?

8            A.     Yes.

9            Q.     That's your allegation.  Okay.  I'm

10   asking you today what evidence do you have to support

11   the allegation that irregular noncompact district lines

12   in Chester County were drawn to carve out black

13   communities in a manner that allowed map makers to

14   minimize black voters' influence in neighboring

15   districts?  Explain to me what evidence --

16              (Simultaneous crosstalk.)

17           Q.     Let me finish my question, ma'am.

18   Explain to me what evidence you have to support that

19   specific allegation.

20           A.     The map itself.

21           Q.     Do you have any other evidence other

22   than, as you say, the map itself?

23           A.     The population within those

24   communities.

25           Q.     Okay.  What evidence with respect to the

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 169

1   population in those communities supports your

2   allegation?

3          A.      Well, if you look at the demographics

4   and I don't have the demographics in front of me.  If

5   you look at the demographics of Chester and where the

6   population white versus black, where the communities

7   are, that needs to be considered as well.

8          Q.      My question again is you're alleging that

9   there was purposeful drawing to carve out black

10  communities to minimize black voters' influence.  Do you

11  have any evidence to support that other than what you

12  just indicated?

13         A.      I am saying -- I don't know what was in

14  the minds of those folks but I'm talking about the

15  outcome in terms of what happened, in terms of how the

16  map's drawn.

17                 That's all I can do is looking at

18  demographics, trying to draw maps in a way that there

19  at least may be some influence on the outcome of an

20  election.  Maybe not fully what we want it to be but

21  at least some influence by the black community.  Now

22  that has to be considered and so I'm not reading the

23  minds of the people that drew this map.  I'm looking

24  at what happened.

25         Q.      And you're drawing conclusions but

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 170

1    without any evidence for those conclusions other than

2    the alleged evidence that you just gave me.  Is that

3    right or wrong, Ms. Murphy?

4              MR. INGRAM:  Objection.  Argumentative.

5         Q.    Please answer my question, Ms. Murphy.

6         A.    Right now, I don't know exactly what

7    the question was.

8         Q.    I said you're drawing conclusions based

9    on your own suppositions without any actual evidence to

10   support it.  Is that right or wrong?

11        A.    Wrong.

12             MR. INGRAM:  Objection.  Argumentative.

13        Q.    Okay.  And what specific evidence do you

14   have to support that conclusion?  You just told me --

15        A.    I am saying we have to look at

16   demographics for a community.

17        Q.    All right.  Let's go down --

18        A.    In order to create districts at least

19   that black voters may have influence.

20        Q.    So let's look at your allegations

21   concerning Sumter and we're going to stick with this

22   complaint, Mr. Parente.  Okay.  Are you familiar with

23   your allegations concerning Sumter?

24        A.    Sir, I think we're dealing with very

25   similar situations here so my answer will be the same.

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 171

1      Q.      All right.  So have you done a comparison

2   between the districts that are drawn in the current

3   House plan as enacted and the lines that were drawn in

4   2011?  Have you done that?

5      A.      No, I did not personally do that.

6      Q.      Okay.  Do you think that it might be wise

7   to look at that before making an allegation here?

8      A.      I did not -- this is not a personal

9   plan of Brenda Murphy, sir.  This is a plan that was

10  developed with input from individuals from the Sumter

11  area, from the Chester area, from the Anderson County

12  area.  So this is not a Brenda Murphy plan.

13     Q.      Who are the individuals from Anderson

14  County who gave you the information that --

15     A.      I have said to you as much as I can.

16  The president, the leadership from the branches,

17  members of the branches.  That is all I can say to

18  you, sir.

19     Q.      I'm asking you for names, Ms. Murphy.

20  Can you give me any names?

21             MR. INGRAM:  Objection.  I'm instructing

22  my client not to answer.  We've already been through

23  this.  We're not giving you names of members of the

24  NAACP.

25             MR. MOORE:  Well, you've already given me

Brenda Murphy                                  February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 172

1    several, Mr. Ingram.

2              MR. INGRAM:  Those are available on

3    public websites and documents.  You're asking for

4    confidential names which she will not provide.

5              MR. MOORE:  Then you're going to need to

6    file a motion for protective order.

7              MR. INGRAM:  I'm aware of the rules.

8         Q.       And I'm going to ask this question again.

9    Can you give me -- and we go back to Anderson.  Can you

10   give me the names of the alleged NAACP members who live

11   in the challenged districts who are challenging those

12   districts?

13             MR. INGRAM:  Asked and answered and

14   objection still stands.

15        Q.       Okay.  Are you going to answer that

16   question, Ms. Murphy?

17             MR. INGRAM:  I'm instructing her not to

18   answer that question.

19        Q.       Okay.  With respect to Chester County,

20   can you give me the name of any person who lives in

21   District Number 41 who alleges that their rights have

22   been violated by the passage of this House plan?  Ms.

23   Murphy?

24        A.       I will not provide names of NAACP

25   members.

Page 173

1          Q.      Okay.  Well, let me ask you this

2    question, Ms. Murphy.  Can you tell me on what date

3    someone from District Number 41 was interviewed or

4    contacted by you or a member of your coalition and who

5    told you that they wanted to challenge House District

6    Number 41?

7          A.      I have not had individual contact with

8    anyone.

9          Q.      Okay.

10                 (Simultaneous crosstalk.)

11         Q.      Although -- correct me if I'm wrong -- I

12   believe that you were on a committee that was

13   responsible for recruiting witnesses as plaintiffs, were

14   you not, Ms. Murphy?  I'm going to go over that in a

15   minute but were you not on such committee?

16         A.      No, I was not on a committee that was

17   responsible for recruiting names of witnesses.

18         Q.      Okay.  All right.  So if Brenda -- let me

19   ask you this question, Ms. Murphy.  If Brenda Murphy

20   didn't contact anybody, okay, then how can Brenda Murphy

21   tell me that someone was contacted with respect to House

22   District Number 41 who resides in that district and that

23   person said I want to challenge this district because my

24   rights have been impacted by the passage of this plan?

25   How can Brenda Murphy tell me that today?

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 174

1              MR. INGRAM:  Objection.  Misstates

2      testimony.

3          Q.     Can you answer that question, Ms. Murphy?

4          A.     I will not answer that question.

5          Q.     So you cannot or you will not?

6          A.     My contacts are members of the NAACP

7      and I will not reveal the names of anyone.

8          Q.     I didn't ask you to reveal a name, Ms.

9      Murphy, and so I'm going to repeat my question again

10     just so we're crystal clear.

11         A.     Sir, I think I have been clear.  I did

12     not operate independently.  This was a -- and not only

13     a coalition but there was -- there were meetings with

14     presidents and leadership from throughout the state of

15     South Carolina.  I did not contact anyone personally.

16         Q.     So if you didn't contact anyone

17     personally, you cannot attest under oath that someone

18     who resides in each of these challenged districts was

19     contacted and asked you to challenge these districts,

20     can you?

21         A.     I can attest to the fact that someone

22     from all of these counties that are mentioned in -- as

23     being concerned about the lines in their area have

24     stated in one way or another to members of their

25     leadership that they were concerned.

Page 175

```
 1        Q.      Okay.  And you believe that that's

 2   sufficient to give standing upon you and your

 3   organization to challenge these districts.  Is that

 4   right?

 5                MR. INGRAM:  Objection.  Calls for a

 6   legal conclusion.

 7        Q.      You can answer that question, Ms. Murphy.

 8        A.      Yes, because their leadership in the

 9   NAACP state conference.

10        Q.      And is there a record -- does the NAACP

11   State Conference have any record of any such

12   communication with any such person to your knowledge?

13   Yes or no.

14        A.      To my knowledge?

15        Q.      Yes, ma'am.

16        A.      In a written document?

17        Q.      Yes, ma'am.

18        A.      I don't know.

19        Q.      Okay.  So you can't tell me that there's

20   a record of that.  Is that right?

21                MR. INGRAM:  Objection.  Asked and

22   answered.

23        Q.      Can you tell me if there's a record?

24        A.      I don't know.

25        Q.      You don't know.  Okay.  Who at the South
```

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 176

1    Carolina NAACP would know the answer to that question,

2    Ms. Murphy?

3         A.       Presidents throughout the state of

4    South Carolina who are members of the state

5    conference.

6         Q.       So are you telling me that I'd have to

7    talk to each and every one of your presidents to get the

8    answer to that question?

9         A.       You may.  I don't know that they would

10   give you a name.  They would not give you a name of

11   their members.

12        Q.       We'll see if the Court orders you to give

13   us a name of a member, Ms. Murphy.

14             MR. MOORE:  Let's take a short break.

15             (Brief recess.)

16        Q.       (BY MR. MOORE:)  So I'm going to go a few

17   new exhibits and all of these exhibits are exhibits that

18   were provided to us last night, but before I go to the

19   new exhibits, I do want -- on this particular exhibit

20   that's still in front of you, I want you to look at page

21   number 7.

22        A.       It's not on there.

23        Q.       He's trying to pull it up.  Paragraph 18.

24   Okay.  All right.  Do you see this page, Ms. Murphy?

25        A.       I do.

Page 177

1        Q.      Okay.  All right.  I'm going to read

2   paragraph 18.  It says -- and when you use the term

3   "its", it's clearly referring to the South Carolina

4   NAACP.  And it says its member and constituents

5   currently live in racially gerrymandered and

6   intentionally dilutive state legislative districts.

7   Specifically members live in the challenged districts.

8   Okay.  Are you prepared to tell me which members live in

9   the challenged districts?

10       A.      No.

11              MR. INGRAM:  Objection.  We've already

12  discussed this.

13              MR. MOORE:  I'm going to continue to

14  discuss it, Mr. Ingram.  I understand that that's your

15  objection.

16       Q.      You're refusing to answer that question,

17  is that right, which members --

18              MR. INGRAM:  Counsel, you can continue to

19  ask.  We can take it to court, but if you're going to

20  keep asking the witness, she will not provide you names

21  in the NAACP membership list.

22       Q.      Can you tell me what process was used to

23  support the allegation here, Ms. Murphy?

24       A.      Concerns voiced by members of the

25  coalition and NAACP leadership and members.

Page 178

```
 1          Q.      Okay.  It then says, these members have

 2     been and if H4493 is not enjoined will continue to be

 3     harmed by H4493's assignment of them to unconstitutional

 4     racially gerrymandered districts and purposely dilutive

 5     districts.

 6                   Can you tell me -- and I'm not asking for

 7     names at this point but I'm asking you can you tell me

 8     if you had a list of members in each of these challenged

 9     districts that would be, according to your complaint,

10     continued to be harmed?  Did you have such a list of

11     those people before you filed this complaint?

12                   MR. INGRAM:  Objection.  Asked and

13     answered.

14          Q.      Did you have such a list, Ms. Murphy?

15          A.      I don't have a list, sir, but I have

16     members that live in these areas.

17          Q.      Okay.  And you told me that --

18          A.      That have expressed concerns, yes.

19          Q.      Okay.  But you can't tell me specifically

20     the name of a specific member or even the fact that you

21     spoke to a specific member who was allegedly harmed by

22     the passage of the act that relates to this District 41,

23     can you?

24                   MR. INGRAM:  Objection.  Asked and

25     answered.
```

Page 179

1          Q.      Can you, Ms. Murphy?

2          A.      No, I cannot.

3          Q.      Okay.  And you mentioned a few minutes

4   ago that the people who spoke to all of these various

5   people who you refuse to identify were state presidents.

6   Is that right?

7          A.      State presidents or members.

8          Q.      Okay.  And who are those presidents that

9   spoke to these folks and who in turn spoke to you?

10         A.      I can't --

11                 MR. INGRAM:  Objection.  At this point,

12  this is badgering the witness.

13         Q.      Is it that you cannot answer or that you

14  will not, Ms. Murphy?

15                 MR. INGRAM:  Objection.  Asked and

16  answered.  We already said we will not disclose the

17  names of the members.  Our allegation is there are

18  members in every district.  Asked and answered.

19         Q.      Okay.  My question -- you may answer the

20  question, Ms. Murphy.  Is it that you cannot or you will

21  not because those are two different things?

22                 MR. INGRAM:  Objection.  Asked and

23  answered.

24         Q.      Ms. Murphy?

25         A.      I cannot.

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 180

1      Q.      You cannot.  All right.

2      A.      Now --

3              MR. INGRAM:  Let her finish.

4      Q.      Sure.

5      A.      Let me make sure you understand what

6  I'm saying.  When I say that I cannot, I mean I cannot

7  identify those names for you.

8      Q.      Because you don't know them?  Because you

9  don't know the names or because --

10     A.      No, that's not -- I'm not saying I

11  don't know the names.

12     Q.      Okay.  Do you know the names?  Here's my

13  next question.  Do you know the names of someone who

14  lives in each of those challenged districts who have

15  alleged to you that they have been harmed?  Do you know

16  the names of people from each of those challenged

17  districts that said they've been harmed?

18             MR. INGRAM:  Objection.  Asked and

19  answered.

20     Q.      Ms. Murphy?

21     A.      I will not answer that question.

22     Q.      You will not answer that question.  All

23  right.

24             MR. MOORE:  So let's pull up the next

25  exhibit which is going to be what exhibit, Mr. Parente?

Page 181

1   Exhibit Number 10.  Is that correct?  And we did not

2   send this document to you this morning, Mr. Ingram.  So

3   if you want to take a minute --

4                  MR. INGRAM:  I object to a last minute

5   exhibit.

6                  MR. MOORE:  Mr. Ingram, we weren't

7   provided these exhibits until yesterday by your group.

8   I can ask her any question about any exhibit.  My point

9   is if you want to pause and talk to her about this

10  exhibit before I proceed to ask her questions, then

11  despite the fact you didn't produce it until yesterday,

12  I'm giving you an opportunity to do that.

13                  So if you want to take that opportunity,

14  okay, then we'll stop.  We'll break and you let us know

15  when you're ready to come back on the record, okay?

16                  (Brief recess.)

17                  (Whereupon, Defendant's

18                  Exhibit 10 was marked for

19                  identification.)

20      Q.     (BY MR. MOORE:)  I want to look at the

21  second page.  It says update from the desk of president.

22  Do you see that?

23      A.     Yes.

24      Q.     Okay.  It says President Murphy reported

25  she and SC NAACP Political Action Group would go through

Page 182

1    identified areas to discuss and identify potential

2    plaintiffs from those areas.  Attorney Boykin and

3    Attorney Aden with LDF volunteered to work with the

4    plaintiffs to prepare them emotionally for testifying

5    during litigation should it become necessary.

6              So my question is did you along with

7    members of the SC NAACP Political Action Group go

8    through the identified areas to identify potential

9    plaintiffs?

10        A.      I'm going to say there was an effort

11    made to do that but there was concerns voiced.  I

12    never received a list, I know that, in terms of

13    identifying plaintiffs.  So was that actualized?  No.

14        Q.      Okay.  So when there was a concern

15    voiced, a concern voiced by whom?

16        A.      About presidents regarding a listing of

17    names.

18        Q.      How many people are members of the

19    SC NAACP Political Action Group?

20        A.      I would say maybe ten.

21        Q.      Okay.  And who are those people?

22              MR. INGRAM:  Objection insofar as these

23    are members of the NAACP whose names are not publicly

24    available.  I'm instructing her not to answer --

25        Q.      I'd also like you to look at the last

Brenda Murphy                              February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 183

1    page where you identify a number of people.  Meeting

2    attendees and contact information.  I take it you

3    identified the members of the NAACP who were involved in

4    these meetings with the other members of your coalition,

5    correct?

6          A.     Yes.

7          Q.     Okay.  So, for example, you didn't hide

8    the identities of NAACP members from people from the

9    ACLU, did you?

10         A.     Those were members of the coalition.

11         Q.     Okay.  So, for example, when I'm looking

12   at this list, there are a number of people identified.

13   It lists Ms. Elizabeth Kilgore, SC State Conference

14   NAACP.  This list which you produced to us identifies

15   her as someone associated with the SC State Conference

16   of the NAACP.  Is that right?

17         A.     Yes, it does.

18         Q.     Okay.  And it identifies Marvin Neal as

19   the third vice president of the SC State Conference of

20   the NAACP.  Is that right?

21         A.     Yes, it does.

22         Q.     Okay.  So you are identifying people by

23   producing these documents to us.  Is that correct, Ms.

24   Murphy?

25         A.     Well, admitting attendees and then

3:21-cv-03302-MBS-TJH-RMG   Date Filed 05/02/22   Entry Number 254-1   Page 185 of 291

Brenda Murphy                                        February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 184

1    minutes were requested, they were not redacted.

2         Q.      Okay.  And is Mr. McLawhorn a member of

3    the NAACP?

4         A.      I will not answer that question.  You

5    see there who he represents.

6               MR. INGRAM:  Objection.

7         Q.      I see a couple of other names here that

8    identifies Eloise Fomby-Denson, Ph.D., SC State

9    Conference NAACP.  Is she a member of the South Carolina

10   State Conference of the NAACP?

11        A.      She is identified on the document as a

12   member of the coalition.

13        Q.      Is she a member of the NAACP --

14               MR. INGRAM:  Objection.  She is not

15   confirming nonpublicly disclosed names of the NAACP.

16   They are publicly posted on websites.

17        Q.      On what publically available websites is

18   the name of Eloise Fomby-Denson disclosed?

19               MR. INGRAM:  If you look at leadership --

20               MR. MOORE:  Mr. Ingram, the question is

21   directed to her, not you.

22               MR. INGRAM:  I'm sorry.  I thought you

23   were talking to me.

24        A.      She is the assistant --

25               MR. MOORE:  I was not talking to you.

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 185

1    You made a statement.  I'm asking her.

2         Q.       What publicly available website is the

3    name Eloise Fomby-Denson identified as belonging to the

4    SC State Conference of the NAACP?

5         A.       All of our officers are identified.

6    She is --

7         Q.       Is she an officer?

8         A.       She is -- yeah, she's the assistant

9    secretary for the state conference.

10        Q.       Okay.  Is Elizabeth Kilgore an officer?

11        A.       Yes, she is.

12        Q.       What's her office?

13        A.       She's the secretary.

14        Q.       Okay.  Did you provide a list of members

15   of the SC NAACP to the other members of your coalition?

16        A.       Only on the minutes.  Do they have

17   access to the minutes?  Yes, they do.

18        Q.       Let me ask you this.  Were members of the

19   ACLU or other members of your coalition involved in

20   helping identify plaintiffs?

21             MR. INGRAM:  Objection.  Privileged

22   communications related to litigation.  I'm instructing

23   my client not to answer.

24             MR. MOORE:  Okay.  You're going to have

25   to file a motion for protective order on that point,

Page 186

1    too.  Let's look at the next document which is listed

2    October 7, 2021 and it's the former 49 (sic),

3    Mr. Parente.  Bear with us.

4                    (Whereupon, Defendant's

5                    Exhibit 11 was marked for

6                    identification.)

7         Q.      Okay.  I'm going to ask you questions.

8    Do you see this document in front of you, Ms. Murphy?

9         A.      Yes.

10        Q.      Okay.  And there's an agenda here and it

11   says identification of perspective witnesses and it

12   lists you and Attorney Charles Boykin as the speakers

13   with respect to that topic.  Is that right?

14        A.      Yes, it does.

15        Q.      Who is Attorney Charles Boykin?

16        A.      He's a member of the executive

17   committee.

18        Q.      Of what?

19        A.      I identified him previously.  He is --

20   he's a member of the South Carolina State Conference

21   executive committee.

22        Q.      Okay.  Fine.  Did you and Mr. Boykin give

23   a presentation on the identification of perspective

24   witnesses on October 7, 2021 as is reflected in your

25   agenda?

Brenda Murphy                              February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 187

1          A.      No.

2          Q.      Why not?

3          A.      We didn't have the information.

4          Q.      Then why is it listed as something on an

5    agenda?

6          A.       It's listed there in hopes of being

7    able to complete that task but it was not completed.

8          Q.      Was that task ever completed, Ms. Murphy?

9          A.      No, it was not.

10         Q.      Okay.  But you still made that -- you

11   still made that a representation in your amended

12   complaint, correct?

13         A.       Regarding?

14         Q.      Regarding the fact that you have a member

15   who was harmed who resided in each one of the challenged

16   districts?

17                 MR. INGRAM:  Objection.  Misstates

18   testimony.

19         Q.      You may answer my question, Ms. Murphy.

20         A.      Okay.  You're asking me in terms of the

21   listing of being able to state that we have witnesses

22   or members within the districts that are mentioned?

23         Q.      Yes, ma'am.  And let me just -- so we're

24   clear, you told me a moment ago that this project was

25   never completed with respect to the identification of

Brenda Murphy                                          February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 188

1    perspective witnesses, correct?  You told me that --

2                    MR. INGRAM:  Objection.  Misstates

3    testimony.  Misstates testimony.

4         Q.     You may answer, Ms. Murphy.

5         A.     I said this task was not completed by

6    myself or Attorney Boykin.

7         Q.     Was it completed by anyone?

8                    MR. INGRAM:  Objection.  Asked and

9    answered.

10        Q.     Please answer my question, Ms. Murphy.

11   Was it completed by anyone if you know?

12        A.     I think I mentioned earlier that

13   members that were impacted in those areas we

14   could emphatically state could be identified.

15        Q.     Was the project completed by anyone?

16                   MR. INGRAM:  Objection.

17        Q.     Yes or no.  That's a yes or no with an

18   explanation if you want to.

19                   MR. INGRAM:  Objection.  Asked and

20   answered.  She's already said her answer multiple times.

21   Stop badgering the witness.

22                   MR. MOORE:  I'm not badgering the

23   witness, Mr. Ingram.  I'm trying to get an answer to a

24   simple question.

25        Q.     I'd like a yes or no answer.  To your

Page 189

1   knowledge --

2        A.      Repeat the question.

3        Q.      Let me finish.  My question is a yes or

4   no question.  Was the project to your knowledge ever

5   completed by someone other than you or Mr. Boykin?

6                MR. INGRAM:  Objection.  Asked and

7   answered.

8                MR. MOORE:  Asked but not answered.

9        Q.      What's your answer, Ms. Murphy?  Yes or

10  no and explain, please.

11       A.      I don't know.

12       Q.      You don't know.  All right.

13               MR. INGRAM:  Objection.

14               MR. MOORE:  What's your objection?

15               MR. INGRAM:  Misstating testimony.

16               MR. MOORE:  You could object to the form

17  and stop your speaking objections, please, Mr. Ingram.

18  I think you might need to go read our local rules.  I'm

19  about to ask my next question.  All right.  So

20  Mr. Parente, we are going to turn to the minutes of

21  Thursday, November 18, 2021.

22                    (Whereupon, Defendant's

23                     Exhibit 12 was marked for

24                     identification.)

25       Q.      Do you recognize this document which is

Brenda Murphy                  February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 190

1   exhibit number what, Mr. Parente?  Twelve.  Do you

2   recognize Exhibit Number 12, Ms. Murphy?

3       A.     Yes.

4       Q.     Okay.  And what is it?

5       A.     Yes.

6       Q.     What is it?

7       A.     They're minutes from the redistricting

8   committee.

9       Q.     Okay.  And of course this redistricting

10  committee did not only include members of the SC NAACP,

11  correct?

12      A.     Sir, I have gone over the membership of

13  the committee and they have been identified under

14  attachment in terms of who is present and their

15  specific role.

16      Q.     So you see here where it says update on

17  mapping for redistricting.  It says, Dr. Ruoff explained

18  on local redistricting, his focus with branches is on

19  county councils by drawing map proposals before

20  councils.  He has been asked if he can draw a fifty

21  percent black district in Kershaw County and said he

22  could draw fifty percent plus two bodies plan.  Do you

23  see that?

24      A.     Sir, may I comment?

25      Q.     I'm asking you first of all if you see

Page 191

1    it.

2          A.      I see it.  Yes, I do see it.

3          Q.      Okay.  Do you know what he was talking

4    about is going to be my question.  Do you know what he's

5    talking about?

6          A.      He's talking about local redistricting.

7    Local.  County, city, municipalities.  This is in no

8    way related to the House.

9          Q.      The next block however says -- is titled

10   update state redistricting, correct?

11         A.      Yes.

12         Q.      Okay.  And let's flip to the second page.

13   It appears to be asking some questions.  Is he asking

14   questions about the Senate or the House?

15         A.      I don't think he's asking -- I don't

16   know.  I'd have to read that.

17         Q.      Why don't you take a minute and read it

18   and I'm going to ask you a question.

19         A.      Sir.

20         Q.      Yes, ma'am.

21         A.      I have to -- I have to defer back to --

22   that question to someone else.  I cannot answer that

23   question.

24         Q.      Okay.  I understand and I don't want you

25   to answer questions you cannot answer.  So I'm going to

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 192

1    go up to the previous line which says that President

2    Murphy said a meeting would be scheduled with the SC

3    Legislative Black Caucus to get their input.  Do you see

4    that?

5         A.    Yes.

6         Q.    Okay.  Did you schedule a meeting with

7    the South Carolina Legislative Black Caucus to get

8    input?

9         A.    No, we did not.

10        Q.    Can you tell me why not?

11        A.    Well, at this point and if you look at

12   the date on this -- on these minutes, we were at a

13   point that our mapping had been completed.  We never

14   met with the black caucus.

15             (Simultaneous crosstalk.)

16        Q.    I'm sorry.

17        A.    And because they were not met with

18   initially to have input at the beginning, they did not

19   feel it necessary to meet with us.

20        Q.    Was there ever a time when members of the

21   black caucus, any member of the black caucus requested

22   that they come and meet with your committee or your

23   office to discuss redistricting?

24        A.    I think -- and I have to give an

25   historical background on this and I can only say what

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 193

1    I was told.  I don't know how true it was but it was

2    stated to me that they were involved in the process.

3    I don't know if that's true or not true.

4                    There was -- you know, I think there

5    were attempts to meet with us but I made it clear from

6    the outset we would not be discussing maps until

7    mapping was done because we were not going to accept I

8    would say feedback or any concerns from the black

9    caucus regarding the mapping because we were doing it

10   without considering incumbents and that wasn't too

11   pleasing to their ears.

12        Q.      To whose ears?

13        A.      The ones that asked to meet.

14        Q.      Who were those -- who were the ones that

15   asked to meet?

16        A.      I will not give those names, sir.

17   That's not important.  The thing is the attempt was

18   made and because it was made, I made it very clear

19   from the beginning that they would not be involved as

20   those maps were being -- as the mapping was done.

21        Q.      President Murphy, you can't refuse to

22   give me names just because you don't want to give me

23   names, okay.  So you said that there were members of the

24   Legislative Black Caucus who asked to meet with you.

25   What were the names of those people?

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 194

1              MR. INGRAM:  Objection as far as those

2     names overlap with the membership list of NAACP South

3     Carolina conference.

4              THE DEPONENT:  They do.

5              MR. INGRAM:  I'm instructing her not to

6     answer.

7              MR. MOORE:  All right.  Again that's

8     another issue for your protective order, Mr. Ingram.  I

9     want to go next, Mr. Parente to what's listed as 25 here

10    which is the agenda for August 5, 2021.

11                   (Whereupon, Defendant's

12                    Exhibit 13 was marked for

13                    identification.)

14         Q.     All right.  So at the bottom of the page,

15    there are some statements about Mr. Ruoff.  It says

16    Attorney Teague was present at the House meeting.  Is

17    that a reference to Lynn Teague?

18         A.     Yes, it is.

19         Q.     Okay.  Is Lynn Teague an attorney to your

20    knowledge?

21         A.     I don't really know.  I never -- I

22    don't know.

23         Q.     Okay.  So you don't have any information

24    that suggests that she is actually an attorney, right?

25         A.     I'm saying -- well, he said attorney.

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 195

1    That may have slipped by me.  Maybe she is.  I

2    don't -- I can't say that I knew that.

3            Q.      But you do know Lynn Teague, right?

4            A.      Yes, I know her.

5            Q.      And --

6            A.      And, you know, as an associate, not

7    personally.

8            Q.      Okay.  And she's done a lot of speaking

9    out in the media about the issues of redistricting, has

10   she not?

11           A.      Yes, she has.

12           Q.      Okay.  And --

13           A.      She provided testimony.

14           Q.      She's provided testimony but she's made a

15   lot of comments to the press.  Is that right?

16           A.      Yes.

17           Q.      Okay.  And at one point, she made a

18   comment indicating that she wasn't going to challenge

19   the maps.  Her role was out vocalizing concerns.  Have

20   you read any such attribution to her, Ms. Murphy?

21           A.      I don't recall.  I didn't read that

22   article, no.

23           Q.      Okay.  All right.  Let me ask you this

24   question.  Did you participate in a discussion with Ms.

25   Teague where it was decided that she would go out and

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 196

1    raise concerns repeatedly in the media?

2         A.    No.

3         Q.    Okay.  Did you ever discuss with her

4    launching some sort of media or public relations

5    campaign?

6         A.    No.

7         Q.    She's certainly spoken out in the media

8    far more than you.  Is that right, Ms. Murphy?

9         A.    Yes.  And may I make a comment?

10        Q.    Yes, ma'am.

11        A.    Ms. Teague did not join our group until

12   after she completed her mapping so they are not

13   associated with each other.

14        Q.    But Mr. Ruoff was involved in both her

15   map -- the map drawing for her and in consultations with

16   you.  Is that right or wrong?

17        A.    Right.

18        Q.    I'm going to page 2.  Do you see a

19   reference to Attorney Leah Aden who's an attorney of

20   record in this case responding to Mr. Matthew's concern

21   regarding how the House and Senate had different

22   criteria and definitions of communities of interest and

23   how it can be defined uniformly and is there community

24   input and access.  And it says that Ms. Aden concluded

25   by stating it is exceedingly difficult to uniformly

Page 197

1    define communities of interest because of a host of

2    community differences within the state.  Do you recall

3    that?

4          A.      When was this?  What's the date on

5    this?

6          Q.      It's August 5th.  Excuse me.  The one at

7    the top says August 5th.  The one at the bottom says

8    August 12th.  So it's hard for me to tell you what date

9    it is.

10         A.      I'm going to say this.  I was not the

11   chair of this committee nor the co-chair.  There

12   were -- I don't recall those comments and sometimes I

13   may not have been present at all of the meetings.  I

14   do not recall that conversation.

15         Q.      Okay.  All right.  And do you know if you

16   were present for that discussion?

17         A.      No.  I don't know.  I don't know.

18         Q.      I mean it does describe a statement from

19   you about the Senate definition of communities of

20   interest.  Do you see that again on page 2?

21         A.      Where?

22         Q.      Before where I quoted the line that says

23   Attorney Leah Aden, LDF.  It says President Murphy

24   commented.  Do you see that?

25         A.      Okay.  My comment was in response to I

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 198

1    guess Mr. Matthews who commented -- he questioned the

2    legality of the two different housing processes,

3    different redistricting standards defining

4    communities, da-da-da, and whatever I said, it was in

5    relationship to what he had said.

6                    MR. MOORE:  Okay.  All right.  So I'm

7    next going to go to August 26th, Mr. Parente, which is

8    Number 27 in here.

9                    MR. INGRAM:  We need a break.

10                   MR. MOORE:  Okay.

11                   (Brief recess.)

