**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

THE SOUTH CAROLINA STATE
CONFERENCE OF THE NAACP, *et al.*,

Plaintiffs,

v.

THOMAS C. ALEXANDER, *et al.*,

Defendants.

Case No.  3:21-cv-03302-MBS-TJH-RMG

**SENATE DEFENDANTS' MOTION**
**TO DISMISS PLAINTIFFS' THIRD**
**AMENDED COMPLAINT**

## INTRODUCTION

Because redistricting "is primarily the duty and responsibility of the State," "[f]ederal-court review of districting legislation represents a serious intrusion on the most vital of local functions." *Miller v. Johnson*, 515 U.S. 900, 915 (1995).  "Electoral districting is a most difficult subject for legislatures, and so the States must have discretion to exercise the political judgment necessary to balance competing interests," and "the good faith of a state legislature must be presumed."  *Id.* Accordingly, federal courts must "exercise extraordinary caution in adjudicating claims that a State has drawn district lines on the basis of race."  *Id.* at 915–16; *see also Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018).

Plaintiffs therefore face a "demanding" burden of proof on their claims that the General Assembly drew South Carolina's Congressional districting lines on the basis of race.  *Easley v. Cromartie*, 532 U.S. 234, 241 (2001) (*Cromartie II*).  The Court should dismiss the Third Amended Complaint because it does not even "plausibl[y]" plead allegations showing that Plaintiffs can meet that burden.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

In particular, Plaintiffs' racial gerrymandering claim in count one requires the demanding showing that race was the General Assembly's "dominant and controlling consideration," *Shaw v.*

*Hunt*, 517 U.S. 899, 905 (1996) (*Shaw II*), such that it "subordinated traditional race-neutral districting principles . . . to racial considerations" in drawing the Congressional Plan and the challenged districts, *Miller*, 515 U.S. at 916.  Plaintiffs' Third Amended Complaint, however, never mentions that the Congressional Plan is largely a continuation of the Benchmark Plan that both this Court and the U.S. Supreme Court upheld against racial gerrymandering and other challenges ten years ago.  *See Backus v. South Carolina*, 857 F. Supp. 2d 553, 557 (D.S.C.), *aff'd*, 568 U.S. 801 (2012).

In all events, Plaintiffs' Third Amended Complaint wholly ignores traditional districting criteria—such as the preservation of district cores—that predominated over race and far more plausibly explain the Congressional Plan than the purported use of race Plaintiffs allege. Moreover, the Congressional Plan performs even *better* than Plaintiffs' proposed alternative plans on the two main traditional criteria Plaintiffs invoke, "maintaining communities of interest" and "respecting county and municipal boundaries."  Dkt. No. 267 ¶ 164.  And even though Plaintiffs acknowledge that race and political affiliation are highly correlated in South Carolina, they offer no plausible allegations to show that "race *rather than* politics *predominantly* explains" the aspects of the Congressional Plan they challenge.  *Cromartie II*, 532 U.S. at 243 (emphasis original).

Plaintiffs' attempt to plead an intentional discrimination claim in count two fares no better. That claim imposes on Plaintiffs the heavy burden to show that the Congressional Plan results in "adverse effects upon an identifiable group" and that the General Assembly enacted the Congressional Plan "because of, not merely in spite of," those effects.  *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).  Plaintiffs' Third Amended Complaint fails plausibly to plead either element.  On the effects element, Plaintiffs do not challenge District 6, which is currently represented by Representative Clyburn—and, in fact, *acknowledge* that District 6 "may still be an

effective district for Black voters." Dkt. No. 267 ¶ 149. Plaintiffs also bring no claim under Section 2 of the Voting Rights Act and, thus, no allegation that the General Assembly violated the law by failing to create a district where African Americans form a compact and politically polarized majority. And on the intent element, Plaintiffs have offered no plausible allegation that the General Assembly "as a whole," *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2350 (2021), enacted the Congressional Plan "because of," *Feeney*, 442 U.S. at 279, a (non-existent) effect on African-American voters.

In fact, at bottom, Plaintiffs' challenges to the Congressional Plan ask the Court to impose a racial gerrymander in Congressional District 1. Plaintiffs allege that the General Assembly should have undertaken—and that the Court itself now should take—the race-conscious action of increasing the black voting-age population ("BVAP") in District 1 "to as high as 34%," or *more than double its current level*. Dkt. No. 267 ¶ 154. But such an action would "subordinate[] traditional race-neutral districting principles . . . to racial considerations," *Miller*, 515 U.S. at 916, and violate the General Assembly's "legitimate political objectives" in District 1, *Cromartie II*, 532 U.S. at 258. And adopting that racial gerrymander in District 1 would not satisfy "strict scrutiny," *Miller*, 515 U.S. at 920, because Section 2 does not require, much less justify, creation of a 34% BVAP "influence" or "opportunity" district, *see, e.g.*, *Bartlett v. Strickland*, 556 U.S. 1 (2009); *Thornburg v. Gingles*, 478 U.S. 30 (1986). The Court should decline Plaintiffs' invitation to inject race into South Carolina's redistricting process and dismiss the Third Amended Complaint.

## BACKGROUND

### A. Congressional Redistricting Following The 2000 Census

In 1994, the General Assembly enacted into law a redistricting plan for South Carolina's congressional delegation. *Colleton Cnty. Council v. McConnell*, 201 F. Supp. 2d 618, 664 (D.S.C.

2002) (three-judge court). District 6 was a majority-BVAP district under the 1994 plan, and the 1994 plan split Charleston into two districts. *See id.* at 665–66 & n.29.

