IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| THE SOUTH CAROLINA STATE CONFERENCE OF THE NAACP, <br><br> and <br><br> TAIWAN SCOTT, on behalf of himself and all other similarly situated persons, <br><br>             Plaintiffs, <br><br>     v. <br><br> THOMAS C. ALEXANDER, in his official capacity as President of the Senate; LUKE A. RANKIN, in his official capacity as Chairman of the Senate Judiciary Committee; JAMES H. LUCAS, in his official capacity as Speaker of the House of Representatives; CHRIS MURPHY, in his official capacity as Chairman of the House of Representatives Judiciary Committee; WALLACE H. JORDAN, in his official capacity as Chairman of the House of Representatives Elections Law Subcommittee; HOWARD KNAPP, in his official capacity as interim Executive Director of the South Carolina State Election Commission; JOHN WELLS, Chair, JOANNE DAY, CLIFFORD J. EDLER, LINDA MCCALL, and SCOTT MOSELEY, in their official capacities as members of the South Carolina Election Commission, <br><br>             Defendants. | Case No. 3:21-cv-03302-MBS-TJH-RMG <br><br><br> **THREE-JUDGE PANEL** <br><br><br><br> **HOUSE DEFENDANTS' MOTION TO DISMISS THIRD AMENDED COMPLAINT** |

  Defendants James H. Lucas (in his official capacity as the former Speaker of the South Carolina House of Representatives[1]), Chris Murphy (in his official capacity as Chairman of the

---

[1] On May 12, 2022, James H. Lucas stepped down as Speaker of the South Carolina House of Representatives. The current Speaker of the House is Representative G. Murrell Smith, Jr. House Defendants will either file or consent to a motion amending the caption to correct the named party.

1

South Carolina House of Representatives Judiciary Committee), and Wallace H. Jordan (in his official capacity as Chairman of the South Carolina House of Representatives Redistricting Ad Hoc Committee[2]) (collectively, the "**House Defendants**"), by and through their undersigned counsel, hereby move to dismiss Plaintiffs' Third Amended Complaint [ECF No. 267] under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) for lack of standing, lack of subject-matter jurisdiction, and failure to state a claim upon which relief can be granted.

## INTRODUCTION

On May 6, 2022, Plaintiffs The South Carolina State Conference of the NAACP ("**SC NAACP**") and Taiwan Scott ("**Scott**") (collectively "**Plaintiffs**") filed a Third Amended Complaint alleging that the House Defendants engaged in racial gerrymandering and intentional racial discrimination in the drawing of three of South Carolina's seven United States Congressional Districts. [*See* ECF No. 267]. Specifically, Plaintiffs allege that House Defendants and the Legislature as a whole "used race as a predominant factor to enact South Carolina Congressional Districts 1, 2, and 5" (the "**Challenged Congressional Districts**") in Act No. 118. *Id.* at ¶9.

While Plaintiffs baldly allege that there are individuals that reside in each of the Challenged Congressional Districts as necessary to support standing, neither the SC NAACP nor Scott have adequately alleged or demonstrated the requisite personal harms to support a racial discrimination claim, as required by the Supreme Court. Because of this failure, Plaintiffs lack standing to bring their claims.

Further, Plaintiffs fail to adequately allege racial gerrymandering, but instead attempt to shoehorn allegations of political gerrymandering into a racial gerrymandering case. Plaintiffs in

---

[2] The Redistricting Ad Hoc Committee is the correct name of the Committee that was tasked with redistricting this cycle.

fact point to examples in their Third Amended Complaint that seem to suggest that politics predominated over race in the drawing of the Challenged Congressional Districts. Because political gerrymandering claims are no longer justiciable in federal court, this Panel lacks subject-matter jurisdiction to preside over such a challenge.

In addition, as discussed in detail in the motions to dismiss [ECF Nos. 178, 271] and reply in further support thereof [ECF No. 209][3] by Thomas C. Alexander, in his official capacity as President of the Senate, and Luke A. Rankin, in his official capacity as Chairman of the Senate Judiciary Committee, (collectively, "**Senate Defendants**"), Plaintiffs fail to acknowledge the race-neutral, traditional redistricting principle of core retention. Because the General Assembly did not subordinate race-neutral principals to considerations of race and Plaintiffs fail to provide more than threadbare recitals of discriminatory intent, Plaintiffs claims must be dismissed.

