**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

THE SOUTH CAROLINA STATE
CONFERENCE OF THE NAACP, *et al.*,

               Plaintiffs,

      v.

THOMAS C. ALEXANDER, *et al.*,

               Defendants.

Case No.  3:21-cv-03302-MBS-TJH-RMG

**THREE-JUDGE PANEL**

**PLAINTIFFS' RESPONSE TO HOUSE DEFENDANTS' MOTION TO DISMISS
<u>PLAINTIFFS' THIRD AMENDED COMPLAINT</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .............................................................................................. ii

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 3

ARGUMENT .................................................................................................................. 4

    I.  Plaintiffs Have Standing to Challenge Congressional Districts 1, 2, and 5.................. 5

    II.  Plaintiffs Have Adequately Pleaded That Race Predominated Over Partisan and Other Considerations in The Legislature's Drawing of The Congressional Map. .............................................................................................................. 9

    III.  Plaintiffs Do Not Plead Partisan Gerrymandering and House Defendants Only Point to Disputed Issues That Cannot Be Resolved on The Pleadings....................... 13

    IV.  Defendants Wrongly Elevate Core Retention Above Other Redistricting Criteria and The U.S. Constitution. .............................................................. 17

    V.  To Cure Unconstitutional Conduct, Relief in Unchallenged Districts Is Not "Foreclosed." ......................................................................................... 20

CONCLUSION............................................................................................................... 22

# TABLE OF AUTHORITIES

**Cases**

*Alabama Legislative Black Caucus v. Alabama,*
    575 U.S. 254 (2015) .................................................................................... 5, 8, 9, 18

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ................................................................................................. 4

*Association of American Physicians & Surgeons v. U.S. Food & Drug Administration,*
    13 F.4th 531 (6th Cir. 2021) ................................................................................. 8

*Backus v. South Carolina,*
    857 F. Supp. 2d 553 (D.S.C. 2012) ..................................................................... 9

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007) ................................................................................................. 4

*Bethune-Hill v. Virginia State Board of Elections,*
    137 S. Ct. 788 (2017) ............................................................................ 6, 18, 19, 20

*Bethune-Hill v. Virginia State Board of Elections,*
    141 F. Supp. 3d 505 (E.D. Va. 2015) ................................................................ 18

*Bethune-Hill v. Virginia State Board of Elections,*
    326 F. Supp. 3d 128 (E.D. Va. 2018) ................................................................ 18

*Collins v. City of Norfolk, Virginia,*
    816 F.2d 932 (4th Cir. 1987) .............................................................................. 12

*Cooper v. Harris,*
    137 S. Ct. 1455 (2017) ..................................................................................... 12, 13

*Covington v. North Carolina,*
    283 F. Supp. 3d 410 (M.D.N.C. 2018) ......................................................... 20, 21

*Democratic Party of Virginia v. Brink,*
    --- F. Supp. 3d ---, No. 3:21-cv-756-HEH, 2022 WL 1159701 (E.D. Va. Apr. 19,
    2022) .......................................................................................................................... 8

*Easley v. Cromartie,*
    532 U.S. 234 (2001) ............................................................................................... 14

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.,*
    528 U.S. 167 (2000) ................................................................................................. 7

*Grand Strand Regional Medical Center, LLC v. Fairpay Solutions, LLC,*
    No. 4:08-cv-00952, 2008 WL 11349701 (D.S.C. May 13, 2008) ......................... 4

*Harris v. McCrory*,
    No. 1:13-cv-949, 2016 WL 3129213 (M.D.N.C. June 2, 2016)............................................ 20

*Hunt v. Cromartie*,
    526 U.S. 541 (1999)............................................................................................................ 14

*League of United Latin American Citizens v. Abbott*,
    No. 1:21-cv-00991, 2022 WL 174525 (W.D. Tex. Jan. 18, 2022)...................................... 17

*Lerman v. Board of Elections in the City of New York*,
    232 F.3d 135 (2d Cir. 2000)................................................................................................. 6

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992).......................................................................................................... 5, 8

*McConchie v. Scholz*,
    --- F. Supp. 3d ---, No. 21-cv-3091, 2021 WL 6197318 (N.D. Ill. Dec. 30, 2021) ......... 14, 15

*Meeks v. Emiabata*,
    No. 7:14CV00534, 2015 WL 1636800 (W.D. Va. Apr. 13, 2015)...................................... 20

*Miller v. Johnson*,
    515 U.S. 900 (1995)........................................................................................................ 6, 18

*North Carolina State Conference of NAACP v. McCrory*,
    831 F.3d 204 (4th Cir. 2016) .......................................................................................... 12, 20

*North Carolina v. Covington*,
    138 S. Ct. 2548 (2018)....................................................................................................... 20

*Ostrzenski v. Seigel*,
    177 F.3d 245 (4th Cir. 1999) .............................................................................................. 21

*Pledger v. Lynch*,
    5 F.4th 511 (4th Cir. 2021) .................................................................................................. 4

*Republican Party of North Carolina v. Martin*,
    980 F.2d 943 (4th Cir. 1992) ............................................................................................... 17

*Shaw v. Hunt*,
    517 U.S. 899 (1996)............................................................................................................ 19

*Shaw v. Reno*,
    509 U.S. 630 (1993)............................................................................................................. 7

*Simon v. Eastern Kentucky Welfare Rights Organization*,
    426 U.S. 26 (1976).............................................................................................................. 5

*Southern Walk at Broadlands Homeowner's Association, Inc. v. OpenBand at Broadlands, LLC*,
713 F.3d 175 (4th Cir. 2013) ............................................................... 8

*United States v. Hays*,
515 U.S. 737 (1995) ............................................................... 5, 6, 8, 21

*Veasey v. Abbott*,
830 F.3d 216 (5th Cir. 2016) ............................................................... 13

*Warth v. Seldin*,
422 U.S. 490 (1975) ............................................................... 7

*Wisconsin Legislature v. Wisconsin Elections Commission*,
142 S. Ct. 1245 (2022) ............................................................... 7

*Wright v. North Carolina*,
787 F.3d 256 (4th Cir. 2015) ............................................................... 4

**Treatises**

5A Charles Allen Wright & Arthur R. Miller,
*Federal Practice and Procedure § 1357* (2d ed.1990) ............................................................... 21

## INTRODUCTION

Defendants violated the Fourteenth and Fifteenth Amendments of the U.S. Constitution by enacting a Congressional map that discriminates against Black voters in South Carolina. Plaintiffs ask this Court to enjoin specific Congressional Districts, namely 1, 2, and 5 ("CDs" or "Challenged Districts") adopted in Senate Bill 865 ("S. 865") that were (1) drawn using race as *the* predominant factor in a manner not narrowly tailored to comply with Section 2 of the Voting Rights Act ("VRA") or for any other compelling government interest ("racial gerrymandering" claim) and (2) motivated, at least in part, by *a* discriminatory purpose ("intentional discrimination" claim). The 51-page Third Amended Complaint ("TAC") (ECF No. 267), is replete with detailed facts that plausibly allege each of these violations. *E.g.*, TAC ¶¶ 2–4, 11, 16, 143, 148–59, 163–66.

