IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| THE SOUTH CAROLINA STATE CONFERENCE OF THE NAACP, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>HENRY D. MCMASTER, *et al.*,<br><br>Defendants. | Case No. 3:21-cv-03302-MBS-TJH-RMG<br><br>**REPLY IN SUPPORT OF SENATE DEFENDANTS' MOTION TO DISMISS THE THIRD AMENDED COMPLAINT** |

Plaintiffs' Opposition to the Senate Defendants' Motion to Dismiss confirms that Plaintiffs have failed to plead sufficient facts to overcome the presumption of the General Assembly's "good faith," *Miller v. Johnson*, 515 U.S. 900, 915 (1995), much less to carry their "demanding" burden of showing that the General Assembly drew South Carolina's Congressional districting lines on the basis of race, *Easley v. Cromartie*, 532 U.S. 234, 241 (2001) (*Cromartie II*). Plaintiffs acknowledge that their racial gerrymandering claim requires a showing that race was the General Assembly's "dominant and controlling" consideration, such that it "subordinated traditional race-neutral districting principles . . . to racial considerations." *Miller*, 515 U.S. at 913, 916; *see also* Dkt. No. 274 at 5–6. Yet Plaintiffs offer nothing more than "legal conclusions" and "naked assertion[s]" that the General Assembly's redistricting decisions were motivated by race. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In fact, as the Senate Defendants have explained, the General Assembly's actions are instead fully "compatible with" and "more likely explained by" race-neutral traditional redistricting criteria. *Id.* at 680. Given this "obvious alternative explanation," Plaintiffs fail to "nudge[]" their racial gerrymandering claim "across the line from conceivable to plausible," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567, 570 (2007).

1

Plaintiffs' intentional discrimination claim fares no better. Even now, Plaintiffs marshal no plausible allegations that the General Assembly subjected African-American voters to "differential treatment" compared to "similarly situated" voters of another race, *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439–40 (1985); fail to identify an "alternative" plan to support their vote dilution theory, *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 480 (1997) (*Reno I*); and offer no factual allegations sufficient to prove that the General Assembly adopted the Congressional Plan "'because of,' not merely 'in spite of,'" a (non-existent) "adverse effect[]" on African-American voters, *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).

In fact, Plaintiffs' Opposition confirms that their challenges to the Congressional Plan ask the Court to inject *more* race consciousness into South Carolina's redistricting process. Plaintiffs point to a Senator's statement that legislators "didn't even look at race numbers." Dkt. No. 274 at 9. Plaintiffs also fault the General Assembly for not conducting a "racially polarized voting" analysis for "a Section 2 VRA" claim they have not asserted. *Id.* at 6. Plaintiffs cannot square these arguments with their theory of the case, much less explain how the General Assembly could have intentionally *discriminated* on the basis of race if it did not even *consider* race. Indeed, if anything, these arguments *disprove* Plaintiffs' preferred "inference" of racial predominance in the Congressional Plan. *Cf. Veasey v. Abbott*, 830 F.3d 216, 236 (5th Cir. 2016) (en banc) (involving facts known to legislators, not unconducted analyses) (cited at Dkt. No. 274 at 9).

Nonetheless, Plaintiffs argue that the General Assembly had an *obligation* to redistrict on the basis of race, *see* Dkt. No. 274 at 9, and to "develop[] the BVAP in CD 1 to as high as 34%," *id.* at 15. But, of course, intentionally increasing a racial group's voting strength is unconstitutional when, as now, it would subordinate traditional principles to race and fail satisfy "strict scrutiny." *Miller*, 515 U.S. at 916, 920. The Court should decline Plaintiffs' invitation to turn the Equal

Protection Clause on its head and dismiss the Third Amended Complaint.

