*SC NAACP v. Alexander,*
D.S.C. Case No.  3:21-cv-03302-MGL-TJH-RMG

# Exhibit G

Page 1

1              IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF SOUTH CAROLINA
2                    COLUMBIA DIVISION
          CASE NO. 3:21-CV-03302-MBS-TJH-RMG
3
     THE SOUTH CAROLINA STATE CONFERENCE OF
4    THE NAACP, AND TAIWAN SCOTT, ON BEHALF
     OF HIMSELF AND ALL OTHER SIMILARLY
5    SITUATED PERSONS,
6                  Plaintiffs,
7            vs.
8    THOMAS C. ALEXANDER, HENRY D. MCMASTER,
     IN HIS OFFICIAL CAPACITY AS GOVERNOR OF
9    SOUTH CAROLINA; HARVEY PEELER, IN HIS
     OFFICIAL CAPACITY AS PRESIDENT OF THE
10   SENATE; LUKE A. RANKIN, IN HIS OFFICIAL
     CAPACITY AS CHAIRMAN OF THE SENATE
11   JUDICIARY COMMITTEE; JAMES H. LUCAS, IN
     HIS OFFICIAL CAPACITY AS SPEAKER OF THE
12   HOUSE OF REPRESENTATIVES; CHRIS MURPHY,
     IN HIS OFFICIAL CAPACITY AS CHAIRMAN OF
13   THE HOUSE OF REPRESENTATIVES JUDICIARY
     COMMITTEE; WALLACE H. JORDAN, IN HIS
14   OFFICIAL CAPACITY AS CHAIRMAN OF THE
     HOUSE OF REPRESENTATIVES ELECTIONS LAW
15   SUBCOMMITTEE; HOWARD KNABB, IN HIS
     OFFICIAL CAPACITY AS INTERIM EXECUTIVE
16   DIRECTOR OF THE SOUTH CAROLINA STATE
     ELECTION COMMISSION; JOHN WELLS, JOANNE
17   DAY, CLIFFORD J. ELDER, LINDA MCCALL,
     AND SCOTT MOSELEY, IN THEIR OFFICIAL
18   CAPACITIES AS MEMBERS OF THE SOUTH
     CAROLINA STATE ELECTION COMMISSION,
19
                  Defendants.
20
21   DEPOSITION OF:    ANDREW THEODORE FIFFICK
                       (Appearing via VTC)
22
     DATE:             July 21, 2022
23
     TIME:             10:10 a.m.
24
25

Page 2

1    LOCATION:            Robinson Gray, LLC

                          1310 Gadsden Street

2                         Columbia, South Carolina

3    TAKEN BY:            Counsel for the Plaintiffs

4    REPORTED BY:    KAREN M. ERNST, CSR

                     (Appearing via VTC)

5    _____

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                                              Page 3

 1      APPEARANCES OF COUNSEL:
 2          ATTORNEYS FOR PLAINTIFFS:
                    THE SOUTH CAROLINA STATE CONFERENCE OF
 3                  THE NAACP, ET AL:
 4                  NAACP LEGAL DEFENSE AND EDUCATIONAL
                    FUND
 5                  BY:  LEAH C. ADEN
                         RAYMOND AUDAIN
 6                       (Appearing via VTC)
                    40 Rector Street, 5th Floor
 7                  New York, New York 10006
                    212-965-7715
 8                  laden@naacpldf.org
                    raudain@naacpldf.org
 9
            ATTORNEYS FOR DEFENDANTS
10                  SENATOR THOMAS C. ALEXANDER AND SENATOR
                    LUKE A. RANKIN:
11
            ATTORNEYS FOR DEPONENT
12                  ANDREW THEODORE FIFFICK:
13                  ROBINSON GRAY, LLC
                    BY:  ROBERT E. TYSON
14                       VORDMAN CARLISLE TRAYWICK, III
                         (Appearing via VTC)
15                  1310 Gadsen Street
                    Columbia, South Carolina 29201
16                  803-929-1400
                    rtyson@robinsongray.com
17                  ltraywick@robinsongray.com
18          ATTORNEYS FOR HOUSE DEFENDANTS:
19                  NEXSEN PRUET, LLC
                    BY:  JENNIFER HOLLINGSWORTH
20                       MICHAEL PARENTE
                         (Appearing via VTC)
21                  1230 Main Street, Suite 700
                    Columbia, South Carolina 29201
22                  803-253-8247
                    jhollingsworth@nexsenpruet.com
23                  Mparente@nexsenpruet.com
24
25
```

Page 4

```
 1    APPEARANCES CONTINUED:
 2       ATTORNEYS FOR ELECTION DEFENDANTS:
 3                BURR & FORMAN, LLP
                  BY:  MICHAEL L. BURCHSTEAD
 4                     JANE W. TRINKLEY
                       (Appearing via VTC)
 5                1221 Main Street, Suite 1800
                  Columbia, South Carolina 29201
 6                803-753-3261
                  mburchstead@burr.com.
 7                jtrinkley@burr.com
 8       ALSO PRESENT:
 9                CYNDI NYGORD
                  SONORA CARROLL
10                RICK ROZOS
                  MADISON VILLARREAL
11                (Appearing via VTC)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                                             Page 5
 1              THE REPORTER:  Can I get appearances,
 2    please.
 3              MS. ADEN:  So I'm Leah Aden, A-d-e-n,
 4    and I'm appearing for the plaintiffs with the NAACP
 5    Legal Defense Fund.  My colleague Raymond --
 6              Do you mind introducing yourself?
 7              MR. AUDAIN:  Raymond Audain,
 8    A-u-d-a-i-n.  I'm also here for plaintiffs, and I
 9    work with Leah at the Legal Defense Fund.
10              MR. TYSON:  Good morning, Karen.  I'm
11    Rob Tyson.  I'm counsel for Senator Alexander and
12    Senator Rankin, and I'm here with the deponent,
13    Andy Fiffick.
14              MS. HOLLINGSWORTH:  It's Jennifer
15    Hollingsworth.  I represent the House Defendants.
16              MR. TYSON:  Jennifer, you sound
17    horrible when you talk, just so you know.
18              MS. HOLLINGSWORTH:  Okay.  Thank you.
19    I'll do my best not to talk.
20              MR. BURCHSTEAD:  I'm Michael Burchstead
21    here on behalf of the Election Defendants.
22              MR. TRAYWICK:  Lisle Traywick here also
23    on behalf of the Senate Defendants.
24              MS. ADEN:  And I wanted to flag that
25    Sonora Carroll, who appears in the chat, is a legal
```

