*SC NAACP v. Alexander,*
D.S.C. Case No.  3:21-cv-03302-MGL-TJH-RMG

# Exhibit H

Page 1

1          UNITED STATES DISTRICT COURT
             DISTRICT OF SOUTH CAROLINA
2                COLUMBIA DIVISION
3    THE SOUTH CAROLINA
     STATE CONFERENCE OF
4    THE NAACP, et al,
5              Plaintiffs,
6         vs.             CASE NO.
                          3:21-CV-03302-MBS-TJH-RMG
7    THOMAS C. ALEXANDER,
     et al,
8
               Defendants.
9
10   VIDEOCONFERENCE
11   DEPOSITION OF:  WILLIAM ROBERTS
12   DATE:           July 7, 2022
13   TIME:           9:35 a.m.
14   LOCATION:       1310 Gadsden Street
                     Mahogany Conference Room
15                   Columbia, SC
16   TAKEN BY:       Counsel for the Plaintiffs
17   REPORTED BY:    ERIC GLAZIER, Court Reporter
18
19
20
21
22
23
24
25

```
                                              Page 2

 1       APPEARANCES OF COUNSEL VIA VIDEOCONFERENCE:

 2

 3            ATTORNEYS FOR THE PLAINTIFFS:

 4                 NAACP LEGAL DEFENSE AND EDUCATIONAL
                   FUND

 5                 BY:  JOHN S. CUSICK
                   40 Rector Street

 6                 5th Floor
                   New York, NY 10006

 7                 (212) 965-2269
                   Jcusick@naacpldf.org

 8
                   and

 9
                   AMERICAN CIVIL LIBERTIES UNION

10                 BY:  ADRIEL CEPEDA DERIEUX
                   125 Broad Street

11                 18th Floor
                   New York, NY 10004

12                 (212) 549-2500
                   Acepedaderieux@aclu.org

13
              ATTORNEYS FOR DEFENDANTS

14                 THOMAS C. ALEXANDER, in his official
                   capacity as President of the Senate;

15                 LUKE A. RANKIN, in his official
                   capacity as Chairman of the Senate

16                 Judiciary Committee:

17                 ROBINSON GRAY
                   BY:  ROBERT E. TYSON

18                 1310 Gadsden Street
                   Columbia, SC 29201

19                 (803) 929-1400
                   Rtyson@robinsongray.com

20
                   and

21
                   JONES DAY

22                 BY:  JOHN M.  GORE
                   51 Louisiana Avenue NW

23                 Washington, DC 20001
                   Jmgore@jonesday.com

24

25
```

```
 1          ATTORNEYS FOR DEFENDANTS
                    JAMES H. LUCAS, in his official
 2                  capacity as Speaker of the House of
                    Representatives; CHRIS MURPHY, in his
 3                  official capacity as Chairman of the
                    House of Representatives Judiciary
 4                  Committee; WALLACE H. JORDAN, in his
                    official capacity as Chairman of the
 5                  House of Representatives Elections Law
                    Subcommittee:
 6
                    NEXSEN PRUET
 7                  BY:  ANDREW MATHIAS
                    104 South Main Street
 8                  Suite 900
                    Greenville, SC 29601
 9                  (864) 282-1195
                    Amathias@nexsenpruet.com
10
            ATTORNEYS FOR DEFENDANTS
11                  JOHN WELLS, Chair, JOANNE DAY, CLIFFORD
                    J. EDLER, LINDA McCALL, and SCOTT
12                  MOSELEY, in their official capacities
                    as members of the South Carolina
13                  Election Commission:
14                  BURR & FORMAN
                    BY:  JANE W. TRINKLEY
15                       MICHAEL R. BURCHSTEAD
                    1221 Main Street
16                  Suite 1800
                    Columbia, SC 29201
17                  (803) 753-3241
                    Jtrinkley@burr.com
18                  Mburchstead@burr.com
19
20          ALSO PRESENT VIA VIDEOCONFERENCE:
21                  MARGARET LEATHERWOOD
                    CYNDI NYGORD
22
23
24              (INDEX AT REAR OF TRANSCRIPT)
25
```

Page 4

1                    P R O C E E D I N G S

2                         - - - - -

3              COURT REPORTER:  The attorneys

4    participating in this deposition acknowledge that

5    the reporter is not physically present in the

6    deposition room and that the reporter will be

7    reporting this deposition remotely.

8                 They further acknowledge that in lieu

9    of an oath administered in person, I will

10   administer the oath remotely.

