*SC NAACP v. Alexander,*
D.S.C. Case No.  3:21-cv-03302-MGL-TJH-RMG

# Exhibit K

```
                                                    Page 1

 1                   UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF SOUTH CAROLINA
 2                      COLUMBIA DIVISION
 3
       THE SOUTH CAROLINA        )
 4     STATE CONFERENCE OF       )
       THE NAACP, et al.,        )
 5                               )
                                 )
 6           Plaintiffs,         )    Case No. 3:21-CV-03302-MGL-
                                 )    TJH-RMG
 7     vs.                       )
                                 )
 8     THOMAS C.                 )
       ALEXANDER, et al.,        )
 9                               )
                                 )
10           Defendants.         )
                                 )
11
12
13
14              Videotaped Remote Deposition of
15             SENATOR GEORGE EARLE CAMPSEN, III
16                  (Taken by Plaintiffs)
17              Isle of Palms, South Carolina
18                 Friday, August 5, 2022
19
20
21
22
23
24              Reported in Stenotype by
               Lauren M. McIntee, RPR, CRR
25        Transcript produced by computer-aided transcription
```

Page 2

```
 1              APPEARANCES
 2    ON BEHALF OF THE PLAINTIFFS:
 3              John S. Cusick, Esquire (via Zoom)
                Leah C. Aden, Esquire (via Zoom)
 4              NAACP Legal Defense & Educational Fund, Inc.
                40 Rector Street, 5th Floor
 5              New York, New York 10006
                (212) 965-7715
 6              Jcusick@naacpldf.org
                Laden@naacpldf.org
 7
                -and-
 8
                Adriel Cepeda, Esquire (via Zoom)
 9              American Civil Liberties Union Foundation
                125 Broad Street, 18th Floor
10              New York, New York 10004
                (212) 549-2500
11              acepedaderieux@aclu.org
12
      ON BEHALF OF THE SENATE DEFENDANTS:
13
                Vordman Carlisle Traywick, III, Esquire (via Zoom)
14              Cynthia Nygord, Esquire (via Zoom)
                Robinson Gray, LLC
15              1310 Gadsden Street
                Columbia, South Carolina 29201
16              (803) 231-7845
                Ltraywick@robinsongray.com
17              Cnygord@robinsongray.com
18              -and-
19              John M. Gore, Esquire (via Zoom)
                Jones Day
20              51 Louisiana Avenue NW,
                Washington, District of Columbia 20001
21              (202) 879-3939
                Jmgore@jonesday.com
22
23
24
25
```

Page 3

1      ON BEHALF OF THE ELECTION DEFENDANTS:
2              Jane W. Trinkley, Esquire (via Zoom)
               Burr & Forman, LLP
3              1221 Main Street, Suite 1800
               Columbia, South Carolina 29201
4              (803) 753-3241
               Jtrinkley@burr.com
5
6      ON BEHALF OF THE HOUSE DEFENDANTS:
7              Rhett Ricard, Esquire (via Zoom)
               Nexsen Pruet, LLC
8              205 King Street, Suite 400
               Charleston, South Carolina 29401
9              (843) 720-1707
               Rricard@nexsenpruet.com
10
       ALSO PRESENT:
11
       Brendan Rolland (via Zoom)
12
       Michael Kirby, Videographer (via Zoom)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1           VIDEOTAPED REMOTE DEPOSITION OF SENATOR GEORGE EARLE

2       CAMPSEN, III, a witness called on behalf of Plaintiffs,

3       before Lauren M. McIntee, Registered Professional

4       Reporter, Certified Realtime Reporter, and Notary

5       Public, in and for the State of North Carolina, in Isle

6       of Palms, South Carolina, on Friday, August 5, 2022,

7       commencing at 9:10 a.m.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                                                        Page 5
 1                        INDEX OF EXAMINATIONS
 2    By Mr. Cusick...................................Page 9
      By Mr. Traywick................................Page 210
 3
 4
 5                        INDEX OF EXHIBITS
 6
      NUMBER        EXHIBIT                            MARKED
 7
      Exhibit 1    Subpoena                              46
 8
      Exhibit 2    Senator George Campsen's             49
 9                 Objections and Responses to
                   Plaintiffs' Subpoena to Produce
10                 Documents, Information, or Objects
                   or to Permit Inspection of
11                 Premises in a Civil Action
12    Exhibit 3    Text Messages                        57
                   (SCSENATE_00027301 to 27316)
13
      Exhibit 4    2021 Policy For Public Plan         111
14                 Submissions, South Carolina Senate
                   Judiciary Committee Redistricting
15                 Subcommittee
                   (SCSENATE_00003723 to 3724)
16
      Exhibit 5    Email Exchange Ending on the First  114
17                 Page From Lynn Teague to Paula
                   Benson, Dated September 30, 2021
18                 (SCSENATE_00003749 to 3751)
19    Exhibit 6    Email Exchange Ending on the First  116
                   Page From Lynn Aden to Senate
20                 Redistricting, et al., Dated
                   October 8, 2021
21                 (SCSENATE_00003798 to 3834)
22    Exhibit 7    2021 Redistricting Guidelines,      118
                   South Carolina Senate Judiciary
23                 Committee, Redistricting Subcommittee
                   (SCSENATE_00003721 to 3722)
24
      Exhibit 8    July 20th of 2021 Hearing Transcript 124
25                 (SCNAACP_CD_011429 to 11485)
```

