# Exhibit 28

3:21-cv-03302-MGL-TJH-RMG  Date Filed 08/19/22  Entry Number 323-28  Page 2 of 14

Kosuke Imai, PhD  August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 1

1        IN THE UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF SOUTH CAROLINA
2                COLUMBIA DIVISION
3   THE SOUTH CAROLINA STATE
    CONFERENCE OF THE NAACP,
4   et al.,
5            Plaintiffs,
6   vs.              CASE NO. 3:21-cv-03302-MGL-TJH-RMG
7   THOMAS C. ALEXANDER,
    et al.,
8
9            Defendants.
10
11  DEPOSITION OF:    KOSUKE IMAI, PhD (Via VTC)
12  DATE:             August 8, 2022
13  TIME:             11:04 a.m.
14  LOCATION:         Cambridge, MA
15  TAKEN BY:         Counsel for the Senate Defendants
16  REPORTED BY:      SOLANGE RUIZ-URIBE, Court Reporter
                      Via Videoteleconference
17  _____
18
19
20
21
22
23
24
25

1    plan and then generating different -- start
2    generating different plans by modifying it.
3              Whereas the SMC is really about
4    starting from a blank slate and start building one
5    district at a time.
6         Q.   Thank you.  So I want to start with the
7    third sentence in the abstract of this paper.
8         A.   Okay.
9         Q.   And I'm just going to read that out loud.
10   It says:  For successful application sampling
11   methods must scale to large maps with many
12   districts, incorporate realistic legal constraints
13   and accurately and efficiently sample from a
14   selected target distribution.  Unfortunately, most
15   existing methods struggle in at least one of these
16   areas.
17             So my first question, Dr. Imai, did I
18   read that correctly?
19        A.   That's correct.
20        Q.   Do you agree that simulation analysis must
21   incorporate realistic legal constraints?
22        A.   I agree.
23        Q.   And the next sentence says that:  Most
24   existing methods struggle in at least one of these
25   areas.

1       Q.   Do you agree that for simulation plans to
2    be instructive they have to comply with legal
3    requirements for redistricting plans generally?
4       A.   I disagree.
5       Q.   Explain that, please.
6       A.   Simulations can be used in many different
7    purposes.  So for example, you could see the impact
8    of, you know, what would happen if you take out one
9    particular requirement.  And so depending on the
10   goal of the analysis, a different set of constraints
11   can be imposed.
12                And also, I'm not a lawyer so I don't
13   really make judgment about whether those
14   constraints, how they correspond to the legal
15   requirements.  They are informed by legal
16   requirements but I don't make any judgment about the
17   viability in the legal sense.  The constraints are
18   mathematical constraints and they are what they are.
19   Nothing more, nothing less.
20      Q.   So is it fair to say, Dr. Imai, that you
21   did not analyze whether any of your simulation plans
22   are legal?
23      A.   I'm not a lawyer so my analysis does not
24   draw any legal conclusions.
25      Q.   Okay.  And I just understand the scope of

3:21-cv-03302-MGL-TJH-RMG    Date Filed 08/19/22    Entry Number 323-28    Page 5 of 14

Kosuke Imai, PhD                                        August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 68

1    your analysis.
2         A.    Right.
3         Q.    You didn't do anything to try to determine
4    whether your plans were legal, correct?
5         A.    Yeah.  No, I didn't do that.
6         Q.    Now, Dr. Imai, I believe your report
7    mentions the South Carolina House and Senate
8    redistricting criteria; is that right?
9         A.    That's correct.
10        Q.    So let's go to tab five of your binder.
11        A.    Okay.
12        Q.    Which is the House Redistricting Criteria.
13        A.    All right.  Tab five.  Okay.  House, yes.
14   Okay.
15        Q.    And I'm going to mark this as Exhibit Six.
16              (Defendant's Exhibit No. 6, SOUTH CAROLINA
17   HOUSE OF REPRESENTATIVES JUDICIARY COMMITTEE
18   REDISTRICTING AD HOC COMMITTEE 2021 GUIDELINES AND
19   CRITERIA FOR CONGRESSIONAL AND LEGISLATIVE
20   REDISTRICTING, was marked for identification.)
21   BY MR. GORE:
22        Q.    And I hope I can figure out how to
23   introduce it.  Okay.  Dr. Imai, do you recognize
24   this document?
25        A.    Yes.

