*SC NAACP v. Alexander,*
D.S.C. Case No.  3:21-cv-03302-MGL-TJH-RMG

# EXHIBIT B

Page 1

1

2   UNITED STATES DISTRICT COURT

3   DISTRICT OF SOUTH CAROLINA

4   CASE NO.  3:21-CV-03302-MBS-TJH-RMG

5   -----------------------------------------x

6   THE SOUTH CAROLINA CONFERENCE OF THE

7   NAACP, et al,

8                              Plaintiffs,

9              -against-

10

11  THOMAS C. ALEXANDER, et al,

12                             Defendants.

13  -----------------------------------------x

14                      July 21, 2022

                        9:30  a.m.

15

16          ZOOM VIRTUAL CONFERENCE

17

18          VIDEOCONFERENCE Examination

19  Before Trial of SEAN PATRICK TRENDE, taken

20  by the Defendants, via Zoom Technology,

21  pursuant to Notice, held before R. Bobbie

22  Levy, a Certified Shorthand Reporter and

23  Notary Public of the State of New York.

24

25

Page 2

```
 1
 2    A P P E A R A N C E S :
 3
 4
 5          ARNOLD & PORTER KAYE SCHOLER LLP
 6           Attorneys for Plaintiffs
 7             601 Massachusetts Avenue NW
 8              Washington, D.C. 20001
 9           BY:   JOHN FREEDMAN, ESQ.
10
11
12          AMERICAN CIVIL LIBERTIES UNION
13          ACLU
14          Attorneys for Defendant
15          Thomas Alexander
16            125 Broad Street, 18th Floor
17             New York, New York 10004
18
19          BY:  ADRIEL CEPEDA DERIEUX, ESQ.
20                  -and-
21               SAMANTHA OSAH, ESQ.
22
23
24
25
```

```
                                              Page 3

 1

 2    A P P E A R A N C E S :   (Continued)

 3

 4

 5            NEXSEN PRUET, LLC

 6            Attorneys for House Defendants

 7            And Chris Murphy, Wallace Jordan

 8            And James Lucas

 9              104 South Main Street

10              Greenville, South Carolina

11              29601

12

13            BY: KONSTANTINE DIAMADURAS, ESQ.

14

15

16            JONES DAY

17            Attorneys for Senate Defendants

18            Thomas Alexander and Luke Rankin

19              51 Louisiana Avenue NW

20              Washington, D.C. 20001

21

22            BY:  JOHN GORE, ESQ.

23                   -and-

24              ADRIEL CEPEDA DERIEUX, ESQ.

25
```

Page 4

1

2   A P P E A R A N C E S :   (Continued)

3

4

5              BURR FORMAN

6              Attorneys for Defendants

7        South Carolina Election Commission

8              1221 Main Street

9              Columbia, South Carolina 29201

10

11             BY:   M. ELIZABETH CRUM, ESQ.

12

13

14

15             ALSO PRESENT:

16             DAVID ROTHSTEIN, Videographer

17             MINK AGGAWAL

18

19

20

21

22

23

24

25

Page 5

1

2                S T I P U L A T I O N S

3

4                IT IS HEREBY STIPULATED AND

5    AGREED by and among the >>> Attorneys for

6    the respective parties hereto that filing

7    and sealing be and the same are hereby

8    waived.

9                IT IS FURTHER STIPULATED AND

10   AGREED that all objections except as to

11   the form of the question, shall be

12   reserved to the time of the trial.

13               IT IS FURTHER STIPULATED AND

14   AGREED that the within examination may be

15   signed and sworn to before any notary

16   public with the same force and effect as

17   though signed and sworn to before this

18   Court.

19

20

21

22

23

24

25

Page 6

```
 1              S. Trende
 2         MR. DIAMADURAS:  I will be
 3    ordering a copy, an electronic copy of
 4    today's deposition.
 5         MR. GORE:  I will be ordering a
 6    copy of today's transcript.
 7         THE VIDEOGRAPHER:  Good morning.
 8    We are going on the record at 9:37
 9    a.m. on July 21, 2022.  Please note
10    that the microphones are sensitive and
11    may pick up whispering, private
12    conversations and cellular
13    interference.
14         Please turn off all cell phones
15    or place them away from the
16    microphones as they can interfere with
17    the deposition audio.  Audio and video
18    recording will continue to take place
19    unless all parties agree to go off the
20    record.
21         This deposition is being held
22    remotely.  This is media unit number 1
23    of the video recorded deposition of
24    Sean Trende, located in Delaware,
25    Ohio.  This deposition is being taken
```

Page 7

1             S. Trende

2       by counsel for the plaintiffs in the

3       matter of the South Carolina state

4       conference of the NAACP et al, versus

5       Thomas C. Alexander, et al. Filed in

6       the United States District Court for

7       the District of South Carolina,

8       Columbia division.  Case number 3:21CV

9       03302 MBS-TJH-RMG.

10            My name is David Rothstein from

11      the firm Veritext, New York and I'm

12      the videographer.  The court reporter

13      is Bobbie Levy from the firm Veritext

14      New York.  I am not related to any

15      party in this action.  Nor am I

16      financially interested in the outcome.

17            Counsel will be noted on the

18      stenographic record.  Will the court

19      reporter please swear in the witness.

20            READ BY THE COURT REPORTER:  Due

21      to the need for this deposition to

22      take place remotely because of the

23      government's order for social

24      distancing, the parties will stipulate

25      that the court reporter may swear in

Page 8

1                    S. Trende
2        the witness over Veritext virtual
3        conference and that the witness has
4        verified that he is, in fact, Sean
5        Patrick Trende.
6              MR. FREEDMAN:  So stipulated for
7        the plaintiffs.
8              MR. GORE:  So stipulated for
9        Senate Defendants.
10             MR. DIAMADURAS:  So stipulated
11       for House defendants.
12             MS. CRUM:  So stipulated for
13       Election Commission defendants.
14
15
16  S E A N    P A T R I C K    T R E N D E,
17  called as a witness, having been first
18  duly sworn by the Notary Public, was
19  examined and testified as follows:
20  TAKEN BY
21  THE COURT REPORTER:
22      Q      Please state your name for the
23  record.
24      A      Sean Patrick Trende.
25      Q      What is your current address?

```
                                        Page 9

 1                    S. Trende
 2        A      1146 Elderberry Loop, Delaware,
 3   Ohio 43015.
 4   EXAMINATION BY
 5   MR. FREEDMAN:
 6        Q      Good morning, Mr. Trende.  My
 7   name is John Freedman I represent the
 8   plaintiffs in this action.  Could you
 9   please state your full name for the
10   record, spelling your last name?
11        A      Sean Patrick Trende,
12   T-r-e-n-d-e.
13        Q      Am I correct that you used to be
14   an attorney, sir?
15        A      I think I still am.
16        Q      Got it.  Are you still
17   practicing?
18        A      No.
19        Q      Did you ever take a deposition
20   as an attorney?
21        A      Yes.
22        Q      How many?
23        A      Several.  I couldn't count.
24   More than 10.
25        Q      So you are familiar with the
```

```
                                          Page 10
 1                    S. Trende
 2   ground rules, right?
 3        A      Yes.
 4        Q      All right.  Well, for purposes
 5   of today's deposition I just want to make
 6   sure our record is clear on a couple of
 7   points.  First of all, do you understand
 8   that you are testifying under oath today?
 9        A      Yes.
10        Q      Do you understand that a court
11   reporter is transcribing this deposition?
12        A      Yes.
13        Q      With that in mind, do you
14   understand you need to answer questions
15   audibly and clearly?
16        A      Yes.
17        Q      Will you tell me if you don't
18   understand a question or need me to repeat
19   any part of it?
20        A      Yes.
21        Q      Is there any reason you can't
22   testify truthfully today?
23        A      No.
24        Q      Any reason that you can't give
25   full, complete and accurate testimony
```

```
                                    Page 11
 1                S. Trende
 2   today?
 3       A     No.
 4       Q     Are you on any medications or
 5   experiencing any condition that would
 6   prevent you from giving full and truthful
 7   testimony today?
 8       A     No.
 9       Q     Okay.  If at any time you would
10   like to take a break please let me know
11   and I will try to accommodate you.  The
12   only thing I ask is that if I have a
13   question pending, that you finish
14   answering that question before asking for
15   a break.  Do you understand that?
16       A     Yes.
17       Q     Now I know you have been deposed
18   before.  Can you tell me approximately how
19   many times you have been deposed?
20       A     I would spitball it at about 20
21   times.
22       Q     Have you had any depositions
23   since your last deposition concerning
24   South Carolina on April 5, 2022?
25       A     I think I was deposed once in
```

```
                                    Page 12
 1                  S. Trende
 2    Montana but I'm not entirely sure of the
 3    timeline.
 4        Q     Any other depositions or
 5    possible depositions since your April 5th
 6    deposition?
 7        A     I don't believe so.
 8        Q     For today's deposition where are
 9    you physically located?
10        A     I'm in my home office in
11    Delaware, Ohio.
12        Q     Is anyone in the room with you?
13        A     No.
14        Q     Did you bring any materials with
15    you today for the deposition?
16        A     I have the folder of exhibits
17    that you sent me open on my desktop.
18        Q     Anything else?
19        A     No.
20        Q     For the documents you have are
21    there any notes on the documents, have you
22    taken notes?
23        A     No.
24        Q     Other than defense counsel, have
25    you spoken to anyone else about your work
```

```
                                    Page 13
 1                 S. Trende
 2   in this matter?
 3       A      In passing, with my wife.
 4       Q      Anyone else?
 5       A      No.
 6       Q      Have you spoken with any member
 7   of the South Carolina Legislature in
 8   conjunction with this case?
 9       A      No.
10       Q      I can give you some names.  See
11   if it jogs your memory.  Have you spoken
12   with Senator Luke Rankin?
13       A      No.
14       Q      Have you spoken with Senator
15   Campsen?
16       A      No.
17       Q      Have you spoken with
18   Representative Jay Jordan?
19       A      No.
20       Q      Have you ever spoken to any
21   South Carolina legislative staff in
22   conjunction with this case?
23       A      No.
24       Q      I'll give you, again, a couple
25   of names and see if it jogs your memory.
```

```
                                      Page 14
 1                  S. Trende
 2   Have you spoken with Patrick Dennis about
 3   this case?
 4       A     No.
 5       Q     Have you spoken with Andy
 6   Fiffick about this case?
 7       A     No.
 8       Q     Have you spoken with Charlie
 9   Terrini about this case?
10       A     No.
11       Q     Have you spoken with anybody
12   from the National Republican Redistricting
13   Trust in conjunction with this case?
14       A     No.
15       Q     Have you ever spoken with Andy
16   Kincaid?
17       A     I don't know who Andy Kincaid
18   is.
19       Q     Fair enough.  Have you ever
20   spoken with Dale Oldham?
21       A     Not in conjunction with this
22   case but I have spoken with him.
23       Q     What was the context in which
24   you have spoken with Mr. Oldham?
25       A     I had multiple contacts with him
```

```
                                    Page 15
 1                 S. Trende
 2   over the course of the past decade.
 3       Q      Any in the last year?
 4       A      I believe he reached out to me
 5   about doing some work in a different
 6   matter.
 7       Q      Have you had any discussions
 8   with Mr. Oldham about South Carolina?
 9       A      No.
10       Q      Have you had any discussion with
11   National Republican Redistricting Trust
12   outside Counsel Holtzman Vogel?
13       A      I have spoken with Jason
14   Torchinsky.
15       Q      In the last year?
16       A      Yes.
17       Q      Have you spoken with him about
18   South Carolina?
19       A      No.
20       Q      Have you talked with him about
21   other jurisdictions?
22       A      Yes.
23       Q      Which jurisdictions?
24       A      I doubt if I could give a
25   complete list.  I know I worked with him
```

```
                                    Page 16
 1              S. Trende
 2   on the Belize case that I worked on.   I
 3   worked with him on amicus brief for the
 4   Pennsylvania matter.  And he's reached
 5   out to me about matters where I haven't
 6   been disclosed.
 7       Q     Do you know what the National
 8   Republican Redistricting Trust is?
 9       A     Yes.
10       Q     What is it?
11       A     My understanding is it's a group
12   to work on getting maps in the cycle to
13   work in a way that's favorable to the
14   Republican Party.
15       Q     Have you ever spoken with
16   anybody from the National Republican
17   Redistricting Trust in this cycle?
18       A     Yes.
19       Q     Who?
20       A     Adam Kincaid.
21       Q     Which jurisdictions have you
22   discussed with Mr. Kincaid?
23       A     Again there have been several.
24   The ones that come most prominently to
25   mind are New York.  And Pennsylvania.
```

Page 17

```
 1                   S. Trende
 2       Q       Have you had any discussions
 3  with Adam Kincaid about South Carolina?
 4       A       No.
 5       Q       Have you had any discussions
 6  with anyone else from the National
 7  Republican Redistricting Trust about South
 8  Carolina?
 9       A       No.
10       Q       Have you spoken to anyone who
11  actually participated in the redistricting
12  of the South Carolina Congressional
13  districts for this cycle?
14       A       I don't know if Mr. Gore did but
15  otherwise, no.
16       Q       And you didn't participate in
17  the Congressional Redistricting yourself,
18  correct?
19       A       That's correct.
20       Q       You weren't asked to draw maps
21  for consideration, were you?
22       A       I was not.
23       Q       So with respect to the
24  Congressional plan that's discussed in
25  your report did anyone from the South
```

```
                                           Page 18
 1                 S.  Trende
 2   Carolina  Legislature  ever  tell  you  or
 3   communicate  to  you  why  any  of  the
 4   districts  were  drawn  the  way  that  they
 5   were?
 6        A     No.
 7        Q     So  you  have  no  direct  knowledge
 8   of  why  any  of  the  districts  in  the  South
 9   Carolina  Congressional  map  were  drawn  the
10   way  that  they  were,  correct?
11        A     To  the  extent  that  would  come
12   from  talking  to  members  of  the  South
13   Carolina  Legislature,  I  guess  that's
14   correct.
15             MR.  FREEDMAN:  This  will  be  our
16        first  experiment  to  see  if  Exhibit
17        Share  is  actually  working  since  I've
18        not  gone  through.
19             I'm  going  to  introduce  as
20        Exhibit  1  the  copy  of  your  deposition
21        notice.
22             (Whereupon,  amended  notice  of
23        deposition  was  marked  as  Exhibit  1  for
24        identification,  as  of  this  date.)
25             THE  WITNESS:  Are  your  exhibits
```

```
                                    Page 19
 1                 S. Trende
 2        highlighted or can I use the ones that
 3        were provided to me?
 4             MR. FREEDMAN:  So you can.  The
 5        number might be so if you can work off
 6        the screen that's better.
 7             So I have introduced as Exhibit
 8        1, the amended notice of deposition.
 9        Can everyone see it?
10             MR. GORE:  No, I can't see it.
11        I just want to note for the record I
12        also can't access Exhibit Share but I
13        can pull up the exhibits on my screen
14        from the folder that you provided a
15        few days ago.
16             (Discussion off the record)
17        Q    So the document I introduced I
18    think was tab 43.  Document number 43?
19        A    Yes, I have it open.
20        Q    Okay.  Have you seen this
21    before?
22        A    Yes.
23        Q    I want to turn to schedule A.
24    Which is the last page of this.  Exhibit
25    A.  And I just want to walk through
```

```
                                    Page 20
 1              S. Trende
 2   categories of documents.  The first
 3   category is "all materials and documents
 4   reflecting facts or data considered in
 5   framing your opinions in the Congressional
 6   map phase of the above captioned case,
 7   Congressional case."
 8              What was done to collect
 9   documents pursuant to this item?
10      A     Shortly after my report was
11   filed, I gathered the code and all the
12   materials that were relied upon.  And
13   provided them to counsel.
14      Q     Do you know what was collected?
15      A     I don't recall except that it
16   should be sufficient material to recreate
17   the data presented in my report and
18   anything I relied upon.
19      Q     Do you know if those materials
20   were turned over?
21      A     I don't.
22      Q     Okay.  Turning to category 2:
23   "All data code materials and documents you
24   relied upon and/or may rely upon in
25   reaching your opinions in the
```

```
                                              Page 21
 1                    S. Trende
 2     Congressional case, including all
 3     electronic and non-publicly available
 4     written data that you relied on including
 5     any computer code used to process or
 6     interpret such data."
 7               Can you tell me what was done to
 8     collect documents pursuant to this item?
 9        A     The answer to that is the same
10     as with the first.
11        Q     Did you -- and what happened to
12     the documents that were collected?
13        A     To my recollection, they were
14     transferred to Mr. Gore.
15        Q     And do you know if counsel
16     turned them over?
17        A     I do not.
18        Q     Okay.  Moving to category 3:
19     "Any materials, documents or
20     communications exchanged with defendants
21     in the Congressional case or other
22     documents reflecting the content of such
23     communications."
24               Do you know what was done to
25     collect documents pursuant to this item?
```

```
                                           Page 22
  1               S. Trende
  2      A     I know I have never communicated
  3   with any of the defendants in this case.
  4   Assuming Mr. Gore is not a defendant.
  5   And so there was nothing to be done,
  6   because I am certain I have never
  7   communicated with any of those people.
  8      Q     Okay.  The fourth item:  "All
  9   correspondence, email between you and any
 10   attorney who represents defendants in the
 11   Congressional case that, sub i. Relate to
 12   your compensation.
 13               "Sub double ii. Identify facts
 14   or data provided to you by attorneys that
 15   you considered in forming your opinions or
 16   sub sub III, identify assumptions that
 17   were provided to you by attorneys and upon
 18   which you rely in forming your opinions."
 19               Can you tell me what was done to
 20   collect documents pursuant to this item?
 21      A     I went through my Outlook inbox.
 22   And filtered my emails to or from Mr.
 23   Gore.  I reviewed those emails and I sent
 24   the emails to him that were responsive.
 25      Q     And do you recall what was
```

Page 23

```
 1                S. Trende
 2    turned over to Mr. Gore?
 3        A     I think it was mostly drafts of
 4    the retaining agreement.
 5        Q     Anything else?
 6        A     I don't think there's anything
 7    other than documents that related to
 8    compensation.
 9        Q     Okay.  Did counsel provide you
10    with documents that contained facts or
11    data that you considered in forming your
12    opinions?
13        A     No.
14        Q     Did counsel provide any
15    assumptions to you that were, that you
16    relied on in forming your opinions?
17        A     No.
18        Q     Do you know what happened to
19    the, for the correspondence that you
20    turned over to Mr. Gore, do you know
21    whether that was produced?
22        A     No.
23        Q     And other than Mr. Gore, have
24    you had any other communications with any
25    other defense counsel?
```

Page 24

1                    S. Trende

2        A      No, I didn't know there were

3     other defense counsel until today.

4        Q      Turning to the fifth category:

5              "All invoices, bills, billing

6     records, time records and expense records

7     connected to any work paid for by

8     defendant or defendants' counsel to you,

9     including but not limited to information

10    sufficient to identify, A, your hourly

11    rate.

12             "B, the amount of time you have

13    spent in connection with your involvement

14    in the Congressional case.  And C, the

15    dates on which such activity or work was

16    performed."

17             Do you know what was done to

18    collect documents pursuant to that item?

19       A      I have sent one invoice to Mr.

20    Gore.  Which has the amount of times I

21    have spent in connection with my

22    involvement in the Congressional case, on

23    the first page, as well as the dates on

24    which such activity or work was performed

25    on the second page.

Page 25

```
 1                  S. Trende
 2              And I believe my hourly rate is
 3   in that document as well, as well as my
 4   reports.
 5       Q      And that one invoice is the only
 6   invoice you have issued so far?
 7       A      That's correct.
 8       Q      Do you have any other time
 9   records or billing records for your work
10   on this case that are not reflected on
11   billed time?
12       A      No.
13       Q      You haven't started pulling
14   together your next invoice in the case
15   yet?
16       A      I have not.  I haven't done work
17   in this case until it became time to get
18   ready for the deposition.
19       Q      Do you have notes about how much
20   time you spent preparing for the
21   deposition?
22       A      No.
23       Q      Let's pull up your report which
24   is exhibit 0 -- or I am sorry.  It's not
25   exhibit 0.  It's the document with the tab
```

```
                                    Page 26
 1              S. Trende
 2   zero in the materials we sent.
 3              MR. FREEDMAN:  On Exhibit Share
 4       I'm going to introduce this as Exhibit
 5       2.
 6              (Whereupon, expert report dated
 7       4/18/22 was marked as Exhibit 2 for
 8       identification, as of this date.)
 9       Q      Do you have a copy of your
10   report, your April 18th report in front of
11   you?
12       A      I do.
13       Q      What is Exhibit 2?
14       A      It is the expert report of Sean
15   P. Trende.
16       Q      When did you start writing this
17   report?
18       A      Shortly before Easter.
19       Q      Who prepared this report?
20       A      I did.
21       Q      Did anyone help you?
22       A      There were drafts exchanged with
23   counsel but beyond that, no.
24       Q      Any counsel besides Mr. Gore?
25       A      No.  As I have testified, I
```

```
                                    Page 27
 1              S. Trende
 2   didn't know there were counsel besides
 3   Mr. Gore for the defendants until this
 4   deposition.
 5      Q     How many drafts of this report
 6   were prepared?
 7      A     I don't know.
 8      Q     Can you give me a ballpark?
 9      A     Perhaps five.
10      Q     Did the reviewers provide edits
11   to the report?
12      A     I don't know if they were edits
13   or suggestions, yeah, there were some
14   stylistic edits, so yes.
15      Q     Okay.
16            MR. FREEDMAN:  We are going to
17      just quickly introduce as the next
18      exhibit your May 4th report, which is
19      tab 3 in the material sent.
20            (Whereupon, rebuttal report
21      dated 5/4/22 was marked as Exhibit 3
22      for identification, as of this date.)
23            (Pause)
24      Q     Sir, I have introduced on
25   Exhibit Share as Exhibit 3 your rebuttal
```

Page 28

```
 1              S. Trende
 2  report from May 4.  Do you have a copy of
 3  that in front of you?
 4      A     Yes.
 5      Q     When did you start writing your
 6  rebuttal report?
 7      A     The initial report was filed on
 8  the 18th; it would have been shortly
 9  after that.
10      Q     Let me take a step back and just
11  make sure my foundation is clear.  What is
12  Exhibit 3?
13      A     It's the rebuttal report of Sean
14  P. Trende.
15      Q     Okay.  Who prepared Exhibit 3?
16      A     I did.
17      Q     Did anyone help you?
18      A     Other than drafts exchanged with
19  counsel, no.
20      Q     Who reviewed Exhibit 3 before
21  the disclosure was made?
22      A     To my knowledge, Mr. Gore.
23      Q     Do you know were there drafts of
24  this report before the disclosure was
25  finalized?
```

```
                                            Page 29
 1                  S. Trende
 2      A      Yes.
 3      Q      Do you recall how many drafts of
 4   this report there were?
 5      A      Again I'm just doing a spitball
 6   estimate and saying five.
 7      Q      Did Mr. Gore provide edits on
 8   this report?
 9      A      Yes.
10      Q      Now do the two reports I have
11   shown you, the April 18 and May 4 reports,
12   Exhibits 2 and 3, do they contain a
13   complete statement of all opinions you
14   intend to offer at trial in this case?
15      A      I don't know exactly what
16   opinions Mr. Gore intends to introduce if
17   he intends to have me testify at trial.
18   But I would not envision offering
19   opinions in addition to what's included
20   in these reports.
21      Q      You are not planning to express
22   any opinions beyond those set forth in
23   these two reports at trial, right?
24      A      That's correct.
25      Q      Do the two reports I have shown
```

```
                                        Page 30
 1                  S. Trende
 2   you, your April 18 and May 4 reports,
 3   Exhibits 2 and 3, contain a complete
 4   statement of the basis or reasons for your
 5   opinions in this matter?
 6       A     I believe so.
 7       Q     Do the two reports I have shown
 8   you, your Exhibits 2 and 3, contain all
 9   the analysis you intend to present at
10   trial in this case?
11       A     If I were to testify, I would
12   not envision expressing opinions or
13   analysis beyond what's included in these
14   reports.
15       Q     Beyond what's in these reports
16   have you reached any other opinions that
17   you intend to offer at trial?
18       A     No.
19       Q     Do you have any plans sitting
20   here today to do any additional analysis
21   to be presented at trial?
22       A     No.
23       Q     Have you been asked to do any
24   additional analysis beyond what's set
25   forth in your two reports?
```

Page 31

1                 S. Trende

2      A      Well, I was asked to review the

3   materials that you provided as potential

4   exhibits for this deposition.  And some

5   of them I have not seen before.  So I

6   took a look at them to the extent they

7   were helpful.

8             But as far as new opinions

9   responsive to things set forth by

10  plaintiff's experts, no.

11     Q      All right.  So maybe the best

12  way of asking this, is are you planning to

13  supplement either your April 18 or May 4

14  reports?

15     A      No.  I have done no work to

16  create a supplement and have no

17  intentions to do so.

18     Q      Okay.  If you could open your

19  April 18 report, Exhibit 2, to pages 7 and

20  8.  I want to ask about the documents you

21  relied on.

22             (Pause)

23     A      Okay.

24     Q      Now on pages 7 and 8 you list

25  the various materials you relied upon in

Page 32

1                    S. Trende
2     formulating your opinions, correct?
3         A     That's correct.
4         Q     Is this the complete list of
5     materials you considered in forming your
6     opinions in this case?
7         A     I believe so.
8         Q     Is there anything else you
9     considered in formulating the opinions
10    identified in your initial report?
11        A     Not to my knowledge.  As we walk
12    through the document in the deposition,
13    things may spring to mind but I was
14    pretty cautious about writing down things
15    that I relied upon.
16        Q     Okay.  At the bottom of page 7
17    and the top of page 8, you cite two court
18    decisions:  The Backus and the Colleton
19    County decisions.  Do you see those?
20        A     Yes.
21        Q     Did you consider any other
22    materials or information from those cases
23    in forming your opinions?
24        A     I don't understand the question.
25        Q     Did you look at the pleadings or

Page 33

1                    S. Trende
2    expert reports or any other documents from
3    those, any other documents from those
4    cases in rendering your opinions?
5        A    Oh, I see.  No.  I did not.
6        Q    Now you also on page 8 identify
7    public hearing transcripts available at
8    the Senate redistricting website.  I just
9    want to be clear what you reviewed.  Can
10   you tell me what that represents?
11       A    That was really included more in
12   the interest of completeness.  Because I
13   did go through some of the public hearing
14   transcripts contained at the website
15   listed.  They were not a substantial
16   contributing factor to the report,
17       Q    Okay.  So just so I'm clear,
18   when you are referring to the public
19   hearing transcripts are you referring to
20   the 10 hearings conducted by the Senate
21   Judiciary Committee in July and August
22   2021 or something else?
23       A    I believe that's what's listed
24   there and that's what I'm referring to.
25       Q    The Senate Judiciary Committee

Page 34

1                    S. Trende
2      hearings?
3           A      Yes.
4           Q      Did you also review any of the
5      Senate or House legislative hearings
6      before today over the actual map?
7           A      No.
8           Q      Do you know whether any of the
9      hearing transcripts you reviewed from the
10     public hearings were after the census
11     bureau released the 2020 decennial census
12     redistricting data?
13          A      No.
14          Q      Okay.  At the bottom of page 8
15     you say that you, that all shaped files
16     are projected using the WGS84 projection.
17     What does that mean?
18          A      So there's a difficulty in
19     mapmaking, because the earth's surface is
20     spherical.  And when you are making a
21     map, you are projecting it onto a flat
22     piece.
23                 It's like if you were to peel an
24     orange and try to smash it down for some
25     strange reason flat on the table, you

Page 35

```
 1            S. Trende
 2  would end up with lumps; it wouldn't go
 3  naturally.
 4            And so there are various
 5  projections that have been suggested for
 6  making that transformation.  And the
 7  WGS84 projection is one of them.
 8      Q     Okay.  And what is the
 9  significance of the WGS84 projection, like
10  how is it different from other ways you
11  could have done this?
12      A     Well, there's the classic
13  projection of the Mercator projection,
14  which is what most maps you see around
15  are where the polar regions kind of
16  spread wide open.  And you end up with
17  Greenland being roughly the size of
18  Africa, which is obviously inaccurate.
19            I chose -- there are at least
20  hundreds of projections, NAD 83.  And
21  there are specific NAD 83 projections for
22  different states.  I used of the WGS84
23  projection because the maps I created
24  rely on open street map for the
25  backgrounds.  And open street map uses
```

```
                                        Page 36
 1                  S. Trende
 2   the WGS84 projection.
 3                  And so to have everything line
 4   up, that's the projection to use.  I'm
 5   not aware of any substantive difference
 6   if I were to use the NAD 83 or the
 7   latitude where South Carolina is
 8   something like Mercator.
 9       Q      Okay.  I want to just shift to
10   your rebuttal report and also go over the
11   materials considered for the rebuttal
12   report.  If you could shift to Exhibit 3.
13   Your May 4th report.
14       A      Okay.
15       Q      Now your May 4th report doesn't
16   contain a list of the facts or documents
17   or data you considered in forming the
18   opinions expressed in this report, right?
19       A      No.
20       Q      Your May 4th report contains
21   sections discussing the reports of
22   plaintiff's experts, Dr. Imai and
23   Dr. Ragusa, right?
24       A      If does.  And I'm not sure.  I
25   think there was a negative in your
```

Page 37

```
                              S. Trende
 1                                           question before and when I answered it
 2     question before and when I answered it
 3     no.  So to answer it in a complete
 4     sentence it doesn't include a statement
 5     of what I relied upon.
 6          Q     Okay.  Thank you for making sure
 7     that's clear.  Just so that we are clear,
 8     I mean presumably you relied on,
 9     presumably, strike that.
10                Presumably you considered the
11     reports of Dr. Imai and Dr. Ragusa in
12     formulating the opinions in your May 4th
13     report, correct?
14          A     Yes.  Both of those are
15     referenced in the report.  So I clearly
16     relied upon them.
17          Q     How did you get copies of those
18     reports?
19          A     They were likely transferred by
20     counsel.
21          Q     Did someone send them to you?
22          A     Yes, it would have been Mr.
23     Gore.
24          Q     Was that by email?
25          A     Yes.  It would have been by
```

Page 38

```
 1              S. Trende
 2   email.
 3       Q     The invoice that you produced
 4   yesterday also references analysis that
 5   you performed with Dr. Imai's code and
 6   output.  Are Dr. Imai's code and output
 7   something you considered in formulating
 8   your opinions in the May 4th report?
 9       A     That's a good question that I
10   could give an extremely pedantic answer
11   to.  But they certainly were needed to
12   create the data and information upon
13   which I relied.
14       Q     And how were Dr. Imai's code and
15   output transmitted to you?
16       A     That I don't remember.  Because
17   sometimes I would say email from counsel
18   but sometimes the documents are too big
19   and I have had, I think I have had this
20   with Dr. Imai where it has to be
21   downloaded.  So I'm not sure.
22       Q     When you were looking for
23   documents responsive to the deposition
24   notice document request, did you look at,
25   did you look for correspondence from
```

```
                                    Page 39
 1                  S. Trende
 2   counsel where materials or data that you
 3   considered in preparing your rebuttal
 4   report were considered?
 5       A     That certainly would have been
 6   part of my review.  It didn't really
 7   click with me until you asked the
 8   question that yes, Dr. Imai's and
 9   Dr. Ragusa's reports would have been
10   relied upon.
11       Q     Okay.  Beyond Dr. Imai's and
12   Dr. Ragusa's reports and Dr. Imai's code
13   and output, did you consider anything else
14   in formulating the opinions expressed in
15   your May 4th report?
16       A     I don't believe there is
17   anything besides what's referenced in the
18   initial report upon which I relied.  It
19   would have been the same basic underlying
20   data sets and sources beyond what's
21   referenced in the report.
22       Q     Now your May 4th report doesn't
23   mention the other plaintiff's experts,
24   Dr. Duchin, Dr. Liu or Dr. Bagley,
25   correct?
```

Page 40

                    S. Trende

1

2       A       Without making us sit through

3    the exercise of me reading the report, I

4    think that's right and I have no reason

5    to doubt you.

6       Q       Is it fair that you have no

7    opinions you intend to offer at trial

8    about the reports filed by Dr. Duchin,

9    Dr. Liu or Dr. Bagley?

10      A       Certainly not their opening

11   reports.  I don't know how things work

12   with their rebuttal reports since I know

13   Dr. Liu, Dr. Bagley and Dr. Duchin filed

14   rebuttal reports to my opinion.  And

15   Dr. Ragusa.

16      Q       Okay.  So just so we are clear,

17   as to their initial reports you are not

18   planning to offer any opinions concerning

19   the initial reports of Dr. Duchin, Dr. Liu

20   or Dr. Bagley, correct?

21      A       That's correct.

22      Q       And I'll ask the question asked

23   earlier.  Are you planning to supplement

24   your reports in any way to address the

25   rebuttal reports of Dr. Duchin, Dr. Liu,

Page 41

```
 1              S. Trende
 2   Dr. Bagley or Dr. Ragusa?
 3       A    No.  I don't intend to do any
 4   supplemental reports or work respecting
 5   the expert reports of Dr. Duchin,
 6   Dr. Liu, L-i-u or Dr. Bagley.
 7       Q    So let me circle back.  Are you
 8   planning to offer any opinions at trial
 9   about the analysis presented by
10   Dr. Duchin, Dr. Liu or Dr. Bagley?
11       A    I have no idea what might be
12   asked as sort of rehabilitation to the
13   extent you cross me on their rebuttal
14   reports.  But with respect to their
15   initial reports, I don't have any
16   intention to testify with respect to
17   those.
18       Q    Okay.  And with regard to their
19   rebuttal reports, putting aside from I
20   might ask you on cross-examination, do you
21   have any plans to testify about their
22   rebuttal reports in your direct testimony?
23       A    Well, again, I don't have, I
24   don't even know if I'll be testifying
25   live at trial.  And I certainly haven't
```

Page 42

```
 1              S. Trende
 2   and doubt I will draft my direct.  But
 3   no, I don't have any intentions to do so.
 4      Q     Okay.  Sitting here today do you
 5   have any opinions concerning Dr. Duchin's
 6   rebuttal report?
 7      A     I have certainly read it and
 8   given it thought.  So I assume I have
 9   opinions with respect to it.  So yes.
10      Q     What are your opinions with
11   regards to Dr. Duchin's rebuttal report?
12      A     I couldn't rehearse them on the
13   fly.  We would have to walk through that
14   report.
15      Q     Are there any, sitting here
16   today are you prepared to express any
17   opinions regarding Dr. Duchin's report?
18      A     Well, again not on the fly but
19   as we go through, if you show me
20   Dr. Duchin's rebuttal report and ask me
21   about something, there's a reasonable
22   chance I have an opinion about it.
23           So I'm not going to close myself
24   out of the ability to give that answer
25   two hours later if we are going through
```

Page 43

```
 1              S. Trende
 2   Dr. Duchin's rebuttal report.
 3       Q     Do you know when Dr. Duchin's
 4   rebuttal report was served?
 5       A     I do not.
 6       Q     It was served on May 4th.  The
 7   same day you served your rebuttal report.
 8   So you have had over two months to express
 9   any opinions you had regarding Dr.
10   Duchin's report or supplementary report.
11              Is there a reason you have not
12   prepared a supplemental report to address
13   Dr. Duchin's any criticisms you have,
14   Dr. Duchin's supplemental rebuttal report?
15       A     Well, from what I was informed
16   about the scheduling order, it doesn't
17   include a supplement.  And it's pretty
18   unusual in my experience to move to go
19   outside the scheduling order to write a
20   supplement.  And I wasn't asked by
21   counsel to prepare one.
22       Q     Same question with regard to
23   Dr. Liu.  Is there a reason why, do you
24   have any, sitting here today can you tell
25   me any criticisms you have of Dr. Liu
```

Page 44

```
 1              S. Trende
 2  based on his rebuttal report?
 3      A      Well, again it's the same basic
 4  answer.  These are not lengthy reports
 5  but substantial reports.  And so on the
 6  fly, I certainly couldn't give you all my
 7  thoughts and opinions on it.
 8              That said, if you were to ask me
 9  about things on cross, that I have
10  thought about or even at the time have
11  impressions about, I'm not inclined to
12  close myself out of the ability to give
13  that answer.
14      Q      Sitting here today are you
15  prepared to identify any criticisms you
16  have of Dr. Liu based on his rebuttal
17  report?
18      A      Well, again, two hours from now
19  if we go through Dr. Liu's rebuttal
20  report and you asked me about something,
21  I'll probably have given it some thought
22  and have opinions about it.
23              Nothing in it changed my mind
24  nor in Dr. Duchin's report.  But beyond
25  that sitting right here, no, I could not
```

Page 45

```
 1                 S. Trende
 2    tell you what my specific opinions with
 3    respect to Dr. Liu are.
 4        Q    Okay.  And in the time since
 5    Dr. Liu's rebuttal report was served in
 6    early May, is there any reason why you
 7    couldn't have expressed any opinions you
 8    had concerning Dr. Liu's analysis in a
 9    supplemental report?
10        A    Well, again, to my
11    understanding, the scheduling order
12    doesn't provide for third or supplemental
13    reports to respond to expert opinions.
14             And in my experience it would be
15    unusual to revise the scheduling order to
16    provide for such reports.  And beyond
17    that, I wasn't asked to do so by Counsel.
18        Q    Okay.  And then same question
19    with regard to Dr. Bagley.  Sitting here
20    today, are you, sitting here today can you
21    articulate any criticisms you have of
22    Dr. Bagley based on his rebuttal report?
23        A    Well, again, it's a substantial
24    report.  So on the fly in response to an
25    open-ended question, I wouldn't be able
```

```
                                    Page 46
 1                  S. Trende
 2    to come up with a list of responses or
 3    objections to Dr. Bagley's report.  With
 4    that said, you may at some point in the
 5    future ask me questions about Dr.
 6    Bagley's report and I wouldn't want to
 7    close myself out of being able to give an
 8    answer there.
 9                  In addition, if you were to
10    cross me on things at trial, it's likely
11    I would have a response to them.  But
12    again, sitting here right now at this
13    moment, in response to an open-ended
14    question, I can't give a list, no.
15        Q      Sitting here today can you
16    identify any criticisms you have of
17    Dr. Bagley?
18        A      Again, without going through the
19    rebuttal report I would not have
20    something in response to an open-ended
21    question.
22        Q      Okay.  And in the time since
23    Dr. Bagley searched his rebuttal report in
24    early May, is there any reason you don't
25    have prepared a supplemental report to
```

Page 47

```
 1                   S. Trende
 2   address any criticisms you have of
 3   Dr. Bagley's report?
 4        A     Well, again, to my understanding
 5   the scheduling order doesn't provide for
 6   supplemental reports.  And in my
 7   experience it will be unusual to modify
 8   scheduling order to do so.  And I haven't
 9   been asked to do so by counsel.
10        Q     Do you know any of the
11   plaintiffs' experts, any of the five
12   individuals?
13        A     Not on a personal level, no.
14        Q     Do you know any of them on a
15   professional level?
16        A     I have seen Dr. Imai, and
17   Dr. Duchin give testimony.  But that's
18   the extent of it.
19        Q     Are you familiar with Dr. Imai's
20   professional qualifications?
21        A     In a general sense, yes.
22        Q     Do you have any opinion about
23   his qualifications to provide his opinions
24   in his reports?
25        A     I think he is certainly
```

```
                                    Page 48
 1                  S. Trende
 2   qualified to run the simulations.  To the
 3   extent his opinions revolve around the
 4   simulations, I don't think there's any
 5   question about that in the mathematics
 6   behind them he is, to my understanding,
 7   not an election scholar; so there may be
 8   areas where his opinions go beyond where
 9   his teaching expertise is.
10       Q      Are you familiar with
11   Dr. Duchin's professional qualifications?
12       A      Generally, yes.
13       Q      Do you have any question about
14   her qualifications to provide the opinions
15   in her reports?
16       A      Well, again to my understanding,
17   Dr. Duchin is a mathematician, I have no
18   reason to doubt her qualifications
19   regarding the mathematics behind
20   simulations and running the simulations.
21            So my understanding she is not
22   an election scholar.  And what I have
23   read of her published work tends to
24   mostly be on the mathematics of
25   simulations.  So there may be areas where
```

Page 49

```
 1                  S. Trende
 2   her expert report goes beyond what her
 3   mathematical qualifications are.
 4        Q      Are you familiar with
 5   Dr. Ragusa's professional qualifications?
 6        A      No.
 7        Q      Do you have any question about
 8   Dr. Ragusa's qualifications to provide the
 9   opinions in his reports?
10        A      I have no opinion about Dr.
11   Ragusa's professional qualifications,
12   period.
13        Q      Are you familiar with Dr. Liu's
14   professional qualifications?
15        A      No.
16        Q      Do you have any question about
17   Dr. Liu's qualifications to provide the
18   opinions in his reports?
19        A      I don't have any opinions about
20   Dr. Ragusa's professional qualifications
21   at all.
22        Q      My question was actually about
23   Dr. Liu, not Dr. Ragusa.
24        A      I am sorry if I misspoke.  I
25   don't have any opinions about Dr. Liu's
```

```
                                        Page 50
 1                S. Trende
 2   professional qualifications at all.
 3       Q      Okay.  For purposes of the
 4   opinions you are seeking to express in
 5   this case, what are you saying are your
 6   fields of expertise?
 7       A      I don't believe I have
 8   identified my fields of expertise.  In my
 9   experience, that's something that's
10   narrowed down and decided upon in the run
11   to trial.
12                With that said, I would say I
13   have expertise in American politics,
14   American elections, statistics related to
15   elections.  In gerrymandering and perhaps
16   other subjects.
17       Q      Do you have any sense what
18   professional disciplines or fields you are
19   going to ask the Court to be qualified in
20   in this case?
21       A      I believe it's Mr. Gore who asks
22   that I be qualified in certain areas and
23   we have not had a discussion about what
24   those areas would be.
25       Q      Okay.  Now you didn't submit a
```

Page 51

```
 1              S. Trende
 2   CV with your April 18 or May 4 reports,
 3   correct?
 4       A      I thought we had but I'm not
 5   sure.
 6       Q      So we got a CV that you
 7   submitted with your February 10th report
 8   in the state house case.  I don't believe
 9   we got a separate CV for the newer
10   reports.  Do you think you submitted a CV
11   with your April or your May report?
12       A      I thought we had.  With the
13   April report.  But I'm not sure.
14       Q      Well, let me show you the CV I
15   have got which is from the, from the one
16   that was submitted with your February 10th
17   report concerning the state house map.
18              MR. FREEDMAN:  That's document 2
19       and I will introduce it as Exhibit 4.
20              (Whereupon, curriculum vitae was
21       marked as Exhibit 4 for
22       identification, as of this date.)
23       Q      Okay, so I have introduced as
24   Exhibit 4 the CV that was filed in
25   conjunction with your February 10th report
```

Page 52

```
 1                S. Trende
 2   in the State House case.  And I guess my
 3   question is is this the latest version of
 4   your CV?
 5        A     It is not.
 6        Q     How recently has your CV been
 7   updated?
 8        A     I can get the exact date for you
 9   at the break.  But I believe in April.
10        Q     What prompted you to update your
11   CV?
12        A     It was probably for use in an
13   expert report.
14        Q     Do you recall what changes were
15   made?
16        A     Additional cases would have been
17   listed.  And -- I probably would have
18   updated teaching political participation
19   and voting behavior to include spring
20   2022.  I believe those would have been
21   the updates made.
22        Q     Okay.
23              MR. FREEDMAN:  I don't want to
24        belabor this.  Mr. Gore, if the
25        updated CV was provided, if you could
```

Page 53

```
 1              S. Trende
 2      point us in the right direction, I
 3      would appreciate it.  Otherwise, if
 4      you could furnish it during a break
 5      that would be great.
 6          MR. GORE:  Yeah, John, I'm
 7      looking at the email I sent out with
 8      his report attached and also attached
 9      to his updated CV.  I'm happy to
10      re-forward it.
11          Your copy of this email is
12      Monday, April 1.  I am happy to
13      re-forward that to you if it's
14      helpful.
15          MR. FREEDMAN:  If you could, I
16      would appreciate it.
17          MR. GORE:  Sure.
18          MR. FREEDMAN:  So I'll take a
19      look at that in a break, which we will
20      take in a few minutes.  Just so I'm
21      clear, I mean I don't think we need to
22      look at it.
23      Q    Is it still the case you do not
24   have, is it still the case you do not have
25   peer-reviewed academic publications?
```

Page 54

1          S. Trende

2          (Pause)

3     A     I have not published any

4    peer-reviewed articles.

5     Q     Okay.  And are there any, any

6    appointments you have had in academic

7    institutions that are not reflected in

8    your peer-reviewed report?

9     A     As I said, the political

10   participation in voting behavior course

11   was taught in spring of 2022.  So it

12   should have been updated to include that.

13    Q     Which institution was that at?

14    A     That was at the Ohio State

15   University.

16    Q     Okay.  The CV I have says that

17   your educational status says you expect to

18   receive your Ph.D. in this year in 2022;

19   is that still accurate?

20    A     Yes.

21    Q     Now in conjunction with your

22   February 10, 2022 report in the state

23   house case, you had language in that

24   report saying that you expected to receive

25   your Ph.D. in May 2022 and filed your

Page 55

```
 1               S. Trende
 2   application to graduate.  Do you recall
 3   that?
 4       A     Yes.
 5       Q     There's not similar language in
 6   your April 18th report.  So let me just
 7   ask just kind of baseline questions.  Did
 8   you receive your Ph.D. in May 2022?
 9       A     No, I did not.
10       Q     What's the, I know you spent a
11   fair amount of time on this in your last
12   deposition.  What's the status of your
13   dissertation defense?
14       A     Two articles are written and
15   considered basically complete.  I need to
16   write the third article.
17       Q     Do you have, like, a defense
18   date?
19       A     No.
20       Q     I think at the time of your last
21   deposition, the report that you had done
22   on the use of spacial modeling in the
23   study of voting article had a placeholder
24   for your analysis on the application of
25   voting.  Have you completed that analysis?
```

Page 56

1                S. Trende

2        A      Yes.

3               MR. FREEDMAN:  All right.  We

4        have been going a little over an hour.

5        Why don't we take a quick break and I

6        will take a look at the revised resent

7        resume and see if I can get Exhibit

8        Share up and running.

9               THE VIDEOGRAPHER:  The time is

10       10:45 and we are going off the record.

11       This is the end of media unit number

12       1.

13               (Recess taken 10:45)

14               (Resumed:  10:58)

15               THE VIDEOGRAPHER:  The time is

16       10:58 and we are back on the record.

17       This is the beginning of media unit

18       number 2.

19               MR. FREEDMAN:  Mr. Trende, your

20       counsel provided me a copy of your

21       updated CV, another copy.  So I'm

22       just, so the record is clear, I'm

23       going to introduce that as Exhibit 5.

24               (Whereupon, updated curriculum

25       vitae was marked as Exhibit 5 for

Page 57

```
 1                 S. Trende
 2        identification, as of this date.)
 3        Q      I don't have any questions about
 4    it because I think it's consistent with
 5    what you described of the updates just in
 6    terms of your teaching experience.
 7                 Then I also wanted to just
 8    briefly talk about your compensation.  On
 9    page 8 of your report you indicate you are
10    being compensated $400 per hour.  Is that
11    right?
12        A      That's correct.
13                 MR. FREEDMAN:  And we received
14        in yesterday's production a copy of
15        your invoice.  But I, just so the
16        record is clear I'm going to, I'm
17        going to introduce a copy of that as
18        an exhibit.  So we will make that as
19        Exhibit 6.
20                 (Whereupon, series of invoice
21        receipts was marked as Exhibit 6 for
22        identification, as of this date.)
23        Q      Do you have a copy of that with
24    you?  We just got it yesterday so it
25    wasn't in the materials we sent.
```

```
                                    Page 58

 1                S. Trende

 2       A      I can probably pull it up.

 3       Q      I don't think that's necessary.

 4  I just want to, like, the invoice receipts

 5  reflect that you have got 87.25 hours on

 6  the matter through your rebuttal report;

 7  does that sound right?

 8       A      Just to make sure we are on the

 9  same page, this is invoice number 100115?

10       Q      Yes.

11       A      Yes, that reflects 87.25 hours

12  work.

13       Q      Okay.  And as of that point you

14  had, if I have done the math right, about

15  45 hours on your opening report; is that

16  right?

17       A      Without, I have no reason.  I'm

18  assuming you did closer to the math so I

19  have no reason to dispute you on that.

20       Q      Okay.  And on the rebuttal

21  report you had about between 41 and 42

22  hours, something around there.  Does that

23  sound about right?

24       A      That sounds right.

25       Q      Who has been cutting your checks
```

```
                                    Page 59
 1                 S. Trende
 2   in this case?
 3       A    I believe the check comes from,
 4   matter of fact, I know it is, because I
 5   can see it.  It comes from Jones Day.
 6       Q    Okay.  All right, if you could
 7   turn back to your report, Exhibit 2, your
 8   April report.  I want to ask about some of
 9   your other expert work.
10           The discussion that starts at
11   the bottom of page 3 and runs through page
12   6 of the other matters in which you have
13   testified.  First question is is this list
14   up to date and correct?
15       A    I believe it is.  There have
16   been a lot of them in the last year so
17   between it and my CV, it should have
18   everything.  But there may have been an
19   oversight.
20       Q    Okay.  If you could walk through
21   the list of cases and identify the ones
22   which are gerrymandering matters.  That's
23   probably the easiest way to narrow this
24   down a little bit.
25       A    Political or racial?
```

Page 60

1              S. Trende

2      Q      Yes.

3      A      So beginning on page 3 the work

4    for the Supreme Court of Virginia was

5    sort of an anti-gerrymandering issue.

6      Q      Let me rephrase my question.

7    Which matters concern redistricting is

8    probably the easiest way to approaching

9    it?

10     A      The work for the Supreme Court

11   of Virginia was certainly redistricting.

12   The work for the Supreme Court of Belize

13   was certainly redistricting.  The work as

14   Voting Rights Act expert counsel for the

15   Arizona independent redistricting

16   commission was certainly redistricting.

17            The work in Dickson v. Rucho was

18   redistricting.  Covington versus North

19   Carolina was a redistricting matter.  A.

20   Philip Randolph Institute V. Smith was a

21   redistricting matter.   Whitford v.

22   Nichol, N-i-c-h-o-l was a redistricting

23   matter.  Common Cause v. Rucho was a

24   redistricting matter.

25            At the bottom of page 5 there's

Page 61

```
 1              S. Trende
 2   a collection of three cases that were
 3   consolidated.  So for purposes of
 4   simplicity, I'll just reference the
 5   League of Women Voters of Ohio v. Ohio
 6   Redistricting Commission.  Those
 7   consolidated matters were redistricting.
 8              At the top of page 6, NCLCD v.
 9   Hall and Harper v. Hall were
10   redistricting cases.  Carter v. Chapman.
11   And Dressman v. Chapman were
12   redistricting matters.  Which were
13   consolidated.  Okay.
14              I'll spell this after I'm done.
15   Harkenrider  v. Hochul.
16   H-a-r-k-e-n-r-i-d-e-r v. H-o-c-h-u-l was
17   a redistricting matter.
18              I don't even know how to
19   pronounce the plaintiff's name in this
20   one.  It is S-z-e-l-i-g-a versus
21   L-a-m-o-n-e,  Lamone.
22              And then there's an in re title
23   for a different case and the in re 2022
24   legislative redistricting of the state.
25   Graham v. Adams.  And then NAACP v.
```

Page 62

1              S. Trende

2    McMaster.

3        Q     Thank you.  Of the cases you

4    just identified, can you tell me which of

5    those matters involved claims of racial

6    gerrymandering?

7        A     Well, the Virginia and Arizona

8    redistricting matters weren't claims but

9    obviously the work that was involved

10   there, trying to not draw racial

11   gerrymanders of, you know, the racial

12   gerrymandering concepts were important.

13   Dickson v. Rucho was a racial

14   gerrymandering case.  The Covington case

15   was a racial gerrymandering case.

16              I don't know for the A. Philip

17   Randolph Institute, the Whitford v.

18   Nichol, the Common Cause v. Rucho, if

19   there was a there was a way that racial

20   gerrymandering was involved in the claim

21   but I certainly wasn't involved if it

22   was.  And my sense is that there was

23   nothing.

24              The NCLCV v. Hall consolidated

25   cases involved racial gerrymandering

Page 63

```
 1              S. Trende
 2  claims, to my understanding.  They may
 3  have been pure section 2 claims, I really
 4  don't know.
 5              And Carter v. Chapman, that was
 6  another map drawing exercise.  So while
 7  it wasn't a claim, it was integrated into
 8  trying to draw an acceptable map.
 9              And Harkenrider v. Hochul was a
10  political gerrymandering claim but taking
11  into account the needs of the voting
12  rights act and minority representation
13  was integral to the case as with the
14  Lamone case in Maryland.
15              There was an aspect -- maybe
16  Graham v. Adams but that's a stretch.
17  And then certainly NAACP v. McMaster.
18      Q      Okay, thank you.  I just want to
19  walk through your gerrymandering cases
20  this cycle.  So why don't we start with
21  Ohio, the League of Women Voters of Ohio
22  cluster.  Who was your client in that
23  case?
24      A      So this is a line of questioning
25  I always have difficulty with to give a
```

Page 64

```
 1              S. Trende
 2   precise answer.  If we can be satisfied
 3   with I testify or I did reports on behalf
 4   of the defendants, I think that's the
 5   cleanest way to do it.  I don't know
 6   exactly who hired me in that matter.
 7       Q     All right.  Do you know, for
 8   example, like, do you know if the
 9   defendants were, like, a state agency?
10       A     So from, the named defendant was
11   the Ohio Redistricting Commission.  So
12   there were certainly state agencies as
13   defendants.
14       Q     Were you working with, were you
15   working for lawyers representing
16   republican Legislators or the Republican
17   Attorney General in the State of Ohio?
18       A     I don't know who the lawyers
19   with whom I work represented.
20       Q     Do you know who was funding your
21   work in that case?
22       A     I believe my checks in that
23   matter came from Nelson Mullins.
24       Q     Do you know whether the National
25   Republican Redistricting Trust funded your
```

Page 65

```
 1              S. Trende
 2   work in that action?
 3      A      No.
 4      Q      No, you don't know or no, you
 5   were not?
 6      A      No, I don't know.
 7      Q      How much were you paid on that
 8   engagement?
 9      A      I don't know.  Somewhere
10   probably in the 20 to 30,000 range.
11      Q      Okay.  Starting at the top of
12   page 6, the North Carolina cases.  Who
13   were you, who was your work on behalf of
14   in that case?
15      A      Again, a lot of these cases have
16   multiple defendants and sometimes teams
17   of lawyers.  As a matter of fact, that
18   case I know did have at least three
19   different sets of lawyers.
20              And I don't know who had engaged
21   the lawyers for whom I worked.  But my
22   checks in that matter came from Nelson
23   Mullins.
24      Q      And do you know whether, do you
25   know who Nelson Mullins' client was?
```

Page 66

```
 1                    S. Trende
 2       A      I do not.
 3       Q      Do you know whether they had a
 4  party affiliation, whether they were
 5  Democrats or Republicans or not
 6  affiliated?
 7       A      I don't know.
 8       Q      Do you know whether the National
 9  Republican Redistricting Trust funded your
10  work in the North Carolina cases?
11       A      I don't believe they did.  I
12  don't know.
13       Q      How much were you paid on the
14  North Carolina engagements?
15       A      Probably in the $30,000 range.
16       Q      Okay.  The Pennsylvania amicus
17  customer work, the Chapman cases.  Do you
18  know which party your work was on behalf
19  of in that case?
20       A      It was a -- I think their
21  official name was like Voters of
22  Pennsylvania.
23       Q      Did your client have a political
24  affiliation?
25       A      I believe the voters -- well, I
```

Page 67

```
 1                 S. Trende
 2   shouldn't speculate, I don't know.
 3        Q     Do you know whether the voters
 4   that you were working on behalf of were
 5   Republicans?
 6        A     I don't.
 7        Q     How did you get paid in that
 8   matter?
 9        A     I was paid by the law firm.
10        Q     Which firm was that?
11        A     It was a small boutique in
12   Pennsylvania.  I don't remember their
13   names.
14        Q     Do you know whether the National
15   Republican Redistricting Trust was funding
16   your work in that case?
17        A     I don't.
18        Q     How much were you paid for that
19   engagement?
20        A     Perhaps $20,000.
21        Q     Okay.  For the New York work,
22   which party were you working for in that
23   case?
24        A     I believe there was only one set
25   of plaintiffs.  I have to think.
```

```
                                        Page 68
 1                  S. Trende
 2              (Pause)
 3      A      Yeah.  So if there were
 4   multiple, I believe there was only one
 5   set of plaintiff's attorneys.  So
 6   certainly Harkenrider, I don't know if
 7   there were multiple plaintiffs in that
 8   case.  I never met any of the plaintiffs.
 9      Q      Did the plaintiffs have any
10   political affiliation?
11      A      I have no idea.
12      Q      How did you get paid in that
13   matter?
14      A      I submitted my invoices to
15   Troutman Sanders -- is it Troutman
16   Sanders or Troutman Pepper?  I don't
17   know.  I can't keep up with the names.
18      Q      Do you know who was funding the
19   prosecution of that case?
20      A      I don't.
21      Q      Do you know whether the National
22   Republican Redistricting Trust was funding
23   the prosecution in that case?
24      A      I don't.
25      Q      How much were you paid for the
```

```
                                        Page 69
 1                  S. Trende
 2    New York engagement?
 3        A      That one just about killed me.
 4    It had like six or seven expert reports
 5    in the end.  And it was in the upper five
 6    figures when everything added up but I
 7    don't know the exact amount
 8        Q      The Maryland work, who was your,
 9    with what party did you work on behalf of
10    in that case?
11        A      So that case did have multiple
12    plaintiff's counsel.  And I don't know
13    who -- the counsel I worked with, his
14    name is Strider Dickson.  S-t-r-i-d-e-r
15    D-i-c-k-s-o-n.
16              He is with a, you know, I think
17    it would be a small firm on the national
18    level, probably a medium-sized firm on
19    the Maryland level.  I don't recall the
20    name of it.  But that's who I did all my
21    work with.  I never met any of the
22    plaintiffs.
23        Q      Did the plaintiffs have any
24    particular political affiliation in that
25    case?
```

Page 70

```
 1                  S. Trende
 2      A       I don't remember.  I never met
 3  them so I don't know.
 4      Q       Do you know who was funding the
 5  prosecution of that action?
 6      A       No, I don't.
 7      Q       You got paid by Strider
 8  Dickson's firm; is that correct?
 9      A       I think so.  They are the ones
10  who I submitted the invoices to.
11      Q       Do you know whether the National
12  Republican Redistricting Trust was funding
13  your work in that case?
14      A       I don't.
15      Q       And how much were you paid on
16  the Maryland engagement?
17      A       That one was around $70,000.
18      Q       Okay.  The Kentucky work.  Does
19  the Kentucky case concern Congressional
20  maps or state maps or both?
21      A       It involved both.
22      Q       Which party did you work on
23  behalf of in that matter?
24      A       In that matter I worked directly
25  with the attorney general's office.
```

Page 71

                    S. Trende

1

2      Q      The attorney general, I believe

3   is David Cameron, right?  Did I get the

4   name right?

5      A      I think it's Daniel Cameron but

6   we will just call him Mr. Cameron.

7      Q      General Cameron.

8      A      General Cameron, right.  Okay,

9   we'll be official.

10     Q      And he is a Republican, right?

11     A      That's correct.

12     Q      And were you paid in that case

13  directly by the attorney general's office?

14     A      Yes.

15     Q      How much were you paid on that

16  engagement?

17     A      I had a cap of about $25,000 in

18  that case and I think I was pretty close

19  to it.

20     Q      Okay.  So I just wanted to make

21  sure I understand the work you have done

22  this cycle.  In this cycle you provided

23  expert opinions in redistricting matters

24  in seven states?

25     A      Yes.  That's my count.

```
                                    Page 72
 1              S. Trende
 2      Q     Do you --
 3      A     If we are excluding the Arizona
 4  work and the Supreme Court of Virginia
 5  work.
 6      Q     Yes.  I mean those aren't
 7  litigations, right?   Those you were
 8  appointed essentially as a consultant,
 9  right?  By the decision-making body,
10  right?
11      A     Yeah.  No litigation had been
12  brought in either of those matters and
13  the goal was to try to avoid litigation.
14      Q     Okay.  Do you have any kind of
15  arrangement with the National Republican
16  Redistricting Trust?
17      A     No.
18      Q     Or the Republican National
19  Committee?
20      A     No.
21      Q     Do you have any kind of
22  arrangement with the National Republican
23  Congressional Committee?
24      A     No.
25      Q     Like a preferred provider
```

Page 73

```
 1                S. Trende
 2    arrangement, something like that?
 3        A     No.
 4        Q     A volume discount arrangement?
 5        A     I do not.
 6        Q     Okay.  Now in addition to the
 7    racial gerrymandering claim in this case,
 8    are you aware that there's an Arlington
 9    Heights claim in this case?
10        A     I believe I have heard it from
11    some of the rebuttal reports that I read.
12        Q     Are you familiar with Arlington
13    Heights?
14        A     Yes.
15        Q     Are you seeking to be certified
16    as an expert on the Arlington Heights
17    factors in this case?
18        A     Well, again, that's something
19    that I think Mr. Gore has to decide.  But
20    since I wasn't aware that the claim was
21    there until I read the rebuttal reports,
22    I would certainly be surprised if he
23    tried to tender me as an expert there.
24        Q     Is it fair to say that you are
25    not opining on Arlington Heights factors
```

```
                                    Page 74
 1              S. Trende
 2    in this case?
 3        A      Certainly not directly.  I don't
 4    know if there's a way that the testimony
 5    that I'm giving is relevant somehow to
 6    the Arlington Heights factors.  I mean I
 7    guess maybe if you are -- there might be
 8    a creative legal theory, right?
 9              Like, if you are going with
10    traditional redistricting principles,
11    maybe that goes to the regularity of the
12    process followed.  But, you know, I think
13    that would be creative.
14        Q      You were not asked to opine on
15    Arlington Heights factors in any of your
16    reports, correct?
17        A      That's correct.
18        Q      You have, in fact, provided
19    expert analysis on Arlington Heights
20    factors before, correct?
21        A      I believe that was in the
22    Feldman case.
23        Q      Yeah, that's what I have seen.
24    Have you done Arlington Heights factors
25    analysis anywhere else?
```

Page 75

                    S. Trende

1        A       Not for a client.  I believe
2    it's part of the syllabus for my
3    political participation and turnout
4    class.  But I am actually not even 100
5    percent sure there.
6        Q       Do you think you have got the
7    qualifications to do an Arlington Heights
8    factor analysis?
9        A       Well, I did it in the Feldman
10   case.  And even if the judge didn't find
11   the testimony particularly helpful it
12   wasn't struck.  So, yes, I would assume I
13   have the qualifications to do so.
14       Q       Okay.  Is there a reason why you
15   didn't provide an Arlington Heights factor
16   analysis in this case?
17       A       You would have to ask Mr. Gore.
18   I didn't even, like I said, I didn't know
19   it was a claim in this case until I read
20   the rebuttal reports.
21       Q       Okay.  Let me take a step back.
22   Did you examine the legislative record in
23   this case?
24       A       I think I answered that earlier.

Page 76

```
 1              S. Trende
 2   But the answer is no, I did not look at
 3   the legislative record.
 4       Q    And is it fair to say you are
 5   not opining on legislative intent in this
 6   case?
 7       A    I think the analysis of
 8   traditional redistricting principles and
 9   the political effects of the maps goes to
10   questions of intent.  That's typically
11   how those analyses are used in legal
12   cases.
13              But in the Arlington Heights
14   sense of examining the, you know, the
15   legislative history, what the traditions
16   are in the given state, no.  I haven't
17   looked at that.
18       Q    Are you planning to present an
19   analysis of racially polarized voting in
20   this case?
21       A    I would be surprised if I were
22   asked to do that since I've done no
23   analysis of racially polarized voting in
24   South Carolina and have no intentions to
25   do so.
```

Page 77

1               S. Trende

2      Q     Do you consider yourself to be

3  an expert in the political geography of

4  South Carolina?

5      A     You know, the legal, we are in a

6  legal proceeding.  And the legal

7  definition of an expert is broad enough

8  that, yeah, I think I can give better

9  testimony about the political geography

10 of South Carolina than regular person on

11 the street.

12             So in the context of a legal

13 proceeding, yes.  It's a state that I was

14 required to research when I co-authored

15 the Almanac of American Politics.

16             Obviously, the political

17 geography of it is extremely important in

18 presidential primary races.  It's

19 important when it comes, you know, we had

20 a, well, what looked like it was going to

21 be a competitive Senate race in the 2020

22 cycle.  So in that sense, I guess, sure.

23     Q     Okay.  In terms of, like, the

24 formal criteria to have you qualified as

25 an expert in South Carolina geography,

```
                                    Page 78
 1                  S. Trende
 2    have you, do you have, has any court ever
 3    found you to be an expert in South
 4    Carolina political geography?
 5         A     No.
 6         Q     Has any -- what academic
 7    training do you have in South Carolina
 8    political geography?
 9         A     There certainly aren't courses
10    offered on South Carolina political
11    geography in the Ohio State political
12    science Ph.D. program;  so I guess I
13    haven't taken any courses on it.
14              There are probably other aspects
15    of academic training, generally, that
16    would apply to evaluating South
17    Carolina's political geography but
18    nothing specific.
19         Q     Have you taught on South
20    Carolina political geography in any of
21    your classes?
22         A     Not that I can recall.
23         Q     Have you published any articles
24    on South Carolina political geography?
25         A     No.  Not peer reviewed.
```

1              S. Trende

2     Q     My question was broader than

3   that.  But do you have non-peer reviewed

4   articles on South Carolina political

5   geography?

6     A     I have written about it pretty

7   extensively on real clear politics.

8     Q     Okay.

9     A     And as I mentioned, South

10  Carolina, the South Carolina

11  Congressional Districts were one of my

12  assignments for the recent Almanac of

13  American Politics or the 2014 Almanac of

14  American politics.

15    Q     When did you first discuss

16  becoming an expert in this case?

17    A     I think it was shortly before my

18  deposition in the House case.

19    Q     Who asked you?

20    A     Mr. Gore -- let me rephrase

21  that.  Because the previous question.  My

22  deposition in the House case was

23  originally scheduled.  And then that

24  matter went into settlement discussions.

25  And my deposition was continued.  Or

Page 80

```
 1                S. Trende
 2   postponed, I guess is the better term.
 3             So it would have been before the
 4   initial scheduled date, shortly before
 5   the initial scheduled date of my
 6   deposition in the House case.
 7        Q     And who asked you to serve?
 8        A     Mr. Gore.
 9        Q     Did you discuss whether to
10   become an expert in this case with anyone
11   else besides Mr. Gore?
12        A     I usually ask my wife.
13        Q     Anyone else?
14        A     No.
15        Q     Do you know if the defendants
16   asked other individuals to serve as
17   experts in this case?
18        A     I don't know.
19        Q     Do you know if anyone who was
20   asked to be an expert in this case
21   declined?
22        A     I don't know.
23        Q     Did you personally ask anyone
24   else to serve as an expert in this case?
25        A     No.
```

```
                                        Page 81

 1                  S. Trende
 2      Q      With regard to any expert
 3   testimony you have previously provided,
 4   has any court ever excluded your testimony
 5   for any reason?
 6      A      Yes.
 7      Q      Which cases or which case or
 8   cases?
 9      A      So even though my understanding
10   of the rule is that you don't have to
11   note that, in your report, I try to note
12   that in the report whether I was excluded
13   or not.  So it should, in case I missed
14   something in this response, everything
15   should be listed in the report.
16              With that caveat, in Feldman
17   versus Arizona, one of the attorneys
18   elicited some calculations for me, from
19   me, while I was on the witness stand.
20              And my understanding is that
21   after trial they were struck because it
22   was an undisclosed opinion that
23   plaintiffs did not have the opportunity
24   to provide a rebuttal for.
25              In NAACP v. Husted there was an
```

Page 82

```
 1                S. Trende
 2  opinion that was struck because the judge
 3  did not believe that the Internet map
 4  drawing tool I used had been
 5  double-checked enough to give sufficient
 6  indicia of reliability.
 7                And then I was struck, I was not
 8  allowed to testify in the matter of Fair
 9  Fight v. Raffensperger.
10      Q     Any other matters where your
11  testimony has been excluded for any other
12  reason?
13      A     As I said, I tried to include
14  them all in my expert report and if I
15  just overlooked something, I apologize.
16  But to to my recollection, those are the
17  three instances.
18      Q     Okay.  What did you do to
19  prepare for today's deposition?
20      A     I read the rebuttal reports of
21  plaintiff experts.  I had conversations
22  with Mr. Gore.  And I reviewed the
23  documents that were provided to me as
24  potential exhibits.
25      Q     Anything else?
```

Page 83

                    S. Trende

1

2       A       Not to my recollection.

3       Q       Without going into the substance

4    of conversations you had with Mr. Gore,

5    how many times did you meet with Mr. Gore

6    to prepare for today's deposition?

7       A       We met over Zoom twice.

8       Q       When were those sessions?

9       A       One was Monday morning and one

10   was Wednesday morning.

11      Q       How long was each session?

12      A       We had set aside an hour, I

13   believe and I think it ended up taking 30

14   minutes each.

15      Q       Was anyone present besides Mr.

16   Gore and yourself during those

17   discussions?

18      A       No.

19      Q       Did you discuss today's

20   deposition with anyone else besides Mr.

21   Gore?

22      A       Counsel in a matter for which I

23   had not been disclosed was informed that

24   I would be unavailable today because of

25   the deposition.  But nothing of the

Page 84

```
 1              S. Trende
 2  substance of this matter.  And my wife.
 3      Q     Anyone else?
 4      A     No.
 5      Q     Did you review any deposition
 6  transcripts to prepare for today's
 7  deposition?
 8      A     I believe you have transcripts
 9  in the materials you provided to me.
10      Q     Yeah.  I think there's a copy of
11  your transcript from the State House case.
12  Did you review that to prepare for today?
13      A     If I did, I would have reviewed
14  it briefly.  I certainly opened it up.
15      Q     Did you review any other
16  transcripts to prepare, deposition
17  transcripts to prepare for today?
18      A     I don't remember there being
19  anything else in the materials you
20  provided.  So no, I wouldn't have
21  reviewed it.
22      Q     Have you ever reviewed the
23  complaint in this matter?
24      A     No.
25      Q     Is there anything else you did
```

Page 85

```
 1                    S. Trende
 2   beyond what you have already discussed
 3   that you did to prepare for today's
 4   deposition?
 5        A     No.
 6        Q     If you could look at the report,
 7   Exhibit 2, the Summary of Opinions.  And
 8   I'd like to start with your opinion, your
 9   opinions on page 7.
10             You have a series of opinions
11   comparing the inactive map to the
12   benchmark plan.  And just so our record is
13   clear, what are you referring to when you
14   refer to the enacted map?
15        A     The enacted map or enacted plan
16   is referenced in the preceding paragraph
17   under Roman Numeral II.
18             And it's the new South Carolina
19   Congressional districts that were in
20   effect from or that will be going into
21   effect in the next 2022 election.
22        Q     Okay.  And what do you mean when
23   you refer to the benchmark plan?
24        A     So again, that's referred to and
25   defined under Roman Numeral II; benchmark
```

```
                                    Page 86
 1              S. Trende
 2   plan refers to the previous map in effect
 3   from 2012 to 2020.
 4       Q     Where did you you get the data
 5   in your report that you present about the
 6   enacted map?
 7       A     I likely would have gotten that
 8   from redistricting data hub.
 9       Q     Where is that source?
10       A     The Redistricting Data Hub is an
11   online repository of redistricting
12   materials collected by academics and
13   experts in the field.  And that's relied
14   upon in redistricting matters.
15              We utilized it as a source for
16   matters for material in the Arizona
17   legislative case.  And I have used it in
18   multiple matters since.
19       Q     Where did you get the data
20   presented in your report about the
21   benchmark map?
22       A     I believe it comes from the same
23   source.
24       Q     So in these opinions you are
25   comparing the enacted plan to the
```

Page 87

```
 1                 S. Trende
 2   benchmark plan.  Why is that?  Why is that
 3   the sole basis for comparison in your
 4   report?
 5       A     Because it's what I was asked to
 6   compare.
 7       Q     In rendering your opinions did
 8   you consider any other plans besides the
 9   enacted plan and the benchmark plan, the
10   enacted map and the benchmark plan?
11       A     There's a history of maps prior
12   to the benchmark plan that are provided
13   in the report.
14       Q     Well, for example, maybe my
15   question wasn't clear.  In rendering your
16   opinions did you consider any of the other
17   plans that were submitted or considered
18   during the legislative process?
19       A     So to make sure we are on the
20   same page, you are asking about
21   alternative plans to the plan that was
22   potentially enacted?
23       Q     Yes.  Did you consider any of
24   those alternatives?
25       A     I did not.
```

```
                                        Page 88
  1                    S. Trende
  2        Q      For example, did you consider
  3   any of the draft plans which the South
  4   Carolina State House legislative staff
  5   developed?
  6        A      I did not.
  7        Q      Did you consider, in particular
  8   example, the House staff plan that was
  9   released on December 13, 2021, are you
 10   familiar with that plan?
 11        A      I am not.
 12        Q      Let me see if you have seen this
 13   before.
 14              MR. FREEDMAN:  This is tab 24.1.
 15      And we will produce it as Exhibit 7.
 16              (Whereupon, Congressional House
 17      Staff Map was marked as Exhibit 7 for
 18      identification, as of this date.)
 19        A      Just to make sure we are on the
 20   same page, this is labeled Cong. House
 21   Staff Map and then Congressional House
 22   Staff Plan when you open it?
 23        Q      Yes.
 24        A      Okay.
 25        Q      Had you seen this plan before it
```

Page 89

```
 1              S. Trende
 2  was sent to you earlier this week?
 3      A     No.
 4      Q     Okay.  I want to start with in
 5  your summary of opinions, your third
 6  opinion which is the second bullet on page
 7  7.  The one that says:
 8              "The enacted map retains high
 9  percentages of the cores of all of the
10  benchmark districts.  Those percentages
11  range from 82.84 percent in District 1 to
12  99.96 percent in District 7.  And five
13  districts retain more than 94 percent of
14  their cores."
15              What do you mean by core
16  retention?
17      A     I believe it's specified later
18  in the map but it is the percentage of
19  the old district that is contained in the
20  new district.  In terms of population.
21      Q     And how did you assess the level
22  of core retention between the enacted map
23  and the benchmark plan?
24      A     I believe I projected the
25  Congressional maps down to a shape file
```

Page 90

```
 1                 S. Trende
 2   of the blocks or how the blocks were
 3   assigned.  I believe this is all included
 4   in the R code that I provided.  R is just
 5   the letter R.
 6                 After that so that, you know,
 7   the shape file is basically a spreadsheet
 8   with some special geographic data in the
 9   file column.
10                 But you create a line in the
11   shape file; you have the shape file of
12   the blocks with the populations.  You
13   create a line in the shape file for each
14   of the blocks for what district they were
15   assigned to previously.
16                 You create a line in the shape
17   file for each district they are assigned
18   to under the new map.
19                 And then you can direct R to
20   look at the differences, you know, of the
21   total population in District 1, how much,
22   you take the total population of District
23   1, you take the total population of
24   District 1 where the old assignment
25   matches the new assignment.  Divide them
```

```
                                        Page 91
 1                 S. Trende
 2   and they give you percentages.
 3              THE WITNESS:  Is now an okay
 4        time to take a break for five minutes?
 5        My son just came home and is looking
 6        for something.
 7              THE VIDEOGRAPHER:  The time is
 8        11:50 and we are going off the record.
 9        This is the end of media unit number
10        2.
11              (Recess taken:  11:50)
12              THE VIDEOGRAPHER:  The time is
13        11:59 and we are back on the record.
14        This is the beginning of media unit
15        number 3.
16        Q    Mr. Trende, when we were just
17   before the break I was asking you about
18   the, your Summary of Conclusion, the third
19   bullet regarding core retention.  And I
20   guess another baseline question:  What do
21   you consider to be a high core retention
22   percentage?
23        A    Yeah.  I read that in
24   Dr. Ragusa's report.  And I guess any
25   time you use an adjective you open
```

```
                                        Page 92
 1                  S. Trende
 2   yourself up for this line of inquiry.
 3   And it's kind of like the question, when
 4   does stubble become a beard?  I don't
 5   know exactly but I know that Rutherford
 6   B. Hayes had a beard.
 7              And I know that if 99.96 core
 8   retention isn't high, then the word high
 9   has no meaning.  To me, 82.84 is also
10   high.  But if someone wanted to quibble
11   about that, I suppose we could.
12      Q     Your report emphasizes 94
13   percent.  And is that, I mean should we
14   take that to mean that's what you consider
15   to be a high core retention percentage?
16      A     No.
17      Q     Are you aware of any
18   peer-reviewed literature that talks about
19   what a high core percentage, core
20   retention percentage is?
21      A     No.
22      Q     Is there any peer review
23   literature that you are aware of that sets
24   a standard for what a high core retention
25   rate is?
```

Page 93

                    S. Trende

1

2       A       No.

3               MR. FREEDMAN:  If you could turn

4       to the document tabbed 32, and I will

5       introduce this as Exhibit 8.

6               (Whereupon, 2021 South Carolina

7       House Redistricting Guidelines was

8       marked as Exhibit 8 for

9       identification, as of this date.)

10              (Pause)

11      Q       Have you seen this document

12  before?

13      A       Yes.

14      Q       What is it?

15      A       It is the South Carolina House

16  of Representatives Judiciary Committee

17  Redistricting Ad Hoc Committee 2021

18  guidelines and criteria for Congressional

19  and legislative redistricting.

20      Q       You had listed this in your list

21  of materials considered on page 7 as

22  something that you considered in rendering

23  the opinions in your report, correct?

24      A       Yes.

25      Q       What's your understanding of the

Page 94

```
 1                 S. Trende
 2    significance of the guidelines?
 3        A     My understanding is that they
 4    were criteria set forth by the committee
 5    to guide how the districts would be
 6    drawn.
 7        Q     Is it fair to say that they are
 8    the criteria that the South Carolina House
 9    of Representatives would use in creating
10    the Congressional districts?
11        A     I don't know if that's a perfect
12    rephrase of what I just said.  I don't
13    know if they were intended to be an
14    exclusive list but they are certainly the
15    guidelines that they would use for
16    assessing redistricting efforts.
17        Q     Do the House guidelines identify
18    core retention as a criteria that was to
19    be used in creating Congressional
20    districts?
21        A     It's not specifically listed,
22    although that's certainly part of
23    incumbency consideration.
24        Q     Does this document use the word
25    core?
```

Page 95

S. Trende

1

2  A  No. The word core is not

3 contained in the document.

4  Q  Does the document use the word

5 retention?

6  A  No, it does not use the word

7 retention.

8  Q  In your report, we can go back

9 to your report.  Your actual analysis on

10 this, let's just go down, it starts at

11 page 17.  And at the bottom of page 17 let

12 me know when you are there.

13    (Pause)

14  A  I'm here.

15  Q  You write:  "Table 2 gives the

16 core retention statistics for the State's

17 Congressional district."

18    First question, when you refer

19 to table 2 there, is that a typo, did you

20 mean to refer to table 3?

21  A  Yes.

22  Q  Okay.  And then you go on to

23 write:  "Core retention is identified in

24 this Court's decisions and the

25 redistricting guidelines promulgated by

Page 96

1                    S. Trende

2       the general assembly."

3              What are you referring to when

4       you refer to this Court's decisions?

5          A      Probably the Colleton County in

6       Backus opinions.

7          Q      Is there anything in Backus that

8       talks about core retention?

9          A      I don't remember off the top of

10      my head.

11         Q      Okay.  If you could turn the

12      page to, let's talk about table 3 for a

13      bit.  Table 3 is at the top of page 18 and

14      my first question is what is this table?

15         A      This is a summary of the

16      population of districts that are retained

17      in the succeeding district with the same

18      number.

19         Q      Okay.  And what's it intended to

20      present?

21         A      The population of districts that

22      are retained in the succeeding districts

23      with the same number.

24         Q      You don't set a source for the

25      information presented in this table, do

```
                                    Page 97
 1                S. Trende
 2    you?
 3        A     No.  It would be taken from the
 4    shape files described above.  And
 5    processes in the R code that was
 6    provided.
 7        Q     So just walk me through that.
 8    Where is this, where are these numbers
 9    coming from?
10        A      They are taken from the shape
11    files from the Redistricting Data Hub
12    that have the census data for each block.
13    And then processed in R.
14        Q     Okay.  And what was the
15    processing that happened in R?
16        A      I believe I described the
17    process before.  But the process, as I
18    recall it, is to take the assignment of
19    each block to districts and create a
20    column that has the district.
21              Create another column that has
22    the old district which each block is
23    assigned.  And then you can command R to
24    summarize the total population of each
25    district as it existed.
```

Page 98

```
 1              S. Trende
 2         And then summarize the total
 3  population of each district where the two
 4  columns match.  So where block 1 was
 5  assigned block 1 in both maps.
 6         And that tells you, that's, the
 7  latter is your numerator.  The former is
 8  your denominator.  And it tells you what
 9  core population retention is.
10     Q    Now, according to your table 3,
11  you are saying the core retention for
12  District 6 was 87.55 percent, right?
13     A    The core population retention,
14  correct.
15     Q    And you got the number from the
16  shape files and in processing it through R
17  in the way you just described, right?
18     A    Correct.
19     Q    And you are also saying that the
20  core population retention for District 1
21  is 82.84 percent, correct?
22     A    Correct.
23     Q    I want to show show you, if you
24  could turn to the document tab 27.
25         (Pause)
```

Page 99

```
 1              S. Trende
 2         MR. FREEDMAN:  And we will
 3    introduce this as Exhibit 9.
 4         (Whereupon, House Core
 5    Constituency Analysis was marked as
 6    Exhibit 9 for identification, as of
 7    this date.)
 8    Q      Have you seen this document
 9  before?
10    A      Yes.
11    Q      In what context?
12    A      I believe it's available on the
13  website, the redistricting committee
14  website.  And then when you provided it
15  during a couple of days ago.
16    Q      Okay.  Did you consider this in
17  rendering your opinions in this case?
18    A      No.
19    Q      If you scroll down to the second
20  page, I want to look at the, this is the
21  core just so the record is clear, this is
22  the core constituency's analysis that was
23  available on the House plan redistricting
24  website.
25              If you look at the analysis of
```

```
                                    Page 100
 1                  S. Trende
 2   District 6, do you see that the fourth
 3   line presents the core constituency
 4   calculation for District 6?
 5        A     That's correct.
 6        Q     And this says that the core
 7   constituency calculation for District 6 is
 8   77.41 percent.  Do you see that?
 9        A     Correct.
10        Q     And you calculated the core
11   population retention for District 6 as
12   87.55 percent, right?
13        A     Correct.
14        Q     And you would agree that the
15   difference between 77.41 percent and 87.55
16   percent is a big number, right?
17        A     It's about 10 percentage points.
18        Q     For District 6 that corresponds
19   to about 75,000 people, right?
20        A     73,120.
21        Q     So do you have any explanation
22   for why the House calculated the core
23   constituency for District 6 at 77.4
24   percent, I'm sorry, 77.41 percent; and you
25   calculated the core population retention
```

Page 101

```
 1                  S. Trende
 2   at 87.55 percent?
 3        A     Yes.
 4        Q     Okay, explain that to me.
 5        A     Well, there's a different way
 6   that you can calculate it and that is
 7   what the House did.
 8              They are looking at the new
 9   district, as you can see on each of these
10   pages, the total population of the
11   district, which is their denominator
12   731,203 or 731,204.  That's a different
13   process than the process I described.
14              Which is taking the population
15   of the old district and seeing how much
16   of it stayed in the new district.  My
17   denominator would be the population of
18   the old district.
19        Q     Is there a reason why your way
20   of calculating the core population
21   retention rate is better than what the
22   House did?
23        A     Not intrinsically.  But --
24        Q     This --
25        A     But since District 6 had to gain
```

Page 102

```
 1              S. Trende
 2  population, it's going to have a smaller
 3  denominator.
 4     Q    The 77.41 percent calculation,
 5  is a valid calculation of core
 6  constituency, right?
 7     A    Right.  But like I said, it's
 8  not intrinsically better.  It giveth and
 9  it taketh away.  If you look at the old
10  District 1 where the district had shed
11  population, it shows a much higher rate
12  of core retention than I had calculated.
13          So it really is just two
14  different ways of looking at the concept
15  of core retention.
16     Q    Okay.  Fair enough.  Let's take
17  a look at how the Senate calculated it.
18  If you could turn to tab 30.
19          (Pause)
20     A    Okay.
21          MR. FREEDMAN:  And we will
22     introduce this as Exhibit 10.  In a
23     second.
24          (Whereupon, Senate core
25     constituency analysis labeled tab
```

Page 103

1              S. Trende

2        30was marked as Exhibit 10 for

3        identification, as of this date.)

4        Q      Exhibit 10 is the same analysis

5    of the enacted plan published on the

6    Senate website.  Have you seen this

7    before?

8        A      Yes.

9        Q      And if you scroll down to page 2

10   and look at the core constituency for

11   District 6, you see that the Senate also

12   calculates the core constituency for

13   District 6 as 77.41 percent.  Do you see

14   that?

15       A      Yes.

16       Q      The same as the House, right?

17       A      Correct.

18       Q      Going back to your table 3, you

19   didn't present in your core population

20   retention race demographic data.  Correct?

21       A      Correct.

22       Q      You are not presenting how many

23   voters of a particular race stayed in the

24   district and how many got out of the

25   district, right?

Page 104

```
 1                S. Trende
 2      A      It is not in table 3, no.
 3      Q      Is there a reason why you didn't
 4   present the racial demographics of your
 5   core constituency analysis?
 6      A      No, because the table is core
 7   population retention overall.
 8      Q      Did you analyze the racial
 9   demographics of the core retention?
10      A      I believe later on I looked at
11   the demographics of the precincts that
12   were moved back and forth.  But not in
13   terms of racial core retention, no.
14      Q      You didn't look at it on an
15   aggregated basis to see what the overall
16   retention for the district was, right?
17      A      I believe that's correct.
18      Q      Were you instructed not to look
19   at the racial demographics of the core
20   constituency --
21      A      I was not.
22      Q      -- done at this time?  Just
23   looking at, we can stick with the Senate
24   analysis.  We can talk about District 1,
25   since you raised that earlier.
```

Page 105

```
 1              S. Trende
 2              You see that the Senate analyzes
 3  and says that District 1 core retention
 4  was 92.78 percent which is higher than
 5  what you presented in tab, tab 3, right?
 6      A     Correct.
 7      Q     And if you go across the columns
 8  do you see that it says, if you look at
 9  the NHWHT column, which is non-Hispanic
10  whites, it says the percentage of white
11  persons who stayed in District 1 was 94.52
12  percent.  Do you see that?
13      A     That's correct.
14      Q     And then you go over to the next
15  column, the NHDOJ black, it says the
16  percentage of black persons who stayed in
17  District 1 was 84.46 percent.  Do you see
18  that?
19      A     That's correct.
20      Q     You can see from this chart that
21  20,240 black people were moved from
22  District 6 to District 1, right?
23      A     Correct.
24      Q     And if you scroll down to
25  District 6, if you look at the same column
```

Page 106

1                  S. Trende

2   you can see that 35,629 black people were

3   moved from District 1 to District 6,

4   right?

5        A       Correct.

6        Q       So the net migration of black

7   people from District 1 and District 6 was

8   15,389 black people were moved from

9   District 1 to District 6, right?

10       A       I have no reason to dispute your

11  math on that.

12       Q       And that's -- okay.  Why don't

13  we in your report go down to table 4, same

14  page, page 18 that we were talking about.

15  And can you tell me what this table is?

16       A       Table 4 is the population

17  movements by district, using from the

18  2012 to the 2022 lines.

19       Q       Okay.  And what's it intended to

20  present?

21       A       It shows total population

22  movements from say District 1.  It's best

23  read in rows.  So for example, row 1

24  represents District 1.  And you can read

25  across it.   No people were moved from

```
                              S. Trende
 1

 2   District 1 to District 2.  No people were

 3   moved from District 1 to District 3 and

 4   so forth.

 5       Q     And again, there's no source

 6   cited for that data and its table, right?

 7       A     That's right.  It's as I

 8   suggested, at the opening of the report

 9   in my deposition+the demographic data are

10   take from the Redistricting Data Hub.

11       Q     Now the numbers in your chart if

12   you look back at Exhibit 10, that is set

13   at the core constituency, core analysis

14   the numbers in table 4 are consistent with

15   population shifts that are described in

16   the Senate's analysis, right?

17       A     Um --

18       Q     I can give you if that's too

19   broad, I can give you --

20       A     I have no reason to dispute what

21   you say as I sit here.

22       Q     Sir -- -

23       A     I have spot checked District 6

24   and the numbers add up.  So.

25       Q     And if you look at District 1
```

Page 108

```
 1                S. Trende
 2    the numbers also add up, right?
 3        A    I shouldn't say add up.  They
 4    match.  Yes.
 5        Q    Okay.  And you and your table 4
 6    again don't present a racial demographic
 7    analysis of the population shifts.  Right?
 8        A    Correct.
 9        Q    And if you had presented the
10    racial demographic analysis, I'm sorry.
11    If you had presented this analysis with
12    racial demographics, as we can see in
13    Exhibit 10 and Exhibit 9, it would have
14    shown that there's a net exodus of 15,389
15    black people moved from District 1 to
16    District 6, right?
17        A    Again, I don't have any reason
18    to dispute your precise math there.
19        Q    Are you familiar with how close
20    recent elections have been in District 1?
21        A    Yes.
22        Q    They have been very close; is
23    that fair?
24        A    Yes.
25        Q    You note later in your report
```

Page 109

```
 1              S. Trende
 2  that in the 2018 election the Democrat Joe
 3  Cunningham received 3,982 more votes than
 4  Katie Arrington.  You're aware of that?
 5      A    I assume you're quoting fire
 6  report correctly.  That was a a very
 7  close race.
 8      Q    And similarly in 2020
 9  Representative Nancy Mace, the Republican,
10  received 5,415 more votes than Joe
11  Cunningham.  That's also in your report,
12  right?
13      A    Yes.  And now I see the old
14  number, the previous number about
15  Arrington as well.  Yes, I see the 5,415.
16      Q    Just so the record is clear,
17  this is discussed on page 33 of your
18  report, right?
19      A    That's correct.
20      Q    What do you think the impact of
21  moving a net of 15,389 black people from
22  District 1 to District 6 will have on
23  Nancy Mace's reelection prospects?
24      A    Well, African-American voters
25  are, generally, reliably Democratic
```

Page 110

```
 1              S. Trende
 2  voters.  It depends on the exact
 3  constituency, somewhere in the realm of
 4  90 percent Democratic voters.  So it
 5  would almost certainly help her.
 6      Q     Moving, you would agree that
 7  moving 15,389 black people from District 1
 8  to District 6 will make it more likely
 9  that Nancy Mace is reelected?
10      A     Right.  But not in and of
11  itself; but given black voters tend to be
12  overwhelmingly Democratic, I would assume
13  that making that change, moving Democrats
14  to a different district would improve her
15  chances of reelection, yes.
16              We should also be clear that
17  that 15,000 number is total population,
18  not voters.  But yes.
19      Q     Or not persons eligible to vote?
20      A     Right.  There's the voting age
21  population.  And then among that voting
22  age population, there's the -- yes,
23  there's a sub set of that voting age
24  population that isn't eligible and then a
25  subset of that population that doesn't
```

Page 111

1                    S. Trende

2    turn out to vote.

3        Q      Right.  If we were to look at

4    the voting age population, it would be

5    just some quick math here --

6                (Pause)

7        Q      It would be over 10,000 black

8    individuals over the age of 18.

9        A      I don't have a reason to dispute

10    your math.

11        Q      Okay.  Let's switch gears a

12    little bit.  Going back to your summary of

13    opinions on page 7 of your report, I want

14    to look at the top vote on page 7, which

15    is your second thorough opinion.

16                "The enacted map generally

17    reflects only modest changes from the

18    benchmark plan which this Court upheld

19    against racial gerrymandering and other

20    challenges in Backus."

21                Let me start with what do you

22    mean when you say this Court upheld

23    against racial gerrymandering claims in

24    Backus?

25        A      My understanding of Backus is

Page 112

```
 1                    S. Trende
 2    that it is a challenge to the 2012
 3    Congressional lines which are the
 4    benchmark plan.  There was a 14th
 5    Amendment racial gerrymandering claim
 6    brought; I believe there was a section 2
 7    claim as well.
 8        Q      Okay.  Have you read Backus?
 9        A      I have.
10        Q      Are you giving a legal
11    interpretation as to what Backus held?
12        A      No.  But it's my reading of the
13    case.  Look, I practice law when I read a
14    case versus when Dr. Duchin reads a case;
15    there's no way I can completely filter
16    out my legal training.
17              But I wouldn't, I wouldn't mean
18    for my statements about things to have
19    any meaning beyond what a social
20    scientist would say about it.
21        Q      Okay, fair enough.  Do you know
22    whether the Backus plaintiffs challenged
23    the whole South Carolina Congressional Map
24    as a racial gerrymander or only in
25    particular districts?
```

Page 113

1                    S. Trende

2      A      Well, that's a good question.

3   You know this is pre-Alabama legislative

4   caucus so they may well have challenged

5   the entire map.  I don't know.

6      Q      Let me see if I can refresh your

7   recollection.  Let's --

8             MR. FREEDMAN:  If you could take

9         a look at tab 37 which is a copy of

10        the Backus decision.  And we will

11        introduce this as Exhibit 11.

12             (Whereupon, Backus decision was

13        marked as Exhibit 11 for

14        identification, as of this date.)

15      Q      If you turn to the bottom of

16   page 8 and the top of page 9, which

17   concerns plaintiffs' proof of racial

18   gerrymandering.

19             It says:  "Dr. Michael McDonald

20   opined at the the general assembly used

21   race as the predominant factor for in

22   drawing 20 House districts and the Sixth

23   Congressional district."  Do you see that?

24      A      Yes.

25      Q      Do you have any reason to think

Page 114

```
 1                  S. Trende
 2   that the Backus plaintiffs challenged any
 3   other district in the benchmark plan other
 4   than the Sixth Congressional district as
 5   racial gerrymandering?
 6      A      Well, if you go to page 6,
 7   that's Dr. McDonald's analysis.  Which
 8   doesn't that necessarily say what the
 9   legal theory was.  I.
10             F you, I believe Dr. Ragusa does
11   an analysis of all the Congressional
12   district boundaries in this case, even
13   though to my understanding the challenge
14   is limited to 2, 5, 6, and 1.
15             If you go to the top on page, if
16   you go to page 6, it says under Roman
17   Numeral II:  "Plaintiffs assert that the
18   House plan and Congressional plan that
19   violate the equal protection clause of
20   the 14th amendment."
21             Which read suggesting there was
22   a broader claim.  But maybe not.
23      Q      Right.  Do you see anything else
24   this decision suggesting that plaintiffs
25   offered proof that any other district
```

Page 115

1                   S. Trende

2    besides the Sixth Congressional district

3    constituted gerrymandering in the Backus

4    case?

5         A    I don't.

6         Q    Now you would agree with me that

7    the Sixth Congressional District and the

8    enacted plan has at least 190,000

9    different people in the Sixth

10   Congressional district considering the

11   Backus decision, right?

12        A    That's correct.

13        Q    I mean we discussed earlier that

14   140,000 some people moved into District 6

15   from District 1.  And 52,000 people moved

16   out of District 6 to District 1.

17        A    Right.   Correct.

18        Q    And the core retention rate

19   between the Sixth Congressional District

20   considered in Backus and the Sixth

21   Congressional District plan is only 87.55

22   percent according to your analysis and

23   77.41 according to the House and Senate

24   analyses, right?

25        A    Those are the correct numbers.

Page 116

```
 1                    S. Trende
 2        Q       And those numbers are lower than
 3   most of the other districts in the plan,
 4   right?
 5        A       That's correct.
 6        Q       Okay.  I want to turn to some of
 7   your other analysis in this section of the
 8   report and some of the maps you are
 9   talking about.
10               If you could turn in your report
11   to Exhibit 2 to the bottom of page 10,
12   where you start your analysis preservation
13   of district cores.
14               (Pause)
15        A       Witness complies)
16        Q       And at the bottom of page 10 you
17   write:  "Despite significant changes to
18   population, and the addition and
19   subtraction of districts, South Carolina's
20   district cores have remained surprisingly
21   consistent over the past century."  Do you
22   see that?
23        A       Yes.
24        Q       I want to ask about some of the,
25   some of that analysis.  So why don't we
```

Page 117

```
 1              S. Trende
 2   start where you do historically with the
 3   1902 map on page 10.
 4       A    Okay.
 5       Q    What's your purpose in
 6   presenting this map?
 7       A    For me, I think it's interesting
 8   historical context of the maps in South
 9   Carolina.  This isn't a state like
10   Maryland, where the districts have kind
11   of wandered all over the state as things
12   have been drawn over time.
13              Or a state like Ohio, where the
14   districts from 100 years ago would
15   largely be unrecognizable compared to
16   what we have today.
17              This is a state where if you
18   look back 100 years ago, the third
19   district was anchored around Anderson and
20   northwestern South Carolina.
21              And the Fourth District was
22   anchored in Greenville and Spartanburg.
23   You know, there are longstanding
24   commonalities in a lot of these
25   districts.
```

Page 118

```
 1              S. Trende

 2     Q      I wanted to ask about a couple

 3   of pieces of your analysis when you are

 4   talking about the historical maps going

 5   back.

 6              First thing is, one of the

 7   observations you make is that this map in

 8   the 1902 map has, as you write it, a

 9   district that was anchored in Beaufort

10   County and the counties along the Georgia

11   border.  What did you mean by that?

12     A      Where are we?

13     Q      I'm reading at the bottom of

14   page 10.  About the map on page 11.

15     A      I see.  The second, is it

16   Beaufort or Beaufort?  Whatever.

17   B-e-a-u-f-o-r-t is the population center

18   where the second went in the 1902

19   district went before stretching up along

20   the South Carolina/Georgia border, which

21   says now it's pretty rural.

22     Q      And Beaufort County in the 1902

23   map was in a different Congressional

24   district than Charleston County, right?

25     A      That's right.
```

Page 119

```
 1              S. Trende
 2      Q      And again, historically
 3  speaking, if we go back a century the City
 4  of Charleston was kept together in a
 5  single Congressional district?
 6      A      That's correct.
 7      Q      As you write going back to the
 8  early 1900s, the district, the first
 9  district was anchored in Charleston,
10  right?
11      A      That's correct.
12      Q      Okay.  I want to move forward to
13  the 1932 map.  On page 12 of your report.
14  And my question is again, sort of based on
15  the question, what are you trying to
16  present with this map?  What's your
17  purpose presenting this map?
18      A      The same as before.  To give
19  historical context how districts have
20  been drawn in South Carolina, as opposed
21  to a state like Maryland where they have
22  really wandered all over the place.
23              Or say, Ohio, where they would
24  be unrecognizable.  Even like the old
25  Pennsylvania maps before then struck down
```

Page 120

```
 1              S. Trende
 2   were, would be completely unrecognizable
 3   to someone who time hopped from 1932 to
 4   2011.  And that's just not the case here.
 5      Q     And again looking at this map,
 6   this is consistent with the last map.  The
 7   city of Charleston is kept together in a
 8   single Congressional district, right?
 9      A     That's correct.
10      Q     It's the center of District 1,
11   right?
12      A     That's correct.
13      Q     Now just, I want to make sure.
14   You have got, you know, two maps that are,
15   the first two maps presented here.  I just
16   wanted to get your understanding as to the
17   basis of why they're relevant today.   I
18   mean you are aware that the maps, the 1902
19   map, the 1932 map, are maps that were
20   adopted in the Jim Crow era?
21      A     That's right.
22      Q     And these maps were also adopted
23   before the equal population requirement
24   for Banker v. Carr, right?
25      A     That's correct.
```

Page 121

1              S. Trende

2      Q      So considering those, would you

3  explain to me why you think the 1902 and

4  1932 maps are relevant to what we are

5  considering?    What the Courts should be

6  considering?

7      A      Because they give interesting

8  historical context to the way that maps

9  have been drawn in South Carolina

10  historically.

11              This isn't a state like

12  Maryland, where the lines have wandered

13  all over the state.  Or a state like

14  Ohio, where the lines today would be

15  completely unrecognizable compared to the

16  very pretty lines we had and compact

17  lines we had before.

18              This isn't even a state like

19  Pennsylvania, where the 2011 map, you

20  know, was horrifyingly distorted compared

21  to the pre-Baker maps.

22              This is a map that the same

23  basic cores or bases have been intact

24  for,  or have been similar for hundreds

25  of years.  And I think that's

Page 122

```
 1               S. Trende
 2  interesting context; perhaps the Court
 3  will disagree.
 4     Q    Okay.  Thank you.  That was
 5  helpful.  So just moving forward in your
 6  report, your next map you discuss is the
 7  1982 map.  I want to ask.
 8               You don't include the first
 9  Apush Court, Baker v. Carr map, the map
10  adopted in the early 1970s.  Is there a
11  reason why that map wasn't included in
12  your report?
13     A    I think there's at least two
14  maps.  Because the first Baker map would
15  have been, everyone would have had to
16  redraw their lines I think, in 1966,
17  except for the single member states.
18               And it was just in the interest
19  of keeping things moving along.
20     Q    Is there any reason to think
21  that those maps would show different, you
22  know, different alignment of the districts
23  than what we have otherwise been looking
24  at?
25     A    I don't think they did.  And
```

Page 123

1              S. Trende
2    they certainly weren't excluded for any
3    reason, like any reason for that.
4              It was just kind of, okay, we
5    have established the longstanding
6    traditions.  Let's get to what people
7    were mostly interested in, which is
8    what's happened in the last few decades.
9        Q    Okay.  Just so I'm -- did you
10   consider either the post-Baker v. Carr map
11   or the 1970 cycle map for purposes of
12   rendering the opinions in your report?
13       A    I'm sure I created them.  But I
14   wouldn't have relied upon them in doing
15   the map.  If they were radically
16   different, to protect myself I probably
17   would have included them.  To not get the
18   tag affixed of excluding them.
19             Honestly, my recollection is
20   that they were just excluded because as
21   you were getting at with the previous
22   line of questioning, what people were
23   probably most interested in is what has
24   happened in the last few decades.
25       Q    Okay.  We can turn to your 1982

Page 124

                    S. Trende

 1

 2   map, which is on page 13 of your report.

 3             (Pause)

 4      Q       Now the 1982 map, what's your

 5   purpose in presenting this one?

 6      A       So it is the same as the

 7   previous ones:  To show some of the

 8   continuities in the way maps have been

 9   drawn.  This isn't the state, where they

10   kind of use the etch a sketch and erase

11   it every 10 years and try to redraw the

12   districts.

13             This isn't someplace like Ohio

14   or Pennsylvania, or Maryland where you

15   just get something radically different

16   every couple of cycles.  It's been kind

17   of the same story, obviously things have

18   to change.  But you still get the same

19   basic story every cycle.

20      Q       Okay.  Is it fair to say the

21   1982 map like the other previous maps that

22   we looked at, the City of Charleston was

23   kept together in a single Congressional

24   district?

25      A       You know, I can't tell from

Page 125

```
 1                    S. Trende
 2   eyeballing the area.  But I am guessing
 3   that it does look like it was.
 4       Q      Okay.  Why don't we move forward
 5   in 1992.  Go to page 14 of your report.
 6   The 1992 map.
 7                (Pause)
 8       Q      Now what's your purpose in
 9   showing the 1992 map?
10       A      Well, I am showing the history
11   of these districts and how they have been
12   drawn.  And obviously, there are some
13   significant differences in this 1992 map,
14   at least in the low country areas of
15   South Carolina.
16                You still have a district like,
17   that's in Anderson.  You still have a
18   district you know, based on combining
19   Greenville and Spartanburg.
20                And one that's, now it would be
21   the Charlotte suburbs.  I'm not sure it
22   was in 1992.  Things get reconfigured,
23   obviously, In low country because that
24   6th District is transformed into an
25   ability to elect district.
```

Page 126

1            S. Trende

2            I don't know for sure if the

3    Bush DOJ was pursuing this state.  But I

4    know a lot of states in the 1992

5    redistricting cycle Bush DOJ was

6    pressuring them to draw more ability to

7    elect districts.  So.

8        Q    So just in terms of you know,

9    what this map does and how it's in

10    comparison to the 1982 map.  This map

11    still keeps City of Charleston in District

12    1, right?

13        A    Yes.

14        Q    And --

15        A    I should say it looks that way.

16    I can't tell if some of the 6th intrudes

17    into the City of Charleston.

18        Q    And not like the 1982 map but

19    some of the earlier maps we saw, Beaufort

20    County is in a different district here

21    than Charleston, right?

22        A    Yes.

23        Q    So moving forward to the 2002

24    map, which is page 15 of your report.

25    This is the map that was evaluated and the

Page 127

1              S. Trende
2    result of a Colleton County case, correct?
3        A      That's right.
4        Q      And this map, like some of the
5    other maps we've looked at, keeps the City
6    of Charleston together in the first
7    Congressional District.  Do you see that?
8        A      Again, I can't tell from this
9    whether the 6th takes in any of the
10   population of City of Charleston.
11       Q      Okay.  Well, like the 1992 map
12   and like the some of the historical maps
13   we were looking at, can you tell whether
14   Beaufort County and Charleston County are
15   in the same Congressional district in this
16   one?
17       A      Beaufort and Charleston are not.
18       Q      The observation you made
19   historically is about having a district
20   anchored in Beaufort County and the
21   counties along the Georgia border, that
22   applies to this map, the 2002 map?
23       A      On this map, yeah.  Beaufort is
24   kept separate and is combined up with
25   Columbia.

Page 128

1              S. Trende

2      Q      Okay.  Turning to the 2012 map

3   on page 16, this is the map that was

4   evaluated in the Backus case, correct?

5      A      That's correct.

6      Q      And this map, like every map we

7   have looked at so far keeps the City of

8   Charleston together in the First

9   Congressional District, right?

10      A      I think we have some nice

11   blowups elsewhere to be able to confirm

12   whether that protrusion from the -- and I

13   know the protrusion from the 6th goes

14   into Charleston County.  I don't know

15   whether it goes into the City of

16   Charleston.

17      Q      And you don't know one way or

18   the other whether City of Charleston was

19   split under the benchmark plan?

20      A      I think we have the split data

21   for locales somewhere else; I don't know.

22      Q      Okay.  With regard to the

23   enacted plan and the analysis you present

24   at the bottom of page 16, you write that

25   the enacted plan makes only minor changes

Page 129

```
 1              S. Trende
 2   to the benchmark plan.
 3              And I think we have talked about
 4   some of that.  You in this analysis don't
 5   note that the enacted plan splits the City
 6   of Charleston between, out of the First
 7   Congressional District?
 8       A     That's correct.
 9       Q     And your report also doesn't
10   discuss that there's a district as there
11   had been in the past, anchored in Beaufort
12   County and the counties along the Georgia
13   border.
14       A     Which district is that?
15       Q     Well, it looks to me that this
16   map actually splits Beaufort from the
17   counties along the Georgia border.  Do you
18   see that?
19       A     Yes.
20       Q     Beaufort is in the First
21   Congressional District and the border
22   counties, and the Georgia border counties
23   look like they are both in 6th and some
24   are in 2.  Do you see that?
25       A     Yes.
```

Page 130

1                S. Trende

2      Q      When you opine that, and this is

3   going back to your overall summary

4   conclusion:  That districts have been

5   surprisingly consistent, did you consider

6   the legislative record and whether

7   legislators understood that there were

8   significant changes between the enacted

9   plan and the benchmark map?

10     A      I did not.

11     Q      Okay.

12            MR. FREEDMAN:  This would be a

13     still earlier than I expected but this

14     is are a good point to take a break

15     for lunch.  So if we can go off, we

16     can talk about how long we should

17     take.

18            THE VIDEOGRAPHER:  The time is

19     12:54 and we are going off the record.

20     This is the end of media unit number

21     3.

22            (Lunch recess taken: 12:54 p.m.)

23

24

25

Page 131

1                        S. Trende
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 132

1               S. Trende

2          A F T E R N O O N   S E S S I O N

3                    1:35  p.m.

4

5    S E A N   P A T R I C K   T R E N D E,

6    having been previously duly sworn,

7    testified further as follows:

8    CONTINUED EXAMINATION

9    BY MR. FREEDMAN:

10             THE VIDEOGRAPHER:  The time is

11       1:35 and we are back on the record.

12       This is the beginning of media unit

13       number 4.

14       Q    Welcome back, Mr. Trende.  You

15    understand you are still under oath?

16             (No audio)

17             (Pause)

18             THE WITNESS:  I don't know how

19       that happened.

20       Q    I ask you the question again.

21    You understand you're still under oath?

22       A    Yes.

23       Q    Okay.  We are switching gears a

24    little bit.  Just so the record is clear,

25    you didn't compare the inactive map to

Page 133

1              S. Trende
2    other maps that were considered during the
3    legislative process, correct?
4        A     That's correct.
5        Q     You had access to the House and
6    Senate redistricting websites, correct?
7        A     That's correct.
8        Q     And I want to go back to Exhibit
9    8, which is tab 24.1.  The Congressional
10   House Staff Plan Map.
11       A     Okay.
12       Q     This is the map that the House
13   Redistricting Committee staff released on
14   December 13.  And I think you testified
15   earlier you did not consider this in
16   forming your opinions in this case?
17       A     That's correct.
18       Q     Okay.  Do you see that this map,
19   like the historical maps in your report,
20   keeps the City of Charleston in the First
21   Congressional District like the maps in
22   1902, 1932, 1972, I am sorry, 1982, 1992,
23   2002 and 2012?
24       A     Assuming that's what happened,
25   in all those maps and there were a couple

Page 134

S. Trende

2  of times I hedged.  I do see that the

3  peninsula that Charleston sits on is in

4  the First.

5      Q      And you can see that this map

6  has a district anchored in Beaufort

7  County, and the counties along the Georgia

8  border.  And that district is different

9  than the Charleston District, like in some

10  of the historical maps discussed in your

11  report, right?

12      A      Yes.  Beaufort and the counties

13  along the Georgia border are kept

14  different than Charleston, separate from

15  Charleston.

16      Q      And can you see that this map

17  keeps Sumter County together in one

18  district that's in the 6th?

19      A      It puts Sumter together in one

20  district, yes.

21      Q      And this map also keeps

22  Orangeburg together in one county,

23  together in the 6th.  Do you see that?

24      A      It puts Orangeburg together in

25  one county, yes.

Page 135

```
 1              S. Trende
 2      Q      Do you know how the compactness
 3  of this map compares to the enacted map?
 4      A      No.
 5      Q      From eyeballing this, can you
 6  tell me if District 1 is more compact in
 7  the Congressional, is more compact in this
 8  map --
 9          (Pause)
10      Q      From eyeballing this, can you
11  tell me whether the District 1 in this
12  map, the Congressional House staff plan
13  map is more compact than District 1 in the
14  enact map?
15      A      I would guess something like
16  using something like REOCK, it is more
17  compact.  Polsby-Popper is a
18  perimeter-based metric.  So it's really
19  hard to tell from eyeballing it.
20      Q      Thanks.  And same question with
21  regard to District 6.  Can you tell me
22  whether District 6 is more compact from
23  eyeballing it, more compact in the
24  Congressional House staff plan than in the
25  enacted plan?
```

Page 136

1              S. Trende

2      A      That I really can't.

3      Q      Okay.  In rendering your

4    opinions in this case did you consider any

5    of the racial demographic analysis that

6    was done of this map, the Congressional

7    House Staff Map?

8      A      No, I didn't look at the

9    Congressional House staff plan at all.

10     Q      Why don't you take a look at tab

11    26.

12     A      Sure.

13            (Pause)

14            MR. FREEDMAN:  Which I'll mark

15        as Exhibit 12.

16            (Whereupon, population summary

17        labeled Tab 26 was marked as Exhibit

18        12 for identification, as of this

19        date.)

20     Q      Have you seen this document

21    before?

22     A      I remember -- so I remember

23    seeing the population summaries online.

24    I don't know if I would have seen it from

25    the Cong House Staff Plan.  I did open it

Page 137

```
1              S. Trende
2   up to see the documents that you
3   provided.
4      Q     Okay.  Well, so this is a
5   document from the South Carolina House
6   Redistricting west side analyzing the
7   Congressional House staff plan map that we
8   have been discussing.  Did you consider
9   this in forming your opinions in this
10  case?
11     A     No, I didn't consider anything
12  from the House staff plan in forming my
13  opinions.
14     Q     Okay.  Do you see that this
15  table, this chart has information on seven
16  districts?
17     A     Yes.
18     Q     And do you understand that those
19  correspond to the seven South Carolina
20  Congressional Districts as proposed in the
21  House staff plan?
22     A     That would be the natural read
23  of it, yes.
24     Q     Are you familiar with the types
25  of information presented in this chart?
```

Page 138

1                    S. Trende

2       A      Yes.

3       Q      Like, do you have an

4   understanding what's a column "18 plus

5   pop" is?  Do you have an understanding

6   what that is?

7       A      I would interpret that to be the

8   voting age population.

9       Q      Great.  And looking across the

10  top row, do you see that the right most

11  column is labeled "percent NH18 plus, DOJ

12  BLK"?  Do you see that?

13      A      Yes.

14      Q      Do you know what that means?

15      A      That is the voting age

16  population, not Hispanic people,

17  conforming to the DOJ definition of

18  "black".

19      Q      Are you familiar with the term

20  black voting age population, BVAP?

21      A      Yes.

22      Q      What is BVAP?

23      A      Yeah.  BVAP, well, if we are

24  just doing BVAP, it is the number of

25  black residents in a district or location

Page 139

S. Trende

1    over the age of 18.  You can express it.
2    A lot of times people use it for the
3    percent; BVAP is shorthand.
4    
5         Q     Okay.  Do you have any
6    understanding whether any of the numbers
7    on this chart could correspond to BVAP or
8    percent BVAP?
9         A     Well, using the DOJ definition
10   of black, the NH18 plus columns would be
11   BVAP.
12        Q     Okay.  If you look at the
13   right-most column, the BVAP column, do you
14   see that for District 1 it says that the
15   percent NH18 plus DOJ BLK is 20.27
16   percent?
17        A     Yes.
18        Q     And then moving more toward the
19   middle of the do you see a column labeled
20   "Percent H18 Percent Plus POP"?
21        A     Yes.
22        Q     Do you have an understanding
23   with a that column means?
24        A     This is one I would want to
25   double-check against my own numbers to

Page 140

```
 1              S. Trende
 2   ensure.  But I would take that to be the
 3   Hispanic population of voting age.
 4       Q      And you see for District 1 it's
 5   5.48 percent from a Congressional staff
 6   plan.  Do you see that?
 7       A      Correct.
 8       Q      Okay.  Now I want to turn back
 9   to your report on page 22.  This is
10   Exhibit 2.  Page 22.  Table 7.
11       A      Okay.
12       Q      And first question is what is
13   this, what is table 7?
14       A      Table 7 is the percent BVAP, to
15   be consistent, I should have said
16   benchmark in enacted South Carolina
17   Districts.  Boy, that would gotten me in
18   trouble at Kirkland & Ellis.
19       Q      For you are referring to, so
20   just so the record is clear when you say
21   what the chart says, the table says, BVAP
22   old and that should say BVAP benchmark?
23       A      Yeah.
24       Q      And the column that says BVAP
25   New should be BVAP enacted plan or enacted
```

Page 141

1              S. Trende

2     map, I'm sorry?

3       A     That's right.

4       Q     Now what's the source for the

5     data in this table?

6       A     So again, it would be the shape

7     files described towards the beginning of

8     the report.  It would have been processed

9     in R, according to the R code and data

10    sets that I provided to counsel.

11      Q     Okay.  And just so I want to

12    make sure I'm interpreting this right.

13    For District 1 you are saying the BVAP of

14    the benchmark plan was 16.6 percent.

15    Right?

16      A     That's correct.

17      Q     And the BVAP of the enacted map

18    was 17, I'm sorry, was 16.7 percent.

19      A     That's correct.

20      Q     Now you say that the difference

21    between those two is two tenths of a

22    percent.  Should that be one 10th of a

23    percent or is there some kind of rounding

24    going on?

25      A     I believe I looked at that one

Page 142

1           S. Trende

2  when I was editing the report and it's a

3  rounding thing.  So if it's 16.56 and

4  16.74, the difference is .18 which you

5  round up to .2 but each of the

6  individuals would round to .6 and .7, if

7  that makes sense.

8      Q      Now on page 22 just below the

9  table, you say (Reading) District 1, and

10 then you mention three other districts,

11 see almost no changes in their racial

12 demographics.

13          When you wrote that did you

14 consider whether that was necessarily

15 going to be the case?

16     A      I don't understand that

17 question.

18     Q      Maybe the way I am putting it is

19 -- are you aware that the members of the

20 South Carolina Legislature considered maps

21 with higher BVAPs for District 1?

22     A      Correct.  I am now.

23     Q      I mean, so the record is clear,

24 you are aware that the House redistricting

25 committee staff proposed a District 1 with

Page 143

1                   S. Trende
2    a BVAP of 2.72 percent -- I am sorry 20.27
3    percent?  Correct?
4        A      Again, I think that's been
5    established in this deposition.
6        Q      Okay.  Let's go back to your
7    summary of opinions on page 7.  Okay.  And
8    my questions are about fifth  bullet.  The
9    one that says:  "The enacted plan's
10   districts compare favorably to the
11   benchmark plan's districts on four common
12   compactness measures."
13              What do you mean by compare
14   favorably?
15       A      I think what I meant there was
16   that they were overall generally more
17   compact than the benchmark plan.
18       Q      And what standard are you
19   applying when you are assessing
20   compactness in making that assessment?
21       A      I was looking for compactness
22   measures, I believe.  REOCK
23   Polsby-Popper.  Inverse Schwartzberg and
24   Convex Hull.
25       Q      Okay.  Let's turn to page 20 of

Page 144

1                S. Trende
2    your report, Exhibit 12.  And my questions
3    are going to be about table 5.  What is
4    table 5?
5        A    So table 5 is the compactness
6    scores for the benchmark and enacted plan
7    for each of the individual districts
8    using the four metrics.
9        Q    Okay.  Where is the, what's the
10   data source for the information presented
11   in this table?
12       A    Well, that just comes from the
13   shape files.  REOCK scores aren't
14   something that you can really calculate
15   by hand.  And so our process, the shape
16   files, and calculated the various scores.
17       Q    So that's in the shape files
18   themselves or is that something R is
19   doing?
20       A    So it's something R is doing. So
21   the REOCK score you imagine a circle that
22   just that bounds the district, that
23   touches the edges of the district but
24   never cuts the district.
25               And the REOCK score is basically

Page 145

```
 1              S. Trende
 2   the percentage of the area of that
 3   bounding circle that the district fills
 4   up.  That is not something, you know,
 5   that's not something embedded in shape
 6   files.  And it's not something you can
 7   with something like one of these
 8   districts you can calculate by hand.
 9          So it's based on the shape files
10   but not embedded in them.  It has to be
11   calculated generally by computer.
12       Q    Okay.  And is it the case, I
13   just want to make sure I understand table
14   5.  Is it the case that for each of the
15   four measures a larger number represents a
16   more compact district?
17       A    That's correct.
18       Q    So just so we are clear, for
19   like District 1, you are saying that for
20   all four compactness measures, enacted map
21   District 1 is more compact than the
22   benchmark plan District 1?
23       A    That's correct.
24       Q    And then for District 2, for,
25   under all four measures the enact map
```

Page 146

```
 1                  S. Trende
 2    District 2 is less compact than the
 3    benchmark plan District 2?
 4        A    That's correct.
 5        Q    And for District 4, under all
 6    four measures the enacted map District 4
 7    is less compact than the benchmark plan
 8    District 4?
 9        A    That's correct.
10        Q    And for District 6 under all
11    four measures, the enact map District 6 is
12    less compact than the benchmark plan
13    District 6?
14        A    That's correct.
15        Q    And for the other three
16    districts, Districts 3, 5 and 7, they are
17    more compact under some measures and less
18    compact under other measures?
19        A    That's correct.
20        Q    Okay.  So to summarize, under
21    all four measures District 1 is more
22    compact and Districts 2, 4 and 6 are less
23    compact?
24        A    That's correct.
25        Q    Okay.  Let's switch gears, if
```

Page 147

1                    S. Trende
2    you want to turn back to your summary of
3    opinions on page 7?
4            Let's talk about the third
5    bullet:  "The enact map reduces the number
6    of split counties from 12 in the benchmark
7    plan to 10 in the enacted plan."
8            Why do you emphasize the
9    reduction in number of county splits in
10   your analysis?
11      A    Because I believe split counties
12   plus consideration, or two things.  I
13   think one of the Court opinions mentions
14   totals for consideration of communities
15   of interest.  And then I believe the
16   guidelines had something about splits.
17      Q    I think you are right.  I think
18   the Senate guidelines talk about
19   minimizing splits.  I don't think I have
20   introduced that as an exhibit yet.
21            MR. FREEDMAN:  So let me
22        introduce, this will be tab 33.  And
23        we will introduce this as Exhibit 13.
24            (Whereupon, Tab 33, county
25        borders document was marked as Exhibit

Page 148

```
 1              S. Trende
 2      13 for identification, as of this
 3      date.)
 4      Q     If you look at the second page,
 5  item 3C, in the second criteria says:
 6  "Minimizing of county boundaries."  Do you
 7  see that?
 8      A     That's right.
 9      Q     With the 7 Congressional
10  District map, what's the smallest number
11  of county splits you would expect to see?
12      A     Well, I don't know about expect
13  to see.  But the theoretical minimum is
14  six.
15      Q     I think we don't need to turn to
16  to it but you used the phrase realistic
17  number of county splits.  Actually, that's
18  not fair to you.  If you want to turn to
19  it, it's on page 10 of your report.
20          (Pause)
21      A     Okay.
22      Q     And you use in the paragraph on
23  respecting county municipal and precinct
24  boundaries.  You use the phrase, this is
25  in the, it starts in the fourth line.
```

Page 149

1                        S. Trende

2      "Realistic minimum number of county

3      splits."    What do you mean by realistic

4      minimum number of county splits?

5          A      That's a funny story but.  So

6      the, maybe you get lucky and you have a

7      combination of counties that add up to

8      exactly equal population criteria.

9                    But that would be, like, I mean

10     that would be like lightning striking.

11     We came about 100 persons away from that

12     in our first Virginia draft.  But you

13     just have to be insanely lucky to find

14     the combination of counties that add up

15     exactly to 731,204 people.

16                    So realistically, every boundary

17     between, not paralyzed boundaries, but

18     every boundary between a sequential

19     number of districts has to split at least

20     one county.  And so the number, the

21     realistic minimum number, theoretically

22     you could have zero splits if you just

23     shot the moon and everything worked out

24     right.

25                    If we assume that there's no

Page 150

1              S. Trende

2    combination of counties that adds up

3    exactly to the equal population

4    requirement, you'd have to have one fewer

5    of those, at least one fewer than the

6    number of districts for your county

7    splits.

8         Q    Thank you.  That was very

9    helpful.

10             MR. FREEDMAN:  Could you turn to

11        Tab 25 in your binder.  This is an --

12        I'll introduce it as Exhibit 14.

13             (Whereupon, House District

14        Report and staff plan labeled Tab 25

15        was marked as Exhibit 14 for

16        identification, as of this date.)

17        Q    First question:  And have you

18    seen this before?

19        A    I probably opened it.  Looking

20    for data on the House website.  But

21    didn't examine it closely.  And I opened

22    it when you provided me with the exhibits

23    for the deposition today.

24        Q    Okay.  This is a document from

25    the House web plan.  It's what's called a

Page 151

```
 1                    S. Trende
 2    political subdivision split between
 3    district report and this is the one that
 4    corresponds to the Congressional House
 5    Staff Plan.
 6             First question is did you
 7    consider this in rendering, reaching the
 8    opinions, your opinions in this case?
 9         A    No.
10         Q    Do you see at the top of the
11    first page there's an analysis or presents
12    numbers, number of subdivisions split into
13    more than one district.  And it says
14    County eight.  Do you see that?
15         A    Yes.
16         Q    Eight county splits is fewer
17    than in the enacted plan, right?
18         A    That's correct.
19         Q    Just looking at the Senate
20    criteria of minimizing county splits, the
21    Congressional the, House staff
22    Congressional plan does a better job than
23    the enacted plan on that criteria, right?
24         A    Yes.  It has fewer county splits
25    than the enacted plan.
```

Page 152

```
 1                    S. Trende
 2      Q      And if you scroll down a little
 3   bit on this chart, you can actually see
 4   the counties that are split.  And you'll
 5   see that the Congressional House staff
 6   plan has three county splits between
 7   Districts 1 and 6.  So you see Berkley
 8   County, Charleston County, Dorchester
 9   County?
10      A      That's correct.
11      Q      And you noted in your report
12   that the enact plan has District 1 and
13   District 6 splitting four counties between
14   them.  Right?  That's on page 10 of your
15   report?
16      A      That's correct.
17      Q      The enacted map split Colleton
18   and Jasper Counties when the Congressional
19   House staff plan did not, right?
20      A      Wait.  Can you say that again?
21      Q      Yeah.  The enacted map splits
22   Jasper, I am sorry.  It splits, yeah,
23   Jasper and Colleton between 1 and 6,
24   right?
25      A      Right.  Well, I think that's
```

Page 153

                    S. Trende

1    right.

2        Q     And the enacted map splits

3    Sumter and Orangeburg Counties while the

4    Congressional House staff plan does not,

5    right?

6        A     That's right.

7        Q     Now your analysis of county

8    splits in your report on page 10 doesn't

9    go into, doesn't discuss the counties

10   which are split or remain split under the

11   enacted map, right?

12       A     No.  Here it's just a

13   calculation of the number of counties

14   that are split.

15       Q     Did you consider in formulating

16   your opinions in this case whether the

17   split counties under the enacted map had

18   more black population than the state

19   average?

20       A     No.  Because I was just looking

21   at the total number of splits.

22       Q     Did you consider whether black

23   eligible voters were disproportionately

24   more likely to be in split counties than

Page 154

```
 1              S. Trende
 2  not split counties?
 3      A     No.  Because again, I'm just
 4  looking at whether the number of county
 5  splits was increased or decreased here.
 6      Q     Okay.  When your report talks
 7  about Sumter County, this is on page 24,
 8  if you want to check, you note that Sumter
 9  County has black voting age population of
10  45.7 percent, right?
11      A     Yes.
12      Q     And that's well above the
13  average for the state, right?
14      A     Yeah.  I don't know the exact
15  BVAP for the state but it wouldn't be
16  45.7.
17      Q     It would be lower than 45.7?
18      A     Yeah.  Let me -- well, yeah, it
19  would be lower than that.
20      Q     And Sumter County is split in
21  the enacted map, right?
22      A     Yeah.  Both in the enacted map
23  and the benchmark.
24      Q     And in your discussion, in your
25  report of Orangeburg County on page 26 you
```

Page 155

```
 1              S. Trende
 2   note that Orangeburg County had black
 3   voting age population of 59.9 percent.
 4   That's on page 26 of your report, right?
 5       A     Yes.
 6       Q     And 59.9 percent BVAP is well
 7   above the average BVAP for the state,
 8   right?
 9       A     Yes.
10       Q     And under the enacted map
11   Orangeburg County is split, correct?
12       A     Under both the benchmark and
13   enacted plan it's split.
14       Q     Okay.  Let me shift gears again.
15   If you could turn in your report to page
16   23, my questions are about table 9.  So
17   let me start with what is table 9?
18       A     So table 9 shows the, it is
19   similar to the earlier presentation of
20   movement of population by district.  From
21   the old lines to the new.  The enacted,
22   the benchmark to the enacted.
23              So the First District doesn't
24   send any Biden voters to the 2nd.  It
25   doesn't send any to the 3rd.  It doesn't
```

Page 156

1           S. Trende
2    send any to the 4th.  Etcetera.  It sends
3    10,808 to the 5th and so forth.
4        Q    And what are you intending to
5    present in this analysis, what's the point
6    of this?
7        A    It shows the move of voters
8    broken down by partisanship that most of
9    the changes are not significant.  With
10   the 6th and the First you see a little
11   bit more change.  The First sends 10,808
12   voters to the 6th.  And then gets 3,342
13   Biden voters back from the 6th.
14       Q    And what's the source of
15   information presented in this table?
16       A    So this again would be taken
17   from the shape files, taken from the
18   Redistricting Data Hub and processed in
19   R.
20       Q    How do you determine whether a
21   voter is a Biden voter for purposes of
22   this analysis?
23       A    For most of it, it's easy.
24   Because we know how many votes were cast
25   for Joe Biden in subcounty data.  And so

Page 157

1           S. Trende

2   as BTD moves from Biden, from District 1

3   to District 6, you know exactly how many

4   Biden voters got moved.

5           It's a little trickier when you

6   are looking at split precincts.  And the

7   common way to do it, I think I explained

8   this, maybe not.

9           Yeah, I explained this on page

10  8.  You take the precincts and R will

11  match census blocks by geography to the

12  precincts.  And since the census blocks

13  are allocated, are already allocated by

14  district where they were before, where

15  they were after redistricting, what you

16  do is you say, okay, let's say there's

17  100 votes cast for Joe Biden, and 200

18  residents in the census blocks match to

19  that precinct.

20          And one census block has 20

21  residents.  Actually, it should be voting

22  age population.  Has 20 residents over

23  the age of 18, so that's 10 percent of

24  the precinct.  You would assign 10 Biden

25  votes to that census block.  That's the

Page 158

```
 1                S. Trende
 2   common way of doing it and it's all
 3   processed in R.
 4       Q     Now the enacted map has, just
 5   looking at the shift of Biden voters from
 6   District 1 and District 6.  The enacted
 7   map had seven precincts that were split
 8   between Districts 1 and 6, right?
 9       A     I don't have a reason to dispute
10   you on that.
11       Q     Including -- let me, I don't
12   want to hide the ball.
13             MR. FREEDMAN:  Why don't you
14       take a look at Tab 28.
15             (Pause)
16       A     Okay.
17             MR. FREEDMAN:  And we will
18       introduce this as Exhibit 15.
19             (Whereupon, House Redistricting
20       Report labeled Tab 28 was marked as
21       Exhibit 15 for identification, as of
22       this date.)
23       Q     Have you seen this document
24   before?
25       A     I have at least seen it in
```

Page 159

S. Trende

1    opening, the date that you sent me I

2    probably would have opened it in the

3    process of reviewing materials for the

4    reports.

5    Q     All right.  Well, this is a

6    report from the House Redistricting

7    website which is a clinical subdivision

8    split for the enacted plan.

9

10   And if you see at the bottom of

11   the first page and top of the second page,

12   there's a list of precincts that are split

13   between the First and the 6th Districts.

14   Do you see that?

15   A     I do.

16   Q     It refers to Beech Hill to

17   B-e-e-c-h Hill II.  Sorry Chris?

18   Delamars.  D-e-l-a-m-a-r-s.  Gibhans.

19   G-i-b-h-a-n-s, Gibhans II, Lincoln and

20   Windsor.

21   So sitting here can you tell us

22   how many voters in the Beech Hill II

23   District voted for Biden, stayed in the

24   First District as opposed to being shifted

25   to the 6th District?

Page 160

```
1              S. Trende
2      A      Not sitting here.  But with the
3   processed R data that was produced I
4   could give you that answer.  To a
5   reasonable degree of scientific certainty
6   using the methods typical of my field.
7      Q      What's the standard of error in
8   that?  I mean you, are not giving, let me
9   take a step back.  You are not saying you
10  can tell us exactly which voters voted for
11  Biden, right?
12              (Inaudible)
13     Q      You are not telling us that you
14  can tell us exactly which voters in the
15  split precincts voted for Biden, correct?
16     A      That's right.  In the post one
17  person one vote universe we never know
18  down to the person precisely what the
19  number of votes in a Congressional
20  District are for a given candidate.
21              With that said, lots of people
22  use the data to backfill what the, what
23  share a candidate got.  So again, this is
24  using techniques, this is using
25  techniques that are standard for
```

Page 161

1                    S. Trende
2    aggregating and disaggregating data in
3    political science.
4        Q     Is there a margin of error to
5    these estimates?
6        A     There is not.  This isn't
7    sampling.  So there wouldn't be a precise
8    margin of error on it.
9        Q     Is there a, do you have some
10   kind of confidence rule?
11       A     Well, no, again.  You are not
12   drawing a sample.  So you wouldn't have a
13   confidence in a role.  But that's not a
14   concept that would apply to this sort of
15   exercise.
16       Q     Okay.  If you look at the seven
17   precincts that are split between the First
18   and the 6th District, some of them are
19   quite large, aren't they?
20       A     That's right.
21       Q     Cypress is over 4,700 people.
22   Do you see that?
23       A     That's right.
24       Q     Beech Hill II is just over 2200
25   people?

Page 162

```
 1              S. Trende
 2    A     That's right.
 3    Q     Delamars is over 1,000 people?
 4    A     That's right.
 5    Q     Lincoln is over 3700 people?
 6    A     That's right.
 7    Q     There are almost 15,000 people
 8  in the precincts that were split between
 9  District 1 and District 6.  And you can't
10  say with precision which ones were Biden
11  voters and which ones were Trump voters,
12  can you?
13    A     No, you don't know for sure.
14  But again, this is the standard
15  technique.  And as far as you are looking
16  for legislative intent, this is the type
17  of data that the legislature likely would
18  have been considering.
19          I don't know what's going on in
20  the fact development side of this case
21  but if you are looking at political
22  implications of redistricting, these are
23  the techniques that people use.  It's the
24  standard techniques in  my field.
25    Q     So when you are saying in table
```

Page 163

1                    S. Trende

2    7 that there are 10,808 Biden voters moved

3    from District 1 to District 6.  And 3,242

4    Biden voters who moved from district 6 to

5    District 1.

6              You can't tell us with precision

7    how many of the almost 15,000 people who

8    lived in the seven precincts that were

9    split between District 1 and District 6

10   for Biden voters, right?

11      A     I can't say with absolute

12   confidence what they are.  All I can say

13   is what would be revealed using, to a

14   reasonable degree of scientific

15   certainty, using the techniques that

16   everyone, to my knowledge, uses when

17   analyzing redistricting maps.

18      Q     Okay.  Let's shift gears a

19   little bit.  In forming your opinions did

20   you consider any of the draft maps that

21   were submitted to legislative staff by the

22   National Republican Redistricting Trust?

23      A     No.  I didn't know that those

24   maps existed.

25              MR. FREEDMAN:  Let me show you,

Page 164

1          S. Trende

2     why don't you turn to Tab 34.  We will

3     introduce it as 16.

4          (Whereupon, email Bates stamped

5     SC7000034244 labeled Tab 34 was marked

6     as Exhibit 16 for identification, as

7     of this date.)

8          MR. GORE:  John, can you give us

9     that tab again?

10          MR. FREEDMAN:  It's 34.

11          MR. GORE:  Thank you.

12     Q     So document 34 is the document

13 bearing the Bates range

14 SC-Senate-000034244.  It's an email Andrew

15 Fiffick is forwarding to himself,

16 forwarding a November 15 email from Adam

17 Kincaid to Andrew Fiffick.  Do you see

18 that?

19     A     Yes.

20     Q     Before getting the package of

21 emails, had you seen this email before?

22     A     No.

23     Q     I think you testified to this

24 before.  Who is Adam Kincaid?

25     A     He is someone involved with the

Page 165

```
 1              S. Trende
 2   map drawing at the National Republican
 3   Redistricting Trust.
 4       Q    And what in what capacity do you
 5   know him?
 6       A    I believe he worked on the
 7   remedial maps in New York and he has
 8   contacted me about working in different
 9   cases, asked if I was interested.
10       Q    Have you actually worked with
11   him on any cases?
12       A    Not directly.  I know he lives
13   in, like I said, I believe he was
14   involved in the, some of the remedial
15   stuff in New York.  He was involved in
16   Pennsylvania.  But other than that, I
17   don't think he's ever popped up in any of
18   my cases.
19       Q    Okay.  Did the document that he
20   is forwarding here is something labeled "A
21   and B zip."  Do you have any understanding
22   what that zip file is?
23       A    No.  I have never seen this
24   email until you sent it yesterday or the
25   day before when was it was.
```

Page 166

1              S. Trende

2      Q      Fair enough.  Have you ever seen

3   the materials in the A and B zip file?

4      A      I would be shocked.  Like I

5   said, I didn't consider alternative maps,

6   I wasn't contacted by Adam Kincaid or

7   Andrew Fiffick in this matter.  I have no

8   -- I mean you are asking me about a pig

9   in a poke, right?

10             I have no idea what A and B are.

11  But to my knowledge I don't, I've never

12  seen it.   If it's one of the documents

13  you just showed me, then yeah, I have

14  seen it.   But I don't know.

15     Q      You don't know if you have seen

16  it?

17     A      Yeah.

18     Q      Okay.

19             MR. FREEDMAN:  Let me just show

20      you, this will be the document tab 35.

21      We will introduce this as Exhibit 17.

22             (Whereupon, email dated 11/24/21

23      Bates stamped SC-Senate-00003245

24      labeled Tab 35 was marked as Exhibit

25      17 for identification, as of this

Page 167

```
 1                S. Trende
 2      date.)
 3      Q      Same initial question:  Before
 4  getting the package of materials of
 5  potential exhibits for your deposition had
 6  you seen this document before?
 7      A      No.
 8      Q      This is, for the record, this is
 9  exhibit 17 has the Bates number
10  SC-Senate-00003245.  It's another email
11  that Andrew Fiffick is forwarding to
12  himself, forwarding an email from Adam
13  Kincaid, November 24, 2021.
14           The attachment to this document
15  is a zip file called Jessamine.
16  J-e-s-s-a-m-i-n-e.  Have you ever seen the
17  files in the Jessamine file?
18      A      Not to my knowledge.
19      Q      Does the term Jessamine have any
20  significance to you?
21      A      Yes.
22      Q      What does it, what do you
23  understand to be?
24      A      It's the county in Kentucky
25  where my wife's mother is from.
```

Page 168

```
 1              S. Trende
 2    Q     Good.  All right.  Let's switch
 3  gears.  I am switching gears again.  Do
 4  you need a quick break or you want to?
 5              (Pause)
 6              MR. FREEDMAN:  Why don't we take
 7      five.
 8              THE WITNESS:  Okay.
 9              MR. FREEDMAN:  And then I'll
10      hopefully be towards the home stretch.
11              THE VIDEOGRAPHER:  The time is
12      2:27 and we are going off the record.
13      This is the end of media unit number
14      4.
15              (Recess taken:  2:25)
16              THE VIDEOGRAPHER:  The time is
17      2:33 and we are back on the record.
18      This is the beginning of media unit
19      number 5.
20    Q     Mr.  Trende, if you could turn
21  to page 24 of your report, Exhibit 2.  I
22  want to ask you about your analysis of
23  Sumter County.  First question:  Where did
24  this analysis come from?
25      A     So again, it comes from the
```

Page 169

1                    S. Trende

2    shape files and the data described in the

3    opening section of the report and it

4    would have been processed in R.

5         Q      Did any of the analysis you have

6    got here concerning Sumter County come

7    directly or indirectly from employees or

8    members of the South Carolina Legislature?

9         A      No.

10        Q      Looking at the map on page 24,

11   what is this map?

12        A      So the black line represents the

13   old district lines and then the gray

14   shaded area shows the moved precincts or

15   portions of precincts that were shifted;

16   so you can see the new district lines by

17   following the contours of the gray shaded

18   areas.

19        Q      Who came up with this map?

20        A      I did.

21        Q      Did you generate it yourself?

22        A      Yes.

23        Q      And did the date from this map

24   come from the share files?

25        A      Yes.

```
                                    Page 170
 1                 S. Trende
 2      Q     You write at the top of page 25:
 3   "Most of these residents live in precincts
 4   that were split by the benchmark plan and
 5   are made whole by the enacted plan."
 6              And  you were talking about the
 7   10,000 some residents that were moved in
 8   Sumter County.
 9              When you say most of the
10   residents, can you tell me which residents
11   were moved between district 5 and District
12   6 that were not to repair splits, precinct
13   splits in the benchmark plan?
14      A     No.
15      Q     Are you referring to, if I
16   understood your analysis, your analysis
17   refers to particular precincts where
18   there's whole precincts were shifted.  I
19   am referring to Wilder, Pocotlito I,
20   Pocotlito II and Swan Lake.  Were those
21   precincts moved whole?
22      A     I believe that's right.
23      Q     Do you recall if there were any
24   other whole precincts that were moved
25   between Districts 5 and 6 in Sumter
```

Page 171

1                    S. Trende

2    County?

3        A      I would have to look to see if

4    Turkey Creek.   I think turkey Creek was

5    done.   Let me, hold on.   I can answer

6    that by looking -- well, I think Turkey

7    Creek did make a precinct whole.   So

8    yeah, I think those were the whole

9    precincts that were moved.

10       Q      Okay.   Did you look -- strike

11   that.   Did you consider the demographics,

12   the racial demographics of the four whole

13   precincts that were shifted between

14   Districts 5 and 6?

15       A      No.

16       Q      There was also at least one

17   district that remains split.   I believe

18   you referred to the Birnie precinct.

19   Birnie.   And do I -- let me strike that.

20   That's a bad question.

21              Is it, do I understand your

22   report correctly that the Birnie precinct

23   remained split under the benchmark plan?

24       A      That's right.   You always have

25   to have, just like you have to unless you

Page 172

```
  1              S. Trende
  2   get super lucky.  This has happened to me
  3   twice where I have messed around and come
  4   up with something that didn't have to
  5   split up precincts.
  6              But generally speaking, just
  7   like you have to split a county at
  8   district boundaries, you have to split at
  9   least one precinct.  And I think Bernie
 10   is, I know Birnie is left split.
 11      Q      Were there any other precincts
 12   that were split under the benchmark plan,
 13   that remain split under the enacted plan?
 14      A      I don't know.  I know we have
 15   the summary statistics on that that will
 16   tell us.
 17      Q      Yeah, I think the exhibit we
 18   just were looking at indicates there were
 19   not.  So okay.  In the second paragraph on
 20   page 25, you attribute certain actions to
 21   the map drawers.  You use the term map
 22   drawers.  What do you mean by map drawers?
 23      A      Whoever drew this map.
 24      Q      Are you expressing an opinion
 25   about the map drawers' intent when you are
```

Page 173

```
 1              S. Trende
 2   referring to the map drawers?
 3      A    I don't think that could be
 4   drawn from -- maybe you can draw an
 5   inference as a legal argument.  But all
 6   this paragraph says is that map drawers
 7   made South Liberty and Hampton Park
 8   precincts whole.
 9            So at least as I'm using it,
10   it's a, meant to be an objective
11   description of what happened.
12      Q    I'm only asking because
13   elsewhere sort of in your descriptions you
14   are just describing the map differences
15   and you are not attributing things to
16   enactor of the map drawer.
17            So I'm just trying to get at,
18   are you making a claim here as to the map
19   drawer's intent with regard to that
20   particular point here?
21      A    I'm not.  I'm thinking I
22   probably just got bored of writing it the
23   same over and over again and in the
24   passive voice.  So this time it's an
25   active voice.  There's no particular
```

Page 174

                    S. Trende

1    significance to including the term map

2

3    drawers there.

4        Q     You are not, putting aside

5    questions of inferences from what was

6    actually drawn, you are not making claims

7    as to the map drawer's intent in drawing a

8    line through Sumter County, right?

9        A     Right.

10       Q     Okay.  If you could turn to page

11   26, and the map there, what is this map?

12       A     This is the Sumter area precinct

13   shaded by BVAP.

14       Q     And what are you intending to

15   convey with this?

16       A     I just thought it was, it would

17   be good not just to show the breakdown

18   by, you know, on a background screen but

19   also with the BVAP background I had

20   talked about.

21              The racial breakdown of

22   individuals in the procedure who were

23   moved to the preceding paragraphs.  So

24   it's conveyed here.  With all the

25   precincts in the area.

Page 175

```
 1              S. Trende
 2      Q     And did you generate this map
 3  yourself?
 4      A     Yes.
 5      Q     And is the data that you used to
 6  draw the map in from the shape files?
 7      A     Yes.
 8      Q     Okay.  If we could turn to just
 9  to the bottom of page 26, I want to turn
10  to your analysis of Orangeburg County.  So
11  your Orangeburg County analysis page 26
12  continues on to 28.  Where did the
13  analysis of Orangeburg County come from?
14      A     Again it came from the shape
15  files using data processed in R.
16      Q     Did any of the analysis in this
17  section come directly or indirectly from
18  the employees of the South Carolina
19  Legislature?
20      A     No, it did not.
21      Q     Now I had noticed when I was
22  going through your analysis here, you
23  don't make a claim with Orangeburg County
24  that you made for Sumter County that most
25  of the changes to the Orangeburg County
```

Page 176

```
 1                S. Trende
 2   map were to make precinct splits by the
 3   benchmark plan whole, right?
 4        A     I don't see that claim in here,
 5   no.
 6        Q     And when you are talking in your
 7   report about the specific shifts, this is
 8   at the bottom of page 27, you are talking
 9   about five precincts being changed.  Do
10   you see that?
11        A     Yes.
12        Q     When you are referring to
13   Limestone I and II, those are whole
14   precincts that are being shifted to the
15   second district, correct?
16        A     Yeah, that's correct.  I guess I
17   could have used the line that most of
18   them were used to make precincts whole.
19   But yeah, I didn't include that, although
20   it does seem to be true.
21        Q     Do you know what the population
22   of Limestone I and Limestone II are?
23        A     I don't.
24        Q     Do you know whether those two
25   precincts account for the majority of
```

Page 177

```
 1              S. Trende
 2  population shift shifted between Districts
 3  2 and District 6 in Orangeburg County?
 4      A     I don't.
 5      Q     Okay.  You have a map on page
 6  28.  And I just want to ask:  What is this
 7  map and what are you trying to convey?
 8      A     So these are the precincts in
 9  Orangeburg County or at least the area
10  around where there were population where
11  there were precincts shifted.  The green
12  lines are the new district lines.  The
13  black lines are the old district lines.
14            And it gives some sense of the
15  racial dispersion in the Orangeburg area,
16  especially since I have just been talking
17  about the BVAPs for the areas that were
18  moved.
19      Q     Did you generate this map
20  yourself?
21      A     Yes.
22      Q     And did the data come from the
23  shape files again?
24      A     Yes.
25      Q     Let's turn to your analysis of
```

Page 178

```
 1                S. Trende
 2    Richland County, which starts at the
 3    bottom of page 28 and goes through midway
 4    through page 32.  So where did this
 5    analysis come from?
 6        A     It's the same answer as above.
 7    It was data that was listed in the
 8    opening, processed in R using the code
 9    that was provided to Counsel.
10        Q     Did any of this analysis come
11    directly or indirectly from employees or
12    members of the South Carolina Legislature?
13        A     No.
14        Q     Turning to your map on page 29,
15    what is this map?
16        A     It's on page 29?
17        Q     Yes, page 29.
18        A     That is the Richland area
19    precincts coded by Biden Trump vote share
20    with the green lines reflecting the new
21    district lines and the black lines
22    reflecting the old district lines.
23        Q     And what is this intended to
24    convey?
25        A     I don't know that I discussed
```

Page 179

```
 1                    S. Trende
 2     the politics of these changes at all.
 3     Well, I mean if you look at it you can
 4     tell that the precincts that are shifted
 5     into the 6th are blue.
 6              But beyond that, I think it
 7     might be just an overlay of the political
 8     contours of Richland County.
 9        Q     Okay.  Did you generate this map
10     yourself?
11        A     I did.
12        Q     And is the data in this map all
13     from the share files?
14        A     It's all from the share files
15     and processed by the R code that I
16     shared.
17        Q     Okay.  If you could turn to the
18     map on page 30, what is this map?
19        A     So this is another variation of
20     the maps that I have included previously,
21     that shows the precincts or portions of
22     precincts that are moved.  With the old
23     district lines shaded in black.  So it
24     gives you a way of seeing what moved into
25     and what moved out of the old district
```

```
                                    Page 180
 1              S. Trende
 2   lines.
 3       Q     And what are you intending to
 4   convey with this?
 5       A     Give better insight into the
 6   physical geography of what was moved.
 7       Q     Okay.  And did you generate this
 8   map yourself?
 9       A     I did.
10       Q     And did the data come from the
11   share files?
12       A     It did and it was processed in
13   the R files that were provided to
14   Counsel.
15       Q     Okay.  I want to, if we could
16   shift back to that bottom of page 29.  You
17   write that "the changes to the lines here
18   mostly make precincts whole or add
19   Democratic-leaning voters to the 6th
20   District."  Do you see that?
21       A     Yes.
22       Q     You say again that the changes
23   are mostly to make precincts whole.  Or to
24   add Democratic-leaning votes.  Which
25   changes were not to make precincts whole?
```

Page 181

1                    S. Trende

2       A      I think they all either to make

3    precincts whole or move

4    Democratic-leaning voters, move

5    Democratic-leaning portions of precincts

6    into the 6th.  As for what precincts were

7    not made whole, that should be in the

8    summary files.

9       Q      Okay.  Just reading your text,

10    at the bottom of page 30, you note that to

11    the north of Fort Jackson, midway precinct

12    is shifted.  Is that a whole precinct

13    shift?

14       A      I don't know.  Off the top of

15    my head.  I believe it is.  I believe the

16    two precincts, both that and Briarwood --

17    no.  Briarwood is made whole.  I think

18    Midway isn't.

19             So if you look at the map, like,

20    if you made Briarwood whole there would

21    be weird indention, indentation without

22    adding Midway.  So that's one of the

23    things that this map could be useful for.

24       Q      Okay.  You also note when you

25    are discussing Spring Valley, a portion of

Page 182

```
 1              S. Trende
 2  Spring Valley District is all added to the
 3  precinct.  Is it the case that Spring
 4  Valley remains split under the enacted
 5  map?
 6      A     Again, we would have to check.
 7  That should be, I know they produced the
 8  file that lists the split precincts.  So
 9  it might be.
10      Q     Sitting here today you can't say
11  for sure?
12      A     Not without looking at the
13  summary file to see what the, I think
14  there was only like 13 left.  So we could
15  check that.  But.
16      Q     Okay.  Now at the top of the
17  page 31, the first full paragraph, you are
18  talking more about the area of western
19  downtown Columbia.
20            And you say nine of the shifts
21  from the 2nd to the 6th District were to
22  make precincts or wards whole.  Do you
23  know how many total shifts there were in
24  the west of the downtown Columbia?
25      A     So first off, you asked me, you
```

Page 183

1              S. Trende
2   characterized it as saying nine shifts
3   were to make precincts or wards whole.
4   And I wasn't attributing intent.  I just
5   said that that's the outcome of it.  But
6   to get to the nut of the question, no, I
7   don't know how many whole precincts were
8   shifted.
9        Q     So you don't know how many of
10  the shifts west of downtown Columbia were
11  to make or were not to make precincts
12  whole?
13       A     I don't know how many were not
14  to make precincts whole, no.
15       Q     If you could turn to page 32 of
16  the map.  What is this map?
17       A     This is the same, a variation of
18  the map we have seen before with the old
19  and new district lines superimposed over
20  the district, the precincts, shaded by
21  BVAP.
22       Q     And what is it intended to
23  convey?
24       A     I think it's a useful
25  illustration of the racial geography of

Page 184

1              S. Trende

2     the Richland area and how the districts

3     are drawn.  I don't know how Counsel

4     might intend to use it.

5         Q     Did you generate this map

6     yourself?

7         A     I did.

8         Q     And it's based entirely on share

9     file data?

10        A     That's right.  And processed in

11    R.

12        Q     Let's turn to your analysis of

13    the Charleston area, which is pages 32 to

14    bottom of page 32, through page 35 in your

15    report.

16        A     Okay.

17        Q     Where did this analysis come

18    from?

19        A     This analysis is my -- oh.  I

20    don't understand the question.

21        Q     Did any of this analysis come

22    directly or indirectly from employees or

23    members of the South Carolina Legislature?

24        A     No.

25        Q     There's a map on page 34.  What

Page 185

```
 1              S. Trende
 2    is this map?
 3        A      So this is a variant on the maps
 4    that we've seen time and again at this
 5    point that shows which precincts moved
 6    between the two districts in the
 7    Charleston area.
 8        Q      Now --
 9        A      I'm sorry.  I didn't include the
10    labels on it.  Because there's a bunch of
11    them and it was disastrous.
12        Q      Too busy?
13        A      Too busy.  Useless.
14        Q      Did you generate this map
15    yourself?
16        A      I did.
17        Q      And did the data used to
18    generate come from share files?
19        A      Yeah.
20        Q      Shape files.  I am saying share
21    files.  I mean shape files?
22        A      Yes.  The same shape files that
23    we discussed before with the R codes that
24    we previously discussed.
25        Q      Now I want to ask a little bit
```

Page 186

```
 1                S. Trende
 2   about your narrative.  Your, if you turn
 3   back to page 33, your personal paragraph,
 4   you write starting in the second sentence:
 5   "The shedding was done in a way that
 6   improves Republican prospects in the
 7   district."
 8            Are you aware of anything in the
 9   legislative record where improving
10   Republican prospects in the First District
11   was cited as a basis for the changes?
12      A     So in the Senate redistricting
13   guidelines, well, I didn't read the
14   legislative record as I have stated.  But
15   in the Senate redistricting guidelines
16   there's a reference to political interest
17   common to the area population for
18   redistricting communities of interest.
19            And there is something in, the
20   -- oh.  So incumbency consideration is in
21   the House files.  And obviously Nancy
22   Mace is a Republican incumbent.  I think
23   there's something else, maybe not, in the
24   House guidelines that refer to politics.
25      Q     But you are not aware of
```

Page 187

1                   S. Trende

2    anything coming up in the, anybody saying

3    in the legislature, the dates, that the

4    population shifts from the First District

5    to improve Republican prospects in the

6    districts, agreed?

7        A     Oh, no.  I haven't read the

8    legislative records.  I just said it's

9    done in such a way as to improves

10   Republican prospects.

11       Q     Okay.  Now in your analysis of

12   the Charleston area, unlike your analysis

13   of Sumter and Richland County, you are not

14   making the claim that shifts in Charleston

15   County were to make the precincts whole?

16       A     Oh.  And just for the record, I

17   am getting a lot of thunder in the

18   background.  But --

19              (Pause)

20              (Discussion off the record)

21       A     And so now I don't remember --

22       Q     Okay.  My sound just went out

23   for you.

24       A     Oh, you can't hear me?  Can you

25   hear me now?

Page 188

```
 1                 S. Trende
 2     Q      Yes.  If you could repeat your
 3  answer, that would be great.
 4     A      I apologize.  So, no, I'm not
 5  describing precincts being made whole
 6  on -- -
 7              (Inaudible)
 8              (Discussion off the record)
 9              MR. FREEDMAN:  Can we go off
10      because we're getting some feedback.
11              THE VIDEOGRAPHER:  The time is 3
12      p.m. and we are going off the record.
13              (Off the record: 3:00)
14              THE VIDEOGRAPHER:  The time is
15      3:01 and we are back on the record.
16     Q      Okay.  On page 33 and it carries
17  over to page 34, you make a series of
18  statements about the map drawers making
19  Berkeley County Hall, making Beaufort
20  County Hall --
21              (Inaudible)
22     Q      Making Berkeley County Hall,
23  making Beaufort County Hall.  And
24  splitting Charleston, Dorchester and
25  Jasper Counties, right?
```

Page 189

1                    S. Trende

2      A     Yes.  Those are all things

3   stated in the report.

4      Q     Now again, consistent with my

5   earlier question, you are not making, you

6   are not expressing an opinion about the

7   map drawer's intent, correct?

8      A     Right.  I don't know what that

9   discovery is going to show or what

10  inferences Counsel may try to draw.  But

11  for purposes of this report, I'm just

12  trying to describe the changes that were

13  made.

14     Q     Now there's also discussion on

15  page 34 that "changes to District 1 and 6

16  bring the district line into conformity

17  with natural geographic boundaries."

18               What was your source of

19  information for this paragraph?

20     A     Looking at the map.

21     Q     Do you have any expertise in the

22  political geography of Charleston County?

23     A     I don't think I'm saying

24  anything about communities of interest in

25  Charleston County.  I'm just talking

Page 190

```
 1              S. Trende
 2   about boundaries and I know how to read a
 3   peninsula.
 4       Q    So just so I'm clear, what is
 5   your basis for being able to speak about
 6   the natural geography of the Cooper River,
 7   Charleston Harbor, Stoner River Wappo
 8   Creek and Wadmalaw River?
 9       A    Being able to look at a map and
10   see whether precinct boundaries follow a
11   river really doesn't require a particular
12   understanding or framing.
13       Q    You also don't suggest anywhere
14   else in your report that lines are being
15   drawn to bring districts into conformity
16   with natural geographic boundaries, do
17   you?
18       A    I think there's something in the
19   discussion of Orangeburg where I mention
20   that Limestone, where the Limestone 1 and
21   2 were the only precincts in the area,
22   let's see.  Limestone 1 and 2 are the
23   only precincts in the area not also
24   contained at least partially within the
25   Orangeburg city boundaries are assigned
```

Page 191

```
 1               S. Trende
 2   to the 2nd District.  That talks about
 3   geographic boundaries.
 4      Q     Are natural geographic
 5   boundaries a criteria under the Senate or
 6   House guidelines?
 7      A     I don't know as I sit here.
 8      Q     Okay.  Earlier in your report,
 9   much earlier today we talked about the
10   language in your report that the District
11   1 core had remained surprisingly
12   consistent over the past century.
13           Is it your opinion that for the
14   last hundred years the boundary of
15   District 1 violated natural geographic
16   boundaries?
17      A     I don't think the point of
18   comparison is where things were 100 years
19   ago.  I think the point of, I don't think
20   there's even a point of comparison.
21           It's brought into the, it
22   follows boundary lines now.  Things like
23   Charleston Peninsula are kept intact.  So
24   if anything, there's a point of reference
25   with the previous map, not this one.
```

Page 192

```
 1                    S. Trende
 2      Q      Well, okay.  Did the benchmark
 3   map use the Cooper River, Charleston
 4   Harbor, the Stoner River, Wappo Creek or
 5   Wadmalaw River and its natural boundaries
 6   to split District 1 from District 6?
 7      A      I don't recall as I sit here.
 8      Q      Did the 2002 map use the Cooper
 9   River, Charleston Harbor or stoner river
10   Wappo Creek or Wadmalaw River as natural
11   geographic boundaries to split District 1
12   from District 6?
13      A      (Response inaudible)
14             (Pause)
15             THE WITNESS:  Did you get that
16      answer?
17             MR. FREEDMAN:  No.
18      A      I said I don't know as I sit
19   here.
20      Q      Same question for the 1992 map.
21      A      I don't know as I sit here.
22      Q      And same question for the 1982
23   map?
24      A      I think 198 -- hold on.  I don't
25   know as I sit here.
```

Page 193

```
 1              S. Trende
 2     Q     What about for the 1932 map?
 3     A     It wouldn't follow those
 4  boundaries because the entire county is
 5  in the same district.
 6     Q     And the same question for the
 7  1902 map?
 8     A     Again, it wouldn't follow those
 9  boundaries because the entire county is
10  in the same district.  So none of those
11  boundaries would have been violated.
12     Q     Now unlike your analysis of
13  Sumter, Orangeburg and Richland Counties,
14  for Charleston County you didn't present a
15  map showing the BVAP of precincts that
16  shifted, right?
17     A     That's right.
18     Q     Why didn't you include a BVAP
19  map for Charleston County?
20     A     I think I was running out of
21  time at this point.  I didn't include a
22  political map either, even though most of
23  the discussion is about politics.
24     Q     Did you prepare a BVAP map for
25  Charleston County and just decide not to
```

Page 194

```
 1                 S. Trende
 2   include it?
 3       A    I don't believe so.
 4       Q    Did you consider the BVAP of the
 5   precincts that were shifted between
 6   District 1 and District 6?
 7       A    I think on the, on page 35 I
 8   discuss it.
 9       Q    Okay.  I'm going to shift gears
10   and to your rebuttal report.
11           MR. FREEDMAN:  You want to keep
12       going or you want to take a quick
13       break?
14           THE WITNESS:  You say the end is
15       in sight.  Is that like another full
16       segment or is that like if we go
17       another half hour we will be done?
18           MR. FREEDMAN:  It's a segment.
19       My segments tend to go a half -- let's
20       go off for a second.
21           THE WITNESS:  All right.
22           THE VIDEOGRAPHER:  The time is
23       3:10 and we are going off the record.
24       This is the end of media unit number
25       5.
```

Page 195

1           S. Trende

2           (Recess taken:  3:10)

3           THE VIDEOGRAPHER:  The time is

4      3:16 and we are back on the record.

5      This is the beginning of media unit

6      number 6.

7      Q      Mr. Trende, I want to turn to

8  your rebuttal report, which is if you need

9  it, is tab 3 in the materials and it's

10  previously marked as Exhibit 3.

11           Why don't we start with your

12  analysis of Dr. Ragusa on page 8.  So

13  first question is is the analysis on page

14  8 through 11 a complete and full statement

15  of the opinions you intend to offer at

16  trial concerning Dr. Ragusa?

17      A      I don't know what Counsel plans

18  to ask me but yes, this is what I see

19  myself testifying to at trial.

20      Q      You don't plan to express any

21  opinions at trial about Dr. Ragusa beyond

22  those set forth in this rebuttal report,

23  correct?

24      A      Certainly not to his initial

25  report.  I don't have any intention to

Page 196

```
 1                S. Trende
 2   give other responds either.
 3       Q     Okay.  Have you reviewed Dr.
 4   Ragusa's February 10, 2022 or June 28,
 5   2022 depositions in this case?
 6       A     No.
 7       Q     Do you plan to?
 8       A     Now that you ask me, I might
 9   because it actually sounds interesting
10   but no, I don't think I could bill that
11   so I probably won't.
12       Q     At page 8 you start to outline
13   your criticisms of Dr. Ragusa and you
14   write that his three tests have the same
15   infirmities and the first infirmity is:
16              "The predictor variable is the
17   count of black residents of voting age in
18   a precinct rather than the percentage of
19   black residents of voting age in the
20   precinct."  What do you mean by that?
21       A     It's laid out in the succeeding
22   sentences but, you know, his independent
23   variable or his response as whether the
24   district, whether the precinct moves
25   between districts, we will just summarize
```

Page 197

1                S. Trende

2  it.  Can I summarize his three analyses

3  as to whether or not the precinct moves

4  and we will know what we are talking

5  about?

6      Q      Yes.

7      A      So it's an dichotomous response,

8  right?  Does it move or does it not.  And

9  what he is using to try to predict is how

10  many black residents there are in the

11  precinct of voting age.

12            But when you are looking at the

13  effect on the racial composition of the

14  districts, it matters greatly whether

15  there are 500 total residents or 5,000

16  total residents.  Or 10.

17            If you have a district that's 25

18  percent black and you take a precinct

19  with five black residents and 10 total

20  residents of voting age and move them

21  over, you have marginally increased the

22  voting age population, the BVAP percent

23  of that district.

24            If you take some district with

25  five black people and 10,000 total

Page 198

                    S. Trende

1    residents of voting age, you have made a

2    more substantial decrease in the voting

3    age population in the recipient district.

4        Q    So is it your position that Dr.

5    Ragusa didn't control for precinct size?

6        A    He does but not in the way you

7    would typically do it.  I know one of his

8    predictors is precinct size.  But to do

9    it properly, you know, when you are

10   trying to convert to a rate you typically

11   use, like, an offset term where you lock

12   in the co-efficient of the size predictor

13   at 1.

14            It would have been cleaner if he

15   would just use percentages and I have no

16   idea why he doesn't do that.

17       Q    Do you remember in your report

18   about Dr. Ragusa's report in the State

19   House case, what your criticism of him

20   there was?

21       A    I believe I made the same

22   criticism.

23       Q    You don't recall criticizing him

24   for using BVAP percentage only and not

Page 199

```
 1                    S. Trende
 2   controlling for precinct size?
 3       A     I thought it was the other way
 4   around, that he, I thought he used counts
 5   there as well.
 6       Q     Okay.  Turning to your next
 7   observation.  You say that Dr. Ragusa
 8   failed to control for the myriad of
 9   traditional redistricting criteria.
10             And you say that:  "He failed to
11   control for things like core retention,
12   reducing precincts splits, preserving
13   communities of interest or keeping
14   municipalities or counties intact."
15   What do you mean by that?
16       A     Again, I think that's set out in
17   the succeeding sentences.  It doesn't
18   make a lot of sense to ask why a precinct
19   in Lexington County is kept in District
20   2, while a precinct in Richland County is
21   taken out, because there's other
22   considerations, like Lexington County has
23   been intact in District 2 for 100 years
24   while Richland County is not.
25             There may be -- in other words,
```

```
                                    Page 200
 1              S. Trende
 2   there may be other reasons that are
 3   legitimate that districts or precincts
 4   are kept in that correlate with race or
 5   kept out; and he doesn't control for that
 6   possibility.
 7      Q     So what's your basis for saying
 8   that he is not controlling for that
 9   possibility?
10      A     Because his controls as I
11   understand them are population, race and
12   politics.
13      Q     Have you examined his regression
14   analysis?
15      A     Yes.
16      Q     And what's your basis for saying
17   his regression analysis didn't control for
18   keeping counties whole?
19      A     Because he doesn't.  His
20   controls are race politics and population
21   size.
22      Q     You write on page 9 that "Dr.
23   Ragusa did not insert contiguity and that
24   the concept of a county envelope treats
25   all precincts within a county equally."
```

Page 201

```
 1                 S. Trende
 2   What's your basis for saying that?
 3       A     Again, having looked at his
 4   regression and his data, the question is
 5   whether a precinct goes into, is kept in
 6   the district or is kept out of the
 7   district, without at least as I read his
 8   regression analyses, without any
 9   reference to whether they happen to be
10   adjacent on the county boundary.
11             It's the county envelope which
12   considers all the precincts in the county
13   or in the district.  Not just those that
14   exist on the boundary of the district.
15       Q     Are you aware of any peer review
16   or academic literature that says the
17   county envelope is invalid because it
18   treats all precincts within the county
19   equally?
20       A     I am not one way or the other.
21   But I think for purposes of using this,
22   an actual case, it's pretty obvious that
23   the decision to keep Berea-Smoaks, that
24   including Berea-Smoaks precinct in the
25   First District in Colleton County raises
```

Page 202

```
 1                    S. Trende
 2    different issues than making Green Pond
 3    precinct whole.
 4        Q      The map at South Carolina, the
 5    next map didn't limit county splits to the
 6    borders of counties, did it?
 7        A      Can you ask me that again?
 8        Q      Yeah.  The enacted map didn't
 9    limit county splits for the borders of
10    counties, did it?
11        A      No.
12        Q      I mean the split in Chelsea
13    County goes deep into the heart of the
14    county, right?
15        A      That's right.
16        Q      It goes all the way to the
17    Charleston Harbor?
18        A      That's right.
19        Q      And the split of Richland County
20    goes deep into the heart of Richland
21    County, right?
22        A      That's correct.
23        Q      And in your words, the boundary
24    in Richland County has, this is your
25    phrase:  Has a distinctive hook shape,
```

Page 203

```
 1                 S. Trende
 2   right?
 3        A      That's correct.
 4        Q      Now when you are talking about
 5   the Berea-Smoaks issue you write Dr.
 6   Ragusa's approach as, quote:  "Why didn't
 7   the map makers include Berea-Smoaks
 8   precinct in District 1?"
 9               Is that language that you are
10   quoting anywhere in Dr. Ragusa's report?
11        A      No.
12        Q      You recognize that Dr. Ragusa in
13   his analysis of District 1 isn't just
14   looking at Colleton County.  He also looks
15   at the other counties in the district,
16   right?
17        A      Of course.
18        Q      He looks at Charleston County,
19   which we just discussed.  The split goes
20   deep into the heart of the county, right?
21        A      That's right.
22        Q      When you write that on page 11
23   that Dr. Ragusa's approach exactly
24   considers the decisions to keep Monticello
25   precinct in District 2 and the Olympia
```

Page 204

1                    S. Trende

2    precinct in District 6 is equivalent to

3    every other precinct, where exactly in

4    your words does Dr. Ragusa's analysis say

5    this?

6        A     Well, because that's what the

7    regression analysis does with every

8    single, every individual county is asking

9    did it move one or did it not.

10              Not every county, every

11   precinct, did it move one or did it stay

12   put.  Zero.  And so beyond that, it

13   doesn't distinguish between the fact

14   that, hey, if this precinct were

15   included, it would marginally shift the

16   boundary of the district.  Versus, hey,

17   if this precinct were included, it would

18   require an entire redraw of the entire

19   map.

20       Q     He is presenting a statistical

21   analysis, though, right?

22       A     Well.  Right, but to the extent

23   you are trying to draw inferences from

24   the statistical analysis, it's only as

25   good as if you are putting proper

Page 205

1                    S. Trende

2    controls in.  So you are accounting for

3    other alternative explanations.

4              So it may be true that after

5    controlling for black population, total

6    population, and Biden vote share, that a

7    given precinct would, that a set of

8    precincts was more or less likely to move

9    over.

10             But with some of these

11   precincts, if you look at it, like

12   Monticello doesn't move, because if you

13   put Monticello into the sixth, that

14   entire arm of the second district or the

15   hook of the second district also has to

16   go into the sixth, unless something

17   really radical is done to reshape it.

18             And so to the extent that

19   there's some correlation between these

20   types, these precincts, in other words,

21   it ultimately when it comes to geography,

22   which is an important consideration in

23   drawing maps, the location of the

24   precincts that you add and subtract does

25   matter.  And that doesn't factor into his

Page 206

1              S. Trende

2    analysis.

3        Q      So how would you control for

4    that?

5        A      I don't know if you can.  I'm

6    not sure how useful this analysis is at

7    all.

8        Q      Right.  He presents, though, he

9    presents three alternative analyses,

10   right?

11       A      But they all do the same thing.

12   They don't have any reference to whether

13   a precinct moves in or moves out.  It's

14   almost like a poor man's Flip MC.  But

15   the Flip Monte Carlo is, you know, does

16   take account of adjacency and which

17   precincts are on the edges of the

18   boundaries when they are flipping them

19   back and forth.

20       Q      Have you rerun Dr. Ragusa's

21   regression to see what would happen if you

22   were to exclude Monticello Olypmia from

23   the analysis?

24       A      Well, that's it.  You can't just

25   exclude Monticello because then

Page 207

```
 1              S. Trende
 2   everything else gets redrawn.  But no, I
 3   haven't rerun his regression analyses
 4   picking and choosing the precincts that I
 5   take out.
 6      Q    Are there any other precincts
 7   that you would take out of the analysis
 8   besides the three that you would identify
 9   in your report?
10      A     Those are the three that are
11   problematic.  But the entire thing has
12   the issue that it treats a precinct on
13   the other side of the county, as
14   equivalent to the precincts that are on
15   the boundary.
16           To go back to the example of
17   Colleton County, the regression analysis
18   will treat the question as, you know, you
19   are looking at these factors:  Why
20   doesn't Berea-Smoaks go in or stay out?
21   And we could make it Ashton-Lodge or
22   Williams or one of these other ones.
23           But the question isn't why does
24   Berea-Smoaks come in or stay out, because
25   to make Berea-Smoaks come in, you have to
```

Page 208

1                    S. Trende

2    take in Edisto and Peples and all these

3    other precincts to make it contiguous

4    with the rest of the district.

5        Q    So what basis do you have if you

6    haven't actually rerun the analysis

7    without the precincts that you have

8    identified as problematic to include?

9              What basis do you have to say

10   the removal of those precincts would have

11   any impact on these conclusions?

12       A    I don't know one way or the

13   other whether including these would

14   change the answer frankly.  I don't know

15   how you would even do it within the

16   concept that he is moving, that he is

17   going forward with.

18             It just seems fatally flawed to

19   treat some precinct that's 10 precincts

20   away from the district, from something

21   that exists on the precinct boundary.

22             As I understand it, it's not the

23   burden of proof to present that data.

24   It's the burden of proof to present a

25   useful reliable regression analysis that

Page 209

```
 1                S. Trende
 2    answers the question and this doesn't do
 3    that.
 4         Q    You don't have a basis to say
 5    that controlling for what you cited,
 6    taking out the precincts that you are
 7    talking about, would have any impact on
 8    his analysis, correct?
 9         A    No.  No.  I have a basis for
10    saying if you are looking at a
11    redistricting question, you have to
12    consider contiguity at least.  I mean
13    everyone considers that a legitimate
14    redistricting criteria.
15         Q    All right, let's try --
16         A    I mean if the position is that
17    you don't have to consider contiguity,
18    then Dr. Ragusa and I just have a
19    fundamental disagreement about how
20    redistricting works.
21         Q    Or maybe you are not
22    understanding how he is addressing
23    contiguity?
24         A    No, I don't think that's it.
25         Q    Let's turn to your analysis of
```

Page 210

1                S. Trende

2    Dr. Imai, starting on page 1.  Is the

3    analysis you present at pages 1 through 8

4    a complete and full statement the opinions

5    you intend to offer at trial concerning

6    Dr. Imai?

7        A    Certainly relating to his

8    initial report.  But I don't know what

9    questions counsel is going to ask me at

10   trial.

11       Q    And you are not planning to

12   express any opinions about Dr. Imai beyond

13   those set forth in your rebuttal report,

14   are you?

15       A    I don't think so.  No.

16       Q    Have you reviewed Dr. Imai's

17   February 10, 2022 deposition?

18       A    I have not.

19       Q    Do you plan to?

20       A    I don't.

21       Q    Were you able to replicate

22   Dr. Imai's simulations?

23       A    Yes.

24       Q    And you acknowledge that the

25   type of simulation analysis that he

Page 211

```
1                  S. Trende
2  presents has been the subject of extensive
3  publication in peer-reviewed articles?
4      A     If you are going to bicker with
5  me about the meaning of large, I guess I
6  could bicker about extensive.  But it's
7  certainly been subject to peer review.
8      Q     And you yourself in your expert
9  report have presented simulation analysis,
10 right?
11     A     That's correct.
12     Q     You have used Dr. Imai's
13 re-disked simulation software in other
14 gerrymandering expert work that you have
15 done, correct?
16     A     That's correct.
17     Q     And you would agree that
18 simulation analysis is widespread in
19 political science?
20     A     Certainly within the study of
21 gerrymandering, yes.
22     Q     And you would agree the
23 simulation approach to redistricting has
24 been accepted in multiple courts?
25     A     Yes.
```

Page 212

S. Trende

1

2      Q      Now in your opinion, you say

3  that Dr. Imai's simulation did not

4  adequately control for poor retention.

5  That's the main point of your analysis,

6  right?

7      A      That's one of the points, yes.

8  It's pages 2 to 4.

9      Q      And on page 2, you say that the

10  House guidelines included criteria for

11  poor retention.  You would agree with me

12  that's not correct, right?

13      A      That should have probably been

14  general assembly instead of House.  But

15  yes.  I believe the Senate guidelines do.

16      Q      Yeah, that's fair.  You say,

17  when you are talking about the core

18  retention principle, you say that "the

19  hook shape in Richland County has been a

20  feature of the South Carolina map for

21  over, for 40 years not over but for 40

22  years."  Is that correct?

23      A      The claim or the --

24      Q      Yes.

25      A      Both the claim and the last

Page 213

1              S. Trende

2    statements are correct.

3        Q    Did the 1928 map have the hook

4    in Richland County?   Did I subtract that

5    wrong and it should be 30?

6        A    Yeah, I guess so.  30 years.

7        Q    You say the split of Sumter

8    County has also been a feature going back

9    40 years.  Do you know whether Sumter

10   County was split before the benchmark map?

11       A    I believe it was split looking

12   at the map in 2002.  And I believe it was

13   split looking at the map in 1992.

14            I have obviously been clonked in

15   the head at some point and thought that

16   the major redraw was 40 years ago.  That

17   1992 was 40 years ago and not 30.  But it

18   is not 40 years ago, it's 30.

19       Q    Okay.  And same question with

20   regard to the divvying up of Charleston.

21   Has City of Charleston been split out of

22   District 1 before the current map?

23       A    Charleston and some of its

24   suburbs, that should be 30 years, not 40.

25       Q    Now on page 7 you write at the

Page 214

```
 1                    S. Trende
 2    bottom:  "Legislators were likely drawing
 3    from a different distribution of maps, one
 4    with higher core retention rates overall
 5    and lower democratic performances in the
 6    First District in particular than
 7    Dr. Imai's ensembles create."
 8              What's your basis for saying
 9    this is likely what the legislators were
10    doing?
11      A     Well, because they produced
12    districts consistently with much, much
13    higher core retention rates.  I guess
14    fact discovery will bear out whether they
15    were really interested in shoring up
16    Nancy Mace or not.
17              But that was certainly my
18    understanding of the redistricting
19    process in South Carolina.  But I think
20    that's probably the meat of the fight the
21    lawyers are going to have.
22      Q     When you make this claim in your
23    report, what evidence from Legislator
24    record do you have that it was likely that
25    legislators were drawing with higher core
```

Page 215

1                    S. Trende

2    retention rates and aiming to lower

3    Democratic performance in the First

4    District?

5        A      Well, you have the output of

6    districts and the fact that core

7    retention is a Senate guideline, which I

8    think is a reasonable basis for thinking

9    that trying to draw much more matches

10   with higher core retention than, you

11   know, Dr. Imai's District 6 usually are

12   has a 40 percent core retention rate.

13            That seems a reasonable

14   inference to me.  And I think when you

15   look at political shifts that were made

16   and the fact that it was Republicans

17   drawing the map with a district that we

18   all agree was politically marginal and

19   became less, I think we all agree, it

20   became less marginal; that that was

21   something that we're interested in.

22            But again I think that's

23   probably the meat of the legal fight that

24   you are going to have so.

25        Q      Well, aside from the Senate

Page 216

1                    S. Trende

2     redistricting criteria, do you have any

3     visibility into any of the other inputs

4     that went into the map making that lead

5     you to conclude that there were likely,

6     legislators were likely trying, aiming for

7     higher core retention rates and lower

8     Democratic performance in the First

9     District?

10        A     As I understand it, the Senate

11    is in large part responsible for the

12    maps.  I think that guideline is

13    important.  And again I think sometimes

14    you draw inferences from the output.

15                And I think the fact that you

16    don't have districts dropping down to 40

17    percent core retention, like Dr. Imai's

18    districts do for District 6, is

19    reasonable evidence to support that.

20        Q     Well, what's your basis for

21    saying the Senate is primarily responsible

22    for the map?

23        A     I thought they were the ones who

24    changed up the House map that you

25    presented to me but maybe I have my

Page 217

```
 1              S. Trende
 2   timeline wrong.
 3              Regardless, the Senate, that one
 4   body engaged in this process, had a
 5   guideline regarding core retention, seems
 6   a reasonable thing to rely upon in
 7   forming an opinion.
 8      Q     And why would that criteria take
 9   precedence over the House criteria?
10      A     Well, in general, bodies, the
11   legislative bodies are kind of jealous of
12   their prerogative.  So I think the fact
13   that a body put forward its own
14   guideline, and even the House after you
15   showed me the data and has higher core
16   retention than 40 percent I think.
17              So I don't know that anyone was
18   drawing maps with the power drawn maps at
19   40 percent core retention factor.
20   Regardless, I think the, personally think
21   the legislative guideline and the output
22   is a sufficient basis for that opinion.
23              MR. FREEDMAN:  All right.  If we
24      can go off for a minute I just want to
25      confer with my counsel, but otherwise,
```

Page 218

```
 1              S. Trende
 2       I think I may be done.
 3              THE VIDEOGRAPHER:  Time is 3:43
 4       and we are going off the record.
 5              (Recess taken: 3:43)
 6              THE VIDEOGRAPHER:  The time is
 7       3:44 and we are back on the record.
 8              MR. FREEDMAN:  Plaintiffs have
 9       no further questions at this time.
10       Thank you, Mr. Trende.
11              THE VIDEOGRAPHER:  Any other
12       questions?
13              MR. GORE:  I do have some
14       questions but maybe I should defer to
15       House defendants and election
16       commission defendants before I go.
17              MS. CRUM:  This is Liz Crum, the
18       election commission defendants.  I
19       have no questions.
20              MR. DIAMADURAS:  This is
21       Konstantine Diamaduras for House
22       defendants.  I have no questions.
23              MR. GORE:  Thank you.
24    EXAMINATION BY
25    MR. GORE:
```

Page 219

```
 1                    S. Trende
 2      Q      Mr. Trende, I have just a few
 3  questions for you today.  In your rebuttal
 4  report on page 2, do you still have that
 5  in front of you?
 6      A      I do.
 7      Q      I think you had some back and
 8  forth with Mr. Freedman about whether
 9  certain time periods had been 40 years or
10  30 years, that you were referring to the
11  hook shape in Richland County.  Do you
12  recall that discussion?
13      A      I do.
14      Q      And you may have also been
15  referring to splits in Sumter County.  Do
16  you recall that discussion as well?
17      A      I do.
18      Q      And if the difference were
19  really 30 years rather than 40 years,
20  would that have any effect on your
21  opinions with respect to Dr. Imai's
22  simulations or your critique of those
23  simulations in your rebuttal report?
24      A      It would not.
25      Q      And Mr. Trende, I would like to
```

Page 220

```
 1                    S. Trende
 2   turn now to the Senate guidelines, which
 3   are Exhibit 13, tab 33.  And just so the
 4   record is clear does this set of
 5   guidelines mention preserving the course
 6   of districts as a consideration in drawing
 7   the Congressional plan?
 8        A     It does.
 9        Q     And is that on page 2?
10        A     Page 2, Roman Numeral 3
11   sub-point B.
12              MR. GORE:  I have no further
13        questions.  Thank you.
14              THE VIDEOGRAPHER:  We are off
15        the record at 3:47 p.m. and this
16        concludes today's testimony given by
17        Sean Trende.
18              The total number of media units
19        used was six and will be retained by
20        Veritext, New York.
21              (Discussion off the record)
22
23              (Continued on the next page to
24        include the jurat)
25
```

Page 221

1              S. Trende

2          MR. GORE:  Ms. Court Reporter, I

3      would like to order a transcript.

4      Electronic is fine.  And I don't need

5      a rush transcript.

6          (Time noted:  3:50 p.m.)

7

8

9

10

11                 _____

12                 SEAN  PATRICK  TRENDE

13

14  Subscribed and sworn to before me

15  this    day of         , 2022

16

17                                      .

18

19

20

21

22

23

24

25

Page 222

1

2           C E R T I F I C A T I O N

3

4

5   STATE OF NEW YORK     )

6                         :    Ss.

7   COUNTY OF NEW YORK    )

8

9

10          I, R. BOBBIE LEVY, a

11  Certified Shorthand Reporter and a Notary

12  Public, do hereby certify that the

13  foregoing witness, was duly sworn on the

14  date indicated, and that the foregoing is

15  a true and accurate transcription of my

16  stenographic notes.

17          I further certify that I am

18  not employed by nor related to any party

19  to this action.

20          IN WITNESS HEREOF, I have

21  hereunto set my hand this 3rd day of

22  August, 2022.

23

24

25          R. BOBBIE LEVY, C.S.R.

Page 223

1

2                    WITNESS INDEX

3

4

5    WITNESS                    PAGE

6    SEAN PATRICK TRENDE

7    EXAMINATION BY

8    MR. FREEDMAN:              9

9    MR. GORE:                  217

10

11   E X H I B I T S

12   FOR IDENTIFICATION

13   EXHIBIT          DESCRIPTION          PAGE

14   Exhibit 1    Deposition notice        18

15   Exhibit 2    Expert report dated      22

16                4/18/22

17   Exhibit 3    Rebuttal report dated    22

18                5/4/22

19   Exhibit 4    Curriculum vitae         51

20   Exhibit 5    Updated curriculum       56

21                Vitae

22   Exhibit 6    Series of invoice        57

23                Receipts

24   Exhibit 7    Congressional House      88

25                Staff map

Page 224

1

2    E X H I B I T S

3    FOR IDENTIFICATION

4    EXHIBIT           DESCRIPTION         PAGE

5    Exhibit 8    2021 Guidelines for      92

6                 South Carolina

7                 Redistricting labeled

8                 Tab 4.1

9    Exhibit 9    House constituency       98

10                Core analysis

11   Exhibit 10   Senate constituency      101

12                Core analysis

13   Exhibit 11   Backus decision          112

14   Exhibit 12   Population summary        135

15                Labeled Tab 26

16   Exhibit 13   County borders labeled   146

17                Tab 33

18   Exhibit 14   House District Report     149

19                And staff plan labeled

20                Tab 25

21   Exhibit 15   House Redistricting       157

22                Report labeled Tab 28

23   Exhibit 16   Email Bates stamped       162

24                SC Senate-000034244

25                Labeled Tab 34

Page 225

1

2    E X H I B I T S

3    FOR IDENTIFICATION

4    EXHIBIT                DESCRIPTION              PAGE

5    Exhibit 17   Email dated 11/24/21    165

6                 Bats stamped

7                 SC-Senate-00005245

8                 Labeled Tab 35

9

10      Exhibits attached electronically to

11                 transcript

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 226

```
 1
 2                ERRATA SHEET
 3              VERITEXT LEGAL SOLUTIONS
 4                  800-567-8658
 5    CASE NAME:  NAACP v. Thomas C. Alexander, et al
 6    DATE OF DEPOSITION:  July 21, 2022
 7    WITNESS' NAME:  SEAN PATRICK TRENDE
 8    PAGE/LINE(S)/    CHANGE      /   REASON
 9    ____/_____/_____/_____
10    ____/_____/_____/_____
11    ____/_____/_____/_____
12    ____/_____/_____/_____
13    ____/_____/_____/_____
14    ____/_____/_____/_____
15    ____/_____/_____/_____
16    ____/_____/_____/_____
17    ____/_____/_____/_____
18    ____/_____/_____/_____
19    ____/_____/_____/_____
20    ____/_____/_____/_____
21    ____/_____/_____/_____
22    SUBSCRIBED AND SWORN TO
23    BEFORE ME THIS_____DAY OF_____, 2022.
24    _____
25    NOTARY PUBLIC   MY COMMISSION EXPIRES _____
```

[& - 1992]    Page 1

**&**

**&**   2:5 140:18

**0**

**0**   25:24,25
**00003245**   166:23
  167:10
**000034244**
  164:14 224:24
**00005245**   225:7
**03302**   1:4 7:9

**1**

**1**   6:22 18:20,23
  19:8 53:12
  56:12 89:11
  90:21,23,24 98:4
  98:5,20 102:10
  104:24 105:3,11
  105:17,22 106:3
  106:7,9,22,23,24
  107:2,3,25
  108:15,20
  109:22 110:7
  114:14 115:15
  115:16 120:10
  126:12 135:6,11
  135:13 139:14
  140:4 141:13
  142:9,21,25
  145:19,21,22
  146:21 152:7,12
  152:23 157:2
  158:6,8 162:9
  163:3,5,9 189:15
  190:20,22
  191:11,15 192:6
  192:11 194:6
  198:14 203:8,13

210:2,3 213:22
  223:14
**1,000**   162:3
**10**   9:24 33:20
  54:22 100:17
  102:22 103:2,4
  107:12 108:13
  116:11,16 117:3
  118:14 124:11
  147:7 148:19
  152:14 153:9
  157:23,24 196:4
  197:16,19
  208:19 210:17
  224:11
**10,000**   111:7
  170:7 197:25
**10,808**   156:3,11
  163:2
**100**   75:5 117:14
  117:18 149:11
  157:17 191:18
  199:23
**10004**   2:17
**100115**   58:9
**101**   224:11
**104**   3:9
**10:45**   56:10,13
**10:58**   56:14,16
**10th**   51:7,16,25
  141:22
**11**   113:11,13
  118:14 195:14
  203:22 224:13
**11/24/21**   166:22
  225:5
**112**   224:13

**1146**   9:2
**11:50**   91:8,11
**11:59**   91:13
**12**   119:13 136:15
  136:18 144:2
  147:6 224:14
**1221**   4:8
**125**   2:16
**12:54**   130:19,22
**13**   88:9 124:2
  133:14 147:23
  148:2 182:14
  220:3 224:16
**135**   224:14
**14**   125:5 150:12
  150:15 224:18
**140,000**   115:14
**146**   224:16
**149**   224:18
**14th**   112:4
  114:20
**15**   126:24 158:18
  158:21 164:16
  224:21
**15,000**   110:17
  162:7 163:7
**15,389**   106:8
  108:14 109:21
  110:7
**157**   224:21
**16**   128:3,24
  164:3,6 224:23
**16.56**   142:3
**16.6**   141:14
**16.7**   141:18
**16.74**   142:4
**162**   224:23

**165**   225:5
**17**   95:11,11
  141:18 166:21
  166:25 167:9
  225:5
**18**   29:11 30:2
  31:13,19 51:2
  96:13 106:14
  111:8 138:4
  139:2 142:4
  157:23 223:14
**18th**   2:16 26:10
  28:8 55:6
**190,000**   115:8
**1900s**   119:8
**1902**   117:3 118:8
  118:18,22
  120:18 121:3
  133:22 193:7
**1928**   213:3
**1932**   119:13
  120:3,19 121:4
  133:22 193:2
**1966**   122:16
**1970**   123:11
**1970s**   122:10
**1972**   133:22
**198**   192:24
**1982**   122:7
  123:25 124:4,21
  126:10,18
  133:22 192:22
**1992**   125:5,6,9
  125:13,22 126:4
  127:11 133:22
  192:20 213:13
  213:17

**[1:35 - 4,700]**     Page 2

**1:35**   132:3,11

**2**

**2**   20:22 26:5,7,13
29:12 30:3,8
31:19 51:18
56:18 59:7 63:3
85:7 91:10
95:15,19 103:9
107:2 112:6
114:14 116:11
129:24 140:10
142:5 145:24
146:2,3,22
168:21 177:3
190:21,22
199:20,23
203:25 212:8,9
219:4 220:9,10
223:15
**2.72**   143:2
**20**   11:20 65:10
113:22 143:25
157:20,22
**20,000**   67:20
**20,240**   105:21
**20.27**   139:15
143:2
**200**   157:17
**20001**   2:8 3:20
**2002**   126:23
127:22 133:23
192:8 213:12
**2011**   120:4
121:19
**2012**   86:3 106:18
112:2 128:2
133:23

**2014**   79:13
**2018**   109:2
**2020**   34:11 77:21
86:3 109:8
**2021**   33:22 88:9
93:6,17 167:13
224:5
**2022**   1:14 6:9
11:24 52:20
54:11,18,22,25
55:8 61:23
85:21 106:18
196:4,5 210:17
221:15 222:22
226:6,23
**21**   1:14 6:9
226:6
**217**   223:9
**22**   140:9,10
142:8 223:15,17
**2200**   161:24
**23**   155:16
**24**   154:7 167:13
168:21 169:10
**24.1.**   88:14 133:9
**25**   150:11,14
170:2 172:20
197:17 224:20
**25,000**   71:17
**26**   136:11,17
154:25 155:4
174:11 175:9,11
224:15
**27**   98:24 176:8
**28**   158:14,20
175:12 177:6
178:3 196:4
224:22

**29**   178:14,16,17
180:16
**29201**   4:9
**29601**   3:11
**2:25**   168:15
**2:27**   168:12
**2:33**   168:17
**2nd**   155:24
182:21 191:2

**3**

**3**   21:18 27:19,21
27:25 28:12,15
28:20 29:12
30:3,8 36:12
59:11 60:3
91:15 95:20
96:12,13 98:10
103:18 104:2
105:5 107:3
130:21 146:16
188:11 195:9,10
220:10 223:17
**3,242**   163:3
**3,342**   156:12
**3,982**   109:3
**30**   83:13 102:18
179:18 181:10
213:5,6,17,18,24
219:10,19
**30,000**   65:10
66:15
**30was**   103:2
**31**   182:17
**32**   93:4 178:4
183:15 184:13
184:14

**33**   109:17 147:22
147:24 186:3
188:16 220:3
224:17
**34**   164:2,5,10,12
184:25 188:17
189:15 224:25
**35**   166:20,24
184:14 194:7
225:8
**35,629**   106:2
**37**   113:9
**3700**   162:5
**3:00**   188:13
**3:01**   188:15
**3:10**   194:23
195:2
**3:16**   195:4
**3:21**   1:4
**3:21cv**   7:8
**3:44**   218:7
**3:47**   220:15
**3:50**   221:6
**3c**   148:5
**3rd**   155:25
222:21

**4**

**4**   28:2 29:11
30:2 31:13 51:2
51:19,21,24
106:13,16
107:14 108:5
132:13 146:5,6,8
146:22 168:14
212:8 223:19
**4,700**   161:21

[4.1 - accommodate]                                                                    Page 3

**4.1**  224:8
**4/18/22**  26:7
  223:16
**40**  212:21,21
  213:9,16,17,18
  213:24 215:12
  216:16 217:16
  217:19 219:9,19
**400**  57:10
**41**  58:21
**42**  58:21
**43**  19:18,18
**43015**  9:3
**45**  58:15
**45.7**  154:10,17
**45.7.**  154:16
**4855**  222:24
**4th**  27:18 36:13
  36:15,20 37:12
  38:8 39:15,22
  43:6 156:2

**5**

**5**  11:24 56:23,25
  60:25 114:14
  144:3,4,5 145:14
  146:16 168:19
  170:11,25
  171:14 194:25
  223:20
**5,000**  197:15
**5,415**  109:10,15
**5.48**  140:5
**5/4/22**  27:21
  223:18
**500**  197:15
**51**  3:19 223:19

**52,000**  115:15
**56**  223:20
**57**  223:22
**59.9**  155:3,6
**5th**  12:5 156:3

**6**

**6**  57:19,21 59:12
  61:8 65:12
  98:12 100:2,4,7
  100:11,18,23
  101:25 103:11
  103:13 105:22
  105:25 106:3,7,9
  107:23 108:16
  109:22 110:8
  114:6,14,16
  115:14,16
  135:21,22 142:6
  146:10,11,13,22
  152:7,13,23
  157:3 158:6,8
  162:9 163:3,4,9
  170:12,25
  171:14 177:3
  189:15 192:6,12
  194:6 195:6
  204:2 215:11
  216:18 223:22
**601**  2:7
**6th**  125:24
  126:16 127:9
  128:13 129:23
  134:18,23
  156:10,12,13
  159:13,25
  161:18 179:5
  180:19 181:6

182:21

**7**

**7**  31:19,24 32:16
  85:9 88:15,17
  89:7,12 93:21
  111:13,14
  140:10,13,14
  142:6 143:7
  146:16 147:3
  148:9 163:2
  213:25 223:24
**70,000**  70:17
**73,120**  100:20
**731,203**  101:12
**731,204**  101:12
  149:15
**75,000**  100:19
**77.4**  100:23
**77.41**  100:8,15
  100:24 102:4
  103:13 115:23

**8**

**8**  31:20,24 32:17
  33:6 34:14 57:9
  93:5,8 113:16
  133:9 157:10
  195:12,14
  196:12 210:3
  224:5
**800-567-8658**
  226:4
**82.84**  89:11 92:9
  98:21
**83**  35:20,21 36:6
**84.46**  105:17
**87.25**  58:5,11

**87.55**  98:12
  100:12,15 101:2
  115:21
**88**  223:24

**9**

**9**  99:3,6 108:13
  113:16 155:16
  155:17,18
  200:22 223:8
  224:9
**90**  110:4
**92**  224:5
**92.78**  105:4
**94**  89:13 92:12
**94.52**  105:11
**98**  224:9
**99.96**  89:12 92:7
**9:30**  1:14

**a**

**a.m.**  1:14 6:9
**ability**  42:24
  44:12 125:25
  126:6
**able**  45:25 46:7
  128:11 190:5,9
  210:21
**absolute**  163:11
**academic**  53:25
  54:6 78:6,15
  201:16
**academics**  86:12
**acceptable**  63:8
**accepted**  211:24
**access**  19:12
  133:5
**accommodate**
  11:11

**account** 63:11
  176:25 206:16
**accounting**
  205:2
**accurate** 10:25
  54:19 222:15
**acknowledge**
  210:24
**aclu** 2:13
**act** 60:14 63:12
**action** 7:15 9:8
  65:2 70:5
  222:19
**actions** 172:20
**active** 173:25
**activity** 24:15,24
**actual** 34:6 95:9
  201:22
**ad** 93:17
**adam** 16:20 17:3
  164:16,24 166:6
  167:12
**adams** 61:25
  63:16
**add** 107:24
  108:2,3 149:7,14
  180:18,24
  205:24
**added** 69:6
  182:2
**adding** 181:22
**addition** 29:19
  46:9 73:6
  116:18
**additional** 30:20
  30:24 52:16
**address** 8:25
  40:24 43:12

47:2
**addressing**
  209:22
**adds** 150:2
**adequately**
  212:4
**adjacency**
  206:16
**adjacent** 201:10
**adjective** 91:25
**adopted** 120:20
  120:22 122:10
**adriel** 2:19 3:24
**affiliated** 66:6
**affiliation** 66:4
  66:24 68:10
  69:24
**affixed** 123:18
**africa** 35:18
**african** 109:24
**age** 110:20,22,23
  111:4,8 138:8,15
  138:20 139:2
  140:3 154:9
  155:3 157:22,23
  196:17,19
  197:11,20,22
  198:2,4
**agencies** 64:12
**agency** 64:9
**aggawal** 4:17
**aggregated**
  104:15
**aggregating**
  161:2
**ago** 19:15 99:15
  117:14,18
  191:19 213:16

213:17,18
**agree** 6:19
  100:14 110:6
  115:6 211:17,22
  212:11 215:18
  215:19
**agreed** 5:5,10,14
  187:6
**agreement** 23:4
**aiming** 215:2
  216:6
**al** 1:7,11 7:4,5
  226:5
**alabama** 113:3
**alexander** 1:11
  2:15 3:18 7:5
  226:5
**alignment**
  122:22
**allocated** 157:13
  157:13
**allowed** 82:8
**almanac** 77:15
  79:12,13
**alternative**
  87:21 166:5
  205:3 206:9
**alternatives**
  87:24
**amended** 18:22
  19:8
**amendment**
  112:5 114:20
**american** 2:12
  50:13,14 77:15
  79:13,14 109:24
**amicus** 16:3
  66:16

**amount** 24:12,20
  55:11 69:7
**analyses** 76:11
  115:24 197:2
  201:8 206:9
  207:3
**analysis** 30:9,13
  30:20,24 38:4
  41:9 45:8 55:24
  55:25 74:19,25
  75:9,17 76:7,19
  76:23 95:9 99:5
  99:22,25 102:25
  103:4 104:5,24
  107:13,16 108:7
  108:10,11 114:7
  114:11 115:22
  116:7,12,25
  118:3 128:23
  129:4 136:5
  147:10 151:11
  153:8 156:5,22
  168:22,24 169:5
  170:16,16
  175:10,11,13,16
  175:22 177:25
  178:5,10 184:12
  184:17,19,21
  187:11,12
  193:12 195:12
  195:13 200:14
  200:17 203:13
  204:4,7,21,24
  206:2,6,23 207:7
  207:17 208:6,25
  209:8,25 210:3
  210:25 211:9,18
  212:5 224:10,12

[analyze - average]                                                                                    Page 5

| | | | |
|---|---|---|---|
| **analyze** 104:8 | **appointments** | **arrington** 109:4 | 98:5 190:25 |
| **analyzes** 105:2 | 54:6 | 109:15 | **assignment** |
| **analyzing** 137:6 | **appreciate** 53:3 | **article** 55:16,23 | 90:24,25 97:18 |
| 163:17 | 53:16 | **articles** 54:4 | **assignments** |
| **anchored** 117:19 | **approach** 203:6 | 55:14 78:23 | 79:12 |
| 117:22 118:9 | 203:23 211:23 | 79:4 211:3 | **assume** 42:8 |
| 119:9 127:20 | **approaching** | **articulate** 45:21 | 75:13 109:5 |
| 129:11 134:6 | 60:8 | **ashton** 207:21 | 110:12 149:25 |
| **anderson** 117:19 | **approximately** | **aside** 41:19 | **assuming** 22:4 |
| 125:17 | 11:18 | 83:12 174:4 | 58:18 133:24 |
| **andrew** 164:14 | **april** 11:24 12:5 | 215:25 | **assumptions** |
| 164:17 166:7 | 26:10 29:11 | **asked** 17:20 | 22:16 23:15 |
| 167:11 | 30:2 31:13,19 | 30:23 31:2 39:7 | **attached** 53:8,8 |
| **andy** 14:5,15,17 | 51:2,11,13 52:9 | 40:22 41:12 | 225:10 |
| **answer** 10:14 | 53:12 55:6 59:8 | 43:20 44:20 | **attachment** |
| 21:9 37:3 38:10 | **apush** 122:9 | 45:17 47:9 | 167:14 |
| 42:24 44:4,13 | **area** 125:2 145:2 | 74:14 76:22 | **attorney** 9:14,20 |
| 46:8 64:2 76:2 | 169:14 174:12 | 79:19 80:7,16,20 | 22:10 64:17 |
| 160:4 171:5 | 174:25 177:9,15 | 87:5 165:9 | 70:25 71:2,13 |
| 178:6 188:3 | 178:18 182:18 | 182:25 | **attorneys** 2:6,14 |
| 192:16 208:14 | 184:2,13 185:7 | **asking** 11:14 | 3:6,17 4:6 5:5 |
| **answered** 37:2 | 186:17 187:12 | 31:12 87:20 | 22:14,17 68:5 |
| 75:25 | 190:21,23 | 91:17 166:8 | 81:17 |
| **answering** 11:14 | **areas** 48:8,25 | 173:12 204:8 | **attribute** 172:20 |
| **answers** 209:2 | 50:22,24 125:14 | **asks** 50:21 | **attributing** |
| **anti** 60:5 | 169:18 177:17 | **aspect** 63:15 | 173:15 183:4 |
| **anybody** 14:11 | **argument** 173:5 | **aspects** 78:14 | **audibly** 10:15 |
| 16:16 187:2 | **arizona** 60:15 | **assembly** 96:2 | **audio** 6:17,17 |
| **apologize** 82:15 | 62:7 72:3 81:17 | 113:20 212:14 | 132:16 |
| 188:4 | 86:16 | **assert** 114:17 | **august** 33:21 |
| **application** 55:2 | **arlington** 73:8 | **assess** 89:21 | 222:22 |
| 55:24 | 73:12,16,25 74:6 | **assessing** 94:16 | **authored** 77:14 |
| **applies** 127:22 | 74:15,19,24 75:8 | 143:19 | **available** 21:3 |
| **apply** 78:16 | 75:16 76:13 | **assessment** | 33:7 99:12,23 |
| 161:14 | **arm** 205:14 | 143:20 | **avenue** 2:7 3:19 |
| **applying** 143:19 | **arnold** 2:5 | **assign** 157:24 | **average** 153:20 |
| **appointed** 72:8 | **arrangement** | **assigned** 90:3,15 | 154:13 155:7 |
| | 72:15,22 73:2,4 | 90:17 97:23 | |

[avoid - better]    Page 6

**avoid**  72:13
**aware**  36:5 73:8
  73:20 92:17,23
  109:4 120:18
  142:19,24 186:8
  186:25 201:15

**b**

**b**  24:12 92:6
  118:17 159:17
  159:19 165:21
  166:3,10 220:11
  223:11 224:2
  225:2
**back**  28:10 41:7
  56:16 59:7
  75:22 91:13
  95:8 103:18
  104:12 107:12
  111:12 117:18
  118:5 119:3,7
  130:3 132:11,14
  133:8 140:8
  143:6 147:2
  156:13 160:9
  168:17 180:16
  186:3 188:15
  195:4 206:19
  207:16 213:8
  218:7 219:7
**backfill**  160:22
**background**
  174:18,19
  187:18
**backgrounds**
  35:25
**backus**  32:18
  96:6,7 111:20,24

111:25 112:8,11
112:22 113:10
113:12 114:2
115:3,11,20
128:4 224:13
**bad**  171:20
**bagley**  39:24
  40:9,13,20 41:2
  41:6,10 45:19,22
  46:17,23
**bagley's**  46:3,6
  47:3
**baker**  121:21
  122:9,14 123:10
**ball**  158:12
**ballpark**  27:8
**banker**  120:24
**based**  44:2,16
  45:22 119:14
  125:18 135:18
  145:9 184:8
**baseline**  55:7
  91:20
**bases**  121:23
**basic**  39:19 44:3
  121:23 124:19
**basically**  55:15
  90:7 144:25
**basis**  30:4 87:3
  104:15 120:17
  186:11 190:5
  200:7,16 201:2
  208:5,9 209:4,9
  214:8 215:8
  216:20 217:22
**bates**  164:4,13
  166:23 167:9
  224:23

**bats**  225:6
**bear**  214:14
**beard**  92:4,6
**bearing**  164:13
**beaufort**  118:9
  118:16,16,22
  126:19 127:14
  127:17,20,23
  129:11,16,20
  134:6,12 188:19
  188:23
**becoming**  79:16
**beech**  159:16,22
  161:24
**beginning**  56:17
  60:3 91:14
  132:12 141:7
  168:18 195:5
**behalf**  64:3
  65:13 66:18
  67:4 69:9 70:23
**behavior**  52:19
  54:10
**belabor**  52:24
**believe**  12:7 15:4
  25:2 30:6 32:7
  33:23 39:16
  50:7,21 51:8
  52:9,20 59:3,15
  64:22 66:11,25
  67:24 68:4 71:2
  73:10 74:21
  75:2 82:3 83:13
  84:8 86:22
  89:17,24 90:3
  97:16 99:12
  104:10,17 112:6
  114:10 141:25

143:22 147:11
147:15 165:6,13
170:22 171:17
181:15,15 194:3
198:22 212:15
213:11,12
**belize**  16:2 60:12
**benchmark**
  85:12,23,25
  86:21 87:2,9,10
  87:12 89:10,23
  111:18 112:4
  114:3 128:19
  129:2 130:9
  140:16,22
  141:14 143:11
  143:17 144:6
  145:22 146:3,7
  146:12 147:6
  154:23 155:12
  155:22 170:4,13
  171:23 172:12
  176:3 192:2
  213:10
**berea**  201:23,24
  203:5,7 207:20
  207:24,25
**berkeley**  188:19
  188:22
**berkley**  152:7
**bernie**  172:9
**best**  31:11
  106:22
**better**  19:6 77:8
  80:2 101:21
  102:8 151:22
  180:5

**beyond**  26:23
  29:22 30:13,15
  30:24 39:11,20
  44:24 45:16
  48:8 49:2 85:2
  112:19 179:6
  195:21 204:12
  210:12
**bicker**  211:4,6
**biden**  155:24
  156:13,21,25
  157:2,4,17,24
  158:5 159:23
  160:11,15
  162:10 163:2,4
  163:10 178:19
  205:6
**big**  38:18 100:16
**bill**  196:10
**billed**  25:11
**billing**  24:5 25:9
**bills**  24:5
**binder**  150:11
**birnie**  171:18,19
  171:22 172:10
**bit**  59:24 96:13
  111:12 132:24
  152:3 156:11
  163:19 185:25
**black**  105:15,16
  105:21 106:2,6,8
  108:15 109:21
  110:7,11 111:7
  138:18,20,25
  139:10 153:19
  153:23 154:9
  155:2 169:12
  177:13 178:21

179:23 196:17
  196:19 197:10
  197:18,19,25
  205:5
**blk**  138:12
  139:15
**block**  97:12,19
  97:22 98:4,5
  157:20,25
**blocks**  90:2,2,12
  90:14 157:11,12
  157:18
**blowups**  128:11
**blue**  179:5
**bobbie**  1:21 7:13
  222:10,25
**bodies**  217:10,11
**body**  72:9 217:4
  217:13
**border**  118:11
  118:20 127:21
  129:13,17,21,22
  134:8,13
**borders**  147:25
  202:6,9 224:16
**bored**  173:22
**bottom**  32:16
  34:14 59:11
  60:25 95:11
  113:15 116:11
  116:16 118:13
  128:24 159:10
  175:9 176:8
  178:3 180:16
  181:10 184:14
  214:2
**boundaries**
  114:12 148:6,24

149:17 172:8
  189:17 190:2,10
  190:16,25 191:3
  191:5,16 192:5
  192:11 193:4,9
  193:11 206:18
**boundary**
  149:16,18
  191:14,22
  201:10,14
  202:23 204:16
  207:15 208:21
**bounding**  145:3
**bounds**  144:22
**boutique**  67:11
**boy**  140:17
**break**  11:10,15
  52:9 53:4,19
  56:5 91:4,17
  130:14 168:4
  194:13
**breakdown**
  174:17,21
**briarwood**
  181:16,17,20
**brief**  16:3
**briefly**  57:8
  84:14
**bring**  12:14
  189:16 190:15
**broad**  2:16 77:7
  107:19
**broader**  79:2
  114:22
**broken**  156:8
**brought**  72:12
  112:6 191:21

**btd**  157:2
**bullet**  89:6 91:19
  143:8 147:5
**bunch**  185:10
**burden**  208:23
  208:24
**bureau**  34:11
**burr**  4:5
**bush**  126:3,5
**busy**  185:12,13
**bvap**  138:20,22
  138:23,24 139:4
  139:7,8,11,13
  140:14,21,22,24
  140:25 141:13
  141:17 143:2
  154:15 155:6,7
  174:13,19
  183:21 193:15
  193:18,24 194:4
  197:22 198:25
**bvaps**  142:21
  177:17

|     c     |

**c**  1:11 2:2 3:2 4:2
  7:5 8:16 24:14
  60:22 61:16
  69:15 132:5
  159:17 222:2,2
  226:5
**c.s.r.**  222:25
**calculate**  101:6
  144:14 145:8
**calculated**
  100:10,22,25
  102:12,17
  144:16 145:11

**[calculates - changes]**                                              Page 8

| | | | |
|---|---|---|---|
| **calculates** | 178:12 184:23 | 128:4 133:16 | **certainly** 38:11 |
| 103:12 | 202:4 212:20 | 136:4 137:10 | 39:5 40:10 |
| **calculating** | 214:19 224:6 | 142:15 145:12 | 41:25 42:7 44:6 |
| 101:20 | **carolina's** 78:17 | 145:14 151:8 | 47:25 60:11,13 |
| **calculation** | 116:19 | 153:17 162:20 | 60:16 62:21 |
| 100:4,7 102:4,5 | **carr** 120:24 | 182:3 196:5 | 63:17 64:12 |
| 153:14 | 122:9 123:10 | 198:20 201:22 | 68:6 73:22 74:3 |
| **calculations** | **carries** 188:16 | 226:5 | 78:9 84:14 |
| 81:18 | **carter** 61:10 | **cases** 32:22 33:4 | 94:14,22 110:5 |
| **call** 71:6 | 63:5 | 52:16 59:21 | 123:2 195:24 |
| **called** 8:17 | **case** 1:4 7:8 13:8 | 61:2,10 62:3,25 | 210:7 211:7,20 |
| 150:25 167:15 | 13:22 14:3,6,9 | 63:19 65:12,15 | 214:17 |
| **cameron** 71:3,5 | 14:13,22 16:2 | 66:10,17 76:12 | **certainty** 160:5 |
| 71:6,7,8 | 20:6,7 21:2,21 | 81:7,8 165:9,11 | 163:15 |
| **campsen** 13:15 | 22:3,11 24:14,22 | 165:18 | **certified** 1:22 |
| **candidate** | 25:10,14,17 | **cast** 156:24 | 73:15 222:11 |
| 160:20,23 | 29:14 30:10 | 157:17 | **certify** 222:12,17 |
| **cap** 71:17 | 32:6 50:5,20 | **categories** 20:2 | **challenge** 112:2 |
| **capacity** 165:4 | 51:8 52:2 53:23 | **category** 20:3,22 | 114:13 |
| **captioned** 20:6 | 53:24 54:23 | 21:18 24:4 | **challenged** |
| **carlo** 206:15 | 59:2 61:23 | **caucus** 113:4 | 112:22 113:4 |
| **carolina** 1:3,6 | 62:14,14,15 | **cause** 60:23 | 114:2 |
| 3:10 4:7,9 7:3,7 | 63:13,14,23 | 62:18 | **challenges** |
| 11:24 13:7,21 | 64:21 65:14,18 | **cautious** 32:14 | 111:20 |
| 15:8,18 17:3,8 | 66:19 67:16,23 | **caveat** 81:16 | **chance** 42:22 |
| 17:12 18:2,9,13 | 68:8,19,23 69:10 | **cell** 6:14 | **chances** 110:15 |
| 36:7 60:19 | 69:11,25 70:13 | **cellular** 6:12 | **change** 110:13 |
| 65:12 66:10,14 | 70:19 71:12,18 | **census** 34:10,11 | 124:18 156:11 |
| 76:24 77:4,10,25 | 73:7,9,17 74:2 | 97:12 157:11,12 | 208:14 226:8 |
| 78:4,7,10,20,24 | 74:22 75:11,17 | 157:18,20,25 | **changed** 44:23 |
| 79:4,10,10 85:18 | 75:20,24 76:6,20 | **center** 118:17 | 176:9 216:24 |
| 88:4 93:6,15 | 79:16,18,22 80:6 | 120:10 | **changes** 52:14 |
| 94:8 112:23 | 80:10,17,20,24 | **century** 116:21 | 111:17 116:17 |
| 117:9,20 118:20 | 81:7,13 84:11 | 119:3 191:12 | 128:25 130:8 |
| 119:20 121:9 | 86:17 99:17 | **cepeda** 2:19 3:24 | 142:11 156:9 |
| 125:15 137:5,19 | 112:13,14,14 | **certain** 22:6 | 175:25 179:2 |
| 140:16 142:20 | 114:12 115:4 | 50:22 172:20 | 180:17,22,25 |
| 169:8 175:18 | 120:4 127:2 | 219:9 | 186:11 189:12 |

**[changes - committee]**    Page 9

189:15
**chapman** 61:10
61:11 63:5
66:17
**characterized**
183:2
**charleston**
118:24 119:4,9
120:7 124:22
126:11,17,21
127:6,10,14,17
128:8,14,16,18
129:6 133:20
134:3,9,14,15
152:8 184:13
185:7 187:12,14
188:24 189:22
189:25 190:7
191:23 192:3,9
193:14,19,25
202:17 203:18
213:20,21,23
**charlie** 14:8
**charlotte** 125:21
**chart** 105:20
107:11 137:15
137:25 139:7
140:21 152:3
**check** 59:3
139:25 154:8
182:6,15
**checked** 82:5
107:23
**checks** 58:25
64:22 65:22
**chelsea** 202:12
**choosing** 207:4

**chose** 35:19
**chris** 3:7 159:17
**circle** 41:7
144:21 145:3
**cite** 32:17
**cited** 107:6
186:11 209:5
**city** 119:3 120:7
124:22 126:11
126:17 127:5,10
128:7,15,18
129:5 133:20
190:25 213:21
**civil** 2:12
**claim** 62:20 63:7
63:10 73:7,9,20
75:20 112:5,7
114:22 173:18
175:23 176:4
187:14 212:23
212:25 214:22
**claims** 62:5,8
63:2,3 111:23
174:6
**class** 75:5
**classes** 78:21
**classic** 35:12
**clause** 114:19
**cleaner** 198:15
**cleanest** 64:5
**clear** 10:6 28:11
33:9,17 37:7,7
40:16 53:21
56:22 57:16
79:7 85:13
87:15 99:21
109:16 110:16
132:24 140:20

142:23 145:18
190:4 220:4
**clearly** 10:15
37:15
**click** 39:7
**client** 63:22
65:25 66:23
75:2
**clinical** 159:8
**clonked** 213:14
**close** 42:23
44:12 46:7
71:18 108:19,22
109:7
**closely** 150:21
**closer** 58:18
**cluster** 63:22
**code** 20:11,23
21:5 38:5,6,14
39:12 90:4 97:5
141:9 178:8
179:15
**coded** 178:19
**codes** 185:23
**collect** 20:8 21:8
21:25 22:20
24:18
**collected** 20:14
21:12 86:12
**collection** 61:2
**colleton** 32:18
96:5 127:2
152:17,23
201:25 203:14
207:17
**columbia** 4:9 7:8
127:25 182:19
182:24 183:10

**column** 90:9
97:20,21 105:9
105:15,25 138:4
138:11 139:13
139:13,19,23
140:24
**columns** 98:4
105:7 139:10
**combination**
149:7,14 150:2
**combined**
127:24
**combining**
125:18
**come** 16:24
18:11 46:2
168:24 169:6,24
172:3 175:13,17
177:22 178:5,10
180:10 184:17
184:21 185:18
207:24,25
**comes** 59:3,5
77:19 86:22
144:12 168:25
205:21
**coming** 97:9
187:2
**command** 97:23
**commission** 4:7
8:13 60:16 61:6
64:11 218:16,18
226:25
**committee** 33:21
33:25 72:19,23
93:16,17 94:4
99:13 133:13
142:25

**[common - considered]**

common 60:23
62:18 143:11
157:7 158:2
186:17
commonalities
117:24
communicate
18:3
communicated
22:2,7
communications
21:20,23 23:24
communities
147:14 186:18
189:24 199:13
compact 121:16
135:6,7,13,17,22
135:23 143:17
145:16,21 146:2
146:7,12,17,18
146:22,23
compactness
135:2 143:12,20
143:21 144:5
145:20
compare 87:6
132:25 143:10
143:13
compared
117:15 121:15
121:20
compares 135:3
comparing
85:11 86:25
comparison 87:3
126:10 191:18
191:20

compensated
57:10
compensation
22:12 23:8 57:8
competitive
77:21
complaint 84:23
complete 10:25
15:25 29:13
30:3 32:4 37:3
55:15 195:14
210:4
completed 55:25
completely
112:15 120:2
121:15
completeness
33:12
complies 116:15
composition
197:13
computer 21:5
145:11
concept 102:14
161:14 200:24
208:16
concepts 62:12
concern 60:7
70:19
concerning
11:23 40:18
42:5 45:8 51:17
169:6 195:16
210:5
concerns 113:17
conclude 216:5
concludes
220:16

conclusion 91:18
130:4
conclusions
208:11
condition 11:5
conducted 33:20
confer 217:25
conference 1:6
1:16 7:4 8:3
confidence
161:10,13
163:12
confirm 128:11
conforming
138:17
conformity
189:16 190:15
cong 88:20
136:25
congressional
17:12,17,24 18:9
20:5,7 21:2,21
22:11 24:14,22
70:19 72:23
79:11 85:19
88:16,21 89:25
93:18 94:10,19
95:17 112:3,23
113:23 114:4,11
114:18 115:2,7
115:10,19,21
118:23 119:5
120:8 124:23
127:7,15 128:9
129:7,21 133:9
133:21 135:7,12
135:24 136:6,9
137:7,20 140:5

148:9 151:4,21
151:22 152:5,18
153:5 160:19
220:7 223:24
conjunction 13:8
13:22 14:13,21
51:25 54:21
connected 24:7
connection
24:13,21
consider 32:21
39:13 77:2 87:8
87:16,23 88:2,7
91:21 92:14
99:16 123:10
130:5 133:15
136:4 137:8,11
142:14 151:7
153:16,23
163:20 166:5
171:11 194:4
209:12,17
consideration
17:21 94:23
147:12,14
186:20 205:22
220:6
considerations
199:22
considered 20:4
22:15 23:11
32:5,9 36:11,17
37:10 38:7 39:3
39:4 55:15
87:17 93:21,22
115:20 133:2
142:20

considering
115:10 121:2,5,6
162:18
considers 201:12
203:24 209:13
consistent 57:4
107:14 116:21
120:6 130:5
140:15 189:4
191:12
consistently
214:12
consolidated
61:3,7,13 62:24
constituency
99:5 100:3,7,23
102:6,25 103:10
103:12 104:5,20
107:13 110:3
224:9,11
constituency's
99:22
constituted
115:3
consultant 72:8
contacted 165:8
166:6
contacts 14:25
contain 29:12
30:3,8 36:16
contained 23:10
33:14 89:19
95:3 190:24
contains 36:20
content 21:22
context 14:23
77:12 99:11
117:8 119:19

121:8 122:2
contiguity
200:23 209:12
209:17,23
contiguous
208:3
continue 6:18
continued 3:2
4:2 79:25 132:8
220:23
continues 175:12
continuities
124:8
contours 169:17
179:8
contributing
33:16
control 198:6
199:8,11 200:5
200:17 206:3
212:4
controlling
199:2 200:8
205:5 209:5
controls 200:10
200:20 205:2
conversations
6:12 82:21 83:4
convert 198:11
convex 143:24
convey 174:15
177:7 178:24
180:4 183:23
conveyed 174:24
cooper 190:6
192:3,8
copies 37:17

copy 6:3,3,6
18:20 26:9 28:2
53:11 56:20,21
57:14,17,23
84:10 113:9
core 89:15,22
91:19,21 92:7,15
92:19,19,24
94:18,25 95:2,16
95:23 96:8 98:9
98:11,13,20 99:4
99:21,22 100:3,6
100:10,22,25
101:20 102:5,12
102:15,24
103:10,12,19
104:5,6,9,13,19
105:3 107:13,13
115:18 191:11
199:11 212:17
214:4,13,25
215:6,10,12
216:7,17 217:5
217:15,19
224:10,12
cores 89:9,14
116:13,20
121:23
correct 9:13
17:18,19 18:10
18:14 25:7
29:24 32:2,3
37:13 39:25
40:20,21 51:3
57:12 59:14
70:8 71:11
74:16,17,20
93:23 98:14,18

98:21,22 100:5,9
100:13 103:17
103:20,21
104:17 105:6,13
105:19,23 106:5
108:8 109:19
115:12,17,25
116:5 119:6,11
120:9,12,25
127:2 128:4,5
129:8 133:3,4,6
133:7,17 140:7
141:16,19
142:22 143:3
145:17,23 146:4
146:9,14,19,24
151:18 152:10
152:16 155:11
160:15 176:15
176:16 189:7
195:23 202:22
203:3 209:8
211:11,15,16
212:12,22 213:2
correctly 109:6
171:22
correlate 200:4
correlation
205:19
correspond
137:19 139:7
correspondence
22:9 23:19
38:25
corresponds
100:18 151:4
counsel 7:2,17
12:24 15:12

20:13 21:15
23:9,14,25 24:3
24:8 26:23,24
27:2 28:19
37:20 38:17
39:2 43:21
45:17 47:9
56:20 60:14
69:12,13 83:22
141:10 178:9
180:14 184:3
189:10 195:17
210:9 217:25
**count** 9:23 71:25
196:17
**counties** 118:10
127:21 129:12
129:17,22,22
134:7,12 147:6
147:11 149:7,14
150:2 152:4,13
152:18 153:4,10
153:14,18,25
154:2 188:25
193:13 199:14
200:18 202:6,10
203:15
**country** 125:14
125:23
**counts** 199:4
**county** 32:19
96:5 118:10,22
118:24 126:20
127:2,14,14,20
128:14 129:12
134:7,17,22,25
147:9,24 148:6
148:11,17,23

149:2,4,20 150:6
151:14,16,20,24
152:6,8,8,9
153:8 154:4,7,9
154:20,25 155:2
155:11 167:24
168:23 169:6
170:8 171:2
172:7 174:8
175:10,11,13,23
175:24,25 177:3
177:9 178:2
179:8 187:13,15
188:19,20,22,23
189:22,25 193:4
193:9,14,19,25
199:19,20,22,24
200:24,25
201:10,11,12,17
201:18,25 202:5
202:9,13,14,19
202:21,24
203:14,18,20
204:8,10 207:13
207:17 212:19
213:4,8,10
219:11,15 222:7
224:16
**couple** 10:6
13:24 99:15
118:2 124:16
133:25
**course** 15:2
54:10 203:17
220:5
**courses** 78:9,13
**court** 1:2 5:18
7:6,12,18,20,25

8:21 10:10
32:17 50:19
60:4,10,12 72:4
78:2 81:4
111:18,22 122:2
122:9 147:13
221:2
**court's** 95:24
96:4
**courts** 121:5
211:24
**covington** 60:18
62:14
**create** 31:16
38:12 90:10,13
90:16 97:19,21
214:7
**created** 35:23
123:13
**creating** 94:9,19
**creative** 74:8,13
**creek** 171:4,4,7
190:8 192:4,10
**criteria** 77:24
93:18 94:4,8,18
148:5 149:8
151:20,23 191:5
199:9 209:14
212:10 216:2
217:8,9
**criticism** 198:20
198:23
**criticisms** 43:13
43:25 44:15
45:21 46:16
47:2 196:13
**criticizing**
198:24

**critique** 219:22
**cross** 41:13,20
44:9 46:10
**crow** 120:20
**crum** 4:11 8:12
218:17,17
**cunningham**
109:3,11
**current** 8:25
213:22
**curriculum**
51:20 56:24
223:19,20
**customer** 66:17
**cuts** 144:24
**cutting** 58:25
**cv** 1:4 51:2,6,9
51:10,14,24 52:4
52:6,11,25 53:9
54:16 56:21
59:17
**cycle** 16:12,17
17:13 63:20
71:22,22 77:22
123:11 124:19
126:5
**cycles** 124:16
**cypress** 161:21

**d**

**d** 8:16 9:12
61:16 69:14,15
132:5 159:18
**d.c.** 2:8 3:20
**dale** 14:20
**daniel** 71:5
**data** 20:4,17,23
21:4,6 22:14

**[data - dichotomous]**

23:11 34:12
36:17 38:12
39:2,20 86:4,8
86:10,19 90:8
97:11,12 103:20
107:6,9,10
128:20 141:5,9
144:10 150:20
156:18,25 160:3
160:22 161:2
162:17 169:2
175:5,15 177:22
178:7 179:12
180:10 184:9
185:17 201:4
208:23 217:15
**date** 18:24 26:8
27:22 51:22
52:8 55:18 57:2
57:22 59:14
80:4,5 88:18
93:9 99:7 103:3
113:14 136:19
148:3 150:16
158:22 159:2
164:7 167:2
169:23 222:14
226:6
**dated** 26:6 27:21
166:22 223:15
223:17 225:5
**dates** 24:15,23
187:3
**david** 4:16 7:10
71:3
**day** 3:16 43:7
59:5 165:25
221:15 222:21

226:23
**days** 19:15 99:15
**decade** 15:2
**decades** 123:8
123:24
**december** 88:9
133:14
**decennial** 34:11
**decide** 73:19
193:25
**decided** 50:10
**decision** 72:9
113:10,12
114:24 115:11
201:23 224:13
**decisions** 32:18
32:19 95:24
96:4 203:24
**declined** 80:21
**decrease** 198:3
**decreased** 154:5
**deep** 202:13,20
203:20
**defendant** 2:14
22:4 24:8 64:10
**defendants** 1:12
1:20 3:6,17 4:6
8:9,11,13 21:20
22:3,10 24:8
27:3 64:4,9,13
65:16 80:15
218:15,16,18,22
**defense** 12:24
23:25 24:3
55:13,17
**defer** 218:14
**defined** 85:25

**definition** 77:7
138:17 139:9
**degree** 160:5
163:14
**delamars** 159:18
162:3
**delaware** 6:24
9:2 12:11
**democrat** 109:2
**democratic**
109:25 110:4,12
180:19,24 181:4
181:5 214:5
215:3 216:8
**democrats** 66:5
110:13
**demographic**
103:20 107:9
108:6,10 136:5
**demographics**
104:4,9,11,19
108:12 142:12
171:11,12
**dennis** 14:2
**denominator**
98:8 101:11,17
102:3
**depends** 110:2
**deposed** 11:17
11:19,25
**deposition** 6:4
6:17,21,23,25
7:21 9:19 10:5
10:11 11:23
12:6,8,15 18:20
18:23 19:8
25:18,21 27:4
31:4 32:12

38:23 55:12,21
79:18,22,25 80:6
82:19 83:6,20,25
84:5,7,16 85:4
107:9 143:5
150:23 167:5
210:17 223:14
226:6
**depositions**
11:22 12:4,5
196:5
**derieux** 2:19
3:24
**describe** 189:12
**described** 57:5
97:4,16 98:17
101:13 107:15
141:7 169:2
**describing**
173:14 188:5
**description**
173:11 223:13
224:4 225:4
**descriptions**
173:13
**desktop** 12:17
**despite** 116:17
**determine**
156:20
**developed** 88:5
**development**
162:20
**diamaduras**
3:13 6:2 8:10
218:20,21
**dichotomous**
197:7

**dickson** 60:17 62:13 69:14
**dickson's** 70:8
**difference** 36:5 100:15 141:20 142:4 219:18
**differences** 90:20 125:13 173:14
**different** 15:5 35:10,22 61:23 65:19 101:5,12 102:14 110:14 115:9 118:23 122:21,22 123:16 124:15 126:20 134:8,14 165:8 202:2 214:3
**difficulty** 34:18 63:25
**direct** 18:7 41:22 42:2 90:19
**direction** 53:2
**directly** 70:24 71:13 74:3 165:12 169:7 175:17 178:11 184:22
**disaggregating** 161:2
**disagree** 122:3
**disagreement** 209:19
**disastrous** 185:11
**disciplines** 50:18

**disclosed** 16:6 83:23
**disclosure** 28:21 28:24
**discount** 73:4
**discovery** 189:9 214:14
**discuss** 79:15 80:9 83:19 122:6 129:10 153:10 194:8
**discussed** 16:22 17:24 85:2 109:17 115:13 134:10 178:25 185:23,24 203:19
**discussing** 36:21 137:8 181:25
**discussion** 15:10 19:16 50:23 59:10 154:24 187:20 188:8 189:14 190:19 193:23 219:12 219:16 220:21
**discussions** 15:7 17:2,5 79:24 83:17
**disked** 211:13
**dispersion** 177:15
**disproportiona...** 153:24
**dispute** 58:19 106:10 107:20 108:18 111:9 158:9

**dissertation** 55:13
**distancing** 7:24
**distinctive** 202:25
**distinguish** 204:13
**distorted** 121:20
**distribution** 214:3
**district** 1:2,3 7:6 7:7 89:11,12,19 89:20 90:14,17 90:21,22,24 95:17 96:17 97:20,22,25 98:3 98:12,20 100:2,4 100:7,11,18,23 101:9,11,15,16 101:18,25 102:10,10 103:11,13,24,25 104:16,24 105:3 105:11,17,22,22 105:25 106:3,3,7 106:7,9,9,17,22 106:24 107:2,2,3 107:3,23,25 108:15,16,20 109:22,22 110:7 110:8,14 113:23 114:3,4,12,25 115:2,7,10,14,15 115:16,16,19,21 116:13,20 117:19,21 118:9 118:19,24 119:5 119:8,9 120:8,10

124:24 125:16 125:18,24,25 126:11,20 127:7 127:15,19 128:9 129:7,10,14,21 133:21 134:6,8,9 134:18,20 135:6 135:11,13,21,22 138:25 139:14 140:4 141:13 142:9,21,25 144:22,23,24 145:3,16,19,21 145:22,24 146:2 146:3,5,6,8,10 146:11,13,21 148:10 150:13 151:3,13 152:12 152:13 155:20 155:23 157:2,3 157:14 158:6,6 159:23,24,25 160:20 161:18 162:9,9 163:3,3 163:4,5,9,9 169:13,16 170:11,11 171:17 172:8 176:15 177:3,12 177:13 178:21 178:22 179:23 179:25 180:20 182:2,21 183:19 183:20 186:7,10 187:4 189:15,16 191:2,10,15 192:6,6,11,12 193:5,10 194:6,6

**[district - duchin's]**    Page 15

196:24 197:17
197:23,24 198:4
199:19,23 201:6
201:7,13,14,25
203:8,13,15,25
204:2,16 205:14
205:15 208:4,20
213:22 214:6
215:4,11,17
216:9,18 224:18
**districts** 17:13
18:4,8 79:11
85:19 89:10,13
94:5,10,20 96:16
96:21,22 97:19
112:25 113:22
116:3,19 117:10
117:14,25
119:19 122:22
124:12 125:11
126:7 130:4
137:16,20
140:17 142:10
143:10,11 144:7
145:8 146:16,16
146:22 149:19
150:6 152:7
158:8 159:13
170:25 171:14
177:2 184:2
185:6 187:6
190:15 196:25
197:14 200:3
214:12 215:6
216:16,18 220:6
**divide** 90:25
**division** 7:8

**divvying** 213:20
**document** 19:17
19:18 25:3,25
32:12 38:24
51:18 93:4,11
94:24 95:3,4
98:24 99:8
136:20 137:5
147:25 150:24
158:23 164:12
164:12 165:19
166:20 167:6,14
**documents**
12:20,21 20:2,3
20:9,23 21:8,12
21:19,22,25
22:20 23:7,10
24:18 31:20
33:2,3 36:16
38:18,23 82:23
137:2 166:12
**doing** 15:5 29:5
123:14 138:24
144:19,20 158:2
214:10
**doj** 126:3,5
138:11,17 139:9
139:15
**dorchester** 152:8
188:24
**double** 22:13
82:5 139:25
**doubt** 15:24 40:5
42:2 48:18
**downloaded**
38:21
**downtown**
182:19,24

183:10
**dr** 36:22,23
37:11,11 38:5,6
38:14,20 39:8,9
39:11,12,12,24
39:24,24 40:8,9
40:9,13,13,13,15
40:19,19,20,25
40:25 41:2,2,5,6
41:6,10,10,10
42:5,11,17,20
43:2,3,9,13,14
43:23,25 44:16
44:19,24 45:3,5
45:8,19,22 46:3
46:5,17,23 47:3
47:16,17,19
48:11,17 49:5,8
49:10,13,17,20
49:23,23,25
91:24 112:14
113:19 114:7,10
195:12,16,21
196:3,13 198:5
198:19 199:7
200:22 203:5,10
203:12,23 204:4
206:20 209:18
210:2,6,12,16,22
211:12 212:3
214:7 215:11
216:17 219:21
**draft** 42:2 88:3
149:12 163:20
**drafts** 23:3
26:22 27:5
28:18,23 29:3

**draw** 17:20
62:10 63:8
126:6 173:4
175:6 189:10
204:23 215:9
216:14
**drawer** 173:16
**drawer's** 173:19
174:7 189:7
**drawers** 172:21
172:22,22,25
173:2,6 174:3
188:18
**drawing** 63:6
82:4 113:22
161:12 165:2
174:7 205:23
214:2,25 215:17
217:18 220:6
**drawn** 18:4,9
94:6 117:12
119:20 121:9
124:9 125:12
173:4 174:6
184:3 190:15
217:18
**dressman** 61:11
**drew** 172:23
**dropping** 216:16
**duchin** 39:24
40:8,13,19,25
41:5,10 47:17
48:17 112:14
**duchin's** 42:5,11
42:17,20 43:2,3
43:10,13,14
44:24 48:11

due  7:20
duly  8:18 132:6
  222:13

**e**

e  2:2,2 3:2,2 4:2
  4:2 8:16,16,16
  9:12,12 61:16,16
  61:20,21 69:14
  118:17 132:2,2,5
  132:5,5 159:17
  159:17,18
  167:16,16 222:2
  223:11 224:2
  225:2
earlier  40:23
  75:25 89:2
  104:25 115:13
  126:19 130:13
  133:15 155:19
  189:5 191:8,9
early  45:6 46:24
  119:8 122:10
earth's  34:19
easiest  59:23
  60:8
easter  26:18
easy  156:23
edges  144:23
  206:17
edisto  208:2
editing  142:2
edits  27:10,12,14
  29:7
educational
  54:17
effect  5:16 85:20
  85:21 86:2

emphasizes
  92:12
employed
  222:18
employees  169:7
  175:18 178:11
  184:22
enact  135:14
  145:25 146:11
  147:5 152:12
enacted  85:14,15
  85:15 86:6,25
  87:9,10,22 89:8
  89:22 103:5
  111:16 115:8
  128:23,25 129:5
  130:8 135:3,25
  140:16,25,25
  141:17 143:9
  144:6 145:20
  146:6 147:7
  151:17,23,25
  152:17,21 153:3
  153:12,18
  154:21,22
  155:10,13,21,22
  158:4,6 159:9
  170:5 172:13
  182:4 202:8
enactor  173:16
ended  45:25
  46:13,20 83:13
engaged  65:20
  217:4
engagement
  65:8 67:19 69:2
  70:16 71:16

effects  76:9
efficient  198:13
efforts  94:16
eight  151:14,16
either  31:13
  72:12 123:10
  181:2 193:22
  196:2
elderberry  9:2
elect  125:25
  126:7
election  4:7 8:13
  48:7,22 85:21
  109:2 218:15,18
elections  50:14
  50:15 108:20
electronic  6:3
  21:3 221:4
electronically
  225:10
elicited  81:18
eligible  110:19
  110:24 153:24
elizabeth  4:11
ellis  140:18
email  22:9 37:24
  38:2,17 53:7,11
  164:4,14,16,21
  165:24 166:22
  167:10,12
  224:23 225:5
emails  22:22,23
  22:24 164:21
embedded  145:5
  145:10
emphasize  147:8

engagements
  66:14
ensembles  214:7
ensure  140:2
entire  113:5
  193:4,9 204:18
  204:18 205:14
  207:11
entirely  12:2
  184:8
envelope  200:24
  201:11,17
envision  29:18
  30:12
equal  114:19
  120:23 149:8
  150:3
equally  200:25
  201:19
equivalent  204:2
  207:14
era  120:20
erase  124:10
errata  226:2
error  160:7
  161:4,8
especially
  177:16
esq  2:9,19,21
  3:13,22,24 4:11
essentially  72:8
established
  123:5 143:5
estimate  29:6
estimates  161:5
et  1:7,11 7:4,5
  226:5

etcetera 156:2
etch 124:10
evaluated
  126:25 128:4
evaluating 78:16
evidence 214:23
  216:19
exact 52:8 69:7
  110:2 154:14
exactly 29:15
  64:6 92:5 149:8
  149:15 150:3
  157:3 160:10,14
  203:23 204:3
examination
  1:18 5:14 9:4
  41:20 132:8
  218:24 223:7
examine 75:23
  150:21
examined 8:19
  200:13
examining 76:14
example 64:8
  87:14 88:2,8
  106:23 207:16
exchanged 21:20
  26:22 28:18
exclude 206:22
  206:25
excluded 81:4,12
  82:11 123:2,20
excluding 72:3
  123:18
exclusive 94:14
exercise 40:3
  63:6 161:15

exhibit 18:16,20
  18:23 19:7,12,24
  25:24,25 26:3,4
  26:7,13 27:18,21
  27:25,25 28:12
  28:15,20 31:19
  36:12 51:19,21
  51:24 56:7,23,25
  57:18,19,21 59:7
  85:7 88:15,17
  93:5,8 99:3,6
  102:22 103:2,4
  107:12 108:13
  108:13 113:11
  113:13 116:11
  133:8 136:15,17
  140:10 144:2
  147:20,23,25
  150:12,15
  158:18,21 164:6
  166:21,24 167:9
  168:21 172:17
  195:10 220:3
  223:13,14,15,17
  223:19,20,22,24
  224:4,5,9,11,13
  224:14,16,18,21
  224:23 225:4,5
exhibits 12:16
  18:25 19:13
  29:12 30:3,8
  31:4 82:24
  150:22 167:5
  225:10
exist 201:14
existed 97:25
  163:24

exists 208:21
exodus 108:14
expect 54:17
  148:11,12
expected 54:24
  130:13
expense 24:6
experience 43:18
  45:14 47:7 50:9
  57:6
experiencing
  11:5
experiment
  18:16
expert 26:6,14
  33:2 41:5 45:13
  49:2 52:13 59:9
  60:14 69:4
  71:23 73:16,23
  74:19 77:3,7,25
  78:3 79:16
  80:10,20,24 81:2
  82:14 211:8,14
  223:15
expertise 48:9
  50:6,8,13 189:21
experts 31:10
  36:22 39:23
  47:11 80:17
  82:21 86:13
expires 226:25
explain 101:4
  121:3
explained 157:7
  157:9
explanation
  100:21

explanations
  205:3
express 29:21
  42:16 43:8 50:4
  139:2 195:20
  210:12
expressed 36:18
  39:14 45:7
expressing 30:12
  172:24 189:6
extensive 211:2
  211:6
extensively 79:7
extent 18:11
  31:6 41:13
  47:18 48:3
  204:22 205:18
extremely 38:10
  77:17
eyeballing 125:2
  135:5,10,19,23

**f**

f 114:10 118:17
  132:2 222:2
fact 8:4 59:4
  65:17 74:18
  162:20 204:13
  214:14 215:6,16
  216:15 217:12
factor 33:16
  75:9,16 113:21
  205:25 217:19
factors 73:17,25
  74:6,15,20,24
  207:19
facts 20:4 22:13
  23:10 36:16

**[failed - four]**                                                                 Page 18

**failed** 199:8,10
**fair** 14:19 40:6
  55:11 73:24
  76:4 82:8 94:7
  102:16 108:23
  112:21 124:20
  148:18 166:2
  212:16
**familiar** 9:25
  47:19 48:10
  49:4,13 73:12
  88:10 108:19
  137:24 138:19
**far** 25:6 31:8
  128:7 162:15
**fatally** 208:18
**favorable** 16:13
**favorably**
  143:10,14
**feature** 212:20
  213:8
**february** 51:7,16
  51:25 54:22
  196:4 210:17
**feedback** 188:10
**feldman** 74:22
  75:10 81:16
**fewer** 150:4,5
  151:16,24
**field** 86:13 160:6
  162:24
**fields** 50:6,8,18
**fiffick** 14:6
  164:15,17 166:7
  167:11
**fifth** 24:4 143:8
**fight** 82:9 214:20
  215:23

**figures** 69:6
**file** 89:25 90:7,9
  90:11,11,13,17
  165:22 166:3
  167:15,17 182:8
  182:13 184:9
**filed** 7:5 20:11
  28:7 40:8,13
  51:24 54:25
**files** 34:15 97:4
  97:11 98:16
  141:7 144:13,16
  144:17 145:6,9
  156:17 167:17
  169:2,24 175:6
  175:15 177:23
  179:13,14
  180:11,13 181:8
  185:18,20,21,21
  185:22 186:21
**filing** 5:6
**fills** 145:3
**filter** 112:15
**filtered** 22:22
**finalized** 28:25
**financially** 7:16
**find** 75:11
  149:13
**fine** 221:4
**finish** 11:13
**fire** 109:5
**firm** 7:11,13
  67:9,10 69:17,18
  70:8
**first** 8:17 10:7
  18:16 20:2
  21:10 24:23
  59:13 79:15

95:18 96:14
  118:6 119:8
  120:15 122:8,14
  127:6 128:8
  129:6,20 133:20
  134:4 140:12
  149:12 150:17
  151:6,11 155:23
  156:10,11
  159:11,13,24
  161:17 168:23
  182:17,25
  186:10 187:4
  195:13 196:15
  201:25 214:6
  215:3 216:8
**five** 27:9 29:6
  47:11 69:5
  89:12 91:4
  168:7 176:9
  197:19,25
**flat** 34:21,25
**flawed** 208:18
**flip** 206:14,15
**flipping** 206:18
**floor** 2:16
**fly** 42:13,18 44:6
  45:24
**folder** 12:16
  19:14
**follow** 190:10
  193:3,8
**followed** 74:12
**following** 169:17
**follows** 8:19
  132:7 191:22
**force** 5:16

**foregoing**
  222:13,14
**form** 5:11
**formal** 77:24
**forman** 4:5
**former** 98:7
**forming** 22:15
  22:18 23:11,16
  32:5,23 36:17
  133:16 137:9,12
  163:19 217:7
**formulating**
  32:2,9 37:12
  38:7 39:14
  153:16
**fort** 181:11
**forth** 29:22
  30:25 31:9 94:4
  104:12 107:4
  156:3 195:22
  206:19 210:13
  219:8
**forward** 53:10
  53:13 119:12
  122:5 125:4
  126:23 208:17
  217:13
**forwarding**
  164:15,16
  165:20 167:11
  167:12
**found** 78:3
**foundation**
  28:11
**four** 143:11
  144:8 145:15,20
  145:25 146:6,11
  146:21 152:13

171:12
**fourth** 22:8
100:2 117:21
148:25
**framing** 20:5
190:12
**frankly** 208:14
**freedman** 2:9
8:6 9:5,7 18:15
19:4 26:3 27:16
51:18 52:23
53:15,18 56:3,19
57:13 88:14
93:3 99:2
102:21 113:8
130:12 132:9
136:14 147:21
150:10 158:13
158:17 163:25
164:10 166:19
168:6,9 188:9
192:17 194:11
194:18 217:23
218:8 219:8
223:8
**front** 26:10 28:3
219:5
**full** 9:9 10:25
11:6 182:17
194:15 195:14
210:4
**fundamental**
209:19
**funded** 64:25
66:9
**funding** 64:20
67:15 68:18,22
70:4,12

**funny** 149:5
**furnish** 53:4
**further** 5:9,13
132:7 218:9
220:12 222:17
**future** 46:5

**g**

**g** 61:20 159:19
**gain** 101:25
**gathered** 20:11
**gears** 111:11
132:23 146:25
155:14 163:18
168:3,3 194:9
**general** 47:21
64:17 71:2,7,8
96:2 113:20
212:14 217:10
**general's** 70:25
71:13
**generally** 48:12
78:15 109:25
111:16 143:16
145:11 172:6
**generate** 169:21
175:2 177:19
179:9 180:7
184:5 185:14,18
**geographic** 90:8
189:17 190:16
191:3,4,15
192:11
**geography** 77:3
77:9,17,25 78:4
78:8,11,17,20,24
79:5 157:11
180:6 183:25

189:22 190:6
205:21
**georgia** 118:10
118:20 127:21
129:12,17,22
134:7,13
**gerrymander**
112:24
**gerrymandering**
50:15 59:22
60:5 62:6,12,14
62:15,20,25
63:10,19 73:7
111:19,23 112:5
113:18 114:5
115:3 211:14,21
**gerrymanders**
62:11
**getting** 16:12
123:21 164:20
167:4 187:17
188:10
**gibhans** 159:18
159:19
**give** 10:24 13:10
13:24 15:24
27:8 38:10
42:24 44:6,12
46:7,14 47:17
63:25 77:8 82:5
91:2 107:18,19
119:18 121:7
160:4 164:8
180:5 196:2
**given** 42:8 44:21
76:16 110:11
160:20 205:7
220:16

**gives** 95:15
177:14 179:24
**giveth** 102:8
**giving** 11:6 74:5
112:10 160:8
**go** 6:19 33:13
35:2 36:10
42:19 43:18
44:19 48:8 95:8
95:10,22 105:7
105:14 106:13
114:6,15,16
119:3 125:5
130:15 133:8
143:6 153:10
188:9 194:16,19
194:20 205:16
207:16,20
217:24 218:16
**goal** 72:13
**goes** 49:2 74:11
76:9 128:13,15
178:3 201:5
202:13,16,20
203:19
**going** 6:8 18:19
26:4 27:16
42:23,25 46:18
50:19 56:4,10,23
57:16,17 74:9
77:20 83:3
85:20 91:8
102:2 103:18
111:12 118:4
119:7 130:3,19
141:24 142:15
144:3 162:19
168:12 175:22

188:12 189:9
194:9,12,23
208:17 210:9
211:4 213:8
214:21 215:24
218:4
**good** 6:7 9:6
38:9 113:2
130:14 168:2
174:17 204:25
**gore** 3:22 6:5 8:8
17:14 19:10
21:14 22:4,23
23:2,20,23 24:20
26:24 27:3
28:22 29:7,16
37:23 50:21
52:24 53:6,17
73:19 75:18
79:20 80:8,11
82:22 83:4,5,16
83:21 164:8,11
218:13,23,25
220:12 221:2
223:9
**gotten** 86:7
140:17
**government's**
7:23
**graduate** 55:2
**graham** 61:25
63:16
**gray** 169:13,17
**great** 53:5 138:9
188:3
**greatly** 197:14
**green** 177:11
178:20 202:2

**greenland** 35:17
**greenville** 3:10
117:22 125:19
**ground** 10:2
**group** 16:11
**guess** 18:13 52:2
74:7 77:22
78:12 80:2
91:20,24 135:15
176:16 211:5
213:6 214:13
**guessing** 125:2
**guide** 94:5
**guideline** 215:7
216:12 217:5,14
217:21
**guidelines** 93:7
93:18 94:2,15,17
95:25 147:16,18
186:13,15,24
191:6 212:10,15
220:2,5 224:5

## h

**h** 60:22 61:16,16
61:16 159:17,19
223:11 224:2
225:2
**h18** 139:20
**half** 194:17,19
**hall** 61:9,9 62:24
188:19,20,22,23
**hampton** 173:7
**hand** 144:15
145:8 222:21
**happen** 201:9
206:21

**happened** 21:11
23:18 97:15
123:8,24 132:19
133:24 172:2
173:11
**happy** 53:9,12
**harbor** 190:7
192:4,9 202:17
**hard** 135:19
**harkenrider**
61:15 63:9 68:6
**harper** 61:9
**hayes** 92:6
**head** 96:10
181:15 213:15
**hear** 187:24,25
**heard** 73:10
**hearing** 33:7,13
33:19 34:9
**hearings** 33:20
34:2,5,10
**heart** 202:13,20
203:20
**hedged** 134:2
**heights** 73:9,13
73:16,25 74:6,15
74:19,24 75:8,16
76:13
**held** 1:21 6:21
112:11
**help** 26:21 28:17
110:5
**helpful** 31:7
53:14 75:12
122:5 150:9
**hereof** 222:20
**hereto** 5:6

**hereunto** 222:21
**hey** 204:14,16
**hide** 158:12
**high** 89:8 91:21
92:8,8,10,15,19
92:24
**higher** 102:11
105:4 142:21
214:4,13,25
215:10 216:7
217:15
**highlighted** 19:2
**hill** 159:16,17,22
161:24
**hired** 64:6
**hispanic** 105:9
138:16 140:3
**historical** 117:8
118:4 119:19
121:8 127:12
133:19 134:10
**historically**
117:2 119:2
121:10 127:19
**history** 76:15
87:11 125:10
**hoc** 93:17
**hochul** 61:15
63:9
**hold** 171:5
192:24
**holtzman** 15:12
**home** 12:10 91:5
168:10
**honestly** 123:19
**hook** 202:25
205:15 212:19
213:3 219:11

**hopefully** 168:10
**hopped** 120:3
**horrifyingly**
  121:20
**hour** 56:4 57:10
  83:12 194:17
**hourly** 24:10
  25:2
**hours** 42:25
  44:18 58:5,11,15
  58:22
**house** 3:6 8:11
  34:5 51:8,17
  52:2 54:23
  79:18,22 80:6
  84:11 88:4,8,16
  88:20,21 93:7,15
  94:8,17 99:4,23
  100:22 101:7,22
  103:16 113:22
  114:18 115:23
  133:5,10,12
  135:12,24 136:7
  136:9,25 137:5,7
  137:12,21
  142:24 150:13
  150:20,25 151:4
  151:21 152:5,19
  153:5 158:19
  159:7 186:21,24
  191:6 198:20
  212:10,14
  216:24 217:9,14
  218:15,21
  223:24 224:9,18
  224:21
**hub** 86:8,10
  97:11 107:10

**hull** 143:24
  156:18
**hundred** 191:14
**hundreds** 35:20
  121:24
**husted** 81:25

**i**

**idea** 41:11 68:11
  166:10 198:17
**identification**
  18:24 26:8
  27:22 51:22
  57:2,22 88:18
  93:9 99:6 103:3
  113:14 136:18
  148:2 150:16
  158:21 164:6
  166:25 223:12
  224:3 225:3
**identified** 32:10
  50:8 62:4 95:23
  208:8
**identify** 22:13,16
  24:10 33:6
  44:15 46:16
  59:21 94:17
  207:8
**ii** 22:13 85:17,25
  114:17 159:17
  159:19,22
  161:24 170:20
  176:13,22
**iii** 22:16
**illustration**
  183:25
**imagine** 144:21

**imai** 36:22 37:11
  38:20 47:16
  210:2,6,12
**imai's** 38:5,6,14
  39:8,11,12 47:19
  210:16,22
  211:12 212:3
  214:7 215:11
  216:17 219:21
**impact** 109:20
  208:11 209:7
**implications**
  162:22
**important** 62:12
  77:17,19 205:22
  216:13
**impressions**
  44:11
**improve** 110:14
  187:5
**improves** 186:6
  187:9
**improving** 186:9
**inaccurate** 35:18
**inactive** 85:11
  132:25
**inaudible** 160:12
  188:7,21 192:13
**inbox** 22:21
**inclined** 44:11
**include** 37:4
  43:17 52:19
  54:12 82:13
  122:8 176:19
  185:9 193:18,21
  194:2 203:7
  208:8 220:24

**included** 29:19
  30:13 33:11
  90:3 122:11
  123:17 179:20
  204:15,17
  212:10
**including** 21:2,4
  24:9 158:11
  174:2 201:24
  208:13
**increased** 154:5
  197:21
**incumbency**
  94:23 186:20
**incumbent**
  186:22
**indentation**
  181:21
**indention** 181:21
**independent**
  60:15 196:22
**index** 223:2
**indicate** 57:9
**indicated** 222:14
**indicates** 172:18
**indicia** 82:6
**indirectly** 169:7
  175:17 178:11
  184:22
**individual** 144:7
  204:8
**individuals**
  47:12 80:16
  111:8 142:6
  174:22
**inference** 173:5
  215:14

**[inferences - keeping]**                                                    Page 22

inferences  174:5
  189:10 204:23
  216:14
infirmities
  196:15
infirmity  196:15
information
  24:9 32:22
  38:12 96:25
  137:15,25
  144:10 156:15
  189:19
informed  43:15
  83:23
initial  28:7 32:10
  39:18 40:17,19
  41:15 80:4,5
  167:3 195:24
  210:8
inputs  216:3
inquiry  92:2
insanely  149:13
insert  200:23
insight  180:5
instances  82:17
institute  60:20
  62:17
institution  54:13
institutions  54:7
instructed
  104:18
intact  121:23
  191:23 199:14
  199:23
integral  63:13
integrated  63:7
intend  29:14
  30:9,17 40:7

41:3 184:4
  195:15 210:5
intended  94:13
  96:19 106:19
  178:23 183:22
intending  156:4
  174:14 180:3
intends  29:16,17
intent  76:5,10
  162:16 172:25
  173:19 174:7
  183:4 189:7
intention  41:16
  195:25
intentions  31:17
  42:3 76:24
interest  33:12
  122:18 147:15
  186:16,18
  189:24 199:13
interested  7:16
  123:7,23 165:9
  214:15 215:21
interesting  117:7
  121:7 122:2
  196:9
interfere  6:16
interference
  6:13
internet  82:3
interpret  21:6
  138:7
interpretation
  112:11
interpreting
  141:12
intrinsically
  101:23 102:8

introduce  18:19
  26:4 27:17
  29:16 51:19
  56:23 57:17
  93:5 99:3
  102:22 113:11
  147:22,23
  150:12 158:18
  164:3 166:21
introduced  19:7
  19:17 27:24
  51:23 147:20
intrudes  126:16
invalid  201:17
inverse  143:23
invoice  24:19
  25:5,6,14 38:3
  57:15,20 58:4,9
  223:22
invoices  24:5
  68:14 70:10
involved  62:5,9
  62:20,21,25
  70:21 164:25
  165:14,15
involvement
  24:13,22
issue  60:5 203:5
  207:12
issued  25:6
issues  202:2
item  20:9 21:8
  21:25 22:8,20
  24:18 148:5

**j**

j  167:16

jackson  181:11
james  3:8
jason  15:13
jasper  152:18,22
  152:23 188:25
jay  13:18
jealous  217:11
jessamine
  167:15,17,19
jim  120:20
job  151:22
joe  109:2,10
  156:25 157:17
jogs  13:11,25
john  2:9 3:22 9:7
  53:6 164:8
jones  3:16 59:5
jordan  3:7 13:18
judge  75:11 82:2
judiciary  33:21
  33:25 93:16
july  1:14 6:9
  33:21 226:6
june  196:4
jurat  220:24
jurisdictions
  15:21,23 16:21

**k**

k  8:16 61:16
  69:15 132:5
katie  109:4
kaye  2:5
keep  68:17
  194:11 201:23
  203:24
keeping  122:19
  199:13 200:18

**keeps** 126:11
127:5 128:7
133:20 134:17
134:21
**kentucky** 70:18
70:19 167:24
**kept** 119:4 120:7
124:23 127:24
134:13 191:23
199:19 200:4,5
201:5,6
**killed** 69:3
**kincaid** 14:16,17
16:20,22 17:3
164:17,24 166:6
167:13
**kind** 35:15 55:7
72:14,21 92:3
117:10 123:4
124:10,16
141:23 161:10
217:11
**kirkland** 140:18
**know** 11:10,17
14:17 15:25
16:7 17:14
20:14,19 21:15
21:24 22:2
23:18,20 24:2,17
27:2,7,12 28:23
29:15 34:8
40:11,12 41:24
43:3 47:10,14
55:10 59:4
61:18 62:11,16
63:4 64:5,7,8,18
64:20,24 65:4,6
65:9,18,20,24,25

66:3,7,8,12,18
67:2,3,14 68:6
68:17,18,21 69:7
69:12,16 70:3,4
70:11 74:4,12
75:19 76:14
77:5,19 80:15,18
80:19,22 90:6,20
92:5,5,7 94:11
94:13 95:12
112:21 113:3,5
117:23 120:14
121:20 122:22
124:25 125:18
126:2,4,8 128:13
128:14,17,21
132:18 135:2
136:24 138:14
145:4 148:12
154:14 156:24
157:3 160:17
162:13,19
163:23 165:5,12
166:14,15
172:10,14,14
174:18 176:21
176:24 178:25
181:14 182:7,23
183:7,9,13 184:3
189:8 190:2
191:7 192:18,21
192:25 195:17
196:22 197:4
198:8,10 206:5
206:15 207:18
208:12,14 210:8
213:9 215:11
217:17

**knowledge** 18:7
28:22 32:11
163:16 166:11
167:18
**konstantine** 3:13
218:21

### l

**l** 5:2 41:6 60:22
61:16,20,21
159:18
**labeled** 88:20
102:25 136:17
138:11 139:19
150:14 158:20
164:5 165:20
166:24 224:7,15
224:16,19,22,25
225:8
**labels** 185:10
**laid** 196:21
**lake** 170:20
**lamone** 61:21
63:14
**language** 54:23
55:5 191:10
203:9
**large** 161:19
211:5 216:11
**largely** 117:15
**larger** 145:15
**latest** 52:3
**latitude** 36:7
**law** 67:9 112:13
**lawyers** 64:15,18
65:17,19,21
214:21

**lead** 216:4
**league** 61:5
63:21
**leaning** 180:19
180:24 181:4,5
**left** 172:10
182:14
**legal** 74:8 76:11
77:5,6,6,12
112:10,16 114:9
173:5 215:23
226:3
**legislative** 13:21
34:5 61:24
75:23 76:3,5,15
86:17 87:18
88:4 93:19
113:3 130:6
133:3 162:16
163:21 186:9,14
187:8 217:11,21
**legislator** 214:23
**legislators** 64:16
130:7 214:2,9,25
216:6
**legislature** 13:7
18:2,13 142:20
162:17 169:8
175:19 178:12
184:23 187:3
**legitimate** 200:3
209:13
**lengthy** 44:4
**letter** 90:5
**level** 47:13,15
69:18,19 89:21
**levy** 1:22 7:13
222:10,25

**lexington** 199:19 199:22
**liberties** 2:12
**liberty** 173:7
**lightning** 149:10
**limestone** 176:13 176:22,22 190:20,20,22
**limit** 202:5,9
**limited** 24:9 114:14
**lincoln** 159:19 162:5
**line** 36:3 63:24 90:10,13,16 92:2 100:3 123:22 148:25 169:12 174:8 176:17 189:16 226:8
**lines** 106:18 112:3 121:12,14 121:16,17 122:16 155:21 169:13,16 177:12,12,13,13 178:20,21,21,22 179:23 180:2,17 183:19 190:14 191:22
**list** 15:25 31:24 32:4 36:16 46:2 46:14 59:13,21 93:20 94:14 159:12
**listed** 33:15,23 52:17 81:15 93:20 94:21 178:7

**lists** 182:8
**literature** 92:18 92:23 201:16
**litigation** 72:11 72:13
**litigations** 72:7
**little** 56:4 59:24 111:12 132:24 152:2 156:10 157:5 163:19 185:25
**liu** 39:24 40:9,13 40:19,25 41:6,10 43:23,25 44:16 45:3 49:23
**liu's** 44:19 45:5 45:8 49:13,17,25
**live** 41:25 170:3
**lived** 163:8
**lives** 165:12
**liz** 218:17
**llc** 3:5
**llp** 2:5
**locales** 128:21
**located** 6:24 12:9
**location** 138:25 205:23
**lock** 198:12
**lodge** 207:21
**long** 83:11 130:16
**longstanding** 117:23 123:5
**look** 31:6 32:25 38:24,25 53:19 53:22 56:6 76:2 85:6 90:20

99:20,25 102:9 102:17 103:10 104:14,18 105:8 105:25 107:12 107:25 111:3,14 112:13 113:9 117:18 125:3 129:23 136:8,10 139:12 148:4 158:14 161:16 171:3,10 179:3 181:19 190:9 205:11 215:15
**looked** 76:17 77:20 104:10 124:22 127:5 128:7 141:25 201:3
**looking** 38:22 53:7 91:5 101:8 102:14 104:23 120:5 122:23 127:13 138:9 143:21 150:19 151:19 153:21 154:4 157:6 158:5 162:15,21 169:10 171:6 172:18 182:12 189:20 197:12 203:14 207:19 209:10 213:11 213:13
**looks** 126:15 129:15 203:14 203:18
**loop** 9:2

**lot** 59:16 65:15 117:24 126:4 139:3 187:17 199:18
**lots** 160:21
**louisiana** 3:19
**low** 125:14,23
**lower** 116:2 154:17,19 214:5 215:2 216:7
**lucas** 3:8
**lucky** 149:6,13 172:2
**luke** 3:18 13:12
**lumps** 35:2
**lunch** 130:15,22

**m**

**m** 4:11 61:21 159:18 167:16
**mace** 109:9 110:9 186:22 214:16
**mace's** 109:23
**main** 3:9 4:8 212:5
**major** 213:16
**majority** 176:25
**makers** 203:7
**making** 34:20 35:6 37:6 40:2 72:9 110:13 143:20 173:18 174:6 187:14 188:18,19,22,23 189:5 202:2 216:4

**[man's - mean]**

**man's** 206:14
**map** 18:9 20:6
34:6,21 35:24,25
51:17 63:6,8
82:3 85:11,14,15
86:2,6,21 87:10
88:17,21 89:8,18
89:22 90:18
111:16 112:23
113:5 117:3,6
118:7,8,14,23
119:13,16,17
120:5,6,19,19
121:19,22 122:6
122:7,9,9,11,14
123:10,11,15
124:2,4,21 125:6
125:9,13 126:9
126:10,10,18,24
126:25 127:4,11
127:22,22,23
128:2,3,6,6
129:16 130:9
132:25 133:10
133:12,18 134:5
134:16,21 135:3
135:3,8,12,13,14
136:6,7 137:7
141:2,17 145:20
145:25 146:6,11
147:5 148:10
152:17,21 153:3
153:12,18
154:21,22
155:10 158:4,7
165:2 169:10,11
169:19,23
172:21,21,22,23

172:25 173:2,6
173:14,16,18
174:2,7,11,11
175:2,6 176:2
177:5,7,19
178:14,15 179:9
179:12,18,18
180:8 181:19,23
182:5 183:16,16
183:18 184:5,25
185:2,14 188:18
189:7,20 190:9
191:25 192:3,8
192:20,23 193:2
193:7,15,19,22
193:24 202:4,5,8
203:7 204:19
212:20 213:3,10
213:12,13,22
215:17 216:4,22
216:24 223:25
**mapmaking**
34:19
**maps** 16:12
17:20 35:14,23
70:20,20 76:9
87:11 89:25
98:5 116:8
117:8 118:4
119:25 120:14
120:15,18,19,22
121:4,8,21
122:14,21 124:8
124:21 126:19
127:5,12 133:2
133:19,21,25
134:10 142:20
163:17,20,24

165:7 166:5
179:20 185:3
205:23 214:3
216:12 217:18
217:18
**margin** 161:4,8
**marginal** 215:18
215:20
**marginally**
197:21 204:15
**mark** 136:14
**marked** 18:23
26:7 27:21
51:21 56:25
57:21 88:17
93:8 99:5 103:2
113:13 136:17
147:25 150:15
158:20 164:5
166:24 195:10
**maryland** 63:14
69:8,19 70:16
117:10 119:21
121:12 124:14
**massachusetts**
2:7
**match** 98:4
108:4 157:11,18
**matches** 90:25
215:9
**material** 20:16
27:19 86:16
**materials** 12:14
20:3,12,19,23
21:19 26:2 31:3
31:25 32:5,22
36:11 39:2
57:25 84:9,19

86:12 93:21
159:4 166:3
167:4 195:9
**math** 58:14,18
106:11 108:18
111:5,10
**mathematical**
49:3
**mathematician**
48:17
**mathematics**
48:5,19,24
**matter** 7:3 13:2
15:6 16:4 30:5
58:6 59:4 60:19
60:21,23,24
61:17 64:6,23
65:17,22 67:8
68:13 70:23,24
79:24 82:8
83:22 84:2,23
166:7 205:25
**matters** 16:5
59:12,22 60:7
61:7,12 62:5,8
71:23 72:12
82:10 86:14,16
86:18 197:14
**mbs** 1:4 7:9
**mc** 206:14
**mcdonald**
113:19
**mcdonald's**
114:7
**mcmaster** 62:2
63:17
**mean** 34:17 37:8
53:21 72:6 74:6

85:22 89:15
92:13,14 95:20
111:22 112:17
115:13 118:11
120:18 142:23
143:13 149:3,9
160:8 166:8
172:22 179:3
185:21 196:20
199:15 202:12
209:12,16
**meaning**  92:9
112:19 211:5
**means**  138:14
139:23
**meant**  143:15
173:10
**measures**  143:12
143:22 145:15
145:20,25 146:6
146:11,17,18,21
**meat**  214:20
215:23
**media**  6:22
56:11,17 91:9,14
130:20 132:12
168:13,18
194:24 195:5
220:18
**medications**
11:4
**medium**  69:18
**meet**  83:5
**member**  13:6
122:17
**members**  18:12
142:19 169:8
178:12 184:23

**memory**  13:11
13:25
**mention**  39:23
142:10 190:19
220:5
**mentioned**  79:9
**mentions**  147:13
**mercator**  35:13
36:8
**messed**  172:3
**met**  68:8 69:21
70:2 83:7
**methods**  160:6
**metric**  135:18
**metrics**  144:8
**michael**  113:19
**microphones**
6:10,16
**middle**  139:19
**midway**  178:3
181:11,18,22
**migration**  106:6
**mind**  10:13
16:25 32:13
44:23
**minimizing**
147:19 148:6
151:20
**minimum**
148:13 149:2,4
149:21
**mink**  4:17
**minor**  128:25
**minority**  63:12
**minute**  217:24
**minutes**  53:20
83:14 91:4

**missed**  81:13
**misspoke**  49:24
**modeling**  55:22
**modest**  111:17
**modify**  47:7
**moment**  46:13
**monday**  53:12
83:9
**montana**  12:2
**monte**  206:15
**months**  43:8
**monticello**
203:24 205:12
205:13 206:22
206:25
**moon**  149:23
**morning**  6:7 9:6
83:9,10
**mother**  167:25
**move**  43:18
119:12 125:4
156:7 181:3,4
197:8,20 204:9
204:11 205:8,12
**moved**  104:12
105:21 106:3,8
106:25 107:3
108:15 115:14
115:15 157:4
163:2,4 169:14
170:7,11,21,24
171:9 174:23
177:18 179:22
179:24,25 180:6
185:5
**movement**
155:20

**movements**
106:17,22
**moves**  157:2
196:24 197:3
206:13,13
**moving**  21:18
109:21 110:6,7
110:13 122:5,19
126:23 139:18
208:16
**mullins**  64:23
65:23,25
**multiple**  14:25
65:16 68:4,7
69:11 86:18
211:24
**municipal**
148:23
**municipalities**
199:14
**murphy**  3:7
**myriad**  199:8

**n**

**n**  2:2 3:2 4:2 5:2
8:16,16 9:12
60:22 61:16,21
69:15 132:2,2,2
132:5,5 159:19
167:16 222:2
**naacp**  1:7 7:4
61:25 63:17
81:25 226:5
**nad**  35:20,21
36:6
**name**  7:10 8:22
9:7,9,10 61:19
66:21 69:14,20

71:4 226:5,7
**named** 64:10
**names** 13:10,25
67:13 68:17
**nancy** 109:9,23
110:9 186:21
214:16
**narrative** 186:2
**narrow** 59:23
**narrowed** 50:10
**national** 14:12
15:11 16:7,16
17:6 64:24 66:8
67:14 68:21
69:17 70:11
72:15,18,22
163:22 165:2
**natural** 137:22
189:17 190:6,16
191:4,15 192:5
192:10
**naturally** 35:3
**nclcd** 61:8
**nclcv** 62:24
**necessarily**
114:8 142:14
**necessary** 58:3
**need** 7:21 10:14
10:18 53:21
55:15 148:15
168:4 195:8
221:4
**needed** 38:11
**needs** 63:11
**negative** 36:25
**nelson** 64:23
65:22,25

**net** 106:6 108:14
109:21
**never** 22:2,6
68:8 69:21 70:2
144:24 160:17
165:23 166:11
**new** 1:23 2:17,17
7:11,14 16:25
31:8 67:21 69:2
85:18 89:20
90:18,25 101:8
101:16 140:25
155:21 165:7,15
169:16 177:12
178:20 183:19
220:20 222:5,7
**newer** 51:9
**nexsen** 3:5
**nh18** 138:11
139:10,15
**nhdoj** 105:15
**nhwht** 105:9
**nice** 128:10
**nichol** 60:22
62:18
**nine** 182:20
183:2
**non** 21:3 79:3
105:9
**north** 60:18
65:12 66:10,14
181:11
**northwestern**
117:20
**notary** 1:23 5:15
8:18 222:11
226:25

**note** 6:9 19:11
81:11,11 108:25
129:5 154:8
155:2 181:10,24
**noted** 7:17
152:11 221:6
**notes** 12:21,22
25:19 222:16
**notice** 1:21
18:21,22 19:8
38:24 223:14
**noticed** 175:21
**november**
164:16 167:13
**number** 6:22 7:8
19:5,18 56:11,18
58:9 91:9,15
96:18,23 98:15
100:16 109:14
109:14 110:17
130:20 132:13
138:24 145:15
147:5,9 148:10
148:17 149:2,4
149:19,20,21
150:6 151:12
153:14,22 154:4
160:19 167:9
168:13,19
194:24 195:6
220:18
**numbers** 97:8
107:11,14,24
108:2 115:25
116:2 139:6,25
151:12
**numeral** 85:17
85:25 114:17

220:10
**numerator** 98:7
**nut** 183:6
**nw** 2:7 3:19

---

**o**

**o** 5:2 60:22
61:16,21 69:15
118:17 132:2,2,2
222:2
**oath** 10:8 132:15
132:21
**objections** 5:10
46:3
**objective** 173:10
**observation**
127:18 199:7
**observations**
118:7
**obvious** 201:22
**obviously** 35:18
62:9 77:16
124:17 125:12
125:23 186:21
213:14
**offer** 29:14
30:17 40:7,18
41:8 195:15
210:5
**offered** 78:10
114:25
**offering** 29:18
**office** 12:10
70:25 71:13
**official** 66:21
71:9
**offset** 198:12

**oh** 33:5 184:19 186:20 187:7,16 187:24

**ohio** 6:25 9:3 12:11 54:14 61:5,5 63:21,21 64:11,17 78:11 117:13 119:23 121:14 124:13

**okay** 11:9 19:20 20:22 21:18 22:8 23:9 27:15 28:15 31:18,23 32:16 33:17 34:14 35:8 36:9 36:14 37:6 39:11 40:16 41:18 42:4 45:4 45:18 46:22 50:3,25 51:23 52:22 54:5,16 58:13,20 59:6,20 61:13 63:18 65:11 66:16 67:21 70:18 71:8,20 72:14 73:6 75:15,22 77:23 79:8 82:18 85:22 88:24 89:4 91:3 95:22 96:11,19 97:14 99:16 101:4 102:16,20 106:12,19 108:5 111:11 112:8,21 116:6 117:4 119:12 122:4 123:4,9,25

124:20 125:4 127:11 128:2,22 130:11 132:23 133:11,18 136:3 137:4,14 139:5 139:12 140:8,11 141:11 143:6,7 143:25 144:9 145:12 146:20 146:25 148:21 150:24 154:6 155:14 157:16 158:16 161:16 163:18 165:19 166:18 168:8 171:10 172:19 174:10 175:8 177:5 179:9,17 180:7,15 181:9 181:24 182:16 184:16 187:11 187:22 188:16 191:8 192:2 194:9 196:3 199:6 213:19

**old** 89:19 90:24 97:22 101:15,18 102:9 109:13 119:24 140:22 155:21 169:13 177:13 178:22 179:22,25 183:18

**oldham** 14:20,24 15:8

**olympia** 203:25

**olypmia** 206:22

**once** 11:25

**ones** 16:24 19:2 59:21 70:9 124:7 162:10,11 207:22 216:23

**online** 86:11 136:23

**open** 12:17 19:19 31:18 35:16,24,25 45:25 46:13,20 88:22 91:25 136:25

**opened** 84:14 150:19,21 159:3

**opening** 40:10 58:15 107:8 159:2 169:3 178:8

**opine** 74:14 130:2

**opined** 113:20

**opining** 73:25 76:5

**opinion** 40:14 42:22 47:22 49:10 81:22 82:2 85:8 89:6 111:15 172:24 189:6 191:13 212:2 217:7,22

**opinions** 20:5,25 22:15,18 23:12 23:16 29:13,16 29:19,22 30:5,12 30:16 31:8 32:2 32:6,9,23 33:4 36:18 37:12

38:8 39:14 40:7 40:18 41:8 42:5 42:9,10,17 43:9 44:7,22 45:2,7 45:13 47:23 48:3,8,14 49:9 49:18,19,25 50:4 71:23 85:7,9,10 86:24 87:7,16 89:5 93:23 96:6 99:17 111:13 123:12 133:16 136:4 137:9,13 143:7 147:3,13 151:8,8 153:17 163:19 195:15 195:21 210:4,12 219:21

**opportunity** 81:23

**opposed** 119:20 159:24

**orange** 34:24

**orangeburg** 134:22,24 153:4 154:25 155:2,11 175:10,11,13,23 175:25 177:3,9 177:15 190:19 190:25 193:13

**order** 7:23 43:16 43:19 45:11,15 47:5,8 221:3

**ordering** 6:3,5

**originally** 79:23

**osah** 2:21

**outcome** 7:16 183:5

outline   196:12
outlook   22:21
output   38:6,6,15
  39:13 215:5
  216:14 217:21
outside   15:12
  43:19
overall   104:7,15
  130:3 143:16
  214:4
overlay   179:7
overlooked
  82:15
oversight   59:19
overwhelmingly
  110:12

**p**

p   2:2,2 3:2,2 4:2
  4:2 5:2 8:16
  26:15 28:14
  132:5
p.m.   130:22
  132:3 188:12
  220:15 221:6
package   164:20
  167:4
page   19:24 24:23
  24:25 32:16,17
  33:6 34:14 57:9
  58:9 59:11,11
  60:3,25 61:8
  65:12 85:9
  87:20 88:20
  89:6 93:21
  95:11,11 96:12
  96:13 99:20
  103:9 106:14,14

109:17 111:13
111:14 113:16
113:16 114:6,15
114:16 116:11
116:16 117:3
118:14,14
119:13 124:2
125:5 126:24
128:3,24 140:9
140:10 142:8
143:7,25 147:3
148:4,19 151:11
152:14 153:9
154:7,25 155:4
155:15 157:9
159:11,11
168:21 169:10
170:2 172:20
174:10 175:9,11
176:8 177:5
178:3,4,14,16,17
179:18 180:16
181:10 182:17
183:15 184:14
184:14,25 186:3
188:16,17
189:15 194:7
195:12,13
196:12 200:22
203:22 210:2
212:9 213:25
219:4 220:9,10
220:23 223:5,13
224:4 225:4
226:8
pages   31:19,24
  101:10 184:13
  210:3 212:8

paid   24:7 65:7
  66:13 67:7,9,18
  68:12,25 70:7,15
  71:12,15
paragraph   85:16
  148:22 172:19
  173:6 182:17
  186:3 189:19
paragraphs
  174:23
paralyzed
  149:17
park   173:7
part   10:19 39:6
  75:3 94:22
  216:11
partially   190:24
participate
  17:16
participated
  17:11
participation
  52:18 54:10
  75:4
particular   69:24
  88:7 103:23
  112:25 170:17
  173:20,25
  190:11 214:6
particularly
  75:12
parties   5:6 6:19
  7:24
partisanship
  156:8
party   7:15 16:14
  66:4,18 67:22
  69:9 70:22

222:18
passing   13:3
passive   173:24
patrick   1:19 8:5
  8:24 9:11 14:2
  221:12 223:6
  226:7
pause   27:23
  31:22 54:2 68:2
  93:10 95:13
  98:25 102:19
  111:6 116:14
  124:3 125:7
  132:17 135:9
  136:13 148:20
  158:15 168:5
  187:19 192:14
pedantic   38:10
peel   34:23
peer   53:25 54:4
  54:8 78:25 79:3
  92:18,22 201:15
  211:3,7
pending   11:13
peninsula   134:3
  190:3 191:23
pennsylvania
  16:4,25 66:16,22
  67:12 119:25
  121:19 124:14
  165:16
people   22:7
  100:19 105:21
  106:2,7,8,25
  107:2 108:15
  109:21 110:7
  115:9,14,15
  123:6,22 138:16

139:3 149:15
160:21 161:21
161:25 162:3,5,7
162:23 163:7
197:25
**peples** 208:2
**pepper** 68:16
**percent** 75:6
89:11,12,13
92:13 98:12,21
100:8,12,15,16
100:24,24 101:2
102:4 103:13
105:4,12,17
110:4 115:22
138:11 139:4,8
139:15,16,20,20
140:5,14 141:14
141:18,22,23
143:2,3 154:10
155:3,6 157:23
197:18,22
215:12 216:17
217:16,19
**percentage**
89:18 91:22
92:15,19,20
100:17 105:10
105:16 145:2
196:18 198:25
**percentages** 89:9
89:10 91:2
198:16
**perfect** 94:11
**performance**
215:3 216:8
**performances**
214:5

**performed** 24:16
24:24 38:5
**perimeter**
135:18
**period** 49:12
**periods** 219:9
**person** 77:10
160:17,18
**personal** 47:13
186:3
**personally** 80:23
217:20
**persons** 105:11
105:16 110:19
149:11
**ph.d.** 54:18,25
55:8 78:12
**phase** 20:6
**philip** 60:20
62:16
**phones** 6:14
**phrase** 148:16
148:24 202:25
**physical** 180:6
**physically** 12:9
**pick** 6:11
**picking** 207:4
**piece** 34:22
**pieces** 118:3
**pig** 166:8
**place** 6:15,18
7:22 119:22
**placeholder**
55:23
**plaintiff** 82:21
**plaintiff's** 31:10
36:22 39:23
61:19 68:5

69:12
**plaintiffs** 1:8 2:6
7:2 8:7 9:8
47:11 67:25
68:7,8,9 69:22
69:23 81:23
112:22 113:17
114:2,17,24
218:8
**plan** 17:24 85:12
85:15,23 86:2,25
87:2,9,9,10,12
87:21 88:8,10,22
88:25 89:23
99:23 103:5
111:18 112:4
114:3,18,18
115:8,21 116:3
128:19,23,25
129:2,5 130:9
133:10 135:12
135:24,25 136:9
136:25 137:7,12
137:21 140:6,25
141:14 143:17
144:6 145:22
146:3,7,12 147:7
147:7 150:14,25
151:5,17,22,23
151:25 152:6,12
152:19 153:5
155:13 159:9
170:4,5,13
171:23 172:12
172:13 176:3
195:20 196:7
210:19 220:7
224:19

**plan's** 143:9,11
**planning** 29:21
31:12 40:18,23
41:8 76:18
210:11
**plans** 30:19
41:21 87:8,17,21
88:3 195:17
**pleadings** 32:25
**please** 6:9,14
7:19 8:22 9:9
11:10
**plus** 138:4,11
139:10,15,20
147:12
**pocotlito** 170:19
170:20
**point** 46:4 53:2
58:13 130:14
156:5 173:20
185:5 191:17,19
191:20,24
193:21 212:5
213:15 220:11
**points** 10:7
100:17 212:7
**poke** 166:9
**polar** 35:15
**polarized** 76:19
76:23
**political** 52:18
54:9 59:25
63:10 66:23
68:10 69:24
75:4 76:9 77:3,9
77:16 78:4,8,10
78:11,17,20,24
79:4 151:2

161:3 162:21
179:7 186:16
189:22 193:22
211:19 215:15
**politically**
215:18
**politics** 50:13
77:15 79:7,13,14
179:2 186:24
193:23 200:12
200:20
**polsby** 135:17
143:23
**pond** 202:2
**poor** 206:14
212:4,11
**pop** 138:5
139:20
**popped** 165:17
**popper** 135:17
143:23
**population**
89:20 90:21,22
90:23 96:16,21
97:24 98:3,9,13
98:20 100:11,25
101:10,14,17,20
102:2,11 103:19
104:7 106:16,21
107:15 108:7
110:17,21,22,24
110:25 111:4
116:18 118:17
120:23 127:10
136:16,23 138:8
138:16,20 140:3
149:8 150:3
153:19 154:9

155:3,20 157:22
176:21 177:2,10
186:17 187:4
197:22 198:4
200:11,20 205:5
205:6 224:14
**populations**
90:12
**porter** 2:5
**portion** 181:25
**portions** 169:15
179:21 181:5
**position** 198:5
209:16
**possibility** 200:6
200:9
**possible** 12:5
**post** 123:10
160:16
**postponed** 80:2
**potential** 31:3
82:24 167:5
**potentially**
87:22
**power** 217:18
**practice** 112:13
**practicing** 9:17
**pre** 113:3 121:21
**precedence**
217:9
**preceding** 85:16
174:23
**precinct** 148:23
157:19,24
170:12 171:7,18
171:22 172:9
174:12 176:2
181:11,12 182:3

190:10 196:18
196:20,24 197:3
197:11,18 198:6
198:9 199:2,18
199:20 201:5,24
202:3 203:8,25
204:2,3,11,14,17
205:7 206:13
207:12 208:19
208:21
**precincts** 104:11
157:6,10,12
158:7 159:12
160:15 161:17
162:8 163:8
169:14,15 170:3
170:17,18,21,24
171:9,13 172:5
172:11 173:8
174:25 176:9,14
176:18,25 177:8
177:11 178:19
179:4,21,22
180:18,23,25
181:3,5,6,16
182:8,22 183:3,7
183:11,14,20
185:5 187:15
188:5 190:21,23
193:15 194:5
199:12 200:3,25
201:12,18 205:8
205:11,20,24
206:17 207:4,6
207:14 208:3,7
208:10,19 209:6
**precise** 64:2
108:18 161:7

**precisely** 160:18
**precision** 162:10
163:6
**predict** 197:9
**predictor** 196:16
198:13
**predictors** 198:9
**predominant**
113:21
**preferred** 72:25
**prepare** 43:21
82:19 83:6 84:6
84:12,16,17 85:3
193:24
**prepared** 26:19
27:6 28:15
42:16 43:12
44:15 46:25
**preparing** 25:20
39:3
**prerogative**
217:12
**present** 4:15
30:9 76:18
83:15 86:5
96:20 103:19
104:4 106:20
108:6 119:16
128:23 156:5
193:14 208:23
208:24 210:3
**presentation**
155:19
**presented** 20:17
30:21 41:9
86:20 96:25
105:5 108:9,11
120:15 137:25

**[presented - purpose]**                                                Page 32

144:10 156:15
211:9 216:25
**presenting**
103:22 117:6
119:17 124:5
204:20
**presents** 100:3
151:11 206:8,9
211:2
**preservation**
116:12
**preserving**
199:12 220:5
**presidential**
77:18
**pressuring** 126:6
**presumably** 37:8
37:9,10
**pretty** 32:14
43:17 71:18
79:6 118:21
121:16 201:22
**prevent** 11:6
**previous** 79:21
86:2 109:14
123:21 124:7,21
191:25
**previously** 81:3
90:15 132:6
179:20 185:24
195:10
**primarily**
216:21
**primary** 77:18
**principle** 212:18
**principles** 74:10
76:8

**prior** 87:11
**private** 6:11
**probably** 44:21
52:12,17 58:2
59:23 60:8
65:10 66:15
69:18 78:14
96:5 123:16,23
150:19 159:3
173:22 196:11
212:13 214:20
215:23
**problematic**
207:11 208:8
**procedure**
174:22
**proceeding** 77:6
77:13
**process** 21:5
74:12 87:18
97:17,17 101:13
101:13 133:3
144:15 159:4
214:19 217:4
**processed** 97:13
141:8 156:18
158:3 160:3
169:4 175:15
178:8 179:15
180:12 184:10
**processes** 97:5
**processing** 97:15
98:16
**produce** 88:15
**produced** 23:21
38:3 160:3
182:7 214:11

**production**
57:14
**professional**
47:15,20 48:11
49:5,11,14,20
50:2,18
**program** 78:12
**projected** 34:16
89:24
**projecting** 34:21
**projection** 34:16
35:7,9,13,13,23
36:2,4
**projections** 35:5
35:20,21
**prominently**
16:24
**prompted** 52:10
**promulgated**
95:25
**pronounce** 61:19
**proof** 113:17
114:25 208:23
208:24
**proper** 204:25
**properly** 198:10
**proposed** 137:20
142:25
**prosecution**
68:19,23 70:5
**prospects** 109:23
186:6,10 187:5
187:10
**protect** 123:16
**protection**
114:19
**protrusion**
128:12,13

**provide** 23:9,14
27:10 29:7
45:12,16 47:5,23
48:14 49:8,17
75:16 81:24
**provided** 19:3
19:14 20:13
22:14,17 31:3
52:25 56:20
71:22 74:18
81:3 82:23 84:9
84:20 87:12
90:4 97:6 99:14
137:3 141:10
150:22 178:9
180:13
**provider** 72:25
**pruet** 3:5
**public** 1:23 5:16
8:18 33:7,13,18
34:10 222:12
226:25
**publication**
211:3
**publications**
53:25
**publicly** 21:3
**published** 48:23
54:3 78:23
103:5
**pull** 19:13 25:23
58:2
**pulling** 25:13
**pure** 63:3
**purpose** 117:5
119:17 124:5
125:8

**purposes** 10:4
50:3 61:3
123:11 156:21
189:11 201:21
**pursuant** 1:21
20:9 21:8,25
22:20 24:18
**pursuing** 126:3
**put** 204:12
205:13 217:13
**puts** 134:19,24
**putting** 41:19
142:18 174:4
204:25

**q**

**qualifications**
47:20,23 48:11
48:14,18 49:3,5
49:8,11,14,17,20
50:2 75:8,14
**qualified** 48:2
50:19,22 77:24
**question** 5:11
10:18 11:13,14
32:24 37:2 38:9
39:8 40:22
43:22 45:18,25
46:14,21 48:5,13
49:7,16,22 52:3
59:13 60:6 79:2
79:21 87:15
91:20 92:3
95:18 96:14
113:2 119:14,15
132:20 135:20
140:12 142:17
150:17 151:6

167:3 168:23
171:20 183:6
184:20 189:5
192:20,22 193:6
195:13 201:4
207:18,23 209:2
209:11 213:19
**questioning**
63:24 123:22
**questions** 10:14
46:5 55:7 57:3
76:10 143:8
144:2 155:16
174:5 210:9
218:9,12,14,19
218:22 219:3
220:13
**quibble** 92:10
**quick** 56:5 111:5
168:4 194:12
**quickly** 27:17
**quite** 161:19
**quote** 203:6
**quoting** 109:5
203:10

**r**

**r** 1:21 2:2 3:2 4:2
8:16,16 9:12
61:16,16,16
69:14,14 90:4,4
90:5,19 97:5,13
97:15,23 98:16
118:17 132:2,5,5
141:9,9 144:18
144:20 156:19
157:10 158:3
159:18 160:3

169:4 175:15
178:8 179:15
180:13 184:11
185:23 222:2,10
222:25
**race** 77:21
103:20,23 109:7
113:21 200:4,11
200:20
**races** 77:18
**racial** 59:25 62:5
62:10,11,13,15
62:19,25 73:7
104:4,8,13,19
108:6,10,12
111:19,23 112:5
112:24 113:17
114:5 136:5
142:11 171:12
174:21 177:15
183:25 197:13
**racially** 76:19,23
**radical** 205:17
**radically** 123:15
124:15
**raffensperger**
82:9
**ragusa** 36:23
37:11 40:15
41:2 49:23
114:10 195:12
195:16,21
196:13 198:6
199:7 200:23
203:12 209:18
**ragusa's** 39:9,12
49:5,8,11,20
91:24 196:4

198:19 203:6,10
203:23 204:4
206:20
**raised** 104:25
**raises** 201:25
**randolph** 60:20
62:17
**range** 65:10
66:15 89:11
164:13
**rankin** 3:18
13:12
**rate** 24:11 25:2
92:25 101:21
102:11 115:18
198:11 215:12
**rates** 214:4,13
215:2 216:7
**reached** 15:4
16:4 30:16
**reaching** 20:25
151:7
**read** 7:20 42:7
48:23 73:11,21
75:20 82:20
91:23 106:23,24
112:8,13 114:21
137:22 186:13
187:7 190:2
201:7
**reading** 40:3
112:12 118:13
142:9 181:9
**reads** 112:14
**ready** 25:18
**real** 79:7
**realistic** 148:16
149:2,3,21

**realistically**
149:16
**really** 33:11 39:6
63:3 102:13
119:22 135:18
136:2 144:14
190:11 205:17
214:15 219:19
**realm** 110:3
**reason** 10:21,24
34:25 40:4
43:11,23 45:6
46:24 48:18
58:17,19 75:15
81:5 82:12
101:19 104:3
106:10 107:20
108:17 111:9
113:25 122:11
122:20 123:3,3
158:9 226:8
**reasonable**
42:21 160:5
163:14 215:8,13
216:19 217:6
**reasons** 30:4
200:2
**rebuttal** 27:20
27:25 28:6,13
36:10,11 39:3
40:12,14,25
41:13,19,22 42:6
42:11,20 43:2,4
43:7,14 44:2,16
44:19 45:5,22
46:19,23 58:6,20
73:11,21 75:21
81:24 82:20

194:10 195:8,22
210:13 219:3,23
223:17
**recall** 20:15
22:25 29:3
52:14 55:2
69:19 78:22
97:18 170:23
192:7 198:24
219:12,16
**receipts** 57:21
58:4 223:23
**receive** 54:18,24
55:8
**received** 57:13
109:3,10
**recess** 56:13
91:11 130:22
168:15 195:2
218:5
**recipient** 198:4
**recognize** 203:12
**recollection**
21:13 82:16
83:2 113:7
123:19
**reconfigured**
125:22
**record** 6:8,20
7:18 8:23 9:10
10:6 19:11,16
56:10,16,22
57:16 75:23
76:3 85:12 91:8
91:13 99:21
109:16 130:6,19
132:11,24
140:20 142:23

167:8 168:12,17
186:9,14 187:16
187:20 188:8,12
188:13,15
194:23 195:4
214:24 218:4,7
220:4,15,21
**recorded** 6:23
**recording** 6:18
**records** 24:6,6,6
25:9,9 187:8
**recreate** 20:16
**redistricting**
14:12 15:11
16:8,17 17:7,11
17:17 33:8
34:12 60:7,11,13
60:15,16,18,19
60:21,22,24 61:6
61:7,10,12,17,24
62:8 64:11,25
66:9 67:15
68:22 70:12
71:23 72:16
74:10 76:8 86:8
86:10,11,14 93:7
93:17,19 94:16
95:25 97:11
99:13,23 107:10
126:5 133:6,13
137:6 142:24
156:18 157:15
158:19 159:7
162:22 163:17
163:22 165:3
186:12,15,18
199:9 209:11,14
209:20 211:23

214:18 216:2
224:7,21
**redraw** 122:16
124:11 204:18
213:16
**redrawn** 207:2
**reduces** 147:5
**reducing** 199:12
**reduction** 147:9
**reelected** 110:9
**reelection**
109:23 110:15
**refer** 85:14,23
95:18,20 96:4
186:24
**reference** 61:4
186:16 191:24
201:9 206:12
**referenced** 37:15
39:17,21 85:16
**references** 38:4
**referred** 85:24
171:18
**referring** 33:18
33:19,24 85:13
96:3 140:19
170:15,19 173:2
176:12 219:10
219:15
**refers** 86:2
159:16 170:17
**reflect** 58:5
**reflected** 25:10
54:7
**reflecting** 20:4
21:22 178:20,22
**reflects** 58:11
111:17

**[refresh - representative]**  Page 35

**refresh** 113:6

**regard** 41:18
43:22 45:19
81:2 128:22
135:21 173:19
213:20

**regarding** 42:17
43:9 48:19
91:19 217:5

**regardless** 217:3
217:20

**regards** 42:11

**regions** 35:15

**regression**
200:13,17 201:4
201:8 204:7
206:21 207:3,17
208:25

**regular** 77:10

**regularity** 74:11

**rehabilitation**
41:12

**rehearse** 42:12

**relate** 22:11

**related** 7:14 23:7
50:14 222:18

**relating** 210:7

**released** 34:11
88:9 133:13

**relevant** 74:5
120:17 121:4

**reliability** 82:6

**reliable** 208:25

**reliably** 109:25

**relied** 20:12,18
20:24 21:4
23:16 31:21,25
32:15 37:5,8,16

38:13 39:10,18
86:13 123:14

**rely** 20:24 22:18
35:24 217:6

**remain** 153:11
172:13

**remained** 116:20
171:23 191:11

**remains** 171:17
182:4

**remedial** 165:7
165:14

**remember** 38:16
67:12 70:2
84:18 96:9
136:22,22
187:21 198:18

**remotely** 6:22
7:22

**removal** 208:10

**rendering** 33:4
87:7,15 93:22
99:17 123:12
136:3 151:7

**reock** 135:16
143:22 144:13
144:21,25

**repair** 170:12

**repeat** 10:18
188:2

**rephrase** 60:6
79:20 94:12

**replicate** 210:21

**report** 17:25
20:10,17 25:23
26:6,10,10,14,17
26:19 27:5,11,18
27:20 28:2,6,7

28:13,24 29:4,8
31:19 32:10
33:16 36:10,12
36:13,15,18,20
37:13,15 38:8
39:4,15,18,21,22
40:3 42:6,11,14
42:17,20 43:2,4
43:7,10,10,12,14
44:2,17,20,24
45:5,9,22,24
46:3,6,19,23,25
47:3 49:2 51:7
51:11,13,17,25
52:13 53:8 54:8
54:22,24 55:6,21
57:9 58:6,15,21
59:7,8 81:11,12
81:15 82:14
85:6 86:5,20
87:4,13 91:24
92:12 93:23
95:8,9 106:13
107:8 108:25
109:6,11,18
111:13 116:8,10
119:13 122:6,12
123:12 124:2
125:5 126:24
129:9 133:19
134:11 140:9
141:8 142:2
144:2 148:19
150:14 151:3
152:11,15 153:9
154:6,25 155:4
155:15 158:20
159:7 168:21

169:3 171:22
176:7 184:15
189:3,11 190:14
191:8,10 194:10
195:8,22,25
198:18,19
203:10 207:9
210:8,13 211:9
214:23 219:4,23
223:15,17
224:18,22

**reporter** 1:22
7:12,19,20,25
8:21 10:11
221:2 222:11

**reports** 25:4
29:10,11,20,23
29:25 30:2,7,14
30:15,25 31:14
33:2 36:21
37:11,18 39:9,12
40:8,11,12,14,17
40:19,24,25 41:4
41:5,14,15,19,22
44:4,5 45:13,16
47:6,24 48:15
49:9,18 51:2,10
64:3 69:4 73:11
73:21 74:16
75:21 82:20
159:5

**repository** 86:11

**represent** 9:7

**representation**
63:12

**representative**
13:18 109:9

**representatives** 93:16 94:9

**represented** 64:19

**representing** 64:15

**represents** 22:10 33:10 106:24 145:15 169:12

**republican** 14:12 15:11 16:8,14,16 17:7 64:16,16,25 66:9 67:15 68:22 70:12 71:10 72:15,18,22 109:9 163:22 165:2 186:6,10 186:22 187:5,10

**republicans** 66:5 67:5 215:16

**request** 38:24

**require** 190:11 204:18

**required** 77:14

**requirement** 120:23 150:4

**rerun** 206:20 207:3 208:6

**research** 77:14

**resent** 56:6

**reserved** 5:12

**reshape** 205:17

**residents** 138:25 157:18,21,22 170:3,7,10,10 196:17,19 197:10,15,16,19

**respect** 17:23 41:14,16 42:9 45:3 219:21

**respecting** 41:4 148:23

**respective** 5:6

**respond** 45:13

**responds** 196:2

**response** 45:24 46:11,13,20 81:14 192:13 196:23 197:7

**responses** 46:2

**responsible** 216:11,21

**responsive** 22:24 31:9 38:23

**rest** 208:4

**result** 127:2

**resume** 56:7

**resumed** 56:14

**retain** 89:13

**retained** 96:16 96:22 220:19

**retaining** 23:4

**retains** 89:8

**retention** 89:16 89:22 91:19,21 92:8,15,20,24 94:18 95:5,7,16 95:23 96:8 98:9 98:11,13,20 100:11,25 101:21 102:12 102:15 103:20 104:7,9,13,16 105:3 115:18

199:11 212:4,11 212:18 214:4,13 215:2,7,10,12 216:7,17 217:5 217:16,19

**revealed** 163:13

**review** 31:2 34:4 39:6 84:5,12,15 92:22 201:15 211:7

**reviewed** 22:23 28:20 33:9 34:9 53:25 54:4,8 78:25 79:3 82:22 84:13,21 84:22 92:18 196:3 210:16 211:3

**reviewers** 27:10

**reviewing** 159:4

**revise** 45:15

**revised** 56:6

**revolve** 48:3

**richland** 178:2 178:18 179:8 184:2 187:13 193:13 199:20 199:24 202:19 202:20,24 212:19 213:4 219:11

**right** 10:2,4 29:23 31:11 36:18,23 40:4 44:25 46:12 53:2 56:3 57:11 58:7,14,16,23,24 59:6 64:7 71:3,4

71:8,10 72:7,9 72:10 74:8 98:12,17 100:12 100:16,19 102:6 102:7 103:16,25 104:16 105:5,22 106:4,9 107:6,7 107:16 108:2,7 108:16 109:12 109:18 110:10 110:20 111:3 114:23 115:11 115:17,24 116:4 118:24,25 119:10 120:8,11 120:21,24 126:12,21 127:3 128:9 134:11 138:10 139:13 141:3,12,15 147:17 148:8 149:24 151:17 151:23 152:14 152:19,24,25 153:2,6,7,12 154:10,13,21 155:4,8 158:8 159:6 160:11,16 161:20,23 162:2 162:4,6 163:10 166:9 168:2 170:22 171:24 174:8,9 176:3 184:10 188:25 189:8 193:16,17 194:21 197:8 202:14,15,18,21 203:2,16,20,21

204:21,22 206:8
206:10 209:15
211:10 212:6,12
217:23
**rights** 60:14
63:12
**river** 190:6,7,8
190:11 192:3,4,5
192:9,9,10
**rmg** 1:4 7:9
**role** 161:13
**roman** 85:17,25
114:16 220:10
**room** 12:12
**rothstein** 4:16
7:10
**roughly** 35:17
**round** 142:5,6
**rounding** 141:23
142:3
**row** 106:23
138:10
**rows** 106:23
**rucho** 60:17,23
62:13,18
**rule** 81:10
161:10
**rules** 10:2
**run** 48:2 50:10
**running** 48:20
56:8 193:20
**runs** 59:11
**rural** 118:21
**rush** 221:5
**rutherford** 92:5

**s**

**s** 2:2 3:2 4:2 5:2
5:2 6:1 7:1 8:1
8:16 9:1 10:1
11:1 12:1 13:1
14:1 15:1 16:1
17:1 18:1 19:1
20:1 21:1 22:1
23:1 24:1 25:1
26:1 27:1 28:1
29:1 30:1 31:1
32:1 33:1 34:1
35:1 36:1 37:1
38:1 39:1 40:1
41:1 42:1 43:1
44:1 45:1 46:1
47:1 48:1 49:1
50:1 51:1 52:1
53:1 54:1 55:1
56:1 57:1 58:1
59:1 60:1 61:1
61:20 62:1 63:1
64:1 65:1 66:1
67:1 68:1 69:1
69:14,15 70:1
71:1 72:1 73:1
74:1 75:1 76:1
77:1 78:1 79:1
80:1 81:1 82:1
83:1 84:1 85:1
86:1 87:1 88:1
89:1 90:1 91:1
92:1 93:1 94:1
95:1 96:1 97:1
98:1 99:1 100:1
101:1 102:1
103:1 104:1
105:1 106:1

107:1 108:1
109:1 110:1
111:1 112:1
113:1 114:1
115:1 116:1
117:1 118:1
119:1 120:1
121:1 122:1
123:1 124:1
125:1 126:1
127:1 128:1
129:1 130:1
131:1 132:1,2,2
132:2,5 133:1
134:1 135:1
136:1 137:1
138:1 139:1
140:1 141:1
142:1 143:1
144:1 145:1
146:1 147:1
148:1 149:1
150:1 151:1
152:1 153:1
154:1 155:1
156:1 157:1
158:1 159:1,18
159:19 160:1
161:1 162:1
163:1 164:1
165:1 166:1
167:1,16,16
168:1 169:1
170:1 171:1
172:1 173:1
174:1 175:1
176:1 177:1
178:1 179:1

180:1 181:1
182:1 183:1
184:1 185:1
186:1 187:1
188:1 189:1
190:1 191:1
192:1 193:1
194:1 195:1
196:1 197:1
198:1 199:1
200:1 201:1
202:1 203:1
204:1 205:1
206:1 207:1
208:1 209:1
210:1 211:1
212:1 213:1
214:1 215:1
216:1 217:1
218:1 219:1
220:1 221:1
223:11 224:2
225:2 226:8
**samantha** 2:21
**sample** 161:12
**sampling** 161:7
**sanders** 68:15,16
**satisfied** 64:2
**saw** 126:19
**saying** 29:6 50:5
54:24 98:11,19
141:13 145:19
160:9 162:25
183:2 185:20
187:2 189:23
200:7,16 201:2
209:10 214:8
216:21

| | | | |
|---|---|---|---|
| **says** 54:16,17 89:7 100:6 105:3,8,10,15 113:19 114:16 118:21 139:14 140:21,21,24 143:9 148:5 151:13 173:6 201:16 | **sealing** 5:7 **sean** 1:19 6:24 8:4,24 9:11 26:14 28:13 220:17 221:12 223:6 226:7 **searched** 46:23 **second** 24:25 89:6 99:19 102:23 111:15 | 148:13 151:10 151:14 152:3,5,7 156:10 159:10 159:14 161:22 164:17 169:16 171:3 176:4,10 180:20 182:13 190:10,22 195:18 206:21 **seeing** 101:15 | 220:2 224:11,24 225:7 **senate's** 107:16 **senator** 13:12,14 **send** 37:21 155:24,25 156:2 **sends** 156:2,11 **sense** 47:21 50:17 62:22 76:14 77:22 |
| **sc** 164:14 166:23 167:10 224:24 225:7 **sc7000034244** 164:5 **schedule** 19:23 **scheduled** 79:23 80:4,5 **scheduling** 43:16 43:19 45:11,15 47:5,8 | 118:15,18 148:4 148:5 159:11 172:19 176:15 186:4 194:20 205:14,15 **section** 63:3 112:6 116:7 169:3 175:17 **sections** 36:21 **see** 13:10,25 | 136:23 179:24 **seeking** 50:4 73:15 **seen** 19:20 31:5 47:16 74:23 88:12,25 93:11 99:8 103:6 136:20,24 150:18 158:23 158:25 164:21 | 142:7 177:14 199:18 **sensitive** 6:10 **sent** 12:17 22:23 24:19 26:2 27:19 53:7 57:25 89:2 159:2 165:24 **sentence** 37:4 186:4 |
| **scholar** 48:7,22 **scholer** 2:5 **schwartzberg** 143:23 **science** 78:12 161:3 211:19 **scientific** 160:5 163:14 **scientist** 112:20 **score** 144:21,25 **scores** 144:6,13 144:16 **screen** 19:6,13 174:18 **scroll** 99:19 103:9 105:24 152:2 | 18:16 19:9,10 32:19 33:5 35:14 56:7 59:5 88:12 100:2,8 101:9 103:11,13 104:15 105:2,8 105:12,17,20 106:2 108:12 109:13,15 113:6 113:23 114:23 116:22 118:15 127:7 129:18,24 133:18 134:2,5 134:16,23 137:2 137:14 138:10 138:12 139:14 139:19 140:4,6 142:11 148:7,11 | 165:23 166:2,12 166:14,15 167:6 167:16 183:18 185:4 **segment** 194:16 194:18 **segments** 194:19 **senate** 3:17 8:9 33:8,20,25 34:5 77:21 102:17,24 103:6,11 104:23 105:2 115:23 133:6 147:18 151:19 164:14 166:23 167:10 186:12,15 191:5 212:15 215:7,25 216:10,21 217:3 | **sentences** 196:22 199:17 **separate** 51:9 127:24 134:14 **sequential** 149:18 **series** 57:20 85:10 188:17 223:22 **serve** 80:7,16,24 **served** 43:4,6,7 45:5 **session** 83:11 **sessions** 83:8 **set** 29:22 30:24 31:9 67:24 68:5 83:12 94:4 96:24 107:12 |

110:23 195:22
199:16 205:7
210:13 220:4
222:21
**sets** 39:20 65:19
92:23 141:10
**settlement** 79:24
**seven** 69:4 71:24
137:15,19 158:7
161:16 163:8
**shaded** 169:14
169:17 174:13
179:23 183:20
**shape** 89:25 90:7
90:11,11,13,16
97:4,10 98:16
141:6 144:13,15
144:17 145:5,9
156:17 169:2
175:6,14 177:23
185:20,21,22
202:25 212:19
219:11
**shaped** 34:15
**share** 18:17
19:12 26:3
27:25 56:8
160:23 169:24
178:19 179:13
179:14 180:11
184:8 185:18,20
205:6
**shared** 179:16
**shed** 102:10
**shedding** 186:5
**sheet** 226:2
**shift** 36:9,12
155:14 158:5

163:18 177:2
180:16 181:13
194:9 204:15
**shifted** 159:24
169:15 170:18
171:13 176:14
177:2,11 179:4
181:12 183:8
193:16 194:5
**shifts** 107:15
108:7 176:7
182:20,23 183:2
183:10 187:4,14
215:15
**shocked** 166:4
**shoring** 214:15
**shorthand** 1:22
139:4 222:11
**shortly** 20:10
26:18 28:8
79:17 80:4
**shot** 149:23
**show** 42:19
51:14 98:23,23
122:21 124:7
163:25 166:19
174:17 189:9
**showed** 166:13
217:15
**showing** 125:9
125:10 193:15
**shown** 29:11,25
30:7 108:14
**shows** 102:11
106:21 155:18
156:7 169:14
179:21 185:5

**side** 137:6
162:20 207:13
**sight** 194:15
**signature** 222:24
**signed** 5:15,17
**significance** 35:9
94:2 167:20
174:2
**significant**
116:17 125:13
130:8 156:9
**similar** 55:5
121:24 155:19
**similarly** 109:8
**simplicity** 61:4
**simulation**
210:25 211:9,13
211:18,23 212:3
**simulations** 48:2
48:4,20,20,25
210:22 219:22
219:23
**single** 119:5
120:8 122:17
124:23 204:8
**sir** 9:14 27:24
107:22
**sit** 40:2 107:21
191:7 192:7,18
192:21,25
**sits** 134:3
**sitting** 30:19
42:4,15 43:24
44:14,25 45:19
45:20 46:12,15
159:21 160:2
182:10

**six** 69:4 148:14
220:19
**sixth** 113:22
114:4 115:2,7,9
115:19,20
205:13,16
**size** 35:17 198:6
198:9,13 199:2
200:21
**sized** 69:18
**sketch** 124:10
**small** 67:11
69:17
**smaller** 102:2
**smallest** 148:10
**smash** 34:24
**smith** 60:20
**smoaks** 201:23
201:24 203:5,7
207:20,24,25
**social** 7:23
112:19
**software** 211:13
**sole** 87:3
**solutions** 226:3
**someplace**
124:13
**son** 91:5
**sorry** 25:24
49:24 100:24
108:10 133:22
141:2,18 143:2
152:22 159:17
185:9
**sort** 41:12 60:5
119:14 161:14
173:13

**[sound - statistical]** Page 40

**sound** 58:7,23
  187:22
**sounds** 58:24
  196:9
**source** 86:9,15
  86:23 96:24
  107:5 141:4
  144:10 156:14
  189:18
**sources** 39:20
**south** 1:3,6 3:9
  3:10 4:7,9 7:3,7
  11:24 13:7,21
  15:8,18 17:3,7
  17:12,25 18:8,12
  36:7 76:24 77:4
  77:10,25 78:3,7
  78:10,16,19,24
  79:4,9,10 85:18
  88:3 93:6,15
  94:8 112:23
  116:19 117:8,20
  118:20 119:20
  121:9 125:15
  137:5,19 140:16
  142:20 169:8
  173:7 175:18
  178:12 184:23
  202:4 212:20
  214:19 224:6
**spacial** 55:22
**spartanburg**
  117:22 125:19
**speak** 190:5
**speaking** 119:3
  172:6
**special** 90:8

**specific** 35:21
  45:2 78:18
  176:7
**specifically**
  94:21
**specified** 89:17
**speculate** 67:2
**spell** 61:14
**spelling** 9:10
**spent** 24:13,21
  25:20 55:10
**spherical** 34:20
**spitball** 11:20
  29:5
**split** 128:19,20
  147:6,11 149:19
  151:2,12 152:4
  152:17 153:11
  153:11,15,18,25
  154:2,20 155:11
  155:13 157:6
  158:7 159:9,12
  160:15 161:17
  162:8 163:9
  170:4 171:17,23
  172:5,7,8,10,12
  172:13 182:4,8
  192:6,11 202:12
  202:19 203:19
  213:7,10,11,13
  213:21
**splits** 129:5,16
  147:9,16,19
  148:11,17 149:3
  149:4,22 150:7
  151:16,20,24
  152:6,21,22
  153:3,9,22 154:5

170:12,13 176:2
  199:12 202:5,9
  219:15
**splitting** 152:13
  188:24
**spoken** 12:25
  13:6,11,14,17,20
  14:2,5,8,11,15
  14:20,22,24
  15:13,17 16:15
  17:10
**spot** 107:23
**spread** 35:16
**spreadsheet** 90:7
**spring** 32:13
  52:19 54:11
  181:25 182:2,3
**ss** 222:6
**staff** 13:21 88:4
  88:8,17,21,22
  133:10,13
  135:12,24 136:7
  136:9,25 137:7
  137:12,21 140:5
  142:25 150:14
  151:5,21 152:5
  152:19 153:5
  163:21 223:25
  224:19
**stamped** 164:4
  166:23 224:23
  225:6
**stand** 81:19
**standard** 92:24
  143:18 160:7,25
  162:14,24
**start** 26:16 28:5
  63:20 85:8 89:4

111:21 116:12
  117:2 155:17
  195:11 196:12
**started** 25:13
**starting** 65:11
  186:4 210:2
**starts** 59:10
  95:10 148:25
  178:2
**state** 1:23 7:3
  8:22 9:9 51:8,17
  52:2 54:14,22
  61:24 64:9,12,17
  70:20 76:16
  77:13 78:11
  84:11 88:4
  117:9,11,13,17
  119:21 121:11
  121:13,13,18
  124:9 126:3
  153:19 154:13
  154:15 155:7
  198:19 222:5
**state's** 95:16
**stated** 186:14
  189:3
**statement** 29:13
  30:4 37:4
  195:14 210:4
**statements**
  112:18 188:18
  213:2
**states** 1:2 7:6
  35:22 71:24
  122:17 126:4
**statistical**
  204:20,24

**[statistics - sworn]**

**statistics** 50:14
95:16 172:15
**status** 54:17
55:12
**stay** 204:11
207:20,24
**stayed** 101:16
103:23 105:11
105:16 159:23
**stenographic**
7:18 222:16
**step** 28:10 75:22
160:9
**stick** 104:23
**stipulate** 7:24
**stipulated** 5:4,9
5:13 8:6,8,10,12
**stoner** 190:7
192:4,9
**story** 124:17,19
149:5
**strange** 34:25
**street** 2:16 3:9
4:8 35:24,25
77:11
**stretch** 63:16
168:10
**stretching**
118:19
**strider** 69:14
70:7
**strike** 37:9
171:10,19
**striking** 149:10
**struck** 75:13
81:21 82:2,7
119:25

**stubble** 92:4
**study** 55:23
211:20
**stuff** 165:15
**stylistic** 27:14
**sub** 22:11,13,16
22:16 110:23
220:11
**subcounty**
156:25
**subdivision**
151:2 159:8
**subdivisions**
151:12
**subject** 211:2,7
**subjects** 50:16
**submit** 50:25
**submitted** 51:7
51:10,16 68:14
70:10 87:17
163:21
**subscribed**
221:14 226:22
**subset** 110:25
**substance** 83:3
84:2
**substantial**
33:15 44:5
45:23 198:3
**substantive** 36:5
**subtract** 205:24
213:4
**subtraction**
116:19
**suburbs** 125:21
213:24
**succeeding**
96:17,22 196:21

199:17
**sufficient** 20:16
24:10 82:5
217:22
**suggest** 190:13
**suggested** 35:5
107:8
**suggesting**
114:21,24
**suggestions**
27:13
**summaries**
136:23
**summarize**
97:24 98:2
146:20 196:25
197:2
**summary** 85:7
89:5 91:18
96:15 111:12
130:3 136:16
143:7 147:2
172:15 181:8
182:13 224:14
**sumter** 134:17
134:19 153:4
154:7,8,20
168:23 169:6
170:8,25 174:8
174:12 175:24
187:13 193:13
213:7,9 219:15
**super** 172:2
**superimposed**
183:19
**supplement**
31:13,16 40:23
43:17,20

**supplemental**
41:4 43:12,14
45:9,12 46:25
47:6
**supplementary**
43:10
**support** 216:19
**suppose** 92:11
**supreme** 60:4,10
60:12 72:4
**sure** 10:6 12:2
28:11 36:24
37:6 38:21 51:5
51:13 53:17
58:8 71:21 75:6
77:22 87:19
88:19 120:13
123:13 125:21
126:2 136:12
141:12 145:13
162:13 182:11
206:6
**surface** 34:19
**surprised** 73:22
76:21
**surprisingly**
116:20 130:5
191:11
**swan** 170:20
**swear** 7:19,25
**switch** 111:11
146:25 168:2
**switching**
132:23 168:3
**sworn** 5:15,17
8:18 132:6
221:14 222:13
226:22

**[syllabus - things]**

**syllabus** 75:3

**t**

**t** 5:2,2 8:16,16
9:12 69:14
118:17 132:2,5,5
222:2,2 223:11
224:2 225:2
**tab** 19:18 25:25
27:19 88:14
98:24 102:18,25
105:5,5 113:9
133:9 136:10,17
147:22,24
150:11,14
158:14,20 164:2
164:5,9 166:20
166:24 195:9
220:3 224:8,15
224:17,20,22,25
225:8
**tabbed** 93:4
**table** 34:25
95:15,19,20
96:12,13,14,25
98:10 103:18
104:2,6 106:13
106:15,16 107:6
107:14 108:5
137:15 140:10
140:13,14,21
141:5 142:9
144:3,4,5,11
145:13 155:16
155:17,18
156:15 162:25
**tag** 123:18

**take** 6:18 7:22
9:19 11:10
28:10 53:18,20
56:5,6 75:22
90:22,23 91:4
92:14 97:18
102:16 107:10
113:8 130:14,17
136:10 140:2
157:10 158:14
160:9 168:6
194:12 197:18
197:24 206:16
207:5,7 208:2
217:8
**taken** 1:19 6:25
8:20 12:22
56:13 78:13
91:11 97:3,10
130:22 156:16
156:17 168:15
195:2 199:21
218:5
**takes** 127:9
**taketh** 102:9
**talk** 57:8 96:12
104:24 130:16
147:4,18
**talked** 15:20
129:3 174:20
191:9
**talking** 18:12
106:14 116:9
118:4 170:6
176:6,8 177:16
182:18 189:25
197:4 203:4
209:7 212:17

**talks** 92:18 96:8
154:6 191:2
**taught** 54:11
78:19
**teaching** 48:9
52:18 57:6
**teams** 65:16
**technique**
162:15
**techniques**
160:24,25
162:23,24
163:15
**technology** 1:20
**tell** 10:17 11:18
18:2 21:7 22:19
33:10 43:24
45:2 62:4
106:15 124:25
126:16 127:8,13
135:6,11,19,21
159:21 160:10
160:14 163:6
170:10 172:16
179:4
**telling** 160:13
**tells** 98:6,8
**tend** 110:11
194:19
**tender** 73:23
**tends** 48:23
**tenths** 141:21
**term** 80:2
138:19 167:19
172:21 174:2
198:12
**terms** 57:6 77:23
89:20 104:13

126:8
**terrini** 14:9
**testified** 8:19
26:25 59:13
132:7 133:14
164:23
**testify** 10:22
29:17 30:11
41:16,21 64:3
82:8
**testifying** 10:8
41:24 195:19
**testimony** 10:25
11:7 41:22
47:17 74:4
75:12 77:9 81:3
81:4 82:11
220:16
**tests** 196:14
**text** 181:9
**thank** 37:6 62:3
63:18 122:4
150:8 164:11
218:10,23
220:13
**thanks** 135:20
**theoretical**
148:13
**theoretically**
149:21
**theory** 74:8
114:9
**thing** 11:12
118:6 142:3
206:11 207:11
217:6
**things** 31:9
32:13,14 40:11

**[things - trende]**

44:9 46:10
112:18 117:11
122:19 124:17
125:22 147:12
173:15 181:23
189:2 191:18,22
199:11
**think** 9:15 11:25
19:18 23:3,6
36:25 38:19
40:4 47:25 48:4
51:10 53:21
55:20 57:4 58:3
64:4 66:20
67:25 69:16
70:9 71:5,18
73:19 74:12
75:7,25 76:7
77:8 79:17
83:13 84:10
109:20 113:25
117:7 121:3,25
122:13,16,20,25
128:10,20 129:3
133:14 143:4,15
147:13,17,17,19
148:15 152:25
157:7 164:23
165:17 171:4,6,8
172:9,17 173:3
179:6 181:2,17
182:13 183:24
186:22 189:23
190:18 191:17
191:19,19
192:24 193:20
194:7 196:10
199:16 201:21

209:24 210:15
214:19 215:8,14
215:19,22
216:12,13,15
217:12,16,20,20
218:2 219:7
**thinking** 173:21
215:8
**third** 45:12
55:16 89:5
91:18 117:18
147:4
**thomas** 1:11
2:15 3:18 7:5
226:5
**thorough** 111:15
**thought** 42:8
44:10,21 51:4,12
174:16 199:3,4
213:15 216:23
**thoughts** 44:7
**three** 61:2 65:18
82:17 142:10
146:15 152:6
196:14 197:2
206:9 207:8,10
**thunder** 187:17
**time** 5:12 11:9
24:6,12 25:8,11
25:17,20 44:10
45:4 46:22
55:11,20 56:9,15
91:4,7,12,25
104:22 117:12
120:3 130:18
132:10 168:11
168:16 173:24
185:4 188:11,14

193:21 194:22
195:3 218:3,6,9
219:9 221:6
**timeline** 12:3
217:2
**times** 11:19,21
24:20 83:5
134:2 139:3
**title** 61:22
**tjh** 1:4 7:9
**today** 10:8,22
11:2,7 12:15
24:3 30:20 34:6
42:4,16 43:24
44:14 45:20,20
46:15 83:24
84:12,17 117:16
120:17 121:14
150:23 182:10
191:9 219:3
**today's** 6:4,6
10:5 12:8 82:19
83:6,19 84:6
85:3 220:16
**tool** 82:4
**top** 32:17 61:8
65:11 96:9,13
111:14 113:16
114:15 138:10
151:10 159:11
170:2 181:14
182:16
**torchinsky** 15:14
**total** 90:21,22,23
97:24 98:2
101:10 106:21
110:17 153:22
182:23 197:15

197:16,19,25
205:5 220:18
**totals** 147:14
**touches** 144:23
**traditional**
74:10 76:8
199:9
**traditions** 76:15
123:6
**training** 78:7,15
112:16
**transcribing**
10:11
**transcript** 6:6
84:11 221:3,5
225:11
**transcription**
222:15
**transcripts** 33:7
33:14,19 34:9
84:6,8,16,17
**transferred**
21:14 37:19
**transformation**
35:6
**transformed**
125:24
**transmitted**
38:15
**treat** 207:18
208:19
**treats** 200:24
201:18 207:12
**trende** 1:19 6:1
6:24 7:1 8:1,5
8:24 9:1,6,11
10:1 11:1 12:1
13:1 14:1 15:1

| | | | |
|---|---|---|---|
| 16:1 17:1 18:1 | 117:1 118:1 | 193:1 194:1 | 163:22 165:3 |
| 19:1 20:1 21:1 | 119:1 120:1 | 195:1,7 196:1 | **truthful**   11:6 |
| 22:1 23:1 24:1 | 121:1 122:1 | 197:1 198:1 | **truthfully**   10:22 |
| 25:1 26:1,15 | 123:1 124:1 | 199:1 200:1 | **try**   11:11 34:24 |
| 27:1 28:1,14 | 125:1 126:1 | 201:1 202:1 | 72:13 81:11 |
| 29:1 30:1 31:1 | 127:1 128:1 | 203:1 204:1 | 124:11 189:10 |
| 32:1 33:1 34:1 | 129:1 130:1 | 205:1 206:1 | 197:9 209:15 |
| 35:1 36:1 37:1 | 131:1 132:1,14 | 207:1 208:1 | **trying**   62:10 |
| 38:1 39:1 40:1 | 133:1 134:1 | 209:1 210:1 | 63:8 119:15 |
| 41:1 42:1 43:1 | 135:1 136:1 | 211:1 212:1 | 173:17 177:7 |
| 44:1 45:1 46:1 | 137:1 138:1 | 213:1 214:1 | 189:12 198:11 |
| 47:1 48:1 49:1 | 139:1 140:1 | 215:1 216:1 | 204:23 215:9 |
| 50:1 51:1 52:1 | 141:1 142:1 | 217:1 218:1,10 | 216:6 |
| 53:1 54:1 55:1 | 143:1 144:1 | 219:1,2,25 220:1 | **turkey**   171:4,4,6 |
| 56:1,19 57:1 | 145:1 146:1 | 220:17 221:1,12 | **turn**   6:14 19:23 |
| 58:1 59:1 60:1 | 147:1 148:1 | 223:6 226:7 | 59:7 93:3 96:11 |
| 61:1 62:1 63:1 | 149:1 150:1 | **trial**   1:19 5:12 | 98:24 102:18 |
| 64:1 65:1 66:1 | 151:1 152:1 | 29:14,17,23 | 111:2 113:15 |
| 67:1 68:1 69:1 | 153:1 154:1 | 30:10,17,21 40:7 | 116:6,10 123:25 |
| 70:1 71:1 72:1 | 155:1 156:1 | 41:8,25 46:10 | 140:8 143:25 |
| 73:1 74:1 75:1 | 157:1 158:1 | 50:11 81:21 | 147:2 148:15,18 |
| 76:1 77:1 78:1 | 159:1 160:1 | 195:16,19,21 | 150:10 155:15 |
| 79:1 80:1 81:1 | 161:1 162:1 | 210:5,10 | 164:2 168:20 |
| 82:1 83:1 84:1 | 163:1 164:1 | **trickier**   157:5 | 174:10 175:8,9 |
| 85:1 86:1 87:1 | 165:1 166:1 | **tried**   73:23 | 177:25 179:17 |
| 88:1 89:1 90:1 | 167:1 168:1,20 | 82:13 | 183:15 184:12 |
| 91:1,16 92:1 | 169:1 170:1 | **trouble**   140:18 | 186:2 195:7 |
| 93:1 94:1 95:1 | 171:1 172:1 | **troutman**   68:15 | 209:25 220:2 |
| 96:1 97:1 98:1 | 173:1 174:1 | 68:15,16 | **turned**   20:20 |
| 99:1 100:1 | 175:1 176:1 | **true**   176:20 | 21:16 23:2,20 |
| 101:1 102:1 | 177:1 178:1 | 205:4 222:15 | **turning**   20:22 |
| 103:1 104:1 | 179:1 180:1 | **trump**   162:11 | 24:4 128:2 |
| 105:1 106:1 | 181:1 182:1 | 178:19 | 178:14 199:6 |
| 107:1 108:1 | 183:1 184:1 | **trust**   14:13 | **turnout**   75:4 |
| 109:1 110:1 | 185:1 186:1 | 15:11 16:8,17 | **twice**   83:7 172:3 |
| 111:1 112:1 | 187:1 188:1 | 17:7 64:25 66:9 | **two**   29:10,23,25 |
| 113:1 114:1 | 189:1 190:1 | 67:15 68:22 | 30:7,25 32:17 |
| 115:1 116:1 | 191:1 192:1 | 70:12 72:16 | 42:25 43:8 |

**[two - voted]**

44:18 55:14
98:3 102:13
120:14,15
122:13 141:21
141:21 147:12
176:24 181:16
185:6
**type**  162:16
210:25
**types**  137:24
205:20
**typical**  160:6
**typically**  76:10
198:8,11
**typo**  95:19

**u**

**u**  5:2 41:6 61:16
118:17
**ultimately**
205:21
**um**  107:17
**unavailable**
83:24
**underlying**
39:19
**understand**  10:7
10:10,14,18
11:15 32:24
71:21 132:15,21
137:18 142:16
145:13 167:23
171:21 184:20
200:11 208:22
216:10
**understanding**
16:11 45:11
47:4 48:6,16,21

63:2 81:9,20
93:25 94:3
111:25 114:13
120:16 138:4,5
139:6,22 165:21
190:12 209:22
214:18
**understood**
130:7 170:16
**undisclosed**
81:22
**union**  2:12
**unit**  6:22 56:11
56:17 91:9,14
130:20 132:12
168:13,18
194:24 195:5
**united**  1:2 7:6
**units**  220:18
**universe**  160:17
**university**  54:15
**unrecognizable**
117:15 119:24
120:2 121:15
**unusual**  43:18
45:15 47:7
**update**  52:10
**updated**  52:7,18
52:25 53:9
54:12 56:21,24
223:20
**updates**  52:21
57:5
**upheld**  111:18
111:22
**upper**  69:5
**use**  19:2 36:4,6
52:12 55:22

91:25 94:9,15,24
95:4,6 124:10
139:3 148:22,24
160:22 162:23
172:21 184:4
192:3,8 198:12
198:16
**useful**  181:23
183:24 206:6
208:25
**useless**  185:13
**uses**  35:25
163:16
**usually**  80:12
215:11
**utilized**  86:15

**v**

**v**  60:17,20,21,23
61:5,8,9,10,11
61:15,16,25,25
62:13,17,18,24
63:5,9,16,17
81:25 82:9
120:24 122:9
123:10 226:5
**valid**  102:5
**valley**  181:25
182:2,4
**variable**  196:16
196:23
**variant**  185:3
**variation**  179:19
183:17
**various**  31:25
35:4 144:16
**verified**  8:4

**veritext**  7:11,13
8:2 220:20
226:3
**version**  52:3
**versus**  7:4 60:18
61:20 81:17
112:14 204:16
**video**  6:17,23
**videoconference**
1:18
**videographer**
4:16 6:7 7:12
56:9,15 91:7,12
130:18 132:10
168:11,16
188:11,14
194:22 195:3
218:3,6,11
220:14
**violate**  114:19
**violated**  191:15
193:11
**virginia**  60:4,11
62:7 72:4
149:12
**virtual**  1:16 8:2
**visibility**  216:3
**vitae**  51:20
56:25 223:19,21
**vogel**  15:12
**voice**  173:24,25
**volume**  73:4
**vote**  110:19
111:2,14 160:17
178:19 205:6
**voted**  159:23
160:10,15

**voter** 156:21,21
**voters** 61:5
  63:21 66:21,25
  67:3 103:23
  109:24 110:2,4
  110:11,18
  153:24 155:24
  156:7,12,13
  157:4 158:5
  159:22 160:10
  160:14 162:11
  162:11 163:2,4
  163:10 180:19
  181:4
**votes** 109:3,10
  156:24 157:17
  157:25 160:19
  180:24
**voting** 52:19
  54:10 55:23,25
  60:14 63:11
  76:19,23 110:20
  110:21,23 111:4
  138:8,15,20
  140:3 154:9
  155:3 157:21
  196:17,19
  197:11,20,22
  198:2,3

**w**

**wadmalaw**
  190:8 192:5,10
**wait** 152:20
**waived** 5:8
**walk** 19:25
  32:11 42:13
  59:20 63:19

97:7
**wallace** 3:7
**wandered**
  117:11 119:22
  121:12
**want** 10:5 19:11
  19:23,25 31:20
  33:9 36:9 46:6
  52:23 58:4 59:8
  63:18 89:4
  98:23 99:20
  111:13 116:6,24
  119:12 120:13
  122:7 133:8
  139:24 140:8
  141:11 145:13
  147:2 148:18
  154:8 158:12
  168:4,22 175:9
  177:6 180:15
  185:25 194:11
  194:12 195:7
  217:24
**wanted** 57:7
  71:20 92:10
  118:2 120:16
**wappo** 190:7
  192:4,10
**wards** 182:22
  183:3
**washington** 2:8
  3:20
**way** 16:13 18:4
  18:10 31:12
  40:24 59:23
  60:8 62:19 64:5
  74:4 98:17
  101:5,19 112:15

121:8 124:8
  126:15 128:17
  142:18 157:7
  158:2 179:24
  186:5 187:9
  198:7 199:3
  201:20 202:16
  208:12
**ways** 35:10
  102:14
**we've** 127:5
  185:4
**web** 150:25
**website** 33:8,14
  99:13,14,24
  103:6 150:20
  159:8
**websites** 133:6
**wednesday**
  83:10
**week** 89:2
**weird** 181:21
**welcome** 132:14
**went** 22:21
  79:24 118:18,19
  187:22 216:4
**west** 137:6
  182:24 183:10
**western** 182:18
**wgs84** 34:16
  35:7,9,22 36:2
**whispering** 6:11
**white** 105:10
**whites** 105:10
**whitford** 60:21
  62:17
**wide** 35:16

**widespread**
  211:18
**wife** 13:3 80:12
  84:2
**wife's** 167:25
**wilder** 170:19
**williams** 207:22
**windsor** 159:20
**witness** 7:19 8:2
  8:3,17 18:25
  81:19 91:3
  116:15 132:18
  168:8 192:15
  194:14,21
  222:13,20 223:2
  223:5 226:7
**women** 61:5
  63:21
**word** 92:8 94:24
  95:2,4,6
**words** 199:25
  202:23 204:4
  205:20
**work** 12:25 15:5
  16:12,13 19:5
  24:7,15,24 25:9
  25:16 31:15
  40:11 41:4
  48:23 58:12
  59:9 60:3,10,12
  60:13,17 62:9
  64:19,21 65:2,13
  66:10,17,18
  67:16,21 69:8,9
  69:21 70:13,18
  70:22 71:21
  72:4,5 211:14

**worked** 15:25
16:2,3 65:21
69:13 70:24
149:23 165:6,10
**working** 18:17
64:14,15 67:4,22
165:8
**works** 209:20
**write** 43:19
55:16 95:15,23
116:17 118:8
119:7 128:24
170:2 180:17
186:4 196:14
200:22 203:5,22
213:25
**writing** 26:16
28:5 32:14
173:22
**written** 21:4
55:14 79:6
**wrong** 213:5
217:2
**wrote** 142:13

**x**

**x** 1:5,13 223:11
224:2 225:2

**y**

**yeah** 27:13 53:6
68:3 72:11
74:23 77:8
84:10 91:23
127:23 138:23
140:23 152:21
152:22 154:14
154:18,18,22
157:9 166:13,17

171:8 172:17
176:16,19
185:19 202:8
212:16 213:6
**year** 15:3,15
54:18 59:16
**years** 117:14,18
121:25 124:11
191:14,18
199:23 212:21
212:22 213:6,9
213:16,17,18,24
219:9,10,19,19
**yesterday** 38:4
57:24 165:24
**yesterday's**
57:14
**york** 1:23 2:17
2:17 7:11,14
16:25 67:21
69:2 165:7,15
220:20 222:5,7

**z**

**z** 61:20
**zero** 26:2 149:22
204:12
**zip** 165:21,22
166:3 167:15
**zoom** 1:16,20
83:7

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.