*SC NAACP v. Alexander,*
D.S.C. Case No.  3:21-cv-03302-MGL-TJH-RMG

# EXHIBIT C

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2          FOR THE DISTRICT OF SOUTH CAROLINA
 3                  COLUMBIA DIVISION
 4     THE SOUTH CAROLINA STATE CONFERENCE OF THE
       NAACP, et al.,
 5
                    Plaintiffs,
 6
            vs.   CASE NO. 3:21-CV-03302-JMC-TJH-RMG
 7
       THOMAS C. ALEXANDER, et al.,
 8
                    Defendants.
 9
10     VIDEOCONFERENCE VIDEOTAPE
11     DEPOSITION OF:  SEAN TRENDE
12                     (Attending by VTC)
13     DATE:           April 5, 2022
14     TIME:           10:06 a.m.
15     LOCATION:       1146 Elderberry Loop
                       Delaware, Ohio
16
       TAKEN BY:       Counsel for the Plaintiff
17
       REPORTED BY:    Julie L. Bonomo
18                     (Attending by VTC)
19     _____
20
21
22
23
24
25
```

```
                                                    Page 2

 1      APPEARANCES OF COUNSEL:
              ATTORNEYS FOR PLAINTIFF
 2                  THE SOUTH CAROLINA STATE CONFERENCE OF
        THE NAACP, et al.:
 3
                    AMERICAN CIVIL LIBERTIES UNION
 4                  BY:  SOMIL TRIVEDI
                        (Attending by VTC)
 5                      PATRICIA YAN
                        (Attending by VTC)
 6                  915 15th Street, NW
                    Washington, DC 20005
 7                  202-715-0802
                    Strivedi@aclu.org
 8                  pyan@acly.org
 9                  AMERICAN CIVIL LIBERTIES UNION
                    BY:  ADRIEL I. CEPEDA DERIEUX
10                      (Attending by VTC)
                        SAMANTHA OSAKI
11                      (Attending by VTC)
                    125 Broad Street
12                  New York, New York  10004
                    212-284-7334
13                  acepedaderieux@aclu.org
14                  NAACP LEGAL DEFENSE AND EDUCATIONAL
                    FUND, INC.
15                  BY:  JOHN S. CUSICK
                        (Attending by VTC)
16                  40 Rector Street, 5th Floor
                    New York, New York  10006
17                  917-858-2870
                    Jcusick@naacpldf.org
18
                    NAACP LEGAL DEFENSE AND EDUCATIONAL
19                  FUND, INC.
                    BY:  ANTONIO L. INGRAM, II
20                  700 14th Street
                    Suite 600
21                  Washington, D.C.  20005
                    202-682-1300
22                  aingram@naacpldf.org
23            ATTORNEYS FOR THE DEFENDANT
                HOUSE DEFENDANTS JAMES LUCAS, CHRIS
24      MURPHY, AND WALLACE JORDAN:
                    NEXSEN PRUET, LLC
25                  BY:  KONSTANTINE DIAMADUROS
```

```
                                              Page 3

 1                      (Attending by VTC)
                        ANDREW MATHIAS
 2                      (Attending by VTC)
                   104 South Main Street
 3                 Suite 900
                   Greenville, South Carolina  29601
 4                 864-370-2211
                   kdiamaduros@nexsenpruet.com
 5                 amathias@nexsenpruet.com
 6          ATTORNEYS FOR THE DEFENDANT
                   SENATE DEFENDANTS THOMAS ALEXANDER AND
 7      LUKE RANKIN:
 8                 JONES DAY
                   BY:  STEPHEN J. KENNY
 9                      (Attending by VTC)
                        JOHN M. GORE
10                      (Attending by VTC)
                   51 Louisiana Avenue NW
11                 Washington, DC  20001
                   202-879-3667
12                 skenny@joesday.com
13           ATTORNEYS FOR THE
      SOUTH CAROLINA ELECTION COMMISSION:
14
                   BURR & FOREMAN, LLP
15                 BY:  JANE W. TRINKLEY
                        (Attending by VTC)
16                 1221 Main Street
                   Suite 1800
17                 Columbia, South Carolina  29201
                   803-799-9800
18                 Jtrinkley@burr.com
19           ALSO PRESENT:
20                 ROOSEVELT HARRISON, LEGAL VIDEOGRAPHER
21
22                 (INDEX AT REAR OF TRANSCRIPT)
23
24
25
```

Page 4

1                    THE VIDEOGRAPHER:  We are now on the

2      record.  The time on the monitor is 9:05 a.m.

3      Eastern Standard time.  Today's date is April 5,

4      2022.  This is the video recorded deposition of

5      Mr. Sean Trende, in the matter of the South

6      Carolina State Conference of the NAACP, et al,

7      versus Thomas C. Alexander, et al.

8                    This deposition is being held remotely

9      via Zoom.

10                    Counsel, please introduce yourselves,

11      after which the court reporter will swear in the

12      witness.

13                    MR. TRIVEDI:  Somil Trivedi from the

14      American Civil Liberty Union Foundation for the

15      Plaintiffs.

16                    MR. DIAMADUROS:  Konstantine

17      Diamanduros, on behalf of the House Defendants,

18      James Lucas, Chris Murphy, and Wallace Jordan.  In

19      the room with me is my colleague, Andrew Mathias,

20      also on behalf of House Defendants.

21                    MS. TRINKLEY:  Jane Trinkley on behalf

22      of Election Commission.

23                    MR. KENNY:  Stephen Kenny on behalf of

24      the Senate Defendants, Thomas Alexander and Luke

25      Rankin.

Page 5

1              MS. YAN:  Patricia Yan of the American

2    Civil Liberty Union for the Plaintiffs.

3              MR. CUSICK:  John Cusick on behalf of

4    the Plaintiffs at the NAACP Legal Defense

5    Educational Fund.

6              MR. DERIEUX:  Hi.  This is Adriel

7    Cepada Derieux of the American Civil Liberties

8    Union for the Plaintiffs.

9              MS. OSAKI:  Hi.  This is Samantha Osaki

10   with the ACLU.  Also for the Plaintiffs.

11              THE COURT REPORTER:  Is that everyone?

12              MR. TRIVEDI:  Seems like it.

13              THE COURT REPORTER:  I'll swear in the

14   witness then.

15                    SEAN TRENDE

16   being first duly sworn, testified as follows:

17                    EXAMINATION

18   BY MR. TRIVEDI:

19        Q.   Thank you, Mr. Trende.  Good morning.

20        A.   Good morning.

21        Q.   Would you mind stating your full name

22   for the record please?

23        A.   Sean Patrick Trende.

24        Q.   And you understand that you're

25   testifying under oath today?

Page 6

1          A.    Yes.

2          Q.    And is there anything before we get

3     started that might prevent you from understanding

4     my questions or answering them truthfully today?

5          A.    No.

6          Q.    Okay.  So let's go over a few ground

7     rules for this deposition, so we all have the same

8     understanding of things.  Is that all right?

9          A.    Sure.

10          Q.    In this deposition, I will be asking

11     you questions.  My questions and your answers will

12     be recorded by the court reporter for the

13     transcript.

14               Does that make sense?

15          A.    Yes.

16          Q.    So especially because we're over Zoom,

17     you'll need to speak up and answer clearly so the

18     reporter can take down your responses, just like I

19     will have to do the same for my questions.

20               The reporter won't be able to record a

21     nod, or a sake of your head, or uh-huh.

22               Do you understand that?

23          A.    Yes.

24          Q.    The court reporter is also going to

25     have trouble if we talk over each other.  So it's

Page 7

1    person that you wait for me to finish a question
2    entirely before you begin answering, even if you
3    think you know what the rest of the questions might
4    be.  This is especially important, again, because
5    we are over video, and there maybe a lag at times.
6              Is that all right with you?
7         A.   Yes.
8         Q.   And similarly, I'll do my best to make
9    sure that I let you completely answer questions
10   before asking about them.
11             Is that okay?
12        A.   Yes.
13        Q.   Okay.  From time to time I might ask a
14   question that you don't understand maybe because of
15   how I phrased it or because my audio cut out.  If
16   you don't understand the question for any reason,
17   just ask me to repeat it and I'll do it.
18             Is that all right?
19        A.   Yes.
20        Q.   As I mentioned a second ago, sometimes
21   there are tech issues especially over Zoom.  There
22   might be background noise, static or lag.  If you
23   experience any of that, just let everybody know,
24   and we will either fix it in real time or go off
25   the record to fix it.  We don't want a garbled

Page 8

```
1      transcript if there are tech issues.

2                  Is that good?

3           A.    Yes.

4           Q.    Okay.  Just to go back to your oath for

5      a second.  You understand that you have taken an

6      oath just now, correct?

7           A.    Yes.

8           Q.    And that requires you to tell the

9      truth, the whole truth, and nothing but the truth,

10     is that right?

11          A.    Yes.

12          Q.    So that is the same oath that you would

13     take if we were sitting in court today.

14                  Do you understand that?

15          A.    Yes.

16          Q.    Okay.  If you need to take a break at

17     any point, for any reason, just tell me or your

18     attorney and we'll finish this question or maybe

19     the line of questions that I'm on.  And then we'll

20     take a break.

21                  Is that fine?

22          A.    Yes.

23          Q.    Okay.  And the local rules dictate that

24     during those breaks you can't speak to your

25     attorney about anything substantive about the
```

Page 9

1    deposition.

2              Do you understand that?

3         A.   Yes.

4         Q.   Okay.  Speaking of your attorneys,

5    during this deposition, they may object to

6    questions of mine.  If they object, unless they

7    instruct you not to answer or the attorneys are

8    having some kind of back and forth about the

9    question, you are supposed to go ahead and answer.

10   They have simply lodged their objection for the

11   record.

12             Is that okay with you?

13        A.   Yes.

14        Q.   Okay.  You may also at some point give

15   an answer to a question and later remember

16   additional information or want to clarify

17   something.  If that happens, just tell me that you

18   would like to add something to an earlier answer

19   and we'll address it.

20             Will you do that?

21        A.   Yes.

22        Q.   Okay.  Similarly, if you realize you

23   said something inaccurate, you can just tell me and

24   we'll clear it up.

25             Is that alright?

```
                                            Page 10
 1          A.    Yes.
 2          Q.    Okay.  So I think I know this answer to
 3    this, but have you been deposed before?
 4          A.    Yes.
 5          Q.    Approximately how many times?
 6          A.    15 to 20 maybe.
 7          Q.    When was the most recent time?
 8          A.    Probability in the Maryland
 9    redistricting case but, I don't know the exact
10    chronology.
11          Q.    Was it this year?
12          A.    Yes.
13          Q.    Okay.  Turning to this case now, you
14    understand that this case broadly alleges racial
15    gerrymandering and potential discrimination against
16    state officials who created the South Carolina
17    State House Redistricting Map?
18          A.    About the racial gerrymandering claim.
19    I don't know anything about the intent issue.
20          Q.    Do you understand that racial
21    gerrymandering and potential discrimination are the
22    claims that the Plaintiffs have brought in this
23    case?
24          A.    I didn't receive the Complaint, so I
25    didn't actually know.  If you had asked me is this
```

Page 11

1    an intention discrimination case, I would say that

2    I don't know.  I only about that it was a Shaw

3    case.

4            Q.   Do you understand that the map that

5    we're discussing relates to the state house in

6    South Carolina?

7            A.   Yes.

8            Q.   Do you know that it was passed into law

9    under a bill called House Bill 4493 or H4493?

10           A.   No.

11           Q.   What I'm trying to get at is that we

12   are talking about the same map.  So in your expert

13   report you refer to something called the enacted

14   map.  Is it your understanding that the enacted map

15   is the map that was passed in 2021 by the state

16   legislature and signed by the governors that now

17   applied to the state house of representatives in

18   South Carolina?

19           A.   Yes.

20           Q.   So for the rest of this deposition I'm

21   going to refer to that as the enacted map just like

22   you do in your report, for ease of use.

23               Is that okay?

24           A.   Yes.

25           Q.   Okay.  And you understand that the

Page 12

1    enacted map is the one that's at issue in the

2    litigation?

3         A.   Yes.

4              (EXHIBIT 1, Amended Deposition Notice,

5    was marked for identification.)

6    BY MR. TRIVEDI:

7         Q.   Okay.  I'm going to pull up an exhibit

8    over screen share and there might be a lag so tell

9    me when you see it?

10        A.   I see it.

11        Q.   Great.  Now this is difficult over Zoom

12   because I control the document.  But do you

13   recognize this document?

14        A.   No.

15        Q.   Can you read what's there in the bold

16   all caps and underlined in the middle of page?

17        A.   Deposition of Sean Trende.

18        Q.   Okay.  Do you know what a Deposition

19   Notice is?

20        A.   Yes.

21        Q.   Okay.  Do you understand this to be a

22   Deposition Notice of you?

23        A.   Yes.

24        Q.   Okay.  I stopped sharing.  So you said

25   a moment ago you didn't recognize it.  You haven't

Page 13

1    seen this document before today?

2              A.    It may have been sent by counsel, but I

3    had the date.  That's what was important to me.

4              Q.    You understand that you have been

5    designated an expert in this case; is that right?

6              A.    Yes.

7              Q.    Okay.  And when I say, "this case," I

8    mean the case regarding the state house map and not

9    any other map.  Is that your understanding?

10             A.    Yes.

11             Q.    Not for congress, for example?

12             A.    Yes, I understand that.

13                   (EXHIBIT 2, Trende Report and CV, was

14   marked for identification.)

15   BY MR. TRIVEDI:

16             Q.    I'm going to pull up another document

17   now just for a moment because I do think you'll

18   recognize this one.  Okay.  Can you read what is in

19   the middle of the page, in all caps, bold and

20   underlined, please?

21             A.    Rebuttal Expert Report for Sean P.

22   Trende.

23             Q.    I know you can't see ever page right

24   now, but do you recognize this document, as I

25   scroll through it?

Page 14

1          A.    Yes.  Yes.

2          Q.    What is it?

3          A.    It is the expert report that I wrote

4     for this case.  At least the first five pages of

5     it.

6          Q.    I'm going to take this down now, but

7     just know that I'm going to refer to it at many

8     times during the deposition.  If there is ever a

9     time where I'm at a part of the deposition or I'm

10    sorry a part of the report, that you would like to

11    see on the screen, I can do that.

12               Is that okay?

13         A.    Yeah.  I have my own copy.

14         Q.    Great.  That is all.

15               You submitted this report on February

16    10, 2022; is that right?

17         A.    Yes.

18         Q.    When did you start writing it?

19         A.    I don't know.

20         Q.    Would you say you started writing it on

21    2022?

22         A.    Certainly.

23         Q.    So not as early as 2021?

24         A.    No, I did not write it in 2021.

25         Q.    Did you start it in February of 2022?

Page 15

```
 1          A.    Would either be late January report
 2     early February.
 3          Q.    What materials did you rely on to write
 4     your report?
 5          A.    The materials referenced in the report
 6     and produced Plaintiffs to my knowledge or
 7     recollection.
 8          Q.    Did you produce to the Plaintiffs every
 9     material that you relied on for your report?
10          A.    I think every substantive material and
11     I didn't consciously withhold anything.
12          Q.    What do you mean by "substantive?"
13          A.    There is always stuff you rely on that,
14     you know, you have learned in other classes, you
15     have read in articles, that give you background
16     information.  But by substantive, I mean the stuff
17     that goes into actual substance of the report.
18          Q.    Are there any documents you created, or
19     the spreadsheets, or notes that you used while
20     creating the report that you didn't turn over?
21          A.    I don't think so.
22          Q.    Any computer code that you employed in
23     the making of your report that you didn't turn
24     over?
25          A.    I don't believe so.
```

```
                                            Page 16
 1            Q.    Any there documents referenced in your
 2      report that you didn't turn over?
 3            A.    I mean, the citations.
 4            Q.    Anything else?
 5            A.    I'm saying I have to look at the
 6      citations.  So, for example, Paragraph 43 I
 7      reference the McCartan and Imai article.  I didn't
 8      produce that article because it's publically
 9      available, so things of that nature I didn't
10      produce.
11            Q.    Sure.
12            A.    I didn't consciously withhold anything,
13      if that's what you're getting at.
14            Q.    When about did you turn these materials
15      over to counsel?  Without revealing anything
16      privileged about any conversation with counsel.
17            A.    I believe it was whenever the case came
18      back to life in my deposition.  Well, I guess it's
19      always been the life for you all.  But for me when
20      it came back to life, and the deposition was back
21      on, I started turning things over.
22            Q.    When about was that?
23            A.    I mean, so last week I was in Iceland,
24      so the week before, the week before that.
25            Q.    Okay.  Did you turn over any materials
```

Page 17

```
 1       in the last week?
 2               A.   No.  Oh, no.  That's not true because I
 3       gave some documents last night.  So those documents
 4       last night.
 5               Q.   Were those documents that you either
 6       relied on or referenced in your report?
 7               A.   There were two shape files that were
 8       publically available that I hadn't turned over, and
 9       there was a GOJ san (ph) that I forgot was in the
10       code, but I guess it is not referenced in the
11       report, so the answer to your question would be no.
12               Q.   Was it relied on in the report?
13               A.   It was relied on indirectly through the
14       code, but it is not relied on directly in the
15       report.
16               Q.   But you used the code in the report,
17       correct?
18               A.   Yes.
19               Q.   Again, without revealing any privileged
20       communications, who did you speak to in creating
21       your report?
22               A.   Attorneys at Nexsen Pruet.
23               Q.   Any other defense experts in this case?
24               A.   Not about this report, no.
25               Q.   Did you speak to any of the names
```

```
                                        Page 18
 1    Defendants?
 2            A.    I don't even know who those are so no.
 3            Q.    Any members of the South Carolina State
 4    House?
 5            A.    No.
 6            Q.    Other members of the South Carolina
 7    Legislature?
 8            A.    No.
 9            Q.    The person or people who created the
10    enacted map?
11            A.    Yeah, no members of the legislature, so
12    no.
13            Q.    Well any third parties who might have
14    helped create the enacted map, you didn't speak
15    with them either?
16            A.    No.
17            Q.    When you say you spoke with attorneys
18    at Nexsen Pruet, again, I want to be clear.  I
19    don't want you to reveal anything privileged.  But
20    about how many times did you meet with them?
21            A.    I don't know.  I could only guess.  It
22    was a long time ago.
23            Q.    So I think you said a moment ago that
24    you started writing this in maybe late January, is
25    that what you mean by a long time ago?
```

Page 19

1             A.    Yeah, for me that's a long time ago.

2       Right now it's been crazy.

3             Q.    Okay.  Did you -- would you say you met

4       with them more than five times?

5             A.    Most likely.  I mean --

6             Q.    More than --

7             A.    I'm sorry, but I want to clarify.  By

8       meeting, do you mean like a generic phone

9       conversation, or do you mean a large-scale

10      conference call?

11            Q.    I mean any type of communication at

12      whatever length?

13            A.    But not e-mail?

14            Q.    I can ask about that in a moment.

15            A.    Okay.  You said any conversation -- any

16      type of communication.  E-mail is communication,

17      but I wouldn't consider it a meeting, as long as

18      we're agreed on that.

19            Q.    How many times did you call Nexsen

20      Pruet attorneys on the phone?

21            A.    I don't know.

22            Q.    Was it more than five?

23            A.    Almost certainly.

24            Q.    Was it more than ten?

25            A.    Probably.

```
                                              Page 20
 1              Q.   Was it more than 15?

 2              A.   I couldn't say.

 3              Q.   How many times approximately did you

 4      e-mail with them?

 5              A.   Dozens.

 6              Q.   And how many times did you meet in

 7      person?

 8              A.   Never.

 9              Q.   So for the phone conversations, I think

10      you said there were dozens of them?

11              A.   I think I said dozens of e-mails.

12              Q.   Oh, I'm sorry.  You're right.  You said

13      -- you said probably more than ten, but you

14      couldn't say if it was more than 15 phone

15      conversations; is that right?

16              A.   That's right.

17              Q.   Okay.  What was the range of length of

18      these calls?  I think you mentioned a minute ago

19      that it might have been a two-minute conversation,

20      it might have been a longer meeting.  Of the tens

21      of 15 phone calls, how many were shorter than half

22      an hour?

23              A.   I don't know.

24              Q.   How many were longer than half an hour?

25              A.   I don't know.
```

```
                                              Page 21
 1            Q.    Were any of them longer than half an
 2      hour?
 3            A.    Most likely.
 4            Q.    Were any of them longer than an hour?
 5            A.    No clue.
 6            Q.    Okay.  We talked a moment ago about
 7      documents you relied on to create your report.
 8                  Did you review any documents before
 9      starting to write your report?
10            A.    Obviously the documents referenced in
11      the report, and the expert reports of the
12      Plaintiffs.  Well, I shouldn't say that.  I read
13      Imai and Ragusa reports and skimmed the Duchin and
14      I can't remember the name of the VRA expert, the
15      racial polarization expert.
16            Q.    Is that Baodong Liu?
17            A.    That sounds right.
18            Q.    You skimmed that one?
19            A.    Yes.
20            Q.    Just because we're on Zoom, and in
21      different locations, do you have any documents in
22      front of you today?
23            A.    I have my expert report open.
24            Q.    Okay.  Could you just show us for the
25      record on the video?  Oh.  I'm sorry.  You have it
```

```
                                        Page 22
 1    open on your desktop?
 2            A.    Yeah.
 3            Q.    Okay.
 4            A.    I don't have any paper in front of me.
 5    Well, I mean, I have all kinds of paper, but
 6    nothing to rely on.
 7            Q.    Okay.  Have you discussed this case
 8    with any one except your attorneys?
 9            A.    Probably my wife.
10            Q.    Anyone else?
11            A.    Not in a substantive sense.  I'm sure
12    for other cases, I'm not even sure I mentioned it
13    in passing with other cases.
14            Q.    What about other --
15            A.    May --
16            Q.    I'm sorry.  Go ahead.
17            A.    Well, if you want to schedule something
18    and something else is scheduled, you might say,
19    "No, I can't do that.  We had an old deposition
20    scheduling."  So I may have said something like
21    that.  I think in my deposition in Maryland when we
22    were going through cases this one came up, although
23    at the time the litigation was stayed.  So there
24    was no substantive discussion of it.  That nature.
25            Q.    So in the Maryland case you discussed
```

```
                                          Page 23

 1      this case with the attorneys in the Maryland case?

 2            A.   In the deposition, when they do the

 3      walkthrough of the cases you have been in, this

 4      case came up.  But at the time it was stayed, so

 5      there wasn't much to discuss.

 6            Q.   Has this case come up in other

 7      depositions that you have been in?

 8                 (Technical interference)

 9            Q.   Oh, I'm sorry.  Sean, I think your

10      sound just cut out for me.

11            A.   The answer is I don't know.

12            Q.   Okay.

13            A.   Well, the answer is I don't know.

14            Q.   Okay.  Sorry about that.

15                 So any other times that you can recall

16      that you spoke to other people about this case?

17            A.   No.

18            Q.   Who first told you that this lawsuit

19      had been filed?

20            A.   An attorney with Nexsen Pruet.

21            Q.   When was that?

22            A.   Probably January.

23            Q.   Of 2022?

24            A.   Yes.

25            Q.   Who first told you that your deposition
```

Page 24

1    had been requested?

2              A.    Probably Mr. Mathias.

3              Q.    Do you mean Andrew Mathias, your

4    attorney?

5              A.    Mathias, yes.

6              Q.    When was that approximately?

7              A.    It would have been whenever you all --

8    whenever Plaintiffs noticed my deposition the first

9    time.

10             Q.    Aside from everything we have discussed

11   to this point, did you do anything else to prepare

12   your deposition?

13             A.    I had a conversation with counsel

14   yesterday, and I reviewed my expert report.

15             Q.    How long was that conversation with

16   counsel yesterday?

17             A.    Perhaps 45 minutes.  I was in the car.

18             Q.    So that was over the phone?

19             A.    Yes.

20             Q.    Are you being compensated by any one

21   for being here today?

22             A.    I hope so.

23             Q.    Well, are you?

24             A.    I hope so I haven't received a check

25   yet.

```
                                              Page 25

 1            Q.    Are you under a contract to be

 2      compensated?

 3            A.    Yes.

 4            Q.    By whom?

 5            A.    I believe it's with -- the contract is

 6      with Nexsen Pruet.

 7            Q.    Do you expect to be compensated to

 8      testify at trial in this case, if we go to trial?

 9            A.    If I'm called as a witness, I would

10      hope so.

11            Q.    And who in this case --

12            A.    I have been -- I have been stiffed

13      before so...

14            Q.    Sorry for that.  If you are

15      compensated, who would do the compensating?

16            A.    I would assume Nexsen Pruet.

17            Q.    Now we're doing to move to some

18      personal background.

19                  Have you ever gone by any other names?

20            A.    No.

21            Q.    What is your date or birth?

22            A.    January 6, 1973.

23            Q.    What is your address?

24            A.    1146 Elderberry, E-L-D-E-R-B-E-R-R-R-Y,

25      Loop, Delaware, Ohio 43015.
```

Page 26

```
 1              Q.    Do you have e-mail accounts?
 2              A.    Yes.
 3              Q.    How many?
 4              A.    Goodness, I don't even know.  There are
 5       three that I have in my Outlook that I use, and a
 6       Gmail that I occasionally use.
 7              Q.    Can you tell us -- can you spell out
 8       those e-mail addresses?
 9              A.    So the spelling of my name, since I
10       don't think we got that is Sean, S-E-A-N
11       T-R-E-N-D-E.  So there is SeanTrende@hotmail.com.
12       There is Trende.30@oc.edu, and then there is
13       Strende@realclearpolitics.  That is all one word,
14       R-E-A-L-P-O-L-I-T-I-C-S.  No.  R-E-A-L-C-L-E-A-R
15       and then politics.com.
16              Q.    And the Gmail?
17              A.    TrendeSean@Gmail.com.
18                    I think there are other ones floating
19       around out there that over the years, but those are
20       the ones that I could log into if I wanted to.
21              Q.    So which of those have you used for
22       work on this case?
23              A.    I believe the
24       STrende@RealClearPolitics.  There may have been
25       some things for -- that came through on the OSU
```

```
                                              Page 27

 1     account.  People sometimes contact me initially

 2     through that, but that's not my main account.

 3              Q.   So what is your main account?

 4              A.   RealClearPolitics account.

 5              Q.   Okay.  And that is the one that used in

 6     the e-mails that you said you sent back and forth

 7     with your attorneys?

 8              A.   Yes.  Unless something came in

 9     initially through the OSU account.

10              Q.   Did you use -- I'm sorry.

11                   Did you search both of OSU account and

12     the RealClearPolitics account for documents you

13     relied on this in case so that you could turn them

14     over to Plaintiffs?

15              A.   No.

16              Q.   Did you send texts related to work on

17     this case?

18              A.   I think -- I don't know actually.  I

19     don't know.

20              Q.   Do you think it's likely?

21              A.   I think it's likely, but I'm not sure.

22              Q.   Have you checked?

23              A.   No.

24              Q.   All right.  If you sent them, with whom

25     did you correspond by text?
```

```
                                             Page 28
 1              A.    They would have been with counsel.

 2              Q.    Only counsel?

 3              A.    Only counsel.

 4              Q.    Do you have any personal social media

 5       accounts like Facebook and twitter?

 6              A.    Yes.

 7              Q.    What accounts are those?

 8              A.    I have my personal Facebook account in

 9       my name.  There is an old business one for

10       realclearpolitics that I'm not sure I can log into

11       anymore.  It's probably haven't logged into it in

12       six years, and then there is my Twitter feed.

13              Q.    What is the full name on the Facebook

14       account?

15              A.    I believe it's just Sean Trende.

16              Q.    What is the handle on the Twitter

17       account?

18              A.    The -- if you look, it's

19       Twitter.com/SeanTrende, one word.  And I think

20       SeanT@RCP is what shows right now as the handle.

21              Q.    Do you have control over any other

22       social media accounts that are not in your name?

23              A.    No.

24              Q.    Okay.  I want to move to your

25       educational background.
```

```
                                           Page 29

 1                    You're get ago Ph.D. political science;
 2      is that right?
 3             A.    Correct.
 4             Q.    It says in your expert report that you
 5      expect to receive your Ph.D. in May 2022; is that
 6      right?
 7             A.    Correct.
 8             Q.    So that's next month, correct?
 9             A.    Correct.
10             Q.    So have you already defended your
11      dissertation?
12             A.    No.
13             Q.    Is the defense of your dissertation
14      scheduled?
15             A.    Nope.  We're hoping to get everything
16      going and completed with drafts at least in a week.
17             Q.    So you hope to finish your dissertation
18      in a week?
19             A.    The remaining paper, yes.
20             Q.    And schedule your defense when?
21             A.    Probably towards the end of April.
22             Q.    Okay.  So you still expect to receive
23      your Ph.D. in May?
24             A.    It's my hope.  My application is just
25      -- my application to graduate has been approved, so
```

```
                                                  Page 30
 1        that is my hope and expectation.  If it has to go
 2        into the summer, it has to go into the summer.  But
 3        that is my expectation right now.  Things have come
 4        together faster.
 5                  Q.   We'll get there.
 6                       Have you completed your dissertation?
 7                  A.   No.
 8                  Q.   In your expert report, you say, quote,
 9        "My dissertation focuses on applications of spatial
10        statistics to political questions, including an
11        article on redistricting simulations and the effect
12        of communities of interest on partisan bias."
13                       Did I get that right?
14                  A.   Yes.
15                  Q.   So I want to unpack that language a
16        bit.  First you say, "my dissertation;" is that
17        right?
18                  A.   Yes.
19                  Q.   You didn't use the words draft
20        dissertation; is that right?
21                  A.   Yes.
22                  Q.   You didn't say working dissertation; is
23        that right?
24                  A.   Yes.
25                  Q.   You didn't say how many articles of
```

```
                                          Page 31
 1      your dissertation were done or not done, correct?
 2             A.   Correct.
 3             Q.   You didn't say that it wasn't complete,
 4      did you?
 5             A.   (Inaudible).
 6             Q.   I'm sorry, that didn't come over the
 7      audio.
 8                  You didn't say that it wasn't complete,
 9      did you?
10             A.   I did not say that.
11             Q.   Do you have someone at Ohio State who
12      is overseeing your work on your dissertation?
13             A.   Yes.
14             Q.   Who is that person?
15             A.   Greg Caldeira.
16             Q.   Do you send Mr. Caldeira drafts of your
17      dissertation?
18             A.   We have over time.  The first paper has
19      gone through some different iterations for
20      different uses.  So yeah.
21             Q.   Okay.  And when you e-mail with
22      Mr. Caldeira, do you say, I have a dissertation, or
23      do you say you have drafts?
24             A.   I don't know.
25             Q.   If we talked to Mr. Caldeira, would he
```

Page 32

1    say you have a dissertation or you a draft

2    dissertation?

3          A.    He would probably say -- I don't know

4    what he would say.  Usually when we talk about --

5    as grad students when we talk about and say, "What

6    is your dissertation about?"  And we say, "Well, my

7    dissertation is about X, Y or Z."  Not my draft

8    dissertation or my working dissertation.  We just

9    refer to it as the dissertation.

10          Q.    So you say -- your dissertation, in

11    your report, you say, it contains, quote, "An

12    article on redistricting simulations and the effect

13    of communities of interest on partisan bias?"

14          A.    That's not right.

15          Q.    That's not right?

16          A.    I didn't say it contained it.

17          Q.    Okay.  Let's unpack the wording then.

18    You said, "My dissertation focuses;" is that right?

19          A.    Uh-huh.  That's right.

20          Q.    Focus is in the present tense?

21          A.    Yes.

22          Q.    All right.  And then you say, "On

23    applications of spatial statistics and political

24    questions, including."

25                Is including a present tense gerund?

```
                                                  Page 33
 1              A.    I have no idea.
 2              Q.    Do you think in the way you used the
 3      word including, that that means that it currently
 4      includes something?
 5              A.    The focus does, yes.
 6              Q.    But not the dissertation?
 7              A.    The dissertation focuses -- I mean, I
 8      don't know how to diagram the sentence.  And I have
 9      to be honest, I didn't spend a whole lot of time
10      crafting the sentence.  If I had to unpack that, I
11      would say my dissertation, which, again, is just
12      kind of how people refer to it.  Not the
13      dissertation project, which may have been more
14      precise focuses.  So what is the focus of your
15      dissertation?  Well, these are the three papers in
16      it.
17              Q.    Okay.  But focuses is a verb, right?
18              A.    If you say so.
19              Q.    You can't say whether focuses is a
20      verb?
21              A.    I suppose it is.  It's been a long time
22      since I -- you just used the term gerund, and I
23      don't have any recollection of what that means, so
24      I'm assuming focus if the verb.
25              Q.    Okay.  And all I'm asking is when you
```

Page 34

```
 1     say something is including an article, do you mean
 2     -- would you understand that to mean that the
 3     article exists?
 4             A.    No.
 5             Q.    No.
 6             A.    No.  If someone said, what is your
 7     dissertation about, and they said, my dissertation
 8     focuses on these three things.  I wouldn't
 9     necessarily conclude or even assume that everything
10     is done.  I would assume that that's what their
11     project focuses on.  That is their area of inquiry
12     and intent.
13             Q.    Okay.  You do have other pieces of your
14     dissertation, right?
15             A.    Right.
16             Q.    You didn't list those in that sentence,
17     correct?
18             A.    Right.
19             Q.    Okay.  Now I want to state for the
20     record that we just received the documents I'm
21     about to show you over the last 12 hours.  So we
22     have not had time to review them thoroughly, but
23     I'm going to pull them up.
24             A.    Okay.
25                   (EXHIBIT 16, Trende Dissertation 2, was
```

```
                                           Page 35
 1     marked for identification.)
 2     BY MR. TRIVEDI:
 3             Q.   Can you see this document?
 4             A.   Yes.
 5             Q.   Do you recognize it?
 6             A.   Yes.
 7             Q.   What is it?
 8             A.   It's the second dissertation paper.
 9             Q.   Okay.  So can you tell us what this is
10     about?
11             A.   This is about use of integrated nested
12     Laplace approximations to improve Bayesian modeling
13     and to enable use of spatial and spatial temporal
14     models in political science.
15             Q.   Okay.  Does this document have anything
16     to do with racial gerrymandering?
17             A.   No.
18             Q.   Does it have anything to do with
19     intentional discrimination and redistricting?
20             A.   I guess you could use INLA if you
21     wanted to somehow bring in spatial model of it, but
22     that's not by intention and it is not the -- not
23     something I really considered.
24             Q.   So it's not part of this dissertation?
25             A.   Racial gerrymandering?
```

```
                                              Page 36

 1          Q.    Yes.
 2          A.    Right.  Racial gerrymandering is not
 3     part of dissertation.
 4          Q.    Nor is intentional discrimination?
 5          A.    Yeah, that's right.  Intentional
 6     discrimination is not part of dissertation.
 7          Q.    Okay.  I want to scroll down to page --
 8     this is 11.  What does it say there at the top?
 9          A.    "Application 1 Voting."
10          Q.    What does it say right underneath
11     there?
12          A.    "Needs to be redone for weighting."
13          Q.    What does that mean?
14          A.    That means that the -- so this section
15     has to do with recreation of -- there is 24 -- 24
16     GHAPS article from Irvin, and -- or three other
17     authors on early voting, and same-day registration,
18     and they use weighted lease squares.  So I had
19     started some work on this and realized that my code
20     and INLA had not used weighted lease squares.  So
21     it's junk, so it has to be redone.
22          Q.    Okay.  But when you say, "voting," you
23     again don't mean redistricting?
24          A.    No, no.
25          Q.    And you don't mean racial
```

```
                                        Page 37
 1      gerrymandering?
 2            A.   No, no.  I think we would agree to
 3      stipulate on it.  Our side at least would agree to
 4      stipulate on this.  It doesn't have anything to do,
 5      in my intent, at least with gerrymandering.
 6            Q.   But it also doesn't have to do with the
 7      sort of simulation that Dr. Imai ran in his expert
 8      report in this case, right?
 9            A.   Agreed.
10            Q.   Or the methods that you employed in
11      your expert report, correct?
12            A.   That's right.  I didn't use INLA in my
13      expert.
14            Q.   And you don't use -- I'm sorry.  You
15      done use the gerrymandering index in this
16      dissertation draft?
17            A.   No.
18            Q.   And just to clarify one more time,
19      Application 2 says, "Ballot Order," correct?
20            A.   Correct.
21            Q.   That doesn't have anything to do with
22      redistricting either?
23            A.   That's correct.
24            Q.   Okay.  I'm pulling up another document.
25      Again, I'm saying for the record that we received
```

1       this document at about 7:40 a.m. this morning, and

2       we have not had a chance to review this nearly at

3       all.  But I want to ask you some questions about it

4       because I have you here.

5                   Do you see this document?

6             A.   Yes.

7                   (EXHIBIT 17, Trende Dissertation 1, was

8       marked for identification.)

9                   (EXHIBIT 18, Ohio Organizing

10      Collaborative v. Husted, 2, was marked for

11      identification.)

12                  MR. TRIVEDI:  And for the record, we

13      have marked this Trende Exhibit 17.  I apologize,

14      Konstantine.  I can send you the exhibit numbers of

15      everything that we have discussed to this point, as

16      well, since we're just doing it over screen share,

17      but, sorry.

18      BY MR. TRIVEDI:

19            Q.   Mr. Trende, so what is this document?

20            A.    This is the first paper.

21            Q.    The first paper of your dissertation?

22            A.    I can call it my dissertation, and not

23      a draft dissertation, yes.

24            Q.    Let's call it your draft dissertation.

25      This paper is not about redistricting either, is

```
                                        Page 39
1      it?
2              A.    No.
3              Q.    It's not about regional gerrymandering,
4      is it?
5              A.    It is not.
6              Q.    It's not about intentional
7      discrimination, correct?
8              A.    That's right.
9              Q.    And it's not about -- it doesn't employ
10     the models used by Dr. Imai in his report, correct?
11             A.    That's right.
12             Q.    It doesn't used the models employed by
13     Dr. Ragusa in his report, correct?
14             A.    That -- that is right.  It is
15     irrelevant to this case.
16             Q.    So I want to go back to -- well, let me
17     finish with these two documents.  I just showed you
18     PDFs, correct?
19             A.    Correct.
20             Q.    Do you work in PDF?
21             A.    No.
22             Q.    What application do you work in?
23             A.    For now, Word, and then it will switch
24     over to whether you call it LaTeX or LaTeX or --
25     I'm going to call it LaTeX because that's what I
```

```
                                              Page 40
 1      call it for the final version.
 2              Q.   Sorry about that.  Say that last part
 3      again?  I cut you off.
 4              A.   The final version will switch over to
 5      LaTeX, but it is not in LaTeX formatting.
 6              Q.   You don't have a version of this that
 7      is in LaTeX currently?
 8              A.   That is correct.
 9              Q.   Do you have a version of it that is in
10      Word?
11              A.   Yes.
12              Q.   Do you have a version of paper one that
13      is in Word?
14              A.   Yes.
15              Q.   And a version of paper two that is in
16      Word?
17              A.   Yes.
18              Q.   Why didn't you send those versions to
19      your counsel?
20              A.   Because I usually would send a
21      finalized version for purposes of something in PDF,
22      and frankly, I don't want your experts being able
23      to mark it up and make comments on it.
24              Q.   But this isn't finalized, is it?
25              A.   For our purposes, it is.
```

```
                                            Page 41

 1            Q.   But -- okay.  Are you saying that the

 2      documents that we just looked at are final?

