*SC NAACP v. Alexander,*
D.S.C. Case No.  3:21-cv-03302-MGL-TJH-RMG

# Exhibit A

Page 1

1

2    IN THE UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF SOUTH CAROLINA
3    COLUMBIA DIVISION
     --------------------------------------x
4    THE SOUTH CAROLINA STATE
     CONFERENCE OF THE NAACP
5
                    and
6
     TAIWAN SCOTT, ON BEHALF OF HIMSELF        Case No.
7    AND ALL OTHER SIMILARLY SITUATED          3:21-CV-03302
     PERSONS,                                  JMC-TJH-RMG
8
                            Plaintiffs,
9
                    Vs.
10
     THOMAS C. ALEXANDER, IN HIS OFFICIAL
11   CAPACITY AS PRESIDENT OF THE SENATE;
     LUKE A. RANKIN, IN HIS OFFICIAL CAPACITY
12   AS CHAIRMAN OF THE SENATE JUDICIARY
     COMMITTEE; MURRELL SMITH, IN HIS OFFICIAL
13   CAPACITY AS SPEAKER OF THE HOUSE OF
     REPRESENTATIVES; CHRIS MURPHY, IN HIS
14   OFFICIAL CAPACITY AS CHAIRMAN OF THE
     HOUSE OF REPRESENTATIVES JUDICIARY
15   COMMITTEE; WALLACE H. JORDAN, IN HIS
     OFFICIAL CAPACITY AS CHAIRMAN OF THE HOUSE
16   OF REPRESENTATIVES ELECTIONS LAW
     SUBCOMMITTEE; HOWARD KNAPP, IN HIS
17   OFFICIAL CAPACITY AS INTERIM EXECUTIVE
     DIRECTOR OF THE SOUTH CAROLINA STATE
18   ELECTION COMMISSION; JOHN WELLS, JOANNE
     DAY, CLIFFORD J. EDLER, LINDA MCCALL,
19   AND SCOTT MOSELEY, IN THEIR OFFICIAL
     CAPACITIES AS MEMBERS OF THE SOUTH
20   CAROLINA STATE ELECTION COMMISSION,
21                          Defendants.
     --------------------------------------x
22
         STENOGRAPHIC REMOTE VIRTUAL DEPOSITION
23                   CHARLES TERRENI
               Tuesday, August 16, 2022
24

25

Page 2

1

2                                    August 16, 2022

3                                    9:56 a.m.

4

5

6              T R A N S C R I P T of the

7       stenographic remote virtual deposition

8       of CHARLES TERRENI, pursuant to the

9       Federal Rules of Civil Procedure, held

10      remotely on Tuesday, August 16, 2022,

11      commencing at approximately 9:56 a.m.

12      (EST), reported by and before Erica

13      Ruggieri, a Registered Professional

14      Reporter, Certified Court Reporter,

15      and Notary Public of the State of New

16      York and New York.

17

18

19

20

21

22

23

24

25

Page 3

1

2   APPEARANCES OF COUNSEL:

3   (Via Videoconference)

4

5   ATTORNEYS FOR THE PLAINTIFFS:

6   THE SOUTH CAROLINA STATE CONFERENCE OF

7   THE NAACP AND MOON DUCHIN, PHD:

8   NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC.

9   BY: LEAH C. ADEN, ESQ.

10      JOHN CUSICK, ESQ.

11      40 Rector Street, Fifth Floor

12      New York, New York 10006

13      (917) 858-2870

14      laden@naacpldf.com

15      jcusick@naacpldf.org

16

17  ATTORNEYS FOR THE HOUSE DEFENDANTS:

18  NEXSEN PRUET, LLC

19  BY: ANDREW MATHIAS, ESQ.

20      104 South Main Street, Suite 900

21      Greenville, South Carolina 29601

22      (864) 370-2211

23      amathias@nexsenpruet.com

24

25

Page 4

1

2   APPEARANCES OF COUNSEL: (Cont'd)

3   (Via Videoconference)

4

5   ATTORNEYS FOR THOMAS C. ALEXANDER, IN HIS

6   OFFICIAL CAPACITY AS PRESIDENT OF THE

7   SENATE; lUKE A. RANKIN, IN HIS OFFICIAL

8   CAPACITY AS CHAIRMAN OF THE SENATE

9   JUDICIARY COMMITTEE;

10  ROBINSON GRAY STEPP & LAFFITTE, LLC

11  BY:  VORDMAN CARLISLE TRAYWICK III, ESQ.

12       1310 Gadsden Street

13       PO Box 11449

14       Columbia, SC 29211

15       (803) 231-7810

16       ltraywick@robinsongray.com

17

18  ATTORNEYS FOR ELECTION DEFENDANTS:

19  BURR & FORMAN, LLP

20  BY: JANE W. TRINKLEY, ESQ.

21       1221 Main Street, Suite 1800

22       Columbia, South Carolina 29201

23       803-799-9800

24       jtrinkley@burr.com

25

Page 5

```
 1
 2    APPEARANCES OF COUNSEL: (Cont'd)
 3    (Via Videoconference)
 4
 5    ATTORNEYS FOR SENATE DEFENDANTS:
 6    JONES DAY
 7    BY:   JOHN M. GORE, ESQ.
 8          51 Louisiana Avenue, N.W.
 9          Washington, D.C. 20001-2113
10          (202) 879-3939
11          jmgore@jonesday.com
12    -and-
13    ROBINSON GRAY STEPP & LAFFITTE, LLC
14    BY:   CYNTHIA NYGORD, ESQ.
15          1310 Gadsden Street
16          PO Box 11449
17          Columbia, South Carolina 29211
18          (803) 231-7810
19          cnygord@robinsongray.com
20
21
22
23
24
25
```

Page 6

1                    TERRENI

2         C H A R L E S    T E R R E N I,

3         called as a witness, having been

4         duly sworn by a Notary Public, was

5         examined and testified as follows:

6         EXAMINATION BY

7         MS. ADEN:

8              Q.   Good morning, Mr. Terreni.

9         I am Leah Aden.  It's nice to see

10        you.

11             A.   Nice to see you again.

12             Q.   I am currently, as you may

13        know, representing Plaintiffs in the

14        current challenge to certain

15        congressional districts and

16        Plaintiffs are the South Carolina

17        NAACP and Mr. Tai Scott.

18             Do you mind going ahead and

19        stating your name and spelling it

20        for the record, please?

21             A.   Certainly.  It's Charles,

22        C-H-A-R-L-E-S.  Terreni,

23        T-E-R-R-E-N-I.

24             Q.   So the correct

25        pronunciation is Terreni?

Page 7

```
 1                    TERRENI
 2        A.    That's fine.
 3            MS. ADEN:  And I'd like to
 4      take a moment and ask everyone who
 5      is representing parties in the case
 6      to also go ahead and state their
 7      name for the record beginning with
 8      counsel for the plaintiffs.
 9            MR. CUSICK:  Good morning.
10      This is John Cusick also with LDF
11      on behalf of the Plaintiffs.
12            MS. ADEN:  Mr. Gore, would you
13      go next, please.
14            MR. GORE:  Sure.  John Gore
15      for the Senate Defendants.
16            MR. TRAYWICK:  Lisle Traywick
17      of Robinson Gray also for the
18      Senate Defendants.
19            MS. TRINKLEY:  Jane Trinkley
20      with Burr & Forman for the Election
21      Defendants.
22            MR. MATHIS:  Andrew Mathias of
23      Nexsen Pruet for the individual
24      House Defendants.
25            MS. ADEN:  And I believe just
```

Page 8

```
 1                    TERRENI
 2       for your knowledge, Mr. Terreni,
 3       that Ms. Nygord is on the staff
 4       team for one of the plaintiff
 5       counsel, I believe the Senate
 6       defendant team.  You may be
 7       familiar but just so you know who
 8       is on the line and I believe that
 9       is everyone.
10           Q.    Mr. Terreni, you are a
11       lawyer; is that correct?
12           A.    Yes, ma'am.
13           Q.    But you are represented
14       here today.  Is that also correct?
15           A.    It is.
16           Q.    And who represents you?
17           A.    John Gore and Lisle
18       Traywick.
19           Q.    And they are with the Jones
20       Day law firm?
21           A.    John Gore is with the Jones
22       Day law firm.  Lisle Traywick is
23       with, they changed their name
24       recently, maybe he will refresh my
25       memory.  Robinson Gray.
```

Page 9

```
 1                TERRENI
 2        Q.    Gray?
 3        A.    Yeah.
 4        Q.    Have you taken depositions
 5   before?
 6        A.    Yes.
 7        Q.    About how many times?
 8        A.    Couple dozen at least.
 9        Q.    So just so that we are on
10   the same page despite your having
11   taken depositions before, I'm going
12   to identify some basic ground rules
13   for how this deposition will proceed
14   today so we are on the same page.
15        You have been sworn in so you
16   are testifying under oath which
17   means that you are testifying as if
18   you are before a judge in a
19   courtroom with the same duty to
20   answer questions truthfully.
21        Do you understand?
22        A.    Yes.
23        Q.    And a court reporter,
24   Ms. Ruggieri, whose name I may
25   already mispronounced already is
```

Page 10

1             TERRENI
2       transcribing this deposition and so
3       with that in mind if you and I both
4       could try to please speak audibly
5       and clearly and I will try to speak
6       slowly.
7             Please refrain from nodding or
8       shaking your head so that we have a
9       clear transcript.  And if I ask a
10      question that you do not understand
11      or you need me to repeat, I'm happy
12      to do so.  I will do my best to
13      rephrase.  If I ask you a question
14      and you answer the question,
15      however, I will assume you
16      understand my question.
17            Do you understand those basic
18      ground rules?
19            A.   Yes, ma'am.
20            Q.   Okay.  There may be
21      attorney objections.  Though we are
22      the primary people who should be
23      talking today in addition to the
24      court reporter who may need
25      something from us, your counsel may

```
                                        Page 11

  1                  TERRENI
  2       object to my question and the
  3       objection will be noted for the
  4       record.  But you still must provide
  5       an answer unless you are instructed
  6       not to.
  7            Do you understand that?
  8            A.   Yes, ma'am.
  9            Q.   Okay.  Is there any reason
 10       why you may be unable to understand
 11       or answer my questions today?
 12            A.   None that I know of.
 13            Q.   Okay.  If at any time you
 14       want to take a break, and I'll try
 15       to take them every once in a while,
 16       please let me know.  We will get off
 17       the record at some point and talk
 18       lunch and make sure that you have
 19       what you need to proceed.  The only
 20       thing I ask is that before we take a
 21       break that I am able to complete my
 22       question and you complete your
 23       answer.
 24            Does that make sense?
 25            A.   Yes, ma'am.
```

```
                                    Page 12
 1                 TERRENI
 2        Q.   Okay.  For today's
 3   deposition where are you physically
 4   located?
 5        A.   In my office at 1508 Lady
 6   Street in Columbia.
 7        Q.   Okay.  Is there anyone else
 8   in the room with you?
 9        A.   No, ma'am.
10        Q.   Did you bring any materials
11   with you for the deposition?
12        A.   I have two screens and on
13   my second screen I have the exhibits
14   that you submitted for my
15   deposition.
16        Q.   Do you have any hard copies
17   of those in front of you?
18        A.   No, ma'am.
19        Q.   And did you take any notes
20   on any of the soft copy exhibits
21   that are on your screen, any
22   comments, put any comments, markup
23   the documents at all?
24        A.   No, ma'am.
25        Q.   What is your understanding
```

```
                                        Page 13
 1                    TERRENI
 2     of this lawsuit?
 3         A.    I understand the plaintiffs
 4     are challenging the configuration of
 5     certain congressional districts in
 6     the State of South Carolina drawn in
 7     the last cycle, that it is generally
 8     an allegation of racial
 9     gerrymandering.
10          You'll have to remind me as to
11     the exact districts you challenged
12     but I know it's not District 6.  It
13     probably is 2, 1 and 5.  But I could
14     stand corrected.
15         Q.    So that's correct, those
16     are the challenged districts, 1, 2
17     and 5.
18          You mentioned a racial
19     gerrymandering claim.  What do you
20     understand that to mean?
21         A.    Well, what I understand a
22     racial gerrymandering claim to mean
23     is generally a claim of improper
24     racial motivation as expressed in
25     Shaw versus Reno.  Though race was
```

Page 14

```
 1                    TERRENI
 2       the predominant factor in the
 3       redistricting decisions that were
 4       made or the challenges.
 5            Q.    Have you ever brought or
 6       defended against a racial
 7       gerrymandering claim?
 8            A.    No.
 9            Q.    Do you know what an
10       intended racial discrimination claim
11       is?
12            A.    Generally speaking, it's a
13       claim that is brought on the basis
14       that an enacted plan was enacted
15       with improper racial motives
16       regardless of its defense.
17            Q.    Do you see a racial
18       gerrymandering claim and an
19       intentional racial discrimination as
20       equal, the same claim?
21            A.    Well, a racial
22       gerrymandering claim does not have
23       to have a direct evidence of intent.
24       So, no, I don't them as equal,
25       although they would often be
```

```
 1                    TERRENI
 2      related.
 3           Q.    In the context of a racial,
 4      intentional racial discrimination
 5      claim in a redistricting action, do
 6      you under- -- what would that mean
 7      to you?
 8           A.    That race was the
 9      predominant intent -- that racial
10      discrimination or disadvantaging a
11      racial minority was the intent of
12      the redistricting effort.
13           Q.    And in an intentional
14      racial discrimination claim as
15      compared to a racial discrimination
16      claim do you understand that intent
17      has to be predominant as well or can
18      it be a purpose motivating the
19      action?
20           A.    I'm sorry, could you
21      restate that question.
22           Q.    Yes.  In an intentional
23      racial discrimination claim as
24      compared to a racial gerrymandering
25      claim --
```

Page 16

```
 1                    TERRENI
 2          A.    Yes, ma'am.
 3          Q.    -- does race have to be the
 4      predominant purpose or can it be a
 5      purpose animating the decision?  Do
 6      you know one way or other?
 7          A.    My understanding is it
 8      would have to be the predominant but
 9      I say that with -- you know.  I have
10      faced racial gerrymandering issues
11      in redistricting but I don't have
12      much experience with intentional.
13          Q.    So that last claim,
14      intentional racial discrimination,
15      have you ever brought and/or
16      defended against an intentional
17      racial discrimination claim whether
18      in the redistricting or
19      nonredistricting context?
20          A.    I don't believe so.
21          Q.    Have you ever familiarized
22      yourself with the Arlington Heights
23      case?
24          A.    It's been a while.  I mean
25      I have read it, I'm familiar with it
```

```
 1                    TERRENI
 2      but it's been a long time.
 3           Q.    Now, you mention that you
 4      have never brought or defended
 5      against a racial gerrymandering case
 6      but I believe you just mentioned
 7      that you faced racial gerrymandering
 8      issues.  Can you explain what you
 9      meant by that?
10           A.    Well, in every litigation
11      cycle there is an awareness of the
12      need to avoid racial gerrymandering.
13      There have been at times accusations
14      of racial gerrymandering and in that
15      context I have encountered racial
16      gerrymandering claims or the theory.
17           Q.    With respect to any other
18      claim of racial discrimination have
19      you ever brought and/or defended
20      against racial discrimination?
21           A.    Yeah.  I brought a racial
22      -- a lawsuit before that was based
23      on racial discrimination.
24           Q.    What was the nature of that
25      claim?
```

Page 18

```
  1                     TERRENI
  2         A.    It was a lawsuit brought
  3     under the South Carolina, I believe
  4     it's called the State Accommodations
  5     Act against a restaurant that
  6     discriminated against my clients for
  7     refusing them service.
  8         Q.    What about a Voting Rights
  9     Act claim, have you ever brought or
 10     defended against one of those?
 11         A.    Yes, ma'am.
 12         Q.    In what context?
 13         A.    Well, there have been a
 14     few.  Would you like me to try to go
 15     through them or...
 16         Q.    Yes, please, briefly.  What
 17     body was at issue?
 18         A.    They were primarily Section
 19     5 claims.  I litigated a Section 5
 20     claim on behalf of the Richland
 21     County Republican Party in the '90s
 22     involving the need to preclear
 23     changes in a redistricting plan.  I
 24     was the plaintiff.
 25              I defended the State
```

```
 1              TERRENI
 2     Republican Party in an action that
 3     was brought trying to compel
 4     preclearance of the state
 5     presidential primary in 2000, which
 6     was a volunteer primary.
 7          I brought a Section 5 claim I
 8     believe against Allendale County
 9     several years ago involving
10     Allendale, one of the Allendale
11     County local governments and that
12     was also a preclearance issue and an
13     equal protection issue.
14          That's what I remember off the
15     top of my head.
16          Q.   You mentioned Section 5.
17     What is your understanding of what
18     Section 5 required?
19          A.   Retrogression.
20          Q.   What does retrogression
21     mean to you?
22          A.   Well, what retrogression
23     meant to me was -- well, it was
24     twofold.  It was one that the
25     existing rights of minority voters
```

Page 20

```
 1                    TERRENI
 2      should not be diminished in a
 3      redistricting plan absent
 4      unavoidable circumstances such as
 5      inward migration or something of
 6      that sort.
 7           There was an intent component
 8      in Section 5 as I recall.  And then
 9      as a practical matter it required
10      either getting preclearance from the
11      Justice Department and persuading
12      them that a plan was
13      nonretrogressive or retrogressive
14      depending on what side I was on.
15      And also -- or in the alternative
16      obtaining a declaratory judgment
17      from the D.C. Circuit.
18           Q.   Under Section 5 could a
19      jurisdiction go from having three
20      majority-minority districts to two,
21      for example?
22           A.   It could.
23           Q.   It could under what
24      circumstances?
25           A.   A plethora of
```

```
                                     Page 21

 1                    TERRENI
 2       circumstances, but one would be that
 3       the population wouldn't be there to
 4       support three minority districts
 5       anymore.
 6            Q.   Did it require looking at
 7       voting patterns to see whether or
 8       not there was racial bloc voting in
 9       a jurisdiction?
10            A.   It could.
11            Q.   Are you familiar with
12       racial bloc voting?
13            A.   To some extent, yes.
14            Q.   What do you understand it
15       to mean?
16            A.   I mean racial bloc voting
17       if you are referring to the Gingles
18       preconditions it would entail a
19       situation in which the minority
20       community is sufficiently compact to
21       form the majority district, that the
22       minority community is politically
23       cohesive and tends to attempt to
24       vote candidates of its choice.  Then
25       if you have racially polarized
```

```
                                    Page 22

 1                    TERRENI
 2      voting, you would have the majority
 3      community consistently frustrating
 4      the efforts of the minority
 5      committee to elect candidates of its
 6      choice.
 7           Q.    While you were defending or
 8      while you were working on Section 5
 9      actions was it also possible for --
10      are you aware whether it was
11      possible for a jurisdiction to
12      receive preclearance under Section 5
13      and still face a lawsuit on the
14      other side of that preclearance
15      under some other constitutional or
16      statutory framework?
17           A.    I'm aware that it was.
18           Q.    Are you aware that the
19      constitutional and statutory
20      framework still exists today that
21      existed when Section 5 was in
22      operation?
23           A.    I'm aware that -- yes.
24      Generally speaking.  I mean I
25      haven't wanted to do a history
```

```
 1                    TERRENI
 2      lesson here because I'm not capable
 3      of it, but I'm generally aware that
 4      you can still sue someone over a
 5      redistricting plan under Section 2
 6      or the 14th Amendment or whatever
 7      causes of action existed before
 8      Section 5 no longer was in effect.
 9           Q.    No longer is in?
10           A.    Effect.
11           Q.    Section 5 is still
12      constitutional, it just doesn't
13      function anymore, is that your
14      understanding?
15           A.    My understanding is until
16      such time as Congress were to update
17      the coverage formula Section 5
18      cannot be implemented.
19           Q.    Do you know anything about
20      the bail-in requirement under
21      Section 3C under the Voting Rights
22      Act?  Are you familiar with that?
23           A.    I'm generally aware that
24      plaintiffs can sue a jurisdiction
25      for discriminatory practices.  You
```

```
                                    Page 24
 1                     TERRENI
 2      know, I don't know the particulars
 3      of it, but to force coverage of
 4      Section 5 for a particular
 5      jurisdiction.
 6          Q.   Have you ever brought or
 7      defended against a Section 2 action
 8      under the Voting Rights Act?
 9          A.   Bear with me, I haven't
10      practiced law in a while.
11          I have never brought a Section
12      2 action.  It is possible that
13      Section 2 was raised as a cause of
14      action in some of the litigation in
15      which I have been involved.
16          Q.   Have you ever represented a
17      minority individual plaintiff or a
18      group that served minority voters in
19      a Section 5 or other voting type
20      challenge or case?
21          A.   That's a broad statement.
22      I mean if you are talking about a
23      named plaintiff, to the best of my
24      recollection, no.  There would have
25      been -- there may have been minority
```

```
 1                    TERRENI
 2      members involved in the entities
 3      that I represented.
 4           Q.   Have you ever represented
 5      -- you mentioned having represented
 6      Republican organizations in some
 7      Section 5 proceedings.  Have you
 8      ever represented a
 9      Democratic-affiliated organization
10      in a Section 5 proceeding?
11           A.   No.
12           Q.   Would you consider the
13      Voting Rights Act a race-conscious
14      statute?
15           A.   I don't understand the
16      question.
17           Q.   Would you consider the
18      Voting Rights Act to be a statute
19      that requires awareness of race?
20           A.   Not universally.  I mean it
21      is certainly a statute that is
22      designed to protect the rights of
23      racial minorities under certain
24      circumstances but it doesn't mean
25      that you need universal awareness of
```

Page 26

```
                            TERRENI
 1
 2      race.  Again, I'm not sure I'm
 3      understanding your question.  I'm
 4      not trying to be evasive though.  It
 5      just seems to me that what you would
 6      do anyway.
 7           Q.   In order to determine
 8      Section 5 compliance or Section 2
 9      compliance would you agree that you
10      have to be aware of the race of
11      voters in a jurisdiction?
12           A.   I think those are two
13      different questions.  Section 5
14      compliance I would imagine you do
15      need to be aware of the race of the
16      voters in a jurisdiction.  Section 2
17      compliance involves defending a
18      Section 2 claim and may not -- at
19      the point their claim is brought
20      they need to have that awareness.
21      But you wouldn't automatically or
22      universally need to be aware of the
23      race of the voters.
24           Q.   You mentioned Thornburg
25      versus Gingles and you mentioned
```

```
 1                TERRENI
 2      something about determining whether
 3      a minority community is compact,
 4      whether the majority of -- minority
 5      community is politically cohesive,
 6      whether or not another group
 7      consistently votes against that
 8      community.  Does that require an
 9      awareness of the race of particular
10      voters in order to determine those
11      different elements that you set
12      forth?
13          A.   To determine those elements
14      it would, yes.
15          Q.   You mentioned Section 2
16      compliance involves defending
17      against a Section 2 lawsuit.  Is it
18      possible to affirmatively raise a
19      Section 2 claim?
20          A.   I don't understand how you
21      would do that.
22          Q.   Have minority plaintiffs
23      affirmatively brought Section 2
24      lawsuits, are you aware of that?
25          A.   That's different from what
```

Page 28

```
 1                    TERRENI
 2       I think you were asking me.
 3       Minority plaintiffs have certainly
 4       brought Section 2 lawsuits.
 5            Q.   And do you believe that
 6       requires an awareness of race in
 7       order to bring a Section 2 lawsuit?
 8            A.   I would imagine so.
 9            Q.   And do you agree that it
10       would require an awareness of race
11       to defend against a Section 2
12       lawsuit?
13            A.   Yes.
14            Q.   So Section 5 requires an
15       awareness of race, Section 2
16       requires an awareness of race.  What
17       about an intentional racial
18       discrimination claim, does that
19       require an awareness of race?
20            A.   Well, let's back up.  I
21       didn't say Section 2 required an
22       awareness of race universally.  I
23       said Section 2 you need an awareness
24       of race to defend a Section 2 claim.
25       Does it foreclose an awareness of
```

```
 1                    TERRENI
 2      race in redistricting otherwise?
 3      But it also doesn't mandate it.  I
 4      might be in South Dakota and I might
 5      not need a section -- I'm not
 6      familiar with the demographics of
 7      South Dakota but I imagine Section 2
 8      is not an overriding concern there.
 9           So you are asking universal
10      questions about Section 2 and
11      Section 5 that I'm really kind of
12      unable to say.  But if you are
13      asking me would I need awareness of
14      race to defend a Section 2 claim,
15      yeah, sure.
16           Q.   Are there protected groups
17      who live in South Dakota are you
18      aware?
19           A.   No.  I told you I'm not
20      aware of the demographics.  I
21      mention that as a hypothetical, but
22      I'm certainly, you know -- you tell
23      me.  I mean you have national
24      experience, I don't know.  But if
25      you were an universally majoritarian
```

1                    TERRENI

2        jurisdiction without a minority

3        group that required protection, I'm

4        not sure you would need great

5        awareness of race.  That's all I was

6        trying to say.

7              Q.   Do you understand Section 2

8        to apply nationwide?

9              A.   Yes.

10             Q.   Or does it apply to certain

11       jurisdictions?

12             A.   I understand it to apply

13       nationwide.

14             Q.   Do you understand that

15       Native American people, for example,

16       live in South Dakota?

17             A.   Of course.  Yes.

18             Q.   And so if they live in

19       South Dakota and are a minority in

20       the community and allege racial vote

21       dilution could they bring a Section

22       2 lawsuit?

23             A.   Yeah.

24             Q.   In order to bring or defend

25       against an intentional racial

```
                                    Page 31
 1                  TERRENI
 2      discrimination claim do you think
 3      that that requires an awareness of
 4      race?
 5           A.   I don't know.  It's a very
 6      broad question.  I just don't know.
 7      I never defended intentional
 8      discrimination.
 9           Q.   Have you read the
10      complaints that have been filed by
11      plaintiffs in this lawsuit?
12           A.   I read the third amended
13      complaint preparing for this
14      deposition.  I believe I read the
15      first complaint.  I didn't spend a
16      great deal of time but I did read
17      it.
18           Q.   Would you agree that the
19      third amended complaint focuses on
20      plaintiffs' challenge to the
21      congressional districts that we
22      discussed, 1, 2 and 5?
23           A.   That's my recollection.
24           Q.   And so today we are going
25      to focus on the allegations in the
```

```
                                    Page 32

  1                    TERRENI

  2          third amended complaint not the

  3          first complaint or any of the

  4          subsequent complaints that have been

  5          filed but solely the third amended

  6          complaint just so that we are on the

  7          same page.

  8               Do you understand?

  9          A.    That's up to you.

 10          Q.    Okay.  In addition to the

 11          attorneys at Jones Day and Robison

 12          [sic] Gray, whose name I also may be

 13          missing if they changed the name,

 14          and without going into the content

 15          of those discussions, have you

 16          sought legal advice from any other

 17          attorneys about this lawsuit?

 18          A.    No.

 19          Q.    What about Nexsen Pruet?

 20          A.    No.

 21          Q.    Now you acknowledge that

 22          you have been involved in South

 23          Carolina's redrawing of its

 24          congressional lines this cycle prior

 25          to the third amended complaint being
```

Page 33

```
 1                    TERRENI
 2      filed.  Is that accurate?
 3           A.    It would be accurate to say
 4      that I worked for the South Carolina
 5      State Senate, one that drew the
 6      congressional lines that are being
 7      disputed.
 8           Q.    And with respect to working
 9      with the Senate to redraw
10      congressional lines this cycle have
11      you sought legal advice from
12      attorneys at Jones Day?
13           A.    The Senate has sought legal
14      advice through me, yes.
15           Q.    Which attorneys?
16           A.    John Gore primarily,
17      Michael Carvin and Lou Fisher.  And
18      another associate or partner of
19      Mr. Gore who will be offended that I
20      can't remember his name.
21           Q.    Can you pronounce Mr. Lou's
22      last name, please?
23           A.    Fisher.
24           Q.    Fisher?
25           A.    F-I-S-H-E-R.
```

Page 34

1              TERRENI

2         Q.   So John Gore, Michael

3    Carvin, Lou Fisher and another

4    associate, those are the four

5    attorneys at Jones Day that you have

6    interacted with regarding

7    congressional redistricting on

8    behalf of the Senate?

9         A.   Well, I believe he was a

10   partner and his name I believe was

11   Stewart Copeland [sic].  I'm sorry,

12   that's also a name of a band member

13   of The Police but I'm not sure so I

14   don't want to get them confused but

15   I believe that was his name.

16        Q.   SO Stewart Copeland [sic],

17   Lou Fisher, Michael Carvin and John

18   Gore?

19        A.   Yes, ma'am.

20        Q.   When did you begin

21   corresponding with them regarding

22   congressional lines for the Senate?

23        A.   I want to answer your

24   question accurately.  I began

25   corresponding with them regarding

```
 1                    TERRENI
 2      redistricting, it would have been in
 3      2011 or late 2010.  Generally
 4      speaking, that correspondence would
 5      have included congressional and
 6      Senate redistricting processes.
 7           Regarding lines, I'm not sure
 8      I remember when I -- the first time
 9      I discussed lines with -- is that
10      what you asked?  I'm sorry.
11      Congressional lines or congressional
12      redistricting?
13      Q.   Let's make sure we are on
14      the same page.  The redrawing of the
15      congressional map this cycle, I'm
16      interested in when you started
17      speaking with, corresponding with,
18      communicating with the four people
19      at Jones Day who you mentioned this
20      cycle?
21      A.   To the extent that
22      congressional redistricting was
23      implicated in the overall
24      redistricting process it would have
25      been sometime around early 2011 or
```

Page 36

1              TERRENI
2     2010, late 2010.  If you are asking
3     something more specific, please let
4     me know.
5          Q.   So for this, the census
6     release data in 2020 is the 2021, is
7     that fair to say?
8          A.   I don't know.
9          Q.   I'm sorry?
10         A.   I'm sorry, was that a
11    question?
12         Q.   Do you agree with that, the
13    census release data for this
14    redistricting cycle in 2021, would
15    you agree with that?
16         A.   Would about it?
17           MR. GORE:  Object to form.
18         Q.   Would you agree that the
19    U.S. census released data related to
20    the redrawing lines for this cycle
21    in 2021?
22         A.   Oh, yes.
23         Q.   And is it your position
24    that you were communicating with the
25    four people who you identified at

```
                                        Page 37

 1                      TERRENI
 2         Jones Day about the redrawing of the
 3         lines that follows the release of
 4         that data beginning after -- in the
 5         last decade in 2011, 2010?
 6              MR. GORE:  Object to form.
 7              A.   I'm really -- I don't
 8         understand the question.
 9              Q.   Okay.  Let me try again.
10         You mentioned speaking to four
11         partners at Jones Day.  Was that
12         with regard to the redrawing of
13         congressional lines by the Senate
14         for the post 2020 redistricting
15         cycle?
16              A.   It was regarding the post
17         2020 redistricting cycle generally,
18         which would include redrawing
19         congressional lines.  That process
20         started in late 2010.  And if you
21         are asking at what point -- if you
22         are asking me something else,
23         please, ask it.
24              Q.   I'm confused about why --
25         so your relationship with Jones Day
```

Page 38

1                    TERRENI
2       about this redistricting cycle goes
3       back to 2010, am I hearing you
4       right, or did you mean 2020?
5            A.   I'm sorry.  I meant 20 -- I
6       did mean 2020 although I had a
7       relation or the Senate was also
8       represented by Jones Day in the last
9       cycle.  But I meant 2020.
10           Q.   So late 2020 you started
11      talking to Jones Day about the
12      redrawing of lines for South
13      Carolina which may include
14      congressional lines?
15           A.   Correct, yeah.
16           Q.   Okay.  What about Robison
17      Gray, who had you spoken with,
18      communicated with there in
19      particular about the redrawing of
20      congressional lines for the Senate
21      or by the Senate?
22           A.   Rob Tyson and Lisle
23      Traywick but that was after your
24      litigation was filed.
25           Q.   And did you talk to anyone

```
                                        Page 39

 1                    TERRENI
 2          with Nexsen Pruet or from Nexsen
 3          Pruet about, not this lawsuit, but
 4          the redrawing of congressional lines
 5          following the 2020 census?
 6               A.   No, ma'am.
 7               Q.   What about the Senate
 8          President's Office, did you
 9          communicate with them about the
10          redrawing of congressional lines by
11          the Senate for this cycle?
12               A.   During the drawing process
13          or after?
14               Q.   During the drawing process?
15               A.   I don't recall.
16               Q.   What about the Office of
17          Legislative Counsel?
18               A.   Only to the extent that we
19          were discussing like bill formats
20          and things like that.
21               Q.   What about Senate Judiciary
22          counsel?
23               A.   Certainly, yes.
24               Q.   Does that include Paula
25          Benson?
```

Page 40

```
 1                  TERRENI
 2         A.   Yes.
 3         Q.   How frequently would you
 4    communicate with her about the
 5    redrawing of congressional lines for
 6    the Senate?
 7         A.   It depends on what part of
 8    the cycle we are in, but when --
 9    generally speaking, around the time
10    the staff plan was released and
11    shortly before that I would have
12    communicated with Paula on almost a
13    daily basis.
14         Q.   And when did that begin?
15    So your communication with her was
16    isolated to around the time of the
17    staff plan or shortly before then,
18    it did not begin in 2020 like with
19    Jones Day?
20         A.   No, ma'am, that's not what
21    I'm saying.  What I'm saying is that
22    your question, as I understood it,
23    was about congressional lines.
24         Q.   Yes.
25         A.   And I'm saying I didn't
```

Page 41

                              TERRENI

1
2      spend a great deal communicating
3      with Paula Benson about
4      congressional lines until the Senate
5      plan was substantially concluded and
6      we shifted our work to congressional
7      lines.  So did I talk to Paula
8      Benson about Congress before then,
9      yeah, I'm sure I did.  But the
10     frequency, which I believe you asked
11     me about, would have been very
12     different once we started getting
13     all of those into Congress.
14          Q.    What is the time frame for
15     when you are talking about where the
16     Senate started get into Congress,
17     what time frame are we talking
18     about?
19          A.    Generally speaking, I
20     believe it was around November of
21     2021.
22          Q.    What was the -- let me --
23     what was the primary means of
24     communicating with those four
25     attorneys at Jones Day beginning in

```
                                    Page 42

 1                  TERRENI

 2      2020, late 2020.  And by means,

 3      phone, email, in-person meetings,

 4      how did you communicate with those

 5      attorneys?

 6          A.    Telephone or video calls.

 7      Probably some emails too but not --

 8      primarily it would have been phone

 9      or video.

10          Q.    What about with Robison

11      Gray, also, how did you communicate

12      with them?

13          A.    Well, I mean again that was

14      after the lawsuit was filed.

15      Primarily, again, phone and video.

16      May have been some email traffic I'm

17      sure.

18          Q.    And with Ms. Benson

19      focusing on the time when the Senate

20      started focusing on congressional

21      lines around November 2021, what

22      were the means by which you

23      communicated with her?

24          A.    Verbally and by email and

25      some video calls.
```

```
 1                    TERRENI
 2        Q.   Among Senate Judiciary
 3   counsel what about John -- Breeden
 4   John, are you familiar with him?
 5        A.   I am familiar with Breeden
 6   John.
 7        Q.   Did you communicate with
 8   him about congressional lines for
 9   this -- drawn by the Senate?
10        A.   Yes.
11        Q.   How frequently?
12        A.   Same frequency.  As we got
13   into it, it would have been nearly
14   daily.
15        Q.   And how did you communicate
16   with him?
17        A.   Verbally, video, email.
18        Q.   What about Ms. Baker, Maura
19   Baker, are you familiar with her?
20        A.   Yes, ma'am.
21        Q.   Did you communicate with
22   her about -- on the Senate side the
23   redrawing of congressional lines?
24        A.   Yes.
25        Q.   How frequently?
```

Page 44

```
 1                    TERRENI
 2        A.    The same.  Once we began
 3    the process in earnest I
 4    communicated with her almost daily.
 5        Q.    Madison Faulk, are you
 6    familiar with her?
 7        A.    Yes, ma'am.
 8        Q.    And does she fall into that
 9    same bucket as Ms. Benson, Breeden
10    John and Maura Baker?
11        A.    No, ma'am.  She wasn't
12    involved as frequently.
13        Q.    Wasn't involved excuse me?
14        A.    As frequently.
15        Q.    Maxine Henry?
16        A.    Same thing.  Maxine was not
17    an attorney, Maxine was really -- is
18    Senate, was a Senate [inaudible] so
19    not as frequently.
20        Q.    And Michelle McGee?
21        A.    Yes, but maybe for
22    different reasons.
23        Q.    Can you explain that?
24        A.    Michelle was an
25    administrative assistant for the
```

Page 45

```
 1                    TERRENI
 2       Senate, was coordinating things like
 3       logistics and that.  She wasn't
 4       really involved in drawing the map.
 5            Q.    Were there any other Senate
 6       Judiciary counsel that you
 7       interacted with when the Senate
 8       focused on congressional lines that
 9       we did not just discuss?
10            A.    With Andy Fiffick.
11            Q.    Okay.
12            A.    I'm thinking to see if we
13       missed anybody.  I don't believe
14       there's anybody else.
15            Q.    And what was the frequency
16       that you communicated with Andy
17       Fiffick?
18            A.    Daily.
19            Q.    What were the means by
20       which you communicated with him?
21            A.    Email, video calls, in
22       person.  Oh, I should add there were
23       probably some text messages as well.
24            Q.    Is that text with Andy
25       Fiffick, Ms. Benson, Breeden John
```

Page 46

```
 1                    TERRENI
 2      and Maura Baker?
 3           A.   Yes, ma'am.  They all were.
 4      It would have been mostly just
 5      logistical, where are the meetings,
 6      something like that.
 7           Q.   How many telephone or video
 8      calls do you think you've had with
 9      attorneys at Jones Day since late
10      2020?
11           A.   I don't know.
12           Q.   A couple of dozen?
13           A.   I don't know.
14           Q.   I'm sorry, I didn't hear
15      you.  What did you say?
16           A.   I said I don't know.
17           Q.   How were those set up?  Did
18      you set them up?  Did you have an
19      assistant set them up or how did
20      they -- how were they scheduled?
21           A.   Generally speaking, it
22      would be Jones Day scheduling.  I
23      mean if you are talking about the
24      logistics of setting it up?
25           Q.   Yes.
```

1                    TERRENI

2          A.    Somebody at Jones Day would

3      send a meeting invite and we would

4      have a call.

5          Q.    Did you ever schedule any

6      of those phone or video calls, your

7      office?

8          A.    It's possible, yeah.

9          Q.    Who would have set those

10     up, you or someone who works for

11     you?

12         A.    I would.

13         Q.    Do you keep a calendar?

14         A.    I do.

15         Q.    Would your calendar

16     populate with the Zoom or telephone

17     conferences that you schedule with

18     Jones Day?

19         A.    I assume so.

20         Q.    Do you know whether or not

21     that calendar was collected for

22     discovery purposes in this case?

23         A.    I don't recall.

24         Q.    Would Senate Judiciary

25     counsel, any of the people that we

Page 48

```
1                    TERRENI
2     discussed, would they attend those
3     telephone or video calls with Jones
4     Day?
5          A.    Sometimes.
6          Q.    Would anyone who was not an
7     attorney but who was a nonattorney
8     be on those calls with Jones Day?
9          A.    I don't recall that ever
10    happening.
11         Q.    Did you seek legal advice
12    -- let me step back.
13           How would you -- what was the
14    purpose of your communications with
15    the Jones Day law firm, as you
16    understood it?
17         A.    To seek legal advice.
18         Q.    What does that mean?
19         A.    To request legal advice.
20    I'm not sure how else to elaborate
21    on that.
22         Q.    Generally what type of
23    legal advice would one need around
24    congressional redrawing of the lines
25    in South Carolina?
```

```
                                          Page 49

 1                    TERRENI

 2          A.    About the redistricting

 3     process and the laws that need to be

 4     compiled.  I mean it's legal advice.

 5     It's just that.

 6          Q.    Would it be reading -- them

 7     advising you on the current state of

 8     the law regarding redistricting?

 9          A.    Yeah.

10          Q.    Would it involve them

11     advising you on the public -- any

12     public hearings that the South

13     Carolina Senate set up?

14          A.    It could.  I mean I don't

15     know if Mr. Gore wants to object to

16     any of this because it seems

17     privileged to me, but it could.

18          Q.    Very generically could

19     legal advice involve reviewing

20     materials that the Senate published

21     on its Senate redistricting website?

22          A.    It could.

23          Q.    Would and could it involve

24     reviewing maps and associated data

25     that the Senate considered in
```

Page 50

```
 1                    TERRENI
 2      redrawing congressional lines?
 3           A.   Yes.
 4           Q.   Would and could it involve
 5      discussing questions that
 6      legislative members -- legislative
 7      members had about the congressional
 8      redrawing of lines?
 9           A.   It could.
10           Q.   Could it involve questions
11      that were asked by the public about
12      the congressional redistricting
13      lines?
14           A.   It could.
15           Q.   Did you on occasion ask for
16      documentation of legal research
17      prepared by the Jones Day law firm?
18           A.    I don't remember.
19           Q.   Do you remember exchanging
20      documents with the Jones Day law
21      firm?
22           A.   I'm sure I exchanged
23      documents with the Jones Day law
24      firm.
25           Q.   Via email?
```

Page 51

```
 1                    TERRENI
 2        A.    It would have been via
 3   email if I did.
 4        Q.    Did you ever exchange
 5   documents in person?
 6        A.    No.
 7        Q.    With respect to redrawing
 8   Senate congressional lines this
 9   cycle you are aware that there was a
10   Senate redistricting subcommittee
11   formed to consider congressional
12   lines?
13        A.    There was a Senate
14   redistricting subcommittee formed to
15   consider Senate and congressional
16   ones.
17        Q.    Who were the members of the
18   Senate subcommittee considering
19   congressional lines?
20        A.    Luke Rankin, Brad Hutto,
21   Talley, Margie Bright Matthews.  I'm
22   sure somebody -- oh, Senator
23   Campsen, Chip Campsen.
24        Q.    What about Senators Young
25   and Sabb?
```

Page 52

```
 1                    TERRENI
 2         A.    I didn't mean to slight
 3     them.  Of course Senator Young and
 4     Senator Sabb.
 5         Q.    Which of those members are
 6     lawyers you are aware?
 7         A.    Young, Sabb, Matthews -- I
 8     mean, excuse me -- Matthews is not
 9     on the committee.  Young, Sabb,
10     Campsen, Rankin, Matthews.  That's a
11     lot of them, right.
12         Q.    What about Senator
13     Harpootlian, was he also a member?
14         A.    He was a member.  How could
15     I forget.
16         Q.    Did you interact with any
17     of the staff of those subcommittee
18     members?
19         A.    On occasion.
20         Q.    Such as?
21         A.    Senator Campsen's lawyer.
22     Senator Harpootlian's attorney from
23     his law practice.  I think that's
24     it.
25         Q.    And do you recall the name
```

```
                                          Page 53

 1                    TERRENI

 2      of Senator Campsen's lawyer?

 3           A.    Brian Cole.

 4           Q.    Cole?

 5           A.    Cole, yeah.

 6           Q.    Do you recall the lawyer

 7      for Senator Harpootlian?

 8           A.    Chris Kenney.

 9           Q.    What about Joey Opperman or

10      Opperman, do you know who that is?

11           A.    I know who he is.  I don't

12      think I ever directly interacted

13      with Mr. Opperman.

14           Q.    Did you communicate with

15      House Judiciary counsel during

16      consideration by the Senate on

17      congressional lines?

18           A.    I don't recall doing so.

19           Q.    Emma Dean?

20           A.    No.

21           Q.    Patrick Dennis?

22           A.    Dennis, you know, it's

23      possible that I had some

24      communication with Patrick.  I don't

25      remember if it was during the Senate
```

Page 54

```
 1                    TERRENI
 2      process or the congressional process
 3      or litigation process honestly.  It
 4      was minimal.
 5           Q.    Would that have been by
 6      email, in person, by phone or a
 7      combination thereof?
 8           A.    It could have been by text
 9      but I believe that was about -- that
10      was about the litigation, I'm sorry.
11      Nothing other than that really.  It
12      was -- I don't think I had any email
13      correspondence from Patrick.  No,
14      actually come to think of it
15      regarding congressional, I don't
16      want to be absolute about it, but I
17      don't recall any conversation with
18      Patrick about congressional.
19           Q.    And you mentioned text
20      messages with him about this
21      litigation?
22           A.    It involved -- yes.  Yes.
23      I had one text exchange with him.
24      It wasn't about the lawsuit as such,
25      it was about some lawyers.
```

Page 55

1                    TERRENI

2         Q.   What about Roland Franklin,

3    are you familiar with him?

4         A.   No.

5         Q.   Jimmy Hinson?

6         A.   Name rings a bell but I

7    didn't have any communication with

8    him.

9         Q.   Are any of the Senate or

10   staff counsel that we talked about,

11   any of them black people?

12        A.   Maxine Henry.  I think

13   that's it.

14        Q.   Is there any other legal

15   counsel that we haven't discussed

16   who you communicated with about this

17   cycle's redrawing of the

18   congressional lines?

19        A.   In an attorney-client

20   context or?

21        Q.   Yes.

22        A.   No.

23        Q.   And in a nonattorney-client

24   context, any other attorneys, any

25   other legal counsel?

```
                                         Page 56
 1                   TERRENI
 2        A.   Well, yeah.   I mean there
 3    were some lawyers I'm sure that
 4    communicated with the community and
 5    with me.  Dale Oldham was one of
 6    them.  I'm trying to think if there
 7    was anybody else.  That was it I
 8    believe.
 9        Q.   Who does Dale Oldham work
10    for?
11        A.   That's a good question.  I
12    don't know.
13        Q.   Did you communicate with
14    him?
15        A.   Yeah.
16        Q.   How often?
17        A.   Rarely.  He called me after
18    his staff plan was released one or
19    two times and I'm talking about
20    communicating with him about
21    congressional redistricting.
22        Q.   Did you talk to him about
23    noncongressional redistricting?
24        A.   Yeah.
25        Q.   Such as?
```

```
                                    Page 57
 1                    TERRENI
 2          A.    A boat.  I didn't talk to
 3     him very often but I have known Dale
 4     for a long time.  I'm sure he wished
 5     me a Merry Christmas and that kind
 6     of thing.
 7          Q.    How long have you known
 8     him?
 9          A.    30 years.
10          Q.    And you don't know -- I'm
11     sorry, do you know who he works for?
12          A.    I do not.  I know he works
13     for some national Republican
14     organization.  The National
15     Republican Redistricting Trust has
16     been mentioned in the discovery that
17     I have seen.  I don't know if he
18     works with them or not.  I have no
19     idea.
20          Q.    So you talked to him one or
21     two times after the staff plan
22     released and we earlier discussed
23     that that was around November of
24     2021.  Is that when you recall
25     talking to him?
```

```
                                        Page 58

1                      TERRENI
2           A.    I think so, yes.
3           Q.    And only those one or two
4       times?
5           A.    Again, if we are talking
6       about congressional, yes.  Only
7       those one or two.  It was a couple
8       of calls.
9           Q.    Who else was on those
10      calls?
11          A.    No one.
12          Q.    How long did they last?
13          A.    Couple minutes.
14          Q.    Did you correspond by
15      email, text or some other means
16      after or around those conversations?
17          A.    He sent me a couple of text
18      messages.
19          Q.    Did you turn those over in
20      discovery in this case?
21          A.    Yes.
22          Q.    Do you know -- more than
23      five texts messages, around how
24      many?
25          A.    I think it was just two or
```

Page 59

1                   TERRENI

2        three.

3             Q.    What was the nature of

4        those texts?

5             A.    As I recall, he texted us

6        something to the effect of having a

7        plan that he thought, just having a

8        plan that he wanted us to see.

9        There was a second text, if I

10       recall, just from the exhibits you

11       shared that -- says something about

12       he had some political data that was

13       different from the data we had

14       posted our website.  Those were the

15       texts.

16            Q.    Is your position that he

17       reached out to you initially or did

18       you reach out to him regarding

19       congressional maps?

20            A.    He reached out to me.

21            Q.    And is it your position

22       that he does not work for the South

23       Carolina Senate this congressional

24       cycle?

25            A.    My position?  I'm not aware

```
                                        Page 60
 1                      TERRENI
 2      that he works for the -- whoa, whoa,
 3      whoa.  I'm not aware that he worked
 4      for the -- that's right, I'm not
 5      aware that he worked for the South
 6      Carolina Senate during this
 7      congressional cycle.
 8           If you want me to expand, I am
 9      aware that he did some work on a
10      Senate Republican caucus during the
11      Senate phase of redistricting, just
12      to be clear.
13           Q.   Now, you said he wanted us
14      to see our maps, some maps on that.
15      Who was us that you are referring
16      to?
17           A.   Senate -- Senate Judiciary
18      staff.
19           Q.   And did he ultimately send
20      you that information?
21           A.   Yes.
22           Q.   And he sent that to you by
23      email?
24           A.   Not me by email.  He would
25      have -- he did not send anything but
```

Page 61

```
 1                    TERRENI
 2      he -- Adam Kincaid, who I understand
 3      to be with the National Republican
 4      Redistricting Trust, I believe, had
 5      to send us the file.  And he needed
 6      to transfer it by gmail or by Google
 7      Drive because it was a big file.
 8      And he did it by sending it to Andy
 9      Fiffick at a gmail address.
10          Q.   Did you tell Oldham to send
11      it to Mr. Fiffick?
12          A.   I didn't tell Oldham to
13      send it to Mr. Fiffick.  I think at
14      some point during this conversation
15      I believe he would have been in the
16      room, we were looking for a gmail
17      address that this individual could
18      use and Andy probably volunteered
19      his gmail address so that the file
20      could be transferred.
21          Q.   So Oldham calls you and
22      said he has some maps that he wants
23      the Senate Judiciary to look at.
24      Does he identify at that time that
25      those maps would come from the
```

Page 62

```
 1                    TERRENI
 2       National Republican Redistricting
 3       Trust?
 4            A.   No.  I don't think so.  I
 5       mean I understood them to come from
 6       some Republican entity but I wasn't
 7       familiar with the National
 8       Redistricting Trust per se.
 9            Q.   Did you tell him at that
10       time to send them to the Senate
11       redistricting email that had been
12       publicized to the rest of the
13       public?
14            A.   I told him he could but he
15       wanted us to see them.  We had
16       already published the staff plan and
17       he said, well, I'd like to send,
18       something to the effect, I don't
19       remember the exact conversation,
20       that he wanted us to see them and
21       wanted us to see them quickly so we
22       gave him that email address.
23            Q.   I want to look at what was
24       submitted as tab 50 which is a text
25       exchange between Mr. Oldham and
```

```
                                      Page 63
 1                     TERRENI
 2      another person from November 23,
 3      2021, that said South Carolina
 4      Senate 4343.  And that would be
 5      Plaintiffs' Exhibit 1.
 6           (Plaintiffs' Exhibit 1, Text
 7       exchange, marked for
 8       identification, as of this date.)
 9           A.   I'm sorry, tab 50?
10           Q.   Yes.
11           A.   Okay.  All right.
12           Q.   You have that in front of
13      you?
14           A.   I do.
15           Q.   Is this -- do you recognize
16      this text exchange?
17           A.   Yes.
18           Q.   Is this one of the texts
19      that you received from Mr. Oldham?
20           A.   Yes.
21           Q.   So this 803-530-2893 number
22      is yours?
23           A.   It is.
24           Q.   Is this your personal cell
25      phone, a work cell phone, what is
```

Page 64

```
 1                    TERRENI
 2      this?
 3           A.    It's both, my cell phone.
 4           Q.    And you used this cell
 5      phone for Senate redistricting
 6      purposes, this cycle?
 7           A.    Among other things, yes.
 8           Q.    Do you also receive emails
 9      around your other business with your
10      law firm on this same cell phone?
11           A.    Yes.
12           Q.    So this is not a cell phone
13      designated just for the Senate, your
14      work with the Senate this
15      redistricting cycle?
16           A.    No, ma'am.
17           Q.    And this is one text
18      exchange, some of it is redacted.
19      Is this the sum total of texts that
20      you had with Mr. Oldham?
21           A.    About congressional
22      redistricting or in general?
23           Q.    About congressional
24      redistricting.
25           A.    Sorry, I'm just trying to
```

Page 65

1                    TERRENI
2        look at it all.
3             I think so.
4        Q.    So looking at the November
5        19, 2021, 9:38 a.m. text, Dalton
6        Oldham reads -- sends a text to you
7        that says:  "Call me.  Want to know
8        if you/Andy has it."
9        A.    Um-hmm.
10       Q.    Do you know what he's
11       referring to here?
12       A.    I believe he's referring to
13       that plan -- he sent three plans at
14       one point and then he sent another
15       plan later on.  I believe this would
16       refer to the first two plans that he
17       sent.
18       Q.    Okay.  We are going to look
19       at those because those were sent on
20       November 18th, I believe?
21       A.    That would make sense.
22       Around that time.
23       Q.    I'm sorry to interrupt you.
24       A.    No, I just said that makes
25       sense, around that time.  I don't

```
                                                Page 66
 1                    TERRENI
 2        have a timeline in front of me but
 3        that makes sense.
 4             Q.    And so he's texting you to
 5        ask whether Andy has received it?
 6             A.    Yes.
 7             Q.    Okay.  And you write and
 8        respond:  "Got it."
 9             Are you saying got it you got
10        the maps or got it about calling him
11        in reference to his -- what he sent?
12             A.    In reference to what he
13        sent.
14             Q.    Did you end up calling him?
15             A.    I don't remember.  I'm sure
16        I did.  At some point I called him
17        even before or after this.  But we
18        did have a telephone conversation.
19        If you are asking me if I called him
20        after that text at 9:41 a.m., I
21        don't remember.
22             Q.    How long was the
23        conversation that you had with him
24        after you received the maps?
25             A.    Minutes.
```

Page 67

```
 1                    TERRENI
 2        Q.    Would you have put that
 3     meeting on your scheduler?
 4        A.    No.
 5        Q.    Do you recall putting any
 6     meetings you had with Mr. Oldham up
 7     on your calendar?
 8        A.    No.  They weren't meetings,
 9     they were telephone calls.  I don't
10     usually log an unscheduled telephone
11     call on my calendar.
12        Q.    Mr. Oldham responds:
13     "Clark, disag'd his numbers
14     differently than us.  Please call.
15     I will explain."
16          Who is Clark?
17        A.    Clark Bensen of Polidata,
18     our vendor for election data.  I'll
19     point out he didn't respond to got
20     it.  That's a message that he sent
21     several days later.
22        Q.    So you responded:  "Got it
23     on the 19th."
24          Then he responds on the 23rd:
25     "Clark disaggregated his numbers
```

Page 68

```
 1                    TERRENI
 2      differently than us.  Please call, I
 3      will explain."
 4           A.   He texts on the 23rd.  I
 5      don't think he's responding to my
 6      saying got it on the 19th.
 7           Q.   I understand.  And Clark,
 8      who is he working for at this time?
 9           A.   Us, the Senate, on a
10      contract.
11           Q.   And is he working on
12      congressional redistricting?
13           A.   He's working on
14      redistricting in general.  He's just
15      a data member.  The company is
16      Polidata.  All he did was
17      disaggregate and reaggregate
18      election results for the Senate.
19      And we put them on our website.
20           Q.   What type of, you mention
21      the disaggregated and reaggregated
22      election results.  What was the
23      point of that data, what could it be
24      used for?
25           A.   To evaluate as far as the
```

```
                                        Page 69

 1                    TERRENI

 2      meeting in the district.

 3          Q.   So census data, race data,

 4      election results from particular

 5      elections?  Can you explain a little

 6      bit more what the data was?

 7          A.   Of course.  South Carolina

 8      election results from past

 9      elections.  The precinct lines were

10      different before and after the

11      census.  So what Clark was hired to

12      do was take the election results and

13      break them out, generally speaking,

14      to the bloc level through a formula

15      of some sort and then reaggregate

16      them into the new VTDs under the --

17      with the new ones.  And that's the

18      data that's on our website.

19          Q.   Did you use that data

20      during this cycle?

21          A.   Yes, some of it.

22          Q.   Do you know if subcommittee

23      members were aware that Clark Bensen

24      was working for the Senate -- Clark

25      Bensen was working for the Senate?
```

Page 70

```
 1                       TERRENI
 2          A.    I think so.  Whether they
 3     aware specifically that it was Clark
 4     Bensen or not they were aware that a
 5     data vendor was working for -- had
 6     been contracted by the Senate.  We
 7     had a discussion about that in one
 8     of the early subcommittee meetings.
 9          Q.    Did Mr. Bensen report to
10     you or did he report to someone else
11     during this consideration of the
12     congressional lines?
13          A.    Me.
14          Q.    Did he send invoices to
15     you?
16          A.    I believe he would have
17     sent his invoice to the clerk's
18     office.  He may have sent it to me,
19     I don't remember.
20          Q.    And do you know what he
21     meant by Mr. Oldham saying "Clark
22     disaggregated his numbers
23     differently than us"?
24          A.    Yes.
25          Q.    Can you explain?
```

```
 1                 TERRENI
 2        A.   Yes.   Mr. Oldham was very
 3   concerned that Clark's numbers
 4   overestimated the Republican
 5   strength of various precincts and,
 6   therefore, of the First District
 7   under our plan because they had used
 8   a different method of disaggregating
 9   and reaggregating their data which
10   Mr. Odom thought was more accurate.
11        Q.   Where did you land on this?
12   Did you think that Clark's method as
13   compared to -- when you are saying
14   their method, is this NRRT or is
15   this Oldham or who?
16        A.   He didn't specify -- I
17   don't think he specified could have
18   been -- I don't know.  It was
19   somebody associated with Mr. Oldham.
20   That's all I know.
21        Q.   What position did you take
22   that Clark's data had done it
23   correctly or that the other entity
24   had done it correctly?
25        A.    I didn't take a position
```

Page 72

```
 1                    TERRENI
 2      one way or the other.  I never saw
 3      Mr. Oldham's data or discussed it in
 4      detail but I felt satisfied that
 5      what Clark had given us was accurate
 6      and that we really didn't need to
 7      revisit the issue.
 8          Q.   But did you call him after
 9      this to talk about this topic?
10          A.   Yeah.  I -- he said Clark
11      dis- -- please call and I will
12      explain.  I called him, he
13      explained.
14          Q.   And then it looks like he
15      called you at 6:00 on the 23rd,
16      6:00 p.m. on the 23rd and then he
17      texted you again at 9:01 on the
18      23rd, the same day, and said:  "We
19      did another version.  Call me back
20      please."
21          So that means -- did you call
22      him after 6:00 p.m. when he sent his
23      first text and then he sent you back
24      what he's referencing here, this
25      other version, is that how it
```

```
                                    Page 73

 1                    TERRENI
 2       worked, or can you explain the
 3       interaction between those two texts
 4       that he sent you on the same day
 5       about three hours apart?
 6           MR. GORE:  Object to form.
 7           A.   I'll do my best.  He sent
 8       me a text at 9:01 p.m. viewed by me
 9       late at 9:15 p.m.  I'm just relying
10       on the record here.  He says:  "We
11       did another version.  Call me back."
12           I said:  "Another version?"
13           He said:  "Another version of
14       the map."
15           And at 9:15 p.m. I replied:
16       "Tomorrow," because it was 9:15 p.m.
17       And I would have called him back the
18       next day and, I imagine the next day
19       because I recall that he sent us
20       another version of the plan and that
21       plan was what he saw as -- what he
22       saw was an improvement on the staff
23       plan which we had released and
24       that's what it was.
25           Q.   And then there's a redacted
```

```
                                    Page 74

 1                    TERRENI

 2        not responsive text exchange after

 3        November 23, 9:15 p.m. but before

 4        November 30, 11:19, a.m., but on

 5        11/30/2021 at 11:19 you view a

 6        message from Dalton Oldham that

 7        says:   "Do you want our political

 8        data.  We are prepared to put it up

 9        on a publicly available site so you

10        can download?  It will provide an

11        explanation of the disaggregation,

12        reaggregation process and provides

13        accurate bloc level political data

14        without using race."

15             Do you see that?

16        A.   Okay.

17        Q.   Did you get that political

18        data from Mr. Oldham?

19        A.   No.

20        Q.   Did you see it?

21        A.   No.

22        Q.   And do you know what he

23        means about providing

24        disaggregation/reaggregation and

25        accurate bloc level political data
```

Page 75

```
 1                    TERRENI
 2       without using race, do you know what
 3       that is?
 4            A.   No.
 5            Q.   Do you know if Mr. Oldham
 6       is affiliated with someone who is
 7       now deceased named Thomas Hofeller
 8       or Hofeller, H-O-F-E-L-L-E-R, I
 9       believe?
10            A.   Hofeller.  Yes, I know him.
11            Q.   What do you know about
12       Mr. Hofeller?
13            A.   Mr. Hofeller was a
14       demographer for various Republican
15       organizations, maybe the Republican
16       National Committee.  He was -- I
17       believe he worked with the Census
18       Bureau at some time.  That's what I
19       know about Mr. Hofeller.  I met him
20       a couple of occasions with
21       redistricting NCSL functions.
22            Q.   Would you consider him a
23       controversial figure?
24            A.   No opinion about
25       Mr. Hofeller one way or the other.
```

Page 76

1                    TERRENI
2          Q.    Were you ever on any phone
3     calls with Mr. Oldham, Mr. Gore and
4     yourself?
5          A.    No.
6          Q.    Are you aware of whether
7     Mr. Gore spoke to Mr. Oldham?
8          A.    Not to my knowledge.  I
9     don't know.  I mean they both are in
10    the same office or actually but not
11    to my knowledge.
12         Q.    Do you know if Mr. Oldham
13    spoke with anyone at Jones Day?
14         A.    No.
15             THE WITNESS:  Would this be a
16     good time to take a break?
17             MS. ADEN:  Yes, maybe five
18     minutes, is that okay or do you
19     need more?
20             THE WITNESS:  Five would be
21     fine.  Thank you.
22             MS. ADEN:  Let's come back at
23     11:18, please.
24             THE WITNESS:  Sounds great.
25     Thank you.

```
 1                    TERRENI
 2           (Whereupon, there is a recess
 3        in the proceedings.)
 4           MS. ADEN:  Back on the record.
 5           Q.   You mentioned knowing
 6      Mr. Oldham for about 30 years.  How
 7      would you contact him if you needed
 8      to?
 9           A.   I would call him.
10           Q.   Would you use the number on
11      this text message?
12           A.   I assume I would, yeah.
13      Whatever is that number is what I
14      would use.
15           Q.   So you're not aware that
16      this number on this text exchange
17      from at least the last time you
18      corresponded with him in
19      November 30, 2021, you are not aware
20      that it's changed?
21           A.   No, ma'am.
22           Q.   Okay.
23           A.   Or that it hasn't changed.
24      I just don't know.
25           Q.   Do you know if he has an
```

```
                                    Page 78
  1                     TERRENI
  2       office in South Carolina, is he
  3       based in Washington?  Do you know
  4       physically where Mr. Oldham is?
  5            A.   No, ma'am.
  6            Q.   Have you seen him in 2022
  7       physically?
  8            A.   I don't think so, no.  Not
  9       that I recall.  It's possible but I
 10       don't recall.
 11            MS. ADEN:  If we could go to
 12        tab 9, which is a communication
 13        between Mr. Fiffick and Mr. Kincaid
 14        dated November 18, 2021, South
 15        Carolina Senate 3244 is the Bates
 16        stamp.  That would be Plaintiffs'
 17        Exhibit 2 I believe.
 18             (Plaintiffs' Exhibit 2,
 19        Communication between Mr. Fiffick
 20        and Mr. Kincaid, Bates South
 21        Carolina Senate 3244, marked for
 22        identification, as of this date.)
 23            Q.   Do you have that?
 24            A.   Yes, ma'am.  Is it a --
 25       it's an email dated November 18th?
```

```
                                        Page 79

 1                    TERRENI
 2         Q.    Yes.
 3         A.    Yes, I have it.
 4         Q.    From Adam Kincaid to Andrew
 5     Fiffick.
 6         A.    Yes, ma'am.
 7         Q.    So you've seen this before?
 8         A.    Yes.
 9         Q.    Before even I sent it?
10         A.    Before you sent it, yes.
11         Q.    When did you see it?
12         A.    I think in the process of
13     discovery.
14         Q.    Is this the two maps that
15     you believe Mr. Oldham was referring
16     to in the text exchange that we just
17     went over?
18         A.    I believe so, yes, ma'am.
19         Q.    And it's your position,
20     correct me if I'm wrong, that in
21     speaking to Mr. Oldham you told him
22     that he could communicate to NRRT,
23     that they could share these maps
24     with Mr. Fiffick at his gmail?
25             MR. GORE:   Object to form.
```

```
                                        Page 80

 1                    TERRENI
 2          A.   Mr. Oldham or Mr. Kincaid,
 3     whoever, needed an email address
 4     with which to share these maps.  And
 5     I believe, I don't specifically
 6     recall, that we provided -- I
 7     provided it to him probably.  I just
 8     know that Mr. Oldham called, he
 9     wanted to share these maps with us,
10     we allowed him to do so.
11          Q.   Did you know Mr. Kincaid
12     before he sent these emails?
13          A.   No, ma'am.
14          Q.   Have you talked to
15     Mr. Kincaid on the phone?
16          A.   No.
17          Q.   Have you emailed separately
18     with Mr. Kincaid about congressional
19     redistricting?
20          A.   No.
21          Q.   So Mr. Oldham is the go-to
22     to NRRT as far as you are concerned?
23          A.   No.  Mr. Oldham -- I don't
24     have a go-to to NRRT.
25          Q.   But Mr. Oldham is the
```

```
                                    Page 81

 1                      TERRENI

 2        connection between NRRT and the

 3        Senate with regard to these maps?

 4             A.    Yeah.

 5               MR. GORE:   Objection.

 6         Mischaracterizes his testimony.

 7         You can answer.

 8             A.    Yeah.

 9             Q.    Can you read the subject of

10        this email, the one from

11        November 18, 2021, at 10:05 p.m.?

12             A.    A and B.zip.

13             Q.    Item shared with you A and

14        B.zip, is that accurate?

15             A.    Yes, ma'am.

16             Q.    And did you ultimately

17        review what was in the A and B.zip?

18             A.    Yes.

19             Q.    What was in there?

20             A.    Two maps.

21             Q.    Do you know if those maps

22        are referred to or have been

23        referred to as the Wren and Palmetto

24        maps?

25             A.    I believe they have.
```

```
                                          Page 82
 1                    TERRENI
 2          Q.   And do you know -- how did
 3     you come to see them, can you
 4     describe what you understand
 5     happened once this Adam Kincaid sent
 6     Mr. Fiffick this zip file, how did
 7     it go from there to you seeing them?
 8          A.   One way or another the
 9     files were conveyed to Will Roberts
10     who loaded them in the Maptitude
11     software so that we could look at
12     them.
13          Q.   And by saying we looked at
14     them, who was that?
15          A.   Generally Mr. Roberts, me,
16     Mr. Fiffick, Breeden John may have
17     been there.  I don't believe anybody
18     else specifically but...
19          Q.   Do you know if these maps
20     were shared with Jones Day?
21          A.   I don't recall.  I think
22     so.
23          Q.   Did you share them with
24     Jones Day?
25          A.   I don't remember.
```

Page 83

```
 1                  TERRENI
 2        Q.    How would you have shared
 3     them with Jones Day?  Via email?
 4        A.    I don't think I would have
 5     shared them with Jones Day, it would
 6     have been -- I would have had Mr.
 7     Roberts or somebody send it to Jones
 8     Day, if we did it.  I just don't
 9     remember this.
10        Q.    Why would you have sent
11     them to Jones Day for what purpose?
12        A.    Because they were submitted
13     to the Senate -- they were
14     represented as having some political
15     consensus behind them and so just
16     for general informational purposes.
17        Q.    Political consensus of who?
18        A.    The congressional
19     delegation.  Specifically the
20     Republican congressional delegation.
21     Mr. Oldham told me they had worked
22     with the Republican congressional
23     delegations on some maps or map
24     delegation singular or rather he had
25     said they worked on the delegations
```

Page 84

```
 1                    TERRENI
 2      -- with the delegation on maps.  I
 3      asked him if the delegation included
 4      Mr. Clyburn.  He said no, this is
 5      the Republican delegation and that
 6      was it.  That's what he told me.
 7           Q.   And by -- so that means
 8      that -- did you understand that to
 9      mean that Mr. Oldham had
10      communicated with all six members of
11      the congressional delegation but
12      Representative Clyburn on this map
13      or both of these maps?
14           A.   I understood Mr. Oldham to
15      represent that the maps were
16      acceptable to the six members of the
17      delegation.  We did not discuss
18      whether he individually communicated
19      with each member or whether he
20      communicated with the staff or he
21      didn't do a role call.  Just what he
22      said.
23           Q.   Are you aware of whether --
24      are you aware that there were other
25      maps submitted by the public
```

Page 85

TERRENI

1    proposing congressional lines of

2    this cycle?

3        A.    Yes.

4        Q.    Are you aware whether those

5    maps were submitted to Jones Day?

6        A.    I imagine Jones Day was

7    made aware of various maps that were

8    submitted.  I don't want to go in --

9    I don't think it's appropriate,

10   unless my attorney tells me so, to

11   go through each map that I submitted

12   to Jones Day, but yes Jones Day was

13   generally made aware of maps that

14   were submitted to the Senate.

15       Q.    How many maps did you share

16   with Jones Day?

17       A.    I don't know how many maps

18   I individually shared with Jones Day

19   again -- I mean it could have been

20   anybody on Senate staff.  I mean if

21   you are saying physically shared,

22   probably not many because Will

23   Roberts would have been the logical

24   person to do it.  I'm speculating

*(Note: lines numbered 1-25 in the margin; the transcript text above is aligned to those numbers.)*

Page 86

```
 1                TERRENI
 2     here.  I just don't -- I mean are
 3     you asking me you if we,
 4     collectively, the Senate staff
 5     shared maps with Jones Day, yes.
 6     The logistics of it, I'm sorry, I
 7     don't remember.
 8          Q.   How did you determine which
 9     maps you would have shared, you
10     collectively, the Senate, with Jones
11     Day?
12          A.   Maps that I thought had
13     some particular political
14     significance perhaps at a
15     constituency that would have made
16     them likely to adopt or the member
17     had some concerns about or had
18     questions about or was interested
19     in.  If someone -- I mean that's a
20     general answer but it's pretty much
21     accurate.
22          Q.   How would a nonpartisan
23     organization have factored into your
24     calculus of a map that had political
25     significance?
```

Page 87

1           TERRENI
2       A.    They certainly could have.
3   League of Women Voters was very
4   active, well respected participant
5   in the process.  I'm sure we paid
6   close attention to their maps.
7       Q.    Do you recall specifically
8   sharing the League of Women Voters
9   map with Jones Day?
10      A.    Again, I'm not trying to be
11  picky here but do I recall me
12  specifically sharing it, no.  Did we
13  share it with Jones Day, probably
14  so.  Jones Day also could have
15  accessed it from the website.  I
16  mean they are all posted.
17      Q.    How many publicly submitted
18  maps are you aware were proposed by
19  the public that were posted on the
20  Senate's website?
21      A.    I believe all of them.
22      Q.    Excuse me?
23      A.    I believe all of them, at
24  least the ones that were submitted
25  by the submission deadline.

```
 1                    TERRENI
 2        Q.    But how many were there,
 3    were there more than five, more than
 4    ten, more than 20?  Do you have any
 5    sense of how many publicly submitted
 6    maps there were?
 7        A.    It was more than five.  May
 8    have been more than ten.  I don't
 9    recall.  We can look at the website
10    and see.
11        Q.    But based upon your
12    previous testimony is it your
13    position that not you or the Senate
14    staff collectively would not
15    necessarily have shared each of
16    those maps with Jones Day, you would
17    have made some determination about
18    which ones you would have selected
19    to send to Jones Day, whether or not
20    they looked at them separate -- all
21    of them separately or not you made a
22    selection of some not all of the
23    maps to be submitted to Jones Day?
24         MR. GORE:  Objection.
25      Mischaracterizes testimony.  Go
```

Page 89

```
 1              TERRENI
 2    ahead.  You can answer.
 3        A.   Well, we did not share
 4    every map with Jones Day.  That
 5    obviously involved some editorial
 6    function which we exercised in
 7    sending maps to Jones Day.  We did
 8    not send every map to Jones Day.
 9        Q.   The calculus for which maps
10    you would send to Jones Day was
11    essentially whether or not you
12    thought, you collectively thought
13    that a map had some political
14    significance, was likely to be
15    adopted or a member would be
16    interested in, those were the
17    contours of how you determine which
18    maps you would pick and potentially
19    submit to Jones Day?
20        A.   Those would be some of the
21    reasons, yes, for sending maps to
22    Jones Day, yes.
23        Q.   Looking at tab 58, and I
24    sent you 57, 58 is the associated
25    stats for the Wren map.  I think we
```

Page 90

```
 1                  TERRENI
 2     added it to that share point file.
 3     Do you see a number 58 in that file?
 4         A.   No, ma'am.  I had to
 5     download those exhibits so if you
 6     added it afterward, you sent them to
 7     us.  For whatever reason I don't
 8     have it.
 9         MS. ADEN:  John, could you
10      screen share it, 58.
11         MR. GORE:  I'm not sure I have
12      it either.  I'm checking to see if
13      I have it, but I'm not certain that
14      I do.
15         Q.   It also should be -- have
16     uploaded in Veritext.
17         MR. GORE:  If Andrew or John
18      Cusick has it and can share it,
19      that might be a little easier.
20         MS. ADEN:  Yeah.  It's South
21      Carolina 26635, that's the Bates
22      stamp number.  John, you can let me
23      know if you have it.
24         MR. CUSICK:  Yup.  I'm about
25      to pull it up in one second.  Oh,
```

Page 91

1                    TERRENI
2       unfortunately -- maybe we can go
3       off record for a moment just
4       because the host disabled
5       participant screen sharing.
6            MS. ADEN:  Mr. Gore, do you
7       need a minute to talk with your
8       client about this?
9            MR. GORE:  Yeah.  Let's take a
10      minute.
11           (Whereupon, there is a recess
12      in the proceedings.)
13           (Plaintiffs' Exhibit 3, Wren
14      plan, Bates South Carolina Senate
15      26635, marked for identification,
16      as of this date.)
17        Q.   So you have had a chance to
18      look at South Carolina Senate 26635,
19      tab 58.  This is identified in the
20      top left-hand corner as the Wren
21      plan.
22           Have you seen this document
23      before?
24        A.   I don't remember.
25        Q.   Looking at this document

Page 92

                              TERRENI

 1     would this have been something
 2     prepared by the South Carolina
 3     Senate during the redistricting
 4     process or does this look like a
 5     document prepared by someone outside
 6     of the Senate?
 7          A.    It likely was prepared by
 8     the Senate.  It was definitely
 9     prepared by somebody with Maptitude.
10     We used Maptitude.  And so I assume
11     it's a Senate document.
12          Q.    Were population summaries
13     like these something you regularly
14     saw during consideration of
15     congressional plans?
16          A.    Among others, yes.
17          Q.    And this summary includes
18     information about total population;
19     is that correct?
20          A.    Yes.
21          Q.    And deviations from
22     equality amongst the seven
23     congressional districts in total
24     numbers and even percentages; is

```
                                            Page 93

 1                     TERRENI

 2       that correct?

 3            A.    Yes, ma'am.

 4            Q.    And does it also report

 5       racial demographic information?

 6            A.    It does.

 7            Q.    Okay.  I want to focus on

 8       the percentage of non-DoJ black

 9       Hispanic people identified in this

10       chart, which is the far right

11       column.

12            Are you familiar with the

13       category non-Hispanic DoJ black?

14            A.    Generally, yes.

15            Q.    What do you understand it

16       to mean?

17            A.    What I understand it to

18       mean is when we at the outset of the

19       process settled on a metric for a

20       percentage of black population for

21       redistricting we had to pick one of

22       the measures.  And for consistency's

23       sake we tried to, as I recall, we

24       tried to replicate the measure that

25       was used by the Department of
```

```
                                        Page 94

 1                    TERRENI

 2         Justice in the 2010-cycle, which

 3         would have been non-Hispanic DoJ

 4         black.

 5             Q.   Do you understand that

 6         category to include people who

 7         self-identify as black on the census

 8         but do not identify as Hispanic in

 9         addition?

10             A.   Yes, ma'am.

11             Q.   Are you familiar with a

12         category called any part black that

13         the census reports?

14             A.   I am.

15             Q.   What do you understand

16         about that category?

17             A.   If a respondent in that

18         category identifies any part as

19         black they will be any part black,

20         meaning you could be Hispanic and

21         black and identify as -- and that

22         would be included in AP black.

23             Q.   I have not asked you, were

24         you born in South Carolina?

25             A.   No, ma'am.
```

Page 95

```
 1                    TERRENI
 2         Q.    Where were you born?
 3         A.    In Italy.
 4         Q.    Did you live in Italy for
 5    any period of time after you were
 6    born?
 7         A.    Yes, ma'am.
 8         Q.    For how long?
 9         A.    I lived in Italy until I
10    was eight.  I lived in Belgium for
11    another three years, moved to the
12    States when I was 11.
13         Q.    Do you have dual
14    citizenship?
15         A.    Yes, ma'am.
16         Q.    And have you -- when you
17    moved to the States when you were
18    around 11 where did you move to?
19         A.    Columbia.
20         Q.    South Carolina?
21         A.    Yes, ma'am.
22         Q.    Have you lived in Columbia,
23    South Carolina since that time?
24         A.    I have.
25         Q.    In South Carolina would you
```

Page 96

1                    TERRENI
2        say that you are familiar -- strike
3        that.
4             Based upon having lived in
5        South Carolina for the better part
6        of your life and your professional
7        experience would you expect the
8        difference between the non-Hispanic
9        DoJ black category and the any part
10       black category in South Carolina to
11       have wide disparities?
12             A.    No.
13             Q.    So you expect them to be
14       similar in number in South Carolina?
15             A.    Generally, yes.
16             Q.    Looking at this Wren plan
17       this is one of the plans -- these
18       are statistics for one of the plans,
19       we don't have a map associated with
20       this statistical summary, but this
21       is one of the statistical summaries
22       from one of the plans that Adam
23       Kincaid sent to Andy Fiffick, is
24       that fair to say?
25             A.    Yeah.

```
                                      Page 97

  1                    TERRENI
  2          Q.    Okay.   Looking  at  the
  3      summary  how  many  of  the  seven
  4      congressional  districts  reflected
  5      within  it  have  a  non-Hispanic  DoJ
  6      black  population  that  is  above
  7      50 percent?
  8          A.    None.
  9          Q.    What  is  the  district  that
 10      has  the  highest  percentage  of
 11      non-Hispanic  DoJ  black  voters  in
 12      this  Wren  plan?
 13          A.    District 6.
 14          Q.    Is  that  the  current
 15      district  represented  by
 16      Representative  Clyburn?
 17          A.    Yes, ma'am.
 18          Q.    And  is  he  the  only  black
 19      congressional  representative  in
 20      South  Carolina?
 21          A.    Yes, ma'am.
 22          Q.    And  in  at  least  the  past
 23      two  decades  has  he  been  the  only
 24      black  congressional  representative
 25      in  South  Carolina?
```

```
                                    Page 98

  1                      TERRENI
  2          A.     I don't remember when
  3     Senator Scott was elected to the
  4     Senate or was appointed to the
  5     Senate by Congress whether that was
  6     in the past two decades or not, but
  7     other than Congressman Scott if he
  8     would fall in that time period, yes.
  9          Q.     And the federal Congress is
 10     Representative Clyburn the only
 11     black representative that has been
 12     elected in at least the past two --
 13     strike that.
 14          Outside of CD 6 what is the --
 15     can you read the percentages of
 16     black voters in each of the other
 17     districts, the approximate
 18     percentages?  So let's start with
 19     CD 1, what is the percentage of
 20     black voters?
 21          A.     18.04 percent.
 22          Q.     What about CD 2?
 23          A.     24.89.
 24          Q.     And CD 3?
 25          A.     18.18.
```

```
                                          Page 99

1                    TERRENI

2           Q.    CD 4?

3           A.    18.54.

4           Q.    CD 5?

5           A.    25.39.

6           Q.    And CD 7?

7           A.    26.81.

8           Q.    So is it fair to say in the

9      Wren plan the lowest BVAP population

10     is in CD 1?

11          A.    Yes.

12          Q.    And the highest is in CD 7

13     15 27 percent, is that fair to say?

14          A.    No, it would be in

15     District 6.

16          Q.    Oh, the second highest.

17     I'm sorry.  The second highest

18     outside of CD 6 was that in CD 7 as

19     26 percent?

20          A.    Yes, ma'am.

21          Q.    Yes -- I think I cut you

22     off.  Yes or no?

23          A.    Oh, I'm sorry, yes.

24          Q.    What else do you recall

25     about seeing the Wren plan?  In
```

```
                                    Page 100
 1                    TERRENI
 2      particular, what was your reaction
 3      to it when you saw this map?
 4          A.   I didn't think it was
 5      viable.  We had already produced a
 6      staff plan which I don't believe had
 7      been posted to the website at that
 8      point but we had already had a plan
 9      that we were going to bring to the
10      subcommittee as a working start.
11      And I looked at both of those plans,
12      Wren, and maybe it was Palmetto,
13      very briefly and thought their
14      shapes were messy and were not an
15      improvement over this back plan.
16          Q.   Did you communicate that
17      feedback about the Wren or the
18      Palmetto to Mr. Oldham?
19          A.   Yes.
20          Q.   Over a phone call?
21          A.   Yes.
22          Q.   Did you communicate that
23      feedback -- and did you ask him to
24      communicate that feedback to NRRT,
25      Mr. Kincaid in particular?
```

```
                                      Page 101

1                    TERRENI

2          A.    No.

3          Q.    Did you receive guidance

4     from Jones Day about the Wren plan

5     before you communicated it back to

6     Mr. Oldham?

7          A.    I don't believe so.

8          Q.    Do you have any reason to

9     dispute that in this map Sumter is

10    split, Sumter as a county is split?

11         A.    I don't know.

12         Q.    What about Orangeburg, do

13    you recall whether Orangeburg was

14    split as a county in this Wren plan?

15         A.    If you showed me the map, I

16    could, but I don't know.  I can't --

17    from memory, no, I don't have any

18    recollection.

19         Q.    Do you have any

20    recollection of how Beaufort was

21    treated in this Wren plan?

22         A.    No.

23         Q.    And what about Charleston,

24    the County of Charleston, do you

25    have any recollection of how
```

Page 102

```
 1                      TERRENI
 2        Charleston was treated, whether
 3        whole or split, in this Wren plan?
 4             A.    I seem to recall the split.
 5             Q.    Do you recall how much
 6        CD 2, Representative Wilson's
 7        district, how CD 2 fared under this
 8        Wren plan?
 9             A.    No.
10             Q.    And what about CD 7, do you
11        have any recollection of how CD 7
12        fared under this Wren plan?
13             A.    What do you mean by fared?
14             Q.    Whether it was kept whole,
15        whether it was split, do you have
16        any recollection?
17             A.    Of CD 7 whether it was
18        split?
19             Q.    Um-hmm.
20             A.    I'm sure it was changed.
21             Q.    Changed from when?
22             A.    The benchmark plan.
23             Q.    And the benchmark plan is
24        referring to the 2011, the plan
25        adopted and enacted after the 2011
```

Page 103

```
 1                    TERRENI
 2      redistricting cycle?
 3           A.   Yeah.  I mean -- everything
 4      would be changed.  I'm not sure how
 5      we are talking about splitting the
 6      district -- I'm not trying to be
 7      cute.  I need the map.  If you show
 8      me the map, I'll be glad to.
 9           Q.   So let's turn to tab 38,
10      which is the map and the associated
11      stats for the Palmetto map.  This is
12      Bates stamped South Carolina 26370
13      to 71.
14           (Plaintiffs' Exhibit 4, Map,
15       Bates South Carolina 26370 to 71,
16       marked for identification, as of
17       this date.)
18           A.   Yes, ma'am.
19           Q.   Have you seen this map and
20      associated stats before?
21           A.   I have seen the map.  And I
22      probably saw the stats.
23           MR. GORE:  Can I clarify the
24       record?  I was just going to try to
25       clarify that with you.  Ms. Aden,
```

Page 104

```
 1                    TERRENI
 2      did you intend for tab 58 to be
 3      Plaintiffs Exhibit 3?
 4           MS. ADEN:  Yes.
 5           MR. GORE:  So I think we're on
 6      4 then now.  Just to clarify we are
 7      at tab 38 and that's going to be
 8      Exhibit 4.  Is that correct?
 9           MS. ADEN:  Yes.
10           MR. GORE:  Okay, thank you.
11        A.   If I may just to complete
12      my answer.  I saw the map.
13        Q.   Yes.
14        A.   And I may or may not have
15      seen the statistics at the time,
16      probably did, but I definitely saw
17      them in reviewing for this
18      deposition?
19        Q.   So this Palmetto map was
20      one of the other maps that was part
21      of A and B.zip file that Mr. Kincaid
22      sent to Andy Fiffick at his gmail;
23      is that correct?
24        A.   I think so, yes.
25        Q.   Where did you see -- when
```

Page 105

1                    TERRENI
2        you said you had seen this map
3        before, where do you think you saw
4        it?
5             A.   It would have been in the
6        redistricting office, probably
7        Senator Rankin's office.
8             Q.   Is that also often referred
9        to as the map room or is that a
10       separate room?
11            A.   That's a separate room.
12            Q.   So you think you saw this
13       map in Senator Rankin's office,
14       that's the first time you saw it?
15            A.   I think.  That's my
16       recollection.  And just to be clear,
17       there were times when we had a map
18       room and I believe it was on the 5th
19       floor.  It was kind of a small
20       cramped room.  When Senator Rankin
21       -- when they weren't in session,
22       Senator Rankin really didn't use his
23       office that much.  He made his
24       office available to us as kind of a
25       de facto map room.

Page 106

```
 1                    TERRENI
 2           My recollection is I saw this
 3      in Senator Rankin's office but I
 4      mean -- there's no functional
 5      difference between me seeing it
 6      upstairs or downstairs except it was
 7      a little less camped and a little
 8      less muggy.
 9           Q.   Who was with you when you
10      saw that map in Senator Rankin's
11      office, do you recall?
12           A.   I remember that Will
13      Roberts was there because he would
14      have loaded it and Andy Fiffick was
15      there.  Paul may have been there.  I
16      remember Andy and Will being there
17      for sure.
18           Q.   Do you have any sense of
19      what the purpose of this map was?
20           A.   Well, as I mentioned
21      earlier, Dale said that they had
22      this map that had the support of the
23      Republican members of the
24      congressional delegation and wanted
25      us to have it and I think he wanted
```

Page 107

```
 1                  TERRENI
 2      us to support it or propose it to
 3      this subcommittee -- so that was --
 4      I mean you have to ask Dale about
 5      his purposes but I imagine it was to
 6      -- I mean I understand his purpose,
 7      it was to put forward a Republican
 8      map that was supported by a
 9      Republican congressional delegation.
10      Whether that was the case or not, I
11      don't know.
12           Q.   Do you know whether this
13      map sort of reflected the particular
14      preferences of members of the
15      congressional delegation?
16           A.   I just said I don't know.
17      It was represented as such, but I
18      don't know.
19           Q.   And let me -- just to be
20      fair, did you -- you did not attend
21      any of those meetings with the
22      congressional delegation that
23      Mr. Oldham referenced?
24           A.   I don't know -- I said
25      Mr. Oldham said this map had the
```

Page 108

TERRENI

1   support of the congressional

2   delegation.  I don't recall him

3   mentioning meetings.  I didn't

4   attend them for sure if they took

5   place.

6         Q.   Were you aware that there

7   were going to be meetings with the

8   congressional delegation to put

9   together proposed maps to be

10  submitted to the Senate?

11        A.   No.

12        Q.   Were you surprised that the

13  congressional delegation went to

14  Dale Oldham to propose maps to put

15  before the Senate rather than coming

16  to you or other members of the

17  Senate staff to propose maps to put

18  into the record?

19        MR. GORE:  Object to form.

20        A.   I don't think I had any

21  reaction to it one way or the other.

22  It didn't surprise me that Dale

23  might have communicated with the

24  Republican members of the delegation

Page 109

```
 1                    TERRENI
 2      about redistricting, that's
 3      generally his job as I know it -- I
 4      don't know.  I wasn't surprised.  I
 5      wasn't expecting it either.
 6           Q.   Had you personally reached
 7      out to members of the congressional
 8      delegation to get their views about
 9      how the congressional maps should
10      look like?
11           A.   Had I reached out?
12           Q.   Yes.
13           A.   I don't recall reaching
14      out.  I mean if I did have a call
15      from Joe Wilson, I don't think it
16      was initiated by me.  I think it
17      might have been initiated by Joe and
18      Dalton Tresvant contacted the Senate
19      but not me on behalf of Congressman
20      Clyburn.
21           Q.   So you had one conversation
22      with Congressman Wilson about
23      congressional map making, is that
24      what you are saying?
25           A.   I think it was one, yes.
```

1              TERRENI
2         Q.   And what was the purpose of
3    that conversation?
4         A.   Congressman Wilson wanted
5    to express his -- some ideas about
6    redistricting those lines in the
7    second district.
8         Q.   What were those ideas?
9         A.   That he wanted to stay in
10   Richland, he wanted to stay in
11   Aiken.  And if he had to expand, he
12   wanted to -- he was not adverse to
13   -- if his district was going to have
14   to move a little bit he was not
15   adverse to having to move to
16   Newberry.
17        Q.   Moving to where?
18        A.   Newberry County.
19        Q.   Did he mention anything
20   about Fort Jackson in particular?
21        A.   I don't recall if he
22   mentioned it expressly, but I would
23   have known from the past two cycles
24   that Fort Jackson was very important
25   to Congressman Wilson.

Page 111

                        TERRENI
1
2          Q.    Did he mention anything
3     about how to treat Beaufort in
4     relation to CD 2 one way or the
5     other?
6          A.    I'm trying to remember.   I
7     know he would have -- he said at
8     some point that he was under
9     Beaufort before and he enjoyed
10    Beaufort.   But I think his
11    preference was not to have his
12    district run down to Beaufort mainly
13    just because of logistics.
14         Q.    What did you do --
15         A.    As I recall.
16         Q.    What did you do with these
17    ideas from Representative Wilson?
18         A.    We took them under
19    advisement.   Like we took
20    Congressman Clyburn's ideas under
21    advisement from Dalton.
22         Q.    Did you communicate the
23    ideas that representative --
24    Congressman Wilson shared with you?
25    Who did you communicate those ideas

Page 112

1                    TERRENI

2       to?

3            A.   I might have communicated

4       them, I don't remember.  I mean they

5       really weren't earth shattering.

6       That he wanted Fort Jackson was

7       something well-known and litigated

8       over before.  That he wanted

9       Southern Orangeburg County, I

10      remember him saying that as well.

11      He's been saying.  I mean that's

12      something that's been going for

13      20 years.  So I don't know if I

14      communicated them at all.  I don't

15      remember having any reason to talk

16      about it.  It just didn't come up in

17      the future.

18           Q.   Do you remember putting the

19      ideas about what Representative

20      Wilson wanted into the public record

21      at any of the hearings that the

22      Senate had on congressional map

23      making?

24           A.   No, ma'am.

25           Q.   Meaning you don't remember

Page 113

```
 1                    TERRENI
 2      or you did not do it?
 3           A.   I don't remember doing it.
 4           Q.   Looking at the second page
 5      of this tab 38?
 6           A.   Yes.
 7           Q.   Does this similarly include
 8      the statistical summary like with
 9      the Wren plan that we just looked
10      at?
11           A.   It does.
12           Q.   And does it similarly
13      include the breakdown of the
14      non-Hispanic, the percentage of the
15      non-Hispanic 18 plus DoJ black
16      population figures for each of those
17      seven districts?
18           A.   It appears to, yes.
19           Q.   How many of the proposed
20      districts in the Palmetto plan have
21      a district above 50 percent of black
22      voters, non-Hispanic DoJ black
23      voters?
24           A.   No.
25           Q.   What is the next highest
```

Page 114

1                    TERRENI
2        percentage of black voters in any of
3        the other congressional districts
4        outside of CD 6?
5            A.    Appears to be District 7,
6        the 24.82.
7            Q.    What is the lowest
8        percentage of black voters in any of
9        the districts under the Palmetto
10       plan?
11           A.    District 1, 17.08.
12           Q.    Looking back at the first
13       page, can you tell what district
14       Beaufort is in in this map?
15           A.    Appears to be mostly in
16       district -- well, it's all in
17       District 1, I believe, unless
18       there's a cut of my Hampton.  I
19       believe it's all in District 1.
20           Q.    And looking at Charleston
21       County can you tell where Charleston
22       County falls under the Palmetto
23       plan?
24           A.    In District 1 and
25       District 6.

Page 115

```
 1                    TERRENI
 2          Q.    Do you have any view of
 3     whether congressional District 7 in
 4     this map looks changed from the
 5     benchmark map in 2011?
 6          A.    I would have -- honestly, I
 7     would have to compare it but it
 8     looks generally the same.
 9          Q.    Is there anything else
10     about the Palmetto plan that stands
11     out to you looking at it at this
12     moment?
13          A.    In what way?
14          Q.    Let's go back.  How long do
15     you remember spending looking at
16     this map in Senator Rankin's office?
17          A.    Five minutes, ten.
18          Q.    Is there a reason why you
19     only looked at it for five or
20     10 minutes?
21          A.    Yes, ma'am.  We had already
22     drawn a plan that we were getting
23     ready to propose.  We didn't see
24     this making any improvement.  We
25     thought District 6, we had some
```

Page 116

1                        TERRENI
2       concerns about the way District 6
3       was drawn just in the form of change
4       and the regular shapes.  And we
5       didn't see this as being the plan
6       that we needed to spend more time
7       worrying about.
8            Q.    And you subsequently spoke
9       to Mr. Oldham again and did you, to
10      be clear, did you ask him what -- he
11      initiated the sending of a second
12      map known as the Jessamine map.  Do
13      you recall that?
14           A.    That was a few days later.
15           Q.    Did you ask for that map or
16      did he just send it in response to
17      the feedback that you gave him about
18      the Palmetto and Wren?
19           A.    It was not solicited by me.
20      He sent it in response to the
21      feedback about Palmetto and Wren and
22      the staff plan, the release of the
23      staff plan.  And the release of the
24      staff plan would have been -- I
25      think he sent it after the staff

1                    TERRENI

2        plan was released and then posted to

3        the website and I think his effort

4        as he described it was to, quote

5        unquote, improve on the staff plan.

6            Q.    Did you at any time ever

7        contemplate asking Mr. Fiffick to

8        forward the maps from Mr. Kincaid

9        received on November 18th to the

10       Senate redistricting email that had

11       been released to the public?

12           A.    I don't recall doing that

13       no.

14           Q.    Do you recall asking any of

15       the Senate staff to forward these

16       two maps to any member of the Senate

17       redistricting subcommittee?

18           A.    I don't recall doing that.

19           Q.    As you sit here today, do

20       you know whether any member of the

21       Senate subcommittee has ever seen

22       the Palmetto or the Wren plan?

23           A.    I believe Senator

24       Harpootlian saw them.

25           Q.    How so?

Page 118

1                    TERRENI

2         A.    Well, because he asked in

3     the subsequent subcommittee meeting

4     in which I believe the staff plan

5     was presented whether or not we had

6     had any communications from a

7     national committee and Andy Fiffick

8     told him that we had and he asked

9     what they were and he told him

10    generally speaking that we had

11    gotten something from this

12    organization I think he struggled to

13    name and told him that we had looked

14    at them and dismissed them and they

15    had not -- Senator Harpootlian was

16    concerned that the staff plan was

17    based on outside input.  Andy told

18    him it wasn't and I believe in the,

19    I guess I shouldn't speculate, my

20    recollection is that in the

21    aftermath of that deposition -- not

22    deposition -- that subcommittee

23    meeting Andy would have -- gave him

24    those maps.

25        Q.    But you don't know whether

Page 119

1                    TERRENI
2        Mr. Fiffick shared those maps with
3        Senator Harpootlian one way or the
4        other?
5             A.    No, ma'am.
6             Q.    And do you know whether, as
7        you sit here today, how any member
8        of the public would be aware of the
9        Palmetto and Wren plan being sent to
10       staff members of the Senate during
11       the redistricting process?
12            A.    I do not.
13            Q.    Let's look at tab 10, which
14       is another email from Adam Kincaid
15       and Andy Fiffick dated
16       November 24th, 2021, and is Bates
17       stamp number South Carolina Senate
18       ending in 3245 and this should be
19       Plaintiffs' Exhibit 5.
20            (Plaintiffs' Exhibit 5, Email
21        from Adam Kincaid to Mr. Fiffick,
22        Bates South Carolina Senate ending
23        in 3245, marked for identification,
24        as of this date.)
25            A.    Yes, ma'am.

```
                                    Page 120

 1                      TERRENI

 2          Q.    Have you seen this before?

 3          A.    In preparing for this

 4     deposition.

 5          Q.    Had you seen the contents

 6     of what was being transmitted from

 7     Mr. Kincaid to Mr. Fiffick, had you

 8     seen that before preparing for this

 9     deposition?

10          A.    In the context of the

11     Jessamine zip file I believe so,

12     yes.

13          Q.    Where would you have seen

14     the Jessamine zip file?

15          A.    In the Senate offices,

16     probably I believe Senator Rankin's

17     office.

18          Q.    Okay.  Do you recall who

19     was with you when you saw this map?

20          A.    I believe Andy would have

21     been and Will Roberts and I don't

22     recall anybody else but there could

23     have been other people.

24          Q.    And is there any reason why

25     after the first email from Adam
```

Page 121

```
 1              TERRENI
 2      Kincaid went to Andy Fiffick's gmail
 3      Adam Kincaid continued to send it to
 4      Mr. Fiffick's gmail and not his
 5      Senate website -- his Senate
 6      professional email?
 7           A.   Yes.  Because what he was
 8      doing was e-mailing a Google --
 9      well, I can't speak for Mr. Kincaid
10      but the practical reason would have
11      been he was e-mailing a Google drive
12      account file which that Jessamine
13      zip file would be downloaded from
14      the Google website.  And to do that
15      you had to sign in with a Google
16      email address.  That's how this
17      whole gmail address got started
18      because as I'm understanding it --
19      understand it they could not have
20      signed in on the Senate board side.
21           Q.   But as you sit here today,
22      are you aware whether this Jessamine
23      map as a pdf with associated
24      statistics, was that ever attached
25      to an email, a separate email and
```

Page 122

1                         TERRENI

2         center to the redistrict -- Senate

3         redistricting email website to be

4         part of that public record?

5              A.    I don't think so.

6              Q.    Is there a reason for that?

7              A.    Yeah.  The public

8         submission deadline had passed a

9         long time ago and this was just

10        somebody sending something in on

11        behalf of individual congressmen.

12        It wasn't being used.  It wasn't the

13        basis for anything in the Senate --

14        in the Senate map drawing so we

15        didn't see the need to post it.

16             Q.    But there was -- outside of

17        submission office maps there was

18        testimony, there were emails from

19        constituents and others being sent

20        after public submissions of maps, is

21        that fair to say?

22             A.    It would have been emails.

23        I don't remember -- we had a map

24        submission process and people

25        generally submitted maps in

Page 123

TERRENI

1    TERRENI

2    compliance with that process.  That

3    doesn't mean that other people might

4    have walked in and said I'm thinking

5    about a map, especially if it was

6    something that was represented as

7    being from a member of the

8    congressional delegation.  Did we

9    want to see it?  Sure.  But I don't

10   know because I wasn't present at

11   that meeting, but Dalton Tresvant

12   may have done the same thing for

13   Congressman Clyburn, that wouldn't

14   have been unusual in my experience

15   in redistricting.

16        If we had somehow used these

17   maps that is before as the basis for

18   something we proposed to the South

19   Carolina Senate for its

20   consideration with the subcommittee,

21   I believe we literally said, hey, we

22   got this map, you know, it has

23   congressional input and style.  We

24   didn't think it -- we didn't think

25   it was useful.  We didn't think it

Page 124

1                    TERRENI
2        was anything that was going to cause
3        us to change anything so basically,
4        you know, we took the email, we
5        loaded the map, looked at it, put it
6        aside.  I mean we were trying to
7        move on.
8            Q.    But you are making the
9        decision about whether it was the
10       basis for anything that you did.
11       The public has no way to analyze
12       whether or not it was the basis for
13       anything that you've done because
14       they have never seen the Jessamine,
15       the Wren or the Palmetto map; is
16       that correct?
17           A.    Yeah.
18           Q.    Did you share the Jessamine
19       map with Jones Day?
20           A.    I don't recall.
21           Q.    Are you aware of anyone who
22       shared the Jessamine map with Jones
23       Day?
24           A.    I don't recall.
25           Q.    Did you direct anyone to

Page 125

1                      TERRENI
2       share the Jessamine map with Jones
3       Day?
4           A.   Again, I don't recall.  It
5       wasn't that significant.  It's very
6       possible I didn't bother.
7           Q.   Did you share the Jessamine
8       map or direct anyone to share the
9       Jessamine map with any Senate
10      leadership?
11          A.   I don't remember.  I don't
12      think so.
13          Q.   Do you recall asking any
14      Senate staff to share the Jessamine
15      map with any Senate leadership?
16          A.   No, ma'am.
17          Q.   After receipt of the
18      Jessamine map did you speak with
19      Mr. Oldham again about the map?
20          A.   I don't recall.  I probably
21      did.
22          Q.   Did you provide him
23      feedback on the Jessamine map like
24      you did with respect to the Palmetto
25      and Wren map?

Page 126

1                    TERRENI
2          A.    Well, I probably said Dale,
3     I'm sorry, we are just going to move
4     on.   These were not detailed
5     discussions.
6          Q.    Looking at tab 11, which is
7     now a third email between Adam
8     Kincaid and Mr. Fiffick dated
9     November 28, 2021, with Bates stamp
10    numbering South Carolina Senate
11    3246.
12          (Plaintiffs' Exhibit 6, Email
13      between Adam Kincaid and
14      Mr. Fiffick, Bates South Carolina
15      Senate 3246, marked for
16      identification, as of this date.)
17          A.    Okay.
18          Q.    Do you have any
19    understanding of why Mr. Kincaid
20    sent Mr. Fiffick another email four
21    days later from November 24th with
22    the file labeled Jessamine map?
23          A.    No.
24          Q.    Did you recall looking at
25    the attachment in this November 28th

Page 127

1                    TERRENI

2       email in Mr. Rankin's or anyone

3       else's office?

4           A.   No, ma'am.  I recall three

5       maps.  Whether they did something

6       else with it I don't remember this

7       at all.  November 28th, you'll have

8       to refresh my memory, but I would

9       add that at some point during that

10      period because we were talking about

11      Thanksgiving would have, you know,

12      been in this; is that correct?

13          If you'll allow me to, I'll

14      look at when Thanksgiving was.  But

15      my only point is I caught COVID at

16      some point after that so I wasn't in

17      the office.  I was in some

18      communication but it's possible this

19      happened when I had COVID.

20          Q.   And how were you -- does

21      that mean you were not working on

22      congressional redistricting?

23          A.   It doesn't mean that I

24      wasn't working on it.  But it does

25      mean I may not have been around when

Page 128

                      TERRENI
1
2      this was sent.  I just don't -- I
3      don't remember a second Jessamine
4      email.  I don't remember this.
5          Q.   Do you recall in the
6      Jessamine map how many districts
7      above 50 percent there were?
8          A.   No.
9          Q.   Do you recall -- strike
10     that.
11          After you told Mr. Oldham stop
12     sending, essentially do not send any
13     more maps, did you have any other
14     conversations with Mr. Oldham about
15     congressional redistricting?
16          A.   I never told Mr. Oldham not
17     to send any more maps.  I don't
18     think that's my testimony.
19          Q.   What -- did you have any --
20     after Mr. Oldham sent this map to
21     Andy Fiffick first on the 24th and
22     then again the same map on the 28th,
23     did you have any further
24     communications with Mr. Oldham about
25     congressional redistricting?

Page 129

1                    TERRENI

2          MR. GORE:  Objection.

3      Mischaracterizes the document.

4          A.   Again, I remember adjusting

5      that -- I remember telling him we

6      were ready, thank you for the map

7      but we think we are going to move

8      on.  I don't recall any additional

9      conversations with Mr. Oldham about

10     congressional redistricting effort.

11     Certainly about any maps or anything

12     like that?

13         Q.   And if you had it would

14     have been via phone?

15         A.    Yeah.

16         Q.   Do you recall whether

17     Mr. Oldham was ever invited by

18     anybody in the Senate Judiciary

19     staff to testify about the Palmetto,

20     Wren or Jessamine maps during the

21     subsequent hearings that were held

22     on South Carolina congressional

23     redistricting?

24         A.    I recall that he was not.

25         Q.   Do you recall whether he

Page 130

1                    TERRENI

2      was invited?

3          A.   I recall that he was not

4      invited.  That's what I just said.

5          Q.   And do you recall was that

6      a decision made by the Senate staff

7      not to invite him or why given --

8      strike that.

9          Given the interest of a

10     congressional, Republican

11     congressional delegation in the

12     drawing of congressional lines did

13     you do anything to include

14     Mr. Oldham or the congressional

15     delegation in the consideration of

16     congressional maps after

17     November 28th?

18         MR. GORE:  Object to form.

19         A.   What we did to include

20     Mr. Oldham, the congressional

21     delegation and Republican, Democrat

22     or anybody else is they were free to

23     contact staff, members of the

24     subcommittee, come to explain and

25     testify if they wanted to.  There

Page 131

```
 1                      TERRENI
 2      was no affirmative decision one way
 3      or the other to not specifically
 4      invite Mr. Oldham, Mr. Tresvant or
 5      anybody else.  They knew where to
 6      find us.
 7           Q.   Could Mr. Oldham and R.T.
 8      have submitted testimony, not maps,
 9      not data or maybe maps and attached
10      data, could they have submitted that
11      as part of the public record and
12      subsequent hearings that were held
13      by the Senate in December and
14      January of 2021 and 2022?
15           A.   To the extent that
16      testimony is received by the
17      subcommittee they were welcome to do
18      that.
19           Q.   Let's look at tab 16.
20             MR. GORE:  Before we move on
21       to that did you mean to mark tab 11
22       as an exhibit?
23             MS. ADEN:  That should be
24       Plaintiffs' Exhibit 6, yes.
25           Q.   So looking at tab 15, which
```

Page 132

TERRENI

1

2      is titled 2021 Policy For Public

3      Plan Submission South Carolina

4      Senate Judiciary Committee

5      Redistricting Committee which was

6      adopted on September 17, 2021, it's

7      Bates stamped South Carolina Senate

8      3723 through 24.  So this should now

9      be Plaintiffs' Exhibit 7.

10            (Plaintiffs' Exhibit 7, 2021

11      Policy For Public Plan Submission

12      South Carolina Senate Judiciary

13      Committee Redistricting Committee,

14      Bates South Carolina Senate 3723

15      through 24, marked for

16      identification, as of this date.)

17          A.    Yes, ma'am.

18          Q.    Take a moment to look at

19      this, please.

20            Are you familiar with this

21      document?

22          A.    Yes, ma'am.

23          Q.    Okay.  What is it?

24          A.    It's a public submissions

25      policy.

Page 133

1                    TERRENI

2          Q.    And if you look at the

3      first page, could you read into the

4      record the sentence in I-B?

5          A.    "All plans submitted to and

6      accepted by the redistricting

7      subcommittee will be made part of

8      the public record and will be made

9      available in the same manner as

10     other redistricting public records."

11         Q.    So is it your position that

12     because -- well, strike that.

13         Let me have you look at

14     paragraph 3A and read that aloud

15     into the record.  It begins with

16     "Via plan"?

17         A.    "Via plan for the full

18     state or for an amendment to an

19     existing plan it should be a

20     complete amendment to the plan not

21     just a proposal for the district.  A

22     plan should stand as a complete

23     statewide plan for redistricting,

24     i.e., all pieces of geography must

25     be accounted for in the same" --

Page 134

1                      TERRENI
2        this seems to say some district --
3        "in some district."
4            Q.    And 3B provides the portal
5        or the means by which plans be
6        submitted and identifies the
7        redistricting.south
8        Carolina.Senate.gov website for
9        submissions.  Is that fair to say?
10           A.    Yes, ma'am.
11           Q.    And it provides that plans
12       have to be in a particular format
13       and with particular naming
14       conventions and other things to be
15       submitted.  Is that fair to say?
16           A.    It does.
17           Q.    And so it's your position
18       that because the -- or is it your
19       position that because the maps sent
20       by Adam Kincaid via his
21       communications with Mr. Oldham, that
22       because they violated this policy,
23       is that the reason why they were not
24       publicized on the Senate's website
25       or accepted by the Senate?

Page 135

1                    TERRENI
2          A.    No.
3          Q.    Then is the reason because
4     of the timing of when they were
5     provided?
6          A.    Yeah.
7          Q.    Okay.  So the timing is the
8     basis for why these did not appear
9     on the Senate's website and were
10    purportedly not accepted by the
11    Senate.  Is that fair to say?
12         A.    No.  It's the context.  And
13    by that I'll try to explain.  We had
14    set a public submissions deadline.
15    We had hearings on publicly
16    submitted plans.  We did all that.
17    We were under some time pressure to
18    produce a congressional
19    redistricting plan because of the
20    time we were aware of the core
21    express of desire for plans to be
22    submitted by January 18th.  The
23    Senate didn't do anything with
24    redistricting until after it had
25    essentially completed, maybe not

Page 136

1                        TERRENI

2       passed, and I'm speaking about

3       congressional, its Senate plan.

4             So at that point we felt some

5       time pressure to get things going.

6       We did a -- we had the public

7       submissions submitted.  We held --

8       we were holding hearings on the

9       plans.  Then at the last minute as

10      we were getting ready to post the

11      staff plan we get this call from

12      Dale that said I had this plan that

13      all the congressional delegations or

14      at least all the Republicans had

15      turned out that he represented as

16      having supported.

17            So at that point we had a

18      choice of do we want to see this

19      plan that supposedly is relevant to

20      two out of seven congressmen in the

21      state or do we tell him we don't,

22      then I said well send it on.  We

23      will take a quick look at it.  We

24      were about to release the staff

25      plan.  So didn't make sense to me to

Page 137

1                    TERRENI
2        ignore it.
3             I believe at one point I had
4        said, well, Dale you can submit it
5        through the public website.  Dale
6        for one reason or another may have
7        been reluctant do to that.  We just
8        said, well, fine, send it to us, we
9        will take a look at it.  And then
10       when we looked at it, it became very
11       clear to us it was not going to be
12       anything we used.
13            So really, I mean I never gave
14       much thought to where it should be
15       on the public website or not.  And
16       it wasn't.  Everybody knew about it
17       by the subsequent subcommittee
18       meeting because at that point that's
19       when Andy and Senator Harpootlian
20       had this exchange.  We were focused
21       on moving the staff plan on.  I mean
22       these plans just, they were kind of
23       dead letters at that point.  That's
24       why we didn't post them.  But, you
25       know, that's just what happens.

Page 138

                        TERRENI

1
2       Q.   But this policy was in
3    place before November 18th when Adam
4    Kincaid sent the first two maps to
5    Andy Fiffick, correct?
6       A.   Yes, ma'am.
7       Q.   So based upon this policy
8    and the timing and the form by which
9    Adam Kincaid was sending those maps,
10   they should not have been considered
11   or accepted by the Senate according
12   to this policy; is that correct?
13          MR. GORE:   Objection.
14    Mischaracterizes testimony and
15    document.
16          MS. ADEN:   I'm asking a
17    question.   I didn't characterize
18    his testimony.
19      Q.   According to this policy --
20      A.   No, I will disagree with
21   that.   Let me explain why.   And
22   there's some shortcuts involved in
23   this.   But the policy was a public
24   submissions policy.   We named the
25   organization such as yours could

Page 139

TERRENI

1    come submit a plan and testify in
2    support of it.  That's how we
3    conceived it.
4         Dale Oldham calls and says
5    there's this plan that's got the
6    support of the congressional
7    Republican delegation.  Maybe it
8    does, maybe it doesn't.  But in the
9    pressing deadline that we had we
10   thought well, let's see it.  Whether
11   Dale had the support of it -- I mean
12   whether -- whether Dale sent it or
13   we could have gone back and said we
14   will get a senator to submit it to
15   us as an amendment, he certainly
16   could have done that.  I mean that's
17   common sense if he's putting
18   something from the Republican
19   delegation in the same way that if
20   Clyburn or another member of the
21   Senate had come in and said we want
22   you to look at this map as something
23   that could be a perspective
24   amendment, we were going to look at

Page 140

TERRENI

1
2    it.
3         So did we go by the letter of
4    this policy, I don't think we gave
5    much thought to it.  We thought we
6    best look at -- it's been told to us
7    that it's something that could be
8    supported by a congressional
9    delegation.  We had not heard from
10    most of them up until that point and
11    we thought we better take a look at
12    it.  And so we did.  And that's kind
13    of where we are.  That's why the
14    policy was -- I mean that's how the
15    policy fits into this.
16         Q.   Turn to the text of this
17    policy, the NRRT submission on
18    November 13th, would have violated
19    it, correct?
20         A.   No.
21         Q.   According to --
22         A.   The text of his policy is
23    referring to the public submissions
24    process.  The NRRT submission was in
25    my mind something that was more akin

Page 141

TERRENI

1
2      to the legislative submission
3      policy.  Congressmen somehow in a
4      congressional redistricting cycle
5      are more akin to members.  Now,
6      whether or not that was an accurate
7      portrayal, that was a decision we
8      made.
9           Q.   So is it your position that
10     the NRRT is equivalent to a
11     legislative submission by a member
12     of the South Carolina legislature?
13          A.   No.
14          Q.   Is it your position that
15     Dale Oldham is a representative, an
16     official representative of the
17     Republican delegation for South
18     Carolina?
19          A.   No.
20          Q.   Is it your position that
21     the submission of a map, the
22     Jessamine map by the NRRT on
23     November 24th was not in violation
24     of the policy, this 2021 policy that
25     we are looking at?

Page 142

1                     TERRENI
2          A.    I don't think it was.
3          Q.    Have you heard of the
4     American Legislative Exchange
5     Council, ALEC?
6          A.    Yes.
7          Q.    How have you heard about
8     them?
9          A.    I'm aware that the American
10    Legislative Exchange Council is an
11    organization that is mostly
12    conservative, that provides access
13    over a think tank for legislators
14    who sometimes go to conferences or
15    receive legislation from them.
16         Q.    Do you know whether NRRT
17    provided data -- actually strike
18    that.
19          Do you know who Reagen Kelley
20    is?
21         A.    Yes.
22         Q.    Who is it?
23         A.    He is an employee of the
24    Senate Republican caucus.  I don't
25    know his specific title but he was

```
 1                    TERRENI
 2      kind of their guy.
 3           Q.   Did you communicate with
 4      Mr. Kelley about congressional
 5      redistricting?
 6           A.   No.
 7           Q.   Do you -- are you aware
 8      that NRRT, whether NRRT provided
 9      Mr. Kelley data related to
10      redistricting in South Carolina this
11      cycle?
12           A.   No.
13           Q.   Have you seen any data that
14      NRRT may have provided to Mr. Kelley
15      about congressional or any other
16      redistricting this cycle?
17           A.   No.
18           Q.   Are you aware of ALEC's
19      involvement in South Carolina
20      redistricting following the 2020
21      census?
22           A.   No.
23           Q.   Beyond who we've already
24      discussed did you or the Senate hire
25      any other consultants to help with
```

Page 144

```
 1                    TERRENI
 2      the congressional redistricting
 3      cycle?
 4           A.    No.
 5           Q.    Are you familiar with Sean
 6      Trende?
 7           A.    Not personally.  I believe
 8      -- no.  Am I familiar with him?  I
 9      mean I have heard of him.
10           Q.    What have you heard about
11      him?
12           A.    That he may be an expert
13      involved in the litigation of this
14      lawsuit.
15           Q.    Have you reviewed any -- he
16      is an expert for defendants in the
17      litigation.  Have you reviewed any
18      of his reports or analyses in the
19      context of this litigation?
20           A.    No.
21           Q.    Beyond what we've discussed
22      then, did you or the Senate hire any
23      other experts to facilitate the work
24      of redistricting by the Senate or
25      Congress during this redistricting
```

```
 1                    TERRENI
 2     cycle?
 3          A.    You mean during the cycle?
 4          Q.    Yes.
 5          A.    To facilitate the work of
 6     the committee?
 7          Q.    Of the Senate.
 8          A.    Of the Senate?  Not that I
 9     recall, no.
10          Q.    Do you know who Thomas
11     Brunell is?
12          A.    I recall the name.
13          Q.    Did he do any work on
14     behalf of the Senate for
15     congressional redistricting?
16          A.    No.
17          Q.    I want to show you what is
18     in tab 57, which should be the
19     retainer on December 2019.
20          A.    Yes.
21          Q.    This is Bates stamped South
22     Carolina Senate 4353 to 4354.
23            (Plaintiffs' Exhibit 8,
24      Charles Terreni representation
25       letter, Bates South Carolina Senate
```

Page 146

```
 1                    TERRENI
 2       4353 to 4354, marked for
 3       identification, as of this date.)
 4            Q.   Do you recognize this
 5       document?
 6            A.   I do.
 7            Q.   And this should be
 8       Plaintiffs' Exhibit 8.  What is this
 9       document?
10            A.   That's my representation
11       letter.
12            Q.   Okay.  And what is the
13       scope of your representation
14       according to this letter?
15            A.   To advise -- "During the
16       course of my representation I will
17       advise and report directly to you as
18       chairman of the Senate Judiciary and
19       such other individuals" -- excuse
20       me, I'm sorry, it's the first
21       paragraph.  "To advise and represent
22       the South Carolina Senate in
23       connection with redistricting
24       following the 2020 Decennial
25       census."
```

1                    TERRENI

2         Q.    And is that scope

3    consistent with what you ultimately

4    did during the redistricting cycle

5    followings the 2020 census?

6         A.    Yes.

7         Q.    Okay.  And as a practical

8    matter did you report directly to

9    the recipient of this letter,

10   Chairman Rankin of the South

11   Carolina Senate?

12        A.    Yes.

13        Q.    Did you report to anybody

14   else?

15        A.    No.

16        Q.    What does it mean to report

17   to Senator Rankin, what does that

18   encompass?

19        A.    Senator Rankin gave broad

20   direction as to the redistricting

21   process.  If there were policy

22   decisions to be made about

23   redistricting Senator Rankin was the

24   ultimate decision-maker.

25        Q.    Did Senator Rankin give you

Page 148

TERRENI

1

2      policy direction regarding

3      congressional maps this cycle?

4          A.    Sometimes.

5          Q.    What did that include?

6          A.    Senator Rankin sought in

7      terms of the 7th District, the 7th

8      District was pretty much a settled

9      matter from the last redistricting

10     cycle and his desire was to not see

11     a lot of change in it.  Senator

12     Rankin otherwise asked us to work

13     with the members and come up with a

14     viable and help them develop a

15     viable redistricting plan that could

16     pass the Senate.

17          I'm sure there were other

18     discussions but I mean that's the

19     general -- that would have been the

20     general direction that he gave.

21     Senator Rankin was involved along

22     the way as things went and arguments

23     were made and we took our cues from

24     him.

25          Q.    Were those directions

```
 1                    TERRENI
 2     committed writing?
 3          A.    Mostly not.
 4          Q.    Who were those directions
 5     communicated to?
 6          A.    Me, Andy.  I mean, his
 7     staff, Senate Judiciary staff.
 8          Q.    Did you or anyone at your
 9     direction communicate those policy
10     directions to the public?
11          A.    I don't recall doing so,
12     no.
13          Q.    Did you implement at least
14     the policy decisions that you just
15     identified, keep no change to CD 7
16     -- well, that was really the only
17     policy direction I saw or heard.
18     Did you implement that policy
19     guidance?
20          A.    Generally, yes.
21          Q.    Did you implement it when
22     the Senate staff developed the
23     initial staff plan?
24          A.    Implementing is a strong
25     word.  There wasn't a lot of, from
```

Page 150

```
 1                    TERRENI
 2        our perspective a lot of reason to
 3        change District 7 but, yes, you
 4        could say that.
 5             Q.   What about --
 6             A.   I'm sorry, you could say
 7        that.  Yes, I'm sorry.
 8             Q.   What about with the Senate
 9        Amendment 1 by Senator Campsen, do
10        you know if keeping CD 7 alone, was
11        that implemented in the context of
12        that proposed map?
13             A.   I believe it was.
14             Q.   And in the enacted map was
15        that guidance implemented keeping
16        CD 7 substantially similar.  And
17        when we are saying substantially
18        similar, it's substantially similar
19        to the benchmark map from 2011?
20             A.   Yes, ma'am.  Yes.
21             Q.   Would it be fair to say
22        that if that guidance was not
23        written or communicated to the
24        public, that the public could
25        potentially propose maps that change
```

Page 151

1                    TERRENI

2    CD 7 without an awareness that that

3    was a policy recommendation by the

4    chair of the Senate Judiciary

5    Committee?

6         A.   I'm not sure it is.  I

7    believe the chair had expressed that

8    policy preference publicly.  In any

9    case, it was never an absolute.  He

10   was saying I would like CD 7 to be

11   kept more or less the same just as

12   any of the other 45 members could

13   come to us and say I'd like to do

14   this or that.

15        He was also the chair, we took

16   our cues from him.  He could also be

17   outvoted.  But I believe Senator

18   Rankin was pretty open about

19   thinking congressional District 7

20   was a settled matter.

21        Q.   You mentioned that Senator

22   Rankin also asked for numbers.  What

23   type of numbers?

24        A.   I don't think I mentioned

25   that.  I could stand corrected if

Page 152

```
 1                      TERRENI
 2      you want to.
 3          Q.   I believe you mentioned
 4      that you talked about CD 7 no change
 5      and then you mentioned something
 6      about numbers and I wanted you to
 7      explain more, like he asked for some
 8      numbers, what you meant by that?
 9          A.   I don't recall saying that.
10      If I did, I stand corrected.  What I
11      believe I said is we took cues from
12      Senator Rankin at different stages
13      of the process.
14          Q.   Did Senator Rankin ever ask
15      you for data?
16          A.   He may have.
17          Q.   Do you recall providing him
18      data or do you recall asking a
19      member of the Senate staff to
20      provide him data?
21          A.   I'm sure Senator Rankin may
22      have asked for data and either I may
23      have asked a member of the staff to
24      or he could have asked them
25      directly.  He didn't have to go
```

Page 153

```
 1                    TERRENI
 2      through me.
 3           Q.   Did you develop or did you
 4      ask a member of the Senate staff to
 5      develop materials to share with
 6      Senator Rankin or any other senator?
 7           A.   Senator Rankin and other
 8      senators on occasion requested
 9      materials of us which I may or may
10      not have conveyed, but I mean,
11      again, it wasn't a formal.  So Andy
12      was always in contact with Senator
13      Rankin, Will, anybody else.  So he
14      could have asked them as well.
15      Materials at various points in time
16      both prepared for Senator Rankin,
17      yeah, sure.
18           Q.   Did those materials include
19      race data?
20           A.   The statistical reports
21      that included our -- on our plans
22      often included race data.  And yes,
23      some of the supporting materials
24      would have included race data.
25           Q.    Did they include talking
```

Page 154

TERRENI

1    points for around maps and different

2    proposals?

3         A.    Yes.

4         Q.    Did you review the data and

5    any talking points before they were

6    shared with legislative members?

7         A.    Often, yes.  Most of the

8    time.

9         Q.    Do you know whether Jones

10   Day reviewed data and talking points

11   before they were shared with

12   legislators?

13        A.    Sometimes, yes.

14        Q.    Do you know if Jones Day

15   reviewed maps, proposed maps before

16   they were shared with legislators?

17        A.    Sometimes.

18        Q.    Would it be you or someone

19   else who would determine when to

20   share data and/or maps and/or

21   talking points with Jones Day?

22        A.    It was generally me and

23   Andy.

24        Q.    What was your basis for

Page 155

```
 1               TERRENI
 2     determining when to share that
 3     information with Jones Day?
 4          A.    There could be a lot of
 5     reasons.  One might be we wanted
 6     Jones Day to check our work, make
 7     sure they didn't see any legal
 8     pitfalls to what we were advancing.
 9     We could want to confirm our own
10     impressions with other things that
11     have been put in front of us or
12     options that had been asked --
13     requested.  It was generally that.
14     Wanting legal advice from Jones Day
15     on various proposals whether they
16     came from us or from other people.
17          Q.    Did you ever ask to confirm
18     that the data that you relied upon
19     was accurate?
20          A.    Of Jones Day?
21          Q.    Yes.
22          A.    I don't think so, no.
23          Q.    Did you ever ask Jones Day
24     to confirm the appropriateness of
25     any of the data that you relied
```

1                    TERRENI

2       upon, you meaning the Senate relied

3       upon for proposed maps?

4            A.   Yes.

5            Q.   Did you do that by email or

6       by phone?

7            A.   I don't remember

8       specifically.  It could have varied

9       depending on the data we were

10      discussing.

11           Q.   Do you consider the

12      question of whether communities of

13      interest -- are you familiar with

14      what communities of interest are?

15           A.   Yes.

16           Q.   What are they?

17           A.   They were defined in our

18      guidelines but they are generally

19      groupings of, demographic groupings

20      of individuals that are defined by

21      geographical boundaries, common

22      shared interests, vernacular history

23      and so forth.  We have a more

24      complete definition in the

25      guidelines, but that's, generally

```
 1                    TERRENI
 2      speaking, what you want, people with
 3      some common interest of some sort.
 4           Q.   Did you -- during your work
 5      on congressional redistricting did
 6      you consider whether communities of
 7      interest were respected in various
 8      proposals by the legislature or by
 9      the public?
10           A.   Yes, we tried to.
11           Q.   Did you consider the
12      question of whether communities of
13      interest were respected to be a
14      legal question?
15           A.    It was partly a legal
16      question, partly a factual issue.
17           Q.    To the extent there was a
18      factual question would you seek
19      guidance from Jones Day about
20      whether or not a communities of
21      interest was respected?
22           A.   No.
23           Q.   How would you determine if
24      it was factual or legal, would you
25      do that, make that determination,
```

Page 158

1              TERRENI
2       you or you in consultation with
3       Senate counsel or how would you
4       determine whether it was a legal or
5       factual question?
6            A.    There was never such a
7       distinction, such a rigid
8       distinction, but I wouldn't have
9       consulted Jones Day about
10      communities of interest in South
11      Carolina unless I was concerned
12      about the legal defensibility of
13      asserting a particular community of
14      interest or the description somebody
15      else gave a community of interest
16      and whether it was something that
17      could be legally justified or
18      supported in litigation which we
19      anticipated.
20           Q.    Do you know what contiguity
21      is?
22           A.    Yes.
23           Q.    What is it?
24           A.    It's the connection between
25      district boundaries which under our

Page 159

TERRENI

1    policies can really be point to

2    point contiguity as I recall or

3    contiguity by water.  But it's the

4    requirement in general that

5    districts be contiguous meaning that

6    districts touch each other.  You

7    couldn't have District 1 in the

8    northeastern corner of the state and

9    then replicated in the southwestern

10   corner of the state.  Absent some

11   legitimate connecting geography such

12   as water.

13       Q.   Did you consider that to be

14   a legal or a factual question

15   whether a district was contiguous

16   with another district?

17       A.   Both.

18       Q.   What about core

19   constituency, are you familiar with

20   that term?

21       A.   Yes.

22       Q.   What do you understand that

23   to mean?

24       A.   Core constituency is

Page 160

```
 1                   TERRENI
 2      generally, can generally be
 3      described as the percentage or the
 4      portion of the district, of an old
 5      district that's retained in a new
 6      district.  Some people may have
 7      variations on it, but that's
 8      basically what it is, it is the
 9      heart or the bulk of the former
10      district preserved in any district.
11           Q.   And whether an analysis of
12      -- an analysis of -- strike that.
13           An analysis of whether the
14      core of a district that was being
15      proposed how it changed this cycle
16      as compared to under the benchmark
17      plan, is that a factual question or
18      a legal question in your view?
19           A.   Both.
20           Q.   What makes it a legal
21      question?
22           A.   Well, core constituencies
23      have been described and defined to
24      some extent in the case law of South
25      Carolina.  Specifically I can think
```

Page 161

```
 1                    TERRENI
 2      of Carlson [ph] County versus
 3      McConnel case in which they
 4      discussed core constituency in some
 5      detail involving how long, what
 6      percentage of the district remained
 7      districts or parts of the district
 8      that were in a district before.
 9           So you asked core
10      constituency.  We can run a core
11      constituency report and that's a
12      factual question in assessing maps
13      in terms of a percentage.  Then
14      there's a second question of, you
15      know, John, how is the court going
16      to view this if it's litigated or
17      how significant is this factor.  I
18      think those are legal questions and
19      ones that we were discussing with
20      Jones Day.
21           Q.   What about maintaining
22      counties, cities and/or VTDs whole
23      or whether to split them, in your
24      view is that both a factual and a
25      legal question?
```

Page 162

```
 1                    TERRENI
 2          A.    Yeah, it is.
 3          Q.    So with respect to many of
 4     these that we just described it's a
 5     factual question whether or not they
 6     are split or not split, whole or not
 7     split whole and your view --
 8            Yes, I'm sorry?
 9          A.    No, I was nodding along,
10     sorry, go ahead.
11          Q.    And then it becomes a legal
12     question in your view about whether
13     or not that split or that keeping of
14     a district as similar, you know, the
15     amount of how a district retains or
16     is not -- or is different from a
17     benchmark plan the degree to whether
18     or not that happens or if that
19     happens is a legal question in your
20     view or whether it's appropriate for
21     it to split or not split, whether
22     it's appropriate to retain this much
23     or that little, for you that's a
24     legal question of how the courts
25     will view those decisions?
```

Page 163

1                    TERRENI

2          A.    Yes.

3              MR. GORE:  Object to form.

4        You can answer.

5          A.    Thank you.  The

6      appropriateness or the legality, the

7      defensibility of one feature or

8      another of the plan would be core

9      constituency splitting counties, the

10     circumstances under which it's done,

11     the reasons for it, I think those

12     are legal questions, at least in the

13     context that they were posed to

14     Mr. Gore.

15         The fact that a plan splits a

16     county five times that's sort of a

17     factual issue that's generated on

18     Maptitude before.  So are these

19     concepts like communities of

20     interest, I think they are a little

21     hazier, but I think it's safe to say

22     I didn't rely on Mr. Gore for his

23     knowledge of South Carolina.

24         Q.    But you might ask -- you

25     might -- is it fair to say that you

Page 164

```
1                    TERRENI
2      might have done an analysis of how
3      many splits there were of a
4      particular county or city, and you
5      might have both shared that data
6      with Jones Day and asked whether or
7      not that is defensible, both of
8      those could have been done in the
9      context of your communications with
10     Jones Day?
11          MR. GORE:  I'm just going to
12      put an objection on the record.  We
13      are getting really close to topics
14      and conversations that may have
15      been covered by attorney-client
16      privilege.  So if the witness can
17      answer that without divulging
18      privileged conversations, he can do
19      so.
20          A.   I'm sorry, can you repeat
21     that question?
22          Q.   Yes.  Would you have on
23     behalf of the Senate have asked
24     Jones Day or have shared with Jones
25     Day factual information about the
```

Page 165

1                    TERRENI

2        number of splits in a particular

3        plan?

4            A.    Yeah.

5            Q.    Would you have asked Jones

6        Day to confirm whether those numbers

7        that you shared were accurate or

8        not?

9            A.    No.

10            Q.    You would -- would you have

11        expected that they would have

12        checked the accuracy of data that

13        you shared with them?

14            A.    No.

15            Q.    But you would have asked

16        them whether or not that number of

17        splits is defensible or not, is that

18        fair to say?

19            A.    I could have, yeah.  I

20        could have.  I mean I -- when it

21        comes to a number of splits I mean

22        we had Maptitude and Will Roberts

23        for that.  I didn't need John Gore

24        for that.  You know, the Senate plan

25        with various attributes and I'd say

Page 166

1                    TERRENI

2       the question generally was give us

3       your legal opinion whether this plan

4       complies with redistricting law and

5       whether it will be defensible in

6       litigation.

7           Q.    Just to be clear, any of

8       the plans that you would have sent

9       to Jones Day would have included

10      statistical data that captured some

11      racial demographics?

12          A.    No.  It could have.  It

13      didn't necessarily.  It's possible.

14      Often do.  But not -- we wouldn't

15      have mandate.  It wasn't pertinent

16      to the question so we probably

17      wouldn't have sent it.  I don't

18      know.

19          Q.    Looking back at this

20      retainer letter.

21          A.    Yes, ma'am.

22          Q.    How would you have

23      communicated or reported to Chairman

24      Rankin, by phone, by text, by email

25      or combination thereof?

```
 1                    TERRENI
 2         A.   Combination.  And in
 3    person.
 4         Q.   Are you still employed by
 5    the Senate?
 6         A.   I never was employed by the
 7    Senate unless you count my time as a
 8    Senate page.  I'm under contract.
 9    Is the Senate paying my bills now,
10    yeah.
11         Q.   Are you still -- is this
12    retainer agreement still in effect
13    with respect to your work with the
14    Senate?
15         A.   Yes.
16         Q.   Looking at the second
17    paragraph it reflects your hourly
18    rate?
19         A.   Yes.
20         Q.   And shares the process by
21    which you will bill for your work on
22    behalf of the Senate.  Who do you
23    bill?
24         A.   The Senate.  I mean
25    specifically?
```

Page 168

1                    TERRENI

2          Q.    Who did you send the bill

3      to?

4          A.    The bill goes to Andy

5      Fiffick and the Senate clerk.

6          Q.    Is it fair to say that

7      based upon this retainer you bill on

8      a monthly basis?

9          A.    I generally do, yes.

10          Q.    Okay.  Do you know the

11      source of those funds?

12          A.    The State of South

13      Carolina.

14          Q.    And this is, reflects a

15      retainer from December 30, 2019, is

16      that fair to say?  At the top of

17      South Carolina Senate?

18          A.    Yes, ma'am.

19          Q.    4353, it's dated

20      December 30, 2019?

21          A.    Yes, ma'am.

22          Q.    Do you know approximately

23      how much you have billed for your

24      work on redistricting under this

25      retainer since December 30, 2019?

Page 169

```
 1                  TERRENI
 2        A.    No, ma'am.
 3        Q.    Would it be fair to say
 4    that you have at least attempted to
 5    on a monthly basis provide bills to
 6    the Senate, Andy Fiffick or someone
 7    else, on a monthly basis since
 8    December 30, 2019?
 9        A.    Generally speaking.  If
10    there was a month without a lot of
11    work I might have held the bill
12    until the next month, but we
13    generally bill monthly.
14        Q.    Do you know whether your
15    monthly bills, would they range in
16    amount of $5,000, $10,000, $20,000?
17        A.    It would vary.  I mean back
18    in 2019 they might have been very
19    small.  During -- after the PL data
20    came out they would have been
21    substantially more because I was
22    spending more time.  I don't really
23    -- I mean -- that's my answer.  I
24    don't know.
25        Q.    Between November and
```

```
 1                    TERRENI
 2       January, November of 2020 and
 3       January of 20 -- I'm sorry, November
 4       of 2021 and January of 2022, do you
 5       know approximately how much you
 6       would have billed for that time when
 7       congressional redistricting would
 8       have been pretty active with the
 9       Senate?
10            A.   70,000 maybe.  Somewhere
11       70, a hundred.  I don't -- somewhere
12       in that range.
13            Q.   And based upon this
14       retainer there's no cap to the
15       amount that you can bill, is that
16       fair to say?
17            A.   $300 an hour.
18            Q.   And there's been no
19       addendum to this agreement, is that
20       fair to say?
21            A.   No, ma'am.
22            MS. ADEN:  Okay.  We have been
23        going for a bit.  It's 1:08.  We
24        started at 10:00.  For the purposes
25        of the court reporter if we could
```

Page 171

                              TERRENI

1

2        go off the record for a second and

3        talk about whether or not it would

4        be a good time for us to take a

5        short lunch.  I know we want to

6        keep pushing through the day, I

7        imagine, but I would love to

8        respect everyone's need for blood

9        sugar.

10              (Luncheon recess:  1:08 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 172

```
 1                    TERRENI
 2      A F T E R N O O N    S E S S I O N
 3             (Time noted:  1:41 p.m.)
 4      C H A R L E S    T E R R E N I,
 5      resumed and testified as follows:
 6      EXAMINATION BY (Cont'd.)
 7      MS. ADEN:
 8          Q.   So I'd like to focus your
 9      attention on some questions about
10      the Senate redistricting criteria
11      and guidelines.  If you look at tab
12      1, which is an email from Paula
13      Benson to Senator Campsen, it copies
14      you Mr. Terreni with the subject
15      adopted guidelines and description
16      of Thornburg versus Gingles and NCSL
17      redbook dated January 18, 2022, it
18      has two attachments, it's Bates
19      stamped South Carolina Senate 22356
20      to 22364 and this will be
21      Plaintiffs' Exhibit 9 I believe.
22             (Plaintiffs' Exhibit 9, Email
23       from Paula Benson to Senator
24       Campsen with attachments, Bates
25       South Carolina Senate 22356, marked
```

Page 173

```
 1                    TERRENI
 2        for identification, as of this
 3        date.)
 4            Q.    Do you have that?
 5            A.    Yes, ma'am.
 6            Q.    What is your understanding
 7        of what these documents are?
 8            A.    Well, one is an email from
 9        Paula to Senator Campsen sending him
10        the guidelines adopted by the
11        subcommittee, an excerpt from the
12        NCSL redbook which is the NCSL's
13        guide on redistricting discussing
14        Thornburg versus Gingles.
15            Q.    I want to focus your
16        attention on page 2, South Carolina
17        Senate 22357.  Looking at that first
18        paragraph at the top of the page is
19        it fair to say that the Senate
20        guidelines identified the purpose of
21        them is to:  "A, the redistricting
22        subcommittee and interested parties
23        in developing and evaluating
24        redistricting plan proposals"?
25            A.    Yes.
```

Page 174

TERRENI

1   Q.   Based on that stated

2   purpose would you agree that the

3   public would reasonably look to this

4   document to understand the

5   guidelines that the Senate would be

6   used to develop and consider public

7   proposals?

8   A.   Yes.

9   Q.   To evaluate public

10  proposals?

11  A.   In part.

12  Q.   What else would it look to

13  besides these guidelines if it's in

14  part?

15  A.   Well, their policy

16  preferences and political

17  considerations.  In any

18  redistricting process these are

19  factors that are going to be

20  considered in the end backdrop to

21  that.

22  Q.   And if those policy

23  preferences and political

24  considerations that are in the

Page 175

1                    TERRENI

2      backdrop are not reduced to writing

3      in the context of South Carolina's

4      redistricting process's cycle would

5      it be fair to say that the public

6      would only know about those

7      preferences and policy

8      considerations if they were made on

9      the public record at a hearing or on

10     one of the documents that the Senate

11     posted to its website?

12         A.    The public in general, I

13     mean members of the public could

14     communicate with individual members

15     of the Senate and I assume they have

16     conversations about what they would

17     like or not like.  The point being

18     these are sort of common guidelines

19     that were adopted by the Senate for

20     the redistricting process.

21            Now, one individual senator

22     may have a different view of what

23     the resulting plan might look like

24     from the other.  They may have

25     several views.  Are every one of

Page 176

```
 1                    TERRENI
 2       those views and policy preferences
 3       expressed in guidelines, no.  I mean
 4       they couldn't be and they are not
 5       meant to be.
 6            Q.   Could these guidelines be
 7       modified?
 8            A.   By the Senate subcommittee.
 9            Q.   Could they?  There's no
10       rule that prevents them from being
11       modified after September 17th, 2021;
12       is that correct?
13            A.   Correct.
14            Q.   And there's no prohibition
15       on reducing -- let me strike that.
16            Do you think it would be fair
17       to the public if a policy preference
18       became important to the decision
19       about whether a map would be adopted
20       or not for that to be publicized in
21       a way acceptable to the general
22       public?
23            MR. GORE:  Object to form.
24            A.   I'm struggling to
25       understand the question.  Would it
```

Page 177

                    TERRENI

 1
 2    be fair?
 3          Q.   Yes.  Would it be --
 4          A.   It could be fair.  It could
 5    be unfair.  I mean that's not my --
 6    do I think it would be?  I mean, no.
 7    If what you are talking about is
 8    what every representative, elected
 9    official expresses in the map
10    drawing process, I mean if they
11    wanted to do that they are free to
12    do it, but that's not the system we
13    have.  I mean they -- I'm not sure
14    what we are saying here.
15          Q.   Do you consider these
16    criteria, these guidelines binding
17    on a subcommittee's decision-making
18    with respect to congressional maps?
19          A.   I think the subcommittee is
20    free to do what the subcommittee
21    wants to do.  They pass guidelines.
22    If they want to deviate from the
23    guidelines and they take a vote to
24    do it, they are free to do it.
25          Q.   And as far as you are

```
 1                    TERRENI
 2      aware, was there any vote to deviate
 3      from these guidelines during this
 4      past redistricting cycle?
 5           A.    Not that I'm aware of.
 6           Q.    Based upon the stated
 7      purpose would you agree that the
 8      public would reasonably look to this
 9      document to understand the criteria,
10      the guidelines, the Senate would be
11      perhaps identified as useful to
12      developing proposals by the
13      legislature?
14           A.    Yeah.
15           Q.    And to evaluate the map
16      ultimately enacted by the
17      legislature?
18           A.    They would be one -- there
19      would be one measure.  I mean a
20      number of people submitted very
21      different policy proposals that they
22      asserted complied with the
23      guidelines.  And certainly with the
24      more objective measures such as plus
25      or minus one and that kind of thing.
```

                              TERRENI

1

2    They did.  I mean but they were very

3    different.  I mean so I'm not

4    sure -- yes, the public would look

5    to these guidelines but then express

6    their policy differences through the

7    guidelines.  In other words, they

8    might say well, no, I think my map,

9    which is, complies with the

10   guidelines, is a threshold matter is

11   a better policy choice than somebody

12   else's map just as you did versus

13   other maps that were for your

14   organization versus other maps that

15   were submitted.

16        Q.   Did you or the Senate

17   present the guidelines to the public

18   as rules for how the maps would be

19   judged?

20        A.   I don't recall using that

21   language, no.

22        Q.   Let's look at tab 49, which

23   is a document titled South Carolina

24   Senate Redistricting Subcommittee

25   2021 Public Hearings.  Tell us about

Page 180

```
 1                TERRENI
 2    our community.  It's Bates stamped
 3    South Carolina Senate 3745.
 4        A.    Um-hmm.
 5        Q.    Have you found that
 6    document?
 7        A.    I have.
 8            (Plaintiffs' Exhibit 10, South
 9     Carolina Senate Redistricting
10     Subcommittee 2021 Public Hearings,
11     Bates South Carolina Senate 3745,
12     marked for identification, as of
13     this date.)
14        Q.    Do you recognize this
15    document?
16        A.    Yes.
17        Q.    Did you help create it?
18        A.    I may have.
19        Q.    Can you read into the
20    record the first two sentences under
21    Redistricting Guidelines beginning
22    with "Redistricting guidelines or
23    criteria"?
24        A.    Yes.  "Redistricting
25    guidelines or criteria are the rules
```

1              TERRENI

2     of the road for how district lines

3     are redrawn in accordance with

4     state's population.  Criteria is

5     intended to make the districts easy

6     to identify and understand and to

7     ensure fairness and consistency."

8         Q.   So based upon this document

9     do you have any reason to disagree

10    that this document was publicized by

11    the Senate Judiciary Redistricting

12    Subcommittee during this last round

13    of redistricting?

14        A.   No.

15        Q.   And is it fair to say that

16    this document that was publicized

17    identified the redistricting

18    guidelines as rules of the road for

19    how lines will be redrawn?

20        A.   Yeah.  The rules of the

21    road for how lines would be drawn,

22    they are not the exclusive criteria

23    for how lines will be judged and I

24    feel confident everybody understood

25    that because they submitted vastly

Page 182

1                    TERRENI

2      different things using these same

3      rules.  I think there's a

4      difference.  That's the colloquial

5      language we use and I think it was

6      well understood by everybody.

7           Q.   Are you aware that Senator

8      Rankin has been deposed in this

9      case?

10          A.   I am.

11          Q.   Would it surprise you if he

12     referred to the guidelines as the

13     end all and be all for the Senate's

14     consideration of congressional maps?

15          A.   I would have to see his

16     deposition.  I don't know how to

17     judge that statement in isolation.

18          Q.   Would it surprise you if he

19     said that the Senate would not and

20     could not deviate from these

21     guidelines?

22          A.   No.

23          Q.   Would you disagree then

24     with Senator Rankin's assessment of

25     the import of these guidelines

Page 183

1                          TERRENI

2       notwithstanding?

3            A.    I have no way of saying

4       that.   I would need for context.

5            Q.    Going back to tab 1 on the

6       Senate guidelines, were you involved

7       in the creation of them?

8            A.    Yes.

9            Q.    How so?

10           A.    I was in -- had some input

11      in the drafting of the document that

12      ultimately was adopted by the Senate

13      subcommittee.

14           Q.    Did you or -- did you or

15      are you aware of anyone who shared

16      these draft guidelines with the

17      Jones Day law firm?

18           A.    I'm sure I shared them with

19      the Jones Day law firm.

20           Q.    Was anyone else outside of

21      the Senate consulted in the

22      development of these guidelines?

23           A.    No, ma'am.

24           Q.    Outside of Jones Day?

25           A.    Not that I know of.

1                    TERRENI

2          Q.    Who made the decision to

3     hire Jones Day this cycle?

4          A.    Senator Rankin.

5          Q.    Were you privy to the scope

6     of the retention with Jones Day?

7          A.    Probably.

8          Q.    Do you know who pays Jones

9     Day?

10         A.    The State of South

11    Carolina.

12         Q.    Do you know how much they

13    are paid an hour for their

14    representation in this litigation?

15         A.    I don't recall.

16         Q.    Do you know what the scope

17    -- do you know how much they were

18    paid for their work with

19    congressional redistricting prior to

20    this litigation?

21         A.    At one time I did.  I do

22    not recall.  And I should clarify

23    that I really don't have any direct

24    knowledge of any arrangements that

25    may be specific to the litigation.

Page 185

1                    TERRENI
2          Q.   Did you see a retention
3     agreement with Jones Day similar to
4     the retention agreement you had with
5     the Senate at any point in your work
6     on redistricting this cycle?
7          A.   I believe I saw the
8     original retention agreement which
9     would not have been similar to mine,
10    at least in form.  But I saw a
11    retention agreement.
12         Q.   Roman numeral I of these
13    guidelines on this first page is
14    identified as Requirements of
15    Federal Law.
16         A.   Yes, ma'am.
17         Q.   If you look at under Roman
18    numeral I-A2 Congressional
19    Districts.
20         A.   Um-hmm.
21         Q.   Is it fair to say that the
22    guidelines urged congressional maps
23    to avoid populational deviations of
24    one person but recognized that a
25    deviation, however small, can be

Page 186

TERRENI

1
2       just fiduciary, is that your
3       understanding?
4           A.    Yes.
5           Q.    Under Roman numeral I-B
6       still in the federal law section
7       it's titled Voting Rights.  Could
8       you take a moment to read that
9       sentence.
10          A.    "A redistricting plan for
11      the general assembly or Congress
12      must not have either the purpose or
13      the effect of diluting minority
14      voting strength and must otherwise
15      comply with Section 2 of the Voting
16      Rights Act, as expressed in
17      Thornburg versus Gingles and its
18      progeny, and the 14th and 15th
19      amendments to the U.S.
20      Constitution."
21          Q.    What did understand the
22      diluting a minority voting strength
23      mean?
24          A.    Generally speaking it means
25      the diluting of -- the effective

Page 187

```
 1                    TERRENI
 2      reduction of a minority community's
 3      ability to exercise its electoral
 4      franchise either through Section 2
 5      by electing a representative of its
 6      choice or through the ability to
 7      elect or an opportunity to elect a
 8      representative of its choice
 9      regarding the three Thornburg versus
10      Gingles preconditions are met and,
11      three, the avoidance of intentional
12      or predominantly race based
13      redistricting under the 14th
14      amendment as shown in subsequent
15      case law.
16           Q.   In South Carolina would
17      minorities include black voters?
18           A.   Yes.
19           Q.   Would an example of
20      dilution of racial or ethnic
21      minority voting strength include the
22      cracking of black voters?
23           A.   It's a legal term but yes,
24      it could.  It could as the term is
25      used in the case law.
```

1                    TERRENI

2        Q.    Could it include the

3    packing of black voters?

4        A.    It could as the term is

5    used in the case law.

6        Q.    Could it include both the

7    packing and cracking of black

8    voters?

9        A.    Yes.

10       Q.    I believe you mentioned the

11   three Gingles preconditions.  Are

12   the three Gingles preconditions that

13   you mentioned what you would

14   consider to be the test for whether

15   there's dilution of minority voting

16   strength?

17       A.    It would be one test.

18       Q.    What is the other or what

19   is another?

20       A.    Well, racial gerrymandering

21   could, I don't suppose it

22   necessarily has to, but could result

23   in the dilution of minority voting

24   strength.  It could result in the

25   enhancement of the minority voting

Page 189

                            TERRENI

1

2    strength as well, but that would be

3    another way of doing it.

4        Q.    I believe you mentioned

5    earlier that racial gerrymandering

6    can be demonstrated through direct

7    evidence of dilution, is that your

8    understanding?

9        A.    I may have said that, but I

10   need to -- I mean the central

11   question of racial gerrymandering

12   would be whether race was a

13   predominant factor in the

14   redistricting process and whether or

15   not if it was the predominant factor

16   in redistricting process whether it

17   was the predominant factor in order

18   to serve a compelling state

19   interest.

20       Q.    And what do you understand

21   to be compelling state interest?

22       A.    Under some circumstances

23   compliance of Section 2 could be a

24   compelling state interest.

25   Compliance of Section 2 does not

Page 190

TERRENI

1
2     always have to be.  I assume you can
3     comply with Section 2 without having
4     to consider race as the predominant
5     factor but it could be.
6         Q.    What about remedying
7     historical discrimination, has that
8     been recognized as a compelling
9     state interest?
10        A.    It may have been recognized
11    as a compelling state interest but
12    in the current redistricting
13    framework, as I understand it,
14    unless it's expressed through the
15    Voting Rights Act it wouldn't in and
16    of itself be -- I don't know there
17    would be a compelling state interest
18    for using race as the predominant
19    factor in redistricting.  I never
20    really had to encounter that.
21        Q.    If staff was instructed not
22    to consider race during
23    congressional redistricting, who
24    would have made that decision on
25    behalf of the Senate?

Page 191

1                    TERRENI
2              MR. GORE:  Again, I'm just
3        going to object to the extent this
4        calls for attorney-client
5        communications.  And the witness
6        can answer to the extent he can do
7        so without divulging confidential
8        or privileged information.
9          A.    Well, the question is if
10      staff were considered -- were
11      instructed not to consider race in
12      redistricting who would have
13      instructed staff in that fashion, is
14      that -- did I restate your question
15      fairly?
16          Q.    Yes.
17          A.    Well, I don't think anybody
18      could have instructed staff in that
19      regard better than the chairman or
20      the subcommittee and the vote if
21      that guidance was given.  However,
22      if that guidance were given, it
23      would have been given by counsel,
24      me, Mr. Gore, Mr. Fiffick.
25          Q.    Are you aware whether

Page 192

1                    TERRENI
2      Chairman Rankin instructed Senate
3      staff not to consider race during
4      congressional redistricting?
5           A.   I don't recall him doing
6      that.
7           Q.   Is that something you would
8      recall?
9           A.   Probably.
10          Q.   Because it's important
11     whether or not the Senate could
12     consider race or not in drawing
13     redistricting lines?
14          A.   No.  It's just because it
15     would have been a specific
16     instruction from Senator Rankin.  I
17     mean when you say considering race,
18     if you are asking did Senate staff
19     look at the racial impact of various
20     draws or the racial composition in
21     districts under various draws, the
22     answer is yes.  Was it the
23     predominant factor in guiding
24     redistrict -- proposed redistricting
25     fans, no, and was it a predominant

Page 193

TERRENI

1    factor for the subcommittee, I don't
2    believe it was.
3        Q.    Who would have made the
4    determination of whether or not race
5    was the predominant factor in
6    redrawing the congressional map?
7        A.    The courts.
8        Q.    So that decision, that
9    analysis of whether race was the
10   predominant factor in the redrawing
11   of South Carolina's congressional
12   map, that has not been determined
13   yet because litigation is ongoing?
14       A.    I mean that's the way I see
15   it.  If you are asking whether or
16   not we consider race as the
17   predominant factor, the answer is
18   no.
19       Q.    Because that's a factual
20   question because there hasn't been a
21   legal determination yet?
22       A.    Well, I suppose so.  I mean
23   obviously we don't think it was.
24   You seem to think that it was the

Page 194

                        TERRENI

1
2    predominant factor and the courts
3    are going to have decide.
4        Q.   If an individual member
5    said during the redistricting
6    process that they did not consider
7    race, is it your position that they
8    were not instructed to do so by
9    Senator Rankin as far as you are
10   aware?
11       A.   I'm not aware of Senator
12   Rankin instructing individual
13   members to do things one way or
14   another.
15       Q.   Do you see anything, and
16   you can take a moment looking at
17   this guidance, do you see anything
18   in the guidance saying that race
19   would not be considered in the
20   development of redistricting lines
21   for maps in South Carolina during
22   this cycle?
23       A.   I don't think so.  And it
24   says race must not be the
25   predominant factor.  Yeah.  I mean

Page 195

                    TERRENI

1    I'm not aware of any instruction in

2    the guidelines that says don't

3    consider race.  Now, whatever

4    individual members wanted to do

5    could be that individual members

6    said I'm just not going to look at

7    race at all.  I mean I think that

8    would be a permissible policy

9    decision on their part.  I had no

10   control over that.

11        Q.   I want to understand a

12   little bit more what you believe to

13   be the consideration of race and I

14   believe you recently testified a few

15   moments ago that it's looking at the

16   racial impact of lines on a

17   particular protected community, is

18   that fair to say?

19        A.   Yeah, by impact I mean you

20   change the composition of the

21   district is the starting point.

22        Q.   Is the --

23        A.   Is a starting point.

24        Q.   What else does

1                    TERRENI
2        consideration of race mean to you in
3        redrawing lines?
4            A.    As a practical matter we
5        consider race in that we look at the
6        racial impact of different
7        permutations or different plans when
8        we draw; in other words, it's a
9        question.  It is also a question,
10       no.  I said it could be a question.
11       What is the BVAP.  Why is that?
12       Because for one thing if it involves
13       a minority-majority district people
14       are going to raise questions about
15       that.  Did you pack it, did you
16       crack it.  Same questions you are
17       raising now.  So for us to just put
18       blinders on and say I don't want to
19       look at BVAP, I don't think is
20       practical in redistricting in South
21       Carolina.  Does it mean that
22       everything is guided by BVAP?  No.
23       It just means that, hey, if there's
24       going to be a substantial change in
25       this district, if there's going to

Page 197

                                TERRENI

1
2      be a substantial change in the BVAP
3      of the district, there's substantial
4      inquiries in the BVAP for the
5      district that may raise some
6      questions that we have to explore,
7      either legal questions or practical
8      questions.  I may need to call
9      Mr. Gore UP and say hey, would this
10     district caused some legal concerns
11     from the racial gerrymandering
12     standpoint where because it's
13     resulting in a different BVAP
14     impact.  It's just one of those
15     things like county boundaries,
16     precinct boundaries, whatever you
17     should reconsider.
18          Q.   Could keeping BVAP as at
19     the relative same levels as the 2011
20     benchmark map also have a racial
21     impact?
22          A.   Could keeping BVAP -- I
23     mean it's going to be what it is,
24     right?  I mean you either drop it,
25     raise it or keep it the same.  It's

Page 198

```
 1                    TERRENI
 2      all an impact, right?
 3          Q.   So keeping BVAP at a
 4      similar level as the 2011 map could
 5      that be under certain actual
 6      scenarios dilution of minority
 7      voting strength?
 8          A.   Oh, I'm sorry.  I didn't --
 9          Q.   I didn't say it great
10      before so it wasn't -- I said it
11      better I think the second time.
12          A.   Could it be dilution to
13      keep it in the benchmark plan under
14      the 2011 -- I mean under 2020 census
15      numbers.  In other words, you have a
16      benchmark plan that was X in
17      District 6, it's now Y in
18      District 6, could that be dilution
19      if you leave it at Y and you don't
20      make some corresponding change.
21      Could be.
22          Q.   I think earlier you
23      testified that at some point you
24      readily Arlington Heights case but
25      you are not super familiar with it,
```

1                    TERRENI

2       is that fair?

3            A.    That's fair.

4            Q.    So do you know under

5       Section 2 -- well, let me step back.

6       I think I understood you to have

7       said earlier that you understand

8       Section 2 to have a effects element

9       and/or a purpose element, you can

10      show a violation of Section 2 by

11      discriminatory results and/or by

12      discriminatory purposes.  Is that

13      what you understand to be the case?

14           A.    Yes, in the sense that I

15      believe at one time purpose was

16      required.  While it was amended

17      Congress said no, you no longer had

18      to show explicit purpose, you could

19      show it through a fact.

20           Could you show a violation of

21      Section 2 by purpose alone?  I

22      believe so.  As a practical matter I

23      don't know that I have ever seen

24      that done.

25           Q.    And therefore are you aware

Page 200

```
 1                TERRENI
 2    of what the test would be for
 3    proving purposeful discrimination
 4    under Section 2?
 5         A.   I imagine it would be an
 6    evidentiary test.
 7         Q.   Who was responsible to the
 8    extent that compliance with the
 9    Voting Rights Act was a criteria
10    that was evaluated in consideration
11    of Senate maps, proposed maps or
12    even public maps, who was
13    responsible for making the
14    determination that a map complied
15    with the Voting Rights Act?
16         A.   Primarily the legal
17    question of voting rights compliance
18    and likely or unlikely liability
19    under the Voting Rights Act would
20    have been something we consulted
21    with Mr. Gore on.
22           So in other words, if we have
23    a map that we were interested in and
24    we had some questions about it we
25    would go to Mr. Gore and say,
```

                    TERRENI

1          Mr. Gore, you know, or John, you
2     know, tell us about the legal
3     upsides and downsides and possible
4     challenges and defenses on this map.
5     We relied on him for, fundamentally
6     for that counseling.
7
8          I have a working knowledge of
9     this stuff, but I was brought in
10    largely in the process to structure
11    it.  Andy had never done it before.
12    I have been around for the past two
13    redistricting cycles.  So a lot of
14    the practical stuff, like hiring
15    demographers, how many printers you
16    need and just the working day-to-day
17    knowledge of voting rights, that's
18    what I did.  Serious questions about
19    compliance we turned to Jones Day.
20         Q.   Based upon your earlier
21    testimony, well, based upon what I'm
22    understanding from you, you
23    mentioned Section 2 compliance as a
24    defense to a claim of racial
25    gerrymandering, is that fair to say?

Page 202

1                   TERRENI

2          A.    It could be.

3          Q.    And based upon what I'm

4    hearing from you is it fair to say

5    that until there is a claim of

6    racial gerrymandering it is not your

7    understanding that you have to look

8    at compliance with Section 2 until

9    that claim has been raised, is that

10   fair?

11         A.    No.  Let --

12         Q.    Let me ask --

13         A.    -- until -- I'm sorry, go

14   ahead.

15         Q.    No, you can go.

16         A.    In the first place, I

17   believe your question was claim of

18   racial gerrymandering when looking

19   at Section 2 compliance?

20         Q.    Well, I think you testified

21   earlier that a defense to racial

22   gerrymandering could be compliance

23   with Section 2.  And then we have

24   the discussion about whether

25   remedying historical discrimination

Page 203

```
 1                    TERRENI
 2      could also be a defense to racial
 3      gerrymandering.  But we've
 4      established Section 2.
 5           A.   I said that compliance with
 6      Section 2 could be a defense to
 7      racial gerrymandering in the context
 8      of -- compliance with Section 2
 9      could be a defense for a racial
10      gerrymandering claim if there's no
11      other way it complied with Section
12      2.  That's my understanding of the
13      law.
14           Q.   Let me ask you this.
15      During your consideration, during
16      your experience with congressional
17      redistricting, did you hear the
18      public or any member of the
19      legislature challenge any plan as a
20      racial gerrymander, any of proposed
21      plans by the Senate or any plan even
22      proposed by the public, did you hear
23      claims of racial gerrymandering
24      during the process?
25           A.   Yes.
```

```
                                    Page 204

 1                     TERRENI
 2        Q.    How then did you consider
 3    whether race was the predominant
 4    factor or not, and if so, whether
 5    there was a compelling state
 6    interest during the legislative
 7    process, how did you go about doing
 8    that?
 9         MR. GORE:  Again, I'm going to
10      just restate my objection on
11      attorney-client privilege and work
12      product grounds.  The witness can
13      answer to the extent he can do so
14      without divulging privileged
15      information.
16         A.    Generally speaking, you
17    asked about every plan or most --
18    any number of plans that might have
19    been submitted and there would have
20    been a criticism of racial
21    gerrymandering, which I'm sure you
22    can appreciate is not an infrequent
23    accusation in this process.  So
24    spending on the plan there may have
25    been different ways to evaluate it.
```

Page 205

```
 1                    TERRENI
 2           First of all, I mean you could
 3      look at it and -- well, let's be --
 4      let's -- I'm trying to
 5      distinguish --
 6           Q.   Let's focus on a plan by
 7      the legislature proposed by the
 8      Senate that was accused of racial
 9      gerrymandering.
10           A.   That makes it a little
11      easier.  Well, in that case first
12      you ask yourself factually were the
13      map drawers, were the members
14      engaged in race-based gerrymandering
15      or do you know personally or from
16      the record that there were other
17      considerations that were expressed
18      and were substantiated why these
19      changes were made.  So if you -- if
20      the answer is yeah, I know why that
21      was done and I know from the record
22      it was explained in the record in
23      incredible fashion that that wasn't
24      a race based gerrymandering, that
25      was -- those changes were made for
```

Page 206

1                    TERRENI

2       race neutral reasons or even for

3       reasons that were not predominantly

4       racial then you don't get there.

5            You only get to this

6       compelling state interest thing if

7       somebody says no, it was -- no, I'm

8       sorry, we just had to do it, we had

9       to take race into account and we had

10      to do it in such fashion in order to

11      comply with Section 2.

12           I'm not aware that we ever got

13      to that on any claim we had,

14      Ms. Aden.  I don't recall making

15      that determination.  There's no

16      opposition that any Senate plan that

17      was advanced was a racial

18      gerrymandering that was necessary

19      for Section 2 compliance.  To the

20      opposite.

21           Q.   Was that -- those were

22      based upon this evaluation of

23      whether race was considered, whether

24      race was predominated over

25      traditional redistricting

Page 207

1              TERRENI

2    principles.  Are you aware whether

3    those discussions about what was

4    done, how it was done, were those

5    reduced to writing or were those by

6    verbal explanations, whether on the

7    floor or in informal proceedings?

8         A.   It would depend on the

9    plan, but if we are talking about

10   the plans that were advanced by the

11   subcommittee and the Senate, they

12   were generally explanations to be

13   given verbally either by Mr. Roberts

14   or individual members in the course

15   of the debate.

16        Q.   And if a plan had been

17   accused of, a legislative plan had

18   been accused or was accused of being

19   a racial gerrymander during the

20   legislative process, there was no

21   systematic analysis, written

22   analysis that would have been done

23   to justify what was and was not

24   considered with respect to that

25   plan?

Page 208

1                    TERRENI

2           MR. GORE:  Again, I'm just

3       going to renew the objection to the

4       extent it calls for privileged

5       communications, attorney-client

6       communications or work product.

7       The witness can answer to the

8       extent he can do so without

9       divulging any such communications.

10          A.   Without divulging those

11      communications there wouldn't

12      automatically have been such an

13      analysis done.  I'm not saying it

14      would have been done on different

15      occasions or different forms.  I

16      mean I -- if you are asking me by --

17      if there were explanations given to

18      legislators for how a plan was drawn

19      or what -- or what the features of a

20      plan were and those explanations

21      offered race mutual explanations or

22      explanations in which didn't

23      predominate but provided fact sheets

24      and that kind of thing to

25      legislators, I certainly am.

Page 209

```
 1                    TERRENI
 2          Q.    I'll move on.  Under Roman
 3      numeral I-C on this guidelines, the
 4      next category under Requirements of
 5      Federal Law is to avoid racial
 6      gerrymandering which we have been
 7      discussing?
 8          A.    Yes, ma'am.
 9          Q.    Would you agree that
10      looking at racial demographics
11      during development of plans is not
12      per se racial predominance?
13          A.    Yes.
14          Q.    Would you agree that
15      considering racial bloc voting, any
16      racial bloc voting patterns is not
17      per se racial predominance?
18          A.    Yes, not per se.
19          Q.    Would you agree that
20      considering where communities live
21      and whether they live in segregated
22      communities or not is not per se
23      racial predominance?
24          A.    Yes.
25          Q.    So would you agree that
```

Page 210

1                    TERRENI

2        under these guidelines and under any

3        of your other sources of information

4        that all of those things could have

5        been considered without necessarily

6        racially gerrymandering?

7             A.    Yes.

8             Q.    Looking at Roman numeral

9        II, Constant Dispute.  Do you

10       understand that to be a federal law

11       requirement or not?

12            A.    Honestly, I never have

13       given it much thought.  It's a

14       practical requirement.  I don't

15       know.

16            Q.    But under -- as it looks

17       like in this guideline under Roman

18       numeral I, Requirements of Federal

19       Law, the major subheadings are

20       Population Equality, Voting Rights

21       and Avoidance of Racial

22       Gerrymandering, those are

23       requirements under I-A?

24            A.    Yes, ma'am.

25            Q.    And contiguity is under

Page 211

TERRENI

1    Roman numeral II and it does not say
2    one way or the other whether it's
3    federal or state law nor a
4    requirement, is that fair to say?
5
6        A.   Yeah.  Yeah, that's fair.
7        Q.   Looking at page 2 South
8    Carolina Senate 22358 there is a
9    Section 3, Additional
10   Considerations.  And it reads:
11   "Other criteria that should be given
12   consideration, where practical and
13   appropriate, in no particular order
14   of preference."
15       Did I read that accurately?
16       A.   You did.
17       Q.   And you see that section?
18       A.   I do.
19       Q.   Do you understand that
20   these subcategories underneath
21   additional considerations are of
22   lower priority than what precedes
23   them under federal law, even
24   contiguity?
25       A.   That's one way of saying

Page 212

1                    TERRENI
2       it.  Another way of saying it would
3       be that the federal, complies with
4       federal law and contiguity for that
5       matter are just kind of baseline
6       requirements and maybe the
7       background to redistricting.  You
8       know, almost the canvas on which you
9       would use the additional
10      considerations to draft your plan.
11           So are they inferior, yeah, in
12      that sense I guess they are.  But I
13      think they really co-exist.
14           Q.   But according to the
15      language in this document it said
16      they should be given consideration,
17      it doesn't say they must be given
18      consideration, is that accurate?
19           A.   Yes.
20           Q.   And it lists the things
21      that follow underneath them as
22      saying that they can be considered
23      where practical and where
24      appropriate and in no particular
25      order or preference?

```
 1                    TERRENI
 2          A.    Correct.
 3          Q.    And we agreed earlier this
 4      document was not modified or amended
 5      but it was adopted on September 17th
 6      by the subcommittee?
 7          A.    That's what I remember.
 8          Q.    And Roman numeral A under
 9      these additional considerations is
10      communities of interest, is that
11      accurate?
12          A.    It is.
13          Q.    Okay.  And you explained
14      earlier what you understood
15      communities of interest to be?
16          A.    Um-hmm.
17          Q.    Is there anything about how
18      it's described here that makes you
19      change how you view communities of
20      interest one way or the other?
21          A.    I think this is probably a
22      better description than I gave you
23      off the top of my head.  But I don't
24      think what I said was inconsistent
25      with this.
```

Page 214

TERRENI

1

2       Q.   I want to just take a

3   moment to talk a little bit about

4   public hearings that were held by

5   the Senate in 2021.  Are you aware

6   that the Senate held public hearings

7   around the state from approximately

8   late July through early,

9   mid-August 2021?

10      A.   Yes, ma'am.

11      Q.   And do you recall how many

12  hearings there were?

13      A.   Not off the top of my head.

14      Q.   If I said around ten, does

15  that seem fair?

16      A.   It does.

17      Q.   Were you involved in the

18  decision to hold these hearings?

19      A.   The decision was the

20  subcommittee's, but I certainly

21  outlined that as part of the process

22  for the Senate and to Senator

23  Rankin.

24      Q.   Do you know if decisions

25  about the public process, whether or

Page 215

```
 1                    TERRENI

 2      not Jones Day was also consulted

 3      about the public hearings?

 4           A.   I'm sure they were.

 5           Q.   Did you create any public

 6      education materials about

 7      redistricting for these public

 8      hearings?

 9           A.   Did I personally?  I don't

10      think so.  But I do remember there

11      was I think what you showed me

12      earlier was one of the handouts that

13      we used.

14           Q.   Which you said you believe

15      you have reviewed?

16           A.   I believe I would have

17      reviewed it, yes.

18           Q.   If there was information

19      disseminated about public hearings,

20      would you likely have reviewed it

21      or?

22           A.   Yes.

23           Q.   Did you personally attend

24      those public hearings?

25           A.   Most of them at least.  I'm
```

```
                                    Page 216
 1              TERRENI
 2     not sure I went to all of them but I
 3     went to most of them.
 4          Q.   And are you aware that
 5     those public hearings were videoed
 6     and there was a written
 7     transcription of the hearings?
 8          A.   I'm generally aware of
 9     written transcription, I'm not sure
10     when it was created.  I don't recall
11     that.  I know they were videoed so
12     they could be accessed in that way
13     and in person to the website.  So
14     then people had access to what was
15     said.
16          Q.   And if you didn't go to a
17     hearing, did you subsequently look
18     at a written transcription or video
19     if it was available for a particular
20     hearing?
21          A.   Yeah, I would have
22     familiarized myself with the
23     testimony one way or another, either
24     by watching the video, reading the
25     transcript or speaking to somebody
```

```
 1                    TERRENI
 2      who was already reading the summary.
 3      There was some times stories that
 4      were created.  I'm struggling to
 5      remember.  I think I attended all of
 6      them but I don't -- I can't be a
 7      hundred percent sure.
 8           Q.   Do you recall taking any
 9      notes during those hearings?
10           A.   I probably did.
11           Q.   Do you recall taking
12      handwritten notes during those
13      hearings?
14           A.   Yes.
15           Q.   Do you recall whether or
16      not you turned those over in the
17      process of discovery in this case?
18           A.   I may have turned them over
19      in the process of discovery.  But
20      I'll just go ahead and point out
21      your subpoena didn't ask for my
22      notes.
23           Q.   Do you consider the work
24      product that you generated during
25      the redistricting process to be the
```

Page 218

```
 1                    TERRENI
 2      work product of the Senate?
 3           A.   Yes.  In accordance with
 4      the terms of my retainer agreement
 5      which has Senator Rankin as the
 6      representative of the Senate to whom
 7      I answer.
 8           Q.   So is that a yes or no?
 9           A.   It's a yes.  I said yes.
10           Q.   I didn't hear you, I'm
11      sorry.  So any handwritten notes of
12      the public hearings would be --
13      could be --
14           A.   Oh, I'm sorry, you said
15      work product of the Senate.  It's my
16      work product on behalf of the
17      Senate.  I failed to make the
18      distinction.  By Senate staff, no.
19           Q.   But do you consider the
20      work product that you generated to
21      be the work product of the Senate
22      since you were hired by the Senate
23      to advise and consult for them?
24           A.   It's my work -- my
25      understanding of work product
```

Page 219

1                    TERRENI

2       protection the way I have treated it

3       in the practice of law is my work

4       product is my work product and is

5       protected from discovery as an

6       attorney acting on behalf of a

7       client.

8               My work product -- if a client

9       were to ask me for a file, I don't

10      think I'm generally obligated to

11      turn over my work product or my

12      notes, although I've never had to do

13      that is that in my communications

14      with the client are attorney-client

15      privilege.  If you are asking me

16      whether my -- I considered my notes

17      to be the equivalent of a Senate

18      staffer's notes, the answer is no.

19          Q.   Are you aware of whether or

20      not there is a common interest

21      agreement -- there was a common

22      interest agreement between the work

23      that the Senate was doing in

24      developing congressional maps and

25      that of the House?

```
                                              Page 220

 1                       TERRENI

 2            A.    No.

 3            Q.    Do you know whether in the

 4       context of this litigation there's a

 5       common interest agreement between

 6       the defendants for the Senate and

 7       the defendants for the House?

 8            A.    I believe there is.

 9            Q.    There is or is not?

10            A.    I said I believe there is.

11       I don't think I have seen any, but I

12       believe I have heard of it.

13            Q.    Did any feedback from these

14       hearings impact your assessment of

15       the maps that the legislature

16       developed or that the public

17       submitted?

18            A.    In what way?

19            Q.    Did you from having

20       participated in public hearings by

21       going to them or reviewing them, if

22       you did not, did anything that you

23       learned from them impact how you

24       developed and considered and

25       critiqued maps?
```

Page 221

1                    TERRENI

2          A.    Yes.

3          Q.    How so?

4          A.    Well, we would have

5     considered maps at times and in some

6     cases as to whether, or most of

7     entitlement, whether testimony

8     supported or opposed them.  But I

9     mean testimony was not the sole

10    source of that, of why a map might

11    have been drawn but it was taken

12    into account.

13         Q.    Do you mind looking at tab

14    45?

15         A.    Yes, ma'am.

16         Q.    Which is the subpoena, the

17    final subpoena --

18         A.    Yes, ma'am.

19         Q.    -- for this deposition.

20         A.    Yes, ma'am.

21         Q.    That would be now

22    Plaintiffs' Exhibit 11.

23         A.    Yes, ma'am.

24             (Plaintiffs' Exhibit 11,

25         Subpoena, marked for

Page 222

```
 1                    TERRENI
 2      identification, as of this date.)
 3          Q.   Could you go under the
 4      definition of communications and
 5      read that to yourself, please.
 6          A.   Yes, ma'am.
 7           "Communications means the
 8      transmittal of information of any
 9      kind, written or oral, by and
10      through any means, including but not
11      limited to emails, email
12      attachments, calendar invitations,
13      PowerPoint presentations, pdfs,
14      written reports, letters and the
15      like.  It includes communications
16      from the National Republican
17      Redistricting Trust that include or
18      are with outside entity and
19      individuals."
20          Q.   And if you can go to the
21      next page and look at paragraph 9,
22      document or documents.  You do not
23      need to read that into the record
24      but take a moment to skim that,
25      please.
```

```
                                    Page 223

 1                    TERRENI

 2          A.    Yes.

 3          Q.    So looking at the

 4    definition of communications and

 5    documents, and you can even go down

 6    to the documents requested on pages

 7    11 through 13, I just want to

 8    understand whether it's your

 9    position that written notes that you

10    made during consideration of

11    congressional maps that that -- you

12    do not believe that they fall within

13    the scope of the subpoena that we

14    served upon you.

15          A.    Well, let's go through

16    this, and I will say that I read the

17    subpoena, I consulted with my

18    counsel and we both agreed that

19    those documents had not been

20    requested.  So I am going to go look

21    at it again.

22          Q.    Let's look at request for

23    production No. 1, for example.

24          A.    Yes, ma'am.

25          Q.    Without reading it entirely
```

Page 224

TERRENI

1
2     into the record would you agree that
3     it in general asks for documents
4     that reflect or discuss the
5     rationale, the purpose, the
6     interpretation, the analysis of the
7     enacted map and predecessor maps?
8          A.    Under certain circumstances
9     -- I mean what it asks for is all
10    documents by the defendant committee
11    members or the South Carolina
12    General Assembly or communications
13    between defendant committee members
14    of South Carolina General Assembly
15    and so forth.  I took notes.  I
16    didn't communicate with anybody.
17         Q.    Can you go up to the
18    definition of you on paragraph 18 on
19    page 6?
20         A.    Certainly.
21         Q.    It says:  "You or your
22    means Charles L.A. Terreni and all
23    current or former agents, advisors,
24    employees, representatives, officers
25    consultant, clerks or contractors

Page 225

<pre>
 1                    TERRENI

 2        with Terreni Law Firm and any person

 3        or entity acting or purporting to

 4        act on your behalf or subject to

 5        your control."

 6             A.    I'm sorry, I'm looking.

 7        Yeah.

 8             Q.    And so it's your position

 9        that the notes that you took during

10        the public hearings that I believe

11        you just testified impacted your

12        consideration of congressional

13        maps --

14             A.    I didn't say that at all.

15        I said -- you asked me if I took

16        notes during the public hearings.  I

17        said I did.  You asked me if we had

18        considered the testimony in public

19        hearings in the process of

20        redistricting and I said I did.  You

21        didn't ask me, and I wouldn't deny

22        if I did, let's just be clear, did

23        you consult your notes.  I may have.

24        I probably consulted the transcript.

25        It was much easier.  I took notes
</pre>

Page 226

1                    TERRENI

2       just because I was taking notes.

3       You know, but anyway it's possible I

4       consulted my notes.

5              Please, go ahead.

6           Q.   And the notes that you

7       consulted, either the handwritten

8       notes or the transcripts, impacted

9       your review, your consideration of

10      congressional maps this cycle, yes

11      or no?

12          A.   They could have.

13          Q.   Are you saying that they

14      didn't?

15          A.   I'm not saying they didn't

16      or they did.  It would depend on the

17      notes.  It would depend on -- I mean

18      I -- that's a very general question.

19          Q.   But there were ten

20      hearings, correct?

21          A.   Yes, there were ten

22      hearings.

23          Q.   And would you agree that

24      there were thousands of pages of

25      transcripts of those hearings or

Page 227

```
 1                    TERRENI
 2      more than a thousand?
 3           A.   I don't know.
 4           Q.   Do you think that any
 5      aspect of your handwritten notes
 6      factored into your consideration of
 7      congressional maps this cycle?
 8           A.   It could have.
 9           Q.   Have you gone back to look
10      at those notes to make an assessment
11      of whether anything in them impacted
12      your assessment for consideration of
13      congressional maps?
14           A.   Not specifically.
15           Q.   But you could do that?
16           A.   I suppose.
17           Q.   And that would be relevant
18      under the scope of the subpoena to
19      what went into the consideration of
20      congressional maps this cycle?
21           A.   No.
22           Q.   Why not?
23           A.   You asked for what you
24      asked for in the subpoena.  Mr. Gore
25      determined that you didn't ask for
```

Page 228

1                          TERRENI
2        the notes.  We complied with the
3        terms of the subpoena.  If you are
4        implying something else, that's
5        different.  If you are asking
6        whether the notes are discoverable,
7        I'm going to let you battle that out
8        with Mr. Gore.  But I deny any
9        implication that I have somehow not
10       complied with the terms of your
11       subpoena.  You asked for
12       communications I gave them to you.
13           Q.   Did you share those notes
14       with Senator Rankin as someone who
15       you report to?
16           A.   No.
17           Q.   And did you share them with
18       any Senate staff?
19           A.   No.
20           Q.   I want to turn your
21       attention to tab 28, which should
22       now be marked as Plaintiffs' Exhibit
23       12.
24              (Plaintiffs' Exhibit 12, Email
25        from Paula Benson to Charles

Page 229

1                         TERRENI

2          Terreni with attachment, Bates

3          South Carolina Senate 22619 to

4          22621, marked for identification,

5          as of this date.)

6             Q.    And this is an email cover

7       from Paula Benson to you and others

8       dated November 2, 2021, with an

9       attachment identified as testimony

10      concerning communities of interest.

11      It's Bates stamped South Carolina

12      Senate 22619 to 22621.

13             Do you have that?

14             A.    I think so, yes.

15             Q.    Are you familiar with this

16      document?

17             A.    At this time I don't

18      remember if I saw this or not.  I

19      just don't remember it.

20             Q.    But you are copied on this

21      document or you sent this document?

22             A.    I appear to be, yes.

23             Q.    And Paula Benson is someone

24      that you said you frequently

25      communicated with during the

Page 230

                    TERRENI

 1    congressional redistricting process?

 2         A.   Yes, ma'am.

 3         Q.   Does the first page reflect

 4    that Ms. Benson had her law clerk

 5    compile a chart showing the

 6    testimony that the Senate received

 7    at public hearings about communities

 8    of interest?

 9         A.   It does.

10         Q.   And is it fair to say that

11    the attached document is a two-page

12    chart?

13         A.   It is.

14         Q.   And is it fair to say that

15    for some entries like for Sumter a

16    July 28th hearing that there is one

17    row entry on that chart summarizing

18    testimony?

19         A.   It is what it is, yes.

20         Q.   Are you aware of any other

21    charts like this summarizing

22    communities of interest testimony

23    produced by the Senate?

24         A.   Off the top of my head I

Page 230

 1                   TERRENI

 2    congressional redistricting process?

 3         A.   Yes, ma'am.

 4         Q.   Does the first page reflect

 5    that Ms. Benson had her law clerk

 6    compile a chart showing the

 7    testimony that the Senate received

 8    at public hearings about communities

 9    of interest?

10         A.   It does.

11         Q.   And is it fair to say that

12    the attached document is a two-page

13    chart?

14         A.   It is.

15         Q.   And is it fair to say that

16    for some entries like for Sumter a

17    July 28th hearing that there is one

18    row entry on that chart summarizing

19    testimony?

20         A.   It is what it is, yes.

21         Q.   Are you aware of any other

22    charts like this summarizing

23    communities of interest testimony

24    produced by the Senate?

25         A.   Off the top of my head I

Page 231

1                    TERRENI
2       mean Goodman, but I don't remember
3       at this time.
4            Q.    Do you know whether this
5       summary was provided to Senate
6       members?
7            A.    No.
8            Q.    Okay.  Going back to tab 1,
9       which is the guidelines.
10           A.    Okay.
11           Q.    Underneath Communities of
12      Interest under 3B on the second page
13      South Carolina Senate 22358 there is
14      a category called Constituent
15      Consistency.
16            Do you see that?
17           A.    Yes, ma'am.
18           Q.    And it says that:
19      "Preserving the cores of existing
20      districts, keeping incumbent
21      residences and districts with their
22      core constituents and avoiding
23      contests between incumbent
24      legislators should be considered."
25            Is that accurate?

Page 232

1                    TERRENI

2         A.    Yes, ma'am.

3         Q.    And based upon where this

4    falls in the guidelines would you

5    agree that this is a subsidiary

6    consideration to federal law

7    requirements?

8         A.    Yeah.  And if you are

9    asking me could you violate federal

10   law for the sake of constituent

11   consistency, my answer would be no.

12        Q.    And by federal law we are

13   talking about compliance with one

14   person, one vote Section 2 and

15   nonracial gerrymandering?

16        A.    Yes, ma'am.

17        Q.    Did you have any concerns

18   that preserving the cores of

19   existing districts could bake in

20   lines that are harmful to compliance

21   with federal law?

22        A.    To the extent that I did, I

23   would have discussed them with

24   Mr. Gore.  In the final analysis my

25   answer would be no.

Page 233

1            TERRENI
2        Q.   Do you know if core
3    constituency is a per se defense to
4    the sorting of voters within,
5    without or keeping them in
6    districts?
7            MR. GORE:  Object to form.
8        A.   Could you repeat that
9    question?
10        Q.   Do you know whether core
11    constituency respecting cores of
12    districts is a per se defense to the
13    improper sorting of voters between
14    districts?
15        A.   Improper sorting of voters
16    according to race is what you mean?
17        Q.   And are legally improper.
18        A.   Of any kind?
19        Q.   Of any kind.
20        A.   I don't think it is.
21        Q.   And do you think it is a
22    per se defense to the legal sorting
23    of voters on the basis of race?
24        A.   No.
25        Q.   In fact, are you aware of

Page 234

1              TERRENI
2     any case law that shows that core
3     constituency can be unjustified if
4     it harms racial minorities?
5          A.   I'm not sure what you mean
6     by the term "harms racial minority,"
7     but I'm not aware of any case law
8     that says core constituencies can
9     justify the violation of federal
10    law, if that's what you are asking
11    me.
12         Q.   Looking at subcategories C,
13    D and E, which are minimizing
14    divisions of county boundaries,
15    minimizing divisions of cities and
16    towns, and minimizing divisions of
17    voting precinct boundaries.
18         A.   Yes.
19         Q.   Do you think this category
20    overlaps with the communities of
21    interest category or do you see them
22    as distinct considerations?
23         A.   They could overlap but not
24    necessarily.
25         Q.   How is responsible -- well,

Page 235

                        TERRENI

1

2    let me strike that.

3         Under the last category

4    District Compactness, what does

5    district compactness mean to you?

6         A.   What courts have said in

7    South Carolina decisions, especially

8    Colleton County, it means the

9    compactness is somebody's view on a

10   subjective and individual basis.

11   That no mechanical measure of

12   compactness is necessarily used.

13   It's really a visual thing.

14        Q.   Does compactness relate to

15   the shape of a district?

16        A.   It could.

17        Q.   And can it relate to the

18   distribution of communities within a

19   district?

20        A.   Please explain what you

21   mean.

22        Q.   So for example, could you

23   look to the way that communities are

24   sorted within a district whether and

25   how communities of interest are

```
 1              TERRENI
 2     expected to determine whether or not
 3     a district is compact?
 4          A.    I think compactness
 5     generally is a geographical question
 6     not a cultural question.  So I think
 7     that's where you would end up being
 8     more in a community of interest
 9     situation than a compactness
10     situation.
11          There are times when one of
12     these factors may override the
13     other.  That's what the guidelines
14     are intended do.
15          Q.   If you look at the language
16     in the guidelines it says:  "In
17     determining the relative compactness
18     of a district consideration should
19     be given to geography, demography,
20     communities of interest and the
21     extent to which parts of the
22     district are joined by roads, media
23     outlets or other areas or other
24     means for constituents to
25     communicate effectively with each
```

```
 1                    TERRENI
 2      other and with their
 3      representatives?
 4           A.    Court act.   Which means
 5      that, at least, the compactness of a
 6      district might mean the extent to
 7      which different communities or
 8      components of a district are able to
 9      communicate with one another or
10      joined by [inaudible] outlets.
11           What I'm saying is I don't
12      think compactness and communities of
13      interest are the same thing.   I
14      think they are different.   Now, it
15      could -- the inclusion of the impact
16      of both communities of interest in a
17      district relate to its compactness I
18      suppose yes.   But I view at least
19      compactness as primarily a visual
20      and geographical feature which may
21      involve these factors that are
22      talked about in there.
23           Q.    Are you familiar with the
24      LULAC versus Perry case that the
25      Supreme Court decided?
```

Page 238

1                    TERRENI

2         A.    I read it a long time ago.

3    But I remember some of it.

4         Q.    And you would accept the

5    Supreme Court's definition of

6    compactness as defined in that case?

7         A.    I don't recall the

8    definition.

9         Q.    In the final category Roman

10    numeral IV it states that:  "Other

11    succinct and importable sources of

12    demographic and political

13    information may be considered in

14    drafting and analyzing proposed

15    redistricting plans."

16         Did I read that correct?

17         A.    You did.

18         Q.    What did you understand

19    demographic and political

20    information to mean here?

21         A.    Well, political results to

22    the extent where we had other

23    political subdivision boundaries

24    such as school district boundaries

25    or things to that effect might be a

Page 239

1                    TERRENI
2       variable or spoken about by members.
3       They could be considered any
4       information, institutional quarters
5       information, do you have presence,
6       do you have diversity, that kind of
7       thing.
8            Q.   And demographic data, what
9       does that include?
10           A.   It says it may be
11      considered, the demographic data we
12      consider is the demographic data
13      which you've seen.  I'm not aware if
14      any other -- if we had had other
15      reliable sources of demographic data
16      we might have included in there if
17      we did that I recall.
18           Q.   And in terms of the
19      political data I know you mentioned
20      the work that Clark Bensen did on
21      election results.  Did you get
22      political data from any other
23      sources this cycle that you
24      considered for congressional map
25      making?

Page 240

1                    TERRENI

2         A.    In congressional map

3    making, and I'm just -- I want to be

4    careful to be complete here, I know

5    that we had access to some voter

6    registration data and I also know

7    that we -- quickly that we had some

8    point determined wasn't really

9    probative or reliable.

10          And -- so I don't believe we

11   considered it in the congressional

12   process.  There was no other

13   political data other than what you

14   see on the website.

15        Q.   And do you know what the

16   source of this unreliable data was

17   that you did not consider?

18        A.    Would have been the State

19   Election Commission.

20        Q.    Mr. Terreni, are you

21   familiar with statements that racial

22   identity and political affiliation

23   are correlated in South Carolina?

24        A.    I have heard that said

25   before.

Page 241

1              TERRENI
2       Q.    What do you understand that
3    to mean?
4       A.    That minorities,
5    specifically African-Americans,
6    overwhelmingly vote for the
7    Democratic party and that white
8    voters not as overwhelmingly but in
9    equal -- not equal, excuse me, but
10   white voters predominantly vote for
11   Republicans.
12      Q.    Are you aware of any cases
13   decided by South Carolina courts,
14   federal or state, or the Fourth
15   Circuit or Supreme Court that have
16   found racially polarized voting in
17   South Carolina?
18      A.    Colleton County versus
19   McConnell found racially polarized
20   voting in South Carolina in 2000 or
21   2001 and '2.  I don't know that it
22   was -- and other than that, I'm not
23   saying there was, but I'm not
24   remembering.
25      Q.    Are you familiar with the

Page 242

1                    TERRENI

2        litigation involving Charleston

3        school districts?

4            A.    Generally.

5            Q.    And are you aware whether

6        racially polarized voting has been

7        found in Charleston?

8            A.    I'm sorry, Charleston

9        school districts?

10           Q.    Or County Commission?

11           A.    That's two different

12       things.

13           Q.    It is.  It's two different

14       things.  There's a county level

15       Section 2 lawsuit?

16           A.    Presently or --

17           Q.    No.  There's a --

18           A.    I remember a section, I

19       guess it was a Section 2 lawsuit but

20       I don't remember a lawsuit

21       challenging Charleston's method of

22       electing county council members

23       which was a voting district

24       decision.  And it would not surprise

25       me that polarized voting was found

Page 243

1                        TERRENI

2       in that lawsuit, but I don't

3       specifically recall, but it wouldn't

4       surprise me.

5            Q.    Did you consider or are you

6       aware of anyone in the Senate who

7       considered any sources of data on

8       voting behavior as congressional

9       maps were developed?

10           A.    I'm sorry, I'm having

11      trouble with that question.  Could

12      you restate it for me?  Maybe if I

13      hear it again.

14           Q.    Let me strike that.  I'm

15      going to move on to something else.

16           You cited the Colleton County

17      case.  Do you dispute or have a

18      basis to dispute that there is --

19      that there continues to be racially

20      polarized voting in South Carolina?

21           A.    I don't know one way or the

22      other honestly.  I mean I have heard

23      people say it, express their views

24      on that both ways.

25           Q.    But you are not aware of

Page 244

```
 1              TERRENI
 2    whether a racially polarized voting
 3    analysis was conducted or are you
 4    aware whether racially polarized
 5    voting analysis was conducted by the
 6    Senate as maps were being developed
 7    for Congress?
 8         A.   I am not aware that a
 9    racially polarized voting analysis
10    was conducted by the Senate as maps
11    were being developed for Congress.
12    I have no knowledge of such a thing
13    and I don't believe it occurred.
14         Q.   Are you aware whether the
15    public or legislative members asked
16    for racially polarized voting
17    analysis to be conducted while
18    congressional maps were being
19    considered?
20         A.   I'm aware that some members
21    of the public and one member of the
22    general assembly, at least, Senator
23    Harpootlian, asked or suggested that
24    it should be done.
25         Q.   And do you know whether
```

Page 245

1                    TERRENI

2        that was acted upon?

3            A.    Yeah.  I know it wasn't.

4            Q.    Who made the decision not

5        to act upon those requests?

6            A.    The subcommittee.

7            Q.    Did they take a vote on

8        that?

9            A.    I think they have.  It was

10       during the, or at least they

11       declined to take a vote on it, but

12       the discussion we had in a public

13       subcommittee meeting in which

14       Senator Harpootlian advanced the

15       opinion that we should have a

16       racially polarized voting analysis

17       conducted in advance of the Senate

18       and congressional process.  I

19       expressed the opinion that it was

20       not useful.  And the Senate, we did

21       not, at least implicitly, the

22       subcommittee did not agree with

23       Senator Harpootlian, and I mean that

24       just the Senate did not vote or

25       direct us to conduct that.  I

Page 246

                    TERRENI

1       shouldn't say we.  I can't speak for

2       them.

3           After this question can we

4       take just a five-minute break?

5           MS. ADEN:  Yes.  Why don't we

6       stop and we will return to that.

7           THE WITNESS:  I appreciate

8       that.  We will come back at three

9       maybe.  Is that okay?

10          MS. ADEN:  Sounds great.

11          (Whereupon, there is a recess

12       in the proceedings.)

13          Q.  Before the break I believe

14      you mentioned not agreeing that a

15      racially polarized voting analysis

16      was necessary, at least in the early

17      part of 2021.  Can you explain why?

18          A.  Yes, ma'am.  We had no

19      reason to believe at the time that

20      we were going to have an issue with

21      Section 2 compliance.  No claims had

22      been asserted.  Nobody really

23      threatened them.  The sixth

24      congressional district which would

Page 247

                              TERRENI

1
2       have been the likely target of that
3       claim had been upheld against a
4       Section 2 challenge by the court ten
5       years ago.  And the upside, if there
6       was one, of conducting a racially
7       polarized voting analysis in my
8       opinion outweighed the downside, at
9       least what I told the subcommittee,
10      and the downside being that all of a
11      sudden race would have been in the
12      middle of the room and that we would
13      risk making race or some artificial
14      target the -- derived from that
15      polarized voting analysis the
16      predominant factor or at least
17      expose ourselves to accusations that
18      it was.  So at that point with no
19      Section 2 claim -- facing no Section
20      2 claim we didn't think it was
21      necessary.
22           Q.   Are you aware of whether
23      the black voting age population in
24      congressional District 6 was reduced
25      as compared to under the 2011

Page 248

1              TERRENI

2        benchmark map?

3            A.    It was.

4            Q.    Okay.  How did you or the

5        Senate assess whether or not that

6        district would still perform with

7        the change in the BVAP having not

8        looked at racial bloc voting

9        patterns in that district?

10           A.    It was an educated judgment

11       in the sense that it was not a

12       substantial diminution of the black

13       population.  It was not all the

14       Senate districts around the state.

15       The minority Senate districts were

16       facing reduced black population

17       because the state Senate certainly

18       as a whole -- I mean, excuse me,

19       black population as a whole had been

20       reduced including the BVAP.

21            I had heard Congressman

22       Clyburn himself say that he didn't

23       think his district needed as much

24       BVAP.  I think he was quoted

25       publicly saying that.  And we didn't

```
 1                    TERRENI
 2      really hear anybody arguing that it
 3      needed to be maintained above that.
 4      I believe perhaps the NAACP's
 5      comments did mention it, but didn't
 6      -- mentioned that there could be a
 7      reduction but I don't even think
 8      your organization took a strong
 9      stand about it, but I don't want to
10      speak for you.  So we didn't feel it
11      was a problem given the relatively
12      small reduction in BVAP.
13          Q.   But it was an educated
14      guess not an analysis reduced to
15      writing?
16          A.   Correct.
17          Q.   Is it your view that the
18      black population in South Carolina
19      has gone down between the 2010
20      census and the 2020 census?
21          A.   That's my recollection.
22          Q.   Have you seen an analysis
23      reflecting that?
24          A.   I have seen the PL data.
25          Q.   Is it possible that the
```

Page 250

```
 1                    TERRENI
 2      population has not been reduced but
 3      that it may have moved throughout
 4      South Carolina?
 5           A.   I think the PL data was
 6      statewide.  It's possible that the
 7      population -- that as a percentage,
 8      I didn't mean hard numbers, I meant
 9      the percentage -- that the
10      percentage of BVAP statewide I
11      believe is lower than it was during
12      the last census results.
13           Q.   But in certain parts of the
14      state because of movement and
15      demographic changes it could have
16      grown in certain counties or
17      districts in the state?
18           A.   Right.  I meant statewide.
19           Q.   I'm going to direct your
20      attention to tab 33, which is the
21      transcript from the September 17th,
22      2021, Senate Judiciary Committee
23      with Bates stamp number 3484, 3571.
24           A.   Okay.
25           Q.   So I think, I'm sorry, for
```

Page 251

1                    TERRENI

2        Ms. Ruggieri's purposes tab 28

3        should have been Plaintiffs' Exhibit

4        12.

5            MS. ADEN:  Is that what you

6         also have, Mr. Gore?

7            MR. GORE:  Let me see.  Yes.

8            MS. ADEN:  And then tab 33,

9         which we are just about to talk

10        about, would be Plaintiffs' Exhibit

11        13.

12            (Plaintiffs' Exhibit 13,

13        Transcript from 9/17/2021 Senate

14        Judiciary Committee, Bates

15        SCSENATE_00003484, marked for

16        identification, as of this date.)

17        Q.   Do you have the transcript

18        in front of you, Mr. Terreni?

19        A.   Yes, ma'am.

20        Q.   Do you recall being in

21        attendance at this meeting?

22        A.   I do.

23        Q.   I want to turn your

24        attention to page 14, South Carolina

25        Senate 3498, lines 4 through 9, and

Page 252

1                    TERRENI

2       have you read aloud the sentence

3       that begins with -- let me stop and

4       say would you agree that in this

5       paragraph Senator Harpootlian's

6       statements are being transcribed on

7       page 14 in lines 5 through 9?

8            A.    They appear to be.

9            Q.    Could you read the sentence

10      that begins "So we don't even" at

11      line 5?

12           A.    "So we don't even have

13      racial bloc.  So how are you going

14      to do a Section 2 analysis without

15      that data?  So I would almost say

16      this constitutes willful wantonness.

17      No, it does constitute willful

18      wantonness."

19           Q.    So is it fair to say at

20      least as of September 17th of 2021

21      Senator Harpootlian is looking for

22      the data to be able to do a racial

23      bloc analysis in order to assess

24      whether or not there's a Section 2

25      issue?

Page 253

1                    TERRENI
2        A.    Senator Harpootlian, as I
3    recall, asked for two things.  He
4    initially asked for an analysis.  He
5    then asked for data with which to do
6    an analysis.  I responded to Senator
7    Harpootlian that I didn't believe --
8    to my recollection, that I didn't
9    believe the analysis was useful for
10   the subcommittee at the time, but
11   that the data that he or other
12   members of the public might wish to
13   use to conduct the racial bloc
14   voting analysis or at least some of
15   it to the extent that we could
16   access it, would be made available
17   in short time and, in fact, it was.
18        Q.    But as of September 17th it
19   does not appear that the Senate had
20   compiled the necessary data to do a
21   racial bloc analysis, is that fair
22   to say?
23        A.    Yes, ma'am.
24        Q.    Looking at tab 17, which
25   should be Plaintiffs' Exhibit 14,

Page 254

```
            1                         TERRENI
            2         this is an email from Lea Aden, me,
            3         to the Senate Redistricting
            4         Subcommittee dated October 8th,
            5         2021, which includes Senate and
            6         congressional map submissions along
            7         with --
            8              A.   I'm sorry, could you --
            9         which tab?
           10              Q.   Tab 17 I hope.
           11              A.   Oh, I'm sorry.  I opened
           12         the wrong one.
           13               Yes, ma'am.
           14              Q.   Okay.  Plaintiffs' Exhibit
           15         14, it's an email from again me to
           16         the Senate Redistricting
           17         Subcommittee dated October 8th,
           18         2021.  It includes Senate and
           19         congressional map submissions along
           20         with attachments with Bates stamp
           21         South Carolina Senate 3798 to 3834.
           22              (Plaintiffs' Exhibit 14, Email
           23          from Leah Aden to the Senate
           24          Redistricting Subcommittee, Bates
           25          South Carolina Senate 3798 to 3834,
```

Page 255

TERRENI

1 
2        marked for identification, as of
3         this date.)
4         Q.    Do you -- this is sent from
5     me to the Senate redistricting
6     email.  I guess I have a question
7     for you which we haven't gotten to
8     which is whether or not you had
9     access to this email box for the
10    Senate?
11        A.    No, not directly that I
12    recall.  But it probably would have
13    been forwarded to me at some point.
14        Q.    And was that the normal
15    practice, that things were forwarded
16    to you from this email inbox if you
17    did not have access to it?
18        A.    Yeah.  I'm not saying
19    everything was, but if was a plan
20    submission or something like this it
21    generally would have been sent to
22    me.
23        Q.    And who would send it to
24    you?
25        A.    That could vary depending

1                    TERRENI

2        on who the recipients were.  As a

3        matter of course, if Michelle indeed

4        was on the email she may have sent

5        it to me because she was kind of was

6        doing logistics.  Could have been

7        Andy, but generally somebody would

8        make sure I got it.

9             Q.   Do you recall reviewing

10       this submission?

11            A.   Yeah.

12            Q.   I want to focus on Bates

13       stamp number South Carolina Senate

14       3807, which is -- should be page 10

15       of the pdf, 10 of 37 of the pdf.

16            A.   Okay.

17            Q.   Is it fair to say looking

18       at the first paragraph of this

19       letter to the Senate that the South

20       Carolina NAACP believes that any

21       racial bloc voting is a

22       consideration that the subcommittee

23       should be taking into account during

24       redistricting?

25            A.   I'm sorry, I was on the

Page 257

1                    TERRENI

2       wrong page.

3             Are you talking about Bates

4       number 0003 --

5             Q.    3807?

6             A.    3817?

7             Q.    3807.

8             A.    07.  Yes.

9             Q.    So yes --

10            A.    Wait a minute.  Please

11      repeat your question.

12            Q.    Yes.  Is it fair to say

13      that based upon the first paragraph

14      of this, in this letter on 3807 that

15      the South Carolina NAACP is urging

16      the subcommittee to consider any

17      racial bloc voting as it performs

18      redistricting this cycle?

19            A.    Yes.

20            Q.    And is it fair to say that

21      the South Carolina NAACP is

22      advancing that it believes racial

23      bloc voting continues to exist in

24      various elections in South Carolina?

25            A.    Yes.

Page 258

1               TERRENI
2        Q.    And is it fair to say that
3    looking at this page the South
4    Carolina NAACP provides data from
5    three elections, the 2020 Senate
6    election and in the footnote 26, the
7    2018 Treasurer and 2018 Secretary of
8    State.   It's analysis that there is
9    racial bloc voting in at least those
10   three elections in South Carolina?
11       A.    It's fair to say the NAACP
12   said as much, yes.
13       Q.    Do you have any reason to
14   disagree that those racial bloc
15   voting findings are erroneous?
16       A.    I don't have any reason to
17   agree or disagree, I haven't
18   examined it.
19       Q.    Do you recall attending a
20   November 12, 2021, Senate
21   redistricting subcommittee meeting?
22       A.    If we look at the
23   transcript, but you might refresh my
24   memory.   Do you have the document?
25       Q.    Let's look at tab 19 which

Page 259

```
 1                    TERRENI
 2      will be Plaintiffs' Exhibit 15.  And
 3      this should be the November 12th
 4      transcript of the Senate
 5      redistricting hearing South Carolina
 6      Senate 11729, 11843.
 7              (Plaintiffs' Exhibit 15,
 8       Transcript of the Senate
 9       redistricting hearing, Bates South
10       Carolina Senate 11729, 11843,
11       marked for identification, as of
12       this date.)
13          A.   I believe I attended.
14          Q.   If you look at page 24,
15      South Carolina Senate 11752, and I'm
16      talking about the page numbers in
17      the top right-hand corner of the
18      actual transcript not the pdfs.
19          A.   Yes.
20          Q.   Can you read into the
21      record slowly lines 12 through --
22      I'm sorry, 2 through 12?
23          A.   "Senator Harpootlian:  The
24      League -- maybe you know the League
25      subjected our -- our plan, the
```

```
                                      Page 260
 1                  TERRENI
 2      subcommittee's working plan, to
 3      racial bloc voting analysis.  Did
 4      you?"
 5           John Ruoff:  "You know, I have
 6      looked at racial bloc voting
 7      analyses but we have not done a
 8      specific rbv analysis of these
 9      districts as drawn now."
10           Senator Harpootlian:  "And to
11      your knowledge, the staff hasn't
12      either; is that correct?"
13           John, and it says John Day, it
14      should be John Ruoff:  "I don't
15      know.  Mr. Terreni and I had a
16      conversation about them during that
17      before the maps were drawn but I
18      don't know whether the staff."
19        Q.   Do you recall having a
20      conversation with John Ruoff, and
21      it's spelled R-U-O-F-F, not as roof
22      as it's written in this transcript,
23      as Mr. Ruoff describes in this
24      proceeding?
25        A.   Yeah.
```

Page 261

```
 1                    TERRENI
 2        Q.    And do you -- so you don't
 3    have any reason to dispute that at
 4    least before November 12, 2021, you
 5    had a conversation with Dr. Ruoff
 6    about the Senate doing an RPV
 7    analysis?
 8        A.    No.  I had a conversation
 9    with Dr. Ruoff about him doing an
10    RBV analysis.  Specifically I asked
11    him if he was going to do one.  He
12    said no, that he didn't have the
13    resources to conduct that.  And I
14    also had a, in that same
15    conversation said well, given that
16    somebody may want to do one at some
17    point in time could we update your
18    list of black/white elections that
19    you compiled in the 2010 scope.  And
20    Dr. Ruoff agreed that that would be
21    a good idea so that people weren't
22    caught flat-footed if they needed
23    one.
24             Dr. Ruoff in 2010, probably
25    going back to 2000, although I
```

Page 262

```
 1                   TERRENI
 2      wasn't directly involved with
 3      Dr. Ruoff doing this, had maintained
 4      this list that became kind of a
 5      source document for election -- for
 6      experts to use in selecting
 7      elections for their analyses just so
 8      they could know, hey, I want to use
 9      this [inaudible].  We needed to
10      update that list for the past ten
11      years.
12              And then in the 2010 election,
13      in the 2010 cycle we thought it was
14      much more likely we would need such
15      an analysis.  Dr. Ruoff and the
16      Senate entered into a collaborative
17      agreement in which we would help
18      update that information and we would
19      share it with Dr. Ruoff and the
20      public.  We did that in 2010.  We
21      did it again in 2020.  So that was
22      part of that conversation with
23      Dr. Ruoff.  So that it could be done
24      if it needed to be done and that
25      everybody would be working from the
```

Page 263

                              TERRENI

1
2      same list of elections if they
3      wanted to.
4           Q.   So you trusted or the
5      Senate trusted Dr. Ruoff to put --
6      to compile relevant elections that
7      anyone could use to consider racial
8      bloc voting analysis, is that fair
9      to say?
10          A.   Well, the Senate assisted
11     Dr. Ruoff.  We made some bloc works
12     available or staff available to help
13     him identify those races using the
14     State Election Commission's voter
15     file and put it together, but so
16     yeah, we trusted Dr. Ruoff to guide
17     the Senate in doing that and we are
18     happy to work together with
19     Dr. Ruoff in that document that I
20     believe was published on the Senate
21     website.  You may have it in your
22     discovery.
23          Q.   You mentioned updating it
24     to include elections featuring black
25     and white candidates.  Why was that

Page 264

1                    TERRENI
2       -- why were those particular
3       elections relevant?
4           A.    Because Dr. Ruoff and other
5       experts in the past had said that
6       those elections, at least some of
7       them, were particularly probative to
8       -- for use in racial bloc voting
9       analyses.
10           That's as far as I have gotten
11      into it.  I knew that's what they
12      needed, that's what they said they
13      wanted, we would provide it.
14          Q.    Let's look at tab 18, which
15      will be Plaintiffs' Exhibit 16,
16      which is an email chain with Breeden
17      John copying two people at
18      elias.law, E-L-I-A-S dot law.
19          A.    Yes, ma'am.
20          Q.    -- dated December 9, 2021,
21      South Carolina Senate 3372 through
22      80.  And it attaches a document
23      identified as South Carolina 2012
24      through 2020 Elections Voting Data
25      Final and the subject is "Request

Page 265

1                    TERRENI

2        for state racial bloc voting data."

3             A.    Yes ma'am.

4               (Plaintiffs' Exhibit 16, Email

5          chain, Bates South Carolina Senate

6          3372 through 3380, marked for

7          identification, as of this date.)

8             Q.    Is this reflecting the

9        compilation of data to do an RBV

10       analysis that you mentioned

11       Dr. Ruoff and the Senate worked

12       together to prepare?

13            A.    I believe it is.

14            Q.    And can you read the first

15       two sentences on South Carolina

16       Senate 3372 which begins with "The

17       attached file"?

18            A.    "The attached file was

19       created through cooperative research

20       by the South Carolina Senate

21       Judiciary Committee and Dr. John

22       Ruoff as their Memorandum of

23       Understanding states."

24               And then it goes -- I don't

25       know if you want me to keep reading.

Page 266

                        TERRENI

1

2          Q.    Yes, that first sentence

3      only.

4          A.    Okay.

5          Q.    The parties -- I'm sorry,

6      of the next paragraph.  It reads:

7      "The parties recognize that the

8      results of certain election contests

9      held in South Carolina since the

10     year 2010 may be needed by the

11     Senate to prepare a redistricting

12     plan to be enacted after the release

13     of the 2020 census results."

14          Do you know if this data was

15     available before December 9, 2021?

16          A.    I believe it may have been.

17     I mean I believe so, yes.

18          Q.    Okay.

19          A.    I don't know when it was

20     finally compiled but I believe it

21     was.

22          Q.    And once it was compiled it

23     would have been put up on the

24     Senate's website?

25          A.    That was the arrangement,

Page 267

```
 1                    TERRENI
 2        yes.
 3             Q.   And though the data was
 4        collected there was not a related
 5        racial bloc voting analysis done
 6        pursuant to that data by the Senate?
 7             A.   Correct.
 8             Q.   Okay.  Could the Senate
 9        have hired someone to do that
10        analysis if it didn't have staff
11        trained to do so?
12             A.   Racial bloc voting
13        analysis?
14             Q.   Yes.
15             A.   Yes.
16             Q.   I just want to look back at
17        tab 1, which should be the --
18             A.   Guidelines?
19             Q.   -- guidelines just to
20        confirm within the guidelines on
21        South Carolina Senate 22357 to
22        22358, is there anything on this
23        guideline that indicates that
24        congressional District 7 should
25        remain as close to the benchmark
```

Page 268

1                     TERRENI
2        2011 plan as possible for
3        congressional redistricting?
4            A.    No.   There's not.
5            Q.    Is there anything within
6        these guidelines expressly stating
7        that the public and/or the
8        legislature preferred a map that
9        minimally made changes between the
10       2011 map and the one to be enacted?
11           A.    I don't think so.
12       Constituent consistency and
13       preserving cores was a factor but it
14       didn't express a preference, no.
15           Q.    Do you think the average
16       member of the public would
17       understand, would equate preserving
18       the cores of constituencies with
19       making a map that minimally changes
20       districts between the 2011 map and
21       the 2020 map?
22           A.    I don't know, but it
23       wouldn't be intended for them to
24       reach that understanding.  That
25       wasn't a foregone conclusion.  These

Page 269

1                    TERRENI
2        criteria would have resulted in --
3        could have weighed other factors
4        above core constituent consistency
5        or cores and the map could have been
6        radically different than the one you
7        submitted.
8            Q.   Except for core
9        constituency could not supercede
10       one person one vote Section 2
11       compliance and nondilution,
12       nonracial gerrymandering?
13           A.   And nonracial
14       gerrymandering?
15           Q.   It could not supercede
16       racial gerrymandering --
17              MR. GORE:   Object to form.
18              MS. ADEN:   I object to my own
19         form.
20           Q.   Core constituency could not
21       supercede compliance with one person
22       one vote compliance with Section 2
23       and it could not lead to racial
24       gerrymandering under the guidelines?
25           A.   Correct.

Page 270

1                    TERRENI

2         Q.   Do you see anything in

3    these guidelines that articulates

4    that Beaufort should remain in CD 1

5    and not be put in CD 2?

6         A.   Not explicitly.  That's an

7    outcome.

8         Q.   But that is something that

9    was debated during the legislative

10   process?

11        A.   Yes.

12        Q.   And similarly you don't see

13   anything expressly in these

14   guidelines that says keep Fort

15   Jackson in CD 2 with -- in CD 2?

16        A.   Again, not expressly, no.

17        Q.   And is there anything in

18   this instruction that says make

19   Congressional District 1 likely to

20   elect a Republican congressional

21   candidate or be Republican leaning?

22        A.   Not specifically, no.

23        Q.   And unspecifically where do

24   you think it says that or suggests

25   that?

Page 271

```
               TERRENI
1
2          A.   It doesn't -- I'm sorry --
3     it doesn't specifically say that or
4     even nonspecifically.  It does say
5     congressional District 1 should be
6     Republican leaning.  No, that's not
7     a guideline.
8          Q.   In tab 12, which should be
9     plaintiffs Exhibit 17.
10         A.    Tab 12, okay.
11         Q.    This should be an email
12    cover from Holi, H-O-L-I, Miller, or
13    two Ls.  Is that two Ls or one L?  I
14    can't see.  Two Ls, H-O-L-L-I Miller
15    on behalf of Senator Harpootlian
16    copying you, Mr. Terreni dated
17    September 16, 2021 with the subject
18    "Notice of redistricting
19    subcommittee meeting" and it's
20    attaching a letter to Luke Rankin.
21    This is Bates stamped South Carolina
22    Senate 3387 to 95.  Can you take a
23    moment to -- I'll direct you to
24    particular things, but it's a
25    nine-page pdf.
```

Page 272

1                    TERRENI
2              (Plaintiffs' Exhibit 17, Email
3         cover from Holli Miller, Bates
4         South Carolina Senate 3387 to 3395,
5         marked for identification, as of
6         this date.)
7              Q.    Do you remember receiving
8         this cover letter and the
9         attachment?
10             A.    Yes.
11             Q.    And are the recipients also
12        other subcommittee members besides
13        Senator Harpootlian?
14             A.    A lot of them, yes.
15             Q.    Are there also Senate staff
16        on that?
17             A.    Yes.  There are some Senate
18        staff and then other people I don't
19        recognize.
20             Q.    Looking at South Carolina
21        Senate 3389 to 3393, so this is the
22        actual letter.  As a general matter
23        what did you understand Senator
24        Harpootlian was doing with this
25        letter?

Page 273

1                    TERRENI

2        A.    Proposing legislative

3    guidelines or redistricting

4    guidelines for consideration of the

5    committee.

6        Q.    Can you read just the first

7    and last sentence of the paragraph

8    on 3390?  The first sentence begins

9    with "However" and last begins with

10   "Because."

11       A.    "However, what is not clear

12   from the draft guidance is what the

13   subcommittee contends would rise to

14   the level of vote dilution under the

15   VRA or the Constitution.  For

16   example" --

17       Q.    Let's stop -- not there.

18   Can you go to the last sentence,

19   "Because"?

20       A.    "Because the threshold

21   requirements must be met before a

22   litigant could even argue if the

23   court should force the state to draw

24   a majority-minority district, the

25   legislature should not voluntarily

Page 274

1                    TERRENI

2      undertake such a task in

3      anticipation of such a challenge

4      without first making sure these

5      conditions were met."

6         Q.   And then looking at the

7      next paragraph, is it fair to say

8      that Senator Harpootlian is asking

9      the subcommittee staff to produce a

10     document, a written document that

11     fully explains what the subcommittee

12     should credit as sufficient evidence

13     of vote dilution to warrant a

14     remedial racial redistricting under

15     Section 2 or the constitution?

16        A.   That's what it says.

17        Q.   And is it fair to say in

18     the last sentence he says:  "In the

19     absence of such data and analysis I

20     do not believe the state can

21     credibly claim to be acting in

22     furtherance of the VRA or the

23     Constitution when subordinating

24     other race neutral considerations to

25     draw majority-minority districts."

Page 275

1                    TERRENI
2          Did I accurately read that?
3          A.    It does.
4          Q.    And does it reflect that
5     Senator Harpootlian thinks that an
6     analysis of a potential vote
7     dilution is necessary not just to
8     defend against a Section 2 lawsuit
9     but also to defend against a
10    constitutional challenge such as a
11    racial gerrymandering or an
12    intentional discrimination
13    challenge?
14         A.    Given what he said, you
15    know, it would be defense and to a
16    racial gerrymandering claim is,
17    quote, in furtherance of the VRA,
18    unquote, which would mean Section 2
19    compliance.  This is a defense to
20    racial gerrymandering because he
21    says when subordinating other race
22    mutual considerations to draw a
23    majority-minority district is just
24    something we didn't do.
25         Q.    And we, the plaintiffs,

Page 276

```
 1                        TERRENI
 2        have brought a racial gerrymandering
 3        lawsuit, correct?
 4             A.    Correct.
 5             Q.    Okay.  Do you know if
 6        Senator Harpootlian's request for
 7        this analysis was adopted?
 8             A.    It was not.
 9             Q.    Read the first sentence of
10        the next paragraph aloud beginning
11        with "However, I believe."
12             A.    Are you talking the second
13        paragraph in Section 3?
14             Q.    I'm sorry, second paragraph
15        under 3 Avoidance of Racial
16        Gerrymandering, South Carolina
17        Senate 3390.
18             A.    "However, I believe the
19        subcommittee should seek guidance
20        from committee staff in order to
21        enact a policy that seeks to correct
22        racial decisions or decision-making
23        that serves as the predicate for the
24        choices reflected in your benchmark
25        plan."
```

Page 277

TERRENI

1

2      Q.    And then if you could just

3    read the last sentence on 3391,

4    which is the next page, beginning

5    with "In light of."  It's the last

6    sentence of the first nonfull

7    paragraph on the South Carolina

8    Senate 3391.

9      A.    Just tell me where it

10    begins and I'll --

11      Q.    You are in the right

12    paragraph.  It's just I'm focusing

13    on the last sentence, which reads:

14    "In light of U.S. Supreme Court

15    precedent --

16      A.    Yes.  I'm sorry.

17      Q.    -- over the last decade."

18      A.    I'm sorry.  "In light of

19    U.S. Supreme Court precedent over

20    the last decade I believe our

21    guidelines should be updated to

22    recognize the districting decisions

23    the legislature made a decade ago

24    under the auspices of Section 5 were

25    based on a flawed view of VRA that

Page 278

                          TERRENI

1

2        was unconstitutionally in effect at

3        the time those decisions were made."

4            Q.   And this guidance from the

5        committee staff about correcting

6        racial decision-making from the

7        benchmark plan, was that

8        recommendation adopted?

9            A.   This isn't guidance from

10       the committee staff.

11           Q.   Excuse me.

12           A.   You asked me if this

13       guidance from the committee staff

14       correcting racial discrimination in

15       the benchmark plan was adopted, and

16       I'm saying --

17           Q.   I'm sorry, that's not the

18       question.  Was the request that the

19       committee do that analysis or seek

20       guidance from staff, was that

21       request taken up, adopted?

22           A.   Senator Harpootlian's

23       request was not adopted because

24       committee staff and the committee

25       did not think the existing districts

```
 1                    TERRENI
 2        were unconstitutionally drawn, which
 3        is the premise of these requests.
 4             Q.   Okay.  But he asked for it
 5        and it was not taken up, that's the
 6        question?
 7             A.   Correct.
 8             Q.   Okay.  And looking at South
 9        Carolina Senate 3392, there is a
10        paragraph D in the middle of the
11        page identified as Maintaining
12        District Cores.  And it reads:
13        "While I agree we should maintain
14        district cores when possible, other
15        considerations stated above should
16        be given priority and we should
17        recognize that maintaining district
18        cores could simply ossify problems
19        caused by past districting efforts.
20        Accordingly, I give this some but
21        relatively low weight."
22             Does that opinion square with
23        the way that district cores or core
24        constituency is characterized in the
25        guidelines that were actually
```

Page 280

```
 1                     TERRENI
 2      adopted?
 3           A.   Well, we have to -- when he
 4      says district cores should be
 5      subordinated to the other criteria
 6      above, no.  It is not consistent
 7      with the way the guidelines were
 8      adopted or implemented because under
 9      his criteria he would have
10      prioritized counties and cities and
11      voting precincts and not splitting
12      or minimizing -- so in other words,
13      he would elevate A, B, C -- A and B
14      and C, as I look at this now it's
15      been a while, over district cores.
16      So A is not consistent with the way
17      the subcommittee directed
18      redistricting to take place.
19           Q.   And A that you are
20      referring to is in the Senate
21      guidelines, which is communities of
22      interest?
23           A.   No, ma'am.  It's in his
24      guidelines which is counties.
25           Q.   Okay.  I'm sorry, I didn't
```

Page 281

```
                            TERRENI
 1
 2      know what you were referring to,
 3      which document you were referring
 4      to.
 5           A.   I'm on the page you told me
 6      to be on, which is the 3392 and he,
 7      Senator Harpootlian proposed the
 8      district cores should be given
 9      priority -- other considerations
10      above should be given priority, I'll
11      read that and understand over
12      district courts.  And those other
13      considerations were counties, towns,
14      cities and precincts.
15           So the way he's phrased this
16      you would prioritize not splitting
17      the precinct down to being able to
18      maintaining the district core.
19      That's just not consistent with what
20      the Senate adopted.  Which I think
21      was your question.
22           Q.   Did the maintaining
23      district cores during the Senate's
24      map, at least part of the Senate's
25      map making process, did that
```

Page 282

```
1              TERRENI
2      ultimately take priority over some
3      of those identified criterias like
4      counties, keeping counties whole,
5      keeping towns and cities whole in
6      your view?
7           A.    It didn't necessarily take
8      priority in the process.  Well, it
9      wasn't mandated that it take
10     priority but the resulting plan did
11     certainly prioritize maintaining
12     cores of splitting precincts,
13     although it didn't split many VTDs.
14     As the process progressed I think it
15     was fair to say that the legislature
16     and the subcommittee members that
17     supported the plan, prioritized
18     maintaining the cores of these
19     districts or weighed that factor to
20     be more significant than others.
21     Not all of them but in perhaps
22     others once.
23          Q.   Can you tell me which
24     others in the guidelines you think
25     fell below -- I'm sorry -- you think
```

TERRENI

1  
2       came before core constituency that

3       were not one of the federal

4       requirements?

5           A.   It's a good question,

6       Ms. Aden.  I imagine for different

7       people --

8           Q.   Looking for that all day.

9       Go ahead.

10          A.   You've asked a lot of good

11      questions.  I imagine for different

12      people it meant different things.

13      Certainly they were merged so that

14      the minimal change in this plan was

15      something that was appreciated by a

16      lot of notes.  But there were other

17      factors too.  It's not an either/or

18      thing.  I mean Berkeley County, for

19      instance, was whole, the VTD splits

20      were not terribly prevalent.  There

21      was certainly a reduction from the

22      previous plan.  So I don't know

23      there was --

24          I'm trying to answer your

25      question but I suppose what I'm

Page 284

1                      TERRENI

2     saying is different members had

3     different motivations.  Certainly

4     many members pointed to an advantage

5     of this plan as being that it was

6     the least change -- that it was a

7     least or a lesser change plan from

8     the existing plan.  That they liked

9     the existing plan and the changes

10    here were not terribly upsetting.

11         Q.   I would like to turn to the

12    initial staff map and some questions

13    about that, but I want to do a, if

14    we could go off the record for a

15    second and do both a time check and

16    a whether people need a five-minute

17    break before we turn to that

18    subject.

19         MR. GORE:  A break is always

20     great.  I would like a five-minute

21     break.

22         (Whereupon, there is a recess

23     in the proceedings.)

24         Q.   Turning to the map room,

25    were you in the map room when

1                        TERRENI
2        members of the legislature would
3        come into the map room to consider
4        congressional maps, Mr. Terreni?
5            A.    Often.
6            Q.    And when members of the
7        legislature would come in to
8        consider congressional maps, was
9        race data available to them as they
10       were drawing maps?
11           A.    If they requested it, it
12       was.
13           Q.    Excuse me?  I'm sorry.
14           A.    If they requested it, it
15       was.
16           Q.    Was it a feature that you
17       would agree could be turned on or
18       off in Maptitude while maps were
19       being developed?
20           A.    It could be displayed.
21           Q.    Okay.  And you would agree,
22       though, that when maps were -- the
23       maps were proposed the initial staff
24       plan and those that follow that they
25       came along with a summary report

Page 286

TERRENI

1
2      which included race data?
3          A.    Yes.
4          Q.    So turning to the initial
5      staff plan I think we talked earlier
6      that the development of that plan
7      happened around November or so after
8      the Senate map making had been
9      completed, is that fair to say?
10         A.    Yes.
11         Q.    As congressional
12     redistricting was underway, did you
13     or were you aware of anyone having a
14     plan for the trajectory of how the
15     bill would proceed through the
16     legislative process?
17         A.    Yeah.  We discussed how the
18     bill could move through the
19     legislative process.  The House was
20     considering a congressional plan,
21     the Senate obviously was and one way
22     or another either the Senate was
23     going to amend the House bill or we
24     were going to exchange bills or --
25     so different scenarios were explored

Page 287

```
  1                    TERRENI
  2      for how to move this through as
  3      efficiently as possible or through
  4      this.  Efficiently is probably not
  5      the best word in legislation.
  6           Q.   On November 23, 2021, the
  7      Senate Redistricting Subcommittee
  8      publicly posted a plan called the
  9      2021 Staff State Congressional Plan.
 10           Do you recall that proposal,
 11      Mr. Terreni?
 12           A.   Give me that date again,
 13      please.
 14           Q.   November 23, 2021.
 15           A.   Yes, ma'am.
 16           Q.   And it's fair to say you
 17      had a role in developing the
 18      Senate's initial staff plan?
 19           A.   Yes, ma'am.
 20           Q.   And it's fair to say that
 21      Jones Day had a role in developing
 22      the initial staff plan?
 23           A.   They had a -- they advised
 24      us -- they gave legal advice in the
 25      development of the initial staff
```

Page 288

```
 1                    TERRENI

 2      plan.  They had no role in drawing

 3      it.

 4           Q.   To be clear, did you have a

 5      role in actually drawing the initial

 6      staff plan?

 7           A.   No, ma'am.  Will Roberts

 8      was our protographer.

 9           Q.   Did you direct Will Roberts

10      in any regard with respect to the

11      initial staff plan?

12           A.   Not in -- direct is a

13      loaded word.  I would have had

14      conversations with Will about the

15      staff plan as it was developed.  I

16      might have asked questions about

17      whether these things were feasible.

18      I don't remember directing Will to

19      do anything.

20           Q.   Do you recall telling

21      Mr. Roberts to develop a map that

22      considers the Senate's adopted

23      criteria?

24           A.   I don't know that I had to

25      tell Mr. Roberts that.  He already
```

```
 1                    TERRENI
 2      knew, he was an experienced mentor,
 3      but if I ever reinforced it, it
 4      wouldn't surprise me.
 5           Q.   Did you ever direct or tell
 6      Mr. Roberts to develop an initial
 7      staff map that responded to Senator
 8      Rankin's request that CD 7 be the
 9      least changed district from the
10      benchmark plan?
11           A.   I may have.  He may have
12      heard that himself, but I may have.
13      It wouldn't surprise me if I did.
14           Q.   Was it possible that
15      Mr. Roberts or Mr. Fiffick or any of
16      the other staff heard stuff from
17      other people and that went into the
18      initial staff plan even if it wasn't
19      something that was specified on
20      these Senate adopted guidelines?
21           A.   Yes.
22           Q.   And then did you guys talk
23      about that or how did -- who was the
24      decision-maker about whether this
25      other stuff that was being talked
```

Page 290

TERRENI

1
2       about made it into the initial staff
3       plan?
4            A.    The staff plan was an
5       initial draft for the consideration
6       of the members.  The staff plan, as
7       I recall, was largely developed by
8       Mr. Roberts.  He had a plan that he
9       thought could work that was a good
10      starting point to bring to the
11      subcommittee, and he showed it to us
12      and we may have had some discussion
13      about one feature or another and
14      then the staff plan developed from
15      that.
16           I hope that answers your
17      question.  It was a group thing.
18           Q.    And how -- when you said
19      there was feedback or there was
20      discussion about one feature or the
21      other, did that lead to him coming
22      up with like another iteration
23      before it became the final initial
24      staff plan, were there like versions
25      of this map that were being

Page 291

1              TERRENI

2        developed before there was the

3        initial staff plan that was given to

4        the subcommittee?

5            A.   I believe so.  If you

6        consider a version every iteration

7        of the map, meaning every time a

8        change was made that's a version,

9        yes.  I mean was the map changed

10       from the first time Will displayed

11       it on the screen for us, I'm sure it

12       was.

13           Q.   Did any subcommittee member

14       have access to the initial staff

15       plan before it was publicized on

16       November 23rd?

17           A.   I don't believe so.  We

18       were kind of in a rush to get it

19       out.

20           Q.   Based upon your past work

21       with congressional redistricting was

22       it normal for subcommittee members

23       to not have seen a draft of the map

24       before it was publicized?

25           A.   It was not abnormal for

Page 292

1                        TERRENI

2        some subcommittee -- I mean the last

3        time, 2010 was a very different

4        process in that there was going to

5        be a new set of congressional

6        district.  That engendered a lot of

7        interest on behalf of members.  So

8        there was more intense interest in

9        the congressional plan.

10            Either way members knew their

11        way to our office.  If they wanted

12        to come in, they were certainly

13        welcome to.  I don't remember there

14        being a break in the old interest

15        about this congressional plan from

16        many members and I don't believe any

17        member had any [inaudible] before

18        the staff plan was promulgated.

19        Again, that was a very quick

20        turnaround.  And I just think the

21        circumstances were so different.

22        There were a lot of people that had

23        -- were very interested in what the

24        district was going to require.

25            Q.    In 2010?

Page 293

TERRENI

1

2          A.    Yes, ma'am.

3          Q.    When you said showed us,

4     can you just briefly reiterate who

5     that us was who would have seen the

6     initial staff plan that Will Roberts

7     was largely developing?

8          A.    Generally speaking, the

9     Senate Judiciary staff, I'm sure

10    Mr. Fiffick, Breeden would have seen

11    it.  I imagine at some time

12    everybody did.  Paula, Maura.  I

13    don't know about Madison.  But Paula

14    and Maura would have seen it likely.

15    I didn't mean to slight anybody by

16    leaving them out.  But I mean that

17    was in --

18         Q.    And just to be clear, did

19    Clark Bensen see this initial staff

20    plan before it was publicized?

21         A.    No.

22         Q.    Did Dale Oldham see this

23    initial staff plan before it was

24    publicized?

25         A.    No.

Page 294

TERRENI

1       Q.    Did Adam Kincaid see this
2   initial staff plan before it was
3   publicized?

4       A.    No.

5       Q.    Did Reagen Kelly see this
6   initial staff plan before it was
7   publicized?

8       A.    I'm almost certain he did
9   not because Reagan really expressed
10  at the beginning of the
11  congressional process that he
12  wanted -- he really didn't want
13  anything to do with it.

14      Q.    He really didn't want to
15  what?

16      A.    That he wasn't going to be
17  involved in the congressional
18  process.  The only hedging I'm
19  getting is Reagen, certainly if
20  Reagen had walked in the room we
21  wouldn't -- knocked on the door and
22  wanted to come in we wouldn't have
23  turned him away, but I don't recall
24  him seeing it and I don't believe he

Page 295

1                    TERRENI

2      did.

3            Q.   As the initial staff plan

4      was being developed, how was -- are

5      you aware of how Will Roberts or any

6      other Senate staffer was factoring

7      in the information received during

8      the public comment period?

9            A.   Oh, he was there.  He heard

10     it.  He would have distilled it.

11     There were little details.  You

12     know, an example that we all thought

13     of was there were members of Sun

14     City in Jasper County who expressed

15     a strong preference for remaining in

16     the same district with the remainder

17     of Sun City, which was largely

18     Beaufort County.  So you'll see that

19     little protrusion in Jasper.  That

20     was the result of public testimony.

21     So some of these features would be

22     absorbed in that way.

23           Q.   Did Sun -- are the

24     demographics of Sun City largely

25     majority white?

Page 296

```
 1                    TERRENI
 2          A.    I believe so, yes.
 3          Q.    But Jasper County is a
 4     considered part of the black belt in
 5     South Carolina?
 6          A.    Jasper County is a
 7     significant African-American
 8     population.  I don't recall its
 9     present demographics.  There's been
10     a lot of spread out in Hilton Head
11     so I don't want to qualify that.
12     But generally speaking, yes, it
13     would be -- it would have a larger
14     African-American population than Sun
15     City, that's for sure.
16          Q.    Do you know whether at any
17     point in developing the initial
18     staff plan or frankly any point
19     while the Senate was considering
20     congressional redistricting whether
21     anyone attempted to draw a Second
22     District in which black voters were
23     the majority of the district?
24          A.    From the Senate staff or
25     the public submissions?
```

Page 297

TERRENI

1

2        Q.    Senate staff.

3        A.    I don't believe anyone

4    purposefully set up to draw a black

5    majority District 6.  I don't recall

6    if anyone drew a map in the course

7    of map drawing that was black

8    majority.  That might not have been

9    the goal as far as I'm aware.

10       Q.    My question I think was a

11   little bit different.  But whether

12   outside of CD 6 whether anyone --

13   let's stop for a second.  CD 6 prior

14   to this enacted map was a district

15   above 50 percent majority of black

16   voters under some measure of black

17   that the census provides?

18       A.    Under the 2010 census that

19   certainly is the case.  I don't

20   recall, Ms. Aden, if CD 6 was

21   majority black under the PL data

22   that was released.  In other words,

23   prior CD 6 I don't know if there was

24   a majority district or at least a

25   BVAP majority district under the PL

Page 298

```
1                    TERRENI
2        data that was released in 2021.
3            Q.   Assuming that it was
4        majority black voting age population
5        in CD 6 in 2011 based upon the 2011
6        enacted map, do you know if anyone
7        this cycle for the Senate attempted
8        to draw a Second District with the
9        majority of black voters?
10           A.   Not for that express
11       purpose, I don't recall that
12       happening.
13           Q.   What other unexpressed
14       purpose would there be?
15           A.   Something else.  I mean
16       there -- you could draw -- you could
17       be trying to draw a different
18       iteration of CD 6 to accommodate any
19       of the various recommendations that
20       were made by whomever.  Maybe one of
21       those plans incidentally resulted in
22       a 50 percent district.  I don't
23       know.  That's what I'm saying.  No
24       one sat down in the map room and
25       said we need a 50 percent
```

Page 299

                              TERRENI

1                  
2       District 6.
3            Q.    Have you heard the term "an
4       effectiveness analysis"?
5            A.    Yes.
6            Q.    What do you understand it
7       to be?
8            A.    It's a statistical analysis
9       that seeks to predict whether the
10      minority community can elect a
11      candidate of its choice.  That's my
12      general understanding of it.
13           Q.    Have you seen effectiveness
14      analysis being performed -- when
15      have you seen effectiveness analysis
16      performed in your career?
17           A.    In litigation, specifically
18      the Colleton County versus McConnell
19      case.  I would have at a greater
20      distance witnessed it performed in
21      2020.  I believe there would have
22      been some litigation, I mean some
23      effectiveness analysis conducted by
24      various parties who were commenting
25      on the preclearance submission in

Page 300

1                    TERRENI

2        two thousand -- I said '20.  I'm

3        sorry.  2010.  I don't believe I saw

4        any in this cycle that I recall.

5             Q.   Can an effectiveness

6        analysis look at whether a district

7        will perform for a racial minority

8        group and/or for a particular

9        candidate?

10            A.   Yes, I think so.

11            Q.   Meaning an effectiveness

12       analysis can look at whether or not

13       black voters can elect their

14       preferred candidate of choice,

15       whoever that candidate is, including

16       a black representative.  Is that

17       fair to say?

18            A.    It is.

19            Q.   But an effectiveness

20       analysis could also look at, for

21       example, whether or not the

22       Democratic candidate in a past

23       election would win under the

24       boundaries of a proposed new

25       district.  Is that fair to say?

Page 301

1              TERRENI
2         A.    I think so, yes.
3         Q.    Basically I guess my
4    question is was an effectiveness
5    analysis you can look at race and/or
6    party -- the candidate of a
7    political party's -- the impact --
8    strike that.  I'll just move on.
9         While the initial staff plan
10   was being developed were there any
11   discussions about increasing,
12   decreasing or maintaining the black
13   voting age population in certain
14   districts?
15        A.    There would have been an
16   awareness of the black population in
17   the Sixth District if we had seen a
18   plan that made a substantial
19   reduction in the black population in
20   the Sixth District and it was plan
21   that we wanted to pursue, we would
22   recognize that race and we then may
23   have been prompted to do further
24   inquiry.
25             I believe the Sixth District

Page 302

1                    TERRENI

2        plan, it was reduced by three or

3        four percentage points, if I

4        remember correctly, it wasn't much.

5        But whatever we did in the Sixth

6        District staff plan was not enough

7        to prompt that concern for us,

8        especially given that many of the

9        plan of the Senate districts from

10       which we had received the input of

11       African-American members were below

12       50 and we had not received any

13       concern from a Section 2 perspective

14       or really even from anyone else that

15       they weren't going to perform -- I

16       don't want to say a general

17       wholesale.  But no, we didn't have a

18       concern about that in this context,

19       in the context of -- we didn't have

20       a concern about that with respect to

21       6 as it was in the staff plan.

22            I hope that answers your

23       question.  If not, please restate

24       it.

25            Q.   Is it your position that

Page 303

1                 TERRENI

2    there was no need to be aware of the

3    black voting age population in

4    districts outside of CD 6 this

5    cycle?

6       A.   No.  We were certainly

7    aware of it as those reports would

8    have produced it.  We didn't see

9    anything in the plans that we

10    produced that caused us one concern

11    or the other.

12        Our primary -- I think our

13    primary concern would have been that

14    if we did something that

15    dramatically changed the racial

16    composition, really reduced it in

17    one of these remaining districts, we

18    might have been accused of some sort

19    of intentional racial drawing.  That

20    wasn't what we were doing.  We were

21    certainly sensitive to those

22    concerns, and so we would have

23    monitored the BVAP of different

24    plans but -- so yeah, we would have

25    looked at it for everybody.

1                    TERRENI

2          Q.    Outside of CD 6 did you

3      have any data, any basis to know one

4      way or the other whether a reduction

5      in the black voting age population

6      of 3 or 4 percentage points or even

7      some larger number would impact the

8      ability of black voters to elect a

9      candidate of choice or influence a

10     candidate of choice.  Did you have

11     any analysis or data to backup

12     whether or not there would be that

13     impact outside of CD 6?

14         A.    Certainly not to elect.  As

15     far as influence, that evidence

16     would have been anecdotal.  I mean

17     -- but so -- and I don't recall any.

18         Q.    Do you think that black

19     voters based upon the way the staff

20     plan was developed could perceive

21     that outside the CD 6 their

22     electoral opportunity doesn't matter

23     to the Senate?

24         A.    No.

25         Q.    Why not?

Page 305

TERRENI

1
2        A.   Well, I don't want to
3    presume to speak for black voters,
4    that's simply not my place.  But
5    they are entitled to participate in
6    elections.  It's not a foregone
7    conclusion how they are going to
8    vote.  And it's not a foregone
9    conclusion that their votes won't
10   matter or not matter just because
11   Republicans have been elected in
12   these other districts.
13        We have had hotly contested
14   elections in the state, as you know,
15   in the First District, in the Sixth
16   District -- excuse me, in the Second
17   District and there's no reason to
18   believe that a black voter or a
19   white voter or Hispanic voter or
20   anyone else might not have a
21   significant impact on these races.
22        Q.   Would you agree, though,
23   that there's a perception about how
24   most black voters vote for
25   political -- for party affiliated

Page 306

1                    TERRENI
2       candidates?
3            A.    There is a perception that
4       most white voters and, for democrats
5       I think that's been borne out
6       statistically, whether it's
7       predicted or not I don't know.  I
8       suspect it is.
9            I guess what I'm saying is
10      it's not like we haven't had
11      uncompetitive elections.  Joe Wilson
12      had a very strong challenge from
13      Adair Boroughs in the last race.
14      Joe Cunningham won the First
15      District.  So if -- in a district
16      that as I recall had a similar
17      composition or one that we passed.
18      So if black voters, even we were to
19      take that jump, that black voters
20      are going to be loyally Democratic
21      as the courts have concluded based
22      on evidence in the past, that it
23      doesn't mean there's -- they have
24      very little influence in the
25      process.

Page 307

1
2      Q.    But there was no analysis
3    around the initial staff plan about
4    whether or not black voters'
5    preferences for candidates in some
6    of these hotly contested or nonhotly
7    contested elections would change or
8    not change under the proposed map?
9      A.    No.
10     Q.    After the redistricting
11   subcommittee published this
12   November 23rd map do you remember
13   what, if anything, you did on
14   congressional redistricting from
15   November 23rd until November 29th or
16   is this the time where you might
17   have been under the weather?
18     A.    It is a time -- I mean 23rd
19   -- I believe Thanksgiving just a
20   couple days later, if I remember
21   from some of the testimony I saw in
22   your exhibits.  The 23rd was a
23   Tuesday before Thanksgiving.
24   Thanksgiving is usually on a
25   Thursday so that would have taken us

Page 308

1                    TERRENI

2      to the 25th.  I remember catching

3      COVID shortly or at least being

4      diagnosed with COVID shortly after

5      that.  So to the extent I would have

6      seen the next subcommittee meeting

7      where -- I believe that was the one

8      in which Congressman Cunningham

9      testified, the former Congressman

10     Cunningham, I think I would have

11     watched that remotely and I would

12     have been out of the Senate offices

13     for several days, whatever the

14     protocol was from when I started to

15     feel better.  Say basically I was

16     out for about a week or so but not

17     incommunicado.

18          Q.   So there was a hearing

19     November 29th about that

20     November 23rd map.  Did you prepare

21     any materials while you were under

22     the weather for that hearing.

23          A.   I didn't prepare them.  I

24     may have reviewed them.

25          Q.   Do you recall preparing any

Page 309

```
 1                    TERRENI
 2      talking points in particular or
 3      cheat sheets or other guidance for
 4      staffers, Senate staffers, preparing
 5      or reviewing those types of
 6      documents for Senate staffers or
 7      Senate leadership for this
 8      November 23rd hearing -- 29th
 9      hearing?
10           A.   Not specifically.
11           Q.   Were you in communication
12      with any Senate members or Senate
13      staff remotely while you were
14      watching that hearing on November
15      29th?
16           A.   In -- no, I don't believe I
17      was.  I know that my hookup -- I
18      seem to recall my hookup was
19      different than -- it's not like I
20      was in with the public blank, but I
21      don't think I had the wherewithal to
22      communicate directly with members.
23      I don't recall doing that.  I don't
24      think I did.
25           Q.   Looking at tab 8, which is
```

Page 310

```
 1                    TERRENI
 2       a transcription of the November 29,
 3       2021, hearing that was transcribed
 4       by a court reporter service and it's
 5       Bates stamped South Carolina NAACP
 6       CD 11844-11934.
 7            A.   Yes, ma'am.
 8              (Plaintiffs' Exhibit 18,
 9        Transcript of 11/29/2021 hearing,
10        Bates South Carolina NAACP CD 11844
11        through 11934, marked for
12        identification, as of this date.)
13            Q.   This will be Plaintiffs'
14       Exhibit 18.  I want to direct you to
15       the remarks of Will Roberts, which
16       go from pages 4 through 7.
17            A.   Um-hmm.
18            Q.   And in particular, I want
19       to direct you to page 5, which is
20       South Carolina Senate -- yes.  South
21       Carolina NAACP, I apologize, Bates
22       stamped South Carolina NAACP CD
23       11848.  So the Bates stamp is wrong
24       that I said before it's South
25       Carolina NAACP CD 11844 through
```

1                    TERRENI

2        11934.  And now we are looking at

3        page 5, which is 11848.  Sorry.

4            If you look at line [sic] 5,

5        I'll represent that this is Will

6        Robert's speaking and providing an

7        overview of this congressional staff

8        plan.  Do you see on line 5 -- on

9        page 5 line 6 that he refers to that

10       plan as a minimal change plan?

11           A.   Yes, ma'am.

12           Q.   And looking at that same

13       page, lines 7 through 11 it reads:

14       "Our goal was to bring the

15       congressional districts back into

16       deviation compliance, while

17       maintaining the core constituencies

18       of the districts.  And with this

19       plan, we have accomplished that."

20           Do you see that?

21           A.   Yes.

22           Q.   Okay.  Does that identify

23       two major goals for this initial

24       staff plan?

25           A.    Yeah, that's fair to say.

Page 312

TERRENI

1    Q.   Does it say anything about
2
3    nondilution of minority voting
4    strength?
5    A.   It does not.
6    Q.   Does it say anything about
7    compliance with Section 2 or
8    nonracial gerrymandering?
9    A.   No.  I think those are
10   presupposed as we discussed earlier.
11   Q.   But it has elevated core
12   constituencies which was an
13   additional consideration in the
14   criteria to one of the top two goals
15   of the map alongside one person one
16   vote.  Is that fair to say?
17   A.   Not over avoidance of
18   racial gerrymandering Section 2.
19   Will would have known that.  I mean
20   those are nonnegotiable, right?  So
21   he would have -- he said our goals,
22   I mean I think he assumed everybody
23   understood them, not trying to
24   violate federal law.  So our goal
25   was to bring congressional districts

Page 313

                          TERRENI

1

2       back into compliance -- check.  I

3       mean that's something we'd want to

4       do, while maintaining the cores of

5       district, that's one of the

6       criteria, in this plan.  And with

7       this plan we have accomplished that.

8            I agree with that statement to

9       the extent it was descriptive.  I

10      agree with that statement to the

11      extent that it states goals.  I

12      don't believe that statement was

13      intended nor would I agree with it

14      to be exclusive.

15           Q.   Have you heard courts refer

16      to the one person one vote principle

17      as a background criteria for

18      redistricting as well?

19           A.   Yes, ma'am.

20           Q.   So you presuppose

21      compliance with one person one vote;

22      is that correct?

23           A.   Yes.

24           Q.   Okay.  But yet it is

25      something that Will Roberts

Page 314

```
 1              TERRENI
 2      identified as being a primary goal
 3      alongside maintaining cores of
 4      constituency when he publicly
 5      introduced this staff plan on the
 6      29th hearing?
 7          A.   Yeah.  And that makes
 8      sense.  And I'll explain my view of
 9      it at least.  I don't remember the
10      specific case but I know the case
11      you are referring to in which the
12      course said well, you know, we save
13      it, you know, the one person one
14      vote standard is a backdrop of
15      whatever you just -- however you
16      just described it.  In the sense
17      that it's not discretionary.  But so
18      Will though as demographer says hey,
19      I complied with one person one vote,
20      I drew this plan, this one that has
21      a deviation of one.
22          Also you might say well, why
23      is that even a frontier.  Well there
24      was a discretionary criteria when it
25      comes to equal population, that's
```

Page 315

```
 1                    TERRENI
 2      the 5 percent frontier.  The general
 3      Senate is not bound to go to a plus
 4      or minus five, it could have been
 5      plus or minus two, it could have
 6      been something else.  That wasn't
 7      substantive of public concern.  So
 8      A, you've gotta know the criteria.
 9      B, Will says it.  I don't think it
10      means -- I'm not sure you need to
11      read more into it than that.
12           Q.   Do you recall when
13      listening to that hearing that there
14      were concerns expressed about
15      packing and cracking black
16      communities with respect to this
17      map?
18           A.   I do.
19           Q.   Okay.  And do you recall
20      that those concerns didn't just come
21      from the public, they came from
22      members of the subcommittee
23      including Senator Bright Matthews
24      and Senator Harpootlian?
25           A.   Yes.
```

Page 316

1                    TERRENI

2          Q.    Turning back to this tab 8,

3     the November 29, 2021 hearing.

4          A.    Um-hmm.

5          Q.    If you look at page 67,

6     lines 15 through line 69 -- I'm

7     sorry, page 67, line 15 through page

8     69, line 9, I just want you to skim

9     it.

10         A.    67 lines what?

11         Q.    Line 15.

12         A.    Okay.

13         Q.    69, line 9.

14            Have you had a chance to skim,

15     Mr. Terreni?

16         A.    Just one second.  Okay.

17         Q.    This is when the public

18     first learned about Adam Kincaid?

19         A.    This is when the Republican

20     subcommittee met, not Adam Kincaid.

21         Q.    Yes.  And looking at page

22     32, you have to go back, page 32 in

23     the top right-hand corner.  And if

24     you look at lines 9 through 16, do

25     you see Senator Harpootlian on the

Page 317

1                    TERRENI

2       29th expressly asking for what

3       information this independent

4       Republican group, having later been

5       identified as Adam Kincaid from

6       NRRT, specifically asking for what

7       had been submitted by them?

8            A.    Yes.

9            Q.    Okay.  And looking at page

10      35, lines 20 through 25 Senator

11      Harpootlian states at the hearing:

12      "And that's what upsets me is that

13      some independent Republican group is

14      allowed to let them know what they

15      think but I'm not.  Never saw the

16      congressional plan.  Never asked for

17      my input."

18           Were you surprised that he

19      made that statement?

20           A.    Yes.

21           Q.    Why?

22           A.    Because Senator Harpootlian

23      was well aware that he had access to

24      the map room.  Senator Harpootlian,

25      among the membership, was most

Page 318

1                    TERRENI
2        reluctant of the members to engage
3        with the staff throughout the
4        process.  So for Senator Harpootlian
5        to claim that we never asked for his
6        input in my opinion didn't tell the
7        whole story because by then,
8        especially after going through the
9        Senate plan for six months,
10       everybody knew that they had access
11       to the staff and that we didn't have
12       -- they didn't have to ask for it.
13       We didn't ask for anybody's input
14       really.  We needed to get a staff
15       plan in front of the subcommittee so
16       that we could have a beginning of a
17       process under which we were under a
18       time crunch.  Remember, we were
19       being sued, we had a judge that was
20       -- that expressed some urgency in
21       receiving a plan.  And we felt like
22       this was the beginning of the
23       process and not the end.  And the
24       Republican group was not solicited
25       by us.  They contacted us and by

Page 319

TERRENI

1
2       then the staff plan had already been
3       done.
4              I believe Mr. Fiffick, and
5       this isn't in the transcript, but
6       during the audio session that I
7       could hear, what I recall is
8       Mr. Fiffick told him as much.
9              Q.   And do you recall Senator
10      Harpootlian not being the lone
11      senator who was -- expressed
12      dissatisfaction that they had not
13      been part of the development of the
14      initial staff plan, that Senator
15      Bright Matthews also shared that
16      concern?
17             A.   I do.
18             Q.   Turning to the initial, the
19      House's initial draft plan.  In
20      December of 2021 were you aware that
21      the House's Redistricting Ad Hoc
22      Committee was working on its first
23      staff plan?
24             A.   I don't remember the dates
25      of when the House did what, but I do

Page 320

```
 1                    TERRENI
 2      recall that the House issued a staff
 3      plan.  Whether it was November or
 4      December, I don't remember.
 5           Q.   Did you review that plan?
 6           A.   When they published it.
 7           Q.   Did you provide any input
 8      on that plan?
 9           A.   No.
10           Q.   Did you share any thoughts
11      about that plan with members of the
12      Senate staff?
13           A.   I'm sure we all looked at
14      it.  I'm sure we all looked at it.
15      I don't -- I remember it made some
16      substantial changes to a number of
17      districts and I remember we didn't
18      think it was something the
19      subcommittee would be interested in.
20           Q.   So do you -- is it fair to
21      say that from your perspective the
22      House's initial map did not impact
23      the map that the Senate was doing,
24      the map making that the Senate was
25      doing, at least initially?
```

Page 321

TERRENI

1

2      A.    I think it was probably

3      fair.

4           Q.    And were you aware that

5      after release, the House released

6      the Ad Hoc Committee released its

7      map on December 13th it held a

8      hearing on that plan on

9      December 16th?

10          A.    I was aware of that.

11          Q.    But you did not participate

12     or listen to that hearing?

13          A.    No, ma'am, not to my

14     recollection.

15          Q.    And you never reviewed a

16     transcript of that hearing?

17          A.    I may have reviewed a

18     transcript at some point.  I don't

19     know when it was produced.  But I

20     don't -- I don't recall.

21          Q.    Were you aware of when the

22     House Redistricting Ad Hoc Committee

23     released an alternative staff plan

24     on December 22nd?

25          A.    I am.

Page 322

TERRENI

1

2          Q.   Did you review that plan?

3          A.   I'm sure I did, yes.

4          Q.   And like with the initial

5     Ad Hoc's plan did you first review

6     it when it was publicized or had you

7     seen it before it was publicized?

8          A.   I don't believe I saw it

9     before it was publicized.  I may

10    have.  But at that point there was a

11    little bit more communication, not

12    between myself but mostly with

13    Mr. Fiffick.  Mr. Fiffick knew more

14    about what the House was doing just

15    because he's in the General

16    Assembly.  When I saw that plan, I

17    don't recall.  It was -- one way or

18    another it was about the time it was

19    published.

20         Q.   About the time of?

21         A.   It was published.

22         Q.   And if you had seen it

23    before it was published, it would

24    have come through Mr. Fiffick or

25    would you have gotten it from

Page 323

1                    TERRENI
2       someone on the House's staff or a
3       House member?
4           A.   I would not have gotten it
5       from a House member.  I would not
6       have gotten it -- I don't believe I
7       would have gotten it from anybody on
8       staff.  If it were anyone it would
9       have been Patrick.  But -- Patrick
10      Dennis.  But I don't recall Patrick
11      Dennis showing me that.  So it
12      probably -- I'm speculating.  It
13      probably would have been
14      Mr. Fiffick.  There are a thousand
15      ways something can make its way from
16      the Blatt building, B-L-A-T-T, to
17      the Gressete building,
18      G-R-E-S-S-E-T-E -- the Blatt
19      building being the House building,
20      House office building and the
21      Gressete building being the Senate
22      building.
23              And again, I mean I'm really
24      speculating here because I don't
25      recall seeing it before it was

Page 324

```
 1              TERRENI

 2      published, but I don't want to deny

 3      the possibility that I saw it before

 4      it was published.  The situation is

 5      pretty fluid at that time.

 6          Q.   Were you aware that the

 7      alternative staff plan that the

 8      House released on December 22nd was

 9      based on the Senate's initial staff

10      plan?

11          A.   I'm aware that it was very

12      similar to the Senate's initial

13      staff plan.  Whether it was

14      identical I'm not clear.  I mean

15      given that it was very similar it's

16      logical to conclude that they based

17      it on it.

18          Q.   And is that because Will

19      Roberts or someone had done an

20      analysis comparing them or is that

21      based upon your own view of the two

22      maps?

23          A.   Probably both.  I mean we

24      probably ran planning components

25      reports on them and, you know,
```

1                    TERRENI
2        looked to see what was where and
3        concluded that they were very
4        similar.  I could have looked at it
5        and known that.  And I'm sure the
6        statistics Will ran on it bore it
7        out and I'm sure he would have run
8        them.
9            Q.   Were you aware of a hearing
10       that was held on that plan on
11       December 29th by the House?
12           A.   I'm aware of the House held
13       a hearing on it, yes.
14           Q.   Did you participate in that
15       hearing virtually or in person
16       simultaneously or did you read a
17       transcript of it subsequent to that?
18           A.   I believe I watched it
19       online.
20           Q.   Did you take any
21       handwritten notes of either of the
22       hearings of on the House map on
23       December 16th or December 29th?
24           A.   I don't recall.
25           Q.   For the December 29th

Page 326

1                    TERRENI
2       hearing do you recall similar
3       concerns about the map packing and
4       cracking black voters?
5            A.    I remember that there were
6       certain House members, notably
7       Representative Bernstein, who were
8       not happy with the map.  I believe
9       some of those concerns may have been
10      expressed.  Now I'm sure they -- I
11      believe they were, yes.
12           Q.    Do you remember anyone else
13      from the House expressing concerns
14      besides Representative Bernstein?
15           A.    Not specifically, although
16      I'm aware that there were other
17      members that expressed concern.  I
18      just -- I recognize Representative
19      Bernstein because she's local to
20      Richland County and that's my home
21      county.
22           Q.    Turning to the Senate
23      second draft plan.  If you look at
24      tab 27, which should be Plaintiffs'
25      Exhibit 19.

Page 327

1                    TERRENI
2          A.    Tab 27.   I have an email
3     and some statistics, is that what
4     you are --
5          Q.    Yes.   This is an email from
6     John Breeden to Chip Campsen and
7     which you are copied on.   It is
8     dated January 11, 2022.   And it
9     attaches a Charleston and Daniel
10     Island plan comparison document.   Or
11     that's the subject of the email.
12     And it's Bates stamped number South
13     Carolina Senate 22547 to 2250.
14           (Plaintiffs' Exhibit 19, Email
15      from John Breeden to Chip Campsen,
16      Bates South Carolina Senate 22547
17      to 2250, marked for identification,
18      as of this date.)
19          A.    Yes.
20          Q.    Do you recall this email
21     chain?
22          A.    Yes.   Now I do, yeah.
23          Q.    Okay.   Were you involved in
24     the development of the data that
25     Mr. Breeden is sharing with Senator

Page 328

```
 1                      TERRENI
 2      Campsen?
 3           A.   No, not directly.  But I
 4      was aware -- if it's what I think it
 5      is I was aware of the request.
 6           Q.   What do you think it is?
 7           A.   Senator Campsen was
 8      interested in knowing what
 9      percentage of Charleston County
10      versus Berkeley County versus
11      Dorchester County was in the various
12      districts.
13             So you know, it was
14      Charleston, you know, was who had
15      the biggest or the second or third
16      biggest share of the population.
17      What were the components.
18           Q.   Do you remember doing other
19      analyses like this for Senator
20      Campsen or any other senator?
21           A.   Like this as in what
22      percentage of which county was
23      there, no.
24           Q.   Yes.
25           A.   No.  I don't recall doing
```

Page 329

1                        TERRENI

2       anything else.  Could have, but I

3       don't remember it.

4            Q.    And looking at South

5       Carolina Senate 22550, this type of

6       analysis of the various plans, the

7       benchmark, the Senate staff plan,

8       the House Judiciary plan, the House

9       Judiciary plan Senate Amendment 1

10      that includes this breakdown of vote

11      shares for President Trump, that

12      would have been based upon the 2020

13      election?

14           A.    Yes, ma'am.

15           Q.    Okay.  And so are you aware

16      of whether an analysis like that was

17      done for other areas in South

18      Carolina?

19           A.    Well, other areas I don't

20      recall that happening, no.

21           Q.    Was there a meeting, a

22      subsequent meeting about this data?

23           A.    Well, if we are looking at

24      the date of this email, it would

25      have been January 11, 2022.  That

Page 330

1            TERRENI
2      was about the time the final
3      committee meetings were heating up.
4      So I don't know if there was this
5      specific meeting about this data.
6      But Senator Campsen was involved in
7      the plan but eventually was passed
8      by the subcommittee and was an
9      advocate of this plan and
10     subcommittee on the floor.  So we
11     met with Senator Campsen on several
12     occasions.
13          Q.   So turning to January 11th,
14     the Senate redistricting
15     subcommittee provided a notice that
16     it posted two proposed congressional
17     plans to be considered on January
18     13th, two dates later.  Do you
19     recall that?
20          A.   Yes.
21          Q.   Would you agree that one
22     was an amendment by Senator
23     Harpootlian, the other was a plan
24     generated by the Senate staff?
25          A.   I think at that point the

1                    TERRENI

2      other was going to be a plan.  It

3      may have gone beyond the staff plan.

4      It may have been a plan that was

5      sponsored by Senator Campsen and

6      Senator Rankin and Senator Campsen.

7      It was basically a majority plan.

8          Q.   Who would have drawn the

9      other plan, not the Harpootlian

10     plan, but the Senator

11     Campsen-Senator Rankin plan?  Would

12     Senate staff had drawn it for them

13     or would they have developed it on

14     their own?

15         A.   Senate staff would have

16     drawn it for them.

17         Q.   Would it be fair to say

18     that that Senator Campsen-Senator

19     Rankin plan was a modification of

20     the initial Senate staff plan?

21         A.   Yes.

22         Q.   And in particular the

23     Senate staff would you credit Will

24     Roberts with having developed it?

25         A.   I would credit Will Roberts

Page 332

                    TERRENI

1
2      for having produced an initial
3      draft.  If you are talking about the
4      Senate staff plan, I would credit
5      the Senate staff with producing it
6      in the Senate -- developing the
7      Senate staff plan with Will acting
8      as protographer and with input
9      everyone else.  But Will was the
10     prime -- had the template for that
11     claim, yes.
12          Q.   Can we refer to the Senator
13     Campsen map as the Senate Amendment
14     1?
15          A.   Yes.
16          Q.   Would it be fair to say
17     that Will Roberts, you Mr. Terreni,
18     Breeden John, Senator Campsen,
19     Senator Rankin were involved in the
20     development of Senate Amendment 1?
21          A.   Yes.  In different ways but
22     yes.
23          Q.   What do you mean in
24     different ways?
25          A.   A Senate amendment is just

Page 333

                        TERRENI

1
2       that.  It was an amendment that is
3       sponsored by a Senate majority and
4       ultimately voted on and adopted by
5       the Senate.  So in that sense it's
6       not my plan.  Did I assist in its
7       development, yeah.  I would say I
8       did, in providing practical or legal
9       advice regarding the plan.
10      Supporting them and advancing it.
11           But at that point it was
12      beyond the staff plan so I just want
13      to make sure by saying did we
14      participate, it was not a
15      relationship among equals.
16           Q.   When you say practical
17      advice about the Senate amendment
18      plan, what's an example of what that
19      would encompass?
20           A.   Well, it would encompass,
21      like, institutional recollection
22      about what maybe some members of the
23      delegation's preferences were, what
24      decisions had been made by the court
25      on the record regarding those

Page 334

1                  TERRENI
2       preferences of and various features
3       of the map.  Features of the map
4       that were inherited from the court.
5            Q.    Like with the initial staff
6       map do you know whether Senate
7       Amendment 1 was shared with Jones
8       Day before it was released to the
9       public?
10           A.    Senate Amendment 1?
11           Q.    Um-hmm.
12           A.    Probably.  Most likely.
13           Q.    Can you describe briefly
14      the process for how the initial
15      Senate staff plan was modified to
16      become Senate Amendment 1?
17           A.    Well, it was replaced at a
18      subcommittee.  There was a hearing
19      held by the subcommittee.  There was
20      public testimony on the plan,
21      various members came and inquired
22      about it, maybe shared concerns
23      about it, maybe suggested things
24      that should or shouldn't be done.
25      And ultimately the amendment

Page 335

```
 1              TERRENI
 2    emerged.  Maybe even the staff had
 3    some ideas about how we could build
 4    on it.  I believe at some point we
 5    understood that Berkeley County
 6    could be kept whole, for instance,
 7    and so we did it.
 8        Q.   Was that a priority to keep
 9    Berkeley whole?
10        A.   No, it wasn't a specific
11    priority to keep Berkeley whole.
12    No, it was just a feature.
13        Q.   What were the priorities of
14    Senate Amendment 1 as far as you can
15    recall?
16        A.   Well, they preserved the
17    course of the existing districts in
18    a way that most other plans didn't.
19    I think for some members there was a
20    political consideration and they at
21    least preserved the competitive
22    nature of District 1 and its
23    viability for a Republican
24    candidate.  There's certainly no
25    guarantee.
```

1              TERRENI
2         And there were some other
3    features, like Beaufort was kept in
4    the First District with Charleston,
5    Berkeley or at least partially
6    Charleston.  I mean there were -- I
7    could go on.  I don't know -- you
8    tell me.
9         Q.   Were there any other key
10   criteria that you think guided the
11   Senate Amendment 1?
12        A.    The criteria were the
13   criteria.  Was there any other key
14   input that guided Senate Amendment
15   1, there might have been.  Again,
16   I'm distinguishing between criteria
17   as the criteria adopted by the
18   subcommittee and political decisions
19   that were made by the membership in
20   the development of the map.  I think
21   those are two different things.
22        Q.    You mentioned Sun City
23   earlier being responded to in terms
24   of that white majority area being
25   kept together in Jasper County?

Page 337

1                    TERRENI
2          A.    Yes.
3          Q.    Do you, sitting here today,
4     believe that the community in
5     Charleston was kept whole and
6     responded to in the same way as
7     those in Sun City?
8          MR. GORE:  Objection.
9      Mischaracterizes his testimony.
10         A.    Yeah, that's certainly not
11    my testimony.
12         Q.    That's a question.  Do you
13    think that --
14         A.    I don't think they are
15    comparable.
16         Q.    You don't think they are?
17         A.    Comparable.
18         Q.    How come?
19         A.    We are talking about a
20    sliver of Jasper County.  I don't
21    remember the specific population but
22    it was de minimis.  It is part of
23    the same -- as far as I know even
24    enclosed but it's certainly the same
25    planned community that has its bulk

Page 338

1                    TERRENI
2      in Berkeley County so -- I mean
3      Beaufort County.  So it really
4      wasn't a stretch to say we are going
5      to take Sun City and loop in this
6      little nub at the top of -- at the
7      bottom of Jasper County, top of
8      Beaufort, and keep the Sun City
9      place together.  It's only -- I
10     don't know, but they certainly --
11     they have the same roads, they have
12     the same community events for its
13     connectivity.  That seemed like a
14     fairly reasonable conclusion to
15     reach and it was not going to have
16     any kind of major political impact
17     on anybody one way or the other.  So
18     we didn't see it as something that
19     would impact the Sixth District or
20     the First District one way or the
21     other.  It was not a big enough
22     situation.
23          Charleston is very different.
24     Charleston in its current
25     configuration, you know, at least

Page 339

                    TERRENI

1
2       the beginnings of it were drawn by
3       the United States District Court.
4       And Charleston County, as far as I
5       know, has never been unified in a
6       congressional district in, certainly
7       since single member districts maybe.
8       I stand corrected.  If we go before
9       2000, my memory is fading a little
10      bit.
11            So no, I don't think there's a
12      comparison between, given the
13      peninsula of Charleston County in
14      District 1, I think they are apples
15      and oranges.
16         Q.   If Charleston could be kept
17      whole in CD 1, comply with the
18      Senate's stated criteria, keep CD 7
19      untouched, largely untouched, would
20      the major political concern that
21      remains be making CD 1 not
22      Republican leading?
23         A.   It's in the eye of the
24      beholder.  I mean it's a -- well,
25      that's a policy decision to be made

Page 340

1                    TERRENI

2        by the people voting on the plans.

3        It's not for me to say.

4              MS. ADEN:  Can we take a

5         five-minute so I can streamline

6         with the time that's remaining?

7              THE WITNESS:  Fine with me.

8              MS. ADEN:  Could we go to 5:05

9         just to be even.  That would be

10        helpful.

11             THE WITNESS:  Sure.

12             (Whereupon, there is a recess

13         in the proceedings.)

14        Q.   If I can have you look at

15        tab 5, which is a transcription of

16        -- which is a transcription of the

17        January 13, 2022, Senate Judiciary

18        hearing transcribed by a court

19        reporter service.  This would be

20        Plaintiffs' Exhibit 20.  And if you

21        could turn to page 18 in the top

22        right-hand corner.

23             (Plaintiffs' Exhibit 20,

24         Transcription of 1/13/2022 Senate

25         Judiciary hearing, marked for

Page 341

```
 1                    TERRENI
 2       identification, as of this date.)
 3            Q.    Beginning at line 3.
 4            A.    I'm sorry, Ms. Aden, could
 5       you identify what hearing is this?
 6            Q.    This is the January 13,
 7       2022, Senate redistricting hearing.
 8            A.    The subcommittee?
 9            Q.    Yes.
10            A.    And where did you want me
11       to go?
12            Q.    To page 18, line 3.  18 in
13       the top right-hand corner, it's
14       South Carolina NAACP CD 19952.
15            A.    Okay.
16            Q.    Were you present at this
17       hearing?
18            A.    I believe I was, yes.
19            Q.    And you identified
20       Mr. Opperman earlier as someone who
21       worked with Senator Harpootlian, is
22       that fair?
23            A.    Yes.  I want to say that he
24       may have worked with some other
25       folks too.  I'm not being cute, I
```

Page 342

1                    TERRENI

2         just seem to remember him maybe

3         working for more than one person, or

4         am I confusing him with someone

5         else.  I know he worked with Senator

6         Harpootlian.  I just thought he may

7         have submitted maps for some other

8         people.

9              Q.   On lines 4 through 5 of

10        page 18, is it fair -- does it state

11        that:  "I offered testimony on

12        behalf of the whole county map which

13        has been designated Senate Amendment

14        2"?

15             A.   Yes.

16             Q.   At any point did you review

17        and assess Senate Amendment 2?

18             A.   Yeah, I'm sure I looked at

19        it and made some conclusions about

20        it.

21             Q.   Do you know whether Senate

22        Amendment 2 was shared with Jones

23        Day?

24             A.   Yes, ma'am.

25             Q.   And was it shared with

Page 343

```
 1                    TERRENI
 2       Senate leadership?
 3            A.    Well, yeah, it was used in
 4       the committee or the subcommittee.
 5            Q.    Leadership outside of the
 6       committee.
 7            A.    Oh.  Well, at some point
 8       I'm sure it was.  When and who I
 9       could not tell you.  I know as the
10       process went towards the floor
11       certainly other members began paying
12       attention so if you could be more
13       specific about Senate leadership.  I
14       know Senator Massey was involved at
15       some point.
16            Q.    If you can look, I'd like
17       you to keep tab 5 open, but if you
18       can open also tab 59, which was one
19       of the new exhibits that was
20       emailed.
21            A.    Oh, I'm sorry, I need to go
22       to a different screen.  I should
23       have it open then.
24            Q.    Tab 59 would be Plaintiffs'
25       Exhibit 21.
```

Page 344

1              TERRENI

2        A.    All right, tab 59.

3        Q.    Okay.

4          (Plaintiffs' Exhibit 21,

5     analysis of House Plan 2, Senate

6     Amendment 2A, marked for

7     identification, as of this date.)

8        Q.    And tab 59 is -- would you

9     agree is an analysis of House Plan

10    2, Senate Amendment 2-A, which

11    includes various reports such as on

12    core constituencies, a partisan

13    analysis?

14        A.    Yes.

15        Q.    Political subdivisions

16    splits between districts?

17        A.    Yes.

18        Q.    Population summary?

19        A.    Yes, ma'am.

20        Q.    Population summary voting

21    age population, various statistics

22    and analyses related to Senate

23    Amendment 2, is that fair to say?

24        A.    Yes.  Yes, ma'am.

25        Q.    Okay.  Were these reports

Page 345

TERRENI

1          
2      prepared by Senate staff?
3          A.   Yes.
4          Q.   Of Senate Amendment 2
5      introduced by Senator Harpootlian?
6          A.   Yes.
7          Q.   Okay.  Were reports like
8      these prepared for other plans
9      prepared by the Senate staff?
10          A.   Some were, but I mean this
11      report in particular was prepared
12      for Mr. Opperman and, therefore,
13      Senator Harpootlian.  I believe this
14      is the eve of the, of a subcommittee
15      meeting.  Maybe we can go back and
16      look.  I don't know.  I know -- I
17      remember why this report was
18      prepared.  It was Mr. Opperman
19      didn't have the wherewithal to
20      create these reports, and either he
21      or Senator Harpootlian asked for our
22      help in doing it and so Will ran
23      them and provided them.
24          Q.   Turning back to tab 5,
25      which is the transcription of the

Page 346

1                      TERRENI
2        hearing from January 13th, I would
3        like you to turn to page 14, lines
4        14 through 19.
5             A.    Yes, ma'am.
6             Q.    Is it fair to -- does Mr.
7        Opperman state that Senate Amendment
8        2:  "Clearly and unquestionably
9        complies with Section 2 of the
10       Voting Rights Act without violating
11       the 14th Amendment prohibition to
12       racial gerrymandering"?
13            A.    Yes.
14            Q.    Did you or anyone assess
15       whether this statement was accurate?
16            A.    We didn't dispute it,
17       although -- we didn't dispute it or
18       as to the compliance with Section 2
19       of voting rights I believe we
20       disputed it.  With regard to racial
21       gerrymandering I would need to
22       revisit Senate Amendment 2, but I
23       don't remember that being an
24       overriding concern.
25            Q.    But is there any, as you

Page 347

1                    TERRENI
2       sit here today, any written analysis
3       of Senate Amendment 2 reflecting,
4       demonstrating a conclusion by you or
5       someone working at your direction
6       that Senate Amendment 2 violates the
7       14th Amendment's prohibition on
8       racial gerrymandering?
9           A.    No.
10          Q.    Or somehow does not comply
11      with Section 2?
12          A.    No.
13          Q.    Okay.  On page 20, lines 4
14      through 6 he states that Senate
15      Amendment 2:  "More closely adheres
16      to contiguity objectives under the
17      Committee's guidelines."
18          A.    He says that.
19          Q.    Did you or anyone at your
20      direction assess whether this
21      statement was accurate?
22          A.    We disagreed with it.
23          Q.    Did you dedicate that
24      disagreement in writing somewhere?
25          A.    It's possible, but I mean I

Page 348

1                      TERRENI
2       think his point was we had water
3       contiguity across Charleston Harbor
4       and he obviously didn't like that,
5       and we felt it was acceptable.
6            Q.    On Page 19 from line 21 to
7       page 20, line 3 Mr. Opperman remarks
8       of Senate Amendment 1 that:  "By
9       having District 1 on one side of the
10      Charleston peninsula and on the
11      other side of the Charleston
12      peninsula but not connecting anyway,
13      this is just one of many examples of
14      bizarre choices that do not follow
15      traditional redistricting criteria."
16           So this is -- would you agree
17      that this is Mr. Opperman lodging an
18      objection with the way that Senate
19      Amendment 1 as compared to Senate
20      Amendment 2 achieved contiguity, at
21      least in that area of the map?
22           A.    Yes.
23           Q.    On page 20, lines 7 through
24      20 Mr. Opperman states that Senate
25      Amendment 2:  "More closely hues to"

```
 1                    TERRENI
 2      communities of interest.
 3             And then on line 21 on that
 4      same page, line 21 -- I'm sorry,
 5      then on line 21 on that same page
 6      through line 10 on page 21 does it
 7      list -- do you see that he lists the
 8      regions of the state that according
 9      to Mr. Opperman respect communities
10      of interest?
11          A.   On page 20 and 21 in the
12      paragraph beginning "As for
13      communities of interest" or --
14          Q.   Yes.
15          A.   Yes.
16          Q.   Did you or anyone that you
17      are aware of assess whether or not
18      that was true that those communities
19      of interest were respected?
20          A.   I don't know that we did it
21      formally.  We certainly did it
22      informally at that process and I
23      know that we didn't agree.  And that
24      the members that were allocating the
25      other plan didn't agree.  We were so
```

Page 350

1                    TERRENI
2      far down -- so I mean that's -- did
3      we assess it?  I mean we heard the
4      testimony.  Obviously we didn't
5      agree with it.  Obviously the
6      subcommittee didn't agree with it.
7           Q.   But the disagreements and
8      your assessments that you talked
9      about, were those committed writing
10     that was made available to the
11     public on the record?
12          A.   I don't think so.
13          Q.   On page 21, lines 11
14     through 20 Mr. Opperman assesses how
15     Senate Amendment 2 preserves
16     district cores and he provides the
17     percentages of the cores of
18     districts that are retained in
19     Senate Amendment 2 as compared to
20     the 2011 benchmark map?
21          A.   Yes, ma'am.
22          Q.   Did you or anyone assess
23     whether these -- this data, these
24     percentages of retention that he
25     reports were accurate or not?

Page 351

```
 1                    TERRENI
 2        A.   I believe we generally
 3   confirmed them.  They were a
 4   comparison to the benchmark map.  We
 5   also compared them to Amendment 1.
 6        Q.   Okay.  But do you have any
 7   basis to disagree that his data as
 8   reported here was inaccurate?
 9        A.   Not at this time but the
10   data speaks for itself.  I don't
11   have any basis to disagree as I sit
12   in this deposition as.  Far as I
13   recall these numbers were accurate.
14   Could they be a little off, they
15   might be, I don't know.  We have to
16   just run the report and see.
17        Q.   On page 21, lines 21
18   through 25 he states that Amendment
19   2 is preferable to the second Senate
20   staff plan or the plan passed by the
21   House because it has fewer county
22   splits.
23        A.   Yes, ma'am.
24        Q.   Did you or anyone assess
25   whether this statement was accurate?
```

Page 352

1                    TERRENI

2          A.    As I recall, this Amendment

3     2 had fewer county splits than

4     Amendment 1.  It was accurate in

5     that respect.

6          Q.    And on page 22, lines 15

7     through page 23 line 5 he reports:

8     "The splits of VTDs where the

9     population is zero as compared to

10    where there are splits and no

11    population and provides explanations

12    for the split VTDs."

13         Did you or anyone assess

14    whether or not this analysis of VTD

15    splits and the reasons for them were

16    accurate?

17         A.    I'm sure we did.  I know we

18    did, and I believe there may have

19    been some question about his

20    explanation of the Georgetown split.

21    And others.  His representation of

22    them.  I know we looked at the

23    split.  I don't think we had an

24    argument about how to even do the

25    VTD split.  I'm not sure we -- I

Page 353

TERRENI

1       don't -- I know that we -- there was
2       some misgiving about the Georgetown
3       split and I don't know about the --
4       I don't know about the other splits.
5       I mean --
6            Q.   Do you know whether that
7       disagreement about the Georgetown
8       split was your concern about it or
9       that of anyone in the Senate
10      dedicated to written analysis for
11      the public record?
12           A.   I don't believe so, no.
13           Q.   On page 23, lines 6 through
14      15 Mr. Opperman provides additional
15      explanation for county splits and
16      why the splits are okay because of
17      the political and economic power of
18      four of the counties that are split.
19      Did you or anyone assess whether or
20      not that opinion was accurate?
21           A.   I don't think it was
22      measured.  To state that a county's
23      political and economic power
24      relative to the rest of the state

Page 354

```
 1                    TERRENI
 2      and if a country must be split,
 3      having a ton of power make it more
 4      easy to bear the split.  You know,
 5      we're medium size or small, at least
 6      there's no county -- small counties
 7      are split.  I'd have to revisit the
 8      plan to see that, but I think a
 9      great deal of what he's saying here
10      is subjective.  Did he split six
11      counties?  As I recall, that's true.
12      Were four large, probably.  The
13      rationale I don't remember one way
14      or the other.
15          Q.   On page 24, lines 12
16      through 17 do you recall Senator
17      Harpootlian asking Mr. Opperman to
18      offer an analysis comparing the
19      Senate Amendment 2 plan against the
20      second Senate staff plan for the
21      Senate?
22          A.   I don't specifically recall
23      that, but I know that it happened in
24      the transcript.
25          Q.   Let's look at tab 3.
```

Page 355

```
 1                    TERRENI
 2         A.    Okay.
 3         Q.    This will be Plaintiffs'
 4    Exhibit 22.   This is an email cover
 5    from Andy Fiffick to Senator Rankin
 6    and you, Mr. Terreni, dated
 7    January 18, 2022, with an attachment
 8    entitled Written Testimony Opperman
 9    OO3, Bates stamped South Carolina
10    Senate 22344, 22352.
11           (Plaintiffs' Exhibit 22, Email
12        cover from Andy Fiffick to Senator
13        Rankin, et al, Bates South Carolina
14        Senate 22344, 22352, marked for
15        identification, as of this date.)
16         Q.    Do you recall seeing this
17    document?
18         A.    Yes.
19         Q.    On 22345 does -- does the
20    title of the document Written
21    Testimony Offered to the
22    Redistricting Subcommittee of the
23    South Carolina Senate Judiciary
24    Committee regarding House Plan 2,
25    Senate Amendments 1 and 2 pursuant
```

Page 356

                         TERRENI

1         to request on January 13, 2022.

2             A.    Yes.

3             Q.    Is it fair to say that

4    Mr. Opperman's testimony on

5    January 13th like in this document

6    wakes through each of the criteria

7    identified in the Senate's

8    guidelines and compares his view of

9    how Senate Amendment 2 complies with

10   each of the Senate's guidelines as

11   compared to Senate Amendment 1?

12            A.    Generally speaking, yes.

13            Q.    Did anyone, you or anyone

14   that you are aware of assess the

15   comparisons within it?

16            A.    Yeah.  I'm sure we would

17   have read Mr. Opperman's document

18   and we would have paid attention to

19   it.  We would have -- I don't know

20   what you mean by assess but I mean

21   we certainly would have considered

22   it.

23            Q.    Did you provide a written

24   response to this testimony?

Page 357

```
 1              TERRENI
 2       A.    I don't believe I
 3   specifically provided a written
 4   response to this testimony.
 5       Q.    Looking at this memo do you
 6   see him reference keeping CD 7 the
 7   same as in the benchmark?
 8       A.    If you could point to a
 9   page number, that might be helpful.
10       Q.    In this letter do you see
11   -- are you aware or have you looked
12   at this letter before or, as you sit
13   here today, of whether or not
14   Mr. Opperman identified keeping CD 7
15   as one of the Senate criteria by
16   which he compares his map Senate
17   Amendment 2 or Senator Harpootlian
18   Senate Amendment 2 to?
19       A.    I'm sorry, do you mean is
20   one of his headings like compactness
21   minimizing, et cetera, keeping
22   related to the Senate amendment -- I
23   mean to -- it's been a long day --
24   congressional District 7 or are you
25   asking me did he discuss
```

Page 358

1           TERRENI

2      congressional District 7 in his

3      analysis?

4           Q.   Meaning looking at this

5      letter is it fair to say that he

6      looks at the Senate guidelines and

7      the categories identified in the

8      Senate guidelines and makes a

9      comparison or an evaluation from his

10     view of how Senate Amendment 2

11     complies with Senate guidelines.  Is

12     that fair?

13          A.   Yes.

14          Q.   At the same time we have

15     been discussing all day how

16     subsequent to those guidelines or

17     around those guidelines there have

18     behind other considerations

19     identified by the public, by

20     legislative members and others.  Is

21     that correct?

22          A.   Yes.

23          Q.   But is it fair to say that

24     some of the criteria such as, or the

25     political considerations such as

Page 359

                              TERRENI

1
2      keeping Senate -- congressional

3      District 7 whole or keeping Fort

4      Jackson in Representative Wilson's

5      district, some of these other

6      political considerations

7      Mr. Opperman does not evaluate

8      alongside these Senate guidelines.

9      Is that fair to say?

10          A.   He does not appear to.  It

11     doesn't mean that he didn't -- I

12     mean Mr. Opperman proposed a plan

13     that, as I recall, had all of

14     Charleston County in it, in one --

15     in Senate district -- I mean

16     Congressional District 1.  And other

17     people did and then other people

18     proposed plans in Mr. Opperman's

19     plan.  As I recall, we arranged

20     congressional District 7.

21          I mean people had policy

22     preferences that were additional to

23     the criteria.  I don't think that

24     should be a surprise to anybody?

25          Q.   Would you agree that at

Page 360

TERRENI

1
2    least according to Mr. Opperman's
3    view Senate Amendment 2 complies
4    with the Senate guidelines, keeps
5    Charleston County whole in CD 1 and
6    keeps Beaufort in CD 1 and out of
7    CD 2?
8        A.    I remember Charleston, I'll
9    take your word for it on Beaufort,
10   and certainly Mr. Opperman thought
11   his plan complied with the
12   guidelines.
13       Q.    But there's no written
14   documenting of the Senate's view of
15   why Mr. Opperman's -- or Senator
16   Harpootlian Amendment 2 failed.  Is
17   that fair to say?
18       A.    Senator Harpootlian's
19   Amendment 2 failed because it didn't
20   have the votes to pass on the floor.
21   The documentation would be the floor
22   debate.
23       Q.    Do you remember from the
24   floor debate a critique with how --
25   a particular critique with how

Page 361

1                    TERRENI

2        Senate Amendment 2 failed to address

3        one of the stated Senate guidelines

4        that had been adopted in September

5        of 2021?

6            A.    Not at this time.  There

7        was certainly an analysis that was

8        -- not an analysis but rather a fact

9        sheet that was provided to the

10       members that compared Senate

11       Amendment 2, the benchmark plan, and

12       Senate Amendment 1.  I mean it would

13       have had things like county splits.

14       It would have had -- it would have

15       been a run down of the criteria

16       basically.

17           Q.    Looking at tab 59 which is

18       -- in your email should be one of

19       the new documents.  This will be

20       Plaintiffs' Exhibit 23.  This is

21       South Carolina Senate 3260 to 68.

22           A.    No.  3260.  You are talking

23       about 59, tab 59?  I have that email

24       to Will Roberts to Robert Joseph

25       Opperman at tab 59.

Page 362

1                    TERRENI

2        Q.   Yes.   And is that South

3    Carolina Senate 3260 to 326 --

4        A.   I have to 368, yes, yes,

5    I'm sorry.   It begins with 60 and

6    ends with 68.

7             (Plaintiffs' Exhibit 23, Email

8         from Will Roberts to Mr. Opperman,

9         Bates South Carolina Senate 3260 to

10        3268, marked for identification, as

11        of this date.)

12       Q.   And this is from Will

13   Roberts to Mr. Opperman copying Andy

14   Fiffick.   You are not copied on this

15   email; is that correct?

16       A.   I don't appear to be, no.

17       Q.   Do you recall seeing this?

18       A.   As I said before, I was

19   aware that Will ran these reports

20   and I think I saw these reports,

21   yeah.

22       Q.   If you can go to 3264,

23   which is pdf pages 5 of 9, there's

24   an analysis of each of the districts

25   and the share, the total number of

Page 363

TERRENI

1
2      voters and the share of voters for
3      Biden as compared to Trump.  Would
4      you agree?
5          A.    Yes, ma'am.
6          Q.    Were these types of
7      analysis done, these particular ones
8      about the vote shares in each of
9      these districts, do you remember
10     this one done for Senate Amendment
11     1?
12         A.    I believe so, yes.
13         Q.    Do you know if it was done
14     for the initial staff plan?
15         A.    Probably.
16         Q.    And do you know.  Well,
17     strike that.
18         A.    It may not have been
19     printed but we looked at partisan
20     numbers.  Specifically these 2020
21     Trump/Biden numbers.
22         Q.    And who gave you those
23     numbers or that data to do those
24     numbers, is this Vincent, Clark
25     Vincent data?

Page 364

1                    TERRENI

2          A.    Yes, ma'am.

3          Q.    On January 19, 2022, the

4     full Senate Judiciary Committee held

5     a hearing on congressional

6     redistricting.  I want to ask you to

7     look at tab 25, which is an email

8     from Will Roberts to Andy Fiffick

9     dated January 16, 2022.  This will

10    be Plaintiffs' Exhibit 24.  And the

11    subject is analysis for Senator

12    Campsen with an attachment that says

13    notes on Senate Amendment 1.

14          (Plaintiffs' Exhibit 24, Email

15     from Will Roberts to Andy Fiffick,

16     marked for identification, as of

17     this date.)

18          A.    Yes.

19          Q.    Do you recall this email

20    and attached analysis?

21          A.    No.

22          Q.    Would an analysis such as

23    this where it appears that or would

24    you agree that Will Roberts appears

25    to have done an analysis of whether

1                          TERRENI

2          Senate Amendment 1 complies with one

3          person one vote, if you look at

4          22529?

5               A.    Yeah.

6               Q.    And whether it adheres to

7          the Voting Rights Act?

8               A.    Appears that he did that.

9               Q.    And whether it avoids

10         racial gerrymandering?

11              A.    He says he did.

12              Q.    And whether it respects

13         contiguity or achieves contiguity

14         among districts?

15              A.    Yes.

16              Q.    22560 is talking about

17         contiguity?

18              A.    Yes.

19              Q.    And it does an analysis of

20         communities of interest also on

21         22530?

22              A.    Yes.

23              Q.    And it also looked at cores

24         of existing districts on 22530?

25              A.    Yes.

1                    TERRENI

2          Q.    And it looks at minimizing

3     splits -- whether the Senate

4     Amendment 1 minimizes splits.  Is

5     that fair to say?

6          A.    Yes.

7          Q.    Would an analysis such as

8     this normally have gone to a leading

9     member of the Senate without counsel

10    such as yourself or Jones Day having

11    reviewed it?

12         A.    I don't know that Jones Day

13    would have necessarily reviewed it.

14    One of the Senate's lawyers would

15    have reviewed it.  I usually would

16    have been included in that loop.

17    I'm not sure why I wasn't.  And I

18    don't remember this particular

19    document.  But usually I would have

20    been copied on it.  Jones Day would

21    have been different.  They would not

22    have been copied on everything.

23         Q.    Are you aware of a memo

24    like this being developed by Will

25    Roberts or any other Senate staff

Page 367

1                     TERRENI

2        regarding any other maps prepared by

3        the -- prepared or considered by the

4        Senate regarding congressional

5        redrawing of the lines?

6            A.    Well, memo like this is a

7        specific format question.  As I have

8        said before, there was a comparison

9        memo that was in a chart form that

10       was performed for subcommittee

11       staff, sponsors of the bill and

12       shared eventually with the entire

13       Senate membership floor debate.  I

14       recall that.  It would have gone

15       through -- it would have gone

16       through the criteria one by one.  It

17       was not in this format.

18           Q.    Would the chart that you

19       are talking about have included

20       something that made a conclusion

21       about whether a map adhered to the

22       Voting Rights Act?

23           A.    It probably would have said

24       something about, to the effect that

25       the Voting Rights Act concerns

Page 368

1                    TERRENI

2    raised by the map.  And I think we

3    would have said that about both

4    maps, Amendment 1 and 2.

5         Q.   And would there have been

6    on this chart an analysis of whether

7    or not the map avoids racial

8    gerrymandering?

9         A.   Analysis to the extent

10   there was a description of the

11   various mapping choices, yes -- and

12   why they, the reasons for them or

13   the physical characteristics of

14   them, yes.

15        Q.   And would those and this

16   chart have gone to every member of

17   the Senate?

18        A.   It did go to every member

19   of the Senate.  It went to every

20   member of the Senate on the day of

21   the debate.  The chart was prepared

22   the night before the debate or the

23   day before the debate in one format

24   or another.  I don't know the

25   specific sequence of it but sponsors

Page 369

```
 1                    TERRENI
 2      and supporters of the comparison did
 3      have this version of it for
 4      reference during an, I think during
 5      the full committee meeting.
 6           Within a relatively short
 7      period of time the chart went -- the
 8      bill was on the floor reporting out
 9      favorably for debate.  And that
10      morning of the debate Senator Bright
11      Matthews requested that chart be
12      distributed or provided to all the
13      members, whether they supported the
14      amendment or not.  And it was.
15           Q.   Can we turn to tab 14,
16      which would be Plaintiffs' Exhibit
17      25.  This is Bates stamped -- well,
18      it's an email exchange from Breeden
19      John to Andy Fiffick and certain
20      senators and it copies or it's
21      directed to you and it's dated
22      January 20th, 2022, there's a
23      subject talking points and cheat
24      sheets.
25           A.   Yes, ma'am.
```

Page 370

TERRENI

1          TERRENI

2          Q.   And there's an attachment

3     Senate Amendment 1 Talking Points

4     2022-0120 and then there's a

5     separate attachment Plan Comparison

6     Sheets 2022-0120.

7          A.   Yes, ma'am.

8               (Plaintiffs' Exhibit 25, Email

9      from Breeden John to Andy Fiffick,

10      et al, with attachment, marked for

11      identification, as of this date.)

12         Q.   This tab 14, Plaintiffs'

13    Exhibit 25, is this the chart that

14    you've been referencing?

15         A.   No, ma'am.  But much of the

16    information is the same.  This looks

17    like there's another version or

18    precursor to it.  But it's not the

19    same one.

20         Q.   What Breeden John is

21    sharing here to Mr. Fiffick and

22    certain legislative members, was

23    this version of information, the

24    talking points and cheat sheets, was

25    this shared with all Senate members?

Page 371

```
 1                         TERRENI
 2         A.    I don't think so.  I don't
 3    know.  I mean I'm looking at who it
 4    was shared with and I think it was
 5    shared with them, which is basically
 6    leadership supporting the amendment.
 7    I see Senator Campsen, Senator
 8    Massey, Senator Grooms.  So I don't
 9    believe so.
10         Q.    But not Senator Bright
11    Matthews, Senator Harpootlian or
12    Senator Sabb, members of the Senate
13    subcommittee?
14         A.    No, ma'am.
15         Q.    Did you help create these
16    documents?
17         A.    I think this would have
18    been mostly -- I don't think so.  I
19    think Breeden and Will compiled
20    these statistics.  I'm not saying I
21    didn't see them when they were
22    created.  I don't have the specific
23    recollection of it, but I wouldn't
24    have -- I mean the tables, for
25    instance, I would have had no --
```

Page 372

                                TERRENI

1
2       they would have done that for sure.
3       So that leads us to page 1 census
4       data overview and our process so
5       far.  I might have reviewed it but I
6       doubt I prepared it.
7            Q.   This constituency analysis
8       on 21742 --
9            A.   Yes.
10           Q.   -- do you recall doing this
11      for the initial staff plan?
12           A.   Not specifically, but we
13      likely did.
14           Q.   Was there a point in time
15      where you started reporting -- well,
16      strike that.
17              On 21733 in the second-to-last
18      bullet it indicates that the Senate:
19      "Received more than 1,000 written
20      comments on the two amendments"
21      around January 13th of 2022?
22           A.   I think it says 1,000
23      comments.  Obviously that would have
24      been -- when was the date of this?
25      I'm just tying to be accurate.

Page 373

1              TERRENI

2          Q.    It was prepared on

3      January --

4          A.    The 20th.  Yeah, okay.

5      Yeah, in the last week is what it

6      says, I mean if he's talking about

7      January 13th to 20, yeah.

8          Q.    Do you know whether those

9      written comments -- have you seen

10     those 1,000 written comments?

11         A.    Not every one of them but

12     some of them, yes.

13         Q.    And were those sent to the

14     Senate Redistricting.gov email

15     address?

16         A.    They were sent to -- I

17     believe so.  They were sent to an

18     address on the website that was set

19     up to receive them.

20         Q.    And based upon your

21     testimony earlier today you wouldn't

22     have had direct access to all 1,000,

23     someone would have had to forward

24     you some of those emails, the ones

25     that they identified as wanting you

Page 374

```
 1                    TERRENI
 2      to see.  Is that fair to say?
 3           A.   I don't recall if I had
 4      direct access to them or not.  As a
 5      practical matter I didn't read 1,000
 6      written comments.  I do recall that
 7      we had staff monitoring comments and
 8      providing some updates on them
 9      during certain periods of time.  I
10      don't know if that was going on at
11      this time or not.
12           Q.   As you sit here today, do
13      you know whether those thousand
14      comments were made available to the
15      public on the Senate's website?
16           A.   I don't recall.
17           Q.   Can we turn to tab 4, which
18      will be Plaintiffs' Exhibit 26,
19      which is an email between
20      Mr. Fiffick, Luke Rankin, copying
21      you Mr. Terreni, dated January 18th,
22      2022, with the subject, "House
23      questions distilled and clarified."
24      And it has an attachment of the same
25      name and it's Bates stamped South
```

Page 375

1              TERRENI
2      Carolina Senate 22286 through 88.
3      You are cc'd on this email and
4      attached document.
5              (Plaintiffs' Exhibit 26, Email
6       between Mr. Fiffick, Luke Rankin
7       with attachment, Bates South
8       Carolina Senate 22286 through
9       22288, marked for identification,
10      as of this date.)
11         Q.   Do you recall receiving
12      this email and attachment?
13         A.   Not specifically.  I'm not
14      saying I didn't, I just don't --
15      today I don't.
16         Q.   Do you recall who created
17      it?
18         A.   Apparently Andy.
19         Q.   In the middle of page 22287
20      there is a paragraph that reads
21      committee or that's titled:
22      "Committee criteria - how was it
23      ranked and was it applied equally
24      across the board?"
25              And it reads:  "Complying with

Page 376

1                     TERRENI
2       state and federal constitutions,
3       state and federal law such as
4       one man one vote, the Voting Rights
5       Act and avoidance of racial
6       gerrymandering and contiguity are
7       absolute requirements of equal
8       importance."
9            Do you agree that complying
10      with state constitutions is of equal
11      importance with complying with
12      federal Constitution?
13           A.    No.
14           Q.    Do you agree that complying
15      with state law is on the same
16      footing as complying with federal
17      law?
18           A.    No.
19           Q.    The next sentence reads --
20      do you agree that contiguity is on
21      equal footing as complying with the
22      federal Constitution?
23           A.    No.
24           Q.    And complying with federal
25      law?

Page 377

TERRENI

1

2      A.    No.

3      Q.    And it reads:  "Maintaining

4    communities of interest constituent

5    consistency, minimizing divisions of

6    city and county boundaries,

7    minimizing divisions of ETDs and

8    district compactness were all given

9    consideration in no particular order

10    of preference and applied equally

11    across all seven districts."

12        Do you agree with that?

13      A.    I'm not sure what he means

14    by that.  Were they applied

15    uniformly across all seven

16    districts, no.  Were they applied

17    equally meaning were they all given

18    consideration, yes.  I mean I think

19    you'd have to ask the author.  To me

20    it's a little bit ambiguous.

21      Q.    There's a paragraph or a

22    title of a paragraph that reads why

23    and, quote, unusual configuration,

24    end quote, in Charleston and why not

25    a, quote, swath, end quote -- swath,

Page 378

                    TERRENI

1
2        S-W-A-T-H, end quote, in Charleston
3        as deposed to their, quote,
4        appearing to be a little, quote
5        again, cutting out, end quote.  And
6        it responds that it was not for
7        racial reasons.
8            A.    Where is this?
9            Q.    This is still on --
10           A.    Oh, I see it.  I'm sorry, I
11       see it.
12           Q.    And it further says:
13       "Members of the Charleston
14       delegation took into consideration
15       core constituency," and it
16       highlights "also need to talk to
17       Campsen as he has an opinion on
18       this."
19               Were you what a part of a
20       conversation with Senator Campsen
21       about an unusual configuration in
22       Charleston and otherwise how
23       Charleston was treated on or around
24       January 18th when this analysis was
25       sent to Senator Rankin?

Page 379

```
 1                    TERRENI
 2        A.    It was really two
 3    questions.   I have no recollection
 4    about discussing an unusual
 5    configuration in Charleston with
 6    Senator Campsen.   Did I discuss
 7    Charleston with Senator Campsen and
 8    the First District, yeah, sure.
 9            MR. GORE:   Ms. Aden, I just
10        want to note for the record that
11        based on the time I have been
12        keeping, we are at six hours and
13        47 minutes.   And I think the rules
14        limit the deposition to seven hours
15        so I'm just flagging that for your
16        awareness.
17            MS. ADEN:   That's correct.   I
18        know we are running down on time.
19        If we are off the record, can you
20        just confirm -- I think you're
21        right.   I'm wrapping up.   I'm not
22        going to waste the time.
23            MR. GORE:   Just wanted to make
24        you aware.   Sorry, go ahead.
25            MS. ADEN:   Always aware of
```

Page 380

```
 1                   TERRENI
 2       time.  This always goes fast.
 3            Q.   On page 22288 there is
 4       another heading:  "Was Charleston
 5       split differently?  Why?"  And it
 6       also highlights that there was lots
 7       of discussion on this with Campsen
 8       and we should talk about this.  Were
 9       you privy to any conversations with
10       Campsen about the treatment of
11       Charleston?
12            A.   Yes.
13            Q.   And would you agree that
14       there was at least one map
15       introduced including by Senator
16       Harpootlian or specifically by
17       Senator Harpootlian that kept
18       Charleston whole in CD 1?
19            A.   Yes.  That would have been
20       a different treatment than
21       Charleston.
22            Q.   After the January -- before
23       the January 19th hearing were you
24       aware that in addition to Senator
25       Harpootlian other amendments were
```

Page 381

```
 1                        TERRENI
 2        introduced?
 3             A.    Yes.
 4             Q.    Did you work with any
 5        senators on other amendments that
 6        were -- that they wanted introduced
 7        into the record?
 8             A.    We all did.
 9             Q.    And we is it the same core
10        that you had been mentioning --
11             A.    Yes, ma'am.
12             Q.    Would you, is your view of
13        why those amendments failed similar
14        to the view of Senator Harpootlian's
15        amendment which is they simply
16        didn't have the votes for passage?
17             A.    Yes.
18             Q.    As you sit here today, are
19        there, are you aware informal on any
20        reports written reports that the
21        Senate staff prepared at your
22        direction or that you are aware of
23        that critique any of the other
24        amendments that were introduced at
25        the January 19th hearing?
```

Page 382

1                    TERRENI

2          A.    No.  I don't think so.  Let

3      me add I don't remember when those

4      memos were prepared.  They may have

5      been prepared after the January 19th

6      hearing in preparation for the floor

7      debate.  The dates are all a little

8      confusing to me.  But what I'm

9      trying to say is the amendments may

10     have been prepared after the favor-

11     -- the subcommittee, the final

12     subcommittee report and after the

13     favorable committee report but

14     before the bill was debated on the

15     floor.

16          Q.    Is it your view that it was

17     too late in the process for those

18     amendments to be successful?

19          A.    No.

20          Q.    Was it possible for

21     amendments as late as mid to late

22     January to be successful?

23          A.    If they had the votes, I

24     mean anything could be successful.

25          MS. ADEN:  I think that is

Page 383

1                    TERRENI

2        what I have at this time.

3              MR. GORE:  Okay.  Thank you.

4        I have some questions, but before I

5        ask my questions either,

6        Mr. Mathias or Ms. Trinkley, would

7        you like to ask anything?

8              MR. MATHIAS:  I have no

9        questions.

10             MS. TRINKLEY:  I have no

11       questions either.  Thank you,

12       Mr. Terreni.

13             THE WITNESS:  Mr. Gore, I'm

14       going to ask you, what do you have,

15       a couple hours or --

16             MR. GORE:  Yeah, I was

17       thinking three or four actually.

18             THE WITNESS:  Okay.  I need

19       two minutes.

20             MR. GORE:  Let's take a couple

21       minute break.

22             (Whereupon, there is a recess

23       in the proceedings.)

24     EXAMINATION BY

25     MR. GORE:

Page 384

1                     TERRENI
2          Q.    Mr. Terreni, I'd like to
3      call your attention back to the
4      document you were just discussing
5      with Ms. Aden, tab 4, Plaintiffs'
6      Exhibit 6 [sic].
7              Do you have that in front of
8      you?
9          A.    I can get it.
10             Yes.
11             MS. ADEN:   You said 6, did you
12       mean 26.
13             MR. GORE:   Yes.   Exhibit 26,
14       tab 4.   Thank you.
15         A.    Yes, sir.
16         Q.    I believe you said that
17     making Charleston whole also would
18     have been different treatment of
19     Charleston County.   Is that right?
20         A.    Yes.
21         Q.    And why is that the case?
22         A.    Because Charleston County
23     was split in the prior plan enacted
24     in 2011, I guess.   It was split in
25     the core plan that was drawn by the

Page 385

```
                              TERRENI
 1
 2     core in 20 -- I think it was 2000
 3     and it was, I believe it had been
 4     divided in the previous plan.  I
 5     know it had.  I know it had.
 6          I'm sorry, it was divided in
 7     the plan in the '90s and I think in
 8     the age of single member districts
 9     it always has been.
10          Q.   I'm referring again to this
11     document, Exhibit 26, tab 4.  Do you
12     know whether this document was
13     reviewed, used or relied upon by
14     anyone?
15          A.   I don't know that, no.
16          Q.   Mr. Terreni, have you
17     discussed this litigation at all
18     with Dale Oldham?
19          A.   No.
20          Q.   Mr. Terreni, will you turn
21     back to tab 5, Plaintiffs' Exhibit
22     21.  This is the transcript of the
23     June 13th, 2022, redistricting
24     subcommittee meeting?
25          A.   Yes.  Bear with me, I need
```

1                    TERRENI
2       to close some tabs here.  Tab 5,
3       yes, sir.
4            Q.   Will you scroll down to
5       page 21.
6            A.   Yes, sir.
7            Q.   You and Ms. Aden discussed
8       these core preservation numbers for
9       Senate Amendment 2.  Do you recall
10      how these preservation numbers
11      compare to the core preservation
12      numbers in Senate Amendment 1?
13           A.   They are all lower,
14      significantly so.
15           Q.   Can you turn with me now to
16      tab 17, Plaintiffs' Exhibit 14.
17           A.   Can you share it?
18           Q.   Yes, I can share it.
19           A.   Which tab was it?
20           Q.   It's tab 17.  Can you see
21      it on my screen now?
22           A.   I can and I'm going to see
23      if I can open it now.  I have it,
24      yes.
25           Q.   This is the letter that

1              TERRENI

2      Ms. Aden drafted on behalf of the

3      NAACP and perhaps related entities

4      and sent to the redistricting

5      subcommittee on October 8th.  And if

6      we scroll to page 10 of the pdf,

7      there's a discussion about racially

8      polarized voting analysis and racial

9      bloc voting.  Do you recall

10     discussing this with Ms. Aden

11     earlier today?

12          A.   Yes, sir.

13          Q.   She had you read the first

14     sentence here about racial bloc

15     voting.  I'd like to call your

16     attention -- that sentence ends in

17     footnote 24.  And I'd like to call

18     your attention to footnote 24 at the

19     bottom of the page.

20          A.   Footnote 24 or 34?

21          Q.   Yes, 24.

22          A.   I'm sorry, what page are we

23     on?

24          Q.   It's page 10 of the pdf.

25     It's --

Page 388

```
 1                    TERRENI
 2         A.   Oh, page 8 of the --
 3         Q.   8 of the letter.  SC Senate
 4    3807 is the Bates number?
 5         A.   I see it now.  I'm sorry.
 6         Q.   And are you familiar with
 7    the four cases cited in this
 8    footnote?
 9         A.   I can't say that I remember
10    Collins versus City of Norfolk.  The
11    North Carolina case, yes.  And
12    Gingles obviously.  And Johnson
13    versus De Grandy I remember.
14         Q.   Whether or not you are
15    familiar with these cases, are all
16    of these cases Section 2 cases?
17         A.   Gingles was the case I
18    believe it was.  I don't know about
19    Collins.  Yeah, they say they are
20    Section 2 cases.  I'm sorry.
21         Q.   Does the parenthetical
22    after Collins indicate that Collins
23    was a Section 2 case?
24         A.   Yes.
25         Q.   And was De Grandy a Section
```

Page 389

                              TERRENI

1

2    2 case?

3         A.   I think so.

4         Q.   You and Ms. Aden spent a

5    significant amount of time today

6    discussing the Voting Rights Act.

7    Had the plaintiffs brought a Section

8    2 claim in this case?

9         A.   No, sir.

10        Q.   Has the General Assembly

11   asserted a Section 2 defense in this

12   case?

13        A.   No, sir.

14        Q.   We will turn away from this

15   letter for a moment.  I'm going to

16   ask you a question and then point

17   you to another document.  I believe

18   you and Ms. Aden discussed Sun City.

19   Do you recall that discussion?

20        A.   I do.

21        Q.   And you testified that Sun

22   City is a majority white community;

23   is that right?

24        A.   That's my understanding.

25        Q.   And is the fact that Sun

Page 390

1                    TERRENI
2         City is majority white the reason
3         that the Sun City community was kept
4         together in the enacted plan?
5              A.    No, sir, it was not.
6              Q.    And what was the reason it
7         was kept together?
8              A.    It was a part of the same
9         development.  We had an individual
10        testify, didn't make any sense, that
11        at least one individual testified
12        very passionately but it didn't make
13        any sense to keep a district line
14        running through his neighborhood
15        that didn't include him with -- in
16        the same district as his neighbors.
17             I'm aware that Sun City is a
18        large development on the outskirts
19        of Beaufort and in its expansion I
20        believe it reached into Jasper
21        County.  So we kept Sun City whole,
22        so to speak.  That was the point of
23        the change.
24             Q.    Do you know whether Senator
25        Margie Bright Matthews supported

                              TERRENI
1
2      keeping Sun City whole?
3              A.    I don't recall.
4              Q.    You and Ms. Aden spent a
5      fair amount of time discussing Adam
6      Kincaid in the National Republican
7      Redistricting Trust.  Do you recall
8      that?
9              A.    Yes, sir.
10             Q.    Do you recall she showed
11     you a transcript where Senator
12     Harpootlian expressed that he wanted
13     to see the National Republican
14     Redistricting Trust plans, do you
15     recall that?
16             A.    Yes, sir.
17             Q.    Do you know whether those
18     plans were ever provided to Senator
19     Harpootlian?
20             A.    Yes.  It's my understanding
21     they were.
22             Q.    Mr. Terreni, can you open
23     tab 59, which is Exhibit 21?
24             A.    Yes.
25             Q.    This is the series of

Page 392

                    TERRENI

1
2       reports that Will Roberts generated
3       for the Harpootlian plan; is that
4       correct?
5            A.    Tab 29.
6            Q.    59.
7            A.    Sorry.  I have to open
8       another tab.
9            Yes sir.
10           Q.    And turning to page 5 of
11      the pdf do you see vote totals and
12      percentages for Joe Biden and Donald
13      Trump for each district?
14           A.    I do.
15           Q.    And do you know whether
16      this data was provided for other
17      plans on the Senate redistricting
18      website?
19           A.    I believe it was.
20           Q.    And would that include
21      Senate Amendment 1?
22           A.    I believe so.
23           Q.    Did it include other
24      proposed plans?
25           A.    Yes, sir.  At the time --

Page 393

```
                              TERRENI
 1
 2        yes.  At the time of the amended,
 3        yes, was my recollection.
 4             Q.   Mr. Terreni, I want to ask
 5        you a few questions about Jones Day,
 6        which has been mentioned in today's
 7        deposition.  I believe you said that
 8        one of the lawyers at Jones Day who
 9        you spoke with has the first name
10        Stewart.  Do you remember that?
11             A.   Yes, sir.
12             Q.   Is it possible that his
13        last name is Crosland,
14        C-R-O-S-L-A-N-D?
15             A.   Yes.  Now that you mention
16        it, it is.  He obviously wasn't
17        Stewart Copeland or apparently
18        wasn't Stewart Copeland with all
19        deference to the band member.
20             Q.   What was Jones Day's role
21        in South Carolina redistricting this
22        cycle?
23             A.   Providing legal advice to
24        the South Carolina Senate,
25        specifically the Redistricting
```

Page 394

```
 1                    TERRENI
 2      Committee and the chairman of the
 3      Senate Judiciary Committee and his
 4      staff as instructed and then later
 5      defending the Senate against this
 6      lawsuit.
 7           Q.   Do you know whether Jones
 8      Day provided legal advice on both
 9      Senate and congressional
10      redistricting?
11           A.   Yes.
12           Q.   And did it do so?
13           A.   Yes.
14           Q.   Did Jones Day do anything
15      in redistricting other than
16      providing legal advice?
17           A.   No.
18           Q.   When you provided
19      information to Jones Day or asked
20      Jones Day to conduct a review, what
21      was your purpose in soliciting Jones
22      Day's involvement?
23           A.   To assess the legality,
24      defensibility of a -- or
25      defensibility of a plan in
```

Page 395

TERRENI

1
2      litigation.  In other words, we
3      wanted to know whether, A, it
4      complied with federal law.
5      Generally state law wasn't a
6      question, but it could have been I
7      suppose.  And, B, in anticipation of
8      litigation how our exposure to the
9      likelihood of a lawsuit and the
10     possible defenses and claims that
11     might be brought.
12          Q.   Is it fair to say that your
13     purpose in soliciting Jones Day's
14     input was to seek legal advice?
15          A.   Yes.
16          Q.   Did you have any other
17     purpose?
18          A.   No.
19          Q.   I believe you testified
20     that the plans provided and posted
21     on the website were available to
22     anybody in the world; is that
23     correct?
24          A.   Anybody with a computer.
25          Q.   Those plans would have been

```
 1                    TERRENI
 2      available to Jones Day from the
 3      website as well, correct?
 4           A.   Correct.
 5           Q.   Do you know whether anyone
 6      ever conveyed maps, plans or data to
 7      Jones Day separate from the website?
 8           A.   Yes.
 9           Q.   Do you know whether anyone
10      sent any of the National Republican
11      Redistricting Trust maps to Jones
12      Day?
13           A.   I think we did.  I don't
14      remember specifically, but we may
15      have.  We didn't spend a lot of time
16      with those maps, Mr. Gore.  I don't
17      remember if I sent them to you or
18      not.
19           Q.   I want to ask you a few
20      questions about Robinson Gray as
21      well.  I believe you testified that
22      Robinson Gray became involved in
23      this matter after litigation was
24      filed; is that correct?
25           A.   Correct.
```

Page 397

```
 1                    TERRENI
 2         Q.   Did Robinson Gray provide
 3    any legal advice on the drawing of
 4    the congressional plan?
 5         A.   I don't recall them doing
 6    that.  I think they were only
 7    engaged after the Senate was sued or
 8    maybe once we were -- well, no the
 9    Senate was sued early on so there
10    wasn't overlap.  I don't recall
11    Robinson Gray providing advice on
12    the maps.
13         Q.   Did Robinson Gray draw any
14    redistricting maps?
15         A.   No.
16         Q.   Did Robinson Gray direct
17    the drawing of any redistricting
18    maps?
19         A.   No.
20         Q.   Did Jones Day draw any
21    redistricting maps?
22         A.   No.
23         Q.   Did Jones Day direct the
24    drawing of any redistricting maps?
25         A.   No.
```

Page 398

                    TERRENI

1

2       Q.    Mr. Terreni, I'd like to

3    get a little more clarity on your

4    role in the redistricting process.

5    Did you draw any redistricting maps?

6       A.    No.

7       Q.    Did you draw any

8    redistricting lines?

9       A.    No.

10      Q.    Did you dictate the drawing

11   of any maps or lines?

12      A.    No.

13      Q.    So today if you testified

14   that "we" drew a plan, did you

15   meaning to include yourself in the

16   "we" who drew the plan?

17      A.    Not in the sense of drawing

18   it.  And if I said that, I was being

19   inartful and I appreciate you

20   pointing it out, Mr. Gore.

21      Q.    So what did you mean by

22   that?

23      A.    What I meant was the Senate

24   redistricting staff and specifically

25   the members -- and the members of

Page 399

                              TERRENI

1
2       the Senate drew a plan.  Some
3       members of the Senate came in and
4       said I want to see this or that done
5       and I would like that include in the
6       amendment and ultimately -- well,
7       ultimately it's the senator and
8       Senate that draws the plan, it's not
9       staff, but the staff can certainly
10      go through the mechanics of it, the
11      staff drew a staff plan.
12              Did I draw it specifically,
13      no.  Was I present while it was
14      being drawn, yes.  Did I facilitate
15      the process, yes.  Did I dictate
16      where a line went or not, no.  Did I
17      convey some institutional knowledge
18      about the preferences of different
19      members or the congressional
20      delegation, yes.
21          Q.   Who is the decision-maker
22      as to which plan would be enacted?
23          A.   The Senate.
24          Q.   Mr. Terreni, can you open
25      tab 1, Plaintiffs' Exhibit 7?

Page 400

1              TERRENI

2         A.    Yes, sir.

3         Q.    This is the 2021 policy for

4    public plan submissions.  Do you

5    recall discussing this with Ms. Aden

6    today?

7         A.    I do.

8         Q.    Paragraph 2 of this

9    document, the first sentence of that

10   paragraph reads:  "The redistricting

11   subcommittee will designate a time

12   period during which it will accept

13   redistricting plans for review and

14   consideration."

15        Did I read that correctly?

16        A.    You did.

17        Q.    Did the subcommittee

18   designate a time period for

19   accepting plan submissions?

20        A.    It did.

21        Q.    Were any of the plans

22   emailed by the National Republican

23   Redistricting Trust provided before

24   that deadline?

25        A.    No.

Page 401

1              TERRENI

2        Q.   Is that the reason why

3    those plans were not posted on the

4    website?

5        A.   Yes.  I mean that's --

6    yeah.  I mean they were sent to us

7    at the last minute, we looked at

8    them.  There wasn't a subcommittee

9    hearing for anybody to comment on.

10   We didn't use them, we didn't

11   consider them and so we didn't post

12   them.  I'm not sure a lot of thought

13   was given it to, Mr. Gore.

14        Q.   Let me point your attention

15   to paragraph I-B.  And the first

16   part of I-B reads:  "All plans

17   submitted to and accepted by the

18   redistricting subcommittee will be

19   made part of the public record and

20   will be made available in the same

21   manner as other redistricting

22   subcommittee public records."

23        Did I read that correctly?

24        A.   You did.

25        Q.   Were the National

Page 402

```
 1                    TERRENI
 2      Republican Redistricting Trust plans
 3      ever accepted by the redistricting
 4      subcommittee within the meaning of
 5      this document?
 6           A.    No, sir.
 7           Q.    Why not?
 8           A.    Because they were never
 9      accepted and brought before the
10      subcommittee for public testimony
11      and for questions by the members of
12      the subcommittee.  They were not
13      presented to the subcommittee.
14           Q.    Do you know whether any
15      member of the subcommittee or any
16      member of the Senate ever saw those
17      plans?
18           A.    Before or after the
19      subcommittee?
20           Q.    Either.
21           A.    Before no.  Afterwards upon
22      request I believe Senator
23      Harpootlian saw them.  I don't
24      believe anybody else wanted to see
25      them.
```

Page 403

```
 1                    TERRENI
 2         Q.    Did it violate any Senate
 3    redistricting subcommittee policy or
 4    this document for you and others to
 5    look at the National Republican
 6    Redistricting Trust plans?
 7         A.    No, sir.
 8         Q.    Mr. Terreni, can you turn
 9    to tab 45, Plaintiffs' Exhibit 11?
10         A.    Yes, sir.
11         Q.    Is this the subpoena that
12    was served on you in this case?
13         A.    Yes.
14         Q.    And do you recall earlier
15    today discussing with Ms. Aden some
16    handwritten notes you took of public
17    hearings in 2021?
18         A.    Yes, sir.
19         Q.    Can you scroll down to page
20    11 of this exhibit?
21         A.    Yes, sir.
22         Q.    This is Request For
23    Production No. 1 towards the bottom
24    of the page.  Calls for "all
25    documents you provided to
```

Page 404

1                    TERRENI

2       defendants, committee members or the

3       South Carolina General Assembly or

4       communications between you and

5       defendants committee members or the

6       South Carolina General Assembly."

7            Did you ever provide your

8       handwritten documents to defendants,

9       committee members or the South

10      Carolina General Assembly?

11           A.    No, sir.

12           Q.    Were your handwritten notes

13      communications between you and

14      defendants, committee members or the

15      South Carolina General Assembly?

16           A.    No.

17           Q.    Would you scroll down to

18      the next page, page 12 of the

19      document, page 15 of the pdf.

20           A.    Yes, sir.

21           Q.    Request For Production 2

22      calls for "all correspondence and

23      documents you received from Mr. Adam

24      Kincaid, the National Republican

25      Redistricting Trust, Fair Alliance

Page 405

```
 1                    TERRENI
 2        America, Magellan Consulting or
 3        anyone else."
 4              Were your handwritten notes --
 5        did I read that correctly?
 6              A.   Yes, sir.
 7              Q.   Were your handwritten
 8        notes, correspondence or documents
 9        you received from Mr. Kincaid, the
10        National Republican Redistricting
11        Trust, Fair Alliance America,
12        Magellan Consulting or anyone else?
13              A.   No, sir.
14              Q.   Scroll down to Request For
15        Production No. 3.  This one asks
16        again for "all documents you
17        provided to or received from
18        defendants, committee members or the
19        South Carolina General Assembly and
20        communications between you and
21        defendants, committee members or the
22        South Carolina General Assembly
23        relating to the following hearings."
24              Did I read that correctly?
25              A.   You did.
```

Page 406

1              TERRENI

2         Q.    Were your handwritten notes

3     documents you provided to or

4     received from defendants, committee

5     members or the South Carolina

6     General Assembly?

7         A.    No, they were not.

8         Q.    Were your handwritten notes

9     communications between you and

10    defendants, committee members or the

11    South Carolina General Assembly?

12        A.    No, sir.

13        Q.    Let's scroll to the next

14    page, which is the final of the

15    subpoena Request For Production No.

16    4.  This request calls for "all

17    documents concerning any retainer

18    agreement, fee agreement or any

19    other contract or agreement between

20    you and defendants, committee

21    members or the South Carolina

22    General Assembly."

23        Did I read that correctly?

24        A.    You did.

25        Q.    Were your handwritten

```
                                            Page 407

 1                     TERRENI
 2       notes, documents concerning any
 3       retainer agreement, fee agreement or
 4       any other contract or agreement
 5       between you and defendants,
 6       committee members or the South
 7       Carolina General Assembly?
 8            A.   No, sir.
 9            Q.   Mr. Terreni, will you now
10       turn to tab 18, which is Plaintiffs'
11       Exhibit 16.
12            A.   Yes, sir.
13            Q.   This is the email from
14       Breeden John to recipients at
15       alliance.law; is that correct?
16            A.   Correct.
17            Q.   And there is an attachment
18       here of various races and vote
19       totals in South Carolina; is that
20       right?
21            A.   Yes, sir.
22            Q.   Now, I believe you may have
23       testified that this attachment was
24       made available on the website; is
25       that right?
```

Page 408

1                    TERRENI

2          A.    I believe it was.

3          Q.    Is it possible that this

4     attachment was too large to be

5     posted on the website and that

6     instead information about how to

7     request this document was posted on

8     the website?

9          A.    Yes.  That's possible.  As

10    a matter of fact, now that you ask

11    me that question I remember that was

12    the case.

13         Q.    But this document was

14    available to the public upon

15    request; is that right?

16         A.    Yeah.  Yeah.  All we needed

17    to do was email or prepare it with

18    Alliance.

19         Q.    Earlier today you and

20    Ms. Aden discussed a racially

21    polarized voting analysis.  Do you

22    recall that?

23         A.    Yes, sir.

24         Q.    And you shared your view as

25    to why such an analysis was not

```
1                    TERRENI
2       helpful or required for the
3       congressional redistricting plan; is
4       that correct?
5            A.    Correct.
6            Q.    Is that a view that you
7       shared publicly on the record in a
8       subcommittee hearing?
9            A.    Yes, sir.
10           Q.    Mr. Terreni, can you turn
11      now, open tab 1, which is
12      Plaintiffs' Exhibit 9?
13           A.    Yes, sir.
14           Q.    And this is the email from
15      Paula Benson to Senator Campsen
16      copying others that attaches, among
17      other things, the Senate guidelines,
18      correct?
19           A.    Yes, sir.
20           Q.    So I'd like to call your
21      attention to the Senate
22      redistricting guidelines.
23           A.    Yes, sir.
24           Q.    Do these guidelines say
25      anything about reunifying Charleston
```

Page 410

```
 1                    TERRENI
 2      County in the enacted plan?
 3           A.   No, sir.
 4           Q.   Do they say anything about
 5      reunifying Richland County in the
 6      enacted plan?
 7           A.   No, sir.
 8           Q.   How about Sumter County?
 9           A.   No, sir.
10           Q.   How about Orangeburg
11      County?
12           A.   No, sir.
13           Q.   Do these guidelines say
14      anything about conducting a racially
15      polarized voting analysis?
16           A.   No, sir.
17           Q.   Do they direct the Senate
18      or Senate staff to conduct a
19      racially polarized voting analysis?
20           A.   No, sir.
21           Q.   Mr. Terreni, for how many
22      cycles have you been involved in
23      redistricting in South Carolina?
24           A.   This was my third.
25           Q.   And based on that
```

Page 411

1                    TERRENI

2     experience and your involvement this

3     time around, do you believe there's

4     any basis in this record to conclude

5     that the enacted congressional plan

6     is a racial gerrymander?

7          A.   No, sir.

8          Q.   And based again on that

9     experience and your own involvement

10    in congressional redistricting this

11    time around, do you believe there's

12    any basis in this record to conclude

13    that the enacted congressional plan

14    is the result of intentional racial

15    discrimination?

16         A.   No, sir.

17           MR. GORE:  Thank you,

18     Mr. Terreni, I have no further

19      questions at this time.

20           MS. ADEN:  I have a very few

21      for redirect.

22    BY MS. ADEN:

23         Q.   Mr. Terreni, you were asked

24    about Charleston County's treatment

25    in prior maps and also testimony of

Page 412

1                        TERRENI
2        one person in Sun City.  Do you
3        recall hearing testimony from
4        members of the public about keeping
5        Charleston County whole even if it
6        had been split in previous maps?
7             A.    I do.
8             Q.    Would you agree that more
9        people testified in support of
10       keeping Charleston County whole than
11       compared to the treatment of Sun
12       City?
13            A.    Yes.
14            Q.    Looking at the Senate
15       redistricting criteria adopted on
16       September 17th, under Additional
17       Considerations is one of the
18       criteria that should be considered
19       keeping counties whole, maintaining
20       counties?
21            A.    It's -- one of the criteria
22       is minimizing of county boundaries.
23            Q.    And so minimizing the
24       splits of counties, including
25       Charleston, would thus comply with

Page 413

1                    TERRENI
2       that additional criteria in the
3       Senate guidelines; is that correct?
4            A.    It could.
5            Q.    You were asked about the
6       four cases in the footnote of the
7       South Carolina NAACP letter in tab
8       17, Plaintiffs' Exhibit 14.
9            A.    Yes, ma'am.
10           Q.    One of those included a
11      McCrory case out of North Carolina.
12      Do you recall that?
13           A.    Yes, ma'am.
14           Q.    And you recall being
15      familiar with that case?
16           A.    I read the opinion.
17           Q.    Do you have any reason to
18      dispute that that case in addition
19      to having a Section 2 claim also had
20      an intentional vote discrimination
21      claim?
22           A.    I don't have any reason to
23      dispute it.  I don't recall.
24           Q.    Do you have any reason to
25      dispute that the basis for why the

Page 414

1              TERRENI
2      plaintiffs sought bail-in under
3      Section 5 of the Voting Rights Act
4      was because of a constitutional
5      violation?
6          A.   That may have been -- no, I
7      don't have any reason to dispute
8      that.
9          Q.   So it's possible that that
10     McCrory case -- in fact, I'm
11     representing that the McCrory case
12     had more than Section 2 claims.  Do
13     you have any reason to dispute that?
14         A.   No.
15         Q.   You had mentioned that --
16     your understanding that Senator
17     Harpootlian received the documents
18     that Adam Kincaid sent to
19     Mr. Fiffick.  Did you personally
20     send Senator Harpootlian the
21     information received from NRRT?
22         A.   No.
23         Q.   And did you personally
24     receive confirmation that the
25     material that Andy Fiffick received

1              TERRENI

2      from NRRT was shared with Senator

3      Harpootlian?

4          A.    I received confirmation

5      that it was offered to him at the

6      very least.  Whether Senator

7      Harpootlian accepted that offer I

8      can't personally say.  I assume that

9      he did.

10         Q.    Do you know who offered the

11     information to Senator Harpootlian?

12         A.    Andy Fiffick.

13         Q.    Do you know whether Senator

14     Bright Matthews asked for the

15     information from NRRT?

16         A.    I do not.

17         Q.    Do you know who Senator

18     Kimpson is?

19         A.    I do.

20         Q.    Is he a lawyer?

21         A.    He is.

22         Q.    And you were asked for your

23     opinion about whether or not the

24     enacted map is a racial

25     gerrymandering.  Do you recall that?

Page 416

1                    TERRENI
2          A.    By Senator Kimpson?
3          Q.    No.  By Mr. Gore on his
4     questioning.
5          A.    Yes, ma'am.
6          Q.    Do you have any reason to
7     dispute that on January 20, 2022,
8     during the Senate floor hearing
9     Senator Kimpson characterized Senate
10    Amendment 1 as a racial gerrymander?
11         A.    I have no reason to dispute
12    that, that that was his
13    characterization, no.
14         Q.    You mentioned when speaking
15    with Mr. Gore that you provided --
16    you did not -- that you did not
17    develop, you yourself did not
18    develop congressional redistricting
19    maps, is that fair?
20         A.    Draw, I think the word was
21    "draw" but develop I wouldn't
22    dispute that.
23         Q.    But you personally do not
24    draw congressional redistricting
25    maps, is that your testimony?

1                    TERRENI

2        A.    Correct, yes.

3        Q.    But you testified that you

4    provided institutional knowledge on

5    those maps, is that fair to say?

6        A.    Yes.

7        Q.    Okay.  You also mentioned

8    earlier today that you provided

9    information to Mr. Roberts, Will

10    Roberts, is that fair to say, as he

11    was developing at least the initial

12    step plan and potentially other

13    congressional maps for the staff, is

14    that fair to say?

15        A.    On some occasions, yes.

16        Q.    And Mr. Roberts is a

17    cartographer as you've described

18    him, is that fair to say?

19        A.    Yes.

20        Q.    Is he a lawyer?

21        A.    No.

22        Q.    Do you think when you were

23    providing information to Mr. Roberts

24    you were providing him with legal

25    advice?

1                    TERRENI

2          A.    On occasions, yes.

3          Q.    Were there occasions such

4      as when you were providing him

5      institutional knowledge about past

6      redistricting decisions that those

7      would have been fact-based

8      information?

9          A.    Yes.

10          MS. ADEN:  I think those are

11      all of my questions.  The only

12      thing I'd like to put on the

13      record, Mr. Gore, is that we would

14      like to hold this deposition open

15      pending our continued review of the

16      subpoena and the testimony today

17      about whether or not all

18      information that was asked to be

19      produced by the Senate has been

20      provide and we will talk internally

21      as a team and may follow up with

22      you, but until such time we'd like

23      to hold the deposition open for

24      that purpose.

25          MR. GORE:  Noted.  We

Page 419

1                        TERRENI

2          obviously object to holding the

3          deposition open.  This deposition

4          has gone the full seven hours

5          allowed by the rules and more.

6               I think it's also clear based

7          on the deposition testimony that

8          the handwritten notes were not

9          within the scope of the subpoena.

10         So we do object to holding this

11         open.

12              We, of course, are happy to

13         hear from you if you'd like to

14         discuss any production issues or

15         document issues that you think may

16         have been arisen, but we do note

17         for the record that we object to

18         holding the deposition open for the

19         reasons stated.

20              MS. ADEN:  And I think we can

21         go off the record.

22              (Time noted:  6:47 p.m.)

23

24

25

Page 420

1

2    STATE OF NEW YORK          )

3                              )   :ss

4    COUNTY OF NEW YORK        )

5

6         I, CHARLES TERRENI, the witness

7    herein, having read the foregoing

8    testimony of the pages of this

9    deposition, do hereby certify it to be a

10   true and correct transcript, subject to

11   the corrections, if any, shown on the

12   attached page.

13

14                    _____

15                    CHARLES TERRENI

16

17

18

19   Sworn and subscribed to before me,

20   this _____ day of _____, 2022.

21   _____

22   Notary Public

23

24

25

Page 421

1

2    STATE OF NEW YORK        )

3                     ss.:

4    COUNTY OF NEW YORK       )

5

6            I, ERICA L. RUGGIERI, RPR and a

7        Notary Public within and for the State

8        of New York, do hereby certify:

9            That I reported the proceedings

10       in the within-entitled matter, and

11       that the within transcript is a true

12       record of such proceedings.

13            I further certify that I am not

14       related by blood or marriage, to any

15       of the parties in this matter and

16       that I am in no way interested in the

17       outcome of this matter.

18            IN WITNESS WHEREOF, I have

19       hereunto set my hand this 23rd day of

20       August, 2022.

21                     *Erica Ruggieri*

22       _____

23          ERICA L. RUGGIERI, RPR, CSR, CLR

24

25

Page 422

1

2    ------------ I N D E X -----------------

3    WITNESS                                    PAGE

4    CHARLES TERRENI

5          By:  Ms. Aden                 6, 411

6               Mr. Gore                     383

7

8    ------------- EXHIBITS -----------------

9    PLAINTIFFS'                        FOR I.D.

10    Exhibit 1, Text exchange           63

11    Exhibit 2, Communication between  78

12    Mr. Fiffick and Mr. Kincaid,

13    Bates South Carolina Senate 3244

14    Exhibit 3, Wren plan, Bates        91

15    South Carolina Senate 26635

16    Exhibit 4, Map, Bates South       103

17    Carolina 26370 to 71

18    Exhibit 5, Email from Adam        119

19    Kincaid to Mr. Fiffick, Bates

20    South Carolina Senate ending in

21    3245

22    Exhibit 6, Email between Adam     126

23    Kincaid and Mr. Fiffick, Bates

24    South Carolina Senate 3246

25

Page 423

1

2    -------------- EXHIBITS -------

3    PLAINTIFFS'                FOR I.D.

4    Exhibit 7, 2021 Policy For          132

5    Public Plan Submission South

6    Carolina Senate Judiciary

7    Committee Redistricting

8    Committee, Bates South Carolina

9    Senate 3723 through 24

10   Exhibit 8, Charles Terreni          145

11   representation letter, Bates

12   South Carolina Senate 4353 to

13   4354

14   Exhibit 9, Email from Paula         172

15   Benson to Senator Campsen with

16   attachments, Bates South

17   Carolina Senate 22356

18   Exhibit 10, South Carolina          180

19   Senate Redistricting

20   Subcommittee 2021 Public

21   Hearings, Bates South Carolina

22   Senate 3745

23   Exhibit 11, Subpoena               221

24

25

Page 424

1

2    -------------- EXHIBITS ---------------

3    PLAINTIFFS'                      FOR I.D.

4    Exhibit 12, Email from Paula      228

5    Benson to Charles Terreni with

6    attachment, Bates South Carolina

7    Senate 22619 to 22621

8    Exhibit 13, Transcript from       251

9    9/17/2021 Senate Judiciary

10   Committee, Bates

11   SCSENATE_00003484

12   Exhibit 14, Email from Leah Aden  254

13   to the Senate Redistricting

14   Subcommittee, Bates South

15   Carolina Senate 3798 to 3834

16   Exhibit 15, Transcript of the     259

17   Senate redistricting hearing,

18   Bates South Carolina Senate

19   11729, 11843

20   Exhibit 16, Email chain, Bates    265

21   South Carolina Senate 3372

22   through 3380

23   Exhibit 17, Email cover from      272

24   Holli Miller, Bates South

25   Carolina Senate 3387 to 3395

```
                                    Page 425

 1

 2      -------------- EXHIBITS --------------

 3      PLAINTIFFS'                      FOR I.D.

 4      Exhibit 18, Transcript of        310

 5      11/29/2021 hearing, Bates South

 6      Carolina NAACP CD 11844 through

 7      11934

 8      Exhibit 19, Email from John      327

 9      Breeden to Chip Campsen, Bates

10      South Carolina Senate 22547 to

11      2250

12      Exhibit 20, Transcription of     340

13      1/13/2022 Senate Judiciary

14      hearing

15      Exhibit 21, analysis of House    344

16      Plan 2, Senate Amendment 2A

17      Exhibit 22, Email cover from     355

18      Andy Fiffick to Senator Rankin,

19      et al, Bates South Carolina

20      Senate 22344, 22352

21      Exhibit 23, Email from Will      362

22      Roberts to Mr. Opperman, Bates

23      South Carolina Senate 3260 to

24      3268

25
```

Page 426

1

2    -------------- EXHIBITS ---------------

3    PLAINTIFFS'                         FOR I.D.

4    Exhibit 24, Email from Will        364

5    Roberts to Andy Fiffick

6    Exhibit 25, Email from Breeden     370

7    John to Andy Fiffick, et al,

8    with attachment

9    Exhibit 26, Email between          375

10   Mr. Fiffick, Luke Rankin with

11   attachment, Bates South Carolina

12   Senate 22286 through 22288

13

14        *** EXHIBITS ATTACHED ***

15

16

17

18

19

20

21

22

23

24

25

Page 427

1

2                INSTRUCTIONS TO WITNESS

3

4        Please read your deposition over
5    carefully and make any necessary
6    corrections.  You should state the reason
7    in the appropriate space on the errata
8    sheet for any corrections that are made.
9            After doing so, please sign the
10   errata sheet and date it.
11           You are signing same subject to
12   the changes you have noted on the errata
13   sheet, which will be attached to your
14   deposition.
15             It is imperative that you return
16   the original errata sheet to the deposing
17   attorney within thirty (30) days of
18   receipt of the deposition transcript by
19   you.  If you fail to do so, the deposition
20   transcript may be deemed to be accurate
21   and may be used in court.

22

23

24

25

Page 428

```
 1
 2                    E R R A T A
 3
 4   I wish to make the following changes, for
 5   the following reasons:
 6   PAGE LINE
     ___  ___
 7   CHANGE:_____
     REASON:_____
 8   ___  ___
     CHANGE:_____
 9   REASON:_____
     ___  ___
10   CHANGE:_____
     REASON:_____
11   ___  ___
     CHANGE:_____
12   REASON:_____
     ___  ___
13   CHANGE:_____
     REASON:_____
14   ___  ___
     CHANGE:_____
15   REASON:_____
     ___  ___
16   CHANGE:_____
     REASON:_____
17   ___  ___
     CHANGE:_____
18   REASON:_____
     ___  ___
19   CHANGE:_____
     REASON:_____
20   ___  ___
     CHANGE:_____
21   REASON:_____
     ___  ___
22   CHANGE:_____
     REASON:_____
23   ___  ___
     CHANGE:_____
24   REASON:_____

     _____    _____
25   WITNESS' SIGNATURE                  DATE
```

[& - 19]

**&**

**&**   3:8 4:10,19
5:13 7:20

**0**

**00003484**   251:15
424:11
**0003**   257:4
**03302**   1:7
**07**   257:8

**1**

**1**   13:13,16 31:22
63:5,6 98:19
99:10 114:11,17
114:19,24 150:9
159:8 172:12
183:5 223:23
231:8 267:17
270:4,19 271:5
329:9 332:14,20
334:7,10,16
335:14,22
336:11,15
339:14,17,21
348:8,9,19 351:5
352:4 355:25
356:12 359:16
360:5,6 361:12
363:11 364:13
365:2 366:4
368:4 370:3
372:3 380:18
386:12 392:21
399:25 403:23
409:11 416:10
422:10
**1,000**   372:19,22
373:10,22 374:5

**1/13/2022**
340:24 425:13
**10**   115:20 119:13
180:8 256:14,15
349:6 387:6,24
423:18
**10,000**   169:16
**10006**   3:12
**103**   422:16
**104**   3:20
**10:00**   170:24
**10:05**   81:11
**11**   95:12,18
126:6 131:21
221:22,24 223:7
311:13 327:8
329:25 350:13
403:9,20 423:23
**11/29/2021**
310:9 425:5
**11/30/2021**   74:5
**11449**   4:13 5:16
**11729**   259:6,10
424:19
**11752**   259:15
**11843**   259:6,10
424:19
**11844**   310:10,25
425:6
**11844-11934**
310:6
**11848**   310:23
311:3
**119**   422:18
**11934**   310:11
311:2 425:7
**11:18**   76:23

**11:19**   74:4,5
**11th**   330:13
**12**   228:23,24
251:4 258:20
259:21,22 261:4
271:8,10 354:15
404:18 424:4
**1221**   4:21
**126**   422:22
**12th**   259:3
**13**   223:7 251:11
251:12 340:17
341:6 356:2
424:8
**1310**   4:12 5:15
**132**   423:4
**13th**   140:18
321:7 330:18
346:2 356:6
372:21 373:7
385:23
**14**   251:24 252:7
253:25 254:15
254:22 346:3,4
369:15 370:12
386:16 413:8
424:12
**145**   423:10
**14th**   23:6 186:18
187:13 346:11
347:7
**15**   99:13 131:25
259:2,7 316:6,7
316:11 352:6
353:15 404:19
424:16
**1508**   12:5

**15th**   186:18
**16**   1:23 2:2,10
131:19 264:15
265:4 271:17
316:24 364:9
407:11 424:20
**16th**   321:9
325:23
**17**   132:6 253:24
254:10 271:9
272:2 354:16
386:16,20 413:8
424:23
**17.08.**   114:11
**172**   423:14
**17th**   176:11
213:5 250:21
252:20 253:18
412:16
**18**   78:14 81:11
113:15 172:17
224:18 264:14
310:8,14 340:21
341:12,12
342:10 355:7
407:10 425:4
**18.04**   98:21
**18.18.**   98:25
**18.54.**   99:3
**180**   423:18
**1800**   4:21
**18th**   65:20 78:25
117:9 135:22
138:3 374:21
378:24
**19**   65:5 258:25
326:25 327:14
346:4 348:6

**[19 - 22286]**                                                              Page 2

364:3 425:8
**19952**   341:14
**19th**   67:23 68:6
380:23 381:25
382:5
**1:08**   170:23
171:10
**1:41**   172:3

## 2

**2**   13:13,16 23:5
24:7,12,13 26:8
26:16,18 27:15
27:17,19,23 28:4
28:7,11,15,21,23
28:24 29:7,10,14
30:7,22 31:22
78:17,18 98:22
102:6,7 111:4
173:16 186:15
187:4 189:23,25
190:3 199:5,8,10
199:21 200:4
201:23 202:8,19
202:23 203:4,6,8
203:12 206:11
206:19 211:7
229:8 232:14
241:21 242:15
242:19 246:22
247:4,19,20
252:14,24
259:22 269:10
269:22 270:5,15
270:15 274:15
275:8,18 302:13
312:7,18 342:14
342:17,22 344:5

344:10,10,23
345:4 346:8,9,18
346:22 347:3,6
347:11,15
348:20,25
350:15,19
351:19 352:3
354:19 355:24
355:25 356:10
357:17,18
358:10 360:3,7
360:16,19 361:2
361:11 368:4
386:9 388:16,20
388:23 389:2,8
389:11 400:8
404:21 413:19
414:12 422:11
425:16
**20**   38:5 88:4
112:13 170:3
300:2 317:10
340:20,23
347:13 348:7,23
348:24 349:11
350:14 373:7
385:2 416:7
425:12
**20,000**   169:16
**2000**   19:5 241:20
261:25 339:9
385:2
**20001-2113**   5:9
**2001**   241:21
**2010**   35:3 36:2,2
37:5,20 38:3
94:2 249:19
261:19,24

262:12,13,20
266:10 292:3,25
297:18 300:3
**2011**   35:3,25
37:5 102:24,25
115:5 150:19
197:19 198:4,14
247:25 268:2,10
268:20 298:5,5
350:20 384:24
**2012**   264:23
**2018**   258:7,7
**2019**   145:19
168:15,20,25
169:8,18
**202**   5:10
**2020**   36:6 37:14
37:17 38:4,6,9
38:10 39:5
40:18 42:2,2
46:10 143:20
146:24 147:5
170:2 198:14
249:20 258:5
262:21 264:24
266:13 268:21
299:21 329:12
363:20
**2021**   36:6,14,21
41:21 42:21
57:24 63:3 65:5
77:19 78:14
81:11 119:16
126:9 131:14
132:2,6,10
141:24 170:4
176:11 179:25
180:10 214:5,9

229:8 246:18
250:22 252:20
254:5,18 258:20
261:4 264:20
266:15 271:17
287:6,9,14 298:2
310:3 316:3
319:20 361:5
400:3 403:17
423:4,20
**2022**   1:23 2:2,10
78:6 131:14
170:4 172:17
327:8 329:25
340:17 341:7
355:7 356:2
364:3,9 369:22
372:21 374:22
385:23 416:7
420:20 421:20
**2022-0120**   370:4
370:6
**20th**   369:22
373:4
**21**   343:25 344:4
348:6 349:3,4,5
349:6,11 350:13
351:17,17
385:22 386:5
391:23 425:15
**21733**   372:17
**21742**   372:8
**22**   352:6 355:4
355:11 425:17
**221**   423:23
**22286**   375:2,8
426:12

**22287**   375:19
**22288**   375:9
  380:3 426:12
**22344**   355:10,14
  425:20
**22345**   355:19
**22352**   355:10,14
  425:20
**22356**   172:19,25
  423:17
**22357**   173:17
  267:21
**22358**   211:8
  231:13 267:22
**22364**   172:20
**2250**   327:13,17
  425:11
**22529**   365:4
**22530**   365:21,24
**22547**   327:13,16
  425:10
**22550**   329:5
**22560**   365:16
**22619**   229:3,12
  424:7
**22621**   229:4,12
  424:7
**228**   424:4
**22nd**   321:24
  324:8
**23**   63:2 74:3
  287:6,14 352:7
  353:14 361:20
  362:7 425:21
**231-7810**   4:15
  5:18
**23rd**   67:24 68:4
  72:15,16,18

291:16 307:12
307:15,18,22
308:20 309:8
421:19
**24**   132:8,15
  259:14 354:15
  364:10,14
  387:17,18,20,21
  423:9 426:4
**24.82.**   114:6
**24.89.**   98:23
**24th**   119:16
  126:21 128:21
  141:23
**25**   317:10 351:18
  364:7 369:17
  370:8,13 426:6
**25.39.**   99:5
**251**   424:8
**254**   424:12
**259**   424:16
**25th**   308:2
**26**   99:19 258:6
  374:18 375:5
  384:12,13
  385:11 426:9
**26.81.**   99:7
**26370**   103:12,15
  422:17
**265**   424:20
**26635**   90:21
  91:15,18 422:15
**27**   99:13 326:24
  327:2
**272**   424:23
**28**   126:9 228:21
  251:2

**28th**   126:25
  127:7 128:22
  130:17 230:17
**29**   310:2 316:3
  392:5
**29201**   4:22
**29211**   4:14 5:17
**29601**   3:21
**29th**   307:15
  308:19 309:8,15
  314:6 317:2
  325:11,23,25
**2a**   344:6 425:16

**3**

**3**   91:13 98:24
  104:3 211:9
  276:13,15 304:6
  341:3,12 348:7
  354:25 405:15
  422:14
**30**   57:9 74:4
  77:6,19 168:15
  168:20,25 169:8
  427:17
**300**   170:17
**310**   425:4
**32**   316:22,22
**3244**   78:15,21
  422:13
**3245**   119:18,23
  422:21
**3246**   126:11,15
  422:24
**326**   362:3
**3260**   361:21,22
  362:3,9 425:23

**3264**   362:22
**3268**   362:10
  425:24
**327**   425:8
**33**   250:20 251:8
**3372**   264:21
  265:6,16 424:21
**3380**   265:6
  424:22
**3387**   271:22
  272:4 424:25
**3389**   272:21
**3390**   273:8
  276:17
**3391**   277:3,8
**3392**   279:9 281:6
**3393**   272:21
**3395**   272:4
  424:25
**34**   387:20
**340**   425:12
**344**   425:15
**3484**   250:23
**3498**   251:25
**35**   317:10
**355**   425:17
**3571**   250:23
**362**   425:21
**364**   426:4
**368**   362:4
**37**   256:15
**370**   426:6
**370-2211**   3:22
**3723**   132:8,14
  423:9
**3745**   180:3,11
  423:22

**[375 - 917]**                                                                    Page 4

| | | | |
|---|---|---|---|

**375** 426:9
**3798** 254:21,25
424:15
**38** 103:9 104:7
113:5
**3807** 256:14
257:5,7,14 388:4
**3817** 257:6
**383** 422:6
**3834** 254:21,25
424:15
**3:21** 1:7
**3a** 133:14
**3b** 134:4 231:12
**3c** 23:21

**4**

**4** 99:2 103:14
104:6,8 251:25
304:6 310:16
342:9 347:13
374:17 384:5,14
385:11 406:16
422:16
**40** 3:11
**411** 422:5
**4343** 63:4
**4353** 145:22
146:2 168:19
423:12
**4354** 145:22
146:2 423:13
**45** 151:12 221:14
403:9
**47** 379:13
**49** 179:22

**5**

**5** 13:13,17 18:19
18:19 19:7,16,18
20:8,18 22:8,12
22:21 23:8,11,17
24:4,19 25:7,10
26:8,13 28:14
29:11 31:22
99:4 119:19,20
252:7,11 277:24
310:19 311:3,4,8
311:9 315:2
340:15 342:9
343:17 345:24
352:7 362:23
385:21 386:2
392:10 414:3
422:18
**5,000** 169:16
**50** 62:24 63:9
97:7 113:21
128:7 297:15
298:22,25
302:12
**5025** 421:21
**51** 5:8
**57** 89:24 145:18
**58** 89:23,24 90:3
90:10 91:19
104:2
**59** 343:18,24
344:2,8 361:17
361:23,23,25
391:23 392:6
**5th** 105:18

**6**

**6** 13:12 97:13
98:14 99:15,18
114:4,25 115:25
116:2 126:12
131:24 198:17
198:18 224:19
247:24 297:5,12
297:13,20,23
298:5,18 299:2
302:21 303:4
304:2,13,21
311:9 347:14
353:14 384:6,11
422:5,22
**60** 362:5
**63** 422:10
**67** 316:5,7,10
**68** 361:21 362:6
**69** 316:6,8,13
**6:00** 72:15,16,22
**6:47** 419:22

**7**

**7** 99:6,12,18
102:10,11,17
114:5 115:3
132:9,10 149:15
150:3,10,16
151:2,10,19
152:4 267:24
289:8 310:16
311:13 339:18
348:23 357:6,14
357:24 358:2
359:3,20 399:25
423:4

**70** 170:11
**70,000** 170:10
**71** 103:13,15
422:17
**78** 422:11
**7th** 148:7,7

**8**

**8** 145:23 146:8
309:25 316:2
388:2,3 423:10
**80** 264:22
**803** 4:15 5:18
**803-530-2893**
63:21
**803-799-9800**
4:23
**858-2870** 3:13
**864** 3:22
**879-3939** 5:10
**88** 375:2
**8th** 254:4,17
387:5

**9**

**9** 78:12 172:21
172:22 222:21
251:25 252:7
264:20 266:15
316:8,13,24
362:23 409:12
423:14
**9/17/2021**
251:13 424:9
**900** 3:20
**90s** 18:21 385:7
**91** 422:14
**917** 3:13

**[95 - adhered]**                                                                                        Page 5

| | | | |
|---|---|---|---|
| **95** 271:22 | 374:4 | **acknowledge** | **added** 90:2,6 |
| **9:01** 72:17 73:8 | **accessed** 87:15 | 32:21 | **addendum** |
| **9:15** 73:9,15,16 | 216:12 | **act** 18:5,9 23:22 | 170:19 |
| 74:3 | **accommodate** | 24:8 25:13,18 | **addition** 10:23 |
| **9:38** 65:5 | 298:18 | 186:16 190:15 | 32:10 94:9 |
| **9:41** 66:20 | **accommodatio...** | 200:9,15,19 | 380:24 413:18 |
| **9:56** 2:3,11 | 18:4 | 225:4 237:4 | **additional** 129:8 |
| **a** | **accomplished** | 245:5 346:10 | 211:9,21 212:9 |
| | 311:19 313:7 | 365:7 367:22,25 | 213:9 312:13 |
| **a.m.** 2:3,11 65:5 | **account** 121:12 | 376:5 389:6 | 353:15 359:22 |
| 66:20 74:4 | 206:9 221:12 | 414:3 | 412:16 413:2 |
| **a2** 185:18 | 256:23 | **acted** 245:2 | **address** 61:9,17 |
| **ability** 187:3,6 | **accounted** | **acting** 219:6 | 61:19 62:22 |
| 304:8 | 133:25 | 225:3 274:21 | 80:3 121:16,17 |
| **able** 11:21 237:8 | **accuracy** 165:12 | 332:7 | 361:2 373:15,18 |
| 252:22 281:17 | **accurate** 33:2,3 | **action** 15:5,19 | **aden** 3:9 6:7,9 |
| **abnormal** | 71:10 72:5 | 19:2 23:7 24:7 | 7:3,12,25 76:17 |
| 291:25 | 74:13,25 81:14 | 24:12,14 | 76:22 77:4 |
| **absence** 274:19 | 86:21 141:6 | **actions** 22:9 | 78:11 90:9,20 |
| **absent** 20:3 | 155:19 165:7 | **active** 87:4 170:8 | 91:6 103:25 |
| 159:11 | 212:18 213:11 | **actual** 198:5 | 104:4,9 131:23 |
| **absolute** 54:16 | 231:25 346:15 | 259:18 272:22 | 138:16 170:22 |
| 151:9 376:7 | 347:21 350:25 | **ad** 319:21 321:6 | 172:7 206:14 |
| **absorbed** 295:22 | 351:13,25 352:4 | 321:22 322:5 | 246:6,11 251:5,8 |
| **accept** 238:4 | 352:16 353:21 | **adair** 306:13 | 254:2,23 269:18 |
| 400:12 | 372:25 427:20 | **adam** 61:2 79:4 | 283:6 297:20 |
| **acceptable** 84:16 | **accurately** 34:24 | 82:5 96:22 | 340:4,8 341:4 |
| 176:21 348:5 | 211:15 275:2 | 119:14,21 | 379:9,17,25 |
| **accepted** 133:6 | **accusation** | 120:25 121:3 | 382:25 384:5,11 |
| 134:25 135:10 | 204:23 | 126:7,13 134:20 | 386:7 387:2,10 |
| 138:11 401:17 | **accusations** | 138:3,9 294:2 | 389:4,18 391:4 |
| 402:3,9 415:7 | 17:13 247:17 | 316:18,20 317:5 | 400:5 403:15 |
| **accepting** 400:19 | **accused** 205:8 | 391:5 404:23 | 408:20 411:20 |
| **access** 142:12 | 207:17,18,18 | 414:18 422:18 | 411:22 418:10 |
| 216:14 240:5 | 303:18 | 422:22 | 419:20 422:5 |
| 253:16 255:9,17 | **achieved** 348:20 | **add** 45:22 127:9 | 424:12 |
| 291:14 317:23 | **achieves** 365:13 | 382:3 | **adhered** 367:21 |
| 318:10 373:22 | | | |

**adheres** 347:15
365:6
**adjusting** 129:4
**administrative**
44:25
**adopt** 86:16
**adopted** 89:15
102:25 132:6
172:15 173:10
175:19 176:19
183:12 213:5
276:7 278:8,15
278:21,23 280:2
280:8 281:20
288:22 289:20
333:4 336:17
361:4 412:15
**advance** 245:17
**advanced** 206:17
207:10 245:14
**advancing** 155:8
257:22 333:10
**advantage** 284:4
**adverse** 110:12
110:15
**advice** 32:16
33:11,14 48:11
48:17,19,23 49:4
49:19 155:14
287:24 333:9,17
393:23 394:8,16
395:14 397:3,11
417:25
**advise** 146:15,17
146:21 218:23
**advised** 287:23
**advisement**
111:19,21

**advising** 49:7,11
**advisors** 224:23
**advocate** 330:9
**affiliated** 25:9
75:6 305:25
**affiliation**
240:22
**affirmative**
131:2
**affirmatively**
27:18,23
**african** 241:5
296:7,14 302:11
**aftermath**
118:21
**afterward** 90:6
**age** 247:23 298:4
301:13 303:3
304:5 344:21
385:8
**agents** 224:23
**ago** 19:9 122:9
195:16 238:2
247:5 277:23
**agree** 26:9 28:9
31:18 36:12,15
36:18 174:3
178:7 209:9,14
209:19,25 224:2
226:23 232:5
245:22 252:4
258:17 279:13
285:17,21
305:22 313:8,10
313:13 330:21
344:9 348:16
349:23,25 350:5
350:6 359:25

363:4 364:24
376:9,14,20
377:12 380:13
412:8
**agreed** 213:3
223:18 261:20
**agreeing** 246:15
**agreement**
167:12 170:19
185:3,4,8,11
218:4 219:21,22
220:5 262:17
406:18,18,19
407:3,3,4
**ahead** 6:18 7:6
89:2 162:10
202:14 217:20
226:5 283:9
379:24
**aiken** 110:11
**akin** 140:25
141:5
**al** 355:13 370:10
425:19 426:7
**alec** 142:5
**alec's** 143:18
**alexander** 1:10
4:5
**allegation** 13:8
**allegations**
31:25
**allege** 30:20
**allendale** 19:8
19:10,10
**alliance** 404:25
405:11 408:18
**alliance.law**
407:15

**allocating**
349:24
**allow** 127:13
**allowed** 80:10
317:14 419:5
**alongside** 312:15
314:3 359:8
**aloud** 133:14
252:2 276:10
**alternative**
20:15 321:23
324:7
**amathias** 3:23
**ambiguous**
377:20
**amend** 286:23
**amended** 31:12
31:19 32:2,5,25
199:16 213:4
393:2
**amendment** 23:6
133:18,20
139:16,25 150:9
187:14 329:9
330:22 332:13
332:20,25 333:2
333:17 334:7,10
334:16,25
335:14 336:11
336:14 342:13
342:17,22 344:6
344:10,23 345:4
346:7,11,22
347:3,6,15 348:8
348:19,20,25
350:15,19 351:5
351:18 352:2,4
354:19 356:10

356:12 357:17
357:18,22
358:10 360:3,16
360:19 361:2,11
361:12 363:10
364:13 365:2
366:4 368:4
369:14 370:3
371:6 381:15
386:9,12 392:21
399:6 416:10
425:16
**amendment's**
347:7
**amendments**
186:19 355:25
372:20 380:25
381:5,13,24
382:9,18,21
**america** 405:2
405:11
**american** 30:15
142:4,9 296:7,14
302:11
**americans** 241:5
**amount** 162:15
169:16 170:15
389:5 391:5
**analyses** 144:18
260:7 262:7
264:9 328:19
344:22
**analysis** 160:11
160:12,13 164:2
193:10 207:21
207:22 208:13
224:6 232:24
244:3,5,9,17

245:16 246:16
247:7,15 249:14
249:22 252:14
252:23 253:4,6,9
253:14,21 258:8
260:3,8 261:7,10
262:15 263:8
265:10 267:5,10
267:13 274:19
275:6 276:7
278:19 299:4,8
299:14,15,23
300:6,12,20
301:5 304:11
307:2 324:20
329:6,16 344:5,9
344:13 347:2
352:14 353:11
354:18 358:3
361:7,8 362:24
363:7 364:11,20
364:22,25
365:19 366:7
368:6,9 372:7
378:24 387:8
408:21,25
410:15,19
425:15
**analyze** 124:11
**analyzing**
238:14
**andrew** 3:19
7:22 79:4 90:17
**andy** 45:10,16
45:24 61:8,18
65:8 66:5 96:23
104:22 106:14
106:16 118:7,17

118:23 119:15
120:20 121:2
128:21 137:19
138:5 149:6
153:11 154:24
168:4 169:6
201:11 256:7
355:5,12 362:13
364:8,15 369:19
370:9 375:18
414:25 415:12
425:18 426:5,7
**anecdotal**
304:16
**animating** 16:5
**answer** 9:20
10:14 11:5,11,23
34:23 81:7
86:20 89:2
104:12 163:4
164:17 169:23
191:6 192:22
193:18 204:13
205:20 208:7
218:7 219:18
232:11,25
283:24
**answers** 290:16
302:22
**anticipated**
158:19
**anticipation**
274:3 395:7
**anybody** 45:13
45:14 56:7
82:17 85:21
120:22 129:18
130:22 131:5

147:13 153:13
191:17 224:16
249:2 293:15
323:7 338:17
359:24 395:22
395:24 401:9
402:24
**anybody's**
318:13
**anymore** 21:5
23:13
**anyway** 26:6
226:3 348:12
**ap** 94:22
**apart** 73:5
**apologize** 310:21
**apparently**
375:18 393:17
**appear** 135:8
229:22 252:8
253:19 359:10
362:16
**appearances** 3:2
4:2 5:2
**appearing** 378:4
**appears** 113:18
114:5,15 364:23
364:24 365:8
**apples** 339:14
**applied** 375:23
377:10,14,16
**apply** 30:8,10,12
**appointed** 98:4
**appreciate**
204:22 246:8
398:19
**appreciated**
283:15

**appropriate**
85:10 162:20,22
211:13 212:24
427:7
**appropriateness**
155:24 163:6
**approximate**
98:17
**approximately**
2:11 168:22
170:5 214:7
**area** 336:24
348:21
**areas** 236:23
329:17,19
**argue** 273:22
**arguing** 249:2
**argument**
352:24
**arguments**
148:22
**arisen** 419:16
**arlington** 16:22
198:24
**arranged** 359:19
**arrangement**
266:25
**arrangements**
184:24
**articulates** 270:3
**artificial** 247:13
**aside** 124:6
**asked** 35:10
41:10 50:11
84:3 94:23
118:2,8 148:12
151:22 152:7,22
152:23,24

153:14 155:12
161:9 164:6,23
165:5,15 204:17
225:15,17
227:23,24
228:11 244:15
244:23 253:3,4,5
261:10 278:12
279:4 283:10
288:16 317:16
318:5 345:21
394:19 411:23
413:5 415:14,22
418:18
**asking** 28:2 29:9
29:13 36:2
37:21,22 66:19
86:3 117:7,14
125:13 138:16
152:18 192:18
193:16 208:16
219:15 228:5
232:9 234:10
274:8 317:2,6
354:17 357:25
**asks** 224:3,9
405:15
**aspect** 227:5
**assembly** 186:11
224:12,14
244:22 322:16
389:10 404:3,6
404:10,15
405:19,22 406:6
406:11,22 407:7
**asserted** 178:22
246:23 389:11

**asserting** 158:13
**assess** 248:5
252:23 342:17
346:14 347:20
349:17 350:3,22
351:24 352:13
353:20 356:15
356:21 394:23
**assesses** 350:14
**assessing** 161:12
**assessment**
182:24 220:14
227:10,12
**assessments**
350:8
**assist** 333:6
**assistant** 44:25
46:19
**assisted** 263:10
**associate** 33:18
34:4
**associated** 49:24
71:19 89:24
96:19 103:10,20
121:23
**assume** 10:15
47:19 77:12
92:11 175:15
190:2 415:8
**assumed** 312:22
**assuming** 298:3
**attached** 121:24
131:9 230:12
265:17,18
364:20 375:4
420:12 426:14
427:13

**attaches** 264:22
327:9 409:16
**attaching** 271:20
**attachment**
126:25 229:2,9
272:9 355:7
364:12 370:2,5
370:10 374:24
375:7,12 407:17
407:23 408:4
424:6 426:8,11
**attachments**
172:18,24
222:12 254:20
423:16
**attempt** 21:23
**attempted** 169:4
296:21 298:7
**attend** 48:2
107:20 108:5
215:23
**attendance**
251:21
**attended** 217:5
259:13
**attending** 258:19
**attention** 87:6
172:9 173:16
228:21 250:20
251:24 343:12
356:19 384:3
387:16,18
401:14 409:21
**attorney** 10:21
44:17 48:7
52:22 55:19
85:11 164:15
191:4 204:11

208:5 219:6,14
427:17
**attorneys** 3:5,17
4:5,18 5:5 32:11
32:17 33:12,15
34:5 41:25 42:5
46:9 55:24
**attributes**
165:25
**audibly** 10:4
**audio** 319:6
**august** 1:23 2:2
2:10 214:9
421:20
**auspices** 277:24
**author** 377:19
**automatically**
26:21 208:12
**available** 74:9
105:24 133:9
216:19 253:16
263:12,12
266:15 285:9
350:10 374:14
395:21 396:2
401:20 407:24
408:14
**avenue** 5:8
**average** 268:15
**avoid** 17:12
185:23 209:5
**avoidance**
187:11 210:21
276:15 312:17
376:5
**avoiding** 231:22
**avoids** 365:9
368:7

**aware** 22:10,17
22:18,23 23:3,23
26:10,15,22
27:24 29:18,20
51:9 52:6 59:25
60:3,5,9 69:23
70:3,4 76:6
77:15,19 84:23
84:24 85:5,8,14
87:18 108:7
119:8 121:22
124:21 135:20
142:9 143:7,18
178:2,5 182:7
183:15 191:25
194:10,11 195:2
199:25 206:12
207:2 214:5
216:4,8 219:19
230:21 233:25
234:7 239:13
241:12 242:5
243:6,25 244:4,8
244:14,20
247:22 286:13
295:5 297:9
303:2,7 317:23
319:20 321:4,10
321:21 324:6,11
325:9,12 326:16
328:4,5 329:15
349:17 356:15
357:11 362:19
366:23 379:24
379:25 380:24
381:19,22
390:17

**awareness** 17:11
25:19,25 26:20
27:9 28:6,10,15
28:16,19,22,23
28:25 29:13
30:5 31:3 151:2
301:16 379:16

**b**

**b** 133:4 186:5
280:13,13 315:9
323:16 395:7
401:15,16
**b.zip** 81:14,17
104:21
**b.zip.** 81:12
**back** 28:20 38:3
48:12 72:19,23
73:11,17 76:22
77:4 100:15
101:5 114:12
115:14 139:14
166:19 169:17
183:5 199:5
227:9 231:8
246:9 261:25
267:16 311:15
313:2 316:2,22
345:15,24 384:3
385:21
**backdrop**
174:21 175:2
314:14
**background**
212:7 313:17
**backup** 304:11
**bail** 23:20 414:2

**bake** 232:19
**baker** 43:18,19
44:10 46:2
**band** 34:12
393:19
**based** 17:22 78:3
88:11 96:4
118:17 138:7
168:7 170:13
174:2 178:6
181:8 187:12
201:20,21 202:3
205:14,24
206:22 232:3
257:13 277:25
291:20 298:5
304:19 306:21
324:9,16,21
329:12 373:20
379:11 410:25
411:8 418:7
419:6
**baseline** 212:5
**basic** 9:12 10:17
**basically** 124:3
160:8 301:3
308:15 331:7
361:16 371:5
**basis** 14:13
40:13 122:13
123:17 124:10
124:12 135:8
154:25 168:8
169:5,7 233:23
235:10 243:18
304:3 351:7,11
411:4,12 413:25

**bates** 78:15,20
90:21 91:14
103:12,15
119:16,22 126:9
126:14 132:7,14
145:21,25
172:18,24 180:2
180:11 229:2,11
250:23 251:14
254:20,24
256:12 257:3
259:9 265:5
271:21 272:3
310:5,10,21,23
327:12,16 355:9
355:13 362:9
369:17 374:25
375:7 388:4
422:13,14,16,19
422:23 423:8,11
423:16,21 424:6
424:10,14,18,20
424:24 425:5,9
425:19,22
426:11
**battle** 228:7
**bear** 24:9 354:4
385:25
**beaufort** 101:20
111:3,9,10,12
114:14 270:4
295:18 336:3
338:3,8 360:6,9
390:19
**began** 34:24
44:2 343:11
**beginning** 7:7
37:4 41:25

180:21 276:10
277:4 294:11
318:16,22 341:3
349:12
**beginnings**
339:2
**begins** 133:15
252:3,10 265:16
273:8,9 277:10
362:5
**behalf** 1:6 7:11
18:20 34:8
109:19 122:11
145:14 164:23
167:22 190:25
218:16 219:6
225:4 271:15
292:7 342:12
387:2
**behavior** 243:8
**beholder** 339:24
**belgium** 95:10
**believe** 7:25 8:5
8:8 16:20 17:6
18:3 19:8 28:5
31:14 34:9,10,15
41:10,20 45:13
54:9 56:8 61:4
61:15 65:12,15
65:20 70:16
75:9,17 78:17
79:15,18 80:5
81:25 82:17
87:21,23 100:6
101:7 105:18
114:17,19
117:23 118:4,18
120:11,16,20

123:21 137:3
144:7 150:13
151:7,17 152:3
152:11 172:21
185:7 188:10
189:4 193:3
195:13,15
199:15,22
202:17 215:14
215:16 220:8,10
220:12 223:12
225:10 240:10
244:13 246:14
246:20 249:4
250:11 253:7,9
259:13 263:20
265:13 266:16
266:17,20
274:20 276:11
276:18 277:20
291:5,17 292:16
294:25 296:2
297:3 299:21
300:3 301:25
305:18 307:19
308:7 309:16
313:12 319:4
322:8 323:6
325:18 326:8,11
335:4 337:4
341:18 345:13
346:19 351:2
352:18 353:13
357:2 363:12
371:9 373:17
384:16 385:3
388:18 389:17
390:20 392:19

392:22 393:7
395:19 396:21
402:22,24
407:22 408:2
411:3,11
**believes** 256:20
257:22
**bell** 55:6
**belt** 296:4
**benchmark**
102:22,23 115:5
150:19 160:16
162:17 197:20
198:13,16 248:2
267:25 276:24
278:7,15 289:10
329:7 350:20
351:4 357:7
361:11
**bensen** 67:17
69:23,25 70:4,9
239:20 293:19
**benson** 39:25
41:3,8 42:18
44:9 45:25
172:13,23
228:25 229:7,23
230:5 409:15
423:15 424:5
**berkeley** 283:18
328:10 335:5,9
335:11 336:5
338:2
**bernstein** 326:7
326:14,19
**best** 10:12 24:23
73:7 140:6
287:5

**better** 96:5
140:11 179:11
191:19 198:11
213:22 308:15
**beyond** 143:23
144:21 331:3
333:12
**biden** 363:3,21
392:12
**big** 61:7 338:21
**biggest** 328:15
328:16
**bill** 39:19 167:21
167:23 168:2,4,7
169:11,13
170:15 286:15
286:18,23
367:11 369:8
382:14
**billed** 168:23
170:6
**bills** 167:9 169:5
169:15 286:24
**binding** 177:16
**bit** 69:6 110:14
170:23 195:13
214:3 297:11
322:11 339:10
377:20
**bizarre** 348:14
**black** 55:11 93:8
93:13,20 94:4,7
94:12,19,19,21
94:22 96:9,10
97:6,11,18,24
98:11,16,20
113:15,21,22
114:2,8 187:17

187:22 188:3,7
247:23 248:12
248:16,19
249:18 261:18
263:24 296:4,22
297:4,7,15,16,21
298:4,9 300:13
300:16 301:12
301:16,19 303:3
304:5,8,18 305:3
305:18,24
306:18,19 307:4
315:15 326:4
**blank** 309:20
**blatt** 323:16,18
**blinders** 196:18
**bloc** 21:8,12,16
69:14 74:13,25
209:15,16 248:8
252:13,23
253:13,21
256:21 257:17
257:23 258:9,14
260:3,6 263:8,11
264:8 265:2
267:5,12 387:9
387:14
**blood** 171:8
421:14
**board** 121:20
375:24
**boat** 57:2
**body** 18:17
**bore** 325:6
**born** 94:24 95:2
95:6
**borne** 306:5

**boroughs** 306:13
**bother** 125:6
**bottom** 338:7
387:19 403:23
**bound** 315:3
**boundaries**
156:21 158:25
197:15,16
234:14,17
238:23,24
300:24 377:6
412:22
**box** 4:13 5:16
255:9
**brad** 51:20
**break** 11:14,21
69:13 76:16
246:5,14 284:17
284:19,21
292:14 383:21
**breakdown**
113:13 329:10
**breeden** 43:3,5
44:9 45:25
82:16 264:16
293:10 327:6,15
327:25 332:18
369:18 370:9,20
371:19 407:14
425:9 426:6
**brian** 53:3
**briefly** 18:16
100:13 293:4
334:13
**bright** 51:21
315:23 319:15
369:10 371:10
390:25 415:14

**bring** 12:10 28:7
30:21,24 100:9
290:10 311:14
312:25
**broad** 24:21
31:6 147:19
**brought** 14:5,13
16:15 17:4,19,21
18:2,9 19:3,7
24:6,11 26:19
27:23 28:4
201:9 276:2
389:7 395:11
402:9
**brunell** 145:11
**bucket** 44:9
**build** 335:3
**building** 323:16
323:17,19,19,20
323:21,22
**bulk** 160:9
337:25
**bullet** 372:18
**bureau** 75:18
**burr** 4:19 7:20
**burr.com** 4:24
**business** 64:9
**bvap** 99:9
196:11,19,22
197:2,4,13,18,22
198:3 248:7,20
248:24 249:12
250:10 297:25
303:23

| c |
| --- |
| **c** 1:10 2:6 3:9 4:5 |
| 6:2,22 172:4 |

209:3 234:12
280:13,14
393:14
**calculus** 86:24
89:9
**calendar** 47:13
47:15,21 67:7,11
222:12
**call** 47:4 65:7
67:11,14 68:2
72:8,11,19,21
73:11 77:9
84:21 100:20
109:14 136:11
197:8 384:3
387:15,17
409:20
**called** 6:3 18:4
56:17 66:16,19
72:12,15 73:17
80:8 94:12
231:14 287:8
**calling** 66:10,14
**calls** 42:6,25
45:21 46:8 47:6
48:3,8 58:8,10
61:21 67:9 76:3
139:5 191:4
208:4 403:24
404:22 406:16
**camped** 106:7
**campsen** 51:23
51:23 52:10
150:9 172:13,24
173:9 327:6,15
328:2,7,20 330:6
330:11 331:5,6
331:11,18

332:13,18
364:12 371:7
378:17,20 379:6
379:7 380:7,10
409:15 423:15
425:9
**campsen's** 52:21
53:2
**candidate**
270:21 299:11
300:9,14,15,22
301:6 304:9,10
335:24
**candidates** 21:24
22:5 263:25
306:2 307:5
**canvas** 212:8
**cap** 170:14
**capable** 23:2
**capacities** 1:19
**capacity** 1:11,11
1:13,14,15,17
4:6,8
**captured** 166:10
**career** 299:16
**careful** 240:4
**carefully** 427:5
**carlisle** 4:11
**carlson** 161:2
**carolina** 1:2,4,17
1:20 3:6,21 4:22
5:17 6:16 13:6
18:3 33:4 38:13
48:25 49:13
59:23 60:6 63:3
69:7 78:2,15,21
90:21 91:14,18
92:3 94:24

95:20,23,25 96:5
96:10,14 97:20
97:25 103:12,15
119:17,22
123:19 126:10
126:14 129:22
132:3,7,12,14
141:12,18
143:10,19
145:22,25
146:22 147:11
158:11 160:25
163:23 168:13
168:17 172:19
172:25 173:16
179:23 180:3,9
180:11 184:11
187:16 194:21
196:21 211:8
224:11,14 229:3
229:11 231:13
235:7 240:23
241:13,17,20
243:20 249:18
250:4 251:24
254:21,25
256:13,20
257:15,21,24
258:4,10 259:5
259:10,15
264:21,23 265:5
265:15,20 266:9
267:21 271:21
272:4,20 276:16
277:7 279:9
296:5 310:5,10
310:20,21,22,25
327:13,16 329:5

329:18 341:14
355:9,13,23
361:21 362:3,9
375:2,8 388:11
393:21,24 404:3
404:6,10,15
405:19,22 406:5
406:11,21 407:7
407:19 410:23
413:7,11 422:13
422:15,17,20,24
423:6,8,12,17,18
423:21 424:6,15
424:18,21,25
425:6,10,19,23
426:11
**carolina's** 32:23
175:3 193:12
**carolina.senate...**
134:8
**cartographer**
417:17
**carvin** 33:17
34:3,17
**case** 1:6 7:5
16:23 17:5
24:20 47:22
58:20 107:10
151:9 160:24
161:3 182:9
187:15,25 188:5
198:24 199:13
205:11 217:17
234:2,7 237:24
238:6 243:17
297:19 299:19
314:10,10
384:21 388:11

388:17,23 389:2
389:8,12 403:12
408:12 413:11
413:15,18
414:10,11
**cases** 221:6
241:12 388:7,15
388:16,16,20
413:6
**catching** 308:2
**categories** 358:7
**category** 93:13
94:6,12,16,18
96:9,10 209:4
231:14 234:19
234:21 235:3
238:9
**caucus** 60:10
142:24
**caught** 127:15
261:22
**cause** 24:13
124:2
**caused** 197:10
279:19 303:10
**causes** 23:7
**cc'd** 375:3
**cd** 98:14,19,22
98:24 99:2,4,6
99:10,12,18,18
102:6,7,10,11,17
111:4 114:4
149:15 150:10
150:16 151:2,10
152:4 270:4,5,15
270:15 289:8
297:12,13,20,23
298:5,18 303:4

304:2,13,21
310:6,10,22,25
339:17,18,21
341:14 357:6,14
360:5,6,7 380:18
425:6
**cell** 63:24,25
64:3,4,10,12
**census** 36:5,13
36:19 39:5 69:3
69:11 75:17
94:7,13 143:21
146:25 147:5
198:14 249:20
249:20 250:12
266:13 297:17
297:18 372:3
**center** 122:2
**central** 189:10
**certain** 6:14 13:5
25:23 30:10
90:13 198:5
224:8 250:13,16
266:8 294:9
301:13 326:6
369:19 370:22
374:9
**certainly** 6:21
25:21 28:3
29:22 39:23
87:2 129:11
139:16 178:23
208:25 214:20
224:20 248:17
282:11 283:13
283:21 284:3
292:12 294:20
297:19 303:6,21

304:14 335:24
337:10,24
338:10 339:6
343:11 349:21
356:22 360:10
361:7 399:9
**certified** 2:14
**certify** 420:9
421:8,13
**cetera** 357:21
**chain** 264:16
265:5 327:21
424:20
**chair** 151:4,7,15
**chairman** 1:12
1:14,15 4:8
146:18 147:10
166:23 191:19
192:2 394:2
**challenge** 6:14
24:20 31:20
203:19 247:4
274:3 275:10,13
306:12
**challenged** 13:11
13:16
**challenges** 14:4
201:5
**challenging** 13:4
242:21
**chance** 91:17
316:14
**change** 116:3
124:3 148:11
149:15 150:3,25
152:4 195:21
196:24 197:2
198:20 213:19

248:7 283:14
284:6,7 291:8
307:7,8 311:10
390:23 428:7,8
428:10,11,13,14
428:16,17,19,20
428:22,23
**changed** 8:23
32:13 77:20,23
102:20,21 103:4
115:4 160:15
289:9 291:9
303:15
**changes** 18:23
205:19,25
250:15 268:9,19
284:9 320:16
427:12 428:4
**characteristics**
368:13
**characterization**
416:13
**characterize**
138:17
**characterized**
279:24 416:9
**charles** 1:23 2:8
6:21 145:24
224:22 228:25
420:6,15 422:4
423:10 424:5
**charleston**
101:23,24 102:2
114:20,21 242:2
242:7,8 327:9
328:9,14 336:4,6
337:5 338:23,24
339:4,13,16

348:3,10,11
359:14 360:5,8
377:24 378:2,13
378:22,23 379:5
379:7 380:4,11
380:18,21
384:17,19,22
409:25 411:24
412:5,10,25
**charleston's**
242:21
**chart** 93:10
230:6,13,18
367:9,18 368:6
368:16,21 369:7
369:11 370:13
**charts** 230:22
**cheat** 309:3
369:23 370:24
**check** 155:6
284:15 313:2
**checked** 165:12
**checking** 90:12
**chip** 51:23 327:6
327:15 425:9
**choice** 21:24
22:6 136:18
179:11 187:6,8
299:11 300:14
304:9,10
**choices** 276:24
348:14 368:11
**chris** 1:13 53:8
**christmas** 57:5
**circuit** 20:17
241:15
**circumstances**
20:4,24 21:2

25:24 163:10
189:22 224:8
292:21
**cited** 243:16
388:7
**cities** 161:22
234:15 280:10
281:14 282:5
**citizenship** 95:14
**city** 164:4
295:14,17,24
296:15 336:22
337:7 338:5,8
377:6 388:10
389:18,22 390:2
390:3,17,21
391:2 412:2,12
**civil** 2:9
**claim** 13:19,22
13:23 14:7,10,13
14:18,20,22 15:5
15:14,16,23,25
16:13,17 17:18
17:25 18:9,20
19:7 26:18,19
27:19 28:18,24
29:14 31:2
201:24 202:5,9
202:17 203:10
206:13 247:3,19
247:20 274:21
275:16 318:5
332:11 389:8
413:19,21
**claims** 17:16
18:19 203:23
246:22 395:10
414:12

**clarified** 374:23
**clarify** 103:23,25
104:6 184:22
**clarity** 398:3
**clark** 67:13,16
67:17,25 68:7
69:11,23,24 70:3
70:21 72:5,10
239:20 293:19
363:24
**clark's** 71:3,12
71:22
**clear** 10:9 60:12
105:16 116:10
137:11 166:7
225:22 273:11
288:4 293:18
324:14 419:6
**clearly** 10:5
346:8
**clerk** 168:5
230:5
**clerk's** 70:17
**clerks** 224:25
**client** 55:19,23
91:8 164:15
191:4 204:11
208:5 219:7,8,14
219:14
**clients** 18:6
**clifford** 1:18
**close** 87:6
164:13 267:25
386:2
**closely** 347:15
348:25
**clr** 421:23

**clyburn** 84:4,12
97:16 98:10
109:20 123:13
139:21 248:22
**clyburn's** 111:20
**cnygord** 5:19
**cohesive** 21:23
27:5
**cole** 53:3,4,5
**collaborative**
262:16
**collected** 47:21
267:4
**collectively** 86:4
86:10 88:14
89:12
**colleton** 235:8
241:18 243:16
299:18
**collins** 388:10,19
388:22,22
**colloquial** 182:4
**columbia** 1:3
4:14,22 5:17
12:6 95:19,22
**column** 93:11
**combination**
54:7 166:25
167:2
**come** 54:14
61:25 62:5
76:22 82:3
112:16 130:24
139:2,22 148:13
151:13 246:9
285:3,7 292:12
294:23 315:20
322:24 337:18

**[comes - compiled]**                                                                 Page 15

comes   165:21
  314:25
coming   108:16
  290:21
commencing
  2:11
comment   295:8
  401:9
commenting
  299:24
comments   12:22
  12:22 249:5
  372:20,23 373:9
  373:10 374:6,7
  374:14
commission   1:18
  1:20 240:19
  242:10
commission's
  263:14
committed   149:2
  350:9
committee   1:12
  1:15 4:9 22:5
  52:9 75:16
  118:7 132:4,5,13
  132:13 145:6
  151:5 224:10,13
  250:22 251:14
  265:21 273:5
  276:20 278:5,10
  278:13,19,24,24
  319:22 321:6,22
  330:3 343:4,6
  355:24 364:4
  369:5 375:21,22
  382:13 394:2,3
  404:2,5,9,14

405:18,21 406:4
  406:10,20 407:6
  423:7,8 424:10
committee's
  347:17
common   139:18
  156:21 157:3
  175:18 219:20
  219:21 220:5
communicate
  39:9 40:4 42:4
  42:11 43:7,15,21
  53:14 56:13
  79:22 100:16,22
  100:24 111:22
  111:25 143:3
  149:9 175:14
  224:16 236:25
  237:9 309:22
communicated
  38:18 40:12
  42:23 44:4
  45:16,20 55:16
  56:4 84:10,18,20
  101:5 108:24
  112:3,14 149:5
  150:23 166:23
  229:25
communicating
  35:18 36:24
  41:2,24 56:20
communication
  40:15 53:24
  55:7 78:12,19
  127:18 309:11
  322:11 422:11
communications
  48:14 118:6

128:24 134:21
  164:9 191:5
  208:5,6,9,11
  219:13 222:4,7
  222:15 223:4
  224:12 228:12
  404:4,13 405:20
  406:9
communities
  156:12,14 157:6
  157:12,20
  158:10 163:19
  209:20,22
  213:10,15,19
  229:10 230:8,23
  231:11 234:20
  235:18,23,25
  236:20 237:7,12
  237:16 280:21
  315:16 349:2,9
  349:13,18
  365:20 377:4
community
  21:20,22 22:3
  27:3,5,8 30:20
  56:4 158:13,15
  180:2 195:18
  236:8 299:10
  337:4,25 338:12
  389:22 390:3
community's
  187:2
compact   21:20
  27:3 236:3
compactness
  235:4,5,9,12,14
  236:4,9,17 237:5
  237:12,17,19

238:6 357:20
  377:8
company   68:15
comparable
  337:15,17
compare   115:7
  386:11
compared   15:15
  15:24 71:13
  160:16 247:25
  348:19 350:19
  351:5 352:9
  356:12 361:10
  363:3 412:11
compares   356:9
  357:16
comparing
  324:20 354:18
comparison
  327:10 339:12
  351:4 358:9
  367:8 369:2
  370:5
comparisons
  356:16
compel   19:3
compelling
  189:18,21,24
  190:8,11,17
  204:5 206:6
competitive
  335:21
compilation
  265:9
compile   230:6
  263:6
compiled   49:4
  253:20 261:19

**[compiled - congressional]**                                                Page 16

266:20,22
371:19
complaint   31:13
31:15,19 32:2,3
32:6,25
complaints
31:10 32:4
complete   11:21
11:22 104:11
133:20,22
156:24 240:4
completed
135:25 286:9
compliance   26:8
26:9,14,17 27:16
123:2 189:23,25
200:8,17 201:19
201:23 202:8,19
202:22 203:5,8
206:19 232:13
232:20 246:22
269:11,21,22
275:19 311:16
312:7 313:2,21
346:18
complied   178:22
200:14 203:11
228:2,10 314:19
360:11 395:4
complies   166:4
179:9 212:3
346:9 356:10
358:11 360:3
365:2
comply   186:15
190:3 206:11
339:17 347:10
412:25

complying
375:25 376:9,11
376:14,16,21,24
component   20:7
components
237:8 324:24
328:17
composition
192:20 195:21
303:16 306:17
computer
395:24
conceived   139:4
concepts   163:19
concern   29:8
302:7,13,18,20
303:10,13 315:7
319:16 326:17
339:20 346:24
353:9
concerned   71:3
80:22 118:16
158:11
concerning
229:10 406:17
407:2
concerns   86:17
116:2 197:10
232:17 303:22
315:14,20 326:3
326:9,13 334:22
367:25
conclude   324:16
411:4,12
concluded   41:5
306:21 325:3
conclusion
268:25 305:7,9

338:14 347:4
367:20
conclusions
342:19
conditions   274:5
conduct   245:25
253:13 261:13
394:20 410:18
conducted   244:3
244:5,10,17
245:17 299:23
conducting
247:6 410:14
conference   1:4
3:6
conferences
47:17 142:14
confident   181:24
confidential
191:7
configuration
13:4 338:25
377:23 378:21
379:5
confirm   155:9
155:17,24 165:6
267:20 379:20
confirmation
414:24 415:4
confirmed   351:3
confused   34:14
37:24
confusing   342:4
382:8
congress   23:16
41:8,13,16 98:5
98:9 144:25
186:11 199:17

244:7,11
congressional
6:15 13:5 31:21
32:24 33:6,10
34:7,22 35:5,11
35:11,15,22
37:13,19 38:14
38:20 39:4,10
40:5,23 41:4,6
42:20 43:8,23
45:8 48:24 50:2
50:7,12 51:8,11
51:15,19 53:17
54:2,15,18 55:18
56:21 58:6
59:19,23 60:7
64:21,23 68:12
70:12 80:18
83:18,20,22
84:11 85:2
92:16,24 97:4,19
97:24 106:24
107:9,15,22
108:2,9,14 109:7
109:9,23 112:22
114:3 115:3
123:8,23 127:22
128:15,25
129:10,22
130:10,11,12,14
130:16,20
135:18 136:3,13
139:7 140:8
141:4 143:4,15
144:2 145:15
148:3 151:19
157:5 170:7
177:18 182:14

**[congressional - constitutions]**                                          Page 17

184:19 185:18
185:22 190:23
192:4 193:7,12
203:16 219:24
223:11 225:12
226:10 227:7,13
227:20 230:2
239:24 240:2,11
243:8 244:18
245:18 246:25
247:24 254:6,19
267:24 268:3
270:19,20 271:5
285:4,8 286:11
286:20 287:9
291:21 292:5,9
292:15 294:12
294:18 296:20
307:14 311:7,15
312:25 317:16
330:16 339:6
357:24 358:2
359:2,16,20
364:5 367:4
394:9 397:4
399:19 409:3
411:5,10,13
416:18,24
417:13
**congressman**
98:7 109:19,22
110:4,25 111:20
111:24 123:13
248:21 308:8,9
**congressmen**
122:11 136:20
141:3

**connecting**
159:12 348:12
**connection**  81:2
146:23 158:24
**connectivity**
338:13
**conscious**  25:13
**consensus**  83:15
83:17
**conservative**
142:12
**consider**  25:12
25:17 51:11,15
75:22 156:11
157:6,11 159:14
174:7 177:15
188:14 190:4,22
191:11 192:3,12
193:17 194:6
195:4 196:5
204:2 217:23
218:19 239:12
240:17 243:5
257:16 263:7
285:3,8 291:6
401:11
**consideration**
53:16 70:11
92:15 123:20
130:15 182:14
195:14 196:2
200:10 203:15
211:12 212:16
212:18 223:10
225:12 226:9
227:6,12,19
232:6 236:18
256:22 273:4

290:5 312:13
335:20 377:9,18
378:14 400:14
**considerations**
174:18,25 175:8
205:17 211:10
211:21 212:10
213:9 234:22
274:24 275:22
279:15 281:9,13
358:18,25 359:6
412:17
**considered**
49:25 138:10
174:21 191:10
194:19 206:23
207:24 210:5
212:22 219:16
220:24 221:5
225:18 231:24
238:13 239:3,11
239:24 240:11
243:7 244:19
296:4 330:17
356:22 367:3
412:18
**considering**
51:18 192:17
209:15,20
286:20 296:19
**considers**  288:22
**consistency**
181:7 231:15
232:11 268:12
269:4 377:5
**consistency's**
93:22

**consistent**  147:3
280:6,16 281:19
**consistently**  22:3
27:7
**constant**  210:9
**constituencies**
160:22 234:8
268:18 311:17
312:12 344:12
**constituency**
86:15 159:20,25
161:4,10,11
163:9 233:3,11
234:3 269:9,20
279:24 283:2
314:4 372:7
378:15
**constituent**
231:14 232:10
268:12 269:4
377:4
**constituents**
122:19 231:22
236:24
**constitute**
252:17
**constitutes**
252:16
**constitution**
186:20 273:15
274:15,23
376:12,22
**constitutional**
22:15,19 23:12
275:10 414:4
**constitutions**
376:2,10

**[consult - correlated]**                                                                Page 18

| | | | |
|---|---|---|---|
| consult 218:23 | contiguity | convey 399:17 | 365:23 |
| 225:23 | 158:20 159:3,4 | conveyed 82:9 | corner 91:20 |
| consultant | 210:25 211:24 | 153:10 396:6 | 159:9,11 259:17 |
| 224:25 | 212:4 347:16 | cooperative | 316:23 340:22 |
| consultants | 348:3,20 365:13 | 265:19 | 341:13 |
| 143:25 | 365:13,17 376:6 | coordinating | correct 6:24 |
| consultation | 376:20 | 45:2 | 8:11,14 13:15 |
| 158:2 | contiguous | copeland 34:11 | 38:15 79:20 |
| consulted 158:9 | 159:6,16 | 34:16 393:17,18 | 92:20 93:2 |
| 183:21 200:20 | continued 121:3 | copied 229:20 | 104:8,23 124:16 |
| 215:2 223:17 | 418:15 | 327:7 362:14 | 127:12 138:5,12 |
| 225:24 226:4,7 | continues 243:19 | 366:20,22 | 140:19 176:12 |
| consulting 405:2 | 257:23 | copies 12:16 | 176:13 213:2 |
| 405:12 | contours 89:17 | 172:13 369:20 | 226:20 238:16 |
| cont'd 4:2 5:2 | contract 68:10 | copy 12:20 | 249:16 260:12 |
| 172:6 | 167:8 406:19 | copying 264:17 | 267:7 269:25 |
| contact 77:7 | 407:4 | 271:16 362:13 | 276:3,4,21 279:7 |
| 130:23 153:12 | contracted 70:6 | 374:20 409:16 | 313:22 358:21 |
| contacted | contractors | core 135:20 | 362:15 379:17 |
| 109:18 318:25 | 224:25 | 159:19,25 | 392:4 395:23 |
| contemplate | control 195:11 | 160:14,22 161:4 | 396:3,4,24,25 |
| 117:7 | 225:5 | 161:9,10 163:8 | 407:15,16 409:4 |
| contends 273:13 | controversial | 231:22 233:2,10 | 409:5,18 413:3 |
| content 32:14 | 75:23 | 234:2,8 269:4,8 | 417:2 420:10 |
| contents 120:5 | conventions | 269:20 279:23 | corrected 13:14 |
| contested 305:13 | 134:14 | 281:18 283:2 | 151:25 152:10 |
| 307:6,7 | conversation | 311:17 312:11 | 339:8 |
| contests 231:23 | 54:17 61:14 | 344:12 378:15 | correcting 278:5 |
| 266:8 | 62:19 66:18,23 | 381:9 384:25 | 278:14 |
| context 15:3 | 109:21 110:3 | 385:2 386:8,11 | corrections |
| 16:19 17:15 | 260:16,20 261:5 | cores 231:19 | 420:11 427:6,8 |
| 18:12 55:20,24 | 261:8,15 262:22 | 232:18 233:11 | correctly 71:23 |
| 120:10 135:12 | 378:20 | 268:13,18 269:5 | 71:24 302:4 |
| 144:19 150:11 | conversations | 279:12,14,18,23 | 400:15 401:23 |
| 163:13 164:9 | 58:16 128:14 | 280:4,15 281:8 | 405:5,24 406:23 |
| 175:3 183:4 | 129:9 164:14,18 | 281:23 282:12 | correlated |
| 203:7 220:4 | 175:16 288:14 | 282:18 313:4 | 240:23 |
| 302:18,19 | 380:9 | 314:3 350:16,17 | |

correspond
  58:14
corresponded
  77:18
correspondence
  35:4 54:13
  404:22 405:8
corresponding
  34:21,25 35:17
  198:20
council  142:5,10
  242:22
counsel  3:2 4:2
  5:2 7:8 8:5
  10:25 39:17,22
  43:3 45:6 47:25
  53:15 55:10,15
  55:25 158:3
  191:23 223:18
  366:9
counseling  201:7
count  167:7
counties  161:22
  163:9 250:16
  280:10,24
  281:13 282:4,4
  353:19 354:6,11
  412:19,20,24
country  354:2
county  18:21
  19:8,11 101:10
  101:14,24
  110:18 112:9
  114:21,22 161:2
  163:16 164:4
  197:15 234:14
  235:8 241:18
  242:10,14,22

243:16 283:18
295:14,18 296:3
296:6 299:18
326:20,21 328:9
328:10,11,22
335:5 336:25
337:20 338:2,3,7
339:4,13 342:12
351:21 352:3
353:16 354:6
359:14 360:5
361:13 377:6
384:19,22
390:21 410:2,5,8
410:11 412:5,10
412:22 420:4
421:4
county's  353:23
  411:24
couple  9:8 46:12
  58:7,13,17 75:20
  307:20 383:15
  383:20
course  30:17
  52:3 69:7
  146:16 207:14
  256:3 297:6
  314:12 335:17
  419:12
court  1:2 2:14
  9:23 10:24
  161:15 170:25
  237:4,25 241:15
  247:4 273:23
  277:14,19 310:4
  333:24 334:4
  339:3 340:18
  427:21

court's  238:5
courtroom  9:19
courts  162:24
  193:8 194:2
  235:6 241:13
  281:12 306:21
  313:15
cover  229:6
  271:12 272:3,8
  355:4,12 424:23
  425:17
coverage  23:17
  24:3
covered  164:15
covid  127:15,19
  308:3,4
crack  196:16
cracking  187:22
  188:7 315:15
  326:4
cramped  105:20
create  180:17
  215:5 345:20
  371:15
created  216:10
  217:4 265:19
  371:22 375:16
creation  183:7
credibly  274:21
credit  274:12
  331:23,25 332:4
criteria  172:10
  177:16 178:9
  180:23,25 181:4
  181:22 200:9
  211:11 269:2
  280:5,9 288:23
  312:14 313:6,17

314:24 315:8
336:10,12,13,16
336:17 339:18
348:15 356:7
357:15 358:24
359:23 361:15
367:16 375:22
412:15,18,21
413:2
criterias  282:3
criticism  204:20
critique  360:24
  360:25 381:23
critiqued  220:25
crosland  393:13
crunch  318:18
csr  421:23
cues  148:23
  151:16 152:11
cultural  236:6
cunningham
  306:14 308:8,10
current  6:14
  49:7 97:14
  190:12 224:23
  338:24
currently  6:12
cusick  3:10 7:9
  7:10 90:18,24
cut  99:21 114:18
cute  103:7
  341:25
cutting  378:5
cv  1:7
cycle  13:7 17:11
  32:24 33:10
  35:15,20 36:14
  36:20 37:15,17

38:2,9 39:11
40:8 51:9 59:24
60:7 64:6,15
69:20 85:3 94:2
103:2 141:4
143:11,16 144:3
145:2,3 147:4
148:3,10 160:15
175:4 178:4
184:3 185:6
194:22 226:10
227:7,20 239:23
257:18 262:13
298:7 300:4
303:5 393:22
**cycle's** 55:17
**cycles** 110:23
201:13 410:22
**cynthia** 5:14

**d**

**d** 234:13 279:10
393:14 422:2
**d.c.** 5:9 20:17
**daily** 40:13
43:14 44:4
45:18
**dakota** 29:4,7,17
30:16,19
**dale** 56:5,9 57:3
106:21 107:4
108:15,23 126:2
136:12 137:4,5
139:5,12,13
141:15 293:22
385:18
**dalton** 65:5 74:6
109:18 111:21

123:11
**daniel** 327:9
**data** 36:6,13,19
37:4 49:24
59:12,13 67:18
68:15,23 69:3,3
69:6,18,19 70:5
71:9,22 72:3
74:8,13,18,25
131:9,10 142:17
143:9,13 152:15
152:18,20,22
153:19,22,24
154:5,11,21
155:18,25 156:9
164:5 165:12
166:10 169:19
239:8,11,12,15
239:19,22 240:6
240:13,16 243:7
249:24 250:5
252:15,22 253:5
253:11,20 258:4
264:24 265:2,9
266:14 267:3,6
274:19 285:9
286:2 297:21
298:2 304:3,11
327:24 329:22
330:5 350:23
351:7,10 363:23
363:25 372:4
392:16 396:6
**date** 63:8 78:22
91:16 103:17
119:24 126:16
132:16 146:3
173:3 180:13

222:2 229:5
251:16 255:3
259:12 265:7
272:6 287:12
310:12 327:18
329:24 341:2
344:7 355:15
362:11 364:17
370:11 372:24
375:10 427:10
428:25
**dated** 78:14,25
119:15 126:8
168:19 172:17
229:8 254:4,17
264:20 271:16
327:8 355:6
364:9 369:21
374:21
**dates** 319:24
330:18 382:7
**day** 1:18 5:6
8:20,22 32:11
33:12 34:5
35:19 37:2,11,25
38:8,11 40:19
41:25 46:9,22
47:2,18 48:4,8
48:15 50:17,20
50:23 72:18
73:4,18,18 76:13
82:20,24 83:3,5
83:8,11 85:6,7
85:13,13,17,19
86:5,11 87:9,13
87:14 88:16,19
88:23 89:4,7,8
89:10,19,22

101:4 124:19,23
125:3 154:11,15
154:22 155:3,6
155:14,20,23
157:19 158:9
161:20 164:6,10
164:24,25 165:6
166:9 171:6
183:17,19,24
184:3,6,9 185:3
201:16,16,19
215:2 260:13
283:8 287:21
334:8 342:23
357:23 358:15
366:10,12,20
368:20,23 393:5
393:8 394:8,14
394:19,20 396:2
396:7,12 397:20
397:23 420:20
421:19
**day's** 393:20
394:22 395:13
**days** 67:21
116:14 126:21
307:20 308:13
427:17
**de** 105:25 337:22
388:13,25
**dead** 137:23
**deadline** 87:25
122:8 135:14
139:10 400:24
**deal** 31:16 41:2
354:9
**dean** 53:19

**debate** 207:15
360:22,24
367:13 368:21
368:22,23 369:9
369:10 382:7
**debated** 270:9
382:14
**decade** 37:5
277:17,20,23
**decades** 97:23
98:6
**deceased** 75:7
**december**
131:13 145:19
168:15,20,25
169:8 264:20
266:15 319:20
320:4 321:7,9,24
324:8 325:11,23
325:23,25
**decennial** 146:24
**decide** 194:3
**decided** 237:25
241:13
**decision** 16:5
124:9 130:6
131:2 141:7
147:24 176:18
177:17 184:2
190:24 193:9
195:10 214:18
214:19 242:24
245:4 276:22
278:6 289:24
339:25 399:21
**decisions** 14:3
147:22 149:14
162:25 214:24

235:7 276:22
277:22 278:3
333:24 336:18
418:6
**declaratory**
20:16
**declined** 245:11
**decreasing**
301:12
**dedicate** 347:23
**dedicated**
353:11
**deemed** 427:20
**defend** 28:11,24
29:14 30:24
275:8,9
**defendant** 8:6
224:10,13
**defendants** 1:21
3:17 4:18 5:5
7:15,18,21,24
144:16 220:6,7
404:2,5,8,14
405:18,21 406:4
406:10,20 407:5
**defended** 14:6
16:16 17:4,19
18:10,25 24:7
31:7
**defending** 22:7
26:17 27:16
394:5
**defense** 3:8
14:16 201:24
202:21 203:2,6,9
233:3,12,22
275:15,19
389:11

**defenses** 201:5
395:10
**defensibility**
158:12 163:7
394:24,25
**defensible** 164:7
165:17 166:5
**deference**
393:19
**defined** 156:17
156:20 160:23
238:6
**definitely** 92:9
104:16
**definition**
156:24 222:4
223:4 224:18
238:5,8
**degree** 162:17
**delegation** 83:19
83:20,24 84:2,3
84:5,11,17
106:24 107:9,15
107:22 108:3,9
108:14,25 109:8
123:8 130:11,15
130:21 139:8,20
140:9 141:17
378:14 399:20
**delegation's**
333:23
**delegations**
83:23,25 136:13
**democrat** 130:21
**democratic** 25:9
241:7 300:22
306:20

**democrats** 306:4
**demographer**
75:14 314:18
**demographers**
201:15
**demographic**
93:5 156:19
238:12,19 239:8
239:11,12,15
250:15
**demographics**
29:6,20 166:11
209:10 295:24
296:9
**demography**
236:19
**demonstrated**
189:6
**demonstrating**
347:4
**dennis** 53:21,22
323:10,11
**deny** 225:21
228:8 324:2
**department**
20:11 93:25
**depend** 207:8
226:16,17
**depending** 20:14
156:9 255:25
**depends** 40:7
**deposed** 182:8
378:3
**deposing** 427:16
**deposition** 1:22
2:7 9:13 10:2
12:3,11,15 31:14
104:18 118:21

118:22 120:4,9
182:16 221:19
351:12 379:14
393:7 418:14,23
419:3,3,7,18
420:9 427:4,14
427:18,19
**depositions** 9:4
9:11
**derived** 247:14
**describe** 82:4
334:13
**described** 117:4
160:3,23 162:4
213:18 314:16
417:17
**describes** 260:23
**description**
158:14 172:15
213:22 368:10
**descriptive**
313:9
**designate** 400:11
400:18
**designated** 64:13
342:13
**designed** 25:22
**desire** 135:21
148:10
**despite** 9:10
**detail** 72:4 161:5
**detailed** 126:4
**details** 295:11
**determination**
88:17 157:25
193:5,22 200:14
206:15

**determine** 26:7
27:10,13 86:8
89:17 154:20
157:23 158:4
236:2
**determined**
193:13 227:25
240:8
**determining**
27:2 155:2
236:17
**develop** 148:14
153:3,5 174:7
288:21 289:6
416:17,18,21
**developed**
149:22 220:16
220:24 243:9
244:6,11 285:19
288:15 290:7,14
291:2 295:4
301:10 304:20
331:13,24
366:24
**developing**
173:23 178:12
219:24 287:17
287:21 293:7
296:17 332:6
417:11
**development**
183:22 194:20
209:11 286:6
287:25 319:13
327:24 332:20
333:7 336:20
390:9,18

**deviate** 177:22
178:2 182:20
**deviation** 185:25
311:16 314:21
**deviations** 92:22
185:23
**diagnosed** 308:4
**dictate** 398:10
399:15
**difference** 96:8
106:5 182:4
**differences**
179:6
**different** 26:13
27:11,25 41:12
44:22 59:13
69:10 71:8
152:12 154:2
162:16 175:22
178:21 179:3
182:2 196:6,7
197:13 204:25
208:14,15 228:5
237:7,14 242:11
242:13 269:6
283:6,11,12
284:2,3 286:25
292:3,21 297:11
298:17 303:23
309:19 332:21
332:24 336:21
338:23 343:22
366:21 380:20
384:18 399:18
**differently** 67:14
68:2 70:23
380:5

**diluting** 186:13
186:22,25
**dilution** 30:21
187:20 188:15
188:23 189:7
198:6,12,18
273:14 274:13
275:7
**diminished** 20:2
**diminution**
248:12
**direct** 14:23
124:25 125:8
184:23 189:6
245:25 250:19
271:23 288:9,12
289:5 310:14,19
373:22 374:4
397:16,23
410:17
**directed** 280:17
369:21
**directing** 288:18
**direction** 147:20
148:2,20 149:9
149:17 347:5,20
381:22
**directions**
148:25 149:4,10
**directly** 53:12
146:17 147:8
152:25 255:11
262:2 309:22
328:3
**director** 1:17
**dis** 72:11
**disabled** 91:4

disadvantaging
15:10
disag'd 67:13
disaggregate
68:17
disaggregated
67:25 68:21
70:22
disaggregating
71:8
disaggregation
74:11,24
disagree 138:20
181:9 182:23
258:14,17 351:7
351:11
disagreed
347:22
disagreement
347:24 353:8
disagreements
350:7
discoverable
228:6
discovery 47:22
57:16 58:20
79:13 217:17,19
219:5 263:22
discretionary
314:17,24
discriminated
18:6
discrimination
14:10,19 15:4,10
15:14,15,23
16:14,17 17:18
17:20,23 28:18
31:2,8 190:7

200:3 202:25
275:12 278:14
411:15 413:20
discriminatory
23:25 199:11,12
discuss 45:9
84:17 224:4
357:25 379:6
419:14
discussed 31:22
35:9 48:2 55:15
57:22 72:3
143:24 144:21
161:4 232:23
286:17 312:10
385:17 386:7
389:18 408:20
discussing 39:19
50:5 156:10
161:19 173:13
209:7 358:15
379:4 384:4
387:10 389:6
391:5 400:5
403:15
discussion 70:7
202:24 245:12
290:12,20 380:7
387:7 389:19
discussions
32:15 126:5
148:18 207:3
301:11
dismissed
118:14
disparities 96:11
displayed
285:20 291:10

dispute 101:9
210:9 243:17,18
261:3 346:16,17
413:18,23,25
414:7,13 416:7
416:11,22
disputed 33:7
346:20
dissatisfaction
319:12
disseminated
215:19
distance 299:20
distilled 295:10
374:23
distinct 234:22
distinction 158:7
158:8 218:18
distinguish
205:5
distinguishing
336:16
distributed
369:12
distribution
235:18
district 1:2,2
13:12 21:21
69:2 71:6 97:9
97:13,15 99:15
102:7 103:6
110:7,13 111:12
113:21 114:5,11
114:13,16,17,19
114:24,25 115:3
115:25 116:2
133:21 134:2,3
148:7,8 150:3

151:19 158:25
159:8,16,17
160:4,5,6,10,10
160:14 161:6,7,8
162:14,15 181:2
195:22 196:13
196:25 197:3,5
197:10 198:17
198:18 235:4,5
235:15,19,24
236:3,18,22
237:6,8,17
238:24 242:23
246:25 247:24
248:6,9,23
267:24 270:19
271:5 273:24
275:23 279:12
279:14,17,23
280:4,15 281:8
281:12,18,23
289:9 292:6,24
295:16 296:22
296:23 297:5,14
297:24,25 298:8
298:22 299:2
300:6,25 301:17
301:20,25 302:6
305:15,16,17
306:15,15 313:5
335:22 336:4
338:19,20 339:3
339:6,14 348:9
350:16 357:24
358:2 359:3,5,15
359:16,20 377:8
379:8 390:13,16
392:13

**districting**
277:22 279:19
**districts** 6:15
13:5,11,16 20:20
21:4 31:21
92:24 97:4
98:17 113:17,20
114:3,9 128:6
159:6,7 161:7
181:5 185:19
192:21 231:20
231:21 232:19
233:6,12,14
242:3,9 248:14
248:15 250:17
260:9 268:20
274:25 278:25
282:19 301:14
302:9 303:4,17
305:12 311:15
311:18 312:25
320:17 328:12
335:17 339:7
344:16 350:18
362:24 363:9
365:14,24
377:11,16 385:8
**diversity** 239:6
**divided** 385:4,6
**division** 1:3
**divisions** 234:14
234:15,16 377:5
377:7
**divulging** 164:17
191:7 204:14
208:9,10
**document** 91:22
91:25 92:6,12

129:3 132:21
138:15 146:5,9
174:5 178:9
179:23 180:6,15
181:8,10,16
183:11 212:15
213:4 222:22
229:16,21,21
230:12 258:24
262:5 263:19
264:22 274:10
274:10 281:3
327:10 355:17
355:20 356:6,18
366:19 375:4
384:4 385:11,12
389:17 400:9
402:5 403:4
404:19 408:7,13
419:15
**documentation**
50:16 360:21
**documenting**
360:14
**documents**
12:23 50:20,23
51:5 173:7
175:10 222:22
223:5,6,19 224:3
224:10 309:6
361:19 371:16
403:25 404:8,23
405:8,16 406:3
406:17 407:2
414:17
**doing** 53:18
113:3 117:12,18
121:8 149:11

189:3 192:5
204:7 219:23
256:6 261:6,9
262:3 263:17
272:24 303:20
309:23 320:23
320:25 322:14
328:18,25
345:22 372:10
397:5 427:9
**doj** 93:8,13 94:3
96:9 97:5,11
113:15,22
**donald** 392:12
**door** 294:22
**dorchester**
328:11
**dot** 264:18
**doubt** 372:6
**download** 74:10
90:5
**downloaded**
121:13
**downside** 247:8
247:10
**downsides** 201:4
**downstairs**
106:6
**dozen** 9:8 46:12
**dr** 261:5,9,20,24
262:3,15,19,23
263:5,11,16,19
264:4 265:11,21
**draft** 183:16
212:10 273:12
290:5 291:23
319:19 326:23
332:3

**drafted** 387:2
**drafting** 183:11
238:14
**dramatically**
303:15
**draw** 196:8
273:23 274:25
275:22 296:21
297:4 298:8,16
298:17 397:13
397:20 398:5,7
399:12 416:20
416:21,24
**drawers** 205:13
**drawing** 39:12
39:14 45:4
122:14 130:12
177:10 192:12
285:10 288:2,5
297:7 303:19
397:3,17,24
398:10,17
**drawn** 13:6 43:9
115:22 116:3
181:21 208:18
221:11 260:9,17
279:2 331:8,12
331:16 339:2
384:25 399:14
**draws** 192:20,21
399:8
**drew** 33:5 297:6
314:20 398:14
398:16 399:2,11
**drive** 61:7
121:11
**drop** 197:24

dual 95:13
duchin 3:7
duly 6:4
duty 9:19

**e**

e 6:2,2,2,22,23
6:23 33:25 75:8
75:8 121:8,11
172:2,2,4,4,4
234:13 264:18
323:18,18,18
422:2 428:2
earlier 57:22
106:21 189:5
198:22 199:7
201:20 202:21
213:3,14 215:12
286:5 312:10
336:23 341:20
373:21 387:11
403:14 408:19
417:8
early 35:25 70:8
214:8 246:17
397:9
earnest 44:3
earth 112:5
easier 90:19
205:11 225:25
easy 181:5 354:4
economic 353:18
353:24
editorial 89:5
edler 1:18
educated 248:10
249:13

education 215:6
educational 3:8
effect 23:8,10
59:6 62:18
167:12 186:13
238:25 278:2
367:24
effective 186:25
effectively
236:25
effectiveness
299:4,13,15,23
300:5,11,19
301:4
effects 199:8
efficiently 287:3
287:4
effort 15:12
117:3 129:10
efforts 22:4
279:19
eight 95:10
either 20:10
90:12 109:5
152:22 186:12
187:4 197:7,24
207:13 216:23
226:7 260:12
283:17 286:22
292:10 325:21
345:20 383:5,11
402:20
elaborate 48:20
elect 22:5 187:7
187:7 270:20
299:10 300:13
304:8,14

elected 98:3,12
177:8 305:11
electing 187:5
242:22
election 1:18,20
4:18 7:20 67:18
68:18,22 69:4,8
69:12 239:21
240:19 258:6
262:5,12 263:14
266:8 300:23
329:13
elections 1:16
69:5,9 257:24
258:5,10 261:18
262:7 263:2,6,24
264:3,6,24 305:6
305:14 306:11
307:7
electoral 187:3
304:22
element 199:8,9
elements 27:11
27:13
elevate 280:13
elevated 312:11
elias.law 264:18
else's 127:3
179:12
email 42:3,16,24
43:17 45:21
50:25 51:3 54:6
54:12 58:15
60:23,24 62:11
62:22 78:25
80:3 81:10 83:3
117:10 119:14
119:20 120:25

121:6,16,25,25
122:3 124:4
126:7,12,20
127:2 128:4
156:5 166:24
172:12,22 173:8
222:11 228:24
229:6 254:2,15
254:22 255:6,9
255:16 256:4
264:16 265:4
271:11 272:2
327:2,5,11,14,20
329:24 355:4,11
361:18,23 362:7
362:15 364:7,14
364:19 369:18
370:8 373:14
374:19 375:3,5
375:12 407:13
408:17 409:14
422:18,22
423:14 424:4,12
424:20,23 425:8
425:17,21 426:4
426:6,9
emailed 80:17
343:20 400:22
emails 42:7 64:8
80:12 122:18,22
222:11 373:24
emerged 335:2
emma 53:19
employed 167:4
167:6
employee 142:23
employees
224:24

enact 276:21
enacted 14:14,14
  102:25 150:14
  178:16 224:7
  266:12 268:10
  297:14 298:6
  384:23 390:4
  399:22 410:2,6
  411:5,13 415:24
enclosed 337:24
encompass
  147:18 333:19
  333:20
encounter
  190:20
encountered
  17:15
ends 362:6
  387:16
engage 318:2
engaged 205:14
  397:7
engendered
  292:6
enhancement
  188:25
enjoyed 111:9
ensure 181:7
entail 21:18
entered 262:16
entire 367:12
entirely 223:25
entities 25:2
  387:3
entitled 305:5
  355:8 421:10
entitlement
  221:7

entity 62:6 71:23
  222:18 225:3
entries 230:16
entry 230:18
equal 14:20,24
  19:13 241:9,9
  314:25 376:7,10
  376:21
equality 92:23
  210:20
equally 375:23
  377:10,17
equals 333:15
equate 268:17
equivalent
  141:10 219:17
erica 2:12 421:6
  421:23
errata 427:7,10
  427:12,16
erroneous
  258:15
especially 123:5
  235:7 302:8
  318:8
esq 3:9,10,19
  4:11,20 5:7,14
essentially 89:11
  128:12 135:25
est 2:12
established
  203:4
et 355:13 357:21
  370:10 425:19
  426:7
etds 377:7
ethnic 187:20

evaluate 68:25
  174:10 178:15
  204:25 359:7
evaluated
  200:10
evaluating
  173:23
evaluation
  206:22 358:9
evasive 26:4
eve 345:14
events 338:12
eventually 330:7
  367:12
everybody
  137:16 181:24
  182:6 262:25
  293:12 303:25
  312:22 318:10
everyone's 171:8
evidence 14:23
  189:7 274:12
  304:15 306:22
evidentiary
  200:6
exact 13:11
  62:19
examination 6:6
  172:6 383:24
examined 6:5
  258:18
example 20:21
  30:15 187:19
  223:23 235:22
  273:16 295:12
  300:21 333:18
examples 348:13

excerpt 173:11
exchange 51:4
  54:23 62:25
  63:7,16 64:18
  74:2 77:16
  79:16 137:20
  142:4,10 286:24
  369:18 422:10
exchanged 50:22
exchanging
  50:19
exclusive 181:22
  313:14
excuse 44:13
  52:8 87:22
  146:19 241:9
  248:18 278:11
  285:13 305:16
executive 1:17
exercise 187:3
exercised 89:6
exhibit 63:5,6
  78:17,18 91:13
  103:14 104:3,8
  119:19,20
  126:12 131:22
  131:24 132:9,10
  145:23 146:8
  172:21,22 180:8
  221:22,24
  228:22,24 251:3
  251:10,12
  253:25 254:14
  254:22 259:2,7
  264:15 265:4
  271:9 272:2
  310:8,14 326:25
  327:14 340:20

**[exhibit - fair]**                                                                 Page 27

340:23 343:25
344:4 355:4,11
361:20 362:7
364:10,14
369:16 370:8,13
374:18 375:5
384:6,13 385:11
385:21 386:16
391:23 399:25
403:9,20 407:11
409:12 413:8
422:10,11,14,16
422:18,22 423:4
423:10,14,18,23
424:4,8,12,16,20
424:23 425:4,8
425:12,15,17,21
426:4,6,9
**exhibits** 12:13
12:20 59:10
90:5 307:22
343:19 422:8
423:2 424:2
425:2 426:2,14
**exist** 212:13
257:23
**existed** 22:21
23:7
**existing** 19:25
133:19 231:19
232:19 278:25
284:8,9 335:17
365:24
**exists** 22:20
**expand** 60:8
110:11
**expansion**
390:19

**expect** 96:7,13
**expected** 165:11
236:2
**expecting** 109:5
**experience** 16:12
29:24 96:7
123:14 203:16
411:2,9
**experienced**
289:2
**expert** 144:12,16
**experts** 144:23
262:6 264:5
**explain** 17:8
44:23 67:15
68:3 69:5 70:25
72:12 73:2
130:24 135:13
138:21 152:7
235:20 246:18
314:8
**explained** 72:13
205:22 213:13
**explains** 274:11
**explanation**
74:11 352:20
353:16
**explanations**
207:6,12 208:17
208:20,21,22
352:11
**explicit** 199:18
**explicitly** 270:6
**explore** 197:6
**explored** 286:25
**expose** 247:17
**exposure** 395:8

**express** 110:5
135:21 179:5
243:23 268:14
298:10
**expressed** 13:24
151:7 176:3
186:16 190:14
205:17 245:19
294:10 295:14
315:14 318:20
319:11 326:10
326:17 391:12
**expresses** 177:9
**expressing**
326:13
**expressly** 110:22
268:6 270:13,16
317:2
**extent** 21:13
35:21 39:18
131:15 157:17
160:24 191:3,6
200:8 204:13
208:4,8 232:22
236:21 237:6
238:22 253:15
308:5 313:9,11
368:9
**eye** 339:23

**f**

**f** 33:25 75:8
172:2 260:21,21
**face** 22:13
**faced** 16:10 17:7
**facilitate** 144:23
145:5 399:14

**facing** 247:19
248:16
**fact** 163:15
199:19 208:23
233:25 253:17
361:8 389:25
408:10 414:10
418:7
**facto** 105:25
**factor** 14:2
161:17 189:13
189:15,17 190:5
190:19 192:23
193:2,6,11,18
194:2,25 204:4
247:16 268:13
282:19
**factored** 86:23
227:6
**factoring** 295:6
**factors** 174:20
236:12 237:21
269:3 283:17
**factual** 157:16
157:18,24 158:5
159:15 160:17
161:12,24 162:5
163:17 164:25
193:20
**factually** 205:12
**fading** 339:9
**fail** 427:19
**failed** 218:17
360:16,19 361:2
381:13
**fair** 36:7 96:24
99:8,13 107:20
122:21 134:9,15

135:11 150:21
163:25 165:18
168:6,16 169:3
170:16,20
173:19 175:5
176:16 177:2,4
181:15 185:21
195:19 199:2,3
201:25 202:4,10
211:5,6 214:15
230:11,15
252:19 253:21
256:17 257:12
257:20 258:2,11
263:8 274:7,17
282:15 286:9
287:16,20
300:17,25
311:25 312:16
320:20 321:3
331:17 332:16
341:22 342:10
344:23 346:6
356:4 358:5,12
358:23 359:9
360:17 366:5
374:2 391:5
395:12 404:25
405:11 416:19
417:5,10,14,18
**fairly**  191:15
338:14
**fairness**  181:7
**fall**  44:8 98:8
223:12
**falls**  114:22
232:4

**familiar**  8:7
16:25 21:11
23:22 29:6 43:4
43:5,19 44:6
55:3 62:7 93:12
94:11 96:2
132:20 144:5,8
156:13 159:20
198:25 229:15
237:23 240:21
241:25 388:6,15
413:15
**familiarized**
16:21 216:22
**fans**  192:25
**far**  68:25 80:22
93:10 177:25
194:9 264:10
297:9 304:15
335:14 337:23
339:4 350:2
351:12 372:5
**fared**  102:7,12
102:13
**fashion**  191:13
205:23 206:10
**fast**  380:2
**faulk**  44:5
**favor**  382:10
**favorable**
382:13
**favorably**  369:9
**feasible**  288:17
**feature**  163:7
237:20 285:16
290:13,20
335:12

**features**  208:19
295:21 334:2,3
336:3
**featuring**  263:24
**federal**  2:9 98:9
185:15 186:6
209:5 210:10,18
211:4,23 212:3,4
232:6,9,12,21
234:9 241:14
283:3 312:24
376:2,3,12,16,22
376:24 395:4
**fee**  406:18 407:3
**feedback**  100:17
100:23,24
116:17,21
125:23 220:13
290:19
**feel**  181:24
249:10 308:15
**fell**  282:25
**felt**  72:4 136:4
318:21 348:5
**fewer**  351:21
352:3
**fiduciary**  186:2
**fiffick**  45:10,17
45:25 61:9,11,13
78:13,19 79:5,24
82:6,16 96:23
104:22 106:14
117:7 118:7
119:2,15,21
120:7 126:8,14
126:20 128:21
138:5 168:5
169:6 191:24

289:15 293:10
319:4,8 322:13
322:13,24
323:14 355:5,12
362:14 364:8,15
369:19 370:9,21
374:20 375:6
414:19,25
415:12 422:12
422:19,23
425:18 426:5,7
426:10
**fiffick's**  121:2,4
**fifth**  3:11
**figure**  75:23
**figures**  113:16
**file**  61:5,7,19
82:6 90:2,3
104:21 120:11
120:14 121:12
121:13 126:22
219:9 263:15
265:17,18
**filed**  31:10 32:5
33:2 38:24
42:14 396:24
**files**  82:9
**final**  221:17
232:24 238:9
264:25 290:23
330:2 382:11
406:14
**finally**  266:20
**find**  131:6
**findings**  258:15
**fine**  7:2 76:21
137:8 340:7

**firm** 8:20,22
48:15 50:17,21
50:24 64:10
183:17,19 225:2
**first** 31:15 32:3
35:8 65:16 71:6
72:23 105:14
114:12 120:25
128:21 133:3
138:4 146:20
173:17 180:20
185:13 202:16
205:2,11 230:4
256:18 257:13
265:14 266:2
273:6,8 274:4
276:9 277:6
291:10 305:15
306:14 316:18
319:22 322:5
336:4 338:20
379:8 387:13
393:9 400:9
401:15
**fisher** 33:17,23
33:24 34:3,17
**fits** 140:15
**five** 58:23 76:17
76:20 88:3,7
115:17,19
163:16 246:5
284:16,20 315:4
340:5
**flagging** 379:15
**flat** 261:22
**flawed** 277:25
**floor** 3:11
105:19 207:7

330:10 343:10
360:20,21,24
367:13 369:8
382:6,15 416:8
**fluid** 324:5
**focus** 31:25 93:7
172:8 173:15
205:6 256:12
**focused** 45:8
137:20
**focuses** 31:19
**focusing** 42:19
42:20 277:12
**folks** 341:25
**follow** 212:21
285:24 348:14
418:21
**following** 39:5
143:20 146:24
405:23 428:4,5
**followings** 147:5
**follows** 6:5 37:3
172:5
**footed** 261:22
**footing** 376:16
376:21
**footnote** 258:6
387:17,18,20
388:8 413:6
**force** 24:3
273:23
**foreclose** 28:25
**foregoing** 420:7
**foregone** 268:25
305:6,8
**forget** 52:15
**form** 21:21
36:17 37:6 73:6

79:25 108:20
116:3 130:18
138:8 163:3
176:23 185:10
233:7 269:17,19
367:9
**formal** 153:11
**formally** 349:21
**forman** 4:19
7:20
**format** 134:12
367:7,17 368:23
**formats** 39:19
**formed** 51:11,14
**former** 160:9
224:23 308:9
**forms** 208:15
**formula** 23:17
69:14
**fort** 110:20,24
112:6 270:14
359:3
**forth** 27:12
156:23 224:15
**forward** 107:7
117:8,15 373:23
**forwarded**
255:13,15
**found** 180:5
241:16,19 242:7
242:25
**four** 34:4 35:18
36:25 37:10
41:24 126:20
302:3 353:19
354:12 383:17
388:7 413:6

**fourth** 241:14
**frame** 41:14,17
**framework**
22:16,20 190:13
**franchise** 187:4
**franklin** 55:2
**frankly** 296:18
**free** 130:22
177:11,20,24
**frequency** 41:10
43:12 45:15
**frequently** 40:3
43:11,25 44:12
44:14,19 229:24
**front** 12:17
63:12 66:2
155:11 251:18
318:15 384:7
**frontier** 314:23
315:2
**frustrating** 22:3
**full** 133:17 364:4
369:5 419:4
**fully** 274:11
**function** 23:13
89:6
**functional** 106:4
**functions** 75:21
**fund** 3:8
**fundamentally**
201:6
**funds** 168:11
**further** 128:23
301:23 378:12
411:18 421:13
**furtherance**
274:22 275:17

| | | | |
|---|---|---|---|
| **future** 112:17 | 293:8 296:12 | 365:10 368:8 | 152:25 162:10 |
| **g** | 351:2 356:13 | 376:6 415:25 | 171:2 200:25 |
| **g** 323:18 | 395:5 | **getting** 20:10 | 202:13,15 204:7 |
| **gadsden** 4:12 | **generated** | 41:12 115:22 | 216:16 217:20 |
| 5:15 | 163:17 217:24 | 136:10 164:13 | 222:3,20 223:5 |
| **general** 64:22 | 218:20 330:24 | 294:20 | 223:15,20 |
| 68:14 83:16 | 392:2 | **gingles** 21:17 | 224:17 226:5 |
| 86:20 148:19,20 | **generically** | 26:25 172:16 | 273:18 283:9 |
| 159:5 175:12 | 49:18 | 173:14 186:17 | 284:14 310:16 |
| 176:21 186:11 | **geographical** | 187:10 188:11 | 315:3 316:22 |
| 224:3,12,14 | 156:21 236:5 | 188:12 388:12 | 336:7 339:8 |
| 226:18 244:22 | 237:20 | 388:17 | 340:8 341:11 |
| 272:22 299:12 | **geography** | **give** 147:25 | 343:21 345:15 |
| 302:16 315:2 | 133:24 159:12 | 166:2 279:20 | 362:22 368:18 |
| 322:15 389:10 | 236:19 | 287:12 | 379:24 399:10 |
| 404:3,6,10,15 | **georgetown** | **given** 72:5 130:7 | 419:21 |
| 405:19,22 406:6 | 352:20 353:3,8 | 130:9 191:21,22 | **goal** 297:9 |
| 406:11,22 407:7 | **gerrymander** | 191:23 207:13 | 311:14 312:24 |
| **generally** 13:7 | 203:20 207:19 | 208:17 210:13 | 314:2 |
| 13:23 14:12 | 411:6 416:10 | 211:11 212:16 | **goals** 311:23 |
| 22:24 23:3,23 | **gerrymandering** | 212:17 236:19 | 312:14,21 |
| 35:3 37:17 40:9 | 13:9,19,22 14:7 | 249:11 261:15 | 313:11 |
| 41:19 46:21 | 14:18,22 15:24 | 275:14 279:16 | **goes** 38:2 168:4 |
| 48:22 69:13 | 16:10 17:5,7,12 | 281:8,10 291:3 | 265:24 380:2 |
| 82:15 85:14 | 17:14,16 188:20 | 302:8 324:15 | **going** 6:18 9:11 |
| 93:14 96:15 | 189:5,11 197:11 | 339:12 377:8,17 | 31:24 32:14 |
| 109:3 115:8 | 201:25 202:6,18 | 401:13 | 65:18 100:9 |
| 118:10 122:25 | 202:22 203:3,7 | **glad** 103:8 | 103:24 104:7 |
| 149:20 154:23 | 203:10,23 | **gmail** 61:6,9,16 | 108:8 110:13 |
| 155:13 156:18 | 204:21 205:9,14 | 61:19 79:24 | 112:12 124:2 |
| 156:25 160:2,2 | 205:24 206:18 | 104:22 121:2,4 | 126:3 129:7 |
| 166:2 168:9 | 209:6 210:6,22 | 121:17 | 136:5 137:11 |
| 169:9,13 186:24 | 232:15 269:12 | **go** 7:6,13 18:14 | 139:25 161:15 |
| 204:16 207:12 | 269:14,16,24 | 20:19 78:11 | 164:11 170:23 |
| 216:8 219:10 | 275:11,16,20 | 80:21,24 82:7 | 174:20 183:5 |
| 236:5 242:4 | 276:2,16 312:8 | 85:9,12 88:25 | 191:3 194:3 |
| 255:21 256:7 | 312:18 346:12 | 91:2 115:14 | 195:7 196:14,24 |
| | 346:21 347:8 | 140:3 142:14 | 196:25 197:23 |

**[going - handwritten]**

204:9 208:3
220:21 223:20
228:7 231:8
243:15 246:21
250:19 252:13
261:11,25
286:23,24 292:4
292:24 294:17
302:15 305:7
306:20 318:8
331:2 338:4,15
374:10 379:22
383:14 386:22
389:15
**good** 6:8 7:9
56:11 76:16
171:4 261:21
283:5,10 290:9
**goodman** 231:2
**google** 61:6
121:8,11,14,15
**gore** 5:7 7:12,14
7:14 8:17,21
33:16,19 34:2,18
36:17 37:6
49:15 73:6 76:3
76:7 79:25 81:5
88:24 90:11,17
91:6,9 103:23
104:5,10 108:20
129:2 130:18
131:20 138:13
163:3,14,22
164:11 165:23
176:23 191:2,24
197:9 200:21,25
201:2 204:9
208:2 227:24

228:8 232:24
233:7 251:6,7
269:17 284:19
337:8 379:9,23
383:3,13,16,20
383:25 384:13
396:16 398:20
401:13 411:17
416:3,15 418:13
418:25 422:6
**gotta** 315:8
**gotten** 118:11
255:7 264:10
322:25 323:4,6,7
**governments**
19:11
**grandy** 388:13
388:25
**gray** 4:10 5:13
7:17 8:25 9:2
32:12 38:17
42:11 396:20,22
397:2,11,13,16
**great** 30:4 31:16
41:2 76:24
198:9 246:11
284:20 354:9
**greater** 299:19
**greenville** 3:21
**gressete** 323:17
323:21
**grooms** 371:8
**ground** 9:12
10:18
**grounds** 204:12
**group** 24:18
27:6 30:3
290:17 300:8

317:4,13 318:24
**groupings**
156:19,19
**groups** 29:16
**grown** 250:16
**guarantee**
335:25
**guess** 118:19
212:12 242:19
249:14 255:6
301:3 306:9
384:24
**guidance** 101:3
149:19 150:15
150:22 157:19
191:21,22
194:17,18
273:12 276:19
278:4,9,13,20
309:3
**guide** 173:13
263:16
**guided** 196:22
336:10,14
**guideline** 210:17
267:23 271:7
**guidelines**
156:18,25
172:11,15
173:10,20 174:6
174:14 175:18
176:3,6 177:16
177:21,23 178:3
178:10,23 179:5
179:7,10,17
180:21,22,25
181:18 182:12
182:21,25 183:6

183:16,22
185:13,22 195:3
209:3 210:2
231:9 232:4
236:13,16
267:18,19,20
268:6 269:24
270:3,14 273:3,4
277:21 279:25
280:7,21,24
282:24 289:20
347:17 356:9,11
358:6,8,11,16,17
359:8 360:4,12
361:3 409:17,22
409:24 410:13
413:3
**guiding** 192:23
**guy** 143:2
**guys** 289:22

### h

**h** 1:15 6:2,22
33:25 75:8
172:4 271:12,14
378:2
**hampton** 114:18
**hand** 91:20
259:17 316:23
340:22 341:13
421:19
**handouts** 215:12
**handwritten**
217:12 218:11
226:7 227:5
325:21 403:16
404:8,12 405:4,7
406:2,8,25 419:8

**happened** 82:5
127:19 286:7
354:23
**happening** 48:10
298:12 329:20
**happens** 137:25
162:18,19
**happy** 10:11
263:18 326:8
419:12
**harbor** 348:3
**hard** 12:16
250:8
**harmful** 232:20
**harms** 234:4,6
**harpootlian**
52:13 53:7
117:24 118:15
119:3 137:19
244:23 245:14
245:23 252:21
253:2,7 259:23
260:10 271:15
272:13,24 274:8
275:5 281:7
315:24 316:25
317:11,22,24
318:4 319:10
330:23 331:9
341:21 342:6
345:5,13,21
354:17 357:17
360:16 371:11
380:16,17,25
391:12,19 392:3
402:23 414:17
414:20 415:3,7
415:11

**harpootlian's**
52:22 252:5
276:6 278:22
360:18 381:14
**hazier** 163:21
**head** 10:8 19:15
213:23 214:13
230:25 296:10
**heading** 380:4
**headings** 357:20
**hear** 46:14
203:17,22
218:10 243:13
249:2 319:7
419:13
**heard** 140:9
142:3,7 144:9,10
149:17 220:12
240:24 243:22
248:21 289:12
289:16 295:9
299:3 313:15
350:3
**hearing** 38:3
175:9 202:4
216:17,20
230:17 259:5,9
308:18,22 309:8
309:9,14 310:3,9
314:6 315:13
316:3 317:11
321:8,12,16
325:9,13,15
326:2 334:18
340:18,25 341:5
341:7,17 346:2
364:5 380:23
381:25 382:6

401:9 409:8
412:3 416:8
424:17 425:5,14
**hearings** 49:12
112:21 129:21
131:12 135:15
136:8 179:25
180:10 214:4,6
214:12,18 215:3
215:8,19,24
216:5,7 217:9,13
218:12 220:14
220:20 225:10
225:16,19
226:20,22,25
230:8 325:22
403:17 405:23
423:21
**heart** 160:9
**heating** 330:3
**hedging** 294:19
**heights** 16:22
198:24
**held** 2:9 129:21
131:12 136:7
169:11 214:4,6
266:9 321:7
325:10,12
334:19 364:4
**help** 143:25
148:14 180:17
262:17 263:12
345:22 371:15
**helpful** 340:10
357:9 409:2
**henry** 44:15
55:12

**hereunto** 421:19
**hey** 123:21
196:23 197:9
262:8 314:18
**highest** 97:10
99:12,16,17
113:25
**highlights**
378:16 380:6
**hilton** 296:10
**hinson** 55:5
**hire** 143:24
144:22 184:3
**hired** 69:11
218:22 267:9
**hiring** 201:14
**hispanic** 93:9,13
94:3,8,20 96:8
97:5,11 113:14
113:15,22
305:19
**historical** 190:7
202:25
**history** 22:25
156:22
**hmm** 65:9
102:19 180:4
185:20 213:16
310:17 316:4
334:11
**hoc** 319:21 321:6
321:22
**hoc's** 322:5
**hofeller** 75:7,8
75:10,12,13,19
75:25
**hold** 214:18
418:14,23

**[holding - include]**

holding 136:8
419:2,10,18
holi 271:12
holli 272:3
424:24
home 326:20
honestly 54:3
115:6 210:12
243:22
hookup 309:17
309:18
hope 254:10
290:16 302:22
host 91:4
hotly 305:13
307:6
hour 170:17
184:13
hourly 167:17
hours 73:5
379:12,14
383:15 419:4
house 1:13,14,15
3:17 7:24 53:15
219:25 220:7
286:19,23
319:25 320:2
321:5,22 322:14
323:3,5,19,20
324:8 325:11,12
325:22 326:6,13
329:8,8 344:5,9
351:21 355:24
374:22 425:15
house's 319:19
319:21 320:22
323:2

howard 1:16
hues 348:25
hundred 170:11
217:7
hutto 51:20
hypothetical
29:21

**i**

i.d. 422:9 423:3
424:3 425:3
426:3
i.e. 133:24
idea 57:19
261:21
ideas 110:5,8
111:17,20,23,25
112:19 335:3
identical 324:14
identification
63:8 78:22
91:15 103:16
119:23 126:16
132:16 146:3
173:2 180:12
222:2 229:4
251:16 255:2
259:11 265:7
272:5 310:12
327:17 341:2
344:7 355:15
362:10 364:16
370:11 375:9
identified 36:25
91:19 93:9
149:15 173:20
178:11 181:17
185:14 229:9

264:23 279:11
282:3 314:2
317:5 341:19
356:8 357:14
358:7,19 373:25
identifies 94:18
134:6
identify 9:12
61:24 94:7,8,21
181:6 263:13
311:22 341:5
identity 240:22
ignore 137:2
ii 210:9 211:2
iii 4:11
imagine 26:14
28:8 29:7 73:18
85:7 107:5
171:7 200:5
283:6,11 293:11
impact 192:19
195:17,20 196:6
197:14,21 198:2
220:14,23
237:15 301:7
304:7,13 305:21
320:22 338:16
338:19
impacted 225:11
226:8 227:11
imperative
427:15
implement
149:13,18,21
implemented
23:18 150:11,15
280:8

implementing
149:24
implicated 35:23
implication
228:9
implicitly 245:21
implying 228:4
import 182:25
importable
238:11
importance
376:8,11
important
110:24 176:18
192:10
impressions
155:10
improper 13:23
14:15 233:13,15
233:17
improve 117:5
improvement
73:22 100:15
115:24
inaccurate 351:8
inartful 398:19
inaudible 44:18
237:10 262:9
292:17
inbox 255:16
incidentally
298:21
include 37:18
38:13 39:24
94:6 113:7,13
130:13,19 148:5
153:18,25
187:17,21 188:2

188:6 222:17
239:9 263:24
390:15 392:20
392:23 398:15
399:5
**included** 35:5
84:3 94:22
153:21,22,24
166:9 239:16
286:2 366:16
367:19 413:10
**includes** 92:18
222:15 254:5,18
329:10 344:11
**including** 222:10
248:20 300:15
315:23 380:15
412:24
**inclusion** 237:15
**incommunicado**
308:17
**inconsistent**
213:24
**increasing**
301:11
**incredible**
205:23
**incumbent**
231:20,23
**independent**
317:3,13
**indicate** 388:22
**indicates** 267:23
372:18
**individual** 7:23
24:17 61:17
122:11 175:14
175:21 194:4,12

195:5,6 207:14
235:10 390:9,11
**individually**
84:18 85:19
**individuals**
146:19 156:20
222:19
**inferior** 212:11
**influence** 304:9
304:15 306:24
**informal** 207:7
381:19
**informally**
349:22
**information**
60:20 92:19
93:5 155:3
164:25 191:8
204:15 210:3
215:18 222:8
238:13,20 239:4
239:5 262:18
295:7 317:3
370:16,23
394:19 408:6
414:21 415:11
415:15 417:9,23
418:8,18
**informational**
83:16
**infrequent**
204:22
**inherited** 334:4
**initial** 149:23
284:12 285:23
286:4 287:18,22
287:25 288:5,11
289:6,18 290:2,5

290:23 291:3,14
293:6,19,23
294:3,7 295:3
296:17 301:9
307:3 311:23
319:14,18,19
320:22 322:4
324:9,12 331:20
332:2 334:5,14
363:14 372:11
417:11
**initially** 59:17
253:4 320:25
**initiated** 109:16
109:17 116:11
**input** 118:17
123:23 183:10
302:10 317:17
318:6,13 320:7
332:8 336:14
395:14
**inquired** 334:21
**inquiries** 197:4
**inquiry** 301:24
**instance** 283:19
335:6 371:25
**institutional**
239:4 333:21
399:17 417:4
418:5
**instructed** 11:5
190:21 191:11
191:13,18 192:2
194:8 394:4
**instructing**
194:12
**instruction**
192:16 195:2

270:18
**instructions**
427:2
**intend** 104:2
**intended** 14:10
181:5 236:14
268:23 313:13
**intense** 292:8
**intent** 14:23 15:9
15:11,16 20:7
**intentional**
14:19 15:4,13,22
16:12,14,16
28:17 30:25
31:7 187:11
275:12 303:19
411:14 413:20
**interact** 52:16
**interacted** 34:6
45:7 53:12
**interaction** 73:3
**interest** 130:9
156:13,14 157:3
157:7,13,21
158:10,14,15
163:20 189:19
189:21,24 190:9
190:11,17 204:6
206:6 213:10,15
213:20 219:20
219:22 220:5
229:10 230:9,23
231:12 234:21
235:25 236:8,20
237:13,16
280:22 292:7,8
292:14 349:2,10
349:13,19

365:20 377:4
**interested** 35:16
  86:18 89:16
  173:22 200:23
  292:23 320:19
  328:8 421:16
**interests** 156:22
**interim** 1:17
**internally**
  418:20
**interpretation**
  224:6
**interrupt** 65:23
**introduced**
  314:5 345:5
  380:15 381:2,6
  381:24
**invitations**
  222:12
**invite** 47:3 130:7
  131:4
**invited** 129:17
  130:2,4
**invoice** 70:17
**invoices** 70:14
**involve** 49:10,19
  49:23 50:4,10
  237:21
**involved** 24:15
  25:2 32:22
  44:12,13 45:4
  54:22 89:5
  138:22 144:13
  148:21 183:6
  214:17 262:2
  294:18 327:23
  330:6 332:19
  343:14 396:22

410:22
**involvement**
  143:19 394:22
  411:2,9
**involves** 26:17
  27:16 196:12
**involving** 18:22
  19:9 161:5
  242:2
**inward** 20:5
**island** 327:10
**isolated** 40:16
**isolation** 182:17
**issue** 18:17
  19:12,13 72:7
  157:16 163:17
  246:21 252:25
**issued** 320:2
**issues** 16:10 17:8
  419:14,15
**italy** 95:3,4,9
**item** 81:13
**iteration** 290:22
  291:6 298:18
**iv** 238:10

### j

**j** 1:18
**jackson** 110:20
  110:24 112:6
  270:15 359:4
**jane** 4:20 7:19
**january** 131:14
  135:22 170:2,3,4
  172:17 327:8
  329:25 330:13
  330:17 340:17
  341:6 346:2

355:7 356:2,6
364:3,9 369:22
372:21 373:3,7
374:21 378:24
380:22,23
381:25 382:5,22
416:7
**jasper** 295:14,19
  296:3,6 336:25
  337:20 338:7
  390:20
**jcusick** 3:15
**jessamine**
  116:12 120:11
  120:14 121:12
  121:22 124:14
  124:18,22 125:2
  125:7,9,14,18,23
  126:22 128:3,6
  129:20 141:22
**jimmy** 55:5
**jmc** 1:7
**jmgore** 5:11
**joanne** 1:18
**job** 109:3
**joe** 109:15,17
  306:11,14
  392:12
**joey** 53:9
**john** 1:18 3:10
  5:7 7:10,14 8:17
  8:21 33:16 34:2
  34:17 43:3,4,6
  44:10 45:25
  82:16 90:9,17,22
  161:15 165:23
  201:2 260:5,13
  260:13,14,20

264:17 265:21
327:6,15 332:18
369:19 370:9,20
407:14 425:8
426:7
**johnson** 388:12
**joined** 236:22
  237:10
**jones** 5:6 8:19,21
  32:11 33:12
  34:5 35:19 37:2
  37:11,25 38:8,11
  40:19 41:25
  46:9,22 47:2,18
  48:3,8,15 50:17
  50:20,23 76:13
  82:20,24 83:3,5
  83:7,11 85:6,7
  85:13,13,17,19
  86:5,10 87:9,13
  87:14 88:16,19
  88:23 89:4,7,8
  89:10,19,22
  101:4 124:19,22
  125:2 154:10,15
  154:22 155:3,6
  155:14,20,23
  157:19 158:9
  161:20 164:6,10
  164:24,24 165:5
  166:9 183:17,19
  183:24 184:3,6,8
  185:3 201:19
  215:2 287:21
  334:7 342:22
  366:10,12,20
  393:5,8,20 394:7
  394:14,19,20,21

**[jones - know]**

Page 36

395:13 396:2,7
396:11 397:20
397:23
**jonesday.com**
5:11
**jordan** 1:15
**joseph** 361:24
**jtrinkley** 4:24
**judge** 9:18
182:17 318:19
**judged** 179:19
181:23
**judgment** 20:16
248:10
**judiciary** 1:12
1:14 4:9 39:21
43:2 45:6 47:24
53:15 60:17
61:23 129:18
132:4,12 146:18
149:7 151:4
181:11 250:22
251:14 265:21
293:9 329:8,9
340:17,25
355:23 364:4
394:3 423:6
424:9 425:13
**july** 214:8
230:17
**jump** 306:19
**june** 385:23
**jurisdiction**
20:19 21:9
22:11 23:24
24:5 26:11,16
30:2

**jurisdictions**
30:11
**justice** 20:11
94:2
**justified** 158:17
**justify** 207:23
234:9

**k**

**keep** 47:13
149:15 171:6
197:25 198:13
265:25 270:14
335:8,11 338:8
339:18 343:17
390:13
**keeping** 150:10
150:15 162:13
197:18,22 198:3
231:20 233:5
282:4,5 357:6,14
357:21 359:2,3
379:12 391:2
412:4,10,19
**keeps** 360:4,6
**kelley** 142:19
143:4,9,14
**kelly** 294:6
**kenney** 53:8
**kept** 102:14
151:11 335:6
336:3,25 337:5
339:16 380:17
390:3,7,21
**key** 336:9,13
**kimpson** 415:18
416:2,9

**kincaid** 61:2
78:13,20 79:4
80:2,11,15,18
82:5 96:23
100:25 104:21
117:8 119:14,21
120:7 121:2,3,9
126:8,13,19
134:20 138:4,9
294:2 316:18,20
317:5 391:6
404:24 405:9
414:18 422:12
422:19,23
**kind** 29:11 57:5
105:19,24
137:22 140:12
143:2 178:25
208:24 212:5
222:9 233:18,19
239:6 256:5
262:4 291:18
338:16
**knapp** 1:16
**knew** 131:5
137:16 264:11
289:2 292:10
318:10 322:13
**knocked** 294:22
**know** 6:13 8:7
11:12,16 13:12
14:9 16:6,9
23:19 24:2,2
29:22,24 31:5,6
36:4,8 46:11,13
46:16 47:20
49:15 53:10,11
53:22 56:12

57:10,11,12,17
58:22 65:7,10
69:22 70:20
71:18,20 74:22
75:2,5,10,11,19
76:9,12 77:24,25
78:3 80:8,11
81:21 82:2,19
85:18 90:23
101:11,16
107:11,12,16,18
107:24 109:3,4
111:7 112:13
117:20 118:25
119:6 123:10,22
124:4 127:11
137:25 142:16
142:19,25
145:10 150:10
154:10,15
158:20 161:15
162:14 165:24
166:18 168:10
168:22 169:14
169:24 170:5
171:5 175:6
182:16 183:25
184:8,12,16,17
190:16 199:4,23
201:2,3 205:15
205:20,21
210:15 212:8
214:24 216:11
220:3 226:3
227:3 231:4
233:2,10 239:19
240:4,6,15
241:21 243:21

**[know - legal]**

244:25 245:3
259:24 260:5,15
260:18 262:8
265:25 266:14
266:19 268:22
275:15 276:5
281:2 283:22
288:24 293:13
295:12 296:16
297:23 298:6,23
304:3 305:14
306:7 309:17
314:10,12,13
315:8 317:14
321:19 324:25
328:13,14 330:4
334:6 336:7
337:23 338:10
338:25 339:5
342:5,21 343:9
343:14 345:16
345:16 349:20
349:23 351:15
352:17,22 353:2
353:4,5,7 354:4
354:23 356:20
363:13,16
366:12 368:24
371:3 373:8
374:10,13
379:18 385:5,5
385:12,15
388:18 390:24
391:17 392:15
394:7 395:3
396:5,9 402:14
415:10,13,17

**knowing** 77:5
328:8
**knowledge** 8:2
76:8,11 163:23
184:24 201:8,17
244:12 260:11
399:17 417:4
418:5
**known** 57:3,7
110:23 112:7
116:12 312:19
325:5

**l**

**l** 6:2,22 75:8,8
172:4 264:18
271:12,13,14,14
323:16 393:14
421:6,23
**l.a.** 224:22
**labeled** 126:22
**laden** 3:14
**lady** 12:5
**laffitte** 4:10 5:13
**land** 71:11
**language** 179:21
182:5 212:15
236:15
**large** 354:12
390:18 408:4
**largely** 201:10
290:7 293:7
295:17,24
339:19
**larger** 296:13
304:7
**late** 35:3 36:2
37:20 38:10

42:2 46:9 73:9
214:8 382:17,21
382:21
**law** 1:16 8:20,22
24:10 48:15
49:8 50:17,20,23
52:23 64:10
160:24 166:4
183:17,19
185:15 186:6
187:15,25 188:5
203:13 209:5
210:10,19 211:4
211:23 212:4
219:3 225:2
230:5 232:6,10
232:12,21 234:2
234:7,10 264:18
312:24 376:3,15
376:17,25 395:4
395:5
**laws** 49:3
**lawsuit** 13:2
17:22 18:2
22:13 27:17
28:7,12 30:22
31:11 32:17
39:3 42:14
54:24 144:14
242:15,19,20
243:2 275:8
276:3 394:6
395:9
**lawsuits** 27:24
28:4
**lawyer** 8:11
52:21 53:2,6
415:20 417:20

**lawyers** 52:6
54:25 56:3
366:14 393:8
**ldf** 7:10
**lea** 254:2
**lead** 269:23
290:21
**leadership**
125:10,15 309:7
343:2,5,13 371:6
**leading** 339:22
366:8
**leads** 372:3
**league** 87:3,8
259:24,24
**leah** 3:9 6:9
254:23 424:12
**leaning** 270:21
271:6
**learned** 220:23
316:18
**leave** 198:19
**leaving** 293:16
**left** 91:20
**legal** 3:8 32:16
33:11,13 48:11
48:17,19,23 49:4
49:19 50:16
55:14,25 155:7
155:14 157:14
157:15,24 158:4
158:12 159:15
160:18,20
161:18,25
162:11,19,24
163:12 166:3
187:23 193:22
197:7,10 200:16

201:3 233:22
287:24 333:8
393:23 394:8,16
395:14 397:3
417:24
**legality** 163:6
394:23
**legally** 158:17
233:17
**legislation**
142:15 287:5
**legislative** 39:17
50:6,6 141:2,11
142:4,10 154:7
204:6 207:17,20
244:15 270:9
273:2 286:16,19
358:20 370:22
**legislators**
142:13 154:13
154:17 208:18
208:25 231:24
**legislature**
141:12 157:8
178:13,17
203:19 205:7
220:15 268:8
273:25 277:23
282:15 285:2,7
**legitimate**
159:12
**lesser** 284:7
**lesson** 23:2
**letter** 140:3
145:25 146:11
146:14 147:9
166:20 256:19
257:14 271:20

272:8,22,25
357:10,12 358:5
386:25 388:3
389:15 413:7
423:11
**letters** 137:23
222:14
**level** 69:14 74:13
74:25 198:4
242:14 273:14
**levels** 197:19
**liability** 200:18
**life** 96:6
**light** 277:5,14,18
**liked** 284:8
**likelihood** 395:9
**limit** 379:14
**limited** 222:11
**linda** 1:18
**line** 8:8 252:11
311:4,8,9 316:6
316:7,8,11,13
341:3,12 348:6,7
349:3,4,5,6
352:7 390:13
399:16 428:6
**lines** 32:24 33:6
33:10 34:22
35:7,9,11 36:20
37:3,13,19 38:12
38:14,20 39:4,10
40:5,23 41:4,7
42:21 43:8,23
45:8 48:24 50:2
50:8,13 51:8,12
51:19 53:17
55:18 69:9
70:12 85:2

110:6 130:12
181:2,19,21,23
192:13 194:20
195:17 196:3
232:20 251:25
252:7 259:21
311:13 316:6,10
316:24 317:10
342:9 346:3
347:13 348:23
350:13 351:17
352:6 353:14
354:15 367:5
398:8,11
**lisle** 7:16 8:17,22
38:22
**list** 261:18 262:4
262:10 263:2
349:7
**listen** 321:12
**listening** 315:13
**lists** 212:20
349:7
**literally** 123:21
**litigant** 273:22
**litigated** 18:19
112:7 161:16
**litigation** 17:10
24:14 38:24
54:3,10,21
144:13,17,19
158:18 166:6
184:14,20,25
193:14 220:4
242:2 299:17,22
385:17 395:2,8
396:23

**little** 69:5 90:19
106:7,7 110:14
162:23 163:20
195:13 205:10
214:3 295:11,19
297:11 306:24
322:11 338:6
339:9 351:14
377:20 378:4
382:7 398:3
**live** 29:17 30:16
30:18 95:4
209:20,21
**lived** 95:9,10,22
96:4
**llc** 3:18 4:10
5:13
**llp** 4:19
**loaded** 82:10
106:14 124:5
288:13
**local** 19:11
326:19
**located** 12:4
**lodging** 348:17
**log** 67:10
**logical** 85:24
324:16
**logistical** 46:5
**logistics** 45:3
46:24 86:6
111:13 256:6
**lone** 319:10
**long** 17:2 57:4,7
58:12 66:22
95:8 115:14
122:9 161:5
238:2 357:23

**longer** 23:8,9 199:17
**look** 61:23 62:23 65:2,18 82:11 88:9 91:18 92:5 109:10 119:13 127:14 131:19 132:18 133:2,13 136:23 137:9 139:23,25 140:6 140:11 172:11 174:4,13 175:23 178:8 179:4,22 185:17 192:19 195:7 196:5,19 202:7 205:3 216:17 222:21 223:20,22 227:9 235:23 236:15 258:22,25 259:14 264:14 267:16 280:14 300:6,12,20 301:5 311:4 316:5,24 326:23 340:14 343:16 345:16 354:25 364:7 365:3 403:5
**looked** 82:13 88:20 100:11 113:9 115:19 118:13 124:5 137:10 248:8 260:6 303:25 320:13,14 325:2 325:4 342:18 352:22 357:11

**363:19 365:23 401:7**
**looking** 21:6 61:16 65:4 89:23 91:25 96:16 97:2 113:4 114:12,20 115:11,15 126:6 126:24 131:25 141:25 166:19 167:16 173:17 194:16 195:16 202:18 209:10 210:8 211:7 221:13 223:3 225:6 234:12 252:21 253:24 256:17 258:3 272:20 274:6 279:8 283:8 309:25 311:2,12 316:21 317:9 329:4,23 357:5 358:4 361:17 371:3 412:14
**looks** 72:14 115:4,8 210:16 358:6 366:2 370:16
**loop** 338:5 366:16
**lot** 52:11 148:11 149:25 150:2 155:4 169:10 201:13 272:14 283:10,16 292:6 292:22 296:10 396:15 401:12

**lots** 380:6
**lou** 33:17 34:3 34:17
**lou's** 33:21
**louisiana** 5:8
**love** 171:7
**low** 279:21
**lower** 211:22 250:11 386:13
**lowest** 99:9 114:7
**loyally** 306:20
**ls** 271:13,13,14
**ltraywick** 4:16
**luke** 1:11 4:7 51:20 271:20 374:20 375:6 426:10
**lulac** 237:24
**lunch** 11:18 171:5
**luncheon** 171:10

**m**

**m** 5:7
**ma'am** 8:12 10:19 11:8,25 12:9,18,24 16:2 18:11 34:19 39:6 40:20 43:20 44:7,11 46:3 64:16 77:21 78:5,24 79:6,18 80:13 81:15 90:4 93:3 94:10,25 95:7,15 95:21 97:17,21 99:20 103:18

**112:24 115:21**
**119:5,25 125:16 127:4 132:17,22 134:10 138:6 150:20 166:21 168:18,21 169:2 170:21 173:5 183:23 185:16 209:8 210:24 214:10 221:15 221:18,20,23 222:6 223:24 230:3 231:17 232:2,16 246:19 251:19 253:23 254:13 264:19 265:3 280:23 287:15,19 288:7 293:2 310:7 311:11 313:19 321:13 329:14 342:24 344:19 344:24 346:5 350:21 351:23 363:5 364:2 369:25 370:7,15 371:14 381:11 413:9,13 416:5
**madison** 44:5 293:13
**magellan** 405:2 405:12
**mailing** 121:8,11
**main** 3:20 4:21
**maintain** 279:13
**maintained** 249:3 262:3

| | | | |
|---|---|---|---|
| **maintaining** | **mandated**  282:9 | 268:8,10,19,20 | 122:25 123:17 |
| 161:21 279:11 | **manner**  133:9 | 268:21 269:5 | 127:5 128:13,17 |
| 279:17 281:18 | 401:21 | 281:24,25 | 129:11,20 |
| 281:22 282:11 | **map**  35:15 45:4 | 284:12,24,25 | 130:16 131:8,9 |
| 282:18 301:12 | 73:14 83:23 | 285:3 286:8 | 134:19 138:4,9 |
| 311:17 313:4 | 84:12 85:12 | 288:21 289:7 | 148:3 150:25 |
| 314:3 377:3 | 86:24 87:9 89:4 | 290:25 291:7,9 | 154:2,16,16,21 |
| 412:19 | 89:8,13,25 96:19 | 291:23 297:6,7 | 156:3 161:12 |
| **major**  210:19 | 100:3 101:9,15 | 297:14 298:6,24 | 177:18 179:13 |
| 311:23 338:16 | 103:7,8,10,11,14 | 307:8,12 308:20 | 179:14,18 |
| 339:20 | 103:19,21 | 312:15 315:17 | 182:14 185:22 |
| **majoritarian** | 104:12,19 105:2 | 317:24 320:22 | 194:21 200:11 |
| 29:25 | 105:9,13,17,25 | 320:23,24 321:7 | 200:11,12 |
| **majority**  20:20 | 106:10,19,22 | 325:22 326:3,8 | 219:24 220:15 |
| 21:21 22:2 27:4 | 107:8,13,25 | 332:13 334:3,3,6 | 220:25 221:5 |
| 196:13 273:24 | 109:23 112:22 | 336:20 342:12 | 223:11 224:7 |
| 274:25 275:23 | 114:14 115:4,5 | 348:21 350:20 | 225:13 226:10 |
| 295:25 296:23 | 115:16 116:12 | 351:4 357:16 | 227:7,13,20 |
| 297:5,8,15,21,24 | 116:12,15 | 367:21 368:2,7 | 243:9 244:6,10 |
| 297:25 298:4,9 | 120:19 121:23 | 380:14 415:24 | 244:18 260:17 |
| 331:7 333:3 | 122:14,23 123:5 | 422:16 | 285:4,8,10,18,22 |
| 336:24 389:22 | 123:22 124:5,15 | **mapping**  368:11 | 285:23 324:22 |
| 390:2 | 124:19,22 125:2 | **maps**  49:24 | 342:7 367:2 |
| **maker**  147:24 | 125:8,9,15,18,19 | 59:19 60:14,14 | 368:4 396:6,11 |
| 289:24 399:21 | 125:23,25 | 61:22,25 66:10 | 396:16 397:12 |
| **making**  109:23 | 126:22 128:6,20 | 66:24 79:14,23 | 397:14,18,21,24 |
| 112:23 115:24 | 128:22 129:6 | 80:4,9 81:3,20 | 398:5,11 411:25 |
| 124:8 177:17 | 139:23 141:21 | 81:21,24 82:19 | 412:6 416:19,25 |
| 200:13 206:14 | 141:22 150:12 | 83:23 84:2,13,15 | 417:5,13 |
| 239:25 240:3 | 150:14,19 | 84:25 85:6,8,14 | **maptitude**  82:10 |
| 247:13 268:19 | 176:19 177:9 | 85:16,18 86:5,9 | 92:10,11 163:18 |
| 274:4 276:22 | 178:15 179:8,12 | 86:12 87:6,18 | 165:22 285:18 |
| 278:6 281:25 | 193:7,13 197:20 | 88:6,16,23 89:7 | **margie**  51:21 |
| 286:8 320:24 | 198:4 200:14,23 | 89:9,18,21 | 390:25 |
| 339:21 384:17 | 201:5 205:13 | 104:20 108:10 | **mark**  131:21 |
| **man**  376:4 | 221:10 224:7 | 108:15,18 109:9 | **marked**  63:7 |
| **mandate**  29:3 | 239:24 240:2 | 117:8,16 118:24 | 78:21 91:15 |
| 166:15 | 248:2 254:6,19 | 119:2 122:17,20 | 103:16 119:23 |

**[marked - meeting]**                                                Page 41

126:15 132:15
146:2 172:25
180:12 221:25
228:22 229:4
251:15 255:2
259:11 265:6
272:5 310:11
327:17 340:25
344:6 355:14
362:10 364:16
370:10 375:9
**markup**  12:22
**marriage**  421:14
**massey**  343:14
371:8
**material**  414:25
**materials**  12:10
49:20 153:5,9,15
153:18,23 215:6
308:21
**mathias**  3:19
7:22 383:6,8
**mathis**  7:22
**matter**  20:9
147:8 148:9
151:20 179:10
196:4 199:22
212:5 256:3
272:22 304:22
305:10,10 374:5
396:23 408:10
421:10,15,17
**matthews**  51:21
52:7,8,10 315:23
319:15 369:11
371:11 390:25
415:14

**maura**  43:18
44:10 46:2
293:12,14
**maxine**  44:15,16
44:17 55:12
**mccall**  1:18
**mcconnel**  161:3
**mcconnell**
241:19 299:18
**mccrory**  413:11
414:10,11
**mcgee**  44:20
**mean**  13:20,22
15:6 16:24
19:21 21:15,16
22:24 24:22
25:20,24 29:23
38:4,6 42:13
46:23 48:18
49:4,14 52:2,8
56:2 62:5 76:9
84:9 85:20,21
86:2,19 87:16
93:16,18 102:13
103:3 106:4
107:4,6 109:14
112:4,11 123:3
124:6 127:21,23
127:25 131:21
137:13,21
139:12,17
140:14 144:9
145:3 147:16
148:18 149:6
153:10 159:24
165:20,21
167:24 169:17
169:23 175:13

176:3 177:5,6,10
177:13 178:19
179:2,3 186:23
189:10 192:17
193:15,23
194:25 195:8,20
196:2,21 197:23
197:24 198:14
205:2 208:16
221:9 224:9
226:17 231:2
233:16 234:5
235:5,21 237:6
238:20 241:3
243:22 245:23
248:18 250:8
266:17 275:18
283:18 291:9
292:2 293:15,16
298:15 299:22
304:16 306:23
307:18 312:19
312:22 313:3
323:23 324:14
324:23 332:23
336:6 338:2
339:24 345:10
347:25 350:2,3
353:6 356:21,21
357:19,23
359:11,12,15,21
361:12 371:3,24
373:6 377:18
382:24 384:12
398:21 401:5,6
**meaning**  94:20
112:25 156:2
159:6 291:7

300:11 358:4
377:17 398:15
402:4
**means**  9:17
41:23 42:2,22
45:19 58:15
72:21 74:23
84:7 134:5
186:24 196:23
222:7,10 224:22
235:8 236:24
237:4 315:10
377:13
**meant**  17:9
19:23 38:5,9
70:21 152:8
176:5 250:8,18
283:12 398:23
**measure**  93:24
178:19 235:11
297:16
**measured**
353:23
**measures**  93:22
178:24
**mechanical**
235:11
**mechanics**
399:10
**media**  236:22
**medium**  354:5
**meeting**  47:3
67:3 69:2 118:3
118:23 123:11
137:18 245:13
251:21 258:21
271:19 308:6
329:21,22 330:5

345:15 369:5
385:24
**meetings** 42:3
46:5 67:6,8 70:8
107:21 108:4,8
330:3
**member** 34:12
52:13,14 68:15
84:19 86:16
89:15 117:16,20
119:7 123:7
139:21 141:11
152:19,23 153:4
194:4 203:18
244:21 268:16
291:13 292:17
323:3,5 339:7
366:9 368:16,18
368:20 385:8
393:19 402:15
402:16
**members** 1:19
25:2 50:6,7
51:17 52:5,18
69:23 84:10,16
106:23 107:14
108:17,25 109:7
119:10 130:23
141:5 148:13
151:12 154:7
175:13,14
194:13 195:5,6
205:13 207:14
224:11,13 231:6
239:2 242:22
244:15,20
253:12 272:12
282:16 284:2,4

285:2,6 290:6
291:22 292:7,10
292:16 295:13
302:11 309:12
309:22 315:22
318:2 320:11
326:6,17 333:22
334:21 335:19
343:11 349:24
358:20 361:10
369:13 370:22
370:25 371:12
378:13 398:25
398:25 399:3,19
402:11 404:2,5,9
404:14 405:18
405:21 406:5,10
406:21 407:6
412:4
**membership**
317:25 336:19
367:13
**memo** 357:5
366:23 367:6,9
**memorandum**
265:22
**memory** 8:25
101:17 127:8
258:24 339:9
**memos** 382:4
**mention** 17:3
29:21 68:20
110:19 111:2
249:5 393:15
**mentioned** 13:18
17:6 19:16 25:5
26:24,25 27:15
35:19 37:10

54:19 57:16
77:5 106:20
110:22 151:21
151:24 152:3,5
188:10,13 189:4
201:23 239:19
246:15 249:6
263:23 265:10
336:22 393:6
414:15 416:14
417:7
**mentioning**
108:4 381:10
**mentor** 289:2
**merged** 283:13
**merry** 57:5
**message** 67:20
74:6 77:11
**messages** 45:23
54:20 58:18,23
**messy** 100:14
**met** 75:19
187:10 273:21
274:5 316:20
330:11
**method** 71:8,12
71:14 242:21
**metric** 93:19
**michael** 33:17
34:2,17
**michelle** 44:20
44:24 256:3
**mid** 214:9
382:21
**middle** 247:12
279:10 375:19
**migration** 20:5

**miller** 271:12,14
272:3 424:24
**mind** 6:18 10:3
140:25 221:13
**mine** 185:9
**minimal** 54:4
283:14 311:10
**minimally** 268:9
268:19
**minimis** 337:22
**minimizes** 366:4
**minimizing**
234:13,15,16
280:12 357:21
366:2 377:5,7
412:22,23
**minorities** 25:23
187:17 234:4
241:4
**minority** 15:11
19:25 20:20
21:4,19,22 22:4
24:17,18,25 27:3
27:4,22 28:3
30:2,19 186:13
186:22 187:2,21
188:15,23,25
196:13 198:6
234:6 248:15
273:24 274:25
275:23 299:10
300:7 312:3
**minus** 178:25
315:4,5
**minute** 91:7,10
136:9 246:5
257:10 284:16
284:20 340:5

383:21 401:7
minutes  58:13
  66:25 76:18
  115:17,20
  379:13 383:19
mischaracterizes
  81:6 88:25
  129:3 138:14
  337:9
misgiving  353:3
mispronounced
  9:25
missed  45:13
missing  32:13
modification
  331:19
modified  176:7
  176:11 213:4
  334:15
moment  7:4 91:3
  115:12 132:18
  186:8 194:16
  214:3 222:24
  271:23 389:15
moments  195:16
monitored
  303:23
monitoring
  374:7
month  169:10,12
monthly  168:8
  169:5,7,13,15
months  318:9
moon  3:7
morning  6:8 7:9
  369:10
moseley  1:19

motivating
  15:18
motivation
  13:24
motivations
  284:3
motives  14:15
move  95:18
  110:14,15 124:7
  126:3 129:7
  131:20 209:2
  243:15 286:18
  287:2 301:8
moved  95:11,17
  250:3
movement
  250:14
moving  110:17
  137:21
muggy  106:8
murphy  1:13
murrell  1:12
mutual  208:21
  275:22

n

n  2:6 6:2,23
  172:2,2,2,4
  393:14 422:2
n.w.  5:8
naacp  1:4 3:7,8
  6:17 256:20
  257:15,21 258:4
  258:11 310:5,10
  310:21,22,25
  341:14 387:3
  413:7 425:6

naacp's  249:4
naacpldf.com
  3:14
naacpldf.org
  3:15
name  6:19 7:7
  8:23 9:24 32:12
  32:13 33:20,22
  34:10,12,15
  52:25 55:6
  118:13 145:12
  374:25 393:9,13
named  24:23
  75:7 138:24
naming  134:13
national  29:23
  57:13,14 61:3
  62:2,7 75:16
  118:7 222:16
  391:6,13 396:10
  400:22 401:25
  403:5 404:24
  405:10
nationwide  30:8
  30:13
native  30:15
nature  17:24
  59:3 335:22
ncsl  75:21
  172:16 173:12
ncsl's  173:12
nearly  43:13
necessarily
  88:15 166:13
  188:22 210:5
  234:24 235:12
  282:7 366:13

necessary
  206:18 246:17
  247:21 253:20
  275:7 427:5
need  10:11,24
  11:19 17:12
  18:22 25:25
  26:15,20,22
  28:23 29:5,13
  30:4 48:23 49:3
  72:6 76:19 91:7
  103:7 122:15
  165:23 171:8
  183:4 189:10
  197:8 201:16
  222:23 262:14
  284:16 298:25
  303:2 315:10
  343:21 346:21
  378:16 383:18
  385:25
needed  61:5 77:7
  80:3 116:6
  248:23 249:3
  261:22 262:9,24
  264:12 266:10
  318:14 408:16
neighborhood
  390:14
neighbors
  390:16
neutral  206:2
  274:24
never  17:4 24:11
  31:7 72:2
  124:14 128:16
  137:13 151:9
  158:6 167:6

190:19 201:11
210:12 219:12
317:15,16 318:5
321:15 339:5
402:8
**new** 2:15,16 3:12
3:12 69:16,17
160:5 292:5
300:24 343:19
361:19 420:2,4
421:2,4,8
**newberry**
110:16,18
**nexsen** 3:18 7:23
32:19 39:2,2
**nexsenpruet.c...**
3:23
**nice** 6:9,11
**night** 368:22
**nine** 271:25
**nodding** 10:7
162:9
**non** 93:8,13 94:3
96:8 97:5,11
113:14,15,22
**nonattorney**
48:7 55:23
**noncongressio...**
56:23
**nondilution**
269:11 312:3
**nonfull** 277:6
**nonhotly** 307:6
**nonnegotiable**
312:20
**nonpartisan**
86:22

**nonracial**
232:15 269:12
269:13 312:8
**nonredistricting**
16:19
**nonretrogressive**
20:13
**nonspecifically**
271:4
**norfolk** 388:10
**normal** 255:14
291:22
**normally** 366:8
**north** 388:11
413:11
**northeastern**
159:9
**notably** 326:6
**notary** 2:15 6:4
420:22 421:7
**note** 379:10
419:16
**noted** 11:3 172:3
418:25 419:22
427:12
**notes** 12:19
217:9,12,22
218:11 219:12
219:16,18 223:9
224:15 225:9,16
225:23,25 226:2
226:4,6,8,17
227:5,10 228:2,6
228:13 283:16
325:21 364:13
403:16 404:12
405:4,8 406:2,8
407:2 419:8

**notice** 271:18
330:15
**notwithstanding**
183:2
**november** 41:20
42:21 57:23
63:2 65:4,20
74:3,4 77:19
78:14,25 81:11
117:9 119:16
126:9,21,25
127:7 130:17
138:3 140:18
141:23 169:25
170:2,3 229:8
258:20 259:3
261:4 286:7
287:6,14 291:16
307:12,15,15
308:19,20 309:8
309:14 310:2
316:3 320:3
**nrrt** 71:14 79:22
80:22,24 81:2
100:24 140:17
140:24 141:10
141:22 142:16
143:8,8,14 317:6
414:21 415:2,15
**nub** 338:6
**number** 63:21
77:10,13,16 90:3
90:22 96:14
119:17 165:2,16
165:21 178:20
204:18 250:23
256:13 257:4
304:7 320:16

327:12 357:9
362:25 388:4
**numbering**
126:10
**numbers** 67:13
67:25 70:22
71:3 92:25
151:22,23 152:6
152:8 165:6
198:15 250:8
259:16 351:13
363:20,21,23,24
386:8,10,12
**numeral** 185:12
185:18 186:5
209:3 210:8,18
211:2 213:8
238:10
**nygord** 5:14 8:3

**o**

**o** 75:8 172:2,2,2
260:21 271:12
271:14 393:14
**oath** 9:16
**object** 11:2
36:17 37:6
49:15 73:6
79:25 108:20
130:18 163:3
176:23 191:3
233:7 269:17,18
419:2,10,17
**objection** 11:3
81:5 88:24
129:2 138:13
164:12 204:10
208:3 337:8

**[objection - orangeburg]**                                          Page 45

348:18
objections   10:21
objective   178:24
objectives
348:18
objections   10:21
objective   178:24
objectives
347:16
obligated   219:10
obtaining   20:16
obviously   89:5
193:24 286:21
348:4 350:4,5
372:23 388:12
393:16 419:2
occasion   50:15
52:19 153:8
occasions   75:20
208:15 330:12
417:15 418:2,3
occurred   244:13
october   254:4,17
387:5
odom   71:10
offended   33:19
offer   354:18
415:7
offered   208:21
342:11 355:21
415:5,10
office   12:5 39:8
39:16 47:7
70:18 76:10
78:2 105:6,7,13
105:23,24 106:3
106:11 115:16
120:17 122:17
127:3,17 292:11
323:20
officers   224:24

offices   120:15
308:12
official   1:10,11
1:12,14,15,17,19
4:6,7 141:16
177:9
oh   36:22 45:22
51:22 90:25
99:16,23 198:8
218:14 254:11
295:9 343:7,21
378:10 388:2
okay   10:20 11:9
11:13 12:2,7
32:10 37:9
38:16 45:11
63:11 65:18
66:7 74:16
76:18 77:22
93:7 97:2
104:10 120:18
126:17 132:23
135:7 146:12
147:7 168:10
170:22 213:13
231:8,10 246:10
248:4 250:24
254:14 256:16
266:4,18 267:8
271:10 276:5
279:4,8 280:25
285:21 311:22
313:24 315:19
316:12,16 317:9
327:23 329:15
341:15 344:3,25
345:7 347:13
351:6 353:17

355:2 373:4
383:3,18 417:7
old   160:4 292:14
oldham   56:5,9
61:10,12,21
62:25 63:19
64:20 65:6 67:6
67:12 70:21
71:2,15,19 74:6
74:18 75:5 76:3
76:7,12 77:6
78:4 79:15,21
80:2,8,21,23,25
83:21 84:9,14
100:18 101:6
107:23,25
108:15 116:9
125:19 128:11
128:14,16,20,24
129:9,17 130:14
130:20 131:4,7
134:21 139:5
141:15 293:22
385:18
oldham's   72:3
once   11:15 41:12
44:2 82:5
266:22 282:22
397:8
ones   51:16 69:17
87:24 88:18
161:19 363:7
373:24
ongoing   193:14
online   325:19
oo3   355:9
open   151:18
343:17,18,23

386:23 391:22
392:7 399:24
409:11 418:14
418:23 419:3,11
419:18
opened   254:11
operation   22:22
opinion   75:24
166:3 245:15,19
247:8 279:22
318:6 353:21
378:17 413:16
415:23
opperman   53:9
53:10,13 341:20
345:12,18 346:7
348:7,17,24
349:9 350:14
353:15 354:17
355:8 357:14
359:7,12 360:10
361:25 362:8,13
425:22
opperman's
356:5,18 359:18
360:2,15
opportunity
187:7 304:22
opposed   221:8
opposite   206:20
opposition
206:16
options   155:12
oral   222:9
orangeburg
101:12,13 112:9
410:10

**oranges** 339:15
**order** 26:7 27:10
28:7 30:24
189:17 206:10
211:13 212:25
252:23 276:20
377:9
**organization**
25:9 57:14
86:23 118:12
138:25 142:11
179:14 249:8
**organizations**
25:6 75:15
**original** 185:8
427:16
**ossify** 279:18
**outcome** 270:7
421:17
**outlets** 236:23
237:10
**outlined** 214:21
**outset** 93:18
**outside** 92:6
98:14 99:18
114:4 118:17
122:16 183:20
183:24 222:18
297:12 303:4
304:2,13,21
343:5
**outskirts** 390:18
**outvoted** 151:17
**outweighed**
247:8
**overall** 35:23
**overestimated**
71:4

**overlap** 234:23
397:10
**overlaps** 234:20
**override** 236:12
**overriding** 29:8
346:24
**overview** 311:7
372:4
**overwhelmingly**
241:6,8

**p**

**p** 2:6
**p.m.** 72:16,22
73:8,9,15,16
74:3 81:11
171:10 172:3
419:22
**pack** 196:15
**packing** 188:3,7
315:15 326:3
**page** 9:10,14
32:7 35:14
113:4 114:13
133:3 167:8
173:16,18
185:13 211:7
222:21 224:19
230:4,12 231:12
251:24 252:7
256:14 257:2
258:3 259:14,16
271:25 277:4
279:11 281:5
310:19 311:3,9
311:13 316:5,7,7
316:21,22 317:9
340:21 341:12

342:10 346:3
347:13 348:6,7
348:23 349:4,5,6
349:11 350:13
351:17 352:6,7
353:14 354:15
357:9 372:3
375:19 380:3
386:5 387:6,19
387:22,24 388:2
392:10 403:19
403:24 404:18
404:18,19
406:14 420:12
422:3 428:6
**pages** 223:6
226:24 310:16
362:23 420:8
**paid** 87:5 184:13
184:18 356:19
**palmetto** 81:23
100:12,18
103:11 104:19
113:20 114:9,22
115:10 116:18
116:21 117:22
119:9 124:15
125:24 129:19
**paragraph**
133:14 146:21
167:17 173:18
222:21 224:18
252:5 256:18
257:13 266:6
273:7 274:7
276:10,13,14
277:7,12 279:10
349:12 375:20

377:21,22 400:8
400:10 401:15
**parenthetical**
388:21
**part** 40:7 94:12
94:18,19 96:5,9
104:20 122:4
131:11 133:7
174:12,15
195:10 214:21
246:18 262:22
281:24 296:4
319:13 337:22
378:19 390:8
401:16,19
**partially** 336:5
**participant** 87:4
91:5
**participate**
305:5 321:11
325:14 333:14
**participated**
220:20
**particular** 24:4
27:9 38:19 69:4
86:13 100:2,25
107:13 110:20
134:12,13
158:13 164:4
165:2 195:18
211:13 212:24
216:19 264:2
271:24 300:8
309:2 310:18
331:22 345:11
360:25 363:7
366:18 377:9

**particularly**
264:7
**particulars** 24:2
**parties** 7:5
173:22 266:5,7
299:24 421:15
**partisan** 344:12
363:19
**partly** 157:15,16
**partner** 33:18
34:10
**partners** 37:11
**parts** 161:7
236:21 250:13
**party** 18:21 19:2
241:7 301:6
305:25
**party's** 301:7
**pass** 148:16
177:21 360:20
**passage** 381:16
**passed** 122:8
136:2 306:17
330:7 351:20
**passionately**
390:12
**patrick** 53:21,24
54:13,18 323:9,9
323:10
**patterns** 21:7
209:16 248:9
**paul** 106:15
**paula** 39:24
40:12 41:3,7
172:12,23 173:9
228:25 229:7,23
293:12,13
409:15 423:14

424:4
**paying** 167:9
343:11
**pays** 184:8
**pdf** 121:23
256:15,15
271:25 362:23
387:6,24 392:11
404:19
**pdfs** 222:13
259:18
**pending** 418:15
**peninsula**
339:13 348:10
348:12
**people** 10:22
30:15 35:18
36:25 47:25
55:11 93:9 94:6
120:23 122:24
123:3 155:16
157:2 160:6
178:20 196:13
216:14 243:23
261:21 264:17
272:18 283:7,12
284:16 289:17
292:22 340:2
342:8 359:17,17
359:21 412:9
**perceive** 304:20
**percent** 97:7
98:21 99:13,19
113:21 128:7
217:7 297:15
298:22,25 315:2
**percentage** 93:8
93:20 97:10

98:19 113:14
114:2,8 160:3
161:6,13 250:7,9
250:10 302:3
304:6 328:9,22
**percentages**
92:25 98:15,18
350:17,24
392:12
**perception**
305:23 306:3
**perform** 248:6
300:7 302:15
**performed**
299:14,16,20
367:10
**performs** 257:17
**period** 95:5 98:8
127:10 295:8
369:7 400:12,18
**periods** 374:9
**permissible**
195:9
**permutations**
196:7
**perry** 237:24
**person** 42:3
45:22 51:5 54:6
63:2 85:25
167:3 185:24
216:13 225:2
232:14 269:10
269:21 312:15
313:16,21
314:13,19
325:15 342:3
365:3 412:2

**personal** 63:24
**personally** 109:6
144:7 205:15
215:9,23 414:19
414:23 415:8
416:23
**persons** 1:7
**perspective**
139:24 150:2
302:13 320:21
**persuading**
20:11
**pertinent** 166:15
**ph** 161:2
**phase** 60:11
**phd** 3:7
**phone** 42:3,8,15
47:6 54:6 63:25
63:25 64:3,5,10
64:12 76:2
80:15 100:20
129:14 156:6
166:24
**phrased** 281:15
**physical** 368:13
**physically** 12:3
78:4,7 85:22
**pick** 89:18 93:21
**picky** 87:11
**pieces** 133:24
**pitfalls** 155:8
**pl** 169:19 249:24
250:5 297:21,25
**place** 108:6
138:3 202:16
280:18 305:4
338:9

| | | | |
|---|---|---|---|
| **plaintiff** 8:4 | 40:10,17 41:5 | 283:14,22 284:5 | 372:11 384:23 |
| 18:24 24:17,23 | 56:18 57:21 | 284:7,8,9 285:24 | 384:25 385:4,7 |
| **plaintiffs** 1:8 3:5 | 59:7,8 62:16 | 286:5,6,14,20 | 390:4 392:3 |
| 6:13,16 7:8,11 | 65:13,15 71:7 | 287:8,9,18,22 | 394:25 397:4 |
| 13:3 23:24 | 73:20,21,23 | 288:2,6,11,15 | 398:14,16 399:2 |
| 27:22 28:3 | 91:14,21 96:16 | 289:10,18 290:3 | 399:8,11,22 |
| 31:11,20 63:5,6 | 97:12 99:9,25 | 290:4,6,8,14,24 | 400:4,19 409:3 |
| 78:16,18 91:13 | 100:6,8,15 101:4 | 291:3,15 292:9 | 410:2,6 411:5,13 |
| 103:14 104:3 | 101:14,21 102:3 | 292:15,18 293:6 | 417:12 422:14 |
| 119:19,20 | 102:8,12,22,23 | 293:20,23 294:3 | 423:5 425:16 |
| 126:12 131:24 | 102:24 113:9,20 | 294:7 295:3 | **planned** 337:25 |
| 132:9,10 145:23 | 114:10,23 | 296:18 301:9,18 | **planning** 324:24 |
| 146:8 172:21,22 | 115:10,22 116:5 | 301:20 302:2,6,9 | **plans** 65:13,16 |
| 180:8 221:22,24 | 116:22,23,24 | 302:21 304:20 | 92:16 96:17,18 |
| 228:22,24 251:3 | 117:2,5,22 118:4 | 307:3 311:8,10 | 96:22 100:11 |
| 251:10,12 | 118:16 119:9 | 311:10,19,24 | 133:5 134:5,11 |
| 253:25 254:14 | 132:3,11 133:16 | 313:6,7 314:5,20 | 135:16,21 136:9 |
| 254:22 259:2,7 | 133:17,19,20,22 | 317:16 318:9,15 | 137:22 153:21 |
| 264:15 265:4 | 133:23 135:19 | 318:21 319:2,14 | 166:8 196:7 |
| 271:9 272:2 | 136:3,11,12,19 | 319:19,23 320:3 | 203:21 204:18 |
| 275:25 310:8,13 | 136:25 137:21 | 320:5,8,11 321:8 | 207:10 209:11 |
| 326:24 327:14 | 139:2,6 148:15 | 321:23 322:2,5 | 238:15 298:21 |
| 340:20,23 | 149:23 160:17 | 322:16 324:7,10 | 303:9,24 329:6 |
| 343:24 344:4 | 162:17 163:8,15 | 324:13 325:10 | 330:17 335:18 |
| 355:3,11 361:20 | 165:3,24 166:3 | 326:23 327:10 | 340:2 345:8 |
| 362:7 364:10,14 | 173:24 175:23 | 329:7,8,9 330:7 | 359:18 391:14 |
| 369:16 370:8,12 | 186:10 198:13 | 330:9,23 331:2,3 | 391:18 392:17 |
| 374:18 375:5 | 198:16 203:19 | 331:4,7,9,10,11 | 392:24 395:20 |
| 384:5 385:21 | 203:21 204:17 | 331:19,20 332:4 | 395:25 396:6 |
| 386:16 389:7 | 204:24 205:6 | 332:7 333:6,9,12 | 400:13,21 401:3 |
| 399:25 403:9 | 206:16 207:9,16 | 333:18 334:15 | 401:16 402:2,17 |
| 407:10 409:12 | 207:17,25 | 334:20 344:5,9 | 403:6 |
| 413:8 414:2 | 208:18,20 | 349:25 351:20 | **please** 6:20 7:13 |
| 422:9 423:3 | 212:10 255:19 | 351:20 354:8,19 | 10:4,7 11:16 |
| 424:3 425:3 | 259:25 260:2 | 354:20 355:24 | 18:16 33:22 |
| 426:3 | 266:12 268:2 | 359:12,19 | 36:3 37:23 |
| **plan** 14:14 18:23 | 276:25 278:7,15 | 360:11 361:11 | 67:14 68:2 |
| 20:3,12 23:5 | 282:10,17 | 363:14 370:5 | 72:11,20 76:23 |

132:19 222:5,25
226:5 235:20
257:10 287:13
302:23 427:4,9
**plethora** 20:25
**plus** 113:15
178:24 315:3,5
**po** 4:13 5:16
**point** 11:17
26:19 37:21
61:14 65:14
66:16 67:19
68:23 90:2
100:8 111:8
127:9,15,16
136:4,17 137:3
137:18,23
140:10 159:2,3
175:17 185:5
195:22,24
198:23 217:20
240:8 247:18
255:13 261:17
290:10 296:17
296:18 321:18
322:10 330:25
333:11 335:4
342:16 343:7,15
348:2 357:8
372:14 389:16
390:22 401:14
**pointed** 284:4
**pointing** 398:20
**points** 153:15
154:2,6,11,22
302:3 304:6
309:2 369:23
370:3,24

**polarized** 21:25
241:16,19 242:6
242:25 243:20
244:2,4,9,16
245:16 246:16
247:7,15 387:8
408:21 410:15
410:19
**police** 34:13
**policies** 159:2
**policy** 132:2,11
132:25 134:22
138:2,7,12,19,23
138:24 140:4,14
140:15,17,22
141:3,24,24
147:21 148:2
149:9,14,17,18
151:3,8 174:16
174:23 175:7
176:2,17 178:21
179:6,11 195:9
276:21 339:25
359:21 400:3
403:3 423:4
**polidata** 67:17
68:16
**political** 59:12
74:7,13,17,25
83:14,17 86:13
86:24 89:13
174:17,24
238:12,19,21,23
239:19,22
240:13,22 301:7
305:25 335:20
336:18 338:16
339:20 344:15

353:18,24
358:25 359:6
**politically** 21:22
27:5
**populate** 47:16
**population** 21:3
92:13,19 93:20
97:6 99:9
113:16 181:4
210:20 247:23
248:13,16,19
249:18 250:2,7
296:8,14 298:4
301:13,16,19
303:3 304:5
314:25 328:16
337:21 344:18
344:20,21 352:9
352:11
**populational**
185:23
**portal** 134:4
**portion** 160:4
**portrayal** 141:7
**posed** 163:13
**position** 36:23
59:16,21,25
71:21,25 79:19
88:13 133:11
134:17,19 141:9
141:14,20 194:7
223:9 225:8
302:25
**possibility** 324:3
**possible** 22:9,11
24:12 27:18
47:8 53:23 78:9
125:6 127:18

166:13 201:4
226:3 249:25
250:6 268:2
279:14 287:3
289:14 347:25
382:20 393:12
395:10 408:3,9
414:9
**post** 37:14,16
122:15 136:10
137:24 401:11
**posted** 59:14
87:16,19 100:7
117:2 175:11
287:8 330:16
395:20 401:3
408:5,7
**potential** 275:6
**potentially**
89:18 150:25
417:12
**power** 353:18,24
354:3
**powerpoint**
222:13
**practical** 20:9
121:10 147:7
196:4,20 197:7
199:22 201:14
210:14 211:12
212:23 333:8,16
374:5
**practice** 52:23
219:3 255:15
**practiced** 24:10
**practices** 23:25
**precedent**
277:15,19

**[precedes - probably]**                                          Page 50

**precedes** 211:22
**precinct** 69:9
  197:16 234:17
  281:17
**precincts** 71:5
  280:11 281:14
  282:12
**preclear** 18:22
**preclearance**
  19:4,12 20:10
  22:12,14 299:25
**preconditions**
  21:18 187:10
  188:11,12
**precursor**
  370:18
**predecessor**
  224:7
**predicate** 276:23
**predict** 299:9
**predicted** 306:7
**predominance**
  209:12,17,23
**predominant**
  14:2 15:9,17
  16:4,8 189:13,15
  189:17 190:4,18
  192:23,25 193:6
  193:11,18 194:2
  194:25 204:3
  247:16
**predominantly**
  187:12 206:3
  241:10
**predominate**
  208:23
**predominated**
  206:24

**preferable**
  351:19
**preference**
  111:11 151:8
  176:17 211:14
  212:25 268:14
  295:15 377:10
**preferences**
  107:14 174:17
  174:24 175:7
  176:2 307:5
  333:23 334:2
  359:22 399:18
**preferred** 268:8
  300:14
**premise** 279:3
**preparation**
  382:6
**prepare** 265:12
  266:11 308:20
  308:23 408:17
**prepared** 50:17
  74:8 92:3,6,8,10
  153:16 345:2,8,9
  345:11,18 367:2
  367:3 368:21
  372:6 373:2
  381:21 382:4,5
  382:10
**preparing** 31:13
  120:3,8 308:25
  309:4
**presence** 239:5
**present** 123:10
  179:17 296:9
  341:16 399:13
**presentations**
  222:13

**presented** 118:5
  402:13
**presently** 242:16
**preservation**
  386:8,10,11
**preserved**
  160:10 335:16
  335:21
**preserves** 350:15
**preserving**
  231:19 232:18
  268:13,17
**president** 1:11
  4:6 329:11
**president's** 39:8
**presidential** 19:5
**pressing** 139:10
**pressure** 135:17
  136:5
**presume** 305:3
**presuppose**
  313:20
**presupposed**
  312:10
**pretty** 86:20
  148:8 151:18
  170:8 324:5
**prevalent** 283:20
**prevents** 176:10
**previous** 88:12
  283:22 385:4
  412:6
**primarily** 18:18
  33:16 42:8,15
  200:16 237:19
**primary** 10:22
  19:5,6 41:23
  303:12,13 314:2

**prime** 332:10
**principle** 313:16
**principles** 207:2
**printed** 363:19
**printers** 201:15
**prior** 32:24
  184:19 297:13
  297:23 384:23
  411:25
**priorities** 335:13
**prioritize** 281:16
  282:11
**prioritized**
  280:10 282:17
**priority** 211:22
  279:16 281:9,10
  282:2,8,10 335:8
  335:11
**privilege** 164:16
  204:11 219:15
**privileged** 49:17
  164:18 191:8
  204:14 208:4
**privy** 184:5
  380:9
**probably** 13:13
  42:7 45:23
  61:18 80:7
  85:23 87:13
  103:22 104:16
  105:6 120:16
  125:20 126:2
  166:16 184:7
  192:9 213:21
  217:10 225:24
  255:12 261:24
  287:4 321:2
  323:12,13

324:23,24
334:12 354:12
363:15 367:23
**probative** 240:9
264:7
**problem** 249:11
**problems** 279:18
**procedure** 2:9
**proceed** 9:13
11:19 286:15
**proceeding**
25:10 260:24
**proceedings**
25:7 77:3 91:12
207:7 246:13
284:23 340:13
383:23 421:9,12
**process** 35:24
37:19 39:12,14
44:3 49:3 54:2,2
54:3 74:12
79:12 87:5 92:5
93:19 119:11
122:24 123:2
140:24 147:21
152:13 167:20
174:19 175:20
177:10 189:14
189:16 194:6
201:10 203:24
204:7,23 207:20
214:21,25
217:17,19,25
225:19 230:2
240:12 245:18
270:10 281:25
282:8,14 286:16
286:19 292:4

294:12,19
306:25 318:4,17
318:23 334:14
343:10 349:22
372:4 382:17
398:4 399:15
**process's** 175:4
**processes** 35:6
**produce** 135:18
274:9
**produced** 100:5
230:24 303:8,10
321:19 332:2
418:19
**producing** 332:5
**product** 204:12
208:6 217:24
218:2,15,16,20
218:21,25 219:4
219:4,8,11
**production**
223:23 403:23
404:21 405:15
406:15 419:14
**professional**
2:13 96:6 121:6
**progeny** 186:18
**progressed**
282:14
**prohibition**
176:14 346:11
347:7
**prompt** 302:7
**prompted**
301:23
**promulgated**
292:18

**pronounce** 33:21
**pronunciation**
6:25
**proposal** 133:21
287:10
**proposals** 154:3
155:15 157:8
173:24 174:8,11
178:12,21
**propose** 107:2
108:15,18
115:23 150:25
**proposed** 87:18
108:10 113:19
123:18 150:12
154:16 156:3
160:15 192:24
200:11 203:20
203:22 205:7
238:14 281:7
285:23 300:24
307:8 330:16
359:12,18
392:24
**proposing** 85:2
273:2
**protect** 25:22
**protected** 29:16
195:18 219:5
**protection** 19:13
30:3 219:2
**protocol** 308:14
**protographer**
288:8 332:8
**protrusion**
295:19
**provide** 11:4
74:10 125:22

152:20 169:5
264:13 320:7
356:24 397:2
404:7 418:20
**provided** 80:6,7
135:5 142:17
143:8,14 208:23
231:5 330:15
345:23 357:3
361:9 369:12
391:18 392:16
394:8,18 395:20
400:23 403:25
405:17 406:3
416:15 417:4,8
**provides** 74:12
134:4,11 142:12
258:4 297:17
350:16 352:11
353:15
**providing** 74:23
152:17 311:6
333:8 374:8
393:23 394:16
397:11 417:23
417:24 418:4
**proving** 200:3
**pruet** 3:18 7:23
32:19 39:2,3
**public** 2:15 6:4
49:11,12 50:11
62:13 84:25
87:19 112:20
117:11 119:8
122:4,7,20
124:11 131:11
132:2,11,24
133:8,10 135:14

136:6 137:5,15
138:23 140:23
149:10 150:24
150:24 157:9
174:4,7,10 175:5
175:9,12,13
176:17,22 178:8
179:4,17,25
180:10 200:12
203:18,22 214:4
214:6,25 215:3,5
215:7,19,24
216:5 218:12
220:16,20
225:10,16,18
230:8 244:15,21
245:12 253:12
262:20 268:7,16
295:8,20 296:25
309:20 315:7,21
316:17 334:9,20
350:11 353:12
358:19 374:15
400:4 401:19,22
402:10 403:16
408:14 412:4
420:22 421:7
423:5,20
**publicized**  62:12
134:24 176:20
181:10,16
291:15,24
293:20,24 294:4
294:8 322:6,7,9
**publicly**  74:9
87:17 88:5
135:15 151:8
248:25 287:8

314:4 409:7
**published**  49:20
62:16 263:20
307:11 320:6
322:19,21,23
324:2,4
**pull**  90:25
**purportedly**
135:10
**purporting**
225:3
**purpose**  15:18
16:4,5 48:14
83:11 106:19
107:6 110:2
173:20 174:3
178:7 186:12
199:9,15,18,21
224:5 298:11,14
394:21 395:13
395:17 418:24
**purposeful**
200:3
**purposefully**
297:4
**purposes**  47:22
64:6 83:16
107:5 170:24
199:12 251:2
**pursuant**  2:8
267:6 355:25
**pursue**  301:21
**pushing**  171:6
**put**  12:22 67:2
68:19 74:8
107:7 108:9,15
108:18 124:5
155:11 164:12

196:17 263:5,15
266:23 270:5
418:12
**putting**  67:5
112:18 139:18

## q

**qualify**  296:11
**quarters**  239:4
**question**  10:10
10:13,14,16 11:2
11:22 15:21
25:16 26:3 31:6
34:24 36:11
37:8 40:22
56:11 138:17
156:12 157:12
157:14,16,18
158:5 159:15
160:17,18,21
161:12,14,25
162:5,12,19,24
164:21 166:2,16
176:25 189:11
191:9,14 193:21
196:9,9,10
200:17 202:17
226:18 233:9
236:5,6 243:11
246:4 255:6
257:11 278:18
279:6 281:21
283:5,25 290:17
297:10 301:4
302:23 337:12
352:19 367:7
389:16 395:6
408:11

**questioning**
416:4
**questions**  9:20
11:11 26:13
29:10 50:5,10
86:18 161:18
163:12 172:9
196:14,16 197:6
197:7,8 200:24
201:18 283:11
284:12 288:16
374:23 379:3
383:4,5,9,11
393:5 396:20
402:11 411:19
418:11
**quick**  136:23
292:19
**quickly**  62:21
240:7
**quote**  117:4
275:17 377:23
377:24,25,25
378:2,3,4,5
**quoted**  248:24

## r

**r**  2:6,6 6:2,2,2,22
6:23,23 33:25
75:8 172:2,4,4,4
260:21 323:18
393:14 428:2,2
**r.t.**  131:7
**race**  13:25 15:8
16:3 25:13,19
26:2,10,15,23
27:9 28:6,10,15
28:16,19,22,24

**[race - ready]**

29:2,14 30:5
31:4 69:3 74:14
75:2 153:19,22
153:24 187:12
189:12 190:4,18
190:22 191:11
192:3,12,17
193:5,10,17
194:7,18,24
195:4,8,14 196:2
196:5 204:3
205:14,24 206:2
206:9,23,24
208:21 233:16
233:23 247:11
247:13 274:24
275:21 285:9
286:2 301:5,22
306:13
**races** 263:13
305:21 407:18
**racial** 13:8,18,22
13:24 14:6,10,15
14:17,19,21 15:3
15:4,9,11,14,15
15:23,24 16:10
16:14,17 17:5,7
17:12,14,15,18
17:20,21,23 21:8
21:12,16 25:23
28:17 30:20,25
93:5 166:11
187:20 188:20
189:5,11 192:19
192:20 195:17
196:6 197:11,20
201:24 202:6,18
202:21 203:2,7,9

203:20,23
204:20 205:8
206:4,17 207:19
209:5,10,12,15
209:16,17,23
210:21 234:4,6
240:21 248:8
252:13,22
253:13,21
256:21 257:17
257:22 258:9,14
260:3,6 263:7
264:8 265:2
267:5,12 269:16
269:23 274:14
275:11,16,20
276:2,15,22
278:6,14 300:7
303:15,19
312:18 346:12
346:20 347:8
365:10 368:7
376:5 378:7
387:8,14 411:6
411:14 415:24
416:10
**racially** 21:25
210:6 241:16,19
242:6 243:19
244:2,4,9,16
245:16 246:16
247:6 387:7
408:20 410:14
410:19
**radically** 269:6
**raise** 27:18
196:14 197:5,25

**raised** 24:13
202:9 368:2
**raising** 196:17
**ran** 324:24 325:6
345:22 362:19
**range** 169:15
170:12
**ranked** 375:23
**rankin** 1:11 4:7
51:20 52:10
105:20,22
147:10,17,19,23
147:25 148:6,12
148:21 151:18
151:22 152:12
152:14,21 153:6
153:7,13,16
166:24 182:8
184:4 192:2,16
194:9,12 214:23
218:5 228:14
271:20 331:6,11
331:19 332:19
355:5,13 374:20
375:6 378:25
425:18 426:10
**rankin's** 105:7
105:13 106:3,10
115:16 120:16
127:2 182:24
289:8
**rarely** 56:17
**rate** 167:18
**rationale** 224:5
354:13
**rbv** 260:8 261:10
265:9

**reach** 59:18
268:24 338:15
**reached** 59:17
59:20 109:6,11
390:20
**reaching** 109:13
**reaction** 100:2
108:22
**read** 16:25 31:9
31:12,14,16 81:9
98:15 133:3,14
180:19 186:8
211:15 222:5,23
223:16 238:2,16
252:2,9 259:20
265:14 273:6
275:2 276:9
277:3 281:11
315:11 325:16
356:18 374:5
387:13 400:15
401:23 405:5,24
406:23 413:16
420:7 427:4
**readily** 198:24
**reading** 49:6
216:24 217:2
223:25 265:25
**reads** 65:6
211:10 266:6
277:13 279:12
311:13 375:20
375:25 376:19
377:3,22 400:10
401:16
**ready** 115:23
129:6 136:10

**reagan** 294:10
**reagen** 142:19
294:6,20,21
**reaggregate**
68:17 69:15
**reaggregated**
68:21
**reaggregating**
71:9
**reaggregation**
74:12,24
**really** 29:11 37:7
44:17 45:4
54:11 72:6
105:22 112:5
137:13 149:16
159:2 164:13
169:22 184:23
190:20 212:13
235:13 240:8
246:23 249:2
294:10,13,15
302:14 303:16
318:14 323:23
338:3 379:2
**reason** 11:9 90:7
101:8 112:15
115:18 120:24
121:10 122:6
134:23 135:3
137:6 150:2
181:9 246:20
258:13,16 261:3
305:17 390:2,6
401:2 413:17,22
413:24 414:7,13
416:6,11 427:6
428:7,9,10,12,13

428:15,16,18,19
428:21,22,24
**reasonable**
338:14
**reasonably**
174:4 178:8
**reasons** 44:22
89:21 155:5
163:11 206:2,3
352:15 368:12
378:7 419:19
428:5
**recall** 20:8 39:15
47:23 48:9
52:25 53:6,18
54:17 57:24
59:5,10 67:5
73:19 78:9,10
80:6 82:21 87:7
87:11 88:9
93:23 99:24
101:13 102:4,5
106:11 108:3
109:13 110:21
111:15 116:13
117:12,14,18
120:18,22
124:20,24 125:4
125:13,20
126:24 127:4
128:5,9 129:8,16
129:24,25 130:3
130:5 145:9,12
149:11 152:9,17
152:18 159:3
179:20 184:15
184:22 192:5,8
206:14 214:11

216:10 217:8,11
217:15 238:7
239:17 243:3
251:20 253:3
255:12 256:9
258:19 260:19
287:10 288:20
290:7 294:24
296:8 297:5,20
298:11 300:4
304:17 306:16
308:25 309:18
309:23 315:12
315:19 319:7,9
320:2 321:20
322:17 323:10
323:25 325:24
326:2 327:20
328:25 329:20
330:19 335:15
351:13 352:2
354:11,16,22
355:16 359:13
359:19 362:17
364:19 367:14
372:10 374:3,6
374:16 375:11
375:16 386:9
387:9 389:19
391:3,7,10,15
397:5,10 400:5
403:14 408:22
412:3 413:12,14
413:23 415:25
**receipt** 125:17
427:18
**receive** 22:12
64:8 101:3

142:15 373:19
414:24
**received** 63:19
66:5,24 117:9
131:16 230:7
295:7 302:10,12
372:19 404:23
405:9,17 406:4
414:17,21,25
415:4
**receiving** 272:7
318:21 375:11
**recess** 77:2
91:11 171:10
246:12 284:22
340:12 383:22
**recipient** 147:9
**recipients** 256:2
272:11 407:14
**recognize** 63:15
146:4 180:14
266:7 272:19
277:22 279:17
301:22 326:18
**recognized**
185:24 190:8,10
**recollection**
24:24 31:23
101:18,20,25
102:11,16
105:16 106:2
118:20 249:21
253:8 321:14
333:21 371:23
379:3 393:3
**recommendation**
151:3 278:8

| | | | |
|---|---|---|---|
| **recommendati...** | 35:22,24 36:14 | 196:20 201:13 | **redistricting.so...** |
| 298:19 | 37:14,17 38:2 | 203:17 206:25 | 134:7 |
| **reconsider** | 49:2,8,21 50:12 | 212:7 215:7 | **redraw** 33:9 |
| 197:17 | 51:10,14 56:21 | 217:25 222:17 | **redrawing** 32:23 |
| **record** 6:20 7:7 | 56:23 57:15 | 225:20 230:2 | 35:14 36:20 |
| 11:4,17 73:10 | 60:11 61:4 62:2 | 238:15 254:3,16 | 37:2,12,18 38:12 |
| 77:4 91:3 | 62:8,11 64:5,15 | 254:24 255:5 | 38:19 39:4,10 |
| 103:24 108:19 | 64:22,24 68:12 | 256:24 257:18 | 40:5 43:23 |
| 112:20 122:4 | 68:14 75:21 | 258:21 259:5,9 | 48:24 50:2,8 |
| 131:11 133:4,8 | 80:19 92:4 | 266:11 268:3 | 51:7 55:17 |
| 133:15 164:12 | 93:21 103:2 | 271:18 273:3 | 193:7,11 196:3 |
| 171:2 175:9 | 105:6 109:2 | 274:14 280:18 | 367:5 |
| 180:20 205:16 | 110:6 117:10,17 | 286:12 287:7 | **redrawn** 181:3 |
| 205:21,22 | 119:11 122:3 | 291:21 296:20 | 181:19 |
| 222:23 224:2 | 123:15 127:22 | 307:10,14 | **reduced** 175:2 |
| 259:21 284:14 | 128:15,25 | 313:18 319:21 | 207:5 247:24 |
| 333:25 350:11 | 129:10,23 132:5 | 321:22 330:14 | 248:16,20 |
| 353:12 379:10 | 132:13 133:6,10 | 341:7 348:15 | 249:14 250:2 |
| 379:19 381:7 | 133:23 135:19 | 355:22 364:6 | 302:2 303:16 |
| 401:19 409:7 | 135:24 141:4 | 385:23 387:4 | **reducing** 176:15 |
| 411:4,12 418:13 | 143:5,10,16,20 | 391:7,14 392:17 | **reduction** 187:2 |
| 419:17,21 | 144:2,24,25 | 393:21,25 | 249:7,12 283:21 |
| 421:12 | 145:15 146:23 | 394:10,15 | 301:19 304:4 |
| **records** 133:10 | 147:4,20,23 | 396:11 397:14 | **refer** 65:16 |
| 401:22 | 148:9,15 157:5 | 397:17,21,24 | 313:15 332:12 |
| **rector** 3:11 | 166:4 168:24 | 398:4,5,8,24 | **reference** 66:11 |
| **redacted** 64:18 | 170:7 172:10 | 400:10,13,23 | 66:12 357:6 |
| 73:25 | 173:13,21,24 | 401:18,21 402:2 | 369:4 |
| **redbook** 172:17 | 174:19 175:4,20 | 402:3 403:3,6 | **referenced** |
| 173:12 | 178:4 179:24 | 404:25 405:10 | 107:23 |
| **redirect** 411:21 | 180:9,21,22,24 | 409:3,22 410:23 | **referencing** |
| **redistrict** 122:2 | 181:11,13,17 | 411:10 412:15 | 72:24 370:14 |
| 192:24 | 184:19 185:6 | 416:18,24 418:6 | **referred** 81:22 |
| **redistricting** | 186:10 187:13 | 423:7,19 424:13 | 81:23 105:8 |
| 14:3 15:5,12 | 189:14,16 | 424:17 | 182:12 |
| 16:11,18 18:23 | 190:12,19,23 | **redistricting.gov** | **referring** 21:17 |
| 20:3 23:5 29:2 | 191:12 192:4,13 | 373:14 | 60:15 65:11,12 |
| 34:7 35:2,6,12 | 192:24 194:5,20 | | 79:15 102:24 |

140:23 280:20
281:2,3 314:11
385:10
**refers** 311:9
**reflect** 224:4
230:4 275:4
**reflected** 97:4
107:13 276:24
**reflecting** 249:23
265:8 347:3
**reflects** 167:17
168:14
**refrain** 10:7
**refresh** 8:24
127:8 258:23
**refusing** 18:7
**regard** 37:12
81:3 191:19
288:10 346:20
**regarding** 34:6
34:21,25 35:7
37:16 49:8
54:15 59:18
148:2 187:9
333:9,25 355:24
367:2,4
**regardless** 14:16
**regions** 349:8
**registered** 2:13
**registration**
240:6
**regular** 116:4
**regularly** 92:14
**reinforced** 289:3
**reiterate** 293:4
**relate** 235:14,17
237:17

**related** 15:2
36:19 143:9
267:4 344:22
357:22 387:3
421:14
**relating** 405:23
**relation** 38:7
111:4
**relationship**
37:25 333:15
**relative** 197:19
236:17 353:25
**relatively** 249:11
279:21 369:6
**release** 36:6,13
37:3 116:22,23
136:24 266:12
321:5
**released** 36:19
40:10 56:18
57:22 73:23
117:2,11 297:22
298:2 321:5,6,23
324:8 334:8
**relevant** 136:19
227:17 263:6
264:3
**reliable** 239:15
240:9
**relied** 155:18,25
156:2 201:6
385:13
**reluctant** 137:7
318:2
**rely** 163:22
**relying** 73:9
**remain** 267:25
270:4

**remainder**
295:16
**remained** 161:6
**remaining**
295:15 303:17
340:6
**remains** 339:21
**remarks** 310:15
348:7
**remedial** 274:14
**remedying** 190:6
202:25
**remember** 19:14
33:20 35:8
50:18,19 53:25
62:19 66:15,21
70:19 82:25
83:9 86:7 91:24
98:2 106:12,16
111:6 112:4,10
112:15,18,25
113:3 115:15
122:23 125:11
127:6 128:3,4
129:4,5 156:7
213:7 215:10
217:5 229:18,19
231:2 238:3
242:18,20 272:7
288:18 292:13
302:4 307:12,20
308:2 314:9
318:18 319:24
320:4,15,17
326:5,12 328:18
329:3 337:21
342:2 345:17
346:23 354:13

360:8,23 363:9
366:18 382:3
388:9,13 393:10
396:14,17
408:11
**remembering**
241:24
**remind** 13:10
**remote** 1:22 2:7
**remotely** 2:10
308:11 309:13
**renew** 208:3
**reno** 13:25
**repeat** 10:11
164:20 233:8
257:11
**rephrase** 10:13
**replaced** 334:17
**replicate** 93:24
**replicated**
159:10
**replied** 73:15
**report** 70:9,10
93:4 146:17
147:8,13,16
161:11 228:15
285:25 345:11
345:17 351:16
382:12,13
**reported** 2:12
166:23 351:8
421:9
**reporter** 2:14,14
9:23 10:24
170:25 310:4
340:19
**reporting** 369:8
372:15

**reports** 94:13
144:18 153:20
222:14 303:7
324:25 344:11
344:25 345:7,20
350:25 352:7
362:19,20
381:20,20 392:2
**represent** 84:15
146:21 311:5
**representation**
145:24 146:10
146:13,16
184:14 352:21
423:11
**representative**
84:12 97:16,19
97:24 98:10,11
102:6 111:17,23
112:19 141:15
141:16 177:8
187:5,8 218:6
300:16 326:7,14
326:18 359:4
**representatives**
1:13,14,16
224:24 237:3
**represented** 8:13
24:16 25:3,4,5,8
38:8 83:14
97:15 107:17
123:6 136:15
**representing**
6:13 7:5 414:11
**represents** 8:16
**republican**
18:21 19:2 25:6
57:13,15 60:10

61:3 62:2,6 71:4
75:14,15 83:20
83:22 84:5
106:23 107:7,9
108:25 130:10
130:21 139:8,19
141:17 142:24
222:16 270:20
270:21 271:6
316:19 317:4,13
318:24 335:23
339:22 391:6,13
396:10 400:22
402:2 403:5
404:24 405:10
**republicans**
136:14 241:11
305:11
**request** 48:19
223:22 264:25
276:6 278:18,21
278:23 289:8
328:5 356:2
402:22 403:22
404:21 405:14
406:15,16 408:7
408:15
**requested** 153:8
155:13 223:6,20
285:11,14
369:11
**requests** 245:5
279:3
**require** 21:6
27:8 28:10,19
292:24
**required** 19:18
20:9 28:21 30:3

199:16 409:2
**requirement**
23:20 159:5
210:11,14 211:5
**requirements**
185:14 209:4
210:18,23 212:6
232:7 273:21
283:4 376:7
**requires** 25:19
28:6,14,16 31:3
**research** 50:16
265:19
**residences**
231:21
**resources** 261:13
**respect** 17:17
33:8 51:7
125:24 162:3
167:13 171:8
177:18 207:24
288:10 302:20
315:16 349:9
352:5
**respected** 87:4
157:7,13,21
349:19
**respecting**
233:11
**respects** 365:12
**respond** 66:8
67:19
**responded** 67:22
253:6 289:7
336:23 337:6
**respondent**
94:17

**responding** 68:5
**responds** 67:12
67:24 378:6
**response** 116:16
116:20 356:25
357:4
**responsible**
200:7,13 234:25
**responsive** 74:2
**rest** 62:12
353:25
**restate** 15:21
191:14 204:10
243:12 302:23
**restaurant** 18:5
**result** 188:22,24
295:20 411:14
**resulted** 269:2
298:21
**resulting** 175:23
197:13 282:10
**results** 68:18,22
69:4,8,12 199:11
238:21 239:21
250:12 266:8,13
**resumed** 172:5
**retain** 162:22
**retained** 160:5
350:18
**retainer** 145:19
166:20 167:12
168:7,15,25
170:14 218:4
406:17 407:3
**retains** 162:15
**retention** 184:6
185:2,4,8,11
350:24

**retrogression**
19:19,20,22
**retrogressive**
20:13
**return** 246:7
427:15
**reunifying**
409:25 410:5
**review** 81:17
154:5 226:9
320:5 322:2,5
342:16 394:20
400:13 418:15
**reviewed** 144:15
144:17 154:11
154:16 215:15
215:17,20
308:24 321:15
321:17 366:11
366:13,15 372:5
385:13
**reviewing** 49:19
49:24 104:17
220:21 256:9
309:5
**revisit** 72:7
346:22 354:7
**richland** 18:20
110:10 326:20
410:5
**right** 38:4 52:11
60:4 63:11
93:10 197:24
198:2 250:18
259:17 277:11
312:20 316:23
340:22 341:13
344:2 379:21

384:19 389:23
407:20,25
408:15
**rights** 18:8 19:25
23:21 24:8
25:13,18,22
186:7,16 190:15
200:9,15,17,19
201:17 210:20
346:10,19 365:7
367:22,25 376:4
389:6 414:3
**rigid** 158:7
**rings** 55:6
**rise** 273:13
**risk** 247:13
**rmg** 1:7
**road** 181:2,18,21
**roads** 236:22
338:11
**rob** 38:22
**robert** 361:24
**robert's** 311:6
**roberts** 82:9,15
83:7 85:24
106:13 120:21
165:22 207:13
288:7,9,21,25
289:6,15 290:8
293:6 295:5
310:15 313:25
324:19 331:24
331:25 332:17
361:24 362:8,13
364:8,15,24
366:25 392:2
417:9,10,16,23
425:22 426:5

**robinson** 4:10
5:13 7:17 8:25
396:20,22 397:2
397:11,13,16
**robinsongray.c...**
4:16 5:19
**robison** 32:11
38:16 42:10
**roland** 55:2
**role** 84:21
287:17,21 288:2
288:5 393:20
398:4
**roman** 185:12
185:17 186:5
209:2 210:8,17
211:2 213:8
238:9
**roof** 260:21
**room** 12:8 61:16
105:9,10,11,18
105:20,25
247:12 284:24
284:25 285:3
294:21 298:24
317:24
**round** 181:12
**row** 230:18
**rpr** 421:6,23
**rpv** 261:6
**ruggieri** 2:13
9:24 421:6,23
**ruggieri's** 251:2
**rule** 176:10
**rules** 2:9 9:12
10:18 179:18
180:25 181:18
181:20 182:3

379:13 419:5
**run** 111:12
161:10 325:7
351:16 361:15
**running** 379:18
390:14
**ruoff** 260:5,14
260:20,23 261:5
261:9,20,24
262:3,15,19,23
263:5,11,16,19
264:4 265:11,22
**rush** 291:18

---

s

**s** 2:6 6:2,22
33:25 172:2,2,2
172:4 264:18
323:18,18 378:2
393:14
**sabb** 51:25 52:4
52:7,9 371:12
**safe** 163:21
**sake** 93:23
232:10
**sat** 298:24
**satisfied** 72:4
**save** 314:12
**saw** 72:2 73:21
73:22 92:15
100:3 103:22
104:12,16 105:3
105:12,14 106:2
106:10 117:24
120:19 149:17
185:7,10 229:18
300:3 307:21
317:15 322:8,16

**[saw - seen]**                                                                 Page 59

324:3 362:20
402:16,23
**saying** 40:21,21
40:25 66:9 68:6
70:21 71:13
82:13 85:22
109:24 112:10
112:11 150:17
151:10 152:9
177:14 183:3
194:18 208:13
211:25 212:2,22
226:13,15
237:11 241:23
248:25 255:18
278:16 284:2
298:23 306:9
333:13 354:9
371:20 375:14
**says** 59:11 65:7
73:10 74:7
139:5 194:24
195:3 206:7
224:21 231:18
234:8 236:16
239:10 260:13
270:14,18,24
274:16,18
275:21 280:4
314:18 315:9
347:18 364:12
365:11 372:22
373:6 378:12
**sc** 4:14 388:3
**scenarios** 198:6
286:25
**schedule** 47:5,17

**scheduled** 46:20
**scheduler** 67:3
**scheduling** 46:22
**school** 238:24
242:3,9
**scope** 146:13
147:2 184:5,16
223:13 227:18
261:19 419:9
**scott** 1:6,19 6:17
98:3,7
**screen** 12:13,21
90:10 91:5
291:11 343:22
386:21
**screens** 12:12
**scroll** 386:4
387:6 403:19
404:17 405:14
406:13
**scsenate** 251:15
424:11
**se** 62:8 209:12
209:17,18,22
233:3,12,22
**sean** 144:5
**second** 12:13
59:9 90:25
99:16,17 110:7
113:4 116:11
128:3 161:14
167:16 171:2
198:11 231:12
276:12,14
284:15 296:21
297:13 298:8
305:16 316:16
326:23 328:15

351:19 354:20
372:17
**secretary** 258:7
**section** 18:18,19
19:7,16,18 20:8
20:18 22:8,12,21
23:5,8,11,17,21
24:4,7,11,13,19
25:7,10 26:8,8
26:13,16,18
27:15,17,19,23
28:4,7,11,14,15
28:21,23,24 29:5
29:7,10,11,14
30:7,21 186:6,15
187:4 189:23,25
190:3 199:5,8,10
199:21 200:4
201:23 202:8,19
202:23 203:4,6,8
203:11 206:11
206:19 211:9,17
232:14 242:15
242:18,19
246:22 247:4,19
247:19 252:14
252:24 269:10
269:22 274:15
275:8,18 276:13
277:24 302:13
312:7,18 346:9
346:18 347:11
388:16,20,23,25
389:7,11 413:19
414:3,12
**see** 6:9,11 14:17
21:7 45:12 59:8
60:14 62:15,20

62:21 74:15,20
79:11 82:3
88:10 90:3,12
104:25 115:23
116:5 122:15
123:9 136:18
139:11 148:10
155:7 182:15
185:2 193:15
194:15,17
211:17 231:16
234:21 240:14
251:7 270:2,12
271:14 293:19
293:22 294:2,6
295:18 303:8
311:8,20 316:25
325:2 338:18
349:7 351:16
354:8 357:6,10
371:7,21 374:2
378:10,11
386:20,22 388:5
391:13 392:11
399:4 402:24
**seeing** 82:7
99:25 106:5
294:25 323:25
355:16 362:17
**seek** 48:11,17
157:18 276:19
278:19 395:14
**seeks** 276:21
299:9
**seen** 57:17 78:6
79:7 91:22
103:19,21
104:15 105:2

| | | | |
|---|---|---|---|
| 117:21 120:2,5,8 | 91:14,18 92:4,7 | 190:25 192:2,11 | 310:20 315:3 |
| 120:13 124:14 | 92:9,12 98:4,5 | 192:18 200:11 | 318:9 320:12,23 |
| 143:13 199:23 | 108:11,16,18 | 203:21 205:8 | 320:24 323:21 |
| 220:11 239:13 | 109:18 112:22 | 206:16 207:11 | 326:22 327:13 |
| 249:22,24 | 117:10,15,16,21 | 211:8 214:5,6,22 | 327:16 329:5,7,9 |
| 291:23 293:5,10 | 119:10,17,22 | 218:2,6,15,17,18 | 330:14,24 |
| 293:14 299:13 | 120:15 121:5,5 | 218:21,22 | 331:12,15,20,23 |
| 299:15 301:17 | 121:20 122:2,13 | 219:17,23 220:6 | 332:4,5,6,7,13 |
| 308:6 322:7,22 | 122:14 123:19 | 228:18 229:3,12 | 332:20,25 333:3 |
| 373:9 | 125:9,14,15 | 230:7,24 231:5 | 333:5,17 334:6 |
| **segregated** | 126:10,15 | 231:13 243:6 | 334:10,15,16 |
| 209:21 | 129:18 130:6 | 244:6,10 245:17 | 335:14 336:11 |
| **selected**   88:18 | 131:13 132:4,7 | 245:20,24 248:5 | 336:14 340:17 |
| **selecting**   262:6 | 132:12,14 | 248:14,15,17 | 340:24 341:7 |
| **selection**   88:22 | 134:25 135:11 | 250:22 251:13 | 342:13,17,21 |
| **self**   94:7 | 135:23 136:3 | 251:25 253:19 | 343:2,13 344:5 |
| **senate**   1:11,12 | 138:11 139:22 | 254:3,5,16,18,21 | 344:10,22 345:2 |
| 4:7,8 5:5 7:15 | 142:24 143:24 | 254:23,25 255:5 | 345:4,9 346:7,22 |
| 7:18 8:5 33:5,9 | 144:22,24 145:7 | 255:10 256:13 | 347:3,6,14 348:8 |
| 33:13 34:8,22 | 145:8,14,22,25 | 256:19 258:5,20 | 348:18,19,24 |
| 35:6 37:13 38:7 | 146:18,22 | 259:4,6,8,10,15 | 350:15,19 |
| 38:20,21 39:7,11 | 147:11 148:16 | 261:6 262:16 | 351:19 353:10 |
| 39:21 40:6 41:4 | 149:7,22 150:8 | 263:5,10,17,20 | 354:19,20,21 |
| 41:16 42:19 | 151:4 152:19 | 264:21 265:5,11 | 355:10,14,23,25 |
| 43:2,9,22 44:18 | 153:4 156:2 | 265:16,20 | 356:10,12 |
| 44:18 45:2,5,7 | 158:3 164:23 | 266:11 267:6,8 | 357:15,16,18,22 |
| 47:24 49:13,20 | 165:24 167:5,7,8 | 267:21 271:22 | 358:6,8,10,11 |
| 49:21,25 51:8,10 | 167:9,14,22,24 | 272:4,15,17,21 | 359:2,8,15 360:3 |
| 51:13,15,18 | 168:5,17 169:6 | 276:17 277:8 | 360:4 361:2,3,10 |
| 53:16,25 55:9 | 170:9 172:10,19 | 279:9 280:20 | 361:12,21 362:3 |
| 59:23 60:6,10,11 | 172:25 173:17 | 281:20 286:8,21 | 362:9 363:10 |
| 60:17,17 61:23 | 173:19 174:6 | 286:22 287:7 | 364:4,13 365:2 |
| 62:10 63:4 64:5 | 175:10,15,19 | 289:20 293:9 | 366:3,9,25 367:4 |
| 64:13,14 68:9,18 | 176:8 178:10 | 295:6 296:19,24 | 367:13 368:17 |
| 69:24,25 70:6 | 179:16,24 180:3 | 297:2 298:7 | 368:19,20 370:3 |
| 78:15,21 81:3 | 180:9,11 181:11 | 302:9 304:23 | 370:25 371:12 |
| 83:13 85:15,21 | 182:19 183:6,12 | 308:12 309:4,6,7 | 372:18 373:14 |
| 86:4,10 88:13 | 183:21 185:5 | 309:12,12 | 375:2,8 381:21 |

386:9,12 388:3
392:17,21
393:24 394:3,5,9
397:7,9 398:23
399:2,3,8,23
402:16 403:2
409:17,21
410:17,18
412:14 413:3
416:8,9 418:19
422:13,15,20,24
423:6,9,12,17,19
423:22 424:7,9
424:13,15,17,18
424:21,25
425:10,13,16,20
425:23 426:12
**senate's** 87:20
134:24 135:9
182:13 266:24
281:23,24
287:18 288:22
324:9,12 339:18
356:8,11 360:14
366:14 374:15
**senator** 51:22
52:3,4,12,21,22
53:2,7 98:3
105:7,13,20,22
106:3,10 115:16
117:23 118:15
119:3 120:16
137:19 139:15
147:17,19,23,25
148:6,11,21
150:9 151:17,21
152:12,14,21
153:6,6,7,12,16

172:13,23 173:9
175:21 182:7,24
184:4 192:16
194:9,11 214:22
218:5 228:14
244:22 245:14
245:23 252:5,21
253:2,6 259:23
260:10 271:15
272:13,23 274:8
275:5 276:6
278:22 281:7
289:7 315:23,24
316:25 317:10
317:22,24 318:4
319:9,11,14
327:25 328:7,19
328:20 330:6,11
330:22 331:5,6,6
331:10,11,18,18
332:12,18,19
341:21 342:5
343:14 345:5,13
345:21 354:16
355:5,12 357:17
360:15,18
364:11 369:10
371:7,7,8,10,11
371:12 378:20
378:25 379:6,7
380:15,17,24
381:14 390:24
391:11,18 399:7
402:22 409:15
414:16,20 415:2
415:6,11,13,17
416:2,9 423:15
425:18

**senators** 51:24
153:8 369:20
381:5
**send** 47:3 60:19
60:25 61:5,10,13
62:10,17 70:14
83:7 88:19 89:8
89:10 116:16
121:3 128:12,17
136:22 137:8
168:2 255:23
414:20
**sending** 61:8
89:7,21 116:11
122:10 128:12
138:9 173:9
**sends** 65:6
**sense** 11:24
65:21,25 66:3
88:5 106:18
136:25 139:18
199:14 212:12
248:11 314:8,16
333:5 390:10,13
398:17
**sensitive** 303:21
**sent** 58:17 60:22
65:13,14,17,19
66:11,13 67:20
70:17,18 72:22
72:23 73:4,7,19
79:9,10 80:12
82:5 83:10
89:24 90:6
96:23 104:22
116:20,25 119:9
122:19 126:20
128:2,20 134:19

138:4 139:13
166:8,17 229:21
255:4,21 256:4
373:13,16,17
378:25 387:4
396:10,17 401:6
414:18
**sentence** 133:4
186:9 252:2,9
266:2 273:7,8,18
274:18 276:9
277:3,6,13
376:19 387:14
387:16 400:9
**sentences** 180:20
265:15
**separate** 88:20
105:10,11
121:25 370:5
396:7
**separately** 80:17
88:21
**september** 132:6
176:11 213:5
250:21 252:20
253:18 271:17
361:4 412:16
**sequence** 368:25
**series** 391:25
**serious** 201:18
**serve** 189:18
**served** 24:18
223:14 403:12
**serves** 276:23
**service** 18:7
310:4 340:19
**session** 105:21
319:6

**[set - software]**

**set** 27:11 46:17
46:18,19 47:9
49:13 135:14
292:5 297:4
373:18 421:19
**setting** 46:24
**settled** 93:19
148:8 151:20
**seven** 92:23 97:3
113:17 136:20
377:11,15
379:14 419:4
**shaking** 10:8
**shape** 235:15
**shapes** 100:14
116:4
**share** 79:23 80:4
80:9 82:23
85:16 87:13
89:3 90:2,10,18
124:18 125:2,7,8
125:14 153:5
154:21 155:2
228:13,17
262:19 320:10
328:16 362:25
363:2 386:17,18
**shared** 59:11
81:13 82:20
83:2,5 85:19,22
86:5,9 88:15
111:24 119:2
124:22 154:7,12
154:17 156:22
164:5,24 165:7
165:13 183:15
183:18 319:15
334:7,22 342:22

342:25 367:12
370:25 371:4,5
408:24 409:7
415:2
**shares** 167:20
329:11 363:8
**sharing** 87:8,12
91:5 327:25
370:21
**shattering** 112:5
**shaw** 13:25
**sheet** 361:9
427:8,10,13,16
**sheets** 208:23
309:3 369:24
370:6,24
**shifted** 41:6
**short** 171:5
253:17 369:6
**shortcuts** 138:22
**shortly** 40:11,17
308:3,4
**show** 103:7
145:17 199:10
199:18,19,20
**showed** 101:15
215:11 290:11
293:3 391:10
**showing** 230:6
323:11
**shown** 187:14
420:11
**shows** 234:2
**sic** 32:12 34:11
34:16 311:4
384:6
**side** 20:14 22:14
43:22 121:20

348:9,11
**sign** 121:15
427:9
**signature** 421:21
428:25
**signed** 121:20
**significance**
86:14,25 89:14
**significant** 125:5
161:17 282:20
296:7 305:21
389:5
**significantly**
386:14
**signing** 427:11
**similar** 96:14
150:16,18,18
162:14 185:3,9
198:4 306:16
324:12,15 325:4
326:2 381:13
**similarly** 1:7
113:7,12 270:12
**simply** 279:18
305:4 381:15
**simultaneously**
325:16
**single** 339:7
385:8
**singular** 83:24
**sir** 384:15 386:3
386:6 387:12
389:9,13 390:5
391:9,16 392:9
392:25 393:11
400:2 402:6
403:7,10,18,21
404:11,20 405:6

405:13 406:12
407:8,12,21
408:23 409:9,13
409:19,23 410:3
410:7,9,12,16,20
411:7,16
**sit** 117:19 119:7
121:21 347:2
351:11 357:12
374:12 381:18
**site** 74:9
**sitting** 337:3
**situated** 1:7
**situation** 21:19
236:9,10 324:4
338:22
**six** 84:10,16
318:9 354:10
379:12
**sixth** 246:24
301:17,20,25
302:5 305:15
338:19
**size** 354:5
**skim** 222:24
316:8,14
**slight** 52:2
293:15
**sliver** 337:20
**slowly** 10:6
259:21
**small** 105:19
169:19 185:25
249:12 354:5,6
**smith** 1:12
**soft** 12:20
**software** 82:11

sole 221:9
solely 32:5
solicited 116:19
  318:24
soliciting 394:21
  395:13
somebody 47:2
  51:22 71:19
  83:7 92:10
  122:10 158:14
  179:11 206:7
  216:25 256:7
  261:16
somebody's
  235:9
sorry 15:20
  34:11 35:10
  36:9,10 38:5
  46:14 54:10
  57:11 63:9
  64:25 65:23
  86:6 99:17,23
  126:3 146:20
  150:6,7 162:8,10
  164:20 170:3
  198:8 202:13
  206:8 218:11,14
  225:6 242:8
  243:10 250:25
  254:8,11 256:25
  259:22 266:5
  271:2 276:14
  277:16,18
  278:17 280:25
  282:25 285:13
  300:3 311:3
  316:7 341:4
  343:21 349:4

357:19 362:5
378:10 379:24
385:6 387:22
388:5,20 392:7
sort 20:6 69:15
  107:13 157:3
  163:16 175:18
  303:18
sorted 235:24
sorting 233:4,13
  233:15,22
sought 32:16
  33:11,13 148:6
  414:2
sounds 76:24
  246:11
source 168:11
  221:10 240:16
  262:5
sources 210:3
  238:11 239:15
  239:23 243:7
south 1:2,4,17
  1:19 3:6,20,21
  4:22 5:17 6:16
  13:6 18:3 29:4,7
  29:17 30:16,19
  32:22 33:4
  38:12 48:25
  49:12 59:22
  60:5 63:3 69:7
  78:2,14,20 90:20
  91:14,18 92:3
  94:24 95:20,23
  95:25 96:5,10,14
  97:20,25 103:12
  103:15 119:17
  119:22 123:18

126:10,14
129:22 132:3,7
132:12,14
141:12,17
143:10,19
145:21,25
146:22 147:10
158:10 160:24
163:23 168:12
168:17 172:19
172:25 173:16
175:3 179:23
180:3,8,11
184:10 187:16
193:12 194:21
196:20 211:7
224:11,14 229:3
229:11 231:13
235:7 240:23
241:13,17,20
243:20 249:18
250:4 251:24
254:21,25
256:13,19
257:15,21,24
258:3,10 259:5,9
259:15 264:21
264:23 265:5,15
265:20 266:9
267:21 271:21
272:4,20 276:16
277:7 279:8
296:5 310:5,10
310:20,20,22,24
327:12,16 329:4
329:17 341:14
355:9,13,23
361:21 362:2,9

374:25 375:7
393:21,24 404:3
404:6,9,15
405:19,22 406:5
406:11,21 407:6
407:19 410:23
413:7 422:13,15
422:16,20,24
423:5,8,12,16,18
423:21 424:6,14
424:18,21,24
425:5,10,19,23
426:11
southern 112:9
southwestern
  159:10
space 427:7
speak 10:4,5
  121:9 125:18
  246:2 249:10
  305:3 390:22
speaker 1:13
speaking 14:12
  22:24 35:4,17
  37:10 40:9
  41:19 46:21
  69:13 79:21
  118:10 136:2
  157:2 169:9
  186:24 204:16
  216:25 293:8
  296:12 311:6
  356:13 416:14
speaks 351:10
specific 36:3
  142:25 184:25
  192:15 260:8
  314:10 330:5

**[specific - started]**                                                    Page 64

335:10 337:21
343:13 367:7
368:25 371:22
**specifically** 70:3
80:5 82:18
83:19 87:7,12
131:3 156:8
160:25 167:25
227:14 241:5
243:3 261:10
270:22 271:3
299:17 309:10
317:6 326:15
354:22 357:3
363:20 372:12
375:13 380:16
393:25 396:14
398:24 399:12
**specified** 71:17
289:19
**specify** 71:16
**speculate** 118:19
**speculating**
85:25 323:12,24
**spelled** 260:21
**spelling** 6:19
**spend** 31:15 41:2
116:6 396:15
**spending** 115:15
169:22 204:24
**spent** 389:4
391:4
**split** 101:10,10
101:14 102:3,4
102:15,18
161:23 162:6,6,7
162:13,21,21
282:13 352:12

352:20,23,25
353:4,9,19 354:2
354:4,7,10 380:5
384:23,24 412:6
**splits** 163:15
164:3 165:2,17
165:21 283:19
344:16 351:22
352:3,8,10,15
353:5,16,17
361:13 366:3,4
412:24
**splitting** 103:5
163:9 280:11
281:16 282:12
**spoke** 76:7,13
116:8 393:9
**spoken** 38:17
239:2
**sponsored** 331:5
333:3
**sponsors** 367:11
368:25
**spread** 296:10
**square** 279:22
**ss** 420:3 421:3
**staff** 8:3 40:10
40:17 52:17
55:10 56:18
57:21 60:18
62:16 73:22
84:20 85:21
86:4 88:14
100:6 108:18
116:22,23,24,25
117:5,15 118:4
118:16 119:10
125:14 129:19

130:6,23 136:11
136:24 137:21
149:7,7,22,23
152:19,23 153:4
190:21 191:10
191:13,18 192:3
192:18 218:18
228:18 260:11
260:18 263:12
267:10 272:15
272:18 274:9
276:20 278:5,10
278:13,20,24
284:12 285:23
286:5 287:9,18
287:22,25 288:6
288:11,15 289:7
289:16,18 290:2
290:4,6,14,24
291:3,14 292:18
293:6,9,19,23
294:3,7 295:3
296:18,24 297:2
301:9 302:6,21
304:19 307:3
309:13 311:7,24
314:5 318:3,11
318:14 319:2,14
319:23 320:2,12
321:23 323:2,8
324:7,9,13 329:7
330:24 331:3,12
331:15,20,23
332:4,5,7 333:12
334:5,15 335:2
345:2,9 351:20
354:20 363:14
366:25 367:11

372:11 374:7
381:21 394:4
398:24 399:9,9
399:11,11
410:18 417:13
**staffer** 295:6
**staffer's** 219:18
**staffers** 309:4,4
309:6
**stages** 152:12
**stamp** 78:16
90:22 119:17
126:9 250:23
254:20 256:13
310:23
**stamped** 103:12
132:7 145:21
172:19 180:2
229:11 271:21
310:5,22 327:12
355:9 369:17
374:25
**stand** 13:14
133:22 151:25
152:10 249:9
339:8
**standard** 314:14
**standpoint**
197:12
**stands** 115:10
**start** 98:18
100:10
**started** 35:16
37:20 38:10
41:12,16 42:20
121:17 170:24
308:14 372:15

**[starting - subdivision]**

**starting** 195:22
195:24 290:10
**state** 1:4,17,20
2:15 3:6 7:6
13:6 18:4,25
19:4 33:5 49:7
133:18 136:21
159:9,11 168:12
184:10 189:18
189:21,24 190:9
190:11,17 204:5
206:6 211:4
214:7 240:18
241:14 248:14
248:17 250:14
250:17 258:8
263:14 265:2
273:23 274:20
287:9 305:14
342:10 346:7
349:8 353:23,25
376:2,3,10,15
395:5 420:2
421:2,7 427:6
**state's** 181:4
**stated** 174:2
178:6 279:15
339:18 361:3
419:19
**statement** 24:21
182:17 313:8,10
313:12 317:19
346:15 347:21
351:25
**statements**
240:21 252:6
**states** 1:2 95:12
95:17 238:10

265:23 313:11
317:11 339:3
347:14 348:24
351:18
**statewide** 133:23
250:6,10,18
**stating** 6:19
268:6
**statistical** 96:20
96:21 113:8
153:20 166:10
299:8
**statistically**
306:6
**statistics** 96:18
104:15 121:24
325:6 327:3
344:21 371:20
**stats** 89:25
103:11,20,22
**statute** 25:14,18
25:21
**statutory** 22:16
22:19
**stay** 110:9,10
**stenographic**
1:22 2:7
**step** 48:12 199:5
417:12
**stepp** 4:10 5:13
**stewart** 34:11,16
393:10,17,18
**stop** 128:11
246:7 252:3
273:17 297:13
**stories** 217:3
**story** 318:7

**streamline** 340:5
**street** 3:11,20
4:12,21 5:15
12:6
**strength** 71:5
186:14,22
187:21 188:16
188:24 189:2
198:7 312:4
**stretch** 338:4
**strike** 96:2 98:13
128:9 130:8
133:12 142:17
160:12 176:15
235:2 243:14
301:8 363:17
372:16
**strong** 149:24
249:8 295:15
306:12
**structure** 201:10
**struggled** 118:12
**struggling**
176:24 217:4
**stuff** 201:9,14
289:16,25
**style** 123:23
**subcategories**
211:20 234:12
**subcommittee**
1:16 51:10,14,18
52:17 69:22
70:8 100:10
107:3 117:17,21
118:3,22 123:20
130:24 131:17
133:7 137:17
173:11,22 176:8

177:19,20
179:24 180:10
181:12 183:13
191:20 193:2
207:11 213:6
245:6,13,22
247:9 253:10
254:4,17,24
256:22 257:16
258:21 271:19
272:12 273:13
274:9,11 276:19
280:17 282:16
287:7 290:11
291:4,13,22
292:2 307:11
308:6 315:22
316:20 318:15
320:19 330:8,10
330:15 334:18
334:19 336:18
341:8 343:4
345:14 350:6
355:22 367:10
371:13 382:11
382:12 385:24
387:5 400:11,17
401:8,18,22
402:4,10,12,13
402:15,19 403:3
409:8 423:20
424:14
**subcommittee's**
177:17 214:20
260:2
**subdivision**
238:23

subdivisions
  344:15
subheadings
  210:19
subject  81:9
  172:14 225:4
  264:25 271:17
  284:18 327:11
  364:11 369:23
  374:22 420:10
  427:11
subjected  259:25
subjective
  235:10 354:10
submission
  87:25 122:8,17
  122:24 132:3,11
  140:17,24 141:2
  141:11,21
  255:20 256:10
  299:25 423:5
submissions
  122:20 132:24
  134:9 135:14
  136:7 138:24
  140:23 254:6,19
  296:25 400:4,19
submit  89:19
  137:4 139:2,15
submitted  12:14
  62:24 83:12
  84:25 85:6,9,12
  85:15 87:17,24
  88:5,23 108:11
  122:25 131:8,10
  133:5 134:6,15
  135:16,22 136:7
  178:20 179:15

181:25 204:19
  220:17 269:7
  317:7 342:7
  401:17
subordinated
  280:5
subordinating
  274:23 275:21
subpoena  217:21
  221:16,17,25
  223:13,17
  227:18,24 228:3
  228:11 403:11
  406:15 418:16
  419:9 423:23
subscribed
  420:19
subsequent  32:4
  118:3 129:21
  131:12 137:17
  187:14 325:17
  329:22 358:16
subsequently
  116:8 216:17
subsidiary  232:5
substantial
  196:24 197:2,3
  248:12 301:18
  320:16
substantially
  41:5 150:16,17
  150:18 169:21
substantiated
  205:18
substantive
  315:7
successful
  382:18,22,24

succinct  238:11
sudden  247:11
sue  23:4,24
sued  318:19
  397:7,9
sufficient  274:12
sufficiently
  21:20
sugar  171:9
suggested
  244:23 334:23
suggests  270:24
suite  3:20 4:21
sum  64:19
summaries
  92:13 96:21
summarizing
  230:18,22
summary  92:18
  96:20 97:3
  113:8 217:2
  231:5 285:25
  344:18,20
sumter  101:9,10
  230:16 410:8
sun  295:13,17,23
  295:24 296:14
  336:22 337:7
  338:5,8 389:18
  389:21,25 390:3
  390:17,21 391:2
  412:2,11
super  198:25
supercede  269:9
  269:15,21
support  21:4
  106:22 107:2
  108:2 139:3,7,12

412:9
supported  107:8
  136:16 140:8
  158:18 221:8
  282:17 369:13
  390:25
supporters
  369:2
supporting
  153:23 333:10
  371:6
suppose  188:21
  193:23 227:16
  237:18 283:25
  395:7
supposedly
  136:19
supreme  237:25
  238:5 241:15
  277:14,19
sure  7:14 11:18
  26:2 29:15 30:4
  34:13 35:7,13
  41:9 42:17
  48:20 50:22
  51:22 56:3 57:4
  66:15 87:5
  90:11 102:20
  103:4 106:17
  108:5 123:9
  148:17 151:6
  152:21 153:17
  155:7 177:13
  179:4 183:18
  204:21 215:4
  216:2,9 217:7
  234:5 256:8
  274:4 291:11

293:9 296:15
315:10 320:13
320:14 322:3
325:5,7 326:10
333:13 340:11
342:18 343:8
352:17,25
356:17 366:17
372:2 377:13
379:8 401:12
**surprise** 108:23
182:11,18
242:24 243:4
289:4,13 359:24
**surprised** 108:13
109:4 317:18
**suspect** 306:8
**swath** 377:25,25
**sworn** 6:4 9:15
420:19
**system** 177:12
**systematic**
207:21

**t**

**t** 2:6,6 6:2,23
172:2,4 323:16
323:16,18 378:2
428:2
**tab** 62:24 63:9
78:12 89:23
91:19 103:9
104:2,7 113:5
119:13 126:6
131:19,21,25
145:18 172:11
179:22 183:5
221:13 228:21

231:8 250:20
251:2,8 253:24
254:9,10 258:25
264:14 267:17
271:8,10 309:25
316:2 326:24
327:2 340:15
343:17,18,24
344:2,8 345:24
354:25 361:17
361:23,25 364:7
369:15 370:12
374:17 384:5,14
385:11,21 386:2
386:16,19,20
391:23 392:5,8
399:25 403:9
407:10 409:11
413:7
**tables** 371:24
**tabs** 386:2
**tai** 6:17
**taiwan** 1:6
**take** 7:4 11:14
11:15,20 12:19
69:12 71:21,25
76:16 91:9
132:18 136:23
137:9 140:11
171:4 177:23
186:8 194:16
206:9 214:2
222:24 245:7,11
246:5 271:22
280:18 282:2,7,9
306:19 325:20
338:5 340:4
360:9 383:20

**taken** 9:4,11
221:11 278:21
279:5 307:25
**talk** 11:17 38:25
41:7 56:22 57:2
72:9 91:7
112:15 171:3
214:3 251:9
289:22 378:16
380:8 418:20
**talked** 55:10
57:20 80:14
152:4 237:22
286:5 289:25
350:8
**talking** 10:23
24:22 38:11
41:15,17 46:23
56:19 57:25
58:5 103:5
127:10 153:25
154:6,11,22
177:7 207:9
232:13 257:3
259:16 276:12
309:2 332:3
337:19 361:22
365:16 367:19
369:23 370:3,24
373:6
**talley** 51:21
**tank** 142:13
**target** 247:2,14
**task** 274:2
**team** 8:4,6
418:21
**telephone** 42:6
46:7 47:16 48:3

66:18 67:9,10
**tell** 29:22 61:10
61:12 62:9
114:13,21
136:21 179:25
201:3 277:9
282:23 288:25
289:5 318:6
336:8 343:9
**telling** 129:5
288:20
**tells** 85:11
**template** 332:10
**ten** 88:4,8
115:17 214:14
226:19,21 247:4
262:10
**tends** 21:23
**term** 159:21
187:23,24 188:4
234:6 299:3
**terms** 148:7
161:13 218:4
228:3,10 239:18
336:23
**terreni** 1:23 2:8
6:1,8,22,25 7:1
8:1,2,10 9:1
10:1 11:1 12:1
13:1 14:1 15:1
16:1 17:1 18:1
19:1 20:1 21:1
22:1 23:1 24:1
25:1 26:1 27:1
28:1 29:1 30:1
31:1 32:1 33:1
34:1 35:1 36:1
37:1 38:1 39:1

| | | | |
|---|---|---|---|
| 40:1 41:1 42:1 | 136:1 137:1 | 212:1 213:1 | 288:1 289:1 |
| 43:1 44:1 45:1 | 138:1 139:1 | 214:1 215:1 | 290:1 291:1 |
| 46:1 47:1 48:1 | 140:1 141:1 | 216:1 217:1 | 292:1 293:1 |
| 49:1 50:1 51:1 | 142:1 143:1 | 218:1 219:1 | 294:1 295:1 |
| 52:1 53:1 54:1 | 144:1 145:1,24 | 220:1 221:1 | 296:1 297:1 |
| 55:1 56:1 57:1 | 146:1 147:1 | 222:1 223:1 | 298:1 299:1 |
| 58:1 59:1 60:1 | 148:1 149:1 | 224:1,22 225:1,2 | 300:1 301:1 |
| 61:1 62:1 63:1 | 150:1 151:1 | 226:1 227:1 | 302:1 303:1 |
| 64:1 65:1 66:1 | 152:1 153:1 | 228:1 229:1,2 | 304:1 305:1 |
| 67:1 68:1 69:1 | 154:1 155:1 | 230:1 231:1 | 306:1 307:1 |
| 70:1 71:1 72:1 | 156:1 157:1 | 232:1 233:1 | 308:1 309:1 |
| 73:1 74:1 75:1 | 158:1 159:1 | 234:1 235:1 | 310:1 311:1 |
| 76:1 77:1 78:1 | 160:1 161:1 | 236:1 237:1 | 312:1 313:1 |
| 79:1 80:1 81:1 | 162:1 163:1 | 238:1 239:1 | 314:1 315:1 |
| 82:1 83:1 84:1 | 164:1 165:1 | 240:1,20 241:1 | 316:1,15 317:1 |
| 85:1 86:1 87:1 | 166:1 167:1 | 242:1 243:1 | 318:1 319:1 |
| 88:1 89:1 90:1 | 168:1 169:1 | 244:1 245:1 | 320:1 321:1 |
| 91:1 92:1 93:1 | 170:1 171:1 | 246:1 247:1 | 322:1 323:1 |
| 94:1 95:1 96:1 | 172:1,14 173:1 | 248:1 249:1 | 324:1 325:1 |
| 97:1 98:1 99:1 | 174:1 175:1 | 250:1 251:1,18 | 326:1 327:1 |
| 100:1 101:1 | 176:1 177:1 | 252:1 253:1 | 328:1 329:1 |
| 102:1 103:1 | 178:1 179:1 | 254:1 255:1 | 330:1 331:1 |
| 104:1 105:1 | 180:1 181:1 | 256:1 257:1 | 332:1,17 333:1 |
| 106:1 107:1 | 182:1 183:1 | 258:1 259:1 | 334:1 335:1 |
| 108:1 109:1 | 184:1 185:1 | 260:1,15 261:1 | 336:1 337:1 |
| 110:1 111:1 | 186:1 187:1 | 262:1 263:1 | 338:1 339:1 |
| 112:1 113:1 | 188:1 189:1 | 264:1 265:1 | 340:1 341:1 |
| 114:1 115:1 | 190:1 191:1 | 266:1 267:1 | 342:1 343:1 |
| 116:1 117:1 | 192:1 193:1 | 268:1 269:1 | 344:1 345:1 |
| 118:1 119:1 | 194:1 195:1 | 270:1 271:1,16 | 346:1 347:1 |
| 120:1 121:1 | 196:1 197:1 | 272:1 273:1 | 348:1 349:1 |
| 122:1 123:1 | 198:1 199:1 | 274:1 275:1 | 350:1 351:1 |
| 124:1 125:1 | 200:1 201:1 | 276:1 277:1 | 352:1 353:1 |
| 126:1 127:1 | 202:1 203:1 | 278:1 279:1 | 354:1 355:1,6 |
| 128:1 129:1 | 204:1 205:1 | 280:1 281:1 | 356:1 357:1 |
| 130:1 131:1 | 206:1 207:1 | 282:1 283:1 | 358:1 359:1 |
| 132:1 133:1 | 208:1 209:1 | 284:1 285:1,4 | 360:1 361:1 |
| 134:1 135:1 | 210:1 211:1 | 286:1 287:1,11 | 362:1 363:1 |

| | | | |
|---|---|---|---|
| 364:1 365:1 | 198:23 202:20 | **texted** 59:5 | 53:12 54:12,14 |
| 366:1 367:1 | 225:11 308:9 | 72:17 | 55:12 56:6 58:2 |
| 368:1 369:1 | 389:21 390:11 | **texting** 66:4 | 58:25 61:13 |
| 370:1 371:1 | 395:19 396:21 | **texts** 58:23 59:4 | 62:4 65:3 68:5 |
| 372:1 373:1 | 398:13 407:23 | 59:15 63:18 | 70:2 71:12,17 |
| 374:1,21 375:1 | 412:9 417:3 | 64:19 68:4 73:3 | 78:8 79:12 |
| 376:1 377:1 | **testify** 129:19 | **thank** 76:21,25 | 82:21 83:4 |
| 378:1 379:1 | 130:25 139:2 | 104:10 129:6 | 85:10 89:25 |
| 380:1 381:1 | 390:10 | 163:5 383:3,11 | 99:21 100:4 |
| 382:1 383:1,12 | **testifying** 9:16 | 384:14 411:17 | 104:5,24 105:3 |
| 384:1,2 385:1,16 | 9:17 | **thanksgiving** | 105:12,15 |
| 385:20 386:1 | **testimony** 81:6 | 127:11,14 | 106:25 108:21 |
| 387:1 388:1 | 88:12,25 122:18 | 307:19,23,24 | 109:15,16,25 |
| 389:1 390:1 | 128:18 131:8,16 | **theory** 17:16 | 111:10 116:25 |
| 391:1,22 392:1 | 138:14,18 | **thereof** 54:7 | 117:3 118:12 |
| 393:1,4 394:1 | 201:21 216:23 | 166:25 | 122:5 123:24,24 |
| 395:1 396:1 | 221:7,9 225:18 | **thing** 11:20 | 123:25 125:12 |
| 397:1 398:1,2 | 229:9 230:7,19 | 44:16 57:6 | 128:18 129:7 |
| 399:1,24 400:1 | 230:23 295:20 | 123:12 178:25 | 140:4 142:2,13 |
| 401:1 402:1 | 307:21 334:20 | 196:12 206:6 | 151:24 155:22 |
| 403:1,8 404:1 | 337:9,11 342:11 | 208:24 235:13 | 160:25 161:18 |
| 405:1 406:1 | 350:4 355:8,21 | 237:13 239:7 | 163:11,20,21 |
| 407:1,9 408:1 | 356:5,25 357:4 | 244:12 283:18 | 176:16 177:6,19 |
| 409:1,10 410:1 | 373:21 402:10 | 290:17 418:12 | 179:8 182:3,5 |
| 410:21 411:1,18 | 411:25 412:3 | **things** 39:20 | 191:17 193:24 |
| 411:23 412:1 | 416:25 418:16 | 45:2 64:7 | 193:25 194:23 |
| 413:1 414:1 | 419:7 420:8 | 134:14 136:5 | 195:8 196:19 |
| 415:1 416:1 | **text** 45:23,24 | 148:22 155:10 | 198:11,22 199:6 |
| 417:1 418:1 | 54:8,19,23 58:15 | 182:2 194:13 | 202:20 212:13 |
| 419:1 420:6,15 | 58:17 59:9 | 197:15 210:4 | 213:21,24 |
| 422:4 423:10 | 62:24 63:6,16 | 212:20 238:25 | 215:10,11 217:5 |
| 424:5 | 64:17 65:5,6 | 242:12,14 253:3 | 219:10 220:11 |
| **terribly** 283:20 | 66:20 72:23 | 255:15 271:24 | 227:4 229:14 |
| 284:10 | 73:8 74:2 77:11 | 283:12 288:17 | 233:20,21 |
| **test** 188:14,17 | 77:16 79:16 | 334:23 336:21 | 234:19 236:4,6 |
| 200:2,6 | 140:16,22 | 361:13 409:17 | 237:12,14 245:9 |
| **testified** 6:5 | 166:24 422:10 | **think** 26:12 28:2 | 247:20 248:23 |
| 172:5 195:15 | | 31:2 46:8 52:23 | 248:24 249:7 |

250:5,25 268:11
268:15 270:24
278:25 281:20
282:14,24,25
286:5 292:20
297:10 300:10
301:2 303:12
304:18 306:5
308:10 309:21
309:24 312:9,22
315:9 317:15
320:18 321:2
328:4,6 330:25
335:19 336:10
336:20 337:13
337:14,16
339:11,14 348:2
350:12 352:23
353:22 354:8
359:23 362:20
368:2 369:4
371:2,4,17,18,19
372:22 377:18
379:13,20 382:2
382:25 385:2,7
389:3 396:13
397:6 416:20
417:22 418:10
419:6,15,20
**thinking** 45:12
123:4 151:19
383:17
**thinks** 275:5
**third** 31:12,19
32:2,5,25 126:7
328:15 410:24
**thirty** 427:17

**thomas** 1:10 4:5
75:7 145:10
**thornburg** 26:24
172:16 173:14
186:17 187:9
**thought** 59:7
71:10 86:12
89:12,12 100:13
115:25 137:14
139:11 140:5,5
140:11 210:13
262:13 290:9
295:12 342:6
360:10 401:12
**thoughts** 320:10
**thousand** 227:2
300:2 323:14
374:13
**thousands**
226:24
**threatened**
246:24
**three** 20:19 21:4
59:2 65:13 73:5
95:11 127:4
187:9,11 188:11
188:12 246:9
258:5,10 302:2
383:17
**threshold** 179:10
273:20
**thursday** 307:25
**time** 11:13 17:2
23:16 31:16
35:8 40:9,16
41:14,17 42:19
57:4 61:24
62:10 65:22,25

68:8 75:18
76:16 77:17
95:5,23 98:8
104:15 105:14
116:6 117:6
122:9 135:17,20
136:5 153:15
154:9 167:7
169:22 170:6
171:4 172:3
184:21 198:11
199:15 229:17
231:3 238:2
246:20 253:10
253:17 261:17
278:3 284:15
291:7,10 292:3
293:11 307:16
307:18 318:18
322:18,20 324:5
330:2 340:6
351:9 358:14
361:6 369:7
372:14 374:9,11
379:11,18,22
380:2 383:2
389:5 391:5
392:25 393:2
396:15 400:11
400:18 411:3,11
411:19 418:22
419:22
**timeline** 66:2
**times** 9:7 17:13
56:19 57:21
58:4 105:17
163:16 217:3
221:5 236:11

**timing** 135:4,7
138:8
**title** 142:25
355:20 377:22
**titled** 132:2
179:23 186:7
375:21
**tjh** 1:7
**today** 8:14 9:14
10:23 11:11
22:20 31:24
117:19 119:7
121:21 337:3
347:2 357:13
373:21 374:12
375:15 381:18
387:11 389:5
398:13 400:6
403:15 408:19
417:8 418:16
**today's** 12:2
393:6
**told** 29:19 62:14
79:21 83:21
84:6 118:8,9,13
118:17 128:11
128:16 140:6
247:9 281:5
319:8
**tomorrow** 73:16
**ton** 354:3
**top** 19:15 91:20
168:16 173:18
213:23 214:13
230:25 259:17
312:14 316:23
338:6,7 340:21
341:13

topic 72:9
topics 164:13
total 64:19 92:19
92:24 362:25
totals 392:11
407:19
touch 159:7
towns 234:16
281:13 282:5
traditional
206:25 348:15
traffic 42:16
trained 267:11
trajectory
286:14
transcribed
252:6 310:3
340:18
transcribing
10:2
transcript 10:9
216:25 225:24
250:21 251:13
251:17 258:23
259:4,8,18
260:22 310:9
319:5 321:16,18
325:17 354:24
385:22 391:11
420:10 421:11
424:8,16 425:4
427:18,20
transcription
216:7,9,18 310:2
340:15,16,24
345:25 425:12
transcripts
226:8,25

transfer 61:6
transferred
61:20
transmittal
222:8
transmitted
120:6
traywick 4:11
7:16,16 8:18,22
38:23
treasurer 258:7
treat 111:3
treated 101:21
102:2 219:2
378:23
treatment
380:10,20
384:18 411:24
412:11
trende 144:6
tresvant 109:18
123:11 131:4
tried 93:23,24
157:10
trinkley 4:20
7:19,19 383:6,10
trouble 243:11
true 349:18
354:11 420:10
421:11
trump 329:11
363:3,21 392:13
trust 57:15 61:4
62:3,8 222:17
391:7,14 396:11
400:23 402:2
403:6 404:25
405:11

trusted 263:4,5
263:16
truthfully 9:20
try 10:4,5 11:14
18:14 37:9
103:24 135:13
trying 19:3 26:4
30:6 56:6 64:25
87:10 103:6
111:6 124:6
205:4 283:24
298:17 312:23
382:9
tuesday 1:23
2:10 307:23
turn 58:19 103:9
140:16 219:11
228:20 251:23
284:11,17
340:21 346:3
369:15 374:17
385:20 386:15
389:14 403:8
407:10 409:10
turnaround
292:20
turned 136:15
201:19 217:16
217:18 285:17
294:24
turning 284:24
286:4 316:2
319:18 326:22
330:13 345:24
392:10
two 12:12 20:20
26:12 56:19
57:21 58:3,7,25

65:16 73:3
79:14 81:20
97:23 98:6,12
110:23 117:16
136:20 138:4
172:18 180:20
201:12 230:12
242:11,13 253:3
264:17 265:15
271:13,13,14
300:2 311:23
312:14 315:5
324:21 330:16
330:18 336:21
372:20 379:2
383:19
twofold 19:24
tying 372:25
type 24:19 48:22
68:20 151:23
329:5
types 309:5
363:6
tyson 38:22

**u**

u 260:21
u.s. 36:19 186:19
277:14,19
ultimate 147:24
ultimately 60:19
81:16 147:3
178:16 183:12
282:2 333:4
334:25 399:6,7
um 65:9 102:19
180:4 185:20
213:16 310:17

**[um - versus]**

316:4 334:11
**unable** 11:10
29:12
**unavoidable**
20:4
**uncompetitive**
306:11
**unconstitution...**
278:2 279:2
**underneath**
211:20 212:21
231:11
**understand** 9:21
10:10,16,17 11:7
11:10 13:3,20,21
15:16 21:14
25:15 27:20
30:7,12,14 32:8
37:8 61:2 68:7
82:4 84:8 93:15
93:17 94:5,15
107:6 121:19
159:23 174:5
176:25 178:9
181:6 186:21
189:20 190:13
195:12 199:7,13
210:10 211:19
223:8 238:18
241:2 268:17
272:23 281:11
299:6
**understanding**
12:25 16:7
19:17 23:14,15
26:3 121:18
126:19 173:6
186:3 189:8

201:22 202:7
203:12 218:25
265:23 268:24
299:12 389:24
391:20 414:16
**understood**
40:22 48:16
62:5 84:14
181:24 182:6
199:6 213:14
312:23 335:5
**undertake** 274:2
**underway**
286:12
**unexpressed**
298:13
**unfair** 177:5
**unfortunately**
91:2
**unified** 339:5
**uniformly**
377:15
**united** 1:2 339:3
**universal** 25:25
29:9
**universally**
25:20 26:22
28:22 29:25
**unjustified**
234:3
**unquestionably**
346:8
**unquote** 117:5
275:18
**unreliable**
240:16
**unscheduled**
67:10

**unspecifically**
270:23
**untouched**
339:19,19
**unusual** 123:14
377:23 378:21
379:4
**update** 23:16
261:17 262:10
262:18
**updated** 277:21
**updates** 374:8
**updating** 263:23
**upheld** 247:3
**uploaded** 90:16
**upsets** 317:12
**upsetting** 284:10
**upside** 247:5
**upsides** 201:4
**upstairs** 106:6
**urged** 185:22
**urgency** 318:20
**urging** 257:15
**use** 61:18 69:19
77:10,14 105:22
182:5 212:9
253:13 262:6,8
263:7 264:8
401:10
**useful** 123:25
178:11 245:20
253:9
**usually** 67:10
307:24 366:15
366:19

**v**

**variable** 239:2
**variations** 160:7
**varied** 156:8
**various** 71:5
75:14 85:8
153:15 155:15
157:7 165:25
192:19,21
257:24 298:19
299:24 328:11
329:6 334:2,21
344:11,21
368:11 407:18
**vary** 169:17
255:25
**vastly** 181:25
**vendor** 67:18
70:5
**verbal** 207:6
**verbally** 42:24
43:17 207:13
**veritext** 90:16
**vernacular**
156:22
**version** 72:19,25
73:11,12,13,20
291:6,8 369:3
370:17,23
**versions** 290:24
**versus** 13:25
26:25 161:2
172:16 173:14
179:12,14
186:17 187:9
237:24 241:18
299:18 328:10
328:10 388:10

388:13
viability  335:23
viable  100:5
  148:14,15
video  42:6,9,15
  42:25 43:17
  45:21 46:7 47:6
  48:3 216:18,24
videoconference
  3:3 4:3 5:3
videoed  216:5,11
view  74:5 115:2
  160:18 161:16
  161:24 162:7,12
  162:20,25
  175:22 213:19
  235:9 237:18
  249:17 277:25
  282:6 314:8
  324:21 356:9
  358:10 360:3,14
  381:12,14
  382:16 408:24
  409:6
viewed  73:8
views  109:8
  175:25 176:2
  243:23
vincent  363:24
  363:25
violate  232:9
  312:24 403:2
violated  134:22
  140:18
violates  347:6
violating  346:10
violation  141:23
  199:10,20 234:9

414:5
virtual  1:22 2:7
virtually  325:15
visual  235:13
  237:19
voluntarily
  273:25
volunteer  19:6
volunteered
  61:18
vordman  4:11
vote  21:24 30:20
  177:23 178:2
  191:20 232:14
  241:6,10 245:7
  245:11,24
  269:10,22
  273:14 274:13
  275:6 305:8,24
  312:16 313:16
  313:21 314:14
  314:19 329:10
  363:8 365:3
  376:4 392:11
  407:18 413:20
voted  333:4
voter  240:5
  263:14 305:18
  305:19,19
voters  19:25
  24:18 26:11,16
  26:23 27:10
  87:3,8 97:11
  98:16,20 113:22
  113:23 114:2,8
  187:17,22 188:3
  188:8 233:4,13
  233:15,23 241:8

241:10 296:22
297:16 298:9
300:13 304:8,19
305:3,24 306:4
306:18,19 307:4
326:4 363:2,2
votes  27:7 305:9
360:20 381:16
382:23
voting  18:8 21:7
21:8,12,16 22:2
23:21 24:8,19
25:13,18 186:7
186:14,15,22
187:21 188:15
188:23,25
190:15 198:7
200:9,15,17,19
201:17 209:15
209:16 210:20
234:17 241:16
241:20 242:6,23
242:25 243:8,20
244:2,5,9,16
245:16 246:16
247:7,15,23
248:8 253:14
256:21 257:17
257:23 258:9,15
260:3,6 263:8
264:8,24 265:2
267:5,12 280:11
298:4 301:13
303:3 304:5
312:3 340:2
344:20 346:10
346:19 365:7
367:22,25 376:4

387:8,9,15 389:6
408:21 410:15
410:19 414:3
vra  273:15
274:22 275:17
277:25
vs  1:9
vtd  283:19
352:14,25
vtds  69:16
161:22 282:13
352:8,12

**w**

w  4:20 378:2
wait  257:10
wakes  356:7
walked  123:4
294:21
wallace  1:15
want  11:14
34:14,23 54:16
60:8 62:23 65:7
74:7 85:9 93:7
123:9 136:18
139:22 145:17
152:2 155:9
157:2 171:5
173:15 177:22
195:12 196:18
214:2 223:7
228:20 240:3
249:9 251:23
256:12 261:16
262:8 265:25
267:16 284:13
294:13,15
296:11 302:16

305:2 310:14,18
313:3 316:8
324:2 333:12
341:10,23 364:6
379:10 393:4
396:19 399:4
**wanted** 22:25
59:8 60:13
62:15,20,21 80:9
106:24,25 110:4
110:9,10,12
112:6,8,20
130:25 152:6
155:5 177:11
195:5 263:3
264:13 292:11
294:13,23
301:21 379:23
381:6 391:12
395:3 402:24
**wanting** 155:14
373:25
**wantonness**
252:16,18
**wants** 49:15
61:22 177:21
**warrant** 274:13
**washington** 5:9
78:3
**waste** 379:22
**watched** 308:11
325:18
**watching** 216:24
309:14
**water** 159:4,13
348:2
**way** 16:6 72:2
75:25 82:8

108:22 111:4
115:13 116:2
119:3 124:11
131:2 139:20
148:22 176:21
183:3 189:3
193:15 194:13
203:11 211:3,25
212:2 213:20
216:12,23 219:2
220:18 235:23
243:21 279:23
280:7,16 281:15
286:21 292:10
292:11 295:22
304:4,19 322:17
323:15 335:18
337:6 338:17,20
348:18 354:13
421:16
**ways** 204:25
243:24 323:15
332:21,24
**we've** 143:23
144:21 203:3
**weather** 307:17
308:22
**website** 49:21
59:14 68:19
69:18 87:15,20
88:9 100:7
117:3 121:5,14
122:13 134:8,24
135:9 137:5,15
175:11 216:13
240:14 263:21
266:24 373:18
374:15 392:18

395:21 396:3,7
401:4 407:24
408:5,8
**week** 308:16
373:5
**weighed** 269:3
282:19
**weight** 279:21
**welcome** 131:17
292:13
**wells** 1:18
**went** 79:17
108:14 121:2
148:22 216:2,3
227:19 289:17
343:10 368:19
369:7 399:16
**whereof** 421:18
**wherewithal**
309:21 345:19
**white** 241:7,10
261:18 263:25
295:25 305:19
306:4 336:24
389:22 390:2
**whoa** 60:2,3
**wholesale**
302:17
**wide** 96:11
**willful** 252:16,17
**wilson** 109:15,22
110:4,25 111:17
111:24 112:20
306:11
**wilson's** 102:6
359:4
**win** 300:23

**wish** 253:12
428:4
**wished** 57:4
**witness** 6:3
76:15,20,24
164:16 191:5
204:12 208:7
246:8 340:7,11
383:13,18 420:6
421:18 422:3
427:2 428:25
**witnessed**
299:20
**women** 87:3,8
**won** 306:14
**word** 149:25
287:5 288:13
360:9 416:20
**words** 179:7
196:8 198:15
200:22 280:12
297:22 395:2
**work** 41:6 56:9
59:22 60:9
63:25 64:14
144:23 145:5,13
148:12 155:6
157:4 167:13,21
168:24 169:11
184:18 185:5
204:11 208:6
217:23 218:2,15
218:16,20,21,24
218:25 219:3,4,8
219:11,22
239:20 263:18
290:9 291:20
381:4

**[worked - zoom]**

Page 75

**worked**  33:4
  60:3,5 73:2
  75:17 83:21,25
  265:11 341:21
  341:24 342:5
**working**  22:8
  33:8 68:8,11,13
  69:24,25 70:5
  100:10 127:21
  127:24 201:8,16
  260:2 262:25
  319:22 342:3
  347:5
**works**  47:10
  57:11,12,18 60:2
  263:11
**world**  395:22
**worrying**  116:7
**wrapping**
  379:21
**wren**  81:23
  89:25 91:13,20
  96:16 97:12
  99:9,25 100:12
  100:17 101:4,14
  101:21 102:3,8
  102:12 113:9
  116:18,21
  117:22 119:9
  124:15 125:25
  129:20 422:14
**write**  66:7
**writing**  149:2
  175:2 207:5
  249:15 347:24
  350:9
**written**  150:23
  207:21 216:6,9

  216:18 222:9,14
  223:9 260:22
  274:10 347:2
  353:11 355:8,20
  356:24 357:3
  360:13 372:19
  373:9,10 374:6
  381:20
**wrong**  79:20
  254:12 257:2
  310:23

| x |
|---|

**x**  1:3,21 198:16
  422:2

| y |
|---|

**y**  198:17,19
**yeah**  9:3 17:21
  29:15 30:23
  38:15 41:9 47:8
  49:9 53:5 56:2
  56:15,24 72:10
  77:12 81:4,8
  90:20 91:9
  96:25 103:3
  122:7 124:17
  129:15 135:6
  153:17 162:2
  165:4,19 167:10
  178:14 181:20
  194:25 195:20
  205:20 211:6,6
  212:11 216:21
  225:7 232:8
  245:3 255:18
  256:11 260:25
  263:16 286:17
  303:24 311:25

  314:7 327:22
  333:7 337:10
  342:18 343:3
  356:17 362:21
  365:5 373:4,5,7
  379:8 383:16
  388:19 401:6
  408:16,16
**year**  266:10
**years**  19:9 57:9
  77:6 95:11
  112:13 247:5
  262:11
**york**  2:16,16
  3:12,12 420:2,4
  421:2,4,8
**young**  51:24
  52:3,7,9
**yup**  90:24

| z |
|---|

**zero**  352:9
**zip**  82:6 120:11
  120:14 121:13
**zoom**  47:16

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.