**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

|  |  |
|---|---|
| THE SOUTH CAROLINA STATE CONFERENCE OF THE NAACP, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> THOMAS C. ALEXANDER, *et al.*, <br><br> Defendants. | Case No.  3:21-cv-03302-MGL-TJH-RMG <br><br> **SENATE AND HOUSE DEFENDANTS' _DAUBERT_ MOTION IN LIMINE TO EXCLUDE REPORTS, OPINIONS, AND TESTIMONY OF DR. JOSEPH BAGLEY** |

The Senate Defendants and the House Defendants[1] move in limine to exclude the reports,

opinions, and testimony of Plaintiffs' putative expert, Dr. Joseph Bagley, because he fails to satisfy

the requirements of *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993) and the

Federal Rules of Evidence.[2]  For the reasons that follow, the Court should grant the motion.

**INTRODUCTION**

On May 6, 2022, Plaintiffs filed a Third Amended Complaint to challenge the General

Assembly's Congressional Plan (S.865) as an alleged product of intentional racial discrimination

and racial gerrymandering.  ECF No. 267.  The Court then allowed Plaintiffs to pierce Defendants'

legislative privilege based on the allegations in the Third Amended Complaint.  ECF No. 299 at

---

[1] The Senate Defendants are Thomas C. Alexander, in his official capacity as President of the Senate, and Luke A. Rankin, in his official capacity as Chairman of the Senate Judiciary Committee.  The House Defendants are James A. Lucas, in his official capacity as Speaker of the House of Representatives, Chris Murphy, in his official capacity as Chairman of the House of Representatives Judiciary Committee, and Wallace H. Jordan, in his official capacity as Chairman of the House of Representatives Elections Law Subcommittee.  As previously noted, Jay Lucas is no longer Speaker of the House.

[2] Because this motion contains a full explanation, a supporting memorandum would serve no useful purpose.  *See* Local Civil Rule 7.04 (D.S.C.).  Further, after consultation, Plaintiffs declined to withdraw Dr. Bagley as an expert.  *See* Local Civil Rule 7.02 (D.S.C.).

10.  Now, armed with access to both the public record and the private record of decisionmakers, Plaintiffs still do not have any evidence to support their extraordinary allegations.  Yet they continue marching forward with the argument that race allegedly was a motivating factor, and even the predominant one, for the General Assembly in enacting the Congressional Plan.  Recognizing they lack direct evidence to support those claims, Plaintiffs have cobbled together an eye-catching conspiracy theory based on strained views of circumstantial evidence to argue procedural irregularities.  In advancing this peripheral process argument, Plaintiffs heavily rely on Dr. Bagley.

Plaintiffs submitted Dr. Bagley's initial report, along with his most recent curriculum vitae, on April 11, 2022.[3]  Dr. Bagley was "asked to present a history of discrimination," Ex. A, Bagley Dep. Tr. at 98:11–13, and that was the focus of the first part of his initial report.  *See* Ex. B, Bagley Initial Report at pp. 4–24.  But Dr. Bagley lacks the requisite qualifications to offer expert opinions on South Carolina history.  His "summary" account of remote history—none of which relates to *this* General Assembly or its redistricting decisions—proves as much.  *See id.*  Dr. Bagley, however, presents a "broad mosaic" to try to tag Defendants with unsupported allegations of racial discrimination.  Ex. A, Bagley Dep. Tr. at 97:5.  Respectfully, that is not the law.

The second half of Dr. Bagley's report fares no better: it merely consists of his uninformed and skewed view of the legislative record leading up to passage of S.865.  *See* Ex. B, Bagley Initial Report at pp. 25–49.  Unfortunately, Dr. Bagley's bias jumps off the page in this section.  He recites with great enthusiasm what Democrats said during public hearings, committee meetings,

---

[3] By way of background, Plaintiffs sought to proffer Dr. Bagley in the House Plan litigation as well.  His reports and deposition from that phase of the case suffered from the same problems.  Interestingly, after getting a sneak peak of Defendants' cross-examination, Dr. Bagley made several changes to his initial report for the Congressional Plan.  *E.g.*, Ex. A, Bagley Dep. Tr. at 93:12–19; 101:10–19; 197:3–11; 198:12–19; 201:13–202:17; 207:18–25.  But these opportunistic changes do not save the day, for Dr. Bagley's "opinions" still suffer from the same fatal problems.

and debate.  Further, he selectively cites what certain members of the public—many of whom

Plaintiffs and their coalition recruited to offer scripted testimony to the General Assembly—said

during meetings and hearings.  Notably, he makes little to no mention of public testimony from

the bill's supporters.  And on the rare occasion he mentions what a Republican member said, Dr.

