## <u>The South Carolina State Conference of the NAACP, et al v. Alexander, et al</u>

CA No.:  3:21-cv-03302-MGL-TJH-RMG

# EXHIBIT A

*Senate and House Defendants' Daubert Motion in Limine to Exclude Reports, Opinions, and Testimony of Dr. Joseph Bagley*

Transcript of June 29, 2022 Deposition of

Joseph Bagley, Ph.D.

Joseph Bagley , PhD                    June 29, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 1

1              UNITED STATES DISTRICT COURT

              DISTRICT OF SOUTH CAROLINA

2                 COLUMBIA DIVISION

3    THE SOUTH CAROLINA STATE CONFERENCE OF

     THE NAACP, et al.,

4

             Plaintiffs,

5

         vs.  CASE NO.  3:21-CV-03302-MBS

6                    TJH-RMG

7    THOMAS C. ALEXANDER, et al.,

8            Defendants.

9

10

11

12

13   VIDEO TELECONFERENCE

14   DEPOSITION OF:   JOSEPH BAGLEY, PhD

15   DATE:            June 29, 2022

16   TIME:            10:00 a.m.

17   LOCATION:        Virtual - Zoom

18   TAKEN BY:        Counsel for the Senate

19                    Defendants

20   REPORTED BY:     Roxanne Easterwood, RPR

21

22

23

24

25

Page 2

```
1  APPEARANCES OF COUNSEL:
2
       ATTORNEYS FOR PLAINTIFFS:
3
       NAACP Legal Defense & Educational
4      Fund, Inc.
       By:  Antonio Ingram, II
5          Leah C. Aden
           John S. Cusick
6          Tanveer Singh
           Princess Jefferson
7      40 Rector Street, 5th Floor
       New York, NY 10006
8      (212) 965-7715
       aingram@naacpldf.org
9      laden@naacpldf.org
       jcusick@naacpldf.org
10
11
       American Civil Liberties Union
12     Foundation
       By:  Samantha Osaki
13     915 15th Street, NW
       Washington, DC 20005
14     (202) 457-0800
       sosaki@aclu.org
15
16  ATTORNEYS FOR HOUSE DEFENDANTS:
17  Nexsen Pruet, LLC
       By:  Michael A. Parente
18         Jennifer Hollingsworth
       1101 Johnson Avenue, Suite 300
19     Myrtle Beach, SC 29577
       (803) 771-8900
20     mparente@nexsenpruet.com
       jhollingsworth@nexsenpruet.com
21
22
23
24
25
```

Page 3

```
1  ATTORNEYS FOR SENATE DEFENDANTS:
2     Robinson Gray, LLC
        By:  Vordman Carlisle Traywick, III
3          Robert E. Tyson
           Cynthia Nygord
4     1310 Gadsden Street
      Columbia, SC 29201
5     (803) 929-1400
      ltraywick@robinsongray.com
6     rtyson@robinsongray.com
      cnygord@robinsongray.com
7
8
      ATTORNEYS FOR ELECTION COMMISSION
9     DEFENDANTS:
10    Burr & Forman, LLP
        By:  Jane W. Trinkley
11    1221 Main Street, Suite 1800
      Columbia, SC 29201
12    (803) 753-3241
      jtrinkley@burr.com
13
14
15
16
17       (INDEX AT REAR OF TRANSCRIPT)
18
19
20
21
22
23
24
25
```

Page 4

```
1            P R O C E E D I N G S
2        *    *    *    *    *    *
3            JOSEPH BAGLEY, PhD
4  being first duly sworn, testified as follows:
5            EXAMINATION
6  BY MR. TRAYWICK:
7      Q.  Good morning, Dr. Bagley.  Thank you
8  for your patience as we've both kind of dealt with
9  technical difficulties.  We've met before and just
10 talked off the record.  I've introduced myself.
11 My name is Lisle Traywick.  I'm with the law firm
12 of Robinson Gray Stepp & Laffitte.  We are
13 representing the Senate defendants in this action
14 filed by the South Carolina Conference of the
15 NAACP and Taiwan Scott against our clients and
16 others.  We met before in your previous
17 deposition, in the House deposition; is that
18 right?
19     A.  Yes, sir.
20     Q.  So today we're here to talk about the
21 Congressional plan litigation, right?
22     A.  That's right.
23     Q.  Just to ensure we're reading from the
24 same sheet of music, the rule requires me to go
25 over the rules of the deposition.  So I'll do that
```

Page 5

```
1  briefly.  I know you're familiar with them.
2           If you have any questions about my
3  questions, please direct those towards me.  If I
4  ask you a question that you don't understand or
5  that's a bad question, which is bound to happen,
6  please ask me to rephrase.  I'm happy to do so.
7  I'm certainly not trying to trick you.
8           This isn't an endurance contest, so if
9  at any time you need to take a break, go to the
10 restroom, get some water, or just take a minute,
11 I'm happy to accommodate you in that regard.  Just
12 let me know.  And I'll try to work in some logical
13 breaks as well for lunch and things like that?
14          If you hear opposing counsel object to
15 my question, you still need to answer the
16 question.  But if he instructs you not to answer,
17 only then can you not answer the question.
18          But aside from that, I'm ready to
19 begin, if you are.
20     A.  Yes, sir, I am.
21     Q.  Can you please state your full name,
22 for the record?
23     A.  Joseph Mark Bagley.
24     Q.  What is your date of birth,
25 Dr. Bagley?
```

2 (Pages 2 - 5)

Joseph Bagley , PhD                                    June 29, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 6

1       A.   February 23, 1981.
2       Q.   What is your address, please?
3       A.   2823 Middleham, M-I-D-D-L-E-H-A-M,
4   Court, Tucker, Georgia 30084.
5       Q.   Is that outside of Atlanta?
6       A.   Yes, sir, just right outside of the
7   northeast corner.
8       Q.   Good deal.
9           MR. TRAYWICK: Dr. Bagley, I'm going
10  to mark as Exhibit 1 to your deposition the
11  subpoena and deposition notice that we served on
12  you. And we'll try to get that in Exhibit Share.
13          (Exhibit 1, Notice of Deposition,
14  Certificate of Service, Acceptance of Service,
15  Subpoena Duces Tecum, marked for identification.)
16          MS. NYGORD: Exhibit 1 should be in
17  there.
18          MR. TRAYWICK: Let me relaunch. Off
19  the record.
20          (A recess was taken.)
21          MR. TRAYWICK: Back again.
22  BY MR. TRAYWICK:
23      Q.   Thanks, again, for you patience with
24  that, Dr. Bagley. Can you see in Exhibit Share a
25  document?

Page 7

1       A.   No, sir, I do not.
2           COURT REPORTER: You will have to
3   refresh.
4   BY MR. TRAYWICK:
5       Q.   Dr. Bagley, I'm going to show you what
6   we're marking as Exhibit 1 to your deposition.
7       A.   All right.
8       Q.   Have you seen this document before?
9       A.   Yes.
10      Q.   What is it?
11      A.   This is a notice of taking of my
12  deposition.
13      Q.   Did you also see the subpoena that was
14  attached thereto?
15      A.   I did.
16      Q.   Did you bring any documents with you
17  today in response to this subpoena?
18      A.   No. I understand that the attorneys
19  had turned over some of what was requested. But I
20  haven't brought anything with me today other than
21  my reports, a clean copy of my report and my
22  rebuttal report.
23      Q.   Did you help furnish information to
24  them to provide responses to the subpoena?
25      A.   I understand that they have submitted

Page 8

1   some things that they had already gotten from me,
2   some of the things that were already requested.
3       Q.   So were you asked to pull any of the
4   documents identified in Exhibit A to the subpoena
5   that was served upon you?
6       A.   No.
7       Q.   Dr. Bagley, what did you do to prepare
8   for your deposition today?
9       A.   Mostly just read over my report. It's
10  been a while since I entered it. So just
11  refreshed myself. It's a lot of information.
12      Q.   Which report?
13      A.   So this is my report from the
14  Congressional phase, and then I have a rebuttal --
15  brief rebuttal report, as well, in this phase.
16      Q.   Did you do anything else to prepare
17  for your deposition?
18      A.   No. I just have had brief
19  conversations with the attorneys, just sort of
20  logistics and, you know, where we're going to be,
21  what we're going to expect, that kind of thing.
22          MR. TRAYWICK: I'm going to mark as
23  Exhibit 2 to your deposition what was produced in
24  connection with your reports as your CV.
25          (Exhibit 2, Bagley CV, marked for

Page 9

1   identification.)
2   BY MR. TRAYWICK:
3       Q.   Do you see that on your screen,
4   Dr. Bagley?
5       A.   I do.
6       Q.   Is that the most current copy or most
7   current version of your curriculum vitae?
8       A.   It is.
9       Q.   Would you mind giving me the benefit
10  of your educational background, please?
11      A.   Sure. I have a BA and MA from Auburn
12  University in history, a PhD from Georgia State in
13  the same, and focussed on American Constitutional
14  and Legal History, 19th and 20th Century American
15  Politics and Law.
16      Q.   What was the topic of your
17  dissertation?
18      A.   The Politics of Race and School
19  Desegregation in Alabama.
20      Q.   Has that been the primary focus of
21  your research and studies?
22      A.   It certainly was up to that point.
23  I've broadened that out in more recent years.
24      Q.   What do you mean by broadened it out?
25      A.   I mean I began to shift towards the

3 (Pages 6 - 9)

Joseph Bagley , PhD                                    June 29, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 10

1 second book project on voting rights several years
2 ago.
3     Q.   When did you begin that?
4     A.   I would say circa 2018 or so.
5     Q.   Is that still a work in progress,
6 Dr. Bagley?
7     A.   Oh, very much, yes.
8     Q.   Do you have a tentative title or
9 subject of it?
10    A.   Title, no.  Subject, sure.  I'm
11 looking at the struggle for voting rights in the
12 Deep South broadly and, you know, sort of legal
13 journey that that has gone through and the
14 attendant politics.  Sort of a similar framework,
15 if you will, to the first book.
16    Q.   What was the first book?
17    A.   It was a distillation of the
18 dissertation, The Politics of White Rights.
19    Q.   On what state or regions did that
20 focus?
21    A.   That focussed on Alabama.  This is an
22 outgrowth of the dissertation.
23    Q.   Would you mind giving me your
24 professional background, please?
25    A.   I have worked for Georgia State in one

Page 11

1 capacity or another since I graduated.  Actually,
2 I was hired by Georgia State as a visiting
3 lecturer and hired by Perimeter College at the
4 same time it was consolidating with Georgia State,
5 as a lecturer, and then got hired on the tenured
6 tract, and actually am up for tenure this year and
7 should be promoted as well.
8     Q.   Congratulations.
9     A.   Thank you.
10    Q.   What is technically your title now?
11    A.   Right now I am assistant professor of
12 history.  I'll be associate professor of history
13 if I don't screw it up by next year.
14    Q.   Good luck with that.
15    A.   Thank you.
16    Q.   Dr. Bagley, can you explain any prior
17 cases in which you were a consulting or testifying
18 expert, please?
19    A.   Sure.  I worked on -- or I suppose I
20 am currently retained in the Milligan versus
21 Merrill case, which is a redistricting case
22 involving Alabama.  I testified at a preliminary
23 injunction hearing in that case.  I have submitted
24 reports in that case.
25         I was certified as an expert in that

Page 12

1 case, as well as in People First versus Merrill,
2 which was realty related to Voting Act status
3 during the pandemic, in Alabama.  Submitted
4 reports in that case and testified at trial.
5 Those are the only cases wherein I have entered
6 reports and testified.
7     Q.   Were both of those cases in Federal
8 Court in Alabama?
9     A.   Yes.
10    Q.   In Milligan, what fields were you
11 qualified as an expert in?
12    A.   I can't remember exactly, but I want
13 to say it was political history in Alabama or --
14 well, and in -- I believe the language was
15 political history in Alabama and historiography or
16 -- or there was something in addition to that.  It
17 was more broad.  I don't remember the exact
18 language -- historical methodology, maybe,
19 something like that.
20    Q.   You said that that was in the context
21 of a preliminary injunction; did I hear that
22 right?
23    A.   That's correct.
24    Q.   What's the status of that case?
25    A.   That unanimous decision of three-judge

Page 13

1 court, that injunction was entered, but it was
2 stayed by the Supreme Court.
3     Q.   Do you recall what the plaintiffs'
4 claims were in Milligan, Dr. Bagley, what legal
5 claims they brought?
6     A.   Yes.  I believe it was a Section 2,
7 Voting Rights Act claim.  Maybe a racial
8 gerrymandering claim as well.
9     Q.   What did your report discuss there
10 where you were qualified as an expert in political
11 history in Alabama and either historiography or
12 historical methodology?
13    A.   So that was a Senate factors report.
14 I think I looked at maybe five of the Senate
15 factors in my assessment in that report.
16    Q.   If you will, can we turn to Merrill?
17 I believe you indicated that was a trial; is that
18 right?
19    A.   You mean People First?  Yes, I'm
20 sorry, that was -- that's what you mean?
21    Q.   Yes, sir.
22    A.   Yes.
23    Q.   Were you qualified as an expert in
24 that case?
25    A.   Yes.  I don't -- I actually looked

4 (Pages 10 - 13)

Joseph Bagley , PhD                                      June 29, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 14

1 somewhat recently at the judge's opinion, and I
2 don't know that I found exactly the language as to
3 what I was certified as an expert in.
4     Q.  So, well, I guess, what was your --
5 what was the subject of your testimony?
6     A.  The history of discrimination in
7 Alabama.  Like, a -- you know, it was also a
8 Senate factors report, so identifying which of the
9 Senate factors are present.
10    Q.  You said that was in the context of
11 voting laws during the pandemic?
12    A.  That's right.
13    Q.  What was the outcome of that case?
14    A.  So the plaintiffs won at trial in that
15 case as well.  I believe it was partially
16 reversed.  Some of that was upheld.  I don't
17 remember the exact particulars of, you know, what
18 got reversed and what was upheld.  But yeah, that
19 was the disposition, as I recall.
20    Q.  Would that have been by an appellate
21 court or by the U.S. Supreme Court?
22    A.  I believe it went all the way through
23 the Supreme Court.  I don't remember exactly.  It
24 went through the 11th Circuit, obviously.
25    Q.  Thank you for that.

Page 15

1        Dr. Bagley, for what purpose were you
2 retained in this matter?
3     A.  So in this matter I was asked to look
4 at the process surrounding the General Assembly's
5 enactment of the laws that have adopted the
6 current Congressional plan and to provide my
7 opinions as to if there might be an inference of
8 discriminatory intent in the passage of that plan.
9     Q.  When were you first contacted about
10 this matter?
11    A.  Last fall, I suppose.  I don't
12 remember exactly when.
13    Q.  By whom?
14    A.  By the Legal Defense Fund.
15    Q.  Who in the Legal Defense Fund?
16    A.  I don't remember who it was that first
17 reached out, but probably Leah Aden.
18    Q.  Would that have been by telephone or
19 the email?
20    A.  Email, if memory serves.
21    Q.  Has email been your primary mode of
22 correspondence with the LDF lawyers?
23    A.  Primary, I would say yes.
24    Q.  If you had to assign a percentage to
25 your communications, about what percentage would

Page 16

1 have been via email?
2     A.  80 percent.
3     Q.  Have you contacted -- have you had any
4 contact with any other lawyers on the plaintiffs'
5 team, to your recollection?
6     A.  Those that are on this call.
7 Obviously, Mr. Ingram, who is here, and
8 Mr. Cusick.
9     Q.  So Mr. Ingram, Mr. Cusick, and
10 Ms. Aden?
11    A.  Yes, sir.
12    Q.  Any other lawyers from the plaintiffs'
13 team?
14    A.  Not on this matter.
15    Q.  How about any other third parties,
16 have you discussed your opinions offered in this
17 case with any other third parties, aside from the
18 three counsel you just named for the Legal Defense
19 Fund?
20    A.  No, I have not.
21    Q.  Did you discuss your deposition
22 testimony with anyone else, aside from those three
23 attorneys?
24    A.  No.
25    Q.  What were you asked to do?

Page 17

1     A.  Like I say, I was asked to examine the
2 process surrounding the enactment of this
3 Congressional plan and to determine if, in my
4 opinion, there was evidence that could be provided
5 to the court that either would or would not
6 support, you know, determination of discriminatory
7 intent.
8     Q.  Were you asked to assist with the
9 Congressional plan litigation before, during, or
10 after your retention to testify as an expert in
11 the House plan litigation?
12    A.  I believe I was retained
13 simultaneously on both matters.
14    MR. TRAYWICK:  Now I'm going to mark as
15 Exhibit 3 to your deposition some invoices that we
16 received late yesterday evening.  If you could let
17 me know when those appear on your screen.
18    (Exhibit 3, Invoices with Attached
19 Email Cover Pages, Bates SCNAACP 3D 11412-11419,
20 marked for identification.)
21    THE WITNESS:  Mr. Ingram is refreshing.
22 He's not seeing them as yet, but there it is.
23 Okay, we have it.
24 BY MR. TRAYWICK:
25    Q.  In the email you address someone named

5 (Pages 14 - 17)

Joseph Bagley , PhD                                        June 29, 2022
The South Carolina State Conf. vs. McMaster/Alexander

Page 18

1 Meghana.  Am I pronouncing that correctly?
2     A.  Yes.
3     Q.  Who is she?
4     A.  She is an admin at LDF in New York, an
5 administrative assistant.
6     Q.  Thank you.  If you could scroll down
7 to the second page, please?
8     A.  Okay.
9     Q.  Is that a copy of one of your invoices
10 submitted in this matter?
11     A.  It is.
12     Q.  It begins on the date
13 January 28, 2022; is that correct?
14     A.  Yes.
15     Q.  This invoice in particular runs
16 through February 10, '22; is that also correct?
17     A.  Yes.
18     Q.  Did you separate out time that you
19 spent on the House plan litigation versus the
20 Congressional plan litigation?
21     A.  Yes, I believe those are separate
22 invoices.
23     Q.  Do you know --
24     A.  Just in terms of -- I will say just
25 because the timelines are different.  I don't know

Page 19

1 that I separated them necessarily as this is --
2 you know, this is a House invoice; this is a
3 Congressional invoice.  I think this is in terms
4 of -- I think my agreement stipulates that, you
5 know, every several weeks or month or two I'm to
6 go ahead and submit whatever hours.
7         So the way that these phases have
8 unfolded, I have submitted separate invoices that
9 would amount to de facto House or Congressional
10 invoices, if that makes sense.
11     Q.  Obviously, we can't see the entries on
12 it.  They're redacted.
13         But in explaining your activities,
14 would you have specified whether it related to
15 House or Congressional redistricting?
16     A.  Yes, I think so.
17     Q.  Would you be able to itemize what was
18 spent on each plan?
19     A.  Yes.  I believe so.
20     Q.  Can you do that?  Because, as you
21 know, plaintiffs are seeking recovery in this case
22 of, among other things, costs.  So we need to know
23 what your time is and your money.
24     A.  Sure.
25     Q.  What was the amount of this bill?

Page 20

1     A.  The balance on this invoice is $6,900.
2     Q.  How many hours did you spend from
3 January 28th to February 10th?
4     A.  46.
5     Q.  During that time, what would that have
6 primarily covered?  Would that have been House or
7 Congressional?
8     A.  This would be Congressional.
9     Q.  Do you recall when you submitted a
10 report for the House plan litigation?
11     A.  I do not.
12     Q.  If you could scroll down to what is
13 the fourth page of that PDF, if you don't mind?
14     A.  Okay.
15     Q.  This appears to be Invoice Number 3?
16     A.  Yes.  Yes.
17     Q.  So we didn't see Invoice Number 1
18 included.  So would it be fair to say that that
19 related exclusively to the House plan litigation?
20     A.  Correct.
21     Q.  Thank you for that clarification.
22         At the top of this Invoice Number 3,
23 it says "Phase 3."
24         Can you explain how you phased out
25 various work in this case and what that means?

Page 21

1     A.  I don't remember putting that there.
2 Probably -- I'm speculating on memory here -- that
3 Phase 1 would be House, and Phase 2 would be maybe
4 House rebuttal.  I'd have to go back and look.
5     Q.  How many hours did you spend from
6 February 17th until April 10th?
7     A.  109.
8     Q.  What was the balance on this bill?
9     A.  $16,350.
10     Q.  Again, the activity is redacted, but
11 some of those appear to be just one letter.  How
12 would that have explained what you were doing?
13     A.  That is a quotation mark to indicate
14 same as above.
15     Q.  Fair enough.  Thank you for that
16 clarification.
17     A.  Yes, sir.
18     Q.  If you could go to Page Number 5 of
19 that PDF, if you don't mind, Dr. Bagley.
20     A.  All right.
21     Q.  In that email you indicate some
22 overlap.  Can you explain what you meant there?
23 Does that mean overlap between House plan
24 litigation and Congressional litigation, or what
25 did you mean by that?

6 (Pages 18 - 21)

Joseph Bagley , PhD                                June 29, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 22

1    A.  Looks like the email reads: "With
2  some overlap in terms of deposition transcript
3  review," which would indicate, presumably, that I
4  was reviewing the transcript from our last
5  deposition.
6    Q.  If you will scroll down to Page 6 of
7  that PDF, if you don't mind, please.
8    A.  Okay.
9    Q.  That appears to be just another a
10  duplicate of Invoice Number 3, right?
11    A.  It does.
12    Q.  If you wouldn't mind flipping to the
13  end of the PDF on Page 8.  How many hours did you
14  spend on this case from April 21st to May 3rd?
15    A.  26.
16    Q.  What was the amount of your bill?
17    A.  $3,900.
18    Q.  Do you recall the date on which you
19  submitted your initial report in this matter?
20    A.  In the Congressional phase?
21    Q.  Yes, sir.
22    A.  No.  But I think in the copy that I
23  have here, the clean copy before me, I may have
24  that date on the last page.  And it appears to be
25  April 11th.

Page 23

1    Q.  What would this time have been spent
2  on after April 11th?
3    A.  Say again, please.
4    Q.  What would this time have been spent
5  on that post dates that initial report?
6    A.  Looks like the rebuttal report that I
7  submitted in this case, which was -- this is dated
8  May 3rd.
9    Q.  Dr. Bagley, does the top of that
10  invoice say "Congressional Trende Rebuttal/House
11  Trial Prep"?
12    A.  It does.
13    Q.  Is there potentially some overlap on
14  this bill?
15    A.  Yes.
16    Q.  Again, would you mind itemizing that
17  for us?
18    A.  Yes.  Yes, we can do that.
19    Q.  Thank you, sir.  I appreciate that.
20    A.  Uh-huh.
21    Q.  So overall, how much have plaintiffs'
22  counsel paid you in this matter?
23    A.  What did we just say?  There's
24  slightly under 4,000 on that, which would bring it
25  to 20, roughly, given that one is a duplicate,

Page 24

1  and roughly 6 there, so 26 or 27,000.
2    Q.  That's on Invoices 2 through 4?
3    A.  Yes, sir.
4    Q.  Do you recall how much your first
5  invoice was for?
6    A.  I genuinely do not.  I would guess
7  perhaps somewhere in the range of 10,000, and
8  possibly less.
9    Q.  Thank you, Dr. Bagley.
10    So we just want to talk about your
11  report.  At some point you were asked to prepare a
12  report in this matter, correct?
13    A.  Indeed.
14    MR. TRAYWICK: We're going to mark that
15  as an exhibit to your deposition.
16    (Exhibit 4, Dr. Bagley Congressional
17  Plan Report, marked for identification.)
18  BY MR. TRAYWICK:
19    Q.  That's the 4/11/22.  Do you see that,
20  Dr. Bagley, in the Exhibit Share?
21    A.  Refreshing.  It's not there yet, but I
22  imagine it will be shortly.  Either way, as I
23  said, I do have a clean copy of that here in my
24  hands.
25    Q.  If that suits, then why don't we just

Page 25

1  move forward with that.
2    A.  Sure.
3    Q.  I'll represent to you that I'm reading
4  the same copy.
5    A.  Got it.  We have it now as well.  So
6  either way.
7    Q.  Great.  Thank you.
8    Before we get to that, you mentioned
9  you had some things present with you today.  Can
10  you tell me what all you have present with you
11  right now at your deposition?
12    A.  All I have is a copy of the report and
13  the rebuttal report and coffee.
14    Q.  Same.  Have you taken any notes on
15  that report?
16    A.  No.
17    Q.  I know I asked you why you were --
18  what you were asked to do, but can you explain to
19  me what fields you're seeking to be qualified as
20  an expert in to testify in this matter?
21    A.  American political history, southern
22  race relations, history of southern politics and
23  law.
24    Q.  I know we just went through your
25  bills.  But as per this specific report, do you

7 (Pages 22 - 25)

Joseph Bagley , PhD                                June 29, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 26

1 recall how long it took you to prepare it?
2     A.  I don't.  I would have to go back to
3 those invoices and tally those hours up, which we
4 can do.  But, I mean, I would say tens of hours.
5     Q.  Tens of hours, okay.  Did that consist
6 primarily of drafting or of other things?
7     A.  Research; drafting; refining; the
8 writing itself, obviously; a lot of reading, of
9 course.
10     Q.  To that end, upon which authorities
11 did you rely to prepare this report?
12     A.  Everything I relied on -- this is sort
13 of standard for the field and for historiography.
14 Everything I've relied upon is in the footnotes.
15 The footnotes are pretty thorough.  So any and
16 everything that I relied upon is in those notes.
17     Q.  Do you have copies of any of those
18 sources or links or anything?
19     A.  Some of them are books, so yes.  Some
20 of them are, obviously, cases that are accessible
21 online.  Some of them are articles that are
22 online.  Some of them are, you know, from
23 newspapers, most of which these days are
24 accessible online, and so on.
25         In terms of physical copies, I guess

Page 27

1 some of it I have, and then some of it I don't.
2     Q.  Did you rely on any other sources that
3 are not listed in your report?
4     A.  No.  Everything that it relied on is
5 in there.
6         MR. TRAYWICK:  Dr. Bagley, I'm going
7 to now mark, I believe -- are we on 4 or 5, Madam
8 Court Reporter?
9         MS. NYGORD:  This will be Number 5.
10         MR. TRAYWICK:  I'm going to mark as
11 Exhibit Number 5 some emails that we received a
12 little after 10:00 last night.  If you will let me
13 know when those appear on your screen, that would
14 be great.
15         (Exhibit 5, Email Correspondence, Bates
16 SCNAACP CD 11420-11423, marked for
17 identification.)
18         THE WITNESS:  Okay.
19 BY MR. TRAYWICK:
20     Q.  Did you have a chance to review those?
21     A.  I see it, yes, sir.
22     Q.  You recognize these emails,
23 Dr. Bagley?
24     A.  I do.
25     Q.  The first one there, what are you

Page 28

1 discussing there?
2     A.  This appears to be where LDF had sent
3 me some transcripts of some of the hearings and a,
4 sort of, list of Senate and House meetings and
5 hearings to review.
6     Q.  Beside those hearings, there are some
7 parenthesis with what appear to be time stamps.
8 Do you know what those relate to?
9     A.  It says on there:  "Relevant portion
10 transcribed."  So that would reflect the portions
11 that have been transcribed.
12     Q.  Transcribed by whom?
13     A.  I don't know if it was a court
14 reporter or if it was a transcribing service.  I
15 don't remember.  It's reflected at the bottom of
16 the transcripts.
17     Q.  So are you saying --
18     A.  Those are publicly available hearings.
19 It was just helpful to have, I think, the actual
20 print, you understand.  But the videos of these
21 are on the House and the Senate -- the Senate
22 Redistricting Subcommittee's website and the House
23 Ad Hoc Committee Redistricting website.
24     Q.  Those are transcribed in full, right?
25 I don't want to misunderstand what you're saying.

