# The South Carolina State Conference of the NAACP, et al v. Alexander, et al

## CA No.:  3:21-cv-03302-MGL-TJH-RMG

# EXHIBIT B

*Senate and House Defendants' Daubert Motion in Limine to Exclude Reports, Opinions, and Testimony of Dr. Joseph Bagley*

Dr. Bagley's April 11, 2022 Initial Report

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

| | |
|---|---|
| THE SOUTH CAROLINA STATE CONFERENCE OF THE NAACP, and<br><br>TAIWAN SCOTT, on behalf of himself and all other similarly situated persons,<br><br>     Plaintiffs,<br><br>  v.<br><br>THOMAS C. ALEXANDER, in his official capacity as President of the Senate; LUKE A. RANKIN, in his official capacity as Chairman of the Senate Judiciary Committee; JAMES H. LUCAS, in his official capacity as Speaker of the House of Representatives; CHRIS MURPHY, in his official capacity as Chairman of the House of Representatives Judiciary Committee; WALLACE H. JORDAN, in his official capacity as Chairman of the House of Representatives Elections Law Subcommittee; HOWARD KNAPP, in his official capacity as interim Executive Director of the South Carolina State Election Commission; JOHN WELLS, Chair, JOANNE DAY, CLIFFORD J. EDLER, LINDA MCCALL, and SCOTT MOSELEY, in their official capacities as members of the South Carolina Election Commission,<br><br>     Defendants. | **Case No. 3-21-cv-03302-MBS-TJH-RMG**<br><br>**THREE-JUDGE PANEL** |

1

## Expert Report of Joseph Bagley, Ph.D.

I.    CREDENTIALS

I am an Assistant Professor of History at Perimeter College, Georgia State University. My specific area of study is United States constitutional and legal history, politics, and race relations, with a focus on the South. I earned a Ph.D. in 2013 from Georgia State and a M.A. (2007) and B.A. (2004) from Auburn University. My first book, *The Politics of White Rights: Race, Justice, and Integrating Alabama's Schools*, was published in November 2018 by the University of Georgia Press in the *Politics and Culture of the Twentieth Century South* series. My current projects include a book manuscript examining the history of the struggle for voting rights in the South, focusing on Alabama, Georgia, and South Carolina. I am also developing, in concert with colleagues at GSU Downtown, a grant proposal for a National Endowment for the Humanities "Public Humanities Discussions" series focused on citizenship rights and obligations in Georgia and in America.

My academic work has been cited in the *Case Western Law Review*, the *Journal of Urban History*, *Rural Sociology*, the *Alabama Civil Rights and Civil Liberties Law Review*, and in the *New York Times Magazine* (*NYTM*). My doctoral thesis, "School Desegregation, Law and Order, and Litigating Social Justice in Alabama," which formed the basis of my book manuscript, was quoted multiple times by Pulitzer Prize winner Nikole Hannah-Jones in her September 6, 2017 piece in the *NYTM*, "Resegregation in Jefferson County."[1] I have also written book and manuscript reviews for, among others, the University Press of Kansas, *Law and History Review*, the *Journal of Southern History*, the *Alabama Review*, *Mississippi Historical Quarterly*, *Georgia Historical Quarterly*, *Urban History*, and *History of Education Quarterly*.

I have been certified as an expert by courts in all previous voting rights litigation wherein I have been retained and presented as a testifying expert. I recently submitted two reports – an initial report and a rebuttal report – and testified at a preliminary injunction hearing in *Milligan v. Merrill* (N.D. Ala.), an ongoing redistricting case involving Alabama's Congressional districts. In a memorandum order and opinion granting a preliminary injunction, the Court found that "Dr. Bagley" was a "credible expert witness," who "prepared [a] lengthy, detailed report that set forth substantial evidentiary bases for [his] opinion in a manner that [was] consistent with [his] expertise and applicable professional methods and standards." The Court cited my report and testimony 32

---

[1] Wendy Parker, "Why Alabama School Desegregation Succeeded (And Failed)," 67 *Case Western Law Review*, 1091 (2017); Rebecca Retzlaff, "Desegregation of City Parks and the Civil Rights Movement: The Case of Oak Park in Montgomery, Alabama," *Journal of Urban History* 47.4, 715 (2019); Erika Frankenberg, "The Impact and Limits of Implementing Brown: Reflections from Sixty-Five Years of School Segregation and Desegregation in Alabama's Largest School District," 11 *Alabama Civil Rights and Civil Liberties Law Review*, 33 (2019); Bryan Mann, "Segregation Now, Segregation Tomorrow, Segregation Forever? Racial and Economic Isolation and Dissimilarity in Rural Black Belt Schools in Alabama," *Rural Sociology* 86.3, 523 (2021). Nikole Hannah-Jones, "The Resegregation of Jefferson County," *The New York Times Magazine*, Sept. 6, 2017.

2

times and observed that "[a]t the preliminary injunction hearing, Dr. Bagley explained at a high level the bases for the detailed opinions on these issues that appear in his report." (*Milligan*, Jan. 24, 2022, pp. 80, 185). I also submitted a report, testified in a deposition and at trial, and was cited favorably in the court's opinion in *People First of Alabama v. Merrill*, 491 F. Supp. 3d 1076 (N.D. Ala. 2020). The Court in *People First* cited to my report 26 times and quoted directly from my testimony at trial *Id.* at 1106.[2] I have submitted previously in this litigation a report and rebuttal report pertaining to the Plaintiffs' claims challenging State House districts.

I am compensated at the rate of $150 per hour for my work in preparing this report. This compensation is not dependent upon my findings, and my opinions stated in this report do not necessarily represent the sum total of my opinions in this matter, which are subject to change upon further research or findings. I append to this report a C.V.

## II.    PURPOSE, METHODOLOGY, SUMMARY FINDINGS

Plaintiffs in this case asked me to examine the enactment of Senate Bill 865 ("S. 865"), which established South Carolina's Congressional districts using the 2020 Census results when it was signed into law as Act 118. I have been asked to consider that process alongside any relevant history of voting discrimination against Black South Carolinians. This report accordingly places the South Carolina General Assembly's enactment of S. 865 within a wider historical and contemporaneous context and considers whether this history, the ongoing record of discrimination, and the legislative sequence of events may support an inference of discriminatory intent.

Experts in cases alleging intentional racial discrimination often follow guidelines set forth by the Supreme Court in *Village of Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252 (1977). In *Arlington Heights*, the Court acknowledged that it was unusual, even at that time, to find direct evidence of discriminatory intent. The Court advised that, when assessing the constitutionality of state action relative to discriminatory intent, courts may conduct a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available" by considering factors that may be relevant to ascertaining intentional discrimination, including (1) "The impact of the official action – whether it bears more heavily on one race than another"; (2) "The historical background of the decision . . . particularly if it reveals a series of official actions taken for invidious purposes"; (3) "The specific sequence of events leading up to the challenged decision . . ."; (4) "Departures from the normal procedural sequence . . ."; (5) and "The legislative or administrative history . . . especially where there are contemporary statements by members of the decision-making body, minutes of its meetings, or reports." *Id.* at 265-266.

As a historian, under this framework, I analyzed the second, third, fourth, and fifth *Arlington Heights* factors. The historical background, the legislative sequence of events, the legislature's procedures, and the statements made in the S. 865's legislative history examined herein are relevant to a court's assessment of whether the General Assembly's actions in enacting Congressional districts ("CDs") 1, 2, and 5 are part of a continuum of South Carolina's

---

[2] 467 F.Supp.3d 1179 (N.D. Ala. 2020).

3

longstanding acts of discrimination in voting and redistricting, particularly against Black South Carolinians.

In examining this, as a historian, I am guided by the common standards of historiography. Relying on these standards, this report draws upon existing historiographical works; public documents from the South Carolina General Assembly's websites, such as video recordings and transcripts of legislative committee meetings, floor debate, and public hearings from June 2021 through January 2022; other information from the state's redistricting websites for the House and Senate; newspaper and journalistic articles; court opinions, briefs, and memoranda; public statements; and scholarly articles and books on voting rights in South Carolina. These are common sources for scholars in the humanities and the social sciences to reference, and I weigh all of these against one another, as is common in the field.

Based on my review of the evidence – the historical background of voting discrimination in South Carolina against Black citizens, the legislative history of S. 865, the irregularities in the drafting and passing of S. 865, and the statements by legislators during this process – I conclude that this all supports a strong inference of discriminatory motive, though I decidedly resist reaching the final conclusion, which is for the Court to do.

III.    HISTORICAL BACKGROUND

a.    Pre-Civil War

South Carolina's historical background is relevant and cannot be detached from understanding S. 865's enactment. The State of South Carolina has a long and largely undisputed history of discrimination against its Black citizens, especially when it comes to voting. The Court in *Colleton County Council v. McConnell* in 2001 observed, "The redistricting process in South Carolina has historically been a troubled one," and it found there to be, in that case, "extensive documentation of the history of voting-related racial discrimination in South Carolina, which was submitted largely as a stipulation among the parties." 201 F. Supp. 2d 618, 641-42, 649, Fn. 1 (D.S.C. 2001). I will very briefly summarize this well-documented and judicially recognized history before examining the state's more recent history of discrimination, particularly with respect to redistricting cycles. This is relevant to the ongoing effort to achieve equal political participation for Black South Carolinians that continues today.

The colony of South Carolina was founded by wealthy, white sugar planters from Barbados who introduced to the British North American colonies the concept of replacing white indentured servant labor with Black African enslaved labor. These planters pioneered the growing of rice in the Low Country and became the richest individuals in the American colonies thanks to the labor of hundreds of thousands of enslaved Black people brought in as chattel from parts of sub-Saharan Africa and the Caribbean. These planters were among the most ardent supporters of what became the American Revolution and later, the American Civil War, in no small measure because of their interest in maintaining their practice of enslaving Black people for incredible profit. Conversely, Black South Carolinians like Robert Smalls were among the most active in seeking escape from bondage and joining "contraband" camps, like Port Royal and Hampton, Virginia, and serving in

the forces of the Union while seeking freedom during the Civil War, per the terms of the Emancipation Proclamation.[3]

    b.  <u>Reconstruction</u>

When the Civil War ended, the white government of the state of South Carolina led the way in enacting "Black Codes" – laws restricting the rights of freedmen, or formerly enslaved people. These laws violated what became the concept of equal protection, embodied ultimately in the Fourteenth Amendment, which invalidated them. Historian Eric Foner has described the Black Codes adopted by South Carolina as the "first and most severe" of all of those enacted in the former Confederacy. Foner described South Carolina's as "in some respects even more discriminatory" than Mississippi's because it "barred" Black people "from following any occupation other than farmer or servant except by paying an annual tax of $10 to $100 (a severe blow to the free Black community of Charleston and to former slave artisans)," and it "required blacks to sign annual contracts and included elaborate provisions regulating relations between 'servants' and their 'masters,' including labor from sunup to sundown and a ban on leaving the plantation." South Carolina added a "vagrancy" law punishing unemployed Black people and "persons who lead idle or disorderly lives."[4]

The brazenness of these laws moved members of the U.S. Congress to oppose the terms of President Lincoln's and, subsequently, President Johnson's Reconstruction plans and to reset the process with a focus on the rights of freedmen. Under the terms of "Radical Republican" Congressional Reconstruction, including the ratification of the 14th and 15th Amendments, and the renewed military occupation of the South, South Carolina saw its Black majority elect candidates, including Smalls, to office at the state and federal level. White backlash against these gains, however, would soon place South Carolina in the vanguard when white Democratic lawmakers, elected via violence and fraud, pursued legally-cemented white supremacy and the complete disenfranchisement of Black citizens.[5]

Beginning in the late 1860s and into the 1870s, white Democrats used voter fraud, intimidation, and violence, including the murder of numerous duly-elected Black state legislators, as well as low-grade guerilla warfare, to reverse the gains that Black citizens had made under Radical Republican auspices. White Democrats began to take back control of certain offices, including at the state level, and began enacting laws that made it difficult for Black people to register and vote, including a re-registration mandate and the consolidation of voting precincts, making travel to polling places more difficult.[6]

---

    [3] John J. Navin, *The Grim Years: Settling South Carolina, 1670-1720* (Columbia: University of South Carolina Press, 2019); Cate Lineberry, *Be Free or Die: The Amazing Story of Robert Smalls' Escape from Slavery to Union Hero* (New York: St. Martin's Press, 2017).

    [4] Eric Foner, *Reconstruction: America's Unfinished Revolution* (New York: Harper Collins, 1988), pp. 199-200.

    [5] Foner, *Reconstruction*, pp. 305-6.

    [6] Foner, *Reconstruction*, pp. 570-72, 589, 594, 599; Orville Vernon Burton, *The Age of Lincoln* (New York: Hill and Wang, 2007), pp. 269. 293, 307-10.

c. Redemption

The efforts of the immediate post-war period accelerated when white Democrats like Wade Hampton, Ben Tillman, and the so-called "Red Shirts" formed "rifle gangs," like Tillman's own Sweetwater Sabre Club, and initiated the "redemption" of the state of South Carolina. They orchestrated what one recent scholar has described as a "coordinated campaign of terror" and another has called a "violent rampage."[7] This terrorism and violence were designed to undo the advancements made following the Civil War, during the brief period that W.E.B. DuBois called Black Reconstruction, in order to prevent Black people from voting and to purge the state of the Republican Party. As Dr. Peter Lau has described, "[i]n turning back the revolutionary implications of Reconstruction and fighting to restore white supremacy as a legal and historical fact of life in South Carolina, the state's white supremacist leadership, along with its counterpart in Mississippi, was unsurpassed."[8]

Tillman spearheaded an effort in the 1890s to completely disenfranchise Black citizens of South Carolina and further entrench white supremacy. The state first eliminated its system of home rule in favor of a state legislative delegation system. This allowed white registered voter majorities, in conjunction with the white-controlled state government, to preclude the possibility of local Black electoral success. Then, in 1895, the South Carolina Constitutional Convention adopted a new state constitution establishing white supremacy. It provided for a poll tax, a literacy test that would be administered by appointed registrars with unlimited discretion, and other provisions that would disenfranchise Black citizens for generations. It also established Jim Crow segregation. It remains the state's operative constitution to this day.

Systematic violence aimed at quashing any Black political participation continued. In 1898, events in and around the community of Phoenix, in Greenwood County, according to Dr. Lau, "announced that the unfolding terms of legalized white supremacy would be maintained by any means necessary." As Lau describes, "[f]or a period of several days, some three hundred armed white men . . . roamed the countryside, seeking out, torturing, and then murdering those they deemed Republican activists." At least twelve Black people were killed, and many more fled the state in response to the violence.[9]

---

[7] Joseph Crespino, *Strom Thurmond's America* (New York: Hill and Wang, 2012), pp. 15-16; Richard Rothstein, *The Color of Law: A Forgotten History of How our Government Segregated America* (New York: Norton, 2017), pp. 40-41.

[8] Peter F. Lau, *Democracy Rising: South Carolina and the Fight for Black Equality since 1865* (Lexington: University Press of Kentucky, 2021), pp. 15-19.

[9] Lau, *Democracy Rising*, pp. 19-21; see also Matthew H. Jennings, "The Phoenix Riot," *Encyclopedia of South Carolina*, University of South Carolina Institute for Southern Studies, https://www.scencyclopedia.org/sce/entries/phoenix-riot/.

d.  <u>From the Redemption to the Voting Rights Act</u>

By the twentieth century, South Carolina was a one-party state and, as the political scientist V.O. Key explained, it adopted a white, localized "friends and neighbors" approach to politics. Black people were not only legally shut out of the process but were subjected to ongoing violence in the form of lynching. According to historian Joseph Crespino, between 1904 and 1918, "a lynching took place in South Carolina, on average, every four months." Crespino further cautions, "This, of course, accounted only for murders that were actually reported. Many were never discovered, and white men regularly killed blacks with impunity." According to the Equal Justice Initiative, between the years of 1877 and 1950, there were 191 reported lynchings in the state of South Carolina.[10]

Key described South Carolina as "an extreme case" when it came to "the race question" in politics. He wrote, "South Carolina's preoccupation with the Negro stifles political conflict. Over offices there is conflict aplenty, but the race question muffles conflict over issues latent in the economy of South Carolina." It functioned as a "diversion" from other issues, in other words. Key observed, "Mill worker and plantation owner alike want to keep the Negro in his place," and he described a "consensus by which the Negro is kept out of politics" owing to the fact that, were the "Negro" not kept out of politics, "[o]ne crowd or another would be tempted to seek his vote."[11]

Key explained how "latent bipartisanship [was] smothered by racism." It was "the Negro question," he wrote, that "suppressed the tendency of the two-party system to reassert itself after Reconstruction." Tillman, Key describes, "drew cheers and votes from the white mill workers (who held a virtual monopoly of mill jobs) by his extraordinary appeals to race prejudice, and at the same time drew quiet and effective support from mill owners." Key argues that this relative absence of class conflict in South Carolina politics was a function of a united white desire to forestall "the return of the Negro in politics," meaning a desire to move permanently beyond the realities of Black Reconstruction, when the state's Black majority was briefly able to enjoy access to the franchise and elect representatives of its choice.[12]

By 1902, there were *no* Black elected officials left at the state level, and Black voter registration was a fraction of what it had been at the height of Congressional reconstruction. South Carolina state law also enshrined the "white primary" until World War II. White supremacy was the order of the day until that time.[13] When the Supreme Court outlawed the white primary in 1944, South Carolina suppressed Black suffrage by creating a so-called private primary. The

---

[10] V.O. Key, *Southern Politics in State and Nation* (New York: Sage, 1949), pp. 130-131; Crespino, *Strom Thurmond's America*, 16-17; Equal Justice Initiative, "Lynching in America," South Carolina, https://lynchinginamerica.eji.org/explore/south-carolina.
[11] Key, *Southern Politics in State and Nation*, pp. 130-131.
[12] Key, pp. 142-44.
[13] J. Morgan Kousser, *The Shaping of Southern Politics: Suffrage Restriction and the Establishment of the One-Party South, 1880-1910* (New Haven: Yale University Press, 1974), pp. 17, 27, 79-91, 145-51, 188, 232.

governor called a special session of the legislature in order to remove all laws relating to primaries, and voters ratified a constitutional amendment erasing any language regarding primaries from the state's constitution such that the Democratic Party's exclusion of Black people would have no connection to any official state action. The NAACP challenged these actions in federal court, and the court found that the changes were made "solely for the purpose of preventing the Negro from gaining a right to vote" and thus violated the Fourteenth and Fifteenth Amendments of the U.S. Constitution.[14] The South Carolina legislature then applied the state's literacy test to primary elections and provided for the statewide use, in primaries, of an anti-single-shot or full-slate voting requirement and a majority-vote requirement, devices intended to dilute the strength of the "bloc" vote, meaning the Black vote.[15]

In the late 1940s, South Carolina's Strom Thurmond led a charge of southern white Democrats out of the party in protest of President Harry Truman's nascent overtures to civil rights. Truman had been motivated by the senseless maiming of Black veteran Isaac Woodard at the hands of a white sheriff outside Aiken, South Carolina in 1946. As the nominee of the States' Rights Democrats, or Dixiecrats, in 1948, Thurmond opposed Truman and won a significant number of southern votes. He subsequently rejoined the party but, in response to the national party's embrace of similar efforts under Presidents Kennedy and Johnson, Thurmond pioneered what has been described as a "northern strategy," an attempt to force the rest of the country to face the kind of scrutiny of racial discrimination that the South had faced. And Thurmond put together a core set of political issues – opposition to any and all civil rights reform; opposition to social welfare spending; opposition to labor organization; strident anti-communism; appeals to the religious Right – that scholars now assert were at the heart of a conservative counterrevolution that went hand-in-hand with the ongoing flight of white voters from the Democratic Party to the Republican Party.

