# The South Carolina State Conference of the NAACP, et al v. Alexander, et al

CA No.: 3:21-cv-03302-MGL-TJH-RMG

# EXHIBIT D

*Senate and House Defendants' Daubert Motion in Limine to Exclude Reports, Opinions, and Testimony of Dr. Joseph Bagley*

Dr. Bagley's May 3, 2022 Rebuttal Report

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | |
|---|---|
| THE SOUTH CAROLINA STATE CONFERENCE OF THE NAACP, and TAIWAN SCOTT, on behalf of himself and all other similarly situated persons,<br><br>    Plaintiffs,<br><br>  v.<br><br>THOMAS C. ALEXANDER, in his official capacity as President of the Senate; LUKE A. RANKIN, in his official capacity as Chairman of the Senate Judiciary Committee; JAMES H. LUCAS, in his official capacity as Speaker of the House of Representatives; CHRIS MURPHY, in his official capacity as Chairman of the House of Representatives Judiciary Committee; WALLACE H. JORDAN, in his official capacity as Chairman of the House of Representatives Elections Law Subcommittee; HOWARD KNAPP, in his official capacity as interim Executive Director of the South Carolina State Election Commission; JOHN WELLS, Chair, JOANNE DAY, CLIFFORD J. EDLER, LINDA MCCALL, and SCOTT MOSELEY, in their official capacities as members of the South Carolina Election Commission,<br><br>    Defendants. | Case No. 3-21-cv-03302-MBS-TJH-RMG<br><br>**THREE-JUDGE PANEL**<br><br>**CONGRESSIONAL REBUTTAL REPORT OF JOSEPH BAGLEY, Ph.D.** |

1

**Congressional Rebuttal Report of Joseph Bagley, Ph.D.**

I.      Introduction and Summary of Findings

I have been asked by Plaintiffs to examine the report of Mr. Sean P. Trende dated April 18, 2022, and to determine whether it supports or undermines any of the findings in my April 11, 2022, report. Mr. Trende evaluated the Congressional redistricting map enacted by the South Carolina General Assembly as Act 118 ("The Enacted Map"), but unlike my report, Mr. Trende's does not address any of the *Arlington Heights* factors and thus does not speak to the history of racial discrimination in South Carolina, the sequence of events, the legislature's procedures, or contemporaneous statements surrounding Act 118's passage. As such, Mr. Trende's report does not confront the bulk of my findings and opinions regarding the Enacted Map.

In Mr. Trende's expert opinion, the changes approved by the Assembly in Act 118 to the post-2010 Congressional map were "modest." Among his key considerations in evaluating the Enacted Map's compliance with state and federal law are high rates of retention of the "cores of existing districts."[1] Mr. Trende also claims that changes made among the Congressional Districts being challenged by Plaintiffs ("The Challenged Districts") "are largely explained by" the repairing of split precincts (i.e., making precincts whole), adhering to natural geographical boundaries, and creating a Republican partisan advantage in U.S. Congressional District 1 ("CD 1"), thus securing a 6-1 Republican super-majority advantage in the state's Congressional delegation.[2]

However, based on my review of the public record leading to the adoption of Act 118, as I explain in detail below, while some House and Senate Staff members touted the plan that eventually became the Enacted Map as a "minimal change" plan, I find that legislators generally understood the Enacted Map to constitute significant changes to Congressional district lines that were necessary to account for demographic shifts between 2010 and 2020, especially in CD 1 and CD 6. And, as legislators repeatedly pointed out, changes to those two CDs had "ripple effects" on other CDs. Also, lawmakers did not seriously consider issues of core retention or adhering to natural geographical boundaries until extremely late in the legislative process, at which point Republican leaders asserted for the first time that these should be key considerations.

The Senate Judiciary Committee's Redistricting Subcommittee and the House Judiciary Committee's Ad Hoc Redistricting Subcommittee first met in the summer of 2021. They held public hearings between July and October and began to reconvene regularly in early November. The General Assembly passed H. 4493, establishing the map for state House redistricting in early December. Yet, only in late January 2022, towards the end of legislative debate on Congressional maps, did Senators Rankin (R) and Campsen (R) in comparing the map in Senate Amendment 1, House Plan 2 ("SA1/H2") to the map introduced by Sen. Harpootlian (D), Senate Amendment 2, Whole County Plan ("SA2/WC"), systematically address core retention and "constituent

---

[1] Expert Report of Sean P. Trende, April 18, 2022, p. 7.
[2] Id.

