# Exhibit 2

Moon Duchin , PhD                                July 14, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF SOUTH CAROLINA
 2                    COLUMBIA DIVISION
 3     THE SOUTH CAROLINA STATE
       CONFERENCE OF THE NAACP
 4
            and
 5
       TAIWAN SCOTT, ON BEHALF OF HIMSELF
 6     AND ALL OTHER SIMILARLY SITUATED
       PERSONS,
 7
                 Plaintiffs,
 8
            vs.            Case No. 3:21-CV-03302-JMC-TJH-RMG
 9
       THOMAS C. ALEXANDER, IN HIS OFFICIAL
10     CAPACITY AS PRESIDENT OF THE SENATE;
       LUKE A. RANKIN, IN HIS OFFICIAL CAPACITY
11     AS CHAIRMAN OF THE SENATE JUDICIARY
       COMMITTEE; MURRELL SMITH, IN HIS OFFICIAL
12     CAPACITY AS SPEAKER OF THE HOUSE OF
       REPRESENTATIVES; CHRIS MURPHY, IN HIS
13     OFFICIAL CAPACITY AS CHAIRMAN OF THE HOUSE
       OF REPRESENTATIVES JUDICIARY COMMITTEE;
14     WALLACE H. JORDAN, IN HIS OFFICIAL CAPACITY
       AS CHAIRMAN OF THE HOUSE OF REPRESENTATIVES
15     ELECTIONS LAW SUBCOMMITTEE; HOWARD KNAPP,
       IN HIS OFFICIAL CAPACITY AS INTERIM
16     EXECUTIVE DIRECTOR OF THE SOUTH CAROLINA
       STATE ELECTION COMMISSION; JOHN WELLS,
17     JOANNE DAY, CLIFFORD J. EDLER, LINDA MCCALL,
       AND SCOTT MOSELEY, IN THEIR OFFICIAL
18     CAPACITIES AS MEMBERS OF THE SOUTH CAROLINA
       STATE ELECTION COMMISSION,
19
                 Defendants.
20     _____
21
22     DEPOSITION OF:   MOON DUCHIN, PHD
                        (Via Videoconference)
23
       DATE:            Tuesday, July 14, 2022
24
       TIME:            10:13 a.m.
25
```

Moon Duchin , PhD                                    July 14, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 2

1    LOCATION:       Barnum Hall
               Packard Avenue
2              Medford, Massachusetts
3    TAKEN BY:      Counsel for Thomas Alexander
               and Luke Rankin
4
     REPORTED BY:    Elaine L. Grove-DeFreitas,
5              Independent Professional Reporter
               (Via Videoconference)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1    APPEARANCES OF COUNSEL:
2
     ATTORNEYS FOR THE PLAINTIFFS
3    THE SOUTH CAROLINA STATE CONFERENCE OF
     THE NAACP AND MOON DUCHIN, PHD:
4
     NAACP LEGAL DEFENSE & EDUCATIONAL FUND,
5    INC.
        BY:  LEAH ADEN
6       BY:  JOHN CUSICK
     40 Rector Street
7    Fifth Floor
     New York, New York  10006
8    917-858-2870
     laden@naacpldf.org
9    jcusick@naacpldf.org
     (Via Videoconference)
10
11
     ATTORNEYS FOR THOMAS C. ALEXANDER AND
12   LUKE A. RANKIN:
13   JONES DAY
        BY:  JOHN M. GORE
14   51 Louisiana Avenue, N.W.
     Washington, D.C.  20001
15   202-879-3930
     jmgore@jonesday.com
16   (Via Videoconference)
17
18   ATTORNEYS FOR THE AMERICAN CIVIL LIBERTIES
     UNION:
19
     AMERICAN CIVIL LIBERTIES UNION
20      BY:  ADRIEL I. CEPEDA DERIEUX
     125 Broad Street
21   18th Floor
     New York, New York  10004
22   212-549-2500
     ACepedaDerieux@aclu.org
23   (Via Videoconference)
24
25

Page 4

1    APPEARANCES OF COUNSEL:
2
     ATTORNEYS FOR THE HOUSE DEFENDANTS:
3
     NEXSEN PRUET, LLC
4       BY:  ANDREW MATHIAS
     104 South Main Street
5    Suite 900
     Greenville, South Carolina  29601
6    864-370-2211
     AMathias@nexsenpruet.com
7    (Via Videoconference)
8
9    ATTORNEYS FOR ELECTION DEFENDANTS:
10   BURR & FORMAN, LLP
        BY:  JANE W. TRINKLEY
11   1221 Main Street
     Suite 1800
12   Columbia, South Carolina  29201
     803-799-9800
13   jtrinkley@burr.com
     (Via Videoconference)
14
15
16   ALSO PRESENT:  Cyndi Nygord (via videoconference)
17
18
19
20
21
22
23
24
25

Page 5

1              I N D E X
                  Page Line
2    EXAMINATION
3    BY MR. GORE.................................. 6/3
4    BY MS. TRINKLEY................................ 222/5
5    BY MR. MATHIAS................................ 222/23
6    BY MS. ADEN.................................... 257/13
7    BY MR. GORE.................................... 269/1
8    CERTIFICATE OF REPORTER........................ 270
9
10            E X H I B I T S
11                Page Line
12   EXHIBIT 1, Senate Defendants' Notice Of Taking
     Videoconference Deposition Of Dr. Moon Duchin.. 10/25
13
     EXHIBIT 2, April 11, 2022 Report on South
14   Carolina Congressional Districts............... 26/14
15   EXHIBIT 3, 2021 Guidelines and Criteria for
     Congressional and Legislative Redistricting.... 41/23
16
     EXHIBIT 4, 2021 Redistricting Guidelines....... 49/19
17
     EXHIBIT 5, No Exhibit Introduced............... --
18
     EXHIBIT 6, Curriculum Vitae of Moon Duchin, PhD 195/24
19
     EXHIBIT 7, Expert Report of Sean P. Trende..... 196/16
20
     EXHIBIT 8, May 4, 2022 Response to the Expert
21   Report of Sean P. Trende dated April 18, 2022.. 197/17
22
23
24
25

2 (Pages 2 - 5)

Moon Duchin , PhD        July 14, 2022

The South Carolina State Confvs.McMaster/Alexander

Page 6

1       MOON DUCHIN, PHD,
2   being first duly sworn, testified as follows:
3       DIRECT EXAMINATION
4  BY MR. GORE:
5       Q.  Good morning, Dr. Duchin.  My name is
6  John Gore.  I'm with the Law Firm of Jones Day.  I
7  represent the Senate Defendants, Thomas Alexander
8  and Luke Rankin in connection with the redistricting
9  challenge that has been brought in the United States
10  District Court for the District of South Carolina.
11  And you understand that you're appearing in
12  connection with that case today.  Correct?
13       A.  Yes.
14       Q.  And will you say and spell your first
15  and last names for the record, please?
16       A.  Sure.  It's Moon Duchin.  That's
17  M-O-O-N, D-U-C-H-I-N.
18       Q.  And you understand that you're under
19  oath and have an obligation to tell the truth today.
20  Correct?
21       A.  I do.
22       Q.  We have a court reporter here to take
23  down your testimony.  The court reporter does need
24  verbal answers, so please give a verbal answer to
25  each question, a yes or a no.  The court reporter

Page 7

1  cannot record a nod or a headshake.  Does that sound
2  fair?
3       A.  Yes.
4       Q.  And you're being defended in this
5  deposition today by Ms. Aden, I believe.  Is that
6  right?
7       A.  Yes.
8       Q.  And Ms. Aden may object to a question
9  that I pose, such as an objection to form or
10  something like that.  Unless you're instructed not
11  to answer, you can go ahead and answer my question.
12  Does that make sense?
13       A.  Yes.
14       Q.  And the most important rule here today
15  is if you don't understand a question, will you ask
16  me to clarify the question?
17       A.  Yes.
18       Q.  And if you do answer a question, I will
19  assume that you understood it.  Is that fair?
20       A.  Yes.
21       Q.  Also, this is not a marathon.  It may
22  feel a little bit like a slog at times, but if you
23  need to take a break for any reason, at any time
24  just let me know and we can do that.  The only thing
25  that I ask is that if a question is pending, you

Page 8

1  answer the question before we go to the break.  Is
2  that fair?
3       A.  Yes.
4       Q.  Okay.  Thank you.  So Dr. Duchin, where
5  are you today?
6       A.  I'm at Tufts University in
7  Massachusetts.
8       Q.  And is anyone in the room with you?
9       A.  No.
10       Q.  And do you have any papers with you
11  where you are?
12       A.  I do not.
13       Q.  What did you do to prepare for today's
14  deposition?
15       A.  I did two preparation sessions with
16  counsel in which we reviewed the materials and
17  discussed some likely questions.
18       Q.  And when did the first of those two
19  sessions take place?
20       A.  Late last week.  I believe it was
21  Friday.
22       Q.  And how long did it last?
23       A.  One to two hours.
24       Q.  Who was present?
25       A.  Leah Aden and John Cusick, both of whom

Page 9

1  are on the call today, and myself.
2       Q.  And when did the second preparation
3  session take place?
4       A.  Tuesday, the day before yesterday.
5       Q.  And how long did that last?
6       A.  I would estimate that was about an hour.
7       Q.  Who was present?
8       A.  The same people.
9       Q.  And did you review any documents in
10  preparation for today's deposition?
11       A.  Yes.
12       Q.  And which documents did you review?
13       A.  We reviewed my two reports that I
14  believe are dated April 11th and May 4th.  We may
15  have briefly reviewed the House and the Senate
16  Guidelines on redistricting.  That is all that I
17  recall.
18       Q.  Do you know why you were retained to
19  provide a report in this case?
20       A.  Yes.  I discussed the assignment with in
21  my first report, but -- so can we pull that up?
22       Q.  We can.  Just one second.  Let me ask
23  you a question, first, if that's okay.
24       A.  Sure.
25       Q.  Do you recall who first contacted you

3 (Pages 6 - 9)

Moon Duchin , PhD                                                  July 14, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 10

1    about doing a report in this case?
2          A.  As I recall, it was Leah Aden.
3          Q.  And when did that take place?
4          A.  That, I'm not sure.  It feels like a
5    very long time ago because this has been along
6    redistricting season.  But as you know, I also
7    provided reports in the State House redistricting
8    matter and so I may have been retained as much as
9    six months ago or more.  I can look up the date, but
10   I'm not sure, as I speak.
11         Q.  And other than these two matters in
12   South Carolina have you previously been retained by
13   Ms. Aden or the NAACP Legal Defense Fund?
14         A.  Yes.  Not working with Ms. Aden, but I
15   did work with LDF in Alabama.  I am still working
16   for LDF in Alabama.
17         Q.  How about the ACLU?
18         A.  I have not been retained by the ACLU.
19         Q.  What about the Law Firm of Arnold &
20   Porter?
21         A.  No.  That is no, I have not been
22   retained by Arnold & Porter.
23         Q.  Got you.  So we can go ahead and
24   introduce this exhibit as Exhibit 1.
25   (Exhibit No. 1, Senate Defendants' Notice Of Taking

Page 11

1    Videoconference Deposition Of Dr. Moon Duchin, was
2    marked)
3    BY MR. GORE:
4          Q.  And can you see anything on your screen?
5          A.  No.  Should I be looking in Exhibit
6    Share?
7          Q.  You can or I can do a quick screen share
8    here.  How about that?  Can you see that?
9          A.  I see the screen share, yes.
10         Q.  And this is the notice of your
11   deposition which was issued for your deposition
12   today.  Have you seen this document before?
13         A.  I attempted to review everything that
14   was in the folder of materials that provided, so
15   I suspect that I at least looked at this.
16         Q.  And as part of this document we asked
17   you to produce documents related to your opinion in
18   this case.  And that's part of the subpoena here all
19   the way at the end of this, Exhibit A.  Have you
20   reviewed this, to your memory?
21         A.  I have looked through it.
22         Q.  I'm going to ask you about a couple of
23   these things.  Letter G asks for copies of all
24   materials provided to you by plaintiff's counsel or
25   plaintiffs or their officers, employees or

Page 12

1    representatives in connection with this case.
2          Prior to today's deposition did you do
3    anything to collect documents that would fall into
4    that category?
5          A.  Yes.  I made an attempt to review all of
6    my communications with counsel to see what materials
7    had been provided.
8          Q.  And letter J asks for copies of any
9    communications exchanged by and between you and
10   plaintiff's counsel in connection with this matter.
11   Did you do anything to review and collect those
12   documents?
13         A.  I did review those documents.  And I
14   believe they were provided by counsel.  Certainly,
15   not directly by me.
16         Q.  And did plaintiff's counsel in this case
17   provide you any facts to use in your -- in preparing
18   your reports?
19         A.  That is -- let me just try and clarify
20   the question.  When you say provide me facts, do you
21   mean represent to me that things were true?
22         Q.  Represent to you that things were true
23   or provide to you any analysis, data, assumptions or
24   facts related to this matter.
25         A.  So then, okay, that includes data.  Yes.

Page 13

1    I was provided with an electoral data set for South
2    Carolina.  That was many months ago, before --
3    before the work had started on the congressional
4    district, specifically.
5          Another matter that we discussed was the
6    timeline of when various demonstrative maps had been
7    introduced.  Other than that -- those are the main
8    things that occur to me as facts or data that were
9    provided by counsel, as opposed to being part of
10   widely available public record.
11         Q.  Did counsel provide you any of the other
12   expert reports in this case?
13         A.  I have seen expert reports from Sean
14   Trende.  I have not seen other plaintiff's expert
15   reports.
16         Q.  And after you collected the documents in
17   response to the subpoena, what did you do with them?
18         A.  Let me see.  I discussed with counsel
19   which documents I thought were responsive to the
20   subpoena, and then my understanding is that they
21   handed over to you a packet of documents and
22   communications.
23         Q.  Okay.  And did you provide to counsel
24   all documents that were responsive to the subpoena?
25         A.  Yes, to the best of my ability.

4 (Pages 10 - 13)

Page 14

1    Q.  Thank you.  I would like to ask you a
2  few more questions about your background.  Can you
3  please describe for us your educational background
4  after high school?
5    A.  Sure.  I was an undergraduate at Harvard
6  University and formally graduated in 1998 with
7  degrees in Mathematics and Women Studies.
8       I matriculated in 1998 at the University
9  of Chicago where I did my graduate work.  I have
10  Master's degree in Mathematics and a PhD in Math
11  from Chicago from 2005.  So that's my educational
12  background.  After that I would characterize it as
13  professional work.
14    Q.  And was legislative redistricting part
15  of your studies during your educational background,
16  during your university studies and graduate work?
17    A.  No, I did not study redistricting as an
18  undergrad or graduate student.
19    Q.  And can you tell me your professional
20  experience and background since you finished your
21  graduate studies?
22    A.  Sure.  I will be brief.  Tell me if you
23  want more detail.  After graduating from East
24  Chicago I held post-doctoral positions at the
25  University of California Davis and University of

Page 15

1  Michigan, along with visits to the Mathematical
2  Sciences Research Institute and a few others.
3       In 2011 I started my tenure track
4  position at Tufts University, and after a few
5  promotions I am now a full professor at Tufts in
6  mathematics with several affiliate appointments.
7  And I'm a senior fellow in the College of Civic Life
8  at Tufts, which is called Tisch College at Tufts.
9    Q.  And since obtaining your PhD what areas
10  of research and scholarship have you concentrated
11  on?
12    A.  Well, in pure mathematics my specialties
13  are load dimensional geometric topology.  Apologies
14  in advance to the court reporter for having to
15  decode that.
16       I studied dynamical systems and discreet
17  geometry and group theory.
18       I also work in the area called Science
19  Technology and Society and directed the program in
20  that area here, at Tufts, for five to six years.
21       Since 2016 I have had an intense
22  research focus in areas connected to voting,
23  especially social choice theory and redistricting.
24    Q.  And so did your interest in
25  redistricting -- your scholarship interest in

Page 16

1  redistricting start in 2016 or at some other time?
2    A.  That's right, in 2016.
3    Q.  And have you written any peer-reviewed
4  publications about redistricting?
5    A.  Yes, quite a few.  Probably -- we can
6  look at my CV and count, but at least ten.
7    Q.  And are those all listed in our CV?
8    A.  Yes.  My CV is as current as I can make
9  it.
10    Q.  Thank you.  Have you written any
11  peer-reviewed publications about South Carolina?
12    A.  South Carolina has been mentioned in my
13  peer-reviewed publications, but there were none that
14  focused on South Carolina exclusively.
15    Q.  Have you submitted any works for peer
16  review that were then rejected and not published?
17    A.  Oh.  And never published?  Or do you
18  mean has a journal ever declined to publish my work?
19    Q.  Has a journal ever declined to publish
20  your work?
21    A.  Absolutely.
22    Q.  How many times has that happened?
23    A.  Oh, I don't know.  But it's quite
24  frequent to have one or more rejections before a
25  paper is placed.  I wouldn't be able to count, off

Page 17

1  the top of my head.
2    Q.  And how many articles have you submitted
3  that were never published by any journal?
4    A.  I cannot think of any articles that were
5  never either published in their original form or in
6  a revised form.  I have a few that are still in
7  submission and so I can't say for sure where they
8  will land, but I can't -- nothing comes to mind that
9  was rejected and never revived.
10    Q.  And do your articles that are still in
11  submission address legislative redistricting at all?
12    A.  Yes, several do.
13    Q.  In how many cases have you been an
14  expert witness?
15    A.  There is a list on the CV.  And so to be
16  fully accurate, I would be happy to pull that up.
17  But I can tell you that I have written reports
18  and/or provided testimony or deposition recently, in
19  the last year, in North Carolina, Pennsylvania,
20  Wisconsin, Alabama, South Carolina and Texas.
21    Q.  And how many of those cases were
22  redistricting cases?
23    A.  All of them.
24    Q.  And have you testified in court in any
25  of those cases?

5 (Pages 14 - 17)

Moon Duchin , PhD                                                    July 14, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 18

1    A.  Yes.
2    Q.  Which ones?
3    A.  I testified in federal district court in
4  the Alabama case.  I testified in state court in
5  North Carolina and in Pennsylvania.  I believe
6  that's it so far.
7    Q.  So you have not testified in court in
8  Texas?
9    A.  Not yet.
10    Q.  How about Wisconsin?
11    A.  No.  There ended up being no expert
12  testimony in Wisconsin.
13    Q.  Can you briefly describe to me what your
14  specific area of expertise is when it comes to
15  redistricting?
16    A.  I will try, although I think my
17  redistricting interests are quite broad.  But I
18  think my particular expertise is in computational
19  methods, on one hand.  And on the other hand, the
20  area that I called STS earlier, which also looks at
21  historical and social aspects of voting rights and
22  redistricting.
23    Q.  Has any court ever excluded your expert
24  testimony?
25    A.  No.

Page 19

1    Q.  And do you know if any of the cases in
2  which you testified your testimony was criticized by
3  a court?
4    A.  Can you be more precise about what
5  criticized might mean?
6    Q.  Has there ever been a case where a court
7  has not accepted your testimony in its ruling?
8    A.  Not in entirety.  As I recall, in the
9  Pennsylvania case the -- let's see if I can get this
10  right.  Before the case was taken up but the State
11  Supreme Court there was testimony heard by a single
12  judge who then became a special master.  And in her
13  report as a special master, I believe she accepted
14  three dozen points of my testimony and cast doubt on
15  two.  Those numbers should be taken as approximate.
16    Q.  Thank you.  Are you a map drawer?
17    A.  I have, at times, drawn maps for various
18  land drawing bodies and sometimes in litigation.
19    Q.  Have you ever been qualified as an
20  expert in map drawing?
21    A.  I believe in Alabama I was qualified as
22  an expert in demography and possibly cartography,
23  but I would have to check the records to be sure.
24    Q.  You mentioned that you, at various
25  times, had drawn maps.  Can you walk me through

Page 20

1  those examples of when that has happened?
2    A.  Sure.  One example is in Alabama where I
3  drew four demonstrative maps that were called:  Plan
4  A, B, C and D that were entered as Gingles 1
5  Demonstration Plans.
6      In numerous of the cases we have
7  discussed I have drawn alternative demonstrative
8  maps that have played various roles in the
9  litigation.  I can give more examples if that is of
10  interest.
11      I have also played a role sometimes in
12  assisting various land-drawing bodies outside of the
13  litigation context.  For example, I provided data
14  support to the so-called People's Maps Commission in
15  Wisconsin which was a commission convened, I
16  believe, by gubernatorial executive order.  And as
17  part of that role I provided the Commission with
18  dozens of demonstrative maps to consider and review.
19      Those are examples.  If you would like
20  more examples of that kind, I can try to drill
21  deeper into the various ways that I have drawn maps,
22  but suffice it to say it's something I do
23  frequently.
24    Q.  I want to ask you a little bit about
25  this Alabama case where you did the four -- I think

Page 21

1  you said you did four demonstrative maps, A, B, C
2  and D on a Gingles 1 analysis?
3    A.  Yes.
4    Q.  So in those maps you were drawing
5  majority-minority districts.  Is that correct?
6    A.  Well, yes.  Let me qualify that by
7  saying that part of the question was how to count
8  which group was at issue, and so I provided
9  demographic analysis for those reports with various
10  bases of population.  But it is true that all four
11  of those plans were -- had two districts in which
12  there was a majority of so-called Any Part Black
13  Voting Age Population.  Is that responsive to your
14  question?
15    Q.  Yes, it is, thank you.  And did the
16  Court in Alabama review or analyze your proposed
17  maps?
18    A.  Yes, they did.
19    Q.  And what did the court say, if anything,
20  about those maps?
21    A.  So the court generally was extremely --
22  found my testimony to be extremely persuasive and
23  credible.  And the maps were part of that testimony.
24      If you are asking for specific comments
25  evaluating the maps, I would -- I would need to have

6 (Pages 18 - 21)

Moon Duchin , PhD                                July 14, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 22

1  the document -- the decision pulled up so that we
2  could review them, because I wouldn't want to try to
3  paraphrase without them.
4         Q.  Thank you.  I appreciate that.  I'm just
5  trying to get a general sense right now.
6              Did the court adopt any of your maps as
7  a remedy in that case?
8         A.  They did not.  They, instead, asked for
9  the state to -- and here I will try to paraphrase --
10  draw either a second district that is majority Black
11  or something very much like it.  I believe their
12  wording was something in that direction, indicating
13  that the second remedial district need not be
14  majority Black.
15         Q.  And was this part of Alabama litigation
16  that was stayed by the U.S. Supreme Court?
17         A.  Yes, indeed.
18         Q.  Now, you mentioned numerous other cases
19  in which you have drawn maps for various purposes.
20  Is that right?
21         A.  Yes.
22         Q.  And in any of those cases were the maps
23  you drew submitted to the court?
24         A.  You mean as exhibits?
25         Q.  As exhibits or as evidence in the case.

Page 23

1         A.  I'm thinking back through.  I am not
2  sure.  I would like to give a technically correct
3  answer, and I'm just not sure if they were submitted
4  as exhibits.
5         Q.  And then you mentioned the People's Maps
6  Commission in Wisconsin.  Do I have that right, that
7  name correct?
8         A.  PMC.  That is correct.
9         Q.  PMC.  Terrific.  And I think you said
10  you provided data support.  Did you also draw maps
11  for the PMC?
12         A.  As I mentioned, I gave them dozens of
13  demonstrative maps to consider.  Not to adopt, but
14  to consider in terms of weighing alternative options
15  for drawing.
16         Q.  And what was the subject of your
17  testimony in the North Carolina case?
18         A.  In the North Carolina case all three
19  levels of redistricting plan were being challenged,
20  the Congressional, State Senate and State House
21  districts.  And my role was, in large part, to
22  examine partisan fairness considerations at all
23  three levels.  But my report -- my reports, I
24  believe there may have been as many as five in that
25  case, went well beyond that, looked at traditional

Page 24

1  districting principles, looked at racial fairness
2  frameworks.  So it was a fairly extensive piece of
3  work.
4         Q.  And is the North Carolina Congressional
5  case the case in which the U.S. Supreme Court
6  recently granted certiorari?  If you know.
7         A.  Yes, that is correct.  To my
8  understanding.  I should always qualify that I am
9  not aware.
10         Q.  And you're much better off for it, I'm
11  sure.
12              How about the Pennsylvania case?  What
13  was the general topic or subject of your testimony
14  in that case?
15         A.  Again, that focused on partisan fairness
16  but did also look at minority opportunity to elect,
17  as did North Carolina, and traditional districting
18  principles.
19              I will mention that in both Pennsylvania
20  and North Carolina I provided analysis connected to
21  a demonstrative map that I did not draw myself.  My
22  role was to evaluate rather than draw in those
23  states.
24         Q.  And who drew the maps that you
25  evaluated?

Page 25

1         A.  In Pennsylvania the map was drawn by the
2  governor's office, although to this day I do not
3  know the identities of the people who actually sat
4  at the computer to draw it.
5              In North Carolina I did not know who
6  drew the map when I evaluated it, but it came out in
7  the course of the trial that it had been drawn by a
8  team that included both attorneys and data
9  scientists.
10         Q.  What was the Wisconsin case about?
11         A.  In Wisconsin, like in North Carolina,
12  there was a challenge to the Congressional districts
13  as well as the State Senate and Assembly districts.
14  The issues that were important in that case were
15  issues of -- well, the State Supreme Court in
16  Wisconsin centered a principle of least change.  So
17  that was a very important issue at the heart of that
18  have case, thinking about what least change might
19  mean and how to measure it.  But issues of partisan
20  fairness and also of minority opportunity to elect
21  were also important.
22         Q.  If you know, was that an impasse case or
23  a partisan gerrymandering case?
24         A.  I do not know.  To clarify, by "impasse"
25  you mean that the split control meant that no map

7 (Pages 22 - 25)

Moon Duchin , PhD                                    July 14, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 26

1   had been enacted and approved?
2        Q.   That's right.
3        A.   I wouldn't want to try to guess how to
4   classify the case correctly in legal terms.
5        Q.   And you have never been an expert in a
6   nonredistricting case. Is that right?
7        A.   That's correct.
8        Q.   If I have done this correctly, you
9   should be able to see your report on the screen.
10  Can you see your report?
11       A.   I can. And I also have a local copy.
12       Q.   Great. And I have marked this as
13  Exhibit 2.
14  (Exhibit No. 2, April 11, 2022 Report on South
15  Carolina Congressional Districts, was marked)
16  BY MR. GORE:
17       Q.   Is this a report you prepared in this
18  case?
19       A.   Yes.
20       Q.   How many reports have you prepared in
21  the case?
22       A.   For Congressional districts there were
23  two, dated April 11th and May 4th.
24       Q.   How much time did you spend preparing
25  this report, this April 11th report?

Page 27

1        A.   I couldn't say, but many hours.
2        Q.   Do you recall how many drafts of this
3   report you went through?
4        A.   I have what I would call a continuous
5   editing process, so I don't think about the process
6   in terms of discreet drafts. But, you know, I
7   worked on this over the course of weeks.
8        Q.   Did you get any assistance in preparing
9   this report?
10       A.   I do have research assistants working
11  under my supervision.
12       Q.   How many of them worked on this report?
13       A.   None of them worked on the writing of
14  this report, if that's what you mean.
15       Q.   What about the analysis behind this
16  report or any of the data support behind this
17  report?
18       A.   Right. I would say two research
19  assistants provided support.
20       Q.   And what was the nature of that support?
21       A.   Data curation, as I call it. So
22  creating a data product that works with our general
23  software and techniques and writing code and running
24  analysis -- well, I shouldn't say running analysis.
25  I should say running computational scripts under my

Page 28

1   supervision. The analysis was done by me.
2        Q.   And I believe your report says that
3   you --
4        A.   Actually --
5        Q.   -- are being paid -- sorry. Go ahead.
6        A.   Can I add to that?
7        Q.   Please.
8        A.   The other element of research support
9   that I received was assistance reviewing the public
10  hearing testimony, just to be complete in my answer.
11       Q.   I see. So can you give me little bit
12  more information about what that review of the
13  public testimony entailed?
14       A.   I personally read all of the public
15  testimony that was presented by the State in written
16  form on the State's website. There was a great deal
17  of it, many, many pages. And in order to attempt a
18  more comprehensive review I also had a research
19  assistant review the same corpus and we discussed it
20  together.
21       Q.   And did your research assistant prepare
22  any summaries or excerpts from the testimony?
23       A.   We, I would say, worked together to flag
24  aspects that seemed relevant.
25       Q.   So you don't recall one way or the

Page 29

1   other, or your research assistant did not prepare
2   any summaries or excerpts or copy and pastes for any
3   of those -- any of those bodies of testimony?
4        A.   I would say the copy and paste was done
5   by me.
6        Q.   And I believe you said that in your
7   report that you're being compensated at $300 an
8   hour. Is that right?
9        A.   We can pull that up, but that sounds
10  right.
11       Q.   Sure. I'll see if I can find it. Right
12  here?
13       A.   Yes. There we are.
14       Q.   Do you know how much -- approximately
15  how much you have been paid to date for your work in
16  this matter?
17       A.   I don't, but I am aware that the
18  invoices were turned over to you in the last few
19  weeks. I think it's the case -- I'm confident that
20  the invoices don't separate the South Carolina House
21  District work from the South Carolina Congressional
22  District work. So it's hard for me to identify
23  specifically how many hours and how much
24  compensation attached to Congressional districts.
25       Q.   So your billing in this matter has been

8 (Pages 26 - 29)

Moon Duchin , PhD                                July 14, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 30

1 for South Carolina, generally, though, than for
2 either aspect of the case.
3       A.   That's right.
4       Q.   Is that fair?
5       A.   That's correct.
6       Q.   So section 1.2 of your report identifies
7 certain materials that you relied on.  You have the
8 Census data, including other products from the
9 Census Bureau, like the ACS.  You looked at the
10 House of Representatives and Senate Guidelines;
11 also, at the Congressional plan and publicly
12 submitted alternative plans and
13 community-of-interest testimony.  Were there any
14 other materials that you relied on or used in
15 preparing this report?
16      A.   Yes.  I would say that in the review to
17 turn over materials I realized that I had
18 inadvertently omitted electoral data from this list.
19 And as I mentioned, electoral data was provided to
20 me by counsel many months ago.
21      Q.   And can you recall what that electoral
22 data was in more detail?
23      A.   Yes.  It was a shapefile of precincts
24 with election results joined.
25      Q.   Do you recall which election results?

Page 31

1       A.   I do not.  But I only used the statewide
2 elections that are referenced in my May 4th report.
3       Q.   And other than Mr. Trende's reports
4 which you reviewed, I believe you said you have not
5 reviewed any other expert reports in the case.  Is
6 that right?
7       A.   That is right.  To be clear, I spent a
8 substantial amount of time reviewing Sean Trende's
9 initial report but had missed the rebuttal report.
10 So I have now reviewed it but have not spent a long
11 time with the rebuttal report.
12      Q.   Thank you.  And both your initial report
13 and your rebuttal report offer testimony on the
14 South Carolina Congressional Map enacted earlier
15 this year.  Correct?
16      A.   Well, I'm not sure it's testimony, per
17 se, but they offer analysis.
18      Q.   Analysis.  Okay.  Great.  And I'm going
19 to refer to that plan as the "enacted plan."  Is
20 that okay?
21      A.   Yes.
22      Q.   Thank you.  Do either of your reports
23 conclude that the enacted plan intentionally
24 discriminates on the basis of race?
25      A.   That sounds, to me, like a legal

Page 32

1 conclusion.  And I would say that I try to carefully
2 scope my role as one that provides evidence.  So I
3 do think that I provide evidence that might be
4 helpful for reaching a conclusion like that.  But
5 that is my sense of my role here, is quantitative
6 analysis and evidence.
7       Q.   Will you be offering an opinion at trial
8 as to whether or not the enacted plan intentionally
9 discriminates on the basis of race?
10      A.   I find -- I think I would try very
11 studiously to construct my response as saying that I
12 find evidence that supports that conclusion.
13      Q.   But will you offer the ultimate opinion
14 one way or the other whether the enacted plan
15 intentionally discriminates?
16      A.   That sounds, to me, like a bit further
17 than I like to go.
18      Q.   Is that a no, then, the answer to my
19 question?
20      A.   Well, you're asking about a future
21 statement and so I cannot conclusively describe all
22 possible future statements, but I can describe my
23 sense of my role and my plans for how I will express
24 them.
25      Q.   And as you sit here today, do you hold

Page 33

1 the opinion that the enacted plan intentionally
2 discriminates on the basis of race?
3       A.   I hold the opinion that there is
4 compelling evidence to support that conclusion.
5       Q.   And do either of your reports conclude
6 that race predominated over traditional district
7 principles in the enacted plan?
8       A.   Let me stipulate that -- so that I don't
9 speak very repetitively, that we can maybe shorthand
10 the phrase "evidence in support of," but let me just
11 stipulate that I always intend to provide evidence
12 in support of various legal conclusions and not to
13 provide legal conclusions myself.  Having said that,
14 I do offer evidence of the predominance of racial
15 concerns over various kinds of other principles.
16      Q.   And as you sit here today do you hold an
17 opinion that race predominated over the -- over
18 traditional districting criteria in the enacted
19 plan?
20      A.   Let's say I do hold the opinion that
21 other principles were subordinated to concerns that
22 are -- that involve race.
23      Q.   And what are those concerns that involve
24 race?
25      A.   If we could look at my report, we can

9 (Pages 30 - 33)

Moon Duchin , PhD
July 14, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 34

1  look at section 7 on page 25 of my initial report.
2  So in this section I look at what I call:
3  "Electoral opportunity for Black voters."  And I do
4  think that there is evidence that electoral
5  opportunity for Black voters has been a concern in
6  the creation of the map.  And, in particular, I
7  offer evidence that it predominates over other
8  partisan considerations.
9      Q.   Are there any other concerns that
10  involve race that you believe predominate over
11  traditional districting criteria?
12      A.   Could I ask you to rephrase the
13  question?
14      Q.   Sure.  I think what you said a couple
15  answers ago was that you believe that concerns that
16  involve race predominated over traditional criteria,
17  and I asked you what those are.
18      You said electoral opportunity for Black
19  voters.  I'm just curious if there are any other
20  concerns or issues that touch on race or involve
21  race, to use your phrase, that are addressed in your
22  report or form part of your opinions.
23      It's not meant to be a trick question.
24  I'm just trying to understand what you meant by
25  concerns that involve race.

Page 35

1      A.   Sure.  I understand.  I think we could
2  look at my response report of May 4th on page 2 and
3  look at the first bullet of that.
4      Q.   Okay.  We can get to that.
5      A.   Okay.  But just to say, there I do
6  discuss the idea that the so-called repair of
7  counties and precincts in the State's plan is
8  selective and fails to address areas of particular
9  salients for Black communities.  That would be
10  another example.
11      Q.   And we will walk through all this in a
12  little bit more detail.
13      A.   Sure.
14      Q.   All right.  I want to turn to page 5 of
15  your opening report --
16      A.   Yes.
17      Q.   -- which I have up on the screen.  I
18  encountered a new word in your report that I had
19  never seen before, at least in my memory.  Under
20  Figure 1 you use this word "choropleth."  Did I say
21  that correctly?
22      A.   You did.  It's choropleth.
23      Q.   Okay.  Can you explain to me what a
24  choropleth is?
25      A.   Gladly.  A choropleth is a kind of map

Page 36

1  visualization that is shaded and where the intensity
2  of the shading reflects some numerical quantity.
3  And that's what we see here.
4      Q.   And what is being depicted in Figure 1?
5      A.   This is the share of Black voting age
6  population in every VTD.  Those are often informally
7  called precincts, so in every precinct in South
8  Carolina.
9      Q.   And which data did you use to determine
10  the BVAP in precincts for Figure 1?
11      A.   This is decennial census data from the
12  PL94-171.
13      Q.   And on page 6 you have -- are these also
14  choropleths?
15      A.   Yes, it's fair to call these
16  choropleths.
17      Q.   Figure 2.  And here is this depicting
18  changes in BVAP by county over a period of time?  Is
19  that right?
20      A.   That's correct.
21      Q.   And that's according to the American
22  Community Survey estimates.  Is that right?
23      A.   Yes.  So this is, on top, by county; on
24  the bottom, by tract.  This is showing the change
25  between the ACS estimates of 2010 and 2019.

Page 37

1      Q.   And Figure 1 was depicting a percentage?
2      A.   That's right.
3      Q.   And Figure 2 appears to depict the total
4  number of people.  Is that right?
5      A.   That's right.  As I would phrase it,
6  it's a share in Figure 1 and a count in Figure 2.
7      Q.   And in Figure 2 is this only voting age
8  population or is this total population?
9      A.   It says that it's voting age population,
10  and so I hope that's correct.
11      Q.   Is there a reason you used the ACS data
12  rather than the decennial census data to generate
13  Figure 2?
14      A.   The pause is me trying to remember the
15  circumstances of the creation of this figure.  I'm
16  not completely sure why that choice was made -- why
17  I made that choice, but I will say, as you know,
18  that census data was delayed this year.
19      The ACS, or American Community Survey,
20  had particular difficulty with its 2020 data, so
21  2019 -- in fact, the Census Bureau has released
22  communications indicating that the 2020 ACS was
23  compromised by COVID and other factors.  And so
24  although I don't, as we sit here, remember the exact
25  thought process, I suspect that I was trying to make

10 (Pages 34 - 37)

Moon Duchin , PhD                                         July 14, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 38

1  an apples-to-apples comparison between ACS releases
2  that were done with similar methodology in 2010 and
3  2019.
4      Q.  Was the decennial census data available
5  when you drafted this report?
6      A.  Definitely.
7      Q.  And could you have generated Figure 2
8  using the decennial census data?
9      A.  Yes.  And I have every reason to believe
10  it would be similar.
11      Q.  But you did not, at least, include that
12  in your report.
13      A.  That's right.
14      Q.  And do you recall whether you actually
15  did, in fact, generate a version of Figure 2 with
16  the decennial census data?
17      A.  I do not recall, but I can assure you
18  that this is not cherry-picked to give a different
19  impression.  I always try to do the best and most
20  forthcoming data practice as possible.  So it is
21  assuredly not the case that a decennial image would
22  show a substantially different result and this was
23  chosen to give a different impression.
24      Q.  But as you sit here today, you don't
25  know how Figure 2 would look if you had used

Page 39

1  decennial census data instead.  Is that right?
2      A.  Well, the only thing I can assure you is
3  that it's not the case that I compared them, they
4  looked different and I chose this one to give a
5  different impression.  I can assure you that's not
6  the case.
7      Q.  Okay.  But you can't -- you don't know,
8  one way or the other, what Figure 2 would look like
9  with decennial census data, as you sit here today?
10      A.  I don't -- I don't have it in my mind.
11  I will tell you some reasons that ACS data might be
12  of interest, as opposed to decennial census data.
13  So ACS data -- for example, this figure says it's
14  BVAP, as in Black voting age population.  It doesn't
15  say that it's BCVAP, as in Black citizen voting age
16  population.
17          But one reason to use ACS data sometimes
18  is to look at citizen voting age share.  That
19  doesn't appear to be what I have done here, but I'm
20  describing reasons that one might choose the ACS as
21  a data product rather than the decennial census.
22  Other than that, I am not able, as I sit here, to
23  account for why this is done with ACS, except to
24  repeat that I assure you it's not cherry-picked.
25      Q.  I appreciate where you're coming from.

Page 40

1  I just would like to get an answer to this question
2  for the record.  You don't know, as you sit here
3  today, what Figure 2 would look like with decennial
4  census data.  Is that correct?
5      A.  I have every reason to believe it would
6  look similar.
7      Q.  But you don't know that.  Correct?
8      A.  I wouldn't want to assert that with
9  certainty.
10      Q.  So the answer is you don't know.
11      A.  I have answered you as best I can.
12      Q.  Let's go to page 7 of your report where
13  you discuss redistricting criteria.  And is it
14  correct that this section, or part 3, is a review of
15  the redistricting criteria in the Guidelines issued
16  by the House and Senate?
17      A.  Yes, that's correct.  And I also attempt
18  to contextualize that sometimes by appealing to
19  sources beyond the State's Guidelines.  But it is
20  correct to say that the focus is the State's
21  Guidelines.
22      Q.  And you divided the criteria here into
23  first-tier and second-tier requirements.  Is that
24  right?
25      A.  Yes, following the Guidelines

Page 41

1  themselves.
2      Q.  Okay.  Did either the House or the
3  Senate Guidelines divide the criteria into first and
4  second tiers?
5      A.  Yes.  And I describe that here.  Let me
6  try to remember whether it was House or Senate, but
7  one of the two -- and we can pull them up and
8  verify -- clearly indicates that the second set may
9  not compromise the first.  So that does follow the
10  Guidelines.  Would you like us to find that in the
11  Guidelines?
12      Q.  Yeah.  And I'm going to pull those up if
13  I can figure out how to do that real quick.  Bear
14  with me for one second, if you don't mind.
15      A.  It's the House Guidelines, just to say.
16      Q.  Okay.  Can you see the House
17  Redistricting Guidelines on your screen?
18      A.  Yes.  And I have a local copy.
19      Q.  And are these the House Redistricting
20  Guidelines we have been discussing and that you
21  reference in your report?
22      A.  Yes.
23  (Exhibit No. 3, 2021 Guidelines and Criteria for
24  Congressional and Legislative Redistricting, was
25  marked)

11 (Pages 38 - 41)

Moon Duchin , PhD                                      July 14, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 42

1  BY MR. GORE:
2      Q.  I have marked these as Exhibit 3.  Can
3  you point me to where the House Redistricting
4  Guidelines divide criteria into first and second
5  tiers?
6      A.  Yes.  Although to be clear, "tier" is my
7  language.  Their language is Priority of Criteria,
8  and it's Section IX.  So I'm specifically referring
9  to IX a. where they say:  "In establishing
10  Congressional and Legislative districts, all
11  criteria identified in these guidelines should be
12  considered.  However, if there is a conflict among
13  the requirements of these guidelines, the
14  requirements addressed in Sections I, II, III and IV
15  herein should be given priority."  So those are the
16  ones that I attempted to summarize as first tier.
17      Q.  Got it.  One of those is section III.
18  Is that right, the requirements addressed in section
19  III?
20      A.  Correct, I, II, III and IV.
21      Q.  And section III, back here on page 1,
22  refers to South Carolina Constitutional Laws of the
23  State and the opinions of the South Carolina Supreme
24  Court.
25      A.  Yes.

Page 43

1      Q.  And were any of the criteria you
2  identified as first tier in your report state law
3  criteria?  I'm happy to pull that back up if you
4  would like.
5      A.  I have it here.  This might be somewhat
6  awkwardly constructed, but I do say in the first
7  paragraph, first sentence of section 3.2:  "The
8  previous criteria I through IV of the House
9  Guidelines are rooted in the Constitution and in
10  federal and state law."
11      Q.  That's right here around 3.2?  Is that
12  what you're referring to?
13      A.  That's right, the first sentence.
14      Q.  And these other second-tier requirements
15  Contiguity, Compactness, Communities of interest and
16  political boundaries, are any of those requirements
17  rooted in state law?
18      A.  Well, I'm not in a good position to
19  answer that as a matter of fact about state law, so
20  I can only describe and I only mean to describe how
21  they are discussed in the House Guidelines.  So in
22  the House Guidelines those lower-ranked criteria are
23  separate from the section that discusses the state
24  law.
25          I wouldn't go so far as to tell you

Page 44

1  whether -- to opine on whether state law addresses
2  those factors.  I can only talk about the way
3  that -- I only intend to talk about the way that
4  they are described in this document.
5      Q.  And other than paragraph IX of the House
6  Guidelines, was there anything else you did or used
7  to determine which criteria would be first tier and
8  which criteria would be second tier?
9      A.  I intended to follow their division.
10      Q.  And did you discuss this division with
11  any members of the South Carolina General Assembly?
12      A.  No.
13      Q.  Or any legislative staff?
14      A.  I did not.
15      Q.  Let's talk about 3.1, first-tier
16  requirements, for just a moment.
17      A.  Yes.
18      Q.  Minority opportunity.  I believe you say
19  that the guidelines clearly contemplate the use of
20  race data.
21      A.  I do say that.
22      Q.  And is it your opinion that the General
23  Assembly was obligated to use race data to draw the
24  congressional line?
25      A.  I think that question goes beyond my

Page 45

1  expertise, although I would note that the -- again,
2  treating this document, in itself it does assert --
3  that is the House Guidelines, treating the House
4  Guidelines as a document -- as a self-contained
5  document it does assert that this committee has the
6  authority to determine the criteria that the House
7  will use.  I cannot tell you whether I agree with
8  that assertion.  I can only tell you that assertion
9  is made here.
10      Q.  And do the Guidelines require the
11  General Assembly to use race to draw any district
12  lines?
13      A.  Are they required to use race?
14          Let's see.  No.  This says race may be a
15  factor, quoting the Guidelines.
16      Q.  Do you know whether the General Assembly
17  used race to draw any lines in the enacted plan?
18      A.  I am not able to describe their process.
19  Is that what you mean?
20      Q.  I'm asking as a factual matter.  You
21  have drawn maps, and I imagine that in your
22  experience you may have drawn maps that used or did
23  not use race one way or another.  Now, do you know
24  one way or the other what -- and you may not.  You
25  may not, and that's fine.  I'm just trying to

12 (Pages 42 - 45)

Moon Duchin , PhD                                    July 14, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 46

1  confirm. I'm trying to understand the scope of your
2  opinion and your testimony.
3       A.  I understand.  To answer that in the
4  most complete manner that I can, I would say there
5  are a few different kinds of procedural activities
6  that can be described as using race.  Sometimes
7  people use the phrase to refer to having a data
8  layer visible.  In other words, there may be a data
9  layer that shows you -- for example, like the
10  choropleths we looked at before there may be a data
11  layer that shows you how much, for example, Black
12  population or Black voting age population is in
13  every unit.  And sometimes people will say I did not
14  use race to mean that they turned that data layer
15  off or did not make it visible.  But of course,
16  especially for someone who is intimately familiar
17  with South Carolina's political geography, the basic
18  contours of race and residential patterns may be
19  well known to the line drawer, and it is quite
20  impossible to turn that off in one's mind.
21       So that's all context to say that I do
22  not know whether the line drawers had their race
23  layer visible, but I think it would be impossible
24  for them to remove all consideration of race from
25  their minds if they were familiar with the political

Page 47

1  and demographic geography of South Carolina.
2       Q.  And what qualifies you to give the
3  opinion as to what may or may not have been in their
4  minds?
5       A.  Well, I'm certainly qualified to opine
6  that it may or may not have been in their minds.  I
7  think that is almost tautological.  And I do not
8  presume to say what was, in fact, in their minds.
9  I'm describing a general state of affairs based, as
10  you said, on my experience.
11       Q.  And so you don't know one way or the
12  other, just to summarize, how the general assembly
13  may or may not have used race in drawing its --
14       A.  That's correct.  I have no knowledge of
15  any procedural details.
16       Q.  Have you discussed it with any member of
17  the General Assembly?
18       A.  I have not, to my knowledge, met any
19  member of the General Assembly, whether in person or
20  virtual.
21       Q.  And how about any staffer?
22       A.  No.
23       Q.  And second-tier requirements, I think
24  you list four here, Contiguity, Compactness,
25  Communities of interest and political boundaries.

Page 48

1  My first question is about communities of interest
2  and political boundaries.  Do the Guidelines treat
3  those as a single factor or as separate factors?
4       A.  So here there is a slight divergence
5  between the way the House and the Senate Guidelines
6  construct the criteria.  Let's see.  Let me try to
7  recall how this works.
8       So the House Guidelines, as I note here
9  in the last paragraph that you have on your
10  screen -- oh, no.  Yes, the last paragraph that you
11  have on your screen, the House Guidelines fold what
12  is usually a separate principle into the category of
13  COIs.  That is, political boundaries which are often
14  itemized separately are considered by the House
15  Guidelines to fall under the umbrella of communities
16  of interest.  I would not say that this set of
17  Guidelines is the only place I have seen it handled
18  this way, but it is different from the Senate
19  Guidelines which split out respect for counties,
20  cities and towns and VTDs under separate headings.
21       Q.  And is there a reason that you decided
22  to put them together, as opposed to treat them as
23  separate headings here?
24       A.  Well, because that was done in the House
25  Guidelines.

Page 49

1       Q.  And other than communities of interest,
2  political boundaries, compactness and contiguity,
3  did the Guidelines identify any other requirements
4  for the map drawer to follow or other criteria?
5       A.  Okay.  Right.  I would say not
6  requirements, but considerations.  There are other
7  considerations that are mentioned; namely,
8  incumbency consideration is section VIII in the
9  House Guidelines and implicit in both sets of
10  Guidelines.
11       Let me open the Senate Guidelines to be
12  sure of the wording.  Both sets of Guidelines find
13  ways to mention the preservation of cores of prior
14  districts.  In the Senate Guidelines it is called
15  Constituent Consistency, section III B.  And in the
16  House Guidelines it's is referenced in various
17  subtle ways throughout the discussion, but it does
18  not have its own heading.
19  (Exhibit No. 4, 2021 Redistricting Guidelines, was
20  marked)
21  BY MR. GORE:
22       Q.  Now, if I have done this correctly I'm
23  displaying Exhibit 4, the Senate Redistricting
24  Guidelines.  Can you see that?
25       A.  I can.  And I have a copy locally.

13 (Pages 46 - 49)

Moon Duchin , PhD                                                                    July 14, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 50

1    Q.   And is the document the Senate
2 Guidelines documents that we have been discussing?
3    A.   It is.
4    Q.   And is it the one that's referred to in
5 your report?
6    A.   Yes.
7    Q.   And I think you were referring to III B,
8 Constituent Consistency?
9    A.   Yes.
10    Q.   And that expressly says: "Preserving
11 the cores of existing districts"?
12    A.   Yes.
13    Q.   And E says: "Minimizing Divisions of
14 Voting Precinct Boundaries." Is that right?
15    A.   Correct. Yes.
16    Q.   I'm trying to take us back to your
17 report. Can you see that now?
18    A.   Yes.
19        MR. GORE:  Okay. So I'm about to move
20 on to the topic area. Would anyone like to take a
21 break? We have been going for a little bit over an
22 hour.
23        THE WITNESS:  I would be happy to take a
24 short break.
25        MR. GORE:  How does five minutes sound?

Page 51

1        THE WITNESS:  Sounds great.
2 (Break In Proceedings)
3        MR. GORE:  Let's go back on the record.
4 BY MR. GORE:
5    Q.   I will, again, attempt to share my
6 screen so you can see the report. Can you see
7 section 4 of your report?
8    A.   Yes.
9    Q.   Starting at section 4. And this section
10 is called: "Review of metrics for Congressional
11 maps." What did you do to generate the metrics that
12 are recorded here in section 4?
13    A.   So first I took the maps that are listed
14 here which were presented on the website for the
15 State. And then I used the software that has been
16 developed by myself and my lab and collaborators
17 over the last few years to run them through the
18 metrics. Is that what you mean?
19    Q.   Yeah. It's a mechanical question, a
20 technical question. What is the software called
21 that you use?
22    A.   Well, so we use Python, which is the
23 preferred package in data science; for language, I
24 should say. We frequently, when it comes to
25 geography, use packages that address geographic data

Page 52

1 such as Pandas and GeoPandas. We sometimes use GIS.
2    Q.   What are Pandas or GeoPandas?
3    A.   These are packages that handle data
4 frames. And GeoPandas is specifically intended for
5 geographical data.
6    Q.   And is that Python software that you
7 used available generally if somebody wants a copy of
8 it?
9    A.   Oh, definitely. Python is freely --
10 it's open source, I think. But it's certainly
11 freely -- it's free and downloadable and widely
12 used. The software, again, we always use
13 open-source software to the fullest extent possible.
14    Q.   And in section 4.1 it's called: "Racial
15 demographics." And I believe you used Any Part
16 Black to calculate these demographics. Is that
17 right?
18    A.   Correct.
19    Q.   Do you know which category the General
20 Assembly has published on its website or used in
21 analyzing plans?
22    A.   That is a good question. I do not know.
23    Q.   Is there a reason you used Any Part
24 Black, as opposed to some other metric?
25    A.   I did use it because my impression is

Page 53

1 that it is becoming the standard in litigation that
2 involves Black electoral opportunity. For example,
3 it was an issue discussed extensively in the Alabama
4 case, and the decision of the district court was
5 that it was clearly the right measure.
6    Q.   And could a map drawer use a different
7 measure?
8    A.   Could they or should they?
9    Q.   Could they?
10    A.   Certainly could.
11    Q.   And, in your opinion, should they or
12 should they not?
13    A.   I -- as a matter of demographics, it can
14 be quite interesting to split population out in
15 different ways.
16        As a matter of legal relevance, here
17 again I was responding, in part, to the district
18 court's decision finding Any Part Black to be the
19 salient category.
20    Q.   And did that district court decision
21 hold that map drawers are required to use Any Part
22 Black?
23    A.   Certainly not.
24    Q.   So this first table, I take it, is just
25 a decimal representation of the BVAPs in each of

14 (Pages 50 - 53)

Moon Duchin , PhD                                      July 14, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 54

1  these districts.  Is that right?
2      A.  Right.  To three decimal places.
3      Q.  And then the second table here is part
4  of Table 1, Table 1A and 1B.  But the table at the
5  bottom here in Table 1, what does this depict?
6      A.  Because there is a quite large number of
7  plans being discussed, this attempt to summarize the
8  number of districts in each over various fairly
9  arbitrarily chosen round number demographic lines.
10     Q.  And are these numbers here cumulative in
11 this row?  So take previous to 2012.
12     A.  That is correct.  For example, you
13 should read this as saying that the South Carolina
14 NAACP1 map has two districts over 30 percent BVAP,
15 of which one is over 50.  That is correct.
16     Q.  As well as over 40.  Right?
17     A.  Being over 50, yes, is also --
18     Q.  Is also over 40.  So each column is a
19 total number of districts in that plan over each
20 threshold.  Is that right?
21     A.  That's right.  It's a cumulative total.
22     Q.  So the NAACP plan doesn't have four
23 districts.  It has three -- or two that are -- tell
24 me how many discrete districts or different
25 districts are being depicted here for the NAACP1

Page 55

1  plan.
2      A.  Let's take a look at that line and
3  compare it back to the previous table, the one
4  that's presented above this.  So you can see,
5  looking at the first table, that there is -- the
6  highest BVAP is .528.  The next highest is .349.
7  And nothing else is over 30.
8          And in the way that is reflected in the
9  lower table is that there is a total of two
10 districts with BVAP over 30, of which one of them is
11 over 40 and, indeed, over 50.  So there is a total
12 of two districts over 30 percent BVAP.  So these are
13 cumulative totals in the lower table.
14     Q.  Of the plans you looked at, does this
15 chart mean that only three of them had a district
16 that was over 50 percent BVAP?
17     A.  That's right.  That is what it says.
18     Q.  And nine plans out of these eleven had a
19 BVAP -- a district with a BVAP over 40 percent.  Is
20 that right?
21     A.  Let's count.  One, two, three, four,
22 five, six, seven, eight, nine, ten, eleven.  There
23 are eleven in all.  And two of them do not, so yes,
24 I agree with you, that means nine do.
25     Q.  And the enacted plan was one of those

Page 56

1  plans.  Is that right?
2      A.  Yes, it is.
3      Q.  And none of the plans had more than one
4  district with over 40 percent BVAP.  Is that right?
5      A.  None of these eleven.  Correct.
6      Q.  And here it looks like, in the last
7  column, the majority of plans you assessed had only
8  one district with over 30 percent BVAP.  Is that
9  right?
10     A.  Let's count.  One, two, three, four,
11 five, six -- six is, indeed, more than half of
12 eleven.
13     Q.  Let's move to Population deviation.
14     A.  Yes.
15     Q.  4.2.  And you have Table 2 here, and in
16 the far right-hand column you marked:  Top-to-bottom
17 deviation?
18     A.  Yes.
19     Q.  Is that the same as what is sometimes
20 described as total deviation?
21     A.  I have heard that term used in different
22 ways, so I'm trying to be precise.  I think top to
23 bottom is the clearest.
24     Q.  And it looks like the enacted plan has a
25 top-to-bottom deviation of one person.  Is that

Page 57

1  right?
2      A.  That's right.
3      Q.  And the SC-NAACP1 has a top-to-bottom
4  deviation of two people, NAACP2 is 4, Harpootlian is
5  4, and LWVSC is 5.  Is that right?
6      A.  Yes.
7      Q.  So do the NAACP1 and 2 plans and
8  Harpootlian and League of Women Voters plans comply
9  with the Senate Guidelines?
10     A.  Okay.  Let's take a look.  The Senate
11 Guidelines say, and I quote:  "So that the State may
12 avoid assuming this additional burden under federal
13 law, a congressional districting plan should not
14 have population deviations greater than 1 percent."
15 And I believe it is correct to say that they are
16 talking about top to bottom, although I could look.
17         Yes, they are.  They talk about the
18 difference between the most populous and least
19 populous.  So the term here is that they should not
20 have population deviations greater than one person.
21     Q.  Okay.  And so I pulled this up as
22 Exhibit 4 again.  Can you see that on the screen?
23     A.  I can.
24     Q.  And Congressional districts, I think
25 it's under I:  Requirements Of Federal Law, A.,

15 (Pages 54 - 57)

Moon Duchin , PhD                                  July 14, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 58

1  Population equality.  2, Congressional districts.
2  Is that what you were reading from?
3      A.  Correct.  I just read the last sentence
4  of that paragraph.
5      Q.  So the Senate was saying it did not want
6  to assume the burden of justifying a larger
7  deviation.  Is that right?
8      A.  I would just stick to the precise
9  language to avoid paraphrase.  They say:  So that
10  the state may avoid assuming this burden, dot, dot,
11  dot, a congressional redistricting plan should not
12  have population deviations greater than one person.
13      Q.  And the NAACP plan, the Harpootlian plan
14  and the League of Women Voters plan all had
15  deviations greater than one person.  Correct?
16      A.  That's correct.
17      Q.  Let's move to 4.3, Compactness.
18      A.  Yes.
19      Q.  And you use the three measures of
20  compactness here:  Polsby-Popper, Reock and Block
21  Cut Edges.  Is that right?
22      A.  That's right.  But to be precise, I
23  averaged the Polsby-Popper and the Reock scores over
24  the plan.
25      Q.  Okay.  And so my next question was going

Page 59

1  to be if I pronounced Reock correctly.  And it
2  sounds like I'm in the ballpark, so thank you.
3      A.  To my knowledge, yes.
4      Q.  Thank you.  How did you choose these
5  three metrics?
6      A.  The Polsby-Popper and the Reock scores
7  belong to a class of compactness scores that I call
8  contour-based.  And as I described it earlier in
9  this report they are used -- let's see.  I can
10  actually quote it from page 8.  "An advantage of the
11  contour scores" -- and here I mean Reock and
12  Polsby-Popper -- "is that they are familiar and in
13  wide use."  That's why I used those.  I also include
14  the more recently popular Block cut edges score
15  because, as I say here, an advantage of discrete
16  scores is that they do not excessively penalize
17  districts for having winding boundaries when those
18  boundaries come from physical geography like
19  coastlines or rivers.
20      Q.  Thank you.  I'm going to scroll back
21  now -- I'm going to scroll back down to
22  4.3.  In your opinion, was the General Assembly
23  obligated to use these metrics to measure
24  compactness in the enacted plan?
25      A.  Obligated by what?

Page 60

1      Q.  Anything.
2      A.  No.  No, not to my knowledge.
3      Q.  And is a map drawer obligated to use any
4  mathematical measures of compactness?
5      A.  Well, there have been instances where a
6  court order specifies measures, in fact.  That was
7  the case in Pennsylvania litigation in 2018 that I
8  was involved in.  So in that instance I think you
9  would be obligated to use particular metrics to
10  comply with the court order.  But absent some
11  directive of that kind, it's a matter of discretion.
12      Q.  Was the General Assembly in South
13  Carolina under a directive of that kind when it drew
14  the enacted plan?
15      A.  Not to my knowledge.
16      Q.  I want to scroll back to page 8.  Isn't
17  it true that the House Guidelines eschewed, for lack
18  of a better term, the use of mathematical
19  calculations or determination for compactness?
20      A.  That's right.  They say, and I quoted it
21  here, that compactness should not be judged based
22  upon any mathematical, statistical or formula-based
23  calculation or determination.
24      Q.  And I believe in the footnote you also
25  quote the Senate Guidelines.

Page 61

1      A.  Right.
2      Q.  And I believe your phrase is that they
3  shy away from shape consideration entirely,
4  referencing what is sometimes called functional
5  compactness.  Is that right?
6      A.  That is right.
7      Q.  So in your review of these plans, on
8  page 11 did you conduct any analysis of compactness
9  other than use of these three metrics?
10      A.  There is other discussion of compactness
11  in my report, namely in the qualitative descriptions
12  in section 5.  I frequently reference erratic
13  shapes, a hook and so on.  Those are compactness
14  considerations that are more holistic in the manner
15  that I think is actually preferred by the
16  Guidelines.  So both quantity and qualitative
17  compactness are discussed in my report.
18      Q.  And we will certainly get to section 5
19  in a preview of coming attractions, but here, in
20  section 4.3, the only compactness analysis you have
21  done here is the mathematical measures.  Is that
22  right?
23      A.  That's correct.  This section is
24  entitled:  Review of metrics.
25      Q.  Thank you.  Let's move down to 4.4,

16 (Pages 58 - 61)

Moon Duchin , PhD                                          July 14, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 62

1   Political subdivisions.
2         Actually, let me ask you one quick
3   question back on compactness, if I might.  So even
4   under these metrics the enacted plan, it looks like,
5   performs better than SC-NAACP1 on all three of these
6   metrics.  Is that right?
7         A.  That's right.
8         Q.  And it performs better than the
9   Harpootlian plan on a Reock.  Is that right?
10        A.  That's right.  It performs worse on
11  Polsby-Popper, substantially worse on block cut
12  edges and better on Reock.  Correct.
13        Q.  Thank you.  And that's because each of
14  these metrics measures a different thing.  Is that
15  right?
16        A.  Yes.  And that's what those
17  illustrations -- those gorgeous illustrations on
18  your screen are attempting to illustrate.
19        Q.  Thank you.  All right.  Let's move to
20  4.4, Political subdivisions.
21        A.  Yes.
22        Q.  And this, again, is just based on
23  metrics.  You didn't include in this section any
24  analysis of other communities of interest.  Is that
25  right?

Page 63

1         A.  That's right.  The divisions that are
2   discussed here are counties, county subdivisions,
3   cities and towns.
4         Q.  I'm going to scroll back to page 8.
5   Now, is it true that the House Guidelines said that
6   counties, municipalities or other political
7   subdivisions would be given no greater weight as a
8   matter of state policy than other identifiable
9   communities of interest?
10        A.  Yes.  That's a direct quote.
11        Q.  It's right there on page 8.  Correct?
12  And if we come back here to 4.4, Political
13  subdivisions, I believe this is Table 4?
14        A.  Yes.
15        Q.  It appears the enacted plan performs
16  better than both SC-NAACP plans on county splits,
17  County pieces of subdivision splits and subdivision
18  pieces.  Is that right?
19        A.  That's right.  Although I would say,
20  particularly on subdivision splits, it's virtually
21  the same as the second NAACP, 29 versus 30.
22        Q.  And then you also looked at city splits.
23  Is that right?
24        A.  That's right.  Cities and towns are in
25  Table 5.

Page 64

1         Q.  And if I understand correctly, the
2   number listed on the left of the slash is total
3   splits, and the number on the right is splits
4   affecting population.  Is that right?
5         A.  That's exactly right.
6         Q.  And in your experience as a map drawer,
7   why might a map drawer split something that does not
8   affect population?
9         A.  One of the learning experiences for me,
10  when I started drawing maps, was just how wild
11  municipal boundaries can be.  So what frequently
12  happens, more in some parts of the country than
13  others, that municipalities, as they are officially
14  defined, may have spurs with no population.
15  Sometimes just almost an individual line that runs
16  out of the city and into -- for historical reasons
17  and may run for many miles.  So sometimes splits to
18  municipalities divide these zero population spurs.
19  And in this report I'm not offering an opinion on
20  whether that's important or not.  I'm reporting it
21  both ways so that readers of the report can draw
22  their own conclusions.
23        Q.  And on city splits here, we will just
24  take column one, it looks like the enacted plan
25  performs better than SC-NAACP1 Muscatel, Harrison

Page 65

1   Sukovich and Roberts.  Is that right?
2         A.  Yes.  And worse than SC-NAACP2
3   Harpootlian and the League.
4         Q.  One more question about splits that
5   don't affect population.
6         A.  Yes.
7         Q.  In your experience, or to your knowledge
8   are there census blocks that do not contain any
9   population?
10        A.  In the 2010 census, 40 percent of the
11  census blocks in the country had no population.
12        Q.  And how about in the 2020 census, do you
13  know one way or the other?
14        A.  I actually don't know that number.  I do
15  know that one of the efforts the Census Bureau made
16  in 2020 was to reduce the number of census blocks
17  nationally.  So I suspect that the number 40 percent
18  has dropped.  Irrespective of that, it is
19  unquestionably the case that many blocks have no
20  population.
21        Q.  And does a map drawer have to put those
22  blocks in a district somewhere?
23        A.  That's an interesting question.  It
24  really depends.
25        One thing that stood out to me, in some

17 (Pages 62 - 65)

Moon Duchin , PhD                                                July 14, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 66

1  of the litigation that I have been involved in, is
2  that sometimes maps that are presented differ in how
3  they handle which blocks have to be assigned.  So I
4  would say that there is not complete consensus on
5  the question of which blocks have to be assigned but
6  that, in my view, it's best practice to assign all
7  of the blocks in the state.
8       Q.  And can assigning census blocks without
9  population help make a district to be contiguous of
10  a particular shape or something like that?
11      A.  Definitely.
12      Q.  Section 4.5 addresses Incumbency.  And
13  you have listed here incumbent pairings in various
14  plans.  Is that right?
15      A.  I have.
16      Q.  Where did you get the incumbent
17  residency information from?
18      A.  This is from the shapefile that I
19  mentioned with electoral data that was provided by
20  counsel.
21      Q.  And so it was preloaded in that file?
22  You didn't get it from somewhere else or merge two
23  files together or anything like that?
24      A.  So shapefiles -- even though we say a
25  shapefile, a shapefile is actually a collection of

Page 67

1  files.  And so it's a little bit insubstantial to
2  talk about whether things were in separate files or
3  the same one, but it was all in the same data
4  package.  It was all in the same delivery.
5       Q.  And before I go to section 5 I want to
6  go back and just round out a few questions on this
7  section 4.
8       A.  Yes.
9       Q.  Did you omit from section 4 any
10  traditional criteria contained in the General
11  Assembly's Guidelines?
12      A.  I made an effort to address all the ones
13  that had high billing.  There isn't a numerical
14  discussion of core retention.  But again, as we
15  reviewed when we looked at the Guidelines before,
16  core retention is kind of packaged with other
17  considerations in the Guidelines, and it wasn't a
18  clear heading, in particular, in the House
19  Guidelines.  So I do not give core retention
20  statistics across the plans but I do give core
21  retention statistics in places where I think they
22  are relevant in the report.
23      Q.  And what about VTD splits, did you give
24  statistics on VTD splits here?
25      A.  It does not look like I did give

Page 68

1  statistics on VTD splits.  I certainly could if that
2  would be helpful.
3       Q.  And did you give any statistics on
4  partisan performance?
5       A.  Not in this section because, indeed,
6  partisan performance is not listed among the
7  criteria in the Guidelines.  But I certainly do
8  discuss partisan performance later in my report.
9       Q.  You said that you focused on the
10  criteria that had, quote -- "high billing" I think
11  was your phrase.  Is that a phrase you used a moment
12  ago?
13      A.  I believe you.
14      Q.  If I'm wrong you can correct me on the
15  transcript.  But how did you determine which
16  criteria do or do not have high billing or otherwise
17  merited inclusion here in section 4?
18      A.  I'm referring, sort of generally, to
19  things like being the heading of a section or being
20  in boldface, things like that.  So that, for
21  example, if you review the House Guidelines you will
22  see that core retention is nowhere a section header
23  or in boldface.  That is an informal
24  characterization of the billing in the Guidelines.
25      Q.  And was the General Assembly prevented

Page 69

1  from considering factors that were not in bold
2  headings in the Guidelines?
3       A.  I know of no attempt to restrain them
4  from other considerations.
5       Q.  So could the General Assembly consider
6  criteria that were not in bold headings in the
7  Guidelines?
8       A.  Well, my view of my reading here is that
9  they can consider anything that they want, but not
10  at the expense of the criteria that I listed here.
11      Q.  Where, in the Guidelines, does it say
12  that they can't consider core preservation at the
13  expense of these other criteria?
14      A.  Well, let's see.  Well, in particular,
15  it says that all criteria -- I'm here reading from
16  the House Guidelines, from the last page in Priority
17  of Criteria.  It says:  If there is a conflict among
18  the requirements of these guidelines, the
19  requirements addressed in the first section should
20  be given priority.
21          Let's see if I can find anything that
22  refers to considerations outside the Guidelines.
23  I'm not sure if that's addressed, but I will try to
24  find out.  I suppose that it is implicit in
25  statements such as Incumbency consideration, which

18 (Pages 66 - 69)

Moon Duchin , PhD                                    July 14, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 70

1    is listed here; therefore, it's a named principle.
2    It shall not influence the redistricting plan to
3    such an extent as to overtake other redistricting
4    principles.
5            So though it's not made explicit, I
6    would say that a reasonable reader would conclude,
7    quite strongly, even, that unnamed criteria also
8    cannot overtake the redistricting principles that
9    are here named.  But I concede to you that that is
10   just an attempt to make sense of what's written here
11   and not explicit text.
12        Q.   And are you looking currently at the
13   House Guidelines?
14        A.   I was just reading from the House
15   Guidelines.  Correct.
16        Q.   And can you see those on the screen now?
17        A.   Yes.
18        Q.   It takes me a moment to catch up with
19   you, so I appreciate your patience.  And the House
20   Guidelines here, in part VII, mention Communities of
21   Interest?
22        A.   Uh-huh.
23        Q.   Are you aware of any authority or any
24   decisions treating existing districts and cores of
25   districts as a community of interest?

Page 71

1        A.   Can you ask that again, please?
2        Q.   Certainly.  Let me ask it a little bit
3    more simply.  Can a core of a district or an
4    existing district be considered a community of
5    interest?
6        A.   In the eyes of a court?
7        Q.   Let's start generally.  As a general
8    matter can it be a community of interest?
9        A.   In my view, that would be a
10   controversial use of the phrase "community of
11   interest."
12        Q.   And why would that be a controversial
13   use of the phrase?
14        A.   Because it overlaps awkwardly with
15   incumbency consideration.  So first of all, you're
16   asking me generally, I believe, and not as pertains
17   to South Carolina specifically.  So generally --
18        Q.   At the moment that's right.  Yeah.
19        A.   Right.  So generally, I would say quite
20   a few states prohibit incumbency consideration.  And
21   so it would be controversial there to
22   smuggle that back in under the guise of communities
23   of interest.  Does that make sense?
24        Q.   I understand that.  I think it's a
25   general matter.

Page 72

1            My follow-up question is, is preserving
2    cores of districts necessarily about incumbency?
3        A.   I think that it substantially overlaps
4    incumbency consideration.  There may be
5    circumstances where it's decoupled from incumbency,
6    such as the retirement of a representative, but as a
7    general matter it's very hard to disambiguate core
8    preservation from favoring other incumbents.
9        Q.   And you're saying that as a general
10   matter, not necessarily as a South Carolina matter.
11   Is that right?
12        A.   That's correct.
13        Q.   Are you aware of any requirements or
14   restrictions in South Carolina on treating cores of
15   districts as a community of interest?
16        A.   Just to make sure, let me clarify the
17   question.  You're asking if I know of any rules or
18   guidelines that touch on that?
19        Q.   I'm asking, I think, a slightly
20   different question.  I think you said, generally,
21   that there are states that prohibit consideration of
22   incumbency -- or favoring of incumbents in drawing
23   districts.  Right?
24        A.   That's right.
25        Q.   Maybe Florida is one of those, or some

Page 73

1    other states.  Correct?
2        A.   Quite a few, yeah.
3        Q.   And you said, as a result, that then
4    affects the extent to which or whether map drawers
5    can consider preservation of cores of districts in
6    those states.  Is that right?
7        A.   That's right.
8        Q.   So I'm just asking, is there anything
9    that you're aware of in South Carolina law that
10   functions that way and would prohibit consideration
11   of preservation of cores?
12        A.   Right.  I understand.  No, there is
13   nothing in the law that I'm aware of.
14        Q.   And are you aware of anything in the law
15   that would prohibit the General Assembly from
16   treating cores of districts as communities of
17   interest in South Carolina?
18        A.   Nothing in the law that I'm aware of.
19        Q.   Are you aware of anything else that
20   would prohibit them from doing so?
21        A.   I would say that as a matter of good
22   government best practices, that there would be some
23   significant skepticism of using the communities of
24   interest heading in that way.
25        Q.   And which good government best practices

19 (Pages 70 - 73)

Moon Duchin , PhD                                              July 14, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 74
1  are you referring to?
2      A.  Well, traditional districting principles
3  are thought to provide a framework that helps
4  redistricting achieve fairer and more objectively
5  measurable outcomes.  And as such I have been at
6  quite a few presentations by nonpartisan groups such
7  as NCSL, the National Conference of State
8  Legislatures, in which best practices around the
9  principles is discussed.  And I have never heard a
10  discussion in which district cores and incumbency
11  are considered to be legitimate communities of
12  interest from outside groups.  That's not to say
13  that there is any law on the subject.  I have
14  written about the law of communities of interest,
15  and it is complicated and far from a unified body of
16  decisions.  So I'm not claiming there is any clear
17  statements in law.
18      Q.  And again, I'm not a lawyer.  So to your
19  question, I think the phrase "good government
20  principles" refers, generally, to the community of
21  people trying to clarify the role of various
22  redistricting principles and not to stipulations of
23  law.
24      Q.  Thank you for all that.
25          Did you rely on those good government

Page 75
1  principles or best practices in formulating your
2  report?
3      A.  I don't see that those are anywhere
4  referenced in my report.
5      Q.  Okay.  Now, you say that the law is
6  complicated and far from unified in communities of
7  interest.  Is that right?
8      A.  That is right.
9      Q.  Can you give me an example of what you
10  mean by that?
11      A.  Sure.  For instance, the extent to which
12  the partisan beliefs of a group constitute a
13  legitimate community of interest I think is an
14  example where the law of the case law is unclear or
15  conflicted.  If you want specifics, we could refer
16  to various pieces of writing that have been
17  published.  So I'm speaking now in generality and
18  from memory.
19      Q.  Thank you.  And I appreciate the caveat.
20  Not a trick question.  Thank you.
21      A.  I'm just trying to be careful and
22  complete in my answers.
23      Q.  And do the Senate Guidelines expressly
24  note preserving cores of districts as a criteria?
25      A.  Let's find out.  As I mentioned in my

Page 76
1  summary, section 3B is called:  Constituent
2  consistency.  And it employs the phrase:
3  "Preserving the cores of existing districts."
4      Q.  I'm going to share that again for the
5  record.  I believe you're reading here off of page
6  2, this heading B, Constituent consistency.  Is that
7  correct?
8      A.  That's right.
9      Q.  And how that heading also discusses
10  keeping incumbents' residences in their districts
11  with their core constituents and avoiding contests
12  between incumbent legislators.  Did I read that
13  correctly?
14      A.  Yes.  It says that all three of those
15  should be considered.
16      Q.  And I'm going to pull up your report
17  again if I can figure out how.  And here, in section
18  4, you discussed incumbent pairing but not
19  preserving cores of districts.  Is that right?
20      A.  That's right.  In this section I
21  discussed incumbent pairing but not core
22  preservation.
23      Q.  All right.  I would like to move on now
24  to your detailed district review in section 5, if
25  that's okay.

Page 77
1      A.  Yes.
2      Q.  Will you briefly describe to me the
3  methodology you're using here in section 5?
4      A.  Sure.  So I begin by recalling the BVAP
5  by district in the four districts numbered 1, 2, 5
6  and 6, as well as the Polsby-Popper score, which is
7  the most widely used compactness score in
8  litigation.  Then I show, in Figure 3, the terrain
9  that has moved in and out of District 6 in the
10  transition from benchmark map to the enacted map.
11  And then in sections 5.1, 2, and 3 I examine,
12  serially, Districts 1, 2 and 5 and highlight
13  qualitative, as opposed to quantitative, features of
14  the districts that seem, to me, to bear on the
15  principles.
16      Q.  Have you offered this kind of
17  qualitative analysis in any prior cases in which you
18  have been an expert?
19      A.  Yes.  Routinely.
20      Q.  Let's go to page 15 maybe.  This is
21  Figure 3.  And I believe you said this shows terrain
22  moved in and out of CD 6.
23      A.  Yes.
24      Q.  And you said the reassignment is
25  happening in scattered chunks and shards.  Can you

Moon Duchin , PhD                                              July 14, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 78

1  tell me what you mean by that?
2      A.  Sure.  The colored areas, which are the
3  areas that were reassigned, are not one connected
4  component or two connected components, but it looks
5  like maybe up to ten if -- I'm informally trying to
6  count.  Some of them are large and some are so small
7  that you have to zoom in quite far to see them.  So
8  that's what merits the colorful phrase "scattered
9  chunks and shards."
10     Q.  And when you talk about areas being
11 large or small are you talking about geography or
12 population?
13     A.  Both.
14     Q.  And these changes involved more than two
15 districts.  Is that right?
16     A.  Correct.  What you see here is 6 to 2, 6
17 to 1.  And what does it say here, and into 6 from
18 the neighbors.
19     Q.  And can you show here that any areas
20 moved in or out of -- in between 6 and 5?
21     A.  Unclear.  That may be covered in -- let
22 me think about that for a moment.  Yeah.  That's
23 unclear because there is purple both on the south
24 side of the map.  And if you zoom in you can also
25 see purple near Columbia.  And so I'm not entirely

Page 79

1  sure whether that -- some of that may well be
2  involving District 5.  It's not identified in
3  this -- in this plot.
4      Q.  All right.  And you also say that the
5  reassignment is not aimed at healing key splits of
6  cities and communities that were frequently cited in
7  the public testimony, including Columbia, Sumter
8  Orangeburg and Charleston.  Is that right?
9      A.  Yes, that is an accurate quote.
10     Q.  Do either the House or the Senate
11 Guidelines say anything about these particular
12 communities and whether they should be split or
13 reunified?
14     A.  These communities are not named in the
15 Guidelines.
16     Q.  Were any of these communities split in
17 the benchmark plan from 2010?
18     A.  I think it's implied here, by the word
19 "healing," that they were split.  And when I say
20 that they are not aimed at healing, I mean those
21 splits were not addressed or lessened in the move
22 from the benchmark to the enacted plan.
23     Q.  How did you identify these four
24 communities of interest for this portion of your
25 report?

Page 80

1      A.  I read all of the public testimony and
2  made a good-faith effort to summarize and synthesize
3  it.
4      Q.  So it's fair to say you read the public
5  hearing transcripts and then drew conclusions based
6  on that reading.  Is that right?
7      A.  That's right.
8      Q.  And have you ever used that method
9  before in any of your prior expert reports?
10     A.  Let's see.  I'm trying to think those
11 through.  I certainly have used selections from
12 public hearing testimony before, but I will say that
13 in many of my prior expert reports the state
14 collected not only oral testimony, narrative
15 testimony, but also collected maps.  And when the
16 state collects maps it's possible to synthesize
17 those as a matter of data science.  When the state
18 collects only narratives, it is much more difficult
19 to synthesize precisely.
20     Q.  So in any of your prior expert reports
21 have you done what you did here, which was to read
22 all the public hearing testimony and then identify
23 certain communities within that testimony?
24     A.  Yes, and particular in Wisconsin.
25     Q.  And so --

Page 81

1      A.  Sorry.  Excuse me.  It's also addressing
2  the South Carolina State House districts also in
3  that report.
4      Q.  Got it.  And do you have -- is there any
5  support or discussion of this particular method in
6  any academic literature that you're aware of?
7      A.  That is, is there any discussion of the
8  method of using public testimony to identify
9  communities of interest?
10     Q.  To identify a subset of communities of
11 interest.
12     A.  I'm sorry.  Could you rephrase?
13     Q.  Sure.  Let me ask you this:  Were these
14 the only four communities of interest identified in
15 the public testimony?
16     A.  I see.  No, certainly not.  Thank you
17 for rephrasing.
18     Q.  Yeah.  Sorry.
19         Okay.  So I want to understand how you
20 identified these four out of the various communities
21 of interest that were identified in the public
22 hearing testimony.  So can you tell me why you
23 identified these four, as opposed to other
24 communities of interest?
25     A.  Sure.  And incidentally, if you look at

21 (Pages 78 - 81)

Moon Duchin , PhD                                July 14, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 82

1  Figure 13 in my report, which is on page 30, you
2  will see one, two, three, four -- five areas
3  highlighted, which I call "A selection of COIs
4  identified in public testimony." So this is page
5  30.
6      Q. Right. I think I'm there. I'm sorry.
7  These are different than what you have got in the
8  form we were just talking about. Correct?
9      A. To be clear, this is labeled "A
10  selection." But yeah, let me try to restate and
11  clarify the broader point that I'm making.
12          The testimony in South Carolina, which I
13  made a significant effort to contend with in its
14  entirety, was exclusively narrative. And that makes
15  it quite challenging to do what a data scientist
16  would call operationalizing the testimony into
17  chunks that you might consider individual COIs.
18  However, I have made a good-faith effort to do that
19  by looking for themes in the public testimony and
20  trying to do so in an even-handed way.
21      Q. How did you determine which communities
22  of interest discussed in the public hearing
23  testimony to include in your report?
24      A. I attempted to find the ones most
25  frequently discussed and most explicitly delineated.

Page 83

1  It is a good-faith effort to do just that.
2      Q. And as part of that good-faith effort
3  did you count the number of comments or the number
4  of commenters? I'm just trying to understand how
5  you determined what was getting more or less
6  emphasis than something else.
7      A. To be clear, I would have greatly
8  preferred a more data-intensive record. But from
9  the narrative record I made a complete but
10  qualitative review.
11      Q. And are you aware of any academic
12  literature that discusses, supports or endorses the
13  kind of qualitative review you undertook here?
14      A. Well, I have a book chapter that
15  discusses the use of public testimony. I have a
16  paper under review that discusses the quantification
17  methods you can use when that testimony is
18  accompanied with maps. I'm trying to think of other
19  examples.
20          Generally, I would say there is a
21  shortage of peer-reviewed work on communities of
22  interest, generally; something I hope to address in
23  the coming months and years.
24      Q. And to the extent that that literature
25  exists, I think I heard you say that it was a

Page 84

1  quantification or quantitative analysis in
2  communities of interest. Is that right?
3      A. I think maybe a good way to answer your
4  question would be to say what academic domain this
5  falls in. So this falls in an area that has a huge
6  literature called "participatory mapping" that's
7  part of the academic geography literature. I would
8  say there are hundreds of papers on participatory
9  mapping and the idea of taking seriously public
10  input, grass-roots input. So I don't know that any
11  of those papers focuses specifically on applications
12  to redistricting, but there is really no shortage of
13  both qualitative and quantitate support for the idea
14  of community mapping.
15      Q. And here I'm just looking for a simple
16  yes or no answer to this next question.
17      A. Sure.
18      Q. Is there any academic literature that
19  discusses the method you used here, in this report,
20  this specific method?
21      A. I'm trying to give you the yes or no
22  answer. I would say the detailed method used here,
23  no.
24      Q. Okay. Thank you. And how about are you
25  aware of any court decisions or opinions discussing

Page 85

1  the detailed method that you employed here in this
2  report?
3      A. All right. I do think -- and please
4  tell me if this is responsive to your question
5  because I'm sincerely trying to be, I do think there
6  are cases where courts have taken, quite seriously,
7  informal communities of interest, as reflected in
8  the public record. For instance, in Texas.
9      Q. And I'm looking for just a yes or no
10  answer to the next question.
11      A. Sure.
12      Q. Are you aware, one way or the other,
13  whether any court has discussed the specific method
14  you used in this report?
15      A. While I would love to give you a simple
16  yes or no, I think too much hinges on what's meant
17  by "the specific method." I'm sorry. But I would
18  say that I'm trying to follow what I take to be the
19  way courts have used communities of interest. I am
20  trying to follow that here to the best of my ability
21  with the public record available.
22      Q. Is public testimony in a redistricting
23  record statistically random?
24      A. I don't understand the question.
25      Q. Is public testimony -- who can provide

22 (Pages 82 - 85)

3:21-cv-03302-MGL-TJH-RMG    Date Filed 09/02/22    Entry Number 343-2    Page 24 of 141

Moon Duchin , PhD                                        July 14, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 86

1 public testimony?
2      A. Okay. In many states anyone can. For
3 instance, the cycle in Michigan, the commission
4 debated whether only residents could provide
5 testimony and decided that it would be open to
6 anyone.
7      Q. And among the people who show up to
8 testify, for example, are they a statistically
9 random sample of the statewide population?
10      A. I'm not sure I understand what that
11 would mean, but I think the spirit is are they --
12 are there any statistics gathered on commenters. Am
13 I understanding right?
14      Q. Well, what I really want to understand
15 is, are commenters, whoever shows up to comment in a
16 public -- in public hearing, can we extrapolate from
17 that that their views represent the views of the
18 entire state or the populace at large from which
19 they are drawn?
20      A. Well, certainly not. With any public
21 anticipatory effort there is always going to be a
22 kind of small sample. And it's hard to say exactly
23 what that might represent in terms of the overall
24 views of all residents, all adults, all voters or
25 some other universe.

Page 87

1      Q. So if I can just briefly summarize, the
2 public testimony does not necessarily represent the
3 views of all voters or all residents of the state.
4 Is that correct?
5      A. It certainly does not represent the
6 views of all voters. It could not.
7      Q. And I think you said that you were
8 looking for communities of interest that got
9 particular focus or emphasis in the public hearing
10 testimony. Is that right?
11      A. That's right. I looked for themes, is
12 the phrase that I used.
13      Q. And so would those communities of
14 interest necessarily be a point of focus or emphasis
15 for all voters or all individuals in the state?
16      A. Again, I clearly concede that there is
17 no way testimony could possibly capture everything.
18 That's certain.
19      Q. But would the weight of that testimony
20 be representative of the weight of the views among
21 all residents or all voters in the state?
22      A. Well, I believe that it's the best we
23 have, that, in fact, considerable effort was
24 expended by the State to collect it. And it strikes
25 me that it would be misuse of that time and those

Page 88

1 resources not to take it seriously as the best
2 record we have of residents characterizing their own
3 communities.
4      Q. And regardless of whether it is the best
5 we have or is something that the General Assembly
6 should have, could have or did, in fact, take
7 account of, I'm asking a slightly different
8 question, which is, do the points of emphasis -- can
9 you say, one way or the other, whether the points of
10 emphasis in the public testimony accurately
11 represent the views of the points of emphasis of the
12 populous generally in South Carolina?
13      A. I think it's reasonable to assume a
14 correlation. Is that what you mean? It's not going
15 to be the entirety, necessarily, but I think it's
16 reasonable to assume correlation.
17      Q. And have you conducted any analysis,
18 either survey analysis or anything like that to try
19 to capture the views of individuals who did not
20 provide public hearing testimony with respect to
21 communities of interest?
22      A. In South Carolina, certainly not.
23      Q. And did plaintiff's counsel ever
24 instruct you to focus, back on page 15, on these
25 four communities, Columbia, Sumter, Orangeburg and

Page 89

1 Charleston?
2      A. No. These were my own choices.
3      Q. And I think you have already testified
4 that there were other communities of interest
5 identified in the public hearing testimony. Is that
6 right?
7      A. Yes. I would estimate that the public
8 testimony probably runs to over 1,000 pages. So it
9 certainly discusses many other areas.
10      Q. That sounds low to me, even, 1,000
11 pages.
12      A. I'm trying to be conservative with my
13 numbers.
14      Q. That makes sense. Okay.
15      So let's move on to 5.1, District One.
16 And you again -- is this a choropleth. Am I saying
17 that right, choropleth here, Figure 4?
18      A. It is, highlighting District 1.
19      Q. All right. So you mention here, under A
20 is the Jasper County split. And you note that two
21 Jasper County precincts are included in the new
22 District 1. Is that right?
23      A. That's right.
24      Q. Are you aware of any public testimony
25 that supported splitting these two precincts from

Moon Duchin , PhD                                            July 14, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 90

1 the rest of Jasper County?
2        A.   Off the top of my head, no.  If I go to
3 selections from public testimony, I see that I have
4 included, on page 31, one selection, which is Mary
5 Ann Bromley who says:  "The economic importance of
6 the Jasper Port Project is an excellent example of a
7 shared community of interest for residents of both
8 counties in that area."  So if anything, Bromley's
9 quote goes to the idea that this area should be kept
10 together.
11       Q.   And are you aware of any other testimony
12 in the public record or do you recall any today that
13 might actually support this slit of Jasper County?
14       A.   No.  It's entirely possible that there
15 is some.
16       Q.   And the next, under B you mention
17 Dorchester County.
18       A.   Yes.
19       Q.   And was Dorchester split in the
20 benchmark plan?
21       A.   Let's see.  I don't mention that here
22 and so I don't have materials in front of me to make
23 that determination.
24       Q.   And are you aware of any public
25 testimony that supported splitting Dorchester

Page 91

1 County?
2        A.   I am not, off the top of my head.  But
3 if I go back to the selections from public testimony
4 I can see that I quoted one person, Tim Lewis, who
5 identified the county as a community of interest.
6        Incidentally, let me mention, this
7 frequently occurred in the public testimony, in my
8 review, that people talked about their county as
9 their community of interest.
10       Q.   Were there any other examples that you
11 can think of?
12       A.   Not off the top of my head.
13       Q.   And do you recall whether there was any
14 such testimony with respect to Berkeley County?
15       A.   Let's see.  I do have selections in the
16 supplement on pages 34, 35 and 36 that all mention
17 Berkeley County in various ways.
18       Q.   And how about what I believe South
19 Carolinians refer to as Beaufort, B-E-A-U-F-O-R-T?
20       And I see Leah nodding, so I hope I got
21 that in the ballpark.
22       MS. ADEN:  I'm not the one to give you
23 the green light.
24       MR. MATHIAS:  Soften the T a little more
25 and you will be there.

Page 92

1 BY MR. GORE:
2        Q.   Okay.  So Dr. Duchin, do you recall any
3 testimony about --
4        A.   Sorry.  I lost sound there.
5        Q.   Can you hear me now?
6        A.   I can, yes.
7        Q.   Wonderful.  Do you recall any testimony
8 in a public record identifying Beaufort County as a
9 community of interest?
10       A.   Yes.  I have quite a few commenters,
11 cited on pages 31, 2, 3, 4, 5 and 6 that all mention
12 Beaufort.
13       Q.   And are you aware -- turning back now to
14 Dorchester County, are you aware of any other
15 justifications for the splits in Dorchester?
16       A.   Other than public testimony?
17       Q.   Yes.  Let me ask it this way.  It's,
18 again, not a trick question.  Did you examine
19 whether there are any justifications for splitting
20 Dorchester County, say, in the legislative record?
21       A.   Okay.  I can say that I did not examine
22 the legislative proceedings.  I restricted my review
23 to the already voluminous public testimony on
24 community.
25       Q.   And then you mention the Coastal and

Page 93

1 Lowcountry COIs disregarded.  And I believe that's
2 your heading C here on page 16.  Is that right?
3        A.   That is right.
4        Q.   And was Charleston split in the
5 benchmark plan?
6        A.   I believe that it was; although I don't,
7 again, have the benchmark plan in front of me.
8        Q.   That's fine.  Are you aware of any
9 public testimony that supported splitting
10 Charleston -- or maintaining a split of Charleston
11 into two districts?
12       A.   I could not quote such testimony as I
13 sit here, but it is entirely possible that there was
14 testimony of that kind.
15       Q.   So Colleton County -- I think I know the
16 answer to this question.  You mentioned Colleton.
17 But do you know, as you sit here right now, whether
18 Colleton County was split in the benchmark plan?
19       A.   There is testimony referring to
20 Colleton's split that's included here, so that gives
21 me reason to believe that it was split.
22       Q.   And are you aware of any public
23 testimony that supported splitting Colleton County
24 or maintaining a split in Colleton County?
25       A.   I am checking what is included here.

24 (Pages 90 - 93)

Moon Duchin , PhD                                    July 14, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 94

1   From what I included, what I see is that the mayor
2   of Walterboro testified that Colleton is very
3   divided, but that it would be kept, quote, together
4   as much as possible as a community of interest.
5   That's not to say that other testimony might not
6   have -- you will find this quite frequently, that
7   you can have testimony preferring one thing and
8   testimony preferring an opposite thing.  And I don't
9   deny that that is possible.  Again, it's a huge
10  record and it's all narrative.
11       Q.  And how about Beaufort?  Do you know
12  whether Beaufort was split in the benchmark plan?
13       A.  I don't have a benchmark plan in front
14  of me.  I'm sorry.
15       Q.  Now, you mention here that the
16  Harpootlian proposal is highly cognizant of the
17  COIs.
18       A.  I did.
19       Q.  What do you mean by that?
20       A.  Well, let's look at page 3 which shows
21  images of the districting plans.  I find that, in
22  particular, in the Lowcountry area, Harpootlian and
23  Coastal regions of the South that Harpootlian has, I
24  think visually prioritized maintaining those
25  counties in that region together.

Page 95

1        I, in my review of the metrics, found
2   that Harpootlian seemed to take the public testimony
3   into account while still having an excellent showing
4   on most of the metrics, though it's very hard to be
5   superlative on all the metrics simultaneously.
6        I'm sorry.  I want to make sure I'm
7   answering your question.  So you were asking
8   specifically why I thought Harpootlian had taken the
9   public testimony into account?
10       Q.  I believe what it says on 16 is the
11  Harpootlian proposal is highly cognizant of these
12  COIs.  And I'm trying to understand the phrase
13  "highly cognizant," whether you're just saying they
14  are not splitting his plan or there is something
15  else that was done with respect to these communities
16  of interest in the Harpootlian proposal that I may
17  have missed.
18       A.  Right.  So I mentioned before that one
19  of the sets of facts that was related to me by
20  counsel had to do with the timeline of when maps
21  were introduced relative to public testimony, and so
22  it's my understanding that Harpootlian is one of the
23  ones that was released after all of the public
24  testimony had been completed.  This is my
25  understanding.  I have not independently verified

Page 96

1   this timeline, but I have no reason to believe this
2   not to be true.  And that in his introduction of the
3   plan, as an amendment, discussed the elements of --
4   some of the elements of community that were in play.
5        Q.  And this timeline that you received from
6   counsel, was that in writing?
7        A.  No.  And by "timeline" here I mean only
8   the informal sense that the NAACP plans had been
9   introduced before the public testimony was complete.
10  That's my impression from informal conversations.
11  But that is what I'm referring to as timeline, and
12  that some of the legislative debate had already been
13  ongoing at the time that the Harpootlian amendment
14  was introduced.  My impression, again, is that it
15  came late in the process.
16       Q.  A moment ago when you were discussing
17  the Harpootlian plan, I believe you said it's
18  difficult for a plan to be superlative on all
19  metrics.
20       A.  I did.
21       Q.  Well, what did you mean by that?
22       A.  Well, I meant that as all of us in the
23  redistricting trenches know, that redistricting
24  involves tradeoffs between the metrics.  If you
25  optimize on one, you might do so at cost to some

Page 97

1   others.  So it's hard to simultaneously be the best
2   plan in contention on each of the twenty or so
3   different metrics in play.  But given that, I find
4   Harpootlian to really be very strong in its
5   balancing with the tradeoffs.
6        Q.  And is the Harpootlian plan the only
7   plan that strikes a strong balance on the various
8   tradeoffs?
9        A.  Let me think about a reasonable response
10  to that.  I can identify strengths and weaknesses in
11  a number of the plans.  But through the process of
12  review Harpootlian emerged, in my opinion, as a
13  particularly strong option that was available to the
14  legislature at the time of enactment.
15       Q.  And in your opinion and experience how
16  does a map drawer -- or how should a map drawer
17  determine where to strike the balance on these
18  various tradeoffs?
19       A.  Well, in my experience, a map drawer
20  usually is either under an assignment to produce a
21  demonstration of some principles or is trying to
22  qualitatively optimize in view of law and local
23  practice.  So how should they strike the balance?  I
24  couldn't answer that in generality.
25       Q.  And so some of that turns on additional

25 (Pages 94 - 97)

Moon Duchin , PhD                                     July 14, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 98

1  assignments or instructions a map drawer might
2  receive.  Is that right?
3      A.  That's right.
4      Q.  And what's an example of that, in your
5  experience or observation?
6      A.  For instance, they might be instructed
7  to use a particular compactness metric.  That's an
8  example.  Or they might be instructed to split --
9  they might -- you know, I will use North Carolina as
10  an example, where legislative plans are under a very
11  stringent whole-county provision that makes it clear
12  exactly how to treat the requirements around county
13  splits.  It's more explicit in North Carolina than
14  in most of the country.  So if you were drawing
15  there, you would need to be cognizant of that
16  framework.
17      Q.  So let me just ask another hypothetical.
18  If a map drawer was told to place emphasis on
19  preserving communities of interest, for example,
20  might that affect the compactness score of the map
21  or result in a map that's less compact than if your
22  map drawer had been told to consider compactness
23  over communities of interest?
24      A.  Certainly.
25      Q.  And would the same be true of, say, with

Page 99

1  preservation of cores and compactness?
2      A.  Yes, I would say the same would be true
3  with, virtually, any two principles; that there
4  would be intention, and optimizing one could be
5  expected to come at a cost to another.
6      Q.  So turning to page 16, would keeping
7  Jasper County, Dorchester County and these other
8  counties together have required tradeoffs with other
9  criteria or objectives the General Assembly might
10  have wanted to pursue?
11      A.  Yes.  And I will add to that there is a
12  strong possibility, and I think a possibility that's
13  reflected in various documents in this court case,
14  that the state was prioritizing criteria not named
15  in the Guidelines.  In particular, partisanship is
16  not explicitly named in the Guidelines but is
17  discussed in various documents that have come out in
18  this litigation, like in the motion to dismiss and
19  the expert report of Sean Trende and so on.
20          So it's entirely possible that the State
21  had various private principles, but the publicly
22  expressed principles are the ones -- the only ones
23  that the public could have been aware of when they
24  prepared plans to submit for consideration.  They
25  cannot have been aware of principles that weren't

Page 100

1  articulated publicly.
2      Q.  And with respect to those publicly
3  articulated principles, isn't it correct that
4  keeping these counties together would have involved
5  tradeoffs with other of the publicly available
6  principles?
7      A.  I will say it could have, definitely.
8      Q.  And I think you mentioned that the state
9  might have been prioritizing criteria that are
10  not -- were not in the public guidelines.  Is that
11  right?
12      A.  Definitely.
13      Q.  And are you aware of any legal
14  prohibition on considering those criteria in South
15  Carolina?
16      A.  No.  I think we have discussed the full
17  extent of the legal framework that I am aware of.
18          So just to be clear, the example that I
19  just gave was partisanship.  And I am not aware of
20  any law that prevents the legislature from
21  prioritizing partisan motives.
22      Q.  And are you aware of anything in the law
23  that prevents the legislature from considering a
24  private criteria -- criterion over the publicly
25  available criteria?

Page 101

1      A.  Well, I would say that the Voting Rights
2  Act and Equal Protection do govern, in part, the
3  proper prioritization, the proper role of
4  considerations that touch on race.  Are you asking
5  in that generality, or could you --
6      Q.  Yeah, I'm happy to clarify the question,
7  if that would be helpful.
8      A.  I think it would.
9      Q.  That's fine.  I think you said that
10  you're not aware of any prohibition on considering
11  partisanship.  Right?
12      A.  That's right.
13      Q.  So now I want to talk about the
14  difference between publicly available criteria and
15  private criteria.  And so it's not necessarily a
16  question about partisanship, but the question is, is
17  there any prohibition, to your knowledge, on a map
18  drawer or General Assembly considering private
19  criteria --
20      A.  Right.
21      Q.  -- that are not public?
22      A.  And again, my answer is, only some.  So,
23  for instance, it would not be proper, it would not
24  be legal, in my understanding, to privately choose
25  to disfavor members of a particular racial or

26 (Pages 98 - 101)

Moon Duchin , PhD
The South Carolina State Conf vs. McMaster/Alexander
July 14, 2022

Page 102

1 language minority group. That's just an example.
2 But --
3    Q. Right. I'm sorry. Finish your answer.
4    A. Just that there are very few
5 restrictions of that kind in the law that I'm aware
6 of.
7    Q. But even in that example it's not the
8 fact that that criterion is private.
9    A. That's correct.
10    Q. It's that it's illegal.
11    A. That's correct. It's not the fact of
12 having been private, but in some possibilities the
13 nature of the private motivation.
14    Q. And so focusing just on the fact that
15 something is private, does the fact that a criterion
16 is private mean a map drawer or General Assembly is
17 prohibited from considering it?
18    A. I think -- just to answer the question
19 technically first, I think they can consider
20 anything at all. However, I do think that when
21 those considerations start to come at a cost to the
22 ones that are named in law, that that's where you
23 could run into trouble. But I truly -- in an honest
24 effort to address your question as you asked it,
25 anything can be considered. But if those

Page 103

1 considerations come at a cost to the traditional
2 principles, that might start to invite scrutiny.
3    Q. Well, it might invite scrutiny, but is
4 it illegal?
5    MS. ADEN: Objection.
6    THE WITNESS: I would say that, in my
7 understanding, that just really depends on the
8 nature of what is being prioritized. At a cost to
9 what?
10 BY MR. GORE:
11    Q. But that analysis, in your experience,
12 doesn't turn on whether the criterion is private or
13 public?
14    A. Okay. Let me -- let me disambiguate two
15 things. So one is whether something might be
16 legally suspect, and another is whether it might be
17 against the law. So I think there is a special role
18 in the law around redistricting related to -- I
19 think race, generally, is treated with a whole host
20 of special provisions in the law. In particular,
21 the role of intent versus results is special for
22 race in current law.
23    And so to your question about whether
24 private considerations are prohibited, I find that
25 question too general to answer.

Page 104

1    Q. May I try to rephrase it, then?
2    A. Please.
3    Q. Would that be okay?
4    Are you aware of any prohibition on a
5 map drawer or General Assembly considering a legal
6 criterion that it has kept private and not disclosed
7 publicly?
8    A. Just to repeat, I think they are
9 allowed, legally, to consider anything that is
10 legally permissible.
11    Q. Okay. Thank you. And then my next
12 question on this is, are you aware of any
13 prohibition on a map drawer or General Assembly
14 prioritizing a legal criterion that it has kept
15 private over criteria it has made public?
16    A. Well --
17    Q. It's a yes or no, if that's possible.
18    A. You're asking if I know of a law.
19 Right?
20    Q. Yes.
21    A. I do not know of such a law.
22    MR. GORE: Can we maybe take a minute to
23 go off the record for a second?
24    THE WITNESS: Fine with me.
25 (Discussion Off The Record)

Page 105

1 (Break In Proceedings)
2    MR. GORE: Back on the record.
3 BY MR. GORE:
4    Q. Dr. Duchin, did you discuss this case
5 with anyone during your break?
6    A. No, I didn't talk to anyone during the
7 break.
8    Q. All right. Let's go back to your report
9 that I have pulled up here. Can you see this on
10 your screen?
11    A. Yes.
12    Q. Let's go to page 17, Figure 5.
13    A. Yes.
14    Q. Can you just tell me what these red and
15 black lines are?
16    A. Yes. The red lines are the municipal
17 boundaries of Charleston and North Charleston, and
18 the black ones are district boundaries.
19    Q. So these are not county boundaries,
20 then. Is that right?
21    A. That's right. They are municipal and
22 district boundaries.
23    Q. And I think you say here, in heading D,
24 "Charleston County split erratically."
25    A. That's right.

27 (Pages 102 - 105)

Moon Duchin , PhD    July 14, 2022

The South Carolina State Conf vs. McMaster/Alexander

Page 106

1    Q.   And you talk about Summerville, Ladson,
2    I hope that's how you say that, and North Charleston
3    are split in the enacted plan.  Is that right?
4        A.   The state has split all three cities.
5    Correct.
6        Q.   And all three of these cities are
7    located in more than one county.  Isn't that right?
8        A.   That's right.  That's what it says in
9    the previous sentence.
10        Q.   So keeping these cities whole would
11   require splitting counties, wouldn't it?
12        A.   That's right.  You have a tradeoff here
13   between counties and cities.
14        Q.   And do you know, one way or the other,
15   whether the district line in these cities deviates
16   from the county line?
17        A.   This picture doesn't tell us that, but
18   I'm -- well, I will just say that, this picture
19   doesn't tell us that.
20        Q.   Okay.  Let's move to 5.2, which is
21   District 2 --
22        A.   Yes.
23        Q.   -- on page 18 of your report.  And you
24   mention that Orangeburg is separated from CD 2.
25        A.   Uh-huh.

Page 107

1        Q.   And as you sit here today, do you know
2    whether Orangeburg County was split in the benchmark
3    plan?
4        A.   I don't know that from these materials.
5        Q.   And are you aware of any public
6    testimony supporting this split in Orangeburg
7    County?
8        A.   No, although I don't discount the
9    possibility that it exists.
10        Q.   Part B mentions a hook into Columbia?
11        A.   Correct.
12        Q.   And I think it acknowledges that this
13   hook shape did exist in the benchmark plan.  Is that
14   correct?
15        A.   Yes.  Hang on.  That's right.  It says
16   that the hook shape is preserved in the new plan
17   from its non-compact hook shape in the prior plan.
18        Q.   And are you aware of any public
19   testimony supporting this hook into Columbia?
20        A.   I am not, but I don't discount the
21   possibility that it was discussed.
22        Q.   And are you aware of any other reason
23   for this hook into Columbia?
24        A.   Well, I mean, incumbent addresses comes
25   to mind.  I believe that this district, the bulb

Page 108

1    around which the hook wraps, has an incumbent
2    address in it.
3        Q.   Do you know which incumbent?
4        A.   I think that would be our District 6
5    incumbent, which is Clyburn.
6        Q.   Turn to page 19.  Again, Figure 7, are
7    the red lines municipal boundaries and the black
8    lines district boundaries?
9        A.   That's right.
10        Q.   And in C you mention splitting in and
11   around Columbia.
12        A.   That's right.
13        Q.   You mention Cayce, Columbia and Forest
14   Acres.  Do you know whether any of these splits were
15   present in the benchmark plan?
16        A.   I don't.  I'm not going to --
17   unfortunately, I'm not going to be able to answer
18   any of those kinds of questions about the benchmark
19   plan using these materials.
20        Q.   Okay.  And are you aware of or do you
21   recall any public testimony supporting the splits?
22        A.   Supporting the splits?  I do not recall
23   that.  Although, again, it may exist.
24        Q.   Let's go to 5.3.  I think you have just
25   said that you're not in a position to answer any

Page 109

1    questions about the benchmark plan.  Is that right?
2        A.   Some questions.  You know, the ones --
3    the ones I have written about.
4        Q.   The specific ones.
5        A.   Right.
6        Q.   Okay.  Then I will not bother asking you
7    those questions.  You mention here, on 20, heading
8    A), "Sumter COI not respected."
9        A.   Correct.
10        Q.   And are you aware of any public
11   testimony supporting these splits that you describe
12   in this paragraph?
13        A.   Supporting these splits, no, I am not
14   aware of that, although it may exist.
15        Q.   And are you aware of any other reason
16   for these splits?
17        A.   Of Sumter.  Correct?
18        Q.   Correct.
19        A.   No.  But it may exist.
20        Q.   And section B) is:  "Sumter split is
21   illogical."
22        A.   Right.
23        Q.   And you mention a precinct is split
24   along several low-density residential roads?
25        A.   Yes.

28 (Pages 106 - 109)

Moon Duchin , PhD                                    July 14, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 110

1    Q.  Do you recall which precinct that is?
2    A.  You mean the name of the precinct?
3    Q.  Yes.
4    A.  No, I do not.
5    Q.  And you mention that the portion of West
6  Oakland Avenue and all of Cemetery Road appear to be
7  in the middle of a cemetery.  Is that right?
8    A.  That's right.  And to clarify, the kinds
9  of materials that I used here were like Google
10  Street search.  I can't be -- you know, that's why I
11  use phrases like "appear to be."
12    Q.  Got it.  Okay.  With respect to a line
13  that runs through a cemetery --
14    A.  Yes.
15    Q.  -- to the extent it runs through a
16  cemetery, does it split any population?
17    A.  You will find, in census data, there is
18  population in the most surprising places, rivers,
19  cemeteries, so I can't be sure.  But, in general, I
20  would agree with what I take to be a premise that
21  not that many people are living in cemeteries.
22    Q.  Okay.  And as you sit here today, you
23  don't know one way or the other whether on the
24  census data this particular stretch of road is
25  splitting any population?

Page 111

1    A.  No, I do not.
2    Q.  And again, are you aware of any public
3  testimony supporting this split?
4    A.  No.
5    Q.  All right.  Let's move on to section 6.
6    A.  Yes.
7    Q.  This is called:  "Vote dilution compared
8  to the neutral baseline."  What standard did you
9  apply to determine whether the enacted plan dilutes
10  Black voting power?
11    A.  So the investigation here is into what
12  is informally called "cracking," which I can define
13  if you would like.  And the way that that was
14  carried out is with a collection of figures that
15  show how Black population is distributed compared to
16  an ensemble of maps that were made with mutual
17  criteria.
18    Q.  And I believe this section is titled:
19  "Vote dilution"?
20    A.  That's right.
21    Q.  So can you tell me what you mean by
22  "vote dilution"?
23    A.  So generally, I'm speaking about, as I
24  said a moment ago, what is called cracking, which
25  involves taking a population that's numerous enough

Page 112

1  to have some opportunity to elect and breaking it
2  into districts in a way that reduces the opportunity
3  to elect.
4    Q.  Is cracking coterminous with vote
5  dilution?
6    A.  No.  It is one of several strategies
7  that are considered to be constitutive of vote
8  dilution.
9    Q.  And in this section of your report when
10  you're referring -- when you use the term
11  "cracking," does that necessarily involve vote
12  dilution?
13    A.  To make sure I understand, you're asking
14  is it possible to imagine a scenario in which there
15  is cracking but no vote dilution?  Am I
16  understanding right?
17    Q.  Go ahead and answer that question, and
18  then I would like to know what you were doing in
19  your report.  But yes, please.
20    A.  Right.  In this report I'm
21  investigating -- in this section of this report I'm
22  investigating the possibility of cracking as a means
23  to dilute the vote or with the result of diluting
24  the vote.
25    Q.  So is it possible to have cracking

Page 113

1  without vote dilution?
2    A.  I don't think you would call it
3  cracking.  I mean, it is possible to split a
4  population without vote dilution, for instance, if
5  that population does not vote cohesively.  But I
6  don't think, in general, people would use the term
7  "cracking" in such an instance.  So I think the
8  weight of the term cracking, as actually employed,
9  is a subcategory of dilutive tactics.
10    Q.  Here, in section 6, did you apply the
11  Gingles analysis to determine whether vote dilution
12  was present?
13    A.  There is no Gingles analysis here.  That
14  is, to be clear, what I mean by that, there is no
15  Gingles 1 which is a demonstrative map that
16  illustrates certain possibilities.  And I did not
17  conduct Gingles 2 and 3, which are analyses of
18  racially polarized voting.
19    Q.  What's the standard of vote dilution or
20  definition of vote dilution that you're applying
21  here in section 6?
22    A.  I will try to quote back what I said a
23  moment ago, but at a minimum it will be a
24  paraphrase.  So I'm examining cracking.  And by
25  "cracking" I mean is a population that could have

29 (Pages 110 - 113)

Moon Duchin , PhD                                July 14, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 114

1  been numerous enough to have electoral opportunity
2  divided in such a way that diminishes their
3  electoral opportunity.
4      Q.  How do you define "electoral
5  opportunity"?
6      A.  So I investigate that further and
7  clarify my working definition in the next section
8  which is called:  "Electoral opportunity for Black
9  voters."  But broadly speaking, it is being arranged
10 across districts in such a way that the groups
11 preferred candidates, or candidates of choice may,
12 with reasonable likelihood, prevail in elections.
13     Q.  Does your definition of "electoral
14 opportunity" require a majority BVAP district?
15     A.  Definitely not.
16     Q.  What BVAP level does your definition of
17 electoral opportunity require?
18     A.  I frequently have written about this.
19 And I emphasize that it is a mistake to connect
20 electoral opportunity with a target percentage of
21 the demographic.  And that is because of voting
22 patterns that sometimes have different levels of
23 support for the Black candidate of choice, for
24 example, among White voters.  So it could easily
25 depend which White voters are in a district, not

Page 115

1  just how many.
2      Q.  So does your definition of electoral
3  opportunity then contemplate crossover voting?
4      A.  Yes.
5      Q.  So you would view a -- would you view a
6  district that is providing an electoral opportunity
7  if the minority group can elect its candidate of
8  choice only in combination with certain White
9  voters?
10     A.  Well, I would like to emphasize that I
11 am -- the terminology that I use overlaps
12 substantially with the terminology used by courts.
13 But I would like to emphasize again, as I said
14 earlier, that I'm resisting making legal
15 conclusions.  And so when I use the term "electoral
16 opportunity" I mean what I said a moment ago, which
17 is the creation of a district in which candidates of
18 choice have a realistic chance of being elected.
19     Q.  Right.  And thank you.  I'm trying to
20 unpack that a little bit because you are using
21 terminology that's similar to court terminology, and
22 I'm trying to understand if there are conceptual
23 differences in how you concede electoral
24 opportunity.  And I don't think I was intending to
25 ask a legal question, so let me try it again.

Page 116

1      A.  Okay.  Good.  Just checking.
2      Q.  Yeah, that's okay.  I think you said --
3  so electoral opportunity for a particular minority
4  group, let's say Black voters in South Carolina, and
5  I think you said that your definition of electoral
6  opportunity contemplates involvement of crossover
7  voting.  Is that right?
8      A.  It allows for the possibility of
9  crossover voting.  To be clear, here, crossover
10 voting means the possibility that both Black voters
11 may not support the general Black candidate of
12 choice and the possibility that non-Black voters
13 may, nonetheless, support the Black candidate of
14 choice.
15     Q.  Thank you.  And the second part of that
16 is what I want to go over for just a second.  So,
17 for example, in your definition does -- a district
18 that has had a BVAP level of 20 percent but an
19 additional 35 percent of the district of White
20 residents vote for the Black preferred candidate,
21 does that district represent an electoral
22 opportunity for the Black voters?
23     A.  I understand your question, I think.  So
24 that is, whether that would count as a district that
25 would be -- sorry, but just -- I'm going to do a

Page 117

1  little bit more of this qualifying language.
2  Whether that would be considered by a court as a
3  remedial district is not a matter I am opining on.
4  But my definition of electoral opportunity has to do
5  with electoral history and, in particular, it has to
6  do with whether identified Black candidates of
7  choice fared well in their elections if you look at
8  the precincts that make up a particular district.
9      So this definition does not have a role
10 for BVAP within it.  It is certainly possible -- if
11 one wants to develop this definition in order to
12 better fit the requirements of a court, it's
13 certainly possible to take the Black population
14 level into account separately, as I have done in
15 some of my published work.  In this report I look
16 only at the electoral history.
17     Q.  Got it.  Okay.  That's helpful.  I want
18 to understand the implications of your definition of
19 electoral opportunity.  Because your definition
20 doesn't examine or require a particular BVAP level,
21 is it possible to have districts that provide an
22 electoral opportunity at, say, a 20 percent BVAP
23 level, not because you're examining that but just
24 because that happens to be an opportunity district,
25 under your definition?

30 (Pages 114 - 117)

Moon Duchin , PhD                           July 14, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 118

1    A.  It's theoretically possible.
2    Q.  And so your definition of "electoral
3  opportunity" is not the Gingles requirements or the
4  Gingles definition of vote dilution under section
5  II.  Is that right?
6    A.  That's right.  This is not intended to
7  be a section II inquiry.
8    Q.  And I think you said that you defined
9  electoral opportunity as an arrangement under which
10  the groups' preferred candidates has, I think, a
11  reasonable opportunity to be elected, is that right,
12  or something along those lines?
13    A.  I think I said a realistic opportunity,
14  but --
15    Q.  Realistic.  Yeah.  And I'm not trying to
16  put words in your mouth.  I want to use your
17  phraseology.  How would you define a "realistic
18  opportunity"?
19    A.  Well, what I have done here is I have
20  taken four elections that were identified as
21  probative by counsel, as I say very clearly in our
22  report, and identified these four Black candidates
23  of choice, Whittenburg, Glenn, Harrison and the
24  Biden/Harris ticket.  And in order to assess whether
25  such a candidate, a similar candidate would have a

Page 119

1  reasonable opportunity to be elected, I look at the
2  major party vote share earned by each of these
3  candidates in the district.  If they won outright,
4  then the district does seem to be effective for
5  candidates like them.
6    I also, in a few places, note where they
7  may not have won outright but got within a 5-point
8  margin, and I see those as ones in which a similar
9  candidate might have a realistic.
10    Opportunity.  But one thing I will add
11  to that, just to give context, is I don't mean for
12  that 5-point margin to be, you know, a bright line
13  or anything very formal.  It is intended to give
14  evidence that the candidate was in contention.
15    Q.  So you believe that, just so I
16  understand, not as a bright line, but the
17  5 percent -- the 5-point margin defines whether
18  there is a realistic opportunity or not?
19    A.  No, I don't propose it as a definition,
20  just as an indication.
21    Q.  How does a map drawer know whether the
22  map he or she has drawn provides a realistic
23  opportunity, under your definition?
24    A.  Well, my specific definition, which
25  involves using these four particular elections -- I

Page 120

1  don't know that anyone else would have constructed
2  the definition in exactly the same way, but I think
3  this kind of analysis, which sometimes goes by the
4  name of "reinstituted election analysis," is
5  entirely standard in the field.
6    Q.  Let's take it away from South Carolina
7  for a moment.  Reconstituted election analysis, you
8  say is common in other places or as a general matter
9  in redistricting or other voting rights analysis.
10  Is that right?
11    A.  That's right.
12    Q.  And within that reconstituted election
13  analysis is there a definition or a standard to
14  determine realistic opportunity for a group to elect
15  its preferred candidate?
16    A.  I don't think that I have encountered
17  any proposed bright line.  I will add to that that
18  there are very few bright lines in this business,
19  although one of them is present in Gingles 1, thanks
20  to Bartlett v Strickland, in which 50 percent was
21  clarified as a kind of fundamental level at which
22  there is a meaningful shift in the finding.  This
23  is, again, not a section II analysis.
24    Q.  Are you aware of any academic
25  literature, peer-reviewed literature that has

Page 121

1  adopted or discussed your definition of electoral
2  opportunity?
3    A.  Yes.  The idea that electoral
4  opportunity can be gauged by selecting probative
5  elections and doing -- I don't personally love the
6  term "reconstituted," but I recognize that others
7  use that term.  So reconstituted election analysis
8  on probative elections, yes, absolutely, that's
9  throughout the peer-reviewed literature.
10    Q.  Well, what about this concept of
11  realistic possibility, I think is what you said, is
12  that --
13    A.  I think people discuss realistic
14  opportunity throughout the peer-reviewed literature.
15  And just to give you some other phrases that are
16  sometimes used in connection with that concept, in
17  the law, the suggestion that groups should have to,
18  so-called, pull, haul and trade in order to get
19  their preferred candidates elected, that's a phrase
20  that you hear echoed many times.
21    The idea that candidates might get close
22  and that would give an indication they could have
23  prevailed, that is, again, a really widespread
24  notion in both litigation and in the peer-reviewed
25  literature.

31 (Pages 118 - 121)

Moon Duchin , PhD                                    July 14, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 122

1        And in my own writing I have frequently
2   talked about the relevance of candidates having been
3   close to a majority of the two-way vote. I can cite
4   several papers where I have written about that.
5        Q. I'm trying to understand this in a
6   little bit more practical terms. If I were advising
7   a map drawer to draw maps that have realistic
8   possibility or probability of election in order to
9   guarantee electoral opportunity, what would I tell
10  map the drawer to do?
11       A. Well, I think that's not a cut-and-dried
12  question. And I could certainly imagine telling a
13  map drawer to draw districts where previous
14  candidates would have prevailed. I can imagine
15  telling a map drawer to draw districts where they
16  would have prevailed comfortably, or I could imagine
17  instructing a map drawer to draw districts where
18  they would have been close. All of those seem like
19  reasonable sets of instructions.
20       Q. But under your definition it's not
21  necessary to draw a district in which the
22  minority-preferred candidate necessarily will
23  prevail.
24       A. Necessarily will prevail, definitely
25  not. I don't even think that's possible.

Page 123

1        Q. You don't think there are districts in
2   which a minority candidate necessarily will prevail?
3        A. In the business of voting, I don't mean
4   this glibly at all, but almost nothing is
5   guaranteed. So you can draw very high-probability
6   districts, but I think certainty is illusive when it
7   comes to voting.
8        Q. Okay. Well, what about District 6 in
9   South Carolina, is that a high probability? How
10  would you define the probability of Congressman
11  Clyburn prevailing in District 6?
12       A. Well, I frequently say that I'm not in
13  the business of making election predictions. I do a
14  lot of modeling, and I would describe that as a
15  district that looks effective from the point of view
16  of the analysis presented here. It looks quite
17  effective.
18       Q. To your knowledge, has any court adopted
19  your definition of "electoral opportunity"?
20       A. Yes. I would say broadly. I mean, of
21  course, no court has adopted a definition that takes
22  these four particular elections. And so when you
23  say "your definition," there is room for a range of
24  specificity. But I think, to a reasonable degree of
25  specificity, yes, I'm describing something entirely

Page 124

1   standard.
2        Q. And this section is titled: "Vote
3   dilution."
4        A. Section 7?
5        Q. Section 6. I'm sorry. Section 6 on the
6   screen here, which is on page 22.
7        A. Yes. It's "Vote dilution compared to
8   the neutral baseline."
9        Q. And I may have already asked this, but
10  I'm not sure I'm clear on the answer. How do you
11  define "vote dilution"?
12       A. I haven't offered a definition of vote
13  dilution, you know, in its entirety, but I have
14  discussed a variety of vote dilution, which is
15  called "cracking." And I can redefine that, but I
16  think I have tried already twice to give a
17  definition of cracking. And that's what I mean here
18  as an instance of vote dilution. So when I say,
19  "Vote dilution compared to the neutral baseline," I
20  could equally have titled this section "Cracking
21  compared to the neutral baseline."
22       Q. What is the neutral baseline you used
23  here in section 6?
24       A. Okay. I used Python tools to build what
25  I call ensembles, which are just collections of

Page 125

1   alternative districting plans that operationalize
2   the rules as I understand them.
3        Q. Has the ensemble method been accepted by
4   any court in a racial gerrymandering case?
5        A. I could not answer authoritatively
6   whether any court has accepted ensembles in a racial
7   gerrymandering context, but I have been involved, as
8   I mentioned before, in numerous cases in the cycle
9   in which ensemble evidence was used, including in a
10  racial fairness context.
11       Q. So as I understand the ensemble method,
12  you program an algorithm to consider certain rules,
13  and then the algorithm generates plans based upon
14  those rules. Is that right?
15       A. Yes, that's right, broadly.
16       Q. Okay. I would like to understand a
17  little bit better what you program the algorithm to
18  do.
19       A. Yes.
20       Q. So I think we are on page 22 here.
21       A. Sure.
22       Q. First you say: "Population balance and
23  contiguity are enforced throughout the algorithm?"
24       A. Yes.
25       Q. What standard of population balance did

32 (Pages 122 - 125)

Moon Duchin , PhD                                July 14, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 126

1  you use?
2      A.  This is described in a bit more detail
3  on page 29 where I explain that I compared runs with
4  a population deviation of 2 percent, 1 percent and
5  half a percent.  There is a supplementary kind of
6  analysis that helps to increase my confidence that
7  the population balance enforced by the algorithm is
8  appropriate to the problem at hand, and that is to
9  experiment with tuning those plans from the ensemble
10  to one-person deviation.  So should I describe that?
11      Q.  Please.
12      A.  I don't want to give any more details
13  than you want, because I know I can get away into
14  the weeds on this.
15      Q.  Please go ahead.
16      A.  Sure.  Okay.  So I have two kinds of
17  tuning protocols that I use to convince myself that
18  in a particular redistricting setting a 1 percent,
19  say, deviation is adequate to understand
20  Congressional redistricting in which, as we have
21  already discussed, the usual standard for adoption
22  is a one-person deviation.
23          So I have done -- I routinely do two
24  kinds of analysis, and did try them here in South
25  Carolina, and those are to run an auto-tuning

Page 127

1  algorithm that swaps blocks at a small level until
2  the population is tuned to one person, and to have a
3  human, in this case me, hand-tune the maps to a
4  one-person deviation.  And the purpose of those
5  tuning experiments is to boost my confidence that
6  1 percent maps can quickly be tuned to one person
7  without breaking any of their metric properties.
8  That is the kind of justification that is properly
9  done, in my view, to build ensembles at something
10  like 1 percent deviation and to have a high
11  confidence that they will be relevant to one-person
12  redistricting requirements.
13      Q.  I would like to turn back now to page 22
14  and carry it over -- you mention several
15  ensembles of 100,000 alternative plans each.
16      A.  Yes.
17      Q.  Were any of those plans drawn to a
18  one-person, top-to-bottom deviation?
19      A.  I can't say whether that occurred in the
20  1 percent ensembles, but I can say that I
21  experimented with tuning selected plans from the
22  ensembles and always found it to be quickly tunable
23  to one person without breaking the other relevant
24  properties.
25      Q.  And with respect to -- just so I

Page 128

1  understand, these 100,000 alternative plans each, or
2  however many the total number was, were drawn with a
3  population deviation as great as 2 percent.  Is that
4  right?
5      A.  The ones that appear in the figures are
6  drawn with 1 percent.  That's right.
7      Q.  And by "the figures," do you mean, for
8  example, Figure 10 here on page 23?
9      A.  There are exactly three figures that use
10  ensembles, and those are Figures 10, 11 and 12.
11      Q.  All right.  Now back to page 22, I think
12  you said the ensemble method is implemented with a
13  presence for compactness --
14      A.  That's right.
15      Q.  -- for the preservation of counties and
16  municipalities.
17      A.  That's right.
18      Q.  Can you tell me what you did to program
19  these preferences in the algorithm?
20      A.  I certainly can.  And here you should
21  give me guidance as to the detail level that you
22  like because, to me, this is a really fascinating
23  research area.  So I will try first with a high
24  level of generality, and then just tell me how
25  specific you would like to get.

Page 129

1          Okay.  The ensemble method here is
2  conducted with what's called a "Markov chain."  And
3  Markov chains are sequences of random
4  transformations.  In this case, an innovation that
5  my research group has introduced into the field of
6  computational redistricting is the use of what are
7  called "spanning trees."  Spanning trees.  And the
8  process of moving from plan to plan is to fuse two
9  districts, select a random spanning tree, cut that
10  tree and that produces two new districts.  That
11  process has been analyzed in multiple peer-reviewed
12  papers as one that promotes compactness.  And the
13  way that it does that is to up-weight -- so all of
14  these Markov chain methods employ randomness.  And
15  that means they are probabilistic.  These methods
16  put a much higher probability on selecting a plan
17  that is more compact in a metric that relates
18  closely to the block cut edges metric that was
19  discussed earlier.  So it is not certain that you
20  will choose a compact plan, but it is far more
21  likely that you will choose a more compact plan.
22  And, in fact, how much more likely it is is in
23  proportion to that compactness.  That's how
24  compactness is promoted.  Is that the right level of
25  detail?

33 (Pages 126 - 129)

Moon Duchin , PhD                                July 14, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 130

1    Q.  That's fine.
2         How about preservation of counties and
3    municipalities?
4    A.  That's done differently.  And this is
5    also something that I think is quite conceptually
6    powerful.  Here is how that's done.  So it mentions
7    that when you fuse two districts you then draw, at
8    random, an object called a "spanning tree."  Now,
9    there are several randomized algorithms for choosing
10   spanning trees.  You could choose them uniformly,
11   but an even faster and more efficient thing to do is
12   to put random weights on the edges and then choose a
13   minimum-weight spanning tree.  Sorry to be a math
14   professor, but that's how -- for a moment I will
15   need to do that to explain this properly.  So there
16   is a classic algorithm to do that called "Kruskal's
17   algorithm," which is what we use.
18        What we do to promote the integrity of
19   counties and cities is to put different weights on
20   edges within a county and edges between counties.
21   By putting a higher weight on edges within counties,
22   we tend to probabilistically prioritize trees that
23   stay within the county.  And that means when you cut
24   an edge of the tree it becomes far more likely that
25   counties will be kept together.

Page 131

1         One thing I will add is that our method
2    has a feature that I think is very helpful for
3    problems for applications to redistricting, which is
4    because this is done with a random weight, the
5    importance placed on county preservation can be
6    interpolated between zero and 100 percent.  So if
7    you find that full weight on county preservation
8    goes too far and produces maps that cut way fewer
9    counties than the ones made by people, you can dial
10   down the weight on county preservation in order to
11   be producing maps that are similar to the ones that
12   were made by the decision-makers.
13        In this case of South Carolina, we found
14   that the number of county splits in our ensemble was
15   comparable to some of the better maps made by
16   people.  And that's a way of telling that you
17   haven't overshot the mark.
18   Q.  And that particular conclusion about
19   county splits being comparable to other plans, is
20   that anywhere in your report?
21   A.  That sentence, no.  That's a standard
22   element of the methodology which I described in
23   peer-reviewed articles also.
24   Q.  Just so I understand, when you talk
25   about a preference for compactness and preservation,

Page 132

1    that's a preference with respect to other plans
2    drawn in the ensemble plans.  Is that right?
3    A.  That's right.  You should imagine that
4    there are trillions of possible plans, and each of
5    them is being selected by the algorithm with some
6    probability.  So "preference" means a higher
7    probability weight on plans that are more compact
8    and split fewer counties.
9    Q.  Your next sentence says:  "I performed
10   runs which attempt to prioritize the preservation of
11   certain communities of interest identified in public
12   testimony and runs that did not operationalize the
13   COI concept."  Which communities of interest did you
14   attempt to prioritize?
15   A.  That's precisely the ones shown in
16   Figure 13 on page 30, exactly those.
17   Q.  How did you choose those communities of
18   interest to prioritize?
19   A.  I believe we discussed that at some
20   length before lunch.
21   Q.  Is it the same method?
22   A.  Oh, absolutely.  This is -- the idea
23   here was to make a good-faith effort to complete a
24   thorough review of public testimony, find places
25   frequently mentioned, try to understand the reasons

Page 133

1    people gave for citing these communities, make sure
2    they were in line with reasons named by the State as
3    legitimate, and recognizing this as selective to
4    operationalize this as a working concept.  Let me
5    emphasize, when I say this, I certainly do not
6    represent this as the only way of taking COIs into
7    account.  This is part of a robustness check that I
8    like to perform whenever I do ensemble analysis to
9    show that at least some effort to keep COIs whole
10   wasn't having a wholesale distorting effect on the
11   other measurable properties of the plans.  And I can
12   confirm that it was not.
13        So the idea here is to have this toggle,
14   COI toggle.  Turn it on and there is one particular
15   way.  Turn it off, see if that changes the
16   measurable properties and the plans that are
17   relevant in Figures 10, 11 and 12.  I find that it
18   does not.
19   Q.  And when you say, "did not
20   operationalize the COI concept," for a layperson
21   like me does that mean turning off COI toggle, to
22   borrow your analogy?
23   A.  That's exactly what I mean.
24   Q.  The next sentence says that:  "Ensemble
25   generation made no use of race data."  Does that

34 (Pages 130 - 133)

Moon Duchin , PhD                                July 14, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 134

1  mean that you turned off race data in the ensemble
2  plans or something else?
3      A.   That means that the algorithm does not
4  use the race field.
5          I want to say something that I think is
6  very important for reasoning about ensembles and
7  race, which is, I think that everything else that's
8  in the ensemble has racial factors subtly proxied.
9  For example, the boundaries of counties and
10 municipalities can well have an important racial
11 history.  And I don't mean to deny that at all, only
12 to say that in this collection of ensemble runs the
13 race field and the data was simply not used by the
14 algorithm.
15     Q.   And the rest of that sentence says that
16 the plans are neutral with respect to all other
17 properties except those listed here.  Does that mean
18 the ensemble plans don't consider data on other
19 traditional districting principles or those
20 principles at all?
21     A.   It does mean that.  And it also means
22 something stronger, which is that the -- those of us
23 who study computational redistricting, we think
24 about, as I was referring to earlier, the
25 probability distribution from which we are sampling

Page 135

1  So I'm not only saying that we didn't use a field in
2  the data that has to do with other features, I'm
3  also saying that I can characterize the limiting
4  distribution and it depends only on the named
5  features, the limiting distribution does, which is
6  to say -- well, let me rephrase that in a way that I
7  think is maybe clearer.  If you take two plans and
8  you ask how much more likely is it to see this than
9  this, I can answer that quantitatively.  And I know
10 that it depends only on the things that are
11 described here.
12     Q.   So when the algorithm is drawing the
13 plans in the ensemble approach or in the ensemble
14 plans does it consider preservation of cores?
15     A.   I have done that in some studies.  I did
16 not do that here.
17     Q.   Okay.  And focusing again on what you
18 did here for South Carolina on the Congressional
19 plan, does the algorithm consider VTD splits?
20     A.   Yes.  Because it only builds from whole
21 VTDs.  It does not split any VTDs.
22     Q.   And does it consider partisan
23 performance in any districts?
24     A.   Certainly not.
25     Q.   How about incumbency pairing?

Page 136

1      A.   Can I do that here?  I did look at
2  incumbency in the South Carolina House, but I think
3  for Congress I did not.  Let me look again at the
4  description in appendix A.  I don't see incumbency
5  described.  And that means in this report I did not
6  look at incumbencies.
7      Q.   Section 6.1 is a statewide analysis --
8  or at least it's headed as a statewide analysis.
9  And you say -- and I don't mean to suggest it's not.
10 I'm just trying to be as accurate as you are, which
11 you're setting a high standard.  The first sentence
12 says:  "Using neutral ensembles of districting maps,
13 we can compare the properties of a plan to
14 alternative statewide plans that were made under
15 traditional criteria."  Are these alternative
16 statewide plans that were made under traditional
17 criteria the ensemble plans made with the parameters
18 we have been discussing?
19     A.   Yes, that's right.
20     Q.   Or art they different?  There are not
21 any different set of plans?
22     A.   No.  We just described the comparative.
23     Q.   Okay.  And as I understand what you have
24 shown here, we will move here to District -- maybe
25 to Figure 10, but I think it's also on page 22, what

Page 137

1  you're getting at here is the demographic statistics
2  of the districts with the second highest BVAP.  Is
3  that right?
4      A.   That's correct.  Let me clarify
5  something which I had to refresh myself while I was
6  rereading this report.  In the statewide plot,
7  that's the second highest out of seven.  And in a
8  focused area plot, it's the second highest out of
9  four.
10     Q.   So why choose the second highest
11 district, as opposed to all other districts or some
12 other district?
13     A.   Because, as it says here, the complaint
14 specifically seeks relief for the dilution of Black
15 voters in 1, 2 and 5.  I have included District 6
16 because it connects 1, 2 and 5 geographically, but
17 it is not being challenged or named in the
18 complaint.  That's the district with the highest
19 BVAP, and that's why I looked at the second highest.
20     Q.   And you say, in 6.1 -- I think the third
21 sentence says:  "Cracking would tend to show up as
22 unusual low BVAP in the second-highest district."
23 Is there any peer-reviewed literature to support
24 that statement?
25     A.   Sure.  Let's be clear on the logic of

35 (Pages 134 - 137)

Moon Duchin , PhD                                July 14, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 138

1  that statement.  So let me try to explain the logic
2  of that statement.  So again, with apologies for
3  repetition, cracking is taking population that could
4  have been numerous enough to exert electoral control
5  and distributing it in such a way that it is
6  dispersed and does not -- the population does not
7  have an opportunity for electoral control.
8      So in this context -- and this is
9  context specific, in this context cracking would
10  mean since the highest district is not alleged to be
11  packed or cracked, cracking would mean a depression
12  of BVAP and potentially also crossover votes in the
13  next district which, in this case, is the second
14  highest.  So yes, I think this is totally standard
15  as an understanding of cracking.
16     Q.  And are you aware of any court opinions
17  that adopt that logic when analyzing cracking or
18  vote dilution issues?
19     A.  Sure.  I couldn't name a case on the
20  spot, but again, I really do think this is quite
21  standard that -- to put it -- to phrase it a
22  different way, sometimes there is packing
23  accompanied by cracking, and sometimes there is a
24  district that is not problematic accompanied by
25  cracking.

Page 139

1      Here, the focus on second highest is
2  because we are setting aside District 6.  So the
3  idea then that cracking would show up as unusually
4  low BVAP, completely standard and accepted by
5  courts, in my view.
6     Q.  Let's go to Figure 10, if we can, just
7  for a moment.  It's on the top of page 23.  And this
8  is a histogram.  And I understand that the kind of
9  shaded boxes are a distribution of the ensemble
10  plans.  Is that correct?
11     A.  Exactly.
12     Q.  And here the enacted plan's second
13  highest BVAP district has a BVAP, it appears, of
14  25.4 percent.  Is that right?
15     A.  That's right.  That's what it says in
16  the key.
17     Q.  And do you recall which district that
18  is?
19     A.  We can easily find that out.
20     Q.  Let's go back.  I think it's on page 9
21  of your report -- or page 8 maybe?
22     A.  Let's find it.  25.4, that's District 2.
23  Actually, it's a tie between District 2 and 7.  So
24  in the statewide it could be either.  But in the
25  restriction to Districts 1, 2, 5 and 6 it would be

Page 140

1  District 2.
2     Q.  And back on page 23, if I'm reading this
3  correctly, each of these shaded boxes, does it cover
4  a range of 1 percent BVAP or not necessarily?
5     A.  I do not remember the width of the bins.
6  So it might be 1 percent.  It's certainly in the
7  neighborhood of 1 percent.
8     Q.  Okay.  And you say here that the State's
9  plan is especially low, which I understand to be the
10  25.4 percent number?
11     A.  Yes.  Low in comparison with the
12  histogram.  That's right.
13     Q.  With the histogram.  Right.
14     A.  In fact, it's in the lowest visible bar.
15     Q.  But what is the standard for determining
16  whether a district is especially low?
17     A.  The term "especially" is not meant to be
18  a term of art.  And I think you will find that if
19  you look at the way ensemble evidence has been
20  interpreted, consistently, both researchers and
21  courts have been resistant to specify a cutoff for
22  what an outlier -- of what would constitute an
23  outlier.  But I think being in the lowest visible
24  bar is a very good indication of being especially
25  low.

Page 141

1     Q.  But as you said, there is no specific
2  standard as to what constitutes an outlier.
3  Correct?
4     A.  That's right.  There is no universal
5  standard.
6     Q.  And you say that the most neutral plans
7  are at or near the 30 percent BVAP.  Is that right?
8     A.  Yes, it does say that.
9     Q.  And you're referring to, kind of, the
10  shaded boxes there that more or less anchor around
11  .3?
12     A.  That's right.  Sorry to interrupt.  What
13  you might call the bulk of the ensemble looks to be
14  occurring at 30 percent plus or minus, you know, 5.
15     Q.  Do you happen to know what the average
16  BVAP in the second highest BVAP district in the
17  ensemble plans is?
18     A.  I don't have that number in front of me.
19     Q.  And it looks like the largest tranche is
20  this tallest box here which, as we discussed, may be
21  29 percent to 30 percent, or something in that
22  range, because we don't -- stipulating we don't know
23  what the range is that's being shown by that box.
24     A.  No, I do think it is 1 percent, as you
25  said, because it looks like there are ten histogram

36 (Pages 138 - 141)

Moon Duchin , PhD                                    July 14, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 142

1  bars between 30 and 40 percent.  So I think
2  1 percent is right.
3         You're right that the highest bar is the
4  one from 29 to 30 percent.  But this is important to
5  know if you're working with data of this kind, the
6  location of the highest bar really depends on how
7  fat your bins are.  So if I made the bins half a
8  percent instead of a full percent, we might have a
9  different highest bar.  It's not quite the same as
10 what is sometimes called the "mode" in statistics,
11 the most common value.  This is binned, or
12 aggregated data, and so the identity of the highest
13 bar could change with the width of the bins.
14        Q.  Thank you for that clarification.
15        So Figure 10, it has the line for the
16 enacted plan at 25.4 percent.  And it also shows the
17 Harpootlian and NAACP1.  Is that right?
18        A.  That's right.
19        Q.  And for both of those lines they are
20 higher than that 30 percent range you identified for
21 the neutral plans.  Is that right?
22        A.  Well, I wouldn't call 30 percent a
23 range.  I would say that, you know, 30 percent, plus
24 or minus a few percentage points, is where the bulk
25 of this ensemble is.  And I agree with you that both

Page 143

1  the green and the red line, which represent
2  Harpootlian and NAACP1, are relatively high.  They
3  don't share the property with the enacted plan of
4  being in the most extreme bar that occurred, but
5  they are relatively high.  Agreed.
6         Q.  And is there a reason why Figure 10
7  doesn't have lines for NAACP2 or the League of Women
8  Voters plans?
9         A.  There were eleven plans overall.  And I
10 believe I did generate a picture that had them all
11 and it was quite cluttered, so I chose to focus on a
12 few.
13        Q.  I would like to turn back to page 8 of
14 your report.
15        A.  Sure.
16        Q.  Maybe it's page 9.  I apologize.  And I
17 want to start with the NAACP2 plan.
18        A.  Yes.
19        Q.  What is the BVAP in the second highest
20 BVAP district in that plan?
21        A.  Statewide, it is 25.4.  And let me just
22 say I'm attempting to read numbers live.  I might
23 make mistakes.
24        Q.  That's okay.
25        A.  It looks like NAACP2, the second highest

Page 144

1  statewide is 25.4, just like District 7.  And it may
2  be identical to District 7.  If you focus on
3  Districts 1, 2, 5 and 6, as I do in some parts of
4  the report, then the second highest is 24 percent.
5         Q.  And you said you focused on 1, 2, 5 and
6  6 in the next portion of your report which we will
7  get to, but in the enacted plan what's the BVAP in
8  the second highest BVAP district among those
9  districts?
10        A.  It's still 25.4.
11        Q.  And then the LWV plan statewide, what's
12 the BVAP in the second highest BVAP district in that
13 plan?
14        A.  Statewide, it looks like it's 24.5, but
15 please correct me if I'm misreading.
16        Q.  It looks like 24.5, at least to me, so
17 we will go with that.  So in the LWV plan, the
18 second highest BVAP district has a lower BVAP than
19 the second highest BVAP district in the enacted
20 plan?
21        A.  Yes.
22        Q.  And in the SC-NAACP2 plan, the second
23 highest BVAP district has the same BVAP as the
24 second highest BVAP district in the enacted plan?
25        A.  Correct.

Page 145

1         Q.  So if we return to page 23 on this
2  histogram, the SC-NAACP2 line would be the same as
3  the enacted plan line.  Correct?  It says 25.4
4  percent.
5         A.  You're challenging my memory, but I
6  think that's right.  I think that's right.
7         Q.  And the LWV plan, because it's slightly
8  lower, would be somewhere to the left of that line.
9  Is that correct?
10        A.  24, I think it was.
11        Q.  Yes, 24, as opposed to 25.4.
12        A.  That is definitely to the left.
13        Q.  So in your opinion, are those plans
14 cracked?
15        A.  I don't think that they are.  Although,
16 let me just say, which I think is quite important,
17 the function of this report is not to defend those
18 plans.  But I think that's important to point out.
19 But, you know, the electoral opportunity, I'm not
20 sure whether I evaluated it in those plans.  Oh.  I
21 did.  I see.  I do have an effectiveness by plan
22 table in Table 7, which I assume we will get to
23 shortly.
24        Q.  We will.
25        A.  So it's that they have a low BVAP, but,

37 (Pages 142 - 145)

Moon Duchin , PhD
July 14, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 146

1 as I have emphasized, that you have to understand
2 effectiveness in the context of which Black voters
3 and which non-Black voters are in the districts. I
4 do agree that they have lower or equal BVAP to the
5 enacted plan which is, I think, what you asked.
6     Q. Yeah. And I understood that section 6
7 was an attempt to analyze whether cracking was
8 present. Is that right?
9     A. Yeah, it was an attempt to analyze the
10 distribution of BVAP with respect to the ensemble.
11 So I agree that those plans are pretty low.
12     Q. Would they be especially low?
13     A. Yes, they would be especially low
14 compared to the ensemble. That's correct.
15     Q. And in the ensemble plans, do any of the
16 ensemble plans have a highest BVAP district with a
17 BVAP lower than enacted District 6?
18     A. Oh, boy. A highest BVAP district lower.
19 I don't think I have got that question answered in
20 the report. I think I always look -- I think -- but
21 you can correct me, please, if I am mistaking
22 something, I think I always look at the second
23 highest, and so I don't have that set of numbers in
24 front of me.
25     Q. Okay. And as I understand the way you

Page 147

1 programmed the algorithm, the algorithm did not
2 require that the plan be drawn with a district that
3 has a BVAP as high as enacted District 6, right,
4 because you didn't direct it to consider race at
5 all?
6     A. That's correct.
7     Q. All right. Let's go to the "Focused
8 area" in 6.2.
9     A. Yes.
10     Q. And I just want to confirm that all of
11 the -- the first thing I want to confirm is that the
12 plans you discuss here are ensemble plans from the
13 set of ensemble plans we have already been
14 discussing, subject to the same parameters we have
15 already discussed.
16     A. No. It's a new ensemble, but with the
17 same parameters. The difference is which districts
18 are being scrambled. In the statewide, in 6.1 all
19 seven districts are being scrambled and redrawn. In
20 6.2 the same principles are used, but only four of
21 the districts are being altered.
22     Q. Got it. And those districts are 1, 2, 5
23 and 6. Is that right?
24     A. That's correct.
25     Q. And again, this Figure 11, the

Page 148

1 histogram, is just showing the distribution of those
2 ensemble plans in this kind of bar chart form. Is
3 that right?
4     A. That's right. It's a new set of 100,000
5 plans.
6     Q. And it looks like the majority of
7 ensemble plans in this focused area ensemble have a
8 second highest BVAP district of less than
9 30 percent. Is that right?
10     A. I agree that to my eye it looks like
11 more than half the mass is to the left of
12 30 percent.
13     Q. And these were drawn with the same
14 criteria --
15     A. Yes.
16     Q. -- that we discussed before for the
17 other set of ensemble maps. Is that correct?
18     A. Yes, they were.
19     MR. GORE: So I'm about to move into
20 section 7. We have been going for just about an
21 hour on the nose. Would anybody like to take a
22 break?
23 (Break In Proceedings)
24     MR. GORE: So let's go back on the
25 record.

Page 149

1 BY MR. GORE:
2     Q. Dr. Duchin, did you discuss your
3 testimony or deposition with anyone during the
4 break?
5     A. I did not.
6     Q. I want to ask one more question about
7 section 6 before I move on to section 7.
8     A. Yes.
9     Q. In section 6, back on page 22 you
10 identified some of the other principles that you
11 used to program the algorithm that generated the
12 ensemble map. And you noted a preference for
13 compactness and for the preservation of counties and
14 municipalities.
15     A. Yes.
16     Q. Does your report contain any analysis of
17 how the enacted plan compares to the ensemble plans
18 with respect to those criteria?
19     A. No, it's not in my report, but it could
20 be derived from the outposts.
21     Q. Thank you. All right. Let's move to
22 section 7. We talked a little bit about minority
23 opportunity during your deposition. Do you know how
24 counsel identified these races that are shown here
25 on page 25?

38 (Pages 146 - 149)

Moon Duchin , PhD                                        July 14, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 150

1    A.  My understanding is that they were
2  derived from the expert work of Baodong Liu who was
3  the Gingle -- let's just say the racially polarized
4  voting expert in the case.  I suppose it's not
5  Gingles.  So I think these come from Liu's RPV
6  analysis.
7    Q.  And you didn't conduct any independent
8  RPV analysis.  Correct?
9    A.  I did not in South Carolina, although I
10  frequently do, and I understand the methodology
11  well.
12    Q.  And under Table 6 it says:  "Black
13  candidates of choice were identified in a racially
14  polarized voting analysis provided by counsel."  So
15  what is the racially polarized voting analysis that
16  counsel provided?
17    A.  I see.  The wording in here might be a
18  little bit confusing.  What I was provided with is
19  this list of four races.  It is my understanding
20  that they were extracted from a racially polarized
21  voting analysis, but I did not read Baodong's
22  report.
23    Q.  And you didn't read any other racially
24  polarized voting analysis for this case -- or for
25  this report, anyway?

Page 151

1    A.  I did not.  I took these at face value
2  as the probative elections to consider.
3    Q.  And are any of these congressional
4  elections?
5    A.  No.  These are all statewide elections,
6  which is important for an ensemble analysis.
7    Q.  And, generally, these would be exogenous
8  elections when analyzing congressional results.  Is
9  that right?
10    A.  Correct.  That term usually means they
11  are from a different contest.  And these being
12  statewide races are exogenous for Congressional
13  analysis.
14    Q.  Was the Black candidate of choice in
15  each of these elections a Democrat?
16    A.  Yes, that's my understanding.
17    Q.  And so if we look down to Table 7, is
18  another way to look at your charts is how often the
19  democratic candidate won.  Correct?
20    A.  Well, these democratic candidates.  By
21  contrast, in Figure 12, I compared these candidates
22  to the other democratic candidates.
23    Q.  Certainly.  We will go get to Figure 12.
24  For now I'm just asking about Table 7.
25    A.  Right.  I was attempting to answer that

Page 152

1  in saying that Table 7 shouldn't be interpreted as
2  democratic performance because it's the performance
3  of these four particular Democrats.
4    Q.  Certainly.  And are these four
5  candidates the only Black candidates of choice in
6  South Carolina electoral history?
7    A.  No, they are not.
8    Q.  Okay.  So you have four elections.  And
9  you have identified -- or had identified for you
10  four Black candidates of choice.  And in each of
11  those four elections those candidates are Democrats.
12  Right?
13    A.  Yes, these were four or five.  I mean,
14  Joe Biden and Kamala Harris being on one ticket but
15  different people.
16    Q.  So maybe we will refer to them as
17  tickets, just to be precise.  Table 7 records the
18  number of times any of these candidates won in each
19  district in each of the plans listed here.  Correct?
20    A.  Right.  And just to be perfectly clear,
21  one means that they had more votes than their major
22  party opponent, in this case a Republican.  So it
23  does not take third-party votes into account.  So
24  it's the plurality winner, essentially.
25    Q.  Thank you.  And thank you for that

Page 153

1  clarification.  So each of these quote/unquote wins
2  is the Black preferred candidate, who is also a
3  democrat, prevailing in the two-party vote.  Is that
4  correct?
5    A.  That is correct.
6    Q.  So take the enacted plan, for example,
7  it lists four wins in District 6.
8    A.  Yes.
9    Q.  And each of those wins is for a Black
10  preferred candidate.  Correct?
11    A.  Yes.
12    Q.  And each is also for a Democrat.
13  Correct?
14    A.  Yes.
15    Q.  And in your experience have you ever
16  seen a case or scenario where the Black preferred
17  candidate was not a democrat?
18    A.  I'm thinking.  In a recent electoral
19  history in statewide elections, that is in elections
20  with a party ID, at the moment Black preferred
21  candidates do strongly tend to be Democrats
22  nationwide.  That's not necessarily true for other
23  minority groups.  Are there exceptions?  Well, it is
24  definitely the case that ecological inference
25  methods, which are usually what underpin RPV

39 (Pages 150 - 153)

Moon Duchin , PhD                                July 14, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 154

1  analysis, show areas of the country in which Black
2  voters have preferred Republicans at times.  But in
3  the studies that I personally have conducted I have
4  not seen that, at least with any frequency.
5      Q.  And so according to Table 7, enacted
6  2022 and previous 2012 which I have been calling the
7  benchmark plan, each have four wins in District 6.
8  Right?
9      A.  That's correct.
10      Q.  And I'm going to flip back to page 24 --
11  23 and 24.  You identified an alternative districts
12  plan here.
13      A.  Yes.
14      Q.  And do you know how many wins these
15  districts generated?
16      A.  I do.  It's described in the footnote.
17      Q.  I see it.  Okay.
18      A.  And the footnote says that the candidate
19  of choice won outright in one of the four contests
20  and received at least 47.5 percent of the vote; i.e.
21  they were in that 5 percent margin in the other
22  three.
23      Q.  So that would be a total of five wins.
24  Is that right?
25      A.  Out of four?  No.

Page 155

1      Q.  If we were to -- if that had been -- if
2  that plan had been listed here on Table 7, how many
3  wins would we be talking about?
4      A.  Yes, I agree, in this table that would
5  show up as a 5.
6      Q.  I was making an assumption, because I
7  believe in the alternative plan that we are talking
8  about District 6 is either identical or
9  substantially similar to enacted District 6.  Is
10  that right?
11      A.  It's virtually identical.
12      Q.  Okay.  So I was drawing the assumption
13  that that counted for four wins right there.
14      A.  Yes.  You are correct.
15      Q.  And you say there is one more in
16  District 5, for a total of five.
17      A.  Agreed.
18      Q.  And I want to go back to that footnote
19  8, last sentence where you say:  "That performance
20  corroborates the claim that this is a strengthened
21  district for Black voters, and one in which a
22  candidate would likely have to campaign in a way
23  that led to some Black support in order to prevail."
24  What analysis did you do to support this statement?
25      A.  It's supported by the previous sentence.

Page 156

1  So, in other words, the fact that it strengthened is
2  because the percentages for the Black candidates of
3  choice are higher.  That is the basis of the claim
4  that it strengthened.  And the fact that -- sorry.
5  Which candidate would likely have to campaign in a
6  way that led to some Black support in order to
7  prevail, right.  So I see that those high
8  percentages tell me the Black supporters have
9  considerable electoral influence, which is what
10  supports the statement that candidates would need
11  some Black support in order to prevail.
12      Q.  Do you know what the BVAP is in this
13  alternative CD 5?
14      A.  Good question.  Let's see if I recorded
15  it.  Yes.  It seems to be 30.3 percent.  I think
16  that is what -- yeah, I think that is the correct
17  way to understand the Figure -- the histogram in
18  Figure 11.
19      Q.  So a candidate could prevail in that
20  district without a single Black vote.  Correct?
21      A.  A candidate -- theoretically, for sure.
22  But under the electoral numbers that I saw in the
23  election history, I consider that to be quite
24  unlikely.
25      Q.  Why did you consider that to be

Page 157

1  unlikely?
2      A.  Because the combination, as we keep
3  discussing, of the votes of Black voters and of the
4  crossover votes that align with Black voters is very
5  strong in this district.
6      Q.  I guess I'm confused.  How does that
7  square with the statement that the -- the
8  assumption that voting in these elections was
9  racially polarized?
10      A.  You mean how is it possible to have
11  racial polarization and also have crossover support
12  for Black candidates of choice?  Is that the
13  question?
14      Q.  Sure.
15      A.  Oh, sure.  For example, you could
16  imagine a scenario where 75 percent of non-Black
17  voters do not support the Black candidate of choice.
18  That would be considered racially polarized
19  frequently by standards that I have seen in court.
20  But that still leaves 25 percent of the non-Black
21  electorate that can cross over and align with the
22  candidate of choice.  And depending on how you draw
23  your district, you might capture just such voters,
24  crossover voters.  Does that answer your question?
25      Q.  Thank you.  Yes.

40 (Pages 154 - 157)

Moon Duchin , PhD                                July 14, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 158

1    So back to footnote 8 on page 23, other
2 than looking at the results of these four elections,
3 did you do any analysis to determine whether a
4 candidate would likely have to campaign in a way
5 that led to some Black support in order to prevail?
6    A.  I'm sorry.  I didn't mean to give you
7 the impression that there was any additional
8 analysis.  That last sentence is my interpretation
9 of the consequence of the previous sentence.  I
10 don't represent any further research supporting
11 that.
12    Q.  Thank you.  All right.  Let's go back
13 then to Table 7.
14    A.  Yes.
15    Q.  Do you happen to know what percentage
16 the vote -- the Black preferred candidate receives
17 in other districts in the enacted plan outside of
18 District 6?
19    A.  I don't have those numbers in front of
20 me.  I did look at those when I was doing the
21 analysis that led to writing this section, but I
22 don't have those numbers in front of me.
23    Q.  And correct me if I'm wrong, but I don't
24 believe those numbers are in your report.
25    A.  No.  That's correct, they are not.

Page 159

1    Q.  All right.  So let's look at this.  So
2 the Harpootlian plan in District 1 generates two
3 wins for the Black preferred candidate.  Is that
4 right?
5    A.  That's right.
6    Q.  Who also happens to be a Democrat.  Is
7 that right?
8    A.  Yes.  And these Black preferred
9 candidates are all Democrats.
10    Q.  I want to go back to page -- and then
11 the Harpootlian plan does not generate any other
12 wins for Black preferred candidates in any other
13 districts.  Correct?
14    A.  That's right.  Although, again, this
15 table doesn't show you instances of getting close
16 but it just shows you whether you cross the line to
17 having plurality support.  You're right.  There are
18 no other instances of plurality support.
19    Q.  So let's go back to page 9, if we might.
20    A.  We might.
21    Q.  And in the Harpootlian plan, what is the
22 BVAP of District 1?
23    A.  21.2 percent.
24    Q.  So for the Black preferred candidate to
25 prevail in a 21.2 percent BVAP district, that means

Page 160

1 there is significant crossover voting in that
2 district.  Correct?
3    A.  Yes.
4    Q.  So to get to a plurality, would the
5 Black preferred candidate need more votes from White
6 voters than that candidate receives from Black
7 voters?
8    A.  It depends on who votes.  It doesn't
9 follow from these numbers.
10    Q.  But it is possible, right, depending on
11 turnout and electoral behavior and things like that?
12    A.  It's possible.  I mean, turnout is far
13 from 100 percent of voting age population, so many
14 things are possible.  It's hard to say who turns
15 out.  It's a general problem facing election
16 analysis.
17    Q.  And can turnout vary by race?
18    A.  Yes, it can.  There is an excellent book
19 on that by Bernard Fraga, F-R-A-G-A.
20    Q.  And this District 1 with 21.2 percent
21 BVAP, that's not the second highest BVAP district in
22 the Harpootlian plan we discussed in section 6.
23 Right?
24    A.  That's right.  It looks like District 5
25 is the second highest.

Page 161

1    Q.  And 21.2 percent BVAP district in
2 District 1 in the Harpootlian plan also has a lower
3 BVAP than the second highest BVAP district in the
4 enacted plan.  Right?
5    A.  Sorry.  Let me unpack that.  You're
6 asking if the 21.2 is higher -- is lower than the
7 second higher.
8    Q.  Yes.  Is 21.2 lower than 25.4?
9    A.  Definitely.  I do answer that.
10    Q.  That will make it easier.  Sorry.  It's
11 hard to describe some of this shorthand.
12    A.  Yes.
13    Q.  And so according to Table 7, the
14 Harpootlian plan performs for the minority preferred
15 candidate in District 1 with 21.2 percent BVAP, but
16 not in District 5 with 33.7 percent BVAP.  Is that
17 right?
18    A.  Well, let's be clear.  The term
19 "performs" is not 100 percent clear, or I don't
20 think is language that I use, but of these Black
21 candidates of choice there are two wins in District
22 1 in the Harpootlian plan and no wins in District 5,
23 despite the fact that 5 has higher BVAP.  I think
24 that was the essence of the question.  Right?
25    Q.  That is the essence of the question.  So

41 (Pages 158 - 161)

Moon Duchin , PhD                    July 14, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 162

1  District 5 has maybe 12-and-a-half-percent higher
2  BVAP than District 1. And in District 5 there are
3  zero wins for those four candidates and in District
4  1 there are two wins for those four candidates.
5  Right?
6      A. Right. I think this completely supports
7  the point discussed earlier, that BVAP is an
8  imperfect proxy for electoral opportunity.
9      Q. And does it also support the point that
10 what is driving wins for Black preferred candidates
11 is the presence or absence of White crossover
12 voting?
13     A. I wouldn't say that drives. I would say
14 it contributes.
15     Q. And you would say that it's a
16 significant factor. Right?
17     A. That White crossover voting is a
18 significant factor in outcomes?
19     Q. Yes.
20     A. No question, yes, it certainly is.
21     Q. And how significant a factor is it?
22     A. Could you maybe rephrase the question?
23     Q. Probably not. That was my
24 characterization, significant factor. And so maybe
25 we can just leave it at that --

Page 163

1      A. I agree with significant factor.
2      Q. -- that you agree with the significant
3  factor.
4      A. (Witness nods head).
5      Q. And do you happen to know where, in
6  South Carolina, White Democrats live?
7      A. Well, first I would say that I resist
8  characterizing people -- people as either Democrats
9  or Republicans because, for example, I live in a
10 state where people vote one way for Senate and
11 wildly differently for governor. And so party
12 affiliations are not immutable. But I have looked
13 at where, in the State, it's possible to find
14 historically effective districts, in the sense that
15 I discuss here in section 7, that are affected
16 despite a relatively low BVAP. I have seen places
17 in the State, especially near Charleston and
18 Columbia, where there are significant historical
19 levels of crossover support.
20     Q. And is it accurate to say, at least in
21 South Carolina, that those areas of crossover
22 support and crossover opportunity are concentrated
23 in particular areas of the State, as opposed to
24 being diffused evenly across the state?
25     A. I would really have to do an analysis

Page 164

1  directed at that question before I would feel
2  comfortable characterizing the geography of
3  crossover support.
4      Q. And you have identified Charleston and
5  Columbia as places where there is significant
6  crossover support in South Carolina. Correct?
7      A. I have noticed those trends in those
8  areas, but again, I did not do, you know, a primary
9  analysis to address that question and so I want to
10 be careful not to overstate.
11     Q. And thank you for that clarification.
12         In addition to Charleston and Columbia
13 are there any others that come to mind?
14     A. No, there aren't, but the fact that
15 nothing comes to mind shouldn't be taken to say that
16 there aren't other areas. I just didn't put primary
17 attention towards that question.
18     Q. Let's return to page --
19     A. Table 7.
20     Q. It's page 25. Can you see it on my
21 screen, by the way?
22     A. Yes, I can.
23     Q. Make sure that's clear for the record.
24         So let's look at the League of Women
25 Voters plan which is right below the Harpootlian

Page 165

1  plan.
2      A. Yes.
3      Q. It has an effectiveness total of 6,
4  which includes two wins in District 1, four wins in
5  District 6 and no wins in any other district. Is
6  that right?
7      A. That's right.
8      Q. And so if we return to page 9 and look
9  at the BVAP in the LWV districts, it looks like it's
10 23.3 percent in District 1.
11     A. Agreed.
12     Q. And that's lower than the 24.4 in
13 District 5 and the 24.5 in District 7. Correct?
14     A. That's right.
15     Q. And so in the LWV plan, District 1 is
16 not the second highest BVAP district. Is that
17 right?
18     A. That's right.
19     Q. And the 23.3 percent is also lower than
20 the 25.4 percent in enacted 2 and 7. Correct?
21     A. Again? Sorry.
22     Q. No problem. The 23.3 percent BVAP in
23 LWV District 1 is lower than the 25.4 percent BVAP
24 in enacted 2 and enacted 7. Correct?
25     A. That's correct.

42 (Pages 162 - 165)

Moon Duchin , PhD                                July 14, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 166

1    Q.   And then if we return to page 25, let's
2  look at the SC-NAACP2 plan.  It has effectiveness of
3  eight out of 28.  Four wins in District 1, two in --
4  I'm sorry.  And four in District 6.  Sorry.  I
5  started reading the wrong line.
6    A.   That's all right.
7    Q.   And none in any other district.
8    A.   Correct.
9    Q.   And if we go back to page 9, the BVAP in
10 SC-NAACP2, District 1, is 24 percent.
11   A.   It is.
12   Q.   And that's lower than 25.4 percent in
13 District 7.
14   A.   Yes.
15   Q.   So it's also not the second-highest BVAP
16 district in that plan.
17   A.   That's right.  Would it be okay to
18 summarize and say that it's frequently the case that
19 District 1 performs well in effectiveness despite a
20 lower BVAP than other nonperforming districts?
21   Q.   Yes, that would be fair.  And my
22 follow-up question is in Charleston -- and is that
23 because of portions of Charleston that are included
24 in District 1 where there is crossover voting?
25   A.   It's possible that those phenomena are

Page 167

1  localized to Charleston.  But what is clear is that,
2  overall, the district contains a population that due
3  to its voting behavior and including turnout it
4  overperforms what you might have supposed from its
5  BVAP alone.
6    Q.   When you were analyzing cracking and
7  vote dilution in section 6 of your report, you
8  focused on the second highest BVAP district.
9  Correct?
10   A.   That's right.
11   Q.   And in the Harpootlian, LWV and
12 SC-NAACP2 plans here in Table 7, the district that
13 you determine is effective is not the second highest
14 BVAP plan.  Correct?
15   A.   Absolutely agreed.
16   Q.   So what does section 6 tell us about
17 vote dilution?
18   A.   Good.  Well, I'm glad you asked.  So I
19 think what it tells us is about what is being
20 constructed across the districts around the state
21 and so, in particular, as we understand well, from
22 our study of voting patterns, there are some areas
23 with higher crossover support and some areas with
24 lower crossover support.  You would never -- I think
25 a reasonable practitioner would never expect a BVAP

Page 168

1  to stand alone as explanatory of performance.  And I
2  always, in my ratings, resist using BVAP alone as a
3  proxy for performance.  This is why I like to use
4  electoral history.  But it is a piece of the puzzle.
5    A high BVAP correlates well with the
6  presence of opportunity in areas with especially
7  high polarization, and so targeting a depressed BVAP
8  in Districts 7 and 2 relative to the neutral
9  baseline is ensuring a reduced electoral opportunity
10 in those areas.  Now, let me be clear, there are
11 parts of the State, as we have just reviewed, where
12 you can overperform your BVAP.  But I haven't seen
13 evidence that it's possible in the parts of the
14 State touched by, for example, District 2 to find a
15 creative configuration that would allow 25 percent
16 BVAP to coexist with meaningful electoral
17 opportunity.
18   So let me summarize all of what I just
19 said.  Hitting a certain target level for BVAP is
20 neither necessary nor sufficient for electoral
21 opportunity.  You have to do both kinds of analysis.
22 But looking at BVAP targeting can give us strong
23 evidence of racial predominance over other
24 considerations, and that's why I offer that as an
25 element of the analysis but not one that is meant to

Page 169

1  be taken in a vacuum of electoral history.
2    Q.   Thank you for that explanation.
3    Let's take enacted District 1 as an
4  example.  So enacted District 1 does not perform for
5  the Black candidate of choice.  Is that correct?  Or
6  it doesn't result in any wins for the Black
7  candidate of choice in those four elections.
8  Correct?
9    A.   That's right.
10   Q.   And so that means it also doesn't result
11 in any wins for the crossover voters' candidate of
12 choice.  Correct?
13   A.   The crossover voters' candidate of
14 choice, that's not a construction that I have heard,
15 but I think what you mean by that is there are,
16 let's say, White voters who support the Black
17 candidate of choice and they also do not see their
18 chosen candidate prevail.  Is that --
19   Q.   That's exactly what I mean.
20   A.   True.
21   Q.   And, in fact, in enacted District 1, for
22 voters who voted for the democratic candidate, their
23 candidate of choice is not winning either.  Right?
24   A.   So I think -- let me try to separate out
25 the phrase "candidate of choice" because that is a

43 (Pages 166 - 169)

Moon Duchin , PhD                                    July 14, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 170

1    little bit of a term of art, as I understand it, at
2    least in my areas of expertise.  So "candidate of
3    choice" is the overall preference of a racial,
4    ethnic or language group.  I don't think it just
5    means the candidate that you voted for.  Right?  And
6    so White voters' candidate of choice in South
7    Carolina is, to my understanding, always the
8    Republican in a party ID contest.  But having said
9    that, just to set out the terms of discussion,
10   you're asking, I think, if White voters who voted
11   for the Democrat can prevail in a district in which
12   the Republican always wins.  Am I understanding --
13        Q.  Go ahead and answer that.  Yeah.
14        A.  If you're a White voter who voted for a
15   Democrat but your district always goes Republican,
16   then your favorite candidate is not being elected.
17        Q.  And so the way you describe that is the
18   candidate of choice or candidate for whom they
19   voted, that candidate is not prevailing.
20        A.  Right.  Any voter who voted for a
21   Democrat is not seeing their preferred candidate
22   elected in a district that always elects
23   Republicans.
24        Q.  And that's true, regardless of the race
25   of that voter.  Correct?

Page 171

1        A.  That has nothing to do with the race of
2    the voter.  I agree.
3        Q.  Let's move to page 26, Figure 12.  And
4    it looks like this top chart in 12 -- or this top
5    histogram, to be more precise, is a histogram of
6    Table 7.  Is that right?
7        A.  That's right.  It shows, I hope, if I
8    don't have any typos, the numbers that you see in
9    the key should match the total effectiveness numbers
10   in the table.
11        Q.  And this bottom chart is a histogram
12   that shows other Democratic -- outcomes for other
13   Democratic candidates in 63 other races.  Is that
14   right?
15        A.  It is --
16        Q.  Or perhaps it's nine races disaggregated
17   over or reconstituted over seven districts.
18        A.  We were just rushing to agree with each
19   other.  It is nine contests times seven districts.
20        Q.  So this is nine statewide races.
21        A.  Correct.
22        Q.  Reconstituted in the seven districts in
23   each of the plans.
24        A.  That's right.
25        Q.  And the total numbers are the number of

Page 172

1    instances in which the Democratic candidate won.  Is
2    that right?
3        A.  Yes.
4        Q.  And if we go to page 27, it looks like
5    these elections are listed on page 27.
6        A.  Let's see.
7        Q.  In the second full paragraph which
8    starts "This finding"?
9        A.  That's right.  Seven more general
10   elections are evaluated, and I list them.
11        Q.  And do you know whether racially
12   polarized voting was present in any of those
13   elections?
14        A.  I don't know.  I have not read any
15   report on that matter, but I think it is general
16   common knowledge that statewide elections in the
17   last ten years in South Carolina tend to be racially
18   polarized.
19        Q.  And if we go back to the bottom
20   histogram of Figure 12, it looks like both the
21   previous and the enacted plans perform -- or
22   generate eight wins for the Democrats.  Is that
23   right?
24        A.  That's right.
25        Q.  And it's ten in the Harpootlian and LWV

Page 173

1    plans.  Is that right?
2        A.  Yes.
3        Q.  As well as NAACP2?
4        A.  Yes.
5        Q.  So I'm hoping, Doctor, as a
6    mathematician you can help me do a little math here
7    in Figure 12.
8        A.  Here is hoping.
9        Q.  Can you entertain me on that?  At least
10   indulge me on that for a moment?  So it looks like
11   in this top histogram the enacted plan generates 4
12   wins out of 28 races.
13        A.  Yes.
14        Q.  Do you know what percentage 4 out of 28
15   is?  Or can you calculate that?
16        A.  7, I think, is about 14 percent.
17        Q.  And in this bottom chart it's 8 out of
18   63.
19        A.  Right.
20        Q.  And do you know what that percentage is?
21        A.  Well, let's see.  8 out 64 would be an
22   eighth, which is 12 and a half percent, so close to
23   that.
24        Q.  So the enacted plan generates wins about
25   14 percent of the time for the Black preferred

44 (Pages 170 - 173)

3:21-cv-03302-MGL-TJH-RMG    Date Filed 09/02/22    Entry Number 343-2    Page 46 of 141

Moon Duchin , PhD                                    July 14, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 174

1 candidate in the races you examined, and about 12
2 and a half percent of the time, maybe 13 percent of
3 the time for the Democratic candidate in the races
4 you examined.  Is that right?
5     A.  Well, as you have repeatedly noted, the
6 probative elections, those are also Democrats.  So
7 the 12.5 is for the other Democrats, not for -- it's
8 not the union of them all.  It's the complement of
9 them.
10    Q.  Thank you.  For now I'm just trying to
11 compare these two histograms.
12    A.  Yes.
13    Q.  So the four elections that were
14 identified to you as having racially polarized
15 voting with a Black candidate of choice are in the
16 top histogram.
17    A.  That's correct.
18    Q.  And the enacted plan generates wins for
19 that candidate around 14 percent of the time, is
20 that correct, because it 4 out of 28?
21    A.  The only thing I might quibble with is
22 the word "generate," but yes --
23    Q.  Results in.
24    A.  That's right.
25    Q.  Yeah, it's a better term of art.  Maybe

Page 175

1 we will use "results."
2         And then for this second histogram,
3 which is 63 other races -- well, it's nine other
4 races over seven districts, the enacted plan results
5 in wins for the Democratic candidate about 12 and a
6 half or 13 percent of the time.  Is that correct?
7     A.  Yes.
8     Q.  So the enacted plan results in wins for
9 the Black candidate of choice more frequently in
10 that first histogram than for the Democratic
11 candidate in the second histogram.  Correct?
12    A.  Well, let's be clear.  The four
13 candidates fared better statewide than the
14 counterparts in the second histogram.  So their vote
15 pole, statewide, was considerably higher.  So it's
16 not surprising at all.  But actually, I suppose I
17 should let you get to the question.  So it's true
18 that the percentage is higher in the first set.  And
19 then was there a question about that?
20    Q.  I was trying to get a yes or no, but I
21 think you gave it to me.  So you agree the
22 percentage is higher.
23    A.  I do.
24    Q.  Percentage of wins -- resulting wins is
25 higher in the first set than in the second set?

Page 176

1     A.  Yeah.  I would only just remind us all
2 that wins are a function of two inputs, the votes
3 and the plan.  Not the plan alone, not the votes
4 alone, but the combination of the votes and the
5 plan.  So yes, the four candidates have a higher
6 percentage of wins.  They also have a higher
7 percentage of votes.
8     Q.  All right.  Let's turn to page 27.  I
9 just want to make sure I understand some of the
10 phrasing that's being used here.
11    A.  Sure.
12    Q.  The third sentence says:  "Only 12.4
13 percent of maps drawn in a race-neutral fashion, top
14 of Figure 12, have as low an effectiveness score as
15 the state's plan."
16    A.  Yes.
17    Q.  What are being referred to as the maps
18 drawn in a race-neutral fashion?
19    A.  That's the ensemble, which I'm just
20 reminding the reader was drawn in a race-neutral
21 fashion.
22    Q.  And drawn subject to the other
23 considerations and parameters you set in the
24 algorithm.  Right?
25    A.  Yes.

Page 177

1     Q.  And then you say something about --
2 starting with the sentence that starts:  "This
3 shows" -- "This shows many alternatives that were
4 available to the legislature will tend to allow
5 Black voters an opportunity to elect candidates of
6 choice at a level in keeping with the human and
7 political geography of the state."  And my question
8 is, what is the human and political geography of the
9 state being referenced here?
10    A.  Oh, sure.  First, though, because you
11 just read much of that paragraph but skipped a few
12 things, so if you don't mind, I will take a moment
13 to just read it through.
14    Q.  Yes, please.
15    A.  So I what I wrote is:  "Only 12.4
16 percent of maps drawn in a race-neutral fashion,
17 parentheses, top of Figure 12, have as low an
18 effectiveness score as the state's plan when
19 considering the probative elections.  By far the
20 most common outcome for these blindly drawn maps is
21 six wins for the Black candidate of choice, with
22 another significant spike at eight.  This shows that
23 many alternatives" -- and I will add, outside of the
24 voice of the report, this is many thousands of
25 alternatives, "that were available to the

Moon Duchin , PhD                                        July 14, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 178

1  legislature from the NAACP options to the LWV map to
2  the compromise plan represented by the Harpootlian
3  amendment will tend to allow Black voters an
4  opportunity to elect candidates of choice at a level
5  in keeping with the human and political geography of
6  the state."
7       Okay.  So what is meant by that?  So
8  "human geography" is a phrase that means demographic
9  distribution.  That's what human geography means.
10  It means where people live and which people live in
11  which locations.  That's human geography.
12       Political geography is the distribution
13  of votes.  It's how people cast votes and in
14  correspondence with where they live.  So the reason
15  that phrase is being used here is that the function
16  of an ensemble analysis is to take us away from
17  abstract notions like proportionality and have us
18  focus on what districts tend to produce under the
19  realistic geographic conditions of who lives where.
20  So it is often said, by me and others, that
21  ensembles are powerful because they hold constant
22  the human geography.  All ensembles are drawn
23  against the same human geography and the old
24  constant -- the political geography, all ensembles
25  operate against the same pattern of votes.

Page 179

1       So when I say here: "A level in keeping
2  with the human and political geography of the
3  state," what I mean is that the human-drawn maps and
4  the computer-drawn maps are assessed against the
5  same pattern of residential and political
6  distribution.
7       Q.  The next sentence says: "The state's
8  maps from ten years ago and again from this year are
9  the ones that are demonstrably diluted, and as we
10  have seen, they submerge traditional principles in
11  order to secure this outcome."
12       A.  Correct.
13       Q.  What analysis did you do on the State's
14  maps from ten years ago?
15       A.  I think it's featured throughout the
16  report, probably in a dozen or more places.  Should
17  we go through and itemize them?  That's a sincere
18  question.  Tell me what you mean.  It's featured
19  throughout the review of metrics, for example, which
20  is what I'm using to talk about traditional
21  principles, and it's featured in the comparisons
22  that immediately precede that conclusion; namely,
23  it's featured in Figure 12, looking at the
24  effectiveness and probative and other Democratic
25  elections.  So that's the basis of the statement.

Page 180

1       Q.  That's fine.  I was just trying to get
2  the basis of the statement.  And if there is any
3  other analysis -- is there any other analysis that
4  forms the basis of that statement?
5       A.  I would say that the statement is
6  primarily justified by those two factors,
7  traditional principles as they were measured in the
8  metrics and the electoral outcomes as featured in
9  the Figure 12.
10       Q.  So for this sentence is there -- are you
11  offering any support or opinion in support of this
12  statement other than the analysis that's in your
13  reports?
14       A.  No.  It's only the analysis that's in
15  the report.
16       Q.  And you say that the maps from ten years
17  ago and again this year submerged traditional
18  principles in order to secure this outcome?
19       A.  I do.
20       Q.  Can you tell me which traditional
21  principles they submerge?
22       A.  Sure.  If we go back to section 4, the
23  metrics section, I think that, arguably, compactness
24  is sacrificed, political subdivisions are higher
25  than they would be if they were being prioritized

Page 181

1  more.  So that includes city splits, town splits,
2  subdivision splits, county splits.  And all of the
3  more qualitative features that are discussed in
4  section 5, with respect to the enacted plan which
5  have to do with when you split something, how do you
6  split it, those are also at issue.
7       Q.  And all those traditional principles
8  involve tradeoffs with other principles, as we
9  discussed before.  Correct?
10       A.  Always.
11       Q.  So if we go back to page 27 --
12       A.  Yes.
13       Q.  -- how is it that you conclude that a
14  certain performance on traditional principles was
15  done in order to secure the dilution of Black votes
16  or Black voting strength?
17       A.  In other words, just to be sure I
18  understand the question, you're asking could it be a
19  coincidence that the traditional principles -- that
20  the metrics are worse on traditional principles?  Is
21  that the question?
22       Q.  Well, I guess I'm asking -- you said
23  that the -- you pointed to the metrics on additional
24  principles and said they are worse in the enacted
25  plan than in other plans.

46 (Pages 178 - 181)

3:21-cv-03302-MGL-TJH-RMG    Date Filed 09/02/22    Entry Number 343-2    Page 48 of 141

Moon Duchin , PhD                                July 14, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 182

1   A.  Yes.
2   Q.  At least with respect to certain
3   metrics.
4   A.  That's right.
5   Q.  And then I read this sentence to be
6   drawing a straight line between that relative
7   performance on those metrics and a conclusion that
8   that relative performance was undertaken for the
9   purpose of securing the outcome of diluting Black
10  voting strength.  Have I read the sentence
11  correctly?
12  A.  I think I understand what you're asking.
13  So I would say I don't tend to make conclusions like
14  that based on metrics alone.  I try to always do a
15  multifactorial analysis.  And in this case there
16  are -- all the tools that I have used here kind of
17  point in this way.  So there are quantitative tools
18  in the metrics section, there are qualitative tools
19  in the detailed district review.  There is a look at
20  BVAP.  There is a look at electoral performance.
21  These are many different kinds of evidence.  And
22  you're absolutely right that in an analysis like
23  this you can't rule out the presence of other
24  reasons.  That is very difficult to do, in general.
25  All you can do, as I emphasized early on, is to

Page 183

1   marshal evidence in support of a conclusion like
2   this.
3       So I suppose better phrasing might be to
4   say that they submerge traditional principles as
5   though in order to secure this outcome.  Right?
6   What I'm trying to get at is I cannot be sure of all
7   the reasons in play.  All I can know is what's in
8   the public record.  But I find no countervailing
9   explanation in the public record that leads me to
10  doubt the causal relationship that I'm describing
11  here.
12  Q.  And what do you mean by "the public
13  record"?
14  A.  I mean I have described what I examined
15  and it included all the voluminous public testimony,
16  it included published guidelines issued by both the
17  House and the Senate.  And I have not seen
18  explanations in that public record.  You're right,
19  that I should be careful, "public record" could mean
20  any number of things.  And I have already conceded
21  that I did not review all of the legislative record.
22  But the record that I did review, which included the
23  State's Guidelines in two forms and the public
24  testimony as well as my knowledge of the ways that
25  these criteria tend to interact, lead me to this

Page 184

1   conclusion.
2   Q.  Going down to Section 8, the
3   "Conclusion," I think we have covered most of this
4   ground but I just want to confirm my understanding,
5   the first sentence of section 8 says:  "By comparing
6   various plans for South Carolina Congressional
7   districting, I find that the state's plan
8   Enacted2022 expressly contravenes the legislature's
9   own Guidelines, which clearly state" -- and then
10  there is a quote which I won't read, for the benefit
11  of the court reporter.  Am I reading the sentence
12  correctly, if I understand, that the express
13  contravention of the legislature's own guidelines is
14  its contravention, in your judgment, of what's
15  quoted here, which is about minority voting
16  strength?
17  A.  That's right.  And with apologies to the
18  court reporter, just to refresh my memory of my own
19  claim here, that quote is:  "Any proposed
20  redistricting plan that is demonstrated to have the
21  intent or effect of dispersing or concentrating
22  minority population in a manner that prevents
23  minorities from electing their candidates of choice
24  will be neither accepted nor approved."  I do feel
25  that that is expressly contravened by the choice of

Page 185

1   plan among the options that were before the State.
2   Q.  And is it an intent violation?
3   A.  Happily, for me, the quote allows for
4   intent or effect.  Now, the use of ensembles has
5   repeatedly been found to be helpful in discerning
6   likely intent, but it's only evidence.  It's not
7   conclusive.  But I find it to be strong evidence.
8   And the effect, I think, is also clear from this
9   kind of evidence.  But the effect is to be
10  uncommonly ineffective, especially in those most
11  probative elections.
12  Q.  So in your opinion that is being
13  conveyed in this sentence, does the plan, in your
14  view, violate the Guidelines because of intent or
15  because of effect?
16      MS. ADEN:  Objection.
17      THE WITNESS:  Let me try to answer that.
18  I think I wrote that in a spirit -- and I continue
19  to support a spirit that's agnostic to intent or
20  effect.  I think there is evidence of intent.  I
21  think there is evidence of effect.  I think that,
22  collectively, intent or effect has been
23  well-supported by this evidence.
24  BY MR. GORE:
25  Q.  But you don't have an opinion either

47 (Pages 182 - 185)

Page 186
1  way, whether it's intent or effect.  Is that right?
2        MS. ADEN:  Objection.
3        THE WITNESS:  I again -- and I'm not
4  trying to slip out of the question but just trying
5  to be precise about my position, I feel I have
6  provided evidence for both intent and effect.  And I
7  leave it to others to measure the strength of that
8  evidence against their standards for intent and
9  effect.
10 BY MR. GORE:
11       Q.  So I'm just trying to understand this
12 sentence.  And the sentence doesn't say that you
13 found evidence.  It says that you found that the
14 enacted plan expressly contravenes the Guidelines.
15       A.  Right.
16       Q.  And I'm just trying to understand what
17 you meant by that.  Is there more you can help me
18 with there?
19       A.  Sure.  I can try.  So I'm a
20 mathematician.  I'm a data scientist.  And so my
21 findings -- especially in a report like this, but
22 many of my writings, more generally, have to do with
23 evidence.  So I try not to make findings that are
24 rooted only in sentiment, but to make findings that
25 are rooted in evidence.  And so when I say "I find,"

Page 187
1  we can take that to be shorthand for I have
2  satisfied myself that there is strong evidence.
3        Q.  And have you satisfied that there is
4  strong evidence that the enacted plan has the intent
5  of dispersing minority population?
6        A.  I do think there is evidence of an
7  intent here.
8        Q.  And do you think that there is evidence
9  that the enacted plan has the effect of dispersing
10 minority population?
11       A.  Yes.  I think -- once again, just at the
12 risk of repetition, I think there is evidence of
13 intent and evidence of effect.
14       Q.  And the next sentence says:
15 "Considering" -- I'm sorry.  One last question on
16 this sentence.
17       A.  Sure.
18       Q.  When you say that the enacted plan
19 expressly contravenes the legislature's own
20 Guidelines, were there other aspects or
21 considerations in the Guidelines that the enacted
22 plan, in your judgment, expressly contravenes, or is
23 it only what's quote here?
24       A.  Well, the full context of the
25 Guidelines, I feel, repeats over and over in both

Page 188
1  sets of Guidelines, that concerns like communities
2  of interest, district cores and so on should be
3  considered but cannot outweigh the protection of
4  minority electoral opportunity.  So this sentence is
5  succinct, but I feel that its gist is supported
6  throughout the Guidelines on both sides.
7        Q.  Thank you for that.  What I'm trying to
8  understand is, are there other considerations in the
9  Guidelines, whether it was compactness or anything
10 else, that you think the enacted plan expressly
11 contravenes?
12       A.  Well, the full complement of principles,
13 as we have noted repeatedly, they function as a
14 balancing act.  And so part of the evidence has to
15 be, and what I hope I have expressed throughout this
16 report, I have looked to the other principles as
17 possible explanatory factors.  That is, if the State
18 were truly optimizing its compactness, if it were
19 making its compactness just as good as possible, if
20 that were top of mind, that might drive other
21 metrics to suffer.  That does not seem to be the
22 case.  So it is a holistic assessment, I want to
23 insist, that has to do with trying to use the full
24 spectrum of tools to analyze that balancing act.
25 And I have failed to find an aspect that was fully

Page 189
1  explanatory of all the small and large choices that
2  I saw that end with the effect of dispersing
3  minority population in a manner that prevents
4  minorities from electing their candidates of choice.
5  So I think this is responsive.  And I'm trying to be
6  succinct.  It's really the guideline documents as a
7  whole.  But this sentence goes very far to explain.
8  It's pointing to the clearest spirit of the
9  Guidelines that I think is not upheld by the plans.
10       Q.  I think the next sentence says:
11 "Considering this strong guidance, and the increased
12 Black population in the Columbia and Charleston
13 areas, we would expect increased electoral
14 opportunities for Black voters to be reflected in
15 the Congressional plan."  Why would we expect that?
16       A.  What this means is if someone were to
17 follow the spirit of the quoted sentence, their
18 opportunity to create effective districts has
19 probably only gone up.  The ability to create
20 effective electoral opportunity for Black voters has
21 probably only increased since ten years ago because
22 of the increased Black population in key areas.  So
23 since -- what this sentence means to say is that
24 since the Guidelines tell us that we should not
25 prevent minorities from electing their candidates of

48 (Pages 186 - 189)

Moon Duchin , PhD                              July 14, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 190

1  choice and since the opportunity is there, then we
2  would expect to see someone following the guidelines
3  to present the plan with increased electoral
4  opportunities over the plan from ten years ago.
5      Q.  And you said that the General Assembly
6  would have had the ability to increase Black voting
7  opportunity.  Did it have an obligation to do so, in
8  your opinion?
9      A.  That's a good question.  That's maybe
10  more of a legal question than one that I am
11  attempting to address in this report.  Did they have
12  the obligation?  The Guidelines seem to provide -- I
13  don't think you would call it an obligation, but an
14  imperative, a mention, a goal.
15      So the Guidelines express that minority
16  electoral opportunity is an important principle for
17  the state.  Is that an obligation?  I don't know
18  that that rises to the level of an obligation.
19      Q.  Now, in the second paragraph here under
20  Section 8, the last sentence says:  "Each time I
21  examined a decision with both racial and partisan
22  elements in the design of the state's plan, I found
23  that racial factors predominated over not only
24  traditional principles, but even over partisan
25  ones."  Where, in your report, is that examination

Page 191

1  of those decisions recorded or discussed?
2      A.  Well, the most direct place that racial
3  and partisan -- the tension between racial and
4  partisan motivations is addressed is in Figure 12
5  which we just spent time unpacking.  So you're
6  asking where else have I compared racial to partisan
7  motivations other than that section?
8      Q.  If anywhere, yes.  I'm just trying to
9  understand -- first I'm trying to understand, you
10  said, "I examined a decision with both racial and
11  partisan elements."  I'm trying to understand what
12  decisions you're referring to.
13      A.  I mean a placement of the lines.  So,
14  for instance, looking at Figure 3, which looks at
15  the terrain that has moved in and out of CD 6, that
16  those are places where you can localize decisions
17  that have been made in the shift from the benchmark
18  to the enacted plan.  And I find that many of those
19  decisions, particularly about what I have called, in
20  this report, the selective healing of counties and
21  VTDs and other relevant geounits, many of the splits
22  that are not chosen for being healed or addressed
23  are, as I describe here, in neighborhoods
24  particularly salient to Black communities.  And that
25  conclusion is drawn, once again, from a review of

Page 192

1  the public testimony.
2      So I think that what I'm getting at, in
3  the Conclusion, is that both the kind of
4  quantitative analysis that's offered in Figure 12
5  and the qualitative analysis that emerged from my
6  review of public testimony and my examination of
7  specific splitting decisions and selective healing
8  decisions, those both point to the same conclusion
9  of racial predominance over even partisan concerns.
10      Q.  And when you were analyzing the splits
11  and selective healing, to use your term, of
12  precincts, did you review any partisan or political
13  data as part of that analysis?
14      A.  Well, I did.  And you can see that in
15  the public testimony.  So, for example, in
16  Dorchester County Tim Lewis identifies himself as
17  the chair of the Democratic Party, whereas in the
18  Coastal region Scott Anderson identifies himself in
19  the federation of Republican men.  So there is quite
20  a bit of partisan self-identification taking place
21  in the public testimony, and that's what I'm
22  referring to.
23      Q.  And when you were considering the splits
24  and selective healing precincts, again, to use your
25  term, did you look at election data with respect to

Page 193

1  those splits or repairs of precincts?
2      A.  I think -- tell me if I'm understanding
3  right, you're asking, in my analysis that looked at
4  particular precincts, did I look at those precincts'
5  voting history?
6      Q.  Yes.
7      A.  Yes, I certainly had that data available
8  to me.  I didn't do a kind of systematic
9  quantitative analysis that I presented in the
10  report.
11      Q.  Okay.  That's what I'm getting at.  So I
12  think it's section 5 of your report which we can
13  turn to, if helpful, but I didn't see anything in
14  section 5 that did any kind of electoral analysis.
15  Is that right?
16      A.  That is right, section 5, except in the
17  ways that it refers back to the testimony in the
18  appendix, some of which, again, is partisan.
19  Section 5 doesn't, in the body, talk about
20  partisanship.  But it was certainly part of the
21  holistic and qualitative review.
22      Q.  But, for example, you didn't use the
23  election data set that you were provided in Figure
24  12 when analyzing the district splits or shifts in
25  District 5 or in section 5, is that right, or

49 (Pages 190 - 193)

Moon Duchin , PhD                                July 14, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 194

1  section 4?
2      A.  I did think about that data but did not
3  present a quantitative summary of it in the report.
4      Q.  Okay.  So, for example -- this is just
5  an example, you didn't say:  Look at the Charleston
6  splits, which you talk about in section 5, and
7  analyze whether those splits had a partisan pattern
8  to them based on election data and past election
9  results?
10     A.  I did look at -- I'm trying to be
11 complete in my answers.  I did look at -- for the
12 terrain pictured in Figure 3, I did look at partisan
13 balance as well as racial balance of those areas.
14 And I determined that, on the whole, they were more
15 racially skewed than they were partisan skewed.  But
16 I did not present a systematic discussion or a
17 quantitative discussion of that in my report.  But
18 it is my belief, based on the analysis that I did,
19 both quantitative and qualitative, that this moved
20 terrain is more racially distinctive than it is
21 partisan skewed.
22     Q.  But you haven't reported -- you haven't
23 said that in your report.  Correct?
24     A.  That's right.
25     Q.  And you haven't provided any supporting

Page 195

1  data for that view in your report.  Correct?
2      A.  Well, I think you have all the data that
3  constitutes these figures, but it's true that I have
4  not provided any such demonstrative in the report.
5      Q.  And you haven't provided a chart or any
6  breakdown of reconstituted election data for those
7  areas identified in Figure 3.  Correct?
8      A.  That's right.  I have not provided that.
9  But it is something that I thought about in forming
10 my impressions.
11         MR. GORE:  So at this point we have been
12 going again for a little bit than over an hour.  Can
13 we go off the record for just a second?
14 (Break In Proceedings)
15         MR. GORE:  Let's go ahead and go back on
16 the record.
17 BY MR. GORE:
18     Q.  Dr. Duchin, did you discuss your
19 testimony or this deposition with anyone during the
20 break?
21     A.  No, I didn't.
22     Q.  I would like to show you a new exhibit
23 which is now marked as Exhibit 6.
24 (Exhibit No. 6, Curriculum Vitae of Moon Duchin,
25 PhD, was marked)

Page 196

1      A.  Yes.
2      Q.  This document, do you recognize this
3  document?
4      A.  Yes.  This is my CV, although I can't
5  yet tell whether it's the most recent update.  But
6  it's my CV.
7      Q.  And how would you tell whether it's the
8  most recent update?
9      A.  I can see now that it is, yes.
10     Q.  I don't think I have any further
11 questions on that.  Thank you.
12         Dr. Duchin, if I have done this
13 correctly, Exhibit 7, the expert report of Sean
14 Trende should be on the screen.  Can you see that?
15     A.  I can.
16 (Exhibit No. 7, Expert Report of Sean P. Trende, was
17 marked)
18 BY MR. GORE:
19     Q.  And are you familiar with this document?
20     A.  Yes.
21     Q.  Have you read it?
22     A.  Yes.  This is the -- just be clear, the
23 report dated -- I'm looking for a date.  There is no
24 date on the first page.  Yes, the last page.  Yes,
25 I'm familiar with this report.

Page 197

1      Q.  And this is the report from April 18th,
2  2022.  Is that right?
3      A.  Correct.
4      Q.  Do you recall whether Mr. Trende's
5  report mentions your analysis in this case anywhere?
6      A.  I don't believe he mentions my analysis
7  or used my name anywhere.
8      Q.  And you submitted a rebuttal report in
9  this case.  Is that correct?
10     A.  I think I called it a response, but yes.
11     Q.  And if Mr. Trende's report did not
12 mention you or your analysis, why did you submit a
13 rebuttal or response report?
14     A.  To respond to several of the points that
15 he made that I felt were related to those that I had
16 discussed.
17 (Exhibit No. 8, May 4, 2022 Response to the Expert
18 Report of Sean P. Trende dated April 18, 2022, was
19 marked)
20 BY MR. GORE:
21     Q.  So if I have done this correctly,
22 everybody has just watched me upload Exhibit 8 into
23 Exhibit Share.  Can you see that, Dr. Duchin?
24     A.  I can see it, yes.
25     Q.  And is this the report that you were

50 (Pages 194 - 197)

Moon Duchin , PhD                                  July 14, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 198

1  just referring to, your response or rebuttal report?
2      A.  Yes.  That's correct.
3      Q.  I note that the title just says
4  "Report."
5      A.  That's true.  This says I have been
6  asked to provide a brief response.
7      Q.  Right.  And so that is dated May 4th,
8  2020 -- or 2022?
9      A.  That's right.
10     Q.  Thank you.  Thank you for that
11 correction.  So I just want to ask a few questions
12 about your rebuttal report.
13     A.  Yes.
14     Q.  So under Section 2 that you have titled
15 as Summary, the second bullet point is what I would
16 like to start asking you questions about.
17     A.  Yes.
18     Q.  The second sentence says:  "The
19 alternative plan shown in my previous report,
20 section 6.2, including Figure 11, is just one
21 example.  92 percent of the population is assigned
22 to districts exactly as in Enacted2022."
23     A.  Yes.
24     Q.  And I believe we talked about this
25 alternative earlier today, what we were talking

Page 199

1  about, the cracking portion of your report.  Is that
2  correct?
3      A.  I think it did come up in passing.
4      Q.  And you say that 92 percent of the
5  population in that plan is the same -- is assigned
6  to districts exactly as in the enacted plan.
7      A.  Yes.
8      Q.  Did you also run any kind of core
9  retention analysis on this plan, your alternative
10 plan, compared to the benchmark plan?
11     A.  I must have, yes.  I don't have those
12 numbers in front of me, but it's quite easy to
13 compare any two plans, and so I suspect that I have
14 comparison numbers for every pair of plans.
15     Q.  Did you provide those comparison plans
16 or comparison numbers in this report?
17     A.  No.  But you can get a -- you can get an
18 estimate by multiplying.  So if this has 92 percent
19 agreement and that plan has a certain percent core
20 retention, then you can estimate by multiplying how
21 much this compares to the benchmark.
22     Q.  And if we conducted that estimate here,
23 would your alternative plan have a lower core
24 preservation number than the enacted plan?
25     A.  Oh, I suspect that it does have a lower

Page 200

1  core preservation number.  You wouldn't learn that
2  just from multiplying, but I would agree that that's
3  probably true.
4      Q.  And the third bullet point, you discuss
5  Mr. Trende's statement about repairing split
6  counties and precincts?
7      A.  Yes.
8      Q.  And then you mention the Harpootlian
9  map?
10     A.  Yes.
11     Q.  And I believe what you say here is
12 substantially fewer subdivision splits?
13     A.  That is what I say here, yes.
14     Q.  And is that based on the numbers that
15 are in your other report?
16     A.  Yes, the ones we have already reviewed.
17     Q.  And do you know how the Harpootlian map
18 compares to the enacted plan with respect to
19 precinct splits or VTD splits?
20     A.  I don't know.  I'm trying to think if --
21 no, that number is not in the report, I'm fairly
22 sure.  But if you think it is, please just show it
23 to me.
24     Q.  Yeah, I don't believe it is.  I'm just
25 trying to confirm that I didn't miss something.

Page 201

1      A.  I tend to agree with you.
2      Q.  Wonderful.  And do you know how the
3  Harpootlian map performs, whether it performs better
4  or worse than the enacted map on preserving the
5  cores of the benchmark districts?
6      A.  Oh, it must be worse, because the
7  enacted plan is so much like the benchmark.  And
8  since -- it follows since the Harpootlian plan makes
9  big changes that it must have lower core retention.
10     Q.  And do you know how the Harpootlian map
11 performs on any partisan metrics or outcomes?
12     A.  Well, yes.  We just reviewed some of
13 that.  So we can see, in Figure 12 from my first
14 report, how it performs in the probative elections
15 and in the other Democratic elections.
16     Q.  And as I recall that discussion, the
17 Harpootlian plan results in more wins for the
18 Democratic candidate than the enacted plan.  Is that
19 correct?
20     A.  Yes.  Looking at Figure 12 that's true
21 both for the probative races, and for the other
22 races it has a few more wins.
23     Q.  So I believe here, in section 3, on the
24 next page of core retention --
25     A.  Yes.

51 (Pages 198 - 201)

Moon Duchin , PhD                                             July 14, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 202

1    Q.  -- you note in the first paragraph the
2  relative core retention percentages between the
3  enacted plan and the Harpootlian plan.  Is that
4  right?  Am I reading that correctly?
5    A.  Let me review.  Yes.  "It essentially
6  revises the state's plan in a single boundary line."
7  So it has an average core retention score of nearly
8  92 percent but gets a markedly better electoral
9  opportunity, et cetera, et cetera.
10    Q.  So back to page 1, this bullet point at
11  the bottom --
12    A.  Yes.
13    Q.  -- in referring to the Harpootlian map,
14  you say:  "This map is comparable or superior to
15  state plan Enacted2022 in all traditional
16  districting principles and provides measurably
17  greater minority opportunity to elect."  Did I read
18  that correctly?
19    A.  Yes.
20    Q.  But it doesn't perform comparably or
21  superior to an Enacted2022 on core preservation or
22  VTD splits.  Is that right?
23    A.  Oh, I don't have the VTD split number in
24  front of me, but -- and honestly, at the moment I
25  cannot remember if I made that comparison.  I simply

Page 203

1  can't remember if I made that comparison.
2        As for cores, I think that there is a
3  sort of judgment question as to whether core
4  preservation is a traditional principle.  I think
5  you could -- you could call it traditional in that
6  it is often cited, but it is also often omitted from
7  most of the traditional principles.  So I did not
8  mean to include that here.  And as you know, I
9  didn't include core retention in the previous
10  report's metrics.
11    Q.  Is core preservation identified as a
12  principle in the Senate Guidelines?
13    A.  It's in one set and not the other.  So I
14  believe you if you say it's the Senate and not the
15  House.
16    Q.  Now turning back to section 3 --
17    A.  Yes.
18    Q.  -- I believe you say what you just said,
19  which is in the second paragraph, first sentence:
20  "The retention of prior districts is a commonly
21  articulated principal in redistricting."
22    A.  Yes.
23    Q.  And then you go on to say:  "It can be
24  described in terms of a positive or a negative" --
25  and this is another good word for me, is that

Page 204

1  valance or valence?
2    A.  It's valence.
3    Q.  Okay.  Can you explain to me what that
4  means?
5    A.  Sure.  I mean, sometimes people describe
6  core retention as a good government principle, and
7  at least as often they describe core retention as
8  cutting against good government principles.
9    Q.  And are you aware of how it has been
10  described in any laws or prior cases in South
11  Carolina?
12    A.  I am aware, let's see, the Guidelines
13  say that they are drawn from, I think, in
14  particular, the Senate Guidelines.  I just want to
15  get this right.  They say they are drawn, in part,
16  from a 2002 opinion, a 2012 opinion and input
17  received in public hearings.  So that leads me to
18  suspect, since they talk about constituent
19  consistency, it's a reasonable guess that it would
20  have potentially been discussed in some of those
21  opinions.  But I don't know, to be clear.
22    Q.  Yeah.  And in your opinion is preserving
23  cores a traditional districting principle?
24    A.  Right.  So I have made an effort here --
25  the term "traditional" is a bit vague.  And I do

Page 205

1  certainly concede that it is an often considered
2  principle.  So traditional, in that sense, yes.  In
3  my opinion, is it a good government principle?  That
4  really depends on the way that it's put in place.
5  It's just very situational.  I have seen instances
6  where I think it is being carried out in the best
7  interests of voters and instances where it is not.
8    Q.  So I would like to probe that a little
9  bit more.  There is a sentence in the second
10  paragraph that starts:  "In this case."
11    A.  Yes.
12    Q.  "In this case, the appeal to core
13  preservation is used to keep minority population
14  dispersed across multiple districts, whereas the
15  shifting population and the reduction in BVAP in CD
16  6 would likely have led to the creation of new
17  opportunities in a neutral process."  So my first
18  question is, is the neutral process referred to here
19  what we discussed in your prior report or does that
20  refer to something else?
21    A.  I'm sorry.  I'm just trying to catch up.
22  Se we are in section 3 of the response report?
23    Q.  Of the response report.  And it's about
24  the middle of that second paragraph, fifth line
25  down, it starts at the very end of the line,

52 (Pages 202 - 205)

Moon Duchin , PhD                                        July 14, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 206

1    right-hand side of the line.
2        A.   Yes.  Thank you.  That's right.  "The
3    appeal to core preservation is used to keep" -- or
4    you might say used to justify, either way --
5    "minority population dispersed across multiple
6    districts, whereas the shifting population and the
7    reduction in BVAP in CD 6 would likely have led to
8    the creation of new opportunities in a neutral
9    process."  Right.  Well, it's certainly true that
10   the ensemble generation process is meant to model
11   neutral process.  But I don't mean to imply that
12   ensemble generation is a perfect representation of
13   every possible neutral process.  It is one kind of
14   neutral process.
15       Q.   What is the neutral process being
16   referred to in this sentence?
17       A.   This sentence means if the -- if the
18   Guidelines are taken literally, they seem, to me, to
19   say -- and here it's a little bit hard because the
20   House and the Senate Guidelines are slightly
21   different, but trying to generalize across both they
22   seem to say that considerations such as cores, if
23   they appear at all in the Guidelines, are described
24   as not meriting a reduction in minority electoral
25   opportunity.  I think that's fair to say about the

Page 207

1    Guidelines.  And so I find that in the spirit of the
2    Guidelines they don't provide a justification for
3    reduced minority electoral opportunity.
4        Q.   And when you say the Guidelines don't
5    provide a justification for reduced minority
6    opportunity, what is the reduced minority
7    opportunity contemplated but not justified by the
8    Guidelines?
9        A.   Is there something else?
10       Q.   Well, I'm trying to understand what you
11   just said.  So maybe reduced compared to some other
12   baseline or comparator, but I think you said that
13   the Guidelines -- that other considerations in the
14   Guidelines can't be read to merit a reduction of
15   minority voting opportunity.
16       A.   That's right.  In particular, House
17   Guidelines IX a. make that very explicit, that any
18   of the lower-ranked considerations such as
19   incumbency and COIs and so on, if there is a
20   conflict with those and minority opportunity,
21   minority opportunity should be given priority.  I
22   think it pretty clearly says that in IX a., to my
23   reading.
24       Q.   And so what would be the comparator to
25   determine whether there has been reduced minority

Page 208

1    voting opportunity under the Guidelines?
2        A.   Well, literally, here it says a manner
3    that prevents minorities from electing their
4    candidates of choice.  So I suppose, if you ask that
5    of the authors of the Guidelines what's the intent
6    of their phrasing, I think that means dispersing in
7    a manner that prevents relative to what was
8    possible.  I think what that means, at least just
9    the plain English reading, I think -- and you can
10   tell me if you agree -- is that, for example, if
11   there are several competing options presented, one
12   has more opportunity and one has less, then core
13   preservation can't be reason to choose the one with
14   less opportunity.  That seems, clearly, to be how to
15   read this.
16       Q.   And so, in your opinion, do the
17   Guidelines require the General Assembly to choose
18   the plan with the highest minority voting
19   opportunity, all other things being equal?
20       A.   No.  And to explain that fully, I'm not
21   sure they require anything.  It's especially hard
22   for me to tell from the way they are written.  But I
23   don't read them to require anything.  I read them
24   only to provide guidelines, although they do say
25   that they have the authority to determine the

Page 209

1    criteria.  But I still don't think that rises to the
2    level of a legal requirement.
3        Q.   Okay.  So I'm trying to understand your
4    hypothetical.  You said if there were two plans
5    presented, one with higher minority voting
6    opportunity and one with lower minority voting
7    opportunity, preservation of cores could not be
8    invoked to choose the plan with lower minority
9    voting opportunity.
10       A.   Under the Guidelines.
11       Q.   Under the Guidelines.  So my question
12   is, is it your reading of the Guidelines that when
13   all other things are equal with respect to other
14   principles or traditional criteria, the General
15   Assembly had to choose the plan with the highest
16   minority voting opportunity?
17       A.   No.  But you presented a scenario in
18   which -- or I think we are discussing a scenario in
19   which all other things are equal and the differences
20   are a tradeoff strictly between district core
21   preservation and minority electoral opportunity.  If
22   we posit that that's the tradeoff, all other things
23   being roughly equal, then I wouldn't say the
24   Guidelines require anything.  But I would say they
25   direct the legislature to choose the one with more

53 (Pages 206 - 209)

Moon Duchin , PhD                                July 14, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 210

1  minority opportunity as opposed to higher core
2  retention, yes. I think that is directed, but I
3  wouldn't say required.
4      Q. So let me rephrase and see if I
5  understand your point. Is it your reading that the
6  Guidelines direct the General Assembly not to trade
7  off compliance with some other principle at the
8  expense of minority voting opportunity?
9      A. So sorry, but I think my entering got
10  cut out in the middle of your sentence. Can you
11  repeat that?
12      Q. It was such a good sentence, I don't
13  know, but I will try. Is it your reading of the
14  Guidelines that the Guidelines direct the General
15  Assembly not to trade off less minority voting
16  opportunity for better compliance with the other
17  principles in the Guidelines or considerations in
18  the Guidelines?
19      A. Well, an exception might be population
20  balance, which is in the first tier here. But
21  specifically as to core retention, my reading is
22  that they are directed to prioritize minority
23  electoral opportunity over core retention. That's
24  correct.
25      Q. And what about over other principles

Page 211

1  that you have placed in the second tier?
2      A. Okay. Let's review. Yes. I think it
3  says the requirements addressed in sections 1, 2, 3
4  and 4 should be given priority if there is a
5  conflict.
6      Q. So on your reading, the Guidelines
7  direct the General Assembly to maximize voting --
8  minority voting strength to the extent it can do so
9  while trading off compliance with the second-tier
10  considerations?
11      A. I would shy away from the word
12  "maximize" which has a very specific meaning for me.
13  I don't think there is maximization here. But I do
14  think that, again, to quote, if there is a conflict,
15  the requirements that include minority electoral
16  opportunity should be given priority. So they are
17  directed, in case of conflict, to prioritize
18  minority electoral opportunity over compactness over
19  district cores and so on.
20      Q. So this is helpful, but let me ask it
21  another way, if that's okay. We talked earlier that
22  redistricting involves tradeoffs. Right? That the
23  criteria may cut in different directions or that a
24  map drawer may prioritize one criterion or
25  consideration over another and that tradeoffs are

Page 212

1  part and parcel of redistricting. Is that right?
2      A. Yes.
3      Q. Is it your reading that the Guidelines
4  direct the General Assembly, when faced with such
5  tradeoff between minority voting strength on the one
6  hand and a second-tier consideration on the other
7  hand, to choose the option that prioritizes minority
8  voting strength?
9      A. I think that's the plain language here.
10  And let me stipulate that I might not have written
11  it exactly this way. But reading the way they wrote
12  it, I do think that's what they say.
13      Q. Okay. And have you discussed the
14  Guidelines with whoever wrote them?
15      A. I certainly haven't. And I have no idea
16  who wrote them.
17      Q. And do you know one way or another
18  whether the standard in the Guidelines was simply
19  meant to be an articulation of what Section 2 of the
20  Voting Rights Act requires?
21      A. Not simply. It says that it goes beyond
22  the Voting Rights Act. And both sets of the
23  Guidelines reference other principles such as equal
24  protection. So it's not simply a recording of
25  Section 2.

Page 213

1      Q. And do the Guidelines refer to anything
2  other than equal protection, the U.S. Constitution
3  and the Voting Rights Act when discussing
4  considerations of minority voting strength?
5      A. They do. They also refer to the
6  opinions of the Supreme Court of the United States.
7      Q. And have you reviewed those opinions?
8      A. I believe I have read all the relevant
9  opinions. Now, that's not to say that I have an
10  attorney's professional vetted interpretation of
11  them, but I believe I have read all the relevant
12  things.
13      Q. And have you analyzed whether the
14  enacted plan violates Section 2?
15      A. That was not part of my assignment.
16      Q. And I just want to return to this
17  sentence again: "In this case, the appeal to core
18  preservation is used to keep minority population
19  dispersed across districts" -- "multiple districts,"
20  that again, reads like a statement of the map
21  drawer's purpose, "used to keep minority population
22  dispersed." Am I reading that correctly?
23      A. Well, yes. That is what it says, yes.
24  When we went over it a few moments ago, maybe
25  fifteen minutes ago, I said that might have been

54 (Pages 210 - 213)

Moon Duchin , PhD                                    July 14, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 214

1  better phrased by me as used to keep or used to
2  justify.
3      Q.  And let's look at the next sentence.  I
4  think you say -- it starts: "I am not aware of any
5  principle in law or in published redistricting
6  guidelines that allows for a threshold level of high
7  core preservation to justify excessively
8  race-conscious decisions with a known dilutive
9  effect."
10     A.  Yes.
11     Q.  So is it your opinion that the General
12 Assembly or a map drawer, in this case, is using
13 high core preservation to justify excessively
14 race-conscious decisions?
15     A.  And who were the people you referred to?
16 The map drawer or who?
17     Q.  The General Assembly.  The legislature.
18     A.  It's a bit hard to identify who all the
19 relevant stakeholders and folks expressing opinions
20 are.  So, in particular, the focus of this report is
21 to respond to Sean Trende's expert report.  And I do
22 not know the extent to which Trende's
23 representations are consonant with those of the
24 Assembly or the map drawer.  So I maybe want to be
25 careful about whose opinions I'm describing.  But

Page 215

1  Trende certainly writes -- and again, that's who I'm
2  primarily responding to, Trende certainly writes as
3  though both core preservation and partisan
4  motivation are justifications for the minority
5  opportunity to elect that is embodied in the plan.
6      Q.  Have you discussed Mr. Trende's report
7  with him?
8      A.  With him?  I don't think we have met,
9  although I look forward to it.
10     Q.  And is it possible to read his report
11 not as a justification for any decisions but as an
12 explanation for what he observed in reviewing the
13 plan?
14     A.  Well, again, I am trying to be quite
15 careful, and so you will forgive me for speaking
16 slowly and deliberately.  I'm trying to be quite
17 careful about what opinions I attribute to whom.
18 But his report certainly reads as though the
19 partisan motivations and the core retention are
20 legitimate justifications that explain the reduced
21 minority electoral opportunity.
22     Q.  So in this sentence is the person doing
23 the justifying in this sentence Mr. Trende or
24 somebody else?
25     A.  I'm pulling up the sentence again.

Page 216

1  Well, the sentence that we just reviewed of mine
2  only says I don't know of anything in law that
3  allows for this to justify that.  So I'm not
4  ascribing a justification to anyone.  I'm just, in
5  particular, here --
6      Q.  So is this statement -- is this then
7  meant to be a general principle or a description of
8  something in this case, specific to this case?
9      A.  That sentence, "I am not aware," is a
10 general statement.  It is relevant to this case
11 because I feel that in various of the documents that
12 are circulating there are attempts, implicit or
13 explicit, to justify reduced minority electoral
14 opportunity with these kinds of factors being
15 partisan and core-preserving criteria.
16     Q.  And which documents make that
17 justification expressly or explicitly?
18     A.  I feel it's explicit in the Trende
19 report.  And also in the motion to dismiss it is,
20 let's see, somewhere on the line of implicit and
21 explicit.  But we can pull that up.  But first I
22 will tell you my general impression is that the
23 motion to dismiss asserts that plaintiffs would need
24 to disambiguate racial from partisan motives.  So
25 that, in other words, at least implicitly, if not

Page 217

1  explicitly, partisan motives are an allowable
2  justification for racially disparate outcomes.
3      Q.  And have you discussed the motion to
4  dismiss with the author of that motion?
5      A.  No, I haven't.
6      Q.  Another question, if I can find it,
7  section 4: "Respect for boundaries, Communities of
8  interest."
9      A.  Yes.
10     Q.  The second paragraph, I think what
11 you're talking about is VTD splits in the benchmark
12 plan and the enacted plan?
13     A.  Yes.
14     Q.  And maybe it's at the end of paragraph
15 one.
16     A.  Yes.
17     Q.  So I just want to make sure I have my
18 facts correct.  When the benchmark plan was drawn,
19 it split 13, 2010 VTDs.  Is that correct?
20     A.  Yes.
21     Q.  And are you aware that South Carolina
22 redrew its VTD lines between 2010 and 2020?
23     A.  I don't think they are able to redraw
24 their VTD lines.  They can redraw their precinct
25 lines, but VTDs are Census Bureau data product.

55 (Pages 214 - 217)

Moon Duchin , PhD                                                July 14, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 218

1    Q.   So are you aware that South Carolina
2  redrew its precinct lines between 2010 and 2020?
3    A.   That seems very likely.
4    Q.   And by the time the 2020 census data
5  came out, the benchmark plan, at least according to
6  your report, then split 65 2020 VTDs.
7    A.   That's right.  And just to help clarify
8  this piece of the conversation, let me just say one
9  sentence about VTDs versus precincts.  Precincts are
10  a moving target.  Not only states but local
11  authorities can change precincts often, at any time,
12  and often -- for any reason.  In many cases they
13  don't even have to report those changes to the
14  state, which is a strange state of affairs.
15            VTDs are a once per ten years effort of
16  the Census Bureau to find out a snapshot of those
17  precincts and reconcile with the other census
18  geography.  So the reason people in a redistricting
19  analysis like to use VTDs is that they are a fixed
20  target rather than a moving target.
21            So one other piece of the puzzle that's
22  relevant here is that it's quite common, in various
23  states around the country, to draw a plan; and then
24  where that plan split VTDs, to change the precincts
25  to nest better in the plan.  So it's a really very

Page 219

1  complicated set of facts here.  And I felt that the
2  wording in the Trende report was misleading, made it
3  sound like there were very few VTDs split.  But that
4  was partly due to not specifying whether he was
5  talking about 2010 or 2020 VTDs.
6    Q.   And do you know anything about whether,
7  in South Carolina, there is a difference between the
8  precinct line and VTD lines in 2020?
9    A.   Well, there is probably no economical
10  source of precinct boundary data, and so I wouldn't
11  know how to start to make the comparison.
12    Q.   Do you know, one way or the other,
13  whether the state maintains a database of precincts
14  in South Carolina?
15    A.   I know that many states, and I believe
16  South Carolina is one, make an effort to keep an
17  up-to-date boundary file.  But very few states, and
18  I believe South Carolina is not one, have strong
19  reporting requirements for local authorities.  So I
20  do think there is an effort to make current data
21  product, but it's really very hard to do.
22    Q.   In your experience does keeping VTDs or
23  precincts whole make election administration easier
24  for election officials than if they are split?
25    A.   Definitely.

Page 220

1    Q.   Is preserving or keeping VTDs whole a
2  traditional districting principle, in your opinion?
3    A.   Good question.  It comes back to parsing
4  traditional.  But traditionally we talk about
5  political boundaries.  It's a bit ambiguous whether
6  precincts are included, but I think they often are
7  included under the umbrella of political boundaries.
8    Q.   And is preserving or not splitting VTDs
9  a traditional districting principle, in your
10  opinion?
11    A.   Do you mean as distinct from precincts?
12    Q.   Sure.
13    A.   I don't think the traditional principles
14  will distinguish between those two.
15    Q.   And do you recall whether the House or
16  Senate Guidelines identified avoiding VTD or
17  precinct splits as one of the considerations for
18  drawing the congressional plan?
19    A.   Yes, I recall that at least one of them
20  did.  Let's check quickly.  Yeah, VTDs are mentioned
21  by name only in the Senate but not in the House
22  Guidelines.
23    Q.   And in your experience, in your opinion,
24  Dr. Duchin, is it possible for a map drawer to
25  preserve cores of districts without engaging in race

Page 221

1  conscious decision-making?
2    A.   Well, let me try to answer that simply
3  but fully.  I think that, inevitably,
4  decision-makers are aware of the level of -- at
5  least roughly of the level of racial -- of minority
6  electoral opportunity that exists in the benchmark
7  plan.  And so implicitly, a decision to prioritize
8  cores is going to be a decision to maintain the
9  status quo, roughly -- roughly speaking of minority
10  electoral opportunity.  So is that race conscious?
11  Well, that comes back to the question of whether we
12  are considering proxies.  That's not race conscious
13  in the sense that you have a race data layer
14  visible, but it has -- of course it has
15  ramifications for minority electoral opportunity,
16  necessarily.
17    Q.   Is it possible for a map drawer, in your
18  experience, to prioritize core preservation without
19  sacrificing minority voting opportunity?
20    A.   Definitely, especially in areas that are
21  not diverse.
22            MR. GORE:  I think I have no further
23  questions, so I'm ready at this point to pass the
24  witness to whoever would like to ask questions.
25            Maybe Andrew, I think if you maybe have

56 (Pages 218 - 221)

Moon Duchin , PhD                                                July 14, 2022

The South Carolina State Confvs.McMaster/Alexander

---

Page 222

1  some questions, want to take over at this point?
2  And Ms. Trinkley, do you have any questions for this
3  witness?
4       MS. TRINKLEY:  Yes.  I think just one.
5            CROSS-EXAMINATION
6  BY MS. TRINKLEY:
7       Q.  Do you know what governmental bodies in
8  South Carolina have the authority to change precinct
9  lines?
10      A.  Good question.  I don't.  I don't
11 specifically know the South Carolina rules, only I
12 have worked with election administrators across the
13 country so I have a sense of how it's done
14 generally.  But I don't have specific knowledge of
15 the rules of South Carolina.
16      MS. TRINKLEY:  Thank you.  That's all
17 the questions I have.
18      MR. MATHIAS:  And I have a few.  It
19 might be about thirty minutes.  Does anybody want a
20 ten-minute break or can we keep going?
21 (Off-Record Discussion)
22      MR. MATHIAS:  Well, let's keep going.
23            CROSS-EXAMINATION
24 BY MR. MATHIAS:
25      Q.  Dr. Duchin, Andrew Mathias.  I know we

Page 223

1  met virtually some months ago.  I don't remember
2  when, frankly.  I represent the House defendants in
3  this case.  I have, hopefully, just a handful of
4  questions.  And you can answer this first one
5  however you want.  What is the MGGG Redistricting
6  Lab?
7       A.  Okay.  So I am a professor at Tufts
8  University, and as I mentioned I'm affiliated with
9  the Tisch College of Civic Life.  And as part of
10 Tisch College I run the lab called MGGG
11 Redistricting Lab.  What it means to run a lab is
12 that we are a collection of people.  We have staff.
13 We have -- I'm the only tenure stream faculty, but
14 we have had postdoctoral scholars, graduate student
15 affiliates, undergraduate, as well as, as I said,
16 full-time and part-time staff.  So we are a
17 collection of people whose primary function is to do
18 scholarly research in redistricting.  And so we have
19 a significant output of peer-reviewed articles, a
20 book that just came out, which I believe we
21 discussed several months ago.  And we also write a
22 substantial body of open-source software that we use
23 and that we hope others will use in analyzing not
24 only redistricting, but other voting-rights issues.
25      Q.  Okay.  Is one of those open-source

Page 224

1  software programs that's referenced the MGGG
2  Redistricting Lab, GerryChain Python Library?
3       A.  That's right.  Our two biggest software
4  packages are GerryChain, which is a Markov chain
5  library, and Districtr which is a community mapping
6  tool.
7       Q.  It's footnote 4 to your report, or I
8  guess in that 4 reference, the GerryChain Python
9  Library, is that referring to software or is that
10 referring to something else that is proprietary to
11 the MGGG or Tufts?
12      A.  It's software, and it's fully public.
13 It's not proprietary to anyone.  It's fully public,
14 and I should mention much copied.
15      Q.  Okay.  You mentioned that it is sort of
16 a group of people that I have seen online that it
17 grew out of the metric geometry and gerrymandering
18 group.  Are any of these -- well, either yourself,
19 as the primary investigator, staff, post-doc or
20 undergrad folks paid by MGGG or Tufts for their work
21 with MGGG?
22      A.  Yes.  For example, right now the staff
23 of MGGG, through Tisch College, is a program
24 administrator and a research analyst.  That's much
25 reduced from last summer, around time that the

Page 225

1  census data came out when we had, I think, over a
2  dozen people on staff.
3       Q.  And how much are you paid for your work
4  with MGGG?
5       A.  I am not paid for my work with MGGG.
6  It's part of my profile as a professor.
7       Q.  Is everyone that works with MGGG,
8  other than you, paid or are there some folks that
9  are doing it as part of their academic work?
10      A.  Yes, that's correct, some are doing
11 academic work with us, which is typically unpaid,
12 and others are doing sort of data analysis that is
13 typically paid for.
14      Q.  Okay.  Is MGGG, in some way shape or
15 form, located in a physical space on Tufts' campus?
16      A.  Yes.  I'm sitting in it.  We have
17 offices in Barnum Hall on Tufts' campus.
18      Q.  Okay.  Does MGGG pay rent to Tufts for
19 the space it has in Barnum Hall?
20      A.  That's a bit of a subtle question.  We
21 raise grant support which has a component that's
22 called "indirect" which is used to defray costs like
23 keeping the lights on and so on.  So when we get a
24 grant --
25      Q.  Overhead?

57 (Pages 222 - 225)

Moon Duchin , PhD                                    July 14, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 226

1    A. Overhead. Exactly. So when we get a
2  grant, say, from the Sloan Foundation, 10 percent of
3  the amount that goes to us will be added on top and
4  will go to the University. When we get a grant from
5  the National Science Foundation, it's 66 percent.
6         I would add something, though, to
7  clarify all this. We have been discussing the
8  academic piece, which is the lab, as part of Tufts.
9  But I also have an LLC that I use for consulting.
10  And for matters relating to litigation, pay does not
11  go through the University. I'm a professor who has
12  several roles. I have a robust conflict of interest
13  policy that I follow here at the University, and I
14  keep litigation income quite separate from the
15  University and its functions.
16    Q. Yes, I saw the invoices were from the
17  Redistricting Lab, LLC. So you have mentioned
18  something, and I may not have it correct, but I will
19  see if I can find the word. You mentioned that you
20  rely on other people to do things such as data
21  curation, writing code, running computational
22  scripts and then reviewing public hearing testimony.
23  Who did that for the purposes of your report?
24    A. So I have multiple research assistants.
25  And in the invoices that I submitted to LDF, they

Page 227

1  are typically identified Research Assistant 1,
2  Research Assistant 2 and so on. And they are
3  performing analysis under my direction. We can talk
4  about who they are, but first let me just clarify
5  the overall division of labor, the LLC that I
6  mentioned, which is a consulting company, also has,
7  at the moment, one full-time employee and several
8  part-time employees who have nothing to do with the
9  University. So they really are kind of separate
10  options.
11         However, it is the case, and again fully
12  in compliance with the conflict of interest policies
13  at my University, that several people work on both
14  sides. So if people who are employed by Tufts
15  University do work for litigation, they do so on
16  evenings and weekends and are compensated through
17  the LLC and not through the University. So even
18  though it may sound like thoroughly intermixed, we
19  are actually quite scrupulous about separation of
20  resources. Having said that, do you want to talk
21  about who the research assistants were who involved
22  in this project?
23    Q. Yes. Who were they?
24    A. Sure. So I believe for the
25  congressional side there were exactly two people who

Page 228

1  provided research support, as reflected in the
2  invoices, and those are Cora Chanel Richardson who
3  has a degree in computer engineering and provides
4  support on the computing side, and Liz Kopecky who
5  has a background in policy and project management.
6    Q. And I'm assuming both Cora and Liz also
7  work for MGGG, or is that incorrect?
8    A. They are also both employees of Tisch
9  College.
10    Q. Okay. Doing work for MGGG?
11    A. Yes.
12    Q. And those two individuals, Cora and Liz,
13  were the ones who did the work of data curation,
14  writing code, running computational scripts and
15  reviewing public testimony in support of you in
16  drafting this report?
17    A. Yes. But to be clear, so Cora
18  Richardson goes by the name Chanel. And Chanel did
19  the coding and data work and Liz helped review
20  public testimony.
21    Q. Would either Chanel or Liz know how to
22  do what they did to support you in writing this
23  report if they had not worked at MGGG?
24    A. I would say, in Chanel's case, that she
25  came in with substantial Python expertise. But, I

Page 229

1  mean, certainly, working with our particular code
2  base was something that she was trained in over her
3  time in the lab.
4         In Liz's case, reviewing public
5  testimony, I think, takes no special knowledge or
6  training.
7    Q. So all Liz did was review public
8  testimony?
9    A. That's right.
10    Q. Did she -- and this is word I'm trying
11  to find -- operationalize -- did she help
12  operationalize that public testimony?
13    A. No. I'm the one who synthesized,
14  summarized and drew the operational regions that
15  were used in the ensemble analysis.
16    Q. Okay. In your testimony you
17  mentioned -- well, for the most part you testified
18  in the first-person singular. On occasion you would
19  say something in the first-person plural, our
20  method. We found our ensemble. We, our, that's you
21  and MGGG or you and who?
22    A. Not necessarily. Depending on context,
23  it often will mean me and collaborators, that is
24  the -- this is something I tried not to be pedantic
25  about throughout the course of this deposition, but

58 (Pages 226 - 229)

Moon Duchin , PhD                                July 14, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 230

1  there are algorithms and then there are
2  implementations and code. The algorithms are fairly
3  abstract. They tell you, kind of, the mathematical
4  ideas behind what you will be doing. And then the
5  code is programming. So often when I say "we" or
6  "our," I'm talking about my scientific
7  collaborations. For example, the algorithms, the
8  concept behind the GerryChain package are described
9  in a peer-reviewed paper that appeared in the
10  Harvard Data Science Review that's joint work with
11  Darryl DeFord and Justin Solomon. Darryl is a
12  professor at Washington State and Justin is a
13  professor at MIT. So partly I'm trained to say
14  "our" when I talk about joint work so that I don't
15  forget to acknowledge that so much scientific work
16  is done collaboratively.
17      Q.  Fair. And that article you're talking
18  about is "Mathematics of nested districts: The
19  case" -- no. I'm sorry. It is: "Recombination: A
20  family of Markov chains for redistricting"?
21      A.  And Markov is M-A-R-K-O-V. That's
22  correct.
23      Q.  And that's the article you list in your
24  references as number 3?
25      A.  I can check that, but that is the main

Page 231

1  article that offers the kind of theoretical
2  framework for the ensemble process.
3      Q.  Can you describe for a minute, then,
4  how -- how critical the methods described in that
5  article are for your expert report and rebuttal that
6  we have been discussing today?
7      A.  Sure. The parts of my report that use
8  ensembles, which I believe are sections 6 and 7, but
9  we can check, those rely on those ideas of
10  recombination. The traditional districting
11  principles, the quality and the review, and so on,
12  does not rely on Markov chains.
13      Q.  And those are a fairly critical form of
14  maybe the core of your opinion and report. Is that
15  correct?
16      A.  Well, I wouldn't say that the work is
17  holistic and has many components, but I do find the
18  ensemble evidence to be compelling.
19      Q.  Okay. And you find the ensemble
20  evidence to be compelling and believe that the court
21  should find it compelling as well. Correct?
22      A.  That would be my hope.
23      Q.  Okay. On the MGGG website there is a
24  sort of, I guess, donation page or fundraising page,
25  and it indicates that the largest financial

Page 232

1  supporter of MGGG is the National Science
2  Foundation. Is that correct?
3      A.  Yes.
4      Q.  And the National Science Foundation, is
5  an agency of the federal government that gives
6  grants. Is that correct?
7      A.  Yes. And, in particular, we -- the lab
8  received a million-dollar grant to study what we
9  called network science and census data.
10      Q.  Is that the only grant that the lab --
11  and I'm using that to refer to MGGG -- has received
12  from the National Science Foundation?
13      A.  No. To be clear, when you apply for an
14  NSF grant you have a PI, or a principal
15  investigator. And that PI is a person, not a lab.
16  So I am the PI on numerous NSF grants. I have,
17  typically, several that are active at any time.
18      Q.  So is that grant that you talked about
19  the only grant that has been used to fund MGGG, the
20  only NSF grant?
21      A.  No. I had a -- for example, there
22  really have been numerous grants that -- partly from
23  the activities of the lab, but another example would
24  be a grant from several years ago that funded a
25  summer program called the "Voting Rights Data

Page 233

1  Institute."
2      Q.  Okay. Is the million dollar grant
3  you're talking about Convergence Accelerator Phase I
4  Network Science and Census Data?
5      A.  Yes, that's the one. And a million is a
6  round number. It might have been $964,000.
7      Q.  Does $962,177 sound right?
8      A.  That sounds perfect.
9      Q.  Okay. Do you ever interact with Laura
10  Campbell at NSF?
11      A.  Laura Campbell was the program director
12  for the convergence accelerator, I think. I think
13  that's right. That sounds right.
14      Q.  That's correct. And just looking at the
15  abstract, it says that the funds obligated to date
16  were the 962,000 and change per fiscal year 2019 and
17  that the end date was May 31st, 2021?
18      A.  I believe we got a no-cost extension for
19  another year, although I could check the records to
20  be sure.
21      Q.  Okay. And pursuant to this grant -- or
22  by way of this grant did Tufts, you as principal
23  investigator, receive anything in addition to the
24  $962,000 and change in 2019?
25      A.  As part of that grant there was a

59 (Pages 230 - 233)

3:21-cv-03302-MGL-TJH-RMG    Date Filed 09/02/22    Entry Number 343-2    Page 61 of 141

Moon Duchin , PhD                                    July 14, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 234

1  supplemental grant called a "rapid grant." The NFS
2  structure is really labyrinthy, so I will try to
3  describe this, but it can be complicated. So there
4  was a second grant, called a rapid grant, for an
5  additional $100,000 that piggybacked on the
6  convergence accelerator and that we used to model
7  how campuses could support the COVID response of
8  hospitals.
9      Q.  Okay. So this grant either initially
10 or -- well, initially and adding this piggyback
11 grant, exceeded a million dollars?
12     A.  Yes.
13     Q.  Okay. On this abstract -- well, the
14 abstract, itself, says that it was last modified on
15 November 30th, 2021 by you. Do you remember
16 modifying it?
17     A.  Not specifically, no.
18     Q.  Do you have any reason to believe that
19 you did not modify it or somebody else did?
20     A.  I don't think it was modified after it
21 was initially submitted. I don't have a memory of
22 that. But maybe you can tell me if there are
23 specific elements that you would like me to try to
24 recall.
25     Q.  There is a section called "Publications

Page 235

1  produced as a result of this research" and it lists
2  four, but one of those is the Recombination: A
3  family of Markov chains for redistricting. Do you
4  have any reason to believe that you would not
5  attribute that article as being -- or that
6  publication as being produced as a result of the
7  research that this grant funded?
8      A.  Right. So the policy of NSF is you can
9  hold one or several concurrent grants. For each one
10 you have a proposal which describes the work you set
11 out to do on that grant. So, for example, the
12 convergence accelerator that you talked about has
13 now concluded. But overlapping with it I had
14 another grant through the math department on what I
15 called something like Geometry and Randomness. And
16 a paper like that Markov chain paper would have
17 cited both of those grants and its acknowledgment of
18 funding support. So that is to say if I write a
19 paper that relates to the proposals of multiple
20 grants I will typically credit all of those grants
21 in the funding support for the paper and include the
22 paper in the outcome report for both of the grants.
23 So you shouldn't be surprised if you see that
24 particular paper mentioned in the documentation for
25 multiple of the grants that I have held in the last

Page 236

1  few years.
2      Q.  Okay. So if I understand you correctly,
3  you're saying that this paper, the publication could
4  be attributable to research that was funded by more
5  than just this grant. But do you --
6      A.  Yes, definitely.
7      Q.  Do you disagree that this grant, the
8  convergence accelerator grant, at least in part,
9  funded the publication and Recombination: A family
10 of Markov chains for redistricting?
11     A.  So often my work -- so that particular
12 paper has some, but not a great deal of empirical
13 work of computational output in it. It has some but
14 it's more theoretical. So what is the sense in
15 which that grant supported the paper? It's that
16 particular grant included a buyout for one of my
17 courses. So that meant my teaching load was reduced
18 which enabled me to do more research. So I hope I'm
19 getting at the right thing for your question.
20 That's the sense in which the grant enabled the
21 research, is that it reduced my teaching obligation,
22 allowing me to do more scholarship.
23     Q.  I will ask it a different way. This is
24 available online. It just says it was -- the
25 abstract was last modified by you in November of

Page 237

1  last year. And under Publications Produced, as in
2  results of this research, it lists the publication
3  that you say forms the basis -- or the methodology
4  discussed in that, and the research discussed in
5  that forms the basis of a significant portion of
6  your report. Do you have any reason to believe that
7  someone other than you listed that article as a
8  publication that was produced as a result of this
9  federally funded research?
10     A.  I'm afraid I don't understand the
11 question at all.
12     Q.  I will ask it again. Do you have any
13 reason to believe that the publication that you,
14 along with two others, wrote called Recombination:
15 A family of Markov chains of redistricting, was
16 listed as a publication produced as a result of this
17 research by someone other than you?
18     A.  No. Of course that was by me. It was
19 probably listed as partly supported by that grant.
20 That is correct. And it would be actually out of
21 line for me to --
22         MS. ADEN: Moon, you just froze.
23 BY MR. MATHIAS:
24     Q.  Yeah. I think you froze at "out of line
25 for me to" --

60 (Pages 234 - 237)

Moon Duchin , PhD                                July 14, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 238

1    A.  It would be out of line for me to have
2  omitted it.  I apologize.  My internet is getting a
3  little glitchy.
4    Q.  So it would be out of line for you to
5  have omitted that publication among those that were
6  produced as a result of this research for the
7  convergence accelerator phase I grant.  Correct?
8    A.  Absolutely.
9    Q.  Do you recall the date of that grant?
10    A.  No, but I have no reason to dispute the
11  dates that you are representing.
12    Q.  Okay.  It says September of 2019.
13  September 10th, to be specific, does that sound
14  about right?
15    A.  Sure.
16    Q.  And is that the largest single source of
17  funding that MGGG has received to date?
18    A.  Yes.
19    Q.  You mentioned that -- I call her Liz.  I
20  can't think of her name or what she goes by now.
21  Liz Kopecky and Chanel Richardson both work for
22  MGGG, but their work for you, in support of your
23  drafting this report, was done on nights and
24  weekends or not on MGGG time.  Is that correct?
25    A.  That's right.

Page 239

1    Q.  Did they do it in the Barnum Hall MGGG
2  office?
3    A.  Well, Chanel lives in North Carolina and
4  has rarely set foot in Barnum Hall.
5    Q.  Okay.  So she didn't help out Liz?
6    A.  No.  Liz sometimes comes into the office
7  but probably wouldn't have done this work in the
8  office.  Maybe at home, but I'm speculating.
9    Q.  Okay.  You really don't know where she
10  did it?
11    A.  I can't be sure.
12    Q.  Do you know who owned the computer that
13  she did the work on?
14    A.  I do not.
15    Q.  Okay.  Is it possible, does she have a
16  computer that's owned by Tufts for her work with
17  MGGG?
18    A.  That is likely.
19    Q.  Okay.  Is it also possible that she used
20  her MGGG computer to do work for you in support of
21  this report?
22    A.  I can't rule it out, but I could ask.
23    Q.  Okay.  You mentioned -- well, you said
24  something that indicates to me that you have some
25  familiarity with Tufts' conflict of interest policy.

Page 240

1    A.  Definitely.
2    Q.  Does Tufts require an annual report of
3  all employees to notify the University of conflicts
4  of interest?
5    A.  I'm not sure about all employees, but
6  definitely all faculty.
7    Q.  Certainly covering you.  Correct?
8    A.  Yes, definitely.
9    Q.  And when do you submit those conflict of
10  interest reports?
11    A.  I submit them whenever I get an email
12  reminder, and I believe I submitted one in the last
13  month.
14    Q.  And I don't have the document and I
15  doubt you have it in front of you, but how do you
16  characterize your conflict of interest with your
17  Research Lab, LLC and the work at MGGG?
18    A.  I describe the existence of the LLC and
19  I describe my consulting work as being -- I should
20  mention, actually, as we speak, this year I'm on
21  leave for my position at Tufts.  So the conflict of
22  interest is simpler than usual because this year I
23  have no obligations as part my professorial
24  position.
25    Q.  Is your compensation group reduced

Page 241

1  because you're on leave?
2    A.  To zero.  That's right.
3    Q.  That would be a reduction, I would
4  think.
5    A.  Yes.
6    Q.  Were you on leave in 2019?
7    A.  I have been on leave for the whole
8  academic year, '19 to '20.  Wait.  Sorry.  '19.  No.
9  Sorry.  I'm getting confused about dates.  I have
10  been on leave for the current academic year, which
11  is '21, '22.
12    In 2019 I may have been on leave.  I
13  have been on leave a lot in the last few years.  I
14  was a Radcliffe fellow in 2018 to 2019, and so I was
15  likely on leave at that time.
16    Q.  Okay.  But you have worked with MGGG and
17  Redistricting Lab, LLC during the time that you were
18  on leave.  Correct?
19    A.  Yes.  So the LLC was probably created in
20  2020 or thereabouts.
21    Q.  November of 2019 sound familiar?
22    A.  That could be right, yeah.  And the --
23  let's see.  The lab at Tufts, I ran summer programs
24  under the name of MGGG in summer of 2018 and '19.  I
25  can't remember when we shifted the name to include

61 (Pages 238 - 241)

Moon Duchin , PhD                                      July 14, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 242

1  the word "Lab," but it might have been in 2019.
2  That sounds possible.
3      Q.  Okay.  So on your conflict of interest
4  form you disclosed to the University the existence
5  of Redistricting Lab, LLC, and you either disclosed
6  or assumed that Tufts knows about MGGG and your
7  association with it?
8      A.  No, the lab -- definitely, the lab is
9  part of my annual faculty information form.
10     Q.  Do you describe in any way the overlap
11 between the work of Redistricting Lab, LLC and the
12 lab?
13     A.  Well, when I set up the LLC I had
14 several meetings with University counsel to be sure
15 that I was setting everything up in accordance with
16 University policy.  So I have met with -- I have met
17 with general counsel for the University to be sure
18 that I'm doing everything on the up and up.
19     Q.  Okay.  Did you disclose to general
20 counsel, either at that meeting or through your
21 conflict of interest forms, that the work with
22 Redistricting Lab, LLC for which you're being
23 compensated would rely on work that was paid for by
24 the federal government in the convergence
25 accelerator grant?

Page 243

1      A.  It's an absolutely well-understood
2  principle of faculty activities that your research
3  is not neatly separable between roles.  And so I
4  should mention that in addition to talking to Tufts
5  University counsel, I also talked to numerous
6  experienced expert witnesses from other universities
7  to be sure that I was setting things up in
8  accordance with best practices.  And I assure you
9  that everything has been done quite scrupulously.  I
10 feel very confident about that.
11     Q.  Sure.  This is a simple yes or no
12 question.  Did you tell any of those folks that you
13 asked for advice that an article that was produced,
14 as a result of this grant to Tufts, was going to
15 support or form the basis of your report for which
16 you would be paid?
17     A.  I don't need to mention that because
18 that's -- I think that is the reason that people who
19 do scholarship are asked to be experts, so that they
20 can reference their scholarship.  I don't think
21 there is any disclosure there.  That would be taken
22 for granted by anyone who has experience with
23 faculty working as expert witnesses.
24     Q.  I don't doubt that, in part, the reason
25 that academics are asked to be expert witnesses is

Page 244

1  because of the research they have done, but you
2  don't think it's significant that the research was
3  explicitly paid for by the federal government and
4  then you're using it to make money is something that
5  needs to be disclosed to the University?
6      A.  That's 100 percent standard.  That's
7  how -- that's how scholarship works.  That's why --
8  in my understanding, that's how the standards for
9  experts work, is that the entire design of the
10 system is that your scholarly expertise which, in
11 the best case, would be funded by the federal
12 government, would then be brought to bear in matters
13 of interest to courts.  I think that's how the
14 system works.
15     Q.  Okay.  But did you disclose those
16 specific facts to Tufts?
17     A.  I think those are well understood by all
18 parties, and so I very much doubt that anything was
19 said explicitly.  I take that to be common
20 understanding of how the system works.
21     Q.  So you made a decision on your own that
22 that was not a conflict of interest and chose not to
23 disclose it to Tufts.  Is that correct?
24         MS. ADEN:  Objection.
25         THE WITNESS:  I think I have answered

Page 245

1  fully.  I don't think that's -- I think the
2  relationship of my scholarship to my consulting is
3  not only completely standard but is the design of
4  the system of expert witnesses, as I understand it
5  as I read the Daubert standard and so on.
6  BY MR. MATHIAS:
7      Q.  But this is a simple question.  You can
8  answer yes or no and then explain.  Isn't it true
9  that you made the decision that this NSF grant
10 resulting in this article, that is used in your
11 report, was not a conflict of interest on your own
12 and that is why you did not disclose it to the
13 University?
14         MS. ADEN:  Objection.
15 BY MR. MATHIAS:
16     Q.  Yes or no and then explain.
17     A.  I would answer yes or no if I could.
18 But the truth is that I don't know if that was
19 brought up.  And the reason I don't know if that was
20 brought up is that I wouldn't have perceived a need.
21 But this is a conversation from years ago, so I'm
22 doing my best to represent it fully and honestly.
23 BY MR. MATHIAS:
24     Q.  Okay.  But there is no doubt you didn't
25 specifically tell the University that one of the

62 (Pages 242 - 245)

Moon Duchin , PhD                                    July 14, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 246

1  articles that was produced by this grant is being
2  used by you in a manner that is to your personal
3  financial benefit. Correct?
4      A. I can't be sure if a sentence to that
5  effect was uttered. But I can tell you, with
6  certainty, that sitting here today I don't perceive
7  that it would be necessary to spell that out.
8      Q. And that's based upon your own judgment.
9  Correct?
10     A. Yes. And my understanding of the
11 system.
12     Q. Okay. Did you tell the University that
13 it's a possibility that some of the individuals that
14 were helping you with this report were using
15 computers owned by Tufts?
16     A. Did I say that that was possible? No.
17 However, I am aware that Tufts' computers should not
18 be used for that purpose. And so I'm aware that the
19 policy is that that shouldn't happen. But since I
20 am not Liz and I am not Chanel, I cannot testify
21 under oath that they followed the policy. But they
22 are aware that the policy is not to use University
23 resources for litigation purposes.
24     Q. And you didn't do anything to ensure
25 that they followed that policy in working for the

Page 247

1  Redistricting Lab, LLC. Correct?
2      A. Well, since I supervise them it is my
3  job to make them aware of the policy, and it's my
4  job to talk through, periodically, with everyone who
5  works for the lab and everyone who works for the
6  LLC, the lines that we draw in order to be sure that
7  we are conducting ourselves with best practices. So
8  we have had that conversation, as a lab, as recently
9  as this summer. That's a conversation I have
10 regularly. But I do not monitor them, if that's
11 what you're asking. I make sure they are aware of
12 the rules and the expectations.
13     Q. Do you happen to know whether or not
14 Tufts is a tax-exempt organization?
15     A. I should maybe know the answer to that,
16 but I don't.
17     Q. Okay. If I represented to you that
18 Tufts is a tax-exempt 501c3 organization, would you
19 have any reason to disagree with me?
20     A. No. I would certainly believe you.
21     Q. Okay. You said you're sitting in Barnum
22 Hall?
23     A. That's right.
24     Q. I assume you're aware that Barnum Hall
25 was renovated extensively within the last maybe five

Page 248

1  or six years. Is that correct? Do I have that
2  right?
3      A. You do. Yes.
4      Q. Do you happen to know the funding source
5  for that renovation?
6      A. I really don't. I do know the funding
7  source for the new math department building, if
8  you're curious.
9      Q. I'm not. If I told you that the funding
10 source was a Massachusetts State organization
11 intended to issue bonds to support economic
12 development, would you have any reason to disagree
13 with me?
14     A. No. I have no opinions on the matter.
15     Q. Are you aware of the fact that Tufts
16 could have some significant tax issues if it is a
17 conflict of interest for you to be making money
18 through Research Lab, LLC by using either the
19 academic outputs of the MGGG as funded by the NSF or
20 Tufts' computers?
21     MS. ADEN: Objection.
22 BY MR. MATHIAS:
23     Q. Do you have any reason to believe that
24 there could be tax consequences for Tufts because --
25 well, there could be tax consequences for Tufts if

Page 249

1  the arrangements we have been discussing, vis-à-vis
2  the grants and Research Lab, LLC are deemed to be a
3  conflict of interest?
4      MS. ADEN: Objection.
5      THE WITNESS: I think you're asking if
6  there could be tax consequences for breaking the
7  conflict of interest policy, and I believe that that
8  would be possible.
9  BY MR. GORE:
10     Q. Okay. And tax consequences both because
11 Tufts is a 501c3 and because the building in which
12 MGGG is located was financed with state bonds?
13     A. This is really beyond -- far, far beyond
14 my expertise. I just simply don't know how the
15 funding of the building has anything to do with -- I
16 just don't know how these -- but I would be happy to
17 find out.
18     Q. Do you think that NSF or Tufts should
19 have been given all of the facts in order to
20 determine if a conflict of interest exists, as
21 opposed to you making a determination that they
22 didn't need to know certain facts?
23     MS. ADEN: Objection.
24     THE WITNESS: I find the question a bit
25 mystifying, but I will attempt to answer it as well

63 (Pages 246 - 249)

Moon Duchin , PhD                                      July 14, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 250

1  as I can. I think it is my responsibility to learn
2  about the conflict of interest policy and to follow
3  it to the very best of my ability. Now, that will
4  certainly involve some judgment calls. I don't deny
5  that. That's the nature of conflict of interest.
6  But I have been quite scrupulous about following the
7  rules to the best of my ability.
8  BY MR. MATHIAS:
9      Q.  Assuming that it is a conflict of
10  interest that you have engaged in, do you believe
11  that Tufts should have been given the opportunity to
12  make a determination if it was a conflict of
13  interest by being given all the facts?
14      MS. ADEN:  Objection.
15      THE WITNESS:  I don't think that
16  question makes sense. Can you rephrase it?
17  BY MR. MATHIAS:
18      Q.  Sure. Did you intentionally withhold
19  relevant facts from Tufts in order to prevent them
20  from making a determination as to whether or not
21  you're engaged in a conflict of interest?
22      MS. ADEN:  Objection.
23      THE WITNESS:  Thank you for rephrasing.
24  That's much clearer. I certainly did not. I
25  disclosed all facts I thought to be relevant and

Page 251

1  then some.
2  BY MR. MATHIAS:
3      Q.  What is the Redistricting Lab, LLC's
4  monthly revenue, on average?
5      A.  I have no idea. I really don't know.
6      Q.  How many clients --
7      A.  That I can answer. The disclosed
8  relationships with civil rights litigation firms and
9  with other law firms are -- I have worked with LDF,
10  as you heard. I have worked with the Lawyers
11  Committee for Civil Rights under law. I have worked
12  with Jenner & Block, which is another law firm. And
13  I believe those are the only -- I believe, yeah,
14  those are -- as I sit here today and with a full
15  attempt to be forthcoming, I think those are the
16  only clients.
17      Q.  And you're on leave from Tufts now.
18  Approximately how many hours a week do you work for
19  Redistricting Lab?
20      A.  I work too much. I think I recently
21  reduced my hourly work from about seventy hours a
22  week, which was my average from last summer through
23  earlier this year, down to a more manageable, I
24  would estimate, fifty hours a week at this point.
25      Q.  And are we talking billable hours or

Page 252

1  just --
2      A.  No. We are talking about hours overall.
3  I bill a small fraction of those because I only bill
4  the hours that are directly related to the contracts
5  that I have signed.
6      Q.  I understand that concept, for sure.
7      You mentioned that your interests in the
8  mathematical side of politics, if that's the
9  appropriate characterization, began in 2016. Is
10  that correct?
11      A.  Yeah. I would say my research program
12  in data and democracy began in 2016. That's right.
13      Q.  Do you know about when?
14      A.  Sure. I was teaching a course called
15  Mathematics of Social Choice. I guess I don't quite
16  remember, I could look it up, whether it was in the
17  fall or the spring. But one of those semesters I
18  was teaching a Voting Theory course, and that was
19  the genesis of the research interest.
20      Q.  And not the MGGG Redistricting Lab but
21  the collective called the Metric Geometry and
22  Gerrymandering Group, when did that start, the more
23  informal group?
24      A.  That's when that started. So I took an
25  interest while I was teaching this course. I had a

Page 253

1  few friends who you can find biographies of on our
2  website, namely Ari and Mira originally. And the
3  three of us kind of came up with the name and the
4  concept of MGGG as an informal collective.
5      Justin Solomon, my earlier-mentioned
6  collaborator from MIT, joined as a kind of force
7  member after a few months, and so we were the
8  original four friends thinking about these issues.
9  That's what evolved over the span of the next few
10  years into the lab that I now direct.
11      Q.  And when did it become the lab that was,
12  I guess, formal or official enough to apply for
13  grants and things like that?
14      A.  Well, again, when I apply for grants I
15  do so as an individual. But I often talk about the
16  work of the lab as part of it. So you should think
17  of the grantee as me in support of the lab.
18      Okay. Our first grants to support MGGG
19  activities would have been in 2017 when we launched
20  a workshop cycle. We had -- I think it was five
21  workshops in 2017 and '18 in Boston, Madison,
22  Durham, North Carolina, Austin, Texas and San
23  Francisco, and some of those were funded by various
24  foundations such as the Sloan Foundation.
25      Q.  Okay. And then the grant that you have

64 (Pages 250 - 253)

Page 254

1 said was the biggest MGGG -- or you had received
2 from MGGG work was in September 2019.  When did you
3 begin leave -- or let me rephrase that.  How much
4 and when have you been on leave since the end of
5 2019?
6     A.  Okay.  Let's see.  I can try to
7 reconstruct it.  So the 2018 to '19 year -- yeah,
8 2018 to '19 year is the year I spent at Radcliffe.
9 So I was on leave, supported by Radcliffe and
10 Guggenheim for projects related to redistricting.
11        After the '19, '20 year I was
12 back at Tufts.  And yes, I was definitely teaching
13 when the shutdown happened in March of 2020.  I was
14 teaching again the following semester.  I'm not sure
15 about the spring.  I mean, I can look this up if you
16 like.
17        And as I said, I have been on leave all
18 of this academic year.  And I'm on leave again the
19 next academic year.  So it would be fair to say that
20 I have been on leave as much as I have not over the
21 last few years.
22     Q.  Okay.  And so you received this grant in
23 September 2019.  And you would not have any reason
24 to disagree with me that Redistricting Lab, LLC was
25 formed less than sixty days later.  Does that sound

Page 255

1 about right?
2     A.  I believe you.
3     Q.  And then you have been on leave doing
4 seventy or fewer hours a week working for
5 Redistricting Lab, LLC for a large majority of the
6 time since then?
7     A.  Just to clarify, for your records, the
8 LLC is what's called -- I don't know if this
9 national or more of a Massachusetts thing, it's
10 called a d/b/a, doing business as.  And so the LLC,
11 sort of, is me.  There is not a very sharp legal
12 distinction between me, as an individual, and the
13 LLC.  So when you say doing work for the LLC, that
14 just means doing work.
15     Q.  But you are the sole member of the LLC
16 in Massachusetts called Redistricting Lab, LLC?
17     A.  I'm the director.  There is also -- at
18 the moment there is another full-time employee and
19 several part-time people who do various hourly work.
20     Q.  But all of its income -- all of its
21 profits are attributable to you for tax purposes.
22 Is that correct?
23     A.  That's right.  That's my understanding.
24 And again, just as I'm not a lawyer, I'm also not an
25 accountant.  But my understanding is that for tax

Page 256

1 purposes I am -- I am the LLC.  It's what is meant
2 by doing business as, in my understanding.
3     Q.  Okay.  If you will bear with me one
4 minute, I have five minutes or less, I just need to
5 pull something up.  And I can flip through these.
6 Who is Ben Fifield?
7     A.  Okay.  Ben is a PhD graduate.
8        MS. ADEN:  I'm going to object.  I don't
9 think these are the nature of any questions by
10 Mr. Gore.  So this is not redirect -- or not
11 redirect.  This is not appropriate --
12        MR. MATHIAS:  This is my own --
13 (cross-talking).
14        MS. ADEN:  -- examination of the
15 testimony of Dr. Duchin from direct.
16        MR. MATHIAS:  This is my own direct
17 examination of her.  That has nothing to do with
18 what I can ask her.
19 BY MR. MATHIAS:
20     Q.  Who is Ben Fifield?
21     A.  Right.  So I believe Ben is a recent
22 PhD.  At least he was a PhD student.  And I think he
23 received his PhD from Princeton University in
24 Political Science within the last few years.  He now
25 works, as I understand it, at ACLU.

Page 257

1     Q.  Okay.  And do you have an LDF email
2 address?
3     A.  Do I have an LDF email address?
4     Q.  Yes.
5     A.  No, I do not, not to my knowledge.
6        MR. MATHIAS:  Okay.  That's all I have
7 got.
8        MS. ADEN:  I have very few because of in
9 the interest of time.  I can go directly into it,
10 but Dr. Duchin, if you need a minute I can also give
11 that to you.
12        THE WITNESS:  No.  Let's roll through.
13        CROSS-EXAMINATION
14 BY MS. ADEN:
15     Q.  Okay.  Dr. Duchin, do you recall
16 Mr. Gore asking if you have been retained by the
17 ACLU in this congressional phase of the case?
18     A.  I don't remember the phrasing, but I
19 remember responding.  But I have not been retained
20 through the ACLU.
21     Q.  For this case do you understand that
22 ACLU is co-counsel with LDF in the congressional
23 phase of the case?
24     A.  Yes, that's my understanding.
25     Q.  And you have also worked with ACLU

65 (Pages 254 - 257)

Moon Duchin , PhD                                    July 14, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 258

1 attorneys in preparing your reports, including for
2 this congressional phase of this case?
3     A.  I'm not sure what "worked with" means.
4 I think that -- I think that all the feedback that I
5 have received has come from you, but it may well
6 have incorporated comments from ACLU attorneys that
7 would not have raised my eyebrows.
8     Q.  Even though you work with some LDF
9 attorneys more directly, is it possible your
10 retainer agreement is jointly with ACLU, as well as
11 LDF as co-counsel?
12     A.  I see.  I apologize if I am not getting
13 all the details perfectly.  I had the impression
14 that it was with LDF, but I agree that it's possible
15 that the retainer agreement mentions ACLU.  I'm not
16 sure about that.
17     Q.  Dr. Duchin, do you recall Mr. Gore
18 asking you questions about the House and Senate's
19 separate redistricting criteria?
20     A.  Yes.  In particular, the Guidelines
21 documents were discussed extensively -- quite
22 extensively.
23     Q.  And do you first recall Mr. Gore asking
24 you questions about your description of first- and
25 second-tier criteria in both documents?

Page 259

1     A.  We talked about the phrase "first and
2 second tier."  I believe I explained my use of that
3 phrase with respect to one of the documents more
4 than the other.  Generally, it was meant to -- I was
5 trying very earnestly, in my report, to summarize
6 both documents together because they agree in many
7 places, even though they differ in a few.
8     Q.  And if you could look at the Senate
9 Guidelines, which I believe have been marked as
10 Defendant's Exhibit 4, and turn to Roman numeral
11 III.
12     A.  Yes.  I'm doing that now.
13     Q.  And if you look at Roman numeral III,
14 does it read:  "ADDITIONAL CONSIDERATIONS"?
15     A.  That's right.  The bold and capital text
16 of the heading is:  "ADDITIONAL CONSIDERATIONS."
17     Q.  And do you mind reading the first
18 sentence -- or clause that follows?
19     A.  Sure.  It says, quote:  "Other criteria
20 that should be given consideration, where practical
21 and appropriate, in no political order of
22 preference, are," and then it continues with A
23 through F.
24     Q.  And I think you said "political."  Did
25 you mean "particular order"?

Page 260

1     A.  I'm sorry.  I must be getting tired.
2 "Where practical and appropriate, in no particular
3 order of preference, are."
4     Q.  Based on what you just read, do you
5 understand these to be second-tier or somehow lower
6 in priority than the Roman numeral categories that
7 precede it?
8     A.  Yes, I think that's the clear
9 implication of the phrasing.
10     Q.  And if you look at the House Guidelines
11 which have been marked, I believe, as Defendant's
12 Exhibit 3 --
13     A.  Yes.
14     Q.  -- Roman numeral IX, there is a section
15 titled:  "Priority of Criteria"?
16     A.  That's right.
17     Q.  Okay.  And that is the bulk of the
18 criteria of the tiers that you were speaking about
19 earlier in the deposition?
20     A.  Yes.  That makes, fairly explicit, which
21 are the prioritized and which are the less
22 prioritized of the criteria.
23     Q.  So is it fair to say that based upon
24 your review, both sets of Guidelines had tiers of
25 criteria that you were aware of as you prepared your

Page 261

1 reports?
2     A.  Yes, I think that is definitely fair to
3 say.
4     Q.  Okay.  And do you recall Mr. Gore's
5 questions about the use of race in drawing maps?
6     A.  Broadly, yes.
7     Q.  And if you look at Roman numeral I B. in
8 the Senate Redistricting Guidelines which, again,
9 should be Defendant's Exhibit 4 --
10     A.  Yes.
11     Q.  -- do you see the first two lines that
12 read:  "A redistricting plan for the General
13 Assembly or Congress must not have either the
14 purpose or the effect of diluting minority voting
15 strength and must otherwise comply with Section 2 of
16 the Voting Rights Act, as expressed through
17 Thornburg versus Gingles and its progeny, and the
18 Fourteenth and Fifteenth Amendments to the U.S.
19 Constitution"?
20     A.  I'm sorry.  I have been catching up.
21 This is in the Senate Guidelines?
22     Q.  Yes, Roman numeral II B.
23     A.  I don't see a II B. in the Guidelines.
24     Q.  Under B., Voting rights.
25     A.  So that's I B.  Yes, what you just said

66 (Pages 258 - 261)

Moon Duchin , PhD                                       July 14, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 262

1  is exactly in there in I B. That's right.
2      Q.  Then I'm also going to have you look at
3  the House Guidelines, Roman numeral II.
4      A.  Yes.
5      Q.  And can you read the first sentence,
6  please?
7      A.  Yes. It says, quote: "Redistricting
8  plans shall also comply with federal law and the
9  Voting Rights Act of 1965, as amended."
10     Q.  And can you read the second-to-last full
11 sentence of that same paragraph?
12     A.  Yes, I can. It says: "The dilution of
13 racial or ethnic minority voting strength is
14 contrary to the laws of the United States and of the
15 State of South Carolina, and also is against the
16 public policy of this state."
17     Q.  Now, I'm not asking you for any legal
18 determinations, but based upon your experiences and
19 expertise and your testimony about having drawn maps
20 on other occasions, is it common to look at the
21 Black voting age population and other race-conscious
22 considerations to develop maps under these
23 criteria -- these types of criteria?
24     A.  In other words, if there is a principle
25 against dilution, is it then common to use BVAP,

Page 263

1  say, as part of map development? Is that the
2  question?
3      Q.  Yes.
4      A.  Yes, I would say that being aware of
5  BVAP is consistent with nondilution.
6      Q.  And beyond BVAP, you testified that
7  there are other race-conscious considerations that a
8  mapmaker might be aware of in trying to pay
9  attention to nondilution of minority voting
10 strength?
11     A.  Absolutely. I think it's legitimate to
12 be aware of various kinds of racial -- race-related
13 considerations while pursuing a policy of
14 nondilution.
15     Q.  Dr. Duchin, do you recall Mr. Gore's
16 questions about total population deviation with
17 respect to a few congressional maps submitted by
18 members of the public?
19     A.  I do. And I think we were talking about
20 it as top-to-bottom deviation.
21     Q.  And if you could look at page 10 of your
22 report, your first report.
23     A.  Yes. I'm doing that now.
24     Q.  I believe Mr. Gore asked you about the
25 Harpootlian South Carolina NAACP2 and the League of

Page 264

1  Women Voters proposed maps?
2      A.  Yes, I do remember that.
3      Q.  And looking at page 10, do you see there
4  are deviations of one, two or even three people, as
5  compared to the enacted map?
6      A.  That's right. The top-to-bottom
7  deviation of the enacted map is one. And for the
8  others -- for the NAACP maps 1 and 2, the
9  top-to-bottom deviations are two and four,
10 respectively. For Harpootlian and the League it's
11 four and five, respectively.
12     Q.  Based upon your experience of map
13 drawing, is it complicated to fix such minimal
14 population deviations as those?
15     A.  I would call it absolutely
16 uncomplicated. In fact, I would call it routine.
17     And this was discussed earlier in the
18 deposition when I mentioned verifying, by hand, that
19 it's easy to tune a map with as much as 1 percent
20 population deviation, which is much higher than
21 this, can easily be tuned -- easily and quickly
22 while maintaining its other important measurable
23 properties.
24     Q.  Do you recall Mr. Gore's questions about
25 statistical measures of compactness?

Page 265

1      A.  I do recall discussing those.
2      Q.  Are you familiar with the Maptitude
3  software for redistricting?
4      A.  I am familiar with it. I have, I
5  believe, attended one Maptitude training at a
6  workshop that I host.
7      Q.  Are you aware of whether it can run
8  programs like statistical measures of compactness?
9      A.  It certainly can. And I believe I
10 recall that the cut-edges measure was added to the
11 package in this redistricting cycle.
12     Q.  And do you have any sense of how long it
13 might take to run one or more statistical measures
14 of compactness using Maptitude?
15     A.  I think it's fair to call it
16 instantaneous.
17     Q.  Do you recall Mr. Gore's questions about
18 how you reviewed and incorporated public testimony
19 collected by the South Carolina Legislature?
20     A.  I do recall that discussion.
21     Q.  Do you recall how many hearings you
22 reviewed?
23     A.  I don't have the exact number, but I
24 believe we agreed that it would total more than
25 1,000 pages of testimony.

67 (Pages 262 - 265)

Moon Duchin , PhD                          July 14, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 266

1    Q.   And, in fact, that was a low estimate of
2  the number of pages of testimony?
3    A.   I believe that to be a conservative
4  estimate.  That's right.
5    Q.   And that was over many months of
6  testimony being collected from the public?
7    A.   Yes.  I described the collection dates
8  in my report.  And I will just quickly try to find
9  that page.
10 (Pause In Proceedings)
11 WITNESS CONTINUES:
12   A.   I remember your question.  And the
13 answer is that the report indicates the meetings
14 took place from July through October, considering
15 both Senate and House hearings.
16   Q.   And do you have any reason to know
17 whether this testimony is not representative of
18 South Carolina communities?
19   A.   I can't say one way or the other, except
20 to repeat what I said before, that it's the best
21 data available.  It's the best information
22 available.
23   Q.   Do you recall Mr. Gore's questions about
24 private criteria being considered by legislators or
25 General Assembly that is not available to members of

Page 267

1  the public during the redistricting process?
2    A.   Yes, I recall discussing that.
3    Q.   Based on your work and exposure to
4  principles of good governance, what do you think
5  about private criteria being used in a statewide map
6  drawing process that is not available to the public?
7    A.   I would be very surprised if anyone
8  described that as a good practice for redistricting.
9    Q.   Do you have any views of how the public
10 would be able to submit maps that complied with
11 private criteria that has not been disclosed to
12 them?
13   A.   Except through guesswork, I can't
14 imagine how to comply with private criteria.
15   Q.   What about the same question concerning
16 legislators who drew maps but were unaware of
17 private criteria?
18   A.   The answer would be the same, they
19 cannot comply with private criteria except through
20 guesswork.
21   Q.   Would maps you drew as alternatives for
22 Congress also risk not meeting private criteria if
23 you were unaware of those criteria?
24   A.   That's right.  I can only take into
25 account the criteria that I am made aware of.

Page 268

1    Q.   This is my last question: Dr. Duchin,
2  do you recall Mr. Gore asking you questions about
3  circumstances when Democrat -- voters, affiliated as
4  Democrats, lose in a Republican-leaning
5  congressional district, for example, under certain
6  conditions in Congressional District 1?
7    A.   Yes, I remember discussing that.
8    Q.   In your reports do you address any
9  strategies that may make that outcome likely?
10   A.   Strategies on the part of the State?
11   Q.   Yes.
12   A.   Yes.  I look at the effectiveness of the
13 plans for the Democratic interests, and I separate
14 out the more probative elections for Black voters.
15   Q.   And did you discuss strategy of cracking
16 as one means of trying to effectuate that type of
17 outcome?
18   A.   Absolutely.  Cracking is a means of
19 diluting the vote and making it more likely that
20 certain kinds of voters will not see their wishes
21 result in representation.
22      MS. ADEN:  That's all the questions I
23 have.
24      MR. GORE:  I have one question on
25 redirect.

Page 269

1      REDIRECT EXAMINATION
2  BY MR. GORE:
3    Q.   Ms. Aden just asked you about the
4  Guidelines and the references, the reference to
5  dilution of minority vote strength.  Do you recall
6  that?
7    A.   Yes.
8    Q.   And do you know what the Guidelines
9  definition or standard for dilution of minority
10 voting strength is?
11   A.   It is my recollection that there is no
12 definition offered.  But in the interest of time, I
13 will leave it at that.
14   Q.   And have you discussed that definition
15 with the author of the Guidelines?
16   A.   I am not aware of who authored the
17 Guidelines.
18      MR. GORE:  Nothing further.
19 (The deposition was concluded at 5:50 p.m.)
20 (The deponent does not waive reading and signing of
21 this deposition)
22
23
24
25

68 (Pages 266 - 269)

**Page 270**

1 CERTIFICATE OF REPORTER
2     I, Elaine L. Grove-DeFreitas, Certified
3 Shorthand Reporter and Notary Public for the State of
4 South Carolina at large, do hereby certify that the
5 foregoing transcript is a true, accurate and complete
6 record.
7     I further certify that I am neither
8 related to nor counsel for any party to the cause
9 pending or interested in the events thereof.
10     WITNESS MY HAND, I have hereunto
11 affixed my official seal this 23rd day of July 2022 at
12 Greenville County, South Carolina.
13
14
15
16 _____
17 ELAINE L. GROVE-DEFREITAS
    Certified Shorthand Reporter
    My Commission Expires 6/22/2030
18
19
20
21
22
23
24
25

**Page 271**

1  Leah C. Aden Esquire
2  laden@naacpldf.org
3     July 25, 2022
4  RE:  South Carolina State Conference Of The NAACP And Scott,
  Taiwan v. Mcmaster, Henry, Et Al.
5     7/14/2022, Moon Duchin , PhD (#5278941)
6     The above-referenced transcript is available for
7  review.
8     Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12     The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  erratas-cs@veritext.com.
16
17  Return completed errata within 30 days from
18  receipt of testimony.
19  If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
22     Yours,
23     Veritext Legal Solutions
24
25

**Page 272**

1  South Carolina State Conference Of The NAACP And Scott, Taiwan v.
  Mcmaster, Henry, Et Al.
2  Moon Duchin , PhD (#5278941)
3     E R R A T A  S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____ _____
24  Moon Duchin , PhD       Date
25

**Page 273**

1  South Carolina State Conference Of The NAACP And Scott, Taiwan v.
  Mcmaster, Henry, Et Al.
2  Moon Duchin , PhD (#5278941)
3     ACKNOWLEDGEMENT OF DEPONENT
4     I, Moon Duchin , PhD, do hereby declare that I
5  have read the foregoing transcript, I have made any
6  corrections, additions, or changes I deemed necessary as
7  noted above to be appended hereto, and that the same is
8  a true, correct and complete transcript of the testimony
9  given by me.
10
11  _____ _____
12  Moon Duchin , PhD       Date
13  *If notary is required
14     SUBSCRIBED AND SWORN TO BEFORE ME THIS
15  _____ DAY OF _____, 20___.
16
17
18  _____
19  NOTARY PUBLIC
20
21
22
23
24
25

69 (Pages 270 - 273)

Moon Duchin , PhD
The South Carolina State Confvs.McMaster/Alexander

**[& - 202-879-3930]**

Page 1

| & | | | |
|---|---|---|---|

**&**   3:4 4:10 10:19 10:22 251:12

| 0 | | | |
|---|---|---|---|

**0**   272:10,20 273:10,20

**03302**   1:8

| 1 | | | |
|---|---|---|---|

**1**   5:12 10:24,25 20:4 21:2 35:20 36:4,10 37:1,6 42:21 54:4,5 57:14 77:5,12 78:17 89:18,22 113:15 120:19 126:4,18 127:6 127:10,20 128:6 137:15,16 139:25 140:4,6,7 141:24 142:2 144:3,5 147:22 159:2,22 160:20 161:2,15,22 162:2,4 165:4,10 165:15,23 166:3 166:10,19,24 169:3,4,21 202:10 211:3 227:1 264:8,19 268:6 271:1 272:1,11,21 273:1,11,21

**1,000**   89:8,10 265:25

**1.2**   30:6

**10**   128:8,10 133:17 136:25

139:6 142:15 143:6 226:2 263:21 264:3 271:10

**10/25**   5:12

**100**   131:6 160:13 161:19 244:6

**100,000**   127:15 128:1 148:4 234:5

**10004**   3:21

**10006**   3:7

**104**   4:4

**10:13**   1:24

**10th**   238:13

**11**   5:13 26:14 61:8 128:10 133:17 147:25 156:18 198:20 271:11

**11th**   9:14 26:23 26:25

**12**   128:10 133:17 151:21,23 162:1 171:3,4 172:20 173:7,22 174:1 175:5 176:14 177:17 179:23 180:9 191:4 192:4 193:24 201:13,20 271:12

**12.4**   176:12 177:15

**12.5**   174:7

**1221**   4:11

**125**   3:20

**13**   82:1 132:16 174:2 175:6 217:19 271:13

**14**   1:23 173:16 173:25 174:19 271:14

**15**   77:20 88:24 271:15

**16**   93:2 95:10 99:6 271:16

**17**   105:12 271:17

**18**   5:21 106:23 197:18 253:21 271:18

**1800**   4:11

**18th**   3:21 197:1

**19**   108:6 241:8,8 241:24 254:7,8 254:11 271:19

**195/24**   5:18

**196/16**   5:19

**1965**   262:9

**197/17**   5:21

**1998**   14:6,8

**1a**   54:4

**1b**   54:4

| 2 | | | |
|---|---|---|---|

**2**   5:13 26:13,14 35:2 36:17 37:3 37:6,7,13 38:7 38:15,25 39:8 40:3 56:15 57:7 58:1 76:6 77:5 77:11,12 78:16 92:11 106:21,24 113:17 126:4 128:3 137:15,16

139:22,23,25 140:1 144:3,5 147:22 165:20 165:24 168:8,14 198:14 211:3 212:19,25 213:14 227:2 261:15 264:8 271:2 272:2,12 272:22 273:2,12 273:22

**20**   109:7 116:18 117:22 241:8 254:11 271:20 273:15

**20001**   3:14

**2002**   204:16

**2005**   14:11

**2010**   36:25 38:2 65:10 79:17 217:19,22 218:2 219:5

**2011**   15:3

**2012**   54:11 154:6 204:16

**2016**   15:21 16:1 16:2 252:9,12

**2017**   253:19,21

**2018**   60:7 241:14 241:24 254:7,8

**2019**   36:25 37:21 38:3 233:16,24 238:12 241:6,12 241:14,21 242:1 254:2,5,23

**202-879-3930**   3:15

Moon Duchin , PhD
July 14, 2022
The South Carolina State Conf.vs.McMaster/Alexander

**[2020 - 5]**
Page 2

**2020**   37:20,22 65:12,16 198:8 217:22 218:2,4,6 219:5,8 241:20 254:13
**2021**   5:15,16 41:23 49:19 233:17 234:15
**2022**   1:23 5:13 5:20,21 26:14 154:6 197:2,17 197:18 198:8 270:11 271:3
**21**   241:11 271:21
**21.2**   159:23,25 160:20 161:1,6,8 161:15
**212-549-2500**   3:22
**22**   124:6 125:20 127:13 128:11 136:25 149:9 241:11 271:22
**222/23**   5:5
**222/5**   5:4
**23**   128:8 139:7 140:2 145:1 154:11 158:1 271:23
**23.3**   165:10,19 165:22
**23rd**   270:11
**24**   144:4 145:10 145:11 154:10 154:11 166:10 271:24
**24.4**   165:12

**24.5**   144:14,16 165:13
**25**   34:1 149:25 157:20 164:20 166:1 168:15 271:3,25
**25.4**   139:14,22 140:10 142:16 144:1 145:3 161:8 165:20,23 166:12
**25.4.**   143:21 144:10 145:11
**257/13**   5:6
**26**   171:3
**26/14**   5:14
**269/1**   5:7
**27**   172:4,5 176:8 181:11
**270**   5:8
**28**   166:3 173:12 173:14 174:20
**29**   63:21 126:3 141:21 142:4
**29201**   4:12
**2922**   270:15
**29601**   4:5

**3**

**3**   5:15 40:14 41:23 42:2 77:8 77:11,21 92:11 94:20 113:17 141:11 191:14 194:12 195:7 201:23 203:16 205:22 211:3 230:24 260:12

**271:3** 272:3,13 272:23 273:3,13 273:23
**3.1**   44:15
**3.2**   43:7,11
**30**   54:14 55:7,10 55:12 56:8 63:21 82:1,5 132:16 141:7,14 141:21 142:1,4 142:20,22,23 148:9,12 271:17
**30.3**   156:15
**300**   29:7
**30th**   234:15
**31**   90:4 92:11
**31st**   233:17
**33.7**   161:16
**34**   91:16
**349**   55:6
**35**   91:16 116:19
**36**   91:16
**3:21**   1:8
**3b**   76:1

**4**

**4**   5:16,20 49:19 49:23 51:7,9,12 57:4,5,22 63:13 67:7,9 68:17 76:18 89:17 92:11 173:11,14 174:20 180:22 194:1 197:17 211:4 217:7 224:7,8 259:10 261:9 271:4 272:4,14,24

**273:4,14,24**
**4.1**   52:14
**4.2.**   56:15
**4.3**   58:17 61:20
**4.3.**   59:22
**4.4**   61:25 62:20 63:12
**4.5**   66:12
**40**   3:6 54:16,18 55:11,19 56:4 65:10,17 142:1
**41/23**   5:15
**47.5**   154:20
**49/19**   5:16
**4th**   9:14 26:23 31:2 35:2 198:7

**5**

**5**   5:17 35:14 57:5 61:12,18 63:25 67:5 76:24 77:3,5,12 78:20 79:2 92:11 105:12 119:7,12,17,17 137:15,16 139:25 141:14 144:3,5 147:22 154:21 155:5,16 156:13 160:24 161:16,22,23 162:1,2 165:13 181:4 193:12,14 193:16,19,25,25 194:6 271:5 272:5,15,25 273:5,15,25

Moon Duchin , PhD
July 14, 2022
The South Carolina State Confvs.McMaster/Alexander

**[5.1 - acknowledge]**

**5.1** 77:11 89:15
**5.2** 106:20
**5.3.** 108:24
**50** 54:15,17
55:11,16 120:20
**501c3** 247:18
249:11
**51** 3:14
**5278941** 271:5
272:2 273:2
**528** 55:6
**5:50** 269:19

**6**

**6** 5:18 36:13
77:6,9,22 78:16
78:16,17,20
92:11 108:4
111:5 113:10,21
123:8,11 124:5,5
124:23 137:15
139:2,25 144:3,6
146:6,17 147:3
147:23 149:7,9
150:12 153:7
154:7 155:8,9
158:18 160:22
165:3,5 166:4
167:7,16 191:15
195:23,24
205:16 206:7
231:8 271:6
272:6,16 273:6
273:16
**6.1** 136:7 137:20
147:18
**6.2** 147:20
198:20

**6.2.** 147:8
**6/22/2030**
270:17
**6/3** 5:3
**63** 171:13 173:18
175:3
**64** 173:21
**65** 218:6
**66** 226:5

**7**

**7** 5:19 34:1
40:12 108:6
124:4 139:23
144:1,2 145:22
148:20 149:7,22
151:17,24 152:1
152:17 154:5
155:2 158:13
161:13 163:15
164:19 165:13
165:20,24
166:13 167:12
168:8 171:6
173:16 196:13
196:16 231:8
271:7 272:7,17
273:7,17
**7/14/2022** 271:5
**75** 157:16

**8**

**8** 5:20 59:10
60:16 63:4,11
139:21 143:13
155:19 158:1
173:17,21 184:2
184:5 190:20
197:17,22 271:8

272:8,18 273:8
273:18
**803-799-9800**
4:12
**864-370-2211**
4:6

**9**

**9** 139:20 143:16
159:19 165:8
166:9 271:9
272:9,19 273:9
273:19
**900** 4:5
**917-858-2870**
3:8
**92** 198:21 199:4
199:18 202:8
**962,000** 233:16
233:24
**962,177** 233:7
**964,000** 233:6

**a**

**a.m.** 1:24
**ability** 13:25
85:20 189:19
190:6 250:3,7
**able** 16:25 26:9
39:22 45:18
108:17 217:23
267:10
**absence** 162:11
**absent** 60:10
**absolutely** 16:21
121:8 132:22
167:15 182:22
238:8 243:1
263:11 264:15

**268**:18
**abstract** 178:17
230:3 233:15
234:13,14
236:25
**academic** 81:6
83:11 84:4,7,18
120:24 225:9,11
226:8 241:8,10
248:19 254:18
254:19
**academics**
243:25
**accelerator**
233:3,12 234:6
235:12 236:8
238:7 242:25
**accepted** 19:7,13
125:3,6 139:4
184:24
**accompanied**
83:18 138:23,24
**account** 39:23
88:7 95:3,9
117:14 133:7
152:23 267:25
**accountant**
255:25
**accuracy** 271:9
**accurate** 17:16
79:9 136:10
163:20 270:5
**accurately** 88:10
**acepedaderieux**
3:22
**achieve** 74:4
**acknowledge**
230:15

Moon Duchin , PhD
The South Carolina State Confvs.McMaster/Alexander

**[acknowledgement - align]**                                                Page 4

acknowledge...
  273:3
acknowledges
  107:12
acknowledgm...
  235:17 271:12
aclu  10:17,18
  256:25 257:17
  257:20,22,25
  258:6,10,15
aclu.org  3:22
acres  108:14
acs  30:9 36:25
  37:11,19,22 38:1
  39:11,13,17,20
  39:23
act  101:2 188:14
  188:24 212:20
  212:22 213:3
  261:16 262:9
active  232:17
activities  46:5
  232:23 243:2
  253:19
add  28:6 99:11
  119:10 120:17
  131:1 177:23
  226:6
added  226:3
  265:10
adding  234:10
addition  164:12
  233:23 243:4
additional  57:12
  97:25 116:19
  158:7 181:23
  234:5 259:14,16

additions  273:6
address  17:11
  35:8 51:25
  67:12 83:22
  102:24 108:2
  164:9 190:11
  257:2,3 268:8
addressed  34:21
  42:14,18 69:19
  69:23 79:21
  191:4,22 211:3
addresses  44:1
  66:12 107:24
addressing  81:1
aden  3:5 5:6 7:5
  7:8 8:25 10:2,13
  10:14 91:22
  103:5 185:16
  186:2 237:22
  244:24 245:14
  248:21 249:4,23
  250:14,22 256:8
  256:14 257:8,14
  268:22 269:3
  271:1
adequate  126:19
administration
  219:23
administrator
  224:24
administrators
  222:12
adopt  22:6 23:13
  138:17
adopted  121:1
  123:18,21
adoption  126:21

adriel  3:20
adults  86:24
advance  15:14
advantage  59:10
  59:15
advice  243:13
advising  122:6
affairs  47:9
  218:14
affect  64:8 65:5
  98:20
affiliate  15:6
affiliated  223:8
  268:3
affiliates  223:15
affiliations
  163:12
affixed  270:11
afraid  237:10
age  21:13 36:5
  37:7,9 39:14,15
  39:18 46:12
  160:13 262:21
agency  232:5
aggregated
  142:12
agnostic  185:19
ago  10:5,9 13:2
  30:20 34:15
  68:12 96:16
  111:24 113:23
  115:16 179:8,14
  180:17 189:21
  190:4 213:24,25
  223:1,21 232:24
  245:21
agree  45:7 55:24
  110:20 142:25

146:4,11 148:10
  155:4 163:1,2
  171:2,18 175:21
  200:2 201:1
  208:10 258:14
  259:6
agreed  143:5
  155:17 165:11
  167:15 265:24
agreement
  199:19 258:10
  258:15
ahead  7:11
  10:23 28:5
  112:17 126:15
  170:13 195:15
aimed  79:5,20
al  271:4 272:1
  273:1
alabama  10:15
  10:16 17:20
  18:4 19:21 20:2
  20:25 21:16
  22:15 53:3
alexander  1:9
  2:3 3:11 6:7
algorithm
  125:12,13,17,23
  126:7 127:1
  128:19 130:16
  130:17 132:5
  134:3,14 135:12
  135:19 147:1,1
  149:11 176:24
algorithms
  130:9 230:1,2,7
align  157:4,21

Moon Duchin , PhD
The South Carolina State Confvs.McMaster/Alexander

July 14, 2022

[alleged - approximately]

Page 5

alleged 138:10
allotted 271:20
allow 168:15
177:4 178:3
allowable 217:1
allowed 104:9
allowing 236:22
allows 116:8
185:3 214:6
216:3
altered 147:21
alternative 20:7
23:14 30:12
125:1 127:15
128:1 136:14,15
154:11 155:7
156:13 198:19
198:25 199:9,23
alternatives
177:3,23,25
267:21
amathias 4:6
ambiguous
220:5
amended 262:9
amendment 96:3
96:13 178:3
amendments
261:18
american 3:18
3:19 36:21
37:19
amount 31:8
226:3
analogy 133:22
analyses 113:17
analysis 12:23
21:2,9 24:20

27:15,24,24 28:1
31:17,18 32:6
61:8,20 62:24
77:17 84:1
88:17,18 103:11
113:11,13 120:3
120:4,7,9,13,23
121:7 123:16
126:6,24 133:8
136:7,8 149:16
150:6,8,14,15,21
150:24 151:6,13
154:1 155:24
158:3,8,21
160:16 163:25
164:9 168:21,25
178:16 179:13
180:3,3,12,14
182:15,22 192:4
192:5,13 193:3,9
193:14 194:18
197:5,6,12 199:9
218:19 225:12
227:3 229:15
analyst 224:24
analyze 21:16
146:7,9 188:24
194:7
analyzed 129:11
213:13
analyzing 52:21
138:17 151:8
167:6 192:10
193:24 223:23
anchor 141:10
anderson 192:18
andrew 4:4
221:25 222:25

ann 90:5
annual 240:2
242:9
answer 6:24
7:11,11,18 8:1
23:3 28:10
32:18 40:1,10
43:19 46:3 84:3
84:16,22 85:10
93:16 97:24
101:22 102:3,18
103:25 108:17
108:25 112:17
124:10 125:5
135:9 151:25
157:24 161:9
170:13 185:17
221:2 223:4
245:8,17 247:15
249:25 251:7
266:13 267:18
answered 40:11
146:19 244:25
answering 95:7
answers 6:24
34:15 75:22
194:11
anticipatory
86:21
anybody 148:21
222:19
anyway 150:25
apologies 15:13
138:2 184:17
apologize 143:16
238:2 258:12
appeal 205:12
206:3 213:17

appealing 40:18
appear 39:19
110:6,11 128:5
206:23
appearances 3:1
4:1
appeared 230:9
appearing 6:11
appears 37:3
63:15 139:13
appended 273:7
appendix 136:4
193:18
apples 38:1,1
applicable 271:8
applications
84:11 131:3
apply 111:9
113:10 232:13
253:12,14
applying 113:20
appointments
15:6
appreciate 22:4
39:25 70:19
75:19
approach 135:13
appropriate
126:8 252:9
256:11 259:21
260:2
approved 26:1
184:24
approximate
19:15
approximately
29:14 251:18

Moon Duchin , PhD
The South Carolina State Conf vs. McMaster/Alexander

July 14, 2022

**april** 5:13,21
9:14 26:14,23,25
197:1,18
**arbitrarily** 54:9
**area** 15:18,20
18:14,20 50:20
84:5 90:8,9
94:22 128:23
137:8 147:8
148:7
**areas** 15:9,22
35:8 78:2,3,10
78:19 82:2 89:9
154:1 163:21,23
164:8,16 167:22
167:23 168:6,10
170:2 189:13,22
194:13 195:7
221:20
**arguably** 180:23
**ari** 253:2
**arnold** 10:19,22
**arranged** 114:9
**arrangement**
118:9
**arrangements**
249:1
**art** 136:20
140:18 170:1
174:25
**article** 230:17,23
231:1,5 235:5
237:7 243:13
245:10
**articles** 17:2,4
17:10 131:23
223:19 246:1

**articulated**
100:1,3 203:21
**articulation**
212:19
**ascribing** 216:4
**aside** 139:2
**asked** 11:16 22:8
34:17 102:24
124:9 146:5
167:18 198:6
243:13,19,25
263:24 269:3
**asking** 21:24
32:20 45:20
71:16 72:17,19
73:8 88:7 95:7
101:4 104:18
109:6 112:13
151:24 161:6
170:10 181:18
181:22 182:12
191:6 193:3
198:16 247:11
249:5 257:16
258:18,23
262:17 268:2
**asks** 11:23 12:8
**aspect** 30:2
188:25
**aspects** 18:21
28:24 187:20
**assembly** 25:13
44:11,23 45:11
45:16 47:12,17
47:19 52:20
59:22 60:12
68:25 69:5
73:15 88:5 99:9

101:18 102:16
104:5,13 190:5
208:17 209:15
210:6,15 211:7
212:4 214:12,17
214:24 261:13
266:25
**assembly's** 67:11
**assert** 40:8 45:2
45:5
**assertion** 45:8,8
**asserts** 216:23
**assess** 118:24
**assessed** 56:7
179:4
**assessment**
188:22
**assign** 66:6
**assigned** 66:3,5
198:21 199:5
**assigning** 66:8
**assignment** 9:20
97:20 213:15
**assignments**
98:1
**assistance** 27:8
28:9
**assistant** 28:19
28:21 29:1
227:1,2
**assistants** 27:10
27:19 226:24
227:21
**assisting** 20:12
**association**
242:7
**assume** 7:19
58:6 88:13,16

145:22 247:24
**assumed** 242:6
**assuming** 57:12
58:10 228:6
250:9
**assumption**
155:6,12 157:8
**assumptions**
12:23
**assure** 38:17
39:2,5,24 243:8
**assuredly** 38:21
**attached** 29:24
271:11
**attempt** 12:5
28:17 40:17
51:5 54:7 69:3
70:10 132:10,14
146:7,9 249:25
251:15
**attempted** 11:13
42:16 82:24
**attempting**
62:18 143:22
151:25 190:11
**attempts** 216:12
**attended** 265:5
**attention** 164:17
263:9
**attorney** 271:13
**attorney's**
213:10
**attorneys** 3:2,11
3:18 4:2,9 25:8
258:1,6,9
**attractions**
61:19

Moon Duchin , PhD

July 14, 2022

The South Carolina State Confvs.McMaster/Alexander

[attributable - believe]

Page 7

**attributable**
236:4 255:21
**attribute** 215:17
235:5
**austin** 253:22
**author** 217:4
269:15
**authored** 269:16
**authoritatively**
125:5
**authorities**
218:11 219:19
**authority** 45:6
70:23 208:25
222:8
**authors** 208:5
**auto** 126:25
**available** 13:10
38:4 52:7 85:21
97:13 100:5,25
101:14 177:4,25
193:7 236:24
266:21,22,25
267:6 271:6
**avenue** 2:1 3:14
110:6
**average** 141:15
202:7 251:4,22
**averaged** 58:23
**avoid** 57:12 58:9
58:10
**avoiding** 76:11
220:16
**aware** 24:9
29:17 70:23
72:13 73:9,13,14
73:18,19 81:6
83:11 84:25

85:12 89:24
90:11,24 92:13
92:14 93:8,22
99:23,25 100:13
100:17,19,22
101:10 102:5
104:4,12 107:5
107:18,22
108:20 109:10
109:14,15 111:2
120:24 138:16
204:9,12 214:4
216:9 217:21
218:1 221:4
246:17,18,22
247:3,11,24
248:15 260:25
263:4,8,12 265:7
267:25 269:16
**awkwardly** 43:6
71:14

**b**

**b** 5:10 20:4 21:1
49:15 50:7 76:6
90:16 91:19
107:10 109:20
255:10 261:7,22
261:23,24,25
262:1
**back** 23:1 42:21
43:3 50:16 51:3
55:3 59:20,21
60:16 62:3 63:4
63:12 67:6
71:22 88:24
91:3 92:13
105:2,8 113:22

127:13 128:11
139:20 140:2
143:13 148:24
149:9 154:10
155:18 158:1,12
159:10,19 166:9
172:19 180:22
181:11 193:17
195:15 202:10
203:16 220:3
221:11 254:12
**background**
14:2,3,12,15,20
228:5
**balance** 97:7,17
97:23 125:22,25
126:7 194:13,13
210:20
**balancing** 97:5
188:14,24
**ballpark** 59:2
91:21
**baodong** 150:2
**baodong's**
150:21
**bar** 140:14,24
142:3,6,9,13
143:4 148:2
**barnum** 2:1
225:17,19 239:1
239:4 247:21,24
**bars** 142:1
**bartlett** 120:20
**base** 229:2
**based** 47:9 59:8
60:21,22 62:22
80:5 125:13
182:14 194:8,18

200:14 246:8
260:4,23 262:18
264:12 267:3
**baseline** 111:8
124:8,19,21,22
168:9 207:12
**bases** 21:10
**basic** 46:17
**basis** 31:24 32:9
33:2 156:3
179:25 180:2,4
237:3,5 243:15
**bcvap** 39:15
**bear** 41:13 77:14
244:12 256:3
**beaufort** 91:19
92:8,12 94:11,12
**becoming** 53:1
**began** 252:9,12
**behalf** 1:5
**behavior** 160:11
167:3
**belief** 194:18
**beliefs** 75:12
**believe** 7:5 8:20
9:14 12:14 18:5
19:13,21 20:16
22:11 23:24
28:2 29:6 31:4
34:10,15 38:9
40:5 44:18
52:15 57:15
60:24 61:2
63:13 68:13
71:16 76:5
77:21 87:22
91:18 93:1,6,21
95:10 96:1,17

Moon Duchin , PhD
The South Carolina State Conf vs. McMaster/Alexander

July 14, 2022

[believe - boundaries]

Page 8

107:25 111:18
119:15 132:19
143:10 155:7
158:24 197:6
198:24 200:11
200:24 201:23
203:14,18 213:8
213:11 219:15
219:18 223:20
227:24 231:8,20
233:18 234:18
235:4 237:6,13
240:12 247:20
248:23 249:7
250:10 251:13
251:13 255:2
256:21 259:2,9
260:11 263:24
265:5,9,24 266:3
**belong** 59:7
**ben** 256:6,7,20
256:21
**benchmark**
77:10 79:17,22
90:20 93:5,7,18
94:12,13 107:2
107:13 108:15
108:18 109:1
154:7 191:17
199:10,21 201:5
201:7 217:11,18
218:5 221:6
**benefit** 184:10
246:3
**berkeley** 91:14
91:17
**bernard** 160:19

**best** 13:25 38:19
40:11 66:6
73:22,25 74:8
75:1 85:20
87:22 88:1,4
97:1 205:6
243:8 244:11
245:22 247:7
250:3,7 266:20
266:21
**better** 24:10
60:18 62:5,8,12
63:16 64:25
117:12 125:17
131:15 174:25
175:13 183:3
201:3 202:8
210:16 214:1
218:25
**beyond** 23:25
40:19 44:25
212:21 249:13
249:13 263:6
**biden** 118:24
152:14
**big** 201:9
**biggest** 224:3
254:1
**bill** 252:3,3
**billable** 251:25
**billing** 29:25
67:13 68:10,16
68:24
**binned** 142:11
**bins** 140:5 142:7
142:7,13
**biographies**
253:1

**bit** 7:22 20:24
28:11 32:16
35:12 50:21
67:1 71:2
115:20 117:1
122:6 125:17
126:2 149:22
150:18 170:1
192:20 195:12
204:25 205:9
206:19 214:18
220:5 225:20
249:24
**black** 21:12
22:10,14 34:3,5
34:18 35:9 36:5
39:14,15 46:11
46:12 52:16,24
53:2,18,22
105:15,18 108:7
111:10,15 114:8
114:23 116:4,10
116:11,12,13,20
116:22 117:6,13
118:22 137:14
146:2,3 150:12
151:14 152:5,10
153:2,9,16,20
154:1 155:21,23
156:2,6,8,11,20
157:3,4,12,16,17
157:20 158:5,16
159:3,8,12,24
160:5,6 161:20
162:10 169:5,6
169:16 173:25
174:15 175:9
177:5,21 178:3

181:15,16 182:9
189:12,14,20,22
190:6 191:24
262:21 268:14
**blindly** 177:20
**block** 58:20
59:14 62:11
129:18 251:12
**blocks** 65:8,11
65:16,19,22 66:3
66:5,7,8 127:1
**bodies** 19:18
20:12 29:3
222:7
**body** 74:15
193:19 223:22
**bold** 69:1,6
259:15
**boldface** 68:20
68:23
**bonds** 248:11
249:12
**book** 83:14
160:18 223:20
**boost** 127:5
**borrow** 133:22
**boston** 253:21
**bother** 109:6
**bottom** 36:24
54:5 56:16,23,25
57:3,16 127:18
171:11 172:19
173:17 202:11
263:20 264:6,9
**boundaries**
43:16 47:25
48:2,13 49:2
50:14 59:17,18

Moon Duchin , PhD
July 14, 2022
The South Carolina State Conf vs. McMaster/Alexander

**[boundaries - candidate]**

Page 9

64:11 105:17,18
105:19,22 108:7
108:8 134:9
217:7 220:5,7
**boundary** 202:6
219:10,17
**box** 141:20,23
**boxes** 139:9
140:3 141:10
**boy** 146:18
**break** 7:23 8:1
50:21,24 51:2
105:1,5,7 148:22
148:23 149:4
195:14,20
222:20
**breakdown**
195:6
**breaking** 112:1
127:7,23 249:6
**brief** 14:22
198:6
**briefly** 9:15
18:13 77:2 87:1
**bright** 119:12,16
120:17,18
**broad** 3:20
18:17
**broader** 82:11
**broadly** 114:9
123:20 125:15
261:6
**bromley** 90:5
**bromley's** 90:8
**brought** 6:9
244:12 245:19
245:20

**build** 124:24
127:9
**building** 248:7
249:11,15
**builds** 135:20
**bulb** 107:25
**bulk** 141:13
142:24 260:17
**bullet** 35:3
198:15 200:4
202:10
**burden** 57:12
58:6,10
**bureau** 30:9
37:21 65:15
217:25 218:16
**burr** 4:10
**burr.com** 4:13
**business** 120:18
123:3,13 255:10
256:2
**buyout** 236:16
**bvap** 36:10,18
39:14 54:14
55:6,10,12,16,19
55:19 56:4,8
77:4 114:14,16
116:18 117:10
117:20,22 137:2
137:19,22
138:12 139:4,13
139:13 140:4
141:7,16,16
143:19,20 144:7
144:8,12,12,18
144:18,19,23,23
144:24 145:25
146:4,10,16,17

146:18 147:3
148:8 156:12
159:22,25
160:21,21 161:1
161:3,3,15,16,23
162:2,7 163:16
165:9,16,22,23
166:9,15,20
167:5,8,14,25
168:2,5,7,12,16
168:19,22
182:20 205:15
206:7 262:25
263:5,6
**bvaps** 53:25

**c**

**c** 1:9 3:11 6:17
20:4 21:1 93:2
108:10 271:1
**calculate** 52:16
173:15
**calculation**
60:23
**calculations**
60:19
**california** 14:25
**call** 9:1 27:4,21
34:2 36:15 59:7
82:3,16 113:2
124:25 141:13
142:22 190:13
203:5 238:19
264:15,16
265:15
**called** 15:8,18
18:20 20:3,14
21:12 35:6 36:7

49:14 51:10,20
52:14 61:4 76:1
84:6 111:7,12,24
114:8 121:18
124:15 129:2,7
130:8,16 142:10
191:19 197:10
223:10 225:22
232:9,25 234:1,4
234:25 235:15
237:14 252:14
252:21 255:8,10
255:16
**calling** 154:6
**calls** 250:4
**campaign**
155:22 156:5
158:4
**campbell** 233:10
233:11
**campus** 225:15
225:17
**campuses** 234:7
**candidate**
114:23 115:7
116:11,13,20
118:25,25 119:9
119:14 120:15
122:22 123:2
151:14,19 153:2
153:10,17
154:18 155:22
156:5,19,21
157:17,22 158:4
158:16 159:3,24
160:5,6 161:15
169:5,7,11,13,17
169:18,22,23,25

Moon Duchin , PhD
July 14, 2022
The South Carolina State Confvs.McMaster/Alexander

170:2,5,6,16,18
170:18,19,21
172:1 174:1,3,15
174:19 175:5,9
175:11 177:21
201:18
**candidates**
114:11,11
115:17 117:6
118:10,22 119:3
119:5 121:19,21
122:2,14 150:13
151:20,21,22
152:5,5,10,11,18
153:21 156:2,10
157:12 159:9,12
161:21 162:3,4
162:10 171:13
175:13 176:5
177:5 178:4
184:23 189:4,25
208:4
**capacities** 1:18
**capacity** 1:10,10
1:12,13,14,15
**capital** 259:15
**capture** 87:17
88:19 157:23
**careful** 75:21
164:10 183:19
214:25 215:15
215:17
**carefully** 32:1
**carolina** 1:1,3,16
1:18 3:3 4:5,12
5:14 6:10 10:12
13:2 16:11,12,14
17:19,20 18:5

23:17,18 24:4,17
24:20 25:5,11
26:15 29:20,21
30:1 31:14 36:8
42:22,23 44:11
47:1 54:13
60:13 71:17
72:10,14 73:9,17
81:2 82:12
88:12,22 98:9,13
100:15 116:4
120:6 123:9
126:25 131:13
135:18 136:2
150:9 152:6
163:6,21 164:6
170:7 172:17
184:6 204:11
217:21 218:1
219:7,14,16,18
222:8,11,15
239:3 253:22
262:15 263:25
265:19 266:18
270:4,12 271:4
272:1 273:1
**carolina's** 46:17
**carolinians**
91:19
**carried** 111:14
205:6
**carry** 127:14
**cartography**
19:22
**case** 1:8 6:12
9:19 10:1 11:18
12:1,16 13:12
18:4 19:6,9,10

20:25 22:7,25
23:17,18,25 24:5
24:5,12,14 25:10
25:14,18,22,23
26:4,6,18,21
29:19 30:2 31:5
38:21 39:3,6
53:4 60:7 65:19
75:14 99:13
105:4 125:4
127:3 129:4
131:13 138:13
138:19 150:4,24
152:22 153:16
153:24 166:18
182:15 188:22
197:5,9 205:10
205:12 211:17
213:17 214:12
216:8,8,10 223:3
227:11 228:24
229:4 230:19
244:11 257:17
257:21,23 258:2
**cases** 17:13,21
17:22,25 19:1
20:6 22:18,22
77:17 85:6
125:8 204:10
218:12
**cast** 19:14
178:13
**catch** 70:18
205:21
**catching** 261:20
**categories** 260:6
**category** 12:4
48:12 52:19

53:19
**causal** 183:10
**cause** 270:8
**caveat** 75:19
**cayce** 108:13
**cd** 77:22 106:24
156:13 191:15
205:15 206:7
**cemeteries**
110:19,21
**cemetery** 110:6
110:7,13,16
**census** 30:8,9
36:11 37:12,18
37:21 38:4,8,16
39:1,9,12,21
40:4 65:8,10,11
65:12,15,16 66:8
110:17,24
217:25 218:4,16
218:17 225:1
232:9 233:4
**centered** 25:16
**cepeda** 3:20
**certain** 30:7
80:23 87:18
113:16 115:8
125:12 129:19
132:11 168:19
181:14 182:2
199:19 249:22
268:5,20
**certainly** 12:14
47:5 52:10
53:10,23 61:18
68:1,7 71:2,21
80:11 81:16
86:20 87:5

Moon Duchin , PhD
July 14, 2022
The South Carolina State Confvs.McMaster/Alexander

**[certainly - clarify]**
Page 11

88:22 89:9
98:24 117:10,13
122:12 128:20
133:5 135:24
140:6 151:23
152:4 162:20
193:7,20 205:1
206:9 212:15
215:1,2,18 229:1
240:7 247:20
250:4,24 265:9
**certainty** 40:9
123:6 246:6
**certificate** 5:8
270:1
**certified** 270:2
270:17
**certify** 270:4,7
**certiorari** 24:6
**cetera** 202:9,9
**chain** 129:2,14
224:4 235:16
**chains** 129:3
230:20 231:12
235:3 236:10
237:15
**chair** 192:17
**chairman** 1:11
1:13,14
**challenge** 6:9
25:12
**challenged** 23:19
137:17
**challenging**
82:15 145:5
**chance** 115:18
**chanel** 228:2,18
228:18,21

238:21 239:3
246:20
**chanel's** 228:24
**change** 25:16,18
36:24 142:13
218:11,24 222:8
233:16,24 272:4
272:7,10,13,16
272:19
**changes** 36:18
78:14 133:15
201:9 218:13
271:10 273:6
**chapter** 83:14
**characterization**
68:24 162:24
252:9
**characterize**
14:12 135:3
240:16
**characterizing**
88:2 163:8
164:2
**charleston** 79:8
89:1 93:4,10,10
105:17,17,24
106:2 163:17
164:4,12 166:22
166:23 167:1
189:12 194:5
**chart** 55:15
148:2 171:4,11
173:17 195:5
**charts** 151:18
**check** 19:23
133:7 220:20
230:25 231:9
233:19

**checking** 93:25
116:1
**cherry** 38:18
39:24
**chicago** 14:9,11
14:24
**choice** 15:23
37:16,17 114:11
114:23 115:8,18
116:12,14 117:7
118:23 150:13
151:14 152:5,10
154:19 156:3
157:12,17,22
161:21 169:5,7
169:12,14,17,23
169:25 170:3,6
170:18 174:15
175:9 177:6,21
178:4 184:23,25
189:4 190:1
208:4 252:15
**choices** 89:2
189:1
**choose** 39:20
59:4 101:24
129:20,21
130:10,12
132:17 137:10
208:13,17 209:8
209:15,25 212:7
**choosing** 130:9
**choropleth**
35:20,22,24,25
89:16,17
**choropleths**
36:14,16 46:10

**chose** 39:4
143:11 244:22
**chosen** 38:23
54:9 169:18
191:22
**chris** 1:12
**chunks** 77:25
78:9 82:17
**circulating**
216:12
**circumstances**
37:15 72:5
268:3
**cite** 122:3
**cited** 79:6 92:11
203:6 235:17
**cities** 48:20 63:3
63:24 79:6
106:4,6,10,13,15
130:19
**citing** 133:1
**citizen** 39:15,18
**city** 63:22 64:16
64:23 181:1
**civic** 15:7 223:9
**civil** 3:18,19
251:8,11
**claim** 155:20
156:3 184:19
**claiming** 74:16
**clarification**
142:14 153:1
164:11
**clarified** 120:21
**clarify** 7:16
12:19 25:24
72:16 74:21
82:11 101:6

Moon Duchin , PhD                                           July 14, 2022
The South Carolina State Conf vs. McMaster/Alexander

[clarify - communities]                                           Page 12

110:8 114:7
137:4 218:7
226:7 227:4
255:7
**class** 59:7
**classic** 130:16
**classify** 26:4
**clause** 259:18
**clear** 31:7 42:6
67:18 74:16
82:9 83:7 98:11
100:18 113:14
116:9 124:10
137:25 152:20
161:18,19
164:23 167:1
168:10 175:12
185:8 196:22
204:21 228:17
232:13 260:8
**clearer** 135:7
250:24
**clearest** 56:23
189:8
**clearly** 41:8
44:19 53:5
87:16 118:21
184:9 207:22
208:14
**clients** 251:6,16
**clifford** 1:17
**close** 121:21
122:3,18 159:15
173:22
**closely** 129:18
**cluttered** 143:11
**clyburn** 108:5
123:11

**coastal** 92:25
94:23 192:18
**coastlines** 59:19
**code** 27:23
226:21 228:14
229:1 230:2,5
**coding** 228:19
**coexist** 168:16
**cognizant** 94:16
95:11,13 98:15
**cohesively** 113:5
**coi** 109:8 132:13
133:14,20,21
**coincidence**
181:19
**cois** 48:13 82:3
82:17 93:1
94:17 95:12
133:6,9 207:19
**collaborations**
230:7
**collaboratively**
230:16
**collaborator**
253:6
**collaborators**
51:16 229:23
**collect** 12:3,11
87:24
**collected** 13:16
80:14,15 265:19
266:6
**collection** 66:25
111:14 134:12
223:12,17 266:7
**collections**
124:25

**collective** 252:21
253:4
**collectively**
185:22
**collects** 80:16,18
**college** 15:7,8
223:9,10 224:23
228:9
**colleton** 93:15
93:16,18,23,24
94:2
**colleton's** 93:20
**colored** 78:2
**colorful** 78:8
**columbia** 1:2
4:12 78:25 79:7
88:25 107:10,19
107:23 108:11
108:13 163:18
164:5,12 189:12
**column** 54:18
56:7,16 64:24
**combination**
115:8 157:2
176:4
**come** 59:18
63:12 99:5,17
102:21 103:1
150:5 164:13
199:3 258:5
**comes** 17:8
18:14 51:24
107:24 123:7
164:15 220:3
221:11 239:6
**comfortable**
164:2

**comfortably**
122:16
**coming** 39:25
61:19 83:23
**comment** 86:15
**commenters**
83:4 86:12,15
92:10
**comments** 21:24
83:3 258:6
**commission** 1:16
1:18 20:14,15,17
23:6 86:3
270:17
**committee** 1:11
1:13 45:5
251:11
**common** 120:8
142:11 172:16
177:20 218:22
244:19 262:20
262:25
**commonly**
203:20
**communications**
12:6,9 13:22
37:22
**communities**
35:9 43:15
47:25 48:1,15
49:1 62:24 63:9
70:20 71:22
73:16,23 74:11
74:14 75:6 79:6
79:12,14,16,24
80:23 81:9,10,14
81:20,24 82:21
83:21 84:2 85:7

Moon Duchin , PhD
The South Carolina State Confvs.McMaster/Alexander

July 14, 2022

**[communities - conclusion]**

Page 13

85:19 87:8,13
88:3,21,25 89:4
95:15 98:19,23
132:11,13,17
133:1 188:1
191:24 217:7
266:18
**community**
30:13 36:22
37:19 70:25
71:4,8,10 72:15
74:20 75:13
84:14 90:7 91:5
91:9 92:9,24
94:4 96:4 224:5
**compact** 98:21
107:17 129:17
129:20,21 132:7
**compactness**
43:15 47:24
49:2 58:17,20
59:7,24 60:4,19
60:21 61:5,8,10
61:13,17,20 62:3
77:7 98:7,20,22
99:1 128:13
129:12,23,24
131:25 149:13
180:23 188:9,18
188:19 211:18
264:25 265:8,14
**company** 227:6
**comparable**
131:15,19
202:14
**comparably**
202:20

**comparative**
136:22
**comparator**
207:12,24
**compare** 55:3
136:13 174:11
199:13
**compared** 39:3
111:7,15 124:7
124:19,21 126:3
146:14 151:21
191:6 199:10
207:11 264:5
**compares**
149:17 199:21
200:18
**comparing**
184:5
**comparison** 38:1
140:11 199:14
199:15,16
202:25 203:1
219:11
**comparisons**
179:21
**compelling** 33:4
231:18,20,21
**compensated**
29:7 227:16
242:23
**compensation**
29:24 240:25
**competing**
208:11
**complaint**
137:13,18
**complement**
174:8 188:12

**complete** 28:10
46:4 66:4 75:22
83:9 96:9
132:23 194:11
270:5 273:8
**completed** 95:24
271:17
**completely**
37:16 139:4
162:6 245:3
**compliance**
210:7,16 211:9
227:12
**complicated**
74:15 75:6
219:1 234:3
264:13
**complied** 267:10
**comply** 57:8
60:10 261:15
262:8 267:14,19
**component** 78:4
225:21
**components**
78:4 231:17
**comprehensive**
28:18
**compromise**
41:9 178:2
**compromised**
37:23
**computational**
18:18 27:25
129:6 134:23
226:21 228:14
236:13
**computer** 25:4
179:4 228:3

239:12,16,20
**computers**
246:15,17
248:20
**computing** 228:4
**concede** 70:9
87:16 115:23
205:1
**conceded** 183:20
**concentrated**
15:10 163:22
**concentrating**
184:21
**concept** 121:10
121:16 132:13
133:4,20 230:8
252:6 253:4
**conceptual**
115:22
**conceptually**
130:5
**concern** 34:5
**concerning**
267:15
**concerns** 33:15
33:21,23 34:9,15
34:20,25 188:1
192:9
**conclude** 31:23
33:5 70:6
181:13
**concluded**
235:13 269:19
**conclusion** 32:1
32:4,12 33:4
131:18 179:22
182:7 183:1
184:1,3 191:25

Moon Duchin , PhD                                    July 14, 2022
The South Carolina State Conf vs. McMaster/Alexander

**[conclusion - constitutes]**                               Page 14

192:3,8
**conclusions**
33:12,13 64:22
80:5 115:15
182:13
**conclusive** 185:7
**conclusively**
32:21
**concurrent**
235:9
**conditions**
178:19 268:6
**conduct** 61:8
113:17 150:7
**conducted** 88:17
129:2 154:3
199:22
**conducting**
247:7
**conference** 1:3
3:3 74:7 271:4
272:1 273:1
**confidence** 126:6
127:5,11
**confident** 29:19
243:10
**configuration**
168:15
**confirm** 46:1
133:12 147:10
147:11 184:4
200:25
**conflict** 42:12
69:17 207:20
211:5,14,17
226:12 227:12
239:25 240:9,16
240:21 242:3,21

244:22 245:11
248:17 249:3,7
249:20 250:2,5,9
250:12,21
**conflicted** 75:15
**conflicts** 240:3
**confused** 157:6
241:9
**confusing**
150:18
**congress** 136:3
261:13 267:22
**congressional**
5:14,15 13:3
23:20 24:4
25:12 26:15,22
29:21,24 30:11
31:14 41:24
42:10 44:24
51:10 57:13,24
58:1,11 126:20
135:18 151:3,8
151:12 184:6
189:15 220:18
227:25 257:17
257:22 258:2
263:17 268:5,6
**congressman**
123:10
**connect** 114:19
**connected** 15:22
24:20 78:3,4
**connection** 6:8
6:12 12:1,10
121:16
**connects** 137:16
**conscious** 214:8
214:14 221:1,10

221:12 262:21
263:7
**consensus** 66:4
**consequence**
158:9
**consequences**
248:24,25 249:6
249:10
**conservative**
89:12 266:3
**consider** 20:18
23:13,14 69:5,9
69:12 73:5
82:17 98:22
102:19 104:9
125:12 134:18
135:14,19,22
147:4 151:2
156:23,25
**considerable**
87:23 156:9
**considerably**
175:15
**consideration**
46:24 49:8 61:3
69:25 71:15,20
72:4,21 73:10
99:24 211:25
212:6 259:20
**considerations**
23:22 34:8 49:6
49:7 61:14
67:17 69:4,22
101:4 102:21
103:1,24 168:24
176:23 187:21
188:8 206:22
207:13,18

210:17 211:10
213:4 220:17
259:14,16
262:22 263:7,13
**considered**
42:12 48:14
71:4 74:11
76:15 102:25
112:7 117:2
157:18 188:3
205:1 266:24
**considering** 69:1
100:14,23
101:10,18
102:17 104:5
177:19 187:15
189:11 192:23
221:12 266:14
**consistency**
49:15 50:8 76:2
76:6 204:19
**consistent** 263:5
**consistently**
140:20
**consonant**
214:23
**constant** 178:21
178:24
**constituent**
49:15 50:8 76:1
76:6 204:18
**constituents**
76:11
**constitute** 75:12
140:22
**constitutes** 141:2
195:3

Moon Duchin , PhD
July 14, 2022
The South Carolina State Confvs.McMaster/Alexander

**[constitution - correct]**                                    Page 15

**constitution** 43:9
213:2 261:19
**constitutional**
42:22
**constitutive**
112:7
**construct** 32:11
48:6
**constructed** 43:6
120:1 167:20
**construction**
169:14
**consulting** 226:9
227:6 240:19
245:2
**contacted** 9:25
**contain** 65:8
149:16
**contained** 45:4
67:10
**contains** 167:2
**contemplate**
44:19 115:3
**contemplated**
207:7
**contemplates**
116:6
**contend** 82:13
**contention** 97:2
119:14
**contest** 151:11
170:8
**contests** 76:11
154:19 171:19
**context** 20:13
46:21 119:11
125:7,10 138:8,9
138:9 146:2

187:24 229:22
**contextualize**
40:18
**contiguity** 43:15
47:24 49:2
125:23
**contiguous** 66:9
**continue** 185:18
**continues** 259:22
266:11
**continuous** 27:4
**contour** 59:8,11
**contours** 46:18
**contracts** 252:4
**contrary** 262:14
**contrast** 151:21
**contravened**
184:25
**contravenes**
184:8 186:14
187:19,22
188:11
**contravention**
184:13,14
**contributes**
162:14
**control** 25:25
138:4,7
**controversial**
71:10,12,21
**convened** 20:15
**convergence**
233:3,12 234:6
235:12 236:8
238:7 242:24
**conversation**
218:8 245:21
247:8,9

**conversations**
96:10
**conveyed** 185:13
**convince** 126:17
**copied** 224:14
**copies** 11:23
12:8 271:14
**copy** 26:11 29:2
29:4 41:18
49:25 52:7
**cora** 228:2,6,12
228:17
**core** 67:14,16,19
67:20 68:22
69:12 71:3 72:7
76:11,21 199:8
199:19,23 200:1
201:9,24 202:2,7
202:21 203:3,9
203:11 204:6,7
205:12 206:3
208:12 209:20
210:1,21,23
213:17 214:7,13
215:3,19 216:15
221:18 231:14
**cores** 49:13
50:11 70:24
72:2,14 73:5,11
73:16 74:10
75:24 76:3,19
99:1 135:14
188:2 201:5
203:2 204:23
206:22 209:7
211:19 220:25
221:8

**corpus** 28:19
**correct** 6:12,20
21:5 23:2,7,8
24:7 26:7 30:5
31:15 36:20
37:10 40:4,7,14
40:17,20 42:20
47:14 50:15
52:18 54:12,15
56:5 57:15 58:3
58:15,16 61:23
62:12 63:11
68:14 70:15
72:12 73:1 76:7
78:16 82:8 87:4
100:3 102:9,11
106:5 107:11,14
109:9,17,18
137:4 139:10
141:3 144:15,25
145:3,9 146:14
146:21 147:6,24
148:17 150:8
151:10,19
152:19 153:4,5
153:10,13 154:9
155:14 156:16
156:20 158:23
158:25 159:13
160:2 164:6
165:13,20,24,25
166:8 167:9,14
169:5,8,12
170:25 171:21
174:17,20 175:6
175:11 179:12
181:9 194:23
195:1,7 197:3,9

Moon Duchin , PhD

July 14, 2022

The South Carolina State Conf vs. McMaster/Alexander

[correct - criteria]

Page 16

198:2 199:2
201:19 210:24
217:18,19
225:10 226:18
230:22 231:15
231:21 232:2,6
233:14 237:20
238:7,24 240:7
241:18 244:23
246:3,9 247:1
248:1 252:10
255:22 273:8
**correction**
198:11
**corrections**
273:6
**correctly** 26:4,8
35:21 49:22
59:1 64:1 76:13
140:3 182:11
184:12 196:13
197:21 202:4,18
213:22 236:2
**correlates** 168:5
**correlation**
88:14,16
**correspondence**
178:14
**corroborates**
155:20
**cost** 96:25 99:5
102:21 103:1,8
233:18
**costs** 225:22
**coterminous**
112:4
**counsel** 2:3 3:1
4:1 8:16 11:24

12:6,10,14,16
13:9,11,18,23
30:20 66:20
88:23 95:20
96:6 118:21
149:24 150:14
150:16 242:14
242:17,20 243:5
257:22 258:11
270:8 271:14
**count** 16:6,25
21:7 37:6 55:21
56:10 78:6 83:3
116:24
**counted** 155:13
**counterparts**
175:14
**countervailing**
183:8
**counties** 35:7
48:19 63:2,6
90:8 94:25 99:8
100:4 106:11,13
128:15 130:2,19
130:20,21,25
131:9 132:8
134:9 149:13
191:20 200:6
**country** 64:12
65:11 98:14
154:1 218:23
222:13
**county** 36:18,23
63:2,16,17 89:20
89:21 90:1,13,17
91:1,5,8,14,17
92:8,14,20 93:15
93:18,23,24

98:11,12 99:7,7
105:19,24 106:7
106:16 107:2,7
130:20,23 131:5
131:7,10,14,19
181:2 192:16
270:12
**couple** 11:22
34:14
**course** 25:7 27:7
46:15 123:21
221:14 229:25
237:18 252:14
252:18,25
**courses** 236:17
**court** 1:1 6:10,22
6:23,25 15:14
17:24 18:3,4,7
18:23 19:3,6,11
21:16,19,21 22:6
22:16,23 24:5
25:15 42:24
53:4,20 60:6,10
71:6 84:25
85:13 99:13
115:21 117:2,12
123:18,21 125:4
125:6 138:16
157:19 184:11
184:18 213:6
231:20
**court's** 53:18
**courts** 85:6,19
115:12 139:5
140:21 244:13
**cover** 140:3
**covered** 78:21
184:3

**covering** 240:7
**covid** 37:23
234:7
**cracked** 138:11
145:14
**cracking** 111:12
111:24 112:4,11
112:15,22,25
113:3,7,8,24,25
124:15,17,20
137:21 138:3,9
138:11,15,17,23
138:25 139:3
146:7 167:6
199:1 268:15,18
**create** 189:18,19
**created** 241:19
**creating** 27:22
**creation** 34:6
37:15 115:17
205:16 206:8
**creative** 168:15
**credible** 21:23
**credit** 235:20
**criteria** 5:15
33:18 34:11,16
40:13,15,22 41:3
41:23 42:4,7,11
43:1,3,8,22 44:7
44:8 45:6 48:6
49:4 67:10 68:7
68:10,16 69:6,10
69:13,15,17 70:7
75:24 99:9,14
100:9,14,24,25
101:14,15,19
104:15 111:17
136:15,17

Moon Duchin , PhD

The South Carolina State Confvs.McMaster/Alexander

July 14, 2022

**[criteria - defined]**

Page 17

148:14 149:18 183:25 209:1,14 211:23 216:15 258:19,25 259:19 260:15 260:18,22,25 262:23,23 266:24 267:5,11 267:14,17,19,22 267:23,25

**criterion** 100:24 102:8,15 103:12 104:6,14 211:24

**critical** 231:4,13

**criticized** 19:2,5

**cross** 157:21 159:16 222:5,23 256:13 257:13

**crossover** 115:3 116:6,9,9 138:12 157:4,11,24 160:1 162:11,17 163:19,21,22 164:3,6 166:24 167:23,24 169:11,13

**cs** 271:15

**cumulative** 54:10,21 55:13

**curation** 27:21 226:21 228:13

**curious** 34:19 248:8

**current** 16:8 103:22 219:20 241:10

**currently** 70:12

**curriculum** 5:18 195:24

**cusick** 3:6 8:25

**cut** 58:21 59:14 62:11 122:11 129:9,18 130:23 131:8 210:10 211:23 265:10

**cutoff** 140:21

**cutting** 204:8

**cv** 1:8 16:6,7,8 17:15 196:4,6

**cycle** 86:3 125:8 253:20 265:11

**cyndi** 4:16

**d**

**d** 5:1 6:17 20:4 21:2 105:23 255:10

**d.c.** 3:14

**darryl** 230:11,11

**data** 12:23,25 13:1,8 20:13 23:10 25:8 27:16,21,22 30:8 30:18,19,22 36:9 36:11 37:11,12 37:18,20 38:4,8 38:16,20 39:1,9 39:11,12,13,17 39:21 40:4 44:20,23 46:7,8 46:10,14 51:23 51:25 52:3,5 66:19 67:3 80:17 82:15 83:8 110:17,24

133:25 134:1,13 134:18 135:2 142:5,12 186:20 192:13,25 193:7 193:23 194:2,8 195:1,2,6 217:25 218:4 219:10,20 221:13 225:1,12 226:20 228:13 228:19 230:10 232:9,25 233:4 252:12 266:21

**database** 219:13

**date** 1:23 10:9 29:15 196:23,24 219:17 233:15 233:17 238:9,17 272:24 273:12

**dated** 5:21 9:14 26:23 196:23 197:18 198:7

**dates** 238:11 241:9 266:7

**daubert** 245:5

**davis** 14:25

**day** 1:17 3:13 6:6 9:4 25:2 270:11 273:15

**days** 254:25 271:17

**deal** 28:16 236:12

**debate** 96:12

**debated** 86:4

**decennial** 36:11 37:12 38:4,8,16 38:21 39:1,9,12 39:21 40:3

**decided** 48:21 86:5

**decimal** 53:25 54:2

**decision** 22:1 53:4,18,20 131:12 190:21 191:10 221:1,4,7 221:8 244:21 245:9

**decisions** 70:24 74:16 84:25 191:1,12,16,19 192:7,8 214:8,14 215:11

**declare** 273:4

**declined** 16:18 16:19

**decode** 15:15

**decoupled** 72:5

**deemed** 249:2 273:6

**deeper** 20:21

**defend** 145:17

**defendant's** 259:10 260:11 261:9

**defendants** 1:19 4:2,9 5:12 6:7 10:25 223:2

**defended** 7:4

**defense** 3:4 10:13

**define** 111:12 114:4 118:17 123:10 124:11

**defined** 64:14 118:8

Moon Duchin , PhD

July 14, 2022

The South Carolina State Conf vs. McMaster/Alexander

[defines - determination]

Page 18

| | | | |
|---|---|---|---|
| **defines** 119:17 | 159:6 170:11,15 | **department** | 170:17 191:23 |
| **definitely** 38:6 | 170:21 268:3 | 235:14 248:7 | 204:5,7 231:3 |
| 52:9 66:11 | **democratic** | **depend** 114:25 | 234:3 240:18,19 |
| 100:7,12 114:15 | 151:19,20,22 | **depending** | 242:10 |
| 122:24 145:12 | 152:2 169:22 | 157:22 160:10 | **described** 44:4 |
| 153:24 161:9 | 171:12,13 172:1 | 229:22 | 46:6 56:20 59:8 |
| 219:25 221:20 | 174:3 175:5,10 | **depends** 65:24 | 126:2 131:22 |
| 236:6 240:1,6,8 | 179:24 192:17 | 103:7 135:4,10 | 135:11 136:5,22 |
| 242:8 254:12 | 201:15,18 | 142:6 160:8 | 154:16 183:14 |
| 261:2 | 268:13 | 205:4 | 203:24 204:10 |
| **definition** | **democrats** 152:3 | **depict** 37:3 54:5 | 206:23 230:8 |
| 113:20 114:7,13 | 152:11 153:21 | **depicted** 36:4 | 231:4 266:7 |
| 114:16 115:2 | 159:9 163:6,8 | 54:25 | 267:8 |
| 116:5,17 117:4,9 | 172:22 174:6,7 | **depicting** 36:17 | **describes** 235:10 |
| 117:11,18,19,25 | 268:4 | 37:1 | **describing** 39:20 |
| 118:2,4 119:19 | **demographic** | **deponent** 269:20 | 47:9 123:25 |
| 119:23,24 120:2 | 21:9 47:1 54:9 | 271:13 273:3 | 183:10 214:25 |
| 120:13 121:1 | 114:21 137:1 | **deposing** 271:13 | **description** |
| 122:20 123:19 | 178:8 | **deposition** 1:22 | 136:4 216:7 |
| 123:21,23 | **demographics** | 5:12 7:5 8:14 | 258:24 |
| 124:12,17 269:9 | 52:15,16 53:13 | 9:10 11:1,11,11 | **descriptions** |
| 269:12,14 | **demography** | 12:2 17:18 | 61:11 |
| **deford** 230:11 | 19:22 | 149:3,23 195:19 | **design** 190:22 |
| **defray** 225:22 | **demonstrably** | 229:25 260:19 | 244:9 245:3 |
| **defreitas** 2:4 | 179:9 | 264:18 269:19 | **despite** 161:23 |
| 270:2,16 | **demonstrated** | 269:21 | 163:16 166:19 |
| **degree** 14:10 | 184:20 | **depressed** 168:7 | **detail** 14:23 |
| 123:24 228:3 | **demonstration** | **depression** | 30:22 35:12 |
| **degrees** 14:7 | 20:5 97:21 | 138:11 | 126:2 128:21 |
| **delayed** 37:18 | **demonstrative** | **derieux** 3:20 | 129:25 |
| **deliberately** | 13:6 20:3,7,18 | **derived** 149:20 | **detailed** 76:24 |
| 215:16 | 21:1 23:13 | 150:2 | 84:22 85:1 |
| **delineated** 82:25 | 24:21 113:15 | **describe** 14:3 | 182:19 |
| **delivery** 67:4 | 195:4 | 18:13 32:21,22 | **details** 47:15 |
| **democracy** | **density** 109:24 | 41:5 43:20,20 | 126:12 258:13 |
| 252:12 | **deny** 94:9 | 45:18 77:2 | **determination** |
| **democrat** 151:15 | 134:11 250:4 | 109:11 123:14 | 60:19,23 90:23 |
| 153:3,12,17 | | 126:10 161:11 | 249:21 250:12 |

250:20
**determinations**
262:18
**determine** 36:9
44:7 45:6 68:15
82:21 97:17
111:9 113:11
120:14 158:3
167:13 207:25
208:25 249:20
**determined** 83:5
194:14
**determining**
140:15
**develop** 117:11
262:22
**developed** 51:16
**development**
248:12 263:1
**deviates** 106:15
**deviation** 56:13
56:17,20,25 57:4
58:7 126:4,10,19
126:22 127:4,10
127:18 128:3
263:16,20 264:7
264:20
**deviations** 57:14
57:20 58:12,15
264:4,9,14
**dial** 131:9
**differ** 66:2 259:7
**difference** 57:18
101:14 147:17
219:7
**differences**
115:23 209:19

**different** 38:18
38:22,23 39:4,5
46:5 48:18 53:6
53:15 54:24
56:21 62:14
72:20 82:7 88:7
97:3 114:22
130:19 136:20
136:21 138:22
142:9 151:11
152:15 182:21
206:21 211:23
236:23
**differently** 130:4
163:11
**difficult** 80:18
96:18 182:24
**difficulty** 37:20
**diffused** 163:24
**dilute** 112:23
**diluted** 179:9
**dilutes** 111:9
**diluting** 112:23
182:9 261:14
268:19
**dilution** 111:7
111:19,22 112:5
112:8,12,15
113:1,4,11,19,20
118:4 124:3,7,11
124:13,14,18,19
137:14 138:18
167:7,17 181:15
262:12,25 269:5
269:9
**dilutive** 113:9
214:8

**dimensional**
15:13
**diminishes** 114:2
**direct** 6:3 63:10
147:4 191:2
209:25 210:6,14
211:7 212:4
253:10 256:15
256:16
**directed** 15:19
164:1 210:2,22
211:17
**direction** 22:12
227:3
**directions**
211:23
**directive** 60:11
60:13
**directly** 12:15
252:4 257:9
258:9
**director** 1:16
233:11 255:17
**disaggregated**
171:16
**disagree** 236:7
247:19 248:12
254:24
**disambiguate**
72:7 103:14
216:24
**discerning** 185:5
**disclose** 242:19
244:15,23
245:12
**disclosed** 104:6
242:4,5 244:5
250:25 251:7

267:11
**disclosure**
243:21
**discount** 107:8
107:20
**discreet** 15:16
27:6
**discrete** 54:24
59:15
**discretion** 60:11
**discriminates**
31:24 32:9,15
33:2
**discuss** 35:6
40:13 44:10
68:8 105:4
121:13 147:12
149:2 163:15
195:18 200:4
268:15
**discussed** 8:17
9:20 13:5,18
20:7 28:19
43:21 47:16
53:3 54:7 61:17
63:2 74:9 76:18
76:21 82:22,25
85:13 96:3
99:17 100:16
107:21 121:1
124:14 126:21
129:19 132:19
141:20 147:15
148:16 160:22
162:7 181:3,9
191:1 197:16
204:20 205:19
212:13 215:6

Moon Duchin , PhD

July 14, 2022

The South Carolina State Confvs.McMaster/Alexander

[discussed - divided]

217:3 223:21
237:4,4 258:21
264:17 269:14
**discusses** 43:23
76:9 83:12,15,16
84:19 89:9
**discussing** 41:20
50:2 84:25
96:16 136:18
147:14 157:3
209:18 213:3
226:7 231:6
249:1 265:1
267:2 268:7
**discussion** 49:17
61:10 67:14
74:10 81:5,7
104:25 170:9
194:16,17
201:16 222:21
265:20
**disfavor** 101:25
**dismiss** 99:18
216:19,23 217:4
**disparate** 217:2
**dispersed** 138:6
205:14 206:5
213:19,22
**dispersing**
184:21 187:5,9
189:2 208:6
**displaying** 49:23
**dispute** 238:10
**disregarded**
93:1
**distinct** 220:11
**distinction**
255:12

**distinctive**
194:20
**distinguish**
220:14
**distorting**
133:10
**distributed**
111:15
**distributing**
138:5
**distribution**
134:25 135:4,5
139:9 146:10
148:1 178:9,12
179:6
**district** 1:1,1
6:10,10 13:4
18:3 22:10,13
29:21,22 33:6
45:11 53:4,17,20
55:15,19 56:4,8
65:22 66:9 71:3
71:4 74:10
76:24 77:5,9
79:2 89:15,18,22
105:18,22
106:15,21
107:25 108:4,8
114:14,25 115:6
115:17 116:17
116:19,21,24
117:3,8,24 119:3
119:4 122:21
123:8,11,15
136:24 137:11
137:12,15,18,22
138:10,13,24
139:2,13,17,22

139:23 140:1,16
141:16 143:20
144:1,2,8,12,18
144:19,23,24
146:16,17,18
147:2,3 148:8
152:19 153:7
154:7 155:8,9,16
155:21 156:20
157:5,23 158:18
159:2,22,25
160:2,20,21,24
161:1,2,3,15,16
161:21,22 162:1
162:2,2,3 165:4
165:5,5,10,13,13
165:15,16,23
166:3,4,7,10,13
166:16,19,24
167:2,8,12
168:14 169:3,4
169:21 170:11
170:15,22
182:19 188:2
193:24,25
209:20 211:19
268:5,6
**districting** 24:1
24:17 33:18
34:11 57:13
74:2 94:21
125:1 134:19
136:12 184:7
202:16 204:23
220:2,9 231:10
**districtr** 224:5
**districts** 5:14
21:5,11 23:21

25:12,13 26:15
26:22 29:24
42:10 49:14
50:11 54:1,8,14
54:19,23,24,25
55:10,12 57:24
58:1 59:17
70:24,25 72:2,15
72:23 73:5,16
75:24 76:3,10,19
77:5,12,14 78:15
81:2 93:11
112:2 114:10
117:21 122:13
122:15,17 123:1
123:6 129:9,10
130:7 135:23
137:2,11 139:25
144:3,9 146:3
147:17,19,21,22
154:11,15
158:17 159:13
163:14 165:9
166:20 167:20
168:8 171:17,19
171:22 175:4
178:18 189:18
198:22 199:6
201:5 203:20
205:14 206:6
213:19,19
220:25 230:18
**divergence** 48:4
**diverse** 221:21
**divide** 41:3 42:4
64:18
**divided** 40:22
94:3 114:2

Moon Duchin , PhD
July 14, 2022
The South Carolina State Confvs.McMaster/Alexander

**[division - easier]**

Page 21

**division** 1:2 44:9
44:10 227:5
**divisions** 50:13
63:1
**doc** 224:19
**doctor** 173:5
**doctoral** 14:24
**document** 11:12
11:16 22:1 44:4
45:2,4,5 50:1
196:2,3,19
240:14
**documentation**
235:24
**documents** 9:9
9:12 11:17 12:3
12:12,13 13:16
13:19,21,24 50:2
99:13,17 189:6
216:11,16
258:21,25 259:3
259:6
**doing** 10:1 73:20
112:18 121:5
158:20 215:22
225:9,10,12
228:10 230:4
242:18 245:22
255:3,10,13,14
256:2 259:12
263:23
**dollar** 232:8
233:2
**dollars** 234:11
**domain** 84:4
**donation** 231:24
**dorchester** 90:17
90:19,25 92:14

92:15,20 99:7
192:16
**dot** 58:10,10,11
**doubt** 19:14
183:10 240:15
243:24 244:18
245:24
**downloadable**
52:11
**dozen** 19:14
179:16 225:2
**dozens** 20:18
23:12
**dr** 5:12 6:5 8:4
11:1 92:2 105:4
149:2 195:18
196:12 197:23
220:24 222:25
256:15 257:10
257:15 258:17
263:15 268:1
**drafted** 38:5
**drafting** 228:16
238:23
**drafts** 27:2,6
**draw** 22:10
23:10 24:21,22
25:4 44:23
45:11,17 64:21
122:7,13,15,17
122:21 123:5
130:7 157:22
218:23 247:6
**drawer** 19:16
46:19 49:4 53:6
60:3 64:6,7
65:21 97:16,16
97:19 98:1,18,22

101:18 102:16
104:5,13 119:21
122:7,10,13,15
122:17 211:24
214:12,16,24
220:24 221:17
**drawer's** 213:21
**drawers** 46:22
53:21 73:4
**drawing** 19:18
19:20 20:12
21:4 23:15
47:13 64:10
72:22 98:14
135:12 155:12
182:6 220:18
261:5 264:13
267:6
**drawn** 19:17,25
20:7,21 22:19
25:1,7 45:21,22
86:19 119:22
127:17 128:2,6
132:2 147:2
148:13 176:13
176:18,20,22
177:16,20
178:22 179:3,4
191:25 204:13
204:15 217:18
262:19
**drew** 20:3 22:23
24:24 25:6
60:13 80:5
229:14 267:16
267:21
**dried** 122:11

**drill** 20:20
**drive** 188:20
**drives** 162:13
**driving** 162:10
**dropped** 65:18
**duchin** 1:22 3:3
5:12,18 6:1,5,16
8:4 11:1 92:2
105:4 149:2
195:18,24
196:12 197:23
220:24 222:25
256:15 257:10
257:15 258:17
263:15 268:1
271:5 272:2,24
273:2,4,12
**due** 167:2 219:4
**duly** 6:2
**durham** 253:22
**dynamical** 15:16

**e**

**e** 5:1,10 50:13
91:19 272:3,3,3
**earlier** 18:20
31:14 59:8
115:14 129:19
134:24 162:7
198:25 211:21
251:23 253:5
260:19 264:17
**early** 182:25
**earned** 119:2
**earnestly** 259:5
**easier** 161:10
219:23

Moon Duchin , PhD

July 14, 2022

The South Carolina State Conf. vs. McMaster/Alexander

[easily - employ]

Page 22

easily 114:24
  139:19 264:21
  264:21
east 14:23
easy 199:12
  264:19
echoed 121:20
ecological
  153:24
economic 90:5
  248:11
economical
  219:9
edge 130:24
edges 58:21
  59:14 62:12
  129:18 130:12
  130:20,20,21
  265:10
editing 27:5
edler 1:17
educational 3:4
  14:3,11,15
effect 133:10
  184:21 185:4,8,9
  185:15,20,21,22
  186:1,6,9 187:9
  187:13 189:2
  214:9 246:5
  261:14
effective 119:4
  123:15,17
  163:14 167:13
  189:18,20
effectiveness
  145:21 146:2
  165:3 166:2,19
  171:9 176:14

177:18 179:24
  268:12
effectuate
  268:16
efficient 130:11
effort 67:12 80:2
  82:13,18 83:1,2
  86:21 87:23
  102:24 132:23
  133:9 204:24
  218:15 219:16
  219:20
efforts 65:15
eight 55:22
  166:3 172:22
  177:22
eighth 173:22
either 17:5 22:10
  30:2 31:22 33:5
  41:2 79:10
  88:18 97:20
  139:24 155:8
  163:8 169:23
  185:25 206:4
  224:18 228:21
  234:9 242:5,20
  248:18 261:13
elaine 2:4 270:2
  270:16
elect 24:16 25:20
  112:1,3 115:7
  120:14 177:5
  178:4 202:17
  215:5
elected 115:18
  118:11 119:1
  121:19 170:16
  170:22

electing 184:23
  189:4,25 208:3
election 1:16,18
  4:9 30:24,25
  120:4,7,12 121:7
  122:8 123:13
  156:23 160:15
  192:25 193:23
  194:8,8 195:6
  219:23,24
  222:12
elections 1:15
  31:2 114:12
  117:7 118:20
  119:25 121:5,8
  123:22 151:2,4,5
  151:8,15 152:8
  152:11 153:19
  153:19 157:8
  158:2 169:7
  172:5,10,13,16
  174:6,13 177:19
  179:25 185:11
  201:14,15
  268:14
electoral 13:1
  30:18,19,21 34:3
  34:4,18 53:2
  66:19 114:1,3,4
  114:8,13,17,20
  115:2,6,15,23
  116:3,5,21 117:4
  117:5,16,19,22
  118:2,9 121:1,3
  122:9 123:19
  138:4,7 145:19
  152:6 153:18
  156:9,22 160:11

162:8 168:4,9,16
  168:20 169:1
  180:8 182:20
  188:4 189:13,20
  190:3,16 193:14
  202:8 206:24
  207:3 209:21
  210:23 211:15
  211:18 215:21
  216:13 221:6,10
  221:15
electorate
  157:21
elects 170:22
element 28:8
  131:22 168:25
elements 96:3,4
  190:22 191:11
  234:23
eleven 55:18,22
  55:23 56:5,12
  143:9
email 240:11
  257:1,3
embodied 215:5
emerged 97:12
  192:5
emphasis 83:6
  87:9,14 88:8,10
  88:11 98:18
emphasize
  114:19 115:10
  115:13 133:5
emphasized
  146:1 182:25
empirical 236:12
employ 129:14

Moon Duchin , PhD
July 14, 2022
The South Carolina State Conf vs. McMaster/Alexander

[employed - evidence]
Page 23

employed   85:1
113:8 227:14
employee   227:7
255:18
employees   11:25
227:8 228:8
240:3,5
employs   76:2
enabled   236:18
236:20
enacted   26:1
31:14,19,23 32:8
32:14 33:1,7,18
45:17 55:25
56:24 59:24
60:14 62:4
63:15 64:24
77:10 79:22
106:3 111:9
139:12 142:16
143:3 144:7,19
144:24 145:3
146:5,17 147:3
149:17 153:6
154:5 155:9
158:17 161:4
165:20,24,24
169:3,4,21
172:21 173:11
173:24 174:18
175:4,8 181:4,24
186:14 187:4,9
187:18,21
188:10 191:18
199:6,24 200:18
201:4,7,18 202:3
213:14 217:12
264:5,7

enacted2022
184:8 198:22
202:15,21
enactment   97:14
encountered
35:18 120:16
ended   18:11
endorses   83:12
enforced   125:23
126:7
engaged   250:10
250:21
engaging   220:25
engineering
228:3
english   208:9
ensemble   111:16
125:3,9,11 126:9
128:12 129:1
131:14 132:2
133:8,24 134:1,8
134:12,18
135:13,13
136:17 139:9
140:19 141:13
141:17 142:25
146:10,14,15,16
147:12,13,16
148:2,7,7,17
149:12,17 151:6
176:19 178:16
206:10,12
229:15,20 231:2
231:18,19
ensembles
124:25 125:6
127:9,15,20,22
128:10 134:6

136:12 178:21
178:22,24 185:4
231:8
ensure   246:24
ensuring   168:9
entailed   28:13
entered   20:4
entering   210:9
entertain   173:9
entire   86:18
244:9
entirely   61:3
78:25 90:14
93:13 99:20
120:5 123:25
entirety   19:8
82:14 88:15
124:13
entitled   61:24
equal   101:2
146:4 208:19
209:13,19,23
212:23 213:2
equality   58:1
equally   124:20
errata   271:11,13
271:17
erratas   271:15
erratic   61:12
erratically
105:24
eschewed   60:17
especially   15:23
46:16 140:9,16
140:17,24
146:12,13
163:17 168:6
185:10 186:21

208:21 221:20
esquire   271:1
essence   161:24
161:25
essentially
152:24 202:5
establishing
42:9
estimate   9:6
89:7 199:18,20
199:22 251:24
266:1,4
estimates   36:22
36:25
et   202:9,9 271:4
272:1 273:1
ethnic   170:4
262:13
evaluate   24:22
evaluated   24:25
25:6 145:20
172:10
evaluating   21:25
evenings   227:16
evenly   163:24
events   270:9
everybody
197:22
evidence   22:25
32:2,3,6,12 33:4
33:10,11,14 34:4
34:7 119:14
125:9 140:19
168:13,23
182:21 183:1
185:6,7,9,20,21
185:23 186:6,8
186:13,23,25

Moon Duchin , PhD                                    July 14, 2022
The South Carolina State Confvs.McMaster/Alexander

[evidence - explanatory]                                           Page 24

187:2,4,6,8,12
187:13 188:14
231:18,20
**evolved** 253:9
**exact** 37:24
265:23
**exactly** 64:5
86:22 98:12
120:2 128:9
132:16 133:23
139:11 169:19
198:22 199:6
212:11 226:1
227:25 262:1
**examination** 5:2
6:3 190:25
192:6 222:5,23
256:14,17
257:13 269:1
**examine** 23:22
77:11 92:18,21
117:20
**examined** 174:1
174:4 183:14
190:21 191:10
**examining**
113:24 117:23
**example** 20:2,13
35:10 39:13
46:9,11 53:2
54:12 68:21
75:9,14 86:8
90:6 98:4,8,10
98:19 100:18
102:1,7 114:24
116:17 128:8
134:9 153:6
157:15 163:9

168:14 169:4
179:19 192:15
193:22 194:4,5
198:21 208:10
224:22 230:7
232:21,23
235:11 268:5
**examples** 20:1,9
20:19,20 83:19
91:10
**exceeded** 234:11
**excellent** 90:6
95:3 160:18
**exception** 210:19
**exceptions**
153:23
**excerpts** 28:22
29:2
**excessively**
59:16 214:7,13
**exchanged** 12:9
**excluded** 18:23
**exclusively**
16:14 82:14
**excuse** 81:1
**executive** 1:16
20:16
**exempt** 247:14
247:18
**exert** 138:4
**exhibit** 5:12,13
5:15,16,17,17,18
5:19,20 10:24,24
10:25 11:5,19
26:13,14 41:23
42:2 49:19,23
57:22 195:22,23
195:24 196:13

196:16 197:17
197:22,23
259:10 260:12
261:9
**exhibits** 22:24
22:25 23:4
**exist** 107:13
108:23 109:14
109:19
**existence** 240:18
242:4
**existing** 50:11
70:24 71:4 76:3
**exists** 83:25
107:9 221:6
249:20
**exogenous** 151:7
151:12
**expect** 167:25
189:13,15 190:2
**expectations**
247:12
**expected** 99:5
**expended** 87:24
**expense** 69:10
69:13 210:8
**experience** 14:20
45:22 47:10
64:6 65:7 97:15
97:19 98:5
103:11 153:15
219:22 220:23
221:18 243:22
264:12
**experienced**
243:6
**experiences** 64:9
262:18

**experiment**
126:9
**experimented**
127:21
**experiments**
127:5
**expert** 5:19,20
13:12,13,14
17:14 18:11,23
19:20,22 26:5
31:5 77:18 80:9
80:13,20 99:19
150:2,4 196:13
196:16 197:17
214:21 231:5
243:6,23,25
245:4
**expertise** 18:14
18:18 45:1
170:2 228:25
244:10 249:14
262:19
**experts** 243:19
244:9
**expires** 270:17
**explain** 35:23
126:3 130:15
138:1 189:7
204:3 208:20
215:20 245:8,16
**explained** 259:2
**explanation**
169:2 183:9
215:12
**explanations**
183:18
**explanatory**
168:1 188:17

Moon Duchin , PhD                                    July 14, 2022
The South Carolina State Conf vs. McMaster/Alexander

[explanatory - field]                                    Page 25

189:1
explicit 70:5,11
  98:13 207:17
  216:13,18,21
  260:20
explicitly 82:25
  99:16 216:17
  217:1 244:3,19
exposure 267:3
express 32:23
  184:12 190:15
expressed 99:22
  188:15 261:16
expressing
  214:19
expressly 50:10
  75:23 184:8,25
  186:14 187:19
  187:22 188:10
  216:17
extension 233:18
extensive 24:2
extensively 53:3
  247:25 258:21
  258:22
extent 52:13
  70:3 73:4 75:11
  83:24 100:17
  110:15 211:8
  214:22
extracted 150:20
extrapolate
  86:16
extreme 143:4
extremely 21:21
  21:22
eye 148:10

eyebrows 258:7
eyes 71:6

f

f 91:19 160:19
  259:23
face 151:1
faced 212:4
facing 160:15
fact 37:21 38:15
  43:19 47:8 60:6
  87:23 88:6
  102:8,11,14,15
  129:22 140:14
  156:1,4 161:23
  164:14 169:21
  248:15 264:16
  266:1
factor 45:15
  48:3 162:16,18
  162:21,24 163:1
  163:3
factors 37:23
  44:2 48:3 69:1
  134:8 180:6
  188:17 190:23
  216:14
facts 12:17,20,24
  13:8 95:19
  217:18 219:1
  244:16 249:19
  249:22 250:13
  250:19,25
factual 45:20
faculty 223:13
  240:6 242:9
  243:2,23

failed 188:25
fails 35:8 271:19
fair 7:2,19 8:2
  30:4 36:15 80:4
  166:21 206:25
  230:17 254:19
  260:23 261:2
  265:15
fairer 74:4
fairly 24:2 54:8
  200:21 230:2
  231:13 260:20
fairness 23:22
  24:1,15 25:20
  125:10
faith 80:2 82:18
  83:1,2 132:23
fall 12:3 48:15
  252:17
falls 84:5,5
familiar 46:16
  46:25 59:12
  196:19,25
  241:21 265:2,4
familiarity
  239:25
family 230:20
  235:3 236:9
  237:15
far 18:6 43:25
  56:16 74:15
  75:6 78:7
  129:20 130:24
  131:8 160:12
  177:19 189:7
  249:13,13
fared 117:7
  175:13

fascinating
  128:22
fashion 176:13
  176:18,21
  177:16
faster 130:11
fat 142:7
favoring 72:8,22
favorite 170:16
feature 131:2
featured 179:15
  179:18,21,23
  180:8
features 77:13
  135:2,5 181:3
federal 18:3
  43:10 57:12,25
  232:5 242:24
  244:3,11 262:8
federally 237:9
federation
  192:19
feedback 258:4
feel 7:22 164:1
  184:24 186:5
  187:25 188:5
  216:11,18
  243:10
feels 10:4
fellow 15:7
  241:14
felt 197:15 219:1
fewer 131:8
  132:8 200:12
  255:4
field 120:5 129:5
  134:4,13 135:1

Moon Duchin , PhD
July 14, 2022
The South Carolina State Conf vs. McMaster/Alexander

[fifield - formal]                                                                    Page 26

**fifield** 256:6,20
**fifteen** 213:25
**fifteenth** 261:18
**fifth** 3:7 205:24
**fifty** 251:24
**figure** 35:20
36:4,10,17 37:1
37:3,6,6,7,13,15
38:7,15,25 39:8
39:13 40:3
41:13 76:17
77:8,21 82:1
89:17 105:12
108:6 128:8
132:16 136:25
139:6 142:15
143:6 147:25
151:21,23
156:17,18 171:3
172:20 173:7
176:14 177:17
179:23 180:9
191:4,14 192:4
193:23 194:12
195:7 198:20
201:13,20
**figures** 111:14
128:5,7,9,10
133:17 195:3
**file** 66:21 219:17
**files** 66:23 67:1,2
**financed** 249:12
**financial** 231:25
246:3
**find** 29:11 32:10
32:12 41:10
49:12 69:21,24
75:25 82:24

94:6,21 97:3
103:24 110:17
131:7 132:24
133:17 139:19
139:22 140:18
163:13 168:14
183:8 184:7
185:7 186:25
188:25 191:18
207:1 217:6
218:16 226:19
229:11 231:17
231:19,21
249:17,24 253:1
266:8
**finding** 53:18
120:22 172:8
**findings** 186:21
186:23,24
**fine** 45:25 93:8
101:9 104:24
130:1 180:1
**finish** 102:3
**finished** 14:20
**firm** 6:6 10:19
251:12
**firms** 251:8,9
**first** 6:2,14 8:18
9:21,23,25 35:3
40:23 41:3,9
42:4,16 43:2,6,7
43:13 44:7,15
48:1 51:13
53:24 55:5
69:19 71:15
102:19 125:22
128:23 136:11
147:11 163:7

175:10,18,25
177:10 184:5
191:9 196:24
201:13 202:1
203:19 205:17
210:20 216:21
223:4 227:4
229:18,19
253:18 258:23
258:24 259:1,17
261:11 262:5
263:22
**fiscal** 233:16
**fit** 117:12
**five** 15:20 23:24
50:25 55:22
56:11 82:2
152:13 154:23
155:16 247:25
253:20 256:4
264:11
**fix** 264:13
**fixed** 218:19
**flag** 28:23
**flip** 154:10 256:5
**floor** 3:7,21
**florida** 72:25
**focus** 15:22
40:20 87:9,14
88:24 139:1
143:11 144:2
178:18 214:20
**focused** 16:14
24:15 68:9
137:8 144:5
147:7 148:7
167:8

**focuses** 84:11
**focusing** 102:14
135:17
**fold** 48:11
**folder** 11:14
**folks** 214:19
224:20 225:8
243:12
**follow** 41:9 44:9
49:4 72:1 85:18
85:20 160:9
166:22 189:17
226:13 250:2
**followed** 246:21
246:25
**following** 40:25
190:2 250:6
254:14
**follows** 6:2 201:8
259:18
**foot** 239:4
**footnote** 60:24
154:16,18
155:18 158:1
224:7
**force** 253:6
**foregoing** 270:5
273:5
**forest** 108:13
**forget** 230:15
**forgive** 215:15
**form** 7:9 17:5,6
28:16 34:22
82:8 148:2
225:15 231:13
242:4,9 243:15
**formal** 119:13
253:12

Moon Duchin , PhD

July 14, 2022

The South Carolina State Conf vs. McMaster/Alexander

**[formally - generally]**

formally   14:6
forman   4:10
formed   254:25
forming   195:9
forms   180:4
   183:23 237:3,5
   242:21
formula   60:22
formulating
   75:1
forthcoming
   38:20 251:15
forward   215:9
found   21:22 95:1
   127:22 131:13
   185:5 186:13,13
   190:22 229:20
foundation
   226:2,5 232:2,4
   232:12 253:24
foundations
   253:24
four   20:3,25
   21:1,10 47:24
   54:22 55:21
   56:10 77:5
   79:23 81:14,20
   81:23 82:2
   88:25 118:20,22
   119:25 123:22
   137:9 147:20
   150:19 152:3,4,8
   152:10,11,13
   153:7 154:7,19
   154:25 155:13
   158:2 162:3,4
   165:4 166:3,4
   169:7 174:13

175:12 176:5
   235:2 253:8
   264:9,11
fourteenth
   261:18
fraction   252:3
fraga   160:19
frames   52:4
framework   74:3
   98:16 100:17
   231:2
frameworks
   24:2
francisco   253:23
frankly   223:2
free   52:11
freely   52:9,11
frequency   154:4
frequent   16:24
frequently   20:23
   51:24 61:12
   64:11 79:6
   82:25 91:7 94:6
   114:18 122:1
   123:12 132:25
   150:10 157:19
   166:18 175:9
friday   8:21
friends   253:1,8
front   90:22 93:7
   94:13 141:18
   146:24 158:19
   158:22 199:12
   202:24 240:15
froze   237:22,24
full   15:5 100:16
   131:7 142:8
   172:7 187:24

188:12,23
   223:16 227:7
   251:14 255:18
   262:10
fullest   52:13
fully   17:16
   188:25 208:20
   221:3 224:12,13
   227:11 245:1,22
function   145:17
   176:2 178:15
   188:13 223:17
functional   61:4
functions   73:10
   226:15
fund   3:4 10:13
   232:19
fundamental
   120:21
funded   232:24
   235:7 236:4,9
   237:9 244:11
   248:19 253:23
funding   235:18
   235:21 238:17
   248:4,6,9 249:15
fundraising
   231:24
funds   233:15
further   32:16
   114:6 158:10
   196:10 221:22
   269:18 270:7
fuse   129:8 130:7
future   32:20,22

**g**

g   11:23 160:19
gathered   86:12
gauged   121:4
general   22:5
   24:13 27:22
   44:11,22 45:11
   45:16 47:9,12,17
   47:19 52:19
   59:22 60:12
   67:10 68:25
   69:5 71:7,25
   72:7,9 73:15
   88:5 99:9
   101:18 102:16
   103:25 104:5,13
   110:19 113:6
   116:11 120:8
   160:15 172:9,15
   182:24 190:5
   208:17 209:14
   210:6,14 211:7
   212:4 214:11,17
   216:7,10,22
   242:17,19
   261:12 266:25
generality   75:17
   97:24 101:5
   128:24
generalize
   206:21
generally   21:21
   30:1 52:7 68:18
   71:7,16,17,19
   72:20 74:20
   83:20,22 88:12
   103:19 111:23
   151:7 186:22

Moon Duchin , PhD                                                July 14, 2022
The South Carolina State Conf vs. McMaster/Alexander

[generally - governance]                                                Page 28

222:14 259:4
**generate** 37:12
38:15 51:11
143:10 159:11
172:22 174:22
**generated** 38:7
149:11 154:15
**generates** 125:13
159:2 173:11,24
174:18
**generation**
133:25 206:10
206:12
**genesis** 252:19
**geographic**
51:25 178:19
**geographical**
52:5
**geographically**
137:16
**geography** 46:17
47:1 51:25
59:18 78:11
84:7 164:2
177:7,8 178:5,8
178:9,11,12,22
178:23,24 179:2
218:18
**geometric** 15:13
**geometry** 15:17
224:17 235:15
252:21
**geopandas** 52:1
52:2,4
**geounits** 191:21
**gerrychain**
224:2,4,8 230:8

**gerrymandering**
25:23 125:4,7
224:17 252:22
**getting** 83:5
137:1 159:15
192:2 193:11
236:19 238:2
241:9 258:12
260:1
**gingle** 150:3
**gingles** 20:4 21:2
113:11,13,15,17
118:3,4 120:19
150:5 261:17
**gis** 52:1
**gist** 188:5
**give** 6:24 20:9
23:2 28:11
38:18,23 39:4
47:2 67:19,20,23
67:25 68:3 75:9
84:21 85:15
91:22 119:11,13
121:15,22
124:16 126:12
128:21 158:6
168:22 257:10
**given** 42:15 63:7
69:20 97:3
207:21 211:4,16
249:19 250:11
250:13 259:20
273:9
**gives** 93:20
232:5
**glad** 167:18
**gladly** 35:25

**glenn** 118:23
**glibly** 123:4
**glitchy** 238:3
**go** 7:11 8:1
10:23 28:5
32:17 40:12
43:25 51:3 67:5
67:6 77:20 90:2
91:3 104:23
105:8,12 108:24
112:17 116:16
126:15 139:6,20
144:17 147:7
148:24 151:23
155:18 158:12
159:10,19 166:9
170:13 172:4,15
179:17 180:22
181:11 195:13
195:15,15
203:23 226:4,11
257:9
**goal** 190:14
**goes** 44:25 90:9
120:3 131:8
170:15 189:7
212:21 226:3
228:18 238:20
**going** 11:22
31:18 41:12
50:21 58:25
59:20,21 63:4
76:4,16 86:21
88:14 108:16,17
116:25 148:20
154:10 184:2
195:12 221:8
222:20,22

243:14 256:8
262:2
**good** 6:5 43:18
52:22 73:21,25
74:19,25 80:2
82:18 83:1,2
84:3 116:1
132:23 140:24
156:14 167:18
188:19 190:9
203:25 204:6,8
205:3 210:12
220:3 222:10
267:4,8
**google** 110:9
**gore** 3:13 5:3,7
6:4,6 11:3 26:16
42:1 49:21
50:19,25 51:3,4
92:1 103:10
104:22 105:2,3
148:19,24 149:1
185:24 186:10
195:11,15,17
196:18 197:20
221:22 249:9
256:10 257:16
258:17,23
263:24 268:2,24
269:2,18
**gore's** 261:4
263:15 264:24
265:17 266:23
**gorgeous** 62:17
**govern** 101:2
**governance**
267:4

Moon Duchin , PhD                                July 14, 2022
The South Carolina State Conf vs. McMaster/Alexander

**[government - happen]**                                Page 29

**government**
73:22,25 74:19
74:25 204:6,8
205:3 232:5
242:24 244:3,12
**governmental**
222:7
**governor** 163:11
**governor's** 25:2
**graduate** 14:9
14:16,18,21
223:14 256:7
**graduated** 14:6
**graduating**
14:23
**grant** 225:21,24
226:2,4 232:8,10
232:14,18,19,20
232:24 233:2,21
233:22,25 234:1
234:1,4,4,9,11
235:7,11,14
236:5,7,8,15,16
236:20 237:19
238:7,9 242:25
243:14 245:9
246:1 253:25
254:22
**granted** 24:6
243:22
**grantee** 253:17
**grants** 232:6,16
232:22 235:9,17
235:20,20,22,25
249:2 253:13,14
253:18
**grass** 84:10

**great** 26:12
28:16 31:18
51:1 128:3
236:12
**greater** 57:14,20
58:12,15 63:7
202:17
**greatly** 83:7
**green** 91:23
143:1
**greenville** 4:5
270:12
**grew** 224:17
**ground** 184:4
**group** 15:17
21:8 75:12
102:1 115:7
116:4 120:14
129:5 170:4
224:16,18
240:25 252:22
252:23
**groups** 74:6,12
114:10 118:10
121:17 153:23
**grove** 2:4 270:2
270:16
**guarantee** 122:9
**guaranteed**
123:5
**gubernatorial**
20:16
**guess** 26:3 157:6
181:22 204:19
224:8 231:24
252:15 253:12
**guesswork**
267:13,20

**guggenheim**
254:10
**guidance** 128:21
189:11
**guideline** 189:6
**guidelines** 5:15
5:16 9:16 30:10
40:15,19,21,25
41:3,10,11,15,17
41:20,23 42:4,11
42:13 43:9,21,22
44:6,19 45:3,4
45:10,15 48:2,5
48:8,11,15,17,19
48:25 49:3,9,10
49:11,12,14,16
49:19,24 50:2
57:9,11 60:17,25
61:16 63:5
67:11,15,17,19
68:7,21,24 69:2
69:7,11,16,18,22
70:13,15,20
72:18 75:23
79:11,15 99:15
99:16 100:10
183:16,23 184:9
184:13 185:14
186:14 187:20
187:21,25 188:1
188:6,9 189:9,24
190:2,12,15
203:12 204:12
204:14 206:18
206:20,23 207:1
207:2,4,8,13,14
207:17 208:1,5
208:17,24

209:10,11,12,24
210:6,14,14,17
210:18 211:6
212:3,14,18,23
213:1 214:6
220:16,22
258:20 259:9
260:10,24 261:8
261:21,23 262:3
269:4,8,15,17
**guise** 71:22

**h**

**h** 1:14 5:10 6:17
272:3
**half** 56:11 126:5
142:7 148:11
162:1 173:22
174:2 175:6
**hall** 2:1 225:17
225:19 239:1,4
247:22,24
**hand** 18:19,19
56:16 126:8
127:3 206:1
212:6,7 264:18
270:10
**handed** 13:21
82:20
**handful** 223:3
**handle** 52:3 66:3
**handled** 48:17
**hang** 107:15
**happen** 141:15
158:15 163:5
246:19 247:13
248:4

Moon Duchin , PhD                                                July 14, 2022
The South Carolina State Conf vs. McMaster/Alexander

**[happened - hook]**                                                Page 30

happened 16:22
  20:1 254:13
happening 77:25
happens 64:12
  117:24 159:6
happily 185:3
happy 17:16
  43:3 50:23
  101:6 249:16
hard 29:22 72:7
  86:22 95:4 97:1
  160:14 161:11
  206:19 208:21
  214:18 219:21
harpootlian 57:4
  57:8 58:13 62:9
  65:3 94:16,22,23
  95:2,8,11,16,22
  96:13,17 97:4,6
  97:12 142:17
  143:2 159:2,11
  159:21 160:22
  161:2,14,22
  164:25 167:11
  172:25 178:2
  200:8,17 201:3,8
  201:10,17 202:3
  202:13 263:25
  264:10
harris 118:24
  152:14
harrison 64:25
  118:23
harvard 14:5
  230:10
haul 121:18
head 17:1 90:2
  91:2,12 163:4

headed 136:8
header 68:22
heading 49:18
  67:18 68:19
  73:24 76:6,9
  93:2 105:23
  109:7 259:16
headings 48:20
  48:23 69:2,6
headshake 7:1
healed 191:22
healing 79:5,19
  79:20 191:20
  192:7,11,24
hear 92:5 121:20
heard 19:11
  56:21 74:9
  83:25 169:14
  251:10
hearing 28:10
  80:5,12,22 81:22
  82:22 86:16
  87:9 88:20 89:5
  226:22
hearings 204:17
  265:21 266:15
heart 25:17
held 14:24
  235:25
help 66:9 173:6
  186:17 218:7
  229:11 239:5
helped 228:19
helpful 32:4 68:2
  101:7 117:17
  131:2 185:5
  193:13 211:20

helping 246:14
helps 74:3 126:6
henry 271:4
  272:1 273:1
hereto 273:7
hereunto 270:10
high 14:4 67:13
  68:10,16 123:5,9
  127:10 128:23
  136:11 143:2,5
  147:3 156:7
  168:5,7 214:6,13
higher 129:16
  130:21 132:6
  142:20 156:3
  161:6,7,23 162:1
  167:23 175:15
  175:18,22,25
  176:5,6 180:24
  209:5 210:1
  264:20
highest 55:6,6
  137:2,7,8,10,18
  137:19,22
  138:10,14 139:1
  139:13 141:16
  142:3,6,9,12
  143:19,25 144:4
  144:8,12,18,19
  144:23,24
  146:16,18,23
  148:8 160:21,25
  161:3 165:16
  166:15 167:8,13
  208:18 209:15
highlight 77:12
highlighted 82:3

highlighting
  89:18
highly 94:16
  95:11,13
hinges 85:16
histogram 139:8
  140:12,13
  141:25 145:2
  148:1 156:17
  171:5,5,11
  172:20 173:11
  174:16 175:2,10
  175:11,14
histograms
  174:11
historical 18:21
  64:16 163:18
historically
  163:14
history 117:5,16
  134:11 152:6
  153:19 156:23
  168:4 169:1
  193:5
hitting 168:19
hold 32:25 33:3
  33:16,20 53:21
  178:21 235:9
holistic 61:14
  188:22 193:21
  231:17
home 239:8
honest 102:23
honestly 202:24
  245:22
hook 61:13
  107:10,13,16,17
  107:19,23 108:1

Moon Duchin , PhD

July 14, 2022

The South Carolina State Conf vs. McMaster/Alexander

[hope - include]                                                                Page 31

**hope** 37:10
  83:22 91:20
  106:2 171:7
  188:15 223:23
  231:22 236:18
**hopefully** 223:3
**hoping** 173:5,8
**hospitals** 234:8
**host** 103:19
  265:6
**hour** 9:6 29:8
  50:22 148:21
  195:12
**hourly** 251:21
  255:19
**hours** 8:23 27:1
  29:23 251:18,21
  251:24,25 252:2
  252:4 255:4
**house** 1:12,13,14
  4:2 9:15 10:7
  23:20 29:20
  30:10 40:16
  41:2,6,15,16,19
  42:3 43:8,21,22
  44:5 45:3,3,6
  48:5,8,11,14,24
  49:9,16 60:17
  63:5 67:18
  68:21 69:16
  70:13,14,19
  79:10 81:2
  136:2 183:17
  203:15 206:20
  207:16 220:15
  220:21 223:2
  258:18 260:10
  262:3 266:15

**howard** 1:15
**huge** 84:5 94:9
**huh** 70:22
  106:25
**human** 127:3
  177:6,8 178:5,8
  178:9,11,22,23
  179:2,3
**hundreds** 84:8
**hypothetical**
  98:17 209:4

**i**

**i.e.** 154:20
**idea** 35:6 84:9
  84:13 90:9
  121:3,21 132:22
  133:13 139:3
  212:15 251:5
**ideas** 230:4
  231:9
**identical** 144:2
  155:8,11
**identifiable** 63:8
**identification**
  192:20
**identified** 42:11
  43:2 79:2 81:14
  81:20,21,23 82:4
  89:5 91:5 117:6
  118:20,22
  132:11 142:20
  149:10,24
  150:13 152:9,9
  154:11 164:4
  174:14 195:7
  203:11 220:16
  227:1

**identifies** 30:6
  192:16,18
**identify** 29:22
  49:3 79:23
  80:22 81:8,10
  97:10 214:18
**identifying** 92:8
**identities** 25:3
**identity** 142:12
**ii** 42:14,20 118:5
  118:7 120:23
  261:22,23 262:3
**iii** 42:14,17,19
  42:20,21 49:15
  50:7 259:11,13
**illegal** 102:10
  103:4
**illogical** 109:21
**illusive** 123:6
**illustrate** 62:18
**illustrates**
  113:16
**illustrations**
  62:17,17
**image** 38:21
**images** 94:21
**imagine** 45:21
  112:14 122:12
  122:14,16 132:3
  157:16 267:14
**immediately**
  179:22
**immutable**
  163:12
**impasse** 25:22
  25:24
**imperative**
  190:14

**imperfect** 162:8
**implementations**
  230:2
**implemented**
  128:12
**implication**
  260:9
**implications**
  117:18
**implicit** 49:9
  69:24 216:12,20
**implicitly** 216:25
  221:7
**implied** 79:18
**imply** 206:11
**importance** 90:5
  131:5
**important** 7:14
  25:14,17,21
  64:20 134:6,10
  142:4 145:16,18
  151:6 190:16
  264:22
**impossible** 46:20
  46:23
**impression**
  38:19,23 39:5
  52:25 96:10,14
  158:7 216:22
  258:13
**impressions**
  195:10
**inadvertently**
  30:18
**incidentally**
  81:25 91:6
**include** 38:11
  59:13 62:23

[include - interest]                                                    Page 32

82:23 203:8,9
211:15 235:21
241:25
**included** 25:8
89:21 90:4
93:20,25 94:1
137:15 166:23
183:15,16,22
220:6,7 236:16
**includes** 12:25
165:4 181:1
**including** 30:8
79:7 125:9
167:3 198:20
258:1
**inclusion** 68:17
**income** 226:14
255:20
**incorporated**
258:6 265:18
**incorrect** 228:7
**increase** 126:6
190:6
**increased** 189:11
189:13,21,22
190:3
**incumbencies**
136:6
**incumbency**
49:8 66:12
69:25 71:15,20
72:2,4,5,22
74:10 135:25
136:2,4 207:19
**incumbent** 66:13
66:16 76:12,18
76:21 107:24
108:1,3,5

**incumbents** 72:8
72:22 76:10
**independent** 2:5
150:7
**independently**
95:25
**indicates** 41:8
231:25 239:24
266:13
**indicating** 22:12
37:22
**indication**
119:20 121:22
140:24
**indirect** 225:22
**individual** 64:15
82:17 253:15
255:12
**individuals**
87:15 88:19
228:12 246:13
**indulge** 173:10
**ineffective**
185:10
**inevitably** 221:3
**inference** 153:24
**influence** 70:2
156:9
**informal** 68:23
85:7 96:8,10
252:23 253:4
**informally** 36:6
78:5 111:12
**information**
28:12 66:17
242:9 266:21
**initial** 31:9,12
34:1

**initially** 234:9,10
234:21
**innovation**
129:4
**input** 84:10,10
204:16
**inputs** 176:2
**inquiry** 118:7
**insist** 188:23
**instance** 60:8
75:11 85:8 86:3
98:6 101:23
113:4,7 124:18
191:14
**instances** 60:5
159:15,18 172:1
205:5,7
**instantaneous**
265:16
**institute** 15:2
233:1
**instruct** 88:24
**instructed** 7:10
98:6,8
**instructing**
122:17
**instructions** 98:1
122:19
**insubstantial**
67:1
**integrity** 130:18
**intend** 33:11
44:3
**intended** 44:9
52:4 118:6
119:13 248:11
**intending** 115:24

**intense** 15:21
**intensity** 36:1
**intensive** 83:8
**intent** 103:21
184:21 185:2,4,6
185:14,19,20,22
186:1,6,8 187:4
187:7,13 208:5
**intention** 99:4
**intentionally**
31:23 32:8,15
33:1 250:18
**interact** 183:25
233:9
**interest** 15:24,25
20:10 30:13
39:12 43:15
47:25 48:1,16
49:1 62:24 63:9
70:21,25 71:5,8
71:11,23 72:15
73:17,24 74:12
74:14 75:7,13
79:24 81:9,11,14
81:21,24 82:22
83:22 84:2 85:7
85:19 87:8,14
88:21 89:4 90:7
91:5,9 92:9 94:4
95:16 98:19,23
132:11,13,18
188:2 217:8
226:12 227:12
239:25 240:4,10
240:16,22 242:3
242:21 244:13
244:22 245:11
248:17 249:3,7

Moon Duchin , PhD
July 14, 2022
The South Carolina State Conf vs. McMaster/Alexander

[interest - kind]
Page 33

249:20 250:2,5
250:10,13,21
252:19,25 257:9
269:12
**interested** 270:9
**interesting** 53:14
65:23
**interests** 18:17
205:7 252:7
268:13
**interim** 1:15
**intermixed**
227:18
**internet** 238:2
**interpolated**
131:6
**interpretation**
158:8 213:10
**interpreted**
140:20 152:1
**interrupt** 141:12
**intimately** 46:16
**introduce** 10:24
**introduced** 5:17
13:7 95:21 96:9
96:14 129:5
**introduction**
96:2
**investigate**
114:6
**investigating**
112:21,22
**investigation**
111:11
**investigator**
224:19 232:15
233:23

**invite** 103:2,3
**invoices** 29:18
29:20 226:16,25
228:2
**invoked** 209:8
**involve** 33:22,23
34:10,16,20,25
112:11 181:8
250:4
**involved** 60:8
66:1 78:14
100:4 125:7
227:21
**involvement**
116:6
**involves** 53:2
96:24 111:25
119:25 211:22
**involving** 79:2
**irrespective**
65:18
**issue** 21:8 25:17
53:3 181:6
248:11
**issued** 11:11
40:15 183:16
**issues** 25:14,15
25:19 34:20
138:18 223:24
248:16 253:8
**itemize** 179:17
**itemized** 48:14
**iv** 42:14,20 43:8
**ix** 42:8,9 44:5
207:17,22
260:14

**j**

**j** 1:17 12:8
**jane** 4:10
**jasper** 89:20,21
90:1,6,13 99:7
**jcusick** 3:9
**jenner** 251:12
**jmc** 1:8
**jmgore** 3:15
**joanne** 1:17
**job** 247:3,4
**joe** 152:14
**john** 1:16 3:6,13
6:6 8:25
**joined** 30:24
253:6
**joint** 230:10,14
**jointly** 258:10
**jones** 3:13 6:6
**jonesday.com**
3:15
**jordan** 1:14
**journal** 16:18,19
17:3
**jtrinkley** 4:13
**judge** 19:12
**judged** 60:21
**judgment**
184:14 187:22
203:3 246:8
250:4
**judiciary** 1:11
1:13
**july** 1:23 266:14
270:11 271:3
**justification**
127:8 207:2,5
215:11 216:4,17

217:2
**justifications**
92:15,19 215:4
215:20
**justified** 180:6
207:7
**justify** 206:4
214:2,7,13 216:3
216:13
**justifying** 58:6
215:23
**justin** 230:11,12
253:5

**k**

**k** 230:21
**kamala** 152:14
**keep** 133:9 157:2
205:13 206:3
213:18,21 214:1
219:16 222:20
222:22 226:14
**keeping** 76:10
99:6 100:4
106:10 177:6
178:5 179:1
219:22 220:1
225:23
**kept** 90:9 94:3
104:6,14 130:25
**key** 79:5 139:16
171:9 189:22
**kind** 20:20 35:25
60:11,13 67:16
77:16 83:13
86:22 93:14
102:5 120:3,21
126:5 127:8

Moon Duchin , PhD                                                July 14, 2022
The South Carolina State Confvs.McMaster/Alexander

[kind - leave]                                                    Page 34

139:8 141:9
142:5 148:2
182:16 185:9
192:3 193:8,14
199:8 206:13
227:9 230:3
231:1 253:3,6
**kinds** 33:15 46:5
  108:18 110:8
  126:16,24
  168:21 182:21
  216:14 263:12
  268:20
**knapp** 1:15
**know** 7:24 9:18
  10:6 16:23 19:1
  24:6 25:3,5,22
  25:24 27:6
  29:14 37:17
  38:25 39:7 40:2
  40:7,10 45:16,23
  46:22 47:11
  52:19,22 65:13
  65:14,15 69:3
  72:17 84:10
  93:15,17 94:11
  96:23 98:9
  104:18,21
  106:14 107:1,4
  108:3,14 109:2
  110:10,23
  112:18 119:12
  119:21 120:1
  124:13 126:13
  135:9 141:14,15
  141:22 142:5,23
  145:19 149:23
  154:14 156:12

158:15 163:5
164:8 172:11,14
173:14,20 183:7
190:17 200:17
200:20 201:2,10
203:8 204:21
210:13 212:17
214:22 216:2
219:6,11,12,15
222:7,11,25
228:21 239:9,12
245:18,19
247:13,15 248:4
248:6 249:14,16
249:22 251:5
252:13 255:8
266:16 269:8
**knowledge** 47:14
  47:18 59:3 60:2
  60:15 65:7
  101:17 123:18
  172:16 183:24
  222:14 229:5
  257:5
**known** 46:19
  214:8
**knows** 242:6
**kopecky** 228:4
  238:21
**kruskal's** 130:16

**l**

**l** 2:4 270:2,16
**lab** 51:16 223:6
  223:10,11,11
  224:2 226:8,17
  229:3 232:7,10
  232:15,23

240:17 241:17
241:23 242:1,5,8
242:8,11,12,22
247:1,5,8 248:18
249:2 251:3,19
252:20 253:10
253:11,16,17
254:24 255:5,16
**labeled** 82:9
**labor** 227:5
**labyrinthy** 234:2
**lack** 60:17
**laden** 3:8 271:2
**ladson** 106:1
**land** 17:8 19:18
  20:12
**language** 42:7,7
  51:23 58:9
  102:1 117:1
  161:20 170:4
  212:9
**large** 23:21 54:6
  78:6,11 86:18
  189:1 255:5
  270:4
**larger** 58:6
**largest** 141:19
  231:25 238:16
**late** 8:20 96:15
**launched** 253:19
**laura** 233:9,11
**law** 1:15 6:6
  10:19 43:2,10,17
  43:19,24 44:1
  57:13,25 73:9,13
  73:14,18 74:13
  74:14,17,23 75:5
  75:14,14 97:22

100:20,22 102:5
102:22 103:17
103:18,20,22
104:18,21
121:17 214:5
216:2 251:9,11
251:12 262:8
**laws** 42:22
  204:10 262:14
**lawyer** 74:18
  255:24
**lawyers** 251:10
**layer** 46:8,9,11
  46:14,23 221:13
**layperson**
  133:20
**ldf** 10:15,16
  226:25 251:9
  257:1,3,22 258:8
  258:11,14
**lead** 183:25
**leads** 183:9
  204:17
**league** 57:8
  58:14 65:3
  143:7 164:24
  263:25 264:10
**leah** 3:5 8:25
  10:2 91:20
  271:1
**leaning** 268:4
**learn** 200:1
  250:1
**learning** 64:9
**leave** 162:25
  186:7 240:21
  241:1,6,7,10,12
  241:13,15,18

Moon Duchin , PhD                                    July 14, 2022
The South Carolina State Confvs.McMaster/Alexander

**[leave - local]**                                              Page 35

251:17 254:3,4,9
254:17,18,20
255:3 269:13
**leaves** 157:20
**led** 155:23 156:6
158:5,21 205:16
206:7
**left** 64:2 145:8
145:12 148:11
**legal** 3:4 10:13
26:4 31:25
33:12,13 53:16
100:13,17
101:24 104:5,14
115:14,25
190:10 209:2
255:11 262:17
271:23
**legally** 103:16
104:9,10
**legislative** 5:15
14:14 17:11
41:24 42:10
44:13 92:20,22
96:12 98:10
183:21
**legislators** 76:12
266:24 267:16
**legislature** 97:14
100:20,23 177:4
178:1 209:25
214:17 265:19
**legislature's**
184:8,13 187:19
**legislatures** 74:8
**legitimate** 74:11
75:13 133:3
215:20 263:11

**length** 132:20
**lessened** 79:21
**letter** 11:23 12:8
**level** 114:16
116:18 117:14
117:20,23
120:21 127:1
128:21,24
129:24 168:19
177:6 178:4
179:1 190:18
209:2 214:6
221:4,5
**levels** 23:19,23
114:22 163:19
**lewis** 91:4
192:16
**liberties** 3:18,19
**library** 224:2,5,9
**life** 15:7 223:9
**light** 91:23
**lights** 225:23
**likelihood**
114:12
**limiting** 135:3,5
**linda** 1:17
**line** 5:1,11 44:24
46:19,22 55:2
64:15 106:15,16
110:12 119:12
119:16 120:17
133:2 142:15
143:1 145:2,3,8
159:16 166:5
182:6 202:6
205:24,25 206:1
216:20 219:8
237:21,24 238:1

238:4 272:4,7,10
272:13,16,19
**lines** 45:12,17
54:9 105:15,16
108:7,8 118:12
120:18 142:19
143:7 191:13
217:22,24,25
218:2 219:8
222:9 247:6
261:11
**list** 17:15 30:18
47:24 150:19
172:10 230:23
**listed** 16:7 51:13
64:2 66:13 68:6
69:10 70:1
134:17 152:19
155:2 172:5
237:7,16,19
**lists** 153:7 235:1
237:2
**literally** 206:18
208:2
**literature** 81:6
83:12,24 84:6,7
84:18 120:25,25
121:9,14,25
137:23
**litigation** 19:18
20:9,13 22:15
53:1 60:7 66:1
77:8 99:18
121:24 226:10
226:14 227:15
246:23 251:8
**little** 7:22 20:24
28:11 35:12

50:21 67:1 71:2
91:24 115:20
117:1 122:6
125:17 149:22
150:18 170:1
173:6 195:12
205:8 206:19
238:3
**liu** 150:2
**liu's** 150:5
**live** 143:22 163:6
163:9 178:10,10
178:14
**lives** 178:19
239:3
**living** 110:21
**liz** 228:4,6,12,19
228:21 229:7
238:19,21 239:5
239:6 246:20
**liz's** 229:4
**llc** 4:3 226:9,17
227:5,17 240:17
240:18 241:17
241:19 242:5,11
242:13,22 247:1
247:6 248:18
249:2 254:24
255:5,8,10,13,13
255:15,16 256:1
**llc's** 251:3
**llp** 4:10
**load** 15:13
236:17
**local** 26:11 41:18
97:22 218:10
219:19

Moon Duchin , PhD                                July 14, 2022
The South Carolina State Confvs.McMaster/Alexander

**[localize - map]**                                                    Page 36

localize  191:16
localized  167:1
locally  49:25
located  106:7
  225:15 249:12
location  2:1
  142:6
locations  178:11
logic  137:25
  138:1,17
long  8:22 9:5
  10:5 31:10
  265:12
look  10:9 16:6
  24:16 33:25
  34:1,2 35:2,3
  38:25 39:8,18
  40:3,6 55:2
  57:10,16 67:25
  81:25 94:20
  117:7,15 119:1
  136:1,3,6 140:19
  146:20,22
  151:17,18
  158:20 159:1
  164:24 165:8
  166:2 182:19,20
  192:25 193:4
  194:5,10,11,12
  214:3 215:9
  252:16 254:15
  259:8,13 260:10
  261:7 262:2,20
  263:21 268:12
looked  11:15,21
  23:25 24:1 30:9
  39:4 46:10
  55:14 63:22

67:15 87:11
  137:19 163:12
  188:16 193:3
looking  11:5
  55:5 70:12
  82:19 84:15
  85:9 87:8 158:2
  168:22 179:23
  191:14 196:23
  201:20 233:14
  264:3
looks  18:20 56:6
  56:24 62:4
  64:24 78:4
  123:15,16
  141:13,19,25
  143:25 144:14
  144:16 148:6,10
  160:24 165:9
  171:4 172:4,20
  173:10 191:14
lose  268:4
lost  92:4
lot  123:14
  241:13
louisiana  3:14
love  85:15 121:5
low  89:10 109:24
  137:22 139:4
  140:9,11,16,25
  145:25 146:11
  146:12,13
  163:16 176:14
  177:17 266:1
lowcountry  93:1
  94:22
lower  43:22 55:9
  55:13 144:18

145:8 146:4,17
  146:18 161:2,6,8
  165:12,19,23
  166:12,20
  167:24 199:23
  199:25 201:9
  207:18 209:6,8
  260:5
lowest  140:14,23
luke  1:10 2:3
  3:12 6:8
lunch  132:20
lwv  144:11,17
  145:7 165:9,15
  165:23 167:11
  172:25 178:1
lwvsc  57:5

**m**

m  3:13 6:17
  230:21
madison  253:21
main  4:4,11 13:7
  230:25
maintain  221:8
maintaining
  93:10,24 94:24
  264:22
maintains
  219:13
major  119:2
  152:21
majority  21:5,12
  22:10,14 56:7
  114:14 122:3
  148:6 255:5
makers  131:12
  221:4

making  82:11
  115:14 123:13
  155:6 188:19
  221:1 248:17
  249:21 250:20
  268:19
manageable
  251:23
management
  228:5
manner  46:4
  61:14 184:22
  189:3 208:2,7
  246:2
map  19:16,20
  24:21 25:1,6,25
  31:14 34:6
  35:25 49:4 53:6
  53:21 54:14
  60:3 64:6,7
  65:21 73:4
  77:10,10 78:24
  97:16,16,19 98:1
  98:18,20,21,22
  101:17 102:16
  104:5,13 113:15
  119:21,22 122:7
  122:10,13,15,17
  149:12 178:1
  200:9,17 201:3,4
  201:10 202:13
  202:14 211:24
  213:20 214:12
  214:16,24
  220:24 221:17
  263:1 264:5,7,12
  264:19 267:5

Moon Duchin , PhD
July 14, 2022
The South Carolina State Conf vs. McMaster/Alexander

**[mapmaker - measurable]**

Page 37

mapmaker
263:8
mapping 84:6,9
84:14 224:5
maps 13:6 19:17
19:25 20:3,8,14
20:18,21 21:1,4
21:17,20,23,25
22:6,19,22 23:5
23:10,13 24:24
45:21,22 51:11
51:13 64:10
66:2 80:15,16
83:18 95:20
111:16 122:7
127:3,6 131:8,11
131:15 136:12
148:17 176:13
176:17 177:16
177:20 179:3,4,8
179:14 180:16
261:5 262:19,22
263:17 264:1,8
267:10,16,21
maptitude 265:2
265:5,14
marathon 7:21
march 254:13
margin 119:8,12
119:17 154:21
mark 131:17
marked 11:2
26:12,15 41:25
42:2 49:20
56:16 195:23,25
196:17 197:19
259:9 260:11

markedly 202:8
markov 129:2,3
129:14 224:4
230:20,21
231:12 235:3,16
236:10 237:15
marshal 183:1
mary 90:4
mass 148:11
massachusetts
2:2 8:7 248:10
255:9,16
master 19:12,13
master's 14:10
match 171:9
materials 8:16
11:14,24 12:6
30:7,14,17 90:22
107:4 108:19
110:9
math 14:10
130:13 173:6
235:14 248:7
mathematical
15:1 60:4,18,22
61:21 230:3
252:8
mathematician
173:6 186:20
mathematics
14:7,10 15:6,12
230:18 252:15
mathias 4:4 5:5
91:24 222:18,22
222:24,25
237:23 245:6,15
245:23 248:22
250:8,17 251:2

256:12,16,19
257:6
matriculated
14:8
matter 10:8
12:10,24 13:5
29:16,25 43:19
45:20 53:13,16
60:11 63:8 71:8
71:25 72:7,10,10
73:21 80:17
117:3 120:8
172:15 248:14
matters 10:11
226:10 244:12
maximization
211:13
maximize 211:7
211:12
mayor 94:1
mccall 1:17
mcmaster 271:4
272:1 273:1
mean 12:21
16:18 19:5
22:24 25:19,25
27:14 43:20
45:19 46:14
51:18 55:15
59:11 75:10
78:1 79:20
86:11 88:14
94:19 96:7,21
102:16 107:24
110:2 111:21
113:3,14,25
115:16 119:11
123:3,20 124:17

128:7 133:21,23
134:1,11,17,21
136:9 138:10,11
152:13 157:10
158:6 160:12
169:15,19 179:3
179:18 183:12
183:14,19
191:13 203:8
204:5 206:11
220:11 229:1,23
254:15 259:25
meaning 211:12
meaningful
120:22 168:16
means 55:24
112:22 116:10
129:15 130:23
132:6 134:3,21
136:5 151:10
152:21 159:25
169:10 170:5
178:8,9,10
189:16,23 204:4
206:17 208:6,8
223:11 255:14
258:3 268:16,18
meant 25:25
34:23,24 85:16
96:22 140:17
168:25 178:7
186:17 206:10
212:19 216:7
236:17 256:1
259:4
measurable 74:5
133:11,16
264:22

Moon Duchin , PhD
July 14, 2022
The South Carolina State Conf vs. McMaster/Alexander

[measurably - minority]                                    Page 38

**measurably**
202:16
**measure**   25:19
53:5,7 59:23
186:7 265:10
**measured**   180:7
**measures**   58:19
60:4,6 61:21
62:14 264:25
265:8,13
**mechanical**
51:19
**medford**   2:2
**meeting**   242:20
267:22
**meetings**   242:14
266:13
**member**   47:16
47:19 253:7
255:15
**members**   1:18
44:11 101:25
263:18 266:25
**memory**   11:20
35:19 75:18
145:5 184:18
234:21
**men**   192:19
**mention**   24:19
49:13 70:20
89:19 90:16,21
91:6,16 92:11,25
94:15 106:24
108:10,13 109:7
109:23 110:5
127:14 190:14
197:12 200:8
224:14 240:20

243:4,17
**mentioned**   16:12
19:24 22:18
23:5,12 30:19
49:7 66:19
75:25 93:16
95:18 100:8
125:8 132:25
220:20 223:8
224:15 226:17
226:19 227:6
229:17 235:24
238:19 239:23
252:7 253:5
264:18
**mentions**   107:10
130:6 197:5,6
258:15
**merge**   66:22
**merit**   207:14
**merited**   68:17
**meriting**   206:24
**merits**   78:8
**met**   47:18 215:8
223:1 242:16,16
**method**   80:8
81:5,8 84:19,20
84:22 85:1,13,17
125:3,11 128:12
129:1 131:1
132:21 229:20
**methodology**
38:2 77:3
131:22 150:10
237:3
**methods**   18:19
83:17 129:14,15
153:25 231:4

**metric**   52:24
98:7 127:7
129:17,18
224:17 252:21
**metrics**   51:10,11
51:18 59:5,23
60:9 61:9,24
62:4,6,14,23
95:1,4,5 96:19
96:24 97:3
179:19 180:8,23
181:20,23 182:3
182:7,14,18
188:21 201:11
203:10
**mggg**   223:5,10
224:1,11,20,21
224:23 225:4,5,7
225:14,18 228:7
228:10,23
229:21 231:23
232:1,11,19
238:17,22,24
239:1,17,20
240:17 241:16
241:24 242:6
248:19 249:12
252:20 253:4,18
254:1,2
**michigan**   15:1
86:3
**middle**   110:7
205:24 210:10
**miles**   64:17
**million**   232:8
233:2,5 234:11
**mind**   17:8 39:10
41:14 46:20

107:25 164:13
164:15 177:12
188:20 259:17
**minds**   46:25
47:4,6,8
**mine**   216:1
**minimal**   264:13
**minimizing**
50:13
**minimum**
113:23 130:13
**minorities**
184:23 189:4,25
208:3
**minority**   21:5
24:16 25:20
44:18 102:1
115:7 116:3
122:22 123:2
149:22 153:23
161:14 184:15
184:22 187:5,10
188:4 189:3
190:15 202:17
205:13 206:5,24
207:3,5,6,15,20
207:21,25
208:18 209:5,6,8
209:16,21 210:1
210:8,15,22
211:8,15,18
212:5,7 213:4,18
213:21 215:4,21
216:13 221:5,9
221:15,19
261:14 262:13
263:9 269:5,9

Moon Duchin , PhD                                                    July 14, 2022
The South Carolina State Confvs.McMaster/Alexander

**[minus - neatly]**                                                    Page 39

**minus** 141:14
142:24
**minute** 104:22
222:20 231:3
256:4 257:10
**minutes** 50:25
213:25 222:19
256:4
**mira** 253:2
**misleading**
219:2
**misreading**
144:15
**missed** 31:9
95:17
**mistake** 114:19
**mistakes** 143:23
**mistaking**
146:21
**misuse** 87:25
**mit** 230:13 253:6
**mode** 142:10
**model** 206:10
234:6
**modeling** 123:14
**modified** 234:14
234:20 236:25
**modify** 234:19
**modifying**
234:16
**moment** 44:16
68:11 70:18
71:18 78:22
96:16 111:24
113:23 115:16
120:7 130:14
139:7 153:20
173:10 177:12

**moved** 77:9,22
78:20 191:15
194:19
**moving** 129:8
218:10,20
**multifactorial**
182:15
**multiple** 129:11
205:14 206:5
213:19 226:24
235:19,25
**multiplying**
199:18,20 200:2
**municipal** 64:11
105:16,21 108:7
**municipalities**
63:6 64:13,18
128:16 130:3
134:10 149:14
**murphy** 1:12
**murrell** 1:11
**muscatel** 64:25
**mutual** 111:16
**mystifying**
249:25

| n |
|---|

**n** 5:1 6:17,17
**n.w.** 3:14
**naacp** 1:3 3:3,4
10:13 54:22
58:13 63:16,21
96:8 178:1
264:8 271:4
272:1 273:1
**naacp1** 54:14,25
57:3,7 62:5
64:25 142:17

143:2
**naacp2** 57:4
65:2 143:7,17,25
144:22 145:2
166:2,10 167:12
173:3 263:25
**naacpldf.org** 3:8
3:9 271:2
**name** 6:5 23:7
110:2 120:4
138:19 197:7
220:21 228:18
238:20 241:24
241:25 253:3
**named** 70:1,9
79:14 99:14,16
102:22 133:2
135:4 137:17
**names** 6:15
**narrative** 80:14
82:14 83:9
94:10
**narratives** 80:18
**national** 74:7
226:5 232:1,4,12
255:9
**nationally** 65:17
**nationwide**
153:22
**nature** 27:20
102:13 103:8
250:5 256:9
**ncsl** 74:7
**near** 78:25 141:7
163:17
**nearly** 202:7
**neatly** 243:3

**202:24 227:7**
255:18
**moments** 213:24
**money** 244:4
248:17
**monitor** 247:10
**month** 240:13
**monthly** 251:4
**months** 10:9
13:2 30:20
83:23 223:1,21
253:7 266:5
**moon** 1:22 3:3
5:12,18 6:1,16
11:1 195:24
237:22 271:5
272:2,24 273:2,4
273:12
**morning** 6:5
**moseley** 1:17
**motion** 99:18
216:19,23 217:3
217:4
**motivation**
102:13 215:4
**motivations**
191:4,7 215:19
**motives** 100:21
216:24 217:1
**mouth** 118:16
**move** 50:19
56:13 58:17
61:25 62:19
76:23 79:21
89:15 106:20
111:5 136:24
148:19 149:7,21
171:3

Moon Duchin , PhD                                    July 14, 2022
The South Carolina State Conf vs. McMaster/Alexander

**[necessarily - obligation]**                                            Page 40

**necessarily** 72:2
72:10 87:2,14
88:15 101:15
112:11 122:22
122:24 123:2
140:4 153:22
221:16 229:22
**necessary**
122:21 168:20
246:7 273:6
**need** 6:23 7:23
21:25 22:13
98:15 130:15
156:10 160:5
216:23 243:17
245:20 249:22
256:4 257:10
**needs** 244:5
**negative** 203:24
**neighborhood**
140:7
**neighborhoods**
191:23
**neighbors** 78:18
**neither** 168:20
184:24 270:7
**nest** 218:25
**nested** 230:18
**network** 232:9
233:4
**neutral** 111:8
124:8,19,21,22
134:16 136:12
141:6 142:21
168:8 176:13,18
176:20 177:16
205:17,18 206:8
206:11,13,14,15

**never** 16:17 17:3
17:5,9 26:5
35:19 74:9
167:24,25
**new** 3:7,7,21,21
35:18 89:21
107:16 129:10
147:16 148:4
195:22 205:16
206:8 248:7
**nexsen** 4:3
**nexsenpruet.c...**
4:6
**nfs** 234:1
**nights** 238:23
**nine** 55:18,22,24
171:16,19,20
175:3
**nod** 7:1
**nodding** 91:20
**nods** 163:4
**non** 107:17
116:12 146:3
157:16,20
**nondilution**
263:5,9,14
**nonpartisan**
74:6
**nonperforming**
166:20
**nonredistricting**
26:6
**north** 17:19 18:5
23:17,18 24:4,17
24:20 25:5,11
98:9,13 105:17
106:2 239:3
253:22

**nose** 148:21
**notary** 270:3
273:13,19
**note** 45:1 48:8
75:24 89:20
119:6 198:3
202:1 271:10
**noted** 149:12
174:5 188:13
273:7
**notice** 5:12
10:25 11:10
**noticed** 164:7
**notify** 240:3
**notion** 121:24
**notions** 178:17
**november**
234:15 236:25
241:21
**nsf** 232:14,16,20
233:10 235:8
245:9 248:19
249:18
**number** 37:4
54:6,8,9,19 64:2
64:3 65:14,16,17
83:3,3 97:11
128:2 131:14
140:10 141:18
152:18 171:25
183:20 199:24
200:1,21 202:23
230:24 233:6
265:23 266:2
**numbered** 77:5
**numbers** 19:15
54:10 89:13
143:22 146:23

156:22 158:19
158:22,24 160:9
171:8,9,25
199:12,14,16
200:14
**numeral** 259:10
259:13 260:6,14
261:7,22 262:3
**numerical** 36:2
67:13
**numerous** 20:6
22:18 111:25
114:1 125:8
138:4 232:16,22
243:5
**nygord** 4:16

**o**

**o** 6:17,17 91:19
230:21
**oakland** 110:6
**oath** 6:19 246:21
**object** 7:8 130:8
256:8
**objection** 7:9
103:5 185:16
186:2 244:24
245:14 248:21
249:4,23 250:14
250:22
**objectively** 74:4
**objectives** 99:9
**obligated** 44:23
59:23,25 60:3,9
233:15
**obligation** 6:19
190:7,12,13,17
190:18 236:21

Moon Duchin , PhD
The South Carolina State Confvs.McMaster/Alexander

July 14, 2022

**[obligations - opportunity]**

Page 41

**obligations**
240:23
**observation** 98:5
**observed** 215:12
**obtaining** 15:9
**occasion** 229:18
**occasions** 262:20
**occur** 13:8
**occurred** 91:7
127:19 143:4
**occurring**
141:14
**october** 266:14
**offer** 31:13,17
32:13 33:14
34:7 168:24
**offered** 77:16
124:12 192:4
269:12
**offering** 32:7
64:19 180:11
**offers** 231:1
**office** 25:2 239:2
239:6,8
**officers** 11:25
**offices** 225:17
**official** 1:9,10,11
1:13,14,15,17
253:12 270:11
**officially** 64:13
**officials** 219:24
**oh** 16:17,23
48:10 52:9
132:22 145:20
146:18 157:15
177:10 199:25
201:6 202:23

**okay** 8:4 9:23
12:25 13:23
31:18,20 35:4,5
35:23 39:7 41:2
41:16 49:5
50:19 57:10,21
58:25 75:5
76:25 81:19
84:24 86:2
89:14 92:2,21
103:14 104:3,11
106:20 108:20
109:6 110:12,22
116:1,2 117:17
123:8 124:24
125:16 126:16
129:1 135:17
136:23 140:8
143:24 146:25
152:8 154:17
155:12 166:17
178:7 193:11
194:4 204:3
209:3 211:2,21
212:13 223:7,25
224:15 225:7,14
225:18 228:10
229:16 231:19
231:23 233:2,9
233:21 234:9,13
236:2 238:12
239:5,9,15,19,23
241:16 242:3,19
244:15 245:24
246:12 247:17
247:21 249:10
253:18,25 254:6
254:22 256:3,7

257:1,6,15
260:17 261:4
**old** 178:23
**omit** 67:9
**omitted** 30:18
203:6 238:2,5
**once** 187:11
191:25 218:15
**one's** 46:20
**ones** 18:2 42:16
67:12 82:24
95:23 99:22,22
102:22 105:18
109:2,3,4 119:8
128:5 131:9,11
132:15 179:9
190:25 200:16
228:13
**ongoing** 96:13
**online** 224:16
236:24
**open** 49:11
52:10,13 86:5
223:22,25
**opening** 35:15
**operate** 178:25
**operational**
229:14
**operationalize**
125:1 132:12
133:4,20 229:11
229:12
**operationalizing**
82:16
**opine** 44:1 47:5
**opining** 117:3
**opinion** 11:17
32:7,13 33:1,3

33:17,20 44:22
46:2 47:3 53:11
59:22 64:19
97:12,15 145:13
180:11 185:12
185:25 190:8
204:16,16,22
205:3 208:16
214:11 220:2,10
220:23 231:14
**opinions** 34:22
42:23 84:25
138:16 204:21
213:6,7,9 214:19
214:25 215:17
248:14
**opponent** 152:22
**opportunities**
189:14 190:4
205:17 206:8
**opportunity**
24:16 25:20
34:3,5,18 44:18
53:2 112:1,2
114:1,3,5,8,14
114:17,20 115:3
115:6,16,24
116:3,6,22 117:4
117:19,22,24
118:3,9,11,13,18
119:1,10,18,23
120:14 121:2,4
121:14 122:9
123:19 138:7
145:19 149:23
162:8 163:22
168:6,9,17,21
177:5 178:4

Moon Duchin , PhD
The South Carolina State Confvs.McMaster/Alexander

July 14, 2022

[opportunity - paper]

Page 42

188:4 189:18,20
190:1,7,16 202:9
202:17 206:25
207:3,6,7,15,20
207:21 208:1,12
208:14,19 209:6
209:7,9,16,21
210:1,8,16,23
211:16,18 215:5
215:21 216:14
221:6,10,15,19
250:11
**opposed** 13:9
39:12 48:22
52:24 77:13
81:23 137:11
145:11 163:23
210:1 249:21
**opposite** 94:8
**optimize** 96:25
97:22
**optimizing** 99:4
188:18
**option** 97:13
212:7
**options** 23:14
178:1 185:1
208:11 227:10
**oral** 80:14
**orangeburg** 79:8
88:25 106:24
107:2,6
**order** 20:16
28:17 60:6,10
117:11 118:24
121:18 122:8
131:10 155:23
156:6,11 158:5

179:11 180:18
181:15 183:5
247:6 249:19
250:19 259:21
259:25 260:3
**organization**
247:14,18
248:10
**original** 17:5
253:8
**originally** 253:2
**outcome** 177:20
179:11 180:18
182:9 183:5
235:22 268:9,17
**outcomes** 74:5
162:18 171:12
180:8 201:11
217:2
**outlier** 140:22
140:23 141:2
**outposts** 149:20
**output** 223:19
236:13
**outputs** 248:19
**outright** 119:3,7
154:19
**outside** 20:12
69:22 74:12
158:17 177:23
**outweigh** 188:3
**overall** 86:23
143:9 167:2
170:3 227:5
252:2
**overhead** 225:25
226:1

**overlap** 242:10
**overlapping**
235:13
**overlaps** 71:14
72:3 115:11
**overperform**
168:12
**overperforms**
167:4
**overshot** 131:17
**overstate** 164:10
**overtake** 70:3,8
**owned** 239:12,16
246:15

**p**

**p** 5:19,21 196:16
197:18
**p.m.** 269:19
**package** 51:23
67:4 230:8
265:11
**packaged** 67:16
**packages** 51:25
52:3 224:4
**packard** 2:1
**packed** 138:11
**packet** 13:21
**packing** 138:22
**page** 5:1,11 34:1
35:2,14 36:13
40:12 42:21
59:10 60:16
61:8 63:4,11
69:16 76:5
77:20 82:1,4
88:24 90:4 93:2
94:20 99:6

105:12 106:23
108:6 124:6
125:20 126:3
127:13 128:8,11
132:16 136:25
139:7,20,21
140:2 143:13,16
145:1 149:9,25
154:10 158:1
159:10,19
164:18,20 165:8
166:1,9 171:3
172:4,5 176:8
181:11 196:24
196:24 201:24
202:10 231:24
231:24 263:21
264:3 266:9
272:4,7,10,13,16
272:19
**pages** 28:17 89:8
89:11 91:16
92:11 265:25
266:2
**paid** 28:5 29:15
224:20 225:3,5,8
225:13 242:23
243:16 244:3
**pair** 199:14
**pairing** 76:18,21
135:25
**pairings** 66:13
**pandas** 52:1,2
**paper** 16:25
83:16 230:9
235:16,16,19,21
235:22,24 236:3
236:12,15

Moon Duchin , PhD
July 14, 2022
The South Carolina State Confvs.McMaster/Alexander

[papers - percent]
Page 43

**papers** 8:10 84:8
84:11 122:4
129:12
**paragraph** 43:7
44:5 48:9,10
58:4 109:12
172:7 177:11
190:19 202:1
203:19 205:10
205:24 217:10
217:14 262:11
**parameters**
136:17 147:14
147:17 176:23
**paraphrase** 22:3
22:9 58:9
113:24
**parcel** 212:1
**parentheses**
177:17
**parsing** 220:3
**part** 11:16,18
13:9 14:14
20:17 21:7,12,23
22:15 23:21
34:22 40:14
52:15,23 53:17
53:18,21 54:3
70:20 83:2 84:7
101:2 107:10
116:15 133:7
188:14 192:13
193:20 204:15
212:1 213:15
223:9,16 225:6,9
226:8 227:8
229:17 233:25
236:8 240:23

242:9 243:24
253:16 255:19
263:1 268:10
**participatory**
84:6,8
**particular** 18:18
34:6 35:8 37:20
60:9 66:10
67:18 69:14
79:11 80:24
81:5 87:9 94:22
98:7 99:15
101:25 103:20
110:24 116:3
117:5,8,20
119:25 123:22
126:18 131:18
133:14 152:3
163:23 167:21
193:4 204:14
207:16 214:20
216:5 229:1
232:7 235:24
236:11,16
258:20 259:25
260:2
**particularly**
63:20 97:13
191:19,24
**parties** 244:18
**partisan** 23:22
24:15 25:19,23
34:8 68:4,6,8
75:12 100:21
135:22 190:21
190:24 191:3,4,6
191:11 192:9,12
192:20 193:18

194:7,12,15,21
201:11 215:3,19
216:15,24 217:1
**partisanship**
99:15 100:19
101:11,16
193:20
**partly** 219:4
230:13 232:22
237:19
**parts** 64:12
144:3 168:11,13
231:7
**party** 119:2
152:22,23 153:3
153:20 163:11
170:8 192:17
270:8
**pass** 221:23
**passing** 199:3
**paste** 29:4
**pastes** 29:2
**patience** 70:19
**pattern** 178:25
179:5 194:7
**patterns** 46:18
114:22 167:22
**pause** 37:14
266:10
**pay** 225:18
226:10 263:8
**pedantic** 229:24
**peer** 16:3,11,13
16:15 83:21
120:25 121:9,14
121:24 129:11
131:23 137:23
223:19 230:9

**penalize** 59:16
**pending** 7:25
270:9
**pennsylvania**
17:19 18:5 19:9
24:12,19 25:1
60:7
**people** 9:8 25:3
37:4 46:7,13
57:4 74:21 86:7
91:8 110:21
113:6 121:13
131:9,16 133:1
152:15 163:8,8
163:10 178:10
178:10,13 204:5
214:15 218:18
223:12,17
224:16 225:2
226:20 227:13
227:14,25
243:18 255:19
264:4
**people's** 20:14
23:5
**perceive** 246:6
**perceived**
245:20
**percent** 54:14
55:12,16,19 56:4
56:8 57:14
65:10,17 116:18
116:19 117:22
119:17 120:20
126:4,4,5,18
127:6,10,20
128:3,6 131:6
139:14 140:4,6,7

Moon Duchin , PhD                    July 14, 2022
The South Carolina State Conf vs. McMaster/Alexander

[percent - plan]                                                Page 44

140:10 141:7,14
141:21,21,24
142:1,2,4,8,8,16
142:20,22,23
144:4 145:4
148:9,12 154:20
154:21 156:15
157:16,20
159:23,25
160:13,20 161:1
161:15,16,19
162:1 165:10,19
165:20,22,23
166:10,12
168:15 173:16
173:22,25 174:2
174:2,19 175:6
176:13 177:16
198:21 199:4,18
199:19 202:8
226:2,5 244:6
264:19
**percentage** 37:1
114:20 142:24
158:15 173:14
173:20 175:18
175:22,24 176:6
176:7
**percentages**
156:2,8 202:2
**perfect** 206:12
233:8
**perfectly** 152:20
258:13
**perform** 133:8
169:4 172:21
202:20

**performance**
68:4,6,8 135:23
152:2,2 155:19
168:1,3 181:14
182:7,8,20
**performed** 132:9
**performing**
227:3
**performs** 62:5,8
62:10 63:15
64:25 161:14,19
166:19 201:3,3
201:11,14
**period** 36:18
**periodically**
247:4
**permissible**
104:10
**person** 47:19
56:25 57:20
58:12,15 91:4
126:10,22 127:2
127:4,6,11,18,23
215:22 229:18
229:19 232:15
**personal** 246:2
**personally** 28:14
121:5 154:3
**persons** 1:6
**persuasive** 21:22
**pertains** 71:16
**phase** 233:3
238:7 257:17,23
258:2
**phd** 1:22 3:3
5:18 6:1 14:10
15:9 195:25
256:7,22,22,23

271:5 272:2,24
273:2,4,12
**phenomena**
166:25
**phrase** 33:10
34:21 37:5 46:7
61:2 68:11,11
71:10,13 74:19
76:2 78:8 87:12
95:12 121:19
138:21 169:25
178:8,15 259:1,3
**phrased** 214:1
**phraseology**
118:17
**phrases** 110:11
121:15
**phrasing** 176:10
183:3 208:6
257:18 260:9
**physical** 59:18
225:15
**pi** 232:14,15,16
**picked** 38:18
39:24
**picture** 106:17
106:18 143:10
**pictured** 194:12
**piece** 24:2 168:4
218:8,21 226:8
**pieces** 63:17,18
75:16
**piggyback**
234:10
**piggybacked**
234:5
**pl94-171** 36:12

**place** 8:19 9:3
10:3 48:17
98:18 191:2
192:20 205:4
266:14
**placed** 16:25
131:5 211:1
**placement**
191:13
**places** 54:2
67:21 110:18
119:6 120:8
132:24 163:16
164:5 179:16
191:16 259:7
**plain** 208:9
212:9
**plaintiff's** 11:24
12:10,16 13:14
88:23
**plaintiffs** 1:7 3:2
11:25 216:23
**plan** 20:3 23:19
30:11 31:19,19
31:23 32:8,14
33:1,7,19 35:7
45:17 54:19,22
55:1,25 56:24
57:13 58:11,13
58:13,14,24
59:24 60:14
62:4,9 63:15
64:24 70:2
79:17,22 90:20
93:5,7,18 94:12
94:13 95:14
96:3,17,18 97:2
97:6,7 106:3

Moon Duchin , PhD

July 14, 2022

The South Carolina State Confvs.McMaster/Alexander

[plan - population]                                                                    Page 45

| | | | |
|---|---|---|---|
| 107:3,13,16,17 | 220:18 221:7 | 85:3 104:2 | 242:16 246:19 |
| 108:15,19 109:1 | 261:12 | 112:19 126:11 | 246:21,22,25 |
| 111:9 129:8,8,16 | **plan's** 139:12 | 126:15 144:15 | 247:3 249:7 |
| 129:20,21 | **plans** 20:5 21:11 | 146:21 177:14 | 250:2 262:16 |
| 135:19 136:13 | 30:12 32:23 | 200:22 262:6 | 263:13 |
| 140:9 142:16 | 52:21 54:7 | **plot** 79:3 137:6,8 | **political** 43:16 |
| 143:3,17,20 | 55:14,18 56:1,3 | **plural** 229:19 | 46:17,25 47:25 |
| 144:7,11,13,17 | 56:7 57:7,8 61:7 | **plurality** 152:24 | 48:2,13 49:2 |
| 144:20,22,24 | 63:16 66:14 | 159:17,18 160:4 | 62:1,20 63:6,12 |
| 145:3,7,21 146:5 | 67:20 94:21 | **plus** 141:14 | 177:7,8 178:5,12 |
| 147:2 149:17 | 96:8 97:11 | 142:23 | 178:24 179:2,5 |
| 153:6 154:7,12 | 98:10 99:24 | **pmc** 23:8,9,11 | 180:24 192:12 |
| 155:2,7 158:17 | 125:1,13 126:9 | **point** 42:3 82:11 | 220:5,7 256:24 |
| 159:2,11,21 | 127:15,17,21 | 87:14 119:7,12 | 259:21,24 |
| 160:22 161:2,4 | 128:1 131:19 | 119:17 123:15 | **politics** 252:8 |
| 161:14,22 | 132:1,2,4,7 | 145:18 162:7,9 | **polsby** 58:20,23 |
| 164:25 165:1,15 | 133:11,16 134:2 | 182:17 192:8 | 59:6,12 62:11 |
| 166:2,16 167:14 | 134:16,18 135:7 | 195:11 198:15 | 77:6 |
| 173:11,24 | 135:13,14 | 200:4 202:10 | **popper** 58:20,23 |
| 174:18 175:4,8 | 136:14,16,17,21 | 210:5 221:23 | 59:6,12 62:11 |
| 176:3,3,5,15 | 139:10 141:6,17 | 222:1 251:24 | 77:6 |
| 177:18 178:2 | 142:21 143:8,9 | **pointed** 181:23 | **popular** 59:14 |
| 181:4,25 184:7 | 145:13,18,20 | **pointing** 189:8 | **population** |
| 184:20 185:1,13 | 146:11,15,16 | **points** 19:14 | 21:10,13 36:6 |
| 186:14 187:4,9 | 147:12,12,13 | 88:8,9,11 142:24 | 37:8,8,9 39:14 |
| 187:18,22 | 148:2,5,7 149:17 | 197:14 | 39:16 46:12,12 |
| 188:10 189:15 | 152:19 167:12 | **polarization** | 53:14 56:13 |
| 190:3,4,22 | 171:23 172:21 | 157:11 168:7 | 57:14,20 58:1,12 |
| 191:18 198:19 | 173:1 181:25 | **polarized** 113:18 | 64:4,8,14,18 |
| 199:5,6,9,10,10 | 184:6 189:9 | 150:3,14,15,20 | 65:5,9,11,20 |
| 199:19,23,24 | 199:13,14,15 | 150:24 157:9,18 | 66:9 78:12 86:9 |
| 200:18 201:7,8 | 209:4 262:8 | 172:12,18 | 110:16,18,25 |
| 201:17,18 202:3 | 268:13 | 174:14 | 111:15,25 113:4 |
| 202:3,6,15 | **play** 96:4 97:3 | **pole** 175:15 | 113:5,25 117:13 |
| 208:18 209:8,15 | 183:7 | **policies** 227:12 | 125:22,25 126:4 |
| 213:14 215:5,13 | **played** 20:8,11 | **policy** 63:8 | 126:7 127:2 |
| 217:12,12,18 | **please** 6:15,24 | 226:13 228:5 | 128:3 138:3,6 |
| 218:5,23,24,25 | 14:3 28:7 71:1 | 235:8 239:25 | 160:13 167:2 |

Moon Duchin , PhD
July 14, 2022
The South Carolina State Conf vs. McMaster/Alexander

[population - preservation]
Page 46

184:22 187:5,10
189:3,12,22
198:21 199:5
205:13,15 206:5
206:6 210:19
213:18,21
262:21 263:16
264:14,20
**populous** 57:18
57:19 86:18
88:12
**port** 90:6
**porter** 10:20,22
**portion** 79:24
110:5 144:6
199:1 237:5
**portions** 166:23
**pose** 7:9
**posit** 209:22
**position** 15:4
43:18 108:25
186:5 240:21,24
**positions** 14:24
**positive** 203:24
**possibilities**
102:12 113:16
**possibility** 99:12
99:12 107:9,21
112:22 116:8,10
116:12 121:11
122:8 246:13
**possible** 32:22
38:20 52:13
80:16 90:14
93:13 94:4,9
99:20 104:17
112:14,25 113:3
117:10,13,21

118:1 122:25
132:4 157:10
160:10,12,14
163:13 166:25
168:13 188:17
188:19 206:13
208:8 215:10
220:24 221:17
239:15,19 242:2
246:16 249:8
258:9,14
**possibly** 19:22
87:17
**post** 14:24
224:19
**postdoctoral**
223:14
**potentially**
138:12 204:20
**power** 111:10
**powerful** 130:6
178:21
**practical** 122:6
259:20 260:2
**practice** 38:20
66:6 97:23
267:8
**practices** 73:22
73:25 74:8 75:1
243:8 247:7
**practitioner**
167:25
**precede** 179:22
260:7
**precinct** 36:7
50:14 109:23
110:1,2 200:19
217:24 218:2

219:8,10 220:17
222:8
**precincts** 30:23
35:7 36:7,10
89:21,25 117:8
192:12,24 193:1
193:4,4 200:6
218:9,9,11,17,24
219:13,23 220:6
220:11
**precise** 19:4
56:22 58:8,22
152:17 171:5
186:5
**precisely** 80:19
132:15
**predictions**
123:13
**predominance**
33:14 168:23
192:9
**predominate**
34:10
**predominated**
33:6,17 34:16
190:23
**predominates**
34:7
**preference**
131:25 132:1,6
149:12 170:3
259:22 260:3
**preferences**
128:19
**preferred** 51:23
61:15 83:8
114:11 116:20
118:10 120:15

121:19 122:22
153:2,10,16,20
154:2 158:16
159:3,8,12,24
160:5 161:14
162:10 170:21
173:25
**preferring** 94:7
94:8
**preloaded** 66:21
**premise** 110:20
**preparation**
8:15 9:2,10
**prepare** 8:13
28:21 29:1
**prepared** 26:17
26:20 99:24
260:25
**preparing** 12:17
26:24 27:8
30:15 258:1
**presence** 128:13
162:11 168:6
182:23
**present** 4:16
8:24 9:7 108:15
113:12 120:19
146:8 172:12
190:3 194:3,16
**presentations**
74:6
**presented** 28:15
51:14 55:4 66:2
123:16 193:9
208:11 209:5,17
**preservation**
49:13 69:12
72:8 73:5,11

Veritext Legal Solutions
800.743.DEPO (3376)
calendar-carolinas@veritext.com
www.veritext.com

Moon Duchin , PhD
The South Carolina State Conf vs. McMaster/Alexander

July 14, 2022

[preservation - process]

Page 47

76:22 99:1
128:15 130:2
131:5,7,10,25
132:10 135:14
149:13 199:24
200:1 202:21
203:4,11 205:13
206:3 208:13
209:7,21 213:18
214:7,13 215:3
221:18
**preserve** 220:25
**preserved**
107:16
**preserving** 50:10
72:1 75:24 76:3
76:19 98:19
201:4 204:22
216:15 220:1,8
**president** 1:10
**presume** 47:8
**pretty** 146:11
207:22
**prevail** 114:12
122:23,24 123:2
155:23 156:7,11
156:19 158:5
159:25 169:18
170:11
**prevailed** 121:23
122:14,16
**prevailing**
123:11 153:3
170:19
**prevent** 189:25
250:19
**prevented** 68:25

**prevents** 100:20
100:23 184:22
189:3 208:3,7
**preview** 61:19
**previous** 43:8
54:11 55:3
106:9 122:13
154:6 155:25
158:9 172:21
198:19 203:9
**previously** 10:12
**primarily** 180:6
215:2
**primary** 164:8
164:16 223:17
224:19
**princeton**
256:23
**principal** 203:21
232:14 233:22
**principle** 25:16
48:12 70:1
190:16 203:4,12
204:6,23 205:2,3
210:7 214:5
216:7 220:2,9
243:2 262:24
**principles** 24:1
24:18 33:7,15,21
70:4,8 74:2,9,20
74:22 75:1
77:15 97:21
99:3,21,22,25
100:3,6 103:2
134:19,20
147:20 149:10
179:10,21 180:7
180:18,21 181:7

181:8,14,19,20
181:24 183:4
188:12,16
190:24 202:16
203:7 204:8
209:14 210:17
210:25 212:23
220:13 231:11
267:4
**prior** 12:2 49:13
77:17 80:9,13,20
107:17 203:20
204:10 205:19
**prioritization**
101:3
**prioritize** 130:22
132:10,14,18
210:22 211:17
211:24 221:7,18
**prioritized** 94:24
103:8 180:25
260:21,22
**prioritizes** 212:7
**prioritizing**
99:14 100:9,21
104:14
**priority** 42:7,15
69:16,20 207:21
211:4,16 260:6
260:15
**private** 99:21
100:24 101:15
101:18 102:8,12
102:13,15,16
103:12,24 104:6
104:15 266:24
267:5,11,14,17
267:19,22

**privately** 101:24
**probabilistic**
129:15
**probabilistically**
130:22
**probability**
122:8 123:5,9,10
129:16 132:6,7
134:25
**probably** 16:5
89:8 162:23
179:16 189:19
189:21 200:3
219:9 237:19
239:7 241:19
**probative**
118:21 121:4,8
151:2 174:6
177:19 179:24
185:11 201:14
201:21 268:14
**probe** 205:8
**problem** 126:8
160:15 165:22
**problematic**
138:24
**problems** 131:3
**procedural** 46:5
47:15
**proceedings**
51:2 92:22
105:1 148:23
195:14 266:10
**process** 27:5,5
37:25 45:18
96:15 97:11
129:8,11 205:17
205:18 206:9,10

Moon Duchin , PhD
July 14, 2022
The South Carolina State Conf vs. McMaster/Alexander

[process - publications]

Page 48

206:11,13,14,15
231:2 267:1,6
**produce** 11:17
97:20 178:18
**produced** 235:1
235:6 237:1,8,16
238:6 243:13
246:1
**produces** 129:10
131:8
**producing**
131:11
**product** 27:22
39:21 217:25
219:21
**products** 30:8
**professional** 2:5
14:13,19 213:10
**professor** 15:5
130:14 223:7
225:6 226:11
230:12,13
**professorial**
240:23
**profile** 225:6
**profits** 255:21
**progeny** 261:17
**program** 15:19
125:12,17
128:18 149:11
224:23 232:25
233:11 252:11
**programmed**
147:1
**programming**
230:5
**programs** 224:1
241:23 265:8

**prohibit** 71:20
72:21 73:10,15
73:20
**prohibited**
102:17 103:24
**prohibition**
100:14 101:10
101:17 104:4,13
**project** 90:6
227:22 228:5
**projects** 254:10
**promote** 130:18
**promoted**
129:24
**promotes** 129:12
**promotions** 15:5
**pronounced**
59:1
**proper** 101:3,3
101:23
**properly** 127:8
130:15
**properties** 127:7
127:24 133:11
133:16 134:17
136:13 264:23
**property** 143:3
**proportion**
129:23
**proportionality**
178:17
**proposal** 94:16
95:11,16 235:10
**proposals**
235:19
**propose** 119:19
**proposed** 21:16
120:17 184:19

264:1
**proprietary**
224:10,13
**protection** 101:2
188:3 212:24
213:2
**protocols** 126:17
**provide** 9:19
12:17,20,23
13:11,23 32:3
33:11,13 74:3
85:25 86:4
88:20 117:21
190:12 198:6
199:15 207:2,5
208:24
**provided** 10:7
11:14,24 12:7,14
13:1,9 17:18
20:13,17 21:8
23:10 24:20
27:19 30:19
66:19 150:14,16
150:18 186:6
193:23 194:25
195:4,5,8 228:1
**provides** 32:2
119:22 202:16
228:3
**providing** 115:6
**provision** 98:11
**provisions**
103:20
**proxied** 134:8
**proxies** 221:12
**proxy** 162:8
168:3

**pruet** 4:3
**public** 13:10
28:9,13,14 79:7
80:1,4,12,22
81:8,15,21 82:4
82:19,22 83:15
84:9 85:8,21,22
85:25 86:1,16,16
86:20 87:2,9
88:10,20 89:5,7
89:24 90:3,12,24
91:3,7 92:8,16
92:23 93:9,22
95:2,9,21,23
96:9 99:23
100:10 101:21
103:13 104:15
107:5,18 108:21
109:10 111:2
132:11,24 183:8
183:9,12,15,18
183:19,23 192:1
192:6,15,21
204:17 224:12
224:13 226:22
228:15,20 229:4
229:7,12 262:16
263:18 265:18
266:6 267:1,6,9
270:3 273:19
**publication**
235:6 236:3,9
237:2,8,13,16
238:5
**publications**
16:4,11,13
234:25 237:1

Moon Duchin , PhD
July 14, 2022
The South Carolina State Conf vs. McMaster/Alexander

[publicly - quoted]
Page 49

**publicly** 30:11 99:21 100:1,2,5 100:24 101:14 104:7
**publish** 16:18,19
**published** 16:16 16:17 17:3,5 52:20 75:17 117:15 183:16 214:5
**pull** 9:21 17:16 29:9 41:7,12 43:3 76:16 121:18 216:21 256:5
**pulled** 22:1 57:21 105:9
**pulling** 215:25
**pure** 15:12
**purple** 78:23,25
**purpose** 127:4 182:9 213:21 246:18 261:14
**purposes** 22:19 226:23 246:23 255:21 256:1
**pursuant** 233:21
**pursue** 99:10
**pursuing** 263:13
**put** 48:22 65:21 118:16 129:16 130:12,19 138:21 164:16 205:4
**putting** 130:21
**puzzle** 168:4 218:21

**python** 51:22 52:6,9 124:24 224:2,8 228:25

**q**

**qualified** 19:19 19:21 47:5
**qualifies** 47:2
**qualify** 21:6 24:8
**qualifying** 117:1
**qualitative** 61:11,16 77:13 77:17 83:10,13 84:13 181:3 182:18 192:5 193:21 194:19
**qualitatively** 97:22
**quality** 231:11
**quantification** 83:16 84:1
**quantitate** 84:13
**quantitative** 32:5 77:13 84:1 182:17 192:4 193:9 194:3,17 194:19
**quantitatively** 135:9
**quantity** 36:2 61:16
**question** 6:25 7:8,11,15,16,18 7:25 8:1 9:23 12:20 21:7,14 32:19 34:13,23 40:1 44:25 48:1 51:19,20 52:22

58:25 62:3 65:4 65:23 66:5 72:1 72:17,20 74:19 75:20 84:4,16 85:4,10,24 88:8 92:18 93:16 95:7 101:6,16,16 102:18,24 103:23,25 104:12 112:17 115:25 116:23 122:12 146:19 149:6 156:14 157:13,24 161:24,25 162:20,22 164:1 164:9,17 166:22 175:17,19 177:7 179:18 181:18 181:21 186:4 187:15 190:9,10 203:3 205:18 209:11 217:6 220:3 221:11 222:10 225:20 236:19 237:11 243:12 245:7 249:24 250:16 263:2 266:12 267:15 268:1,24
**questions** 8:17 14:2 67:6 108:18 109:1,2,7 196:11 198:11 198:16 221:23 221:24 222:1,2 222:17 223:4 256:9 258:18,24

261:5 263:16 264:24 265:17 266:23 268:2,22
**quibble** 174:21
**quick** 11:7 41:13 62:2
**quickly** 127:6,22 220:20 264:21 266:8
**quite** 16:5,23 18:17 46:19 53:14 54:6 70:7 71:19 73:2 74:6 78:7 82:15 85:6 92:10 94:6 123:16 130:5 138:20 142:9 143:11 145:16 156:23 192:19 199:12 215:14 215:16 218:22 226:14 227:19 243:9 250:6 252:15 258:21
**quo** 221:9
**quote** 57:11 59:10 60:25 63:10 68:10 79:9 90:9 93:12 94:3 113:22 153:1 184:10,19 185:3 187:23 211:14 259:19 262:7
**quoted** 60:20 91:4 184:15 189:17

Moon Duchin , PhD                                July 14, 2022
The South Carolina State Confvs.McMaster/Alexander

[quoting - rebuttal]                                           Page 50

**quoting** 45:15

**r**

**r** 91:19 160:19
230:21 272:3,3
**race** 31:24 32:9
33:2,6,17,22,24
34:10,16,20,21
34:25 44:20,23
45:11,13,14,17
45:23 46:6,14,18
46:22,24 47:13
101:4 103:19,22
133:25 134:1,4,7
134:13 147:4
160:17 170:24
171:1 176:13,18
176:20 177:16
214:8,14 220:25
221:10,12,13
261:5 262:21
263:7,12
**races** 149:24
150:19 151:12
171:13,16,20
173:12 174:1,3
175:3,4 201:21
201:22
**racial** 24:1 33:14
52:14 101:25
125:4,6,10 134:8
134:10 157:11
168:23 170:3
190:21,23 191:2
191:3,6,10 192:9
194:13 216:24
221:5 262:13
263:12

**racially** 113:18
150:3,13,15,20
150:23 157:9,18
172:11,17
174:14 194:15
194:20 217:2
**radcliffe** 241:14
254:8,9
**raise** 225:21
**raised** 258:7
**ramifications**
221:15
**ran** 241:23
**random** 85:23
86:9 129:3,9
130:8,12 131:4
**randomized**
130:9
**randomness**
129:14 235:15
**range** 123:23
140:4 141:22,23
142:20,23
**ranked** 43:22
207:18
**rankin** 1:10 2:3
3:12 6:8
**rapid** 234:1,4
**rarely** 239:4
**ratings** 168:2
**reaching** 32:4
**read** 28:14 54:13
58:3 76:12 80:1
80:4,21 143:22
150:21,23
172:14 177:11
177:13 182:5,10
184:10 196:21

202:17 207:14
208:15,23,23
213:8,11 215:10
245:5 259:14
260:4 261:12
262:5,10 271:9
273:5
**reader** 70:6
176:20
**readers** 64:21
**reading** 58:2
69:8,15 70:14
76:5 80:6 140:2
166:5 184:11
202:4 207:23
208:9 209:12
210:5,13,21
211:6 212:3,11
213:22 259:17
269:20
**reads** 213:20
215:18
**ready** 221:23
**real** 41:13
**realistic** 115:18
118:13,15,17
119:9,18,22
120:14 121:11
121:13 122:7
178:19
**realized** 30:17
**really** 65:24
84:12 86:14
97:4 103:7
121:23 128:22
138:20 142:6
163:25 189:6
205:4 218:25

219:21 227:9
232:22 234:2
239:9 248:6
249:13 251:5
**reason** 7:23
37:11 38:9
39:17 40:5
48:21 52:23
93:21 96:1
107:22 109:15
143:6 178:14
208:13 218:12
218:18 234:18
235:4 237:6,13
238:10 243:18
243:24 245:19
247:19 248:12
248:23 254:23
266:16 271:11
272:6,9,12,15,18
272:21
**reasonable** 70:6
88:13,16 97:9
114:12 118:11
119:1 122:19
123:24 167:25
204:19
**reasoning** 134:6
**reasons** 39:11,20
64:16 132:25
133:2 182:24
183:7
**reassigned** 78:3
**reassignment**
77:24 79:5
**rebuttal** 31:9,11
31:13 197:8,13
198:1,12 231:5

Moon Duchin , PhD

July 14, 2022

The South Carolina State Confvs.McMaster/Alexander

**[recall - regardless]**

Page 51

recall 9:17,25
10:2 19:8 27:2
28:25 30:21,25
38:14,17 48:7
90:12 91:13
92:2,7 108:21,22
110:1 139:17
197:4 201:16
220:15,19
234:24 238:9
257:15 258:17
258:23 261:4
263:15 264:24
265:1,10,17,20
265:21 266:23
267:2 268:2
269:5
recalling 77:4
receipt 271:18
receive 98:2
233:23
received 28:9
96:5 154:20
204:17 232:8,11
238:17 254:1,22
256:23 258:5
receives 158:16
160:6
recognize 121:6
196:2
recognizing
133:3
recollection
269:11
recombination
230:19 231:10
235:2 236:9
237:14

reconcile 218:17
reconstituted
120:7,12 121:6,7
171:17,22 195:6
reconstruct
254:7
record 6:15 7:1
13:10 40:2 51:3
76:5 83:8,9 85:8
85:21,23 88:2
90:12 92:8,20
94:10 104:23,25
105:2 148:25
164:23 183:8,9
183:13,18,19,21
183:22 195:13
195:16 222:21
270:6
recorded 51:12
156:14 191:1
recording
212:24
records 19:23
152:17 233:19
255:7
rector 3:6
red 105:14,16
108:7 143:1
redefine 124:15
redirect 256:10
256:11 268:25
269:1
redistricting
5:15,16 6:8 9:16
10:6,7 14:14,17
15:23,25 16:1,4
17:11,22 18:15
18:17,22 23:19

40:13,15 41:17
41:19,24 42:3
49:19,23 58:11
70:2,3,8 74:4,22
84:12 85:22
96:23,23 103:18
120:9 126:18,20
127:12 129:6
131:3 134:23
184:20 203:21
211:22 212:1
214:5 218:18
223:5,11,18,24
224:2 226:17
230:20 235:3
236:10 237:15
241:17 242:5,11
242:22 247:1
251:3,19 252:20
254:10,24 255:5
255:16 258:19
261:8,12 262:7
265:3,11 267:1,8
redraw 217:23
217:24
redrawn 147:19
redrew 217:22
218:2
reduce 65:16
reduced 168:9
207:3,5,6,11,25
215:20 216:13
224:25 236:17
236:21 240:25
251:21
reduces 112:2
reduction
205:15 206:7,24

207:14 241:3
refer 31:19 46:7
75:15 91:19
152:16 205:20
213:1,5 232:11
reference 41:21
61:12 212:23
224:8 243:20
269:4
referenced 31:2
49:16 75:4
177:9 224:1
271:6
references
230:24 269:4
referencing 61:4
referred 50:4
176:17 205:18
206:16 214:15
referring 42:8
43:12 50:7
68:18 74:1
93:19 96:11
112:10 134:24
141:9 191:12
192:22 198:1
202:13 224:9,10
refers 42:22
69:22 74:20
193:17
reflected 55:8
85:7 99:13
189:14 228:1
reflects 36:2
refresh 137:5
184:18
regardless 88:4
170:24

Moon Duchin , PhD
The South Carolina State Confvs.McMaster/Alexander

July 14, 2022

[region - reporter]

Page 52

**region** 94:25 192:18
**regions** 94:23 229:14
**regularly** 247:10
**reinstituted** 120:4
**rejected** 16:16 17:9
**rejections** 16:24
**related** 11:17 12:24 95:19 103:18 197:15 252:4 254:10 263:12 270:8
**relates** 129:17 235:19
**relating** 226:10
**relationship** 183:10 245:2
**relationships** 251:8
**relative** 95:21 168:8 182:6,8 202:2 208:7
**relatively** 143:2 143:5 163:16
**released** 37:21 95:23
**releases** 38:1
**relevance** 53:16 122:2
**relevant** 28:24 67:22 127:11,23 133:17 191:21 213:8,11 214:19 216:10 218:22 250:19,25

**relied** 30:7,14
**relief** 137:14
**rely** 74:25 226:20 231:9,12 242:23
**remedial** 22:13 117:3
**remedy** 22:7
**remember** 37:14 37:24 41:6 140:5 202:25 203:1 223:1 234:15 241:25 252:16 257:18 257:19 264:2 266:12 268:7
**remind** 176:1
**reminder** 240:12
**reminding** 176:20
**remove** 46:24
**renovated** 247:25
**renovation** 248:5
**rent** 225:18
**reock** 58:20,23 59:1,6,11 62:9 62:12
**repair** 35:6
**repairing** 200:5
**repairs** 193:1
**repeat** 39:24 104:8 210:11 266:20
**repeatedly** 174:5 185:5 188:13

**repeats** 187:25
**repetition** 138:3 187:12
**repetitively** 33:9
**rephrase** 34:12 81:12 104:1 135:6 162:22 210:4 250:16 254:3
**rephrasing** 81:17 250:23
**report** 5:13,19 5:21 9:19,21 10:1 19:13 23:23 26:9,10,14 26:17,25,25 27:3 27:9,12,14,16,17 28:2 29:7 30:6 30:15 31:2,9,9 31:11,12,13 33:25 34:1,22 35:2,15,18 38:5 38:12 40:12 41:21 43:2 50:5 50:17 51:6,7 59:9 61:11,17 64:19,21 67:22 68:8 75:2,4 76:16 79:25 81:3 82:1,23 84:19 85:2,14 99:19 105:8 106:23 112:9,19 112:20,21 117:15 118:22 131:20 136:5 137:6 139:21 143:14 144:4,6

145:17 146:20 149:16,19 150:22,25 158:24 167:7 172:15 177:24 179:16 180:15 186:21 188:16 190:11,25 191:20 193:10 193:12 194:3,17 194:23 195:1,4 196:13,16,23,25 197:1,5,8,11,13 197:18,25 198:1 198:4,12,19 199:1,16 200:15 200:21 201:14 205:19,22,23 214:20,21 215:6 215:10,18 216:19 218:6,13 219:2 224:7 226:23 228:16 228:23 231:5,7 231:14 235:22 237:6 238:23 239:21 240:2 243:15 245:11 246:14 259:5 263:22,22 266:8 266:13
**report's** 203:10
**reported** 2:4 194:22
**reporter** 2:5 5:8 6:22,23,25 15:14 184:11,18 270:1 270:3,17

Moon Duchin , PhD                                    July 14, 2022
The South Carolina State Conf vs. McMaster/Alexander

**[reporting - retention]**                                    Page 53

**reporting** 64:20
  219:19
**reports** 9:13
  10:7 12:18
  13:12,13,15
  17:17 21:9
  23:23 26:20
  31:3,5,22 33:5
  80:9,13,20
  180:13 240:10
  258:1 261:1
  268:8
**represent** 6:7
  12:21,22 86:17
  86:23 87:2,5
  88:11 116:21
  133:6 143:1
  158:10 223:2
  245:22
**representation**
  53:25 206:12
  268:21
**representations**
  214:23
**representative**
  72:6 87:20
  266:17
**representatives**
  1:12,13,14 12:1
  30:10
**represented**
  178:2 247:17
**representing**
  238:11
**republican**
  152:22 170:8,12
  170:15 192:19
  268:4

**republicans**
  154:2 163:9
  170:23
**require** 45:10
  106:11 114:14
  114:17 117:20
  147:2 208:17,21
  208:23 209:24
  240:2
**required** 45:13
  53:21 99:8
  210:3 273:13
**requirement**
  209:2
**requirements**
  40:23 42:13,14
  42:18 43:14,16
  44:16 47:23
  49:3,6 57:25
  69:18,19 72:13
  98:12 117:12
  118:3 127:12
  211:3,15 219:19
**requires** 212:20
**rereading** 137:6
**research** 15:2,10
  15:22 27:10,18
  28:8,18,21 29:1
  128:23 129:5
  158:10 223:18
  224:24 226:24
  227:1,2,21 228:1
  235:1,7 236:4,18
  236:21 237:2,4,9
  237:17 238:6
  240:17 243:2
  244:1,2 248:18
  249:2 252:11,19

**researchers**
  140:20
**residences** 76:10
**residency** 66:17
**residential** 46:18
  109:24 179:5
**residents** 86:4
  86:24 87:3,21
  88:2 90:7
  116:20
**resist** 163:7
  168:2
**resistant** 140:21
**resisting** 115:14
**resources** 88:1
  227:20 246:23
**respect** 48:19
  88:20 91:14
  95:15 100:2
  110:12 127:25
  132:1 134:16
  146:10 149:18
  181:4 182:2
  192:25 200:18
  209:13 217:7
  259:3 263:17
**respected** 109:8
**respectively**
  264:10,11
**respond** 197:14
  214:21
**responding**
  53:17 215:2
  257:19
**response** 5:20
  13:17 32:11
  35:2 97:9
  197:10,13,17

  198:1,6 205:22
  205:23 234:7
**responsibility**
  250:1
**responsive** 13:19
  13:24 21:13
  85:4 189:5
**rest** 90:1 134:15
**restate** 82:10
**restrain** 69:3
**restricted** 92:22
**restriction**
  139:25
**restrictions**
  72:14 102:5
**result** 38:22 73:3
  98:21 112:23
  169:6,10 235:1,6
  237:8,16 238:6
  243:14 268:21
**resulting** 175:24
  245:10
**results** 30:24,25
  103:21 151:8
  158:2 174:23
  175:1,4,8 194:9
  201:17 237:2
**retained** 9:18
  10:8,12,18,22
  257:16,19
**retainer** 258:10
  258:15
**retention** 67:14
  67:16,19,21
  68:22 199:9,20
  201:9,24 202:2,7
  203:9,20 204:6,7
  210:2,21,23

Moon Duchin , PhD

July 14, 2022

The South Carolina State Conf.vs.McMaster/Alexander

[retention - rmg]

Page 54

215:19
**retirement** 72:6
**return** 145:1
  164:18 165:8
  166:1 213:16
  271:13,17
**reunified** 79:13
**revenue** 251:4
**review** 9:9,12
  11:13 12:5,11,13
  16:16 20:18
  21:16 22:2
  28:12,18,19
  30:16 40:14
  51:10 61:7,24
  68:21 76:24
  83:10,13,16 91:8
  92:22 95:1
  97:12 132:24
  179:19 182:19
  183:21,22
  191:25 192:6,12
  193:21 202:5
  211:2 228:19
  229:7 230:10
  231:11 260:24
  271:7
**reviewed** 8:16
  9:13,15 11:20
  16:3,11,13 31:4
  31:5,10 67:15
  83:21 120:25
  121:9,14,24
  129:11 131:23
  137:23 168:11
  200:16 201:12
  213:7 216:1
  223:19 230:9

265:18,22
**reviewing** 28:9
  31:8 215:12
  226:22 228:15
  229:4
**revised** 17:6
**revises** 202:6
**revived** 17:9
**richardson**
  228:2,18 238:21
**right** 7:6 16:2
  19:10 22:5,20
  23:6 26:2,6
  27:18 29:8,10,11
  30:3 31:6,7
  35:14 36:19,22
  37:2,4,5 38:13
  39:1 40:24
  42:18 43:11,13
  49:5 50:14
  52:17 53:5 54:1
  54:2,16,20,21
  55:17,20 56:1,4
  56:9,16 57:1,2,5
  58:7,21,22 60:20
  61:1,5,6,22 62:6
  62:7,9,10,15,19
  62:25 63:1,11,18
  63:19,23,24 64:3
  64:4,5 65:1
  66:14 71:18,19
  72:11,23,24 73:6
  73:7,12 75:7,8
  76:8,19,20,23
  78:15 79:4,8
  80:6,7 82:6 84:2
  85:3 86:13
  87:10,11 89:6,17

89:19,22,23 93:2
  93:3,17 95:18
  98:2,3 100:11
  101:11,12,20
  102:3 104:19
  105:8,20,21,25
  106:3,7,8,12
  107:15 108:9,12
  109:1,5,22 110:7
  110:8 111:5,20
  112:16,20
  115:19 116:7
  118:5,6,11
  120:10,11
  125:14,15 128:4
  128:6,11,14,17
  129:24 132:2,3
  136:19 137:3
  139:14,15
  140:12,13 141:4
  141:7,12 142:2,3
  142:17,18,21
  145:6,6 146:8
  147:3,7,23 148:3
  148:4,9 149:21
  151:9,25 152:12
  152:20 154:8,24
  155:10,13 156:7
  158:12 159:1,4,5
  159:7,14,17
  160:10,23,24
  161:4,17,24
  162:5,6,16
  164:25 165:6,7
  165:14,17,18
  166:6,17 167:10
  169:9,23 170:5
  170:20 171:6,7

171:14,24 172:2
  172:9,23,24
  173:1,19 174:4
  174:24 176:8,24
  182:4,22 183:5
  183:18 184:17
  186:1,15 193:3
  193:15,16,25
  194:24 195:8
  197:2 198:7,9
  202:4,22 204:15
  204:24 206:1,2,9
  207:16 211:22
  212:1 218:7
  224:3,22 229:9
  233:7,13,13
  235:8 236:19
  238:14,25 241:2
  241:22 247:23
  248:2 252:12
  255:1,23 256:21
  259:15 260:16
  262:1 264:6
  266:4 267:24
**rights** 18:21
  101:1 120:9
  212:20,22 213:3
  223:24 232:25
  251:8,11 261:16
  261:24 262:9
**rises** 190:18
  209:1
**risk** 187:12
  267:22
**rivers** 59:19
  110:18
**rmg** 1:8

Moon Duchin , PhD

July 14, 2022

The South Carolina State Confvs.McMaster/Alexander

**[road - scrutiny]**

Page 55

road 110:6,24
roads 109:24
roberts 65:1
robust 226:12
robustness 133:7
role 20:11,17
  23:21 24:22
  32:2,5,23 74:21
  101:3 103:17,21
  117:9
roles 20:8
  226:12 243:3
roll 257:12
roman 259:10
  259:13 260:6,14
  261:7,22 262:3
room 8:8 123:23
rooted 43:9,17
  186:24,25
roots 84:10
roughly 209:23
  221:5,9,9
round 54:9 67:6
  233:6
routine 264:16
routinely 77:19
  126:23
row 54:11
rpv 150:5,8
  153:25
rule 7:14 182:23
  239:22
rules 72:17
  125:2,12,14
  222:11,15
  247:12 250:7
ruling 19:7

run 51:17 64:17
  102:23 126:25
  199:8 223:10,11
  265:7,13
running 27:23
  27:24,25 226:21
  228:14
runs 64:15 89:8
  110:13,15 126:3
  132:10,12
  134:12
rushing 171:18

s

s 5:10 272:3
sacrificed
  180:24
sacrificing
  221:19
salient 53:19
  191:24
salients 35:9
sample 86:9,22
sampling 134:25
san 253:22
sat 25:3
satisfied 187:2,3
saw 156:22
  189:2 226:16
saying 21:7
  32:11 54:13
  58:5 72:9 89:16
  95:13 135:1,3
  152:1 236:3
says 28:2 37:9
  39:13 45:14
  50:10,13 55:17
  69:15,17 76:14

90:5 95:10
  106:8 107:15
  132:9 133:24
  134:15 136:12
  137:13,21
  139:15 145:3
  150:12 154:18
  176:12 179:7
  184:5 186:13
  187:14 189:10
  190:20 198:3,5
  198:18 207:22
  208:2 211:3
  212:21 213:23
  216:2 233:15
  234:14 236:24
  238:12 259:19
  262:7,12
sc 57:3 62:5
  63:16 64:25
  65:2 144:22
  145:2 166:2,10
  167:12
scattered 77:25
  78:8
scenario 112:14
  153:16 157:16
  209:17,18
scholarly 223:18
  244:10
scholars 223:14
scholarship
  15:10,25 236:22
  243:19,20 244:7
  245:2
school 14:4
science 15:18
  51:23 80:17

226:5 230:10
  232:1,4,9,12
  233:4 256:24
sciences 15:2
scientific 230:6
  230:15
scientist 82:15
  186:20
scientists 25:9
scope 32:2 46:1
score 59:14 77:6
  77:7 98:20
  176:14 177:18
  202:7
scores 58:23
  59:6,7,11,16
scott 1:5,17
  192:18 271:4
  272:1 273:1
scrambled
  147:18,19
screen 11:4,7,9
  26:9 35:17
  41:17 48:10,11
  51:6 57:22
  62:18 70:16
  105:10 124:6
  164:21 196:14
scripts 27:25
  226:22 228:14
scroll 59:20,21
  60:16 63:4
scrupulous
  227:19 250:6
scrupulously
  243:9
scrutiny 103:2,3

Moon Duchin , PhD    July 14, 2022
The South Carolina State Confvs.McMaster/Alexander

**[se - sense]**    Page 56

se   31:17 205:22
seal   270:11
sean   5:19,21
    13:13 31:8
    99:19 196:13,16
    197:18 214:21
search   110:10
season   10:6
second   9:2,22
    22:10,13 40:23
    41:4,8,14 42:4
    43:14 44:8
    47:23 54:3
    63:21 104:23
    116:15,16 137:2
    137:7,8,10,19,22
    138:13 139:1,12
    141:16 143:19
    143:25 144:4,8
    144:12,18,19,22
    144:24 146:22
    148:8 160:21,25
    161:3,7 165:16
    166:15 167:8,13
    172:7 175:2,11
    175:14,25
    190:19 195:13
    198:15,18
    203:19 205:9,24
    211:1,9 212:6
    217:10 234:4
    258:25 259:2
    260:5 262:10
section   30:6 34:1
    34:2 40:14 42:8
    42:17,18,21 43:7
    43:23 49:8,15
    51:7,9,9,12

52:14 61:12,18
61:20,23 62:23
66:12 67:5,7,9
68:5,17,19,22
69:19 76:1,17,20
76:24 77:3
109:20 111:5,18
112:9,21 113:10
113:21 114:7
118:4,7 120:23
124:2,4,5,5,20
124:23 136:7
146:6 148:20
149:7,7,9,22
158:21 160:22
163:15 167:7,16
180:22,23 181:4
182:18 184:2,5
190:20 191:7
193:12,14,16,19
193:25 194:1,6
198:14,20
201:23 203:16
205:22 212:19
212:25 213:14
217:7 234:25
260:14 261:15
sections   42:14
    77:11 211:3
    231:8
secure   179:11
    180:18 181:15
    183:5
securing   182:9
see   11:4,8,9 12:6
    13:18 19:9 26:9
    26:10 28:11
    29:11 36:3

41:16 45:14
48:6 49:24
50:17 51:6,6
55:4 57:22 59:9
68:22 69:14,21
70:16 75:3 78:7
78:16,25 80:10
81:16 82:2 90:3
90:21 91:4,15,20
94:1 105:9
119:8 133:15
135:8 136:4
145:21 150:17
154:17 156:7,14
164:20 169:17
171:8 172:6
173:21 190:2
192:14 193:13
196:9,14 197:23
197:24 201:13
204:12 210:4
216:20 226:19
235:23 241:23
254:6 258:12
261:11,23 264:3
268:20
seeing   170:21
seeks   137:14
seen   11:12 13:13
    13:14 35:19
    48:17 153:16
    154:4 157:19
    163:16 168:12
    179:10 183:17
    205:5 224:16
select   129:9
selected   127:21
    132:5

selecting   121:4
    129:16
selection   82:3,10
    90:4
selections   80:11
    90:3 91:3,15
selective   35:8
    133:3 191:20
    192:7,11,24
self   45:4 192:20
semester   254:14
semesters
    252:17
senate   1:10,11
    5:12 6:7 9:15
    10:25 23:20
    25:13 30:10
    40:16 41:3,6
    48:5,18 49:11,14
    49:23 50:1 57:9
    57:10 58:5
    60:25 75:23
    79:10 163:10
    183:17 203:12
    203:14 204:14
    206:20 220:16
    220:21 259:8
    261:8,21 266:15
senate's   258:18
senior   15:7
sense   7:12 22:5
    32:5,23 70:10
    71:23 89:14
    96:8 163:14
    205:2 221:13
    222:13 236:14
    236:20 250:16
    265:12

Moon Duchin , PhD
The South Carolina State Conf vs. McMaster/Alexander

July 14, 2022

[sent - simply]

Page 57

sent 271:14
sentence 43:7,13
    58:3 106:9
    131:21 132:9
    133:24 134:15
    136:11 137:21
    155:19,25 158:8
    158:9 176:12
    177:2 179:7
    180:10 182:5,10
    184:5,11 185:13
    186:12,12
    187:14,16 188:4
    189:7,10,17,23
    190:20 198:18
    203:19 205:9
    206:16,17
    210:10,12
    213:17 214:3
    215:22,23,25
    216:1,9 218:9
    246:4 259:18
    262:5,11
sentiment
    186:24
separable 243:3
separate 29:20
    43:23 48:3,12,20
    48:23 67:2
    169:24 226:14
    227:9 258:19
    268:13
separated
    106:24
separately 48:14
    117:14
separation
    227:19

september
    238:12,13 254:2
    254:23
sequences 129:3
serially 77:12
seriously 84:9
    85:6 88:1
session 9:3
sessions 8:15,19
set 13:1 41:8
    48:16 136:21
    146:23 147:13
    148:4,17 170:9
    175:18,25,25
    176:23 193:23
    203:13 219:1
    235:10 239:4
    242:13
sets 49:9,12
    95:19 122:19
    188:1 212:22
    260:24
setting 126:18
    136:11 139:2
    242:15 243:7
seven 55:22
    137:7 147:19
    171:17,19,22
    172:9 175:4
seventy 251:21
    255:4
shaded 36:1
    139:9 140:3
    141:10
shading 36:2
shape 61:3 66:10
    107:13,16,17
    225:14

shapefile 30:23
    66:18,25,25
shapefiles 66:24
shapes 61:13
shards 77:25
    78:9
share 11:6,7,9
    36:5 37:6 39:18
    51:5 76:4 119:2
    143:3 197:23
shared 90:7
sharp 255:11
sheet 271:11
shift 120:22
    191:17
shifted 241:25
shifting 205:15
    206:6
shifts 193:24
short 50:24
shortage 83:21
    84:12
shorthand 33:9
    161:11 187:1
    270:3,17
shortly 145:23
show 38:22 77:8
    78:19 86:7
    111:15 133:9
    137:21 139:3
    154:1 155:5
    159:15 195:22
    200:22
showing 36:24
    95:3 148:1
shown 132:15
    136:24 141:23
    149:24 198:19

shows 46:9,11
    77:21 86:15
    94:20 142:16
    159:16 171:7,12
    177:3,3,22
shutdown
    254:13
shy 61:3 211:11
side 78:24 206:1
    227:25 228:4
    252:8
sides 188:6
    227:14
sign 271:12
signature 270:15
signed 252:5
    271:20
significant 73:23
    82:13 160:1
    162:16,18,21,24
    163:1,2,18 164:5
    177:22 223:19
    237:5 244:2
    248:16
signing 269:20
similar 38:2,10
    40:6 115:21
    118:25 119:8
    131:11 155:9
similarly 1:6
simple 84:15
    85:15 243:11
    245:7
simpler 240:22
simply 71:3
    134:13 202:25
    212:18,21,24
    221:2 249:14

Moon Duchin , PhD

July 14, 2022

The South Carolina State Conf vs.McMaster/Alexander

[simultaneously - specificity]

Page 58

simultaneously
  95:5 97:1
sincere  179:17
sincerely  85:5
single  19:11 48:3
  156:20 202:6
  238:16
singular  229:18
sit  32:25 33:16
  37:24 38:24
  39:9,22 40:2
  93:13,17 107:1
  110:22 251:14
sitting  225:16
  246:6 247:21
situated  1:6
situational  205:5
six  10:9 15:20
  55:22 56:11,11
  177:21 248:1
sixty  254:25
skepticism  73:23
skewed  194:15
  194:15,21
skipped  177:11
slash  64:2
slight  48:4
slightly  72:19
  88:7 145:7
  206:20
slip  186:4
slit  90:13
sloan  226:2
  253:24
slog  7:22
slowly  215:16
small  78:6,11
  86:22 127:1

189:1 252:3
smith  1:11
smuggle  71:22
snapshot  218:16
social  15:23
  18:21 252:15
society  15:19
soften  91:24
software  27:23
  51:15,20 52:6,12
  52:13 223:22
  224:1,3,9,12
  265:3
sole  255:15
solomon  230:11
  253:5
solutions  271:23
somebody  52:7
  215:24 234:19
somewhat  43:5
sorry  28:5 81:1
  81:12,18 82:6
  85:17 92:4
  94:14 95:6
  102:3 116:25
  124:5 130:13
  141:12 156:4
  158:6 161:5,10
  165:21 166:4,4
  187:15 205:21
  210:9 230:19
  241:8,9 260:1
  261:20
sort  68:18 203:3
  224:15 225:12
  231:24 255:11
sound  7:1 50:25
  92:4 219:3

227:18 233:7
238:13 241:21
254:25
sounds  29:9
  31:25 32:16
  51:1 59:2 89:10
  233:8,13 242:2
source  52:10,13
  219:10 223:22
  223:25 238:16
  248:4,7,10
sources  40:19
south  1:1,3,16
  1:18 3:3 4:4,5
  4:12 5:13 6:10
  10:12 13:1
  16:11,12,14
  17:20 26:14
  29:20,21 30:1
  31:14 36:7
  42:22,23 44:11
  46:17 47:1
  54:13 60:12
  71:17 72:10,14
  73:9,17 78:23
  81:2 82:12
  88:12,22 91:18
  94:23 100:14
  116:4 120:6
  123:9 126:24
  131:13 135:18
  136:2 150:9
  152:6 163:6,21
  164:6 170:6
  172:17 184:6
  204:10 217:21
  218:1 219:7,14
  219:16,18 222:8

222:11,15
262:15 263:25
265:19 266:18
270:4,12 271:4
272:1 273:1
space  225:15,19
span  253:9
spanning  129:7
  129:7,9 130:8,10
  130:13
speak  10:10 33:9
  240:20
speaker  1:12
speaking  75:17
  111:23 114:9
  215:15 221:9
  260:18
special  19:12,13
  103:17,20,21
  229:5
specialties  15:12
specific  18:14
  21:24 84:20
  85:13,17 109:4
  119:24 128:25
  138:9 141:1
  192:7 211:12
  216:8 222:14
  234:23 238:13
  244:16
specifically  13:4
  29:23 42:8 52:4
  71:17 84:11
  95:8 137:14
  210:21 222:11
  234:17 245:25
specificity
  123:24,25

Moon Duchin , PhD                                July 14, 2022
The South Carolina State Confvs.McMaster/Alexander

[specifics - statistically]                                Page 59

| | | | |
|---|---|---|---|
| **specifics** 75:15 | 131:14,19 | **start** 16:1 71:7 | 270:3 271:4 |
| **specifies** 60:6 | 135:19 181:1,1,2 | 102:21 103:2 | 272:1 273:1 |
| **specify** 140:21 | 181:2 191:21 | 143:17 198:16 | **state's** 28:16 |
| **specifying** 219:4 | 192:10,23 193:1 | 219:11 252:22 | 35:7 40:19,20 |
| **spectrum** 188:24 | 193:24 194:6,7 | **started** 13:3 15:3 | 140:8 176:15 |
| **speculating** | 200:12,19,19 | 64:10 166:5 | 177:18 179:7,13 |
| 239:8 | 202:22 217:11 | 252:24 | 183:23 184:7 |
| **spell** 6:14 246:7 | 220:17 | **starting** 51:9 | 190:22 202:6 |
| **spend** 26:24 | **splitting** 89:25 | 177:2 | **statement** 32:21 |
| **spent** 31:7,10 | 90:25 92:19 | **starts** 172:8 | 137:24 138:1,2 |
| 191:5 254:8 | 93:9,23 95:14 | 177:2 205:10,25 | 155:24 156:10 |
| **spike** 177:22 | 106:11 108:10 | 214:4 | 157:7 179:25 |
| **spirit** 86:11 | 110:25 192:7 | **state** 1:3,16,18 | 180:2,4,5,12 |
| 185:18,19 189:8 | 220:8 | 3:3 10:7 18:4 | 200:5 213:20 |
| 189:17 207:1 | **spot** 138:20 | 19:10 22:9 | 216:6,10 |
| **split** 25:25 48:19 | **spring** 252:17 | 23:20,20 25:13 | **statements** 32:22 |
| 53:14 64:7 | 254:15 | 25:15 28:15 | 69:25 74:17 |
| 79:12,16,19 | **spurs** 64:14,18 | 42:23 43:2,10,17 | **states** 1:1 6:9 |
| 89:20 90:19 | **square** 157:7 | 43:19,23 44:1 | 24:23 71:20 |
| 93:4,10,18,20,21 | **staff** 44:13 | 47:9 51:15 | 72:21 73:1,6 |
| 93:24 94:12 | 223:12,16 | 57:11 58:10 | 86:2 213:6 |
| 98:8 105:24 | 224:19,22 225:2 | 63:8 66:7 74:7 | 218:10,23 |
| 106:3,4 107:2,6 | **staffer** 47:21 | 80:13,16,17 81:2 | 219:15,17 |
| 109:20,23 | **stakeholders** | 86:18 87:3,15,21 | 262:14 |
| 110:16 111:3 | 214:19 | 87:24 99:14,20 | **statewide** 31:1 |
| 113:3 132:8 | **stand** 168:1 | 100:8 106:4 | 86:9 136:7,8,14 |
| 135:21 181:5,6 | **standard** 53:1 | 133:2 163:10,13 | 136:16 137:6 |
| 200:5 202:23 | 111:8 113:19 | 163:17,23,24 | 139:24 143:21 |
| 217:19 218:6,24 | 120:5,13 124:1 | 167:20 168:11 | 144:1,11,14 |
| 219:3,24 | 125:25 126:21 | 168:14 177:7,9 | 147:18 151:5,12 |
| **splits** 63:16,17 | 131:21 136:11 | 178:6 179:3 | 153:19 171:20 |
| 63:20,22 64:3,3 | 138:14,21 139:4 | 184:9 185:1 | 172:16 175:13 |
| 64:17,23 65:4 | 140:15 141:2,5 | 188:17 190:17 | 175:15 267:5 |
| 67:23,24 68:1 | 212:18 244:6 | 202:15 218:14 | **statistical** 60:22 |
| 79:5,21 92:15 | 245:3,5 269:9 | 218:14 219:13 | 264:25 265:8,13 |
| 98:13 108:14,21 | **standards** | 230:12 248:10 | **statistically** |
| 108:22 109:11 | 157:19 186:8 | 249:12 262:15 | 85:23 86:8 |
| 109:13,16 | 244:8 | 262:16 268:10 | |

Moon Duchin , PhD
The South Carolina State Conf vs. McMaster/Alexander
July 14, 2022

[statistics - support]                                                          Page 60

statistics 67:20
  67:21,24 68:1,3
  86:12 137:1
  142:10
status 221:9
stay 130:23
stayed 22:16
stick 58:8
stipulate 33:8,11
  212:10
stipulating
  141:22
stipulations
  74:22
stood 65:25
straight 182:6
strange 218:14
strategies 112:6
  268:9,10
strategy 268:15
stream 223:13
street 3:6,20 4:4
  4:11 110:10
strength 181:16
  182:10 184:16
  186:7 211:8
  212:5,8 213:4
  261:15 262:13
  263:10 269:5,10
strengthened
  155:20 156:1,4
strengths 97:10
stretch 110:24
strickland
  120:20
strictly 209:20
strike 97:17,23

strikes 87:24
  97:7
stringent 98:11
strong 97:4,7,13
  99:12 157:5
  168:22 185:7
  187:2,4 189:11
  219:18
stronger 134:22
strongly 70:7
  153:21
structure 234:2
sts 18:20
student 14:18
  223:14 256:22
studied 15:16
studies 14:7,15
  14:16,21 135:15
  154:3
studiously 32:11
study 14:17
  134:23 167:22
  232:8
subcategory
  113:9
subcommittee
  1:15
subdivision
  63:17,17,20
  181:2 200:12
subdivisions
  62:1,20 63:2,7
  63:13 180:24
subject 23:16
  24:13 74:13
  147:14 176:22
submerge
  179:10 180:21

183:4
submerged
  180:17
submission 17:7
  17:11
submit 99:24
  197:12 240:9,11
  267:10
submitted 16:15
  17:2 22:23 23:3
  30:12 197:8
  226:25 234:21
  240:12 263:17
subordinated
  33:21
subpoena 11:18
  13:17,20,24
subscribed
  273:14
subset 81:10
substantial 31:8
  223:22 228:25
substantially
  38:22 62:11
  72:3 115:12
  155:9 200:12
subtle 49:17
  225:20
subtly 134:8
succinct 188:5
  189:6
suffer 188:21
suffice 20:22
sufficient 168:20
suggest 136:9
suggestion
  121:17

suite 4:5,11
sukovich 65:1
summaries
  28:22 29:2
summarize
  42:16 47:12
  54:7 80:2 87:1
  166:18 168:18
  259:5
summarized
  229:14
summary 76:1
  194:3 198:15
summer 224:25
  232:25 241:23
  241:24 247:9
  251:22
summerville
  106:1
sumter 79:7
  88:25 109:8,17
  109:20
superior 202:14
  202:21
superlative 95:5
  96:18
supervise 247:2
supervision
  27:11 28:1
supplement
  91:16
supplemental
  234:1
supplementary
  126:5
support 20:14
  23:10 27:16,19
  27:20 28:8 33:4

Moon Duchin , PhD
The South Carolina State Confvs.McMaster/Alexander

July 14, 2022

[support - talked]

33:10,12 81:5
84:13 90:13
114:23 116:11
116:13 137:23
155:23,24 156:6
156:11 157:11
157:17 158:5
159:17,18 162:9
163:19,22 164:3
164:6 167:23,24
169:16 180:11
180:11 183:1
185:19 225:21
228:1,4,15,22
234:7 235:18,21
238:22 239:20
243:15 248:11
253:17,18
**supported** 89:25
90:25 93:9,23
155:25 185:23
188:5 236:15
237:19 254:9
**supporter** 232:1
**supporters**
156:8
**supporting**
107:6,19 108:21
108:22 109:11
109:13 111:3
158:10 194:25
**supports** 32:12
83:12 156:10
162:6
**suppose** 69:24
150:4 175:16
183:3 208:4

**supposed** 167:4
**supreme** 19:11
22:16 24:5
25:15 42:23
213:6
**sure** 6:16 9:24
10:4,10 14:5,22
17:7 19:23 20:2
23:2,3 24:11
29:11 31:16
34:14 35:1,13
37:16 49:12
69:23 72:16
75:11 77:4 78:2
79:1 81:13,25
84:17 85:11
86:10 95:6
110:19 112:13
124:10 125:21
126:16 133:1
137:25 138:19
143:15 145:20
156:21 157:14
157:15 164:23
176:9,11 177:10
180:22 181:17
183:6 186:19
187:17 200:22
204:5 208:21
217:17 220:12
227:24 231:7
233:20 238:15
239:11 240:5
242:14,17 243:7
243:11 246:4
247:6,11 250:18
252:6,14 254:14
258:3,16 259:19

**surprised** 235:23
267:7
**surprising**
110:18 175:16
**survey** 36:22
37:19 88:18
**suspect** 11:15
37:25 65:17
103:16 199:13
199:25 204:18
**swaps** 127:1
**sworn** 6:2
273:14
**synthesize** 80:2
80:16,19
**synthesized**
229:13
**system** 244:10
244:14,20 245:4
246:11
**systematic** 193:8
194:16
**systems** 15:16

| t |
| --- |

**t** 5:10 91:19,24
272:3,3
**table** 53:24 54:3
54:4,4,4,5 55:3,5
55:9,13 56:15
63:13,25 145:22
145:22 150:12
151:17,24 152:1
152:17 154:5
155:2,4 158:13
159:15 161:13
164:19 167:12
171:6,10

**tactics** 113:9
**taiwan** 1:5 271:4
272:1 273:1
**take** 6:22 7:23
8:19 9:3 10:3
50:16,20,23
53:24 54:11
55:2 57:10
64:24 85:18
88:1,6 95:2
104:22 110:20
117:13 120:6
135:7 148:21
152:23 153:6
169:3 177:12
178:16 187:1
222:1 244:19
265:13 267:24
**taken** 2:3 19:10
19:15 85:6 95:8
118:20 164:15
169:1 206:18
243:21
**takes** 70:18
123:21 229:5
**talk** 44:2,3,15
57:17 67:2
78:10 101:13
105:6 106:1
131:24 179:20
193:19 194:6
204:18 220:4
227:3,20 230:14
247:4 253:15
**talked** 91:8
122:2 149:22
198:24 211:21
232:18 235:12

Moon Duchin , PhD
July 14, 2022
The South Carolina State Conf vs. McMaster/Alexander

**[talked - theoretically]**

Page 62

243:5 259:1
**talking** 57:16
 78:11 82:8
 155:3,7 198:25
 217:11 219:5
 230:6,17 233:3
 243:4 251:25
 252:2 256:13
 263:19
**tallest** 141:20
**target** 114:20
 168:19 218:10
 218:20,20
**targeting** 168:7
 168:22
**tautological** 47:7
**tax** 247:14,18
 248:16,24,25
 249:6,10 255:21
 255:25
**teaching** 236:17
 236:21 252:14
 252:18,25
 254:12,14
**team** 25:8
**technical** 51:20
**technically** 23:2
 102:19
**techniques** 27:23
**technology**
 15:19
**tell** 6:19 14:19
 14:22 17:17
 39:11 43:25
 45:7,8 54:23
 78:1 81:22 85:4
 105:14 106:17
 106:19 111:21

122:9 128:18,24
 156:8 167:16
 179:18 180:20
 189:24 193:2
 196:5,7 208:10
 208:22 216:22
 230:3 234:22
 243:12 245:25
 246:5,12
**telling** 122:12,15
 131:16
**tells** 167:19
**ten** 16:6 55:22
 78:5 141:25
 172:17,25 179:8
 179:14 180:16
 189:21 190:4
 218:15 222:20
**tend** 130:22
 137:21 153:21
 172:17 177:4
 178:3,18 182:13
 183:25 201:1
**tension** 191:3
**tenure** 15:3
 223:13
**term** 56:21
 57:19 60:18
 112:10 113:6,8
 115:15 121:6,7
 140:17,18
 151:10 161:18
 170:1 174:25
 192:11,25
 204:25
**terminology**
 115:11,12,21,21

**terms** 23:14 26:4
 27:6 86:23
 122:6 170:9
 203:24
**terrain** 77:8,21
 191:15 194:12
 194:20
**terrific** 23:9
**testified** 6:2
 17:24 18:3,4,7
 19:2 89:3 94:2
 229:17 263:6
**testify** 86:8
 246:20
**testimony** 6:23
 17:18 18:12,24
 19:2,7,11,14
 21:22,23 23:17
 24:13 28:10,13
 28:15,22 29:3
 30:13 31:13,16
 46:2 79:7 80:1
 80:12,14,15,22
 80:23 81:8,15,22
 82:4,12,16,19,23
 83:15,17 85:22
 85:25 86:1,5
 87:2,10,17,19
 88:10,20 89:5,8
 89:24 90:3,11,25
 91:3,7,14 92:3,7
 92:16,23 93:9,12
 93:14,19,23 94:5
 94:7,8 95:2,9,21
 95:24 96:9
 107:6,19 108:21
 109:11 111:3
 132:12,24 149:3

183:15,24 192:1
 192:6,15,21
 193:17 195:19
 226:22 228:15
 228:20 229:5,8
 229:12,16
 256:15 262:19
 265:18,25 266:2
 266:6,17 271:9
 271:18 273:8
**texas** 17:20 18:8
 85:8 253:22
**text** 70:11
 259:15
**thank** 8:4 14:1
 16:10 19:16
 21:15 22:4
 31:12,22 59:2,4
 59:20,21 61:25
 62:13,19 74:24
 75:19,20 81:16
 84:24 104:11
 115:19 116:15
 142:14 149:21
 152:25,25
 157:25 158:12
 164:11 169:2
 174:10 188:7
 196:11 198:10
 198:10 206:2
 222:16 250:23
**thanks** 120:19
**themes** 82:19
 87:11
**theoretical** 231:1
 236:14
**theoretically**
 118:1 156:21

Moon Duchin , PhD
The South Carolina State Confvs.McMaster/Alexander

July 14, 2022

**[theory - time]**

Page 63

theory   15:17,23
   252:18
thereabouts
   241:20
thereof   270:9
thing   7:24 39:2
   62:14 65:25
   94:7,8 119:10
   130:11 131:1
   147:11 174:21
   236:19 255:9
things   11:23
   12:21,22 13:8
   67:2 68:19,20
   103:15 135:10
   160:11,14
   177:12 183:20
   208:19 209:13
   209:19,22
   213:12 226:20
   243:7 253:13
think   17:4 18:16
   18:18 20:25
   23:9 27:5 29:19
   32:3,10 34:4,14
   35:1 44:25
   46:23 47:7,23
   50:7 52:10
   56:22 57:24
   60:8 61:15
   67:21 68:10
   71:24 72:3,19,20
   74:19 75:13
   78:22 79:18
   80:10 82:6
   83:18,25 84:3
   85:3,5,16 86:11
   87:7 88:13,15

89:3 91:11
93:15 94:24
97:9 99:12
100:8,16 101:8,9
102:18,19,20
103:17,19 104:8
105:23 107:12
108:4,24 113:2,6
113:7 115:24
116:2,5,23 118:8
118:10,13 120:2
120:16 121:11
121:13 122:11
122:25 123:1,6
123:24 124:16
125:20 128:11
130:5 131:2
134:5,7,23 135:7
136:2,25 137:20
138:14,20
139:20 140:18
140:23 141:24
142:1 145:6,6,10
145:15,16,18
146:5,19,20,20
146:22 150:5
156:15,16
161:20,23 162:6
167:19,24
169:15,24 170:4
170:10 172:15
173:16 175:21
179:15 180:23
182:12 184:3
185:8,18,20,21
185:21 187:6,8
187:11,12
188:10 189:5,9

189:10 190:13
192:2 193:2,12
194:2 195:2
196:10 197:10
199:3 200:20,22
203:2,4 204:13
205:6 206:25
207:12,22 208:6
208:8,9 209:1,18
210:2,9 211:2,13
211:14 212:9,12
214:4 215:8
217:10,23
219:20 220:6,13
221:3,22,25
222:4 225:1
229:5 233:12,12
234:20 237:24
238:20 241:4
243:18,20 244:2
244:13,17,25
245:1,1 249:5,18
250:1,15 251:15
251:20 253:16
253:20 254:11
256:9,22 258:4,4
259:24 260:8
261:2 263:11,19
265:15 267:4
thinking   23:1
   25:18 153:18
   253:8
third   137:20
   152:23 176:12
   200:4
thirty   222:19
thomas   1:9 2:3
   3:11 6:7

thornburg
   261:17
thorough   132:24
thoroughly
   227:18
thought   13:19
   37:25 74:3 95:8
   195:9 250:25
thousands
   177:24
three   19:14
   23:18,23 54:2,23
   55:15,21 56:10
   58:19 59:5 61:9
   62:5 76:14 82:2
   106:4,6 128:9
   154:22 253:3
   264:4
threshold   54:20
   214:6
ticket   118:24
   152:14
tickets   152:17
tie   139:23
tier   40:23,23
   42:6,16 43:2,14
   44:7,8,15 47:23
   210:20 211:1,9
   212:6 258:25
   259:2 260:5
tiers   41:4 42:5
   260:18,24
tim   91:4 192:16
time   1:24 7:23
   10:5 16:1 26:24
   31:8,11 36:18
   87:25 96:13
   97:14 173:25

Moon Duchin , PhD                                    July 14, 2022
The South Carolina State Confvs.McMaster/Alexander

**[time - true]**                                                    Page 64

174:2,3,19 175:6
190:20 191:5
218:4,11 223:16
223:16 224:25
227:7,8 229:3
232:17 238:24
241:15,17 255:6
255:18,19 257:9
269:12 271:19
**timeframe** 271:8
**timeline** 13:6
95:20 96:1,5,7
96:11
**times** 7:22 16:22
19:17,25 121:20
152:18 154:2
171:19
**tired** 260:1
**tisch** 15:8 223:9
223:10 224:23
228:8
**title** 198:3
**titled** 111:18
124:2,20 198:14
260:15
**tjh** 1:8
**today** 6:12,19
7:5,14 8:5 9:1
11:12 32:25
33:16 38:24
39:9 40:3 90:12
107:1 110:22
198:25 231:6
246:6 251:14
**today's** 8:13
9:10 12:2
**toggle** 133:13,14
133:21

**told** 98:18,22
248:9
**tool** 224:6
**tools** 124:24
182:16,17,18
188:24
**top** 17:1 36:23
56:16,22,25 57:3
57:16 90:2 91:2
91:12 127:18
139:7 171:4,4
173:11 174:16
176:13 177:17
188:20 226:3
263:20 264:6,9
**topic** 24:13
50:20
**topology** 15:13
**total** 37:3,8
54:19,21 55:9,11
56:20 64:2
128:2 154:23
155:16 165:3
171:9,25 263:16
265:24
**totally** 138:14
**totals** 55:13
**touch** 34:20
72:18 101:4
**touched** 168:14
**town** 181:1
**towns** 48:20 63:3
63:24
**track** 15:3
**tract** 36:24
**trade** 121:18
210:6,15

**tradeoff** 106:12
209:20,22 212:5
**tradeoffs** 96:24
97:5,8,18 99:8
100:5 181:8
211:22,25
**trading** 211:9
**traditional**
23:25 24:17
33:6,18 34:11,16
67:10 74:2
103:1 134:19
136:15,16
179:10,20 180:7
180:17,20 181:7
181:14,19,20
183:4 190:24
202:15 203:4,5,7
204:23,25 205:2
209:14 220:2,4,9
220:13 231:10
**traditionally**
220:4
**trained** 229:2
230:13
**training** 229:6
265:5
**tranche** 141:19
**transcript** 68:15
270:5 271:6,20
273:5,8
**transcripts** 80:5
**transformations**
129:4
**transition** 77:10
**treat** 48:2,22
98:12

**treated** 103:19
**treating** 45:2,3
70:24 72:14
73:16
**tree** 129:9,10
130:8,13,24
**trees** 129:7,7
130:10,22
**trenches** 96:23
**trende** 5:19,21
13:14 99:19
196:14,16
197:18 215:1,2
215:23 216:18
219:2
**trende's** 31:3,8
197:4,11 200:5
214:21,22 215:6
**trends** 164:7
**trial** 25:7 32:7
**trick** 34:23
75:20 92:18
**tried** 124:16
229:24
**trillions** 132:4
**trinkley** 4:10 5:4
222:2,4,6,16
**trouble** 102:23
**true** 12:21,22
21:10 60:17
63:5 96:2 98:25
99:2 153:22
169:20 170:24
175:17 195:3
198:5 200:3
201:20 206:9
245:8 270:5
273:8

Moon Duchin , PhD
The South Carolina State Conf vs. McMaster/Alexander

July 14, 2022

**[truly - understand]**

Page 65

| | | | |
|---|---|---|---|
| truly   102:23 | 229:10 259:5 | turnout   160:11 | **u** |
| 188:18 | 263:8 268:16 | 160:12,17 167:3 | |
| truth   6:19 | tuesday   1:23 9:4 | turns   97:25 | u   6:17 91:19 |
| 245:18 | tufts   8:6 15:4,5,8 | 160:14 | u.s.   22:16 24:5 |
| try   12:19 18:16 | 15:8,20 223:7 | twenty   97:2 | 213:2 261:18 |
| 20:20 22:2,9 | 224:11,20 | twice   124:16 | uh   70:22 106:25 |
| 26:3 32:1,10 | 225:15,17,18 | two   8:15,18,23 | ultimate   32:13 |
| 38:19 41:6 48:6 | 226:8 227:14 | 9:13 10:11 | umbrella   48:15 |
| 69:23 82:10 | 233:22 239:16 | 19:15 21:11 | 220:7 |
| 88:18 104:1 | 239:25 240:2,21 | 26:23 27:18 | unaware   267:16 |
| 113:22 115:25 | 241:23 242:6 | 41:7 54:14,23 | 267:23 |
| 126:24 128:23 | 243:4,14 244:16 | 55:9,12,21,23 | unclear   75:14 |
| 132:25 138:1 | 244:23 246:15 | 56:10 57:4 | 78:21,23 |
| 169:24 182:14 | 246:17 247:14 | 66:22 78:4,14 | uncommonly |
| 185:17 186:19 | 247:18 248:15 | 82:2 89:20,25 | 185:10 |
| 186:23 210:13 | 248:20,24,25 | 93:11 99:3 | uncomplicated |
| 221:2 234:2,23 | 249:11,18 | 103:14 122:3 | 264:16 |
| 254:6 266:8 | 250:11,19 | 126:16,23 129:8 | undergrad   14:18 |
| trying   22:5 | 251:17 254:12 | 129:10 130:7 | 224:20 |
| 34:24 37:14,25 | tunable   127:22 | 135:7 153:3 | undergraduate |
| 45:25 46:1 | tune   127:3 | 159:2 161:21 | 14:5 223:15 |
| 50:16 56:22 | 264:19 | 162:4 165:4 | underpin   153:25 |
| 74:21 75:21 | tuned   127:2,6 | 166:3 174:11 | understand   6:11 |
| 78:5 80:10 | 264:21 | 176:2 180:6 | 6:18 7:15 34:24 |
| 82:20 83:4,18 | tuning   126:9,17 | 183:23 199:13 | 35:1 46:1,3 64:1 |
| 84:21 85:5,18,20 | 126:25 127:5,21 | 209:4 220:14 | 71:24 73:12 |
| 89:12 95:12 | turn   30:17 35:14 | 224:3 227:25 | 81:19 83:4 |
| 97:21 115:19,22 | 46:20 103:12 | 228:12 237:14 | 85:24 86:10,14 |
| 118:15 122:5 | 108:6 127:13 | 261:11 264:4,9 | 95:12 112:13 |
| 136:10 174:10 | 133:14,15 | type   268:16 | 115:22 116:23 |
| 175:20 180:1 | 143:13 176:8 | types   262:23 | 117:18 119:16 |
| 183:6 186:4,4,11 | 193:13 259:10 | typically   225:11 | 122:5 125:2,11 |
| 186:16 188:7,23 | turned   29:18 | 225:13 227:1 | 125:16 126:19 |
| 189:5 191:8,9,11 | 46:14 134:1 | 232:17 235:20 | 128:1 131:24 |
| 194:10 200:20 | turning   92:13 | typos   171:8 | 132:25 136:23 |
| 200:25 205:21 | 99:6 133:21 | | 139:8 140:9 |
| 206:21 207:10 | 203:16 | | 146:1,25 150:10 |
| 209:3 215:14,16 | | | 156:17 167:21 |
| | | | 170:1 176:9 |

Moon Duchin , PhD
The South Carolina State Confvs.McMaster/Alexander
July 14, 2022

**[understand - violates]**    Page 66

181:18 182:12
184:12 186:11
186:16 188:8
191:9,9,11
207:10 209:3
210:5 236:2
237:10 245:4
252:6 256:25
257:21 260:5
**understanding**
13:20 24:8
86:13 95:22,25
101:24 103:7
112:16 138:15
150:1,19 151:16
170:7,12 184:4
193:2 244:8,20
246:10 255:23
255:25 256:2
257:24
**understood** 7:19
146:6 243:1
244:17
**undertaken**
182:8
**undertook** 83:13
**unfortunately**
108:17
**unified** 74:15
75:6
**uniformly**
130:10
**union** 3:18,19
174:8
**unit** 46:13
**united** 1:1 6:9
213:6 262:14

**universal** 141:4
**universe** 86:25
**universities**
243:6
**university** 8:6
14:6,8,16,25,25
15:4 223:8
226:4,11,13,15
227:9,13,15,17
240:3 242:4,14
242:16,17 243:5
244:5 245:13,25
246:12,22
256:23
**unnamed** 70:7
**unpack** 115:20
161:5
**unpacking** 191:5
**unpaid** 225:11
**unquestionably**
65:19
**unquote** 153:1
**unusual** 137:22
**unusually** 139:3
**update** 196:5,8
**upheld** 189:9
**upload** 197:22
**use** 12:17 34:21
35:20 36:9
39:17 44:19,23
45:7,11,13,23
46:7,14 51:21,22
51:25 52:1,12,25
53:6,21 58:19
59:13,23 60:3,9
60:18 61:9
71:10,13 83:15
83:17 98:7,9

110:11 112:10
113:6 115:11,15
118:16 121:7
126:1,17 128:9
129:6 130:17
133:25 134:4
135:1 161:20
168:3 175:1
185:4 188:23
192:11,24
193:22 218:19
223:22,23 226:9
231:7 246:22
259:2 261:5
262:25
**usual** 126:21
240:22
**usually** 48:12
97:20 151:10
153:25
**uttered** 246:5

**v**

**v** 120:20 230:21
271:4 272:1
273:1
**vacuum** 169:1
**vague** 204:25
**valance** 204:1
**valence** 204:1,2
**value** 142:11
151:1
**variety** 124:14
**various** 13:6
19:17,24 20:8,12
20:21 21:9
22:19 33:12,15
49:16 54:8

66:13 74:21
75:16 81:20
91:17 97:7,18
99:13,17,21
184:6 216:11
218:22 253:23
255:19 263:12
**vary** 160:17
**verbal** 6:24,24
**verified** 95:25
**verify** 41:8 271:9
**verifying** 264:18
**veritext** 271:14
271:23
**veritext.com.**
271:15
**version** 38:15
**versus** 63:21
103:21 218:9
261:17
**vetted** 213:10
**videoconference**
1:22 2:5 3:9,16
3:23 4:7,13,16
5:12 11:1
**view** 66:6 69:8
71:9 97:22
115:5,5 123:15
127:9 139:5
185:14 195:1
**views** 86:17,17
86:24 87:3,6,20
88:11,19 267:9
**vii** 70:20
**viii** 49:8
**violate** 185:14
**violates** 213:14

Moon Duchin , PhD

July 14, 2022

The South Carolina State Conf vs. McMaster/Alexander

[violation - way]

Page 67

violation   185:2
virtual   47:20
virtually   63:20
  99:3 155:11
  223:1
vis   249:1,1
visible   46:8,15
  46:23 140:14,23
  221:14
visits   15:1
visualization
  36:1
visually   94:24
vitae   5:18
  195:24
voice   177:24
voluminous
  92:23 183:15
vote   111:7,19,22
  112:4,7,11,15,23
  112:24 113:1,4,5
  113:11,19,20
  116:20 118:4
  119:2 122:3
  124:2,7,11,12,14
  124:18,19
  138:18 153:3
  154:20 156:20
  158:16 163:10
  167:7,17 175:14
  268:19 269:5
voted   169:22
  170:5,10,14,19
  170:20
voter   170:14,20
  170:25 171:2
voters   34:3,5,19
  57:8 58:14

86:24 87:3,6,15
87:21 114:9,24
114:25 115:9
116:4,10,12,22
137:15 143:8
146:2,3 154:2
155:21 157:3,4
157:17,23,24
160:6,7 164:25
169:11,13,16,22
170:6,10 177:5
178:3 189:14,20
205:7 264:1
268:3,14,20
votes   138:12
  152:21,23 157:3
  157:4 160:5,8
  176:2,3,4,7
  178:13,13,25
  181:15
voting   15:22
  18:21 21:13
  36:5 37:7,9
  39:14,15,18
  46:12 50:14
  101:1 111:10
  113:18 114:21
  115:3 116:7,9,10
  120:9 123:3,7
  150:4,14,15,21
  150:24 157:8
  160:1,13 162:12
  162:17 166:24
  167:3,22 172:12
  174:15 181:16
  182:10 184:15
  190:6 193:5
  207:15 208:1,18

209:5,6,9,16
210:8,15 211:7,8
212:5,8,20,22
213:3,4 221:19
223:24 232:25
252:18 261:14
261:16,24 262:9
262:13,21 263:9
269:10
vs   1:8
vtd   36:6 67:23
  67:24 68:1
  135:19 200:19
  202:22,23
  217:11,22,24
  219:8 220:16
vtds   48:20
  135:21,21
  191:21 217:19
  217:25 218:6,9
  218:15,19,24
  219:3,5,22 220:1
  220:8,20

w

w   4:10
wait   241:8
waive   269:20
walk   19:25
  35:11
wallace   1:14
walterboro   94:2
want   14:23
  20:24 22:2 26:3
  35:14 40:8 58:5
  60:16 67:5 69:9
  75:15 81:19
  86:14 95:6

101:13 116:16
117:17 118:16
126:12,13 134:5
143:17 147:10
147:11 149:6
155:18 159:10
164:9 176:9
184:4 188:22
198:11 204:14
213:16 214:24
217:17 222:1,19
223:5 227:20
wanted   99:10
wants   52:7
  117:11
washington   3:14
  230:12
watched   197:22
way   11:19 28:25
  32:14 39:8 44:2
  44:3 45:23,24
  47:11 48:5,18
  55:8 65:13
  73:10,24 82:20
  84:3 85:12,19
  87:17 88:9
  92:17 106:14
  110:23 111:13
  112:2 114:2,10
  120:2 122:3
  129:13 131:8,16
  133:6,15 135:6
  138:5,22 140:19
  146:25 151:18
  155:22 156:6,17
  158:4 163:10
  164:21 170:17
  182:17 186:1

Moon Duchin , PhD                              July 14, 2022
The South Carolina State Conf vs. McMaster/Alexander

**[way - workshops]**                                      Page 68

205:4 206:4
208:22 211:21
212:11,11,17
219:12 225:14
233:22 236:23
242:10 266:19
**ways** 20:21
49:13,17 53:15
56:22 64:21
91:17 183:24
193:17
**weaknesses**
97:10
**website** 28:16
51:14 52:20
231:23 253:2
**weeds** 126:14
**week** 8:20
251:18,22,24
255:4
**weekends**
227:16 238:24
**weeks** 27:7
29:19
**weighing** 23:14
**weight** 63:7
87:19,20 113:8
129:13 130:13
130:21 131:4,7
131:10 132:7
**weights** 130:12
130:19
**wells** 1:16
**went** 23:25 27:3
213:24
**west** 110:5
**white** 114:24,25
115:8 116:19

160:5 162:11,17
163:6 169:16
170:6,10,14
**whittenburg**
118:23
**wholesale**
133:10
**wide** 59:13
**widely** 13:10
52:11 77:7
**widespread**
121:23
**width** 140:5
142:13
**wild** 64:10
**wildly** 163:11
**winding** 59:17
**winner** 152:24
**winning** 169:23
**wins** 153:1,7,9
154:7,14,23
155:3,13 159:3
159:12 161:21
161:22 162:3,4
162:10 165:4,4,5
166:3 169:6,11
170:12 172:22
173:12,24
174:18 175:5,8
175:24,24 176:2
176:6 177:21
201:17,22
**wisconsin** 17:20
18:10,12 20:15
23:6 25:10,11,16
80:24
**wishes** 268:20

**withhold** 250:18
**witness** 17:14
50:23 51:1
103:6 104:24
163:4 185:17
186:3 221:24
222:3 244:25
249:5,24 250:15
250:23 257:12
266:11 270:10
271:8,10,12,19
**witnesses** 243:6
243:23,25 245:4
**women** 14:7
57:8 58:14
143:7 164:24
264:1
**won** 119:3,7
151:19 152:18
154:19 172:1
**wonderful** 92:7
201:2
**word** 35:18,20
79:18 174:22
203:25 211:11
226:19 229:10
242:1
**wording** 22:12
49:12 150:17
219:2
**words** 46:8
118:16 156:1
181:17 216:25
262:24
**work** 10:15 13:3
14:9,13,16 15:18
16:18,20 24:3
29:15,21,22

83:21 117:15
150:2 224:20
225:3,5,9,11
227:13,15 228:7
228:10,13,19
230:10,14,15
231:16 235:10
236:11,13
238:21,22 239:7
239:13,16,20
240:17,19
242:11,21,23
244:9 251:18,20
251:21 253:16
254:2 255:13,14
255:19 258:8
267:3
**worked** 27:7,12
27:13 28:23
222:12 228:23
241:16 251:9,10
251:11 257:25
258:3
**working** 10:14
10:15 27:10
114:7 133:4
142:5 229:1
243:23 246:25
255:4
**works** 16:15
27:22 48:7
225:7 244:7,14
244:20 247:5,5
256:25
**workshop**
253:20 265:6
**workshops**
253:21

Moon Duchin , PhD
The South Carolina State Conf vs. McMaster/Alexander
July 14, 2022

[worse - à]                                                                    Page 69

worse  62:10,11
  65:2 181:20,24
  201:4,6
wraps  108:1
write  223:21
  235:18
writes  215:1,2
writing  27:13,23
  75:16 96:6
  122:1 158:21
  226:21 228:14
  228:22
writings  186:22
written  16:3,10
  17:17 28:15
  70:10 74:14
  109:3 114:18
  122:4 208:22
  212:10
wrong  68:14
  158:23 166:5
wrote  177:15
  185:18 212:11
  212:14,16
  237:14

**x**

x  5:1,10

**y**

yeah  41:12 51:19
  71:18 73:2
  78:22 81:18
  82:10 101:6
  116:2 118:15
  146:6,9 156:16
  170:13 174:25
  176:1 200:24
  204:22 220:20

237:24 241:22
  251:13 252:11
  254:7
year  17:19 31:15
  37:18 179:8
  180:17 233:16
  233:19 237:1
  240:20,22 241:8
  241:10 251:23
  254:7,8,8,11,18
  254:19
years  15:20
  51:17 83:23
  172:17 179:8,14
  180:16 189:21
  190:4 218:15
  232:24 236:1
  241:13 245:21
  248:1 253:10
  254:21 256:24
yesterday  9:4
york  3:7,7,21,21

**z**

zero  64:18 131:6
  162:3 241:2
zoom  78:7,24

**à**

à  249:1

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.