# Exhibit 2

Kosuke Imai, PhD                                      August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 1

1              IN THE UNITED STATES DISTRICT COURT

              FOR THE DISTRICT OF SOUTH CAROLINA

2                    COLUMBIA DIVISION

3      THE SOUTH CAROLINA STATE

       CONFERENCE OF THE NAACP,

4      et al.,

5              Plaintiffs,

6      vs.                  CASE NO. 3:21-cv-03302-MGL-TJH-RMG

7      THOMAS C. ALEXANDER,

       et al.,

8

9              Defendants.

10

11     DEPOSITION OF:    KOSUKE IMAI, PhD (Via VTC)

12     DATE:             August 8, 2022

13     TIME:             11:04 a.m.

14     LOCATION:         Cambridge, MA

15     TAKEN BY:         Counsel for the Senate Defendants

16     REPORTED BY:      SOLANGE RUIZ-URIBE, Court Reporter

                         Via Videoteleconference

17     _____

18

19

20

21

22

23

24

25

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

```
                                              Page 2
 1      APPEARANCES OF COUNSEL:
 2           ATTORNEYS FOR THE PLAINTIFFS
                THE SOUTH CAROLINA STATE CONFERENCE OF THE
 3              NAACP, ET AL.:
 4              AMERICAN CIVIL LIBERTIES UNION
                BY:  ADRIEL I. CEPEDA
 5              VIA VIDEOTELECONFERENCE
                1730 M Street, NW, Suite 1800
 6              Washington, DC 20036
                (202) 457-0800
 7              acepedaderieux@aclu.org
 8                          AND
 9              AMERICAN CIVIL LIBERTIES UNION
                BY:  PATRICIA YAN
10              VIA VIDEOTELECONFERENCE
                1730 M Street, NW, Suite 1800
11              Washington, DC 20036
                (202) 457-0800
12              pyan@aclu.org
13                          AND
14              NAACP LEGAL DEFENSE AND EDUCATIONAL FUND
                BY:  JOHN S. CUSICK
15              VIA VIDEOTELECONFERENCE
                40 Rector Street, 5th Floor
16              New York, NY 10006
                (212)-965-2200
17              jcusick@naacpldf.org
18           ATTORNEYS FOR THE DEFENDANTS
                SENATE DEFENDANTS:
19
                JONES DAY
20              BY:  JOHN M. GORE
                VIA VIDEOTELECONFERENCE
21              51 Louisiana Avenue, N.W.
                Washington, D.C. 20001
22              (202) 879-3939
                jmgore@jonesday.com
23
24
25      (appearances continued)
```

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

                                                        Page 3

```
 1      (appearances continued)
 2            ATTORNEYS FOR THE DEFENDANT
                 HOUSE DEFENDANTS:
 3
                 NEXSEN PRUET
 4               BY:  ANDREW MATHIAS
                 VIA VIDEOTELECONFERENCE
 5               104 S. Main Street, Suite 900
                 Greenville, SC 29601
 6               (864) 282-1195
                 amathias@nexsenpruet.com
 7
 8            ATTORNEYS FOR THE DEFENDANT
                 ELECTION COMMISSION DEFENDANTS:
 9
                 BURR & FORMAN, LLP
10               BY:  MICHAEL R. BURCHSTEAD
                 VIA VIDEOTELECONFERENCE
11               1221 Main Street, Suite 1800
                 Columbia, SC 29201
12               (803) 799-9800
                 mburchstead@burr.com
13
                                AND
14
                 BURR & FORMAN, LLP
15               BY:  M. ELIZABETH CRUM
                 VIA VIDEOTELECONFERENCE
16               1221 Main Street, Suite 1800
                 Columbia, SC 29201
17               (803) 799-9800
                 lcrum@burr.com
18
19
20            ALSO PRESENT:
21               SAMANTHA FORAN, ACLU Intern
22
23               (INDEX AT REAR OF TRANSCRIPT)
24
25
```

Kosuke Imai, PhD          August 8, 2022

The South Carolina State Confvs.McMaster/Alexander

Page 4

1            KOSUKE IMAI, PhD,

2    after first being duly sworn, testified as follows:

3              EXAMINATION

4    BY MR. GORE:

5       Q.    Good morning, Dr. Imai.

6       A.    Good morning.

7       Q.    Thank you for being here today. For the

8    record will you say your full name and spell your

9    last name, please.

10      A.    Kosuke Imai, it's spelled I-M-A-I.

11      Q.    Dr. Imai, my name is John Gore. I'm with

12    the law firm of Jones Day. I represent the Senate

13    defendants, Senate President Thomas Alexander and

14    Senate Judiciary Committee Chairman, Luke Rankin,

15    and we are here today in the Congressional

16    redistricting case in South Carolina.

17            Do you understand that you are

18    appearing in connection with that case?

19      A.    Yes, I do.

20      Q.    The court reporter has just placed you

21    under oath and do you understand that means you are

22    under an obligation to tell the truth today?

23      A.    Yes, I do.

24      Q.    Is there any reason you are unable to

25    testify truthfully today?

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

                                                    Page 5

 1          A.    No.

 2          Q.    The court reporter is here to take down

 3     your testimony and to do so she'll need verbal

 4     answers; yes and no.  She can't record nods or

 5     shakes of the head.  Does that make sense?

 6          A.    Okay, yes.  That makes sense.

 7          Q.    And are you being represented by counsel

 8     here today?

 9          A.    Yes.

10          Q.    And who is that?

11          A.    Mr. Cepeda.

12          Q.    So Mr. Cepeda may from time to time object

13     to some of my questions, things like objection to

14     form, and he's obviously entitled to do that.  But

15     unless he instructs you not to answer, you should go

16     ahead and answer all of my questions.

17          A.    Okay.

18          Q.    Do you understand that?

19          A.    That makes sense, yes.

20          Q.    And most important rule today, if you

21     don't understand a question please ask me to

22     clarify.  Can we have that agreement?

23          A.    Yes, I will.

24          Q.    And if you answer a question I'm going to

25     assume that you understood it; is that fair?

Kosuke Imai, PhD                                          August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 6

```
 1          A.   That's fair.
 2          Q.   And of course, if you need to take a break
 3     for any reason just please let me know and we can
 4     take a break.  We'll take periodic breaks throughout
 5     the day.  My only request is that if a question is
 6     pending, you answer the question before we take the
 7     break; does that make sense?
 8          A.   Yes, that makes sense.
 9          Q.   Okay.  Great.  How many times have you
10     been deposed, Dr. Imai?
11          A.   I think I had once before.
12          Q.   Okay.  And do you remember which case that
13     was?
14          A.   I think it was a South Carolina house
15     case.
16          Q.   Okay.  Dr. Imai, where are you today?
17          A.   I'm in Cambridge, Massachusetts.
18          Q.   And is anyone in the room with you?
19          A.   No.
20          Q.   What did you do to prepare for today's
21     deposition?
22          A.   I reviewed my own report and exhibits that
23     were sent by Mr. Cepeda and I also had conversations
24     with Mr. Cepeda.
25          Q.   How many conversations have you had with
```

Page 7

1    Mr. Cepeda?

2         A.   I think we had maybe four times, four or

3    five times before this -- before today.

4         Q.   When did those conversations take place?

5         A.   Most recently it took place on Friday and

6    Saturday of last week and before that we had a

7    conversation, if I recall correctly, I think the

8    last week or the last couple weeks of July.

9         Q.   How long did each of those conversations

10   last?

11        A.   I'd say an hour to two hours, one hour to

12   two hours.

13        Q.   Was anyone else present for those

14   conversations?

15        A.   I think that Ms. Yan may have been present

16   in not all -- not all instances but one or two

17   times.

18        Q.   And apart from Mr. Cepeda and Ms. Yan have

19   you discussed today's deposition with anyone else?

20        A.   No.

21        Q.   Do you have any documents with you today?

22        A.   I have my own expert report which was sent

23   to me, just printed out a copy of it, a paper copy

24   of it as well as some other materials that was sent

25   by the -- you know, the exhibit materials that were

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 8

1    sent by counsel, the South Carolina House

2    Representative Redistricting Guideline copy as well

3    as Senate Guideline copy and two reports by Mr. Sean

4    Trende that were also sent to me by counsel as part

5    of the exhibit, you know, the exhibit folder that I

6    received.  I just printed them up just in case that

7    I need to reference them.

8        Q.   Do any of your documents have handwritten

9    notes on them?

10       A.   No.

11       Q.   We touched on this a little bit before but

12   which documents did you review in preparing for

13   today's deposition?

14       A.   So I reviewed my own report.  I also

15   reviewed the reports by Mr. Sean Trende, two reports

16   that were sent to me as part of the exhibit.  I also

17   reviewed the redistricting guidelines, the House and

18   Senate Redistricting Guidelines that was also sent

19   to me as part of the exhibit materials.  And I also

20   reviewed, you know, other materials that were sent

21   to me as part of the exhibit, some of them brief,

22   very briefly.

23       Q.   At any time have you reviewed any of the

24   other plaintiffs' expert reports in this case?

25       A.   Can you repeat the question again?  Sorry.

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

                                                    Page 9

 1          Q.    Certainly.  At any time have you reviewed
 2     any of the other plaintiffs' expert reports in this
 3     case?
 4          A.    I don't recall reviewing other experts
 5     reports, yeah.
 6          Q.    So have you reviewed any expert reports by
 7     Dr. Baodong Liu?
 8          A.    No.
 9          Q.    Moon Duchin?
10          A.    No.
11          Q.    Dr. Bagley?
12          A.    No.
13          Q.    Or Dr. Ragusa?
14          A.    No.
15          Q.    Thank you.  Dr. Imai, I'm going to
16     introduce as the first exhibit the document that was
17     sent to you as tab one in the zip folder, if you
18     want to turn to that.
19          A.    Yeah.
20               (Defendant's Exhibit No. 1, SENATE
21     DEFENDANTS' AMENDED NOTICE OF TAKING VIDEO CONFERENCE
22     DEPOSITION OF KOSUKE IMAI, PHD, was marked for
23     identification.)
24               THE WITNESS:  Okay.  I have it opened.
25     BY MR. GORE:

Kosuke Imai, PhD                                          August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 10

1          Q.    And I'm going to display this as well as
2     in Exhibit Share --
3          A.    Okay.
4          Q.    For the benefit of counsel and our court
5     reporter.  Dr. Imai, do you recognize this document?
6          A.    Yes.
7          Q.    What document is this?
8          A.    This is the announcement about notice of
9     deposition.
10         Q.    And do you recall receiving this document?
11         A.    Yes, I do.
12         Q.    Now turn with me, if you will, to what I
13    believe is the seventh page or so of this document.
14         A.    Seventh page.
15         Q.    The page has Exhibit A at the top.
16         A.    Yes.
17         Q.    And the letter A, B and C.  Do you see
18    that?
19         A.    Yes, I see that.
20         Q.    And this is a subpoena for you to produce
21    documents in connection with your testimony.  What
22    did you do to collect documents listed here on
23    Exhibit A?
24         A.    For Exhibit A I listed all the books and
25    treatises and articles and publication that were

Kosuke Imai, PhD                                August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 11

1      used in my, you know, to formulate my opinions in

2      this case in my own expert report.  And so I asked

3      counsel to simply submit those for Exhibit B and C.

4      I was struggling during the time when this request

5      came and so I asked counsel to prepare these because

6      all these items were with counsel and, you know,

7      they were cc'd on email.

8                    And then I, upon my return from my

9      travel I checked my inbox and to make sure that no

10     item is missing, I sent all the list of items that I

11     have to counsel to cross-check.  And I confirmed

12     that, all the materials, relevant materials being

13     submitted.

14         Q.   Dr. Imai, did you receive any data from

15     plaintiffs' counsel in this case --

16         A.   Yes.

17         Q.   To form your report?

18         A.   Yes, I did.

19         Q.   And what data did you receive?

20         A.   All the data that were used in my analysis

21     which are listed in my expert report I received from

22     counsel.

23         Q.   And other than the data listed in your

24     expert report did you receive any other data from

25     plaintiffs' counsel?

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 12

1        A.    There may have been included in the data

2    that were shared with me that, you know, for

3    example, there may have been variables that I did

4    not use, I did not end up using in my analysis, but

5    I don't recall exactly what were, you know, in the

6    data shared but not included in my analysis.

7        Q.    And whether you used the data or not, what

8    types of data did plaintiffs' counsel provide you?

9        A.    Data mostly from the census data, the

10   shared files and population few years and racial

11   information that I used.  And then in addition there

12   were also data about incumbent residence location

13   which I used for my analysis.

14       Q.    Did counsel provide you with any election

15   data?

16       A.    I don't think so but again, you know, I

17   did not use them at all in my analysis.  I cannot

18   100 percent certain that no election data were

19   included in the -- in the data that were sent to me

20   but I certainly did not look at them.

21       Q.    Did counsel provide you any assumptions to

22   rely on in your expert report?

23       A.    We discussed the assumptions that I used

24   in my analysis during conversations we had in the

25   course of preparing my draft report and -- but yeah,

Kosuke Imai, PhD                              August 8, 2022
The South Carolina State Conf.vs.McMaster/Alexander

                                                    Page 13

1      that's what I received, some feedback.

2            Q.     And what assumptions did counsel provide

3      you that you relied on in your expert report?

4                   MR. CEPEDA:   Objection; mischaracterizes

5      the record.

6                   MR. GORE:   You can answer.

7                   THE WITNESS:   The assumptions were not

8      directly provided.  We may have discussed them

9      during our conversations of draft reports but all

10     the assumptions that I ended up imposing in my final

11     report are my own decisions.

12     BY MR. GORE:

13           Q.     And are those assumptions disclosed in

14     your expert report?

15           A.     Yes.  All the assumptions are written in

16     the expert report.

17           Q.     Okay.

18           A.     In the form of algorithm constraints, just

19     to be clear.

20           Q.     Thank you.  Dr. Imai, I want to talk a

21     little bit about how you were hired for this case.

22     Do you recall who first contacted you about this

23     case?

24           A.     I think it was Ms. Yan but I might be

25     wrong.  It could be Mr. Cepeda but I think one of

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 14

1     the two people contacted me first.

2          Q.    And do you have a formal engagement letter

3     with the ACLU or the NAACP Legal Defense Fund?

4          A.    Yes, I do.

5          Q.    And who is that with?

6          A.    I think it was with the ACLU.

7          Q.    And other than this case are there any

8     other cases where you have been retained by the

9     ACLU?

10         A.    Yes.  Oh, would you like me to list them?

11         Q.    I'll ask follow-up questions.  Can you

12    tell me what those cases are?

13         A.    Okay.  So it should be listed in my expert

14    report but they are Alabama Congressional case and

15    Ohio State House Congressional case.  Let's see.

16    And the South Carolina State House case.  Yeah, I

17    think that's -- that's it.

18         Q.    How much are you charging for your work in

19    this case?

20         A.    So it's a hourly charge of $450.

21         Q.    Do you have a cap on your fees for this

22    case?

23         A.    There may have been a cap in the agreement

24    that needs to be discussed if I reach that cap but I

25    don't recall specifics.

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

                                                    Page 15

1          Q.   Did anyone assist you in preparing your

2    expert report?

3          A.   Yes.

4          Q.   Who is that?

5          A.   So I have research assistants and there

6    are three research assistants that were involved in

7    preparing for my expert report.  One is Shiro

8    Kuriwaki.  Would you like me to spell that for you?

9          Q.   Please.

10         A.   Okay.  Shiro is S-H-I-R-O.  And Kuriwaki

11   is K-U-R-I-W-A-K-I.  And Tyler Sinko.  Sinko is

12   S-I-N-K-O.  And Kevin Wang.  K-E -- oh, Kevin you

13   know.  Wang is W-A-N-G.

14         Q.   What did Shiro do to assist you on your

15   report?

16         A.   He helped me, under my guidance, run

17   simulations, make figures, et cetera.

18         Q.   What did Tyler do to assist you on your

19   expert report?

20         A.   The same.

21         Q.   How about Kevin?

22         A.   The same.

23         Q.   Has anyone conducted a peer review of your

24   expert report?

25         A.   I don't think so.  Would you -- do you

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

                                                   Page 16

 1      mean the academic peer reviews?

 2           Q.   Yes.

 3           A.   No, no.

 4           Q.   Dr. Imai, I'm next going to pull up your

 5      expert report.

 6           A.   Okay.

 7           Q.   Which I believe is tab two in your binder.

 8           A.   Yes, I got this opened.

 9                (Defendant's Exhibit No. 2, EXPERT REPORT OF

10      KOSUKE IMAI, PH.D. DATED APRIL 4, 2022, was marked for

11      identification.)

12      BY MR. GORE:

13           Q.   I'm introducing this now as Exhibit Two

14      and loading it into Exhibit Share.  Dr. Imai, do you

15      recognize this document?

16           A.   Yes.

17           Q.   What is this document?

18           A.   This is a report I wrote.

19           Q.   Does this expert report contain all of

20      your opinions related to the Congressional plan

21      litigation?

22           A.   Yes.

23           Q.   Do you intend to offer any opinions at

24      trial that are not contained in your report?

25           A.   No.

Kosuke Imai, PhD                                          August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

                                                        Page 17

 1            Q.    Do you intend to supplement or amend your

 2      report?

 3            A.    Not right now.

 4            Q.    Did you prepare a rebuttal report in this

 5      case?

 6            A.    No, I didn't.

 7            Q.    Why not?

 8            A.    I reviewed the report by Mr. Trende and --

 9      but he did not use any simulation analysis and, you

10      know, my expertise is about redistricting simulation

11      so I decided to not offer any opinions on that

12      particular report.

13            Q.    Dr. Imai, I'm going to turn to page 31 of

14      your report.

15            A.    Okay, page 31.

16            Q.    Which is a copy of your CV.

17            A.    Oh, okay.

18            Q.    But I understand this may no longer be

19      your current CV.  Is this still your current CV?

20            A.    No.  This was prepared when I submitted my

21      report back in April.

22            Q.    And I'm going to pull up what I believe is

23      your updated CV which unfortunately is not included

24      in your zip file.

25            A.    Oh, okay.

Page 18

1        Q.    But I will pull it up on Exhibit Share and

2    I can share my screen with you if you can see it.

3    Do you have access to Exhibit Share?

4        A.    I don't have -- that's the software

5    that --

6        Q.    Yeah, it's part --

7        A.    No.

8        Q.    A browser.

9        A.    Okay.  I don't have that right now.

10       Q.    Now, Dr. Imai, I have tried to share my

11   screen with you.

12       A.    Yeah.

13       Q.    And it's small on your monitor.  Can you

14   see that?

15       A.    I can see that.  It's big now.

16       Q.    And this I believe is your -- this is --

17   says Kosuke Imai CV June 2022; is that correct?

18       A.    That's correct.

19       Q.    And do you recognize this document?

20       A.    Yes.  I shared this with counsel.

21       Q.    And what is this?

22       A.    My CV.

23       Q.    Is it your current CV?

24       A.    Well, it's CV as of June, you know, as of

25   June when I received that request.

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 19

1          Q.    I've marked this as Exhibit Three for the
2     record.
3               (Defendant's Exhibit No. 3, JUNE 2022
4     CURRICULUM VITAE OF KOSUKE IMAI, was marked for
5     identification.)
6     BY MR. GORE:
7          Q.    Dr. Imai, can you briefly describe your
8     educational background.
9          A.    Yes.   I received bachelor of arts in
10    liberal arts from University of Tokyo in 1998.   I
11    received a master's degree in statistics from
12    Harvard in 2002 and I received PhD in political
13    science from also Harvard in 2003.
14         Q.    And as part of your education did you take
15    any classes in legislative redistricting?
16         A.    Oh, there is no such a class back then
17    that I was aware of so I did not take it.
18         Q.    And when did redistricting become part of
19    your studies or scholarship?
20         A.    I think it was around 2010.
21         Q.    And how did you become interested in
22    redistricting as a topic of scholarship?
23         A.    You know, I was interested in methodology
24    that's used to evaluate redistricting trends because
25    my expertise is political methodology which is

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 20

1    greater study of algorithms and statistical methods

2    for understanding political science.  So this was

3    one of the important topics in the field.

4          Q.   And what is the focus of your legislative

5    redistricting scholarship?

6          A.    There are -- there are two components.

7    One is the development and application of algorithms

8    to evaluate the redistricting trends.  And the

9    second part is the method development for ecological

10   inference which basically trying to inquire

11   individual behavior from aggregate data.

12         Q.    Have you written any peer-reviewed

13   publications about South Carolina?

14         A.    No.

15         Q.    Have you submitted any works for

16   publication that were not published?

17         A.    Can you repeat that question again?

18         Q.    Sure.  During your career --

19         A.    Uh-huh.

20         Q.    Have you submitted any articles, books or

21   other written works for peer review that were

22   rejected for publication and not published?

23         A.    Oh, I see.  Yes, yes.

24         Q.    How many, how many of those?

25         A.    Oh, you can count, you know, number of

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 21

1        publications I have but it's hard to count the

2        number of rejections.  Many.

3             Q.    Any about redistricting?

4             A.    Oh, yes.

5             Q.    And what do you recall about any of those

6        publications and why they were rejected?

7             A.    I don't recall specifics of reasons for

8        rejections, you know.  It ranges from, you know,

9        complaints about the algorithm itself or complaints

10       about -- or criticism, I shouldn't say complaints --

11       criticism about applications, criticism about

12       literature reviewed to, you know -- it ranges by one

13       review to another.  So I don't recall all the

14       specifics.

15            Q.    And were any of these draft articles about

16       simulation analysis?

17            A.    Oh, yes.

18            Q.    And what do you recall about criticisms of

19       those articles?

20            A.    So for example, the paper I eventually

21       published in Journal of Computational and Graphical

22       Statistics, during that review process of that

23       paper, there were criticism about how, you know, the

24       full particular performance of the algorithm I was

25       studying at that time.  And there may have been also

Page 22

1    criticisms about the interpretation of the empirical

2    applications of that particular algorithm.

3         Q.    And with respect to these draft articles,

4    did any of them discuss or relate to the simulation

5    analysis you used for your expert report in this

6    case?

7         A.    They are related but they are not the ones

8    that I used for this analysis.

9         Q.    What were the simulation analyses in your

10   draft articles that were rejected for publication?

11   Can you explain to me what those were?

12        A.    Can you repeat that question again?

13        Q.    Sure.  I'd just like to understand the

14   differences between those simulation analyses and

15   the one you did in this report.  So can you explain

16   to me the differences or explain to me what those

17   analyses were and I'll follow up by asking about

18   your analysis in this case.

19        A.    Okay.  Just to be clear, rejection doesn't

20   necessarily mean that the paper will never be

21   published.  So if -- it's an iterative process, so

22   often it's very rare for paper in academic journals

23   to be accepted when you submit and often it will be

24   rejected and sometimes you will be asked to revise,

25   to address the criticism and resubmit.

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

                                                    Page 23

1            And eventually the paper may get

2       accepted or the paper may be submitted to a

3       different journal and then again through the review

4       process you -- after it goes through the process

5       eventually, you know, the paper gets accepted.

6            So it's a long process so the fact

7       that the paper is rejected doesn't necessarily mean

8       it will never be published, just to make sure that's

9       understood.

10           And the difference between algorithm

11      that I used which is the merge-split type algorithm

12      that's explained in my expert report is different

13      from the algorithms that were developed in the

14      articles that I have.  They are both, all these

15      algorithms are part of the Monte Carlo methods, it's

16      a broad class of mathematical algorithms that try to

17      plan and regenerate representative sample from the

18      particular populations.  It's all related, part of

19      the Monte Carlo family.

20           But the algorithm that I used which

21      is the merge-split, broadly speaking, basically is a

22      Markov chain Monte Carlo algorithm where you

23      basically randomly choose two districts, adjacent

24      districts, and you launch them and then you run the

25      resplit in a specific way and then you retreat.  So

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 24

1     that you start with a particular plan might be an

2     enacted plan and then you'll randomly merge two

3     adjacent districts and then randomly split them and

4     that way you start modifying the plan.

5                    The algorithm that I developed in my

6     own article, there are two types.  One is called

7     Frep, which basically start modifying the boundaries

8     of particular units by swapping certain units, say

9     precincts, from one district to another in a

10    specific way and then proceed.

11                   The other one is called sequential

12    Monte Carlo which basically starts from scratch so

13    it's a blank slate and it starts creating one

14    district at a time.

15                   So these are the different types of

16    algorithms that are all part of the family of Monte

17    Carlo methods and for this case I used the more

18    split-type algorithm.

19         Q.    Thank you for all that.  I'm going to

20    scroll down on your CV to what I believe is the last

21    page.  It appears to be buffering.

22         A.    Yeah.

23         Q.    Let me do this a different way.

24         A.    Yeah.

25         Q.    Let's go back to your expert report if we

Kosuke Imai, PhD                           August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 25

1    can.
2          A.    Okay.
3          Q.    Which was previously marked as Exhibit
4    Two.
5          A.    Right.  I have Two, right.
6          Q.    Yes.
7          A.    Okay.
8          MR. CEPEDA:  Tab two is the CV.
9          MR. GORE:  I think tab one was the notice
10   of deposition.  Tab two is the report which
11   contained an old version of the CV.
12         MR. CEPEDA:  Yeah.
13         MR. GORE:  And I've marked the new version
14   of the CV as Exhibit Three, although it wasn't a
15   tab.  I'm trying to pull this back up if I can.
16   That's back in Exhibit Share.  Exhibit Two.
17   BY MR. GORE:
18         Q.    And I want to go, Dr. Imai, if we might,
19   to paragraph -- let's start with paragraph 13 on
20   page 6.
21         A.    Oh, so this is tab two?
22         Q.    Yes, sir.
23         A.    Thirteen.  Okay page 13 of which
24   paragraph?
25         Q.    It's -- sorry, paragraph 13.

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

                                                    Page 26

1          A.    Oh, 13 you said.

2          Q.    Yeah.

3          A.    Thirteen, page 6.  Okay.  I have it here.

4          Q.    Paragraph 13 mentions that your

5    methodology for predicting individuals' race was

6    used in a recent decision of the Second Circuit?

7          A.    That's right.

8          Q.    Were you an expert witness in that case?

9          A.    No.

10         Q.    What is your methodology for predicting

11   individuals' race using voter files and census data?

12         A.    So I focus on developing statistical

13   methodology to use voter file information,

14   information from voter files such as name and

15   address of registered voters and tried to impute the

16   race which is used in some of the ecological

17   inference analysis.

18         Q.    Is that the same as Bayesian Improved

19   Surname Geocoding?

20         A.    That's correct.

21         Q.    Thank you.  All right.  Now, let's look at

22   paragraph 14.

23         A.    Okay.

24         Q.    And I want to ask you if this is a

25   complete list of all cases in which you have been an

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

                                                    Page 27

 1    expert witness?

 2          A.    So I have filed expert report in July,

 3    maybe it's three or four weeks ago for Jacksonville,

 4    Florida case which was not included when this CV was

 5    submitted back in March or April.

 6          Q.    And what -- is the Jacksonville case also

 7    a redistricting case?

 8          A.    Yes.  It's a city council redistricting

 9    case.

10          Q.    Other than the Jacksonville case does

11    paragraph 14 list all cases in which you have

12    appeared as an expert or submitted an expert report?

13          A.    I think so.  Except Ohio case has evolved

14    and I'm involved in both state legislative case and

15    Congressional case and sometimes I'm not 100 percent

16    sure what the name of the case is.  I think that has

17    changed.  But either way, I submitted reports to

18    those two cases.

19          Q.    Are all the cases in which you have been

20    an expert redistricting cases?

21          A.    Yes, these are all redistricting cases.

22          Q.    And have you ever testified or submitted a

23    report as an expert in any non-redistricting cases?

24          A.    No.

25          Q.    Have you ever been an expert on behalf of

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 28

1    a defendant in a redistricting case?

2         A.   Yes.

3         Q.   Which case was that?

4         A.   I think the Supreme Court of Pennsylvania

5    case, Pennsylvania State House redistricting case

6    is -- I think it was a defendant because I testified

7    as expert witness for the legislative, the

8    apportionment commission.

9         Q.   Will you identify all the cases in this

10   paragraph that are racial gerrymandering cases.

11        A.   Okay.  So Alabama case is a racial

12   gerrymandering case, Congressional and also South

13   Carolina House, you know, South Carolina House,

14   State House case is also racial gerrymandering case.

15        Q.   Are the rest of the cases here in

16   paragraph 14 partisan gerrymandering cases?

17        A.   That's right.  I think so.

18        Q.   How about Jacksonville?

19        A.   Oh, Jacksonville is a racial

20   gerrymandering case.  Thank you.

21        Q.   So this case, Graham versus Adams in

22   Kentucky, is a partisan gerrymandering case; is that

23   right?

24        A.   That's correct.

25        Q.   Dr. Imai, are you a map drawer?

Page 29

1          A.    No.

2          Q.    Have you ever been qualified as an expert

3     in map drawing?

4          A.    No.

5          Q.    Have you ever been disqualified as an

6     expert witness?

7          A.    No, not that I know.

8          Q.    And in any case, have some or all of your

9     expert opinions been found inadmissible by a court?

10         A.    Not that I know of.

11         Q.    All right.  I'd like to focus now on the

12    summary of opinions which starts on the page 4.

13    It's paragraph six to seven.

14         A.    Okay.  Hold on.  Page 4, okay.

15         Q.    And I believe your report analyzes the

16    South Carolina Congressional map enacted earlier

17    there year; is that correct?

18         A.    That's correct.

19         Q.    And I will generally refer to that map as

20    the enacted plan; does that make sense to you?

21         A.    That's how I refer to it so that works for

22    me.

23         Q.    Great.  Does your report examine whether

24    the enacted plan intentionally discriminates on the

25    basis of race?

Page 30

1          A.    Not the part intentional, no.

2          Q.    And so your report draws no conclusions

3     about intent; is that right?

4          A.    Right.    That's correct.    No opinion on

5     intent.

6          Q.    And your report -- does your report

7     conclude that race predominated over traditional

8     districting criteria in the enacted plan?

9          A.    No.

10         Q.    Why not?

11         A.    This is a statistical analysis and a

12    statistical evaluation so my analysis only addresses

13    whether race played a significant role in

14    determining the district boundaries in the enacted

15    plan, not the legal conclusion suggested by the

16    phrase, the predominant.

17         Q.    Paragraph seven, starting at the sentence

18    that carries over from page 4 to 5.

19         A.    Uh-huh.

20         Q.    Uses the word cracks and the word

21    cracking.    Do you see that?

22         A.    Yes.

23         Q.    How do you define cracking as that term is

24    use in your report?

25         A.    It's a simple definition that refers to

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

                                                    Page 31

 1    splitting particular geographical area and that's
 2    the definition.  Splitting into multiple districts.
 3         Q.    So splitting a county, splitting any
 4    county in South Carolina, does that constitute
 5    cracking under your definition?
 6         A.    I wouldn't call it cracking a county.
 7    Usually I use cracking as particular group of orders
 8    for living, you know, specific geography, so not so
 9    much about administrative boundaries themselves.
10         Q.    Does cracking occur any time a group of
11    say black voters is divided into more than one
12    district?
13         A.    You may call that cracking.  I think in my
14    report you can, you know, think of cracking as just
15    a splitting a group of voters who live in, you know,
16    certain geographical area.  It has no legal or any
17    other meaning.
18         Q.    So what does -- in your report is there a
19    particular test for when cracking occurs or is it
20    simply the splitting of voters, like you just said?
21         A.    Splitting voters, you can test whether
22    that's unusual.  So you can test, use the
23    statistical test, to see if particular splitting or
24    cracking is unusual related to the simulated plans.
25         Q.    Did you conduct an effectiveness analysis

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 32

1      on the enacted plan or in any of your simulation

2      plans?

3              A.    No, I did not.

4              Q.    And did you analyze any election data in

5      your report?

6              A.    No, no.

7              Q.    And did you analyze the political effect

8      of any plan?

9              A.    Would you clarify what you mean by

10     political effect?

11             Q.    Sure.  Well, for example, did you consider

12     whether districts were likely to elect a Republican

13     or a Democrat?

14             A.    Oh, no.

15             Q.    And did you consider partisan performance

16     in any district?

17             A.    No.

18             Q.    Now we talked a little bit before about

19     the methodology you used, I believe you gave some

20     detail on.  And I want to understand.  Let's turn to

21     paragraph 17 on page 7 of your report.

22             A.    Okay, hold on.  Yes.

23             Q.    I believe paragraph 17 says that you set

24     to generate a representative sample of all possible

25     plans that satisfy a specified set of criteria; is

Kosuke Imai, PhD                                        August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 33

1    that right?

2         A.    That's correct.

3         Q.    And how does your methodology ensure a

4    representative sample?

5         A.    Right.  So this is -- the algorithm that I

6    use is merge-split type algorithm and it is a type

7    of Markov chain Monte Carlo algorithm and this

8    algorithm is a target distribution which is

9    specified by, in this case, specifying the set of

10   constraints that are imposed in the algorithms and

11   once those constraints are imposed the algorithm has

12   a mathematical property that generates a

13   representative sample from that distribution that

14   you specified.

15        Q.    And is there anything that you do in your

16   methodology or through the algorithm to guarantee

17   that the set of simulation plans you end up with is

18   in fact a representative sample?

19        A.    So the guarantee comes from mathematical

20   property.  So there is a mathematical theorem that

21   gives mathematical guarantee.  And in addition, we

22   use standard diagnostics to ensure that the samples

23   that we generate is following what in the field

24   described as the best practice of using this type of

25   algorithm.

Page 34

1          Q.   All right.  Dr. Imai, I'm going to pull up

2     what is Exhibit Four.

3               (Defendant's Exhibit No. 4, SEQUENTIAL MONTE

4     CARLO FOR SAMPLING BALANCED AND COMPACT REDISTRICTING

5     PLANS PAPER, was marked for identification.)

6     BY MR. GORE:

7          Q.   Tab four in your binder and it will also

8     be numbered as Exhibit Four.

9          A.   Okay, tab four.  Yes.

10         Q.   Now I uploaded it in Exhibit Share as

11    well.  Dr. Imai, do you recognize this document?

12         A.   Yes.

13         Q.   What is this document?

14         A.   This is a paper I've written on

15    redistricting simulation.

16         Q.   Has this paper been published?

17         A.   Not yet.

18         Q.   But you hope it will, right?

19         A.   Yes.

20         Q.   So I'd like to just walk through a couple

21    of points that you make in this paper.  So in the

22    abstract --

23         A.   Sure.

24         Q.   Is that -- well, let me back up.

25               So this paper is about sequential

Kosuke Imai, PhD                                August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 35

1    Monte Carlo method, right?

2         A.   That's correct.

3         Q.   And we talked about that earlier, that the

4    sequential method starts from a blank slate.

5         A.   That's right.

6         Q.   Whereas the Markov chain method starts

7    with an existing plan; is that correct?

8         A.   That's correct.

9         Q.   Are there any other differences between

10   sequential Monte Carlo method and the Markov chain

11   Monte Carlo method?

12        A.   I mean, there are a lot of differences

13   that, you know, in this application.  Just so the

14   most basic difference is this nature that sequential

15   Monte Carlo starts from a blank slate and start

16   building one district at a time.  And then once you

17   generate, you know, one -- so you basically generate

18   multiple plans in parallel.

19                  Whereas, Markov chain Monte Carlo

20   will generate multiple plans, not in parallel, but

21   in actually sequence.  So it start generating

22   multiple plans by modifying a plan, you know,

23   sequentially.  So even though sequential part is

24   used for the sequential Monte Carlo, Markov chain is

25   more independent.  So it starts from the existing

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 36

1      plan and then generating different -- start

2      generating different plans by modifying it.

3                      Whereas the SMC is really about

4      starting from a blank slate and start building one

5      district at a time.

6          Q.    Thank you.  So I want to start with the

7      third sentence in the abstract of this paper.

8          A.    Okay.

9          Q.    And I'm just going to read that out loud.

10     It says:  For successful application sampling

11     methods must scale to large maps with many

12     districts, incorporate realistic legal constraints

13     and accurately and efficiently sample from a

14     selected target distribution.  Unfortunately, most

15     existing methods struggle in at least one of these

16     areas.

17                      So my first question, Dr. Imai, did I

18     read that correctly?

19         A.    That's correct.

20         Q.    Do you agree that simulation analysis must

21     incorporate realistic legal constraints?

22         A.    I agree.

23         Q.    And the next sentence says that:  Most

24     existing methods struggle in at least one of these

25     areas.

Kosuke Imai, PhD                                        August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 37

 1          A.    Uh-huh.

 2          Q.    And are the existing methods referred to

 3    in this sentence, Markov chain Monte Carlo methods?

 4          A.    Included is Markov chain Monte Carlo

 5    algorithm.  That's not the only one, but yes.

 6          Q.    What other methods are included here?

 7          A.    There are enumeration algorithm, which

 8    simply enumerate all possible, you know,

 9    redistricting plans under certain set of

10    constraints.

11                There are also something called

12    constructive Monte Carlo methods which often start

13    with a seed for each district.  So you pick -- if

14    you have six districts you pick six precincts, for

15    example, and then start growing a district from each

16    of those seed precincts.

17                So there are different type of

18    algorithms out there other than the SMC and MCMC.

19    And that sentence, the existing methods include all

20    that.

21          Q.    And I'm going to skip down a couple of

22    sentences to a sentence that starts, because.

23                Because it draws many plans in

24    parallel, the SMC algorithm can efficiently explore

25    the relevant space of redistricting plans better

3:21-cv-03302-MGL-TJH-RMG    Date Filed 09/02/22    Entry Number 344-2    Page 39 of 239

Kosuke Imai, PhD                                        August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 38

1    than the existing Markov chain Monte Carlo, MCMC

2    algorithms that generate plans sequentially.

3                    Did I read that correctly?

4        A.    You did.

5        Q.    And so is it your view that SMC is better

6    than the Markov chain Monte Carlo algorithm?

7        A.    So I don't want to make general statement

8    like that because even though, you know, in the

9    abstract that's one way to summarize how the

10   sequential Monte Carlo improves upon the existing

11   methods.

12                   Depending on different cases,

13   especially the purpose of analysis, you know,

14   certain algorithm may do just fine and, you know,

15   certain algorithm may be more suitable than other

16   algorithms.  So I don't want you to think of this

17   statement applies generally to every single, you

18   know, redistricting analysis algorithms on that.

19       Q.    I'm going to scroll down to the next page

20   which I think is page 2 of the document or the PDF,

21   but it's page 1 in the footer.  It's the page after

22   the abstract.

23       A.    Oh, okay.  Okay.

24       Q.    And then it's the fourth paragraph down,

25   starts, MC algorithms.

Kosuke Imai, PhD                           August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 39

1        A.    Yes.

2        Q.    MCMC algorithms, citation, can in theory

3    sample from a specific target distribution and

4    incorporate constraints through the use of an energy

5    function.  In practice, however, existing algorithms

6    struggle to mix and traverse through a highly

7    complex sampling space, making scale a bit difficult

8    and accuracy hard to prove.  Some of these

9    algorithms make proposals by flipping precincts at

10   the boundary of existing districts, rendering it

11   difficult or even impossible to transition between

12   points in the state space, especially as more

13   constraints are imposed.

14               Did I read that correctly?

15       A.    Yes, you did.

16       Q.    And is that a valid criticism of MCM

17   algorithms?

18       A.    I think it's a valid general criticism of

19   the MCMC algorithm but I would like to emphasize

20   that depending on the specific use case, this

21   particular, you know, criticism may not apply.  So

22   it should be evaluated based on the specific use

23   case.

24       Q.    And is that point made in this paragraph

25   of the draft or elsewhere in the draft?

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

                                                    Page 40

1          A.    I don't recall all the sentences I've

2     written but, you know, this is a general point

3     that's being made, not a criticism of specific

4     applications per se.  So I think for any statistical

5     analysis if you are criticizing a particular

6     application of it, you would want to consider the

7     specific factors that are relevant for that case.

8                    You know, this is general weakness of

9     the MCMC algorithms that are acknowledged in the

10    field but that doesn't mean that, you know, that the

11    application of it, all the applications of it are

12    automatically invalid and it needs to be -- the

13    validity of the application needs to be evaluated

14    case by case.

15         Q.    Dr. Imai, in light of these criticisms of

16    MCMC algorithms, why did you use that approach here

17    instead of SMC in your report?

18         A.    Okay.  There are several reasons.  First,

19    I'd like to point out that in the race-blind

20    simulations that I have conducted, so this is

21    referring to the first race-blind simulation which

22    basically generates the simulated boundaries between

23    districts one and six.

24                    And then the second race-blind

25    simulation which examines the District 1 within the

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 41

1    Charleston County, okay.  So in these two race-blind

2    simulations, because there is only two districts are

3    in question, essentially the SMC and MCMC are very,

4    very similar.

5                So if you recall, merge-split

6    algorithm, they merge two districts and then spread

7    them.  And SMC starts from blank slate and then

8    generate one district at a time.

9                In these cases where you only have

10   two districts starting from the blank slate and

11   merging and then splitting is essentially the same.

12   So they are very, very similar in terms of the --

13   how the algorithm -- how the algorithm, you know,

14   progresses.

15               And for the statewide analysis where

16   I analyze all districts at a time, there are

17   important differences, how the SMC handles that case

18   as well as MCMC handles that case.  But there I

19   wanted to impose the constraint that the District 6

20   has this VRA percentage, BVAP percentage, between 45

21   and 50 percent, and so in order to specify, to tell

22   the algorithm that District 6 should have that

23   percentage, it's better to use MCMC algorithm where

24   you start with existing primary states enacted plan,

25   which has a District 6 and then generate the new

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 42

1      districts in sequence.

2                     Whereas, if you start from a blank

3      slate, it's a little bit more difficult to tell the

4      algorithm District 6 should have BVAP proportion or

5      percentage.  So it makes sense for that statewide

6      analysis to use the merge-split type of algorithm

7      and for the sake of consistency, I use the

8      merge-split algorithm in the race-blind simulation,

9      whereas, the rest difference between the use of SMC

10     and merge-split because there are only two districts

11     that are involved.

12          Q.   Could you have used the SMC algorithm for

13     your statewide simulations?

14          A.   It would have taken, you know, different

15     type of constraints.  I haven't -- you could try it.

16     I haven't tried that.

17          Q.   Is there any technical reason why that

18     would not be possible?

19          A.   I wouldn't say it's impossible because I

20     haven't tried it, but as I explained, SMC starts

21     from the blank slate and they build the district in

22     sequence, one by one.  And so to impose the VRA

23     constraints, which is basically pairing the

24     algorithm that the particular district should have

25     certain range of BVAP proportion, it's much easier

Kosuke Imai, PhD                                          August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 43

1    to specify that constraint in the MSMC where you

2    start with existing plan that has District 6.

3         Q.   Dr. Imai, I'd like to go down to page --

4    it's page 3 of the draft article, it's the fourth

5    page.

6         A.   Okay.

7         Q.   In what I have sent you since the abstract

8    page is not numbered.

9         A.   Okay.

10        Q.   I just want to read some of this to you.

11   So the second-to-last paragraph, the last sentence

12   of that paragraph starts, however.

13             However, these methodological debates

14   are also relevant for other cases where simulation

15   algorithms have been extensively used by expert

16   witnesses, citation, and highlight the difficulties

17   in practically applying existing sampling algorithms

18   to actual redistricting problems.

19             Did I read that correctly?

20        A.   Yes.

21        Q.   And do you stand by that statement about

22   existing sampling algorithms?

23        A.   I stand by it but again, I have not

24   examined each application, you know, one by one, so

25   I cannot say anything about this specific, you know,

Kosuke Imai, PhD

August 8, 2022

The South Carolina State Conf vs. McMaster/Alexander

Page 44

1    case.

2         Q.   And then I just want to read a couple more

3    sentences.  It says:  First, the distributions that

4    some of these algorithms sample from are not made

5    explicit, leaving open the possibility that the

6    generated ensemble is systematically different from

7    the true set of all valid plans.  Second, even when

8    the distribution is known, MCMC algorithms used to

9    sample from it may be prohibitively slow to mix and

10   cannot yield a representative sample.

11            Did I read that correctly?

12        A.   Yes, you did.

13        Q.   So in certain cases MCMC algorithms don't

14   yield representative samples; is that correct?

15        A.   That's correct.

16        Q.   In fact, in other cases or maybe even the

17   same cases MCMC algorithms can generate ensemble

18   plans or simulations that are systematically

19   different from the true set of all valid plans; is

20   that right?

21        A.   That's certainly a possibility.

22        Q.   I'd like to go back to the abstract

23   page and ask you about the first footnote which is a

24   star footnote where you thank a few people for input

25   on the draft.

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 45

1          A.    Yes.

2          Q.    The first person is Ben Fifield.  Do you

3     see that?

4          A.    Yes, I do.

5          Q.    And who is Mr. Fifield?

6          A.    He was ACLU staff but more importantly, he

7     was my former student from Princeton when I taught

8     there and he was also a collaborator on some of

9     these papers, not this one, but some of these

10    redistricting algorithm papers.

11         Q.    And approximately how many papers have you

12    collaborated with Mr. Fifield?

13         A.    Oh, I think two, at least two papers that

14    were published already and the software that I

15    developed, he was also involved in that development

16    at the earlier years, way back, you know, several

17    years ago, I think, or maybe ten even.

18         Q.    And do you know where Mr. Fifield works

19    now?

20         A.    I -- my understanding is that he left the

21    ACLU and went to Facebook but I'm not 100 percent

22    sure.

23         Q.    Have you discussed this case with him?

24         A.    Not about this case.

25         Q.    How about your expert report, have you

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 46

1    discussed that with him?

2         A.   No.  Oh, just one clarification.  So he

3    was part of the -- some of the conversation I had

4    with counsel.  So I didn't discuss with him, you

5    know, just with him alone about this case but he was

6    present when I had a conversation about draft

7    reports with Mr. Cepeda and other lawyers so...

8         Q.   Did you have any conversations with

9    Mr. Fifield about any draft maps or plans for South

10   Carolina Congressional redistricting?

11        A.   I don't think so.

12        Q.   Did you receive any data from Mr. Fifield?

13        A.   I did receive the data from Mr. Fifield

14   through the email that -- where the -- my counsel

15   was also copied and through the SharePoint side that

16   they provided.

17        Q.   Other than the data that was provided with

18   counsel copied did you receive any other data from

19   Mr. Fifield?

20        A.   No.

21        Q.   Did Mr. Fifield provide you any

22   assumptions in this case?

23        A.   No.

24        Q.   I'm going to take down this exhibit for

25   now and if I can figure out how to do it I'd like to

Kosuke Imai, PhD                                August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 47

1    bring up your report again.

2         A.    Okay.

3              MR. GORE:  Adriel, can you see that in

4    Exhibit Share?

5              MR. CEPEDA:  No.  I didn't have access

6    when I tried.  I'm sorry, I can't answer your

7    question at the moment.

8              MR. GORE:  I just want to make sure you're

9    comfortable and you're able to follow along with all

10   these.

11             MR. CEPEDA:  I'm following along with the

12   tabs so as long as you are saying where you are

13   looking at, I'm there.

14   BY MR. GORE:

15        Q.    Okay.  So back to the expert report which

16   is tab two.

17        A.    Yes.

18        Q.    And has previously been marked as Exhibit

19   Two.

20        A.    Right.

21        Q.    I would ask you some questions about this

22   but before I do so, Dr. Imai, did you run any

23   simulation analysis on the benchmark plan?

24        A.    I may have run it in the draft expert

25   reports that were included in the draft expert

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 48

1    reports.

2         Q.    And what was the result of that simulation

3    analysis?

4              MR. CEPEDA:  John, I'm going to object to

5    the extent that the question calls for the substance

6    of a draft under -- that would be protected under

7    Rule 26B.

8              MR. GORE:  Okay.  Well, he said he ran the

9    analysis but didn't report it.  I would like to know

10   why it's not in the report and if there is a reason

11   for that.

12             MR. CEPEDA:  Well, you are asking about a

13   draft report which the rules explicitly protect.

14             MR. GORE:  Well, I didn't ask about the

15   substance of the draft report, I asked about the

16   outcome of the analysis that your expert says he

17   ran.  We had this with Dr. Lieu last week.  He had

18   run some analyses that weren't in his report and he

19   told me what the results of those analyses were.

20             MR. CEPEDA:  All right.

21   BY MR. GORE:

22        Q.    So I'm just going to ask you, Dr. Imai,

23   what was the result of the simulation analysis you

24   ran on the benchmark plan?

25        A.    I don't recall the specific results.

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 49

1          Q.   Did you get the same result from the

2     simulation analysis on the benchmark plan that you

3     got from the simulation analysis on the enacted

4     plan?

5          A.   Oh, it will be different.  I mean, once

6     you add different constraint it will be a different

7     result.

8          Q.   And did your analysis show that the

9     benchmark plan was an outlier with respect to

10    cracking of black voters?

11              MR. CEPEDA:  Same objection as before.

12    BY MR. GORE:

13         Q.   You can go ahead and answer.

14         A.   I didn't evaluate benchmark plan.  I may

15    have used benchmark plan as parts of algorithm but I

16    didn't evaluate directly the benchmark plan.

17         Q.   So what analysis did you do on the

18    benchmark plan?

19              MR. CEPEDA:  Same objection.

20    BY MR. GORE:

21         Q.   You can go ahead and answer.

22         A.   I was asked by lawyers to -- by counsel to

23    incorporate the benchmark plan in the simulation,

24    not to evaluate the benchmark plan because my

25    analysis focuses on the evaluation of enacted plan

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 50

1    so...

2         Q.    Well, let me ask the question this way,

3    did you run your Markov chain Monte Carlo simulation

4    on the benchmark plan?

5         A.    Can you clarify what you mean by, on the

6    benchmark plan?  I don't quite understand.

7         Q.    Okay.  Well, I read your report to say

8    that you ran a Markov chain Monte Carlo simulation

9    on the enacted plan or in relation to the enacted

10   plan.

11        A.    That's not quite correct.

12        Q.    Okay.

13        A.    Because when you run the simulation

14   algorithm the enacted plan is not directly used.

15        Q.    Okay.

16        A.    You generate -- not directly used, right.

17   You generate the simulated plan under a set of

18   constraints.  And then once you generate those

19   simulated plans the next step is to compare those

20   simulated plans with the enacted plan.  And that's

21   where enacted plan comes in.

22        Q.    Okay.  So thank you for that

23   clarification.  So the simulation plans take, as I

24   understand it, the 2020 census data, for example,

25   and other constraints which we'll talk about that

Kosuke Imai, PhD                                August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 51

1      you programmed the algorithm to consider, right?

2              A.    That's correct.

3              Q.    And that generates a set of simulation

4      plans; is that correct?

5              A.    That's correct.

6              Q.    And then you compare that to the enacted

7      plan; is that correct?

8              A.    That's right, that's right.

9              Q.    Okay.

10             A.    So that's where -- so the actual

11     generation of simulated plans does not directly

12     involve the enacted plan.  In my -- the one that I,

13     you know, the analysis that's presented in my

14     report.

15             Q.    Did you conduct any simulation using 2020

16     or 2010 census data which was the data used for the

17     benchmark plan?

18                   MR. CEPEDA:  Same objection.

19     BY MR. GORE:

20             Q.    You can answer.

21             A.    So in my draft report I may have included

22     the simulation results that you used the benchmark

23     plan.

24             Q.    And did you then compare those simulation

25     results to the benchmark plan?

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

                                                    Page 52

1                    MR. CEPEDA:   Same objection.

2        BY MR. GORE:

3             Q.    You can answer.

4             A.    I -- I don't compare with the benchmark

5        plan because my goal -- I didn't because my goal is

6        not to evaluate the benchmark plan.

7             Q.    So when you --

8             A.    I evaluated the enacted plan.

9             Q.    I've got it.  But when you ran the

10       simulation set using the 2010 census data did you

11       then compare that simulation set to the enacted

12       plan?

13                   MR. CEPEDA:   Same objection.

14       BY MR. GORE:

15            Q.    You can answer.

16            A.    Can you repeat that question again?  I'm

17       not understanding.

18            Q.    Certainly.  So as I understand it, your

19       analysis really has two steps.  You generate a set

20       of simulation plans and then you compare that set to

21       the enacted plan and I believe what's in your

22       report; is that correct?

23            A.    That's in my report, yes, my final report.

24            Q.    Okay.  And I think in your report we just

25       discussed that you generated some simulation sets

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 53

1      using 2020 census data --

2            A.    That's right.

3            Q.    Plus various constraints which we'll talk

4      about later.  And then you compared that simulation

5      set to the enacted plan?

6            A.    That's right.

7            Q.    Okay.  I just asked you if you ran the

8      simulation set using 2010 census data.

9            A.    I don't think so.  The census data I've

10     seen that, you know, the census data I used has been

11     always 2020.

12           Q.    Okay.

13           A.    That's the data that matter.

14           Q.    Okay.  So did you -- let me ask the

15     question again because I think the record may be

16     unclear on this point.

17                 Did you ever run a set for this case,

18     this report, did you ever run a simulation set using

19     2010 census data?

20                 MR. CEPEDA:  Same objection.

21     BY MR. GORE:

22           Q.    You can answer.

23           A.    I mean, I may have run the simulation

24     analysis that used the benchmark plan so to that

25     extent, if you think of that as using the 2010

Kosuke Imai, PhD                                      August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 54

```
 1      census data, then the answer is yes.  But the
 2      population data that I used always come from 2020
 3      census because that's the data that matters
 4      currently.
 5           Q.   So the simulations that you ran using the
 6      benchmark plan, how did those work?
 7                MR. CEPEDA:  Same objection.
 8      BY MR. GORE:
 9           Q.   You can answer.
10           A.   So as part of the, you know, draft expert
11      report, I may have included a simulation analysis
12      that, you know, imposes some similarity to the
13      benchmark plan.
14           Q.   Would that --
15           A.   As additional constraint.
16           Q.   Okay.  And was that constraint an attempt
17      to control for preservation of cores of the
18      benchmark district?
19                MR. CEPEDA:  Same objection.
20      BY MR. GORE:
21           Q.   You can answer.
22           A.   I was asked by counsel to perform that
23      analysis and I normally don't, you know, use any
24      plan including the previous plan in my redistricting
25      analysis because, you know, it will contaminate
```

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 55

1     the -- it basically prevents me from isolating the

2     role that race play and redrawing the boundaries of

3     the districts in the enacted plan when you include

4     some information, include any plan that for all the

5     factors that affected it.

6                 So that's the reason why I don't in

7     general use the previous plans or any other plan to

8     construct my -- directly construct my algorithm

9     constraints.

10                But I recall that the draft expert

11    reports may have included analysis that put some

12    constraints with respect to the benchmark plan upon

13    the request of counsel.

14        Q.   Okay.  And was that an effort to control

15    for the shape and location of the benchmark

16    districts and how that might have affected the

17    enacted plan?

18                MR. CEPEDA:  Same objection and also now

19    calling for attorney-expert communication.

20                MR. GORE:  Are you instructing him not to

21    answer?

22                MR. CEPEDA:  I'll let it but I'm lodging

23    the objection.

24                MR. GORE:  Thank you.

25    BY MR. GORE:

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 56

1            Q.    Go ahead, Dr. Imai, you may answer.

2            A.    I don't -- because it was a suggestion by

3    counsel, I don't know exactly what the, you know,

4    real goal of that particular analysis.  But from my

5    point of view that because it would prevent me from

6    isolating the role the race plays in redistricting

7    plan, I don't directly incorporate any plan in my

8    algorithm constraints including the previous, you

9    know, benchmark plan.  And that's why in the final

10   report it's not there.

11           Q.    And you include other constraints in your

12   simulation set, correct?

13           A.    That's correct.

14           Q.    And those other constraints such as

15   contiguity or incumbency pairings don't prevent you

16   from isolating the role of race, correct?

17           A.    That's correct to the extent that those

18   factors are controlled, right.  Like I don't want to

19   consider noncontiguous districts or the districts

20   that have a large population deviation.

21           Q.    So --

22           A.    I would want to exclude those.

23           Q.    Why does including or why did including

24   the benchmark plan-related constraints prevent you

25   from isolating the role that race played in the

Kosuke Imai, PhD

August 8, 2022

The South Carolina State Conf vs. McMaster/Alexander

Page 57

1    enacted plan?

2            MR. CEPEDA:   Object to form.

3    BY MR. GORE:

4       Q.   You can answer.

5       A.   Yeah, so the reason is that benchmark plan

6    may be based on a set of unknown factors that I just

7    don't know what factors went into create the

8    benchmark plan and one of those factors could be

9    race or it could be some other factors.  And if I

10   really want to isolate the role of the race I know

11   what I include is unknown, you know, set of factors

12   that may influence my results.  Whereas, the

13   population and contiguity, I know exactly what they

14   are so I impose them.

15      Q.   Did you --

16      A.   I don't want noncontiguous districts.

17      Q.   And do you have any reason to believe that

18   the benchmark plan violated traditional districting

19   principles?

20           MR. CEPEDA:   Object to the form.

21           THE WITNESS:   I don't evaluate benchmark

22   plans so I don't form any opinion on benchmark plan.

23   BY MR. GORE:

24      Q.   How is the benchmark plan-related

25   constraint different from the other constraints you

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 58

1    imposed in your report?

2         A.   As I said, the benchmark plan is perhaps

3    created based on a number of factors that I don't

4    know what they are because I don't evaluate the

5    benchmark plan.  My goal has been to evaluate the

6    enacted plan so if I directly impose the benchmark

7    plan in my algorithm as a constraint I would be

8    inheriting a number of unknown factors that

9    influence the benchmark plan which would prevent me

10   from drawing any conclusions about the role race

11   played in drawing the district in the enacted plan.

12        Q.   Well, what if the map drawer had started

13   with the benchmark plan when drawing the enacted

14   plan, wouldn't that affect the set of plans from

15   which the map drawer was drawing?

16        A.   How the map drawer drew the enacted plan

17   doesn't affect my analysis.  My analysis is

18   completely independent of exact intention or

19   anything that the map drawer has had.  The goal is

20   just to only evaluate the enacted plan that resulted

21   in the process.

22        Q.   So it doesn't matter to your analysis

23   whether the map drawer drew the enacted plan based

24   on the benchmark plan; is that right?

25        A.   I did not evaluate whether the map drawer,

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 59

1    you know, what information the map drawer used to
2    draw enacted plan.  My evaluation is really just
3    about the final enacted plan, the characteristics of
4    it and then specifically the role race played in the
5    final product.  And that's really the goal.  It's
6    just not my goal to understand how map drawer drew
7    the enacted plan.
8         Q.   So after you generated the simulation set
9    that included the benchmark plan-related
10   constraints, did you compare that set to the enacted
11   plan?
12             MR. CEPEDA:  Object to form;
13   mischaracterizes testimony and asking for questions
14   about the draft protected by Rule 26.
15             MR. GORE:  Again, I'm not asking about the
16   draft, I'm asking about the analysis.
17   BY MR. GORE:
18        Q.   So Dr. Imai, I believe you can answer.
19        A.    In the draft expert report the results may
20   have been included but I don't recall specifics.
21        Q.   And no such results are included in your
22   final report; is that correct?
23        A.   What do you mean by such results?
24        Q.   You don't, your expert report doesn't
25   contain a simulation set with a benchmark

Kosuke Imai, PhD                                August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 60

1      plan-related constraint, right?

2           A.    That's correct.

3           Q.    Do you recall what the benchmark

4      plan-related constraint was in the analysis that you

5      ran that included that constraint?

6                 MR. CEPEDA:    Same objection as above.

7                 THE WITNESS:    There are several ways to do

8      that but I don't recall which one I used.

9      BY MR. GORE:

10          Q.    What are some of the possible ways to do

11     that?

12          A.    Like one possible way is to look at the

13     geographical overlap.    Another possible way is to

14     look at the population overlap, although one has to

15     be very careful about this because people have moved

16     over the past ten years.    So the fact that there is

17     a number of people in a certain location may not

18     necessarily, you know, reflect the people who've

19     been living there for the last decade.

20          Q.    Okay.    So other than geographical overlap

21     and population overlap, are there any other ways to

22     control for the benchmark plan or any other

23     benchmark plan-related constraints that would be

24     possible in your simulation model?

25          A.    So in my simulation model the incumbency

Kosuke Imai, PhD                                        August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 61

1      regions restraint is imposed so that also partially,

2      you know, controls for the overlap, if you -- if you

3      make sure that incumbency won't be paired in each

4      district that will to some extent have some

5      implications on the overlap with the benchmark plan.

6                  In my race-blind analysis I basically

7      only look at two districts so to the extent that the

8      rest of the districts are untouched, they are the

9      same as, you know, benchmark plan.  And in my second

10     race-blind simulation I freeze even the District One

11     Six boundary outside of Charleston County, so to the

12     extent that, you know, that part is following the

13     boundary of -- under the benchmark plan or the

14     enacted plan.  The enacted plan is similar to the

15     benchmark plan.

16                 You know, there are implications in

17     the overlap but I don't want to use the benchmark

18     plan directly in my constraint because it inherits

19     all sorts of factors that I don't know and basically

20     my analysis.

21         Q.   Okay.  Is it possible that some of those

22     factors the benchmark plan inherits are not related

23     to race?

24         A.   It's possible.  Again, I didn't evaluate

25     the benchmark plan, that was never the goal of my

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 62

1     analysis so I don't know what factors went into the

2     benchmark plan and precisely for that reason I don't

3     want to include it.

4         Q.   And my final question, what -- on this for

5     now, what was the benchmark plan-related constraint

6     in your simulation analysis that you ran?

7              MR. CEPEDA:  Object to form and object

8     because it asks the question about the draft

9     protected under Rule 26.

10             MR. GORE:  Again, I'm not asking about the

11    draft.  I'm asking about the analysis you ran,

12    Dr. Imai.

13             MR. CEPEDA:  Dr. Imai has referenced that

14    he conducted the analysis as part of a draft report

15    several times.

16             MR. GORE:  The fact that it's in a draft

17    doesn't insulate it from discovery if it's an

18    analysis he did.

19    BY MR. GORE:

20        Q.   So Dr. Imai, go ahead.

21             MR. CEPEDA:  We can disagree about that,

22    John.

23             MR. GORE:  I imagine we will.  Thank you.

24    BY MR. GORE:

25        Q.   Dr. Imai, can you answer the question?

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

                                                    Page 63

1          A.    Yes.   So there are two possible ways to

2     impose the overlap constraint with respect to the

3     benchmark plan, as I explained to you, geography or

4     population based.   There might be some other ways

5     but those are the two that were part of the software

6     factors that I used in my own software case, and I

7     don't recall which one I used.   I'm sorry.

8          Q.    And do you recall the results of comparing

9     that simulation to the enacted plan?

10              MR. CEPEDA:   Same objection.

11              THE WITNESS:   I may -- again, the draft

12    expert report may have included the comparison but I

13    don't recall the specific results.

14    BY MR. GORE:

15         Q.    And I want to ask you a few more questions

16    about your report.   So the simulation analysis

17    that's in your report does not include the benchmark

18    plan-related constraint, correct?

19         A.    That's correct.

20         Q.    Okay.  Did you ever compare any of those

21    simulations to, for example, any of the plans

22    proposed by members of the public during the

23    Congressional redistricting process?

24         A.    No.

25         Q.    So you didn't ever compare that to the

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 64

1      NAACP plan one, for example?

2             A.   I didn't have access to those, yeah.

3             Q.   So you didn't compare to NAACP Plan Two

4      either; is that right?

5             A.   No, I didn't do that.

6             Q.   Or the League of Women Voters' plan?

7             A.   No.

8             Q.   Or the Harpootlian plan?

9             A.   No.

10            Q.   And so the analyses you ran were a local

11     simulation of District 1 and 6; correct, was the

12     first one?

13            A.   Yeah.  The first one, yeah.

14            Q.   And the second one was a local simulation

15     of Districts 1 and 6 limited to Charleston; is that

16     correct?

17            A.   Yeah, that's right.  That's the second

18     one.

19            Q.   And the third is a statewide simulation;

20     is that correct?

21            A.   That's correct.

22                 MR. GORE:  At this point we have been

23     going an hour and a half.  Let's go off the record.

24                      (A recess was taken.)

25     BY MR. GORE:

Kosuke Imai, PhD                              August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 65

1          Q.   So bear with me for on second if you would

2     be so kind.   Okay.   I'd like to go to what's marked

3     as tab three.

4          A.   Tab three.   Okay.

5          Q.   In your zip.

6          A.   Yes.

7          Q.   I will go ahead and mark that as Exhibit

8     Five.

9               (Defendant's Exhibit No. 5, RECOMBINATION: A

10    FAMILY OF MARKOV CHAINS FOR REDISTRICTING ARTICLE, was

11    marked for identification.)

12    BY MR. GORE:

13         Q.   I have loaded it into Exhibit Share and

14    now hopefully we are going to display.   And I

15    believe this is an article called Recombination:   A

16    Family of Markov Chains for Redistricting; is that

17    right?

18         A.   Yes.

19         Q.   And I'm not even going to ask you to

20    explain what those words mean.   Thank you for

21    confirming.   I'd like to go to page 41 of this

22    article, if we might.

23         A.   Forty-one, okay.  Hold on.   Yes.   Okay,

24    yes.

25         Q.   Thank you.   And I believe there is a

Kosuke Imai, PhD                              August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 66

1    sentence here that I would like to explore with you

2    for a moment.  So it's the first full sentence on

3    the top of page 41, it starts, Comparator plans.

4                Comparator plans must be legally

5    viable and pragmatically plausible to draw power

6    from the conclusion that a proposed plan has very

7    different properties.

8                Did I read that correctly?

9        A.   Yes.

10       Q.   And I believe this article was listed on

11   your reliance list.  Do you agree with that

12   statement?

13       A.   I have no opinion.  I did not form opinion

14   on this particular sentence.

15       Q.   Okay.  Let me ask it this way.  Regardless

16   of what the sentence says, do you agree that for

17   simulation plans to tell you something about the

18   enacted plan, the simulation plans have to be

19   legally viable and pragmatically plausible?

20       A.   I don't know what they mean by those words

21   so I can't really form opinion on that particular

22   sentence.

23       Q.   Let me ask it this way.  Forget about that

24   sentence.  I'm going to take that down.

25       A.   Okay.

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 67

1         Q.    Do you agree that for simulation plans to

2    be instructive they have to comply with legal

3    requirements for redistricting plans generally?

4         A.    I disagree.

5         Q.    Explain that, please.

6         A.    Simulations can be used in many different

7    purposes.  So for example, you could see the impact

8    of, you know, what would happen if you take out one

9    particular requirement.  And so depending on the

10   goal of the analysis, a different set of constraints

11   can be imposed.

12             And also, I'm not a lawyer so I don't

13   really make judgment about whether those

14   constraints, how they correspond to the legal

15   requirements.  They are informed by legal

16   requirements but I don't make any judgment about the

17   viability in the legal sense.  The constraints are

18   mathematical constraints and they are what they are.

19   Nothing more, nothing less.

20        Q.    So is it fair to say, Dr. Imai, that you

21   did not analyze whether any of your simulation plans

22   are legal?

23        A.    I'm not a lawyer so my analysis does not

24   draw any legal conclusions.

25        Q.    Okay.  And I just understand the scope of

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 68

1    your analysis.
2          A.    Right.
3          Q.    You didn't do anything to try to determine
4    whether your plans were legal, correct?
5          A.    Yeah.  No, I didn't do that.
6          Q.    Now, Dr. Imai, I believe your report
7    mentions the South Carolina House and Senate
8    redistricting criteria; is that right?
9          A.    That's correct.
10         Q.    So let's go to tab five of your binder.
11         A.    Okay.
12         Q.    Which is the House Redistricting Criteria.
13         A.    All right.  Tab five.  Okay.  House, yes.
14    Okay.
15         Q.    And I'm going to mark this as Exhibit Six.
16              (Defendant's Exhibit No. 6, SOUTH CAROLINA
17    HOUSE OF REPRESENTATIVES JUDICIARY COMMITTEE
18    REDISTRICTING AD HOC COMMITTEE 2021 GUIDELINES AND
19    CRITERIA FOR CONGRESSIONAL AND LEGISLATIVE
20    REDISTRICTING, was marked for identification.)
21    BY MR. GORE:
22         Q.    And I hope I can figure out how to
23    introduce it.  Okay.  Dr. Imai, do you recognize
24    this document?
25         A.    Yes.

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 69

1          Q.    And what is this document?

2          A.    This is the redistricting guidelines for

3     South Carolina House of Representatives

4     Redistricting Committee.

5          Q.    And did you review this document as part

6     of preparing your expert report?

7          A.    Yes, I received this document from

8     counsel.

9          Q.    I'm going to take that down and I'm going

10    to ask you about tab six in your binder.

11         A.    Okay.  It's open.

12         Q.    Great.  I'm going to mark this as Exhibit

13    Seven.

14               (Defendant's Exhibit No. 7, 2021

15    REDISTRICTING GUIDELINES SOUTH CAROLINA SENATE

16    JUDICIARY COMMITTEE REDISTRICTING SUBCOMMITTEE, was

17    marked for identification.)

18    BY MR. GORE:

19         Q.    And introduce it in Exhibit Share.  Do you

20    recognize this document?

21         A.    Yes.

22         Q.    And what is this document?

23         A.    This is the redistricting guideline for

24    Senate Judiciary Committee.

25         Q.    And did you review this document?

Kosuke Imai, PhD                          August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 70

 1          A.    Yes, I received it from counsel.

 2          Q.    Okay.  We'll refer to both of those

 3    documents a little bit later.

 4          A.    Okay.

 5          Q.    I'd like to turn back to your expert

 6    report.

 7          A.    Okay.

 8          Q.    And ask you a few questions about that

 9    before we break.  And I'd like to start with

10    paragraph 20.

11          A.    Okay.

12          Q.    Which is on page 8.

13          A.    Yes.

14          Q.    And we may also talk about paragraph 22

15    which starts on page 9 and carries over to page 10.

16          A.    Uh-huh.

17          Q.    Both page 20 and page 22, excuse me, list

18    as one of your criteria that all districts are

19    geographically contiguous; is that right?

20          A.    That's correct.

21          Q.    And how did you -- how did you program the

22    algorithm to guarantee that districts are

23    contiguous?

24          A.    Would you want the technical explanation?

25          Q.    I guess I'd just like to understand.

Page 71

1        A.    Okay.

2        Q.    Let me ask you this, does the algorithm

3   consider water-to-water contiguity to be

4   permissible?

5        A.    Yes.

6        Q.    How about point-to-point contiguity?

7        A.    No.

8        Q.    Are all of the districts in all of your

9   simulation plans contiguous?

10       A.    From that point of view, yes, from that

11  definition, yes, based on that definition.

12       Q.    Based on that definition?

13       A.    Yes.

14       Q.    So they are contiguous but don't use

15  point-to-point contiguity; is that right?

16       A.    That's correct, yes.

17       Q.    Okay.  And the next factor is, you say you

18  program all relevant districts not to exceed an

19  overall population deviation of plus or minus

20  .1 percent; is that right?

21       A.    That's correct.

22       Q.    And that's 730 people, I think,

23  approximately, according to footnote three; is that

24  right?

25       A.    That's my understanding, yes.

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 72

1          Q.    You would agree with me though that this

2     deviation is greater than what the House guidelines

3     or the Senate guidelines permit, right?

4          A.    Yes.

5          Q.    And do you recall what the House

6     guidelines and Senate guidelines say about equal

7     population?

8          A.    I don't recall exact language but...

9          Q.    Do you recall what the requirement was for

10    equal population in those guidelines?

11         A.    So I don't recall exact language.

12         Q.    Okay.  That's no problem.  It's not a

13    memory test.  So let's flip back to Exhibit Six, tab

14    five which is the House redistricting criteria.

15         A.    Okay, hold on.  Tab five, okay, yes.

16         Q.    All right.  So this is the House criteria?

17         A.    Uh-huh.

18         Q.    And roman numeral four is equal population

19    slash deviation?

20         A.    Right.

21         Q.    And letter B says:  The number of persons

22    in Congressional districts shall be as nearly equal

23    in population as is practicable.  The ideal

24    population for Congressional districts shall be

25    731,204.  In every case efforts shall be made to

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 73

1    achieve strict equality or produce the lowest

2    overall range of deviation possible when taking into

3    consideration geographic limitations.

4              Did I read that correctly?

5         A.    That's correct.

6         Q.    Okay.  And now if you will turn to tab six

7    which has been marked as Exhibit Seven, this is the

8    Senate guidelines.

9         A.    Right.

10        Q.    Do you have that in front of you?

11        A.    Yes.

12        Q.    And roman numeral one says:  Requirements

13   of federal law.  And A is population equality.  Two

14   is congressional districts.  And it says, under the

15   apportionment clause of Article One, Section Two of

16   the U.S. Constitution:  Any population deviation

17   among congressional districts, no matter how small,

18   must be justified through a showing that the

19   specific deviation is required by legitimate

20   redistricting policies such as making districts

21   compact, respecting political subdivision

22   boundaries, preserving the course of prior districts

23   and avoiding contest between incumbent

24   representatives.  So that the state may avoid

25   assuming this additional burden under federal law, a

Kosuke Imai, PhD                                          August 8, 2022

The South Carolina State Conf vs. McMaster/Alexander

Page 74

1      congressional redistricting plan should not have

2      population deviations greater than one person.  Is

3      that correct?

4              A.    That's correct.

5              Q.    So if we turn back to your expert report.

6              A.    Uh-huh.

7              Q.    Paragraph 20 and paragraph 22, you use the

8      constraint of plus or minus 0.1 percent, correct?

9              A.    That is right.

10             Q.    And that's greater than what the --

11     certainly what the Senate guidelines permitted

12     because Senate guidelines said the deviation should

13     be no greater than one person; is that correct?

14             A.    That's correct.

15             Q.    Why did you use 0.1 percent as your

16     constraint rather than one person?

17             A.    The reason is that my simulation is based

18     on the present level data.

19             Q.    Can you elaborate on that?

20             A.    So the precinct is much later greater than

21     the census blocks which typically are used as units

22     for actually doing the enacted plan and because a

23     precinct has on average the population of a couple

24     thousand often and there is a variation depending on

25     the precincts you are looking at.

Page 75

1              And so its appropriate to use the

2       population deviation that corresponds to that

3       particular size.

4          Q.   Would it have been possible for you to

5       program the algorithm to avoid a population

6       deviation of greater than one person?

7          A.   I think that would be difficult given the

8       current state of algorithm development except you

9       can always take a simulated plan that's generated

10      using the precinct level data and modify the

11      boundaries of the district to equalize the

12      population.  You know, you can do that.

13              But automatically generating at the

14      census block level is -- is one -- there is no

15      reason to do that and I can elaborate why there is

16      no reason to do that.  And two, even if you wanted

17      to do it, it's not, you know, necessarily simple.

18         Q.   And I think you said that you can take a

19      plan generated through your method and equalize the

20      population after the fact, correct?

21         A.   Right, that's one possibility as opposed

22      to generate directly sampling the plans as the

23      census block level because there are many, many more

24      census blocks than precincts in any given state.

25      And I can explain why, you know, one should use

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 76

 1    precincts rather than census blocks.

 2        Q.    Why don't you -- tell me why you used

 3    precincts as opposed to census block?

 4        A.    All right.  So first thing that's very

 5    important is that I'm not trying to generate the

 6    plan that can be enacted, like I'm not trying to be

 7    automated map drawer.  Like, my goal is to evaluate

 8    the characteristics of the enacted plan.

 9                So in this case, I'm -- the goal is

10    really to analyze the role that race played in

11    drawing the district, the boundaries of districts in

12    the enacted plan.  So for that purpose, the

13    equalizing the few hundred people -- and that's the

14    maximum deviation -- so a lot of simulated plans

15    have actually fewer deviation, it's not going to

16    affect the substantive conclusions that I draw from

17    the simulation analysis.

18                If you look at the results they are

19    not different by a few hundred people, the

20    difference is way, way diverse.  So adjusting the

21    population deviation is not going to change.

22                The other reason is that one of the

23    things that guideline mentions is a preservation of

24    the precincts and so it also makes sense to keep

25    that simulation at the precinct level as opposed to

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 77

1    census block level.

2         Q.    Thank you for all that.  Did you in your

3    report otherwise ever try to equalize the population

4    on any of your simulation plans?

5         A.    No.

6         Q.    Or did you just take them as they were?

7         A.    No, I did not try to equalize them.

8              MR. GORE:  Let's go off the record for a

9    minute.

10                   (A recess was taken.)

11   BY MR. GORE:

12        Q.    Dr. Imai, did you discuss your deposition

13   with anyone during the break?

14        A.    No.

15        Q.    I'd like to go back to your expert report.

16   At the break we were discussing paragraphs 20 and 22

17   where you list some of the principles that you used

18   for your simulation.  And we talked about contiguity

19   and equal population.

20              The next few bullets in both of those

21   paragraphs 20 and 22 say:  No incumbent is paired

22   with another incumbent.  All the relevant districts

23   are on average at least as compact as the enacted

24   plan.  The number of split counties is on average no

25   greater than the corresponding number under the

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 78

1    enacted plan.  And the number of split

2    municipalities is on average no greater than the

3    corresponding number under the enacted plan.

4                    So I'd like to walk through each of

5    these factors but before I do so, did you program

6    constraints for each of these factors in your

7    simulations?

8        A.    Can you clarify what you mean by, did you

9    program?

10       Q.    Or did the algorithm operate subject to

11   constraints for each of these factors?

12       A.    So each of these factors, basically that

13   you can instruct algorithm to discourage or

14   encourage certain type of plans.  So for example,

15   for the no incumbent pairing constraint I encouraged

16   algorithm not to sample the plans that paired

17   incumbents in some districts.

18       Q.    Let's turn to page 25 of your report.

19       A.    Okay.

20       Q.    I'd like to ask you about paragraph 57 on

21   page 25.

22       A.    Yes.

23       Q.    Okay.  You mention a couple of different

24   kinds of constraints in this paragraph.  I'd like to

25   understand what they mean.  First, what is a

Kosuke Imai, PhD                      August 8, 2022

The South Carolina State Conf vs. McMaster/Alexander

Page 79

```
 1    hierarchical constraint?
 2         A.   Oh, hierarchical constraint is a
 3    constraint that, you can think of it as a hard
 4    constraint which limits the number of counties,
 5    county splits to basically like total number of
 6    districts minus one.  So which in this case is six.
 7              So this can be done in the process of
 8    splitting the merged district into two districts.
 9    So if you recall, the merged split algorithm merges
10    two adjacent districts and then splits, merge
11    district into two new districts.  And when you do
12    that you can make sure that you only split county
13    boundary once which basically effectively limits the
14    number of counties being split to six which is equal
15    to the total number minus one.
16              So it's a hard constraint.  So you
17    can think of it as every simulated plan has this
18    property.
19         Q.   What is a soft constraint?
20         A.   Soft constraint has a weight parameter and
21    it encourages or discourages certain type of plans
22    so it doesn't ensure that all the plans satisfy
23    particular constraints.  So for example, incumbency
24    pairing avoidance is a soft constraint so some of
25    the plan that we sample pairs incumbents, it's a
```

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 80

1      very small number.  And what I do is basically drop

2      those, you know, plans that don't satisfy the

3      constraint afterwards.

4                     But during the sampling process it's

5      using a soft constraint which, you know, discourages

6      the plans that pair incumbents in some districts.

7           Q.    Okay.  Paragraph 57 of your report assigns

8      certain strengths to certain constraints.  So for

9      example, you have a default compactness of strength

10     one and there are other numbers in here.  Just, can

11     you explain to me what the strength of the

12     constraint is?

13          A.    Right.  So the strengths of the constraint

14     is used for the soft constraint where the algorithm

15     is instructed to discourage or encourage certain

16     type of plans.  And so that strength of the

17     constraints basically tells us how strong that

18     discouragement or encouragement is in the

19     implementation of the algorithm.  It's a parameter

20     that controls that strength.

21          Q.    So for each of these factors in

22     paragraph 57, how did you choose the strength of the

23     constraint?

24          A.    So this is case-by-case, you know, choice

25     so you, given this particular, each specific

Kosuke Imai, PhD                                   August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 81

1     analysis you choose these parameters such that a set

2     of, you know, certain goals and criteria are being

3     met.  So for example,l if I want to ensure that

4     incumbency is not paired in any district, if I

5     choose the constraint that is too, you know, soft

6     constraint that is too weak, I would end up with

7     many plans that pair incumbents.  So I increase it

8     until I eliminate pretty much most of the incumbency

9     avoidance.  And of course, I have to do this while

10    making sure that other properties of the simulated

11    plans are satisfied as well.

12         Q.   So let me ask you a question as an

13    example.  In the localized Charleston County

14    simulation you raised the compactness constraint to

15    1.07, according to this paragraph.  Why choose 1.07

16    as opposed to 1.2 or 1.35 or something else?

17         A.   Uh-huh.  So the default parameter value

18    for this is one.  There are mathematical reasons

19    that particular default value is convenient for the

20    sampling algorithm.

21              And if I wanted to make sure that the

22    plans are more compact, so this is relative value so

23    it's a reactive strength.  And the reason why I

24    raised it is because when I run it with constraint

25    of strength one that's a default value, it's less

Kosuke Imai, PhD                                        August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 82

1    compact.

2              And in many cases, not all of the

3    cases, many of the simulated plans are less compact

4    than enacted plan so I wanted to make sure that the

5    simulated plans are, you know, equally compact when

6    compared to the enacted plan.  That's why I raised

7    that value, the encouraged, the simulation algorithm

8    to sample more compact plan.

9         Q.   How do you know that the precise strength

10   you have selected is the right strength for that

11   constraint in your model?

12        A.   So you can basically run a simulation with

13   different values and then see what the compactness

14   of the simulated plans are.

15        Q.   So in your model does changing the

16   strength of the constraint change the sample of

17   plans that the simulation generates?

18        A.   That's correct.  So changing the values of

19   parameters will change the distribution, the target

20   distribution.  Hence it would change the output,

21   simulated output.

22        Q.   And would that be true if one of the

23   factors, the strength of one factor was changed

24   within the constraints?

25        A.   Yeah.  Like any factor that -- of the

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 83

 1    constraint if you choose that it's -- it's empirical
 2    question, it's possible that it would change the
 3    simulated plans as well.
 4          Q.    Same if you change the strength or two or
 5    more of the constraints?
 6          A.    Yeah, that's correct.
 7          Q.    Or all of the constraints?
 8          A.    That's correct.
 9          Q.    Do the strengths of the constraints you
10    selected approximate the constraints followed by the
11    general assembly in the enacted plan?
12          A.    No.  In the sense that I don't -- my goal
13    is not to -- you know, my constraints are informed
14    by these guidelines and then traditional
15    redistricting criteria.  But they are not designed
16    to mimic the way that the map drawers created these
17    maps.
18          Q.    So if the general assembly had assigned a
19    different strength to these constraints it would
20    have been working off of a different universe of
21    potential plans, right?
22          A.    Well, my understanding is the general
23    assembly doesn't use the algorithm.  So I'm not sure
24    what do you mean by, if the general assembly changed
25    the strength?  Different constraints, strength

Kosuke Imai, PhD                                August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 84

1    constraints.

2         Q.   Yeah, that's a fair question.  So would

3    you agree that compliance with these principles

4    requires tradeoffs or can require tradeoffs between

5    various of the principles?

6         A.   In some cases there are tradeoffs.  In

7    other cases the tradeoff is not very strong.

8         Q.   And if the general assembly weighted

9    certain factors more heavily than your model it

10   would have come up with a different plan than your

11   model, right?

12        A.   I mean, again, I don't think that my model

13   would inform how the general assembly came up with a

14   plan but it's certainly the case that if you change

15   the parameters of my model that would result in

16   different simulated plans.

17        Q.   Okay.  So let's walk through each of these

18   factors and some of the constraints that you used,

19   if that's okay.

20        A.   Sure.

21        Q.   So incumbency pairing, I'm still in

22   paragraph 57 on page 25, it looks like for the

23   localized District 1 and 6 simulation, an incumbency

24   pairing avoidance constraint of strength one was

25   used.

Page 85

1      A.    Uh-huh.

2      Q.    Is that one value out of another number or

3   what does that -- how do I understand that number?

4      A.    Yes, so this is a reductive value so the

5   reason you need a scale that tells you what one is,

6   it really depends on the data that you are analyzing

7   as well as other parameters that you are specifying.

8            So, you know, one doesn't nearly have

9   intuitive meaning in the model, it's a relative

10  strength so the higher this value is, you know, the

11  stronger the constraint is and lower this value is,

12  the weaker the constraint.

13     Q.    And so --

14     A.    Yeah.

15     Q.    I'm sorry, I didn't mean to cut you off.

16     A.    All this is meant to say that the zero

17  means no constraint.

18     Q.    So in the statewide VRA simulation --

19     A.    Uh-huh.

20     Q.    I notice that your incumbency pairing

21  avoidance constraint had a strength of eight.  Is

22  that a stronger constraint than the constraint of

23  one in the other simulation that we were just

24  discussing?

25     A.    So you can't really compare the statewide

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 86

1    simulation with the two-district simulation because

2    now the data are very different and we have

3    different number of districts and there are many

4    other factors that are different.

5             So this number, say one or eight,

6    needs to be understood within the particular

7    simulation context as opposed to comparing that

8    number across different simulation analysis.

9         Q.   Okay.  Thank you for that clarification.

10   I think you mentioned before that none of your

11   simulation plans pair incumbents; is that correct?

12        A.   That's correct.  But, you know, after

13   dropping a small number of simulated plans that do

14   pair incumbents, so because of the constraints that

15   reduced the number of simulated plans that pair some

16   incumbents, but in the final analysis simulated

17   plans, the simulated plans that I used for the final

18   analysis I dropped those small number of plans so

19   none of those plans I used for the final analysis

20   has incumbent pairing.

21        Q.   So help me make sure that I got this

22   right.  Because the incumbency pairing constraint is

23   a soft constraint, when you run the simulation, the

24   simulation will generate some plans that pair

25   incumbents somewhere?

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 87

1          A.    Yeah.

2          Q.    Did I have that right so far?

3          A.    It may or may not.

4          Q.    Okay.

5          A.    It may or may not, yeah.

6          Q.    Fair?

7          A.    But it's possible.

8          Q.    And to the extent it did so here, you just

9     went through and eliminated those plans from your

10    simulation set; is that right?

11         A.    That's right.  That's right.  It was very

12    small number, it was very trivial number.

13         Q.    Yeah, not to hold you to this, but can you

14    quantify it for me either in a number of plans or

15    like a percentage that might have generated

16    incumbency pairings?

17         A.    I don't recall that.

18         Q.    Okay.  Now in each of your simulation

19    plans you give the district number, the number for

20    the incumbent's district in the enacted plan,

21    correct?

22         A.    That's correct because the simulated plan

23    has no pairings so I can use the incumbency location

24    to, you know, to level the district in the simulated

25    plan.

Kosuke Imai, PhD                                      August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 88

1          Q.    And that's true even though the simulated

2     district often does not cover the same geographic

3     area as the enacted district, right?

4          A.    That's possible, certainly.

5          Q.    Okay.  Let's get back if we can, just

6     briefly, to paragraph 23 of your report.

7          A.    Twenty-three, okay.

8          Q.    Which is on page 10 I think.

9          A.    Okay.  Hold on.  Yes.

10         Q.    And I'll just read the last sentence of

11    that paragraph.  It says:  This renaming procedure

12    allows me to compare each enacted district with a

13    comparable simulated district even though the two

14    districts often do not cover the same geographic

15    area.  Is that right?

16         A.    You read it correctly.

17         Q.    All right, thank you.  So for example, in

18    your plan, in your setup plan, your simulated plans,

19    District 1 was the district where Nancy Mace

20    resides; is that correct?

21         A.    Right.

22         Q.    Even if that district covered a different

23    geographic area or some different geographic area

24    than the enacted District 1; is that right?

25         A.    Right, with varying degree.

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

                                                    Page 89

1          Q.    Okay.  Thank you.  So let's go back to

2     page 25, paragraph 57 if we can and talk about some

3     of the other constraints that you used.

4          A.    Okay.  Page, hold on.  Okay.

5          Q.    So for -- let's talk about split counties

6     for a second.  I think for the localized District 1

7     and 6 you used a split, a county split avoidance

8     constraint of 0.4; is that right?

9          A.    That's correct.

10         Q.    And would you consider that a moderate

11    strength for that constraint, a heavy strength?  How

12    would you -- help me understand that number a little

13    better.

14         A.    Yeah, again, it doesn't really have a

15    scale so other than the relative scale so, you know,

16    it's hard for me to characterize it that way.

17         Q.    And so as a result of this constraint did

18    your simulation sets generate any plans with more

19    county splits than the enacted plan?

20         A.    So the results of the county splits is in

21    Figure 12.  And so you see that, you know, many of

22    my simulated plans split, you know, have fewer or

23    equal number of county splits as enacted plan.

24    There are a smaller number of maybe about 20 percent

25    of the simulated plan has, you know, slightly more

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

                                                    Page 90

1    county splits than the enacted plan.

2         Q.    Thank you.  I'm glad you sent me to

3    Figure 12 because that was my next question.

4         A.    Oh, okay.

5         Q.    So on the right-hand side on Figure 12

6    there is a histogram for the statewide VRA

7    simulation; is that right?

8         A.    Right.

9         Q.    So I'm having a little trouble reading

10   these numbers but is each of these bars like a

11   single number, like four or five or six or are they

12   a range or?

13        A.    Yeah.

14        Q.    You have the whole number of county splits

15   in the plan, right?

16        A.    Yeah.  It's a whole number even though

17   it's a little bit, slightly shifted to the left.

18        Q.    Okay.

19        A.    Yeah.

20        Q.    What's the minimum number of county splits

21   in a seven district congressional plan with a plus

22   or minus one population deviation?

23        A.    A plus or minus -- I don't -- can you

24   repeat the question again?

25        Q.    Sure.  Yeah.  I'm asking about the -- I'm

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

                                                    Page 91

 1    asking you a background question and then I'll ask
 2    you about the histogram.
 3            A.   Oh.
 4            Q.   The enacted plan has seven districts,
 5    right?
 6            A.   Right.
 7            Q.   And in the -- and the Senate factors also
 8    limited the enacted plan to a plus or minus one
 9    person population deviation, right?
10            A.   Right.
11            Q.   So what would you expect to be the minimum
12    number of county splits in a plan under those
13    constraints or under those criteria?
14            A.   If I do a simulation under that condition?
15            Q.   Well, not -- either a simulation or just
16    in the real world.  I mean, before I think you
17    mentioned something about six county splits and it
18    seems to me that if you are drawing seven districts
19    and you've got to get the district to plus or minus
20    one person, then you are going to split six counties
21    to do that, aren't you?
22            A.   I can't really speak to a hypothetical.
23            Q.   Okay.
24            A.   So my analysis is based on, you know,
25    present level data.

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 92

1          Q.    Some of the plans in your statewide VRA
2     simulation generate fewer than six county splits,
3     right?
4          A.    That's correct.
5          Q.    Did you examine how a plan with seven
6     districts can split only four or five counties?
7          A.    Would you clarify what you mean by
8     examine?
9          Q.    Yeah.  Do you have any explanation as to
10    how a plan with seven districts splits only four or
11    five counties?
12         A.    I did not look at this, you know, the
13    plan, simulated plan with this specific number of
14    county splits.
15         Q.    I believe your report says that you were
16    calculating county splits, on average you were
17    counting them so that -- or you programmed them so
18    that on average it doesn't have more than an enacted
19    plan.  And I'm curious what you mean by average,
20    what kind of average are you talking about?
21         A.    Across simulated plans.
22         Q.    Okay.  So --
23         A.    So 10,000 simulated plans.
24         Q.    So if I average the number of county
25    splits across the 10,000 simulated plans, you

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 93

1      program the algorithm so that that number would be

2      the same or less than the number of county splits in

3      the enacted plan; is that right?

4          A.    Oh, I see.  No.  So what I did was

5      basically choose the constraint parameter because

6      that's the input into the algorithm such that, you

7      know, when you look at the number of county splits

8      on average, the simulated plans have fewer county

9      splits than the enacted plan so some simulated plan

10     may have than enacted plans.

11                So some simulated plans may have more

12     county splits but many other simulated plans would

13     have fewer county splits.  It's not that directly

14     told the algorithm to, you know, make sure an

15     average number of county splits is fewer than

16     enacted, it's more that I choose the parameters of

17     the soft county split constraints in some cases such

18     that the number of county splits is, after looking

19     at the simulated plan, is on average fewer than the

20     enacted plan.

21         Q.    Okay.  So just so I understand, and I

22     appreciate your patience with me since I'm not

23     familiar with your method, okay?  But as I

24     understand it, you are saying that each set of

25     10,000 plans that you have put forward in your

Kosuke Imai, PhD                                          August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 94

1    report, each set has on average fewer county splits

2    per plan or as many as the enacted plan, right?

3         A.   Right, that's correct.

4         Q.   So within your set of 10,000 some may have

5    more splits, some may have fewer, right?

6         A.   Yes.  That's exactly right.

7         Q.   And I think Figure 12 shows that and the

8    best way to see that is Districts 1 and 6

9    simulation?

10        A.   Right.

11        Q.   You've got the line for the enacted plan

12   where it is and then you've got --

13        A.   Yeah.

14        Q.   Some plans from your simulation falling on

15   either side of that; is that right?

16        A.   That's right.  So the goal was to put the

17   simulated plans in about the same range or at least

18   about the same range as the enacted plan.

19        Q.   Okay.  And is that also -- in turning how

20   to split municipalities is that also how you

21   calculated the average for split municipalities?

22        A.   Yes, that's correct.  That's Figure 13.

23        Q.   And that's Figure 13 on page 27 of your

24   report, right?

25        A.   Uh-huh.  That's right.

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 95

1          Q.   So as I understand what happens, you

2     assign a constraint strength and the algorithm

3     generates a universe of plans and then you can go

4     back and pair down that universe to 10,000 plans

5     that enforces kind of your averages for county

6     splits and municipalities and everything else; is

7     that right?

8          A.   Well, so you choose the parameters such

9     that the sample plans, you know, have fewer or equal

10    on average number of splits when compared to the

11    enacted plan.

12         Q.   So while we are talking about splits I

13    have a couple of more questions.

14         A.   Sure.

15         Q.   Do some of your -- did you place --let me

16    back up.

17              Let's take county splits as an

18    example.  Did you constrain the algorithm to split

19    only the same counties as the enacted plan or can

20    the algorithm draw plans that split different

21    counties than the enacted plan?

22         A.   For statewide simulation it could be a

23    different counties that could be split.  For the

24    second race run simulation, the first one which is

25    the District 1 and 6 simulation, it could also be a

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 96

1      different counties could be split.

2                   For the second plan simulation where

3      I focus on Charleston County you reach how the

4      Charleston County was split is the focus of the

5      analysis.  And since the rest of the, you know, the

6      districts are kept the same as the enacted plan they

7      would split exactly the same place in county as the

8      enacted plan.  So it depends on which analysis that

9      I've done.

10         Q.   Okay.  And could you have instructed the

11     algorithm to split the same counties as the enacted

12     plan only?

13         A.   Right.  I mean, it's possible to do that.

14         Q.   And is there a reason you didn't do that?

15         A.   So my constraints were guided, you know,

16     in part based on these South Carolina redistricting

17     guidelines and I don't recall that it specified the

18     specific counties that need to be spread in that

19     guideline, although I think there is provision that,

20     you know, said something about dividing the number

21     of county splits.

22         Q.   Now, I'm going to ask you the same

23     questions about the municipality splits.  So do any

24     of your simulated plans with different

25     municipalities than the enacted plan?

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 97

1          A.    Probably.  I did not specify that certain

2     municipalities should be split.

3          Q.    Let's move to the next criteria which is

4     compactness.

5          A.    Okay.

6          Q.    We talked a little bit already about

7     paragraph 57 where there is a default compactness

8     constraint of one and then there is a localized --

9     in a localized Charleston County simulation raised

10    to 1.07; is that right?

11         A.    Right, right.

12         Q.    And again, your report says that all the

13    relevant districts are on average at least as

14    compact as the enacted plan?

15         A.    Yeah.

16         Q.    So what was your method for calculating

17    that average?

18         A.    Right.  So this is Figures 10 and 11 so I

19    used two different measures of compactness and, you

20    know, so I specified the constraint and then

21    generate the simulated plans and look at the

22    compactness of districts using these two measures,

23    Polsby-Popper and fractions of edges kept.

24         Q.    How did you choose those measures?

25         A.    So Polsby-Popper is perhaps most commonly

Kosuke Imai, PhD                                        August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 98

1     used measure in this type of analysis and fractions

2     of edges kept is actually related, closely related

3     to the -- the compactness that algorithm directly

4     controls.  So these measures are, you know,

5     obviously related but they are different.  And

6     fraction of edges kept is something that algorithm

7     directly controls or closely related to directly.

8          Q.    Thank you for that.  Are these

9     mathematical measures of compactness?

10         A.    Yes, they are.

11         Q.    And again, on the averages, so within your

12    each bucket of 10,000 simulated plans, is it that

13    each bucket on average that districts are as compact

14    as the corresponding district in the enacted plan,

15    is that how you get the average?

16         A.    So here I'm looking at the overall

17    compactness.  So Polsby-Popper is a major for each

18    district, but I'm looking at the average of the

19    districts so that's why there is one number for each

20    limited plan.  It's not like a comparison of the

21    specific district and fraction of edges kept is a

22    plan-wide measure to begin with.  So in both cases

23    I'm looking at the overall compactness, not like

24    each district specific comparison of compactness of

25    those.

Kosuke Imai, PhD                                      August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 99

1      Q.   So if I can rephrase that, your average is

2    the average of the plan like compactness?

3      A.   Correct.

4      Q.   Not any average of district specific

5    compactness?

6      A.   That's correct.

7      Q.   Okay.  Thank you.  Dr. Imai, can you go

8    back to tab five in your --

9      A.   Okay, tab five.  Yes, House guideline.

10     Q.   Yes, that's the House redistricting

11   guidelines?

12     A.   Yes.

13     Q.   And if you will scroll down with me I

14   previously marked this as Exhibit Six.  And on the

15   second page of these guidelines --

16     A.   Uh-huh.

17     Q.   Roman numeral six is titled Compactness.

18   Do you see that?

19     A.   Yes.

20     Q.   The second paragraph under that factor?

21     A.   Uh-huh.

22     Q.   It says:  Compactness should be judged in

23   part by the configuration of prior plans.

24   Compactness should not be judge based on any

25   mathematical, statistical or formula-based

Kosuke Imai, PhD                                        August 8, 2022

The South Carolina State Confvs.McMaster/Alexander

Page 100

1    calculation or determination.

2              Did I read that correctly?

3        A.   You did.

4        Q.   So did you do anything in your model to

5    judge compactness by the configuration of prior

6    plans?

7        A.   Not directly.

8        Q.   How about indirectly?

9        A.   Well, to the extent that I tried to make

10   sure that the overall compactness of my simulated

11   plans is comparable to the enacted plan.  So to the

12   extent that the enacted plan does take this

13   consideration into account, you know, they are

14   related, but not directly.  I didn't directly

15   compare to the prior plans.

16       Q.   And when you were -- to the extent that

17   you were indirectly comparing, that was based on the

18   mathematical measures, correct?

19       A.   Yes, everything I do is mathematical.

20       Q.   So it wasn't based on the shape of the

21   district, for example, correct?

22       A.   No.  Shape in the mathematical sense.

23       Q.   Fair enough.  Very well said.  And here

24   the House says that compactness should not be judged

25   based upon any mathematical calculation or

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 101

1    determination, correct?

2         A.    That's -- you read it correctly.

3         Q.    And Dr. Imai, if you would be so kind as

4    to turn back to tab six with me which I previously

5    marked as Exhibit Seven.

6         A.    Senate Guidelines.

7         Q.    And this is the Senate Guidelines.

8         A.    Okay.

9         Q.    And if you will go with me to page 2.

10        A.    Okay.

11        Q.    Roman numeral three is additional

12   considerations?

13        A.    Uh-huh.

14        Q.    And F is district compactness?

15        A.    Okay.

16        Q.    And it reads:  In determining the relative

17   compactness of the district consideration should be

18   given to geography, demography, communities of

19   interest and the extent to which parts of the

20   district are joined by roads, media outlets or other

21   means for constituents to communicate effectively

22   with each other and with their representative.

23             Did I read that correctly?

24        A.    You did.

25        Q.    And does the algorithm account for

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 102

1    geography, demography, communities of interest or

2    the extent to which parts of the district are joined

3    by roads, media outlets or other means for

4    constituents to communicate effectively with each

5    other?

6         A.    So it depends on what we mean by

7    geography, demography, community.  So interest,

8    because obviously the algorithm is using the state

9    geography, it operates on the shape files and it

10   uses population data to determine the size,

11   population size of the district.

12                   And in the statewide case, you know,

13   analysis I take into account for the racial data.

14   In terms of communities of interest, you know, I

15   take into account the administrative boundaries like

16   counties and municipalities.  And so to the extent

17   that those inputs I used are related to this type of

18   consideration they are taken into account but, you

19   know, the algorithm doesn't do anything more than

20   that.

21        Q.    And the Senate guidelines also don't

22   mention use of a mathematical measure of

23   compactness, correct?

24        A.    Yes, I don't see that mentioned.

25        Q.    Let's scroll up here, same page,

Page 103

1     additional considerations on the Senate guidelines,

2     letter B is constituent consistency and it lists:

3     Preserving the cores of existing districts.

4                    Did the algorithm consider preserving

5     the cores of existing districts in generating plans?

6          A.   So to the extent that, you know, I

7     instructed the algorithm to avoid incumbents pairing

8     and to the extent that my race plan simulations, for

9     example, freezes, you know, all the districts other

10    than Districts 1 and 6 and in the case of second

11    race-blind simulation it freezes everything other

12    than Charleston County.

13                    So in that sense, you know, there are

14    constraints that have implications of cores of

15    existing districts, preservation.

16         Q.   Did you --

17         A.   But the analysis I presented in my final

18    report did not directly use, you know, previous --

19    the benchmark plan.

20         Q.   And so your analysis did not include a

21    constraint for preserving the cores of districts,

22    correct?

23         A.   Not directly.

24         Q.   And likewise, it did not include a

25    constraint for keeping incumbents' residences in

Kosuke Imai, PhD                                    August 8, 2022

The South Carolina State Confvs.McMaster/Alexander

Page 104

1      districts with their core constituents, correct?

2           A.   Yeah, incumbents weren't paired but there

3      was no constraint that directly, you know, that

4      needs a definition of what the core constituency of

5      incumbents are.  And that information was not

6      available so I did not include that either.

7           Q.   And as we discussed before, the districts

8      in your simulation plans had the same numbers as

9      districts in the enacted plan but may cover

10     different geography; is that right?

11          A.   That's correct, depending on, you know,

12     this will change across analysis and, you know, I

13     have three analyses.  So first two analyses are

14     probably much bigger overlap than statewide

15     analysis, for example, but yeah.

16          Q.   So for example, wouldn't that also mean

17     that because the districts encompass different

18     geography they encompass different populations and

19     voters, correct?

20          A.   That's correct, different people in

21     different areas.

22          Q.   And speaking with this page, communities

23     of interest --

24          A.   Uh-huh.

25          Q.   Did you include any constraint for

Kosuke Imai, PhD                                   August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 105

1    communities of interest?

2        A.    So again, only to the extent that, you

3    know, things like administrative boundaries, like

4    counties and municipalities overlap with these

5    interest and to the extent that, you know, incumbent

6    residence wasn't paired, but there is no definition

7    of communities of interest available so I didn't use

8    that.

9        Q.    So there was no direct constraint on

10   communities of interest, correct?

11       A.    That's correct to the extent that --

12       Q.    Okay.

13       A.    Yeah, I don't have, you know, definitions

14   of what these communities are.

15       Q.    And so you didn't assign a strength to

16   communities of interest, correct?

17       A.    Right, because there is no mathematical,

18   you know, geographical definition of communities of

19   interest so I didn't assign that constraint directly

20   to this.

21       Q.    And so you also didn't assign a strength

22   to preserving the course of existing districts,

23   correct?

24       A.    That's correct.  For the reason that I

25   explained that in order to isolate the role that

Kosuke Imai, PhD                                         August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 106

1    race played in determining the districts of enacted

2    plan that I didn't want to include any plan

3    including the benchmark plan.

4        Q.   And similarly, you didn't assign a

5    strength to keeping incumbents residences in

6    districts with their core constituents, correct?

7        A.   Right.  So the weights are for just the

8    avoidance of incumbent pairing and not with respect

9    to their core constituents because they are not --

10   that definition was not available to me.

11       Q.   Okay.  Let's look down at letter E,

12   minimizing divisions of voting precinct boundaries?

13       A.   Uh-huh.

14       Q.   Did you program a constraint in the

15   algorithm for VTD splits or precinct splits?

16       A.   Let's me double check.  Yeah, I don't

17   think so.  It's no a listed in paragraph 57, which

18   is not -- yeah.

19       Q.   And I don't believe it's listed in

20   paragraphs 20 or 22 either.

21       A.   Yeah, I wanted to double check, yeah.  I

22   don't think I imposed that constraint.

23       Q.   So let's go to -- can we go to figure 14

24   on page 27 of your report?

25       A.   Yes.

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 107

1      Q.    Wonderful.  Thank you.  So you do include
2    here some histograms of VTD splits?
3      A.    Uh-huh.
4      Q.    Is that what I'm seeing in figure 14?
5      A.    Yes.
6      Q.    And it looks like the enacted plan
7    performs better than most of the District 1 and six
8    simulation plans on VTD splits; is that right?
9      A.    That's correct.
10     Q.    And the enacted plan appears to perform
11   better than all the Charleston County simulation
12   plans or at least the vast majority of them on VTD
13   splits too, right?
14     A.    Yes, that's correct.
15     Q.    And I add that caveat because I can't tell
16   based on this histogram whether there is --
17   Charleston County seems to be left to that line,
18   right?
19     A.    Yeah, sure.
20     Q.    And then in terms of state wide VRA
21   simulation the enacted plan again outperforms the
22   vast majority of the plan from the statewide VRA
23   simulations; is that right?
24     A.    That's correct.
25     Q.    And down here in paragraph F, the second

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 108

1      paragraph or I'm sorry the second sentence there in
2      paragraph 61 under the heading F still on page 27?
3              A.   Yeah, I see that.
4              Q.   You say:  This is in part due to the fact
5      that many municipalities split VTDs implying that
6      there often is a direct tradeoff between
7      municipality and precinct splits.
8              A.   Uh-huh.
9              Q.   Did I read that correctly?
10             A.   Yes, you did.
11             Q.   Can you explain what you mean by tradeoff
12     between municipalities -- I'm sorry, municipality
13     and precinct splits?
14             A.   Yeah, so basically the precincts are not
15     nested, in the case of South Carolina, are not
16     necessarily nested in municipalities.  So
17     municipalities may split the VTD so if you want to
18     reduce the number of municipality splits that may
19     mean that you end up -- because a municipality cut
20     to the precinct you may end up splitting the VTDs,
21     the precincts.
22             Q.   I've got it.  So minimizing municipalities
23     splits means that sometimes VTDs will be split; is
24     that right?
25             A.   That's right.

Kosuke Imai, PhD                                August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 109

1      Q.   Okay.

2      A.   So if you are trying to keep the

3  municipalities together you may end up splitting the

4  VTDs whether as if you try to keep the VTDs together

5  you may end up splitting municipalities.

6      Q.   And the other thing I want to ask you

7  about this sentence is you use VTDs in precinct?

8      A.   Oh.

9      Q.   Are you -- are you using those terms

10  interchangeably?

11      A.   Yes, yes, interchangeably.

12      Q.   All right.  I'd like to go back to

13  paragraphs 20 and 22 back on page seven?

14      A.   Okay, hold on.

15      Q.   I guess.  I'm sorry, I think maybe

16  page eight.

17      A.   Page 8, okay.

18      Q.   In paragraph 20 it says:  No race or

19  partisan information was used and in paragraph 22

20  which is talking about your VRA set is says:  No

21  partisan information was used.  So just to confirm,

22  you didn't use partisan information in any of your

23  simulations, correct?

24      A.   No.

25      Q.   So you didn't consider election data; is

Kosuke Imai, PhD                                         August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 110

1    that right?

2         A.    Yeah, I didn't use it.

3         Q.    And you didn't consider whether the

4    district would enact -- would elect a Republican or

5    a Democrat, right?

6         A.    No, yeah.

7         Q.    And you didn't --

8         A.    That's right.

9         Q.    And you didn't consider voter registration

10   by party, correct?

11        A.    No, yeah, I didn't consider that.

12        Q.    Now, could you have instructed the

13   algorithm to consider politics or added a politics

14   constraint to the algorithm?

15        A.    If the politics is, you know, what we mean

16   by partisan mathematically formulated, yes.

17        Q.    All right.  So for example, could you have

18   added a constraint to the algorithm that required

19   that six of the seven districts elect a Republican

20   rather than a Democrat?

21        A.    Right, yeah, I could have done that.

22        Q.    And could you have instructed the

23   algorithm to require that District 1 have a higher

24   percentage of the Trump vote share in 2020 than the

25   benchmark District 1?

Kosuke Imai, PhD                                August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 111

1      A.    That's definitely possible as long as it's

2    specified, you know, in a mathematical, operational

3    way.

4      Q.    And if you use some kind of constraint

5    like this in partisan gerrymandering cases, right?

6      A.    I -- I don't think so although, you know,

7    it's -- I'm using my memory because in partisan

8    gerrymandering case often is to see if you use a

9    simulation without partisan information and then

10   compare that nonpartisan baseline with enacted plan

11   and look at the partisan, you know, how different

12   they are with the partisan simulation.  So in the

13   simulation often you don't include the partisan

14   information because you want to establish a

15   nonpartisan baseline.

16     Q.    I've got it, okay.  Thank you for that

17   clarification.

18     A.    Uh-huh.

19     Q.    But for these -- for this report at least

20   you didn't include any kind of constraint like that,

21   correct?

22     A.    Right, for this report I did not use any

23   partisan information.

24     Q.    And why didn't you do that?

25     A.    Because it was not clear from the

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 112

1    guideline how the partisan information should be

2    incorporated, at least to me, so -- and I wasn't

3    also instructed to do so either.

4         Q.   Dr. Imai, do you have a view as to whether

5    race and politics are highly correlated in South

6    Carolina?

7         A.   I have not analyzed that particular aspect

8    so I don't have, you know, I don't have opinion on

9    that particular question.

10        Q.   And do you have an opinion on whether race

11   rather than politics explains the enacted plan?

12        A.   My analysis does not address that question

13   so I have no opinion on that.

14        Q.   All right.  So now I can ask you some more

15   questions about each of the simulations you

16   conducted if that would be okay?

17        A.   Sure.

18        Q.   So we are still in your report and your

19   first simulations, your localized simulations do not

20   include a VRA constraint; is that right?

21        A.   That's correct.  It's race neutral.

22        Q.   And why don't they include a VRA

23   constraint?

24        A.   Oh, because, you know, in order to assess

25   whether race played any role in drawing the

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 113

1   boundaries of the enacted plan what you want to do

2   as a first step is to, you know, create -- conduct a

3   simulation analysis to have a race neutral baseline

4   and then by comparing the race neutral baseline with

5   the enacted plan you can see how race played a role

6   in drawing boundaries, in this case between

7   Districts 1 and 6 under the enacted plan.

8        Q.   And in the statewide simulation you did

9   include the VRA constraint, correct?

10       A.   That's correct.

11       Q.   And what -- I'm sorry, go ahead.

12       A.   Yeah, that's correct.

13       Q.   Okay.  And is there a reason you didn't

14   run a statewide simulation without the VRA

15   constraint?

16       A.   Oh, I see.  The reason is that statewide

17   simulation was there to address the possibility that

18   you know, what I found in the race neutral

19   simulation analysis is due to the VRA consideration.

20   And that was the purpose of the statewide simulation

21   analysis and so for that analysis I included the VRA

22   constraint.

23       Q.   Dr. Imai, let's go to -- let's talk first

24   about your District 1 and District 6 localized

25   simulation, if that's okay?

Kosuke Imai, PhD                                      August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 114

1          A.    Sure.

2          Q.    I'd like to start at page 11.

3          A.    Okay.

4          Q.    So as I understand the simulation you only

5     altered the boundary between District 1 and 6,

6     right?

7          A.    That's correct.

8          Q.    So the boundaries of Districts 2, 5 -- 2,

9     3, 4, 5 and 7 are all unchanged in this simulation?

10         A.    Right, fixed under the enacted plan.

11         Q.    Great.  All right.  So paragraph 27 and

12    then you have a Figure 1 on page 12 --

13         A.    Uh-huh.

14         Q.    That shows precincts or VTDs by BVAP; is

15    that right?

16         A.    Right, that's correct.

17         Q.    And you are using the total black voting

18    age population by number rather than a black voting

19    age population percentage, right?

20         A.    That's correct.

21         Q.    And so the black voting age population

22    percentage in two districts with the same total

23    black voting age population could be different,

24    right?

25         A.    Oh, yeah, that's true.

Kosuke Imai, PhD

The South Carolina State Confvs.McMaster/Alexander

August 8, 2022

Page 115

1          Q.   And so moving either of those precincts in

2     or out of the district could have a different net

3     effect on the district's BVAP percentage, correct?

4          A.   I'm not sure I understand the question.

5          Q.   Sure.  So let's -- let's spin this out.  I

6     think you agree with me there are two precincts --

7     let's take two precincts, each of which have 500

8     individuals -- black individuals of voting age

9     population.

10         A.   Uh-huh.

11         Q.   One of those precincts -- let's say it

12    only has 500 people in it so it's 100 percent BVAP

13    precinct?

14         A.   I see.

15         Q.   The other precinct has a thousand people

16    in it so it's a 50 percent BVAP precinct.

17         A.   I see, I see.

18         Q.   And moving those in between districts will

19    have different effects on the districts' BVAP

20    population, right?

21         A.   Moving meaning -- what do you mean by

22    moving?

23         Q.   Well, either moving it in or out of the

24    district.

25         A.   Oh, I see.

Kosuke Imai, PhD                                    August 8, 2022

The South Carolina State Conf vs. McMaster/Alexander

Page 116

1        Q.   So if I have 100 percent BVAP precinct to

2    a district that has a different effect on a district

3    than if I have 50 percent BVAP?

4        A.   Yeah.

5        Q.   Okay.

6        A.   So yeah, so the number -- BVAP population

7    is the same but the proportion would be different,

8    different depending on the total number of -- total

9    population in that precinct, that's correct.

10       Q.   Now, if I'm reading this correctly,

11   Figure 1, on the right-hand side there -- you also

12   have the -- this cool colored chart that shows how

13   often the VTD was placed in District 1; is that

14   right?

15       A.   Uh-huh, right.

16       Q.   And the darker numbers show that the VTD

17   was more frequently placed in District 1?

18       A.   That's right.

19       Q.   In the lighter color, right?

20       A.   That's correct.

21       Q.   And so do you know as you sit here right

22   now where Nancy Mace, the District 1 incumbent,

23   lives?

24       A.   Yes, I think near the border, right, the

25   precinct border, the district border, if I remember

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 117

1    correctly.

2         Q.    Yeah, I think she lives in Berkeley County

3    if I'm not mistaken, but I don't know that for sure,

4    but I'm pretty sure that's right.  So of course,

5    whatever precinct she lives in ends up in District 1

6    100 percent of the time?

7         A.    That's right.

8         Q.    Okay.

9         A.    That's correct, yeah.

10        Q.    All right.  It looks like large parts of

11   Charleston -- the city of Charleston and Charleston

12   County end up at in District 1 very frequently, at

13   least 90 percent of the time or more; is that right?

14        A.    That's my finding.

15        Q.    Okay.  So in your simulated plans, Nancy

16   Mace is frequently placed in a district with the

17   City of Charleston or large portions of Charleston

18   County; is that right?

19        A.    That I think is consistent with my

20   finding.

21        Q.    Are you aware of any reason why the map

22   drawer may not have wanted to include Nancy Mace in

23   a district with the city of Charleston or a big

24   portion of Charleston County?

25        A.    No, I don't consider a map drawer's

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

                                                    Page 118

1     intent.

2          Q.   Did you consider the political effect on

3     Nancy Mace's reelection chances --

4          A.   No.

5          Q.   Of Nancy Mace being placed with City of

6     Charleston?

7          A.   No.

8          Q.   Or with a large portion of Charleston

9     County?

10         A.   No political information is used for my

11    analysis.

12         Q.   Okay.  So in this analysis shown in

13    Figure 1 --

14         A.   Uh-huh.

15         Q.   Does your analysis control at all for the

16    benchmark district the VTD was in under the

17    benchmark plan?

18         A.   No, I don't use the benchmark plan for my

19    analysis.

20         Q.   And does it control for where the black

21    voters and black individuals on this map live?

22         A.   No, this is race-blind simulation so no

23    racial information is used either.

24         Q.   And in terms of the -- so we've talked

25    about this, this was Districts 1 and 6; is that

Kosuke Imai, PhD

August 8, 2022

The South Carolina State Conf vs. McMaster/Alexander

Page 119

```
 1    correct?
 2         A.    That's correct.
 3         Q.    And I think on paragraph 29 you mentioned
 4    that the average difference in the BVAP proportion
 5    of District 1 between the enacted and race-blind
 6    simulated plans is about 5.8 percentage points; is
 7    that right?
 8         A.    Right, the difference, yes, average
 9    difference.
10         Q.    And where is that 5.8 percentage point
11    average coming -- where are those black voters
12    coming from in your simulated plans?
13         A.    Oh, I suspect they are coming from the
14    City of Charleston.
15         Q.    Okay.  And so in your simulated plans --
16         A.    And then maybe the City of North
17    Charleston as well.
18         Q.    So your simulated plans have 5.8
19    percentage points BVAP higher in District 1 --
20         A.    Right.
21         Q.    But they have a lower BVAP in some other
22    district or districts as a result, correct?
23         A.    Right.  In this case, there is only two
24    districts being analyzed so District 6 would be the
25    one that's lower in terms of BVAP proportion under
```

Kosuke Imai, PhD                                    August 8, 2022

The South Carolina State Confvs.McMaster/Alexander

Page 120

1      the simulated plan compared to the enacted plan.

2          Q.    So the 5.8 percentage points would mean

3      that District 6's BVAP has dropped to something like

4      41.1 percent; is that right?

5          A.    Yeah, it won't be exact because the

6      population difference is there, but yeah, I think

7      there is, you know, decrease in BVAP proportion of

8      District 6 under the simulated plan when you compare

9      that with enacted plan.

10         Q.    So let me turn to the histogram on page 13

11     which is your Figure 2.

12         A.    Page 13 -- oh, Figure 2, yes.

13         Q.    So Figure 2 shows that some of the

14     simulated plans have a District 1 BVAP proportion of

15     up to 28 percent or maybe even 30 percent; is that

16     right?

17         A.    Yeah, close to 30 maybe.

18         Q.    30 percent, close to 30 would be about 12

19     to 13 percent higher in District 1 than in the

20     enacted plan, right?

21         A.    I don't recall exact -- yeah, no, that's

22     right.

23         Q.    Well, it's higher?

24         A.    Yeah, I see the line.  Yeah, I don't know

25     the exact number but, yes.

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 121

```
 1          Q.   Yeah, I think in paragraph 29 it says
 2     17.4 percent.
 3          A.   Okay.
 4          Q.   Okay.  So if we have a plan in the
 5     simulation --
 6          A.   Yeah.
 7          Q.   At 29.4 percent that's 12 percent higher,
 8     right?
 9          A.   That's right.
10          Q.   And that would mean that District 6's BVAP
11     is 12 percent lower, right?
12          A.   Right.
13          Q.   But you didn't provide a histogram showing
14     how enacted District 6's BVAP compares to the BVAP
15     in your simulated plan, correct?
16          A.   Right, because it would be, you know, a
17     mirror image because I'm just working with two
18     districts.
19          Q.   So enacted District 6 has a higher BVAP on
20     average than your simulated District 6s would have,
21     correct?
22          A.   For District 6, yeah.
23          Q.   And in fact, it would be on average
24     5.8 percent or so higher --
25          A.   Right.
```

Kosuke Imai, PhD                                          August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

                                                    Page 122

1         Q.    Once you account for population variation?

2         A.    Yeah, in that range, that's correct.

3         Q.    So in this simulation, black voters are

4    just being moved between District 6 and District 1,

5    correct?

6         A.    Well, not just black voters but because

7    I'm just doing the simulation between Districts 1

8    and 6 so that, you know, the voters are assigned to

9    one of the two districts.

10        Q.    And did you analyze the effect in

11   District 6 of decreasing the BVAP, did you analyze

12   the effect of that on black voters' ability to elect

13   their candidates of choice?

14        A.    Oh, I didn't use any partisan analysis in

15   my report so no.

16        Q.    Now, you didn't do a similar local

17   simulation for Districts 2 and 6, correct?

18        A.    Two and six, no.

19        Q.    Why not?

20        A.    Well, I started with the one and six

21   because that boundary is the largest change that

22   happened in the enacted plan when they -- you know,

23   compared to the benchmark plan.

24        Q.    And have you done any similar local

25   simulation for Districts 2 and 6?

Kosuke Imai, PhD                                   August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 123

1          A.    I don't think so.

2          Q.    How about for Districts 5 and 6?

3          A.    I don't think so.

4          Q.    And why not for Districts 5 and 6?

5          A.    Like I said, the largest change happened

6    in district boundary in between one and six so it

7    was natural for me to focus on that.

8          Q.    So we were talking a minute ago about how

9    the change in District 6's BVAP is the mirror image

10   of the change in District 1's BVAP?

11         A.    In this analysis?

12         Q.    In this analysis, correct.

13         A.    Right.

14         Q.    Okay.  So under your definition this

15   analysis cracks black voters out of District 6,

16   correct?

17         A.    Well, it depends on which black voters you

18   are looking at.  If you look at black voters in, you

19   know, Charleston, the City of Charleston, then the

20   enacted plan cracks it because they divided these

21   voters into Districts 1 and 6 and that's basically

22   my finding for that analysis.

23         Q.    In terms of -- I believe you said your

24   definition of cracking is voters being split --

25   black voters living in a certain area are split into

Kosuke Imai, PhD                                August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 124

1    separate districts; is that right?

2         A.    That's right.

3         Q.    So in your simulation plans black voters

4    living in certain areas are split between Districts

5    6 and 1, correct?

6         A.    Well, you -- if you give me a definition

7    of group of black voters who live in a certain

8    location I might be able to answer that question,

9    but without that definition it's...

10         Q.    Okay.  Well, take Charleston for example.

11         A.    Uh-huh.

12         Q.    You said the enacted plan cracks voters in

13    the City of Charleston but doesn't -- don't your

14    simulation plans do the same thing?

15         A.    I think more often the City of Charleston

16    as a whole is included in the same district under my

17    simulated plan.

18         Q.    But some simulated plans split the City of

19    Charleston.

20         A.    Oh, yeah, of course.  It's all statistical

21    so it's a question of how frequently that occurs.

22         Q.    And so those plans crack black voters,

23    correct?

24         A.    Well, I don't know whether there is such

25    simulated plans and it could exist and if they do,

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 125

1    they do but I don't know whether any of my simulated

2    plans have such, you know, specific split that you

3    describe.

4        Q.    But if the simulated plans do have that

5    split then they crack black voters, right?

6        A.    That particular plan does.

7        Q.    And similarly, if a simulated plan cracks

8    or splits North Charleston, for example, would that

9    also be cracking under your definition?

10       A.    If there is such a simulated plan then it

11   is but we need to look at the distribution of

12   simulated plans, not particular specific ones.

13   That's sort of the whole point of statistical

14   analysis is to look at the distribution as opposed

15   to specific simulated plans.

16       Q.    Right, but just conceptually speaking, a

17   simulated plan that splits a black community in a

18   defined location whether it's City of Charleston,

19   North Charleston or somewhere else --

20       A.    Uh-huh.

21       Q.    Cracks that black community under your

22   definition, right?

23       A.    Right, but the -- the use of the term,

24   cracked, does not have any legal meaning.  It just

25   means that the group of voters who living in a

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

                                               Page 126

1      certain geographical area are separated into two

2      districts.  So I just wanted to make sure that

3      that's clear.

4           Q.   Thank you.  Yeah, I think you said that

5      before.

6           A.   Okay, okay.

7           Q.   But thank you, I appreciate that.

8           A.   All right.

9           Q.   And there was not -- I didn't see anything

10     in this section of your report discussing whether

11     the simulated plans or how frequently the simulated

12     plans split the City of Charleston.  Is that in

13     here?

14          A.   I don't think so.  Yeah, I don't think so.

15          Q.   And similarly, it also doesn't include

16     that kind of statistic or statement for North

17     Charleston either I don't think; is that right?

18          A.   Yeah, I don't think so.

19          Q.   All right.  Now, let's turn to your --

20               MR. GORE:  Actually, go let's go off the

21     record for just a moment.

22               THE WITNESS:  Okay.

23                    (A recess was taken.)

24     BY MR. GORE:

25          Q.   All right.  Let's talk about your

Kosuke Imai, PhD                                    August 8, 2022

The South Carolina State Confvs.McMaster/Alexander

Page 127

1       Charleston County simulation.

2               A.    Okay.

3               Q.    Which starts on page 13.  And as I

4       understand it, this is similar to the first

5       simulation except with the further constraint that

6       the boundaries of Districts 1 and 6 are the same

7       except in Charleston County; is that right?

8               A.    That's right.

9               Q.    So you've frozen the enacted plan and all

10      you are looking at is the boundary between

11      Districts 1 and 6 in Charleston County; is that

12      correct?

13              A.    That's correct.

14              Q.    And let's see.  So pages 14 and 15 you

15      again have a couple of histograms here.

16              A.    Right.

17              Q.    That show Charleston County BVAP in

18      Figure 3; is that right?

19              A.    Uh-huh.

20              Q.    And again, the analysis here is total

21      number of black voters rather than BVAP percentage;

22      is that right?

23              A.    Right, although in Figure 2 it's

24      percentage.

25              Q.    Right.  And Figure 2 is a percentage for

Kosuke Imai, PhD                                              August 8, 2022

The South Carolina State Confvs.McMaster/Alexander

Page 128

1      District 1, correct?

2             A.    Right, and here it's the BVAP in

3      population who live in Charleston County.

4             Q.    All right.  So help me understand that

5      because I had an understanding of figure four, so is

6      figure four showing me something about Charleston

7      County or district one as a whole?

8             A.    Oh, this is among the black voters who

9      live in Charleston County how many of them are

10     assigned to District 1.

11            Q.    Okay.  I think I just confused us both.

12     Are you talking about Figure 3 or Figure 4?

13            A.    Figure 3.

14            Q.    Figure 3, okay.  Thank you.  Okay.  So

15     Figure 3 is just Charleston County and it's BVAP

16     total, not BVAP percentage, right?

17            A.    Right, that's right.

18            Q.    And again, in this simulation you didn't

19     control for which benchmark district a voter was in,

20     in the benchmark plan, correct?

21            A.    No.

22            Q.    And you also didn't control for which

23     district the black voters lived in, in the benchmark

24     plan, correct?

25            A.    No, I didn't use benchmark plan.

Kosuke Imai, PhD                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 129

1          Q.    And I believe in paragraph 32 you said the

2     difference on average, that District 1 has

3     approximately 24,900 black voters on average in your

4     simulation plans and that that's a difference of

5     9500 voters compared to the enacted plan; is that

6     right?

7          A.    Yeah, that's correct.

8          Q.    And 9500 voters, do you know what that

9     translates into in terms of District 1's BVAP

10    percentage?

11         A.    Oh, you just have to divide by the

12    population.

13         Q.    By the population, okay.  So if I told you

14    that I tried to do this math last night and I think

15    it's 1.3 percent, does that sound about right to

16    you?

17         A.    Yes, I suppose.  Yeah, it's more than

18    1 percent.  Yeah, that sounds right.  I trust you.

19         Q.    Okay.  Well, that's fine.  We'll -- you

20    can take my word for it, you don't have to agree

21    with me, but you have no reason to dispute that it

22    might be 1.3 percent?

23         A.    Right.

24         Q.    1.29 or whatever it rounds off to?

25         A.    Sure.

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 130

1          Q.   And so that would mean that under the
2     simulation plans the BVAP in District 1 is
3     1.3 percent higher on average but in District 6 it's
4     1.3 percent lower on average; is that right?
5          A.   Right, in the simulation analysis, that's
6     correct, yeah.
7          Q.   And have you done any effect of this
8     analysis on this 1.3 percent change in these two
9     districts' BVAP?
10         A.   No, I have not done any partisan analysis.
11         Q.   All right.  Let's go to page 26 in your
12    report.
13         A.   Twenty-six, okay.
14         Q.   I'd like to look at Figure 10.
15         A.   Okay.  Figure 10.  Okay.
16         Q.   As I understand it, Figure 10 shows the
17    Polsby-Popper compactness scores for the various
18    simulations and the enacted plan; is that right?
19         A.   Right, that's correct.
20         Q.   And on Polsby-Popper metric a higher
21    number means more compact, correct?
22         A.   That's correct, yeah.
23         Q.   So I want to look at the Charleston County
24    simulation table you have here in Figure 10 or a
25    histogram rather than a table.

Page 131

1        A.    Yeah.

2        Q.    So you froze all of the other district

3    boundaries in the enacted plan except for Charleston

4    County between one and six?

5        A.    Uh-huh.

6        Q.    It appears here that the enacted plan

7    performs better on average than the vast majority of

8    plans under the Charleston County simulation on the

9    Polsby-Popper; is that right?

10        A.    I wouldn't characterize it that way.  It

11    would be, it was in, you know, within statistical

12    differences.  It's not significantly different.

13        Q.    But the --

14        A.    They are essentially in the same range.

15        Q.    Okay.  But the majority of the simulated

16    plans on average are to the left of that line,

17    right?

18        A.    It looks like it but, again, I would not

19    take that difference, you know, to be statistically

20    meaningful and I would characterize it as they are

21    basic -- essentially in the same range.

22        Q.    And do you have any view on what accounts

23    for that difference?

24        A.    Can you clarify the question?

25        Q.    Well, I'm just curious, it's more for my

Kosuke Imai, PhD                                August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 132

 1    academic interest.

 2         A.   Uh-huh.

 3         Q.   You know, if there is something about the

 4    model that would explain this difference as to why

 5    the simulation --

 6         A.   Oh, I see.

 7         Q.   I mean, on average -- given the other

 8    constraints that you programmed and other things

 9    that you did.

10         A.   Yeah, I mean, compactness, you know, there

11    are different measures and each measure reflects

12    different aspects of geographical shape of districts

13    and, you know, the algorithm controls the fraction

14    of edges kept which is the one in Figure 11 so that

15    is the one that sort of much more closely related to

16    what algorithm does, just a mathematical

17    formulation.

18              And so Polsby-Popper is related to

19    that but not the same thing so, you know, I would

20    characterize the results on the Polsby-Popper to be

21    essentially in the same range, simulated plan and

22    enacted plan essentially the same.  For the fraction

23    of edges kept simulated plans is maybe a little bit

24    better but it's not that, you know, huge difference.

25    That would be my characterization.

Kosuke Imai, PhD                                            August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 133

1         Q.    Okay.  And just so I'm clear, this

2    histogram in Figure 10, the Charleston County

3    simulation average Polsby-Popper score, is that

4    showing the averages for Districts 1 and 6 or is

5    that showing the average for the whole plan?

6         A.    For Districts 1 and 6.

7         Q.    Okay, thank you.

8         A.    Oh, wait.  Actually, I don't recall so...

9         Q.    Okay.

10        A.    So either way, the other districts are

11   frozen so it won't affect the difference --

12        Q.    Right, okay.

13        A.    Between the two, yeah.

14        Q.    Yeah, so in relative terms it would be the

15   same, right?

16        A.    Yeah, yeah, that's right.  And that's what

17   matters is that, you know, the differences as

18   opposed to the number itself.

19        Q.    Other than Charleston County, are you

20   aware of any other counties that are split between

21   Districts 1 and 6 in the enacted plan?

22        A.    Yeah, I think I analyzed Richland and

23   Sumter in the statewide analysis.

24        Q.    Are those counties split between

25   Districts 1 and 6?

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 134

1        A.   Oh, one and six, I'm sorry.  I thought any
2   county that's split by District 6.  So I -- yeah, I
3   misunderstood your question.
4        Q.   Would you like me to rephrase it again?
5        A.   Yeah, yeah, yeah.
6        Q.   Yeah.  So other than Charleston County are
7   you aware of any other counties that are split
8   between District 1 and District 6 in the enacted
9   plan?
10       A.   Yeah, I know there are others.  I don't
11  recall exactly which one but...
12       Q.   And did you conduct a similar local
13  simulation analysis of any of those counties?
14       A.   Oh, no.
15       Q.   So you didn't do one for Dorchester
16  County; is that correct?
17       A.   No, I didn't do that.
18       Q.   Or Colleton County?
19       A.   No.
20       Q.   Or Jasper County?
21       A.   No.
22            MR. GORE:  So let's go off the record
23  again.
24                 (A recess was taken.)
25  BY MR. GORE:

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

                                                    Page 135

1        Q.   Dr. Imai, did you discuss your deposition

2    with anyone on the break?

3        A.   No.

4        Q.   All right.  Let's move to your statewide

5    simulation analysis with the VRA constraint.

6        A.   Okay.

7        Q.   And in the statewide simulation unlike the

8    local simulations you don't freeze any districts,

9    correct?

10       A.   That's correct.

11       Q.   And you add the additional criterion of

12   your VRA constraint, correct?

13       A.   Uh-huh, that's correct.

14       Q.   And that criterion was to keep the overall

15   BVAP proportion of District 6 between 45 percent and

16   50 percent, correct?

17       A.   That's right.

18       Q.   And in your simulation that district would

19   have been Congressman Clyburn's district since he is

20   the representative of District 6 in the enacted

21   plan, right?

22       A.   That's right.

23       Q.   And why did you add this criterion or

24   constraint?

25       A.   Oh, because in the statewide simulation as

Kosuke Imai, PhD                                      August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 136

1     we discussed the district boundary that's been

2     simulated is just between Districts 1 and 6 so as we

3     discussed, you know, the increase in BVAP in

4     District 1 would decrease the BVAP proportion of

5     District 6 because there is only two districts

6     that's being considered in the analysis.

7                    So I wanted to make sure that when,

8     you know, when this BVAP for District 6 is at the

9     certain level in enacted plan if that consideration

10    was incorporated in that simulation analysis my

11    results are still robust to that change.

12                   So by considering other districts it

13    allows me to keep the BVAP proportion of District 6

14    at the same level, you know, in comparison to the

15    two district analysis where increasing the BVAP in

16    District 1 would automatically just by construction

17    decreases the BVAP proportion of District 6.

18        Q.    And are you aware of whether the General

19    Assembly had a goal to keep District 6's BVAP

20    between 45 percent and 50 percent?

21        A.    No, I don't take into account for any

22    intent of General Assembly in my analysis.

23        Q.    And did -- was this 45 percent to

24    50 percent District 6 BVAP constraint anywhere in

25    the House or Senate Redistricting Guidelines?

Kosuke Imai, PhD                                        August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 137

1        A.    Not this specific number, no.

2        Q.    Okay.  How did you select this specific

3    number?

4        A.    Oh, just the same range as the one in the

5    enacted plan, which I think is 46-point some percent

6    so.

7        Q.    So you chose this range because it

8    approximately straddles the actual BVAP percentage

9    in enacted District 6?

10        A.    That's correct, yeah.

11        Q.    And do you believe that a district drawn

12    between 45 and 50 percent BVAP complies with the

13    Voting Rights Act?

14        A.    I'm not a lawyer so I can't -- I don't

15    have, you know, legal opinion on that.

16        Q.    Do you have a nonlegal opinion on that?

17            MR. CEPEDA:   Object to form.

18    BY MR. GORE:

19        Q.    Do you have any opinion on that?

20        A.    The question is legal so I have no opinion

21    on that legal question.

22        Q.    I followed up with nonlegal, but then I

23    said, do you have any opinion on that one way or the

24    other?

25        A.    Well, if the question is legal I don't

Kosuke Imai, PhD

August 8, 2022

The South Carolina State Confvs.McMaster/Alexander

Page 138

```
 1    have any opinion on that.
 2          Q.   All right.  Let's go back to page 26 of
 3    your report, paragraph 57.
 4          A.   Okay.  Wait, can you say page number
 5    again?
 6          Q.   I'm sorry, page 25.
 7          A.   Oh, 25.
 8          Q.   Page 25, paragraph 57.
 9          A.   Twenty-five, 57, okay.  All right.  Okay.
10          Q.   Okay.  So we are back to the strength of
11    the constraint?
12          A.   Uh-huh.
13          Q.   And then the statewide VRA simulation it
14    says:  A custom constraint that penalizes plans in
15    which District 6's BVAP is outside the range of 0.45
16    to 0.5, this constraint is given a strength of
17    eight.
18               Did I read that correctly?
19          A.   Yes.
20          Q.   So what does it mean to have a custom
21    constraint that penalizes certain plans?
22          A.   Oh, I see.  So the custom just means that
23    it's very specific to this particular analysis
24    because you are choosing a specific district,
25    District 6, and choosing a specific range of BVAP so
```

Kosuke Imai, PhD

The South Carolina State Conf vs. McMaster/Alexander

August 8, 2022

Page 139

1    that's all it means.  It's just a constraint but

2    it's sort of a specific constraint used for this

3    particular analysis as opposed to generic, you know,

4    constraint such as compactness or county splits.

5                   And again, the strength of it is all

6    relative so eight itself doesn't really mean

7    anything and it's basically there to ensure that,

8    you know, most of the simulated plan don't have BVAP

9    of District 6 going outside of that range.

10        Q.   Is that a hierarchical constraint or a

11   soft constraint?

12        A.   No, that's a soft constraint.

13        Q.   So within your final set of 10,000

14   statewide VRA simulation plans, do any place

15   District 6 BVAP outside of that range?

16        A.   So again, similar to the incumbency

17   pairing, there are sometimes that went below

18   45 percent, a very small number, but that was

19   removed from the final 10,000 simulation plans.

20        Q.   Similarly, were there any that went above

21   50 percent?

22        A.   I don't think so although I don't recall

23   the detail, but I don't think so.  It tends to be

24   lower.

25        Q.   So would you agree that keeping the

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

                                        Page 140

1    overall BVAP proportion of District 6 between 45 and

2    50 percent was a significant factor in the statewide

3    simulation plans?

4          A.    Can you clarify what you mean by

5    significant factor?

6          Q.    Yeah.  I mean, well, I want to know if

7    it's a significant factor.  Was it a determinant as

8    to --

9                      Well, first of all, it sounds like

10   every plan in your set of 10,000 satisfies that

11   criteria, correct?

12         A.    Right, right.

13         Q.    And any plan that didn't satisfy that

14   criterion is excluded from your set of 10,000

15   statewide simulation plans; is that right?

16         A.    That's right.  That's right.

17         Q.    So no plan outside of that range could

18   have been included in your set of 10,000 simulation

19   plans, correct?

20         A.    That's correct.

21         Q.    So you within your analysis didn't

22   compromise on that factor, correct?

23         A.    That's right.  Compromise meaning -- yeah,

24   that's correct, that constraint was imposed.

25         Q.    And I believe your report says that race

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 141

1    is a significant factor in the enacted plan.  And so

2    isn't it also true that this criterion is a

3    significant factor in your statewide simulation?

4              MR. CEPEDA:  Object to form.

5              THE WITNESS:  Right.  So my conclusion of

6    the report says for the statewide simulation

7    analysis race was a significant factor beyond the

8    purpose of, you know, keeping this District 6's BVAP

9    in that range.

10             So the finding that I observed, basically

11   the difference between enacted plan and simulated

12   plan in terms of racial, you konw, factors that

13   cannot be explained by the possibility of keeping

14   District 6 BVAP in this range, that's what I mean.

15   So that's the purpose of the statewide analysis is

16   to see what I found in the local analysis can be

17   explained by the fact that perhaps District 6's BVAP

18   had to be higher because in the localized analysis,

19   you know, if the BVAP increases in District 1

20   automatically that will reduce the BVAP of

21   District 6.

22             But in the statewide simulation that's not

23   necessarily the case because I'll make sure that the

24   District 6 BVAP is kept in the same range as the one

25   in the enacted plan.  So then the question is, if I

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 142

1       keep -- place that constraint, do I still observe

2       race being -- playing a significant role in

3       determining district boundaries between one and six

4       and then elsewhere.

5            Q.   But in terms -- I'm asking about how the

6       simulation plans are drawn?

7            A.   Uh-huh.

8            Q.   What you described to me makes it sound

9       like this BVAP range in District 6 was a significant

10      factor in how those plans were drawn, correct?

11           A.   It is a significant constraint in the

12      sense that if I don't have that particular

13      constraint the results would have been different,

14      but my conclusion basically says even if you place

15      that constraint the race played a significant role

16      beyond that particular constraint.

17           Q.   Well, and isn't it also a significant

18      constraint because any plan that didn't satisfy that

19      constraint was excluded from your set of 10,000

20      plans, right?

21           A.   That's right.  So if I don't impose this

22      particular constraint the results would have been

23      different sometimes the order -- the analysis be

24      incorporated and so on.

25           Q.   And so this VRA -- satisfying the VRA

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

                                                Page 143

1      constraint was the price of admission for a plan to

2      be part of your 10,000 plans in the simulation set,

3      right?

4           A.   What do you mean by the price of

5      admission?

6                MR. CEPEDA:  Object to form.

7      BY MR. GORE:

8           Q.   That's a colloquialism.  But let me just

9      say it this way.  Only plans that satisfied that

10     criterion were included in your set of 10,000,

11     correct?

12          A.   That's correct.

13          Q.   Okay.

14          A.   But there are plans that may satisfy that

15     constraint but still were excluded for other

16     reasons.

17          Q.   Sure, because you have other constraints

18     programmed?

19          A.   Yeah, other constraints, yeah, okay.  I

20     just wanted to make sure.

21          Q.   I think I understand now.

22          A.   That's not the only -- that's not the --

23     like, you know, constraint that dominates everything

24     else.

25          Q.   Did you examine whether race was a

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 144

1      significant factor in any of your statewide

2      simulation plans?

3           A.   Can you repeat that question again?

4           Q.   Sure.  Did you consider or examine whether

5      race was a significant factor in any of your

6      statewide simulation plans?

7           A.   Right, that's what I did.

8           Q.   Well, help me understand that a little

9      bit.  I think that you said that you considered --

10     you used the simulation plan to determine whether

11     the enact -- race was a significant factor in the

12     enacted plan?

13          A.   Oh, simulated plan.

14          Q.   Between the simulated plans did you look

15     at any of those plans to determine whether race was

16     a significant factor in any of those plans?

17          A.   Okay.  I use the simulated plan to

18     evaluate the enacted plan, not the other way around

19     so...

20          Q.   Right.  But did you compare any simulated

21     plan to the set of simulated plans to determine

22     whether any of those plans --

23          A.   Oh, no, I did not evaluate the simulated

24     plans.

25          Q.   Okay.  And did you conduct any of that

Kosuke Imai, PhD                              August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

                                              Page 145

1    kind of analysis with respect to any of the plans

2    submitted by members of the public?

3         A.    No.

4         Q.    So you didn't do it for the NAACP Plan

5    One?

6         A.    No.

7         Q.    Or Plan Two?

8         A.    I don't even know what these plans are

9    so...

10        Q.    Okay.

11        A.    Yeah.

12        Q.    You didn't do it for the League of Women

13   Voters' plan?

14        A.    No.

15        Q.    Or Harpootlian plan?

16        A.    No.

17        Q.    All right.  Let's flip back to pages --

18   maybe start around page 15.

19        A.    Okay.

20        Q.    In the statewide simulation here.

21        A.    Okay, 15.  Okay, hold on.

22        Q.    Starting on page -- paragraph 35.

23        A.    Okay.

24        Q.    So here, again, you are analyzing the

25   district boundary in Charleston County, correct?

Kosuke Imai, PhD                                                  August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 146

1        A.    That's right.

2        Q.    And that's -- the district boundary

3    running through there is Districts 1 and 6, correct?

4        A.    Uh-huh, that's right.

5        Q.    And it says here -- so again, in this

6    analysis -- let's flip over to Figure 5.

7        A.    Yeah.

8        Q.    Okay.  And Figure 5 you have again the

9    cool colored chart that shows the likelihood of a

10   VTD or precinct being placed in District 1; is that

11   right?

12       A.    That's correct.

13       Q.    And again, this is the total number -- do

14   you have -- do you show -- I guess you don't show

15   anything about BVAP here, right?  This is just

16   likelihood of being placed in District 1; is that

17   right?

18       A.    That's correct.

19       Q.    And again, we are seeing that in your

20   model Nancy Mace's portion of Berkeley is being

21   placed very frequently with City of Charleston or a

22   large swath of Charleston County; is that right?

23       A.    Again, I don't have a precise location of

24   her region so I think that's probably right.

25       Q.    Okay.  And again, in this analysis you

Kosuke Imai, PhD                                    August 8, 2022

The South Carolina State Confvs.McMaster/Alexander

Page 147

1    didn't control for which district the VTD was in the

2    benchmark plan, correct?

3         A.    Right, I did not use benchmark plan.

4         Q.    Now, I think in paragraph 35 you say:  On

5    average the BVAP proportion of District 1 under the

6    enacted plan is 6.5 percentage points, 4.5 standard

7    deviations of the simulated distribution lower than

8    the corresponding number under the simulated plans.

9         A.    Uh-huh.

10        Q.    Did I read that correctly?

11        A.    Yes.

12        Q.    So where -- in the simulated plans where

13   is that 6.5 percentage points on average coming

14   from?

15        A.    Yeah, I think my guess, again, I don't

16   have exact numbers but, you know, it's from the City

17   of Charleston and perhaps North Charleston.

18        Q.    And so when it's being moved into

19   District 1 or placed in District 1 under your

20   simulation plans it's necessarily being placed

21   outside of other districts, right?

22        A.    Right.

23        Q.    So it may be coming from District 6, maybe

24   in some of the plans it's coming from District 7

25   even; is that possible?

Page 148

1         A.    That's possible.  Probably from, you know,

2    District 6 in this case.

3         Q.    Yeah, but probably District 6 because

4    District 6 has black voters and District 7 doesn't

5    have as many, right?

6         A.    Right.  That's correct and also District 6

7    is the part that will be, you know, assigned with

8    high probability to District 1 in the Charleston

9    County area.

10        Q.    And so again, in your simulation,

11   statewide simulation --

12        A.    Uh-huh.

13        Q.    Those plans also may crack black voters

14   when they split communities where black voters live

15   just like you localized simulations we discussed

16   before, correct?

17             MR. CEPEDA:  Objection; mischaracterizes

18   testimony.

19             THE WITNESS:  What do you mean by those

20   plans?  The simulated plans?

21   BY MR. GORE:

22        Q.    Yeah, so I think earlier we talked about

23   your definition of cracking.

24        A.    Uh-huh.

25        Q.    And how in changing the line between

Page 149

1    District 1 and District 6 various black communities

2    could be cracked in any individual simulation plan?

3             MR. CEPEDA:  Object to form.

4    BY MR. GORE:

5        Q.   Do you recall that?

6             MR. CEPEDA:  Object to form.

7             THE WITNESS:  It's not any individual --

8    it's just a description of how the district

9    boundary, you know, runs through a specific group of

10   voters who live in the same area.

11   BY MR. GORE:

12       Q.   Right.  And yeah, so I'm using your -- I'm

13   trying to use your definition of cracking.

14       A.   Okay.

15       Q.   And I think you said that the enacted plan

16   cracks black voters between Districts 1 and 6?

17       A.   Uh-huh.

18       Q.   Because of how the line runs through

19   Charleston or may or may not run through Charleston,

20   correct?

21       A.   Right, right.

22       Q.   And some of the simulation plans also may

23   crack black voters because of how the lines run

24   through certain communities, correct?

25       A.   Right, but my finding is that the

Kosuke Imai, PhD                                            August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 150

1    simulated plan tend to keep those black voters who
2    are, you know, cracked by enacted plan tend to keep
3    them together.
4            Q.    Correct, but they could possibly -- it
5    could possibly -- the simulation plans could crack
6    that community of black voters or some other
7    community of black voters somewhere else, correct?
8            A.    It's possible but unless you tell me which
9    area of black voters, I cannot tell whether the
10   simulated plan or enacted plan cracks that community
11   of voters.
12           Q.    And did you review any of the public
13   testimony or comment in the legislative record for
14   this plan?
15           A.    No.
16           Q.    And did you review any statements by
17   legislators?
18           A.    No.
19           Q.    So paragraph 36 says:  The way in which
20   the enacted plan splits Charleston County by
21   displaying a disproportionately large number of
22   black voters into District 6 is highly unusual in
23   comparison to the simulated plans.  Is that right?
24           A.    Uh-huh, that's correct.
25           Q.    And it seems like a further explanation

Kosuke Imai, PhD                              August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 151

1      concerns the placement of the City of North

2      Charleston; is that correct?

3             A.    Yeah, that's one.

4             Q.    So if a simulation plan split Charleston

5      County or North Charleston in a way that affected

6      where black voters were placed that plan would also

7      crack voters, correct?

8             A.    Right, but my finding is that simulated

9      plan tends to keep them together in one district.

10            Q.    So let's go to Figure 6 on page 17.

11            A.    Right.

12            Q.    And will you explain to me what Figure 6

13     is showing?

14            A.    So Figure 6 shows that a number of, you

15     know, the black voting age population who lives in

16     Charleston County were assigned to District 1.

17     Under the simulated plan which is the bar and the

18     enacted plan which is the vertical line.

19            Q.    And so the difference between the enacted

20     plan and any of the simulated plans is the

21     difference between the line for the enacted plan and

22     the bar or whatever for the simulated plan, correct?

23            A.    That's right, that's correct.

24            Q.    And so in the simulation where are those

25     extra black voters coming from?

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 152

1          A.    Well, these are all black voters who live
2     in Charleston County.
3          Q.    Okay.  And so they otherwise are being
4     placed in District 6?
5          A.    Right, the ones -- that's probably right
6     although I haven't, you know, examined every
7     simulated plan.
8          Q.    And so these black voters are being placed
9     in District 1 and not in District 6 or some other
10    district, correct?
11         A.    Right, so this shows the black voters who
12    are assigned to District 1 on the simulated plan.
13         Q.    Okay.  And did you generate a similar
14    histogram for what happens with black voters in
15    District 6?
16         A.    Black voters in Charleston County or black
17    voters in general?
18         Q.    How about Charleston County since that's
19    what you have here in Figure 6?
20         A.    Yeah, I didn't create that because in most
21    simulated plans the rest of the black voters who
22    live in Charleston County would be placed in
23    District 6, I think.
24         Q.    Okay.  So at least with respect to most of
25    the simulation plans the enacted plans places more

Page 153

1    black voters from Charleston County in District 6

2    than the simulation plan, correct?

3        A.   I think that's right.  Although, you know,

4    again, it's possible that some other districts come

5    in play and I have not checked every -- every

6    district to make sure that's, you know, that's --

7    how often that happens.

8        Q.   But each district in your simulation plan

9    is constrained to some extent by where the incumbent

10   lives, correct?

11       A.   Oh, yes, because I tried to avoid the

12   incumbent pairing so that's right.

13       Q.   So for another district to move into

14   Charleston your simulation plan would have to

15   somehow still be contiguous ultimately?

16       A.   That's right.

17       Q.   To the precinct where in incumbent

18   resides, right?

19       A.   Yeah, I think for any simulated plan for

20   District 6 it would be definitely in play and maybe

21   additional districts like District 7 may also play

22   on the eastern side but most likely it would be

23   District 6.

24       Q.   And given that it's most likely that the

25   enacted plan places more black voters in District 6

Page 154

1    than the simulation plans, right, in Charleston

2    County?

3         A.    Oh, in Charleston County, yes, because you

4    know, that's just -- there is a fixed number of

5    black voters in Charleston County and if there are

6    more in District 1 than there is in the rest of the

7    other districts.

8         Q.    And so paragraph 37 --

9         A.    Uh-huh.

10        Q.    You say there is a sentence that begins,

11   in fact:  In fact, a large spike around 74,600

12   implies a vast majority of simulated plans,

13   76.3 percent assigned the entire county to

14   District 1.

15              Did I read that correctly?

16        A.    Yeah, that's correct.

17        Q.    Do you know whether Charleston County was

18   split in the benchmark plan?

19        A.    Oh, in the benchmark plan.  In the enacted

20   plan it was but I don't know the benchmark plan.

21        Q.    And if a map drawer preferred to keep

22   Charleston County split he would have rejected plans

23   that made it whole in District 1, correct?

24        A.    Again, I don't have any opinion on how or

25   why map drawer made certain decisions.

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 155

1         Q.   And again, you didn't review any public
2    testimony, comment or legislative testimony about
3    splitting or repairing the split in Charleston
4    County, correct?
5         A.   No.
6         Q.   And did you analyze the political effect
7    of placing all of Charleston County in District 1
8    with Nancy Mace?
9         A.   I did not use any partisan data in my
10   analysis.
11        Q.   And did you analyze what changes to the
12   map would have been required in other parts of the
13   state if all the Charleston was placed in
14   District 1?
15        A.   Can you repeat the question again?  Sorry.
16        Q.   Sure.  So if you -- Charleston County, if
17   you place Charleston County in District 1?
18        A.   Uh-huh.
19        Q.   In the enacted plan, you would have to
20   make changes to other districts in order to equalize
21   population, correct?
22        A.   That's correct.
23        Q.   All right.  And did you do any analysis of
24   that other than to recognize if that's true?
25        A.   Yeah, that's true but I didn't do any

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 156

1    specific analysis with -- regarding that particular

2    point.

3        Q.    Now, your statewide simulation analysis

4    with respect to District 1 and District 6 you have

5    this discussion of Charleston County, right?

6        A.    Uh-huh.

7        Q.    Did you also examine in your statewide

8    simulation analysis Dorchester County?

9        A.    No.

10       Q.    How about Colleton County?

11       A.    No.

12       Q.    Or Jasper County?

13       A.    No.

14       Q.    Okay.  Why did you not examine Dorchester

15   County?

16       A.    Well, so my -- you know, analysis, the

17   entire analysis for this report started with

18   examining, you know, District 1 and 6, that's the

19   first part of the analysis District 1 and 6

20   boundaries and what I found there is that it's

21   Charleston County where I see the largest difference

22   in terms of the role that the race played between

23   the simulated plan and enacted plan.

24              And so what I wanted to then do is,

25   you know, that is really the start of the analysis.

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 157

1    And the other two analyses, the second race analysis

2    and statewide analysis, is to make sure that the

3    results are robust to other factors.

4                    So for the second race run analysis I

5    wanted to make sure that it was actually the

6    Charleston, the way Charleston County was split, not

7    necessarily, you know, other parts of Districts 1

8    and 6 so that's why I froze the other parts of the

9    Districts 1 and 6.

10                   And for this analysis I wanted to

11   make sure that it wasn't due to this particular

12   constraint about keeping the BVAP proportion for

13   District 6 at a certain level so each of these

14   analyses sort of tried to look at the robustness of

15   the initial analysis that I conducted where I show

16   that there are just differences coming from

17   District 1 and District 6 boundaries.

18        Q.   And do you know one way or the other

19   whether Dorchester, Colleton and Jasper are split

20   between Districts 1 and District 6 in the enacted

21   plan?

22        A.   I don't recall which other counties are

23   being split.

24        Q.   Let's turn to page 18 of your report.

25        A.   Okay.

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 158

1          Q.    And we'll discuss the line here in

2    Richland County.

3          A.    Uh-huh.

4          Q.    Between District 2 and District 6.

5          A.    Sure.

6          Q.    First of all, do you know whether Richland

7    County was split in the benchmark plan?

8          A.    Yes, you can see it's -- oh, in the

9    benchmark plan I don't know.  In the enacted plan

10   they are split.

11         Q.    And you see the -- if we look at Figure 7.

12         A.    Right.

13         Q.    District 2 and District 6 are shown here

14   with a line in what appears to be Richland County;

15   is that correct?

16         A.    Yeah, Richland County is demarked by the

17   gray, thick line there.

18         Q.    And are you aware of any explanations for

19   the shape of the boundary between Districts 2 and 6

20   in Richland County?

21         A.    No.

22         Q.    And again, you have not reviewed the

23   public record of the legislative record on that,

24   have you?

25         A.    No.

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 159

1          Q.    So let's go to paragraph 40.

2          A.    Okay.

3          Q.    I believe it's actually on page 19.

4          A.    Okay.

5          Q.    You start:  In fact, 39.4 percent of the

6     simulated plans did not split Richland County at all

7     and all the simulated plans assign the entire county

8     to District 6.

9                Did I read that correctly?

10         A.    That's correct.

11         Q.    And if a map drawer would have preferred

12    to keep Richland County split, he would have

13    rejected plans that make it whole in District 2,

14    correct?

15         A.    That's right.  Although I don't know what,

16    you know, the map drawer considered.

17         Q.    And did you analyze the political effect

18    of placing all of Richland County in District 6?

19         A.    No, I didn't use partisan information if

20    that's what you mean by political.

21         Q.    Thank you.  Or any election result

22    information?

23         A.    No.

24         Q.    All right.  So page 19 contains Figure 8?

25         A.    Uh-huh.

Kosuke Imai, PhD                                      August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 160

1        Q.    Would you explain to me what Figure 8 is

2    about?

3        A.    Right, so this is similar to the previous

4    figure where I look at, you know, among the black

5    voting age population who live in Richland County

6    how many of them are assigned to District 2.

7        Q.    And is this a total number of black voting

8    age population or percentage?

9        A.    Yes, that's right.  And this is among the

10   plans that split into Districts 2 and 6 so it does

11   not include the one that assigned the entire county

12   to the district.

13       Q.    Okay.

14       A.    So it's focused on the subset.

15       Q.    And so according to this, this shows that

16   district -- that the enacted District 2 places more

17   individuals of black voting age -- black individuals

18   of voting age from Richland County in District 2

19   then the average statewide simulation plan that also

20   splits Richland between Districts 2 and 6, correct?

21       A.    That's right, that's right.

22       Q.    So what would a histogram of District 6,

23   the corresponding histogram of District 6 look like

24   to Figure 8?

25       A.    Oh, I see.  Well, as I said, you know,

Kosuke Imai, PhD                                    August 8, 2022

The South Carolina State Confvs.McMaster/Alexander

Page 161

1    40 percent, about 40 percent of the simulated plans

2    assigned the entire Richland County to District 6

3    so, you know, it -- in that case, you know, all the

4    BVAP population would be in District 6 and even in

5    the cases where the simulated plans split Richland

6    County, they assigned, you know, much fewer BVAP to

7    District 2, excuse me, than the enacted plan.  So

8    yeah, I think a lot of Richland County BVAP would be

9    in Richland County, in District 6.

10        Q.    District 6?

11        A.    Yeah.

12        Q.    So if I can just summarize that.

13        A.    Yeah.

14        Q.    The simulation plans assigned lower BVAP

15   to District 2 but higher BVAP to District 6 compared

16   to the enacted districts in those simulation plans

17   that split Richland County between Districts 2 and

18   6; is that correct?

19        A.    That's correct, that's exactly right.

20        Q.    And if we were to show that as a histogram

21   to District 6 it would be the mirror image of what

22   we see here in Figure 8 accounting for small

23   population variations in your model?

24        A.    That's probably right.  Except I don't

25   know how often the other districts are split but my

Kosuke Imai, PhD

The South Carolina State Conf vs. McMaster/Alexander

August 8, 2022

Page 162

1    sense is that most of the simulated plans involve

2    Districts 2 and 6 for this county so that's probably

3    correct although I don't have, you know, exact

4    numbers with me.

5         Q.   Well, I'm glad you raise that because I

6    think paragraph 40 says that 39.4 percent of the

7    simulated plans don't split Richland at all?

8         A.   Right, right.  So in that case all --

9         Q.   So in that case -- right, and then

10   paragraph 41 says:  23.9 percent of simulated plans

11   divide Richland into two and six?

12        A.   Right, so there are some.

13        Q.   Yeah, and so I understood Figure 8 to

14   relate only to that 23.9 percent referenced in

15   paragraph 41, right?

16        A.   That's exactly right.  That's why it's

17   2388 plans.

18        Q.   I've got it.

19        A.   Yeah.  So there are some districts --

20   sorry, there are some simulated plans that would

21   involve some other districts.

22        Q.   So there is a third category of simulated

23   plans that split Richland between two districts but

24   not two and six?

25        A.   Or three and six.  Possibly three and six.

Page 163

1      Yeah, I don't know, yeah.

2              Q.    Yeah, you just don't know?

3              A.    Right.

4              Q.    But that's a category?

5              A.    Yeah, yeah.

6              Q.    But at least the 23.9 percent split

7      between two and six?

8              A.    That's right.

9              Q.    We have Figure -- so we have Figure 8 for

10     the District 2 BVAP and the District 6 BVAP would be

11     the mirror image of that simply control for

12     population variation that your model tolerates,

13     right?

14             A.    That's right.  For this subset, yes.

15             Q.    For this 23.9 percent subset?

16             A.    That's right.  That's right.

17             Q.    Okay.  Now, you mind flipping back to

18     page 15, Figure 4?

19             A.    Okay.

20             Q.    So when you are discussing in your

21     statewide simulation the line between District 1 and

22     6 in Charleston you provided us this BVAP proportion

23     table, the histogram?

24             A.    Uh-huh.

25             Q.    But I didn't see a similar BVAP proportion

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 164

1    histogram for any district in your discussion of

2    Richland County, so back on pages 18 or 19 --

3         A.    Uh-huh.

4         Q.    There wasn't the same kind of histogram.

5         A.    Of this district you are talking about?

6         Q.    For District 2 or District 6.

7         A.    Oh, I see.  Well, District 6 BVAP

8    proportion is constrained to between 45 and 50 so

9    that's not, you know, that's just by design

10   constrained.  District 2, yeah, I don't show BVAP

11   proportion.

12        Q.    Is there a reason for that?

13        A.    Because here I'm just focusing on how

14   unusual it is -- just like for this case how unusual

15   it is to split this particular county in a certain

16   way.

17        Q.    And have you examined District 2's BVAP in

18   your statewide simulation plans?

19        A.    No, because that's not the goal of this

20   particular analysis here.

21        Q.    And have you examined whether your

22   statewide simulation plans or any particular

23   statewide simulation plan cracks black voters in

24   Richland County?

25        A.    Can you repeat that question again, sorry.

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 165

1          Q.    Sure.  Using your definition of cracking?

2          A.    Uh-huh.

3          Q.    Have you examined whether any of your

4    statewide simulation plans crack black voters in

5    Richland County?

6               MR. CEPEDA:  Object to form.

7               THE WITNESS:  I mean, compared to the

8    enacted plan, the simulated plan tends to keep them

9    together.  Like for example, like 40 percent of them

10   keep all the counties together in the same district

11   so that's -- there is no split at all.  And even in

12   other 26.9 percent of the cases, you know, they tend

13   to -- most of the BVAP population tend to be on

14   District 6 so that's what this is showing with

15   respect to the cracking of black voters in Richland

16   County.

17   BY MR. GORE:

18         Q.    And is it possible as we discussed before

19   that the simulation plan cracks black voters in

20   Richland County with how it draws the district line

21   through that county and through a black community?

22               MR. CEPEDA:  Object to form.

23               THE WITNESS:  Are you talking about the

24   remainder of the simulated plans beyond the

25   40 percent and 24 percent of them or are you --

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 166

BY MR. GORE:

     Q.   Or even the 24 percent.  I mean, I take it
that there is a 39.4 percent that doesn't crack in
Richland at all.

     A.   Right, that's right.

     Q.   But I'm just asking and I think you've
answered this a few times now and I don't mean to
belabor the point, but more broadly speaking under
your definition of cracking, cracking is simply
splitting a community of black voters into more than
one district, correct?

     A.   Right, but there is a different degree of
cracking, right, you know, what's the percentage or
what's the, you know -- like it's one thing to split
a community into two districts by taking one person
out of that community but it's another thing to
split the community into say two halves.

     Q.   And where in your report do you discuss
the degree of cracking?

     A.   So this Richland County BVAP basically
shows that, like this analysis shows, that say
40 percent of the cases they are in, you know,
basically 100 percent is in one district and even in
the 33.9 percent of the case that there are a lot
fewer BVAP being assigned to District 2.  A lot of

Page 167

1    them very close to zero so that means that most of

2    them, most of the black voters would be in

3    District 6 and those -- that would spike that's

4    almost accounting for 50 percent out of that

5    24 percent.

6         Q.   And at the same time in Figure 8 there is

7    some simulation plans that place more black voters

8    from Richland in District 2 than the enacted plan,

9    correct?

10        A.   Right.  So this is statistics knowledge,

11   this you really want to look at the distribution of,

12   you know, simulated plans as opposed to focusing on

13   one and two specific simulated plans.

14        Q.   And --

15        A.   And that's the goal of the analysis, the

16   statistics analysis.

17        Q.   Let's step back from Richland County for a

18   moment.  I want to ask just a more global

19   question --

20        A.   Sure.

21        Q.   About the simulation.  Is it possible that

22   plans in your statewide simulation crack black

23   voters by splitting their communities into more than

24   one district?

25        A.   It depends on the community.  So I don't

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 168

1      know unless you specify specific communities I won't

2      know whether simulated plan would split that

3      community.

4              Q.   But you didn't program the simulation, for

5      example, with a constraint against splitting black

6      communities, did you?

7              A.   No but to the extent that, you know,

8      keeping the BVAP proportion of District 6 to be in

9      certain race that definitely encourages certain

10     number of black voters to be placed in District 6 to

11     the extent that I try to, you know, reduce the

12     number of county splits, municipalities splits and

13     depending on how the black voters are, you know,

14     there are geographical distribution that may have an

15     impact on whether those communities are being split

16     and if they are how.

17             Q.   So in the enacted plan are there any other

18     counties that are split between Districts 2 and 6

19     other than Richland?

20             A.   Oh, yeah, I'm sure there are.  Yeah, I

21     don't recall exactly what those counties are.

22             Q.   Okay.  Did you analyze the district

23     boundary between Districts 2 and 6 in Orangeburg

24     County?

25             A.   I don't think so.

Kosuke Imai, PhD                              August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 169

1        Q.   And why not?

2        A.   I don't recall the reason.  I mean, the

3    draft report may have included.  Again, I don't

4    recall, you know, whether I did it or whether that

5    was included in the draft reports or, you know, if I

6    didn't do it why I didn't do it.  I don't -- I don't

7    recall.

8        Q.   Let's move to your analysis of Sumter

9    County.

10       A.   Okay.

11       Q.   Which is split between Districts 5 and 6

12   of the enacted plan; is that correct?

13       A.   Yes, that's correct.

14       Q.   And do you know why Sumter -- well, first

15   of all, do you know whether Sumter was split in the

16   benchmark plan?

17       A.   No, I don't know.

18       Q.   And do you know why Sumter was kept split

19   in the enacted plan?

20       A.   No, I don't know.

21       Q.   Paragraph 43 --

22       A.   Uh-huh.

23       Q.   And Table One shows that 90.3 percent of

24   simulated plans make Sumter whole and place it in

25   District 6; is that correct?

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 170

1          A.    Yes, that's correct.

2          Q.    And if a map drawer preferred to keep a

3    portion of Sumter County in District 5 he would have

4    rejected all of those plans, correct?

5          A.    Right.  Although I didn't consider the map

6    drawers in my analysis.

7          Q.    And you also didn't consider any public

8    testimony or comment or the legislative record on

9    this split, did you?

10         A.    No, I didn't.

11         Q.    And did you analyze the political effect

12   of placing all of Sumter County in District 6?

13         A.    No, I didn't use partisan information or

14   election results.

15         Q.    And here when you are discussing Sumter

16   County you didn't include any histogram showing BVAP

17   numbers or BVAP proportions?

18         A.    Uh-huh.

19         Q.    What is the number of black individuals of

20   voting age implicated by the split in Sumter County,

21   do you know?

22         A.    Oh, I don't know off the top of my head,

23   but I didn't include them because, you know,

24   90 percent of the whole county is in District 6 so

25   it's obvious that simulated plan keep those people

Kosuke Imai, PhD

August 8, 2022

The South Carolina State Confvs.McMaster/Alexander

Page 171

1    together most of the time.

2        Q.    And did you analyze the effect of keeping,

3    placing Sumter County whole in District 6 on any

4    district's BVAP proportion or total BVAP?

5        A.    Oh, how that affects the BVAP proportion

6    of other districts?

7        Q.    Or any district.

8        A.    Okay.  I didn't do that.  I didn't look at

9    that.

10       Q.    All right.

11       A.    Although by construction, again, the

12   District 6 will maintain that specified level of

13   BVAP proportion so I know that it does not affect

14   the BVAP proportion of District 6.

15       Q.    And within your model District 6 could

16   have a range of BVAP between 45 and 50 percent,

17   right?

18       A.    That's correct, yeah.

19       Q.    And so if District 6's BVAP in the

20   simulation plan is 50 percent that means accordingly

21   that there is 3 percent less BVAP for other

22   districts, correct?

23            MR. CEPEDA:  Object to form.

24            THE WITNESS:  3 percent of the District 6

25   population, right.

Kosuke Imai, PhD

August 8, 2022

The South Carolina State Conf vs. McMaster/Alexander

Page 172

1    BY MR. GORE:

2        Q.    So in the --

3        A.    Come from other districts, is that what

4    you mean?

5        Q.    Yeah, so in the enacted plan District 6

6    BVAP is I think 46.9 percent; does that sound about

7    right?

8        A.    I trust you.

9        Q.    Okay.  Let's just for -- and this is just

10   a conceptual point so the numbers are not as

11   important, but a simulated plan with a 49.9 percent

12   BVAP means that that's 3 percent higher than the

13   enacted plan, correct?

14       A.    Uh-huh.

15       Q.    And that 3 percent is being drawn from

16   other districts other than District 6, correct?

17       A.    That's correct but we should also remember

18   that ranges go from 45 to 50 and there are more

19   districts, there are more simulated plans that are

20   on the lower end so I had to remove some of the

21   plans that don't reach, excuse me, don't reach the

22   45 percent and so there may be a district that has

23   BVAP of, you know, close to 50 percent for

24   District 6 and in a simulated plan, there is also a

25   lot of plans that are closer to the BVAP proportion

Kosuke Imai, PhD                              August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 173

 1    for District 6 that is closer to 45 percent and less
 2    than enacted plan number.
 3         Q.   And do you know the average BVAP
 4    proportion for your 10,000 plans in the statewide
 5    VRA simulation?
 6         A.   I don't recall.
 7         Q.   All right.  I'm going to mark a new
 8    exhibit.
 9         A.   Okay.
10         Q.   It's tab eight in your zip file.
11         A.   Yeah.
12         Q.   I'm going to mark it as Exhibit Eight.
13              (Defendant's Exhibit No. 8, REBUTTAL REPORT
14    OF SEAN P. TRENDE, was marked for identification.)
15              THE WITNESS:  This is the rebuttal.
16    BY MR. GORE:
17         Q.   Yes.  It's the rebuttal report by
18    Mr. Trende?
19         A.   Yes.
20         Q.   Dr. Imai, do you recognize this document?
21         A.   Yes, I was given this document by counsel.
22         Q.   And when were you given it by counsel?
23         A.   Oh, I don't recall the exact date.  I
24    think it's very recent.  Maybe two weeks ago or
25    something along those lines, but yeah, I don't

Page 174

1    recall exact date.

2         Q.    Okay.  But it was -- I believe the date of

3    this report is, I'll scroll to the last page,

4    May 4th?

5         A.    May 4th, okay.

6         Q.    So you don't recall receiving it in May

7    2022 it sounds like?

8         A.    Yeah, I just -- like I think it was two or

9    three weeks ago when counsel sent me as a part of

10   the exhibits.  I didn't remember and so that doesn't

11   necessarily mean I didn't have it, but I just don't

12   pay attention, I guess, if I had it.

13        Q.    Okay.  And you've not offered an opinion

14   on any of Mr. Trende's analysis in this case,

15   correct?

16        A.    No, I didn't.  I did not.

17        Q.    And you have not offered an opinion on any

18   of his analysis in his rebuttal report?

19        A.    No, I did not and I also wasn't asked

20   so...

21        Q.    Okay.  And did you attempt to recreate the

22   numbers that Mr. Trende or the statistics that

23   Mr. Trende provides in his rebuttal report?

24        A.    No, I did not attempt.

25        Q.    And at this point do you plan to do so?

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

                                                    Page 175

1          A.   I don't think so.

2          Q.   Okay.  And as you sit here today, do you

3     dispute any of the calculations in Mr. Trende's

4     report?

5          A.   I haven't formed an opinion on this so I

6     can't -- I can't make any judgment about accuracy or

7     validity of his analysis.

8          Q.   And likewise, you haven't formed any

9     opinion about his rebuttal report, correct?

10         A.   Wait, are you talking about the previous

11    report or the rebuttal report?  I'm a little

12    confused.

13         Q.   I was talking about the rebuttal, but I

14    wanted to make the record clear.

15         A.   Oh.

16         Q.   I think I called it his report rather than

17    his rebuttal report.

18         A.   Okay.

19         Q.   So I'm glad that you and I were equally

20    confused by my poor question.  So let me ask the

21    question a little bit more cleanly for the record if

22    that's okay.

23         A.   Sure, sure.

24         Q.   Have you formed any opinions about

25    Mr. Trende's rebuttal report?

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 176

1        A.    No.

2        Q.    Or any of the statistics or numbers he

3    provides in his rebuttal report?

4        A.    No, I have not formed opinions on those.

5        Q.    So on page 2 of this rebuttal report

6    through page 5 Mr. Trende discusses core retention

7    and offers a variety of statistics about core

8    retention.

9        A.    Uh-huh.

10       Q.    And so you have not formed -- you have not

11   analyzed or formed any opinions about Mr. Trende's

12   discussion of core retention in this rebuttal

13   report, correct?

14       A.    I have not analyzed nor formed opinion on

15   that.

16       Q.    And Mr. Trende, starting on page 5 through

17   page 8 discusses politics and partisanship?

18       A.    Uh-huh.

19       Q.    And you have not formed any opinions or

20   done any analysis on Mr. Trende's statistics here

21   either?

22       A.    No.   Yeah, I have not done that and I

23   haven't formed opinion on that.

24       Q.    And similarly, on page 8 Mr. Trende refers

25   to movement of citizens or voters to repair precinct

Kosuke Imai, PhD                                        August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 177

1    splits and you haven't analyzed or formed an opinion

2    about that either, have you?

3         A.   No, yeah.

4              MR. GORE:  Let's go off the record here

5    for a moment.

6                   (A recess was taken.)

7              MR. GORE:  Dr. Imai, did you discuss your

8    deposition with anyone during the break?

9              THE WITNESS:  No.

10             MR. GORE:  Dr. Imai, thank you for your

11   attentiveness today.  I have no further questions.

12   I'm now passing the witness.

13             Andrew or Ms. Crum, anyone have questions

14   for Dr. Imai?

15             MS. CRUM:  This is Liz Crum.  No, we have

16   no questions on behalf of the Election Commission

17   defendants.

18             MR. MATHIAS:  This is Andrew Mathias, on

19   behalf of the House Defendants.  I have no

20   questions.

21             MR. CEPEDA:  Thank you.  I guess, I have a

22   few questions.

23                        EXAMINATION

24   BY MR. CEPEDA:

25        Q.   Dr. Imai, just a second.  Dr. Imai, you

Kosuke Imai, PhD

August 8, 2022

The South Carolina State Conf vs. McMaster/Alexander

Page 178

1    testified that you drafted a single report on the

2    Congressional map in this case, right?

3         A.    There is only one final report, yes.

4         Q.    So from the time that you started working

5    on simulations having to do with the Congressional

6    map you meant those to form part of the same report,

7    right?

8         A.    Right, right.

9         Q.    And did you mention at some point an early

10   draft included simulations that had to do with the

11   benchmark map, right?

12        A.    Right, I think there may have some

13   simulation results.

14        Q.    Yeah, and it sounded like you mentioned

15   that you may have discussed that draft with your

16   lawyers, right?

17        A.    That's correct.

18        Q.    With me, for example?

19        A.    Yeah, I think you and I know Patricia was

20   there, Ms. Yan was there, and there may have been

21   some others.

22        Q.    I've got it.  And the lawyers or can I

23   recall we gave you our impressions and shared our

24   thoughts of what we were seeing?

25        A.    Right.

Kosuke Imai, PhD                                   August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

                                                    Page 179

1              MR. GORE:  Object to the form.

2       BY MR. CEPEDA:

3              Q.   And at some point I believe you testified

4       those simulations involving the benchmark plan got

5       cut from later drafts, right?

6              A.   That's correct.

7              Q.   But you didn't share those drafts with

8       anyone besides plaintiffs counsel in this lawsuit or

9       their staff, right?

10             A.   That's correct.

11             Q.   Dr. Imai, earlier Mr. Gore asked you

12      whether you had looked at any maps proposed by the

13      public and you noted that you don't even know what

14      those maps are; am I right?

15             A.   Right.  I did not -- yeah, I don't know

16      what they are.

17             Q.   Is it possible that you could have looked

18      at other maps that were not enacted at some point

19      even if you don't recognize them now by name or

20      label?

21             A.   Oh, hum.  Yeah, I don't -- you know, I

22      don't recall looking at them.  I guess that's --

23      but, you know, that's based on my recollection.

24             Q.   That's fine.  Thank you.  But were any

25      un-enacted maps discussed in your final report?

Page 180

1        A.    No, I look at the enacted plan.

2        Q.    Thank you.  You answered my next question.

3              So Dr. Imai, you base your simulation

4    constraints on the published South Carolina

5    guidelines for the House and Senate, right?

6        A.    Yeah, I don't know whether they are

7    published but those two guidelines that were given

8    to me.

9        Q.    And in those two guidelines was there any

10   indication, for example, that core preservation

11   should be prioritized over other criteria?

12       A.    No.  I believe that it was listed as

13   additional constraint in Senate guideline I think

14   and may not be even directly mentioned in the House

15   guideline or at least it was not priority, listed as

16   a priority.

17       Q.    Thank you.  And you testified -- well, why

18   did you choose not to incorporate core preservation,

19   if you can explain again?

20       A.    Right.  So the goal of my analysis, the

21   entire report, the goal of the entire report was to

22   examine whether race played a significant role in

23   drawing district boundaries of the enacted plan and,

24   if so, how that happened.  And to do that I need to

25   isolate the impact of race, like the role that race

Kosuke Imai, PhD                                    August 8, 2022

The South Carolina State Confvs.McMaster/Alexander

Page 181

1    played from other traditional redistricting criteria

2    and some of the rules in the -- mentioned in the

3    guideline.

4              If I incorporate any product does not

5    have to be benchmark plan, but if I incorporate any

6    plan in my simulation analysis, it will basically

7    carry all the factors that went into that particular

8    plan.  So in order to isolate the race as a factor I

9    did not use this through my analysis that I did not

10   use any plan including the previous plan.

11        Q.   Thank you.  Now, you recall Mr. Gore asked

12   you some questions about the use of partisanship

13   data in your simulation, right?

14        A.   Yes.

15        Q.   And you explained that you didn't do

16   any -- you didn't use partisanship information; is

17   that right?

18        A.   Right.

19        Q.   And we just covered this, but you read the

20   guidelines, right?

21        A.   Uh-huh, yes, I did.

22        Q.   Did anything in the guidelines suggest to

23   you that your simulation should have accounted for

24   Nancy Mace's election chances, for example?

25        A.   I didn't see any mention of that.  Yeah, I

Kosuke Imai, PhD                                August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 182

1    did not see any specific instruction about use of

2    election outcomes.

3         Q.   Did anything suggest to you that it was

4    important for the map makers to enact a map that

5    favored Republicans?

6         A.   I don't analyze intent of map drawer so I

7    can't, you know, say what they have thought about

8    but the guideline didn't specify, you know, specific

9    use of electoral outcome or electoral chance of

10   politicians and that wasn't, you know, even -- a

11   political consideration wasn't an additional

12   consideration and so I took other more traditional

13   redistricting criteria as priority.

14            MR. CEPEDA:   Thank you, Dr. Imai.  I have

15   no more questions.

16                 EXAMINATION

17   BY MR. GORE:

18        Q.   I have just a couple of questions of

19   redirect, Dr. Imai.

20        A.   Okay.

21        Q.   Now, you said you haven't attempted to

22   analyze the intent or motives of the map drawer or

23   legislators, correct?

24        A.   That's correct.

25        Q.   And so you don't have an opinion one way

Kosuke Imai, PhD                                August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 183

1     or the other as to whether the map drawer or the

2     legislators considered politics even if politics is

3     not in the guidelines, correct?

4          A.    That's right.  I don't have any opinion on

5     that.

6          Q.    Do you have a view or opinion on whether

7     the map drawer or the legislators considered Nancy

8     Mace's reelection prospect whether or not that's

9     listed in the guidelines?

10         A.    No, I don't have any opinion on that.

11         Q.    And do you have any opinion or view on

12    whether the map drawer or legislators wanted a plan

13    that would elect six Republicans regardless of

14    whether that's in the guidelines?

15         A.    I don't have any opinion on that.

16         Q.    And Dr. Imai, is keeping Charleston in a

17    single district anywhere in the guidelines?

18         A.    I don't think so, there is no specific

19    counties being mentioned.

20         Q.    How about keeping Richland in a single

21    district?

22         A.    I don't think so.

23         Q.    And how about keeping District 6's BVAP

24    between 45 percent and 50 percent?

25         A.    Those numbers are not specifically

Page 184

1    mentioned but the VRA consideration is listed as one

2    of the principles that should be followed.

3         Q.    And you don't have a view, do you, as to

4    whether a District 6 between 45 percent and

5    50 percent BVAP complies with the VRA, right?

6         A.    I'm not a lawyer so I don't make legal

7    judgment.

8         Q.    And you haven't conducted any racially

9    polarized voting analysis in this case, correct?

10        A.    No, that's right.  I did not conduct

11    racial polarize analysis.

12             MR. GORE:  Thank you, Dr. Imai.  I have no

13    further questions.

14             MR. CEPEDA:  I think that might be it.

15    That's it unless Liz or Andrew -- I've spoken out of

16    turn but I hope not.

17             MR. MATHIAS:  I'm not going to disappoint

18    you.  No questions.

19             THE COURT REPORTER:  Dr. Imai, will you

20    read and sign?  If so, where can we email that?

21             MR. CEPEDA:  He will and you can send it

22    to me.

23             THE COURT REPORTER:  To you, okay.

24             All right.  Mr. Gore, regular turnaround

25    which is the 22nd; is that correct?

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 185

1           MR. GORE:  What can you do as an expedited
2    turnaround?
3           THE COURT REPORTER:  So I can get it to
4    you by Monday or do you need it before that?  I can
5    also provide you with a rough draft.
6           MR. GORE:  Yeah, Monday would be fine and
7    we are happy to take a rough too, I guess.
8           THE COURT REPORTER:  Okay.
9           Mr. Cepeda, would you also like it
10   expedited and a rough draft?
11          MR. CEPEDA:  Monday would be good for me
12   and we can work the details.
13          THE COURT REPORTER:  I don't know what you
14   mean.  Do you want a rough tomorrow or no?
15          MR. CEPEDA:  I would like the rough too,
16   sure.
17          THE COURT REPORTER:  Okay.  Do you want
18   your copy Monday too?
19          MR. CEPEDA:  I don't need it by Monday.
20   Does that have any additional cost?
21          THE COURT REPORTER:  Yes, it does.
22          MR. CEPEDA:  So when would I get the
23   regular?
24          THE COURT REPORTER:  That would be the
25   22nd.

Kosuke Imai, PhD

August 8, 2022

The South Carolina State Confvs.McMaster/Alexander

Page 186

1              MR. CEPEDA:  No, we want it before that so

2        I'll take it Monday as well.

3              THE COURT REPORTER:  Okay.

4              Ms. Crum?

5              MS. CRUM:  We do not need a transcript.

6              THE COURT REPORTER:  Okay.

7              Mr. Mathias?

8              MR. MATHIAS:  I guess it is peer pressure,

9        but we will take it Monday.

10             THE COURT REPORTER:  And do you want a

11       rough?

12             MR. MATHIAS:  Yes.

13             THE COURT REPORTER:  Okay.  Thank you.

14             (The deposition concluded at 4:32 p.m.)

15             (The witness, after having been advised of

16       his right to read and sign this transcript, does not

17       waive that right.)

18

19

20

21

22

23

24

25

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 187

1                    CERTIFICATE OF REPORTER

2

3          I, Solange Ruiz-Uribe, Notary Public for the

4    State of South Carolina at Large, do hereby certify

5    that the foregoing transcript is a true, accurate, and

6    complete record.

7          I further certify that I am neither related to

8    nor counsel for any party to the cause pending or

9    interested in the events thereof.

10         Witness my hand, I have hereunto affixed my

11   official seal this 8th day of August, 2022 at Fort

12   Mill, York County, South Carolina.

13

14

15

16

17

18

19

20

21

22

23                      _____

24                      Solange Ruiz-Uribe

                        My Commission expires

25                      February 2, 2027

Page 188

1                        I N D E X

2                                        Page/Line

3     WITNESS EXAMINATION

4     KOSUKE IMAI, PhD                    4          1

5     EXAMINATION

6     BY MR. GORE                         4          3

7     EXAMINATION

8     BY MR. CEPEDA                       177        23

9     EXAMINATION

10    BY MR. GORE                         182        16

11    SIGNATURE OF DEPONENT

12    CERTIFICATE OF REPORTER             187        1

13

14

15

16            REQUESTED INFORMATION INDEX

17

18            (No Information Index Requested)

19

20

21

22

23

24

25

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 189

1                    E X H I B I T S
2                                        Page/Line
3        DEFENDANT'S EXHIBITS
4        EXHIBIT 1        SENATE DEFENDANTS'      9          20
                          AMENDED NOTICE OF TAKING
5                         VIDEO CONFERENCE
                          DEPOSITION OF KOSUKE
6                         IMAI, PHD
7        EXHIBIT 2        EXPERT REPORT OF KOSUKE  16         9
                          IMAI, PH.D. DATED
8                         APRIL 4, 2022
9        EXHIBIT 3        JUNE 2022 CURRICULUM     19         3
                          VITAE OF KOSUKE IMAI
10
11       EXHIBIT 4        SEQUENTIAL MONTE CARLO   34         3
                          FOR SAMPLING BALANCED
12                        AND COMPACT REDISTRICTING
                          PLANS PAPER
13
14       EXHIBIT 5        RECOMBINATION: A FAMILY  65         9
                          OF MARKOV CHAINS FOR
15                        REDISTRICTING ARTICLE
16       EXHIBIT 6        SOUTH CAROLINA HOUSE OF  68         16
                          REPRESENTATIVES JUDICIARY
17                        COMMITTEE REDISTRICTING
                          AD HOC COMMITTEE 2021
18                        GUIDELINES AND CRITERIA
                          FOR CONGRESSIONAL AND
19                        LEGISLATIVE REDISTRICTING
20       EXHIBIT 7        2021 REDISTRICTING       69         14
                          GUIDELINES SOUTH
21                        CAROLINA SENATE JUDICIARY
                          COMMITTEE REDISTRICTING
22                        SUBCOMMITTEE
23       EXHIBIT 8        REBUTTAL REPORT OF SEAN  173        13
                          P. TRENDE
24
25

Kosuke Imai, PhD                                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 190

1       1  Adriel Cepeda

2       2  acepedaderieux@aclu.org

3       3                         August 15, 2022

4       4  RE:     South Carolina State Conference Of The NAACP And Scott,

        Taiwan v. Mcmaster, Henry, Et Al.

5       5      8/8/2022, Kosuke Imai, PhD (#5350506)

6       6      The above-referenced transcript is available for

7       7  review.

8       8      Within the applicable timeframe, the witness should

9       9  read the testimony to verify its accuracy. If there are

10      10  any changes, the witness should note those with the

11      11  reason, on the attached Errata Sheet.

12      12      The witness should sign the Acknowledgment of

13      13  Deponent and Errata and return to the deposing attorney.

14      14  Copies should be sent to all counsel, and to Veritext at

15      15  cs-southeast@veritext.com

16      16

17      17   Return completed errata within 30 days from

18      18  receipt of testimony.

19      19    If the witness fails to do so within the time

20      20  allotted, the transcript may be used as if signed.

21      21

22      22                    Yours,

23      23                    Veritext Legal Solutions

24      24

25      25

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 191

1    1  South Carolina State Conference Of The NAACP And Scott, Taiwan v.

     Mcmaster, Henry, Et Al.

2    2  Kosuke Imai, PhD (#5350506)

3    3              E R R A T A  S H E E T

4    4  PAGE_____ LINE_____ CHANGE_____

5    5  _____

6    6  REASON_____

7    7  PAGE_____ LINE_____ CHANGE_____

8    8  _____

9    9  REASON_____

10   0  PAGE_____ LINE_____ CHANGE_____

11   1  _____

12   2  REASON_____

13   3  PAGE_____ LINE_____ CHANGE_____

14   4  _____

15   5  REASON_____

16   6  PAGE_____ LINE_____ CHANGE_____

17   7  _____

18   8  REASON_____

19   9  PAGE_____ LINE_____ CHANGE_____

20   0  _____

21   1  REASON_____

22   2

23   3  _____     _____

24   4  Kosuke Imai, PhD                              Date

25   5

Kosuke Imai, PhD                                        August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 192

1    1  South Carolina State Conference Of The NAACP And Scott, Taiwan v.

     Mcmaster, Henry, Et Al.

2    2  Kosuke Imai, PhD (#5350506)

3    3              ACKNOWLEDGEMENT OF DEPONENT

4    4     I, Kosuke Imai, PhD, do hereby declare that I

5    5  have read the foregoing transcript, I have made any

6    6  corrections, additions, or changes I deemed necessary as

7    7  noted above to be appended hereto, and that the same is

8    8  a true, correct and complete transcript of the testimony

9    9  given by me.

10   0

11   1  _____    _____

12   2  Kosuke Imai, PhD                         Date

13   3  *If notary is required

14   4              SUBSCRIBED AND SWORN TO BEFORE ME THIS

15   5              _____ DAY OF _____, 20____.

16   6

17   7

18   8              _____

19   9              NOTARY PUBLIC

20   0

21   1

22   2

23   3

24   4

25   5

Kosuke Imai, PhD
The South Carolina State Confvs.McMaster/Alexander

August 8, 2022

[& - 22]

Page 1

**&**

**&**   3:9,14

**0**

**0**   191:10,20
    192:10,20
**0.1**   74:8,15
**0.4**   89:8
**0.45**   138:15
**0.5**   138:16
**03302**   1:6

**1**

**1**   9:20 38:21
    40:25 64:11,15
    71:20 84:23
    88:19,24 89:6
    94:8 95:25
    103:10 107:7
    110:23,25 113:7
    113:24 114:5,12
    116:11,13,17,22
    117:5,12 118:13
    118:25 119:5,19
    120:14,19 122:4
    122:7 123:21
    124:5 127:6,11
    128:1,10 129:2
    129:18 130:2
    133:4,6,21,25
    134:8 136:2,4,16
    141:19 146:3,10
    146:16 147:5,19
    147:19 148:8
    149:1,16 151:16
    152:9,12 154:6
    154:14,23 155:7
    155:14,17 156:4
    156:18,19 157:7

157:9,17,20
    163:21 188:4,12
    189:4 190:1
    191:1,11,21
    192:1,11,21
**1's**   123:10 129:9
**1.07**   81:15,15
    97:10
**1.2**   81:16
**1.29**   129:24
**1.3**   129:15,22
    130:3,4,8
**1.35**   81:16
**10**   70:15 88:8
    97:18 130:14,15
    130:16,24 133:2
    190:10
**10,000**   92:23,25
    93:25 94:4 95:4
    98:12 139:13,19
    140:10,14,18
    142:19 143:2,10
    173:4
**100**   12:18 27:15
    45:21 115:12
    116:1 117:6
    166:23
**10006**   2:16
**104**   3:5
**11**   97:18 114:2
    132:14 190:11
**11:04**   1:13
**12**   89:21 90:3,5
    94:7 114:12
    120:18 121:7,11
    190:12
**1221**   3:11,16

**13**   25:19,23,25
    26:1,4 94:22,23
    120:10,12,19
    127:3 189:23
    190:13
**14**   26:22 27:11
    28:16 106:23
    107:4 127:14
    189:20 190:14
**15**   127:14 145:18
    145:21 163:18
    190:3,15
**16**   188:10 189:7
    189:16 190:16
**17**   32:21,23
    151:10 190:17
**17.4**   121:2
**173**   189:23
**1730**   2:5,10
**177**   188:8
**18**   157:24 164:2
    190:18
**1800**   2:5,10 3:11
    3:16
**182**   188:10
**187**   188:12
**19**   159:3,24
    164:2 189:9
    190:19
**1998**   19:10

**2**

**2**   16:9 38:20
    101:9 114:8,8
    120:11,12,13
    122:17,25
    127:23,25 158:4
    158:13,19

159:13 160:6,10
    160:16,18,20
    161:7,15,17
    162:2 163:10
    164:6,10 166:25
    167:8 168:18,23
    176:5 187:25
    189:7 190:2
    191:2,12,22
    192:2,12,22
**2's**   164:17
**20**   70:10,17 74:7
    77:16,21 89:24
    106:20 109:13
    109:18 189:4
    190:20 192:15
**20001**   2:21
**2002**   19:12
**2003**   19:13
**20036**   2:6,11
**2010**   19:20 51:16
    52:10 53:8,19,25
**202**   2:6,11,22
**2020**   50:24 51:15
    53:1,11 54:2
    110:24
**2021**   68:18 69:14
    189:17,20
**2022**   1:12 16:10
    18:17 19:3
    174:7 187:11
    189:8,9 190:3
**2027**   187:25
**21**   190:21
**212**   2:16
**21903**   187:22
**22**   70:14,17 74:7
    77:16,21 106:20

Kosuke Imai, PhD
The South Carolina State Conf vs. McMaster/Alexander

August 8, 2022

[22 - 6]

109:13,19
190:22

**22nd**  184:25
185:25

**23**  88:6 188:8
190:23

**23.9**  162:10,14
163:6,15

**2388**  162:17

**24**  165:25 166:2
167:5 190:24

**24,900**  129:3

**25**  78:18,21
84:22 89:2
138:6,7,8 190:25

**26**  59:14 62:9
130:11 138:2

**26.9**  165:12

**26b**  48:7

**27**  94:23 106:24
108:2 114:11

**28**  120:15

**282-1195**  3:6

**29**  119:3 121:1

**29.4**  121:7

**29201**  3:11,16

**29601**  3:5

---

**3**

**3**  19:3 43:4
114:9 127:18
128:12,13,14,15
171:21,24
172:12,15 188:6
189:9,9,11 190:3
191:3,13,23
192:3,13,23

---

**30**  120:15,17,18
120:18 190:17

**31**  17:13,15

**32**  129:1

**33.9**  166:24

**34**  189:11

**35**  145:22 147:4

**36**  150:19

**37**  154:8

**39.4**  159:5 162:6
166:3

**3:21**  1:6

---

**4**

**4**  16:10 29:12,14
30:18 34:3
114:9 128:12
163:18 188:4,6
189:8,11 190:4
191:4,14,24
192:4,14,24

**4.5**  147:6

**40**  2:15 159:1
161:1,1 162:6
165:9,25 166:22

**41**  65:21 66:3
162:10,15

**41.1**  120:4

**43**  169:21

**45**  41:20 135:15
136:20,23
137:12 139:18
140:1 164:8
171:16 172:18
172:22 173:1
183:24 184:4

**450**  14:20

---

**457-0800**  2:6,11

**46**  137:5

**46.9**  172:6

**49.9**  172:11

**4:32**  186:14

**4th**  174:4,5

---

**5**

**5**  30:18 65:9
114:8,9 123:2,4
146:6,8 169:11
170:3 176:6,16
189:14 190:5
191:5,15,25
192:5,15,25

**5.8**  119:6,10,18
120:2 121:24

**50**  41:21 115:16
116:3 135:16
136:20,24
137:12 139:21
140:2 164:8
167:4 171:16,20
172:18,23
183:24 184:5

**500**  115:7,12

**51**  2:21

**5350506**  190:5
191:2 192:2

**57**  78:20 80:7,22
84:22 89:2 97:7
106:17 138:3,8,9

**5th**  2:15

---

**6**

**6**  25:20 26:3
41:19,22,25 42:4
43:2 64:11,15
68:16 84:23

---

89:7 94:8 95:25
103:10 113:7,24
114:5 118:25
119:24 120:8
121:19,22 122:4
122:8,11,17,25
123:2,4,15,21
124:5 127:6,11
130:3 133:4,6,21
133:25 134:2,8
135:15,20 136:2
136:5,8,13,17,24
137:9 138:25
139:9,15 140:1
141:14,21,24
142:9 146:3
147:23 148:2,3,4
148:6 149:1,16
150:22 151:10
151:12,14 152:4
152:9,15,19,23
153:1,20,23,25
156:4,18,19
157:8,9,13,17,20
158:4,13,19
159:8,18 160:10
160:20,22,23
161:2,4,9,10,15
161:18,21 162:2
163:10,22 164:6
164:7 165:14
167:3 168:8,10
168:18,23
169:11,25
170:12,24 171:3
171:12,14,15,24
172:5,16,24
173:1 184:4

Kosuke Imai, PhD

August 8, 2022

The South Carolina State Confvs.McMaster/Alexander

**[6 - al]**

Page 3

189:16 190:6
191:6,16 192:6
192:16
**6's** 120:3 121:10
121:14 123:9
136:19 138:15
141:8,17 171:19
183:23
**6.5** 147:6,13
**61** 108:2
**65** 189:14
**68** 189:16
**69** 189:20
**6s** 121:20

**7**

**7** 32:21 69:14
114:9 147:24
148:4 153:21
158:11 189:20
190:7 191:7,17
192:7,17
**730** 71:22
**731,204** 72:25
**74,600** 154:11
**76.3** 154:13
**799-9800** 3:12
3:17

**8**

**8** 1:12 70:12
109:17 159:24
160:1,24 161:22
162:13 163:9
167:6 173:13
176:17,24
189:23 190:8
191:8,18 192:8
192:18

**8/8/2022** 190:5
**803** 3:12,17
**864** 3:6
**879-3939** 2:22
**8th** 187:11

**9**

**9** 70:15 189:4,7
189:14 190:9
191:9,19 192:9
192:19
**90** 117:13 170:24
**90.3** 169:23
**900** 3:5
**9500** 129:5,8
**965-2200** 2:16

**a**

**a.m.** 1:13
**ability** 122:12
**able** 47:9 124:8
**abstract** 34:22
36:7 38:9,22
43:7 44:22
**academic** 16:1
22:22 132:1
**accepted** 22:23
23:2,5
**access** 18:3 47:5
64:2
**account** 100:13
101:25 102:13
102:15,18 122:1
136:21
**accounted**
181:23
**accounting**
161:22 167:4

**accounts** 131:22
**accuracy** 39:8
175:6 190:9
**accurate** 187:5
**accurately** 36:13
**acepedaderieux**
2:7 190:2
**achieve** 73:1
**acknowledged**
40:9
**acknowledge...**
192:3
**acknowledgm...**
190:12
**aclu** 3:21 14:3,6
14:9 45:6,21
**aclu.org** 2:7,12
190:2
**act** 137:13
**actual** 43:18
51:10 137:8
**ad** 68:18 189:17
**adams** 28:21
**add** 49:6 107:15
135:11,23
**added** 110:13,18
**addition** 12:11
33:21
**additional** 54:15
73:25 101:11
103:1 135:11
153:21 180:13
182:11 185:20
**additions** 192:6
**address** 22:25
26:15 112:12
113:17

**addresses** 30:12
**adjacent** 23:23
24:3 79:10
**adjusting** 76:20
**administrative**
31:9 102:15
105:3
**admission** 143:1
143:5
**adriel** 2:4 47:3
190:1
**advised** 186:15
**affect** 58:14,17
76:16 133:11
171:13
**affixed** 187:10
**age** 114:18,19,21
114:23 115:8
151:15 160:5,8
160:17,18
170:20
**aggregate** 20:11
**ago** 27:3 45:17
123:8 173:24
174:9
**agree** 36:20,22
66:11,16 67:1
72:1 84:3 115:6
129:20 139:25
**agreement** 5:22
14:23
**ahead** 5:16
49:13,21 56:1
62:20 65:7
113:11
**al** 1:4,7 2:3
190:4 191:1
192:1

Kosuke Imai, PhD
The South Carolina State Conf vs. McMaster/Alexander

August 8, 2022

[alabama - appropriate]

Page 4

**alabama** 14:14
28:11
**alexander** 1:7
4:13
**algorithm** 13:18
21:9,24 22:2
23:10,11,20,22
24:5,18 33:5,6,7
33:8,11,16,25
37:5,7,24 38:6
38:14,15 39:19
41:6,13,13,22,23
42:4,6,8,12,24
45:10 49:15
50:14 51:1 55:8
56:8 58:7 70:22
71:2 75:5,8
78:10,13,16 79:9
80:14,19 81:20
82:7 83:23 93:1
93:6,14 95:2,18
95:20 96:11
98:3,6 101:25
102:8,19 103:4,7
106:15 110:13
110:14,18,23
132:13,16
**algorithms** 20:1
20:7 23:13,15,16
24:16 33:10
37:18 38:2,16,18
38:25 39:2,5,9
39:17 40:9,16
43:15,17,22 44:4
44:8,13,17
**allotted** 190:20
**allows** 88:12
136:13

**altered** 114:5
**amathias** 3:6
**amend** 17:1
**amended** 9:21
189:4
**american** 2:4,9
**analyses** 22:9,14
22:17 48:18,19
64:10 104:13,13
157:1,14
**analysis** 11:20
12:4,6,13,17,24
17:9 21:16 22:5
22:8,18 26:17
30:11,12 31:25
36:20 38:13,18
40:5 41:15 42:6
47:23 48:3,9,16
48:23 49:2,3,8
49:17,25 51:13
52:19 53:24
54:11,23,25
55:11 56:4
58:17,17,22
59:16 60:4 61:6
61:20 62:1,6,11
62:14,18 63:16
67:10,23 68:1
76:17 81:1 86:8
86:16,18,19
91:24 96:5,8
98:1 102:13
103:17,20
104:12,15
112:12 113:3,19
113:21,21
118:11,12,15,19
122:14 123:11

123:12,15,22
125:14 127:20
130:5,8,10
133:23 134:13
135:5 136:6,10
136:15,22
138:23 139:3
140:21 141:7,15
141:16,18
142:23 145:1
146:6,25 155:10
155:23 156:1,3,8
156:16,17,19,25
157:1,2,4,10,15
164:20 166:21
167:15,16 169:8
170:6 174:14,18
175:7 176:20
180:20 181:6,9
184:9,11
**analyze** 32:4,7
41:16 67:21
76:10 122:10,11
155:6,11 159:17
168:22 170:11
171:2 182:6,22
**analyzed** 112:7
119:24 133:22
176:11,14 177:1
**analyzes** 29:15
**analyzing** 85:6
145:24
**andrew** 3:4
177:13,18
184:15
**announcement**
10:8

**answer** 5:15,16
5:24 6:6 13:6
47:6 49:13,21
51:20 52:3,15
53:22 54:1,9,21
55:21 56:1 57:4
59:18 62:25
124:8
**answered** 166:7
180:2
**answers** 5:4
**apart** 7:18
**appearances** 2:1
2:25 3:1
**appeared** 27:12
**appearing** 4:18
**appears** 24:21
107:10 131:6
158:14
**appended** 192:7
**applicable** 190:8
**application** 20:7
35:13 36:10
40:6,11,13 43:24
**applications**
21:11 22:2 40:4
40:11
**applies** 38:17
**apply** 39:21
**applying** 43:17
**apportionment**
28:8 73:15
**appreciate** 93:22
126:7
**approach** 40:16
**appropriate**
75:1

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

[approximate - basically]                                          Page 5

**approximate**
83:10
**approximately**
45:11 71:23
129:3 137:8
**april** 16:10
17:21 27:5
189:8
**area** 31:1,16
88:3,15,23,23
123:25 126:1
148:9 149:10
150:9
**areas** 36:16,25
104:21 124:4
**article** 24:6 43:4
65:10,15,22
66:10 73:15
189:15
**articles** 10:25
20:20 21:15,19
22:3,10 23:14
**arts** 19:9,10
**asked** 11:2,5
22:24 48:15
49:22 53:7
54:22 174:19
179:11 181:11
**asking** 22:17
48:12 59:13,15
59:16 62:10,11
90:25 91:1
142:5 166:6
**asks** 62:8
**aspect** 112:7
**aspects** 132:12
**assembly** 83:11
83:18,23,24 84:8

84:13 136:19,22
**assess** 112:24
**assign** 95:2
105:15,19,21
106:4 159:7
**assigned** 83:18
122:8 128:10
148:7 151:16
152:12 154:13
160:6,11 161:2,6
161:14 166:25
**assigns** 80:7
**assist** 15:1,14,18
**assistants** 15:5,6
**assume** 5:25
**assuming** 73:25
**assumptions**
12:21,23 13:2,7
13:10,13,15
46:22
**attached** 190:11
**attempt** 54:16
174:21,24
**attempted**
182:21
**attention** 174:12
**attentiveness**
177:11
**attorney** 55:19
190:13
**attorneys** 2:2,18
3:2,8
**august** 1:12
187:11 190:3
**automated** 76:7
**automatically**
40:12 75:13
136:16 141:20

**available** 104:6
105:7 106:10
190:6
**avenue** 2:21
**average** 74:23
77:23,24 78:2
92:16,18,19,20
92:24 93:8,15,19
94:1,21 95:10
97:13,17 98:13
98:15,18 99:1,2
99:4 119:4,8,11
121:20,23 129:2
129:3 130:3,4
131:7,16 132:7
133:3,5 147:5,13
160:19 173:3
**averages** 95:5
98:11 133:4
**avoid** 73:24 75:5
103:7 153:11
**avoidance** 79:24
81:9 84:24
85:21 89:7
106:8
**avoiding** 73:23
**aware** 19:17
117:21 133:20
134:7 136:18
158:18

**b**

**b** 10:17 11:3
72:21 103:2
189:1
**bachelor** 19:9
**back** 17:21
19:16 24:25

25:15,16 27:5
34:24 44:22
45:16 47:15
70:5 72:13 74:5
77:15 88:5 89:1
95:4,16 99:8
101:4 109:12,13
138:2,10 145:17
163:17 164:2
167:17
**background**
19:8 91:1
**bagley** 9:11
**balanced** 34:4
189:11
**baodong** 9:7
**bar** 151:17,22
**bars** 90:10
**base** 180:3
**based** 39:22 57:6
58:3,23 63:4
71:11,12 74:17
91:24 96:16
99:24,25 100:17
100:20,25
107:16 179:23
**baseline** 111:10
111:15 113:3,4
**basic** 35:14
131:21
**basically** 20:10
23:21,23 24:7,12
35:17 40:22
42:23 55:1 61:6
61:19 78:12
79:5,13 80:1,17
82:12 93:5
108:14 123:21

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

**[basically - bvap]**                                    Page 6

139:7 141:10
142:14 166:20
166:23 181:6
**basis** 29:25
**bayesian** 26:18
**bear** 65:1
**begins** 154:10
**behalf** 27:25
177:16,19
**behavior** 20:11
**belabor** 166:8
**believe** 10:13
16:7 17:22
18:16 24:20
29:15 32:19,23
52:21 57:17
59:18 65:15,25
66:10 68:6
92:15 106:19
123:23 129:1
137:11 140:25
159:3 174:2
179:3 180:12
**ben** 45:2
**benchmark**
47:23 48:24
49:2,9,14,15,16
49:18,23,24 50:4
50:6 51:17,22,25
52:4,6 53:24
54:6,13,18 55:12
55:15 56:9,24
57:5,8,18,21,22
57:24 58:2,5,6,9
58:13,24 59:9,25
60:3,22,23 61:5
61:9,13,15,17,22
61:25 62:2,5

63:3,17 103:19
106:3 110:25
118:16,17,18
122:23 128:19
128:20,23,25
147:2,3 154:18
154:19,20 158:7
158:9 169:16
178:11 179:4
181:5
**benefit** 10:4
**berkeley** 117:2
146:20
**best** 33:24 94:8
**better** 37:25
38:5 41:23
89:13 107:7,11
131:7 132:24
**beyond** 141:7
142:16 165:24
**big** 18:15 117:23
**bigger** 104:14
**binder** 16:7 34:7
68:10 69:10
**bit** 8:11 13:21
32:18 39:7 42:3
70:3 90:17 97:6
132:23 144:9
175:21
**black** 31:11
49:10 114:17,18
114:21,23 115:8
118:20,21
119:11 122:3,6
122:12 123:15
123:17,18,25
124:3,7,22 125:5
125:17,21

127:21 128:8,23
129:3 148:4,13
148:14 149:1,16
149:23 150:1,6,7
150:9,22 151:6
151:15,25 152:1
152:8,11,14,16
152:16,21 153:1
153:25 154:5
160:4,7,17,17
164:23 165:4,15
165:19,21
166:10 167:2,7
167:22 168:5,10
168:13 170:19
**blank** 24:13 35:4
35:15 36:4 41:7
41:10 42:2,21
**blind** 40:19,21
40:24 41:1 42:8
61:6,10 103:11
118:22 119:5
**block** 75:14,23
76:3 77:1
**blocks** 74:21
75:24 76:1
**books** 10:24
20:20
**border** 116:24
116:25,25
**boundaries** 24:7
30:14 31:9
40:22 55:2
73:22 75:11
76:11 102:15
105:3 106:12
113:1,6 114:8
127:6 131:3

142:3 156:20
157:17 180:23
**boundary** 39:10
61:11,13 79:13
114:5 122:21
123:6 127:10
136:1 145:25
146:2 149:9
158:19 168:23
**break** 6:2,4,7
70:9 77:13,16
135:2 177:8
**breaks** 6:4
**brief** 8:21
**briefly** 8:22 19:7
88:6
**bring** 47:1
**broad** 23:16
**broadly** 23:21
166:8
**browser** 18:8
**bucket** 98:12,13
**buffering** 24:21
**build** 42:21
**building** 35:16
36:4
**bullets** 77:20
**burchstead** 3:10
**burden** 73:25
**burr** 3:9,14
**burr.com** 3:12
3:17
**bvap** 41:20 42:4
42:25 114:14
115:3,12,16,19
116:1,3,6 119:4
119:19,21,25
120:3,7,14

Kosuke Imai, PhD                                      August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

[bvap - certainly]                                              Page 7

121:10,14,14,19
122:11 123:9,10
127:17,21 128:2
128:15,16 129:9
130:2,9 135:15
136:3,4,8,13,15
136:17,19,24
137:8,12 138:15
138:25 139:8,15
140:1 141:8,14
141:17,19,20,24
142:9 146:15
147:5 157:12
161:4,6,8,14,15
163:10,10,22,25
164:7,10,17
165:13 166:20
166:25 168:8
170:16,17 171:4
171:4,5,13,14,16
171:19,21 172:6
172:12,23,25
173:3 183:23
184:5

**c**

**c** 1:7 10:17 11:3
**calculated** 94:21
**calculating**
  92:16 97:16
**calculation**
  100:1,25
**calculations**
  175:3
**call** 31:6,13
**called** 24:6,11
  37:11 65:15
  175:16

**calling** 55:19
**calls** 48:5
**cambridge** 1:14
  6:17
**candidates**
  122:13
**cap** 14:21,23,24
**career** 20:18
**careful** 60:15
**carlo** 23:15,19
  23:22 24:12,17
  33:7 34:4 35:1
  35:10,11,15,19
  35:24 37:3,4,12
  38:1,6,10 50:3,8
  189:11
**carolina** 1:1,3
  2:2 4:16 6:14
  8:1 14:16 20:13
  28:13,13 29:16
  31:4 46:10 68:7
  68:16 69:3,15
  96:16 108:15
  112:6 180:4
  187:4,12 189:16
  189:21 190:4
  191:1 192:1
**carries** 30:18
  70:15
**carry** 181:7
**case** 1:6 4:16,18
  6:12,15 8:6,24
  9:3 11:2,15
  13:21,23 14:7,14
  14:15,16,19,22
  17:5 22:6,18
  24:17 26:8 27:4
  27:6,7,9,10,13

27:14,15,16 28:1
28:3,5,5,11,12
28:14,14,20,21
28:22 29:8 33:9
39:20,23 40:7,14
40:14 41:17,18
44:1 45:23,24
46:5,22 53:17
63:6 72:25 76:9
79:6 80:24,24
84:14 102:12
103:10 108:15
111:8 113:6
119:23 141:23
148:2 161:3
162:8,9 164:14
166:24 174:14
178:2 184:9
**cases** 14:8,12
26:25 27:11,18
27:19,20,21,23
28:9,10,15,16
38:12 41:9
43:14 44:13,16
44:17 82:2,3
84:6,7 93:17
98:22 111:5
161:5 165:12
166:22
**category** 162:22
163:4
**cause** 187:8
**caveat** 107:15
**cc'd** 11:7
**census** 12:9
26:11 50:24
51:16 52:10
53:1,8,9,10,19

54:1,3 74:21
75:14,23,24 76:1
76:3 77:1
**cepeda** 2:4 5:11
5:12 6:23,24 7:1
7:18 13:4,25
25:8,12 46:7
47:5,11 48:4,12
48:20 49:11,19
51:18 52:1,13
53:20 54:7,19
55:18,22 57:2,20
59:12 60:6 62:7
62:13,21 63:10
137:17 141:4
143:6 148:17
149:3,6 165:6,22
171:23 177:21
177:24 179:2
182:14 184:14
184:21 185:9,11
185:15,19,22
186:1 188:8
190:1
**certain** 12:18
24:8 31:16 37:9
38:14,15 42:25
44:13 60:17
78:14 79:21
80:8,8,15 81:2
84:9 97:1
123:25 124:4,7
126:1 136:9
138:21 149:24
154:25 157:13
164:15 168:9,9
**certainly** 9:1
12:20 44:21

Kosuke Imai, PhD                                              August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

[certainly - committee]                                                Page 8

52:18 74:11
84:14 88:4
**certificate** 187:1
188:12
**certify** 187:4,7
**cetera** 15:17
**chain** 23:22 33:7
35:6,10,19,24
37:3,4 38:1,6
50:3,8
**chains** 65:10,16
189:14
**chairman** 4:14
**chance** 182:9
**chances** 118:3
181:24
**change** 76:21
82:16,19,20 83:2
83:4 84:14
104:12 122:21
123:5,9,10 130:8
136:11 191:4,7
191:10,13,16,19
**changed** 27:17
82:23 83:24
**changes** 155:11
155:20 190:10
192:6
**changing** 82:15
82:18 148:25
**characteristics**
59:3 76:8
**characterization**
132:25
**characterize**
89:16 131:10,20
132:20

**charge** 14:20
**charging** 14:18
**charleston** 41:1
61:11 64:15
81:13 96:3,4
97:9 103:12
107:11,17
117:11,11,11,17
117:17,23,24
118:6,8 119:14
119:17 123:19
123:19 124:10
124:13,15,19
125:8,18,19
126:12,17 127:1
127:7,11,17
128:3,6,9,15
130:23 131:3,8
133:2,19 134:6
145:25 146:21
146:22 147:17
147:17 148:8
149:19,19
150:20 151:2,4,5
151:16 152:2,16
152:18,22 153:1
153:14 154:1,3,5
154:17,22 155:3
155:7,13,16,17
156:5,21 157:6,6
163:22 183:16
**chart** 116:12
146:9
**check** 11:11
106:16,21
**checked** 11:9
153:5

**choice** 80:24
122:13
**choose** 23:23
80:22 81:1,5,15
83:1 93:5,16
95:8 97:24
180:18
**choosing** 138:24
138:25
**chose** 137:7
**circuit** 26:6
**citation** 39:2
43:16
**citizens** 176:25
**city** 27:8 117:11
117:17,23 118:5
119:14,16
123:19 124:13
124:15,18
125:18 126:12
146:21 147:16
151:1
**civil** 2:4,9
**clarification**
46:2 50:23 86:9
111:17
**clarify** 5:22 32:9
50:5 78:8 92:7
131:24 140:4
**class** 19:16 23:16
**classes** 19:15
**clause** 73:15
**cleanly** 175:21
**clear** 13:19
22:19 111:25
126:3 133:1
175:14

**close** 120:17,18
167:1 172:23
**closely** 98:2,7
132:15
**closer** 172:25
173:1
**clyburn's** 135:19
**collaborated**
45:12
**collaborator**
45:8
**collect** 10:22
**colleton** 134:18
156:10 157:19
**colloquialism**
143:8
**color** 116:19
**colored** 116:12
146:9
**columbia** 1:2
3:11,16
**come** 54:2 84:10
153:4 172:3
**comes** 33:19
50:21
**comfortable**
47:9
**coming** 119:11
119:12,13
147:13,23,24
151:25 157:16
**comment** 150:13
155:2 170:8
**commission** 3:8
28:8 177:16
187:24
**committee** 4:14
68:17,18 69:4,16

Kosuke Imai, PhD                                              August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

[committee - consistency]                                              Page 9

69:24 189:17,17
189:21
**commonly** 97:25
**communicate**
101:21 102:4
**communication**
55:19
**communities**
101:18 102:1,14
104:22 105:1,7
105:10,14,16,18
148:14 149:1,24
167:23 168:1,6
168:15
**community**
102:7 125:17,21
150:6,7,10
165:21 166:10
166:15,16,17
167:25 168:3
**compact** 34:4
73:21 77:23
81:22 82:1,3,5,8
97:14 98:13
130:21 189:12
**compactness**
80:9 81:14
82:13 97:4,7,19
97:22 98:3,9,17
98:23,24 99:2,5
99:17,22,24
100:5,10,24
101:14,17
102:23 130:17
132:10 139:4
**comparable**
88:13 100:11

**comparator** 66:3
66:4
**compare** 50:19
51:6,24 52:4,11
52:20 59:10
63:20,25 64:3
85:25 88:12
100:15 111:10
120:8 144:20
**compared** 53:4
82:6 95:10
120:1 122:23
129:5 161:15
165:7
**compares**
121:14
**comparing** 63:8
86:7 100:17
113:4
**comparison**
63:12 98:20,24
136:14 150:23
**complaints** 21:9
21:9,10
**complete** 26:25
187:6 192:8
**completed**
190:17
**completely**
58:18
**complex** 39:7
**compliance** 84:3
**complies** 137:12
184:5
**comply** 67:2
**components**
20:6

**compromise**
140:22,23
**computational**
21:21
**conceptual**
172:10
**conceptually**
125:16
**concerns** 151:1
**conclude** 30:7
**concluded**
186:14
**conclusion** 30:15
66:6 141:5
142:14
**conclusions** 30:2
58:10 67:24
76:16
**condition** 91:14
**conduct** 31:25
51:15 113:2
134:12 144:25
184:10
**conducted** 15:23
40:20 62:14
112:16 157:15
184:8
**conference** 1:3
2:2 9:21 189:5
190:4 191:1
192:1
**configuration**
99:23 100:5
**confirm** 109:21
**confirmed** 11:11
**confirming**
65:21

**confused** 128:11
175:12,20
**congressional**
4:15 14:14,15
16:20 27:15
28:12 29:16
46:10 63:23
68:19 72:22,24
73:14,17 74:1
90:21 178:2,5
189:18
**congressman**
135:19
**connection** 4:18
10:21
**consider** 32:11
32:15 40:6 51:1
56:19 71:3
89:10 103:4
109:25 110:3,9
110:11,13
117:25 118:2
144:4 170:5,7
**consideration**
73:3 100:13
101:17 102:18
113:19 136:9
182:11,12 184:1
**considerations**
101:12 103:1
**considered**
136:6 144:9
159:16 183:2,7
**considering**
136:12
**consistency** 42:7
103:2

Kosuke Imai, PhD                                           August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

**[consistent - correct]**                                        Page 10

**consistent**
117:19
**constituency**
104:4
**constituent**
103:2
**constituents**
101:21 102:4
104:1 106:6,9
**constitute** 31:4
**constitution**
73:16
**constrain** 95:18
**constrained**
153:9 164:8,10
**constraint** 41:19
43:1 49:6 54:15
54:16 57:25
58:7 60:1,4,5
61:18 62:5 63:2
63:18 74:8,16
78:15 79:1,2,3,4
79:16,19,20,24
80:3,5,12,13,14
80:23 81:5,6,14
81:24 82:11,16
83:1 84:24
85:11,12,17,21
85:22,22 86:22
86:23 89:8,11,17
93:5 95:2 97:8
97:20 103:21,25
104:3,25 105:9
105:19 106:14
106:22 110:14
110:18 111:4,20
112:20,23 113:9
113:15,22 127:5

135:5,12,24
136:24 138:11
138:14,16,21
139:1,2,4,10,11
139:12 140:24
142:1,11,13,15
142:16,18,19,22
143:1,15,23
157:12 168:5
180:13
**constraints**
13:18 33:10,11
36:12,21 37:10
39:4,13 42:15,23
50:18,25 53:3
55:9,12 56:8,11
56:14,24 57:25
59:10 60:23
67:10,14,17,18
78:6,11,24 79:23
80:8,17 82:24
83:5,7,9,10,13
83:19,25 84:1,18
86:14 89:3
91:13 93:17
96:15 103:14
132:8 143:17,19
180:4
**construct** 55:8,8
**construction**
136:16 171:11
**constructive**
37:12
**contacted** 13:22
14:1
**contain** 16:19
59:25

**contained** 16:24
25:11
**contains** 159:24
**contaminate**
54:25
**contest** 73:23
**context** 86:7
**contiguity** 56:15
57:13 71:3,6,15
77:18
**contiguous**
70:19,23 71:9,14
153:15
**continued** 2:25
3:1
**control** 54:17
55:14 60:22
118:15,20
128:19,22 147:1
163:11
**controlled** 56:18
**controls** 61:2
80:20 98:4,7
132:13
**convenient**
81:19
**conversation** 7:7
46:3,6
**conversations**
6:23,25 7:4,9,14
12:24 13:9 46:8
**cool** 116:12
146:9
**copied** 46:15,18
**copies** 190:14
**copy** 7:23,23 8:2
8:3 17:16
185:18

**core** 104:1,4
106:6,9 176:6,7
176:12 180:10
180:18
**cores** 54:17
103:3,5,14,21
**correct** 18:17,18
26:20 28:24
29:17,18 30:4
33:2 35:2,7,8
36:19 44:14,15
50:11 51:2,4,5,7
52:22 56:12,13
56:16,17 59:22
60:2 63:18,19
64:11,16,20,21
68:4,9 70:20
71:16,21 73:5
74:3,4,8,13,14
75:20 82:18
83:6,8 86:11,12
87:21,22 88:20
89:9 92:4 94:3
94:22 99:3,6
100:18,21 101:1
102:23 103:22
104:1,11,19,20
105:10,11,16,23
105:24 106:6
107:9,14,24
109:23 110:10
111:21 112:21
113:9,10,12
114:7,16,20
115:3 116:9,20
117:9 119:1,2,22
121:15,21 122:2
122:5,17 123:12

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

[correct - cracks]                                          Page 11

123:16 124:5,23
127:12,13 128:1
128:20,24 129:7
130:6,19,21,22
134:16 135:9,10
135:12,13,16
137:10 140:11
140:19,20,22,24
142:10 143:11
143:12 145:25
146:3,12,18
147:2 148:6,16
149:20,24 150:4
150:7,24 151:2,7
151:22,23
152:10 153:2,10
154:16,23 155:4
155:21,22
158:15 159:10
159:14 160:20
161:18,19 162:3
166:11 167:9
169:12,13,25
170:1,4 171:18
171:22 172:13
172:16,17
174:15 175:9
176:13 178:17
179:6,10 182:23
182:24 183:3
184:9,25 192:8
**corrections**
192:6
**correctly**   7:7
36:18 38:3
39:14 43:19
44:11 66:8 73:4
88:16 100:2

101:2,23 108:9
116:10 117:1
138:18 147:10
154:15 159:9
**correlated**   112:5
**correspond**
67:14
**corresponding**
77:25 78:3
98:14 147:8
160:23
**corresponds**
75:2
**cost**   185:20
**council**   27:8
**counsel**   1:15 2:1
5:7 8:1,4 10:4
11:3,5,6,11,15
11:22,25 12:8,14
12:21 13:2
18:20 46:4,14,18
49:22 54:22
55:13 56:3 69:8
70:1 173:21,22
174:9 179:8
187:8 190:14
**count**   20:25 21:1
**counties**   77:24
79:4,14 89:5
91:20 92:6,11
95:19,21,23 96:1
96:11,18 102:16
105:4 133:20,24
134:7,13 157:22
165:10 168:18
168:21 183:19
**counting**   92:17

**county**   31:3,4,6
41:1 61:11 79:5
79:12 81:13
89:7,19,20,23
90:1,14,20 91:12
91:17 92:2,14,16
92:24 93:2,7,8
93:12,13,15,17
93:18 94:1 95:5
95:17 96:3,4,7
96:21 97:9
103:12 107:11
107:17 117:2,12
117:18,24 118:9
127:1,7,11,17
128:3,7,9,15
130:23 131:4,8
133:2,19 134:2,6
134:16,18,20
139:4 145:25
146:22 148:9
150:20 151:5,16
152:2,16,18,22
153:1 154:2,3,5
154:13,17,22
155:4,7,16,17
156:5,8,10,12,15
156:21 157:6
158:2,7,14,16,20
159:6,7,12,18
160:5,11,18
161:2,6,8,9,17
162:2 164:2,15
164:24 165:5,16
165:20,21
166:20 167:17
168:12,24 169:9
170:3,12,16,20

170:24 171:3
187:12
**couple**   7:8 34:20
37:21 44:2
74:23 78:23
95:13 127:15
182:18
**course**   6:2 12:25
73:22 81:9
105:22 117:4
124:20
**court**   1:1,16 4:20
5:2 10:4 28:4
29:9 184:19,23
185:3,8,13,17,21
185:24 186:3,6
186:10,13
**cover**   88:2,14
104:9
**covered**   88:22
181:19
**crack**   124:22
125:5 148:13
149:23 150:5
151:7 165:4
166:3 167:22
**cracked**   125:24
149:2 150:2
**cracking**   30:21
30:23 31:5,6,7
31:10,13,14,19
31:24 49:10
123:24 125:9
148:23 149:13
165:1,15 166:9,9
166:13,19
**cracks**   30:20
123:15,20

Kosuke Imai, PhD                                                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

[cracks - describe]                                                                    Page 12

124:12 125:7,21
149:16 150:10
164:23 165:19
**create** 57:7
113:2 152:20
**created** 58:3
83:16
**creating** 24:13
**criteria** 30:8
32:25 68:8,12,19
70:18 72:14,16
81:2 83:15
91:13 97:3
140:11 180:11
181:1 182:13
189:18
**criterion** 135:11
135:14,23
140:14 141:2
143:10
**criticism** 21:10
21:11,11,23
22:25 39:16,18
39:21 40:3
**criticisms** 21:18
22:1 40:15
**criticizing** 40:5
**cross** 11:11
**crum** 3:15
177:13,15,15
186:4,5
**cs** 190:15
**curious** 92:19
131:25
**current** 17:19,19
18:23 75:8
**currently** 54:4

**curriculum** 19:4
189:9
**cusick** 2:14
**custom** 138:14
138:20,22
**cut** 85:15 108:19
179:5
**cv** 1:6 17:16,19
17:19,23 18:17
18:22,23,24
24:20 25:8,11,14
27:4

**d**

**d** 188:1
**d.c.** 2:21
**darker** 116:16
**data** 11:14,19,20
11:23,24 12:1,6
12:7,8,9,9,12,15
12:18,19 20:11
26:11 32:4
46:12,13,17,18
50:24 51:16,16
52:10 53:1,8,9
53:10,13,19 54:1
54:2,3 74:18
75:10 85:6 86:2
91:25 102:10,13
109:25 155:9
181:13
**date** 1:12 173:23
174:1,2 191:24
192:12
**dated** 16:10
189:7
**day** 2:19 4:12
6:5 187:11

192:15
**days** 190:17
**dc** 2:6,11
**debates** 43:13
**decade** 60:19
**decided** 17:11
**decision** 26:6
**decisions** 13:11
154:25
**declare** 192:4
**decrease** 120:7
136:4
**decreases** 136:17
**decreasing**
122:11
**deemed** 192:6
**default** 80:9
81:17,19,25 97:7
**defendant** 3:2,8
28:1,6
**defendant's** 9:20
16:9 19:3 34:3
65:9 68:16
69:14 173:13
189:3
**defendants** 1:9
1:15 2:18,18 3:2
3:8 4:13 177:17
177:19
**defendants'** 9:21
189:4
**defense** 2:14
14:3
**define** 30:23
**defined** 125:18
**definitely** 111:1
153:20 168:9

**definition** 30:25
31:2,5 71:11,11
71:12 104:4
105:6,18 106:10
123:14,24 124:6
124:9 125:9,22
148:23 149:13
165:1 166:9
**definitions**
105:13
**degree** 19:11
88:25 166:12,19
**demarked**
158:16
**democrat** 32:13
110:5,20
**demography**
101:18 102:1,7
**depending** 38:12
39:20 67:9
74:24 104:11
116:8 168:13
**depends** 85:6
96:8 102:6
123:17 167:25
**deponent** 188:11
190:13 192:3
**deposed** 6:10
**deposing** 190:13
**deposition** 1:11
6:21 7:19 8:13
9:22 10:9 25:10
77:12 135:1
177:8 186:14
189:5
**describe** 19:7
125:3

Kosuke Imai, PhD                                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

[described - district]                                                    Page 13

described   33:24
  142:8
description
  149:8
design   164:9
designed   83:15
detail   32:20
  139:23
details   185:12
determinant
  140:7
determination
  100:1 101:1
determine   68:3
  102:10 144:10
  144:15,21
determining
  30:14 101:16
  106:1 142:3
developed   23:13
  24:5 45:15
developing
  26:12
development
  20:7,9 45:15
  75:8
deviation   56:20
  71:19 72:2,19
  73:2,16,19 74:12
  75:2,6 76:14,15
  76:21 90:22
  91:9
deviations   74:2
  147:7
diagnostics
  33:22
difference   23:10
  35:14 42:9

76:20 119:4,8,9
120:6 129:2,4
131:19,23 132:4
132:24 133:11
141:11 151:19
151:21 156:21
differences
  22:14,16 35:9,12
  41:17 131:12
  133:17 157:16
different   23:3,12
  24:15,23 36:1,2
  37:17 38:12
  42:14 44:6,19
  49:5,6,6 57:25
  66:7 67:6,10
  76:19 78:23
  82:13 83:19,20
  83:25 84:10,16
  86:2,3,4,8 88:22
  88:23 95:20,23
  96:1,24 97:19
  98:5 104:10,17
  104:18,20,21
  111:11 114:23
  115:2,19 116:2,7
  116:8 131:12
  132:11,12
  142:13,23
  166:12
difficult   39:7,11
  42:3 75:7
difficulties   43:16
direct   105:9
  108:6
directly   13:8
  49:16 50:14,16
  51:11 55:8 56:7

58:6 61:18
75:22 93:13
98:3,7,7 100:7
100:14,14
103:18,23 104:3
105:19 180:14
disagree   62:21
  67:4
disappoint
  184:17
disclosed   13:13
discourage
  78:13 80:15
discouragement
  80:18
discourages
  79:21 80:5
discovery   62:17
discriminates
  29:24
discuss   22:4 46:4
  77:12 135:1
  158:1 166:18
  177:7
discussed   7:19
  12:23 13:8
  14:24 45:23
  46:1 52:25
  104:7 136:1,3
  148:15 165:18
  178:15 179:25
discusses   176:6
  176:17
discussing   77:16
  85:24 126:10
  163:20 170:15
discussion   156:5
  164:1 176:12

display   10:1
  65:14
displaying
  150:21
disproportiona...
  150:21
dispute   129:21
  175:3
disqualified   29:5
distribution   33:8
  33:13 36:14
  39:3 44:8 82:19
  82:20 125:11,14
  147:7 167:11
  168:14
distributions
  44:3
district   1:1,1
  24:9,14 30:14
  31:12 32:16
  35:16 36:5
  37:13,15 40:25
  41:8,19,22,25
  42:4,21,24 43:2
  54:18 58:11
  61:4,10 64:11
  75:11 76:11
  79:8,11 81:4
  84:23 86:1
  87:19,20,24 88:2
  88:3,12,13,19,19
  88:22,24 89:6
  90:21 91:19
  95:25 98:14,18
  98:21,24 99:4
  100:21 101:14
  101:17,20 102:2
  102:11 107:7

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

**[district - dr]**                                                          Page 14

110:4,23,25
113:24,24 114:5
115:2,24 116:2,2
116:13,17,22,25
117:5,12,16,23
118:16 119:5,19
119:22,24 120:3
120:8,14,19
121:10,14,19,20
121:22 122:4,4
122:11 123:6,9
123:10,15
124:16 128:1,7
128:10,19,23
129:2,9 130:2,3
131:2 134:2,8,8
135:15,18,19,20
136:1,4,5,8,13
136:15,16,17,19
136:24 137:9,11
138:15,24,25
139:9,15 140:1
141:8,14,17,19
141:21,24 142:3
142:9 145:25
146:2,10,16
147:1,5,19,19,23
147:24 148:2,3,4
148:4,6,8 149:1
149:1,8 150:22
151:9,16 152:4,9
152:9,10,12,15
152:23 153:1,6,8
153:13,20,21,23
153:25 154:6,14
154:23 155:7,14
155:17 156:4,4
156:18,19

157:13,17,17,20
158:4,4,13,13
159:8,13,18
160:6,12,16,16
160:18,22,23
161:2,4,7,9,10
161:15,15,21
163:10,10,21
164:1,5,6,6,7,10
164:17 165:10
165:14,20
166:11,23,25
167:3,8,24 168:8
168:10,22
169:25 170:3,12
170:24 171:3,7
171:12,14,15,19
171:24 172:5,16
172:22,24 173:1
180:23 183:17
183:21,23 184:4
**district's** 115:3
171:4
**districting** 30:8
57:18
**districts** 23:23
23:24 24:3 31:2
32:12 36:12
37:14 39:10
40:23 41:2,6,10
41:16 42:1,10
55:3,16 56:19,19
57:16 61:7,8
64:15 70:18,22
71:8,18 72:22,24
73:14,17,20,22
76:11 77:22
78:17 79:6,8,10

79:11 80:6 86:3
88:14 91:4,18
92:6,10 94:8
96:6 97:13,22
98:13,19 103:3,5
103:9,10,15,21
104:1,7,9,17
105:22 106:1,6
110:19 113:7
114:8,22 115:18
115:19 118:25
119:22,24
121:18 122:7,9
122:17,25 123:2
123:4,21 124:1,4
126:2 127:6,11
130:9 132:12
133:4,6,10,21,25
135:8 136:2,5,12
146:3 147:21
149:16 153:4,21
154:7 155:20
157:7,9,20
158:19 160:10
160:20 161:16
161:17,25 162:2
162:19,21,23
166:15 168:18
168:23 169:11
171:6,22 172:3
172:16,19
**diverse** 76:20
**divide** 129:11
162:11
**divided** 31:11
123:20
**dividing** 96:20

**division** 1:2
**divisions** 106:12
**document** 9:16
10:5,7,10,13
16:15,17 18:19
34:11,13 38:20
68:24 69:1,5,7
69:20,22,25
173:20,21
**documents** 7:21
8:8,12 10:21,22
70:3
**doing** 74:22
122:7
**dominates**
143:23
**dorchester**
134:15 156:8,14
157:19
**double** 106:16
106:21
**dr** 4:5,11 6:10,16
9:7,11,13,15
10:5 11:14
13:20 16:4,14
17:13 18:10
19:7 25:18
28:25 34:1,11
36:17 40:15
43:3 47:22
48:17,22 56:1
59:18 62:12,13
62:20,25 67:20
68:6,23 77:12
99:7 101:3
112:4 113:23
135:1 173:20
177:7,10,14,25

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

**[dr - enacted]**                                                    Page 15

177:25 179:11 180:3 182:14,19 183:16 184:12 184:19
**draft** 12:25 13:9 21:15 22:3,10 39:25,25 43:4 44:25 46:6,9 47:24,25 48:6,13 48:15 51:21 54:10 55:10 59:14,16,19 62:8 62:11,14,16 63:11 169:3,5 178:10,15 185:5 185:10
**drafted** 178:1
**drafts** 179:5,7
**draw** 59:2 66:5 67:24 76:16 95:20
**drawer** 28:25 58:12,15,16,19 58:23,25 59:1,6 76:7 117:22 154:21,25 159:11,16 170:2 182:6,22 183:1,7 183:12
**drawer's** 117:25
**drawers** 83:16 170:6
**drawing** 29:3 58:10,11,13,15 76:11 91:18 112:25 113:6 180:23

**drawn** 137:11 142:6,10 172:15
**draws** 30:2 37:23 165:20
**drew** 58:16,23 59:6
**drop** 80:1
**dropped** 86:18 120:3
**dropping** 86:13
**duchin** 9:9
**due** 108:4 113:19 157:11
**duly** 4:2

**e**

**e** 15:12 106:11 188:1 189:1 191:3,3,3
**earlier** 29:16 35:3 45:16 148:22 179:11
**early** 178:9
**easier** 42:25
**eastern** 153:22
**ecological** 20:9 26:16
**edges** 97:23 98:2 98:6,21 132:14 132:23
**education** 19:14
**educational** 2:14 19:8
**effect** 32:7,10 115:3 116:2 118:2 122:10,12 130:7 155:6 159:17 170:11

171:2
**effectively** 79:13 101:21 102:4
**effectiveness** 31:25
**effects** 115:19
**efficiently** 36:13 37:24
**effort** 55:14
**efforts** 72:25
**eight** 85:21 86:5 109:16 138:17 139:6 173:10,12
**either** 27:17 64:4 87:14 91:15 94:15 104:6 106:20 112:3 115:1,23 118:23 126:17 133:10 176:21 177:2
**elaborate** 74:19 75:15
**elect** 32:12 110:4 110:19 122:12 183:13
**election** 3:8 12:14,18 32:4 109:25 159:21 170:14 177:16 181:24 182:2
**electoral** 182:9,9
**eliminate** 81:8
**eliminated** 87:9
**elizabeth** 3:15
**email** 11:7 46:14 184:20
**emphasize** 39:19

**empirical** 22:1 83:1
**enact** 110:4 144:11 182:4
**enacted** 24:2 29:16,20,24 30:8 30:14 32:1 41:24 49:3,25 50:9,9,14,20,21 51:6,12 52:8,11 52:21 53:5 55:3 55:17 57:1 58:6 58:11,13,16,20 58:23 59:2,3,7 59:10 61:14,14 63:9 66:18 74:22 76:6,8,12 77:23 78:1,3 82:4,6 83:11 87:20 88:3,12,24 89:19,23 90:1 91:4,8 92:18 93:3,9,10,16,20 94:2,11,18 95:11 95:19,21 96:6,8 96:11,25 97:14 98:14 100:11,12 104:9 106:1 107:6,10,21 111:10 112:11 113:1,5,7 114:10 119:5 120:1,9,20 121:14,19 122:22 123:20 124:12 127:9 129:5 130:18 131:3,6 132:22 133:21 134:8

Kosuke Imai, PhD
The South Carolina State Confvs.McMaster/Alexander

August 8, 2022

**[enacted - expedited]**

Page 16

135:20 136:9
137:5,9 141:1,11
141:25 144:12
144:18 147:6
149:15 150:2,10
150:20 151:18
151:19,21
152:25 153:25
154:19 155:19
156:23 157:20
158:9 160:16
161:7,16 165:8
167:8 168:17
169:12,19 172:5
172:13 173:2
179:18,25 180:1
180:23
**encompass**
104:17,18
**encourage** 78:14
80:15
**encouraged**
78:15 82:7
**encouragement**
80:18
**encourages**
79:21 168:9
**ended** 13:10
**ends** 117:5
**energy** 39:4
**enforces** 95:5
**engagement**
14:2
**ensemble** 44:6
44:17
**ensure** 33:3,22
79:22 81:3
139:7

**entire** 154:13
156:17 159:7
160:11 161:2
180:21,21
**entitled** 5:14
**enumerate** 37:8
**enumeration**
37:7
**equal** 72:6,10,18
72:22 77:19
79:14 89:23
95:9
**equality** 73:1,13
**equalize** 75:11
75:19 77:3,7
155:20
**equalizing** 76:13
**equally** 82:5
175:19
**errata** 190:11,13
190:17
**especially** 38:13
39:12
**essentially** 41:3
41:11 131:14,21
132:21,22
**establish** 111:14
**et** 1:4,7 2:3
15:17 190:4
191:1 192:1
**evaluate** 19:24
20:8 49:14,16,24
52:6 57:21 58:4
58:5,20,25 61:24
76:7 144:18,23
**evaluated** 39:22
40:13 52:8

**evaluation** 30:12
49:25 59:2
**events** 187:9
**eventually** 21:20
23:1,5
**evolved** 27:13
**exact** 58:18 72:8
72:11 120:5,21
120:25 147:16
162:3 173:23
174:1
**exactly** 12:5 56:3
57:13 94:6 96:7
134:11 161:19
162:16 168:21
**examination** 4:3
177:23 182:16
188:3,5,7,9
**examine** 29:23
92:5,8 143:25
144:4 156:7,14
180:22
**examined** 43:24
152:6 164:17,21
165:3
**examines** 40:25
**examining**
156:18
**example** 12:3
21:20 32:11
37:15 50:24
63:21 64:1 67:7
78:14 79:23
80:9 81:3,13
88:17 95:18
100:21 103:9
104:15,16
110:17 124:10

125:8 165:9
168:5 178:18
180:10 181:24
**exceed** 71:18
**exclude** 56:22
**excluded** 140:14
142:19 143:15
**excuse** 70:17
161:7 172:21
**exhibit** 7:25 8:5
8:5,16,19,21
9:16,20 10:2,15
10:23,24 11:3
16:9,13,14 18:1
18:3 19:1,3 25:3
25:14,16,16 34:2
34:3,8,10 46:24
47:4,18 65:7,9
65:13 68:15,16
69:12,14,19
72:13 73:7
99:14 101:5
173:8,12,13
189:4,7,9,11,14
189:16,20,23
**exhibits** 6:22
174:10 189:3
**exist** 124:25
**existing** 35:7,25
36:15,24 37:2,19
38:1,10 39:5,10
41:24 43:2,17,22
103:3,5,15
105:22
**expect** 91:11
**expedited** 185:1
185:10

Kosuke Imai, PhD                                             August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

[expert - first]                                                    Page 17

expert   7:22 8:24
  9:2,6 11:2,21,24
  12:22 13:3,14,16
  14:13 15:2,7,19
  15:24 16:5,9,19
  22:5 23:12
  24:25 26:8 27:1
  27:2,12,12,20,23
  27:25 28:7 29:2
  29:6,9 43:15
  45:25 47:15,24
  47:25 48:16
  54:10 55:10,19
  59:19,24 63:12
  69:6 70:5 74:5
  77:15 189:7
expertise   17:10
  19:25
experts   9:4
expires   187:24
explain   22:11,15
  22:16 65:20
  67:5 75:25
  80:11 108:11
  132:4 151:12
  160:1 180:19
explained   23:12
  42:20 63:3
  105:25 141:13
  141:17 181:15
explains   112:11
explanation
  70:24 92:9
  150:25
explanations
  158:18
explicit   44:5

explicitly   48:13
explore   37:24
  66:1
extensively
  43:15
extent   48:5
  53:25 56:17
  61:4,7,12 87:8
  100:9,12,16
  101:19 102:2,16
  103:6,8 105:2,5
  105:11 153:9
  168:7,11
extra   151:25

                f

f   101:14 107:25
  108:2
facebook   45:21
fact   23:6 33:18
  44:16 60:16
  62:16 75:20
  108:4 121:23
  141:17 154:11
  154:11 159:5
factor   71:17
  82:23,25 99:20
  140:2,5,7,22
  141:1,3,7 142:10
  144:1,5,11,16
  181:8
factors   40:7 55:5
  56:18 57:6,7,8,9
  57:11 58:3,8
  61:19,22 62:1
  63:6 78:5,6,11
  78:12 80:21
  82:23 84:9,18

86:4 91:7
  141:12 157:3
  181:7
fails   190:19
fair   5:25 6:1
  67:20 84:2 87:6
  100:23
falling   94:14
familiar   93:23
family   23:19
  24:16 65:10,16
  189:14
far   87:2
favored   182:5
february   187:25
federal   73:13,25
feedback   13:1
fees   14:21
fewer   76:15
  89:22 92:2 93:8
  93:13,15,19 94:1
  94:5 95:9 161:6
  166:25
field   20:3 33:23
  40:10
fifield   45:2,5,12
  45:18 46:9,12,13
  46:19,21
figure   46:25
  68:22 89:21
  90:3,5 94:7,22
  94:23 106:23
  107:4 114:12
  116:11 118:13
  120:11,12,13
  127:18,23,25
  128:5,6,12,12,13
  128:14,15

130:14,15,16,24
  132:14 133:2
  146:6,8 151:10
  151:12,14
  152:19 158:11
  159:24 160:1,4
  160:24 161:22
  162:13 163:9,9
  163:18 167:6
figures   15:17
  97:18
file   17:24 26:13
  173:10
filed   27:2
files   12:10 26:11
  26:14 102:9
final   13:10 52:23
  56:9 59:3,5,22
  62:4 86:16,17,19
  103:17 139:13
  139:19 178:3
  179:25
finding   117:14
  117:20 123:22
  141:10 149:25
  151:8
fine   38:14
  129:19 179:24
  185:6
firm   4:12
first   4:2 9:16
  13:22 14:1
  36:17 40:18,21
  44:3,23 45:2
  64:12,13 66:2
  76:4 78:25
  95:24 104:13
  112:19 113:2,23

Kosuke Imai, PhD
The South Carolina State Confvs.McMaster/Alexander

August 8, 2022

[first - given]

Page 18

127:4 140:9
156:19 158:6
169:14
**five** 7:3 65:8
68:10,13 72:14
72:15 90:11
92:6,11 99:8,9
138:9
**fixed** 114:10
154:4
**flip** 72:13 145:17
146:6
**flipping** 39:9
163:17
**floor** 2:15
**florida** 27:4
**focus** 20:4 26:12
29:11 96:3,4
123:7
**focused** 160:14
**focuses** 49:25
**focusing** 164:13
167:12
**folder** 8:5 9:17
**follow** 14:11
22:17 47:9
**followed** 83:10
137:22 184:2
**following** 33:23
47:11 61:12
**follows** 4:2
**footer** 38:21
**footnote** 44:23
44:24 71:23
**foran** 3:21
**foregoing** 187:5
192:5

**forget** 66:23
**form** 5:14 11:17
13:18 57:2,20,22
59:12 62:7
66:13,21 137:17
141:4 143:6
149:3,6 165:6,22
171:23 178:6
179:1
**formal** 14:2
**forman** 3:9,14
**formed** 175:5,8
175:24 176:4,10
176:11,14,19,23
177:1
**former** 45:7
**formula** 99:25
**formulate** 11:1
**formulated**
110:16
**formulation**
132:17
**fort** 187:11
**forty** 65:23
**forward** 93:25
**found** 29:9
113:18 141:16
156:20
**four** 7:2,2 27:3
34:2,7,8,9 72:18
90:11 92:6,10
128:5,6
**fourth** 38:24
43:4
**fraction** 98:6,21
132:13,22
**fractions** 97:23
98:1

**freeze** 61:10
135:8
**freezes** 103:9,11
**frep** 24:7
**frequently**
116:17 117:12
117:16 124:21
126:11 146:21
**friday** 7:5
**front** 73:10
**froze** 131:2
157:8
**frozen** 127:9
133:11
**full** 4:8 21:24
66:2
**function** 39:5
**fund** 2:14 14:3
**further** 127:5
150:25 177:11
184:13 187:7

**g**

**g** 15:13
**general** 38:7
39:18 40:2,8
55:7 83:11,18,22
83:24 84:8,13
136:18,22
152:17
**generally** 29:19
38:17 67:3
**generate** 32:24
33:23 35:17,17
35:20 38:2 41:8
41:25 44:17
50:16,17,18
52:19 75:22

76:5 86:24
89:18 92:2
97:21 152:13
**generated** 44:6
52:25 59:8 75:9
75:19 87:15
**generates** 33:12
40:22 51:3
82:17 95:3
**generating** 35:21
36:1,2 75:13
103:5
**generation** 51:11
**generic** 139:3
**geocoding** 26:19
**geographic** 73:3
88:2,14,23,23
**geographical**
31:1,16 60:13,20
105:18 126:1
132:12 168:14
**geographically**
70:19
**geography** 31:8
63:3 101:18
102:1,7,9 104:10
104:18
**gerrymandering**
28:10,12,14,16
28:20,22 111:5,8
**give** 87:19 124:6
**given** 75:7,24
80:25 101:18
132:7 138:16
153:24 173:21
173:22 180:7
192:9

Kosuke Imai, PhD                                          August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

[gives - higher]                                                    Page 19

**gives** 33:21
**glad** 90:2 162:5
  175:19
**global** 167:18
**go** 5:15 24:25
  25:18 43:3
  44:22 49:13,21
  56:1 62:20
  64:23 65:2,7,21
  68:10 77:8,15
  89:1 95:3 99:7
  101:9 106:23,23
  109:12 113:11
  113:23 126:20
  126:20 130:11
  134:22 138:2
  151:10 159:1
  172:18 177:4
**goal** 52:5,5 56:4
  58:5,19 59:5,6
  61:25 67:10
  76:7,9 83:12
  94:16 136:19
  164:19 167:15
  180:20,21
**goals** 81:2
**goes** 23:4
**going** 5:24 9:15
  10:1 16:4 17:13
  17:22 24:19
  34:1 36:9 37:21
  38:19 46:24
  48:4,22 64:23
  65:14,19 66:24
  68:15 69:9,9,12
  76:15,21 91:20
  96:22 139:9
  173:7,12 184:17

**good** 4:5,6
  185:11
**gore** 2:20 4:4,11
  9:25 13:6,12
  16:12 19:6 25:9
  25:13,17 34:6
  47:3,8,14 48:8
  48:14,21 49:12
  49:20 51:19
  52:2,14 53:21
  54:8,20 55:20,24
  55:25 57:3,23
  59:15,17 60:9
  62:10,16,19,23
  62:24 63:14
  64:22,25 65:12
  68:21 69:18
  77:8,11 126:20
  126:24 134:22
  134:25 137:18
  143:7 148:21
  149:4,11 165:17
  166:1 172:1
  173:16 177:4,7
  177:10 179:1,11
  181:11 182:17
  184:12,24 185:1
  185:6 188:6,10
**graham** 28:21
**graphical** 21:21
**gray** 158:17
**great** 6:9 29:23
  69:12 114:11
**greater** 20:1
  72:2 74:2,10,13
  74:20 75:6
  77:25 78:2

**greenville** 3:5
**group** 31:7,10,15
  124:7 125:25
  149:9
**growing** 37:15
**guarantee** 33:16
  33:19,21 70:22
**guess** 70:25
  109:15 146:14
  147:15 174:12
  177:21 179:22
  185:7 186:8
**guidance** 15:16
**guided** 96:15
**guideline** 8:2,3
  69:23 76:23
  96:19 99:9
  112:1 180:13,15
  181:3 182:8
**guidelines** 8:17
  8:18 68:18 69:2
  69:15 72:2,3,6,6
  72:10 73:8
  74:11,12 83:14
  96:17 99:11,15
  101:6,7 102:21
  103:1 136:25
  180:5,7,9 181:20
  181:22 183:3,9
  183:14,17
  189:18,20

**h**

**h** 15:10 189:1
  191:3
**half** 64:23
**halves** 166:17

**hand** 90:5
  116:11 187:10
**handles** 41:17,18
**handwritten** 8:8
**happen** 67:8
**happened**
  122:22 123:5
  180:24
**happens** 95:1
  152:14 153:7
**happy** 185:7
**hard** 21:1 39:8
  79:3,16 89:16
**harpootlian** 64:8
  145:15
**harvard** 19:12
  19:13
**head** 5:5 170:22
**heading** 108:2
**heavily** 84:9
**heavy** 89:11
**help** 86:21 89:12
  128:4 144:8
**helped** 15:16
**henry** 190:4
  191:1 192:1
**hereto** 192:7
**hereunto** 187:10
**hierarchical**
  79:1,2 139:10
**high** 148:8
**higher** 85:10
  110:23 119:19
  120:19,23 121:7
  121:19,24 130:3
  130:20 141:18
  161:15 172:12

3:21-cv-03302-MGL-TJH-RMG    Date Filed 09/02/22    Entry Number 344-2    Page 213 of 239

Kosuke Imai, PhD                                                    August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

[highlight - included]                                              Page 20

**highlight** 43:16
**highly** 39:6
  112:5 150:22
**hired** 13:21
**histogram** 90:6
  91:2 107:16
  120:10 121:13
  130:25 133:2
  152:14 160:22
  160:23 161:20
  163:23 164:1,4
  170:16
**histograms**
  107:2 127:15
**hoc** 68:18 189:17
**hold** 29:14 32:22
  65:23 72:15
  87:13 88:9 89:4
  109:14 145:21
**hope** 34:18
  68:22 184:16
**hopefully** 65:14
**hour** 7:11,11
  64:23
**hourly** 14:20
**hours** 7:11,12
**house** 3:2 6:14
  8:1,17 14:15,16
  28:5,13,13,14
  68:7,12,13,17
  69:3 72:2,5,14
  72:16 99:9,10
  100:24 136:25
  177:19 180:5,14
  189:16
**huge** 132:24
**huh** 20:19 30:19
  37:1 70:16

72:17 74:6
81:17 85:1,19
94:25 99:16,21
101:13 104:24
106:13 107:3
108:8 111:18
114:13 115:10
116:15 118:14
124:11 125:20
127:19 131:5
132:2 135:13
138:12 142:7
146:4 147:9
148:12,24
149:17 150:24
154:9 155:18
156:6 158:3
159:25 163:24
164:3 165:2
169:22 170:18
172:14 176:9,18
181:21
**hum** 179:21
**hundred** 76:13
  76:19
**hypothetical**
  91:22

---

**i**

**ideal** 72:23
**identification**
  9:23 16:11 19:5
  34:5 65:11
  68:20 69:17
  173:14
**identify** 28:9
**image** 121:17
  123:9 161:21

163:11
**imagine** 62:23
**imai** 1:11 4:1,5
  4:10,11 6:10,16
  9:15,22 10:5
  11:14 13:20
  16:4,10,14 17:13
  18:10,17 19:4,7
  25:18 28:25
  34:1,11 36:17
  40:15 43:3
  47:22 48:22
  56:1 59:18
  62:12,13,20,25
  67:20 68:6,23
  77:12 99:7
  101:3 112:4
  113:23 135:1
  173:20 177:7,10
  177:14,25,25
  179:11 180:3
  182:14,19
  183:16 184:12
  184:19 188:4
  189:6,7,9 190:5
  191:2,24 192:2,4
  192:12
**impact** 67:7
  168:15 180:25
**implementation**
  80:19
**implicated**
  170:20
**implications**
  61:5,16 103:14
**implies** 154:12
**implying** 108:5

**important** 5:20
  20:3 41:17 76:5
  172:11 182:4
**importantly**
  45:6
**impose** 41:19
  42:22 57:14
  58:6 63:2
  142:21
**imposed** 33:10
  33:11 39:13
  58:1 61:1 67:11
  106:22 140:24
**imposes** 54:12
**imposing** 13:10
**impossible** 39:11
  42:19
**impressions**
  178:23
**improved** 26:18
**improves** 38:10
**impute** 26:15
**inadmissible**
  29:9
**inbox** 11:9
**include** 37:19
  55:3,4 56:11
  57:11 62:3
  63:17 103:20,24
  104:6,25 106:2
  107:1 111:13,20
  112:20,22 113:9
  117:22 126:15
  160:11 170:16
  170:23
**included** 12:1,6
  12:19 17:23
  27:4 37:4,6

47:25 51:21 54:11 55:11 59:9,20,21 60:5 63:12 113:21 124:16 140:18 143:10 169:3,5 178:10
**including** 54:24 56:8,23,23 106:3 181:10
**incorporate** 36:12,21 39:4 49:23 56:7 180:18 181:4,5
**incorporated** 112:2 136:10 142:24
**increase** 81:7 136:3
**increases** 141:19
**increasing** 136:15
**incumbency** 56:15 60:25 61:3 79:23 81:4 81:8 84:21,23 85:20 86:22 87:16,23 139:16
**incumbent** 12:12 73:23 77:21,22 78:15 86:20 105:5 106:8 116:22 153:9,12 153:17
**incumbent's** 87:20
**incumbents** 78:17 79:25
80:6 81:7 86:11 86:14,16,25 103:7,25 104:2,5 106:5
**independent** 35:25 58:18
**index** 3:23 188:16,18
**indication** 180:10
**indirectly** 100:8 100:17
**individual** 20:11 149:2,7
**individuals** 26:5 26:11 115:8,8 118:21 160:17 160:17 170:19
**inference** 20:10 26:17
**influence** 57:12 58:9
**inform** 84:13
**information** 12:11 26:13,14 55:4 59:1 104:5 109:19,21,22 111:9,14,23 112:1 118:10,23 159:19,22 170:13 181:16 188:16,18
**informed** 67:15 83:13
**inheriting** 58:8
**inherits** 61:18,22
**initial** 157:15
**input** 44:24 93:6
**inputs** 102:17
**inquire** 20:10
**instances** 7:16
**instruct** 78:13
**instructed** 80:15 96:10 103:7 110:12,22 112:3
**instructing** 55:20
**instruction** 182:1
**instructive** 67:2
**instructs** 5:15
**insulate** 62:17
**intend** 16:23 17:1
**intent** 30:3,5 118:1 136:22 182:6,22
**intention** 58:18
**intentional** 30:1
**intentionally** 29:24
**interchangeably** 109:10,11
**interest** 101:19 102:1,7,14 104:23 105:1,5,7 105:10,16,19 132:1
**interested** 19:21 19:23 187:9
**intern** 3:21
**interpretation** 22:1
**introduce** 9:16 68:23 69:19
**introducing** 16:13
**intuitive** 85:9
**invalid** 40:12
**involve** 51:12 162:1,21
**involved** 15:6 27:14 42:11 45:15
**involving** 179:4
**isolate** 57:10 105:25 180:25 181:8
**isolating** 55:1 56:6,16,25
**item** 11:10
**items** 11:6,10
**iterative** 22:21

**j**

**jacksonville** 27:3 27:6,10 28:18,19
**jasper** 134:20 156:12 157:19
**jcusick** 2:17
**jmgore** 2:22
**john** 2:14,20 4:11 48:4 62:22
**joined** 101:20 102:2
**jones** 2:19 4:12
**jonesday.com** 2:22
**journal** 21:21 23:3
**journals** 22:22
**judge** 99:24 100:5

Kosuke Imai, PhD
The South Carolina State Confvs.McMaster/Alexander

August 8, 2022

[judged - left]

Page 22

judged   99:22
   100:24
judgment   67:13
   67:16 175:6
   184:7
judiciary   4:14
   68:17 69:16,24
   189:16,21
july   7:8 27:2
june   18:17,24,25
   19:3 189:9
justified   73:18

**k**

k   15:11,11,12,12
keep   76:24 109:2
   109:4 135:14
   136:13,19 142:1
   150:1,2 151:9
   154:21 159:12
   165:8,10 170:2
   170:25
keeping   103:25
   106:5 139:25
   141:8,13 157:12
   168:8 171:2
   183:16,20,23
kentucky   28:22
kept   96:6 97:23
   98:2,6,21 132:14
   132:23 141:24
   169:18
kevin   15:12,12
   15:21
kind   65:2 92:20
   95:5 101:3
   111:4,20 126:16
   145:1 164:4

kinds   78:24
know   6:3 7:25
   8:5,20 11:1,6
   12:2,5,16 15:13
   17:10 18:24
   19:23 20:25
   21:8,8,12,23
   23:5 28:13 29:7
   29:10 31:8,14,15
   35:13,17,22 37:8
   38:8,13,14,18
   39:21 40:2,8,10
   41:13 42:14
   43:24,25 45:16
   45:18 46:5 48:9
   51:13 53:10
   54:10,12,23,25
   56:3,3,9 57:7,10
   57:11,13 58:4
   59:1 60:18 61:2
   61:9,12,16,19
   62:1 66:20 67:8
   75:12,17,25 80:2
   80:5,24 81:2,5
   82:5,9 83:13
   85:8,10 86:12
   87:24 89:15,21
   89:22,25 91:24
   92:12 93:7,14
   95:9 96:5,15,20
   97:20 98:4
   100:13 102:12
   102:14,19 103:6
   103:9,13,18
   104:3,11,12
   105:3,5,13,18
   110:15 111:2,6
   111:11 112:8,24

113:2,18 116:21
   117:3 120:7,24
   121:16 122:8,22
   123:19 124:24
   125:1,2 129:8
   131:11,19 132:3
   132:10,13,19,24
   133:17 134:10
   136:3,8,14
   137:15 139:3,8
   140:6 141:8,19
   143:23 145:8
   147:16 148:1,7
   149:9 150:2
   151:15 152:6
   153:3,6 154:4,17
   154:20 156:16
   156:18,25 157:7
   157:18 158:6,9
   159:15,16 160:4
   160:25 161:3,3,6
   161:25 162:3
   163:1,2 164:9
   165:12 166:13
   166:14,22
   167:12 168:1,2,7
   168:11,13 169:4
   169:5,14,15,17
   169:18,20
   170:21,22,23
   171:13 172:23
   173:3 178:19
   179:13,15,21,23
   180:6 182:7,8,10
   185:13
knowledge
   167:10

known   44:8
konw   141:12
kosuke   1:11 4:1
   4:10 9:22 16:10
   18:17 19:4
   188:4 189:5,7,9
   190:5 191:2,24
   192:2,4,12
kuriwaki   15:8
   15:10

**l**

l   81:3
label   179:20
language   72:8
   72:11
large   36:11
   56:20 117:10,17
   118:8 146:22
   150:21 154:11
   187:4
largest   122:21
   123:5 156:21
launch   23:24
law   4:12 73:13
   73:25
lawsuit   179:8
lawyer   67:12,23
   137:14 184:6
lawyers   46:7
   49:22 178:16,22
lcrum   3:17
league   64:6
   145:12
leaving   44:5
left   45:20 90:17
   107:17 131:16

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

[legal - majority]                                                    Page 23

**legal** 2:14 14:3
30:15 31:16
36:12,21 67:2,14
67:15,17,22,24
68:4 125:24
137:15,20,21,25
184:6 190:23
**legally** 66:4,19
**legislative** 19:15
20:4 27:14 28:7
68:19 150:13
155:2 158:23
170:8 189:19
**legislators**
150:17 182:23
183:2,7,12
**legitimate** 73:19
**letter** 10:17 14:2
72:21 103:2
106:11
**level** 74:18 75:10
75:14,23 76:25
77:1 87:24
91:25 136:9,14
157:13 171:12
**liberal** 19:10
**liberties** 2:4,9
**lieu** 48:17
**light** 40:15
**lighter** 116:19
**likelihood** 146:9
146:16
**likewise** 103:24
175:8
**limitations** 73:3
**limited** 64:15
91:8 98:20

**limits** 79:4,13
**line** 94:11
107:17 120:24
131:16 148:25
149:18 151:18
151:21 158:1,14
158:17 163:21
165:20 188:2
189:2 191:4,7,10
191:13,16,19
**lines** 149:23
173:25
**list** 11:10 14:10
26:25 27:11
66:11 70:17
77:17
**listed** 10:22,24
11:21,23 14:13
66:10 106:17,19
180:12,15 183:9
184:1
**lists** 103:2
**literature** 21:12
**litigation** 16:21
**little** 8:11 13:21
32:18 42:3 70:3
89:12 90:9,17
97:6 132:23
144:8 175:11,21
**liu** 9:7
**live** 31:15 118:21
124:7 128:3,9
148:14 149:10
152:1,22 160:5
**lived** 128:23
**lives** 116:23
117:2,5 151:15
153:10

**living** 31:8 60:19
123:25 124:4
125:25
**liz** 177:15 184:15
**llp** 3:9,14
**loaded** 65:13
**loading** 16:14
**local** 64:10,14
122:16,24
134:12 135:8
141:16
**localized** 81:13
84:23 89:6 97:8
97:9 112:19
113:24 141:18
148:15
**location** 1:14
12:12 55:15
60:17 87:23
124:8 125:18
146:23
**lodging** 55:22
**long** 7:9 23:6
47:12 111:1
**longer** 17:18
**look** 12:20 26:21
60:12,14 61:7
76:18 92:12
93:7 97:21
106:11 111:11
123:18 125:11
125:14 130:14
130:23 144:14
157:14 158:11
160:4,23 167:11
171:8 180:1
**looked** 179:12
179:17

**looking** 47:13
74:25 93:18
98:16,18,23
123:18 127:10
179:22
**looks** 84:22
107:6 117:10
131:18
**lot** 35:12 76:14
161:8 166:24,25
172:25
**loud** 36:9
**louisiana** 2:21
**lower** 85:11
119:21,25
121:11 130:4
139:24 147:7
161:14 172:20
**lowest** 73:1
**luke** 4:14

**m**

**m** 2:5,10,20 3:15
4:10
**ma** 1:14
**mace** 88:19
116:22 117:16
117:22 118:5
155:8
**mace's** 118:3
146:20 181:24
183:8
**main** 3:5,11,16
**maintain** 171:12
**major** 98:17
**majority** 107:12
107:22 131:7,15
154:12

Kosuke Imai, PhD
The South Carolina State Confvs.McMaster/Alexander

August 8, 2022

**[makers - mimic]**                                                                Page 24

**makers** 182:4
**making** 39:7
  73:20 81:10
**map** 28:25 29:3
  29:16,19 58:12
  58:15,16,19,23
  58:25 59:1,6
  76:7 83:16
  117:21,25
  118:21 154:21
  154:25 155:12
  159:11,16 170:2
  170:5 178:2,6,11
  182:4,4,6,22
  183:1,7,12
**maps** 36:11 46:9
  83:17 179:12,14
  179:18,25
**march** 27:5
**mark** 65:7 68:15
  69:12 173:7,12
**marked** 9:22
  16:10 19:1,4
  25:3,13 34:5
  47:18 65:2,11
  68:20 69:17
  73:7 99:14
  101:5 173:14
**markov** 23:22
  33:7 35:6,10,19
  35:24 37:3,4
  38:1,6 50:3,8
  65:10,16 189:14
**massachusetts**
  6:17
**master's** 19:11
**materials** 7:24
  7:25 8:19,20

11:12,12
**math** 129:14
**mathematical**
  23:16 33:12,19
  33:20,21 67:18
  81:18 98:9
  99:25 100:18,19
  100:22,25
  102:22 105:17
  111:2 132:16
**mathematically**
  110:16
**mathias** 3:4
  177:18,18
  184:17 186:7,8
  186:12
**matter** 53:13
  58:22 73:17
**matters** 54:3
  133:17
**maximum** 76:14
**mburchstead**
  3:12
**mc** 38:25
**mcm** 39:16
**mcmaster** 190:4
  191:1 192:1
**mcmc** 37:18 38:1
  39:2,19 40:9,16
  41:3,18,23 44:8
  44:13,17
**mean** 16:1 22:20
  23:7 32:9 35:12
  40:10 49:5 50:5
  53:23 59:23
  65:20 66:20
  78:8,25 83:24
  84:12 85:15

91:16 92:7,19
  96:13 102:6
  104:16 108:11
  108:19 110:15
  115:21 120:2
  121:10 130:1
  132:7,10 138:20
  139:6 140:4,6
  141:14 143:4
  148:19 159:20
  165:7 166:2,7
  169:2 172:4
  174:11 185:14
**meaning** 31:17
  85:9 115:21
  125:24 140:23
**meaningful**
  131:20
**means** 4:21
  85:17 101:21
  102:3 108:23
  125:25 130:21
  138:22 139:1
  167:1 171:20
  172:12
**meant** 85:16
  178:6
**measure** 98:1,22
  102:22 132:11
**measures** 97:19
  97:22,24 98:4,9
  100:18 132:11
**media** 101:20
  102:3
**members** 63:22
  145:2
**memory** 72:13
  111:7

**mention** 78:23
  102:22 178:9
  181:25
**mentioned** 86:10
  91:17 102:24
  119:3 178:14
  180:14 181:2
  183:19 184:1
**mentions** 26:4
  68:7 76:23
**merge** 23:11,21
  24:2 33:6 41:5,6
  42:6,8,10 79:10
**merged** 79:8,9
**merges** 79:9
**merging** 41:11
**met** 81:3
**method** 20:9
  35:1,4,6,10,11
  75:19 93:23
  97:16
**methodological**
  43:13
**methodology**
  19:23,25 26:5,10
  26:13 32:19
  33:3,16
**methods** 20:1
  23:15 24:17
  36:11,15,24 37:2
  37:3,6,12,19
  38:11
**metric** 130:20
**mgl** 1:6
**michael** 3:10
**mill** 187:12
**mimic** 83:16

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

**[mind - number]**                                              Page 25

**mind**  163:17
**minimizing**
  106:12 108:22
**minimum**  90:20
  91:11
**minus**  71:19
  74:8 79:6,15
  90:22,23 91:8,19
**minute**  77:9
  123:8
**mirror**  121:17
  123:9 161:21
  163:11
**mischaracterizes**
  13:4 59:13
  148:17
**missing**  11:10
**mistaken**  117:3
**misunderstood**
  134:3
**mix**  39:6 44:9
**model**  60:24,25
  82:11,15 84:9,11
  84:12,15 85:9
  100:4 132:4
  146:20 161:23
  163:12 171:15
**moderate**  89:10
**modify**  75:10
**modifying**  24:4
  24:7 35:22 36:2
**moment**  47:7
  66:2 126:21
  167:18 177:5
**monday**  185:4,6
  185:11,18,19
  186:2,9

**monitor**  18:13
**monte**  23:15,19
  23:22 24:12,16
  33:7 34:3 35:1
  35:10,11,15,19
  35:24 37:3,4,12
  38:1,6,10 50:3,8
  189:11
**moon**  9:9
**morning**  4:5,6
**motives**  182:22
**move**  97:3 135:4
  153:13 169:8
**moved**  60:15
  122:4 147:18
**movement**
  176:25
**moving**  115:1,18
  115:21,22,23
**msmc**  43:1
**multiple**  31:2
  35:18,20,22
**municipalities**
  78:2 94:20,21
  95:6 96:25 97:2
  102:16 105:4
  108:5,12,16,17
  108:22 109:3,5
  168:12
**municipality**
  96:23 108:7,12
  108:18,19

**n**

**n**  15:12,13 188:1
**n.w.**  2:21
**naacp**  1:3 2:3,14
  14:3 64:1,3

145:4 190:4
  191:1 192:1
**naacpldf.org**
  2:17
**name**  4:8,9,11
  26:14 27:16
  179:19
**nancy**  88:19
  116:22 117:15
  117:22 118:3,5
  146:20 155:8
  181:24 183:7
**natural**  123:7
**nature**  35:14
**near**  116:24
**nearly**  72:22
  85:8
**necessarily**
  22:20 23:7
  60:18 75:17
  108:16 141:23
  147:20 157:7
  174:11
**necessary**  192:6
**need**  5:3 6:2 8:7
  85:5 96:18
  125:11 180:24
  185:4,19 186:5
**needs**  14:24
  40:12,13 86:6
  104:4
**neither**  187:7
**nested**  108:15,16
**net**  115:2
**neutral**  112:21
  113:3,4,18
**never**  22:20 23:8
  61:25

**new**  2:16 25:13
  41:25 79:11
  173:7
**nexsen**  3:3
**nexsenpruet.c...**
  3:6
**night**  129:14
**nods**  5:4
**non**  27:23
**noncontiguous**
  56:19 57:16
**nonlegal**  137:16
  137:22
**nonpartisan**
  111:10,15
**normally**  54:23
**north**  119:16
  125:8,19 126:16
  147:17 151:1,5
**notary**  187:3
  192:13,19
**note**  190:10
**noted**  179:13
  192:7
**notes**  8:9
**notice**  9:21 10:8
  25:9 85:20
  189:4
**number**  20:25
  21:2 58:3,8
  60:17 72:21
  77:24,25 78:1,3
  79:4,5,14,15
  80:1 85:2,3 86:3
  86:5,8,13,15,18
  87:12,12,14,19
  87:19 89:12,23
  89:24 90:11,14

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

**[number - ones]**                                            Page 26

90:16,20 91:12
92:13,24 93:1,2
93:7,15,18 95:10
96:20 98:19
108:18 114:18
116:6,8 120:25
127:21 130:21
133:18 137:1,3
138:4 139:18
146:13 147:8
150:21 151:14
154:4 160:7
168:10,12
170:19 173:2
**numbered** 34:8
43:8
**numbers** 80:10
90:10 104:8
116:16 147:16
162:4 170:17
172:10 174:22
176:2 183:25
**numeral** 72:18
73:12 99:17
101:11
**nw** 2:5,10
**ny** 2:16

**o**

**o** 15:10,12
**oath** 4:21
**object** 5:12 48:4
57:2,20 59:12
62:7,7 137:17
141:4 143:6
149:3,6 165:6,22
171:23 179:1

**objection** 5:13
13:4 49:11,19
51:18 52:1,13
53:20 54:7,19
55:18,23 60:6
63:10 148:17
**obligation** 4:22
**observe** 142:1
**observed** 141:10
**obvious** 170:25
**obviously** 5:14
98:5 102:8
**occur** 31:10
**occurs** 31:19
124:21
**offer** 16:23
17:11
**offered** 174:13
174:17
**offers** 176:7
**official** 187:11
**oh** 14:10 15:12
17:17,25 19:16
20:23,25 21:4,17
25:21 26:1
28:19 32:14
38:23 45:13
46:2 49:5 79:2
90:4 91:3 93:4
109:8 112:24
113:16 114:25
115:25 119:13
120:12 122:14
124:20 128:8
129:11 132:6
133:8 134:1,14
135:25 137:4
138:7,22 144:13

144:23 153:11
154:3,19 158:8
160:25 164:7
168:20 170:22
171:5 173:23
175:15 179:21
**ohio** 14:15 27:13
**okay** 5:6,17 6:9
6:12,16 9:24
10:3 13:17
14:13 15:10
16:6 17:15,17,25
18:9 22:19 25:2
25:7,23 26:3,23
28:11 29:14,14
32:22 34:9 36:8
38:23,23 40:18
41:1 43:6,9 47:2
47:15 48:8 50:7
50:12,15,22 51:9
52:24 53:7,12,14
54:16 55:14
60:20 61:21
63:20 65:2,4,23
65:23 66:15,25
67:25 68:11,13
68:14,23 69:11
70:2,4,7,11 71:1
71:17 72:12,15
72:15 73:6
78:19,23 80:7
84:17,19 86:9
87:4,18 88:5,7,9
89:1,4,4 90:4,18
91:23 92:22
93:21,23 94:19
96:10 97:5 99:7
99:9 101:8,10,15

105:12 106:11
109:1,14,17
111:16 112:16
113:13,25 114:3
116:5 117:8,15
118:12 119:15
121:3,4 123:14
124:10 126:6,6
126:22 127:2
128:11,14,14
129:13,19
130:13,15,15
131:15 133:1,7,9
133:12 135:6
137:2 138:4,9,9
138:10 143:13
143:19 144:17
144:25 145:10
145:19,21,21,23
146:8,25 149:14
152:3,13,24
156:14 157:25
159:2,4 160:13
163:17,19
168:22 169:10
171:8 172:9
173:9 174:2,5,13
174:21 175:2,18
175:22 182:20
184:23 185:8,17
186:3,6,13
**old** 25:11
**once** 6:11 33:11
35:16 49:5
50:18 79:13
122:1
**ones** 22:7 125:12
152:5

Kosuke Imai, PhD                                                              August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

**[open - part]**                                                               Page 27

open  44:5 69:11
opened  9:24
　16:8
operate  78:10
operates  102:9
operational
　111:2
opinion  30:4
　57:22 66:13,13
　66:21 112:8,10
　112:13 137:15
　137:16,19,20,23
　138:1 154:24
　174:13,17 175:5
　175:9 176:14,23
　177:1 182:25
　183:4,6,10,11,15
opinions  11:1
　16:20,23 17:11
　29:9,12 175:24
　176:4,11,19
opposed  75:21
　76:3,25 81:16
　86:7 125:14
　133:18 139:3
　167:12
orangeburg
　168:23
order  41:21
　105:25 112:24
　142:23 155:20
　181:8
orders  31:7
outcome  48:16
　182:9
outcomes  182:2
outlets  101:20
　102:3

outlier  49:9
outperforms
　107:21
output  82:20,21
outside  61:11
　138:15 139:9,15
　140:17 147:21
overall  71:19
　73:2 98:16,23
　100:10 135:14
　140:1
overlap  60:13,14
　60:20,21 61:2,5
　61:17 63:2
　104:14 105:4

**p**

p  173:14 189:23
p.m.  186:14
page  10:13,14,15
　17:13,15 24:21
　25:20,23 26:3
　29:12,14 30:18
　32:21 38:19,20
　38:21,21 43:3,4
　43:5,8 44:23
　65:21 66:3
　70:12,15,15,17
　70:17 78:18,21
　84:22 88:8 89:2
　89:4 94:23
　99:15 101:9
　102:25 104:22
　106:24 108:2
　109:13,16,17
　114:2,12 120:10
　120:12 127:3
　130:11 138:2,4,6

138:8 145:18,22
　151:10 157:24
　159:3,24 163:18
　174:3 176:5,6,16
　176:17,24 188:2
　189:2 191:4,7,10
　191:13,16,19
pages  127:14
　145:17 164:2
pair  80:6 81:7
　86:11,14,15,24
　95:4
paired  61:3
　77:21 78:16
　81:4 104:2
　105:6
pairing  42:23
　78:15 79:24
　84:21,24 85:20
　86:20,22 103:7
　106:8 139:17
　153:12
pairings  56:15
　87:16,23
pairs  79:25
paper  7:23 21:20
　21:23 22:20,22
　23:1,2,5,7 34:5
　34:14,16,21,25
　36:7 189:12
papers  45:9,10
　45:11,13
paragraph  25:19
　25:19,24,25 26:4
　26:22 27:11
　28:10,16 29:13
　30:17 32:21,23
　38:24 39:24

43:11,12 70:10
　70:14 74:7,7
　78:20,24 80:7,22
　81:15 84:22
　88:6,11 89:2
　97:7 99:20
　106:17 107:25
　108:1,2 109:18
　109:19 114:11
　119:3 121:1
　129:1 138:3,8
　145:22 147:4
　150:19 154:8
　159:1 162:6,10
　162:15 169:21
paragraphs
　77:16,21 106:20
　109:13
parallel  35:18,20
　37:24
parameter  79:20
　80:19 81:17
　93:5
parameters  81:1
　82:19 84:15
　85:7 93:16 95:8
part  8:4,16,19
　8:21 18:6 19:14
　19:18 20:9
　23:15,18 24:16
　30:1 35:23 46:3
　54:10 61:12
　62:14 63:5 69:5
　96:16 99:23
　108:4 143:2
　148:7 156:19
　174:9 178:6

Kosuke Imai, PhD                                August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

[partially - plan]                                                      Page 28

partially 61:1
particular 17:12
    21:24 22:2
    23:18 24:1,8
    31:1,7,19,23
    39:21 40:5
    42:24 56:4
    66:14,21 67:9
    75:3 79:23
    80:25 81:19
    86:6 112:7,9
    125:6,12 138:23
    139:3 142:12,16
    142:22 156:1
    157:11 164:15
    164:20,22 181:7
partisan 28:16
    28:22 32:15
    109:19,21,22
    110:16 111:5,7,9
    111:11,12,13,23
    112:1 122:14
    130:10 155:9
    159:19 170:13
partisanship
    176:17 181:12
    181:16
parts 49:15
    101:19 102:2
    117:10 155:12
    157:7,8
party 110:10
    187:8
passing 177:12
patience 93:22
patricia 2:9
    178:19

pay 174:12
pdf 38:20
peer 15:23 16:1
    20:12,21 186:8
penalizes 138:14
    138:21
pending 6:6
    187:8
pennsylvania
    28:4,5
people 14:1
    44:24 60:15,17
    60:18 71:22
    76:13,19 104:20
    115:12,15
    170:25
percent 12:18
    27:15 41:21
    45:21 71:20
    74:8,15 89:24
    115:12,16 116:1
    116:3 117:6,13
    120:4,15,15,18
    120:19 121:2,7,7
    121:11,24
    129:15,18,22
    130:3,4,8 135:15
    135:16 136:20
    136:20,23,24
    137:5,12 139:18
    139:21 140:2
    154:13 159:5
    161:1,1 162:6,10
    162:14 163:6,15
    165:9,12,25,25
    166:2,3,22,23,24
    167:4,5 169:23
    170:24 171:16

171:20,21,24
172:6,11,12,15
172:22,23 173:1
183:24,24 184:4
184:5
percentage
    41:20,20,23 42:5
    87:15 110:24
    114:19,22 115:3
    119:6,10,19
    120:2 127:21,24
    127:25 128:16
    129:10 137:8
    147:6,13 160:8
    166:13
perform 54:22
    107:10
performance
    21:24 32:15
performs 107:7
    131:7
periodic 6:4
permissible 71:4
permit 72:3
permitted 74:11
person 45:2 74:2
    74:13,16 75:6
    91:9,20 166:15
persons 72:21
ph.d. 16:10
    189:7
phd 1:11 4:1
    9:22 19:12
    188:4 189:6
    190:5 191:2,24
    192:2,4,12
phrase 30:16

pick 37:13,14
place 7:4,5 95:15
    96:7 139:14
    142:1,14 155:17
    167:7 169:24
placed 4:20
    116:13,17
    117:16 118:5
    146:10,16,21
    147:19,20 151:6
    152:4,8,22
    155:13 168:10
placement 151:1
places 152:25
    153:25 160:16
placing 155:7
    159:18 170:12
    171:3
plaintiffs 1:5 2:2
    8:24 9:2 11:15
    11:25 12:8
    179:8
plan 16:20 23:17
    24:1,2,4 29:20
    29:24 30:8,15
    32:1,8 35:7,22
    36:1 41:24 43:2
    47:23 48:24
    49:2,4,9,14,15
    49:16,18,23,24
    49:25 50:4,6,9
    50:10,14,17,20
    50:21 51:7,12,17
    51:23,25 52:5,6
    52:8,12,21 53:5
    53:24 54:6,13,24
    54:24 55:3,4,7
    55:12,17 56:7,7

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

**[plan - plus]**                                              Page 29

| | | | |
|---|---|---|---|
| 56:9,24 57:1,5,8 | 125:7,10,17 | 36:2 37:9,23,25 | 142:20 143:2,9 |
| 57:18,22,24 58:2 | 127:9 128:20,24 | 38:2 44:7,18,19 | 143:14 144:2,6 |
| 58:5,6,7,9,11,13 | 128:25 129:5 | 46:9 50:19,20,23 | 144:14,15,16,21 |
| 58:14,16,20,23 | 130:18 131:3,6 | 51:4,11 52:20 | 144:22,24 145:1 |
| 58:24 59:2,3,7,9 | 132:21,22 133:5 | 55:7 57:22 | 145:8 147:8,12 |
| 59:11 60:1,4,22 | 133:21 134:9 | 58:14 63:21 | 147:20,24 |
| 60:23 61:5,9,13 | 135:21 136:9 | 66:3,4,17,18 | 148:13,20,20 |
| 61:14,14,15,18 | 137:5 139:8 | 67:1,3,21 68:4 | 149:22 150:5,23 |
| 61:22,25 62:2,5 | 140:10,13,17 | 71:9 75:22 | 151:20 152:21 |
| 63:3,9,18 64:1,3 | 141:1,11,12,25 | 76:14 77:4 | 152:25,25 154:1 |
| 64:6,8 66:6,18 | 142:18 143:1 | 78:14,16 79:21 | 154:12,22 159:6 |
| 74:1,22 75:9,19 | 144:10,12,13,17 | 79:22 80:2,6,16 | 159:7,13 160:10 |
| 76:6,8,12 77:24 | 144:18,21 145:4 | 81:7,11,22 82:3 | 161:1,5,14,16 |
| 78:1,3 79:17,25 | 145:7,13,15 | 82:5,14,17 83:3 | 162:1,7,10,17,20 |
| 82:4,6,8 83:11 | 147:2,3,6 149:2 | 83:21 84:16 | 162:23 164:18 |
| 84:10,14 87:20 | 149:15 150:1,2 | 86:11,13,15,17 | 164:22 165:4,24 |
| 87:22,25 88:18 | 150:10,10,14,20 | 86:17,18,19,24 | 167:7,12,13,22 |
| 88:18 89:19,23 | 151:4,6,9,17,18 | 87:9,14,19 88:18 | 169:24 170:4 |
| 89:25 90:1,15,21 | 151:20,21,22 | 89:18,22 92:1,21 | 172:19,21,25 |
| 91:4,8,12 92:5 | 152:7,12 153:2,8 | 92:23,25 93:8,10 | 173:4 189:12 |
| 92:10,13,13,19 | 153:14,19,25 | 93:11,12,25 | **plausible** 66:5 |
| 93:3,9,9,19,20 | 154:18,19,20,20 | 94:14,17 95:3,4 | 66:19 |
| 94:2,2,11,18 | 155:19 156:23 | 95:9,20 96:24 | **play** 55:2 153:5 |
| 95:11,19,21 96:2 | 156:23 157:21 | 97:21 98:12 | 153:20,21 |
| 96:6,8,12,25 | 158:7,9,9 160:19 | 99:23 100:6,11 | **played** 30:13 |
| 97:14 98:14,20 | 161:7 164:23 | 100:15 103:5 | 56:25 58:11 |
| 98:22 99:2 | 165:8,8,19 167:8 | 104:8 107:8,12 | 59:4 76:10 |
| 100:11,12 103:8 | 168:2,17 169:12 | 117:15 119:6,12 | 106:1 112:25 |
| 103:19 104:9 | 169:16,19 | 119:15,18 | 113:5 142:15 |
| 106:2,2,3 107:6 | 170:25 171:20 | 120:14 124:3,14 | 156:22 180:22 |
| 107:10,21,22 | 172:5,11,13,24 | 124:18,22,25 | 181:1 |
| 111:10 112:11 | 173:2 174:25 | 125:2,4,12,15 | **playing** 142:2 |
| 113:1,5,7 114:10 | 179:4 180:1,23 | 126:11,12 129:4 | **plays** 56:6 |
| 118:17,18 120:1 | 181:5,6,8,10,10 | 130:2 131:8,16 | **please** 4:9 5:21 |
| 120:1,8,9,20 | 183:12 | 132:23 138:14 | 6:3 15:9 67:5 |
| 121:4,15 122:22 | **plans** 31:24 32:2 | 138:21 139:14 | **plus** 53:3 71:19 |
| 122:23 123:20 | 32:25 33:17 | 139:19 140:3,15 | 74:8 90:21,23 |
| 124:12,17 125:6 | 34:5 35:18,20,22 | 140:19 142:6,10 | 91:8,19 |

Kosuke Imai, PhD
The South Carolina State Confvs.McMaster/Alexander

August 8, 2022

**[point - principles]**

Page 30

point  39:24 40:2
  40:19 53:16
  56:5 64:22 71:6
  71:6,10,15,15
  119:10 125:13
  137:5 156:2
  166:8 172:10
  174:25 178:9
  179:3,18
points  34:21
  39:12 119:6,19
  120:2 147:6,13
polarize  184:11
polarized  184:9
policies  73:20
political  19:12
  19:25 20:2 32:7
  32:10 73:21
  118:2,10 155:6
  159:17,20
  170:11 182:11
politicians
  182:10
politics  110:13
  110:13,15 112:5
  112:11 176:17
  183:2,2
polsby  97:23,25
  98:17 130:17,20
  131:9 132:18,20
  133:3
poor  175:20
popper  97:23,25
  98:17 130:17,20
  131:9 132:18,20
  133:3
population
  12:10 54:2

56:20 57:13
  60:14,21 63:4
  71:19 72:7,10,18
  72:23,24 73:13
  73:16 74:2,23
  75:2,5,12,20
  76:21 77:3,19
  90:22 91:9
  102:10,11
  114:18,19,21,23
  115:9,20 116:6,9
  120:6 122:1
  128:3 129:12,13
  151:15 155:21
  160:5,8 161:4,23
  163:12 165:13
  171:25
populations
  23:18 104:18
portion  117:24
  118:8 146:20
  170:3
portions  117:17
possibility  44:5
  44:21 75:21
  113:17 141:13
possible  32:24
  37:8 42:18
  60:10,12,13,24
  61:21,24 63:1
  73:2 75:4 83:2
  87:7 88:4 96:13
  111:1 147:25
  148:1 150:8
  153:4 165:18
  167:21 179:17
possibly  150:4,5
  162:25

potential  83:21
power  66:5
practicable
  72:23
practically
  43:17
practice  33:24
  39:5
pragmatically
  66:5,19
precinct  74:20
  74:23 75:10
  76:25 106:12,15
  108:7,13,20
  109:7 115:13,15
  115:16 116:1,9
  116:25 117:5
  146:10 153:17
  176:25
precincts  24:9
  37:14,16 39:9
  74:25 75:24
  76:1,3,24 108:14
  108:21 114:14
  115:1,6,7,11
precise  82:9
  146:23
precisely  62:2
predicting  26:5
  26:10
predominant
  30:16
predominated
  30:7
preferred
  154:21 159:11
  170:2

prepare  6:20
  11:5 17:4
prepared  17:20
preparing  8:12
  12:25 15:1,7
  69:6
present  3:20
  7:13,15 46:6
  74:18 91:25
presented  51:13
  103:17
preservation
  54:17 76:23
  103:15 180:10
  180:18
preserving  73:22
  103:3,4,21
  105:22
president  4:13
pressure  186:8
pretty  81:8
  117:4
prevent  56:5,15
  56:24 58:9
prevents  55:1
previous  54:24
  55:7 56:8
  103:18 160:3
  175:10 181:10
previously  25:3
  47:18 99:14
  101:4
price  143:1,4
primary  41:24
princeton  45:7
principles  57:19
  77:17 84:3,5
  184:2

Kosuke Imai, PhD                                      August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

**[printed - racial]**                                          Page 31

printed 7:23 8:6
prior 73:22
  99:23 100:5,15
prioritized
  180:11
priority 180:15
  180:16 182:13
probability
  148:8
probably 97:1
  104:14 146:24
  148:1,3 152:5
  161:24 162:2
problem 72:12
problems 43:18
procedure 88:11
proceed 24:10
process 21:22
  22:21 23:4,4,6
  58:21 63:23
  79:7 80:4
produce 10:20
  73:1
product 59:5
  181:4
program 70:21
  71:18 75:5 78:5
  78:9 93:1
  106:14 168:4
programmed
  51:1 92:17
  132:8 143:18
progresses 41:14
prohibitively
  44:9
properties 66:7
  81:10

property 33:12
  33:20 79:18
proportion 42:4
  42:25 116:7
  119:4,25 120:7
  120:14 135:15
  136:4,13,17
  140:1 147:5
  157:12 163:22
  163:25 164:8,11
  168:8 171:4,5,13
  171:14 172:25
  173:4
proportions
  170:17
proposals 39:9
proposed 63:22
  66:6 179:12
prospect 183:8
protect 48:13
protected 48:6
  59:14 62:9
prove 39:8
provide 12:8,14
  12:21 13:2
  46:21 121:13
  185:5
provided 13:8
  46:16,17 163:22
provides 174:23
  176:3
provision 96:19
pruet 3:3
public 63:22
  145:2 150:12
  155:1 158:23
  170:7 179:13
  187:3 192:19

publication
  10:25 20:16,22
  22:10
publications
  20:13 21:1,6
published 20:16
  20:22 21:21
  22:21 23:8
  34:16 45:14
  180:4,7
pull 16:4 17:22
  18:1 25:15 34:1
purpose 38:13
  76:12 113:20
  141:8,15
purposes 67:7
put 55:11 93:25
  94:16
pyan 2:12

**q**

qualified 29:2
quantify 87:14
question 5:21,24
  6:5,6 8:25 20:17
  22:12 36:17
  41:3 47:7 48:5
  50:2 52:16
  53:15 62:4,8,25
  81:12 83:2 84:2
  90:3,24 91:1
  112:9,12 115:4
  124:8,21 131:24
  134:3 137:20,21
  137:25 141:25
  144:3 155:15
  164:25 167:19
  175:20,21 180:2

questions 5:13
  5:16 14:11
  47:21 59:13
  63:15 70:8
  95:13 96:23
  112:15 177:11
  177:13,16,20,22
  181:12 182:15
  182:18 184:13
  184:18
quite 50:6,11

**r**

r 3:10 15:10,11
  191:3,3
race 26:5,11,16
  29:25 30:7,13
  40:19,21,24 41:1
  42:8 55:2 56:6
  56:16,25 57:9,10
  58:10 59:4 61:6
  61:10,23 76:10
  95:24 103:8,11
  106:1 109:18
  112:5,10,21,25
  113:3,4,5,18
  118:22 119:5
  140:25 141:7
  142:2,15 143:25
  144:5,11,15
  156:22 157:1,4
  168:9 180:22,25
  180:25 181:8
racial 12:10
  28:10,11,14,19
  102:13 118:23
  141:12 184:11

Kosuke Imai, PhD
The South Carolina State Conf vs. McMaster/Alexander

August 8, 2022

**[racially - refer]**

Page 32

racially 184:8
ragusa 9:13
raise 162:5
raised 81:14,24
  82:6 97:9
ran 48:8,17,24
  50:8 52:9 53:7
  54:5 60:5 62:6
  62:11 64:10
randomly 23:23
  24:2,3
range 42:25 73:2
  90:12 94:17,18
  122:2 131:14,21
  132:21 137:4,7
  138:15,25 139:9
  139:15 140:17
  141:9,14,24
  142:9 171:16
ranges 21:8,12
  172:18
rankin 4:14
rare 22:22
reach 14:24 96:3
  172:21,21
reactive 81:23
read 36:9,18
  38:3 39:14
  43:10,19 44:2,11
  50:7 66:8 73:4
  88:10,16 100:2
  101:2,23 108:9
  138:18 147:10
  154:15 159:9
  181:19 184:20
  186:16 190:9
  192:5

reading 90:9
  116:10
reads 101:16
real 56:4 91:16
realistic 36:12
  36:21
really 36:3 52:19
  57:10 59:2,5
  66:21 67:13
  76:10 85:6,25
  89:14 91:22
  139:6 156:25
  167:11
rear 3:23
reason 4:24 6:3
  42:17 48:10
  55:6 57:5,17
  62:2 74:17
  75:15,16 76:22
  81:23 85:5
  96:14 105:24
  113:13,16
  117:21 129:21
  164:12 169:2
  190:11 191:6,9
  191:12,15,18,21
reasons 21:7
  40:18 81:18
  143:16
rebuttal 17:4
  173:13,15,17
  174:18,23 175:9
  175:11,13,17,25
  176:3,5,12
  189:23
recall 7:7 9:4
  10:10 12:5
  13:22 14:25

21:5,7,13,18
  40:1 41:5 48:25
  55:10 59:20
  60:3,8 63:7,8,13
  72:5,8,9,11 79:9
  87:17 96:17
  120:21 133:8
  134:11 139:22
  149:5 157:22
  168:21 169:2,4,7
  173:6,23 174:1,6
  178:23 179:22
  181:11
receipt 190:18
receive 11:14,19
  11:24 46:12,13
  46:18
received 8:6
  11:21 13:1
  18:25 19:9,11,12
  69:7 70:1
receiving 10:10
  174:6
recess 64:24
  77:10 126:23
  134:24 177:6
recognize 10:5
  16:15 18:19
  34:11 68:23
  69:20 155:24
  173:20 179:19
recollection
  179:23
recombination
  65:9,15 189:14
record 4:8 5:4
  13:5 19:2 53:15
  64:23 77:8

126:21 134:22
  150:13 158:23
  158:23 170:8
  175:14,21 177:4
  187:6
recreate 174:21
rector 2:15
redirect 182:19
redistricting
  4:16 8:2,17,18
  17:10 19:15,18
  19:22,24 20:5,8
  21:3 27:7,8,20
  27:21,23 28:1,5
  34:4,15 37:9,25
  38:18 43:18
  45:10 46:10
  54:24 56:6
  63:23 65:10,16
  67:3 68:8,12,18
  68:20 69:2,4,15
  69:16,23 72:14
  73:20 74:1
  83:15 96:16
  99:10 136:25
  181:1 182:13
  189:12,15,17,19
  189:20,21
redrawing 55:2
reduce 108:18
  141:20 168:11
reduced 86:15
reductive 85:4
reelection 118:3
  183:8
refer 29:19,21
  70:2

Kosuke Imai, PhD                                      August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

[reference - requires]                                              Page 33

| | | | |
|---|---|---|---|
| **reference** 8:7 | **relation** 50:9 | 22:5,15 23:12 | 185:8,13,17,21 |
| **referenced** 62:13 | **relative** 81:22 | 24:25 25:10 | 185:24 186:3,6 |
| 162:14 190:6 | 85:9 89:15 | 27:2,12,23 29:15 | 186:10,13 187:1 |
| **referred** 37:2 | 101:16 133:14 | 29:23 30:2,6,6 | 188:12 |
| **referring** 40:21 | 139:6 | 30:24 31:14,18 | **reports** 8:3,15 |
| **refers** 30:25 | **relevant** 11:12 | 32:5,21 40:17 | 8:15,24 9:2,5,6 |
| 176:24 | 37:25 40:7 | 45:25 47:1,15 | 13:9 27:17 46:7 |
| **reflect** 60:18 | 43:14 71:18 | 48:9,10,13,15,18 | 47:25 48:1 |
| **reflects** 132:11 | 77:22 97:13 | 50:7 51:14,21 | 55:11 169:5 |
| **regarding** 156:1 | **reliance** 66:11 | 52:22,23,23,24 | **represent** 4:12 |
| **regardless** 66:15 | **relied** 13:3 | 53:18 54:11 | **representative** |
| 183:13 | **rely** 12:22 | 56:10 58:1 | 8:2 23:17 32:24 |
| **regenerate** 23:17 | **remainder** | 59:19,22,24 | 33:4,13,18 44:10 |
| **region** 146:24 | 165:24 | 62:14 63:12,16 | 44:14 101:22 |
| **regions** 61:1 | **remember** 6:12 | 63:17 68:6 69:6 | 135:20 |
| **registered** 26:15 | 116:25 172:17 | 70:6 74:5 77:3 | **representatives** |
| **registration** | 174:10 | 77:15 78:18 | 68:17 69:3 |
| 110:9 | **remove** 172:20 | 80:7 88:6 92:15 | 73:24 189:16 |
| **regular** 184:24 | **removed** 139:19 | 94:1,24 97:12 | **represented** 5:7 |
| 185:23 | **renaming** 88:11 | 103:18 106:24 | **republican** |
| **rejected** 20:22 | **rendering** 39:10 | 111:19,22 | 32:12 110:4,19 |
| 21:6 22:10,24 | **repair** 176:25 | 112:18 122:15 | **republicans** |
| 23:7 154:22 | **repairing** 155:3 | 126:10 130:12 | 182:5 183:13 |
| 159:13 170:4 | **repeat** 8:25 | 138:3 140:25 | **request** 6:5 11:4 |
| **rejection** 22:19 | 20:17 22:12 | 141:6 156:17 | 18:25 55:13 |
| **rejections** 21:2,8 | 52:16 90:24 | 157:24 166:18 | **requested** |
| **relate** 22:4 | 144:3 155:15 | 169:3 173:13,17 | 188:16,18 |
| 162:14 | 164:25 | 174:3,18,23 | **require** 84:4 |
| **related** 16:20 | **rephrase** 99:1 | 175:4,9,11,11,16 | 110:23 |
| 22:7 23:18 | 134:4 | 175:17,25 176:3 | **required** 73:19 |
| 31:24 56:24 | **report** 6:22 7:22 | 176:5,13 178:1,3 | 110:18 155:12 |
| 57:24 59:9 60:1 | 8:14 11:2,17,21 | 178:6 179:25 | 192:13 |
| 60:4,23 61:22 | 11:24 12:22,25 | 180:21,21 189:7 | **requirement** |
| 62:5 63:18 98:2 | 13:3,11,14,16 | 189:23 | 67:9 72:9 |
| 98:2,5,7 100:14 | 14:14 15:2,7,15 | **reported** 1:16 | **requirements** |
| 102:17 132:15 | 15:19,24 16:5,9 | **reporter** 1:16 | 67:3,15,16 73:12 |
| 132:18 187:7 | 16:18,19,24 17:2 | 4:20 5:2 10:5 | **requires** 84:4 |
| | 17:4,8,12,14,21 | 184:19,23 185:3 | |

Kosuke Imai, PhD                                             August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

**[research - rmg]**                                             Page 34

research  15:5,6
residence  12:12
  105:6
residences
  103:25 106:5
resides  88:20
  153:18
respect  22:3
  49:9 55:12 63:2
  106:8 145:1
  152:24 156:4
  165:15
respecting  73:21
resplit  23:25
rest  28:15 42:9
  61:8 96:5
  152:21 154:6
restraint  61:1
resubmit  22:25
result  48:2,23
  49:1,7 84:15
  89:17 119:22
  159:21
resulted  58:20
results  48:19,25
  51:22,25 57:12
  59:19,21,23 63:8
  63:13 76:18
  89:20 132:20
  136:11 142:13
  142:22 157:3
  170:14 178:13
retained  14:8
retention  176:6
  176:8,12
retreat  23:25
return  11:8
  190:13,17

review  8:12
  15:23 20:21
  21:13,22 23:3
  69:5,25 150:12
  150:16 155:1
  190:7
reviewed  6:22
  8:14,15,17,20,23
  9:1,6 17:8 20:12
  21:12 158:22
reviewing  9:4
reviews  16:1
revise  22:24
richland  133:22
  158:2,6,14,16,20
  159:6,12,18
  160:5,18,20
  161:2,5,8,9,17
  162:7,11,23
  164:2,24 165:5
  165:15,20 166:4
  166:20 167:8,17
  168:19 183:20
right  17:3 18:9
  25:5,5 26:7,21
  28:17,23 29:11
  30:3,4 33:1,5
  34:1,18 35:1,5
  44:20 47:20
  48:20 50:16
  51:1,8,8 53:2,6
  56:18 58:24
  60:1 64:4,17
  65:17 68:2,8,13
  70:19 71:15,20
  71:24 72:3,16,20
  73:9 74:9 75:21
  76:4 80:13

82:10 83:21
84:11 86:22
87:2,10,11,11
88:3,15,17,21,24
88:25 89:8 90:5
90:7,8,15 91:5,6
91:9,10 92:3
93:3 94:2,3,5,6
94:10,15,16,24
94:25 95:7
96:13 97:10,11
97:11,18 104:10
105:17 106:7
107:8,13,18,23
108:24,25
109:12 110:1,5,8
110:17,21 111:5
111:22 112:14
112:20 114:6,10
114:11,15,16,19
114:24 115:20
116:11,14,15,18
116:19,21,24
117:4,7,10,13,18
119:7,8,20,23
120:4,16,20,22
121:8,9,11,12,16
121:25 123:13
124:1,2 125:5,16
125:22,23 126:8
126:17,19,25
127:7,8,16,18,22
127:23,25 128:2
128:4,16,17,17
129:6,15,18,23
130:4,5,11,18,19
131:9,17 133:12
133:15,16 135:4

135:17,21,22
138:2,9 140:12
140:12,15,16,16
140:23 141:5
142:20,21 143:3
144:7,20 145:17
146:1,4,11,15,17
146:22,24 147:3
147:21,22 148:5
148:6 149:12,21
149:21,25
150:23 151:8,11
151:23 152:5,5
152:11 153:3,12
153:16,18 154:1
155:23 156:5
158:12 159:15
159:24 160:3,9
160:21,21
161:19,24 162:8
162:8,9,12,15,16
163:3,8,13,14,16
163:16 166:5,5
166:12,13
167:10 170:5
171:10,17,25
172:7 173:7
178:2,7,8,8,11
178:12,16,25
179:5,9,14,15
180:5,20 181:13
181:17,18,20
183:4 184:5,10
184:24 186:16
186:17
rights  137:13
rmg  1:6

Kosuke Imai, PhD
The South Carolina State Confvs.McMaster/Alexander

August 8, 2022

**[roads - sense]**

Page 35

roads 101:20
102:3
robust 136:11
157:3
robustness
157:14
role 30:13 55:2
56:6,16,25 57:10
58:10 59:4
76:10 105:25
112:25 113:5
142:2,15 156:22
180:22,25
roman 72:18
73:12 99:17
101:11
room 6:18
rough 185:5,7,10
185:14,15
186:11
rounds 129:24
ruiz 1:16 187:3
187:24
rule 5:20 48:7
59:14 62:9
rules 48:13
181:2
run 15:16 23:24
47:22,24 48:18
50:3,13 53:17,18
53:23 81:24
82:12 86:23
95:24 113:14
149:19,23 157:4
running 146:3
runs 149:9,18

**s**

s 2:14 3:5 15:10
15:12 189:1
191:3
sake 42:7
samantha 3:21
sample 23:17
32:24 33:4,13,18
36:13 39:3 44:4
44:9,10 78:16
79:25 82:8,16
95:9
samples 33:22
44:14
sampling 34:4
36:10 39:7
43:17,22 75:22
80:4 81:20
189:11
satisfied 81:11
143:9
satisfies 140:10
satisfy 32:25
79:22 80:2
140:13 142:18
143:14
satisfying
142:25
saturday 7:6
saying 47:12
93:24
says 18:17 32:23
36:10,23 44:3
48:16 66:16
72:21 73:12,14
88:11 92:15
97:12 99:22
100:24 109:18

109:20 121:1
138:14 140:25
141:6 142:14
146:5 150:19
162:6,10
sc 3:5,11,16
scale 36:11 39:7
85:5 89:15,15
scholarship
19:19,22 20:5
science 19:13
20:2
scope 67:25
score 133:3
scores 130:17
scott 190:4 191:1
192:1
scratch 24:12
screen 18:2,11
scroll 24:20
38:19 99:13
102:25 174:3
se 40:4
seal 187:11
sean 8:3,15
173:14 189:23
second 20:9 26:6
40:24 43:11
44:7 61:9 64:14
64:17 65:1 89:6
95:24 96:2
99:15,20 103:10
107:25 108:1
157:1,4 177:25
section 73:15
126:10
see 10:17,19
14:15 18:2,14,15

20:23 30:21
31:23 45:3 47:3
67:7 82:13
89:21 93:4 94:8
99:18 102:24
108:3 111:8
113:5,16 115:14
115:17,17,25
120:24 126:9
127:14 132:6
138:22 141:16
156:21 158:8,11
160:25 161:22
163:25 164:7
181:25 182:1
seed 37:13,16
seeing 107:4
146:19 178:24
seen 53:10
select 137:2
selected 36:14
82:10 83:10
senate 1:15 2:18
4:12,13,14 8:3
8:18 9:20 68:7
69:15,24 72:3,6
73:8 74:11,12
91:7 101:6,7
102:21 103:1
136:25 180:5,13
189:4,21
send 184:21
sense 5:5,6,19
6:7,8 29:20 42:5
67:17 76:24
83:12 100:22
103:13 142:12
162:1

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

[sent - simulated]                                                    Page 36

| | | | |
|---|---|---|---|
| **sent** 6:23 7:22,24 | **sets** 52:25 89:18 | **shows** 94:7 | **simulated** 31:24 |
| 8:1,4,16,18,20 | **setup** 88:18 | 114:14 116:12 | 40:22 50:17,19 |
| 9:17 11:10 | **seven** 29:13 | 120:13 130:16 | 50:20 51:11 |
| 12:19 43:7 90:2 | 30:17 69:13 | 146:9 151:14 | 75:9 76:14 |
| 174:9 190:14 | 73:7 90:21 91:4 | 152:11 160:15 | 79:17 81:10 |
| **sentence** 30:17 | 91:18 92:5,10 | 166:21,21 | 82:3,5,14,21 |
| 36:7,23 37:3,19 | 101:5 109:13 | 169:23 | 83:3 84:16 |
| 37:22 43:11 | 110:19 | **side** 46:15 90:5 | 86:13,15,16,17 |
| 66:1,2,14,16,22 | **seventh** 10:13,14 | 94:15 116:11 | 87:22,24 88:1,13 |
| 66:24 88:10 | **shakes** 5:5 | 153:22 | 88:18 89:22,25 |
| 108:1 109:7 | **shape** 55:15 | **sign** 184:20 | 92:13,21,23,25 |
| 154:10 | 100:20,22 102:9 | 186:16 190:12 | 93:8,9,11,12,19 |
| **sentences** 37:22 | 132:12 158:19 | **signature** 187:22 | 94:17 96:24 |
| 40:1 44:3 | **share** 10:2 16:14 | 188:11 | 97:21 98:12 |
| **separate** 124:1 | 18:1,2,3,10 | **signed** 190:20 | 100:10 117:15 |
| **separated** 126:1 | 25:16 34:10 | **significant** 30:13 | 119:6,12,15,18 |
| **sequence** 35:21 | 47:4 65:13 | 140:2,5,7 141:1 | 120:1,8,14 |
| 42:1,22 | 69:19 110:24 | 141:3,7 142:2,9 | 121:15,20 |
| **sequential** 24:11 | 179:7 | 142:11,15,17 | 124:17,18,25 |
| 34:3,25 35:4,10 | **shared** 12:2,6,10 | 144:1,5,11,16 | 125:1,4,7,10,12 |
| 35:14,23,24 | 18:20 178:23 | 180:22 | 125:15,17 |
| 38:10 189:11 | **sharepoint** 46:15 | **significantly** | 126:11,11 |
| **sequentially** | **she'll** 5:3 | 131:12 | 131:15 132:21 |
| 35:23 38:2 | **sheet** 190:11 | **similar** 41:4,12 | 132:23 136:2 |
| **set** 32:23,25 33:9 | **shifted** 90:17 | 61:14 122:16,24 | 139:8 141:11 |
| 33:17 37:9 44:7 | **shiro** 15:7,10,14 | 127:4 134:12 | 144:13,14,17,20 |
| 44:19 50:17 | **show** 49:8 | 139:16 152:13 | 144:21,23 147:7 |
| 51:3 52:10,11,19 | 116:16 127:17 | 160:3 163:25 | 147:8,12 148:20 |
| 52:20 53:5,8,17 | 146:14,14 | **similarity** 54:12 | 150:1,10,23 |
| 53:18 56:12 | 157:15 161:20 | **similarly** 106:4 | 151:8,17,20,22 |
| 57:6,11 58:14 | 164:10 | 125:7 126:15 | 152:7,12,21 |
| 59:8,10,25 67:10 | **showing** 73:18 | 139:20 176:24 | 153:19 154:12 |
| 81:1 87:10 | 121:13 128:6 | **simple** 30:25 | 156:23 159:6,7 |
| 93:24 94:1,4 | 133:4,5 151:13 | 75:17 | 161:1,5 162:1,7 |
| 109:20 139:13 | 165:14 170:16 | **simply** 11:3 | 162:10,20,22 |
| 140:10,14,18 | **shown** 118:12 | 31:20 37:8 | 165:8,24 167:12 |
| 142:19 143:2,10 | 158:13 | 163:11 166:9 | 167:13 168:2 |
| 144:21 | | | 169:24 170:25 |

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

[simulated - speaking]                                              Page 37

172:11,19,24
simulation  17:9
  17:10 21:16
  22:4,9,14 32:1
  33:17 34:15
  36:20 40:21,25
  42:8 43:14
  47:23 48:2,23
  49:2,3,23 50:3,8
  50:13,23 51:3,15
  51:22,24 52:10
  52:11,20,25 53:4
  53:8,18,23 54:11
  56:12 59:8,25
  60:24,25 61:10
  62:6 63:9,16
  64:11,14,19
  66:17,18 67:1,21
  71:9 74:17
  76:17,25 77:4,18
  81:14 82:7,12,17
  84:23 85:18,23
  86:1,1,7,8,11,23
  86:24 87:10,18
  89:18 90:7
  91:14,15 92:2
  94:9,14 95:22,24
  95:25 96:2 97:9
  103:11 104:8
  107:8,11,21
  111:9,12,13
  113:3,8,14,17,19
  113:20,25 114:4
  114:9 118:22
  121:5 122:3,7,17
  122:25 124:3,14
  127:1,5 128:18
  129:4 130:2,5,24

131:8 132:5
133:3 134:13
135:5,7,18,25
136:10 138:13
139:14,19 140:3
140:15,18 141:3
141:6,22 142:6
143:2 144:2,6,10
145:20 147:20
148:10,11 149:2
149:22 150:5
151:4,24 152:25
153:2,8,14 154:1
156:3,8 160:19
161:14,16
163:21 164:18
164:22,23 165:4
165:19 167:7,21
167:22 168:4
171:20 173:5
178:13 180:3
181:6,13,23
simulations
  15:17 40:20
  41:2 42:13
  44:18 54:5
  63:21 67:6 78:7
  103:8 107:23
  109:23 112:15
  112:19,19
  130:18 135:8
  148:15 178:5,10
  179:4
single  38:17
  90:11 178:1
  183:17,20
sinko  15:11,11

sir  25:22
sit  116:21 175:2
six  29:13 37:14
  37:14 40:23
  61:11 68:15
  69:10 72:13
  73:6 79:6,14
  90:11 91:17,20
  92:2 99:14,17
  101:4 107:7
  110:19 122:18
  122:20 123:6
  130:13 131:4
  134:1 142:3
  162:11,24,25,25
  163:7 183:13
size  75:3 102:10
  102:11
skip  37:21
slash  72:19
slate  24:13 35:4
  35:15 36:4 41:7
  41:10 42:3,21
slightly  89:25
  90:17
slow  44:9
small  18:13
  73:17 80:1
  86:13,18 87:12
  139:18 161:22
smaller  89:24
smc  36:3 37:18
  37:24 38:5
  40:17 41:3,7,17
  42:9,12,20
soft  79:19,20,24
  80:5,14 81:5
  86:23 93:17

139:11,12
software  18:4
  45:14 63:5,6
solange  1:16
  187:3,24
solutions  190:23
sorry  8:25 25:25
  47:6 63:7 85:15
  108:1,12 109:15
  113:11 134:1
  138:6 155:15
  162:20 164:25
sort  125:13
  132:15 139:2
  157:14
sorts  61:19
sound  129:15
  142:8 172:6
sounded  178:14
sounds  129:18
  140:9 174:7
south  1:1,3 2:2
  4:16 6:14 8:1
  14:16 20:13
  28:12,13 29:16
  31:4 46:9 68:7
  68:16 69:3,15
  96:16 108:15
  112:5 180:4
  187:4,12 189:16
  189:20 190:4
  191:1 192:1
southeast  190:15
space  37:25 39:7
  39:12
speak  91:22
speaking  23:21
  104:22 125:16

Kosuke Imai, PhD
The South Carolina State Confvs.McMaster/Alexander

August 8, 2022

[speaking - step]

Page 38

166:8
**specific** 23:25
24:10 31:8 39:3
39:20,22 40:3,7
43:25 48:25
63:13 73:19
80:25 92:13
96:18 98:21,24
99:4 125:2,12,15
137:1,2 138:23
138:24,25 139:2
149:9 156:1
167:13 168:1
182:1,8 183:18
**specifically** 59:4
183:25
**specifics** 14:25
21:7,14 59:20
**specified** 32:25
33:9,14 96:17
97:20 111:2
171:12
**specify** 41:21
43:1 97:1 168:1
182:8
**specifying** 33:9
85:7
**spell** 4:8 15:8
**spelled** 4:10
**spike** 154:11
167:3
**spin** 115:5
**split** 23:11,21
24:3,18 33:6
41:5 42:6,8,10
77:24 78:1 79:9
79:12,14 89:5,7
89:7,22 91:20

92:6 93:17
94:20,21 95:18
95:20,23 96:1,4
96:7,11 97:2
108:5,17,23
123:24,25 124:4
124:18 125:2,5
126:12 133:20
133:24 134:2,7
148:14 151:4
154:18,22 155:3
157:6,19,23
158:7,10 159:6
159:12 160:10
161:5,17,25
162:7,23 163:6
164:15 165:11
166:14,17 168:2
168:15,18
169:11,15,18
170:9,20
**splits** 79:5,10
89:19,20,23 90:1
90:14,20 91:12
91:17 92:2,10,14
92:16,25 93:2,7
93:9,12,13,15,18
94:1,5 95:6,10
95:12,17 96:21
96:23 106:15,15
107:2,8,13 108:7
108:13,18,23
125:8,17 139:4
150:20 160:20
168:12,12 177:1
**splitting** 31:1,2,3
31:3,15,20,21,23
41:11 79:8

108:20 109:3,5
155:3 166:10
167:23 168:5
**spoken** 184:15
**spread** 41:6
96:18
**staff** 45:6 179:9
**stand** 43:21,23
**standard** 33:22
147:6
**star** 44:24
**start** 24:1,4,7
25:19 35:15,21
36:1,4,6 37:12
37:15 41:24
42:2 43:2 70:9
114:2 145:18
156:25 159:5
**started** 58:12
122:20 156:17
178:4
**starting** 30:17
36:4 41:10
145:22 176:16
**starts** 24:12,13
29:12 35:4,6,15
35:25 37:22
38:25 41:7
42:20 43:12
66:3 70:15
127:3
**state** 1:3 2:2
14:15,16 27:14
28:5,14 39:12
73:24 75:8,24
102:8 107:20
155:13 187:4
190:4 191:1

192:1
**statement** 38:7
38:17 43:21
66:12 126:16
**statements**
150:16
**states** 1:1 41:24
**statewide** 41:15
42:5,13 64:19
85:18,25 90:6
92:1 95:22
102:12 104:14
107:22 113:8,14
113:16,20
133:23 135:4,7
135:25 138:13
139:14 140:2,15
141:3,6,15,22
144:1,6 145:20
148:11 156:3,7
157:2 160:19
163:21 164:18
164:22,23 165:4
167:22 173:4
**statistic** 126:16
**statistical** 20:1
26:12 30:11,12
31:23 40:4
99:25 124:20
125:13 131:11
**statistically**
131:19
**statistics** 19:11
21:22 167:10,16
174:22 176:2,7
176:20
**step** 50:19 113:2
167:17

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

**[steps - tends]**                                                    Page 39

steps 52:19
straddles 137:8
street 2:5,10,15
    3:5,11,16
strength 80:9,11
    80:16,20,22
    81:23,25 82:9,10
    82:16,23 83:4,19
    83:25,25 84:24
    85:10,21 89:11
    89:11 95:2
    105:15,21 106:5
    138:10,16 139:5
strengths 80:8
    80:13 83:9
strict 73:1
strong 80:17
    84:7
stronger 85:11
    85:22
struggle 36:15
    36:24 39:6
struggling 11:4
student 45:7
studies 19:19
study 20:1
studying 21:25
subcommittee
    69:16 189:22
subdivision
    73:21
subject 78:10
submit 11:3
    22:23
submitted 11:13
    17:20 20:15,20
    23:2 27:5,12,17
    27:22 145:2

subpoena 10:20
subscribed
    192:14
subset 160:14
    163:14,15
substance 48:5
    48:15
substantive
    76:16
successful 36:10
suggest 181:22
    182:3
suggested 30:15
suggestion 56:2
suitable 38:15
suite 2:5,10 3:5
    3:11,16
summarize 38:9
    161:12
summary 29:12
sumter 133:23
    169:8,14,15,18
    169:24 170:3,12
    170:15,20 171:3
supplement 17:1
suppose 129:17
supreme 28:4
sure 11:9 20:18
    22:13 23:8
    27:16 32:11
    34:23 45:22
    47:8 61:3 79:12
    81:10,21 82:4
    83:23 84:20
    86:21 90:25
    93:14 95:14
    100:10 107:19
    112:17 114:1

115:4,5 117:3,4
126:2 129:25
136:7 141:23
143:17,20 144:4
153:6 155:16
157:2,5,11 158:5
165:1 167:20
168:20 175:23
175:23 185:16
surname 26:19
suspect 119:13
swapping 24:8
swath 146:22
sworn 4:2
    192:14
systematically
    44:6,18

**t**

t 189:1 191:3,3
tab 9:17 16:7
    25:8,9,10,15,21
    34:7,9 47:16
    65:3,4 68:10,13
    69:10 72:13,15
    73:6 99:8,9
    101:4 173:10
table 130:24,25
    163:23 169:23
tabs 47:12
taiwan 190:4
    191:1 192:1
take 5:2 6:2,4,4
    6:6 7:4 19:14,17
    46:24 50:23
    66:24 67:8 69:9
    75:9,18 77:6
    95:17 100:12

102:13,15 115:7
124:10 129:20
131:19 136:21
166:2 185:7
186:2,9
taken 1:15 42:14
    64:24 77:10
    102:18 126:23
    134:24 177:6
talk 13:20 50:25
    53:3 70:14 89:2
    89:5 113:23
    126:25
talked 32:18
    35:3 77:18 97:6
    118:24 148:22
talking 92:20
    95:12 109:20
    123:8 128:12
    164:5 165:23
    175:10,13
target 33:8
    36:14 39:3
    82:19
taught 45:7
technical 42:17
    70:24
tell 4:22 14:12
    41:21 42:3
    66:17 76:2
    107:15 150:8,9
tells 80:17 85:5
ten 45:17 60:16
tend 150:1,2
    165:12,13
tends 139:23
    151:9 165:8

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

[term - trende]                                              Page 40

**term** 30:23
  125:23
**terms** 41:12
  102:14 107:20
  109:9 118:24
  119:25 123:23
  129:9 133:14
  141:12 142:5
  156:22
**test** 31:19,21,22
  31:23 72:13
**testified** 4:2
  27:22 28:6
  178:1 179:3
  180:17
**testify** 4:25
**testimony** 5:3
  10:21 59:13
  148:18 150:13
  155:2,2 170:8
  190:9,18 192:8
**thank** 4:7 9:15
  13:20 24:19
  26:21 28:20
  36:6 44:24
  50:22 55:24
  62:23 65:20,25
  77:2 86:9 88:17
  89:1 90:2 98:8
  99:7 107:1
  111:16 126:4,7
  128:14 133:7
  159:21 177:10
  177:21 179:24
  180:2,17 181:11
  182:14 184:12
  186:13

**theorem** 33:20
**theory** 39:2
**thereof** 187:9
**thick** 158:17
**thing** 76:4 109:6
  124:14 132:19
  166:14,16
**things** 5:13
  76:23 105:3
  132:8
**think** 6:11,14 7:2
  7:7,15 12:16
  13:24,25 14:6,17
  15:25 19:20
  25:9 27:13,16
  28:4,6,17 31:13
  31:14 38:16,20
  39:18 40:4
  45:13,17 46:11
  52:24 53:9,15,25
  71:22 75:7,18
  79:3,17 84:12
  86:10 88:8 89:6
  91:16 94:7
  96:19 106:17,22
  109:15 111:6
  115:6 116:24
  117:2,19 119:3
  120:6 121:1
  123:1,3 124:15
  126:4,14,14,17
  126:18 128:11
  129:14 133:22
  137:5 139:22,23
  143:21 144:9
  146:24 147:4,15
  148:22 149:15
  152:23 153:3,19

161:8 162:6
  166:6 168:25
  172:6 173:24
  174:8 175:1,16
  178:12,19
  180:13 183:18
  183:22 184:14
**third** 36:7 64:19
  162:22
**thirteen** 25:23
  26:3
**thomas** 1:7 4:13
**thought** 134:1
  182:7
**thoughts** 178:24
**thousand** 74:24
  115:15
**three** 15:6 19:1
  25:14 27:3 65:3
  65:4 71:23 88:7
  101:11 104:13
  162:25,25 174:9
**time** 1:13 5:12
  5:12 8:23 9:1
  11:4 21:25
  24:14 31:10
  35:16 36:5 41:8
  41:16 117:6,13
  167:6 171:1
  178:4 190:19
**timeframe** 190:8
**times** 6:9 7:2,3
  7:17 62:15
  166:7
**titled** 99:17
**tjh** 1:6
**today** 4:7,15,22
  4:25 5:8,20 6:16

7:3,21 175:2
  177:11
**today's** 6:20
  7:19 8:13
**tokyo** 19:10
**told** 48:19 93:14
  129:13
**tolerates** 163:12
**tomorrow**
  185:14
**top** 10:15 66:3
  170:22
**topic** 19:22
**topics** 20:3
**total** 79:5,15
  114:17,22 116:8
  116:8 127:20
  128:16 146:13
  160:7 171:4
**touched** 8:11
**tradeoff** 84:7
  108:6,11
**tradeoffs** 84:4,4
  84:6
**traditional** 30:7
  57:18 83:14
  181:1 182:12
**transcript** 3:23
  186:5,16 187:5
  190:6,20 192:5,8
**transition** 39:11
**translates** 129:9
**travel** 11:9
**traverse** 39:6
**treatises** 10:25
**trende** 8:4,15
  17:8 173:14,18
  174:22,23 176:6

Kosuke Imai, PhD                                    August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

**[trende - use]**                                              Page 41

176:16,24
189:23
**trende's** 174:14
175:3,25 176:11
176:20
**trends** 19:24
20:8
**trial** 16:24
**tried** 18:10
26:15 42:16,20
47:6 100:9
129:14 153:11
157:14
**trivial** 87:12
**trouble** 90:9
**true** 44:7,19
82:22 88:1
114:25 141:2
155:24,25 187:5
192:8
**trump** 110:24
**trust** 129:18
172:8
**truth** 4:22
**truthfully** 4:25
**try** 23:16 42:15
68:3 77:3,7
109:4 168:11
**trying** 20:10
25:15 76:5,6
109:2 149:13
**turn** 9:18 10:12
17:13 32:20
70:5 73:6 74:5
78:18 101:4
120:10 126:19
157:24 184:16

**turnaround**
184:24 185:2
**turning** 94:19
**twenty** 88:7
130:13 138:9
**two** 7:11,12,16
8:3,15 14:1 16:7
16:13 20:6
23:23 24:2,6
25:4,5,8,10,16
25:21 27:18
41:1,2,6,10
42:10 45:13,13
47:16,19 52:19
61:7 63:1,5 64:3
73:13,15 75:16
79:8,10,11 83:4
86:1 88:13
97:19,22 104:13
114:22 115:6,7
119:23 121:17
122:9,18 126:1
130:8 133:13
136:5,15 145:7
157:1 162:11,23
162:24 163:7
166:15,17
167:13 173:24
174:8 180:7,9
**tyler** 15:11,18
**type** 23:11 24:18
33:6,6,24 37:17
42:6,15 78:14
79:21 80:16
98:1 102:17
**types** 12:8 24:6
24:15

**typically** 74:21

**u**

**u** 15:11
**u.s.** 73:16
**uh** 20:19 30:19
37:1 70:16
72:17 74:6
81:17 85:1,19
94:25 99:16,21
101:13 104:24
106:13 107:3
108:8 111:18
114:13 115:10
116:15 118:14
124:11 125:20
127:19 131:5
132:2 135:13
138:12 142:7
146:4 147:9
148:12,24
149:17 150:24
154:9 155:18
156:6 158:3
159:25 163:24
164:3 165:2
169:22 170:18
172:14 176:9,18
181:21
**ultimately**
153:15
**un** 179:25
**unable** 4:24
**unchanged**
114:9
**unclear** 53:16
**understand** 4:17
4:21 5:18,21

17:18 22:13
32:20 50:6,24
52:18 59:6
67:25 70:25
78:25 85:3
89:12 93:21,24
95:1 114:4
115:4 127:4
128:4 130:16
143:21 144:8
**understanding**
20:2 45:20
52:17 71:25
83:22 128:5
**understood** 5:25
23:9 86:6
162:13
**unfortunately**
17:23 36:14
**union** 2:4,9
**united** 1:1
**units** 24:8,8
74:21
**universe** 83:20
95:3,4
**university** 19:10
**unknown** 57:6
57:11 58:8
**untouched** 61:8
**unusual** 31:22
31:24 150:22
164:14,14
**updated** 17:23
**uploaded** 34:10
**uribe** 1:16 187:3
187:24
**use** 12:4,17 17:9
26:13 30:24

Kosuke Imai, PhD
The South Carolina State Conf vs. McMaster/Alexander

August 8, 2022

**[use - washington]**

Page 42

31:7,22 33:6,22
39:4,20,22 40:16
41:23 42:6,7,9
54:23 55:7
61:17 71:14
74:7,15 75:1,25
83:23 87:23
102:22 103:18
105:7 109:7,22
110:2 111:4,8,22
118:18 122:14
125:23 128:25
144:17 147:3
149:13 155:9
159:19 170:13
181:9,10,12,16
182:1,9
**uses** 30:20
102:10
**usually** 31:7

**v**

**v** 190:4 191:1
192:1
**valid** 39:16,18
44:7,19
**validity** 40:13
175:7
**value** 81:17,19
81:22,25 82:7
85:2,4,10,11
**values** 82:13,18
**variables** 12:3
**variation** 74:24
122:1 163:12
**variations**
161:23

**variety** 176:7
**various** 53:3
84:5 130:17
149:1
**varying** 88:25
**vast** 107:12,22
131:7 154:12
**verbal** 5:3
**verify** 190:9
**veritext** 190:14
190:23
**veritext.com**
190:15
**version** 25:11,13
**versus** 28:21
**vertical** 151:18
**viability** 67:17
**viable** 66:5,19
**video** 9:21 189:5
**videoteleconfe...**
1:16 2:5,10,15
2:20 3:4,10,15
**view** 38:5 56:5
71:10 112:4
131:22 183:6,11
184:3
**violated** 57:18
**vitae** 19:4 189:9
**vote** 110:24
**voter** 26:11,13
26:14 110:9
128:19
**voters** 26:15
31:11,15,20,21
49:10 64:6
104:19 118:21
119:11 122:3,6,8
122:12 123:15

123:17,18,21,24
123:25 124:3,7
124:12,22 125:5
125:25 127:21
128:8,23 129:3,5
129:8 145:13
148:4,13,14
149:10,16,23
150:1,6,7,9,11
150:22 151:6,7
151:25 152:1,8
152:11,14,16,17
152:21 153:1,25
154:5 164:23
165:4,15,19
166:10 167:2,7
167:23 168:10
168:13 176:25
**voting** 106:12
114:17,18,21,23
115:8 137:13
151:15 160:5,7
160:17,18
170:20 184:9
**vra** 41:20 42:22
85:18 90:6 92:1
107:20,22
109:20 112:20
112:22 113:9,14
113:19,21 135:5
135:12 138:13
139:14 142:25
142:25 173:5
184:1,5
**vs** 1:6
**vtc** 1:11
**vtd** 106:15 107:2
107:8,12 108:17

116:13,16
118:16 146:10
147:1
**vtds** 108:5,20,23
109:4,4,7 114:14

**w**

**w** 15:11,13
**wait** 133:8 138:4
175:10
**waive** 186:17
**walk** 34:20 78:4
84:17
**wang** 15:12,13
**want** 9:18 13:20
25:18 26:24
32:20 36:6 38:7
38:16 40:6
43:10 44:2 47:8
56:18,22 57:10
57:16 61:17
62:3 63:15
70:24 81:3
106:2 108:17
109:6 111:14
113:1 130:23
140:6 167:11,18
185:14,17 186:1
186:10
**wanted** 41:19
75:16 81:21
82:4 106:21
117:22 126:2
136:7 143:20
156:24 157:5,10
175:14 183:12
**washington** 2:6
2:11,21

Kosuke Imai, PhD
The South Carolina State Confvs.McMaster/Alexander

August 8, 2022

**[water - zip]**

Page 43

water 71:3,3
way 23:25 24:4
  24:10,23 27:17
  38:9 45:16 50:2
  60:12,13 66:15
  66:23 76:20,20
  83:16 89:16
  94:8 111:3
  131:10 133:10
  137:23 143:9
  144:18 150:19
  151:5 157:6,18
  164:16 182:25
ways 60:7,10,21
  63:1,4
we've 118:24
weak 81:6
weaker 85:12
weakness 40:8
week 7:6,8 48:17
weeks 7:8 27:3
  173:24 174:9
weight 79:20
weighted 84:8
weights 106:7
went 45:21 57:7
  62:1 87:9
  139:17,20 181:7
who've 60:18
wide 98:22
  107:20
witness 9:24
  13:7 26:8 27:1
  28:7 29:6 57:21
  60:7 63:11
  126:22 141:5
  148:19 149:7
  165:7,23 171:24

173:15 177:9,12
  186:15 187:10
  188:3 190:8,10
  190:12,19
witnesses 43:16
women 64:6
  145:12
wonderful 107:1
word 30:20,20
  129:20
words 65:20
  66:20
work 14:18 54:6
  185:12
working 83:20
  121:17 178:4
works 20:15,21
  29:21 45:18
world 91:16
written 13:15
  20:12,21 34:14
  40:2
wrong 13:25
wrote 16:18

**x**

x 188:1 189:1

**y**

yan 2:9 7:15,18
  13:24 178:20
yeah 9:5,19
  12:25 14:16
  18:6,12 24:22,24
  25:12 26:2 57:5
  64:2,13,13,17
  68:5 82:25 83:6
  84:2 85:14 87:1
  87:5,13 89:14

90:13,16,19,25
  92:9 94:13
  97:15 104:2,15
  105:13 106:16
  106:18,21,21
  107:19 108:3,14
  110:2,6,11,21
  113:12 114:25
  116:4,6 117:2,9
  120:5,6,17,21,24
  120:24 121:1,6
  121:22 122:2
  124:20 126:4,14
  126:18 129:7,17
  129:18 130:6,22
  131:1 132:10
  133:13,14,16,16
  133:22 134:2,5,5
  134:5,6,10
  137:10 140:6,23
  143:19,19
  145:11 146:7
  147:15 148:3,22
  149:12 151:3
  152:20 153:19
  154:16 155:25
  158:16 161:8,11
  161:13 162:13
  162:19 163:1,1,2
  163:5,5 164:10
  168:20,20
  171:18 172:5
  173:11,25 174:8
  176:22 177:3
  178:14,19
  179:15,21 180:6
  181:25 185:6

year 29:17
years 12:10
  45:16,17 60:16
yield 44:10,14
york 2:16 187:12

**z**

zero 85:16 167:1
zip 9:17 17:24
  65:5 173:10

South Carolina Rules of Civil Procedure

Part V. Depositions and Discovery

Court Rule 30

(e) Submission to Witness; Changes; Signing.
When the testimony is fully transcribed the
deposition shall be submitted to the witness for
examination and shall be read to or by him unless
such examination and reading are waived by the
witness and by the parties. Any changes in form or
substance which the witness desires to make shall
be entered upon the deposition by the officer with
a statement of the reasons given by the witness for
making them. The deposition shall then be signed by
the witness, unless the parties by stipulation
waive the signing or the witness is ill or cannot
be found or refuses to sign. If the deposition is
not signed by the witness within 30 days of its
submission to him, the officer shall sign it and
state on the record the fact of the waiver or of
the illness or absence of the witness or the fact
of the refusal to sign together with the reason, if
any, given therefor; and the deposition may then be
used as fully as though signed unless on a motion
to suppress under Rule 32(d)(4) the court holds

that the reasons given for the refusal to sign
require rejection of the deposition in whole or in
part.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.