UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| THE SOUTH CAROLINA STATE CONFERENCE OF THE NAACP,<br><br>and<br><br>TAIWAN SCOTT, on behalf of himself and all other similarly situated persons,<br><br>Plaintiffs,<br><br>v.<br><br>THOMAS C. ALEXANDER, in his official capacity as President of the Senate; LUKE A. RANKIN, in his official capacity as Chairman of the Senate Judiciary Committee; JAMES H. LUCAS, in his official capacity as Speaker of the House of Representatives; CHRIS MURPHY, in his official capacity as Chairman of the House of Representatives Judiciary Committee; WALLACE H. JORDAN, in his official capacity as Chairman of the House of Representatives Elections Law Subcommittee; HOWARD KNAPP, in his official capacity as interim Executive Director of the South Carolina State Election Commission; JOHN WELLS, Chair, JOANNE DAY, CLIFFORD J. EDLER, LINDA MCCALL, and SCOTT MOSELEY, in their official capacities as members of the South Carolina Election Commission,<br><br>Defendants. | Case No.: 3:21-cv-03302-MGL-TJH-RMG<br><br>**SENATE DEFENDANTS AND HOUSE DEFENDANTS' MOTION IN LIMINE TO EXCLUDE THE TESTIMONY OF PLAINTIFFS' PUTATIVE EXPERT JORDAN RAGUSA** |

Senate Defendants and House Defendants hereby move in limine to exclude the reports, opinions, and testimony of Plaintiffs' purported expert, Dr. Jordan Ragusa, because he fails to satisfy the requirements of *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), and

the Federal Rules of Evidence. For the reasons that follow, the Court should grant Defendants' *Daubert* motion.[1]

## BACKGROUND

Dr. Ragusa is a political science professor at the College of Charleston who filed a report in this case and also a rebuttal report. (**Ex. A**, Dr. Ragusa's Report dated April 11, 2022) (**Ex. B**, Dr. Ragusa's Rebuttal Report dated May 4, 2022). Plaintiffs have proffered Dr. Ragusa as an expert and intend to call him as a witness at trial. ECF No. 331 at 1.

Dr. Ragusa seeks to offer testimony and evidence regarding his analysis that race was a substantial factor in five of the seven newly drawn Congressional districts. Ragusa Rep. 2-3 (**Ex. A**). To ascertain whether "race was a factor," Dr. Ragusa analyzes the state's 2000+ voting tabulation districts ("VTDs") and whether they were moved in or out of the redrawn district. *Id.* Dr. Ragusa's methodology analyzes whether every VTD outside the old district but within the "county envelope" has been moved. The "county envelope" encompasses every county in the old district, even though counties were split between congressional districts. *Id.*

In furtherance of their strained and evidence-lacking complaint, Plaintiffs intend to rely on the reports and testimony of Dr. Ragusa. However, Dr. Ragusa is not an expert in analyzing redistricting plans. He has never served as an expert witness, nor does he have the requisite experience analyzing redistricting plans or traditional redistricting criteria to be designated an expert by this court.

Congressional districts are drawn with numerous factors in mind. The benchmark plan traditionally is the starting point. Complying with federal law and constitutional provisions are

---

[1] Because this motion contains a full explanation, a supporting memorandum would serve no useful purpose. *See* Local Civil Rule 7.04 (D.S.C.). Further, after consultation, Plaintiffs declined to withdraw Dr. Ragusa as an expert. *See* Local Civil Rule 7.02 (D.S.C.).

mandatory for a legal plan. Generally, race can be considered while drawing the districts, but race must not be the predominant factor in that race-neutral considerations are subordinated to racial considerations, unless that subordination is narrowly tailored to serve a compelling state interest. Map drawers follow traditional redistricting criteria or else the map drawer is left with no rules or guidelines to follow when he or she commences drawing. Traditional criteria include compactness; contiguity; minimizing splits of counties, cities, and precincts; and preserving communities of interest, just to name a few. Clearly, being able to analyze or assess whether a plan meets all these components requires extensive knowledge. Addressing only one sliver of the redistricting model is not a complete assessment of any redistricting plan. In this case, Plaintiffs have done just that. Dr. Ragusa opines whether race was a factor, but he concedes he failed to look at any other reason why the map was drawn. Therefore, he is not qualified, and his testimony and report must be excluded.

