<u>The South Carolina State Conference of
the NAACP, et al v. Alexander, et al</u>

CA No.:  3:21-cv-03302-MGL-TJH-RMG

# EXHIBIT C

*Senate Defendants and House Defendants' Motion
in Limine to Exclude Testimony of Plaintiffs'
Putative Expert Jordan Ragusa*

June 28, 2022

Deposition Transcript of

Jordan Ragusa

Jordan M. Ragusa , Ph.D.                    June 28, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 176

1              UNITED STATES DISTRICT COURT
               DISTRICT OF SOUTH CAROLINA
2                    COLUMBIA DIVISION
3

     THE SOUTH CAROLINA STATE CONFERENCE OF
4    THE NAACP, et al.,
5              Plaintiffs,
6    vs.              CASE NO. 3:21-cv-03302-MBS
                           TJH-RMG
7

     THOMAS C. ALEXANDER, et al.,
8

                   Defendants.
9
10   VTC
     DEPOSITION OF:   JORDAN M. RAGUSA, PH.D.
11                    (Appearing by VTC)
                      VOLUME II (Pages 176 - 344)
12

     DATE:            June 28, 2022
13

     TIME:            10:03 a.m.
14

     LOCATION:        College of Charleston
15                    Charleston, SC
16   TAKEN BY:        Counsel for the Defendants
17   REPORTED BY:     Susan M. Valsecchi, CRR
                      Registered Professional Reporter
18                    (Appearing by VTC)
19
20
21
22
23
24
25

Jordan M. Ragusa , Ph.D.                          June 28, 2022
The South Carolina State Confvs.McMaster/Alexander

                                              Page 200

1      your deposition earlier; and you know, Dr. Ragusa,

2      you've been -- your report has been offered by the

3      Plaintiffs as an expert witness, right?

4                  MR. FREEDMAN:  Objection.

5                  THE WITNESS:  That's my understanding,

6           yes.

7      BY MR. TYSON:

8           Q.    In what field or topic do you contend

9      you are an expert?

10          A.    I often describe my expertise in

11     American politics as a generalist, and what I mean

12     by that is that my research and my teaching covers

13     a lot of different topics.

14                 Some of my research is on the U.S.

15     Congress, some of it covers political parties.  I

16     also write papers on elections and voting behavior,

17     as well as South Carolina politics.

18                 So on the one hand, my expertise

19     touches on a lot of things that encompass

20     redistricting.  At the same time, my second field

21     of expertise is research methodology and

22     statistics.  Obviously, when we're talking about

23     redistricting, we're talking about a lot of data,

24     and my expertise is in how we can use data to

25     understand political and social phenomenon.

Jordan M. Ragusa , Ph.D.                                    June 28, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 204

1              MR. FREEDMAN:  Object to form.

2              THE WITNESS:  So, again, I wouldn't

3         concede that understanding the outcomes is

4         inconsequential.  I think it is incredibly

5         consequential.

6    BY MR. TYSON:

7         Q.   Agreed.

8         A.   What I would say is that my expertise

9    on elections and South Carolina politics, and most

10   importantly how we can use data to understand those

11   things, is central to this matter.  And it is on

12   the front end, as you put it.

13        Q.   All right.  Well, let's walk through

14   that just a little bit, just your expertise, you

15   said, in elections.

16             What expertise is that, that you

17   just -- how would you describe that?

18        A.   So I've published a paper on special

19   elections to the U.S. House that concerns which

20   candidates win special elections and why.  That's

21   not unlike the issue at hand.

22        Q.   How so?

23        A.   In the sense that we want to know how

24   factors about a district could shape future

25   outcomes.

Jordan M. Ragusa , Ph.D.                     June 28, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 206

1          Q.   Okay, we'll just leave that as that, I

2     hear you; I'm not sure I see the link as clearly as

3     you describe it.

4               Let me just go back through, then.  You

5     started to mention some things.

6               Neither of the two books that you

7     co-authored were about redistricting, though,

8     correct?

