# Exhibit 8

Page 1

```
          IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF SOUTH CAROLINA
                    COLUMBIA DIVISION
  THE SOUTH CAROLINA STATE
  CONFERENCE OF THE NAACP

       and

  TAIWAN SCOTT, ON BEHALF OF HIMSELF
  AND ALL OTHER SIMILARLY SITUATED
  PERSONS,

              Plaintiffs,

       vs.             Case No. 3:21-CV-03302-JMC-TJH-RMG

  THOMAS C. ALEXANDER, IN HIS OFFICIAL
  CAPACITY AS PRESIDENT OF THE SENATE;
  LUKE A. RANKIN, IN HIS OFFICIAL CAPACITY
  AS CHAIRMAN OF THE SENATE JUDICIARY
  COMMITTEE; MURRELL SMITH, IN HIS OFFICIAL
  CAPACITY AS SPEAKER OF THE HOUSE OF
  REPRESENTATIVES; CHRIS MURPHY, IN HIS
  OFFICIAL CAPACITY AS CHAIRMAN OF THE HOUSE
  OF REPRESENTATIVES JUDICIARY COMMITTEE;
  WALLACE H. JORDAN, IN HIS OFFICIAL CAPACITY
  AS CHAIRMAN OF THE HOUSE OF REPRESENTATIVES
  ELECTIONS LAW SUBCOMMITTEE; HOWARD KNAPP,
  IN HIS OFFICIAL CAPACITY AS INTERIM
  EXECUTIVE DIRECTOR OF THE SOUTH CAROLINA
  STATE ELECTION COMMISSION; JOHN WELLS,
  JOANNE DAY, CLIFFORD J. EDLER, LINDA MCCALL,
  AND SCOTT MOSELEY, IN THEIR OFFICIAL
  CAPACITIES AS MEMBERS OF THE SOUTH CAROLINA
  STATE ELECTION COMMISSION,

              Defendants.
  _____

  DEPOSITION OF:   MOON DUCHIN, PHD
                   (Via Videoconference)

  DATE:            Wednesday, June 22, 2022

  TIME:            10:13 a.m.
```

1   and demographic geography of South Carolina.
2           Q.   And what qualifies you to give the
3   opinion as to what may or may not have been in their
4   minds?
5           A.   Well, I'm certainly qualified to opine
6   that it may or may not have been in their minds.  I
7   think that is almost tautological.  And I do not
8   presume to say what was, in fact, in their minds.
9   I'm describing a general state of affairs based, as
10  you said, on my experience.
11          Q.   And so you don't know one way or the
12  other, just to summarize, how the general assembly
13  may or may not have used race in drawing its --
14          A.   That's correct.  I have no knowledge of
15  any procedural details.
16          Q.   Have you discussed it with any member of
17  the General Assembly?
18          A.   I have not, to my knowledge, met any
19  member of the General Assembly, whether in person or
20  virtual.
21          Q.   And how about any staffer?
22          A.   No.
23          Q.   And second-tier requirements, I think
24  you list four here, Contiguity, Compactness,
25  Communities of interest and political boundaries.

3:21-cv-03302-MGL-TJH-RMG    Date Filed 09/02/22    Entry Number 347-8    Page 4 of 9

Moon Duchin, PhD                                     July 14, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 140

1     District 2.
2            Q.   And back on page 23, if I'm reading this
3     correctly, each of these shaded boxes, does it cover
4     a range of 1 percent BVAP or not necessarily?
5            A.   I do not remember the width of the bins.
6     So it might be 1 percent. It's certainly in the
7     neighborhood of 1 percent.
8            Q.   Okay. And you say here that the State's
9     plan is especially low, which I understand to be the
10    25.4 percent number?
11           A.   Yes. Low in comparison with the
12    histogram. That's right.
13           Q.   With the histogram. Right.
14           A.   In fact, it's in the lowest visible bar.
15           Q.   But what is the standard for determining
16    whether a district is especially low?
17           A.   The term "especially" is not meant to be
18    a term of art. And I think you will find that if
19    you look at the way ensemble evidence has been
20    interpreted, consistently, both researchers and
21    courts have been resistant to specify a cutoff for
22    what an outlier -- of what would constitute an
23    outlier. But I think being in the lowest visible
24    bar is a very good indication of being especially
25    low.

