# Exhibit 9

Page 1

```
 1
 2   UNITED STATES DISTRICT COURT
 3   DISTRICT OF SOUTH CAROLINA
 4   CASE NO.  3:21-CV-03302-MBS-TJH-RMG
 5   ------------------------------------x
 6   THE SOUTH CAROLINA CONFERENCE OF THE
 7   NAACP, et al,
 8                              Plaintiffs,
 9              -against-
10
11   THOMAS C. ALEXANDER, et al,
12                              Defendants.
13   ------------------------------------x
14                    July 21, 2022
                      9:30  a.m.
15
16         ZOOM VIRTUAL CONFERENCE
17
18         VIDEOCONFERENCE Examination
19   Before Trial of SEAN PATRICK TRENDE, taken
20   by the Defendants, via Zoom Technology,
21   pursuant to Notice, held before R. Bobbie
22   Levy, a Certified Shorthand Reporter and
23   Notary Public of the State of New York.
24
25
```

Page 86

1         S. Trende
2  plan refers to the previous map in effect
3  from 2012 to 2020.
4     Q    Where did you you get the data
5  in your report that you present about the
6  enacted map?
7     A    I likely would have gotten that
8  from redistricting data hub.
9     Q    Where is that source?
10    A    The Redistricting Data Hub is an
11 online repository of redistricting
12 materials collected by academics and
13 experts in the field.  And that's relied
14 upon in redistricting matters.
15        We utilized it as a source for
16 matters for material in the Arizona
17 legislative case.  And I have used it in
18 multiple matters since.
19    Q    Where did you get the data
20 presented in your report about the
21 benchmark map?
22    A    I believe it comes from the same
23 source.
24    Q    So in these opinions you are
25 comparing the enacted plan to the

Page 87

1         S. Trende
2  benchmark plan.  Why is that?  Why is that
3  the sole basis for comparison in your
4  report?
5     A    Because it's what I was asked to
6  compare.
7     Q    In rendering your opinions did
8  you consider any other plans besides the
9  enacted plan and the benchmark plan, the
10 enacted map and the benchmark plan?
11    A    There's a history of maps prior
12 to the benchmark plan that are provided
13 in the report.
14    Q    Well, for example, maybe my
15 question wasn't clear.  In rendering your
16 opinions did you consider any of the other
17 plans that were submitted or considered
18 during the legislative process?
19    A    So to make sure we are on the
20 same page, you are asking about
21 alternative plans to the plan that was
22 potentially enacted?
23    Q    Yes. Did you consider any of
24 those alternatives?
25    A    I did not.

Page 88

1         S. Trende
2     Q    For example, did you consider
3  any of the draft plans which the South
4  Carolina State House legislative staff
5  developed?
6     A    I did not.
7     Q    Did you consider, in particular
8  example, the House staff plan that was
9  released on December 13, 2021, are you
10 familiar with that plan?
11    A    I am not.
12    Q    Let me see if you have seen this
13 before.
14        MR. FREEDMAN:  This is tab 24.1.
15    And we will produce it as Exhibit 7.
16        (Whereupon, Congressional House
17    Staff Map was marked as Exhibit 7 for
18    identification, as of this date.)
19    A    Just to make sure we are on the
20 same page, this is labeled Cong. House
21 Staff Map and then Congressional House
22 Staff Plan when you open it?
23    Q    Yes.
24    A    Okay.
25    Q    Had you seen this plan before it

Page 89

1         S. Trende
2  was sent to you earlier this week?
3     A    No.
4     Q    Okay.  I want to start with in
5  your summary of opinions, your third
6  opinion which is the second bullet on page
7  7.  The one that says:
8        "The enacted map retains high
9  percentages of the cores of all of the
10 benchmark districts.  Those percentages
11 range from 82.84 percent in District 1 to
12 99.96 percent in District 7.  And five
13 districts retain more than 94 percent of
14 their cores."
15        What do you mean by core
16 retention?
17    A    I believe it's specified later
18 in the map but it is the percentage of
19 the old district that is contained in the
20 new district.  In terms of population.
21    Q    And how did you assess the level
22 of core retention between the enacted map
23 and the benchmark plan?
24    A    I believe I projected the
25 Congressional maps down to a shape file

23 (Pages 86 - 89)

