*SC NAACP v. Alexander,*
D.S.C. Case No.  3:21-cv-03302-MGL-TJH-RMG

# Exhibit A

Page 1

1        UNITED STATES DISTRICT COURT DISTRICT OF SOUTH

2              CAROLINA COLUMBIA DIVISION

3

4        Case No.: 3:21-cv-03302-JMC-TJH-RMG

5

6    THE SOUTH CAROLINA STATE CONFERENCE OF THE NAACP,

7    And TAIWAN SCOTT, on behalf of himself and all

8    other similarly situated persons,

9

10            Plaintiffs,

11        v.

12

13    HENRY D. MCMASTER, in his official capacity as

14    Governor of South Carolina; HARVEY PEELER, in his

15    official capacity as President of the Senate;

16    LUKE A. RANKIN, in his official capacity as

17    Chairman of the Senate Judiciary Committee; JAMES

18    H. LUCAS, in his official capacity as Speaker of

19    the House of Representatives; CHRIS MURPHY, in

20    his official capacity as Chairman of the House of

21    Representatives Judiciary Committee; WALLACE H.

22    JORDAN, in his official capacity as Chairman of

23    the House of Representatives Elections Law

24    Subcommittee; HOWARD KNABB, in his official

25    capacity as interim Executive Director of the

1    South Carolina State Election Commission; JOHN

2    WELLS, JOANNE DAY, CLIFFORD J. ELDER, LINDA

3    MCCALL, and SCOTT MOSELEY, in their official

4    capacities as members of the South Carolina State

5    Election Commission,

6

7            Defendants.

8

9            Transcription of Video File:

10       20220112HHouseofRepresentatives11637_1

11            Date:  January 12, 2022

12              Runtime:  3:25:42

13       Transcription Begins:  40:00

14

15

16

17

18

19

20

21

22

23

24

25

1          UNIDENTIFIED SPEAKER:  Hand it to

2    Jordan.

3          SPEAKER LUCAS:  (Inaudible) hand it to

4    him.

5          REPRESENTATIVE KING:  (Inaudible)

6    lawyer to my (inaudible).

7          SPEAKER LUCAS:  You ready?

8          CLERK REID:  Yes, sir.  Sorry about

9    that (inaudible).

10          SPEAKER LUCAS:  No, it's all right.

11    It's all right.

12          CLERK REID:  (Inaudible).

13          SPEAKER LUCAS:  (Inaudible) so,

14    (inaudible).  Okay.  Well, let me -- let me

15    see (inaudible).  (Inaudible) make one.

16    Clerk will read.  House will be in order,

17    you may want to hear this.

18          CLERK CROMER:  House Resolution by the

19    Rules Committee, Committee Bill setting for

20    special order Senate 865.  This is House

21    Resolution 4781.

22          SPEAKER LUCAS:  Members, this is House

23    Resolution 4081, setting for special order,

24    Senate Bill 865.  I'm going to repres-- I'm

25    going to recognize Ms. Thayer to explain the

Page 4

1  resolution.  Ms. Thayer is recognized.  The

2  House will come to order.

3      REPRESENTATIVE THAYER:  Thank you so

4  much, Mr. Speaker.  As you know in the past,

5  when we've talked about redistricting, we've

6  come before you and we've set that for

7  special order.  And we're here to do that

8  today as well.  Today of course, we'll be

9  discussing the congressional lines, once we

10 pass the special order, --

11     CLERK CROMER:  Thank --

12     REPRESENTATIVE THAYER:  -- if it

13 passes, then we will take it up immediately.

14 Thank you.

15     SPEAKER LUCAS:  Thank you, Ms. Thayer.

16 Pending question -- pending question -- yes,

17 sir?

18     CLERK CROMER:  Mr. Hill.

19     SPEAKER LUCAS:  Yes sir, Mr. Hill?

20     REPRESENTATIVE HILL:  Thank you, Mr.

21 Speaker.  I was wondering, I'm not seeing

22 this on our dashboard, and I don't have a

23 copy of it, would it be possible to have

24 this read?

25     SPEAKER LUCAS:  Is it -- is --?  So,

1  Mr. Hill, it's not a bill, it's a

2  resolution.  We don't have to read it; I'm

3  going to read it.  That H. 865, relating to

4  the Bill to establish districts from which

5  the members of the congressional districts

6  are elected, beginning with the 2022 general

7  election, is set by special order for second

8  reading consideration on Wednesday, January

9  12th, 2022, immediately following adoption

10  of the special-order resolution.  And to

11  provide following the roll call on each

12  legislative day thereafter, for continuing

13  special order consideration until S. 865 is

14  given third reading or other disposition.

15     That's the resolution from the Rules

16  Committee.  The pending question is the

17  adoption of the resolution.  All in favor

18  say, "aye."

19     ALL:  Aye.

20     SPEAKER LUCAS:  Opposed, no? The aye's

21  have it.  All right, members if you would

22  turn to your calendar, we're on page two --

23  the middle of page two, that's Senate Bill

24  865, relating to congressional

25  reapportionment.  Mr. Jordan?  Wait a minute

Page 6

1    -- hold --

2        CLERK CROMER:  The Amendment.

3        SPEAKER LUCAS:  All right, we have an

4    amendment on the desk, it's Amendment 1.

5    The Amendment is from the Judiciary

6    Committee.  I'm going to recognize Mr.

7    Jordan to explain the Amendment.

8        CLERK REID:  (Inaudible).

9        CLERK CROMER:  Yes, sir.

10       SPEAKER LUCAS:  Hold on a minute.

11   (Inaudible) Amendment 1, it's a committee

12   amendment.  Mr. Jordan is recognized to

13   explain the Amendment.  House will be in

14   order.  Members are going to want to hear

15   this.  Mr. Jordan is recognized.

16       REPRESENTATIVE JORDAN:  Thank you, Mr.

17   Speaker.  As you all know, I've had the

18   privilege of chairing the Redistricting Ad

19   Hoc Committee.  I want to recognize my

20   colleagues today, Representative Henegan,

21   Representative (Inaudible) are you pointing

22   at me, or are you --?

23       UNIDENTIFIED SPEAKER 2:  No.  We can't

24   hear.

25       UNIDENTIFIED SPEAKER 3:  We can't hear

1  back there.

2      REPRESENTATIVE JORDAN:   Representative

3  Henegan, Representative Bernstein,

4  Representative Newton, Representative

5  Elliott, Representative Bamberg,

6  Representative -- and Representative

7  Collins.  I can tell you, members, that

8  we've spent the last five months working on

9  the very important task of redistricting on

10  behalf of the House.  I want to thank them

11  for all their hard work over these past

12  several months, as well as our staff, and

13  other members who have assisted in this

14  process.

15      I am pleased to be here presenting the

16  final component of South Carolina's

17  redistricting plans, for this, the United

18  States congressional districts.  The Ad Hoc

19  Committee was responsible for providing this

20  body with a framework for redistricting

21  these seven congressional districts,

22  following a release of the 2020 census data.

23  Which we are here, of course, to take up

24  today, just as we did for the House

25  districts that were recently enacted.  As

Page 8

1   you all just recently went through a similar

2   process for the House districts, you are

3   well aware that this is a very challenging,

4   time consuming, but also vitally important

5   issue for our state, so that we can or-- in

6   order to protect the one person, one vote

7   ideal in South Carolina's seven United

8   States congressional districts.  The same

9   ideal that get -- that guided our

10  development of the 124 House districts.  I

11  firmly believe that the plan that has been

12  advanced here today accords with that goal,

13  and other -- the other guidelines and

14  criteria that I will talk to you about this

15  afternoon.

16      Let me first provide the House

17  membership with an update on the activities

18  of the Ad Hoc Committee, that ultimately led

19  to the -- to the development of this

20  proposed plan.  For those members that are

21  like me and have not gone through prior

22  redistricting -- a prior redistricting

23  cycle, it is important to understand that

24  this process would have, of course, begun

25  much sooner, but largely due to the

1    (inaudible) -- due to the disruption of the

2    pandemic, the United States Census Bureau

3    was delayed by several months in its release

4    of the 2020 census data.  Which of course

5    impacted the timing of redistricting here in

6    South Carolina.

7        While the census results are usually

8    released in the spring, the Census Bureau

9    did not provide the public raw data in its

10   final format to the states until September

11   16th of 2021.  We could not begin the

12   mechanics of actually examining the

13   population changes and drawing new districts

14   until we had that data.  Now, although the

15   final data was delayed several months, the

16   Ad Hoc Committee was formed, and we started

17   right on in the process in early August.  As

18   you can see, as I listed out earlier, a bi-

19   partisan membership was asked to work the

20   front lines of redistricting.  My colleagues

21   represent constituents across the state.

22   Representative Henegan from District 54,

23   representing Chester, Darlington, and

24   Marlboro.  Representative Collins, from

25   District 5, representing Pickens.

Page 10

1    Representative Elliott, from District 22,

2    representing Greenville.  Representative

3    Bamberg, from District 90, representing

4    Bamberg, Barnwell, and Colleton.

5    Representative Newton, from District 120,

6    representing Beaufort and Jasper.

7    Representative Bernstein, from right here in

8    Richland County, in District 78.  And of

9    course, District 63, which I represent in

10   Florence.  I think our process benefited

11   greatly from the composition of this

12   committee, and each and every one of us put

13   in countless hours, and thousands of miles

14   in our work on redistricting.

15       Going back to August, the Ad Hoc

16   Committee first met to adopt the 2021

17   redistricting criteria and guidelines that

18   would be used in the process, drawing both

19   the 124 House districts and the seven

20   congressional districts.  Then in early

21   September, we undertook the task of

22   traveling throughout the state, to meet with

23   South Carolinians and hear from them

24   directly and in person, about what was

25   important to them and their communities, as

1  we worked on the maps.  These public hearing

2  were held in 10 cities across the state,

3  beginning in Myrtle Beach, then onto

4  Florence, Rockhill, Greenville, North

5  Charleston, Bluffton, Aiken, Greenwood, and

6  Orangeburg.  Finally, before coming to

7  Columbia and holding two hearings here in

8  the Block Building, so that we can

9  accommodate virtual participation.  We heard

10  from many individual citizens, as -- and

11  also, a number of our colleagues who came to

12  speak, and the Committee very much

13  appreciated the active participation in the

14  public, as well as our colleagues.

15      The issue raised during these hearings

16  were important, in order to fully consider

17  both the House and the congressional

18  districts.  And we took note and paid in--

19  paid great attention to what South

20  Carolinians had to say.  We also received

21  hundreds of pages of written testimony from

22  the public on both staff plans, as well as

23  the plans submitted by the public.  Our

24  staff, let me tell you, they did a

25  phenomenal job.  They worked hard to keep

1    the House website updated with all the

2    information activities that related to

3    redistricting.  And I commend them for their

4    hard work and commitment to the process.

5         With all the testimony, written

6    submissions, maps from the public, it was

7    then our primary task to account for the

8    population changes in South Carolina since

9    2010 and address the ways in which our

10   current House and congressional districts no

11   longer accorded with the necessary,

12   constitutional and legal principles.  The

13   census data revealed that while South

14   Carolina continues to grow and attract new

15   residents, the growth is not consistent

16   across the state, and there were significant

17   movements in population densities in that

18   last ten years.  For example, the suburbs of

19   Charlotte are pushing South, and spilling

20   into Northern York and Lancaster Counties,

21   and there has been tremendous growth in that

22   area.  As with the coastal areas, such as

23   Myrtle Beach and Charleston, also tremendous

24   growth.  However, we learned that there were

25   areas of our state that lost significant

Page 13

1  amounts of population.  These movements

2  impacted a number of districts, which meant

3  we had work to do to bring House and

4  congressional districts into conformance

5  with our principles of equality.

6      Now, let me speak for a moment on these

7  principles.  I've mentioned a couple times,

8  I'm sure you all know, that when it comes to

9  the task of redistricting there are in fact

10  overriding constitutional mandates that

11  guide our work.  The equal population clause

12  of the United States Constitution, which

13  requires apportionment of representatives on

14  a population basis, and the 14th Amendment's

15  equal protection clause, which requires that

16  we make an honest and good faith effort to

17  construct legislative districts as nearly of

18  equal population as is practicable.  The

19  redistricting of congressional districts,

20  however, do not allow for the small

21  deviations as the legislative districts, and

22  every effort must be made to achieve strict

23  equality of population.  The congressional

24  districts proposed are within a deviation of

25  one person from that ideal.

Page 14

```
 1              I will tell you, it is extremely
 2       difficult to balance districts with hundreds
 3       of thousands of people within one person of
 4       that ideal, using census blocks that are
 5       determined by the Census Bureau.  And I
 6       remind you that that's a determination
 7       beyond our control.  In addition to those
 8       Federal Constitutional mandates, our South
 9       Carolina Constitution mandates free and
10       equal elections.  And the Voting Rights Act
11       prohibits voting practices that discriminate
12       on the basis of race, color, or membership
13       in a language minority group.  With these
14       federal and state principles in mind, and
15       prioritized in our process, the 2021
16       redistricting guidelines and criteria also
17       incorporated the redistricting principles
18       that you heard me mention before.
19       Compactness, contiguity, respect--
20       respecting of communities of interest, as
21       well as incumbency considerations.
22              Our 2021 guidelines were modeled from
23       the 2011 guidelines, and took into
24       consideration important court decisions,
25       such as the Federal District Court in
```

1  Colleton County Council v. McConnell.  As we

2  worked on these maps, we strove to maintain

3  county boundaries when possible, and I will

4  tell you particularly true of smaller

5  counties.  We also tried to minimize splits

6  in precincts such as in cities and voting

7  precincts.  I realize, it may seem easy to

8  improve lines and divisions when focused on

9  one area or region, but it has been our job,

10  and is not this body's job, to consider the

11  entire state.  And when an improvement of --

12  on point A leads to disruptions of point B

13  through G, I would argue that's not really

14  an improvement, or certainly not one that we

15  can adopt.

16      So, based on the 2020 census results,

17  the ideal population for each of the

18  congressional districts is 731,204.  The

19  population changes I discussed meant that

20  Congressional District 1 was nearly 12%

21  above the ideal population, and

22  Congressional District 6 was more than 11.5%

23  under the ideal population.  The remaining

24  congressional districts were within four

25  percent of the ideal population.  This

Page 16

1  allowed us to use the same general district

2  boundaries as ten years ago, with some

3  adjustments to account for those population

4  shifts I referenced earlier.  This mainly

5  occurred in District 1 and District 6, which

6  had the most significant population changes,

7  but could be nearly balanced between each

8  other.

9      While I think it's self-evident, let me

10  explain for the record that the Ad Hoc

11  Committee, and the Judiciary Committee chose

12  to focus on and pursue a plan for the House

13  districts before turning to the

14  congressional districts.  We certainly

15  solicited and collected public input on both

16  maps throughout the process, but in terms of

17  our time and attention in drawing new maps,

18  we worked on and developed the House plan,

19  before picking up the task for Congress.

20      To provide further background specific

21  to the congressional maps, I want to explain

22  the timeline the Ad Hoc Committee -- of the

23  Ad Hoc Committee, and the Judiciary

24  Committee, that has brought us to this

25  point.  The House plan was approved by the

1  House on December 6th, 2021.  The map

2  recommended by the Ad Hoc Committee

3  underwent several amendments before the

4  final version was adopted.  Following a

5  proposed amendment by the Senate to include

6  the Senate's plan for its legislative

7  districts, we concurred on December 9th, and

8  H. 4493 was sent to Governor McMaster.  On

9  December 13th, the Ad Hoc Committee posted

10  an initial staff draft plan --

11      SPEAKER LUCAS:  Mr. Jordan, let me

12  interrupt you just a minute.

13      REPRESENTATIVE JORDAN:  Yes, sir.

14      SPEAKER LUCAS:  House will be in order.

15      UNIDENTIFIED SPEAKER 4:  Thank you, Mr.

16  Speaker.

17      SPEAKER LUCAS:  House will be in order

18  and continue to be in order.  Mr. Jordan?

19      UNIDENTIFIED SPEAKER 4:  Thank you, Mr.

20  Speaker.

21      REPRESENTATIVE JORDAN:  Thank you, Mr.

22  Speaker.  On December 13th, the Ad Hoc

23  Committee posted an initial staff draft plan

24  for the congressional districts, as well as

25  the Senate's staff plan, as a point of

Page 18

1    comparison, in order that we could receive

2    input on a congressional plan.  The Senate

3    had previously released its staff plan in

4    November, and it's Redistricting Committee

5    held a hearing to receive public comments

6    just after Thanksgiving.  The initial staff

7    plan posted by the Ad Hoc Committee on

8    December 13th, presented a fairly

9    significant change to the landscape of South

10   Carolina's congressional districts.  While

11   the Senate's plan, more closely resembled

12   the congressional districts that were

13   enacted ten years ago.

14        On December 16th, the Ad Hoc Committee

15   held a hearing to receive feedback and take

16   public testimony, regarding the initial

17   staff plan, as well as the Senate's staff

18   plan.  We did not take any formal action at

19   that meeting, and instead allowed time for

20   further input from the public and interested

21   parties.  From there, the Committee receive-

22   - ended up receiving hundreds of pages of

23   written testimony concerned about, and

24   vocally objecting to, the proposed movement

25   of Beaufort County back into District 2,

1  after having been in District 1 for the past

2  ten years.  I'm not talking about a few

3  emails are a couple letters, it was sub-- a

4  substantial -- I was a high volume of

5  testimony to that affect.  My understanding

6  is Representative Newton would personally

7  attest to a significant volume of emails,

8  and concerns he received as a representative

9  of Beaufort County.  The sheer volume of

10 comments was vastly -- excuse me, the sheer

11 volume of comments vastly outnumbered those

12 received from any other region of the

13 proposed map.

