*SC NAACP v. Alexander,*
D.S.C. Case No.  3:21-cv-03302-MGL-TJH-RMG

# Exhibit C

Page 1

1              UNITED STATES DISTRICT COURT
               DISTRICT OF SOUTH CAROLINA
2                  COLUMBIA DIVISION


3
    THE SOUTH CAROLINA STATE
4   CONFERENCE OF THE NAACP,


5   and


6   TAIWAN SCOTT, on behalf of
    himself and all other
7   similarly situated persons,


8        Plaintiffs,


9   v.                    CASE NO.: 3:21-cv-03302-JMC-TJH-RMG


10  HENRY D. MCMASTER, in his official
    Capacity as Governor of South Carolina;
11  HARVEY PEELER, in his official capacity
    As President of the Senate; LUKE A.
12  RANKIN, in his official capacity as
    Chairman of the Senate Judiciary
13  Committee; JAMES H. LUCAS, in his
    official capacity as Speaker of the
14  House of Representatives; CHRIS MURPHY,
    in his official capacity as Chairman
15  of the House of Representatives
    Judiciary Committee; WALLACE H. JORDAN,
16  in his official capacity as Chairman
    of the House of Representatives
17  Elections Law Subcommittee; HOWARD KNABB,
    in his official capacity as interim
18  Executive Director of the South Carolina
    State Election Commission; JOHN WELLS,
19  JOANNE DAY, CLIFFORD J. ELDER,
    LINDA MCCALL, and SCOTT MOSELEY,
20  in their official capacities as
    members of the South Carolina State
21  Election Commission,


22       Defendants.
    _____/

23
                 TRANSCRIPTION OF PROCEEDINGS
24             Wednesday, January 19, 2022
      File Name:  20220119SJudiciaryFullCommittee11673_1.mp4
25         Run Time:  01:17:25 (hours, minutes, seconds)

Confidential

SCNAACP_CD_006846

1                          * * *

2         SENATOR RANKIN:  All right, guys.  Ladies and

3    gentlemen, Madam Court Reporter, welcome back.  We are

4    going to start this out of orderly called meeting,

5    obviously, due to our delay yesterday.  And glad to

6    see everybody's here with us and the sun's shining.

7    Maybe there's a little ice on the road in upstate, I

8    don't know.

9         But we will now start the full judiciary

10   committee with the single purpose of taking up the

11   congressional redistricting plan.  And so, hopefully,

12   before us today will be two options, which the

13   subcommittee last Thursday advanced both to the full

14   committee for debate and consideration.

15        And so rather than restate the long, long

16   recitation of what has happened with this entire

17   subject beginning in August until today, I will

18   dispense with that and we will go right into the bill

19   itself.

20        And correct me if I'm wrong, but we have a shell

21   bill 966, which is what we introduced last week to

22   effectively receive and amend whatever we adopt here

23   today and to get that up and on the floor.

24        There was a -- and there still is a court

25   deadline effectively, but we're, again, loosely

Confidential

SCNAACP_CD_006847

1  adhering to that, which required at its initial stage

2  that we had to -- the House and Senate had to come to

3  a resolution with a plan by yesterday, the 18th.

4      That deadline does not appear to be hanging over

5  us here.  But nonetheless, we do plan to get this bill

6  out of this committee and to the floor and hopefully

7  see what happens there and get it back to the House.

8      And so that, procedurally, kind of a little

9  history of where we are and what our intentions are.

10  (Indiscernible) your question.

11      SENATOR HUTTO:  I can -- these are really long.

12  Is there just a picture?  Do you have the pictures to

13  go along with this?

14      SENATOR RANKIN:  There are pictures.  And those

15  pictures, which is a plan, a map --

16      SENATOR HUTTO:  Yeah, yeah, the map.

17      SENATOR RANKIN:  -- is what you're talking about.

18      SENATOR HUTTO:  That's what I'm asking about.

19      SENATOR RANKIN:  That's -- that was produced on

20  our website, and it is in your notebook as well.

21      SENATOR HUTTO:  It's in the notebook.  Okay.

22      SENATOR RANKIN:  Yeah.  And so there are two

23  options there:  Amendment 1 and Amendment 2 and/or 2A,

24  I guess.  So we'll jump into those in a second.

25      But bottom line, again, our goal is to -- with

Confidential

SCNAACP_CD_006848

Page 4

1    this shell bill, and then we're going to turn it over

2    to the subcommittee members with their competing plans

3    for our consideration today.  Obviously, have the

4    election for these districts set and beginning in 22.

5    We provide for the repeal of the current congressional

6    districts, except that they would be continuing in

7    effect for filling vacancies.

8         Third, the President, the Senate, and Speaker

9    have an unconditional right to intervene in any state

10   or federal court action concerning these, provide

11   intervening or participating litigation would not be a

12   waiver of our privilege.  24-hour notice from the

13   Attorney General of a complaint concerning the valid

14   -- validity, excuse me, of this act.

15        Then we authorize and empower the President, the

16   Speaker, again, to employ attorneys for this

17   litigation in the defense of our legislative or

18   congressional districts.

19        And then, similarly, authorize the President or

20   the Speaker to participate in the litigation regarding

21   the redistricting.

22        Again, this is -- this -- this -- effectively,

23   the shell bill of what we have before us.  And now, we

24   have in your notebooks six tabs, obviously, plan -- a

25   House plan, the Senate Amendment 1 and Senate

Confidential

SCNAACP_CD_006849

1    Amendment 2 and 2A.

2        So Senator Campsen, as the author of Senate

3    Amendment 1 at our subcommittee, I'm going to turn it

4    over to Senator Campsen Now to discuss that, and then

5    we'll turn it over to Senator Harpootlian on the other

6    side.

7        So Senator Campsen.

8        SENATOR KIMPSON:  (Indiscernible), Mr. Chairman.

9        SENATOR RANKIN:  Senator Kimpson?

10       SENATOR KIMPSON:  Thank you, Mr. Chair.  If -- if

11   the Senator could just refer to the tab, if we could

12   just have reference to the tab numbers as we discuss

13   these plans, I'd appreciate it.  Thank you.

14       SENATOR RANKIN:  Very good.  It looks like you

15   might be in our building.  Are you quarantining from

16   one of us in particular or maybe you're not in our

17   building.

18       SENATOR KIMPSON:  I am in the building.  I'm just

19   following some protocol.  You know, I -- we -- I

20   believe in medicine and the science, and we've got a

21   jam-packed room.

22       SENATOR RANKIN:  Okay.

23       SENATOR KIMPSON:  I'm taking precautionary steps

24   to make sure that my children are not exposed to

25   COVID.

Confidential

SCNAACP_CD_006850

1       SENATOR RANKIN:  Not quibbling with that.  You've

2   got the notebook, though, right?

3       SENATOR KIMPSON:  (Nodding affirmatively.)

4       SENATOR RANKIN:  Okay.  Good.  All right.

5   Senator Kimpson.

6       SENATOR MALLOY:  Mr. Chair, I have a question.

7       SENATOR RANKIN:  Senator Malloy.

8       SENATOR MALLOY:  So the -- the status that we --

9   that we're in now with this -- with this bill, I just

10  want to make certain that I understand.  So we -- so

11  we have the shell that's here before us now, correct?

12      SENATOR RANKIN:  Correct.

13      SENATOR MALLOY:  We have a bill that's returned

14  from the House on the floor.  Is that the same bill?

15      SENATOR RANKIN:  It's a Senate bill they returned

16  to us.  That is a different number.  Is it 860?

17      UNIDENTIFIED SPEAKER:  865.

18      SENATOR MALLOY:  865.

19      SENATOR RANKIN:  Yeah.

20      SENATOR MALLOY:  So -- and so the -- so the plan

21  is then to -- to try and pass this bill, but use that

22  as a vehicle?

23      SENATOR RANKIN:  Correct.

24      SENATOR MALLOY:  Okay.

25      SENATOR RANKIN:  We would amend the Senate bill

Confidential

SCNAACP_CD_006851

1    with whatever we adopt here and on the floor and then

2    take that off and send that back to the House.

3        SENATOR MALLOY:  Okay.  And so -- and so the --

4    the only two measures that we have in front of us

5    today is a measure that we have from the Senator from

6    Charleston and the senator from Richland that would be

7    amending this shell bill so that we can have the --

8    the ability for this committee, 23 of us --

9        UNIDENTIFIED SPEAKER:  (Indiscernible).

10       SENATOR MALLOY:  Excuse me.

11       UNIDENTIFIED SPEAKER:  Yeah.

12       SENATOR MALLOY:  We have the -- the 23 of us to

13   then -- to then adopt, make it a committee -- possibly

14   make this a committee report.  Then -- then at some

15   point in time have the committee report attached to

16   the bill in the Senate.  Is that -- the bill in the

17   Senate.

18       UNIDENTIFIED SPEAKER:  As passed by the House,

19   yeah.

20       SENATOR MALLOY:  And return from -- from the

21   House that's -- that's already on our calendar.

22       UNIDENTIFIED SPEAKER:  Correct.

23       SENATOR MALLOY:  Okay.  And so pardon the

24   inquiry, those are the only two amendments that we

25   have on the -- on the bill here in this committee

Confidential

SCNAACP_CD_006852

1  for --

2      SENATOR RANKIN:  For today's purposes, yes.

3      UNIDENTIFIED SPEAKER:  One is the amendment to

4  (indiscernible), and then there's two (indiscernible)

5  amendments.

6      SENATOR MALLOY:  Okay.  And so do we have -- do

7  we know whether or not we have any amendments that are

8  on the bill that is on the floor?

9      UNIDENTIFIED SPEAKER:  Not yet.

10      SENATOR MALLOY:  We don't -- not yet or there is

11  nothing yet?

12      UNIDENTIFIED SPEAKER:  There's nothing yet.

13      SENATOR MALLOY:  Okay.  And so the report is that

14  there's no amendments on the floor, so I'm trying to

15  see how you mesh all of this in together to make

16  certain that we can have a process and procedure so

17  that we -- I can adequately follow it.

18      And then -- and then so both of these amendments

19  that we have from the people that were on the

20  committee, correct?

21      SENATOR RANKIN:  Correct.

22      SENATOR MALLOY:  Okay.  All right.  Thank you.

23      SENATOR RANKIN:  All right.  Senator Campsen.

24      SENATOR HARPOOTLIAN:  Chairman, could I make one

25  further (indiscernible) the Senator from Darlington

Confidential

SCNAACP_CD_006853

1  raised?  So the House bill sent back over is -- is not

2  going to be the vehicle --

3       SENATOR MALLOY:  It's the Senate bill.

4       SENATOR HARPOOTLIAN:  Oh, it's the Senate bill

5  returned from the House?

