*SC NAACP v. Alexander,*
D.S.C. Case No. 3:21-cv-03302-MGL-TJH-RMG

# EXHIBIT 4

Page 1

```
IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION
---------------------------------------x
THE SOUTH CAROLINA STATE
CONFERENCE OF THE NAACP

            and

TAIWAN SCOTT, ON BEHALF OF HIMSELF        Case No.
AND ALL OTHER SIMILARLY SITUATED          3:21-CV-03302
PERSONS,                                  JMC-TJH-RMG

                    Plaintiffs,

            Vs.

THOMAS C. ALEXANDER, IN HIS OFFICIAL
CAPACITY AS PRESIDENT OF THE SENATE;
LUKE A. RANKIN, IN HIS OFFICIAL CAPACITY
AS CHAIRMAN OF THE SENATE JUDICIARY
COMMITTEE; MURRELL SMITH, IN HIS OFFICIAL
CAPACITY AS SPEAKER OF THE HOUSE OF
REPRESENTATIVES; CHRIS MURPHY, IN HIS
OFFICIAL CAPACITY AS CHAIRMAN OF THE
HOUSE OF REPRESENTATIVES JUDICIARY
COMMITTEE; WALLACE H. JORDAN, IN HIS
OFFICIAL CAPACITY AS CHAIRMAN OF THE HOUSE
OF REPRESENTATIVES ELECTIONS LAW
SUBCOMMITTEE; HOWARD KNAPP, IN HIS
OFFICIAL CAPACITY AS INTERIM EXECUTIVE
DIRECTOR OF THE SOUTH CAROLINA STATE
ELECTION COMMISSION; JOHN WELLS, JOANNE
DAY, CLIFFORD J. EDLER, LINDA MCCALL,
AND SCOTT MOSELEY, IN THEIR OFFICIAL
CAPACITIES AS MEMBERS OF THE SOUTH
CAROLINA STATE ELECTION COMMISSION,
                           Defendants.
-----------------------------------------x

    STENOGRAPHIC REMOTE VIRTUAL DEPOSITION
             CHARLES TERRENI
          Tuesday, August 16, 2022
```

Page 18

1  TERRENI
2      A.  It was a lawsuit brought
3  under the South Carolina, I believe
4  it's called the State Accommodations
5  Act against a restaurant that
6  discriminated against my clients for
7  refusing them service.
8      Q.  What about a Voting Rights
9  Act claim, have you ever brought or
10 defended against one of those?
11     A.  Yes, ma'am.
12     Q.  In what context?
13     A.  Well, there have been a
14 few.  Would you like me to try to go
15 through them or...
16     Q.  Yes, please, briefly.  What
17 body was at issue?
18     A.  They were primarily Section
19 5 claims.  I litigated a Section 5
20 claim on behalf of the Richland
21 County Republican Party in the '90s
22 involving the need to preclear
23 changes in a redistricting plan.  I
24 was the plaintiff.
25     I defended the State

Page 19

1  TERRENI
2  Republican Party in an action that
3  was brought trying to compel
4  preclearance of the state
5  presidential primary in 2000, which
6  was a volunteer primary.
7      I brought a Section 5 claim I
8  believe against Allendale County
9  several years ago involving
10 Allendale, one of the Allendale
11 County local governments and that
12 was also a preclearance issue and an
13 equal protection issue.
14     That's what I remember off the
15 top of my head.
16     Q.  You mentioned Section 5.
17 What is your understanding of what
18 Section 5 required?
19     A.  Retrogression.
20     Q.  What does retrogression
21 mean to you?
22     A.  Well, what retrogression
23 meant to me was -- well, it was
24 twofold.  It was one that the
25 existing rights of minority voters

Page 20

1  TERRENI
2  should not be diminished in a
3  redistricting plan absent
4  unavoidable circumstances such as
5  inward migration or something of
6  that sort.
7      There was an intent component
8  in Section 5 as I recall.  And then
9  as a practical matter it required
10 either getting preclearance from the
11 Justice Department and persuading
12 them that a plan was
13 nonretrogressive or retrogressive
14 depending on what side I was on.
15 And also -- or in the alternative
16 obtaining a declaratory judgment
17 from the D.C. Circuit.
18     Q.  Under Section 5 could a
19 jurisdiction go from having three
20 majority-minority districts to two,
21 for example?
22     A.  It could.
23     Q.  It could under what
24 circumstances?
25     A.  A plethora of

Page 21

1  TERRENI
2  circumstances, but one would be that
3  the population wouldn't be there to
4  support three minority districts
5  anymore.
6      Q.  Did it require looking at
7  voting patterns to see whether or
8  not there was racial bloc voting in
9  a jurisdiction?
10     A.  It could.
11     Q.  Are you familiar with
12 racial bloc voting?
13     A.  To some extent, yes.
14     Q.  What do you understand it
15 to mean?
16     A.  I mean racial bloc voting
17 if you are referring to the Gingles
18 preconditions it would entail a
19 situation in which the minority
20 community is sufficiently compact to
21 form the majority district, that the
22 minority community is politically
23 cohesive and tends to attempt to
24 vote candidates of its choice.  Then
25 if you have racially polarized

