*SC NAACP v. Alexander,*
D.S.C. Case No. 3:21-cv-03302-MGL-TJH-RMG

# EXHIBIT 9

```
                                                              Page 1

 1
 2    IN THE UNITED STATES DISTRICT COURT.
      FOR THE DISTRICT OF SOUTH CAROLINA
 3    COLUMBIA DIVISION
      ---------------------------------------x
 4    THE SOUTH CAROLINA STATE CONFERENCE
      OF THE NAACP
 5
                    and
 6
      TAIWAN SCOTT, ON BEHALF OF HIMSELF       Case No.
 7    AND ALL OTHER SIMILARLY SITUATED         3:21-CV-03302
      PERSONS,                                 JMC-TJH-RMG
 8
                         Plaintiffs,
 9
                    Vs.
10
      THOMAS C. ALEXANDER, IN HIS OFFICIAL
11    CAPACITY AS PRESIDENT OF THE SENATE;
      LUKE A. RANKIN, IN HIS OFFICIAL CAPACITY
12    AS CHAIRMAN OF THE SENATE JUDICIARY
      COMMITTEE; MURRELL SMITH, IN HIS OFFICIAL
13    CAPACITY AS SPEAKER OF THE HOUSE OF
      REPRESENTATIVES; CHRIS MURPHY, IN HIS
14    OFFICIAL CAPACITY AS CHAIRMAN OF THE
      HOUSE OF REPRESENTATIVES JUDICIARY
15    COMMITTEE; WALLACE H. JORDAN, IN HIS
      OFFICIAL CAPACITY AS CHAIRMAN OF THE HOUSE
16    OF REPRESENTATIVES ELECTIONS LAW
      SUBCOMMITTEE; HOWARD KNAPP, IN HIS
17    OFFICIAL CAPACITY AS INTERIM EXECUTIVE
      DIRECTOR OF THE SOUTH CAROLINA STATE
18    ELECTION COMMISSION; JOHN WELLS, JOANNE
      DAY, CLIFFORD J. EDLER, LINDA MCCALL,
19    AND SCOTT MOSELEY, IN THEIR OFFICIAL
      CAPACITIES AS MEMBERS OF THE SOUTH
20    CAROLINA STATE ELECTION COMMISSION,
21                       Defendants.
      ------------------------------------------x
22
         STENOGRAPHIC REMOTE VIRTUAL DEPOSITION
23                  BREEDEN JOHN
              Tuesday, August 9, 2022
24
25
```

Page 266

JOHN

1  
2   A. Yes.
3   Q. Would you agree that not
4 every guideline in the redistricting
5 guidelines is applicable to every
6 single line drawn?
7   A. Yeah. In a perfect world
8 you may be able -- that may be the
9 case but it's just not how it plays
10 out.
11   Q. And tensions that rise in
12 the guidelines for any specific cuts
13 were resolved by political
14 directions, were they not?
15   A. They were.
16   Q. There's nothing wrong with
17 that, is there?
18   A. No. It's part of the
19 legislative process.
20   Q. Are you aware of any legal
21 requirement or any requirement in
22 the guidelines for the Senate to
23 start with a blank slate?
24   A. No.
25   Q. Did it make more sense to

Page 267

JOHN

1  
2 use the starting point, a map that
3 was blessed by the Supreme Court of
4 the United States and survived
5 racial gerrymandering claims and
6 section 2 claims?
7   A. Yes. It certainly makes a
8 lot more sense.
9   Q. Was that especially the
10 case when the 7th Districts were in
11 the high 90s of the deviation for
12 population?
13   A. Right. It was the most
14 logical starting point in my
15 opinion.
16   Q. Were you aware that the
17 Backus case, that's B-A-C-K-U-S,
18 that was litigated last cycle for
19 redistricting involved a racial
20 gerrymandering claim?
21   A. That was my impression.
22 Yes, I was aware.
23   Q. So it wasn't decided
24 specifically on section 5 grounds,
25 was it?

Page 268

JOHN

1  
2   A. That's correct. That's
3 correct.
4   Q. And were you aware that the
5 court there actually held that the
6 defendants disproved that race was a
7 predominant factor?
8   A. That's what I was trying to
9 harken back to earlier in my
10 conversation with Mr. Cusick that --
11 yes, that's what I was trying to
12 relay.
13   Q. So it wasn't just a failure
14 of the plaintiffs' burden of proof,
15 they found that the defendants
16 disproved it, did they not?
17   A. That's correct.
18   Q. So in light of all that did
19 you see any issues with starting
20 with the benchmark plan and tweaking
21 accordingly based on population
22 changes?
23   A. Not at all. No problem.
24   Q. Mr. John, you were involved
25 in this process from day one, right?

Page 269

JOHN

1  
2   A. Pretty much, yes.
3   Q. Are you aware of anything
4 in law or in fact that would in any
5 way suggest the notion that race was
6 a predominant factor in drawing the
7 plan for Congress that was enacted
8 by the General Assembly?
9   A. No. And that's part of why
10 I was so disappointed with the
11 testimony we received at the
12 November 29th hearing from former
13 Congressman Cunningham. We all felt
14 good about the process and that
15 everything was done appropriately
16 and to hear some of the accusations
17 was a little disappointing.
18   Q. And are you aware that the
19 plaintiffs have not challenged
20 congressional District 6, correct?
21   A. Yes, I'm aware.
22   Q. And you are also aware that
23 the enacted plan has Congressional
24 District 1 with a higher BVAP than
25 the benchmark plan, correct?