*SC NAACP v. Alexander,*
D.S.C. Case No. 3:21-cv-03302-MGL-TJH-RMG

# EXHIBIT 4

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF SOUTH CAROLINA
 2                    COLUMBIA DIVISION
 3    THE SOUTH CAROLINA STATE
      CONFERENCE OF THE NAACP
 4
          and
 5
      TAIWAN SCOTT, ON BEHALF OF HIMSELF
 6    AND ALL OTHER SIMILARLY SITUATED
      PERSONS,
 7
              Plaintiffs,
 8
          vs.             Case No. 3:21-CV-03302-MGL-TJH-RMG
 9
      THOMAS C. ALEXANDER, IN HIS OFFICIAL
10    CAPACITY AS PRESIDENT OF THE SENATE;
      LUKE A. RANKIN, IN HIS OFFICIAL CAPACITY
11    AS CHAIRMAN OF THE SENATE JUDICIARY
      COMMITTEE; MURRELL SMITH, IN HIS OFFICIAL
12    CAPACITY AS SPEAKER OF THE HOUSE OF
      REPRESENTATIVES; CHRIS MURPHY, IN HIS
13    OFFICIAL CAPACITY AS CHAIRMAN OF THE HOUSE
      OF REPRESENTATIVES JUDICIARY COMMITTEE;
14    WALLACE H. JORDAN, IN HIS OFFICIAL CAPACITY
      AS CHAIRMAN OF THE HOUSE OF REPRESENTATIVES
15    ELECTIONS LAW SUBCOMMITTEE; HOWARD KNAPP,
      IN HIS OFFICIAL CAPACITY AS INTERIM
16    EXECUTIVE DIRECTOR OF THE SOUTH CAROLINA
      STATE ELECTION COMMISSION; JOHN WELLS,
17    JOANNE DAY, CLIFFORD J. EDLER, LINDA MCCALL,
      AND SCOTT MOSELEY, IN THEIR OFFICIAL
18    CAPACITIES AS MEMBERS OF THE SOUTH CAROLINA
      STATE ELECTION COMMISSION,
19
              Defendants.
20    _____
21    DEPOSITION OF:   BRENDA C. MURPHY
                       (Via Videoconference)
22
      DATE:            Monday, August 8, 2022
23
      TIME:            10:00 a.m.
24
      LOCATION:        6111 North Main Street
25                     Columbia, South Carolina
```

Page 68

1    against each other in certain districts.

2              MR. INGRAM:  Objection.

3              THE WITNESS:  It depends on how the

4    lines are drawn.  And we were doing it in such a

5    manner that we were in terms of not minimizing the

6    influence of the Black voter.

7    BY MR. TYSON:

8              Q.   No, I understand that.  You were -- you

9    were looking at the Black voters and you were

10   looking at race, and that was a factor that you used

11   in drawing your maps.  Right?

12             A.   That's right, in order to be able to

13   be -- for Black voters to be able to -- be able to

14   at least have some influence on who is elected,

15   whether it's a Black person or a White person, but

16   have some influence on a person of choice for their

17   community.

18             Q.   And I understand that position strongly.

19   Let's just be clear on this.  Race was a factor --

20   race was a factor that the NAACP used in drawing its

21   maps.  Right?

22             A.   To minimize the impact on the ability of

23   Black people to influence the selection -- the

24   person of choice.

25             Q.   And so that was real important to you

Page 69

1    and the NAACP.  Right?

2             A.   Yes.

3             Q.   And it was more important to make sure

4    that the lines were drawn, that race was used in a

5    way that it even might be at the expense of looking

6    at some of these traditional criteria, right, like

7    splitting and contiguous and compact and cores of

8    interest?

9                  MR. INGRAM:  Objection.

10                 THE WITNESS:  Okay.  Would you ask that

11   question again?

12   BY MR. TYSON:

13            Q.   Yeah.  I'm just trying to -- I'm not

14   trying to make an argument or trying to be in an

15   argument, but I think we are speaking the same way.

16   Race was used in a way by the NAACP maps to draw its

17   districts.  Correct?