12                    (Whereupon, Defendant's

13                     Exhibit 14 was marked for

14                     identification.)

15                   MR. MOORE:  All right.  So we're back on

16    the record.  I just have a couple of more questions, but

17    again before I finish my questions and cede the floor,

18    I'm going to note that we intend to keep this deposition

19    open because we have not received all of the documents

20    that might be relevant to a deposition of Ms. Murphy.

21                   We just received a number of the

22    documents.  We barely had a chance to go over them last

23    night and I will say that -- we both said this for the

24    record.  I do not believe it is appropriate objection

25    and an appropriate position to take that you will not

Page 199

1    reveal information about members of the SC NAACP,

2    particularly when there's a confidentiality order in

3    place in this litigation and -- but we will deal with

4    that at the appropriate time.  So I'm going to pull up

5    the next exhibit which is exhibit number what, Mr.

6    Parente?  Is it 14?  Okay.  You can go down for just a

7    moment.

8         Q.      Do you see this document, Ms. Murphy?

9         A.      August the 26th?

10        Q.      Yes, ma'am.

11        A.      Yes, I do.

12        Q.      It's dated at the top August the 26th.

13   It's dated at the bottom September 2nd.  I'm assuming --

14   you correct me if I'm wrong -- that the meeting was

15   actually held on August the 26th but maybe the other

16   date is the date the minutes were done.  Is that right?

17   Do you know?

18        A.      Yes.  The calendar -- I guess you could

19   determine that by looking at the calendar, the day of

20   the week it is.  If it's a Thursday, that would be

21   correct.

22        Q.      Okay.  And it first says that Attorney

23   Teague identified as an attorney reported attending the

24   SC Democratic caucus meeting as a nonpartisan observer.

25   Is that what it says?

Brenda Murphy                                February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 200

1          A.        Where are you at?

2          Q.        Where it says update on mapping for

3     redistricting.

4          A.        Oh, Attorney Lynn Teague?

5          Q.        Yes, ma'am.

6          A.        I see that.

7          Q.        Okay.  Again she's identified as an

8     attorney there, correct?

9          A.        I see.  Uh-huh.

10         Q.        And it says that she attended the SC

11    State Democratic caucus meeting.  Do you know if she --

12    she takes the position that her organization is also

13    nonpartisan.  Is that right?

14         A.        That's a question -- we invited

15    nonpartisan participants.

16         Q.        Okay.  And do you know if she attended

17    any Republican caucus meetings if you know?

18                   MR. INGRAM:  Objection.

19         Q.        Please answer.

20         A.        No, I do not know.  That's a question

21    you will have to ask Ms. Teague.

22         Q.        Okay.  Later it says Dr. Ruoff stated he

23    is working on state maps and his work reveals that

24    Charleston, York, and Myrtle Beach would gain new

25    districts based on population increases.  As a result,

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 201

1    three districts will go away.  Do you see that?

2         A.      I see that.

3         Q.      And you understood, did you not,

4    President Murphy, that there were population increases

5    in certain areas of the state like Charleston, York, and

6    Myrtle Beach.  Is that right?  Did you understand that?

7         A.      Yes.

8         Q.      Okay.  And did you also understand that

9    there were population decreases in a number of areas?

10        A.      Yes.

11        Q.      And when you have an increase in

12   population, you sometimes have to draw new districts in

13   relation to that because the map is dictated by the

14   population.  Do you agree or disagree with that?

15        A.      Yes.

16        Q.      All right.  Now I'm going to ask maybe

17   one or two more questions and then I'm done and I'll

18   cede the floor.  Ms. Murphy, could you tell me -- can

19   you identify for me the last time you voted for a

20   Republican candidate for any office?

21               MR. INGRAM:  Objection.

22        Q.      Okay.  Please answer my question, Ms.

23   Murphy.

24        A.      No.

25        Q.      You cannot identify any such vote?

Page 202

1      A.      No.

2      Q.      Okay.  Do you think you voted for a

3   Republican candidate for office in the last twenty

4   years?

5              MR. INGRAM:  Objection.  I'm instructing

6   her not to answer.  That's not relevant to her testimony

7   as a representative of the South Carolina National

8   Conference of NAACP.

9              MR. MOORE:  You can't instruct her not to

10  answer a question because you don't believe it's

11  relevant, Mr. Ingram, under our rules.  And I believe

12  that a number of your instructions have been

13  inappropriate.

14     Q.      Are you going to answer that question or

15  not, Ms. Murphy?

16     A.      Based on my instructions from the

17  attorney, I am not.

18     Q.      Okay.

19              (Simultaneous crosstalk.)

20              MR. INGRAM:  First amendment

21  constitutional rights, you can't -- especially in this

22  case where it's not even relevant toward the claims of

23  the case.

24              MR. MOORE:  You can take -- you will need

25  to file a motion for protective order with respect to

Brenda Murphy                                February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 203

1    that, Mr. Ingram, okay.  So with that, I think I'm done.

2    So who is going next?  Is it going to be counsel for any

3    of the other defendants?  You, Mr. Ingram?  How are we

4    going to proceed?

5                 MR. INGRAM:  I need to redirect but first

6    see if there's any other questions from other

7    defendants.

8                 MR. TYSON:  I'd like to ask some

9    questions if this is a good time.

10                 MR. INGRAM:  Sure.  You know we're

11    already significantly over our five hour time frame

12    but -- and I don't believe you were noticed.  Did you

13    notice that you wanted to ask questions?  We just had a

14    notice from the House defendants.

15                 MR. TYSON:  Yeah, he noticed the

16    deposition.  I'm a defendant.  I'm Rob Tyson.  I

17    represent the Senate.  I'm allowed to ask questions.

18                 (Audio interference.)

19                 MR. TYSON:  Guys, you need to get on

20    mute.  And, Mr. Ingram, since this thing is going to be

21    held open, I think we're okay.  Ms. Murphy, do you have

22    about fifteen minutes for me?  I see you rolling your

23    eyes.

24                 MR. INGRAM:  I would prefer we just wait

25    to a later date since they don't seem to be -- we've

                                                    Page 204

1   already had a long day today.

2                  MR. TYSON:  I don't have a whole lot of

3   questions right now and it would be kind of following

4   up.  It's not going to be on new material.  So Ms.

5   Murphy, if you're okay, I've got some questions I can

6   ask.

7                  THE DEPONENT:  Go ahead.

8

9   EXAMINATION BY MR. TYSON:

10          Q.      Ms. Murphy, thank you.  Again I'm Rob

11  Tyson and I represent the Senate defendants in this

12  case.  I just want to -- I have a couple of -- several

13  buckets of questions.

14          A.      Buckets?

15          Q.      But Mr. Moore kind of went from A to B to

16  C to D so I'm going to try to stay in one bucket before

17  I go to another but I'm not promising I'm going to be

18  that organized.

19                  Let me just ask you a question to start

20  off.  Mr. Moore asked right off the bat if you had ever

21  been deposed and you said you had been deposed

22  previously one time in some case and I think Mr. Moore

23  asked you about whether Judge Lydon was the judge in

24  that case or something.  Do you remember that?

25          A.      I recall the question.

Page 205

```
 1          Q.      Okay.  And do you recall your answer?

 2    That's what I'm interested in.

 3          A.      It was about the Myrtle Beach case,

 4    yes.

 5          Q.      And the question was have you ever been

 6    deposed before.  And do you remember you were deposed by

 7    me two years ago?

 8          A.      What was that in reference to?

 9          Q.      Absentee ballot voting when you were a

10    plaintiff, the NAACP was the plaintiff in the Thomas

11    lawsuit?

12          A.      Absentee ballots.  I may have.

13          Q.      It was July the 27th.

14          A.      Okay.

15          Q.      Yes, ma'am.  2020.  I'm not a memorable

16    person but I just wanted to make sure that the record

17    was accurate that you have been deposed before.

18          A.      Thank you.  Thank you for reminding me

19    of that.

20          Q.      Yes, ma'am.  This bucket that I wanted to

21    ask questions about is kind of about process.  And some

22    of the complaints that the NAACP raised -- oh, let me

23    ask you something.  I'm really confused about how your

24    deposition is.

25                  Sometimes you say you're representing --
```

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 206

1   you're there today representing the state conference.

2   Other times -- your attorney started off and said you're

3   just there individually.  So I'm trying to figure out --

4   I think these questions are going to be addressed to you

5   individually.  Is that okay?

6          A.      How is it relevant to this conversation

7   when we're here about the state conference?

8          Q.      Because there are two types of

9   depositions and your attorney started off making sure --

10  his first question, his first comment that he said was

11  this wasn't a 30(b)(6) where you would be speaking on

12  behalf of the organization.  And Mr. Moore said, no, I'm

13  not doing that.  If I did that, I'd have to give you the

14  topics.  I'd have to do that.

15          And so you're here speaking, testifying

16  individually.  I just wanted to make sure that that's

17  clear so when I ask these questions, you're able to

18  answer those?

19          MR. INGRAM:  For clarification as I said

20  before, she's here in her personal capacity as the

21  president of the state conference.  She is not here as

22  Brenda Murphy.  She's not a named plaintiff.  She's here

23  representing the state conference.  This is not a

24  30(b)(6) deposition.

25          Q.      Okay.  So part of the complaint that's

Page 207

1   gone throughout and Mr. Moore asked you some questions

2   was about process and I just wanted to ask some

3   questions about that.  Isn't it fair to say that the

4   NAACP has been an active participant in the

5   redistricting process?

6       A.      We have been an active participant in

7   terms of attending sessions.  Not to the extent that

8   we would like to be but we have provided testimony

9   that's been -- you know, in terms of the testimony

10  being received, I will say we have been active in that

11  respect, yes.

12      Q.      And I think you testified earlier that

13  you and/or your members participated in a significant

14  number of the meetings that were held across the state,

15  right?

16      A.      Oh, I didn't say that.  I said a number

17  was -- in terms of the hearings, yes, they were

18  encouraged to participate but there was difficulty in

19  terms of some attending the meetings because they were

20  during the day.  You know, the majority of those

21  sessions were done at the hours that were not good for

22  some of the membership of the NAACP.

23      Q.      And I think in each of those, you could

24  have provided written comments.  In fact, I think maybe

25  the NAACP did provide comments on those, correct?

Brenda Murphy                                February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 208

1          A.      We did.

2          Q.      So you did participate in a number of the

3    statewide hearings across the state, right?

4          A.      Me personally?

5          Q.      No.  The NAACP, your members, you and

6    your members.

7          A.      I can't say what number.  I can only

8    say that the time was difficult.  In terms of virtual

9    capability because some could not come to the sites

10   where they were being held, they were unable to attend

11   because they were not virtual.  There was not the

12   virtual capability.

13         Q.      I understand that.  But didn't you say

14   earlier that you attended some of those meetings,

15   correct?

16         A.      Yes, I did.

17         Q.      And didn't you say earlier that you

18   attended some of the meetings held by the redistricting,

19   the ad hoc committee?  Not the public meetings held

20   across the state but the ones back in Columbia once they

21   got here.

22         A.      I did.  I attended two meetings.

23         Q.      And you testified at both of them?

24         A.      Yes.

25         Q.      And, you know, we've had -- Mr. Moore's

Page 209

1    talked to you for a long time about all the different

2    letters that you and I think you called your

3    coalition -- but y'all wrote a number of letters to the

4    state House of Representatives concerning redistricting,

5    didn't you?

6         A.      The letters were written, yes.

7         Q.      A number of them, correct?

8         A.      The ones that were mentioned today.

9         Q.      I think it was at least a dozen but it

10   might be more.

11        A.      I don't think it was a dozen.

12        Q.      Okay.  But it was a lot of letters.  You

13   had an opportunity and you did take advantage of that

14   opportunity, correct?

15        A.      I would say me personally as

16   attending -- I attended two.  I testified at two.

17        Q.      Yeah, but I'm talking about --

18        A.      Letters were written.  Letters were

19   written.

20        Q.      Yes, ma'am.

21        A.      I'm not saying that is adequate

22   representation from the full body.  I still as a

23   matter of record say the opportunities were not as

24   great to participate in testimony as was provided by

25   the Senate.  It was a difference.

Page 210

1          Q.      And as the lawyer for the Senate, I say

2     thank you but today we're here about the House and you

3     did write -- and your group did write a bunch of letters

4     and you also provided a number of maps, correct?

5          A.      Not a number of maps.

6          Q.      How many maps did you provide -- did your

7     organization --

8          A.      That was provided for the House.

9          Q.      Right.  More than one?

10          A.      I'm thinking one, maybe one revision.

11          Q.      Yes, ma'am.  So at least a couple.  And

12     you provided comments on various drafts of the House

13     maps, right?

14          A.      I did.  May I comment, sir?

15          Q.      Yes, ma'am.

16          A.      My -- we may have provided comments.

17     The goal, it was not just to make comments but it was

18     for our voices to be heard and at least considered and

19     to see some type of outcome in terms of what we had

20     recommended.

21          Q.      And that was --

22          A.      That was the intent.

23          Q.      And I appreciate that.  But my point is

24     just a simple one.  You did express your right and you

25     did voice it, right?

Brenda Murphy                              February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 211

1          A.       Yes.

2          Q.       And in many ways.  From meetings,

3    testimony, letters, letters from your lawyers, legal

4    positions, maps.  You did a variety of things to provide

5    input in the process, correct?

6          A.       Yes, we did.

7          Q.       Okay.  But that doesn't mean that you

8    always get your way though, does it?

9          A.       It's not just my way.  There were many,

10   many concerns that were expressed by many at those

11   hearings.

12         Q.       I understand that but I'm talking about

13   you specifically at the NAACP, your comments.

14         A.       This is not about me specifically or

15   the state conference.  It's about outcomes.

16         Q.       Okay.  But isn't it fair to say that just

17   generally speaking on legislative actions, the

18   legislative process takes in multiple views, correct?

19         A.       They may.  I can't answer that for them

20   but --

21         Q.       Well, you know they do.

22         A.       I cannot speak for the legislators.

23         Q.       You know people have different opinions

24   on different issues, right, Ms. Murphy?

25         A.       Yeah, everybody has different opinions

Brenda Murphy                              February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 212

1    but you are there to represent us as citizens of the

2    state.  The input that we provide should be not only a

3    consideration --

4         Q.     But --

5                MR. INGRAM:  Let her finish.

6         A.     Not only considered but acted upon.

7         Q.     Now what if somebody else said the same

8    thing?  What if the ACLU said the same thing or the

9    League of Women Voters said the same thing or the South

10   Carolina Homebuilders said the same thing?  If they said

11   we're entitled to have our views heard and you must act

12   on them, how would that work?

13        A.     Sir, you represent us.

14        Q.     Correct.  And that's what I'm just trying

15   to make sure that you understand that you are able and

16   were afforded the opportunity to provide in the process

17   and I appreciate you doing that.

18               Okay.  Let me ask you questions about

19   your membership.  I know we've had a lot of discussion

20   about that and your lawyer there has a whole bunch of

21   motions for protective order that he has to file here

22   shortly but let me ask you something.  Mr. Moore asked

23   why did you sue the House?  And your answer was

24   opportunity districts are not there but could have been.

25   And so he said why did you sue -- why did you bring the

Page 213

```
 1   suit?  And you said we heard from members across the

 2   state.  Do you remember that?

 3                 MR. INGRAM:  Objection.  Misstates --

 4                 MR. TYSON:  For what?

 5                 MR. INGRAM:  Misstates testimony.

 6                 MR. TYSON:  Does she get to answer that

 7   before you do?

 8                 MR. INGRAM:  That's how objections work.

 9        Q.     Ms. Murphy?

10        A.     Yes.

11                 MR. TYSON:  I don't think that's how

12   objections work but I appreciate that late on a Friday

13   afternoon.

14                 MR. INGRAM:  We can read back the

15   testimony if we want to quote what she earlier said in

16   the deposition.

17                 MR. TYSON:  I'm a pretty good transcriber

18   because it took my attention.  I'm glad if you want to

19   go back, Mr. Ingram, and make it -- read it but I want

20   to ask her a question, not talk to you.

21        Q.     Ms. Murphy, do you remember that

22   testimony?

23        A.     I'm not --

24                 MR. INGRAM:  Objection.  She's not going

25   to respond to your summary of her words when there's a
```

Page 214

1    record that we can refer to.

2         Q.     Let's try it again, Ms. Murphy.  Do you

3    remember Mr. Moore's question why did you bring this

4    suit?

5         A.     I remember the question but it was much

6    more detailed than what you have just said.

7         Q.     Give me an answer then, whatever you

8    believe the detailed question is.  Why did you bring the

9    suit?

10        A.     Why did I bring the suit?  Why did the

11   state conference bring the suit?

12        Q.     Correct.

13        A.     The suit was brought because of several

14   reasons.  The maps are not representative of districts

15   that provide the opportunity for representation,

16   especially I will note black representation.  There

17   has been -- the numbers have been minimized in terms

18   of potential opportunities for representation.

19        Q.     Did you hear from any members across the

20   state?

21        A.     I think I answered that, too.

22        Q.     And what was your answer?

23        A.     My answer is we have branches

24   throughout the state which we regularly communicate

25   with.

Brenda Murphy
The South Carolina State Conference vs. McMaste,
February 4, 2022

Page 215

1    Q.    And so my question is did you hear from

2    those branches and those members before bringing this

3    lawsuit?

4              MR. INGRAM:  Objection.  Asked and

5    answered.

6    Q.    Go ahead.  You get to answer the

7    question.

8    A.    Let me say again we started planning

9    and talking about redistricting long before the

10   numbers were in.  We encouraged -- we met with our

11   members.  We encouraged them.  We provided information

12   to make them more familiar with the process in order

13   for them to be involved in the redistricting process

14   also because of the importance of that.

15              How districts is drawn we know impacts

16   on our citizens, particularly black citizens.  And so

17   in terms of dilution of the vote, it's very important

18   that they be drawn in such a way that the votes are

19   not diluted and that they are in compliance with the

20   Constitution.  One man, one vote.  What else did I

21   have to say?  Do you want me to repeat everything I

22   said?

23   Q.    No.  I just want you to be responsive to

24   my simple question.  Did you hear from members across

25   the state?

Brenda Murphy                                   February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 216

1      A.      Of course I did, sir.  I just said I

2   did because we were --

3      Q.      Okay.  How did you hear from them?  Did

4   you get written communications?  Was it --

5      A.      Sir --

6              MR. INGRAM:  Objection.  Asked and

7   answered.

8      A.      Sir --

9              MR. TYSON:  I just got here.  I just

10  started.  Let me finish my question before you yell

11  that.  So let's hold on, Mr. Ingram.  Let me finish my

12  question.  I know you and Mr. Moore didn't gee haw but

13  give me a second here.

14     Q.      The question is how did you hear from

15  those members?  I'm not asking you to identify them.

16  I'm asking, Ms. Murphy --

17     A.      We have --

18     Q.      Hold on.  Let me ask my question.  Did

19  you get emails from them?  Did you get phone calls from

20  them?  Did you get -- were you at meetings?  I'm just

21  asking a simple question.  When you say you heard from

22  members before you bought the suit, what does that

23  process look like?

24     A.      Our membership meets at least monthly.

25  We had symposiums and by virtue of meetings.  And I

Brenda Murphy                                        February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 217

1    don't know if symposium is the right word but it was

2    where we came together to look at the maps that have

3    been drawn and it was done in such a manner that

4    everyone had input that wanted to have input.  And we

5    had representation from throughout the state and there

6    were at least two of those sessions.  By Zoom meetings

7    if you want to know.

8         Q.      Ms. Murphy, here is just -- I'm sorry.

9    Did I interrupt?

10        A.      No.  I'm listening.

11        Q.      Here's the problem.  You say you heard

12   from your membership and you heard from registered

13   voters.  That's in your complaint.  And you say that

14   you've got specific members in each of these challenged

15   districts.

16              And what you're telling us today is just

17   trust us because you did, you heard from them.  And what

18   we're trying to figure out is there any way, any

19   communication, anybody that can tell us who in the world

20   lives in any of these 29 districts or who in the world

21   wanted to bring this lawsuit.  Is there any way?

22        A.      I cannot give you those names, sir,

23   because they are members of the NAACP so I cannot give

24   you those names.

25        Q.      One of the comments that you responded

Page 218

1    when I was talking about your answer just a second ago,

2    you said that you wanted to -- the opportunity districts

3    are not there that could have been.  How many

4    opportunity districts do you think there should have

5    been?

6            A.      Oh, I'm not going to answer that

7    question because I think that was a group discussion

8    about that.  I don't have those notes in front of me

9    and I wouldn't attempt to answer it.

10           Q.      So not very much or a whole lot more or

11   just --

12                   MR. INGRAM:  Objection.  Asked and

13   answered.

14           Q.      I'm still waiting for the answer.

15           A.      I don't have an answer for you, sir.

16           Q.      Okay.  So when you said that they are not

17   there but could have been, how would we get that answer?

18           A.      They are not there but could have been?

19           Q.      That's what you said.  That was your

20   testimony.

21           A.      That's probably a part of a phrase that

22   you took, sir, but I think the opportunity for there

23   to have been more competitive districts does exist.

24           Q.      And I hear you saying that and the

25   question is how many more and what's that based on?  How

Brenda Murphy                                February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 219

1    do we factor that into --

2          A.    Sir, I can't --

3                MR. INGRAM:  Objection.  Asked and

4    answered.

5          Q.    Ms. Murphy, I asked a question.

6          A.    Sir?

7          Q.    I asked a question.  How would we find

8    that out?  You just said -- you just testified --

9          A.    Sir, I'm going to ask a question.  Why

10   am I being asked the same questions over and over

11   again when I've answered them?

12         Q.    Well, I'm just asking you is there -- I

13   want to know is there somebody that can testify that can

14   tell us because your testimony was there weren't enough

15   opportunity districts there.  I'm just asking is there

16   somebody that can tell us that answer?  If it's not you

17   on a Friday afternoon, who else?

18         A.    I don't have -- I was instructed not to

19   bring any notes, any of my documents.  I'm in the

20   office which is closed and I came in due to COVID.  I

21   do not have access to those records.  I cannot speak

22   off the top of my head regarding this.

23               There is -- there is a great deal of

24   information and I think it's very unfair to ask me

25   questions and I not have access to information which

Page 220

1   you all instructed me not to have in front of me,

2   beside me, behind me or whatever.

3            MR. MOORE:  Can I interpose a point?  Who

4   is the "you all" who instructed you not to have any

5   document in front of you?  Because I can tell you that

6   "you all" is not me.

7            MR. TYSON:  It's not me.  I don't know

8   who she's talking about.

9            MR. MOORE:  Who is "you all"?

10       A.    Well, I was asked that question from

11  the beginning, did I have any documents with me.

12       Q.    I'm not asking that.  I'm just trying

13  to -- your testimony was there were not enough

14  opportunity districts that were drawn.

15       A.    I can only --

16       Q.    My question is -- and I hear you.  I

17  respect your answer.  I think what you're saying you

18  have the answer to that but you just don't have it there

19  today with you because you don't have those materials --

20       A.    That's right.

21       Q.    -- that you're able to say that, right?

22       A.    Yes.  I can review the documents and

23  provide that information.

24       Q.    Okay.  I was just trying to -- the way

25  that you first said it, it was just kind of like a I

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 221

1    just think there should have been more and I was just

2    trying to find out if there was any documentation to

3    support it.  So I appreciate that you don't have them

4    there.  So we will figure out how to get that answer

5    from you when you can review your documentation, okay?

6                One of the things that you went through

7    that was kind of a discussion and it rambles throughout

8    the complaint and it was about this -- the prior history

9    of South Carolina redistricting and how it has been

10   unfavorable to black voters.  And so I want to make sure

11   that I follow up on some of the questions that Mr. Moore

12   said because that's not true for 2010, correct?

13        A.      The numbers increased in 2010 and we

14   know why it did.

15        Q.      What does that mean, the numbers

16   increased?  What numbers?

17        A.      The number of black legislators.

18        Q.      Okay.  So there were opportunities for

19   more African American --

20        A.      Because there were even fewer than

21   there are currently.

22        Q.      I'm just trying to ask a question about

23   in 2010.  I want to be clear on this.  When the

24   complaint makes these assertions about the prior

25   problems with racial gerrymandering in South Carolina,

Page 222

1    that's not accurate for 2010, correct?

2          A.      I can say and, you know, I base things

3    on how -- and I say this word often -- in terms of

4    outcomes.  The numbers did increase in 2010.  So were

5    they better than before?  Yes.

6          Q.      Well, I'm speaking in legal terms.

7          A.      I'm not an attorney, sir.

8          Q.      But it pre-cleared plans from President

9    Obama's Department of Justice, correct?

10                 MR. INGRAM:  Objection.  Calls for legal

11   conclusion.

12                 MR. TYSON:  No, it doesn't.

13         Q.      It's just a simple yes or no.  Did these

14   plans, the House, the Senate and the congressional

15   plans, all get pre-cleared by the Department of Justice?

16   You've already testified yes.

17         A.      In 2010.

18         Q.      In 2010.

19         A.      '11.

20         Q.      Right.

21         A.      No.

22         Q.      And then there was a complaint that was

23   brought in the United States District Court of South

24   Carolina claiming that the districts were racially

25   gerrymandered in a section two plan (sic).  Do you know

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 223

1    anything about the Ficus (sic) case?

2         A.      No, I don't.

3         Q.      Okay.  But --

4         A.      Fifteen minutes, sir.

5         Q.      I might have twenty.  Mr. Moore asked you

6    a question and I think you just kind of spoke on it a

7    few minutes ago.  When you analyze these maps or

8    whatever, you testified -- or let me make sure.  I don't

9    want Mr. Ingram to say that I'm putting words in your

10   mouth.  I think it was something along the lines that --

11   help me if I'm not -- that when you analyzed these maps,

12   you looked at the outcomes.  Do you remember saying

13   anything like that or is that accurate?

14        A.      You mean me, Murphy, or Moore?

15        Q.      You.  You said you looked at the outcome

16   of the maps, how --

17        A.      Yes.

18        Q.      -- they affected black districts and the

19   opportunity for black people to be in competitive

20   districts.

21        A.      Yes.

22        Q.      Okay.  And so did you look at any other

23   factors when you analyzed these before your organization

24   brought the lawsuit?

25        A.      Let me say this.  We looked at data.

Brenda Murphy                          February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 224

1    We look -- we had in terms of individuals that could

2    be helpful, in terms of looking at data, looking at

3    the variables that we needed to consider.  It's not

4    that we independently -- we're not attorneys.  We are

5    not demographers and so we had to depend on others

6    with those skills that could do that.

7              So with those skills that we -- that

8    they had that complimented us in terms of knowing how

9    to evaluate these maps, the decision was made that --

10   in relevance to what you're asking me.

11             So it was not an independent decision

12   by the state conference.  We had to use demographers.

13   We had to have individuals with expertise in certain

14   areas.  Legally.  Even in terms of the need for legal

15   guidance, we needed that as well.  We are not

16   attorneys.  There was one -- we have one attorney

17   that's a member of our committee but his expertise is

18   not in redistricting.

19        Q.    But, Ms. Murphy, I just wanted to know --

20   you said that you looked just at the outcomes and my

21   question was did you look at --

22             (Simultaneous crosstalk.)

23        Q.    And did you look at any of the other

24   redistricting criteria or did your consultants --

25        A.    Yes, of course.  That's why I said we

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 225

1    used demographers.  We used individuals with expertise

2    in terms of redistricting and to ensure that we

3    considered all the factors that needed to be

4    considered.  So this was -- this was a comprehensive

5    look at this with the consultation of individuals that

6    have expertise in the area.

7         Q.      And Mr. Moore asked you about the -- I

8    think he called it redistricting principles and you said

9    you weren't fully aware of that but you understood the

10   criteria, right?

11        A.      Yes.

12        Q.      And you know the House had a whole list

13   of criteria that they use that weren't race-related,

14   traditional redistricting criteria, right?  Compactness.

15   They needed to be contiguous, needed to protect

16   communities, right?  You know about all those, right?

17        A.      Yeah.  Yes, I do.

18        Q.      And so what I'm asking is this.  You

19   know, I know you looked at the numbers to see what the

20   feedback is.  You've got that throughout your complaint.

21   I'm trying to figure out did you look at any of those

22   factors to analyze those specific 29 challenged

23   districts and why they were drawn that way?

24        A.      Of course they were -- we did look at

25   that.  That's why I said this was not looked at just

Page 226

1   as a specific district did one way or the other.

2   Factors were or variables were considered and that was

3   with the expertise of demographers, individuals

4   experienced in mapping.

5            So it's not just a shot in the dark

6   regarding potential for mapping to increase

7   opportunities for representation by black people.

8        Q.      I think Mr. Moore asked you some

9   questions about District 95 which Representative Govan's

10  is a member of that but --

11       A.      He didn't ask me about that, not 95,

12  but what is your question about 95?

13       Q.      So for District 95, there were questions

14  and there is all kinds of data throughout the complaint

15  about the BVAP and I was just wondering what are these

16  other redistricting criteria used by the state

17  conference to analyze whether those were used to draw

18  District 95?

19       A.      Let me just say and I said this before

20  no district was drawn in such a way it was reflective

21  or to ensure an incumbent.  That was not considered as

22  one of the factors that we used.

23       Q.      But what I'm asking about is do you know

24  whether you or your experts analyzed whether the

25  district was compact?  Did you analyze --

Brenda Murphy                                February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 227

1        A.        I'm sure that -- well, I'm certain that
2    was considered, yes.
3        Q.        Did they look to see whether it was
4    contiguous?
5        A.        That was one of the consistent
6    criteria.
7        Q.        Did they look to see whether the
8    population fell within the deviation?
9        A.        Sir, I just said to you that all of the
10   variables were considered.
11       Q.        And so who would we ask to determine if
12   these 29 challenged districts that you have said you
13   just looked at the results, who would be able to --
14       A.        I did not say --
15       Q.        Hold on.  Hold on.
16       A.        Well, I just don't want you putting
17   words in my mouth because I did not say that I just
18   looked at results.
19       Q.        I thought we just went through this.  Do
20   you want me to repeat those?
21       A.        We look at outcomes.  Outcomes.
22       Q.        Outcomes.  Okay.  And tell me how outcome
23   is different than results.
24       A.        It may have more variables.  I may -- I
25   know.  Let's just say we looked at it from a

Brenda Murphy                                        February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 228

1    comprehensive standpoint considering all of the

2    variables that needed to be considered, and if a

3    district could be mapped in such a way that it could

4    be reflective or competitive, then that's the way the

5    mapping was done by our group.

6            Q.      So let me just -- so you recognize that

7    the House used traditional redistricting criteria to

8    draw some of these districts, right?

9            A.      Traditional?

10           Q.      Compactness, continuity, communities of

11   interest, deviation, all of those traditional issues.

12           A.      I hope that was the intent.

13           Q.      I'm sorry?

14           A.      I hope that was the --

15           Q.      Let me ask that question again.  Isn't it

16   clear that the House used those criteria for drawing

17   some of these districts?

18                   MR. INGRAM:   Objection.  Asked and

19   answered.