Following an impasse between the General Assembly and then-Governor Hodges, a three-judge panel of this Court drew a new Congressional districting plan in 2002 to account for population shifts revealed by the 2000 Census results. *See id.* at 663–68. Among other things, the 2000 Census revealed that District 6 was "severely underpopulated" by nearly 10%. *Id.* at 663. In drawing the remedial plan, the three-judge panel "generally sought to maintain the cores of the existing congressional districts" and to make other changes "as individual district requirements dictated to correct the population deviations." *Id.* at 664. The 2002 court-drawn plan maintained a split of Charleston. *See id.* at 666 n.29; *see also* S.C. Redistricting 2021 - Senate Judiciary Committee, *Congressional Districts - 2002 District Court Order*, https://tinyurl.com/2t24k5ca.[1]

**B.    Congressional Redistricting Following The 2010 Census**

In 2011, the General Assembly enacted a new Congressional redistricting plan that reflected population shifts revealed by the 2010 Census results and the apportionment of a seventh Congressional district to South Carolina. *See Backus*, 857 F. Supp. 2d at 557. The 2011 plan ("Benchmark Plan") maintained a split of Charleston County between District 1 and District 6. *See* Act No. 75, 119th Gen. Assemb., 1st Sess. (S.C. 2011), tinyurl.com/yckjcdr9. Under the Benchmark Plan, District 1 had a BVAP of 18.18%, District 2 had a BVAP of 21.48%, District 5 had a BVAP of 26.46%, and District 6 had a BVAP of 55.18%. *See* S.C. Redistricting 2021 -

---

[1] The Court may take judicial notice of maps, data, and statistics that "are publicly available on the official redistricting website" of the Senate Redistricting Subcommittee. *Hall v. Virginia*, 385 F.3d 421, 424 n.3 (4th Cir. 2004). "Facts subject to judicial notice may be considered by a court on a motion to dismiss." *Briggs v. Newberry Cnty. Sch. Dist.*, 838 F. Supp. 232, 234 (D.S.C. 1992).

Senate Judiciary Committee, *Senate Judiciary District Statistics Report* (July 27, 2011), https://tinyurl.com/2p9crm58.

A three-judge panel of this Court upheld the Benchmark Plan against racial gerrymandering, intentional discrimination, and Section 2 claims. The U.S. Supreme Court summarily affirmed that decision. *See Backus*, 857 F. Supp. 2d at 558–70, *aff'd*, 568 U.S. 801.

## C.   Congressional Redistricting Following The 2020 Census

The belatedly released 2020 Census results, *see* Dkt. No. 267 ¶ 65, revealed that the Benchmark Plan had become malapportioned and needed to be redrawn to comply with the Constitution's one-person, one-vote mandate. In particular, the Census results revealed massive population shifts in South Carolina away from predominantly African-American areas and toward coastal areas. Thus, under the 2020 Census results, Benchmark District 6 was severely underpopulated by 11.59% and neighboring Benchmark District 1 was severely overpopulated by 11.99%. *See id.* ¶ 143; *see also* S.C. Redistricting 2021 - Senate Judiciary Committee, *Benchmark Congressional Districts with 2020 Data: District Statistics*, https://tinyurl.com/yckvat2k ("*Benchmark Congressional Stats*"). The remaining districts were between 3.34% underpopulated and 3.97% overpopulated, and all of the districts had to be redrawn to comply with the strict equal population requirement for Congressional districts incorporated into the Senate Redistricting Guidelines. *See* Dkt. No. 267 ¶ 143; *Benchmark Congressional Stats*, *supra*; *Karcher v. Daggett*, 462 U.S. 725 (1983); 2021 S.C. Senate Judiciary Committee, Redistricting Subcommittee, *2021 Redistricting Guidelines* I.A.2, *available at* https://tinyurl.com/54d7jt3s ("*2021 Senate Redistricting Guidelines*").

The General Assembly adopted the Congressional Plan in early 2022. As Plaintiffs acknowledge, the General Assembly "enacted a map that does the bare minimum to correct for population deviations." Dkt. No. 267 ¶ 147. Indeed, the Senate's Redistricting Guidelines

specifically identified "[p]reserving the cores of existing districts" as a traditional districting criterion. *2021 Senate Redistricting Guidelines* III.B; Dkt. No. 267 ¶ 56; *Karcher*, 462 U.S. at 740; *Colleton Cnty. Council*, 201 F. Supp. 2d at 630, 647, 664. The Congressional Plan thus preserves the cores of the existing seven Congressional districts. In particular, the Congressional Plan preserves, as measured by total population:

- 92.78% of District 1's core;

- 96.75% of District 2's core;

- 94.75% of District 3's core;

- 98.09% of District 4's core;

- 95.04% of District 5's core;

- 77.41% of District 6's core; and

- 99.51% of District 7's core.

S.C. Redistricting 2021 - Senate Judiciary Committee, *House Plan 2, Senate Amendment 1: Core Constituencies* (Jan. 11, 2022), https://tinyurl.com/4nmv45d2.[2]

The Congressional Plan maintains a split of Charleston County—which has been split for three decades—and splits a total of only 10 counties and 13 voting districts (precincts). *See* S.C. Redistricting 2021 - Senate Judiciary Committee, *House Plan 2 Senate Amendment 1: Political Subdivision Splits Between Districts* (Jan. 11, 2022), https://tinyurl.com/2p9fvjkv. The Congressional Plan also maintains the partisan split of six majority-Republican districts and one majority-Democratic district (District 6). *See* S.C. Redistricting 2021 - Senate Judiciary

---

[2] The data made publicly available on the Senate Redistricting website and cited in this motion measures core preservation as the percentage of the population of the (new) Congressional District that came from the (old) Benchmark District. It is also possible to measure core preservation as the percentage of the population of the (old) Benchmark District that remained in the (new) Congressional District.

Committee, *House Plan 2 Senate Amendment 1: Partisan Analysis*, https://tinyurl.com/yvaantn4. According to 2020 presidential election results, District 1 is 54.39% Republican in the Congressional Plan. *See id.*

The 2020 Census results also showed changes in the BVAP levels in the Benchmark Plan. At the time of the 2020 Census results, Benchmark District 1 had a BVAP of 16.56%; Benchmark District 2 had a BVAP of 23.06%; Benchmark District 5 had a BVAP of 25.06%; and Benchmark District 6 had a BVAP of 51.44% but was nearly 12% underpopulated. *See Benchmark Congressional Stats*, *supra*. Under the Congressional Plan, as corrected for population deviations, District 1 has a BVAP of 16.72%; District 2 has a BVAP of 24.49%; District 5 has a BVAP of 24.03%; and District 6 has a BVAP of 45.90%. *See* S.C. Redistricting 2021 - Senate Judiciary Committee, *House Plan 2 Senate Amendment 1: Statistics*, https://tinyurl.com/mw4a4f8b. The Congressional Plan slightly increases the number of African Americans of voting age in District 6 from 265,982 at the time of the 2020 Census, *see Benchmark Congressional Stats*, *supra*, to 269,326 today, *see House Plan 2 Senate Amendment 1: Statistics*, *supra*.