Finally, by selecting only Congressional Districts 1, 2, and 5 as the Challenged Congressional Districts, Plaintiffs have foreclosed the possibility of any relief in the areas of South Carolina not affected by these districts. Thus, any claim as to those areas of the state not in Challenged Districts must be dismissed.

## APPLICABLE STANDARDS

Article III of the United States Constitution limits the federal judicial power to resolving "Cases" or "Controversies." U.S. Const. art. III § 2; *Ansley v. Warren*, 861 F.3d 512, 517 (4th Cir. 2017). Accordingly, whether a plaintiff has identified an actual case or controversy is a question of subject-matter jurisdiction. *See South Carolina v. United States*, 912 F.3d 720, 726 (4th Cir. 2019). The requirement that jurisdiction be established as a threshold matter "spring[s]

---

[3] House Defendants incorporate by reference and adopt the arguments made by Senate Defendants in their motions to dismiss and other briefings in support thereof.

3

from the nature and limits of the judicial power of the United States" and is "inflexible and without exception." *Mansfield, C. & L.M.R. Co. v. Swan*, 111 U.S. 379, 382 (1884). At the outset, the "threshold jurisdictional question" in this case is whether "the plaintiff … has standing to sue." *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 102 (1998).

The requirement of standing is "perhaps the most important" condition of justiciability. *Allen v. Wright*, 468 U.S. 737, 750 (1984). This "standing inquiry ensures that a plaintiff has a sufficient personal stake in a dispute to render judicial resolution appropriate." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 153 (4th Cir. 2000) (citing *Wright*, 468 U.S. at 750–51). The standing requirement also "tends to assure that the legal questions presented to the court will be resolved, not in the rarefied atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge Christian College v. Am. United for Separation of Church and State, Inc.*, 454 U.S. 464, 472 (1982).

"[I]t is not enough that the party invoking the power of the court have a keen interest in the issue." *Hollingsworth v. Perry*, 570 U.S. 693, 700 (2013). Establishing standing requires the plaintiff to show (1) an "injury in fact," (2) "a causal connection between the injury and the conduct complained of," and (3) that a favorable decision will likely redress the injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). If a litigant does not meet these requirements, the case must be dismissed for lack of subject matter jurisdiction. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. at 88-89.

Further, when a motion pursuant to Rule 12(b)(1) raises a challenge to the factual basis for subject-matter jurisdiction, such as standing, the burden of proving subject-matter jurisdiction is on the plaintiff. *Richmond, Fredericksburg & Potomac R. Co. v. United States*, 945 F.2d 765,

4

768–69 (4th Cir. 1991) (citing *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)). In determining whether jurisdiction exists, "the district court is to regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Id.* (citing *Trentacosta v. Frontier Pacific Aircraft Indus.*, 813 F.2d 1553, 1558 (9th Cir.1987)). As such, the Court "should apply the standard applicable to a motion for summary judgment, under which the nonmoving party must set forth specific facts beyond the pleadings to show that a genuine issue of material fact exists." *Trentacosta*, 813 F.2d at 1559 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

Finally, in considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court accepts the factual allegations of the complaint as true and asks whether the complaint states a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6); *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). On such a motion, a "complaint must be dismissed if it does not allege enough facts to state a claim to relief that is ***plausible*** on its face." *Simmons v. United Mortg. & Loan Inv., LLC*, 634 F. 3d 754, 768 (4th Cir. 2011) (internal quotation marks omitted) (emphasis in original). A claim is plausible only "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Thus, in reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court "must determine whether it is plausible that the factual allegations in the complaint are 'enough to raise a right to relief above the speculative level.'" *Andrew v. Clark*, 561 F. 3d 261, 266 (4th Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 555 U.S. 544, 545 (2007)).

Importantly, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678; *see also US Airline Pilots Ass'n v.*

*AWAPPA, LLC*, 615 F.3d 312, 317 (4th Cir. 2010) (holding a "complaint must 'provide the grounds of [the plaintiff's] entitlement to relief' with 'more than labels and conclusions' and more than 'a formulaic recitation of the elements of a cause of action'") (quoting *Iqbal*, 550 U.S. at 555 (2007)). Indeed, "courts must overlook 'conclusory, unwarranted deductions of fact, or unreasonable inferences.'" *Brown v. Lowe's Cos., Inc.*, 52 F. Supp. 3d 749, 753 (W.D.N.C. 2014) (quoting *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002)).