This Court already rejected many of the arguments that House Defendants now repackage in their Motion to Dismiss. *See* Order & Op., ECF No. 161, at 7. In their Motion to Dismiss ("Motion" or "House Defs.' Mot.") (ECF No. 272), House Defendants once again mischaracterize Plaintiffs' arguments, misapply case-law, and ignore or dispute well-pled factual allegations that must be resolved at trial.

First, the House Defendants again argue that Plaintiffs (or, in the case of the South Carolina State Conference of the NAACP ("SC NAACP"), its members) lack standing to challenge the redistricting of districts they live and vote in. This claim has been repeatedly rejected by this Court and again fails. No facts about Plaintiffs have changed since this Court's previous Order. SC NAACP has associational standing because, as an organization with 77 branches across South Carolina's 46 counties and over 13,000 members, it is exceedingly plausible that a member resides in each of the three Challenged Districts. In any event, House Defendants concede that NAACP has produced membership lists showing it has members who live in at least two of the three

1

Challenged Districts (*i.e.*, CDs 2 and 5).[1]  House Defs.' Mot. at 8.  Meanwhile, Plaintiff Taiwan Scott lives in CD 1, a Challenged District, and is a paradigmatic plaintiff in a racial gerrymandering case.

Next, House Defendants argue that because Plaintiffs reference party affiliation to allege that *race* predominated in the Legislature's mapmaking process, Plaintiffs mount non-justiciable partisan gerrymandering claims.  *Id.* at 10–15.  Yet nowhere in Plaintiffs' TAC do Plaintiffs argue that party considerations predominated in the redistricting process.  *See generally* TAC.  Instead, Plaintiffs reference party affiliation (based on an analysis of voters' participation in gubernatorial elections) to demonstrate how the mapmakers treated Black Democrats differently from white Democrats in drawing the map, such that Black voters bore the brunt of movement in and out of districts to dilute their vote.  *See, e.g.*, TAC ¶¶ 5, 150, 157.  House Defendants' Motion fails to acknowledge, much less undercut, Plaintiffs' district-by-district description of Defendants' targeted decisions to crack Black communities and voters—not white Democrat voters—across South Carolina.  *Id.* ¶¶ 148–59.

Finally, the House Defendants cherry-pick one traditional redistricting principle ("core retention") that purportedly explains voters' placement within and outside of districts.  But the law is clear that legislatures can consider traditional redistricting principles and still racially gerrymander.  And measured against the facts alleged in the Complaint, their contentions provide no basis to dismiss this case.  Notably, House Defendants cite no cases—nor could they—where a court has ever held that a ruling on this metric has warranted dismissal at the pleading stage based on a Rule 12 motion.

---

[1]    A list of a few of Plaintiff SC NAACP's members residing in the Challenged Districts is forthcoming and will be subject to "attorney-eyes only" protections.

House Defendants also ignore significant portions of the TAC describing the sequence of events that included many members of the public—not just SC NAACP—proposing non-gerrymandered and non-dilutive alternative Congressional maps. They neglect to address procedural flaws that led to the map's adoption. They likewise avoid mention of being confronted with evidence of the likely harm of the map to prevent Black voters from having fair opportunities to elect candidates of their choice or otherwise impact elections.

Instead, House Defendants ask this Court to prematurely act as a factfinder and improperly weigh the facts and resolve complex issues on their theory of the case on a motion to dismiss, when their substantive arguments and defenses involve adjudication on the merits, typically after summary judgment filings or trial. What House Defendants fail to offer is any law that undercuts the plausibility of allegations in the Third Amended Complaint or allows obviously contested issues to be resolved at the pleading stage. The Court should therefore find yet again that "Defendants have provided no basis for dismissing Plaintiffs' serious allegations at this early stage." Order & Op., ECF No. 161, at 7.

## BACKGROUND

In South Carolina, the 2020 Census revealed "significant population shifts and growth in the past decade." TAC ¶ 143. These "changes created unequal apportionment among South Carolina's seven congressional districts." *Id*. Most notably, CD 1 was "nearly 12% overpopulated, while CD 6 was 11.59% underpopulated." *Id.* These population and demographic shifts needed to be addressed to ensure equality of access to representatives to all people and voters in the state, as well as the non-dilution of the vote of protected Black citizens.

Having finally redrawn South Carolina's U.S. Congressional map—which was signed into law on January 26, 2022—the Legislature enacted a racially gerrymandered map that, consistent with previous redistricting cycles, discriminates against Black voters. *Id.* ¶¶ 1, 31. Among other

3

things, the enacted map "cracks" Black communities of interest in Charleston, Orangeburg, Florence, Richland, and Sumter Counties, dispersing Black voters across predominantly white majority districts. *Id.* ¶¶ 151, 153. It also ignores the many South Carolinians who implored lawmakers to draw fair and nondiscriminatory maps that comply with the U.S. Constitution. *Id.* ¶ 144–50. In its enactment, the Legislature chose perhaps the worst option of the available maps— of those that had been proposed either by the Legislature or by members of the public—in terms of its harmful impact on Black voters. Accordingly, Plaintiffs filed a Third Amended Complaint.

## ARGUMENT

A motion to dismiss asks the Court to determine whether the complaint alleges a valid cause of action. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007). It "should not be granted unless it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitle [them] to relief." *Grand Strand Reg'l Med. Ctr., LLC v. Fairpay Sols., LLC*, No. 4:08-cv-00952, 2008 WL 11349701, at *1 (D.S.C. May 13, 2008). Under Rule 8, a Plaintiff must only allege a "short and plain statement of" the claim. *Pledger v. Lynch*, 5 F.4th 511, 519 (4th Cir. 2021) (quotation marks omitted). Courts accept all factual allegations in the complaint as true and draw "all reasonable inferences in favor of the plaintiff." *Wright v. North Carolina*, 787 F.3d 256, 263 (4th Cir. 2015) (citation omitted).