## ARGUMENT

Plaintiffs' Opposition rests on two threshold errors. *First*, Plaintiffs improperly conflate the standard for a motion to dismiss with their burden of proof when they argue that their "burden at the pleadings stage is not 'demanding.'" Dkt. No. 274 at 4. At all times, Plaintiffs bear the "demanding" burden to prove their allegations that the General Assembly unconstitutionally used race to draw the Congressional Plan and the districts Plaintiffs challenge. *Cromartie II*, 532 U.S. at 241. To avoid dismissal, Plaintiffs must offer more than "legal conclusions" and "naked assertion[s]" that they can satisfy that heavy burden. *Iqbal*, 556 U.S. at 678. They must plead facts sufficient to raise their right to relief to a "plausible" level. *Twombly*, 550 U.S. at 556.

*Second*, Plaintiffs assert that the Senate Defendants "ask this Court to prematurely act as a factfinder and improperly weigh the facts and resolve complex issues on their theory of the case on a motion to dismiss." Dkt. No. 274 at 2. But the Senate Defendants have asked for no such thing. Instead, the Senate Defendants have pointed to maps, data, and statistics that "are publicly available on the [Senate's] official redistricting website"—of which the Court may take judicial notice, *Hall v. Virginia*, 385 F.3d 421, 424 n.3 (4th Cir. 2004), and on which it may rely to grant "a motion to dismiss," *Briggs v. Newberry Cnty. Sch. Dist.*, 838 F. Supp. 232, 234 (D.S.C. 1992). Plaintiffs do not dispute the accuracy or authenticity of any of the maps, data, or statistics the Senate Defendants have cited. Instead, they dispute only the legal significance of those objective and undisputed facts regarding the Congressional Plan.

As explained more fully below, however, Plaintiffs' various arguments do not transform their allegations "from conceivable to plausible." *Twombly*, 550 U.S. at 570. Plaintiffs offer no basis for the Court to abandon "extraordinary caution" and "adjudicat[e] [their] claims that [the

3

General Assembly] has drawn district lines on the basis of race." *Miller*, 515 U.S. at 916; *see also Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018). The Court should dismiss.

## I. COUNT ONE FAILS TO STATE A RACIAL GERRYMANDERING CLAIM

### A. Plaintiffs Fail Plausibly To Plead That The General Assembly Subordinated Traditional Principles To Race

The Court should dismiss count one because Plaintiffs fail to plead sufficient facts to show that the General Assembly "subordinated traditional race-neutral districting principles . . . to racial considerations." *Miller*, 515 U.S. at 916; *see also* Dkt. No. 271 at 10–19. In fact, the Congressional Plan comports with, rather than subordinates, traditional districting principles.

#### 1. The Congressional Plan Preserves The Cores Of Districts

Plaintiffs acknowledge that "[p]reserving the cores of existing districts" is a traditional districting principle incorporated in the Senate Redistricting Guidelines. Dkt. No. 267 ¶ 56. Plaintiffs also do not dispute that the Congressional Plan scores extremely highly on this criterion and outperforms the two alternative plans they proposed to the General Assembly. *Compare* Dkt. No. 274 at 10–13, *with* Dkt. No. 271 at 12–13. Instead, Plaintiffs attempt to minimize the Congressional Plan's high performance on core preservation with six arguments, all of which fail.

*First*, Plaintiffs assert that a core preservation "defense" does not "defeat[]" a racial gerrymandering claim, and courts "must still assess the basis upon which map drawers . . . placed voters within or without a particular district." Dkt. No. 274 at 10–11 (internal quotation marks and citation omitted); *see also id.* at 12. But Senate Defendants do not raise core preservation as a "defense." Instead, the Congressional Plan's high marks on this criterion (and others) underscore that Plaintiffs failed to meet *their* burden of plausibly pleading that the General Assembly subordinated traditional redistricting criteria to racial considerations. *Miller*, 515 U.S. at 916. And in all events, Plaintiffs' allegations regarding voters placed "within or without" the Challenged

4

Districts fail as a matter of law. *See infra* part I.A.3; *see also* Dkt. No. 271 at 11–12.