```
                                              Page 6
 1    intern with the Legal Defense Fund, so I wanted you
 2    to be aware of her.
 3              MR. TYSON:  And Cindy Nygord, who's
 4    listed also as a participant, is a paralegal in our
 5    office who is helping provide support for us.
 6              THE REPORTER:  Thank you.
 7              ANDREW THEODORE FIFFICK
 8    being first duly sworn, testified as follows:
 9                    EXAMINATION
10    BY MS. ADEN:
11         Q.    Thank you.
12              Good morning, Mr. Fiffick.
13         A.    Good morning.
14         Q.    Good morning.  As you know, I am Leah
15    Aden.  I am counsel for the plaintiffs.
16              Do you recall that we spoke on the
17    phone before and exchanged emails in 2021 as the
18    legislature considered state redistricting plans?
19         A.    Yes, ma'am.
20         Q.    Okay.  And again, I represent the
21    plaintiffs, specifically the South Carolina and
22    NAACP and Mr. Tai Scott.
23              Do you mind going ahead and saying your
24    full name and spelling it for the record?
25         A.    My name is Andrew Theodore Fiffick.
```

Page 7

1    Andrew Theodore Fiffick.  It's F-i-f-f-i-c-k is the

2    last name.  The other two are just the conventional

3    spellings, Andrew and Theodore like french fry.

4         Q.   And are you a lawyer?

5         A.   Yes, ma'am.

6         Q.   Okay.  But you are represented here

7    today by counsel; is that correct?

8         A.   Yes, ma'am.

9         Q.   Okay.  And who?

10         A.   Rob Tyson is currently here but in the

11    aggregate, my outside counsel would include Charlie

12    Terreni and John Gore.  Charlie is a sole

13    practitioner here in Columbia, and John Gore is

14    with Jones Day out of DC.

15         Q.   Have you taken depositions before?

16         A.   No.

17         Q.   So in light of that, I'm going to

18    explain some ground rules so that we sort of

19    understand some things that we should all know in

20    common.  The first is that you have been sworn in.

21    You are testifying under oath, which means that you

22    are testifying with the same duty to answer

23    questions truthfully as though you were before a

24    judge in a courtroom.

25              Do you understand?

Page 22

1    that you've mentioned, the attorneys of the law

2    firms that you mentioned, is there any other

3    attorney who you have sought legal advice from

4    about this case broadly?

5            A.    No.   No.   I mean, Paula Benson is our

6    in-house senior staff attorney, but I did not seek

7    her legal advice on these maps.   We outsourced it

8    exclusively to Charlie and John Gore.   And Breeden

9    John also is an attorney with the Senate, but I did

10   not seek his advice on it.   He was exclusively

11   helping with the technical side of the maps, not --

12   when I say technical side, the computer side of it.

13   You know, here, we need you to run a report.   We

14   need you to print this map, sort of the

15   administrative side of things is what he focused

16   on.

17           Q.    Explain that to me a little bit more.

18   So he's an attorney, Mr. Breeden is -- or Breeden

19   John, right?

20           A.    Right.   Yes, ma'am.

21           Q.    Mr. John is an attorney.

22           A.    Yeah.

23           Q.    But he was providing support on the

24   technical side of things.   Again without -- tell me

25   generally what does that mean to provide legal

Page 23

1   support on the technical side?

2          A.   He didn't provide legal support on the

3   technical side.  He learned how to use Maptitude

4   basically in case Will Roberts got hit by a bus, we

5   would have needed somebody to do that.  I think

6   Charlie knows how to use Maptitude.  You know, I

7   tried to learn it some.  But Breeden was mostly in

8   a worst case scenario someone that would have had

9   to step up and been the guy who knew how to use

10  Maptitude.  Luckily that didn't happen.

11         Q.   Did Mr. John, in fact, have to draw any

12  maps, though he learned?  You said that he was

13  really a backup.  Did he actually have to draw

14  maps?

15         A.   Not that I recall, no, he didn't draw

16  maps.

17         Q.   And would you characterize anybody else

18  besides Mr. Roberts as responsible for drawing

19  congressional maps for the legislature?

20         A.   No.  No.  Again, the extent of my

21  experience was just to try to learn Maptitude.  I

22  didn't draw anything at any direction of anybody

23  from the assembly men.  Again, we wanted to make

24  sure we had backup in case Mr. Roberts was unable

25  to, you know, be around.

```
                                          Page 24
 1           Q.    So you, like Mr. John, learned
 2     Maptitude so you were the second and third backup
 3     for Mr. Roberts.
 4           A.    I would say I would be a distant third
 5     and he was a second, yes.
 6           Q.    Okay.  So just to be clear, you haven't
 7     sought legal advice on congressional map making for
 8     this case from the Senate's President's Office?
 9           A.    No.
10           Q.    From the office of legislative counsel?
11           A.    No.  We did have to submit our -- we
12     had to submit bloc equivalency files and language
13     to legislative counsel for them to format it and
14     put it into a bill form, but they had no input as
15     to what the substance of those maps were.
16           Q.    Tell me a little bit about Maura Baker,
17     who she is and her role with congressional map
18     making.
19           A.    Maura is one of our staff attorneys.
20     Her primary focus is on family law, probate, does
21     some criminal stuff.  She was in the room
22     40 percent of the time maybe.
23           Q.    How many?
24           A.    40 percent of the time.
25                 She and Madison Faulk, both of them
```

Page 25

```
 1   assisted in aggregating and putting together and
 2   receiving public input in realtime.  As we were out
 3   on the road, they would be back at the office, you
 4   know, making sure that anything somebody submitted
 5   was archived and available, you know, for the
 6   members to read if they wanted to do it.  I would
 7   say that was her biggest and most important role,
 8   the organizational aspect of that.
 9          Q.   And when you mention out on the road,
10   are you referring to the Senate public hearings
11   that were held in July and August?
12          A.   Yes, ma'am.  Yes, ma'am.  They were
13   done back then, and they also would have done it in
14   subsequent meetings back in Columbia.
15          Q.   Besides being the backup in case
16   something happened to Mr. Roberts, what other roles
17   did Breeden John play in the development of
18   congressional maps?
19          A.   Development of the maps, I mean, he
20   didn't.  I mean, we took construction from members
21   and then we took maps that, you know, if it got to
22   the point where number one was sent to John Gore
23   for review -- I would say in terms of the word
24   development, I don't think he developed maps at
25   all.
```

Page 26