11                If any party has an objection to this

12   manner of reporting, please state it now.

13                Hearing none, I will proceed.

14                   WILLIAM ROBERTS,

15   being first duly sworn, testified as follows:

16                      EXAMINATION

17   BY MR. CUSICK:

18         Q.   Good morning, Mr. Roberts.  My name is

19   John Cusick.  I'm one of the attorneys representing

20   the plaintiffs in this lawsuit, The South Carolina

21   State Conference of the NAACP vs. Alexander.

22                If you don't mind, could you please

23   state your full name for the record, spelling your

24   first and last name?

25         A.   My name is William Francis Roberts, Jr.

```
                                                 Page 5
 1     W-I-L-L-I-A-M is the first name.  Last name is
 2     Roberts, R-O-B-E-R-T-S.
 3            Q.   Great.  Thank you.
 4                 MR. CUSICK:  And I'll just take a
 5     moment now, if everybody in the virtual room, if
 6     you will, who is planning to make an appearance,
 7     will do so in a moment.
 8                 And I'll start with any of your counsel
 9     in your room, Mr. Roberts.
10                 MR. GORE:  Good morning.  This is John
11     Gore of Jones Day for senate defendants Rankin and
12     Alexander.
13                 MR. TYSON:  And Rob Tyson.  I'm with
14     John and Will.
15                 MR. MATHIAS:  And this is Andrew
16     Mathias with Nexsen Pruet on behalf of the
17     individual house defendants.  With me in the room
18     is Meg Leatherwood, who's a Georgetown law student
19     and summer associate with us at Nexsen Pruet.
20                 MS. TRINKLEY:  This is Jane Trinkley
21     with Burr & Forman.  I represent the election
22     defendants.
23                 MR. DERIEUX:  Hi.  This is Adriel
24     Cepeda of the ACLU, also representing the
25     plaintiffs.
```

Page 54

1            A.    Okay.  Just me and Breeden John.

2            Q.    And who did you primarily seek input

3      and instructions from when you were drawing maps?

4            A.    That would have been Charlie Terreni

5      and Andy Fiffick.

6            Q.    Did Mr. Terreni at all create a binder

7      during the redistricting process with information?

8            A.    That I don't know.

9            Q.    Do you recall any senators having a

10     binder of information related to redistricting?

11           A.    All senate members were given a binder

12     of information on redistricting prior to the -- or

13     at the subcommittee and full committee meetings.

14           Q.    And who prepared that binder?

15           A.    That would have been judiciary staff.

16           Q.    Were there any weekly meetings with the

17     redistricting members, like Mr. Terreni or other

18     staff members, for congressional redistricting?

19           A.    We met daily for a long time, working

20     out maps and discussing congressional

21     redistricting.

22           Q.    On a weekly basis, biweekly?

23           A.    I can't recall.

24           Q.    What was involved in those meetings,

25     generally?

1          A.   It would have been the judiciary staff

2     and Charlie Terreni.

3          Q.   And just so we're on the same page for

4     the staff moving forward, that's Mr. Fiffick, would

5     that include Ms. Faulk?

6          A.   She was in and out of these meetings,

7     as well as Maura Baker was in and out sometimes.

8     Really it was Charlie, Andy, Paula, Breeden, and

9     myself.

10          Q.   Were any other attorneys outside of

11     Mr. Terreni involved in any of these discussions?

12          A.   Mr. Gore, sitting next to me.

13          Q.   And when did Mr. Gore's involvement

14     begin for congressional redistricting?

15          A.   I don't remember the exact date.

16          Q.   Did you have any regular meetings with

17     members of the redistricting subcommittee that

18     weren't -- during their -- that weren't public?

19          A.   Can you repeat the question, please?

20          Q.   Did you have any meetings with any

21     members of the redistricting subcommittee?

22          A.   We did.  We had -- we did have meetings

23     with some of the members.