```
                                              Page 6

 1                    EXHIBITS (Cont'd)
 2      NUMBER        EXHIBIT                        MARKED
 3      Exhibit 9    September 13, 2021, Email From    157
                     Madison Faulk to Maura Baker with
 4                   Attachments
                     (SCSENATE_00022919 to 22925)
 5
        Exhibit 10   November 12th Senate Judiciary     159
 6                   Hearing
                     (SCNAACP_CD_011844 to 11843)
 7
        Exhibit 11   Staff Subcommittee Plan Map        163
 8
        Exhibit 12   November 29th, 2021, Hearing       171
 9                   Transcript
                     (SCNAACP_CD_011729 to 11934)
10
        Exhibit 13   January 5, 2022, Email From Will   174
11                   Roberts to Senator Campsen
                     (SCSENATE_00022581 to 22584)
12
        Exhibit 14   Text Messages                      177
13                   (SCSENATE_00027173 to 27174)
14      Exhibit 15   Email Exchange Ending on the First 178
                     Page From Breeden John to Chip
15                   Campsen, et al., Dated October 8,
                     2021, with Attachment
16                   (SCSENATE_00022547 to 22549)
17      Exhibit 16   January 11, 2022, Email From       180
                     Breeden John to Chip Campsen, et
18                   al., with Attachment
                     (SCSENATE_00022561 to 22564)
19
        Exhibit 17   January 11, 2022, Email From       181
20                   Michelle McGee to Luke Rankin, et al.
                     (SCSENATE_00022556 to 22557)
21
        Exhibit 18   January 13, 2022, Hearing          188
22                   Transcript
                     (SCNAACP_CD_011935 to 12054)
23
        Exhibit 19   January 17, 2022, Email From       193
24                   Robert Oppermann to Andy Fiffick
                     with Attachment
25                   (SCSENATE_00003269 to 3277)
```

Page 7

```
 1                       EXHIBITS (Cont'd)
 2      NUMBER        EXHIBITS                          MARKED
 3      Exhibit 20  List of Written Testimony Received    196
                    After Announcement of Meeting,
 4                  January 11, 2022
                    (SCSENATE_00023933 to 24040)
 5
        Exhibit 21  January 16, 2022, Email From Will     197
 6                  Roberts to Andy Fiffick with
                    Attachment
 7                  (SCSENATE_000022528 to 22530)
 8      Exhibit 22  January 17, 2022, Email From          199
                    Breeden John to Chip Campsen, et
 9                  al., Zoom Invite
                    (SCSENATE_00022510)
10
        Exhibit 23  January 18, 2022, Email From Paula    199
11                  Benson to Chip Campsen, et al.,
                    with Attachment
12                  (SCSENATE_000022356 to 22364)
13      Exhibit 24  January 18, 2022, Email From Luke     201
                    Rankin to Andy Fiffick with
14                  Attachment
                    (SCSENATE_00022289 to 22291)
15
        Exhibit 25  January 19, 2022, Hearing             204
16                  Transcript
                    (SCNAACP_CD_013197 to 13264)
17
        Exhibit 26  January 20, 2022, Hearing             207
18                  Transcript
19
20
21
22
23
24
25
```

```
                                              Page 8
 1              THE VIDEOGRAPHER:  We're on the record at

 2        9:10 a.m.  This is the deposition of Senator George

 3        E. Campsen, III.  This deposition is being held on

 4        August 5th, 2022.  The court reporter is Lauren

 5        McIntee.  The videographer is Michael Kirby.  The

 6        court reporter will now do the swearing.

 7              THE COURT REPORTER:  Participating attorneys

 8        recognize that all parties, including the witness

 9        and court reporter, are participating remotely.  In

10        lieu of an oath administered in person, the witness

11        will verbally declare that their testimony in this

12        deposition is under penalty of perjury and will be

13        the truth, the whole truth, and nothing but the

14        truth.