1     additional considerations on the Senate guidelines,
2     letter B is constituent consistency and it lists:
3     Preserving the cores of existing districts.
4                    Did the algorithm consider preserving
5     the cores of existing districts in generating plans?
6          A.   So to the extent that, you know, I
7     instructed the algorithm to avoid incumbents pairing
8     and to the extent that my race plan simulations, for
9     example, freezes, you know, all the districts other
10    than Districts 1 and 6 and in the case of second
11    race-blind simulation it freezes everything other
12    than Charleston County.
13                   So in that sense, you know, there are
14    constraints that have implications of cores of
15    existing districts, preservation.
16         Q.   Did you --
17         A.   But the analysis I presented in my final
18    report did not directly use, you know, previous --
19    the benchmark plan.
20         Q.   And so your analysis did not include a
21    constraint for preserving the cores of districts,
22    correct?
23         A.   Not directly.
24         Q.   And likewise, it did not include a
25    constraint for keeping incumbents' residences in

1    districts with their core constituents, correct?
2         A.   Yeah, incumbents weren't paired but there
3    was no constraint that directly, you know, that
4    needs a definition of what the core constituency of
5    incumbents are.  And that information was not
6    available so I did not include that either.
7         Q.   And as we discussed before, the districts
8    in your simulation plans had the same numbers as
9    districts in the enacted plan but may cover
10   different geography; is that right?
11        A.   That's correct, depending on, you know,
12   this will change across analysis and, you know, I
13   have three analyses.  So first two analyses are
14   probably much bigger overlap than statewide
15   analysis, for example, but yeah.
16        Q.   So for example, wouldn't that also mean
17   that because the districts encompass different
18   geography they encompass different populations and
19   voters, correct?
20        A.   That's correct, different people in
21   different areas.
22        Q.   And speaking with this page, communities
23   of interest --
24        A.   Uh-huh.
25        Q.   Did you include any constraint for

3:21-cv-03302-MGL-TJH-RMG   Date Filed 08/19/22   Entry Number 323-28   Page 8 of 14

Kosuke Imai, PhD                                      August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 105

1  communities of interest?
2       A.  So again, only to the extent that, you
3  know, things like administrative boundaries, like
4  counties and municipalities overlap with these
5  interest and to the extent that, you know, incumbent
6  residence wasn't paired, but there is no definition
7  of communities of interest available so I didn't use
8  that.
9       Q.  So there was no direct constraint on
10 communities of interest, correct?
11      A.  That's correct to the extent that --
12      Q.  Okay.
13      A.  Yeah, I don't have, you know, definitions
14 of what these communities are.
15      Q.  And so you didn't assign a strength to
16 communities of interest, correct?
17      A.  Right, because there is no mathematical,
18 you know, geographical definition of communities of
19 interest so I didn't assign that constraint directly
20 to this.
21      Q.  And so you also didn't assign a strength
22 to preserving the course of existing districts,
23 correct?
24      A.  That's correct.  For the reason that I
25 explained that in order to isolate the role that

3:21-cv-03302-MGL-TJH-RMG     Date Filed 08/19/22     Entry Number 323-28     Page 9 of 14

Kosuke Imai, PhD                                              August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 106

1    race played in determining the districts of enacted
2    plan that I didn't want to include any plan
3    including the benchmark plan.
4         Q.   And similarly, you didn't assign a
5    strength to keeping incumbents residences in
6    districts with their core constituents, correct?
7         A.   Right.  So the weights are for just the
8    avoidance of incumbent pairing and not with respect
9    to their core constituents because they are not --
10   that definition was not available to me.
11        Q.   Okay.  Let's look down at letter E,
12   minimizing divisions of voting precinct boundaries?
13        A.   Uh-huh.
14        Q.   Did you program a constraint in the
15   algorithm for VTD splits or precinct splits?
16        A.   Let's me double check.  Yeah, I don't
17   think so.  It's no a listed in paragraph 57, which
18   is not -- yeah.
19        Q.   And I don't believe it's listed in
20   paragraphs 20 or 22 either.
21        A.   Yeah, I wanted to double check, yeah.  I
22   don't think I imposed that constraint.
23        Q.   So let's go to -- can we go to figure 14
24   on page 27 of your report?
25        A.   Yes.