 3            A.   For purposes of this deposition, it's

 4      the final format they're going to be in, yes.

 5            Q.   So you're refusing to send us a Word

 6      version?

 7            A.   I can't think of any rule that requires

 8      you to send it in a particular format, or any

 9      reason why you would need it in Word, so, yes.

10            Q.   When was the last --

11            A.   I could be -- I could be -- I could be

12      persuaded on that, but...

13            Q.   When was the last time you worked on

14      either of these articles?

15            A.   Last night.

16            Q.   Which article did you work on last

17      night?

18            A.   Both of them.

19            Q.   Okay.  What did you do?

20            A.   I cleaned up some of language and made

21      some edits.  Because if it's going to go out the

22      door to someone like Dr. Imai, I want it to look as

23      good as it can.

24            Q.   Are you aware that we asked for these

25      documents before last night?
```

```
                                          Page 42
 1            A.    Yes.
 2            Q.    Did you have access to them before last
 3      night?
 4            A.    No.
 5            Q.    No?
 6            A.    No.
 7            Q.    But you had access to them last night,
 8      such that you were working on them?
 9            A.    Yes.
10            Q.    And you knew that there was a request
11      out to send them to us?
12            A.    Yes.
13            Q.    And you worked on them more instead?
14            A.    Yes.  I got home from my overseas trip,
15      cleaned up some of the language on them, and sent
16      them out.  And they are now the latest version of
17      my dissertation, which was what the request was.
18            Q.    Okay.  Did you work on them at another
19      time in the last week?
20            A.    I may have drafted an insert that
21      didn't go in, but no...
22            Q.    What do you mean may have, did you?
23            A.    I'm trying to remember.  It didn't go
24      in, so, no.
25            Q.    So when did you draft that piece that
```

Page 43

```
 1    didn't go in?
 2             A.    I had a separate document, a one pager
 3    that I was messing with on my laptop in Iceland.
 4    Yeah.
 5             Q.    So you had access to Word in Iceland,
 6    correct?
 7             A.    Oh, yeah.
 8             Q.    Did you have access to your draft
 9    dissertation papers in Iceland?
10             A.    No.
11             Q.    How was that?
12             A.    Because I have a desktop, and because
13    constructive Monte Carlo simulations require a lot
14    of power.  That's where things are pretty much
15    housed.
16             Q.    When did you go to Iceland?
17             A.    I went -- so that question is not as
18    straightforward as one may assume.  Friday I had to
19    teach and then deliver my kids to my parents.
20    Saturday we traveled to Lexington, and Sunday after
21    dropping my oldest off at his school for special
22    needs, we left for Iceland.
23             Q.    Okay.  During that weekend, did you
24    work on your dissertation at all?
25             A.    No.
```

Page 44

```
 1          Q.   No.  Last night though, you worked on
 2     it, correct?
 3          A.   Because I was back in my house, yes.
 4          Q.   Were you in your house that weekend
 5     that you just described?
 6          A.   No.  As I said, I was traveling to
 7     Iceland, and then we dropped my kid off at the
 8     school for special needs.  I was travelling
 9     Lexington, Kentucky, where my wife's in-laws go,
10     and where my son's school for special needs --
11     well, I guess it's in Frankfurt, but close enough.
12     Then we were traveling to Iceland.
13          Q.   Okay.  I want to go back to the paper
14     that says the article -- or I'm sorry, "The
15     application on voting needs to be redone for
16     waiting?"
17          A.   Uh-huh.
18          Q.   I think you said earlier that you
19     expect to be done with your dissertation in the
20     next week, right?
21          A.   I have drafted to everyone yes of all
22     three.
23          Q.   Do you expect that -- do you expect
24     that piece on waiting to be redone in the next
25     week?
```

Page 45

```
 1              A.    Yes.
 2              Q.    And you said --
 3              A.    It's a matter -- it's a matter of
 4       inserting a waiting term into the INLA and
 5       rerunning it.
 6              Q.    Okay.  You haven't done that at this
 7       point?
 8              A.    No, I have not.
 9              Q.    And you haven't turned over the article
10       that you say will cover redistricting simulations
11       and effect of communities of interest on partisan
12       bias, correct?
13              A.    There is nothing to turn over.
14              Q.    There is no draft at all?
15              A.    No.
16              Q.    Nothing in Word?
17              A.    Nothing in Word.
18              Q.    And you expect that to get done in the
19       next week as well?
20              A.    Yes.
21              Q.    How many pages is that going to be?
22              A.    Probably 20 to 30.
23              Q.    Okay.  And you're going to run
24       mathematical computations for that as well?
25              A.    Yes.
```

```
                                              Page 46
 1              Q.    All right.
 2              A.    We're lawyers, we have all written 25
 3      page briefs in a day or two.  It is a skill that's
 4      fun to develop.
 5              Q.    How long have you been enrolled in your
 6      Ph.D. program at OSU?
 7              A.    Since 2016.
 8              Q.    During this time, you have never
 9      established an academic peer review journal
10      article, correct?
11              A.    Correct.
12              Q.    So you certainly haven't established an
13      academic peer journal article regarding
14      redistricting, correct?
15              A.    Correct.
16              Q.    Or voting rights?
17              A.    Correct.
18              Q.    Have you ever presented at any academic
19      conference regarding redistricting?
20              A.    No.
21              Q.    Or voting rights?
22              A.    No.
23              Q.    You write for a website called
24      RealClearPolitics, correct?
25              A.    Correct.
```

Page 47

1          Q.    Would you say that's what you spend
2     most of your time on?
3          A.    Certainly over the past decade, yes.  I
4     mean, right now it's busy with redistricting work.
5     But, generally speaking, yes.
6          Q.    And RealClearPolitics is like a blog;
7     is that right?
8          A.    No.
9          Q.    Is it published online?
10         A.    It is.
11         Q.    Does it appear in print?
12         A.    It does not.
13         Q.    And the articles that you write for it,
14    they're not peer reviewed, correct?
15         A.    That's correct.
16         Q.    Do any of your articles involve
17    quantitative analysis that you did yourself?
18         A.    Yes.
19         Q.    What sort of quantitative analysis?
20         A.    I mean, I typically -- not typically.
21    I frequently will use regression analysis.  I would
22    have to go through the articles to see what else
23    has been used, but that is the main tool that I
24    used for them.
25         Q.    Have you used REDIST for your articles

```
                                         Page 48
 1      in RealClearPolitics?
 2               A.    No.
 3               Q.    Have you used the gerrymandering index
 4      for those articles?
 5               A.    No.
 6               Q.    Have you use any methodology that
 7      Dr. Imai used in his expert report?
 8               A.    No.
 9               Q.    Have you used any of the methodologies
10      that Dr. Ragusa used?
11               A.    I think he uses logistics.  Well, no.
12      I'm not sure he uses varying on logistics, so no.
13               Q.    You teach some classes as well, right?
14               A.    That's right.
15               Q.    Any on simulations analysis?
16               A.    That's not what the class is on, no.
17               Q.    Any of any of the methodologies that
18      Dr. Imai used in his report?
19               A.    Not for the class.  I wouldn't say
20      they're classes on sequential Monte Carlo or
21      anything like that so no.
22               Q.    Any of the -- did -- in the classes
23      that you teach, do you teach any of simulations or
24      analyses that Dr. Ragusa uses?
25               A.    Well, that -- okay.  So that's a
```

                                                    Page 49

1        slightly different question than --than your last

2        one, but no, I don't.

3              Q.    You mentioned a program called REDIST,

4        that's R-E-D-I-S-T in your report, right?

5              A.    That's right.

6              Q.    Can you tell us what REDIST is?

7              A.    It's a package to run redistricting

8        simulations that was developed by Dr. Imai and his

9        team for use in R.

10             Q.    When you say, "for use in R" what do

11       you mean?

12             A.    So R -- I mean, I would say -- I don't

13       -- I don't know if I would refer to REDIST as the

14       program.  R is the program platform that runs the

15       REDIST package.

16             Q.    When you say, "R is the program," what

17       does that mean?

18             A.    So R is a computing language, and it's

19       a -- I don't know if the precise word is platform

20       or whatever that enables this computing language.

21       And I consider that to be a program.  It's commonly

22       used in statistics and data analysis.

23             Q.    And you said Dr. Imai helped develop

24       that program; is that right?

25             A.    I don't think he helped develop R, but

```
                                                Page 50
 1     he helped -- I think he was primarily responsible
 2     for REDIST package.
 3              Q.   All right.  When did you learn how to
 4     use REDIST?
 5              A.   Last year.
 6              Q.   About when?
 7              A.   I mean the second half.
 8              Q.   Okay.  Do you use REDIST in your draft
 9     dissertation?
10              A.   No.
11              Q.   Do you use it for any of your Ph.D.
12     work?
13              A.   No.  Well, no.
14              Q.   Do you use it in your articles for
15     RealClearPolitics?
16              A.   No.
17              Q.   Have you us used it in other expert
18     reports that you have done?
19              A.   Yes, yes.
20              Q.   Which one?
21              A.   There is an expert report in Kentucky,
22     an expert report in Maryland, and an expert report
23     in New York.  An expert report where I haven't -- I
24     will say, I'll just say this one.  I haven't been
25     disclosed, and I'm not going to discuss that one
```

Page 51

1      obviously.  Off the top of my head that is all I
2      can think of.
3              Q.   In those expert reports where you use
4      REDIST, are any of them racial gerrymandering
5      cases?
6              A.   So can we just -- the one where I
7      haven't been disclosed, can we just put that to the
8      side, and say that I have mentioned it and not
9      talked about it further, and my answers will be
10     assumed to not include that case?
11             Q.   Yes.
12             A.   Okay.  Then it's not the -- then no.
13     Then -- none of those cases which I have been
14     disclosed are racial gerrymandering case.
15             Q.   Would you say you learned REDIST for
16     your expert report work?
17             A.   I think I learned about it in one of
18     the department colloquia.  Someone who is doing
19     redistricting simulations on school boards.  So
20     that would have been where I was exposed to it, and
21     kind of got the idea of how it worked.  I don't
22     think it -- well, I'm positive it didn't have SMC
23     in it yet.  But that's where I have done the most
24     of the work with it, yeah.
25             Q.   In your expert report work?

Page 52

```
 1          A.    Yes.
 2          Q.    Okay.  And did anyone teach you how to
 3     use REDIST?
 4          A.    No.
 5          Q.    You learned it on your own?
 6          A.    I think I might have asked Mike Barber
 7     some questions about it, but not for this case.
 8     But for the most part I learned it on my own.  I
 9     mean, that's -- that's kind of basic Ph.D. methods
10     coursework is -- or, you know, problem set
11     coursework is, you know, here is a package, go
12     figure out how to use it, and answer some questions
13     about it.  So, thankfully, Dr. Imai and his team
14     put very useful demonstrations of it online.
15          Q.    You don't use it for your dissertation,
16     right?
17          A.    It will have a mention in kind of
18     literature review obviously for the redistricting
19     paper.  But no, I won't be employing SMC for it as
20     a constructive Monte Carlo program.
21          Q.    Right.  I think it is SMC.  What --
22     what version of REDIST was used by Dr. Imai in his
23     expert report?
24          A.    He has a special version that has to be
25     downloaded from -- you get instructions on how to
```

```
                                        Page 53
 1      download it from the -- from -- I think it's the
 2      GitHub.
 3              Q.    Did you download it?
 4              A.    Yes.
 5              Q.    Do you know what it's called?
 6              A.    I don't.
 7              Q.    Would it surprise you to learn that
 8      it's called Markov Chain Monte Carlo or MCMC?
 9              A.    Package?
10              Q.    Uh-huh.
11              A.    No, I didn't know that.  I'm shocked.
12      Know one has used MCMC as a package name before
13      this.
14              Q.    So it's -- what would you say is the
15      thing that you downloaded from GitHub?
16              A.    In his documentation, there is a Read
17      Me file that tells you how to download the version
18      of his package the he used for this case.
19              Q.    And so that's what you did?
20              A.    I followed those instructions, yes.
21              Q.    You never used the thing that was
22      downloaded before?
23              A.    Oh.  I mean, no.  I'm assuming he is
24      giving truthful instructions on how to download it.
25      It seemed to replicate his findings from the codes.
```

```
                                          Page 54
 1    So yeah.
 2           Q.   I'm sorry.  I -- yeah.  My -- my
 3    question was unclear.  What I mean is, the
 4    resulting package that came from that download, was
 5    that the first time you had used that package?
 6           A.   Yeah, that's why I don't do -- I don't
 7    really change up the assumptions of his code that
 8    much or -- or anything of the sort.  I wouldn't
 9    feel comfortable doing that.  I just wanted to
10    produce his maps.
11           Q.   Right.  Are you familiar with Strata?
12           A.   Strata?
13           Q.   Uh-huh.
14           A.   No.  Is that -- I mean, well -- I -- I
15    have heard the word Strata before, but I'm assuming
16    you're using it in a particular context.  So I
17    don't know the particular context you're using it
18    for.
19           Q.   I'm sorry.  I -- I -- I misread
20    toggling between documents.  Give me one second.
21           A.   If he means Stata or Stata, the answer
22    is yes.
23           Q.   Yeah.  I just want to make sure I get
24    it right now, too.  Yep.  Yeah.  You mentioned a
25    program or package called Stata.  Can you tell us
```

Page 55

```
 1    what that is?
 2          A.   It's another -- it's another
 3    programming language or programming package.  I
 4    don't know -- I don't know if I would call it a
 5    language.  It's been around for a long time.  I
 6    used it back in my master's program for the first
 7    time.
 8          Q.   How often do you use Stata in your
 9    work?
10          A.   I don't prefer it.  I mean, a lot of --
11    some of -- a good good chunk of my statistics
12    coursework used it and learned how to use it there,
13    but I prefer R.
14          Q.   Okay.  When was the last time you used
15    Stata?
16          A.   Not for this report.
17          Q.   How so?
18          A.   It's -- Dr. Ragusa's code is written in
19    Stata or State.
20               THE WITNESS:  It's S-T-A-T-A for the
21    court reporter.
22               Actually, I think -- there may have
23    been another expert court since then that was
24    written in Stata that I executed.  It had code in
25    Stata.
```

```
                                         Page 56
 1              Q.   Do you know that for sure?
 2              A.   I'm almost positive that I have used it
 3      for something else, some replication since then.
 4                   Oh, the -- the -- what do you call it?
 5      It's for my dissertation.  The burden paper did
 6      their work in Stata so to make sure I was
 7      replicated correctly in R, I had to run it in
 8      Stata.
 9              Q.   Was that the last time you used Stata?
10              A.   Yeah.
11              Q.   What was the last time before that?
12              A.   For this paper or for this expert
13      report.
14              Q.   And the last time before that?
15              A.   I couldn't say.  The last time -- the
16      last time I can say with certainty would have been
17      probably for my longitudinal data analysis class
18      that was in the School of Public Health.  And it
19      was big over there.  I have no idea if I have used
20      it in the interim.  I'm sure I have because there
21      is still people who program in it.
22              Q.   But you can't remember when exactly?
23              A.   No, I couldn't give particular
24      particulars on it.
25              Q.   All right.  You testified and/or filed
```

```
                                         Page 57
 1      expert reports in many voting rights cases; is that
 2      right?
 3             A.    Yes.
 4             Q.    How many would you say?
 5             A.    Maybe 15.
 6             Q.    But you have only once ever been an
 7      expert for the plaintiff's side; is that right?
 8             A.    That's right.
 9             Q.    What case was that?
10             A.    That was -- well, actually, no.  That's
11      not true.   Twice.
12             Q.    What are both of those cases?
13             A.    The challenges to the New York
14      redistricting plan and the challenge to the
15      Maryland redistricting plan.
16             Q.    Were the plaintiffs in either of those
17      cases racial minorities?
18             A.    I didn't meet them, so I have no clue.
19             Q.    Were they making racial gerrymandering
20      claims?
21             A.    They were not.
22             Q.    Were they claiming that the state had
23      discriminated against them based on race?
24             A.    They did not.
25                   (EXHIBIT 10, Trende New York Report,
```

```
                                        Page 58
 1      was marked for identification.)
 2                    (EXHIBIT 11, Common Cause v. Rucho, was
 3      marked for identification.)
 4                    (EXHIBIT 12, New York Redist Opinion,
 5      was marked for identification.)
 6      BY MR. TRIVEDI:
 7            Q.   I want to turn to the New York case.
 8      That's the redistricting case this year, correct?
 9            A.   Correct.
10            Q.   You didn't list your work in that case,
11      in your expert report in this case, did you?
12            A.   Um, I will take your assertion as true.
13            Q.   Do you want to check your expert report
14      in this case real quick?
15            A.   I was going to do a search for it, but
16      I can't remember how to pronouns or spell the name.
17      I don't see it in there, no.
18            Q.   Okay.  Do you know when you submitted
19      your expert report in the New York case?
20            A.   I don't.
21            Q.   I'm going to pull it up for you.  Give
22      me one second.  Can you see that, Mr. Trende?
23            A.   (No verbal response).
24            Q.   I'm sorry.  Has it come up for you yet?
25            A.   Yes.
```

```
                                                   Page 59
 1            Q.   I'm scrolling down.  Can you read
 2       what's there in the middle?
 3            A.   Expert Report of Sean P. Trende,
 4       February 14th.  And then the embarrassing typo on
 5       the front page of 2021.
 6            Q.   The date is actually 2022; is that
 7       right?
 8            A.   That's correct.
 9            Q.   Now, scrolling up to the caption, do
10       you recognize that as the caption in the New York
11       case?
12            A.   Yes.
13            Q.   Okay.  And -- so would you agree that
14       you submitted this report in the New York case on
15       February 14th, 2022?
16            A.   Yes.
17            Q.   And do you remember what date you
18       submitted your expert report in this case?
19            A.   It says February 10th at the bottom of
20       what I have up.
21            Q.   Okay.  And you didn't list the New York
22       case in your South Carolina -- in the export report
23       in this case, did you?
24            A.   No.
25            Q.   Were you working on the New York export
```

```
                                              Page 60
 1     report on February 10th?

 2            A.    Yes.

 3            Q.    And in the New York case, or in the New

 4     York export report, you don't list your South

 5     Carolina expert report either, do you?

 6            A.    I, again, will take your word for it.

 7            Q.    Okay.  And you had certainly submitted

 8     your expert report in this case by the time you

 9     submitted your export report in New York, correct?

10            A.    That's right.

11            Q.    And you didn't list it?

12            A.    No.  It does -- again, I'll take your

13     stipulation.  I probably forgot to update it in the

14     craziness of filing.

15            Q.    Okay.  I'm going to take this --

16            A.    I mean, they're four days apart so...

17            Q.    So you were working on them at the same

18     time?

19            A.    Yes.  I wouldn't have listed it here

20     because I don't think I have been disclosed yet,

21     and I probably just forgot the New York.

22            Q.    What do you mean you wouldn't have

23     listed it here because you wouldn't have been

24     disclosed yet?

25            A.    I don't list work where I haven't been
```

Page 61

1    disclosed as an expert.

2            Q.   You don't think you were disclosed as

3    an expert in New York four days before you

4    submitted your expert report?

5            A.   I don't think I was.  Maybe they did

6    expert witness disclosures, and I wasn't aware of

7    it.  But I don't think we know -- we certainly

8    didn't know who their experts were going to be

9    until we received their report in that case.

10               In that cases -- cases -- cases that

11   cycle are a little bit of a fire drill because we

12   got to census data so late, so it's -- it's been

13   kind of a nightmare.

14           Q.   Uh-huh.  Are there any other case that

15   you didn't list in your expert report in this case?

16           A.   Well, let's see.  So that Maryland case

17   that we talked about.

18           Q.   Were you working on an expert report in

19   the Maryland case when you submitted your expert

20   report in this case?

21           A.   Yeah.  Yeah.  It may have been in two

22   expert reports.  I don't remember when we got

23   started on the state senate stuff.

24           Q.   And you didn't list it in your expert

25   report in this case?

```
                                              Page 62

 1            A.   No, I wouldn't disclose myself as an

 2     expert.  I don't think I have ever done that.

 3            Q.   What is the case name in Maryland?

 4            A.   It's Szelgia I think, S-Z-E-L-G-I-A.

 5            Q.   Are you disclosed now?

 6            A.   Yes.

 7            Q.   But you didn't send us your reports or

 8     update your report to note that at any point, did

 9     you?

10            A.   No.

11            Q.   Okay.  Will you send us that

12     information now?

13            A.   Oh, sure.  I'm happy to send you the

14     expert reports.

15            Q.   Okay.  Are there any other cases that

16     you decided that you wouldn't disclose yourself as

17     an expert?

18            A.   Now -- and see, this is a genuine

19     oversight.  The North Carolina political

20     gerrymandering cases are not on here.  I did two

21     short expert reports that don't involve simulations

22     in those cases.

23            Q.   And is that because of the fact that

24     you weren't disclosed or you just didn't list them?

25            A.   That -- that was a mistake.
```

Page 63

1          Q.   Okay.

2          A.   Yeah.

3          Q.   And I think you mentioned the case in

4     Kentucky as well.  I don't see that in your expert

5     report in this case?

6          A.   I hadn't even been hired by the time

7     I -- I don't think I got hired in that until pretty

8     recently.

9          Q.   Okay.  You're hired now?

10          A.   Yes.  Dr. Imai should have my report.

11          Q.   Well, have you turned it over to the

12     Plaintiffs?

13          A.   No.

14          Q.   Will you do that now?

15          A.   Happily.  I mean, you can get it from

16     Dr. Imai a lot quicker, but, yes.

17          Q.   Dr. Imai doesn't have the same

18     obligations that you do.

19               What is that Kentucky case name?

20          A.   I don't know.

21          Q.   Can you look that up for us --

22          A.   It's in Kentucky -- it's in Kentucky

23     State Court.

24          Q.   Okay.  Any other cases that you did not

25     put on your expert report in this case that you are

Page 64

1     working on?
2            A.   Well, like I said, and we kind of
3     agreed earlier that with one of the cases, because
4     I haven't been disclosed as a witness yet, it is
5     okay not to talk about it, and I'm not going to
6     talk about it.  I'll -- at the break, I will e-mail
7     to counsel my reports in New York, Maryland, and
8     Kentucky, and I will also check to see if there are
9     any other reports that I can't think of right now
10    that I have sent along.
11           Q.   In North Carolina?
12           A.   If I even have those, but sure.
13           Q.   Do you have drafts?
14           A.   I'm sure I do, but that would be
15    protected information.  So I'll see if I have
16    finalized signed and send them to you since they're
17    in federal court.
18           Q.   You're aware that we have a Protective
19    Order in this case, right?
20           A.   Yeah.  I guess.  Actually, no, I don't
21    know that.
22                (EXHIBIT 3, NAACP vs. McCrory, was
23    marked for identification.)
24    BY MR. TRIVEDI:
25           Q.    Okay.  I want to talk about some of

Page 65

1    cases that you did list in your CV.  First is NAACP
2    v. McCrory.
3              Do you remember that case?
4         A.   Yes.
5         Q.   So I want to pull up quickly page five
6    of your report.  Can you see that, Mr. Trende?
7         A.   Yes.
8         Q.   Can you read Paragraph 14?
9         A.   "I authored two expert reports NAACP v.
10   McCrory #13CV658 Federal District of North
11   Carolina, which involved challenges to multiple
12   changes to North Carolina's voter laws, including
13   the elimination of a law allowing for counting of
14   ballots casted in the wrong precinct.  I was
15   admitted as an expert witness and testified at
16   trial.  My testimony discussed the "effect" prong
17   of the Voting Rights Act claim.  I did not examine
18   the issues relating to intent.
19        Q.   Okay.  Are you aware that there was an
20   opinion in this case?
21        A.   Yes.
22        Q.   Have you read that opinion?
23        A.   It's about 600 pages long, and it's
24   been a while, but yes.
25        Q.   Did you read the whole thing at the

```
                                    Page 66
 1     time it came out?
 2            A.    Probably not.
 3            Q.    Are you aware that it discusses your
 4     testimony and your expert opinion?
 5            A.    The District Court opinion, yeah.
 6            Q.    Okay.  I'm going to pull that up now.
 7            Can you see that, Mr. Trende?
 8            A.    Yes.
 9            Q.    And I know that caption is long, but do
10     you understand this to be the opinion in the case
11     North Carolina State Conference NAACP v. McCrory?
12            A.    Yes.
13            Q.    Okay.  You're right that it's a long
14     opinion.  I'm going to go to page 63.
15            A.    And just to clarify, I listed this
16     opinion which is about 600.  I see it's 200 here.
17            Q.    That's fine.  Thanks.
18            Do you see Note 71 here?
19            A.    Yes.
20            Q.    Do you see that it references your
21     name?
22            A.    Yes.
23            Q.    And do you see at the bottom, I may
24     even be able to highlight it for you.  Can you read
25     that part that I just highlighted?
```

Page 67

1         A.    "In any case, this court concludes

2    Mr. Trende is qualified to present and organize the

3    laws of the fifty states."

4         Q.    That was the extent of the expert

5    opinion that the court allowed in this case, right?

6         A.    As long as we agree that it didn't rule

7    on any other part.  I don't know if it ever cited

8    to any other part, but I'll take your stipulation

9    that it didn't.

10         Q.    Did the court accept an opinion about

11    the VRA?

12         A.    That's a -- that had to do with the

13    totality of the circumstances test, so that was

14    part of VRA claim.

15         Q.    But when the court says, "Mr. Trende is

16    qualified to present and organize the laws of the

17    fifty states," was the VRA included in that part?

18         A.    So the case involved a challenge to a

19    variety of laws, and, at least to my understanding,

20    part of how Defendants wanted to make their

21    totality of the circumstances argument for the

22    Voting Rights Act was by arguing that their laws --

23    that the -- that the state of laws in North

24    Carolina that brought about wasn't anything

25    particularly unusual.  And so they had to do a --

```
                                              Page 68
 1      for part of the analysis, they had to do a
 2      fifty-state survey of -- of, you know, how many
 3      days early voting states offer, whether it's
 4      same-day registration was allowed.  So this was
 5      used for the Voting Rights Act claim.
 6              Q.   Did the Court say you were qualified to
 7      present and organize -- to prevent on the Voting
 8      Rights Act?
 9              A.   No.  It does not say that, but this
10      opinion was offered as part of a Voting Rights Act
11      claim.
12              Q.   But you didn't say in your expert
13      report, in this case, that the court only qualified
14      you as to the laws of the fifty states and not the
15      Voting Rights Act, correct?
16              A.   No, I don't think I was offered as a
17      Voting Rights Act expert in that case.
18              Q.   Great.
19              A.   As a matter of fact, it says what I was
20      offered at the top of footnotes 51 or 71, sorry.
21              Q.   And going back to your expert report,
22      you say, "My testimony discussed the affect from
23      the Voting Rights Act on this claim."
24                   You did not include in your expert
25      report the fact that you were not qualified as an
```

Page 69

```
 1    expert other than when you write that claim; is
 2    that right?
 3              A.    I wasn't offered as an expert on the
 4    Voting Rights Act.  I was offered as an elections
 5    expert.  I mean, the exact verbiage is on that we
 6    just saw, and so that testimony went to the Voting
 7    Rights Act claim.  I don't think I'm being offered
 8    as an expert on Shaw claims in this case, but if I
 9    were to summarize my opinion, I would certainly say
10    it has to do with Shaw claim.
11              Q.    I'm now with going to page 85 of that
12    opinion.
13              Do you see a Footnote 112?
14              A.    Yes.
15              Q.    Can you read Footnote 112, up to the
16    citation that starts C?  You don't have to read the
17    citation.
18              A.    "At trial Mr. Trende testified that
19    Utah does not permit out-of-precinct voting.
20    However, it appears that Utah will have ballots
21    casts in the wrong precincts so long as they're
22    casted in the correct county."
23              Q.    So is it fair to say that you made a
24    mistake about whether Utah permits out-of-precinct
25    voting?
```

Page 70

```
 1            A.    That certainly seems to be what the
 2      Court found, yes.
 3            Q.    Did you put that in your expert report
 4      in this case?
 5            A.    No.
 6                  (EXHIBIT 4, Ohio Organizing
 7      Collaborative v. Husted, was marked for
 8      identification.)
 9      BY MR. TRIVEDI
10            Q.    Okay.  I want to talk about another
11      case where you were an expert at Ohio Democratic
12      Party versus Husted.  So give me just a second to
13      pull it up.
14                  So you admit in your expert report in
15      this case that the judge in the Husted case, quote,
16      "Refused to consider one of your opinions,"
17      correct?
18            A.    Correct.
19            Q.    And you characterized it in your expert
20      report as the judge, quote, "Believed you should
21      have done more work to check the data behind the --
22      behind the -- that the data behind the application
23      was accurate," correct?
24            A.    That is my recollection, yes.
25            Q.    Okay.  Do you know that there was an
```

Page 71

1      opinion in the Husted case of law?

2              A.    Yes.

3              Q.    You read it?

4              A.    Probably eight years ago, but yeah.

5              Q.    Okay.  Did you read it at the time,

6      eight years ago?

7              A.    I would assume so, yes.

8              Q.    Do you think you learned any lessons

9      from it?

10             A.    I would hope so.  You like to think you

11     learn from everything you do.

12             Q.    You're not sure though?

13             A.    No, I'm not sure.

14             Q.    Okay.  Do you see the paragraph where I

15     have highlighted the first couple words?

16             A.    "Even if the Court admitted the maps,

17     the Court would," yes, I see that.

18             Q.    Okay.  Could you read the part that I

19     highlighted?

20             A.    Yeah.  "Even if the Court admitted the

21     maps or recorded them as well as Trende's opinion

22     of what they visually demonstrate little weight.

23     While Trende offers them to demonstrate the

24     relatively convenient locations for early voting

25     centers to non-white voters, they do not account

Page 72

1      for the population density of the precincts or the

2      myriads of other factors related to convenience and

3      required no mechanism by which to determine the

4      actual distance between the EIP voting center and

5      the locations on the map."

6              Q.    Okay.   The Court here, accorded your

7      opinion, about maps, quote, "little weight;" is

8      that right?

9              A.    That's right.

10             Q.    Did you put this in your expert report

11     in this case?

12             A.    No.

13             Q.    Sorry, give me one second.   Okay.   I'm

14     sorry, it's hard to see with the way Zoom is set

15     up, but can you see the part that I have

16     highlighted now?

17             A.    Yes.

18             Q.    Can you read that for me, please?

19             A.    "While Trende implied the data from

20     Figure 44 was obtained during his work in NAACP v.

21     V. McCrory, he does not identify the source of the

22     data, let alone establish how he collected it or

23     has testify to it's reliability.   As accordingly,

24     the Court will exclude Table 44."

25             Q.    Did you include this in your expert

Page 73

1    report in this case?

2         A.    No.

3         Q.    All right.  There was a companion case

4    called Ohio Organizing Collaborative v. Husted; is

5    that right?  You listed that in your report?

6         A.    Yeah.  I think it seems sequentially --

7    I think this case -- one of the cases settled, and

8    then a different group of plaintiffs kind of re-

9    brought up the mantle, but I don't remember the

10   order.

11        Q.    Okay.  Do you remember an opinion

12   coming out in Ohio Organizing Collaborative?

13        A.    I'm sure there was one.

14        Q.    Okay.  I'm going to show it to you.

15              To you see the part I have highlighted?

16        A.    Yes.

17        Q.    Can you read that for me?

18        A.    "As explained in greater detail in the

19   Court's Order on Plaintiff's Motion to Exclude

20   Trende as an expert, much of his report is

21   irrelevant to the Court's analysis."

22        Q.    You didn't include this part in your

23   export report in this case, did you?

24        A.    No.

25              (EXHIBIT 5, WHITFORD v. GILL, was

Page 74

```
 1    marked for identification.)
 2    BY MR. TRIVEDI:
 3         Q.    Okay.  The next case I want to talk
 4    about is Whitford v. Nickel or Whitford v. Gill in
 5    Wisconsin.
 6              Do you remember that case?
 7         A.    Yes.
 8         Q.    So in your expert report in this case,
 9    you said at Paragraph 19, "I authored expert
10    reports in these cases, which were efficiency
11    gap-based redistricting cases filled in Ohio,
12    Wisconsin, and North Carolina;" is that right?
13         A.    That's right.
14         Q.    You don't say anything about how the
15    Court treated your expert report or opinions; is
16    that right?
17         A.    No.
18         Q.    Okay.  Have you read the opinions in
19    these cases?
20         A.    I don't think I have in the Ohio case.
21    Certainly in the North Carolina and Wisconsin
22    cases.
23         Q.    You did read the Wisconsin opinion?
24         A.    Yeah.
25         Q.    Can you tell us what the gist is of
```

```
                                              Page 75
 1      your opinion in this case?

 2              A.    This case is guilty Whitford?

 3              Q.    Uh-huh.

 4              A.    The Whitford v. Nickel?

 5              Q.    Yes.

 6              A.    I believe in that case, the opinion was

 7      about clustering in Wisconsin.  Political

 8      clustering.

 9              Q.    What about it?

10              A.    So if partisans are clustered in the

11      state.  So the -- the efficiency gap, at least

12      purports to measure packing and cracking of

13      partisans.  And so I think the argument the counsel

14      wanted to make was that if democrats were packed in

15      a few key districts, or in a few areas that it

16      would naturally inflate their efficiency gap.

17              Q.    Okay.

18              A.    It would be unintentionally

19      gerrymandering to borrow a phrase.

20              Q.    And you submitted maps in this case,

21      right?

22              A.    Yes.

23              Q.    Okay.  Can you read the part that I

24      have highlighted from the -- oh.  Sorry about that.