Bagley quickly dismisses the statement as not genuine or supported by the record.  For one, those

aren't his calls to make.  As Dr. Bagley admits, it is the Court's role to ascertain legislative intent

and make credibility determinations.  For another, the evidence has consistently proven Dr. Bagley

wrong.  In other words, his speculative opinions are neither reliable nor relevant.

In response to Plaintiffs' rollout of five putative experts, Defendants identified Sean Trende

as their expert and submitted his report on April 18, 2022.  Although Trende did not mention Dr.

Bagley in his report, *see* Ex. C, Trende Report at 1–36, Dr. Bagley still submitted a "rebuttal"

report on May 3, 2022.  *See* Ex. D, Bagley Rebuttal Report at 1–11.  In this strawman report, Dr.

Bagley emphatically concluded that "[t]here is no evidence whatsoever, among the materials that

[he] reviewed, that the Enacted Map was drawn with the express purpose of securing a Republican

advantage in CD 1 or in the General Assembly pursuing a 6-1 Republican super-majority

advantage in the state's Congressional delegation." *Id.* at 11.  This puzzling statement—coupled

with the flaws outlined above—brings into focus the problems underpinning Dr. Bagley's report,

analysis, and testimony.  Simply put, his opinions are not consistent with the facts or the law.

Moreover, as Plaintiffs are aware, "[a]ny statement or opinion to the effect that [the expert]

believed a particular reason given by Defendant was not the primary motivation . . . or that he does

not find a reason of Defendant plausible is not admissible." *NAACP v. Molly Darcy, Inc.*, No.

4:11-cv-01293-RBH, 2012 WL 4473138, at *7 (D.S.C. Sept. 26, 2012).  Yet that is the entire crux

of Dr. Bagley's reports and testimony in this matter.  As the Court has recognized, "[s]uch

statements or opinions are not helpful . . . and a waste of time." *Id.* Defendants agree. The Court

should therefore exclude Dr. Bagley's reports and prevent him from testifying at trial.

## STANDARD

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, as

interpreted by the Supreme Court in *Daubert* and its progeny. "A witness who is qualified as an

expert by knowledge, skill, experience, training, or education may testify in the form of an opinion

or otherwise" if:

> (a) the expert's scientific, technical, or other specialized knowledge
> will help the trier of fact to understand the evidence or to determine
> a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods;
> and
>
> (d) the expert has reliably applied the principles and methods to the
> facts of the case.

Fed. R. Evid. 702.

"Implicit in the text of Rule 702, the *Daubert* Court concluded, is a district court's

gatekeeping responsibility to 'ensur[e] that an expert's testimony both rests on a reliable

foundation and is relevant to the task at hand.'" *Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th

Cir. 2017) (quoting *Daubert*, 509 U.S. at 597). "This entails a preliminary assessment of whether

the reasoning or methodology underlying the testimony is scientifically valid and of whether that

reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at

592–93. The proponent of expert testimony must demonstrate that the testimony satisfies these

requirements. *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001); *see also* Fed.

R. Evid. 104(a) (placing burden on proponent of expert testimony).

4

Rule 702 affords a court wide latitude to admit expert testimony, to be sure, but such testimony must be (1) based on the special knowledge of the expert and (2) helpful to the trier of fact. *See Daubert*, 508 U.S. at 589–91. And a court's gatekeeping function under *Daubert* is equally applicable to scientific and nonscientific expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147–49 (1999). That said, "[t]he factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Id.* at 150. Regardless, "[t]he reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, *et alia*." *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 155 (3d Cir. 1999).

In assessing reliability, "[t]he Supreme Court has advised district courts to require more than the mere '*ipse dixit*' of the expert witness." *Nucor Corp. v. Bell*, No. 2:06-cv-02972-DCN, 2008 WL 4442571, at *4 (D.S.C. Jan. 11, 2008). And "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002).

**ARGUMENT**

The Court should exclude Dr. Bagley under *Daubert* because (1) he is not qualified; (2) his opinions and testimony will not assist the trier of fact; (3) his opinions are unreliable and irrelevant; and (4) he is seeking to invade the province of this Court.