Page 29

1     A.  Yes.
2     Q.  So these time stamps aren't just as to
3 what's transcribed, are they?
4     A.  Well, where I'm seeing under where it
5 says "Full House," the time stamps say:  "Relevant
6 portion transcribed," but there are other time
7 stamps.
8         I think it may just be the length of
9 the video, actually.
10     Q.  So how about the Senate Redistricting
11 Subcommittee ones above?  What do those time
12 stamps denote?
13     A.  Honestly, I believe that's the length
14 of the video.
15     Q.  Then the full Senate down there at the
16 bottom?
17     A.  Yes.
18     Q.  So do you know what those time stamps
19 correlate to?
20     A.  I would assume the same thing, the
21 length of the video.
22     Q.  If you can scroll down to Page 3 of
23 that PDF, if you don't mind, Dr. Bagley.
24     A.  Okay.
25     Q.  Do you recognize this email?

8 (Pages 26 - 29)

Joseph Bagley , PhD                          June 29, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 30

1    A.  I do.
2    Q.  You received it?
3    A.  Yes.
4    Q.  Do you know what those time stamps
5  correlate to on the various meetings that are
6  listed on the email?
7    A.  Under Senate Judiciary Redistricting
8  Subcommittee, those appear to be the length of the
9  video.
10   Q.  Do you know why these were provided to
11  you?
12   A.  This was simply flagging the relevant
13  hearings in terms of the passage of this report --
14  I mean, the passage of this, you know, law that
15  enacted the map.
16   Q.  If you will scroll to the last page of
17  the PDF, if you don't mind, Page 4.  What is being
18  conveyed by plaintiffs' counsel to you there?
19   A.  They said they had filed a second
20  amended complaint, added additional claims
21  regarding the newly enacted map:  "Attached is a
22  copy, and attached is the expert report of
23  Dr. Woodard," which would have been in the House
24  phase of this case.
25   Q.  Dr. Bagley, are these the only emails

Page 31

1  from plaintiffs' counsel that provided facts or
2  data for you to look into or rely on for
3  formulating your report?
4    A.  Yes.
5    Q.  There are no other ones?
6    A.  No, not as you've described.
7    Q.  Do you have any emails with
8  plaintiffs' counsel that identify assumptions that
9  they have provided to you?
10   A.  No.
11   Q.  So it's your contention that all of
12  those have been produced?
13   A.  Yes.
14   Q.  Have you personally undertaken that
15  review?
16   A.  Yeah.  I mean, I was asked -- well,
17  could you re-ask the question again?
18   Q.  Have you personally looked in your
19  emails to see if what was produced last night is
20  the sum total?
21   A.  Yes.  Yes.
22   Q.  You're confirming that no other emails
23  regarding facts, data, or assumptions exist?
24   A.  Correct.
25   Q.  Now, I want to make sure I understand.

Page 32

1  Are you asserting that all of the remainder of
2  your emails are privileged?
3    A.  Yes.
4    MR. TRAYWICK:  Then we would ask that
5  you provide a privilege log to that effect that
6  logs all of those emails, or plaintiffs' counsel.
7    MR. INGRAM:  Objection.  He's not an
8  attorney.
9    MR. TRAYWICK:  I said "or plaintiffs'
10  counsel," Mr. Ingram.  Thank you.
11  BY MR. TRAYWICK:
12   Q.  During your last deposition in the
13  House plan litigation, you mentioned you had taken
14  a lot of notes on the various legislative
15  hearings.  What would those notes have been about?
16   A.  Very straightforward:  time stamped,
17  this is who said what.  I mean, as you know, or as
18  you even just saw with these time stamps, these
19  are long meetings, long hearings.  A lot is said,
20  you know, and it's helpful for me to be able to
21  distill, you know, what is relevant to the inquiry
22  here versus, you know ...
23    As you know, Chairman Rankin and
24  Chairman Jordan are both very -- seem like good
25  guys, very jovial.  So there's a lot of, you know,

Page 33

1  just friendly bantering back and forth in these
2  public hearings, for example.  So it would be
3  useful for me to say, all right, you know, from
4  10 minutes and 30 seconds to 15 minutes and
5  30 seconds there's an exchange about a peanut
6  festival or something versus here is an actual
7  relevant discussion, if that makes sense.
8    Q.  Sure.  There were a lot of hearings,
9  weren't there?
10   A.  There were.
11   Q.  Dr. Bagley, taking a step back to your
12  background.  Have you ever taken any courses in
13  South Carolina history?
14   A.  Nothing specific only to South
15  Carolina.  Although, I would point out, it's
16  fairly unusual for -- at the graduate level, to
17  have -- it would be unusual to have a seminar, you
18  know, focussed on one specific state.
19    I didn't take a seminar in history of
20  any specific state, in other words.
21   Q.  When you say that's not typical, do
22  you mean at your institution of higher education,
23  or at all?
24   A.  I mean anywhere.  I mean, I don't --
25  may be the case at Clemson or USC that they offer

9 (Pages 30 - 33)

Joseph Bagley , PhD                                          June 29, 2022
The South Carolina State Conf.vs.McMaster/Alexander

Page 34

1 graduate seminar specific to South Carolina
2 history. I don't know. You know, but that would
3 be the only place that I would expect for that to
4 be the case.
5      Q. Dr. Bagley, have you ever attended any
6 roundtable discussions, symposia, or conferences
7 related to South Carolina history?
8      A. Again, nothing specifically focussed
9 on South Carolina.
10      Q. You have never taught South Carolina
11 history?
12      A. No -- well, let me say the answer is
13 the same. I mean, in classes I've taught -- I
14 have discussed the history of South Carolina. I
15 have not taught a course specific to the history
16 of South Carolina.
17      Q. Dr. Bagley, have you ever written any
18 articles, blogs, posts, book chapters, or any
19 other publications on South Carolina history?
20      A. I have not published anything specific
21 exclusively to South Carolina.
22      Q. Have you ever been to South Carolina?
23      A. I have.
24      Q. When?
25      A. Many times. I'm trying to remember

Page 35

1 how recently. As recently as -- I don't know,
2 three -- years ago, maybe, two. In my youth we
3 would go to and through South Carolina quite
4 frequently. I've been to Columbia. I've been to
5 Charleston. I've been to Greenville.
6      Q. You said to and through. Have you
7 ever gone any time there, or did you just drive
8 through those places?
9      A. No. I have been to Charleston a
10 number of times. I've been to Columbia. I've
11 been to Clemson. I spent a little bit of time in
12 all of those places.
13      Q. Were those trips of leisure or
14 professional related?
15      A. Leisure or related to secondary
16 occupation; to whit, music.
17      Q. Sorry, your screen froze a little bit
18 there. What is your second occupation?
19      A. I said "music."
20      Q. Great. What do you focus on there?
21 Do you sing, or do you play an instrument?
22      A. I sing and play guitar.
23      Q. Are you in a band?
24      A. I was.
25      Q. What was that called?

Page 36

1      A. Blue Denim, and there's the Joe Bagley
2 Band.
3      Q. Good deal. Before writing this
4 report, Dr. Bagley, had you done any research
5 specific to South Carolina?
6      A. Sorry, you cut out on me. Can you say
7 that again?
8      Q. Of course. Before writing this
9 report, had you done any research specific to
10 South Carolina?
11      A. Not specific to South Carolina, no.
12      Q. So you conducted the vast majority of
13 the research reflected in your report for purposes
14 of this litigation; is that fair to say?
15      A. I was broadly familiar with much of
16 the secondary literature that I cite. So in terms
17 of secondary historical sources, that's all the
18 material that I was familiar with beforehand.
19          In terms of primary source research,
20 and, of course, in terms of reviewing the record
21 relevant to the law that was enacted here that
22 created the map, that was all done for purposes of
23 this litigation.
24      Q. Dr. Bagley, are you an attorney?
25      A. No.

Page 37

1      Q. Do you have any legal training? Have
2 you had any semesters in law school?
3      A. I have not had any semesters in law
4 school. One of my PhD examination fields is U.S.
5 Constitutional and Legal History, though. I'm a
6 member of the American Society of Legal History.
7      Q. Would you agree that you're not
8 qualified to offer legal opinions?
9      A. I would.
10      Q. Does your report include all facts and
11 sources on which you relied to formulate your
12 opinions?
13      A. It does.
14      Q. Would you agree with me that
15 legislative intent is a question of law for the
16 court to determine?
17      A. Yes.
18      Q. Would you agree with me, based on your
19 studies, that the Supreme Court has said past
20 discrimination cannot, in the manner of original
21 sin, condemn governmental action that is not
22 itself unlawful?
23          MR. INGRAM: Objection.
24 BY MR. TRAYWICK:
25      Q. You can answer.

10 (Pages 34 - 37)

Joseph Bagley , PhD                               June 29, 2022
The South Carolina State Confvs.McMaster/Alexander

---

Page 38

1    A.   Are you referring to the Shelby County
2 decision?
3    Q.   There's multiple.  I believe that was
4 City of Mobile.
5    A.   Wasn't City of Mobile superseded?
6    Q.   Right.  But the Supreme Court said it
7 multiple times in sentencing Abbott and others.
8        Do you agree with that principle that
9 the Supreme Court has recognized, that past
10 discrimination can't condemn future action in --
11    MR. INGRAM:  Objection.
12       THE WITNESS:  I agree that that's what
13 the court has said.  That being said, I don't
14 think that can follow from that that the past is
15 irrelevant, that past discrimination is
16 irrelevant.  And the mode of inquiry that I have
17 undertaken here asks that I review the history of
18 discrimination.
19 BY MR. TRAYWICK:
20    Q.   Do you agree that the court must apply
21 a presumption of legislative good faith in
22 determining legislative intent?
23    A.   Yes.  I'm sorry, I have an echo.
24       (Discussion off record.)
25 BY MR. TRAYWICK:

---

Page 39

1    Q.   Dr. Bagley, do you think it's proper
2 for a court in determining legislative intent to
3 just rely on the statements of a few individual
4 legislators?
5    A.   Not exclusively, no.  I would think
6 you would take that as part of your inquiry, along
7 with history of discrimination, statements made by
8 the public, et cetera.
9    Q.   Do you think it's proper for a court
10 to rely solely on comments of opponents to
11 legislation in determining legislative intent?
12    A.   No.  I think you would have to look at
13 the full mosaic:  Again, what does the public have
14 to say; what do all legislators have to say or not
15 say.
16    Q.   Would you agree that in a bench trial
17 it's the role of the court to determine the
18 credibility of witnesses?
19    A.   Sure.
20    Q.   Do you think it's the proper role of
21 an expert to determine credibility of witnesses?
22    A.   Credibility of witnesses in a case?
23    Q.   Yes.
24    A.   If you could clarify what you mean by
25 witnesses, I guess, is my question?

---

Page 40

1    Q.   Sure.  In this case we have
2 legislators that, depending on the court's ruling,
3 could be witnesses.  Do you think it would be up
4 to the court to determine their credibility?
5    A.   Insofar as they are witnesses, of
6 course.  Insofar as they are a part of the record
7 that I reviewed, I think that's a separate issue.
8    Q.   So did you make credibility
9 determinations into your review of the legislative
10 record?
11    A.   I would say that I weighed all of the
12 evidence against itself and provided a
13 straightforward account of, you know, what I saw
14 and what I thought was important relative to the
15 court's decision regarding intent.
16    Q.   We'll get to that.
17       When you say what was relevant, did
18 you rely upon or take at face value the statements
19 of any Republican members to show legislative
20 intent in your report?
21    A.   I would tell you that if you watch the
22 videos of these hearings and of these meetings,
23 other than the chairman or the acting chairman --
24 so that would include Senator Rankin,
25 Representative Jordan, and at times Senator

---

Page 41

1 Campsen -- or rather, Representative Newton -- the
2 Republican legislators are largely silent.
3       So if there's a dearth of --
4 comparatively, of their voices in the report, it's
5 not because I was, you know, selective in terms of
6 what I put in there; it's because they didn't have
7 much to say.
8    Q.   Did you have any reason to suspect
9 that legislators in the majority were not telling
10 the truth in their explanation of the plan?
11    A.   Could you ask it again, Mr. Traywick?
12    Q.   Sure.  I'd be glad to.
13       Do you have any reason to believe that
14 the legislators who did speak about the plan who
15 were in the majority were not telling the truth?
16    A.   I wouldn't say that I have reason to
17 believe they're, quote unquote, "not telling the
18 truth."  I think the full record and the full
19 mosaic revealed to me that perhaps there was some
20 obfuscation.
21    Q.   Some what?
22    A.   Obfuscation, obfuscating -- you know,
23 for example, in my report, I talk about how, you
24 know, perhaps there is a selective use of criteria
25 in justifying certain decisions, but, you know,

11 (Pages 38 - 41)

Joseph Bagley , PhD                                    June 29, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 42

1 largely that a lot of that, obviously, was behind
2 the scenes and unavailable.
3      Q.  Is it your position that every line in
4 a redistricting plan must have every single
5 criteria articulated to justify it?
6      A.  Not necessarily.
7      Q.  Do you believe that Chairman Rankin
8 harbors racist motives?
9      A.  No.  I don't know what is in the
10 chairman's heart, anymore than I do, you know,
11 Chairman Jordan or anyone else.  Probably more
12 importantly, let me say, that's not what I've been
13 asked to ascertain.
14      Q.  Have you ever met any of them?
15      A.  I have not.
16      Q.  Dr. Bagley, just a few general
17 questions before getting into the more specifics
18 of your report.
19          Did you consider anything other than
20 race in formulating your opinions in this matter?
21      A.  Sure.  You know, I've looked at the
22 guidelines that were adopted by both bodies.  I
23 have considered any motives that they might have
24 had.
25      Q.  Did you consider politics?

Page 43

1      A.  Of course.
2      Q.  Where in your report did you consider
3 politics?
4      A.  Well, obviously, everyone in the
5 report is identified by party.  So there's no
6 hiding the ball in terms of who is who.  And then,
7 of course, in the "History of Discrimination"
8 section, I talk at length about the intertwining
9 of politics and race in the South.
10          You know, even from -- there was a
11 time when the party of white supremacy was the
12 Democratic party for a long time.  I discuss that
13 period.  I discuss the brief period where
14 Republicans were the party of emancipation, and I
15 talk about the periods in the 20th century where
16 sort of in fits and starts that began to and
17 continued to change.
18          And so the initial half of the report
19 is sort of laying forth that intermingling of race
20 and politics that's so integral to the history of
21 the Deep South in a state like South Carolina.
22      Q.  In pretty summary fashion, right?
23      A.  Say again.
24      Q.  That was in sort of a summary fashion,
25 right, the Subsections 3A through 3C, before

Page 44

1 getting the Voting Rights Act?
2      A.  Well, yeah, but it continues from
3 there.  So this is beginning on Page 4.  But I
4 think you have to go through the entire history
5 section, because the full shift doesn't occur
6 until later.  You know, the Republican takeover of
7 the legislator in, I think, the '90s, the
8 Republican takeover of the 5th in, I think, 2010
9 and so on.  So the sort of chipping sands of
10 politics and race cover the whole history up to
11 the present.
12      Q.  In your report, Dr. Bagley, I notice
13 several criticisms regarding scheduling; is that
14 fair to say?
15      A.  Criticisms from the public or from
16 legislators, yes.
17      Q.  Well, in your report.
18      A.  Could you show me?  Not to be
19 difficult, but just so I understand.
20      Q.  Sure.  If you will turn with me, it's
21 the last half of your report, going through all of
22 the various -- in one of the sections you appear
23 to criticize maps being published before
24 Thanksgiving and a meeting being scheduled after
25 Thanksgiving.  Do you recall that?

Page 45

1      A.  I do.  That's not necessarily just my
2 criticism, my hot take, if you will.  Those are
3 criticisms that I found in the record.
4      Q.  Are you suggesting that Senate and
5 House staff acted in bad faith in scheduling
6 meetings?
7      A.  I wouldn't say that myself.  I would
8 say that I'm reflecting in the report where other
9 legislators suggested that they believe that that
10 was the case.  It's not for me to say whether I
11 think it was the case or not.
12      Q.  Do you believe the House and Senate
13 staff acted in bad faith when they posted maps?
14      A.  Again, I don't make any judgments in
15 terms of bad faith regarding staff myself.
16 Anything that I have done in here reflects
17 comments or concerns that legislators or members
18 of the public had.
19      Q.  So is it your position that this is an
20 objective overview of what happened?
21      A.  It is.
22      Q.  Regardless of adverbs or anything like
23 that describing the sequence of events as you saw
24 it?
25      A.  That's right.

12 (Pages 42 - 45)

Joseph Bagley , PhD                                    June 29, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 46

1    Q.  From where did you obtain the
2  information staff were not as available to some
3  members as others?
4    A.  This is from watching the hearings and
5  watching the meetings and reading the transcripts.
6  So, for example, Senator Harpootlian said he had
7  to hire his own map drawers.  Indicated in his
8  opinion staff were not available to him.  Other
9  legislators at times expressed similar concerns.
10      So I, obviously, have -- I don't know
11  what goes on behind the scenes any more than
12  anyone else.  So that determination, like anything
13  else, is just from conveying what the legislators
14  themselves are saying.
15    Q.  They didn't cite any examples of staff
16  being unresponsive, did they?
17    A.  Other than, I mean, like I said,
18  Senator Harpootlian said he had to hire his own
19  map drawer.
20    Q.  Did he say why?
21    A.  I don't know.  I don't remember what
22  all he said to that effect, but he's very
23  demonstrative about it.
24      I will say, too, that just in terms of
25  the staff dynamic, you know, Senator Rankin,

Page 47

1  Chairman Jordan, they always have by their side,
2  you know, Ms. Dean, Mr. Terreni, Ms. Benson.  They
3  will confer with them before they will answer
4  questions, say, from black members.  Oftentimes
5  Mr. Terreni would himself be the one sort of
6  having a contentious back-and-forth.
7      Then, too, I would say look at the
8  examples of when maps come out and, you know,
9  Representative Bernstein, Senator Matthews, if
10  memory serves, they say, "I haven't seen this map.
11  I have no idea where this came from.  I don't know
12  why this even exists.  I had no part in this."
13      If memory serves, there was an
14  exchange where Senator Matthews and Senator
15  Harpootlian are saying, you know, "These outside
16  groups might have had more of a role in this than
17  I did in this, because I didn't have anything to
18  do with the drawing of this map."
19      So where you referenced, I think, is
20  me trying to convey the impression that I got
21  that, you know, staffer working more closely with
22  leadership or perhaps even on their own, and they
23  were working with even, you know, members of the
24  minority on the committee.
25    Q.  Would you agree that you have no

Page 48

1  firsthand knowledge of whether that's true or not?
2    A.  Yes.  I'm just conveying what's being
3  said -- over and over again, though, I'll point
4  out -- but what's being said in the meetings and
5  in the hearings.  Obviously, I'm not in the
6  Gressette Building.  I'm not on Gervais Street.
7  I'm not there to physically personally to witness
8  it firsthand.
9    Q.  I know you're not in the Gressette
10  Building.  But when you say he had a
11  demonstrative -- by he, I mean Senator
12  Harpootlian -- showing of not having access to
13  staff, I want to get more clarity on what you
14  relied on to base that opinion.
15    A.  Well, there is a meeting or -- I don't
16  know which meeting it was.  One of the meetings
17  where Senator Harpootlian and Mr. Opperman come in
18  and explained the whole county plan.
19      And there is an exchange -- I can't
20  recall exactly who all was a part of it, but it's
21  in the report -- where Senator Harpootlian, I
22  believe twice, insists that he was forced to have
23  his own map drawer.
24    Q.  Sure.  But do you recall any
25  statements from him of examples in which he was

Page 49

1  denied access to the map room or even asked to go
2  in the map room?
3    A.  Not specifically instances where he
4  would have said, you know, on such and such date I
5  tried to enter the map room and was barred.
6    Q.  He never said he was denied access,
7  though, at all?
8    A.  He never said specifically that he was
9  denied access, no.
10    Q.  Or that he was denied access to staff,
11  right?
12    A.  I don't know that he would have said
13  specifically that he was denied access, no.
14    Q.  But staff would be better to ask that
15  question, right?
16    A.  Sure.
17    Q.  Dr. Bagley, would you agree that the
18  Senate held nine public hearings statewide about
19  redistricting to solicit public input before map
20  drawing?
21    A.  Yes.
22    Q.  Would you agree that the Senate held
23  at least six hearings on the Congressional
24  redistricting plan?  I believe that would have
25  been five subcommittees and one full committee.

13 (Pages 46 - 49)

Joseph Bagley , PhD                                      June 29, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 50

1    A.  That sounds right.
2    Q.  Would you agree the House held eleven
3  public hearings statewide about redistricting to
4  solicit public input before map drawing?
5    A.  Yes, that sounds correct.
6    Q.  Would you agree that the House held at
7  least four hearings on a Congressional
8  redistricting plan?  That would have been at least
9  three subcommittees and one full committee.
10    A.  That sounds correct.
11    Q.  Can you think of any other recent
12  legislation in South Carolina that's received that
13  much process?
14    A.  No.  Redistricting is, obviously, of
15  paramount importance, so it's a time-consuming
16  process.
17    Q.  Would you agree that the General
18  Assembly here took that role seriously?
19    A.  I would agree.
20    Q.  Let's go through your report that we
21  previously marked.  Let's start on Page 2.  Do you
22  have it in front of you, Dr. Bagley?
23    A.  I do.
24    Q.  First of all, are you okay?  Do you
25  need a break or anything?

Page 51

1    A.  I'm okay for now.
2    Q.  Just speak up if you need one.  I'll
3  try to work in a logical one, but I want to put
4  the ball in your court, too.  Just speak up.
5    A.  I appreciate it.
6    Q.  Thank you, Dr. Bagley.
7      So in that first paragraph regarding
8  your credentials, you mention, "Current projects
9  include a book manuscript."  Do you see that?
10    A.  I do.
11    Q.  In your initial report in the House
12  plan, it says, "Examining the history of the
13  struggle for voting rights in the South," and it
14  stopped there.  In this version of the report it
15  now says, "Focussing on Alabama, Georgia, and
16  South Carolina."
17      What's the reason for that change?
18    A.  As you probably know, anyone who does
19  this kind of work, particularly when you submit
20  full-on, lengthy, detailed reports to court,
21  experts like Mr. Ruoff or Vernon Burton, people of
22  this nature, they will typically, you know, find a
23  way to publish that and have, you know, something
24  distilled, in the way that my book was distilled
25  from my dissertation, a distilled version of that

Page 52

1  for scholarly publication.
2      So following in that pattern, being
3  that I have entered a report now in the other
4  phase of this case, at the time that this was
5  being written it was my intention to, you know,
6  incorporate that into the project that I was
7  already working on.
8    Q.  So in light of the research you have
9  conducted for this case, you want to expand upon
10  it in your ongoing manuscript; is that fair to
11  say?
12    A.  Yes.
13    Q.  Thank you.  Next, down to the third
14  full paragraph on Page 2, Dr. Bagley, you say you
15  have been certified as an expert by courts in all
16  previous voting rights litigation.  That's twice,
17  correct?
18    A.  That is in the Milligan case and the
19  People First case in terms of when I was certified
20  and actually testified.
21    Q.  Both were in the Northern District of
22  Alabama; is that right?
23    A.  Yes.
24    Q.  On Page 3, can you please explain the,
25  quote, "ongoing record of discrimination" to which

Page 53

1  you allude?
2    A.  Where is that?
3    Q.  Sure.  It's at the bottom of the very
4  first paragraph under Section 2, "Purpose,
5  Methodology, Summary Findings."
6    A.  Just meaning throughout history.
7    Q.  Can you put dates on that?  What do
8  you mean by ongoing?  Sorry, I'm not trying to --
9  I'm trying --
10    A.  Well, I would say, as I said in the
11  report, I'm not trying to make the determination
12  for the court that there is, in fact, legally
13  speaking, discriminatory intent here.  So I don't
14  mean to infer that by saying "ongoing," if that's
15  what you're getting at.
16    Q.  That's fair.  That's helpful.  I
17  appreciate that clarification.  I wanted to see if
18  you had specific examples in mind of what you
19  meant by "ongoing."
20    A.  Well, anything that would be in the
21  report that, say, is not from the redemption
22  period, but it's further into the 20th century and
23  into the latter half of the 20th century, you
24  know, into more recent years and decades.
25    Q.  Do you have a most recent year in

Joseph Bagley , PhD                                          June 29, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 54

1 mind, an example?
2      A.  I would say you could look at the fact
3 that the Confederate flag was only removed from
4 the capital grounds in 2015 as a result of a
5 racial massacre.  I would point to the COVID
6 litigation, whereby the state was forced to sort
7 of open up access to absentee voting.  I would
8 point to Civil Rights Division, Section 5
9 objections from the 2010s up to Shelby County.
10 Those would be some examples.
11      Q.  With regard to the COVID-19
12 litigation, are you aware that the ruling in that
13 case was that the laws in place by the district
14 court, I mean, as applied were unconstitutional
15 because of COVID-19?
16      A.  I'm not super, super familiar with the
17 findings in terms of my memory on those cases, but
18 I understand it was similar to the litigation in
19 Alabama.  I think it was the -- some of it got
20 stayed, but I believe it was the witness
21 requirement for notarization purposes that got
22 overturned.
23      Q.  So you believe there was a notary
24 requirement on the witness requirement in South
25 Carolina?