In the 1950s and 1960s, South Carolina was also at the center of the battle over segregated schools. One of the trial court cases that came under the umbrella of *Brown v. Board* originated in the state. Indeed, Judge J. Waties Waring's dissent in *Briggs v. Elliott* heavily influenced the Supreme Court when it finally held that legally mandated segregation of public schools was unconstitutional.[16] South Carolina and other southern states reacted with "massive resistance," using any means deemed 'legally' feasible to avoid even token desegregation. This included, in South Carolina's case, a renewed claim to the state's power of "nullification" of federal authority,

---

[14] *Elmore v. Rice*, 72 F.Supp. 517, 527 (E.D. S.C. 1947), *aff'd sub nom Rice v. Elmore* 165 F.2d 387 (4th Cir., 1947), *cert. denied*, 333 U.S. 875 (1948).

[15] Numan Bartley, *The New South, 1945-1980: The Story of the South's Modernization* (Baton Rouge: Louisiana State University Press, 1995), pp. 15, 26-29; Orville Vernon Burton et al., "South Carolina," in Chandler Davidson and Bernard Grofman, eds, *Quiet Revolution in the South: The Impact of the Voting Rights Act, 1965-1990* (Princeton, N.J.: Princeton University Press, 1994), pp. 191-232, pp. 195-99.

[16] Briggs v. Elliott, 98 F. Supp. 529, 538-48 (E.D.S.C. 1951); Richard Gergel, *Unexampled Courage: The Blinding of Sgt. Isaac Woodard and the Awakening of President Harry S. Truman and Judge J. Waties Waring* (New York: Farrar, Strauss, and Giroux, 2019).

harkening back to the so-called Tariff of Abominations that slaveholding lawmakers had rejected in 1828 due to their interests in exporting cash crops grown by the enslaved.[17]

South Carolina resisted desegregation so effectively that by 1964 it remained one of only two states in the old Confederacy to maintain completely segregated schools. The state also orchestrated the effective banishment of the organization deemed responsible for *Brown*, the NAACP. The state did this using old laws designed to combat the Ku Klux Klan and other white supremacist groups, and using alterations of old barratry and champerty laws. The latter were developed from the common law, designed to prevent the solicitation of litigants and to punish attorneys or firms that profited from repeated and frivolous litigation.[18] The state also called on the NAACP to produce membership rolls, which it refused to do, knowing that this would form the basis for economic reprisal. And it charged the organization with being a foreign corporation that had not met the requirements for doing business in the state and, as such, had been "soliciting" plaintiffs for profit in violation of the barratry and champerty laws. A state court imposed a fine that the organization could not pay and refused it the administrative means to rectify the situation even if it could.[19]

When the Voting Rights Act was passed in 1965, there were *no* Black public officials in South Carolina, despite Black voter registration sitting at 37 percent. The State of South Carolina was the first state to challenge the constitutionality of the act. It of course lost, meaning that under Section 4's coverage provision, South Carolina would be required to seek Section 5 preclearance review. In effect, this meant that any voting changes that state or local officials in South Carolina sought to implement would have to be pre-approved by a federal court or by the U.S. Department of Justice, which would assess whether or not the proposed changes were intentionally discriminatory or potentially retrogressive in their effect.

The state's literacy test and provision requiring prospective voters to demonstrate "understanding" of a portion of the U.S. Constitution as read by a registrar were invalidated and abolished. White elected officials conceded an increase in Black voter registration and turned their attention to vote dilution practices. County governing bodies across the state switched to at-large

---

[17] Clive Webb, *Massive Resistance: Southern Opposition to the Second Reconstruction* (New York: Oxford University Press, 2005), pp. 28-32; Burton, *The Age of Lincoln*, p. 58.

[18] As explained by a legal scholar, analyzing these laws in 1959, "Striking directly at the ability and ubiquity of the NAACP's legal staff, Georgia, Mississippi, South Carolina, Tennessee, and Virginia have adopted statutes redefining and tightening the common law offenses of barratry, champerty, and maintenance. Barratry is the 'habitual stirring up of quarrels and suits.' Champerty describes a situation where a person with no real interest in a particular piece of litigation assists one of the actual parties by money or service in return for a share of the expected proceeds of the case. Maintenance is the more general term that encompasses 'officious intermeddling in a suit which in no way belongs to one, by maintaining or assisting either party, with money or otherwise, to prosecute or defend it.'" (footnotes omitted)  Walter F. Murphy, "The South Counterattacks: The Anti-NAACP Laws," *The Western Political Quarterly* Vol. 12, No. 2 (June 1959): pp. 371-390, p. 374, accessed from JSTOR.

[19] Bartley, *The New South*, pp. 162-62.

voting systems, with multimember districts and numbered posts, as they had done across the South during the "redemption" when rolling back Reconstruction-era Republican rule.[20]

Bringing back the dilutive voting practices would, over decades, lead to myriad Section 5 objections.[21] In single-member district elections, Black voters in majority Black areas had an opportunity to elect candidates of their choice. White elected officials switched to at-large elections to avoid that possibility. In a pure at-large system, all candidates would compete with each other for the seats up for election, and all voters could cast as many votes as there were seats at issue. They were not required to cast all of their available votes. If five seats were open, for example, the five candidates with the most votes won. This allowed a group of voters to engage in "single-shot" voting, or casting one vote for the same candidate and not casting any of their remaining votes for candidates competing with that preferred candidate.

Single-shot voting provided minority voters with a better opportunity, though by no means a certainty, of winning one seat. Separating at-large seats in a multi-member body by divisions (numbered posts/places) for electoral purposes, however, enhanced the already dilutive potential of at-large election systems by precluding a minority group from single-shot voting, since each contest was head-to-head. The majority vote rule for determining a winner in each contest further ensured control of the electoral outcome in favor of the majority group, i.e. white people.

I proceed below to a discussion of the State of South Carolina's efforts to redistrict from the 1960s to the present, first focusing on the state legislature and then the U.S. Congress, with some overlap in the 1980s and 1990s cycles I include a summary of local governmental entities' efforts in seeking, via the state legislature, to enact local electoral changes that ran afoul of the U.S. Justice Department's preclearance standards. I present this in the context of the South Carolina electorate's shift from majority white Democrat, in the preceding decades, to majority white Republican, from the mid-2000s to the present.[22]

e.    <u>Redistricting from 1960 - 1990</u>

Renewed interest in dilutive voting structures coincided with the beginnings of judicial oversight of legislative redistricting under both the mantle of the one-person/one-vote standard adopted by the Court in *Reynolds v. Sims* (1964) and the auspices of Section 2 of the Voting Rights Act of 1965. Facing the probability of a sharp increase in Black voter registration, numerous governing bodies in South Carolina opted for dilutive at-large voting practices with multi-member districts, numbered posts, and majority vote requirements. The Justice Department began to

---

[20] Burton et al., "South Carolina," pp. 200-202.

[21] *See generally*, Justice Department, Civil Rights Division Section 5 Objection Letters, South Carolina, https://www.justice.gov/crt/voting-determination-letters-south-carolina.

[22] J. Morgan Kousser, *Colorblind Injustice: Minority Voting Rights and the Undoing of the Second Reconstruction* (Chapel Hill: University of North Carolina Press, 1999), pp. 139, 337-38, 347-48, 351, 475.

interpose objections to many of these practices, including one devised for the South Carolina legislature.[23]

In the immediate aftermath of *Reynolds*, a federal court in *O'Shields v. McNair,* 254 F. Supp. 708 (D.S.C. 1966) ordered South Carolina's Senate to reapportion itself. At the time, each of the state's 46 counties had one senator, elected at-large, a system that failed to meet the one-person/one-vote standard. The legislature devised a plan that replaced some single-member districts under the county-based plan with multimember districts with white voter majorities. The court in *O'Shields* approved that plan on a strictly interim basis, at which time the legislature modified the plan using just five single member districts and 15 multimember districts with white-voter majorities and a majority vote requirement. The state's congressional delegation included six members of the U.S. House of Representatives at that time – all of whom were white. In fact, the state did not elect a single Black congressional member between 1897 and the 1990s.[24]

Following the 1970 Census, the legislature took up its duty to reapportion and redistrict and this time was required to submit proposed changes to the Justice Department. The legislature passed Act No. 932 in Nov. 1971, adopting a plan for the reapportionment of the state Senate. The state submitted the act to the Attorney General for preclearance review. While that was pending, several suits were filed in federal court challenging the plan as violative of the Fourteenth and Fifteenth Amendments of the U.S. Constitution.[25]

While those cases were consolidated before a three-judge court, under the styling of *Twiggs. V. West*, in March of 1972, the Justice Department blocked Act No. 932. The Assistant Attorney General concluded that the "combination of multi-member districts, numbered posts, and majority vote (run-off) requirement" was likely to result in "an abridgement of minority voting rights."[26] The court in *Twiggs* then held that the act would produce a malapportioned body and gave the legislature the opportunity to enact a new plan (*Twiggs*, unreported, Apr. 7, 1972).

The legislature then passed Act. 1205, which the *Twiggs* court upheld in May 1972. The following month, the Assistant Attorney General indicated, in a lengthy letter, that he determined that the plan produced by Act. 1205 was violative of the Fifteenth Amendment, but he indicated that, out of deference to the court, the Attorney General would not object to the Senate plan.[27]

---

[23] I discuss the localized objections below, in order to keep the discussion of redistricting compact and concurrent. *Reynolds v. Sims*, 377 U.S. 533 (1964); Burton et al., "South Carolina," pp. 200-202.

[24] *O'Shields v. McNair*, 254 F. Supp. 708, 715-16.

[25] *Twiggs v. West*, Civ. Ac. No. 71-1106 (D.S.C. 1972).

[26] David L. Norman, Assistant Attorney General, Civil Rights Div., to Hon. Daniel R. McCleod, Attorney General, State of South Carolina, March 6, 1972, U.S. Dept of Justice, Civil Rights Division Section 5 Objection Letters, https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/SC-1000.pdf.

[27] David L. Norman, Assistant Attorney General, Civil Rights Div., to Hon. Daniel R. McCleod, Attorney General, State of South Carolina, June 30, 1972, U.S. Dept of Justice, Civil Rights Division Section 5 Objection Letters, https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/SC-1010.pdf.

Some of the *Twiggs* plaintiffs then filed a separate action in the District Court in South Carolina, asking that the Attorney General be compelled to enter an objection. The court entered that order, and the Attorney General objected to Act 1205.[28] The District of Columbia Circuit Court upheld the District Court decision, and a new suit was filed seeking an injunction against the use of the plan established by Act 1205. The District Court in that case held that the Attorney General's failure to render an objection within the 60-day window afforded by Section 5 satisfied Section 5's requirements and dismissed the complaint. The Supreme Court upheld the decision.[29]

South Carolina's efforts to redistrict its state House of Representatives in the 1970s also involved Justice Department objections and lengthy litigation. By that time, Black citizens in South Carolina had begun to capitalize on their ability to register and vote, due in large part to the Voting Rights Act, and they had organized by forming the United Citizens Party in 1969. The group was so successful in turning out Black voters that the Democratic Party made some limited overtures, including supporting the nomination of a few Black candidates in areas with significant Black populations in Charleston and Columbia in the 1970 House elections. Three of those candidates won election that fall and became the first Black representatives in the state House since the Tillman-orchestrated "redemption" of the late 19th Century.[30]

Three representatives out of 124 was still grossly disproportionate, however, given that South Carolina's Black population at the time constituted approximately 30 percent of the electorate. Black plaintiffs subsequently challenged the redistricting plan adopted by the state House in Act. 1205, citing the use of multimember districts and the anti-single-shot law.[31] The court upheld the plan but not the anti-single-shot law, though the state simply replaced the latter with a numbered place law. The Justice Department, in the same letter in which it deferred to the court vis-à-vis the Senate plan in Act 1205, objected to the application of the numbered place law to contests throughout the state, including the state House of Representatives.[32]

Elections were held in 1972 under the state's plan for the state House, and the number of Black representatives increased from three to four, as noted above. The following year, the U.S. Supreme Court, in *Stevenson v. West*, reversed the trial court's decision to uphold the House's use of multimember districts with numbered posts.[33] The legislature once again produced a plan that used such devices, leading the Justice Department to register an objection due to the "submergence of significant concentrations of Negro voters into large majority multi-member districts and the magnification of this dilution of Negro voting strength by the numbered post and majority vote requirement." The state finally relented and redistricted using single-member districts. In 1974, 13

---

[28] Harper v. Kleindienst, 362 F.Supp. 742 (D.S.C. 1973); J. Stanley Pottinger, Assistant Attorney General, Civil Rights Div. to Hon. Daniel McLeod, Attorney General, State of South Carolina, July 30, 1973, https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/SC-1040.pdf.

[29] Morris v. Gressette, 425 F.Supp. 331, D.S.C. 1977, aff'd 432 U.S. 491 (1977).

[30] Willie M. Legette, "The South Carolina Legislative Black Caucus, 1970-1988," *Journal of Black Studies* 30, No. 6 (July 2000), pp. 839-858, pp. 840-43.

[31] *Johnson v. West*, No. 72-680 (D.S.C. 1972).

[32] Norman to McLeod, June 30, 1972, supra, fn. 30.

[33] 413 U.S. 902 (1973).

Black candidates were elected to the state House. The Senate remained comprised *only* of white members. The South Carolina congressional delegation also remained exclusively white, then comprised of two Senators and six members of the U.S. House.[34]

The presence of Black representatives in the state House led white legislators to abandon the longstanding system of legislative appointment of local governing bodies. As the authority to elect such bodies was handed back to counties, some switched to single-member district plans while others opted for at-large systems, most of them using dilutive devices like numbered posts, staggered terms, overly-large districts, and majority vote requirements. The Supreme Court had already declared that such systems, which enhance the ability of the quantitative majority to control election outcomes, also "enhanced the opportunity for racial discrimination." *White v. Regester*, 412 U.S. 744, 766 (1973). The Supreme Court would soon determine that the dilutive impact of those kinds of enhancing factors constituted a continuing practical impediment to the opportunity of black voting minorities to elect candidates of their choice.[35]

The Justice Department registered dozens of objections to these kinds of changes and more throughout the 1970s, 1980s, and 1990s, and plaintiffs brought suits challenging these actions in the courts.[36] As a result, more county commissions and city councils began adopting single-member electoral methods, particularly after lengthy, costly, and well-publicized litigation in Edgefield and Sumter Counties ultimately resulted in the blocking of at-large practices. This occurred around the same time as Congress amending the Voting Rights Act in 1982 to include a discriminatory results standard, as opposed to the racially discriminatory intent standard announced by the Supreme Court in *City of Mobile v. Bolden*.[37]

After the 1980 Census, and the South Carolina General Assembly's submission of plans for redistricting for the state House and Senate, the Justice Department found in the state's House plan "noticeable dilution or fragmentation of the minority vote in Florence County (Proposed District Nos. 59, 62, 63), Richland County (Proposed District Nos. 70, 72, 73, 74, 75, 76, 79), Lee County (Proposed District Nos. 50, 65, 66), Allendale-Bamberg-Barnwell Counties (Proposed District Nos. 90, 91), and Jasper-Beaufort Counties (Proposed District No. 122)." The Justice Department also noted that it was aware of alternate proposals that "would have avoided the fragmentation and dilution of minority voting strength in each of the referenced areas," and it noted

---

[34] Legette, "The South Carolina Legislative Black Caucus, 1970-1988," pp. 841-42; J. Stanley Pottinger, Asst Attorney General for Civil Rights, to Hon. Daniel R. McLeod, Attorney General, State of South Carolina, Feb. 14, 1974, U.S. Dept of Justice, Civil Rights Division Section 5 Objection Letters, https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/SC-1070.pdf.

[35] Thornburg v. Gingles, 478 U.S. 30, 39-40, 80 (1986).

[36] See generally Civil Rights Division, Section 5 Objection Letters, South Carolina, https://www.justice.gov/crt/voting-determination-letters-south-carolina; I summarize these below.