2

consistency," for example. This took place after members of the relevant legislative committees accused other members of having contact with representatives of the national Republican Party.

In hearings that took place prior to the bulk of the legislative proceedings, testifying members of the public urged keeping precincts whole or adhering to natural geographical boundaries. But those recommendations were almost universally made in conjunction with pleas to not "pack" and "crack" Black voters, to not dilute minority voting strength, to draw districts that would provide more competitiveness in elections, or to start from scratch in drawing maps; these were concerns that members of the public subsequently expressed were not met by the plan that ultimately became the majority's Enacted Map. At no point in the record did any current legislative member publicly urge changes between CD 1 and CD 6 to secure or fortify a partisan Republican advantage in CD 1.

As such, Mr. Trende's opinions on these matters more likely represent *ex post facto* justifications that were not really an integral part of the lengthy legislative or public discussions regarding the creation of the Enacted Map and, therefore, are not very useful in discerning evidence of legislative intent. Below I lay out when these issues appear in the public record and how lawmakers and members of the public engaged with them.

## II.      The Legislative Hearings and Floor Debate

When the South Carolina House of Representatives Judiciary Committee's Redistricting Ad Hoc Committee met on August 3, 2021, it unanimously adopted, without debate, House Guidelines for redistricting state House Districts and U.S. Congressional Districts. The approved House Guidelines do not include retaining the cores of existing districts or constituent consistency.[3] Chairman Jordan noted that the Guidelines did not change, in his opinion, very much, if at all, from cycle to cycle.[4]

When the Senate Judiciary's Redistricting Subcommittee met on September 17, 2021, there was some debate before adopting guidelines for redistricting the state Senate and U.S. Congressional Districts. Senator Harpootlian suggested that the guidelines be listed as a hierarchy, with preservation of the cores of districts last among all considerations. His plan was not adopted, however. In the Senate Guidelines, as adopted, item III. B. is "Constituent Consistency," which is defined as "[p]reserving the cores of existing districts, keeping incumbents' residences in districts with their core constituents, and avoiding contests between incumbent legislators." Also included were minimizing county splits and splits of voting precincts, as defined as "represented by the Census Bureau's Voting Tabulation District (VTD) lines."[5]

---

[3] South Carolina House of Representatives, Judiciary Committee, Redistricting Ad Hoc Committee, "2021 Guidelines and Criteria for Congressional and Legislative Redistricting."

[4] South Carolina House of Representatives Judiciary Committee, Ad Hoc Redistricting Subcommittee, Meeting of Aug. 3, 2021, South Carolina General Assembly (SCGA) Online Video Archive, at 7:30 – 8:30.

[5] South Carolina Senate Judiciary Committee, Redistricting Subcommittee, "2021 Redistricting Guidelines."

3

After holding public hearings around the state, the Senate Subcommittee and the House Ad Hoc Committee met again in early November. The House Ad Hoc committee met on November 10, 2021, in order to hear feedback on its plan for redistricting the state House. In the meeting, which lasted four and a half hours and featured testimony from over 25 members of the public, the only mention of "cores of existing districts" came from Liz Keitt. Ms. Keitt lamented the elimination of Rep. Jerry Govan's District 95. Ms. Keitt said, "I'm just appalled at the way the lines have been drawn. Well, we will not have a representative in Orangeburg. . . . You know, an effort should be made to preserve cores of existent districts, and separate incumbents where permissible. For the last 50 years, we've been fighting to have someone to represent us. And we have in Jerry Govan a great representative."[6]

The Senate Redistricting Subcommittee met two days later, on November 12, 2021, and heard public testimony on its Senate Staff plan and regarding a forthcoming Congressional plan.[7] One woman, the daughter-in-law of the Mayor of Pelion, read from the 2011 Guidelines and invoked core preservation in her argument that Pelion should not be included in a Senate District with Orangeburg. A number of people spoke of partisanship, though exclusively in terms of their desire to see that Districts were drawn <u>without</u> consideration of either political party.[8]