Further, it is worth noting that Plaintiffs have only challenged three of the seven Congressional districts. Dr. Ragusa, however, concluded "race was a significant factor" in *five* of the seven Congressional Districts. Thus, even Plaintiffs refuse to embrace Dr. Ragusa's analysis, which only further demonstrates why the Court should exclude Dr. Ragusa's reports and testimony from the trial of this matter.

## STANDARD

A party offering expert testimony "has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence." Fed. R. Evid. 702 advisory committee's note (citing *Bourjaily v. United States*, 483 U.S. 171, 176 (1987)). "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise" if:

3

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

These requirements are "exacting." *Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000). Thus, as *Daubert* explains, Rule 702 imposes a "special gatekeeping obligation" on the district court to ensure that an expert's testimony "rests on a reliable foundation" and "is relevant to the task at hand." *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 281 (4th Cir. 2021) (quoting *Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017)).

To be reliable, expert testimony must be "based on scientific, technical, or other specialized *knowledge* and not on belief or speculation," and "to the extent an expert makes inferences based on the facts presented to him," the inferences must be "derived using scientific or other valid methods." *Id.* (quoting *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999)). The reliability analysis focuses on the expert's "principles and methodology" and is informed by four "guideposts" set out in *Daubert*: "(1) whether the expert's theory or technique 'can be (and has been) tested'; (2) 'whether the theory or technique has been subjected to peer review and publication'; (3) 'the known or potential rate of error' inherent in the expert's theory or technique; and (4) whether the expert's methodology is generally accepted in his field of expertise." *Id.* (quoting *Daubert*, 509 U.S. at 593–95). These guideposts are not exhaustive, however, and courts often consider additional factors, including "whether the expert's analysis leaves unexplained analytical gaps and whether the expert has reasonably accounted for alternative explanations."

4

*Nucor Corp. v. Bell*, No. 2:06-CV-02972, 2008 WL 4442571, at *2 (D.S.C. Jan. 11, 2008); *see Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 202 (4th Cir. 2001); *In re Pella Corp. Architect & Designer Series Windows Mktg., Sales Pracs. & Prod. Liab. Litig.*, 214 F. Supp. 3d 478, 494 (D.S.C. 2016). In short, because faulty expert testimony can be "quite misleading," *Daubert* aims to ensure that such testimony is based on "intellectual rigor" rather than the "ipse dixit" of the putative expert. *In re Lipitor Mktg., Sales Pracs. & Prod. Liab. Litig.*, 892 F.3d 624, 631–32 (4th Cir. 2018) (quoting *Kumho Tire Co.*, 526 U.S. at 152); *see also Holesapple v. Barrett*, 5 F. App'x 177, 179 (4th Cir. 2001).

Moreover, expert testimony is irrelevant unless it has "a valid scientific connection to the pertinent inquiry." *Id.* (quoting *Belville v. Ford Motor Co.*, 919 F.3d 224, 232 (4th Cir. 2019)). "This ensures that the expert 'helps the trier of fact to understand the evidence or to determine a fact in issue.'" *Id.* (quoting *Nease*, 848 F.3d at 228).

The objective of *Daubert*'s gatekeeping requirement is to ensure "that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. at 152. And while a court has broad discretion "to determine reliability in light of the particular facts and circumstances of the particular case," such discretion does not include "abandon[ing] the gatekeeping function." *Id.* at 158-59 (Scalia, J., concurring). Indeed, with expert witnesses, the stakes are especially high because "[e]xpert evidence can be both powerful and quite misleading." *Sardis*, 10 F.4th are 283 (quoting *Daubert*, 509 U.S. at 595).

In *Sardis*, the Fourth Circuit Court of Appeals recently clarified the gatekeeping duties of a district court under Rule 702 and *Daubert*. *Id.* at 283-84. There, the Fourth Circuit noted that the

Advisory Committee on Evidence Rules unanimously approved a proposal to amend Rule 702 on April 30, 2021, which was motivated in part by the Committee's observation that in a number of federal cases, "judges did not apply the preponderance standard of admissibility to [Rule 702's] requirements of sufficiency of basis and reliable application of principles and methods, instead holding that such issues were ones of weight for the jury." *Id.* (quoting Advisory Comm. on Evidence Rules, *Agenda for Committee Meeting* 17 (Apr. 30, 2021)).