9          A.   Not redistricting specifically,

10    although I would note that the book on the South

11    Carolina primary is relevant in this context.

12         Q.   How so?

13         A.   One of the key features of the book on

14    the South Carolina primary is describing the

15    electorate in South Carolina, that, demographically

16    speaking, it talks a lot about race in South

17    Carolina politics; and those are all subjects that

18    I think come into play in this case.

19         Q.   But it's about the South Carolina

20    presidential primary, right?

21         A.   Correct.

22         Q.   Yeah.  And that doesn't affect

23    redistricting.  That's just -- you're just

24    analyzing the voters of South Carolina?  Is that

25    what you're talking about?

Jordan M. Ragusa , Ph.D.                    June 28, 2022
The South Carolina State Confvs.McMaster/Alexander

                                              Page 207

1              MR. FREEDMAN:  Object to form.

2              THE WITNESS:  Yes, sir, it's analyzing

3        South Carolina's primary voters, but

4        broadly, it's about the demographics of the

5        state and in particular the central role

6        that African Americans play in the

7        democratic primary.  And so that parallels

8        in many ways what I'm doing in this matter.

9   BY MR. TYSON:

10             Q.   All right.  Well, how about your dozen

11   peer-reviewed articles on legislative politics,

12   political parties, national elections, political

13   economy, and South Carolina politics; they don't

14   have anything specific on redistricting either, do

15   they?

16             MR. FREEDMAN:  Object to form.

17             THE WITNESS:  I would say it depends on

18        how you define specific.

19             Again, my contention is that all of

20        those subjects are relevant to redistricting

21        and that, you know, knowing about those

22        topics can help inform an analysis of the

23        redrawn map.

24   BY MR. TYSON:

25             Q.   But if somebody was going to look up

Jordan M. Ragusa , Ph.D.                                    June 28, 2022
The South Carolina State Confvs.McMaster/Alexander

                                                      Page 208

1    and they were doing research on redistricting, they

2    wouldn't go to your political economy peer-reviewed

3    article to found out anything about redistricting,

4    would they?

5               MR. FREEDMAN:  Object to form.

6               THE WITNESS:  I don't know that it

7          would be the first source that they consult.

8    BY MR. TYSON:

9          Q.   Political parties, that's not about

10   redistricting, though, specifically, is it?

11              MR. FREEDMAN:  Object to form.

12              THE WITNESS:  Again, I think we're

13         discussing what is meant by specifically.  I

14         think that political parties play a very

15         important role in redistricting.

16   BY MR. TYSON:

17         Q.   How about your two authored book

18   chapters, your two book chapters; they don't have

19   anything specifically to do with redistricting, do

20   they?

21         A.   No, those two are fairly far removed

22   from the topic of redistricting, but what I would

23   say is that both of those are quantitative papers

24   that use statistical analysis to try to understand

25   a political outcome.

Jordan M. Ragusa , Ph.D.                                June 28, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 209

1           Q.   So they would be kind of the second leg
2    of your expertise, is how you would -- that would
3    be how you would deem yourself to be an expert
4    there?
5                MR. FREEDMAN:  Object to form.
6                THE WITNESS:  I think that's fair, yes.
7    BY MR. TYSON:
8           Q.   How about your two works in progress,
9    they're not about redistricting, right?
10               MR. FREEDMAN:  Object to the form.
11               THE WITNESS:  No, they are not, but I
12           would give the same answer, that they are
13           quantitative papers that use data to try to
14           understand political phenomena.
15   BY MR. TYSON:
16          Q.   Gun owners in Congress doesn't have
17   anything to do with redistricting, right?
18          A.   Not as a subject matter, no.
19          Q.   "Locked, Loaded, and Legislating:  An
20   Examination of Gun Owners in Congress," that
21   doesn't have anything to do with it, right?
22          A.   Again, the subject matter may not be
23   relevant, but it is a quantitative piece that uses
24   political data to try to understand something that
25   is, at its essence, political.

Page 210

1          Q.   When I look at your op-eds, editorials,

2      and other publications, I don't see any of these

3      30-some-odd published -- these publications that

4      have anything specifically to do with

5      redistricting.

6               Can you point me to anything that

7      has -- any of these that have any specific

8      reference to redistricting?