3:21-cv-03302-MGL-TJH-RMG     Date Filed 09/02/22     Entry Number 347-8     Page 5 of 9

Moon Duchin , PhD                          July 14, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 141

1      Q.   But as you said, there is no specific
2  standard as to what constitutes an outlier.
3  Correct?
4      A.   That's right.  There is no universal
5  standard.
6      Q.   And you say that the most neutral plans
7  are at or near the 30 percent BVAP.  Is that right?
8      A.   Yes, it does say that.
9      Q.   And you're referring to, kind of, the
10  shaded boxes there that more or less anchor around
11  .3?
12      A.   That's right.  Sorry to interrupt.  What
13  you might call the bulk of the ensemble looks to be
14  occurring at 30 percent plus or minus, you know, 5.
15      Q.   Do you happen to know what the average
16  BVAP in the second highest BVAP district in the
17  ensemble plans is?
18      A.   I don't have that number in front of me.
19      Q.   And it looks like the largest tranche is
20  this tallest box here which, as we discussed, may be
21  29 percent to 30 percent, or something in that
22  range, because we don't -- stipulating we don't know
23  what the range is that's being shown by that box.
24      A.   No, I do think it is 1 percent, as you
25  said, because it looks like there are ten histogram

1        A.   That has nothing to do with the race of
2   the voter.  I agree.
3        Q.   Let's move to page 26, Figure 12.  And
4   it looks like this top chart in 12 -- or this top
5   histogram, to be more precise, is a histogram of
6   Table 7.  Is that right?
7        A.   That's right.  It shows, I hope, if I
8   don't have any typos, the numbers that you see in
9   the key should match the total effectiveness numbers
10  in the table.
11       Q.   And this bottom chart is a histogram
12  that shows other Democratic -- outcomes for other
13  Democratic candidates in 63 other races.  Is that
14  right?
15       A.   It is --
16       Q.   Or perhaps it's nine races disaggregated
17  over or reconstituted over seven districts.
18       A.   We were just rushing to agree with each
19  other.  It is nine contests times seven districts.
20       Q.   So this is nine statewide races.
21       A.   Correct.
22       Q.   Reconstituted in the seven districts in
23  each of the plans.
24       A.   That's right.
25       Q.   And the total numbers are the number of

Moon Duchin , PhD                                July 14, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 172

1    instances in which the Democratic candidate won.  Is
2    that right?
3         A.   Yes.
4         Q.   And if we go to page 27, it looks like
5    these elections are listed on page 27.
6         A.   Let's see.
7         Q.   In the second full paragraph which
8    starts "This finding"?
9         A.   That's right.  Seven more general
10   elections are evaluated, and I list them.
11        Q.   And do you know whether racially
12   polarized voting was present in any of those
13   elections?
14        A.   I don't know.  I have not read any
15   report on that matter, but I think it is general
16   common knowledge that statewide elections in the
17   last ten years in South Carolina tend to be racially
18   polarized.
19        Q.   And if we go back to the bottom
20   histogram of Figure 12, it looks like both the
21   previous and the enacted plans perform -- or
22   generate eight wins for the Democrats.  Is that
23   right?
24        A.   That's right.
25        Q.   And it's ten in the Harpootlian and LWV

3:21-cv-03302-MGL-TJH-RMG    Date Filed 09/02/22    Entry Number 347-8    Page 8 of 9

Moon Duchin , PhD    July 14, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 212

1    part and parcel of redistricting.  Is that right?

2        A.   Yes.

3        Q.   Is it your reading that the Guidelines

4    direct the General Assembly, when faced with such

5    tradeoff between minority voting strength on the one

6    hand and a second-tier consideration on the other

7    hand, to choose the option that prioritizes minority

8    voting strength?

9        A.   I think that's the plain language here.

10   And let me stipulate that I might not have written

11   it exactly this way.  But reading the way they wrote

12   it, I do think that's what they say.

13       Q.   Okay.  And have you discussed the

14   Guidelines with whoever wrote them?

15       A.   I certainly haven't.  And I have no idea

16   who wrote them.

17       Q.   And do you know one way or another

18   whether the standard in the Guidelines was simply

19   meant to be an articulation of what Section 2 of the

20   Voting Rights Act requires?

21       A.   Not simply.  It says that it goes beyond

22   the Voting Rights Act.  And both sets of the

23   Guidelines reference other principles such as equal

24   protection.  So it's not simply a recording of

25   Section 2.

3:21-cv-03302-MGL-TJH-RMG     Date Filed 09/02/22     Entry Number 347-8     Page 9 of 9

Moon Duchin, PhD                                                             July 14, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 269

1                REDIRECT EXAMINATION
2    BY MR. GORE:
3        Q.   Ms. Aden just asked you about the
4    Guidelines and the references, the reference to
5    dilution of minority vote strength.  Do you recall
6    that?
7        A.   Yes.
8        Q.   And do you know what the Guidelines
9    definition or standard for dilution of minority
10   voting strength is?
11       A.   It is my recollection that there is no
12   definition offered.  But in the interest of time, I
13   will leave it at that.
14       Q.   And have you discussed that definition
15   with the author of the Guidelines?
16       A.   I am not aware of who authored the
17   Guidelines.
18            MR. GORE:  Nothing further.
19   (The deposition was concluded at 5:50 p.m.)
20   (The deponent does not waive reading and signing of
21   this deposition)
22
23
24
25