Page 90

```
 1         S. Trende
 2  of the blocks or how the blocks were
 3  assigned.  I believe this is all included
 4  in the R code that I provided.  R is just
 5  the letter R.
 6         After that so that, you know,
 7  the shape file is basically a spreadsheet
 8  with some special geographic data in the
 9  file column.
10         But you create a line in the
11  shape file; you have the shape file of
12  the blocks with the populations.  You
13  create a line in the shape file for each
14  of the blocks for what district they were
15  assigned to previously.
16         You create a line in the shape
17  file for each district they are assigned
18  to under the new map.
19         And then you can direct R to
20  look at the differences, you know, of the
21  total population in District 1, how much,
22  you take the total population of District
23  1, you take the total population of
24  District 1 where the old assignment
25  matches the new assignment.  Divide them
```

Page 91

```
 1         S. Trende
 2  and they give you percentages.
 3         THE WITNESS:  Is now an okay
 4     time to take a break for five minutes?
 5     My son just came home and is looking
 6     for something.
 7         THE VIDEOGRAPHER:  The time is
 8     11:50 and we are going off the record.
 9     This is the end of media unit number
10     2.
11         (Recess taken:  11:50)
12         THE VIDEOGRAPHER:  The time is
13     11:59 and we are back on the record.
14     This is the beginning of media unit
15     number 3.
16     Q    Mr. Trende, when we were just
17  before the break I was asking you about
18  the, your Summary of Conclusion, the third
19  bullet regarding core retention.  And I
20  guess another baseline question:  What do
21  you consider to be a high core retention
22  percentage?
23     A    Yeah.  I read that in
24  Dr. Ragusa's report.  And I guess any
25  time you use an adjective you open
```

Page 92

```
 1         S. Trende
 2  yourself up for this line of inquiry.
 3  And it's kind of like the question, when
 4  does stubble become a beard?  I don't
 5  know exactly but I know that Rutherford
 6  B. Hayes had a beard.
 7         And I know that if 99.96 core
 8  retention isn't high, then the word high
 9  has no meaning.  To me, 82.84 is also
10  high.  But if someone wanted to quibble
11  about that, I suppose we could.
12     Q    Your report emphasizes 94
13  percent.  And is that, I mean should we
14  take that to mean that's what you consider
15  to be a high core retention percentage?
16     A    No.
17     Q    Are you aware of any
18  peer-reviewed literature that talks about
19  what a high core percentage, core
20  retention percentage is?
21     A    No.
22     Q    Is there any peer review
23  literature that you are aware of that sets
24  a standard for what a high core retention
25  rate is?
```

Page 93

```
 1         S. Trende
 2     A    No.
 3         MR. FREEDMAN:  If you could turn
 4     to the document tabbed 32, and I will
 5     introduce this as Exhibit 8.
 6         (Whereupon, 2021 South Carolina
 7     House Redistricting Guidelines was
 8     marked as Exhibit 8 for
 9     identification, as of this date.)
10         (Pause)
11     Q    Have you seen this document
12  before?
13     A    Yes.
14     Q    What is it?
15     A    It is the South Carolina House
16  of Representatives Judiciary Committee
17  Redistricting Ad Hoc Committee 2021
18  guidelines and criteria for Congressional
19  and legislative redistricting.
20     Q    You had listed this in your list
21  of materials considered on page 7 as
22  something that you considered in rendering
23  the opinions in your report, correct?
24     A    Yes.
25     Q    What's your understanding of the
```

24 (Pages 90 - 93)

Page 94

1         S. Trende
2  significance of the guidelines?
3     A    My understanding is that they
4  were criteria set forth by the committee
5  to guide how the districts would be
6  drawn.
7     Q    Is it fair to say that they are
8  the criteria that the South Carolina House
9  of Representatives would use in creating
10 the Congressional districts?
11    A    I don't know if that's a perfect
12 rephrase of what I just said.  I don't
13 know if they were intended to be an
14 exclusive list but they are certainly the
15 guidelines that they would use for
16 assessing redistricting efforts.
17    Q    Do the House guidelines identify
18 core retention as a criteria that was to
19 be used in creating Congressional
20 districts?
21    A    It's not specifically listed,
22 although that's certainly part of
23 incumbency consideration.
24    Q    Does this document use the word
25 core?