14     On December 22nd, the Ad Hoc Committee

15 posted a second plan, which we have all

16 called, "Staff Alternative Plan 1," which

17 sought to address the comments and concern

18 raised to us, such as in Beaufort County.

19 And also, more closely aligns with the

20 Senate's original staff draft plan, and as a

21 result of the configuration of the

22 congressional districts as approved by the

23 2011 plan.

24     Again, I think it's important to take

25 into consideration that unlike our House map

Page 20

1  -- House map, the congressional map is the

2  one that we must undertake together with our

3  colleagues in the Senate.  We do not have

4  total autonomy over this map, and without

5  agreement we would have been unable to adopt

6  a congressional plan.  That said, we believe

7  altern-- our alternative plan makes several

8  improvements to the Senate's original draft

9  plan, including unifying Calhoun,

10  Orangeburg, and Jasper Counties.

11       On to December 29th, the Ad Hoc

12  Committee hold a second hearing, dedicated

13  to the congressional plans, in order to

14  receive further public input on both plans

15  that had been put forward by the Committee.

16  Again, -- again, at this hearing we took no

17  action, and continued to receive written

18  testimony through January the 9th of '22.

19  The submissions were received, and again, a

20  significant amount of feedback from the

21  residents of Beaufort, this time supporting

22  the Second, or Alternative Plan, which

23  retained Beaufort County in District 1.

24       On Monday, January 10th, the Ad Hoc

25  Committee convened for a third time on the

Page 21

```
 1   plan for congressional districts, and voted

 2   to amend S. 865 with what is called, "the

 3   Staff Alternative Plan 1," and gave it a

 4   favorable report to Ju-- to Judiciary on

 5   House 4492.  From there, the Judiciary

 6   Committee voted in favor of advancing 4492

 7   to this body, and we are here today.

 8        Unlike the House plan, we did not

 9   receive any proposed amendments, and I am

10   not aware of any members requesting

11   amendments to either of the proposed

12   congressional maps between December 13th and

13   today.  There was certainly good discussion

14   within the committees earlier this week.

15   And hearing from my colleagues and taking to

16   heart their concerns, I still firmly believe

17   that the plan presented here is the

18   necessary next step to achieve the

19   fundamental, constitutional goal -- thank

20   you --

21        CLERK CROMER:  Uh-huh.

22        REPRESENTATIVE JORDAN:  -- of equality

23   in voting, and in a -- and is in accordance

24   with the guidelines and criteria adopted for

25   this redistricting cycle, and complies with
```

1   the United States Constitution, the South

2   Carolina Constitution, as well as federal

3   and state law.

4       We worked to incorporate concerns from

5   citizens and communities across South

6   Carolina and tried to account for

7   communities of interest.  The proposed

8   congressional districts generally adhere to

9   the previous boundaries that were

10  sufficiently contiguous and compact, to be

11  approved by the Department of Justice and

12  past judicial scrutiny in 2011.  I would

13  also argue that we made important

14  improvements by unifying counties, such as

15  Newberry and Orangeburg, from that 2011

16  plan.  Our proposed congressional plan keeps

17  all but 10 counties and seven voting

18  precincts whole, which are all improvements

19  over 2000-- over the 2011 plan.

20      The plan before you also provides, or

21  improves, the compactness of District 2

22  versus what was first proposed in the

23  initial staff plan.  It keeps the coastal

24  communities of Hilton Head and Charleston

25  together, which encompasses many shared

Page 23

1  social, economic, and environmental

2  interests.  This is evidence by the public

3  input.  Further, this plan reduces the

4  numbers -- the number of points into

5  Charleston County from District 6.

6      Also, let me Address some of the

7  questions posed by the Committee members

8  earlier this week.  We heard concerns to the

9  effect that the second map posted was a

10  replacement, and somehow took the place of

11  the first map.  The two maps were at all

12  times on the same footing.  We simply drew a

13  second map, that offered an alternative

14  version of redistricting for the

15  congressional districts.  Both of these maps

16  were to be considered, and in my view, were

17  considered by the public, by our members,

18  and ultimately, by the Ad Hoc Committee.

19  Unlike the House District plan, we did not

20  receive any amendments or proposed

21  alternative maps from House members.  The Ad

22  Hoc Committee convened three times, and

23  Staff Alternative Plan 1 was the -- was the

24  one that was offered for vote, and was

25  passed by the Ad Hoc Committee, and later

 1    the Judiciary Committee.

 2         Regarding the process concerns, both of

 3    the maps posted by the Ad Hoc Committee

 4    followed the same process.  We sought and

 5    considered public input into the

 6    congressional district plans.  We were

 7    guided by the same procedural and

 8    substantiative rules, and were deliberative

 9    and allowing time for a receipt, as well as

10    consumption of the proposals before our

11    third and final meeting.  The Committee was

12    ready and available to hear concerns from

13    any and every interested person, and the

14    fact of the matter is that we received

15    hundreds of pages of written submissions

16    regarding the movement of Beaufort County

17    into District 1.  We did not make special

18    accommodations for Beaufort County, but we

19    certainly were attentive two the large-scale

20    public response, and took it into

21    consideration along with the original option

22    that had been presented by the Senate in

23    mid-December.  The Alternative Plan 1 was an

24    option that bridged the Senate's draft plan,

25    but still made several improvements over

1  both the Senate and the 2011 plans, as I

2  noted earlier, by unifying several counties

3  and voting precincts.

4      Let me also say in response to the

5  criticism about the racial makeup of this

6  plan.  I heard concerns, and still believe,

7  that the statistics refute the criticisms.

8  These are difficult and important issues we

9  face, but let me be clear, our proposed map,

10  and our entire process, was not motivated or

11  dominated by any discriminatory intent.  We

12  face undeniably -- we face an undeniably

13  political process with an overriding goal of

14  equality in voting rights.  The

15  Congressional District Plan does not, I

16  repeat, does not pack District 6 with

17  minority voters, as we heard from this week.

18  The data shows that the percentage of black

19  voting age population it's actually 8% less

20  than it was 10 years ago in District 6.  We

21  have been widely criticized by some public

22  interest groups, and yet the congressional

23  maps submitted by those groups do not offer

24  superior alternatives, including for

25  District 6.

Page 26

```
 1          We, as representatives, do not have
 2     control over who chooses to make South
 3     Carolina their home, and where that home is
 4     made.  Our state is compromised [sic] of
 5     roughly 25% black voting age population --
 6     of a population total across the state.
 7     This proposed plan provides three
 8     congressional districts that are roughly 25%
 9     black voting age population, which is
10     reflective of the overall percentage of
11     black voting age population across the
12     state.  The allegations of discrimination
13     and harm, that I heard earlier this week,
14     are simply not supported by either the facts
15     or the data.
16          I appreciate having had the opportunity
17     to chair this important Ad Hoc Committee.
18     It was a -- I can say -- I've said many
19     times, it is truly a learning experience
20     like no other.  I believe the plan before
21     you adheres to the Ad Hoc Committee's
22     criteria, to the guidelines, to the one
23     person one vote principle, and I encourage
24     you each to vote in favor of it.  Thank you
25     so much for your time.
```

1          SPEAKER LUCAS:  Will you take

2   questions, Mr. Jordan?

3          REPRESENTATIVE JORDAN:  Yes, sir.

4          SPEAKER LUCAS:  Mr. King is recognized

5   for a question.  Mr. Pope?

6          REPRESENTATIVE KING:  Thank you, Mr.

7   Speaker.  I have a question in reference to

8   the makeup of the Committee.  You mentioned

9   that there were members from each

10  Congressional District, am I correct?

11         REPRESENTATIVE JORDAN:  So, initially,

12  there was a member from each congressional

13  committee. Representative Brandon Newton,

14  who was originally on the Committee -- I

15  don't think he would mind me saying -- he

16  was blessed with a -- the birth of his first

17  child.  And that process came along about

18  the time, and it simply had -- he simply had

19  to withdraw from his service on the

20  Committee as a result of that obligation.

21  Certainly, him driving across the state over

22  a period of weeks, while he had a new baby

23  on the way or at home, I can tell you --

24         REPRESENTATIVE KING:  So, -- so, --

25         REPRESENTATIVE JORDAN:  -- I --

Page 28

1          REPRESENTATIVE KING:  -- my question, -

2    -

3          REPRESENTATIVE JORDAN:  -- look, just -

4    - I'm --

5          REPRESENTATIVE KING:  Yes.

6          REPRESENTATIVE JORDAN:  -- about to

7    wrap it up.

8          REPRESENTATIVE KING:  No, no, no

9    (inaudible).  No, you're fine.

10          REPRESENTATIVE JORDAN:  He was unable

11    to be a part of the meet-- part of the team,

12    and therefore we had all but one district

13    represented as a result --

14          REPRESENTATIVE KING:  So, do you know -

15    -

16          REPRESENTATIVE JORDAN:  -- (inaudible)

17    withdraw.

18          REPRESENTATIVE KING:  -- who actually

19    looked at Congressional District 5, that was

20    from our area?  Or who -- or any of my

21    delegation members, or -- when I say

22    delegation, from Congressional District 5,

23    that you all spoke to in the -- in concern

24    of how we wanted to see the makeup of our

25    Congressional District?  That's one

1    question.  Mr. Chair, as --

2         REPRESENTATIVE JORDAN:  (Inaudible).

3         REPRESENTATIVE KING:  -- the chair of

4    the Committee, did you know that there were

5    other members who were on Judiciary that are

6    from Congressional District 5?  And then,

7    when Mr. Newton was unable to be a part of

8    the Committee, that you all could have

9    appointed to have that voice?  So, there was

10   a -- there was a void from Congressional

11   District 5, did you know that?

12        REPRESENTATIVE JORDAN:  I disagree that

13   there was a void.  I will tell you that --

14   and this is absolutely no criticism of

15   Representative Newton, having three children

16   myself, I -- he absolutely made the right

17   decision to be where he needed to be.  But

18   I'll tell you this, this was truly a team --

19        REPRESENTATIVE KING:  Mr. Chairman, --

20        REPRESENTATIVE JORDAN:  -- let --

21        REPRESENTATIVE KING:  -- I -- with all

22   due respect --

23        REPRESENTATIVE JORDAN:  -- if you don't

24   mind, I would like to finish the question.

25        REPRESENTATIVE KING:  Okay, no problem.

Page 30

```
 1          REPRESENTATIVE JORDAN:  Finish -- and I
 2    -- certainly, we -- I'll stay as long as you
 3    want.  But I would -- I would argue that it
 4    really was a team effort in this process.
 5    Looking at the congressional districts, we
 6    didn't divide up the congressional areas and
 7    say, "you work on this one from --" because,
 8    you know, Representative Henegan and I
 9    didn't go work on District 7 by ourselves,
10    necessarily.  We -- it was a team effort
11    that we all participated in the process,
12    because at the end of the day, the entire
13    Committee had to vote on the overall map.
14    We didn't go district by district, approving
15    this one and that one, we had to unify the
16    map, because it does all have to connect up.
17    As I said, when you're trying to get every
18    single district to be equal pop-- equally
19    populated, as required by the law, it takes
20    a team atmosphere and effort.
21          And of course, I would also say,
22    Representative King, as you heard me list --
23    and I think you attended the meeting in your
24    area, if I'm correct -- remembering
25    correctly in Rockhill.  There were -- just
```

1  because you weren't on the Committee, there

2  were ample opportunities for everyone in

3  this room, as well as constituents and

4  members -- and the population of South

5  Carolina to participate.

6      REPRESENTATIVE KING:  Well, granted I

7  understand what you're saying, but when it

8  came down to a voice from Congressional

9  District 5, there was a void.  And the

10  reason why I say there was a void is because

11  we did not have one vote on that committee,

12  when you all submitted it from subcommittee

13  to full committee, which means there was a

14  void of our voice and our vote in the map.

15  The way it was drawn, (inaudible) it was the

16  House map, or the congressional map.  And we

17  had ample opportunity, because Mr. Newton

18  informed you all early on that he was unable

19  to participate.  Did you know Mr. Jordan,

20  that I am the senior member of Judiciary, as

21  well as I'm the -- one of, probably, the

22  only members that have gone through

23  redistricting?  Did you know that?

24      REPRESENTATIVE JORDAN:  I knew -- I

25  certainly know you are on Judiciary, having

1    sat near you for a number of -- number of

2    years.

3         REPRESENTATIVE KING:  Well, I will say,

4    and I've said publicly, that I believe

5    Congressional District 5 did not have a

6    voice, in reference to a vote, on the

7    Committee.  And as my colleague from my

8    Congressional District had a very, very

9    important obligation, I believe it was

10   prudent on this body to have appointed

11   someone, from Congressional District 5, to

12   be on that committee.  Also, did you know

13   that Congressional District 5, the way it is

14   drawn, may not be what we want in our

15   congressional area?  No one that I know of

16   spoke with me.  I'm not sure if you spoke to

17   my other delegation members from the

18   Congressional District, but I -- me, being

19   one of the only African Americans in that

20   Congressional District, me and Annie

21   McDaniel, I'm pretty sure you did not speak

22   with her either.  So, I -- I would say that,

23   you know, --

24        REPRESENTATIVE JORDAN:  May I -- may I

25   respond --

1          REPRESENTATIVE KING:  -- the input --

2          REPRESENTATIVE JORDAN:  -- to that?

3          REPRESENTATIVE KING:  -- the input from

4     the Congressional District, and especially

5     the minorities in the Congressional

6     District, were not heard.  Did you know

7     that?

8          REPRESENTATIVE JORDAN:  Mr. King, what

9     I would say is this was a process that we

10    went to great lengths to make as transparent

11    as possible.  I evidenced that by the fact

12    that we traveled all over the state, the

13    fact any member of this body had the

14    opportunity to create an amendment, if they

15    didn't like the version that was put before.

16    And as I said before, to my knowledge, I

17    don't think a single amendment was actually

18    put forward to say, "if this doesn't work

19    let's try something else."  That's the

20    process that we go through, you know, this

21    process is not unique.  Just because we're

22    drawing a map, doesn't mean it's not subject

23    to the amendment process.  And I would say,

24    if there were concerns, there was a process

25    to deal with those concerns.  Whether it was

1  presenting before the Ad Hoc Committee, if

2  you were on Judiciary, bringing those

3  concerns -- which I know you did bring some

4  concerns to the Committee -- but an

5  amendment opportunity was available there,

6  as is -- as is -- has been to this time.

7         REPRESENTATIVE KING:  Well, I

8  appreciate you taking my questions.  And I

9  hope that, not only colleagues within this

10 room, but the folk that are listening to us,

11 understand that I don't believe that this

12 process was done fair for the people for

13 Congressional District 5.  We did not have a

14 voice or a vote on that committee.  And so,

15 I'm -- I stand up for my Congressional

16 District, and the voice that we lacked on

17 that committee.  Thank you, Mr. Chairman.

18        SPEAKER LUCAS:  Ms. -- Ms. Cobb-Hunter

19 is recognized.

20        REPRESENTATIVE COBB-HUNTER:  Thank you.

21 Thank you, Mr. Speaker.  Mr. Jordan, thank

22 you for your work, thank you for your

23 committee's work.  Just got a couple of

24 questions, if I may, regarding the

25 congressional map.  And I don't know quite

1   what Mr. Hill was saying, but did you know

2   how difficult it is for us to follow what

3   you've described when we don't have anything

4   up there to look at?

5        REPRESENTATIVE JORDAN:  So, I can

6   certainly understand that I just walked you

7   through essentially more than five months,

8   or approximately five months' worth of

9   process and material.

10       REPRESENTATIVE COBB-HUNTER:  Uh-huh.

11       REPRESENTATIVE JORDAN:  So, I can

12  certainly understand that unless you were

13  paying incredibly close attention, it would

14  be difficult to digest it all.  And

15  certainly, I can answer -- or attempt to

16  answer, any question you have to anything

17  that I've explained over these last 20

18  minutes or so.  And if --

19       UNIDENTIFIED SPEAKER 5:  It's also on

20  the redistricting website.

21       REPRESENTATIVE JORDAN:  -- and I

22  believe it's also available on the website,

23  and if you have a copy.

24       REPRESENTATIVE COBB-HUNTER:  Well, it

25  would have been nice to have it up there, so

Page 36

1  that we could reference it.  I appreciate

2  your staff bringing me a copy now, but

3  that's --

4         REPRESENTATIVE JORDAN:  Yes, ma'am.

5         REPRESENTATIVE COBB-HUNTER:  -- neither

6  here nor there, quite frankly, after the

7  fact.  My question, specifically, regards to

8  the 6th Congressional District.  I heard you

9  mention something about Orangeburg and some

10  other county.  My specific questions -- and

11  I appreciate the fact that you have a very

12  comprehensive understanding of this, unlike

13  most of us who are sitting here listening to

14  you.  What I would like to know whether or

15  not Charleston and Beaufort Counties are

16  made whole, and what is before us?  Are

17  those two counties split?

18         REPRESENTATIVE JORDAN:  So, Charleston

19  is split, just like it was split in the

20  previous plan, of which we lived off of the

21  last ten years.