6       SENATOR MALLOY:  Correct.

7       SENATOR HARPOOTLIAN:  Okay.  That's -- I wasn't

8  clear on that.  I just wanted to make sure.  Okay.

9  Great.

10      SENATOR RANKIN:  Senator Campsen.

11      SENATOR CAMPSEN:  Thank you, Mr. President.  What

12  I'm about to explain can be found behind Tab 4.

13  That's the Senate Amendment 1 to the House judiciary

14  plan.

15      This amendment to the House judiciary plan

16  restores key aspects of the senate staff plan and is

17  intended to be responsive to some of the public input

18  received by the subcommittee.

19      The amendment keeps 36 counties whole and splits

20  13 VTDs.  In the Midlands, the amendment restores the

21  split in Orangeburg County, as drawn in the Senate

22  staff plan, and keeps Calhoun County whole as in the

23  House version.

24      In Richland County, St. Andrews and the Broad

25  River Corridor are moved back to the Sixth District in

Confidential

SCNAACP_CD_006854

1  the amendment.  The amendment also follows the

2  boundaries between Senate Districts 21 and 22 in

3  dividing -- as the dividing line between Congressional

4  Districts 2 and 6 in Eastern Columbia.

5      In the Lowcountry, the -- in the amendment

6  Jasper, Beaufort, and Colleton counties are -- are

7  kept as drawn in the House judiciary plan with

8  Hardeeville in southern Jasper County and -- in

9  District 6 and all of Beaufort County in the First

10  District.

11      In Charleston County, the amendment follows

12  natural geographic boundaries such as the Stono River

13  and Wadmalaw sound, adding approximately 16,000 people

14  in Wadmalaw Island and Johns Island to the First

15  District, moving them from the Sixth.

16      The entire peninsula of North Charleston are in

17  the Sixth Congressional District with the Cooper River

18  as a natural boundary between the First and the Sixth.

19      The West Ashley portion of Charleston County is

20  also whole in Congressional District Six, separating

21  West Ashley from James Island and Johns Island

22  following the Stono River.

23      Rural areas in western Dorchester County moved

24  from the First District to the Sixth in the amendment,

25  along with the West Ashley portion of Dorchester

Confidential

SCNAACP_CD_006855

1  County.  Ridgeville remains in the Sixth District as

2  drawn in the House judiciary version of the plan.

3      More of a rural Berkeley County -- more of rural

4  Berkeley County around Lake Moultrie is added to the

5  First District moving it from the Sixth.

6      And you have a picture of the -- of the plan

7  behind Tab 4.

8      SENATOR RANKIN:  All right.  Any questions?

9      SENATOR HUTTO:  I have one.

10     SENATOR RANKIN:  Senator Hutto.

11     SENATOR HUTTO:  So I've seen several maps that --

12  that keep Charleston whole or at least keep Charleston

13  and Columbia out of the same district.  It just seems

14  to me with the three major metropolitan areas that you

15  shouldn't have one congressional district that spans

16  two of those metropolitan areas.

17     Can you speak to that?  I mean, why would we draw

18  a district that's got Charleston and Columbia in the

19  same district?

20     SENATOR CAMPSEN:  Well, that district is really

21  still the -- kind of was drawn in the 1990s

22  originally, the genesis of this district.  It's been

23  changed over time.  Was reaffirmed in 2012 in the

24  Bacchus decision.

25     And the issue is you have so much population in

Confidential

SCNAACP_CD_006856

1    the urban areas that you -- you need to -- you need to

2    use that population.  It's hard to keep that

3    population whole.

4         You have -- you have Spart --

5    Greenville/Spartanburg is split.  Columbia's split.

6    All the major -- major metropolitan areas really are

7    (indiscernible).

8         SENATOR HUTTO:  You're talking about county is

9    split.

10        SENATOR CAMPSEN:  Right.

11        SENATOR HUTTO:  But Greenville and Spartanburg

12   are whole within the Fourth, the cities.  Why can't

13   the City of Charleston be in one and the City of

14   Columbia be in a separate one?  Why do they need to be

15   in the same one?

16        SENATOR CAMPSEN:  Well, we're following -- this

17   is a -- you know, a least amount of change with

18   regards to that dynamic of the Sixth District.

19        SENATOR HUTTO:  All right.  So -- so you're

20   saying -- saying that they -- we're just following the

21   least change mode as opposed to --

22        SENATOR CAMPSEN:  No, I'm saying --

23        SENATOR HUTTO:  And I understood our

24   parameters --

25        SENATOR CAMPSEN:  I'm saying that's one --

Confidential

SCNAACP_CD_006857

1    SENATOR HUTTO:  -- for trying to keep cities

2    whole.

3    SENATOR CAMPSEN:  I'm saying that is one -- that

4    is one factor.

5    SENATOR HUTTO:  All right.  But isn't another

6    factor to try and keep --

7    SENATOR CAMPSEN:  Constituent consistency is what

8    (indiscernible).

9    SENATOR HUTTO:  Right.  Okay.  Thank you.

10    SENATOR RANKIN:  Senator Kimpson.

11    SENATOR KIMPSON:  Yes.  Thank you, Mr. Chairman.

12    Senator, can you just -- can you just explain to me

13    the change in BVAP from the current way the lines

14    exist versus this proposal?  Do you understand the

15    question?

16    SENATOR CAMPSEN:  Yeah.  The current -- the

17    current is 51 percent, and the map is 45 percent.

18    UNIDENTIFIED SPEAKER:  In the Sixth.

19    SENATOR CAMPSEN:  In the Sixth.

20    SENATOR KIMPSON:  Oh, the current -- and I'm

21    talking about with respect to District 1.

22    SENATOR CAMPSEN:  Oh, with District 1.

23    SENATOR KIMPSON:  Yeah, and (indiscernible) --

24    SENATOR CAMPSEN:  If I'm correct --

25    SENATOR KIMPSON:  (Indiscernible) the map, the

Confidential

SCNAACP_CD_006858

1    black voter participation under the current map change

2    are (indiscernible).

3        SENATOR CAMPSEN:  It's -- the BVAP in the First

4    goes from 16.56 to 16.72.

5        SENATOR KIMPSON:  So currently on 16 --

6        SENATOR CAMPSEN:  So virtually unchanged.

7        SENATOR KIMPSON:  Okay.

8        SENATOR CAMPSEN:  Virtually unchanged.

9        SENATOR KIMPSON:  So currently, it's 16.5

10   percent.  Under the new map, it would be 16.7 percent

11   under your proposal, correct?

12       SENATOR CAMPSEN:  Correct.

13       SENATOR RANKIN:  Senator Stephens.

14       SENATOR STEPHENS:  Senator, looking at your map,

15   your amended -- your amendment, looking at BVAP and

16   WVAP, it appears, though, in the Sixth Congressional

17   District, WVAP is 44.5 and BVAP is 45.9.

18       What's the -- what's the -- what's the premise

19   behind that, understanding that the Sixth

20   Congressional District was basically a minority drawn

21   district.

22       With this map, you will practically lose about --

23   when you're going from 51 percent BVAP to 40, 45,

24   you're talking about a 6 percent decrease in the --

25   the voter population of African Americans.

Confidential

SCNAACP_CD_006859

1          SENATOR CAMPSEN:  Well, it goes from -- it goes

2     from 51.4 to 45.9 is what it does.  And it's -- it's

3     because you had to shed 100,000 voting age population

4     because of population grows -- growth.

5          SENATOR STEPHENS:  And is a great number of

6     that -- as I look at -- I'm looking back and forth

7     between the two maps.  Looking at the -- I guess you

8     can call it the eastern side of Berkeley County is

9     where you picked up quite a few voters on your -- on

10    this particular map, if I'm looking at it right.

11         SENATOR CAMPSEN:  On the -- say that again, on

12    what?

13         SENATOR STEPHENS:  Okay.  On your --

14         SENATOR CAMPSEN:  Where?

15         SENATOR STEPHENS:  On your amended map, I'm

16    looking at Berkeley County and the addition of the

17    eastern side of Berkeley County added into -- well,

18    taken away, actually, from District Number 6 and now

19    reside in District Number 1.  Is that correct from

20    what I'm seeing?

21         SENATOR CAMPSEN:  Yes.

22         SENATOR STEPHENS:  And not looking at the numbers

23    yet, but do you know off the top of your head how

24    many -- what the population shift from -- from that

25    area?  I think that's -- that's one of the fastest

Confidential

SCNAACP_CD_006860

1  growing areas in the --

2      SENATOR CAMPSEN:  I can tell you districtwide.  I

3  don't have it at the top of my head as far the --

4  districtwide it was 100,947 voting age population went

5  from the First to the Sixth.

6      SENATOR STEPHENS:  And was the premise behind

7  this amendment to make the district more competitive?

8  And I'm talking about District Number 6 and District

9  Number 1.

10     SENATOR CAMPSEN:  Now, the goal was to adhere to

11 our redistricting principles, which include continuity

12 of representation, constituent consistency, following

13 geographic boundaries.

14     Like on the amendment that I offered there, the

15 following of geographic and boundaries was a -- a

16 major change that -- an improvement that we've made

17 from what the House passed.

18     SENATOR STEPHENS:  So with that being said, do we

19 not think that the southern part of Colleton County

20 and Jasper County need to be given the same

21 consideration, as I see that they went from the Sixth

22 Congressional District to the First Congressional

23 District?  It's just a question.

24     SENATOR CAMPSEN:  Well, you have -- you --

25 another principle is -- is communities of interest,

Confidential

SCNAACP_CD_006861

1    and you do have along -- along that coastline, you do

2    have communities of interest, communities in those

3    counties dealing with similar issues like flooding and

4    hurricanes and beach re-nourishment and things like

5    that.

6         And that also is the -- the set -- the First

7    District traditionally has -- has gone down into that

8    area of Colleton and -- and Beaufort Counties and

9    Jasper.

10        SENATOR STEPHENS:  Okay.  Thank you, Senator.

11   Thank you, Mr. Chair.

12        SENATOR RANKIN:  Senator Margie Bright Matthews.

13        SENATOR MATTHEWS:  Thank you, Mr. Chair.  Senator

14   Campsen, just a couple of questions looking at your

15   map.  You -- can you just, for those people who might

16   not know this, tell us the areas in the Lowcountry

17   that you represent.  And with that, explain why it is

18   important that you have a -- you represent a community

19   of interests in your senate district.  Just give us an

20   overview of your areas.