6 (Pages 18 - 21)

Page 22

TERRENI

1  TERRENI
2  voting, you would have the majority
3  community consistently frustrating
4  the efforts of the minority
5  committee to elect candidates of its
6  choice.
7      Q.  While you were defending or
8  while you were working on Section 5
9  actions was it also possible for --
10 are you aware whether it was
11 possible for a jurisdiction to
12 receive preclearance under Section 5
13 and still face a lawsuit on the
14 other side of that preclearance
15 under some other constitutional or
16 statutory framework?
17     A.  I'm aware that it was.
18     Q.  Are you aware that the
19 constitutional and statutory
20 framework still exists today that
21 existed when Section 5 was in
22 operation?
23     A.  I'm aware that -- yes.
24 Generally speaking.  I mean I
25 haven't wanted to do a history

Page 23

1  TERRENI
2  lesson here because I'm not capable
3  of it, but I'm generally aware that
4  you can still sue someone over a
5  redistricting plan under Section 2
6  or the 14th Amendment or whatever
7  causes of action existed before
8  Section 5 no longer was in effect.
9      Q.  No longer is in?
10     A.  Effect.
11     Q.  Section 5 is still
12 constitutional, it just doesn't
13 function anymore, is that your
14 understanding?
15     A.  My understanding is until
16 such time as Congress were to update
17 the coverage formula Section 5
18 cannot be implemented.
19     Q.  Do you know anything about
20 the bail-in requirement under
21 Section 3C under the Voting Rights
22 Act?  Are you familiar with that?
23     A.  I'm generally aware that
24 plaintiffs can sue a jurisdiction
25 for discriminatory practices.  You

Page 24

1  TERRENI
2  know, I don't know the particulars
3  of it, but to force coverage of
4  Section 5 for a particular
5  jurisdiction.
6      Q.  Have you ever brought or
7  defended against a Section 2 action
8  under the Voting Rights Act?
9      A.  Bear with me, I haven't
10 practiced law in a while.
11     I have never brought a Section
12 2 action.  It is possible that
13 Section 2 was raised as a cause of
14 action in some of the litigation in
15 which I have been involved.
16     Q.  Have you ever represented a
17 minority individual plaintiff or a
18 group that served minority voters in
19 a Section 5 or other voting type
20 challenge or case?
21     A.  That's a broad statement.
22 I mean if you are talking about a
23 named plaintiff, to the best of my
24 recollection, no.  There would have
25 been -- there may have been minority

Page 25

1  TERRENI
2  members involved in the entities
3  that I represented.
4      Q.  Have you ever represented
5  -- you mentioned having represented
6  Republican organizations in some
7  Section 5 proceedings.  Have you
8  ever represented a
9  Democratic-affiliated organization
10 in a Section 5 proceeding?
11     A.  No.
12     Q.  Would you consider the
13 Voting Rights Act a race-conscious
14 statute?
15     A.  I don't understand the
16 question.
17     Q.  Would you consider the
18 Voting Rights Act to be a statute
19 that requires awareness of race?
20     A.  Not universally.  I mean it
21 is certainly a statute that is
22 designed to protect the rights of
23 racial minorities under certain
24 circumstances but it doesn't mean
25 that you need universal awareness of

7 (Pages 22 - 25)

```
                                                        Page 186                                                          Page 188
 1              TERRENI                                               1              TERRENI
 2    just fiduciary, is that your                                    2       Q.  Could it include the
 3    understanding?                                                  3    packing of black voters?
 4       A.  Yes.                                                     4       A.  It could as the term is
 5       Q.  Under Roman numeral I-B                                  5    used in the case law.
 6    still in the federal law section                                6       Q.  Could it include both the
 7    it's titled Voting Rights.  Could                               7    packing and cracking of black
 8    you take a moment to read that                                  8    voters?
 9    sentence.                                                       9       A.  Yes.
10       A.  "A redistricting plan for                               10       Q.  I believe you mentioned the
11    the general assembly or Congress                               11    three Gingles preconditions.  Are
12    must not have either the purpose or                            12    the three Gingles preconditions that
13    the effect of diluting minority                                13    you mentioned what you would
14    voting strength and must otherwise                             14    consider to be the test for whether
15    comply with Section 2 of the Voting                            15    there's dilution of minority voting
16    Rights Act, as expressed in                                    16    strength?
17    Thornburg versus Gingles and its                               17       A.  It would be one test.
18    progeny, and the 14th and 15th                                 18       Q.  What is the other or what
19    amendments to the U.S.                                         19    is another?
20    Constitution."                                                 20       A.  Well, racial gerrymandering
21       Q.  What did understand the                                 21    could, I don't suppose it
22    diluting a minority voting strength                            22    necessarily has to, but could result
23    mean?                                                          23    in the dilution of minority voting
24       A.  Generally speaking it means                             24    strength.  It could result in the
25    the diluting of -- the effective                               25    enhancement of the minority voting

                                                        Page 187                                                          Page 189
 1              TERRENI                                               1              TERRENI
 2    reduction of a minority community's                             2    strength as well, but that would be
 3    ability to exercise its electoral                               3    another way of doing it.
 4    franchise either through Section 2                              4       Q.  I believe you mentioned
 5    by electing a representative of its                             5    earlier that racial gerrymandering
 6    choice or through the ability to                                6    can be demonstrated through direct
 7    elect or an opportunity to elect a                              7    evidence of dilution, is that your
 8    representative of its choice                                    8    understanding?
 9    regarding the three Thornburg versus                            9       A.  I may have said that, but I
10    Gingles preconditions are met and,                             10    need to -- I mean the central
11    three, the avoidance of intentional                            11    question of racial gerrymandering
12    or predominantly race based                                    12    would be whether race was a
13    redistricting under the 14th                                   13    predominant factor in the
14    amendment as shown in subsequent                               14    redistricting process and whether or
15    case law.                                                      15    not if it was the predominant factor
16       Q.  In South Carolina would                                 16    in redistricting process whether it
17    minorities include black voters?                               17    was the predominant factor in order
18       A.  Yes.                                                    18    to serve a compelling state
19       Q.  Would an example of                                     19    interest.
20    dilution of racial or ethnic                                   20       Q.  And what do you understand
21    minority voting strength include the                           21    to be compelling state interest?
22    cracking of black voters?                                      22       A.  Under some circumstances
23       A.  It's a legal term but yes,                              23    compliance of Section 2 could be a
24    it could.  It could as the term is                             24    compelling state interest.
25    used in the case law.                                          25    Compliance of Section 2 does not
```