18            A.   Yes.

19            Q.   And some of that resulted potentially in

20   not -- in having -- making race at a higher priority

21   than some of these other nonracial criteria --

22                 MR. INGRAM:  Objection.

23   BY MR. TYSON:

24            Q.   -- compactness, contiguous, contiguity.

25   Does that make sense?

Page 70

1          A.    Yeah.   But keep in mind the Voting

2     Rights Act, Section 2.   That's something we also

3     considered.   Okay?

4               Now, you don't have to -- in terms of

5     being able to influence what happens to you in your

6     community, you know, when you look at BVAPs it

7     doesn't have to be a higher BVAP, because maybe the

8     person that you want to represent you may not always

9     be a Black person, but at least you get a

10    blurry-free vote.

11         Q.   I'm not -- like I said, Ms. Murphy, I

12    wasn't arguing with you.   I just wanted to make sure

13    we were on the same page about that.

14               You just mentioned the Voting Rights

15    Act.   There is not a Voting Rights Act Section 2

16    claim in this complaint, though, is there?

17         A.   Well, you know, I think the thing -- we

18    have to consider the constitution in terms of how --

19    and making sure we are in compliance.   So when it

20    comes to the Voting Rights Act, you know, we have to

21    look at Section 2.   And I understand what you're

22    saying.   But my point is, if we are not saying

23    that -- we are not asking that the BVAP be

24    50 percent or greater, you know, it may be 25

25    percent and that community still can influence who

Brenda C. Murphy                                        August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 71

1    represents them in that area.

2         Q.   Yes, ma'am.  I understand there are some

3    constitutional challenges, but when you made that

4    reference I just wanted to make sure, again, we were

5    on the same page, that a Section 2 Voting Rights Act

6    claim is not in the complaint.

7         A.   Okay.

8         Q.   All right.  I have got about maybe ten

9    or fifteen more minutes this morning.  Is that okay

10   or do you want a break?

11             MR. INGRAM:  Can we take a five-minute

12   break?

13             MR. TYSON:  Yeah, let's do that, and

14   then we will go through this.  There is probably

15   fifteen more minutes before finishing up, but let's

16   take a five-minute break.

17             THE WITNESS:  Okay.

18   (Break In Proceedings)

19   BY MR. TYSON:

20        Q.   Ms. Murphy, I have got, I thought, ten

21   or fifteen minutes, but I think I'm only going to

22   have about five more minutes of questions because I

23   think the second round of questions is probably

24   better over in the 30(b)(6) part than in this part.

25             But let me just make sure that we are on

Page 72

1    the -- that we were speaking the same.  When an

2    issue comes up and I have an opinion on it, I have

3    texted my representative or called my representative

4    and my senator just to give them my two cents.  And

5    so I was asking you earlier, have you contacted your

6    senator or your House member to give them your

7    opinions?  And if I heard you, you said no, you

8    didn't because you didn't want to look like you were

9    being partisan or that you were trying to influence

10   the process.  Is that right?

11              A.    Yes.

12              Q.    Okay.  How about other members of the

13   NAACP?  Do you know whether they contacted their

14   various representatives and senators to provide

15   their input on Congressional redistricting?

16              A.    I was -- I can only say that they were

17   highly discouraged from doing that.  We were

18   reminded several occasions we are nonpartisan, and

19   so this process should be done in that manner.

20              Q.    And so they were encouraged not to

21   participate in the process?

22              A.    No.  No.  Not to contact their

23   representatives regarding the process.

24              Q.    Just to participate in the -- in the --

25              A.    Hearings.

Brenda C. Murphy                           August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 73

1          Q.   All right.  But to stay away from any

2     personal contact with them.

3          A.   Correct.

4               MR. TYSON:  All right.  Let's go to,

5     Antonio, what was marked in the book as Exhibit 20,

6     and we will mark it as Exhibit 3.