20           A.      I cannot answer that question because

21   it was -- I was not sitting on the committee when they

22   drew the maps.

23           Q.      But somebody in your group has looked at

24   them and they can tell that they're compact, right?

25           A.      Oh, I'm certain, yes.

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 229

1          Q.      And they can tell that they're

2     contiguous, right?

3          A.      Yes, they are.

4          Q.      And they can tell they preserve

5     communities of interest, right?

6          A.      Yes, they did.

7          Q.      Okay.  That's my point.  Mr. Moore went

8     through a whole bunch of examples of communities of

9     interest so let me try this one last time.  Is it fair

10    to say or accurate to say that the House did follow its

11    criteria when drawing its districts?

12               MR. INGRAM:  Objection.  Asked and

13    answered.

14         Q.      Go ahead and answer that, please.

15         A.      I was not a member of the subcommittee

16    so I don't know if they were consistent or not.

17         Q.      Do you have any reason to think that they

18    weren't?

19         A.      I don't know.

20         Q.      You looked at the maps.  You said you

21    studied them.  They're compact.  You can tell me that,

22    can't you?  You can look at a map and tell me.  We can

23    pull one of those up that's still over there.  We can go

24    back through it ourselves.

25         A.      Sir.  Sir, right now the attorney

Brenda Murphy                                February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 230

1   doesn't have to speak for me but I'm telling you you

2   are badgering me.  Would you please be succinct in

3   your questions so we can get on with this and I can go

4   home.  We've been at this since 10:00 a.m.  It is now

5   five o'clock and I was told this deposition would only

6   take five hours.

7           MR. TYSON:  Ms. Murphy, can I just say

8   one thing?  I appreciate your patience.  This isn't an

9   easy issue.  So with that, I will take your advice.  I

10  apologize if I was badgering you.  I was trying to

11  make sure I understood your answer, but with that, I

12  don't have any more questions.  I hope you have a good

13  weekend.  Thank you for your time.

14          THE DEPONENT:  Thank you.

15          MR. INGRAM:  Does counsel for the

16  governor or any other defendants have questions before I

17  redirect?

18          MR. LIMEHOUSE:  Yes, I do.  This is

19  Thomas Limehouse for Governor McMaster.  I have a couple

20  of quick questions.

21

22  EXAMINATION BY MR. LIMEHOUSE:

23      Q.      Good afternoon, Ms. Murphy.  My name is

24  Thomas Limehouse.  I represent Governor Henry McMaster.

25  I have a few quick questions for you.  It shouldn't be

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 231

1    fifteen.  Try to keep it as quick as possible.  Are you

2    aware that Governor McMaster is named as a defendant in

3    this lawsuit?

4           A.      Yes.

5           Q.      Both in the original complaint and the

6    amended complaint, right?

7           A.      Yes.

8           Q.      I believe you testified that you were

9    involved in the NAACP's decision to file this lawsuit.

10   Is that correct?

11          A.      Involved in the decision to?  Yes.

12          Q.      Who else was involved in the decision, if

13   anyone?

14          A.      The coalition.  We made a group

15   decision to do it.

16          Q.      Okay.  Who made the decision to sue the

17   governor?

18          A.      The governor has final overall

19   authority, responsibility.

20                  MR. TYSON:  I was badgering.

21                  MR. INGRAM:  Can you put it on mute?

22                  THE DEPONENT:  Yes, you were badgering

23   me.

24                  MR. INGRAM:  And objection.  Objection.

25   Calls for a legal conclusion.

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 232

1              MR. LIMEHOUSE:  I'm sorry.  The reference

2      to badgering?

3              MR. INGRAM:  No.

4              (Simultaneous crosstalk.)

5              MR. INGRAM:  Your question about who made

6      the decision to sue the governor.

7              MR. LIMEHOUSE:  I'm sorry.  You were

8      speaking over the witness.  The witness' reference to

9      badgering.

10      Q.     Ms. Murphy, what were you referring to?

11      A.     The voice in the background, not you.

12      Q.     Okay.  Got you.  Okay.  Try that again.

13      Who made the decision to sue the governor?

14              MR. INGRAM:  Objection.  Calls for a

15      legal conclusion.

16      Q.     You can answer.

17      A.     The coalition decided.

18      Q.     Which members of the coalition?

19      A.     The coalition that's listed on our

20      correspondence.

21      Q.     Okay.  When was the decision made to file

22      this lawsuit?

23              MR. INGRAM:  Objection.  This is

24      attorney-client privilege.  Legal strategy.  I'm going

25      to direct my client not to answer.

Page 233

1          Q.      Why did the NAACP sue the governor?

2                  MR. INGRAM:  Objection.  Privileged.  I'm

3     going to direct my client not to answer.

4          Q.      What do you or the NAACP claim the

5     governor did or didn't do related to the claims in this

6     lawsuit?

7          A.      The governor has ultimate

8     responsibility for the final House plan which has been

9     signed off.

10         Q.      Anything else?

11         A.      Because the plan as we see it as a

12    coalition still has -- we still have concerns about

13    specific areas and we want our voices to be heard.

14                 MR. LIMEHOUSE:  All right.  Thank you.

15    I have no further questions.  Appreciate your time.

16                 THE DEPONENT:  Thank you.

17                 MR. INGRAM:  Okay.  I need five minutes

18    to clear my thoughts for redirect.

19                 (Brief recess.)

20

21    EXAMINATION BY MR. INGRAM:

22         Q.      Ms. Murphy or President Murphy, I have

23    just a few questions for you.  First, earlier today, you

24    were asked questions about your preparation for a

25    deposition.  You testified to meeting twice.  Do you

Brenda Murphy                                February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 234

1    remember if that was once or twice a day on either of

2    those days?

3                    MR. MOORE:  Object to the form.

4        Q.     You may answer.

5        A.     Twice on one day.

6        Q.     On which day?

7        A.     My days running -- today is Friday?

8    Thursday.

9        Q.     Okay.  And I have a couple of questions

10   about discovery.  So you were asked about discovery in

11   this case and about your role in discovery.  So without

12   disclosing specifically what you discussed, do you

13   recall whether you worked with an attorney in this case

14   to respond to different questions that the defendants

15   were seeking from the South Carolina NAACP?

16                    (Audio interference.)

17                    THE DEPONENT:  Somebody is talking in the

18   background.

19                    MR. INGRAM:  Can we please go on mute?

20   Someone is speaking.

21       Q.     I'll repeat the question.  Without

22   disclosing specifically what you discussed, do you

23   recall when you worked with any attorney in this case to

24   respond to different questions that the defendants were

25   seeking of you?

Page 235

1          A.       No.

2          Q.       Do you remember discussing discovery

3    responses with any of your attorneys?

4          A.       No.

5          Q.       Do you remember your attorneys asking you

6    to collect documents for this case?

7                   MR. MOORE:  Object to the form.

8          Q.       You may respond.

9          A.       In terms of documents that were needed?

10         Q.       Correct.

11         A.       I was requested by someone by email

12   that the documents were needed and I instructed the

13   staff to send those forms that were requested.

14         Q.       Thank you.  I have a couple of questions

15   about the distinction between the coalition and the

16   South Carolina NAACP.  President Murphy, you testified

17   about working with the coalition on redistricting or

18   what otherwise may be reapportionment, slash,

19   redistricting committee.  Are these one and the same?

20   That is, is the coalition and the reapportionment

21   committee the same thing or are they separate things?

22         A.       They are the same.

23         Q.       Can you describe off the top of your head

24   if you can the various groups who are part of the

25   coalition?

Page 236

1      A.      They are reflected in the minutes.  The

2   coalition -- I don't want to miss anybody.

3      Q.      Okay.

4      A.      You know, I would rather you refer to

5   the listings on the minutes to have an accurate

6   membership.

7      Q.      And just to clarify, the coalition is

8   different from the South Carolina NAACP?

9      A.      Yes, it is.

10      Q.      And what role in the coalition would the

11   South Carolina NAACP have?

12      A.      Your question again?

13      Q.      What role in the coalition does the South

14   Carolina NAACP have?

15      A.      Ask that -- could you rephrase it?

16      Q.      The South Carolina NAACP is a part of a

17   broader coalition, correct?

18      A.      That's a different organization.

19      Q.      Correct.  You would say the coalition is

20   an umbrella group of different groups, right?

21      A.      That's correct.  Yes.

22      Q.      And what role does the South Carolina

23   NAACP have within that larger group?

24      A.      We are participants.

25      Q.      Are you -- would you consider yourself a

Brenda Murphy                              February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 237

1    leader of the coalition?  Is it a democracy?  How does

2    that work?

3         A.      It is a democracy.  We spearheaded the

4    initiative but it was a group pulled together to work

5    together on the redistricting process.

6         Q.      Thank you.  Now I'm going to turn to a

7    few questions about the legislative cycle to get some

8    clarification.  You testified about individuals not

9    being able to participate in legislative proceedings.

10   What do you mean by that?

11        A.      Some were not able to participate

12   because of the scheduled time for the hearing.

13        Q.      What time were the hearings scheduled?

14        A.      During the day.

15        Q.      Do you remember what hours?

16        A.      Ten a.m.  Maybe 1:00 p.m.

17        Q.      Does the conflict with many of the

18   schedules of the NAACP members?

19        A.      Yes, it does.  Many of them work.  The

20   only individuals that were able to attend were those

21   that were retired pretty much.

22        Q.      How many proceedings were at night or on

23   the weekend?

24        A.      None on the weekend.  At night?  I

25   don't recall any at night.

Page 238

1    Q.      And did you attend hearings by the House

2    on proposed state House maps?

3    A.      Yes.

4    Q.      What do you recall from those meetings

5    regarding concerns people had about the impact of the

6    maps on black voters?

7    A.      There were many concerns expressed,

8    disagreements in terms of how the maps had been drawn.

9    Not just from the members that did participate that

10    were giving testimony but also from others.  Concerns

11    and disagreements regarding with how lines were drawn.

12    Q.      And did those concerns overlap with some

13    of the challenged House districts in the amended

14    complaint?

15    A.      They did.

16    Q.      And do you recall if your plans combined

17    nineteen incumbents?

18    MR. MOORE:  Objection as to form.

19    Q.      You may respond.

20    A.      Okay.  You're asking me if --

21    Q.      Do you remember if the map submitted by

22    the South Carolina conference combined nineteen

23    incumbents against each other?

24    A.      No.  I think I said no before.  That's

25    something I would have to look at.  I can't -- I can't

Brenda Murphy                                February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 239

1    state yes or no on that.

2         Q.      Thank you.  I just have a few last

3    questions about South Carolina NAACP membership.  So

4    you've been asked about the identity of South Carolina

5    NAACP members by Mr. Moore and you stated your

6    unwillingness to disclose names.  Why are you concerned

7    about disclosing the names of your membership?

8         A.      I'm very concerned about disclosing the

9    names because I have to look at the history in this

10   state in terms of what happened to people in past

11   years in some of these counties where their names were

12   disclosed.  They lost their jobs.  Some even had to

13   move out of state so that is a big concern, a great

14   concern for not disclosing the names of our

15   membership.

16        Q.      Thank you.  And do you have concerns

17   today about the same sort of reprisal that you just

18   described?

19        A.      I will and I always will.

20               MR. INGRAM:  Thank you.  That is all I

21   have on redirect.

22               MR. MOORE:  Mr. Tyson, do you have any

23   questions before I begin because I only have one or two?

24               MR. TYSON:  No, I don't have any

25   questions.

Page 240

1              MR. MOORE:  Mr. Lambert.  Excuse me.

2      Mr. Limehouse.

3              MR. LIMEHOUSE:  I do not.

4

5      EXAMINATION BY MR. MOORE:

6          Q.      So Ms. Murphy, do you believe that you

7      shouldn't have to disclose the names of your members in

8      discovery?  Is that correct?

9          A.      Well, not only is it a personal belief,

10     it is a national -- in terms of our constitution and

11     bylaws, we cannot disclose the names of members and

12     it's for a reason such as I have stated that we do

13     not.

14         Q.      You also don't want to disclose the

15     process by which you say trust us, we have people in

16     these challenged districts.  You don't want to disclose

17     that process either, do you, ma'am?

18             MR. INGRAM:  Objection.  Misstating

19     testimony.

20         Q.      Please answer my question, Ms. Murphy.

21         A.      I stated as a requirement of our

22     national office, we are not to disclose the names of

23     our membership.

24         Q.      I didn't ask you a question about names.

25     I asked a question about process because -- I'm going to

Page 241

1    ask you again.  Can you tell me what process and what

2    records there are at the SC NAACP that can identify

3    these members for names in the challenged districts?

4                    MR. INGRAM:  Objection.  Asked and

5    answered.

6         Q.     Yes or no.

7                    MR. INGRAM:  Objection.  Asked and

8    answered.

9         Q.     The answer is yes or no, ma'am.  Can you

10   describe that for me?

11        A.     No.

12        Q.     Okay.  However --

13        A.     No.  Excuse me.  I cannot answer that

14   because of my restrictions because of policy from the

15   national organization that we do not disclose that

16   information.

17        Q.     But yet you're aware that your counsel

18   has taken the position that the House by virtue of your

19   challenge must subject all of its documents that are

20   arguably shielded by legislative privilege to scrutiny

21   by you.  Is that correct?

22                    MR. INGRAM:  Objection.  Objection.

23   Calls for a legal conclusion.

24        Q.     You may answer that question, Ms. Murphy.

25        A.     I would have to refer you to our

Page 242

1    general counsel, the NAACP national office.

2         Q.      And, Ms. Murphy, again as we sit here

3    today, you can't give me a bit of evidence that you have

4    to support your claim of purposeful racial

5    discrimination, can you?

6              MR. INGRAM:  Objection.  Asked and

7    answered.

8         Q.      You can answer, Ms. Murphy.

9         A.      I will again say in terms of looking at

10   the districts and how the lines have been drawn and

11   who live in those areas which is the outcome, the vote

12   for black people has been diluted.  That's the outcome

13   statement.

14        Q.      There's a difference between outcome --

15   and that's your opinion that the votes of black people

16   have been diluted, right?  That's an opinion by you?

17        A.      Well --

18             MR. INGRAM:  Objection.

19        A.      I again respond I'm a member of a

20   coalition.  We have evaluated these mappings, the

21   drawings, the mapping that has been done and that is

22   our opinion based on consultation with individuals

23   that have expertise in the area.

24             MR. MOORE:  I don't have any further

25   questions.  Thank you.  As I said earlier, we're

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

Page 243

 1    leaving this deposition open because of the late

 2    production of documents.

 3              Ms. Murphy, I didn't tell you this

 4    deposition would only take five hours.  It was a goal

 5    but I will also say that in my opinion the reason this

 6    deposition went so long is because instead of giving

 7    responses, direct responses to questions, you engaged

 8    in soliloquy rather than answering the question.

 9    That's my opinion.

10              MR. INGRAM:  This is harassment at this

11    point.

12              MR. MOORE:  I just wanted to say that.

13              MR. INGRAM:  This is harassment at this

14    point.  I want to make a record that you just launched a

15    diatribe at my client.

16              MR. MOORE:  I didn't want to diatribe.

17    This is in response to her comments about the length of

18    the deposition so --

19              MR. INGRAM:  Can I get on the record by

20    the court reporter about how long this deposition has

21    taken?

22              THE COURT REPORTER:  Just a second.  Six

23    hours and six minutes.

24              MR. INGRAM:  Thank you.

25              MR. MOORE:  Again we will leave this

Page 244

1    deposition open provided -- pending resolution by the

2    Court of the issues surrounding the unanswered questions

3    and the providing of other documents.  I don't have

4    anything further.  Mr. Tyson?

5                    MR. TYSON:  No.  I'm good.  Thanks,

6    everybody.  It's been a long day.  Thank you.

7                    MR. INGRAM:   Thank you.

8

9                    FURTHER DEPONENT SAITH NOT

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 245

1                    C E R T I F I C A T E

2

3

4    STATE OF ALABAMA)

5    MOBILE COUNTY)

6

7              I hereby certify that the above

8    proceedings were taken down by me and transcribed by me

9    and that the above is a true and correct transcript of

10   the said proceedings given by said witness.

11             I further certify that I am neither of

12   counsel nor of kin to the parties nor in anywise

13   financially interested in the outcome of this case.

14

15

16                     *Jan A. Mann*

17

18

19              JAN A. MANN

20              COMMISSIONER - NOTARY PUBLIC

21              ACCR NO. 321

22

23

24

25

Brenda Murphy

The South Carolina State Conference vs. McMaste,

February 4, 2022

**[& - 6]**

Page 1

| & | |
|---|---|
| **&** | 4:4 5:2,8 |

**0**

**03302** 1:5

**1**

**1** 6:10 22:22 39:23 40:1,7
**10** 6:21 86:22 181:1,18
**10-7-21** 6:22
**10006** 4:9
**102** 131:3 132:14
**103** 131:3 132:14
**106** 6:18
**10:00** 230:4
**10th** 56:25
**11** 6:22 186:5 222:19
**11-10-21** 6:14
**11-18-21** 6:23
**1100** 4:24
**111** 131:3 132:15
**115** 20:7
**117** 56:20 151:2 152:6
**12** 6:23 189:23 190:2
**1221** 5:10
**1230** 4:15
**12th** 111:2 197:8
**13** 6:24 194:12
**1310** 5:4
**132** 6:19
**14** 6:25 198:13 199:6
**15** 125:10 130:18 131:18
**16** 166:24
**165** 6:20

**17** 160:14
**18** 176:23 177:2 189:21
**1800** 5:10
**181** 6:21
**18286** 245:17
**186** 6:22
**189** 6:23
**19** 125:11
**1939** 42:22
**194** 6:24
**1975** 33:4
**198** 6:25
**1985** 35:8
**1:00** 237:16
**1:15** 102:23

**2**

**2** 6:12 44:6,9 67:1 196:18 197:20
**2000** 29:16 30:17 31:1,13
**2010** 101:7 105:16 119:10,20,21,22 120:7,15,19,25 121:21,22 153:7 221:12,13,23 222:1,4,17,18
**2011** 152:1,14 153:7 154:21 155:4 171:4
**2020** 85:8,11,16 86:2 95:9 103:24 105:9,12,14 205:15
**2021** 21:12 55:10 56:11 77:1 86:22 96:13 106:5 107:5 125:8,9,10,10,11 130:18 131:18 140:25 186:2,24 189:21 194:10

**2022** 1:24 3:7 7:6
**204** 6:4
**21** 96:13
**23** 46:23 47:8 56:11 96:8 97:10
**23-7028846** 41:24 43:13 44:2 45:18
**230** 6:5
**233** 6:6
**23rd** 57:1 111:4
**24.59** 85:17,22 86:10 87:5
**240** 6:7
**25** 87:4,4,11 194:9
**25.28** 85:12,21 86:4
**26** 104:5,21
**26.6** 99:10 101:2
**26.8** 104:19
**260** 2:4
**26th** 198:7 199:7 199:12,15
**27** 85:24 125:9 198:8
**27th** 205:13
**28** 85:24 87:19 104:21
**29** 83:22 86:21 87:11,19 217:20 225:22 227:12
**29201** 4:16,25 5:11
**29211** 5:5
**2nd** 199:13

**3**

**3** 6:13 66:23 67:4 67:8
**30** 13:10,11,14,17 22:22 125:8 206:11,24
**30th** 125:12

**321** 245:21
**33** 101:2 104:6
**34** 101:3,7,11,21 104:1,7,16,16 156:10,11,15,15
**36** 159:17
**365** 151:3,10 152:7 152:20
**36603** 2:5
**37** 162:25 163:13 163:14 167:22,23
**39** 6:10
**3:21** 1:5

**4**

**4** 1:24 6:14 7:6 43:2 67:2 81:21
**40** 4:8
**41** 159:20 160:1 161:2 162:13,14 165:22 166:6 172:21 173:3,6,22 178:22
**43** 160:1 161:2
**44** 6:12
**49** 186:2
**4th** 3:6

**5**

**5** 6:15 88:12 194:10
**500** 152:2,16
**501** 43:2
**509** 137:14,14
**57** 46:23 47:7
**57-0327661** 45:14
**579** 135:12,17
**5th** 4:8 197:6,7

**6**

**6** 6:16 13:10,11,14 13:17 87:20 97:9 97:11,11,14 106:5

Brenda Murphy
The South Carolina State Conference vs. McMaste,

**[6 - ago]**

Page 2

107:5 164:22
166:1,2 206:11,24
**6/10/2021** 45:23
**611** 45:9
**628** 151:14 152:22
**65** 91:21 92:8
**66** 6:13
**6th** 106:15

---

**7**

**7** 6:3,18 81:24
106:9,12 132:2
155:17 156:22
157:4,14 176:21
186:2,24
**70** 92:8 160:13
**700** 4:15
**75** 91:21
**77** 20:13

---

**8**

**8** 6:19 41:14,15,15
43:11 106:11,12
125:10 132:2,3,5
**8-26-21** 6:25
**8-5-21** 6:24
**80** 91:21
**81** 6:14
**85** 35:9
**88** 6:15

---

**9**

**9** 6:20 42:8,9 43:6
43:12 165:9
**9-30-21** 6:21
**95** 226:9,11,12,13
226:18
**97** 6:16
**9:05** 1:24 7:7

---

**a**

**a.m.** 1:24 7:7
230:4 237:16

**ability** 9:4 75:4,12
93:12,12
**able** 12:6 38:9
51:5 94:25 100:19
110:19 114:6
115:8,9 128:20
151:22 156:5
158:9 187:7,21
206:17 212:15
220:21 227:13
237:9,11,20
**absentee** 205:9,12
**absolutely** 103:20
**academy** 100:1
**accept** 193:7
**acceptable** 24:2
**access** 115:5,6
144:11 185:17
196:24 219:21,25
**accr** 245:21
**accurate** 83:23
205:17 222:1
223:13 229:10
236:5
**aclu** 14:15 26:19
27:8 77:23 99:6
141:15,17 142:3,5
142:18 143:20
144:14 145:1
183:9 185:19
212:8
**act** 56:20,25 74:17
151:2,3 178:22
212:11
**acted** 55:20 212:6
**acting** 7:2 69:19
**action** 181:25
182:7,19
**actions** 211:17
**active** 207:4,6,10

**activities** 38:22
**actual** 126:13,16
156:15 170:9
**actualized** 182:13
**ad** 62:25 115:24
116:3,6,8 117:2,4
125:4 127:10,17
127:18,22 130:19
134:12 208:19
**add** 34:13 127:5
130:14
**adding** 129:1
**addition** 83:13
**address** 20:6
**addressed** 206:4
**addresses** 144:11
144:16
**aden** 4:6 13:25
14:9 99:1 182:3
196:19,24 197:23
**adequate** 55:4
209:21
**administration**
33:14
**administrative**
98:9
**admission** 43:1
**admissions** 6:11
39:18 40:20
**admit** 41:23 42:13
43:19,20,22
132:20
**admits** 43:12 44:2
**admitted** 42:8
45:18
**admitting** 183:25
**adriel** 99:5,5
**advantage** 209:13
**adversely** 69:22
**advice** 230:9

**advisor** 35:15
**advocacy** 76:19
77:9,16,18
**advocate** 38:23
**advocated** 78:5
**affairs** 33:11
**affiliate** 29:24
**affiliated** 29:21
36:2
**affiliates** 51:15
**afforded** 212:16
**afl** 27:8 77:23
98:11
**african** 48:21 64:9
64:10,11,13 78:25
94:3 95:7,19
101:8 103:23
104:2,16 105:9,10
105:11,15 121:19
122:9 221:19
**afternoon** 213:13
219:17 230:23
**age** 33:24,25 86:10
86:17 88:19,24
89:1 99:10 100:18
100:18 105:11
157:15
**agency** 47:11
52:10 74:11
**agenda** 6:22,24
38:24 186:10,25
187:5 194:10
**agent** 45:7
**ages** 109:16
**ago** 44:24 115:15
118:19 129:10
131:10 138:13
147:5,17 148:5,18
153:13 163:7
179:4 187:24
205:7 218:1 223:7

Brenda Murphy
The South Carolina State Conference vs. McMaste,

February 4, 2022

[agree - answered]

Page 3

**agree** 42:25 43:12
43:25 54:12,14
55:8 57:4 67:17
67:20 88:18,22
89:22 90:18,19
91:1 104:15,19
115:23 116:19,20
116:22 119:19
125:20 134:20
135:6,9,10,20,24
136:3,6,8 138:5,8
145:18 147:16,20
150:4 151:25
152:2,5,16 154:19
155:3,15 157:13
157:15 161:15
164:21,21 165:19
165:22 201:14
**agreed** 3:3,8,14,20
76:18 82:7,19
113:2 126:4
147:17 153:12
**agreement** 17:12
130:22
**agrees** 104:8
**ahead** 131:17
149:2 204:7 215:6
229:14
**al** 1:15
**alabama** 2:5 7:2
22:23 245:4
**allegation** 59:14
59:17 60:19 62:1
62:10 111:7 160:2
163:3 168:7,9,11
168:19 169:2
171:7 177:23
179:17
**allegations** 119:20
153:23 159:3,12
160:19 170:20,23

**allege** 59:24
**alleged** 170:2
172:10 180:15
**allegedly** 178:21
**alleges** 59:4
159:19 172:21
**alleging** 169:8
**allow** 47:3 92:10
115:17
**allowed** 11:1
129:13 168:4,13
203:17
**alongside** 141:6
**amelia** 98:8
**amended** 17:1,2
55:9,11 56:10,21
57:1,8 59:4 60:3
66:5,6 71:21
73:14 74:10 111:2
156:8 165:21
166:11 187:11
231:6 238:13
**amendment** 57:7
79:13 202:20
**american** 36:5
48:21 64:9,10,12
64:13 78:25 95:7
95:19 101:8 104:2
104:16 121:19
122:10 221:19
**americans** 94:3
103:23 105:9,10
105:11,15
**analytical** 27:1
**analytics** 28:18
**analyze** 223:7
225:22 226:17,25
**analyzed** 223:11
223:23 226:24
**anderson** 67:19
137:3 138:20

139:1,3,9,9,15
153:20,24,24
154:14,14 155:10
160:9 171:11,13
172:9
**announced** 24:20
24:22,22
**annual** 36:21
**annually** 45:4
**answer** 9:15 10:3
10:14,15,20 11:8
12:23,25 22:12,16
22:18 30:7,11,12
30:21,22 31:10,14
31:17,19,22,24
32:6,13 35:1
39:13 46:7 47:2,5
47:15,16,20 50:11
50:12 55:16 57:25
58:15,16 59:21
60:10,22 61:4,14
61:15,22,23 62:5
62:17 65:13,17
70:3,12,22,24 75:1
80:14,15 84:6,8
87:14 89:13
104:12,13,14
109:5 110:15,19
111:14 112:20
113:4,5,9,23,25
114:3,5,6 115:2
120:12,13,14,15
120:22 121:23
122:15 124:14,16
126:2 127:1 129:2
129:21 137:18
138:2 141:20
143:25 145:18,20
145:21 147:10
149:10 157:23
158:18 159:1,16

164:20 167:9
170:5,25 171:22
172:15,18 174:3,4
175:7 176:1,8
177:16 179:13,19
180:21,22 182:24
184:4 185:23
187:19 188:4,10
188:20,23,25
189:9 191:22,25
191:25 194:6
200:19 201:22
202:6,10,14 205:1
206:18 211:19
212:23 213:6
214:7,22,23 215:6
218:1,6,9,14,15,17
219:16 220:17,18
221:4 228:20
229:14 230:11
232:16,25 233:3
234:4 240:20
241:9,13,24 242:8
**answered** 31:16
47:1 50:10 57:24
59:23 60:7,9 61:6
61:13,21 62:4,16
72:24 73:1 74:23
75:3,8,11 80:11,12
82:12,14,17,23
84:5 104:11 109:4
109:5 110:12,14
112:18,19 113:8
113:11,14 114:10
123:25 124:1,17
126:1,25 143:4,11
147:9 172:13
175:22 178:13,25
179:16,18,23
180:19 188:9,20
189:7,8 214:21

Brenda Murphy
The South Carolina State Conference vs. McMaste,

February 4, 2022

[answered - attachment]

Page 4

| | | | |
|---|---|---|---|
| 215:5 216:7 | **approved** 48:7 | **article** 195:22 | 111:13 112:9 |
| 218:13 219:4,11 | **approximate** 37:6 | **asked** 18:2,4,7,16 | 115:2 122:14 |
| 228:19 229:13 | **approximately** | 18:23,24 19:4,16 | 135:4,4,5 137:17 |
| 241:5,8 242:7 | 16:13 25:2,4 | 28:3 31:15 41:5 | 148:5,6,12 149:12 |
| **answering** 9:21 | 36:12 37:16 83:22 | 46:25 50:9 57:23 | 160:25 161:3,9 |
| 111:11 112:22 | 86:21 | 59:13,20,22 60:6,9 | 167:12 168:10 |
| 145:23 243:8 | **april** 42:24,24 | 61:12,20 62:4,15 | 171:19 172:3 |
| **answers** 8:20,21 | **area** 34:6,8,24 | 65:9 70:6 71:18 | 177:20 178:6,7 |
| 113:15,16,19 | 41:11 63:7 69:7,9 | 72:23,25 74:22 | 185:1 187:20 |
| 146:25 147:1 | 71:15,18 72:1,4 | 75:7 80:7,10,13 | 190:25 191:13,13 |
| **antonio** 4:5 | 91:23 94:11,21 | 82:11,13,22 84:4 | 191:15 216:15,16 |
| **anybody** 103:4 | 134:21,23 138:16 | 93:6 104:11 | 216:21 219:12,15 |
| 173:20 217:19 | 139:16 141:15 | 112:17,19,23 | 220:12 224:10 |
| 236:2 | 142:4,15 151:5 | 113:7 114:10 | 225:18 226:23 |
| **anywise** 245:12 | 158:22 162:12,21 | 123:24 124:1,17 | 235:5 238:20 |
| **apologize** 67:7 | 171:11,11,12 | 125:25 126:24 | **asks** 161:1 |
| 88:16 164:11 | 174:23 225:6 | 130:19,22 132:13 | **assertion** 137:24 |
| 230:10 | 242:23 | 143:3,10,24 | 138:13 139:8 |
| **app** 85:3 | **areas** 35:3 66:20 | 145:17 147:8 | **assertions** 221:24 |
| **apparently** 51:25 | 66:21 67:18,22 | 148:18 155:22 | **assign** 3:17 |
| **appearing** 4:3,11 | 68:2,22 71:9,13 | 172:13 174:19 | **assignment** 178:3 |
| 4:18 5:1,7 | 73:9,18,20 89:20 | 175:21 178:12,24 | **assist** 51:18 |
| **appears** 191:13 | 111:18 114:21 | 179:15,18,22 | 142:17 |
| **appendage** 159:22 | 121:5,9,12 124:12 | 180:18 188:8,19 | **assistant** 98:9 |
| 163:16 164:23 | 124:15,23,23 | 189:6,8 190:20 | 184:24 185:8 |
| 165:20 | 130:23 133:9 | 193:13,15,24 | **assisting** 28:7,19 |
| **appendages** 163:4 | 135:14 138:25 | 204:20,23 207:1 | **associate** 33:12 |
| **application** 36:15 | 159:15,24 160:10 | 212:22 215:4 | 195:6 |
| **applies** 114:11 | 160:17 161:21 | 216:6 218:12 | **associated** 28:5 |
| **apportion** 53:16 | 178:16 182:1,2,8 | 219:3,5,7,10 | 50:19 183:15 |
| **apportioned** 54:9 | 188:13 201:5,9 | 220:10 223:5 | 196:13 |
| **appreciate** 137:18 | 224:14 233:13 | 225:7 226:8 | **association** 36:6,6 |
| 145:18 210:23 | 242:11 | 228:18 229:12 | 38:11 43:2 79:10 |
| 212:17 213:12 | **arguably** 241:20 | 233:24 234:10 | **assume** 9:15 |
| 221:3 230:8 | **argumentative** | 239:4 240:25 | **assuming** 7:22 |
| 233:15 | 58:14 60:21 87:13 | 241:4,7 242:6 | 103:11 199:13 |
| **appropriate** 62:7 | 104:10 170:4,12 | **asking** 9:8 13:8 | **assure** 71:24 72:5 |
| 145:20 198:24,25 | **army** 34:14 | 22:11,13 23:10,11 | 74:16 |
| 199:4 | **arrive** 83:25 84:3 | 65:14 69:5 73:20 | **attachment** |
| **appropriately** | **arrived** 84:7 | 73:23 90:6 91:10 | 166:23 190:14 |
| 130:5 | | 95:16 104:4 | |