### D.  Plaintiffs' Alternative Plans

During the redistricting process, "Plaintiff South Carolina NAACP proposed two plans to the Legislature" as alternatives to the Congressional Plan. Dkt. No. 267 ¶ 154. The first such proposal, NAACP Congressional Submission 1, redraws South Carolina's congressional map compared to the Benchmark Plan and the Congressional Plan. NAACP Congressional Submission 1 thus preserves a significantly smaller percentage of the cores of districts than the Congressional Plan. In particular, NAACP Congressional Submission 1 preserves, as a percentage of total population:

- 52.23% of District 1's core;

- 71.69% of District 2's core;

- 75.30% of District 3's core;

- 83.00% of District 4's core;

- 57.15% of District 5's core;

- 45.53% of District 6's core; and

- 59.77% of District 7's core.

S.C. Redistricting 2021 - Senate Judiciary Committee, *NAACP Congressional Submission 1: Core Constituencies* (Nov. 10, 2021), https://tinyurl.com/yvar6ueu.

NAACP Congressional Submission 1 also splits 14 counties affecting population and 24 voting districts (precincts) affecting population, both more than the Congressional Plan. *See* S.C. Redistricting 2021 - Senate Judiciary Committee, *NAACP Congressional 1: Political Subdivision Splits Between Districts* (Oct. 29, 2021), https://tinyurl.com/2p8kxaef. By dramatically redrawing South Carolina's congressional districts, NAACP Congressional Submission 1 also increases District 1's BVAP to 34.02%, more than double the level in either the Benchmark Plan or the Congressional Plan under the 2020 Census results. *See* S.C. Redistricting 2021 - Senate Judiciary Committee, *NAACP Congressional 1: Statistics*, https://tinyurl.com/yckwxrwr. NAACP Congressional Submission 1 also increases the total number of African Americans of voting age in District 6 to 295,992, over 26,000 more than in the Congressional Plan. *See id.*

The NAACP's second proposal, NAACP Congressional Submission 2, also preserves less of the cores of the Benchmark Districts than the Congressional Plan. In particular, NAACP Congressional Submission 2 preserves, as a percentage of total population:

- 72.46% of District 1's core;

- 51.52% of District 2's core;

- 86.34% of District 3's core;

- 87.51% of District 4's core;

- 79.85% of District 5's core;

- 46.35% of District 6's core; and

- 99.30% of District 7's core.

S.C. Redistricting 2021 - Senate Judiciary Committee, *NAACP Congressional 2: Core Constituencies* (Oct. 29, 2021), https://tinyurl.com/jz6p6fhf.

NAACP Congressional Submission 2 also splits 11 counties affecting population and 53 voting districts (precincts) affecting population, both more than the Congressional Plan. *See* S.C. Redistricting 2021 - Senate Judiciary Committee, *NAACP Congressional 2: Political Subdivision Splits Between Districts* (Oct. 29, 2021), https://tinyurl.com/49p8v5nt. NAACP Congressional Submission 2 increases District 1's BVAP to 23.26%, which is at least 5% higher than the Benchmark Plan or the Congressional Plan at any time. *See* S.C. Redistricting 2021 - Senate Judiciary Committee, *NAACP Congressional 2: Statistics*, https://tinyurl.com/bdh8f29t. NAACP Congressional Submission 2 also increases the total number of African Americans of voting age in District 6 to 283,932, more than 14,000 more than in the Congressional Plan. *See id.*

Plaintiffs allege that both NAACP Congressional Submission 1 and NAACP Congressional Submission 2 do not maintain six majority-Republican districts and one majority-Democratic district. *See* Dkt. No. 267 ¶ 6 (NAACP alternatives do not "lock[] in the majority's advantage in six of the seven congressional districts").

## LEGAL STANDARD

The purpose of a Rule 12(b)(6) motion is to test the legal sufficiency of a complaint. *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 616 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 1376 (2021). To

survive a motion to dismiss, a complaint must contain enough "[f]actual allegations" to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* The complaint is deficient if it contains only "[t]hreadbare recitals of the elements of a cause of action" and "tenders naked assertion[s] devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The complaint must demonstrate "more than a sheer possibility that a defendant has acted unlawfully." *Id.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility." *Twombly*, 550 U.S. at 557. Although the court must "take all well-pled facts to be true," the court "need not accept the legal conclusions drawn from the facts" nor "accept as true unwarranted inferences, unreasonable conclusions or arguments." *Carey v. Throwe*, 957 F.3d 468, 474 (4th Cir. 2020).

## ARGUMENT

## I.    COUNT ONE FAILS TO STATE A RACIAL GERRYMANDERING CLAIM

The Third Amended Complaint fails to plead facts sufficient to show that Plaintiffs can discharge their "demanding" burden, *Cromartie II*, 532 U.S. at 241, to prove that the General Assembly "subordinated traditional race-neutral districting principles . . . to racial considerations," *Miller*, 515 U.S. at 916, in drawing the Congressional Plan. Nor could they: this Court and the U.S. Supreme Court upheld the Benchmark Plan against racial gerrymandering and other challenges in *Backus*, *see* 857 F. Supp. 2d at 570, *aff'd*, 568 U.S. 801, and Plaintiffs acknowledge that the General Assembly "enacted a map that does the bare minimum" to the Benchmark Districts "to correct for population deviations," Dkt. No. 267 ¶ 147.

Thus, it is unsurprising that Plaintiffs' Third Amended Complaint fails even to address traditional redistricting criteria that fully explain the Congressional Plan and the districts Plaintiffs

challenge, much less to rebut the presumption of the General Assembly's "good faith" in enacting that Plan. *Miller*, 515 U.S. at 915. And not only do Plaintiffs fail to engage their burden to show that "race *rather than* politics *predominantly* explains" the Congressional Plan, *Cromartie II*, 532 U.S. at 243 (emphasis original), they concede any such showing away with their acknowledgement that their proposed alternatives do not preserve the 6-1 Republican-to-Democratic split, *see* Dkt. No. 267 ¶ 6. The Court should dismiss count one.