## ARGUMENTS

**I.  Plaintiffs Lack Standing as They Have Not Provided Sufficient Facts of Personal Harms Stemming from Alleged Racial Gerrymandering or Racial Discrimination.**

In order to have standing, "a complainant must clearly allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers." *Warth v. Seldin*, 422 U.S. 490, 490 (1975). In the redistricting context, the Supreme Court has clearly explained that district-by-district analysis and proof are required to support standing. *See Abbott v. Perez*, 138 S. Ct. 2305, 2332 (2018) ("We have made clear that redistricting analysis must take place at the district level. In failing to perform that district-level analysis, the District Court went astray."). The Supreme Court further explained in *Alabama Legislative Black Caucus v. Alabama*,

> Our district-specific language makes sense in light of the nature of the harms that underlie a racial gerrymandering claim. Those harms are personal. They include being personally subjected to a racial classification, as well as being represented by a legislator who believes his primary obligation is to represent only the members of a particular racial group. They directly threaten a voter who lives in the *district* attacked. But they do not so keenly threaten a voter who lives elsewhere in the State. Indeed, the latter voter normally lacks standing to pursue a racial gerrymandering claim.

575 U.S. 254, 263 (2015) (emphasis in original; internal citations and quotations omitted). Therefore, it is not enough for a plaintiff to allege it has members in each challenged district. What is required is a district-by-district analysis where the Plaintiffs must show there is at least one

6

member in each challenged district who has suffered the personal harms of racial discrimination or racial gerrymandering.

Thus, it is clear Supreme Court precedent that a voter who is not directly harmed by the Challenged Congressional Districts "lacks standing to pursue a racial gerrymandering claim." *Id.* at 263 (citing *United States v. Hays*, 515 U.S. 737, 744–45 (1995)). The Supreme Court has stated that mere allegations "that some (unidentified) members …will suffer (unidentified) concrete harm as a result" of the defendants' actions is a "novel approach to the law of organizational standing," which "would make a mockery of our prior cases." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009). Indeed, the District of South Carolina, in the last redistricting cycle, made clear that "[i]t is not enough for plaintiffs to allege that they reside in a district adjacent to a racially gerrymandered district and that the racial composition of their district would have been different absent the racial gerrymander." *Backus v. South Carolina*, 857 F. Supp. 2d 553, 560 (D.S.C.), *aff'd*, 568 U.S. 801 (2012) (citing *United States v. Hays*, 515 U.S. 737, 746 (1995)). "Plaintiffs cannot assert a generalized grievance and must show that they have been *personally* denied equal protection." *Id.* (emphasis added).

In the Third Amended Complaint, Plaintiffs allege that Scott lives in Congressional District 1 in Hilton Head, South Carolina. [*See* ECF No. 267 at ¶17]. Following the 2011 redistricting cycle, Hilton Head was in Congressional District 1 and now, following the enactment of Act No. 118, remains in Congressional District 1. Thus, the Congressional District in which Scott resides has not changed with the enactment of Act No. 118. In addition, while Scott alleges that "Black South Carolinians, including Gullah community members" like himself "have endured discrimination and other harms relating to taxation, heirs' property, land seizures, highway construction, lack of business and development opportunities, and many other issues," Scott offers

7

no evidence that he has suffered personal harms related to discrimination or gerrymandering as a result of the enactment of Act No. 118. *Id.*

In addition, Plaintiffs allege that SC NAACP's "members live in each of the Challenged Congressional Districts" and these members have been and "will continue to be harmed by their assignment to unconstitutionally racially gerrymandered districts and purposefully dilutive districts." *Id.* at ¶ 16. While the SC NAACP has previously produced a list of members who live in the previously Challenged House Districts when ordered by this Panel, that membership list shows members in only two of the three Challenged Congressional Districts: Congressional Districts 2 and 5, but not Congressional District 1. Thus, without further proof of membership, SC NAACP, like Scott, does not have standing to challenge Congressional District 1. As to Congressional Districts 2 and 5, the membership list alone still fails to address the requisite substance for allegations of individual, personal harms suffered by those members.