The complaint need only "contain sufficient facts to state a claim that is plausible on its face," and Plaintiffs "need only give the defendant fair notice of what the claim is and the grounds upon which it rests." *Id.* (citation omitted); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Courts view the complaint with a "forgiving lens" and construe it "liberally so as to do substantial justice" at the motion to dismiss stage. *Wright*, 787 F.3d at 263, 265.

## I.    PLAINTIFFS HAVE STANDING TO CHALLENGE CONGRESSIONAL DISTRICTS 1, 2, AND 5.

To have standing, plaintiffs must have suffered or show they will imminently suffer an "injury in fact" that is "concrete and particularized." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Second, plaintiffs must show a causal connection between the injury alleged and the conduct complained of. *See id.* Third, plaintiffs must establish that the injury will "be redressed by a favorable decision." *Id.* at 561 (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41–42 (1976)).

Plaintiffs have standing to challenge the enacted Challenged Districts as the product of unconstitutional racial gerrymandering. That is because "[w]here a plaintiff resides in a racially gerrymandered district . . . the plaintiff has been denied equal treatment because of the legislature's reliance on racial criteria" without a legally sufficient basis. *United States v. Hays*, 515 U.S. 737, 744–45 (1995). Plaintiffs who live in the challenged district "therefore ha[ve] standing to challenge the legislature's action." *Id.*

Indeed, House Defendants' Motion confirms Plaintiffs' standing to challenge all three Challenged Districts. It acknowledges Plaintiffs' allegation—which must be taken as true—that Mr. Scott lives in CD 1. House Defs.' Mot. at 7. It concedes that Mr. Scott lived in CD 1, both, before the latest redistricting and after it. *Id.* And it acknowledges that in this action, SC NAACP "produced a list of members . . . [which] shows members in . . . Congressional Districts 2 and 5[.]" Id. at 8. Put simply, House Defendants accept that Mr. Scott and some of SC NAACP's members live in each of the "district[s] that [they] allege[] [were] the product of a racial gerrymander." *Al. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 269 (2015) ("*ALBC*"). That is enough for Article III standing. *See generally* Order & Op., ECF No. 161, at 3–6.

House Defendants incorrectly argue that Mr. Scott fails to allege that he has "suffered personal harms related to discrimination . . . as a result of" the enacted CD 1.  House Defs.' Mot. at 8.  That fundamentally misunderstands redistricting law, which demands only that Mr. Scott, an eligible and registered voter, live in the district he challenges.  *See, e.g.*, *Miller v. Johnson*, 515 U.S. 900, 909 (1995) ("As residents of the challenged [district], all appellees had standing.").  Mr. Scott has shown that he lives in CD 1, as this Court already concluded once.  *See* Order & Op., ECF No. 161, at 4 (noting Mr. Scott "is a Black voter living in that district," referring to CD 1); *see also* TAC ¶ 17–18.  House Defendants again "offer[] no basis to question that straightforward factual allegation."  Order & Op., ECF No. 161, at 4.  Instead, they confirm it.  *See* House Defs.' Mot. at 7 ("Plaintiffs allege that Scott lives in Congressional District 1 in Hilton Head . . . . [After] 2011 redistricting cycle, Hilton Head was in [CD 1] and now . . . remains in [CD 1].").  Thus, Mr. Scott undisputedly lives in CD 1.

Mr. Scott's injury necessarily follows because the very act of racial classification that Mr. Scott alleges resulted in CD 1's overpopulation and allows him to "[d]emonstrat[e] the individualized harm [that] standing doctrine requires."  *Hays*, 515 U.S. at 744; *see also Lerman v. Bd. of Elections in City of New York*, 232 F.3d 135, 142–43 (2d Cir. 2000) ("In the context of so-called 'racial gerrymandering' . . . the injury-in-fact is caused by the 'special representational harms' that result from being identified and placed in a particular electoral district based on one's race[.]").  Any House Defendants' claim to the contrary misstates the law.  Their standard ignores that a plaintiff that lives in a racially gerrymandered district suffers direct "harms that flow from racial sorting."  *Bethune-Hill v. Va. State Bd. of Elections*, 137 S. Ct. 788, 797 (2017). And that is true because "districting maps that sort voters on the basis of race 'are by their very nature

odious.'" *Wis. Legis. v. Wis. Elections Comm'n*, 142 S. Ct. 1245, 1248 (2022) (quoting *Shaw v. Reno*, 509 U.S. 630, 643 (1993)).

For its part, SC NAACP has standing to challenge districts 1, 2, and 5 "on behalf of its members [who] would otherwise have standing to sue in their own right[.]" *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).[2]  As noted, the House Defendants concede that SC NAACP has "previously produced a list of members" showing members in "Congressional Districts 2 and 5." House Defs.' Mot. at 8.  And in tandem with Mr. Scott in CD 1, House Defendants have acknowledged a Plaintiff or Plaintiff's members live in all three Challenged Districts—House Defendants' standing argument falls apart within their Motion's four corners.

But SC NAACP also adequately pleads that it has 13,000 members "across all 46 counties" in South Carolina, and that some of them live in "*each* of the Challenged Congressional districts." TAC ¶¶ 15–17 (emphasis added).  It alleges that many of those members will be imminently harmed by being "assign[ed] to unconstitutionally gerrymandered" and "purposefully dilutive districts." *Id.* ¶ 16.  On a Rule 12(b) motion, where the Court deems a plaintiff's factual allegations as true and assumes inferences in its favor, these allegations suffice to conclude that SC NAACP

---

[2]     To properly rely on "associational" or "representational" standing, an association must satisfy two other factors: (1) the interests at stake in the dispute must be "germane to the organization's purpose," and (2) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc.*, 528 U.S. at 181 (citation omitted).  House Defendants' Motion does not challenge either of these factors.  *See generally* House Defs.' Mot.  In any event, SC NAACP clearly meets them: the Court has already recognized that "combatting racial gerrymandering is unquestionably 'germane' to the NAACP's purpose." Order & Op., ECF No. 161, at 4.  And because Plaintiffs seek injunctive relief, the individual participation of the SC NAACP's members is not required.  *See Warth v. Seldin*, 422 U.S. 490, 515 (1975); *see also* Order & Op., ECF No. 161, at 4 (noting House Defendants "offered no explanation why evidence regarding individual voters would be necessary to resolve [] racial gerrymandering claims").