*Second*, Plaintiffs assert that the Senate Defendants "[e]levat[ed]" core preservation "over other[]" redistricting criteria, notwithstanding that the Senate Redistricting Guidelines "only listed it as one of several criteria that legislators could consider." Dkt. No. 274 at 11. But both parts of this assertion are faulty. The Senate Defendants have not "elevated" consideration of this criterion; rather, they have shown that the Congressional Plan (indisputably) satisfies this criterion *and* others, including Plaintiffs' preferred criteria. *See* Dkt. No. 271 at 12–19. Moreover, in all events, the General Assembly would have been free to elevate this traditional principle over others *regardless* of where it was listed in the Senate Redistricting Guidelines. That is because the General Assembly retains the "political judgment necessary to balance competing interests," including any competing interests between traditional districting criteria. *Miller*, 515 U.S. at 915.

*Third*, Plaintiffs again err when they suggest that the Court can ignore preservation of cores as a "*post hoc* justification[]" for the Congressional Plan. Dkt. No. 274 at 11. There is nothing *post hoc* about the General Assembly utilizing a criterion listed in the *pre-enactment* Senate Redistricting Guidelines. *Bethune-Hill v. Va. State Bd. of Elecs.*, 137 S. Ct. 788, 799 (2017) (criterion is not a "*post hoc* justification[]" when it was an "actual consideration[]" in how the lines were drawn) (cited at Dkt. No. 274 at 11). The other case cited by Plaintiffs, *Shaw v. Hunt*, 517 U.S. 899 (1996) (cited at Dkt. No. 274 at 11), is also inapposite: the Senate Defendants have pointed to preservation of cores as a traditional districting principle that forecloses a showing of racial predominance at the first step of the racial gerrymandering analysis, not as a "compelling state interest" to justify a predominant use of race at the second step of that analysis. *Id.* at 908 n.4 (cited at Dkt. No. 274 at 11); *see also* Dkt. No. 271 at 12–13.

*Fourth*, Plaintiffs argue that Senate Defendants cannot "rel[y] on the 2011 maps, drawn

5

and upheld in *Backus* in response to demographic conditions and legal standards at that time." Dkt. No. 274 at 12. It is unclear what Plaintiffs mean. To the extent Plaintiffs suggest that core preservation is not an applicable principle "when . . . population shifts demand new districts," *id.* at 13, they are wrong as a matter of their own pleading, *see* Dkt. No. 267 ¶ 56, and black-letter law, *see Backus v. South Carolina*, 857 F. Supp. 2d 553, 560 (D.S.C. 2012), *aff'd*, 568 U.S. 801 (2012).

*Fifth*, Plaintiffs selectively quote *Bethune-Hill* for the notion that "[r]ace may predominate even when a reapportionment plan respects traditional principles." 137 S. Ct. at 798 (cited at Dkt. No. 274 at 13). As the full quote makes clear, that theory requires Plaintiffs to show that "[r]ace was the criterion that, in the State's view, could not be compromised" and that race-neutral considerations "came into play only after the race-based decision had been made," such as when a legislature draws a plan with a racial target or floor. *Id.* Here, however, Plaintiffs have not pled the existence of a BVAP floor, much less that "race for its own sake is the overriding reason for choosing [the Congressional Plan] over other[]" maps. *Id.* at 799; *see also* Dkt. No. 271 at 11–21. Nor could they, since the General Assembly did not use a BVAP floor and chose the plan that *best* complies with traditional districting principles. *See* Dkt. No. 271 at 11–21.

*Finally*, Plaintiffs quote the *Bethune-Hill* district court for the proposition that "[c]ore retention alone cannot be used to save an otherwise offensive district." *Bethune-Hill v. Va. State Bd. of Elecs.*, 141 F. Supp. 3d 505, 565 (E.D. Va. 2015) (quoted at Dkt. No. 274 at 11). But Plaintiffs do not mention that, in the very same section of the opinion, the court recognized the "worth" of core preservation and *upheld* the challenged district against a racial gerrymandering claim. *See id.* Here as well, Plaintiffs have not plausibly pleaded that any of the Challenged Districts is an "offensive" racial gerrymander, so the Court should dismiss count one.