```
 1         Q.   So did he go out and seek feedback from
 2    members or was he available to members for feedback
 3    and then --
 4         A.   We were all -- I'm sorry.  Yes, ma'am.
 5    We were all available.  We never sought out -- we
 6    never solicited feedback from members, but we, and
 7    as nonpartisan staff, we, as with any other bill,
 8    we had an open door policy and everybody knew they
 9    could come in the map room anytime they wanted to.
10    So it wasn't a matter of us soliciting, but it was
11    a matter of us being available 24/7 to anybody.
12         Q.   Now, I understand -- let me ask.  Were
13    you involved in the development of the Senate maps?
14         A.   Are you talking about the Senate maps
15    or the Senate version of the congressional map?
16         Q.   The 46 Senate districts.
17         A.   Yes, ma'am.  Same situation.  Yes,
18    ma'am.
19         Q.   So as compared to the process for
20    developing the congressional map, would you say
21    that you also did not go out and solicit feedback
22    for the Senate districts?
23         A.   Correct.  We did not.  Open door
24    policy.  Anybody who wanted to come in could.  Lots
25    more people came in for Senate than congressional
```

                                                    Page 27

1    because there's more senators and there's more

2    districts and there's just more to it.

3            Q.    And by came in, what are you referring

4    to?  Came in where?

5            A.    Just requested to come to the map room

6    and look at the maps.

7            Q.    Maxine Henry, is that name familiar to

8    you?

9            A.    Yes, ma'am.

10           Q.    Who is she?

11           A.    She's our proofreader.

12           Q.    Is she a lawyer?

13           A.    No, ma'am.  Smarter than most lawyers I

14   know, but not a lawyer.

15           Q.    And what is she proofreading?

16           A.    She would proofread bills.  And to the

17   extent that these bills really aren't the

18   traditional type of bills, she had almost no bar.

19   I mean, she goes to counts where, you know, say in

20   a probate bill, 30 page probate bill, she would

21   proofread those 30 pages to make sure that there

22   weren't typos, you know.  The drafting was

23   craftier.  The way these bills were developed, all

24   of them went through legislative counsel and they

25   were all fairly automated and so there was not much

Page 28

1    for her to have to do.  I mean, as a matter of

2    course, she probably read through those bills that

3    went to the floor, but that really would have just

4    been a formality, not something that was necessary

5    or I don't even recall asking her to do it, but she

6    may have done it.

7           Q.   Michelle McGee, do you recognize that

8    name?

9           A.   Yes.  She was our meeting coordinator

10   and has now moved on headed to law school.

11          Q.   So she was pre-law when she was

12   coordinating meetings; is that correct?

13          A.    Yes, ma'am.  No, she wasn't pre-law.

14   She was private sector not in school but was a

15   full-time employee of the Senate.  Her title, I

16   believe, was meeting coordinator for the Senate

17   judiciary committee.  She had no role in drawing of

18   any of the maps.  She coordinated the meetings,

19   made sure the trains were running on time, and we

20   got where we needed to be, and the documents were

21   in the right folders in the binders and all that.

22          Q.    And when you're talking about meetings,

23   you're not talking about the meetings with

24   Mr. Gore, you're talking about meetings with

25   legislature?

1        A.    Oh.   Yes, ma'am.   No, public meetings.

2    Public meetings.   She didn't coordinate any of the

3    meetings with members about maps.   She didn't have

4    anything to do with that.   Nothing to do with

5    meetings with Gore.   She coordinated the public

6    meetings so the subcommittee meetings, the full

7    committee meetings, the road show meetings we had

8    in July and August.   That was her role.

9        Q.    And tell me a little bit more about

10   Ms. Benson.   If you could provide very helpfully

11   like you did with Ms. Baker and Ms. Faulk sort of

12   how much of her time was dedicated to congressional

13   redistricting and what her role was?

14       A.    Sure.   Her role is she's been with the

15   Senate -- either the Senate or the law library for

16   35 years.   She has a great way of drafting talking

17   points and things that, you know, the members would

18   want to use.   She did a lot of that.   I think

19   exclusively she was the person that drafted Senator

20   Rankin's talking points.   She probably drafted some

21   talking points for Senator Campsen just because she

22   has a good way with words and has been writing for

23   years and years and years and years and years.

24             I would say she was in the map room

25   50 percent of the time maybe, 60 percent of the

```
                                              Page 30
 1     time.  And I think she has -- I don't know if she
 2     worked on all the four past redistricting.  She's
 3     been working on redistricting for a long time.  I
 4     can say that.
 5              Q.   Have you sought any legal advice about
 6     congressional redistricting from any of the Senate
 7     redistricting subcommittee members?
 8              A.   Legal advice, no.
 9              Q.   Are any of those members lawyers?
10              A.   Yes, they are.
11              Q.   And going back, is any of the Senate
12     judiciary staff that we've talked about so far, are
13     any of them black people?
14              A.   I don't believe so, no.
15              Q.   And can you identify the members of the
16     Senate redistricting subcommittee?
17              A.   Off the top of my head, I think it's
18     Campsen, Harpootlian, Margie Bright Matthews, I
19     think Senator Rankin, Scott Talley.  Did I say
20     Ronny Sabb already?
21              Q.   No.
22              A.   Okay.  Ronny Sabb.  I think that I may
23     have missed somebody there, but I think that's
24     them.
25              Q.   Senator Young?
```

```
 1          A.    Yeah, Senator Young, but he dropped off
 2     when Senator Leatherman passed away and we got the
 3     finance.
 4          Q.    Did you communicate about congressional
 5     redistricting -- would it be fair to say that you
 6     communicated with each of those subcommittee
 7     members with respect to congressional
 8     redistricting?
 9          A.    All of them, yes.  Yes.  All of them,
10     yes.  The folks down in the low country area more
11     because they have more involvement with it.
12          Q.    What about the staff of those committee
13     members?  Did you communicate with any subcommittee
14     staff?
15          A.    Subcommittee staff?
16          Q.    Yes.  Oh, the staff with subcommittee
17     members.  I'm sorry.
18          A.    So that -- okay.  So yes.  Yes.  Would
19     have been Brian Cohl, who is Senator Campsen's
20     staffer, yeah.  We talked with him some about it.
21          Q.    And what did you communicate with him
22     about?
23          A.    Specifics I don't remember, but I think
24     it was kind of, you know, what Senator Campsen --
25     you know, research he did for Senator Campsen.  You
```

1    case and that's how that was determined.

2         Q.   And once again, are John Gore and/or

3    Mr. Terreni the two people you feel are responsible

4    for assessing compliance with this Senate

5    guideline?

6         A.   Well, with all of the requirements of

7    federal law, yes, that's who we turned to.

8         Q.   Take a moment to look at Roman Numeral

9    II, Contiguity.  Is this a federal law requirement?

10        A.   I don't know.  I don't know.  That's

11   one that I've always -- that one is -- that's just

12   something I think is just -- I don't know.  I don't

13   know.  But I know that's something that is

14   irrefutable.  I mean, you can't have a district

15   that's in two different parts of the state.  I

16   don't know if it's federal law though.

17        Q.   What does contiguity mean to you?

18        A.   Touching or -- and all of our maps

19   again were reviewed by outside counsel and no one

20   ever raised the issue of contiguity.

21        Q.   What is the difference between land and

22   water contiguity?

23        A.   Land contiguity and water contiguity,

24   again, outside counsel is who we referred to on

25   this.  I think outside counsel's recommendation

Page 119