24          Q.   I know you recalled you can't remember

25     when the weekly meetings were with the core

```
                                              Page 56
 1        redistricting team.  Are there any documents or

 2        documentation of when those meetings occurred?

 3              A.   I didn't take any notes during the

 4        meetings.

 5              Q.   Do you recall if anyone else took

 6        notes?

 7              A.   I can't recall who did or who didn't.

 8              Q.   Do you know who would know?

 9              A.   You'd have to ask each member of the

10        committee if they took notes, or the redistricting

11        committee, the technical committee, I guess you'd

12        call it.

13              Q.   So, I guess, to drill down a little bit

14        on the timeline, you were hired for the position

15        with the senate as a cartographer roughly two years

16        ago; is that right?

17              A.   That's correct, 2020.

18              Q.   And during that first year, 2020 till

19        2021, who were you regularly meeting with?

20              A.   Would have been Charlie Terreni and

21        Andy Fiffick.

22              Q.   And that's it?

23              A.   That's all I can recall.

24              Q.   And then you testified that Mr. Gore at

25        some point joined some of those meetings
```

```
                                           Page 57
 1      beginning -- do you recall if it was before maps
 2      were proposed?
 3              A.    I can't recall.
 4              Q.    Do you know who would be able to
 5      recall?
 6              A.    Either Andy Fiffick or Charlie Terreni.
 7              Q.    And you don't have any general
 8      recollection if it was -- if Mr. Gore joined before
 9      census data was released?
10              A.    I couldn't tell you if it was before or
11      after.
12              Q.    What about before any maps were
13      publically shared by the senate?
14              A.    I couldn't tell you if it was before or
15      after.
16              Q.    Did you have a calendar invite for
17      those meetings?
18              A.    I couldn't tell you.  I'd have to go
19      back and look at my calendar.
20              Q.    Did you turn over the calendar invites
21      for these meetings as part of the request from
22      counsel?
23              A.    I'm not sure.  They would have been
24      included in the emails, I believe.
25              Q.    Who sent out the calendar invites for
```

```
                                          Page 58
 1     these meetings?
 2          A.   If it was a Zoom call, it's typically
 3     Breeden John.
 4          Q.   When was Mr. John first hired?
 5          A.   I don't recall when he was first hired.
 6          Q.   Do you recall how many meetings
 7     Mr. Gore joined --
 8          A.   I don't recall.
 9          Q.   -- regarding congressional
10     redistricting?
11          A.   I don't recall.
12          Q.   More than three?
13          A.   I couldn't say, because he was also
14     involved in the senate redistricting, so I couldn't
15     tell you at all how many he...
16          Q.   Did he participate in person?
17          A.   No, just via Zoom.
18          Q.   When did the process for creating
19     congressional maps begin?
20          A.   I can't give you -- can't give you an
21     exact date.
22          Q.   What about a month?
23          A.   I just -- I can't recall.
24          Q.   Do you understand why Mr. Gore was
25     included in these weekly meetings?
```

Page 59

```
 1            A.   I didn't hire him, so I have no idea.
 2            Q.   Did you have any understanding of his
 3      role in the meetings that you were participating
 4      in?
 5            A.   I believe he was there to give legal
 6      advice.
 7            Q.   Were there any other attorneys outside
 8      of Mr. Gore and Mr. Terreni that were considered
 9      outside counsel?
10            A.   Not that I can recall.
11            Q.   I'll now move on to some questions
12      about the senate redistricting criteria and
13      guidelines.  This is in -- it's labeled Tab 4 in
14      SharePoint.  It'll be labeled Plaintiff's
15      Exhibit 4.  It's titled, The 2021 Redistricting
16      Guidelines, dated -- with adopted September 17,
17      2021, with Bates stamp numbering South Carolina
18      Senate ending in 3721.
19                 Give me one moment to just put it into
20      Exhibit Share, Exhibit -- and I'll pull that up on
21      the screen.
22                 (PLF. EXHIBIT 4, 2021 REDISTRICTING
23      GUIDELINES, was marked for identification.)
24      BY MR. CUSICK:
25            Q.   Can you see this document okay,
```

```
                                          Page 60
 1    Mr. Roberts?  Or if it's easier in front of you...
 2           A.   We've got it pulled up.
 3           Q.   What's your understanding of this
 4    document?
 5           A.   Can I review and read this document
 6    before I answer?
 7           Q.   Yeah, sure.
 8           A.   Okay.  Can you repeat the question,
 9    please?
10           Q.   Sorry, just to take one step back, did
11    you review this document at all in preparation for
12    today's deposition?
13           A.   I've seen it before, but have not read
14    it.
15           Q.   When you say you have not read it, that
16    includes the entire redistricting process?
17           A.   Repeat the question, please.
18           Q.   You said that you skimmed it before,
19    but have not read this document?
20           A.   That's correct.
21           Q.   And so did you at all become aware of
22    this document during the congressional
23    redistricting cycle?
24           A.   Yes.  This is --
25           Q.   Did you rely on --
```

```
                                        Page 61
  1            A.   I'm sorry.  Go ahead.
  2            Q.   No, no, sorry.  Go ahead.
  3            A.   Yeah, this was -- this document was
  4       created prior to the start of the redistricting
  5       process.
  6            Q.   Did it guide your work in drawing maps?
  7            A.   These were the guidelines that were
  8       adopted by the subcommittee, yes.
  9            Q.   And so did you review it as you were
 10       drawing maps?
 11            A.   Not -- (inaudible)
 12            Q.   Sorry.  I don't know -- it might
 13       have -- came in and out for me.  I didn't hear what
 14       you said.
 15            A.   Not as we were drawing maps, did we go
 16       back to this document to review the document.
 17            Q.   Did you review it before you drew any
 18       congressional maps?
 19            A.   This was -- (inaudible)
 20                 (Off-the-record conference to address a
 21       technical issue)
 22       BY MR. CUSICK:
 23            Q.   Mr. Roberts, during the break, did you
 24       have any conversation with your attorneys about
 25       this deposition?
```

```
                                        Page 62
 1            A.   Not about the deposition, no.
 2            Q.   I'm going to pull back up the --
 3       Plaintiff's Exhibit 4, which is the 2021
 4       redistricting guidelines that were adopted by the
 5       senate on September 17, 2021.  It might make
 6       sense -- I'll begin with my first -- the first
 7       question again.
 8                 Did you at all review this document
 9       before drawing any maps for congressional districts
10       or congressional maps?
11            A.   I did look at this document prior to
12       drawing maps.
13            Q.   Sorry, I don't know if that was me.
14       Could you repeat that answer again?
15            A.   Said, yes, we did look at this prior to
16       drawing maps, from what I remember.
17            Q.   And when you say, we, who are you
18       referring to?
19            A.    It would have been Paula Benson, Andy
20       Fiffick, Charlie Terreni, and myself, and Breeden
21       John as well.
22            Q.   Did you have any involvement or role in
23       creating these guidelines?
24            A.   No.  That was primarily Paula Benson's
25       responsibility, from what I can remember, this
```