15              Counsel stipulate that all objections to the

16        remote participation are waived.  Please state your

17        name and indicate your agreement on the record.

18              MR. TRAYWICK:  Lisle Traywick agrees on

19        behalf of the Senate defendants.

20              MR. CUSICK:  John Cusick agrees behalf of

21        plaintiffs.

22              MS. TRINKLEY:  Jane Trinkley on behalf of the

23        Election defendants.

24              THE COURT REPORTER:  If that's all, counsel,

25        you may proceed.
```

```
                                                Page 9
 1               MR. CUSICK:  Thank you.
 2                       EXAMINATION
 3    BY MR. CUSICK:
 4         Q.    Good morning, Senator Campsen.  How are you
 5    doing today?
 6         A.    Good morning.  Doing fine.  Thank you.
 7         Q.    My name is John Cusick.  I'm one of the
 8    attorneys representing the plaintiffs in this lawsuit,
 9    The South Carolina State Conference of the NAACP versus
10    Alexander.  If you could please state your full name for
11    the record, spelling your last name.
12         A.    George Earle Campsen, III.  C-A-M-P-S-E-N.
13         Q.    Great.  Thank you.
14               MR. CUSICK:  And I'd like to just briefly go
15          around the virtual room, if you will, for any
16          attorneys planning to make an appearance today.  And
17          we can begin with House defendants.
18               Hearing none, I will turn to the Election
19          defendants, Ms. Trinkley.
20               MS. TRINKLEY:  We're here.
21               MR. CUSICK:  Great.  And anyone else from the
22          Senate defendants?
23               MR. TRAYWICK:  Lisle Traywick here on behalf
24          of the Senate defendants, and I believe John Gore is
25          participating remotely as well.
```

1          A.     That would have been his call, yes.

2          Q.     But you weren't consulted on any of those

3    decisions, even if it would have been his ultimate

4    decision on whether to make it or not?

5          A.     Sometimes he may consult me.  And he never --

6    it's true with every chairman of the committee.  The

7    chairman of the committee makes the call and he may

8    consult members, but he never consulted me about hiring

9    a demographer that I can recall.

10         Q.     Outside of the subcommittee public hearings,

11   were there regular meetings among the members where you

12   all met that were not public?

13              MR. TRAYWICK:  Object to the form.

14         A.     No, not as a -- there may be a few members in

15   the map room looking at different maps, but never a full

16   committee or never a majority of the committee.

17   BY MR. CUSICK:

18         Q.     Did you have any regular meetings with

19   subcommittee staff regarding congressional

20   redistricting?  I know we'll talk about some specific

21   meetings, but was there a general standing meeting or a

22   regular meeting that you met with staff?

23         A.     No.

24         Q.     Were any of your meetings on congressional

25   redistricting for maps that you were proposing or

```
                                                    Page 108
 1        considering, were there any other outside counsel
 2        outside of Mr. Terreni who participated in those
 3        meetings?
 4             A.    In which -- which type of meetings?
 5             Q.    Any meetings discussing proposed or maps that
 6        were being considered that you were a part of with
 7        Senate staff or Senator Rankin?
 8             A.    Yeah, we -- I mean, with -- with John Gore.
 9        We also sought his evaluation of the maps.  Are they
10        defensible?  Are we going to get any Voting Rights Act
11        violation?  Any problems?  We also sought his legal
12        advice.
13             Q.    Do you recall how many times you were in a
14        meeting with Mr. Gore for congressional redistricting?
15             A.    Well, there were virtual meetings.  I can't
16        remember, but I -- maybe five.  Three to five probably.
17             Q.    No more than -- so no more than five from
18        your recollection?
19             A.    That's my recollection, but it's a
20        recollection.
21             Q.    And you said the meetings were all virtual?
22             A.    Yes.  For -- yes.
23             Q.    I'm not asking you to discuss any of the
24        content of those meetings, but did you see him in a
25        similar role as Mr. Terreni of providing legal advice to
```

Page 109

```
1     questions that might come up for congressional

2     redistricting?

3          A.    Yes.

4          Q.    Do you know who made the decision to bring in

5     Mr. Gore to advise in this capacity?

6          A.    I don't know.  My -- my impression that it

7     was Chairman Rankin.  I don't know that.  I'm only

8     assuming that.

9          Q.    Outside of the firm that Mr. Gore represents,

10    Jones Day, were there any other attorneys outside of

11    Mr. Terreni and Mr. Gore who were involved in these

12    five, three to five meetings?