1    Q.   And again, you didn't review any public
2    testimony, comment or legislative testimony about
3    splitting or repairing the split in Charleston
4    County, correct?
5    A.   No.
6    Q.   And did you analyze the political effect
7    of placing all of Charleston County in District 1
8    with Nancy Mace?
9    A.   I did not use any partisan data in my
10   analysis.
11   Q.   And did you analyze what changes to the
12   map would have been required in other parts of the
13   state if all the Charleston was placed in
14   District 1?
15   A.   Can you repeat the question again?  Sorry.
16   Q.   Sure.  So if you -- Charleston County, if
17   you place Charleston County in District 1?
18   A.   Uh-huh.
19   Q.   In the enacted plan, you would have to
20   make changes to other districts in order to equalize
21   population, correct?
22   A.   That's correct.
23   Q.   All right.  And did you do any analysis of
24   that other than to recognize if that's true?
25   A.   Yeah, that's true but I didn't do any

1      A.    No, I look at the enacted plan.

2      Q.    Thank you.  You answered my next question.

3            So Dr. Imai, you base your simulation

4   constraints on the published South Carolina

5   guidelines for the House and Senate, right?

6      A.    Yeah, I don't know whether they are

7   published but those two guidelines that were given

8   to me.

9      Q.    And in those two guidelines was there any

10  indication, for example, that core preservation

11  should be prioritized over other criteria?

12     A.    No.  I believe that it was listed as

13  additional constraint in Senate guideline I think

14  and may not be even directly mentioned in the House

15  guideline or at least it was not priority, listed as

16  a priority.

17     Q.    Thank you.  And you testified -- well, why

18  did you choose not to incorporate core preservation,

19  if you can explain again?

20     A.    Right.  So the goal of my analysis, the

21  entire report, the goal of the entire report was to

22  examine whether race played a significant role in

23  drawing district boundaries of the enacted plan and,

24  if so, how that happened.  And to do that I need to

25  isolate the impact of race, like the role that race

1   played from other traditional redistricting criteria
2   and some of the rules in the -- mentioned in the
3   guideline.
4                    If I incorporate any product does not
5   have to be benchmark plan, but if I incorporate any
6   plan in my simulation analysis, it will basically
7   carry all the factors that went into that particular
8   plan.  So in order to isolate the race as a factor I
9   did not use this through my analysis that I did not
10  use any plan including the previous plan.
11         Q.   Thank you.  Now, you recall Mr. Gore asked
12  you some questions about the use of partisanship
13  data in your simulation, right?
14         A.   Yes.
15         Q.   And you explained that you didn't do
16  any -- you didn't use partisanship information; is
17  that right?
18         A.   Right.
19         Q.   And we just covered this, but you read the
20  guidelines, right?
21         A.   Uh-huh, yes, I did.
22         Q.   Did anything in the guidelines suggest to
23  you that your simulation should have accounted for
24  Nancy Mace's election chances, for example?
25         A.   I didn't see any mention of that.  Yeah, I

Page 182

1   did not see any specific instruction about use of
2   election outcomes.
3       Q.   Did anything suggest to you that it was
4   important for the map makers to enact a map that
5   favored Republicans?
6       A.   I don't analyze intent of map drawer so I
7   can't, you know, say what they have thought about
8   but the guideline didn't specify, you know, specific
9   use of electoral outcome or electoral chance of
10  politicians and that wasn't, you know, even -- a
11  political consideration wasn't an additional
12  consideration and so I took other more traditional
13  redistricting criteria as priority.
14           MR. CEPEDA:  Thank you, Dr. Imai.  I have
15  no more questions.
16                      EXAMINATION
17  BY MR. GORE:
18      Q.   I have just a couple of questions of
19  redirect, Dr. Imai.
20      A.   Okay.
21      Q.   Now, you said you haven't attempted to
22  analyze the intent or motives of the map drawer or
23  legislators, correct?
24      A.   That's correct.
25      Q.   And so you don't have an opinion one way

1    or the other as to whether the map drawer or the
2    legislators considered politics even if politics is
3    not in the guidelines, correct?
4         A.   That's right.  I don't have any opinion on
5    that.
6         Q.   Do you have a view or opinion on whether
7    the map drawer or the legislators considered Nancy
8    Mace's reelection prospect whether or not that's
9    listed in the guidelines?
10        A.   No, I don't have any opinion on that.
11        Q.   And do you have any opinion or view on
12   whether the map drawer or legislators wanted a plan
13   that would elect six Republicans regardless of
14   whether that's in the guidelines?
15        A.   I don't have any opinion on that.
16        Q.   And Dr. Imai, is keeping Charleston in a
17   single district anywhere in the guidelines?
18        A.   I don't think so, there is no specific
19   counties being mentioned.
20        Q.   How about keeping Richland in a single
21   district?
22        A.   I don't think so.
23        Q.   And how about keeping District 6's BVAP
24   between 45 percent and 50 percent?
25        A.   Those numbers are not specifically