25                    Can you read the part I have
```

```
                                        Page 76
 1    highlighted?
 2            A.    Yeah.   "Moreover, the color coding on
 3    Mr. Trende's maps, although a useful demonstrative,
 4    reported to serve a substitute for quantitative
 5    data on the margin of victory in each county.
 6    Without this information we cannot know whether,
 7    for example, a county won by a Republican
 8    presidential candidate was deeply or narrowly
 9    Republican."
10            Q.    Okay.   Can you -- well, can you read
11    this opinion, too?
12            A.    "In our view this evidence is worthy of
13    little if any weight.
14            Q.    Okay.   This is two cases in a row where
15    the opinion give your evidence little weight; is
16    that right?
17            A.    I will assume that we're going
18    chronologically, then yes.
19            Q.    No.   Just two there a row that I have
20    showed you just now?
21            A.    Yes.
22            Q.    You didn't put the fact that the Court
23    accorded your evidence around maps, little if any
24    weight, in your expert report in this case, did
25    you?
```

```
                                            Page 77
 1            A.    No.
 2                  (EXHIBIT 6, Fair Fight Action v.
 3      Raffensperger, were marked for identification.)
 4                  (EXHIBIT 7, League of Women Voters of
 5      Ohio v. Ohio Redistricting Commission, was marked
 6      for identification.)
 7      BY MR. TRIVEDI:
 8            Q.    Okay.  The next case is Fair Fight
 9      Action v. Raffensperger.
10                  Do you remember this case?
11            A.    Yes.
12            Q.    In your expert report in this case, you
13      admit that you were rejected in the Raffensperger
14      case; is that right?
15            A.    That's correct.
16            Q.    Because you lacked sufficient
17      credentials for the opinion that you were trying to
18      give?
19            A.    From my read of it, it was because the
20      judge -- because the judge felt that I lacked
21      sufficient expertise in elections administration.
22      Which I -- I'll be honest, I'm not sure what that
23      has to do with my opinion that I rendered there,
24      but that's my understanding.
25            Q.    Do you remember the judge having
```

Page 78

```
 1      anything to say about your qualifications to be an
 2      expert in that case?
 3           A.   I mean, he certainly took into
 4      consideration the fact that I didn't have a Ph.D.
 5      and hadn't written peer-reviewed articles.  I
 6      remembered him leaving open the possibility that I
 7      would be -- have that sufficient expertise in areas
 8      like elections.  But as I recall --
 9           Q.   Do you still --
10           A.   -- as I recall, at least, the -- the
11      final conclusion was that I didn't have expertise
12      as an elections administrator, which is true.
13           Q.   And you're right, the Court did note
14      that you had never authored a peer-reviewed study
15      or article, and never been asked to peer review the
16      work of others.  Is that still the case?
17           A.   That -- that last sentence is untrue or
18      the last phrase.
19           Q.   How about the part -- was it true at
20      the time that you had never authored a
21      peer-reviewed study or article?
22           A.   That's true.
23           Q.   Is it still true?
24           A.   That's still true.  I had peer reviewed
25      other's articles, but I don't know where he got
```

```
                                        Page 79
 1    that.
 2           Q.    Okay.   The next is another case called
 3    Ohio Organizing Collaborative, but it's a different
 4    one on political gerrymandering?
 5           A.    That's right.
 6           Q.    For -- right.
 7                 For these cases in your report in this
 8    case, you say that you authored an expert report
 9    and that the cases are, quote, "Pending in original
10    action before the Ohio Supreme Court;" is that
11    right?
12           A.    That's right.
13           Q.    Okay.   That's not true anymore; is that
14    right?
15           A.    That was the -- the opinion has come
16    down.   It may have come down by the time I
17    submitted, and I just updated that, but yeah.
18           Q.    That's actually --
19           A.    Well, I mean, I guess there is still --
20    there is still pending because there is this back
21    and forth going on between the Court and
22    legislature that's been kind of a nightmare.
23           Q.    Do you know --
24           A.    I think they had to file -- I think
25    they had to file -- they had to file a new matter
```

Page 80

```
 1    for this last go round, but I don't think they did
 2    for the second and third.
 3           Q.   Fair to say you don't know where the
 4    case stands right now?
 5           A.   Oh, I do.  Like right now, at least the
 6    Congressional version had to be re-filed as a new
 7    matter.  But I don't remember -- you know, we're on
 8    like our fourth version of the maps now, and I
 9    think one, two and three all came out of the same
10    action.
11           Q.   Do you know if there has been an
12    opinion at all in this case concerning you?
13           A.   Yes.
14           Q.   Do you know when that came out?
15           A.   I think it was mid January.
16           Q.   Surprise you to learn it was January
17    10th?
18           A.   That would be mid January, so no.
19           Q.   Okay.  And you -- you submitted your
20    report in this case on February 10th, right?
21           A.   Correct.
22           Q.   So the actions were not pending before
23    the Ohio Supreme Court when you wrote that; is that
24    right?
25           A.   No, I think they were, because I think
```

```
                                              Page 81
 1      that case survived for the first three rounds.  And
 2      they only had to file new go rounds for this one.
 3            Q.    Okay.  You didn't put anything about
 4      the January 10th opinion in your February 10th
 5      report in this case?
 6            A.    That's correct.
 7            Q.    In the Ohio Organizing Collaborative
 8      case, you compared an enacted map to maps submitted
 9      by other people; is that right?
10            A.    No.  Well, so define that.  I -- I --
11      as I recall it, it was a -- it was compared to a
12      counter bailing plan by representative Sykes, but I
13      don't think it was submitted to the Court.
14            Q.    Do you compare an enacted map by a
15      state government to other maps?
16            A.    Yes.  To a map that had been offered --
17      when you said submitted, it sounded to me like you
18      meant to the Court or by simulations.  And I didn't
19      do that when I wrote my report.  To my
20      understanding, those simulations had been put into
21      the case.  But I did compare it to a map that had
22      been suggested in the drafting process by
23      representative Sykes.
24            Q.    Okay.  Did you read the January 10th
25      opinion in this case?
```

```
                                            Page 82

 1              A.    Yes.

 2              Q.    Okay.  Did you read the part that

 3      referenced you?

 4              A.    Yes.

 5              Q.    Okay.

 6              A.    Or at least -- at least one of them,

 7      there maybe others.

 8              Q.    Uh-uh.

 9              In this case you were an expert along

10      with a person named Michael Barber; is that right?

11              A.    Correct.

12              Q.    Okay.  Can you read this part that I

13      have highlighted?

14              A.    "Dr. Barber and Trende mainly compared

15      the adopted plan to plans introduced by Senator

16      Sykes on September 1st and September 15th.  They

17      pointed out the various ways in which Senator Sykes

18      plans are pro-democratic gerrymanders.

19              Q.    Okay.  Can you read this part now?

20              A.    Yeah.  "By showing that other plans are

21      per Democratic gerrymanders are no noncompliant

22      with Article -- but showing that other plans of

23      pro-democratic gerrymanders are noncompliant with

24      Article XI does not validate the adopted plan."

25              Q.    So taken together, does that mean to
```

```
                                         Page 83
 1      you that showing that noncompliant maps are not
 2      compliant with the law, does not make the enacted
 3      map legal?
 4              A.    At least in Ohio, with the
 5      gerrymandering casing, yes.
 6              Q.    Do you disagree with the Court's
 7      opinion here?
 8              A.    There is a fair amount of Ohio legal
 9      analysis that was -- that I don't know about
10      frankly.  But I'm assuming, or -- or to my reading,
11      if you had a choice between a -- what appeared to
12      be a pro-Republican gerrymandering and a
13      pro-democratic gerrymandering, as they only
14      submitted submittal maps before the commission,
15      that seems relevant to me, but the Court disagreed.
16              Q.    Do you think the Court got it wrong?
17              A.    I think on this point.  I think it is
18      relevant that -- that the only two plans were
19      apparently a pro-Republican gerrymandering or
20      pro-democratic gerrymandering.
21              Q.    But the Court --
22                    (Simultaneous speaking)
23              Q.    I'm sorry.  Go ahead.
24              A.    On the big picture, I mean, I think
25      this case was mostly about whether the Court had
```

Page 84

1    the power to strike down plans under the Ohio
2    Constitution, and having found that yeah, I thought
3    the plan had a Republican lead.
4         Q.   But I am asking a specify question,
5    which is, the highlighted part that you just read,
6    do you think the Court got that wrong?
7         A.   I think so.  I think it's a relevant
8    part of the inquiry.  I don't know that it
9    completely validates it.  I don't know that it was
10   intended to completely win the case one way or the
11   other, but I think it is relevant to want question.
12        Q.   I don't think you have answered
13   question.  Do you think the Court got this part of
14   the opinion wrong?
15        A.   I think I have.
16        Q.   And your answer is yes?
17        A.   My answer is to the extent that the
18   question is, is this a relevant consideration that
19   can be part of an argument for validating it, sure.
20   For a stand, like standing along, if this were the
21   only piece of evidence offered by all the
22   plaintiffs, I guess not.
23        Q.   Because logically speaking, showing
24   that another map is not compliant with the law says
25   nothing about whether the enacted map is compliant

Page 85

```
 1    with the law?
 2              A.    I just said I thought it was relevant.
 3              Q.    But logically speaking?
 4              A.    I would like to think I'm not being
 5    illogical.  I -- I think it's relevant.
 6              Q.    Okay.  Now this is hard because at the
 7    bottom of the page and the top of the page so I'm
 8    just going to read it.
 9                    "Nor does it show that the commission
10    attempted to comply with Article 11 Section 6A when
11    it drew the adopted plan."
12                    Do you take that to mean nor does your
13    analysis about Senator Sykes' plan show what the
14    commission attempted to do in drawing its own plan,
15    is that your reading of that sentence?
16              A.    Can you show it to me?  Can you scroll
17    down at the bottom and that would be easier?
18              Q.    Sure.  Sure.
19              A.    Because that's where the -- that's
20    where it is.
21              Q.    You're right.  So why don't you read to
22    yourself, if you don't mind, this sentence starting
23    with "More."
24              A.    Let's see -- More -- I'm sorry.  I
25    think "it" is referring to showing that other plans
```

```
                                                Page 86
 1      are pro-Democratic gerrymanders and not compliant

 2      with Article XI.  And that is the part of the

 3      analysis from the three experts.  So I've forgotten

 4      the original question, but it does seem to go back

 5      to our original opinion.

 6              Q.   So the question is:  Does an analysis

 7      of a non-enacting plan tell us anything about

 8      whether the legislature that enacted the plan

 9      intended or didn't intend to comply with a

10      particular law?

11                  MR. DIAMADUROS:  Object to the form.

12                  THE COURT REPORTER:  I just need to

13      know who objected, please.

14                  THE WITNESS:  It certainly suggests the

15      Supreme Court --

16                  THE COURT REPORTER:  Who objected,

17      please?

18                  MR. DIAMADUROS:  That would be me,

19      Konstantine Diamaduros.

20                  THE COURT REPORTER:  Thank you.

21                  THE WITNESS:  It certainly suggested

22      the Supreme Court of Ohio thought that showing that

23      a competing plan was also unconstitutional or it

24      was also a gerrymander, doesn't mean that it

25      complied with Article 11 Section 6A of Ohio law.
```

```
                                              Page 87
 1     BY MR. TRIVEDI:
 2            Q.   Do you think the Court got that wrong?
 3            A.   I don't know even know what is in
 4     Article 11 Section 6A, so I can't opine on that.
 5            Q.   Can you read this highlighted part?
 6            A.   Yeah.  "Trende does not however offer
 7     an alternative way to measure partisan bias.  More
 8     importantly, he does not offer testimony rebutting
 9     Dr. Roddens', R-O-D-D-E-N-S, or Dr. Imai, I-M-A-I's
10     evidence that it is possible for the commission to
11     draw a district plan that is compliant with Article
12     11, and that does not favor republican candidates
13     so heavily."
14            Q.   So, in this case, Dr. Imai submitted
15     evidence that it was possible for the commission to
16     draw a complaint plan; is that right?
17            A.   Yeah.  After I had submitted my report,
18     he -- he and Dr. Rodden dropped the simulations in.
19            Q.   And you didn't offer an alternative way
20     to measure partisan bias?
21            A.   I'm not sure any of partisan bias
22     metrics are particularly good.
23            Q.   You didn't submit evidence rebutting
24     Dr. Imai's evidence, that it was possible for the
25     commission to draw a compliant plan?
```

Page 88

```
1              A.   I mean, I -- I couldn't.  I submitted
2       my report, and they did it in their relay, which
3       was cleverer lawyering.  But how was I supposed to
4       rebut it?  I never understood this sentence in the
5       Court's opinion to be perfectly honest.
6              Q.   Okay.  So you think the Court got this
7       part wrong?
8              A.   I think it was impossible for me to
9       rebut their testimony since they did it in the
10      reply, and we didn't have an opportunity to do a
11      surrebuttal.
12             Q.   You didn't offer it in your affirmative
13      report, didn't you?
14             A.   We didn't -- the simulations weren't in
15      the case at that point, so no.  How am I supposed
16      to -- how am I -- how am I supposed to rebut
17      Dr. Rodden's and Dr. Imai's evidence when it hadn't
18      been submitted yet?
19             Q.   Were you aware that it was possible to
20      draw a compliant plan when you submitted your
21      affirmative report in this case?
22             A.   No.
23             Q.   You thought the only -- it was -- it
24      was only possible for the state to draw illegal
25      plans?
```

Page 89

1          A.   I had examined the question one way or

2     the other.  I was only asked to compare states plan

3     to the competing plan, and then one other competing

4     plan that had been drawn by some citizens

5     redistricting group, and so that's what I did.

6          Q.   So is your opinion now that it's

7     impossible to draw a compliant plan in Ohio?

8          A.   I think it's very difficult, because --

9          Q.   Is it --

10          A.   I'm not sure it's -- I'm not sure it's

11     possible because Ohio's -- and I'm not sure any of

12     Dr. Rodden's or Dr. Imai's maps particularly were

13     legal to be honest.  Because Ohio's redistricting

14     laws are incredibly complex and convoluted, and I

15     don't know how you would possibly -- at least with

16     Dr. Imai's simulations, I don't know how you would

17     possibly account for everything.

18          Q.   But the Court seems to think it is

19     possible?

20          A.   The Court never saw the maps.  As far

21     as I know, no one has seen the maps that were

22     produced.

23          Q.   What I mean is, they used the word

24     possible in this opinion, correct?

25          A.   Well, yeah.  But like I said, I'm not

Page 90

```
 1      sure that any of those maps actually comply with
 2      Ohio's convoluted laws.
 3          Q.    Okay.
 4          A.    And I don't think the Court is either
 5      because no one has seen those maps.  I think Dr.
 6      Rodden was using a constructed Monte Carlo system,
 7      so I find it easier to believe that he had coded it
 8      up to comply with Ohio's bizarre laws.  But I
 9      haven't seen Dr. Imai's code either, because,
10      again, it was submitted as a rebuttal report.
11      Sorry, I'm a little annoyed by the Court putting in
12      there that I didn't rebut evidence that there is no
13      way I could have rebutted.
14          Q.    Do you have more to say there?
15          A.    No.
16              (EXHIBIT 8, Democratic National
17      Committee versus Reagan, was marked for
18      identification.)
19      BY MR. TRIVEDI:
20          Q.    I'm going to show you another opinion
21      in a case that you didn't list in your report or
22      CV.  Do you remember being an expert in a case
23      called Democratic National Committee versus Reagan?
24          A.    No.
25          Q.    In Arizona?
```

Page 91

```
 1              A.    No.
 2              Q.    About out-of-precinct voting and
 3     third-party ballot collection?
 4              A.    Okay.  I thought that was -- that was
 5     Brnovich.
 6              Q.    Right.
 7              A.    Right?  Okay.  Well, wasn't Reagan the
 8     one that was filed?
 9              Q.    It was a pretty big case, right?
10              A.    Once it made it to Supreme Court, yeah.
11              Q.    Yeah.  It wasn't big at the District
12     Court?
13              A.    I didn't think so.
14              Q.    Okay.  But you were an expert in this
15     case --
16              A.    Yes.
17              Q.    -- is that right?
18              A.    Yes.
19              Q.    You didn't list it on your CV or in
20     your report in this case?
21              A.    We will check.  But I will assume that
22     I did not.  I will take your word for it.
23              Q.    Okay.  I am pulling up -- okay.  Can
24     you see this, Mr. Trende?
25              A.    Yes.
```

```
 1              Q.   And can you read the highlighted part
 2       for me?
 3              A.   Yes.  "Sean Trende critiqued
 4       Dr. Lichtman's analysis of Arizona's voting
 5       patterns and the history of racial discrimination,
 6       but offered no new information or analysis.  The
 7       Court found some of his criticisms worth
 8       considering.  Overall, they were insignificant.
 9       For example, although Trende generally agreed with
10       Dr. Lichtman that there was unexperienced racial
11       polarized voting.  He made much of the irrelevant
12       fact that Arizona voting is not as variably
13       polarized as voting in Alabama."
14              Q.   So you did not include the piece of the
15       opinion in the report in this case because you
16       didn't even include this case in your report; is
17       that correct?
18              A.   Yeah.  I should have included this
19       case.
20              Q.   And in particular, this judge says that
21       you made much of an irrelevant fact that Arizona
22       voting is not as variably polarized as voting in
23       Alabama.  Did the Court get that wrong?
24              A.   I don't think it's irrelevant, but the
25       Court disagreed.
```

Page 93

1        Q.   Okay.  So this is another case where
2   you pointed to factors outside of the law at issue
3   as probative, and this is the second Court that
4   says it was irrelevant, correct?
5        A.   I didn't point to anything as
6   probative.  No experts get asked to answer
7   questions that the Court may find interesting or
8   irrelevant.  And if the Court doesn't find it
9   interesting or irrelevant, that's the end of the
10  case.  But I didn't give any -- any legal analysis,
11  which I think you're suggesting with probative.
12       Q.   I'm not suggesting that.  Let's use the
13  word relevant.  You say it's relevant that racially
14  polarized voting is more polarized in Alabama, in
15  this case, than Arizona.  The Court called it
16  irrelevant, correct?  And in the previous case, you
17  thought it was relevant that the Sykes map was more
18  of a gerrymander than the inactive map, and the
19  Court called it irrelevant, correct?
20       A.   Yes.
21       Q.   Okay.  I think we have been going for a
22  while, and we're about to move onto another
23  section.  So we could take a short break now or
24  make it a very early lunch.  I'll leave that up to
25  you, Mr. Trende, and your attorneys.

Page 94

1                    THE VIDEOGRAPHER:  Let me take us off

2          the record so it is not on the transcript.  10:56

3          a.m.  We're going off the record.

4                    (A brief recess was taken.)

5                    THE VIDEOGRAPHER:  The time on the

6          monitor is 11:24 a.m., and we're back on the

7          record.

8          BY MR. TRIVEDI:

9               Q.   Hi, Mr. Trende.  We're back on the

10          record.  Are you ready to get started again?

11               A.   Yes.

12               Q.   Okay.  Just for the record, did you

13          have any conversations with counsel during that

14          break?

15               A.   I e-mailed them the reports that you

16          requested, but I did not confer with them.

17               Q.   Okay.  Did they respond to you?

18               A.   I would say not to my knowledge and I

19          can check my Outlook at the next break.

20               Q.   Of course.  Okay.

21                    MR. DIAMADUROS:  Just for the record,

22          we have been responded to that e-mail.

23                    MR. TRIVEDI:  I appreciate that.  Thank

24          you.

25                    (EXHIBIT 9, Report of Dr. Kosuke Imai,

Page 95

1    was marked for identification.)

2    BY MR. TRIVEDI:

3         Q.   So I want to pull up a document that we

4    have marked Trende Exhibit 9.  Mr. Trende, I know

5    this is a long document, but based on the first

6    page, do you recognize it?

7         A.   It looks like the expert report of

8    Dr. Imai in this case.

9         Q.   Okay.  Have you reviewed this document?

10        A.   Yes.

11        Q.   I'm going to refer to it from time to

12   time, but I'll take it off screen share now.

13        A.   Okay.  And you asked what date I would

14   have gotten started with my report.  It would have

15   been January 24th.

16        Q.   I see.  Is that the day that Dr. Imai's

17   report -- you received Dr. Imai's report?

18        A.   Almost certainly.  I mean, unless they

19   delayed circulating it by a day, but within --

20   let's say within the vicinity of January 24th.

21        Q.   Great.  Thanks for that clarification.

22             Okay.  Going to Dr. Imai's report, I'm

23   scrolling down to -- I'm sorry.  I apologize.  I'm

24   going to back to your report where we discussed

25   Dr. Imai's report.

Page 96

1          Can you read the two pieces that I have
2    highlighted right there?
3          A.    "I was asked to review the reports of
4    Plaintiff's experts regarding the newly enacted
5    districts for the South Carolina House of
6    Representatives.  In the particular, I was asked to
7    opine on the expert report of Dr. Kosuke Imai and
8    Dr. Jordan Ragusa, R-A-G-U-S-A."  I guess it
9    skipped in parens, (see my report).
10          Acknowledging referring to them see my
11    report, Ragusa report throughout this.  That's not
12    a direct quote, but I left out the parentheticals.
13          Getting back to the quote.  "I do not
14    critique Dr. Imai's mathematics here.  Instead, I
15    provide context to assist the Court in evaluating
16    his maps."
17          Q.    Okay.  Is it still true that you do not
18    critique Dr. Imai's mathematics with respect to
19    this case?
20          A.    (Inaudible.)
21          Q.    Sir, I think that actually cut out for
22    me.  Could you repeat that answer?
23          A.    That's right.
24          Q.    Do you agree that his simulations
25    methodology that he uses in his report is widely

Page 97

1    accepted?

2         A.    Yes.

3         Q.    And that he applied it correctly in

4    this case?

5         A.    I assume.  So -- so let's back up.  He

6    has this new version.  You have to do this special

7    download from -- my -- my assumption is that it's

8    fine, and I don't know offer any critique of his

9    math or methodology.

10         Q.    Do you agree that he is qualified to

11    conduct this sort of analysis?

12         A.    He seems qualified.  I mean, certainly

13    to run simulation and write simulation code, yes.

14         Q.    You said earlier that he helped develop

15    the REDIST package; is that right?

16         A.    Yes.  He is certainly qualified to

17    write simulation code and run them, yes.

18         Q.    He -- do you know whether he has

19    published peer-reviewed papers about redistricting?

20         A.    I'm certain he has.

21         Q.    You cite one in your expert report,

22    don't you?

23         A.    Um, I don't think McCartan and Imai's

24    paper has been published yet, but I know it's --

25    it's relied upon, and the method has been relied

Page 98

```
 1        upon by Courts so...
 2                  I know the McCartan and Imai paper is
 3        under peer review right now, but I don't think it's
 4        been officially published yet.
 5                  Q.   Okay.  By comparison, you have no
 6        peer-reviewed papers, correct?
 7                  A.   Still no peer-reviewed papers.
 8                  Q.   Okay.  So starting at page eight in --
 9        in your report, you assert with respect to
10        Dr. Imai's simulation analysis that 5,000 maps does
11        not mean 5,000 unique maps; is that right?
12                  A.   That's right.
13                  Q.   And as part of your analysis, to come
14        to that conclusion, you conducted a sampling; is
15        that right?
16                  A.   Right.
17                  Q.   Of how many maps?
18                  A.   Ten.
19                  Q.   Okay.  To get these ten maps out of
20        5,000, did you use a random number generator?
21                  A.   Yes.
22                  Q.   And which one did you use?
23                  A.   I think I ran a uniform sample across
24        5,000 in R.
25                  Q.   Okay.  Did you produce the code or any
```

Page 99

1    resulting information or documents that would

2    confirm your use of that random number generator?

3           A.    I think I produced the code, yes.

4           Q.    And did that random number generator

5    produce an electronic or written output?

6           A.    It would have created, in R, an object

7    -- a vector of length ten that had ten numbers in

8    it.

9           Q.    Okay.  Did you produce an image of that

10   vector or list?

11          A.    No.  Well, I mean, you can see the map

12   numbers in the map that was produced.  So that

13   would be the vector, or those would all be at least

14   within the vector.

15          Q.    Well, in your expert report you don't

16   actually produce all ten numbers for any of the

17   clusters; is that right?

18          A.    That's right.  There are certain ones

19   within those ten that produced duplicates within a

20   sample of ten.

21          Q.    Even beyond duplicates, you didn't

22   produce certain results that the random number

23   generator produced, correct?

24          A.    No.

25          Q.    No, you -- when you sampled, for

Page 100

1    example, ten maps from the Chester cluster, you did

2    not include all ten maps in your expert report, did

3    you?

4            A.    No, because the point is simply that it

5    produces duplicates.  I mean, that's it.

6            Q.    Right --

7                  (Simultaneous speaking)

8            A.    If your point is just that it produced

9    duplicates, then you show the duplicates.

10           Q.    No, that's not my point.  My point is

11   that you say you ran a sample of ten maps for each

12   cluster; is that right?

13           A.    Right.

14           Q.    You didn't include all ten maps for

15   every cluster in your expert report, did you?

16           A.    No, because my only point was that it

17   produces duplicates.

18           Q.    Can you guarantee right now that for

19   every sampling of ten maps, every map you didn't

20   put in the report was a duplicate?

21           A.    Yes.  I'm sorry.  Wait.  Wait.  Wait.

22   Can you rephrase that?  I want to make sure I

23   answer it correctly.

24           Q.    Okay.  For all of the clusters, you say

25   you conducted a ten-map sampling; is that right?

Page 101

1          A.    Right.

2          Q.    Okay.  For all of clusters, you don't

3     actually include the ten maps that were the result

4     of the random sampling in the report itself,

5     correct?

6          A.    Correct.

7          Q.    And you haven't produced them to us

8     otherwise either, correct?

9          A.    Correct.

10          Q.    So are you saying now, that every map

11     that is not contained in your report is a duplicate

12     of something that is contained in the report?

13          A.    Oh, no.  That's not -- I'm glad we went

14     through that.  No.  No.

15          Q.    Okay.

16          A.    Sorry.  There is a negative in there.

17     Yeah, no.  That is not my point.

18          Q.    So we have no way of knowing what the

19     results were for your random sampling unless

20     they're contained in your report?

21          A.    Well, right because the only point is

22     that it produces duplicates.

23          Q.    You just said -- you just said that not

24     every map that you included from the report is a

25     duplicate.  There are some non-duplicates that you

Page 102

1    excluded from the report, correct?

2         A.    But my point is not -- I'm sorry if it

3    came across this way as the report.  My point is

4    certainly not that every map within Dr. Imai's

5    report is a duplicate.  I did not mean to suggest

6    that.  There are duplicates.  This process will

7    produce duplicate maps.  It's not 5,000 completely

8    different maps because I think if you don't know

9    much about how the simulations work, you -- a

10   natural assumption might be that, you know, these

11   are just like 5,000 maps that are all radically

12   different.  So like I said at the beginning, I just

13   think it's important context.

14        Q.    But focusing on the sampling point, you

15   agree that even though all you did was sample ten

16   for each cluster, you didn't even include all ten

17   results in your report, correct?

18        A.    Oh, that's right.  Because my point --

19   my point is simply --

20        Q.    Yeah.

21              (Simultaneous speaking)

22        A.    I'm not done with my answer.

23        Q.    Please.  Please.

24        A.    Because my point is not that his maps

25   don't produce unique maps.  It's that they do

Page 103

1    sometimes produce duplicates.

2         Q.   But in coming to your point, you didn't

3    allow the reader to compare the maps that you

4    included in the report with maps that were -- with

5    the other maps that were created by the random

6    number generator, correct?

7         A.   Because I think it's clear from how the

8    report is written that not every map within the

9    report is a duplicate.

10        Q.   But you also --

11             (Simultaneous speaking)

12        A.   I think if a -- I think if a -- if a --

13   an average reasonable reader sees the header that

14   says -- you know, it produced -- or not the header,

15   but sees a sentence saying it produces duplicates

16   maps, I think ten you report duplicates, I think

17   the natural intuition is that the other six aren't

18   duplicates.  But I'm happy, like I said, if it's

19   unclear I'm glad we had this opportunity to clarify

20   it.

21        Q.   So could you produce all of the sample

22   maps that the number generator created that you did

23   not include in the report?

24        A.   Um, I don't know.  I don't remember if

25   I set a seed or not.

Page 104

1          Q.    So those might be gone?

2          A.    They might be.  I would have to look at

3    the report and see if there is ten numbers that

4    appear in the map titles.

5          Q.    Is there a way to reproduce exactly

6    your process for the report, such that you could

7    recreate the ten map samples for each cluster?

8          A.    I mean, no.  It's -- it's just a random

9    sample of maps.  You can produce -- you can

10   certainly replicate a random sample of ten maps,

11   and you can certainly replicate the maps that have

12   been produced because they're numbered in the code.

13   And I'm happy to say that the other six were not --

14   or the other, however many, were not duplicates.

15         Q.    But we can't replicate the exact ten

16   that you got?

17         A.    I don't know if that is true or not

18   because if there is ten numbers in the maps that

19   are in the report, then you could.  Because I only

20   -- I only generated the vector once.

21         Q.    But there is no cluster for which you

22   actually produced the map numbers for all ten,

23   correct?

24         A.    Well, that's -- no.  You're -- I think

25   I'm being unclear.  You know, if one cluster is

Page 105

1    1234, another cluster is 5678, and another cluster

2    is 910, that actually could go back and reproduce

3    everything.

4            Q.    Okay.  I was under the impression that

5    you sampled ten maps for each luster?

6            A.    Well, right.  But it's -- I only did

7    the -- I -- I would have to go back and look at the

8    code.  I'm sure if I'm wrong Dr. Imai will let me

9    know, but I think I only sampled vector once, and I

10   pulled the same ten maps for all six clusters.

11           Q.    So if it possible to recreate the

12   sampling that you did, meaning, that the ten map

13   sample for each cluster would be the same as the

14   one that you analyzed for your report, will you

15   produce all ten sampled maps for each cluster now?

16           A.    No.  But I can give you -- I mean, the

17   numbers will appear in the report, and your experts

18   are more than able to generate those maps with my

19   code.

20           Q.    But you can't recreate --

21           A.    Unless counsel -- unless -- oh, I

22   could.  Unless counsel instructs me to spend their

23   money recreating these maps, I won't do it, but it

24   could be done.

25           Q.    Okay.  Let's go to page nine of your

Page 106

1    report.

2            A.    You're not sharing anything with me by

3    the way.

4            Q.    You said you had your report?

5            A.    Yeah.  I closed it at the break, sorry.

6            Q.    Can you reopen it?

7            A.    Okay.

8            Q.    Okay.  So at the bottom of page nine,

9    Paragraph 28, you say, "Take for example the

10   Chester configuration.  I selected ten maps at

11   random from each of Dr. Imai's ensemble of maps."

12                First of all, let me pause there.  Do

13   we agree that ensemble means roughly the same thing

14   as assimilation?

15           A.    Yes.

16           Q.    Okay.  Great.  So you say, "I selected

17   ten maps at random from of each of Dr. Imai's

18   ensemble of maps.  Four of these appear to be

19   identical."

20           A.    Correct.

21           Q.    You didn't say that they are identical,

22   correct?

23           A.    That's right.

24           Q.    Are they identical?

25           A.    I believe so.

Page 107

1          Q.    Then why didn't you say that they are

2     identical?

3          A.    Because they appear to be identical and

4     I believe they're identical.

5          Q.    But you could have said they are

6     identical.  Instead, you said they appear to be

7     identical.  Is it are they identical or do they

8     merely appear to be identical?

9          A.    I don't think it's either or.  I mean,

10    they appear to be identical, and I don't see how

11    they could not be.  But if someone went through and

12    did a precinct by precinct analysis and found a way

13    that they are not, then I would be wrong.  I

14    wouldn't be wrong -- I wouldn't be wrong because

15    they still appear to be identical and I can't

16    imagine that they aren't.

17         Q.    Okay.  But you didn't provide us with

18    the data, precinct by precinct, to show whether

19    they're identical or not?

20         A.    That's Dr. Imai's maps.

21         Q.    But it's your report?

22         A.    It's Dr. Imai's maps, and I'm relying

23    on his code to generate these maps.  All I did was

24    -- all -- all I did was run his codes, so he should

25    have all of this.

Page 108

1          Q.   I agree.  But you used the word, "these

2     appear to be identical," and not Dr. Imai, right?

3          A.   Well, right.

4          Q.   Okay.  So back to the conversation we

5     were having a minute ago, you said you sampled ten

6     maps at random, correct?

7          A.   Correct.

8          Q.   And how many do you include in your

9     report?

10         A.   It looks like for Chester there are --

11    it looks like six.

12         Q.   So how many --

13         A.   Well, there -- there is eight, but six

14    are taken from the sample.

15         Q.   Well, I'm sorry.  How many images of

16    maps are there, first of all?

17         A.   For Chester, I believe there are eight,

18    and six of those are taken from the sample.

19         Q.   Okay.  So four of the ten from your

20    sample do not appear in your expert report at all;

21    is that right?

22         A.   Yeah.  They're not identical.

23         Q.   What do you mean when you say, "they're

24    not identical?"  Not identical to what?

25         A.   To the map that's produced.

Page 109

1              Q.    Okay.  And you don't remember what

2      those four looked like, correct?

3              A.    Let me check to see.  I do have the --

4      yeah, I can -- I can produce for you the ten maps

5      from each sample.

6              Q.    Okay.  Any reason you didn't produce

7      them before today?

8              A.    Well, because these were the maps that

9      I relied upon.

10             Q.    Okay.

11             A.    And there is -- there is and you can

12     see my process in the code.

13             Q.    Okay.  Was your point in this section

14     to show maps, first of all, that appeared

15     identical?

16             A.    Yes.

17             Q.    Okay.  And then on page -- I'm sorry.

18     Hold on one second.  On page 12, you say, "In fact,

19     just in the ten maps that I randomly sampled,

20     Dr. Imai's algorithm produces any map that is

21     almost identical to the map that the legislature

22     produced."

23                   Can I take from that that out of the

24     ten you sampled, one of them looked, as you say,

25     almost identical to the enacted map; is that right?

```
                                            Page 110

 1              A.    That's right.

 2              Q.    If there had been others in your random

 3      sampling of maps that looks almost identical to the

 4      enacted map, would you have included it in the

 5      report?

 6              A.    Surely.

 7              Q.    So can we assume then out of the ones

 8      that you didn't produce in the report, they didn't

 9      look like the enacted map?

10              A.    Oh, yes.

11              Q.    Okay.  And out of the -- out of the

12      images from the sampling that you included, you're

13      not contending that any of those looked like the

14      enacted map either, right?

15              A.    They don't look at all like it.  It's a

16      different configuration.  It keeps the City of

17      Chester in Chester County.

18              Q.    Okay.  So just to confirm, in your

19      ten-map sampling in Chester only one looked similar

20      to the enacted map?

21              A.    Yes.

22              Q.    Okay.  I'm moving to Sumter on page 14.

23                    In Sumter, did you also do a ten-map

24      sampling?

25              A.    Yes.
```

Page 111

1              Q.   You didn't include all ten in your

2      report, correct?

3              A.   That's right.

4              Q.   In fact, you only included two images,

5      correct?

6              A.   Correct.

7              Q.   Okay.  You haven't produced the other

8      eight to us yet, correct?

9              A.   That's right.

10             Q.   Okay.  And for Sumter, you admit that

11     none of the sampled ten maps look like the enacted

12     map, correct?

13             A.   His process prefers to split it on an

14     east/west axis.

15             Q.   I'm sorry.  Where it Dr. Imai's report

16     does he say, I prefer to split Sumter on an

17     east/west axis?

18             A.   Well, if you take a sample of ten maps,

19     so, to answer your question correctly, he doesn't

20     say that.  But if you -- and I also didn't say that

21     Dr. Imai prefers to have that on an east/west axis.

22     What I said was is -- on the exact code or the fact

23     of the exact wording here, is that whatever the

24     parameters of the simulation are, they prefer this

25     east/west because all ten of the maps split the

Page 112

1    City or split the county on an east/west axis.

2         Q.   I'm sorry.  In what document does it

3    say there is a preference to spit Sumter on an

4    east/west axis?

5         A.   If you pulled a sample of ten maps from

6    a sample of 5,000 maps, and they're all split on an

7    east/west axis, some parameter in the simulation is

8    leading it to prefer, even if it's not explicit, an

9    east/west split.

10        Q.   So there is no explicit parameter that

11   prefers an east/west split.  That just happens to

12   be what is produced from the parameters that do

13   exist, correct?

14        A.   Well, it's probably a result --

15             MR. DIAMADUROS:  Object to the form.

16             THE WITNESS:  It's probably a result --

17   the result of the compactness parameter.  Mapmakers

18   weren't prying with the compactness parameter of

19   one or whatever Dr. Imai is using, you would get --

20   probably get different maps.

21   BY MR. TRIVEDI:

22        Q.   But you don't know that for sure,

23   correct?

24        A.   No.  Dr. Imai is using his

25   developmental software, and I didn't feel

Page 113

1    comfortable messing around too much with it.

2         Q.    Okay.   In terms of preferences,

3    Dr. Imai did use -- well, okay.

4              Do you agree that Dr. Imai attempted to

5    simulate the parameters that the legislature,

6    itself, used?

7         A.    I don't know.

8         Q.    Okay.   Okay.   The next cluster is

9    Richland.

10        A.    Uh-huh, yes.

11        Q.    For Richland, your report says, "We see

12   this again in the Richland County group with just a

13   minor difference rendering these maps distinct; is

14   that right?"

15        A.    That's right.

16        Q.    You include two pictures of maps from

17   Richland, correct?

18        A.    Correct.

19        Q.    You don't include the other eight from

20   your sampling of ten, correct?

21        A.    That's correct.

22        Q.    Okay.   You have no data in this section

23   of Richland explaining how they are similar or

24   different, these two maps, correct?

25        A.    That's correct.   I mean, you can look

```
                                        Page 114
 1      at them and see that the lines are identical except

 2      with a slight difference in how District 2 and map

 3      1393 and District 4 in map 1494 are configured on

 4      the north.  A little protrusion on District 2 in

 5      1494 versus 1393, and then the -- I guess it's

 6      District 6 and 8 in both maps have some slightly

 7      different configurations.  But I think any

 8      reasonable person looking at these districts would

 9      say they're substantially similar with minor

10      differences.

11           Q.   But you don't assert here that these

12      two images look anything like the enacted map,

13      correct?

14           A.   That's right.  My -- my -- my point --

15      my general point here is just that you aren't --

16      you aren't necessarily getting 5,000 radically

17      different maps, which I don't think people

18      necessarily intuit when they start out with

19      redistricting plans or redistricting simulations.

20      That's -- that's really all there is.

21           Q.   Okay.  So moving to PD.  Here your

22      analysis is, "We see this again in the PD maps."