## I.    Dr. Bagley is not qualified.

When a putative expert "clearly has no relevant qualifications," a court may exclude the witness. *Templeton v. Bishop of Charleston*, No. 2:18-CV-02003-DCN, 2021 WL 3419442, at *3

5

(D.S.C. Aug. 5, 2021). "Even where a witness has special knowledge or experience, qualification to testify as an expert also requires that the area of the witness's competence matches the subject matter of the witness's testimony." 29 Charles A. Wright. et al., *Federal Practice & Procedure* § 6265 at 255 & nn.34–35 (1977). And "an expert witness may not offer an opinion where the subject matter goes beyond the witness's area of expertise." *Young v. Swiney*, 23 F. Supp. 3d 596, 611 (D. Md. 2014).

As a preliminary matter, Dr. Bagley made several important concessions in his deposition. *First*, Dr. Bagley conceded he is not a lawyer and not qualified to offer legal opinions. Ex. A, Bagley Dep. Tr. at 36:24–37:9. *Second*, Dr. Bagley conceded he has no legislative experience or redistricting experience. *Id.* at 67:22–68:17. *Third*, Dr. Bagley admitted he is only "generally" familiar with the South Carolina legislative process. *Id.* at 67:18–21. *Fourth*, Dr. Bagley agreed it is the Court's role to determine legislative intent. *Id.* at 37:14–17. *Fifth*, Dr. Bagley agreed it is the Court's job to conduct an *Arlington Heights* analysis. *Id.* at 67:7–9. *Sixth*, Dr. Bagley agreed it is up to the Court—in this bench trial—to assign credibility to witnesses. *Id.* at 156:4–7. Yet he proceeded to opine on all these things in his reports and testimony.

During his deposition, Dr. Bagley clarified that he was being offered as an expert in the fields of "American political history, southern race relations, [and] history of southern politics and law." *Id.* at 25:21–23. But "South Carolina" is not anywhere in those descriptions, and none of them "matches the subject matter of" Dr. Bagley's reports or testimony. Start with the reports. In the first part of Dr. Bagley's initial report, he admittedly discussed in "summary fashion," *id.* at 43:24–44:2, South Carolina's historical background. *See* Ex. B, Bagley Initial Report at 4–24. A newfound professional witness for the NAACP, Dr. Bagley has only testified as an expert in two

cases. *See id.* at 2. Both were in Alabama, *id.*, and the Supreme Court either stayed or reversed the district court's decision each time. *See* Ex. A, Bagley Dep. Tr. at 13:1–2, 14:15–16.

Alabama, of course, was the focus of Dr. Bagley's research before he began conducting research on South Carolina solely for purposes of this litigation. *Id.* at 10:17–22, 36:12–23. More specifically, he focused on desegregation in Alabama. *Id.* at 9:18–23. Prior to this lawsuit, Dr. Bagley had only read some "chapters" about South Carolina in his classes on Southern politics, more generally, and read some voting cases about the state. *Id.* at 91:2–19, 63:7–12, 92:17–93:2. He has never (1) taught South Carolina history; (2) taken a class on South Carolina history; (3) written books, articles, or blogposts about South Carolina history; or (3) presented or participated in any roundtables, panels, or symposia discussions about South Carolina history. *Id.* at 33:12– 34:21. Knowledge of Southern politics in general, with an emphasis on Alabama, simply does not translate into qualifications to offer an authoritative recitation of South Carolina history. Thus, the first half of his report and concomitant testimony must be excluded.

In the second half of Dr. Bagley's initial report, he included a highly selective sequence of events and what—in his view—were alleged departures from the normal process surrounding passage of the South Carolina General Assembly's Congressional plan. *See* Ex. A, Bagley Initial Report at 24–49. Dr. Bagley's "rebuttal" report simply rehashed the same narrative in the second half of his initial report. *See* Ex. D, Bagley Rebuttal Report at 1–11. When asked if he was "retained to analyze the last cycle's redistricting process," Dr. Bagley replied, "Systematically, no." Ex. A, Bagley Dep. Tr. at 77:10. He apparently only read the *Backus* decision but did not educate himself on the process used last cycle. As noted above, Dr. Bagley has no personal experience in legislative process or redistricting. *Id.* at 67:18–68:13. Accordingly, Dr. Bagley is not qualified to opine on whether the current redistricting process suffered from procedural

irregularities.  As explained in greater detail below, his opinions on alleged departures from normal

procedures only prove the point.

Respectfully, Dr. Bagley "clearly" lacks the qualifications to opine on (1) South Carolina

history and (2) the legislative process surrounding the passage of S.865.  *Templeton*, 2021 WL

3419442, at \*3.  Nor do these subjects match what Dr. Bagley, in his own words, described as the

areas in which he is being offered to testify as an expert.  *See* Bagley Dep. Tr. at 25:21–23; *cf.*

Wright. et al., *supra*, § 6265 at 255 & nn.34–35; *Young*, 23 F. Supp. 3d at 611.  The Court should

therefore exclude Dr. Bagley's reports and prevent him from testifying at trial.