Page 55

1      A.  No, I don't mean to say notary.  I
2 mean the witness.
3      Q.  You mentioned earlier that litigation
4 was stayed; is that correct?
5      A.  Yes.
6      Q.  By the United States Supreme Court?
7      A.  Yes.
8      Q.  Do you recall what the reasoning for
9 that was?
10      A.  I do not.
11      Q.  Are you aware that the Supreme Court
12 has upheld numerous challenges to witness
13 requirements outside the context of COVID-19?
14      A.  I am aware.
15      Q.  Regarding the DOJ objections, were all
16 of those sort of smattering of objections at the
17 local level?
18      A.  It depends on how you view that.  The
19 very last one, of course, as you know, is the
20 photo ID situation, which we discussed in the last
21 deposition.  But even the local ones, I think what
22 you have to realize is the Attorney General is
23 objecting to laws that are passed by the General
24 Assembly.
25           So these may be local matters.  These

Page 56

1 may be things orchestrated by local delegations,
2 but they're still laws passed out of the General
3 Assembly.
4      Q.  Do you have any knowledge of how that
5 process works, of how folks vote on local
6 legislation in South Carolina General Assembly?
7      A.  I understand it's like most State
8 House legislators.  There's a lot of deference to
9 local delegations.
10           MR. TRAYWICK:  Let's take a quick
11 break, if you don't mind.
12           THE WITNESS:  I was about to ask the
13 same, so that works.
14           MR. TRAYWICK:  Let's go off the record,
15 Madam Court Reporter.
16           (A recess was taken.)
17           MR. TRAYWICK:  Let's go back on the
18 record.
19 BY MR. TRAYWICK:
20      Q.  Thank you, Dr. Bagley.  We are back on
21 the record now.  And like I said before, please
22 speak up if you want to take any other breaks.  I
23 anticipate our next break will probably be for
24 lunch.  Let's try to cover as much as we can until
25 then.  I don't anticipate having you here all day

Page 57

1 by any stretch of the imagination.  I've just got
2 to get through some of this stuff.
3      A.  Yes, sir.  Sounds good.
4      Q.  Thank you for your patience.
5           Regarding some of those DOJ
6 objections, is it your position that all of them
7 related to local laws that were passed by the
8 General Assembly?
9      A.  All of them, meaning literally all of
10 them?
11      Q.  The local -- the objections to local
12 laws.
13      A.  No.  Some of those were things that
14 passed out of the General Assembly, but I wouldn't
15 say every single one.
16      Q.  Speaking of pre-clearance -- we talked
17 about this in your last deposition -- but you're
18 aware that President Obama's Department of Justice
19 pre-cleared the plan in 2011, correct?
20      A.  Correct.
21      Q.  You're aware that that plan also
22 survived a Section 2 challenge and a racial
23 gerrymandering challenge; is that correct?
24      A.  Yes, in the Backus case.
25      Q.  Are you suggesting that the fact that

15 (Pages 54 - 57)

Joseph Bagley , PhD                                      June 29, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 58

1 a plaintiff files a challenge that is unsuccessful
2 is still evidence or indicative of discriminatory
3 intent of the plan at issue?
4        A.  Not in and of itself.  I think you
5 have to consider something like that within the
6 bigger picture, you know, as we would never take
7 any one single piece of evidence and, you know,
8 take that out of context and rely upon that
9 exclusively.  But I think if you look at the fact
10 that a challenge was brought then, after all these
11 other challenges in previous decades, and then
12 what people are saying now, I think it's
13 significant.
14        Also, too, if you look at what members
15 of the public and the legislator are saying in
16 these hearings and in these meetings, in their
17 minds, the sort of legal landscape, if you will,
18 regarding redistricting has changed since that
19 time.  And, you know, in their minds, there's some
20 things that could be done differently.
21        Q.  Are you referring to the
22 non-retrogression after Shelby County V. Holder?
23        A.  Yes, that would be one of the things
24 that people mention that -- you know, for example
25 it was no longer necessary to remain -- to

Page 59

1 maintain CD 6 as such.  And then given that, you
2 know, for example, they would -- in their minds,
3 there would not be a need to, you know, begin by
4 splitting black people off of North Charleston and
5 putting them with concentrations of black voters
6 in Columbia, just for example.
7        Q.  Regarding that legal argument, are you
8 aware that plaintiffs in Backus, after Shelby
9 County, sought to revise the lawsuit to make those
10 arguments?  Were you aware of that?
11        A.  That's Senator Harpootlian?
12        Q.  Yes, sir.
13        A.  I'm not as familiar with that
14 particular filing.
15        Q.  So are you aware that they lost and
16 that the Supreme Court still affirmed?
17        A.  If that's what you're presenting.  I
18 don't remember after -- you're talking about after
19 the dispensation of Backus?
20        Q.  Yes.  They tried to revive the
21 challenge in light of Shelby County V. Holder.
22 Were you aware of that?
23        A.  Yes.
24        Q.  Do you think that this court -- I
25 mean, we're in a court of law.  I understand your

Page 60

1 history.
2        Do you think this court has the
3 ability to go behind the panel and the U.S.
4 Supreme Court from Backus to determine whether the
5 2011 plan was a racial gerrymander and counter --
6        MR. INGRAM:  Objection.
7        THE WITNESS:  I think that goes beyond
8 the scope of what I've been asked to do.  I've
9 been asked to put before the court anything that I
10 think is relative to a determination of
11 discriminatory intent using the Arlington Heights
12 framework.  That's what I have done.
13        To that extent, I discuss Backus.  To
14 that extent, I put forth before the court the
15 things that people are saying that they think are
16 relevant since that decision has been made, if
17 that makes sense.
18        It's certainly not for me to make a
19 legal argument regarding where the law stands post
20 Backus, post Shelby County, or whatever.
21 BY MR. TRAYWICK:
22        Q.  Dr. Bagley, if we could turn back to
23 Page 3 of your report.  Can you explain what you
24 mean by, quote, "Wider historical and
25 contemporaneous contexts," end quote?

Page 61

1        A.  This is in the first full paragraph
2 under Roman II?
3        Q.  Yes, sir.
4        A.  That just means to place the sequence
5 of events within the historical context.  Again,
6 that's the Arlington Heights framework to say is
7 there -- what's the historical background,
8 particularly if it reveals a series of official
9 actions taken for immediate purposes.  And then,
10 of course, you discuss the sequence of events, and
11 those are elemental to this framework.
12        Q.  Do you think the discrimination or
13 discriminatory statements need to be probative of
14 the decision at issue; that is, redistricting?
15        A.  Could you rephrase the question, I'm
16 sorry?
17        Q.  Sure.  The discrimination or past
18 discrimination on which you relied, do you think
19 it should be probative or related to
20 redistricting, which is the decision that is under
21 challenge right now?
22        A.  Not exclusively.
23        Q.  What other examples did you take into
24 account?
25        A.  Historical discrimination?

16 (Pages 58 - 61)

Page 62

1    Q.  Just in general?
2    A.  I'm asking.  Maybe ask the question
3 again.
4    Q.  Sure.  What other examples did you
5 rely on, other than the redistricting context?
6    A.  Well, I tried to focus on voting
7 rights specifically.  For example, I didn't talk
8 about segregation.
9    Q.  That's where a lot of the focus of
10 your research has been in the past, right?
11    A.  Initially, yes.
12    Q.  Do you think that DOJ's past
13 objections to local government laws can be
14 attributed to the South Carolina General
15 Assembly's redistricting decisions this cycle?
16    A.  I think that insofar as they're in my
17 report, they're relevant to the bigger picture.  I
18 don't think everything has to have a direct line
19 drawn to the General Assembly's passage of this
20 redistricting plan.  I think the Arlington Heights
21 framework asks us to sort of present this broader
22 mosaic, if you will, that will include that.
23    Q.  Can you explain upon what accepted and
24 reliable methods you relied to sort of draw the
25 line between those things?

Page 63

1    A.  I think the framework allows us to do
2 it.  I think, you know, we present -- as I have
3 here -- the historical background, and you carry
4 that forward to the present as you can, and then
5 you discuss the specific sequence of events as it
6 relates.
7    Q.  How did you know to use Arlington
8 Heights?
9    A.  So when I started doing research on
10 voting rights litigation, I read a lot of case
11 law, and I became aware of the sort of general
12 structure of a lot of these voting rights cases.
13 This is when I -- the transition was sort of I'd
14 done a lot of work in the archives of Judge Frank
15 Johnson, a district court judge and appellate
16 court judge from Alabama.
17    I started researching the Library of
18 Congress's voting rights cases.  So that kind of
19 began my journey in this.
20    Then, as I think we touched upon in
21 the last deposition, I believe I told you that I
22 actually -- my very -- my first report that I
23 wrote as an expert was an Arlington Heights
24 framework report.  It was never entered into the
25 record.  There was a settlement in that case.

Page 64

1    But just to answer your question,
2 again, I became aware of that framework through
3 research, and then I'd actually prepared a report
4 using that framework several years ago.
5    Q.  Do you remember when that was,
6 Dr. Bagley?
7    A.  Time has gotten weird with COVID.  Let
8 me think.  That probably would have been around
9 2018, maybe.
10    Q.  Do you recall in which court that
11 would have been pending?
12    A.  I don't remember if it was Middle
13 District or Northern District of Alabama, but one
14 of the two.  But the report was never officially
15 submitted into the record.
16    Q.  By whom were you retained in that
17 case?
18    A.  LDF.
19    Q.  Has that been the entity to retain you
20 in all of the matters in which you have testified
21 as an expert or been retained as such?
22    A.  Yes.
23    Q.  Have you ever testified in favor of
24 any government defendants?
25    A.  Not yet.

Page 65

1    Q.  Turning back to your report, how did
2 you choose Factors 2, 3, 4, and 5 in this case?
3    A.  Those are the ones that I thought were
4 most relevant and that I thought I could tackle
5 most effectively, given the timeframe that I had
6 to work with.
7    Q.  The fourth factor was not in your
8 House report, was it?
9    A.  I don't recall, genuinely.  If I
10 didn't list it specifically in the report, I think
11 I at least talked about procedural departures.
12    Q.  We'll get to that in a minute.
13    Do you agree that the Arlington
14 Heights test is a legal analysis for the court?
15    A.  I would agree with that.  For my
16 purposes, though, it just establishes as an expert
17 the sort of approach that we take to drafting a
18 report and analysis.
19    Q.  Can you explain what approach you took
20 here?
21    A.  I took as my point of departure these
22 factors.
23    Q.  What else?
24    A.  I undertook an inquiry based upon
25 these factors.  I examined, you know, works of

17 (Pages 62 - 65)

Joseph Bagley , PhD                                    June 29, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 66

1 secondary sources that I was familiar with. Those
2 drew me to some different sources that I was not
3 previously familiar with. I undertook what amount
4 of primary source researches I could, and, of
5 course, I reviewed the sequence of events, as
6 available, in the public record.
7      Q.  Turn with me, if you don't mind, to
8 Page 4 of your report.
9      A.  Okay.
10     Q.  Thank you. I just want to make sure
11 we're on the same page. You said there right at
12 the end of Section 2 that you, quote, "Decidedly
13 resist reaching final conclusions, which is for
14 the court to do," end quote.
15         Did I read that correctly?
16     A.  Yes.
17     Q.  So you take no opinion at all on
18 whether discriminatory intent motivated the South
19 Carolina General Assembly in the passage of that
20 plan?
21     A.  I can't reach that final conclusion.
22 What I can say is that the evidence might tend to
23 support that.
24     Q.  Are we just parsing words here?
25     A.  That's a lot of the law, isn't it?

Page 67

1      Q.  I mean, what is your opinion? That's
2 why I'm deposing you today, to find out what your
3 opinions are.
4      A.  My opinion is that there is quite a
5 bit of evidence here that the court could use to
6 reach a finding of discriminatory intent.
7      Q.  You agree that it's the court's job to
8 conduct the Arlington Heights analysis, correct?
9      A.  Yes.
10     Q.  Can you please explain what you mean
11 by "procedural irregularities"?
12     A.  So departures from normal practice,
13 departures from, sort of, best practices and good
14 government and so on. And in this case, in
15 particular, things that members of these
16 legislative committees have flagged themselves as
17 irregularities.
18     Q.  Are you familiar generally with the
19 legislative process in South Carolina, how a bill
20 becomes a law?
21     A.  Generally, yes.
22     Q.  Have you ever been part of
23 redistricting before?
24     A.  You mean before this cycle?
25     Q.  Yes.

Page 68

1      A.  I have not been a part of it or party
2 to it myself, no.
3      Q.  Have you ever worked for a state
4 legislature before?
5      A.  No.
6      Q.  Have you ever worked for any member of
7 Congress or the United States Senate?
8      A.  I have only worked as an historian.
9      Q.  Have you ever been part of
10 redistricting litigation before your testimony in
11 the Alabama case this cycle?
12     A.  No. I was still in graduate school at
13 the time of the 2010 redistricting cycle.
14     Q.  Do you agree you have no personal
15 experience in the redistricting process?
16     A.  Personal, hands-on experience, no.
17 That would be correct.
18     Q.  What is your understanding of how the
19 process normally works?
20     A.  Well, I think there are elements of it
21 that worked as they normally would, as they did in
22 2010. For example, the hearings being held. But
23 what I'm flagging in terms of departures is when
24 legislators on the committee say, "I don't know
25 where this map came from"; when legislators on the

Page 69

1 committee say, "I don't understand why this was
2 put out before the holiday and then we come back
3 and now we have to vote on it." You know, when,
4 for example, Representative King says, "I don't
5 understand why I'm not chairing this meeting," and
6 so forth.
7          These are things to me that are being
8 flagged by the legislators themselves as
9 procedural departures.
10     Q.  Let's take those in order. Number
11 one, don't know where the map came from. Staff
12 drew all the maps here, right?
13     A.  That's my understanding.
14     Q.  So notwithstanding they don't know
15 where the map came from, can you explain how
16 that's a procedural departure?
17     A.  Let me rephrase. Representative
18 Bernstein, for example, says I -- at one point, "I
19 didn't know that we were even drafting a second
20 map. I don't understand why we were drafting a
21 second map. I had no idea that this was going
22 on." And she's on the committee. Senator
23 Matthews had similar comments at another point.
24         So those are things that strike me as
25 irregularities when you have members of a

18 (Pages 66 - 69)

Page 70

1  committee that are indicating that they have not
2  been at all a part of the process and in a
3  legislative committee meeting for having been
4  blindsided.
5      Q.  Do you know whether they asked to be a
6  part of the process?
7      A.  All I know is what they -- I mean, if
8  they had asked and then they're expressing dismay,
9  one presumes that they would have said, you know,
10  I had asked to X, Y, or Z.  Again, it's -- if
11  they're expressing frustration that things are
12  being done without their input, then presumably
13  they wanted to have input.
14      Q.  They were given input on it, weren't
15  they?
16      A.  At what stage, is the question,
17  though.  I mean, it's -- specific examples are
18  these two specific examples that they're saying
19  they didn't have anything to do with it.
20      Q.  Is it your position that every single
21  member of the subcommittee must be in the map room
22  at all times for a map to be drafted?
23      A.  No, but if we're talking about two
24  major maps, one being published and then without a
25  second one being literally published and then

Page 71

1  members of the committee finding out about it at
2  the same time as the public, that strikes me as a
3  departure and irregularity.
4      Q.  What's normal practice there then?  Do
5  you know?
6      A.  Well, according to Representative
7  Bernstein, it would be that she would be informed
8  before members of the public that staff were
9  producing a second map.
10      Q.  Do you think it's a bad idea to have
11  options?
12      A.  Meaning in terms of the second map?
13      Q.  In general.
14      A.  Do I think it's a bad idea to have
15  options?  No.  I think it's great to have options.
16      Q.  So she had an opportunity to comment
17  on that second option; did she not?
18      A.  After it was published.
19      Q.  So what, in your view, is the problem?
20      A.  In her view, the problem was that as a
21  member of the committee she was finding out about
22  it at the same time as the public.
23          I mean, if you are a member of a
24  committee that's responsible for something,
25  wouldn't you think that you would at least know of

Page 72

1  the existence of a major, you know, piece to the
2  process before it went online?
3      Q.  Do you know what the process behind
4  the scenes was or why?
5      A.  No.  I would love to know, but therein
6  is the issue.
7      Q.  But because you don't know, can you
8  offer an opinion one way or the other as to
9  whether there was some nefarious motive or
10  departure from normal procedure by releasing it as
11  soon as it was available?
12      A.  All I can do is convey what the
13  members of the committee are saying.  That's what
14  I have done.
15      Q.  She is a member of the minority party
16  that voted against this legislation, correct?
17      A.  That's correct.
18      Q.  Turning to your second alleged
19  departure from procedure, publishing things on
20  holidays.  I'll go back, again, to my question
21  earlier:  I mean, are you suggesting that staff
22  acted in bad faith on when they published maps or
23  scheduled meetings?
24      A.  I am presenting to the court where
25  members of the committee have expressed their

Page 73

1  dismay at that kind of scheduling.
2      Q.  So members of the Democratic Party
3  were not pleased with the scheduling, and you
4  think that's a departure from legislative
5  procedure?  Is that your opinion?
6      A.  I think for it to happen multiple
7  times and for multiple people to complain about
8  it, and if they are actually on a bipartisan
9  committee that's supposed to be cooperating with
10  one another, yes, I think that deserved to be
11  discussed.
12      Q.  Do you know whether there was any
13  coordination to -- between and amongst members of
14  the Democratic Party to repeatedly voice those
15  objections?
16      A.  You cut out on me.  To do what?
17      Q.  Sorry.  Do you know whether there was
18  any coordination between and amongst members of
19  the Democratic Party to voice those objections?
20      A.  I'm not privy to any internal
21  discussions that they would have had.
22      Q.  Turning to Mr. King, I mean, are you
23  saying that this entire process is tainted because
24  one member did not preside over one of the dozens
25  of meetings?

19 (Pages 70 - 73)

Joseph Bagley , PhD                                                        June 29, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 74

1    A.  Of course not.  No.  I just present
2  that as one of a number of examples.
3    Q.  Dr. Bagley, do you have any opinions
4  as to whether the map drawing process, this cycle,
5  differed in any way procedurally from the previous
6  cycles in South Carolina?
7    A.  Could you restate it, Mr. Traywick,
8  I'm sorry?
9    Q.  Sure.  I'll be glad to.
10        Do you have any opinions as to whether
11  the map drawing process this cycle differed in any
12  material way from the previous cycles in South
13  Carolina?
14    A.  I understand it was generally
15  analogous.  There were some differences in terms
16  of, like, time of day meetings were held, maybe.
17  The things that we're talking about here, like the
18  example with Representative King.
19        I'm, obviously, familiar with the
20  dispensation of Backus.  You know, general
21  awareness of the hearings that were held in that
22  cycle and the process.  Obviously, not as
23  intimately familiar with that cycle as this one.
24        But I'm not asked to opine on that
25  cycle anyway or regardless, just insofar as it's

Page 75

1  part of the framework for the report.
2    Q.  Just for your edification, I'm trying
3  to -- there's a lot of criticism in here about
4  lack of transparency and things like that.  So I'm
5  trying to figure out the standard on which you
6  relied to make that opinion.
7        What do you think the proper process
8  was, and upon what historical or reliable methods
9  did you rely in formulating that standard?
10    A.  So I go back to our basic principle, I
11  mean, going all the way back to gravitas (sic).  I
12  mean, you don't take any one source and, you know,
13  base a conclusion or opinion on that single source
14  out of context.
15        So if I were to review this whole
16  record and one single legislators or one single
17  member of the public said, "I don't think you guys
18  are being totally transparent here," you know, I'm
19  not going to base an opinion on that.  But when
20  it's within the context that I've presented and
21  then it's multiple people, multiple members of the
22  public and multiple members of these legislative
23  committees saying, "I don't think there's
24  transparency, and I don't know what's being done
25  in a, quote unquote, 'back room,'" you know, even

Page 76

1  Senator Rankin discussing the process in the House
2  and suggesting they've got a guy in a room that
3  nobody knows where it is is cooking things up.
4  You know, when it's multiple voices in a chorus,
5  then I think we can say this is significant.
6        If it were just one single person
7  saying at one point in time, "I think there's a
8  lack of transparency," then that's not what you
9  would base it on.  That's, again, you know, just a
10  common standard.
11    Q.  Dr. Bagley, did you take into account
12  the fact that a lot of those voices of
13  transparency concerns came from plaintiffs'
14  counsel here?
15    A.  I understand that that was -- those
16  were among the voices, yes.
17    Q.  Are you aware that they filed
18  litigation against the legislative leader at that
19  point?
20    A.  Yes, I'm aware that they were -- you
21  know, a couple of times testified as part of that
22  chorus at a couple of different hearings, if
23  memory serves.
24    Q.  Are you aware of any coordination
25  between and amongst folks who testified about the

Page 77

1  lack of transparency?
2    A.  I'm not privy to any private
3  conversations that they may have had.
4    Q.  Would that affect your analysis if
5  there was, in fact, coordination?
6    A.  Sure.
7    Q.  Obviously, you said you weren't
8  retained to analyze the last cycle's redistricting
9  process, correct?
10    A.  No.  Systematically, no.  I discuss it
11  in the report as part of this history of getting
12  us up to the present.
13    Q.  So you don't have any opinions
14  regarding whether this process was consistent with
15  prior practice or whether it was abnormal?
16    A.  I understand that there is probably a
17  general consistency, but what I'm being asked to
18  do is review the record relevant to this cycle and
19  identify, you know, what's asked for in the
20  Arlington Heights framework.
21    Q.  Just so I'm clear -- I want to make
22  sure.  This is my only time or might be the only
23  time to talk to you -- your three objections that
24  I wrote down are that, you know, some members said
25  on the record they didn't know where maps came

20 (Pages 74 - 77)

Joseph Bagley , PhD                              June 29, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 78

1 from, some maps were dropped around the holidays,
2 and Representative King complained that he did not
3 preside over the Judiciary Committee meeting for
4 the House.
5        Are there any other examples that you
6 claim demonstrate procedural departure from the
7 normal procedure?
8    A.  If there are, they're in the report.
9 I don't remember everything that I flagged as a
10 potential procedural departure in the report.  So
11 I couldn't speak to that with 100 percent
12 certainty without flipping through that whole
13 "Sequence of Events" section.
14    Q.  Is it your opinion that those three
15 examples render the process invalid under an
16 Arlington Heights factor?
17    A.  No.  I think they're simply among the
18 things that a court would consider.
19    Q.  You agree that this process was
20 generally consistent with prior cycles, correct?
21    A.  I think there are elements of it that
22 were.
23    Q.  I have written down "generally
24 analogous" and "general consistency."  Do you
25 disagree with those prior statements?

Page 79

1    A.  I would say, in terms of hearings --
2 the public hearings being held, members of the
3 public coming forward and saying, "There's been
4 packing and cracking of black voters," members of
5 the legislator saying the same, people expressing,
6 you know, transparency concerns and that kind of
7 thing, yes.
8    Q.  Can you concede that everyone had an
9 opportunity to be heard in this redistricting
10 cycle?
11    A.  I think there was wide opportunity for
12 the submission of input or feedback, yes.
13    Q.  Thank you.
14        Do you concede it would be unworkable
15 to draft a map live with all 306 legislators in
16 the room?
17    A.  Sure.  Yes.
18    Q.  Do you concede it would have been even
19 more unworkable to draw a map live with all 124
20 House members in the room?
21    A.  Absolutely.
22    Q.  Do you concede it would have been
23 unworkable for map drawer to draw a map live in
24 front of members of the public with conflicting
25 views?

Page 80

1    A.  Yes.
2    Q.  Is that how any legislation is
3 crafted?
4    A.  Of course not.
5    Q.  So legislators and their staff don't
6 type out in real time what the language of the
7 bill is going to be, right?  Work needs to be done
8 ahead of time, and then it's introduced; is that
9 the normal process for legislation?
10    A.  Generally speaking, but I would expect
11 at least that, you know, members of a very
12 important committee would be equally involved in
13 the primary work of that committee, which appears
14 not to have been the case here.
15    Q.  How is that not the case?  Weren't
16 they at every meeting that they decided to show up
17 for and for which they didn't have leave?
18    A.  Yes, but none of the work was actually
19 done at the meetings.  Like, none of it.  It's all
20 done in the map room, and it's done by staff, in
21 consultation, evidently, with only members of
22 majority.
23    Q.  Do you know whether members of the
24 minority asked to be present in those meetings?
25    A.  Asked to be present at which?