[37] Mobile v. Bolden, 446 U.S. 55 (1980); Blanding v. Dubose, 509 F.Supp. 1334 (D.S.C. 1981); McCain v. Lybrand, 465 U.S. 236 (1984); Burton et al., "South Carolina," pp. 208-11.

having "received complaints alleging that such alternate proposals were rejected for racially discriminatory reasons."[38]

The General Assembly submitted its state Senate plan for preclearance and sought a declaratory judgment in the D.C. District Court. It then moved forward with the election process for the 1984 primaries under the assumption that the plan would pass muster. The Justice Department objected to that action, as did the appellate court, and the state was enjoined from moving forward.[39] Private litigants then filed suit in the District Court in South Carolina seeking an interim plan imposed by the court. The court provided such a plan, but the state passed a new law establishing a plan of its own. That plan included 10 districts with majority Black populations, 7 of which had majority Black voting age populations. That was the plan ultimately used in elections in 1984, and four Black senators were elected to serve Districts 7, 19, 39, and 42.[40] Two other Black senators were elected, in 1988 and 1990, to represent District 30 and District 45, respectively. The South Carolina congressional delegation remained all white.[41]

Following the 1990s Census, the legislature passed new redistricting plans for the state House and Senate. Then-governor Carroll Campbell vetoed both plans, arguing that both would fail Section 5 preclearance review, particularly given the results standard embodied in the 1982 VRA amendment. Campbell noted that the plans did not create additional majority-minority districts, reduced the number of Black voters in existing minority districts, and cracked the Black voting population at the expense of white incumbents and at the expense of creating additional majority-minority districts. The governor's actions were characterized by his opponents as "cynical," meaning that they believed that he supported more majority-minority districts only because that would mean more safely white districts that Republicans could win.[42]

Unable to override the vetoes or pass new plans, the state legislative redistricting process ended up in federal court again. In *Burton v. Sheheen*, a three-judge court ordered the use of a plan for the Senate establishing 11 districts with majority Black populations, 10 of which had majority

---

[38] William Bradford Reynolds, Asst Attorney General, Civil Rights Division, to Hon. Daniel R. McLeod, Nov. 18, 1981, Civil Rights Division Section 5 Objection Letters, https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/SC-1460.pdf; Legette, "The South Carolina Legislative Black Caucus, 1970-1988," pp. 858-59.

[39] State of South Carolina v. United States, 585 F. Supp. 418, D.D.C. (1984); William Bradford Reynolds, Assistant Attorney General, Civil Rights Division, to Terrell Glenn, March 20, 1984, Civil Rights Division Section 5 Objection Letters, https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/SC-1540.pdf.

[40] These were not quite the first Black representatives to serve in the South Carolina Senate. I. DeQuincey Newman was elected from Orangeburg in a special election in 1983; *see* Leggete, "The South Carolina Legislative Black Caucus," p. 843.

[41] John C. Ruoff and Herbert E. Buhl, "Voting Rights in South Carolina, 1982-2006," *University of Southern California Review of Law and Social Justice* 17.2 (Spring 2008), pp. 643-711, pp. 673-75.

[42] William E. Rone, Jr., "Will Proportional Representation Improve Government," *The State* (Columbia, S.C.), Feb. 9, 1992, p. 2D; Valerie Bauerlein, "S.C. Redistricting Finalized Relatively Fast," *The State*, March 25, 2002.

Black voting age populations. Seven Black senators were elected under the plan that fall of 1992. The *Burton* court adopted a plan for the state House that included 28 majority-minority districts, 23 of which contained Black voting age majorities. Eighteen Black House members were elected under the plan that fall.[43]

f.    Redistricting, 1980 - Present

Following the 1980 Census, the South Carolina General Assembly failed to pass a congressional redistricting plan, with the House and Senate failing to come to agreement on a map. The South Carolina State Conference of Branches of the NAACP filed suit, as did two other individual plaintiffs, urging a three-judge federal court to adopt one of several submitted plans. The NAACP submitted three plans, two of which would create a majority-Black Sixth Congressional district ("CD 6"). The Court determined that the county splits in the NAACP plans were "radical" and opted to order the adoption of a modified version of a plan passed by the state House.[44]

The South Carolina General Assembly again failed to pass a congressional redistricting plan following the 1990 Census. Plaintiffs filed suit, and that case ended up before the court in *Burton*. As was the case in the 1980s, the state House and Senate each passed congressional redistricting plans but could not come together to pass one as the full assembly. The court in *Burton* determined that none of the plans submitted by parties was sufficient and, as with the state House and Senate plans, drew its own, though it also acknowledged that no parties disputed the need to draw, for the first time, a majority-minority district. CD 6 was thus drawn with a majority Black population.[45]

That fall, Jim Clyburn was elected to the U.S. Congress in the newly redrawn 6th Congressional District, becoming South Carolina's first Black representative in Washington in nearly 100 years. The campaign, which pitted Clyburn against a white Republican, was described in the media as having been "tinged with racial controversy." A television ad supporting Chase featured a distorted photo of Clyburn described by his campaign manager as "reminiscent of the vaudeville days when black people were not allowed to perform and white actors were made up with blackface with their eyes rolled back and lips popped out." The photo was placed on a "Welfare Express" card. Clyburn himself called it "a not-so-subtle way of injecting race" into the campaign and insisted that the photo made him look "like Buckwheat."[46]

---

[43] *Burton v. Sheheen*, 793 F. Supp. 1329 (D.S.C. 1992); Ruoff and Buhl, "Voting Rights in South Carolina, 1982-2006," pp. 676-82.

[44] S.C. State Conference of Branches, et al. v. Riley, 533 F. Supp. 1178, 1182 (D.S.C. 1982).

[45] *Burton*, at 1367.

[46] Lisa Key, "Black Turnout Called Key to Sixth District Win," *The State*. Oct. 29, 1992; Lisa Greene, "Race Issue Heats Up Clyburn, Chase Attacks," *The State*, Nov. 1, 1992; Lisa Greene, "Clyburn Makes History, Promises to Work for All," *The State*, Nov. 4, 1992; Clejetter Pickett, "NAACP Threatens Lawsuit over District 2 Voting Lines," *The Item*, Oct. 28, 1992.

The Supreme Court vacated *Burton* the following year on the grounds that the District Court had not thoroughly considered a Section 2 analysis. The legislature then passed a state House plan in 1994. Governor Campbell allowed the bill to become law without his signature so that it could go before the Justice Department for preclearance review. The Attorney General objected to the plan, in part, on account of its packing and cracking of Black populations. Assistant Attorney General Deval Patrick wrote in his objection letter, "We cannot preclear those portions of a plan where the legislature has deferred to the interests of incumbents while refusing to accommodate the community of interest shared by insular minorities." This problem was typically associated, Patrick wrote, with "the unnecessary fragmentation of minority communities or the needless packing of minority constituents into a minimal number of districts in which they can expect to elect candidates of their choice."[47]

The *Burton* court deferred to the legislature, though with a deadline. Before the deadline expired, a coalition of legislators in the South Carolina Legislative Black Caucus and the Republican Party, which was in the process of siphoning off white legislators from the Democratic Party, passed through a plan that would increase the number of majority-minority districts by nine. Black Caucus members felt like they had been taken advantage of by white Democrats and agreed with Republicans to draw more heavily white districts that white Republicans could win and more majority-minority districts that Black candidates could win. As Columbia's *The State* wrote, looking back, "Facing extinction, some white Democrats bolted for [the Republican Party]."[48] The Civil Rights Division did not object to this plan, and it was adopted just before the deadline established by the court in *Burton* had passed. The General Assembly also adopted a congressional redistricting plan that reflected the plan drawn by the court in *Burton*. CD 6 under that plan had a Black population of 61 percent and a Black voting age population ("BVAP") of 58 percent.[49]

In the fall of 1994, the same year, 24 Black legislators were elected to the state House, but a challenge was brought to the state House plan based on the Supreme Court's decisions in *Shaw v. Reno* (1993) and *Miller v. Johnson* (1995). These cases challenged majority-minority districts under a racial gerrymandering theory; a framework which requires a plaintiff to show that race predominated in the development of those districts without a legally sufficient justification like compliance with the Voting Rights Act. The court in *Smith v. Beasley* in 1996 held that race had predominated to an unacceptable degree in drawing 6 of the 9 new districts. The state House redistricted again to reflect the court's finding and adopted a plan under which all but one of the new Black legislators elected under the final *Burton* plan were reelected.[50]

---

[47] Deval Patrick, Asst Attorney General, Civil Rights Division, to Hon. Robert Sheheen, Speaker of the South Carolina House of Representatives, May 2, 1994, Civil Rights Division Section 5 Objection Letters, https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/SC-1980.pdf; Ruoff and Buhl, "Voting Rights in South Carolina," pp. 676-82.

[48] Cindi Ross Scoppee, "A House Divided Sweats Out Remap," *The State*, May 12, 1994; Gina Smith, "Endangered Species: South Carolina Democrats," *The State*, Feb. 6, 2011; Tim Flatch, "Elections Expected to Give Republicans 'Working Control' of State House," *Greenville News*, Nov. 9, 1994.

[49] Rouff, "Voting Rights in South Carolina," pp. 707-08.

[50] *Smith v. Beasley*, 946 F. Supp. 1174 (D.S.C. 1996); Ruoff and Buhl, "Voting Rights in South Carolina," pp. 680-82.

The impact of *Shaw* and *Miller* was felt in the South Carolina Senate's efforts as well. The Senate passed a plan in 1995 that created two new majority-minority Senate districts. In *Smith v. Beasley*, the court held that not only were those two districts the product of impermissible racial predominance, but so was one additional district. The Senate then passed a plan, in 1997, that no longer provided for Black majorities in the two districts created in the 1995 plan. The Justice Department objected to the boundaries of one of the districts, observing, "[T]here are alternative configurations that would minimize the reduction in black voting strength in District 37," and that some of these were "available to the state" and would have "substantially address[ed] the *Smith* court's constitutional concerns," without "significantly diminish[ing] black voting strength in neighboring senate districts." The Justice Department also objected to the plan on the grounds that it represented a "clear violation" of Section 2 of the Voting Rights Act. Senate redistricting thus ended up back before the *Smith* court, which then ordered the implementation of its own plan, based in part on the 1997 plan and in part on the 1984 plan, with the court's own modifications. Special elections were held that fall, and Black South Carolinians lost a seat in the Senate, District 37.[51]

Plaintiffs also brought a *Shaw/Miller* challenge against the drawing of the new CD 6, filing *Leonard v. Beasley* in late 1996. The parties in that case reached a settlement whereby the defendants conceded that drawing CD 6, as it was, required subordinating traditional redistricting principles to "racial considerations," and the plaintiffs conceded that "the State has a compelling state interest in adopting [a] congressional plan that does not have the purpose, effect or result of providing minority citizens with less opportunity than other members of the electorate to elect representatives of their choice."[52]

Following the 2000 Census, the General Assembly passed redistricting plans for the state House and Senate and for the state's congressional districts, but then-Governor Jim Hodges, a white Democrat, vetoed the bill, H.3003. The governor argued that the state legislative plans lacked sufficient "opportunity" districts for Black voters, and that the congressional map split too many counties. The head of the state's Legislative Black Caucus, Rep. Joe Neal, argued that the plans for the state legislature, in particular, were conducive to the election of candidates espousing extreme positions due to a lack of competition. The process ended up again before a three-judge federal court, with multiple parties filing suit under one-person/one-vote claims of malapportionment, due to the impasse.[53]

---

[51] Isabell Katz Pinzler, Asst Attorney General, Civil Rights Division, to Hon. John W. Drummond, April 1, 1997, Civil Rights Division Section 5 Rejection Letters, https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/SC-2090.pdf; Ruoff and Buhl, "Voting Rights in South Carolina," pp. 675-77.

[52] Leonard v. Beasley, No.3:96-03640 (D.S.C. Aug. 6, 1997); Ruoff, "Voting Rights in South Carolina," pp. 707-08.

[53] "Democrats Push for Influence in Redistricting," Associated Press, *Orangeburg Times-Democrat*, Sept. 11, 2001; Bauerlein, "S.C. Redistricting Finalized Relatively Fast," *The State*, March 25, 2002.

In 2002, the court in *Colleton County Council v. McConnell*, took special note of the "overwhelming" evidence of what was by then being called racially polarized voting, or what had been up to that point referred to as "bloc voting," a term carried over from colormasked denunciations of the nascent Black vote in the 1950s and 1960s. 201 F. Supp. 2d 618, 623-36, 642 (D.S.C. 2002). Racially polarized voting occurs when a minority group votes as a block for a particular candidate who is then defeated by non-minority voters, who are usually voting as a bloc against those candidates of choice of the minority. The court in *Colleton* adopted a plan for the state Senate that included 11 majority Black districts, 10 of which had a majority BVAP, and one opportunity district that sat just below 50 percent. The court's plan for the state House established 31 majority Black districts, of which 28 were majority in BVAP.

The General Assembly modified the court's plans in 2003, and those plans were precleared under the standard of Section 5 – non-retrogression. In addressing the need for a new congressional plan, the *Colleton* court acknowledged that the "benchmark" plan, drawn by the court in *Burton* in 1992 and amended and adopted by the General Assembly in 1994, had been challenged under *Shaw/Miller* as an unconstitutional plan but that a settlement had been reached wherein there was no ruling on the constitutionality of the plan. The state defendants had agreed to concede that racial considerations had predominated in drawing the plan if a new suit was brought. But the court further acknowledged that no Section 2 claim was being brought in the current case. All parties and the court had agreed, though, that Section 2 required maintenance of CD 6 as a majority-minority district. CD 6 had also lost 68,000 or so in population and would need to take in BVAP in order to remain a majority-minority district. The court held, then, that "§ 2 and § 5 of the Voting Rights Act require the maintenance of CD 6 as a majority-minority district. We believe the minority population in the core areas of CD 6, as drawn by the court, is sufficiently compact and shares a sufficiently strong community of interest to warrant being a majority-minority district" (*Colleton County Council*, at 665).

Following the 2010 Census, South Carolina gained a U.S. congressional seat. The General Assembly enacted Acts 72 and 75 (both in 2011) establishing redistricting plans for the state legislature and Congress, respectively. The state legislative plans passed with biracial support, indicating some measure of cooperation between Black legislators and white Republicans, but also drawing the ire of Black and white Democrats who insisted that the plans packed Black voters into majority-minority districts in order to "bleach out" white Republican districts, meaning to give them a large enough percentage of white voters that candidates would not have to campaign for Black votes at all.[54]

The bills were signed by Governor Nikki Haley, and the plans were precleared by the Obama Justice Department under the standard of non-retrogression. The congressional plan maintained the majority Black CD 6, at 53 percent, and created the new CD 7 in the growing Pee Dee, in Horry and Georgetown Counties. Rep. Gilda Cobb-Hunter, a Black Democrat in the state

---

[54] Jim Davenport, "Democrat: GOP District Plan 'Electoral Apartheid,'" *The Greenville News*, June 16, 2011; Liz Carey, "Redistricting Plan One Step Closer to Final," *Anderson Independent Mail*, June 17, 2011.

House, argued that this represented packing CD 6 unnecessarily when a second Black opportunity district could have been drawn using some of the BVAP in CD 6 and Black populations that were cracked among the remaining districts. Cobb-Hunter described a compromise reconciling conflicting state House and Senate plans for the new congressional map as a "fait accompli" at the time and said, "I hope for the people of South Carolina that this plan ends up in court." Plaintiffs indeed brought suit, alleging Fifteenth Amendment violations against all three plans and racial gerrymandering and Section 2 violations in the enactment of the state House and congressional plans.[55]

With respect to the racial gerrymandering claims, the three-judge federal court in *Backus v. South Carolina* found that the "Defendants were able to disprove that race was the predominant factor by demonstrating that their decisions adhered to traditional race-neutral principles." 857 F. Supp. 2d 553, 560, D.S.C., *aff'd* 133. S.Ct. 156, 2012. The court found the expert report and testimony of plaintiffs' expert Dr. Michael McDonald to be lacking in credibility, particularly in that Dr. McDonald failed to consider the race-neutral redistricting guidelines adopted in the General Assembly's relevant committees and subcommittees when he concluded that race had predominated in the drawing of the approved maps. The court also found that while the testimony of state Rep. Bakari Sellers, state Senator Brad Hutto, U.S. Rep. Clyburn, and others "strongly suggested" that race was a factor in the drawing of district lines, plaintiffs failed to establish that it was the *predominant* factor (at 565).

The *Backus* court concluded that the plaintiffs, in District Judge Patrick Duffy's words, "focused too much on changes that increased the BVAP in certain districts and not enough on how traditional race-neutral principles were subordinated to race in making those changes. This approach," the court held, "risks ignoring that race might have been an unintended consequence of a change rather than a motivating factor" (at 565). According to the court, this also "ignore[d] that race can be – and often must be – a factor in redistricting," because South Carolina was "a covered jurisdiction under [Sections 4 and 5 of] the Voting Rights Act" (Id). The court shot down the plaintiffs' Section 2 claims on the basis that they had not met the first "precondition" of the *Gingles* framework: "Plaintiffs have not shown that, absent the districting scheme imposed by the House and Congressional plans, African–Americans could form a majority of voters in another potential district" (567).