Similar concerns were raised when the Subcommittee met again on November 29.[9] There was <u>no</u> discussion of core retention, though Staff cartographer Will Roberts did describe the plan put before the Subcommittee as a "minimal change" plan. Mr. Roberts mentioned "fixing" some precinct splits in Richland County in CD 2.[10]

Former Congressman Joe Cunningham appeared at the November 29, 2021, Senate Redistricting Subcommittee meeting and was the only person present to invoke partisan advantage. Mr. Cunningham expressed his view that the map under consideration, the original Senate Staff Congressional map, had been drawn by a Republican "partisan hack" in Washington D.C. Despite this comment, there was no discussion at this meeting about Republican legislators having a goal to draw a safely 6-1 Congressional Map or to take CD 1 out of competitive territory. According to Mr. Cunningham, the Senate map was a blatant racial gerrymander that deliberately gave CD 1 the lowest Black population in the state despite its rich diversity. Democrats on the Subcommittee followed up Mr. Cunningham's remarks with questions directed at Staff regarding what contact they might have had with the national Republican Party, but at no point did anyone on staff or any Republican members on the Subcommittee suggest that partisan advantage was one of the goals when drawing the map.[11]

---

[6] South Carolina House of Representatives Judiciary Committee, Redistricting Subcommittee, Meeting of Nov. 10, 2021, SCGA Online Video Archive, at 3:49:30 – 3:51:45.

[7] I briefly discuss these hearings below. South Carolina Senate Judiciary Committee, Redistricting Subcommittee, Meeting of Nov. 12, 2021, SCGA Online Video Archive.

[8] Id. at approx. 14:30, 19:30, 2:05:00, 2:36:30.

[9] South Carolina Senate Judiciary Committee, Redistricting Subcommittee, Meeting of Nov. 29, 2021, SCGA Online Video Archive.

[10] Id. at 3:30.

[11] Id. at 9:45.

The General Assembly adopted its plan for state House redistricting (H. 4493, Act 117) on December 9, 2021. The House Ad Hoc Redistricting Committee met again one week later. At this meeting, Mr. Cunningham echoed his sentiments from the previous Senate Redistricting Subcommittee meeting.[12] He expressed his opinion that the House Staff's proposed Congressional map was flawed but superior to the Senate Staff's Congressional map. Mr. Cunningham explained, "[t]he House map is more compact and rightly expands its footprint in Charleston County. Unlike the Senate map, it keeps communities like West Ashley, John's Island, and the downtown peninsula in the same district. And those are all good things that any fair and reasonable Congressional map should do." But, he added, "[d]espite the improvement over the Senate map, you know, which -- which wasn't exactly a high bar, the House map still falls significantly short." He then questioned the splitting of Charleston, saying, "[t]his map goes to great lengths to carve out one section of Charleston County, and then scrambles to make up for it by including parts of other surrounding counties. You know, in your map it's Colleton County. In the Senate map, it's Colleton, Beaufort, and now Jasper." He suggested that the "simple" solution was keeping Charleston whole.[13]

Other members of the public again expressed concerns about potential minority vote dilution, packing and cracking of Black voters, and unfair partisan advantage or lack of competitiveness, particularly in CD 1, which was described as "naturally competitive."[14] Committee members did not discuss core retention, precinct repair, or the use of natural geographical boundaries in map drawing. Members of the public from both Beaufort and Charleston expressed their concerns that those respective counties should be kept whole and within CD 1 during this meeting.[15]

After the holiday, the House Redistricting Ad Hoc Committee met again on December 29, 2021.[16] It was at this meeting that a new House Staff plan for Congress emerged, to the surprise of Democrats on the Committee and members of the public who had condemned the Senate Staff map (these individuals opined that the new House map was strongly similar to the original Senate map). There was no discussion of core retention or precinct repair, or natural geographical boundaries. The only person to bring up partisan advantage was a member of the public, Sam Grant, a Black student from Charleston who expressed his opinion that "the only explanation for this [new House Congressional] map even being in existence, is that it serves a larger political purpose. And in this case, that purpose is to gut the First District, to ensure an inherent advantage for one party in the Congressional election," which he described as "not right, downright unethical . . . ."[17] Had this been an expressed goal of the Republican members of the committee or of Staff working with them, this would have been an opportunity to explain that partisan advantage was

---

[12] South Carolina House of Representatives Judiciary Committee, Ad Hoc Redistricting Committee, Meeting of Dec. 16, 2021, SCGA Online Video Archive.
[13] Id. at 42:00 – 49:30.
[14] Id. at 8:30, 15:30, 42:00.
[15] Id. passim.
[16] Ad Hoc Redistricting Committee, Meeting of Dec. 29, 2021, SCGA Online Video Archive.
[17] Id. at 10:15 – 13:15.