## ARGUMENT

Viewed in this prism, the Court should exclude Dr. Ragusa's report, testimony, and opinions under *Daubert* because (1) he is not qualified to testify about redistricting; (2) his opinions are not the product of reliable principles and methods; and (3) his opinions fail to address traditional redistricting criteria and, thus, will not assist the trier of fact.

**1. Dr. Ragusa is Not Qualified to Testify Regarding Redistricting**

This Court should exclude Dr. Ragusa's written report and testimony for a fundamental reason: he is not qualified to testify as an expert regarding redistricting. Dr. Ragusa has knowledge and education related to American politics and quantitative research generally, but he has not demonstrated sufficient knowledge, experience, or education related to redistricting specifically.

First, before this case, Dr. Ragusa had never been asked to serve as an expert witness. Thus, he has never been tendered as an expert witness, nor has he ever been qualified as an expert witness. (**Ex. C**, Dr. Ragusa Deposition Transcript, 333:2–21).

When questioned as to his area of expertise, Dr. Ragusa first described himself as a "generalist," (**Ex. C**, Dr. Ragusa Deposition Transcript, 200:8–13), and then stated "my expertise touches on a lot of things that encompass redistricting. At the same time, my second field of expertise is research methodology and statistics." (**Ex. C**, Dr. Ragusa Deposition Transcript,

6

200:18-22) (emphasis added)). He does not focus specifically on redistricting; rather, he studies elections and South Carolina politics. (**Ex. C**, Dr. Ragusa Deposition Transcript, 204:7-11).

None of his books concern redistricting. (**Ex. C**, Dr. Ragusa Deposition Transcript, 206:6-11). Dr. Ragusa admits that his two authored book chapters don't have anything specifically to do with redistricting. (**Ex. C**, Dr. Ragusa Deposition Transcript, 206:17-22). He also admits his current two works in progress are not related to redistricting. (**Ex. C**, Dr. Ragusa Deposition Transcript, 209:8-11). One of his current projects is titled, "Locked, Loaded, and Legislating: An Examination of Gun Owners in Congress" which is miles away from having anything to do with redistricting. (**Ex. C**, Dr. Ragusa Deposition Transcript, 209:16-25). His dozen or so peer-reviewed articles don't have anything to do with redistricting. In fact, when asked if any of these works could be used for research on redistricting, he answered, "I don't know if this would be the first source they consult." (**Ex. C**, Dr. Ragusa Deposition Transcript, 207:25 to 208:7).

Dr. Ragusa stated he has written numerous op-eds, editorials, and other publications and that they did not have anything to do with redistricting. (**Ex. C**, Dr. Ragusa Deposition Transcript, 210:1-13). Dr. Ragusa stated that he had done some consulting work, but it too had nothing to do with redistricting. (**Ex. C**, Dr. Ragusa Deposition Transcript, 211:10-14). Dr. Ragusa admitted he had never reviewed or offered any analysis for any governmental entity's redistricting plan. (**Ex. C**, Dr. Ragusa Deposition Transcript, 212:1-10). Dr. Ragusa has never used any redistricting software to develop or draw any maps or plans and, thus, he has never drawn a complete redistricting map for a state or any other governmental unit. (**Ex. C**, Dr. Ragusa Deposition Transcript, 212:15-23).

In the House plan litigation, Plaintiffs sought to proffer Dr. Ragusa as an expert. His reports and deposition testimony in the House litigation suffered from the same problems as his report in

7

the Congressional phase, i.e., he does not meet the qualifications to be an expert witness on redistricting. One glaring example of how he doesn't meet the threshold of an expert comes from his first deposition. When asked if he was familiar with the traditional principles of redistricting, Ragusa responded, "I don't know what the term means." (**Ex. D**, Dr. Ragusa Deposition of February 10, 2022 Transcript, 66:10–13). When asked whether he considered the terms in his analysis, he testified, "Being that I don't know what the terms means, I can't answer the question." (**Ex. D**, Dr. Ragusa Deposition of February 10, 2022 Transcript, 66:14–18). Having no knowledge of the most basic of basic principles of drawing redistricting plans highlights why this court must reject him as an expert.