9               MR.  FREEDMAN:   Object to form.

10               THE WITNESS:   I'd have to review them

11          to know for sure.   I may have mentioned

12          redistricting in a piece or two; I'm not

13          confident on that.

14               But, again, I would say that most of

15          those are about elections, South Carolina

16          politics, the U.S. Congress, voting

17          behavior, and the like, all topics that, in

18          one way or another, matter when we talk

19          about redistricting.

20      BY MR.  TYSON:

21          Q.   Well, you've got, it looks like, 6, 7,

22      8, 10 of them were about all the Democratic

23      candidates in the Democratic presidential primary

24      back several years ago.

25               Those wouldn't involve redistricting,

Jordan M. Ragusa , Ph.D.                    June 28, 2022

The South Carolina State Confvs.McMaster/Alexander

Page 211

1    right?  Tom Steyer, Pete Buttigieg, Amy Klobuchar,

2    Bernie Sanders, Joe Biden, those don't have any

3    reference points; do they?

4         A.    Again, not specifically, but they are

5    about those candidates and how they would perform

6    in the South Carolina primary, where one of the

7    important pieces of that is describing the South

8    Carolina electorate and what makes our voters

9    unique.

10        Q.    And you've got -- you referenced some

11   consulting work.  Clearly none of that has anything

12   to do with redistricting, right?

13        A.    No, although, again, I think that would

14   touch on the second leg, as I believe you put it.

15             They are all consulting projects where

16   my expertise was sought as a methodologist, that

17   is, as someone who can take political and social

18   data and help make sense of it.

19        Q.    As we were talking about this

20   redistricting process, the first part of it, you

21   don't have any experience in that, correct?

22             MR. FREEDMAN:  Object to form.

23             THE WITNESS:  Can you clarify what you

24        mean by experience?

25   BY MR. TYSON:

Jordan M. Ragusa , Ph.D.                    June 28, 2022
The South Carolina State Confvs.McMaster/Alexander

                                              Page 212

1            Q.   Yeah, I mean just, have you ever

2      represented a governmental entity to help them draw

3      any district lines?

4            A.   No, sir.

5            Q.   Have you ever analyzed anybody's -- any

6      governmental entity -- school board, city council,

7      county council, legislative bodies -- redistricting

8      lines prior to this litigation?

9                 MR. FREEDMAN:  Object to form.

10                THE WITNESS:  No, sir.

11     BY MR. TYSON:

12           Q.   I'm sorry, what did you say?

13           A.   No, sir.

14           Q.   No, sir?

15                I think you mentioned in your earlier

16     deposition that you had a software, or the software

17     that you used had a component where it would allow

18     you to draw a district or to draw -- and I think

19     you said you played around or tampered with that or

20     tinkered with that.

21                Is my memory right?

22                MR. FREEDMAN:  Object to form.

23                MR. TYSON:  That's correct.  I use a

24           software package called Stata, which is a

25           very common package among both political

Jordan M. Ragusa , Ph.D.                    June 28, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 235

1    figuring out how to do -- how to do that analysis
2    for the congressional plan?
3            A.    Yes.
4            Q.    Okay.  And you did that, right?
5            A.    Correct.
6            Q.    Yeah.  And you came up with the
7    statistical modeling that you used to analyze the
8    plan, correct?
9            A.    Can you define what you mean by came up
10   with --
11           Q.    Yeah.
12           A.    -- the statistical modeling?
13           Q.    Yeah, thank you, that was -- that needs
14   to be defined.  Let's step back a little bit.  How
15   did you analyze the plan?  What was your modeling?
16   Can you describe it for me?
17                 MR. FREEDMAN:  Object to form.  Go
18           ahead.
19                 THE WITNESS:  I can.
20                 In the three models that I estimate,
21           the dependent variable is three different
22           versions of how the VTDs and thus voters
23           were moved around between the districts.
24                 The specific statistical routine that I
25           use is something known as logistic

Page 236

1          regression, which is not mine; that is a

2          very common technique used in the social

3          sciences to analyze outcomes that have a

4          one-zero dependent variable.