Page 95

1         S. Trende
2     A    No.  The word core is not
3  contained in the document.
4     Q    Does the document use the word
5  retention?
6     A    No, it does not use the word
7  retention.
8     Q    In your report, we can go back
9  to your report.  Your actual analysis on
10 this, let's just go down, it starts at
11 page 17.  And at the bottom of page 17 let
12 me know when you are there.
13        (Pause)
14    A    I'm here.
15    Q    You write:  "Table 2 gives the
16 core retention statistics for the State's
17 Congressional district."
18        First question, when you refer
19 to table 2 there, is that a typo, did you
20 mean to refer to table 3?
21    A    Yes.
22    Q    Okay.  And then you go on to
23 write:  "Core retention is identified in
24 this Court's decisions and the
25 redistricting guidelines promulgated by

Page 96

1         S. Trende
2  the general assembly."
3        What are you referring to when
4  you refer to this Court's decisions?
5     A    Probably the Colleton County in
6  Backus opinions.
7     Q    Is there anything in Backus that
8  talks about core retention?
9     A    I don't remember off the top of
10 my head.
11    Q    Okay.  If you could turn the
12 page to, let's talk about table 3 for a
13 bit.  Table 3 is at the top of page 18 and
14 my first question is what is this table?
15    A    This is a summary of the
16 population of districts that are retained
17 in the succeeding district with the same
18 number.
19    Q    Okay.  And what's it intended to
20 present?
21    A    The population of districts that
22 are retained in the succeeding districts
23 with the same number.
24    Q    You don't set a source for the
25 information presented in this table, do

Page 97

1         S. Trende
2  you?
3     A    No.  It would be taken from the
4  shape files described above.  And
5  processes in the R code that was
6  provided.
7     Q    So just walk me through that.
8  Where is this, where are these numbers
9  coming from?
10    A    They are taken from the shape
11 files from the Redistricting Data Hub
12 that have the census data for each block.
13 And then processed in R.
14    Q    Okay.  And what was the
15 processing that happened in R?
16    A    I believe I described the
17 process before.  But the process, as I
18 recall it, is to take the assignment of
19 each block to districts and create a
20 column that has the district.
21        Create another column that has
22 the old district which each block is
23 assigned.  And then you can command R to
24 summarize the total population of each
25 district as it existed.

Page 98

1  S. Trende
2      And then summarize the total
3  population of each district where the two
4  columns match. So where block 1 was
5  assigned block 1 in both maps.
6      And that tells you, that's, the
7  latter is your numerator. The former is
8  your denominator. And it tells you what
9  core population retention is.
10  Q    Now, according to your table 3,
11  you are saying the core retention for
12  District 6 was 87.55 percent, right?
13  A    The core population retention,
14  correct.
15  Q    And you got the number from the
16  shape files and in processing it through R
17  in the way you just described, right?
18  A    Correct.
19  Q    And you are also saying that the
20  core population retention for District 1
21  is 82.84 percent, correct?
22  A    Correct.
23  Q    I want to show show you, if you
24  could turn to the document tab 27.
25      (Pause)

Page 99

1  S. Trende
2      MR. FREEDMAN: And we will
3      introduce this as Exhibit 9.
4      (Whereupon, House Core
5      Constituency Analysis was marked as
6      Exhibit 9 for identification, as of
7      this date.)
8  Q    Have you seen this document
9  before?
10  A    Yes.
11  Q    In what context?
12  A    I believe it's available on the
13  website, the redistricting committee
14  website. And then when you provided it
15  during a couple of days ago.
16  Q    Okay. Did you consider this in
17  rendering your opinions in this case?
18  A    No.
19  Q    If you scroll down to the second
20  page, I want to look at the, this is the
21  core just so the record is clear, this is
22  the core constituency's analysis that was
23  available on the House plan redistricting
24  website.
25      If you look at the analysis of

Page 100

1  S. Trende
2  District 6, do you see that the fourth
3  line presents the core constituency
4  calculation for District 6?
5  A    That's correct.
6  Q    And this says that the core
7  constituency calculation for District 6 is
8  77.41 percent. Do you see that?
9  A    Correct.
10  Q    And you calculated the core
11  population retention for District 6 as
12  87.55 percent, right?
13  A    Correct.
14  Q    And you would agree that the
15  difference between 77.41 percent and 87.55
16  percent is a big number, right?
17  A    It's about 10 percentage points.
18  Q    For District 6 that corresponds
19  to about 75,000 people, right?
20  A    73,120.
21  Q    So do you have any explanation
22  for why the House calculated the core
23  constituency for District 6 at 77.4
24  percent, I'm sorry, 77.41 percent; and you
25  calculated the core population retention