22         REPRESENTATIVE COBB-HUNTER:  And let me

23  -- before you go further, when you say,

24  "just like it was in the previous plan,"

25  does that mean that the numbers are the same

1    percentage wise?  That there's an even

2    distribution of voters of color in the 1st

3    and the 6th Congressional District?

4         REPRESENTATIVE JORDAN:  No, ma'am.  I'm

5    speaking in terms of --

6         REPRESENTATIVE COBB-HUNTER:  Could you

7    speak int the mic a little bit?  I'm --

8         REPRESENTATIVE JORDAN:  Sure.

9         REPRESENTATIVE COBB-HUNTER:  -- having

10   trouble hearing you.

11        REPRESENTATIVE JORDAN:  I'm speaking in

12   terms of no part of --

13        SPEAKER POPE:  Sergeant, if you could

14   help us, folks I know this is not a lot of -

15   - but there is a low buzz here.  Ms. Cobb-

16   Hunter's having difficulty hearing, I think

17   Mr. Jordan's trying to explain, this is very

18   important for all of us.  If you have

19   conversations, please take them out back.

20   Sergeant, if you would help us, we would

21   appreciate it.

22        REPRESENTATIVE COBB-HUNTER:  Thank you,

23   Mr. Speaker.

24        SPEAKER POPE:  Thank you.

25        REPRESENTATIVE JORDAN:  I'm not

Page 38

1    addressing any specific in that answer

2    statistical evaluation.  I'm -- what I'm

3    saying is, like the previous map that we

4    lived under for 10 years, no part -- or

5    Beaufort County was not split, and

6    Charleston in some way, shape, or form was

7    split, meaning not whole.  And that same --

8          REPRESENTATIVE COBB-HUNTER:  Got it.

9          REPRESENTATIVE JORDAN:  -- concept is

10   true today.

11         REPRESENTATIVE COBB-HUNTER:  And I'm

12   asking about the concept, and the concept of

13   splitting.  And perhaps, one of your staff

14   members has heard my question and has now

15   found the answer, and could share that with

16   you?  Because what I am asking is whether or

17   not the split in Charleston County is maybe

18   not as equal in number, but is it relatively

19   speaking, the same degree of split that was

20   there before between the 1st Congressional

21   District and the 6th Congressional District?

22   And let me -- let me do it this way, you may

23   be --

24         UNIDENTIFIED SPEAKER 6:  (Inaudible)

25   map (inaudible).

Page 39

1          REPRESENTATIVE COBB-HUNTER:  Go ahead?

2          UNIDENTIFIED SPEAKER 7:  (Inaudible).

3          REPRESENTATIVE COBB-HUNTER:  Here's

4    what I -- let me ask it this way, Mr.

5    Jordan.  There are some who maintain that

6    what the Committee did to the 6th

7    Congressional District is to crack and pack,

8    in order to make the 1st Congressional

9    District more republican-leaning and less

10   competitive.  And my question for you, is

11   whether or not the plan that is before us,

12   whether or not that plan, indeed, cracks

13   populations of color in Charleston County,

14   pack all of them into the 6th Congressional

15   District?  As opposed to being in the 1st

16   Congressional District, thereby -- in the

17   opinion of some -- rendering the 1st

18   Congressional District less competitive?

19          REPRESENTATIVE JORDAN:  So,

20   specifically, I would say I do not believe

21   that's the case.  And I would point you to

22   the data.  So, if you look at District 6, --

23          REPRESENTATIVE COBB-HUNTER:  Uh-huh.

24          REPRESENTATIVE JORDAN:  -- in the -- in

25   the 2011 draw, I can tell you --

Page 40

```
1          REPRESENTATIVE COBB-HUNTER:

2    (Inaudible) I'm sorry, could they also --

3    they brought me this little -- nice little

4    colored map which means nothing without the

5    data.  Is there data that they have that

6    they could share, that explain -- and I'm

7    only interested, staff, in the 1st and the

8    6th?

9          REPRESENTATIVE JORDAN:  Certainly.

10   It's -- we -- so, I can give you some of the

11   data that --

12         REPRESENTATIVE COBB-HUNTER:  Okay.

13         REPRESENTATIVE JORDAN:  -- I have in my

14   compilation of notes here.  So, in 2011, the

15   black voting age population in District 6

16   was 55%.

17         REPRESENTATIVE COBB-HUNTER:  Uh-huh.

18         REPRESENTATIVE JORDAN:  In the version

19   that you have before you today, the South --

20   the House Alternate Plan 1, it's 47.57%.

21   So, it's actually less.

22         REPRESENTATIVE COBB-HUNTER:  In the --

23   in which district, the 6th?

24         REPRESENTATIVE JORDAN:  That's the 6th

25   Congressional District.
```

Page 41

1        REPRESENTATIVE COBB-HUNTER:  Uh-huh.

2        REPRESENTATIVE JORDAN:  So, I think

3   that's evidence directly answering that --

4        REPRESENTATIVE COBB-HUNTER:  And tell

5   me --

6        REPRESENTATIVE JORDAN:  -- question.

7        REPRESENTATIVE COBB-HUNTER:  -- tell me

8   what the numbers are, if you don't mind, in

9   the first?  What's the BVAP in the first?

10  What was it before, and what is it under

11  this current plan?

12       REPRESENTATIVE JORDAN:  So, it was

13  18.58 in '11 and its 15.67 in the new

14  version.  Now, again, this is -- as I've

15  talked about many times -- you know, trying

16  to be exact with something that is

17  incredibly difficult to be exact with.

18  Trying to make those population numbers land

19  just where they need to land.  And oh, by

20  the way, as I said, when you -- when you

21  make A and B, right?  Sometimes you fix --

22  you mess up, you know, C, D, E, F.  So, I'm

23  giving you those things to help you

24  articulate, kind of, that balancing aspect,

25  --

1        REPRESENTATIVE COBB-HUNTER:  Yeah.

2        REPRESENTATIVE JORDAN:  -- if I would

3    say.

4        REPRESENTATIVE COBB-HUNTER:  And again,

5    I'm looking at this, and I'm not privy to

6    the detail, but it kind of looks to me that

7    your point about con-- contiguity and

8    compactness doesn't apply across the board

9    in these two.  I'm looking at the first, and

10   this looks like a part of Charleston County.

11       UNIDENTIFIED SPEAKER 8:  (Inaudible).

12       REPRESENTATIVE COBB-HUNTER:  Oh, huh?

13       UNIDENTIFIED SPEAKER 8:  (Inaudible).

14       REPRESENTATIVE COBB-HUNTER:  I'm

15   looking at the first, and it looks like a

16   part of -- it looks like a part of

17   Charleston County, or maybe this is -- and

18   I'm showing my ignorance of the State's

19   geography, but I'm looking at what appears

20   to be an unusual configuration, that in my

21   layperson's eyes, would have been easier

22   just to kind of have a swap.  And there

23   seems to be a little cutting out of some of

24   the areas here.  So, that's why I wanted the

25   detail.

1        REPRESENTATIVE JORDAN:  Are you

2   specifically talking about a particular --

3   so, I can give you an example, for instance,

4   where Charleston and Berkley --

5        REPRESENTATIVE COBB-HUNTER:  Why is

6   Patrick Dennis over here, Mr. Chairman?

7         REPRESENTATIVE JORDAN:  Does that let

8   me off the hook?

9        MR. DENNIS:  Jasper County line

10  (inaudible).

11       REPRESENTATIVE COBB-HUNTER:  I have a

12  distraction over here, what did you say

13  there?

14       REPRESENTATIVE JORDAN:  I was simply

15  saying, and again trying to -- I know it's

16  difficult to try and communicate on the maps

17  here, but for instance, I can tell you it

18  wasn't an arbitrary concept.

19       REPRESENTATIVE COBB-HUNTER:  Uh-huh.

20       REPRESENTATIVE JORDAN:  The line in

21  Charleston goes up to the county line with

22  Berkley County, so --

23       REPRESENTATIVE COBB-HUNTER:  So, I'm

24  told, Mr. -- I'm told by PD that our trusted

25  Chief of -- you all's trusted Chief of

1  Staff, that I'm looking at a Dorchester

2  County line.  And it looks to me, like it

3  may not necessarily be Dor-- I -- let me

4  (inaudible) -- let me yield?  And come up

5  here --

6       REPRESENTATIVE JORDAN:  Sure.

7       REPRESENTATIVE COBB-HUNTER:  -- and

8  show your people what I'm talking about, and

9  have them tell me what I'm looking at.  May

10  I do that?

11       REPRESENTATIVE JORDAN:  Sure.

12       REPRESENTATIVE COBB-HUNTER:  Thank you,

13  Mr. Jordan, appreciate your patience.

14       REPRESENTATIVE JORDAN:  Yes, ma'am.

15       REPRESENTATIVE COBB-HUNTER:  Thank you,

16  Mr. Speaker.

17       SPEAKER POPE:  Mr. Jordan, if you have

18  further -- Mr. Govan has a question.

19       UNIDENTIFIED SPEAKER 9:  This

20  (inaudible) --

21       REPRESENTATIVE COBB-HUNTER:  Yeah,

22  (inaudible)?

23       REPRESENTATIVE GOVAN:  Thank you very

24  much, Mr. Speaker.  Mr. Jordan, I -- you

25  know, I want to just tag onto that.  I

Page 45

1    guess, when I'm looking at this map, it

2    looks like you got a high sign, for the lack

3    of a better term, thumbs up in the 1st

4    Congressional District.  And I'm looking at

5    a -- it looks like a -- I don't know whether

6    that's a county line at the -- at the --

7    above the elbow portion.  But if that's a

8    county line, I'm just curious in terms of

9    why, you know, what the issue was there?

10   And also, in terms of -- you go up towards

11   Richland County, and if the green portion is

12   the 6th Congressional District, and you're

13   talking about continuity and lines that are

14   contiguous to one another, it -- that little

15   piece up there that looks like a tag -- if

16   you would -- could you -- and it's kind of

17   hard to see, could you kind of explain the

18   rationale behind that?  When, you know, in

19   terms of your introduction, you were talking

20   about meeting the traditional redistricting

21   criteria.  Because it does beg the question.

22          REPRESENTATIVE JORDAN:  So, nothing

23   would have made me happier, Representative

24   Govan, had we added up the population, and

25   everybody fit nicely into county blocks, and

Page 46

1   we didn't have to break a single county line

2   in order to accommodate all these diff-- all

3   these congressional districts.  What I would

4   tell you, is the points you point out, if

5   you would -- if you have a chance, look at

6   the 2010 congressional boundaries, and they

7   look very, very similar to that.  And again,

8   as we attempt to deal with that population

9   influx, both up and down, depending on

10  different crosses -- parts of the state,

11  bear in mind and remember, we start from a

12  point of the 2010 process, or map version

13  that we've been living under, that we know

14  was -- went through the process and

15  determined to be Department of Justice

16  approved and legal reasonable.  So, again, I

17  think some of the things you point out are

18  either similar to, or I would argue improved

19  by, the modern -- the new plan.

20      REPRESENTATIVE GOVAN:  I -- if I

21  remember some of the areas under that

22  particular draw, I -- we might have some

23  disagreement over that.  But I was just

24  curious and trying to point out, in terms of

25  some of the concerns that was shared by some

1   of colleagues.  The other thing is, you

2   know, you had mentioned that -- the

3   extraordinary lengths that the Committee

4   went through to keep certain communities of

5   interest together.  And I just found that to

6   be very interesting, considering the fact

7   that in terms of the House draw, that in

8   instances, particularly involving my county,

9   that was certainly not the case.

10      REPRESENTATIVE JORDAN:  Well, --

11      REPRESENTATIVE GOVAN:  Thank you.

12      REPRESENTATIVE JORDAN:  -- I would say

13  this, Representative Govan, I certainly

14  respect the comment, but the same criteria

15  and process was employed.  But it's

16  difficult -- while that's true, it's

17  difficult to compare the process beyond the

18  criteria and the process, because 124 of us

19  with a pop-- population deviation included

20  in there of two and a half percent on either

21  side of the magic number, so to speak, that

22  we talked about so many times in the House

23  drawing process?  Compared to seven

24  congressional districts, where in there is

25  no allowed percentage deviation.  So again,

Page 48

1    the process employed, and the criteria

2    employed, are the same, but it's a very

3    different issue we face.

4        REPRESENTATIVE GOVAN:  But you would

5    agree, based on what you just said -- and I

6    appreciate your comments on that -- but that

7    was by our decision, and not by -- out of --

8    out of a decision that was made by the

9    Committee, and not out of necessity based on

10   the flexibility that you're allowed under

11   the law, and under the -- under the courts,

12   and what was previously established in the

13   criteria, in terms to the standard

14   deviation.

15       REPRESENTATIVE JORDAN:  I would say

16   that the Committee, the Ad Hoc Committee and

17   the Judiciary Committee, and then the full

18   House as well, went to every length possible

19   to make sure we followed the process and the

20   criteria that was legally given to us, and I

21   think we did.

22       REPRESENTATIVE GOVAN:  But you had the

23   flexibility, in terms of the deviation, to

24   go to a higher deviation, but we elected not

25   to do that?

1      REPRESENTATIVE JORDAN:  We discussed

2   that, at length I believe, in this body.

3   And ultimately, felt like given several

4   issues before us, one being specifically the

5   timeliness, trying to get the process done

6   and that we were so delayed through no fault

7   of this body, or anyone by that matter, by

8   the census data, that the safest course of

9   action regarding the House district line

10   deviation was to stay with what we knew

11   worked, what had worked previously.  And

12   that was the two and a half percent.

13      REPRESENTATIVE GOVAN:  Well, now we'll

14   respectfully disagree on --

15      REPRESENTATIVE JORDAN:  Yes, sir.

16      REPRESENTATIVE GOVAN:  -- that, but

17   thank you.  Thank you, --

18      REPRESENTATIVE JORDAN:  Yes, sir.

19      REPRESENTATIVE GOVAN:  -- Mr. Chairman.

20      SPEAKER POPE:  Mr. Garvin's recognized?

21      REPRESENTATIVE GARVIN:  Thank you, Mr.

22   Speaker, and thank you Mr. Jordan.  Mr.

23   Jordan, did you know that I appreciate your

24   service, as well as the service of the

25   members of this committee?

Page 50

```
 1        REPRESENTATIVE JORDAN:  Thank you.  I
 2   appreciate your service as well.
 3        REPRESENTATIVE GARVIN:  Thank you, Mr.
 4   Jordan.  I have -- Mr. Jordan, did you know
 5   that I actually had the opportunity to watch
 6   all the hearings virtually?  And I listened
 7   very closely --
 8        REPRESENTATIVE JORDAN:  I'm sorry --
 9        REPRESENTATIVE GARVIN:  -- (inaudible)
10   --
11        REPRESENTATIVE JORDAN:  -- you had to
12   do that.
13        REPRESENTATIVE GARVIN:  Well, I really
14   took the time to listen to those hearings,
15   Mr. Jordan, did you know?  So, that I could
16   understand some of the issues that we --
17   that would come before this body today.  And
18   I guess, my concern, Mr. Jordan, did you
19   know, is that it -- they're there -- there
20   are more process concerns.  Mr. Jordan, did
21   you know that the first map that the
22   Committee released, many folks were actually
23   fairly pleased with the map, in regards to
24   it being fair, did you know?  Did you know
25   that Mr. Jordan?
```

1          REPRESENTATIVE JORDAN:  Certainly, I

2     would tell you -- and you --

3          REPRESENTATIVE KING:  Thank you.

4          REPRESENTATIVE JORDAN:  -- gathered

5     this probably from watching, you're never

6     going to make everybody happy.

7          REPRESENTATIVE GARVIN:  Sure.

8          REPRESENTATIVE JORDAN:  And certainly,

9     we put out the first version, and we heard

10    from some folks that said it was not that

11    bad, and we heard some from some folks,

12    particularly in Beaufort -- as I addressed

13    earlier -- that's said it was awful.

14         REPRESENTATIVE GARVIN:  Sure.

15         REPRESENTATIVE JORDAN:  And then we put

16    out an alternate version, and we heard from

17    a few folks that said it was much improved,

18    and we heard from a few folks that didn't

19    like it as well.  Back to my underly point

20    of, we're trying to do the best we can to

21    put out the best product that complies with

22    the law, and the under -- with the

23    underlying idea that we're not going to make

24    everyone happy.

25         REPRESENTATIVE GARVIN:  Right,

Page 52

1  absolutely.  Mr. Jordan, did you know, I

2  absolutely agree, no matter what you do,

3  folks will -- that you could never please

4  everybody?  But Mr. Jordan, did you know

5  that I was watching the hearing earlier this

6  week, and there was a comment made about if

7  the folks down in Beaufort who were

8  displeased with the fact that they were no

9  longer in what is now the 1st Congressional

10  District?  And they were actually move

11  towards, did you know, the inland district

12  that's currently represented by Congressman

13  Wilson?  They -- did you know that those

14  folks raised a concern, and they were then

15  in the second map brought back into the

16  first?  But I -- as you are well aware, did

17  you -- you know, folks down in Charleston I

18  have also raised concerns?  So, I guess my

19  question is, what made the concerns of the

20  Beaufort folks more prevalent to change the

21  actions of a committee, versus the folks in

22  Charleston?

23        REPRESENTATIVE JORDAN:  So, what I

24  would say -- very fair question, but

25  ultimately, it's just like any piece of

1    legislation.  The Committee is tasked, just

2    as the full judiciary was, just as we are,

3    of finding that best possible version to put

4    forward.  The folks in Beaufort made a, what

5    I thought in my -- from my vote, was a

6    compelling argument that it wasn't fair to

7    ping pong them back and forth, as they had

8    been during the process.  They also, in my

9    mind, made a very compelling argument that

10   they, like Charleston, dealt with coastal

11   issues that were unique.  That not everyone

12   in the state -- other parts of the state

13   deal with, those coastal -- those shoreline

14   issues that are specific to the coastal

15   regions.