21        SENATOR CAMPSEN:  Yeah, well, I represent parts

22   of Charleston, Colleton, and Beaufort Counties.

23        SENATOR MATTHEWS:  And you were --

24        SENATOR CAMPSEN:  And I represent the -- the

25   coastal port -- portions, largely, although inland

Confidential

SCNAACP_CD_006862

1  portions in -- in Mount Pleasant -- although Mount

2  Pleasant is -- is certainly near the coast or on the

3  harbor, and down to Port Royal Sound.  So my -- my

4  Senate district goes from Bulls Bay down to Port Royal

5  Sound.

6      SENATOR MATTHEWS:  And one of the tenets of your

7  representation of this area is primarily you scan an

8  area that basically are on the coastline and represent

9  communities of interests that would be concerned with

10 conservation in that area, as well as all of the

11 things that you deal with as chair of the committee ag

12 -- not agriculture.

13     SENATOR CAMPSEN:  Fish, Game and --

14     SENATOR MATTHEWS:  Fish -- I should not call it

15 feathers and whatever committee, but Fish, Game, and

16 Forestry committee.  Those are things that are

17 important.  Other things are important, but those are

18 things that are important to your constituents in your

19 senate district, correct?

20     SENATOR CAMPSEN:  That's correct, yes.

21     SENATOR MATTHEWS:  And that is why when

22 advocating for the way that you wanted to make sure

23 that your -- your senate district continued in the --

24 after this last census evaluation, you wanted to make

25 sure that your communities of interest remained the

Confidential

SCNAACP_CD_006863

1    same, correct?

2        SENATOR CAMPSEN:  Yes.

3        SENATOR MATTHEWS:  And so you would agree that we

4    -- when this subcommittee, when we looked at the

5    congressional maps, particularly in our area, the area

6    that you and I -- we serve on a lot of the same

7    delegations in the Lowcountry, you would agree that

8    one of the primary things that we started out in -- in

9    our subcommittee when looking at the numbers, you

10   would agree that we saw very clearly from the census

11   that the middle of South Carolina, the inland portions

12   of South Carolina, we saw a pattern of them losing

13   census numbers as opposed to gaining.

14       SENATOR CAMPSEN:  That's correct.

15       SENATOR MATTHEWS:  And you would agree that in

16   areas up near York County, you would also agree that

17   areas near Greenville, Georgetown, Horry, Charleston,

18   and Jasper showed a significant pattern of having --

19   being areas that experienced the greatest number of

20   increase in population?  You would agree with that?

21       SENATOR CAMPSEN:  Yes.

22       SENATOR MATTHEWS:  And you would also agree that

23   considering the pattern there, that the Lowcountry,

24   particularly those areas such as Jasper County, Sun

25   City area, Beaufort, Hilton Head, you would agree that

Confidential

SCNAACP_CD_006864

1    Charleston, Georgetown, Myrtle Beach had the greatest

2    degree of increase in population because of an influx

3    of folks to the Lowcountry?

4        SENATOR CAMPSEN:  Horry County had the largest

5    growth by --

6        SENATOR MATTHEWS:  Correct.

7        SENATOR CAMPSEN:  -- a wide margin.

8        SENATOR MATTHEWS:  Yeah, I get that.  What I'm

9    saying is generally there was a pattern there that

10   people wanted to be on the water?

11       SENATOR CAMPSEN:  That's correct.

12       SENATOR MATTHEWS:  Okay.  Now, what I am having

13   -- and you would agree that there's a content --

14   contiguity issue as it relates to an analysis of what

15   we have to go to -- go through in redrawing or either

16   amending the maps?  Was there -- is that true?

17       SENATOR CAMPSEN:  Yes.

18       SENATOR MATTHEWS:  Was there a significant

19   consideration that you felt that needed to be -- that

20   we placed as a priority at the initial outset of

21   redrawing these maps that we were going to leave -- we

22   wanted to leave representation as it was because

23   wasn't that one of the primary things that the League

24   of Women Voters, as well as a lot of other folks that

25   came to us and said, hey, we want to make sure that

Confidential

SCNAACP_CD_006865

1    community of interests work together, not necessarily

2    protecting the same elected folks that represented an

3    area.  Isn't that right?

4        SENATOR CAMPSEN:  Well, that is one of the

5    issues.  Continuity of representation is one of the

6    issues.

7        SENATOR MATTHEWS:  As you sit --

8        SENATOR CAMPSEN:  (Indiscernible) principles.

9        SENATOR MATTHEWS:  -- here today, which do you

10   think is most important, making sure that a district

11   remains the same or following the flow of the census

12   data?

13       SENATOR CAMPSEN:  Well, one -- they -- one is no

14   more important than the other.  There is a panoply or

15   redistricting principles that are brought to bear.

16   And there has to be -- there's no -- there's equal

17   weight with regards to these principles that you're

18   referring to.

19       SENATOR MATTHEWS:  In your opinion, there is --

20       SENATOR CAMPSEN:  Well, not --

21       SENATOR MATTHEWS:  -- equal weight?

22       SENATOR CAMPSEN:  -- when it comes to certain

23   issues like Voting Rights Act and things like that,

24   but when it comes to communities of -- communities of

25   interest.

Confidential

SCNAACP_CD_006866

1           SENATOR MATTHEWS:  Well, Senator, I -- I'm in

2      Colleton County.  You represent a portion of Colleton

3      County.  I also represent Hampton and Jasper, as well

4      as Charleston.  I do not represent Berkeley.

5           But I sat, as you did, through several hours'

6      worth of public hearings.  And I seem to remember, as

7      I took copious notes like yourself, that we had

8      speaker after speaker -- and I understand some folks

9      have gotten together and had folks to send in written

10     comments.

11          But I sat through and I listened over and over to

12     a lot of the folks that came before our committee that

13     said, number one, they wanted to keep Charles -- they

14     thought that the -- one of the proposed maps that kept

15     Charleston whole went along with the principle of

16     keeping that community of interest together.  Did --

17     were you present at those hearings?

18          SENATOR CAMPSEN:  Well, I've heard that and I've

19     also heard people say they -- they'd rather have two

20     congressmen representing them than one.

21          SENATOR MATTHEWS:  I heard that --

22          SENATOR CAMPSEN:  Because two advocates are

23     better than one.  I've heard that principle, too.

24          SENATOR MATTHEWS:  I had -- I heard that from a

25     couple of people.  It seems like we had people in

Confidential

SCNAACP_CD_006867

1    Berkeley County wanting to be aligned with Charles --

2    be in the same congressional district as Charleston.

3    But they didn't necessarily say anything about the

4    congressman they would have.  It seems like they

5    wanted to be with Charleston because of an economic

6    alliance agreement that they had in place.  And --

7         SENATOR CAMPSEN:  Well, there is -- there is --

8    as you know, there's the tri --

9         SENATOR MATTHEWS:  That has --

10        SENATOR CAMPSEN:  It's been referred to as the

11   tri-county area for decades, and so they're

12   economically inter --

13        SENATOR MATTHEWS:  But we --

14        SENATOR CAMPSEN:  -- twined.

15        SENATOR MATTHEWS:  Follow me if you would.  I

16   heard Berkeley kept saying that they liked the fact

17   that they were in an economic alliance, and that was

18   basically members of county -- different county

19   councils and town councils that said those things.

20        But we didn't hear Charleston saying that they

21   needed -- they thought that they had a community of

22   interests in common with Berkeley.  It seems like one

23   loved the other one, but the other one -- the love

24   wasn't necessarily returned.

25        SENATOR CAMPSEN:  I -- I -- that's not my

Confidential

SCNAACP_CD_006868

1  recollection.  In fact, if you look at the tri-county

2  area, you have untold number of public and private

3  entities that even refer to themselves.  The

4  Tri-County Chamber of Commerce, the Tri-County Board

5  of Realtors, the --

6      SENATOR MATTHEWS:  Well, we have --

7      SENATOR CAMPSEN:  -- Tri-County Council of

8  Governments and -- because they're -- because they're

9  an economic engine that are inextricably intertwined,

10  so.

11      SENATOR MATTHEWS:  Okay.  So if we follow that

12  economic engine, we have the Southern Carolina

13  Alliance that has Beaufort, Jasper, Colleton, Hampton,

14  Bamberg, Barnwell.  So if we follow that economic

15  alliance analysis, then we're going to say that we're

16  going to move the Second into that, and because that's

17  the same -- that's -- that's the same economic

18  alliance.

19      What I'm trying to say is throughout the state of

20  South Carolina, there are a lot of alliances for

21  different reasons, mostly economic.  My -- my biggest

22  problem here is, number one, we have -- it appears

23  that this is a -- and -- and I might be wrong.

24      According to the numbers, it appears that this is

25  a typical gerrymandered Congressional Seat 6 where you

Confidential

SCNAACP_CD_006869

1    packed all of -- you went in under -- into Charleston

2    and pulled out areas of West Ashley and other areas in

3    North Charleston just to put blacks into Congressional

4    District 6.

5        And it creates a -- it looks like -- I don't know

6    what it -- it looks like a funky boot print that goes

7    into Congressional District 1.

8        SENATOR CAMPSEN:  Well, Senator, I can tell you

9    the statistics don't bear that out.

10       SENATOR MATTHEWS:  Well, they don't, well, if you

11   look at --

12       SENATOR CAMPSEN:  Because -- because --

13       SENATOR MATTHEWS:  Sorry.

14       SENATOR CAMPSEN:  Because of the 100,947 voting

15   age population that went from the First to the Sixth,

16   66 percent were white and 22 percent were black.

17       SENATOR MATTHEWS:  Well, let's not -- since you

18   brought up that, let's -- what is the Biden --

19   Biden/Trump numbers from the First Congressional

20   District that you have?

21       SENATOR CAMPSEN:  Trump numbers are 54.39, and

22   the Cook Political Report has it at 52.1 Trump, so two

23   different sets of metrics.  But within the margin of

24   error of poll -- of any poll.

25       SENATOR MATTHEWS:  Okay.  And so what's the

Confidential

SCNAACP_CD_006870

1   Democratic versus the Republican for the First

2   District as drawn and the way it was?

3        SENATOR CAMPSEN:  I'm not sure what -- which

4   metric are you wanting to use?

5        SENATOR MATTHEWS:  Whatever one that was made

6   available to all the committee members, because I

7   don't necessarily believe that we had the different

8   metrics that you're referring -- that were presented

9   to our subcommittee.  I just want to make sure we're

10  on the same page.