Page 190

```
                TERRENI
 1                TERRENI
 2      always have to be.  I assume you can
 3      comply with Section 2 without having
 4      to consider race as the predominant
 5      factor but it could be.
 6         Q.  What about remedying
 7      historical discrimination, has that
 8      been recognized as a compelling
 9      state interest?
10         A.  It may have been recognized
11      as a compelling state interest but
12      in the current redistricting
13      framework, as I understand it,
14      unless it's expressed through the
15      Voting Rights Act it wouldn't in and
16      of itself be -- I don't know there
17      would be a compelling state interest
18      for using race as the predominant
19      factor in redistricting.  I never
20      really had to encounter that.
21         Q.  If staff was instructed not
22      to consider race during
23      congressional redistricting, who
24      would have made that decision on
25      behalf of the Senate?
```

Page 191

```
 1                TERRENI
 2         MR. GORE:  Again, I'm just
 3      going to object to the extent this
 4      calls for attorney-client
 5      communications.  And the witness
 6      can answer to the extent he can do
 7      so without divulging confidential
 8      or privileged information.
 9         A.  Well, the question is if
10      staff were considered -- were
11      instructed not to consider race in
12      redistricting who would have
13      instructed staff in that fashion, is
14      that -- did I restate your question
15      fairly?
16         Q.  Yes.
17         A.  Well, I don't think anybody
18      could have instructed staff in that
19      regard better than the chairman or
20      the subcommittee and the vote if
21      that guidance was given.  However,
22      if that guidance were given, it
23      would have been given by counsel,
24      me, Mr. Gore, Mr. Fiffick.
25         Q.  Are you aware whether
```

Page 192

```
 1                TERRENI
 2      Chairman Rankin instructed Senate
 3      staff not to consider race during
 4      congressional redistricting?
 5         A.  I don't recall him doing
 6      that.
 7         Q.  Is that something you would
 8      recall?
 9         A.  Probably.
10         Q.  Because it's important
11      whether or not the Senate could
12      consider race or not in drawing
13      redistricting lines?
14         A.  No.  It's just because it
15      would have been a specific
16      instruction from Senator Rankin.  I
17      mean when you say considering race,
18      if you are asking did Senate staff
19      look at the racial impact of various
20      draws or the racial composition in
21      districts under various draws, the
22      answer is yes.  Was it the
23      predominant factor in guiding
24      redistrict -- proposed redistricting
25      fans, no, and was it a predominant
```

Page 193

```
 1                TERRENI
 2      factor for the subcommittee, I don't
 3      believe it was.
 4         Q.  Who would have made the
 5      determination of whether or not race
 6      was the predominant factor in
 7      redrawing the congressional map?
 8         A.  The courts.
 9         Q.  So that decision, that
10      analysis of whether race was the
11      predominant factor in the redrawing
12      of South Carolina's congressional
13      map, that has not been determined
14      yet because litigation is ongoing?
15         A.  I mean that's the way I see
16      it.  If you are asking whether or
17      not we consider race as the
18      predominant factor, the answer is
19      no.
20         Q.  Because that's a factual
21      question because there hasn't been a
22      legal determination yet?
23         A.  Well, I suppose so.  I mean
24      obviously we don't think it was.
25      You seem to think that it was the
```

49 (Pages 190 - 193)

Veritext Legal Solutions
212-267-6868     www.veritext.com     516-608-2400