7     (Senate Exhibit No. 0003, 9-30-21 SC State Conference

8     NAACP Reapportionment Coalition Meeting Minutes, was

9     marked)

10              MR. INGRAM:  I will let you know once it

11    loads.

12              Got it.

13    BY MR. TYSON:

14         Q.   It's a September 30, 2021 document.  Do

15    you see that?

16         A.   Yes.

17         Q.   Okay.  And it's Reapportionment

18    Coalition Meeting Minutes.  Correct?

19         A.   Yes.

20         Q.   Okay.  Down there at the bottom, just

21    the last paragraph where it's titled "Update on

22    Plenary," do you see that?

23         A.   Yes.

24         Q.   What was that about, that Attorney

25    Cusick -- what does that sentence mean, that first

Page 74

1    sentence that Reverend Moore -- that he stated

2    something, what does that mean?  I will let you read

3    it.

4          A.    Okay.  Reverend Moore was one of the LDF

5    trainers.  And I guess he -- that was Moore still

6    training, that's all.

7          Q.    Okay.  And what does that mean, "to

8    strengthen branch members in challenging areas?"

9          A.    I don't know if that terminology is

10   correct, because at this point we had not talked

11   about challenging.  I think he maybe was saying in

12   terms of strengthening their ability to challenge,

13   if there was an area, with testimony.  You know, I

14   think it is just in terms of with testimony and

15   challenges.  Oh.  That was just preparation.  We had

16   not -- no, we had not identified any areas.

17         Q.    I read this to just say that it looked

18   like that there were challenging areas with

19   testimonial challenges, that maybe there were some

20   branches that didn't have folks that were testifying

21   or speaking on some of their challenges.  That's

22   kind of how I read it, not a legal challenge.  Is

23   that right?

24         A.    No, no, no.  Those basically were

25   scenarios that were presented to help them in terms

Brenda  C. Murphy                              August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 75

1    of being able to articulate what the challenges

2    were.

3          Q.   Then how about the next sentence, what

4    did he say?

5          A.   "He needs communication support and

6    assistance to remind and encourage -- "to come out."

7    That sentence?

8          Q.   Yes, ma'am.

9          A.   Oh, that's basically that they need to

10   be branch members.  Not just the officers need to

11   participate in the process.  So branch -- you know,

12   we were preparing branch leaders to be able to share

13   information with their members, in terms of

14   encouraging them to participate.

15         Q.   And then the next sentence, what does

16   that say?  What is that talking to?

17         A.   Which one?  Aiden (sic)?

18         Q.   The one that starts off "Attorney

19   Aiden."

20         A.   "spoke about the model testimony."

21         Q.   Yes.

22         A.   "model testimony and demographic

23   profiles."  That was just information sharing.

24   That's still all it was, just information sharing.

25         Q.   So it looks like Attorney Aiden prepared

Page 76

1    or is talking about model testimony for the branch

2    members to use.  Right?

3        A.   No.  No.  They were not -- no.  As I

4    said, they had scenarios that they were working on.

5        Q.   Who is "they"?

6        A.   The trainers.  That was Moore, Cusick.

7        Q.   Well, what does it mean to "model

8    testimony"?

9        A.   I don't know.  I guess you would have to

10   ask her about that.  I don't know if that

11   terminology is correct or not.  But I know the only

12   thing that they were doing was looking at

13   scenarios -- kind of, members were reflecting how

14   they might respond.  And just training.

15       Q.   And then the last sentence of that

16   paragraph talks about that you sent out these

17   information and training documents three times this

18   week.  Right?

19       A.   Yeah.  Yes.

20       Q.   So you were doing a lot to make sure

21   that your members and your branches participated in

22   the process.  Right?

23       A.   Yes.

24       Q.   And is it fair to say that they did

25   participate in the process, based on your training

Brenda C. Murphy                        August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 77

1    and your educational materials?

2           A.    Yes.

3           Q.    Two paragraphs below that it talks about

4    "Identification of Prospective Plaintiffs."  What

5    does that mean?