Brenda Murphy
The South Carolina State Conference vs. McMaste,

February 4, 2022

[attempt - berkeley]

Page 5

**attempt** 193:17 218:9
**attempted** 19:6
**attempts** 193:5
**attend** 24:10,24 54:2 129:14 161:16 208:10 237:20 238:1
**attendance** 26:21 27:16,17,22 97:23
**attended** 23:7,13 23:14,14 24:25 29:6,8 53:23 64:16 65:10 100:2 141:5 200:10,16 208:14,18,22 209:16
**attendees** 183:2,25
**attending** 22:3 199:23 207:7,19 209:16
**attention** 213:18
**attest** 174:17,21
**attorney** 14:7 55:17 97:25 100:12,23 111:15 182:2,3 186:12,15 188:6 194:16,19 194:24,25 196:19 196:19 197:23 199:22,23 200:4,8 202:17 206:2,9 222:7 224:16 229:25 232:24 234:13,23
**attorneys** 7:17 13:23 14:1,2,10,24 45:18 98:22 224:4 224:16 235:3,5
**attribution** 195:20

**audio** 203:18 234:16
**august** 14:4 76:22 125:8 194:10 197:6,7,8 198:7 199:9,12,15
**author** 82:21,24
**authority** 231:19
**authorization** 74:5
**available** 51:18 97:3,4 138:19 144:20 172:2 182:24 184:17 185:2
**avoiding** 150:9
**aware** 53:1,3,5,9 85:10 105:8 111:24 120:4,6,9 120:15,19,21 122:2 125:2 128:13,15 129:3,5 129:7,8,11 135:2 142:1 145:6,7 148:17,19,21,23 148:25 151:1,3 172:7 225:9 231:2 241:17

| **b** |
|---|

**b** 13:10,11,14,17 22:22 204:15 206:11,24
**bachelor's** 32:21
**back** 29:10 42:15 75:17 76:3 94:9 94:12 102:9 103:10 138:7 153:3 154:21 160:9 167:7,10,17 172:9 181:15 191:21 198:15 208:20 213:14,19

229:24
**background** 32:19 192:25 232:11 234:18
**bad** 9:24 90:7 162:17
**badgering** 62:3,16 113:8 179:12 188:21,22 230:2 230:10 231:20,22 232:2,9
**bailey** 119:2
**ballot** 205:9
**ballots** 205:12
**ballpark** 34:2
**bamberg** 63:19 64:11
**barely** 198:22
**base** 129:24 130:4 222:2
**based** 43:21 76:18 85:8 88:8 90:4 101:1,16 104:5 105:20 110:10 113:15,16 118:3 143:19 160:3 170:8 200:25 202:16 218:25 242:22
**basically** 15:8,11 15:18 25:18 51:15 77:24 88:6,7 89:21 94:2 107:24 108:4 124:5
**basics** 141:24
**basis** 12:25 20:23 20:25,25 21:9 31:23,24 137:8
**bat** 204:20
**batch** 166:24

**beach** 8:8 200:24 201:6 205:3
**bear** 186:3
**began** 18:21,25
**beginning** 7:6 113:18 192:18 193:19 220:11
**begun** 54:20
**behalf** 1:9 4:3,11 4:18 5:1,7 17:7 73:24 112:10,11 113:19 206:12
**belief** 240:9
**believe** 9:1 12:6 13:14 14:5 22:14 45:22 55:19 60:8 65:2,24 66:25 70:7 81:17 88:15 90:10 93:5 95:18 103:15 106:21 109:8 110:1,9,16 111:3 112:5,15,21 113:5,12 114:24 114:25 115:18,23 116:3,21 118:9,14 118:18,19,25 122:16 123:4,20 125:6 133:22 134:19 139:18 141:5 146:21 147:4,17 148:17 153:12 156:19 164:5 173:12 175:1 198:24 202:10,11 203:12 214:8 231:8 240:6
**belonging** 185:3
**belton** 158:12,20 158:20,23
**berkeley** 131:5 133:3,5,7 152:8,9

Brenda Murphy                                          February 4, 2022
The South Carolina State Conference vs. McMaste,

| | | | |
|---|---|---|---|
| **bernstein** 63:7 | 223:18,19 226:7 | **brenda** 1:23 3:5 | **bvaps** 100:2 |
| **best** 9:8,12,25 | 238:6 242:12,15 | 7:7,11 8:1 106:4 | **bylaws** 240:11 |
| 30:14 33:1 66:10 | **blacks** 84:16 94:15 | 107:4 112:23 | **c** |
| 75:4,12 133:20 | 96:2 160:11 | 171:9,12 173:18 | **c** 4:1,13 43:2 |
| **beth** 63:6 | **block** 191:9 | 173:19,20,25 | 112:23 204:16 |
| **better** 67:5 89:2 | **blocks** 157:15 | 206:22 | 245:1,1 |
| 222:5 | **blow** 67:13 | **brief** 52:17 146:17 | **calendar** 199:18 |
| **beyond** 32:3 | **bodies** 190:22 | 160:7,7 165:7 | 199:19 |
| **big** 40:17 239:13 | **body** 209:22 | 176:15 181:16 | **call** 99:1 |
| **bikers** 8:8 | **born** 19:24 20:2 | 198:11 233:19 | **called** 19:25 84:21 |
| **bill** 152:14,18 | **borrow** 157:5 | **bring** 11:24 49:8 | 163:15 209:2 |
| **bit** 19:21 27:21 | **bottom** 45:22 | 74:13 131:8 168:1 | 225:8 |
| 32:18 134:15,16 | 100:22,23 194:14 | 212:25 214:3,8,10 | **calls** 55:14,22 |
| 135:15 242:3 | 197:7 199:13 | 214:11 217:21 | 89:11 157:21 |
| **bizarrely** 159:22 | **bought** 216:22 | 219:19 | 175:5 216:19 |
| **black** 8:8 23:23 | **boundary** 132:14 | **bringing** 215:2 | 222:10 231:25 |
| 48:8,13,17,18,22 | **boykin** 97:25 | **brings** 8:1 | 232:14 241:23 |
| 59:9,9 60:14 61:2 | 182:2 186:12,15 | **broader** 19:15,17 | **campaign** 39:9 |
| 62:21,21 64:7 | 186:22 188:6 | 236:17 | 81:10 196:5 |
| 81:8 83:22 84:20 | 189:5 | **brooklyn** 33:16,19 | **campus** 32:23 |
| 84:21 85:4,12,19 | **branch** 30:20 | 33:19,21,22 90:11 | **candidate** 30:16 |
| 85:21 86:3,6,9,12 | 52:11 68:2 69:6,7 | 90:13,17 | 31:1,13 39:10 |
| 86:16,17,21 87:5 | 98:5 | **brought** 54:13 | 81:11 105:2 |
| 87:18 91:21,23 | **branches** 24:12 | 111:2,3,4 214:13 | 122:24 201:20 |
| 92:9 93:11 94:1,3 | 37:10,11,12,14,15 | 222:23 223:24 | 202:3 |
| 94:24 99:9 100:18 | 37:15 42:20 | **bryant** 13:12 | **candidates** 30:8 |
| 101:2,2 102:3 | 138:25 140:1 | **bucket** 204:16 | 39:2,7 55:5 |
| 104:5,6 105:2 | 171:16,17 190:18 | 205:20 | 122:22 123:17 |
| 109:22 118:5 | 214:23 215:2 | **buckets** 204:13,14 | **capability** 208:9 |
| 121:21 122:5,8,10 | **brawley** 78:17,19 | **bunch** 210:3 | 208:12 |
| 122:23 136:13,13 | 79:2 94:19 | 212:20 229:8 | **capacity** 1:14 32:2 |
| 146:7,9 157:10,14 | **break** 10:17,19,20 | **bunny** 159:22 | 206:20 |
| 157:17 158:8 | 10:21,24 52:15,19 | 163:4,16 164:23 | **carefully** 50:5 |
| 159:20,23,24 | 96:23 102:7,9,17 | 165:20 | **carolina** 1:2,7,15 |
| 160:14 168:4,5,5 | 103:3 146:11,13 | **bureau** 53:9 | 4:16,20,25 5:5,11 |
| 168:12,14 169:6,9 | 146:15,16 165:5 | **burr** 5:8 | 8:8 11:14,17 13:9 |
| 169:10,21 170:19 | 176:14 181:14 | **business** 79:9 | 14:6 17:8 18:13 |
| 190:21 192:3,7,14 | 198:9 | **busy** 16:10 | 19:25 20:8 26:16 |
| 192:21,21 193:8 | **breaks** 105:2 | **buy** 36:21 | 27:5 30:20 31:7 |
| 193:24 214:16 | **breath** 109:4 | **bvap** 99:10 100:8 | 32:2,22 33:17 |
| 215:16 221:10,17 | | 100:16 226:15 | 34:2,4,6,20 35:4 |

Brenda Murphy
The South Carolina State Conference vs. McMaste,

February 4, 2022

**[carolina - clear]**

Page 7

36:1,6,10 37:8,23
39:1 42:19,20
45:6,10 48:1
49:14,21,23 50:1,2
65:1,15,21,23 66:1
66:4,18 71:1 76:9
76:9 86:11 99:25
105:16 109:25
112:24 121:20
133:23 136:18
138:24 140:22
153:2 174:15
176:1,4 177:3
184:9 186:20
192:7 194:3 202:7
212:10 221:9,25
222:24 234:15
235:16 236:8,11
236:14,16,22
238:22 239:3,4
**carolinian** 19:24
**carolinians** 83:21
86:20
**carve** 168:3,12
169:9
**case** 1:5 8:9 14:19
17:24 22:22 28:11
51:22 52:1 120:1
196:20 202:22,23
204:12,22,24
205:3 223:1
234:11,13,23
235:6 245:13
**cast** 151:22
**categories** 36:25
**caucus** 192:3,7,14
192:21,21 193:9
193:24 199:24
200:11,17
**cause** 7:7

**cede** 198:17
201:18
**census** 53:1,9,13
54:8 85:8,11,16
86:2,23 87:3
99:15 105:6,9,12
105:14,16 121:2,5
121:20,21,22
122:4 157:15
**cepeda** 99:5,5,7
100:13,14,15,23
101:6 103:11
104:4
**cepeda's** 103:22
103:25
**certain** 10:13 11:5
59:15 81:10,11
103:20 121:3
130:19 142:1,17
151:18 160:16
201:5 224:13
227:1 228:25
**certainly** 20:21
102:19 196:7
**certify** 7:3 245:7
245:11
**cetera** 71:10
**chair** 126:17
197:11,11
**chairman** 48:3,3
**challenge** 173:5,23
174:19 175:3
195:18 241:19
**challenged** 66:13
66:16 67:18,21,25
68:10,14,18 69:12
69:21 70:1,16,21
71:21 72:7,20
73:13,20 74:3,12
74:19,20,21 75:19
75:21 114:9

120:20 132:18
133:1,6 153:19
172:11 174:18
177:7,9 178:8
180:14,16 187:15
217:14 225:22
227:12 238:13
240:16 241:3
**challenges** 66:19
120:4 133:9
**challenging**
172:11
**chance** 198:22
**change** 46:5,8 91:9
104:13
**changed** 58:18,19
109:15 144:5
154:23
**chapter** 13:10
14:6
**charge** 52:5
**charles** 97:25
186:12,15
**charleston** 33:17
34:7,7 131:5
133:3,6,7 200:24
201:5
**check** 97:6
**chester** 67:19
159:4,6,13,23,24
160:1,9 161:22
162:5,12,17
165:17,25 168:3
168:12 169:5
171:11 172:19
**chi** 36:7
**chief** 33:12
**children** 34:21,22
**choice** 162:23
**choosing** 66:16

**chose** 67:25
**christmas** 111:3
**cio** 27:8 77:23
98:11
**circle** 36:2
**circulated** 106:13
**cities** 92:22
**citizens** 23:22,23
212:1 215:16,16
**city** 33:16 69:1
90:14 136:14,19
136:22,24 137:1,2
137:5,9,20,24
138:4,14 139:9,11
139:12 153:24
154:14 159:23
161:22 162:5,17
191:7
**civil** 7:4 8:20
22:21
**claim** 83:21 137:8
233:4 242:4
**claimed** 86:14
**claiming** 222:24
**claims** 202:22
233:5
**clarification** 13:7
15:19 35:23
206:19 237:8
**clarified** 38:13
**clarify** 57:18
86:15 148:12
156:2,14 236:7
**classroom** 140:12
**clear** 9:9 11:6 15:8
32:8 37:24 80:17
80:23 95:3 104:22
109:10 174:10,11
187:24 193:5,18
206:17 221:23
228:16 233:18

Brenda Murphy                                              February 4, 2022
The South Carolina State Conference vs. McMaste,

[clearance - community]                                              Page 8

clearance 120:7
cleared 120:8,16
  222:8,15
clearer 134:16
clearly 80:20
  177:3
clicks 97:2
client 22:12,15
  31:22,24 65:12,14
  70:3 171:22
  185:23 232:24,25
  233:3 243:15
clinical 33:11
clock 102:8
close 100:22
closed 126:14
  219:20
closer 87:4,11
coalition 14:3,11
  14:15,16,18 17:9
  17:10,15,16,22
  18:9,11 19:15,17
  22:7 25:15,18,24
  26:3,12,18 27:10
  28:15 49:9,12,13
  49:22,24 56:14,17
  68:7 72:15 76:14
  76:16,21 77:3,7,11
  80:18 82:6,7,18,20
  83:1,2,3,7,13,15
  83:17,19 88:7,7,10
  99:21 103:13
  112:12,12,23
  113:15,17,20,21
  114:16 124:25
  125:3 126:4,8,11
  127:6 131:2
  141:23 142:19
  143:19 149:22
  173:4 174:13
  177:25 183:4,10

184:12 185:15,19
  209:3 231:14
  232:17,18,19
  233:12 235:15,17
  235:20,25 236:2,7
  236:10,13,17,19
  237:1 242:20
coalition's 48:6
  130:22
collaboratively
  77:25
collect 19:6 235:6
collected 19:9,16
  68:6
college 35:16
columbia 1:3 4:16
  4:25 5:5,11 7:21
  7:22 11:17 20:1,3
  20:6,7 32:23
  33:14,16 34:6,20
  34:23 35:2 54:6
  63:7 68:24 69:1,2
  69:6,7,9 94:10,21
  136:14,18,23,25
  137:1,6,9,13,20,25
  138:2,4,14,17
  139:14 161:17
  208:20
combination
  101:22
combine 146:2
combined 48:20
  145:3,7,8,10,19
  147:6,16 148:19
  238:16,22
come 29:10 75:17
  76:3 79:17 93:16
  99:8 102:9 181:15
  192:22 208:9
comes 27:11 37:13
  167:15

comment 23:16
  101:20 134:13
  145:22 147:23
  149:1 151:16,16
  152:24 154:23
  190:24 195:18
  196:9 197:25
  206:10 210:14
commentary
  106:3,24 107:3
  145:24
commented
  197:24 198:1
commenting 144:9
comments 73:7
  167:25 168:1
  195:15 197:12
  207:24,25 210:12
  210:16,17 211:13
  217:25 243:17
commissioner 3:6
  3:21 7:3 245:20
committee 6:17
  18:14 50:15 62:25
  96:12 97:20 98:3
  98:6 110:20
  115:24 116:3,6,8
  117:2,4 125:4
  126:17,17,18
  127:19,22 130:19
  132:13 173:12,15
  173:16 186:17,21
  190:8,10,13
  192:22 197:11
  208:19 224:17
  228:21 235:19,21
committee's
  127:10 134:12
communicate
  76:12 214:24

communication
  74:23 175:12
  217:19
communications
  11:7 185:22 216:4
communities
  28:10 48:23 89:6
  89:10,15,21,23
  90:2,17,21,25
  91:12 92:19,19
  94:17 109:21
  111:20 112:5,16
  112:21 113:6,12
  113:20,22 114:2
  114:24 115:18,25
  116:4,9,13,14,18
  116:23 118:19,20
  118:25 119:1
  127:15 134:17,18
  134:21 135:1,6,7
  135:21 136:11
  151:18 168:4,13
  168:24 169:1,6,10
  196:22 197:1,19
  198:4 225:16
  228:10 229:5,8
community 22:2
  28:13 30:6,15
  89:19 92:11,13
  108:5 109:23
  111:18 114:16,19
  118:5 119:4,6,8
  128:20 135:12,14
  135:18,19 136:15
  136:17,20,21
  137:3,9,20,25
  138:14 139:9
  158:22 162:23
  169:21 170:16
  196:23 197:2

Brenda Murphy                                          February 4, 2022
The South Carolina State Conference vs. McMaste,

**[compact - considered]**                                      Page 9

compact 226:25
228:24 229:21
compactness
225:14 228:10
compared 128:19
157:9
comparing 167:12
comparison 171:1
compelling 22:23
competing 94:15
competition
149:24
competitive 59:11
59:13 60:16 61:3
62:22,23 89:5
122:12 157:11
158:7,21 218:23
223:19 228:4
competitively
62:23
competitiveness
161:11,13
complaint 6:13
17:1,2,2 21:11,17
55:8,9,19 56:2,8
56:11,12,21 57:1,8
59:4,14 60:3 66:5
66:6 68:19 69:19
71:22 73:14 74:10
111:2 132:23
153:23 155:25
156:1,4,8,11 159:8
160:25 161:1
165:21 166:5,11
170:22 178:9,11
187:12 206:25
217:13 221:8,24
222:22 225:20
226:14 231:5,6
238:14

complaints 16:24
17:4,10,11,13
205:22
complete 12:16
36:15 58:7 187:7
completed 50:8,13
58:4,17 187:7,8,25
188:5,7,11,15
189:5 192:13
196:12
completion 58:1
compliance 3:11
127:13 215:19
complimented
224:8
comply 117:5
127:23
complying 128:8
composed 91:20
126:11 135:16
comprehensive
225:4 228:1
comprised 159:24
concept 119:12
concern 51:2
66:21 71:8,16
73:25 161:25
166:7 182:14,15
196:20 239:13,14
concerned 23:22
48:7 58:6 164:9
174:23,25 239:6,8
concerning 159:12
170:21,23 209:4
concerns 50:3,6
51:6 57:17 68:7
161:20,22,23
177:24 178:18
182:11 193:8
195:19 196:1
211:10 233:12

238:5,7,10,12
239:16
concert 17:21
concise 9:9
conclude 12:6
63:25
concluded 196:24
conclusion 55:15
55:23 89:12
157:22 170:14
175:6 222:11
231:25 232:15
241:23
conclusions
169:25 170:1,8
conduct 140:15
conducted 16:1
17:17
conducts 53:13
conference 1:7
11:14 17:8 18:14
26:11 27:5 31:7
32:2 36:10 37:8
37:10,12,14,15,17
37:18,23 38:3
39:1 42:19,20
43:10 45:6,11
48:1 49:15,21,24
50:1 65:1,16,21,23
66:1,4 71:2 72:14
73:5 77:8 96:11
98:16 112:25
140:22 149:22
175:9,11 176:5
183:13,15,19
184:9,10 185:4,9
186:20 194:3
202:8 206:1,7,21
206:23 211:15
214:11 224:12
226:17 238:22

conference's 98:5
confidential 11:6
70:4 172:4
confidentiality
199:2
configured 92:10
confirm 46:19
65:14 75:5
confirming 65:6
184:15
conflict 237:17
confused 205:23
confusion 150:9
150:13,17 153:14
congressional
163:22 166:2,9,14
166:14 167:13,16
222:14
connotation
110:23
consider 24:2
38:16,19 110:16
135:1 136:14,20
137:2,11,12
149:23,25 158:6
224:3 236:25
consideration
50:25 57:11
131:12 141:11
212:3
considered 24:5
95:5 110:7,11,17
122:24 129:19
130:6,8 142:2
144:5 154:24
158:1 167:15
169:7,22 210:18
212:6 225:3,4
226:2,21 227:2,10
228:2

Brenda Murphy
The South Carolina State Conference vs. McMaster,

February 4, 2022

**[considering - criteria]**

Page 10

considering
  103:18 110:6,10
  149:4 157:7
  193:10 228:1
consist  134:21
consistent  227:5
  229:16
constituents  48:23
  177:4
constitution  90:5
  117:5 127:14
  215:20 240:10
constitutional
  91:4 93:21 202:21
consult  103:3
consultant  98:14
  98:15 140:16,17
consultants
  224:24
consultation
  140:18 225:5
  242:22
consultations
  196:15
consulting  27:12
consults  98:18
contact  173:7,20
  174:15,16 183:2
contacted  173:4
  173:21 174:19
contacts  174:6
contends  114:16
contents  107:7
context  117:19,21
contiguous  89:20
  155:1 160:5
  225:15 227:4
  229:2
continue  55:3,24
  177:13,18 178:2

continued  178:10
continuity  228:10
contrast  149:6
contribute  151:21
contributes  154:4
contributions
  29:19
convenient  128:17
conversation
  52:20 80:23,25
  119:15 197:14
  206:6
conversations
  10:25 11:2 15:4
  79:6
coordinate  76:8
coordinated  71:2
copies  17:4
copy  41:17
corps  34:14
correct  10:10
  13:22 15:2,24
  19:13 22:17 32:7
  32:9 40:21,25
  43:21 46:11,21,23
  47:8 49:5,16,17
  50:8 52:11 53:16
  56:2 58:8,12
  70:13 81:15 84:22
  87:10 98:22 99:2
  99:15 103:11,21
  105:2,12,16,18
  108:20 110:23
  117:8 119:21
  121:6,10,11,13,17
  121:22 123:4
  125:16 130:25
  131:5 132:11
  139:19 152:2,7,20
  152:23 153:20
  162:8 166:1

173:11 181:1
  183:5,23 187:12
  188:1 190:11
  191:10 199:14,21
  200:8 207:25
  208:15 209:7,14
  210:4 211:5,18
  212:14 214:12
  221:12 222:1,9
  231:10 235:10
  236:17,19,21
  240:8 241:21
  245:9
correspondence
  232:20
cost  36:20,23 37:2
  50:19,21 51:19
councils  190:19,20
counsel  3:4,16 7:5
  9:20 10:25 11:8
  12:5 44:24 52:19
  83:5 103:4 131:9
  131:10 146:19
  177:18 203:2
  230:15 241:17
  242:1 245:12
count  85:1 103:21
  103:22,22
counted  30:13
counties  37:13
  92:23 124:11,20
  131:5 150:3,5,8
  162:20 174:22
  239:11
country  33:10
counts  103:16
county  68:20,21
  69:1,9,13 84:11
  94:11 114:18,19
  114:21 124:21,21
  124:22 133:3,4,6,7

138:18 139:6,11
  152:11 157:8
  159:13,21,21,25
  160:1,9 165:25,25
  168:3,12 171:11
  171:14 172:19
  190:19,21 191:7
  245:5
couple  66:11
  111:3 184:7
  198:16 204:12
  210:11 230:19
  234:9 235:14
course  99:14
  114:18 190:9
  216:1 224:25
  225:24
court  1:1 3:12 7:1
  9:21 10:4 16:25
  17:14 22:22 32:13
  35:23 55:21 58:12
  97:5 102:11
  119:25 120:4,20
  152:1 155:5 161:1
  176:12 177:19
  222:23 243:20,22
  244:2
covid  28:8 83:8
  84:14 126:14
  219:20
cracking  89:7
  91:14 92:15 93:22
create  100:11
  159:22 170:18
created  48:12
criminal  71:9
criteria  78:6 85:12
  85:17,21,22 86:3,9
  87:5,6 117:5
  127:16 134:17
  135:2,5 196:22

3:21-cv-03302-MBS-TJH-RMG    Date Filed 05/02/22    Entry Number 254-1    Page 257 of 291

Brenda Murphy
The South Carolina State Conference vs. McMaste,

[criteria - deponent]    Page 11

224:24 225:10,13 225:14 226:16 227:6 228:7,16 229:11
**criticism** 134:11
**criticisms** 163:18
**criticize** 164:23 165:21
**criticized** 118:11
**critiqued** 141:25 142:22
**crosstalk** 47:18 70:9 78:11 123:18 130:1 138:10 153:10 168:16 173:10 192:15 202:19 224:22 232:4
**crystal** 174:10
**csr** 2:2 7:1
**culminated** 100:5
**current** 20:14 94:6 102:1 123:12 148:19 171:2
**currently** 20:1 21:2 36:11 95:8 95:12 105:19 161:6 162:6 177:5 221:21
**cusick** 4:7 13:25 14:8 99:2
**cut** 28:21
**cv** 1:5
**cycle** 99:9 101:7 119:21,22 120:7 237:7
**cycles** 129:4
**cynthia** 5:15

**d**

**d** 1:13 6:1 204:16
**da** 198:4,4,4
**dark** 226:5
**data** 53:1,6,10,12 53:15 54:8 68:15 84:1 85:8,11,16 86:3,6,23 87:3,9 99:15 144:20,24 223:25 224:2 226:14
**date** 7:3 12:15 45:20,21 46:9 53:3 73:13 74:16 74:17 173:2 192:12 197:4,8 199:16,16 203:25
**dated** 106:4,15 125:8,9,9,10,11,11 130:17 199:12,13
**dates** 56:22 125:7
**daughters** 36:1
**day** 3:6 7:21 8:2 18:24 84:1,1 133:20 199:19 204:1 207:20 234:1,5,6 237:14 244:6
**days** 16:6 44:24 111:3 131:10 234:2,7
**deal** 123:16 199:3 219:23
**dealing** 119:18 121:1,2,4 123:16 135:2 170:24
**december** 49:5 55:10 56:11,25 57:1 106:4,15 107:5 111:4

**decide** 81:9 94:25
**decided** 48:2,25 49:20 77:6,8,9 89:21 195:25 232:17
**decision** 28:24,25 48:6 49:8,9,11 50:7 57:14 146:9 158:18 224:9,11 231:9,11,12,15,16 232:6,13,21
**decisions** 88:9
**decrease** 48:21 96:1 122:8,9 150:13,16
**decreased** 62:20 94:7 101:24 102:5 105:11
**decreases** 201:9
**defendant** 4:18 159:25 203:16 231:2
**defendant's** 6:9 39:22 44:5 66:22 81:20 88:11 97:13 106:8 132:4 165:8 181:17 186:4 189:22 194:11 198:12
**defendants** 1:16 4:11 5:1,7 7:18 203:3,7,14 204:11 230:16 234:14,24
**defending** 10:10
**defense** 4:4 38:3
**defer** 46:3 191:21
**define** 89:9,16,16 116:14,17,23 197:1
**defined** 89:18 109:8 115:25

116:4,9,13 124:12 196:23
**defining** 117:6 198:3
**definition** 92:13 116:20,22 197:19
**definitions** 196:22
**degree** 32:21,22
**delay** 57:17 58:3,7 58:12
**delayed** 54:23
**delivered** 86:22
**democracy** 237:1 237:3
**democratic** 30:2 30:14,24 76:9 199:24 200:11
**demographers** 224:5,12 225:1 226:3
**demographics** 169:3,4,5,18 170:16
**denson** 184:8,18 185:3
**denying** 65:6
**department** 33:10 120:8,16 222:9,15
**depend** 27:2 224:5
**dependent** 26:2 89:4
**depending** 91:8 150:19
**depends** 92:12 150:18 151:5
**deponent** 96:24 102:14,21,24 164:13 194:4 204:7 230:14 231:22 233:16 234:17 244:9

Brenda Murphy                                          February 4, 2022
The South Carolina State Conference vs. McMaste,

[deposed - districts]                                            Page 12

deposed 8:4,12,14
  8:17 112:14
  204:21,21 205:6,6
  205:17
deposition 1:21
  3:5,9,10,18,21
  8:18 9:19 10:10
  11:25 12:3,7,9,13
  12:14 13:10,12,15
  13:17 15:5,13
  16:23 64:25 84:13
  99:1 113:19
  164:12 198:18,20
  203:16 205:24
  206:24 213:16
  230:5 233:25
  243:1,4,6,18,20
  244:1
depositions 3:13
  13:14 67:3 206:9
derogatory 108:3
describe 197:18
  235:23 241:10
described 239:18
desire 36:15 99:8
  99:11 122:25
desires 83:15
desk 181:21
despite 8:16
  181:11
detailed 214:6,8
determination
  77:12
determine 199:19
  227:11
determined 76:15
  153:8,9
detriment 111:8
detrimental 48:8
developed 82:18
  83:1 149:3 171:10

deviation 227:8
  228:11
diamond 37:2
diatribe 243:15,16
dictate 121:15
dictated 201:13
difference 161:12
  209:25 242:14
differences 197:2
different 36:25
  37:13 42:14 45:17
  50:14 71:13 73:8
  84:20 85:1 90:16
  90:20 91:7 92:24
  100:10 116:17,18
  116:23,24 120:10
  121:1 138:17,25
  138:25 139:14
  154:6 158:16
  159:15 162:9
  167:14,16 179:21
  196:21 198:2,3
  209:1 211:23,24
  211:25 227:23
  234:14,24 236:8
  236:18,20
differently 147:22
difficult 164:12
  196:25 208:8
difficulties 44:6
difficulty 207:18
digest 96:6
digesting 96:7
dillon 67:19
diluted 215:19
  242:12,16
dilutes 91:22
  93:11 109:23
dilution 215:17
dilutive 177:6
  178:4

direct 9:19 232:25
  233:3 243:7
directed 184:21
direction 69:20
directly 42:5 83:6
directs 12:24
disagree 56:24
  87:2 88:22 90:18
  91:1 108:14,16
  116:19,22 136:6
  138:8 152:3
  157:13,16 165:22
  201:14
disagreements
  238:8,11
disclose 32:10
  64:21 70:3 179:16
  239:6 240:7,11,14
  240:16,22 241:15
disclosed 184:15
  184:18 239:12
disclosing 234:12
  234:22 239:7,8,14
disclosure 22:19
  22:24
discovery 17:23
  64:23 234:10,10
  234:11 235:2
  240:8
discrimination
  59:5,8,16 60:5,20
  60:24,25 61:11,19
  62:2,11 64:2
  161:13 242:5
discuss 21:13,21
  124:12 146:15
  177:14 182:1
  192:23 196:3
discussed 13:16
  17:10 25:5 29:3
  177:12 234:12,22

discussing 133:15
  193:6 235:2
discussion 23:21
  23:25 56:5 114:9
  150:24 156:9
  164:8 195:24
  197:16 212:19
  218:7 221:7
discussions 23:20
  81:3 88:8 103:6
dismissed 119:25
display 79:19
dispute 86:2,5,8
  87:7,17 104:8
distance 67:17
distinction 235:15
district 1:1,2 20:9
  20:12,15 60:15
  61:3 69:21 70:21
  71:21 74:21 91:6
  91:7,20 92:8,17,21
  120:16 122:21
  123:10 131:3
  135:16 137:15
  152:1 154:25
  155:16 156:21,22
  157:4,11,14,19,20
  157:24 158:3,8,10
  158:21 159:19,20
  160:23 161:5
  162:6,13,14,18
  164:22,24 165:22
  166:1,2,6 168:3,11
  172:21 173:3,5,22
  173:22,23 178:22
  179:18 190:21
  222:23 226:1,9,13
  226:18,20,25
  228:3
districts 48:16,19
  53:20,24 55:6