## A. The Congressional Plan Complies With, Rather Than Subordinates, Traditional Districting Principles

The gravamen of Plaintiffs' racial gerrymandering claim is that the General Assembly engaged in unconstitutional "packing" and "cracking" by moving—or in some instances, failing to move—African-American voters into or out of District 6. *See* Dkt. No. 267 ¶ 7. Notably, however, Plaintiffs do not allege that District 6 is itself a racial gerrymander or that voters in District 6 are victims of cracking or packing. In fact, Plaintiffs admit that voters in District 6 are not cracked when they state that Congressional Plan District 6 "may still be an effective district for Black voters." *Id.* ¶ 149. And they cannot claim that voters in District 6 are packed because both of their alternative plans place significantly *more* African Americans of voting age—26,000 more in NAACP Congressional Submission 1 and 14,000 more in NAACP Congressional Submission 2—than the Congressional Plan. *See supra* pp. 8–9.

Plaintiffs instead allege that Districts 1, 2, and 5 are racial gerrymanders, *see* Dkt. No. 267 ¶ 163, but none of those allegations is "plausible" even on its face, *Twombly*, 550 U.S. at 556. Addressing District 1, Plaintiffs take the facially inconsistent positions that "[i]n the downtown and West Ashley areas of Charleston . . . the Legislature moved a disproportionate share of white voters from CD 1 into CD 6, as compared to Black voters in the same area," Dkt. No. 267 ¶ 8, while at the same time "grab[bing] Black voters from CD 1, such as the Black population of West

Ashley, and bring[ing] them into CD 6," *id.* ¶ 152. Plaintiffs lodge a single objection to District 2: that the General Assembly allegedly moved white voters but not black voters in Richland County from District 2 to District 6. *See id.* ¶ 150. And in District 5, as in District 1, Plaintiffs appear to object to moving African-American voters both into and out of District 5. *See id.* ¶¶ 153–55.

In all events, count one fails at the threshold because "race-neutral considerations are the basis for," and "are not subordinated to race" in, the challenged districts and the Congressional Plan. *Miller*, 515 U.S. at 916. Plaintiffs' Third Amended Complaint gives short shrift to the controlling criteria and fails to disclose that the Congressional Plan outperforms their proposed alternatives even on their preferred criteria. The Court should dismiss count one.

### 1. The Congressional Plan Preserves The Cores Of Districts

This Court long has recognized that "preserving the cores of existing districts" is a traditional districting principle in South Carolina—and, in fact, that compliance with this principle also fosters compliance with other traditional districting principles, such as maintaining communities of interest and respecting political boundaries. *Backus*, 857 F. Supp. 2d 560; *see also Colleton Cnty. Council*, 201 F. Supp. 2d at 649. In particular, when drawing South Carolina's redistricting plans in 2002, this Court observed:

> Generally speaking, however, we find that the cores in existing districts are the clearest expression of the legislature's intent to group persons on a "community of interest" basis, and because cores are drawn with other traditional principles in mind, they will necessarily incorporate the state's other recognized interests in maintaining political boundaries, such as county and municipal lines, as well as other natural and historical communities of interest.

*Colleton Cnty. Council*, 201 F. Supp. 2d at 649.

Plaintiffs also acknowledge that "[p]reserving the cores of existing districts" is a traditional districting principle incorporated in the Senate Redistricting Guidelines. Dkt. No. 267 ¶ 56; *see*

*also 2021 Senate Redistricting Guidelines* III.B; *Karcher*, 462 U.S. at 740; *Colleton Cnty. Council*, 201 F. Supp. 2d at 630, 647, 664.  Plaintiffs also acknowledge that the General Assembly "enacted a map that does the bare minimum to correct for population deviations."  Dkt. No. 267 ¶ 147.

Yet Plaintiffs otherwise wholly fail to mention this criterion in the Third Amended Complaint—so they fail to disclose that the Congressional Plan dramatically outperforms both of Plaintiffs' proposed alternative plans on this metric in *every* district, including the districts Plaintiffs challenge.

**Preservation Of Cores Of Existing Districts**

| District | Congressional Plan | NAACP 1 | NAACP 2 |
|----------|--------------------|---------|---------|
| 1 | 92.78% | 52.23% | 72.46% |
| 2 | 96.75% | 71.69% | 51.52% |
| 3 | 94.75% | 75.30% | 86.34% |
| 4 | 98.09% | 83.00% | 87.51% |
| 5 | 95.04% | 57.15% | 79.85% |
| 6 | 77.41% | 45.53% | 46.35% |
| 7 | 99.51% | 59.77% | 99.30% |

Thus, it is unsurprising that Plaintiffs nowhere allege that the General Assembly subordinated this traditional districting principle to race.  Dkt. No. 267 ¶ 164.  Indeed, that the "race-neutral considerations," *Miller*, 515 U.S. at 917, of preserving cores and making minimal changes "to correct for population deviations," Dkt. No. 267 ¶ 147, were "not subordinated to race" but "are the basis for" the challenged districts alone demonstrates that Plaintiffs' racial gerrymandering claim fails as a matter of law, *Miller*, 515 U.S. at 916.

13

### 2. The Congressional Plan Outperforms Plaintiffs' Alternative Plans On Preserving Political Subdivisions And Maintaining Communities Of Interest

Plaintiffs' two principal examples of race allegedly "predominat[ing] over traditional redistricting principles" in the challenged districts are the criteria of "respecting county and municipal boundaries" and "maintaining communities of interest." Dkt. No. 267 ¶ 164. But the Congressional Plan and the challenged districts do not subordinate either criterion to race. Indeed, Plaintiffs' proposed alternative plans prove as much because they perform *worse* than the Congressional Plan on both metrics.

*First*, the Congressional Plan splits only 10 counties and 13 voting districts affecting population. *See House Plan 2 Senate Amendment 1: Political Subdivision Splits Between Districts*, *supra*. NAACP Congressional Submission 1 splits 14 counties and 24 voting districts affecting population. *See NAACP Congressional 1: Political Subdivision Splits Between Districts*, *supra*. NAACP Congressional Submission 2 also splits 11 counties affecting population and 53 voting districts affecting population. *See NAACP Congressional 2: Political Subdivision Splits Between Districts*, *supra*. Thus, far from "subordinat[ing]" this "traditional race-neutral districting principle[] . . . to racial considerations," the General Assembly chose the alternative that best complies with it. *Miller*, 515 U.S. at 916. This criterion thus belies Plaintiffs' attempt to plead a racial gerrymandering claim in count one. *See id.* at 916–17.