To satisfy associational standing requirements, "an organization must do more than identify a likelihood that the defendant's conduct will harm an unknown member in light of the organization's extensive size or membership base." *Physicians & Surgeons v. United States Food & Drug Admin.*, 13 F.4th at 543 (citing *Summers*, 555 U.S. at 498-99). Rather, the "organization must instead identify a member who has suffered (or is about to suffer) a concrete and particularized injury from the defendant's conduct." *Id.*; *see also S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013).

Following clear precedent, the Sixth Circuit Court of Appeals has very recently noted that federal courts must "vigilantly ensure that an association's members have incurred a personal injury." *Ass'n of Am. Physicians & Surgeons v. United States Food & Drug Admin.*, 13 F.4th 531, 534 (6th Cir. 2021). Indeed, the Sixth Circuit dismissed a complaint where the plaintiff association

"failed to plausibly plead that any member has been injured by the actions of the" defendant. *Id.* The Sixth Circuit has also dismissed the complaint for lack of standing as there were not facts alleged in the complaint to support such a showing. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 136 (2016) (making clear that a complaint must "clearly ... allege facts demonstrating" standing).

Plaintiffs have now amended their complaint three times and have had several months to clearly allege facts to demonstrate standing through either declaration, affidavit, written discovery, document discovery, or deposition. Plaintiffs have inexcusably failed to do so. Courts have found that such declarations or statements from organizational plaintiff's members may "sufficiently demonstrate a concrete injury…." *Sierra Club v. Perry*, 373 F. Supp. 3d 128, 139 (D.D.C. 2019); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000) (holding that statements, such as "affidavits and testimony" from organization members who lived near contaminated areas with harmful pollutants "adequately documented injury in fact"). Such submissions could "present dispositively more than the mere general averments and conclusory allegations." *Friends of the Earth, Inc.*, 528 U.S. at 169 (internal citations omitted). Without such statements demonstrating injury to the organizational members, or Scott for that matter, Plaintiffs cannot establish standing as they are left with such general averments and conclusory allegations.[4] Still, such statements may not be sufficient to establish the standing required to bring this suit. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 899 (1990) (several affidavits did "not set forth the specific facts necessary" to establish organizational standing).

In this case, neither Scott nor SC NAACP demonstrates any specific, personal harm

---

[4] Certainly, House Defendants recognize that it is within this Panel's authority to require Plaintiffs to submit such statements. *See Warth v. Seldin*, 422 U.S. 490 (1975) ("[I]t is within the trial court's power to allow or to require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing.").

suffered as a result of the enactment of Act 118. Instead, Plaintiffs merely allege that the racial composition of the Challenged Congressional Districts could have been different. Plaintiffs do exactly what the court in *Backus* warned was insufficient to establish standing – merely allege a "generalized" equal protection claim. *Backus*, 857 F. Supp. 2d at 560 ("[i]t is not enough for plaintiffs to allege that they reside in a district adjacent to a racially gerrymandered district and that the racial composition of their district would have been different absent the racial gerrymander."). Because of this failure, Plaintiffs do not have standing and this Panel does not have subject-matter jurisdiction over their challenges to the House Districts, so these claims against the House Defendants must be dismissed.

## II. Plaintiffs' Claims Are Political Gerrymandering Claims at Best, Which Are Not Justiciable in Federal Court.

Again, Plaintiffs allege without support that the Challenged Congressional Districts are the results of racial gerrymandering and intentional racial discrimination. [*See* ECF No. 267 at ¶¶1-9; 160-173]. However, as will be discussed further below, Plaintiffs' claims that the South Carolina Legislature engaged in intentional racial discrimination and that race was the predominant factor in drawing the Challenged Congressional Districts are threadbare allegations made without sufficient factual grounds to withstand dismissal. In fact, by the language Plaintiffs use in the Third Amended Complaint, it appears this is simply a political quarrel masquerading as racial gerrymandering claims in hopes of being justiciable, as federal courts do not have subject-matter jurisdiction over claims of partisan gerrymandering. *See Rucho v. Common Cause*, 139 S. Ct. 2484 (2019).