has standing to challenge all the districts at issue, including CD 1.  *See ALBC*, 575 U.S. at 269–70; *see also Lujan*, 504 U.S. at 560–61.  They give rise to the "common sense inference" that members live in each challenged district, which is "strong enough" to defeat the House Defendants' Motion.  *ALBC*, 575 U.S. at 270.[3]

Still, House Defendants suggest that SC NAACP would not meet the burden needed to survive a motion on the pleadings on standing absent further showing of injury to its members.  House Defs.' Mot. at 8–10.  That is wrong, for reasons this Court has already put well: "the primary injury in racial gerrymandering cases" *is* "being subjected to 'racial classification.'"  Order & Op., ECF No. 161, at 6.  Ultimately House Defendants' arguments ignore that Plaintiffs' central claim alleges that the sorting of voters by race, without a legally sufficient justification that resulted in the Challenged Districts, "threaten[s] to stigmatize individuals by reasons of their membership in a racial group . . . ."  *Hays*, 515 U.S. at 745.  That constitutes an injury sufficient to confer standing to SC NAACP by way of its members, who reside in each of the Challenged Districts.

Lastly, House Defendants' reliance on case law pointing to how racial gerrymandering claims demand a "district-by-district" analysis requiring a plaintiff to live in each challenged district misses the mark.  *See* House Defs.' Mot. at 6–7.  That principle is correct but irrelevant as

---

[3]     House Defendants heavily rely on *Association of American Physicians & Surgeons v. U.S. Food & Drug Administration*, a recent out-of-circuit decision holding that an "organization must [] identify a member who has suffered (or is about to suffer) a concrete and particularized injury from the defendant's conduct."  13 F.4th 531, 543 (6th Cir. 2021).  If that decision cannot be reconciled with the Supreme Court's decision in *ALBC*, *Physicians & Surgeons* is wrong.  Similarly, the Fourth Circuit's decision in *Southern Walk at Broadlands Homeowner's Association, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175 (4th Cir. 2013), which predates *ALBC*, cannot stand for a rule that SC NAACP must identify individual members to sufficiently allege associational standing because in *ALBC*, "the Supreme Court *did not* require the organization to point to specific individuals to prove standing," *Democratic Party of Va. v. Brink*, --- F. Supp. 3d ---, No. 3:21-cv-756-HEH, 2022 WL 1159701, at *5 (E.D. Va. Apr. 19, 2022); *see also id.* n.10 (noting *ALBC* "moderates [] slightly" associational standing).

applied to this lawsuit. Plaintiffs don't allege that "'they reside in a district *adjacent to* a racially gerrymandered district.'" *Id.* at 7 (quoting *Backus v. South Carolina*, 857 F. Supp. 2d 553, 560 (D.S.C. 2012) (emphasis added)). They allege that they or, in the case of SC NAACP, their members live *in* the districts that they claim are racially gerrymandered. Plaintiffs are not voters who "live[] elsewhere." *ALBC*, 575 U.S. at 263. They are or include members who have been "directly harmed by the Challenged Congressional Districts," House Defs.' Mot. at 7, and are "directly threaten[ed]" by the personal, attending harms of racial gerrymandering, *see ALBC*, 575 U.S at 263. That is "sufficient" to challenge the districts in which they or their members live. Order & Op., ECF No. 161, at 6.

## II.    PLAINTIFFS HAVE ADEQUATELY PLEADED THAT RACE PREDOMINATED OVER PARTISAN AND OTHER CONSIDERATIONS IN THE LEGISLATURE'S DRAWING OF THE CONGRESSIONAL MAP.[4]

Plaintiffs sufficiently allege that race predominated over partisan and other considerations in the Legislature's decision to move specific voters into or out of the Challenged Districts. Specifically, the TAC contains numerous well-pleaded allegations that, in drawing the Challenged Districts, mapmakers subordinated traditional race-neutral redistricting principles to race. *See*, *e.g.*, TAC ¶¶ 9, 156. Plaintiffs also allege that the record is devoid of any pre-enactment legislative analysis, including of racially polarized voting ("RPV")—a key element in demonstrating the need for Section 2 of the Voting Rights Act's race-conscious remedial redistricting—to demonstrate that the Legislature's decisions were narrowly tailored to comply with Section 2, a compelling governmental interest. *Id.* ¶ 7, 128, 133. Indeed, the TAC includes specific allegations that the legislative sponsors affirmatively decided *not* to conduct an RPV analysis. *Id.*

---

[4]     *See also* Pls.' Senate Defs.' Mot. to Dismiss Third Am. Compl., Part I.A.

Among other allegations, Plaintiffs have alleged that South Carolina voters were sorted into, left out of, or kept in Challenged Districts for race-predominant reasons, *id.* ¶¶ 5, 9, 18, 149, 156, 163–64; that white and Black voters likely of the same political party (based on Plaintiffs' analysis of primary gubernatorial elections) were treated differently under the map, *id.* ¶¶ 5, 8, 150, 158–59; that the Legislature eschewed traditional redistricting principles like compactness, respecting county and municipal boundaries (by *inter alia* cracking Charleston, Orangeburg, Florence, Richland, and Sumter Counties), and respecting communities of actual shared interests, to enact S. 865, *id.* ¶¶ 156, 164; that it was repeatedly put on notice that it could easily have avoided the cracking of Black voters across Congressional Districts, *id.* ¶ 68; that given patterns of RPV, which members of the public brought to light through the legislative process, *id.* ¶ 72, legislative choices to crack voters and subsume them in districts in which white voters are the majority—and in some cases supermajority—limit or deny entirely the ability of Black voters to impact elections in the Challenged Districts, *id.* ¶¶ 5, 148, 152–53, 171 (detailing the ways in which Black voters were moved out of CD 1 as well as "dispersed among CDs 2, 5, and 7"); that the Legislature engaged in exclusionary, non-transparent, and irregular procedures to enact S. 865, *id.* ¶¶ 64–66, 172, including defying rules to permit a Black legislative member to lead in legislative proceedings, *id.* ¶ 95; and that these legislative choices occurred against the backdrop of a history of discrimination against Black voters in South Carolina that includes the use of redistricting schemes to dilute Black voting power, *id.* ¶¶ 37–38. These specific allegations, which House Defendants largely fail to acknowledge, sufficiently plead the constitutional violations alleged and confirm that the enacted map will need to be evaluated under a factually intensive strict scrutiny standard.