6

### 2. The Congressional Plan Outperforms Plaintiffs' Alternative Plans On Respecting Political Subdivisions And Maintaining Communities Of Interest

Plaintiffs' racial gerrymandering claim also fails because the Congressional Plan outperforms Plaintiffs' alternative plans on Plaintiffs' two principal preferred criteria: "respecting county and municipal boundaries" and "maintaining communities of interest." Dkt. No. 267 ¶ 164; *see also* Dkt. No. 271 at 14–16.  Plaintiffs do not dispute that the Congressional Plan splits fewer counties and voting districts than both NAACP Congressional Submission 1 and NAACP Congressional Submission 2.  *See* Dkt. No. 271 at 14.  Rather, Plaintiffs attempt to explain away the Congressional Plan's compliance with these criteria, but their various arguments fail.

*First*, Plaintiffs accuse the Senate Defendants of focusing on the "two narrow metrics" of respecting political boundaries and maintaining communities of interest.  Dkt. No. 274 at 13.  But it was *Plaintiffs* who picked those criteria when they alleged in count one that "[r]ace predominated over traditional redistricting principles such as maintaining communities of interest [and] respecting county and municipal boundaries."  Dkt. No. 267 ¶ 164.  The Senate Defendants have simply shown that this allegation is false because the Congressional Plan outperforms Plaintiffs' proposed alternatives on their chosen metrics.  Dkt. No. 274 at 13; *see also* Dkt. No. 271 at 14–16.

*Second*, Plaintiffs contend that there is no "requirement" for challengers to "put forth a constitutionally compliant map" to prove a racial gerrymandering claim.  Dkt. No. 274 at 13.  To be sure, the five-justice majority in *Cooper v. Harris* opined, as a general matter, that "[a]n alternative map is merely an evidentiary tool to show that [a racial gerrymander] has occurred[.]"  137 S. Ct. 1455, 1480 (2017).  But even the majority recognized that "a plaintiff will sometimes need an alternative map, as a practical matter, to make his case," and must provide an alternative map in any case where "the plaintiffs ha[ve] meager direct evidence of a racial gerrymander and need[] to rely on evidence of forgone alternatives."  *Id.* at 1479, 1481.  And the dissenting justices

7

in *Cooper* thought that an alternative map *is* required to prove a racial gerrymander. *See id.* at 1488–91 (Alito, J., joined by Roberts, C.J., & Kennedy, J., dissenting in part).

In all events, Plaintiffs *have* put forth two alternative plans: they mention those alternatives in the Third Amended Complaint and point to them as support for their claim. *See, e.g.*, Dkt. No. 267 ¶ 154. Plaintiffs cannot rely on the alternative plans when it suits and disavow them when it does not. Even under the majority's opinion in *Cooper*, an alternative plan is probative only where it shows that the legislature could have achieved its race-neutral goals through a map that was less race-conscious than the map it adopted. *See Cooper*, 137 S. Ct. at 1479. Here, however, *both* of Plaintiffs' proposed alternative maps are *less* compliant with traditional districting principles and the General Assembly's political goals than the Congressional Plan. *See* Dkt. No. 271 at 11–18. Thus, the alternative plans Plaintiffs interjected into the case underscore Plaintiffs' failure to plead sufficient facts to show that the General Assembly "subordinated traditional race-neutral districting principles" to race. *Miller*, 515 U.S. at 916; *see also* Dkt. No. 271 at 12–21.

*Third*, Plaintiffs contend that their alternative plans "outperform the enacted plan on various other traditional redistricting criteria." Dkt. No. 274 at 15. But the criteria Plaintiffs identify—"one person, one vote," "preserving the ability of Black voters to continue to elect candidates of their choice in CD 6, respecting communities of interest in CD 1, and developing the BVAP in CD 1 to as high as 34%"—prove just the opposite. *Id.* In the first place, Plaintiffs *concede* that the Congressional Plan complies with one person, one vote and preserves the ability of African-American voters to elect candidates of their choice in District 6. *See* Dkt. No. 267 ¶ 149. Moreover, as the Senate Defendants have explained, the Congressional Plan outperforms the alternative plans on maintaining communities of interest. *See* Dkt. No. 271 at 15–16. And doubling the BVAP in District 1 "to as high as 34%," Dkt. No. 274 at 15, is not a traditional

8

districting principle.  It is an intentional use of race that does not satisfy "strict scrutiny"—or, in other words, a racial gerrymander.  *Miller*, 515 U.S. at 920; *see also* Dkt. No. 271 at 16, 21.