```
 1    there was that water contiguity is acceptable.  I
 2    don't remember where that comes from, but that was
 3    another thing that we referred to outside counsel
 4    and they found acceptable.
 5            Q.    Looking to the next category, Roman
 6    Numeral III, Additional Considerations.  It's on
 7    the next page.  Do you mind --
 8            A.    Sure.
 9            Q.    Well, I guess I'll look at it myself.
10    Is it fair to -- under Roman Numeral III,
11    Additional Consideration, it reads, Other criteria
12    that should be given consideration, where practical
13    and appropriate, in no particular order of
14    preference.
15            Am I reading accurately what follows
16    that category?
17            A.    Yes, ma'am.
18            Q.    Okay.  Did you understand the things
19    that follow in this part of the Senate guidelines
20    to be of lower priority to compliance with federal
21    law and the categories that preceded this section?
22            A.    That wasn't my understanding, but
23    that's -- well, yeah, based on outside counsel's
24    advice, yes, these were things that could not, you
25    know, or should not be considered over the
```

Page 120

1    federal --

2           Q.    But --

3           A.    -- guidelines.

4           Q.    I'm sorry.  I cut you off.

5           A.    I'm sorry.  My understanding from

6    outside counsel is that this stuff in No. III are

7    additional considerations that were not as

8    paramount as the federal -- requirements of federal

9    law, and then additional considerations, I think in

10   here it tells you in this document the difference

11   between the two.

12          Q.    And the words that I read, other

13   criteria that should be given consideration, where

14   practical and appropriate, in no particular order

15   of preference, does that also give support for the

16   idea that these are of lower priority than the

17   federal requirements that precede it?

18          A.    I mean, that could be construed that

19   way, yes, ma'am.  It's up to members of the Senate

20   to consider whatever they want to consider when

21   they're making decisions.  And when those decisions

22   were made and turned into maps based on those

23   decisions how they wanted the map drawn, we then

24   submitted them to outside counsel to review.

25          Q.    Looking at subcategory III(A), what is

Page 121

1    your understanding of what a community of interest
2    is?
3            A.    Well, I think it defines it.
4            Q.    What do you understand it to mean?
5            A.    Areas defined by geographic,
6    demographic, historic or other characteristics that
7    cause people to identify with one another,
8    including economic, social, cultural, language,
9    political, and recreational activity interests
10    common to the area's population may constitute
11    communities of interest.  Communities of interest
12    may be overlapping and may consist of one or more
13    formally, or informally, defined geographic areas
14    with unifying common interests.
15            Q.    Thank you for reading it fast and just
16    let's remember Ms. Beckham, who, I'm sure, got a
17    little workout.
18                  What is an area defined by a geographic
19    characteristic?
20            A.    I mean, I don't think there's a single
21    definition for that.
22            Q.    Is it a neighborhood, a precinct?
23            A.    It could be.  It could be a precinct.
24    I mean, for our purposes, I can tell you that one
25    thing we did really really really really -- I think

1    you can tell this -- that the members really wanted

2    and I think what the public wanted was to minimize

3    splitting up VTDs and we did that.

4          Q.    What are VTDs?

5          A.    They are voter tabulation districts.

6    There's a fine distinction between them and

7    precincts.  I think VTDs is the term that the

8    census bureau uses, and precincts are areas that

9    the state can change as they feel they need to.

10   But we tried to get precincts lined up with VTDs.

11   That was part of our recommendation from outside

12   counsel to make the map as clean as possible.

13         Q.    And looking at III(E), does this Senate

14   guideline carve out VTDs as a separate additional

15   consideration irrespective of communities of

16   interest?

17         A.    Yes.  But I don't think it can't

18   operate in concert.  And in the mind of any senator

19   or member of the Senate, you know, I think they

20   could consider those together or apart or

21   intermingle as they decided to.

22         Q.    A demographic characteristic, what does

23   that mean to you?

24         A.    I guess that could be anything from,

25   you know, age to race to economic status.  Again,

1   that's probably something that's a subjective term

2   that could be up to whatever member of the Senate,

3   you know, wanted to interpret it as they asked us

4   to draw the map.

5            Q.   You earlier mentioned that Will Roberts

6   and you in the map room and others had access to

7   race data.  Can you tell me a little bit more about

8   what data you had?

9            A.   I'm hardly an expert in all the DOJ

10  black, BVAP, non-Hispanic black.  It was that sort

11  of information.  I don't know the distinctions very

12  well, but it was information from the census.

13  There's some documents in here that y'all have

14  shown, you know, the charts that they produced that

15  reflected that information.

16           Q.   How did Will Roberts with you in the

17  room consider race in developing any of the maps

18  that you drew in that map room?

19           A.   I'm not aware that he did that at all.

20  If a member of the Senate in their own mind

21  considered it and then asked us to draft something,

22  they may have.  I don't know.  The maps were

23  drafted with the instruction numbers.  So it wasn't

24  a matter of Will considering the information, it's

25  not a member presenting the information, and then

```
                                        Page 124
 1    us presenting the information and the maps to our
 2    outside experts who then decided whether or not
 3    they passed federal common law.
 4         Q.    Are you aware of whether race data was
 5    loaded into the computer that y'all shared in the
 6    map room?
 7         A.    Oh, yeah.  It was, yeah, for sure.
 8         Q.    Was it on a screen projected on the
 9    wall at any time as you were developing maps?
10         A.    I was not developing maps, but as
11    members came in and wanted to talk about maps, yes,
12    members came in and asked about those numbers.
13         Q.    For the maps that were transmitted to
14    Mr. Terreni and Mr. Gore, did they include
15    associated data with them?
16         A.    I'm sure they did.  I'm sure Charlie
17    Terreni saw the associated data when he was in the
18    room and I'm sure Will would bring set statistics
19    to John Gore when they sent any map to us.
20         Q.    And are you aware of whether race data
21    was one of the categories of data that was part of
22    that?
23         A.    I believe it was, yeah.
24         Q.    What other ways was race considered as
25    maps were developed, congressional maps were
```

Page 249

1     to, I guess, a lesser extent Mr. Breeden, is there

2     anyone else who was involved in the initial Staff

3     Plan development?

4           A.    I'm not sure there was some discussion

5     with members.  I don't recall specifics.  I don't

6     remember if at that point we already knew that Luke

7     Rankin, for example, didn't want the 7th changed at

8     all.  I think we probably knew that.  I can't

9     recall.  It would have been broad strokes like

10    that.

11                Campsen may have mentioned, you know,

12    talked to congressman in Charleston and keeping the

13    blue -- I'm sorry, the red nature, slight Trump

14    advantage.  He may have mentioned that to us.  I

15    don't remember that far back.

16          Q.    How did public input from the ten

17    hearings that you attended, how was it reflected or

18    implemented in that initial Staff Plan?

19          A.    Well, I mean, I think we took some of

20    it into account.  I mean, I don't remember exactly.

21    I do not remember specific outside input prior to

22    the staff map being put into the staff map, but the

23    general sense we got from the public and all that,

24    I think that was all to be refined by the members

25    based on what weight they had, what weight they put

Page 250

1   on different testimony and different criteria in

2   the maps.

3          Q.    What data did you rely on to develop

4   the initial Staff Plan?

5          A.    Census data.  I don't remember the

6   extent to which we relied on political data, but I

7   assume we did because they wanted the least change

8   map.  I'm almost positive we at some point had

9   instruction from somebody, maybe Senator Campsen,

10  to make sure that Congressional District 1 retained

11  its political numbers.  I can't recall for sure.

12         Q.    How many meetings were held to develop

13  this initial plan?

14         A.    I don't remember.

15         Q.    More than one?

16         A.    Oh, yeah.  I'm sure.

17         Q.    How many versions of the initial Staff

18  Plan became the one that was introduced on the

19  23rd?

20         A.    I don't recall.

21         Q.    Were the guidelines consulted during

22  development of the initial Staff Plan?

23         A.    Yes.

24         Q.    And who assessed whether the guidelines

25  had been followed in the development of this

Page 251

1   initial Staff Plan?

2           A.   I think in the initial phase, it would

3   have been, you know -- Charlie would have been the

4   main word in the room whether or not we were

5   following the guidelines appropriately.  Paula was

6   in the room; I was in the room; will was in the

7   room; Breeden was in the room.  I don't know that

8   any one of us, you know, assumed the primary

9   enforcer of guidelines, but clearly Charlie's

10  experience and Will's experience and Paula's

11  experience, they had, you know, more experience.

12  So they had more experience, I suppose.

13          And then I do believe we sent it to

14  Gore before we published it as the Staff Plan.  I'm

15  almost positive we did.

16          Q.   I probably will not go through all the

17  criteria, but without doing that, is it your

18  position that multiple people assessed whether the

19  one person, one vote had been complied with with

20  the initial Staff Plan or was there one person?

21          A.   With that with one person, one vote, I

22  would say that was just Will with his computer

23  because, I mean, he could see it.  He could get it

24  down to one person, one, you know, deviation.  That

25  wasn't a judgment call really, that was just a

Page 252

1    fact.

2        Q.    What about Section 2?  Who was

3    responsible for assessing whether or not the

4    initial Staff Plan complied with Section 2 of the

5    Voting Rights Act?

6        A.    That would have been outside counsel,

7    Charlie Terreni and John Gore.

8        Q.    Are you aware of whether a second

9    majority black district or district comprised of a

10   majority of black voters was attempted to be drawn

11   during the congressional redistricting process?

12       A.    I don't recall that.  If it happened,

13   it wasn't -- I don't recall that, no.  It might

14   have been maybe, but I don't remember.  You mean

15   two minority-majority districts?

16       Q.    Yes.

17       A.    I don't think so.  I don't recall.

18       Q.    Do you recall being aware that it was

19   not possible one way or the other to draw two, one

20   more than what had been in place?

21       A.    I mean, I don't think I was -- me

22   personally from my own personal information, I

23   wasn't aware of that, but I think we -- I don't

24   recall talking about that so, I mean, were we aware

25   of that?  I don't really remember.  I mean, from my

Page 253

 1    recollection -- I guess we'd call this an eyeball
 2    test -- I don't remember it being possible.
 3         Q.   And do you think you can make a
 4    determination about whether there can be a majority
 5    black district based upon an eyeball view?
 6         A.   Well, I mean, looking at it, looking at
 7    the map and where the population was, I just don't
 8    think we thought -- and this is in Section 2 House
 9    so it would be much more in Charlie's wheelhouse,
10    but I don't think -- and also no one ever came to
11    us and asked us to do one either, so I think those
12    are the factors that kind of led us down that path.
13    I don't recall anybody ever asking us to do that.
14         Q.   But you are not aware of anyone
15    affirmatively attempting to draw an additional
16    majority black district?
17         A.   No.   I don't recall ever doing that,
18    no.
19         Q.   Was the political data, the 2020
20    presidential election data considered during the
21    development of this initial Staff Plan?
22         A.   I believe so, yes.
23         Q.   Was a racially polarized voting
24    analysis conducted during consideration of this
25    initial Staff Plan?

Page 254