Page 63

```
 1    document.
 2                    (Off-the-record conference to address a
 3    technical issue)
 4    BY MR. CUSICK:
 5            Q.    On the screen, we have Plaintiff's
 6    Exhibit 4, which are the 2021 redistricting
 7    guidelines.
 8                    I believe, Mr. Roberts, before we just
 9    went off record, you had mentioned that you,
10    Mr. Fiffick, and Mr. Terreni had reviewed these
11    guidelines at some point before drawing any
12    congressional maps or districts?
13                    (Off-the-record conference to address a
14    technical issue)
15            A.    That's correct.
16            Q.    And I believe before, you had mentioned
17    you were not at all involved in the creation of
18    these guidelines?
19            A.    No, I was not.
20            Q.    How did these guidelines impact the
21    drawing of congressional districts for your work?
22            A.    These are the guidelines that we were
23    to use to draw the redistricting plans.
24            Q.    After initially reviewing the document,
25    did you look to this document to make assessments
```

```
                                            Page 64

 1     of any maps that you drew?

 2            A.    To figure out if the maps that we were

 3     drawing complied with this, that was something the

 4     attorneys would have looked at, not myself.

 5            Q.    Got it.

 6                  Did you create or rely on any

 7     additional documents to supplement this criteria?

 8            A.    Not that I can recall.

 9            Q.    Were you given any other documents

10     related to redistricting criteria?

11            A.    I believe that there was a letter

12     submitted by Senator Harpootlian at one point.

13     That was probably the only other document that I

14     recall that revolved around the guidelines.

15            Q.    Did you receive any other instructions

16     about criteria that you should focus on when

17     drawing maps?

18            A.    Yes, for the congressional districts,

19     we did.

20            Q.    And what were those instructions?

21            A.    The instructions were, don't touch the

22     seventh congressional district, Congressman Clyburn

23     wanted a minimal-change plan, and Congressman Joe

24     Wilson didn't want to go to Beaufort; he wanted to

25     keep Fort Jackson.
```