13         A.    Not that I can recall.

14         Q.    During these three to five meetings, was

15    there anyone in charge of taking notes or meeting

16    minutes?

17         A.    No.

18         Q.    I think we covered this already.  Outside of

19    Representative Simrill and potentially Representative

20    Newton, you did not have any interactions with any House

21    staff members?

22         A.    No.

23         Q.    Dennis Patrick -- or Patrick Dennis, sorry?

24         A.    No.  I didn't have any interaction with

25    Patrick Dennis.
```

1          Q.    Would you say you had to work with the House

2     to pass the congressional map that was ultimately signed

3     by the governor?

4          A.    Not really.  I didn't work with them on our

5     map.  The only thing that I did, are y'all, are y'all

6     okay -- are y'all going to be open looking at a

7     different map than what y'all passed?  Because we

8     don't -- and the answer was yes.  And that was really

9     the only interaction.

10         Q.    I know we briefly touched earlier in the

11    deposition about the map room.  What's a brief

12    description of that for how or your understanding of the

13    congressional map room and how you used it?

14         A.    Well, it's a -- it's a program that has all

15    the data, precincts of the whole state and the data on

16    each precinct, each population.  You take up, you can

17    look at any race, any election that occurred and see

18    what the results are in that precinct, in the

19    Trump/Biden race or Graham/Harrison race.

20              And you have precinct lines and you have, you

21    can pull up the benchmark plan, which was the existing,

22    or at that point the existing plan.  And you can work on

23    a plan and save it and pull up a plan that maybe had

24    worked for them previously.  So it's a -- it's a

25    computer program that produces that type of data and

Page 119

1     adopting these guidelines?

2          A.     (Inaudible.)

3          Q.     Sorry.  There might have been a lag there.  I

4     don't know if anyone else heard that.

5               THE VIDEOGRAPHER:  Yeah, had a little skip

6          there.  If you had just said something, Senator, if

7          you could repeat it.

8               THE WITNESS:  No, I didn't say anything.

9               THE VIDEOGRAPHER:  Okay.  Just wanted to make

10         sure.  Thank you.

11    BY MR. CUSICK:

12         Q.     And what was the purpose of the subcommittee

13    creating and adopting the guidelines?

14         A.     Well, to lay out factors that you take into

15    account in the redistricting process and also to help

16    keep us from violating any legal -- any -- any laws that

17    we are subject to in the process.

18         Q.     Was it your understanding that maps the staff

19    created and were made public had to comply with these

20    guidelines?

21         A.     Could you restate that question again?

22         Q.     Was it your understanding that any map the

23    subcommittee produced had to comply with these

24    guidelines?

25         A.     Well, the goal is to comply, but you never

                                                    Page 120

1     can draw a map that -- compliance is in the eye of the

2     holder, number one.  And it's guidelines.  There is no

3     objective goal line you reach.  And -- and there's

4     always some give and take.  You maybe -- you maybe

5     comply with one guideline more fully, but the next one

6     not quite as fully.

7              But they're guidelines and things that are

8     markers, guardrails to keep you in the road, keep you

9     moving in the right direction, but you can -- you can't

10    fully -- sometimes you have to -- may have to diminish

11    your degree of compliance with one guideline to comply

12    with another and be in congruence.  So they're

13    guidelines.  So it's hard to say they -- you have to --

14    compliance even is in the eye of the holder in reality

15    in a lot of these instances.

16         Q.    But would it be fair to say that these

17    guidelines guided the subcommittee's assessment and

18    creation of proposed congressional maps?

19         A.    Yes.  We're -- yes.

20         Q.    Would -- would you also agree it's helpful

21    for publishing this so it would give guidance to members

22    of the public for what they should be considering in

23    both assessing and drawing proposed maps?

24         A.    Yes.

25         Q.    Is there anything that the subcommittee

Page 121

1    created or relied upon that supplemented this criteria?

2         A.    Well, case law that we are subject to.

3    Mentioned one, I think mentioned one case in, two cases

4    in here.  There's a lot more case law we're subject to.

5         Q.    And you know, assuming that case law is -- is

6    subsumed within the legal requirements, is there

7    anything else outside of this document that was relied

8    upon or created to supplement the guidelines by the

9    subcommittee?

10        A.    As far as the subcommittee adopting anything

11   different, no, that didn't happen.  Anything additional,

12   that did not happen.

13        Q.    And while -- and I didn't -- it might not

14   have adopted.  Are you aware of anything that the

15   subcommittee or staff members relied upon that they

16   considered criteria or guidelines that isn't included

17   within this document?

18        A.    No.

19        Q.    Would you also agree that publishing these

20   guidelines helped achieve the subcommittee's goal of

21   providing transparency?

22        A.    Yes.

23        Q.    And why so?

24        A.    Because the public would know factors that we

25   consider.