23      You don't say anything more about PD, correct?

24           A.   That 's right.

25           Q.   Then you have two maps out of your
```

Page 115

1      ten-map sampling, correct?

2              A.    That's right.

3              Q.    Not the other eight?

4              A.    That's correct.

5              Q.    And you're not contending that these

6      two maps look anything like the enacted map?

7              A.    That's -- that's certainly correct.

8              Q.    Okay.  Now below the PD section, on

9      page 18, you say, "To be perfectly clear, I do not

10     believe that this calls into question the overall

11     legitimacy of the approach;" is that right?

12             A.    Yes.

13             Q.    Okay.  Your whole point was that some

14     maps turn out identical?

15             A.    Right.  That -- that -- that we aren't

16     getting 5,000 completely, I guess you would call

17     fresh or unique looks at the map.  I think that is

18     an important context to understand.

19             Q.    Okay.  Then you use an analogy about

20     newborn babies in the United States; is that right?

21             A.    Right.

22             Q.    So what's your analogy?

23             A.    If you sampled the weight of newborn

24     babies in the United States, you would get numbers

25     around 7.5 repeated because that's where the center

Page 116

1      of the distribution is for newborn babies.

2              Q.    But, mathematically speaking, whether

3      the mean is at 7.5 because many, many babies weigh

4      exactly 7.5, or whether many, many babies weighed

5      7.49 and 7.51 doesn't really matter, right?  The

6      mean is at 7.5 either way, correct?

7                    MR. DIAMADUROS:  Object to the form.

8                    THE WITNESS:  Yeah.  Yeah.  My -- my

9      point is that if you really have a background in

10     math and statistics to think about it, this isn't

11     terribly surprising, and it makes sense when you

12     think about other things that people sample.  I

13     mean, this -- this -- this part actually is not a

14     critique of Dr. Imai.

15     BY MR. TRIVEDI:

16             Q.    All right.  Just to close out this

17     section, you're aware that the Plaintiffs also

18     challenged a cluster of districts in Andersen

19     County; is that right?

20             A.    Correct.

21             Q.    And this sampling analysis doesn't

22     address Andersen County at all, is that right?

23             A.    It does not.

24             Q.    Did you do a ten-map sampling of

25     Andersen County?

Page 117

1          A.    Yes.

2          Q.    You just didn't include it here?

3          A.    I didn't have anything to say about it.

4          Q.    Okay.  You didn't produce to us those

5     ten maps either, did you?

6          A.    No.  But they should have the same

7     numbers as the maps included here.  So at the very

8     least, we should be able to reproduce most of them

9     from this.

10         Q.    Sorry.  What do you mean that they

11    could have the same numbers?  Because you have map

12    numbers in each cluster that are different from

13    other clusters, right?

14         A.    Right.  So if you go be the page 11,

15    you'll see map number 1633.  If you go onto page 12

16    you'll see map number 1494.  And if you go on page

17    15, you'll see map number 1633.  And if you go on

18    page 17, you'll see map number 1494.

19         Q.    I see.  This is helpful.  Okay.

20               So you used the random-number generator

21    and created the same ten map numbers for all

22    clusters?

23         A.    That's what I mean what I said -- and

24    -- and I'm sure I will hear about it if I'm wrong

25    with this in the code.  But I said my recollection

Page 118

```
 1      is that I created -- I had created the vector of
 2      random numbers once.
 3              Q.   Great.  Okay.  That is helpful.  Thank
 4      you.
 5              A.   You're welcome.
 6              Q.   Okay.  To go back to your report, in
 7      Paragraph 37 you say, "It does."  It meaning the
 8      appearance of duplicates, would you agree?
 9              A.   Be almost certain exists as duplicates,
10      right.
11              Q.   Right.  So it does not -- it does
12      however give some important context to the peaks in
13      the histogram.  You say, "Those peaks don't occur
14      because out of all of the possible combinations of
15      precincts in districts, almost all the racial
16      breakdowns would be near the peak."
17                   Did I read that right?
18              A.   Yeah.  There is an embarrassing typo in
19      there, but yeah.
20              Q.   I didn't read the typo.
21              A.   Sorry about that.
22              Q.   Does Dr. Imai claim that almost all
23      racial breakdowns occur near the peak?
24              A.   Oh, no.  This isn't -- this is why I
25      put that sentence up front.  That -- I'm not
```

Page 119

1      critiquing his mathematics, and why I put in the

2      paragraph saying, you know, I'm not critiquing the

3      overall legitimacy of the approach.  What I want

4      the people evaluating these maps to understand is

5      -- is that because his software weights or his

6      package, when it's trying to decide mass select

7      weights them with certain parameters, it's going

8      to -- it's going to -- some maps are going to be a

9      lot more likely to be selected than others.  And

10     so, you know, there -- there -- there -- it's just

11     not like -- when -- when you say randomness to most

12     people, they think like a dice or the lottery.  You

13     know, where it's to use mathematical geek terms as

14     a uniform distribution.

15              Q.    Uh-huh.

16              A.    And I don't -- that -- that's not how

17     that works because it gives preference for certain

18     maps to be drawn, which is why you see these

19     repetitions.  It is a different shape.  That is all

20     I'm saying.

21              Q.    But you agree that that State

22     Legislature also had parameters that they did not

23     made uniform distribution, correct.

24              A.    Correct.

25              Q.    Okay.  And I just want to focus on -- I

Page 120

1    take your point that you just made.  I just want to

2    focus on your use of the term "Almost all the

3    racial breakdowns would be near the peak."  And get

4    your agreement that Dr. Imai's histograms don't

5    claim that almost all racial breakdowns occur near

6    the peaks.  His why access tells you exactly what

7    proportion of the racial breakdowns occur at the

8    peak; is that right?

9            A.    I mean, I think for like Chester

10   County, if I'm looking at this histogram of page

11   eight correctly, it does suggest that out of his

12   sample, you know, 60 percent of the maps or 70

13   percent of the maps are at the peak.  And that

14   doesn't mean 70 percent of all unique, randomly

15   drawn possible maps.  It's -- it's the maps that

16   are drawn according to the parameters of the

17   software that can produce lots of duplicates in

18   very very similar maps.

19           Q.    Right.  And so I'm glad you pointed me

20   back to the histograms on page eight.  That is

21   exactly my point that 60 -- 70 percent, for

22   example, of plans in district 41 have a BVAP around

23   40 percent, do you agree?

24           A.    70, I would say, but yeah.

25           Q.    Okay.  That doesn't say almost all,

Page 121

1    correct?

2            A.    It kind of considers 70 percent almost

3    all, but...

4            Q.    You would?

5            A.    Yeah.  And you got another 20 percent

6    in the immediately adjacent histogram.  So that's

7    90 percent, very near the peak so...

8            Q.    Okay.  And, therefore, you would agree

9    that the enacted plan that is above 50 percent is

10   not near almost all the outputs, correct?

11           A.    Yeah.

12           Q.    Okay.  So I have one more question

13   about --

14           A.    We -- we -- we can quibble about

15   whether it's near or not.  I -- I -- whether it's

16   much higher, but it's different.

17           Q.    Okay.

18           A.    And one other thing on almost all.  If

19   you look at District 43, that -- that, to my eye at

20   least, appears to be 85 percent of the districts at

21   this, you know, just below 30 percent BVAP, which

22   to me is almost all.

23           Q.    Okay.  I have one question about

24   clusters with a small number of districts, but

25   let's stick with Chester.  Chester has two

Page 122

1    districts, correct?

2            A.    Right.

3            Q.    The cluster that the -- the Plaintiffs

4    -- the cluster that the Plaintiffs call Chester has

5    two districts, correct?

6            A.    Correct.

7            Q.    Wouldn't you then expect, with only one

8    line dividing two districts, that there would be a

9    lot of maps that are similar or substantially

10   similar?

11           A.    I think this is -- first off, I would

12   expect it because I have been dealing with these

13   simulations for a while.  I don't know that an

14   average observer would.

15           Q.    I'm just asking about you.

16           A.    Well, I know.  And -- and I have a

17   different perspective on this than most.  It -- it

18   didn't surprise me that a lot of these maps look

19   the same for the simulation.  I don't know if

20   people were just randomly drawing maps without a

21   compactness parameter of one, whatever that means

22   programmed into their heads, that you would get a

23   bunch of maps that look almost identical, because

24   there is a lot of different combinations you can

25   draw here.

Page 123

1          Q.   But you do know that the legislature
2      had certain parameters, correct?
3          A.   I don't know that they had compactness
4      parameter of one in mind or a compactness parameter
5      of anything.  Or that they would have had the
6      Polsby-Popper definition of compactness in mind.
7      But they probably had some big parameters in mind,
8      yes.
9          Q.   Okay.  Okay.  On page 19 of -- of your
10     report, you have it that districts often persist
11     out of habit as much as anything else; is that
12     right?
13         A.   Yes.
14         Q.   You don't cite any scholarship for this
15     assertion; is that right?
16         A.   No.  It's my experience drawing maps,
17     for example.  And having studied district lines for
18     a long time, you rarely see a legislature
19     completely -- excused me, wiped the slate clean and
20     draw again.
21         Q.   Have you written a peer-reviewed paper
22     about that?
23         A.   No.  But if someone wants to suggest to
24     suggest to rebuttal those pictures routinely wipe
25     the slate clean in redistricting, I -- I would like

Page 124

1    to see it.  But I don't think you'll fine any one

2    to say that.

3         Q.   But you haven't found anyone to say

4    that district often persists out of habit as much

5    as anything else either, have you?

6         A.   Well, in my experience drawing maps,

7    actual maps, yes.  In my experience studying

8    congressional districts for a dozen years now,

9    professionally, yeah.  I mean -- we have had -- had

10   9th District Virginia located in the panhandle for

11   probably 100 how.  And when we were drawing in

12   Virginia, even though we were trying to draw from a

13   blank slate, we always referred to the 9th District

14   in Southwest Virginia because we both knew that.

15        Q.   Okay.  But, again, you're basing this

16   on your personal experience?

17        A.   I mean, yeah.  My personal experience

18   and training.

19        Q.   Okay.  You don't cite any peer-reviewed

20   studies or mathematical models supporting the

21   assertion that district often persists on habit as

22   much as anything else?

23        A.   No.  It's my professional experience

24   and training assessment.

25        Q.   When you say, "As much as anything

Page 125

1      else," do you think habit is equally as relevant a

2      factor as other things?

3              A.   What paragraph are we on?

4              Q.   Page 19.  Paragraph 38.

5              A.   Oh, no.  That's not a specific

6      probability.

7              Q.   Okay.  So later in that paragraph, you

8      say that, for example, "The pairing of the City of

9      Chester with Fairfield County could be the result

10     of habit or path dependency;" is that right?

11             A.   Yeah, core retention.

12             Q.   You don't say, "core retention" though,

13     you say, "habit or path dependency," correct?

14             A.   Yeah, but it's the same concept.

15             Q.   Then you write, "The map drawers could

16     reasonably have had this configuration in mind out

17     of habit, rather than out of any nefarious purpose,

18     correct?

19             A.   Right.

20             Q.   But you can't prove that, correct?

21             A.   No.  I don't purport to.

22             Q.   Okay.  You don't include any evidence

23     that that is actually the case, right?

24             A.   No.  I don't purport to do that either,

25     no.

Page 126

1          Q.   And you didn't talk to any of the map

2     drawers as to whether they had a various purpose or

3     not, did you?

4          A.   No.  And I'm assuming if you had good

5     evidence, as they did, that's -- that's going to be

6     a different look.

7          Q.   And on this habit-based explanation, we

8     talked about your New York report a moment ago, and

9     we'll get to it again.  But it's not contained

10    anywhere in your New York report, is it?

11         A.   No.

12         Q.   Or your Maryland report?

13         A.   No.  Well, no because this Maryland is

14    ridiculous, but no.

15         Q.   Okay.  Let me take a quick pause.

16              THE VIDEOGRAPHER:  I'll take us off the

17    record.  Sorry.  The time on the monitor is 12:05

18    p.m.  Going off the record.

19              (A brief recess was taken.)

20              THE VIDEOGRAPHER:  The time on the

21    monitor is 12:09 p.m.  We're back on the record.

22    BY MR. TRIVEDI:

23         Q.   Hey.  Welcome back, Mr. Trende.  I have

24    to ask, did you speak to counsel during this break?

25         A.   No.

Page 127

1            Q.    Okay.  I'm moving to Page 21 of your
2     report, which discusses the gerrymandering index.
3     Can you tell us what that is?
4            A.    That is something that was provided --
5     proposed by Bangia and suggested by McCartan and
6     Imai in their article on sequential Monte Carlo.
7     It's a way of trying to summarize how extreme a map
8     is relative to the distribution produced by the
9     ensemble.
10           Q.    And again, by ensemble, we mean
11    simulations, equivalently?
12           A.    And let's just stipulate for time that
13    ensembles are just the results of simulations.
14           Q.    Great.  And under the gerrymandering
15    index approach, is it fair to say that the farther
16    the map in question is from the mean, the more
17    gerrymandered it is?
18           A.    The -- the stronger the evidence that
19    it wasn't being drawn with the same parameters as
20    the existing map, yeah.  The more likely it is that
21    some other consideration predominated.
22           Q.    So in a racial gerrymander, the farther
23    the map in question is from the beam, the more race
24    considerations predominate?
25           A.    If all the other -- if every other

Page 128

1    consideration besides race is accounted for in the

2    map, then yes, or in the ensemble, then yes.  If

3    every other consideration is not accounted for, you

4    know, if people were drawing with Re-occ (ph) in

5    mind instead of Polsby-Popper about the compactness

6    parameter of one, then it could be that one of

7    those considerations is responsible for the

8    deviation.  But your inference becomes stronger on

9    whatever other theory you posit.

10           Q.   The farther the target map is from the

11   beam?

12           A.   Right.

13           Q.   And speaking of the difference between

14   the mean and the target map, there are different

15   ways to measure that difference, right?

16           A.   Sure.

17           Q.   One of them is standard deviations?

18           A.   Yes.

19           Q.   Another way is to simply look at the Y

20   axis and see if the target map has a higher

21   gerrymandering index figure than the mean, correct?

22           A.   The X axis, yeah.

23           Q.   I'm sorry.  Yes.  The X axis, where the

24   gerrymandering indention is, correct.

25                I'll rephrase that.  You can look at

Page 129

1    the X axis of your graphs, and see if a target map

2    has a higher gerrymandering index on the X axis,

3    than where the mean looks to be; is that right?

4           A.    Correct.

5           Q.    But that's not as precise, because you

6    can tell the exact number of the gerrymandering

7    index either for the mean or for the target map,

8    correct?

9           A.    Oh, yeah.  I mean, it -- yes.

10          Q.    Okay.  So, for example, speaking again

11   of the X axis, if the mean on the graph is about 50

12   percent, and a single map in question is at 10

13   percent, can we say that the map in question is

14   five types less gerrymander, give or take?

15          A.    Well, again, we're -- we're -- if we

16   will stipulate that this is all assuming that every

17   consideration except for politics is accounted for,

18   then -- then that's a useful way to refer to it,

19   yes.

20          Q.    But you just said the word politics I

21   think by accident.  Do you mean race?

22          A.    Force of habit.  Yes, race, in this

23   context.

24          Q.    Okay.  In your report, though, you

25   didn't actually give us the gerrymandering index

Page 130

1    numbers for each of these analyses that you ran; is

2    that right?

3            A.    Right.

4            Q.    You just gave us graphs, correct?

5            A.    With relative positioning, yeah.

6            Q.    And you didn't report the mean for each

7    graph, correct?

8            A.    That's right.

9            Q.    And you didn't report the number of

10   standard deviations from the mean of any of the

11   maps that you analyzed; is that right?

12           A.    That's right.

13           Q.    Did you produce those actual numbers to

14   Plaintiffs?

15           A.    I think I -- I think I gave you the

16   code to produce gerrymandering indices, but I don't

17   believe that I have calculated those numbers.  It's

18   a relative -- it's a relative analysis so...

19           Q.    Sorry.  What do you mean, "It's a

20   relative analysis?"

21           A.    Well, so, this analysis is looking kind

22   of three different maps to compare to each other,

23   and to the body of the distribution of -- if the

24   gerrymandering indices.  So it's how these plans

25   perform relative to each other as much as anything

Page 131

1    else.

2                    (Simultaneous speaking)

3            A.   If something -- and if something is

4    completely outside the distribution of the

5    gerrymandering index, I mean, then, you know, it's

6    -- not going to say it's irrelevant, but I -- I

7    think the point is made either way.

8            Q.   Okay.  But just on what the graphs tell

9    us and what they don't, there is a mean for each of

10   the graphs that you have put into your report,

11   correct, a numeric figure, correct?

12           A.   How it exists, yeah.

13           Q.   Right.  But we don't have it in the

14   report?

15           A.   I mean, no.

16           Q.   Okay.  And you didn't produce it as a

17   numeric figure to us, correct?

18           A.   No.  If it's something that Plaintiff's

19   experts think is relevant, they should be able to

20   reproduce it from my code and do whatever

21   calculations they're interested in.

22           Q.   Okay.

23           A.   But I -- from my analysis, I didn't

24   think it was relevant.

25           Q.   Okay.  Did you think producing the

Page 132

1    standard deviations from the mean for any map that

2    you analyzed was relevant?

3             A.    I don't think so.

4             Q.    Okay.  The gerrymandering index was

5    designed to be used in the partisan gerrymandering

6    context, correct?

7             A.    Correct.

8             Q.    You're using it here on a racial

9    gerrymandering case; is that right?

10            A.    That's right.

11            Q.    So would you say that changing the

12    variable that you're controlling for doesn't change

13    the validity of the approach?

14            A.    Well, that's a -- that's -- that's a

15    little bit of a broad generalization.  I don't

16    think I can -- I can't admit to that that broadly.

17            Q.    Does controlling for race and not

18    partisanship render the gerrymandering index

19    useless?

20            A.    I don't think so.

21            Q.    Okay.  You didn't include any caveats

22    in your report saying that the gerrymandering index

23    is less valid for racial gerrymandering than for

24    partisan gerrymandering; is that right?

25            A.    I don't -- I don't think it would be,

Page 133

1    but I could be persuaded on that.

2         Q.    Okay.  Okay.  So I want to dive into

3    the -- the graphs themselves, but I have a

4    clarification.  So on page 24 of your report, you

5    produce a graph showing that gerrymandering index

6    -- or starting on page 24 you show graphs for

7    several clusters.  But there is a chart on the top

8    of page 24, and a chart on page 25 labeled as the

9    "Distribution of Gerrymandering Index for Andersen

10   Cluster."

11             Do you see that?

12        A.    Yeah.  That's probably a typo or I

13   didn't update the title.  Yeah.

14        Q.    No problem.  Can you tell by eyeballing

15   it, which if either, are Andersen?

16        A.    No.

17        Q.    Okay.  So I'll skip that one for now,

18   putting on the record that we may have to hold open

19   the deposition, including for other reasons

20   previously stated on the record, but also because

21   we can't tell what these two graphs are, correct?

22        A.    You -- you can note what you would like

23   for the record.

24        Q.    Oh, okay.  But I'm asking you to

25   confirm.  You can't confirm just by eyeballing it

Page 134

1    whether either of these two are Anderson, or

2    whether if one of them is Andersen what the other

3    one is?

4         A.   Oh, I'm certain one of them is

5    Andersen.  I can't confirm which one.

6         Q.   Okay.  Okay.  So let's go to page 24

7    where you talk about Chester.

8              Do you see that?

9         A.   Yes.

10        Q.   Okay.  In Chester, the enacted map is

11   outside the distribution; is that right?

12        A.   So I'm color blind.

13        Q.   Okay.

14        A.   But I'm going to assume, looking at

15   this, that this is the middle one that's red, so,

16   yes.

17        Q.   You note that there is a heavy cluster

18   of maps, quote unquote, "Heavy cluster of maps

19   around one percent on the gerrymandering index;" is

20   that right?

21        A.   That is right.

22        Q.   And it looks like, based on the Y axis,

23   that over 3,500 of the 5,000 simulated maps are

24   around one percent gerrymandering index; is that

25   right?

Page 135

1          A.    That's right.

2          Q.    Is it fair to say that the mean is

3     likely around one percent as well?

4          A.    Yes.

5          Q.    Okay.  And I know it's tough to see,

6     but would you agree that the enacted map in red,

7     the middle of the three, is around nine percent?

8          A.    Yes.

9          Q.    Okay.  You also say that there are,

10    quote unquote, "Clusters of maps that produce

11    similar gerrymandering indices to the enacted

12    plan," right?

13         A.    That's right.

14         Q.    I assume you're talking about these

15    small bars around 7.5 percent and eight percent?

16         A.    Yes.

17         Q.    Can you say roughly how many maps that

18    constitutes out of the 5,000?

19         A.    3,500 here, we have got 4,000.  A

20    couple hundred maybe.

21         Q.    Okay.

22         A.    Maybe.

23         Q.    But when you say that there are

24    clusters of maps that are similar to the enacted

25    plan, you mean a couple hundred out of 5,000?

```
                                          Page 136
```

1           A.    Which isn't surprising since we know

2     that simulations produce maps that look a lot like

3     the enacted plan in Chester County.

4           Q.    I'm sorry?  The -- you said the

5     simulation produces a lot of plans that look like

6     the enacted plan in Chester?

7           A.    Yeah.  We -- we just -- we just went

8     through that.

9           Q.    I'm -- I'm not sure we did.  So I

10    thought we just established that thirty -- over

11    3,500 of the maps have a gerrymandering index

12    around one percent, but the enacted map has an

13    index of nine percent?

14          A.    Yeah.  But, if --

15          Q.    -- you can contend that though -- that

16    can still mean that the enacted map looks like the

17    mean?

18          A.    I didn't say it looks like the mean.

19          Q.    Okay.

20          A.    We were talking about this cluster --

21    this cluster of maps out on the right, that's

22    similar to the enacted plan.  And I'm just saying

23    it's not surprising that we have these bars outside

24    the enacted plan because when you look at the maps

25    in the sample, there are maps generated that look

Page 137

1      like the enacted plan, so of course they're going

2      to generate similar gerrymandering indices.

3              Q.    Right.  But as a -- as a matter of

4      numbers, there are only, what you said, a couple

5      hundred that actually look like the -- anything

6      like the enacted map while there are many more that

7      don't look like it, correct?

8              A.    I'm guesstimating it's about a couple

9      of hundred, but one out of 20, to me, is a lot of

10     maps when you are talking about 5,000 maps.

11                  (Simultaneous speaking)

12             A.    But I will -- but I will agree with

13     you, and I am not even trying to remotely suggest

14     that the mean, or the mode, or those factors are

15     out of the enacted plan.

16             Q.    Okay.  And you said a moment ago that

17     the enacted plan is outside the distribution here?

18             A.    Yes.

19             Q.    Okay.  Again, you didn't calculate the

20     standard deviation between the enacted map and the

21     mean here, did you?

22             A.    That's right.

23             Q.    So, would it surprise you to know that

24     it is 4.14 standard deviations from the mean?

25             A.    That's actually smaller than I would

Page 138

1    have thought, but, yeah, okay.

2        Q.    Okay.  So on page 25, we, again, have

3    the thing that's called Andersen, so I'm going to

4    skip that one.  But on the bottom of page 25 you

5    say -- you say in your report, sorry, "In

6    Orangeburg it is a similar story."

7            Do you see that?

8        A.    Yeah, and I can see what happens now.

9    Yeah, that is the -- well, yeah.  That's -- that's

10   the Orangeburg map produced twice.

11       Q.    Okay.  You're saying that the map

12   labeled "Andersen" on page 25 is actually a

13   reproduction of Orangeburg map at the top of page

14   26?

15       A.    Yeah.  I think -- I think that

16   paragraph 52 was probably just meant to come out

17   and never did in an edit.

18       Q.    Okay.  Okay.  So then let's talk about

19   Orangeburg.  You say, "In Orangeburg it is a

20   similar story."  There is no other text there,

21   correct?

22       A.    Right.

23       Q.    So when you say, "It is a similar

24   story," you're saying that the enacted map is

25   outside of the distribution?

Page 139

1            A.   No.  The point here was that the -- the
2     -- I guess here is the enacted plan, the NAACP
3     plan, or both outside the -- the bulk of the
4     distribution.
5            Q.   But the enacted plan is outside of the
6     bulk of the distribution, correct?
7            A.   (Inaudible).
8            Q.   Sorry.  Sorry.  I didn't hear an answer
9     to that?
10           A.   I said right.
11           Q.   Oh, sorry.  There -- there are times
12     when you're -- you're cutting out just for a
13     second.  Okay.  I appreciate that.
14                (Simultaneous speaking)
15                THE WITNESS:  Madam Court Reporter, am
16     I cutting out for you, too?
17                THE COURT REPORTER:  Sir, that time you
18     did, yes.
19                THE WITNESS:  Okay.  I'll try to hold
20     the microphone closer to my mouth.
21           Q.   I honestly think it's a -- it's a --
22     nothing we can do.  It happens sometimes.  I can
23     here 99 percent of what you're saying.
24           A.   Okay.
25           Q.   You're within the mean.

Page 140

1                    Okay.  So in Orangeburg, we calculated

2        the standard deviation, and got 3.84 standard

3        deviation between the mean and the enacted plan.

4        Any reason to think that's wrong?

5            A.    No.

6            Q.    Okay.  On page 27, we have the PD

7        cluster; is that right?

8            A.    That's right.

9            Q.    Okay.  And in your report you say the

10       enacted plan is not within the expected

11       distribution in PD here, correct?

12           A.    That's right.

13           Q.    Okay.  We calculated the standard

14       deviation here, and we got 4.53 standard

15       deviations.  Does that surprise you?

16           A.    I -- I mean, I thought it was a little

17       larger, but that seems right.

18           Q.    Okay.  So next on page 28, is the

19       Richland cluster.

20                   Do you see that?

21           A.    Yeah.

22           Q.    Okay.  For Richland you say that the

23       enacted map falls on a "Cluster of maps," quote

24       unquote, is that right?

25           A.    Yes.

1          Q.   It doesn't fall on the largest cluster,

2     correct?

3          A.   Oh, no.   No, I think that's obvious.

4          Q.   It's not at the mean either?

5          A.   No.   I think -- again, that's obvious

6     as well.

7          Q.   Okay.   So in Sumter now on the -- at

8     that same page, the enacted plan is entirely

9     outside the distribution, correct?

10         A.   That's the enacted plan, which looks

11    like -- yes.

12         Q.   We also calculated the standard

13    deviation here and got 5.72 standard deviations.

14              Does the seem right to you?

15         A.   I don't have any reason to disagree

16    with it.   That one was larger than I would have

17    expected, but, I mean, I am just eyeballing the

18    data.

19         Q.   Okay.   For this map would you say it's

20    impossible to draw something near the mean?

21         A.   No.

22         Q.   Why is that?

23         A.   Well, I wouldn't say that for any of

24    them because obviously it's possible because you

25    have simulated maps that appear near the mean, and

Page 142

1     this one it looks like -- in this cluster, at

2     least, it looks like Dr. Duchin's map is near the

3     means as well.

4             Q.   Okay.  Great.  So now I'm going to turn

5     to your New York report.  Give me one second to

6     pull it up.  Sorry.  I'm having a tech issue this

7     time.

8             A.   I didn't do it.

9             Q.   Okay.  Do you see that now?

10            A.   Yes.

11            Q.   Okay.  Is this your expert report in

12    New York that we pulled up earlier?

13            A.   Yes.

14            Q.   Okay.  So I want to go down to page 14.

15    Okay.  Do you see where you say, "The ensemble maps

16    have on average a gerrymandering index of around

17    7.5 percent.  The enacted two congressional map on

18    the other hand has a gerrymandering index of 17

19    percent.  Almost six standard deviations from the

20    mean."

21            Did I read that right?

22            A.   You did.

23            Q.   Then the next thing you say is, "The

24    probability that the enacted congressional map will

25    be drawn by map drawers who care only about the

Page 143

1    constitutional mandate for compactness and avoiding

2    undue partisan influence is vanishingly small."

3    Did I read that correctly?

4            A.    That's right.

5            Q.    The next sentence says, "Put simply, it

6    is implausible, if not impossible, that this map

7    was drawn without a heavy reliant upon political

8    data, and was likely drawn to favor or disfavor a

9    political party;" is that right?

10           A.    That's right.

11           Q.    So is it fair to summarize it to say,

12   multiple standard deviations from the mean in the

13   gerrymandering index in New York, indicate that

14   partisanship was almost certainly the reason for

15   the drawing of the map, correct?

16           A.    Well, right.  Because we had control

17   for compactness, and avoiding undue partisan.

18   Well, I guess we had control for compactness at

19   that point.

20           Q.    Right.  And in South Carolina, we're

21   also controlling for compactness, correct?

22           A.    Well, I demonstrated -- maybe Dr. Imai

23   did this, too, and I have forgotten.  But I had

24   demonstrated that the compactness of the maps lined

25   up with what the legislature had actually drawn.

Page 144

1    So I was actually pretty confident that the

2    legislative team, even if they didn't know it, were

3    drawing with this compactness method in mind.  Now,

4    of course, the Defendants came back and said, well

5    you didn't call for this, this, and this.  And I

6    did have a control for those things to support the

7    distribution -- or support the conclusion.

8         Q.   And that's in New York you're talking

9    about, correct?

10        A.   That's right.

11        Q.   Yeah, okay.  So in -- in New York it

12   seemed evident that they were controlling for

13   compactness; is that right?

14        A.   They were controlling for compactness

15   at the same level that the simulations were.

16   Because when you ran the compactness analysis on

17   the enacted plan it fell in the center of

18   distribution of the -- of -- of the ensemble.

19        Q.   Right.  And the variable that they were

20   controlling for though -- I'm sorry.  Let me start

21   over.

22             The variable that you were controlling

23   for was partisanship, correct?

24        A.   Well, I was control -- I was examining

25   partisanship, and I was controlling for

Page 145

1    compactness.  I think that was the only parameter

2    that I had to build into the sim -- and -- and

3    continuity of course.  I think that was the only

4    parameter I had built into the simulations at that

5    point.

6          Q.    And that's helpful.  So you were

7    examining partisanship there using the

8    gerrymandering index, correct?

9          A.    That's right.

10         Q.    Okay.  And your conclusion was that at

11   that number of standard deviations away from the

12   mean, it was implausible, if not impossible, that

13   the map was drawn without heavy reliance on

14   partisanship?

15         A.    That's right.  And then like I said,

16   they came back and said there were all these other

17   things that they considered.  So you had to build

18   those into the simulations, which is in the

19   rebuttal report.

20         Q.    So we just talked a moment ago about

21   how the gerrymandering index can also be used for

22   racial gerrymandering.  In fact, that's what you

23   used it for, correct?

24         A.    That's right.

25         Q.    So isn't it correct then that if an

Page 146

1    enacted map is several standard deviations from the

2    mean, in a rational gerrymandering index, that that

3    also means that it is implausible, if not

4    impossible, that the map was drawn without racial

5    consideration?

6         A.    Controlling -- or if Dr. Imai is

7    controlling for everything else.  I mean, it is

8    tricky in the South separating race from

9    partisanship.  There may be a political

10    gerrymander.  There maybe other things.  I have no

11    idea what is going on in discovery, and what people

12    have said, you know, what other factors that may or

13    may not have raised.  But, yeah, if everything is

14    property controlled for, besides race, then you

15    know that race played a factor in drawing the

16    districts.

17         Q.    In fact, it's close to impossible that

18    it didn't, correct?

19         A.    Yeah.

20         Q.    And the standard deviation numbers that

21    I just read off track with that opinion, that it's

22    almost impossible, the races didn't play a factor?

23         A.    If everything else is properly

24    controlled for in the ensemble, then, yeah.

25         Q.    Do you have any reason to believe that

Page 147

1    things weren't properly controlled for in the

2    ensemble?

3         A.    Like I said, I have no idea.  I

4    genuinely have no idea what is come out in

5    depositions and discovery.  I don't have an opinion

6    one way or the other there.

7         Q.    Well, I just mean looking at Dr. Imai's

8    methodology and data, do you have any reason to

9    think that he didn't properly control for

10   everything but race?

11        A.    I think I answered that.  I don't know

12   what other things have been raised.  People are

13   saying no, they're trying to hurt democrats there.

14            I -- I honestly don't know.  So I can't

15   express an opinion one way or the other.  That is

16   the lawyer's job, not mine.

17        Q.    Okay.

18        A.    I will say, I -- I -- when I was

19   practicing, the advice I gave experts was it's not

20   your job to win the case for us, just answers the

21   questions, and that is something that I have tried

22   to take very seriously in my expert work.

23        Q.    Okay.  There is an opinion now in the

24   New York case; is that right?

25        A.    That's right.

Page 148

1              Q.    Do you know generally what it says?

2              A.    I know it struck down the maps.  It

3      came down right before I left for vacation, so I

4      haven't had a chance to read it.

5              Q.    Okay.

6              A.    Honestly.

7              Q.    So before we get to the opinion, in New

8      York there were also factors that you didn't

9      control for, right?

10             A.    I think we controlled for them as well

11     as the legislature did.  So I'm not sure that's

12     true.

13             Q.    Well, are there factors that the

14     legislature considered that you didn't?

15             A.    They made the claim, but I don't

16     particularly buy it.

17             Q.    Oh.  They say they controlled for

18     communities of interest, for example?

19             A.    Exactly.  And I look at those maps and

20     I don't really believe that they did.  I -- I -- I

21     have done a lot of work on Congressional districts,

22     and did the Almanac American Politics for New York,

23     and I'm not aware of a community of interest that

24     would require you to merge the Hamptons with the

25     districts in -- you know, that's all the way out to

Page 149

1    Nassau County, bypassing all the republican

2    precincts along the way.  So I'm pretty sceptical

3    with the claim, or -- or that would connect Yonkers

4    with Yorktown.

5            Q.    But you just -- are you saying they're

6    lying about what they controlled for?

7            A.    I don't think they really controlled

8    for communities of interest, no.

9            Q.    Okay.  Are there any other factors that

10   they controlled for, that they say that they

11   controlled for in New York, that you think that

12   they're lying about?

13           A.    I think we controlled for -- no.  I

14   think we controlled for everything else.  And I

15   shouldn't say they're laying about it.  But I think

16   they were -- a better way to put it is I think they

17   were opportunistic when they controlled for

18   communities of interest.

19           Q.    But you definitely didn't control for

20   communities of interest?

21           A.    I wasn't interested in drawing maps

22   that were opportunistic for drawing communities of

23   interest, no.

24           Q.    So that's a no?

25           A.    Like I said, no.  I -- I -- I just -- I

```
                                              Page 150

 1     don't think it would have gone over well if I had

 2     drawn maps that were programmed to select those

 3     city's interests in an opportunistic way.

 4            Q.   Okay.  I'm going to show you -- well,

 5     let me ask you the question.  You just said, with

 6     respect to virtually all the clusters we discussed,

 7     that the enacted map was outside the distribution;

 8     is that right?

 9            A.   That's right.

10            Q.   Okay.  So I know you said that you

11     haven't had a chance to read the New York opinion,

12     but, here it is.

13                 Do you have any reason to believe this

14     isn't it?

15            A.   No.

16            Q.   Okay.  I can't highlight this because

17     it's not text readable.  But do you see in the

18     middle of the page where it says, "One does not

19     reach the worst of 5,000 maps by chance?"