## II.    Dr. Bagley's opinions will not assist the trier of fact.

At the outset, Dr. Bagley's reports and testimony present somewhat of an identity crisis.

Is he testifying as a lay witness or an expert?  On the one hand, Dr. Bagley "agree[d] that a

layperson could watch these videos and give their interpretation of what was happening."  Ex. A,

Bagley Dep. Tr. at 102:18–20; *cf. Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993) ("Testimony

from an expert is presumed to be helpful unless it concerns matters within the everyday knowledge

and experience of a lay juror.").  On the other hand, Plaintiffs are seeking to imbue him with the

imprimatur of an expert when he is doing the *exact same thing*.  But Dr. Bagley knows little about

the South Carolina legislative process and has no redistricting experience in South Carolina.  Thus,

Dr. Bagley's opinions and testimony will not assist the Court—as trier of fact—because he

admittedly has no "technical[] or other specialized knowledge."  Fed. R. Evid. 702(a).

According to Dr. Bagley, his work was different because he, as an historian, provided what

he thought was "most relevant."  Ex. A, Bagley Dep. Tr. at 102:21.  In other words, Dr. Bagley

"made judgment calls on what [he] felt was relevant" in offering *his* "interpretation of legislative

history."  *Id.* at 105:21–21, 105:24–106:1.  Respectfully, that is not helpful to the Panel.  "As a

lay, not expert, witness, he lacked the personal knowledge necessary to express the opinions that

he did." *Certain Underwriters at Lloyd's, London v. Sinkovich*, 232 F.3d 200, 204 (4th Cir. 2000).

Dr. Bagley admits as much: he does not know any of the members he criticized. *See* Ex. A, Bagley

Dep. Tr. at 41:13–42:15. Dr. Bagley said, "All I can do is convey what members of the committee

are saying. That's what I have done." *Id.* 72:12–15. But the Court is just as capable, if not more,

of watching the hearings—or reading the transcripts—and does not need the biased bent offered

by Dr. Bagley. Contrary to his self-serving and inaccurate "opinions," Republican members were

not "largely silent" throughout the process. *Id.* at 41:2. They *did* speak about the various features

of the plan when it came time to debate, and every legislator and staffer has testified that no lines

drawn in the Congressional plan were based on race. *See* ECF No. 323 at 9 (citing testimony of

Will Roberts, Andy Fiffick, Sen. Campsen, Sen. Massey). Dr. Bagley just did not find them

"relevant" or persuasive to his result-oriented analysis stemming from the charge to "present a

history of discrimination." *Id.* at 98:11–13.

A putative expert's argumentative and slanted narrative of the legislative record will not

"help" the Court fulfil its role of determining the South Carolina General Assembly's intent behind

the enacted Congressional Plan. Fed. R. Evid. 702(a). Consequently, the Court should exclude

Dr. Bagley's reports and prevent him from testifying at trial.

**III.     Dr. Bagley's opinions are unreliable and irrelevant.**

It is axiomatic that "the district court must ensure that the proffered expert opinion is 'based

on scientific, technical, or other specialized knowledge and not on belief or speculation, and

inferences must be derived using scientific or other valid methods.'" *Nease*, 848 F.3d at 229

(quoting *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999)). A district "court is to

exclude 'subjective belief or unsupported speculation.'" *In re Bausch and Lomb Inc. Contact Lens*

*Sol. Prods. Liab. Litig.*, No. 2:06-MN-77777-DCN, 2009 WL 2750462, at \*9 (D.S.C. Aug. 26, 2009) (citing *Daubert*, 509 U.S. at 590).

Courts often consider "whether the expert's analysis leaves unexplained analytical gaps and whether the expert has reasonably accounted for alternative explanations." *Wickersham v. Ford Motor Co.*, No. 9:13-cv-1192-DCN; 9:14-cv-0459-DCN, 2016 WL 5349093, at \*7 (D.S.C. Sept. 26, 2016) (citing *Gen. Elec. Co. v. Joinder*, 522 U.S. 136, 146 (1996)). Also worthy of consideration is "[w]hether experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for the purposes of testifying." Fed. R. Evid. 702, advisory committee note; *see also Bowers v. Norfolk S. Corp.*, 537 F. Supp. 2d 1343, 1354–64 (M.D. Ga. 2007) (finding experts' opinions lacked independent bases because they did not form the "opinions independent of the litigation" but instead "in the context of the litigation").