Page 81

1    Q.  At any time where maps were being
2 drawn?
3    A.  According to what they had to say at
4 the meetings that I saw, they -- you know, if
5 you're expressing dismay that you didn't have any
6 input or any involvement and, presumably, you
7 would have wanted to have had that input or
8 involvement prior to.
9    Q.  Do you know whether members of the
10 majority were all present at the time the maps
11 were drawn?
12    A.  Well, I know that none of them
13 complained after the fact about having a lack of
14 input.
15    Q.  Someone has to draw it, right?
16    A.  Sure.
17    Q.  So you think that seven people from
18 all different competing perspectives ought to be
19 in there with the map drawer and staff to draw in
20 real time?
21    A.  I would think that the staff
22 cartographer or the chairman of the committee
23 would at least seek input from the members of the
24 committee before a map is published to the public.
25    Q.  The maps that were published to the

21 (Pages 78 - 81)

Joseph Bagley , PhD            June 29, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 82

1 public were, quote, "A starting point," were they
2 not? Isn't that in your report?
3      A. That is how they were characterized,
4 yes.
5      Q. Do you have any reason to dispute that
6 characterization?
7      A. No. But I know it was pointed out by
8 members of the committee that given that fact, if
9 the first House map was a starting point, they
10 questioned then what was the point for having a
11 second House map? Why not simply have a
12 discussion and amend the existing map?
13        "If it's a starting point," they said,
14 "what is the purpose of going back and drawing an
15 entirely different map," which everyone agreed was
16 essentially a facsimile of the Senate map, which
17 was widely panned by members of the public.
18      Q. Didn't the Senate also consider a
19 second entirely different map that Harpootlian had
20 drawn?
21      A. They did.
22      Q. So is it a problem to have options?
23      A. No.
24      Q. Dr. Bagley, do you know whether the
25 South Carolina General Assembly in any prior

Page 83

1 redistricting cycle has ever provided specific
2 notes and feedback on every single map submitted
3 by the public?
4      A. Could you restate? It's a long
5 question, sorry.
6      Q. Sure. Do you know whether the General
7 Assembly in any prior redistricting cycle has ever
8 provided specific notes and feedback on publicly
9 submitted maps?
10      A. I don't think that they would provide
11 detailed, lengthy feedback on every single
12 publicly submitted map, no.
13      Q. Do you think that's required?
14      A. Not necessarily.
15      Q. Because you know being a member of the
16 General Assembly is a part-time job, right?
17      A. Sure. Yeah.
18      Q. Dr. Bagley, on Page 5 of your
19 report -- I'm sorry, Page 4. Sorry about that.
20        Can you please explain the, quote,
21 "common standards of historiography," end quote,
22 on which you relied to formulate your opinions in
23 this case?
24      A. Well, in part, that's what I was
25 talking about a moment ago in terms of reliance

Page 84

1 upon myriad sources, and widened that, as
2 possible, in terms of sources.
3        And then, of course, one of the things
4 that historiography means is simply history that's
5 been written by historians. And so, obviously,
6 there's a lot of that in the first half of that
7 report where I talk about the historical
8 background. We rely on historical monographs,
9 publications that have been peer reviewed and so
10 on for their veracity and their value.
11      Q. That would have been on your
12 "Historical Background" section only?
13      A. Not necessarily, no, because the
14 sequence of events, even though I'm relying upon
15 these transcripts, videos, public hearings, that's
16 within the context of everything else that I have
17 put forth prior to.
18      Q. You put in the report in different
19 parts, though, right? Don't you agree that
20 Pages 25 through 49 are different than the
21 "Historical Background" section?
22      A. Sure. Yes.
23      Q. In fact, they're different factors
24 under the Arlington Heights analysis, aren't they?
25      A. That's correct.

Page 85

1      Q. Is it your contention that the same
2 standards apply to your recitation of the history
3 as to your review of the current legislative
4 record?
5      A. Yes. But I would say we're looking
6 at -- it's not just any one public hearing. It's
7 not just any one meeting of any one subcommittee
8 or committee. It's just as you enumerated
9 earlier, this wide swath of hearings and meetings
10 and, again, a chorus of voices of members of the
11 public and members of these legislative committees
12 within the historical context that I have
13 provided.
14      Q. Sure. Within that sort of wide range
15 of hearings, is it your contention that the
16 process is generally consistent with prior cycles?
17 Did I hear that correctly, or generally analogous?
18      A. In terms of holding public hearings
19 across the state to receive input and then members
20 of the public expressing that they thought not a
21 lot of input had actually been acted upon.
22      Q. Aside from that, how about legislative
23 procedures? Are you familiar with legislative
24 procedure in South Carolina or not?
25      A. Generally speaking, yes.

22 (Pages 82 - 85)

Joseph Bagley , PhD                                    June 29, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 86

1    Q.  Any departures there?
2    A.  Not in terms of, you know, a bill
3 being introduced in one House or the other and
4 eventually passing out of that entire body.
5    Q.  So in looking at that factor, would
6 you agree that the court has to look at the
7 totality of the circumstances?
8    A.  Yes.
9    Q.  I don't want to get into the history;
10 let me make clear on the front end, Dr. Bagley.
11 I'm certainly not here disputing South Carolina's
12 troubled history as relating to race, particularly
13 relating to the Civil War and these others eras.
14        In looking at this section, it's a
15 little light on sources.  I want to know where you
16 obtained information.  Entire paragraphs cite one
17 footnote.  Is every sentence in those paragraphs
18 related to the sources?
19    A.  Yes.  So a pretty common practice for
20 me is not to litter a paragraph with footnotes.
21 So the first paragraph in a section is
22 introductory, apart from the quotation from
23 Colleton.
24        The second paragraph goes to
25 Footnote 3.  It looks like there are two

Page 87

1 historical monographs cited there that would cover
2 the information in that paragraph.
3    Q.  So that's not common practice in
4 historical text, to source your materials with
5 footnotes after each sentence?
6    A.  After each sentence, no.
7    Q.  So is that just the --
8    A.  If I were quoting directly,
9 absolutely.  But no, if you're talking about
10 summarizing a period of history, and then to cite
11 two authorities on that would be common practice
12 at the end of the paragraph.
13    Q.  Let's look at Page 5, the first
14 paragraph under "Reconstruction."  Each of those
15 sentences contains quotes, correct?
16    A.  Yes.  Those are from -- that's all
17 from Foner, and the pages that are cited, 199 and
18 200.
19    Q.  If you would turn with me, please, to
20 Page 6 of your report.  First of all, with regard
21 to the pre-Civil War and reconstruction and
22 redemption, I mean, certainly you're not trying to
23 draw a straight line from those periods to the
24 present, right?
25    A.  No, not a straight line.  But I think

Page 88

1 it's still relevant, and I think it's
2 indispensable, in fact.
3    Q.  There on Page 6, in the second full
4 paragraph, at the end of it you state that, "The
5 1895 constitution," quote, 'remains the state's
6 operative constitution to this date,'" end quote.
7        From where did you obtain that
8 information?
9    A.  Well, I understand that it's been
10 amended a number of times.  I know the West
11 Committee has undertaken a systemic revision of it
12 and so on.
13    Q.  Have you ever studied the West
14 Committee?
15    A.  Not closely.
16    Q.  Would you agree that the 1895
17 constitution has been amended hundreds of times
18 since it was ratified initially?
19    A.  I would.  And I'm sure black South
20 Carolinians are very grateful for that.
21    Q.  Sure.  And do you know who was on the
22 West Committee?
23    A.  Not off the top of my head.
24    Q.  Have you ever read the West Committee
25 report?  I know it's a long one.

Page 89

1    A.  Not entirely, no.
2    Q.  Is it really accurate to say that the
3 1895 constitution remains the operative
4 constitution to this day?  A little more nuanced
5 than that, right?
6    A.  I mean, I suppose it's -- it's
7 still -- it has been amended numerous times, as
8 you just said.  I don't -- obviously, I don't mean
9 to suggest there that it exists in the form that
10 it existed during the redemption period.  I think
11 everyone would understand that.
12    Q.  Thank you for clarifying that.  It was
13 a little unclear for me from the report.
14        THE WITNESS:  Mr. Traywick, do you
15 think it's a useful time to take a lunch break, or
16 do we need to maybe plow through another half
17 hour?
18        MR. TRAYWICK:  Let's go off the record
19 real quick.
20        (A recess was taken.)
21        MR. TRAYWICK:  Back on the record.  And
22 just let me know whenever it comes time for lunch,
23 and we'll take a longer break at that time.
24        THE WITNESS:  Thanks.
25        MR. TRAYWICK:  I'm going to try to

23 (Pages 86 - 89)

Joseph Bagley , PhD                                    June 29, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 90

1 speak up. I'm not screaming at you, but I hear
2 I'm having audio issues on the court reporter's
3 end, so I'm trying to address it.
4         THE WITNESS:  Got it.
5 BY MR. TRAYWICK:
6     Q.  On Page 10 of your report, you discuss
7 various voting practices that have come under
8 fire, such as "at-large elections" and
9 "single-shot voting."
10         You do you think that all at-large
11 elections negatively affect minority voters?
12     A.  I think historically they have been
13 used, along with other devices, like majority vote
14 requirements and number placed requirements, which
15 taken all together typically would be seen as sort
16 of quintessential vote dilution scheme.
17     Q.  Would you agree that it depends on the
18 locality at issue, though, and the composition of
19 that locality?
20     A.  Sure.  Yes.
21     Q.  If you would, Dr. Bagley, what South
22 Carolina-specific sources did you rely on to
23 sketch your historic background and for your
24 opinions in this case, aside from the case law?
25     A.  This was reflected in the footnotes,

Page 91

1 so ...
2     Q.  I see a lot, for example, about the
3 New South and things of that nature.  But do you
4 recall any South Carolina-specific sources?
5     A.  I see Dr. Lau here, Democracy Rising:
6 South Carolina and the Fight for Black Equality.
7 Reference to Encyclopedia of South Carolina.  BOT,
8 who is cited by Professor Woodard in his report in
9 the House case.  What else?
10         There's a chapter dedicated to South
11 Carolina in The Quiet Revolution book.  Obviously,
12 there is Judge Gergel's book cited.
13     Q.  Did you read that book?
14     A.  Yes.  Clive Webb, there's a chapter on
15 South Carolina in that book, if memory serves.
16     Q.  Dr. Bagley, do you recall whether you
17 relied on any sources written by Cole Blease
18 Graham, Walter Edgar, or Professor Underwood?
19     A.  I don't believe I did.
20     Q.  With regard to the South
21 Carolina-specific sources that you mentioned, did
22 you read those for the first time in connection
23 with your work on this case?
24     A.  No.
25     Q.  Which ones had you read before

Page 92

1 conducting your primary research for this case?
2     A.  Most of them.  There might be one or
3 two that I read for the first time as part of my
4 work on this case.
5     Q.  Do you recall what you might have read
6 for the first time for this case?
7     A.  Not off the top of my head.  I mean, I
8 would have to flip through again.
9     Q.  As for the others, do you recall when
10 you would have read those and for what purpose?
11     A.  It would vary.  I mean, some of them
12 might be from graduate school.  Some of them from
13 my research in terms of voting rights when I
14 started to work on the second project after the
15 book was -- first book was published.  So, I mean,
16 it varies probably widely.
17     Q.  Do you recall, Dr. Bagley, from where
18 you obtained your information about prior
19 redistricting cases?
20     A.  So that, you know, is pretty easy.  If
21 you read the Backus case, the opinion, they're
22 going to talk about the Colleton case.  If you
23 read the Colleton case, they're going to talk
24 about Burton.  If you read Burton, they're going
25 to talk about the '80s cycle, and they're going to

Page 93

1 talk about Twiggs.  And Twiggs are going to talk
2 about O'Shields.
3         So it's easy to kind of weave your way
4 back through.  Two, there's secondary sources that
5 discuss that history as well, such as Professor
6 Burton's, Professor Rupe's work and so on.
7     Q.  Did you draft all of these sections by
8 yourself, or did you receive any assistance?
9     A.  No.  This work is all mine.
10     Q.  The entire report?
11     A.  Correct.
12     Q.  Speaking of Backus, I recall from your
13 last deposition you had about a sentence dedicated
14 to it, but you beefed it up this time.  Is there
15 any reason for that?
16     A.  I had more time, you know, to get back
17 into that.  I had a little bit more time to go
18 back and read that and speak a little more
19 thoroughly about it.
20     Q.  On Page 18, you mention that the plan
21 at issue in Backus was pre-cleared by Obama
22 Justice Department under the standard of
23 non-retrogression; is that correct?
24     A.  Yes.
25     Q.  But it also cleared the Federal Court

24 (Pages 90 - 93)

Joseph Bagley , PhD                                    June 29, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 94

1 on other constitutional grounds and under
2 Section 2 as well, correct?
3      A.  Correct.
4      Q.  On Page 19, you quote the Backus court
5 as saying, "Defendants were able to disprove that
6 race was the predominant factor by demonstrating
7 that their decisions adhered to traditional
8 race-neutral principles."
9          Do you see that?
10     A.  I do.
11     Q.  I think I mentioned earlier, were you
12 aware that plaintiffs tried to revive that
13 challenge after the U.S. Supreme Court decided --
14     A.  Shelby County, yes.
15     Q.  They lost again, right?
16     A.  That's right.
17     Q.  How does that affect your analysis
18 about the applicability of non-retrogression to
19 this plan as discussed in your report?
20     A.  Could you ask the question again or
21 rephrase?
22     Q.  Sure, I'll be glad to.  It might not
23 have been a good one.
24          The subsequent denial of that claim
25 from the Backus plaintiffs, did you take that into

Page 95

1 account in discussing the applicability of
2 non-retrogression for purposes of this
3 redistricting cycle?
4      A.  No.  I just know that there are a
5 number of people, and not just Senator
6 Harpootlian, who were -- who have made the case in
7 public hearings or in these meetings that it was
8 their opinion that you could -- you know, at --
9 some people said, "start from scratch in drawing
10 the districts."
11          This is suggested by, you know, a
12 number of people in the public hearings and in
13 terms of their input.  Again, not just Senator
14 Harpootlian, who, as you said, obviously, lost
15 that case.
16     Q.  Would you agree, in a typical case
17 plaintiffs bear the burden of proof?
18     A.  Yes.
19     Q.  In your report you quoted the court as
20 saying, "Defendants were able to disprove that
21 race was a predominant factor"; is that right?
22     A.  That was the determination of the
23 court in that case, yes.
24     Q.  So that's binding, correct?
25     A.  Right.

Page 96

1      Q.  On Page 22, Dr. Bagley, if you
2 wouldn't mind turning there with me.  Now we're in
3 sort of the DOJ objections under Section 5.  I
4 think earlier in your report you mentioned that
5 DOJ had objected 122 times by 2012; is that right?
6      A.  That sounds right.
7      Q.  Do you know -- you then discuss the
8 local objections, but I'm missing a lot of dates.
9 Do you know the date ranges in which these
10 occurred and when the most recent ones were?
11     A.  I think between 2000 or late '90s and
12 2011 or just before Shelby County, there's like a
13 dozen or so.  A lot of them are from the 1980s and
14 early '90s.  You know, obviously, would have begun
15 in 1970s.
16     Q.  That would have been following passage
17 of the Voting Rights Act of 1965?
18     A.  Right.
19     Q.  In fact, your report says that many of
20 these objections came between the passage of the
21 VRA and its renewal in the 1980s; is that right?
22     A.  Correct.
23     Q.  Can you explain for me the relevance
24 of those objections from 40 to some of them
25 70 years ago, how those relate to the General

Page 97

1 Assembly's redistricting decisions in this case?
2      A.  Well, the framework asks us to look at
3 the history of discrimination, and it asks us to
4 present to the court this big picture, this broad
5 mosaic.
6          If you're discussing the history of
7 voting rights in South Carolina, I mean, to me
8 it's highly relevant that there were these number
9 of objections.  You know, that it -- it wasn't
10 that long ago.  I mean, a lot of the players, for
11 example, in the 1980s are among some of the same
12 now.
13          Even regardless of that, even, as they
14 say, that's 40 years ago, we're asked to look at
15 the history and to present that as part of these
16 reports.  So this is simply a part of that.
17     Q.  Right.  But you know the history has
18 got to be probative of the decision at issue,
19 right?  So I'm trying to ascertain what you think
20 the link is there.  Where is the hook?
21     A.  Well, I mean, I'm not being asked to
22 draw a direct line between one Section 5 objection
23 from 1981 and the plan at issue here.  Again, this
24 is just part of a broader picture.  It's part of
25 what would be relevant to a court's determination.

25 (Pages 94 - 97)

Joseph Bagley , PhD                                      June 29, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 98

1    Q.  Because one couldn't draw a straight
2 line, right?
3    A.  That's not what we're being asked to
4 do.
5    Q.  Well, you agreed with me that the
6 discrimination has to be probative of the
7 decision.  So I'm trying to ask you to explain the
8 relevance there, and I'm asking whether you think
9 you can draw a straight line?
10    A.  I mean, we're talking about Civil
11 Rights Division objections.  And I'm writing a
12 report where I'm asked to present a history of
13 discrimination.  And if we have this litany of
14 examples of the General Assembly passing laws that
15 the Attorney General and Civil Rights Division
16 objects to, I think that's relevant to this
17 report, when one of the Arlington Heights factors
18 says look at the history.
19    Q.  Let's drill that down a little bit.
20 As I read this section of your report, you say
21 Beaufort County was blocked from doing so.  You
22 say the City of Charleston was blocked from doing
23 so; the Town of Hollywood; City Gaffney; Kershaw
24 County.  These are all local governments, correct?
25    A.  Yes.  But like we were talking about

Page 99

1 earlier, a lot of that, you know, passes through
2 the General Assembly.
3    Q.  With the local delegation, right?  I
4 mean, let's -- didn't you agree that that's the
5 way things go?
6    A.  I understand it's common practice for
7 deference to local delegations, sure.
8    Q.  When is the most current local
9 objection you reference?
10    A.  The most recent would have been
11 shortly before Shelby County.  The very last one
12 was the photo ID law in 2011.  So probably 2010,
13 if memory serves.
14    Q.  That was upheld in part, correct?
15    A.  The photo ID, yes, after it was
16 modified.
17    Q.  Yes, sure, just to take away a certain
18 element of proof if somebody for some strange
19 reason didn't have an ID, right?
20    A.  If I remember correctly, the court
21 said -- or there was a concurring opinion that
22 said this is telling, this is why we need
23 Section 5, because if there hadn't been this
24 challenge to this, they would not have gone back
25 and modified to have the reasonable impediment

Page 100

1 standard, and that's why this litigation was
2 necessary.  That's my recollection.
3    Q.  That was a concurrence, right?
4    A.  Yes.
5    Q.  So that was not a majority opinion,
6 right?
7    A.  No.  Although, I think Judge Kavanaugh
8 also made note of the fact that the law had been
9 amended, allowing it to get the, sort of, seal of
10 approval.
11    Q.  Sure, just a couple things moved.  But
12 with respect to the Section 5 review concurrence
13 you just mentioned, two years later that was
14 gutted, correct?
15    A.  Meaning Section 5?
16    Q.  Right.
17    A.  Right.
18    Q.  So the United States Supreme Court,
19 they got the last word, right?
20    A.  Sure.
21    Q.  They disagreed with the concurring
22 opinion you reference, correct?
23    A.  Shelby County gutted Section 5, as you
24 say, yes.
25    Q.  Were you aware of any evidence that

Page 101

1 people don't actually have any form of
2 government-issued identification in South
3 Carolina?
4    A.  No.  And I'm not here trying to
5 relitigate the photo ID case.  I just mention it
6 because it happened to be the very last section,
7 the example of an objection.  And you had asked
8 what was, you know, the date of that last
9 objection.  I think it was, like I said, 2011.
10    Q.  On Page 23, you discuss long wait
11 times for voting.  I notice that you eliminated
12 reference to Richland County here; that was
13 mentioned in your previous report to the House
14 plan litigation.  Is there any reason for that?
15    A.  No.  I think in the last deposition
16 you had pointed out, hey, isn't this handled at
17 the local level, and is that majority black
18 district.  I don't recall having taken it out for
19 that reason.
20       I would acknowledge, of course, that
21 that's local, but it's still relevant to me.
22 Again, if we're looking at this broad mosaic of
23 access to the franchise and South Carolina
24 historically and contemporaneously, if there's
25 something that disproportionately affects black

26 (Pages 98 - 101)

Joseph Bagley , PhD                                June 29, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 102

1 voters, then I think it's relevant to the report.
2       It's not something that I have spent a
3 whole lot of time on. It's just something that
4 was relevant. That's why I mention it.
5       Q. Dr. Bagley, if you could, would you
6 explain sort of generally what you believe the
7 relevance is of Pages 24 to 49 of your report?
8 Now we're kind of moving into the next section.
9       A. That's the sequence of events as
10 described in the Arlington Heights framework, and
11 that would be the legislative sequence of events
12 in terms of the hearings that were held and the
13 meetings of the redistricting subcommittee and the
14 House Ad Hoc Committee.
15       Q. Do you agree that a layperson could go
16 watch all of these videos and write down what
17 happened?
18       A. I agree that a layperson could watch
19 these videos and give their interpretation of what
20 was happening. What I have done is provided what
21 I think is most relevant, as a historian familiar
22 with the history of South Carolina and familiar
23 with, you know, the history of the struggle for
24 voting rights.
25       Q. So you did make some selections here

Page 103

1 in what you included; is that right?
2       A. I mean, obviously, you can't just
3 reproduce the transcripts, so yes.
4       Q. Right. But made your points. You
5 made calls individually on what to include, right?
6       A. Yes.
7       Q. On Page 25, I'm -- I say that:
8 "Senators Sabb and Matthews were the only black
9 legislators names in a seven-member committee."
10       Do you see that?
11       A. I do.
12       Q. What do you mean by "only"? Do you
13 have a criticism as to the composition of the
14 committee?
15       A. It's just a statement of fact.
16       Q. Well, I mean, I would suggest to you
17 that a lot of statements of fact are written like
18 that, right, so they seem like criticism. So
19 that's why I'm asking you: Do you have a
20 criticism of the composition of the committee?
21       A. It's not for me to personally
22 criticize anything. I'm simply laying forth the
23 facts as relevant.
24       Q. But "only" suggests a persuasive tone;
25 does it not?

Page 104

1       A. It might.
2       Q. Do you, sitting here today, have any
3 criticisms as to the composition of the
4 redistricting subcommittee for the South Carolina
5 Senate?
6       A. No.
7       Q. In fact, they were all lawyers,
8 weren't they?
9       A. Yes. Yes, they were.
10       Q. Also on Page 25, do you agree that
11 this cycle at the beginning, the committee was
12 faced with Congressional District 6 being roughly
13 12 percent underpopulated and Congressional
14 District 1 being roughly 12 percent overpopulated,
15 correct?
16       A. That's correct.
17       Q. You would agree that those two
18 districts are contiguous and adjacent to one
19 another, correct?
20       A. That's right.
21       Q. Before we go into this --
22       MR. TRAYWICK: Off the record real
23 quick.
24       (A lunch recess was taken.)
25       MR. TRAYWICK: Back on the record.

Page 105

1 BY MR. TRAYWICK:
2       Q. Dr. Bagley, before we got off, I
3 believe you indicated that you were asked to find
4 a history of discrimination?
5       A. I was asked to examine the process of
6 the passage of a bill that became the plan and to
7 determine if there was any evidence that would
8 influence the court in making a determination one
9 way or the other on discriminatory intent.
10       Q. But all you are willing to say is an
11 inference, not whether there is such intent?
12       A. Right.
13       Q. I now want to run through, sort of,
14 the last half of your report. Again, we talked
15 about this earlier. I pointed to a few words.
16 You said you're just reporting the facts, but
17 surely you're not -- you would acknowledge that
18 it's in a persuasive way, right?
19       A. I think that would be fair to say.
20       Q. You agreed earlier that you made
21 judgment calls on what you felt was relevant,
22 correct?
23       A. Yes.
24       Q. This is your interpretation of
25 legislative history, correct?

27 (Pages 102 - 105)

Joseph Bagley , PhD                                        June 29, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 106

1     A.  I think that's fair.
2     Q.  Page 27, would you mind flipping with
3  me there, please?
4     A.  All right.
5     Q.  Can you please explain what, quote,
6  "serious transparency concerns" you contend were
7  revealed at the September 17, 2021, meeting?
8     A.  There were a number of people -- or
9  let me see.  Let me just flip through and make
10  sure I'm with you.  You said Page 27?
11     A.  Yes, sir.  It's the third line from
12  the bottom of the first full paragraph.
13     A.  I see.
14        (The witness reviews the document, as
15  requested.)
16        THE WITNESS:  So this was -- Senator
17  Harpootlian, Senator Matthews are among those who
18  had argued at times that the process was not
19  entirely transparent.
20  BY MR. TRAYWICK:
21     Q.  We already went through that earlier,
22  the specific concerns, right?
23     A.  Some of them, yes, I think we did.
24     Q.  Are there any others that we didn't
25  cover?

Page 107

1     A.  I know it was repeated by not just
2  Senators Harpootlian and Matthews and not just at
3  this meeting.  There were other meetings where,
4  you know, for example Senator Harpootlian
5  expressed his concerns.  There were members of the
6  public that expressed their belief that the
7  process was not entirely transparent.
8     Q.  But you said, "serious transparency
9  concerns," so that indicates a heightened level.
10        What serious transparency concerns are
11  you referencing here?
12     A.  Well, Senator Harpootlian at one point
13  refers to it as a "kabuki theater."  I think at
14  one point he suggested things were being done,
15  quote, "in a back room."  I think it was said that
16  they weren't going to allow the public to, quote,
17  "look under the hood and see what was going on,"
18  and so on.
19     Q.  Do you recall whether in any prior
20  redistricting cycle whether the public was allowed
21  access to the map room?
22     A.  I don't think the public typically
23  would have access to the map room, no.
24     Q.  Do you think that's required?
25     A.  No.