The *Backus* court similarly found that the plaintiffs failed to prove either discriminatory intent or effect. The court wrote, "There is no convincing direct evidence indicating that the General Assembly drew the district lines for the purpose of diluting Plaintiffs' voting strength. Nor do the totality of the facts yield an inference that the General Assembly acted with such a discriminatory purpose. More importantly," it continued, "Plaintiffs have failed to prove a discriminatory effect. They offered no evidence demonstrating how the House and Congressional

---

[55] Jim Davenport, "S.C. Legislators Seek U.S. House District Line Support," *Anderson Independent Mail*, July 26, 2011; Tim Smith, "District Splits Upset Minorities," *Greenville News*, July 28, 2011; Gina Smith, "Senate Passes Surprise Plan for Seventh Congressional District," *The Herald* (Rock Hill, S.C.), June 29, 2011.

plans dilute their votes. . . . There was no expert testimony describing how the House and Congressional plans minimized or cancelled out minority voting potential" (568-69). As to the 15th Amendment claims, the court in *Backus* held, "[b]cause Plaintiffs have offered no evidence, nor have they argued, that any Plaintiff was denied the ability to vote, the Court finds that the House and Congressional plans do not violate the Fifteenth Amendment" (570).

g.   <u>Section 5 Challenges and the Shift in Political Affiliation</u>

The white flight from the Democratic Party to the Republican Party that had begun with Thurmond and the Dixiecrats continued, erratically, and less thoroughly, in South Carolina than elsewhere in the old Confederacy, into the 2010s.[56] As political scientists Merle and Earl Black have described, white folks in South Carolina initially remained loyal to the Democratic Party in state and local elections after they began to vote for candidates like Thurmond or Republicans Barry Goldwater and Richard Nixon for president. That began to change in the 1990s, and by the new millennium, white flight to the Republican Party and Black identification with the Democratic Party was significant enough that there were almost no Black Republicans and few remaining white Democrats in the South Carolina General Assembly.[57]

This remains the case in South Carolina today, though Republican Senator Tim Scott does represent the state in Washington. Mr. Scott was elected to the state legislature in 2009, won a seat in CD 1 in the U.S. House of Representatives in 2011, and was subsequently appointed by Governor Nikki Haley to the U.S. Senate seat vacated by Jim DeMint in 2011. He won a special election in 2014 and a full-term election in 2016. Democratic Judge Donald Beatty has also been elected by the General Assembly to the state Supreme Court (2007) and to the Chief Justiceship of that Court (2017). South Carolina maintains more white Democrats in its state legislature than surrounding states. The white southern exodus from the Democratic Party to the Republican Party, nationally, has been nonetheless repeatedly shown to be substantially the result of racial animus and backlash against the national Democratic Party's embrace of civil rights and social welfare spending. South Carolina's congressional delegation was all Democratic as of 1899. It became all-

---

[56] Crespino, *Strom Thurmond's America*, pp. 3-11. See also Dan Carter, *The Politics of Rage: George Wallace, the Origins of the New Conservatism, and the Transformation of American Politics*, 2nd ed. (Baton Rouge: Louisiana State University Press, 2000); Dan Carter, *From George Wallace to Newt Gingrich: Race in the Conservative Counterrevolution, 1963-1994* (Baton Rouge: Louisiana State University Press, 1999); Kevin Kruse, *White Flight: Atlanta and the Making of Modern Conservatism* (Princeton, NJ: Princeton University Press, 2005); Matthew Lassiter, *The Silent Majority: Suburban Politics in the Sunbelt South* (Princeton U.P. 2007); Joseph Crespino, *In Search of Another Country: Mississippi and the Conservative Counterrevolution* (Princeton U.P., 2009); Thomas Sugrue, *Sweet Land of Liberty: The Forgotten Struggle for Civil Rights in the North*, (New York: Random House, 2008); Thomas Sugrue, *The Origins of the Urban Crisis: Race and Inequality in Postwar Detroit* (Princeton U.P., 2014); Michelle Nickerson and Darren Dochuk, *Sunbelt Rising: The Politics of Space, Place, and Region* (Philadelphia: University of Pennsylvania, 2014); and Lisa McGirr, *Suburban Warriors: The Origins of the New American Right* (Princeton: Princeton University Press, 2001).

[57] Merle and Earl Black, *The Rise of Southern Republicans* (New York: Belknap Press of Harvard, 2002), pp. 115-17, 296-97, 317.

white Republican, excepting Mr. Clyburn, in 2011. Mr. Cunningham served from 2019 to 2021. Recently, Mike Reichenbach, a Black Republican, replaced the venerable Hugh Leatherman in the Senate, winning a special election in Florence County.

By 2012, the Justice Department had objected to South Carolina state and local election changes 122 times.[58] Many of those involved redistricting, but others were aimed at blocking dilutive practices at the local level, many of which involved local governing bodies in the congressional districts that Plaintiffs in this case allege cracking of Black voters. In CD 2, this included Aiken County, which was blocked from using numbered posts in all multi-member bodies in the county and from maintaining at-large positions on the school board. The city of Barnwell was blocked from using at-large elections with staggered terms for aldermen and from using a majority vote requirement for mayor and city council.[59]

Beaufort County was blocked from using at-large elections for county council. The city of North Charleston was twice blocked from using at-large elections for its city council. It was likewise blocked, more than once, from making racially selective and dilutive annexations, accepting only white areas to the point of leaving "'doughnut holes'" of Black neighborhoods un-annexed.[60] The city of Charleston was blocked from reducing its Black majority city council districts in 2001 and from making racially selective and dilutive annexations. The town of McClellanville in Charleston County was also blocked from making racially selective and dilutive annexations. The town of Hollywood was blocked from using a majority vote requirement for election to the town council. Charleston County was blocked from using, for its charter council, multi-member districts, at-large elections, a majority vote requirement, residency requirements, and numbered posts. It was likewise blocked from changing the method of electing the Board of Trustees for its school board from non-partisan to partisan elections and eliminating plurality victories by requiring head to head contests with a majority votes requirement.[61]

The City of Gaffney was blocked from switching to at-large elections for its Board of Public Works. Cherokee County was blocked from reducing the number of members of its school board. Chester County was blocked from switching to at-large election of the county Board of Directors with a majority vote requirement. The city of Chester was blocked from having unduly high candidate filing fees for city council and mayor. Fairfield County was blocked from increasing the number of members of its school board by adding members appointed by the county's legislative delegation. Kershaw County was blocked from switching from the method of filling school board vacancies to avoid the election of a Black member by way of a referendum. Lancaster County was blocked from switching to at-large elections for its board of education and for its county commissioners and school board, as was the city of Lancaster, twice, for its city

---

[58] Civil Rights Division, Section 5 Objection Letters, South Carolina, https://www.justice.gov/crt/voting-determination-letters-south-carolina.
[59] Id.
[60] One objection was withdrawn when the city annexed some of the Black neighborhoods.
[61] Civil Rights Division, Section 5 Objection Letters, South Carolina, https://www.justice.gov/crt/voting-determination-letters-south-carolina.

council. The city of Lancaster was also blocked from instituting a majority vote requirement for judicially contested elections. The town of Bishopville in Lee County was blocked from staggering the terms of its town council in order to prevent single-shot voting. Lee County itself had its county council and school board redistricting blocked. The town of Batesburg-Leesville in Lexington and Saluda Counties was blocked from implementing a majority vote requirement for elections for mayor and town council. Finally, the Richland-Lexington School District No. 5 was blocked from adopting numbered posts and a majority vote requirement.[62]

Orangeburg County was blocked from implementing a racially dilutive redistricting plan for its county council, and the town of Norway in Orangeburg County was blocked from maintaining at-large election of its mayor. The town of North was blocked from making racially selective annexations. Richland County was blocked from reducing the number of seats on its county council to the detriment of Black voters.[63]

Spartanburg County was blocked from switching from an elected to an appointed board of education. The city of Greer in Greenville and Spartanburg Counties had its redistricting blocked. Sumter County was blocked from adopting at-large for its school board and county council. Sumter also had its 2001 redistricting for county council blocked. The city of Sumter was blocked from making racially selective annexations. Union County had its 2002 redistricting blocked. York County was blocked from adopting at-large elections for its county council. The city of York had a redistricting plan blocked. The city of Rock Hill was blocked from adopting a majority vote requirement for its city council and from making racially selective annexations. Rock Hill also had its 1990s redistricting plan blocked.[64]

Many of these objections came between the passage of the VRA and its renewal in the 1980s. But eleven of these Section 5 objections came after the last DOJ objection to a statewide South Carolina redistricting plan in 1997, and between 1997 and 2013 there were also two Section 2 DOJ lawsuits filed, successfully challenging electoral methods for the City of Charleston's City Council and Georgetown County's School District.[65]

The final Section 5 objection in 2011 was aimed at the state legislature's passage of a strict voter photo identification law. The Justice Department concluded that the state had submitted no evidence of its stated concern in the passage of the legislation, to wit: voter fraud, and it concluded that the state had done nothing to address the obviously disparate racial impact that the law would have if enacted. Assistant Attorney General Thomas Perez wrote, "Until South Carolina succeeds in substantially addressing the racial disparities described above . . . the state cannot meet its burden of proving that, when compared to the benchmark standard, the voter identification

---

[62] Id.

[63] Id.

[64] Id.

[65] See *United States v. Charleston Cty.*, 316 F. Supp. 2d 268, 272 (D.S.C. 2003), *aff'd sub nom. United States v. Charleston Cty., S.C.*, 365 F.3d 341 (4th Cir. 2004); see *United States v. Georgetown County School District*, No. 2:08- cv-00889 (D.S.C. 2008).

requirements proposed . . . will not have a retrogressive effect."[66] The state applied for a declaratory judgment from the D.C. District Court. Then-Circuit-Judge Brett Kavanaugh wrote for the court in allowing the law to go into effect only with significant modification. While preclearing the law with a '"reasonable impediment" exemption process, the court rejected the state's attempt to require a reasonable impediment form be notarized because of its likely racially discriminatory harm. In a concurring opinion, Circuit Judge John Bates argued that this litigation demonstrated the continuing utility of Section 5 review, which was nonetheless suspended in *Shelby County v. Holder*.[67]

South Carolina has been accused of having an unduly strict voter registration deadline. It was forcibly brought into compliance with the "Motor Voter" or "NVRA" Act in 1993. The state has also recently been cited for requiring prospective voters to include their full Social Security number on voter registration applications. The state also enforces a restrictive felony disenfranchisement law and has been accused of obstructing the proper counting of college students and inmates. It is also one of approximately 15 states that has refused to adopt "no excuse" absentee voting and refuses early in-person voting for all voters. The state also requires a supporting witness requirement. These kinds of strictures, in the context of the COVID-19 pandemic, led Black citizens to file suit citing an undue and disproportionate burden. For the June 2020 primary, for example, the state was compelled to relax its witness requirement, partly because the court recognized that the pandemic had disproportionately affected Black citizens.[68]

Black voters in South Carolina have also endured extremely long wait times due to a combination of poor election administration, polling place closures, and other facts. Before the 2020 elections, wait times were abysmal. In the 2012 general election, South Carolina was reportedly tied for having the second worst polling place wait times in the country, with an average wait time of 25 minutes; Black voters disproportionately experience longer wait times within the state.[69] By comparison, the national average wait time was 13 minutes, and two-thirds of voters nationally waited less than 10 minutes.[70]

---

[66] Assistant Attorney General Thomas E. Perez to C. Havird Jones, Assistant Deputy Attorney General, Dec. 23, 2011, Civil Rights Division, Section 5 Objection Letters, https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/l_111223.pdf.

[67] Mark A. Posner, "Current Conditions of Voting Rights Discrimination in South Carolina," Leadership Conference on Civil and Human Rights, https://andstillivote.org/wp-content/uploads/2021/09/South-Carolina-HHRG-117-JU10-Wstate-HendersonW-20210816-SD016.pdf, p. 5; *South Carolina v. United States*, 898 F. Supp. 2d 30 (D.D.C. 2012), at 38, 41, 53-4.

[68] Posner, "Current Conditions of Voting Rights Discrimination in South Carolina, p. 4; *Thomas v. Andino*, --- F. Supp. 3d ---, 2020 WL 2617329 (D.S.C. May 25, 2020).

[69] Posner, "Current Conditions of Voting Rights Discrimination in South Carolina, p. 4.

[70] Rachel Weiner, "How Long Did You Wait to Vote? Depends on Your race," *Washington Post*, April 3, 2013, citing Charles Stewart III, "Waiting to Vote in 2012," *Journal of Law and Politics*, April 1, 2013, https://www.washingtonpost.com/news/the-fix/wp/2013/04/08/how-long-did-you-wait-to-vote-depends-on-your-race/.

These realities are inseparable from the state of South Carolina's history of violence and disenfranchisement aimed at its Black citizens. Those citizens fought into the present century to remove the Confederate flag from the dome of the state capitol. A fight that, tellingly, and very recently, bitterly divided the General Assembly along racial lines. Lawmakers opted to remove the flag to a Confederate monument, as opposed to the top of the state house.[71] This is a state that reacted to Black Reconstruction with systematic violence and complete disenfranchisement. It resisted any and all efforts to roll that back in the first half of the Twentieth Century, especially through the enactment of vote denial schemes. Following the passage of the Voting Rights Act, the state and its governing localities, acting in concert through legislators in Columbia, pursued myriad vote dilution systems, many of which were struck by the Civil Rights Division of the Justice Department under Section 5 preclearance. More recently, there have been Section 2 cases litigated and a Section 5 objection to the photo ID law and backlash against long lines and other restrictions on absentee voting.

Plaintiffs of course also brought many challenges to the state's reapportionment efforts. Right before the passage of S. 865 in 2022, Rep. Govan described how the redistricting process had been challenged every single cycle since Black citizens had first won the right to actually vote and elect candidates of choice in the 1970s.[72] In his opinion, what is happening now is simply more of the same. Based on the documented historical and contemporaneous patterns of voting rights discrimination against Black South Carolinians, the historical record supports a discriminatory motive animating the enactment of S. 865.

## IV.    THE SEQUENCE OF EVENTS AND DEPARTURES FROM NORMAL PROCESS

The sequence of events during the redistricting process reveals transparency concerns, procedural norm departures, and inconsistencies in legislative action. As described in the legislative history below, members of the public, as well as legislators on the committees in charge of the redistricting process, had little time to review proposed maps before hearings, because staff proposed maps would sometimes be published days before hearings or just before long holiday breaks. Numerous members of the public and of the committees that were tasked with producing maps complained that they lacked access to the actual map drawing process. The public was given opportunities to weigh-in via public hearings, but it is unclear how much weight their testimony was given, nor is any insight given into how those comments impacted amendments and changes to proposed maps. Committee members reported being blindsided by the appearance of maps and being at a loss for why certain changes would have taken place. Finally, leadership refers to a swell of support for two members of Congress representing Charleston that is simply not supported by the evidence available to the public. No one supported that at the Charleston public Senate hearing, and almost no one mentioned it in public testimony thereafter.

---

[71] Stephanie McCrummen, "Confederate Flag Comes Down on South Carolina's Statehouse," *Washington Post*, July 10, 2015.
[72] See p. 42, infra.

a. The First Senate Redistricting Subcommittee Meeting, June 2021

On July 20, 2021, the South Carolina Senate Judiciary Committee's Redistricting Subcommittee met for the first time in order to be briefed by Judiciary Committee staff counsel Charlie Terreni and Paula Benson. The General Assembly ensured that there were both Republicans and Democrats represented on the Subcommittee and that the various regions of the state, as reflected in congressional districts, had representation. The role of staff was revealed to be that of real-time and behind-the-scenes support for leadership and key-decision-makers. Staff played a fundamental, though often obscured, role in the process, and they appear not to have been as available to committee members beyond the leadership.

The Senate Subcommittee was tasked with adopting redistricting plans for both the state's legislative and congressional districts. The results of the 2020 Census revealed that South Carolina experienced significant, and uneven, population growth since 2010, especially effecting the state's congressional districts. In particular, the Census data revealed that CD 1 was almost 12% overpopulated and that CD 6 was almost 12% underpopulated.[73]

Members of the Senate Subcommittee included Charmain Luke Rankin and fellow Republican representatives Chip Campsen, Tom Young, Scott Talley, and Democratic representatives Ronnie Sabb, Margie Bright Matthews, and Dick Harpootlian. Senators Sabb and Matthews were the only Black legislators named to the 7-member committee. Mr. Terreni gave members a rundown of Census data, and Ms. Benson informed them of the schedule of public hearings. These would be held in order to collect testimony on COIs in South Carolina. In addition to Mr. Terreni and Ms. Benson, Chairman Rankin introduced staff members Will Roberts and Breeden John as individuals entrusted with drawing maps.[74]

In the Subcommittee's initial press release on July 16, Chairman Rankin is quoted, "[t]he members of our bipartisan subcommittee represent a wide range of different experiences and perspectives. I look forward to our working together on a redistricting process that is fair and equitable to all South Carolinians." The release continued:

Districts for the S.C. General Assembly and the U.S. House of Representatives are redrawn every ten years, after the census is taken, to meet the requirements of federal and state law. This process ensures that members of the S.C. General Assembly and South Carolina's members to the U.S. House of Representatives are elected from districts with

---

[73] Judiciary Committee Press Release, Aug. 12, 2021, https://redistricting.scsenate.gov/docs/Press%20Release%20-%20Senate%20Judiciary%20Redistricting%20Subcommittee%20-%20Census%20Data%20Available%20on%20S.C.%20Redistricting%20Website.pdf; Census Legacy Data, House Ad Hoc Committee Website, https://redistricting.schouse.gov/demographicprofile.html.
[74] South Carolina State Legislature, Video Archive, https://www.scstatehouse.gov/video/archives.php; South Carolina Senate Judiciary Committee, Meeting Information, https://redistricting.scsenate.gov/meetinginfo.html.

approximately the same population. The public is urged to attend the public hearings that will be held across the state.[75]

A second press release describes the purpose of the public hearings: "The mission of these public hearings is to receive testimony and gather information about how people see the areas in which they live and what factors need to be considered when the Senate Districts and the Congressional Districts are redrawn."[76]

   b.   The First House Ad Hoc Committee Meeting

On August 3, 2021, the House Redistricting Ad Hoc Committee met for the first time. As with the Senate Subcommittee, the Ad Hoc Committee was tasked with adopting guidelines for redistricting, with gathering input from the public, and with overseeing the process of drawing congressional and state legislative districts to replace the malapportioned maps of the last post-2010 redistricting cycle. And, again as with the Senate Subcommittee, much of the technical work done in the redistricting process was handled by staff; in the House's case, this meant, especially, Emma Dean.[77]

Members named to the Committee included Chairman Jay Jordan and fellow Republican representatives Neal Collins, Jason Elliot, Brandon Newton, and Weston Newton, and Democratic members Justin Bamberg, Patricia Moore Henegan, and Beth Bernstein. Representatives Bamberg and Henegan were the only Black members of the Committee. Representative Brandon Newton subsequently withdrew from the committee upon the birth of his child.