5

(or not), indeed, one of the motivations behind the changes to CD 1 and CD 6. There was no discussion to that effect.[18]

On January 10, 2022, and January 12, 2022, when the House Judiciary Committee and the full House met, respectively, Representative King (D), who is Black, expressed his concern that the new Congressional map had been drawn to benefit the Republican legislative members, to eliminate competition in Congressional Districts, and "to ensure that Black folk only have a voice in one Congressional District."[19] Rep. King said that the map did "nothing but empower one particular party for the next ten years. And how did they do it? Cracked the Black districts and packed and put them all in" CD 6.[20] Other than these comments by Rep. King, there was no discussion of partisan advantage. And there was no discussion of core retention, precinct repair, or following natural geographical boundaries.[21]

The Senate Subcommittee met on January 13, 2022, to discuss and to hear public feedback on what were by then being described as SA1/H2 and SA2/WC.[22] Senator Harpootlian questioned attorney Joseph Opperman, whom he had retained to draft SA2/WC. It was Mr. Opperman who first began to discuss core retention rates. He touted the retention rates in his description of the SA2/WC plan and listed the percentages demonstrating that the plan "preserves district cores."[23] He also noted that SA2/WC split minimal precincts and hued to "traditional" or historical Congressional Districts in the state in terms of geography. Others at that hearing, while expressing support for SA2/WC, encouraged the Subcommittee to avoid "racial, partisan, constituent, and incumbent gerrymandering."[24]

It was then at the January 19, 2022, Senate Judiciary Committee meeting that Senator Campsen began to repeatedly refer to "constituent consistency," "continuity of representation," and following "natural geographical boundaries."[25] These appeared to have become major talking points despite hardly having been discussed at all up to that point during public legislative hearings and meetings. When Senator Campsen was asked why these new priority principles were not applied to other areas, namely southern Colleton and Jasper Counties, which were moved from CD 6 to CD 1, he replied, "Well. Well … another principle is communities of interest and you do have along -- along that coastline, you do have communities of interest, communities in those counties dealing with similar issues like flooding and hurricanes and beach re-nourishment and

---

[18] Id., passim.

[19] South Carolina House of Representatives Judiciary Committee, Meeting of Jan. 10, 2022, SCGA Online Video Archive, 14:15 – 26:00, esp. at 15:45.

[20] South Carolina House of Representatives, in Session Jan. 12, 2022, SCGA Online Video Archive, 1:59:30 – 2:45:00, esp. at 2:18:30 – 2:22:00, directly at 2:19:00.

[21] Fns 19 and 20 supra, passim.

[22] South Carolina Senate Judiciary Committee, Redistricting Subcommittee, Meeting of Jan. 13, 2022, SCGA Online Video Archive.

[23] Id. at 17:30 – 28:30, esp. at 22:10.

[24] Id. at 46:15.

[25] South Carolina Senate Judiciary Committee, Meeting of Jan. 19, 2022, SCGA Online Video Archive, 13:00, 18:00 -18:35, 25:00.

things like that." Many of the public and legislative advocates of including Charleston wholly within CD 1 had based this on community of interest concerns.[26]

When the full Senate met the following day, January 20, 2022, Senator Rankin rose to summarize the work of the Subcommittee. Sen. Mia McLeod (D), who is Black, asked Sen. Rankin to describe the Subcommittee's guidelines. In describing the guidelines in response, Senator Rankin seemed to connect the idea of constituent consistency and preserving the cores of districts with both the idea of communities of interest and with avoiding the removal of incumbents from their districts. Sen. Rankin said, "[n]ext consideration and finally, or the third of four, communities of interest. Again, we heard from lots of people on our Senate plans, what people want, who they identify, what their common interests are. Again, political, recreational, economic, social, cultural, language, political. They – and that is a consideration that we adopted as our Subcommittee, constituent consistency. This is preserving cores of existing districts. Again, we talked about the benchmark. And so again, one plan you will hear the argument advances and preserves the existing seven districts and keeping incumbents' residences in the districts with their core constituents."[27]