Dr. Ragusa's qualifications are lacking. *See Templeton v. Bishop of Charleston*, No. 2:18-CV-02003-DCN, 2021 WL 3419442, at *3 (D.S.C. Aug. 5, 2021) (holding when a putative expert "clearly has no relevant qualifications," a court may exclude the witness). Dr. Ragusa admittedly has experience with data; however, Dr. Ragusa's qualifications suffer from the absence of any specialized knowledge, education, or experience with the specific topics on which he was asked to opine. *See* Fed. R. Evid. 702(a). Based on the foregoing, this Court should find Dr. Ragusa unqualified to offer any expert opinion on redistricting.

**2. Dr. Ragusa's report and testimony are not the product of reliable principles and methods.**

Dr. Ragusa's written report and testimony should also be deemed inadmissible because they are not the product of reliable principles and methods. In fact, Dr. Ragusa himself admits as much because none of the four guideposts offered by *Daubert* are met in this case. Those guideposts are:

> (1) whether the expert's theory or technique "can be (and has been) tested"; (2) "whether the theory or technique has been subjected to peer review and publication"; (3) "the known or potential rate of

> error" inherent in the expert's theory or technique; and (4) whether the expert's methodology is generally accepted in his field of expertise.

*Sardis v. Overhead Door Corp.*, 10 F.4th 268, 281 (4th Cir. 2021) (quoting *Daubert*, 509 U.S. at 593–94).

As an initial matter, Dr. Ragusa stated in his deposition the methodology he used was his own. (**Ex. C**, Dr. Ragusa Deposition Transcript, 235: 6-16; 236:10-11; 236:13-18). Dr. Ragusa acknowledged he did not talk to anyone about his methodology before conducting his analysis using his methodology. (**Ex. C**, Dr. Ragusa Deposition Transcript, 238:2-6). He didn't know whether it had been used by others and acknowledged the uniqueness of his methodology. (**Ex. C**, Dr. Ragusa Deposition Transcript, 238:18 through 239:16). Dr. Ragusa fails the first factor since he's not confident his methodology has been used or tested.

Regarding the second factor, Dr. Ragusa acknowledged that his specific methodology has not been subject to peer review or publication. (**Ex. C**, Dr. Ragusa Deposition Transcript, 239:21 through 240:2). Dr. Ragusa stated, "I don't know whether that very specific approach [I used] has been peer-reviewed." (**Ex. C**, Dr. Ragusa Deposition Transcript, 329:6-8). In his deposition, Dr. Ragusa echoed his earlier statement and testified, "Again, this one piece of my methodology has not been peer-reviewed, to my knowledge." (**Ex. C**, Dr. Ragusa Deposition Transcript, 330:5-14).

Third, since Dr. Ragusa did not discuss his methodology with anyone, nor had his methodology peer-reviewed, he does not have any information about his specific methodology's known or potential error rate. Clearly, he could not provide any information about the existence or maintenance of standards concerning the operation of his methodology.

Finally, Dr. Ragusa's concession his methodology was unique to him and not used by others suggests his manner of analysis has not attracted widespread acceptance within a relevant

scientific community.

By Dr. Ragusa's own admissions, he has not—*and cannot*—establish that his methodology meets any of the four important *Daubert* guideposts for determining the reliability of a scientific theory or technique. *See Sardis*, 10 F.4th at 281 (quoting *Daubert*, 509 U.S. at 593–94). Based on his admissions alone, this Court should exclude Dr. Ragusa's written report and testimony.

### 3. Dr. Ragusa's failure to consider traditional redistricting criteria does not assist the trier of fact.

In addition to the four *Daubert* guideposts previously discussed, Dr. Ragusa's written report and testimony should be deemed unreliable and inadmissible based upon his admission he failed to consider traditional redistricting criteria in his analysis. As stated previously, in his first deposition, Dr. Ragusa did not even know what the term "traditional redistricting criteria meant."[2] Here, the Court must determine "whether the expert's analysis leaves unexplained analytical gaps and whether the expert has reasonably accounted for alternative explanations." *Nucor Corp.*, 2008 WL 4442571, at *2 (citing *Gen. Elec. Co.*, 522 U.S. at 146). That is a pretty big gap.