5                In this case, the ones and zeros

6          indicate whether a VTD was added to and/or

7          removed from the district.

8                So to answer your question, the

9          statistical routine is not mine; it's a very

10         common basic technique.  What is mine is

11         using the data in this specific context.

12    BY MR. TYSON:

13         Q.   All right.  You said what is yours is

14    using the data in this specific what?

15         A.   In this specific context.

16         Q.   Context, okay.

17         A.   That is, data on South Carolina's

18    redrawn map from 2020.

19         Q.   And when you describe that, are you

20    talking about using -- analyzing this county

21    envelope -- taking this county envelope and then

22    determining what VTDs were in that in the prior

23    district compared to the new one, or which ones

24    were moved out that could have gone?  Is that what

25    you're describing?

Jordan M. Ragusa , Ph.D.                              June 28, 2022
The South Carolina State Confvs.McMaster/Alexander

                                                    Page 238

1      out and kept out.

2            Q.    And let me -- this methodology that

3      you're talking about, did you talk to anybody else

4      about using this prior to conducting your analysis

5      this way?

6            A.    I did not.

7            Q.    Has it been peer-reviewed before?

8            A.    No, because there has not been

9      sufficient time for me to submit the data to a

10     journal, have it refereed, and receive a decision.

11           But what I would say is that the

12     statistical routine that I'm using, logistic

13     regression, is something that I've used in

14     peer-reviewed articles, and my peer-reviewed

15     articles, of course, use various kinds of

16     demographic data in a similar manner that I'm using

17     in this report.

18           Q.    Have you seen anyone else that had used

19     this methodology that had been peer-reviewed by

20     others, not just whether you've done it but whether

21     you've seen it anywhere else?

22           MR. FREEDMAN:  Object to form.

23           THE WITNESS:  You would have to be

24           specific about which elements of the

25           methodology.

Jordan M. Ragusa , Ph.D.                    June 28, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 239

1              If you're referring to logistic

2          regression, I can't put a number on the

3          number of articles that have been refereed

4          that have used that method.  We're talking

5          tens or hundreds of thousands.

6    BY MR. TYSON:

7              Q.   Right.  Let's move to kind of this

8    unique approach where you have taken the county

9    envelope and have described the moving in and out

10   of the VTDs.  How about that portion of it?  Have

11   you seen that peer-reviewed anywhere before?

12             A.   I don't know off the top of my head;

13   however, it's the kind of methodology that is

14   unlikely to be used except for in this very

15   specific context.  It's something that has more

16   applied applications.

17             Q.   It has what?  I'm sorry.

18             A.   It has more of an applied application

19   rather than one that tends to make it into academic

20   articles.

21             Q.   But you're not aware of anybody's prior

22   analysis of redistricting plans that have applied

23   this application, though, are you?

24             MR. FREEDMAN:  Object to form.

25             THE WITNESS:  Well, the Stephen

Jordan M. Ragusa , Ph.D.                                June 28, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 240

1          Ansolabehere report does.  To my knowledge,
2          that has not been peer-reviewed.
3    BY MR. TYSON:
4          Q.   Just the last kind of question along
5    those lines, is there any information -- or it's
6    accurate to say that there's no information in
7    existence to research your methodology of analyzing
8    the congressional plan as to this component of the
9    county envelope, correct?
10              MR. FREEDMAN:  Object to form.
11              THE WITNESS:  I don't understand the
12          question.  Can you repeat it or restate it?
13   BY MR. TYSON:
14         Q.   Yeah, let me try again.
15              I'm just kind of trying to -- you've
16   got this notion of looking at the county envelope
17   and moving the VTDs in and out.
18              And what I'm just trying to understand,
19   is there analysis or information about that
20   anywhere out there besides what you just
21   referenced, Ansolabehere's report?
22              MR. FREEDMAN:  Object to form.
23              THE WITNESS:  There are papers that
24          look at how precincts or VTDs are moved
25          around as a way to assess redistricting.