Page 101

1  S. Trende
2  at 87.55 percent?
3  A    Yes.
4  Q    Okay, explain that to me.
5  A    Well, there's a different way
6  that you can calculate it and that is
7  what the House did.
8      They are looking at the new
9  district, as you can see on each of these
10  pages, the total population of the
11  district, which is their denominator
12  731,203 or 731,204. That's a different
13  process than the process I described.
14      Which is taking the population
15  of the old district and seeing how much
16  of it stayed in the new district. My
17  denominator would be the population of
18  the old district.
19  Q    Is there a reason why your way
20  of calculating the core population
21  retention rate is better than what the
22  House did?
23  A    Not intrinsically. But --
24  Q    This --
25  A    But since District 6 had to gain

26 (Pages 98 - 101)

Page 102

1       S. Trende
2  population, it's going to have a smaller
3  denominator.
4     Q    The 77.41 percent calculation,
5  is a valid calculation of core
6  constituency, right?
7     A    Right. But like I said, it's
8  not intrinsically better. It giveth and
9  it taketh away. If you look at the old
10 District 1 where the district had shed
11 population, it shows a much higher rate
12 of core retention than I had calculated.
13      So it really is just two
14 different ways of looking at the concept
15 of core retention.
16    Q    Okay. Fair enough. Let's take
17 a look at how the Senate calculated it.
18 If you could turn to tab 30.
19      (Pause)
20    A    Okay.
21      MR. FREEDMAN: And we will
22    introduce this as Exhibit 10. In a
23    second.
24      (Whereupon, Senate core
25    constituency analysis labeled tab

Page 103

1       S. Trende
2    30 was marked as Exhibit 10 for
3    identification, as of this date.)
4     Q    Exhibit 10 is the same analysis
5  of the enacted plan published on the
6  Senate website. Have you seen this
7  before?
8     A    Yes.
9     Q    And if you scroll down to page 2
10 and look at the core constituency for
11 District 6, you see that the Senate also
12 calculates the core constituency for
13 District 6 as 77.41 percent. Do you see
14 that?
15    A    Yes.
16    Q    The same as the House, right?
17    A    Correct.
18    Q    Going back to your table 3, you
19 didn't present in your core population
20 retention race demographic data. Correct?
21    A    Correct.
22    Q    You are not presenting how many
23 voters of a particular race stayed in the
24 district and how many got out of the
25 district, right?

Page 104

1       S. Trende
2     A    It is not in table 3, no.
3     Q    Is there a reason why you didn't
4  present the racial demographics of your
5  core constituency analysis?
6     A    No, because the table is core
7  population retention overall.
8     Q    Did you analyze the racial
9  demographics of the core retention?
10    A    I believe later on I looked at
11 the demographics of the precincts that
12 were moved back and forth. But not in
13 terms of racial core retention, no.
14    Q    You didn't look at it on an
15 aggregated basis to see what the overall
16 retention for the district was, right?
17    A    I believe that's correct.
18    Q    Were you instructed not to look
19 at the racial demographics of the core
20 constituency --
21    A    I was not.
22    Q    -- done at this time? Just
23 looking at, we can stick with the Senate
24 analysis. We can talk about District 1,
25 since you raised that earlier.

Page 105

1       S. Trende
2      You see that the Senate analyzes
3  and says that District 1 core retention
4  was 92.78 percent which is higher than
5  what you presented in tab, tab 3, right?
6     A    Correct.
7     Q    And if you go across the columns
8  do you see that it says, if you look at
9  the NHWHT column, which is non-Hispanic
10 whites, it says the percentage of white
11 persons who stayed in District 1 was 94.52
12 percent. Do you see that?
13    A    That's correct.
14    Q    And then you go over to the next
15 column, the NHDOJ black, it says the
16 percentage of black persons who stayed in
17 District 1 was 84.46 percent. Do you see
18 that?
19    A    That's correct.
20    Q    You can see from this chart that
21 20,240 black people were moved from
22 District 6 to District 1, right?
23    A    Correct.
24    Q    And if you scroll down to
25 District 6, if you look at the same column

27 (Pages 102 - 105)