16       They also made the point -- back to

17   that ping pong -- that you know, this is

18   working. This is established, why undo and

19   change?  And I felt like, when you balanced

20   all the different issues together, --

21   because I do agree with you that, you know,

22   one county doesn't have priority over

23   another -- but it's important when you look

24   at all the issues, for my vote, I felt like

25   this made the most sense.

Page 54

```
 1          REPRESENTATIVE GARVIN:  All right, and
 2    I appreciate that answer, Mr. Jordan.  I
 3    guess, did you know, Mr. Jordan, that I also
 4    think that the issues in Charleston and
 5    North Charleston, I think that those
 6    constituencies also share some of the same
 7    concerns, given that they're, you know, a
 8    much closer?  Downtown Charleston is much
 9    closer to North Charleston than downtown
10    Columbia.  Did you know that I find that to
11    be concerning?  That in this current map
12    that we have the University of South
13    Carolina and the College of Charleston in
14    the same legislative district?
15          REPRESENTATIVE JORDAN:  Again, we could
16    go back and forth, as we do in a lot of ways
17    in our lives, developing a pro and con list,
18    and you would make a good argument for some
19    pros and cons on either side.  But when you
20    look at the sum total of the facts, it was
21    my opinion that this version was the better
22    version, ultimately.
23          REPRESENTATIVE GARVIN:  Fair enough,
24    Mr. Jordan.  Did you know that I disagree,
25    that I think a district --
```

Page 55

1          REPRESENTATIVE JORDAN:  Sure.

2          REPRESENTATIVE GARVIN:  -- that's 100

3   miles, and that shares the College of

4   Charleston and the University of South

5   Carolina, did you know, I think that's not a

6   great map?  But Mr. Jordan, I'm not going to

7   belabor the point, I guess my next question

8   is the process question.  We are all aware

9   that the Senate -- that this map mirrors

10  pretty much, with a few minor tweaks,

11  mirrors the Senate's map.  And the Senate's

12  map, Mr. Jordan, did you know, was wildly

13  criticized?  And -- but for some odd reason,

14  the House decided to adopt a map that was

15  similar to the Senate's map.  Mr. Jordan,

16  did you know that I am con-- somewhat

17  concerned about the process?  Can you, kind

18  of, talk about how we ended up, I guess, for

19  this particular map, do you know, if there

20  were any outside groups that influenced this

21  map?  Do you know if any of our

22  congressional members had any input on this

23  particular map?

24          REPRESENTATIVE JORDAN:  So, I will tell

25  you that no partisan group, national or

Page 56

1  otherwise, were involved in the drafting of

2  this plan.  None of that outside partisan

3  stuff took place in this process.  The

4  process in this was as I -- as I described

5  in that timeline.  The Ad Hoc needed a

6  starting point in which to discuss, so we

7  pushed out a version.  And I don't know that

8  it would have made sense right out the gate,

9  to push out a version that simply looked

10  like the Senate version.

11        REPRESENTATIVE GARVIN:  Uh-huh.

12        REPRESENTATIVE JORDAN:  For purposes of

13  discussion of where we go in drawing these

14  maps.

15        REPRESENTATIVE GARVIN:  Uh-huh.

16        REPRESENTATIVE JORDAN:  We pushed out a

17  version, we had a hearing on it, we had --

18  as I've already stated, a large amount of

19  input given to us from the public.  We

20  listened to the public and we put another

21  version up.

22        REPRESENTATIVE GARVIN:  Uh-huh.

23        REPRESENTATIVE JORDAN:  I would also

24  say, as you brought concerns and others

25  brough concerns, at -- the process -- the

Page 57

1   process is the process.  There was multiple

2   opportunities in this time to produce

3   amendments to the map, if the ver-- if the

4   version didn't like -- if a member didn't

5   like the particular issues within the map.

6   At the end of the day, ultimately, I believe

7   the process worked, the public input process

8   worked, and the Ad Hoc Committee produced a

9   product that was ultimately approved by the

10  full Judiciary, and now sits before you.

11      REPRESENTATIVE GARVIN:  Very good.

12  Thank you, Mr. Jordan.

13      REPRESENTATIVE JORDAN:  Yes, sir.

14      SPEAKER POPE:  Ms. Matthews is

15  recognized.

16      REPRESENTATIVE MATTHEWS:  Thank you,

17  Mr. Speaker.  Representative Jordan, again,

18  thank you for your hard work on this

19  committee.  Did you know that were many

20  questions that we asked that people, really,

21  didn't know the answers to?  But I do have

22  the answers because a lot of the questions

23  were about Charleston County, which I am a

24  part of, and I really, pretty much, know

25  pretty well.  So, I'll make a couple points

Page 58

1    that I am confused about.  One of them is

2    the fact that you keep saying something

3    about process, but if I remember corrects,

4    process was not followed in Judiciary when

5    this came out, with -- in regards to who was

6    supposed to be first Vice Chair and lead the

7    Committee.  My second point is that, the

8    question was asked about does this split

9    Charleston County, and you gave an answer

10   that you thought that it was kept the way

11   that it was before --

12        REPRESENTATIVE JORDAN:  No, that's not

13   --

14        REPRESENTATIVE MATTHEWS:  Okay, can you

15   please clarify what --?

16        REPRESENTATIVE JORDAN:  I can

17   absolutely clear that.  The question was

18   regarding Beaufort County not being split

19   previously, and Charleston being split in

20   some form or fashion.  If you look at the

21   two maps, you can clearly see that

22   Charleston is split as it was split, not in

23   the same -- I'm not saying in the same

24   places, or the same percentages, but

25   Charleston County was in fact a split county

Page 59

1  in the prior version and is in fact a split

2  county in this version.  The -- and I -- I

3  apologize for any confusion on that issue.

4       REPRESENTATIVE MATTHEWS:  No, it's

5  okay.  I'm -- let me take my mask off.  What

6  Rep Cobb-Hunter was asking you was, were the

7  communities of color split?  And I don't

8  know if you know this about me, but I'm

9  really particular about being clear.  So,

10 let me be very clear, it was split.  The 1st

11 Congressional District was given the white

12 areas of Charleston County, and

13 Congressional District 6 was given the black

14 areas of Charleston County, predominantly.

15 So, to -- the answer to her question, if you

16 look at the data on your screen right now,

17 in Congressional District 1, if you go to

18 track 54, that's where you see the

19 Charleston County.  If you go for six, is

20 track 51, that's where you'll see the list

21 for Charleston County.  And when you look at

22 the way those tracks were split, it is very

23 clear, based on where people live how those

24 were split.

25       I also would like to just add, for the

Page 60

1    record, since you had a lot of statements

2    for the record, that I don't really

3    understand why West Ashley was cut in half,

4    and it put John Island in six.  Because I

5    thought we were supposed to keep communities

6    of interest together, and that, for me, was

7    a little confusing.

8        REPRESENTATIVE JORDAN:  So, several

9    points I would like to address in there, and

10   going back to some things I've already said.

11   Communities of interest, compactness,

12   multiple criterias that we attempt to look

13   at, in figuring out balancing these

14   congressional districts off each other.  I

15   would say, be careful to look at any one

16   small particular area.  You know, when

17   you're looking at over 700,000 people across

18   a congressional district, it can be easy to

19   just focus on one area, but remember, we're

20   looking at the entire area as a whole.  And

21   I said to Representative Cobb-Hunter, you

22   can look at the percentages from 2010 and 11

23   to now, and clearly see it's not packed and

24   there's a difference there.  Did you have

25   another question?

1      REPRESENTATIVE COBB-HUNTER:

2   (Inaudible).

3      SPEAKER POPE:  Ms. Cobb-Hunter is

4   recognized.

5      REPRESENTATIVE JORDAN:  Is that it?

6      SPEAKER POPE:  Ms. Cobb-Hunter is

7   recognized.

8      REPRESENTATIVE COBB-HUNTER:  Thank you

9   so much, Mr. Speaker.  Let me, if I may, Mr.

10  Jordan, again, just trying to make sure I'm

11  clear on how we're doing things now and how

12  they've been done in the past.  I'm still

13  curious about the Committee's criteria, and

14  how all of that was ranked and applied.  Did

15  the Committee have a criteria that was

16  established for each district?

17     REPRESENTATIVE JORDAN:  Do we have a

18  copy of that? We have --

19     REPRESENTATIVE COBB-HUNTER:  How you

20  ranked criteria?  Like you talked about

21  compactness, contiguity.  So, my question is

22  whether or not the Committee had -- so, is

23  that -- oh, (inaudible), I'm sorry.

24     REPRESENTATIVE JORDAN:  No, I just

25  wanted to be able to -- so, to answer your

Page 62

1    question, the Committee adopted one of the

2    very first things -- if not the first thing

3    -- the Committee did was adopt a criteria, -

4    -

5         REPRESENTATIVE COBB-HUNTER:  Uh-huh.

6         REPRESENTATIVE JORDAN:  -- of which we

7    would operate under.  And you're absolutely

8    right, they are -- they -- it starts with

9    the Constitution of the United States, then

10   Federal Law, then State Law, then equal

11   population, then contiguity, compactness,

12   communities of interest, incumbency

13   consideration.  If you follow --

14        REPRESENTATIVE COBB-HUNTER:  Uh-huh.

15        REPRESENTATIVE JORDAN:  -- down the

16   ranking.

17        REPRESENTATIVE COBB-HUNTER:  Okay, and

18   was that criteria applied uniformly across

19   the board at all levels?  You all looked at

20   those things you just read to me as

21   committee criteria?  Was it uniformly

22   applied or was there some application in

23   some districts -- and I'm talking

24   congressional, not House.  I'm just trying

25   to figure out if it was uniformly applied,

Page 63

1    the rankings?

2        REPRESENTATIVE JORDAN:  So, what I

3    would tell you is, you know, it -- there's a

4    reason why it was listed in that order.

5    Having said that, it was the Committee's

6    attempt to employ all of these things in the

7    process of adopting the map.

8        REPRESENTATIVE COBB-HUNTER:  I'm trying

9    to figure out, Mr. Jordan, whether or not --

10   two things, one, was the same rank -- was it

11   -- was it applied consistently, number one,

12   regardless of which of the seven districts

13   we are talking about.  Or whether or not

14   there was come criteria that was applied

15   differently in the 1st and the 6th

16   Congressional District, than in the other

17   five. If that makes sense?

18       REPRESENTATIVE JORDAN:  I would say,

19   the criteria is the criteria.  I don't me to

20   be -- trying to avoid the question, --

21       REPRESENTATIVE COBB-HUNTER:  I got you.

22       REPRESENTATIVE JORDAN:  -- but, you

23   know, we --

24       REPRESENTATIVE COBB-HUNTER:  I got you.

25       REPRESENTATIVE JORDAN:  -- we put that

Page 64

1   before the Ad Hoc Committee, I think it was

2   unanimously adopted, and we attempted to

3   follow it.

4        REPRESENTATIVE COBB-HUNTER:  I was just

5   trying to figure out if it was higher or

6   lower, depending on the Committee's

7   conversation and action?  If I may, just one

8   -- one or two more questions, and these are

9   Voting Rights Act questions.  I know, thanks

10  to the Supreme Court, mainly Chief Justice

11  Roberts, the 2013 decision gutted the Voting

12  Rights Act.  And all protections for voters

13  of color, for disabled voters, all of that

14  was gutted by the Robert's Court in 2013, as

15  it relates to Section 5.  What was still

16  there is Section 2.  Was there a Section 2

17  analysis that was done on these maps?  Did

18  you all do a Section 2 analysis?

19       REPRESENTATIVE JORDAN:  I think --

20       REPRESENTATIVE COBB-HUNTER:  And if you

21  did, may I see the results of that analysis?

22       REPRESENTATIVE JORDAN:  -- what I would

23  -- what I would say is, because I -- you're

24  absolutely right, and there was two --

25       REPRESENTATIVE COBB-HUNTER:  Mr.

Page 65

1   Speaker?  I'm so sorry, but Mr. Jordan's

2   voice is real soft, and your leadership over

3   here --

4        REPRESENTATIVE JORDAN:  Ouch.

5        REPRESENTATIVE COBB-HUNTER:  -- is

6   making way too much noise for me to hear.

7   Would you do something with them?

8        SPEAKER POPE:  Mr. Simrill appears to

9   be leaving.

10       REPRESENTATIVE COBB-HUNTER:  And that's

11  my chairman, too.

12       SPEAKER POPE:  Yeah.

13       REPRESENTATIVE COBB-HUNTER:  I'm just

14  crushed.

15       SPEAKER POPE:  Sergeant, if you would

16  help us maintain some quiet in here?

17       REPRESENTATIVE COBB-HUNTER:  Oh, wow.

18       REPRESENTATIVE JORDAN:  Mr. Jordan, if

19  you'll speak up a little bit.

20       REPRESENTATIVE COBB-HUNTER:  Thank you,

21  Mr. Speaker.

22       REPRESENTATIVE JORDAN:  I'll do my

23  best, Mr. Speaker.

24       REPRESENTATIVE COBB-HUNTER:  Did you

25  say yes, you all did an analysis?

1          REPRESENTATIVE JORDAN:  I would -- I

2    would say this, I -- because I -- you're

3    absolutely right.

4          REPRESENTATIVE COBB-HUNTER:  So, that's

5    no?

6          REPRESENTATIVE JORDAN:  You're

7    absolutely right that the 2013 decision did

8    change the process to some degree.  What I

9    would argue -- thank you, I got ice this

10   time too.  Thank you.

11         CLERK CROMER:  Uh-huh.

12         REPRESENTATIVE JORDAN:  To my

13   knowledge, to answer your question

14   specifically, we did everything in

15   compliance with the law that we were told

16   and required to do.

17         REPRESENTATIVE COBB-HUNTER:  That's a

18   nice lawyer answer.  I'm not a lawyer.  So,

19   does that mean yes, you all did a Section 2

20   analysis? Or no, you did not?

21         UNIDENTIFIED SPEAKER 10:  (Inaudible).

22         REPRESENTATIVE JORDAN:  Right.  To my

23   knowledge, we did everything we possibly

24   needed to do under the terms of the law.

25         REPRESENTATIVE COBB-HUNTER:  Thank you,

Page 67

1   Mr. Chairman.

2        REPRESENTATIVE JORDAN:  Thank you.

3        REPRESENTATIVE COBB-HUNTER:  I will

4   take that as a "no," you did not do a vote -

5   - a Section 2 analysis.

6        REPRESENTATIVE JORDAN:  To my

7   knowledge, we complied with every aspect of

8   the law.

9        REPRESENTATIVE COBB-HUNTER:  You are so

10  good.  Thank you, Mr. Jordan.  Thank you so

11  much, Mr. --

12       REPRESENTATIVE JORDAN:  Thank you.

13       REPRESENTATIVE COBB-HUNTER:  --

14  Speaker.

15       SPEAKER POPE:  Yes, ma'am.  Mr. Thigpen

16  is recognized?

17       REPRESENTATIVE COBB-HUNTER:  Huh?

18       REPRESENTATIVE THIGPEN:  Thank you, Mr.

19  Speaker.  Thank you, Mr. Jordan, for

20  answering questions and staying up there as

21  long as you have.  Do you know that I

22  believe that this is not an easy task?  Did

23  you know that as stated in committee, with

24  this process it's impossible to please

25  everyone?  With that being said, did you

Page 68

1   know that I believe that the greatest tool

2   that we have, in taking on such a difficult

3   task, is process?  Did you know that my

4   concern about the transparency of the

5   process, and the consistency of the process,

6   is what has caused me to rise?  Did you know

7   that?  When we look at the first map that

8   was drawn by the House, in comparison to the

9   second map that we're looking at now, could

10  you tell me what was the primary impetus,

11  primary trigger, difference?  What caused

12  this to go from one map to the next?  I know

13  you may have stated it before, if you would

14  just be so kind as to restate it.

15          REPRESENTATIVE JORDAN:  So, what I

16  would say is, the process was the biggest

17  factor in the change.  As I stated earlier,

18  the Committee took input all -- from all

19  folks across the state.  When it came time

20  for the congressional districts, we pushed

21  out a starting point, just like we did in

22  the House plan.  A starting point.  If you

23  remember in that House plan, that starting

24  point was amended several times during the

25  course of the process that ultimately led to

Page 69

1    what we passed.  The congressional

2    districts, we put out the account staff plan

3    as a starting point.  In my mind, it didn't

4    make a whole lot of sense to put out a

5    starting point for discussion -- or you had

6    to have a starting point for discussion.  We

7    pushed that plan out, we had public

8    hearings, we listened to the public, and we

9    made alterations based on the public input.

10   And the -- some of the concerns that we were

11   raised, we had an alternative plan to

12   discuss.