11       SENATOR CAMPSEN:  Well, the benchmark was 53.03.

12       SENATOR MATTHEWS:  For?

13       SENATOR CAMPSEN:  Trump.  That's the benchmark.

14  And under the amendment it's 54.39, so it's a little

15  over 1 percentage point change.

16       SENATOR MATTHEWS:  So --

17       SENATOR CAMPSEN:  It's not a massive change.

18       SENATOR MATTHEWS:  So --

19       SENATOR CAMPSEN:  So under the benchmark, the

20  Trump numbers in the First were 53.03.  Under

21  Amendment 1, they're 54.39.

22       SENATOR MATTHEWS:  Well, I'm going to tell you

23  where I have a big problem.  The biggest problem I

24  have if -- if you're going to -- you -- I listened to

25  you carefully, and you said:  Conservation issues is

Confidential

SCNAACP_CD_006871

1  an important issues.  Constituent consistency.

2      It would appear that if we're going to go along

3  with the coastline being the First Congressional

4  District, and that's always been one of the things

5  that they've campaigned on and championed for, it

6  would appear that the least appropriate extension of

7  the congressional -- First Congressional District, the

8  last thing you would want to do would go up into

9  Berkeley.

10      Instead, you would want to go into Georgetown

11  because that is on the coast, and that would have

12  accomplished the numbers that you needed.  But

13  instead, it appears that Congressional District Six is

14  broken up by that water pattern there.  I assume that

15  is Santee where it separates Clarendon verse -- from

16  Calhoun.  And you jump over to Santee Calhoun to take

17  the Sixth Congressional District into -- all the way

18  from Clarendon into Williamsburg.

19      SENATOR CAMPSEN:  Well, a big -- a big part of

20  Berkeley is currently in the First in the benchmark.

21  And as far as why -- why did these changes have to

22  happen is because you had -- you had about 80,000

23  people that the Sixth had to pick up.  You had about

24  80,000 people that the First had to -- had to shed.

25      SENATOR MATTHEWS:  And those 80,000 --

Confidential

SCNAACP_CD_006872

Page 28

1    SENATOR CAMPSEN:  And that's why we had -- that's

2    why these changes are happening, because of the 14th

3    Amendment requirement of one man, one vote.

4    And unlike our districts where we can have a 5

5    percent variation, these districts -- when it comes to

6    congressional districts, a one person deviation is all

7    you can have, which makes it even much more -- more

8    difficult.

9    But when you have that type of population growth

10   in a -- in a district that is juxtapositioned next to

11   one that had about the same amount of population loss,

12   you're going to have -- you're going to have to have

13   some changes to comply with the 14th Amendment.

14   SENATOR MATTHEWS:  Last question, Senator -- my

15   last -- next to the last question.  My problem is

16   then -- and I understand the 1 percent deviation on

17   congressional maps.

18   SENATOR CAMPSEN:  It's one person, not 1 percent.

19   SENATOR MATTHEWS:  One person deviation on

20   congressional maps, then that could also have been

21   accomplished by keeping Jasper -- keeping Hilton Head,

22   Sun City on the coast in the First Congressional

23   District, and giving -- and those 80,000 people were

24   there and available in Berkeley.  Keep it -- that

25   could have gone to the Sixth Congressional District.

Confidential

SCNAACP_CD_006873

1    I mean, it's just -- just a matter of moving the

2    numbers.  Isn't that correct?

3         SENATOR CAMPSEN:  Well, there are a lot of ways

4    you can draw a -- a reapportionment map, no matter

5    which -- whether it's congressional or state

6    legislative.  That's for sure.

7         SENATOR MATTHEWS:  This is my last question.  But

8    you are exactly right, there are a lot of ways that

9    you could draw.

10        Am I correct in understanding that this

11   particular map that is -- that we're talking about

12   that House Plan to Senate Amendment 1 that you've just

13   presented to us, is this not the same map that was

14   presented and recommended by the National Republican

15   Party?

16        SENATOR CAMPSEN:  No.  I've had --

17        SENATOR MATTHEWS:  This is not the one that was

18   presented ins subcommittee?

19        SENATOR CAMPSEN:  I've had no -- I've had no

20   communication with them on redistricting.

21        SENATOR MATTHEWS:  Well, that's not my question.

22        SENATOR CAMPSEN:  But I -- no, I --

23        SENATOR MATTHEWS:  Is this the same one that was

24   presented at our House -- our Senate subcommittee

25   meeting when you were chair --

Confidential

SCNAACP_CD_006874

Page 30

1        SENATOR CAMPSEN:  No, it's not.

2        SENATOR MATTHEWS:  Okay.  Okay.  Thank you.

3        SENATOR CAMPSEN:  This is much improved over

4    that.

5        SENATOR MATTHEWS:  Thank you.

6        SENATOR HARPOOTLIAN:  Senator, let me make sure

7    we understand the land -- the legal landscape in 2021

8    and '22, as compared to 2010 and 2012.  It is very

9    different, is it not?

10       SENATOR CAMPSEN:  The -- the -- what landscape?

11       SENATOR HARPOOTLIAN:  The legal landscape, the

12   scrutiny, the legal -- the legal framework for these

13   reapportionment plans.

14       SENATOR CAMPSEN:  Versus 2010?

15       SENATOR HARPOOTLIAN:  Yes.

16       SENATOR CAMPSEN:  There are some changes, yes.

17       SENATOR HARPOOTLIAN:  Well, major changes.

18       SENATOR CAMPSEN:  There are some significant

19   changes.

20       SENATOR HARPOOTLIAN:  So Section 3 -- Section 4

21   and 5 of the Voting Rights Act is no longer, is it --

22   isn't that correct?

23       SENATOR CAMPSEN:  That's correct.

24       SENATOR HARPOOTLIAN:  And as a result, there's no

25   Justice Department preclearance, right?

Confidential

SCNAACP_CD_006875

1          SENATOR CAMPSEN:  That's correct.

2          SENATOR HARPOOTLIAN:  There's no prohibition

3    against retrogression, given as long as it meets

4    Section 2 analysis, correct?

5          SENATOR CAMPSEN:  As long as the subject of that

6    analysis, that's correct.

7          SENATOR HARPOOTLIAN:  So when we talk about

8    redistricting and -- you know, I don't need to bore

9    you with the history of how we got to the racial

10   preference issues beginning in 1988 with the Justice

11   Department insisting on minority/majority districts.

12   You would agree with me that this process began

13   30-something years ago, correct?

14         SENATOR CAMPSEN:  That -- that resulted in the

15   drawing of the first in the '90s?  Yes.

16         SENATOR HARPOOTLIAN:  Right.

17         SENATOR CAMPSEN:  It did.

18         SENATOR HARPOOTLIAN:  And so with the with the

19   elimination of Section 4 and Section 5, we don't have

20   that kind of analysis.  Really, all we have now is the

21   Gingles analysis.  Are you familiar with the Gingles

22   case?

23         SENATOR CAMPSEN:  I'm familiar with the Gingles

24   case.

25         SENATOR HARPOOTLIAN:  And so what you really want

Confidential

SCNAACP_CD_006876

1    to know is whether there is racial bloc voting, I

2    mean, in terms of adjusting these districts.  I mean,

3    it's instead of worrying about what the percentage of

4    African American vote is, you want to know whether

5    there's racial bloc voting; is that correct?  In other

6    words, will -- is there a group of white people that

7    would never vote for black people?  And you can do

8    that, and that analysis is done all the time.

9        SENATOR CAMPSEN:  Is this the third Gingles test?

10       SENATOR HARPOOTLIAN:  Is that correct?

11       SENATOR CAMPSEN:  That's -- generally, that's my

12   understanding of it.

13       SENATOR HARPOOTLIAN:  Okay.  Was there any racial

14   bloc voting analysis done?  If so, by who?  Was there

15   an expert?  Typically, they're experts involved.  Was

16   there any racial bloc voting analysis done in the --

17   in compiling this plan?

18       SENATOR CAMPSEN:  Well, that's not for -- that's

19   something that would happen if and when a plan is

20   litigated.  As far as that analysis that -- I'm not

21   aware of that being done here, but that's something

22   that -- that would be what a -- a plaintiff, if they

23   were to file suit against this, would -- would provide

24   and argue.

25       SENATOR HARPOOTLIAN:  Well, you -- well, I

Confidential

SCNAACP_CD_006877

1    understand that would be something raised by somebody

2    in a lawsuit.  But assuming we're trying to avoid a

3    lawsuit, wouldn't it have been productive to get

4    racial bloc voting analysis done so that we all

5    understand whether or not to -- to in create -- in

6    creating this -- this --

7         SENATOR CAMPSEN:  Well --

8         SENATOR HARPOOTLIAN:  -- plan, that that -- that

9    was not a factor that --

10        SENATOR CAMPSEN:  Well, I have it -- it would

11   have resulted in us perhaps taking race into account

12   and having racial targets, which would be --

13        SENATOR HARPOOTLIAN:  Acceptable under Gingles?

14        SENATOR CAMPSEN:  No.  That's -- that's an

15   analysis that -- that the Court is -- is to apply.

16   But we are -- we are to not take race primarily into

17   account in drawing this.

18        SENATOR HARPOOTLIAN:  Primarily.

19        SENATOR CAMPSEN:  And I took it hardly at all

20   into account.

21        SENATOR HARPOOTLIAN:  Well, but every -- every --

22        SENATOR CAMPSEN:  And it's up to -- it's up to up

23   to a Court if someone files an action to make that --

24   to do that analysis and do -- and make that claim.

25   But we don't want to get -- we don't want to draw

Confidential

SCNAACP_CD_006878

1    districts on the basis of race.  We want to draw it on

2    the basis of -- of other redistricting principles.

3         SENATOR HARPOOTLIAN:  So why do we have race in

4    any of this analysis?  I mean, when I -- the analysis,

5    I've got page after page on all these plans.

6         SENATOR CAMPSEN:  The staff have -- I mean, they

7    -- they provide that.

8         SENATOR HARPOOTLIAN:  Why?

9         SENATOR CAMPSEN:  As far as looking at drawing

10   districts, I didn't -- I didn't consider any of that.

11   I wanted them to tell me if we were in a -- if we had

12   any problems, you know, with --

13        SENATOR HARPOOTLIAN:  But how would you --

14        SENATOR CAMPSEN:  -- Gingles or anything else.

15   But I wanted to be colorblind.

16        SENATOR HARPOOTLIAN:  Well, but you weren't

17   colorblind, were you?