6           A.    I'm not for sure what that says.  I

7    guess she is saying, you know, basically, there is

8    lack of timeliness.  This is President Williams, in

9    the Orangeburg area, just in terms of getting public

10   information about meetings.

11          Q.    Yeah, but what about the prospective

12   plaintiffs?  What is that?

13          A.    "in low public participation from the

14   community perspective."  It says:  "It is critical

15   to keep communities informed with transparent,

16   up-to-date, and timely notifications about meetings,

17   sessions, mapping, and public input information."

18                And I guess this was basically her

19   perception, that they were not getting timely

20   notices about -- and I guess this is when -- what

21   date is on that?

22          Q.    September the 3rd.  But it was your

23   desire, too, to go out and find prospective clients

24   at this time.  Right?

25          A.    To do what?

Page 78

1          Q.   To go out and find prospective

2     plaintiffs for a lawsuit.

3               MR. INGRAM:   Objection.

4               THE WITNESS:   No.  No, that is not

5     correct.  No.

6     BY MR. TYSON:

7          Q.   You weren't trying to identify potential

8     plaintiffs?

9          A.   No.  No.

10         Q.   Well, let's read the next sentence,

11    then, "Update From the Desk of President," where it

12    says:  "President Murphy" --

13         A.   Just a moment.

14              "Should it become necessary.  Boykin and

15    Aiden discussed negative and historical backlash

16    against people testifying during litigation risks

17    outside of the norm."

18         Q.   Yeah, but the first sentence says:

19    "President Murphy reported she and the PAG would go

20    through identified areas to discuss and identify

21    potential plaintiffs from those areas."  Right?

22    That's what it says.

23         A.   I don't know that that actually

24    happened.  It didn't, actually.

25         Q.   But this was done on September the 30th,

Page 79

1     and that was done before a lawsuit was filed.

2     Right?

3          A.   No.  I think you're mixing words here.

4     This is training.  This is training.  They are

5     working with individuals in the community.  They

6     know who are the -- who has the skill level.  Some

7     people don't have the skill level to testify, if

8     they were needed.  So as they trained, if there was

9     a need for litigation then they could have

10    identified those persons.  But in actuality, at this

11    point no one was identified.  And as you see, I

12    guess Attorney Boykin and Aden talk about the

13    negative and historical backlash against people

14    testifying and believe, you know, that is something

15    that may impact on people being willing to testify.

16         Q.   I understand.  I'm just reading the

17    words.  It said:  President Murphy reported she was

18    out trying to discuss and identify potential

19    plaintiffs from those areas.

20              And so my question, it doesn't qualify

21    it at all about if it shall be necessary.  My

22    question to you was -- you were looking for a

23    plaintiff to file a lawsuit is what that reads.

24    Right?

25         A.   That is not true, sir.  We had no reason

Brenda C. Murphy                        August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 80

1    to file a lawsuit at this point.

2            Q.   Well, that's what I was getting to.  How

3    in the world would you even know how to file a

4    lawsuit?  Because the Congressional plan hadn't been

5    done.  So that's why I just want to make sure --

6            A.   Okay.

7            Q.   -- that this group wasn't looking for

8    plaintiffs before the lawsuit was even -- before a

9    map was even drawn.  You would agree that's

10   improper, isn't it?

11           MR. INGRAM:  Objection.

12           THE WITNESS:  No.

13   BY MR. TYSON:

14           Q.   It's not improper to find a plaintiff --

15           A.   I'm saying --

16           Q.   Hold on, Ms. Murphy.  I don't want to

17   speak over you, but I'm asking, would it be improper

18   for you try to go find a plaintiff and potential

19   litigation and you don't even know what the

20   Congressional map looks like?  Is that not improper?

21           A.   If I did that, yes.

22           Q.   Well, this says you did.

23           A.   No, I did not, sir.

24           Q.   So you're saying that you didn't do what

25   this report -- well, what the assistant secretary,

Brenda  C. Murphy                                August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 81

1     how he reported the minutes?