Brenda Murphy
The South Carolina State Conference vs. McMaste,

February 4, 2022

**[districts - eight]**

Page 13

57:7,15 59:11,15
60:15 62:22,23
66:13,13,16 67:18
67:21,25 68:10,14
68:18 69:13,23
70:1,16 72:8,21
73:13,20,25 74:3
74:12,19,20 75:14
75:19,21 93:9,22
96:1 108:20 114:9
115:4,12,14 117:6
118:10 120:20
121:16 122:12,19
123:6,9,12,14,21
123:22 124:3
130:19 132:14,17
132:18,21,25
133:1,5,7 151:9,10
153:8,19 154:15
155:10 158:16
160:1 161:2,24
163:22 168:6,15
170:18 171:2
172:11,12 174:18
174:19 175:3
177:6,7,9 178:4,5
178:9 180:14,17
187:16,22 200:25
201:1,12 212:24
214:14 215:15
217:15,20 218:2,4
218:23 219:15
220:14 222:24
223:18,20 225:23
227:12 228:8,17
229:11 238:13
240:16 241:3
242:10
**divided** 92:20,23
**dividing** 92:17

**division** 1:3 35:16
**doctor's** 33:7
**document** 12:15
39:20 40:8,9,10,23
41:4,6,17,18 43:21
44:1,3,22,23 45:3
45:17,18 66:10
67:9 74:7 82:5,8
82:18 91:13 95:25
96:3,4 97:16
103:10 131:20
156:16,17 163:1
164:4,15,17 165:3
165:6,12 167:18
175:16 181:2
184:11 186:1,8
189:25 199:8
220:5
**documentation**
221:2,5
**documented** 82:6
**documents** 12:8
12:12 16:16,19
17:3,9 18:3,4,5,6,7
18:11,16,20 19:4,7
19:9,16 40:14,16
40:22 41:10 44:4
58:12 64:23 65:5
82:6 83:10 96:22
115:19,20 172:3
183:23 198:19,22
219:19 220:11,22
235:6,9,12 241:19
243:2 244:3
**dog** 8:1,3
**doing** 75:25 100:4
133:19 154:11
167:12 193:9
206:13 212:17
**doj** 84:21 85:3,16
85:22 86:9

**dollar** 36:20
**dollars** 37:5
**doubt** 103:25
151:8,11,13
**dozen** 209:9,11
**dr** 98:13 140:9,11
190:17 200:22
**drafted** 126:4,7,9
126:21 132:24
**drafting** 129:19
**drafts** 210:12
**draw** 51:10,11,13
144:7 157:10,24
158:20 169:18
190:20,22 201:12
226:17 228:8
**drawers** 168:5
**drawing** 51:18
57:20 59:14 69:23
89:5 141:10,19,21
142:9,25 143:18
144:2,8,9,12,17,21
149:23 157:19
158:3,7 169:9,25
170:8 190:19
196:15 228:16
229:11
**drawings** 167:13
242:21
**drawn** 81:7 92:21
93:9,11 94:14
109:16,21,22
110:5,9 111:17
121:16,17 141:14
142:22 156:22
157:4,14 158:11
160:22 161:9,9
165:17 166:5
168:3,12 169:16
171:2,3 215:15,18
217:3 220:14

225:23 226:20
238:8,11 242:10
**drew** 110:21
141:13,16 142:5
144:15,23 166:8
169:23 228:22
**drive** 20:7
**due** 49:6 126:14
219:20
**dues** 36:16,18,19
37:4
**duly** 7:12
**duty** 127:23

**e**

**e** 4:1,1 5:3 6:1
245:1,1
**ear** 159:22
**eared** 163:4,16
165:20
**earlier** 28:18
38:15 66:17 99:23
105:5 125:17
126:3,10,13 140:3
188:12 207:12
208:14,17 213:15
233:23 242:25
**ears** 193:11,12
**easier** 146:24
**eastern** 35:24
**easy** 230:9
**edited** 126:5
**educate** 28:10
**education** 71:10
107:25
**educational** 4:4
32:19
**effect** 3:11
**effort** 155:2
182:10
**eight** 159:25

Brenda Murphy
The South Carolina State Conference vs. McMaste,

February 4, 2022

[eighty - extent]

Page 14

eighty  35:8
ein  42:1,2,3 43:10
  43:13,15,16,20,23
  44:2 45:17,19
  46:5,11,14,15
either  19:1 67:16
  71:19 72:6 103:3
  234:1 240:17
elaborate  70:25
  94:22
elapsed  102:8
elected  102:4
election  5:7 29:17
  30:17 95:9 101:7
  103:24 144:20,24
  169:20
elections  29:15
eliminating  78:6
elizabeth  183:13
  185:10
eloise  184:8,18
  185:3
email  12:3 235:11
emailed  83:4
emails  216:19
emotionally  182:4
emphatically
  188:14
employee  41:24
employers  45:13
employment  43:3
enacted  152:14
  171:3
enactment  54:9
  56:20 57:17
encourage  128:12
encouraged
  207:18 215:10,11
endeavor  146:23
endorse  39:2

engage  38:21
  110:2 138:7
engaged  59:15
  60:4 61:9,18 62:2
  111:7 243:7
engaging  64:1
enjoined  178:2
ensure  99:8
  162:21 225:2
  226:21
ensures  89:6
ensuring  23:23
entire  69:9 107:11
  107:20 112:4
  136:15,19,20
  137:25
entitled  212:11
entity  162:18
equitable  99:9
erin  44:12
especially  106:16
  134:17 202:21
  214:16
established  42:21
  42:22,23
et  1:15 71:10
eta  36:7
ethics  89:20
ethnic  84:17 85:6
  86:7
evaluate  57:9
  224:9
evaluated  242:20
evaluating  58:18
eventually  100:5
everybody  84:1
  211:25 244:6
evidence  3:19 60:2
  60:18 61:7,17,25
  62:9 94:9,12
  111:6 117:17

130:4 139:8
  143:21 168:10,15
  168:18,21,25
  169:11 170:1,2,9
  170:13 242:3
evident  94:11
exact  46:9 148:18
exactly  113:20
  160:15 170:6
examination  6:2
  7:8,15 204:9
  230:22 233:21
  240:5
examined  7:12
example  26:19
  27:16 63:6 68:24
  69:4 85:2 91:20
  135:11 183:7,11
examples  229:8
exceedingly
  196:25
excuse  67:2 84:24
  146:12 197:6
  240:1 241:13
executive  18:14
  98:2,5 186:16,21
exhibit  6:10,12,13
  6:14,15,16,18,19
  6:20,21,22,23,24
  6:25 39:23,25
  40:7 44:6,8,17
  66:23 67:1,2,4,8
  81:21,23 88:12
  97:6,9,11,11,14
  106:9 132:1,5
  156:7 164:7,10
  165:9,13 166:17
  166:24 176:19
  180:25,25 181:1,5
  181:8,10,18 186:5
  189:23 190:1,2

194:12 198:13
  199:5,5
exhibits  6:8,9
  166:20 176:17,17
  176:17,19 181:7
exist  84:15 218:23
exists  48:17 95:2
expect  15:9,9,20
  15:21
expecting  111:14
experienced  226:4
expert  51:10,11,22
  51:25 52:1
expertise  141:15
  141:22 142:3,15
  143:18 224:13,17
  225:1,6 226:3
  242:23
experts  51:13,21
  51:24 52:4 226:24
explain  37:20
  38:19 45:16 55:18
  75:10 113:20
  114:23 120:12,15
  126:22 137:10
  148:5 153:22
  155:10 157:3
  166:4,6,6 168:15
  168:18 189:10
explained  125:17
  126:3 190:17
explaining  93:18
explanation
  120:13 188:18
express  210:24
expressed  161:25
  178:18 211:10
  238:7
extent  12:23
  121:16 136:1
  207:7

Brenda Murphy

February 4, 2022

The South Carolina State Conference vs. McMaste,

**[eyes - forward]**

Page 15

| | | | |
|---|---|---|---|
| **eyes** 203:23 | **favorite** 8:2 67:7 | **filed** 16:25 43:20 | **flip** 42:7 100:21 |
| **f** | **february** 1:24 3:7 | 45:23 46:6 54:20 | 191:12 |
| | 7:6 111:1 | 55:9 56:11 60:3 | **floor** 4:8 79:13 |
| **f** 245:1 | **federal** 7:4 8:19 | 72:6 178:11 | 198:17 201:18 |
| **fact** 8:16 26:21 | 16:25 17:14 22:21 | **files** 45:25 | **florence** 124:22 |
| 51:13,21 69:3 | 41:24 45:13 | **filing** 3:21 50:12 | **focus** 41:12 163:3 |
| 76:18 85:15 96:25 | 120:20 152:1,15 | 54:24 68:18 69:18 | 190:18 |
| 127:21 130:6 | 155:4 | 71:21 73:14 74:4 | **folder** 44:17 |
| 151:14 154:13 | **fee** 140:17,19 | 74:9 113:21 | 131:24 |
| 160:3 164:11 | **feedback** 25:8,9 | **final** 62:13 82:8 | **folk** 136:13 |
| 174:21 178:20 | 25:20 26:22 51:3 | 231:18 233:8 | **folks** 26:19 37:7 |
| 181:11 187:14 | 68:5 71:15,17 | **finalized** 83:2 | 157:17 169:14 |
| 207:24 | 140:6 193:8 | 142:23 | 179:9 |
| **factor** 53:8 157:19 | 225:20 | **financially** 245:13 | **follow** 84:15 91:3 |
| 157:24 158:3 | **feel** 167:1 192:19 | **find** 106:20 219:7 | 117:4 127:23 |
| 160:17 219:1 | **fell** 227:8 | 221:2 | 137:13 221:11 |
| **factors** 60:23 | **fewer** 60:15 | **fine** 7:20 137:22 | 229:10 |
| 110:6,17 158:6 | 105:15 134:21 | 186:22 | **following** 7:8 |
| 223:23 225:3,22 | 221:20 | **finish** 9:21 10:2 | 117:2 204:3 |
| 226:2,22 | **ficus** 223:1 | 12:14 120:3 130:2 | **follows** 7:13 |
| **facts** 110:10 111:6 | **fifteen** 52:14 | 168:17 180:3 | **fomby** 184:8,18 |
| 137:19,24 | 203:22 223:4 | 189:3 198:17 | 185:3 |
| **failed** 110:16 | 231:1 | 212:5 216:10,11 | **force** 3:10 |
| **fair** 93:20 99:9 | **fifty** 37:4 92:3,6 | **first** 6:10 7:12 | **ford** 5:16 |
| 149:11 207:3 | 123:1 190:20,22 | 8:18 12:10 16:11 | **foregoing** 7:5 |
| 211:16 229:9 | **figure** 27:15 37:7 | 16:12 21:11 39:17 | **form** 3:16 10:13 |
| **fairfield** 159:21,21 | 85:11,21 86:4,9 | 40:20 41:6 45:3 | 12:24 47:9 62:7 |
| 165:17,25 | 87:11 104:19 | 49:8,24 107:7 | 77:6 189:16 234:3 |
| **familiar** 35:4 | 149:16 151:11 | 111:1 113:14 | 235:7 238:18 |
| 51:21 52:1 82:2 | 160:14 168:2 | 126:21 131:4 | **forman** 5:8 |
| 84:19,22,25 85:4 | 206:3 217:18 | 132:12 145:24 | **formed** 14:3 28:15 |
| 85:13,15,18,23,24 | 221:4 225:21 | 159:11 190:25 | 76:21 99:21 100:6 |
| 108:8 127:9,17,21 | **figures** 85:8,11 | 199:22 202:20 | **former** 186:2 |
| 127:24,25 134:1,8 | 87:3 103:25 105:6 | 203:5 206:10,10 | **forms** 235:13 |
| 139:3 153:20 | **file** 23:1 32:14 | 220:25 233:23 | **forth** 138:8 |
| 155:16,21 156:21 | 45:4 50:7 56:20 | **five** 34:4 51:21,24 | **forum** 29:4,6 |
| 158:12 159:3,11 | 57:1,7 58:12 | 52:15 146:16,23 | **forums** 73:16,17 |
| 163:21 170:22 | 172:6 185:25 | 203:11 230:5,6 | 75:12,12 |
| 215:12 | 202:25 212:21 | 233:17 243:4 | **forward** 74:21 |
| **far** 194:1 196:8 | 231:9 232:21 | **flexibility** 13:13 | 147:3 |
| **fashion** 161:10 | | | |

Brenda Murphy
The South Carolina State Conference vs. McMaste,

February 4, 2022

[forwarded - going]

Page 16

**forwarded** 125:14
126:17
**founded** 70:8
**founding** 36:7
**four** 33:22 35:12
95:12,14,14,15,18
104:21 123:6,9,11
123:11,13,21,22
124:3,6,6,8,15,22
124:22 154:15
**frame** 203:11
**frankly** 139:6
**friday** 213:12
219:17 234:7
**front** 11:21 25:12
42:5 60:18 61:7
61:17 63:25 69:14
77:4 131:7 154:1
155:19 163:23,24
164:4 165:12
169:4 176:20
186:8 218:8 220:1
220:5
**full** 3:11 209:22
**fully** 169:20 225:9
**fund** 4:4 38:4
**funding** 50:16
142:16
**further** 3:8,14,20
48:20 87:9 233:15
242:24 244:4,9
245:11

**g**

**gadsden** 5:4
**gain** 200:24
**gained** 121:13
**gains** 121:15
**gap** 101:1,17
**gather** 53:20
**gauge** 84:20

**gears** 139:17
**gee** 216:12
**general** 25:17
52:20 80:25 118:3
119:15,15 242:1
**generally** 90:25
150:2 211:17
**generate** 43:15
**geographic** 134:20
**gerrymandered**
177:5 178:4
222:25
**gerrymandering**
108:15,19,23,23
108:24 109:8,9,12
110:2,23 111:8,25
117:16,20,22,24
118:3,4,7,11,12
119:9,13,14,20
149:20 221:25
**gervais** 4:24
**getting** 11:9 50:23
58:3 62:5 73:21
142:20
**give** 8:20 10:3 34:2
44:13 46:7,9 47:4
62:13 84:6,8
94:12 109:2 112:3
114:13 115:11
123:15 125:7
143:1 146:16
149:10 155:22
156:8,13,14
159:16 171:20
172:9,10,20 175:2
176:10,10,12
186:22 192:24
193:16,22,22
206:13 214:7
216:13 217:22,23
242:3

**given** 16:22 46:2
46:13,14,20 47:5
50:20 51:3 57:11
62:11 115:22
130:11 166:4
171:25 245:10
**giving** 94:8 114:12
140:6 171:23
181:12 238:10
243:6
**glad** 131:16
213:18
**glass** 10:18
**glisson** 98:8
**go** 8:17 10:18 15:3
32:19 67:12 71:10
74:21 103:9
115:13 117:11
124:11 129:1
131:11,17 132:24
147:3 149:2
156:20 167:2,3,7
167:10,17 170:17
172:9 173:14
176:16,18 181:25
182:7 189:18
192:1 194:9
195:25 198:7,22
199:6 201:1 204:7
204:17 213:19
215:6 229:14,23
230:3 234:19
**goal** 162:20
210:17 243:4
**goals** 150:10
**goes** 104:25
**going** 9:7,8,15,24
10:9 11:1 12:6,13
14:17,18 16:23
22:12,25 27:21
28:24 30:4 31:10

**given** (right column continues)
31:21 32:14 33:25
39:20 48:24 50:23
52:13 58:25 61:5
62:8,13,14,18
64:20,24 69:16
75:15,16,16,17
81:13 86:5 88:21
88:24 89:3 91:11
92:1 96:3,4,22
97:1 100:20 101:9
102:6 103:9
105:20,21 106:13
107:11,12,13
109:17 112:3
113:4,5,9 114:4
115:6,13,14 117:9
117:10 118:14
120:14 123:15
124:3,14,16,19,25
125:1 128:9
129:21,23 131:20
131:21 132:24
133:11,11,14,15
133:18 137:14,23
138:7 139:17
145:16 147:1
148:2 153:15
154:22 159:9
164:4,5,19 165:4
170:21 172:5,8,15
173:14 174:9
176:16 177:1,13
177:19 180:25
182:10 185:24
186:7 189:20
191:4,18,25 193:7
195:18 196:18
197:10 198:7,18
199:4 201:16
202:14 203:2,2,4
203:20 204:4,16

Brenda Murphy

February 4, 2022

The South Carolina State Conference vs. McMaste,

**[going - house]**

Page 17

204:17 206:4
213:24 218:6
219:9 232:24
233:3 237:6
240:25
**golden** 36:2
**good** 7:16,18,20
52:16 69:4 88:21
102:14 203:9
207:21 213:17
230:12,23 244:5
**gotten** 31:17
138:24
**govan** 64:19 65:9
80:1,4,8 81:1
**govan's** 226:9
**governor** 1:14
4:19,20 31:1,13
230:16,19,24
231:2,17,18 232:6
232:13 233:1,5,7
**grabs** 159:23
**graduate** 32:24
**graduated** 33:2,4
**granted** 56:1,7
**gray** 5:2
**grayson** 4:23
**great** 209:24
219:23 239:13
**greater** 91:19 92:3
92:3 104:18,21
137:16 145:13
146:7 151:19
153:4 154:24
**greatest** 136:1
**ground** 8:18
**grounds** 3:17
**group** 77:16 78:3
99:21,22 100:6
112:8 181:7,25
182:7,19 196:11

210:3 218:7 228:5
228:23 231:14
236:20,23 237:4
**grouped** 67:18
**groups** 76:19 77:9
77:19 84:17 85:6
86:7 235:24
236:20
**guess** 13:13,24
16:25 17:17 28:3
32:12 49:25 84:19
89:22 90:7 92:6
92:12 106:12
126:19 198:1
199:18
**guidance** 224:15
**guidelines** 91:3
127:10,13,22
128:2,5 134:12,14
**guys** 166:8 203:19

## h

**h4493** 178:2
**h4493's** 178:3
**half** 158:24
**hall** 36:2
**happen** 71:14
92:22 154:9
**happened** 27:13
71:25 169:15,24
239:10
**happening** 27:6
**happens** 71:7,13
92:22 109:19
138:17,17 158:10
**happy** 22:20
146:16
**harassment**
243:10,13
**hard** 41:17 197:8
**harmed** 178:3,10
178:21 180:15,17

187:15
**hate** 28:21 33:24
89:1 117:7 159:15
**haw** 216:12
**head** 115:7 142:11
219:22 235:23
**hear** 107:7 112:1
214:19 215:1,24
216:3,14 218:24
220:16
**heard** 50:3 62:13
142:12 210:18
212:11 213:1
216:21 217:11,12
217:17 233:13
**hearing** 31:6
87:22,25 116:12
161:16 237:12
**hearings** 51:4,4,5
53:24 54:2 57:13
65:25 81:14 83:3
128:14,16,24
129:4,7,12,14
130:13 141:5
207:17 208:3
211:11 237:13
238:1
**heavily** 159:24
**held** 24:7 75:13
105:1 128:16
129:4,8 199:15
203:21 207:14
208:10,18,19
**help** 26:24 69:16
223:11
**helpful** 156:2
224:2
**helping** 185:20
**henegan** 63:14
64:8

**henry** 1:13 4:21
230:24
**hide** 183:7
**high** 157:8,14
**higher** 85:25
**highway** 154:2,3
**highways** 154:8
**hints** 114:13
**historical** 192:25
**history** 142:20
221:8 239:9
**hoc** 62:25 115:24
116:3,6,8 117:2,4
125:4 127:10,18
127:18,22 130:19
134:12 208:19
**hold** 12:13 133:12
156:4 216:11,18
227:15,15
**home** 230:4
**homebuilders**
212:10
**honea** 158:13,19
**hope** 93:15,19
228:12,14 230:12
**hopefully** 93:15,24
**hopes** 187:6
**horry** 67:19
**hospital** 33:6,14
33:15
**host** 197:1
**hour** 16:13 52:14
203:11
**hours** 146:21,23
207:21 230:6
237:15 243:4,23
**house** 4:11 7:18
20:9,12,15 21:2,13
21:17,18,19 23:5,6
23:9,12 25:7
47:13,14 48:4

Brenda Murphy
The South Carolina State Conference vs. McMaste,

[house - influenced]                                                     Page 18

49:4 53:24 54:17
54:20 57:7 59:5
59:15 60:4 61:8
61:17 62:1 79:13
79:13,20 91:7
95:8,19 101:1,8,14
101:17,22,23
103:19,24 104:2,7
104:17,25 105:3
108:20 110:9,16
111:7 116:6
117:24,24 118:10
118:23 120:16
122:10 128:24
129:4,8 132:14
136:6 148:6 151:8
151:9 152:19
154:15 155:10
158:16 162:4,4
164:2,3,24 165:22
166:5 167:13,17
167:18 171:3
172:22 173:5,21
191:8,14 194:16
196:21 203:14
209:4 210:2,8,12
212:23 222:14
225:12 228:7,16
229:10 233:8
238:1,2,13 241:18
**housing** 198:2
**howard** 20:18,19
**huh** 200:9
**hundred** 25:2,4
37:4,4
**husband** 34:16

**i**

**idea** 119:11
**ideas** 126:12
**identification**
39:24 41:24 43:3

44:7 45:14 66:24
81:22 88:13 97:15
106:10 132:6
165:10 181:19
186:6,11,23
187:25 189:24
194:13 198:14
**identifications**
64:25
**identified** 65:24
66:20 72:2,4
113:21 115:5,12
130:18,23 134:18
166:24 182:1,8
183:3,12 184:11
185:3,5 186:19
188:14 190:13
199:23 200:7
**identifies** 183:14
183:18 184:8
**identify** 29:1,2
61:16 66:3 77:18
114:15 115:17
124:3,19,20
144:15 179:5
180:7 182:1,8
183:1 185:20
201:19,25 216:15
241:2
**identifying** 70:14
70:18 182:13
183:22
**identities** 183:8
**identity** 22:13
65:14 70:4 239:4
**ii** 4:5
**impact** 57:14 64:6
64:6 93:13 238:5
**impacted** 173:24
188:13

**impacts** 215:15
**impairs** 9:4
**importance** 28:12
107:25 140:4,5
215:14
**important** 9:23
58:23 135:7
193:17 215:17
**impressions** 88:10
**improves** 152:19
**inaccurate** 103:16
**inappropriate**
202:13
**inappropriately**
114:17
**include** 162:17
190:10
**included** 18:11
24:13 75:13 81:2
98:25 127:7,8
129:12
**including** 97:23
**inclusive** 142:2
**inconsistent**
113:17
**incorrect** 58:9,13
105:17 121:22
149:10
**increase** 136:11
150:13,16 201:11
222:4 226:6
**increased** 105:12
153:2 221:13,16
**increases** 200:25
201:4
**increasing** 153:6
**incumbent** 24:5
64:15,17 81:6
226:21
**incumbents** 80:19
95:5 144:12,16

145:2,7,9,10,13,19
146:3 147:6,15
148:13,19,24
149:4,23 150:1
193:10 238:17,23
**independent**
224:11
**independently**
174:12 224:4
**index** 6:8
**indicate** 59:8
**indicated** 74:12
169:12
**indicates** 72:19
73:11 74:8 105:14
**indicating** 195:18
**individual** 32:3
92:11 102:4 173:7
**individually**
112:14 158:18
206:3,5,16
**individuals** 25:9
48:14 51:5 57:12
64:4 66:20 68:5
72:13 77:25 81:7
81:8 89:18 91:22
92:9 94:23 95:2
100:9 109:24
123:17 135:17
139:15 141:22
171:10,13 224:1
224:13 225:1,5
226:3 237:8,20
242:22
**inferring** 86:18
**influence** 48:11
93:13 168:6,14
169:10,19,21
170:19
**influenced** 158:10

Brenda Murphy

February 4, 2022

The South Carolina State Conference vs. McMaste,

[influential - involved]                                                  Page 19

**influential** 160:23
**information** 11:7
  11:9 28:6,9 59:2
  62:12 63:24 68:6
  115:3 142:20
  144:16 153:16
  171:14 183:2
  187:3 194:23
  199:1 215:11
  219:24,25 220:23
  241:16
**informed** 57:13
**ingram** 4:5 6:6
  10:6,8,9,12 11:19
  12:20 13:7,18,21
  13:22,25 14:7,7,21
  22:11,18 30:10,18
  31:2,15,18,21 32:1
  32:7,9 34:25
  39:11 40:2,5,7,19
  40:22,25 41:3
  44:13 46:17,25
  47:9 50:9 52:16
  55:14,22 57:23
  58:14 59:22 60:6
  60:9,21 61:12,20
  62:3,15 64:20,22
  65:4,12 70:2,6,12
  70:13,17 72:23
  73:1 74:22,25
  75:7 80:10 82:11
  82:22 84:4 87:13
  89:11,14 97:6,12
  102:18 103:3
  104:10 111:10,14
  112:17 113:7,18
  114:8,14 123:24
  124:17 125:25
  126:24 131:24,25
  132:8,9,11 143:3
  143:10,24 146:11

146:13 147:8
  156:1,5,13,18,20
  157:21 159:7
  163:11,13,14
  164:1,4,14 165:2
  166:10,16,19,23
  167:6 170:4,12
  171:21 172:1,2,7
  172:13,17 174:1
  175:5,21 177:11
  177:14,18 178:12
  178:24 179:11,15
  179:22 180:3,18
  181:2,4,6 182:22
  184:6,14,19,20,22
  185:21 187:17
  188:2,8,16,19,23
  189:6,13,15,17
  194:1,5,8 198:9
  200:18 201:21
  202:5,11,20 203:1
  203:3,5,10,20,24
  206:19 212:5
  213:3,5,8,14,19,24
  215:4 216:6,11
  218:12 219:3
  222:10 223:9
  228:18 229:12
  230:15 231:21,24
  232:3,5,14,23
  233:2,17,21
  234:19 239:20
  240:18 241:4,7,22
  242:6,18 243:10
  243:13,19,24
  244:7
**initial** 17:1 21:17
  56:1,8
**initially** 192:18
**initiative** 27:4
  83:18 237:4

**initiator** 49:24
**input** 12:2 53:20
  69:22 129:19,21
  130:5,7 131:1
  141:14 142:7
  171:10 192:3,8,18
  196:24 211:5
  212:2 217:4,4
**insofar** 182:22
**instruct** 22:12
  31:21 202:9
**instructed** 219:18
  220:1,4 235:12
**instructing** 22:15
  31:24 32:5 65:12
  70:2,11 171:21
  172:17 182:24
  185:22 194:5
  202:5
**instructions** 13:1
  202:12,16
**instructs** 10:15
**intend** 12:19
  198:18
**intended** 76:6 93:8
  127:23 131:11
**intensely** 84:14
**intent** 80:18,18
  149:22 158:20
  162:19,19 210:22
  228:12
**intentional** 93:2,4
  93:7,10
**intentionally** 81:2
  92:17 109:17
  177:6
**interact** 73:5
  77:22
**interest** 89:6,10,15
  89:24 90:2,17,21
  90:25 91:13 92:19

115:25 116:4,9,15
  116:18,24 127:15
  134:18,22 135:1,6
  135:7,12,19,22
  136:15,18,20,21
  137:3,10,21,25
  138:14,18 139:10
  196:22 197:1,20
  228:11 229:5,9
**interested** 22:3
  100:4 108:1 205:2
  245:13
**interests** 92:20
**interference**
  203:18 234:16
**interpose** 220:3
**interpretation**
  28:20
**interpreting**
  147:21 162:8
**interrupt** 217:9
**interruption** 151:1
**interview** 79:9
  118:1 124:4
**interviewed** 173:3
**introduced** 100:3
  166:16
**introduces** 44:15
**invite** 24:23 77:9
  77:15
**invited** 24:9 26:19
  26:19 28:16 76:17
  77:13,16 200:14
**involved** 25:17
  28:12 47:12 49:7
  49:10 51:16 75:14
  129:10 140:5
  141:10 142:9
  146:8 183:3
  185:19 193:2,19
  196:14 215:13

Brenda Murphy
The South Carolina State Conference vs. McMaste,

February 4, 2022

[involved - lawsuit]

Page 20

231:9,11,12
**involvement** 66:15
**irregular** 168:2,11
**issue** 50:14 80:8
　111:25 119:10,10
　120:7 128:10
　154:13 194:8
　230:9
**issued** 113:1
　127:22
**issues** 52:25 71:8
　119:23 195:9
　211:24 228:11
　244:2
**items** 12:17

**j**

**jan** 2:2 3:5 7:1
　245:19
**jane** 5:9
**jennifer** 98:10
**jerry** 64:19 80:1
**jmc** 1:5
**joachim** 2:4
**jobs** 239:12
**john** 4:7 78:7
　98:12,13
**johnson** 94:19
**join** 24:14 36:15
　78:3 196:11
**joining** 78:4
**jordan** 48:3
**judge** 8:10,11
　120:1 152:15
　204:23,23
**july** 205:13
**june** 96:13 140:24
**junior** 37:1
**justice** 23:24 71:9
　71:9 76:20 78:5
　120:8,16 222:9,15