Plaintiffs' theory that the General Assembly somehow subordinated this criterion to race by choosing the alternative that best complies with it appears to boil down to their repeated complaint that the General Assembly did not reunite Charleston County in the Congressional Plan. *See, e.g.*, Dkt. No. 267 ¶¶ 73, 78, 80, 83, 86, 93, 108, 111, 120, 122, 126, 134, 138, 144, 145, 152, 154. But Charleston County *already* has been split for three decades—and a three-judge panel of this Court both perpetuated a split of Charleston County in 2002 and upheld a split of Charleston

14

County against racial gerrymandering and intentional discrimination claims in 2012. *See Colleton Cnty. Council*, 201 F. Supp. 2d at 664–65 & n.29; *Backus*, 857 F. Supp. 2d at 558–70, *aff'd*, 568 U.S. 801. Moreover, because of the strict population equality requirement for congressional districts, *Karcher*, 462 U.S. 725; *2021 Senate Redistricting Guidelines* I.A.2, *every* Congressional districting plan must split some counties and voting districts. Plaintiffs cite no authority for their proposition that the General Assembly was required—on pain of racial gerrymandering liability— to reunite Charleston County and split *more* counties and voting districts elsewhere in South Carolina for the first time, as their proposed alternatives do. At a minimum, the General Assembly's selection of the plan that best complied with this traditional criterion was an appropriate exercise of its "political judgment . . . to balance competing interests" that forecloses Plaintiffs' racial gerrymandering claim. *Miller*, 515 U.S. at 915.

*Second*, the General Assembly's preservation of the cores of districts was "the clearest expression of [its] intent to group persons on a 'community of interest' basis." *Colleton Cnty. Council*, 201 F. Supp. 2d at 649. Indeed, during this cycle, the General Assembly defined the concept of "[c]ommunities of interest" broadly to include communities "defined by geographic, demographic, historic or other characteristics that cause people to identify with one another, including economic, social, cultural, language, political, and recreational activity interests." *2021 Senate Redistricting Guidelines* III.A. Consistent with that definition, the General Assembly chose to preserve the communities of interest that had formed around Congressional districts statewide in the prior three decades and in the Benchmark Plan. The General Assembly therefore preserved those communities and the cores of existing districts while making minimal changes "to correct for population deviations." Dkt. No. 267 ¶ 147.

15

Moreover, in Richland County, the General Assembly sensibly kept the community of interest around Fort Jackson in District 2: that district is represented by Representative Joe Wilson, who serves on the House Armed Services Committee.  *See* S.C. Redistricting 2021 - Senate Judiciary Committee, *S.C. Congressional Districts: House Plan 2 Senate Amendment 1*, https://tinyurl.com/6jnypt6k.  And the General Assembly maintained the Republican "political" community of interest in District 1 at a 54.39% level.  *2021 Senate Redistricting Guidelines* III.A; *see also House Plan 2 Senate Amendment 1: Partisan Analysis*, *supra*.

Neither of Plaintiffs' proposed alternative plans maintain any of those communities of interest.  *See, e.g.*, Dkt. No. 267 ¶ 6.  Instead, Plaintiffs' theory again appears to be that the General Assembly did not reunite Charleston County, *see, e.g.*, *id.* ¶¶ 73, 78, 80, 83, 86, 93, 108, 111, 120, 122, 126, 134, 138, 144, 145, 152, 154, or preserve communities of interest alleged to exist along racial lines, *see, e.g.*, *id.* ¶¶ 151–56.  But, of course, the General Assembly had no obligation to choose to reunite Charleston County rather than to "maintain[]" *existing* "communities of interest" elsewhere, *id.* ¶ 164, as part of its preservation of district cores, *see Colleton Cnty. Council*, 201 F. Supp. 2d at 649.  Moreover, intentionally violating traditional districting principles to preserve communities based upon race—as Plaintiffs request—would itself have violated the Constitution or at a minimum raised serious racial gerrymandering concerns.  *See, e.g.*, *Miller*, 515 U.S. at 916; *infra* Part I.C.  Once again, Plaintiffs' own pleading demonstrates that their racial gerrymandering claim fails and that the Court should dismiss count one.

### 3.    The Changes In Districts 1, 2, and 5 That Plaintiffs Challenge Are Consistent With Traditional Districting Principles

Plaintiffs also fail plausibly to plead that the General Assembly subordinated traditional districting principles to race in the three districts they challenge—Districts 1, 2, and 5.  After all, this Court upheld the Benchmark Plan against racial gerrymandering and other challenges in

*Backus*, 857 F. Supp. 2d at 570, and the Congressional Plan preserves 92.78%, 96.75%, and 95.04%, respectively, of the cores of the challenged districts. As explained, the General Assembly's preservation of the cores of the constitutional Benchmark Districts alone demonstrates that Plaintiffs' racial gerrymandering claim fails as a matter of law. *See supra* Part I.A.1; *Miller*, 515 U.S. at 916.

Plaintiffs attempt to avoid this conclusion by pointing to population swaps between District 6, on the one hand, and Districts 1, 2, and 5, on the other hand. *See* Dkt. No. 267 ¶ 163. But Plaintiffs challenge only one side of those swaps—the Districts 1, 2, and 5 side—and *not* the mirror-image District 6 side of the swaps. Plaintiffs, however, nowhere explain how the swaps between District 1 and District 6, District 2 and District 6, and District 5 and District 6 somehow result in racial gerrymanders in Districts 1, 2, and 5 but not in District 6. *See id.* Indeed, if anything, any alleged racial predominance in the swaps involving District 6 and *three other districts* would have infected District 6 with racial gerrymandering *more* than any of the three other districts individually. Yet Plaintiffs have not challenged District 6 as a racial gerrymander.

In all events, Plaintiffs cannot show that the side of the swaps they challenge involve any subordination of traditional districting principles to race because "race-neutral considerations . . . are the basis for" those swaps. *Miller*, 515 U.S. at 916, 917. For example, the General Assembly pursued compliance with the traditional districting principle of "minimizing divisions of voting precinct boundaries," *2021 Redistricting Guidelines* III.A.E, *supra*, by dramatically reducing the number of voting district splits form 65 in the Benchmark Plan, *Benchmark Plan Political Subdivision Splits Between Districts*, https://tinyurl.com/yum74f7m, to 13 in the Congressional Plan, *see House Plan 2 Senate Amendment 1: Political Subdivision Splits Between Districts*, *supra*.