In 2019, the Supreme Court held that partisan gerrymandering claims present political questions that are beyond the jurisdiction of federal courts. *See id.* at 2508. While racial discrimination in redistricting raises constitutional issues that can be addressed by the federal

10

courts, partisan gerrymandering claims are not justiciable, in part because "a jurisdiction may engage in constitutional political gerrymandering." *Id.* at 2497 (quoting *Hunt v. Cromartie*, 526 U.S. 541, 551 (1999) (internal citations omitted)). The Supreme Court stated that "[t]o hold that legislators cannot take partisan interests into account when drawing district lines would essentially countermand the Framers' decision to entrust districting to political entities." *Id.* Thus, the "central problem" is "not determining whether a jurisdiction has engaged in partisan gerrymandering," it is "determining when political gerrymandering has gone too far." *Id.* (quoting *Vieth v. Jubelirer*, 541 U.S. 267, 296 (2004)). As a result, federal courts must dismiss these cases for a lack of subject-matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). *See Rucho,* 139 S. Ct. at 2508 ("cases are remanded with instructions to dismiss for lack of jurisdiction").

In this latest redistricting cycle, a three-judge panel in Illinois denied any injunctive or declaratory relief for similar redistricting claims, upholding a Democrat-controlled legislature's plan and rejecting all of the plaintiffs' proposed remedial maps. *See McConchie v. Scholz*, No. 21-CV-3091, 2021 WL 6197318 (N.D. Ill. Dec. 30, 2021). In that case, similar to this one, the plaintiffs asserted racially gerrymandering claims that were actually political gerrymandering claims. The plaintiffs in that case presented constitutional claims, contending that several legislative districts were racially gerrymandered in violation of the Fourteenth Amendment's Equal Protection Clause. *Id*. at *1. The plaintiffs challenged districts where, in all but one of the districts, "Latino voters maintain a census voting age population of 42.7% or higher, which Legislative Defendants insist allow for additional opportunities to form coalitions with voters of other races to elect their candidate of choice, enhancing the overall political power of Latinos in Illinois." *Id.* In a proposed remedial plan, plaintiffs suggested districts that "barely surpass the 50% mark." *Id.* The three-judge panel noted, "[a]lthough there is debate about how to achieve the

11

guarantees of the Voting Rights Act, one thing is clear: A federal court is not the arbiter of that dispute unless Plaintiffs carry their burden to prove that an elected legislature's approach violates the law." *Id*. at \*2 (citing *Voinovich v. Quilter*, 507 U.S. 146, 156 (1993) ("the federal courts may not order the creation of majority-minority districts unless necessary to remedy a violation of federal law")). The three-judge panel found there was only "a 'modicum' of evidence that race predominated, but it was not enough to satisfy the plaintiff's demanding burden" of proving racial gerrymandering. *Id.* at \*23. Because plaintiffs failed to show racial gerrymandering, the three-judge panel, citing *Rucho*, noted that their "role as federal judges is limited and does not extend to complaints about excessive partisanship in the drawing of legislative districts," because "the Supreme Court has declared partisan gerrymandering claims to present political questions beyond the reach of the federal courts." *Id.* at \*31 (citing *Rucho,* 139 S. Ct. at 2507).

Respectfully, Plaintiffs' Third Amended Complaint presents the same political question that is beyond the reach of this Panel. Plaintiffs' mere recitals and conclusions of racial gerrymandering and intentional racial discrimination lack any substance whatsoever, purportedly derived from simply looking at the district lines in the Challenged Congressional Districts. "Although for purposes of this motion to dismiss [the court] must take all the factual allegations in the complaint as true, [the court is] not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986). As has been briefed by the Senate Defendants and as the House Defendants demonstrate herein, legitimate, race-neutral redistricting principles, such as core retention, were used for each Challenged Congressional District. To the extent Plaintiffs' claims are in fact political gerrymandering challenges masquerading as racial gerrymandering allegations, they should be dismissed for lack of subject-matter jurisdiction.

It is clear from the language of the Third Amended Complaint that politics, as well as other race-neutral factors, took precedence over race in the drawing of the Challenged Congressional Districts. For example, Plaintiffs complain that a "disproportionate number of white voters" were moved from Congressional District 2 into Congressional District 6 and that those voters "in recent elections have voted for Democratic candidates." [ECF No. 267 at ¶5]. More specifically, Plaintiffs allege that,

> based on an analysis, the Legislature moved VTDs with a significant majority of white voters, who have preferred Democratic candidates in recent elections from Richland County in CD2 and brought them into CD 6 from Richland County. At the same time, it left VTDs with a majority of Black voters who prefer Democratic candidates in recent elections in Richland in CD2, though those VTDs were available to be moved into CD 6. There is thus an inference that race, not party, drove the selection of voters that were moved into CD 6 and left in CD 2.