Indeed, the TAC describes these allegations in detail, including by pointing to the way in which the Legislature moved a disproportionate number of white voters who have preferred Democratic candidates in recent elections from CD 2 into CD 6, the lone district in which Black voters had been the majority. *Id.* ¶ 150. Conversely, the enacted plan *left* areas with high concentrations of Black voters who have recently preferred Democratic candidates in CD 2. *Id.* These legislative choices support Plaintiffs' allegation that it is reasonable to infer that race, not partisan affiliation, drove the sorting of voters into districts in the enacted plan. That is, if party affiliation, not racial vote dilution, drove the drawing of these lines, then there should be no clear difference in how Black and white-affiliated Democratic voters were split between districts. Moreover, by showing that the Legislature surgically left behind parts of the underpopulated CD 6 with high Black voter concentrations, the TAC plausibly alleges that the enacted plan set out to correct the state's malapportionment, while ensuring that Black voters could neither elect a candidate of their choice nor impact elections in any district *other than* CD 6. *Id.* ¶ 148.

This strategy of disadvantaging Black voters is particularly evident in the way the Legislature split communities of interest of Black voters in Florence, Orangeburg, Richland, and Sumter Counties with the result of dispersing Black voters across CDs 2, 5, and 7, which are historically—and continue to be—overwhelmingly white-majority districts. *Id.* ¶¶ 151, 153. By "cracking" these communities into districts with predominately white voting-age populations, the Legislature has drastically reduced the impact Black voters can have on Congressional elections in those districts. *See id.* ¶ 153. In CD 5, the enacted plan went further, moving a disproportionate number of white voters into the redrawn district, driving down the percentage of Black voters in that district and making it even more unlikely that Black communities are able to help choose their elected representatives. *Id.* ¶ 155.

Similarly, the Legislature ignored the pleas of the public and various legislators to keep Charleston County whole in CD 1, instead splitting it between CDs 1 and 6 along racial lines and fracturing a community of interest of Black voters. *See id.* ¶¶ 73, 78, 80, 83, 86, 93, 96, 99, 108, 111, 126–27, 134, 139, 144–45, 152, 154. For example, the Legislature "cracked" historically-Black areas in West Ashley and split the cities of North Charleston and Charleston, which "form a single community of interest based on shared history, voting patterns, and socioeconomic realities." *Id.* ¶¶ 126, 145. Indeed, in the legislative session at issue, Defendant Representative Jordan, a white legislative member, admitted "that Charleston County is being split differently than under current district boundaries." TAC ¶ 111.

This race-based sorting of voters has no legitimate justification and raises questions that cannot be resolved on a motion to dismiss. Notably, the TAC alleges that one of the bill's sponsors, Senator Campsen, also a white legislative member, failed to conduct a functional Section 2 analysis prior to or during consideration of the congressional map. *See id.* ¶¶ 128, 133; *see also id.* ¶¶ 7. That fact is crucial because an RPV analysis—*i.e.*, racial bloc voting by Black and white voters and the degree of any white cross-over voting for the candidates preferred by Black voters—is a key consideration to determine whether a redistricting plan complies with the VRA. *See N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 221 (4th Cir. 2016) (RPV is "one of the critical background facts of which a court must take notice" in Section 2 cases); *Collins v. City of Norfolk, Va.*, 816 F.2d 932, 936–38 (4th Cir. 1987) (RPV is a "cardinal factor" in determining Section 2 liability). And "a legislature undertaking a redistricting *must* assess whether the new districts it contemplates . . . conform to the VRA's requirements." *Cooper v. Harris*, 137 S. Ct. 1455, 1471 (2017) (emphasis added). Yet in response to a question by Sen. Harpootlian, Sen. Campsen confirmed for the full Senate that his plan did not include a RPV analysis. TAC ¶ 133. According

to Sen. Campsen, the sponsors "didn't even look at race numbers" or ask "what's the BVAP"[5] of

any given district. *Id.* The Legislature's apparent refusal to study RPV or its impact supports an

inference that the bill's proponents endeavored to avoid, or even hide from, its results. *See, e.g.*,

*Veasey v. Abbott*, 830 F.3d 216, 236 (5th Cir. 2016) (en banc) (legislators' willful avoidance of

known effect on minority voters did not preclude finding of actual knowledge of facts that are

"common sense").

## III.     PLAINTIFFS DO NOT PLEAD PARTISAN GERRYMANDERING AND HOUSE DEFENDANTS ONLY POINT TO DISPUTED ISSUES THAT CANNOT BE RESOLVED ON THE PLEADINGS.

Plaintiffs robustly allege racial gerrymandering and intentional racial discrimination, both

of which demand a fact-based analysis. Instead of squarely addressing why those allegations

should be dismissed on the pleadings, House Defendants wrongly recharacterize Plaintiffs'

allegations as non-justiciable partisan gerrymandering claims. House Defs.' Mot. at 10. But the

Court rejected that theory once before in this action. *See* Order & Op., ECF No. 161, at 8

("Defendants identify no authority for the proposition that the court can forcibly recharacterize the

allegations of a plaintiff's complaint in ruling on a motion to dismiss."). And this theory fails

again.

As this Court has explained, in this procedural posture, Plaintiffs need only "plausibly

alleg[e] that [the] State 'subordinated other factors—compactness, respect for political

subdivisions, partisan advantage, what have you—to 'racial considerations.'" *Id.* at 7 (citing

*Cooper*, 137 S. Ct. at 1464). That demands a "'a sensitive inquiry' into all 'circumstantial and

direct evidence of intent' to assess whether the plaintiffs have managed to disentangle race from

politics and prove that the former drove a district's lines." *Cooper*, 137 S. Ct. at 1473 (quoting

---

[5]     "BVAP" refers to Black voting-age population in a given district. *See* TAC ¶ 7.