*Fourth*, Plaintiffs accuse Senate Defendants of ignoring Senator Harpootlian's proposed plan ("Senate Amendment 2 Plan").  *See* Dkt. No. 274 at 15 (citing Dkt. No. 267 ¶ 120).  But Senate Amendment 2 Plan also performed markedly worse on key redistricting metrics than the Congressional Plan.  For example, it preserved only between 50% and 74% of district cores.  *See* S.C. Redistricting 2021 - Senate Judiciary Committee, *House Plan 2, Senate Amendment 2: Core Constituencies* (Jan. 11, 2022), https://tinyurl.com/2p8fezhz.  And it did not preserve six Republican-leaning districts, as the Congressional Plan did.  *See* S.C. Redistricting 2021 - Senate Judiciary Committee, *House Plan 2, Senate Amendment 2: Partisan Analysis*, https://tinyurl.com/363fzr9p; Dkt. No. 271 at 6–7.

*Fifth*, Plaintiffs take issue with the General Assembly's preservation of communities of interest formed around the congressional districts that have existed in South Carolina for "three decades," suggesting that communities of interest can be formed only around other "characteristics."  Dkt. No. 274 at 15–16.  But Plaintiffs do not mention, much less square their suggestion with, this Court's recognition that preserving cores is "the clearest expression of the legislature's intent to group persons on a 'community of interest' basis" and advances other race-neutral redistricting policies.  *Colleton Cnty. Council v. McConnell*, 201 F. Supp. 2d 618, 649 (D.S.C. 2002) (three-judge court).  Thus, far from constituting a "pretext[]" or subordinating communities of interest around other "characteristics," Dkt. No. 274 at 16, the General Assembly's respect of communities of interest around existing districts is a proper exercise of its "political judgment" in redistricting, *Miller*, 515 U.S. at 915.

Nor is it of any moment that the Senate Redistricting Guidelines recognized core

9

preservation and maintaining communities of interest as "separate" principles. Dkt. No. 274 at 16 n.6. So, too, did this Court in *Colleton County*. *See, e.g.*, 201 F. Supp. 2d at 647. And as the Court recognized, it is not uncommon for multiple traditional districting principles to point in the same direction: for example, preserving cores of districts tends to maintain communities of interest and to respect "political boundaries" such as county lines. *Id.* at 649. In fact, if anything, that the General Assembly drew a Congressional Plan that comports with *multiple* traditional principles only further underscores that count one fails plausibly to plead that the General Assembly subordinated such principles to race.[1] The Court should dismiss count one.

### 3. Plaintiffs' District-Specific Challenges Fail

Plaintiffs attempt to save count one by invoking various "district-specific" allegations against Districts 1, 2, and 5, *see, e.g.*, Dkt. No. 274 at 6–8, but they nowhere explain the various inconsistencies in those allegations, *see* Dkt. No. 271 at 11–12. Plaintiffs also complain that the General Assembly "surgically left behind parts of the underpopulated CD 6 with high Black voter concentrations," Dkt. No. 274 at 7—but Plaintiffs notably have not challenged District 6 as a racial gerrymander, *see id.* at 6. And Plaintiffs point to splits in "Florence, Orangeburg, Richland, and Sumter Counties" in "CDs 2, 5, and 7." *Id.* at 8. Plaintiffs have not challenged District 7, however, and they fail to mention that all of those counties already were split in the Benchmark Plan. *See* S.C. Redistricting 2021 - Senate Judiciary Committee, *Benchmark Congressional Districts with 2020 Data: Political Subdivision Splits Report* (Jan. 13, 2022), https://tinyurl.com/2p9fwpt2.