```
 1              MR. TYSON:  Objection; asked and
 2      answered numerous times.
 3              THE WITNESS:  No.  Not to my knowledge,
 4      no.
 5   BY MS. ADEN:
 6        Q.   Who would have been responsible for
 7      making the assessment that the initial Staff Plan
 8      was not a racial gerrymander?
 9        A.   We would have relied upon Charlie
10      Terreni and John Gore.
11        Q.   What about whether the districts were
12      contiguous?  Who would have made that assessment in
13      the initial Staff Plan?
14        A.   It would have probably been -- Will
15      drew the map so he could see whether things were
16      produced or not.  So we all looked at the map, but
17      he was actually drawing a map so that's pretty much
18      a no brainer to draw a map that's contiguous.
19        Q.   And what about communities of interest?
20      Who would have taken responsibility to ensure that
21      those kind of guideline criteria respecting
22      communities of interest was respected, reflected in
23      the initial Staff Plan?
24        A.   I think it would have been a kind of
25      everybody in the room discussion.
```

Page 255

1    Q.   And what about constituent consistency?
2    Who would have been responsible for making that
3    determination?
4        A.   Again, everybody in the room
5    discussion.  And by seeing the map, you know, which
6    didn't change a lot of lines -- just about anybody
7    could make that initial change -- but again, this
8    was a first staff map so I don't know that we
9    really were cognizant of everything because we knew
10    it was going to change.  We knew the numbers were
11    going to change it.
12        Q.   And who would have been responsible for
13    determining whether the plan minimized divisions of
14    counties, cities and towns, and/or splits of VTDs?
15        A.   I think those are again numbers that
16    really would have happened but not determined.
17    It's just what the numbers were.
18        Q.   And district compactness?
19        A.   Compactness?
20        Q.   District compactness.
21        A.   Yeah.  I mean, I guess, you know,
22    everybody in the room kind of again looked at it
23    knowing that we were going to have many changes.
24    And all this would have gone on the back end up to
25    Charlie Terreni and John Gore.

Page 256

1          Q.    Have you heard of the term
2     effectiveness analysis?
3          A.    I have not.  Well, I can't place it.  I
4     don't recall.
5          Q.    During discussion of the initial Staff
6     Plan or development of the initial Staff Plan, was
7     there discussion about increasing, decreasing, or
8     maintaining the black voting age population in
9     particular districts?
10          A.    No.  I mean, I think everyone was
11     cognizant that, you know, drastic changes in a
12     staff map -- drastic changes meaning that we were
13     requested to produce a least change map was always
14     undoubtedly with problems.  In answering all these
15     questions I'm giving, that was something we thought
16     about.
17          Q.    Did you set out to preserve the same
18     number of majority-minority districts in the
19     initial Staff Plan as existed in the 2011 Staff
20     Plan?
21          A.    Because it was a least change map plan,
22     I think that was sort of the necessary result that
23     came about.
24          Q.    What role did partisan considerations
25     play in the development of the initial Staff Plan?

Page 257

1          A.   I think we're cognizant -- again, this

2     is from -- I'm pretty sure we talked to Senator

3     Campsen about this, that he wanted the 1st district

4     to stay a Republican-leaning district.

5          Q.   Did you set out to keep the black

6     voting age population in CD6 the same as in the

7     Benchmark Plan in your endeavor to do a least

8     change map?

9          A.   It wasn't the first thing we looked at

10    no, huh-uh.

11         Q.   Was it something you looked at down the

12    road about whether the black voting age population

13    in CD6 looked similar to or was the same as in the

14    2011 benchmark map?

15         A.   I don't remember if we did.  We may

16    have.  I don't remember.

17         Q.   Did someone give you a direction or you

18    or others in the room developing that map on the

19    number of majority-minority districts that the

20    initial Staff Plan should include?

21         A.   No.  But the instructions for least

22    change map, I think, would follow that.

23         Q.   Did you have any target be the target

24    in any district outside of CD6?

25         A.   I don't think we had a target do that

Page 258

1     in any district.

2          Q.   Did you have a goal of getting BVAP in

3     any particular district outside of CD6?

4          A.   No.  We didn't have a goal in CD6 per

5     se.  There was no goal to sort of say get CD6 BVAP

6     on any district.

7          Q.   But there was a goal to keep the map as

8     minimally changed at least as Senator Rankin --

9          A.   Correct.  Yes, ma'am.

10          Q.   Turning to November 29th, after the

11     Senate Redistricting Committee published the map,

12     what, if anything, did you do on congressional

13     redistricting from November 23rd until the 29th

14     when it was published?

15          A.   You know, I don't recall exactly what

16     was going on at that point.  That would have been

17     around Thanksgiving?

18          Q.   Around that time, yes.

19          A.   Then probably not too much because that

20     week was probably shut down or at least not very

21     active because it was Thanksgiving.

22          Q.   For the November 29th hearing, did you

23     prepare any materials?

24          A.   I did not that I recall.

25          Q.   Were those materials similar to the

Page 259

1    ones you described for earlier hearings?

2          A.    Yeah.   I can't remember which meeting

3    that was.  Was that the one to receive comment

4    about the staff map?

5          Q.    Exactly.  And this is the one where, to

6    refresh your memory, Senator Harpootlian talks

7    about NRRT and Mr. Roberts introduces the initial

8    Staff Plan.

9          A.    Right.   Okay.  No, he would have

10   prepared -- Mr. Roberts would have prepared his

11   little narrative of what the Staff Plan did.  And

12   I'm sure that we had the Staff Plan in notebooks.

13   And I'm not sure if we had other plans in there,

14   but I don't think so.

15         Q.    What was your role at that hearing on

16   November 29th?

17         A.    I was sitting on the back row right

18   behind Senator Harpootlian just watching and seeing

19   how members reacted to the map and listened to what

20   they had to say about the map.

21         Q.    Is that the role that you played in all

22   the hearings or did you have different roles

23   depending upon the hearing?

24         A.    No.  That's pretty much my role.  I

25   listened and talked to them later about it and

Page 260

1    asked them, hearing what they wanted done.

2         Q.   Were you providing legal guidance or

3    advice to any members during any of the hearings?

4         A.   I don't believe so, no, huh-uh.

5         Q.   Was anybody?

6         A.   Mr. Terreni was there.  I don't recall

7    how many times someone asked for legal advice, but

8    he would have been the person for it.

9         Q.   Did you have any concerns that a

10   minimal change plan could carry over concerns that

11   voters may have had with the previous 2011 map?

12        A.   I'm sure it had something to do on the

13   map.  I'm sure, because there were people concerned

14   about being the least change map, yes, obviously,

15   we should do that.

16        Q.   During that hearing, do you recall any

17   concerns about the process for rolling out

18   congressional maps not being transparent?

19        A.   I think there were some folks that were

20   concerned about -- I want to say there was some

21   people concerned about technology barriers, you

22   know, some folks not able to use the Internet.

23        Q.   Do you recall any concerns about

24   packing and cracking of black communities in the

25   initial Staff Plan?

1          A.    I don't recall.  I'm sure someone,

2     probably a member of the public, maybe said

3     something like that.  I didn't get anything from --

4     I don't recall questions from members about it.

5          Q.    Okay.  I want to next briefly discuss

6     the congresional proposals from the House side and

7     we can move through these pretty quickly.  In

8     December, were you aware that the House

9     Redistricting Ad Hoc Committee was working on its

10    first Staff Plan?

11         A.    For congressional?

12         Q.    For congressional.

13         A.    I'm sure I was.  I don't particularly

14    recall that.  I'm sure I was aware of that, yes.

15         Q.    Were you aware of when the House

16    released its first Staff Plan on December 13th?

17         A.    I was.

18         Q.    Did you review that plan?

19         A.    I looked at it.  I didn't do any sort

20    of in-depth analysis of it.

21         Q.    Is this the time where you met briefly

22    with Patrick Dennis or do you think that was a

23    different occasion?

24         A.    Are you talking about their formal

25    meeting?

Page 262

1          Q.    The ad hoc was working on a plan and
2     they released it on December 13th.  And I guess my
3     question is is that when -- like how did you know
4     that it was released on the 13th?  Is that when
5     Patrick Dennis shared it with you?  Did you follow
6     it in the legislative process?
7          A.    I would have been following it a little
8     bit, yes.  And I can't remember exactly when
9     Patrick Dennis showed me that on the map.
10         Q.    Did you have any input into that plan,
11    the Staff Plan for the House?
12         A.    No.
13         Q.    What did you think about that plan?
14         A.    I didn't really have any thoughts on
15    the plan.  My job was to get a Senate plan together
16    so I didn't -- I don't recall having any sort of
17    in-depth review of it ever happening.
18         Q.    Were you aware of the hearing the House
19    held on the ad hoc plan on December 16?
20         A.    I probably was aware of it.  I wasn't
21    at it.  I don't recall much.
22         Q.    Did you attend that hearing?
23         A.    Not that I recall.
24         Q.    Did you talk to people about it?
25         A.    Not that I recall, no.

Page 263

1          Q.    Were you aware when the House

2    Redistricting Ad Hoc Committee released an

3    alternative Staff Plan on December 22nd?

4          A.    I'm sure I was.

5          Q.    Do you think you reviewed that plan?

6          A.    If I did, it was very briefly.  I

7    didn't do a major analysis of it.

8          Q.    Were you aware that it was based on the

9    staff's initial Staff Plan -- the Senate's initial

10   Staff Plan?

11         A.    Okay.  Now you jogged my memory.  Yeah,

12   I think that is the case.  Yes, I do recall that.

13   Yes.

14         Q.    And did you have any input into the

15   House's alternative plan?

16         A.    I did not.

17         Q.    What did you think about their plan,

18   the Alternative House Staff Plan?

19         A.    This is the one that looks strangely

20   similar to the Senate plan?

21         Q.    Yes.

22         A.    I thought it was probably a compromise

23   that a good percentage of this report, they could

24   agree to go along with the Senate.  If it was based

25   on the Senate plan already, then the majority of

Page 264

1    the senators -- it's just like any piece of

2    legislation.  If the House comes back with a piece

3    of legislation that substantially tracks the

4    Senate's version of a piece of legislation, as

5    opposed to a different document, a different draft

6    the House passed, we would just intuitively know it

7    still had a chance to pass.  That's what my thought

8    would have been.

9         Q.    Thank you.

10             Were you involved in any conversations

11   about the House staff's plan mirroring the Senate's

12   initial Staff Plan with any leadership in the House

13   or Senate?

14        A.    Leadership, no.  I'm sure as staffers

15   we probably, you know, we noticed what they were

16   doing.  When we found out what they were doing, I

17   probably thought to myself, well, this might make

18   our lives easy because they were doing something

19   that was similar in the past.

20        Q.    Were you aware of the hearing that the

21   House held on this alternative Staff Plan on

22   December 29th?

23        A.    I'm sure I was aware of it.  I don't

24   recall going to it or watching it or reading about

25   it.

Page 265