Page 65

1          Q.    Who provided the instruction to not
2     touch Congressional District Seven?
3          A.    That would come from either Andy
4     Fiffick or Senator Rankin.  I don't recall which
5     one.
6          Q.    What about the -- I think you mentioned
7     a minimal change by either Representative Clyburn
8     or someone in his office?
9          A.    That's correct.  That came straight
10    from Dalton Tresvant when we had a meeting with
11    him.
12         Q.    Did you remain in contact with him
13    during congressional map drawing?
14         A.    I believe the only conversation we had
15    was at that meeting, and that would have been all
16    my contact with him, I believe, that I can recall.
17         Q.    And then you said from Representative
18    Wilson, the instruction not to include Beaufort in
19    Congressional District Two?
20         A.    That's correct, and keep Fort Jackson.
21         Q.    How did you weight these instructions
22    based on the other criteria that had been adopted
23    by the senate and was within the congressional
24    guidelines?
25         A.    That wasn't a call for me to make, on

```
                                              Page 66
 1      the -- on which had priority.
 2              Q.   Whose call would that have been?
 3              A.   Either the members or Charlie Terreni
 4      or Andy Fiffick.
 5              Q.   Outside of those three instructions,
 6      were there any others given by Mr. Fiffick,
 7      Mr. Terreni, or any other outside counsel?
 8              A.   Not that I recall at this moment.
 9              Q.   Do you know who would know if there
10      were any additional instructions?
11              A.   That would have been either Andy or
12      Charlie.
13              Q.   In each map you drew, did you follow
14      each one of these three instructions?
15              A.   Not on each map we drew, no.
16              Q.   What did you make of the instruction
17      not to touch Congressional District Seven?
18              A.   Can you repeat the question?
19              Q.   What was your assessment of the
20      instruction not to touch Congressional District
21      Seven?
22              A.   Just to balance the population and make
23      no drastic changes to the district.
24              Q.   And so under Roman numeral one, the --
25      in the middle of the page here that I have
```

Page 165

1    before it was released or not.

2            Q.    Do you think it would have been helpful

3    to seek their input before it was released?

4            A.    It could have been, but then it

5    wouldn't have been a staff plan.  It would have

6    been a senator -- a senate plan.

7            Q.    Got it.

8                  So the designation that it's a staff

9    subcommittee plan indicates no senators'

10   involvement in it?

11           A.    Not with the congressional districts,

12   no.

13           Q.    Who had the responsibility for

14   assessing and reviewing this plan before it was

15   publicly posted to see if it complied with

16   redistricting criteria?

17           A.    That would have been the attorneys.

18           Q.    Including Mr. Gore?

19           A.    I don't know exactly -- he was sought

20   for legal advice.  I just don't recall -- I wasn't

21   privy to a lot of those conversations, as it dealt

22   with attorney information.  So I wasn't involved in

23   a lot of those conversations.

24           Q.    Were you at all involved in any

25   conversations about compliance with redistricting

```
                                           Page 166

 1     criteria that didn't involve legal questions?

 2            A.   Not that I can recall.

 3            Q.   Do you know if any assessment of

 4     whether this map complied with the Voting Rights

 5     Act was conducted?

 6            A.   I have no idea.

 7            Q.   Did you take any steps from a technical

 8     side to ensure that this map complied with

 9     redistricting criteria?

10            A.   We ran a continuity check on it to make

11     sure everything was contiguous according to the

12     software algorithm, made sure that everything was

13     also assigned so there was no unassigned population

14     in the map.  And that's all I can recall at this

15     moment.

16            Q.   Even if you didn't conduct an RPV

17     analysis, do you know if any was contemplated or

18     conducted on this map, or for this map?

19            A.   I don't know.

20            Q.   Have you heard the term, effectiveness

21     analysis?

22            A.   No, I have not.

23            Q.   If I explained it as a study of two or

24     more redistricting plans using a set of metrics to

25     assess opportunities for voters, does that at all
```

Page 167

1    seem consistent or accurate with anything you've

2    heard about it?

3          A.    Can you say that one more time?

4          Q.    I guess maybe a simpler way is, were

5    there any assessments conducted that compared two

6    maps for how they might perform for certain voters?

7          A.    We did compare -- we did do sheets and

8    reports comparing this map to the benchmark map.

9          Q.    On what metrics for the comparison

10   purposes?

11         A.    Looked at population, looked at racial

12   make-up of the districts, as well as partisan

13   numbers.

14         Q.    And for the partisan numbers, was that

15   based on the 2020 presidential elections?

16         A.    Primarily, yes.

17         Q.    Any other elections?

18         A.    We did have 2016 data, but I don't

19   believe it was used in any kind of analysis.

20         Q.    We talked earlier about assessments to

21   see if maps might perform for racial minorities to

22   elect candidates of their choice.

23               Do you recall that discussion?

24         A.    Yes.

25         Q.    Were any assessments along those lines