```
                                        Page 183
 1     Campsen?
 2          A.    Are we looking at another exhibit here?
 3          Q.    This is Senate Amendment 1.  Not looking at
 4     it.
 5          A.    Okay.
 6          Q.    This is the one we've talked about, yeah.
 7          A.    Right.  Yeah, I sponsored that amendment,
 8     yes.
 9          Q.    And so would it be fair to say that was
10     your -- you were the primary decisionmaker involved in
11     that involvement?
12          A.    Well, there were others that -- that gave
13     input, but prob- -- but probably gave probably the, gave
14     the most input anyway to it.
15          Q.    How long did it take to create that amendment
16     before it was publicly posted on January 11th?
17          A.    I really can't recall.  It was a process that
18     went on, I -- I can't recall.
19          Q.    Were you involved in all meetings regarding
20     that amendment, or were there meetings you might not
21     have been involved in discussing, discussing it?
22          A.    No, I think there may have been meetings that
23     I wasn't involved in.  I'm not certain, but there may
24     have been.
25          Q.    Do you recall how many meetings you attended
```

Page 184

1      related to the development of that plan?

2          A.    I don't.

3          Q.    As an amendment that you sponsored, would you

4      have been the primary person to getting it ready before

5      it was publicly posted, or responsible for?

6          A.    Yes.

7          Q.    And I won't run down the long laundry list of

8      similar questions that we've talked to you about

9      analyses and reports, but you know, we've talked about

10     Mr. Terreni, Mr. Fiffick, and other folks who are legal

11     counsel.  If you had any questions about how it complied

12     with the redistricting guidelines, your Senate

13     Amendment 1, would that have been a question that went

14     to them?

15         A.    Yes.

16         Q.    Would any -- was Mr. Gore at all involved in

17     any of those meetings or discussions about Senate

18     Amendment 1?

19              MR. TRAYWICK:  Object to the form of the

20         question.

21         A.    I believe, it's my recollection he looked at

22     the final product for evaluation of whether it was

23     problematic, defensible, are we going to be -- are we --

24     are we violating -- violating any -- any requirements?

25     Does it make us vulnerable to litigation?  I mean, he

Page 185

1    did do that, but that was I think in looking -- in a

2    look at the final product as I recall.

3    BY MR. CUSICK:

4        Q.    And just about as familiar with the process

5    of sponsoring an amendment, but as the lead -- would it

6    -- would it be fair to say you were the lead sponsor or

7    the sponsor?

8        A.    Yes, you could say either.

9        Q.    And so for any analyses or review that needed

10   to be conducted, would that have been at your direction?

11       A.    The staff would have done that as a matter of

12   course.

13       Q.    And they would have conducted the same types

14   of reviews that we've already discussed today about

15   other iterations of maps you've been involved in?

16       A.    That's correct.  And I certainly asked them,

17   is it defensible or is it going to work?  And, so.  But

18   I didn't really need to ask them.  I knew they would do

19   that analysis.

20       Q.    Would you say one of the objectives for CD1

21   was to make it more politically advantageous for

22   Republicans?

23       A.    To keep it a Republican district, that was

24   one of the --

25       Q.    And what was the process?

Page 186

1          A.    -- goals, it is.

2          Q.    And what steps did you take to -- to

3     determine whether it would remain a Republican district?

4          A.    Looked at the political numbers as far as the

5     vote counts and among the -- in the precincts for the

6     district.  And it really, it really moved the needle

7     very, just very slightly actually.  Could have made a

8     lot more Republican, but also would have violated

9     more -- perhaps run afoul of some of the federal law or

10    the redistricting principles that we are subject to.

11              In fact, probably took a little -- probably a

12    lot -- a lot of people say should have been -- been more

13    Republican, but I wanted to honor those principles.  And

14    we -- we moved it like a point and a half, one and a

15    half percentage points to the Republican side.  It was

16    basically a swing district, and we moved -- the

17    Republican vote went up like one and a half percentage

18    points.

19         Q.    Did you consider CD1 a swing district before

20    the new -- the new lines?

21         A.    It was -- it was pretty -- pretty close to a

22    swing district, yes.  I mean, you had Joe Cunningham was

23    elected and Nancy Mace was elected.  It was pretty much

24    a swing, or close to it anyway.  The -- so still a

25    Republican district, but close to being a swing, is what