20                 Do you see that?

21            A.   That's right.

22            Q.   Do you agree with that?

23            A.   Yeah.

24            Q.   Okay.  And the Court goes on to say,

25     "Therefore, the Court agrees with petitions that
```

Page 151

```
 1      the congressional map was unconstitutionally drawn
 2      with political bias;" is that right?
 3              A.   That's right.
 4              Q.   And in our case, we just established
 5      that if something is, quote unquote, "The worst of
 6      5,000 maps here," it was almost certainly drawn
 7      with racial bias?
 8              A.   If everything else was properly
 9      controlled for, yeah.
10              Q.   Okay.  Can we take another short break?
11      Really short this time?  Thank you.
12              A.   How short is short?  I will be back.
13              Q.   Ten minutes.
14              A.   Got it.
15                   THE VIDEOGRAPHER:  The time on the
16      monitor is 12:41 p.m.  We're going off the record.
17                   (A brief recess was taken.)
18                   THE VIDEOGRAPHER:  The time on the
19      monitor is 12:58 p.m.  We're back on the record.
20      BY MR. TRIVEDI:
21              Q.   Welcome back, Mr. Trende.
22              A.   Hello.
23              Q.   Did you speak with your counsel during
24      that break?
25              A.   I e-mailed another report to them, but
```

Page 152

1    they did not respond, and I did not have any

2    substantive conversation, no.

3                   (EXHIBIT 13, Ragusa Report, was marked

4    for identification.)

5                   (EXHIBIT 14, NAACP House Submission,

6    was marked for identification.)

7    BY MR. TRIVEDI:

8         Q.   Thank you.  So I want to move now to

9    the section of your report that discusses

10   Dr. Ragusa's report, that starts on page 29.

11                  So first a clarification, which

12   sections or analyses of Dr. Ragusa's report did you

13   analyze for your report?

14        A.   Um, I don't know.  I don't have his

15   report in front of me.

16        Q.   Okay.  I can pull that up for you.

17        A.   If you want a general response, it

18   looks like it is a response to his approach where

19   he is doing the logistic regression analysis of

20   precincts that could have gone in and out of a -- a

21   district.

22        Q.   Okay.  So I think that is only Model 1

23   or Analysis 1, but let me pull it up for you to

24   make sure that you agree.

25        A.   I'll tell you what.  To make our lives

Page 153

1    easier, I will pull up his report, too, so I can

2    scroll through it.

3        Q.    That would be great.  I appreciate

4    that.  So do you have it open in front of you?

5        A.    Yes.

6        Q.    Okay.  That's great.  So a minute ago

7    you described what the analysis that -- that you

8    thought you were rebutting.  Scrolling through

9    maybe on pages four through eight, is that part of

10   his report that you were rebutting?

11       A.    All right.  So let's look at the

12   summary on page four.  That might be the best way

13   to do it.  So Model 1 analyses which need to be

14   surrounding the district were moved into to redrawn

15   district.  So I think -- yeah.  The county in the

16   idea is the one I was mostly responding to.  I

17   don't remember if it has any implications for the

18   other two.  Oh, so, yeah.  He does it the -- the

19   opposite way.  All right.  And then tried to put

20   them together.  Well, when he is trying to put them

21   together, there was flaws with Model 1.  At least

22   presumably through Model 3.

23       Q.    Okay.  But Models 1, 2, and 3 are all

24   under a Section No. 1.  And you're saying that you

25   only analyzed Section No. 1?

Page 154

1         A.    Oh.   I see what you're saying.   I see
2    what you're saying.   Yeah.   Yeah.
3         Q.    Okay.   I want to be fair to you, so
4    there is a Section 2 that starts on page nine.   It
5    doesn't sound like you analyzed that at all?
6         A.    No.   I -- I definitely want to go
7    through the other two to make sure.   So this is two
8    months ago.   So he looks out -- no.   I didn't
9    analyze how the racial composition of districts
10   shifted.
11        Q.    Okay.   And then if we scroll down --
12        A.    I didn't do anything with incumbent
13   protection.
14        Q.    Okay.   So you didn't do anything with
15   respect to Section 3.
16             Section 4 starts on page 19.   Did you
17   do anything what that?
18        A.    Just the racial -- no.   It looks like a
19   racial polarized voting analysis, so no.
20        Q.    Okay.   And the appendices don't look
21   like you -- something that you considered?
22        A.    Well, I think I used -- yeah.   So
23   that's not true.   I used them to make sure I was
24   replicating properly.
25        Q.    Okay.   But only as to Section 1

Page 155

1      District TB change?

2           A.   Yeah.

3           Q.   Okay.  At the end of your report, on

4      page 32, you say that "Time prohibited flooring

5      every district in every cluster."  So that is a

6      further limitation as to your review of Section 1?

7           A.   Yeah, yeah.  I mean, obviously I would

8      have loved to have gone through all of them.  But I

9      think if you don't go through all of them it's

10     better if you can offer the reader an explanation

11     of why you didn't, and just I didn't have time.

12          Q.   Okay.  So just to summarize, you only

13     analyzed part of one analysis in Dr. Ragusa's

14     report?

15          A.   Yeah.

16          Q.   Okay.  On page 31, Paragraph 63, you

17     address Dr. Ragusa's use of accounting envelope; is

18     that right?

19          A.   Right.

20          Q.   You say, "A map drawer can always take

21     the district into a new neighboring country,"

22     correct?

23          A.   Correct.

24          Q.   That would create a county split

25     though, correct?

Page 156

1          A.    Right.

2          Q.    Okay.  You're aware that the

3     legislature had a -- a guideline seeking to reduce

4     county splits; is that right?

5          A.    No.

6               (EXHIBIT 15, House Defendants MTD, was

7     marked for identification.)

8     BY MR. TRIVEDI:

9          Q.    No.  Okay.  I'm going to pull up

10    Exhibit 15.  Okay.  Can you see this document?

11         A.    Part of it, yeah.

12         Q.    Yeah.  Okay.  I'm scrolling back up to

13    the top, and do you see how the middle here it

14    says, "This is the Motion to Dismiss Plaintiff's

15    Amended Complaint by House Defendants, James H.

16    Lucas, Chris Murphy, and Wallace Jordan?"

17         A.    Yes.

18         Q.    Okay.  You're aware -- as a former

19    lawyer, do you know what a Motion to Dismiss is?

20         A.    I have forgotten a lot, but I still

21    remember the old 12(b)(6) Motion, yes.

22         Q.    Okay.  So this is House Defendant's

23    attempt to get the case dismissed; is that right?

24         A.    Yes.  Yes.

25         Q.    I'm now scrolling down to page 13.

Page 157

1              Can you read the highlighted line here?

2        A.    "Clearly one of the factors prioritized

3    by the General Assembly was preserving political

4    subdivision boundaries, such as county and precinct

5    lines."

6        Q.    So do you take the as some evidence

7    that the General Assembly wanted to limit county

8    splits?

9        A.    Certainly.  I mean -- certainly had as

10   a goal, based on this, at least some degree of

11   preserving political subdivision boundaries.

12       Q.    Including county lines; is that right?

13       A.    Well, yes.

14       Q.    Okay.  So when you say, "The map drawer

15   could always take the district into a new

16   neighboring county," that is the opposite of what

17   the actual legislature was trying to do; is that

18   right?

19       A.    I don't think that's right.  You have

20   to cross at least some political boundaries.  And,

21   you know, you can't keep all county lines intact.

22   And so, if the goal of legislature was to go into a

23   different county or choose one county or another, I

24   don't think Dr. Ragusa's analysis takes that

25   possibility into account.

Page 158

1          Q.   But you concede that Dr. Ragusa limited
2     his VTD movement analysis to VTDs within adjacent
3     counties, and that had the effect of reducing
4     possible county splits, correct?
5               MR. DIAMADUROS:  Object to the form.
6               THE WITNESS:  Yeah.  You're going to
7     have to say that again.
8     BY MR. TRIVEDI:
9          Q.   Okay.  You critique Dr. Ragusa's
10    approach because you say, "The map drawer can
11    always take the district into a new neighboring
12    county; is that right?
13         A.   Right.
14         Q.   And Dr. Ragusa's analysis simply did
15    not simply take VTDs into a new neighboring
16    country, right?
17         A.   Right.
18         Q.   And I just read to you a line from the
19    House Defendant's Motion to Dismiss saying,
20    clearly, the General Assembly was also not trying
21    to take VTDs into new neighboring counties,
22    correct?
23         A.    It says it's trying to preserve them,
24    but it doesn't say anything about which forces for
25    the county, which county would preserve county --

Page 159

1     or preserve to traverse.

2          Q.    But no one is forcing them to split a

3     county; is that right?

4          A.    (Inaudible).

5               MR. DIAMADUROS:  Object to the form.

6               THE WITNESS:  Yeah, I don't think

7     that's right.  The one person one vote rules do.  I

8     mean, I shouldn't say that.  Maybe it is possible

9     to draw this map without traversing any county

10    lines, but I doubt it.

11    BY MR. TRIVEDI:

12         Q.    Well, no one said any.  The General

13    Assembly said it was trying to preserve as many

14    county lines as possible, correct?

15         A.    Well, right.  But you said no one was

16    forcing them to cross county lines, and I don't

17    think that's true.  You have to.

18         Q.    In certain circumstances, right?

19         A.    Right.  So you --

20         Q.    But you can also have a parameter that

21    seeks to limit county splits, right?

22         A.    Certainly.  Yeah.  None of that is

23    inconsistent --

24               (Simultaneous speaking)

25         Q.    Some maps split more county --

```
                                        Page 160

  1                (Simultaneous speaking)

  2          A.    Can I finish?

  3          Q.    Yeah.  Sorry.

  4          A.    None of that is inconsistent with what

  5     I have been saying.

  6          Q.    Okay.  But when you say, "A map drawer

  7     could always take the district into a new

  8     neighboring county," that is intention with a goal

  9     to limit county splits, correct, because if they

 10     always do it, then they wouldn't be limiting county

 11     slits, correct?

 12                MR. DIAMADUROS:  Object to the form.

 13                THE WITNESS:  There have been -- there

 14     may certain counties in South Carolina where you

 15     can put the requisite number of districts within

 16     whole counties, so that would an exception to my

 17     statement.

 18     BY MR. TRIVEDI:

 19          Q.    Okay.  You didn't --

 20          A.    I don't know if there are -- I don't

 21     know if there are any whole counties in this map.

 22          Q.    Okay.  But you didn't list any county

 23     where Dr. Ragusa stayed within a county where the

 24     legislature crossed the county line, correct?

 25          A.    No.
```

Page 161

1          Q.   Okay.  You didn't identify any counties

2     where Dr. Ragusa's analysis unnecessarily stays

3     within a county, correct?

4          A.   That's right.

5          Q.   Okay.  Okay.  I want to go to the final

6     paragraph of your report where you note, "A

7     potential issue with Dr. Ragusa's model."  And tell

8     me if I'm mischaracterizing what you say.  But it

9     seems like you're raising a potential issue with

10    Dr. Ragusa's model because it returned

11    statistically significant results for race for some

12    districts where you analyzed Dr. Imai's

13    race-neutral maps, right?

14         A.   Did you say the last paragraph in my

15    report?

16         Q.   Yeah.

17         A.   Okay.  I must actually not have the

18    assigned version in front of me.  Can we bring it

19    up?

20         Q.   Sure.  And if you give me a second, I

21    should just point you to the language.

22         A.   Well, I -- I -- I read the last

23    paragraph in what I have up, but I don't see that

24    language so...

25         Q.   Yeah.  Right now I've got a lot of tabs

Page 162

1     open.

2              A.   I can hear that.

3              Q.   Okay.  So it's the last page, the last

4     couple of paragraphs, 66 and 67.  Do you -- do you

5     have the version?

6              A.   I have 66 and 67 as the last

7     paragraphs, yes.

8              Q.   Okay.  Perfect.  Okay.  And there, you

9     say that you took the existing precincts in

10    Dr. Imai's Andersen grouping and ran Dr. Ragusa's

11    model on it; is that right?

12             A.   That's right.

13             Q.   And based on doing that, you saw

14    race-based redistricting in 4,054 of the 5,000

15    districts?

16             A.   Right.

17             Q.   Okay.  So isn't it accurate though that

18    Dr. Ragusa was analyzing VTD movements based on the

19    previous enacted plan and comparing it to the newly

20    enacted plan, right?

21                  MR. DIAMADUROS:  Object to the form.

22                  THE WITNESS.  Right.  That's my

23    understanding.

24    BY MR. TRIVEDI:

25             Q.   Okay.  Great.  But then is it also

Page 163

1    accurate that Dr. Imai was comparing the newly

2    enacted plan to a distribution of race blind

3    simulations?

4         A.    Right.  So I'm looking at this race

5    blind simulations and seeing if you run it on that,

6    does it suggest that there were -- that -- that

7    race played a factor.  And so, if you're turning

8    statistically to just get results with maps that we

9    know are drawn without respect to race, that's a

10   pretty obvious problem.

11        Q.    Right.  But it's apples to oranges to

12   use a model that was created for comparison of a

13   previously enacted plan to a currently enacted

14   plan, and then apply it to race blind simulations

15   created a new; isn't that right?

16        A.    No.

17        Q.    Isn't it true that Dr. Imai didn't use

18   the previously enacted map?

19        A.    That's right.

20        Q.    Right.  And --

21        A.    Well, actually, I don't know.  I would

22   have to remember whether he -- he starts from the

23   newly enacted map with this -- with this approach.

24   My brain is fried enough that I get all cases

25   confused right now.  But, certainly, the maps that

                                        Page 164

1    he produced are not the previously enacted maps.

2           Q.   Okay.  So if you're -- if -- does it

3    stand to reason that if you're comparing a

4    previously enacted plan to Dr. Imai's race blind

5    simulation, that a district would present as race

6    based if the previously enacted plan was race based

7    because all of the simulations are race blind,

8    correct?

9           A.   All simulations --

10              MR. DIAMADUROS:  Object to the form.

11              THE WITNESS:  Sorry.  As far as I know,

12   all the simulations are race blind.

13   BY MR. TRIVEDI:

14          Q.   Right.  And so if you compare -- if you

15   compare a race blind simulation to a previously

16   enacted map that was race based, virtually all of

17   them are going to present as race based because the

18   simulation was race blind, right?

19          A.   No.  Because if Dr. Imai's maps are the

20   enacted maps, you're going to -- it should -- it

21   should just be random.  You shouldn't have

22   80 percent of the maps showing statistically

23   significant results, and other -- and other ones

24   not.  I'm sorry.  I'm not following this line of

25   questions.

Page 165

1          Q.   Well, let's say, is it -- isn't it
2     possible than when you ran Dr. Ragusa's model, on
3     Dr. Imai's race blind simulations in a handful of
4     districts, that the statistically significant
5     results could have simply picked up VTD movements
6     from a previous raced based map to a new race blind
7     map?
8          A.   Yeah, I suppose it's possible.
9          Q.   Okay.  Okay.  Last thing.  In terms of
10    your report, you say at page 30, Paragraph 62, that
11    the districts here were definitely drawn
12    purposefully with respect to race in some areas; is
13    that right?
14         A.   Yes.
15         Q.   I think you say that a couple of times
16    in the report; is that right?
17         A.   Yes.
18         Q.   And then you say, "The VRA requires
19    this;" is that right?
20         A.   Yes.
21         Q.   So you're not putting yourself forward
22    as an expert in the VRA in this case; is that
23    right?
24         A.   I have no idea what I'm going to be put
25    forward as an expert in.

Page 166

1             Q.    Well, we can go back to the top of your

2      report.  Do you list the VRA as something that you

3      are an expert in?

4             A.    I don't know if I list anything as my

5      particular expertise, but I served as the voting

6      rights expert for counsel from the Arizona

7      Independent Redistricting Commission, so someone

8      thinks I'm an expert in the VRA.

9             Q.    Do you consider yourself an expert in

10     the VRA?

11            A.    I teach it.  So, yes.

12            Q.    Okay.  Are you offering an opinion in

13     this case on the VRA?

14            A.    No.

15            Q.    Okay.  Are you offering an opinion on

16     the VRA even in this paragraph that we're talking

17     about?

18            A.    I have it.  So if we want to back out,

19     I haven't done a particular racial polarized voting

20     analysis, so I understand your experts have, which

21     would seem to suggest that you do need to use race

22     to some degree, but, you know --

23            Q.    Well, have you done -- go ahead.

24            A.    I haven't done -- I haven't done my own

25     racially polarized voting analysis, no.

Page 167

1           Q.    Have you done any analysis with respect
2      to the VRA in your report?
3           A.    No.
4           Q.    Have you identified any districts that
5      were, quote unquote, "Drawn purposely with respect
6      to race" in order to comply with the VRA?
7           A.    No.
8           Q.    Have you identified any districts whose
9      changes were required by the VRA?
10          A.    No, I haven't looked at that.
11          Q.    So you say the VRA requires this, but
12     you have been identified a single district where
13     that's the case?
14          A.    That's right.
15          Q.    Okay.  Do you have a list of districts
16     say that were out of compliance with the VRA, and
17     then required certain VTD movements to come into
18     compliance with the VRA?
19          A.    No.
20          Q.    Conversely, do you have a list of
21     districts that were already VRA compliant that
22     didn't need any race-conscious line drawings to
23     become compliant?
24          A.    No.
25          Q.    Do you have any statistical evidence

Page 168

1     for whether a particular district in the enacted

2     plan were drawn with a BVAP level to comply with

3     the VRA?

4          A.    No.

5          Q.    So, for example, a district can add

6     BVAP to become compliant with the VRA; is that

7     right?

8          A.    That's right.

9          Q.    But if it has too much BVAP, it is then

10    passed and falls out of compliance with the VRA and

11    becomes illegal; is that right?

12         A.    I don't -- I think that's in

13    contention.

14         Q.    Okay.  Is it a --

15              (Simultaneous speaking)

16         Q.    Sorry.  Can I just finish asking my

17    question?

18         A.    Yeah.  Yeah.  I'm just trying to --

19         Q.    Can a district have a BVAP that is so

20    high to be noncompliant with the VRA?

21         A.    I think you have to -- so, I don't

22    think it can inherent that -- can typically

23    inherently happen.  It depends on the other

24    evidence being produced in the case, right?  Like

25    if you look at the places like Arizona -- Alabama

Page 169

1    democratic party, you know, they had set firm

2    baseline of 70 percent, and there was no evidence

3    that you needed a base line that high.  But I don't

4    think if you just were drawing districts without

5    respect to race, and you ended up with a district

6    that was, you know, 70 percent BVAP, I don't think

7    that would get you into sure trouble, but I'm not

8    sure.

9           Q.    Okay.  But you haven't done that

10   analysis in this case?

11          A.    I have not, no.

12          Q.    Not with respect to any district?

13          A.    That's right.

14          Q.    Okay.  You had access to all the same

15   census data that everyone else in this case did,

16   correct?

17          A.    That's right.

18          Q.    That would include BVAP data?

19          A.    Yes.

20          Q.    And prior elections data?

21          A.    That's right.

22          Q.    And you had all -- you had access to

23   all the same programs that Dr. Ragusa used?

24          A.    Sure.

25          Q.    And that Dr. Imai used?

Page 170

1              A.    Yes.

2              Q.    And you didn't conduct a single

3       analysis about whether certain districts were,

4       quote unquote, "Definitely drawn purposely with

5       respect to race in some areas," correct?

6              A.    No.  I wasn't asked to do that so of

7       course I didn't.

8              Q.    But you said it.  You said, "There were

9       districts that were definitely drawn purposely with

10      respect to race in some areas," correct?

11             A.    Yes.

12             Q.    But you didn't identify any of those

13      districts?

14             A.    No.

15             Q.    And you said the VRA requires this,

16      right?

17             A.    Correct.

18             Q.    But you didn't explain how?

19             A.    That's right.

20             Q.    Okay.  I think we can be done here with

21      affirmative questions.  That said -- and this is

22      not a question posed to you Mr. Trende, but

23      something I'm putting on the record.

24             A.    Understood.

25                   MR. TRIVEDI:  Given the copious

Page 171

1    information that we have discussed today that

2    wasn't turned over, or wasn't turned over on a

3    timely manner, including things that Mr. Trende has

4    admitted that he e-mailed over to counsel during

5    this deposition, Plaintiffs are going to have to

6    keep this open to address all of that material that

7    we weren't given adequate time to review.

8              MR. DIAMADUROS:  Just to put on the

9    record, House Defendant's position, Plaintiff's

10   Counsel knew when this information was going to be

11   coming.  So we are not going to agree to leave this

12   open, but again, that is just to put our position

13   on the record as well.  And we would like to take a

14   quick five-minute break before we proceed with our

15   questioning.

16             MR. TRIVEDI:  Okay.

17             THE VIDEOGRAPHER:  The time on the

18   monitor is 1:22 p.m.  We're going off the record.

19             (Discussion off the record.)

20             (A brief recess was taken.)

21             THE VIDEOGRAPHER:  The time on the

22   monitor is 1:31 p.m. and we're back on record.

23             MR. DIAMADUROS:  All right.  Thank you,

24   Mr. Trende.  We appreciate you being here today,

25   and just before I ask you a couple of brief

Page 172

1    questions, I just want to add to a couple of points

2    to what we said before we went off the record.

3                    We just want to put on the record that

4    last week we did tell Plaintiff's Counsel that

5    Mr. Trende was going to be out of the country, and

6    we told him that he would be back Monday, and he

7    would get that many materials shortly after his

8    return.  We told him last week that to the extent

9    they needed any other materials from him that we

10   needed that request as soon as possible last week.

11   We had not receive the request for the metadata

12   related to his dissertation until late yesterday.

13   And we also told Plaintiff's Counsel that with

14   respect to the issue with Mr. Trende's son that was

15   not a hard stop, it was just something that we

16   needed to work around.  So based on -- on those

17   representations, we're -- we're not going to agree

18   to leave this open, but, again, just wanted to put

19   that on the record.

20                         EXAMINATION

21   BY MR. DIAMADUROS:

22          Q.   So Mr. Trende, do you know whether --

23                    MR. TRIVEDI:  So Mr. Diamaduros, I

24   don't want to go back and forth too much.  I just

25   want to acknowledge the point about Mr. Trende's

Page 173

1   son.  If that was the misunderstanding, I'm glad

2   that we're going to finish on time so that he can

3   get to that, that's fine.

4              As to the other requests, I disagree

5   with the factual recitation, and I would note that

6   Defendant's Counsel and the expert have obligations

7   to turn stuff over whether we have made a request

8   or not.  Okay.  So let's move forward.

9              MR. DIAMADUROS:  Fair enough.  Just

10  wanted to put that position on the record.  So

11  thank for that.

12  BY MR. DIAMADUROS:

13       Q.   So Mr. Trende, do you have any

14  knowledge whether any of the Plaintiff's experts in

15  this case have dissertations of their own?

16       A.   I would assume.

17       Q.   Okay.  And do you know what any of

18  those everything dissertations would be about, what

19  topics they're on?

20       A.   No clue.

21       Q.   Okay.  Mr. Trende, I know that you --

22  you were and are still a lawyer, so you're probably

23  familiar with the Federal Rules of Civil Procedure

24  generally, but I'm -- I'm going to just briefly

25  read to you Federal Rule of Civil Procedure

Page 174

1    26(a)(2)(B)(5), and that's with respect to an item

2    that you would be required to disclose in an expert

3    report.

4           So again, just because I'm not a -- I

5    don't think I have the ability to share my screen

6    on this -- on this deposition right now, I'm just

7    going to read it into the record.  So that rule

8    says, "Unless otherwise stipulated or ordered by

9    the Court, this disclosure, an expert disclosure,

10   must be accompanied by a written report prepared

11   and signed by the witness, if the witness is, one,

12   retained or especially employed to provide expert

13   testimony in the case, or one whose duties as the

14   party's employee regularly involve giving expert

15   testimony.  The report must contain" -- Again, this

16   is Item 5, "A list of all other cases in which

17   during the previous four years the witness

18   testified as an expert at trial or by deposition."

19           MR. TRIVEDI:  Object to the form.

20   Calls for a legal conclusion.

21   BY MR. DIAMADUROS:

22        Q.   Based on my reading of that rule,

23   Mr. Trende, did you intentionally omit any cases

24   that fall within that subsection of Rule 22?

25        A.   No.

Page 175

1          Q.    Okay.   And when you were drafting your

2     expert opinions, Mr. Trende, is it your practice to

3     do what counsel instructs you to do?

4          A.    Generally, yes.   Unless I think it's

5     something that I can't do.

6          Q.    And just to clarify, with respect to

7     the scope of the opinions that you -- that you

8     create for cases, it's -- it's your practice to

9     keep a scope of those opinions within the scope

10    that counsel specifically requests you to do,

11    right?

12         A.    Yes.   As I said, it's not my job to win

13    the case for you.

14         Q.    Okay.   That's exactly what you did in

15    this case, right?

16         A.    That's right.

17         Q.    And you're unaware of -- with respect

18    to disclosing your expert testimony or previous

19    expert testimony, you're not aware of any rule that

20    would require you to disclose how much weight a

21    Court may have given your prior testimony, right?

22         A.    No.

23              MR. TRIVEDI:  Objection.  Calls for

24    legal conclusion.

25              MR. DIAMADUROS:  No further questions

Page 176

```
 1     from us.
 2                  THE VIDEOGRAPHER:  If that's it, I'll
 3     get us off the record.  All right.  The time on my
 4     monitor is 1:36 p.m.  This concludes the
 5     deposition.
 6                  THE COURT REPORTER:  I will need to
 7     know about read and sign, please.
 8                  MR. DIAMADUROS:  I'm sorry.  I spoke
 9     over you just then, Julie.
10                  THE COURT REPORTER:  Oh, I'm sorry.
11     I'm asking about the witness reading and signing
12     the deposition or waiving?
13                  MR. DIAMADUROS:  Yeah, we would like to
14     read and sign.
15                  THE WITNESS:  All right.  I'll read and
16     sign.
17                  THE COURT REPORTER:  Okay.  And can I
18     send it through you?
19                  MR. DIAMADUROS:  Yes.
20                  THE COURT REPORTER:  Sorry.  Okay.
21                  And then if you all can let me know who
22     needs a copy, and who -- what you would like?  If
23     E-transcript is okay.
24                  MR. DIAMADUROS:  Yes.  You can just
25     send a copy of the transcript to me for the House
```

Page 177

1    Defendants and we would like a rough as well.

2                    THE COURT REPORTER:  Okay.

3                    MR. TRIVEDI:  Same with Plaintiffs, and

4    if there is an expedited rough, could you let us

5    know?  Maybe we'll -- we'll e-mail you about costs?

6                    THE COURT REPORTER:  Yes.  I will do

7    that.  Sure.

8                    MR. TRIVEDI:  Thank you.

9                    MS. TRINKLEY:  This is Jane Trinkley

10   for the Election Defendants, I do not need a copy.

11                   THE COURT REPORTER:  Okay.  Thank you.

12                   MR. KENNY:  This is Stephen Kenny for

13   the Senate Defendants, we would like a copy.  We

14   don't need a rough or a rough transcript.  Just

15   standard.

16                   THE COURT REPORTER:  Okay.  Thank you.

17                   (The witness, after having been advised

18   of his right to read and sign this transcript, does

19   not waive that right.)

20                   (The deposition concluded at 1:38 p.m.)

21

22

23

24

25

Page 178

1                    CERTIFICATE OF REPORTER

2

3              I, Julie L. Bonomo, Court Reporter and

4       Notary Public for the State of South Carolina at

5       Large, do hereby certify that the foregoing

6       transcript is a true, accurate, and complete

7       record.

8              I further certify that I am neither

9       related to nor counsel for any party to the cause

10      pending or interested in the events thereof.

11             Witness my hand, I have hereunto

12      affixed my official seal this 18th day of April,

13      2022, at Charleston, Charleston County, South

14      Carolina.

15

16

17

18

19

20

21

22

23

                              Julie L. Bonomo

24                            Court Reporter

                              My Commission expires

25                            July 28, 2027

Page 179

```
 1                  I N D E X

 2

 3                                  Page      Line

 4

 5     SEAN TRENDE                  5         15

 6     EXAMINATION                  5         17

 7     BY MR. TRIVEDI

 8     EXAMINATION                  172       20

 9     BY MR. DIAMADUROS

10     CERTIFICATE OF REPORTER      178       1

11

12           REQUESTED INFORMATION INDEX

13            (No Information Requested)