"In considering these factors, the focus 'must be solely on principles and methodology, not on the conclusions that they generate.'" *Wickersham*, 2016 WL 5349093, at \*2 (citing *Daubert*, 509 U.S. at 591). "Although an inquiry under *Daubert* is flexible, other federal courts have held that experts fail to pass *Daubert* scrutiny when the expert has failed to measure, test, or validate their opinions." *Walker v. DDR Corp.*, No. 3:17-cv-01586-JMC, 2019 WL 3409724, at \*9 (D.S.C. Jan. 4, 2019). After all, "[u]ntested potentialities do not satisfy the *Daubert* standard." *Bausch*, 2009 WL 2750462, at \*11. Further, "[a] failure to consider potential alternative causes may render an expert's testimony inadmissible." *In re: Pella Corp. Architect & Designer Series Windows Mktg., Sales Practices & Prods. Liab. Litig.*, 214 F. Supp. 3d 478, 483 (D.S.C. 2016).

Here, Dr. Bagley summarily discussed a "broad mosaic" of historical events, ranging from the Civil War and Reconstruction to the Civil Rights movement and past redistricting cycles in

South Carolina. Ex. A, Bagley Dep. Tr. 97:5; *see* Ex. B, Bagley Report at 4–24. These historical

events, however, are simply too remote in time to "condemn" today's Congressional Plan. *Abbott*,

138 S. Ct. at 2324 (quoting *City of Mobile v. Bolden*, 446 U.S. 55, 74 (1980) (plurality opinion)).

Courts "cannot accept official actions taken long ago as evidence of current intent," *McCleskey v.

Kemp*, 481 U.S. 279, 298 n.20 (1987), and a current legislature's failure to "cure" past

discrimination does not establish a discriminatory intent either, *Abbott*, 138 S. Ct. at 2325–26.

Indeed, "[p]ast discrimination cannot, in the manner of original sin, condemn governmental action

that is not itself unlawful." *Id.* at 2324 (quoting *City of Mobile*, 446 U.S. at 2324); *see also Greater

Birmingham Ministries v. Sec'y of State for Ala.*, 992 F.3d 1299, 1325 (11th Cir. 2021) ("outdated

intentions of previous generations" do not "taint" "legislative action forevermore on certain

topics").

      At bottom, "what matters" is "the intent of the [current] legislature," *Abbott*, 138 S. Ct. at

2325, in "the precise circumstances surrounding the passing of the [challenged] law," *GBM*, 992

F.3d at 1325–26; *accord Brnovich*, 141 S. Ct. at 2349, and Dr. Bagley's dated historical analysis

does not demonstrate that the General Assembly enacted the Congressional Plan with a

discriminatory intent in 2022.

      Indeed, this Court rejected similar evidence in *Backus*. South Carolina's historical

treatment of African-American voters was squarely before the three-judge panel in *Backus*, but the

panel nonetheless rejected the *Backus* plaintiffs' intentional discrimination challenge to the

Benchmark Plan in an opinion summarily affirmed by the Supreme Court. *See Backus*, 857 F.

Supp. 2d 553, *aff'd*, 568 U.S. 801. And while Dr. Bagley also cited the history of Department of

Justice (DOJ) objections to various primarily *local* voting practices under Section 5 of the Voting

Rights Act, *see* Ex. A, Bagley Report at 20–24, DOJ precleared the Benchmark Plan in *Backus*,

857 F. Supp. 2d at 557; Ex. A, Bagley Report at 18, and the most recent objection Dr. Bagley cited

was more than a decade ago—much too "remote in time" to be probative here. *Regents*, 140 S.

Ct. at 1916; *see* Ex. A, Bagley Dep. Tr. 99:8–16; Ex. B, Bagley Report at 22.  As the Court has

reaffirmed, evidence from past redistricting cycles does not bear on "the intent of any legislator

[or] the South Carolina General Assembly as a whole[]" in voting for redistricting plans this cycle.

ECF No. 153 at 13.[4]  Thus, Dr. Bagley's pivot to a smattering of Section 5 objections to local

practices and a voter ID law—which was upheld with one minor modification—is equally

unavailing.[5]  None of that is relevant to the Congressional Plan *this* General Assembly enacted.

*See Sardis v. Overhead Door Corp.*, 10 F.4th 268, 281 (4th Cir. 2021) (stating to be relevant,

expert testimony must have "a valid [] connection to the pertinent inquiry" (quoting *Belville v.