Page 108

1     Q.  I apologize, I jumped ahead a little
2  bit.  Would you flip back with me to Page 25, that
3  first Senate Redistricting Subcommittee meeting?
4     A.  Yes.
5     Q.  Do you have any opinions about that
6  subcommittee meeting as it related to process
7  transparency or any other opinions you intend to
8  offer in this case?
9     A.  Any opinions I have about that meeting
10  would be in this section.
11     Q.  Can you point me to what those
12  opinions are?
13     A.  This is just a narrative of what the
14  committee did, who was on it, who staff were and
15  that sort of thing, what was the press release.
16        If you're describing a sequence of
17  events, obviously, you want to establish when the
18  committee first met and who was on it.
19     Q.  Again, this is from your perspective,
20  correct?
21     A.  Well, yes.  But, I mean, this is
22  pretty straightforward.
23     Q.  I know we discussed it earlier.  But,
24  I mean, you include things like staff played a,
25  quote, "fundamental, though often obscured, role

Page 109

1  in the process and appeared not to have been
2  available to committee members beyond leadership."
3     A.  Where is that?  Oh, this is 25, first
4  paragraph?
5     Q.  Yes, sir?
6     A.  I see.  Yes.
7     Q.  Upon what facts did you rely to
8  formulate that opinion?
9     A.  So there are multiple times throughout
10  the process where, you know, the chair is
11  conferring with staff in order to formulate a
12  response to other members of the committee --
13     Q.  Do you contend that's unusual --
14  sorry, I don't mean to cut you off.
15        Do you think that's unusual?
16     A.  I think there were opinions voiced by
17  other members of the committee who said, "We
18  didn't have, you know, as much access to staff in
19  terms of the drawing of maps."
20        I think that, you know, it was clear
21  that at times that -- for example, when there's
22  opposition to anything in terms of the plans that
23  were being put forth, it's Mr. Terreni who is
24  responding to these concerns, and it's very clear
25  that there's not been any kind of exchange between

28 (Pages 106 - 109)

Page 110

1 opponents of these maps and staff of Mr. Terreni
2 or Ms. Vincent.
3      Q.   Do you know whether members
4 affirmatively reached out to Mr. Terreni before
5 that?  And do you think it's odd that legal
6 counsel for redistricting would respond to those
7 issues?
8      A.   What strikes me is that there is the
9 dynamic that's playing out at these meetings where
10 it's clear that staff have been working with
11 leadership and with these other members who
12 subsequently expressed their concerns about the
13 process.
14      Q.   Every committee has a chairman,
15 correct, in the Senate?
16      A.   Of course.
17      Q.   Those chairmen or chairwomen are
18 responsible for hiring staff, correct?
19      A.   Right.
20      Q.   So they report to their chairman,
21 correct?
22      A.   Sure.
23      Q.   They're also available to other
24 members of the committee, correct?
25      A.   Well, I know that, for example,

Page 111

1 Senator Harpootlian said that he had to hire his
2 own map drawer.  And I think Senator Campsen told
3 him, no, you didn't.  He said, "No, I absolutely
4 did."  So there are examples like this where, you
5 know, it would seem that these other members are
6 not working with staff at all.
7      Q.   As you conceded earlier, he never
8 explained why, right?  He just said it?
9      A.   He did not explain that at that time,
10 no.
11      Q.   Turning to the next page, Page 26 of
12 your report.  Do you have any opinions about the
13 August 3, 2021, House Ad Hoc Redistricting
14 Committee Meeting?
15      A.   Let me look at this section.  Whatever
16 opinions I have are in these three paragraphs.
17      Q.   Back to Page 27.  We already discussed
18 what you allege were serious transparency
19 concerns.  Can you highlight what you meant by
20 "fundamental disagreement," about how to handle
21 the process?
22      A.   Where is that, please?
23      Q.   On Page 27.  It's in that same
24 sentence we were focus- --
25      A.   Oh, I see.

Page 112

1      Q.   Before Footnote 79.
2      A.   For example, when Representative
3 Bernstein and others expressed dismay at the
4 publication or production of a second House map
5 would be an example that they asked repeatedly why
6 are we doing this; why the need to do this; the
7 first map was supposedly a starting point; why do
8 we need to produce this map, this additional map;
9 what we could have done is amend the other.
10      Q.   Is Bernstein in the Senate?
11      A.   No.  That would be an example of the
12 House.  Let me -- this is a two-page section.  Let
13 me just skim real quick, if you wouldn't mind.
14      MR. TRAYWICK:  Sure.  Take your time.
15      (The witness reviews the document, as
16 requested.)
17      THE WITNESS:  Senator Harpootlian and
18 Senator Matthews are asking if any racially
19 polarized voting analysis was done or if they
20 intended to do that.  It was their opinion that
21 that was necessary.  And Mr. Terreni expressed his
22 opinion that it was not.
23      For Senator Harpootlian and Senator
24 Matthews, it would have been an elemental part of
25 the process in terms of not packing or cracking

Page 113

1 black voters.  And so in their opinion, that
2 should have been a part of the process.  And
3 Mr. Terreni explained it was his opinion that
4 unless they were sued, that was not necessary.
5 BY MR. TRAYWICK:
6      Q.   Anything other than RPV that you
7 describe as a fundamental disagreement?
8      A.   Senator Harpootlian asked about
9 technical assistance, and that was shot down.  So
10 those would be -- I mean, the most fundamental
11 would be RPV, which I think Senator Harpootlian
12 and Matthews argued would have been elemental to
13 this process, which that was rejected.
14      And you can see at the top of 28,
15 Senator Harpootlian says, "Well, we're just going
16 to wait for somebody to sue us."  He expressed his
17 own concern that this was, quote, "going to be
18 cooked up in a back room," and so on.  So those
19 are the fundamental disagreements.
20      Q.   So you contend the Senate was required
21 to draw maps and provide technical assistance to
22 members of the public?
23      A.   No.  I'm saying -- simply reporting
24 that Senator Harpootlian and Matthews argue that
25 that should have been a part of the process --

29 (Pages 110 - 113)

Joseph Bagley , PhD                                    June 29, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 114

1  elemental part of the process, and it was not.
2      Q.  Would you agree that the subcommittee
3  agreed to include the Gingles factors as well as
4  the case law addressing Section 2 claims as part
5  of its guidelines per Senator Harpootlian's
6  request?
7      A.  They added the Gingles and "its
8  progeny" lines to the guidelines, yes.
9      Q.  Didn't the subcommittee also include
10  Senator Margie Bright Matthews's amendments to
11  include culture and linguistics into the
12  guidelines?
13      A.  Yes, those were the two amendments.
14  Those were the only two.
15      Q.  Didn't she make that amendment
16  specifically in reference to Berkeley County?
17      A.  The Gullah-Geechee community, yes.
18      Q.  Wasn't the vote to reject Senator
19  Harpootlian's proposal to eliminate, or at least
20  place at the bottom, incumbency protection as
21  criteria -- sorry, that's a bad question.
22          Was it not a bipartisan vote to reject
23  Senator Harpootlian's amendment to include
24  incumbency protection, or at least place it at the
25  bottom of the list?

Page 115

1      A.  Yes.
2      Q.  Was it also a biracial vote?
3      A.  Yes.
4      Q.  Turn to Page 29, if you will, with
5  regard to "The House Public Hearings."  In the
6  first sentence of that third paragraph of your
7  Section D there, you say that:  "Most committee
8  members appear to have given almost no weight to
9  input received in these initial hearings."
10          Upon what reliable historical methods
11  or accepted principles did you reach that
12  conclusion?
13      A.  Well, very little was done as a result
14  of citizens' concerns in terms of what was -- what
15  transpired at the subsequent meetings.  About the
16  only thing that seems to have carried significant
17  weight were the residents of Beaufort, who had
18  come forth and expressed their concerns about
19  being in CD 1.
20      Q.  Was that the only change you contend
21  resulted from public input?
22      A.  No.  There were a few other things.  I
23  would have to scroll through.  But I would say
24  that there is a vast amount of the public
25  testimony that was not -- either not -- well, I

Page 116

1  won't say not discussed, because there were
2  members who brought a lot of it up, but in terms
3  of affecting the outcomes.
4      Q.  Do you agree that the members who
5  voted would know better whether weight was given
6  to public input?
7      A.  Could you re-ask or reframe?
8      Q.  Sure.  How do you know one way or the
9  other whether committee members gave weight and
10  what weight was assigned to public input?  Don't
11  you have to jump into their minds to do that?
12      A.  Yes.  I'm not trying to jump into
13  anyone's mind.  But what I'm saying or trying to
14  intimate there is, you know, there's not any
15  substantive discussion of a large amount of the
16  public input, at least in terms of in these
17  meetings in the public record.
18      Q.  Would you agree, a lot of moving parts
19  go into drafting a map?
20      A.  Sure.
21      Q.  A lot of different considerations?
22      A.  Yes.
23      Q.  Do you agree that a member might not
24  speak about every single consideration that went
25  through his or her mind when talking about the

Page 117

1  map?
2      A.  That's fair.
3      Q.  In debate, only certain issues rise to
4  the surface, right?
5      A.  Okay.
6      Q.  Not every single one; would you agree
7  with that?
8      A.  In a general sense.
9      Q.  Do you think the only way for senators
10  to receive public input was from those public
11  hearings?
12      A.  No.  There was a written-submission
13  window open.
14      Q.  Do you think those are the only two
15  manners in which senators could receive feedback?
16      A.  I'm sure people could hear
17  individually from constituents.  But, obviously,
18  I'm not privy to any private conversations that
19  anyone had.
20      Q.  So you don't necessarily know the full
21  universe of what constituents thought, correct?
22      A.  All I can report on is the public
23  record.
24      Q.  On Page 30, you discuss the third
25  meeting of the Senate Redistricting Subcommittee.

30 (Pages 114 - 117)

Joseph Bagley , PhD          June 29, 2022
The South Carolina State Conf vs. McMaster/Alexander

---

Page 118

1      Do you have any opinions about the
2 November 12, 2021, meeting of that subcommittee?
3    A.  The ones that are contained herein.
4    Q.  What specific opinions are you
5 authoring?
6    A.  Let me scan this two-page section.
7      (The witness reviews the document, as
8 requested.)
9      THE WITNESS:  This is the subcommittee
10 meeting wherein the subcommittee heard from
11 members of the public, who submitted their own
12 Congressional plans.  So I'm reporting here on
13 what those individuals had to say to the
14 committee.
15 BY MR. TRAYWICK:
16    Q.  Were you aware that the League of
17 Women Voters, ACLU, NAACP, and others were part of
18 the coalition?
19    A.  Yes.
20    Q.  For purposes of this redistricting
21 cycle?
22    A.  I am.
23    Q.  Was the South Carolina Progressive
24 Network Education Fund part of that coalition?
25    A.  I'm not 100 percent certain, but I

---

Page 119

1 think so.
2    Q.  Aside from that, you discuss only one
3 other person, correct -- or two other people?
4    A.  There is the young woman from
5 Stanford; Eric Johnson, of the South Carolina
6 Coalition of Black Communities; Brett Bursey of
7 the South Carolina Progressive Network Education
8 Fund.
9    Q.  Which was part of the coalition,
10 though, right?
11    A.  Right.  Yes.
12    Q.  Regarding the plan submitted that
13 added Berkeley and Horry County together, do you
14 understand the difference between the Grand Strand
15 and the Lowcountry in South Carolina?
16    A.  I do.
17    Q.  What is your understanding of the
18 difference between those two regions?
19    A.  The Lowcountry is the old planation
20 belt, the swampy lowlands to the south of the
21 state. The Grand Strand is, like, Myrtle Beach.
22 Obviously, Horry County, upper northeast coast.
23    Q.  Do you know where Senator Rankin's
24 district is located?
25    A.  I believe Senator Rankin is -- he is

---

Page 120

1 from the northeast.  He's from -- Jordan is from
2 Florence.  I believe Senator Rankin may be from
3 Horry, if I'm not mistaken.
4    Q.  Do you think he was off base for
5 suggesting that Berkeley and Horry County do not
6 share communities of interests?
7    A.  Not necessarily, but there were --
8 there seems to be a guideline for, sort of,
9 rejecting any and everything, if that makes sense.
10    What struck me of interest here, this
11 is an example of saying let's take a plan, find
12 the one thing that could be paired with the
13 guideline that doesn't fit and then grow out that
14 plan, if that makes sense.
15    Q.  I'm going to show you what will now
16 be, I believe, Exhibit 6 to your deposition, the
17 Senate redistricting guidelines. I'll give you a
18 minute to look through, as we share that in
19 Exhibit Share.  If you wouldn't mind letting me
20 know when that hits your screen.
21    (Exhibit 6, 2021 Redistricting
22 Guidelines, SC Senate Judiciary Committee
23 Redistricting Subcommittee, marked for
24 identification.)
25 BY MR. TRAYWICK:

---

Page 121

1    Q.  Do you see that, Dr. Bagley?
2    A.  We're refreshing over and over.  For
3 whatever reason, it seems to be taking a minute.
4    Q.  Take your time.  Let me know when you
5 see it.
6    A.  I think we have it now.
7    Q.  Have you seen this document before?
8    A.  Yes.
9    Q.  Is it your understanding that these
10 are the guidelines that the South Carolina Senate
11 adopted for redistricting this cycle?
12    A.  It is.
13    Q.  A minute ago in your testimony you
14 mentioned there seemed to be guidelines for
15 rejecting anything and everything.  Can you point
16 to me on which page you can find that?
17    A.  I don't mean it as stated, obviously,
18 explicitly in the guidelines.  I just mean that
19 when alternative plans are put forth, you could
20 nitpick any one single thing and say, okay, that
21 Koi (sic) doesn't match.  You know, this is --
22 doesn't respect this community of interest or that
23 community of interest, or, you know, there are too
24 many precincts that aren't kept whole, and so on.
25    Q.  The same is true for any plan, right?

---

31 (Pages 118 - 121)

Joseph Bagley , PhD                    June 29, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 122

1    A.  Right.
2    Q.  Will you look at Number 2 for me, if
3 you don't mind.  Sorry, this is Part 1,
4 Section A2, labeled "Congressional Districts."
5    A.  Yes.
6    Q.  Would you agree that one of the
7 criteria -- or I should say guidelines, to be more
8 precise, was preserving the cores of prior
9 districts?
10    A.  That is one of the considerations,
11 yes.  Specifically avoiding contests between
12 incumbents.
13    Q.  And preserving cores and respecting
14 political subdivision boundaries, correct?
15    A.  Right.
16    Q.  Dr. Bagley, are you aware of any
17 statute or case law that requires the General
18 Assembly to conduct racial polarizing analysis on
19 the front end?
20    A.  No.  I would point out, as Senator
21 Harpootlian said, that -- you know, it's his
22 opinion that if the states did that -- there is a
23 state entity that did that for, say, school
24 boards, that it was his opinion that it ought to
25 be done in this case.

Page 123

1    Q.  If attention were paid significantly
2 to that, can't we end up on the other end, too,
3 that race was considered too much?  Would you
4 agree with that?
5    A.  That is, under the Shaw paradigm, that
6 could be the case.
7    Q.  So the General Assembly would be
8 facing a lawsuit either way, right?
9    A.  I don't know if I would characterize
10 it that way.
11    Q.  Do you think an RPV would have
12 mattered here?
13    A.  Do I think RPV would matter?
14    Q.  Would have mattered here?
15    A.  You know, that's outside the scope, I
16 think, of what I'm being asked.
17    Q.  So you're just presenting what he
18 argued; you're not offering an opinion one way or
19 the other on it?
20    A.  Not on whether or not RPV analysis
21 should have been performed, no.
22    Q.  Do you know what RPV numbers are in
23 South Carolina?
24    A.  The whole state?
25    Q.  Yes.

Page 124

1    A.  How do you mean, exactly?  Could you
2 maybe restate?
3    Q.  Racially polarized voting analysis for
4 black voters in South Carolina, do you know what
5 that general trend is?
6    A.  That black voters tend to vote for
7 black candidates, but not exclusively, and that
8 white voters would tend to vote as a block to
9 block the candidates of choice for black voters.
10    Q.  Is that what RPV means, or does it
11 mean that white voters tend to vote Republican?
12    A.  I think it means both.
13    Q.  But white voters vote Democrats, too,
14 correct?
15    A.  Some of them do.
16    Q.  Do you have any idea what the
17 percentage is there?
18    A.  In terms of white South Carolinians
19 who vote Democrats?
20    Q.  Yes, sir.
21    A.  I don't know that number off the top
22 of my head.  I would hate to speculate and be
23 incorrect.
24    Q.  Sure.  I don't want you to speculate.
25 I appreciate that.

Page 125

1       So is it your position that the Senate
2 intentionally discriminated against black people
3 by not conducting an RPV analysis?
4    A.  No.  I'm simply reporting that there
5 are members of the committee that thought that
6 that should have been done, that that would have
7 been an elemental part of the process, and
8 ultimately that was not done.
9    Q.  So you don't know one way or another
10 whether that's even legally required?
11    A.  I don't offer an opinion on that.
12    Q.  Is it your position that the Senate
13 intentionally discriminated against black people
14 by relying on political data?
15    A.  Could you restate?
16    Q.  Sure.  I'll be glad to.
17       Is it your position that if the Senate
18 relied on political data, that would constitute
19 intentional racial discrimination against black
20 people?
21    A.  No.
22    Q.  On Page 31 of your report, you cite
23 Ms. Aden's testimony.  Do you see that?
24    A.  Yes.
25    Q.  Wherein, it said that black voters

32 (Pages 122 - 125)

Joseph Bagley , PhD                                    June 29, 2022
The South Carolina State Confvs.McMaster/Alexander

1 only had representation in 14 percent of the
2 state's Congressional delegation. Do you see
3 that?
4    A. Yes.
5    Q. Are you aware that the Congressional
6 delegation consists of both Congress persons and
7 U.S. Senators?
8    A. Which would include Senator Scott. So
9 what I mean there is the House representatives
10 delegation.
11    So 14 percent there. But would you
12 agree that when it's 2 out of 9 members of the
13 actual delegation, that's 22 percent?
14    A. Yes. Although -- and I don't have the
15 numbers in front of me -- I don't believe that
16 Senator Scott is the candidate of choice of black
17 voters. He is, of course, himself a black man.
18    Q. Does he not represent black people?
19 Is that your assertion?
20    A. I'm saying I don't think he is the
21 candidate of choice of black voters.
22    Q. Do you know what the numbers are on
23 that?
24    A. I don't have them in front of me.
25    Q. On Page 32, Dr. Bagley, do you have

1 any opinions about the Senate's fourth
2 subcommittee meeting?
3    A. Those are contained in Pages 32
4 through 34. Yes.
5    Q. Any opinions in particular, though?
6 This is your recitation of events?
7    A. Let me scan, please.
8    (The witness reviews the document, as
9 requested.)
10    THE WITNESS: So this particular
11 meeting was falling upon the staff drafting a
12 Congressional plan, publishing that on
13 November 23rd. Committee meets on 29th. They get
14 feedback on that. And I explain that there were
15 people who came forth with some criticism of that.
16    I'm not sure how to answer your
17 question in terms of outside of just reciting
18 what's contained in the three pages.
19 BY MR. TRAYWICK:
20    Q. Part of my deposition of you is to
21 ascertain what opinions you have. So I want to
22 make sure I understand what opinion you have here.
23    A. My opinion is that it appears, from
24 what was said at this meeting, that certain
25 lawmakers argued that they didn't have any role in

1 the process of the drafting of the map, which to
2 me would seem to be significant for the court in
3 making its determination. Public feedback was
4 also overwhelmingly negative.
5    Also, this is the meeting in which I
6 think it comes to light also that members of staff
7 had communications with the Republican National
8 Redistricting Trust.
9    Q. Do you know what those communications
10 were about?
11    A. No.
12    Q. Do you know whether the Republican
13 National Redistricting Trust played a role at all
14 in the map of this precinct?
15    A. I believe Chairman Jordan later said
16 that they provided input on the process. Someone
17 asked were they solicited, and he said, "I
18 wouldn't say they were solicited; they provided
19 input that we considered."
20    Q. Everyone provided input, right? That
21 we've been talking about; have we not?
22    A. Multiple people provided input at the
23 hearings. We're talking about behind-the-scenes
24 input.
25    Q. We talked about this earlier. There's

1 multiple ways to receive input, right? Not just
2 showing up and testifying at the public hearing;
3 would you agree with that?
4    A. Yes.
5    Q. So public feedback being
6 overwhelmingly negative, as you suggest on
7 Page 32, was just based on the folks who showed up
8 and testified, correct?
9    A. On what was available. There was
10 publicly submitted feedback in terms of written
11 testimony that the Senate published on its
12 website, references made at times to public
13 feedback that was provided.
14    There was written testimony provided
15 to the House, but to my knowledge, that was not
16 published or available. So I was unable to review
17 that.
18    Q. Would you agree that Senator Rankin
19 said at the prior meeting that a plan was going to
20 roll out in November and the committee would meet
21 again at that time?
22    A. Yes.
23    Q. So are you suggesting that staff
24 intentionally waited until Thanksgiving to dump a
25 plan on everybody?

33 (Pages 126 - 129)

Joseph Bagley , PhD                                    June 29, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 130

1     A.  I'm not suggesting that, but I'm
2  reporting that members of the committee suggested
3  that.
4     Q.  If it was ready, should they have sat
5  on it until after Thanksgiving?
6     A.  I don't offer opinion on that, other
7  than, again, reporting that some members of the
8  committee were -- took issue with that.
9     Q.  Would you agree that staff should
10 release a plan when it's ready?
11    A.  I would agree that probably all
12 members of the committee ought to be aware of the
13 timeline, aware of the parameters of a plan and,
14 you know, not be blindsided by it, and argue that
15 it was released in an untimely fashion.
16        Senator Matthews says at one point
17 that she's trying to prepare for depositions and
18 had to clear her schedule, just for example.
19    Q.  You agree that in scheduling these
20 meetings, staff has to take into account all of
21 those members' schedules, which can be difficult
22 because they're all lawyers, right?
23    A.  I can imagine.
24    Q.  Would you agree that it takes a while
25 to draft a redistricting map, or do you know?

Page 131

1     A.  It takes a while?  Yes, it's a
2  complicated process.
3     Q.  Were you aware that in November
4  plaintiffs had already filed suit?
5     A.  Yes.
6     Q.  Were you aware that the basis of that
7  suit was that the General Assembly was moving too
8  slow?
9     A.  Yes.
10    Q.  Were you aware that the position was
11 taken in these public meetings that the General
12 Assembly was somehow simultaneously moving too
13 fast?
14    A.  I think one influences the other.  If
15 you move too slow to begin with and then you're
16 under a deadline, you necessarily have to move
17 very quickly.
18    Q.  When did the census data came out?
19    A.  I understand it came out late.
20    Q.  That was abnormal, correct?
21    A.  It was the result, arguably, of the
22 pandemic.
23    Q.  Do you have any reference point for
24 how long the redistricting process took in prior
25 cycles as compared to how many weeks or months it

Page 132

1  took this cycle?
2     A.  Off the top of my head, I don't have
3  that comparison.
4     Q.  Page 32, you mention Will Roberts's
5  statements during the November 29th hearing,
6  calling this a "minimal change plan."  Do you
7  dispute that this was a minimal change plan?
8     A.  No.
9     Q.  Regarding Sun City, do you remember
10 expressing that, that Senator Margie Bright
11 Matthews brought up?
12    A.  I remember that, yes.
13    Q.  Were you aware that that change was
14 incorporated into the plan?
15    A.  It was.
16    Q.  You also indicate that staff heard
17 from Congressman Clyburn.  Do you see that?
18    A.  I do.
19    Q.  Did you think it was inappropriate for
20 the General Assembly to draw his district similar
21 to his existing one?
22    A.  Could you ask again?
23    Q.  Sure.  Do you think it was
24 inappropriate for the General Assembly to draw his
25 district similar to his existing one?