At the inaugural meeting, Chairman Jordan listed the committee's proposed guidelines for the redistricting process. The guidelines were adopted without debate. Rep. Weston Newton asked what data the committee would be working with, and Chairman Jordan explained that it would have the Census legacy data for use in public hearings and that the Committee would not get the final tabulations from the Census Bureau until September, with maps being made in October of 2021. He did not indicate who would be drawing the maps, either to begin with or to the extent that subsequent changes would be made.

---

[75] Senate Judiciary Committee Press Release, July 16, 2021, https://redistricting.scsenate.gov/docs/Press%20Release%20-%20Senate%20Judiciary%20Redistricting%20Subcommittee%2007-16-21.pdf.

[76] Senate Judiciary Committee Press Release, July 20, 2021, https://redistricting.scsenate.gov/docs/Press%20Release%20-%20Senate%20Judiciary%20Redistricting%20Subcommittee%2007-20-21.pdf.

[77] South Carolina Legislature, Video Archives by Meeting Time, https://www.scstatehouse.gov/video/archives.php; South Carolina House of Representatives, Ad Hoc Redistricting Committee, https://redistricting.schouse.gov/index.html.

c.  The Senate Hearings and Second Senate Redistricting Subcommittee Meeting

The Senate Redistricting Subcommittee met for the second time on September 17, 2021, and unanimously adopted guidelines for redistricting.[78] It had held public hearings by that point, in July and August, across the state: in Aiken, Conway, Orangeburg, Beaufort, Florence, Greenville, Rock Hill, Sumter, and Columbia. The Subcommittee was accepting real-time and written public testimony, though without any comment or any feedback pertaining to how that input would be assessed. Members of the public held forth on issues ranging from county and precinct splits to concerns about packing and cracking Black communities to consideration of Communities of Interests ("COIs") and incumbency Many of them offered very specific guidance as to how they felt the legislature ought to draw certain districts. The Subcommittee members, having toured the state and heard from its citizens, as would the members of the House Ad Hoc Committee, brought their respective takeaways from these hearings to the September meeting. This meeting revealed that there were serious transparency concerns among the Senate Subcommittee as well as fundamental disagreement about how to handle the process with respect to the drawing of the congressional map.[79]

At this meeting, Sen. Harpootlian, a white Democrat and former Columbia prosecutor who litigated the *Backus* case in 2010, made note of the Supreme Court's 2013 decision in *Shelby County v. Holder* and noted that, with the end of the Justice Department's preclearance requirements, the state was no longer bound by the principle of non-retrogression in terms of majority-minority districts. He argued that the committee ought to acknowledge that the existing congressional districts were "misshapen" since they had been redrawn in the 1990s, prior to the Court's decision in *Shaw v. Reno*, in order to "pack Black voters" into the 6th District so that Black voters could, for the first time, have the chance to elect candidates of their choice to Congress. Sen. Harpootlian also expressed concern that the committee's work might become a form of "Kabuki theater," in which the only real concern was that incumbents were able to secure reelection. He proposed adopting the principles set forth in *Thornburg v. Gingles*, the 1986 case establishing the guidelines for a Section 2 vote dilution claim, and subsequent litigation as part of the committee's guidelines.

To bolster his argument regarding non-retrogression, Sen. Harpootlian asked the Senate Subcommittee staff if they had conducted or planned to conduct racially polarized voting analyses. These analyses, he explained, would allow the committee to see what percentage of the Black voting age population (BVAP) would be necessary for minority voters to elect candidates of choice where white voters routinely blocked those choices by bloc voting against Black voters' preferred candidates. He termed the failure to conduct them "willful blindness." Sen. Harpootlian insisted

---

[78] Senate Redistricting Guidelines, https://redistricting.scsenate.gov/docs/Senate%20Redistricting%20Guidelines%20Adopted%209-17-21.DOCX.
[79] Senate Redistricting Subcommittee Meeting, Sept. 17, 2021, https://redistricting.scsenate.gov/meeting/subcommittee.html?date=091721.

that, without these data analyses, the Senate would not be able to successfully meet a challenge in court under Section 2 of the Voting Rights Act.

Sen. Matthews joined in these concerns. Mr. Terreni replied that he did not think it would be productive at that time to conduct such analyses, given that it would open up the "peril" of having to "meet certain racial targets" when those did not necessarily need to be met. Sen. Harpootlian asked, "Are we going to wait for somebody to sue us?" And he expressed hope that the committee was not going to "cook this up in a back room." Mr. Terreni insisted that certain data would be made available on the staff website, but that no analyses need be conducted unless the plan adopted by the legislature was challenged in court under Section 2. Sen. Sabb asked when that data would be made available, and Mr. Terreni responded that he did not yet have a timeframe for that. He noted that he was awaiting information on contests between white and Black candidates in order to make that data available, though racially polarized voting analysis would not be limited to such contests as Black voters might sometimes prefer white candidates, even, in some cases, over Black candidates.

Sen. Harpootlian continued to advocate for guidelines that would acknowledge the state of South Carolina's history, which he said was characterized by "using unconstitutional principles to deny African Americans the right to participate in a meaningful way in the political process." He argued that not replacing the maps dating back to the 1990s with newly redrawn maps based upon RPV analysis would result in perpetuating "the sins of the past." Sen. Matthews proposed amending the guidelines regarding COIs to reflect that COIs included cultural and linguistic ties, citing especially the Gullah-Geechee community in her district. This amendment passed. Sen. Harpootlian's amendment regarding *Gingles* and "its progeny" also passed, with the committee amending the language of section I-B of the guidelines to read, "A redistricting plan for the General Assembly or Congress must not have either the purpose or the effect of diluting minority voting strength and must otherwise comply with Section 2 of the Voting Rights Act, as expressed through *Thornburg v. Gingles* and its progeny, and the Fourteenth and Fifteenth Amendments to the U.S. Constitution." These were the only two amendments to the guidelines to be brought and passed at this meeting of the subcommittee based upon public testimony at the summer public hearings.

Before the September meeting concluded, Sen. Harpootlian asked the staff if any technical assistance could be rendered to members of the public who wished to submit map proposals, citing especially concerns from his constituents about the highly technical nature of composing such plans and the format in which they were required to be submitted. Mr. Terreni insisted that staff did not have the resources for that, referred the Senator to the website *Dave's Redistricting*, and noted the availability to testify at public hearings and to beseech one's state representative to visit the "map room." Sen. Harpootlian asked if the public had access to the staff's map room, to which the answer was no. Sen. Campsen argued that such access would tax the abilities of staff and that the public had the opportunity to testify at hearings. Sen. Harpootlian concluded, "I know we won't let average citizens look under the tent and figure out what's going on." The Subcommittee left the window for the adoption of public submissions open through the end of October and resolved to meet again in November. The House, Chairman Rankin acknowledged, was working on a much slower timeline regarding redistricting and, according to the Chairman, was not being as

transparent as the Senate was in the process. There were no further legislative hearings on redistricting for nearly two months.

        d.   <u>The House Public Hearings</u>

Legislative sessions aside, over the course of September and through the first week of October 4, the House Ad Hoc Committee held hearings and heard public testimony in Myrtle Beach, Florence, York, Greenville, North Charleston, Bluffton, Aiken, Greenwood, Orangeburg, and Columbia. Like the Senate Subcommittee hearings, citizens testified about COIs that they either wanted to keep or make whole, or at the very least avoid numerous splits in those communities. They expressed, among other things, concern about minority representation and the ability of Black voters to have an equitable opportunity to elect their candidates of choice. A number of representatives in the state House appeared at these hearings and expressed similar concerns.[80]

As I discuss in greater detail below, it is unclear how much weight testimony from these hearings was given in the drawing of maps by staff members. Neither staff nor the Committee provided a collection of written public testimony for the public to access. Nor did it create any COIs mapping based on oral and/or written testimony. During the hearings, Committee members offered no thoughts, responses to comments, assurances to concerns raised, and provided no information about next steps, nor did they make any mention of any mechanisms for how feedback would be incorporated. Chairman Jordan explained during the final meeting in Columbia, "[A]s I've told ten prior meetings, just so everyone understands, we are here to receive information. This is a forum for you, the public, to express to the committee the issues and concerns that you have related to redistricting. While I and other members of the Committee may occasionally make a comment or ask a question, we'll strive to limit our speaking so that we can maximize the time available to you. We traditionally have asked folks to keep the comments to around five minutes."

Most Committee members appear to have given almost no weight to input received at these initial hearings. The amendments brought and proposals put forth, in other words, do not reflect the myriad comments of the public. Some Committee members would be moved by later testimony, but their concerns are not supported by the initial feedback provided at these hearings, at least with respect to the subcommittee's congressional plan. Black committee members would subsequently cite some of this testimony to support their congressional proposals. White committee members would make claims about public input, in general, wildly out of line with what was said at the hearings, referring instead to submitted written testimony that was not made available to the public. The Senate subcommittee made public commentary submitted at its hearings available, but none of it supports assertions, for example, that voters wanted two representatives for Charleston or that voters valued the "Tri-County" COI above other considerations.

_____

[80] South Carolina House of Representatives Ad Hoc Redistricting Committee Website, https://redistricting.scsenate.gov/meeting/subcommittee.html?date=091721.

      e.   The Third Meeting of the Senate Redistricting Subcommittee

On November 12, 2021, the Senate Redistricting subcommittee met to hear public feedback on the Senate staff plan adopted on Nov. 4, but also to hear from members of the public who had submitted congressional redistricting plans of their own. The feedback on the submitted congressional plans focused on avoiding packing and cracking Black populations, and thus diluting the strength of Black citizens' votes.[81]

Dakota Forster of Stanford University spoke first regarding a plan that she had submitted. She described it as adhering to the one-person, one-vote standard deviation, minimizing county and precinct splits, creating one majority-minority district and two Black opportunity districts, and keeping Charleston whole. Lynne Teague of the League of Women Voters spoke next, accompanied by veteran map-drawer John Ruoff. Ms. Teague explained that the League understood that most of the population that had shifted or grown was concentrated in congressional districts 1 and 6, and she indicated that its primary concern was that minority voters would have a fair and equitable ability to elect candidates of their choice. She noted some flaws in the existing map configuration, including a Congressional District (CD) 6 that was "packed" with Black voters, and a split in Charleston that separated North Charleston from the more coastal areas to the south. She and Mr. Ruoff explained that they drew a map that avoided such splits and gave no consideration to incumbency protection.

Chairman Rankin, with advice from Mr. Terreni, asked Mr. Ruoff why part of Berkeley County was in the CD 7 with Horry County and asked if Mr. Ruoff had heard any testimony in the public from folks in Berkeley who wanted to be paired with Horry. Mr. Ruoff said that he had not, but that his primary concern was keeping the Charleston metropolitan area whole and making sure each district got the numbers that they needed. He added that all congressional districts will have some discontinuities of interest and cited a few examples, suggesting that any district could be criticized for such discontinuities. Ms. Teague added, "I think at the extremes we can say they're real things like North Charleston belongs with Charleston. I mean, that's real. But yes, every congressional district will have diverse communities of interest within it." These were among the first of what would become myriad comments asking the legislative committees to keep Charleston whole, despite past splits. Lawmakers referred to these past splits in defense of subsequent plans, while at the same time lauding "improvements," such as making other communities, like Orangeburg, whole.

Brett Bursey spoke next, representing the South Carolina Progressive Network Education Fund. Mr. Bursey explained that having a packed CD 6 since the 1990s, when majority-minority districts were deliberately drawn for the first time, had subsequently allowed the legislature to

---

[81] South Carolina Senate Redistricting Subcommittee, Transcripts and Video. Nov. 12, 2021, https://redistricting.scsenate.gov/meeting/subcommittee.html?date=111221.

crack the Black population elsewhere and ensure that only CD 6 could elect a Black preferred candidate. He argued that, given the percentage of the population of the state that is Black, when CD 7 was created after the 2010 Census, that district should have at least been competitive. Mr. Bursey insisted that the "weight of the Black vote is three-fifths of the white vote" in the state, which he compared to the Three Fifths Comprise from the 1789 Philadelphia Convention and the U.S. Constitution. He argued that by conducting RPV analysis and departing from the existing paradigm, one could draw a map that had multiple districts that were competitive for Black voters. He explained that his organization had submitted such a map in which CDs 1, 2, 5, and 6 were competitive. There were no questions for Mr. Bursey.

Brenda Murphy followed, representing the South Carolina NAACP, along with Somil Trevedi of the American Civil Liberties Union and Leah Aden of the NAACP Legal Defense and Educational Fund. Ms. Murphy asked the subcommittee to avoid packing Black voters into one district and then cracking them elsewhere, to consider not just one majority-minority district, but the possibility of opportunity districts, to consider conducting RPV analysis to determine where such opportunity districts might be, and to consider proportionality.

Ms. Aden echoed these concerns, especially the call to conduct and consider RPV analysis to help the committee avoid packing and cracking when correcting the severe malapportionment between CDs 6 and 1. She also noted that in terms of proportionality, the state had 29 percent BVAP, but Black voters only had representation in 14 percent of the state's congressional delegation. Ms. Aden explained that the two plans submitted by the NAACP "maintain CD 6 as a Section 2 compliant opportunity district where Black voters are a majority and do not needlessly elevate CD 6 Black population." Ms. Aden told the subcommittee that these maps and others presented prior to her testimony demonstrated without doubt that "it's possible to preserve CD 6 while also ensuring the influence and the voice of black people in areas outside of CD 6. There are far too many options on the table that this subcommittee has available to it to ensure that." Mr. Trevedi followed, speaking specifically to the NAACP's second map, which he described as a "least change" map when it came to all districts besides CDs 1 and 6. When adjusting those districts, he explained that the NAACP was keen to avoid packing and cracking, and diluting the voting strength of Black voters in CD 1.

Eric Johnson of the South Carolina Coalition of Black Communities was next. He explained that Black South Carolinians had been fighting for their rights to vote from chattel slavery through literacy tests and, more recently, the enactment of vote dilution mechanisms. He called for greater transparency in the redistricting process and insisted that redistricting affected policy at the end of the day, citing better wages, relief for those in food deserts, and support for anti-hate crime laws and issues of concern for Black voters. Heather Odom of the same organization followed and asked the Committee to avoid dilution of Black voting strength and to avoid any form of gerrymandering.

With that, Chairman Rankin concluded the meeting by directing staff to draft a plan to present to the Committee. He advised the public, "look for notices about the next Subcommittee and full Committee meeting which we will be setting over the next day or two with an intent of

31

advancing this effort both on the Senate plan and the congressional plans to the full Committee with again my goal that we conclude our work in the month of November."

####    f.    The Fourth Meeting of the Senate Redistricting Subcommittee

Senate Judiciary Committee staff drafted a congressional plan and published that plan on Tuesday, November 23, 2021, the week of the Thanksgiving holiday, making it available to members of the committee at that time. The Senate Redistricting Subcommittee met again on November 29, the Monday following the holiday. Legislators questioned the timing of this process, arguing that the release of the map prior to a holiday was a deliberate procedural departure and wondering why an RPV analysis had not been conducted. Lawmakers also insisted that they had had no role whatsoever in the process of drafting the map. Public feedback was overwhelmingly negative. It was also revealed that a national partisan group had submitted some sort of input to the members of the staff, unbeknownst to Democratic members of the Committee.[82]

At the onset of the meeting, staff member and cartographer Will Roberts explained the plan to the Committee members as a "minimal change" plan in which the primary concern was adjusting populations in CDs 6 and 1 to adhere to the one-person, one-vote principle. Sen. Matthews indicated that she had not had adequate time to analyze the map and that she wanted to know why Charleston was "carved up" between CDs 1 and 6. Sen. Harpootlian echoed those concerns and indicated that he would like to see an RPV analysis that showed staff did not pack CD 6 with BVAP beyond what was necessary.

The Subcommittee then heard public feedback on the map, beginning with former Congressman Joe Cunningham, a white Democrat, who won the seat in CD 1 in 2018 by one percentage point, then lost it in 2020 by roughly the same margin. Mr. Cunningham described the proposed map as "awful" and a blatant racial gerrymander whose "sole purpose" was to ensure Republican victories in all six congressional districts but CD 6 by cracking Black voters and other voters who would tend to vote for Black-preferred candidates. He stated his belief that no actual Committee members had anything to do with drawing the map, that it was more likely drawn by a "partisan hack" from Washington D.C. Committee members Senators Matthews and Harpootlian then added that they had not been consulted by staff about this proposed draft map. Mr. Cunningham also argued that the timing of the map's release and the holding of this meeting were further evidence of things being done "in the dark."

Sen. Matthews agreed and said that not only had she not been consulted, but that she had not had adequate time to examine the map, though she was able to see, she said, that Black voters had been "carved out" of certain areas in order to pack and crack them. She added that there were issues that came up during numerous public hearings that had not been addressed, it appeared. Sen. Matthews specifically noted that Sun City residents in Jasper County wanted to be with Beaufort

---

[82] South Carolina Senate Judiciary Committee, Nov. 23, 2021, https://www.scstatehouse.gov/video/archives.php.

and that Charleston residents wanted Charleston whole and yet, she said, Black voters were "carved out" of Charleston while "more affluent areas" were put into CD 1. Sen. Matthews explained that she would like to ask staff whom they consulted with to develop that proposed map because, she said, it was certainly not her. Regarding the timing, she said, "On Tuesday, when I received notice [of the map's publication and of this meeting], my office was winding down; I knew I had depositions, this morning – this afternoon, and had to be in court this morning. I had to cancel everything immediately, because this is critically important, because it astounded me that no more notice was – was – should have – was given."