While constituent consistency in terms of preserving the cores of existing districts was among the guidelines adopted by the Subcommittee and listed as such by Chairman Rankin at the onset of the remote public hearings, this consideration had not been discussed publicly in any substantive way prior to that point. And in the guidelines it is tethered to the imperative of keeping incumbents in their districts, not to communities of interest or to any consideration of percentages of incumbent voters kept within a given district.

Senator Campsen, in making the case for SA1/H2, described it as a "minimal change" plan and said, "I'll give you some statistics that demonstrate that."[28] He listed a comparison of the constituent consistency rates in each CD in SA1/H2 and SA2/WC.[29] Senator Campsen then said that he would like to discuss "the issue of some allegations of partisan gerrymandering" and said that he would provide numbers that showed that SA1/H2 was not drawn for that purpose.[30] He compared the "Benchmark" CD 1 Trump vote percentage from the 2020 election (53.03 percent) to the CD 1 Trump numbers retained in SA1 (54.39 percent). He said, "[t]hat's an increase of only 1.36 percent."[31] Mr. Trende, in his report, indicates that the Biden "net vote share," excluding third-party votes, in CD 1 in the "Benchmark" (47 percent) fell to 45.6 in the Enacted Map. He indicates that accounting for not just Biden votes moved out of CD 1 but also Trump votes moved in, the net percentage change in the Trump vote is actually close to a 3 percent increase.[32] Senator Campsen only provided the 1.36 percent figure.

---

[26] Id. at 18:45 – 19:10.
[27] South Carolina Senate, in Session Jan. 20, 2022, SCGA Online Video Archive, at 1:56:30.
[28] Id. at 2:26:00 – 2:26:35.
[29] Id. at 2:26:35 – 2:20:30.
[30] Id. at 2:22:15 – 2:22:30.
[31] Id. at 2:22:50.
[32] See Trende Report, pp. 7, 23, 33. Dr. Trende refers on p. 33 to "Table 5" for reference to Trump numbers, but Table 5 in his report is actually a representation of compactness scores. He also indicates that President Trump carried CD 1 by 6 points when it appears, according to his tables, to have been 3 points.

Senator Campsen also discussed, for the first time, following natural geographical boundaries. These were the reasons given for the split in Charleston between CD 1 and CD 6 – constituent consistency and following natural geographical boundaries.[33] Senator Campsen recalled an earlier discussion with Sen. Harpootlian regarding the ubiquity of waterways in the Low Country. The impetus for that discussion had been questions of contiguity by water in Senator Campsen's proposed district. At the January 10 Senate session, Sen. Campsen touted the use of waterways like the Stono River in drawing the new lines dividing CD 1 and CD 6. This had not been discussed in previous hearings or meetings. Moreover, the ubiquity of waterways in the Low Country that Sen. Campsen had discussed separately with Sen. Harpootlian makes this a questionable rationale, because the many boundaries these rivers create could easily be used to obfuscate impermissible motivations.

When Senator Matthews (D), who is Black, asked Sen. Campsen about his reference to the "Benchmark" plan, despite the lack of such language in the Guidelines, Sen. Campsen explained that "Benchmark" referred to the "guideline of constituent consistency, preserving the cores of existing districts." Senator Matthews asked if Sen. Campsen had earlier indicated that this was a "primary concern" in drawing the map. Despite his repeated references to it, Senator Campsen said that it was not a "primary" concern. "It's a description of the plan that it's minimizing the changes," he explained. Senator Harpootlian asserted that "Benchmark" was not in the guidelines, saying that what was in the guidelines was "core constituency" and, he said, "it's not the same thing."[34]