#### i. VTD Analysis

For Dr. Ragusa's report, he analyzed the 2,000 plus VTDs within the forty-six counties of the state and examined whether they were moved into or out of a given district. (**Ex. A**, Dr. Ragusa's Written Report, pp. 2–5). After recording the black voting age population ("BVAP") for each VTD, Dr. Ragusa imposed his "county envelope" analysis. (**Ex. A**, Dr. Ragusa's Written Report, p. 2). Dr. Ragusa analyzed VTDs that were outside the old district, but within the "county envelope," to determine if there is a statistically significant indication that VTDs with certain

---

[2] Interestingly, after being unknowledgeable on such a basic principle, Dr. Ragusa apparently was coached-up and in his second deposition, he intimated he had reviewed the Senate criteria and now understood the term. However, the primary point remains - Dr. Ragusa is a novice when it comes to redistricting and his "on the job training" does not change this fact.

BVAPs were moved into or out of a district. (**Ex. A**, Dr. Ragusa's Written Report, p. 2). However, analyzing the movement of VTDs within a "county envelope" is not a reliable methodology for at least four reasons, all of which involve unexplained analytical gaps and a lack of alternative explanations.

Dr. Ragusa's analysis had "small sample sizes and/or few events per variable in a few cases." (**Ex. A**, Dr. Ragusa's Written Report, p. 3). Multiple courts have noted the problems with small sample sizes. *See, e.g.*, *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 340 (1977) ("Considerations such as small sample size may, of course, detract from the value of such evidence."); *Harper v. Trans World Airlines, Inc.*, 525 F.2d 409, 412 (8th Cir. 1975) ("[S]tatistical evidence derived from an extremely small universe, as in the present case, has little predictive value and must be disregarded."); *Aragon v. Republic Silver State Disposal Inc.*, 292 F.3d 654, 663 (9th Cir. 2002), *as amended* (July 18, 2002) ("The problem with a small number, of course, is that slight changes in the data can drastically alter the result."). Without more, this Court should disregard all findings and results based on what Dr. Ragusa self-describes as a small sample size.

Further, Dr. Ragusa's approach suffers from a basic line-drawing problem. From a geographical standpoint, it is possible, if not probable, that a VTD on the edge of a county would not be geographically proximate to a district that covers some portion of the same county on the other side of the "county envelope." If mapmakers were to adopt such an approach, i.e. reach out across counties for one VTD or possibly a number of VTDs, districts could and would be drawn with irregular shapes. Dr. Ragusa acknowledged this would violate traditional redistricting criteria. (**Ex. C**, Dr. Ragusa Deposition Transcript, 254:4-22). Dr. Ragusa also confirmed he could have adopted a more granular approach and narrowed in on more specific areas rather than the broader VTD. (**Ex. C**, Dr. Ragusa Deposition Transcript, 307:7-10). Thus, Dr. Ragusa's methodology not

only could cause an over inclusive problem, his analysis also could create an exclusivity problem. In other words, it is entirely possible for a mapmaker to look into an adjoining county to shift a VTD in or out of the district. Dr. Ragusa's approach completely fails to consider or account for this possibility.

### ii. Failure to analyze traditional redistricting criteria

Dr. Ragusa testified over and over that he only reviewed the data (numbers) after the maps were drawn. (**Ex. C**, Dr. Ragusa Deposition Transcript, 247:9-248:24; 261:7-15; 261:23-25; 270:10-13; 281:2-12) He didn't review or analyze the criteria the map drawers might have used in the crafting of the district lines. As this court knows, race can be considered while drawing the districts, but race must not be the predominant factor such that race-neutral considerations are subordinated to racial considerations. To make this assessment, it is logical that one must consider and assess the "race-neutral" criteria used by the General Assembly. Dr. Ragusa used a "county envelope" approach that attempted to evaluate whether higher-BVAP voting districts were more or less likely to be moved into or out of a district as part of the Congressional Plan, but he did not consider core preservation, voting district splits, contiguity, compactness, political subdivisions, partisan performance, and communities of interest at a granular level. *See* **Ex. A**, Ragusa Report at 1–4; **Ex. C**, Ragusa Dep. Tr. 306:11–12, 306:3–6, 307:7–16.

As this court knows well, redistricting litigation often refers to the law from the most recent round of redistricting litigation. For example, *Colleton Cty. Council v. McConnell*, 201 F. Supp. 2d 618 (D.S.C. 2002), *opinion clarified* (Apr. 18, 2002), repeatedly referenced earlier redistricting plans and attendant judicial proceedings:

- In determining what traditional redistricting principles it should apply, the court "look[ed] to the historical redistricting policies of the state." *Id.* at 628.

- As part of that analysis, the court examined the degree to which maintaining county boundaries had been a principle emphasized by the courts that drew impasse plans in 1982 and 1992. *Id.* at 647–48.