3:21-cv-03302-MGL-TJH-RMG    Date Filed 09/02/22    Entry Number 346-3    Page 17 of 31

The South Carolina State Confvs.McMaster/Alexander

Page 247

1    figure out.  The communities of interest that are

2    contained in the counties, within the counties, how

3    do they factor into this analysis?

4                  MR. FREEDMAN:  Object to form.

5                  THE WITNESS:  They are part of the

6            entire package of VTD changes that I'm

7            examining.

8    BY MR. TYSON:

9            Q.    So you just looked at the numbers and

10   then just concluded, because the VTD was changed,

11   or population changed, or this was done last time,

12   then that community of interest is captured; is

13   that what you're saying?

14                 MR. FREEDMAN:  Object to form.

15                 THE WITNESS:  What I would say is that

16           communities of interest are part and parcel

17           to the analysis that I'm doing.

18   BY MR. TYSON:

19           Q.    But you're not looking at Charleston

20   County to see whether the residents of Hollywood,

21   South Carolina remain whole as a community of

22   interest within a congressional district; you're

23   not doing that type of analysis, right?

24           A.    That's correct, yeah.

25           Q.    Have you looked at the congressional

Veritext Legal Solutions
800.743.DEPO (3376)    calendar-carolinas@veritext.com    www.veritext.com

Jordan M. Ragusa , Ph.D.                                June 28, 2022
The South Carolina State Confvs.McMaster/Alexander

                                                    Page 248

1    plan, not the numbers, but just looked at the map?

2              A.    I have.

3              Q.    Are you aware of what the 2012 map

4    looked like?

5              A.    Generally speaking, yes.

6              Q.    Were you able to look at it and try to

7    compare, just eyeball the new map and how it

8    compares against the prior map?

9                    (Technical difficulties.)

10                   THE WITNESS:   I'm having some kind of

11             audio trouble.

12                   (Off-the-record discussion.)

13   BY MR. TYSON:

14             Q.    My question was just did you -- did you

15   look at the map, the new map, the congressional map

16   that's been challenged here?  And your answer was

17   yes.  And then you said you're generally familiar

18   with the prior map, right?

19             A.    Yes, my report looks at the raw data,

20   the raw population data, and how voters were moved

21   between the districts.  I don't analyze the

22   geography of the districts per se, but it is, of

23   course, something that I looked at in the course of

24   this work.

25             Q.    And that's what I was talking about, I

Jordan M. Ragusa , Ph.D.                    June 28, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 254

1              MR. FREEDMAN:  Object to form.
2              THE WITNESS:  It could, yes.
3     BY MR. TYSON:
4         Q.   And so if you move that into the
5     district, or you assert, as your analysis, that it
6     was left in or left out, wouldn't that have the
7     potential to really alter a -- what a congressional
8     district looks like?
9         A.   Again, it depends on whether you're
10    talking geographically or demographically.
11        Q.   Both.
12        A.   So geographically, it could.  If the
13    district goes into a small portion of a county,
14    then the addition of one on the other side would
15    geographically change the contours of the district.
16    Demographically, it would depend.
17        Q.   All right.  Let me understand it.
18             For a redrawn map, you're not saying
19    that it could reach out and take a VTD, skip over
20    closer ones and grab one on the other side of the
21    county just because it's in the county envelope,
22    though, are you?
23             MR. FREEDMAN:  Object to form.
24             THE WITNESS:  No, because, as I
25        understand your question, that district

Jordan M. Ragusa , Ph.D.                    June 28, 2022
The South Carolina State Confvs.McMaster/Alexander

                                        Page 261

1          Q.   And my point is, once that's done,

2    that's going to have an impact on what the old

3    district looks like and what the new district looks

4    like, correct?

5          A.   It would have an effect on what the new

6    district looks like, yes.

7          Q.   And as you said correctly, depending

8    on -- it impacts more, depending on whether we're

9    talking about geography or population.  So I

10   understand that.  But it will have an impact on it.

11              And, then, so my question is, that

12   analysis that you're talking about is based solely

13   on numbers, solely on the number of persons, right?

14              MR. FREEDMAN:  Object to form.

15              THE WITNESS:  That's correct.  You

16         know, I think one of the advantages of an

17         approach like mine is that I don't have any

18         preconceived notions about what a proper map

19         should look like.