Page 114

1       S. Trende
2  that the Backus plaintiffs challenged any
3  other district in the benchmark plan other
4  than the Sixth Congressional district as
5  racial gerrymandering?
6     A    Well, if you go to page 6,
7  that's Dr. McDonald's analysis. Which
8  doesn't that necessarily say what the
9  legal theory was. I.
10      F you, I believe Dr. Ragusa does
11 an analysis of all the Congressional
12 district boundaries in this case, even
13 though to my understanding the challenge
14 is limited to 2, 5, 6, and 1.
15      If you go to the top on page, if
16 you go to page 6, it says under Roman
17 Numeral II: "Plaintiffs assert that the
18 House plan and Congressional plan that
19 violate the equal protection clause of
20 the 14th amendment."
21      Which read suggesting there was
22 a broader claim. But maybe not.
23    Q    Right. Do you see anything else
24 this decision suggesting that plaintiffs
25 offered proof that any other district

Page 115

1       S. Trende
2  besides the Sixth Congressional district
3  constituted gerrymandering in the Backus
4  case?
5     A    I don't.
6     Q    Now you would agree with me that
7  the Sixth Congressional District and the
8  enacted plan has at least 190,000
9  different people in the Sixth
10 Congressional district considering the
11 Backus decision, right?
12    A    That's correct.
13    Q    I mean we discussed earlier that
14 140,000 some people moved into District 6
15 from District 1. And 52,000 people moved
16 out of District 6 to District 1.
17    A    Right. Correct.
18    Q    And the core retention rate
19 between the Sixth Congressional District
20 considered in Backus and the Sixth
21 Congressional District plan is only 87.55
22 percent according to your analysis and
23 77.41 according to the House and Senate
24 analyses, right?
25    A    Those are the correct numbers.

Page 116

1       S. Trende
2     Q    And those numbers are lower than
3  most of the other districts in the plan,
4  right?
5     A    That's correct.
6     Q    Okay. I want to turn to some of
7  your other analysis in this section of the
8  report and some of the maps you are
9  talking about.
10      If you could turn in your report
11 to Exhibit 2 to the bottom of page 10,
12 where you start your analysis preservation
13 of district cores.
14      (Pause)
15    A    Witness complies)
16    Q    And at the bottom of page 10 you
17 write: "Despite significant changes to
18 population, and the addition and
19 subtraction of districts, South Carolina's
20 district cores have remained surprisingly
21 consistent over the past century." Do you
22 see that?
23    A    Yes.
24    Q    I want to ask about some of the,
25 some of that analysis. So why don't we

Page 117

1       S. Trende
2  start where you do historically with the
3  1902 map on page 10.
4     A    Okay.
5     Q    What's your purpose in
6  presenting this map?
7     A    For me, I think it's interesting
8  historical context of the maps in South
9  Carolina. This isn't a state like
10 Maryland, where the districts have kind
11 of wandered all over the state as things
12 have been drawn over time.
13      Or a state like Ohio, where the
14 districts from 100 years ago would
15 largely be unrecognizable compared to
16 what we have today.
17      This is a state where if you
18 look back 100 years ago, the third
19 district was anchored around Anderson and
20 northwestern South Carolina.
21      And the Fourth District was
22 anchored in Greenville and Spartanburg.
23 You know, there are longstanding
24 commonalities in a lot of these
25 districts.

Page 118

```
 1          S. Trende
 2     Q    I wanted to ask about a couple
 3  of pieces of your analysis when you are
 4  talking about the historical maps going
 5  back.
 6          First thing is, one of the
 7  observations you make is that this map in
 8  the 1902 map has, as you write it, a
 9  district that was anchored in Beaufort
10  County and the counties along the Georgia
11  border.  What did you mean by that?
12     A    Where are we?
13     Q    I'm reading at the bottom of
14  page 10.  About the map on page 11.
15     A    I see.  The second, is it
16  Beaufort or Beaufort?  Whatever.
17  B-e-a-u-f-o-r-t is the population center
18  where the second went in the 1902
19  district went before stretching up along
20  the South Carolina/Georgia border, which
21  says now it's pretty rural.
22     Q    And Beaufort County in the 1902
23  map was in a different Congressional
24  district than Charleston County, right?
25     A    That's right.
```