13        Those plans were at all times on equal

14   footing in the -- in the eyes of the

15   Committee.  Or in the power of the

16   Committee, maybe is a better way to say it,

17   the authority of the Committee.  The

18   Committee met after having time to -- ample

19   time for folks to weigh in, and having time

20   to digest the issues that were presented to

21   the Committee.  And ultimately, the plan

22   that had -- that was voted out is the plan

23   that you see before you.  The only plan, I

24   might add, that was -- that was motioned to

25   be approved and voted on in that process.

Page 70

1  So, I would tell you that -- I hope that's

2  clear, you know, walking through what we

3  did, when we did, kind of, thing.

4      REPRESENTATIVE THIGPEN:  Right, thank -

5  - and thank you too for supplying that

6  answer again.  The question I have,

7  particularly to process, is when input was

8  taken, public input, -- and I know we've

9  weighed heavily on the input, I believe,

10  from Beaufort County.  When we talk about

11  the input from Charleston, and other areas,

12  was there more weight, more partiality -- if

13  you would -- more importance given to input

14  from one area than the next?  Or how did you

15  go about determining prioritizing the input?

16      REPRESENTATIVE JORDAN:  I certainly

17  don't think one area was given any more

18  priority over the other.  I can tell you,

19  just for -- however you -- for whatever it's

20  worth, the volume of input was higher from

21  the folks in Beaufort.  I think, when we

22  added up all the comments, I think roughly

23  85% of the issues came out of Beaufort

24  comparatively.  With the -- as it related to

25  the issue we're talking about.  But

Page 71

1  ultimately, -- I can't remember who asked

2  the question earlier -- it goes back to, I'm

3  simply one vote on the Committee.  And when

4  I analyzed the issues before me -- and

5  again, we could talk about the pros and the

6  cons that have delineated here today on this

7  -- the floor of this -- the floor of the

8  House.  Ultimately, to me, I felt like it

9  made more sense for the version you have in

10  front of you.

11      REPRESENTATIVE THIGPEN:  Right, and I

12  appreciate that.  And again, I am not in any

13  way discrediting the intent.  And I agree

14  with you, in regards to the pros and cons

15  that either could have.  I think you could

16  make pros and cons for anything.  Equally, I

17  think also, with the process being the

18  process, and the criteria being the

19  criteria, would you agree with me that that

20  is something that we can always look at?

21  There's always room for improvement, any

22  process that we have, right?

23      REPRESENTATIVE JORDAN:  A -- the

24  process is what makes us special.  The

25  process is what, you know, -- what we need

Page 72

1  to rely on.

2      REPRESENTATIVE THIGPEN:  Right, and

3  once again, to restate the original

4  statement in question, is that I believe

5  process is so important to what we do,

6  particularly when it comes to transparency.

7  To that regard, when it comes to some of the

8  specifics and statistics that Representative

9  Cobb-Hunter was referencing, i.e., BVAP, in

10  the original plan that was submitted by the

11  House -- the starter, as you named it, and

12  the plan that we have before us now, did

13  that BVAP go up, did it go down?  Did it

14  stay the same?  Was that a target, or a

15  concern or consideration in the rendering of

16  a new map?

17      REPRESENTATIVE JORDAN:  So, if you

18  (inaudible) --

19      REPRESENTATIVE THIGPEN:  In --

20  particularly in Congressional District 1.

21      REPRESENTATIVE JORDAN:  You're talking

22  about District 1?

23      REPRESENTATIVE THIGPEN:  Yes, sir.

24      REPRESENTATIVE JORDAN:  District 1,

25  you're -- and you're comparing the ori-- the

1  alternate version that you have in front of

2  you versus the original --

3       REPRESENTATIVE THIGPEN:  House

4  original.

5       REPRESENTATIVE JORDAN:  -- staff

6  presented --

7       REPRESENTATIVE THIGPEN:  Yes.

8       REPRESENTATIVE JORDAN:  -- plan?  I

9  believe the percentage, --

10       REPRESENTATIVE THIGPEN:  The starter, I

11  believe you called it.

12       REPRESENTATIVE JORDAN:  -- I believe it

13  went down from the first one to the second

14  one.  And if you compare it to District 6,

15  it went down as well.  So, again, you're

16  balancing those two off of each other

17  primarily.  Does that make sense?

18       REPRESENTATIVE THIGPEN:  Yeah, I just

19  want to make sure that I understood you

20  correctly.  So, you're saying that --

21       REPRESENTATIVE JORDAN:  Here, I'll just

22  read you the statistics.

23       REPRESENTATIVE THIGPEN:  Go ahead.

24       REPRESENTATIVE JORDAN:  So, --

25       REPRESENTATIVE THIGPEN:  That would be

1    -- that would be even better.

2         REPRESENTATIVE JORDAN:  -- so, original

3    House plan, 20.27 down to 15.67, 50-point--

4         REPRESENTATIVE THIGPEN:  That's

5    District 1?

6         REPRESENTATIVE JORDAN:  -- 50.67 to

7    47.57.  So, you know, same -- similar

8    percentage --

9         REPRESENTATIVE THIGPEN:  (Inaudible) --

10        REPRESENTATIVE JORDAN:  --

11   neighborhoods, but adjusted as I just

12   described.

13        REPRESENTATIVE THIGPEN:  Okay.  Thank

14   you.

15        REPRESENTATIVE JORDAN:  Thank you, sir.

16        SPEAKER LUCAS:  Ms. McDaniel, did you

17   have a question for Mr. Jordan?  Yeah.  Is

18   that up, down?

19        REPRESENTATIVE MCDANIEL:  (Inaudible).

20        SPEAKER LUCAS:  Ms. McDaniel is

21   recognized.

22        REPRESENTATIVE MCDANIEL:  Thank you,

23   Mr. Speaker.  Thank you, Mr. Jordan.  I just

24   want to commend that committee on all of the

25   hard work that you guys did.  I did watch

Page 75

1    many of the sessions via the internet.  But

2    I have just a few questions, if you don't

3    mind?  And just trying to make sure I

4    understand processes, since this is my first

5    time going through this.  When the green --

6    is that District 6?  Can I -- where --

7    where's your -- may I hold that?  Okay,

8    yeah, District 6, where we went down, looked

9    like Beaufort, and picked up Charleston.  It

10   looked like we was about to make a complete

11   circle and we changed our mind?  Is that the

12   part where I'm hearing there's concern about

13   where Charleston is split?

14        REPRESENTATIVE JORDAN:  So, I'm sorry,

15   say that again?

16        REPRESENTATIVE MCDANIEL:  Okay, if

17   you're looking at District 6, and you go all

18   the way down by the coast?  And let me --

19   and let me preface by stating, I worked in

20   Charleston for six years, so I have a lot of

21   friends and associates that are still in

22   Charleston.  So, I do have an intricate

23   interest in Charleston, as well as my

24   district, which is District 6.  But in

25   District 6, it goes all the way down to the

1  coast, and I see Charleston written on the

2  map, and it almost made a circle, but it did

3  not.  It looked like it went around Berkley

4  County.

5      UNIDENTIFIED SPEAKER 11:  She said one

6  and six.

7      REPRESENTATIVE MCDANIEL:  Am I looking

8  at the right map?

9      REPRESENTATIVE JORDAN:  So, here --

10 here's what I would say do, if you have the

11 -- I think you have some maps in front of

12 you.  The easiest --

13     REPRESENTATIVE MCDANIEL:  This is the

14 right one.

15     REPRESENTATIVE JORDAN:  The easiest way

16 to do it is to compare the 2010 and the plan

17 before you.  And then --

18     REPRESENTATIVE MCDANIEL:  Okay, let me

19 just ask the questions then, so I don't have

20 to do that.  What percentage -- oh, any

21 commonsense person would think that when the

22 census came in, that Charleston grew -- if

23 I'm not mistaken -- more than any of the

24 other districts, is that correct?

25     REPRESENTATIVE JORDAN:  Parts of

Page 77

1   Charleston grew, yes.  For instance, --

2        REPRESENTATIVE MCDANIEL:  What --

3        REPRESENTATIVE JORDAN:  -- Mount

4   Pleasant, if you remember, we have a new

5   House district --

6        REPRESENTATIVE MCDANIEL:  What --

7        REPRESENTATIVE JORDAN:  -- there,

8   because of the exploding population,

9   particularly on the coastal area.

10       REPRESENTATIVE MCDANIEL:  Okay, is

11  Mount Pleasant a separate county, or is this

12  part of Charleston?

13       REPRESENTATIVE JORDAN:  Mount Pleasant

14  is part of Charleston.

15       REPRESENTATIVE MCDANIEL:  Okay, so

16  Charleston is one of the counties that grew

17  more than any other county, correct?

18       REPRESENTATIVE JORDAN:  Correct.

19       REPRESENTATIVE MCDANIEL:  Okay, so I

20  think the concern is, why would we split

21  Charleston?  Now, when I worked down in

22  Charleston, there was some sense of -- I

23  don't know how to say it, (inaudible) --

24  except just say it, that there -- that the

25  folk in Charle-- in North Charleston was a

Page 78

1  whole lot different from the people that was

2  on the -- on the bottom side of Charleston.

3  On the side of Charleston downtown and going

4  up -- and going across to Mount Pleasant and

5  all those areas.

6       REPRESENTATIVE KING:  Uh-huh.

7       REPRESENTATIVE MCDANIEL:  So, what was

8  the motivation to actually split Charleston

9  period?  Because I was thinking that as we

10  were drawing these maps, the counties that

11  were larger, most -- were in most part,

12  since the numbers were increasing, would be

13  the counties that we would make whole.  So,

14  what was the appetite for (inaudible) -- for

15  splitting Charleston?

16       REPRESENTATIVE JORDAN:  Well, remember,

17  -- something we've talked about previously -

18  - we're dealing with not particular

19  counties, we're dealing with that 700-plus

20  thousand people population that we have to,

21  --

22       REPRESENTATIVE MCDANIEL:  Okay.

23       REPRESENTATIVE JORDAN:  -- you know,

24  divide up and put into groups equally.

25       REPRESENTATIVE MCDANIEL:  Okay, so --

1        REPRESENTATIVE JORDAN:  So, --

2        REPRESENTATIVE MCDANIEL:  -- how many

3   people do we have in Charleston? How many

4   people lives in Charleston?

5        REPRESENTATIVE JORDAN:  I don't have

6   the total, but I'm getting to your question

7   here.  So, in the prior version, if you look

8   at it you can see Charleston was actually

9   split in two places.  So, it was always

10  split previously.  This version actually, in

11  my opinion, makes it better by minimalizing

12  that spit-- split down to one.

13       REPRESENTATIVE MCDANIEL:  Okay, but

14  that does not seem to be what I'm hearing

15  from most of the people I know that's still

16  lives in Charleston.  And people who are

17  concerned about if we had started with

18  Charleston and kept it whole -- which I'm

19  hearing a lot of Beaufort wanted to be part

20  of Charleston, and I'm also hearing that if

21  we kept Beaufort and Charleston together,

22  there still would have been room for other

23  people of that -- to put in that district.

24  So, if we had kept Charleston and Beaufort

25  whole, and started with that district first,

Page 80

1  then we could have went around and made the

2  other districts.

3       REPRESENTATIVE JORDAN:  Well, --

4       REPRESENTATIVE MCDANIEL:  Because --

5       REPRESENTATIVE JORDAN:  -- may I -- may

6  I answer that?

7       REPRESENTATIVE MCDANIEL:  Yeah, go

8  ahead.

9       REPRESENTATIVE JORDAN:  So, I would

10  point you back to a comment that I consider

11  very applicable, that Representative Thigpen

12  made a little while ago.  You know, picking

13  and choosing -- you know, you have to start

14  from somewhere, I'm not saying that.  But

15  saying, you know, one county is any more

16  favored than the other was not the process.

17  Again, I -- back to that criteria that we

18  applied, ultimately taking into

19  consideration the bigger point, which was

20  getting those equal populations in all seven

21  congressional districts.  So, just saying

22  Charleston -- as much as I love Charleston -

23  - has a priority over other counties, --

24       REPRESENTATIVE MCDANIEL:  Okay, so then

25  which county did we start with, as it

Page 81

1    relates to starting to draw onto the maps?

2         REPRESENTATIVE JORDAN:  Well, in the

3    version you're looking at now, we

4    essentially -- the starting point was the

5    prior map that we lived under for ten years,

6    that we look-- that we knew was legally

7    appropriate, and Department of Justice

8    approved.  I would also tell you -- and

9    again, I think you have the sense, maybe,

10   that we're picking on Charleston.  Most

11   larger counties are split.  Greenville,

12   Spartanburg, Richland all have splits to

13   accommodate this idea of making the

14   populations add up to that 700-plus thousand

15   equal number.

16        REPRESENTATIVE MCDANIEL:  Okay.  Okay,

17   Rep Jordan.  Now, you do know that when you

18   all drew my House district, you all did go

19   into my district and make a community whole

20   that was not whole before?

21        REPRESENTATIVE JORDAN:  Now, be

22   careful, I don't -- I don't mean -- I mean,

23   what I mean by be careful is, be careful to

24   compare the House process and district.

25   Remember --

Page 82

1          REPRESENTATIVE MCDANIEL:  No, no, no.

2     I'm not speaking relative to process; I'm

3     speaking relative to keeping communities

4     whole.

5          REPRESENTATIVE JORDAN:  You're --

6          REPRESENTATIVE MCDANIEL:  So, there was

7     an appetite to make a community whole that

8     was once split.  So, I guess I'm trying to

9     figure out why it wasn't an appetite to keep

10    Charleston whole, being it's one of the

11    counties in the state that brings in a lot

12    of revenue, we have the Port down there.  We

13    -- I mean, that's where most of the people

14    who are moving from up North are moving to

15    Charleston.  So, I'm just still trying to

16    understand that appetite of not keeping

17    Charleston whole?  Particularly in light of

18    the concern that we keep hearing from most

19    of the individuals who are in that district,

20    as well as the ones who are in Congressman

21    Clyburn's district.  Which I wouldn't even

22    mind (inaudible) District 5, if you would

23    have brought Clyburn's district on up to

24    District -- up to Fairfield, so that we

25    would have had an opportunity to probably

1  have a chance to be elected to Congress.

2      REPRESENTATIVE JORDAN:  So, what I

3  would say goes back to a point I made to

4  Representative Govan a little while ago.  I

5  would love it if we could just use county

6  lines, and the population all clicked into

7  place, and we didn't have to split

8  Charleston, or Greenville, or Spartanburg,

9  or Richland.  Which I think you would agree,

10  are all, you know, important counties in

11  South Carolina.  But I keep coming back to

12  this overriding concept that we have, to

13  make -- to make -- to follow the criteria, -

14  -

15      REPRESENTATIVE MCDANIEL:  Uh-huh.

16      REPRESENTATIVE JORDAN:  -- which you

17  can't pick and choose, they're all involved

18  in this process.

19      REPRESENTATIVE MCDANIEL:  Uh-huh.

20      REPRESENTATIVE JORDAN:  But at the same

21  time, make the math work out and have,

22  substantially, the exact same number of

23  people living in each of these seven

24  congressional districts.

25      REPRESENTATIVE MCDANIEL:  Well, I'm

Page 84

1  going to commend you for standing up there

2  and taking all of the questions that we have

3  asked you.

4      REPRESENTATIVE JORDAN:  Well, that's

5  about --

6      REPRESENTATIVE MCDANIEL:  But --

7      REPRESENTATIVE JORDAN:  -- to stop.

8      REPRESENTATIVE MCDANIEL:  -- but I

9  think that in some of the explanations, the

10 rehearsal, or the repetition, this is great.

11 But I do believe that we could have done a

12 better job, and I think with Charleston

13 being one of our largest and one of our most

14 productive counties in this state down on

15 the coast, it should have been stayed -- it

16 should have stayed whole, so that all of the

17 revenues would flow up together coming from

18 Charleston, while we kept -- keep

19 communities whole.  And I don't know how

20 much time you've spent in Charleston, but I

21 think North Charleston and Charleston

22 together would have done a lot to pull those

23 communities together, and make Charleston a

24 much better county overall.  Versus that

25 split between North Charleston and downtown

Page 85

1   Charleston.  But thank you.

2       SPEAKER LUCAS:  Mr. King is recognized.

3   Mr. King.

4       REPRESENTATIVE KING:  Thank you, Mr.

5   Speaker and colleagues.  I want to start off

6   by saying, I'm concerned with the conduct of

7   the meeting of the Judiciary Committee on

8   Monday, January the 10th, 2022.  The rules

9   of the Judiciary Committee are clear.  Rule

10  one states, that the first vice chair shall

11  preside over a committee meeting in the

12  absence of the chairman.  As the chairman

13  was absent from the meeting, the rules

14  required that I, in my capacity, as the

15  first vice chair, preside over the meeting.