18        SENATOR CAMPSEN:  It can be a factor, but it's

19   not a predominant factor.

20        SENATOR HARPOOTLIAN:  But if you had done --

21        SENATOR CAMPSEN:  A racial (indiscernible) would

22   factor --

23        SENATOR HARPOOTLIAN:  -- a racial bloc voting

24   analysis, you would have -- you could have determined

25   whether or not race was a factor that -- that should

Confidential

SCNAACP_CD_006879

Page 35

1  have been taken into consideration.  If you did -- I

2  mean, if the analysis as it was in 1988 or '86 when I

3  ran for county council, virtually no white person

4  would vote for a black person, period, in Richmond

5  County.

6      And so that's why we went to single member

7  districts.  That analysis was done.  You don't think

8  we should have done that analysis before drafting this

9  plan?  And if your answer is no, I'll move on.

10     SENATOR CAMPSEN:  Well, I know you wanted -- you

11  wanted that, but I think the subcommittee decided not

12  to do that.

13     SENATOR HARPOOTLIAN:  I understand

14  (indiscernible).

15     SENATOR CAMPSEN:  It was not my decision, but it

16  was a subcommittee decision.

17     SENATOR HARPOOTLIAN:  But in drafting this plan,

18  you did not take into consideration any racial bloc

19  voting analysis and --

20     SENATOR CAMPSEN:  We did not do that analysis, as

21  the subcommittee conclude -- decided that we would

22  not.

23     SENATOR HARPOOTLIAN:  Right.  So would that --

24  that idea to even do racial bloc analysis was rejected

25  by the subcommittee and, therefore, was not a

Confidential

SCNAACP_CD_006880

1    consideration in your plan, two plans.  But -- but

2    there are two plans.  In this plan, correct?  Okay.

3         So let me move on to -- we talked about Gingles

4    and the radical change in the analysis being done by a

5    Court.  This plan splits 10 counties, is that correct?

6         SENATOR CAMPSEN:  It's 13.

7         SENATOR HARPOOTLIAN:  13.  Eight of those are in

8    the Sixth District, is that correct, Or bordering the

9    Sixth District?  Eight of the 13.

10        SENATOR CAMPSEN:  I'd have to get you that

11   number.  I'm not exactly sure at this point.

12        SENATOR HARPOOTLIAN:  I looked at it.  It looked

13   like eight to me.

14        SENATOR CAMPSEN:  Okay.

15        SENATOR HARPOOTLIAN:  Eight --

16        UNIDENTIFIED SPEAKER:  Counties.

17        SENATOR HARPOOTLIAN:  -- counties split to

18   accommodate the plan's outline of Congressional

19   District Six.  Eight of the -- eight of the 13.

20        SENATOR CAMPSEN:  Okay.  Yeah, some staff says

21   it's eight.

22        SENATOR HARPOOTLIAN:  And in -- for instance, in

23   -- you would agree with me that -- that the Sixth

24   District basically goes from the Atlantic Ocean to now

25   within a couple miles of Lake Murray; is that correct?

Confidential

SCNAACP_CD_006881

1          SENATOR CAMPSEN:  Well, it's not right on the

2    ocean, but close.

3          SENATOR HARPOOTLIAN:  How -- how far --

4          SENATOR CAMPSEN:  From the harbor, from

5    Charleston Harbor.

6          SENATOR HARPOOTLIAN:  I'm sorry.  In our --

7    Midland's view, the harbor is the ocean.

8          SENATOR CAMPSEN:  From the coastal view, the

9    ocean is at -- east of the beach.

10         SENATOR HARPOOTLIAN:  The water.

11         SENATOR CAMPSEN:  Yes.

12         SENATOR HARPOOTLIAN:  Well, I mean, that's a --

13   but it goes from the Charleston Harbor to the Lake

14   Murray Marina.  I mean, I guess it's for -- you're

15   looking for somebody with sea -- sea legs or ocean

16   background, water background, sailing background,

17   would be more suited because those two ends are where

18   you can sail a boat, right?  I mean, it doesn't --

19         SENATOR CAMPSEN:  You can't really sail a boat up

20   at Lake Murray, but --

21         SENATOR HARPOOTLIAN:  No, but you can sail a boat

22   in Lake Murray.

23         SENATOR CAMPSEN:  Yes, you can.

24         SENATOR RANKIN:  Real quick, I'm going to

25   interrupt.  You were stating that the number of county

Confidential

SCNAACP_CD_006882

1   splits was what in this plan -- in his plan?

2        SENATOR CAMPSEN:  13.

3        SENATOR RANKIN:  Perhaps you're right.  Staff's

4   count is 10.

5        UNIDENTIFIED SPEAKER:  10 statewide.

6        SENATOR RANKIN:  10 statewide.  Are you talking

7   about within the First Congressional District?

8        UNIDENTIFIED SPEAKER:  No.

9        SENATOR HARPOOTLIAN:  No, I'm saying 10

10  statewide, and Eight of the ten --

11       SENATOR RANKIN:  Are in the Sixth?

12       SENATOR HARPOOTLIAN:  In the Sixth.  Am I correct

13  (indiscernible).

14       SENATOR RANKIN:  In the existing benchmark,

15  they're nine.

16       SENATOR HARPOOTLIAN:  Okay.  Let's -- let's talk

17  about the existing benchmark.

18       SENATOR RANKIN:  And I'm not trying to --

19       SENATOR HARPOOTLIAN:  No, no.

20       SENATOR RANKIN:  -- get buried in that minutia,

21  but, again, just for -- to correct the record, it's

22  ten and eight.

23       SENATOR HARPOOTLIAN:  Right, right.

24       SENATOR RANKIN:  Okay.

25       SENATOR HARPOOTLIAN:  So -- so the -- let's talk

Confidential

SCNAACP_CD_006883

1   about the existing --

2       SENATOR RANKIN:  Talk into your mic.  There's a

3   Senator in the front can't hear you.  Please, sir.

4       SENATOR HARPOOTLIAN:  Which one?

5       SENATOR RANKIN:  The One that is most important

6   for you at this moment.

7       SENATOR HARPOOTLIAN:  So we have this concept

8   apparently in this plan that what -- what -- I mean,

9   they're core constituencies, I understand that, but

10  that we shouldn't -- we should minimize changing the

11  -- a plan that was approved in 2012; is that correct?

12      SENATOR CAMPSEN:  Well, no, I -- it's just an

13  application of the constituent consistency of a

14  district, that that's a reapportionment principle that

15  you have -- honor lines that have previously been

16  established.  And -- and the -- and the district has

17  changed over time, but it's changed on the margins

18  over time is what's happened.

19      SENATOR HARPOOTLIAN:  Well, there's some dispute

20  about that.  But more importantly, you would concede,

21  I assume --

22      SENATOR CAMPSEN:  And with the population, you

23  have to have a lot of -- more change with the

24  population growth.

25      SENATOR HARPOOTLIAN:  You would concede that old

Confidential

SCNAACP_CD_006884

Page 40

1    plan, the benchmark plan, was the product of Justice

2    Department preclearance, 2000 (indiscernible)?

3        SENATOR CAMPSEN:  It was -- it was a three-judge

4    panel that approved it in the Bacchus decision.

5        SENATOR HARPOOTLIAN:  (Indiscernible) included a

6    Justice Department review and then a -- a judicial

7    panel?

8        SENATOR CAMPSEN:  Yeah.  You had a Justice

9    Department preclearance requirement at that time.  And

10   -- and -- and then it was after that was accomplished,

11   it was litigated and upheld by a three-judge panel.

12       SENATOR HARPOOTLIAN:  But we don't -- we're not

13   operating under those constraints anymore, are we,

14   with Section 4 and 5 gone?  (Indiscernible) --

15       SENATOR CAMPSEN:  But you're still subject to

16   Section 2.

17       SENATOR HARPOOTLIAN:  Section 2.

18       SENATOR CAMPSEN:  But yeah, but the preclearance

19   part is not there.

20       SENATOR HARPOOTLIAN:  Right.  Well, not only the

21   preclearance part, but the input of the Justice

22   Department, and the likelihood of litigation is much

23   less under -- under the current -- the current scheme,

24   right, because all that's left is Section 2.

25       SENATOR CAMPSEN:  I wouldn't say that.  It may be

Confidential

SCNAACP_CD_006885

1    more, actually.

2        SENATOR HARPOOTLIAN:  Well, if you draw plans

3    like this, it is.  So my -- I guess -- I'm sorry.

4    Going too long?

5        What I'm trying to get at is this.  Honoring a

6    plan which was constructed under law that no longer

7    exists is what -- is what the benchmark plan is.  The

8    benchmark plan was drawn by the courts in concert with

9    inter -- inter -- a plan that had been criticized by

10   the Justice Department; is that correct?

11       SENATOR CAMPSEN:  Well, it was upheld by a Court

12   in 2012, as recently as 2012.

13       SENATOR HARPOOTLIAN:  Right.  So they blessed it.

14   But the plan was as a result of Justice Department

15   objections or not?

16       SENATOR CAMPSEN:  In 2012?

17       SENATOR HARPOOTLIAN:  Yes.

18       SENATOR CAMPSEN:  I -- I don't think so, but I'm

19   not certain about that.

20       SENATOR HARPOOTLIAN:  I guess what I'm saying is

21   this, this is the first time we haven't had to worry

22   about retrogression, correct?

23       SENATOR CAMPSEN:  You still have to worry about

24   retrogression.

25       SENATOR HARPOOTLIAN:  Only under a Section 2

Confidential

SCNAACP_CD_006886

1    analysis.

2        SENATOR CAMPSEN:  Well, yes.

3        SENATOR HARPOOTLIAN:  And you can't really tell

4    about that unless you've done racial bloc voting

5    analysis, but we're not going to go back through that

6    again, because you can't do the Section 2 analysis.

7        SENATOR MALLOY:  It appears the court reporter is

8    having a little bit difficulty hearing.

9        THE COURT REPORTER:  No, it's good.  It's just

10   when you completely turn your face away.

11       SENATOR HARPOOTLIAN:  I was -- I was just -- I

12   was brought up to look at people when I talk to them.

13       SENATOR MALLOY:  If she brought up -- they've got

14   to record this.

15       THE COURT REPORTER:  I feel you, but I've just

16   got to get it down.

17       SENATOR HARPOOTLIAN:  Well, I'll speak much

18   louder then.