2          A.    No, I did not.

3          Q.    And the next two sentences by Attorney

4     Boykin and Attorney Aiden, they are discussing about

5     the problems that one might have if they are going

6     to be plaintiffs because they might be called to

7     testify during litigation.  Right?

8          A.    Well, let me say something to you.  The

9     thing is, we were talking about the challenges if

10    anybody was to serve -- was needed to serve as a

11    plaintiff because of the historical challenges in

12    the past.  And I think that is part of that in terms

13    of the training that has been done.  And if there

14    was a need for a plaintiff to be a part of

15    litigation, then that was just some of the

16    challenges that they would be faced with because of

17    some of the fears from the past.

18         Q.    Let me ask you something, Ms. Murphy.

19    You have now testified at a deposition -- I think

20    this is at least your third or your fourth time.

21    Have you had any negative or historic backlash

22    because you have testified?  Have you had any

23    backlash because you are the president of the NAACP

24    and are testifying about litigation -- in this

25    litigation?

Brenda  C.  Murphy                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 82

1          A.    Right now?

2          Q.    Yes, ma'am.

3          A.    In the past?  Maybe not directly, but

4     indirectly, yes.

5          Q.    I'm talking about this litigation.  Not

6     in the past.  I'm talking about now.

7          A.    Well, when you look at the date on this,

8     we are talking pre-litigation.

9          Q.    Yeah.  That's why you're going out and

10    it says you're looking for plaintiffs.  It says

11    you're trying to look for --

12         A.    Sir, I can only say that what is

13    reflected there is not truly what was the intent.

14    And I know what my intent was.  And we were not

15    thinking about litigation prior to maps, because how

16    in the world could we think about litigation --

17    well, maybe we should think about litigation because

18    of what has happened in the past, but it was not

19    looking for plaintiffs for this case.

20         Q.    Well, I just want to make sure we are on

21    the same page, because that would be improper for

22    you to try to go find plaintiffs.

23         A.    I understand exactly what you're saying,

24    and I'm telling you that was not the intent.

25         Q.    No, I heard you say that.  But I'm

Brenda C. Murphy                                   August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 83

 1     asking the question because that would be improper

 2     for you to go find plaintiffs in a district --

 3             A.   Sir, I have heard --

 4             Q.   Hold on, Ms. Murphy.  Let me finish my

 5     question.  Because you don't even know what the

 6     districts are going to look like, so you couldn't

 7     find a plaintiff.

 8             A.   Sir, you have said that several times.

 9     And I have told you that is not my intent.  That was

10     not my intent.  Because I did not know what the maps

11     were going to look like.  And if there was

12     litigation, it would have been related to the

13     failure of the maps to be drawn in September or

14     earlier because there was no time to truly react to

15     the maps.

16             MR. TYSON:  Well, I was just trying to

17     make sure I understood what those words on the paper

18     said.  And I appreciate you answering my question.

19             Ms. Murphy, I'm going to end my part

20     right here of the personal part.  And I don't know

21     if the House or the Election defendants have any

22     questions that they want to ask, but I appreciate

23     you answering my questions.

24             THE WITNESS:  Okay.  You're welcome.

25             MS. HOLLINGSWORTH:  Thank you,

Brenda C. Murphy
The South Carolina State Confvs.McMaster/Alexander

August 8, 2022

Page 84

1    Mr. Tyson.

2              I'm Jennifer Hollingsworth on behalf the

3    House, and I think it makes sense that I will

4    reserve my questions for the 30(b)(6) deposition.

5              MR. TYSON:  Jane, are you still on?

6              MS. TRINKLEY:  Yes.  I have no

7    questions.  Thank you, Ms. Murphy.