**justin** 63:18

**k**

**keep** 25:23,25 26:4
　46:16 73:19
　118:14 129:1
　135:7 146:23
　150:2,7 162:20
　177:20 198:18
　231:1
**keeping** 145:24
**keeps** 162:5
**kept** 19:19 25:14
　25:16 26:6,8
　73:17
**kershaw** 190:21
**kilgore** 183:13
　185:10
**kin** 245:12
**kind** 204:3,15
　205:21 220:25
　221:7 223:6
**kinds** 226:14
**king** 78:7
**knew** 195:2
**know** 11:10 14:13
　16:9 19:17,18,21
　20:9,14,19,20 21:1
　21:4,5 25:3,3,13
　28:7 36:9 38:4,6
　38:10 41:25 43:8
　43:8 44:9 45:2
　46:3,4,20 48:18
　49:18 51:2,4,6,23
　52:4,7 55:5 56:19
　62:24 63:3,4,4,6,8
　63:11,13,18 64:8
　64:10,11,13,23
　67:24 68:3,5
　69:12 70:17 75:17
　75:20 76:20 77:21
　77:22 78:7,16,19

78:20,21,22,24
79:1,3,4,18,22,23
80:1 83:4,6 84:12
86:11,15 89:14
91:8 93:8 94:8
95:7,10,25 97:9
98:19 100:8
101:10,10,15,25
103:11,17,18,19
110:20 111:15,21
111:24,24 117:7
117:19 118:5,6,24
124:9 127:2 128:6
132:18,25 133:2,6
133:9,19 134:25
135:15 137:12,15
137:23 138:22,24
140:2 141:3,4,20
141:24 142:8,16
142:24 143:14,15
144:14,17,23
145:2,12,20
146:10 151:15
154:22 158:7,24
160:4 164:20
167:11 169:13
170:6 175:18,24
175:25 176:1,9
180:8,9,11,12,13
180:15 181:14
182:12 188:11
189:11,12 191:3,4
191:16 193:1,3,4
194:21,22 195:3,4
195:6 197:15,17
197:17 199:17
200:11,16,17,20
203:10 207:9,20
208:25 211:21,23
212:19 215:15
216:12 217:1,7

219:13 220:7
221:14 222:2,25
224:19 225:12,16
225:19,19 226:23
227:25 229:16,19
236:4
**knowing** 79:11
　224:8
**knowledge** 12:20
　13:9 19:7,10,16
　50:20 76:4 118:4
　145:4 175:12,14
　189:1,4 194:20
**known** 73:8
**knows** 84:2

**l**

**l** 3:1
**labeled** 107:8
**lady** 33:24 89:1
**laffittee** 5:2
**lag** 54:7
**lambert** 4:23
　240:1
**large** 91:5 138:5
**larger** 90:1,2,24
　90:25 135:18
　236:23
**late** 18:1 25:21
　53:1,5 213:12
　243:1
**launched** 243:14
**launching** 196:4
**law** 22:22 56:25
　117:2 127:24
　137:13,16 152:15
　152:18
**lawmakers** 53:20
**lawrence** 67:19
**laws** 3:12
**lawsuit** 14:13
　47:23 49:8 54:13

Brenda Murphy
The South Carolina State Conference vs. McMaste,

February 4, 2022

**[lawsuit - look]**

Page 21

54:19,24 72:5
74:4,13,18 76:6
111:1 113:21
119:25 133:8
159:12 205:11
215:3 217:21
223:24 231:3,9
232:22 233:6
**lawyer** 111:11
210:1 212:20
**lawyers** 15:4 18:3
27:16 28:4 59:2
113:2 126:7,20
132:24 149:6
211:3
**ldf** 14:2 15:17 27:8
38:10,14 83:5,10
126:16,20,22
182:3 197:23
**lead** 63:25 153:14
**leader** 237:1
**leadership** 24:12
25:19 26:15 35:14
71:5,13 99:22
142:23 171:16
174:14,25 175:8
177:25 184:19
**leading** 3:16 49:25
**league** 76:12 77:21
79:15 98:19 141:2
212:9
**leah** 4:6 196:19
197:23
**learn** 55:6 67:5
**learned** 141:24
**learning** 100:5,10
**leave** 243:25
**leaving** 243:1
**legal** 2:3 4:4 38:3
55:15,23 89:12
157:22 175:6

211:3 222:6,10
224:14 231:25
232:15,24 241:23
**legality** 198:2
**legally** 224:14
**legislation** 61:9
74:9
**legislative** 177:6
192:3,7 193:24
211:17,18 237:7,9
241:20
**legislator** 29:1
**legislators** 211:22
221:17
**legislature** 94:4
**legislatures** 53:16
**length** 243:17
**leon** 20:18
**letter** 6:19 125:7
126:16 130:17,18
130:24 131:7
166:23
**letters** 125:2,4,12
125:13,21,24
126:3,10,11,15,19
127:3,3 128:6,8,10
209:2,3,6,12,18,18
210:3 211:3,3
**level** 38:12
**life** 20:1 34:3 37:1
**lifetime** 36:22,23
**limehouse** 4:22
6:5 230:18,19,22
230:24 232:1,7
233:14 240:2,3
**line** 104:23 159:22
161:9 165:16
192:1 197:22
**lines** 6:18 81:7
94:14 106:3,25
107:2 109:16,21

110:21 132:14
141:21 160:21
161:2,9 166:9
168:3,11 171:3
174:23 223:10
238:11 242:10
**link** 106:13
**list** 22:20 27:10
65:8 71:15 74:2,7
74:14 98:25 100:1
132:2,20 155:19
177:21 178:8,10
178:14,15 182:12
183:12,14 185:14
194:2 225:12
**listed** 73:9,24 77:5
98:22 114:2 131:4
132:22 186:1
187:4,6 194:9
232:19
**listen** 9:4 26:12
111:22 112:4
117:9,10 122:17
**listening** 217:10
**listing** 74:6 132:21
182:16 187:21
**listings** 236:5
**lists** 45:6,9,13,17
64:21 65:7 70:19
97:22,25 156:11
183:13 186:12
**litigation** 8:7
32:11 47:12 50:16
50:21 57:21 58:6
58:7 75:23 182:5
185:22 199:3
**little** 19:21,25
27:21 32:18 67:6
87:4 113:17
134:14,16 135:15
147:1

**live** 33:19,21 34:7
34:10,23,24 68:24
88:3 89:19 138:2
139:16 157:17
172:10 177:5,7,8
178:16 242:11
**lived** 20:1 34:1,5
90:10
**lives** 172:20
180:14 217:20
**living** 32:15 154:5
**llc** 4:12 5:2
**load** 88:16 156:4
164:15,16,17
**loading** 88:15
131:23
**loads** 40:3
**local** 12:22 98:16
140:1 189:18
190:18 191:6,7
**located** 11:12,13
37:12
**location** 155:18,22
155:23
**long** 15:16 16:7,11
33:21 34:10 35:6
35:10 56:19 57:6
57:22 81:25 88:16
97:1 102:8,12
107:9 204:1 209:1
215:9 243:6,20
244:6
**longer** 48:17 55:20
58:5,11,12 95:2
102:20 137:21
**look** 40:8 42:15
43:11 44:18 45:1
45:22 48:15 59:18
60:13,23,25 62:18
62:19 64:4 85:10
86:6 87:2 91:5

Brenda Murphy

February 4, 2022

The South Carolina State Conference vs. McMaste,

[look - maps]

Page 22

93:15 94:10 96:3
100:7 102:1,2
111:16 128:19
130:10 131:15
135:18 136:16,17
136:18 149:23
151:19,20 153:3
156:10 159:17
160:8,9,10,15
162:25 169:3,5
170:15,20 171:7
176:20 181:20
182:25 184:19
186:1 192:11
216:23 217:2
223:22 224:1,21
224:23 225:5,21
225:24 227:3,7,21
229:22 238:25
239:9
**looked** 66:9 84:10
89:14 95:6 101:13
144:7,9 223:12,15
223:25 224:20
225:19,25 227:13
227:18,25 228:23
229:20
**looking** 40:13 41:4
41:17,18 43:6,7
45:21 46:17,18
48:20 56:22 60:17
86:6,17 95:24,25
100:11 101:14,23
142:20 156:24,24
159:16 160:8
162:11 169:17,23
183:11 199:19
224:2,2 242:9
**looks** 89:6 149:19
**lose** 123:6,21
124:5

**losing** 123:11
**losses** 121:15
**lost** 121:6,10
239:12
**lot** 13:13 133:14
146:24 195:8,15
204:2 209:12
212:19 218:10
**low** 157:10 158:8
**lower** 69:5 85:17
153:4 160:12
**lucas** 48:3
**lunch** 96:23 102:7
102:9,13,17 103:1
103:3
**luxury** 26:25
**lydon** 8:10 204:23
**lynn** 194:17,19
195:3 200:4

**m**

**ma'am** 23:17
27:14 31:4,5
34:16 35:25 36:4
37:25 40:12 42:10
43:18 59:20 76:1
81:24 84:9 85:20
88:5 99:19 113:1
115:15 118:24
121:8,25 122:3
124:10 127:17
130:2,25 132:23
134:24 136:19,24
137:17 138:3
139:12,21,23
145:11 147:13,14
147:16,24 148:2
148:15 149:5,8,18
150:6 152:9,25
154:7 155:13
157:3 159:19
160:6,24,24,24

167:10,24 168:17
175:15,17 187:23
191:20 196:10
199:10 200:5
205:15,20 209:20
210:11,15 240:17
241:9
**magic** 91:24
**main** 4:15 5:10
45:9
**maintain** 122:11
168:5
**maintains** 72:19
73:11
**majority** 159:20
159:23 207:20
**makers** 168:13
**making** 79:21
122:6 142:1 146:9
164:11 171:7
206:9
**mama** 89:1
**man** 127:14
215:20
**manhattan** 90:21
**mann** 2:2 3:6 7:1
97:4 102:7 245:19
**manner** 23:22
58:24 92:18,21
93:11,20 109:6
110:9 153:17
154:20 158:11
168:4,13 217:3
**map** 6:20 51:1,3
57:20 79:13 136:4
136:5 137:5
142:24 144:7
149:23 156:11,22
157:25 158:23
164:18,22,23
166:3,10,11,12,12

166:14 167:8,10
167:13,17,18,19
168:4,13,20,22
169:23 190:19
196:15,15 201:13
229:22 238:21
**map's** 169:16
**mapped** 228:3
**mapping** 25:7,20
26:23 28:19 48:7
50:5,8,13 57:10
62:19 64:5 88:9
100:3,3 111:17
190:17 192:13
193:7,9,20 196:12
200:2 226:4,6
228:5 242:21
**mappings** 26:23
242:20
**maps** 25:7 49:1,4
50:24 51:10,11,13
51:18 54:9 57:17
57:21 58:2,2,4,4
58:16,19 59:7,19
61:1 73:6 79:19
89:5,5 99:8
100:11 102:2
110:2,9,16 111:16
117:24 120:8
129:20 130:10
141:10,13 142:5,9
142:21 143:18
144:2,8,9,12,15,17
144:21,24 154:25
164:2,3 166:14
167:13,16 169:18
193:6,20 195:19
200:23 210:4,5,6
210:13 211:4
214:14 217:2
223:7,11,16 224:9

Brenda Murphy
The South Carolina State Conference vs. McMaste,

February 4, 2022

**[maps - met]**

Page 23

228:22 229:20
238:2,6,8
**march** 42:24
**mark** 4:13 7:17
13:8
**marked** 39:23
44:6,17 66:23
81:21 88:12 97:9
97:14 106:9 132:5
165:9 181:18
186:5 189:23
194:12 198:13
**married** 34:12,13
**marvin** 183:18
**masonic** 36:3
**master's** 32:22
**material** 115:6
204:4
**materials** 11:21,24
18:17 220:19
**math** 104:7
**matter** 26:21
51:13 63:1 69:3
114:10 145:25
209:23
**matters** 21:14
**matthew's** 196:20
**matthews** 198:1
**mcdaniel** 161:6,17
162:7
**mcdaniel's** 161:8
**mclawhorn** 184:2
**mcmaster** 1:13
4:19,21 230:19,24
231:2
**mean** 47:23 50:22
51:23 75:25 90:4
91:18 92:16 93:17
95:23 97:9 98:4,5
100:17 108:22
109:13 116:5,6

119:19 123:1
127:11,18 135:17
148:4,4 154:3
160:21 180:6
197:18 211:7
221:15 223:14
237:10
**meaningful** 12:16
**means** 28:11 55:18
58:12 65:5 91:19
**meant** 43:1
**media** 195:9 196:1
196:4,7
**medication** 9:3
**meet** 15:12,15
21:8,12,18,21 26:2
68:4 71:4 73:6
143:2,5 192:19,22
193:5,13,15,24
**meeting** 6:17 23:5
23:12 24:6,7,8,14
24:17 25:1,11,14
25:15,17 26:6,9,11
26:11,12 27:18
28:2,25 64:16
65:10,13 68:4
71:5,12 96:11,12
96:14 97:20
107:24 183:1
192:2,6 194:16
199:14,24 200:11
233:25
**meetings** 15:22,25
18:9,10,11 21:24
22:2,2 23:8 25:22
25:23 26:1,3
28:23 54:21 68:1
71:2,3 72:13
80:17,18 83:8
112:13 174:13
183:4 197:13

200:17 207:14,19
208:14,18,19,22
211:2 216:20,25
217:6 238:4
**meets** 216:24
**melissia** 5:16
**member** 21:25,25
22:1,13,19 23:4,6
23:7,15 24:16
27:23 35:7,17,21
35:22 36:5,8,13,14
37:3 47:13 49:12
65:15,20,22,25
68:10,13 69:20
74:6 77:10 98:2
112:22 143:19
173:4 176:13
177:4 178:20,21
184:2,9,12,13
186:16,20 187:14
192:21 224:17
226:10 229:15
242:19
**members** 14:14,15
21:12,19 22:3
23:13 24:9,13,17
24:21,24 25:18
26:17,18 28:10,12
36:9 37:8,16 61:8
62:25 64:1 65:1
68:2,8 72:1,4
75:13,17,20 76:17
77:3 83:17 100:4
108:1 126:18
129:13 142:22
144:14 171:17,23
172:10,25 174:6
174:24 176:4,11
177:7,8,17,24,25
178:1,8,16 179:7
179:17,18 182:7

182:18,23 183:3,4
183:8,10 185:14
185:15,18,19
187:22 188:13
190:10 192:20
193:23 199:1
207:13 208:5,6
213:1 214:19
215:2,11,24
216:15,22 217:14
217:23 232:18
237:18 238:9
239:5 240:7,11
241:3
**membership**
22:20 25:19,19
26:13,14 36:21,22
36:24 37:11,13
50:1,3,6 64:21
65:6,14 66:21
70:4,19 139:2
177:21 190:12
194:2 207:22
212:19 216:24
217:12 236:6
239:3,7,15 240:23
**memorable**
205:15
**mention** 128:15
**mentioned** 7:24
13:12 18:18 25:24
34:7 38:15 99:20
99:23 100:12
124:25 126:10
139:14 153:19
174:22 179:3
187:22 188:12
209:8
**merely** 111:11
**met** 22:16 23:4,10
23:11 88:7 192:14

Brenda Murphy

February 4, 2022

The South Carolina State Conference vs. McMaste,

**[met - murphy]**

Page 24

| | | | |
|---|---|---|---|
| 192:17 215:10 | 185:16,17 189:20 | 146:14,18 150:21 | **moving** 37:2 |
| **methods** 141:25 | 190:7 192:12 | 155:24 156:3,7,17 | **multiple** 89:23 |
| **michael** 4:14 | 199:16 203:22 | 156:19 159:9 | 188:20 211:18 |
| 164:7 167:20 | 223:4,7 233:17 | 163:12 164:3,9,16 | **municipalities** |
| **midnight** 57:2 | 236:1,5 243:23 | 165:4,11 166:12 | 91:11 191:7 |
| **mind** 119:5,8 | **mirrors** 103:22 | 166:18,22 167:20 | **municipality** |
| 150:13,17 | **misstates** 174:1 | 167:23 171:25 | 89:3 90:1,3,24 |
| **minds** 64:3 110:20 | 187:17 188:2,3 | 172:5 176:14,16 | **murphy** 1:23 3:5 |
| 169:14,23 | 213:3,5 | 177:13 180:24 | 7:7,11,18 8:1,3 |
| **mindset** 93:1 | **misstating** 189:15 | 181:6,20 184:20 | 13:6 14:1 17:3 |
| **mine** 104:8 | 240:18 | 184:25 185:24 | 19:22 23:2 30:21 |
| **minimal** 140:17 | **mobile** 2:5 245:5 | 188:22 189:8,14 | 30:21 31:20,20 |
| 157:9 | **moment** 48:25 | 189:16 194:7 | 32:16 33:19 34:12 |
| **minimize** 168:5,14 | 81:13 96:19 | 198:6,10,15 202:9 | 35:1 36:24 39:13 |
| 169:10 | 108:25 112:3 | 202:24 204:15,20 | 40:8,10,24 41:4 |
| **minimized** 48:12 | 117:14 118:16 | 204:22 206:12 | 42:4 43:5 44:23 |
| 214:17 | 130:17 133:12 | 207:1 212:22 | 47:2 48:3 49:11 |
| **minority** 111:8 | 138:11 139:18 | 216:12 220:3,9 | 50:11 52:18 55:16 |
| **mintues** 6:21 | 150:22 155:25 | 221:11 223:5,14 | 55:24 56:13 57:25 |
| **minute** 29:10 | 187:24 199:7 | 225:7 226:8 229:7 | 58:15 60:11,22 |
| 50:24 52:15 69:16 | **monday** 19:1,2 | 234:3 235:7 | 61:14,22 62:6,9,17 |
| 88:15 102:17 | **monthly** 73:6 | 238:18 239:5,22 | 65:16,17 66:7 |
| 107:1,12 118:18 | 216:24 | 240:1,5 242:24 | 67:9 70:21 72:11 |
| 132:25 146:16 | **moore** 4:13 6:3,7 | 243:12,16,25 | 72:16 73:2 75:2,9 |
| 147:17 163:5,5 | 7:15,17 13:11,19 | **moore's** 208:25 | 82:1,25 84:7 87:7 |
| 166:20 173:15 | 22:14,25 31:17,23 | 214:3 | 87:14 88:23 89:10 |
| 181:3,4 191:17 | 32:5,8,12 39:25 | **mooted** 55:9,12 | 89:14 97:17 103:2 |
| **minutes** 6:16,23 | 40:4,6,21,25 41:5 | **morning** 7:16,18 | 103:11 104:12,20 |
| 6:25 18:9,13,17 | 44:12 52:13,18 | 7:20 10:6 181:2 | 106:4,22 107:2,4 |
| 19:18,21 25:12,14 | 60:8 62:5 64:22 | **motion** 22:21 23:1 | 108:9,23 109:12 |
| 25:16,22,23,25 | 70:5,11 72:25 | 32:14 172:6 | 110:2 111:10 |
| 26:4,6,8 27:20,22 | 74:24 80:12 81:23 | 185:25 202:25 | 112:20,23 113:10 |
| 28:2,23,25 29:1,3 | 82:13 87:20 96:8 | **motions** 212:21 | 114:1,7,15 115:10 |
| 52:14 65:11 73:17 | 96:21,25 97:8 | **mouth** 223:10 | 115:14 117:18 |
| 76:3 96:6,12,15,16 | 102:6,12,16,19,22 | 227:17 | 120:11 124:2,18 |
| 97:19 107:12 | 102:25 103:2 | **move** 20:3 62:14 | 124:25 126:2,8 |
| 115:15 133:19 | 107:9,18 111:13 | 75:16 81:13 | 127:1 131:21 |
| 138:13 146:22 | 112:19 114:12 | 105:20,21 124:24 | 133:8 143:6 |
| 147:5 148:5,18 | 117:7,13 118:16 | 133:11,11,16,18 | 145:14,14 146:18 |
| 153:13 156:3 | 124:1 131:23 | 239:13 | 147:7,11 151:25 |
| 163:6 179:3 184:1 | 132:1,7,10 146:12 | | 156:23 157:23 |

Brenda Murphy
The South Carolina State Conference vs. McMaste,

**[murphy - nineteen]**                                    Page 25

159:13 160:20
163:16 164:20
165:14 170:3,5
171:9,12,19
172:16,23 173:2
173:14,19,19,20
173:25 174:3,9
175:7 176:2,13,24
177:23 178:14
179:1,14,20,24
180:20 181:24
183:24 186:8
187:8,19 188:4,10
189:9 190:2 192:2
193:21 195:20
196:8 197:23
198:20 199:8
201:4,18,23
202:15 203:21
204:5,10 206:22
211:24 213:9,21
214:2 216:16
217:8 219:5
223:14 224:19
230:7,23 232:10
233:22,22 235:16
240:6,20 241:24
242:2,8 243:3
**mute** 150:22
203:20 231:21
234:19
**myrtle** 8:8 200:24
201:6 205:3

**n**

**n** 3:1 4:1 6:1
**naacp** 1:8 4:4 13:9
14:6,25,25 21:25
22:1,13,22 23:7,15
24:16,18,21 25:19
26:15 27:23 30:20
35:7,11 36:10

37:9,18 38:3 39:2
42:20 43:1 44:1
45:6,11 48:2
49:15,21 65:2,13
65:16,21 66:1,4
74:6 76:4 83:5,16
96:11 106:4 107:4
130:11 140:1
142:22 147:13
171:24 172:10,24
174:6 175:9,10
176:1 177:4,21,25
181:25 182:7,19
182:23 183:3,8,14
183:16,20 184:3,9
184:10,13,15
185:4,15 190:10
194:2 199:1 202:8
205:10,22 207:4
207:22,25 208:5
211:13 217:23
233:1,4 234:15
235:16 236:8,11
236:14,16,23
237:18 239:3,5
241:2 242:1
**naacp's** 110:1
164:17 231:9
**name** 7:17 8:11
22:19 27:9 42:18
45:8 64:17 142:8
142:12,14 143:1
143:16 172:20
174:8 176:10,10
176:13 178:20
184:18 185:3
230:23
**named** 8:1 49:13
49:15 99:4 206:22
231:2

**names** 64:21,25
65:5,6 70:6
123:15,16 162:10
171:19,20,23
172:4,10,24
173:17 174:7
177:20 178:7
179:17 180:7,9,11
180:12,13,16
182:17,23 184:7
184:15 193:16,22
193:23,25 194:2
217:22,24 239:6,7
239:9,11,14 240:7
240:11,22,24
241:3
**national** 37:18
38:3,9,10,14,14
43:17 46:2,3,15
68:16 202:7
240:10,22 241:15
242:1
**nature** 36:17
**neal** 183:18
**near** 128:18
**necessary** 3:15
12:14 54:25 182:5
192:19
**need** 10:17,20
19:21 20:25 21:9
23:1 26:2 27:12
30:22 32:14 38:12
38:13 44:14 47:20
65:16 68:3 92:2
102:13,15,20
106:6,14,16 107:7
107:20 111:21,22
112:1 117:8,9
121:16 122:2,18
122:19 128:15
138:1,22 148:1

156:5 158:11
162:9 172:5
189:18 198:9
202:24 203:5,19
224:14 233:17
**needed** 55:20 81:5
109:4 110:6,10,17
111:23 116:12
142:1 144:4 224:3
224:15 225:3,15
225:15 228:2
235:9,12
**needs** 27:1 30:5,6
30:15 105:1 165:2
169:7
**neighborhoods**
109:15
**neighboring** 168:6
168:14
**neither** 245:11
**never** 31:17 95:4,4
143:16 182:12
187:25 192:13
194:21
**new** 4:9,9 27:4,13
33:16,16 53:16
57:7 90:13 119:11
119:12 176:17,19
200:24 201:12
204:4
**nexsen** 4:12
**night** 12:11,13
25:22 64:24 96:5
176:18 198:23
237:22,24,25
**nine** 34:11 165:13
**nineteen** 35:8
107:11 145:7,8,10
145:19 146:2
147:6,15 148:13
148:19,24 149:16

Brenda Murphy                                February 4, 2022
The South Carolina State Conference vs. McMaste,

**[nineteen - office]**                                Page 26

238:17,22
**non** 23:15
**noncompact** 168:2
168:11
**nonpartisan** 23:18
23:20 38:16,20
199:24 200:13,15
**nonprofit** 23:19
76:19
**nonpublicly**
184:15
**nonresponsive**
147:1
**north** 2:4 45:9
**notary** 7:2 245:20
**note** 198:18
214:16
**noted** 12:5 131:10
**notes** 104:24 115:5
218:8 219:19
**notice** 3:21 13:15
16:22 113:2
203:13,14
**noticed** 203:12,15
**november** 86:22
125:10,11,12
130:17 131:18
189:21
**number** 1:5 13:23
14:18 25:22,22
27:20 28:23 30:13
39:25 41:16,21,24
42:1,2,3,14,16
43:3,4,8,10,13,14
43:21,22,23 44:2,9
45:14,17,19 46:1,5
46:11,12,12,13,14
46:14,15,16,17,23
47:4,7,8 50:24
56:20 66:12 67:1
67:2,4,8 77:21

81:24 83:25 84:3
84:7,20 85:17,25
87:20 90:2,16,20
90:25 91:6,20,24
96:1,8 97:7,10,11
97:11,22 98:21
101:11 102:2,5
103:23 104:18
106:11,12,12
115:13 122:9
132:1,3 137:15
139:2 151:2,2,19
151:19,20 152:6
153:3,4 154:24
155:17 156:22
157:4,14 160:11
162:13,14 165:13
166:24 172:21
173:3,6,22 176:21
181:1 183:1,12
190:1,2 198:8,21
199:5 201:9
202:12 207:14,16
208:2,7 209:3,7
210:4,5 221:17
**numbers** 43:15,16
46:20 48:15 87:3
87:18 91:3,4,5
103:18 122:5
151:20 153:6
157:12 214:17
215:10 221:13,15
221:16 222:4
225:19
**nurse** 32:17 33:5
33:11,12,12 34:14
**nurses** 36:5,6
**nursing** 36:7
**nygord** 5:15

**o**

**o** 3:1
**o'clock** 230:5
**oath** 8:19 9:1
71:19 72:10 74:16
75:5 143:17
174:17
**obama's** 222:9
**object** 10:12 12:22
12:22 13:21 47:9
62:6 164:7 181:4
189:16 234:3
235:7
**objection** 6:10
10:14 22:11 30:10
30:18 31:2,15
34:25 39:11 40:15
40:19 41:25 46:25
50:9 55:14,22
57:23 58:14 59:22
60:6,21 61:12,20
62:3,15 64:20
65:3 70:2,7,17,19
72:23 74:22 75:7
80:10 82:11,22
84:4 87:13 89:11
104:10 111:10
112:17 113:7
114:8,11 123:24
125:25 126:24
143:3,10,24 147:8
157:21 164:1
166:10 170:4,12
171:21 172:14
174:1 175:5,21
177:11,15 178:12
178:24 179:11,15
179:22 180:18
182:22 184:6,14
185:21 187:17
188:2,8,16,19

189:6,13,14 194:1
198:24 200:18
201:21 202:5
213:3,24 215:4
216:6 218:12
219:3 222:10
228:18 229:12
231:24,24 232:14
232:23 233:2
238:18 240:18
241:4,7,22,22
242:6,18
**objections** 3:15,17
12:24 39:17
114:13 189:17
213:8,12
**objects** 12:21
**observer** 199:24
**obvious** 100:25
101:17
**occasion** 21:8,24
22:4
**occur** 112:1 118:4
154:12
**occurred** 109:8
118:5,7 119:16
**october** 21:12 49:3
54:13 111:2
125:10 186:2,24
**offered** 3:19 79:12
79:15
**office** 4:20 11:15
33:7 38:14 43:17
45:10 46:2,3,15
47:4 68:16 95:1
102:4,5 126:14
185:12 192:23
201:20 202:3
219:20 240:22
242:1

Brenda Murphy                                      February 4, 2022
The South Carolina State Conference vs. McMaste,

[officer - opinions]                                      Page 27

| | | | |
|---|---|---|---|
| **officer** 47:13 | 59:13 61:5,16 | 132:12,17 133:13 | 195:8,12,17,23 |
| 185:7,10 | 62:7 63:3,10,13,16 | 133:16,17,21 | 196:3 197:15,25 |
| **officers** 185:5 | 63:18,24 64:19 | 134:4,11,19 | 198:6,10 199:6,22 |
| **official** 1:13 42:18 | 66:5,9,12,15,25 | 135:20,24 136:3 | 200:7,16,22 201:8 |
| **oh** 31:4 116:5 | 67:15,16,24 68:8 | 137:2,8 138:4,9 | 201:22 202:2,18 |
| 130:7 200:4 | 68:12,17,25 69:12 | 139:7,17,18,25 | 203:1,21 204:5 |
| 205:22 207:16 | 69:17 70:14,15 | 140:10,19,23 | 205:1,14 206:5,25 |
| 218:6 228:25 | 72:10 74:15 75:5 | 141:13 142:8,24 | 209:12 211:7,16 |
| **okay** 8:6,25 9:3,12 | 76:15 77:6,12 | 143:2,8,15 144:19 | 212:18 216:3 |
| 9:18,25 10:1,9,12 | 78:16 79:1,5,17 | 145:2,6 146:1,10 | 218:16 220:24 |
| 10:17,24 11:10,12 | 80:3 81:17,23 | 146:14,21 147:10 | 221:5,18 223:3,22 |
| 11:16,18,21,24 | 82:21 83:4,12,20 | 148:2,9,16,23 | 227:22 229:7 |
| 12:19,20 13:6,23 | 83:25 85:7,10,15 | 149:15,24 150:12 | 231:16 232:12,12 |
| 14:8,12,17,21,24 | 86:1 87:1,10 88:2 | 150:21 151:13,18 | 232:21 233:17 |
| 15:3,12,22 16:6,11 | 88:14 89:9 90:1,9 | 151:24 152:5,18 | 234:9 236:3 |
| 16:14,16,19,24 | 90:13,16,24 91:18 | 153:11,12,22 | 238:20 241:12 |
| 17:6,16,19 18:23 | 92:15,15 94:2 | 154:13,19 155:14 | **old** 20:4 83:21 |
| 19:3,12,20 20:2,5 | 96:5,18,20,24 | 155:16,18 156:10 | 86:20 |
| 20:9,14,19,22 21:6 | 97:22,25 98:4,18 | 157:1,2,18 158:15 | **older** 67:6 |
| 21:8,10,16 22:8 | 98:21,25 99:4,7,14 | 161:5,16,20 162:3 | **once** 90:11 208:20 |
| 24:9,20 26:6 | 99:17 100:20,22 | 162:14,14,15,25 | 234:1 |
| 27:20 28:1 29:8 | 101:6 102:6,12,19 | 163:5,15,21,25 | **one's** 92:12 |
| 29:15,18,21 30:1,7 | 102:21,22,24 | 164:21 165:4,16 | **ones** 15:17 36:8 |
| 30:11,25 32:5,18 | 103:9,20 104:15 | 165:19,24 166:4 | 77:20 78:25 |
| 33:3,5,18,24 34:5 | 104:22 105:5,8,14 | 167:25,25 168:9 | 193:13,14 208:20 |
| 34:10,12,19,21,23 | 105:19 106:18,24 | 168:25 170:13,22 | 209:8 |
| 35:3,6,13,17 36:13 | 107:1,9,23 108:11 | 171:6 172:15,19 | **ongoing** 71:3 |
| 36:16,19,23 37:6 | 108:14,22 109:11 | 173:1,9,18,20 | **online** 15:18 |
| 37:20 38:1,6,15,19 | 110:8,25 112:15 | 175:1,19,25 | **onset** 95:3 |
| 39:9,15,20 41:2,9 | 113:16 114:4,6,23 | 176:24 177:1,8 | **open** 12:13 24:17 |
| 41:10,15,16,20,23 | 115:23 116:17,21 | 178:1,17,19 179:3 | 29:4,5,5 83:8 |
| 42:9,11,13,21 | 117:1,17 118:2,9 | 179:8,19 180:12 | 198:19 203:21 |
| 43:11 44:18,22,25 | 119:7,19,24 120:6 | 181:14,15,24 | 243:1 244:1 |
| 44:25 45:5,13,16 | 120:12,19 121:12 | 182:14,21 183:7 | **operate** 174:12 |
| 45:24 46:10 47:11 | 121:15 122:16,21 | 183:11,18,22 | **operative** 55:20 |
| 47:22 48:24 49:13 | 123:9,22 124:13 | 184:2 185:10,14 | **opinion** 59:19 |
| 49:18,20 50:22 | 125:6,15,19,23 | 185:24 186:7,10 | 112:7,7 242:15,16 |
| 51:8 52:4,7,10,15 | 127:12 128:1,5,25 | 186:22 187:10,20 | 242:22 243:5,9 |
| 53:9,18,23 54:5,12 | 129:18,24 130:3 | 190:4,9 191:3,12 | **opinions** 211:23 |
| 54:15 55:12 56:6 | 130:24,24 131:3 | 191:24 192:6 | 211:25 |
| 56:16,19 58:11,21 | 131:18,21,22 | 193:23 194:19,23 | |