The General Assembly's pursuit of that goal was on full display in the changes to the lines between Districts 1 and 6, Districts 2 and 6, and Districts 5 and 6 that Plaintiffs challenge. *First*, Plaintiffs challenge the swaps between Districts 1 and 6 in Charleston. Dkt. No. 267 ¶¶ 152, 154. But they nowhere mention that those swaps eliminated all 5 voting-district splits that existed in Charleston under the Benchmark Plan. *Compare Benchmark Plan Political Subdivision Splits Between Districts*, *supra*, *with House Plan 2 Senate Amendment 1: Political Subdivision Splits Between Districts*, *supra*.

*Second*, Plaintiffs challenge the swaps between Districts 2 and 6 in Richland and Orangeburg. *See, e.g.*, Dkt. No. 267 ¶¶ 150, 151, 153. Those swaps, however, repaired 22 voting-district splits that existed under the Benchmark Plan and, thus, significantly reduced or even eliminated the number of such splits in those counties. In particular, the swaps in Richland repaired 19 voting district splits and reduced the total number of such splits from 21 in the Benchmark Plan to two in the Congressional Plan. *Compare Benchmark Plan Political Subdivision Splits Between Districts*, *supra*, *with House Plan 2 Senate Amendment 1: Political Subdivision Splits Between Districts*, *supra*. Similarly, the swaps in Orangeburg eliminated all three voting-district splits in that county that existed under the Benchmark Plan. *Compare Benchmark Plan Political Subdivision Splits Between Districts*, *supra*, *with House Plan 2 Senate Amendment 1: Political Subdivision Splits Between Districts*, *supra*.

*Third*, Plaintiffs challenge the swaps between Districts 5 and 6 in Sumter. Dkt. No. 267 ¶ 153. But once again, those swaps eliminated 5 of the 6 voting-district splits in Sumter that existed under the Benchmark Plan. *Compare Benchmark Plan Political Subdivision Splits Between Districts*, *supra*, *with House Plan 2 Senate Amendment 1: Political Subdivision Splits Between Districts*, *supra*. The General Assembly's "race-neutral consideration[]" of minimizing divisions

of voting precinct boundaries was "not subordinated to race" in, but was "the basis for," the sides of the swaps Plaintiffs challenge in Districts 1, 2, and 5 (but do not challenge in District 6). *Miller*, 515 U.S. at 916, 917. For this reason as well, Plaintiffs' racial gerrymandering claim fails as a matter of law. *Id.* at 916.

**B.    Plaintiffs Have Eschewed Their Burden To Prove That Race Rather Than Politics Predominated In The Congressional Plan**

In South Carolina, as elsewhere, race "is highly correlated with political affiliation." *Cromartie II*, 532 U.S. at 243; *see also, e.g.*, Dkt. No. 267 ¶¶ 5, 37, 72 n.16. Accordingly, as part of their demanding burden to prove their racial gerrymandering claim, Plaintiffs must decouple race from politics and demonstrate that "race *rather than* politics *predominantly* explains" the Congressional Plan. *Cromartie II*, 532 U.S. at 243 (emphasis original). That is because the Supreme Court's jurisprudence "ma[kes] clear that a jurisdiction may engage in constitutional political gerrymandering, even if it so happens that the most loyal Democrats happen to be black Democrats and even if the State were *conscious* of that fact." *Hunt v. Cromartie*, 526 U.S. 541, 551 (1999) (emphasis original) (*Cromartie I*). "Evidence that blacks constitute even a supermajority in one congressional district while amounting to less than a plurality in a neighboring district will not, by itself, suffice to prove that a jurisdiction was motivated by race in drawing its district lines when the evidence also shows a high correlation between race and party preference." *Id.* at 551–52; *see also Cromartie II*, 532 U.S. at 245.

Thus, a plaintiff in a racial gerrymandering case "must show at the least that the legislature could have achieved its legitimate political objectives in alternative ways that are comparably consistent with traditional districting principles"—and "that those districting alternatives would have brought about significantly greater racial balance"—compared to the plan the legislature adopted. *Cromartie II*, 532 U.S. at 258. Plaintiffs here, however, have eschewed any effort to

offer plausible allegations sufficient to carry this burden.  In fact, Plaintiffs *acknowledge* that their proposed alternative plans do not maintain the 6-1 Republican-Democratic split that the Congressional Plan maintains.  *See* Dkt. No. 267 ¶ 6 (alternative plans do not "lock[] in the majority's advantage in six of the seven congressional districts").  That acknowledgment alone dooms their racial gerrymandering claim, and the Court should dismiss count one.  *See Cromartie I*, 526 U.S. at 551; *Cromartie II*, 532 U.S. at 243–45, 258.

In fact, the best that Plaintiffs can muster on this point is their allegation that the General Assembly moved "a disproportionate number of white voters from CD 1 and CD 2 into CD 6, as compared to Black voters from the same areas," even though the moved white voters and the unmoved African-American voters both have "preferred candidates running on the Democratic ticket in recent elections."  *See* Dkt. No. 267 ¶ 5.  But that conclusory allegation—or even proof of it—would not carry Plaintiffs' demanding burden on count one.  *See, e.g.*, *Cromartie II*, 532 U.S. at 243–50.  After all, even if the two groups of voters "prefer" Democratic candidates, the strength of that preference—and of their support for Democratic candidates—may vary across the two groups; one group may cross over to vote for non-Democratic candidates more frequently than another; and the two groups may include different total numbers of voters.  *See, e.g.*, *id.*  Indeed, such variations were fatal to the racial gerrymandering claim in *Cromartie II*.  *See, e.g.*, *id.*

Moreover, Plaintiffs have not alleged that the General Assembly could have included the unmoved African-American voters in District 6 in a manner that is "comparably consistent with traditional districting principles" to the Congressional Plan.  *Id.* at 258.  For example, Plaintiffs do not allege that including those voters in District 6 would have achieved a comparable preservation of cores, respect for county lines, or maintenance of communities of interest to the Congressional

Plan. *See id.* In fact, as discussed, both of Plaintiffs' proposed alternatives fail this test. *See id.*; *see also* Part I.A, *supra*. The Court should dismiss count one.