*Id.* at ¶150. Plainly here Plaintiffs in reality allege that the Legislature "packed" Democratic voters into Congressional District 6, which is not an equivalent to predominance of race. *See, e.g., Shaw v. Reno*, 509 U.S. 630, 647, (1993) (rejecting the "perception that members of the same racial group—regardless of their age, education, economic status, or the community in which they live—think alike, share the same political interests, and will prefer the same candidates at the polls.").

In an attempt to illustrate this point, the Third Amended Complaint includes a map of this area of Richland, reproduced below. The map includes the lines enacted in 2011 (blue) compared to the lines enacted in 2022 in Act No. 118 (yellow). The map also shows the census blocks with higher percentages of Black voting-age population ("**BVAP**") in darker green and those with lower BVAP in lighter colors. However, the map instead demonstrates that race-neutral principles, such as unifying communities of interest and core retention predominated the process – not race.

**Richland**



*Id.* at ¶150.

This map highlights the areas of Columbia, South Carolina that were previously in Congressional District 2, but are now in Congressional District 6 under Act No. 118. These areas include the communities of Shandon and Melrose Heights, along with Five Points, which were previously split between Congressional Districts 2 and 6, and are now united in Congressional District 6. These previously split areas contain a high number of students and professors, now united with surrounding communities such as the University of South Carolina and downtown Columbia. The area noted by Plaintiffs that was moved from Congressional District 2 into Congressional District 6 has a BVAP of roughly 13.5%, yet still favors Democratic candidates, by a more than 2-1 preference for a Democrat candidate among voters. Thus, it is irrelevant what the racial make-up of this area is because the voting patterns of this area are well-known.

What this does not do is create "an inference that race, not party, drove the selection of voters that were moved into CD 6 and left in CD 2." *Id.* at ¶150. Plaintiffs offer no support for such an inference, aside from the fact that it was "based on an analysis." *Id.* The map clearly shows that the prior lines had a more bizarre shape and more closely followed the higher-BVAP census blocks. The new lines in Act No. 118 less closely follow the racial makeup of the census blocks and better respect communities of interest.

As this example shows, Plaintiffs have no more than bare accusations of racial gerrymandering and intentional discrimination and vague references to some analysis. Thus, Plaintiffs have not met their burden to show that "race *rather than* politics *predominantly* explains" the Congressional Plan. *Easley v. Cromartie*, 532 U.S. 234, 243 (2001) (emphasis in original). As political gerrymandering claims are not justiciable, the Third Amended Complaint, or at a minimum Count 1 of the Third Amended Complaint, must be dismissed.

### III.  Core Retention Is a Race-Neutral Principle That Took Precedence Over Race.

House Defendants and the General Assembly as a whole took into consideration the cores of the Congressional Districts as they had been drawn and approved in 2011, which is both race-neutral and a traditional redistricting principle. The term "core retention" is the principle that the new districts are drawn so that, for the most part, districts do not change dramatically from election to election and most voters remain in the "core" of their existing district. This is a race-neutral and long-observed traditional redistricting principle in South Carolina. *See Colleton Cnty. Council v. McConnell*, 201 F. Supp. 2d 618, 647 (D.S.C. 2002), *opinion clarified* (Apr. 18, 2002) ("traditional redistricting principles in South Carolina have directed courts to maintain, where possible, recognized communities of interest and the cores of existing districts") (citing *S.C. State Conf. of Branches of Nat. Ass'n for Advancement of Colored People, Inc. v. Riley*, 533 F. Supp. 1178, 1180

15

(D.S.C.) (1982)). Indeed, Plaintiffs concede that "the Legislature did not significantly change CDs 3, 4, and 7," but ignore that the Challenged Congressional Districts retain the vast majority of their prior districts, while accounting for the significant population shifts in the state. [ECF No. 267 at ¶155].