*Hunt v. Cromartie*, 526 U.S. 541, 546 (1999) (*Cromartie I*)); *see also Easley v. Cromartie*, 532 U.S. 234, 243–44 (2001) (*Cromartie II*) (carefully evaluating evidence presented *at trial* to determine whether race rather than partisanship predominated).

Plaintiffs allege claims to make a plausible showing that racial considerations predominated over partisan (and other) considerations in the Legislature's enactment of the Challenged Districts. Plaintiffs' TAC provides a district-by-district description of Defendants' choices to sort voters by race in and out of districts without a compelling justification. *See*, *e.g.*, TAC ¶¶ 148–59. As just one example, Plaintiffs allege that "[t]he Legislature significantly dropped the BVAP in CD 6, and, given RPV patterns, also ensured that no other district would have a meaningful opportunity for Black voters to elect candidates of their choice." *Id.* ¶ 148. Plaintiffs also allege that while the Legislature "moved [voting districts] [("VTDs")] with a significant majority of white voters . . . in CD 2 and brought them into CD 6," it left "VTDs with a majority of Black voters . . . in CD2, though those VTDs were available to be moved into CD6," *despite* the fact that both voting groups preferred Democratic candidates, thereby creating "an inference that race, not party, drove the selection of voters what were moved into CD 6 and left in CD 2." *Id.* ¶ 150. *See also* TAC ¶¶ 5–9 (S. 865 discriminates on the basis of race in violation the U.S. Constitution), *id.* ¶¶ 150–158 (county-by-county description of Defendants' decisions to draw district lines on the basis of race).

House Defendants do not contest these facts; they instead ask the Court to dismiss this case on partisan gerrymandering claims that no party to this suit raised. And they point the Court to *McConchie v. Scholz*, --- F. Supp. 3d ---, No. 21-cv-3091, 2021 WL 6197318 (N.D. Ill. Dec. 30, 2021), a racial gerrymandering case where the district court "reject[ed] all of the plaintiffs' proposed remedial maps." House Defs.' Mot. at 11. But that case is inapposite, because

*McConchie* went to the court on a summary judgment posture. *See McConchie*, 2021 WL 6197318, at *3. It was only after reviewing the district-specific facts before it, including "extensive fact and expert discovery," holding an evidentiary hearing, and conducting an oral argument, that the district court in *McConchie* issued its ruling. *Id.* at *3–4; *see also id.* at *30 (noting "ample evidence" in the record of "crossover voting to defeat any claim of racially polarized voting"). In any event, the court in *McConchie* did not "forcibly recharacterize" those plaintiffs' complaint as a partisan gerrymandering case, as House Defendants try to do here. Order & Op., ECF No. 161 at 8. It merely weighed the "extensive," post-discovery evidentiary record before it and ruled that plaintiffs failed to show by a preponderance of the evidence that race, not partisanship, drove the legislature's redistricting. *McConchie*, 2021 WL 6197318, at *3.

Here, without any evidence before the Court, House Defendants do not explain why Plaintiffs' claims should be recast as partisan gerrymandering claims. Nor could they. Nowhere in Plaintiffs' 51-page TAC do Plaintiffs allege that partisan considerations predominated in the Legislature's map drawing process. On the contrary, Plaintiffs repeatedly allege that Black voters, as compared to white voters, were moved in, out of, or kept in districts in South Carolina regardless of their party affiliation consistently and in a way that reduced the political power of Black communities. TAC ¶ 5 (the key denominator in who was moved in and out of voting districts *was race, not party*); *id.* ¶ 8 ("The Legislature's line-drawing, as well as an analysis of how Black and white voters in the precincts moved out of CD 1 . . . share party preferences, but were sorted differently between these districts, makes clear that *race drove the selection of voters* brought into CD 6 over those left in CD 1 from areas of Charleston."); *id.* ¶ 150 ("There is . . . an inference that *race, not party*, drove the selection of voters that were moved into CD 6 and left in CD 2."); *id.* ¶ 157 ("[Regardless of party affiliation,] Defendants chose to keep the majority of Black voters . .

15

. inside CD 6, while keeping a much smaller percentage of white voters[.]"); *id.* ¶ 158 ("Defendants kept the vast majority of white voters inside CD 1, *regardless of partisan affiliation*.  Conversely, Defendants only kept a much smaller percentage of possible Black voters in CD 1, again *regardless of partisan affiliation*."); *id.* (the likelihood of voting districts being moved from or kept inside CDs 1 and 6 changed depending on the size of the Black Voting Age Population[, regardless of party affiliation]) (emphases added).  Further, Plaintiff South Carolina NAACP is a nonpartisan organization, which aims to "remove all barriers of racial discrimination," regardless of party affiliation.  *Id.* ¶ 13.  And Plaintiff Taiwan Scott brings this case as a non-party affiliated individual who is harmed by the Legislature's race-based sorting of voters without legal justification and intentional "dilut[ion of] Black voting power in South Carolina."  *Id.* ¶ 18.

In a last-ditch attempt, House Defendants highlight one area that Plaintiffs have used as an illustration in the TAC, offer alternative theories to explain its shape, and then claim that it "demonstrates that race-neutral principles, such as unifying communities of interest and core retention predominated the process—not race."  House Defs.' Mot. at 13; 14–15.  Putting aside these claims' inaccuracy, by offering alternative *post-hoc* theories to justify the enacted maps' lines in contested areas, House Defendants concede disputes of fact and show that this cannot be the end of the line for this case.  *See id*. at 14 ("The area noted by Plaintiffs that was moved from Congressional District 2 into Congressional District 6 has a BVAP of roughly 13.5%, yet still favors Democratic candidates, by a more than 2-1 preference for a Democrat candidate among voters.  Thus, it is irrelevant what the racial make-up of this area is because the voting patterns of this area are well-known.").  The movement of voters described in the TAC more clearly gives rise to a reasonable inference that race, not party, drove the selection of voters moved or left in CD 2.  Put another way, House Defendants' assertions "do not on their own render Plaintiffs'

allegations implausible." *League of United Latin Am. Citizens v. Abbott*, No. 1:21-cv-00991, 2022 WL 174525, at *4 (W.D. Tex. Jan. 18, 2022). They only raise factual disputes that cannot be decided at this stage, because "[a] motion to dismiss . . . does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citations and quotations omitted); *see also id.* at 955 (denying motion to dismiss in gerrymandering case where complaint "include[d] numerous specific allegations of discriminatory intent").