In all events, Plaintiffs' district-specific allegations fail because the "race-neutral

---

[1] Plaintiffs' three cited cases also are inapposite. *Harris v. McCrory*, 159 F. Supp. 3d 600, 620 (M.D.N.C. 2016) (cited at Dkt. No. 274 at 16), and *Burton v. City of Belle Glade*, 178 F.3d 1175, 1192 (11th Cir. 1999) (cited at Dkt. No. 274 at 16–17), had nothing to do with maintaining communities of interest. And in *Miller*, the legislature *subordinated*, rather than complied with, the communities-of-interest criterion. *See Miller*, 515 U.S. at 919 (cited at Dkt. No. 274 at 15).

10

consideration[]" of minimizing division of voting precinct boundaries explains the population swaps they challenge. *Miller*, 515 U.S. at 916, 917; Dkt. No. 271 at 16–19. Plaintiffs do not dispute that the General Assembly sought to "minimize[e] divisions of voting precinct boundaries" and that the Congressional Plan drastically reduces the number of split voting districts from the Benchmark Plan. Dkt. No. 271 at 17–18. Instead, Plaintiffs again try to avoid their burden and argue that this reduction in splits does "not prove that race did not predominate in the Legislature's map-drawing process." Dkt. No. 274 at 12–13. But, of course, it is Plaintiffs' burden to prove that race predominated over traditional redistricting criteria, not Defendants' burden to prove it did not. And Plaintiffs' assertion that precincts "can easily be strung together into grotesque formations," *Bethune-Hill*, 141 F. Supp. 3d at 538 (quoted at Dkt. No. 274 at 12), is of no moment because Plaintiffs do not allege that the General Assembly created "grotesque" districts when it preserved the cores of the Benchmark Districts that this Court and the U.S. Supreme Court upheld against racial gerrymandering and other claims in *Backus*. The Court should dismiss count one.

    **B.    Plaintiffs Do Not Plausibly Allege That Race Rather Than Politics Explains The Congressional Plan.**

    Count one fails for the independent reason that Plaintiffs have failed plausibly to plead that "race *rather than* politics *predominantly* explains" the Congressional Plan. *Cromartie II*, 532 U.S. at 243 (emphases original). Plaintiffs concede that, within the population shifts they challenge, "Black Democrats and white Democrats' voting preferences '*may* vary' and that 'one group *may* cross over to vote for non-Democratic candidates more frequently than another.'" Dkt. No. 274 at 18. That concession proves the Senate Defendants' point: because of that possible variance in political and voting behavior, Plaintiffs' allegations of disparate treatment of African-American and white Democrats do not "nudge[]" their racial gerrymandering claim "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 547; Dkt. No. 271 at 19–21.

11

Plaintiffs thus fall back on arguing that they "are not required to disentangle race and party" or to "present a plan that maintains a 6-1 partisan split that favors Republicans while adhering to traditional districting principles." Dkt. No. 274 at 17, 19. In fact, Plaintiffs are required to do precisely that. *See Cromartie II*, 532 U.S. at 243, 258; *Cooper*, 137 S. Ct. at 1473, 1479. Plaintiffs' failure even to engage that burden requires dismissal of count one. *See* Dkt. No. 271 at 19–21.

## II. COUNT TWO FAILS TO STATE AN INTENTIONAL DISCRIMINATION CLAIM

Count two also fails because Plaintiffs have not plausibly pled that the General Assembly subjected African-American voters to "differential treatment" compared to "similarly situated" voters of another race, *City of Cleburne*, 473 U.S. at 439–40, much less that it adopted the Congressional Plan "'because of,' not merely 'in spite of,'" an "adverse effect[]" on African-American voters, *Pers. Adm'r*, 442 U.S. at 279; *see also* Dkt. No. 271 at 22–27.