```
 1          Q.   Do you recall learning about similar

 2     concerns that the House's alternative plan as

 3     compared to the Senate's initial Staff Plan packed

 4     and cracked black voters?

 5          A.   Someone may have said that, but I do

 6     not personally recall that.

 7          Q.   Turning to the Senate's Second Draft

 8     Plan, I'm now marking an email -- this is tab 70 --

 9     which is from Chip Campsen to John Breeden [sic]

10     and you're copied on it.  It's dated January 11th,

11     2022, and it attaches a Plan Comparison Sheet.  It

12     is South Carolina Senate 22549 to 22550.

13               MR. AUDAIN:  Leah, tell me again what

14     tab it is.

15               MS. ADEN:  Tab 70 for us, I hope.

16               (EXHIBIT 13, Email from Chip Campsen to

17     Breeden John dated January 11, 2022, Bates labeled

18     SCSENATE_00022549, was marked for identification.)

19               THE WITNESS:  22549?

20     BY MS. ADEN:

21          Q.   22549 to 2250 -- 22550?

22          A.   Yes, ma'am.  I've got it.

23          Q.   Okay.  Do you recall receiving this

24     email?

25          A.   I don't recall receiving it.  I do
```

Page 266

1   recall this bit.  I think he was trying to decide

2   how many people in Daniel Island.

3           Q.   Was it common for Senator Campsen to

4   use his personal Gmail to correspond about

5   congressional redistricting?

6           A.   No, huh-uh.  I mean, not that I can

7   recall.  He didn't do a lot of email so, no.

8           Q.   Were you involved in the preparation of

9   the data reported here?

10          A.   No.

11          Q.   Do you know why there was a focus on

12  Charleston and Daniel Island?

13          A.   Because that's the area that Chip

14  Campsen represents.

15              MS. ADEN:  Raymond, I'm not sure if 15

16  is the right document that you've uploaded into

17  Exhibit Share.  It's South Carolina Senate 22549,

18  22550, which you might see at the end.  Are you

19  hearing me because I can't hear you.

20              MR. AUDAIN:  Yeah, I'm hearing you.

21  We're at 13.  You said tab 70?

22              MS. ADEN:  Yes.  Oh, wait.  I

23  understand why.  I somehow got into the wrong

24  folder.

25              Can we go off the record for just two

Page 267