14                E X H I B I T S

15                                  Page      Line

16     EXHIBIT 1, Amended Deposition    12      4

17     Notice

18     EXHIBIT 2, Trende Report and     13      13

19     CV

20     EXHIBIT 16, Trende               34      25

21     Dissertation 2

22     Exhibit 17, Trende               38      7

23     Dissertation 1

24     EXHIBIT 18, Ohio Organizing      38      9

25     Collaborative v. Husted, 2
```

Page 180

```
1      EXHIBIT 10, Trende New York      57        25
2      Report
3      EXHIBIT 11, Common Cause v.      58        2
4      Rucho
5      EXHIBIT 12, New York REDIST      58        4
6      Opinion
7      EXHIBIT 3, NAACP vs. McCrory     64        22
8      EXHIBIT 4, Ohio Organizing       70        6
9      Collaborative v. Husted
10     EXHIBIT 5, WHITFORD v. GILL      73        25
11     EXHIBIT 6, Fair Fight Action     77        2
12     v. Raffensperger
13     EXHIBIT 7, League of Women       77        4
14     Voters of Ohio v. Ohio
15     Redistricting Commission
16     EXHIBIT 8, Democratic National   90        16
17     Committee versus Reagan
18     EXHIBIT 9, Report of             94        25
19     Dr. Kosuke Imai
20     EXHIBIT 13, Ragusa Report        152       3
21     EXHIBIT 14, NAACP House          152       5
22     Submission
23     EXHIBIT 15, House Defendants     156       6
24     MTD
25
```

Page 181

1    KONSTANTINE DIAMADUROS

2    kdiamaduros@nexsenpruet.com

3                        April 19, 2022

4    RE:    The South Carolina State Conference Of The NAACP v.

           Alexander, Thomas C

5        4/5/2022, Sean Trende (#5166711)

6        The above-referenced transcript is available for

7    review.

8        Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12       The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   erratas-cs@veritext.com.

16

17    Return completed errata within 30 days from

18   receipt of testimony.

19     If the witness fails to do so within the time

20   allotted, the transcript may be used as if signed.

21

22                    Yours,

23                    Veritext Legal Solutions

24

25

Page 182

1    The South Carolina State Conference Of The NAACP v. Alexander,

Thomas C

2    Sean Trende (#5166711)

3                    E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____    _____

24   Sean Trende                         Date

25

Page 183

1    The South Carolina State Conference Of The NAACP v. Alexander,

     Thomas C

2    Sean Trende (#5166711)

3                   ACKNOWLEDGEMENT OF DEPONENT

4        I, Sean Trende, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____    _____

12   Sean Trende                        Date

13   *If notary is required

14                    SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                    _____ DAY OF _____, 20___.

16

17

18                    _____

19                    NOTARY PUBLIC

20

21

22

23

24

25

[& - 51]                                                                 Page 1

| & | | | |
| --- | --- | --- | --- |

**&**   3:14

**0**

**03302**   1:6

**1**

**1**   12:4 36:9 38:7
152:22,23 153:13
153:21,23,24,25
154:25 155:6
179:10,16,23
**10**   14:16 57:25
129:12 180:1
**100**   124:11
**10004**   2:12
**10006**   2:16
**104**   3:2
**10:06**   1:14
**10th**   59:19 60:1
80:17,20 81:4,4
81:24
**11**   36:8 58:2 85:10
86:25 87:4,12
117:14 180:3
**112**   69:13,15
**1146**   1:15 25:24
**11:24**   94:6
**12**   34:21 58:4
109:18 117:15
156:21 179:16
180:5
**1221**   3:16
**1234**   105:1
**125**   2:11
**12:09**   126:21
**12:41**   151:16
**12:58**   151:19
**13**   152:3 156:25
179:18,18 180:20
**1393**   114:3,5

**13cv658**   65:10
**14**   65:8 110:22
142:14 152:5
180:21
**1494**   114:3,5
117:16,18
**14th**   2:20 59:4,15
**15**   10:6 20:1,14,21
57:5 117:17 156:6
156:10 179:5
180:23
**152**   180:20,21
**156**   180:23
**15th**   2:6 82:16
**16**   34:25 179:20
180:16
**1633**   117:15,17
**17**   38:7,13 117:18
142:18 179:6,22
**172**   179:8
**178**   179:10
**18**   38:9 115:9
179:24
**1800**   3:16
**18th**   178:12
**19**   74:9 123:9
125:4 154:16
181:3
**1973**   25:22
**1:22**   171:18
**1:31**   171:22
**1:36**   176:4
**1:38**   177:20
**1st**   82:16

| 2 | | | |
| --- | --- | --- | --- |

**2**   13:13 34:25
37:19 38:10 114:2
114:4 153:23
154:4 174:1
179:18,21,25
180:3,11

**20**   10:6 45:22
121:5 137:9 179:8
183:15
**200**   66:16
**20001**   3:11
**20005**   2:6,21
**2016**   46:7
**202-682-1300**   2:21
**202-715-0802**   2:7
**202-879-3667**   3:11
**2021**   11:15 14:23
14:24 59:5
**2022**   1:13 4:4
14:16,21,25 23:23
29:5 59:6,15
178:13 181:3
**2027**   178:25
**21**   127:1
**212-284-7334**   2:12
**21875**   178:23
**22**   174:24 180:7
**24**   36:15,15 133:4
133:6,8 134:6
**24th**   95:15,20
**25**   46:2 133:8
138:2,4,12 179:20
180:1,10,18
**26**   138:14 174:1
**27**   140:6
**28**   106:9 140:18
178:25
**29**   152:10
**29201**   3:17
**29601**   3:3

| 3 | | | |
| --- | --- | --- | --- |

**3**   64:22 153:22,23
154:15 180:7,20
**3,500**   134:23
135:19 136:11
**3.84**   140:2

**30**   45:22 121:21
165:10 181:17
**31**   155:16
**32**   155:4
**34**   179:20
**37**   118:7
**38**   125:4 179:22
179:24
**3:21**   1:6

**4**

**4**   70:6 114:3
154:16 179:16
180:5,8,13
**4,000**   135:19
**4,054**   162:14
**4.14**   137:24
**4.53**   140:14
**4/5/2022**   181:5
**40**   2:16 120:23
**41**   120:22
**43**   16:6 121:19
**43015**   25:25
**44**   72:20,24
**4493**   11:9
**45**   24:17

**5**

**5**   1:13 4:3 73:25
174:1,16 179:5,6
180:10,21
**5,000**   98:10,11,20
98:24 102:7,11
112:6 114:16
115:16 134:23
135:18,25 137:10
150:19 151:6
162:14
**5.72**   141:13
**50**   121:9 129:11
**51**   3:10 68:20

**[5166711 - agreement]**

**5166711**   181:5
182:2 183:2
**52**   138:16
**5678**   105:1
**57**   180:1
**58**   180:3,5
**5th**   2:16

**6**

**6**   25:22 77:2 114:6
156:21 180:8,11
180:23
**60**   120:12,21
**600**   2:20 65:23
66:16
**62**   165:10
**63**   66:14 155:16
**64**   180:7
**66**   162:4,6
**67**   162:4,6
**6a**   85:10 86:25
87:4

**7**

**7**   77:4 179:22
180:13
**7.49**   116:5
**7.5**   115:25 116:3,4
116:6 135:15
142:17
**7.51**   116:5
**70**   120:12,14,21
120:24 121:2
169:2,6 180:8
**700**   2:20
**71**   66:18 68:20
**73**   180:10
**77**   180:11,13
**7:40**   38:1

**8**

**8**   90:16 114:6
180:16
**80**   164:22
**803-799-9800**   3:17
**85**   69:11 121:20
**864-370-2211**   3:4

**9**

**9**   94:25 95:4
179:24 180:18
**90**   121:7 180:16
**900**   3:3
**910**   105:2
**915**   2:6
**917-858-2870**   2:17
**94**   180:18
**99**   139:23
**9:05**   4:2
**9th**   124:10,13

**a**

**a.m.**   1:14 4:2 38:1
94:3,6
**ability**   174:5
**able**   6:20 40:22
66:24 105:18
117:8 131:19
**academic**   46:9,13
46:18
**accept**   67:10
**accepted**   97:1
**access**   42:2,7 43:5
43:8 120:6 169:14
169:22
**accident**   129:21
**accompanied**
174:10
**accorded**   72:6
76:23
**account**   27:1,2,3,4
27:9,11,12 28:8

28:14,17 71:25
89:17 157:25
**accounted**   128:1,3
129:17
**accounting**   155:17
**accounts**   26:1
28:5,7,22
**accuracy**   181:9
**accurate**   70:23
162:17 163:1
178:6
**acepedaderieux**
2:13
**acknowledge**
172:25
**acknowledgement**
183:3
**acknowledging**
96:10
**acknowledgment**
181:12
**aclu**   5:10
**aclu.org**   2:7,13
**acly.org**   2:8
**act**   65:17 67:22
68:5,8,10,15,17
68:23 69:4,7
**action**   77:2,9
79:10 80:10
180:11
**actions**   80:22
**actual**   15:17 72:4
124:7 130:13
157:17
**add**   9:18 168:5
172:1
**additional**   9:16
**additions**   183:6
**address**   9:19
25:23 116:22
155:17 171:6

**addresses**   26:8
**adequate**   171:7
**adjacent**   121:6
158:2
**administration**
77:21
**administrator**
78:12
**admit**   70:14 77:13
111:10 132:16
**admitted**   65:15
71:16,20 171:4
**adopted**   82:15,24
85:11
**adriel**   2:9 5:6
**advice**   147:19
**advised**   177:17
**affect**   68:22
**affirmative**   88:12
88:21 170:21
**affixed**   178:12
**ago**   7:20 12:25
18:22,23,25 19:1
20:18 21:6 29:1
71:4,6 108:5
126:8 137:16
145:20 153:6
154:8
**agree**   37:2,3 59:13
67:6 96:24 97:10
102:15 106:13
108:1 113:4 118:8
119:21 120:23
121:8 135:6
137:12 150:22
152:24 171:11
172:17
**agreed**   19:18 37:9
64:3 92:9
**agreement**   120:4

agrees 150:25
ahead 9:9 22:16
  83:23 166:23
aingram 2:22
al 1:4,7 2:2 4:6,7
alabama 92:13,23
  93:14 168:25
alexander 1:7 3:6
  4:7,24 181:4
  182:1 183:1
algorithm 109:20
alleges 10:14
allotted 181:20
allow 103:3
allowed 67:5 68:4
allowing 65:13
almanac 148:22
alright 9:25
alternative 87:7
  87:19
amathias 3:5
amended 12:4
  156:15 179:16
american 2:3,9
  4:14 5:1,7 148:22
amount 83:8
analogy 115:19,22
analyses 48:24
  130:1 152:12
  153:13
analysis 47:17,19
  47:21 48:15 49:22
  56:17 68:1 73:21
  83:9 85:13 86:3,6
  92:4,6 93:10
  97:11 98:10,13
  107:12 114:22
  116:21 130:18,20
  130:21 131:23
  144:16 152:19,23
  153:7 154:19

155:13 157:24
158:2,14 161:2
166:20,25 167:1
169:10 170:3
analyze 152:13
  154:9
analyzed 105:14
  130:11 132:2
  153:25 154:5
  155:13 161:12
analyzing 162:18
andersen 116:18
  116:22,25 133:9
  133:15 134:2,5
  138:3,12 162:10
anderson 134:1
andrew 3:1 4:19
  24:3
annoyed 90:11
answer 6:17 7:9
  9:7,9,15,18 10:2
  17:11 23:11,13
  52:12 54:21 84:16
  84:17 93:6 96:22
  100:23 102:22
  111:19 139:8
answered 84:12
  147:11
answering 6:4 7:2
answers 6:11 51:9
  147:20
antonio 2:19
anymore 28:11
  79:13
apart 60:16
apologize 38:13
  95:23
apparently 83:19
appear 47:11
  104:4 105:17
  106:18 107:3,6,8

107:10,15 108:2
108:20 141:25
appearance 118:8
appearances 2:1
appeared 83:11
  109:14
appears 69:20
  121:20
appended 183:7
appendices 154:20
apples 163:11
applicable 181:8
application 29:24
  29:25 36:9 37:19
  39:22 44:15 70:22
applications 30:9
  32:23
applied 11:17 97:3
apply 163:14
appreciate 94:23
  139:13 153:3
  171:24
approach 115:11
  119:3 127:15
  132:13 152:18
  158:10 163:23
approved 29:25
approximately
  10:5 20:3 24:6
approximations
  35:12
april 1:13 4:3
  29:21 178:12
  181:3
area 34:11
areas 75:15 78:7
  165:12 170:5,10
arguing 67:22
argument 67:21
  75:13 84:19

arizona 90:25
  92:12,21 93:15
  166:6 168:25
arizona's 92:4
article 16:7,8
  30:11 32:12 34:1
  34:3 36:16 41:16
  44:14 45:9 46:10
  46:13 78:15,21
  82:22,24 85:10
  86:2,25 87:4,11
  127:6
articles 15:15
  30:25 41:14 47:13
  47:16,22,25 48:4
  50:14 78:5,25
aside 24:10
asked 10:25 41:24
  52:6 78:15 89:2
  93:6 95:13 96:3,6
  170:6
asking 6:10 7:10
  33:25 84:4 122:15
  133:24 168:16
  176:11
assembly 157:3,7
  158:20 159:13
assert 98:9 114:11
assertion 58:12
  123:15 124:21
assessment 124:24
assigned 161:18
assimilation
  106:14
assist 96:15
assume 25:16 34:9
  34:10 43:18 71:7
  76:17 91:21 97:5
  110:7 134:14
  135:14 173:16

**assumed** 51:10

**assuming** 33:24
53:23 54:15 83:10
126:4 129:16

**assumption** 97:7
102:10

**assumptions** 54:7

**attached** 181:11

**attempt** 156:23

**attempted** 85:10
85:14 113:4

**attending** 1:12,18
2:4,5,10,11,15 3:1
3:2,9,10,15

**attorney** 8:18,25
23:20 24:4 181:13

**attorneys** 2:1,23
3:6,13 9:4,7 17:22
18:17 19:20 22:8
23:1 27:7 93:25

**audio** 7:15 31:7

**authored** 65:9
74:9 78:14,20
79:8

**authors** 36:17

**available** 16:9
17:8 181:6

**avenue** 3:10

**average** 103:13
122:14 142:16

**avoiding** 143:1,17

**aware** 41:24 61:6
64:18 65:19 66:3
88:19 116:17
148:23 156:2,18
175:19

**axis** 111:14,17,21
112:1,4,7 128:20
128:22,23 129:1,2
129:11 134:22

**b**

**b** 25:24 156:21
174:1 179:14

**babies** 115:20,24
116:1,3,4

**back** 8:4 9:8 16:18
16:20,20 27:6
39:16 44:3,13
55:6 68:21 79:20
86:4 94:6,9 95:24
96:13 97:5 105:2
105:7 108:4 118:6
120:20 126:21,23
144:4 145:16
151:12,19,21
156:12 166:1,18
171:22 172:6,24

**background** 7:22
15:15 25:18 28:25
116:9

**bailing** 81:12

**ballot** 37:19 91:3

**ballots** 65:14
69:20

**bangia** 127:5

**baodong** 21:16

**barber** 52:6 82:10
82:14

**bars** 135:15
136:23

**base** 169:3

**based** 57:23 74:11
95:5 126:7 134:22
157:10 162:13,14
162:18 164:6,6,16
164:17 165:6
172:16 174:22

**baseline** 169:2

**basic** 52:9

**basing** 124:15

**bayesian** 35:12

**beam** 127:23
128:11

**beginning** 102:12

**behalf** 4:17,20,21
4:23 5:3

**believe** 15:25
16:17 25:5 26:23
28:15 75:6 90:7
106:25 107:4
108:17 115:10
130:17 146:25
148:20 150:13

**believed** 70:20

**best** 7:8 153:12

**better** 149:16
155:10

**beyond** 99:21

**bias** 30:12 32:13
45:12 87:7,20,21
151:2,7

**big** 56:19 83:24
91:9,11 123:7

**bill** 11:9,9

**birth** 25:21

**bit** 30:16 61:11
132:15

**bizarre** 90:8

**blank** 124:13

**blind** 134:12
163:2,5,14 164:4
164:7,12,15,18
165:3,6

**blog** 47:6

**boards** 51:19

**body** 130:23

**bold** 12:15 13:19

**bonomo** 1:17
178:3,23

**borrow** 75:19

**bottom** 59:19
66:23 85:7,17
106:8 138:4

**boundaries** 157:4
157:11,20

**brain** 163:24

**break** 8:16,20
64:6 93:23 94:14
94:19 106:5
126:24 151:10,24
171:14

**breakdowns**
118:16,23 120:3,5
120:7

**breaks** 8:24

**brief** 94:4 126:19
151:17 171:20,25

**briefly** 173:24

**briefs** 46:3

**bring** 35:21
161:18

**brnovich** 91:5

**broad** 2:11 132:15

**broadly** 10:14
132:16

**brought** 10:22
67:24 73:9

**build** 145:2,17

**built** 145:4

**bulk** 139:3,6

**bunch** 122:23

**burden** 56:5

**burr** 3:14

**burr.com** 3:18

**business** 28:9

**busy** 47:4

**buy** 148:16

**bvap** 120:22
121:21 168:2,6,9
168:19 169:6,18

[bypassing - chronologically]    Page 5

**bypassing**  149:1

**c**

**c**  1:7 4:7 26:14,14
  69:16 181:4 182:1
  183:1
**calculate**  137:19
**calculated**  130:17
  140:1,13 141:12
**calculations**
  131:21
**caldeira**  31:15,16
  31:22,25
**call**  19:10,19
  38:22,24 39:24,25
  40:1 55:4 56:4
  115:16 122:4
  144:5
**called**  11:9,13
  25:9 46:23 49:3
  53:5,8 54:25 73:4
  79:2 90:23 93:15
  93:19 138:3
**calls**  20:18,21
  115:10 174:20
  175:23
**candidate**  76:8
**candidates**  87:12
**caps**  12:16 13:19
**caption**  59:9,10
  66:9
**car**  24:17
**care**  142:25
**carlo**  43:13 48:20
  52:20 53:8 90:6
  127:6
**carolina**  1:2,4 2:2
  3:3,13,17 4:6
  10:16 11:6,18
  18:3,6 59:22 60:5
  62:19 64:11 65:11
  66:11 67:24 74:12

74:21 96:5 143:20
  160:14 178:4,14
  181:4 182:1 183:1
**carolina's**  65:12
**case**  1:6 10:9,13
  10:14,23 11:1,3
  13:5,7,8 14:4
  16:17 17:23 22:7
  22:25 23:1,1,4,6
  23:16 25:8,11
  26:22 27:13,17
  37:8 39:15 51:10
  51:14 52:7 53:18
  57:9 58:7,8,10,11
  58:14,19 59:11,14
  59:18,22,23 60:3
  60:8 61:9,14,15
  61:16,19,20,25
  62:3 63:3,5,19,25
  64:19 65:3,20
  66:10 67:1,5,18
  68:13,17 69:8
  70:4,11,15,15
  71:1 72:11 73:1,3
  73:7,23 74:3,6,8
  74:20 75:1,2,6,20
  76:24 77:8,10,12
  77:14 78:2,16
  79:2,8 80:4,12,20
  81:1,5,8,21,25
  82:9 83:25 84:10
  87:14 88:15,21
  90:21,22 91:9,15
  91:20 92:15,16,19
  93:1,10,15,16
  95:8 96:19 97:4
  125:23 132:9
  147:20,24 151:4
  156:23 165:22
  166:13 167:13
  168:24 169:10,15

173:15 174:13
  175:13,15
**cases**  22:12,13,22
  23:3 51:5,13 57:1
  57:12,17 61:10,10
  61:10 62:15,20,22
  63:24 64:3 65:1
  73:7 74:10,11,19
  74:22 76:14 79:7
  79:9 163:24
  174:16,23 175:8
**casing**  83:5
**casted**  65:14 69:22
**casts**  69:21
**cause**  58:2 178:9
  180:3
**caveats**  132:21
**census**  61:12
  169:15
**center**  72:4 115:25
  144:17
**centers**  71:25
**cepada**  5:7
**cepeda**  2:9
**certain**  97:20
  99:18,22 118:9
  119:7,17 123:2
  134:4 159:18
  160:14 167:17
  170:3
**certainly**  14:22
  19:23 46:12 47:3
  60:7 61:7 69:9
  70:1 74:21 78:3
  86:14,21 95:18
  97:12,16 102:4
  104:10,11 115:7
  143:14 151:6
  157:9,9 159:22
  163:25

**certainty**  56:16
**certificate**  178:1
  179:10
**certify**  178:5,8
**chain**  53:8
**challenge**  57:14
  67:18
**challenged**  116:18
**challenges**  57:13
  65:11
**chance**  38:2 148:4
  150:11,19
**change**  54:7
  132:12 155:1
  182:4,7,10,13,16
  182:19
**changes**  65:12
  167:9 181:10
  183:6
**changing**  132:11
**characterized**
  70:19
**charleston**  178:13
  178:13
**chart**  133:7,8
**check**  24:24 58:13
  64:8 70:21 91:21
  94:19 109:3
**checked**  27:22
**chester**  100:1
  106:10 108:10,17
  110:17,17,19
  120:9 121:25,25
  122:4 125:9 134:7
  134:10 136:3,6
**choice**  83:11
**choose**  157:23
**chris**  2:23 4:18
  156:16
**chronologically**
  76:18

chronology 10:10
chunk 55:11
circulating 95:19
circumstances 67:13,21 159:18
citation 69:16,17
citations 16:3,6
cite 97:21 123:14 124:19
cited 67:7
citizens 89:4
city 110:16 112:1 125:8
city's 150:3
civil 2:3,9 4:14 5:2 5:7 173:23,25
claim 10:18 65:17 67:14 68:5,11,23 69:1,7,10 118:22 120:5 148:15 149:3
claiming 57:22
claims 10:22 57:20 69:8
clarification 95:21 133:4 152:11
clarify 9:16 19:7 37:18 66:15 103:19 175:6
class 48:16,19 56:17
classes 15:14 48:13,20,22
clean 123:19,25
cleaned 41:20 42:15
clear 9:24 18:18 103:7 115:9
clearly 6:17 157:2 158:20

cleverer 88:3
close 44:11 116:16 146:17
closed 106:5
closer 139:20
clue 21:5 57:18 173:20
cluster 100:1,12 100:15 102:16 104:7,21,25 105:1 105:1,13,15 113:8 116:18 117:12 122:3,4 133:10 134:17,18 136:20 136:21 140:7,19 140:23 141:1 142:1 155:5
clustered 75:10
clustering 75:7,8
clusters 99:17 100:24 101:2 105:10 117:13,22 121:24 133:7 135:10,24 150:6
code 15:22 17:10 17:14,16 36:19 54:7 55:18,24 90:9 97:13,17 98:25 99:3 104:12 105:8,19 107:23 109:12 111:22 117:25 130:16 131:20
coded 90:7
codes 53:25 107:24
coding 76:2
collaborative 38:10 70:7 73:4 73:12 79:3 81:7 179:25 180:9

colleague 4:19
collected 72:22
collection 91:3
colloquia 51:18
color 76:2 134:12
columbia 1:3 3:17
combinations 118:14 122:24
come 23:6 30:3 31:6 58:24 79:15 79:16 98:13 138:16 147:4 167:17
comfortable 54:9 113:1
coming 73:12 103:2 171:11
comments 40:23
commission 3:13 4:22 77:5 83:14 85:9,14 87:10,15 87:25 166:7 178:24 180:15
committee 90:17 90:23 180:17
common 58:2 180:3
commonly 49:21
communication 19:11,16,16
communications 17:20
communities 30:12 32:13 45:11 148:18 149:8,18 149:20,22
community 148:23
compactness 112:17,18 122:21 123:3,4,6 128:5

143:1,17,18,21,24 144:3,13,14,16 145:1
companion 73:3
compare 81:14,21 89:2 103:3 130:22 164:14,15
compared 81:8,11 82:14
comparing 162:19 163:1 164:3
comparison 98:5 163:12
compensated 24:20 25:2,7,15
compensating 25:15
competing 86:23 89:3,3
complaint 10:24 87:16 156:15
complete 31:3,8 178:6 183:8
completed 29:16 30:6 181:17
completely 7:9 84:9,10 102:7 115:16 123:19 131:4
complex 89:14
compliance 167:16,18 168:10
compliant 83:2 84:24,25 86:1 87:11,25 88:20 89:7 167:21,23 168:6
complied 86:25
comply 85:10 86:9 90:1,8 167:6 168:2

**composition** 154:9
**computations** 45:24
**computer** 15:22
**computing** 49:18 49:20
**concede** 158:1
**concept** 125:14
**concerning** 80:12
**conclude** 34:9
**concluded** 177:20
**concludes** 67:1 176:4
**conclusion** 78:11 98:14 144:7 145:10 174:20 175:24
**conduct** 97:11 170:2
**conducted** 98:14 100:25
**confer** 94:16
**conference** 1:4 2:2 4:6 19:10 46:19 66:11 181:4 182:1 183:1
**confident** 144:1
**configuration** 106:10 110:16 125:16
**configurations** 114:7
**configured** 114:3
**confirm** 99:2 110:18 133:25,25 134:5
**confused** 163:25
**congress** 13:11
**congressional** 80:6 124:8 142:17 142:24 148:21

**151**:1
**connect** 149:3
**conscious** 167:22
**consciously** 15:11 16:12
**consider** 19:17 49:21 70:16 166:9
**consideration** 78:4 84:18 127:21 128:1,3 129:17 146:5
**considerations** 127:24 128:7
**considered** 35:23 145:17 148:14 154:21
**considering** 92:8
**considers** 121:2
**constitutes** 135:18
**constitution** 84:2
**constitutional** 143:1
**constructed** 90:6
**constructive** 43:13 52:20
**contact** 27:1
**contain** 174:15
**contained** 32:16 101:11,12,20 126:9
**contains** 32:11
**contend** 136:15
**contending** 110:13 115:5
**contention** 168:13
**context** 54:16,17 96:15 102:13 115:18 118:12 129:23 132:6
**continuity** 145:3

**contract** 25:1,5
**control** 12:12 28:21 143:16,18 144:6,24 147:9 148:9 149:19
**controlled** 146:14 146:24 147:1 148:10,17 149:6,7 149:10,11,13,14 149:17 151:9
**controlling** 132:12 132:17 143:21 144:12,14,20,22 144:25 146:6,7
**convenience** 72:2
**convenient** 71:24
**conversation** 16:16 19:9,15 20:19 24:13,15 108:4 152:2
**conversations** 20:9,15 94:13
**conversely** 167:20
**convoluted** 89:14 90:2
**copies** 181:14
**copious** 170:25
**copy** 14:13 176:22 176:25 177:10,13
**core** 125:11,12
**correct** 8:6 17:17 29:3,7,8,9 31:1,2 34:17 37:11,19,20 37:23 39:7,10,13 39:18,19 40:8 43:6 44:2 45:12 46:10,11,14,15,17 46:24,25 47:14,15 58:8,9 59:8 60:9 68:15 69:22 70:17 70:18,23 77:15

**80**:21 81:6 82:11 89:24 92:17 93:4 93:16,19 98:6 99:23 101:5,6,8,9 102:1,17 103:6 104:23 106:20,22 108:6,7 109:2 111:2,5,6,8,12 112:13,23 113:17 113:18,20,21,24 113:25 114:13,23 115:1,4,7 116:6 116:20 119:23,24 121:1,10 122:1,5 122:6 123:2 125:13,18,20 128:21,24 129:4,8 130:4,7 131:11,11 131:17 132:6,7 133:21 137:7 138:21 139:6 140:11 141:2,9 143:15,21 144:9 144:23 145:8,23 145:25 146:18 155:22,23,25 158:4,22 159:14 160:9,11,24 161:3 164:8 169:16 170:5,10,17 183:8
**corrections** 183:6
**correctly** 56:7 97:3 100:23 111:19 120:11 143:3
**correspond** 27:25
**costs** 177:5
**counsel** 1:16 2:1 4:10 13:2 16:15 16:16 24:13,16 28:1,2,3 40:19

64:7 75:13 94:13
105:21,22 126:24
151:23 166:6
171:4,10 172:4,13
173:6 175:3,10
178:9 181:14
**counter** 81:12
**counties** 158:3,21
160:14,16,21
161:1
**counting** 65:13
**country** 155:21
158:16 172:5
**county** 69:22 76:5
76:7 110:17 112:1
113:12 116:19,22
116:25 120:10
125:9 136:3 149:1
153:15 155:24
156:4 157:4,7,12
157:16,21,23,23
158:4,12,25,25,25
159:3,9,14,16,21
159:25 160:8,9,10
160:22,23,24
161:3 178:13
**couple** 71:15
135:20,25 137:4,8
162:4 165:15
171:25 172:1
**course** 94:20
137:1 144:4 145:3
170:7
**coursework** 52:10
52:11 55:12
**court** 1:1 4:11
5:11,13 6:12,24
8:13 55:21,23
63:23 64:17 66:5
67:1,5,10,15 68:6
68:13 70:2 71:16

71:17,20 72:6,24
74:15 76:22 78:13
79:10,21 80:23
81:13,18 83:15,16
83:21,25 84:6,13
86:12,15,16,20,22
87:2 88:6 89:18
89:20 90:4,11
91:10,12 92:7,23
92:25 93:3,7,8,15
93:19 96:15
139:15,17 150:24
150:25 174:9
175:21 176:6,10
176:17,20 177:2,6
177:11,16 178:3
178:24
**court's** 73:19,21
83:6 88:5
**courts** 98:1
**cover** 45:10
**cracking** 75:12
**crafting** 33:10
**craziness** 60:14
**crazy** 19:2
**create** 18:14 21:7
155:24 175:8
**created** 10:16
15:18 18:9 99:6
103:5,22 117:21
118:1,1 163:12,15
**creating** 15:20
17:20
**credentials** 77:17
**criticisms** 92:7
**critique** 96:14,18
97:8 116:14 158:9
**critiqued** 92:3
**critiquing** 119:1,2
**cross** 157:20
159:16

**crossed** 160:24
**cs** 181:15
**currently** 33:3
40:7 163:13
**cusick** 2:15 5:3,3
**cut** 7:15 23:10
40:3 96:21
**cutting** 139:12,16
**cv** 1:6 13:13 65:1
90:22 91:19
179:19
**cycle** 61:11

**d**

**d** 25:24 26:11 49:4
87:9,9 179:1
**d.c.** 2:21
**data** 49:22 56:17
61:12 70:21,22
72:19,22 76:5
107:18 113:22
141:18 143:8
147:8 169:15,18
169:20
**date** 1:13 4:3 13:3
25:21 59:6,17
95:13 182:24
183:12
**day** 3:8 36:17 46:3
68:4 95:16,19
178:12 183:15
**days** 60:16 61:3
68:3 181:17
**dc** 2:6 3:11
**dealing** 122:12
**decade** 47:3
**decide** 119:6
**decided** 62:16
**declare** 183:4
**deemed** 183:6
**deeply** 76:8

**defendant** 2:23
3:6
**defendant's**
156:22 158:19
171:9 173:6
**defendants** 1:8
2:23 3:6 4:17,20
4:24 18:1 67:20
144:4 156:6,15
177:1,10,13
180:23
**defended** 29:10
**defense** 2:14,18
5:4 17:23 29:13
29:20
**define** 81:10
**definitely** 149:19
154:6 165:11
170:4,9
**definition** 123:6
**degree** 157:10
166:22
**delaware** 1:15
25:25
**delayed** 95:19
**deliver** 43:19
**democratic** 70:11
82:18,21,23 83:13
83:20 86:1 90:16
90:23 169:1
180:16
**democrats** 75:14
147:13
**demonstrate**
71:22,23
**demonstrated**
143:22,24
**demonstrations**
52:14
**demonstrative**
76:3

density   72:1
department   51:18
dependency
  125:10,13
depends   168:23
deponent   181:13
  183:3
deposed   10:3
deposing   181:13
deposition   1:11
  4:4,8 6:7,10 9:1,5
  11:20 12:4,17,18
  12:22 14:8,9
  16:18,20 22:19,21
  23:2,25 24:8,12
  41:3 133:19 171:5
  174:6,18 176:5,12
  177:20 179:16
depositions   23:7
  147:5
derieux   2:9 5:6,7
described   44:5
  153:7
designated   13:5
designed   132:5
desktop   22:1
  43:12
detail   73:18
determine   72:3
develop   46:4
  49:23,25 97:14
developed   49:8
developmental
  112:25
deviation   128:8
  137:20 140:2,3,14
  141:13 146:20
deviations   128:17
  130:10 132:1
  137:24 140:15
  141:13 142:19

143:12 145:11
  146:1
diagram   33:8
diamaduros   2:25
  4:16 86:11,18,19
  94:21 112:15
  116:7 158:5 159:5
  160:12 162:21
  164:10 171:8,23
  172:21,23 173:9
  173:12 174:21
  175:25 176:8,13
  176:19,24 179:9
  181:1
diamanduros   4:17
dice   119:12
dictate   8:23
difference   113:13
  114:2 128:13,15
differences   114:10
different   21:21
  31:19,20 49:1
  73:8 79:3 102:8
  102:12 110:16
  112:20 113:24
  114:7,17 117:12
  119:19 121:16
  122:17,24 126:6
  128:14 130:22
  157:23
difficult   12:11
  89:8
direct   96:12
directly   17:14
disagree   83:6
  141:15 173:4
disagreed   83:15
  92:25
disclose   62:1,16
  174:2 175:20

disclosed   50:25
  51:7,14 60:20,24
  61:1,2 62:5,24
  64:4
disclosing   175:18
disclosure   174:9,9
disclosures   61:6
discovery   146:11
  147:5
discriminated
  57:23
discrimination
  10:15,21 11:1
  35:19 36:4,6 39:7
  92:5
discuss   23:5 50:25
discussed   22:7,25
  24:10 38:15 65:16
  68:22 95:24 150:6
  171:1
discusses   66:3
  127:2 152:9
discussing   11:5
discussion   22:24
  171:19
disfavor   143:8
dismiss   156:14,19
  158:19
dismissed   156:23
dissertation   29:11
  29:13,17 30:6,9
  30:16,20,22 31:1
  31:12,17,22 32:1
  32:2,6,7,8,8,9,10
  32:18 33:6,7,11
  33:13,15 34:7,7
  34:14,25 35:8,24
  36:3,6 37:16 38:7
  38:21,22,23,24
  42:17 43:9,24
  44:19 50:9 52:15

56:5 172:12
  179:21,23
dissertations
  173:15,18
distance   72:4
distinct   113:13
distribution   116:1
  119:14,23 127:8
  130:23 131:4
  133:9 134:11
  137:17 138:25
  139:4,6 140:11
  141:9 144:7,18
  150:7 163:2
district   1:1,2
  65:10 66:5 87:11
  91:11 114:2,3,4,6
  120:22 121:19
  123:17 124:4,10
  124:13,21 152:21
  153:14,15 155:1,5
  155:21 157:15
  158:11 160:7
  164:5 167:12
  168:1,5,19 169:5
  169:12
districts   75:15
  96:5 114:8 116:18
  118:15 121:20,24
  122:1,5,8 123:10
  124:8 146:16
  148:21,25 154:9
  160:15 161:12
  162:15 165:4,11
  167:4,8,15,21
  169:4 170:3,9,13
dive   133:2
dividing   122:8
division   1:3
document   12:12
  12:13 13:1,16,24

35:3,15 37:24
38:1,5,19 43:2
95:3,5,9 112:2
156:10
**documentation**
53:16
**documents** 15:18
16:1 17:3,3,5 21:7
21:8,10,21 27:12
34:20 39:17 41:2
41:25 54:20 99:1
**doing** 25:17 38:16
51:18 54:9 152:19
162:19
**door** 41:22
**doubt** 159:10
**download** 53:1,3
53:17,24 54:4
97:7
**downloaded** 52:25
53:15,22
**dozen** 124:8
**dozens** 20:5,10,11
**dr** 37:7 39:10,13
41:22 48:7,10,18
48:24 49:8,23
52:13,22 55:18
63:10,16,17 82:14
87:9,9,14,18,24
88:17,17 89:12,12
89:16 90:5,9 92:4
92:10 94:25 95:8
95:16,17,22,25
96:7,8,14,18
98:10 102:4 105:8
106:11,17 107:20
107:22 108:2
109:20 111:15,21
112:19,24 113:3,4
116:14 118:22
120:4 142:2

143:22 146:6
147:7 152:10,12
155:13,17 157:24
158:1,9,14 160:23
161:2,7,10,12
162:10,10,18
163:1,17 164:4,19
165:2,3 169:23,25
180:19
**draft** 30:19 32:1,7
37:16 38:23,24
42:25 43:8 45:14
50:8
**drafted** 42:20
44:21
**drafting** 81:22
175:1
**drafts** 29:16 31:16
31:23 64:13
**draw** 87:11,16,25
88:20,24 89:7
122:25 123:20
124:12 141:20
159:9
**drawer** 155:20
157:14 158:10
160:6
**drawers** 125:15
126:2 142:25
**drawing** 85:14
122:20 123:16
124:6,11 128:4
143:15 144:3
146:15 149:21,22
169:4
**drawings** 167:22
**drawn** 89:4
119:18 120:15,16
127:19 142:25
143:7,8,25 145:13
146:4 150:2 151:1

151:6 163:9
165:11 167:5
168:2 170:4,9
**drew** 85:11
**drill** 61:11
**dropped** 44:7
87:18
**dropping** 43:21
**duchin** 21:13
**duchin's** 142:2
**duly** 5:16
**duplicate** 100:20
101:11,25 102:5,7
103:9
**duplicates** 99:19
99:21 100:5,9,9
100:17 101:22,25
102:6 103:1,15,16
103:18 104:14
118:8,9 120:17
**duties** 174:13

**e**

**e** 19:13,16 20:4,11
25:24,24,24 26:1
26:8,10,11,11,14
26:14,14 27:6
31:21 49:4 62:4
64:6 87:9 94:15
94:22 151:25
171:4 176:23
177:5 179:1,14
182:3,3,3
**earlier** 9:18 44:18
64:3 97:14 142:12
**early** 14:23 15:2
36:17 68:3 71:24
93:24
**ease** 11:22
**easier** 85:17 90:7
153:1

**east** 111:14,17,21
111:25 112:1,4,7
112:9,11
**eastern** 4:3
**edit** 138:17
**edits** 41:21
**educational** 2:14
2:18 5:5 28:25
**effect** 30:11 32:12
45:11 65:16 158:3
**efficiency** 74:10
75:11,16
**eight** 71:4,6 98:8
108:13,17 111:8
113:19 115:3
120:11,20 135:15
153:9
**eip** 72:4
**either** 7:24 15:1
17:5 18:15 37:22
38:25 41:14 57:16
60:5 90:4,9 101:8
107:9 110:14
116:6 117:5 124:5
125:24 129:7
131:7 133:15
134:1 141:4
**elderberry** 1:15
25:24
**election** 3:13 4:22
177:10
**elections** 69:4
77:21 78:8,12
169:20
**electronic** 99:5
**elimination** 65:13
**embarrassing**
59:4 118:18
**employ** 39:9
**employed** 15:22
37:10 39:12

**[employed - extent]**                                                      Page 11

174:12
**employee** 174:14
**employing** 52:19
**enable** 35:13
**enables** 49:20
**enacted** 11:13,14
  11:21 12:1 18:10
  18:14 81:8,14
  83:2 84:25 86:8
  96:4 109:25 110:4
  110:9,14,20
  111:11 114:12
  115:6 121:9
  134:10 135:6,11
  135:24 136:3,6,12
  136:16,22,24
  137:1,6,15,17,20
  138:24 139:2,5
  140:3,10,23 141:8
  141:10 142:17,24
  144:17 146:1
  150:7 162:19,20
  163:2,13,13,18,23
  164:1,4,6,16,20
  168:1
**enacting** 86:7
**ended** 169:5
**enrolled** 46:5
**ensemble** 106:11
  106:13,18 127:9
  127:10 128:2
  142:15 144:18
  146:24 147:2
**ensembles** 127:13
**entirely** 7:2 141:8
**envelope** 155:17
**equally** 125:1
**equivalently**
  127:11
**errata** 181:11,13
  181:17

**erratas** 181:15
**especially** 6:16 7:4
  7:21 174:12
**establish** 72:22
**established** 46:9
  46:12 136:10
  151:4
**et** 1:4,7 2:2 4:6,7
**evaluating** 96:15
  119:4
**events** 178:10
**everybody** 7:23
**evidence** 76:12,15
  76:23 84:21 87:10
  87:15,23,24 88:17
  90:12 125:22