Ford Motor Co.*, 919 F.3d 224, 232 (4th Cir. 2019))); *see also Bishop of Charleston v. Adams*, 538

F. Supp. 3d 608, 615 (D.S.C. 2021) (rejecting "efforts to draw a straight line through the

unconscionable discrimination of the past to the . . . decisions of the present").

Further, Dr. Bagley unquestionably "developed his opinions expressly for the purposes of

testifying."  *Collins v. Cash Am. E., Inc.*, No. 2:20-cv-2989-RMG, 2021 WL 5757393, at *1

---

[4] But even if it could bear on intent, the *Backus* court found the legislative defendants "were able to *disprove* that race was the predominant factor by demonstrating that their decisions adhered to traditional race-neutral principles."  857 F. Supp. 2d at 560 (emphasis added).

[5] Similarly, Dr. Bagley's reliance on the COVID-19 absentee ballot litigation is misplaced. At the outset, Dr. Bagley conceded he was "not super, super familiar with the findings" in the 2020 witness requirement case.  Ex. A, Bagley Dep. Tr. at 54:16–17.  First, that begs the question of why it was included in his report.  Second, the Court there expressly noted that Plaintiffs' "as-applied constitutional challenge[]" to the witness requirement was solely "based on the ongoing COVID-19 pandemic."  *Middleton v. Andino*, 488 F. Supp. 3d 261, 296 (D.S.C. May 25, 2020). Third, the Supreme Court stayed the district court's order enjoining the witness requirement, and the General Assembly temporarily removed the excuse requirement for the 2020 elections.  *See Andino v. Middleton*, 141 S. Ct. 9, 9–10 (2020) (mem.); Act 133, 123rd Gen. Assemb., 2d Sess. (S.C. 2020); Act 143, 123rd Gen. Assemb., 2d Sess. (S.C. 2020).  Accordingly, Dr. Bagley's passing reference to COVID-19 litigation is irrelevant, and his effort to link a case about which he knows nothing to the current Congressional Plan is unreliable.

(D.S.C. Dec. 2, 2021). After all, Dr. Bagley's focus before this litigation was on desegregation and voting lawsuits in Alabama. And he developed his opinions with an eye toward generating one conclusion: a finding of racial discrimination. *Cf. Wickersham*, 2016 WL 5349093, at \*2. Of course, "[e]xpert reports . . . must include 'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions.'" *Bresler v. Wilmington Trust Co.*, 855 F.3d 178, 210 (4th Cir. 2017) (Wynn, J., concurring in part and dissenting in part) (quoting *Salgado by Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 741 n.6 (7th Cir. 1998)). Yet Dr. Bagley only offered conclusory opinions and provided no standard on which to judge them. The following exchange is illustrative:

> Q:    Where in your report do you lay out what, in your expert opinion as a historian, are the normal procedural sequences that you then are measuring the sequence of events in South Carolina against?
>
> A:    Rather than lay it out like that, what I've done is convey where members of the public or members of the committees have indicated that they felt like there was significant procedural departures.
>
> Q.    Certainly, you would agree with me that those legislators or the members of the public are not expert historians, right?
>
> A.    Well, certainly not.

Ex. A, Bagley Dep. Tr. at 203:11–24.

Courts have repeatedly held that expert opinions must be supported "by something more than the 'it is so because I say it is so' of the expert." *Holesapple v. Barrett*, 5 F. App'x 177, 180 (4th Cir. 2001); *see also Nucor Corp.*, 2008 WL 4442571, at \*4 ("The Supreme Court has advised district courts to require more than the mere '*ipse dixit*' of the expert witness."). In his report, Dr. Bagley merely highlighted the comments of Democratic legislators—while barely mentioning and trying to discredit Republican legislators' comments—to reach his preordained conclusion that the

Congressional Plan had to be the product of racial discrimination. *See* Ex. B, Bagley Initial Report at 24–49. He also relied on members of the public who testified against the bill. *See id.* When asked if his opinions about their statements would change if the evidence showed Plaintiffs, who had already filed suit, coordinated and scripted some of their testimony, Dr. Bagley said, "Sure." Ex. A, Bagley Dep. Tr. at 76:24–77:6.

Although Dr. Bagley offered no standard for determining departures from normal legislative procedures, he nevertheless pointed to three alleged procedural irregularities: (1) that some members complained they did not know where *staff plans* came from, (2) that some maps were posted around the holidays, and (3) that Rep. John King did not get to chair a House Judiciary Committee meeting in the absence of Chairman Chris Murphy. Ex. A, Bagley Dep. Tr. at 77:21–78:16. But none of these even constitutes an irregularity. Even Dr. Bagley recognized they did not "render the process invalid under an Arlington Heights factor." *Id.* at 78:14–17. Rather, he said "they're simply among the things that a court would consider." *Id.* at 78:17–18.