Page 133

1     A.  I know that a great many members of
2  the public and members of the committee argued
3  that under the circumstances, in their opinion,
4  that that district should not contain the black
5  voters of Columbia in the same district with black
6  voters of Charleston that, they argue, were carved
7  out of metropolitan Charleston to put together
8  that district, as have been done by necessity some
9  decades prior.
10    Q.  Even without necessity, though, in
11 2011 it was upheld, correct?
12    A.  That was upheld under the
13 circumstances at that time, yes.
14    Q.  What do you mean by "under the
15 circumstances at that time"?  That seems to be a
16 qualifier.
17    A.  All I can tell you is that the
18 testimony and the arguments of these committee
19 members were that the district as constructed as
20 such represented an unnecessary carving up of
21 black communities and putting them into that
22 district.
23    Q.  Again, only the opponents to the plan
24 argued that, correct?
25    A.  Well, yes.  They're the only ones,

34 (Pages 130 - 133)

Joseph Bagley , PhD                                      June 29, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 134

1  most of the time, saying anything at all.
2      Q.   So you contend members of the majority
3  were just numb the whole time?
4      A.   They were pretty quiet.
5      Q.   Did you include their statements in
6  your recitation of the legislative history?
7      A.   I did, and that's -- if it seems like
8  I didn't, that would be because, again, they're
9  not hardly saying anything at all.
10      Q.   Would you agree that every time you
11  did mention a statement, it was in the context of
12  what other people disagreed with them about?
13      A.   Those are pretty much the only
14  conversations that are being had.
15      Q.   You are aware that plaintiffs did not
16  challenge Congressional District 6 here, correct?
17      A.   Yes.
18      Q.   They're not challenging its
19  constitutionality, right?
20      A.   That's right.
21      Q.   How does that affect the analysis of
22  the other districts?
23      A.   How do you mean?
24      Q.   So if they're not challenging the
25  constitutionality of District 6, you would

Page 135

1  agree -- we talked about this earlier -- it's
2  contiguous and adjacent to District 1, right?
3      A.   Yes.
4      Q.   Doesn't it become a function of
5  geography and numbers at that point?
6      A.   Well, I think the point here is --
7  that people are making in the hearings and in
8  their submitted testimony, is that it's the
9  packing unnecessarily of black voters in the 6
10  that allows you to crack black voters elsewhere
11  and to minimize their numbers elsewhere and to
12  minimize their ability to get candidates of choice
13  elected in CD 1, for example.
14      Q.   Have plaintiffs brought a Section 2
15  challenge?
16      A.   No.
17      Q.   Do you know where Congressman Clyburn
18  lives?
19      A.   In Columbia, I assume.
20      Q.   Do you think it was inappropriate for
21  the General Assembly to put -- to keep Fort
22  Jackson in Congressional District 2, which is
23  currently occupied and represented by Joe Wilson?
24      A.   I understand the argument was that
25  Mr. Wilson is on the Defense Committee and it's

Page 136

1  what justified leaving that in there.  I know
2  there were people who disagreed with that pretty
3  strongly.
4      Q.   Do you recall a court addressing that
5  in prior cases, upon your review of the case law?
6      A.   I don't recall off the top of my head.
7      Q.   If Joe Wilson wins reelection and is
8  slated to become chair of the Armed Services
9  Committee, don't you think that would be helpful
10  to those constituents in Fort Jackson to represent
11  them?
12      A.   Perhaps.  But, obviously, there were
13  people who disagreed with that and thought there
14  were more paramount concerns.
15      Q.   Would you agree that the Port of
16  Charleston is important economically to South
17  Carolina?
18      A.   Of course.
19      Q.   Do you think it's important to have
20  the Majority Whip of the United States House of
21  Representatives representing one of South
22  Carolina's largest economic entities?
23      A.   I know Senator Campsen argued that it
24  was beneficiary for Charleston to have two
25  representatives for Charleston.  He said there

Page 137

1  were people arguing that, when no one actually
2  made that argument at all.
3      Q.   That you saw, right, or that you
4  heard?
5      A.   I mean, Senator Campsen could have
6  heard from constituents personally, but it's not
7  in the public record.
8      Q.   So was he limited to the public record
9  in making decisions, or could he listen to his
10  constituents back home?
11      A.   He could certainly listen to his
12  constituents.  All I have to go on is the public
13  record.
14      Q.   Would you agree that not everybody
15  comes and shows up to a hearing?  Constituents
16  make phone calls all the time.  They see people at
17  restaurants.  They see people at events.  Would
18  you agree with that?
19      A.   I would, but it seems as though
20  Senator Campsen refers, at a certain point, to
21  actually submitted written testimony.
22      Q.   Can you point to me where that was, in
23  what point of your report, and in what meeting he
24  said that?
25      A.   He certainly says he has heard from

35 (Pages 134 - 137)

Joseph Bagley , PhD

June 29, 2022

The South Carolina State Confvs.McMaster/Alexander

Page 138

1 people on that.  Chairman Jordan, I believe, is
2 one who makes reference to this mountain of
3 written testimony for people wanting Beaufort to
4 be in CD 1.  I can't find...
5      Q.  There was public testimony on that,
6 you would agree, right?
7      A.  There was some, yes.
8      Q.  Dr. Bagley, on Pages 34 through 37 of
9 your report, discussing the House Redistricting Ad
10 Hoc Committee meeting --
11      A.  Yes.
12      Q.  -- you indicate the position taken
13 before the committee, that Charleston being whole
14 ought to take precedence.  Why is that?
15      A.  Where is that in this section?
16      Q.  I'm sorry.  It's in the last sentence
17 of the third full paragraph on Page 35.
18      A.  Third full paragraph, beginning:
19 "Misdeeds"?
20      Q.  Yes, the last full sentence there.
21      A.  "Bringing the Charlotte suburbs all
22 the way down to Richland"?  Or you mean the third
23 full paragraph of the section, beginning:
24 "Mr. Cunningham"?
25      Q.  The third full paragraph, starting:

Page 140

1      A.  Yes.
2      Q.  So is it really accurate to say,
3 quote, "keep Charleston whole," when it hasn't
4 been whole?  Didn't they want the committee to
5 draw a new district to make Charleston whole?
6      A.  It depends on your point of departure,
7 I guess.  If your point of departure is the
8 existing plan, okay.  If your point of departure
9 was to say let's look at the map of voters of
10 South Carolina, keep that community whole as a
11 community, then that's a different way of looking
12 at it.
13      Q.  Preserving cores was one of the
14 guidelines, correct?
15      A.  That is one of them.
16      Q.  On Pages 36 to 37, can you point to me
17 anyone, aside from Democrats, on whom you relied
18 to formulate this recitation of events?
19      A.  This is similar to other meetings.
20 They're the ones doing the majority of the
21 talking.
22      Q.  Would you agree Chairman Jordan
23 answered their questions?
24      A.  There was no point at which he flatly
25 refused to answer a question, if that's what you

Page 139

1 "Mrs. Teague."  It's the last sentence there,
2 about what she said.  On Page 35.  Are you on the
3 right page?
4      A.  I'm sorry.  I'm sorry.  I was on 34.
5 That's my mistake.
6      Q.  Take your time.  Take your time.  I'm
7 sorry if I confused you.
8      A.  Regarding:  "An either/or situation
9 with Charleston being whole, but that, if it was,
10 Charleston being whole ought to take precedence."
11 Yes.
12      Q.  Do you agree with that?
13      A.  I don't think it's for me to offer my
14 opinion on that.  I'm simply reporting what people
15 are arguing regarding their position.
16      Q.  Do you know whether Charleston has
17 been whole at any time in the last 50 years?
18      A.  It's been split since it was
19 deliberately split in order to satisfy, at the
20 time, interpretation of the Voting Rights Act.
21      Q.  Notwithstanding what we've talked
22 about in Backus, right?
23      A.  Right.
24      Q.  The litigation that postdated Shelby,
25 correct?

Page 141

1 mean.
2      Q.  Are you aware that Representative
3 Bernstein voted in favor of the House plan?
4      A.  You cut out on me.  That she what?
5      Q.  Are you aware that Representative
6 Bernstein voted in favor of the House plan?
7      A.  At what point?
8      Q.  At every point; did she not?
9      A.  I don't have the record in front of
10 me.
11      Q.  Do you have any reason to dispute that
12 Representative Bernstein voted in favor of passing
13 the House redistricting plan this cycle?
14      A.  Could you restate?
15      Q.  Sure.  House, not Congress?
16      A.  Oh, okay.  All right.  Then, yes.
17      Q.  Do you have in here what -- any
18 explanation of what Republicans said in response
19 to the Democrats' complaints?
20      A.  Any responses that they offered, I
21 tried to effectively summarize.  There's nothing I
22 intentionally left out.
23      Q.  On Page 37, you include Chairman
24 Jordan's explanation that the House was trying to
25 work with everybody's schedules and juggle the

36 (Pages 138 - 141)

Joseph Bagley , PhD                                June 29, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 142

1 holidays; is that true?
2      A.  Yes.
3      Q.  He references a timeliness issue.  Do
4 you see that?
5      A.  Which paragraph?
6      Q.  It is the last full paragraph above
7 Subsection I, and it's that last sentence there
8 that starts with, "again."
9      A.  Yes, I see that.
10     Q.  Were you aware that litigation was
11 pending against House and Senate leadership at
12 that time?
13     A.  It was.
14     Q.  Were you aware that the Federal Court
15 had set a deadline by which the General Assembly
16 needed to act, or the parties would have to appear
17 for a status conference to discuss next steps?
18     A.  Yes.
19     Q.  In Subsection I, you mention the video
20 of the meetings starting late.  Certainly you
21 recognize that technical difficulties can arise
22 with the online videoing of hearings, correct?
23     A.  These things do happen.  It just -- it
24 was highly unfortunate in terms of that
25 potentially being, you know, an important part of

Page 143

1 the record that's just not there.
2      Q.  Certainly members of the public were
3 free to attend the meeting in person, right?
4      A.  Correct.
5      Q.  On Page 38, at the very top -- we went
6 through this earlier -- are you suggesting it was
7 a procedural irregularity for Representative
8 Newton to preside over the Judiciary Subcommittee
9 meeting at the request of Chairman Chris Murphy
10 instead of John King?
11     A.  Representative King certainly thought
12 that, as did others who later expressed solidarity
13 with him in that matter.
14     Q.  So just because John King did not
15 personally preside over a meeting, that renders
16 the process suspect?  Is that your contention?
17     A.  That was the contention of multiple
18 members of the General Assembly.
19     Q.  Was that even relating to the map that
20 got passed?
21     A.  You cut out, sorry.
22     Q.  Sorry about that.
23         Was that committee meeting even
24 related to the actual map that was ultimately
25 enacted by the General Assembly?

Page 144

1      A.  Let me skim this section.  There were
2 so many meetings.
3         (The witness reviews the document, as
4 requested.)
5         THE WITNESS:  I will tell you that
6 Representative King was very upset.  Again, there
7 were others who expressed solidarity with him.  In
8 that meeting, the only explanation given, I think,
9 was that Chairman Murphy had written a note to
10 Representative Newton.  Representative Newton then
11 didn't reference, like, any specific rule or
12 change or anything like that.  So, yes, there were
13 some serious concerns about that.
14 BY MR. TRAYWICK:
15     Q.  Were you aware that Chairman Murphy
16 was deposed recently?
17     A.  I am not aware.
18     Q.  As we mentioned earlier, the
19 plaintiffs had already sued members of the General
20 Assembly at this point, correct?
21     A.  Right.
22     Q.  Were you aware that Chairman Murphy
23 was one of the named defendants?
24     A.  Yes.
25     Q.  Are you aware that Representative

Page 145

1 Newton is a lawyer?
2      A.  Yes.
3      Q.  Are you aware that Representative King
4 is not a lawyer?
5      A.  I am aware of that, but I would say
6 this was not the explanation that was given at the
7 time.
8      Q.  Do you know what the explanation was?
9      A.  Again, I think Representative Newton
10 simply said that Chairman Murphy had written him a
11 note and asked him to preside.
12     Q.  Do you know why Chairman Murphy
13 couldn't preside at the time?
14     A.  He did not say.
15     Q.  Did you know he was sick?
16     A.  I did not know that.
17     Q.  Pages 39 to 42 is discussing the full
18 House of Representatives session, January 12,
19 2022?
20     A.  Yes.
21         MR. INGRAM:  Do you mind if we take a
22 five-minute break before you get to the next line
23 of questioning?
24         MR. TRAYWICK:  Sure.  We'll come back
25 at 2:46.

37 (Pages 142 - 145)

Joseph Bagley , PhD                                June 29, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 146

1         (A recess was taken.)
2         MR. INGRAM:  We are back and ready to
3    go.
4    BY MR. TRAYWICK:
5         Q.  Thank you, Dr. Bagley.
6         On Page 38, at the bottom there, you
7    note that:  "Representative Thigpen questioned the
8    reasoning for creating an entirely new map based
9    on complaints of one community."
10        Do you see that?
11        A.  Yes.
12        Q.  And he said:  "What made one county's
13   concerns rise to the level of triggering a whole
14   new map?"
15        Do you see that?
16        A.  I do.
17        Q.  How is that any different than what
18   Charleston was demanding?
19        A.  I can tell you there are people who
20   ask was it not possible for Beaufort and
21   Charleston to be kept whole within CD 1.  There
22   was a point in time at which Representative
23   Bernstein asked if this was possible, and Chairman
24   Jordan said he did not believe it was.  This later
25   came up where other legislators pointed out that

Page 147

1    it was their opinion it was, in fact, possible.
2         So I don't know, like Ms. Teague was
3    suggesting it might be the case, it was either/or
4    scenario, that it could have been done without
5    splitting either one of them.
6         Q.  Did it have to?
7         A.  I'm sorry?
8         Q.  Are you contending that the General
9    Assembly had to keep them both together or keep
10   them both whole?
11        A.  I'm not saying the General Assembly
12   had to do anything.
13        Q.  Because certainly they have to make
14   any number of judgment calls in putting together a
15   complex Congressional map, correct?
16        A.  That's right, as in a general sense.
17        Q.  On Pages 39 to 42 of your report, this
18   relates to the full House of Representatives
19   debate?
20        A.  Yes.
21        Q.  I'm wondering if you included anywhere
22   what any members of the majority party said about
23   the plan?
24        A.  Insofar as they said anything, it
25   should be summarized in this section.  Like I

Page 148

1    said, I'm not intentionally leaving anything out.
2         Q.  The instances in which the members of
3    the majority did speak, you then seek to discredit
4    it with what members of the minority party said,
5    correct?
6         A.  No.  I'm simply laying out the
7    dialogue, the arguments that are taking place.
8         Q.  In a fully objective manner?
9         A.  I would hope so.
10        Q.  How about on Page 39, where you opine
11   that the debate demonstrated the legislative
12   leadership's tendency to weigh some guidelines and
13   some testimony more heavily than others?
14        How did you arrive at that opinion,
15   and upon what reliable and accepted standards of
16   procedure did you base that opinion?
17        A.  Well, that's cutting to what we were
18   just talking about, the weighing of the evidence
19   of the -- I think it was the five people who came
20   forward from Beaufort, and weighing that more
21   heavily than the people that came forward about
22   Charleston.
23        Q.  As you agreed earlier, you don't know
24   how any individual member weighed various
25   evidence, do you?

Page 149

1         A.  I'm not in their mind.  Of course.
2         Q.  In discussing what happened, you agree
3    you primarily relied on the statements of
4    Democrats?
5         A.  I'm not attempting to, in the draft
6    report, to do that.  If it weighs more heavily to
7    that side, that's because they were the ones who
8    were the most vocal.  Members of the majority, as
9    I said, said very little at many of these
10   legislative sessions and hearings.
11        Q.  You're familiar with the Senate
12   procedure of a filibuster, correct?
13        A.  Yes.
14        Q.  In legislative procedure, in your
15   experience, are opponents of the legislation most
16   often the most vocal?
17        A.  In a filibuster?
18        Q.  In general, on debating any
19   legislation?
20        A.  I don't know that I would say that
21   necessarily.
22        Q.  Do you contend that opponents to
23   legislation in their opinions are dispositive of
24   legislative intent?
25        A.  I'm saying that insofar as there's a

38 (Pages 146 - 149)

Page 150

1 dearth of commentary from members of the majority
2 in my report, it is because there is a dearth of
3 that in the record. It is not a selectivity
4 issue.
5     Q.  On Page 42, turning to the "Final
6 Senate Judiciary Redistricting Subcommittee
7 Meeting, re:  Congressional Districts," would you
8 agree that Mr. Opperman submitted a plan that did
9 not satisfy the one-person/one-vote requirement?
10     A.  He explained that it -- I think the
11 deviation was 4 percent.  And his argument was
12 that that could easily be amended to fall in line
13 more closely with, you know, sort of a more
14 acceptable deviation.
15         He also offered his opinion, though,
16 that no plan had been struck, in his
17 understanding, for a deviation of -- for the
18 deviation that he had provided in that plan.
19     Q.  But you would agree, it still required
20 tinkering?
21     A.  I believe that would be a fair way to
22 characterize it.
23     Q.  Would you agree that the committee
24 heard and considered his feedback?
25     A.  I would agree that they heard his

Page 151

1 testimony.
2     Q.  Why do you think they didn't consider
3 it?  Why the qualification?
4     A.  Again, I'm not in their minds.  I
5 suppose insofar as they heard it, they considered
6 it.
7     Q.  In that same vein, on Page 43, if
8 you're not in their minds, then why did you offer
9 the opinion that Republicans wanted to maintain
10 the status quo with CD 6 as the minority-majority
11 district and keep the other districts, especially
12 the first, limited in terms of BVAP?
13     A.  This is the argument that was made
14 repeatedly, that they're packing and cracking.
15     Q.  So that's not your opinion; you're
16 saying that was just expressed as a recitation of
17 events?
18     A.  I'm saying that's supported by members
19 of the public and members of the legislature
20 making that case.
21     Q.  But not any Republicans, right?
22     A.  Correct.
23     Q.  You didn't rely on any of their
24 statements to make that decision, did you?
25     A.  I wouldn't say I relied on their lack

Page 152

1 of expression of opinions on that.
2     Q.  Let's go over that.  Didn't Senator
3 Campsen say he didn't even look at BVAP?
4     A.  He said that, to which response was
5 that, you know, they're surrounded by these charts
6 of racial numbers.  And two, I would say that I
7 doubt very seriously Senator Campsen created a
8 map.  It's the staff that are creating the maps.
9     Q.  Are you saying you don't believe him
10 about BVAP?
11     A.  I'm not saying I don't believe him,
12 no.
13     Q.  Other than that, what statements are
14 you aware of where Republican members of the
15 subcommittee or the committee discussed BVAP and
16 wanting to keep the 1st limited in terms of BVAP?
17     A.  I'm saying that that came up
18 repeatedly from opponents who were arguing that
19 this was the rationale for limiting the ability of
20 black voters in CD 1 to get their candidate of
21 choice elected.
22     Q.  From those statements alone from the
23 opponents, you then opine that Republicans wanted
24 to keep CD 1 limited in terms of BVAP?
25     A.  Where is the line and question, if you

Page 153

1 don't mind?
2     Q.  Sure.  It is in Subsection M.  I
3 believe it's the third sentence.
4     A.  So they repeatedly asserted that they
5 needed to maintain CD 6 as such, the result of
6 which would, you know, be limiting black influence
7 in the other district.
8     Q.  Is CD 6 as drawn in the map located in
9 the majority-minority district?
10     A.  Right.
11     Q.  No.  Is it?
12     A.  I believe it's just below 50 percent.
13     Q.  In the next paragraph you mention,
14 again -- you insinuate that Senator Campsen's
15 statement about the benefits of two congressmen is
16 not true.  Is that your opinion?
17     A.  I'm saying there's no evidence in the
18 record that anyone provided that argument at any
19 point.  It had never come up in the publicly
20 available record up to that point.
21     Q.  Do you have any reason to not believe
22 him when he said constituents told him that?
23     A.  Constituents may have told him that,
24 but no one submitted that in written testimony.
25 No one brought it up in any of the hearings.

39 (Pages 150 - 153)

Joseph Bagley , PhD                                          June 29, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 154

1  There was reference made to the feedback.
2        Could he have heard it at a cafe
3  somewhere or on the golf course? I don't know.
4  Maybe.
5        Q.  Do you have any idea what the
6  political affiliation was of the vast majority of
7  people who testified at public hearings?
8        A.  I have no clue.
9        Q.  Let's take this a step further.
10  Earlier in your report you made representations of
11  what former Representative Cunningham said about
12  what his former constituents told him about the
13  1st District, correct?
14        A.  He expressly said he had heard this,
15  yes, from his constituents.
16        Q.  Right.  So Senator Campsen said the
17  same thing.  Upon what methods or reliable
18  principles are you relying to make these
19  credibility determinations between Senator Campsen
20  and former Congressman Joe Cunningham?
21        A.  Because what former Congressman
22  Cunningham was saying that he had heard from
23  constituents was something that had come up
24  repeatedly, otherwise, in the public record.  This
25  assertion about two representatives for Charleston

Page 155

1  appears out of thin air.
2        It is pointed out also to not really
3  hold rational weight.  I mean, the idea that
4  Congressman Clyburn and Congressman Mace are
5  walking in lock step in Congress is absurd.  Just
6  take for example, I believe, Congressman Clyburn
7  was the only one to vote for the infrastructure
8  bill.
9        So I mean, this is not just me
10  opining.  This is pointed out in the proceeding
11  that, again, this idea that the two congressmen or
12  congress people representing the city or the metro
13  area are always acting in concert is not really
14  supported by the fact.
15        Q.  Is that what he said?
16        A.  Who?
17        Q.  It's beneficial because they act in
18  concert?  Isn't the point that it's good to have
19  the House Majority Whip representing the Port of
20  Charleston, which is a primary economic engine for
21  South Carolina, and when he's not the majority, to
22  have a Republican who also represents the
23  interests of Charleston?  Are you suggesting that
24  that's a bad thing?
25        A.  I'm saying that there was pushback on

Page 156

1  his point that indicated that people -- you know,
2  that other lawmakers didn't think that his
3  argument held much weight.
4        Q.  But you agree that it would be up to
5  the court to assign credibility determinations,
6  correct?
7        A.  Yes.
8        Q.  You don't know any of these people, do
9  you?
10        A.  No.
11        Q.  So this is all based on you just
12  watching hearings online?
13        A.  Reading the transcripts, the rest of
14  the record, et cetera.
15        Q.  On that note, did you primarily review
16  transcripts, or did you watch the hearings?
17        A.  Both.
18        Q.  Both.  What percentage would you
19  assign to each?
20        A.  I watched the entirety of the video
21  and read the transcripts in entirety.
22        Q.  So you're not suggesting that you're
23  qualified to pick who is right and who is wrong in
24  those settings, right?
25        A.  That will be up to the court.

Page 157

1        Q.  On Pages 43 to 46, this is, I believe,
2  the final full Senator Judiciary Committee
3  meeting.  Do you see that in your report,
4  Dr. Bagley?
5        A.  Yes.
6        Q.  Again, in the context of Republicans
7  presenting criteria, is the tenor of your report
8  not seeking to undermine their arguments by what
9  Democrats say?  Is that an unfair characterization
10  of your report?
11        A.  I think so.
12        Q.  How would you describe what we're
13  reading here?
14        A.  Narrative recounting of the sequence
15  of events.
16        Q.  You made judgment calls on what to
17  include, correct?
18        A.  Yes.
19        Q.  You agreed earlier you used some
20  persuasive language, correct?
21        A.  Occasionally.
22        Q.  So this isn't a fully objective thing,
23  right?  You're trying to make a point; are you
24  not?
25        A.  No.  I'm trying to lay the record

40 (Pages 154 - 157)

3:21-cv-03302-MGL-TJH-RMG    Date Filed 09/02/22    Entry Number 342-1    Page 42 of 57

Joseph Bagley , PhD                                    June 29, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 158

1 before the court. I don't think that the fact
2 that I've used a few adjectives here and there
3 would discount the objectivity of the entire
4 report.
5      Q.  Then why is the report reading as
6 trying to discount what Republicans said?
7      A.  You cut out again, I'm sorry.
8      Q.  Why is the tenor of your report
9 disagreeing with what Republicans said?
10      A.  That may be the tenor that you take
11 away from it, but that's not my intention.
12      Q.  So your intention was to provide a
13 totally neutral recitation of events?
14      A.  I'm laying the record before the
15 court.  It will be up to the court whether they
16 read it with that tenor or not.
17      Q.  So you weren't asked to find racial
18 discrimination in this case?
19      A.  No.
20      Q.  Why do you discredit the asserted
21 justifications of geographical concerns,
22 constituents consistency, minimal precinct splits,
23 and preservation of core?
24      A.  The first part of the question was why
25 do I what?  You don't have to recite the

Page 159

1 guidelines again.
2      Q.  Why do you discredit those assertions?
3      A.  I don't intend to discredit those
4 assertions at all.  All I'm doing is faithfully
5 reporting the opposition and the arguments between
6 the opposition and the supporters.
7      Q.  Did you see Senator Campsen's quote on
8 Page 44 that you included, saying that, "Zoom
9 meeting is not weighted heavier"?
10      A.  Yes.
11      Q.  There are other ways to receive input,
12 correct?
13      A.  Right.
14      Q.  Would you agree that the current plan
15 maintains the same BVAP in the Congressional
16 District 1 as the prior plan?
17      A.  It's roughly similar, yes.
18      Q.  Page 49, going to the "Summary of
19 Information For the Court to Consider" section.
20 Dr. Bagley, what recent evidence do you rely upon
21 as history of voting rights discrimination to
22 support your conclusion?
23      MR. INGRAM:  Objection.
24      THE WITNESS:  Could you restate,
25 please, Mr. Traywick?

Page 160

1 BY MR. TRAYWICK:
2      Q.  Of course.  What recent risk history
3 or what recent evidence, I should say, do you rely
4 upon as history of voting rights discrimination to
5 support your conclusion here?
6      A.  I mean, what's in the report, what we
7 discussed earlier, which -- everything we've been
8 discussing here today.
9      Q.  Can you give me a year of the most
10 recent thing you contend is relevant as evidence
11 of discrimination and voting rights?
12      A.  Well, we discussed the photo ID case.
13 We discussed --
14      (Crosstalk)
15      Q.  -- Park, right?
16      A.  Right.  We discussed the Section 5
17 objections from the 2010.  We discussed the COVID
18 litigation and so on.
19      Q.  2010s?
20      A.  I'm sorry, the 2000 OTs (sic), I'm
21 sorry.
22      Q.  You think the COVID litigation is
23 related to the voting rights discrimination?  You
24 don't think it had to do with just COVID?
25      A.  That had to do with mechanisms that

Page 161

1 were going to disproportionately affect black
2 voters.
3      Q.  You agree the witness requirement had
4 been on the books for 50 years before the
5 plaintiffs challenged it?
6      A.  Yeah, those witness requirements date
7 back to the same time as, you know, majority
8 member -- the multimember districts, membered
9 posts, these diluted schemes.  So that's not
10 surprising that that was put in place at that
11 time.
12      Q.  Do you think it's surprising that no
13 one challenged it until COVID?
14      A.  Do I think it's what?
15      Q.  Surprising that no one challenged it
16 until COVID?
17      A.  I am not sure I would characterize it
18 as surprising.
19      Q.  As we discussed earlier, the U.S.
20 Supreme Court stayed the ruling about the witness
21 requirement, correct?
22      A.  Yes.
23      Q.  Were you aware that the plaintiffs
24 then dismissed the lawsuit after that?
25      A.  Yes.