Sen. Harpootlian then asked Mr. Roberts if the Committee had any input from either sitting members of Congress or any outside groups in the development of the proposed congressional map. There follows an exchange between the two wherein Mr. Roberts is largely inaudible because his microphone is not turned on, something noted by Mr. Cunningham, who was present but also could not hear. Eventually, it was established that staff had heard from Congressman Joe Wilson and a representative of Congressman Jim Clyburn. Sen. Harpootlian asked if they had talked with any other members of the state's congressional delegation, to which Mr. Roberts replied, "Not since this map has been out." He likewise said that staff had heard from "some outside groups" after the map was published and that insofar as they might have heard from such groups prior to the publication of the map, it would not have affected the drawing of the map. By the end of the meeting, it was established that the Committee had input, prior to the publication of the map, from Adam Kincaid, Executive Director of the National Republican Redistricting Trust.

Sen. Harpootlian said that this was what Mr. Cunningham had meant earlier by indicating his belief that a "partisan hack had influenced the map drawing," and Sen. Harpootlian said, "[t]hey had more say in the design than I did, and I'm on this Committee." Mr. Cunningham added that this kind of communication was happening "in the dark." Sen. Campsen said that he had not "really" had any input either, suggesting that he had at least some input, and said that this was not a final plan in any case. At that point, the Subcommittee moved on to further public testimony.

Lynne Teague and John Ruoff appeared again on behalf of the League of Women Voters. Ms. Teague argued that the Senate map respected neither COIs nor political subdivisions. She said that even though it was being described by Mr. Roberts as a "minimal change" map, it was problematic because, for example, Charleston should not be split and North Charleston should not be put with Columbia in CD 6. She added that Black communities were split along municipal lines that had themselves been drawn for discriminatory purposes. She noted what she described as a "finger" reaching out to grab Fort Jackson for the CD 2, represented by Congressman Wilson, who serves on the Armed Services Committee. She suggested that perhaps the congressman would be interested in protecting Shaw Air Force Base or Parris Island Marine Corps Recruiting Depot.

Mr. Ruoff followed and explained that in the 1990s, oddly shaped districts were drawn that brought Black population centers together so that Black voters could elect their preferred candidates, in many cases, for the first time. He added, "We know a lot more about electable Black districts than we did" back then and reminded the Committee that this was why RPV analysis was so important. He said that drawing such districts was no longer necessary to meet the requirements of the Voting Rights Act. He then explained his understanding of map-drawing as making a series

33

of hierarchical policy choices, citing the inclusion of Fort Jackson as an example and then asking, rhetorically, where on the list of policy choices was it to take a competitive district, CD 1, and make it safely Republican.

Sen. Harpootlian asked Mr. Ruoff if he believed the proposed Senate map to have represented a deliberate choice to take "most African American voters" and put them in CD 6 while keeping white voters in CD 1. Mr. Rouff agreed, adding that it was his opinion that this was, then, in the Senator's words, "a race-based reapportionment plan to benefit incumbency." Two other members of the public spoke in opposition to the proposed plan, citing packing and cracking, and a lack of transparency, before the meeting was adjourned with Sen. Campsen reminding the committee that this was not a final plan.

### g.  House Redistricting Ad Hoc Committee Meeting, December 16, 2022

The House Ad Hoc Committee met on December 16, 2021, to discuss congressional redistricting after staff had posted and made available a working draft staff plan for the first time just three days earlier on December 13. Chairman Jordan indicated that the staff had received four plans from the public and was aware of the Senate's proposed plan. With that, the Committee began hearing public testimony on its proposed map. This hearing revealed a general public perception that the House staff plan, while not perfect, was superior to the Senate staff plan, along with a call from Beaufort residents to hear their concerns. Five individuals, most from Hilton Head, spoke in opposition to moving Beaufort County out of CD 1. They argued that it was part of a coastal COI with Charleston and shared concerns of hurricane response, flood relief, environmental stewardship, and shared ecology.[83]

Ms. Teague spoke and indicated that the House staff plan was superior to the Senate's plan but that it still had some problems in her mind. She argued that all of Charleston belonged in the Low Country CD 1, noting that this would make CD 1 what it ought to be, meaning "naturally competitive." She indicated that the BVAP in the House plan was far too high in CD 6 and said that, in her view, there needed to be a greater respect for the Pee Dee and Midlands as regional COIs. She took issue with bringing the Charlotte suburbs all the way down into Richland.

Mr. Cunningham also spoke and, like Ms. Teague, said that, while flawed, the House staff map was certainly superior to the Senate staff map. He described the latter as "blatant gerrymandering," reiterated his opinions that he shared with the Senate Redistricting Committee and said that his former constituents were "livid" about it. Regarding the House staff map, he said this map also seemed to "start" by splitting Charleston and then making the numbers work after that. In his opinion, there was no reason other than race to do this.

### h.  House Redistricting Ad Hoc Committee Meeting, December 29, 2021

---

[83] South Carolina House of Representatives Ad Hoc Redistricting Committee, https://www.scstatehouse.gov/video/archives.php.

When the House Redistricting Committee met on December 29, 2021, Chairman Jordan explained, "Because of your feedback and important public input, we have released multiple options for these Federal Congressional Districts." He noted that the initial draft staff plan for congressional districts was posted on Monday, December 13, along with the Senate's staff plan, "as a point of comparison, and to receive input on." He noted the December 16 meeting and the receipt of written submissions. He explained, "In response to those plans, we heard from many members of the public, concerned with the inclusion of Beaufort County in the Second Congressional District. As a result, on December 22nd, we posted an alternative draft staff plan, which attempts to address the concerns that we heard from the public, such as in Beaufort. The alternative staff plan also includes some positive features from the Senate's draft plan, as well."[84]

This meeting featured surprise and confusion among legislators and members of the public alike. People wondered why a second map was produced by staff to begin with, much less two days before a major holiday and long weekend. They seemed unsatisfied with the explanation supplied by Chairman Jordan, and also questioned why the plan so closely mirrored the widely criticized Senate plan, particularly when the House's initial plan met with at least tacit approval. This meeting also reveals where the leadership of the Committee, or perhaps of the legislature in general, seems to have chosen to prioritize certain guidelines above others and the concerns of certain communities over others. The public began to call for the unification of Charleston in a single CD, but that proposal never gained any traction, unlike the concerns from Beaufort. No outcry at all called for jettisoning the House plan for the Senate plan.

Ms. Teague of the League of Women Voters spoke in opposition to the new map, calling it an "obvious racial and partisan gerrymander" and noting that it scored worse in most measures than the original House map. She noted that it was incredibly similar to the Senate's map, which she said the Senate Redistricting Committee had "wisely" not acted upon after it received a flurry of very negative feedback. She argued that the "most obvious" example of racial gerrymandering was the splitting of Charleston and the reduction of the BVAP in CD 1 vis-à-vis the original House plan. She said, regarding Beaufort being in CD 1, that it did not need to be an either/or situation with Charleston being whole but that, if it was, then Charleston being whole ought to take precedence.

Two students from the College of Charleston, speaking separately, echoed those thoughts and indicated their belief that Charleston should be whole and with the Low Country. One referred to the "gutting" of Black voters in CD 1 as "unethical." Brenda Murphy spoke on behalf of the state NAACP. She also criticized what she characterized as the unnecessary splitting of Charleston, as well as Richland and Sumter, and the dilution of Black voting strength in general, but especially in CD 1. She also noted that the new map had been published on December 22, right before the Christmas holiday. Gloria Aslandis also appeared and identified herself as a longtime resident of West Ashley who could not see any reason to put her area into CD 6. She further insisted that there was no need to split Charleston County at all.

---

[84] South Carolina House of Representatives Ad Hoc Redistricting Committee, https://www.scstatehouse.gov/video/archives.php.

With public testimony concluded, Rep. Bernstein questioned the need for staff to draft an entirely new plan and indicated that she had not known such a plan was being drafted in the first place. Representative Bernstein said, "I think it's important as the Committee just to get some questions answered, if possible. Because the last time we met as a public -- in this public forum, we had a map that we took feedback from -- public testimony and some feedback from. And then last week, as I was out of town, a new map was drafted unbeknownst to me, I'm not sure about the other members of the Committee. And so, I've – I guess I think it is pertinent, and prudent, to make -- to ask certain questions of why an alternative map was drawn." Chairman Jordan replied, "I can tell you, and you might remember, today we've heard a lot from Charleston. The previous public input we heard a tremendous amount from the folks of Beaufort with, I guess I would consider it, alternative testimony to these two different plans. It seems to me both – both Beaufort and pieces of Charleston want the same thing – or want two different things. I would tell you that this alternative plan is largely after consideration of the comments we received – staff received, from the original public hearing, back on December, I believe, it was the 13th – or 16th."

Representative Bernstein asked the chairman if any outside groups or sitting members of Congress had been consulted. Chairman Jordan replied, "I would tell you that as staff drew both plans, they had the benefit of lots of different testimony during the course of our roadshow back in the fall. As well as multiple proposals from individual and national groups of their own proposals. And had the benefit of the Senate plan going out first, and receiving input by way of individuals, as well as national groups. So, I would say -- I guess the answer is, the staff had the benefit of those different elements in drafting both our versions." Representative Bernstein followed up, "So that would be yes, some national partisan groups were consulted?" Chairman Jordan replied, "I don't know that I would say they were consulted. I would say their plans and input were received, and as a result were available for consideration."

Representative Bernstein asked if any sitting members of Congress had been consulted. Chairman Jordan replied that "at any appropriate time," staff could "get to the bottom" of whether or not any members of Congress had been consulted before the map was released to the public. Rep. Bernstein reiterated that she had not seen the map until it was released or even been made aware that it was being created. She said that she was concerned about the new map because it "really replicates more of the Senate map, which received numerous complaints, and vocalized concerns. And I just don't know why we are even entertaining this alternative map, unbeknownst to me as a Committee member."

Chairman Jordan said that the new map was a "opportunity for a starting point." He explained, "We've had folks from Beaufort come and say, 'we don't like the original plan.' We've heard from folks from Charleston say, 'we don't like parts of this plan." You know, so it's a – I would say, it's a starting point for the conversation for the Committee to consider the pros and cons of the different concepts of where these district lines need to be drawn. And my plan and opinion on this has been the same from the beginning, we need to take -- we need to push out a starting point, give everyone an opportunity to weigh in on their opinion on the different versions, we need to digest all that. And then, once we regather, you know, I'm sure we'll go through the process just like we do on a regular piece of legislation, someone will make a motion for this

36

version, the other version, or a different version that we receive, between now and our next meeting. And then from there, we'll send it to the full Judiciary, to continue on its journey."

Representative Bernstein said that if the staff's proposed maps were "starting points," then she saw no need to put forth an entirely new map. She added, "I think the alternative map really, does not have any competitive districts drawn at all. And I don't think that is the purpose of our Committee to draw districts like we have on the alternative map. And I wanted to make sure that I've vocalized and voiced those concerns." She thanked Chairman Jordan for the opportunity to express her concerns and concluded, "And we will continue this discussion."

Representative Henegan asked when the Committee would next meet. Chairman Jordan replied, "Give me till the end of the day to figure that out. Obviously, with New Year's coming, it won't be this week. It will – it will either be the end of next week, or the very beginning of the following week, trying to work with everybody's schedules. Of course, we have session looming, and we have a – obviously, a timeliness issue with moving this process forward as quickly as we can." Representative Bernstein then asked if the Committee would be voting on a map at the next meeting, to which Chairman Jordan replied, "I would say most likely that is the case," adding, "Again, given the timeliness of the issue, we have the full House coming back into session on the 11th, so for planning purposes, obviously, things could change, but I would plan on us attempting to have a meeting in which we could vote on a proposal."

  i.  <u>House Redistricting Ad Hoc Committee Meeting and Meeting of the Full House Judiciary Committee, January 10, 2022</u>

The House Ad Hoc Committee next met on January 10, 2022. When the video and transcript of this meeting begin, this meeting is already in progress, with Chairman Jordan and representative Rep. Bernstein evidently having picked up their discussion from the previous meeting regarding the need for the staff's second/alternative map, which Rep. Bernstein says she will oppose. Rep. Newton indicated that he had constituents telling him that they preferred to remain in CD 1. Rep. Bernstein asked if there was a way to have both Charleston and Beaufort whole and in the same CD, to which Chairman Jordan replied, "I don't think the math works in that scenario." Rep. Newton noted that CD 1 was overpopulated and agreed with Chairman Jordan that the numbers would not accommodate all of Beaufort and all of Charleston. Rep. Bernstein said that she thought it was of paramount importance, in any case, to keep Charleston whole, particularly because, in her mind, North Charleston, which has a significant Black population, was cut out and put into CD 6 because CD 6 is a majority-minority district. Representative Rep. Newton and Chairman Jordan noted that that is simply the way it was on the previous map.[85]

  j.  <u>Full House Judiciary Committee Meeting, Same Day, January 10, 2022</u>

---

[85] South Carolina House of Representatives Ad Hoc Redistricting Committee, https://www.scstatehouse.gov/video/archives.php.

After the Subcommittee adjourned, the full House Judiciary Committee convened, with Rep. Weston Newton presiding in lieu of Chairman Chris Murphy. This was among a number of procedural irregularities in the redistricting process. Rep. John King, a Black Democratic representative, immediately took issue with this, arguing that, as First Vice-Chair of the Committee, he ought to be the one presiding over the meeting, not Rep. Newton. Rep. Newton disagreed and said he was presiding on the written instructions of Chairman Murphy. Rep. King said that this was a violation of the rules and expressed his intention to dispute in writing the validity of the meeting, which nonetheless went forth. Beyond this, the meeting featured questions again about the necessity of staff producing a new map based on the concerns of Beaufort residents when Charleston residents also stated concerns, and when the initial staff map was supposed to be a "starting place" after all.[86]

Chairman Jordan explained the Committee's work to that point, indicating that the alternate staff plan had been put forth in response to the public comments from Beaufort residents, a majority white community, wanting to stay in CD 1. Rep. King noted that Rep. Bernstein had been told in the previous meeting that it would not be possible for both Beaufort and Charleston to be wholly included in CD 1. He indicated that he believed that it was, in fact, possible. He argued that the removal of North Charleston was "strategic" and racially motivated and insisted that that area "carved out" did not constitute a COI with Richland County. He added that too many Black voters had been "plopped" into CD 6 so that there were no other competitive congressional districts and said that this was a "slap in the face" to Black voters. Rep. Bernstein agreed, saying that she believed Beaufort and Charleston could be kept whole in a district and said, "After hearing the concerns of some of the Beaufort County residents, we could have had a discussion, worked on maybe looking at the numbers. But instead, a staff plan alternative map, very similar to the controversial Senate map, was proposed and presented to the Committee at the same time it was presented to the public. And then we took some testimony on that, and we heard some likewise criticism on this alternative map."

Rep. Collins responded, explaining that he was "sensitive to the racial aspect" and that he would say "it's kind of the opposite," meaning that the staff had done the opposite of packing. He noted that the BVAP in the NAACP and LWV plans was higher for CD 6 than the staff map. Rep. King responded to this assertion by saying that packing had to be considered alongside cracking elsewhere, which, he said, the staff's plan did (i.e., crack Black voters elsewhere), whereas the LWV and NAACP's plans did not. Representative Rep. Wetmore asked Rep. Jordan if it was true that the Committee had heard from people from Charleston asking to be kept whole. He said that they had but that they there were not as many people in number as people from Beaufort; there was no quantification of the people speaking to Charleston as compared to Beaufort.

Rep. Thigpen questioned the reasoning for creating an entirely new map based on complaints from residents of one community (i.e., Beaufort). What made one county's concerns, he asked, "rise to the level" of triggering a whole new map. He asked why the staff could not have

---

[86] South Carolina State Legislature House Judiciary Committee,  South Carolina House of Representatives Ad Hoc Redistricting Committee, https://www.scstatehouse.gov/video/archives.php.

simply amended the existing map and, noting that the Committee had received consistent feedback from residents of Charleston asking to be kept whole, asked why staff did not produce a third alternative map doing that. The second map was, in any case, he said, "less clear, less vetted, [and] took less time [to produce]." He suggested that there was perhaps information that the Committee members did not have, that other persons or groups had been weighing in, or that there was some distinction about the residents of Beaufort County which afforded them special treatment. Chairman Jordan replied that great weight was accorded to Beaufort because they had just been moved into CD 1 in the previous cycle, and it was not fair to send them back. The alternative staff plan was adopted and given a favorable report by a vote of 13-6, with no Black members voting aye.[87]

### k.  Full House of Representatives, January 12, 2022

House Resolution 4781/Senate Bill 865 came to the floor of the House of Representatives on January 12, 2022. The debate on the floor further revealed Black legislators' concerns about transparency and public concern about the House's adoption of the widely-criticized Senate congressional plan. It also demonstrates the legislative leadership's tendency to weigh some guidelines and some testimony more heavily than others. The concerns of residents of Beaufort, primarily Hilton Head, are given great weight, whereas the concerns of residents of Charleston, are brushed aside with explanations that existing boundaries, "constituent consistency," and prior approval hold sway.[88]

Chairman Jordan summarized the process up to that point. He explained that, after the staff posted the initial plan on December 13th, 2021, it was determined that this "presented a fairly significant change to the landscape of South Carolina's congressional districts. While the Senate's plan," he explained," more closely resembled the congressional districts that were enacted ten years ago." He then claimed that, after the hearing on Dec. 16, at which five people spoke in opposition to moving Beaufort out of CD 1, staff received "hundreds of pages of written testimony" expressing that same concern. He noted that this correspondence "vastly outnumbered" concerns from other areas. This, he said, was the impetus for the alternative plan put out by staff on Dec. 22. He later responded to a question from Rep. Thigpen, saying that "roughly 85 percent" of comments received by the Committee were from Beaufort residents wanting to stay in CD 1. This plan returned Beaufort to CD 1 and, Rep. Jordan explained, "[m]ore closely aligns with the Senate's original staff draft plan, and as a result of the configuration of the congressional districts as approved by the 2011 plan." The chairman explained, "I think it's important to take into consideration that, unlike our House map, the congressional map is the one that we must undertake together with our colleagues in the Senate. We do not have total autonomy over this map, and without agreement, we would have been unable to adopt a congressional plan."

---

[87] Voting no were Reps Bernstein, King, Thigpen, Wetmore, Wheeler, and McKnight. Not voting were Reps Bamberg, Henegan, Rose, and Chairman Murphy.