The record of the legislative sequence of events seems to show that core retention, precinct repair, and following natural boundaries were only rarely or passingly discussed until the January 19, 2022, meeting of the Senate Judiciary Committee, after the discussion of possible contact with the national Republican Party and after Mr. Opperman raised "core retention" in his discussion of SA2/WC. Only then and the following day did lawmakers raise these points and begin to assert that these were key motivations or justifications for the Congressional District lines, despite the fact that the second House Staff plan had come to the Senate earlier that month and had been adopted by the House Ad Hoc Committee on December 29, 2021, following months of hearings and deliberations. At no point did anyone suggest that the lines ought to be drawn to secure a safe Republican advantage in CD 1 and ensure a 6-1 Republican-Democrat delegation. When members of the public or members of the legislature suggested that perhaps this had been the case, there was not any admission to this fact. Indeed, Sen. Campsen himself argued that this had not been the case.[35]

---

[33] South Carolina Senate, in Session Jan. 20, 2022, SCGA Online Video Archive, at 2:15:00 – 2:26:00.
[34] Id. at 3:03:00 – 3:05:00.
[35] See Fns 27, 30, supra.

III.    The Public Hearings

The Senate Redistricting Subcommittee held public hearings in July and August of 2021, and the House Redistricting Ad Hoc Committee did so in September and October of 2021. At the Senate hearing in Aiken on September 20, several people in their testimony asked that the Subcommittee not split precincts. These same individuals also asked the Subcommittee not to engage in the "trickery" of packing and cracking Black voters and to avoid minority vote dilution in general. They asked the Subcommittee to adopt "strict anti-gerrymandering guidelines," including avoiding drawing lines for partisan advantage, and to increase competition in districts.[36]

Members of the public at the Charleston hearing on August 10 likewise lamented split precincts and, at the same time (in one case, in the same sentence), asked the Subcommittee not to draw lines for partisan advantage.[37] Several individuals spoke of split precincts causing confusion at polling places. One suggested that the existence of such splits in the first place was due to "racial bias" and repeated a call for a non-partisan, independent redistricting commission.[38] One man from Folly Beach indicated that the current composition of the Congressional District lines in Charleston did not make sense to him, given the geography of the area. He then explained that he had gone back and had read the minutes from deliberations in 2011 and that the same concerns had been voiced then as had been voiced at this hearing. He asserted that the committee did not care about citizens' concerns in 2011 and that it likely did not care at the present moment either. He called the proceedings a "dog and pony show" wherein legislators like Chairman Rankin could "crack little jokes" and say that they did their due process.[39] Another woman suggested that natural geographical boundaries ought to be used in drawing the Congressional District lines, though only if the legislature were "start[ing] from a scratch position" in drawing the lines.[40]

At the hearing in Orangeburg on September 22, several individuals spoke about precinct splits or natural geographical boundaries, though this was in conjunction with calls either to increase the political competitiveness of elections in Congressional Districts, to "keep politics out of it," or to reconfigure the CDs using Interstate Highway lines.[41] In the Senate hearings in Beaufort (August 4), Sumter (July 28), and Columbia (July 27), the only discussion of the issues that Mr. Trende focused on was one woman in Beaufort expressing her hope that "constituent consistency" in the Guidelines was not a "euphemism" for incumbency protection.[42] Of course, incumbency protection itself is in the House and Senate Guidelines. "Constituent consistency" was not invoked by legislators to mean precisely that when it was invoked at all. At the public hearings, it was only mentioned by Chairman Rankin in passing in his opening remarks. In the legislative proceedings, beginning with the January 19 meeting of the Senate Judiciary Committee,

---

[36] SCGA, Senate Redistricting Subcommittee, Public Hearing Transcripts, Aiken, Sept. 20, 2021.
[37] SCGA Senate Redistricting Subcommittee, Public Hearings, North Charleston, Sept. 15, 2021.
[38] Id. p. 73.
[39] Id. pp. 82-4.
[40] Id. p. 138.
[41] SCGA Senate Redistricting Subcommittee, Public Hearing Transcripts, Orangeburg, Sept. 22, 2021.
[42] SCGA Senate Redistricting Subcommittee, Public Hearing Transcripts, Beaufort, Aug. 4, 2021, quotation at pp. 102-3; Sumter, July 28, 2022; Columbia, July 27, 2021.