- In deciding whether portions of two counties were part of the "core" of a district, the court looked to the reasons why other portions of those counties had been removed from the district by the court that drew the impasse plan in 1992. *Id.* at 667.

This makes sense from both a practical perspective when drawing a new map and from a legal perspective when you have court-blessed principles of law.

Lastly, even Plaintiffs reject Dr. Ragusa's analysis given that they chose to only challenge three of the five Congressional districts in which Dr. Ragusa concluded race was factor. Dr. Ragusa testified Plaintiffs probably chose not to use his analysis completely because there might have been other reasons and factors for the way the districts were drawn. (**Ex. C**, Dr. Ragusa Deposition Transcript, 285:14-286:11; 286:13-25; 266:23-267:5; 277:10-24)  But that only proves the point. Dr. Ragusa's concession that he doesn't know the other reasons why the districts were crafted in the manner in which they were renders his report meaningless.  By only using numbers and data to support his conclusion and not having a comprehensive understanding of why the districts were drawn the way they were, Dr. Ragusa offers no support to Plaintiffs' erroneous claim that race was the predominant factor in establishing the districts.

In sum, Dr. Ragusa's analysis leaves "unexplained analytical gaps"—from sample size to line drawing problems to filtering and contextual problems—and does not "reasonably account[] for alternative explanations.". *Nucor Corp.*, 2008 WL 4442571, at *2 (citing *Gen. Elec. Co.*, 522 U.S. at 146).

**CONCLUSION**

Based on the foregoing, Senate Defendants and House Defendants respectfully request the Court grant this Motion, exclude the written report and testimony of Dr. Ragusa, and Order his testimony is inadmissible at trial.

Respectfully submitted,

By:   s/Robert E. Tyson, Jr.
Robert E. Tyson, Jr. (7815)
Vordman C. Traywick (12483)
La'Jessica Stringfellow (13006)
Robinson Gray Stepp & Laffitte, LLC
1310 Gadsden Street
Post Office Box 11449 (29211)
Columbia, South Carolina 29201
803-929-1400 Telephone
803-929-0300 Facsimile
rtyson@robinsongray.com
ltraywick@robinsongray.com
lstringfellow@robinsongray.com

John M Gore, Esquire (admitted *pro hac vice*)
Stephen J Kenny, Esquire (admitted *pro hac vice*)
Jones Day
51 Louisiana Avenue NW
Washington, DC 20001
202-879-3930
jmgore@jonesday.com
skenny@jonesday.com

**Attorneys for Thomas C. Alexander** *in his official capacity as President of the Senate* **and Luke A. Rankin** *in his official capacity as Chairman of the Senate Judiciary Committee*

s/ Mark C. Moore
Mark C. Moore (Fed. ID No. 4956)
Jennifer J. Hollingsworth (Fed. ID No. 11704)
Hamilton B. Barber (Fed. ID No. 13306)
Michael A. Parente (Fed. ID No. 13358)
NEXSEN PRUET, LLC

        1230 Main Street, Suite 700
        Columbia, SC 29201
        Telephone: 803.771.8900
        MMoore@nexsenpruet.com
        JHollingsworth@nexsenpruet.com
        HBarber@nexsenpruet.com
        MParente@nexsenpruet.com

        William W. Wilkins (Fed. ID No. 4662)
        Andrew A. Mathias (Fed. ID No. 10166)
        Konstantine P. Diamaduros (Fed. ID No. 12368)
        NEXSEN PRUET, LLC
        104 S. Main Street, Suite 900
        Greenville, SC 29601
        Telephone: 864.370.2211
        BWilkins@nexsenpruet.com
        AMathias@nexsenpruet.com
        KDiamaduros@nexsenpruet.com

        Rhett D. Ricard (Fed. ID No. 13549)
        NEXSEN PRUET, LLC
        205 King Street, Suite 400
        Charleston, SC 29401
        Telephone: 843.720.1707
        RRicard@nexsenpruet.com

        **Attorneys for James H. Lucas,** *in his official capacity as Speaker of the House of Representatives***; Chris Murphy,** *in his official capacity as Chairman of the House of Representatives Judiciary Committee***; and Wallace H. Jordan,** *in his official capacity as Chairman of the House of Representatives Elections Law Subcommittee*

Columbia, South Carolina
September 2, 2022

15