20              I don't say anything in my report about

21         what's a good map, what's a bad map, whether

22         certain choices that were made were

23         permissible or impermissible.  I'm simply

24         looking at the data corresponding to the

25         choices that mapmakers made, and reporting

Jordan M. Ragusa , Ph.D.                    June 28, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 266

```
 1    BY MR. TYSON:
 2         Q.   Just because race is a factor doesn't
 3    make it the predominant factor, though, correct?
 4              MR. FREEDMAN:  Object to form.
 5              THE WITNESS:  That's possible, yes.
 6    BY MR. TYSON:
 7         Q.   Yeah, or it doesn't make it the
 8    controlling factor, right?
 9              MR. FREEDMAN:  Object to form.
10              THE WITNESS:  That's certainly
11         possible, yes.
12    BY MR. TYSON:
13         Q.   Because we just went through all of
14    those other redistricting criteria that we know the
15    mapmakers used, so we know that race couldn't be
16    the predominant factor, correct?
17              MR. FREEDMAN:  Object to form.
18              THE WITNESS:  I wouldn't concede that,
19         no.
20    BY MR. TYSON:
21         Q.   Why not?
22              MR. FREEDMAN:  Object to form.
23              THE WITNESS:  Again, I would say that
24         some of the other criteria are present in my
25         analysis, and not having examined all of
```

Jordan M. Ragusa , Ph.D.                    June 28, 2022
The South Carolina State Confvs.McMaster/Alexander

                                          Page 267

1              those other criteria, I can't say, you know,

2              whether mapmakers were following them at the

3              expense of race, in spite of race.  Those

4              are all not things my report -- those are

5              things my report does not speak to.

6       BY MR. TYSON:

7              Q.   Yeah, so you can't conclude one way or

8       the other, is my point, but your report clearly

9       doesn't say race was the predominant factor in the

10      construction of these congressional districts;

11      let's be clear on that.

12              MR. FREEDMAN:  Object to form.

13              THE WITNESS:  Again, I don't use the

14              word predominance specifically.  What I do

15              say is that race was a significant factor in

16              the design of five of the seven districts.

17      BY MR. TYSON:

18              Q.   And you also -- you say that it was a

19      factor, but you also don't conclude in any of those

20      five that there was any discriminatory intent,

21      correct?

22              MR. FREEDMAN:  Object to form.

23              THE WITNESS:  Once again, that's a

24              legal question, one that's not addressed in

25              my report.

Jordan M. Ragusa , Ph.D.                                June 28, 2022
The South Carolina State Confvs.McMaster/Alexander

                                              Page 270

 1              MR. FREEDMAN:  Object to form.

 2              THE WITNESS:  I have demographic

 3         factors in my analysis for all of those

 4         places, the racial composition of those

 5         places, the partisanship of those places,

 6         and whether the VTDs are large or small,

 7         which would correlate with whether they're

 8         urban or rural.

 9    BY MR. TYSON:

10         Q.   You didn't look at whether there was a

11    neighborhood that needed to be protected or

12    preserved and put together, did you?  You just

13    looked at the numbers of the VTDs, correct?

14         A.   Something that granular is not in my

15    analysis, no.

16         Q.   Governmental jurisdictions, you didn't

17    look at what the county border or the city border

18    was, did you?

19              MR. FREEDMAN:  Object to the form.

20              THE WITNESS:  I don't have a city

21         border variable in my analysis, no.

22    BY MR. TYSON:

23         Q.   You didn't look at split precincts or

24    anything like that, did you?