Page 119

```
 1          S. Trende
 2     Q    And again, historically
 3  speaking, if we go back a century the City
 4  of Charleston was kept together in a
 5  single Congressional district?
 6     A    That's correct.
 7     Q    As you write going back to the
 8  early 1900s, the district, the first
 9  district was anchored in Charleston,
10  right?
11     A    That's correct.
12     Q    Okay.  I want to move forward to
13  the 1932 map.  On page 12 of your report.
14  And my question is again, sort of based on
15  the question, what are you trying to
16  present with this map?  What's your
17  purpose presenting this map?
18     A    The same as before.  To give
19  historical context how districts have
20  been drawn in South Carolina, as opposed
21  to a state like Maryland where they have
22  really wandered all over the place.
23          Or say, Ohio, where they would
24  be unrecognizable.  Even like the old
25  Pennsylvania maps before then struck down
```

Page 120

```
 1          S. Trende
 2  were, would be completely unrecognizable
 3  to someone who time hopped from 1932 to
 4  2011.  And that's just not the case here.
 5     Q    And again looking at this map,
 6  this is consistent with the last map.  The
 7  city of Charleston is kept together in a
 8  single Congressional district, right?
 9     A    That's correct.
10     Q    It's the center of District 1,
11  right?
12     A    That's correct.
13     Q    Now just, I want to make sure.
14  You have got, you know, two maps that are,
15  the first two maps presented here.  I just
16  wanted to get your understanding as to the
17  basis of why they're relevant today.   I
18  mean you are aware that the maps, the 1902
19  map, the 1932 map, are maps that were
20  adopted in the Jim Crow era?
21     A    That's right.
22     Q    And these maps were also adopted
23  before the equal population requirement
24  for Banker v. Carr, right?
25     A    That's correct.
```

Page 121

```
 1          S. Trende
 2     Q    So considering those, would you
 3  explain to me why you think the 1902 and
 4  1932 maps are relevant to what we are
 5  considering?  What the Courts should be
 6  considering?
 7     A    Because they give interesting
 8  historical context to the way that maps
 9  have been drawn in South Carolina
10  historically.
11          This isn't a state like
12  Maryland, where the lines have wandered
13  all over the state.  Or a state like
14  Ohio, where the lines today would be
15  completely unrecognizable compared to the
16  very pretty lines we had and compact
17  lines we had before.
18          This isn't even a state like
19  Pennsylvania, where the 2011 map, you
20  know, was horrifyingly distorted compared
21  to the pre-Baker maps.
22          This is a map that the same
23  basic cores or bases have been intact
24  for, or have been similar for hundreds
25  of years.  And I think that's
```

31 (Pages 118 - 121)

Page 122

1         S. Trende
2  interesting context; perhaps the Court
3  will disagree.
4     Q   Okay.  Thank you.  That was
5  helpful.  So just moving forward in your
6  report, your next map you discuss is the
7  1982 map.  I want to ask.
8         You don't include the first
9  Apush Court, Baker v. Carr map, the map
10 adopted in the early 1970s.  Is there a
11 reason why that map wasn't included in
12 your report?
13    A   I think there's at least two
14 maps.  Because the first Baker map would
15 have been, everyone would have had to
16 redraw their lines I think, in 1966,
17 except for the single member states.
18        And it was just in the interest
19 of keeping things moving along.
20    Q   Is there any reason to think
21 that those maps would show different, you
22 know, different alignment of the districts
23 than what we have otherwise been looking
24 at?
25    A   I don't think they did.  And

Page 123

1         S. Trende
2  they certainly weren't excluded for any
3  reason, like any reason for that.
4         It was just kind of, okay, we
5  have established the longstanding
6  traditions.  Let's get to what people
7  were mostly interested in, which is
8  what's happened in the last few decades.
9     Q   Okay.  Just so I'm -- did you
10 consider either the post-Baker v. Carr map
11 or the 1970 cycle map for purposes of
12 rendering the opinions in your report?
13    A   I'm sure I created them.  But I
14 wouldn't have relied upon them in doing
15 the map.  If they were radically
16 different, to protect myself I probably
17 would have included them.  To not get the
18 tag affixed of excluding them.
19        Honestly, my recollection is
20 that they were just excluded because as
21 you were getting at with the previous
22 line of questioning, what people were
23 probably most interested in is what has
24 happened in the last few decades.
25    Q   Okay.  We can turn to your 1982