16  Yet this did not happen.  Instead, another

17  representative presided over the meeting,

18  per written designation of the chairman that

19  cited unspecific, extra-ordinary

20  circumstances, as justification for this

21  unprecedented deviation from the normal

22  operating procedures of the Committee.  The

23  meeting was held in violation of the

24  Committee rules, and constituted a breach of

25  decorum in the House of Representatives.

```
 1          We are a body that functions according
 2    to established rules and procedures.  Yes,
 3    we are ruled by the majority, but the rights
 4    of the minorities, and the rights of
 5    individual members must -- and I say must --
 6    be respected.  Dis-procedure irregularity is
 7    particularly concerning because it took
 8    place during a meeting on congressional
 9    reapportionment.  The majority broke its own
10    rule.  Let me restate that, the majority
11    broke its own rule, in order to get this
12    bill to the floor today.
13          And when we look at the map, you can
14    see why.  It is because this map is
15    gerrymandered.  It was drawn to elect six
16    Republicans and only one Democrat.  It
17    cracked and packs African American
18    communities, thus diluting the power of
19    African Americans to -- African Americans to
20    influence elections.  This map breaks up
21    counties and cities, in order to put as many
22    black folk, or black voters, into one
23    district.  Look no further than the
24    Lowcountry.  Look no further than Charleston
25    County.  A county that is nearly one quarter
```

Page 87

1    black.  Rather than keep Charleston County

2    whole, as the people have Charleston have

3    testified again and again that they want,

4    this map splits the county.  I was told in

5    committee on Monday, that the 1st

6    Congressional District is supposed to keep

7    coastal communities together in one

8    committee of interest.  That makes sense to

9    me.

10        Why then does this map go out of its

11   way to remove coastal communities in

12   Charleston County? I think John's Island and

13   -- if I pronounce it right -- Wadmalaw

14   Island, have much more in coming with

15   Charleston and Beaufort than downtown

16   Columbia.  Yet under this map, both of those

17   islands are in the same District as downtown

18   Columbia, more than 100 miles away.

19        As we vote for this map today, I would

20   have to vote against it.  As I stated in

21   committee on Monday, it is apparent -- it is

22   apparent that if you look at the map, the

23   heavily African American areas were placed

24   in Congressional District 6 to ensure that

25   Republicans win six of the seven

1  congressional districts in this state.  As

2  I've stated earlier, Congressional District

3  5 has no voice and no vote on these maps in

4  subcommittee.  As I've state before, there

5  are members on Judiciary that are from

6  Congressional District 5, who were

7  overlooked I the past.  Since we're looking

8  and have spoken about all day today by the

9  chairman, that we wanted to be as closely in

10  line with what we did in the past

11  reapportionment and redistricting process.

12  That process was done by the election

13  commiss-- committee of Judiciary.  That was

14  not that -- that was not done this time.

15      So, if we look at what has happened

16  during this process, it is important for me

17  to point out that if you look at who the

18  senior member is, and who has gone through

19  the process on Judiciary before of

20  redistricting, that is myself.  If you look

21  at the process, as to who sits on Election

22  Laws Subcommittee from the 5th Congressional

23  District, that is me, Representative John

24  King.  There was very effort to keep me out

25  of the process, starting with the selection

Page 89

1    of the Committee.  Also, going into Judici--

2    Judiciary meeting on Monday, to circumvent

3    the rule where it says, "you shall, you

4    shall, upon the absence of the chair, the

5    vice chair chairs the Committee." To those

6    that are listening outside of the four walls

7    of these chambers, look and listen --

8         UNIDENTIFIED SPEAKER 12:  That's right.

9         REPRESENTATIVE KING:  -- to what I'm

10   saying.  And they're saying that the process

11   is transparent, open, and honest.  It has

12   not been.  It has not been.  The small

13   things that you all have done.  The small

14   things that you have done has given this a

15   black eye, when you could have been above

16   board about the process.  If the shoe fit,

17   wear it.  Whoever needs to hear this, wear

18   it.

19        I cannot sit by and not say something

20   when you have blatantly disrespected me as a

21   member of this body.  This is the most

22   important piece of legislation that we will

23   take up in this chamber, because this piece

24   of legislation -- and when I say

25   legislation, I'm talking about

Page 90

1    reapportionment and redistricting -- will

2    affect generations.  And those generations

3    have some of my bloodline in it.  It has

4    some of my bloodline in it, because my

5    nieces, nephews, cousins, will have to live

6    with the decisions that we make.  If we're

7    going to have rules, let's follow them.  If

8    you don't follow the rules, why have them?

9    You came up here to fast track this piece of

10   legislation by having the chairwoman of

11   Rules come up here.  But I go into

12   Judiciary, and the rules that we put in

13   place were not followed.  I'm not even sure

14   if this piece of legislation can even come

15   to the floor, because the procedures of what

16   we are supposed to do in Judiciary, by the

17   rules, were not followed.

18        And the first thing that I was taught

19   when I was elected, and the speaker at that

20   time was Bobby Harrel, and we were in the

21   Block Building, and they brought us in for

22   orientation.  Two things they told us, your

23   word is your bond, learn the rules and

24   you'll do well here.  I've always tried to

25   be honest, where you may not agree with me,

Page 91

1    but I tell you how I feel, and you don't

2    have to wonder.  If you ask me something and

3    I give you an answer, you can take it to the

4    bank.  I will not lie to you.  I've tried to

5    learn the rules and respect the rules.  And

6    it is disheartening, regardless of how you

7    may feel about me, it is disheartening when

8    you walk into a committee meeting, and the

9    rules are not followed, and you're

10   disrespected.

11        Mr. Speaker and colleagues, I'm

12   disappointed.  I'm disappointed in my

13   colleagues, and Mr. Speaker, I would hope

14   that you as the leader of this chamber,

15   would ensure that the rules that are put in

16   place are followed.  And let me say this,

17   this is by no way a jab at my colleague who

18   ran the meeting.  And let me be very clear

19   here, he's more than capable of conducting

20   any meeting, but the process, and the rule

21   was not followed.  And I don't take it

22   lightly, because it's not about me, it's

23   about this institution.  And when we, as

24   members of this Chamber disregard the

25   established rules that we vote on and put

1  forth, it hurts this institution that we all

2  say we care and love.

3      So, while we may be up here voting for

4  these maps today, what do we send -- or what

5  message do we send to the general public

6  when we can't even follow the rules in which

7  we have established in our committees and in

8  this chamber?  But we'll sit up here and

9  make laws to put people in jail when they

10  don't follow the rules of this state.

11      Mr. Speaker, I think it's dangerous.  I

12  think it's dangerous when we have rules that

13  we circumvent to bring a congressional map

14  out here.  But more importantly, a

15  congressional map that does nothing but

16  empowers one particular party for the next

17  10 years.  Take away the race and how you

18  packed and cracked black districts, but more

19  importantly, why you made -- I -- I'm

20  concerned about every South Carolinian being

21  able to have an opportunity to run for which

22  ever party they run in, but have a fair

23  chance.  A fair chance, and an opportunity

24  to run for office and not be voted down

25  before they even put the name as a

1  registered person to run for office.

2      It's not a good day in South Carolina,

3  it's a sad day in South Carolina.  And

4  Representative Gilliard and I, a few years

5  ago, for the members who were not here,

6  when then Governor Nikki Haley made it a

7  part of her administration to have everyone

8  answer the phone, "it's a great day in South

9  Carolina."  We put up a bill that said, "no,

10  it's not." It's not a great day in South

11  Carolina, and I'm not going to pretend like

12  it is.  We've got children suffering in this

13  state.  We've got old folk that can't even

14  keep their homes, because we're taxing them

15  out.  And Wendy Brawley, Representative

16  Brawley, puts up something that would help

17  those folk, and we vote it down.  But we'll

18  rush a bill that gives Republicans more

19  power in this state.  We're fast to change

20  the rule when you're afraid of who maybe the

21  chair.  All I have to do is follow the

22  rules, I have to conduct the meeting, what

23  more can I do? But you want to answer the

24  phones, "it's a great day in South

25  Carolina," when you have segments of this

1    community, of this state, who feel left out?

2    Who feel unappreciated? And we're up here

3    drawing maps that will affect people for

4    years to come, and then you wonder why

5    private loan don't want to move to South

6    Carolina?  Or better yet, when we have

7    people who are here in South Carolina, who

8    want to stay here, they have to leave

9    because they don't have opportunities, or

10   they don't feel like they have

11   opportunities, to want to stay here.

12       We come up here every year and argue

13   about how many students come here from out

14   of state, and go to different institutions

15   around this state, and then they leave, and

16   we have given them scholarships and they

17   don't stay in South Carolina.  It's because

18   of the craziness we do in this room.  People

19   don't want to come to a state where we're

20   divided and can't do things right.  People

21   are looking at us.  I've been in South

22   Carolina my entire life, I love this state,

23   when I graduated from Morehouse, I had job

24   offers all over the country, as most men of

25   Morehouse have, because that's what they

Page 95

1    pride themselves on.

2         UNIDENTIFIED SPEAKER 13:  Excuse me.

3         REPRESENTATIVE KING:  And while you may

4    laugh, honestly, they focus on that, career

5    planning and placement.  But I chose to come

6    back home, because I love South Carolina.

7    South Carolina has been good to me, it's

8    been good to my family, but I can't say the

9    same for my nieces and my nephews in

10   reference to staying in this state.

11        We have to do better.  And to vote for

12   these gerrymandered maps, which pack and

13   crack African American areas of this state,

14   it's not right.  Absolutely, not right.

15   There's no way if you look at this map, you

16   can make Beaufort whole, go down, take all

17   the black folk, put them in Congressional

18   District 6.  Crack it, divide it, whatever

19   you want to call it, so that you weaken the

20   voices of the people of District 1.  All

21   because there's been a Democrat there

22   before, we've got to go in there and we've

23   got to make sure that no Democrat don't win

24   that congressional seat no more.  Make it

25   competitive, as it was.  Heck, a Democrat

Page 96

1    had it, Republican had it.  Then it went

2    back to the Republican.  It was a

3    competitive district.

4         So, those that are listening, who are

5    preparing to sue South Carolina?  Yes, this

6    is party driven lines.  And how did they do

7    it?  Cracked the black districts and packed,

8    and put them all in Congressional 6.  Now, I

9    respect my congressman, but I think he needs

10   competition over in Congressional District

11   5.  I believe that we all should have an

12   opportunity, regardless of if you are a

13   Democrat or Republican, to run for those

14   seats and not be counted out before you even

15   start.  I'm pretty sure Congressman Clyburn

16   wouldn't mind giving up some black folk to

17   make other districts competitive in this

18   state, because he's under the belief that

19   he's done a great job.  People have seen his

20   work, and they'll vote for him.  But it

21   seems as if Republicans are afraid of

22   competition.  Do your job, people vote for

23   you, regardless of if your Democrat or

24   Republican.  There are some Democrats and

25   some Republicans that are in heavy

Page 97

1   republican districts or democrat districts.

2   It's the person.  But you all want to crack

3   and pack, in order to accomplish your goal

4   of 10 years of non-competitive districts.

5       Us today, maybe you tomorrow, because I

6   remember when South Carolina was a Democrat

7   state.  And guess what, Democrats shared

8   power.  But when it's time for someone to

9   serve as a chair, according to the rules,

10  Republicans change the rules.  Without even

11  -- without two thirds vote of the Committee.

12  By just a written letter by one person, the

13  chair of the Committee.  Remember, John

14  today, maybe you tomorrow.  Because the

15  rules don't just affect me, it affects

16  everyone in this room.  Every one of us in

17  this room.  We got to live in this state

18  together, you all.  We've got to start doing

19  what's right for the people of South

20  Carolina.  And today was the day to start by

21  drawing fair maps, which allows every voice

22  to be heard in every district.  Obviously,

23  the congressional people didn't care,

24  because when we asked Representative Jordan,

25  had any of them participated in the process,

Page 98

1   they didn't say -- they didn't care, because
2   he said that no one reached out to him from
3   the congressional people.  Unlike everyone
4   in this room, when it came down to our
5   districts, we were involved, because we
6   wanted to ensure that the communities of
7   interest stayed intact.  Oh, they didn't
8   have to worry about it, because they knew
9   they was going to pack all the black folk in
10  Congressional 6.  They were going to go down
11  into Charleston and crack it a little bit to
12  make Congressional 1 stronger for the
13  Republican.  And they were assured once they
14  did that, all the rest of them were going to
15  be taken care of.
16       So, to answer your question, Ms.
17  McDaniel, the map started with Congressional
18  6.  They had to make sure all the black folk
19  were put with Clyburn.  Then they went
20  around that and created all the others.  So,
21  that's how the map was created.  They were
22  going to get you one Democrat.  And how do
23  you do that?  We crack and we pack.  So,
24  while you may not know the answer, or they
25  may not give it to you, I can assure you,

Page 99

1  that's how it was created.  That was that

2  rule.  The rule was, and the instructions

3  was, we got to get Jim Clyburn, Congressman

4  Clyburn out of the way, because then that

5  way we can get all the Republicans elected

6  across the other six congressional

7  districts.  So, we're going to pack all the

8  black folk from Richland County and all over

9  into Congressional District 6.  They -- I'm

10  surprised they didn't come to Fairfield,

11  because you all are heavily African

12  American.  I guess they had to give

13  Congressman Norman just a little bit of

14  black folk.

15      So, as you continue this process, don't

16  think that people in this state are

17  delusional as to how this process has

18  faltered, has been -- has gone the way that

19  the Republicans were instructed to do it.

20  And because I'm vocal, they started there.

21  Senior member, only one been through

22  redistricting as a House member?  No, no,

23  no, he isn't going to be on that committee,

24  talks too much.  Come around -- see, let me

25  tell you about me, I'm honest, I know what

Page 100

1  you say about me so it don't matter.  And I

2  know I talk.  But one thing people know in

3  House District 49 -- and my colleagues will

4  tell you, because I get on TV up there --

5  what I say here, I say it back home.  When I

6  walk in places in my district?  Go in some

7  of the store up there, they got my picture

8  up.  Representative King in my district.

9  They trust me, because I'm always honest

10 with them.  I have people who call me on my

11 phone and say, "Representative King, I don't

12 like how you voted, I isn't voting for you."

13 I said, "that's your prerogative, don't vote

14 for me." I don't come down here to be

15 elected for two more years.  My time might

16 be out in June.

17      UNIDENTIFIED SPEAKER 12:  That's right.

18      REPRESENTATIVE KING:  But you're going

19 to know I've been here for the last 12 to 13

20 years.  I'm going to leave a mark.  And if I

21 get elected again, only God's grace.  But

22 the two years that he has blessed me with,

23 I'm going to do what I have to do for my

24 constituency.  So, yeah, until this process

25 change, and we are respected in this body,

1    we will never move forward in this state.

2    And I know you all have it in you to do the

3    right thing.  But I'm glad I'm of a party --

4    and when I'm saying -- I'm talking about the

5    Democratic Party, I'm glad that Trav

6    (phonetic) know not to call me and tell me

7    how to vote.  I'm glad I'm of a party that

8    doesn't put pressure on me and tell me I

9    have to tow the party line, because they

10   recognize that each one of their members who

11   sign up to run as a Democrat has a

12   constituency that they have to represent.

13        I'm sorry you all have to go through

14   that, because I wouldn't be of a party that

15   it had to be dic-- they have to be dictating

16   to me what I have -- what I can and cannot

17   do.  That I can't be an individual.  Because

18   I know from the conversations I have with

19   you all, and then I watch your vote, I know

20   that can't be who you really are.  Because

21   you all are some good people up in here, but

22   some of you are controlled by the wrong

23   party, or the wrong people.

24        I don't get very religious up in here,

25   but it's times like this that hurt.  But my

Page 102

1  mother always says, before I leave to come

2  down here, she'll say, "John, it'll be all

3  right because the God we serve, --" I never

4  leave home without my mother praying,

5  silently, every morning.  I walk downstairs,

6  I find my mom on her knees praying for each

7  one of her children.  I'm baffled and hurt

8  that this elected body would disenfranchise

9  people of this state for at least the next

10  10 to twenty years.  10 years, the tables

11  could be turned.  I've seen people up here

12  who have voted on bills, that have come back

13  and apologized, said "I was on the wrong

14  side."  And I believe -- whole heartedly

15  believe, that some of you will be saying

16  that in the very near future.

17      Mr. Speaker, I'll take any questions if

18  there are any, but I want to thank you all

19  for listening to me.

20      SPEAKER LUCAS:  Ms. Matthews, you have

21  a question? You're recognized.

22      REPRESENTATIVE MATTHEWS:  Thank you,

23  Mr. Chair.  Representative King, did you

24  know that when I heard what happened to you,

25  I was utterly disturbed?  And I guess, the

1  first thing that came to my mind is the

2  question that I will ask you, is when that

3  happened did any one of the Republicans in

4  the room stand up and say, "this isn't

5  right, we need to do what is supposed to be

6  done?"

7      REPRESENTATIVE KING:  Representative

8  Matthews, no one.  No one.  Rep-- no one

9  said anything.

10     SPEAKER LUCAS:  Gilliard, did you have

11 a question, sir?  Mr. Gilliard is

12 recognized.

13     REPRESENTATIVE GILLIARD:  Thank you,

14 Mr. Speaker.  Thank you.  Is this on?

15     REPRESENTATIVE KING:  Uh-uh, but I hear

16 you.

17     REPRESENTATIVE GILLIARD:  Well, I want

18 everybody to hear me.  One, two, thank you.

19 Mr. Speaker, I think of -- point of -- my

20 question is to you and the Clerk, Mr.

21 Speaker.  Point of information, I have a

22 question?

23     SPEAKER LUCAS:  Yes sir, Mr. Gilliard?

24     REPRESENTATIVE GILLIARD:  Let's say

25 that what Representative King so eloquently

1  stated, that the parliament-- parliamentary

2  procedure was circumvented, is what I wanted

3  to say.  Let's say that did happen.  What's

4  the rules of the House for that committee

5  that when you look at S. 865, this Amendment

6  here, is this legit?  If that by virtue of

7  what happened, as he stated in that

8  committee meeting?  Because he was

9  overlooked, his responsibilities.  So, the

10  procedure was broken at that point.  So,

11  anything that came out of that committee,

12  during the -- that day, that particular day,

13  like Representative King stated, is this, S.