19       UNIDENTIFIED SPEAKER:  Maybe what you're saying

20   is --

21       SENATOR HARPOOTLIAN:  Senator Talley is -- is --

22   whatever he can tolerate.

23       UNIDENTIFIED SPEAKER:  All right.  Senator

24   Harpootlian.

25       SENATOR HARPOOTLIAN:  Okay.  So -- and it's

Confidential

SCNAACP_CD_006887

1    interesting to me, continuity is -- is a issue, a

2    standard we're looking at, right?

3          SENATOR CAMPSEN:  Yes.

4          SENATOR HARPOOTLIAN:  And you would agree that in

5    your plan, you -- there is a -- let me make sure I

6    don't get this wrong.  But there is a part of the --

7    your plan in which the contiguity is met by crossing

8    the Cooper River; is that correct?

9          SENATOR CAMPSEN:  Well, yes.  And you -- that's

10   -- that's something that's a characterization that's

11   endemic to the Lowcountry.  We have rivers all over

12   the Lowcountry.  But communities -- but communities

13   still are considered the same community, even though

14   they cross a bridge, they drive across the bridge.

15         SENATOR HARPOOTLIAN:  Did you look at -- did you

16   analyze whether or not you could meet that same --

17   those necessities by using land, rather than water?

18   Is there any analysis, written analysis?

19         SENATOR CAMPSEN:  It's very difficult in the

20   Lowcountry.

21         SENATOR HARPOOTLIAN:  But has that -- was that

22   analysis done?

23         SENATOR CAMPSEN:  That was considered.  But

24   again, in the Lowcountry it's almost -- it's just a

25   function of geography and nature.

Confidential

SCNAACP_CD_006888

1          SENATOR HARPOOTLIAN:  So are there -- by the way,

2     is there written communications or analysis done by

3     staff on this plan that you were -- that you were

4     given?  For instance, why you go by water rather than

5     land.

6          SENATOR CAMPSEN:  I have nothing.  I know that

7     water continuity is permitted under the

8     reapportionment principles, but that's -- that's the

9     only written document.

10          SENATOR HARPOOTLIAN:  But no analysis -- no

11     analysis of whether meeting the same goals could have

12     been done by crossing land rather than water?

13          SENATOR CAMPSEN:  Well, if you don't cross water

14     in Charleston, you're going to end up with districts

15     that go --

16          SENATOR HARPOOTLIAN:  So your answer's

17     (indiscernible).

18          SENATOR CAMPSEN:  -- all the way to Newberry

19     County probably.

20          SENATOR HARPOOTLIAN:  So your answer -- your

21     answer would be no?

22          SENATOR CAMPSEN:  No to what question?

23          SENATOR HARPOOTLIAN:  If there was no analysis of

24     -- could you meet the same goals by crossing land

25     rather than water.

Confidential

SCNAACP_CD_006889

1          SENATOR CAMPSEN:  Well, there were at times

2     discussions about that, but --

3          SENATOR HARPOOTLIAN:  Where?

4          SENATOR CAMPSEN:  Where geographically?

5          SENATOR HARPOOTLIAN:  No.  I mean, I wasn't privy

6     to any discussion.

7          SENATOR CAMPSEN:  Well, I mean, in -- I've

8     discussed -- you spent time with staffs discussing,

9     you know, maps, and I have as well, so.

10          SENATOR HARPOOTLIAN:  (Indiscernible).

11          SENATOR CAMPSEN:  I know you have -- you have

12     your own map you're going to present, but --

13          SENATOR HARPOOTLIAN:  Yeah.  I had to pay

14     somebody to do it.

15          SENATOR CAMPSEN:  Yeah.

16          SENATOR HARPOOTLIAN:  But that's okay.

17          SENATOR CAMPSEN:  You didn't have to, Senator,

18     but --

19          SENATOR HARPOOTLIAN:  Oh, I think so.  I think I

20     had to because we are about to do something,

21     perpetuate a racist scheme for the next 10 years,

22     which we had to live with.  One of the reasons I

23     ran -- the major reason I ran for the Senate was that

24     we would not replicate this race-based gerrymandering,

25     and that's what this plan does.

Confidential

SCNAACP_CD_006890

Page 46

1        SENATOR RANKIN:  All right, Senator.  Questions,

2   please.

3        SENATOR HARPOOTLIAN:  Well, he asked me.  I'm

4   responding.

5        SENATOR RANKIN:  All right.  So any more

6   questions?

7        SENATOR HARPOOTLIAN:  I do.

8        SENATOR RANKIN:  All right.

9        SENATOR HARPOOTLIAN:  So -- and I'm going to wrap

10  this up fairly quickly.  I know you'll be happy to

11  hear.

12       How many municipal boundaries were -- were

13  divided under your plan?

14       SENATOR CAMPSEN:  Let me get that data.  13.

15       SENATOR HARPOOTLIAN:  13.  Can -- could it have

16  been less?  Could you have designed a plan with less

17  municipal divisions?

18       SENATOR CAMPSEN:  It's 22.  Well, you --

19  theoretically, I'm sure you could always devise a plan

20  with -- with less splits.  That'd be possible, but --

21       SENATOR HARPOOTLIAN:  You would agree with me

22  that our guidelines were that we should attempt to

23  divide count -- not attempted to avoid abiding --

24  dividing counties, municipalities, and precincts?

25       SENATOR HUTTO:  (Speaking sotto voce.)

Confidential

SCNAACP_CD_006891

1          SENATOR CAMPSEN:  Okay.  Splits wholly within a

2    county are only seven.  Okay.  Under the Senate

3    Amendment 1 under the benchmark, there are eight.  So

4    if you try to keep counties -- to the extent you keep

5    counties whole, you necessarily split some

6    municipalities.  So it's seven under the benchmark,

7    eight under this plan when you -- when you deal

8    with --

9          SENATOR HUTTO:  Eight existing, seven --

10          SENATOR CAMPSEN:  Eight existing, seven under

11    this plan.  When -- when you deal with counties that

12    are wholly within -- within a county.

13          SENATOR HARPOOTLIAN:  Cities wholly within a

14    county, but --

15          SENATOR CAMPSEN:  I mean cities wholly within a

16    county, correct.

17          SENATOR HARPOOTLIAN:  But when you look at --

18    you've split counties and cities.  How many total

19    cities are split?  22, right?

20          SENATOR CAMPSEN:  There's -- there's 22 in this

21    and 19 in the benchmark.

22          SENATOR HARPOOTLIAN:  And all that ties back into

23    the benchmark?  You're looking at the benchmark as --

24    I mean, if you could have not changed the benchmark,

25    that would have been great, right?

Confidential

SCNAACP_CD_006892

Page 48

1          SENATOR CAMPSEN:  No.

2          SENATOR HARPOOTLIAN:  I mean, it's the benchmark.

3          SENATOR CAMPSEN:  Then you have some cities that

4     are split when you follow rivers too.  I mean, you

5     have Casey is that way, Charleston's that way.

6          SENATOR HARPOOTLIAN:  So but you would agree with

7     me that the portions of Charleston that are not

8     contained -- that are -- that are shifted to the Sixth

9     District have basically African -- significant African

10    American population, correct?

11         SENATOR CAMPSEN:  No, no.  Again, I'll say that

12    the --

13         SENATOR HARPOOTLIAN:  So why were they -- why --

14    why are they in the Sixth District?

15         SENATOR CAMPSEN:  The voting age population that

16    went from the First to the Sixth?

17         SENATOR HARPOOTLIAN:  Not that went from -- no,

18    because it was already in the Sixth.  I'm talking

19    about what -- the population in Charleston County that

20    went to the Sixth, what's the African American or

21    black voting age population of that piece, whether it

22    was in the Sixth before or not?

23         If you --if you take the position that dividing

24    Charleston was bad in 2012 and -- and you're

25    perpetuating that in this, you can't look at what was

Confidential

SCNAACP_CD_006893

1    shifted, what is there?  What -- if you look at

2    Charleston County and the piece of Charleston County

3    that you propose to put in the Sixth, what's the

4    African American population percentage?

5        SENATOR CAMPSEN:  Yeah, it's -- it's about 50/50.

6    I get the staff to give the number.

7        SENATOR HARPOOTLIAN:  The piece is about 50/50,

8    as opposed to the whole county.  The proportion of

9    African American voters in that piece is higher than

10   it is in the county in total; is that correct?

11       SENATOR CAMPSEN:  In the -- the --

12       SENATOR HARPOOTLIAN:  No.

13       SENATOR CAMPSEN:  The percentage that are in the

14   Sixth is higher than the percentage in the county as a

15   whole?

16       SENATOR HARPOOTLIAN:  Yes.  African American

17   population.

18       SENATOR CAMPSEN:  It's -- isn't that it?  Is that

19   the figure there?

20       SENATOR KIMPSON:  Charleston County is about 30

21   -- 30 percent black.

22       SENATOR HARPOOTLIAN:  And this -- and according

23   to what we just heard, the piece that is in the Sixth

24   District under this plan is 50/50.  So significantly a

25   higher percentage of African American population being

Confidential

SCNAACP_CD_006894

1    put into the Sixth.

2         SENATOR RANKIN:  But -- and perhaps I'm wrong on

3    this, but I'm told -- again, not to get to your point.

4    But if the sense is that moving those -- that

5    population was a racial-motivated decision, I'm told

6    that the -- it wasn't moving blacks only.  It was

7    moving white and Black and both Democratic performing

8    population but not based on a racial split.

9         SENATOR HARPOOTLIAN:  Well, the Court will look

10   at the numbers.  We don't have to hash that out today.

11        SENATOR RANKIN:  So for that -- in that point,

12   let's move on so we don't get tied up on the 50/50.

13   Okay?

14        SENATOR HARPOOTLIAN:  Okay.

15        SENATOR CAMPSEN:  The Charleston County VBAP, is

16   that what you're asking, Senator?

17        SENATOR HARPOOTLIAN:  Yes.

18        SENATOR HUTTO:  In District 6 --

19        SENATOR CAMPSEN:  In District Six is 31.18

20   percent.

21        SENATOR HARPOOTLIAN:  As drawn by you?

22        SENATOR CAMPSEN:  Under this amendment, yes.

23        SENATOR HARPOOTLIAN:  Okay.  And what is the

24   county as a whole?

25        SENATOR HUTTO:  22 percent.

Confidential

SCNAACP_CD_006895

1        SENATOR CAMPSEN:  22 percent.

2        SENATOR HARPOOTLIAN:  So it's 22 percent, county

3    as a whole.  31 percent of the district's -- of

4    Congressional District Six piece.  So it -- it would

5    be -- right.  I mean, it's the proportion is what I'm

6    interested in.