8              THE WITNESS:  You're welcome.

9              MR. TYSON:  All right.  Madam Court

10   Reporter, that ought to finish the first deposition.

11             MR. INGRAM:  Wait.  Sorry.

12             MR. TYSON:  Sorry.  Excuse me, Antonio.

13             MR. INGRAM:  I may have redirect.  Give

14   me five minutes to look at my notes.  I may have

15   some redirect.

16             MR. TYSON:  Okay.  But you didn't say

17   you were going to talk to Ms. Murphy.  I missed what

18   you said.

19             MR. INGRAM:  No.  I said I may have some

20   redirect if you will give me five minutes to look at

21   my notes.

22             MR. TYSON:  Gotcha.  Thank you.  We will

23   see you in five minutes.

24                      CROSS-EXAMINATION

25   BY MR. INGRAM:

Page 85

1          Q.   So President Murphy, I just have a

2    question for you on redirect.

3               Earlier, in today's deposition when

4    Mr. Tyson asked you what congressional district you

5    resided in, you said you reside in Congressional

6    District 2.  Is it possible that you misspoke?

7          A.   Congressional District -- oh, yeah.  I'm

8    sorry.  I live -- it's in Congressional District 6.

9    I'm sorry.  Yeah.

10              MR. INGRAM:  No problem.  Thanks for

11   clarifying.  That is all my questions.

12              MR. TYSON:  Madam Court Reporter, we

13   will go off the record and finish this one.

14   (The deposition was concluded at 12:15 p.m.)

15   (The deponent does not waive reading and signing of

16   this deposition)

17

18

19

20

21

22

23

24

25

Brenda C. Murphy                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 86

1                    CERTIFICATE OF REPORTER

2                  I, Elaine L. Grove-DeFreitas, Certified

3        Shorthand Reporter and Notary Public for the State of

4        South Carolina at large, do hereby certify that the

5        foregoing transcript is a true, accurate and complete

6        record.

7                  I further certify that I am neither

8        related to nor counsel for any party to the cause

9        pending or interested in the events thereof.

10                 WITNESS MY HAND, I have hereunto

11       affixed my official seal this     day of     2022 at

12       Greenville County, South Carolina.

13

14

15

16       _____

         ELAINE L. GROVE-DEFREITAS

17       Certified Shorthand Reporter

         My Commission Expires 6/22/2030

18

19

20

21

22

23

24

25

Brenda  C. Murphy                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 87

1    Jennifer Hollingsworth

2    jhollingsworth@nexsenpruet.com

3                      August 19, 2022

4    RE: South Carolina State Conference Of The NAACP And Scott,

        Taiwan v. Mcmaster, Henry, Et Al.

5        8/8/2022, Brenda  C. Murphy (#5340046)

6        The above-referenced transcript is available for

7    review.

8        Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12       The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   cs-carolinas@veritext.com.

16

17    Return completed errata within 30 days from

18   receipt of testimony.

19     If the witness fails to do so within the time

20   allotted, the transcript may be used as if signed.

21

22                 Yours,

23                 Veritext Legal Solutions

24

25

Brenda  C. Murphy                                          August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 88

1    South Carolina State Conference Of The NAACP And Scott, Taiwan

v. Mcmaster, Henry, Et Al.

2    Brenda  C. Murphy (#5340046)

3                      E R R A T A  S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____    _____

24   Brenda  C. Murphy                              Date

25

Brenda  C. Murphy                                    August 8, 2022
The South Carolina State Confvs.McMaster/Alexander

Page 89

1    South Carolina State Conference Of The NAACP And Scott, Taiwan

     v. Mcmaster, Henry, Et Al.

2    Brenda  C. Murphy (#5340046)

3                    ACKNOWLEDGEMENT OF DEPONENT

4        I, Brenda  C. Murphy, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____    _____

12   Brenda  C. Murphy                        Date

13   *If notary is required

14                    SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                    _____ DAY OF _____, 20____.

16

17

18                    _____

19                    NOTARY PUBLIC

20

21

22

23

24

25