Brenda Murphy
The South Carolina State Conference vs. McMaste,

February 4, 2022

[opportunistic - partners]

Page 28

**opportunistic**
157:11,20
**opportunities**
15:19 62:12,21
81:7 94:24 95:6
96:2 123:17,19
124:7,8 128:23
149:24 209:23
214:18 221:18
226:7
**opportunity** 9:22
12:16 48:16,21
57:15 59:9,10
60:13 61:2,3
62:14,20 81:9
92:10 94:5,6,25
95:1 101:24 102:3
112:4 122:19,21
122:22,24 123:3
131:7,12 136:9,11
136:13 145:13
146:7 161:10,11
162:24 167:2,3
181:12,13 209:13
209:14 212:16,24
214:15 218:2,4,22
219:15 220:14
223:19
**option** 29:4
**oral** 7:8
**orangeberg**
124:21
**orangeburg** 67:20
**order** 23:1 32:14
35:24 106:14
157:10 158:9
170:18 172:6
185:25 194:8
199:2 202:25
212:21 215:12

**orders** 36:3
176:12
**organization**
19:12 23:18 38:16
38:20,25 42:18
43:2,20 47:24
49:3 50:22,24
57:19 58:6 59:17
59:24 67:25 71:20
72:6,19 73:11
74:1 75:18 103:14
136:4 150:10
175:3 200:12
206:12 210:7
223:23 236:18
241:15
**organization's**
39:16 57:16
**organizationally**
37:22
**organizations**
35:18,20 38:5
**organized** 204:18
**original** 231:5
**outcome** 59:7,18
60:13,18 64:4
108:3 109:20
119:17 130:10
169:15,19 210:19
223:15 227:22
242:11,12,14
245:13
**outcomes** 60:25
62:19 211:15
222:4 223:12
224:20 227:21,21
227:22
**outset** 193:6
**outside** 30:18
**overall** 61:1 119:3
130:22 231:18

**overlap** 114:10
194:2 238:12
**oversight** 37:22

**p**

**p** 3:1 4:1,1
**p.m.** 237:16
**packed** 158:22
**packing** 89:6
91:14,18,19,25
93:22 109:22
111:17 157:4,6
158:22
**page** 6:2 41:14,15
41:15 42:7,8,9
43:6,11,12 45:23
67:14 100:21
132:12 156:8,10
156:11 159:17
162:25 163:11,13
167:22 176:20,24
181:21 183:1
191:12 194:14
196:18 197:20
**pagination** 156:15
156:17
**paid** 14:25 51:10
140:19 141:2
**pains** 8:22 135:21
**paired** 92:25
**pairs** 165:24
**panel** 120:1
152:15
**paper** 144:4
**paragraph** 176:23
177:2
**paralegals** 7:24
**parente** 4:14
40:17 44:14
107:10 132:3
156:8 170:22
180:25 186:3

189:20 190:1
194:9 198:7 199:6
**parente's** 103:22
**part** 14:3 17:16
38:24 58:22 59:5
76:14,16 77:16
83:7,13,18 84:21
85:4,12,19,21 86:3
87:5 90:13 103:12
109:24 138:18
141:23 142:19
206:25 218:21
235:24 236:16
**partial** 22:19
**participant** 207:4
207:6
**participants** 27:9
200:15 236:24
**participate** 51:5
60:14 76:17,18
77:17 130:13
144:1 195:24
207:18 208:2
209:24 237:9,11
238:9
**participated** 22:1
72:13 130:12
144:6 207:13
**participation**
129:13
**particular** 26:9
28:2 29:22 38:22
39:7,10 41:8,11
176:19
**particularly** 199:2
215:16
**parties** 3:4,17
245:12
**partisan** 80:19
**partners** 14:15
27:2 28:5 51:15

3:21-cv-03302-MBS-TJH-RMG    Date Filed 05/02/22    Entry Number 254-1    Page 275 of 291

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

[partners - please]                                                        Page 29

100:9
parts  8:2
party  29:22,24
  30:2,3,9 38:22,23
  64:1 76:5,10
passage  23:8 74:8
  172:22 173:24
  178:22
passed  21:18 49:1
  49:4 61:9 74:17
  74:17 136:5 151:8
  155:4 162:5
pat  63:13
path  158:13,19
patience  230:8
pause  102:7 107:1
  107:18,18 117:10
  117:13 118:16
  150:21 181:9
paused  109:2,2
pay  36:16 37:3
  51:10,12 140:15
  140:17 141:21
paying  14:19,21
  50:18 52:7 140:23
pdf  132:2
penalties  8:22
pencil  144:3
pending  10:21
  244:1
people  24:4,25
  51:2 55:1 56:16
  60:14 61:2 62:21
  64:7 74:2,12 81:6
  91:6 94:1,3,24
  97:22 109:22
  116:17,23 122:23
  136:13 144:7,9,23
  146:8,9 153:4
  154:8,25 169:23
  178:11 179:4,5

180:16 182:18,21
  183:1,8,12,22
  193:25 211:23
  223:19 226:7
  238:5 239:10
  240:15 242:12,15
perceived  122:8
percent  83:22
  85:12,18,22,23
  86:4,10,21 87:4,4
  87:5,11,12,19
  91:21,21 92:3,7,8
  92:9 99:10 101:2
  104:5 160:13,14
  190:21,22
percentage  84:12
  84:16 100:12
  105:9,10,15 123:2
  157:8
percentages  84:16
  85:2
perfect  156:18
perform  140:8
performing
  127:23
period  16:10
  53:19 54:8 57:21
periods  54:17
perjury  8:22
permits  137:16
person  15:25 16:2
  19:22 23:14 30:4
  30:15 48:22 54:3
  64:16,17 65:10
  68:17 69:25 70:15
  70:15,19 71:20
  72:7,20 74:11,19
  99:4 141:19 142:9
  142:14 143:2,5,9
  143:13,14,16,17
  143:18 172:20

173:23 175:12
  205:16
person's  93:12
personal  12:20
  13:8 30:19 32:10
  171:8 206:20
  240:9
personally  17:19
  21:4,5 49:19
  56:13 79:3 144:1
  171:5 174:15,17
  195:7 208:4
  209:15
persons  1:10 54:5
perspective  107:4
  111:12,14 186:11
  186:23 188:1
perspectives  106:4
  106:24
ph.d.  184:8
phi  36:7
phone  12:3 16:1
  150:14 216:19
phrase  84:21,25
  85:4 89:4 91:12
  93:14 122:17,18
  134:2,9 157:5
  218:21
physically  11:13
piece  61:25 62:12
place  155:19 199:3
placed  56:15
  126:5
places  22:23 69:3
  121:3
plaintiff  4:3 30:19
  32:3 49:14,22
  205:10,10 206:22
plaintiffs  1:11
  12:7,11 13:24
  49:16 173:13

182:2,4,9,13
  185:20
plan  21:18 51:25
  94:6 130:20 145:3
  145:6,8,12,19
  146:2 147:6,12,13
  148:11,12,20
  149:3 151:8,14,25
  152:1,19,22 153:7
  154:7,10 155:4
  158:15 159:4
  162:4,4 163:21
  165:24 171:3,9,9
  171:12 172:22
  173:24 190:22
  222:25 233:8,11
planning  215:8
plans  23:9 48:4
  222:8,14,15
  238:16
platform  40:3
  55:7 164:10,15
play  106:14
  107:11,12,20
playing  49:25
  107:14,16 117:12
  118:15
please  9:10,11,20
  10:2,3 11:9 31:13
  31:19 47:2,20
  50:11 55:3,18,24
  56:6 57:18 58:15
  60:10,22 61:14,22
  70:24 73:2 75:1
  80:14 87:14 89:13
  94:22 112:20
  114:14 126:2
  130:21 137:10
  145:23 168:1
  170:5 188:10
  189:10,17 200:19

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

**[please - probably]**                                    Page 30

201:22 229:14
230:2 234:19
240:20
**pleasing** 193:11
**plus** 123:1 190:22
**point** 9:9 13:7 41:7
62:16 65:5,9 87:8
87:15,16 99:25
105:21 123:5
127:7 135:5 178:7
179:11 181:8
185:25 192:11,13
195:17 210:23
220:3 229:7
243:11,14
**police** 147:2
**policy** 241:14
**political** 24:1
29:18,22 32:10
38:21 108:22
109:25 146:8,9
149:20 181:25
182:7,19
**politics** 24:1
**popped** 40:5
**popping** 132:7
**population** 84:11
84:16 85:6 86:10
86:11,13,16 87:19
91:8,23 92:8
99:10,11 102:1,2
109:16 121:6,10
121:13,19,21
122:5,9 135:3,12
137:11,14 138:5
153:1 157:7,9,10
157:15 158:8
168:23 169:1,6
200:25 201:4,9,12
201:14 227:8

**populations** 100:7
109:14 160:10,11
**portion** 41:3,8
**portions** 119:24
165:24
**posed** 31:11
**position** 33:12
57:20 81:10,11
129:18 130:5,6
137:20,22,23
166:13 198:25
200:12 241:18
**positions** 58:8
76:5 95:5 211:4
**possibility** 162:22
**possible** 99:9
150:3,7 155:2
162:23 231:1
**posted** 184:16
**potential** 48:13
64:6 109:24
122:25 123:11
124:5,6 148:13
182:1,8 214:18
226:6
**potentially** 48:16
**practice** 71:3,11
**pre** 120:7,8,16
222:8,15
**precedent** 22:23
**precinct** 150:20
151:21
**precincts** 135:25
136:5 150:12,16
151:2,10,14,20
152:2,6,16,20,23
153:3,5,8,9,13
154:6 159:25
**predominant**
157:18,24 158:3

**prefer** 162:10
203:24
**preferable** 150:2
**preferences** 32:10
134:6
**premature** 54:13
**preparation** 66:7
166:21 233:24
**prepare** 15:5,13
16:20 82:4 88:3,4
182:4
**prepared** 113:23
115:16,17 177:8
**preparing** 108:4
**presence** 80:16,21
**present** 5:13 25:10
62:20 73:7 82:8
190:14 194:16
197:13,16
**presentation**
111:19 117:25
129:12 186:23
**presented** 21:17
83:3
**presently** 111:17
**preserve** 229:4
**president** 13:9
30:20,23 35:11
47:17,21,23 66:3
68:22,23,25 69:1,2
69:4 71:1 77:23
79:4 83:16 84:7
87:7 111:10 139:1
171:16 181:21,24
183:19 192:1
193:21 197:23
201:4 206:21
222:8 233:22
235:16
**presidential** 30:17

**presidents** 22:3
24:11,13,23 26:15
66:17,19 68:2,21
68:24 69:8 138:24
142:21 174:14
176:3,7 179:5,7,8
182:16
**press** 145:5 195:15
**pretty** 16:10
104:22 138:4
213:17 237:21
**prevention** 22:24
**previous** 104:14
167:7,10 192:1
**previously** 47:12
60:12 129:8 157:5
186:19 204:22
**price** 50:20
**primarily** 33:11
38:11 86:7 126:21
140:9
**primary** 36:8
82:21,24 83:17
**prince** 36:2
**principles** 133:23
134:1,7,8 225:8
**prior** 3:19 17:11
17:14 21:11 23:8
35:13 69:18 73:13
74:3 113:21 126:5
167:18 221:8,24
**private** 79:9
**privilege** 12:25
232:24 241:20
**privileged** 22:15
31:25 74:23
185:21 233:2
**probably** 54:16
78:10 96:22
116:11 218:21

Brenda Murphy

The South Carolina State Conference vs. McMaste,

February 4, 2022

[problem - question]

Page 31

problem 217:11
problematic 153:6
problems 119:23
  151:22 154:4
  221:25
procedure 7:4
  22:21
proceed 7:16
  167:6 181:10
  203:4
proceeding 8:20
proceedings 7:8
  237:9,22 245:8,10
process 31:11
  51:17 53:19 54:20
  57:20 58:22 59:10
  72:14 78:12,14
  108:2,16 109:25
  139:22 140:4,5,13
  142:17 144:8
  146:8 159:25
  177:22 193:2
  205:21 207:2,5
  211:5,18 212:16
  215:12,13 216:23
  237:5 240:15,17
  240:25 241:1
processes 58:3
  198:2
produce 18:2,4
  113:2 181:11
produced 12:8,12
  25:21 74:2 183:14
producing 183:23
product 149:20
production 12:10
  12:15 243:2
programs 142:17
prohibit 78:4
project 187:24
  188:15 189:4

promise 160:8
promising 204:17
proper 166:20
properly 53:15
  54:9
proportional
  99:12 101:3
  104:18 105:2
proposal 166:15
proposals 190:19
propose 53:20
proposed 110:1
  132:14 136:4
  152:22 156:22
  157:25 164:18,22
  166:8 238:2
proposition 136:7
protect 55:1 80:19
  225:15
protective 23:1
  32:14 172:6
  185:25 194:8
  202:25 212:21
proud 99:25
provide 25:20
  62:12 64:25 74:5
  136:12 149:24
  172:4,24 177:20
  185:14 207:25
  210:6 211:4 212:2
  212:16 214:15
  220:23
provided 7:3
  13:15 42:2,3,4,16
  43:10,16 57:12
  59:3 64:23 81:17
  96:16 131:9 136:9
  139:18 176:18
  181:7 195:13,14
  207:8,24 209:24
  210:4,8,12,16

215:11 244:1
providing 12:2
  28:6,8,9 107:25
  244:3
pruet 4:12
public 7:2 24:9
  53:20,24 54:20
  65:4,25 79:12
  81:14 128:14
  129:13,19,21
  130:5,7 141:5
  145:4 149:6
  161:18 172:3
  196:4 208:19
  245:20
publically 184:17
publicly 24:20
  65:25 182:23
  184:16 185:2
published 86:23
pull 81:23 88:14
  89:2 96:4,8,17
  155:24 165:5
  176:23 180:24
  199:4 229:23
pulled 97:12 237:4
pulls 82:1
purchase 36:21
  37:1
purpose 54:15
  60:1
purposeful 59:4
  59:16 60:4,20
  61:9,10,18 62:2,10
  64:1 110:23
  161:13 169:9
  242:4
purposely 178:4
put 39:20,25 44:1
  44:8 87:20 106:11
  126:11 127:19

131:20 140:11
  148:20 150:22
  158:15 163:24
  164:4 231:21
puts 162:5 165:25
putting 144:3
  167:19 223:9
  227:16

q

question 9:10,14
  9:16,21 10:3,14,20
  11:8 13:20 17:17
  17:20 19:8 21:10
  28:22,22 30:8
  31:3,4,10,12,19
  32:13 41:5,7,13
  42:17 43:19 45:3
  47:2,5,6,15,20
  49:7,10 50:11
  51:7,9,20 55:12
  59:1,4,12,13,21
  60:10,22 61:6,14
  61:22 62:6,8
  65:18,19 69:18
  70:7,10,14,18,24
  71:12 72:3,5
  73:10 74:25 75:1
  75:3,11 80:14,15
  82:9,17 84:24
  89:13 90:7 93:6
  104:4 105:22
  108:7 109:5,11
  112:5,15,20 113:3
  113:4,9,11,14,24
  113:25 114:5,7
  115:1,9,10 116:22
  118:6,8,9,10,24
  119:7 120:11,14
  120:22 121:9,23
  122:7 124:14
  125:19 126:2

Brenda Murphy
The South Carolina State Conference vs. McMaste,

February 4, 2022

**[question - reconsider]**

Page 32

127:1 128:10
129:1,2,3,6 131:17
131:19,21 137:18
138:1,12 141:9
145:17,18,24,25
147:10,25 148:8,9
148:10,14,15,18
149:12 150:15,19
150:25 151:7
156:6 157:2 158:2
158:17 159:10,11
160:25 164:5,20
167:9 168:17
169:8 170:5,7
172:8,16,18 173:2
173:19 174:3,4,9
175:7 176:1,8
177:16 179:19,20
180:13,21,22
181:8 182:6 184:4
184:20 187:19
188:10,24 189:2,3
189:4,19 191:4,18
191:22,23 195:24
200:14,20 201:22
202:10,14 204:19
204:25 205:5
206:10 213:20
214:3,5,8 215:1,7
215:24 216:10,12
216:14,18,21
218:7,25 219:5,7,9
220:10,16 221:22
223:6 224:21
226:12 228:15,20
232:5 234:21
236:12 240:20,24
240:25 241:24
243:8
**questionable**  92:2

**questioned**  198:1
**questions**  3:16
8:21 9:5,8,18,20
10:13 11:5 12:12
12:19,21 13:3,8
14:18 31:11 32:3
91:10 96:23
107:13 114:3
117:11 146:23,25
167:1 181:10
186:7 191:13,14
191:25 198:16,17
201:17 203:6,9,13
203:17 204:3,5,13
205:21 206:4,17
207:1,3 212:18
219:10,25 221:11
226:9,13 230:3,12
230:16,20,25
233:15,23,24
234:9,14,24
235:14 237:7
239:3,23,25
242:25 243:7
244:2
**quick**  230:20,25
231:1
**quickly**  138:15
**quite**  115:3
**quote**  213:15
**quoted**  197:22

**r**

**r**  4:1 245:1
**rabon**  5:14 40:1
44:16 81:24 87:21
96:4,9 97:2,2
100:22 117:14
**race**  122:23
157:18,23 158:1,7
225:13

**racial**  59:5,16 60:5
60:20 61:10,18
62:2,10 64:2
108:23,24 109:12
110:2,22 111:8
161:13 221:25
242:4
**racially**  177:5
178:4 222:24
**radical**  155:9,11
155:12,13
**rainy**  7:21
**raise**  128:10 196:1
**raised**  161:21
205:22
**raising**  161:23
**rally**  39:10
**rambles**  221:7
**reaches**  159:21
**read**  64:3 67:11,16
89:3 100:24
104:23 177:1
189:18 191:16,17
195:20,21 213:14
213:19
**reading**  3:9 105:4
169:22
**ready**  7:16 181:15
**really**  26:10 28:21
30:7 79:10 92:18
120:12 145:17
159:1 194:21
205:23
**realm**  13:20
**reapportionment**
6:16 96:12 97:20
235:18,20
**reason**  8:25 86:1,8
87:2,6,17 103:15
103:25 104:8
151:8,11,13

229:17 240:12
243:5
**reasonable**  123:2
**reasons**  84:13
214:14
**recall**  8:11 25:2
54:16 79:14 89:7
91:16 96:10,13
116:2,7,9,11 117:1
119:24 120:2,5
122:16,18 123:7
125:12,13 161:20
161:22,24 162:1
195:21 197:2,12
197:14 204:25
205:1 234:13,23
237:25 238:4,16
**receive**  68:5 140:1
**received**  12:10
17:4 18:1 32:21
182:12 198:19,21
207:10
**receiving**  26:22
**recess**  52:17 103:1
146:17 165:7
176:15 181:16
198:11 233:19
**recognize**  67:9
166:11 189:25
190:2 228:6
**recollection**  33:1
66:10
**recommendation**
79:21
**recommendations**
26:23
**recommended**
210:20
**reconsider**  130:20
132:13

Brenda Murphy                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

**[reconvene - representation]**                          Page 33

**reconvene** 102:22
**record** 43:24 56:5
  72:18,22 73:3,11
  73:14 87:7 105:22
  106:2,5 150:24
  156:9 164:8
  166:19 175:10,11
  175:20,23 181:15
  196:20 198:16,24
  205:16 209:23
  214:1 243:14,19
**recorded** 105:23
  106:15
**recording** 122:18
**records** 159:16
  219:21 241:2
**recruiting** 173:13
  173:17
**rector** 4:8
**redacted** 184:1
**redirect** 203:5
  230:17 233:18
  239:21
**redistrict** 125:3
**redistricting** 18:10
  18:13,15 21:13,22
  24:3 25:5,6 27:4
  28:7,11 31:8,9
  51:17 53:6,19,21
  68:7 71:7 72:14
  78:10,14 80:4,9,24
  81:3 93:19 98:17
  99:24 105:25
  106:3,17,25 107:3
  108:2,5 119:11
  127:10,18 133:23
  134:1,5,8,12
  139:22 140:1,13
  190:7,9,17,18
  191:6,10 192:23
  195:9 198:3 200:3

207:5 208:18
209:4 215:9,13
221:9 224:18,24
225:2,8,14 226:16
228:7 235:17,19
237:5
**redraw** 161:2
**redrawing** 155:9
**redrawn** 161:7
**reduced** 60:16
  61:4 95:13
**refer** 22:6,9 24:6
  28:4 92:5 159:9
  214:1 236:4
  241:25
**reference** 101:21
  117:23 194:17
  196:19 205:8
  232:1,8
**referenced** 104:19
**referred** 125:3
**referring** 39:1
  94:18 118:20,22
  119:1 159:7 165:3
  177:3 232:10
**reflect** 27:22 93:21
**reflected** 186:24
  236:1
**reflective** 30:5
  51:3 122:5 226:20
  228:4
**refresh** 44:14 97:3
**refreshing** 40:2
**refuse** 29:2 64:17
  179:5 193:21
**refusing** 177:16
**regarding** 8:7,7
  18:10,12,12,15
  25:20 28:10,19
  31:7 38:13 50:14
  71:7,14,15 80:25

88:9 99:23 101:20
105:25 106:17
108:1 134:13
139:22 140:3,4
146:9 154:23
182:16 187:13,14
193:9 196:21
219:22 226:6
238:5,11
**regards** 153:23
**registered** 45:7
  217:12
**regular** 20:22,25
**regularly** 73:6
  214:24
**reject** 131:11
**relate** 28:19
**related** 31:8 37:17
  50:13 71:8,9 80:8
  108:4 134:17
  154:1 185:22
  191:8 225:13
  233:5
**relates** 178:22
**relating** 3:12
**relation** 201:13
**relations** 196:4
**relationship** 37:21
  38:2 119:17 198:5
**release** 53:5 54:8
  130:20
**released** 99:15
**releases** 53:10,12
**relevance** 30:10
  164:6 224:10
**relevant** 12:8
  198:20 202:6,11
  202:22 206:6
**relied** 61:25 62:10
**relief** 56:1,7

**rely** 137:19 138:12
  139:8
**remain** 148:13
**remember** 125:13
  131:6 204:24
  205:6 213:2,21
  214:3,5 223:12
  234:1 235:2,5
  237:15 238:21
**reminding** 205:18
**repeat** 50:12 174:9
  189:2 215:21
  227:20 234:21
**repeatedly** 109:7
  196:1
**repercussions**
  106:3,25 107:3
**rephrase** 9:10,12
  90:8 161:1 236:15
**replaced** 103:14
**report** 6:12 45:4
  45:20,24 46:6
**reported** 2:1 46:13
  181:24 199:23
**reporter** 7:1 9:22
  10:4 35:23 97:5
  102:11 243:20,22
**reports** 51:22,25
  88:8
**represent** 14:9,19
  30:5 83:12 92:11
  140:6 203:17
  204:11 212:1,13
  230:24
**representation**
  48:10,13 73:18
  75:14 95:6 99:11
  101:23 123:7,21
  124:6,7 136:10
  160:16 187:11
  209:22 214:15,16

Brenda Murphy                                                    February 4, 2022
The South Carolina State Conference vs. McMaste,

[representation - right]                                                    Page 34

214:18 217:5
226:7
**representational**
101:1,17
**representative**
20:15,20 22:8
24:15 31:20 32:1
48:22 63:7,9,13,15
63:18,21 64:8,19
65:9 73:12 78:7,8
78:16,19,20 79:2,4
79:7,11 80:2,4,5,7
80:8 81:1 82:8,20
94:16,18,19 104:7
161:6,17 162:7,22
202:7 214:14
226:9
**representatives**
21:1,2,13,19 23:5
23:6,12 47:13,14
48:18 59:6,15
60:4 61:8,18 62:1
63:5 68:20 78:21
78:22 81:2 92:24
95:8,9,19 101:3,8
101:22 104:2,6,17
104:17,25 122:10
123:12,13 149:7
162:21 209:4
**represented** 96:2
161:6 162:6
**representing**
14:25 83:14,15
112:24 161:21,23
205:25 206:1,23
**represents** 14:5,12
184:5
**reprisal** 239:17
**republic** 30:14
**republican** 30:3
30:16,25 31:12

76:10 148:24
200:17 201:20
202:3
**republicans**
149:16
**request** 6:11 39:18
40:13,15,20 41:16
41:21 42:25 43:19
93:22
**requested** 25:9
42:16 43:23 184:1
192:21 235:11,13
**required** 8:17 9:19
10:4 36:18
**requirement**
240:21
**requirements**
93:21
**requires** 155:9
**reserve** 34:15
**reside** 20:6,10
68:8 74:2 75:18
75:20
**resided** 69:21
70:15 72:7 187:15
**residents** 158:9
**resides** 68:10,13
74:11 173:22
174:18
**resolution** 244:1
**resource** 141:15
141:17,18 142:18
**resourcefulness**
28:16
**resources** 26:24
27:8 51:17 83:9
83:11 126:15
138:16,19 142:15
**respect** 13:16
52:25 53:21 56:10
67:8 103:23

105:10 151:9
159:4,5 165:21
166:8,13 168:25
172:19 173:21
186:13 187:25
202:25 207:11
220:17
**respective** 3:4
55:5 109:6
**respond** 70:18
73:2,4 114:14
115:3,7,8,9 118:23
128:21 213:25
234:14,24 235:8
238:19 242:19
**responded** 217:25
**responding** 196:20
**response** 41:7,13
46:4 108:7 118:10
124:2 128:25
197:25 243:17
**responses** 10:4
39:16,17 235:3
243:7,7
**responsibility**
231:19 233:8
**responsible**
173:13,17
**responsive** 28:22
146:25 215:23
**restate** 56:6 60:12
121:9
**restricted** 145:25
**restrictions**
241:14
**restroom** 10:18
**result** 109:20
200:25
**results** 64:5
227:13,18,23

**resume** 143:8,12
143:16
**retired** 32:17
33:10 34:17,18
237:21
**reveal** 22:18 174:7
174:8 199:1
**revealed** 88:10
**reveals** 168:2
200:23
**reverse** 149:20
**review** 12:17
16:16,24 17:6,7,17
17:19,23 56:12
57:21 58:2 73:6
87:9 115:19 128:5
131:8,13 220:22
221:5
**reviewed** 16:19,21
17:3,9,13,15,21
39:16,17 56:14,17
58:17 66:6 73:7
82:6,19 83:2 85:7
87:16 127:6 128:1
128:4
**reviewing** 40:11
**revision** 210:10
**rhetorical** 65:18
65:19
**richland** 67:20
69:1,5,9,13 94:11
114:18,19,21
124:21
**ridge** 135:11,13,17
**ridgeway** 19:25
20:2
**right** 15:1,23 19:3
19:20 20:5 21:16
27:24 37:9 38:17
38:18 39:15 41:20
43:5 44:8 45:5,7

Brenda Murphy

February 4, 2022

The South Carolina State Conference vs. McMaste,

**[right - second]**

Page 35

46:24 47:6,7,22,24
49:1 50:25 52:23
53:2,7,10,13,21,25
54:10 56:8 58:25
59:6 60:1 62:24
64:14 66:2,13
67:1,10 69:10,11
69:14 78:14 79:24
81:18 82:2 85:7
86:24 87:1,10,12
87:23 88:2 89:24
90:3,11,14,17,21
90:22 92:13 93:3
93:7 94:4 95:20
95:25 97:23 99:17
100:20 101:17
102:10,20 103:9
105:6,24 106:13
107:5 108:11,12
108:14 110:25
111:20 114:1,20
116:19 124:18,19
125:4 127:4,9
128:11,14 130:20
131:4 132:12,15
132:18 134:4
135:8,10,22,25
138:9 139:4,7
141:7 142:25
143:15,22 147:7
147:18 149:15
153:14,18,22,25
154:15,17 155:19
159:1,14,17
160:15 161:7,14
162:3 163:7,15,16
163:19 168:7
170:3,6,10,17
171:1 173:18
175:4,20 176:24
177:1,17 179:6

180:1,23 183:16
183:20 186:13
189:12,19 194:7
194:14,24 195:3
195:15,23 196:8
196:16,17 197:15
198:6,15 199:16
200:13 201:6,16
204:3,20 207:15
208:3 210:9,13,24
210:25 211:24
217:1 220:20,21
222:20 225:10,14
225:16,16 228:8
228:24 229:2,5,25
231:6 233:14
236:20 242:16
**rights** 23:24 55:1
172:21 173:24
202:21
**ringing** 150:14
**river** 90:22
**rmg** 1:5
**rob** 203:16 204:10
**robert** 5:3
**robinson** 5:2
**role** 35:10,14
49:25 190:15
195:19 234:11
236:10,13,22
**rolling** 203:22
**room** 11:18
**routine** 71:6,7
72:12
**routinely** 71:4
77:23 84:18
**ruled** 120:1,4
**rules** 3:12 7:4 8:18
12:21,22 22:21
62:7 172:7 189:18
202:11

**run** 62:22 81:10
95:1
**running** 102:4
234:7
**ruoff** 98:12,13,13
140:9,11 141:10
190:17 194:15
196:14 200:22
**rural** 161:21,24
162:11