### C.   Plaintiffs Ask The Court To Impose A Racial Gerrymander

The Court should dismiss count one for a final reason: Plaintiffs ask the Court to impose a racial gerrymander in South Carolina's Congressional districts. In particular, Plaintiffs ask the Court to engage in the race-conscious exercise of increasing African Americans' ability to "influence" elections in District 1 or other districts. *See* Dkt. No. 267 ¶¶ 148, 152, 153. Plaintiffs even go so far as to request that the Court redraw District 1 to increase its BVAP to "34%"—or *more than double* its level in either the Benchmark Plan or the Congressional Plan under the 2020 Census results. *Id.* ¶ 154.

But intentionally increasing or maximizing African-American voting strength is unlawful when, as now, such action would involve subordinating traditional districting principles to race and fail to satisfy strict scrutiny. *See, e.g.*, *Miller*, 515 U.S. 917–27. Here, *both* of Plaintiffs' proposed alternative plans—including NAACP Congressional Submission 1, which creates a 34% BVAP in District 1—are far more race-conscious than the Congressional Plan and perform demonstrably worse on traditional redistricting criteria and partisan performance than the Congressional Plan. *See* Parts I.A–B, *supra*.

Moreover, Plaintiffs have not attempted to show that either of their proposed alternatives satisfies "strict scrutiny." *Miller*, 515 U.S. at 920. Nor could they: Section 2 does not require or justify creating a 34% BVAP district, *Bartlett*, 556 U.S. 1; *Thornburg*, 478 U.S. 30, and no other compelling interest can justify intentionally increasing or maximizing African-American voting strength or "influence," *see, e.g.*, *Miller*, 515 U.S. 917–27. Count one should be dismissed.

## II.   COUNT TWO FAILS TO STATE AN INTENTIONAL DISCRIMINATION CLAIM

The Court should also dismiss Plaintiffs' intentional discrimination claim in count two. Count two fails at the threshold because Plaintiffs have not plausibly pled that the General Assembly subjected African-American voters to "differential treatment" compared to "similarly situated" voters of another race. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439–40 (1985). Indeed, as explained, the General Assembly adhered to the same race-neutral traditional criteria across the Congressional Plan, in all of the challenged districts, for all South Carolina voters—and Plaintiffs' intentional discrimination claim rests on proposed alternative plans that are *less* compliant with race-neutral principles than the Congressional Plan. *See* Part I, *supra*. There is no intentional discrimination when, as now, a legislature applies the same race-neutral criteria to all voters *regardless* of their race. For this reason alone, count two does not plausibly plead a claim for relief and should be dismissed. *See Twombly*, 550 U.S. at 556.

Plaintiffs nonetheless claim that the General Assembly engaged in "intentional vote dilution" in the challenged districts. Dkt. No. 267 ¶ 3. "The essence of a vote dilution claim under the Fourteenth Amendment is 'that the State has enacted a particular voting scheme as a purposeful device to minimize or cancel out the voting potential of racial or ethnic minorities.'" *Backus*, 857 F. Supp. 2d at 567 (quoting *Miller*, 515 U.S. at 911).[3] "Viable vote dilution claims require proof that the districting scheme has a discriminatory effect and the legislature acted with a discriminatory purpose." *Id.* (citing *Washington v. Finlay*, 664 F.2d 913, 919 (4th Cir. 1981)). Because Plaintiffs have failed adequately to plead either discriminatory effect or discriminatory purpose, the Court should dismiss count two.

---

[3] It is an open question whether a vote-dilution claim is cognizable under the Fifteenth Amendment, but, if it were, such a claim is "essentially congruent with vote-dilution claims under the Fourteenth Amendment." *Backus*, 857 F. Supp. 2d at 569.

**A.  Plaintiffs Have Not Adequately Alleged That The Congressional Plan Has A Discriminatory Effect**

The discriminatory effect prong of an intentional vote dilution claim calls for a comparative exercise between the allegedly dilutive scheme and a non-dilutive alternative.  In other words, the plaintiff must offer at the threshold "a reasonable alternative voting practice to serve as the benchmark 'undiluted' voting practice." *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 480 (1997) *(Reno I)*; *see id.* ("[T]he very concept of vote dilution implies—and, indeed, necessitates—the existence of an 'undiluted' practice against which the fact of dilution may be measured."); *see also Backus*, 857 F. Supp. 2d at 568.

Plaintiffs have not even attempted to satisfy this requirement.  In the first place, Plaintiffs advance no vote dilution claim under Section 2.  They therefore do not allege that the General Assembly was required to create a Congressional district in which African-American voters form a compact, politically polarized majority. *See, e.g.*, *Bartlett*, 556 U.S. 1; *Thornburg*, 478 U.S. 30; *see also Cooper v. Harris*, 137 S. Ct. 1455, 1470 (2017).  Accordingly, such a district cannot be "a reasonable alternative voting practice" to the Congressional Plan. *Reno I*, 520 U.S. at 480.

Nor do Plaintiffs' proposed alternative plans qualify as "reasonable alternative[s]" to the Congressional Plan. *Id.*  Those alternative plans fare materially worse on traditional criteria than the Congressional Plan. *See* Part I, *supra*.  They therefore cannot prove that the Congressional Plan is dilutive, let alone that the General Assembly's decision to enact it was intentionally discriminatory. *See Reno I*, 520 U.S. at 480; *see also Cooper*, 137 S. Ct. at 1470 (alternative district must be "reasonably configured"); *League of United Latin Amer. Citizens v. Perry*, 548 U.S. 399, 433–34 (2006) ("Legitimate yet differing communities of interest should not be disregarded in the interest of race."); *Abrams v. Johnson*, 521 U.S. 74, 92 (1997) (vote dilution

inquiry should take into account "traditional districting principles such as maintaining communities of interest and traditional boundaries").

**B.    Plaintiffs Have Not Adequately Alleged That The General Assembly Enacted The Congressional Plan For A Discriminatory Purpose.**

Finally, Plaintiffs have not alleged sufficient facts to defeat the "presumption of legislative good faith," *Abbott*, 138 S. Ct. at 2324, much less that the General Assembly "as a whole," *Brnovich*, 141 S. Ct. at 2350, enacted the Congressional Plan "because of, not merely in spite of," (non-existent) "adverse effects upon an identifiable group," *Feeney*, 442 U.S. at 279. Plaintiffs' conclusory allegations of racist intent do not "unlock the doors of discovery," *Iqbal*, 556 U.S. at 678, and they may not conduct "a fishing expedition for unspecified evidence" into legislative intent via "discovery," *Wesley v. Collins*, 791 F.2d 1255, 1262–63 (6th Cir. 1986); *see also DHS v. Regents of Univ. of Calif.*, 140 S. Ct. 1891, 1915–16 (2020) (resolving a claim of intentional discrimination at the motion-to-dismiss stage).