At the outset, Plaintiffs summarily allege that the Legislature engaged in "racial gerrymandering and intentional vote dilution." [ECF No. 267 at ¶3]. Plaintiffs proceed to allege the "Legislature subordinated racially [neutral] redistricting principles and used race as a predominant factor to enact South Carolina Congressional Districts 1, 2, and 5," which "are not narrowly tailored to comply with Section 2 of the VRA or any other compelling governmental interest." *Id.* at ¶9. While Plaintiffs purport to provide a few examples, *see, e.g., id.* at ¶5, Plaintiffs generally make unsupported accusations, without expert opinion, statistical analysis, or claims by actual voters allegedly injured by the enactment of Act No. 118. Plaintiffs improperly assume the intent of the Legislature based on a superficial look at the map and some cursory statistics. This is not enough to survive the "plausibility" standard required by federal courts. *See Twombly*, 550 U.S. at 557 (a complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."); s*ee also Iqbal*, 556 U.S. at 677 (the "plausibility" standard requires a plaintiff to demonstrate more than "a sheer possibility that a defendant has acted unlawfully"); *Young v. City of Mount Ranier*, 238 F.3d 567, 577 (4th Cir. 2001) (recognizing that mere "bald assertions and conclusions of law" do not prevent dismissal of a complaint under Rule 12(b)(6)).

At the most basic level, Plaintiffs overlook or ignore the multitude of considerations that impact drawing new legislative districts. These considerations are outlined in the House and Senate's redistricting criteria. [*See* ECF No. 267 at ¶¶40-59]. It is clear that "core retention"

encompasses those specific issues underpinning the House Defendants' criteria of incumbency consideration, communities of interest, and compliance with federal and state law, as those prior districts were precleared by the Department of Justice and withstood federal court challenge. *See Colleton Cnty. Council v. McConnell*, 201 F. Supp. 2d 618, 647 (D.S.C. 2002), *opinion clarified* (Apr. 18, 2002). In addition, the Senate, in its criteria, has "constituent consistency," which includes "[p]reserving the cores of existing districts" in its Guidelines. *Id.* at ¶56.

Adherence to this principle of core retention is apparent in a comparison of the Congressional Districts enacted in Act No. 118 to the prior districts enacted following the 2011 redistricting cycle. [*See also* ECF Nos. 178 at 11-12; 271 at 12-13]. However, the changes made were necessary to account for significant population shifts in the state. For example, Congressional District 1 was 11.99% over the ideal district population, while Congressional District 6 was 11.59% underpopulated. This was the result of decreases in population in rural areas and along I-95, which are mainly in Congressional District 6, and significant population increases in Charleston and Berkley Counties in Congressional District 1. Thus, the more impactful changes necessarily occurred in Congressional Districts 1 and 6 in order to adhere to the "one person, one vote" principle—a principle with a much stringent standard than allowed to state legislative districts. *See Kirkpatrick v. Preisler*, 394 U.S. 526, 530–31, (1969) (discussing that for Congressional Districts, "the 'as nearly as practicable' standard requires that the State make a good-faith effort to achieve precise mathematical equality.") (internal citations omitted). The plan enacted by Act No. 118 moves some densely populated areas of Charleston and Richland Counties into Congressional District 6, while at the same time minimizing divisions of county boundaries in accordance with the House and Senate criteria. [*See, e.g.,* ECF No. 267 at ¶57; *see also* ECF No. 271 at 14-15]. Thus, Congressional District 1 includes all of Berkeley and Beaufort Counties,

which were previously split, as well as the coastal areas of Charleston and Colleton Counties, while still preserving the cores of the prior districts.

The Legislature has several noteworthy reasons to use the prior districts as a starting point and to attempt to retain at least the cores of those districts when drawing new Congressional Districts. *See Karcher v. Daggett*, 462 U.S. 725, 740 (1983) ("preserving the cores of prior districts" is among a state's "legitimate objectives"). For one, in our democratic system, representatives speak for the citizens they represent, so states have a legitimate interest in "promot[ing] 'constituency-representative relations'" by "maintaining existing relationships between incumbent congressmen and their constituents." *White v. Weiser*, 412 U.S. 783, 791–92 (1973). Maintaining the cores of these districts helps foster that relationship and allows the representative to better learn about the issues and needs of their district over the long term. In turn, citizens become more trusting of their representative to help them with those issues and needs that are specific to them as residents in a particular area.