Instead, Plaintiffs' have clearly made out a plausible racial gerrymandering claim against the Challenged Districts. *E.g.*, TAC ¶¶ 2–4, 11, 16, 143, 148–59, 163–66. As this Court rightly held before, if Defendants nonetheless "wish to argue the districts they have drawn are a race-neutral partisan gerrymander, they can attempt to do so at trial." Order & Op., ECF No. 161, at 8.

## IV.    DEFENDANTS WRONGLY ELEVATE CORE RETENTION ABOVE OTHER REDISTRICTING CRITERIA AND THE U.S. CONSTITUTION.[6]

As described above, House Defendants cannot wave away Plaintiffs' detailed allegations that the Legislature subordinated many traditional redistricting principles to race-based sorting of voters without a compelling justification, including but not limited to "compactness, respecting county and municipal boundaries, and respecting communities of actual shared interests." TAC ¶ 156; *see also id.* ¶¶ 144, 152–53, 158–59. Instead, House Defendants put "core retention" on a pedestal as the driving explanation for South Carolina's new Congressional map and in an attempt to undercut Plaintiffs' racial gerrymandering claim. *See* House Defs.' Mot. at 15–19. But this argument lacks merit and does not entitle House Defendants to relief on the pleadings.

To start, House Defendants' view is wrong as a matter of law. Retention of the core of districts is not a neutral redistricting criterion that standing alone defeats a racial gerrymandering

---

[6]    *See also* Pls.' Resp. to Senate Defs.' Mot. to Dismiss Third Am. Compl., Part I.B.

claim. That is, "[c]ore retention is a necessary feature of nearly every redistricting," because "unless a district is moved entirely, . . . a new district necessarily will involve at least some change to the original geography." *Bethune-Hill v. Va. State Bd. of Elections*, 326 F. Supp. 3d 128, 173 (E.D. Va. 2018). Where, as here, the Challenged Districts were changed during the legislative process, core retention does not provide any insight into the central racial gerrymandering inquiry: "*which* voters the legislature decides to choose" when sorting them inside or outside of a district. *ALBC*, 575 U.S. at 273. Courts must still assess the basis upon which map drawers—here, Defendants during this redistricting cycle—placed voters "'within or without a particular district.'" *See Bethune-Hill v. Virginia State Bd. of Elections*, 141 F. Supp. 3d 505, 544–45 (E.D. Va. 2015), *aff'd in part, vacated in part*, 137 S. Ct. 788 (citing *Miller*, 515 U.S. at 916). In short, "[c]ore retention alone cannot be used to save an otherwise offensive district . . . ." *Id.* at 565.

Moreover, whether the 2011 map drawn in response to the population and demographics of the 2010 Census was upheld under a different legal standard (*i.e.*, the non-retrogression standard of Section 5 of the VRA) cannot answer whether the State's *current* maps reflect actual demographic trends or comply with the U.S. Constitution. Plaintiffs here allege that "S. 865 flies in the face of the geography of the state post-2020 which reflects the movement of Black people to the South Carolina coast," among other areas of the state, and that under a constitutional theory, S. 865 intentionally cracks Black voters among districts to dilute their voting power. TAC ¶¶ 7, 154. Put simply, "core preservation[] is not directly relevant to the origin of the *new* district inhabitants" in South Carolina's new Congressional districts. *ALBC*, 575 U.S. at 274.

Second, core preservation was not prioritized as a chief redistricting criterion under the Legislature's own guidelines, which only listed it as one of several criteria that legislators could consider. *See* TAC ¶ 40 n.8 (citing House 2021 Guidelines), ¶ 50 n.9 (citing Senate 2021

Guidelines).  A reasonable inference can be drawn that elevating that lone principle over others for the first time now in the course of this litigation is an improper, "*post hoc* justification[]" because it was not advanced as the actual top priority during the redistricting process.  *Bethune-Hill*, 137 S. Ct. at 799; *see generally Shaw v. Hunt*, 517 U.S. 899, 908 n.4 (1996) ("To be a compelling interest, the State must show that the alleged objective was the legislature's 'actual purpose' for the discriminatory classification").

House Defendants claim in their Motion that by hewing close to old district lines, they respect communities of interest and other traditional redistricting principles.  House Defs.' Mot. at 18.  Defendants then conclude that race must not have predominated in the Legislature's mapmaking process.  *Id*.  But this conclusory argument is without basis.  As described above, hewing close to previous district lines alone does not shield Defendants from any liability.  And the Legislature's decision to consider district cores—*if true*—simply does not amount to a *per se* defense to Plaintiffs' allegations of discriminatory line-drawing.  As the Supreme Court has explained, "[r]ace may predominate even when a reapportionment plan respects traditional principles . . . ."  *Bethune-Hill*, 137 S. Ct. at 798.  That is because review of the role that race played in developing and enacting district maps compels a "holistic analysis."  *Id.* at 800.  In that analysis, preserving the status quo is not a defense when, as House Defendants concede (House Defs.' Mot. at 16, 17), population shifts demand new districts that reflect the changed demographics and distribution of South Carolina residents.  Ultimately and again, whether race or Defendants' conveniently elevated redistricting principle predominated in the Legislature's mapmaking process is a disputed fact best left for trial.

## V. TO CURE UNCONSTITUTIONAL CONDUCT, RELIEF IN UNCHALLENGED DISTRICTS IS NOT "FORECLOSED."

House Defendants claim that because Plaintiffs have challenged only CDs 1, 2, and 5, they have "foreclosed the opportunity for relief" in other Congressional districts, *i.e.*, CDs, 3, 4, 6, and 7. But House Defendants cite no authority for this proposition, nor could they.[7] *See generally* House Defs.' Mot. If this Court finds that Defendants acted unlawfully by racial gerrymandering and/or intentionally diluting Black voting power, its remedial power is broad and certainly not so limited as House Defendants claim. *See Harris v. McCrory*, No. 1:13-cv-949, 2016 WL 3129213, at *2 (M.D.N.C. June 2, 2016), *aff'd sub nom. Harris v. Cooper*, 138 S. Ct. 2711 (2018) ("[A]lthough the defendants contend that this Court's review is limited to whether the new Congressional Districts 1 and 12 pass constitutional muster, precedent suggests that we have a responsibility to review the plan as a whole."); *see also N.C. State Conf. of NAACP*, 831 F.3d at 221 ("If a court finds that a statute is unconstitutional, it can enjoin the law."); *Covington v. North Carolina*, 283 F. Supp. 3d 410, 426 (M.D.N.C. 2018), *aff'd in part, rev'd in part*, 138 S. Ct. 2548 (2018) ("[R]eview of a remedial redistricting plan extends beyond the particular legal theory that was the basis for invalidating the original plan . . . .").