### A. Plaintiffs Do Not Adequately Allege A Discriminatory Effect

Count two alleges "intentional vote dilution," Dkt. No. 267 ¶ 3, but that allegation fails as a matter of law because Plaintiffs have not pointed to "a reasonable alternative voting practice to serve as the benchmark 'undiluted' voting practice." *Reno I*, 520 U.S. at 480; *Backus*, 857 F. Supp. 2d at 568. In other words, a vote dilution claim is comparative: it requires Plaintiffs to produce a plan that would have existed but for the alleged dilution. *See, e.g.*, *Reno I*, 520 U.S. at 480; *Backus*, 857 F. Supp. 2d at 568. Regardless of whether an "alternate map" is "essential" for purposes of a racial-gerrymandering claim, Dkt. No. 274 at 27 (quoting *Cooper*, 137 S. Ct. at 1462), it undoubtedly is for a vote dilution claim, so Plaintiffs' failure to produce such a map dooms their intentional discrimination claim, *see* Dkt. No. 271 at 23–24.

Plaintiffs' Opposition attempts to repackage their allegation of discriminatory effect, but these efforts fail. *First*, Plaintiffs suggest that they need not show "a threshold minimum number of impacted voters" to prevail on their intentional discrimination claim. Dkt. No. 274 at 27. Even so, they must show that African-American voters are "impacted" by a discriminatory effect, *id.*—and they have failed plausibly to plead such an effect, *see* Dkt. No. 271 at 23–24.

*Second*, Plaintiffs assert that the Third Amended Complaint pleads "the myriad ways in which Black South Carolinians bear the brunt of" the alleged discrimination in the Congressional Plan. Dkt. No. 274 at 28 (citing Dkt. No. 267 ¶¶ 147–48, 151–59). But Plaintiffs nowhere explain how the Congressional Plan somehow *dilutes* voting strength compared to the constitutional Benchmark Plan or any constitutional "reasonable alternative." *Reno I*, 520 U.S. at 480. And an alleged lack of voting strength proportional to a group constituting "approximately 29% of South Carolina's population," Dkt. No. 274 at 28, does not amount to a discriminatory effect, just as it did not in the Benchmark Plan, *see Backus*, 857 F. Supp. 2d at 568–69.

*Third*, Plaintiffs erroneously assert that the Senate Defendants argued that Plaintiffs must plead the *Gingles* preconditions to maintain their intentional discrimination claim. Dkt. No. 274 at 28. In fact, the Senate Defendants cited *Gingles* to demonstrate that Plaintiffs' demand that the General Assembly take the race-conscious action of raising the BVAP of District 1 to 34% would impose a racial gerrymander. *See* Dkt. No. 271 at 3. The Senate Defendants at no point suggested that Plaintiffs must plead the *Gingles* preconditions to state a constitutional vote dilution claim.

### B. Plaintiffs Do Not Adequately Allege A Discriminatory Purpose

Finally, count two fails because Plaintiffs do not adequately allege that the General Assembly acted with a discriminatory purpose in enacting the Congressional Plan. *See* Dkt. No. 271 at 24–27. Plaintiffs invoke the *Arlington Heights* framework and argue that "the impact of

13

the official action" is "an important starting point" for assessing discriminatory purpose allegations. Dkt. No. 274 at 22 (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)). Yet Plaintiffs have not plausibly pled a discriminatory effect, *see supra* Part II.A, so this factor dooms rather than saves count two.

Plaintiffs' arguments under other *Arlington Heights* factors fare no better. For example, Plaintiffs double down on the "long history of racial discrimination in the political process in South Carolina against Black voters," but even Plaintiffs implicitly concede that such evidence is not sufficient to prove intentional discrimination now, just as it failed to do so in *Backus*. Dkt. No. 274 at 23–24. And the fact that this Court "needed to adjudicate racial discrimination claims relating to" the Benchmark Plan, Dkt. No. 267 ¶¶ 3, 38, *contradicts* Plaintiffs' allegation that historical discrimination still motivates the General Assembly in modern times because the Court *rejected* those claims in *Backus*, *see* Dkt. No. 271 at 24–25.