```
 1    minutes?  I want to make sure I'm in the right
 2    folder.
 3                THE REPORTER:  Yes.
 4                MS. ADEN:  Okay.  I'm back.  Thank you.
 5    BY MS. ADEN:
 6         Q.   If you could look at the document
 7    titled 2250 or Bates stamped 22550, I apologize.
 8         A.   I don't see one marked that, but it's
 9    the next page, I assume.
10         Q.   Yeah, I think it fell off.  I apologize
11    for that too.  South Carolina Senate 22550.
12         A.   Yep.  I've got it.
13         Q.   What information is this chart
14    reporting?
15         A.   It looks like it's got -- is it maybe
16    that 19,000 people or subtracted 19,000 people from
17    Charleston and Daniel Island?  Looks to be
18    comparisons population.
19         Q.   So the DI in the second set of data on
20    the bottom, DI is referring to Daniel Island?
21         A.   I think so.
22         Q.   And does it look like it's reporting
23    the population numbers and Trump support in several
24    counties under various plans?
25         A.   Yes, it is.
```

```
                                            Page 268
 1           Q.    And the counties include Charleston,
 2      Berkeley, Dorchester, and Beaufort?
 3           A.    Yes.
 4           Q.    And the plans considered are the
 5      Benchmark 2011 plan, the Senate Staff Plan, the
 6      House Judiciary Plan, and the House Judiciary Plan
 7      Senate Amendment 1?
 8           A.    Yes.
 9                 MR. TYSON:  Leah, I don't know, did you
10      say Benchmark 2011?
11                 MS. ADEN:  Sorry, 2020.  Thank you for
12      correcting me.  Benchmark 2020.
13      BY MS. ADEN:
14           Q.    Is it Benchmark 2020 or does it
15      actually say?  But would you assume that it would
16      be or do you know?
17           A.    With the number that, I would assume it
18      would be.  I don't know.  I couldn't tell you from
19      this document.
20           Q.    Looking at all of the measures -- and I
21      want to focus on the Trump column -- does it
22      reflect that in all of the plans compared -- and
23      again, we don't know which benchmark we're
24      referring to, but between the plans compared, that
25      in Charleston, Berkeley, Dorchester, and Beaufort,
```

```
                                            Page 269
 1    that the Trump share of the vote increased from the

 2    Benchmark Plan?

 3           A.    Yes.  I think you can see.

 4           Q.    From 53 percent to over 54 percent in

 5    some of those areas?

 6           A.    Yes.

 7           Q.    And it looks like under both measures,

 8    the top columns -- the top rows and the bottom

 9    rows, that the population of Charleston is reduced

10    significantly from the Benchmark Plans or reduced?

11           A.    Yes.  I think so.

12           Q.    Is this the type of political data that

13    we've been discussing this afternoon that was

14    reported with plans that you and others who were

15    working on plans would provide?

16           A.    Sure.  Yeah.

17           Q.    Did you attend the meeting where this

18    information -- was there a meeting where this

19    information was shared to Senator Campsen?

20           A.    I don't recall whether this was

21    something we shared with him at a meeting or got

22    to -- I'm sure at some point he talked with us

23    about it, I'd say.  He wouldn't have just received

24    this information cold and not discussed it at some

25    point.
```

```
                                                  Page 270
 1          Q.    So it was customary that if data or
 2    information was shared with Senator Campsen, even
 3    if it was emailed, you would then subsequently meet
 4    with him by phone, in person to discuss it?
 5          A.    Correct.  Correct.  Yes.  He was very
 6    involved.
 7          Q.    Was that true of other members?
 8          A.    He was probably the most involved of
 9    anyone.  Definitely he was involved more.
10          Q.    On January 11, 2022, the Senate
11    Redistricting Subcommittee provided a notice that
12    it posted two proposed congressional plans to be
13    considered on January 13 two days later.  Do you
14    recall that?
15          A.    Yes.  I think I do, yeah, uh-huh.
16          Q.    Do you have any concerns that there
17    wasn't enough notice to the public for them to
18    meaningfully review the two proposed maps between
19    when notice was published and when the hearing was
20    held?
21          A.    I mean, obviously that's a short period
22    of time, but we were -- I think my recollection is
23    that we were on deadline set by court so they
24    wanted us moving.
25          Q.    Now onto the proposed plans.  Would you
```

Page 271

```
 1    agree that one was an amendment by Senator
 2    Harpootlian and the other was a plan generated by
 3    staff including you?
 4           A.    The other one was one created primarily
 5    by staff at the direction of Senator Campsen so it
 6    wasn't just a Staff Plan.  Campsen was involved
 7    with it.  I want to say Grooms was involved with
 8    it.  There was some other things that other members
 9    were involved with it, I believe.  I would say the
10    member most involved was Senator Campsen.
11           Q.    Can we call the Staff Plan with input
12    from Senator Campsen the Second Senate Staff Plan
13    for purposes of discussing it for the next few
14    minutes?
15           A.    I'm sorry, I didn't quite catch that.
16           Q.    The one that was developed by staff and
17    you said with some direction from Senator Campsen,
18    can we refer to that colloquially as the Second
19    Senate Staff Plan?
20           A.    I would say even more accurately for
21    sure there was much more member input there so it
22    would be maybe the Subcommittee Draft Plan.  I
23    can't just say draft plan.  I get you're trying to
24    just make it easier to talk, but I don't want it
25    lost in the shuffle and have people maybe read this
```

                                                    Page 272

1    and say, oh, that was the Staff Plan.  It wasn't.

2          Q.    But it was the second plan produced by

3    the subcommittee?

4          A.    Yes.  I mean, that's fair.

5          Q.    And was it also referred to in the

6    public testimony as Senate Amendment 1?

7          A.    I believe it was.  I just know there

8    was one that was basically the Campsen and then the

9    other one was the Harpootlian Amendment.

10         Q.    And the Harpootlian plan, do you recall

11   it being referred to as Senate Amendment 2 in

12   discussions on the floor?

13         A.    I think so, yeah.

14         Q.    When did the process start for the

15   development of the Campsen 1 -- what are we

16   referring -- I would just like something.  How will

17   you refer to the Campsen Plan as compared to the

18   Harpootlian Plan so that we can be on the same

19   page?

20         A.    I would maybe call it Campsen Plan.  He

21   was the subcommittee member that had the most

22   involvement.

23         Q.    When did the process start in the

24   development of the Campsen Plan?

25         A.    I don't specifically recall.

Page 273

1   Probably -- I think there were -- I don't remember.

2   I don't remember.  There was obviously elements of

3   that Campsen Plan that came from the Staff Plan.

4   So I guess in earnest it probably happened sometime

5   before that subcommittee admitted the Staff Plan.

6        Q.   And you mentioned staff and Campsen

7   primarily worked on it.  Which staff members are

8   you referring to with respect to the Campsen 1

9   Plan?

10       A.   The people that were in the room at

11  that point in time would have been the same as

12  usual, Charlie Terreni, Will Roberts, myself,

13  Breeden John, and in and out Paula Benson and Maura

14  Baker.

15       Q.   Maura Baker?

16       A.   Maura Dawson Baker, yes, ma'am.

17       Q.   Okay.  What about Senators Bright

18  Matthews, Sabb, and/or Harpootlian?  Were they

19  involved in the Campsen 1 development?

20       A.   Yeah.  I mean, I guess you could say

21  they were.  Harpootlian, I don't think was.  But I

22  can't say to the extent of which the other plans

23  that we drew from Margie Bright Matthews and Ronnie

24  Sabb affected the Campsen Amendment off the top of

25  my head.  But, I mean, they would have seen it.

Page 274