  126:5 127:18
  157:6 167:25
  168:24 169:2
**evident** 144:12
**exact** 10:9 69:5
  104:15 111:22,23
  129:6
**exactly** 56:22
  104:5 116:4 120:6
  120:21 148:19
  175:14
**examination** 5:17
  172:20 179:6,8
**examine** 65:17
**examined** 89:1
**examining** 144:24
  145:7
**example** 13:11
  16:6 76:7 92:9
  100:1 106:9
  120:22 123:17
  125:8 129:10
  148:18 168:5
**exception** 160:16

**exclude** 72:24
  73:19
**excluded** 102:1
**excused** 123:19
**executed** 55:24
**exhibit** 12:4,7
  13:13 34:25 38:7
  38:9,13,14 57:25
  58:2,4 64:22 70:6
  73:25 77:2,4
  90:16 94:25 95:4
  152:3,5 156:6,10
  179:16,18,20,22
  179:24 180:1,3,5
  180:7,8,10,11,13
  180:16,18,20,21
  180:23
**exist** 112:13
**existing** 127:20
  162:9
**exists** 34:3 118:9
  131:12
**expect** 25:7 29:5
  29:22 44:19,23,23
  45:18 122:7,12
**expectation** 30:1,3
**expected** 140:10
  141:17
**expedited** 177:4
**experience** 7:23
  123:16 124:6,7,16
  124:17,23
**expert** 11:12 13:5
  13:21 14:3 21:11
  21:14,15,23 24:14
  29:4 30:8 37:7,11
  37:13 48:7 50:17
  50:21,22,22,23
  51:3,16,25 52:23
  55:23 56:12 57:1
  57:7 58:11,13,19

59:3,18 60:5,8
  61:1,3,4,6,15,18
  61:19,22,24 62:2
  62:14,17,21 63:4
  63:25 65:9,15
  66:4 67:4 68:12
  68:17,21,24 69:1
  69:3,5,8 70:3,11
  70:14,19 72:10,25
  73:20 74:8,9,15
  76:24 77:12 78:2
  79:8 82:9 90:22
  91:14 95:7 96:7
  97:21 99:15 100:2
  100:15 108:20
  142:11 147:22
  165:22,25 166:3,6
  166:8,9 173:6
  174:2,9,12,14,18
  175:2,18,19
**expertise** 77:21
  78:7,11 166:5
**experts** 17:23
  40:22 61:8 86:3
  93:6 96:4 105:17
  131:19 147:19
  166:20 173:14
**expires** 178:24
**explain** 170:18
**explained** 73:18
**explaining** 113:23
**explanation** 126:7
  155:10
**explicit** 112:8,10
**export** 59:22,25
  60:4,9 73:23
**exposed** 51:20
**express** 147:15
**extent** 67:4 84:17
  172:8

**extreme** 127:7
**eye** 121:19
**eyeballing** 133:14
  133:25 141:17

**f**

**facebook** 28:5,8
  28:13
**fact** 62:23 68:19
  68:25 76:22 78:4
  92:12,21 109:18
  111:4,22 145:22
  146:17
**factor** 125:2
  146:15,22 163:7
**factors** 72:2 93:2
  137:14 146:12
  148:8,13 149:9
  157:2
**factual** 173:5
**fails** 181:19
**fair** 69:23 77:2,8
  80:3 83:8 127:15
  135:2 143:11
  154:3 173:9
  180:11
**fairfield** 125:9
**fall** 141:1 174:24
**falls** 140:23
  168:10
**familiar** 54:11
  173:23
**far** 89:20 164:11
**farther** 127:15,22
  128:10
**faster** 30:4
**favor** 87:12 143:8
**february** 14:15,25
  15:2 59:4,15,19
  60:1 80:20 81:4
**federal** 64:17
  65:10 173:23,25

**feed** 28:12
**feel** 54:9 112:25
**fell** 144:17
**felt** 77:20
**fifty** 67:3,17 68:2
  68:14
**fight** 77:2,8
  180:11
**figure** 52:12 72:20
  128:21 131:11,17
**file** 53:17 79:24,25
  79:25 81:2
**filed** 23:19 56:25
  80:6 91:8
**files** 17:7
**filing** 60:14
**filled** 74:11
**final** 40:1,4 41:2,4
  78:11 161:5
**finalized** 40:21,24
  64:16
**find** 90:7 93:7,8
**findings** 53:25
**fine** 8:21 66:17
  97:8 124:1 173:3
**finish** 7:1 8:18
  29:17 39:17 160:2
  168:16 173:2
**fire** 61:11
**firm** 169:1
**first** 5:16 14:4
  23:18,25 24:8
  30:16 31:18 38:20
  38:21 54:5 55:6
  65:1 71:15 81:1
  95:5 106:12
  108:16 109:14
  122:11 152:11
**five** 14:4 19:4,22
  65:5 129:14
  171:14

**fix** 7:24,25
**flaws** 153:21
**floating** 26:18
**floor** 2:16
**flooring** 155:4
**focus** 32:20 33:5
  33:14,24 119:25
  120:2
**focuses** 30:9 32:18
  33:7,14,17,19
  34:8,11
**focusing** 102:14
**followed** 53:20
**following** 164:24
**follows** 5:16
**footnote** 69:13,15
**footnotes** 68:20
**force** 129:22
**forces** 158:24
**forcing** 159:2,16
**foregoing** 178:5
  183:5
**foreman** 3:14
**forgot** 17:9 60:13
  60:21
**forgotten** 86:3
  143:23 156:20
**form** 86:11 112:15
  116:7 158:5 159:5
  160:12 162:21
  164:10 174:19
**format** 41:4,8
**formatting** 40:5
**former** 156:18
**forth** 9:8 27:6
  79:21 172:24
**forward** 165:21
  165:25 173:8
**found** 70:2 84:2
  92:7 107:12 124:3

**foundation** 4:14
**four** 60:16 61:3
  106:18 108:19
  109:2 153:9,12
  174:17
**fourth** 80:8
**frankfurt** 44:11
**frankly** 40:22
  83:10
**frequently** 47:21
**fresh** 115:17
**friday** 43:18
**fried** 163:24
**front** 21:22 22:4
  59:5 118:25
  152:15 153:4
  161:18
**full** 5:21 28:13
**fun** 46:4
**fund** 2:14,19 5:5
**further** 51:9 155:6
  175:25 178:8

**g**

**g** 62:4 96:8
**gap** 74:11 75:11
  75:16
**garbled** 7:25
**geek** 119:13
**general** 114:15
  152:17 157:3,7
  158:20 159:12
**generalization**
  132:15
**generally** 47:5
  92:9 148:1 173:24
  175:4
**generate** 105:18
  107:23 137:2
**generated** 104:20
  136:25

**generator** 98:20
99:2,4,23 103:6
103:22 117:20
**generic** 19:8
**genuine** 62:18
**genuinely** 147:4
**gerrymander**
86:24 93:18
127:22 129:14
146:10
**gerrymandered**
127:17
**gerrymandering**
10:15,18,21 35:16
35:25 36:2 37:1,5
37:15 39:3 48:3
51:4,14 57:19
62:20 75:19 79:4
83:5,12,13,19,20
127:2,14 128:21
128:24 129:2,6,25
130:16,24 131:5
132:4,5,9,18,22
132:23,24 133:5,9
134:19,24 135:11
136:11 137:2
142:16,18 143:13
145:8,21,22 146:2
**gerrymanders**
82:18,21,23 86:1
**gerund** 32:25
33:22
**getting** 16:13
96:13 114:16
115:16
**ghaps** 36:16
**gill** 73:25 74:4
180:10
**gist** 74:25
**github** 53:2,15

**give** 9:14 15:15
54:20 56:23 58:21
70:12 72:13 76:15
77:18 93:10
105:16 118:12
129:14,25 142:5
161:20
**given** 170:25
171:7 175:21
183:9
**gives** 119:17
**giving** 53:24
174:14
**glad** 101:13
103:19 120:19
173:1
**gmail** 26:6,16
**gmail.com.** 26:17
**go** 6:6 7:24 8:4 9:9
22:16 25:8 30:1,2
39:16 41:21 42:21
42:23 43:1,16
44:9,13 47:22
52:11 66:14 80:1
81:2 83:23 86:4
105:2,7,25 117:14
117:15,16,17
118:6 134:6
142:14 154:6
155:9 157:22
161:5 166:1,23
172:24
**goal** 157:10,22
160:8
**goes** 15:17 150:24
**going** 6:24 11:21
12:7 13:16 14:6,7
22:22 29:16 34:23
39:25 41:4,21
45:21,23 50:25
58:15,21 60:15

61:8 64:5 66:6,14
68:21 69:11 73:14
76:17 79:21 85:8
90:20 93:21 94:3
95:11,22,24 119:7
119:8,8 126:5,18
131:6 134:14
137:1 138:3 142:4
146:11 150:4
151:16 156:9
158:6 164:17,20
165:24 171:5,10
171:11,18 172:5
172:17 173:2,24
174:7
**goj** 17:9
**good** 5:19,20 8:2
41:23 55:11,11
87:22 126:4
**goodness** 26:4
**gore** 3:9
**gotten** 95:14
**government** 81:15
**governors** 11:16
**grad** 32:5
**graduate** 29:25
**graph** 129:11
130:7 133:5
**graphs** 129:1
130:4 131:8,10
133:3,6,21
**great** 12:11 14:14
68:18 95:21
106:16 118:3
127:14 142:4
153:3,6 162:25
**greater** 73:18
**greenville** 3:3
**greg** 31:15
**ground** 6:6

**group** 73:8 89:5
113:12
**grouping** 162:10
**guarantee** 100:18
**guess** 16:18 17:10
18:21 35:20 44:11
64:20 79:19 84:22
96:8 114:5 115:16
139:2 143:18
**guesstimating**
137:8
**guideline** 156:3
**guilty** 75:2

**h**

**h** 156:15 179:14
182:3
**h4493** 11:9
**habit** 123:11
124:4,21 125:1,10
125:13,17 126:7
129:22
**half** 20:21,24 21:1
50:7
**hamptons** 148:24
**hand** 142:18
178:11
**handful** 165:3
**handle** 28:16,20
**happen** 168:23
**happens** 9:17
112:11 138:8
139:22
**happily** 63:15
**happy** 62:13
103:18 104:13
**hard** 72:14 85:6
172:15
**harrison** 3:20
**head** 6:21 51:1
**header** 103:13,14

**heads** 122:22
**health** 56:18
**hear** 117:24 139:8
  162:2
**heard** 54:15
**heavily** 87:13
**heavy** 134:17,18
  143:7 145:13
**held** 4:8
**hello** 151:22
**helped** 18:14
  49:23,25 50:1
  97:14
**helpful** 117:19
  118:3 145:6
**hereto** 183:7
**hereunto** 178:11
**hey** 126:23
**hi** 5:6,9 94:9
**high** 168:20 169:3
**higher** 121:16
  128:20 129:2
**highlight** 66:24
  150:16
**highlighted** 66:25
  71:15,19 72:16
  73:15 75:24 76:1
  82:13 84:5 87:5
  92:1 96:2 157:1
**hired** 63:6,7,9
**histogram** 118:13
  120:10 121:6
**histograms** 120:4
  120:20
**history** 92:5
**hold** 109:18
  133:18 139:19
**home** 42:14
**honest** 33:9 77:22
  88:5 89:13

**honestly** 139:21
  147:14 148:6
**hope** 24:22,24
  25:10 29:17,24
  30:1 71:10
**hoping** 29:15
**hotmail.com.**
  26:11
**hour** 20:22,24
  21:2,4
**hours** 34:21
**house** 2:23 4:17,20
  10:17 11:5,9,17
  13:8 18:4 44:3,4
  96:5 152:5 156:6
  156:15,22 158:19
  171:9 176:25
  180:21,23
**housed** 43:15
**huh** 6:21 32:19
  44:17 53:10 54:13
  61:14 75:3 113:10
  119:15
**hundred** 135:20
  135:25 137:5,9
**hurt** 147:13
**husted** 38:10 70:7
  70:12,15 71:1
  73:4 179:25 180:9

**i**

**iceland** 16:23 43:3
  43:5,9,16,22 44:7
  44:12
**idea** 33:1 51:21
  56:19 146:11
  147:3,4 153:16
  165:24
**identical** 106:19
  106:21,24 107:2,3
  107:4,6,7,7,8,10
  107:15,19 108:2

108:22,24,24
109:15,21,25
110:3 114:1
115:14 122:23
**identification** 12:5
  13:14 35:1 38:8
  38:11 58:1,3,5
  64:23 70:8 74:1
  77:3,6 90:18 95:1
  152:4,6 156:7
**identified** 167:4,8
  167:12
**identify** 72:21
  161:1 170:12
**ii** 2:19
**illegal** 88:24
  168:11
**illogical** 85:5
**image** 99:9
**images** 108:15
  110:12 111:4
  114:12
**imagine** 107:16
**imai** 16:7 21:13
  37:7 39:10 41:22
  48:7,18 49:8,23
  52:13,22 63:10,16
  63:17 87:9,14
  94:25 95:8 96:7
  98:2 105:8 108:2
  111:21 112:19,24
  113:3,4 116:14
  118:22 127:6
  143:22 146:6
  163:1,17 169:25
  180:19
**imai's** 87:24 88:17
  89:12,16 90:9
  95:16,17,22,25
  96:14,18 97:23
  98:10 102:4

106:11,17 107:20
107:22 109:20
111:15 120:4
147:7 161:12
162:10 164:4,19
165:3
**immediately**
  121:6
**implausible** 143:6
  145:12 146:3
**implications**
  153:17
**implied** 72:19
**important** 7:4
  13:3 102:13
  115:18 118:12
**importantly** 87:8
**impossible** 88:8
  89:7 141:20 143:6
  145:12 146:4,17
  146:22
**impression** 105:4
**improve** 35:12
**inaccurate** 9:23
**inactive** 93:18
**inaudible** 31:5
  96:20 139:7 159:4
**include** 51:10
  68:24 72:25 73:22
  92:14,16 100:2,14
  101:3 102:16
  103:23 108:8
  111:1 113:16,19
  117:2 125:22
  132:21 169:18
**included** 67:17
  92:18 101:24
  103:4 110:4,12
  111:4 117:7
**includes** 33:4

**including** 30:10
32:24,25 33:3
34:1 65:12 133:19
157:12 171:3
**inconsistent**
159:23 160:4
**incredibly** 89:14
**incumbent** 154:12
**indention** 128:24
**independent**
166:7
**index** 3:22 37:15
48:3 127:2,15
128:21 129:2,7,25
131:5 132:4,18,22
133:5,9 134:19,24
136:11,13 142:16
142:18 143:13
145:8,21 146:2
179:12
**indicate** 143:13
**indices** 130:16,24
135:11 137:2
**indirectly** 17:13
**inference** 128:8
**inflate** 75:16
**influence** 143:2
**information** 9:16
15:16 62:12 64:15
76:6 92:6 99:1
171:1,10 179:12
179:13
**ingram** 2:19
**inherent** 168:22
**inherently** 168:23
**initially** 27:1,9
**inla** 35:20 36:20
37:12 45:4
**inquiry** 34:11 84:8
**insert** 42:20

**inserting** 45:4
**insignificant** 92:8
**instruct** 9:7
**instructions** 52:25
53:20,24
**instructs** 105:22
175:3
**intact** 157:21
**integrated** 35:11
**intend** 86:9
**intended** 84:10
86:9
**intent** 10:19 34:12
37:5 65:18
**intention** 11:1
35:22 160:8
**intentional** 35:19
36:4,5 39:6
**intentionally**
174:23
**interest** 30:12
32:13 45:11
148:18,23 149:8
149:18,20,23
**interested** 131:21
149:21 178:10
**interesting** 93:7,9
**interests** 150:3
**interference** 23:8
**interim** 56:20
**introduce** 4:10
**introduced** 82:15
**intuit** 114:18
**intuition** 103:17
**involve** 47:16
62:21 174:14
**involved** 65:11
67:18
**irrelevant** 39:15
73:21 92:11,21,24
93:4,8,9,16,19

131:6
**irvin** 36:16
**issue** 10:19 12:1
93:2 142:6 161:7
161:9 172:14
**issues** 7:21 8:1
65:18
**item** 174:1,16
**iterations** 31:19

**j**

**j** 3:8
**james** 2:23 4:18
156:15
**jane** 3:15 4:21
177:9
**january** 15:1
18:24 23:22 25:22
80:15,16,18 81:4
81:24 95:15,20
**jcusick** 2:17
**jmc** 1:6
**job** 147:16,20
175:12
**joesday.com** 3:12
**john** 2:15 3:9 5:3
**jones** 3:8
**jordan** 2:24 4:18
96:8 156:16
**journal** 46:9,13
**jtrinkley** 3:18
**judge** 70:15,20
77:20,20,25 92:20
**julie** 1:17 176:9
178:3,23
**july** 178:25
**junk** 36:21

**k**

**kdiamaduros** 3:4
181:2

**keep** 157:21 171:6
175:9
**keeps** 110:16
**kenny** 3:8 4:23,23
177:12,12
**kentucky** 44:9
50:21 63:4,19,22
63:22 64:8
**key** 75:15
**kid** 44:7
**kids** 43:19
**kind** 9:8 33:12
51:21 52:9,17
61:13 64:2 73:8
79:22 121:2
130:21
**kinds** 22:5
**knew** 42:10
124:14 171:10
**know** 7:3,23 10:2
10:9,19,25 11:2,8
12:18 13:23 14:7
14:19 15:14 18:2
18:21 19:21 20:23
20:25 23:11,13
26:4 27:18,19
31:24 32:3 33:8
49:13,19 52:10,11
53:5,11,12 54:17
55:4,4 56:1 58:18
61:7,8 63:20
64:21 66:9 67:7
68:2 70:25 76:6
78:25 79:23 80:3
80:7,11,14 83:9
84:8,9 86:13 87:3
87:3 89:15,16,21
95:4 97:8,18,24
98:2 102:8,10
103:14,24 104:17
104:25 105:9

112:22 113:7
119:2,10,13
120:12 121:21
122:13,16,19
123:1,3 128:4
131:5 135:5 136:1
137:23 144:2
146:12,15 147:11
147:14 148:1,2,25
150:10 152:14
156:19 157:21
160:20,21 163:9
163:21 164:11
166:4,22 169:1,6
172:22 173:17,21
176:7,21 177:5
**knowing** 101:18
**knowledge** 15:6
94:18 173:14
**konstantine** 2:25
4:16 38:14 86:19
181:1
**kosuke** 94:25 96:7
180:19

**l**

**l** 1:17 2:19 25:24
26:14,14,14,14
62:4 178:3,23
**labeled** 133:8
138:12
**lacked** 77:16,20
**lag** 7:5,22 12:8
**language** 30:15
41:20 42:15 49:18
49:20 55:3,5
161:21,24
**laplace** 35:12
**laptop** 43:3
**large** 19:9 178:5
**larger** 140:17
141:16

**largest** 141:1
**late** 15:1 18:24
61:12 172:12
**latest** 42:16
**latex** 39:24,24,25
40:5,5,7
**law** 11:8 65:13
71:1 83:2 84:24
85:1 86:10,25
93:2
**laws** 44:9 65:12
67:3,16,19,22,23
68:14 89:14 90:2
90:8
**lawsuit** 23:18
**lawyer** 156:19
173:22
**lawyer's** 147:16
**lawyering** 88:3
**lawyers** 46:2
**laying** 149:15
**lead** 84:3
**leading** 112:8
**league** 77:4
180:13
**learn** 50:3 53:7
71:11 80:16
**learned** 15:14
51:15,17 52:5,8
55:12 71:8
**lease** 36:18,20
**leave** 93:24 171:11
172:18
**leaving** 78:6
**left** 43:22 96:12
148:3
**legal** 2:14,18 3:20
5:4 83:3,8 89:13
93:10 174:20
175:24 181:23

**legislative** 144:2
**legislature** 11:16
18:7,11 79:22
86:8 109:21 113:5
119:22 123:1,18
143:25 148:11,14
156:3 157:17,22
160:24
**legitimacy** 115:11
119:3
**length** 19:12 20:17
99:7
**lessons** 71:8
**level** 144:15 168:2
**lexington** 43:20
44:9
**liberties** 2:3,9 5:7
**liberty** 4:14 5:2
**lichtman** 92:10
**lichtman's** 92:4
**life** 16:18,19,20
**limit** 157:7 159:21
160:9
**limitation** 155:6
**limited** 158:1
**limiting** 160:10
**line** 8:19 122:8
157:1 158:18
160:24 164:24
167:22 169:3
179:3,15 182:4,7
182:10,13,16,19
**lined** 143:24
**lines** 114:1 123:17
157:5,12,21
159:10,14,16
**list** 34:16 58:10
59:21 60:4,11,25
61:15,24 62:24
65:1 90:21 91:19
99:10 160:22

166:2,4 167:15,20
174:16
**listed** 60:19,23
66:15 73:5
**literature** 52:18
**litigation** 12:2
22:23
**little** 61:11 71:22
72:7 76:13,15,23
90:11 114:4
132:15 140:16
**liu** 21:16
**lives** 152:25
**llc** 2:24
**llp** 3:14
**local** 8:23
**located** 124:10
**location** 1:15
**locations** 21:21
71:24 72:5
**lodged** 9:10
**log** 26:20 28:10
**logged** 28:11
**logically** 84:23
85:3
**logistic** 152:19
**logistics** 48:11,12
**long** 18:22,25 19:1
19:17 24:15 33:21
46:5 55:6 65:23
66:9,13 67:6
69:21 95:5 123:18
**longer** 20:20,24
21:1,4
**longitudinal** 56:17
**look** 16:5 28:18
41:22 63:21 104:2
105:7 110:9,15
111:11 113:25
114:12 115:6
121:19 122:18,23

126:6 128:19,25
136:2,5,24,25
137:5,7 148:19
153:11 154:20
168:25
**looked** 41:2 109:2
109:24 110:13,19
167:10
**looking** 114:8
120:10 130:21
134:14 147:7
163:4
**looks** 95:7 108:10
108:11 110:3
115:17 129:3
134:22 136:16,18
141:10 142:1,2
152:18 154:8,18
**loop** 1:15 25:25
**lot** 33:9 43:13
55:10 63:16 119:9
122:9,18,24 136:2
136:5 137:9
148:21 156:20
161:25
**lots** 120:17
**lottery** 119:12
**louisiana** 3:10
**loved** 155:8
**lucas** 2:23 4:18
156:16
**luke** 3:7 4:24
**lunch** 93:24
**luster** 105:5
**lying** 149:6,12

**m**

**m** 3:9 87:9
**madam** 139:15
**mail** 19:13,16 20:4
26:1,8 31:21 64:6
94:22 177:5

**mailed** 94:15
151:25 171:4
**mails** 20:11 27:6
**main** 3:2,16 27:2,3
47:23
**making** 15:23
57:19
**mandate** 143:1
**manner** 171:3
**mantle** 73:9
**map** 10:17 11:4,12
11:14,14,15,21
12:1 13:8,9 18:10
18:14 72:5 81:8
81:14,16,21 83:3
84:24,25 93:17,18
99:11,12 100:19
100:25 101:10,24
102:4 103:8 104:4
104:7,22 105:12
108:25 109:20,21
109:25 110:4,9,14
110:19,20,23
111:12 114:2,3,12
115:1,6,17 116:24
117:11,15,16,17
117:18,21 125:15
126:1 127:7,16,20
127:23 128:2,10
128:14,20 129:1,7
129:12,13 132:1
134:10 135:6
136:12,16 137:6
137:20 138:10,11
138:13,24 140:23
141:19 142:2,17
142:24,25 143:6
143:15 145:13
146:1,4 150:7
151:1 155:20
157:14 158:10

159:9 160:6,21
163:18,23 164:16
165:6,7
**mapmakers**
112:17
**maps** 54:10 71:16
71:21 72:7 75:20
76:3,23 80:8 81:8
81:15 83:1,14
89:12,20,21 90:1
90:5 96:16 98:10
98:11,17,19 100:1
100:2,11,14,19
101:3 102:7,8,11
102:24,25 103:3,4
103:5,16,22 104:9
104:10,11,18
105:5,10,15,18,23
106:10,11,17,18
107:20,22,23
108:6,16 109:4,8
109:14,19 110:3
111:11,18,25
112:5,6,20 113:13
113:16,24 114:6
114:17,22,25
115:6,14 117:5,7
119:4,8,18 120:12
120:13,15,15,18
122:9,18,20,23
123:16 124:6,7
130:11,22 134:18
134:18,23 135:10
135:17,24 136:2
136:11,21,24,25
137:10,10 140:23
141:25 142:15
143:24 148:2,19
149:21 150:2,19
151:6 159:25
161:13 163:8,25

164:1,19,20,22
**margin** 76:5
**mark** 40:23
**marked** 12:5
13:14 35:1 38:8
38:10,13 58:1,3,5
64:23 70:7 74:1
77:3,5 90:17 95:1
95:4 152:3,6
156:7
**markov** 53:8
**maryland** 10:8
22:21,25 23:1
50:22 57:15 61:16
61:19 62:3 64:7
126:12,13
**mass** 119:6
**master's** 55:6
**material** 15:9,10
171:6
**materials** 15:3,5
16:14,25 172:7,9
**math** 97:9 116:10
**mathematical**
45:24 119:13
124:20
**mathematically**
116:2
**mathematics**
96:14,18 119:1
**mathias** 3:1 4:19
24:2,3,5
**matter** 4:5 45:3,3
68:19 79:25 80:7
116:5 137:3
**mccartan** 16:7
97:23 98:2 127:5
**mccrory** 64:22
65:2,10 66:11
72:21 180:7

**[mcmc - named]**                                                                 Page 18

**mcmc**  53:8,12
**mean**  13:8 15:12
  15:16 16:3,23
  18:25 19:5,8,9,11
  22:5 24:3 33:7
  34:1,2 36:13,23
  36:25 42:22 47:4
  47:20 49:11,12,17
  50:7 52:9 53:23
  54:3,14 55:10
  60:16,22 63:15
  69:5 78:3 79:19
  82:25 83:24 85:12
  86:24 88:1 89:23
  95:18 97:12 98:11
  99:11 100:5 102:5
  104:8 105:16
  107:9 108:23
  113:25 116:3,6,13
  117:10,23 120:9
  120:14 124:9,17
  127:10,16 128:14
  128:21 129:3,7,9
  129:11,21 130:6
  130:10,19 131:5,9
  131:15 132:1
  135:2,25 136:16
  136:17,18 137:14
  137:21,24 139:25
  140:3,16 141:4,17
  141:20,25 142:20
  143:12 145:12
  146:2,7 147:7
  155:7 157:9 159:8
**meaning**  105:12
  118:7
**means**  33:3,23
  36:14 54:21
  106:13 122:21
  142:3 146:3

**meant**  81:18
  138:16
**measure**  75:12
  87:7,20 128:15
**mechanism**  72:3
**media**  28:4,22
**meet**  18:20 20:6
  57:18
**meeting**  19:8,17
  20:20
**members**  18:3,6
  18:11
**mention**  52:17
**mentioned**  7:20
  20:18 22:12 49:3
  51:8 54:24 63:3
**merely**  107:8
**merge**  148:24
**messing**  43:3
  113:1
**met**  19:3
**metadata**  172:11
**method**  97:25
  144:3
**methodologies**
  48:9,17
**methodology**  48:6
  96:25 97:9 147:8
**methods**  37:10
  52:9
**metrics**  87:22
**michael**  82:10
**microphone**
  139:20
**mid**  80:15,18
**middle**  12:16
  13:19 59:2 134:15
  135:7 150:18
  156:13
**mike**  52:6

**mind**  5:21 85:22
  123:4,6,7 125:16
  128:5 144:3
**mine**  9:6 147:16
**minor**  113:13
  114:9
**minorities**  57:17
**minute**  20:18,19
  108:5 153:6
  171:14
**minutes**  24:17
  151:13
**mischaracterizing**
  161:8
**misread**  54:19
**mistake**  62:25
  69:24
**misunderstanding**
  173:1
**mode**  137:14
**model**  35:21
  152:22 153:13,21
  153:22 161:7,10
  162:11 163:12
  165:2
**modeling**  35:12
**models**  35:14
  39:10,12 124:20
  153:23
**moment**  12:25
  13:17 18:23 19:14
  21:6 126:8 137:16
  145:20
**monday**  172:6
**money**  105:23
**monitor**  4:2 94:6
  126:17,21 151:16
  151:19 171:18,22
  176:4
**monte**  43:13 48:20
  52:20 53:8 90:6

  127:6
**month**  29:8
**months**  154:8
**morning**  5:19,20
  38:1
**motion**  73:19
  156:14,19,21
  158:19
**mouth**  139:20
**move**  25:17 28:24
  93:22 152:8 173:8
**moved**  153:14
**movement**  158:2
**movements**
  162:18 165:5
  167:17
**moving**  110:22
  114:21 127:1
**mtd**  156:6 180:24
**multiple**  65:11
  143:12
**murphy**  2:24 4:18
  156:16
**myriads**  72:2

**n**

**n**  26:10,11 87:9
  179:1
**naacp**  1:4 2:2,14
  2:18 4:6 5:4 64:22
  65:1,9 66:11
  72:20 139:2 152:5
  180:7,21 181:4
  182:1 183:1
**naacpldf.org**  2:17
  2:22
**name**  5:21 21:14
  26:9 28:9,13,22
  53:12 58:16 62:3
  63:19 66:21
**named**  82:10

**names** 17:25 25:19

**narrowly** 76:8

**nassau** 149:1

**national** 90:16,23 180:16

**natural** 102:10 103:17

**naturally** 75:16

**nature** 16:9 22:24

**near** 118:16,23 120:3,5 121:7,10 121:15 141:20,25 142:2

**nearly** 38:2

**necessarily** 34:9 114:16,18

**necessary** 183:6

**need** 6:17 8:16 41:9 86:12 153:13 166:21 167:22 176:6 177:10,14

**needed** 169:3 172:9,10,16

**needs** 36:12 43:22 44:8,10,15 176:22

**nefarious** 125:17

**negative** 101:16

**neighboring** 155:21 157:16 158:11,15,21 160:8

**neither** 178:8

**nested** 35:11

**neutral** 161:13

**never** 20:8 46:8 53:21 116:14,15,20 88:4 89:20 138:17

**new** 2:12,12,16,16 50:23 57:13,25 58:4,7,19 59:10

59:14,21,25 60:3 60:3,9,21 61:3 64:7 79:25 80:6 81:2 92:6 97:6 126:8,10 142:5,12 143:13 144:8,11 147:24 148:7,22 149:11 150:11 155:21 157:15 158:11,15,21 160:7 163:15 165:6 180:1,5

**newborn** 115:20 115:23 116:1

**newly** 96:4 162:19 163:1,23

**nexsen** 2:24 17:22 18:18 19:19 23:20 25:6,16

**nexsenpruet.com** 3:4,5 181:2

**nickel** 74:4 75:4

**night** 17:3,4 41:15 41:17,25 42:3,7 44:1

**nightmare** 61:13 79:22

**nine** 105:25 106:8 135:7 136:13 154:4

**nod** 6:21

**noise** 7:22

**non** 71:25 86:7 101:25

**noncompliant** 82:21,23 83:1 168:20

**nope** 29:15

**north** 62:19 64:11 65:10,12 66:11 67:23 74:12,21

114:4

**notary** 178:4 183:13,19

**note** 62:8 66:18 78:13 133:22 134:17 161:6 173:5 181:10

**noted** 183:7

**notes** 15:19

**notice** 12:4,19,22 179:17

**noticed** 24:8

**number** 98:20 99:2,4,22 103:6 103:22 117:15,16 117:17,18,20 121:24 129:6 130:9 145:11 160:15

**numbered** 104:12

**numbers** 38:14 99:7,12,16 104:3 104:18,22 105:17 115:24 117:7,11 117:12,21 118:2 130:1,13,17 137:4 146:20

**numeric** 131:11 131:17

**nw** 2:6 3:10

**o**

**o** 26:14 87:9

**oath** 5:25 8:4,6,12

**object** 9:5,6 86:11 99:6 112:15 116:7 158:5 159:5 160:12 162:21 164:10 174:19

**objected** 86:13,16

**objection** 9:10 175:23

**obligations** 63:18 173:6

**observer** 122:14

**obtained** 72:20

**obvious** 141:3,5 163:10

**obviously** 21:10 51:1 52:18 141:24 155:7

**oc.edu** 26:12

**occ** 128:4

**occasionally** 26:6

**occur** 118:13,23 120:5,7

**offer** 68:3 87:6,8 87:19 88:12 97:8 155:10

**offered** 68:10,16 68:20 69:3,4,7 81:16 84:21 92:6

**offering** 166:12,15

**offers** 71:23

**official** 178:12

**officially** 98:4

**officials** 10:16

**oh** 17:2 20:12 21:25 23:9 43:7 53:23 56:4 62:13 75:24 80:5 101:13 102:18 105:21 110:10 118:24 125:5 129:9 133:24 134:4 139:11 141:3 148:17 153:18 154:1 176:10

**ohio** 1:15 25:25 31:11 38:9 70:6 70:11 73:4,12 74:11,20 77:5,5 79:3,10 80:23

81:7 83:4,8 84:1
86:22,25 89:7
179:24 180:8,14
180:14
**ohio's** 89:11,13
90:2,8
**okay** 6:6 7:11,13
8:4,16,23 9:4,12
9:14,22 10:2,13
11:23,25 12:7,18
12:21,24 13:7,18
14:12 16:25 19:3
19:15 20:17 21:6
21:24 22:3,7
23:12,14 27:5
28:24 29:22 31:21
32:17 33:17,25
34:13,19,24 35:9
35:15 36:7,22
37:24 41:1,19
42:18 43:23 44:13
45:6,23 48:25
50:8 51:12 52:2
55:14 58:18 59:13
59:21 60:7,15
62:11,15 63:1,9
63:24 64:5,25
65:19 66:6,13
70:10,25 71:5,14
71:18 72:6,13
73:11,14 74:3,18
75:17,23 76:10,14
77:8 79:2,13
80:19 81:3,24
82:2,5,12,19 85:6
88:6 90:3 91:4,7
91:11,14,23,23 93:1
93:21 94:12,17,20
95:9,13,22 96:17
98:5,8,19,25 99:9
100:24 101:2,15

105:4,25 106:7,8
106:16 107:17
108:4,19 109:1,6
109:10,13,17
110:11,18,22
111:7,10 113:2,3
113:8,8,22 114:21
115:8,13,19 117:4
117:19 118:3,6
119:25 120:25
121:8,12,17,23
123:9,9 124:15,19
125:7,22 126:15
127:1 129:10,24
131:8,16,22,25
132:4,21 133:2,2
133:17,24 134:6,6
134:10,13 135:5,9
135:21 136:19
137:16,19 138:1,2
138:11,18,18
139:13,19,24
140:1,6,9,13,18
140:22 141:7,19
142:4,9,11,14,15
144:11 145:10
147:17,23 148:5
149:9 150:4,10,16
150:24 151:10
152:16,22 153:6
153:23 154:3,11
154:14,20,25
155:3,12,16 156:2
156:9,10,12,18,22
157:14 158:9
160:6,19,22 161:1
161:5,5,17 162:3
162:8,8,17,25
164:2 165:9,9
166:12,15 167:15
168:14 169:9,14

170:20 171:16
173:8,17,21 175:1
175:14 176:17,20
176:23 177:2,11
177:16
**old** 22:19 28:9
156:21
**oldest** 43:21
**omit** 174:23
**once** 57:6 91:10
104:20 105:9
118:2
**ones** 26:18,20
99:18 110:7
164:23
**online** 47:9 52:14
**open** 21:23 22:1
78:6 133:18 153:4
162:1 171:6,12
172:18
**opine** 87:4 96:7
**opinion** 58:4
65:20,22 66:4,5
66:10,14,16 67:5
67:10 68:10 69:9
69:12 71:1,21
72:7 73:11 74:23
75:1,6 76:11,15
77:17,23 79:15
80:12 81:4,25
83:7 84:14 86:5
88:5 89:6,24
90:20 92:15
146:21 147:5,15
147:23 148:7
150:11 166:12,15
180:6
**opinions** 70:16
74:15,18 175:2,7
175:9

**opportunistic**
149:17,22 150:3
**opportunity** 88:10
103:19
**opposite** 153:19
157:16
**orangeburg** 138:6
138:10,13,19,19
140:1
**oranges** 163:11
**order** 37:19 64:19
73:10,19 167:6
**ordered** 174:8
**organize** 67:2,16
68:7
**organizing** 38:9
70:6 73:4,12 79:3
81:7 179:24 180:8
**original** 79:9 86:4
86:5
**osaki** 2:10 5:9,9
**osu** 26:25 27:9,11
46:6
**outlook** 26:5
94:19
**output** 99:5
**outputs** 121:10
**outside** 93:2 131:4
134:11 136:23
137:17 138:25
139:3,5 141:9
150:7
**overall** 92:8
115:10 119:3
**overseas** 42:14
**overseeing** 31:12
**oversight** 62:19

---

**p**

**p** 13:21 26:14 59:3
**p.m.** 126:18,21
151:16,19 171:18

171:22 176:4
177:20
**package** 49:7,15
50:2 52:11 53:9
53:12,18 54:4,5
54:25 55:3 97:15
119:6
**packed** 75:14
**packing** 75:12
**page** 12:16 13:19
13:23 36:7 46:3
59:5 65:5 66:14
69:11 85:7,7 95:6
98:8 105:25 106:8
109:17,18 110:22
115:9 117:14,15
117:16,18 120:10
120:20 123:9
125:4 127:1 133:4
133:6,8,8 134:6
138:2,4,12,13
140:6,18 141:8
142:14 150:18
152:10 153:12
154:4,16 155:4,16
156:25 162:3
165:10 179:3,15
182:4,7,10,13,16
182:19
**pager** 43:2
**pages** 14:4 45:21
65:23 153:9
**pairing** 125:8
**panhandle** 124:10
**paper** 22:4,5
29:19 31:18 35:8
38:20,21,25 40:12
40:15 44:13 52:19
56:5,12 97:24
98:2 123:21

**papers** 33:15 43:9
97:19 98:6,7
**paragraph** 16:6
65:8 71:14 74:9
106:9 118:7 119:2
125:3,4,7 138:16
155:16 161:6,14
161:23 165:10
166:16
**paragraphs** 162:4
162:7
**parameter** 112:7
112:10,17,18
122:21 123:4,4
128:6 145:1,4
159:20
**parameters**
111:24 112:12
113:5 119:7,22
120:16 123:2,7
127:19
**parens** 96:9
**parentheticals**
96:12
**parents** 43:19
**part** 14:9,10 35:24
36:3,6 40:2 52:8
66:25 67:7,8,14
67:17,20 68:1,10
71:18 72:15 73:15
73:22 75:23,25
78:19 82:2,12,19
84:5,8,13,19 86:2
87:5 88:7 92:1
98:13 116:13
153:9 155:13
156:11
**particular** 41:8
54:16,17 56:23
86:10 92:20 96:6
166:5,19 168:1

**particularly** 67:25
87:22 89:12
148:16
**particulars** 56:24
**parties** 18:13
**partisan** 30:12
32:13 45:11 87:7
87:20,21 132:5,24
143:2,17
**partisans** 75:10,13
**partisanship**
132:18 143:14
144:23,25 145:7
145:14 146:9
**party** 70:12 91:3
143:9 169:1 178:9
**party's** 174:14
**passed** 11:8,15
168:10
**passing** 22:13
**path** 125:10,13
**patricia** 2:5 5:1
**patrick** 5:23
**patterns** 92:5
**pause** 106:12
126:15
**pd** 114:21,22,23
115:8 140:6,11
**pdf** 39:20 40:21
**pdfs** 39:18
**peak** 118:16,23
120:3,8,13 121:7
**peaks** 118:12,13
120:6
**peer** 46:9,13 47:14
78:5,14,15,21,24
97:19 98:3,6,7
123:21 124:19
**pending** 79:9,20
80:22 178:10

**people** 18:9 23:16
27:1 33:12 56:21
81:9 114:17
116:12 119:4,12
122:20 128:4
146:11 147:12
**percent** 120:12,13
120:14,21,23
121:2,5,7,9,20,21
129:12,13 134:19
134:24 135:3,7,15
135:15 136:12,13
139:23 142:17,19
164:22 169:2,6
**perfect** 162:8
**perfectly** 88:5
115:9
**perform** 130:25
**permit** 69:19
**permits** 69:24
**persist** 123:10
**persists** 124:4,21
**person** 7:1 18:9
20:7 31:14 82:10
114:8 159:7
**personal** 25:18
28:4,8 124:16,17
**perspective**
122:17
**persuaded** 41:12
133:1
**petitions** 150:25
**ph** 17:9 128:4
**ph.d.** 29:1,5,23
46:6 50:11 52:9
78:4
**phone** 19:8,20
20:9,14,21 24:18
**phrase** 75:19
78:18

phrased 7:15
picked 165:5
picture 83:24
pictures 113:16
 123:24
piece 42:25 44:24
 84:21 92:14
pieces 34:13 96:1
places 168:25
plaintiff 1:16 2:1
plaintiff's 57:7
 73:19 96:4 131:18
 156:14 171:9
 172:4,13 173:14
plaintiffs 1:5 4:15
 5:2,4,8,10 10:22
 15:6,8 21:12 24:8
 27:14 57:16 63:12
 73:8 84:22 116:17
 122:3,4 130:14
 171:5 177:3
plan 57:14,15
 81:12 82:15,24
 84:3 85:11,13,14
 86:7,8,23 87:11
 87:16,25 88:20
 89:2,3,4,7 121:9
 135:12,25 136:3,6
 136:22,24 137:1
 137:15,17 139:2,3
 139:5 140:3,10
 141:8,10 144:17
 162:19,20 163:2
 163:13,14 164:4,6
 168:2
plans 82:15,18,20
 82:22 83:18 84:1
 85:25 88:25
 114:19 120:22
 130:24 136:5

platform 49:14,19
play 146:22
played 146:15
 163:7
please 4:10 5:22
 13:20 72:18 86:13
 86:17 102:23,23
 176:7
point 8:17 9:14
 24:11 38:15 45:7
 62:8 83:17 88:15
 93:5 100:4,8,10
 100:10,16 101:17
 101:21 102:2,3,14
 102:18,19,24
 103:2 109:13
 114:14,15 115:13
 116:9 120:1,21
 131:7 139:1
 143:19 145:5
 161:21 172:25
pointed 82:17
 93:2 120:19
points 172:1
polarization 21:15
polarized 92:11
 92:13,22 93:14,14
 154:19 166:19,25
political 29:1
 30:10 32:23 35:14
 62:19 75:7 79:4
 143:7,9 146:9
 151:2 157:3,11,20
politics 129:17,20
 148:22
politics.com.
 26:15
polsby 123:6
 128:5
popper 123:6
 128:5

population 72:1
posed 170:22
posit 128:9
position 171:9,12
 173:10
positioning 130:5
positive 51:22
 56:2
possibility 78:6
 157:25
possible 87:10,15
 87:24 88:19,24
 89:11,19,24
 105:11 118:14
 120:15 141:24
 158:4 159:8,14
 165:2,8 172:10
possibly 89:15,17
potential 10:15,21
 161:7,9
power 43:14 84:1
practice 175:2,8
practicing 147:19
precinct 65:14
 69:19,24 91:2
 107:12,12,18,18
 157:4
precincts 69:21
 72:1 118:15 149:2
 152:20 162:9
precise 33:14
 49:19 129:5
predominate
 127:24
predominated
 127:21
prefer 55:10,13
 111:16,24 112:8
preference 112:3
 119:17

preferences 113:2
prefers 111:13,21
 112:11
prepare 24:11
prepared 174:10
present 3:19 32:20
 32:25 67:2,16
 68:7 164:5,17