Again, Dr. Bagley is just parroting statements from opponents to the Congressional Plan. No reliable historical (or legal) standards support his cabined analysis of legislative intent. *See NLRB. v. Fruit & Vegetable Packers & Warehousemen, Loc. 760*, 377 U.S. 58, 66 (1964) ("But we have often cautioned against the danger, when interpreting a statute, of reliance upon the views of its legislative opponents. In their zeal to defeat a bill, they understandably tend to overstate its reach. The fears and doubts of the opposition are no authoritative guide to the construction of legislation. It is the sponsors that we look to . . . .").

What is more, Dr. Bagley offers the curious opinion that politics did not motivate the General Assembly in enacting this plan. *See* Ex. D, Bagley Rebuttal Report at 5–6, 8, 11. Yet every single Senator who has been deposed, and a smattering of legislators from both parties who

14

spoke during debate, has said the exact opposite. *E.g.*, ECF No. 323 at 20–21 (citing deposition testimony of Senators and staff in ECF Nos. 323-22, 323-23, 323-24, 323-25); Ex. B, Bagley Initial Report at 41. In formulating this opinion, Dr. Bagley either stuck his head in the sand or based it on sheer speculation. Neither satisfies the *Daubert* standard. *See Nease*, 848 F.3d at 229 (stating opinions cannot be based "on belief or speculation, and inferences must be derived using scientific or other valid methods" (quoting *Oglesby*, 190 F.3d at 250)); *see also Fernandez v. Spar Tek Indus., Inc.*, No. 0:06-cv-3253-CMC, 2008 WL 2185395, at *6 (D.S.C. May 23, 2008) (stating "an opinion based on an inadequate or inaccurate factual foundation cannot be a reliable opinion, no matter how valid the principles and methods applied or how well-qualified the expert").

These are but a few of many examples from the 60 pages of reports Dr. Bagley submitted and the 211 pages of his deposition testimony that demonstrate Dr. Bagley's opinions are unreliable and irrelevant. Plaintiffs bear the burden of proving his testimony is admissible, and no matter what opinions they cite from Dr. Bagley's biased trope, they failed as a matter of law to carry that burden. Thus, the Court should exclude Dr. Bagley's reports and prevent him from testifying at trial.

## IV.    Bagley's opinions and observations on legal issues and credibility seek to invade the role of the Court.

It is well-settled that "[t]he question of intent is" a question for factfinders "and not one for experts." *In re Diet Drugs Prod. Liab Litig.*, 2000 WL 876900, at *9 (E.D. Pa. June 20, 2000); *Taylor v. Novartis Pharm. Corp.*, 2013 WL 5118945, at *4 (S.D. Fla. Apr. 22, 2013) ("motivation or intent is not a proper subject of expert testimony."); *Kaufman v. Pfizer Pharm., Inc.*, 2011 WL 7659333, at *9 n.8 (S.D. Fla. Aug. 4, 2011) ("The Court will exclude all of Dr. Parisian's opinions about Defendants' motives and state of mind, regardless of where or how they appear in her expert report."); *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004) ("Inferences

about the intent or motive of parties or others lie outside the bounds of expert testimony."); *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009) (precluding testimony as to "the knowledge, motivations, intent, state of mind, or purposes [of a company and] its employees" because it "is not a proper subject for expert . . . testimony").

Likewise, "in a bench trial, the court, as the trier of fact, is the sole judge of the credibility of witnesses and the weight to be given their testimony." *Invs. Title Ins. Co. v. Bair*, No. 9:05-cv-1434-PMD, 2007 WL 9735299, at *1 (D.S.C. June 5, 2007), *aff'd*, 296 F. App'x 332 (4th Cir. 2008). Questions of law also lie exclusively within the province of the Court. *See, e.g.*, *Brown v. Dennis*, No. 3:15-3334-JMC-PJG, 2016 WL 4618892, at *2 (D.S.C. Sept. 6, 2016) ("Courts have frequently found [] expert reports or testimony opining as to the law governing the case or containing legal conclusions to be inadmissible under Rule 702 and controlling case law.").