41 (Pages 158 - 161)

Joseph Bagley , PhD                                June 29, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 162

1    Q.   Are you aware that the General
2 Assembly passed election reform this session?
3    A.   Yes.
4    Q.   Are you aware that that retained the
5 witness requirement?
6    A.   Yes.
7    Q.   Are you aware that it got rid of the
8 excuse requirement?
9    A.   Yes.
10    Q.   Are you aware that that passed with
11 large bipartisan support?
12    A.   I don't know what the exact vote was
13 on that, but if you represent that.
14    Q.   Would you agree that the General
15 Assembly during COVID got rid of the excuse
16 requirement before both the primary and the
17 general election in 2020?
18    A.   Could you restate, I'm sorry?
19    Q.   Sure.  Were you aware that the General
20 Assembly temporarily got rid of the witness -- not
21 the witness requirement -- the excuse requirement
22 for both the primary and the general election in
23 2020?
24    A.   Temporarily, right.
25    Q.   They now, after seeing how it worked,

Page 163

1 agreed to get rid of it permanently, correct?
2    A.   Yes.
3    Q.   So are you suggesting any illicit or
4 discriminatory motive behind that?
5    A.   That's really not the subject of my
6 report.  It's sort of, in terms of getting into
7 the weeds in the details, that is really outside
8 of the scope.
9    Q.   I'm trying to draw the line from that
10 redistricting, right, because the evidence of
11 discrimination has to be probative of the
12 decisions which were made earlier, right?
13    A.   Right.
14    Q.   Dr. Bagley, did you consider any other
15 possibilities here aside from race?
16    A.   Of course.  Politics, for example.
17    Q.   Can you point me to any examples in
18 your report where you assign credibility to a
19 Republican's statement regarding legislative
20 intent?
21    A.   I don't know how you would
22 characterize "assign credibility."
23    Q.   Or took them at face value without
24 saying what Democrats said to undermine it?
25    A.   I think it's all presented at face

Page 164

1 value.
2    Q.   I believe that's all the questions I
3 have about your initial report.  Do you have any
4 other opinions regarding your initial report that
5 we haven't covered thus far?
6    A.   No.
7    Q.   At this time let's turn to your
8 rebuttal report.
9         MR. TRAYWICK:  I believe this will be
10 marked as Exhibit -- are we on Exhibit 6 or 7?
11         MR. INGRAM:  7.
12         MR. TRAYWICK:  Thank you.
13         (Exhibit 7, Dr. Bagley Congressional
14 Rebuttal Report, marked for identification.)
15 BY MR. TRAYWICK:
16    Q.   I'll put that up on the screen.  Do
17 you see that, Dr. Bagley?
18    A.   Yes.  And I have it here, a clean
19 copy.
20    Q.   Excellent.  Thank you.
21         At the beginning of your report, you
22 recognize that Sean Trende did not mention
23 anything about your report or Arlington Heights,
24 correct?
25    A.   That's correct.

Page 165

1    Q.   So what was the purpose of you
2 drafting a rebuttal report?
3    A.   I was asked to examine it and to offer
4 my opinions as to whether it supported or
5 undermined any of my findings, even if it didn't
6 respond within that same framework.
7    Q.   Findings, what do you mean by that?
8    A.   Anything that I put forth in my
9 report.
10    Q.   I'm trying to better understand it.
11 The last half of your report, you said, was an
12 historical account of the legislative record,
13 right?
14    A.   But in my summation, I said that it's
15 my opinion that there is evidence here that the
16 court might use to find an inference of
17 discriminatory intent.
18    Q.   That section was written with an eye
19 towards that conclusion, correct?
20    A.   It wasn't written with an eye towards
21 that.  That's the conclusion I came to after
22 having reviewed all of that.
23    Q.   If Mr. Trende did not mention
24 Arlington Heights or other things about your
25 report, what was the purpose of your rebuttal?

42 (Pages 162 - 165)

Joseph Bagley , PhD                                    June 29, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 166

1        MR. INGRAM:  Objection.
2        THE WITNESS:  The purpose of the
3   rebuttal was simply to examine that report and
4   offer my opinion on it as it relates to my report
5   in any way.
6   BY MR. TRAYWICK:
7        Q.   On Page 2 of your report, if you turn
8   to that.
9        A.   Yes.
10       Q.   Thank you.  Is it your position that
11  Trende does not rely on any contemporaneous
12  statements surrounding the Congressional plan of
13  passage?
14       A.   The sentence says that:  "He does not
15  speak to the history of discrimination."
16            He may reference some contemporaneous
17  statements.  I seem to recall it was simply an
18  analysis of -- to what may have been the
19  justifications for certain aspects of the plan.
20       Q.   That were articulated, though,
21  correct?
22       A.   I'm sorry?
23       Q.   That were articulated, correct?
24       A.   Right.
25       Q.   The members have repeatedly called the

Page 167

1   enacted plan a "minimal change plan"?
2        A.   Staff described it that way.
3        Q.   How about members?
4        A.   Potentially, yes.
5        Q.   Do you have any reason to disagree
6   with Mr. Trende's opinions, the changes to the
7   post-2010 Congressional map were, quote, "modest"?
8        A.   I know that some members considered
9   them to be more significant than others.
10       Q.   Did you have occasion to look at the
11  core retention scores for each of the seven
12  districts in the enacted plan?
13       A.   At one point in time, yes.
14       Q.   Would you agree that five districts
15  scored in the 90s?
16       A.   Yes, if memory serves.  Was the one
17  outlier -- how many did you say?
18       Q.   I said five.
19       A.   So two outliers, probably one of which
20  was CD 1.
21       Q.   Right.  So one scored 82, and another
22  one in the high 80s.  That would have been CD 1
23  and CD 6.  Does that sound right?
24       A.   Yes.
25       Q.   Of course, one was 12 percent

Page 168

1   overpopulated, and one was 12 percent
2   underpopulated, correct?
3        A.   Right.
4        Q.   Why do you take issue with Trende
5   expressing politics as a driver behind the
6   Congressional plan that was enacted?
7        A.   No one ever said that.  Not only that,
8   but it was that -- that was put forth as an
9   accusation and flatly denied, in fact, at one
10  point.
11       Q.   Wasn't that in the context of being
12  accused of a partisan gerrymandering and not just
13  that politics was involved?
14       A.   I don't understand the difference.
15       Q.   Well, the Supreme Court, has it not,
16  has repeatedly said that politics are fine, the
17  question becomes when it's too much and when it
18  becomes an unlawful partisan gerrymander.  Would
19  you agree with that?
20       A.   Yes.  They didn't say we didn't, you
21  know, go too far; this is -- you know, we didn't
22  engage in -- well, politics was never put forth as
23  a motivating factor by anybody in the materials
24  that I reviewed.
25       Q.   Which included what?

Page 169

1        A.   What were the materials I reviewed?
2   The sequence of events, the hearings, the
3   transcripts, the legislative floor debates, and so
4   on.
5        Q.   Do you agree that the court in cases
6   only prevents post hoc justification after passage
7   of the plan?
8        A.   Could you say it again, please?
9        Q.   Would you agree with me that the case
10  law only prevents post hoc justifications after
11  passage of the plan?
12            MR. INGRAM:  Objection.
13            THE WITNESS:  Yeah, I'm not intimately
14  familiar enough with that particular aspect of the
15  case law.
16  BY MR. TRAYWICK:
17       Q.   Well, assuming it was, does it matter
18  when in the process members vote or explain their
19  justifications for the enacted plan as long as
20  it's prior passage, in your opinion?
21       A.   I know that they offered
22  justifications at every step of the way, and that
23  was not among those justifications listed that
24  were put forth.
25       Q.   Would you agree that for a lot of

43 (Pages 166 - 169)

3:21-cv-03302-MGL-TJH-RMG    Date Filed 09/02/22    Entry Number 342-1    Page 45 of 57

Joseph Bagley , PhD                                      June 29, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 170

1 members, in the beginning, they may not have had a
2 ton of time to study it, but had time to study the
3 plan as it progressed? Would you agree with that?
4      MR. INGRAM: Objection.
5      THE WITNESS: I suppose that's true.
6 BY MR. TRAYWICK:
7      Q. Are you assuming bad faith by them
8 offering various justifications?
9      MR. INGRAM: Objection.
10     THE WITNESS: I'm not assuming bad
11 faith. I'm just simply saying that this never
12 came up.
13 BY MR. TRAYWICK:
14     Q. So do you have any opinions about the
15 debate that was had on the plan and whether
16 justifications offered were credible?
17     A. I am not sure how that's relevant to
18 the rebuttal report. Maybe just ask again or
19 rephrase.
20     Q. Sure. I'll tell you how it's
21 relevant. On Page 2, it says: "Lawmakers did not
22 seriously consider issues of core retention."
23     Upon what evidence do you rely to make
24 that assertion?
25     A. That didn't come up until very, very

Page 171

1 late in the process. In fact, Mr. Opperman
2 brought it up in regards to the whole county plan,
3 and then all of a sudden it became a talking
4 point. I mean, it's not something that up to that
5 point had ever come up in the proceeding, at least
6 in the public record.
7      Q. Would you agree that preservation of
8 cores and constituent consistency were both
9 factors adopted in the very first meeting of the
10 Senate Redistricting Subcommittee and Guidelines
11 for Redistricting?
12     A. They were adopted. That was part of
13 the guidelines that were adopted, but it never
14 came up again at all until late in the process.
15     Q. Prior to passage, though, right?
16     A. At the very tail end.
17     Q. Why is that significant, in your mind?
18     A. Because it seems as if it was, you
19 know, only something that was brought in at the
20 very end as a late-stage justification.
21     Q. So you don't believe it?
22     A. I'm not saying that.
23     Q. Then what are you saying?
24     A. About what?
25     Q. How do you think that's relevant when

Page 172

1 it came in? Because it's during the debate about
2 the plan, why does which committee meeting or
3 which hearing it arose in matter, from your
4 perspective?
5      A. I don't understand why it wouldn't
6 matter.
7      Q. Can you explain why it matters?
8      A. Well, it matters because it's not
9 something that was discussed at all for these
10 many, many weeks and months, and then all of a
11 sudden it's not just something that comes up, but
12 something that comes up repeatedly, repeatedly,
13 repeatedly.
14     I think if anybody reviewing anything
15 were to see something just pop out of thin air and
16 then be, like, repeatedly pounced upon, you would
17 think that's significant in some way, shape, or
18 form.
19     Q. Do you know when in the process
20 Senators were able to focus on Congressional
21 redistricting?
22     A. Senators broadly, outside of the
23 committee?
24     Q. Any of them?
25     A. I don't know their personal schedules,

Page 173

1 if that's what you mean.
2      Q. Sure. So then why infer a nefarious
3 motive about when they brought up justifications?
4      MR. INGRAM: Objection.
5      THE WITNESS: I'm simply reading
6 Mr. Trende's report and responding and saying that
7 it's significant to me that this was not an issue
8 until very late in the process.
9 BY MR. TRAYWICK:
10     Q. So then take it a step further. And
11 why is it significant to you? What does that
12 show, in your view?
13     A. It shows me that possibly this is
14 something that an attorney said, hey, you could
15 focus on this, and this will let this pass muster.
16     Q. Do you think attorneys advise
17 Democrats on things to say and put in the public
18 record?
19     A. Sure.
20     Q. You seem to take issue with
21 phraseology here. Would you agree that everyone
22 knew what the benchmark plan meant?
23     A. That everyone knew what that meant?
24     Q. Yes.
25     A. And referring to the existing or 2010

44 (Pages 170 - 173)

Joseph Bagley , PhD                                 June 29, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 174

1  plan?
2      Q.  Right.
3      A.  I think they understood what was meant
4  by that.
5      Q.  Do you know one way or the other if
6  Senators or their staff consulted with the
7  Republican National Redistricting Trust in
8  drafting the plan?
9      A.  My understanding is that Chairman
10  Jordan said that their input was received.  I
11  don't know the nature of that.  I just know that
12  it came off at the hearing with former
13  Representative Cunningham, and it was later said
14  by Chairman Jordan that their input had been
15  received.
16      Q.  Do you know whether Mr. Cunningham had
17  any firsthand knowledge as to whether that
18  occurred?
19      A.  I don't know what Mr. Cunningham had
20  personal knowledge of.
21      Q.  Even if they did, what would be the
22  problem with that?  That's just politics, right?
23      A.  Well, certainly people seem to take
24  issue with it over the course of the hearings.
25  And I think you have to just pose it with the fact

Page 175

1  that members of the committee are saying we
2  ourselves didn't have anything to do with the
3  drafting of the map, so why consult a national
4  entity when you're not even consulting the members
5  of the committee itself?
6      Q.  But you don't know one way or another
7  whether that occurred, right, as we already
8  established?
9      A.  Whether what occurred?
10      Q.  Whether those conversations occurred
11  or whether they played a role in the map?
12      A.  According to their own telling of it,
13  they -- Harpootlian at one point said, "This group
14  had more input than I did," in this opinion.
15      Q.  Did he know that, or was he asking
16  questions before he made that assertion?
17          MR. INGRAM:  Objection.
18          THE WITNESS:  I can just tell you that
19  there are instances where he and others said that
20  they had little to no input in the process.
21  BY MR. TRAYWICK:
22      Q.  Have you read Rucho V. Common Cause?
23      A.  Broadly familiar with it.
24      Q.  Since you're an historian, did you
25  read the Court's history of the role that politics

Page 176

1  has played in redistricting?
2      A.  I mean, I don't -- it's been a while
3  since I've read Rucho, so I could not present to
4  you the particulars of that opinion.
5      Q.  Do you agree that politics does play a
6  role in redistricting, regardless of the party in
7  charge and regardless of the level of government?
8      A.  I understand that the Supreme Court
9  has said that it's acceptable up to a point.
10      Q.  On Page 3, about Senator Harpootlian's
11  proposal for guidelines, are you aware that the
12  vote not to accept some of his guidelines was a
13  bipartisan one?
14      A.  Yes.
15      Q.  Have courts repeatedly recognized that
16  incumbency protection is a proper consideration in
17  redistricting?
18      A.  Yes.
19      Q.  So was there any specific point for
20  including the fact that the subcommittee did not
21  adopt Senator Harpootlian's plan or guidelines?
22      A.  Where is this on Page 3?
23      Q.  Yes.
24      A.  Where on the page, I'm sorry?
25      Q.  I'm sorry.  The bottom paragraph.

Page 177

1      A.  I think the point there is that he
2  suggested the guidelines be lifted as a hierarchy
3  with the preservation of the core of the district
4  last in all considerations, and that was not
5  adopted.
6      Q.  Is it your opinion that anything was
7  wrong with the process because folks disagreed
8  with those guidelines?
9          MR. INGRAM:  Objection.
10          THE WITNESS:  Not necessarily.
11  BY MR. TRAYWICK:
12      Q.  Do you recall saying in your last
13  deposition that Backus was haphazardly litigated?
14      A.  Yes.
15      Q.  Do you realize that he was counsel of
16  record for that case?
17      A.  I do.  If memory serves, the court did
18  not find the plaintiffs' expert to be credible.
19      Q.  And in your own report you recognize
20  that the court found the defendants disproved any
21  racial discriminatory intent, right?
22      A.  Right.
23      Q.  With regard to Mr. Cunningham's
24  testimony, you recognize he's running for
25  governor, right?

45 (Pages 174 - 177)

Joseph Bagley , PhD                                   June 29, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 178

1    A.  I do.
2    Q.  Do you think any of that testimony at
3  either hearing had to do with politics?
4    A.  It's inherently so, yes.  It's not
5  like former Representative Cunningham came forth
6  with -- or was the only person to come forth with
7  the concerns that he did.
8    Q.  In both of your reports, Dr. Bagley,
9  it mentions this looming Republican National
10 Redistricting Trust, but you also seem to indicate
11 that politics is nowhere mentioned regarding the
12 map.  How do you reconcile those positions?
13       MR. INGRAM:  Objection.
14       THE WITNESS:  Well, it took the
15 accusation from Mr. Cunningham for that to come
16 up, number one.  Number two, the point is not that
17 politics had nothing to do with it; I'm saying
18 that nobody put forth the notion that what they
19 were doing was trying to take or to -- yes, to
20 take CD 1 out of competitive territory.
21 BY MR. TRAYWICK:
22    Q.  The primary argument there advanced by
23 Mr. Cunningham was that Charleston needed to be
24 kept whole, correct?
25    A.  That was one of the focal points in

Page 179

1  his testimony, yes.
2    Q.  You're aware it hasn't been whole for
3  at least 50 years?
4    A.  Since it was drawn as a
5  majority-minority district, yes.
6    Q.  That includes court-drawn and
7  court-approved plans, correct?
8    A.  Yes.
9    Q.  Again, a lot of the legislative
10 history here seems to focus on what opponents to
11 the legislation said.
12       I believe on Page 6 of your report, if
13 you wouldn't mind turning there with me, you
14 recognize that Representative King said, "The map
15 did nothing but empower one particular party for
16 the next ten years"?
17    A.  Yes.
18    Q.  So if you think what opponents say is
19 relevant to legislative intent, do you believe
20 that that is relevant to whether partisan
21 advantage was used in this map?
22    A.  Could you restate, please?  I'm sorry
23 to ask you to do that so many times.
24    Q.  No.  Sure.  It was probably a bad
25 question.

Page 180

1       Representative King was on the
2  unsuccessful voting side of the plan, correct?
3    A.  Right.
4    Q.  Throughout your report and your
5  rebuttal, you emphasized what opponents to the
6  legislation said, correct?
7    A.  Not trying to emphasize it.  I would
8  say that just cuts back again to the dearth of
9  commentary to those who voted in favor.
10    Q.  So then if you think that's relevant,
11 do you think that their comments are relevant to
12 legislative intent?
13    A.  Yes.
14    Q.  So then do you think his comment that
15 he said:  "The plan did nothing but empower one
16 political party for the next ten years," is
17 indicative that partisan advantage was used?
18    A.  So then why do we have to hear it from
19 him?  Why do we have to hear about the motivations
20 of those who voted in favor from Representative
21 King.
22    Q.  That wasn't my question.
23    A.  Could you use that in terms of
24 inferring intent?  Sure.
25    Q.  Certainly you're not suggesting that

Page 181

1  members of the General Assembly could only use
2  comments made by the public in offering their own
3  reasons for passing a map, right?
4    A.  Right.
5    Q.  So then throughout the report, you
6  know, you mention certain principles of
7  redistricting that members of the public said, but
8  then when members rely on those, you discredit
9  them because they're not linked to exactly what
10 the public said.
11       MR. INGRAM:  Objection.
12 BY MR. TRAYWICK:
13    Q.  I'll give you an example.  So
14 Opperman, "preserving district cores," and ...
15    A.  Yes, Opperman is the first person to
16 really substantively bring it up.
17    Q.  And then traditional and geographical
18 and things like that.  So if Senators who then
19 defended the plan offered those as justifications,
20 are you saying they couldn't just because they
21 were not expressed as Mr. Opperman expressed them?
22    A.  They weren't expressed at all up to
23 that point.
24    Q.  They were expressed before they
25 passed, right?

46 (Pages 178 - 181)

Joseph Bagley , PhD                                          June 29, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 182

1      A.  At the 11th hour.
2      Q.  Again, what does that have to do with
3  whether that's a valid justification or not?  Are
4  you saying that's not a valid justification
5  because of when they asserted it?
6      A.  The court can determine whether
7  there's value in that or not.
8      Q.  So you agree you're not qualified to
9  do that, to evaluate credibility of legislative
10  intent, correct?
11      A.  I'm not making a determination myself
12  of legislative intent.
13      Q.  Coming pretty close, though, right?
14      MR. INGRAM:  Objection.
15      I want to take a break.
16      MR. TRAYWICK:  Let me ask just a couple
17  more questions, then I'll be at a logical breaking
18  point, if you don't mind.
19      MR. INGRAM:  Perfect.
20  BY MR. TRAYWICK:
21      Q.  Do you think perhaps that Senators had
22  an opportunity to review and study the plan, and
23  that's when changes were made and justifications
24  were offered prior to its passage?
25      A.  If we're talking about the members

Page 183

1  that are on the committee, I don't understand why
2  it would not have come up at all up to that point,
3  and they needed their other Senators that are not
4  on the committee to have time to fully study
5  something, but they're having conversations with
6  staff.  I don't understand why it would not come
7  up at all when explaining the parameters of the
8  map.
9      Q.  So you agree there were conversations
10  with the staff, right?
11      A.  I assume that there were.  I'm not
12  privy to those.
13      Q.  Do you think Senators understand
14  communities of interest in their areas?
15      A.  Of course.
16      Q.  On Page 6 of your report, you've said
17  a couple times that you were at the meeting.  You
18  attended these virtually, though, correct?
19      A.  Where is this, I'm sorry?
20      Q.  Sorry, Page 6.
21      A.  You're referring to whom?
22      Q.  I think you said: "I was at the
23  meeting."
24      A.  I don't believe that I said that.  If
25  I did, that was a mistake.  Could you point me to

Page 184

1  where it is?
2      Q.  Yes.  I'm trying to find it.  It's in
3  my notes.
4      A.  Let me just say that I attended no
5  meetings.
6      Q.  Fair enough.
7      MR. TRAYWICK:  We can take a quick
8  break.  And then I think I'll be rounding third,
9  coming home.
10      MR. INGRAM:  Perfect.  We'll come back
11  at 3:40.
12      (A recess was taken.)
13      MR. TRAYWICK:  Back on the record.
14  BY MR. TRAYWICK:
15      Q.  Dr. Bagley, I'm sorry, I meant to ask
16  you this:  Have you spoken regarding the substance
17  of your testimony with Mr. Ingram or any other
18  attorneys during the breaks?
19      A.  No.
20      Q.  Do you agree that constituent
21  consistency can be considered in tandem with other
22  guidelines for redistricting?
23      A.  Yes.  Sure.  Yes.
24      Q.  Do you agree that the plan enacted for
25  the 1st District follows natural geographical

Page 185

1  boundaries?
2      A.  Yeah.  Senator Campsen made that
3  point.
4      Q.  He's from the Charleston area,
5  correct?
6      A.  Yes.
7      Q.  He's chairman of the Fish, Game and
8  Forestry Committee, correct?
9      A.  Yeah.  I think he was -- didn't he --
10  he's a ship captain of some sort, if memory
11  serves.
12      Q.  So he had great knowledge of the
13  waterways surrounding the Port of Charleston,
14  correct?
15      A.  I would think so.
16      Q.  Do you agree that the enacted plan
17  significantly reduces the number of precinct
18  splits?
19      A.  That was one of the things that was
20  touted about the plan.
21      Q.  Would you agree that members of the
22  public voiced that concern?
23      A.  It came up a few times.
24      Q.  Do you agree, it can be confusing when
25  you and your neighbor vote at the same precinct,

47 (Pages 182 - 185)

Page 186

1 but they're in different districts?
2     A.   That concern was voiced a time or two.
3     Q.   Would you agree that the General
4 Assembly recognized and addressed that problem in
5 the enacted plan?
6     A.   They made some precincts whole, yes.
7     Q.   You would agree, the General Assembly
8 incorporated that public feedback into the plan?
9     A.   I would say that was among the
10 considerations.
11     Q.   Would you agree, the General Assembly
12 disagreed with some of the public testimony it
13 received, such as keeping Charleston whole, and
14 did not incorporate that into the plan?
15     A.   That is correct.
16     Q.   Would you agree that that's how
17 legislation works?  I mean, take some, disagree
18 with them?
19          MR. INGRAM:  Objection.
20          THE WITNESS:  I suppose that's true.
21 But I think the takeaway in terms of my reports
22 would be that a few citizens here or there talked
23 about precincts.  Whereas, you had a very, very
24 significant amount of testimony regarding
25 Charleston throughout the process.

Page 187

1 BY MR. TRAYWICK:
2     Q.   So does the mere fact that the General
3 Assembly chose not to keep Charleston whole render
4 this a racial gerrymander?
5     A.   In and of itself, no.
6     Q.   On Page 9 of your report, if you don't
7 mind flipping there with me.  You mentioned that:
8 "Some members of the public spoke about the
9 precinct splits, but seemed to take the committee
10 to task for not considering what else they had to
11 say."
12          Is that a fair reading of what you
13 said?  Or if not, can you explain?
14     A.   Is this which paragraph?
15     Q.   At the beginning, the first two.
16     A.   So they asked the committee not to
17 split precincts, but also expressed their concerns
18 about packing, cracking, and minority vote
19 dilution.
20          What was your question?
21     Q.   So with regard to -- I'm sorry, I'm
22 down in the third paragraph, precinct splits and
23 natural geographical boundaries.  Do you agree, or
24 is it your opinion that all of the concerns
25 expressed by the public had to be considered

Page 188

1 together, or that the General Assembly could agree
2 with some and maybe not necessarily others?
3     A.   It could certainly elect to agree with
4 some, agree with others, ignore others, dismiss
5 others.
6     Q.   Do you have an opinion about the
7 repeated call for a nonpartisan independent
8 redistricting commission?
9     A.   I know that came up quite frequently.
10 I know that that has been rejected.
11     Q.   For purposes of this cycle, that ship
12 had already sailed, right?
13     A.   You did the cutting out thing again.
14 I heard "ship sailed."
15     Q.   For purposes of this cycle that the
16 committee constituted in doing its work, that ship
17 had already sailed, right, in terms of --
18     A.   I understand that that was rejected,
19 yes.
20     Q.   On Page 10, right before your
21 conclusion, you rely upon a number of the public
22 criticizing the committee for scheduling.
23          You know, you're not suggesting that
24 staff intentionally scheduled a meeting to
25 interfere with Yom Kippur, are you?