[88] South Carolina House of Representatives, https://www.scstatehouse.gov/video/archives.php.

Chairman Jordan took questions, all of which came from Black members who opposed the plan for a variety of reasons, most of which had been raised in proceedings prior to that point. Rep. King asked why Rep. Brandon Newton had not been replaced by someone else from CD 5, he himself being from CD 5 and also being the senior member of the Judiciary Committee. Representative King argued that not replacing Rep. B. Newton meant that there was no voice for CD 5 on the Committee and suggested that the reason Rep. B. Newton had not been replaced was because he, Rep. King, would have been the obvious replacement and, in his opinion, leadership did not want him on the Committee. Chairman Jordan argued that Rep. King brought his concerns about the maps to the Judiciary Committee and had input in that way. Rep. Cobb-Hunter asked about the splitting of Charleston and what the BVAP of the new CD 1 one would be under this map. Chairman Jordan said that Charleston was split in the existing plan and that the loss of BVAP in CD 1 was the result of a "ripple effect" when accounting for population shifts.

Rep. Garvin stated that he had watched all of the public hearings and that he recalled a preponderance of people saying that the Committee ought to make Charleston whole. He asked why those concerns were not addressed while those of the Beaufort residents were. Chairman Jordan explained that the staff ultimately did not want to "ping-pong" Beaufort back out of CD 1 after their recently being put into the district (for the post 2010 map) and that they made a "compelling argument" about being part of a coastal COI. Rep. Garvin replied that, in his opinion, Charleston and North Charleston were an even more logical COI and that putting North Charleston with Richland in CD 6 made less sense than putting Beaufort with the west Midlands. Rep. Garvin also expressed concern with the "process," especially the adoption of a Senate plan that had been "wildly criticized." He asked if outside groups had perhaps requested the change. Chairman Jordan said, "[n] o partisan group, national or otherwise, were involved in the drafting of this plan." He added, "[a]nd I don't know that it would have made sense right out the gate to push out a version that simply looked like the Senate version." And he concluded, "[w]e pushed out a version, we had a hearing on it, we had -- as I've already stated, a large amount of input given to us from the public. We listened to the public, and we put another version up."

Rep. Krystle Matthews spoke in support of Rep. King and indicated that, in her understanding of the rules, the process to which Chairman Jordan had repeatedly referred was not followed in that Rep. Weston Newton should not have chaired the meeting on January 10. She also spoke to Representative Rep. Cobb-Hunter's concern with Charleston, saying, " [w]hat Rep Cobb-Hunter was asking you was, were the communities of color split? And I don't know if you know this about me, but I'm really particular about being clear. So, let me be very clear, it was split. The 1st Congressional District was given the white areas of Charleston County, and Congressional District 6 was given the black areas of Charleston County, predominantly." Chairman Jordan cautioned against focusing on any one small area and argued that, compared to the existing map, CD 6 was not packed.

Rep. Cobb-Hunter questioned the assertion that the Committee's guidelines had been applied uniformly and asked Chairman Jordan if the staff had conducted a Section 2 (Voting Rights Act) analysis. Chairman Jordan replied, "[t]o my knowledge, to answer your question specifically, we did everything in compliance with the law that we were told and required to do." Rep. Cobb-Hunter said, " [t]hat's a nice lawyer answer. 'I'm not a lawyer. So, does that mean yes, you all did

40

a Section 2 analysis? Or no, you did not?" Chairman Jordan leaned down to confer with Ms. Dean and replied, " [r]ight. To my knowledge, we did everything we possibly needed to do under the terms of the law."  Rep. Cobb-Hunter said that she would take that as a "no," to which Chairman Jordan replied for a third time, "[t]o my knowledge, we complied with every aspect of the law."

Rep. Thigpen asked about the BVAP in CD 1 in the alternate staff map versus the original, and Chairman Jordan indicated that it went from 22.27 percent to 15.67 percent. Rep. McDaniel indicated that she had heard from quite a few Charleston residents who wanted Charleston whole and asked why staff did not produce an alternate map that contained both Beaufort and a whole Charleston and build around that, since a great deal of public input seemed to also support making Charleston whole in addition to just putting Beaufort back into CD 1. Chairman Jordan replied that "[y]ou have to start somewhere," and that staff chose to start with the existing map when it drafted the alternate plan.

Rep. King repeated his assertion claim that the January 10, 2022, Judiciary Committee meeting was held in violation of House rules and constituted a breach of decorum. He added that he believed the Ad Hoc Committee was created in the first place to remove the redistricting process from the Elections Committee, of which he is a member. He joined those who acknowledged repeated calls from the public to make Charleston whole and argued that this was not considered because the Charleston split was the starting point for cracking Black areas and packing them into the 6th CD 6. He argued that the election of Mr. Cunningham in 2018, a white Democrat in CD1, was the impetus for the changes, saying, "[a]ll because there's been a Democrat there before, we've got to go in there and we've got to make sure that no Democrat don't win that congressional seat no more." He argued that the lack of competitiveness in the state was responsible for a lack of responsiveness on the part of the state congressional delegation to the needs of Black voters and insisted that the "craziness" that went on in the state house was driving people from the state.

Rep. Matthews rose to offer solidarity, saying that she was "utterly disturbed" by "what happened to you," meaning that Rep. King had not been allowed to chair the January 10 meeting of the Judiciary Committee when that was his rightful place to do so. Rep. Gilliard raised a point of information asking if what Rep. King had said regarding his right to chair the meeting instead of Rep. Weston Newton, affected the bill being considered. Speaker Lucas indicated that the issue should have been handled at the Committee level and that there was nothing he could do on the floor. Mr. Thigpen offered his support for Rep. King, who reiterated his argument and noted with disdain that most of his Republican colleagues had left the floor after being admonished by the Speaker for talking and not paying attention. Rep. Cobb-Hunter rose again to reiterate her belief that a Section 2 analysis should have been done and to also lament that no Republican members were paying attention.

A vote was held to advance to the third reading, with 73 ayes, all Republicans, and 35 nays, all Democrats. No Black members voted aye. Rep. Govan rose and added that he too was disappointed that no Republicans were paying attention and gave his support to Rep. King, noting that the Speaker had to confer with the Clerk on that matter because the House was a body of rules. He then said, "[t]he fact of the matter is this, for the past 50 years, in the state of South Carolina, the redistricting process has required court intervention and prolonged litigation. Let me say that

again," he added, "because I want you to understand this. For the past 50 years, the way we have handled this process has ended up in court, because we didn't do it the right way. And at some point, ladies and gentlemen, this has got to stop." Rep. Govan then summarized the various challenges to the redistricting process going back to the election of the first Black representatives since Reconstruction in the 1970s. A vote was held subsequently, and the bill passed 74-35, with Rep. Justin Bamberg, having previously not voted, switching his vote to no and Rep. Chris Hart casting the lone aye vote as a Black member.

          l.   <u>Final Senate Judiciary Redistricting Subcommittee Meeting re: Congressional Districts</u>

The Senate Judiciary Redistricting Subcommittee met a final time on January 13, 2022, regarding congressional redistricting. The purpose was to receive public input on two amendments representing two separate plans. Amendment 1 ("SA1/H2" or Senate Amendment 1, House Plan 2) was the plan advanced by the House, which was the original Senate plan with some modifications made by the House. Amendment 2 ("SA2/WC," or Senate Amendment 2, Whole County Plan) was introduced by Sen. Harpootlian. This plan kept Charleston and Beaufort whole and in CD 1, and it kept Richland whole and in CD 6. The BVAP of CD 6 was 48.59, slightly higher than that of SA1/H2, but the BVAPs of CDs 1, 2, and 5 were 20.57, 21.29, and 33.05, respectively. At the hearing, 48 people provided testimony. Of those, 31 supported SA2/WC, and 17 supported SA1/H2. Of those supporting SA2/WC, 20 said that they wanted the legislature to keep Charleston whole, and 9 of those said that they were happy to see Charleston and Beaufort together in one CD despite previous assertions that this was not possible.[89]

Of those supporting SA1/H2, ten said that they wanted to keep the "Tri-County" of Charleston, Dorchester, and Berkeley together. Several supporters of SA2/WC questioned the value of this maintenance of a Tri-County area if it did not include all of Charleston and noted that no Charlestonians had said they wanted to be included with Dorchester and Berkeley, only the other way around. One pointed out that nearly half of those supporting the Tri-County idea were local elected officials, whereas the vast majority, if not the entirety, of those supporting the idea of a whole Charleston were constituents, not public officials. Another supporter of SA2/WC noted that several people who had testified in support of SA1/H2 had said that their support was based upon keeping Beaufort in CD 1, despite the fact that SA2/WC also kept Beaufort whole in CD 1. A few supporters of SA2/WC noted that the plan laid out therein would likely avoid costly and "embarrassing" litigation that would possibly lead to a federal court drawing districts for the state, whereas the plan laid out in SA1/H2 would possibly not.

Attorney Joseph Opperman testified, indicating that he had been retained by Sen. Harpootlian to draw a map, this being the SA2/WC map. Mr. Opperman indicated that the weakness of his map was that it used a 4-person deviation, though he noted that no plan had been struck by a court for this reason and that this would be easily fixable by way of amendment in any

---

[89] South Carolina State Senate Redistricting Subcommittee, South Carolina House of Representatives Ad Hoc Redistricting Committee, https://www.scstatehouse.gov/video/archives.php.

case. He argued that his map hued to traditional regions, maintained the core of districts, and only contained 6 county splits, compared to 10 in S1/H2. He argued that his plan "clearly and unquestionably" complied with Section 2, whereas he believed SA1/H2 had some "bizarre choices" that might come under scrutiny. Mr. Opperman argued, "[t]hose shapes can only be reasonably explained by an overarching racial -- a predominant and overarching racial policy. The point of which would be to concentrate black voting power in District 6 for the fig leaf of legal compliance, and otherwise diminish and destroy black voting power in every other part of the state." He continued, "[t]here is no other reasonable explanation for the lines in either the House plan that was passed, or Senate Amendment. Race is the only plausible explanation for that, which suggests a predominant racial motive in those draws, which of course is unconstitutional." Mr. Opperman indicated that he was submitting written testimony to the Subcommittee. No action was taken by the Committee at that time.

m. Final Full Senate Judiciary Committee Meeting re: Congressional Districts

The Senate Judiciary Committee as a whole met on January 19, 2022, to consider adopting a congressional redistricting plan in light of the testimony provided at the earlier meeting of the reapportionment Subcommittee. This meeting illuminated the two sides of the redistricting debate in South Carolina, when it came to Congress, starkly. Republicans wanted to maintain the status quo with CD 6 as a majority-minority district and keep the other districts, especially the First, limited in terms of BVAP. Democrats argued that, since the Supreme Court had signaled an end to the Preclearance era of the Voting Rights Act, and since RPV analysis had been used during that period to determine what constituted racially competitive districts, state legislatures could start from scratch and begin drawing districts anew for the first time since the 1990s, limiting Black VRA districts to what RPV analysis said would allow election of a minority preferred candidate and limiting the ability of white legislators to pack white districts to get radical white candidates elected. The South Carolina General Assembly demurred.[90]

Lawmakers made claims that do not appear to be supported by the publicly available facts. No one at the initial Senate public hearings at Charleston, Orangeburg, or Columbia said anything about wanting two congressmen from Charleston. None of them mentioned keeping the communities together that Sen. Campsen mentions. There was some support for keeping Beaufort in CD 1 and for keeping the so-called Tri-County together with Charleston, but even at the Senate and House public hearings and meetings held after maps were released, there was no support for two representatives in the U.S. Congress for Charleston.

Sen. Campsen presented SA1/H2 and was questioned by Democrats. Sen. Hutto asked why Charleston was split, saying that he was aware of maps that kept it whole or at least kept it out of Richland. Sen. Campsen insisted that it had been this way since the 1990s and was approved by the courts in the *Backus* decision. Sen. Hutto asked why the City of Charleston had to be split when other cities like Greenville and Spartanburg were kept whole. Sen. Campsen replied, "[w]ell, we're

---

[90] South Carolina State Senate Judiciary Committee, South Carolina House of Representatives Ad Hoc Redistricting Committee, https://www.scstatehouse.gov/video/archives.php.

following – this is a – you know, a least amount of change with regards to that dynamic of the Sixth District." He added that another concern was constituent consistency.

Sen. Stephens then questioned Sen. Campsen when the latter explained that geographical boundaries were used in drawing the split between CD 1 and CD 6 in Charleston. Sen. Stephens asked why the southern portions of Colleton and Jasper were not given the same consideration, and Sen. Campsen said that the consideration in that regard was COIs. In that same vein, Sen. Matthews asked if Sen. Campsen considered it more important to keep CDs districts the same or to "follow the flow" of the Census Data, which showed that people were moving to the coast. Sen. Campsen insisted that equal weight was afforded to those factors, along with others in the guidelines.

Sen. Matthews also said that the Committee "sat . . . through several hours' worth of public hearings. And I seem to remember, as I took copious notes like yourself, that we had speaker after speaker -- and I understand some folks have gotten together and had folks to send in written comments. But I sat through, and I listened over and over to a lot of the folks that came before our Committee that said, number one, they wanted to keep Charleston – they thought that the – one of the proposed maps that kept Charleston whole went along with the principle of keeping that community of interest together. Were you present at those hearings," she asked Sen. Campsen replied, "[w]ell, I've, I've heard that and I've also heard people say they – they'd rather have two congressmen representing them than one."

Sen. Campsen repeated this assertion later when asked the same question by Sen. Sabb. Sen. Sabb asked, "[w]ould you agree with me, particularly in the last hearing that we had, that the vast majority of the comments that we had centered around the question as to whether or not Charleston ought be whole and whether or not the plan and – and specifically the plan that's before us now ought be the operative plan because of the -- what do you call it, the tri-county group, Berkeley, Charleston, and -- and Dorchester and their economic relationship." Sen. Campsen replied:

> A majority did that, voted -- or expressed opinions in that fashion. Although we -- we also have a lot of input from e-mails and other way -- other – and letters and that have equal weight. Just because you weren't on the Zoom meeting -- the Zoom meeting is not weighted heavier. And so I – it's my understanding we have a lot of diverse opinions on that, that -- which one is weighted more, I'm not completely sure. But I do know that there is a lot more input from folks who like being represented by two members of Congress instead of one because two advocates is better than one. I mean, I've heard that from -- from constituents as well. So we can't let the Zoom meeting be the -- the final -- the final determination of what type of input the public wants because I understand there's a lot of other input that's received electronically.

Sen. Sabb followed up, "[b]ut did the vast majority of the written communication center around a desire to either keep those three counties together or keep Charleston whole? I mean, so were those fairly consistent with what we heard on the Zoom call?" Sen. Campsen replied, "I really can't answer that. I know there's been a lot of input -- both ways." Sen. Kimpson added that he

represented more people in Charleston than anyone else in the Senate and that it was his belief that the people of Charleston wanted to be kept whole.

Sen. Matthews followed up on that line of questioning by echoing some of the public testimony whereby people explained that, while a number of people from the so-called Tri-County expressed their desire to be with Charleston, no one from Charleston returned that sentiment. She also echoed public testimony wherein people noted that most of the people calling to remain in the Tri-County were public elected officials. Sen. Campsen said that was not his recollection and began listing various Tri-County economic alliances, to which Sen. Matthews responded by listing similar entities from counties elsewhere that had been split, including Colleton. She concluded that, in her opinion, SA1/H2 was a gerrymandered map that deliberately went into Charleston and West Ashley and put Black voters into CD 6 via a "funky boot print." Sen. Campsen noted that CD 6 needed to pick up population, to which Sen. Matthews replied that those numbers could have come from Berkeley or elsewhere.

Sen. Harpootlian noted that, since the *Shelby County v. Holder* decision and the elimination of the Department of Justice Department's preclearance process, there was no longer a need to focus on non-retrogression and that states could go back to the drawing board rather than maintaining the districts as drawn beginning in the 1990s, when, he explained, the focus was on creating majority-minority districts. He explained that in that case, states would want to conduct RPV analyses and asked if this had been considered. Sen. Campsen said that "that's something that would happen if and when a plan is litigated. . . . A plaintiff, if they were to file suit against this, would -- would provide [that]." Sen. Harpootlian said, "But assuming we're trying to avoid a lawsuit, wouldn't it have been productive to get racial bloc voting analysis done . . . ." Sen. Campsen said, "Well, I have it -- it would have resulted in us perhaps taking race into account and having racial targets . . . ." Senator Harpootlian asked, would that not be "Acceptable under Gingles?" Senator Campsen replied, "No. That's -- that's an analysis that -- that the Court is -- is to apply. But we are -- we are to not take race primarily into account in drawing this." Senator Harpootlian emphasized, "Primarily," to which Sen. Campsen replied, "I took it hardly at all into account." Sen. Harpootlian replied by referring to "page after page" of racial data in the notebooks given to Committee members. Senator Campsen said, "The staff have -- I mean, they -- they provide that," and he insisted that he "wanted to be colorblind."

Sen. Harpootlian continued to question Sen. Campsen, pointing out the number of county and municipal splits in his plan and its use of water for contiguity. He asked if Sen. Campsen had considered using land for contiguity in those cases and, if so, was there evidence of that in writing. Sen. Campsen said no, that he had had discussions with staff, as presumably had Sen. Harpootlian, to which the latter replied, "Not me. I had to pay somebody," referring to Joseph Opperman, who testified at the January 13, 2022, Redistricting Committee meeting regarding SA2/Whole-County map introduced by Sen. Harpootlian. Sen. Campsen said that Sen. Harpootlian did not have to retain someone, to which Sen. Harpootlian replied, "Oh, I think so. I think I had to because we are about to do something, perpetuate a racist scheme for the next 10 years, which we had to live with. One of the reasons I ran -- the major reason I ran for the Senate was that we would not replicate this race-based gerrymandering, and that's what this plan does."