9

constituent consistency was paired with the preservation of the cores of existing districts, which was itself put forth as meaning that a plan ought to hew as closely as possible to the "Benchmark" plan, or the existing map.[43]

Citizens testifying at the House Ad Hoc Committee hearing in North Charleston on September 15 expressed concerns about split precincts while at the same time arguing that the Charleston metropolitan area should be kept whole, that there ought to be more competitiveness, and that geographical boundaries could serve as a starting point in drawing district lines.[44] At the House hearings in Orangeburg (Sept. 22) and Columbia (Sept. 28, Oct. 4), a few citizens expressed concerns about precinct splits in conjunction with concerns about reduced competitiveness, packing and cracking, and partisan favoritism.[45] One individual who identified herself as a member of the Republican Party argued that lawmakers and map-drawers had to follow natural or man-made boundaries, and this made the issue of "strange shapes" obsolete.[46]

At the House Ad Hoc Committee hearing in Bluffton on September 16, the citizens who asked the Committee to respect precinct lines also asked it to avoid limiting competitiveness, packing and cracking, partisan line-drawing, and drawing maps that negatively affected Black and Latino voters.[47] One person who expressed her concern about precinct splits also lamented a lack of transparency, specifically in the process as handled in the state House, and also decried the holding of such an important hearing before the sundown of Yom Kippur, which she called a "travesty."[48]

IV. Conclusion

Mr. Trende's expert opinion that the changes between the so-called post-2010 Benchmark Plan and the post-2020 Enacted Map are "largely explained by" core retention, precinct repair, the following of natural geographical boundaries, and the pursuit of a partisan advantage is not supported by the evidence found in the public record. Members of the public expressed their concerns about precinct splits, though almost uniformly in concert with their desire for non-dilution of minority voting strength, non-packing-and-cracking of Black voters, and the drawing of politically competitive Congressional Districts, particularly CD 1, which numerous members of the public insisted ought to include all of Charleston or, at least, not parts of Charleston *and* Richland County/Columbia. Members of the public expressed their desire to see natural boundaries used in drawing maps, though this was typically expressed as part of a desire to see the maps drawn from scratch, i.e., not in regard to shifting existing lines.

---

[43] See Fns 27, 29, 33, 34, supra.

[44] SCGA, House Ad Hoc Redistricting Committee, Public Hearing Transcripts, North Charleston, Sept. 15, 2021.

[45] SCGA, House Ad Hoc Redistricting Committee, Public Hearing Transcripts, Orangeburg, Sept. 22, 2021; Columbia, Sept. 28, 2021; Columbia, Oct. 4, 2021.

[46] Orangeburg Transcript (Fn. 45 supra), pp. 70-75.

[47] SCGA, House Ad Hoc Redistricting Committee, Public Hearing Transcripts, Bluffton, Sept. 16, 2021.

[48] Id. pp. 34-37.

Only after the introduction, in late December 2021, of the surprise replacement House map – which became SA1/H2 – did legislators begin to home in on some of those issues that Mr. Trende lists in his report: following geographical boundaries and the maintaining the cores of districts. It was not until the Senate Judiciary meeting of January 19, 2022, that legislators took up as a key talking point the 'maintenance of the cores of districts' – to be understood not as avoiding incumbent removal but as maintaining as high of a percentage of constituents as possible in a given CD as compared to the "Benchmark." This was the meeting at which Committee members were briefed on and decided between SA1/H2 and SA2/WC. At the previous meeting of the Subcommittee, Mr. Opperman had touted core retention as a key feature of SA2/WC. Prior to that, there had been no substantive discussion of this issue. It was also at that time that following geographical boundaries was promoted as the rationale for the adjustment of lines between CDs 1 and 6. What had essentially been limited to Chairman Rankin's introductory remarks at the public hearings, in other words, became, at the eleventh hour, repeatedly referenced justifications.

There is no evidence whatsoever, among the materials that I reviewed, that the Enacted Map was drawn with the express purpose of securing a Republican advantage in CD 1 or in the General Assembly pursuing a 6-1 Republican super-majority advantage in the state's Congressional delegation.

I reserve the right to continue to supplement my report in light of additional facts, testimony and/or materials that may come to light.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct according to the best of my knowledge, information, and belief.

Executed on May 3, 2022

**Joseph Bagley, Ph.D.**