25         A.   I didn't independently analyze split

Jordan M. Ragusa , Ph.D.                    June 28, 2022
The South Carolina State Confvs.McMaster/Alexander

                                              Page 277

     1           aspect of Model 1.  I would say those three
     2           criteria are all firmly part of my analysis.
     3      BY MR. TYSON:
     4           Q.   Let me ask you this, have you reviewed
     5      the Complaint?
     6           A.   I have not.
     7           Q.   Do you know what the challenged
     8      congressional districts are?
     9           A.   I don't.
    10           Q.   What would it say to you that if you
    11      said race was a significant factor in five of the
    12      districts but only three of the districts were
    13      challenged?
    14                MR. FREEDMAN:  Object to form.
    15      BY MR. TYSON:
    16           Q.   How would that affect your -- what does
    17      that say to you?
    18                MR. FREEDMAN:  Object to form.
    19                THE WITNESS:  I think it says a few
    20           things.  I mean, one, I would reiterate a
    21           point from earlier that my report is one
    22           among many pieces of evidence that could be
    23           used in this case.  Evidence can sometimes
    24           point in different directions.
    25                The second thing I would say is that --

Jordan M. Ragusa , Ph.D.                                    June 28, 2022
The South Carolina State Confvs.McMaster/Alexander

                                                    Page 281

1    other factors besides just these numerical data.

2    You know, you have pulled data and you've looked at

3    race based on these numbers that you have, but you

4    didn't look at any of the other things that you

5    just analyzed on why a district might be

6    challenged, correct?

7                  MR. FREEDMAN:  Object to form.

8                  THE WITNESS:  Yeah.  As I understand

9           your question, I'm not looking at the -- why

10          districts were drawn the way that they were.

11          I'm examining the choices that mapmakers

12          made.

13   BY MR. TYSON:

14          Q.   And Congressional District 3, you

15   concluded that race was a significant factor in two

16   of the models, correct, two of your models?

17          A.   That's correct.

18          Q.   And wouldn't you think that would lead

19   to some sort of correlation to a challenged

20   district?

21                 MR. FREEDMAN:  Object to form.

22                 THE WITNESS:  Again, it could be that

23          others have determined that even though race

24          was a factor in the design of Congressional

25          District 3, that was not impermissible, and

Jordan M. Ragusa , Ph.D.                                June 28, 2022
The South Carolina State Confvs.McMaster/Alexander

                                                    Page 306

1    versus whether -- how many of those there were
2    versus the last time, did you?
3           A.   I don't report precinct splits in my
4    analysis, no.
5           Q.   You didn't look at compactness, right?
6           A.   That's right.
7           Q.   You didn't look at the core retention,
8    right?
9           A.   I would qualify that.  I would say the
10   core retention is part of Model 2 in my analysis.
11   If you're asking whether I report core retention
12   statistics, I do not.
13          Q.   You said that you looked at some
14   communities of interest.  You argued, I think, that
15   it was baked in there because it talked about the
16   county, and you looked at it, what the county was,
17   and then whatever the numbers might be in the VTDs,
18   but you didn't look at anything beyond just those
19   kind of generic or general communities of interest
20   did you?
21               MR. FREEDMAN:  Object to form.
22               THE WITNESS:  What I would say is that
23          by looking at counties, that in part
24          encompasses communities of interest.
25               By looking at the district as it was

Jordan M. Ragusa , Ph.D.                          June 28, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 307

```
 1              previously drawn and all the VTDs contained
 2              within the prior district, that in part gets
 3              at communities of interest.  And by looking
 4              at demographic factors, like partisanship
 5              and race and precinct size, that, in a way,
 6              gets at communities of interest.
 7                   But to your earlier question, on very
 8              granular levels, looking at neighborhoods,
 9              no, that is not something contained in my
10              analysis.
11      BY MR. TYSON:
12              Q.   And so you didn't look at political
13      subdivision boundaries that were protected either,
14      did you?
15                   MR. FREEDMAN:  Object to form.
16                   THE WITNESS:  Not explicitly, although
17              splits and repaired splits are included in
18              my analysis.
19      BY MR. TYSON:
20              Q.   But more importantly, one of the most
21      important aspects that you didn't look at was
22      public input, correct?
23                   MR. FREEDMAN:  Objection, form.
24                   THE WITNESS:  I did not review the
25              transcripts or the live proceedings of
```

Jordan M. Ragusa , Ph.D.                          June 28, 2022
The South Carolina State Confvs.McMaster/Alexander

                                              Page 329

1     don't know if that methodology has ever been

2     subjected to any peer review; is that right?