Page 124

1         S. Trende
2  map, which is on page 13 of your report.
3         (Pause)
4     Q   Now the 1982 map, what's your
5  purpose in presenting this one?
6     A   So it is the same as the
7  previous ones:  To show some of the
8  continuities in the way maps have been
9  drawn.  This isn't the state, where they
10 kind of use the etch a sketch and erase
11 it every 10 years and try to redraw the
12 districts.
13        This isn't someplace like Ohio
14 or Pennsylvania, or Maryland where you
15 just get something radically different
16 every couple of cycles.  It's been kind
17 of the same story, obviously things have
18 to change.  But you still get the same
19 basic story every cycle.
20    Q   Okay.  Is it fair to say the
21 1982 map like the other previous maps that
22 we looked at, the City of Charleston was
23 kept together in a single Congressional
24 district?
25    A   You know, I can't tell from

Page 125

1         S. Trende
2  eyeballing the area.  But I am guessing
3  that it does look like it was.
4     Q   Okay.  Why don't we move forward
5  in 1992.  Go to page 14 of your report.
6  The 1992 map.
7         (Pause)
8     Q   Now what's your purpose in
9  showing the 1992 map?
10    A   Well, I am showing the history
11 of these districts and how they have been
12 drawn.  And obviously, there are some
13 significant differences in this 1992 map,
14 at least in the low country areas of
15 South Carolina.
16        You still have a district like,
17 that's in Anderson.  You still have a
18 district you know, based on combining
19 Greenville and Spartanburg.
20        And one that's, now it would be
21 the Charlotte suburbs.  I'm not sure it
22 was in 1992.  Things get reconfigured,
23 obviously, In low country because that
24 6th District is transformed into an
25 ability to elect district.

32 (Pages 122 - 125)

Page 126
1         S. Trende
2         I don't know for sure if the
3  Bush DOJ was pursuing this state.  But I
4  know a lot of states in the 1992
5  redistricting cycle Bush DOJ was
6  pressuring them to draw more ability to
7  elect districts.  So.
8      Q    So just in terms of you know,
9  what this map does and how it's in
10 comparison to the 1982 map.  This map
11 still keeps City of Charleston in District
12 1, right?
13     A    Yes.
14     Q    And --
15     A    I should say it looks that way.
16 I can't tell if some of the 6th intrudes
17 into the City of Charleston.
18     Q    And not like the 1982 map but
19 some of the earlier maps we saw, Beaufort
20 County is in a different district here
21 than Charleston, right?
22     A    Yes.
23     Q    So moving forward to the 2002
24 map, which is page 15 of your report.
25 This is the map that was evaluated and the

Page 127
1         S. Trende
2  result of a Colleton County case, correct?
3      A    That's right.
4      Q    And this map, like some of the
5  other maps we've looked at, keeps the City
6  of Charleston together in the first
7  Congressional District.  Do you see that?
8      A    Again, I can't tell from this
9  whether the 6th takes in any of the
10 population of City of Charleston.
11     Q    Okay.  Well, like the 1992 map
12 and like the some of the historical maps
13 we were looking at, can you tell whether
14 Beaufort County and Charleston County are
15 in the same Congressional district in this
16 one?
17     A    Beaufort and Charleston are not.
18     Q    The observation you made
19 historically is about having a district
20 anchored in Beaufort County and the
21 counties along the Georgia border, that
22 applies to this map, the 2002 map?
23     A    On this map, yeah.  Beaufort is
24 kept separate and is combined up with
25 Columbia.

Page 128
1         S. Trende
2      Q    Okay.  Turning to the 2012 map
3  on page 16, this is the map that was
4  evaluated in the Backus case, correct?
5      A    That's correct.
6      Q    And this map, like every map we
7  have looked at so far keeps the City of
8  Charleston together in the First
9  Congressional District, right?
10     A    I think we have some nice
11 blowups elsewhere to be able to confirm
12 whether that protrusion from the -- and I
13 know the protrusion from the 6th goes
14 into Charleston County.  I don't know
15 whether it goes into the City of
16 Charleston.
17     Q    And you don't know one way or
18 the other whether City of Charleston was
19 split under the benchmark plan?
20     A    I think we have the split data
21 for locales somewhere else; I don't know.
22     Q    Okay.  With regard to the
23 enacted plan and the analysis you present
24 at the bottom of page 16, you write that
25 the enacted plan makes only minor changes