14  865 Amendment legit?  Should we be

15  entertaining this?  That's my question.

16       SPEAKER LUCAS:  Okay.  You raising that

17  question as a point, Mr. Gilliard?

18       REPRESENTATIVE GILLIARD:  Yes, sir.

19       SPEAKER LUCAS:  Okay, well here's my

20  understanding of the rule, and how it

21  applies.  We have committees, and we have

22  the House floor, and we have rules for

23  committees, and we have rules for the House

24  floor.  Mr. King, in his argument, is

25  referencing a rule, I believe, that refers

1    to the first Vice Chair.  There are a couple

2    of rules that deal with the issue of who

3    presides in a committee meeting, and how

4    that can be monitored.  Needless to say, a

5    committee enforces its own procedural

6    committee --

7          REPRESENTATIVE GILLIARD:  Right.

8          SPEAKER LUCAS:  -- rules.  So, it's up

9    to that committee to deal with a procedural

10   violation, if it is raised in that

11   committee.  Once it is dealt with, and it's

12   a procedural violation, then I can't deal

13   with it on the floor.  So, if the argument

14   is that a procedural rule is broken in the

15   Judiciary Committee, can the Speaker of the

16   House somehow go down to the committee level

17   and rectify that?  I cannot.  So, that would

18   -- that motion would not be appropriate for

19   the floor, Mr. Gilliard.

20         REPRESENTATIVE GILLIARD:  Okay.

21         SPEAKER LUCAS:  Do you have a question

22   of me, Dr. Thigpen?  Of Doc-- Mr. King?

23         REPRESENTATIVE THIGPEN:  Yes, sir.

24         SPEAKER LUCAS:  Dr. Thigpen?

25         REPRESENTATIVE THIGPEN:  Thank you, Mr.

Page 106

1  Speaker, for not only your explanation of

2  the rules, both of the Committee and the

3  House, but also for recognizing me for this

4  question for Representative King.

5      Representative King, I too, do you

6  know, was concerned about what took place in

7  Judiciary as I was there.  Do you know that

8  I thought that you handled it well, with

9  great decency and civility, as I would

10  expect of you?  Did you know that beyond

11  your personal concern, as it relates to not

12  only you, but this entire body, and what we

13  do moving forward, not even this particular

14  bill, rules, procedures, and our policies

15  that govern us -- our adhering to them, is

16  vitally important?

17      REPRESENTATIVE KING:  Most definitely.

18      REPRESENTATIVE THIGPEN:  Would you --

19      REPRESENTATIVE KING:  And I -- let me -

20  - let me say this to you, my discussion of

21  the rule violation that happened on Monday

22  is not about me.  I want to be very clear.

23  It's about this institution that we all say

24  we love.  And if we have rules that are in

25  place regardless of who the person is, we

Page 107

1  have an obligation to follow the rules.

2      REPRESENTATIVE THIGPEN:  Would you

3  agree with me in saying that we all seek to

4  operate in good faith and not bad faith?

5      REPRESENTATIVE KING:  Most definitely.

6      REPRESENTATIVE THIGPEN:  That our

7  desire to come here is for the betterment

8  of, not only our state, but this body?

9      REPRESENTATIVE KING:  Yes, sir.

10      REPRESENTATIVE THIGPEN:  Would you

11  agree that rules not only protect the

12  person, but it even protects us from

13  ourselves, as well as protects the integrity

14  of the institution.  Would you agree with

15  that?

16      REPRESENTATIVE KING:  My point exactly.

17  So, I agree with you, and that's what I've

18  been trying to say in reference to ensuring

19  that we follow the rules, because of the

20  integrity of the institution.

21      REPRESENTATIVE THIGPEN:  Would you

22  agree that rules serve the wheel of the

23  majority, but also seek to protect the

24  minority?

25      REPRESENTATIVE KING:  That is what it's

1    supposed to do.

2       REPRESENTATIVE THIGPEN:  In what took

3    place, and what we see happening now, my

4    concern, did you know, is that as we

5    decrease in number as the minority party,

6    that heavy becomes the mantle on the

7    majority party, to adhering to rules and

8    regulation.  Not for the sake of me, or you,

9    or this legislative body, but particularly

10   for precedent that we set.  Did you know

11   that?

12      REPRESENTATIVE KING:  Yes.

13      REPRESENTATIVE THIGPEN:  And as much as

14   I believe, and want to believe, and have

15   good faith in the intent of individuals

16   beyond the intentions, because good

17   intentions pave a great pathway to hell.  It

18   must be the rules and the regulations, and

19   the policies and procedures that guide us,

20   so that at the end of the day, regardless of

21   whether we are Democrat or Republican, or

22   what position we hold, on any committee, it

23   is what allows us to rise above those

24   things, and do what is not only most

25   efficient, but what is in the best interest

1  of the wheel of the entire body.  Did you

2  know that?

3      REPRESENTATIVE KING:  Yes.  Let me say

4  this to you, Dr. Thigpen.  I still don't

5  understand why the rule was not followed.

6  As a member of the Judiciary Committee, if

7  I'm the chair, I have to still follow the

8  rules, I have to conduct the meeting in

9  order.  And so, what bothers me, is if you -

10  - and I've stated this before, is the entire

11  process, if you look at it from my vantage

12  point, the entire process was to circumvent

13  any involvement of myself.  Because if you

14  go back and look at how we have done

15  redistricting in the past, it was done

16  through election laws, in which I sat on.

17  Okay? Secondarily, we had one of my members

18  from my Congressional District, when -- in

19  which I respect and know he would have done

20  an amazing job, could not serve, for

21  whatever particular reason.  Yet, they left

22  that seat vacant, after I've called and

23  inquired about being on redistricting and

24  reapportionment.  Okay? So, let's put it out

25  there.  Then I get to a meeting on Monday

1   where I'm supposed to serve as the chair,

2   because the chair was not there.  A letter

3   from the Chair comes in, that says he

4   appoints another one of my colleagues.

5   Okay? According to any rules, I would

6   assume, to establish the rules, or to change

7   the rule, I think it takes two-thirds vote,

8   which did not happen in committee, which you

9   sat in on.  A letter was written.  So, what

10  I'm -- as you have stated, we have now set a

11  standard, because it was allowed.

12      REPRESENTATIVE THIGPEN:  Well, did you

13  know that I too share in your alarm, I too

14  share in your concern.  Did you know that I

15  want to thank you for taking the time to

16  come and address this?  I also wanted to say

17  that I do understand that there are persons

18  who have different interpretations of rules.

19  Do you know that I also understand that

20  there were other remedies that were

21  available to the Committee to act, i.e.  the

22  example that you just gave, that tit could

23  have been brought to a two-thirds vote.

24      REPRESENTATIVE KING:  Representative --

25      REPRESENTATIVE THIGPEN:  And --

1        REPRESENTATIVE KING:  -- Representative

2    --

3        REPRESENTATIVE THIGPEN:  -- did you

4    know that they quite possibly could have

5    even had the two-thirds vote there.

6        REPRESENTATIVE KING:  Representative

7    Thigpen, let me say this to you, I'm not

8    going to give people an out on

9    interpretation.  Interpretation says,

10   "shall," S-H-A-L-L, okay? So, there is no

11   other interpretation but shall serve, okay?

12   So, if we are having people that can't

13   interpret, or understand the definition or

14   the meaning of shall, then we're in trouble

15   with this state.

16       REPRESENTATIVE THIGPEN:  Well, I'll go

17   to my seat on this final question.  Did you

18   know that what concerns me most is that when

19   presented, even though it was noted your

20   objection, we did not take an action, even

21   an action as to vote as to how the majority

22   at that point felt?  And I do believe, did

23   you know, that the responsibility of

24   upholding the fairness, the good faith of

25   this body, is increasingly more and more on

1    the majority party as they gain more seats,

2    did you know that?

3        REPRESENTATIVE KING:  Well, you mention

4    about gaining more seats, that was a part of

5    the cracking and packing in what we were

6    doing and what's happening up here.  So, we

7    have issues.  I will publicly state and put

8    in the record that I believe what we are

9    doing today should not even happen, based

10   on, we did not follow the rules of the

11   Committee.  Which means you voted out a bill

12   where a fully constitutional -- or

13   constituted meeting didn't happen, because

14   the rules were not followed.  And for those

15   attorneys that are waiting to sue South

16   Carolina for these maps, go pick up the

17   rules for the House Judiciary Committee, and

18   show that South Carolina didn't even follow

19   its own rules to conduct a meeting to even

20   discuss the congressional maps.  So, as I

21   take my seat, I hope that the ones of you

22   who are in the chamber, who took your

23   responsibility, what your constituents sent

24   you down here for, I appreciate you standing

25   here and listening.  Because we don't always

Page 113

1    agree or like what the other person has to

2    say, but you stayed in here.  And for those

3    Republican and Democrats that didn't?  I hope

4    their constituents are looking at them.

5    This is the most important piece of

6    legislation that are doing, and members are

7    not even in this room.  Regardless of you're

8    listening or not, people are watching you,

9    they see that you're in your seat.  And

10   isn't that much talking in lobby, so you

11   can't go home and tell your constituents,

12   "Well, I was outside talking to a

13   constituent online," you've been gone all

14   day.  So, I appreciate the ones of you that

15   have stayed in here, and you have listened

16   to my concern with the map, my concern with

17   the process.  I appreciate you and I thank

18   you.

19        And Mr. Speaker, as we move forward,

20   and as we work together to try to make South

21   Carolina better, I hope that you will

22   encourage each one of us, regardless about

23   how we may feel about someone, to follow the

24   rules.  Follow the rules that we have put in

25   place to conduct our meetings.  Mr. Speaker,

1  it starts with the head.  And I am asking

2  you, as my speaker, who I voted for, to

3  serve me and my colleagues, to ensure, so

4  that we can all work together to ensure that

5  the rules are followed, and that they are

6  fair, and interpreted not for your benefit,

7  for the benefit of the citizens of South

8  Carolina.  Thank you, Mr. Speaker.

9        SPEAKER LUCAS:  Thank you, Mr. King.

10  Ms. Brawley is recognized to speak on the

11  Amendment.  Members, the pending question, -

12  -

13        REPRESENTATIVE COBB-HUNTER:

14  (Inaudible).

15        SPEAKER LUCAS:  Ms. Cobb-Hunter? Ms.

16  Cobb-Hunter is recognized to be heard on

17  Amendment 1.  Ms. Cobb-Hunter.

18        REPRESENTATIVE COBB-HUNTER:  Thank you

19  so much, Mr. Speaker and members.  I'm not

20  going to be here long, I just wanted to come

21  up and make sure that there was clarity on

22  the point and the questions that I raised

23  for Chairman Jordan regarding Section 2, and

24  whether an analysis had been done on the

25  Congressional District maps per Section 2 of

1  the Voting Rights Act.  Let me back up and

2  remind you, for some of you who are not --

3  this is all new to you, there is something

4  called the Voting Rights Act that is being

5  fought in the Congress right now, which has

6  been around for decades, which has been

7  reauthorized for decades by Republican

8  Administrations, and Republican Presidents

9  signed it into law.  We are at a point in

10  our history now where voter participation

11  seems to be of interest depending on who is

12  participating.  What I am concerned about,

13  Mr. Speaker, in addition to all of the

14  points that have been raised by my

15  colleagues about the process, is the voter -

16  - the adherence to the voting rights act.

17  For those of you in here who are attorneys,

18  you may recall that there is something

19  called the 1965 voting rights act, which

20  protects the rights, mainly, of voters of

21  color, of handicap or disabled voters, and

22  people who have problems accessing the

23  polls.  We used to have, prior to 2013,

24  before Chief Justice Roberts decided in his

25  infinite wisdom, along with the majority of

Page 116

1   accord at that time, to remove section 5

2   from the Voting Rights Act.  Section 5

3   required preclearance among other things.

4   And all that simply said is that before a

5   state could sign off or pass a vote -- a

6   redistricting plan, that it had to be

7   precleared by the department of justice.

8   When that was eliminated in 2013, that

9   pretty much, for all practical purposes

10  gutted the Voting Rights Act.  But what it

11  did leave was Section 2.  And when we talk

12  about tools in our tool kit, what it did

13  leave was one little lynchpin what people

14  who are concerned about access to voting

15  could hang their hat on.  When I raised the

16  question with Mr. Jordan, about whether an

17  analysis of Section 2 had been done, and he

18  is a very skilled attorney, but I never

19  quite got a yes or no answer from him.  And

20  so, from my perspective, if it's pretty

21  clear-cut, I think it's very easy to say,

22  "yes," or "no." The fact that I got a

23  lawyer's response, to me, suggests that

24  perhaps a Section 2 analysis had not been

25  done.  Let me tell you why that is important

1    for purposes of this conversation.  If there

2    is not a Section 2 analysis that has been

3    done, what that allows is for districts to

4    be cracked and packed.  Mr. Speaker, could I

5    get a little order back in here? I know that

6    people aren't interested in what I have to

7    say, but I'm not going to be very long.

8        SPEAKER LUCAS:  All right.

9        REPRESENTATIVE COBB-HUNTER:  But when

10   I'm distracted by sounds it makes me talk

11   longer.

12       SPEAKER LUCAS:  House -- House will be

13   in order.  You're doing a good job, Ms.

14   Cobb-Hunter.  They're doing a pretty good

15   job, but I'll see if I can get everybody to

16   keep their seats, keep their conversations

17   outside and not in the chamber.  Ms. Cobb-

18   Hunter.

19       REPRESENTATIVE COBB-HUNTER:  Thank you

20   so much, Mr. Speaker.  You know, Mr.

21   Speaker, next session, we need to think

22   about what we can do about that little back

23   wall back there.  I don't know if it's a

24   magnet or something, but it seems to attract

25   people in conversations.  It's empty now,

Page 118

1    but it's really distracting when you're up

2    here trying to make your point and you hear

3    a bunch of stuff.  But thank you, Mr.

4    Speaker for getting order for me.  Here's

5    the point I'm trying to make to you, when

6    Representative Matthews, following up on our

7    question to the chair, gave you the specific

8    areas, and the precincts, and the census

9    blocks in Charleston that had been shifted,

10   Mr. Speaker and members, it is clear that

11   whether we want to own it or not, there was

12   serious cracking and packing done in the 6th

13   Congressional District and the 1st

14   Congressional District.  Without a Section 2

15   analysis, that gives the Committee and

16   thereby this body the authority to sign off

17   on that.  Mr. King talked about process, a

18   committee process, what I would like you to

19   think about for future reference, is a

20   process as a whole.  You may recall that

21   there is legislation right now in the

22   Judiciary Committee which would change the

23   way that we draw lines, and this entire

24   process.  Whether we want to do it or not,

25   we, meaning those of us who were blessed and

1  highly favored enough to be in these chairs

2  and across the hall.  Whether we want to or

3  not, a large portion of the public here in

4  South Carolina is interested in not having

5  politicians pick voters, but having voters

6  pick the politicians.  And so, I offer that

7  to you in the for what it's worth

8  department, because Mr. Speaker, one of the

9  things that is most troubling about this

10  Amendment, and one of the main reasons that

11  it will be voting against this Amendment, is

12  because it eliminates, in my view, the

13  competitiveness of Congressional District 1.

14  What we've done, and Ms. Matthews was clear

15  in her annunciation of those precincts and

16  those census blocks that were in that --

17  that have been moved around.  What we did,

18  in effect, was as move all the black people

19  out of Congressional District 1 that are in

20  Charleston County, and pack them into the

21  6th Congressional District.  Because we

22  didn't do a Section 2 analysis, that allows

23  that to be done.  What we've done, by saying

24  that we're going to, on one hand, keep

25  communities of interest together, goes back

Page 120

```
 1   to the point that Representative Kambrell

 2   was making.  It is unclear to me how we can

 3   see commonality between Richland Northeast

 4   and Charleston County.  That's quite a

 5   stretch and quite a distance.  And I think

 6   Mr. Kambrell, very eloquently, made that

 7   point.  And I would remind you all that we

 8   need.  To not just talk the talk, but walk

 9   the walk, if we are serious about keeping

10   communities of interest together.  And Mr.

11   Speaker, at the risk of blasphemy, let me

12   say that the Senate has shown us the way.

13   The Senate has today, as I understand it,

14   released a map that has Charleston County

15   and Beaufort County whole, and in one

16   district.  So, this business about we

17   couldn't do it shouldn't be we couldn't do

18   it, we chose not to do it.  And there is a

19   big difference.  And so, Mr. Speaker, I

20   appreciate the patience that the members

21   have shown for the most part, except some

22   ppl who are just rude by nature and can't do

23   any better.  But I really want us to

24   understand the gravity of what we are about

25   to do.  And I would encourage those of you
```

1    who believe that we ought to have a

2    redistricting process that requires us to

3    speak to voters about issues that are

4    important to us.  We need to have a

5    redistricting process that makes these seats

6    more competitive, and that's on both sides

7    of the isle.  Because I'm a firm believer,

8    Mr. Speaker, that the seats belong to the

9    people not to individuals.  And I know that

10   there are some of us on both sides of the

11   isle who get it twisted.  Some of us think

12   of these seats as our seats, and they're

13   not.  The seats belong to the people, the

14   people have a right to make a change at

15   whatever point they choose to do so.  So, I

16   just wanted, as I pointed out, Mr. Speaker,

17   to stop by and say from this podium what was

18   attempting to say from my seat, and that is

19   without a Section 2 analysis, which I don't

20   think was done on this plan, that opened the

21   door for the Committee, whether intentional

22   or not, to crack and pack people of color

23   into a district that's already designated as

24   a district held by a person of color.  So,

25   why do we need to add more people of color

1    to that district? What we in effect did, in

2    my opinion in this map, is to remove enough

3    voters of color from the 1st Congressional

4    District, and thereby affecting voters of

5    color in the 1st Congressional District to

6    be able to support a candidate of their

7    choice, or influence I should say, a

8    candidate who may be of a different

9    political party.  And so, with those of you

10   who are here, and this is your first bite at

11   the apple, as far as redistricting is

12   concerned, I would encourage you, especially

13   those of you who are Democrats, who are more

14   likely Mr. Kambrell, to be here in ten

15   years, let this be a teachable moment for

16   you.  Let this be an opportunity to learn

17   what not to do.  An di would encourage

18   Democrats to look within its own caucus, to

19   look in the mirror, and before we start

20   (inaudible) pointing fingers at the

21   Republicans and what they did or didn't do

22   in this plan, we need to understand that a

23   person can't ride your back unless it's

24   bent.  And if we don't have a strategy, if

25   we don't have the kind of leadership that

Page 123

1    will bring us together, and arrive at a

2    common goal, than this is what's going to

3    happen.  My final comments, again, is a

4    message that hopefully will be resonant with

5    you in eight years when we start doing this.