7        It's -- so it's -- the piece in the Sixth

8    District is significantly more African American than

9    the county as a whole?  Yes?

10       SENATOR CAMPSEN:  10 percent more.

11       SENATOR HARPOOTLIAN:  10 percent is significant.

12    When we start doing the budget, trust me, it'll be

13    significant.  Okay.

14       Let me make one last point, and that is this.  In

15    -- no, strike that.  I don't have one last point.  I'm

16    done.

17       SENATOR MALLOY:  Mr. President, Mr. Chairman.

18    Pardon the inquiry, so we have another committee

19    that's going on.  How many proxies do we have?

20       SENATOR RANKIN:  Well, we got a majority here

21    now, but then we've got a number of proxies that are

22    ready to (indiscernible).

23       SENATOR MALLOY:  I heard from the Senator from

24    Orangeburg.

25       UNIDENTIFIED SPEAKER:  Six -- six proxies.

Confidential

SCNAACP_CD_006896

1      SENATOR MALLOY:  So and the -- my next -- my next

2   parliamentary inquiry, it just seems as -- seems as

3   though that we've been here now an hour and 10

4   minutes, and the conversation has largely been amongst

5   the subcommittee members.

6      And so my question is, is that:  Were there any

7   votes taken on either of these amendments in the

8   subcommittee?

9      SENATOR RANKIN:  We advanced both plans to have

10  fuller debate here, and I think we're about to be

11  finished with that debate, unless there's other

12  questions.  I'm not trying to cut anybody off.

13     UNIDENTIFIED SPEAKER:  (Indiscernible) .

14     SENATOR MALLOY:  Was there -- but was there a

15  vote on the --

16     (Indiscernible cross-talk.)

17     SENATOR MALLOY:  Okay.  It's my question.  It's

18  my question.  My question was is that was there a vote

19  on this in the subcommittee, or did you just say

20  advance the -- if you advanced it, that's fine.  I

21  just want to know.  Okay.  Okay.

22     And so -- and so I'm getting to the point as to

23  what the -- the plan today is to -- is to -- is to

24  vote on both of these amendments today and then carry

25  them on to the floor.

Confidential

SCNAACP_CD_006897

1      SENATOR RANKIN:   Correct.

2      SENATOR MALLOY:   Okay.  And so is there any

3   wisdom in the process that, as it was described to us

4   today, is to have some discussion here, carry these

5   over to the floor because one thing that I'm -- I'm

6   very conscious of is, is that finance committee has

7   not -- would not have a chance to vote but one time.

8      We on this committee get a chance to end up

9   voting once under normal procedures.  We'll get at

10  least second and third reading in the posture that we

11  have this bill in today.  We get one vote on the

12  congressional plan.

13     I just want to make certain that, one, that we

14  have a chance to -- to fully vet this out,

15  understanding -- I think we can all -- I understand

16  where it may end up.  But I just want to make certain

17  that we're -- that we're careful as we're going

18  forward because what we're doing, the process is is

19  that we get -- we get a chance to vote once.

20     We normally get a second and third reading on the

21  floor.  This time, we only get one vote, and then it's

22  -- the bill is sent back to the House.

23     And so is there any wisdom into -- into having

24  this discussion?  And obviously, we do whatever you --

25  whatever you end up saying.  But I think that is there

Confidential

SCNAACP_CD_006898

Page 54

1    any wisdom in having this full discussion here, which

2    it seems to be engaging to some extent, and then --

3    and then carrying these amendments over in -- in case

4    there's something else that happens on the floor?

5         SENATOR RANKIN:  Well, the plan would be, again,

6    respectfully to all members, that we either have some

7    more conversation and question and exchange on this

8    plan and then Senator Harpootlian's plan today and

9    that we vote today.

10         And no bar for any member not on the

11    subcommittee, but otherwise, finance committee or

12    elsewhere, to offer their own amendments on the floor.

13    It won't be one and done unless we all decide that it

14    needs to be a one and done.  There will be ample

15    opportunity to continue this on the floor, so if

16    the --

17         SENATOR MALLOY:  Right.  So but -- and the point

18    I just wanted to make and -- and then I can get back

19    to discussion is that this is a bill returned from the

20    -- from the House, Senate bill, and so we don't get

21    second and third reading on the floor.  We get just

22    the reading on the floor.

23         And so there will be -- part of our process is is

24    that normally we will end up getting a second and

25    third reading.  And so the curious point is is that if

Confidential

SCNAACP_CD_006899

1    we -- if we carry them over, we have the -- the

2    discussion on the floor again in which it will be a

3    discussion on the floor; or will the one that does not

4    pass, then will it be reintroduced on the floor again?

5         UNIDENTIFIED SPEAKER:  (Indiscernible).

6         SENATOR MALLOY:  Okay.

7         SENATOR RANKIN:  So my goal, and for the record's

8    purposes, we need to vote on these day today or at

9    whatever time the committee decides to.  My hope would

10   be today.

11        SENATOR MALLOY:  And is he -- and is he -- and

12   I'm -- I want to get to this transportation meeting.

13   But is the intent to take this bill up on the Senate

14   floor today?

15        SENATOR RANKIN:  I don't know how we can do that.

16        SENATOR MALLOY:  Okay.  I would encourage us not

17   to.

18        SENATOR RANKIN:  Somebody can raise the point.

19        SENATOR MALLOY:  Okay.

20        SENATOR RANKIN:  We are not under the court --

21   the early court order of a January 18th deadline.  We

22   would like to make efficient work of this, but there's

23   not going to be any hurry to preclude amendments.

24        SENATOR MALLOY:  Right.

25        SENATOR RANKIN:  And floor discussion.

Confidential

SCNAACP_CD_006900

1       SENATOR MALLOY:  I think that -- and that

2    deadline --

3       SENATOR RANKIN:  Which will come in full or

4    fashion later.

5       SENATOR MALLOY:  And as a point of clarity, that

6    deadline was -- was 18 -- the 18th, which was

7    yesterday.  And so but we still want to move as

8    quickly as possible beyond that deadline, even -- even

9    though we think that -- that they may be debating --

10    they may end up debating, having another plan before

11    them now.  So we're not in real jeopardy of getting

12    our plan out, if it's -- if it's not today.

13       SENATOR RANKIN:  Correct.

14       SENATOR MALLOY:  Okay.

15       SENATOR RANKIN:  All right.  Senator -- any other

16    questions of Senator Campsen?  Oh, Senator Sabb?

17       SENATOR SABB:  Thank you.  Thank you,

18    Mr. Chairman.  Does the Senator from Charleston yield?

19       UNIDENTIFIED SPEAKER:  Yes.

20       SENATOR SABB:  Senator, of course, you and I both

21    sat on the subcommittee.  And would you agree with me,

22    particularly in the last hearing that we had, that the

23    vast majority of the comments that we had centered

24    around the question as to whether or not Charleston

25    ought be whole and whether or not the plan and -- and

Confidential

SCNAACP_CD_006901

1    specifically the plan that's before us now ought be

2    the operative plan because of the -- what do you call

3    it, the tri-county group, Berkeley, Charleston, and --

4    and Dorchester and their economic relationship.

5        Would you agree with me that the vast majority of

6    the comments that we had related to whether we ought

7    to go with your plan because it maintains those three

8    counties together and their economic interests that

9    they've fostered over the years versus whether or not

10   we ought to keep Charleston whole?

11   SENATOR CAMPSEN:  Well, during the Zoom meeting

12   testimony --

13   SENATOR SABB:  Yes, sir.

14   SENATOR CAMPSEN:  -- that might have -- that was

15   -- a majority did that, voted -- or expressed opinions

16   in that fashion.  Although we -- we also have a lot of

17   input from e-mails and other way -- other -- and

18   letters and that have equal weight.  Just because you

19   weren't on the Zoom meeting -- the Zoom meeting is not

20   weighted heavier.

21       And so I -- it's my understanding we have a lot

22   of diverse opinions on that, that -- which one is

23   weighted more, I'm not completely sure.  But I do know

24   that there is a lot more input from folks who like

25   being represented by two members of Congress instead

Confidential

SCNAACP_CD_006902

1    of one because two advocates is better than one.

2        I mean, I've heard that from -- from constituents

3    as well.  So we can't let the Zoom meeting be the --

4    the final -- the final determination of what type of

5    input the public wants because I understand there's a

6    lot of other input that's received electronically.

7        SENATOR SABB:  And Senator, do you know that I --

8    I agree with you and -- and appreciate that.  And I

9    guess my question would be whether or not -- and I

10   know you've identified one other idea, and that is the

11   idea of being represented by two congressmen as

12   opposed to one.

13       But did the vast majority of the written

14   communication center around a desire to either keep

15   those three counties together or keep Charleston

16   whole?  I mean, so were those fairly consistent with

17   what we heard on the Zoom call?

18       SENATOR CAMPSEN:  I really can't answer that.  I

19   know there's been a lot of input --

20       SENATOR SABB:  Okay.

21       SENATOR CAMPSEN:  -- both ways.  But I -- but

22   there has been -- and I have heard from folks who want

23   to keep -- who don't want Berkeley and Dorchester

24   County to be in the Seventh District, for example,

25   because they have a real connection with the

Confidential

SCNAACP_CD_006903

1    tri-county area.  It's -- it's an integrated economy.

2    And so I have received a lot of input from that, and I

3    think the staff has as well.

4         SENATOR SABB:  Yes, sir.  And, of course,

5    Senator, under your current plan Charleston is split.

6    It's divided.  Is that correct?

7         SENATOR CAMPSEN:  Yeah.  That's the way it's been

8    since 1990.

9         SENATOR SABB:  Yes, sir.

10         SENATOR CAMPSEN:  It is.  And it's also the way

11    Richland is and -- and as far as the county goes,

12    Greenville and Spartanburg as well.  All the

13    municipal, high population municipal MSAs share

14    that --

15         SENATOR SABB:  And, Senator, you --

16         SENATOR CAMPSEN:  -- characteristic.

17         SENATOR SABB:  Yes, sir.  And did you know that

18    one of the things that struck me, coming from one of

19    the citizens in the Charleston area, was how the plan

20    splits West Ashley and that the comment, by at least

21    one of the gentlemen that is qualified to do an

22    analysis on these plans, concluded that the only

23    explanation that he could have for that was the fact

24    that race was an -- an overriding factor?