**s**

**s** 3:1,1 4:1
**saith** 244:9
**saw** 25:21 43:4
107:25
**saxonbury** 20:7
**saying** 87:15,17
89:7 92:6,7 94:2
95:24 101:6 104:1
104:3 106:2 116:2
116:7,10 117:1
118:12,13 122:7,7
123:7 147:22
148:10 162:9,12
169:13 170:15
180:6,10 194:25
209:21 218:24
220:17 223:12
**says** 41:20,23 42:8
44:1,3 45:5,23
100:25 101:16,18
101:19 104:5
107:2,6 132:13
177:2,4 178:1
181:21,24 186:11
190:16,17 191:9
192:1 194:15
196:24 197:7,7,22
197:23 199:22,25
200:2,10,22

**sc** 43:1 96:11 99:8
99:9 181:25 182:7
182:19 183:13,15
183:19 184:8
185:4,15 190:10
192:2 199:1,24
200:10 241:2
**schedule** 16:9
192:6
**scheduled** 26:1,2
128:18 192:2
237:12,13
**schedules** 237:18
**scheduling** 13:14
**school** 32:20
**scnaacp's** 41:23
42:1
**scope** 30:19 32:4
32:11
**scott** 1:9 49:15,18
**screen** 39:21 40:18
41:18,19 44:9,10
44:20 67:1,2,4,10
91:13 106:19,21
106:22
**scroll** 42:15
100:21
**scrolling** 156:14
**scrutiny** 241:20
**se** 106:1 144:22
**seat** 105:1
**seats** 93:16,25
**second** 16:14 17:2
42:9 44:13 74:10
100:21 131:25
150:23 156:4,13
156:14 163:10
181:21 191:12
216:13 218:1
243:22

Brenda Murphy
February 4, 2022
The South Carolina State Conference vs. McMaste,

[secretaries - sitting]
Page 36

secretaries 24:23
secretary 185:9,13
section 67:12 89:3
  128:9 222:25
see 8:3 40:1,3,17
  41:16,21 42:8,12
  42:14 43:4 44:20
  45:14,21 91:14,16
  93:15 94:3 98:23
  99:12 100:22,25
  101:4,5,16 106:6
  106:16,18 107:2
  132:8,10 143:8,12
  160:2 162:3
  163:12,15 164:6
  165:2,5,11,13,15
  165:16 168:1
  176:12,24 181:22
  184:5,7 186:8
  190:16,23,25
  191:2,2 192:3
  196:18 197:20,24
  199:8 200:6,9
  201:1,2 203:6,22
  210:19 225:19
  227:3,7 233:11
seeking 11:6
  234:15,25
seen 25:21 27:20
  40:9,9,23 41:6
  44:22 45:2 97:16
  107:8 143:16
  166:7
seminar 68:4
senate 5:1 21:18
  23:8 25:8 49:4
  91:5,6 101:14
  103:19 105:1,3
  118:23 128:19,24
  151:9 191:14
  196:21 197:19

203:17 204:11
  209:25 210:1
  222:14
send 181:2 235:13
sending 83:6
sent 44:23 113:2
  125:4 166:22,25
separate 15:22
  38:5 235:21
september 76:22
  76:22,23 125:9
  199:13
seriously 81:12
serve 35:13 94:5
  95:8 151:21 153:5
served 34:14
  62:25
serves 30:15
serving 94:4
session 16:12,14
  54:17 162:2
sessions 16:17
  207:7,21 217:6
set 6:10 39:18
  40:20
setting 140:12
seven 37:4 163:12
seventeen 148:24
  149:16
shape 160:4 163:6
  163:9 167:14,15
shaped 159:22
  164:23
share 59:2 79:7
  111:22 138:19,21
  164:10
shared 51:14 68:6
shares 164:22
sharing 25:6
sheree 5:14

shielded 241:20
shift 112:3 139:17
shifted 121:2,5
short 165:5 176:14
shortly 212:22
shot 226:5
show 96:21 106:11
  115:11 125:1
  131:16
showed 167:18
showing 44:17
shows 107:5
sic 13:12 62:6
  99:25 121:22
  186:2 222:25
  223:1
side 154:2,3
signatory 125:15
  125:20
signature 3:9
  56:15 126:5,20,21
  245:17
signed 56:12,25
  82:19 130:18,25
  131:1 152:18
  233:9
significant 207:13
significantly 121:2
  153:2 160:12,12
  203:11
signing 128:6
silver 37:2
similar 89:19
  92:19 135:14
  139:15 164:22
  165:20,23 170:25
similarly 1:10
simple 43:19
  59:13,20 73:10
  137:17,18 145:17
  160:25 188:24

210:24 215:24
  216:21 222:13
simply 28:22
  36:14 51:9 65:9
  70:6 83:16 138:12
simultaneous
  47:18 70:9 78:11
  123:18 130:1
  138:10 153:10
  168:16 173:10
  192:15 202:19
  224:22 232:4
sir 13:19 29:23
  64:3 72:17 107:15
  107:17 113:14
  120:2,5 130:21
  131:14,19 132:20
  143:14 144:25
  147:23 149:9
  164:17 168:1
  170:24 171:9,18
  174:11 178:15
  190:12,24 191:19
  193:16 210:14
  212:13 216:1,5,8
  217:22 218:15,22
  219:2,6,9 222:7
  223:4 227:9
  229:25,25
sit 46:10,22 47:7
  61:24 68:9 74:15
  86:1 110:25 111:5
  111:6 124:15
  133:1 160:20
  242:2
site 43:4
sites 208:9
sits 158:20
sitting 65:22 93:16
  93:25 228:21

Brenda Murphy

February 4, 2022

The South Carolina State Conference vs. McMaste,

**[situated - state]**    Page 37

situated  1:10
situation  8:12
  48:12 120:10
  121:1 155:6,8
  160:22
situations  160:18
  170:25
six  20:4 37:4 41:16
  41:21 159:18
  167:23 243:22,23
size  150:19
skills  224:6,7
slash  235:18
slipped  195:1
small  150:8
smaller  134:20,23
  150:3,5
social  76:20 78:5
socialize  21:6
soliloquy  243:8
solitary  137:9
solutions  2:3
somebody  24:1
  56:3 212:7 219:13
  219:16 228:23
  234:17
somewhat  144:5
  158:10
soon  41:12
sorority  36:7,8
sorry  8:14 11:16
  47:19,19 55:3
  67:3 145:16 148:3
  149:13 150:1,15
  151:1 152:13
  153:1 163:8
  184:22 192:16
  217:8 228:13
  232:1,7
sort  11:9 22:23
  33:6,7 35:14

139:25 140:10
  196:4 239:17
sound  149:18
sounds  52:16
south  1:2,7,15
  4:16,20,25 5:5,11
  8:8 11:14,17 13:9
  14:6 17:8 18:13
  19:24,25 20:7
  26:16 27:5 30:20
  31:6 32:2,22
  33:17 34:1,3,6,20
  35:4 36:1,6,10
  37:8,23 39:1
  42:19,20 45:5,10
  48:1 49:14,21,23
  49:25 50:2 65:1
  65:15,20,23 66:1,4
  66:18 71:1 76:9,9
  83:21 86:11,20
  99:25 105:16
  109:25 112:24
  121:20 133:23
  136:18 138:24
  140:22 153:1
  174:15 175:25
  176:4 177:3 184:9
  186:20 192:7
  194:2 202:7 212:9
  221:9,25 222:23
  234:15 235:16
  236:8,11,13,16,22
  238:22 239:3,4
speak  20:22,24
  68:17 69:20,20
  70:20 75:22 76:4
  146:19 211:22
  219:21 230:1
speaker  48:3
speakers  186:12

speaking  17:7
  73:22,24 112:10
  112:11 114:12
  189:17 195:8
  206:11,15 211:17
  222:6 232:8
  234:20
spearheaded
  83:18 237:3
specific  41:3 61:7
  61:16,25 62:9
  67:12,14 73:20
  74:24 84:6 94:9
  94:12 114:15
  119:4,8 137:19,24
  139:7 159:10
  166:5 168:19
  170:13 178:20,21
  190:15 217:14
  225:22 226:1
  233:13
specifically  71:18
  177:7 178:19
  211:13,14 234:12
  234:22
specifics  48:25
spend  133:14,19
spent  138:20
split  112:6,16,21
  113:6,13,22
  114:17,22,24,25
  115:18 118:20,25
  135:21,25 136:4
  137:5 151:2,10,14
  152:2,6,15,22
  154:2,8,14,20,21
  158:23 159:25
splitting  109:9
  111:20,25 136:9
  137:7 150:12,16
  152:20 153:13,24

spoke  69:25 70:15
  71:20 72:7,19
  73:12 74:11 81:14
  117:3 147:22
  148:3,4,6 161:17
  178:21 179:4,9,9
  223:6
spoken  63:10,16
  63:22 72:21 74:3
  74:18 78:9,13
  80:3,6,7 196:7
spring  135:11,13
  135:17 166:20
sprung  166:25
staff  15:17 19:19
  26:25 235:13
stand  86:25 87:17
standard  71:3,11
standards  198:3
standing  175:2
standpoint  228:1
stands  172:14
stars  35:24
start  204:19
started  13:4 54:22
  99:20,22 206:2,9
  215:8 216:10
starting  33:11
state  1:7 7:2 11:14
  17:8 18:14 23:23
  24:12 26:11,16
  27:5 31:7 32:2
  34:1 35:3 36:10
  37:8,11,17,23
  38:11 39:1 42:19
  42:20 43:10 45:6
  45:10 48:1 49:14
  49:21,23 50:1,2,4
  53:12 54:21 65:1
  65:21,23 66:1,4,18
  68:21,22 71:2,6

Brenda Murphy                                              February 4, 2022
The South Carolina State Conference vs. McMaste,

**[state - take]**                                                    Page 38

72:10,14 73:5
77:8,23 78:21,23
79:20 84:11 86:6
96:11 98:5,16
101:1,8,17 109:25
112:25 119:16
121:5,9,12 128:14
138:23 139:6
140:22 149:21
154:23 174:14
175:9,11 176:3,4
177:6 179:5,7
183:13,15,19
184:8,10 185:4,9
186:20 187:21
188:14 191:10
197:2 200:11,23
201:5 206:1,7,21
206:23 207:14
208:3,20 209:4
211:15 212:2
213:2 214:11,20
214:24 215:25
217:5 224:12
226:16 238:2
239:1,10,13 245:4
**stated** 27:19 57:17
66:17 68:1 80:20
87:16 126:13
129:17 174:24
193:2 200:22
239:5 240:12,21
**statement** 43:7
80:16 88:22 99:18
100:23 101:20
119:2,3,15 120:23
121:24 122:6,13
122:14 153:16
157:16 160:5
185:1 197:18
242:13

**statements** 149:6
194:15
**states** 1:1 44:4
53:15 99:7 222:23
**statewide** 208:3
**stating** 196:25
**statistic** 85:2,3
**statistics** 84:22
**statute** 74:16
**stay** 204:16
**stepp** 5:2
**stick** 170:21
**stipulated** 3:3,8,14
3:20
**stipulation** 7:5
**stop** 47:20 109:3
114:14 138:11
145:16 148:2
181:14 188:21
189:17
**stopped** 107:19
109:3 117:15
118:17
**strategy** 232:24
**street** 2:4 4:8,15
4:24 5:4,10 45:10
154:5
**streets** 154:8
**strength** 91:22
**strike** 128:9
144:20
**stringent** 147:2
**studied** 84:12,14
85:6 105:6 127:18
229:21
**study** 84:18,18
85:5
**subcommittee**
25:8,8 229:15
**subject** 8:21
114:10 145:25

241:19
**submission** 17:11
17:14 18:21,25
21:11 79:12
142:23
**submit** 18:16,20
18:23,24 22:20
51:1
**submitted** 17:24
18:5,7,8,15 42:13
50:24 51:22,25
57:10 58:17 82:5
141:11 156:12
166:13 167:4
238:21
**subparagraph**
104:24
**substance** 10:25
52:22 103:7
**substantial** 121:16
**succinct** 230:2
**sue** 48:2,25 212:23
212:25 231:16
232:6,13 233:1
**sued** 49:3
**sufficient** 175:2
**suggestions** 144:4
**suggests** 12:23
194:24
**suit** 213:1 214:4,9
214:10,11,13
216:22
**suite** 4:15 5:10
**summary** 213:25
**sumter** 67:19
170:21,23 171:10
**supplies** 28:9
**support** 39:6
60:19 111:7
117:17 137:19,24
138:12 139:8

143:22 160:19
166:13 168:10,18
169:11 170:10,14
177:23 221:3
242:4
**supports** 169:1
**supposed** 146:15
**suppositions** 170:9
**supreme** 22:22
**sure** 13:21 15:8
23:20 67:13 88:20
97:18 100:11
101:15 127:7
142:2 145:5,7
151:17,17 155:18
158:19 180:4,5
203:10 205:16
206:9,16 212:15
221:10 223:8
227:1 230:11
**surgically** 157:14
**surrounding**
244:2
**sworn** 7:12
**symposium** 217:1
**symposiums**
216:25

|   **t**   |

**t** 3:1,1 245:1,1
**tague** 98:10
**taiwan** 1:9 49:15
49:18
**take** 9:22 10:4,17
10:19,20,21,24
40:8 52:14 58:7
75:15,16 76:6
81:11 96:19,22
97:1,1 102:16
109:4 115:9,16
125:1 135:21
137:22,23 146:11

Brenda Murphy
The South Carolina State Conference vs. McMaste,

**[take - thank]**

154:13 165:4
176:14 177:19
181:3,13 183:2
191:17 198:25
202:24 209:13
230:6,9 243:4
**taken** 3:5 57:19,22
129:18,22 241:18
243:21 245:8
**takes** 53:19 58:5
58:11,16,19 88:16
156:3 200:12
211:18
**talk** 9:23 24:1
47:22 52:18,22
119:13 128:8
151:3 153:18
162:10 167:2,4
176:7 181:9
213:20
**talked** 15:10 19:20
25:6 111:23
140:14 163:6,9
209:1
**talking** 19:22 22:7
47:19 56:3 86:12
86:16 94:20,23,24
95:2 96:15 104:23
104:24 106:7
108:8 115:4,20,21
119:14 123:22
127:15 136:22,24
139:11 152:8
160:13 162:13,14
167:14 169:14
184:23,25 191:3,5
191:6 209:17
211:12 215:9
218:1 220:8
234:17

**task** 187:7,8 188:5
**taught** 89:1
**teague** 141:6
194:16,17,19
195:3,25 196:11
199:23 200:4,21
**technical** 44:16
**technology** 67:6
88:16,20,21
**tell** 8:6 9:11 15:5
16:6 19:22 26:8
32:18 33:2 35:20
43:9 46:10,22
47:7 48:2 56:23
57:6 60:2 61:7,25
68:9,12 71:18
74:1 88:24 102:9
102:14 103:21
106:14 109:14
110:8 111:6 113:4
137:21,22 138:15
142:10,13 143:17
144:19 155:8
173:2,21,25
175:19,23 177:8
177:22 178:6,7,19
192:10 197:8
201:18 217:19
219:14,16 220:5
227:22 228:24
229:1,4,21,22
241:1 243:3
**telling** 60:17 97:10
142:6 154:7,9
162:16 176:6
217:16 230:1
**ten** 53:10 54:9
129:10 182:20
237:16
**tend** 30:1,2,8

**term** 22:5 89:9
92:16 93:23,24,24
100:16,17 109:1
109:12 155:11,13
177:2
**terms** 13:13 15:19
15:20 16:9 17:9
21:23 23:24 24:3
26:22 28:6,7,8,17
28:18 46:4 48:10
48:10 49:25 50:5
51:2,4,16 55:2,4
57:10 58:1,18
59:8,11 60:24,25
61:1 62:22 64:4
66:19 68:7 71:5
73:4 75:24,24
79:21 83:9 84:16
85:6 87:18 88:7
89:5,20 91:3,5
93:12,19 99:22
101:25 102:3
105:3 109:15,16
109:20 111:16,18
112:12 116:13
117:5,24 119:17
122:4 126:10,16
127:13 128:20
129:22 130:7
134:5,14,16
136:10 137:12,16
138:5 140:12
141:25 144:4
145:12 151:22
153:7 154:1,25
157:7 158:7
160:16,21 162:11
169:15,15 182:12
187:20 190:14
207:7,9,17,19
208:8 210:19

214:17 215:17
222:3,6 224:1,2,8
224:14 225:2
235:9 238:8
239:10 240:10
242:9
**testified** 7:12
87:22 141:6
207:12 208:23
209:16 219:8
222:16 223:8
231:8 233:25
235:16 237:8
**testify** 9:1 219:13
**testifying** 182:4
206:15
**testimony** 6:14,15
11:1 16:20 52:23
57:12 66:7 81:18
82:2 83:20 86:20
86:22 87:12 88:3
88:15 103:7
115:21 125:18
129:12 130:11
146:15 174:2
187:18 188:3,3
189:15 195:13,14
202:6 207:8,9
209:24 211:3
213:5,15,22
218:20 219:14
220:13 238:10
240:19
**text** 12:3
**thank** 7:20 9:7
13:6,18 41:1
47:11 102:24,25
103:10 164:13
204:10 205:18,18
210:2 230:13,14
233:14,16 235:14

Brenda Murphy                                          February 4, 2022
The South Carolina State Conference vs. McMaste,

**[thank - true]**                                                     Page 40

| | | | |
|---|---|---|---|
| 237:6 239:2,16,20 | 207:12,23,24 | 96:6 102:8 118:21 | 170:14 173:5 |
| 242:25 243:24 | 209:2,9,11 213:11 | 124:13 125:1 | 178:17 187:24 |
| 244:6,7 | 214:21 218:4,7,22 | 133:20 138:20 | 188:1 193:1 230:5 |
| **thanks** 244:5 | 219:24 220:17 | 192:20 199:4 | **tools** 28:17 |
| **thereto** 3:19 | 221:1 223:6,10 | 201:19 203:9,11 | **top** 115:7 142:11 |
| **thing** 10:19 15:7 | 225:8 226:8 | 204:22 208:8 | 197:7 199:12 |
| 45:25 67:7 88:17 | 229:17 238:24 | 209:1 229:9 | 219:22 235:23 |
| 88:21 162:17 | **thinking** 35:9 | 230:13 233:15 | **topic** 186:13 |
| 193:17 203:20 | 149:9 210:10 | 237:12,13 | **topics** 13:16,16 |
| 212:8,8,9,10 230:8 | **third** 183:19 | **timeliness** 49:6 | 206:14 |
| 235:21 | **thirteen** 36:12 | 50:14 | **totally** 92:24 |
| **things** 15:10 58:23 | 37:7,16 | **timely** 58:24 | 137:12 158:21 |
| 140:13 179:21 | **thirty** 27:7 36:20 | **times** 30:13 46:19 | **touched** 134:19 |
| 211:4 221:6 222:2 | 95:14,15 102:17 | 128:16 139:2,2 | **town** 19:25 135:11 |
| 235:21 | 104:21 133:19 | 188:20 206:2 | 158:23 |
| **think** 13:20 14:3 | 146:22 159:18 | **timing** 52:25 | **towns** 158:12,16 |
| 16:8 18:21 19:1 | 163:12 167:23 | **titled** 191:9 | **traditional** 133:22 |
| 21:24 25:16 27:9 | **thomas** 4:22 | **tjh** 1:5 | 133:25 134:5,7 |
| 33:22 42:24 46:18 | 205:10 230:19,24 | **today** 8:19 9:1 | 225:14 228:7,9,11 |
| 51:14 54:3 62:11 | **thorough** 154:20 | 11:13 12:7 13:24 | **training** 18:11,12 |
| 67:9 76:22 77:5 | **thought** 77:14 | 14:7,22 15:6,18 | 18:17 99:22 100:2 |
| 77:14 80:16 82:17 | 184:22 227:19 | 16:20,23 27:17 | 139:19,20,25 |
| 92:24 95:3 99:23 | **thoughts** 126:12 | 46:11,22 61:24 | 140:8,9,10,15 |
| 100:1,1 102:20 | 144:10 233:18 | 66:7 68:9 71:19 | **transcribed** 245:8 |
| 105:21 107:6,6 | **thousand** 36:12 | 74:15 75:25 83:14 | **transcriber** |
| 108:25 109:3,9 | 37:7,16 | 86:2 108:18 111:1 | 213:17 |
| 110:5,12 111:21 | **three** 17:1 34:22 | 111:5,6 112:11 | **transcript** 245:9 |
| 111:21,23 115:1 | 36:25 64:1 67:2 | 113:24 114:5,17 | **transparency** |
| 117:8,8 124:22,24 | 95:13 97:8 119:25 | 115:16 119:18 | 116:13 128:11,12 |
| 126:9,16 128:25 | 124:23,24 132:25 | 128:4 133:1 | **transparent** |
| 136:16 138:22,22 | 133:5 146:21 | 160:20 164:10 | 115:24 116:1,3,8 |
| 140:3 145:12 | 152:15 201:1 | 166:17,25 168:10 | 134:15 |
| 150:8 153:25 | **thursday** 189:21 | 173:25 204:1 | **traveled** 138:23 |
| 154:1,23 162:9,16 | 199:20 234:8 | 206:1 209:8 210:2 | **treasurer** 45:25 |
| 165:23 167:11 | **time** 3:18,18 8:13 | 217:16 220:19 | **trial** 3:18 8:9 |
| 170:24 171:6 | 8:14 16:22 19:3 | 233:23 234:7 | **trinkley** 5:9 |
| 174:11 188:12 | 21:16 28:8 34:8 | 239:17 242:3 | **true** 13:14 91:2 |
| 189:18 191:15 | 35:13 53:19 54:18 | **told** 53:8 56:24 | 116:25 120:25 |
| 192:24 193:4 | 54:19 55:4 58:2 | 90:10 105:5 | 193:1,3,3 221:12 |
| 202:2 203:1,21 | 58:16,20 66:9 | 115:15 118:9,18 | 245:9 |
| 204:22 206:4 | 74:8,9 89:4 93:16 | 123:20 147:4,17 | |

3:21-cv-03302-MBS-TJH-RMG    Date Filed 05/02/22    Entry Number 254-1    Page 287 of 291

Brenda Murphy
The South Carolina State Conference vs. McMaste,

[truly - virtual]                                                                Page 41

**truly** 122:4
**trust** 217:17
 240:15
**truthful** 8:20
**try** 9:8,23,24 90:8
 204:16 214:2
 229:9 231:1
 232:12
**trying** 27:15 67:11
 89:2 96:17 106:20
 147:2 148:11
 149:11 154:11
 164:16,17 165:1,1
 169:18 176:23
 188:23 206:3
 212:14 217:18
 220:12,24 221:2
 221:22 225:21
 230:10
**tuesday** 16:8
 166:23 167:5
**turn** 41:13 179:9
 189:20 237:6
**twelve** 128:14
 190:1
**twenty** 95:12,14
 95:18 97:8 202:3
 223:5
**twice** 233:25 234:1
 234:5
**two** 15:18,22 38:5
 46:19 54:3,3,5
 69:7,7,8 73:16
 75:12 84:20 92:23
 107:12 118:19
 128:17 129:11
 158:15 160:10
 179:21 190:22
 198:2 201:17
 205:7 206:8
 208:22 209:16,16

217:6 222:25
 239:23
**type** 83:10 210:19
**typed** 127:2,3
**types** 206:8
**typically** 30:1
 84:15
**typo** 101:10
**tyson** 5:3 6:4
 203:8,15,16,19
 204:2,9,11 213:4,6
 213:11,17 216:9
 220:7 222:12
 230:7 231:20
 239:22,24 244:4,5

**u**

**u** 3:1
**u.s.** 34:14
**ucf** 156:15
**uh** 200:9
**ultimate** 233:7
**ultimately** 136:5
**umbrella** 236:20
**unable** 208:10
**unanswered** 244:2
**unconstitutional**
 178:3
**undated** 125:8
**underneath** 107:4
**understand** 8:19
 8:22 9:5,10,11,16
 10:5,15,22 11:2
 12:17,25 27:14
 43:18 53:18 54:7
 54:11 55:6 56:4
 108:5 110:22
 147:5 162:4,7
 177:14 180:5
 191:24 201:6,8
 208:13 211:12
 212:15

**understanding**
 15:8
**understood** 9:15
 11:4 147:5 201:3
 225:9 230:11
**unfair** 115:1
 219:24
**unfavorable**
 221:10
**uniformly** 196:23
 196:25
**unincorporated**
 43:1
**unintelligible**
 35:22
**unintentionally**
 109:18
**unit** 34:15
**unitary** 139:9
**united** 1:1 222:23
**university** 32:22
**unusual** 160:4
**unwillingness**
 239:6
**update** 181:21
 190:16 191:10
 200:2
**upfront** 11:4
**upheld** 120:20
 152:1,15 155:4
**use** 10:18 22:5
 26:24 53:15 61:10
 85:16,20,21,22
 86:2,9 87:5,6 89:3
 91:12,14 92:15
 93:4,14,23,24
 110:13,13,17
 133:20 155:11
 177:2 224:12
 225:13

**uses** 85:3,3
**utilize** 51:17

**v**

**v** 22:22
**va** 33:15
**valid** 65:2
**validate** 43:7,14
**validated** 68:15
**values** 89:19
**variables** 122:2,3
 139:13 142:1
 224:3 226:2
 227:10,24 228:2
**variety** 211:4
**various** 179:4
 210:12 235:24
**veers** 13:20
**verbal** 10:3
**verify** 156:5
**veritext** 2:3 40:4
 164:10
**versus** 169:6
**veterans** 33:9,10
 33:13
**vice** 183:19
**video** 6:18 105:22
 106:2,5,6,14,15,18
 107:1,14,15,16,19
 107:21,23 108:8
 108:12 111:19
 112:4 116:7 117:9
 117:12,15,18
 118:15,17 123:5
**videoconference**
 3:6 7:6
**view** 55:13 91:25
**views** 107:5
 211:18 212:11
**violated** 172:22
**virtual** 67:3
 128:23 129:12

Brenda Murphy

February 4, 2022

The South Carolina State Conference vs. McMaste,

**[virtual - word]**

Page 42

208:8,11,12
**virtually** 54:4
129:14
**virtuals** 128:18
**virtue** 103:12
216:25 241:18
**visited** 138:25
139:1,5,5,6
**vocalizing** 195:19
**voice** 210:25
232:11
**voiced** 177:24
182:11,15,15
**voices** 210:18
233:13
**volunteered** 182:3
**vote** 29:11,13,14
30:1,2,4,8,12,14
30:23 31:8 48:11
48:11 83:22 86:21
93:12,13 100:19
105:11 127:14
151:23 201:25
215:17,20 242:11
**voted** 29:16,17
30:14,16,25 31:12
201:19 202:2
**voter** 86:12,16
87:18 99:10 150:9
150:12,13,16,16
153:13,14
**voters** 48:8 59:9,9
76:13 77:22 79:16
83:22 84:21 86:9
86:17,21 98:19
100:18 101:2
104:5 141:3
151:22 153:17
159:24 168:5,6,14
169:10 170:19
212:9 217:13

221:10 238:6
**votes** 111:9 215:18
242:15
**voting** 86:10 91:22
99:10 121:21
135:25 136:5
151:10 157:15
205:9
**vs** 1:12

**w**

**w** 5:9
**wait** 9:20 10:2
156:6 163:5,5
203:24
**waiting** 164:14
218:14
**waived** 3:10,22
**want** 11:4,6 15:3
41:11 44:25 47:22
59:1,1,3 81:5,10
88:14 95:1 96:25
102:16 110:8,15
115:11 118:7
124:21 127:2
132:20 137:21,23
146:5,22 149:9
153:18 161:5,7
163:3 166:6
169:20 173:23
176:19,20 181:3,9
181:13,20 188:18
191:24 193:22
194:9 204:12
213:15,18,19
215:21,23 217:7
219:13 221:10,23
223:9 227:16,20
233:13 236:2
240:14,16 243:14
243:16

**wanted** 24:13,24
29:7 74:13,21
77:10,15 78:3
109:5 127:7 173:5
203:13 205:16,20
206:16 207:2
217:4,21 218:2
224:19 243:12
**watch** 111:24
**watched** 50:4
**water** 10:18
**way** 12:22 24:2,4
31:8 55:21 92:10
93:9 94:14 107:8
109:22 110:6
136:4,12 144:6
152:6 154:20
160:22 164:11
169:18 174:24
191:8 211:8,9
215:18 217:18,21
220:24 225:23
226:1,20 228:3,4
**ways** 84:20 85:1
116:16,18,24
211:2
**we've** 12:16 19:20
21:23 46:2 51:15
52:13 67:5 95:6
114:8 171:22
177:11 203:25
208:25 212:19
230:4
**website** 127:19
185:2
**websites** 172:3
184:16,17
**wednesday** 16:9
18:22
**week** 8:8 16:5 19:2
128:4 199:20

**weekend** 230:13
237:23,24
**weekly** 25:25 26:1
26:3
**weeks** 66:11
**welcomed** 78:3
**wendy** 78:16
**went** 8:9 93:14
117:18 204:15
221:6 227:19
229:7 243:6
**white** 86:7 157:8
160:13 169:6
**whites** 84:17
**widespread**
128:20 135:15
**william** 4:23
**williamsburg**
67:20
**win** 123:2,3
**winning** 122:25
**wise** 171:6
**witness** 3:10 7:7
62:4,16 113:8
114:13 177:20
179:12 188:21,23
232:8,8 245:10
**witnesses** 52:1
173:13,17 186:11
186:24 187:21
188:1
**woman** 7:25
**women** 76:13
77:21 79:16 98:19
141:2 212:9
**wonderful** 88:17
**wondering** 28:1
226:15
**word** 61:10 91:12
92:15 93:2,5,6
217:1 222:3

Brenda Murphy

February 4, 2022

The South Carolina State Conference vs. McMaste,

**[words - zoom]**

Page 43

| words | y |
|---|---|

**words** 73:19 86:19 91:14,17 108:17 110:13,13,18 112:1 134:7 213:25 223:9 227:17
**work** 8:1 24:3 27:1 31:7 33:5,6,6 33:7,7,13 38:6,7,8 38:8,10,13 50:15 100:9,10 182:3 200:23 212:12 213:8,12 237:2,4 237:19
**worked** 27:2,10 33:9,15 77:24,25 100:8 234:13,23
**working** 33:11,18 200:23 235:17
**works** 7:25 88:17 102:18
**world** 217:19,20
**write** 82:9,10,15 82:16 125:23 210:3,3
**written** 6:14 81:18 82:2,18 83:20 115:6 175:16 207:24 209:6,18 209:19 216:4
**wrong** 15:1 46:24 90:18 123:5 135:8 153:14 170:3,10 170:11 173:11 196:16 199:14
**wrote** 209:3

| x |
|---|

**x** 6:1

**y'all** 102:12,16 209:3
**yeah** 90:19 100:15 101:9 116:25 123:8 127:25 185:8 203:15 209:17 211:25 225:17
**year** 14:4 27:13 49:4 76:24,25 140:24
**years** 20:4 27:3,7 27:11 28:5 33:23 34:1,4,11 35:12 51:16 53:10 54:9 78:1 129:10 202:4 205:7 239:11
**yell** 216:10
**yesterday** 16:10 96:17 181:7,11
**york** 4:9,9 33:16 33:16 90:13 200:24 201:5
**youth** 35:15

| z |
|---|

**zoom** 16:1,3 24:8 83:9 217:6

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.