Here, Plaintiffs fail to substantiate their assertion that the General Assembly enacted the Congressional Plan for a discriminatory purpose. Plaintiffs "d[o] not identify [racist] statements" made by any legislator who voted for S. 865, let alone by the entire General Assembly. *DHS*, 140 S. Ct. at 1916 (cleaned up); *see also Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 (1977) (considering "contemporary statements" of officials). Instead, Plaintiffs ask the Court to infer discriminatory intent on the basis of two allegations: South Carolina's regrettable history of discrimination against African-American voters and "the sequences of events and flawed and non-transparent process which resulted in the enactment of S. 865." Dkt. No. 267 ¶ 172. Neither allegation warrants such an inference.

*First*, the historical record Plaintiffs compile does not suggest that the General Assembly enacted the Congressional Plan for a discriminatory purpose. The events described in the Third

Amended Complaint, starting in the year 1892, are simply too remote to "condemn governmental action that is not itself unlawful." *City of Mobile v. Bolden*, 446 U.S. 55, 74 (1980) (plurality opinion); Dkt. No. 267 ¶¶ 32–39. Courts "cannot accept official actions taken long ago as evidence of current intent," *McCleskey v. Kemp*, 481 U.S. 279, 298 n.20 (1987), and "[p]ast discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful," *Abbott*, 138 S. Ct. at 2324; *see also Bishop of Charleston v. Adams*, 538 F. Supp. 3d 608, 615 (D.S.C. 2021) (rejecting "efforts to draw a straight line through the unconscionable discrimination of the past to the judicial and administrative decisions of the present").

This Court has recognized as much. South Carolina's history of racial discrimination was before the three-judge panel in *Backus*, but the panel nonetheless rejected the *Backus* plaintiffs' intentional discrimination challenge to the Benchmark Plan in an opinion summarily affirmed by the Supreme Court. *See Backus*, 857 F. Supp. 2d 553, *aff'd*, 568 U.S. 801. And while Plaintiffs also rely heavily on the history of Department of Justice objections to various voting practices under Section 5 of the Voting Rights Act, *see* Dkt. No. 267 ¶¶ 34–36, they ignore that the Department of Justice precleared the Benchmark Plan challenged in *Backus*, *see Backus*, 857 F. Supp. 2d at 557. And in this case, the Court has reaffirmed that evidence from past redistricting cycles does not bear on "the intent of any legislator [or] the South Carolina General Assembly as a whole[]" in voting for redistricting plans this cycle. Dkt. No. 153 at 13.

*Second*, Plaintiffs lodge several procedural objections surrounding the enactment of the Congressional Plan, but "procedural violations do not demonstrate invidious intent of their own accord." *Rollerson v. Brazos River Harbor Navigation Dist. of Brazoria Cnty.*, 6 F.4th 633, 640 (5th Cir. 2021); *see also Greater Birmingham Ministries v. Sec'y of State for Ala.*, 992 F.3d 1299, 1326 (11th Cir. 2021) (truncated debate, use of cloture, party-line vote, and lack of support from

black legislators were not indicative of discriminatory intent). Rather, procedural violations "must have occurred in a context that suggests the decision-makers were willing to deviate from established procedures *in order to accomplish a discriminatory goal*." *Rollerson*, 6 F.4th at 640 (emphasis added). Thus, "fail[ure] to follow the proper procedures against all individuals," when such conduct is not "targeted to any identifiable minority group," is not indicative of discriminatory intent. *Rollerson v. Port Freeport*, No. 18-CV-00235, 2019 WL 4394584, at *8 (S.D. Tex. Sept. 13, 2019), *aff'd*, 6 F.4th 633.

Plaintiffs offer no factual allegations that the General Assembly deviated from established procedures to accomplish a discriminatory goal or in a way that targeted a minority group. Plaintiffs allege, in conclusory fashion, a "lack of transparency" and "limited opportunities for public input." Dkt. No. 267 ¶ 60. But these minor process objections, common in legislative practice, are not the kind of "radical departures from normal procedures," that could support a finding of discriminatory intent. *Veasey v. Abbott*, 830 F.3d 216, 237 (5th Cir. 2016) (en banc). Moreover, Plaintiffs' own pleadings demonstrate that the General Assembly engaged in robust process around the Congressional Plan. The two redistricting committees clearly articulated their criteria for redistricting (Dkt. No. 267 ¶¶ 40–59), held numerous public hearings (*e.g.*, *id.* ¶¶ 61, 65, 72, 76, 83, 85, 92, 119) solicited proposed maps from the public (*id.* ¶ 71), and considered various plans (*e.g.*, *id.* ¶¶ 119–29).

Plaintiffs allege that the General Assembly disregarded "constitutionally-compliant alternative maps offered by the public and amendments offered by legislative members." *Id.* ¶ 172. But the General Assembly was not required to adopt one of these "constitutionally-compliant alternative maps" over the constitutionally-compliant map it chose to enact. The adoption of a preferred map over a non-preferred map is, of course, left to the General Assembly's "political

judgment . . . to balance competing interests," *Miller*, 515 U.S. at 915, and is not remotely suggestive of racially discriminatory intent. And, of course, the General Assembly had good reasons to choose the Congressional Plan because it comports with, and outperforms Plaintiffs' alternative plans on, race-neutral traditional redistricting criteria. *See* Part I, *supra*.

## CONCLUSION

The Court should dismiss the Third Amended Complaint.

May 20, 2022

Respectfully submitted,

*/s/*Robert E. Tyson Jr.
Robert E. Tyson, Jr. (7815)
Vordman Carlisle Traywick, III (12483)
La'Jessica Stringfellow (13006)
ROBINSON GRAY STEPP & LAFFITTE, LLC
1310 Gadsden Street
Post Office Box 11449 (29211)
Columbia, South Carolina 29201
(803) 929-1400
rtyson@robinsongray.com
ltraywick@robinsongray.com
lstringfellow@robinsongray.com

John M. Gore (admitted *pro hac vice*)
Stephen J. Kenny (admitted *pro hac vice*)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Phone: (202) 879-3939
Fax: (202) 626-1700
jmgore@jonesday.com
skenny@jonesday.com

*Counsel for Senate Defendants*