Finally, as has been succinctly stated in this District, "the cores in existing districts are the clearest expression of the legislature's intent to group persons on a 'community of interest' basis." *Colleton Cnty. Council v. McConnell*, 201 F. Supp. 2d 618, 649 (D.S.C. 2002). And "because the cores are drawn with other traditional districting principles in mind, they will necessarily incorporate the state's other recognized interests in maintaining political boundaries, such as county and municipal lines." *Id.* Thus, retaining the cores of districts is a traditional redistricting principle that encompasses many of those expressly stated in the criteria adopted by both the House and the Senate. The prior districts were a starting point and changes were made to account for population shifts, while maintaining the cores of those prior districts. Plaintiffs cannot show that race predominated or that there was intentional racial discrimination on the parts of the House

18

Defendants or Senate Defendants. Thus, Plaintiffs fail to meet their burden and their claims in the Third Amended Complaint must be dismissed.

**IV.     Plaintiffs' Selection of Challenged Districts Forecloses Relief in Certain Areas.**

As discussed, Plaintiffs allege the Legislature "used race as a predominant factor to enact South Carolina Congressional Districts 1, 2, and 5." [ECF No. 267 at ¶9]. These are the only Congressional Districts that Plaintiffs challenge. Specifically, Plaintiffs do not challenge Congressional Districts 3, 4, 6, or 7. It is of particular note that Plaintiffs do not challenge Congressional District 6 despite numerous allegations regarding that district throughout the Third Amended Complaint. Because of the selection of the three Challenged Congressional Districts, Plaintiffs have foreclosed the opportunity for relief in certain areas of the state.

For example, Plaintiffs allege that "the Legislature unnecessarily splits Florence" County, among others. *Id.* at ¶153. Plaintiffs further allege that in splitting these counties, "Black communities within these areas are dispersed among CDs 2, 5, and 7." *Id.* However, Florence County is only split between Congressional Districts 6 and 7 – neither of which are Challenged Congressional Districts. Plaintiffs include a map of this area, which focuses on Lake City, South Carolina. Lake City was in Congressional District 6 in the prior plan and remains in Congressional District 6 under Act No. 118 and borders only Congressional District 7. Because Plaintiffs specifically declined to challenge either Congressional District 6 or 7, they are foreclosed from any relief in areas such as Lake City.

**CONCLUSION**

For the foregoing reasons, House Defendants respectfully move this Panel to dismiss Plaintiffs' Third Amended Complaint [ECF No. 267] with prejudice.

*[signature page follows]*

|  |  |
|---|---|
|  | Respectfully submitted, |
|  | *s/ Mark C. Moore* |
|  | Mark C. Moore (Fed. ID No. 4956) |
|  | Jennifer J. Hollingsworth (Fed. ID No. 11704) |
|  | Erica H. Wells (Fed. ID No. 13206) |
|  | Hamilton B. Barber (Fed. ID No. 13306) |
|  | Michael A. Parente (Fed. ID No. 13358) |
|  | NEXSEN PRUET, LLC |
|  | 1230 Main Street, Suite 700 |
|  | Columbia, SC 29201 |
|  | Telephone: 803.771.8900 |
|  | MMoore@nexsenpruet.com |
|  | JHollingsworth@nexsenpruet.com |
|  | EWells@nexsenpruet.com |
|  | HBarber@nexsenpruet.com |
|  | MParente@nexsenpruet.com |
|  |  |
|  | William W. Wilkins (Fed. ID No. 4662) |
|  | Andrew A. Mathias (Fed. ID No. 10166) |
|  | Konstantine P. Diamaduros (Fed. ID No. 12368) |
|  | NEXSEN PRUET, LLC |
|  | 104 S. Main Street, Suite 900 |
|  | Greenville, SC 29601 |
|  | Telephone: 864.370.2211 |
|  | BWilkins@nexsenpruet.com |
|  | AMathias@nexsenpruet.com |
|  | KDiamaduros@nexsenpruet.com |
|  |  |
|  | Rhett D. Ricard (Fed. ID No. 13549) |
|  | NEXSEN PRUET, LLC |
|  | 205 King Street, Suite 400 |
|  | Charleston, SC 29401 |
|  | Telephone: 843.720.1707 |
|  | RRicard@nexsenpruet.com |
| May 20, 2022 | *Attorneys for James H. Lucas, Chris Murphy,* |
| Columbia, South Carolina | *and Wallace H. Jordan* |