House Defendants also ignore the very nature of racial gerrymandering and intentional discrimination claims: that unconstitutional discrimination occurred from the outset of map drawing, and therefore the map as a whole must be reassessed. *See, e.g., Bethune-Hill*, 137 S. Ct. at 798 ("[T]he constitutional violation in racial gerrymandering cases stems from the racial purpose

---

[7] House Defendants' argument is underdeveloped. But to the extent they seek to preclude a particular remedy—namely, any redrawing of CDs 3, 4, 6, or 7—via a motion to dismiss, the request is improper. *See Meeks v. Emiabata*, No. 7:14CV00534, 2015 WL 1636800, at *2 (W.D. Va. Apr. 13, 2015) ("Several judges of this court [and] [o]ther courts, too, have recognized that Rule 12(b)(6) does not allow the dismissal of a request for a remedy.") (collecting cases).

of state action, not its stark manifestation. The Equal Protection Clause does not prohibit misshapen districts. It prohibits unjustified racial classifications.") (quotations and citations omitted).

Lastly, House Defendants' argument as to remedies is fully at odds with their standing arguments. On standing, House Defendants correctly assert that Mr. Scott or the SC NAACP's members must live in the districts they allege violate the U.S. Constitution to properly allege injury-in-fact. *See supra* Part I; *cf. Hays*, 515 U.S. at 739. But for remedies, House Defendants claim that Plaintiffs should have also challenged districts where named plaintiffs or members of SC NAACP may *not* live, simply to preserve the ability to alter lines in those non-challenged districts post-judgment on the merits. This point ignores that the SC NAACP has members that reside in every South Carolina congressional district. Moreover, House Defendants' assertion turns both standing and discrimination analysis on its head. The correct approach is that Plaintiffs with standing in certain districts prove violations and Defendants' liability in those districts, and then the Court remedies those violations by appropriate means, including incidental alterations to adjacent districts, if necessary. *Covington*, 283 F. Supp. 3d at 425 ("It is axiomatic that this Court has the inherent authority to enforce its own orders."). This approach represents the commonsense understanding that, in a bounded geographic space, changes in one area may necessarily impact others.[8]

---

[8]    If the Court agrees with House Defendants that Plaintiffs must sue on every district that might possibly be impacted by a redrawn remedial map, Plaintiffs would request leave to amend their complaint, as SC NAACP has members in each of the seven congressional districts, *see supra* Part I, or, any dismissal should be without prejudice. *Ostrzenski v. Seigel*, 177 F.3d 245, 252–53 (4th Cir. 1999) ("The federal rule policy of deciding cases on the basis of the substantive rights involved rather than on technicalities requires that plaintiff be given every opportunity to cure a formal defect in his pleading.") (quoting 5A Charles Allen Wright & Arthur R. Miller, *Federal Practice and Procedure § 1357*, at 360–67 (2d ed.1990)).

**CONCLUSION**

For the reasons stated above, Plaintiffs respectfully request that this court deny House Defendants' Motion to Dismiss.

Dated: June 3, 2022

Leah C. Aden**
Stuart Naifeh**
Raymond Audain**
John S. Cusick**
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector St, 5th Fl.
NY, NY 10006
Tel.: (212) 965-7715
laden@naacpldf.org

Santino Coleman, Fed. ID. 11914
Antonio L. Ingram II**
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
700 14th St, Ste. 600
Washington, D.C. 20005
Tel.: (202) 682-1300
scoleman@naacpldf.org

Adriel I. Cepeda Derieux**
Samantha Osaki**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: (212) 549-2500
acepedaderieux@aclu.org

John A. Freedman**
Elisabeth S. Theodore*
Gina M. Colarusso**
John M. Hindley**
ARNOLD & PORTER KAYE SCHOLER
LLP
601 Massachusetts Ave., N.W.

Respectfully Submitted,

/s/ Christopher J. Bryant
Christopher J. Bryant, Fed. ID 12538
BOROUGHS BRYANT, LLC
1122 Lady St., Ste. 208
Columbia, SC 29201
Tel.: (843) 779-5444
chris@boroughsbryant.com

Somil B. Trivedi**
Patricia Yan**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th St., NW
Washington, DC 20005
Tel.: (202) 457-0800
strivedi@aclu.org

Allen Chaney, Fed. ID 13181
AMERICAN CIVIL LIBERTIES UNION
OF SOUTH CAROLINA
Charleston, SC 29413-0998
Tel.: (843) 282-7953
Fax: (843) 720-1428
achaney@aclusc.org

Jeffrey A. Fuisz**
Paula Ramer**
ARNOLD & PORTER KAYE SCHOLER
LLP
250 West 55th Street
New York, NY 10019
Tel: (212) 836-8000
jeffrey.fuisz@arnoldporter.com

Washington, D.C. 20001
Tel: (202) 942-5000
john.freedman@arnoldporter.com

*Motion for admission Pro Hac Vice
forthcoming*
*\*\* Admitted Pro Hac Vice*

Sarah Gryll**
ARNOLD & PORTER KAYE SCHOLER
LLP
70 West Madison Street, Suite 4200
Chicago, IL 60602-4231
Tel: (312) 583-2300
sarah.gryll@arnoldporter.com

*Counsel for Plaintiffs the South Carolina
Conference of the NAACP and Taiwan Scott*

Janette M. Louard*
Anthony P. Ashton*
Anna Kathryn Barnes*
NAACP OFFICE OF THE GENERAL
COUNSEL
4805 Mount Hope Drive
Baltimore, MD 21215
Tel: (410) 580-5777
jlouard@naacpnet.org

\* Motion for admission *Pro Hac Vice*
forthcoming
\*\* Admitted *Pro Hac Vice*

*Counsel for Plaintiff the South Carolina
Conference of the NAACP*

## CERTIFICATE OF SERVICE

I hereby certify that on June 3, 2022, a true and correct copy of the foregoing was served on all counsel of record by electronic mail.

/s/ *Christopher Bryant*
Christopher Bryant