Plaintiffs also point to the alleged "opaque process through which the Legislature enacted" the Congressional Plan. Dkt. No. 274 at 24. Plaintiffs' own pleading, however, demonstrates that the General Assembly engaged in a robust and transparent public process in considering and enacting the Congressional Plan. That process included numerous public hearings—all of which were preceded by at least 24 hours' notice and attended by at least one representative of Plaintiff SC NAACP—and consideration of testimony, comments, and submissions by the public. *See, e.g.*, Dkt. No. 267 ¶¶ 61–142. Moreover, S. 865 went through the same process of subcommittee hearings and review, committee hearings and review, amendments, floor debates and vote as every other piece of legislation that the General Assembly enacts. *See, e.g.*, S. 865, 124th Gen. Assemb. (S.C. 2022), https://www.scstatehouse.gov/sess124_2021-2022/bills/865.htm.

Plaintiffs nonetheless highlight statements and objections by opponents of the Congressional Plan, suggesting that the General Assembly must have been motivated by discriminatory animus because it did not incorporate or act upon all comments received by the public. *See* Dkt. No. 274 at 24–26. But there is nothing discriminatory about rejecting "[a]lternative proposals" or not changing the Congressional Plan based upon every shred of "public input." *Id.* at 24, 26. To the contrary, in redistricting as in other contexts, the General Assembly retains the "political judgment necessary to balance competing interests," including any competing or contradictory public input. *Miller*, 515 U.S. at 915. Thus, Plaintiffs' allegations indicate a robust process resulting from the determined views of the Congressional Plan's proponents and opponents, but are devoid of any allegations sufficient to show that the General Assembly acted with a discriminatory purpose. *See Brnovich v. Dem. Nat'l Comm.*, 141 S. Ct. 2321, 2350 (2021).

Moreover, in any event, statements of a law's opponents "are generally not appropriate evidence of [a legislature's] motive[s] for enacting [it]." *United States v. Machic-Xiap*, 552 F. Supp. 3d 1055, 1075 (D. Or. 2021); *compare also NLRB v. Fruit & Vegetable Packers & Warehousemen, Loc. 760*, 377 U.S. 58, 66 (1964). Plaintiffs' Third Amended Complaint and Opposition demonstrate precisely why: Plaintiffs seeded the legislative record with statements opposing the Congressional Plan and now point back to those statements in an attempt to bolster their allegations of discriminatory intent in this Court. *See* Dkt. No. 274 at 24–26. But overcoming the "presumption of legislative good faith" requires evidence of invidious intent by the General Assembly, not Plaintiffs' repetition of their own manufactured allegations against the Congressional Plan. *Abbott*, 138 S. Ct. at 2324.

Finally, Plaintiffs point to alleged "deviations from procedure" in designating a chair in a House Redistricting Committee hearing. Dkt. No. 274 at 25–26. Plaintiffs, however, offer no

15

facts to show that this purported deviation was racially rather than politically motivated, as they must to prove their intentional discrimination claim. *See Brnovich*, 141 S. Ct. at 2349 ("partisan motives are not the same as racial motives"); *see also* Dkt. No. 274 at 26 (describing allegations that three Democratic senators were denied access and input at certain junctures). Indeed, Plaintiffs' own allegations suggest that this purported deviation was a "breach of decorum," not intentional discrimination. Dkt. No. 274 at 26 (quoting Dkt. No. 267 ¶ 106). And they do not allege that this purported breach would have changed the outcome of any vote by the Committee.

## CONCLUSION

The Court should dismiss the Third Amended Complaint.

June 10, 2022

Respectfully submitted,

*/s/*Robert E. Tyson Jr.
Robert E. Tyson, Jr. (7815)
Vordman Carlisle Traywick, III (12483)
La'Jessica Stringfellow (13006)
ROBINSON GRAY STEPP & LAFFITTE, LLC
1310 Gadsden Street
Post Office Box 11449 (29211)
Columbia, South Carolina 29201
(803) 929-1400
rtyson@robinsongray.com
ltraywick@robinsongray.com
lstringfellow@robinsongray.com

John M. Gore (admitted *pro hac vice*)
Stephen J. Kenny (admitted *pro hac vice*)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Phone: (202) 879-3939
Fax: (202) 626-1700
jmgore@jonesday.com
skenny@jonesday.com

*Counsel for Senate Defendants*