```
 1    They would have looked at it for sure, I think.  I
 2    may be mistaken, but I think they would have
 3    probably seen it.
 4              This was about the same time we had
 5    drafted plans for them that were never offered as
 6    amendments like the Sabb -- I specifically remember
 7    a plan that Will drew at Sabb's direction that kept
 8    Charleston whole.  It was called Charleston Strong.
 9    So, I mean, to the extent we saw that plan and we
10    then talked to him about the other plan and talked
11    to Campsen, I'm sure there was some interplay
12    there.  I just don't remember exactly how much it
13    was.  I can't recall it.
14         Q.   And this Campsen Plan, was NRRT
15    involved in its development at all?
16         A.   No.
17         Q.   Anyone from the House?
18         A.   No.
19         Q.   How many meetings roughly do you think
20    it took to come up with the Campsen 1?
21         A.   Public meetings or meetings with him?
22         Q.   Meetings with him.
23         A.    I can't -- I would say maybe eight to
24    ten here and there of different phone calls.  I
25    mean, yeah, it was...
```

Page 275

```
 1          Q.   Did he come into the map room for the
 2    development of this one plan?
 3          A.   Sometimes he did and I think other
 4    times he Zoomed and other times it was just phone
 5    calls.
 6          Q.   What data did you rely on to develop
 7    the Campsen 1 Plan?
 8          A.   The same data we relied on most of the
 9    time, you know, information like we've got in the
10    this whatever it is you've got marked 22550.  I
11    mean, that's sort of the type of information we're
12    looking to see where the population moved.  So,
13    yeah, that would be typical information I would use
14    as an example.
15          Q.   So on this chart it looks like
16    population numbers and percentages and vote shares
17    for Trump in the 2020 election, but it -- or I'm
18    not even sure if it's the 2020 election, but vote
19    share for Trump, but it does not include any
20    demographic data based upon race or ethnicity; is
21    that fair?
22          A.   Yes, that's fair.
23          Q.   So when you were working with Senator
24    Campsen on these approximately eight to ten
25    sessions -- and I understand it's an
```

```
 1    approximation -- did you consider the BVAPs in any
 2    particular district during those conversations?
 3            A.   I don't recall him ever asking about
 4    that.  I don't.  That's probably why it wasn't on
 5    this sheet here that was produced for him.  I know
 6    I think on the back end someone probably -- we can
 7    take a look to see if maybe Charlie or somebody to
 8    make sure we didn't do something that wasn't
 9    satisfied state or federal constitution.  I really
10    almost specifically recall Campsen not asking.
11            Q.   Was there one Campsen proposal that was
12    being tweaked or were there various iterations of
13    the map that became Campsen 1?
14            A.   I think it was sort of a living,
15    breathing...  Over the few days, it was changed and
16    tweaked and, you know, that kind of thing.  There
17    may have been more than one, but I don't think so.
18    It was easier just to draw the map and save it and
19    refer to previous versions of the map.  So, yeah, I
20    guess you could say in a way there was more than
21    one map because if we did something on a Monday and
22    saved it and then did something on Tuesday, we
23    generally, I think kept that map from Monday just
24    in case it was needed or something.  That wasn't
25    always the case.
```

Page 277

1          Q.   And do you know why the version that
2     became Campsen 1, why that was the one selected
3     from among the other iterations that may have led
4     up to it?
5          A.   I seem to recall that's the one he
6     wanted to offer as an amendment.
7          Q.   And it was his call?
8          A.   I think he offered it as an amendment.
9     I don't remember.  That would make sense.  I mean,
10    it had to be offered as an amendment and so I think
11    he offered it as an amendment.
12         Q.   And did this map also go to the -- you
13    mentioned Mr. Terreni was in the room with Senator
14    Campsen or on phone calls with Senator Campsen when
15    this was developed.  Was this map also sent to
16    Mr. Gore to review?
17         A.   Yes.  I'm sure.
18         Q.   Before it was offered?
19         A.   Yes.  I'm sure.
20         Q.   Okay.  Was there a subsequent version
21    of a map developed after it went up to Gore,
22    Mr. Gore?
23         A.   I don't remember.  I don't remember.
24    If there was, it was something that was minor
25    tweaked or if it was anything major, it would have

Page 309

```
 1    other folks during that time period towards the end
 2    of the process.
 3           Q.   So the point of this was to give him a
 4    script to potentially defend Campsen 1?
 5           A.   No, I don't think it was intended as a
 6    script because I don't think it was ever used as a
 7    script.  I don't recall it ever being used as a
 8    script.  I think it was just anticipating
 9    questions, some of which I think might have been
10    asked, some of them weren't.  I don't think it was
11    intended as a script.
12           Q.   Prior to other hearings, were there --
13    are you aware whether talking points were created
14    for Senator Campsen for each of the hearings
15    that --
16           A.   I recall us creating it and maybe
17    talking it over with Senator Campsen.
18           Q.   You do or do not?
19           A.   I'm sorry?
20           Q.   You do or do not recall?
21           A.   I do not recall creating a bunch of --
22    well, I didn't personally that I can remember
23    creating talking points for Senator Campsen.  I
24    think we saw some back there that maybe Breeden put
25    together and then the comparison that Will did.  I
```

Page 310

```
1    mean, those are probably the closest things to
2    talking points.  There probably were some talking
3    points for him on the floor, and I'm sure we
4    produced those, but it wasn't -- every time Senator
5    Rankin ran a meeting, Paula Benson would put a
6    script together for him.  I don't know that that
7    was done every time with Campsen so no.
8            Q.    At the January 19th hearing of the full
9    Senate judiciary, which I believe you mentioned you
10   were present, what was your understanding of the
11   purpose of that hearing?
12           A.    Which one, the last --
13           Q.    January 19th, the full Senate
14   judiciary.
15           A.    I think that was to report a bill out
16   to the floor that could be taken up on the floor
17   for a congressional plan.  I think that's probably
18   the right timeframe.  As I mentioned before, we
19   were trying to set it up, so...
20           Q.    And do you recall that it was at that
21   hearing where various amendments, particularly the
22   ones by Senator Hutto and another potentially
23   Martin and Harpootlian 3A were presented.  Do you
24   recall that?
25           A.    I don't recall those specifically, but
```

```
                                           Page 311
 1    it sounds correct.
 2            Q.   Are you aware whether any of those
 3    amendments that were offered then were adopted?
 4            A.   I do not recall that.  Name the
 5    members' amendments again.
 6            Q.   There's a Hutto Green Fix 2, a Hutto
 7    Amendment 6, a Hutto Amendment 5, a Hutto
 8    Amendment 4, a Martin Spartanburg Fix and a
 9    Harpootlian Amendment 3A.  Are you familiar with
10    any of those?
11            A.   Not off the top of my head, no.
12            Q.   Are you aware of any amendment being
13    introduced on January 19th when you were at the
14    hearing that passed?
15            A.   I don't recall.  That Martin one might
16    have.  I don't recall.  He may have put it down.
17            Q.   After the Senate judiciary voted out
18    the Second Senate Staff Plan -- well, let me ask
19    you.
20                 Do you agree that the Senate Judiciary
21    Committee voted out the Second Staff Plan,
22    Campsen's Plan, and not Harpootlian's Plan?
23            A.   Yes, that's correct.
24            Q.   What was your role after that hearing?
25    Did you remain involved in congressional
```