presented 46:18
preserve 158:23
 158:25 159:1,13
preserving 157:3
 157:11
presidential 76:8
presumably
 153:22
pretty 43:14 63:7
 91:9 144:1 149:2
 163:10
prevent 6:3 68:7
previous 93:16
 162:19 165:6
 174:17 175:18
previously 133:20
 163:13,18 164:1,4
 164:6,15
primarily 50:1
print 47:11
prior 169:20
 175:21
prioritized 157:2
privileged 16:16
 17:19 18:19
pro 82:18,23
 83:12,13,19,20
 86:1
probability 10:8
 125:6 142:24
probably 19:25
 20:13 22:9 23:22
 24:2 28:11 29:21

32:3 45:22 56:17
60:13,21 66:2
71:4 112:14,16,20
123:7 124:11
133:12 138:16
173:22
**probative** 93:3,6
93:11
**problem** 52:10
133:14 163:10
**procedure** 173:23
173:25
**proceed** 171:14
**process** 81:22
102:6 104:6
109:12 111:13
**produce** 15:8 16:8
16:10 54:10 98:25
99:5,9,16,22
102:7,25 103:1,21
104:9 105:15
109:4,6 110:8
117:4 120:17
130:13,16 131:16
133:5 135:10
136:2
**produced** 15:6
89:22 99:3,12,19
99:23 100:8 101:7
103:14 104:12,22
108:25 109:22
111:7 112:12
127:8 138:10
164:1 168:24
**produces** 100:5,17
101:22 103:15
109:20 136:5
**producing** 131:25
**professional**
124:23

**professionally**
124:9
**program** 46:6
49:3,14,14,16,21
49:24 52:20 54:25
55:6 56:21
**programmed**
122:22 150:2
**programming**
55:3,3
**programs** 169:23
**prohibited** 155:4
**project** 33:13
34:11
**prong** 65:16
**pronouns** 58:16
**properly** 146:23
147:1,9 151:8
154:24
**property** 146:14
**proportion** 120:7
**proposed** 127:5
**protected** 64:15
**protection** 154:13
**protective** 64:18
**protrusion** 114:4
**prove** 125:20
**provide** 96:15
107:17 174:12
**provided** 127:4
**pruet** 2:24 17:22
18:18 19:20 23:20
25:6,16
**prying** 112:18
**public** 56:18 178:4
183:19
**publically** 16:8
17:8
**published** 47:9
97:19,24 98:4

**pull** 12:7 13:16
34:23 58:21 65:5
66:6 70:13 95:3
142:6 152:16,23
153:1 156:9
**pulled** 105:10
112:5 142:12
**pulling** 37:24
91:23
**purport** 125:21,24
**purports** 75:12
**purpose** 125:17
126:2
**purposefully**
165:12
**purposely** 167:5
170:4,9
**purposes** 40:21,25
41:3
**put** 51:7 52:14
63:25 70:3 72:10
76:22 81:3,20
100:20 118:25
119:1 131:10
143:5 149:16
153:19,20 160:15
165:24 171:8,12
172:3,18 173:10
**putting** 90:11
133:18 165:21
170:23
**pyan** 2:8

**q**

**qualifications**
78:1
**qualified** 67:2,16
68:6,13,25 97:10
97:12,16
**quantitative** 47:17
47:19 76:4

**question** 7:1,14,16
8:18 9:9,15 17:11
43:17 49:1 54:3
84:4,11,13,18
86:4,6 89:1
111:19 115:10
121:12,23 127:16
127:23 129:12,13
150:5 168:17
170:22
**questioning**
171:15
**questions** 6:4,11
6:11,19 7:3,9 8:19
9:6 30:10 32:24
38:3 52:7,12 93:7
147:21 164:25
170:21 172:1
175:25
**quibble** 121:14
**quick** 58:14
126:15 171:14
**quicker** 63:16
**quickly** 65:5
**quote** 30:8 32:11
70:15,20 72:7
79:9 96:12,13
134:18 135:10
140:23 151:5
167:5 170:4

**r**

**r** 25:24,24,24,24
26:11,14,14,14
49:4,9,10,12,14
49:16,18,25 55:13
56:7 87:9 96:8
98:24 99:6 182:3
182:3
**race** 57:23 127:23
128:1 129:21,22
132:17 146:8,14

146:15 147:10
161:11,13 162:14
163:2,4,7,9,14
164:4,5,6,7,12,15
164:16,17,18
165:3,6,12 166:21
167:6,22 169:5
170:5,10
**raced** 165:6
**races** 146:22
**racial** 10:14,18,20
21:15 35:16,25
36:2,25 51:4,14
57:17,19 92:5,10
118:15,23 120:3,5
120:7 127:22
132:8,23 145:22
146:4 151:7 154:9
154:18,19 166:19
**racially** 93:13
166:25
**radically** 102:11
114:16
**raffensperger**
77:3,9,13 180:12
**ragusa** 21:13
39:13 48:10,24
96:8,11 152:3
158:1 160:23
162:18 169:23
180:20
**ragusa's** 55:18
152:10,12 155:13
155:17 157:24
158:9,14 161:2,7
161:10 162:10
165:2
**raised** 146:13
147:12
**raising** 161:9

**ran** 37:7 98:23
100:11 130:1
144:16 162:10
165:2
**random** 98:20
99:2,4,22 101:4
101:19 103:5
104:8,10 106:11
106:17 108:6
110:2 117:20
118:2 164:21
**randomly** 109:19
120:14 122:20
**randomness**
119:11
**range** 20:17
**rankin** 3:7 4:25
**rarely** 123:18
**rational** 146:2
**rcp** 28:20
**reach** 150:19
**read** 12:15 13:18
15:15 21:12 53:16
59:1 65:8,22,25
66:24 69:15,16
71:3,5,18 72:18
73:17 74:18,23
75:23,25 76:10
77:19 81:24 82:2
82:12,19 84:5
85:8,21 87:5 92:1
96:1 118:17,20
142:21 143:3
146:21 148:4
150:11 157:1
158:18 161:22
173:25 174:7
176:7,14,15
177:18 181:9
183:5

**readable** 150:17
**reader** 103:3,13
155:10
**reading** 83:10
85:15 174:22
176:11
**ready** 94:10
**reagan** 90:17,23
91:7 180:17
**real** 7:24 58:14
**realclearpolitics**
26:13,24 27:4,12
28:10 46:24 47:6
48:1 50:15
**realize** 9:22
**realized** 36:19
**really** 35:23 54:7
114:20 116:5,9
148:20 149:7
151:11
**rear** 3:22
**reason** 7:16 8:17
41:9 109:6 140:4
141:15 143:14
146:25 147:8
150:13 164:3
181:11 182:6,9,12
182:15,18,21
**reasonable** 103:13
114:8
**reasonably** 125:16
**reasons** 133:19
**rebut** 88:4,9,16
90:12
**rebuttal** 13:21
90:10 123:24
145:19
**rebutted** 90:13
**rebutting** 87:8,23
153:8,10

**recall** 23:15 78:8
78:10 81:11
**receipt** 181:18
**receive** 10:24 29:5
29:22 172:11
**received** 24:24
34:20 37:25 61:9
95:17
**recess** 94:4 126:19
151:17 171:20
**recitation** 173:5
**recognize** 12:13
12:25 13:18,24
35:5 59:10 95:6
**recollection** 15:7
33:23 70:24
117:25
**record** 4:2 5:22
6:20 7:25 9:11
21:25 34:20 37:25
38:12 94:2,3,7,10
94:12,21 126:17
126:18,21 133:18
133:20,23 151:16
151:19 170:23
171:9,13,18,19,22
172:2,3,19 173:10
174:7 176:3 178:7
**recorded** 4:4 6:12
71:21
**recreate** 104:7
105:11,20
**recreating** 105:23
**recreation** 36:15
**rector** 2:16
**red** 134:15 135:6
**redist** 47:25 49:3,6
49:13,15 50:2,4,8
51:4,15 52:3,22
58:4 97:15 180:5

**redistricting** 10:9
10:17 30:11 32:12
35:19 36:23 37:22
38:25 45:10 46:14
46:19 47:4 49:7
51:19 52:18 57:14
57:15 58:8 74:11
77:5 89:5,13
97:19 114:19,19
123:25 162:14
166:7 180:15
**redone** 36:12,21
44:15,24
**redrawn** 153:14
**reduce** 156:3
**reducing** 158:3
**refer** 11:13,21
14:7 32:9 33:12
49:13 95:11
129:18
**reference** 16:7
**referenced** 15:5
16:1 17:6,10
21:10 82:3 181:6
**references** 66:20
**referred** 124:13
**referring** 85:25
96:10
**refused** 70:16
**refusing** 41:5
**regarding** 13:8
46:13,19 96:4
**regional** 39:3
**registration** 36:17
68:4
**regression** 47:21
152:19
**regularly** 174:14
**rejected** 77:13
**related** 27:16 72:2
172:12 178:9

**relates** 11:5
**relating** 65:18
**relative** 127:8
130:5,18,18,20,25
**relatively** 71:24
**relay** 88:2
**relevant** 83:15,18
84:7,11,18 85:2,5
93:13,13,17 125:1
131:19,24 132:2
**reliability** 72:23
**reliance** 145:13
**reliant** 143:7
**relied** 15:9 17:6,12
17:13,14 21:7
27:13 97:25,25
109:9
**rely** 15:3,13 22:6
**relying** 107:22
**remaining** 29:19
**remember** 9:15
21:14 42:23 56:22
58:16 59:17 61:22
65:3 73:9,11 74:6
77:10,25 80:7
90:22 103:24
109:1 153:17
156:21 163:22
**remembered** 78:6
**remotely** 4:8
137:13
**render** 132:18
**rendered** 77:23
**rendering** 113:13
**reopen** 106:6
**repeat** 7:17 96:22
**repeated** 115:25
**repetitions** 119:19
**rephrase** 100:22
128:25

**replicate** 53:25
104:10,11,15
**replicated** 56:7
**replicating** 154:24
**replication** 56:3
**reply** 88:10
**report** 11:13,22
13:13,21 14:3,10
14:15 15:1,4,5,9
15:17,20,23 16:2
17:6,11,12,15,16
17:21,24 21:7,9
21:11,23 24:14
29:4 30:8 32:11
37:8,11 39:10,13
48:7,18 49:4
50:21,22,22,23
51:16,25 52:23
55:16 56:13 57:25
58:11,13,19 59:3
59:14,18,22 60:1
60:4,5,8,9 61:4,9
61:15,18,20,25
62:8 63:5,10,25
65:6 68:13,21,25
70:3,14,20 72:10
73:1,5,20,23 74:8
74:15 76:24 77:12
79:7,8 80:20 81:5
81:19 87:17 88:2
88:13,21 90:10,21
91:20 92:15,16
94:25 95:7,14,17
95:17,22,24,25
96:7,9,11,11,25
97:21 98:9 99:15
100:2,15,20 101:4
101:11,12,20,24
102:1,3,5,17
103:4,8,9,16,23
104:3,6,19 105:14

105:17 106:1,4
107:21 108:9,20
110:5,8 111:2,15
113:11 118:6
123:10 126:8,10
126:12 127:2
129:24 130:6,9
131:10,14 132:22
133:4 138:5 140:9
142:5,11 145:19
151:25 152:3,9,10
152:12,13,15
153:1,10 155:3,14
161:6,15 165:10
165:16 166:2
167:2 174:3,10,15
179:18 180:2,18
180:20
**reported** 1:17
76:4
**reporter** 4:11 5:11
5:13 6:12,18,20
6:24 55:21 86:12
86:16,20 139:15
139:17 176:6,10
176:17,20 177:2,6
177:11,16 178:1,3
178:24 179:10
**reports** 21:11,13
50:18 51:3 57:1
61:22 62:7,14,21
64:7,9 65:9 74:10
94:15 96:3
**representations**
172:17
**representative**
81:12,23
**representatives**
11:17 96:6
**reproduce** 104:5
105:2 117:8

131:20
**reproduction**
138:13
**republican** 76:7,9
83:12,19 84:3
87:12 149:1
**request** 42:10,17
172:10,11 173:7
**requested** 24:1
94:16 179:12,13
**requests** 173:4
175:10
**require** 43:13
148:24 175:20
**required** 72:3
167:9,17 174:2
183:13
**requires** 8:8 41:7
165:18 167:11
170:15
**requisite** 160:15
**rerunning** 45:5
**respect** 96:18 98:9
150:6 154:15
163:9 165:12
167:1,5 169:5,12
170:5,10 172:14
174:1 175:6,17
**respond** 94:17
152:1
**responded** 94:22
**responding**
153:16
**response** 58:23
152:17,18
**responses** 6:18
**responsible** 50:1
128:7
**rest** 7:3 11:20
**result** 101:3
112:14,16,17

125:9
**resulting** 54:4
99:1
**results** 99:22
101:19 102:17
127:13 161:11
163:8 164:23
165:5
**retained** 174:12
**retention** 125:11
125:12
**return** 172:8
181:13,17
**returned** 161:10
**reveal** 18:19
**revealing** 16:15
17:19
**review** 21:8 34:22
38:2 46:9 52:18
78:15 96:3 98:3
155:6 171:7 181:7
**reviewed** 24:14
47:14 78:5,14,21
78:24 95:9 97:19
98:6,7 123:21
124:19
**richland** 113:9,11
113:12,17,23
140:19,22
**ridiculous** 126:14
**right** 6:8 7:6,18
8:10 13:5,23
14:16 19:2 20:12
20:15,16 21:17
27:24 28:20 29:2
29:6 30:3,13,17
30:20,23 32:14,15
32:18,19,22 33:17
34:14,15,18 36:2
36:5,10 37:8,12
39:8,11,14 44:20

46:1 47:4,7 48:13
48:14 49:4,5,24
50:3 52:16,21
54:11,24 56:25
57:2,7,8 59:7
60:10 64:9,19
66:13 67:5 69:2
72:8,9 73:3,5
74:12,13,16 75:21
76:16 77:14 78:13
79:5,6,11,12,14
80:4,5,20,24 81:9
82:10 85:21 87:16
91:6,7,9,17 96:2
96:23 97:15 98:3
98:11,12,15,16
99:17,18 100:6,12
100:13,18,25
101:1,21 102:18
105:6 106:23
108:2,3,21 109:25
110:1,14 111:3,9
113:14,15 114:14
114:24 115:2,11
115:15,20,21
116:5,16,19,22
117:13,14 118:10
118:11,17 120:8
120:19 122:2
123:12,15 125:10
125:19,23 128:12
128:15 129:3
130:2,3,8,11,12
131:13 132:9,10
132:24 134:11,20
134:21,25 135:1
135:12,13 136:21
137:3,22 138:22
139:10 140:7,8,12
140:17,24 141:14
142:21 143:4,9,10

143:16,20 144:10
144:13,19 145:9
145:15,24 147:24
147:25 148:3,9
150:8,9,21 151:2
151:3 153:11,19
155:18,19 156:1,4
156:23 157:12,18
157:19 158:12,13
158:16,17 159:3,7
159:15,18,19,21
161:4,13,25
162:11,12,16,20
162:22 163:4,11
163:15,19,20,25
164:14,18 165:13
165:16,19,23
167:14 168:7,8,11
168:24 169:13,17
169:21 170:16,19
171:23 174:6
175:11,15,16,21
176:3,15 177:18
177:19
**rights** 46:16,21
57:1 65:17 67:22
68:5,8,10,15,17
68:23 69:4,7
166:6
**rmg** 1:6
**rodden** 87:18 90:6
**rodden's** 88:17
89:12
**roddens** 87:9
**room** 4:19
**roosevelt** 3:20
**rough** 177:1,4,14
177:14
**roughly** 106:13
135:17

**[round - september]**

**round** 80:1
**rounds** 81:1,2
**routinely** 123:24
**row** 76:14,19
**rucho** 58:2 180:4
**rule** 41:7 67:6
  173:25 174:7,22
  174:24 175:19
**rules** 6:7 8:23
  159:7 173:23
**run** 45:23 49:7
  56:7 97:13,17
  107:24 163:5
**runs** 49:14

**s**

**s** 2:15 26:10,14
  49:4 55:20 62:4
  87:9 96:8 114:24
  179:14 182:3
**sake** 6:21
**samantha** 2:10 5:9
**sample** 98:23
  99:20 100:11
  102:15 103:21
  104:9,10 105:13
  108:14,18,20
  109:5 111:18
  112:5,6 116:12
  120:12 136:25
**sampled** 99:25
  105:5,9,15 108:5
  109:19,24 111:11
  115:23
**samples** 104:7
**sampling** 98:14
  100:19,25 101:4
  101:19 102:14
  105:12 110:3,12
  110:19,24 113:20
  115:1 116:21,24

**san** 17:9
**saturday** 43:20
**saw** 69:6 89:20
  162:13
**saying** 16:5 37:25
  41:1 101:10
  103:15 119:2,20
  132:22 136:22
  138:11,24 139:23
  147:13 149:5
  153:24 154:1,2
  158:19 160:5
**says** 29:4 37:19
  44:14 59:19 67:15
  68:19 84:24 92:20
  93:4 103:14
  113:11 143:5
  148:1 150:18
  156:14 158:23
  174:8
**scale** 19:9
**sceptical** 149:2
**schedule** 22:17
  29:20
**scheduled** 22:18
  29:14
**scheduling** 22:20
**scholarship**
  123:14
**school** 43:21 44:8
  44:10 51:19 56:18
**science** 29:1 35:14
**scope** 175:7,9,9
**screen** 12:8 14:11
  38:16 95:12 174:5
**scroll** 13:25 36:7
  85:16 153:2
  154:11
**scrolling** 59:1,9
  95:23 153:8
  156:12,25

**seal** 178:12
**sean** 1:11 4:5 5:15
  5:23 12:17 13:21
  23:9 26:10 28:15
  59:3 92:3 179:5
  181:5 182:2,24
  183:2,4,12
**seant** 28:20
**seantrende** 26:11
  28:19
**search** 27:11
  58:15
**second** 7:20 8:5
  35:8 50:7 54:20
  58:22 70:12 72:13
  80:2 93:3 109:18
  139:13 142:5
  161:20
**section** 36:14
  85:10 86:25 87:4
  93:23 109:13
  113:22 115:8
  116:17 152:9
  153:24,25 154:4
  154:15,16,25
  155:6
**sections** 152:12
**see** 12:9,10 13:23
  14:11 35:3 38:5
  47:22 58:17,22
  61:16 62:18 63:4
  64:8,15 65:6 66:7
  66:16,18,20,23
  69:13 71:14,17
  72:14,15 73:15
  85:24 91:24 95:16
  96:9,10 99:11
  104:3 107:10
  109:3,12 113:11
  114:1,22 117:15
  117:16,17,18,19

119:18 123:18
  124:1 128:20
  129:1 133:11
  134:8 135:5 138:7
  138:8 140:20
  142:9,15 150:17
  150:20 154:1,1
  156:10,13 161:23
**seed** 103:25
**seeing** 163:5
**seeking** 156:3
**seeks** 159:21
**seen** 13:1 89:21
  90:5,9
**sees** 103:13,15
**select** 119:6 150:2
**selected** 106:10,16
  119:9
**senate** 3:6 4:24
  61:23 177:13
**senator** 82:15,17
  85:13
**send** 27:16 31:16
  38:14 40:18,20
  41:5,8 42:11 62:7
  62:11,13 64:16
  176:18,25
**sense** 6:14 22:11
  116:11
**sent** 13:2 27:6,24
  42:15 64:10
  181:14
**sentence** 33:8,10
  34:16 78:17 85:15
  85:22 88:4 103:15
  118:25 143:5
**separate** 43:2
**separating** 146:8
**september** 82:16
  82:16

sequential  48:20 127:6
sequentially  73:6
seriously  147:22
serve  76:4
served  166:5
set  52:10 72:14 103:25 169:1
settled  73:7
shape  17:7 119:19
share  12:8 38:16 95:12 174:5
sharing  12:24 106:2
shaw  11:2 69:8,10
sheet  181:11
shifted  154:10
shocked  53:11
short  62:21 93:23 151:10,11,12,12
shorter  20:21
shortly  172:7
show  21:24 34:21 73:14 85:9,13,16 90:20 100:9 107:18 109:14 133:6 150:4
showed  39:17 76:20
showing  82:20,22 83:1 84:23 85:25 86:22 133:5 164:22
shows  28:20
side  37:3 51:8 57:7
sign  176:7,14,16 177:18 181:12
signature  178:23
signed  11:16 64:16 174:11 181:20

significant  161:11 164:23 165:4
signing  176:11
sim  145:2
similar  110:19 113:23 114:9 120:18 122:9,10 135:11,24 136:22 137:2 138:6,20,23
similarly  7:8 9:22
simply  9:10 100:4 102:19 128:19 143:5 158:14,15 165:5
simulate  113:5
simulated  134:23 141:25
simulation  37:7 97:13,13,17 98:10 111:24 112:7 122:19 136:5 164:5,15,18
simulations  30:11 32:12 43:13 45:10 48:15,23 49:8 51:19 62:21 81:18 81:20 87:18 88:14 89:16 96:24 102:9 114:19 122:13 127:11,13 136:2 144:15 145:4,18 163:3,5,14 164:7 164:9,12 165:3
simultaneous  83:22 100:7 102:21 103:11 131:2 137:11 139:14 159:24 160:1 168:15
single  129:12 167:12 170:2

sir  96:21 139:17
sitting  8:13
six  28:12 103:17 104:13 105:10 108:11,13,18 142:19
skenny  3:12
skill  46:3
skimmed  21:13,18
skip  133:17 138:4
skipped  96:9
slate  123:19,25 124:13
slight  114:2
slightly  49:1 114:6
slits  160:11
small  121:24 135:15 143:2
smaller  137:25
smc  51:22 52:19 52:21
social  28:4,22
software  112:25 119:5 120:17
solutions  181:23
somil  2:4 4:13
son  172:14 173:1
son's  44:10
soon  172:10
sorry  14:10 19:7 20:12 21:25 22:16 23:9,14 25:14 27:10 31:6 37:14 38:17 40:2 44:14 54:2,19 58:24 68:20 72:13,14 75:24 83:23 85:24 90:11 95:23 100:21 101:16 102:2 106:5 108:15 109:17

111:15 112:2 117:10 118:21 126:17 128:23 130:19 136:4 138:5 139:8,8,11 142:6 144:20 160:3 164:11,24 168:16 176:8,10 176:20
sort  37:7 47:19 54:8 97:11
sound  23:10 154:5
sounded  81:17
sounds  21:17
source  72:21
south  1:2,4 2:2 3:2 3:3,13,17 4:5 10:16 11:6,18 18:3,6 59:22 60:4 96:5 143:20 146:8 160:14 178:4,13 181:4 182:1 183:1
southwest  124:14
spatial  30:9 32:23 35:13,13,21
speak  6:17 8:24 17:20,25 18:14 126:24 151:23
speaking  9:4 47:5 83:22 84:23 85:3 100:7 102:21 103:11 116:2 128:13 129:10 131:2 137:11 139:14 159:24 160:1 168:15
special  43:21 44:8 44:10 52:24 97:6
specific  125:5
specifically  175:10

specify 84:4
spell 26:7 58:16
spelling 26:9
spend 33:9 47:1
  105:22
spit 112:3
split 111:13,16,25
  112:1,6,9,11
  155:24 159:2,25
splits 156:4 157:8
  158:4 159:21
  160:9
spoke 18:17 23:16
  176:8
spreadsheets
  15:19
squares 36:18,20
stand 84:20 164:3
standard 4:3
  128:17 130:10
  132:1 137:20,24
  140:2,2,13,14
  141:12,13 142:19
  143:12 145:11
  146:1,20 177:15
standing 84:20
stands 80:4
start 14:18,25
  114:18 144:20
started 6:3 14:20
  16:21 18:24 36:19
  61:23 94:10 95:14
starting 21:9
  85:22 98:8 133:6
starts 69:16
  152:10 154:4,16
  163:22
stata 54:21,21,25
  55:8,15,19,24,25
  56:6,8,9

state 1:4 2:2 4:6
  10:16,17 11:5,15
  11:17 13:8 18:3
  31:11 34:19 55:19
  57:22 61:23 63:23
  66:11 67:23 68:2
  75:11 81:15 88:24
  119:21 178:4
  181:4 182:1 183:1
stated 133:20
statement 160:17
states 1:1 67:3,17
  68:3,14 89:2
  115:20,24
static 7:22
stating 5:21
statistical 167:25
statistically
  161:11 163:8
  164:22 165:4
statistics 30:10
  32:23 49:22 55:11
  116:10
stayed 22:23 23:4
  160:23
stays 161:2
stephen 3:8 4:23
  177:12
stick 121:25
stiffed 25:12
stipulate 37:3,4
  127:12 129:16
stipulated 174:8
stipulation 60:13
  67:8
stop 172:15
stopped 12:24
story 138:6,20,24
straightforward
  43:18

strata 54:11,12,15
street 2:6,11,16,20
  3:2,16
strende 26:13,24
strike 84:1
strivedi 2:7
stronger 127:18
  128:8
struck 148:2
students 32:5
studied 123:17
studies 124:20
study 78:14,21
studying 124:7
stuff 15:13,16
  61:23 173:7
subdivision 157:4
  157:11
submission 152:5
  180:22
submit 87:23
submittal 83:14
submitted 14:15
  58:18 59:14,18
  60:7,9 61:4,19
  75:20 79:17 80:19
  81:8,13,17 83:14
  87:14,17 88:1,18
  88:20 90:10
subscribed 183:14
subsection 174:24
substance 15:17
substantially
  114:9 122:9
substantive 8:25
  15:10,12,16 22:11
  22:24 152:2
substitute 76:4
sufficient 77:16,21
  78:7

suggest 102:5
  120:11 123:23,24
  137:13 163:6
  166:21
suggested 81:22
  86:21 127:5
suggesting 93:11
  93:12
suggests 86:14
suite 2:20 3:3,16
summarize 69:9
  127:7 143:11
  155:12
summary 153:12
summer 30:2,2
sumter 110:22,23
  111:10,16 112:3
  141:7
sunday 43:20
support 144:6,7
supporting 124:20
suppose 33:21
  165:8
supposed 9:9 88:3
  88:15,16
supreme 79:10
  80:23 86:15,22
  91:10
sure 6:9 7:9 16:11
  22:11,12 27:21
  28:10 48:12 54:23
  56:1,6,20 62:13
  64:12,14 71:12,13
  73:13 77:22 84:19
  85:18,18 87:21
  89:10,10,11 90:1
  100:22 105:8
  112:22 117:24
  128:16 136:9
  148:11 152:24
  154:7,23 161:20

[sure - think]    Page 30

169:7,8,24 177:7
**surely** 110:6
**surprise** 53:7
80:16 122:18
137:23 140:15
**surprising** 116:11
136:1,23
**surrebuttal** 88:11
**surrounding**
153:14
**survey** 68:2
**survived** 81:1
**swear** 4:11 5:13
**switch** 39:23 40:4
**sworn** 5:16 183:14
**sykes** 81:12,23
82:16,17 85:13
93:17
**system** 90:6
**szelgia** 62:4

**t**

**t** 26:11,14 49:4
55:20,20 179:14
182:3,3
**table** 72:24
**tabs** 161:25
**take** 6:18 8:13,16
8:20 14:6 58:12
60:6,12,15 67:8
85:12 91:22 93:23
94:1 95:12 106:9
109:23 111:18
120:1 126:15,16
129:14 147:22
151:10 155:20
157:6,15 158:11
158:15,21 160:7
171:13
**taken** 1:16 8:5
82:25 94:4 108:14
108:18 126:19

151:17 171:20
**takes** 157:24
**talk** 6:25 32:4,5
64:5,6,25 70:10
74:3 126:1 134:7
138:18
**talked** 21:6 31:25
51:9 61:17 126:8
145:20
**talking** 11:12
135:14 136:20
137:10 144:8
166:16
**target** 128:10,14
128:20 129:1,7
**tb** 155:1
**teach** 43:19 48:13
48:23,23 52:2
166:11
**team** 49:9 52:13
144:2
**tech** 7:21 8:1
142:6
**technical** 23:8
**tell** 8:8,17 9:17,23
12:8 26:7 35:9
49:6 54:25 74:25
86:7 127:3 129:6
131:8 133:14,21
152:25 161:7
172:4
**tells** 53:17 120:6
**temporal** 35:13
**ten** 19:24 20:13
98:18,19 99:7,7
99:16,19,20 100:1
100:2,11,14,19,25
101:3 102:15,16
103:16 104:3,7,10
104:15,18,22
105:5,10,12,15

106:10,17 108:5
108:19 109:4,19
109:24 110:19,23
111:1,11,18,25
112:5 113:20
115:1 116:24
117:5,21 151:13
**tens** 20:20
**tense** 32:20,25
**term** 33:22 45:4
120:2
**terms** 113:2
119:13 165:9
**terribly** 116:11
**test** 67:13
**testified** 5:16
56:25 65:15 69:18
174:18
**testify** 25:8 72:23
**testifying** 5:25
**testimony** 65:16
66:4 68:22 69:6
87:8 88:9 174:13
174:15 175:18,19
175:21 181:9,18
183:8
**text** 27:25 138:20
150:17
**texts** 27:16
**thank** 5:19 86:20
94:23 118:3
151:11 152:8
171:23 173:11
177:8,11,16
**thankfully** 52:13
**thanks** 66:17
95:21
**theory** 128:9
**thereof** 178:10
**thing** 53:15,21
65:25 106:13

121:18 138:3
142:23 165:9
**things** 6:8 16:9,21
26:25 30:3 34:8
43:14 116:12
125:2 144:6
145:17 146:10
147:1,12 171:3
**think** 7:3 10:2
13:17 15:10,21
18:23 20:9,11,18
22:21 23:9 26:10
26:18 27:18,20,21
28:19 33:2 37:2
41:7 44:18 48:11
49:25 50:1 51:2
51:17,22 52:6,21
53:1 55:22 60:20
61:2,5,7 62:2,4
63:3,7 64:9 68:16
69:7 71:8,10 73:6
73:7 74:20 75:13
79:24,24 80:1,9
80:15,25,25 81:13
83:16,17,17,24
84:6,7,7,11,12,13
84:15 85:4,5,25
87:2 88:6,8 89:8
89:18 90:4,5
91:13 92:24 93:11
93:21 96:21 97:23
98:3,23 99:3
102:8,13 103:7,12
103:12,16,16
104:24 105:9
107:9 114:7,17
115:17 116:10,12
119:12 120:9
122:11 124:1
125:1 129:21
130:15,15 131:7

131:19,24,25
132:3,16,20,25
138:15,15 139:21
140:4 141:3,5
145:1,3 147:9,11
148:10 149:7,11
149:13,14,15,16
150:1 152:22
153:15 154:22
155:9 157:19,24
159:6,17 165:15
168:12,21,22
169:4,6 170:20
174:5 175:4
**thinks** 166:8
**third** 18:13 80:2
91:3
**thirty** 136:10
**thomas** 1:7 3:6 4:7
4:24 181:4 182:1
183:1
**thoroughly** 34:22
**thought** 84:2 85:2
86:22 88:23 91:4
93:17 136:10
138:1 140:16
153:8
**three** 26:5 33:15
34:8 36:16 44:22
80:9 81:1 86:3
130:22 135:7
**time** 1:14 4:2,3
7:13,13,24 10:7
14:9 18:22,25
19:1 22:23 23:4
24:9 31:18 33:9
33:21 34:22 37:18
41:13 42:19 46:8
47:2 54:5 55:5,7
55:14 56:9,11,14
56:15,16 60:8,18

63:6 66:1 71:5
78:20 79:16 94:5
95:11,12 123:18
126:17,20 127:12
139:17 142:7
151:11,15,18
155:4,11 171:7,17
171:21 173:2
176:3 181:19
**timeframe** 181:8
**timely** 171:3
**times** 7:5 10:5
14:8 18:20 19:4
19:19 20:3,6
23:15 139:11
165:15
**title** 133:13
**titles** 104:4
**tjh** 1:6
**today** 5:25 6:4
8:13 13:1 21:22
24:21 109:7 171:1
171:24
**today's** 4:3
**toggling** 54:20
**told** 23:18,25
172:6,8,13
**tool** 47:23
**top** 36:8 51:1
68:20 85:7 133:7
138:13 156:13
166:1
**topics** 173:19
**totality** 67:13,21
**tough** 135:5
**track** 146:21
**training** 124:18,24
**transcript** 3:22
6:13 8:1 94:2
176:23,25 177:14
177:18 178:6

181:6,20 183:5,8
**traveled** 43:20
**traveling** 44:6,12
**travelling** 44:8
**traverse** 159:1
**traversing** 159:9
**treated** 74:15
**trende** 1:11 4:5
5:15,19,23 12:17
13:13,22 28:15
34:25 38:7,13,19
57:25 58:22 59:3
65:6 66:7 67:2,15
69:18 71:23 72:19
73:20 82:14 87:6
91:24 92:3,9
93:25 94:9 95:4,4
126:23 151:21
170:22 171:3,24
172:5,22 173:13
173:21 174:23
175:2 179:5,18,20
179:22 180:1
181:5 182:2,24
183:2,4,12
**trende's** 71:21
76:3 172:14,25
**trende.30** 26:12
**trendesean** 26:17
**trial** 25:8,8 65:16
69:18 174:18
**tricky** 146:8
**tried** 147:21
153:19
**trinkley** 3:15 4:21
4:21 177:9,9
**trip** 42:14
**trivedi** 2:4 4:13,13
5:12,18 12:6
13:15 35:2 38:12
38:18 58:6 64:24

70:9 74:2 77:7
87:1 90:19 94:8
94:23 95:2 112:21
116:15 126:22
151:20 152:7
156:8 158:8
159:11 160:18
162:24 164:13
170:25 171:16
172:23 174:19
175:23 177:3,8
179:7
**trouble** 6:25 169:7
**true** 17:2 57:11
58:12 78:12,19,22
78:23,24 79:13
96:17 104:17
148:12 154:23
159:17 163:17
178:6 183:8
**truth** 8:9,9,9
**truthful** 53:24
**truthfully** 6:4
**try** 139:19
**trying** 11:11 42:23
77:17 119:6
124:12 127:7
137:13 147:13
153:20 157:17
158:20,23 159:13
168:18
**turn** 15:20,23 16:2
16:14,25 27:13
45:13 58:7 115:14
142:4 173:7
**turned** 17:8 45:9
63:11 171:2,2
**turning** 10:13
16:21 163:7
**twice** 57:11
138:10

**twitter** 28:5,12,16
**twitter.com** 28:19
**two** 17:7 20:19
  39:17 40:15 46:3
  61:21 62:20 65:9
  76:14,19 80:9
  83:18 96:1 111:4
  113:16,24 114:12
  114:25 115:6
  121:25 122:5,8
  133:21 134:1
  142:17 153:18
  154:7,7
**type** 19:11,16
**types** 129:14
**typically** 47:20,20
  168:22
**typo** 59:4 118:18
  118:20 133:12

**u**

**u** 96:8
**uh** 6:21 32:19
  44:17 53:10 54:13
  61:14 75:3 82:8,8
  113:10 119:15
**um** 58:12 97:23
  103:24 152:14
**unaware** 175:17
**unclear** 54:3
  103:19 104:25
**unconstitutional**
  86:23
**unconstitutionally**
  151:1
**underlined** 12:16
  13:20
**underneath** 36:10
**understand** 5:24
  6:22 7:14,16 8:5
  8:14 9:2 10:14,20
  11:4,25 12:21

13:4,12 34:2
  66:10 115:18
  119:4 166:20
**understanding** 6:3
  6:8 11:14 13:9
  67:19 77:24 81:20
  162:23
**understood** 88:4
  170:24
**undue** 143:2,17
**unexperienced**
  92:10
**uniform** 98:23
  119:14,23
**unintentionally**
  75:18
**union** 2:3,9 4:14
  5:2,8
**unique** 98:11
  102:25 115:17
  120:14
**united** 1:1 115:20
  115:24
**unnecessarily**
  161:2
**unpack** 30:15
  32:17 33:10
**unquote** 134:18
  135:10 140:24
  151:5 167:5 170:4
**untrue** 78:17
**unusual** 67:25
**update** 60:13 62:8
  133:13
**updated** 79:17
**use** 11:22 26:5,6
  27:10 30:19 35:11
  35:13,20 36:18
  37:12,14,15 47:21
  48:6 49:9,10 50:4
  50:8,11,14 51:3

52:3,12,15 55:8
  55:12 93:12 98:20
  98:22 99:2 113:3
  115:19 119:13
  120:2 155:17
  163:12,17 166:21
**useful** 52:14 76:3
  129:18
**useless** 132:19
**uses** 31:20 48:11
  48:12,24 96:25
**usually** 32:4 40:20
**utah** 69:19,20,24

**v**

**v** 38:10 58:2 65:2
  65:9 66:11 70:7
  72:20,21 73:4,25
  74:4,4 75:4 77:2,5
  77:9 179:25 180:3
  180:9,10,12,14
  181:4 182:1 183:1
**vacation** 148:3
**valid** 132:23
**validate** 82:24
**validates** 84:9
**validating** 84:19
**validity** 132:13
**vanishingly** 143:2
**variable** 132:12
  144:19,22
**variably** 92:12,22
**variety** 67:19
**various** 82:17
  126:2
**varying** 48:12
**vector** 99:7,10,13
  99:14 104:20
  105:9 118:1
**verb** 33:17,20,24
**verbal** 58:23

**verbiage** 69:5
**verify** 181:9
**veritext** 181:14,23
**veritext.com.**
  181:15
**version** 40:1,4,6,9
  40:12,15,21 41:6
  42:16 52:22,24
  53:17 80:6,8 97:6
  161:18 162:5
**versions** 40:18
**versus** 4:7 70:12
  90:17,23 114:5
  180:17
**vicinity** 95:20
**victory** 76:5
**video** 4:4 7:5
  21:25
**videoconference**
  1:10
**videographer** 3:20
  4:1 94:1,5 126:16
  126:20 151:15,18
  171:17,21 176:2
**videotape** 1:10
**view** 76:12
**virginia** 124:10,12
  124:14
**virtually** 150:6
  164:16
**visually** 71:22
**vote** 159:7
**voter** 65:12
**voters** 71:25 77:4
  180:14
**voting** 36:9,17,22
  44:15 46:16,21
  57:1 65:17 67:22
  68:3,5,7,10,15,17
  68:23 69:4,6,19
  69:25 71:24 72:4

91:2 92:4,11,12
92:13,22,22 93:14
154:19 166:5,19
166:25
**vra**  21:14 67:11
67:14,17 165:18
165:22 166:2,8,10
166:13,16 167:2,6
167:9,11,16,18,21
168:3,6,10,20
170:15
**vs**  1:6 64:22 180:7
**vtc**  1:12,18 2:4,5
2:10,11,15 3:1,2,9
3:10,15
**vtd**  158:2 162:18
165:5 167:17
**vtds**  158:2,15,21

**w**

**w**  3:15
**wait**  7:1 100:21,21
100:21
**waiting**  44:16,24
45:4
**waive**  177:19
**waiving**  176:12
**walkthrough**  23:3
**wallace**  2:24 4:18
156:16
**want**  7:25 9:16
18:18,19 19:7
22:17 28:24 30:15
34:19 36:7 38:3
39:16 40:22 41:22
44:13 54:23 58:7
58:13 64:25 65:5
70:10 74:3 84:11
95:3 100:22 119:3
119:25 120:1
133:2 142:14
152:8,17 154:3,6

161:5 166:18
172:1,3,24,25
**wanted**  26:20
35:21 54:9 67:20
75:14 157:7
172:18 173:10
**wants**  123:23
**washington**  2:6,21
3:11
**way**  33:2 72:14
84:10 87:7,19
89:1 90:13 101:18
102:3 104:5 106:3
107:12 116:6
127:7 128:19
129:18 131:7
147:6,15 148:25
149:2,16 150:3
153:12,19
**ways**  82:17 128:15
**website**  46:23
**week**  16:23,24,24
17:1 29:16,18
42:19 44:20,25
45:19 172:4,8,10
**weekend**  43:23
44:4
**weigh**  116:3
**weighed**  116:4
**weight**  71:22 72:7
76:13,15,24
115:23 175:20
**weighted**  36:18,20
**weighting**  36:12
**weights**  119:5,7
**welcome**  118:5
126:23 151:21
**went**  43:17 69:6
101:13 107:11
136:7 172:2

**west**  111:14,17,21
111:25 112:1,4,7
112:9,11
**white**  71:25
**whitford**  73:25
74:4,4 75:2,4
180:10
**widely**  96:25
**wife**  22:9
**wife's**  44:9
**win**  84:10 147:20
175:12
**wipe**  123:24
**wiped**  123:19
**wisconsin**  74:5,12
74:21,23 75:7
**withhold**  15:11
16:12
**witness**  4:12 5:14
25:9 55:20 61:6
64:4 65:15 86:14
86:21 112:16
116:8 139:15,19
158:6 159:6
160:13 162:22
164:11 174:11,11
174:17 176:11,15
177:17 178:11
181:8,10,12,19
**women**  77:4
180:13
**won**  76:7
**word**  26:13 28:19
33:3 39:23 40:10
40:13,16 41:5,9
43:5 45:16,17
49:19 54:15 60:6
89:23 91:22 93:13
108:1 129:20
**wording**  32:17
111:23

**words**  30:19 71:15
**work**  26:22 27:16
31:12 36:19 39:20
39:22 41:16 42:18
43:24 47:4 50:12
51:16,24,25 55:9
56:6 58:10 60:25
70:21 72:20 78:16
102:9 147:22
148:21 172:16
**worked**  41:13
42:13 44:1 51:21
**working**  30:22
32:8 42:8 59:25
60:17 61:18 64:1
**works**  119:17
**worst**  150:19
151:5
**worth**  92:7
**worthy**  76:12
**write**  14:24 15:3
21:9 46:23 47:13
69:1 97:13,17
125:15
**writing**  14:18,20
18:24
**written**  46:2 55:18
55:24 78:5 99:5
103:8 123:21
174:10
**wrong**  65:14
69:21 83:16 84:6
84:14 87:2 88:7
92:23 105:8
107:13,14,14
117:24 140:4
**wrote**  14:3 80:23
81:19

**[x - zoom]**

| x |
| --- |

**x** 32:7 128:22,23
129:1,2,11 179:1
179:14
**xi** 82:24 86:2

| y |
| --- |

**y** 25:24 32:7
128:19 134:22
**yan** 2:5 5:1,1
**yeah** 14:13 18:11
19:1 22:2 31:20
36:5 43:4,7 51:24
54:1,2,6,23,24
56:10 61:21,21
63:2 64:20 66:5
71:4,20 73:6
74:24 76:2 79:17
82:20 84:2 87:6
87:17 89:25 91:10
91:11 92:18
101:17 102:20
106:5 108:22
109:4 116:8,8
118:18,19 120:24
121:5,11 124:9,17
125:11,14 127:20
128:22 129:9
130:5 131:12
133:12,13 136:7
136:14 138:1,8,9
138:9,15 140:21
144:11 146:13,19
146:24 150:23
151:9 153:15,18
154:2,2,22 155:2
155:7,7,15 156:11
156:12 158:6
159:6,22 160:3
161:16,25 165:8
168:18,18 176:13

**year** 10:11 50:5
58:8
**years** 26:19 28:12
71:4,6 124:8
174:17
**yep** 54:24
**yesterday** 24:14
24:16 172:12
**yonkers** 149:3
**york** 2:12,12,16
2:16 50:23 57:13
57:25 58:4,7,19
59:10,14,21,25
60:3,4,9,21 61:3
64:7 126:8,10
142:5,12 143:13
144:8,11 147:24
148:8,22 149:11
150:11 180:1,5
**yorktown** 149:4

| z |
| --- |

**z** 32:7 62:4
**zoom** 4:9 6:16
7:21 12:11 21:20
72:14

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.