As Dr. Bagley admitted during his deposition, it is the Court's job to determine legislative intent and judge the credibility of legislators and their staff. Dr. Bagley nevertheless sought to invade the Court's roles. *See, e.g.*, Ex. A, Bagley Dep. Tr. at 41:18–20 ("I think the full record revealed to me that perhaps there was some obfuscation"); Ex. D, Bagley Rebuttal at 2 ("I find that legislators generally understood the Enacted Map to constitute significant changes to Congressional district lines that were necessary to account for demographic shifts between 2010 and 2020, especially in CD 1 and CD 6."); *id.* (stating lawmakers did not seriously consider issues of core retention or adhering to natural geographical boundaries until extremely late in the legislative process, at which point Republican leaders asserted for the first time that these should be key considerations"); *id.* at 6 (stating Sen. Campsen's arguments in defense of the plan "appeared to have become major talking points despite hardly having been discussed at all up to that point"); *id.* at 8 (describing Sen. Campsen's argument on "following natural geographical

16

boundaries," which the plan undisputedly does, as "a questionable rationale"); *id.* at 11 ("What had essentially been limited to Chairman Rankin's introductory remarks at the public hearings, in other words, became, at the eleventh hour, repeatedly referenced justifications."); *id.* at 3 ("Mr. Trende's opinions on these matters more likely represent *ex post facto* justifications that were not really an integral part of the lengthy legislative or public discussions regarding the creation of the Enacted Map and, therefore, are not very useful in discerning evidence of legislative intent.").

And Dr. Bagley's creative effort to stop short of deciding intent by suggesting there is "a strong inference of a discriminatory motive," Ex. A, Bagley Initial Report at 4, is a distinction without a difference. Dr. Bagley made his opinions on intent clear in his report and testimony. Because such uninformed and ipse dixit opinions are inadmissible, *see NAACP*, 2012 WL 4473138, at \*7 ("Any statement or opinion to the effect that [the expert] believed a particular reason given by Defendant was not the primary motivation . . . or that he does not find a reason of Defendant plausible is not admissible. Such statements or opinions are not helpful . . . and a waste of time."), the Court should exclude Dr. Bagley's reports and prevent him from testifying at trial on this ground alone.

## CONCLUSION

In sum, Dr. Bagley lacks the requisite qualifications to opine on remote South Carolina history that bears no relation to the current (or even a recent) General Assembly or Congressional redistricting. Further, his selective observations on what citizens or legislators said in the public record—or what they really meant—are inappropriate. These opinions seek to invade the role of this Court, "are not helpful," unreliable, irrelevant, "and a waste of time." *NAACP*, 2012 WL 4473138, at \*7. The Court should therefore exclude Dr. Bagley's reports, opinions, and testimony from the trial of this matter under *Daubert*.

17

September 2, 2022

Respectfully submitted,

/s/Robert E. Tyson, Jr.
Robert E. Tyson, Jr. (7815)
Vordman Carlisle Traywick, III (12483)
La'Jessica Stringfellow (13006)
ROBINSON GRAY STEPP & LAFFITTE, LLC
Post Office Box 11449
Columbia, South Carolina 29211
(803) 929-1400
rtyson@robinsongray.com
ltraywick@robinsongray.com
lstringfellow@robinsongray.com

John M. Gore (admitted *pro hac vice*)
Stephen J. Kenny (admitted *pro hac vice*)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Phone: (202) 879-3939
Fax: (202) 626-1700
jmgore@jonesday.com
skenny@jonesday.com

*Counsel for Senate Defendants*

/s/Mark C. Moore
Mark C. Moore (Fed. ID No. 4956)
Jennifer J. Hollingsworth (Fed. ID No. 11704)
Hamilton B. Barber (Fed. ID No. 13306)
Michael A. Parente (Fed. ID No. 13358)
NEXSEN PRUET, LLC
1230 Main Street, Suite 700
Columbia, SC 29201
Telephone: 803.771.8900
MMoore@nexsenpruet.com
JHollingsworth@nexsenpruet.com
HBarber@nexsenpruet.com
MParente@nexsenpruet.com

William W. Wilkins (Fed. ID No. 4662)
Andrew A. Mathias (Fed. ID No. 10166)
Konstantine P. Diamaduros (Fed. ID No. 12368)
NEXSEN PRUET, LLC
104 S. Main Street, Suite 900
Greenville, SC 29601

18

Telephone: 864.370.2211
BWilkins@nexsenpruet.com
AMathias@nexsenpruet.com
KDiamaduros@nexsenpruet.com

Rhett D. Ricard (Fed. ID No. 13549)
NEXSEN PRUET, LLC
205 King Street, Suite 400
Charleston, SC 29401
Telephone: 843.720.1707
RRicard@nexsenpruet.com

*Counsel for House Defendants*