Page 189

1     A.   No.
2     Q.   Because, you would agree, it's
3 difficult to schedule meetings with lots of
4 different members' schedules and to find
5 locations, particularly for those public hearings,
6 right?
7          MR. INGRAM:  Objection.
8          THE WITNESS:  I understand that there
9 are a number of considerations that would go into
10 scheduling.
11 BY MR. TRAYWICK:
12     Q.   You would agree, the Senate had a lot
13 of public hearings around the state, right?
14          MR. INGRAM:  Objection.
15          THE WITNESS:  They had a number of
16 hearings around the state.
17 BY MR. TRAYWICK:
18     Q.   I'm not trying to take words out of
19 your mouth, but I heard you say "a lot" earlier.
20 I was trying to make sure I understood that
21 recollection.
22     A.   Sure.  I should say this is just one
23 example of a number of people expressing their
24 concerns over scheduling matters.
25     Q.   Right.  But does that really have any

48 (Pages 186 - 189)

Joseph Bagley , PhD                                    June 29, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 190

1 significance on the legislative process and
2 procedure? I mean, calendars are tough. You
3 would agree, right?
4          MR. INGRAM: Objection.
5          THE WITNESS: I found it significant.
6 The court can take it or leave it.
7 BY MR. TRAYWICK:
8      Q. So you find it significant that one
9 member suggested -- one member of the public
10 suggested that a hearing in Beaufort was
11 intentionally held to conflict with the sundown of
12 Yom Kippur?
13          MR. INGRAM: Objection.
14          THE WITNESS: First, I don't think that
15 she said -- I don't think she accused them of
16 doing it deliberately, as such. I would say I
17 considered this alongside other concerns about
18 scheduling, not in and of itself.
19 BY MR. TRAYWICK:
20      Q. Would you agree that redistricting was
21 not the only thing going on in the Senate, in the
22 Senators' professional lives, or in their personal
23 lives?
24          MR. INGRAM: Objection.
25          THE WITNESS: I just lost battery power

Page 191

1 in one of my headphones. I anticipate the other
2 one -- losing it very soon. Could I take a minute
3 or two and let me disconnect and simply have
4 computer audio?
5          MR. TRAYWICK: Of course. Yes. And
6 I'm getting close, so no need to take a long
7 break. Of course we'll accommodate you. Just let
8 me know when you're ready.
9          THE WITNESS: Are you able to hear me?
10          MR. TRAYWICK: Yes, sir. Can you hear
11 me?
12          THE WITNESS: I can't hear you.
13          (Discussion off record.)
14 BY MR. TRAYWICK:
15      Q. I think before that I was asking -- I
16 mean, would you agree that redistricting is not
17 the only thing going on in the Senators' lives as
18 it relates to their Senate work or their
19 professional work or even their personal lives?
20      A. Of course.
21      Q. As we established earlier, they're
22 part-time, correct?
23      A. Right.
24      Q. The census data came in the late
25 summer/early fall 2021; is that right?

Page 192

1      A. Yes.
2      Q. So the timeline was even more
3 compressed than in prior redistricting cycles;
4 would you agree with that?
5      A. Yes.
6      Q. Did you agree that that would have an
7 effect on scheduling inherently?
8      A. I suppose that would be of some
9 effect, yes.
10      Q. Were you also told of the
11 court-imposed deadline by which the General
12 Assembly needed to enact redistricting plans
13 because the plaintiffs here had filed a lawsuit in
14 Federal Court?
15      A. I understand that that was -- there
16 were pending deadlines.
17      Q. At the end of your report, Dr. Bagley,
18 it suggests that -- I'm sorry, at the bottom of
19 Page 10: "Members of the public wanted the
20 General Assembly to start from scratch."
21          Do you see that? It's the last line
22 there above the line, not the footnotes, but the
23 last sentence above the line on Page 10. Do you
24 see that?
25      A. Yes.

Page 193

1      Q. Was that required by or consistent
2 with the guidelines adopted by the Senate
3 Redistricting Subcommittee?
4      A. That the map be drawn from scratch?
5      Q. Right.
6      A. No.
7      Q. Would you agree that Will Roberts, who
8 was in the first meeting, described the plan as a
9 "minimal change plan"?
10      A. He did say that at one point, yes.
11      Q. Do you think that's consistent with
12 the core preservation?
13      A. I guess it depends on what you mean or
14 what you want to emphasize in terms of core
15 preservation. You know, is it strict percentage,
16 or is it avoiding incumbency issues, pitting
17 incumbents against each other, taking them out of
18 their districts.
19      Q. Do you agree that those concepts can
20 be interrelated, the concepts of preservation of
21 core, incumbency protection, and minimal change?
22      A. Sure.
23      Q. Is it your opinion that there's no
24 evidence whatsoever that partisanship was used?
25      A. I wouldn't say that. I would just say

49 (Pages 190 - 193)

Joseph Bagley , PhD                          June 29, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 194

1  that members of the committees did not offer
2  partisan advantage as an explanation during the
3  process.
4      Q.  So on Page 11 of your report, it's the
5  last, sort of, substantive paragraph before you
6  reserve the right down there.  You said: "There
7  was no evidence whatsoever."
8          Are you kind of walking that back a
9  little bit now?
10     A.  No.  I'm saying, among the materials
11  that I reviewed, that there is no evidence with
12  the express purpose behind this that that was the
13  motivation.
14     Q.  But you're not suggesting that there
15  was no partisan motivation behind it, are you?
16     A.  There may have been.  I'm just saying
17  it was not put forth at all during process as a
18  justification.
19     Q.  Just to recount, the second half of
20  your primary report and a good portion of your
21  rebuttal report are your interpretation of the
22  legislative history in this case?
23     A.  It's my narrative recounting of what
24  transpired as it relates to the issues at hand.
25     Q.  From your perspective, correct?

Page 195

1          MR. INGRAM:  Objection.
2          THE WITNESS:  Insofar as I wrote it,
3  it's my perspective.
4  BY MR. TRAYWICK:
5      Q.  Dr. Bagley, do you intend to offer any
6  additional opinions in this matter, other than the
7  ones we have discussed today or in the reports?
8      A.  If I were provided with any other
9  evidence, I may submit a supplement to my report.
10  I don't anticipate that being the case, but it
11  may.
12         MR. TRAYWICK:  I appreciate that.
13         Well, given that we have some
14  privilege issues over communications outstanding,
15  I'm going to respectfully reserve the right to
16  leave the deposition open.  But at this time I'll
17  turn it over to any co-counsel, brother parties
18  who may have questions for you.
19         I do appreciate your time, again,
20  today.  Thanks so much for working with me on all
21  of these technical issues and getting through all
22  of this stuff.  I really do appreciate it.
23         THE WITNESS:  Of course.  You're
24  welcome.
25             EXAMINATION

Page 196

1  BY MS. HOLLINGSWORTH:
2      Q.  Can you hear me, Dr. Bagley?
3      A.  Yes, I can.
4      Q.  If it's all right, I'll go ahead.
5          I'm Jennifer Hollingsworth, here on
6  behalf of the House defendants.  We have met
7  before at your deposition previously in this case.
8  I don't have many questions.  Counsel for the
9  Senate did a good job of walking through all of
10  the very important issues.  But I will -- and I
11  will do my very best not to plow through anything
12  that he has already covered.
13         If you could, let's look at your
14  report for the Congressional portion, your initial
15  report.
16     A.  All right.
17     Q.  Do you have it in front of you?
18     A.  I do.
19     Q.  In looking at -- let's see, I think if
20  you could go to Page 4.  And I know you answered
21  questions from Mr. Traywick about this.
22         But this paragraph right before you
23  walk into this verbal background, that last
24  sentence:  "I conclude that this all supports a
25  strong inference of discriminatory motive, though

Page 197

1  I decided to resist reaching a final conclusion,
2  which is for the court to do."
3          Do you see that, Dr. Bagley?
4      A.  Yes, I do.
5      Q.  This is different than the way you,
6  sort of, addressed your preliminary, kind of,
7  opinion or finding from your report in the House
8  on the House plan; is that right?
9      A.  I don't recall exactly how I phrased
10  it in that report, but if you represent that
11  that's the case.  It might be slightly different.
12     Q.  I'll represent that the similar
13  language in that report was on Page 3:  "In my
14  opinion, the legislative record reveals a sequence
15  of events that strongly supports an inference of
16  discriminatory motive, given the nature and
17  historical background of voter discrimination in
18  South Carolina and the state's black citizens."
19         Does that sound familiar to you?
20     A.  Sure.  Yes.
21     Q.  Coming back to the way that you
22  phrased it here on the Congressional plan, is
23  there any particular reason or motivation for the
24  change in the way you addressed your opinion in
25  this instance, now saying that you conclude it

50 (Pages 194 - 197)

3:21-cv-03302-MGL-TJH-RMG    Date Filed 09/02/22    Entry Number 342-1    Page 52 of 57

Joseph Bagley , PhD                                    June 29, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 198

1 supports a strong inference, though decidedly
2 resist reaching the final conclusion?  Can you
3 tell me why?
4        A.  I don't think so.  No.  I mean,
5 they're pretty similar, I think.  I guess there is
6 the additional phrase, "though I decided to resist
7 reaching the final conclusion."
8             I think that was the point I was
9 attempting to make in the other report as well,
10 even if I didn't spell it out in the exact same
11 language.
12       Q.  So no specific reason that you recall
13 why you, sort of, added language related to the
14 Court's role in reaching a final conclusion?
15       A.  I can't recall.  It may be that there
16 was case law that I was reading that seemed
17 significant to that.  I honestly don't remember
18 writing that any differently than I had written it
19 in the previous report.
20       Q.  Turn to Page 16 of your report,
21 please.
22       A.  All right.
23       Q.  So in the middle paragraph that starts
24 with "Burton court," you have a -- well, take a
25 moment to read that paragraph to yourself, if you

Page 199

1 would, just -- that starts with, "Burton court."
2             (The witness reviews the document, as
3 requested.)
4             THE WITNESS:  All right.
5 BY MS. HOLLINGSWORTH:
6        Q.  You have some observations in here
7 related to -- for example, you have here: "Black
8 caucus members felt like they had been taken
9 advantage of by white Democrats and agreed with
10 Republicans to draw more heavily white districts
11 than white Republicans could win and more
12 majority-minority districts that black candidates
13 could win."
14             Do you see that language?
15       A.  I do.
16       Q.  Did you conduct any interviews as part
17 of the development or preparation of this report?
18       A.  No.
19       Q.  Where did this information come from?
20       A.  So the footnotes on this paragraph are
21 48 and 49.  It looks like in 48 there are two
22 articles from the State and one from Greenville
23 News, and 49 looks like it's in reference to a
24 Ruoff report, Pages 707 and 708.
25       Q.  So all of the content that I just read

Page 200

1 would have come from one of those sources?
2        A.  Correct.
3        Q.  You have a number of newspaper
4 articles that you have cited in your footnotes for
5 this -- I guess it would be "Historical
6 Background" section of your Congressional report;
7 is that fair?
8        A.  Yes.
9        Q.  All of these newspaper articles, did
10 you collect them all yourself, or were any of
11 these articles provided to you?
12       A.  None of this was provided to me.  It's
13 all my own research.  And these days it's fairly
14 easy to do because everything has been digitized.
15            So these -- you know, in decades prior
16 you would have to go to an archive and go through.
17 I spent many an hour early on in my career looking
18 through microfilm.  But, fortunately, it's all
19 been digitized, and it's all available online.  So
20 this is particularly helpful under the
21 circumstances of the pandemic.
22            So these are -- this is research that
23 I was able to conduct online through digitized
24 sources.
25       Q.  Including these newspaper articles,

Page 201

1 like, for example, 1994 edition of the Greenville
2 News?
3        A.  Yes.
4        Q.  With regard to any of the other
5 resources -- so you had various books,
6 periodicals, things of that nature -- were any of
7 those sources provided to you, as opposed to
8 sources that you independently located for use in
9 your report?
10       A.  No.  The only thing that was provided
11 to me were the transcripts that we talked about, I
12 think very early on, with Mr. Traywick.
13       Q.  In your Congressional plan report, you
14 go through a much deeper detail of, for example,
15 like, the DOJ Section 5 objection letters.  You
16 have, I think, for example, Page 21.
17       A.  Okay.
18       Q.  So it looks like, starting from the
19 first paragraph:  "By 2012," and then through the
20 rest of the page.  And your footnote just says,
21 generally:  "Civil Rights Division, Section 5
22 objections, South Carolina," but the content
23 addresses a number of issues or, you know, subject
24 matters from a variety of letters that you had
25 found online.

51 (Pages 198 - 201)

Joseph Bagley , PhD                                          June 29, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 202

1        My question:  Did you review each and
2 every one of these Section 5 letters and prepare
3 this, or did you have any assistants help you in
4 assessing all of these to pull out the information
5 that's here at Page 21?
6        A.  I was able to review them myself.
7 They're all -- helpfully, the Civil Rights
8 Division -- you see the link there.   It's whited
9 out on my page because I don't have color ink in
10 my printer at the moment -- but they're all
11 available, sort of, on the same page.  They're
12 sorted out by state.  So you're able to just very
13 quickly say, you know, click through them.
14        Not all of them are very lengthy.
15 Some are, but usually it's only a page or two.  So
16 I had more time, obviously, since the House phase
17 to, sort of, more thoroughly review those.
18        Q.  You did all of that independently; is
19 that right?
20        A.  That's correct.
21        Q.  Page 24, in the middle of the page you
22 reference Representative Govan:  "Describing how
23 the redistricting process has been challenged
24 every single cycle since black citizens had first
25 won the right to actually vote and elect

Page 203

1 candidates of choice in the 1970s."
2        You will agree with me that the
3 redistricting process has not been successfully
4 challenged in every single cycle, correct?
5        A.  That is true.
6        Q.  The Number 4 -- the fourth Arlington
7 Heights factor that is identified on Page 3 of
8 your report -- and I'll just read it:  "Departures
9 from the normal procedural sequence."
10        A.  Yes.
11        Q.  Where in your report do you lay out
12 what, in your expert opinion as a historian, are
13 the normal procedural sequences that you then are
14 measuring the sequence of events in South Carolina
15 against?
16        A.  Rather than lay it out like that, what
17 I've done is convey where members of the public or
18 members of the committees have indicated that they
19 felt like there was significant procedural
20 departures.
21        Q.  Certainly, you would agree with me
22 that those legislators or the members of the
23 public are not expert historians, right?
24        A.  Well, certainly not.
25        Q.  So in what way could we know whether

Page 204

1 or not their view of an irregularity or complaint
2 is relevant to what otherwise would be a normal
3 procedural sequence?
4        A.  Well, in terms of the legislators, I
5 would say that, obviously, they would understand
6 good governance and normal legislative procedures
7 and practices.
8        In terms of the public, I would say
9 that I, you know, wouldn't take any one individual
10 citizen's input and give great weight to that.  I
11 think it would have to be a complex or, as I said
12 earlier, a chorus of people concerned about
13 something which would give that more weight.
14        Q.  So in terms of your opinions, how do
15 we know where you have reached a finding or a
16 conclusion that any particular complaint or issue
17 that was raised that you address in the sequence
18 is a departure from the normal procedural
19 sequence?
20        A.  I tried -- and maybe I didn't do a
21 good job, but I tried to summarize that at the
22 beginning of, sort of, each section, rather than
23 lump that off at the beginning of an end.  I
24 thought it read better to, sort of, identify those
25 at the beginning of sections.

Page 205

1        Q.  Have you -- I think we talked about
2 this at your last deposition.  I believe you had
3 testified that you were familiar with
4 redistricting process in Alabama.
5        Are there any other states that you
6 have familiarized yourself with in terms of
7 procedure for redistricting in the Southeast or
8 elsewhere?
9        A.  Yeah.  In terms of secondary source
10 resource and reading case law, but a number of
11 others.  I haven't undertaken, obviously, a
12 systematic study of another state.  But obviously,
13 again, you know, reading case law and studying
14 secondary sources, you know, I'm familiar with the
15 process, sort of broadly speaking.
16        Q.  In your opinion, what is the
17 difference between core constituency or core
18 reservation and incumbency considerations?
19        A.  I understand that they're listed under
20 the same, sort of, sub-guidelines.  Like I say, I
21 think you could look at that a couple of ways.
22        Core retention, to me, could mean or
23 could be synonymous with avoiding contests between
24 incumbents or removing an incumbent from their
25 district, or, as Mr. Opperman put forth, it could

52 (Pages 202 - 205)

Joseph Bagley , PhD                                    June 29, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 206

1  be -- you know, it could reference a numerical
2  representation of the number of constituents who
3  are preserved in a given district.
4      Q.  We had talked last time about your
5  work in Alabama on that redistricting matter, that
6  your review of the sequence of events there
7  included descriptions of instances where lawmakers
8  were recorded on tape making racist remarks.  Do
9  you recall that?
10     A.  Yes, I do.
11     Q.  We discussed last time -- you agreed
12 with me -- that you hadn't come across anything
13 similar to that when you were reviewing materials
14 for the House plan; is that right?
15     A.  That's correct.
16     Q.  So with regard to everything that
17 you've reviewed and considered on the
18 Congressional plan here in South Carolina, have
19 you come across anything similar to what you saw
20 in Alabama, such as the racist remarks by
21 lawmakers that were recorded?
22     A.  The only thing that I think is in the
23 report that's similar to that is the racist
24 characterization of Congressman Clyburn from that
25 campaign.  I didn't come across anything analogous

Page 207

1  to those particularly egregious statements from
2  that instance you reference in Alabama, no.
3      Q.  Let me make sure that we don't get a
4  little clouded in the record.  Are you talking
5  about the -- Congressman Clyburn, are you talking
6  about Page 15 of your report where you're
7  describing the 1980s?
8      A.  Yes.  Yes.
9      Q.  My question is with regard to what you
10 reviewed for purposes of the House and the Senate
11 in the most recent redistricting cycle leading up
12 to the passage of the Congressional plan that is
13 now challenged in this lawsuit.  Have you come
14 across anything similar to what you did in
15 Alabama, which were the instance where lawmakers
16 were record on tape making racist remarks?
17     A.  Nothing analogous to that, no.
18     Q.  I think since the last time you
19 prepared a report, you had done -- you've done
20 some more evaluation of other positions of
21 authority in our state that are held by black men
22 and black women; is that right?  And you included
23 some more information, for example, about our
24 Chief Justice of the Supreme Court?
25     A.  Yes.

Page 208

1      Q.  Did you also do further study of some
2  of those cases in terms of Backus and Burton and
3  such?  Did you spend some more time on some of
4  those cases as well?
5      A.  Yes.  I think there's a, fair to say,
6  a more thorough discussion in this report of those
7  two cases.
8      Q.  I think Mr. Traywick did ask you this:
9  As you sit here today, you're not aware of any
10 opinions that you would offer at the trial that
11 you have not addressed at some point today in your
12 testimony with Mr. Traywick or myself, as you sit
13 here today?
14     A.  No.
15     Q.  As you sit here today, is there
16 anything that you intend to go study or review as
17 a result of what you discussed here today prior to
18 offering testimony in court?
19     A.  No.
20         MS. HOLLINGSWORTH:  Let me take one
21 minute real quick.  I think those are all my
22 questions, but give me just one minute to look.
23         (A recess was taken.)
24         MS. HOLLINGSWORTH:  Dr. Bagley, I don't
25 have any other questions.  I very much appreciate

Page 209

1  your time this afternoon.
2         THE WITNESS:  I'm sorry,
3  Ms. Hollingsworth, let me just shut this off.  I don't
4  understand why that happened.  Can you hear me?
5         MS. HOLLINGSWORTH:  Yes.  Yes.  Well,
6  now we can't hear you.  I think that went
7  backwards.
8         THE WITNESS:  We're good now.
9         MS. HOLLINGSWORTH:  Believe it or not,
10 I don't have any other questions.  I don't know if
11 counsel for the Election Commission is still on.
12 But I'm done.  I thank you very much for your
13 time.
14         MS. TRINKLEY:  This is Jane Trinkley.
15 I do not have any questions on behalf of the
16 Election Commission.
17         MR. INGRAM:  I have some redirect, but
18 give me five minutes to get my thoughts together.
19         (A recess was taken.)
20             EXAMINATION
21 BY MR. INGRAM:
22     Q.  I just have a few questions for you,
23 Dr. Bagley, on redirect.  My first question is
24 during your discussion with Mr. Traywick, you
25 referenced Chair Jordan in reference to some of

53 (Pages 206 - 209)

Page 210

1 the questions related to the Senate process.
2        Might you have meant Chair Rankin,
3 rather than Jordan, related to the Senate?
4    A.   Right.  Chairman Rankin was the head
5 of the Senate Redistricting Committee, and
6 Representative Jordan was head of the House Ad Hoc
7 Committee.
8    Q.   Thank you.
9        Dr. Bagley, do you recall
10 Mr. Traywick's questions at the beginning of the
11 deposition asking you when you began working on
12 the Congressional case?
13    A.   Yes.
14    Q.   Do you recall when the South Carolina
15 General Assembly passed a Congressional map?
16    A.   I don't remember the exact date, but I
17 can thumb through here.  The final passage was
18 January 26th.
19    Q.   When did you start working on the
20 Congressional report?  Was it before or after the
21 map was passed?
22    A.   It would have been after.  So any work
23 done previously would have been a part of the
24 House phase.
25    Q.   Then I just have one last question for

Page 211

1 you.  Dr. Bagley, you discussed the Arlington
2 Heights framework with Mr. Traywick.  Did the
3 method you employed as an historian and political
4 scientist overlap at all with the Arlington
5 Heights factoring or Arlington Heights framework?
6    A.   Yes, they overlap.
7    Q.   How so?
8    A.   Well, we look at information from a
9 number of different sources, and we understand
10 that the past informs the present.
11        MR. INGRAM:  Thank you.  That's all my
12 questions.
13        I also want it on the record,
14 Mr. Traywick, we understand your position about
15 keeping the deposition open.  But for the record,
16 we disagree for the basis that there is a need to
17 keep it open for those communications we've
18 referenced before.
19        MR. TRAYWICK:  Understood.  And we'll
20 talk offline about it.  And if necessary, we'll
21 move forward and protect our own interests.  So
22 thank you for that.
23        No further questions from me.
24        MS. HOLLINGSWORTH:  None from me.
25 Thank you very much.

Page 212

1        COURT REPORTER:  Would you let me know
2 if he's reading and signing, and can I get orders
3 on the record, please?
4        MR. INGRAM:  Yes.  For plaintiffs, we
5 would like a rough transcript, electronic.  And we
6 will read and sign as well.
7        MR. TRAYWICK:  I would like a rough,
8 and then we'll take an electronic copy.
9        MS. HOLLINGSWORTH:  This is Jennifer
10 Hollingsworth.  We would also like the rough
11 transcript.  We will order an electronic copy.  We
12 do not need a word index.
13        (The deposition was concluded at 4:30
14 p.m.)
15        (The witness, after having been advised
16 of the right to read and sign this transcript,
17 does not waive that right.)
18
19
20
21
22
23
24
25

Page 213

1        CERTIFICATE OF REPORTER
2
3        I, Roxanne M. Easterwood, Registered
4 Professional Reporter and Notary Public for the
5 State of South Carolina at Large, do hereby
6 certify that the foregoing transcript is a true,
7 accurate, and complete record.
8        I further certify that I am neither
9 related to nor counsel for any party to the cause
10 pending or interested in the events thereof.
11        Witness my hand, I have hereunto
12 affixed my official seal this 29th day of June
13 2022 at Charleston, Charleston County, South
14 Carolina.
15
16
17
18
19
20

21
22
        _____
        Roxanne M. Easterwood, RPR
23      My Commission expires
        February 1, 2025
24
25

Page 214

1            I N D E X
2                    Page    Line
3    JOSEPH BAGLEY, PhD           4      3
4    EXAMINATION            4      5
5    BY MR. TRAYWICK
6    EXAMINATION          195     25
7    BY MS. HOLLINGSWORTH
8    EXAMINATION          209     20
9    BY MR. INGRAM
10   CERTIFICATE OF REPORTER        213    1
11
12           E X H I B I T S
13                    Page    Line
14   Exhibit 1, Notice of        6      13
15   Deposition, Certificate of
16   Service, Acceptance of
17   Service, Subpoena Duces Tecum
18   Exhibit 2, Bagley CV        8      25
19   Exhibit 3, Invoices with       17     18
20   Attached Email Cover Pages,
21   Bates SCNAACP 3D 11412-11419
22   Exhibit 4, Dr. Bagley        24     16
23   Congressional Plan Report
24   Exhibit 5, Email           27     15
25   Correspondence, Bates SCNAACP

Page 215

1    CD 11420-11423
2    Exhibit 6, 2021 Redistricting    120     21
3    Guidelines, SC Senate
4    Judiciary Committee
5    Redistricting Subcommittee
6    Exhibit 7, Dr. Bagley         164     13
7    Congressional Rebuttal Report
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 216

1    Antonio Ingram, II
2    aingram@naacpldf.org
3            July 13, 2022
4    RE: The South Carolina State Conference Of The NAACP v. Alexander,
     Thomas, Et Al
5    6/29/2022, Joseph Bagley , PhD (#5278889)
6        The above-referenced transcript is available for
7    review.
8        Within the applicable timeframe, the witness should
9    read the testimony to verify its accuracy. If there are
10   any changes, the witness should note those with the
11   reason, on the attached Errata Sheet.
12       The witness should sign the Acknowledgment of
13   Deponent and Errata and return to the deposing attorney.
14   Copies should be sent to all counsel, and to Veritext at
15   erratas-cs@veritext.com.
16
17    Return completed errata within 30 days from
18   receipt of testimony.
19       If the witness fails to do so within the time
20   allotted, the transcript may be used as if signed.
21
22       Yours,
23       Veritext Legal Solutions
24
25

Page 217

1    The South Carolina State Conference Of The NAACP v. Alexander,
     Thomas, Et Al
2    Joseph Bagley , PhD (#5278889)
3        E R R A T A  S H E E T
4    PAGE_____ LINE_____ CHANGE_____
5    _____
6    REASON_____
7    PAGE_____ LINE_____ CHANGE_____
8    _____
9    REASON_____
10   PAGE_____ LINE_____ CHANGE_____
11   _____
12   REASON_____
13   PAGE_____ LINE_____ CHANGE_____
14   _____
15   REASON_____
16   PAGE_____ LINE_____ CHANGE_____
17   _____
18   REASON_____
19   PAGE_____ LINE_____ CHANGE_____
20   _____
21   REASON_____
22
23   _____  _____
24   Joseph Bagley , PhD Date
25

Veritext Legal Solutions
800.743.DEPO (3376)    calendar-carolinas@veritext.com    www.veritext.com

Joseph Bagley , PhD                                      June 29, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 218

1    The South Carolina State Conference Of The NAACP v. Alexander,
     Thomas, Et Al

2    Joseph Bagley , PhD (#5278889)

3            ACKNOWLEDGEMENT OF DEPONENT

4      I, Joseph Bagley , PhD, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____ _____

12   Joseph Bagley , PhD Date

13   *If notary is required

14            SUBSCRIBED AND SWORN TO BEFORE ME THIS

15            _____ DAY OF _____, 20___.

16

17

18            _____

19            NOTARY PUBLIC

20

21

22

23

24

25

Veritext Legal Solutions
800.743.DEPO (3376)    calendar-carolinas@veritext.com    www.veritext.com