Sen. Malloy expressed his belief that the bill should not advance to the floor of the Senate on that day because it needed more discussion. He pointed out that, because of the posture or status of the bill, it would advance to the House immediately rather than receiving second and third readings that would provide the usual time to digest and discuss. Chairman Rankin expressed his desire to have a vote, nonetheless. Sen. Malloy entered a motion to carry the bill over, but that failed. And The bill subsequently passed out of the Committee by a party-line vote of 14-8, with all Back members voting no.

n.  The Senate Floor, January 20, 2022

Chairman Rankin began his introduction of the plan coming out of the Senate Judiciary Committee by indicating that the Redistricting Subcommittee had received "over 1,000 written comments" in addition to the testimony taken at the public hearings. He then gave way to Senators Massey and Campsen for descriptions of the various elements of the map. This material was not made available to the public. The Senate did release to the public written input it received at public hearings, unlike the House, but it did not release this supposed mountain of evidence that weighs heavily in favor of consideration of Beaufort feedback and "Tri-county" feedback as opposed to Charleston feedback. There is nothing in the available public record to support this. No one at the Charleston public hearing of the Senate Subcommittee mentioned a preference for two representatives.[91]

Sen. Campsen reiterated the characterization that this was a "minimal change" plan and that one of the primary concerns was "constituent consistency." He addressed the accusations of partisan gerrymandering by comparing 2020 election figures in what was by then being called the "benchmark," or existing plan, to the one then before the Senate. And he addressed accusations of racial gerrymandering by noting that the BVAP in CD 1 remained roughly the same as it was in the existing plan. He addressed allegations of packing by noting that the BVAP in CD 6 was less in the proposed plan than what it was in the existing plan. He noted that the "coastal" and Tri-County COIs were kept together and that the splits in Charleston followed waterways.

 Sen. Grooms asked why Charleston was split when it had been wholly tied to Berkely and Dorchester since the nation's founding. Sen. Campsen said that it had been split since the 1990s and that he prioritized the Tri-County COI and keeping Beaufort in CD 1 and also keeping two representatives for Charleston for the purposes of federal funding for the area.  Sen. Scott pointed out the preponderance of county splits affecting CD 6 and the fact that Columbia and Charleston were the only "urban cores" split in the plan. He asked for a document with county split information and was told to consult the website, which he had already done. He was told that Mr. Roberts would get the information for him.

Sen. Matthews had the Redistricting Committee's guidelines distributed to the chamber and noted that the word "benchmark" was not included. She noted that minimizing city and county

---

[91] South Carolina State Senate,  South Carolina House of Representatives Ad Hoc Redistricting Committee, https://www.scstatehouse.gov/video/archives.php.

splits was included and noted that SA1/H2 contained more city and county splits than both the existing plan and SA2/WC. She noted that "90 percent" of the people who testified before the Committee, in her recollection, were concerned with either staying with Charleston or keeping it whole. She added that it "matters not about your race" in Charleston and that Sen. Campsen had had to "go in and snake in or salamander into" Charleston and West Ashley because of "how those folks voted." She argued that the population numbers that CD 6 needed following the 2020 census could instead have come from Clarendon, Orangeburg, upper Dorchester, Berkeley, or Colleton, or some combination thereof. Sen. Campsen insisted that he had followed geographical boundaries.

Sen. Harpootlian argued that the legislature had been freed from the "handcuffs" of the preclearance, non-retrogression standard by *Shelby County* and asked if Sen. Campsen had done any analysis to see what could be done to "clean up" the "weird" shapes of what he characterized as gerrymandered districts. He asked Sen. Campsen if he considered keeping Charleston whole, given the amount of testimony that the Committee had heard to that effect. Sen. Campsen said no, that he would rather have two representatives for Charleston and that it was good to have a representative from each party. Sen. Harpootlian noted that Congressman Mendel Rivers represented the unified metropolitan area for decades. He insisted that the split was perpetuated because it allowed legislators to keep most of the white portion of Charleston in CD 1 and most of the Black portion in CD 6, which he said was a racial gerrymander. Sen. Campsen repeated his assertion that he did not consider race at all, to which Sen. Harpootlian repeated his question regarding the ubiquity of BVAP charts provided to legislative members. Sen. Hutto asked Sen. Campsen if there were retrogression standards that needed to be considered "now that the rules have changed," to which Sen. Campsen replied no.

Sen. Malloy rose to register again his objection to moving forward with a vote. He noted again that there would be no second or third reading and said, "We had about an hour and change of discussion" and that they had been repeatedly told that "the information is online" on the website. He argued that that was not nearly enough time and consideration for something as important as a redistricting bill. He said that there had been a measure of bipartisan cooperation in 2010 because they had more time to consider things. And he noted that the process was so rushed this time that legislators were arguing on the floor over who had received what information. He concluded, "I didn't sign up for this."

Sen. Kimpson repeated his assertion that the people of Charleston, of whom he represented more than any other legislator, "unequivocally" wanted to be placed wholly into CD 1 and not into a "hodgepodge" district as in SA1/H2. He said that Sen. Campsen's argument regarding two representatives fell short. He said the idea that Congressman Clyburn and Congresswoman Mace were "in lockstep" was incorrect. He noted that Congressman Clyburn was the only member of the state's delegation to vote for the American Rescue Act, which was set to provide the state with billions of dollars for the kinds of programs that Sen. Campsen was talking about when supporting his claim that two representatives were better for Charleston. He concluded by stating his belief that SA1/H2 represented a plan designed by the national Republican Party. The Senate subsequently voted 26-15 to adopt SA1/H2. All Black members voted no.

Sen. Harpootlian then introduced SA2/WC. He described the existing configuration of districts as "remedial" in nature in that the map that was drawn in the 1990s was part of a policy of drawing majority-minority districts in order to get Black candidates of choice elected when it was recognized that there were patterns of racial block voting preventing that from being the case. He argued, "[b]ut a remedial measure is like a cast, and if you leave the case on the body too long, it atrophies." He explained, "[a]nd that's what's happened in our state and that, Senator from Charleston, is what's wrong with using a benchmark of what we did and had to do, where we maximized and packed in order to elect an African-American, which is no longer, in my opinion, necessary." He added, "[a]nd by not doing that . . . racial block voting analysis we talked about earlier, you don't know and I don't know what you could have done to change that benchmark and start over." He indicated that the state's Regulatory and Fiscal Affairs agency conducted such analysis in a preliminary fashion when assisting local governing bodies on redistricting and added that there was no reason to, as Sen. Campsen suggested, wait for litigation in order to have a plaintiff submit such an analysis. He also explained that, in his experience, white legislators had responded to the 1990s packing by cracking and "whitewashing" remaining districts. The result in South Carolina, he argued, was "a Frankenstein monster" of a benchmark plan that was created to meet an "arcane political goal."

Sen. Harpootlian then explained that SA1/H2 had appeared "out of nowhere" in the Subcommittee and that neither he nor Senators Matthews or Sabb had had any input into it whatsoever. He said, "We never discussed it. We were never called back in the map room. We were never asked anything about the contours of it. It just appeared, you know, sort of an immaculate deception, if you will. It was created in a back room, literally in a back room." Speaking to Sen. Matthews, he said, "We showed up, they handed us a plan. I think you, Senator Sabb and I were astonished to see what obviously required a huge amount of time and effort to put together and it just -- it was a fait accompli." He noted that Committee members were told, at the same meeting, when he asked about input from outside from outside groups, that the National Republican Redistricting Trust had submitted a plan "that we never saw."

Sen. Massey argued that SA1/H2 did not pack CD 6, that CD 1's BVAP was essentially unchanged, the SA2/WC took Fort Jackson from Congressman Wilson and split the Savannah River environmental site. He motioned to table, which carried, 26-13, with Senators Malloy and Williams being the only two Black members to vote aye.[92] Sen. Harpootlian briefly introduced the League of Women Voters' plan, which failed by a voice vote. Sen. Hutto introduced one of the NAACP's plans, which failed on a 27-12 vote, with Senator Allen being the lone aye vote among Black members and Senators Malloy and Kevin Johnson not voting. Sen. Scott introduced a plan that he argued did not pack poor voters into CD 6 and instead provided the opportunity for economic growth for the poorer regions of the state. Sen. Bennett argued that the plan split Dorchester three ways and motioned to table, which carried 27-11, with Senator Karl Allen being the lone Black member voting aye, Senator Malloy not voting, and Senator Kevin Johnson having been granted leave. So quick was Sen. Bennett to dismiss the plan that Sen. Scott was compelled

---

[92] Senator Darrell Jackson had leave.

to say, before finishing, "You're going to move to table it no matter what I put up here. At least wait till I sit down."

On January 26, 2022, the House voted 72-33 to concur in the Senate's amendment. Robert Williams was the lone Black member to vote aye, with Reps. Alexander, Bamberg, Hosey, J.A. Moore, and Rutherford not voting. Governor McMaster signed S. 865's into law later that day.

## V.     SUMMARY OF INFORMATION FOR THE COURT TO CONSIDER

The historical background of this law reveals, unquestionably, evidence of discrimination against Black citizens in South Carolina, especially in regard to voting rights, even very recently. The sequence of events and legislative history surrounding S. 865's enactment also reveal procedural and substantive departures, as well as statements and actions by members of the decision-making body that offers evidence of support for a finding of discriminatory intent.

I reserve the right to continue to supplement my declarations in light of additional facts, testimony and/or materials that may come to light. Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct according to the best of my knowledge, information, and belief.

Executed on:  _____4/11/2022_____

_Joseph Bagley_
_____
**Joseph Bagley, PhD**

**Joseph Bagley, PhD**
**Curriculum Vitae**



Assistant Professor of History
Honors Program Coordinator
Perimeter College, Newton Campus
Georgia State University
239 Cedar Lane, Covington GA, 30014

Email:   jbagley3@gsu.edu
Home: 10210 Northlake Heights Circle
          Atlanta, GA 30345
Cell:     770-815-3771
Office:  404-413-6364

**Education**

---

PhD, History, 2013, Georgia State University
        *"School Desegregation, Law and Order, and Litigating Social Justice in Alabama, 1954-1974"*
MA, History, 2007, Auburn University
 BA, History, 2004, Auburn University

**Major Publications**

---

*The Politics of White Rights: Race, Justice, and Integrating Alabama's Schools*
        (University of Georgia Press, Nov. 2018)

**Teaching and Administrative Experience**

---

Honors Program Coordinator, Perimeter College, Georgia State University, 2019 – Present

Assistant Professor, Perimeter College, Georgia State University, 2017 – Present (5/4/2 Load)
        AAS 1142, African American History since 1865
        AAS 2010, Introduction to Africana Studies
        HIST 1111, Survey of World History to 1500
        HIST 1112, Survey of World History since 1500
        HIST 2110, Survey of United States History

Lecturer, Georgia Perimeter College, 2015 – 2017 (6/6/2 Load)
        HIST 1112, Survey of World History since 1500
        HIST 2111, Survey of U.S. History to 1865; HIST 2112, Survey of U.S. History since 1865
        HIST 2110, Survey of U.S. History

Visiting Lecturer, Georgia State University, 2013 – 2015 (4/4/2 Load)
        HIST 2110, Survey of United States History

Graduate Instructor of Record, Georgia State University, 2009 – 2013 (1/1/1 Load)
        HIST 1112, Survey of World History since 1500
        HIST 2110, Survey of United States History

Graduate Teaching Assistant,
        Georgia State University, 2008-2009, 2013
                HIST 1112, Survey of World History since 1500; HIST 2110, Survey of United States History
                HIST 3000, Introduction to Historical Studies; HIST 4990, Historical Research (co-taught)
        Auburn University, 2004-2008
                HIST 1010, Survey of World History to 1789; HIST 1020, Survey of World History since 1789

**Joseph Bagley, PhD**
**Curriculum Vitae**



### Invited Talks

Symposium on the Struggle for Black Freedom, Georgia State University, Perimeter College, Keynote Address, February 11, 2020, "The Struggle for Black Voting Rights: from Reconstruction to *Right Now*."

Georgia State University Constitution Day Event, September 18, 2019, "'To Abridge and Deny': Vote Dilution, Section 5 Preclearance, and Undermining the 15th Amendment."

Auburn University Critical Studies Working Group, College of Education, April 12, 2019, "*Teach Us All*, The Little Rock Nine, and Contemporary School Segregation."

League of Women Voters of Greater Jefferson County, February 21, 2019, "School Desegregation in Alabama."

Auburn University Caroline Marshall Draughon Center for the Arts and Humanities, January 29, 2019, Book Talk.

Alabama Department of Archives and History, *Alabama in the Age of Aquarius* Symposium, August 19, 2016, "Desegregating Alabama's Schools: the Montgomery Experience."

Alabama Department of Archives and History, Monthly Lecture Series, May 15, 2014, "Now a Single Shot Can Do It': *Lee v. Macon County Board of Education* and School Desegregation in Alabama."

### Notable Citations

Nikole Hannah-Jones, "The Resegregation of Jefferson County," *The New York Times Magazine*, Sept. 6, 2017.

Wendy Parker, "Why Alabama School Desegregation Succeeded (And Failed)," 67 *Case Western Law Review*, 1091 (2017).

Rebecca Retzlaff, "Desegregation of City Parks and the Civil Rights Movement: The Case of Oak Park in Montgomery, Alabama," *Journal of Urban History* 47.4, 715 (2019).

Erika Frankenberg, "The Impact and Limits of Implementing *Brown*: Reflections from Sixty-Five Years of School Segregation and Desegregation in Alabama's Largest School District," 11 *Alabama Civil Rights and Civil Liberties Law Review*, 33 (2019).

Bryan Mann, "Segregation Now, Segregation Tomorrow, Segregation Forever? Racial and Economic Isolation and Dissimilarity in Rural Black Belt Schools in Alabama," *Rural Sociology* 86.3, 523 (2021).

### Expert Witness

*Milligan v. Merrill* (N.D., Ala. 2021), Submitted an expert report, Certified as an expert, Testified at hearing for preliminary injunction (Ruling pending)

*People First v. Merrill* (N.D., Ala. 2020), Submitted an expert report, Certified as an expert, testified in deposition and at trial, Findings adopted by the Court in opinion (479 F.Supp. 3d 1200)

**Joseph Bagley, PhD**
**Curriculum Vitae**



## Service

Newton Academic Community Engagement, 2019-present
Chair, Search Committee, Lecturer in History, Fall 2019
Search Committee, Adjunct Faculty in African American Studies, Summer 2019
Search Committee, Faculty Associates to Center for Excellence in Teaching and Learning, Summer 2018
Search Committee, Lecturers in History, Spring 2018
Panthers Vote Presidential Election Panel, Fall 2016
History 2110 Assessment Committee for the Georgia State-Georgia Perimeter Consolidation, 2016 - 2017
Consultant, Shiloh Community Restoration Foundation, Notasulga, Alabama, 2014 - 2015
Coordinating Committee, First Annual Atlanta Graduate Student Conference in History, Emory University, 2012

## Conference Presentations

"'We Have Had a Dream, Too': School Desegregation Litigation, Racial Innocence, and Politics in Alabama," Organization of American Historians Annual Conference, St. Louis, Missouri, April 16, 2015.

"'Life, Liberty, and the Pursuit of Alabama's Happiness': School Desegregation, the 'Law and Order' Narrative, and Litigating Social Change in Alabama, 1954-75," Midwest Political Science Association Annual Conference, Chicago, Illinois, April 12, 2013.

"Black Alabamians' Efforts to Desegregate Schools, 1954-1963: Civil Rights, Litigation, and the Road to *Lee. v. Macon,*" presented at the University of Alabama History Department's Graduate Conference on Power and Struggle, March 3, 2012.

## Solicited Manuscript and Book Reviews

Outside Reader for Book Manuscript, Brian K. Landsberg, *Revolution by Law: The Federal Government and the Desegregation of Alabama Schools*, University of Kansas Press (Spring 2021)

Camille Walsh, *Racial Taxation: Schools, Segregation, and Taxpayer Citizenship, 1869-1973* (UNC Press, 2018), *The Alabama Review* (Pending, Spring 2021)

Outside Reader for Essay Manuscript for *Urban History* (Fall, 2019), Anonymous

Stephanie R. Rolph, *Resisting Equality: The Citizens' Council, 1954-1989* (LSU Press, 2018), in *The Journal of Mississippi History* (Fall, 2019)

Wayne A. Weigand and Shirley A. Weigand, *The Desegregation of Public Libraries in Jim Crow South: Civil Rights and Local Activism* (LSU Press, 2018), in *Georgia Historical Quarterly* (Summer, 2019)

Leeann G. Reynolds, *Maintaining Segregation: Children and Racial Instruction in the South, 1920-1955* (LSU Press, 2018), in *The Alabama Review* (Summer, 2019)

Outside Reader for Essay Manuscript for *History of Education Quarterly* (Fall, 2018), Anonymous

James Turner, *Selma and the Liuzzo Murders: The First Modern Civil Rights Convictions* (University of Michigan Press, 2018), in *Law and History Review*, *The Docket*, Vol. 1, Issue 2 (August, 2018)

**Joseph Bagley, PhD**
**Curriculum Vitae**



**Solicited Manuscript and Book Reviews Cont.**

Tracy E. K'Meyer, *From* Brown *to* Meredith*: The Long Struggle for School Desegregation in Louisville, Kentucky, 1955—2007* (University of North Carolina Press, 2013), in *The Journal of Southern History* 80, No. 4 (Nov, 2014): pp. 1019-20

Frank Sikora, *The Judge: The Life and Opinions of Alabama's Frank M. Johnson, Jr.* (New South Books, 2007), in *The Alabama Review* 61, No. 2 (April, 2008): 153-4

**Awards**

- John M. Matthews Distinguished Dissertation Award, 2013, Georgia State University

**Examination Fields**

- 19th-20th Century United States History
- United States Legal and Constitutional History
- History of South Africa

**Professional Organizations**

- Organization of American Historians
- American Historical Association
- American Society for Legal History
- Southern Historical Association
- Alabama Historical Association

**Languages**

- Spanish: Reading, Good
- French: Reading, Good