3                MR. FREEDMAN:  Object to form.

4                THE WITNESS:  I believe Mr. Tyson was

5            asking about the county envelope method

6            specifically, and that is correct.  I don't

7            know whether that very specific approach has

8            been peer-reviewed.

9     BY MR. MOORE:

10           Q.   And I believe what you told me in

11    reference to the House districts, is that you used

12    your own methodology.  I believe I called it, at

13    one point, the Ragusa method, right?

14           A.   I remember that, yes.

15           Q.   And as I believe you told me, the

16    Ragusa method, to your knowledge, has not been

17    subjected to any sort of peer review; is that

18    right?

19               MR. FREEDMAN:  Object to form.

20               THE WITNESS:  I believe I said that in

21           the prior deposition, yes.

22    BY MR. MOORE:

23           Q.   And you used similar methodologies here

24    to prepare your report here; did you not, Doctor?

25               MR. FREEDMAN:  Object to form.

Page 330

1            THE WITNESS:  Are you referring to my

2       congressional report or are we still talking

3       about --

4    BY MR. MOORE:

5       Q.   Yes, sir, I'm referring to your

6    congressional report, not your rebuttal report.

7       A.   That's correct.  That aspect of my

8    methodology is included in my congressional report.

9       Q.   And to your knowledge, it's not

10   peer-reviewed, is it?

11           MR. FREEDMAN:  Object to form.

12           THE WITNESS:  Again, that one specific

13       piece of my methodology has not been

14       peer-reviewed, to my knowledge.

15   BY MR. MOORE:

16       Q.   Are there any other specific pieces of

17   your methodology that have been subject to peer

18   review, Doctor?

19       A.   Yes.

20       Q.   Which ones, in your opinion?

21       A.   So I would say it's important to keep

22   in mind that a methodology has many components.

23           On the one hand, the overall approach

24   is deductive in nature; that is something that I

25   adopt in all of my refereed articles and books.  So

Jordan M. Ragusa , Ph.D.                          June 28, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 285

1              THE WITNESS:  Again, that would be my
2          guess, but I have no way of answering that
3          question.
4     BY MR. TYSON:
5          Q.   So are your models overinclusive if
6     they've got this data and it says that it's a
7     significant factor but they're not included as
8     challenged districts?  How do we rely on your
9     report, I guess?
10             MR. FREEDMAN:  Object to form.
11             THE WITNESS:  Can you define
12         overinclusive?
13    BY MR. TYSON:
14         Q.   Yeah, I'm just trying to -- I'm a
15    simple fellow, Dr. Ragusa.  If you concluded five
16    districts have race as a factor and only three are
17    there, I'm trying to figure out why is your report
18    relevant to anything.  So help me.
19             MR. FREEDMAN:  Object to form.
20             THE WITNESS:  So with respect to CD 6,
21         we know that CD 6 was designed after the
22         1990 census to be a majority-minority
23         district.  The BVAP, in the current round of
24         redistricting, is less than
25         majority-minority.  I believe the BVAP is

Jordan M. Ragusa , Ph.D.                                    June 28, 2022
The South Carolina State Confvs.McMaster/Alexander

                                                        Page 286

1          somewhere around 45 or 46 percent, but,
2          nonetheless, that still has a sizable
3          percentage of African American voters.
4                I think it would be kind of odd, going
5          back to a question you asked earlier, if
6          race wasn't a factor in the design of that
7          district.
8                So, again, just because race is a
9          factor in my analysis does not mean it's
10         impermissible, and so the decision to not
11         challenge it could be on those grounds.
12    BY MR. TYSON:
13         Q.   So couldn't that be true for
14    Districts 1, 2 and 5?  There could be other reasons
15    beyond this analysis that you've done related to
16    race as to why those districts were drawn the way
17    that they were to adhere to whatever criteria they
18    might have been drawn to?
19               MR. FREEDMAN:  Object to form.
20    BY MR. TYSON:
21         Q.   Can the same be true there?
22         A.   As I've said many times, I made no
23    claims about whether the changes are good or bad,
24    whether race was used properly or improperly.  My
25    analysis simply looks at the question of whether