Page 129
1         S. Trende
2  to the benchmark plan.
3         And I think we have talked about
4  some of that.  You in this analysis don't
5  note that the enacted plan splits the City
6  of Charleston between, out of the First
7  Congressional District?
8      A    That's correct.
9      Q    And your report also doesn't
10 discuss that there's a district as there
11 had been in the past, anchored in Beaufort
12 County and the counties along the Georgia
13 border.
14     A    Which district is that?
15     Q    Well, it looks to me that this
16 map actually splits Beaufort from the
17 counties along the Georgia border.  Do you
18 see that?
19     A    Yes.
20     Q    Beaufort is in the First
21 Congressional District and the border
22 counties, and the Georgia border counties
23 look like they are both in 6th and some
24 are in 2.  Do you see that?
25     A    Yes.

Page 166

1      S. Trende
2    Q   Fair enough.  Have you ever seen
3  the materials in the A and B zip file?
4    A   I would be shocked.  Like I
5  said, I didn't consider alternative maps,
6  I wasn't contacted by Adam Kincaid or
7  Andrew Fiffick in this matter.  I have no
8  -- I mean you are asking me about a pig
9  in a poke, right?
10       I have no idea what A and B are.
11  But to my knowledge I don't, I've never
12  seen it.  If it's one of the documents
13  you just showed me, then yeah, I have
14  seen it.  But I don't know.
15    Q   You don't know if you have seen
16  it?
17    A   Yeah.
18    Q   Okay.
19       MR. FREEDMAN:  Let me just show
20    you, this will be the document tab 35.
21    We will introduce this as Exhibit 17.
22       (Whereupon, email dated 11/24/21
23    Bates stamped SC-Senate-00003245
24    labeled Tab 35 was marked as Exhibit
25    17 for identification, as of this

Page 167

1      S. Trende
2    date.)
3    Q   Same initial question:  Before
4  getting the package of materials of
5  potential exhibits for your deposition had
6  you seen this document before?
7    A   No.
8    Q   This is, for the record, this is
9  exhibit 17 has the Bates number
10  SC-Senate-00003245.  It's another email
11  that Andrew Fiffick is forwarding to
12  himself, forwarding an email from Adam
13  Kincaid, November 24, 2021.
14       The attachment to this document
15  is a zip file called Jessamine.
16  J-e-s-s-a-m-i-n-e.  Have you ever seen the
17  files in the Jessamine file?
18    A   Not to my knowledge.
19    Q   Does the term Jessamine have any
20  significance to you?
21    A   Yes.
22    Q   What does it, what do you
23  understand to be?
24    A   It's the county in Kentucky
25  where my wife's mother is from.

Page 168

1      S. Trende
2    Q   Good.  All right.  Let's switch
3  gears.  I am switching gears again.  Do
4  you need a quick break or you want to?
5       (Pause)
6       MR. FREEDMAN:  Why don't we take
7    five.
8       THE WITNESS:  Okay.
9       MR. FREEDMAN:  And then I'll
10    hopefully be towards the home stretch.
11       THE VIDEOGRAPHER:  The time is
12    2:27 and we are going off the record.
13    This is the end of media unit number
14    4.
15       (Recess taken:  2:25)
16       THE VIDEOGRAPHER:  The time is
17    2:33 and we are back on the record.
18    This is the beginning of media unit
19    number 5.
20    Q   Mr. Trende, if you could turn
21  to page 24 of your report, Exhibit 2.  I
22  want to ask you about your analysis of
23  Sumter County.  First question:  Where did
24  this analysis come from?
25    A   So again, it comes from the

Page 169

1      S. Trende
2  shape files and the data described in the
3  opening section of the report and it
4  would have been processed in R.
5    Q   Did any of the analysis you have
6  got here concerning Sumter County come
7  directly or indirectly from employees or
8  members of the South Carolina Legislature?
9    A   No.
10    Q   Looking at the map on page 24,
11  what is this map?
12    A   So the black line represents the
13  old district lines and then the gray
14  shaded area shows the moved precincts or
15  portions of precincts that were shifted;
16  so you can see the new district lines by
17  following the contours of the gray shaded
18  areas.
19    Q   Who came up with this map?
20    A   I did.
21    Q   Did you generate it yourself?
22    A   Yes.
23    Q   And did the date from this map
24  come from the share files?
25    A   Yes.