6    You ought to be now, and I'm talking

7    strictly to Democrats, here's how you

8    prevent all of this from becoming the major

9    issue that it is now, in my opinion.  You

10   stop whining and complaining, and then get

11   off your butts and do some work.  And what

12   do I mean by that? We know that the

13   redistricting is based on the census count.

14   We know that the previous administration did

15   everything they could to make sure that

16   people were not counted.  We know that .And

17   what I've said to anybody who will listen,

18   we know what the problem is, we've seen it,

19   we experienced it.  We need to learn from

20   this, Ms. McDaniel.  And those of us who

21   call ourselves Democrats, instead of sitting

22   around, whining about what we think we've

23   lost, we need to be out here mobilizing with

24   community-based groups, getting the word

25   out, educating our communities about the

1  importance, Mr. Clyburn, of the census, and

2  responding to the census.  Anything else is

3  a waste of time, a waste of energy, and a

4  waste of effort.  And so, I leave you with

5  this challenge, those of you who will be

6  here in 2020, and Mr. Speaker, I'm looking

7  at these young Democrats who are in here,

8  Ms. Wetmore, and Ms. Johnson, and Mr.

9  Kambrell, and all of these good people.  Ms.

10  (Inaudible) and Mr. Gilliard, you'll be here

11  too.  You aren't as young as them, but I

12  just got faith that you're going to be here.

13  And so, I'm hoping you will lead the charge,

14  Mr. Gilliard, and remind these young people

15  of how important leadership is in everything

16  we do.  Leadership matter, the lack of

17  leadership matters even more.  And so, as I

18  take my seat, Mr. Speaker, thank you for

19  allowing me to come up, and to have my say.

20  I appreciate it, but I wanted to make sure

21  that I had an opportunity to explain to you

22  why I will be voting no on this Amendment.

23  Thank you so much, Mr. Speaker.  I don't

24  think there are any questions, but I would

25  be more than happy to respond if there are.

1   I think everybody's probably ready to go.

2   Thank you, Mr. Speaker.

3        SPEAKER LUCAS:  Thank you, Ms. Cobb-

4   Hunter.  All right, members, pending

5   question is the adoption of Amendment 1.

6   All those in favor, --

7        REPRESENTATIVE COBB-HUNTER:  Roll call.

8        SPEAKER LUCAS:  -- Ms. Cobb-Hunter

9   requests a roll call, do nine members second

10  her request? Nine do, a roll call is

11  required and ordered.  We'll vote on the

12  board.  Again, the pending question is the

13  adoption of Amendment 1.

14       SPEAKER LUCAS:  Time has expired.

15  Polls will close, clerk will tabulate, by a

16  vote of 73 to 35, Amendment 1 is adopted.

17  There being no further amendments on the

18  desk, Mr. -- Mr. Govan, for what purpose to

19  you rise? The pending question is passage of

20  Senate Bill 865 as amended.  Mr. Govan has

21  asked to be hard on the Bill and is

22  recognized.  House will be in order.  Let's

23  give Mr. Govan your attention.

24       REPRESENTATIVE GOVAN:  Thank you, Mr.

25  Speaker.  Members of the House, I'm not

1    going to be very long, I think you have --

2    in fact, I'm not going to be long at all.  I

3    think you've heard from my colleagues, in

4    terms of various arguments, in terms of with

5    the regards and the concerns about this

6    particular plan.  But I would be remiss if I

7    not -- if I did not stand here and share

8    with you the ramifications in terms of what

9    we're about to do in terms of passing this

10   Amendment in lieu of what was said.  And I

11   see now that we have more members who have

12   come in, who missed some very eloquent

13   points that were made by my colleagues.

14        SPEAKER LUCAS:  Mr. Govan? Let me get

15   you to suspend a minute.  House will come to

16   order.  Mr. Govan, we're not going to start

17   back until we have order.

18        REPRESENTATIVE GOVAN:  Thank you, Mr.

19   Speaker.  And I think it's important -- I

20   think it's important for this body to really

21   understand why the concern was brought up

22   the way it was brought up.  And why what we

23   are doing is important, because we are at a

24   critical point in the history, not of --

25   only of this state and nation, and which

1    individuals are becoming increasingly,

2    instead of coming together in good will and

3    making good public policy, we seem to be

4    getting caught up int eh weeds.  And instead

5    of looking out for the people, we seem to be

6    caught up into the weeds of partisanship and

7    division.  And just knowing some of the

8    people that I have -- I've had the pleasure

9    of meeting since being in this body, I know

10   all of you all don't feel that way, but we

11   are all kind of pushed one way or another in

12   terms of taking some of the positions that

13   we've had.  But let me just very quickly say

14   this, and -- two points and I'll take my

15   seat, because I don't know how many more

16   opportunities, I'll have an opportunity to

17   stand at this podium.

18        But first and foremost, I want to speak

19   to the issue of my rep-- my good friend and

20   colleague, Representative King, who serves

21   on the House Judiciary Committee, who spoke

22   so eloquently about the rules.  I'll never

23   forget, a good friend and former speaker of

24   this body, who I served under when he first

25   -- when I first arrived in this body in '92

Page 128

 1    -- I started serving in '93, at the

 2    beginning of the session -- by the Bob

 3    Sheheen, and he talked -- spoke so

 4    eloquently, talking about the House of

 5    Representatives and what it meant, and the

 6    process.  Never forgot that.  And for those

 7    who have never been through a

 8    reapportionment, who have been here 10 years

 9    or less, or maybe this is just your first --

10    those who have been here and this is for

11    first, this body is only as good as the

12    respect that we give one another, and show

13    one another.

14         And there's a reason why we have a

15    Rules Committee.  There's a reason why this

16    House has rules that govern its actions, and

17    the decisions.  There's a reason why if in

18    case many of you haven't noticed it, that

19    when a speaker just doesn't come up with a

20    ruling off the top of his head, and he turns

21    to the Clerk of the House, and there is a --

22    an -- a document in the back there of all of

23    the rulings by the Speaker of the House that

24    have been made in this body that they're

25    referred to, so that we can have consistency

Page 129

1    in which the rules are applied.  I don't

2    know if many of you all know that, but there

3    is a document back there that does that.

4    And we are blessed to have a clerk of the

5    House, who has been here long enough, that

6    is thoroughly familiar with most of that

7    back there, unless he has to refer to a

8    specific ruling by a previous speaker.  That

9    allows consistency, and that allows this

10   body to operate in such a way that it should

11   be consistent in terms of the rules.  And

12   so, it is the same way in terms of the

13   committees.  And so, I don't want us to miss

14   out on this moment of understanding what

15   Representative King has shared with you.

16   And this is no disrespect to the current

17   chair, or anybody else in this body.  But if

18   this body is not going to operate by the

19   rules that we set for ourselves, then what

20   is the use of adopting rules when we come

21   here at the beginning of the session, Ms.

22   Brawley? What is the ready for it then, if

23   we're not going to follow the rules?

24        The second thing is this, and I'll move

25   on from my colleague, Representative King.

Page 130

 1    I know what it's -- I know what it means to

 2    feel disrespected in this body at the

 3    committee level.  And for Mr. King to serve

 4    as first Vice Chair of the Committee, and

 5    all of a sudden, for some reason, having

 6    been elected to that position but not been

 7    afforded to run a meeting, I can understand

 8    how that feels.  If that's the case, then

 9    why have elected individuals in those

10    positions of any standing committee in this

11    body, or any other committee? Why have a

12    first Vice Chairman, or second Vice

13    Chairman? Why have these particular

14    individuals that are elected by you, members

15    of this body, if we're not going to afford

16    them the respect that we've elected them to

17    serve to allow them to serve.  And so, for

18    those of you who heard what he said,  I --

19    and I'm hoping that you weren't in the back

20    and not paying attention --that means every

21    person sitting in a committee, regardless of

22    whether they're a Democrat or Republican,

23    regardless of if they are black or white,

24    regardless of whether they are male or

25    female, the bottom line is all of us want to

Page 131

1   feel respected, Mr. Williams.  And you can't

2   cherry pick, you've got to be consistent.

3   And if you don't feel an individual can

4   handle that responsibility, why elect them

5   in the first place?

6        Now, I want to mention this because

7   we're on camera, and we have people all over

8   this state who look upon us to set the tone

9   and the example.  You have students, you

10  have parents, and you have other

11  constituencies out there watching us, as

12  we're supposed to represent a body that is

13  supposed to lead.  And if we can't lead by

14  example, then how can we truly call

15  ourselves leaders?  And as someone once

16  said, "that's all I want to say about that.

17       My second and final point is this,

18  there are a few of us who consider ourselves

19  historians in this body, been around a

20  little while.  But this whole debate and

21  argument about this plan, the passage of

22  this bill, let me tell you, over the past 50

23  years -- and these are facts, and I

24  challenge anybody if they want to question

25  it, to research it.  The fact of the matter

1    is this, for the past 50 years, in the state

2    of South Carolina, the redistricting process

3    has required court intervention and

4    prolonged litigation.  Let me say that

5    again, because I want you to understand

6    this.  For the past 50 years, the way we

7    have handled this process has ended up in

8    court, because we didn't do it the right

9    way.  And at some point, ladies and

10   gentlemen, this has got to stop.  And there

11   are some of us who believe so much in this

12   body, even though there are many times we

13   end up on the short end of the stick.  There

14   are some of us who still believe that this

15   process matters, that this body matters, and

16   that we have sacrificed in terms of time and

17   effort to come up here, regardless of

18   whether we win or lose on a vote, that this

19   service in this body -- that it's a

20   privilege, still matters.  That democracy

21   works and this all still matters.

22         Let me give you an example, and let's

23   just go back quickly.  In the year -- in the

24   2010 election cycle, did you know that it

25   took nearly four months to adjudicate the

1    redistricting plans in Backus v.  South

2    Carolina?  We ended up in court.  Filed --

3    the lawsuit was filed in November, the court

4    held hearings on various motions to dismiss

5    it for a couple of months, and then held the

6    trial.  That was just in 2000-- that's going

7    through the 2010 cycle.  Well, what about 10

8    years prior to that?

9        Let's go back to 2000.  South Carolina

10   House Judiciary Committee received the

11   census data, went through the process, and

12   after expedited discovery -- some of you all

13   remember that, I think some of you all had

14   just gotten here.  We had a trial, the trial

15   ran for almost two months, and in March, the

16   court ended up issuing a remedial

17   redistricting plan to ensure that no further

18   elections were conducted under invalid

19   plans.  That's what happened in 2010 -- I

20   mean, 2000.

21       1990, back when I was elected, in '92,

22   '93.  Well, in '90, the census was put out

23   there, and we went through that process.  It

24   was released in '91.  However, much like

25   today, the legislature dropped the ball, and

1  so, without passing maps or a plan, or

2  creating a special session to do so, we dot

3  sued, the state got sued, and it ended up

4  that it wasn't until 1992, they moved the

5  date of the primary, they knew -- moved all

6  that.  That's when I got elected,

7  Representative Clyburn.  I'll never forget,

8  they drew the -- one map drew me in one

9  district, the other map, you know, drew the

10  line right by a railroad track, and we ran

11  for the House, and we've been here ever

12  since.

13      What about 1980?  1980, I'll never

14  forget, I was working across the hall there,

15  as a page in the Senate, and then in Senate

16  research.  And we found a three-judge panel,

17  had to basically intervene and draw a plan

18  because of a lawsuit that was a filed at

19  that time by the NAACP.  1984, gave us, for

20  the first time in the history of this state,

21  since reconstruction, African Americans to

22  serve in the State Senate.  And I'll never

23  forget the proud moment and day, that I.

24  DeQuincey Newman in 1984 became the first

25  African American to serve.  And it was

1  especially significant for me, be there were

2  only two individual who worked in the

3  Gressette building that were African

4  American, that were not pages, and I'm proud

5  to have been one of them.  And then, if you

6  go back to 1970.  Of course, we all know

7  that in the 70s, with the litigation that

8  was filed, they gave African Americans a

9  presence in this body for the first time

10  since reconstruction.

11       So, the point is this, you know,

12  there's an old saying, and you all have

13  heard that staying it -- saying, I think

14  Albert Einstein was the one that came up

15  with it, if you keep on doing the same thing

16  over again, you're going to get, basically,

17  the same results.  I got to believe, because

18  my time in this body is probably shorter

19  than it is longer.  But if someone who

20  sacrifices -- who have committed his life to

21  serving this state, I got to believe that

22  we're going to work to -- we should be

23  working together to make this state as one -

24  - one of my colleagues said, "for a better

25  place for all of us." I got to believe that

Page 136

1    the people that are coming out here, coming

2    up here, being sent up here are truly

3    committed to service all the people of South

4    Carolina, and that instead of regressing,

5    what we're committed to progressing.  And

6    so, I don't know if that will change a whole

7    lot of minds, it probably won't, but I

8    wanted to get it off my chest, because we

9    can do better.  If not us, then who?  And if

10    not now, because it has to begin, when?

11    When?  It's not about us, it's about the

12    people who have given us the honor and

13    privilege of serving.  We should never

14    forget, not only where we come from, but

15    those whose shoulders we stand upon.  Thank

16    you, Mr. Speaker.

17        SPEAKER LUCAS:  Thank you, Mr. Govan.

18    Pending question, second reading of Senate

19    Bill 865, as amended by this body.  Roll

20    call is required and ordered; we'll vote on

21    the board.

22        SPEAKER LUCAS:  Ladies and gentlemen,

23    if the House will come to order, to my left

24    at the back of the chamber, under Thomas

25    Jefferson, I believe, is former member Mandy

1  Powers Norrell, let's welcome her back.

2      SPEAKER LUCAS:  Polls will close, Clerk

3  will tabulate.  By a vote of 74 to 35,

4  Senate Bill 865 is amended by the body,

5  receives second reading.  All right,

6  members, House will come to order.  If

7  you'll take your seat, we're about to get

8  out of here in just a moment.  Please,

9  Sergeant, if you could assist me to get

10  members in their seat?

11      Members, we obviously -- we have some

12  very, very sad news about one of our

13  members, as you all noticed today,

14  Representative Robinson-Simpson --

15  Representative Robinson, excuse me, was not

16  here today.  She has been out in California

17  with her son, Basheer, who has been battling

18  cancer.  And she is back in Greenville now,

19  but I'm sorry to report that Basheer lost

20  his life.  I can tell you that on the sad

21  days here are the days we lose members,

22  which has happened.  I can remember at least

23  three occasions, where a member has lost a

24  child, and I don't think I can think of

25  anything sadder than that.  So, what I would

Page 138

1   ask you to do is to stand in memory of

2   Basheer Robinson, and let's silently go to

3   the Lord in prayer for Leola and her family.

4   Thank you all so much.  Thank you to reach

5   out and touch Leola sometime over the

6   weekend and let her know we love her, and we

7   miss her.  How sorry we are for her loss.

8        All right, members, I'm going to

9   entertain a motion tomorrow, remember we

10  came in at two today, we come in at 10 on

11  Thursdays -- continue to do that.  So, that

12  being said, Mr. Taylor has moved that the

13  House adjourn to meet at 10 a.m. tomorrow.

14  All in favor say, "aye."

15       ALL:  Aye.

16       SPEAKER LUCAS:  Opposed, no?  The aye's

17  have it.

18            (End of recording.)

19

20

21

22

23

24

25

1                    CERTIFICATE

2

3                    - - -

4

5        I, Alexandria Brobst, Transcriptionist,

6    do hereby certify that I was authorized to

7    and did listen to and transcribe the

8    foregoing recorded proceedings and that the

9    transcript is a true record to the best of

10   my professional ability.

11

12       Dated this 19th day of January, 2022.

13

14

15

16   _____

17   Alexandria Brobst

18

19

20

21

22

23

24

25