25         SENATOR CAMPSEN:  Well, it doesn't -- the House

Confidential

SCNAACP_CD_006904

1  plan may have done that, but the Senate plan did not

2  split West Ashley.  I mean, it -- it followed the

3  Stono River which keeps -- keeps James Island and the

4  Sea Islands basically in a --

5       SENATOR SABB:  I may have misunderstood that.

6       SENATOR CAMPSEN:  And West Ashley in the --  in

7  the Sixth.

8       SENATOR SABB:  Okay.  Thank you, Senator.

9       SENATOR RANKIN:  Other questions of Senator

10  Campsen?  All right.

11       Would there be a motion on behalf of.

12       SENATOR KIMPSON:  Mr. Chairman?  Mr. Chairman?

13       SENATOR RANKIN:  Senator Kimpson.

14       SENATOR KIMPSON:  I'll be very brief,

15  Mr. Chairman.  Does the Senator yield for questions,

16  Senator Campsen?

17       SENATOR CAMPSEN:  Yes.

18       SENATOR KIMPSON:  Senator, did you know as the

19  Senator who represents more people than anybody else

20  in the General Assembly from Charleston -- and I'm

21  speaking of myself -- the people of Charleston want to

22  be kept whole.  Did you know that?

23       SENATOR CAMPSEN:  Not -- it's not a unanimous

24  decision, Senator, I know that.

25       SENATOR KIMPSON:  Thank you, Mr. Chair.

Confidential
SCNAACP_CD_006905

1      SENATOR RANKIN:  All right.  Thank you.  Now,

2  would there be any other questions of full committee

3  members?  If not, entertain a motion on behalf of

4  Senator Campsen's plan.

5      SENATOR MALLOY:  Mr. President.

6      SENATOR RANKIN:  Still --

7      SENATOR MALLOY:  Mr. Chairman.

8      SENATOR RANKIN:  Yes, sir.  Senator Malloy.

9      SENATOR MALLOY:  So I -- so I'm looking around

10  here, and again, I go back to the point that we

11  have -- that we've had some discussion here for

12  another hour and 15 minutes, and mostly amongst this

13  subcommittee.

14      I would respectfully move that we carry both of

15  these amendments over and that we take them up on the

16  floor.  It's no prejudice to anyone.  I mean, it's

17  obvious what's happening here.  The record -- the

18  record is going to reflect the will of this committee.

19      And I don't see the benefit of -- of actually

20  just having a vote just to have a vote for this

21  whenever -- whenever we're going to end up having the

22  vote on the floor anyway.  And it joins in with the

23  members of the Finance Committee, which would be the

24  entire Senate.

25      And so this will be one of only two amendments

Confidential

SCNAACP_CD_006906

1    possibly that we will have.  We've had -- we had a

2    detailed discussion here.  We have to -- we're going

3    to have the same discussion on the floor.  We're going

4    to have to have a debate on the floor again.  It is a

5    vote on the floor, which would include the other

6    23 people.  And so we know that we have -- we are

7    finite here, and so -- so with that, I would move to

8    carry both amendments over.

9        SENATOR RANKIN:  Motion.  Any second?

10       UNIDENTIFIED SPEAKER:  Second.

11       UNIDENTIFIED SPEAKER:  Second.

12       SENATOR RANKIN:  All right.  And respectfully,

13   now, motion -- motion under discussion.  If I may,

14   respectfully, no different than the Finance Committee

15   subcommittee's work going to the full -- again, I

16   think we owe the subcommittee members a vote on their

17   work.

18       No prejudice.  Again, that you vote for a bill

19   today doesn't mean you can't vote against it on the

20   floor.  Procedurally, I think we need a vote because I

21   can't imagine Senator Peeler, Finance Committee

22   Chairman, effectively saying in the open floor debate

23   about a budget:  We didn't take a vote.  Again, no

24   harm either way.

25       So again, I would respectfully urge us to take

Confidential

SCNAACP_CD_006907

1    these up, vote, whatever amendments come.  Again,

2    we've got a motion now for one, but to your point -- I

3    want to insist on that.

4        SENATOR MALLOY:  Yeah.  Let me -- let me withdraw

5    it so we can have a little -- little discussion on it

6    so because normally no -- no -- no -- no debate on the

7    carry of a motion, so withdraw it temporarily.

8        The reason, though, is is that there was no vote

9    in the subcommittee.  And so if there was an

10   opportunity for -- to -- for casting votes, if there's

11   no vote in in the subcommittee, I don't know.  I don't

12   know.

13       SENATOR SABB:  Senator, if (indiscernible) will

14   permit, there was a vote in subcommittee.  I just

15   wanted you to know that.

16       SENATOR MALLOY:  I was just told that it was

17   advanced, and then --

18       SENATOR SABB:  That would not be accurate.

19       SENATOR MALLOY:  Well -- well, you know, you did

20   vote in a subcommittee?  And what was the vote?

21       UNIDENTIFIED SPEAKER:  Unanimous to advance --

22       UNIDENTIFIED SPEAKER:  Both of them.

23       SENATOR MALLOY:  Okay.  So there was a vote in

24   the subcommittee.

25       UNIDENTIFIED SPEAKER:  For one or the other --

Confidential

SCNAACP_CD_006908

1          SENATOR MALLOY:  So then that goes even further,

2     then, of the necessity to end up having -- having one

3     here when we're going to have the same debate again.

4     And with that, I just respectfully move to carry --

5     carry -- carry it over.

6          SENATOR RANKIN:  All right.  All in favor of the

7     motion to carry over, say aye.

8          MULTIPLE SPEAKERS:  Aye.

9          SENATOR RANKIN:  All right.  Those in opposition,

10    say aye -- or nay -- nay.

11         MULTIPLE SPEAKERS:  Nay.

12         SENATOR RANKIN:  Nay.  Does -- do you request

13    a -- all right.  Motion fails.

14         Senator Campsen, you have a motion?

15         SENATOR CAMPSEN:  I have a motion to adopt Senate

16    Amendment 1.

17         SENATOR RANKIN:  Is there a second?

18         UNIDENTIFIED SPEAKER:  Second.

19         SENATOR RANKIN:  All right.  Second.

20         All in favor say aye.

21         MULTIPLE SPEAKERS:  Aye.

22         SENATOR RANKIN:  And those in opposition say nay?

23         MULTIPLE SPEAKERS:  Nay.

24         SENATOR RANKIN:  Do we need a show of hands?

25         UNIDENTIFIED SPEAKER:  Yes.

Confidential

SCNAACP_CD_006909

1          SENATOR RANKIN:  All right.  So let's show of

2     hands and proxies.  First, show of hands in support of

3     Senator Campsen's amendment, please raise your right

4     hand, left hand, whichever, both hands, pick your --

5     all right.

6          UNIDENTIFIED SPEAKER:  Eight.

7          SENATOR RANKIN:  Eight present.  Proxies?

8          UNIDENTIFIED SPEAKER:  I have -- may I see --

9          UNIDENTIFIED SPEAKER:  I have Kimbrell.

10         SENATOR RANKIN:  So Kimbrell votes aye.

11         UNIDENTIFIED SPEAKER:  Massey, aye.  Climer, aye.

12         UNIDENTIFIED SPEAKER:  Johnson.

13         UNIDENTIFIED SPEAKER:  Aye.

14         UNIDENTIFIED SPEAKER:  Aye.  Aye.

15         SENATOR RANKIN:  All right.  Ernst & Young

16    accounting firm.  In a second.  All right.  By a vote

17    of 13 in support.  Now let's count the nay votes again

18    and proxies.

19         UNIDENTIFIED SPEAKER:  Hutto votes negative.

20         SENATOR RANKIN:  Senator Kimpson, you're voting

21    nay as well?

22         SENATOR KIMPSON:  Nay.  Nay.

23         UNIDENTIFIED SPEAKER:  Mia is voting nay.

24         SENATOR RANKIN:  Mia, Senator McLeod, is voting

25    as well.  She votes nay.

Confidential

SCNAACP_CD_006910

1        UNIDENTIFIED SPEAKER:  (Indiscernible).

2        SENATOR RANKIN:  By vote of --

3        SENATOR MALLOY:  Senator from Orangeburg, I have

4    his proxy, and he votes no.

5        SENATOR RANKIN:  We think by a vote of 13 to

6    eight.

7        SENATOR MALLOY:  And also my vote is no.

8        SENATOR RANKIN:  All right.  So that motion

9    advances.

10        Are there any other amendments that would be

11    proposed today?  Senator Harpootlian.

12        SENATOR HARPOOTLIAN:  Mr. Chairman, the proposal

13    labeled 2A I'm going to withdraw from committee

14    consideration, reserving my right to present an

15    amendment on the floor.

16        SENATOR RANKIN:  Okay.  And so, again, as we have

17    -- we all say it.  We all wonder what it means.  You

18    got many more bites of the apple that you're not

19    attempting it here at the full committee.  And so --

20    an apple, an orange, pick your --

21        SENATOR HARPOOTLIAN:  Banana.

22        SENATOR RANKIN:  A banana, whichever.  So we've

23    got a revision of the vote with Senator Kimbrell's

24    proxy.  It is 14 to 8.  So Ernst & Young will certify

25    these in June.

Confidential

SCNAACP_CD_006911

1      So would there be a motion on to the bill now as

2    amended?

3      SENATOR MALLOY:  I use the same vote,

4    Mr. Chairman.

5      SENATOR RANKIN:  All right.

6      SENATOR HARPOOTLIAN:  Unanimous consent to the

7    same vote?

8      SENATOR RANKIN:  All right.  Unanimous consent

9    motion made, seconded that we use the same outcome of

10   the last vote.  All in favor say aye.

11      MULTIPLE SPEAKERS:  Aye.

12      SENATOR RANKIN:  Any opposition to that?  All

13   right.  By a vote of 14 to 8, the Bill 965 will

14   advance, and we will see you on the floor shortly.

15   Thank you all so much.

16

17                   * End of Recording *

18

19

20

21

22

23

24

25

Confidential

SCNAACP_CD_006912

1           C E R T I F I C A T E

2

3        I, Robin L. Deal, Florida Professional Court

4    Reporter and Transcriptionist, do hereby certify that I

5    was authorized to and did listen to and transcribe the

6    foregoing recorded proceedings and that the transcript is

7    a true record to the best of my professional ability.

8

9        Dated this 20th day of January, 2022.

10

11

12

13

14

15

16

17        _____

18        ROBIN L. DEAL

19

20

21

22

23

24

25

Confidential                                                                    SCNAACP_CD_006913