*SC NAACP v. Alexander,*
D.S.C. Case No.  3:21-cv-03302-MGL-TJH-RMG

# Exhibit G

Page 1

1

2

3

4

5                    SC NAACP v. McMASTER

6

7

8

9

10        TRANSCRIPT OF VIDEO-RECORDED PROCEEDINGS

11               SENATE OF SOUTH CAROLINA

12                  January 20, 2022

13       (Transcription Time 1:43:00 - 6:32:20)

14

15

16

17

18

19

20

21

22

23

24   Transcribed By:
     TERRI NESTORE
25   CSR No. 5614, RPR, CRR

1          PRESIDENT ALEXANDER:  The Senate will come to

2  order.  The Senate will come to order.

3          SENATOR MASSEY:  Mr. President?

4          PRESIDENT ALEXANDER:  The Senator from Edgefield,

5  for what purpose do you rise?

6          SENATOR MASSEY:  Mr. President, I move to

7  dispense with the balance of the motion period.

8          PRESIDENT ALEXANDER:  All in favor, say aye.

9          Any opposed?  The ayes have the motion.

10          The motion period is dispensed with.

11          The Senator from Edgefield.

12          SENATOR MASSEY:  Mr. President, I understand that

13  the pages have some documentation related to redistricting

14  to distribute to the membership.  I ask unanimous consent

15  that they be allowed to distribute that information.

16          PRESIDENT ALEXANDER:  Without objection.

17          SENATOR MASSEY:  Mr. President, as they are --

18          PRESIDENT ALEXANDER:  The Senator from Edgefield.

19          SENATOR MASSEY:  As they are distributing that

20  information, I ask unanimous consent that Mr. Terreni be

21  given access behind the rail.

22          PRESIDENT ALEXANDER:  Without objection.

23  Unanimous consent, is agreed.  Senator from Edgefield.

24          Now that brings us to page 4, bills returned from

25  the House, S-865.  Amendment on the desk, the clerk will

1  read.  Publish the first amendment.

2          THE CLERK:  First amendment is Amendment No. 1 by

3  Senators Campsen and Rankin, amends a bill by striking all

4  enacting words and inserting them.

5          PRESIDENT ALEXANDER:  Senator from Horry, what

6  purpose do you rise?

7          SENATOR RANKIN:  Request to be recognized.

8          PRESIDENT ALEXANDER:  So granted.  Senator from

9  Horry is being recognized.  The senator from Charleston,

10 Senator Campsen?

11         SENATOR CAMPSEN:  I'd ask unanimous consent for a

12 table and chair to be permitted on the floor for

13 Mr. Terreni.

14         PRESIDENT ALEXANDER:  Without objection.

15         Staff to have access to the floor, without

16 objection.  Senator from Horry.

17         SENATOR RANKIN:  Happy Thursday, happy early

18 Thursday and happy hopeful quicker Thursday here after.

19         I rise to speak to the report that has just been

20 announced and make some general comments about this, as

21 well as an overview of our redistricting process to this

22 point, specifically regarding the congressional plan

23 itself and again, the amendment that you have before you.

24         And so I plan to make some over general comments

25 and then yield to a question.

1            PRESIDENT ALEXANDER:  Senator from Edgefield, for

2   what purpose do you rise?

3            SENATOR MASSEY:  I'm already retaining the floor.

4            I ask unanimous consent that the senator from

5   Richland, Senator Harpootlian's staff member be given

6   access on the other side of the rail, to the chamber on

7   the other side of the rail.

8            PRESIDENT ALEXANDER:  Unanimous consent request.

9            Without objection, so ordered.

10   Senator from Horry.

11            SENATOR RANKIN:  Thank you, Mr. President.

12            Again, we know what we're here to talk about.  I

13   don't want to belabor this.  Obviously the subcommittee

14   who presented to you the Senate plan is the same group

15   that is now presenting to you the congressional plan, made

16   up -- the subcommittee made up of myself, along with the

17   Senator from Charleston, Senator Campsen; Senator Sabb

18   from Williamsburg County; Senator Margie Bright Matthews

19   from Colleton and Senator Talley from Spartanburg; Senator

20   Harpootlian from Columbia and then until he left us with

21   very little notice, Senator Young, who has now joined the

22   Finance Committee, likewise, he served with us.

23            Again, census data overview, we know this, you've

24   heard it -- forgive me for having to put this in the

25   record, but we got that in October as the Senate was

Page 5

1  wrapping up the round of the ten public hearings that we

2  held around the state.

3            The population total for 2020 was 5,118,425

4  people, representing a 10.66 percent increase from our

5  2010 population county.

6            Obviously, as the governor, many of you might

7  have heard it -- some of you may not have -- last night

8  that stating the obvious, we know that this state is

9  booming.  Whether you want to talk about more incentives

10  to get more people here or cut off the incentives to keep

11  them from coming, that's not what we're talking about

12  today.  We're talking about the tremendous growth that

13  we've experienced and the blessing that we have again with

14  the challenges.

15            The Greenville-Spartanburg southern suburbs of

16  Charlotte spreading into York and Senator Johnson's area,

17  Senator Fanning's area and the Lancaster area, and of

18  course across the coast along from Little River to the

19  Savannah River.  Seven districts have to have a one

20  person, one man vote deviation.  That number is 731,204,

21  up from 660 plus thousand 10 years ago.

22            So again, committee met in July, we had these

23  hearings that I've talked about.  In September we adopted

24  the guidelines and a public submissions policy, focusing

25  on the efforts again to develop a redistricting plan for

Page 6

1  both the Senate and the congressional plans and we

2  received congressional plans in November --

3         PRESIDENT ALEXANDER:  Senator from Lexington, for

4  what purpose do you rise.

5         SENATOR SETZLER:  Senator, could yield for a

6  quick friendly question?

7         PRESIDENT ALEXANDER:  Senator yield?

8         Senator yields.

9         SENATOR SETZLER:  Senator, do you have a map that

10 you can have passed out of what these are?

11        SENATOR RANKIN:  We can public these.  There's a

12 baseline, there's an amendment we have before us and then

13 there will be another amendment, and I think those are on

14 the website as well but again, we'll have that made

15 available to you.

16        Then after we passed the Senate and the House

17 plans in early December, we turned our attention to the

18 congressional redistricting.  Wednesday of last week we

19 introduced 966, the skeleton bill for congressional

20 redistricting and then the House amended their bill,

21 adopted its congressional plan by adopting our bill which

22 is our role now H-65, and they returned that to us on the

23 13th.

24        That day, the 13th, we met to hear testimony on

25 the two proposed plans.  The Senate amendments, again,

Page 7

1  which are on our website.  Y'all confirmed for me that

2  those are on the website.  Rayden, did we put the plans?

3          Yeah, plans are on the website.  So again, we can

4  print -- we're now publishing Senator from Lexington's,

5  Senator Setzler, again, you can see it here.  We'll have

6  it up for y'all to review as you ponder this.

7          So we heard from 60 folks last week and received

8  over a thousand written comments on those amendments and

9  we reported, we voted those out last Thursday, both of

10 those out unanimously to the full committee, which as you

11 know, met yesterday and we took both of those up with a

12 vote of 14-8 in favor of Senate Amendment 1, which is what

13 we'll be talking about a little bit more later.

14          And then today my intent is to present to y'all,

15 along with Senators Massey from the Midlands, Senator

16 Talley from Upstate, Senator Campsen from the Lowcountry

17 and Tri-County area, this overview of this information.

18          One comment and the information that we have and

19 have produced to all is an overview of what we have a

20 comparison of these, and to Senator Margie Bright

21 Matthews's credit, a comparison of these plans produced

22 from this information was available to some, available to

23 all today.  Yesterday to some, available to all today.

24          No attempt to hide the ball here.

25          And then one other matter.

Page 8

1           When making sure that everything that is in that
2  document was on the website for God and country to see, we
3  discovered that one thing was not, and that is a core
4  constituency comparison of Senate 1 or Amendment 1 and
5  Amendment 2.  That was emailed to our website guy at LSA
6  on January 11th he was supposed to publish this, emailed
7  from Will Roberts.  That is now on the website and again,
8  that is a very specific but general information
9  Mr. Opperman and others will have that and again, so
10  fully, finally and factually, we all have all that we
11  have.

12           And so my apologies to the world for some sense,
13  perhaps, that we didn't and to the credit of those who
14  insisted we do, and I'll gladly receive that and take
15  umbrage and/or ownership.

16           And so we all have what we all have.

17           So now moving forward, let me just make an
18  overview of the entire plan and then I'm going to talk
19  about the PD and then I'm going to hand it over to Senator
20  Massey to talk about the Midlands.

21           Again, overall, Congressional Districts 2, 3, 4,
22  5 and 7 grew at a similar rate as the rest of the state,
23  largely unchanged from the benchmark plan.  Benchmark
24  means that's what we did before, that's what our seven
25  congressman have run on since 2010-2012.

1          Growth, obviously, in District 1 substantially

2   outpaced the rest of the state.  Upwards of about 86,000

3   more people in the 1st District, which is the Charleston

4   coastal area, and District 6, which is presently held by

5   Congressman Clyburn, lost population of about the same

6   amount, 86-ish thousand people.

7          So those two, District 6 and 1, underwent fairly

8   significant changes in population and -- but the

9   demographic and partisan makeup of each district is

10  substantially similar to the benchmark, meaning the 2012

11  plan.

12          In terms of geography, in terms of this plan we

13  have, there are ten split counties, seven split VTDs,

14  voter tabulation data, compared to 12 split and 65 in that

15  benchmark plan.  That's an overview, again.

16          Now let me tack to the PD and the grand strand.

17          PRESIDENT ALEXANDER:  Senator from Columbia, for

18  what purpose do you rise?

19          SENATOR MCLEOD:  To see if the Senator would

20  yield for a friendly question.

21          PRESIDENT ALEXANDER:  Senator yields.

22          SENATOR MCLEOD:  Senator, you referred to the

23  guidelines.  Do you have any opposition to explaining what

24  the guidelines were that our committee under your

25  leadership came up with prior to even starting the

1 redistricting process a little bit more?

2      Because you just generically said and someone

3 asked me a question and I just thought it would be a good

4 idea if you could talk about those guidelines.

5      SENATOR RANKIN:  Very good.  And so the

6 requirements of federal law generally population,

7 equality, voting rights, gerrymandering, avoiding that;

8 continuity or contiguity and then others.

9      And so for those of us who know these, were tired

10 of hearing about 'em.  Those who don't will be tired of

11 hearing about it as soon as I finish but Senate districts,

12 again, have to be done differently.  We have a deviation

13 of a number where percentagewise, whereas in the

14 Congressional Districts based on Article I, Section 2 of

15 the Constitution, you have effectively a deviation of one

16 person.  You've got to have 713,000 or 731,204 or 205 or

17 203 people within each congressional district.

18      And so that is number 1.

19      Number 2, the Voting Rights Act and our plan or

20 the congressional plan has got to -- cannot have the

21 purpose of diluting minority voting strength and it must

22 otherwise comply with Section 2 of the Voting Rights Act

23 of 1965-1964.  Again, there's case law on this, as

24 expressed by Thornburg v. Gingles.

25      You'll hear from Professor Harpootlian later,

1  perhaps, about a more thorough explanation of that case

2  and others.

3          But that case and its progeny, pursuant to 14th

4  and 15th Amendments of the U.S. Constitution, avoidance of

5  racial gerrymandering, again, there's a case, Shaw v.

6  Reno.  That's the construct of the lens that we have to do

7  what we're doing that if there's a challenge, we'll be

8  kind of the metrics that this plan is compared to.

9          Again, I'll be corrected gladly by Professor and

10 Senator Harpootlian later, but this plan has got to comply

11 with the 14th Amendment, as interpreted by Shaw and again

12 its progeny.

13         Under those cases, while the consideration of

14 race is permissible, race must not be the predominant

15 factor, in that race neutral considerations are

16 subordinated to racial considerations unless that

17 subordination is narrowly tailored to give and serve a

18 compelling State interest.

19         Next is contiguity, again composed of contiguous

20 geography by continuity or contiguity by waters acceptable

21 to link territory within a district.  Those on the full

22 committee yesterday heard the exchange between Senator

23 Harpootlian from the dry lands and the Senator from

24 Charleston, Senator Campsen from the wetlands, about

25 contiguity being advanced with bridges because you can't

Page 12

1  get there, and so again.  But the reasonable opportunity

2  exists in all parts of the district and linkage designed

3  to meet the other criteria.

4          Again, point-to-point contiguity is acceptable,

5  as long as the adjacent districts don't use the same

6  vertex as points of transversal.

7          No, I will not explain that.

8          Next consideration and finally or the third of

9  four, communities of interest.  Again, we heard from lots

10  of people on our Senate plans what people want, who they

11  identify, what their common interests are.

12          Again, political, recreational, economic, social,

13  cultural, language, political.

14          They -- and that is a consideration that we

15  adopted as our subcommittee, constituent consistency.

16          This is preserving cores of existing districts.

17          Again, we talked about the benchmark.

18          And so again, one plan you will hear the argument

19  advances and preserves the existing seven districts and

20  keeping incumbents residences in the districts with their

21  core constituents.

22          Minimizing divisions of county, borders, cities

23  and towns, minimizing divisions of -- again, I mentioned

24  the VTD, voter tabulation districts data, and then

25  compactness and then finally again data as a consideration

Page 13

1   with the State's population reported by the census in

2   2020.

3            So that, Senator Margie Bright Matthews, answers

4   those who were asking you that question and we can give

5   you a lot more of that, if you like.

6            So back to, again, the Horry PD stretch.

7            7th District, 7, represents the grand strand and

8   the vast majority of the PD regions.  It includes

9   Chesterfield, Darlington, Dillon, Georgetown, Horry,

10  Marion and Marlboro Counties, as well as a majority of

11  Florence County, with the exception of approximately

12  10,000 people around Lake City.

13           Obviously we all know the growth that's going on

14  in my Senate district.  I was second only to Senator

15  Johnson with the most people over our deviation out of 46,

16  so we are bursting at the seams.  And we had in Horry a

17  growth rate that was 30.35 percent, where we added to the

18  county nearly 82,000.  It's the forth largest, county

19  population-wise, with 351,029 residents but that's the

20  growing tree, I'll call it, and the other counties that I

21  mentioned, the other areas, did not experience that same

22  level of growth and in fact after all the growth that was

23  experienced in one area within District 7, 3200 people

24  were needed to bring it within deviation by one vote.

25           And so this plan that we have carves into an area

1  and picks those folks up.  Again, we'll talk about that

2  later as well.  It is largely unchanged from the benchmark

3  again, which we heard and me forgive me but paying an

4  acute local ear to what folks from the 7th were saying, I

5  don't know that there's any nicer way of saying it, but

6  what we heard overall was people like the way they've got

7  it.  Don't fix what isn't broken, is my assessment of

8  that.  Whether in the business interest, whether from

9  Chambers, whether from political office holders, whether

10  from groups and economic development, NISA is an example.

11       Again, we heard that they like the contiguity of

12  and the share of community of interest with folks across

13  that district.  Senator Williams, we are in NISA together.

14       You have a leadership position there.

15       We like it, we heard it, and so again selfishly

16  I'm pointing to 7 as hoping to be retained as its current

17  form in that mark.

18       So again, changes from the benchmark and you're

19  going to hear about that -- within the plan that Senator

20  Campsen will talk about specifically in a few minutes,

21  that change effectively within that specific interest that

22  I'm talking about, constituency consistency and preserving

23  existing districts, seven of these are compared under each

24  plan.

25       Senator Harpootlian will talk about this later

Page 15

1  but within Senate -- or Congressional District 7 it

2  retains 99.51 percent of its benchmark population and

3  again adding those 3200 that I mentioned from a very small

4  section from District 6 in Florence County.

5          With that now I want to turn it over to a

6  Midlands overview, Senator Massey, to speak to that.

7          Thereafter Senator Talley and then Senator

8  Campsen and then we will start talking from there.

9          Thank y'all so much.

10  PRESIDENT ALEXANDER:  Senator from Edgefield,

11  what purpose do you rise, sir?

12  SENATOR MASSEY:  Mr. Chairman, I ask to be

13  recognized to speak on the amendment.

14  PRESIDENT ALEXANDER:  So recognized, the Senator

15  from Edgefield.  Please give him your attention.

16          Thank you, Senator from Horry.

17  SENATOR MASSEY:  Thank you, Mr. President.

18          I've been tasked with giving an overview of the

19  Midlands region in the amendment, so let me try to go

20  through that.  There are four Congressional Districts that

21  represent parts of the Midlands; 2nd, 3rd, 5th and 6th

22  Districts.

23          District 2 has been and remains situated around

24  the I-20 corridor between Augusta and Columbia.  It

25  includes all of Aiken, Barnwell and Lexington Counties,

Page 16

1  along with about 25,000 people in western Orangeburg

2  County.

3           In Richland County, the 2nd Congressional

4  District includes Fort Jackson and the surrounding

5  residential areas as well as the northwestern portion of

6  the county in the Irma area.

7           Congressman Joe Wilson, who is the incumbent in

8  the 2nd District, has been a member of the House Armed

9  Services Committee since he was elected to Congress in

10  2001.  Fort Jackson being in District 2 is important to

11  that representation, the interests of his service members

12  who are stationed there and I will add that if --

13  depending on what happens with the elections later this

14  year, it's certainly possible, if not likely, that

15  Congressman Wilson could be the chairman of the House

16  Armed Services Committee, so having Fort Jackson in his

17  district is extremely important.

18           District 3 runs along the Savannah River from the

19  northwestern corner of the state, down to the heart of the

20  CSRA, the Central Savannah River Area.

21           District 3 includes Oconee, Pickens, Anderson,

22  Abbeville, Greenwood, Laurens, Newberry, Saluda, Edgefield

23  and McCormick Counties in their entirety, which have all

24  been together for generations, and approximately 65,000

25  people in rural southern Greenville County.

District 3 in this plan retains 98.02 percent of its benchmark population and to balance the population, Newberry County was made whole in District 3 and approximately 7,000 people were added from District 4 in the Simpsonville area of Greenville County.

District 5 covers the northern swath of the central Midlands from northern Sumter County up to the North Carolina border. It includes all of Cherokee, Chester, Fairfield, Lancaster, Kershaw, Lee, Union and York Counties.

District 5 also includes a portion of Spartanburg County at the northwestern end of the district and the majority of Sumter County at the opposite end.

District 5 in this amendment retains just over 94 percent of its benchmark population and adds approximately 36,000 people from District 4 in eastern Spartanburg County and a small number of about 350 people from District 6 in Sumter County.

District 6 covers the southern portion of the Midlands from Columbia down through the I-95 corridor heading towards the coast. Districtwide, the 6 includes all of Allendale, Bamberg, Calhoun, Clarendon, Hampton and Williamsburg Counties and portions of Richland, Sumter, Orangeburg, Jasper, Colleton, Dorchester and Charleston Counties.

Page 18

1            In the Midlands, District 6 includes the majority

2    of Orangeburg County, including the city of Orangeburg, a

3    portion of the city of Sumter, rural areas in southeast

4    Sumter County, the Lake City area of Florence County and

5    nearly half of Richland County, including portions of the

6    city of Columbia and rural areas to the southeast.

7            The amendment follows the boundary between Senate

8    Districts 21 and 22 as the dividing line between

9    Congressional Districts 2 and 6 in the eastern Columbia

10   area.

11           District 6 retains more than 87 percent of its

12   existing benchmark population and in the Midlands, only

13   minor changes are made from the benchmark plan in

14   Richland, Orangeburg, Sumter and Florence Counties.

15           So Mr. President, with that overview of the

16   Midlands, I think I will turn it over to the Senator from

17   Spartanburg to do more of the state in District 4.

18           PRESIDENT ALEXANDER:  Senator from Spartanburg,

19   Senator Talley, for what purpose do you rise?

20           SENATOR TALLEY:  I'd like to be recognized.

21           PRESIDENT ALEXANDER:  So recognized, Senator from

22   Spartanburg.

23           SENATOR TALLEY:  Thank you, Mr. President and

24   members of the Senate.  I want to talk a little bit about

25   what's before you in regards to the Upstate.

1              The Upstate area is represented by the 3rd, 4th

2   and 5th Congressional Districts.  As the Senator from

3   Edgefield just mentioned, Districts 3 and 5 also include

4   portions of regions outside the Upstate, while District 4

5   is located in the heart of the Upstate in the Greenville

6   and Spartanburg area.

7              I want to talk first about District 3, which runs

8   from Pickens and Oconee Counties to the south through a

9   portion of southern Greenville County and includes all of

10  Abbeville, Anderson, Edgefield, Greenwood, Laurens,

11  McCormick, Newberry and Saluda Counties.

12             The changes in the amendments before you from the

13  benchmark in regards to District 3, there was a shortage

14  of approximately 24,000 people that needed to be added to

15  District 3 to balance out its population.

16             This was done by repairing split precincts

17  between Districts 3 and 4 in southern Greenville County

18  and bringing Newberry County, which was previously split

19  between Districts 3 and 5, entirely into the 3rd district.

20             District 4 includes the majority of the

21  population in Greenville and Spartanburg Counties and is

22  virtually unchanged from the benchmark plan.  It was

23  overpopulated by approximately 29,000 people.

24             This imbalance was corrected by bringing

25  District 3 a little further into the rural and suburban

1  areas of southern Greenville, as I just mentioned, and

2  District 5 came more into the rural and suburban areas of

3  eastern or northeastern Spartanburg County.

4          District 5 connects the eastern side of the

5  Upstate with the central Midlands running from eastern

6  Spartanburg County along the North Carolina through

7  Cherokee, York, Lancaster, Chester, Union, Fairfield,

8  Kershaw and Lee Counties, as well as the western half of

9  Sumter County.

10         Changing -- or the amendment before you retains

11  nearly 95 percent of District V's benchmark population,

12  adding approximately 36,000 people from District 4 in the

13  rural northeastern part of Spartanburg County, as I

14  mentioned earlier, and a number of people in Sumter

15  County.  Mr. President, that concludes my overview.

16         PRESIDENT ALEXANDER:  Senator from Charleston --

17  so you've completed and given up the floor, okay.

18         SENATOR CAMPSEN:  I'll do this from my desk,

19  Mr. President.

20         PRESIDENT ALEXANDER:  Senator from Charleston,

21  Senator Campsen is recognized.

22         SENATOR CAMPSEN:  Thank you, Mr. President.  I'm

23  going to give a Lowcountry and Tri-County area overview.

24         As with the grand strand, the southern half of

25  the coast experienced substantial growth over the last ten

Page 21

1  years; however, this growth occurred in pockets and was

2  not homogeneous across the two Congressional Districts in

3  the area.

4          Under the benchmark plan, District 1 was

5  overpopulated by nearly 88,000 people, while District 6

6  was underpopulated by nearly 85,000 people.

7          District 1 predominantly represents residential

8  coastal communities in the Lowcountry and Tri-County area.

9          In the Lowcountry, District 1 includes all of

10  Beaufort County, approximately 4,500 people in the Sun

11  City community in Jasper County, and approximately 2300

12  people in the Edisto and Green Pond communities of

13  Colleton County.

14          In the Tri-County area, District 1 includes all

15  of Berkeley County, the majority of the population in

16  Dorchester County around the Summerville area and nearly

17  180,000 people in Mount Pleasant and the Sea Islands in

18  Charleston County.

19          Changes from the benchmark.  District 1 retains

20  82 percent of its benchmark population and adds 53,000

21  people from the 6th District, including 13,000 people in

22  Beaufort County and 29,000 people in Berkeley County.

23          In Charleston County, the amendment follows

24  natural geographic boundaries such as the Stono River and

25  Wadmalaw Sound, adding approximately 16,000 people on

Page 22

1  Wadmalaw Island and Johns Island to the 1st District from

2  the 6th.

3          The 6th District represents the portions of

4  Jasper, Colleton, Dorchester, and Charleston Counties that

5  are not included in District 1 along the coast, as well as

6  Allendale, Bamberg, Calhoun, Clarendon, Hampton and

7  Williamsburg Counties in their entirety.

8          District 6 also includes portions of Orangeburg,

9  Richland, Sumter and Florence Counties.

10         In the Lowcountry, District 6 includes the

11 majority of the population in Jasper and Colleton

12 Counties, with the exception of Jasper County's Sun City

13 community and coastal portions of Colleton County in the

14 Green Pond and Edisto precincts.

15         In the Tri-County area District 6 includes

16 approximately 34,000 people in Dorchester County,

17 including areas such as St. George, Ridgeville, rural

18 Dorchester County...  I lost my...  outside of

19 Summerville, and the West Ashley portion of Dorchester

20 County.

21         District 6 also includes approximately 228,000

22 people in Charleston County.  The entire Charleston

23 Peninsula in north Charleston are in the 6th District,

24 with the Cooper River as a natural boundary between the

25 1st and the 6th Districts.

1          The West Ashley portion of Charleston County is
2  also in the 6th, with the Stono River separating West
3  Ashley from James Island and Johns Island in District 1.
4          Change -- as for changes from the benchmark,
5  District 6 retains more than 87 percent of its benchmark
6  population and adds approximately 140,000 people from
7  District 1 in the Tri-County area.
8          Now I'd like to address some -- because
9  District 1 and District 6 seem to have had the most focus
10  in recent days, I want to address a few other -- make a
11  few other points with regard to the District and the first
12  point I would like to make is that this plan is a minimal
13  change plan from the current District, and I'll give you
14  some statistics that demonstrate that.
15          When it comes to constituent consistency, in this
16  plan, Amendment 1, in the 1st District, 82.4 percent of
17  its current population remains in the 1st.
18          Under the competing plan that you're going to
19  hear later, only 65-and-a-half percent remain in the 1st.
20          When it comes to the 2nd Congressional District,
21  98.01 percent of the population currently in the 2nd
22  District remain in the 2nd.  Under the plan you're going
23  to hear later today, only 66.56 percent of the population
24  in District 2 remains in the District.
25          Look at District 3.  Under this amendment,

1   98.02 percent of District 3 residents remain in the 3rd

2   District.  Under the plan you'll hear later, just

3   72.8 percent remain in the District.

4           District 4, 94.34 percent under this plan remain

5   in the 4th District.  The amendment -- the proposal you're

6   going to hear later today, 71.5 percent remain in the 4th

7   District.

8           District 5, 94.38 percent of the population

9   remain in the 5th District of the current residents.

10          Under the plan you'll hear later, only 54, almost

11  half .84 percent remain in the 5th.

12          You go to the 6th District, even though we had a

13  lot of growth around the 6th, we still were able in this

14  plan to have 87-and-a-half percent of the current

15  residents of the 6th District remain in the 6th.  Under

16  the plan you'll hear later, it will only be 61.4 percent.

17          The 7th District has an amazing 99.96 percent

18  constituent consistency, whereas under the proposed

19  amendment, it dramatically changes to 56.08 percent.

20          So this is a minimal plan and this constituent

21  consistency numbers are evidence of that and that's one of

22  the reapportionment guidelines that we draw plans by.

23          I'm not going to take any questions until I

24  finish my presentation, and then I'll be happy to,

25  Mr. President.

1              So this is a minimal change plan from a plan that

2    was approved by a federal court -- actually by the United

3    States Supreme Court -- as recently as 2012 in the Backus

4    decision.

5              Now 2012 is like yesterday in reapportionment

6    time, okay, because you only do reapportionment every ten

7    years.  That was the last reapportionment we did and the

8    Supreme Court upheld our current benchmark and the current

9    benchmark I just read to you, the very minor changes that

10   we've made in this plan, Amendment 1, from the current

11   benchmark both honoring the constituent consistency

12   guideline, but also based upon a plan that the Supreme

13   Court upheld in 2012.

14             And to the extent District 1 and District 6 had

15   the change, it's really driven by growth because the

16   chairman mentioned earlier, we had 87,000 people in the

17   1st District that had to -- we had to shed and we had

18   84,000 people or 85,000 in the 6th District that the 6th

19   District had to pick up.

20             Now I want to also address the issue of some

21   allegations of partisan gerrymandering.  I'd like to give

22   some numbers that I think will demonstrate that that's

23   really not the case.

24             In the 1st District, if you look at the Trump

25   vote in the 1st, under the benchmark it was 53.03 percent.

1        That's the benchmark Trump vote in 2020.

2        Under Amendment 1, the vote would be

3    54.39 percent.  That's an increase of only 1.36 percent.

4    If you look at Amendment 2 that's going to be presented

5    later, it goes from 53.03 percent Trump to 48.17 percent

6    Trump, as far as the political numbers go.

7        As for constituent consistency, I've already

8    addressed that.  But what you see in the constituent

9    consistency numbers is if you're going to make this type

10   of dramatic change to the 1st and the 6th that the 2nd

11   amendment's going to propose, you have to radically change

12   the rest of the state.  Some of the other Districts losing

13   50 percent of their constituents under the -- not which,

14   of course, violates that guideline constituent

15   consistency.

16       And I'm also going to address the black voting,

17   the black voting age population in the District because

18   there's been some allegations about some form of racial

19   motivation here and when you look at the numbers, the

20   benchmark plan has in the 1st District 16.56 percent black

21   voting age population.  Under this plan, Amendment 1, it

22   has a 16.72 voting age population.  Very little change.

23       Under Amendment 2 that you're going to see later,

24   it's higher, it goes to 20.57 percent.

25       The notion -- some have said, well, you've packed

1  minority voters into the 6th District.  Well, you look at

2  the benchmark plan for the 6th, it's 51.44 black voting

3  age population.  Under this amendment, the black voting

4  age population goes down to 45.9 percent.

5          So certainly the allegations of packing have --

6  are not panned out when you look at the statistics.

7          You had 113,000 people move from a voting age

8  population, move from the 1st to the 6th District.  Of

9  that number, of that amount, 72,601 were white voters and

10  26,617 were African-Americans.

11          So you had a 63 percent -- 63.9 percent white

12  vote move from the 1st to the 6th and only a 23.4

13  African-American.  Again, did not pack the 6th.

14          Now I'd like to just real quickly, because the

15  1st and the 6th seem to be obtaining -- attracting the

16  most attention, I want to real quickly go through how the

17  -- how both the 1st and the 6th, how we met the

18  redistricting guidelines when we drew these plans.

19          With regard to population equality, we are within

20  the variance.  And again, I'm going to reiterate, the

21  changes had to happen to the 1st and the 6th because the

22  1st had tremendous growth and the 6th had about the same

23  amount of people that grew in the 1st that it needed to

24  pick up and it's that growth and that growth pattern that

25  really has driven this process.

Page 28

1          First of all, with regards to voting rights, the

2     redistricting plan must not have either the purpose or the

3     effect of diluting minority voting strength and must

4     otherwise comply with Section 2 of the Voting Rights Act,

5     as expressed through Thornburg v. Gingles and its progeny,

6     and the 14th and 15th Amendments to the U.S. Constitution.

7          I think when you look at the statistics that's

8     clear that this does comply with Section 2 of the Voting

9     Rights Act.  There's no suggestion that District 6 cannot

10    elect a candidate of choice.

11         Avoiding racial gerrymandering, again Amendment 1

12    preserves many of the boundaries upheld in the Backus

13    decision that was handed down in 2012 and affirmed by the

14    U.S. Supreme Court.  The 1st District's black voting age

15    population again is virtually unchanged.

16         With regards to the 6th District, the part of

17    Charleston County added to the 6th had a -- is 100,947

18    voting age population, of which 66,756 or 66 percent are

19    white and 22 are black.

20         Yeah, and I would also like to talk about the

21    natural boundaries that we followed because this changes

22    -- this is a change from -- significantly from the House

23    passed plan, in that it follows more geographic and

24    political boundaries.

25         The border of the 1st District with the 6th is

1  largely defined by the Cooper, Ashley, Stono, and Edisto

2  Rivers.  The splits in the Charleston County boundary are

3  not along racial lines.  It's the -- you have the Cooper

4  River and that is segregating the Charleston Peninsula and

5  the Charleston neck from Daniel Island and the east Cooper

6  area and as you follow the Stono River and Wadmalaw Sound

7  down south again following natural geographic boundaries.

8        Contiguity is another redistricting principle.

9  Contiguity by water is acceptable to link territory with

10  the District, provided there is a reasonable opportunity

11  to access all parts of the District and the linkage is

12  designed to meet other criteria and so in Charleston, the

13  Senator from Richland and I had this conversation

14  yesterday that when you get in the Lowcountry, you can't

15  help but have to deal with -- you have to deal with water

16  bodies, rivers, harbors, and contiguity by water is

17  inescapable along the coast.

18        Communities of interest.  Communities of interest

19  should be considered.  They're defined by geographic,

20  demographic, historic, and other characteristics that

21  cause people to identify with one another, including

22  economic, social, cultural, language, political and

23  recreational activity.

24        We honor -- we have communities of interest.

25        The Sea Islands of Charleston County and Beaufort

1  County are together in the District and have a coastal

2  community of interest.

3          Sun City, the Sun City portion of Jasper County,

4  is joined with Sun City in Beaufort County.

5          The Dorchester County part of Summerville,

6  Berkeley, the Charleston area is called the Tri-County

7  area.  It's economically integrated inescapably and has

8  been for many, many years and it remains so in this plan.

9          It keeps Lexington, Aiken, Barnwell, hold -- I'm

10  not going to go away from the coast because I'm mainly

11  focusing on the coastal areas of the 1st District.

12          On the 6th District, Hampton, Allendale, Bamberg,

13  Calhoun, Clarendon, Williamsburg, Jasper except for Sun

14  City remain in the 6th, Peninsula Charleston, north

15  Charleston, West Ashley, St. Paul's area of Charleston,

16  1st -- as again 1st and 6th District are separated by

17  water boundaries.

18          So that concludes my remarks, Mr. President, my

19  explanation, and I'll be happy to take any questions.

20          PRESIDENT ALEXANDER:  Senator from Berkeley, for

21  what purpose do you rise?

22          SENATOR GROOMS:  See if the Senator would answer

23  a question.

24          SENATOR CAMPSEN:  Yes, I will.

25          PRESIDENT ALEXANDER:  Senator yields.

1          Senator from Berkeley.

2          SENATOR GROOMS:  Senator, I'm looking at this

3  plan and I'm looking at the other plan I think we've got

4  coming up next and I noticed that we have Berkeley,

5  Charleston, and a large portion of Dorchester County all

6  tied together in this plan; is that right?

7          SENATOR CAMPSEN:  That's correct.

8          SENATOR GROOMS:  You want to take a guess at how

9  long Berkeley, Charleston and portions of Dorchester have

10  been tied together in congressional plans throughout the

11  history of this country?

12          SENATOR CAMPSEN:  I think from the founding,

13  Charleston and Berkeley have been tied together, actually

14  from the founding of the country.

15          SENATOR GROOMS:  In 1889 through -- I'm sorry --

16  1789 through 1793 there were five Districts.  The

17  Charleston District composed of the areas of Berkeley,

18  Charleston, Dorchester, Beaufort and it went up the

19  Savannah River a little bit to what we now have present

20  day Jasper, Hampton and Allendale Counties.

21          But the point is from this nation's founding the

22  majority populations Charleston, Berkeley and Dorchester

23  have been tied together and I'm happy to see that the plan

24  we're debating right now keeps those populations together,

25  but what about the other plan, Amendment 2, does that keep

1  the Tri-County area together?

2          SENATOR CAMPSEN:  It's my understanding, it does

3  not.  That Berkeley and Dorchester or at least most of

4  those counties are -- not all of them but most of them

5  would go into the 7th Congressional District, is my

6  understanding.

7          SENATOR GROOMS:  Did you know that in 1982 there

8  was a reapportionment plan and back then it was not the --

9  there was not the requirement for a one man, one vote,

10  there was some deviational population and at the time my

11  predecessor, Senator Rembert Dennis, argued for about

12  three days on the floor until I think he was clotured,

13  that Berkeley County should not be split.

14          That was one of the first times Berkeley County

15  was split into the 6th District and to the 1st District,

16  with the upper portion of Berkeley going into the 6th but

17  the majority population going into the 1st.

18          So did you know it was split at that time?

19          SENATOR CAMPSEN:  I am aware of that but you have

20  been more of a student of history, of the history of the

21  interrelation of Charleston and Berkeley County.

22          SENATOR GROOMS:  The point, Senator, that I'm

23  trying -- that I was getting at is sometimes throughout

24  this nation's history, portions of Dorchester, Charleston

25  and Berkeley have been in other Districts but the majority

1  population of those conditions have been in the

2  1st District.

3        So under the plan we're debating now, there's a

4  portion of Charleston County that is in the 6th District.

5        Can you tell us why?

6        SENATOR CAMPSEN:  Well, that's really it's been

7  in the 6th historically since the 1990s, is my

8  understanding, and so part of it is constituent

9  consistency, part of it is the Backus decision, as

10  recently as 2012, upheld a similar type split, and also

11  you're just dealing with the -- you have a math problem

12  here because you have a large growth in the Charleston and

13  the coastal areas and it makes it difficult to not divide

14  Charleston if you're going to keep Berkeley and the

15  Tri-County area together, you're going to keep Beaufort,

16  which is a coastal community of interest along the

17  southern coast.

18        It makes it more difficult to do that and, you

19  know, frankly I think what it does mean is you have two

20  Congressmen representing the county and I'd rather have

21  two Congressmen than one represent the county and we're

22  not really -- we still have constituent consistency

23  because the 1st and the 6th are in Charleston County, we

24  still have a pretty good constituent consistency but you

25  have the benefit of two advocates in the U.S. House of

Page 34

1  Representatives instead of just one, and I think that's

2  been beneficial for Charleston particularly when it comes

3  to pocketbook and business-related issues, port deepening

4  money from the federal government, relief after storms,

5  transportation dollars, infrastructure dollars coming from

6  D.C.  I mean all of that, it helps to have two members

7  advocating for those things for a county instead of just

8  one.

9         And you have the same thing in Richland County,

10 two members of Congress in the Greenville-Spartanburg

11 area, the same thing.  So the larger metropolitan areas,

12 it's not unusual for them -- in fact it's typical to have

13 two Congressmen representing them.

14        SENATOR GROOMS:  So what you're telling me, at

15 least in modern times, at least since 1982 and perhaps

16 even before then, it's not uncommon for one of the

17 Tri-County areas, Charleston, Berkeley and Dorchester, to

18 be split between the 1st and the 6th?

19        SENATOR CAMPSEN:  That's correct.

20        That's been the norm.

21        SENATOR GROOMS:  So this is not anything new.

22        SENATOR CAMPSEN:  Again, it's a minimal change

23 plan, is what -- the way I'd like to put it.  Minimal

24 change with regards to the Tri-County area and the three

25 counties but it's also -- it's minimal change when it

1  comes to changing statistics, as far as black voting age

2  that I went through before, the political numbers, the

3  Trump vote moves just slightly.  Just slightly.

4        SENATOR GROOMS:  So would it be something new if

5  we were split Dorchester -- the majority population of

6  Berkeley and all of Dorchester out of the 1st District and

7  put it into the 7th District with Horry, Georgetown

8  Counties?

9        SENATOR CAMPSEN:  Well, that would be new.

10       I've heard from some Dorchester and Berkeley

11  County people that -- no offense to the wonderful grand

12  strand, Mr. Chairman, but they want to remain in that

13  Tri-County alliance that they have.

14       It's really the economic engine of the port is

15  what you see, and coming up I-26 is a major common

16  interest that they have.  You have...  you have the port

17  and then you have the distribution facilities in

18  Dorchester and Berkeley County and tremendous growth

19  because of the move, because of the Amazon economy that is

20  now ascendent.

21       SENATOR GROOMS:  Senator, you touched on this

22  earlier, but if you could talk to me a little bit more --

23  because I've listened to all the testimony.  I've sat

24  there at my computer either on the television on the South

25  Carolina ETV channel and watched the testimony, and I

Page 36

1  heard allegations that this plan right here is somehow a

2  racial gerrymander and that somehow the black voting

3  population of District 1 and District 6 deviates greatly

4  from the benchmark.

5          Could you talk to me a little bit about how

6  Districts 1 and District 6 regarding black voting

7  population actually changed.  Was there a great change?

8          SENATOR CAMPSEN:  Yeah, I already addressed that.

9          The truth is that it's a very...  it's a very

10  slight change and in fact it's an increase in this

11  amendment, the black voting age population is a slight

12  increase.  It goes from 16.56 percent to 16.72 percent in

13  the 1st and a slight decrease in the 6th from

14  51.44 percent to 45.9 percent.

15          SENATOR GROOMS:  And a moving population was

16  around and trying to equalize.

17          Earlier you said there was about 86,000 people

18  overpopulated in the 1st and about 86,000 something people

19  in the 6th.

20          SENATOR CAMPSEN:  About the same number, yes, and

21  that's why we had to make changes here.

22          SENATOR GROOMS:  And in order to make changes and

23  during this population shift, could you tell me about the

24  population that shifted from the 1st District to the 6th?

25          Basically how much was white and how much was

Page 37

1  black?  Because I've heard all kinds of things but I think

2  I know what the truth is and I sure would appreciate it if

3  you could clarify that a little bit.

4          SENATOR CAMPSEN:  Yeah, and again, I really don't

5  want to focus on the racial numbers but they have been

6  raised by others, so I will address that, that 113,500

7  people were moved from the 1st to the 6th and 72,600 were

8  white.  That's 63.95 percent were white and 26,600 or

9  23.4 percent were African-American.  So it was not... we

10 weren't... we weren't packing the 6th, I mean that some

11 have alleged.

12         SENATOR GROOMS:  That's a false allegation?

13         SENATOR CAMPSEN:  That's correct.

14         The numbers don't bear that out.

15         SENATOR GROOMS:  Senator, also under Amendment 1,

16 it looks like all of Beaufort County is whole; is that

17 correct?

18         SENATOR CAMPSEN:  Under Amendment 1, all of

19 Beaufort County is in the 1st, yes.

20         SENATOR GROOMS:  But Jasper seems to be split,

21 and why is there a split at Jasper?

22         SENATOR CAMPSEN:  Well, again, it's population.

23         You've had a lot of growth down there as well.

24         SENATOR GROOMS:  Talk to me about Sun City.

25         SENATOR CAMPSEN:  In Sun City, in Jasper County,

1  Sun City kind of spans the county line and so you have a

2  Sun City area down there that is part in Jasper and part

3  in Beaufort County.

4          SENATOR GROOMS:  Could you tell me about the

5  interstate that connects the Tri-County together?  That

6  would be I-26.  Is there anything different between I-26

7  and let's say I-77?

8          SENATOR CAMPSEN:  Well --

9          SENATOR GROOMS:  Is there a community of interest

10 with Charleston, Berkeley and Dorchester with I-26?

11         SENATOR CAMPSEN:  Yeah, it needs widening, I know

12 that much.

13         SENATOR GROOMS:  It does need widening.

14         SENATOR CAMPSEN:  Badly.  But yes, there is a

15 huge community of interest, and in fact the Secretary of

16 Transportation has referred to I-26 as the state's

17 economic spine.  And I would say that the -- you know, the

18 central nervous system of that economic spine really is

19 the port and that the I-26 terminates in Charleston and

20 you have all of those goods that are moved up I-26 or by

21 rail paralleling I-26 to distribution centers in Berkeley

22 and Dorchester County, and so it's a very big community of

23 interest.

24         Just off the top of my head, you think of the

25 entities that identify themselves as Tri-County, the

Page 39

1  Tri-County Association of Realtors, the Tri-County Chamber

2  of Commerce, the Convention and Visitors Bureau is

3  Tri-County.

4           We have CHATS, we have COG, we have a lot --

5  there's -- they're intricately interrelated economically,

6  socially, culturally.

7           SENATOR GROOMS:  For road planning, CHATS, the

8  Charleston Area Transportation Study committee.

9           SENATOR CAMPSEN:  Right.

10          SENATOR GROOMS:  What is the Charleston area?

11          SENATOR CAMPSEN:  It's the Tri-County area.

12          SENATOR GROOMS:  Charleston, Berkeley into large

13 populations of Dorchester; is that right?

14          SENATOR CAMPSEN:  Right, right.

15          SENATOR GROOMS:  Now tell me, as another plan

16 which separates almost all of Berkeley and all of

17 Dorchester and puts it into the 7th District, could you

18 explain to me the community of interest with, let's say,

19 the community of Cross and the community of Little River,

20 when it comes to roads?

21          SENATOR CAMPSEN:  I can't think of -- the only

22 common interest is you can't get there from here.

23          That's probably about the only common interest.

24          SENATOR GROOMS:  Well, you can.

25          SENATOR CAMPSEN:  You can, but it's about a

Page 40

1  two-and-a-half hour drive, I think.

2          SENATOR GROOMS:  What's the drive time, let's say

3  from West Ashley to Columbia?  From one end of the

4  proposed 6th District to the other?

5          SENATOR CAMPSEN:  It's about an hour-and-a-half,

6  maybe an hour and 40 minutes.

7          SENATOR GROOMS:  And is there a common interest

8  for folks in West Ashley wanting to drive I-26 to Columbia

9  and folks in Columbia wanting to drive I-26 to Charleston?

10          SENATOR CAMPSEN:  Well, yeah, it's one of the

11  most heavily traveled roads in the state.

12          SENATOR GROOMS:  Would that be even more --

13          SENATOR CAMPSEN:  In that direction.

14          SENATOR GROOMS:  Would that be more of a

15  community of interest than the folks in St. George would

16  have with the folks, let's say in Little River or

17  Marlboro?

18          SENATOR CAMPSEN:  I would say so, yes.  I see the

19  Senator from Horry shaking his head in agreement.

20          SENATOR GROOMS:  Senator, many years ago we both

21  were involved in high school athletes, athletics and our

22  children have.  You've traveled to many schools with

23  various conferences and I know my children have.

24          How many conferences in Charleston where the kids

25  would play are in -- would have schools, let's say in

1  Horry or in --

2          SENATOR CAMPSEN:  I never played against anyone

3  in Horry.  I don't know if -- because maybe we were scared

4  of some of those Horry guys football players but...

5          SENATOR GROOMS:  Did you know I had two children

6  that graduated from Timberland High School and one from

7  Bishop England and that most of the schools that I visited

8  -- and I got stories about all of 'em over a 12-year

9  period, with Summerville High School, Woodland High

10  School, Ashley Ridge, Fort Dorchester, North Charleston

11  High School, Academic Magnet, Whale Branch, Battery Creek

12  -- all those trips down to Beaufort.

13          SENATOR CAMPSEN:  I played against Beaufort High,

14  Battery Creek.  Summerville just wiped us clean.

15          This was the Coach McKissick era, and we never

16  beat Summerville but we were playing teams in that area;

17  Summerville, Dorchester, Beaufort.

18          SENATOR GROOMS:  Do you recall spending a lot of

19  time in athletics in Horry County?

20          SENATOR CAMPSEN:  Um...

21          SENATOR GROOMS:  Particularly in conference play.

22          SENATOR CAMPSEN:  No.  I think I surfed in a surf

23  competition in Horry County once and that was it.

24          SENATOR GROOMS:  Well, Senator, from a historic

25  standpoint dating back to 1889, holding Charleston,

Page 42

1   Berkeley and portions of Dorchester together, through

2   today.  I appreciate the work of the committee, I

3   appreciate the amendment that's here right now, and I

4   thank you for your work on this.

5              SENATOR CAMPSEN:  Thank you.

6              PRESIDENT ALEXANDER:  Senator from Richland, what

7   purpose do you rise?

8              SENATOR SCOTT:  Would the Senator yield for a few

9   questions?

10             SENATOR CAMPSEN:  Yes.

11             PRESIDENT ALEXANDER:  Senator yields.

12             SENATOR SCOTT:  Senator, first let me commend you

13  and the committee for the work that you all have done.

14             One real question is that it's really hard to

15  follow y'all because we don't have a working document in

16  front of us.  Such a document would also tell us the total

17  population in these counties, what the deviation numbers

18  actually look like, black and white, voting age

19  population.  We don't have --

20             SENATOR CAMPSEN:  I just presented -- I just

21  explained that.

22             PRESIDENT ALEXANDER:  Senator Darrell Jackson.

23             SENATOR SCOTT:  You can explain it but a working

24  document to be able to follow.

25             SENATOR CAMPSEN:  A document that has been passed

Page 43

1  out, multipage document has that in it.

2          SENATOR SCOTT:  This is the document?

3          This is the only document I have on my desk.

4          SENATOR CAMPSEN:  Yes.

5          SENATOR SCOTT:  It doesn't give me the population

6  when I get to Richland County, if I wanted to know what's

7  in the 6th and what's in the 2nd.

8          SENATOR CAMPSEN:  It's the first page.

9          No, it's the total population.

10         SENATOR SCOTT:  I need to know the total

11 population of the four 16 --

12         SENATOR CAMPSEN:  You want to know -- that's not

13 in that.  You want to know the population of Richland

14 that's in the 6th versus the 2nd?

15         SENATOR SCOTT:  Yes, right.  I know the total

16 county population because I've been following along but

17 it's hard to have for me to follow -- I'm looking at the

18 6th having 14 different counties, wholes and splits.  I'm

19 looking at Greenville having two counties where you've

20 taken a small piece off in the fourth.  I'm looking at the

21 3rd having about roughly eight counties and the 5th

22 roughly about ten counties and I'm trying to figure out if

23 I wanted to go to each one of the counties and try to put

24 it together and then take a look at what the voting age

25 population is for each one of 'em, I don't have a document

Page 44

1  to help me do that.

2           I know the committee has come up with its

3  proposal to present to the body but there's the rest of us

4  who don't sit on the committee, sit on judiciary and all

5  the --

6           SENATOR CAMPSEN:  Well, Senator, one thing I can

7  help you with on the splits, if you look at page 15 of

8  that document, you look at the benchmark, Senate

9  Amendment 1, Senate Amendment 2A you have the splits of

10  counties and in the benchmark for the 6th you had nine

11  splits and in Amendment 1, you have eight.

12          SENATOR SCOTT:  Senator, I only have page 13.

13          I don't have --

14          SENATOR CAMPSEN:  Excuse me, it's page 15, I'm

15  sorry.

16          SENATOR SCOTT:  I don't have page 15.

17          I stop at page 13.

18          SENATOR CAMPSEN:  Oh, well...

19          SENATOR SCOTT:  So what I'm simply saying is that

20  in the reapportionment --

21          SENATOR CAMPSEN:  It is available on the website,

22  I've been informed right now.

23          SENATOR SCOTT:  Yeah, but --

24          SENATOR CAMPSEN:  For everyone.

25          SENATOR SCOTT:  I've looked at the website.  The

1  website give me total population and each one of the

2  Districts.  I'm saying it would work better to be able to

3  follow you easily and to eliminate a lot of questions if

4  we had some working documents that show population, these

5  counties and we go in what they actually look like.

6          One example, when I go to Charleston County and I

7  follow some of that -- not being a part of the committee

8  and I look at the 6th Congressional District and I think

9  what y'all had in Charleston County was like 228,000 --

10 and that may have changed since y'all last amendment and

11 in Richland County like 218,000 but that's some

12 independent work I've done on my own.

13         So I'm asking the question.  I need to know what

14 those numbers are in those counties.

15 SENATOR CAMPSEN:  We could have staff provide

16 that for you, Senator.  We'll do that and it is available

17 on the website but we will have Will Roberts get in touch

18 with you on that.

19 SENATOR SCOTT:  The other question, in looking at

20 the 3rd, the central location of the 3rd, unlike the 6th,

21 where Richland County is not made whole.

22         You only took, based on my calculation, half of

23 it that went into the 6th, the other half went into the

24 2nd.  What was the thinking pattern with that?  Because

25 that would have eliminated a whole lot of small drawings

1  when you got down to some of the other counties.

2          SENATOR CAMPSEN:  Those lines are almost exactly

3  what they are under the benchmark.

4          SENATOR SCOTT:  I understand that but I'm asking

5  what was the thought pattern because I recognize that the

6  6th lost 34,000 in population.  It needed to go to 84,000

7  to make the 730 a perfect district.

8          So we're looking for -- 84,000 population does

9  not mean that during reapportionment you can't shift

10  counties around.  Looking at the 2nd.  Of 2nd, 10 was at

11  720.  Only 10,000.

12          That's the whole reason for reapportioning, to

13  reapportion these counties to cut down on some of the

14  county precinct splits and have less counties as possible

15  because when I really follow this map, the counties that

16  remain in the 6th, with the exception of I think Berkeley

17  and Dorchester got some industry into it, major industry

18  that all these other counties are pretty poor counties and

19  if you're going to have to balance it so it works in

20  looking at trying to provide some revenue or some

21  corporations or some tax base in these counties, and so

22  I'm just trying to figure out the thought process, when I

23  asked you about what the numbers are, which counties we

24  can shift, it may have been in it last time, doesn't mean

25  it has to be in it this time.  At least that's what my

Page 47

1  experience says in the three times I've had

2  reapportionment since I've been in this general assembly.

3          So I know you tried to maintain most of them

4  exactly the way it was before but you've had a total

5  population shift in the state.

6          19 counties lost population.

7          SENATOR CAMPSEN:  Well, I mean constituent

8  consistency, maintaining core portions of a District, are

9  reapportionment guidelines and this plan does it very well

10  because except for where you had the real strong growth,

11  it's in the mid to high 90 percent residence remaining in

12  the same District and frankly you couldn't quite reach the

13  90 plus level when it comes to the coastal region because

14  of the amount of growth and you had about the same amount

15  of growth that the 1st had to shed, 85,000 about, and you

16  had about 85,000 that the 6th had to pick up and the 6th

17  is contiguous to it, and so you look at the keeping

18  Districts core Districts, the core part of Districts

19  together and also --

20          SENATOR SCOTT:  Let's examine the thought process

21  you just gave as I listen to the Senator from Berkeley

22  talked about Berkeley.

23          When I go into that region of Orangeburg,

24  Bamberg, Allendale, Colleton and Hampton, that lost

25  population and all those counties and I look at the

Page 48

1  adjacent counties, Dorchester and Berkeley, it's probably

2  where they shift in but I have no way of actually knowing.

3          And the state grew 500,000, the total in

4  population which says that it is almost in order to get

5  this thing and make some real sense.

6          The core part of what we keep talking about may

7  require a shifting because of core economic apportionment

8  in those Districts shift to other counties, simply because

9  we did not provide enough economic growth, with industry

10  and others, to maintain the core of those counties.

11          And so if the county was, four, 10 years ago,

12  20 years ago, 30 years ago unless we make some adjustments

13  in these Congressional Districts, that means that

14  Congressional District is always going to be poor.

15          And I think in terms of what we're trying to do

16  in growing the economy in South Carolina, we should open

17  our minds up to be a little bit more flexible and trying

18  to either grow some industry that's already occurred in

19  these Congressional Districts, if not shift some of these

20  counties around.

21          It just kind of bothers me up in Greenville, the

22  core for the 4th District is all of Greenville.

23          When I get to Richland, only half of the core.

24          When I get to Lexington, where the 2nd really is,

25  because it's a spillover, that means in the 2nd, Lexington

1  is whole.

2         And so when I get to Horry County, the 7th, it's

3  whole and so it raises some real concern:

4         Can we do develop maps in the core portion of

5  these Congressional Districts, making those particular

6  counties whole, other than amending the lifestyle?

7         SENATOR CAMPSEN:  Well, the counties or the

8  Districts that remain very -- that experienced little

9  change are Districts that had very little growth, along

10 with their neighbors.

11        So again, you had this large, large growth over

12 the last ten years along the coast and so this is why we

13 had to make significant changes no matter how you --

14 whatever map you come up with, you're going to have to

15 make pretty significant changes in the 1st and the 6th.

16        SENATOR SCOTT:  I'm trying to examine the maps

17 and look at all the maps and provide what my thinking

18 pattern is in it.  I'm not so sure how you change it so

19 you do get growth in the next ten years based on the way

20 we have designed these maps this time.

21        Because you still don't have counties with the

22 exception of Dorchester and Berkeley in the bottom, that

23 these counties have any form of advantage of trying to

24 grow the population as we drew it right back the way it

25 was.

Page 50

1           SENATOR CAMPSEN:  Well, we can't do that.

2           We have to reapportion every ten years.

3           SENATOR SCOTT:  I understand that but you could

4    reapportion, this ten years, a plan that makes a little

5    better sense than putting all these poor counties again

6    stacked in one District.

7           I think as soon as y'all can give me that

8    information, I'd appreciate it, then I can come back and

9    really ask some questions that I think make some sense.

10          SENATOR CAMPSEN:  Thank you, Senator.

11          PRESIDENT ALEXANDER:  Senator from Colleton, what

12   purpose do you rise?

13          SENATOR BRIGHT MATTHEWS:  To see if the Senator

14   would yield for a couple of questions.

15          SENATOR CAMPSEN:  Yes.

16          PRESIDENT ALEXANDER:  Senator yields.

17          SENATOR BRIGHT MATTHEWS:  Now you were one of the

18   members on the redistricting subcommittee for the Senate;

19   is that correct?

20          SENATOR CAMPSEN:  That's right.

21          SENATOR BRIGHT MATTHEWS:  And you, along with

22   myself and several other members, served and prior to the

23   redistricting committee under the Senator from Horry's

24   leadership we, before we even started talking about the

25   Senate maps or the congressional maps, the first thing we

Page 51

1  did was to go over and approve guidelines.

2          SENATOR CAMPSEN:  Correct.

3          SENATOR BRIGHT MATTHEWS:  Now do you testify or

4  present your position on Senate Plan Amendment A based

5  upon those guidelines?

6          SENATOR CAMPSEN:  Well, yes.

7          I explained some of the --

8          SENATOR BRIGHT MATTHEWS:  I heard you.

9          SENATOR CAMPSEN:  -- manner or ways in which the

10  plan meets the guidelines.

11          SENATOR BRIGHT MATTHEWS:  Do you have the

12  guidelines?  Is that what the Senator from Horry is

13  handing up to you now?

14          SENATOR CAMPSEN:  Yeah, I have one in my book and

15  he handed me one too.

16          SENATOR BRIGHT MATTHEWS:  Mr. President, while I

17  am proceeding, I know quite a few members in the chamber

18  do not have the guidelines.  I would move unanimously -- I

19  request unanimous consent to pass out the guidelines.

20          The pages have already copied those and is ready

21  to distribute.

22          PRESIDENT ALEXANDER:  You want to distribute

23  information to the chambers?

24          SENATOR BRIGHT MATTHEWS:  Yes, the guidelines for

25  which we are about to...  they are already out, if the

Page 52

1  pages would deliver them.

2         PRESIDENT ALEXANDER:  Without objection.

3         SENATOR BRIGHT MATTHEWS:  If we could have one

4  set going over there.

5         Now if you would, in looking at the guidelines

6  that -- you've already gone over in a cursory and very

7  efficient manner.  The first one is requirements of

8  federal law.  You talked about population equality and you

9  also started out by talking about legislative Districts

10 and you very well explained that this time there's only a

11 deviation of one man, one vote.  One man, one person.

12        SENATOR CAMPSEN:  Correct.

13        SENATOR BRIGHT MATTHEWS:  Okay.

14        And then you talked about the Congressional --

15        SENATOR CAMPSEN:  That's a federal requirement, a

16 Constitutional requirement.

17        SENATOR BRIGHT MATTHEWS:  And then you talked

18 about voting rights, and you did a very good job of going

19 over the different -- generally what Shaw v. Reno and

20 Thornburg v. Gingles and you talked about contiguity as

21 well as the other considerations like communities of

22 interest, constituency service.

23        Aren't those all of the areas generally that when

24 we sat through all of those hearings where citizens came

25 in and talked about their areas, didn't we hear different

Page 53

1  people touch on different -- each one of these -- these

2  considerations or guidelines that our committee had

3  already set up?

4          SENATOR CAMPSEN:  Yeah, we had a lot of diverse

5  opinions that we heard that touched upon these guidelines

6  and some of the opinions didn't really address the

7  guidelines, but that's okay too.

8          SENATOR BRIGHT MATTHEWS:  Correct.

9          Senator, you are a legislative delegation member

10  that represents Charleston with myself.

11          SENATOR CAMPSEN:  Correct.

12          SENATOR BRIGHT MATTHEWS:  Even though the Senator

13  from -- two senators that are up in the balcony from

14  Charleston that share a balcony, share representation of

15  Charleston don't think we represent that much of

16  Charleston.  We also are delegation members on the

17  Colleton County delegation as well as Beaufort delegation.

18          SENATOR CAMPSEN:  Correct.

19          SENATOR BRIGHT MATTHEWS:  So in this chamber you

20  and I are probably the ones that are kissing cousins

21  representing most of the Lowcountry.

22          SENATOR CAMPSEN:  I would claim you as a kissing

23  cousin any day, Senator.

24          SENATOR BRIGHT MATTHEWS:  Now Senator, we adhered

25  to these guidelines in everything we tried to do regarding

1    the Congressional plans and discussing it, did we not?

2           SENATOR CAMPSEN:  Well, you tried to, although at

3    times there's conflicting provisions that in a particular

4    application may be conflicting and you -- and sometimes

5    it's even impossible to follow them.  They are not -- they

6    are guidelines.  They are not absolute, you know,

7    requirements because no plan can probably meet every

8    single guideline absolutely.

9           SENATOR BRIGHT MATTHEWS:  Well, can you tell me,

10   in looking at this plan that is adopted September 17th,

11   2021, where is it on that plan of our guidelines that 2020

12   redistricting guidelines sheet that the Senate Judiciary

13   Committee adopted, where is the word "benchmark"?

14          You have told us over and over again about the

15   benchmark from 2012, and here we are in 2022 and nowhere

16   in any case law or in the Senate redistricting

17   subcommittee guidelines is the word or the notion or that

18   we've talked about in any of our subcommittees where we

19   talked about benchmarks.

20          SENATOR CAMPSEN:  Well, the benchmark is just a

21   term to reference the existing Districts, number one.

22          And number two, not making dramatic changes to

23   the existing plan does -- does satisfy, in part anyway,

24   the guideline of constituent consistency.  Preserving the

25   cores of existing Districts, keeping incumbent residents

1  and Districts with their core constituents, avoiding

2  contests between incumbent legislators.  So it is --

3  that's a guideline.  It's not an overriding guideline that

4  overrides others, but it is a guideline.

5            SENATOR BRIGHT MATTHEWS:  So just for the rest of

6  the chamber, because they weren't on the subcommittee,

7  when we referred to constituent consistency on the last

8  page, it is Section 3, subtitle B, constituent

9  consistency, preserving the cores of existing District,

10  keeping incumbents, residences in Districts with their

11  core constituents and avoiding contests between incumbent

12  legislators should be considered.

13            So -- but when you started out your presentation,

14  did I not understand that that was a primary concern of

15  you or did I misconstrue what you were saying?

16            SENATOR CAMPSEN:  It's not a primary concern,

17  it's a description of the plan that it's minimizing the

18  changes, honoring -- that is an honoring of core

19  constituency and that's a legitimate...  that's a

20  legitimate redistricting guideline and a legitimate

21  political choice to make as well.

22            SENATOR BRIGHT MATTHEWS:  Well, Senator, I tried

23  my best, in your presentation, I tried my best to take

24  copious notes but I -- the first thing you got up when you

25  said...  you said primarily the biggest point about the

Page 56

1    Senate Plan Amendment A was the constituent consistency

2    rate of 84 percent.  Is that not -- is that not a concern

3    now of yours?

4            SENATOR CAMPSEN:  No.  If you look on page 14 of

5    the handout that's online, apparently there was a

6    somewhat -- you didn't get the last two or three pages,

7    apparently --

8            SENATOR BRIGHT MATTHEWS:  Let's clarify for the

9    record.  I apologize for interrupting.  You said page 15

10   but it's actually page 13 that you were referring to.

11           This handout, for the record --

12           SENATOR CAMPSEN:  I think we have a different

13   version.  I have one that was just updated, I think.

14           SENATOR BRIGHT MATTHEWS:  I want to make sure

15   we're talking from the same page.

16           SENATOR CAMPSEN:  If you look at constituent

17   consistency and the spreadsheet has District 1 through 7,

18   and then in Senate Amendment 1 it has the percentage of

19   residents in the District, that remain in the District

20   after, you know -- under this plan and then next to it,

21   under Senate Amendment 2A, same metric but the percentage

22   of the residents who remain in the District plan 2A and

23   Senate Amendment 1 --

24           SENATOR BRIGHT MATTHEWS:  Senator, out of

25   fairness to you as well as protecting the rights of all

1  the constituents in South Carolina under this plan, I

2  respectfully submit to you that upon my request earlier

3  that we receive the comparison report that was referred to

4  in your Judiciary Committee meeting, on yesterday I

5  requested that we stand at ease until you provided to --

6  that the committee provide it to the entire Senate.

7          Just one second.

8          I respectfully submit to you now, you have

9  referred in two different times of my questioning to pages

10 that are not consistent.  I understand since then that --

11 since I made the request for these documents the committee

12 has finally uploaded their work on the site, the Senate

13 redistricting site.

14         So I'm going to ask whether or not what you're

15 referring to regarding benchmark and constituent

16 consistency, whether or not it in fact begins on page 8,

17 the bottom -- excuse me -- on the bottom of page 10 and

18 extends to page 13.

19         SENATOR CAMPSEN:  You were -- you asked for and

20 were given what was handed out in committee and it's the

21 same data, it's just formatted differently.

22         SENATOR BRIGHT MATTHEWS:  I believe you.

23         SENATOR CAMPSEN:  Bigger numbers.

24         So I can read it from here.  I'll give you this

25 version too.  I'll be happy to do that.

1           SENATOR BRIGHT MATTHEWS:  I was just trying to

2    make sure that we follow along.

3           SENATOR CAMPSEN:  Yeah.

4           SENATOR BRIGHT MATTHEWS:  That's why I asked are

5    you referring to constituent consistency of the pages that

6    we receive that starts on page 10 and it says what

7    percentage of the new District's population is made up of

8    benchmark -- of the benchmark Districts.

9           SENATOR CAMPSEN:  Yeah, yes, it begins on page 10

10   but I'm looking -- I'm referring you to the numbers at the

11   bottom of page 11 because it goes from page 10 over to

12   page 11.

13          SENATOR BRIGHT MATTHEWS:  Got it.

14          We're saying the same thing.

15          SENATOR CAMPSEN:  Right.

16          SENATOR BRIGHT MATTHEWS:  So in committee meeting

17   there was a lot of talk.  Now if I go on what you're

18   talking about here, it says -- it compares the Senate

19   Amendment 1 that you're presenting and it says that as it

20   relates to municipalities, there are 22 splits but as

21   compared to Senate Amendment 2A, there are only 15 splits.

22          SENATOR CAMPSEN:  That's correct.

23          SENATOR BRIGHT MATTHEWS:  And the benchmark had

24   19.  Now the benchmark that you're referring to, that is

25   not a plan, if I go by what the Senator from Berkeley,

1  Senator Grooms just talked about, that particular plan was

2  not actually approved, it had to be approved and created

3  in the courts; am I correct?

4            SENATOR CAMPSEN:  No.

5            SENATOR BRIGHT MATTHEWS:  So let's move on.

6            SENATOR CAMPSEN:  It was challenged but upheld.

7            But going to the city benchmarks, you do have 19

8  splits in the benchmark, you have 22 splits in

9  Amendment 1, you have 15 splits in Amendment 2 but the

10 truth is when it comes to cities, you're always going to

11 have a lot of splits and dynamic splits because cities

12 cross-county boundaries, for example, and so you have

13 cities that cross-county boundaries, cities are always as

14 you know we all know because the annexation war is kind

15 of -- sometimes bubble up and rise to the level of

16 municipalities want to make changes to your annexation

17 laws.

18           So cities are constantly annexing and they're

19 annexing and they may annex a piece of property that's in

20 the same county but outside of the District, you know, or

21 they may annex something in another county and so that is

22 kind of -- that's just the way cities are because they are

23 constantly engaged in annexing their boundaries are

24 changing all the time.

25           You and I know, we in the Lowcountry, it's

Page 60

1  Yemassee.  Yemassee has done a lot of annexation, so we do

2  have -- so those are the splits benchmark 19, 22 and

3  amendment 115 --

4         SENATOR BRIGHT MATTHEWS:  Am I understanding

5  you --

6         SENATOR CAMPSEN:  -- on the cities.

7         SENATOR BRIGHT MATTHEWS:  Am I understanding --

8  and for everybody else's edification in here you're saying

9  the less splits, no matter what, is better, correct?

10        SENATOR CAMPSEN:  No, it's just a factor to

11 consider, that's all.  It's just a factor to consider.

12        SENATOR BRIGHT MATTHEWS:  So what about do you

13 remember the Colleton County case?

14        SENATOR CAMPSEN:  Colleton County v. McConnell?

15        SENATOR BRIGHT MATTHEWS:  Versus McConnell.

16        SENATOR CAMPSEN:  Yes.

17        SENATOR BRIGHT MATTHEWS:  What did that case --

18 what was that filed upon, what premise?  They wanted to

19 keep counties whole, isn't that right?  Primarily they

20 wanted to keep -- if I'm wrong --

21        SENATOR CAMPSEN:  That one was an impasse.

22        The courts drew the lines because the legislature

23 reached an impasse.

24        SENATOR BRIGHT MATTHEWS:  I know, but I'm asking

25 why did they file it?  You represent Colleton County and

1  that's -- Mr. Terreni's shaking his head but I want to

2  know whether or not that was why it was filed.

3          I'm not asking for the ruling.  Is that what --

4          SENATOR CAMPSEN:  Because there wasn't a plan

5  that the general assembly produced.

6          SENATOR BRIGHT MATTHEWS:  I am asking, did

7  Colleton County want to remain whole?

8          SENATOR CAMPSEN:  Oh, I don't know.

9          I don't know.

10         SENATOR BRIGHT MATTHEWS:  You didn't look at that

11 case?

12         SENATOR CAMPSEN:  I don't know.

13         SENATOR BRIGHT MATTHEWS:  So people of Colleton,

14 you don't know that we wanted to remain whole.

15         What about minimizing division of county

16 boundaries?  And it's on my page 12.  Under Senate Plan 1,

17 Amendment 1 that you're talking about, you have four under

18 minimizing division of county boundaries under District 1.

19         SENATOR CAMPSEN:  Right.

20         SENATOR BRIGHT MATTHEWS:  And the plan that is

21 presented by Senate Amendment 2 has a one.

22         So that's less counties.

23         SENATOR CAMPSEN:  Right, and the benchmark has

24 five.

25         SENATOR BRIGHT MATTHEWS:  Okay, so we're going in

Page 62

1   the right direction with Senate District -- Senate

2   Amendment 2.

3           What about on 6?  It looks like the benchmark --

4   or the old map is what I'm going to refer instead of

5   benchmark because I think we need to do better.

6           SENATOR CAMPSEN:  Existing one.

7           SENATOR BRIGHT MATTHEWS:  Well, because the

8   population has changed, benchmark isn't where we need to

9   be, we need to do better to make it right, correct?

10          We don't need a map from ten years ago.

11          SENATOR CAMPSEN:  No, we have to do a map every

12  ten years.

13          SENATOR BRIGHT MATTHEWS:  Right, so let's just

14  skip over what benchmark is.  Under the area that I

15  represent is 1 and 6.  My counties intersect out of

16  Congressional District 1 and 6.

17          It looks like on the map you're advocating the

18  number of counties that is split is eight but the number

19  of counties that I have proposed on the Senate Amendment

20  No. 2 is only two.

21          So I understand -- am I correct in understanding

22  that the reason why you think that it's okay is because of

23  your colloquy with the Senator from Berkeley talking about

24  these Districts and economic interests and whatnot and

25  consistency of those folks being represented by the same

Page 63

1  congressman; is that what your position is as you go --

2       SENATOR CAMPSEN:  Senator, I did not place any

3  one reapportionment -- I mean, there are some that there

4  is a hierarchy, I mean it's like the Voting Rights Act and

5  the Constitutional requirement, one man, one vote.

6       But there are other guidelines that sometimes you

7  meet one and it means you can't meet the other.

8       I was simply explaining that considering the

9  growth we had in South Carolina, this Plan Amendment 1

10  does a pretty amazing job of keeping constituents in the

11  same District.

12       It's a very high percentage and it's a lot higher

13  percentage than the plan under 2 in the same Congressional

14  District, and that's the only point I'm making.

15       That's not the only factor but it is a factor and

16  the plan does a good job and one reason I'm making that

17  plan -- because people are saying this is gerrymandering.

18       Well, if you going to gerrymander, you've got to

19  change.  You've got to change the Districts dramatically

20  if you're doing that gerrymandering, and we're not hardly

21  changing them at all.

22       SENATOR BRIGHT MATTHEWS:  Senator, Senator,

23  Senator, we I believe sat through only one day of hearings

24  as it relates to the Congressional plan, and primarily the

25  comments that were received were from people who had a

Page 64

1  comment regarding the 6th versus the 1st Congressional

2  District.  Isn't that the majority of the comments we

3  received in the public hearings last Friday or Thursday?

4          SENATOR CAMPSEN:  Yes.

5          SENATOR BRIGHT MATTHEWS:  And tell me, if you

6  would, what percentage of those folks -- because I don't

7  want this body, this Senate, to turn into what is in D.C.

8  where we always doing dog whistling regarding race.

9          What percentage of the folks that came and

10  testified before us, what percentage did you hear say

11  racial gerrymandering versus keep Charleston County whole?

12          Because I didn't hear a whole lot of that.

13          SENATOR CAMPSEN:  No, I'm not talking about

14  racial gerrymandering.

15          SENATOR BRIGHT MATTHEWS:  You just said it.

16          SENATOR CAMPSEN:  No, I was talking about

17  political gerrymandering.

18          SENATOR BRIGHT MATTHEWS:  No, earlier you said

19  racial -- I wrote it down.  You said there's been

20  allegations of racial gerrymandering.

21          SENATOR CAMPSEN:  Well, I have heard that too but

22  not in that meeting but I've heard -- I've heard an

23  allegation on that.

24          SENATOR BRIGHT MATTHEWS:  Almost 90 percent of

25  the people who came and talked --

1          SENATOR CAMPSEN:  I'm not talking about the

2   people --

3          SENATOR BRIGHT MATTHEWS:  -- regardless of their

4   complexion, said keep Charleston County whole.  A

5   percentage came from Dorchester and Berkeley and said keep

6   us with Charleston County, right?

7          SENATOR CAMPSEN:  Senator, I was making the point

8   that people said we're backing or we're -- and if you have

9   very little change on the existing map, that's not

10  gerrymandering because you're basically using the lines of

11  the existing map and that's a legitimate reapportionment

12  principle or guiding principle and that's the only point

13  I'm making, and this map largely does that where it can.

14  I can't do that where there's tremendous growth because

15  it's impossible because you have to have the same number

16  of people in each District.

17          And as far as that -- as far as the Zoom meeting,

18  I'm not saying anyone made any allegation of racial

19  gerrymandering there at all, I'm not saying that, but I

20  have heard those allegations, you know, over the course of

21  this extended reapportionment process, I have heard that.

22          And I just wanted to make -- I just wanted to

23  present some data to indicate that that has not happened.

24          SENATOR BRIGHT MATTHEWS:  Did you know, when you

25  gave in your initial presentation that gave the numbers

Page 66

1  that I totally agree with you, that Congressional

2  District 1 picked up an additional 88,000, whereas

3  Congressional District 6 lost in the last census 85,000?

4        So one would think that the most obvious, the

5  most obvious, would you not agree, the most obvious way to

6  handle that -- because we all agree and we all know that

7  the areas that and I represent, we've gained population,

8  whereas the middle -- whereas Richland County in the

9  middle of South Carolina, has lost population.

10        We all agree with that, right?

11        SENATOR CAMPSEN:  Yes.

12        SENATOR BRIGHT MATTHEWS:  So what confused me

13  when I first saw your amendment is then if you have gained

14  properly in the Lowcountry -- and we need to gain about

15  the same amount with the difference of 3,000 -- why did

16  you go and snake in or salamander into a portion of

17  Charleston to grab your votes?

18        Because we're not going to get into the racial

19  gerrymandering thing because you and I both know in

20  Charleston it matters not about your race, it is just that

21  you went by how those folks voted in West Ashley.

22        You pushed, you pulled --

23        SENATOR CAMPSEN:  Actually --

24        SENATOR BRIGHT MATTHEWS:  Let me just finish my

25  question and then I'll sit down.

1            It appears that there's a salamandering effect.
2    Instead of pulling the 85,000 that Congressional
3    District 6 needed, instead of pulling those out of
4    Clarendon, Orangeburg, the upper part of Dorchester and
5    Berkeley, there was apparently a decision to salamander
6    into the lower part of Charleston, the Democratic voting
7    area of Charleston, and snatch those people that are in my
8    District and yours.
9            SENATOR CAMPSEN:  Senator, the main thing we did
10   in Charleston and to the House plan that's sent over here
11   is we're following geographic boundaries in Charleston.
12           We're following the Ashepoo -- I mean the Stono
13   River, the Wadmalaw Sound, the Wanda -- the Cooper River,
14   we're following that and we took -- as I recall, it's
15   about 78,000 people who moved from the 1st to the -- I
16   mean from the 6th to the 1st.
17           78,000 came from the 6th to the 1st.
18           SENATOR BRIGHT MATTHEWS:  That boundary does not
19   flush out when you could have gotten out of Colleton
20   County 30,000 people to add, to give, meaning that only
21   50,000 would be needed after there.
22           Instead you skip over a portion of Colleton and
23   snaked around into the bottom of Charleston, and you could
24   have gotten this same number if you had entertained a plan
25   which would have given it to you so that that

1  Congressional District would not snake unnecessarily into

2  the Lowcountry.

3          SENATOR CAMPSEN:  Well, Senator, there's a lot of

4  ways you can draw a plan.  You know that because you've

5  been on the subcommittee.

6          And so there's a lot of decisions along the way

7  that end up producing a particular plan.

8          SENATOR BRIGHT MATTHEWS:  Senator, you know, I

9  really appreciate you agreeing with me that our opposition

10  to Senate Plan 1 versus 2 is not about racial, it's about

11  gerrymandering and packing; packing the 6th Congressional

12  District to make the 1st Congressional District more

13  electable but with Trump numbers.

14          SENATOR CAMPSEN:  Well, Senator, if you have

15  consistency, you haven't changed much and if you're going

16  to gerrymander, you have to change a lot of things, is the

17  point I'm making.

18          PRESIDENT ALEXANDER:  Senator from Richland,

19  Senator Harpootlian what purpose do you rise?

20          SENATOR HARPOOTLIAN:  Would the speaker yield to

21  a question?

22          PRESIDENT ALEXANDER:  Does the speaker yield?

23          SENATOR CAMPSEN:  Yes.

24          PRESIDENT ALEXANDER:  The speaker yields.

25          Senator from Richland.

Page 69

1          SENATOR HARPOOTLIAN:  Senator, I've got an

2    amendment I'm going to propose after we vote on your

3    amendment and I'm going to deal with a lot of the issues

4    that I could ask you about but we went over them in

5    committee yesterday so unless you have some reason to

6    change any of your answers yesterday I'll just move on, if

7    that's okay with you.

8          SENATOR CAMPSEN:  I'm happy for you to move on,

9    Senator.

10         SENATOR HARPOOTLIAN:  That's what I thought.  So

11   are you familiar with the case of Shelby v. Holder?

12         SENATOR CAMPSEN:  Yes.

13         SENATOR HARPOOTLIAN:  And could you tell me,

14   please, what you think it did?

15         SENATOR CAMPSEN:  I'm not real familiar with it,

16   but Shelby --

17         SENATOR HARPOOTLIAN:  Let me just make this

18   quick.  Shelby v. Holder struck down Sections 4 and 5 of

19   the Voting Rights Act.

20         SENATOR CAMPSEN:  Oh, the Voting Rights Act case,

21   yes.

22         SENATOR HARPOOTLIAN:  Now you would agree with me

23   that the Voting Rights Act was in effect when the 2012

24   plan was adopted, correct?

25         SENATOR CAMPSEN:  Well, it's still in effect

Page 70

1  today but those sections were in effect.

2          SENATOR HARPOOTLIAN:  I'm talking about

3  Sections 4 and 5.

4          SENATOR CAMPSEN:  Yes, they were in effect, yes.

5          SENATOR HARPOOTLIAN:  The only real section we

6  look at now is Section 2; is that correct?

7          SENATOR CAMPSEN:  Correct.

8          SENATOR HARPOOTLIAN:  So the plan that was

9  composed in 2012 was one that was shaped by the Voting

10  Rights Act, Sections 4 and 5, to some extent, correct?

11          SENATOR CAMPSEN:  Well, certainly it was impacted

12  because preclearance was required.

13          SENATOR HARPOOTLIAN:  Well, and no retrogression,

14  right?

15          SENATOR CAMPSEN:  Correct.

16          SENATOR HARPOOTLIAN:  And that's no longer the

17  rule.  You can have retrogression now, correct?

18          SENATOR CAMPSEN:  I'm not sure.

19          It certainly can't be a primary objective but

20  that can't be primary for sure.

21          SENATOR HARPOOTLIAN:  As long as it doesn't

22  violate Section 2.

23          SENATOR CAMPSEN:  Excuse me?

24          SENATOR HARPOOTLIAN:  If the retrogression

25  doesn't violate Section 2.

1            SENATOR CAMPSEN:  Yes, yes.

2            SENATOR HARPOOTLIAN:  So you would agree with me

3    that the so-called benchmark plan is one that was

4    constructed under constraints that no longer exist today,

5    to some extent?

6            SENATOR CAMPSEN:  Yes, the Senate did -- it was

7    in a different legal environment, yes.

8            SENATOR HARPOOTLIAN:  Right.  And that

9    environment was more restrictive on this body and other

10   bodies in composing a reapportionment plan, was it not?

11           SENATOR CAMPSEN:  Yes, that was restrictive on

12   states that were subject to Section 5 oversight, yes.

13           SENATOR HARPOOTLIAN:  Right.  So now, freed from

14   those constraints, freed from the handcuffs imposed by the

15   Washington bureaucracy, tell me what analysis was used by

16   you and others that composed this plan, to see what we

17   could do to straighten out some of the weird shapes and

18   gerrymandered -- I mean they were gerrymandered for

19   allegedly legitimate purposes to meet Section 4 and

20   Section 5 preclearance.

21           What did you do to change the plan?  How did you

22   look at that, in devising this, or did you?

23           SENATOR CAMPSEN:  Well, we weren't completely

24   restrained to the existing lines.  I mean I'm -- in

25   drawing this but preserving core parts of existing

Page 72

1  Districts, and constituent consistency are reapportionment

2  guidelines that would tend to push a plan in the direction

3  of something being similar to the current plan.

4        SENATOR HARPOOTLIAN:  But the current plan was

5  imposed by Federal edict, almost, over the years.  It

6  changed but basically the idea was to create a majority

7  minority Congressional District, correct?

8        SENATOR CAMPSEN:  Yeah, originally, and it was

9  upheld as recently as 2012.  I think you're very familiar

10 with the Backus case and opinion, Senator.

11       SENATOR HARPOOTLIAN:  I am.

12       SENATOR CAMPSEN:  And it was upheld as recently

13 as 2012 which again, is as recent as you can get when it

14 comes to reapportionment.

15       SENATOR HARPOOTLIAN:  Well, no, actually when you

16 look at Shelby v. Holder and a number of out -- there's

17 another Alabama case --

18       SENATOR CAMPSEN:  I'm talking about a case that

19 dealt with our plan and upheld it.

20       SENATOR HARPOOTLIAN:  But you would agree with me

21 the law's changed since that plan was upheld, correct?

22       SENATOR CAMPSEN:  It has, yes.

23       SENATOR HARPOOTLIAN:  And what adjustments were

24 made by you in devising this plan to accommodate that,

25 those changes, or were there any considerations?

1           SENATOR CAMPSEN:  Well, we didn't have -- I mean
2    we didn't have preclearance requirements because Section 5
3    had been struck down.
4           SENATOR HARPOOTLIAN:  Right.
5           No retrogression analysis.
6           SENATOR CAMPSEN:  Well, that would happen -- you
7    know, that's something that would happen in -- if it...
8    you look at retrogression analysis, I mean I know what we
9    did in the 1st District and the 6th.  I mean, BVAP -- the
10   BVAP went down, not up.  It wasn't packing.
11          SENATOR HARPOOTLIAN:  And did you do any racial
12   block voting analysis to indicate -- to find areas where
13   white people wouldn't vote for black people, did you do
14   that?
15          SENATOR CAMPSEN:  No.
16          SENATOR HARPOOTLIAN:  So I guess what I'm saying
17   is the guidelines never mention the work "benchmark,"
18   never say we're going to start with the existing plan --
19          SENATOR CAMPSEN:  No.
20          SENATOR HARPOOTLIAN:  -- right?
21          It never says that.
22          SENATOR CAMPSEN:  But it does -- but they do say
23   maintain the core elements of existing Districts.
24          SENATOR HARPOOTLIAN:  The core.
25          SENATOR CAMPSEN:  And constituent consistency,

1  and so they are guidelines that move you in the direction.

2           SENATOR HARPOOTLIAN:  Of the core.

3           SENATOR CAMPSEN:  But it also says less change

4  than more change.  Minor change, not radical change.

5           SENATOR HARPOOTLIAN:  Well...

6           SENATOR CAMPSEN:  I didn't call you a radical

7  now, Senator.  I'm talking about change.

8           SENATOR HARPOOTLIAN:  I've been called worse.

9           So -- but my point is this:  You've got to admit,

10 when you look at what your plan does to Charleston County,

11 it's weird.  I mean, it's -- well, the hook, it looks

12 like...  well, actually, I'm not going to go there.

13          But it looks weird.  You would agree that the

14 only reason you all did that was to pick up population and

15 goes -- it hooks around.  I mean wouldn't you want

16 Charleston County to be whole, if you had that choice?

17          SENATOR CAMPSEN:  No, actually, Senator, no.

18          SENATOR HARPOOTLIAN:  You don't want -- wait a

19 minute, wait a minute.  You folks in Charleston watching

20 this, your Senator just said he does not want you all to

21 be in the same Congressional District.

22          SENATOR CAMPSEN:  Senator, because I believe that

23 having -- I'd rather be two Congressmen advocating for my

24 county than one and so I don't think it's a -- it's

25 terrible that that happened.

1             I think that Jim Clyburn representing Charleston

2 has been good for Charleston.  I think that a Republican

3 member of Congress representing Charleston County has been

4 good for Charleston.  Because when it comes to doing

5 something for Charleston County, it's kind of like what

6 most of our legislative delegations are like.

7             It's about pocketbook issues.

8             Example.  Are we going to get funding to deepen

9 Charleston Harbor?  Under the Biden administration, if we

10 needed something like that under the Biden administration,

11 I'd much rather have Congressman Clyburn being our

12 spokesman, trying to get that.

13            Under the Trump or the Bush administration, you

14 know, it would have been -- a Republican congressman would

15 have been better, probably, getting some of that.  And so

16 it's pocketbook, kitchen table issues, you'd rather have

17 two people advocating for me any day than one.

18            SENATOR HARPOOTLIAN:  Why not four?

19            SENATOR CAMPSEN:  Well, because you can't do that

20 and stay within -- you can't do that -- we don't have any

21 counties -- for four, you'd have to have a 3 million

22 person county.  You'd have to have like New York counties,

23 New York City.

24            SENATOR HARPOOTLIAN:  What piece of Charleston

25 County do Mendel's River have?

1            SENATOR CAMPSEN:  What?

2            SENATOR HARPOOTLIAN:  What piece of Charleston

3    County did Mendel's River have?

4            SENATOR CAMPSEN:  I think my Congressional

5    District historian desk mate might be able to come up with

6    it but I'm not sure.

7            SENATOR HARPOOTLIAN:  All of it.  All of it.

8            And it worked out okay.

9            SENATOR:  And he had all of Berkeley too.

10           SENATOR CAMPSEN:  And he had all of Berkeley.

11           SENATOR HARPOOTLIAN:  That's all the questions I

12   have.

13           SENATOR CAMPSEN:  Yeah, Senator, it's just -- it

14   works -- here in these chambers, it's better to have more

15   members of a delegation because we can fight about

16   philosophical issues here at the Statehouse, in Congress

17   they can fight about the philosophical issues in D.C., but

18   when it comes to a South Carolina Congressional

19   delegation, much like a county legislative delegation in

20   the general assembly, the focus is not upon what you're

21   going to fight about.

22           We'll go fight about issues in this chamber but

23   when we're working for our constituents back home, we're

24   trying to just bring home the bacon, you know.  We're

25   trying to do -- get things from D.C. transportation

1  dollars, relief from hurricanes, money to help build the

2  seawall at the battery to keep Charleston from flooding,

3  yadi, yadi, yada, those type of things, and it's much

4  better to have two members than one.

5          SENATOR HARPOOTLIAN:  Well, and there's a

6  tradeoff here and what you've done here -- and I'm going

7  to talk about it in just a minute -- is that most of the

8  people that you have put into -- and I understand they

9  were already there -- most of the people you put into the

10  1st were white and most of the people you put into the 6th

11  from Charleston County were black, and disproportionately

12  so.

13          In a moment I'm going to talk about why this is

14  not a political gerrymander, this is a racial gerrymander.

15          And --

16          SENATOR CAMPSEN:  All I'm saying -- I didn't even

17  look at race numbers.

18          SENATOR HARPOOTLIAN:  Why are there BVAP charts

19  everywhere?

20          SENATOR CAMPSEN:  Because that issue's been

21  raised, and of course the staff was ready to tell me, or

22  you're doing something wrong when it comes to a

23  retrogression that will get you in trouble, but I think

24  everyone that I've worked with --

25          SENATOR HARPOOTLIAN:  It's just coincidence,

1  then?

2          SENATOR CAMPSEN:  I've never asked what should

3  the BVAP of this precinct or that.

4          SENATOR HARPOOTLIAN:  Stuff happens, that's just

5  the way.  And we're going to look at some numbers I think

6  that are shocking about how race was used in composing

7  this plan and why that's bad -- wait a minute -- why

8  that's bad for this state.  It may be good for the folks

9  up in D.C. fighting each other but it's bad for our state

10 when we divide our voters based on race.

11         SENATOR CAMPSEN:  Senator, I never even asked,

12 you know -- I mean never even -- what's the BVAP of this,

13 what's the BVAP of that?  I didn't ask that.  We needed to

14 make sure that we weren't running afoul of any of the

15 Federal laws and case law and statutes.

16         SENATOR HARPOOTLIAN:  And I believe you have but

17 that's for another day and another forum.

18         SENATOR CAMPSEN:  Okay.

19         SENATOR HARPOOTLIAN:  Thank you.

20         PRESIDENT ALEXANDER:  Senator from Orangeburg,

21 what purpose do you rise?

22         SENATOR HUTTO:  If you'd yield for a quick

23 question?

24         SENATOR CAMPSEN:  Yes.

25         PRESIDENT ALEXANDER:  Senator yields.

Page 79

1           SENATOR HUTTO:  Did I just hear you say that you

2    got advice from staff that we were running afoul of

3    retrogression?

4           SENATOR CAMPSEN:  No.  You need to let me know if

5    we're running afoul of anything here.

6           That's what I'm saying.

7           SENATOR HUTTO:  Are there any retrogression

8    standards, now that the rules have changed, that we had to

9    take into account?

10          SENATOR CAMPSEN:  No.

11          SENATOR HUTTO:  So that really wasn't an issue

12   this time.  It was really more communities of interest and

13   the other standards that we adopted, than whether we

14   retrogressed or not; is that correct?

15          SENATOR CAMPSEN:  Yes.

16          SENATOR HUTTO:  Okay, thank you.  That was

17   Section 2.  I move for adoption.

18          PRESIDENT ALEXANDER:  The pending question is the

19   adoption of Amendment No. 1.  Rollcall.

20          Rollcall is required is required, yes.

21          SENATOR MALLOY:  Can I be heard?

22          PRESIDENT ALEXANDER:  The Senator from Darlington

23   is recognized.

24          SENATOR MALLOY:  Thank you, Mr. President,

25   members of the Senate.

Page 80

1          So just to put us into the posture as to where I
2    would think that we are is that we're on a bill that was
3    returned from the House that is the redistricting bill
4    that's going to end up working on the Congressional
5    Districts; is that right?  Nodded your head yes.
6          So I go back and I look over the period of time
7    and what's happening in CHAT and I mentioned to someone
8    that I've been through five of these and I just want to
9    make sure we get this record straight.  Two of those was
10   as a lawyer, three of those is since I've been here.
11         Senator from Orangeburg, you've been through I
12   don't know how many.  Senator from Lexington, I don't know
13   how many you've been through since you've been here -- a
14   bunch.  And Mr. President, you've been through a bunch in
15   your time in service here in the House and in the Senate.
16         I think in 2011 the Senator from Berkeley -- I
17   was minding your show one day.  It didn't last but on
18   second reading, we had an amendment that came up and
19   no one expected it to pass and it did pass, much to the
20   surprise of many folks here in the body.
21         And then we had another day to come back and we
22   voted on third reading and we passed the bill then.
23         Candidly, at that point in time I would tell you
24   that if I did not want to end up honoring what we had
25   agreed upon here, we'd have probably had that bill drug

Page 81

1  out to the courts because the Senate would not have gotten

2  together on it and it would have, Senator from Berkeley,

3  failed on third reading, had the minority side decided to

4  end up voting against it.  But we didn't.  And so hence we

5  go to conference and we come in with a plan that became

6  the plan.  It was what the body had agreed to.

7          I'm not casting anything to anyone but I'll just

8  say that this process here is very difficult for a person

9  that watches this redistricting go forward.

10          We are looking at a redistricting plan here for

11  the 5.2 million people in South Carolina and we get one

12  bite at this apple.  We don't get second reading and third

13  reading.  We don't bill return from the House.

14          That bothers me.  We've got a looming deadline

15  that was placed on us by the courts and that's not today,

16  it was two days ago.  They say, does a deadline matter?

17          Well, it's in writing so it may not because they

18  got other things to go on and we will get in timing.

19          Now it's not clear to me as I watch this process

20  and the discussion is largely amongst the subcommittee

21  members, the folks that served on finance, hey, it's

22  online, the information's online.  You want a map, you go

23  look at it online.  We started today at 10:00 o'clock.

24  We're past 1:30 now.  We had about an hour and change of

25  discussion, and the information's online.

1           I queried yesterday, I believe it was, after we

2    had a little bit of storm and said what happened in

3    subcommittee?  Was this information exchanged in

4    subcommittee?  Why am I listening to this conversation

5    today about who got the documents and where the documents

6    are?  They're online.

7           We're going to vote through the subcommittee.  We

8    voted and some would say we didn't vote and some would say

9    we advanced it because it would have been at 3-3, so we

10   had two plans.  We advanced it.

11          You advanced it, does that mean vote?  Did the

12   Democrats vote for it then?  Some would say yes, some

13   would say no.  And the answer is I don't know.

14          I know what was said and so the bill came out of

15   subcommittee and advanced to the full committee, two

16   different bills.  And so now we come to the full committee

17   yesterday, what are we going to do?

18          We're going to pull this bill out?  Maybe we

19   should carry 'em over, give everybody a chance to end up

20   starting afresh over on the floor.

21          Well, if you want a bill and it comes out of

22   committee and it gets on the floor and it gets in the

23   masthead status, then we get a chance to end up voting on

24   it, to get second reading, go home, look at it, read, get

25   third reading and then vote on it.

Page 83

1          We get 24 votes on second reading for cloture, 26

2    votes on third reading for cloture, but on this one,

3    here's what happens, Senator from Orangeburg:  When the

4    last amendment is on the desk you ain't -- you not going

5    to vote.  You're not even going to vote.

6          You're not even going to vote, y'all.

7          I love all y'all here, but I didn't sign up for

8    this.  I didn't.  And I know my chairman, my classmate

9    from college and classmate from law school, he's got some

10   constraints on him too.  He's got to get a bill through,

11   right?  And so I get that.

12         And, you know, I would have to just say to the

13   staff, I didn't get a chance to work so much on this one,

14   I worked on the other bills.  You could not find folks

15   that worked as hard as that team that they have over there

16   with Will and Andy and Charlie and those guys.

17         I mean, I wore 'em out.

18         And I think that what happens now is that we're

19   coming here, folks, we're getting down to the end, I'm not

20   going to be in your way but I just got to be clear as to

21   what -- as to what happens.  I don't like not being able

22   to vote on second reading.  I don't like not being able to

23   vote on third reading.

24         We demonstrated that yesterday.  I had to pause

25   on second reading, Senator from Orangeburg, on the CON.

Page 84

1            You get a chance to look at it again on third

2    reading?  We're going to do that.

3            What if I pass something today and overnight,

4    whenever I sit down and look at it, I say you know what, I

5    saw something.  I think I want to readdress that.  I won't

6    get a chance to.  I saw something in the CON bill I want

7    to change.  It's not going to be a secret either.

8            There's a couple of those amendments that make

9    absolutely no sense.

10           So today I look forward to getting the other

11   amendments up.  This is the first amendment.  In my view,

12   this is going to be the amendment that becomes the bill.

13           We can count the votes.

14           The problem is, the issue is if the documentation

15   that supports it, then we got to have it.  The problem we

16   have is that if we get an amendment and we put it up

17   there, guess what it has to do?  It has to comply with the

18   deviation requirements.  You can't just end up just doing

19   it, you know, on a quick -- in a quick way.  You've got to

20   do it within a deviation of one person and it's not easy.

21           And to folks outside the chamber, they don't

22   necessarily end up -- they can submit the plan but if we

23   follow what they are doing, it may not comply with what we

24   believe to be the standards.

25           So I say as we go along is that I just wanted to

Page 85

1    say that little piece, because as we stand before us, you

2    know, we're moving here now to vote on the very first

3    amendment.  If there is other information that we need,

4    this is our only chance.  We're not going to be able to

5    correct it as it goes forward.

6            If the goal is to try to get the courts to end up

7    doing this, they can do it better than us, you know, I'm

8    not certain of how it happens if we are creating a record

9    of exactly what we're doing.

10           But I do know that the bill returned from the

11   House as soon as the last amendment is voted on, done.

12           And I don't think that's the way we do a

13   redistricting bill.

14           PRESIDENT ALEXANDER:  Pending question, Senator

15   from Charleston?

16           SENATOR KIMPSON:  I'd like to be heard on the

17   amendment.

18           PRESIDENT ALEXANDER:  Senator from Charleston is

19   recognized, Senator Kimpson.

20           SENATOR KIMPSON:  Thank you, Mr. President,

21   members.

22           I've been up in the balcony since Wednesday and

23   I've had a chance to observe -- you can see a lot more

24   effectively your colleagues, sitting up there, than you

25   can down here; watch who's talking to who, who's here,

Page 86

1  who's not here, but you learn a lot about in the balcony,

2  and you can actually hear more, Mr. President.

3          So I don't want to take a lot of time this

4  morning but there's been a lot of talk...  there's been a

5  lot of talk about the people of Charleston and what the

6  people of Charleston want.  Well, guess what?  You've

7  heard me say this before and I think this is a fact:  I

8  represent more people in Charleston County than any other

9  Senator in here.  I even think under the Senate plan I'll

10 represent more people.  It might be the new District in

11 Senate District 20.

12         So I was not on the subcommittee.  I couldn't

13 attend many of the hearings because I got a very active

14 and robust law practice, but what I have done is I've

15 engaged with the people I represent, the majority of the

16 citizens of Charleston County, and unequivocally, the

17 majority want to be left whole.  They don't want to be in

18 a hodgepodge of 17 other counties.  That's not what the

19 people that I talk to, the majority, want.

20         We had a hodgepodge under this map, split all

21 different kinds of ways.  I've heard salamandering, I've

22 heard bootstrapping.  I've heard it called an amphibious

23 drawing.  They want to be left -- why?  Why?

24         As much as I like Richland County -- I'm a

25 product of Richland County, born in Richland Memorial

1  Hospital downtown.  I live -- my parents live 2233 -- I'm

2  not going to say the street, but downtown near Eau Claire

3  High School.  I love Richland County.

4          But we ain't got no interest.  We ain't got no

5  interest.  But King Street and north Charleston, with the

6  Hugh Leatherman Terminal, many of the people in Richland

7  ain't even been to the Hugh Leatherman Terminal.

8          That is a whole juggernaut, in and of itself.

9          So Jim Clyburn is my congressman.  He has

10 represented that area well.  But what I hear today is he

11 and Congressman Mace, they in lockstep, representing the

12 Lowcountry.  Well, if I remember, I don't believe

13 Congressman Mace voted for the American Rescue Act.

14         I mean, I'm going to ask staff to check that.

15         I could be wrong.  $13 billion for the state of

16 South Carolina that this governor spent last night taking

17 credit for it?  He spent it all in one speech.

18         We got no Republican votes for the American

19 Rescue Act, so how all of a sudden, Senator from

20 Charleston, is that two Congressmen supporting the

21 Lowcountry?  It's not.

22         Then we move to infrastructure.  Millions of

23 dollars only -- last time I checked the roll, there was no

24 Republican congressman that supported infrastructure.

25         What's all this two Congress people working

1  together?  Because the record does not bear that.  And so

2  there is no this argument that we want two.

3          What about the insurrection?  We got a mob the

4  descending on the United States capital, committee

5  terrorist acts on television where we got -- where we got

6  people who died, law enforcement, over throwing our

7  democracy from what I've called there's only one

8  congressman in the Lowcountry that was consistently

9  against that.

10          So your argument would have merit with me at

11  least if we had two Congressmen working for similar

12  interests, the interests of South Carolina, but that's not

13  what we have.

14          And so why is all that important?  And I'm

15  winding up and I'm going to take my seat, but the

16  alternative is to listen to the Senator from Richland,

17  Dick Harpootlian.

18          Why is all this important?  We need competitive

19  seats in the state of South Carolina.  This plan that

20  we're currently going to vote on -- and for the people

21  watching on TV, the vote that you're going to see in a

22  minute is going to be the same vote for the members of the

23  judiciary that you see here in a minute.

24          In my view, the plan will pass.  This is a plan

25  designed by the National Republican Party from Washington,

Page 89

1   D.C.  Now, we can talk.  We had meetings.  Well, staff.

2   We hired a lawyer.  It may not be verbatim.

3           I'm going to encourage all of the people out

4   there to read the definition of gerrymandering.  I won't

5   read it to you.  You guys are scholars.  Fortunately for

6   the Senator from Colleton, she encouraged judiciary

7   chairman to walk through the factors.

8           Factors are important but if you look at the

9   definition of gerrymandering, this plan is Exhibit A for

10  gerrymander.  Exhibit A.  And I'm glad it's on the map.

11  We don't use this.  We don't use this thing often.

12          But I'm glad we got it and we spent the money for

13  it but why is this whole argument important?  Because in

14  South Carolina, like most of the rest of the country, we

15  need a competitive map.  We need robust ideas in

16  Congressional District.

17          We're not a monolithic state but if you pack

18  everybody who looks like each other and who thinks like

19  each other in the same Congressional District, guess what?

20  The Congressperson does not have to listen to the voices

21  of the few.

22          And that's what we got in Congress and that's

23  what we got at the Statehouse, Exhibit B.  We got the

24  South Carolina General Assembly, the Senate.  The

25  Republicans sit on that side.  They're the majority.  The

1  Democrats sit on this side.  They're the minority.

2          And if you look at every major vote that we take

3  in this General Assembly, it's along partisan lines.  You

4  can have the most merit based idea as a Democrat but if

5  you offer that plan as a Democrat, you're going to get

6  shot down.

7          Now that used to be different in the Senate, and

8  there are a couple of exceptions.  Yesterday I joined the

9  CON argument.  I voted for the CON.  Somebody mentioned --

10  the Senator from Spartanburg isn't here, but he -- I

11  believe I heard him say from up there, he was a

12  businessman and a politician but didn't believe he could

13  also be a lawyer.

14          Well, I am a former banker, businessman.  I am --

15  I hold a jurist doctor degree, a lawyer, and I represent

16  Senate District 42, a politician.  My Senate District, in

17  my view, is the epicenter of commerce for the entire

18  state.

19          I run from Calhoun Street -- y'all been to Halls.

20          Well, that it starts at Calhoun, goes down to

21  Boeing and then over to West Ashley.

22          And so why is that important?  Because I joined

23  the CON debate because I used to lend money.  I lent money

24  to dialysis centers and health care facilities and you

25  know what, we look at the financial statements.

Page 91

1            And in the note to financial statements you can
2    look at a balance sheet, that's just a snapshot in time.
3            What you do if you're studying a company's cash
4    flow and operations, you look at the notes to the
5    financial statements and what we had there was a note that
6    said some of these cash flow statements are assumption
7    based on the premises that we going to get a CON approved,
8    so if we add this dialysis center, our cash flows will be
9    consistent with the projections.
10           The only reason that's relevant, I'm trying to
11   explain my CON vote -- I've gotten some calls -- I've
12   gotten some calls, but that was bipartisan legislation.
13           The other example -- and I'll be brief because
14   Lucas, our chairman, is getting anxious -- is a bipartisan
15   bill that we passed, just got the numbers from Mike
16   Shealy, I am the primary author.  I hate to recognize
17   myself but sometimes you have to recognize yourself.
18           Back in 2014 I introduced the internet sales tax
19   bill.  That was bipartisan legislation that passed two or
20   three years after I introduced it.
21           I was joined by Republicans.
22           And I just got a spreadsheet.  That bill has
23   generated over $900 million for the state of South
24   Carolina.  So sometimes we do things in a bipartisan
25   manner.

1            But what is happening with packed Districts that

2    are gerrymandered -- and I'm talking to the Fourth Circuit

3    now because that's where we going, and that's my final

4    point.  We got a gerrymandered District by the people in

5    Washington, D.C., the Republican National Convention, and

6    under this map we got a plus 17 Republican.  That ain't no

7    competitive District.  We weakening the people and the

8    voices of South Carolina.

9            And so as I take my seat -- and I might be off

10   one or two percentage points -- but as I take my seat, we

11   headed to Richland.  We headed to the Fourth Circuit, and

12   so every argument that has been made on here will be in

13   the record.

14           I'm going to commend you and I'm going to ask the

15   general counsel, Mr. Moffitt, to pass around when we get

16   ready -- I'll move for unanimous consent -- the Ohio

17   Supreme Court opinion.  Mr. Moffitt, Mr. President.

18           PRESIDENT ALEXANDER:  Senator from Charleston.

19           SENATOR KIMPSON:  Unanimous consent to distribute

20   the Ohio Supreme Court opinion at the earliest available

21   time it's ready to be distributed to this body.

22           PRESIDENT ALEXANDER:  Distributing material to

23   the body.  Any objection?  Hearing none, so ordered.

24           SENATOR KIMPSON:  And I offer that to you as I

25   take my seat.  I'm going back up to the balcony but I

Page 93

1  offer that to you as Exhibit C as to where we going, and

2  that was a Ohio Supreme Court State Court case but it

3  struck down, struck down gerrymandered districts, which I

4  submit is what we going to arguably pass today.

5          Now I do want to take a moment to thank the

6  staff, because the staff does what the people who they

7  serve tell them to do.  So it's not the staff.  The staff

8  is working hard.  But we're in a body of the majority and

9  we've been so for about two decades.  We got good lawyers

10 too.  Mr. Terreni, you're a good lawyer and I'm not

11 casting any doubt on you.  You just do the -- you know,

12 you serve the will of the legislature.

13         But we going to Richland, got able lawyers who

14 will litigate this case, much like all the other cases

15 we've litigated that are patently unconstitutional.

16 Legislation we pass here, we'll see what the court says.

17 We'll live another day.  Thank you, Mr. President.

18         PRESIDENT ALEXANDER:  Thank you, Senator.

19         The pending question is the amendment.  The

20 Senator from Horry, what purpose do you rise?

21         SENATOR RANKIN:  I just wanted to make the motion

22 for the pending question and invoke the name for Senator

23 Kimpson of A. Louis Patterson, who you do a fine

24 impression of.  In the spirit of A. Louis Patterson and

25 Senator Kimpson, I move adoption of the amendment.

Page 94

1              PRESIDENT ALEXANDER:  Rollcall is required.

2              Senator from Edgefield, what purpose do you rise?

3              SENATOR MASSEY:  I ask unanimous consent for

4    leave from Senator Cherokee.

5              PRESIDENT ALEXANDER:  Without objection.

6              The clerk will call the roll.

7              THE CLERK:  Mr. Adams?

8              SENATOR ADAMS:  Aye.

9              THE CLERK:  Aye.  Mr. Alexander?

10             PRESIDENT ALEXANDER:  Aye.

11             THE CLERK:  Aye.  Mr. Allen?

12             Mr. Allen not voting.  Mr. Bennett?

13             SENATOR BENNETT:  Aye.

14             THE CLERK:  Aye.  Mr. Campsen?

15             SENATOR CAMPSEN:  Aye.

16             THE CLERK:  Aye.  Mr. Cash?

17             SENATOR CASH:  Aye.

18             THE CLERK:  Aye.  Mr. Climer?

19             SENATOR CLIMER:  Aye.

20             THE CLERK:  Aye.  Mr. Corbin?

21             Mr. Corbin not voting.  Mr. Cromer?

22             SENATOR CROMER:  Aye.

23             THE CLERK:  Aye.  Mr. Davis?

24             SENATOR DAVIS:  Aye.

25             THE CLERK:  Aye.  Mr. Fanning?

Page 95

1    SENATOR FANNING:  No.

2    THE CLERK:  No.  Mr. Gambrell?

3    SENATOR GAMBRELL:  Aye.

4    THE CLERK:  Aye.  Mr. Garrett?

5    SENATOR GARRETT:  Aye.

6    THE CLERK:  Aye.  Mr. Goldfinch?

7    SENATOR GOLDFINCH:  Aye.

8    THE CLERK:  Aye.  Mr. Grooms?

9    SENATOR GROOMS:  Aye.

10   THE CLERK:  Aye.  Mrs. Gustafson?

11   SENATOR GUSTAFSON:  Aye.

12   THE CLERK:  Aye.  Mr. Harpootlian?

13   SENATOR HARPOOTLIAN:  No.

14   THE CLERK:  No.  Mr. Hembree has leave.

15   Mr. Hutto?

16   SENATOR HUTTO:  No.

17   THE CLERK:  No.  Mr. Jackson?  Not voting.

18   Mr. Kevin Johnson?

19   SENATOR K. JOHNSON:  No.

20   THE CLERK:  No.  Mr. Michael Johnson?

21   SENATOR M. JOHNSON:  Aye.

22   THE CLERK:  Aye.  Mr. Kimbrell?

23   SENATOR KIMBRELL:  Aye.

24   THE CLERK:  Aye.  Mr. Kimpson?

25   Mr. Kimpson votes no.  Mr. Loftis?

Page 96

1          SENATOR LOFTIS:  Aye.

2          THE CLERK:  Aye.  Mr. Malloy?  Mr. Malloy not

3    voting.  Mr. Martin?

4          SENATOR MARTIN:  Aye.

5          THE CLERK:  Aye.  Mr. Massey?

6          SENATOR MASSEY:  Aye.

7          THE CLERK:  Aye.  Mrs. Matthews?

8          SENATOR BRIGHT MATTHEWS:  No.

9          THE CLERK:  No.  Mr. McElveen?

10         SENATOR MCELVEEN:  No.

11         THE CLERK:  No.  Mrs. McLeod?

12         SENATOR MCLEOD:  No.

13         THE CLERK:  No.  Mr. Peeler has leave.

14    Mr. Rankin?

15         SENATOR RANKIN:  Aye.

16         THE CLERK:  Aye.  Mr. Rice?

17         SENATOR RICE:  Aye.

18         THE CLERK:  Aye.  Mr. Sabb?

19         SENATOR SABB:  No.

20         THE CLERK:  No.  Mr. Scott?

21         SENATOR SCOTT:  No.

22         THE CLERK:  No.  Mrs. Senn?  Not voting.

23    Mr. Setzler?

24         SENATOR SETZLER:  No.

25         THE CLERK:  No.  Mrs. Shealy?

1          SENATOR SHEALY:  Aye.

2          THE CLERK:  Aye.  Mr. Stephens?

3          SENATOR STEPHENS:  No.

4          THE CLERK:  No.  Mr. Talley?

5          SENATOR TALLEY:  Aye.

6          THE CLERK:  Aye.  Mr. Turner?

7          SENATOR TURNER:  Aye.

8          THE CLERK:  Aye.  Mr. Verdin?

9          SENATOR VERDIN:  Aye.

10         THE CLERK:  Aye.  Mr. Williams?

11         SENATOR WILLIAMS:  No.

12         THE CLERK:  No.  Mr. Young?

13         SENATOR YOUNG:  Aye.

14         THE CLERK:  Aye.

15         PRESIDENT ALEXANDER:  Have all senators voted?

16         Senator from Richland, Senator Harpootlian?

17         SENATOR HARPOOTLIAN:  Ask consent for Senator

18    Jackson to have leave.

19         PRESIDENT ALEXANDER:  Without objection, the

20    Senator from Richland, Senator Allen votes no.

21         Senator Corbin votes aye.  Yes, Senator Malloy?

22         SENATOR MALLOY:  No.

23         PRESIDENT ALEXANDER:  Votes no.

24         Other members needing to vote?  Senator from

25    Lexington, Senator Shealy?  Without objection, Senator

1  Senn has leave.  Other votes?  Other votes.  Hearing none,

2  the polls are closed and the clerk will tabulate.  By a

3  vote of 26-15, the amendment is adopted.

4           The clerk will publish the next amendment.

5           THE CLERK:  Next amendment is Amendment No. 2 by

6  Senator Harpootlian.  It amends the bill by striking out

7  the enacting words.

8           PRESIDENT ALEXANDER:  Senator from Richland, what

9  purpose -- or Senator Harpootlian, what purpose?

10          SENATOR HARPOOTLIAN:  I'd like to speak to the

11 amendment, please.

12          PRESIDENT ALEXANDER:  You're recognized to speak

13 to your amendment.  Senator from Richland.

14          SENATOR HARPOOTLIAN: Ladies and gentlemen, I

15 intended on giving this speech six hours ago.  I have

16 pared it back somewhat but not enough, I'm sure, to meet

17 your approval, and the reason for that is this:  When I

18 decided to run for the Senate in 2018 as somebody as a

19 lawyer who had been involved in reapportionment cases, I

20 believed and still believe that the apportionment of our

21 legislative bodies in Congress is one of the root causes

22 of many of our difficulties.

23          And I want to walk you through a little bit of my

24 personal history that gives rise to my belief that it's

25 all about race.  This is all about race.  And I would say

Page 99

1  we don't talk about that because that's the elephant in

2  the room but unfortunately, it's the elephant and the

3  donkey in the room.  We all share the blame.

4         I grew up in Charlotte, North Carolina, suburban

5  neighborhood and graduated from high school 1966.  I never

6  attended a single class in elementary, middle or high

7  school with an African-American.  Ever.  Because I went to

8  a segregated public school.  I went through the entire

9  public school system.  The only black folks I ever saw in

10 my school were the janitors and the folks that were

11 serving us lunch, and we didn't converse with them.

12        I grew up in an environment where we had white

13 only bathrooms, where black folks were not allowed in the

14 same facilities we were in, and I must tell you, I didn't

15 notice it because I grew up in a white privileged suburban

16 area and we were more concerned with music, the Beach

17 Boys, the Beatles, we were concerned about who had the

18 newest GTO or 442.  Who was dating the prettiest girl.

19        Social issues did not permeate our brains and

20 certainly not integration.  And it was on the news.  You

21 know, we had three networks back then:  NBC, ABC, CBS.

22 You either watched Huntley?Brinkley or you watched Walter

23 Cronkite, in my household.  I didn't watch either one

24 because I did not care about current events.  I did not

25 care about racial justice.  I did not care about the war.

Page 100

1          I did not care about any of the things that had
2   begun to seep up and I did not attend an integrated school
3   until 1966.  The fall of 1966 I entered Clemson University
4   which had integrated about 30 months before with a guy
5   named Harvey Gantt.  Still less than 20 African-Americans
6   out of 5,000 kids.

7          Very, very, very, very -- I mean that was
8   integrated but not significantly.  Not an African-American
9   on the football team, basketball team, baseball team, no
10  African-American athletes, period.

11         So as I matured at college, I began to see that
12  black folks had not enjoyed the same opportunities I had.

13         And I guess that came home to me in February 1968
14  when on my student newspaper I got to interview three
15  young black kids heading home from SE State where they had
16  witnessed three of their fellow students murdered, killed,
17  ten others wounded because they were demonstrating.  To do
18  what?  They were demonstrating because they were not
19  allowed to bowl in the all white bowling alley in downtown
20  Orangeburg, and they died for it.  Killed.  Shot.

21         I just couldn't comprehend that.

22         Two months later, along with several other kids,
23  we went down to Atlanta to Martin Luther Kings's funeral
24  and again, didn't quite understand what I was seeing but
25  what I did see, what I did see, was -- and talked to a

Page 101

1  number of kids my age, African-American kids who explained

2  to me their frustration, their anger at being treated the

3  way they were treated on a daily basis.

4         I got to tell you, I would have reacted more

5  violently than they did to the way they were treated.  I

6  went in a bar with a kid I befriended at Clemson, just

7  outside of Clemson and we sat down and ordered a beer.

8  The bartender came and said, you can stay but the N, he's

9  got to leave.  I mean, the hurt in that kid's eyes, the

10  degradation he went through.  I never understood it.

11         Never had seen it.

12         And as I grew older, I became more accustomed to

13  their life experience as opposed to my life experience and

14  their life experience was every day somebody was treating

15  them differently because of the color of their skin.

16         Every friggin' day.

17         So let me fast forward a little bit.

18         In 1986, I ran for County Council in Richland

19  County, which at the time was at large the entire county.

20         I ran after I got through the primaries a guy

21  named Willie Rogers who was a deputy superintendent of

22  school District 2, had a Master's in education, his

23  daughter later on became a family court judge, but Willie

24  and I campaigned together for the general election and I

25  took him to white neighborhoods and he took me to black

Page 102

1   churches and African-American neighborhood gatherings.

2            There were six seats open.

3            On election night, 1986, I led the ticket, county

4   council.  There were six seats, he ran 7th.  White people

5   did not vote for him at all.  At all.

6            When I asked about racial block voting earlier,

7   this was the most distinct demonstration I had ever seen

8   of racial block voting because white people would not vote

9   for black people, period.

10           Most places in the state in Richland County they

11  wouldn't, which was -- we had the university, probably one

12  of the more moderate or liberal places.

13           In 1988, we went to single member Districts after

14  a court suit, Justice Department intervened and we elected

15  our first African-American county councilman.  John Scott

16  was in that class.  He and I served together on County

17  Council for two -- I served for two years, he served

18  longer than that.

19           But we had a perspective on County Council those

20  second two years we didn't have before.  Nobody cared

21  about what was going on down in lower Richland.  Nobody

22  cared about what was going on in the upper part of the

23  county, which were predominantly African-American

24  neighborhoods, because we didn't live there.  I lived in

25  Shandon.  I was concerned about downtown Columbia.

1            So lawsuits were brought, the Justice Department

2    dictated single member Districts with significant majority

3    African-American populations, because white people would

4    not vote for African-Americans.

5            Now that shaped me to understand that there is a

6    segment of our community that will not acknowledge that we

7    are a multiracial culture and that we need to address

8    that.  And let me explain that also about those single

9    member Districts.

10           When they were ordered, everyone thought and

11   understood they were remedial measure -- remedial, not

12   permanent -- remedial.  The idea being that once we had

13   integrated our elected bodies, that people then would

14   shift, and they did, but a remedial measure is like a

15   cast, and if you leave the cast on the body too long, it

16   atrophies.

17           And that's what's happened in our state and that,

18   Senator from Charleston, is what's wrong with using a

19   benchmark of what we did and had to do, where we maximized

20   and packed in order to elect an African-American, which is

21   no longer, in my opinion, necessary.

22           And by not doing that racial block analysis we

23   talked about, racial block voting analysis we talked about

24   earlier, you don't know and I don't know what you could

25   have done to change that benchmark and start over.

Page 104

1          There's no reason you could have started over.

2          You have no reason why we couldn't have a more

3  homogeneous competitive District plan.

4          Now I will tell you that this plan sort of

5  appeared -- I don't know how it got done because we went

6  to a subcommittee meeting and one day it just appeared and

7  when I asked staff, they indicated that there had been

8  submissions from, for instance, the Senate redistricting a

9  Republican group called the -- let me make sure I get

10  their name right so I don't screw it up -- the

11  redistricting group out of Washington.

12          I never saw that plan.

13          But the plan that was proposed is very much --

14  it's this plan.  We never had any input into.  We never

15  discussed it.  We were never called back in the map room.

16  We were never asked anything about the contours of it.  It

17  just appeared, you know, sort of an immaculate deception,

18  if you will.  It was created in a back room, literally in

19  a back room.  And as you voted on it today, I don't think

20  that you really had an understanding of what it does.

21          And if you do this for me, please -- I think they

22  can do this -- would you put the plan that was just passed

23  up on the screen, please, and zero in on Charleston

24  County.  Can you do that?  Oh, I'm sorry.  I'm sorry, it

25  was the National Republican Redistricting Trust, are the

Page 105

1  folks that submitted a plan that we never saw.  Yep, okay?

2       So...

3       PRESIDENT ALEXANDER:  Senator from Richland,

4  Senator McLeod, for what purpose do you rise?

5       SENATOR MCLEOD:  Will the Senator yield --

6       SENATOR HARPOOTLIAN:  Yes.

7       SENATOR MCLEOD:  -- for a question?

8       PRESIDENT ALEXANDER:  For a question.

9       SENATOR MCLEOD:  Thank you, Senator.  I

10 appreciate you raising the point or the fact that all of

11 us are aware that race is the elephant in the room, and

12 the reason that I decided to ask you a few questions is

13 because when I was first elected to the South Carolina

14 House, you may recall that we were about to start the

15 redistricting process, and I was eager to learn as much as

16 I could.

17      And it wasn't until my colleagues packed my swing

18 District -- can you hear me?

19      SENATOR HARPOOTLIAN:  Not real well, I'm sorry,

20 but that's me, that's not you, I guess.

21      SENATOR MCLEOD:  I'll try to talk a little

22 clearer.

23      It wasn't until I realized that my colleagues

24 packed my swing District with black voters and I had to do

25 some research, because I couldn't understand why.  That

1 wasn't what I asked them to do or needed them to do.   In

2 fact, I had just won pretty handily in a swing District.

3        I think my black voting population at that time

4 was 34 percent and they bumped it to 52 percent, if I'm

5 not mistaken, and I went to my caucus and asked questions

6 about why the Republican party would see fit to increase

7 my black voting population numbers in that way and it led

8 me to do my own research and what I discovered was exactly

9 what you have just talked about, and that is that it was a

10 part of their national strategy in 2011 to blacken swing

11 Districts like mine for the purpose -- the purpose was

12 threefold.

13        The first thing they wanted to do was to further

14 marginalize the voices of the minority.

15        Secondly, they wanted to rid the Democratic party

16 of white Democrats.

17        And 3rd, they wanted to create a permanent

18 Republican majority stronghold.

19        We were -- I'm sorry -- I was at the time the

20 only person who saw fit to fight that and I had to come to

21 you.  You had a lawsuit in progress.  And I'd like you to

22 maybe share some of your insight, if you can remember what

23 happened then because if we fast forward today, we are

24 seeing that, you know, all of their...  all of their goals

25 have come to fruition.

1          SENATOR HARPOOTLIAN:  Absolutely.

2          SENATOR MCLEOD:  And that what I think part of

3    the point that you're raising right now so I just want to

4    know if you can speak to that.

5          SENATOR HARPOOTLIAN:  Well, what I would say is

6    this:  That is -- and, you know, one of the architects of

7    this strategy was a friend of mine, somebody that I spent

8    a lot of time with back right in college and law school

9    and we got to be fast friends, a guy named Lee Atwater

10   from Columbia, and he made no bones about it in articles

11   later on.  He wanted to use the Justice Department's

12   efforts to create more African-American representation, to

13   pack African-Americans into Districts, bleaching out the

14   adjoining Districts.

15          And to some extent that's what this does.  This

16   is deja vu all over again, as Yogi Berra would say.

17          It is -- what I want to say to the folks in this

18   chamber is this:  You are better than this.  You are

19   playing a game being dictated by some group in D.C., and

20   God knows they're as dysfunctional as it gets.

21          If what we continue to do is predicate

22   reapportionment on race and do things that bleach out

23   Districts, in an effort to help our poor African-American

24   elected officials have a blacker District or frack it,

25   divide the African-Americans up -- and I'm going to talk

Page 108

1  about some numbers in a minute that indicate to me clearly

2  that's what's happened with this plan, this immaculate

3  deception.

4            And Senator, they did it in 2012.  The difference

5  is this talk about benchmark plan, that benchmark plan was

6  a Frankenstein monster and there was no effort to change

7  it in any meaningful way.  They're comfortable with it.

8            They're comfortable with it because it divides

9  the state into black and white, and that is reprehensible.

10           That is reprehensible.

11           This is the most racially divisive plan you could

12  design.  We have a plan, I've proposed a plan which meets

13  all the guidelines, not just some of them, and while it

14  may divide Berkeley and Dorchester away from Charleston,

15  the League of Women Voters plan in a minute keeps them

16  together but does not do the kind of violence to racial

17  coalitions that Senate -- the plan the Senate just passed.

18           I think it's also important to understand this:

19  We passed a Senate plan.  Y'all understand my belief that

20  county lines are inviolate.

21           If you want proof that I was looking for a way to

22  help ensure that we didn't have to rely on purely racial

23  gerrymandering to make this a fair plan, I met with the

24  folks, Mr. Terreni and others, and I said take my

25  District, send it to Charleston.  It's more important to

1  me that we do that and create -- Senator McLeod, Senator

2  Jackson, Senator Scott, all their Districts are totally

3  contained within Richland County.  They have two senators

4  who have no allegiance to any other county but Richland.

5        That was important to me.  And it was important

6  enough to where I said, send my District elsewhere.

7        And by the way, my District was a Frankenstein

8  creation that the previous occupant had created to ensure

9  his reelection.  It ain't worth it.  It ain't worth it.

10 When he did that, he bleached out his District with

11 17 percent African-American.  President Trump carried it

12 in '16.  Shockingly, I carried it in '18 and again in '20

13 because what I found was that people in my District, that

14 District, were concerned about transparency.  They were

15 concerned about responsible conduct on taxes.  I found

16 that there was a coalition of folks, black and white, that

17 were concerned about roads and education and doing

18 something in a very constructive, physically conservative

19 way.

20        We could all be fiscal conservatives.  We could

21 all focus on these issues, but for the fact that race

22 continues to divide this state and it's shocking to me

23 that we continue to do this purely for political

24 advantage.  And again, there's plenty of blame to go

25 around.

Page 110

1           The only other thing I'd say before I get into
2    the specific plan is this:  I've been here since 2018,
3    four years now.  I think, without fear of contradiction,
4    every person I've met here is a person of integrity,
5    honesty and people that want to do the right thing, but we
6    all, every one of us, every one of us, fall victim, prey
7    to this sort of partisan accumulation of power.  Not much
8    over here, but it's about getting back here, it's about
9    getting another position, it's about moving forward.
10          And that's fine, as long as you don't use race or
11   religion or national origin to get you there.
12          Whether or not, you know, if we continue to go
13   this route, then the minorities in both parties, the
14   minority position in both parties will dominate primaries
15   and they will dominate your party and my party, whether
16   it's Antifa for the Democrats or the traitorous scoundrels
17   that took over the United States capital and attempted to
18   disrupt democracy -- and by the way, in another lifetime
19   those folks should have been hung.  I'd just say that you
20   don't commit that kind of conduct without consequences.  I
21   don't believe this 48-month sentence stuff is enough.  And
22   that's coming from somebody that has participated in the
23   trial sentencing and execution of people.  I believe
24   strongly that this conduct cannot be tolerated but that's
25   for another day.

Page 111

1           So when you look at...

2           PRESIDENT ALEXANDER:  Senator, you need to...  we

3  need to get you a copy.  Senator from Richland.  Senator

4  from Richland.  We'll have to get you a copy, please.

5           Please.

6           SENATOR HARPOOTLIAN:  I want to demonstrate that

7  this creates this hook into Charleston County which has no

8  necessity.  There's no reason to do that.  Charleston

9  County could be whole.  You could include Berkeley and

10 Dorchester, if you want the League of Women Voters' plan

11 that's amended.

12          But what I will tell you is this:  This is the

13 result of trying to perpetuate the 2012 plan, which is no

14 longer required.  The federal government's Section 4 and

15 Section 5 of the Voting Rights Act required them to do

16 this and now for and my Republican colleagues I find it, I

17 got to say, somewhat astounding that you would say we've

18 got to abide by the federal guidelines on anything.

19          Thank you.

20          But again, they're no longer there.  This is a

21 federal guideline that's no longer in existence.  There's

22 no ban against retrogression.  There's no ban -- I mean

23 you want to keep core constituencies there, but what's the

24 core constituency of the 6th District and the benchmark

25 plan.  Is it Richland County?  Is it Orangeburg County?

1  Is it half of Charleston County or a third of Charleston

2  County?  Rd what is it?  It's -- and it's this idea that

3  somehow this benchmark plan ought to dictate what you pass

4  is just amazing to me.

5          So this plan, the one we just passed, splits ten

6  counties, and eight of those have splits on the border of

7  the 6th; Jasper, Colleton, Dorchester, Charleston,

8  Florence, Orangeburg and Sumter.

9          And one of the guidelines is the integrity of

10  county and municipal lines.

11          So -- and there's no justification for it other

12  than this cockamamie we've got to stick with the benchmark

13  plan, which there's no requirement to do.

14          Our guidelines don't even require that.

15          About 46 percent of Richland County is in the 6th

16  while 54 percent is in the 2nd.

17          Now in Richland County the total of

18  African-American or BVAP of Richland County is 44 percent.

19          What's the BVAP of the part they put in the 6th?

20          60 percent.  60 percent.

21          I would note that if you look at...  this is the

22  plan we just passed, 13 precincts, but 11 of those splits

23  on the border of the 6th.  Again, not spread out through

24  the state, just on the 6th.

25          So all but two of the plan's municipal splits are

Page 113

1  on the border of the 6th.  So Columbia, for instance.  A

2  3rd of Columbia is in the 2nd, two-thirds is in the 6th,

3  but 75 percent of the Columbia's BVAP is in the 6th.

4          Sumter, about a 3rd of Sumter is in the 6th.

5  Two-thirds is in the 5th.  But only 18 percent of the city

6  of Sumter's white population is allocated to the 6th.

7          I mean, clearly race, this is about race.  The

8  city of Charleston, two-thirds.  City of Charleston is in

9  the 6th, one-third in the 5th but 85 percent of the city's

10  BVAP is allocated to the 6th.  Other splits on the border

11  of the 6th include north Charleston, Forest Acres,

12  Hardeeville and Scranton.

13          All substantial population splits.

14          So if you look at the number of county splits in

15  our plan as opposed to the others, minimal.  Our splits

16  don't represent any racial gerrymandering whatsoever.

17          And in our plan, 91 percent of Greenville stays

18  in the District.  In one District, 95.5 percent of Laurens

19  stays in one District.  85.3 percent of Rock Hill stays in

20  one District.

21          So what I'm saying to you is this:  Yeah, there

22  are a number of different ways you can draw these lines.

23  There's a number of different ways you can skin this cat,

24  if you will.  But what's clear is the plan we just passed

25  was based on race and this history I told you about, the

Page 114

1  trauma of that.

2        Now there are some African-American leaders and

3  elected officials that believe that they would have

4  difficulty getting significant white votes and so they

5  continue to lobby for huge majority minority Districts.

6        Some of them occur naturally.

7        Resist that and resist this.  If you adopt my

8  amendment, not whether Districts are competitive, if you

9  keep counties together and minimize splits of counties and

10 cities and you don't do it on the basis of race, the

11 1st District becomes competitive.

12        Now let me say this to you:  If you're saying

13 this was a partisan gerrymander, you can't use party as a

14 proxy for race.

15        And by the way, most of the numbers I see in the

16 data I've received is BVAP.  There's no real data other

17 than a Biden-Trump race, no real historical -- and again,

18 no racial block voting analysis.

19        So if you look at the guidelines, my plan, our

20 plan, the Democratic caucus plan, Senator Sabb and

21 Matthews's plan, it complies with the guidelines.  There

22 is no benchmark contained in these guidelines.  The word

23 is core constituency and they don't mean the same thing.

24        So I guess what's going to happen today is y'all

25 are going to vote against this plan.  You're going to

1  continue down the road of racial division and we're going

2  to have to rely on the federal courts once again -- I mean

3  the federal courts that required us to integrate our

4  schools, federal courts that required us to create

5  Districts where black folks could get elected, federal

6  courts now are going to take a different position on that.

7         I mean it's just a shame to me that we will be

8  embarrassed once again and it will be a blemish on this

9  body and again, I have the utmost respect but to ignore

10  the racial basis for every one of these splits I talked

11  about is to be willfully blind.  Thank you.  No questions?

12         Fine with me.

13         PRESIDENT ALEXANDER:  Senator from Colleton, for

14  what purpose do you rise?

15         SENATOR BRIGHT MATTHEWS:  Does the Senator yield

16  for a couple of questions?

17         SENATOR HARPOOTLIAN:  Yes.

18         SENATOR BRIGHT MATTHEWS:  Senator, does the issue

19  of the splitting of precincts play -- either county or

20  municipal precincts splitting of counties or

21  municipalities, did that have any effect or play in any

22  way in your -- the map that you drew versus the one that

23  was presented in Amendment A1?

24         SENATOR HARPOOTLIAN:  Yes, ma'am.  The plan that

25  was just passed has ten split, county splits.  We have

Page 116

1    six.  Most of ours are not -- the bulk of ours are not

2    involving District 1 and District 6.  The bulk, as I

3    explained earlier, the bulk of theirs, the vast majority

4    are to deal with 6 and 1.

5         SENATOR BRIGHT MATTHEWS:  Senator, what we're

6    looking at on the projection screen today and the only map

7    we've seen on the projection screen is really the one that

8    has already been voted upon.

9         SENATOR HARPOOTLIAN:  Right.

10        SENATOR BRIGHT MATTHEWS:  Can you please have the

11   staff to put up the -- good.  Put up the map that you have

12   and our caucus has requested that we consider that you

13   feel is competitive and if you would, walk those who are

14   still interested in this map -- because I'm not sure this

15   body is interested in this map -- can you show us the

16   difference in the two?

17        And staff -- I'm not sure if they can -- in

18   answering that question, would you please do a -- put both

19   -- you just had it where one map was on one side and one

20   was on the other?  Can you do that and do the

21   demonstration for us if you would, Senator?

22        SENATOR HARPOOTLIAN:  So I mean it's tough to

23   look at the map and tell you what happened, but I can tell

24   you this --

25        SENATOR BRIGHT MATTHEWS:  Well, let me ask you a

1  question, then:  Right there, that's map one that was just

2  -- that we just voted upon, Colleton County is -- the tip

3  of Colleton County has been snatched away, hasn't it?

4          SENATOR HARPOOTLIAN:  Yes.

5          SENATOR BRIGHT MATTHEWS:  And when you go over to

6  map number 2 that keeps moving, Colleton County is in 1,

7  isn't it?

8          SENATOR HARPOOTLIAN:  It is.

9          SENATOR BRIGHT MATTHEWS:  And Colleton County,

10 for the sake of argument -- that's much better --

11 unanimous consents --

12         SENATOR HARPOOTLIAN:  We adopted guidelines --

13         SENATOR BRIGHT MATTHEWS:  Right.

14         SENATOR HARPOOTLIAN:  -- in which C was

15 minimizing divisions of county boundaries, D was

16 minimizing divisions of cities and towns and E was

17 minimizing divisions of voting precincts, okay?

18         My plan is far superior on those three elements.

19         SENATOR BRIGHT MATTHEWS:  Senator, if it's okay

20 with you, I'd like to ask the president unanimous consent

21 to allow you -- because we don't have --

22         PRESIDENT ALEXANDER:  State your request.

23         SENATOR BRIGHT MATTHEWS:  Because we don't have a

24 screen that faces the Senator as he's at the well, I would

25 ask unanimous consent to allow him to go to a mike so that

1 he can look at this map and explain the differences in the

2 split that we've talked about.

3         If he can talk from his desk, even.

4         PRESIDENT ALEXANDER:  That's the unanimous

5 consent request, to go to your desk to be able to speak

6 from his desk.  Is there objection to that?

7         Hearing none, so ordered.

8         SENATOR HARPOOTLIAN:  Look at the map.  You can

9 see again going to their plan, Charleston, you have this

10 weird -- you called it a salamander, I called it a snake.

11        It represents a number of different anatomical

12 and members of the animal kingdom.

13        We don't have that.  We have a Charleston County

14 that's whole, that is black folks, white folks, downtown

15 folks, north Charleston folks, one Congressional District.

16        When you look at the 6th District, look, they

17 divide Sumter, Columbia, Forest Acres, Charleston, north

18 Charleston, Hardeeville, Scranton, Simpsonville and

19 Fountain Inn.

20        Now, their divisions of Simpsonville and

21 Fountain Inn, admittedly are minimal, but ours is far, far

22 less than that and again, those divisions are based on

23 race.

24        SENATOR BRIGHT MATTHEWS:  Senator, for those

25 people who haven't had their lunch and might be a little

Page 119

1  hungry and not paying attention, just the District 6 in

2  the first map that has been voted upon is in blue,

3  correct?

4           SENATOR HARPOOTLIAN:  Yes.

5           SENATOR BRIGHT MATTHEWS:  And the District 6, as

6  proposed in your map that you're talking on, is in a lime

7  type green?

8           SENATOR HARPOOTLIAN:  Yes.

9           SENATOR BRIGHT MATTHEWS:  And District 1 is in

10  brown in both maps.

11           SENATOR HARPOOTLIAN:  Yes.

12           SENATOR BRIGHT MATTHEWS:  Yes, now in map number

13  2 to the right of the screen, for all the members of this

14  Senate, does District 1 border...  does it go all the way

15  through and keep Jasper County whole?

16           SENATOR HARPOOTLIAN:  Yes.

17           SENATOR BRIGHT MATTHEWS:  And Beaufort County

18  whole?

19           SENATOR HARPOOTLIAN:  Yes.

20           SENATOR BRIGHT MATTHEWS:  And Charleston County

21  whole?

22           SENATOR HARPOOTLIAN:  Yes.

23           SENATOR BRIGHT MATTHEWS:  Why then would you want

24  -- if you have an opportunity to keep Jasper, Colleton,

25  Beaufort and Charleston all whole on the south, if you --

1  why would you then want to, if you want to keep like and

2  you have a guideline where you want to keep continuity --

3  where you say you like contiguity -- I hate that word --

4  if you say you want things to be contiguous and that's

5  part of your guideline, why then, on Amendment 1, would

6  you snake out Jasper County and only put and throw Sun

7  City -- which Sun City, in all of our hearings, said that

8  they have more in common with Beaufort.  That was said

9  over and over again.  Why would then you throw the folks

10 in Sun City in with 6?  Why do that?

11        SENATOR HARPOOTLIAN:  Well, I think the

12 motivation for virtually every one of these tweaks, if you

13 will, is race.  I think that it maximizes African-American

14 population in the 6th, minimizes it in the 1st, the 5th,

15 and the 2nd.  And Richland County is the same thing.

16        Why divide Richland County up?

17        SENATOR BRIGHT MATTHEWS:  I don't understand

18 that.

19        SENATOR HARPOOTLIAN:  In our plan, Richland

20 County is kept whole, except for three precincts or four

21 precincts in a northernmost area on Lake Murray.

22        Those folks have a different -- believe me, I

23 represent 'em -- they have a different interest totally

24 than the rest of Richland County.

25        SENATOR BRIGHT MATTHEWS:  Well, you heard the

1  Senator from Charleston, one of the senators from

2  Charleston say that there was only 80 -- that District 6

3  needed 85,000, whereas District 1 needed to lose 88,000.

4           So why not take that 88,000 from the upper part

5  that's closest to Richland, why snake down into

6  Charleston?

7           SENATOR HARPOOTLIAN:  Well, I think two reasons.

8           The first reason is they're pretty happy with the

9  benchmark plan, but they needed to whiten up the 1st a

10  little bit.  So I mean that's the -- if you look at where

11  they split precincts, where they split counties, where

12  they split cities, virtually every one of them is on the

13  6th, which means they were looking to put white people one

14  way and black people the other.

15          SENATOR BRIGHT MATTHEWS:  Senator, I know you are

16  familiar with this particular District when it was -- it's

17  a recently created District, isn't it?  All the data --

18  that area on the coast is recently because we only, just

19  like the Senator from Berkeley talked about earlier, it

20  was only six Districts.

21          SENATOR HARPOOTLIAN:  Right now it's seven.

22          SENATOR BRIGHT MATTHEWS:  We created the 7th, and

23  the 1st ended up being on the coast.

24          Was it the primary strategy and campaigning

25  strategy and message when the 1st Congressional District

1   was first being populated by candidates, was it the

2   strategy or the campaign message that primary issue on the

3   coastline, wasn't that about dredging?

4           SENATOR HARPOOTLIAN:  Yes.

5           SENATOR BRIGHT MATTHEWS:  Environmental

6   protection on the coast?

7           SENATOR HARPOOTLIAN:  Yes.

8           SENATOR BRIGHT MATTHEWS:  The ports?

9           SENATOR HARPOOTLIAN:  Yes.

10          SENATOR BRIGHT MATTHEWS:  Then why would...  why

11  would they then want to stick Congressional District 6

12  down into Charleston to deal with the issues that one has

13  already campaigned on?

14          SENATOR HARPOOTLIAN:  Well, Senator, you and I

15  were not involved in the back room in drafting this plan.

16          We were not there.  So I don't know what went

17  into it but the circumstantial evidence, as we say in the

18  law business, is everything was driven by bleaching out

19  the 1st and in terms -- when I say maximizing black vote

20  in the 6th, my plan has a slightly higher BVAP, but they

21  took other black votes and split them back up so they had

22  no effect in the other Districts.

23          And look, this is a plan that maximizes the

24  advantage for white South Carolinians.  It means that the

25  1st, 7th, 5th, the 4th, the 2nd -- everything but the 6th

1  is going to be dominated by white voters.

2          SENATOR BRIGHT MATTHEWS:  Are you trying to say

3  that even though you are a member of the subcommittee,

4  that you were not afforded the opportunity to go back in

5  the back room with the maps to lay out that plan that is

6  listed as number 2 there?

7          SENATOR HARPOOTLIAN:  Never saw it until it

8  popped out in our subcommittee meeting, I think you and

9  Senator Sabb and I were all very shocked to see.

10          And then we were told that while they didn't

11  consider it, this national Republican group had submitted

12  a plan.

13          I mean, I don't know how this was conceived, as I

14  say the immaculate deception, but it certainly didn't have

15  input from me or you or Senator Sabb.

16          SENATOR BRIGHT MATTHEWS:  Was it the same

17  reception we sort of received when we wanted to -- I

18  didn't direct that we have a Congressional plan,

19  Congressional chart.

20          Was that the same reception we got when we found

21  out that there was comparison chart created in the

22  committee and we had to bring it out -- ask that it be

23  presented to us this morning?

24          SENATOR HARPOOTLIAN:  Well, again, I don't think

25  we were afforded that.  I understand why y'all weren't

Page 124

1  included, I'm just a little worried about why I wasn't

2  included.

3          SENATOR BRIGHT MATTHEWS:  Why?  If I could get

4  you on the record why.  Oh, because you're white, okay.

5          Well, my concern is sort of the same as Senator

6  Kimpson's.

7          PRESIDENT ALEXANDER:  Senator, has he completed

8  that?  Have you completed referring to that?

9          He might come back to...

10          SENATOR BRIGHT MATTHEWS:  Yes, thank you,

11  Mr. President.

12          PRESIDENT ALEXANDER:  Senator from Richland.

13          SENATOR BRIGHT MATTHEWS:  Following what you

14  said, my concern is sort of the same as what you said

15  earlier.  You're from Richland County 6th and the concern

16  -- you are concerned about what happens to the 6th

17  Congressional District.

18          I am sitting here counting.  I represent six of

19  the counties that either make up the 1st or the 6th and

20  even though I was a sitting, and I believe I was a pretty

21  active member on the committee, accessible at all times,

22  no one, including Senator Kimpson from Charleston, but

23  especially me because six of those counties, I presently

24  represent -- I had to sit through and hear my constituents

25  talk about contiguity.  I had to hear them talk, as you

Page 125

1  did, about communities of interest.  I had to hear of them

2  talk about the not putting certain areas in certain areas.

3        They wanted to make sure that we didn't try to

4  pack -- I even heard the word "frack."  I didn't even know

5  -- do you see or understand the process, the political

6  process or lack thereof that went on to get Amendment A

7  voted on at no cost?  At all costs?

8        SENATOR HARPOOTLIAN:  I mean, I wasn't there, I

9  don't know.  It popped out.  As I said, we were in the

10  subcommittee.  We showed up, they handed us a plan.

11        I think you, Senator Sabb and I were astonished

12  to see what obviously required a huge amount of time and

13  effort to put together and it just -- it was a fait

14  accompli.

15        SENATOR BRIGHT MATTHEWS:  Do you think it was

16  about as Democratic as the January 6th incident?

17        SENATOR HARPOOTLIAN:  I don't believe I need to

18  go there but thank you for offering the opportunity.

19        PRESIDENT ALEXANDER:  Senator from Williamsburg,

20  for what purpose do you rise?

21        SENATOR SABB:  We've continued to ask the Senator

22  to yield for a question or two.

23        SENATOR HARPOOTLIAN:  Absolutely.

24        PRESIDENT ALEXANDER:  Senator yields for a

25  question.  Senator from Williamsburg.

Page 126

1           SENATOR SABB:  Senator, I wanted to express my

2    appreciation to you and all of the work that you've done

3    on this issue, not only as it relates to this map but the

4    manner in which you've given of yourself for many years to

5    fight these kinds of causes that I consider righteous, and

6    so I just wanted you to know that I appreciate it.

7           SENATOR HARPOOTLIAN:  Thank you.

8           SENATOR SABB:  Senator, when you began -- and I

9    will mess this up because I won't be as artful as you were

10   when you were explaining the circumstances upon which --

11   and I will borrow a phraseology from my colleague who

12   served on committee with us when he talked about the

13   benchmark -- you were very meticulous, I think, in

14   identifying why we ought not use those benchmarks, and so

15   I want to go back, if you don't mind, and try to

16   reestablish why we ought not use the benchmarks.

17          Now you mentioned a couple of legal principles

18   that were in place at the time those benchmarks were

19   created.  Would you indulge me and say again what those

20   principles were then and establish the fact that they are

21   not there now?

22          SENATOR HARPOOTLIAN:  Sure.  When this plan was

23   -- benchmark plan, as they call it, was approved by the

24   federal court in 2012, we had to operate under Section 5,

25   which required preclearance.

Page 127

1            The Justice Department has its own list of things

2    that they wanted to make sure were in effect, much more

3    restrictive -- even I argued back then much more

4    restrictive than I felt the court cases required, but they

5    also -- Section 4 was very stringent on any sort of

6    retrogression; that is, the dimutation of African-American

7    population in a District.

8            So when Shelby v. Holder came down a few years

9    later, they did away with Section 4 and Section 5.  No

10   more Justice Department meddling, no more Washington

11   bureaucrats telling us how to redistrict, as long as you

12   didn't, under Section 2, divide a African-American

13   community that occurs naturally in order to defeat the

14   ability of an African-American candidate to get elected

15   from that community.  You couldn't...  you couldn't frack

16   it, as they say, divide it up.

17           But in packing, to me, under -- without the

18   Justice Department looking over your shoulder and trying

19   to argue to a court that, you know, that black folks

20   couldn't get white votes -- and by the way, they even had

21   -- they had...  they had a racial block voting analysis

22   done before they made that allegation.

23           We don't have that here.

24           And let me mention one other thing that's

25   important to understand about racial block voting.

1              The RFA State agency works with counties, cities

2    and School Districts to do reapportionment for those --

3    and they're all getting ready to go through it.

4              They, as a preliminary matter -- and they're

5    advising every one of those governmental entities -- do a

6    racial block voting analysis before they undertake to

7    advise them on reapportionment.  We don't have that here.

8              This is because it's based on the benchmark which

9    isn't required by law, which isn't even our guidelines, we

10   have sort of said, okay, we're going to start off with

11   this plan that was approved by a court under a different

12   set of guidelines and laws, and not even -- we didn't say

13   benchmark in our guidelines, we said core, constituent

14   cores.  For the 6th District that might be Orangeburg and

15   Richland, but you have to do a racial block voting

16   analysis if you're going to say, well, you shouldn't put

17   Berkeley County in it because Berkeley County has racially

18   polarized voting.  None of that analysis has been done.

19             Now the Senator from Charleston indicated that

20   would be something to be done at a litigation level.

21             Again, we're doing it, the state is doing it for

22   counties and cities and School Districts at the front end,

23   not here.

24             SENATOR SABB:  Well, and Senator, do you know

25   that I, as you, listened attentively to hear about the

1  racial block voting analysis that was done and I too

2  thought that the presentation was wanting in that regard,

3  but if we go back, Senator, to the legal principles that

4  you just shared that are no longer present, you would

5  agree with me that our laws have developed as our times

6  have changed; would you agree with me on that?

7              SENATOR HARPOOTLIAN:  I would.

8              SENATOR SABB:  And that at the time it was

9  important that certain laws, certain rules, certain

10  guidelines put in place to give African-Americans an

11  opportunity to be elected.

12             SENATOR HARPOOTLIAN:  Absolutely.

13             SENATOR SABB:  And so based on the Shelby

14  decision, the decisionmakers that ruled on that decision

15  essentially said to the rest of us, times have changed.

16  We will no longer put these rules in place to try to have

17  these outcomes be the way that we've designed the laws to

18  have them be -- and I know I messed that all up but I hope

19  you followed me.

20             SENATOR HARPOOTLIAN:  Sort of.

21             SENATOR SABB:  The point being we are not going

22  to require the Justice Department to oversee what we once

23  required them to oversee.

24             SENATOR HARPOOTLIAN:  Correct.

25             SENATOR SABB:  And so because the times have

Page 130

1  changed -- and I believe you said some of this -- we ought

2  not go back to the benchmarks because they represent a

3  different time.

4          SENATOR HARPOOTLIAN:  Correct.

5          SENATOR SABB:  And that if you gerrymandered in

6  those days trying to get African-Americans elected, that's

7  not where we are right now.

8          SENATOR HARPOOTLIAN:  You know what, I think I

9  did mention was this; when Willie Rogers lost that County

10 Council seat and I won --

11         SENATOR SABB:  Yes, sir.

12         SENATOR HARPOOTLIAN:  -- he cried like a baby.

13 He did not understand why people would not vote for him,

14 but for the color of his skin, and I think that indelibly

15 is etched on my memory and I think it is what we are

16 perpetuating by adopting this plan, that you can't get

17 elected except by people of your own pigmentation.

18         I don't believe that.  I endorse and supported

19 Barack Obama in April of '07 because I believed he could

20 overcome that and he did.  I think there are plenty of

21 folks of goodwill on both sides of the racial divide that

22 can make this happen, if we let them.

23         And what this plan does is prohibit them from

24 crossing that racial line and voting for somebody that

25 doesn't look like them.

1          SENATOR SABB:  Senator, I remember, you know,

2    years ago being moved by a preacher that had this dream

3    where you had hoped that people would be judged based upon

4    the content of their character and not the color of their

5    skin and so Senator, you know I think you're right, I

6    think we're there in a number of instances but as you've

7    indicated, many of us believe that the design of this plan

8    that has been voted upon by this Senate essentially

9    prohibits that, doesn't give it the opportunity.

10          And Senator, do you remember during several of

11    our hearings, when folks came before us and said:  We want

12    to be able to elect our representatives and not have our

13    representatives create maps where they elect themselves;

14    do you remember?

15          SENATOR HARPOOTLIAN:  I remember.

16          SENATOR SABB:  Many of our constituents

17    throughout the state of South Carolina came before us and

18    shared that view; did they not, Senator?

19          SENATOR HARPOOTLIAN:  They did, and unfortunately

20    the plan we just passed is one constructed to meet some

21    arcane political goal and not one that promotes racial

22    harmony.

23          Communities of interest?  I mean, Richland

24    County, Charleston County, Orangeburg County, in our plan,

25    Sumter County would all be whole.  They'd have one

Page 132

1  congressman.  And I don't buy this two is better than one.

2          If you've got one person responsible, you can

3  hold that one person accountable.  They can't say, well,

4  he was supposed to do it or she was supposed to do it.

5          And again, to carve the pie up the way they've

6  carved it up and mutilate it to meet some preconceived

7  goal is wrong.

8          SENATOR SABB:  Let me go back to the notion of

9  some of the testimony that we received, and I think the

10  other Senator from Charleston, Senator Kimpson, spoke on

11  the notion of Charleston and the desire of Charlestonians

12  to be -- to be whole, and of course this is not a part of

13  the Senate plan, but did you know that the House plan that

14  was proposed went so far as to divide West Ashley?

15          SENATOR HARPOOTLIAN:  Yes.

16          SENATOR SABB:  And we had individuals come before

17  our subcommittee and indicate that he lived in West Ashley

18  and that the House plan essentially put him on one side,

19  but his black neighbors on the other.

20          SENATOR HARPOOTLIAN:  Correct.

21          SENATOR SABB:  And of course this plan doesn't do

22  that but Senator, you carefully pointed out a number of

23  places on the map where although West Ashley is not

24  divided, a number of the cities and municipalities are

25  divided in similar fashions, are they not?

1          SENATOR HARPOOTLIAN:  By race, yes.

2          SENATOR SABB:  And Senator, you mentioned another

3    statistic and I've forgotten exactly what it related to.

4    I think it was -- and it was in the early part of the

5    presentation in which you got on the maps, but I believe

6    it related to the amount of growth perhaps in one of the

7    areas and how the constituents that were a part of that

8    growth, it seems like you broke them down along racial

9    lines and indicated who had been moved into the 6th

10   District and who had been moved into the 1st.

11          Did you share some information similar to that?

12          SENATOR HARPOOTLIAN:  I didn't do it based on

13   population growth but for instance, if you look at the

14   city of Sumter, about a 3rd of Sumter is in the 6th,

15   two-thirds in the 5th, but only 18 percent of the city of

16   Sumter's white population is allocated to the 6th.

17          So if a 3rd of their population is allocated to

18   the 6th but only 16 percent, the vast majority of folks

19   that are going from Sumter into the 6th are

20   African-Americans.  Same thing with Columbia, same thing

21   with Charleston.  So there's a pattern here.

22          SENATOR SABB:  Senator, if you don't mind, walk

23   me through that.  You just shared that specific statistic.

24          Can you do that for us in Richland and can you do

25   that for us in Charleston as well?

1              SENATOR HARPOOTLIAN:  When you talk about the

2    city of Columbia, for instance, a third of Columbia is in

3    the 2nd, two-thirds in the 6th, but 75 percent of

4    Columbia's BVAP is in the 6th.

5              I mean, again, if you were to look at dividing

6    the county proportionately, if it was the just based on

7    population, disproportionately, African-Americans are

8    being pushed into the 6th and that happens in Charleston,

9    it happens in Columbia, it happens in Sumter.  I mean, it

10   happens everywhere, and that's why so many county and city

11   splits in their plan are in the 6th District or on the

12   border of the 6th District.

13             So again, they start off with a benchmark and

14   that benchmark, I believe, wouldn't pass muster today but

15   they've adjusted it by putting more black folks in the 6th

16   or taking actually population growth of white folks and

17   putting them in the 1st or the 5th.

18             SENATOR SABB:  And Senator, did you know there

19   was young lady who testified before our subcommittee and

20   she was a surgeon?

21             SENATOR HARPOOTLIAN:  I remember.

22             SENATOR SABB:  And one of the things that she

23   alluded to that she did not want South Carolina to become,

24   she used North Carolina and what the courts had said about

25   North Carolina, in terms of how they surgically

Page 135

1  gerrymandered in such a way that it was so clear what they

2  were doing to the African-American population and her plea

3  to us, being a surgeon, was that we would not find

4  ourselves as a state where a court was saying something

5  along those lines about us.

6          Do you remember that, Senator?

7          SENATOR HARPOOTLIAN:  I do.

8          SENATOR SABB:  And, you know, that was telling to

9  me because one of the things that we want to continue to

10  be proud of is who we are, whose we are and how we treat

11  our fellow brothers and sisters.

12          Do you agree with me on that?

13          SENATOR HARPOOTLIAN:  I do, absolutely.

14          SENATOR SABB:  Well, Senator, I'll tell you I

15  think that your prediction is probably correct in terms of

16  where the votes will lie on what I believe is a good and a

17  fair plan that, in my mind, addresses what is a naturally

18  competitive area from a Congressional standpoint, that one

19  being the 1st, and if we would just allow nature to take

20  its course and not interfere, then the people in that area

21  will get the opportunity to choose their own

22  Congressperson, and not us choosing the Congressperson for

23  them.  Do you agree with that?

24          SENATOR HARPOOTLIAN:  I do.

25          SENATOR SABB:  Thank you, Senator.

1          SENATOR HARPOOTLIAN:   Thank you.

2          SENATOR SABB:   Thank you, Mr. President.

3          PRESIDENT ALEXANDER:   Yes, sir.   Senator from

4  Richland, Senator McLeod, what purpose do you rise?

5          SENATOR MCLEOD:   Will the Senator yield for a

6  couple of final questions from me?

7          SENATOR HARPOOTLIAN:   Yes, I will.

8          PRESIDENT ALEXANDER:   Senator yields.

9          SENATOR MCLEOD:   Thank you, Senator.   I want to

10  correct something that you said earlier.   I think you said

11  that I represent Richland County only.   I represent

12  Kershaw, a small portion of Kershaw as well.

13          SENATOR HARPOOTLIAN:   Yes, ma'am, I'm sorry.

14          SENATOR MCLEOD:   And when we did redistricting

15  last time -- I mean I've said this many times and I may be

16  in the minority -- but I do believe that we should not be

17  choosing our voters.   Our voters should be choosing us.

18          SENATOR HARPOOTLIAN:   Yes.

19          SENATOR BRIGHT MATTHEWS:   And that's why I've

20  always introduced and co-sponsored legislation that would

21  allow for an independent redistricting commission but did

22  you know when we did this, when we did the redistricting

23  plan in 2012.   There were -- I had so many constituents

24  who were upset that I was no longer on their ballots, even

25  though I -- they were my neighbors, we live in the same

1  neighborhood separated by one street or a couple of

2  streets, and they weren't aware of the impact on them.

3           So my question to you is -- I mean I know --

4  we've talked a lot about communities of interest and, you

5  know, keeping counties and certain areas whole.

6           But apart from or in addition to, rather, the

7  federal courts, I think all of us know how this is going

8  to end when it ultimately does come to a vote.

9           What recourse, what options, what opportunities

10 do voters have to, you know, have a say in who represents

11 them, aside from voting for the person that -- I mean,

12 they don't -- they won't have a choice when these maps

13 are, you know -- when these maps are finalized.

14          So what is -- what are their options?

15          Can you speak to that?

16          SENATOR HARPOOTLIAN:  Well, I mean I think

17 obviously this is going to end up in federal court,

18 there's going to be a three judge panel, and based on what

19 I've seen so far, there's not going to be any new

20 Constitutional issue here.  I think whatever that three

21 judge panel decides will not be granted cert by the U.S.

22 Supreme Court.  I mean, this is pretty basic stuff.  We're

23 not advancing any new Constitutional principles.  So I

24 think they're going to get some relief there.

25          But I also think this:  I mean I'd like to see,

Page 138

1  as many competitive Districts now, you know, something

2  like 90 percent of the -- our races are resolved in

3  primaries, not general elections, so that's not really a

4  competition of ideas, and that's one of the things that's

5  attractive to my plan is that they will be competitive.

6          They're not D or R Districts, they're the 1st and

7  the 5th would be competitive.  You know, somebody could...

8  could come up...  you know, we could actually debate

9  ideas, not race.  Somebody could actually debate from a

10  federal -- I mean if you send somebody to Congress,

11  they're not going to be owned by one party or the other.

12          So I think constituents out there have to ask

13  their House members or Senators how they voted on this and

14  explain this idea that somehow they had to follow -- the

15  benchmark is, I believe, legally infirm and I think the

16  4th Circuit -- the three judge panel will decide the same

17  way.

18          But look, we are more divided as a country than

19  we've ever been.  We adopt this plan, it's just pouring

20  gasoline on the fire.  It's more division.  It's all about

21  who can be more Republican or who can be more Democrat,

22  not who's going to be more American.

23          SENATOR MCLEOD:  Right.

24          SENATOR HARPOOTLIAN:  Thank you.

25          PRESIDENT ALEXANDER:  Thank you.  Yes, sir,

1  Senator from Clarendon.

2            SENATOR K. JOHNSON:  Thank you.  I wanted to see

3  if the Senator will just yield for one question.

4            SENATOR HARPOOTLIAN:  One question.

5            PRESIDENT ALEXANDER:  Senator yields.

6            SENATOR K. JOHNSON:  Senator, thank you.

7            I've heard the Senator from Charleston, Senator

8  Kimpson, allude to the fact that you made awhile ago also,

9  and you all are alluding to the fact that this is going to

10 end up in federal court.

11           SENATOR HARPOOTLIAN:  Yes.

12           SENATOR K. JOHNSON:  And I really don't know.  So

13 if that's the case, is that expensive and who pays for it?

14           SENATOR HARPOOTLIAN:  Well, if I were involved,

15 it would be expensive.  I would hope.

16           The State will hire lawyers.  I don't know

17 whether Mr. Terreni will be a lawyer or a witness but

18 people that -- I mean, I don't know who does this stuff

19 for the Senate.  Jones Day, I think did it last time.

20           Big-time lawyers, very expensive.

21           And of course the plaintiffs will, having done

22 that and won one back in the '90s, we do it on typically,

23 if we win, we get attorneys' fees.

24           So you're doing it on the come.

25           But the State will pay hundreds of thousands of

Page 140

1  dollars to defend this.  Millions.  A bunch.

2          Okay, done.  Thank you.

3          SENATOR K. JOHNSON:  Thank you.

4          PRESIDENT ALEXANDER:  The pending question,

5  Senator from Edgefield, what purpose do you rise?

6          SENATOR MASSEY:  Mr. President, I'd like to be

7  heard on the amendment.

8          PRESIDENT ALEXANDER:  Senator from Edgefield has

9  been recognized to speak on the amendment.

10         SENATOR MASSEY:  Mr. President, if I can, I'm

11 going to try to stay here at my desk just so I can have

12 the view of the screens but if I need to come up, I will,

13 if that's a problem, but I'd like to stay here if I can.

14         And I want to have just a little bit of response

15 to the Senator's comments and some of the questions

16 because it seems to me that there are two primary

17 arguments that the Senator from Richland articulated in

18 support of his amendment, his map.

19         The first one, the first argument that I

20 understood from the Senator from Richland is that the map

21 that the Senate adopted a few minutes ago is all about

22 race; that that's the only thing that was really taken

23 into consideration or that was the primary consideration,

24 and he then offers this map as a correction to a sole

25 consideration of race.

Page 141

1            And in fact one of the arguments that the Senator

2    articulated was that the Senate -- what the Senate just

3    adopted constituted -- I think the words he used was a

4    bleaching of the 1st; however, Mr. President, I would

5    point out that the map that the Senate adopted earlier

6    actually has a larger percentage of African-American

7    voters than the 1st has today.

8            So I ask, how then did the Senate bleach it when

9    it created -- when it had more of an African-American

10   voting population in the new map than in the existing one?

11           Secondly, the Senator from Richland argues and I

12   think what he said was that the map that the Senate

13   adopted earlier today made it such that African-Americans

14   were disproportionately pushed into the 6th District.

15           I would point out first if we look at the

16   statistics, the map that the Senate adopted earlier today

17   actually has a lower African-American voting population in

18   the 6th under what we adopted than what it is in the

19   current.  So not only did we not push more black voters

20   into the 6th, we actually pushed some out of the 6th -- a

21   significant number.

22           I would say further that the senator's proposal,

23   which is presumably offered to correct this focus on race,

24   particularly as he talked so much about the 6th District,

25   the Senator's plan actually packs more black voters into

Page 142

1 the 6th District.

2          So I would argue, Mr. President, that the plan

3 adopted by the Senate earlier today is better for the

4 Senator's arguments than what the Senator proposes himself

5 because we have not bleached the 1st, we have not packed

6 more African-Americans into the 6th.

7          It has been the opposite of those things.

8          Now the second big argument that I heard the

9 Senator from Richland articulate was that with case law of

10 recent years, Shelby in particular, that there is no

11 requirement that the General Assembly use the existing map

12 as the basis for the next map, but then the Senator goes

13 further and says, well -- and suggests that using the

14 existing map is somehow improper.

15          But that's not the case.  There's been no court

16 guidance that indicates that using the existing map as

17 guidance is improper but there can be a whole host of

18 reasonable, permissible maps.

19          Now we can disagree about what those options

20 ought to be.  I would hope that we can do that without

21 calling each other racists.  But the fact that we disagree

22 on a map does not mean that one is impermissible while the

23 other is permissible.  There are several options that you

24 could choose.

25          While the Senator argues that you're not bound to

Page 143

1  use the benchmark as the basis, there's nothing that says

2  we can't use the benchmark as the basis.

3          And I would argue that there are other things

4  that we should consider, and that is a constituency having

5  consistent representation.  A constituency having other

6  folks with whom they have been in the District for many

7  years before, remain in that District.

8          If we look at where I live, where you live,

9  Mr. President, in the 3rd Congressional District from

10 Oconee and Pickens down to Edgefield and Saluda,

11 Mr. President, those counties have been in the 3rd

12 District for generations.

13         The Senator's plan, the Senator from Richland's

14 plan, divides that up and takes Greenwood, Abbeville,

15 McCormick, Edgefield, Saluda and puts them into the 2nd.

16         They've never been there.  Those folks have

17 always been in the 3rd, surely, and that is part of the

18 criteria that we -- that the committee established, but

19 surely that is a reasonable basis for a General Assembly

20 to consider when drawing lines, having that consistency in

21 place.

22         The Senator's plan -- and few people would notice

23 this -- the Senator's plan splits the Savannah River site

24 by dividing Aiken and Barnwell Counties.  I don't know

25 that Aiken and Barnwell have ever been separated.

Page 144

1           He puts all the plutonium, the Senator from

2    Orangeburg, all the plutonium goes to the 6th District but

3    he leaves the rest of the site to the 2nd.

4           I would argue, Mr. President, that because of the

5    Savannah River site's significant impact on the economy in

6    South Carolina, it is helpful to have someone who spends

7    time there, who understands the issues there and who is

8    forceful in articulating those positions for the Savannah

9    River site, whereas right now, the Congressman

10   representing the 2nd District, Congressman Wilson, does

11   that because he has that experience.

12          The Senator's plan also -- and I mentioned this

13   earlier when I was talking about how I thought it was

14   important that the 2nd District include Fort Jackson.

15          I think that is especially important because if

16   you look at the current representation, Congressman

17   Wilson, if Congressman Wilson is reelected this year and

18   if the Congress were to change majorities -- which is

19   certainly something a lot of people are talking about --

20   some people think that will happen -- Congressmen Joe

21   Wilson is in line to be chairman of the Armed Services

22   Committee.  In that respect, it would be especially

23   important for him to have Fort Jackson, which plays such a

24   significant role nationally for the United States Army,

25   it's important for him to have that District -- have that

Page 145

1   Fort and those military personnel in his District, to

2   advocate for them, to articulate their issues and to

3   better represent the State as a whole.

4          There are a number of other issues and I won't

5   talk about all of them but I do find it interesting that

6   in the 5th, Senator puts Lake City and Rock Hill together.

7   I don't know that that's ever happened and, you know,

8   there's a...  there's a lot of -- and folks in Columbia

9   and Charleston go back and forth on I-26 a fair amount.

10          I don't know that there's a whole lot of

11   traveling back and forth between Lake City and Rock Hill,

12   and how difficult that might be on the articulation of the

13   issues that are important to those folks.

14          Mr. President, I wanted to point out that I think

15   that there are...  there are just some flaws in the

16   Senator from Richland's argument, that some of the points

17   he makes are just, respectfully, wrong as it relates to

18   the 1st District and to the 6th, and I think if you look

19   at the analysis, the statistics on it, it bears out that

20   his arguments are wrong.

21          But there are other criteria, several criteria

22   that the General Assembly could use in drawing Districts.

23          And some of the -- some of those things that I've

24   articulated, the courts have said are perfectly reasonable

25   things for the legislature to consider.  Those are things

Page 146

1   that I think we ought to consider, and I think keeping the

2   constituency together, having that consistency is an

3   important thing, along with some of the other things I've

4   articulated.

5           So Mr. President, respectfully, I would move to

6   table the Senator from Richland's amendment.

7           PRESIDENT ALEXANDER:  The motion is to table the

8   amendment.  Rollcall is required.  Not on a tabled motion.

9           All in favor -- rollcall is not required -- so

10  all in favor -- rollcall has been requested.

11          The five members second, they call for a

12  rollcall.  More than five members second to call.

13          The clerk will ring the bell.  The Senator from

14  Fairfield.

15          SENATOR FANNING:  Unanimous consent request.

16          PRESIDENT ALEXANDER:  State your request.

17          SENATOR FANNING:  Leave for the Senator from

18  Spartanburg, Senator Kimbrell for the remainder of the

19  day.

20          PRESIDENT ALEXANDER:  Without objection.

21          The clerk will call the roll.

22          THE CLERK:  Mr. Adams?

23          SENATOR ADAMS:  Aye.

24          THE CLERK:  Aye.  Mr. Alexander?

25          PRESIDENT ALEXANDER:  Aye.

Page 147

```
 1   THE CLERK:  Aye.  Mr. Allen?

 2   SENATOR ALLEN:  No.

 3   THE CLERK:  No.  Mr. Bennett?

 4   SENATOR BENNETT:  Aye.

 5   THE CLERK:  Aye.  Mr. Campsen?

 6   SENATOR CAMPSEN:  Aye.

 7   THE CLERK:  Aye.  Mr. Cash?

 8   SENATOR CASH:  Aye.

 9   THE CLERK:  Aye.  Mr. Climer?

10   SENATOR CLIMER:  Aye.

11   THE CLERK:  Aye.  Mr. Corbin?

12   SENATOR CORBIN:  Aye.

13   THE CLERK:  Aye.  Mr. Cromer?

14   SENATOR CROMER:  Aye.

15   THE CLERK:  Aye.  Mr. Davis?

16   SENATOR DAVIS:  Aye.

17   THE CLERK:  Aye.  Mr. Fanning?

18   SENATOR FANNING:  No.

19   THE CLERK:  No.  Mr. Gambrell?

20   SENATOR GAMBRELL:  Aye.

21   THE CLERK:  Aye.  Mr. Garrett?

22   SENATOR GARRETT:  Aye.

23   THE CLERK:  Aye.  Mr. Goldfinch?

24   SENATOR GOLDFINCH:  Aye.

25   THE CLERK:  Aye.  Mr. Grooms?
```

1    SENATOR GROOMS:  Aye.

2    THE CLERK:  Aye.  Mrs. Gustafson?

3    SENATOR GUSTAFSON:  Aye.

4    THE CLERK:  Aye.  Mr. Harpootlian?

5    SENATOR HARPOOTLIAN:  No.

6    THE CLERK:  No.  Mr. Hembree has leave.

7    Mr. Hutto?

8    SENATOR HUTTO:  No.

9    THE CLERK:  No.  Mr. Jackson has leave.

10   Mr. Kevin Johnson?

11   SENATOR K. JOHNSON:  No.

12   THE CLERK:  No.  Mr. Michael Johnson?

13   SENATOR M. JOHNSON:  Aye.

14   THE CLERK:  Aye.  Mr. Kimbrell has leave.

15   Mr. Kimpson?

16   SENATOR KIMPSON:  No.

17   THE CLERK:  No.  Mr. Loftis?

18   SENATOR LOFTIS:  Aye.

19   THE CLERK:  Aye.  Mr. Malloy?

20   SENATOR MALLOY:  Aye.

21   THE CLERK:  Aye.  Mr. Martin?

22   SENATOR MARTIN:  Aye.

23   THE CLERK:  Mr. Martin votes aye.  Mr. Massey?

24   SENATOR MASSEY:  Aye.

25   THE CLERK:  Aye.  Mrs. Matthews?

1    SENATOR BRIGHT MATTHEWS:  No.

2    THE CLERK:  No.  Mr. McElveen?

3    SENATOR MCELVEEN:  No.

4    THE CLERK:  No.  Ms. McLeod?

5    SENATOR MCLEOD:  No.

6    THE CLERK:  No.  Mr. Peeler has leave.

7    Mr. Rankin?  Mr. Rankin not voting.  Mr. Rice?

8    SENATOR RICE:  Aye.

9    THE CLERK:  Aye.  Mr. Sabb?

10   SENATOR SABB:  No.

11   THE CLERK:  No.  Mr. Scott?

12   SENATOR SCOTT:  No.

13   THE CLERK:  No.  Mrs. Senn?  Mrs. Senn has leave.

14   Mr. Setzler?

15   SENATOR SETZLER:  No.

16   THE CLERK:  No.  Mrs. Shealy?

17   SENATOR SHEALY:  Aye.

18   THE CLERK:  Aye.  Mr. Stephens?

19   SENATOR STEPHENS:  No.

20   THE CLERK:  No.  Mr. Talley?

21   SENATOR TALLEY:  Aye.

22   THE CLERK:  Aye.  Mr. Turner?

23   SENATOR TURNER:  Aye.

24   THE CLERK:  Aye.  Mr. Verdin?

25   SENATOR VERDIN:  Aye.

Page 150

1            THE CLERK:  Aye.  Mr. Williams?

2            SENATOR WILLIAMS:  Aye.

3            THE CLERK:  Aye.  Mr. Young?

4            SENATOR YOUNG:  Aye.

5            THE CLERK:  Aye.

6            PRESIDENT ALEXANDER:  Have all senators answered

7    the rollcall?  All senators answered the rollcall.  Polls

8    will close and the clerk will tabulate.

9            By a vote of 26-13, the amendment is tabled.

10           The reading clerk will publish the next

11   amendment.

12           THE CLERK:  Next amendment, amendment number 3 by

13   Senator Harpootlian, amends the bill, strikes out the

14   enacting words and inserts.

15           PRESIDENT ALEXANDER:  The Senator from Richland,

16   what purpose do you rise?

17           SENATOR HARPOOTLIAN:  May I explain the

18   amendment?

19           PRESIDENT ALEXANDER:  Recognized to explain his

20   amendment.  Senator from Richland.

21           SENATOR HARPOOTLIAN:  At this point it's the

22   League of Women Voters plan, tweaked slightly, which is

23   already in the record, it allows Dorchester, Berkeley and

24   Charleston to remain together, sort of.

25           But it speaks for itself.

Page 151

1           All the data was filed by the League of Women

2    Voters and I think we additionally supplemented that data.

3           Again, it keeps counties whole, keeps cities

4    whole, it doesn't split as many precincts, as many cities,

5    as many counties as the Senate plan does.  So unless you

6    have questions, I will...  that's all I have.

7           PRESIDENT ALEXANDER:  The question is the

8    adoption.  Senator from Berkeley.

9           SENATOR GROOMS:  Move to table.

10          PRESIDENT ALEXANDER:  Move to table.

11          All in favor, say aye?

12          SENATE MEMBERS:  Aye.

13          PRESIDENT ALEXANDER:  Aye.  Any -- those opposed,

14   say no.  The ayes have it.  The amendment is tabled.

15          Reading clerk will read the next amendment.

16          THE CLERK:  Amendment number 4 by Senator Hutto.

17          It amends a bill by striking out enacting words

18   and inserting them.

19          PRESIDENT ALEXANDER:  Senator from Darlington?

20          THE CLERK:  The next amendment is Senator from

21   Orangeburg's amendment as well.  Next several.

22          PRESIDENT ALEXANDER:  Next several.

23          Do you want to do yours?

24          Stand at ease momentarily.

25          SENATOR SABB:  Mr. President, if the Senate will

Page 152

1  oblige, the Senator from Richland has an amendment that's

2  ready, and if we want to keep moving unanimous consent to

3  allow him to go to his amendment.

4          PRESIDENT ALEXANDER:  Without objection.

5          SENATOR SABB:  Number 8.

6          PRESIDENT ALEXANDER:  The request unanimous

7  consent is to go to amendment number 8 by the Senator from

8  Richland.

9          SENATOR MARTIN:  Mr. President, pardon me.  What

10  amendment number do I have?  Is it 7?

11          THE CLERK:  That is correct, number 7.

12          PRESIDENT ALEXANDER:  Amendment number 7.

13          SENATOR MARTIN:  All right, it's amendment

14  number 7.

15          PRESIDENT ALEXANDER:  To go to number 7.

16          Is there objection to go with number 7?

17          Hearing none, the reading clerk will publish the

18  amendment.

19          THE CLERK:  Amendment number 7 is by Senator

20  Martin.  It amends a bill by striking all after the

21  enacting words.

22          PRESIDENT ALEXANDER:  Senator from Spartanburg.

23          SENATOR MARTIN:  Mr. President?

24          PRESIDENT ALEXANDER:  Yes, sir.

25          SENATOR MARTIN:  Thank you, Mr. President,

1  members of the Senate.  My amendment -- first off, I want

2  to thank the Judiciary Committee staff.

3          As we know, these amendments have to be done

4  detailed and be within variance and all of that, so I want

5  to thank all the judiciary staff and everyone who helped

6  draw this amendment.

7          My amendment really focuses on the 4th

8  Congressional District, but it impacts the 3rd, 4th and

9  5th.

10          So what happened in the -- see the comparison,

11  have the comparison up, but the 5th Congressional District

12  came into northern Spartanburg or northeastern Spartanburg

13  slightly under the last plan this body adopted ten years

14  ago.

15          Under the new plan, they brought in the 5th

16  District with about 35,000 more people into Spartanburg

17  County, moving westward in that little portion.

18          So what my amendment does is takes those 35,000

19  additional people back that were added to Spartanburg

20  County, moves those back into the 4th Congressional

21  District.  It makes a large portion of Newberry that was

22  in the 3rd under the Judiciary Committee plan that we just

23  -- the Senate just adopted, puts Newberry into the 5th and

24  it moves the 4th Congressional District into Greenville

25  County but allowing a little bit of the southern portion

1 of Greenville on the map -- it allows the 3rd to come up

2 into Greenville just a little bit more.

3          And my goal on this is if you talk about...  I

4 hate to use the word "benchmark" but I think that's a word

5 being used by the Senator from Colleton, so we'll go

6 there.

7          The benchmark for Greenville-Spartanburg -- and

8 I'm looking at Greenville-Spartanburg years ago --

9 Greenville-Spartanburg -- the Greenville County and

10 Spartanburg County were whole in the 4th Congressional

11 District.  Each county was solid.  The entire county of

12 Greenville, the entire county of Spartanburg was whole.

13          But as we gained a District, a Congressman -- we

14 used to have six, now we have seven -- I believe if we'd

15 have done the census six months later, we'd probably have

16 an eighth Congressman now.

17          But anyway, the benchmark difference between

18 Greenville County and Spartanburg County is 148,000 more

19 voters in Greenville County than Spartanburg County.

20          Under the plan that we just adopted from the

21 committee that we just adopted, I think that was

22 Amendment 1, I believe that's correct, that has a

23 difference of 190,812.

24          What my amendment does is strictly looking at

25 that Greenville-Spartanburg relationship.  It puts that

1 number back to where Greenville has 118,974 more voters

2 than Spartanburg.

3            I think if you look at the map, talk about

4 Districts and communities being together, I would love

5 personally for Spartanburg to be whole but I understand

6 that that probably cannot happen.

7            I do feel that moving those folks out of northern

8 -- northeastern Spartanburg, leaving them in Spartanburg

9 and moving the 5th to Newberry, is a little more

10 consistent and contiguous for those communities involved,

11 and that's really all my amendment does.

12            So if there's any questions, I'll take them.

13            If not, I'd like to move adoption.

14            PRESIDENT ALEXANDER:  The pending motion is the

15 adoption.  Senator from Newberry.

16            SENATOR CROMER:  See if the Senator will yield

17 for a question.

18            PRESIDENT ALEXANDER:  Senator yield?

19            SENATOR MARTIN:  Yes, sir, I'll gladly yield.

20            PRESIDENT ALEXANDER:  Senator yields.

21            SENATOR CROMER:  Senator, did I hear you say in

22 the one that we passed earlier, Newberry was made whole

23 but in this redraw that you're doing now, you're splitting

24 Newberry into two Congressional Districts?

25            SENATOR MARTIN:  I do believe that Newberry,

1  under what we just passed, is in the 3rd Congressional

2  District.

3              SENATOR CROMER:  That's correct.

4              SENATOR MARTIN:  Under this amendment, Newberry

5  goes into the 5th all but I believe three precincts

6  because I had to get to that one person.

7              I was hoping we could do a pure deal.

8              SENATOR CROMER:  Senator, as you know personally,

9  and I think most of the people in Newberry, they like

10 Jeff.  They also like Ralph.  So it wouldn't matter but I

11 think they'd want to be in one Congressional District.

12             PRESIDENT ALEXANDER:  Senator from Sumter.

13             Senator, for what purpose do you rise?

14             SENATOR MCELVEEN:  Can I ask the Senator from

15 Spartanburg to yield?

16             PRESIDENT ALEXANDER:  For a question?

17             SENATOR MARTIN:  I'll yield for a question.

18             PRESIDENT ALEXANDER:  For a question.

19             SENATOR MCELVEEN:  Senator from Spartanburg, I

20 was looking at your map and just had a couple of

21 questions.

22             Did you know that the only proposal I've seen so

23 far that keeps my home county intact in one District would

24 be the Senator from Richland's first plan I think that he

25 put up there and as you probably do know, my county now is

1  divided between the 5th and the 6th.  I live in the 5th

2  District but not too far from the 6th.

3          Senator, the plan that we actually adopted, did

4  you study it pretty closely?

5          SENATOR MARTIN:  Can you repeat that?

6          SENATOR MCELVEEN:  The first amendment we

7  actually adopted, did you study that map pretty carefully

8  also?

9          SENATOR MARTIN:  Senator, I'll be honest with

10  you, being on Finance, I did not.  I did not study

11  anything closely.  I looked at the maps and I started

12  looking at the counties I represent and that's why I came

13  up with this amendment.

14          SENATOR MCELVEEN:  Just keeping it to the 5th

15  District for a second.  What I saw on that first map --

16  and I'm on Finance now too, so I try to look at it

17  carefully, but that first map that I saw, I noticed that

18  on that first map that every county was intact in the 5th

19  District, I believe, except for yours and mine, and so

20  what I kind of wondered in that map, if there wasn't a way

21  to push, you know, out of Spartanburg County, push the 5th

22  out of Spartanburg County and fill in Sumter, because I

23  think the top tip of that District and then the bottom tip

24  -- top being in Spartanburg, bottom being Sumter -- were

25  the only two that weren't kept intact, but you didn't look

Page 158

1  at a way to possibly do that?

2          SENATOR MARTIN:  No, I didn't and I looked at a

3  way just to deal with the 4th, but I understood that the

4  3rd and 5th would be impacted, so I asked staff to draw an

5  amendment to where it wouldn't -- to where it would fit

6  and keep some of those things that have been discussed

7  whole in some of those areas.  But other than that, that's

8  the purpose of this amendment we're on now.

9          SENATOR MCELVEEN:  You know, like I said,

10  Senator, I think most people in my home county, I mean

11  have gotten kind of used to having two Congressional

12  Districts hit us, but I think it also makes it a lot

13  easier for folks if we can keep these counties intact like

14  I think you're trying to do here with your home county as

15  much as you can, it's easier for people to know who their

16  representative is in Washington and that's why I think

17  we're also looking for.

18          SENATOR MARTIN:  I agree.  I wish I could have

19  done more for moving the 5th out of Spartanburg more, but

20  I just physically couldn't.

21          SENATOR MCELVEEN:  I heard you say that and I

22  appreciate you.  Thank you.

23          SENATOR MARTIN:  Thank you.  Move adoption.

24          PRESIDENT ALEXANDER:  Pending question is the

25  adoption of the -- Senator from Anderson, what purpose do

1  you rise?

2          SENATOR CASH:  To see if the Senator will yield

3  for a question.

4          SENATOR MARTIN:  I will yield.

5          PRESIDENT ALEXANDER:  Senator yields.

6          SENATOR CASH:  Senator, I kind of followed the

7  broad outline here.  Do you have the numbers in front of

8  you as to what the 4th District would be, population-wise,

9  between Greenville and Spartanburg when you get -- if this

10  was to be adopted?

11          And also the other number that would be of

12  interest to me is how many voters in Greenville would be

13  now in the 3rd District?

14          SENATOR MARTIN:  Well, the numbers -- and I can

15  get all that, I've got that right here, but the numbers I

16  gave out, you asked -- I said that from the podium, the

17  difference in Greenville and Spartanburg under the plan

18  the benchmark before this plan came out, before

19  redistricting this time, was 148 more thousand voters in

20  Greenville County than Spartanburg County.

21          SENATOR CASH:  More voters?

22          SENATOR MARTIN:  More voters.  So under the plan

23  that was just adopted under Amendment 1, it had 190,812

24  more voters in Greenville than Spartanburg County.

25          My amendment has 118,974 more voters in the

Page 160

1  county.

2          SENATOR CASH:  And do you know, under your

3  amendment, how many Greenville voters would go into the

4  3rd District?

5          SENATOR MARTIN:  Well, if I'm just doing the math

6  -- let me look here and see.  I think I have that on here

7  what the staff gave me for a plan.  Let's see.

8          I'm trying to see if I've got a county breakdown.

9          I think the number that I have for Greenville

10  County right here is, under the plan that was just

11  adopted, there's 461,008 people under the plan that we

12  just adopted in Greenville County.

13          Under my amendment, there's 425,089.  So it moves

14  about 30,000 people.  30-ish.

15          SENATOR CASH:  Okay, thank you.

16          SENATOR MARTIN:  Move adoption.

17          PRESIDENT ALEXANDER:  The pending question is the

18  adoption of the amendment.  Senator from Newberry, what

19  purpose do you rise?

20          SENATOR CROMER:  Mr. President, I respectfully

21  move to table the amendment.

22          SENATOR MARTIN:  Rollcall.

23          PRESIDENT ALEXANDER:  Motion to table by the

24  Senator from Newberry.  Rollcall has been requested by the

25  Senator from Spartanburg.  Do five members second the call

```
1  for a first?  They do.  The clerk will ring the bell.

2            Rollcall on the tabling of the amendment.

3            The clerk will call the roll.

4            THE CLERK:  Mr. Adams?

5            SENATOR ADAMS:  Aye.

6            THE CLERK:  Aye.  Mr. Alexander?  Not voting.

7            Mr. Allen?

8            SENATOR ALLEN:  Aye.

9            THE CLERK:  Aye.  Mr. Bennett?

10            SENATOR BENNETT:  Aye.

11            THE CLERK:  Aye.  Mr. Campsen?

12            SENATOR CAMPSEN:  Aye.

13            THE CLERK:  Mr. Cash?  Not voting.  Mr. Climer?

14            SENATOR CLIMER:  Aye.

15            THE CLERK:  Aye.  Mr. Corbin?

16            SENATOR CORBIN:  Aye.

17            THE CLERK:  Aye.  Mr. Cromer?

18            SENATOR CROMER:  Aye.

19            THE CLERK:  Aye.  Mr. Davis?  Not voting.

20            Mr. Fanning?

21            SENATOR FANNING:  No.

22            THE CLERK:  No.  Mr. Gambrell?

23            SENATOR GAMBRELL:  Aye.

24            THE CLERK:  Aye.  Mr. Garrett?

25            SENATOR GARRETT:  Aye.
```

1          THE CLERK:  Aye.  Mr. Goldfinch?

2          SENATOR GOLDFINCH:  Aye.

3          THE CLERK:  Aye.  Mr. Grooms?

4          SENATOR GROOMS:  Aye.

5          THE CLERK:  Aye.  Mrs. Gustafson?

6          SENATOR GUSTAFSON:  Aye.

7          THE CLERK:  Aye.  Mr. Harpootlian?

8          SENATOR HARPOOTLIAN:  No.

9          THE CLERK:  No.  Mr. Hembree has leave.

10  Mr. Hutto?  Not voting.  Mr. Jackson has leave.  Mr. Kevin

11  Johnson?  Not voting.  Mr. Michael Johnson?

12         SENATOR M. JOHNSON:  Aye.

13         THE CLERK:  Aye.  Mr. Kimbrell has leave.

14  Mr. Kimpson?

15         SENATOR KIMPSON:  No.

16         THE CLERK:  No.  Mr. Loftis?

17         SENATOR LOFTIS:  Aye.

18         THE CLERK:  Mr. Loftis votes aye.  Mr. Malloy?

19         SENATOR MALLOY:  Aye.

20         THE CLERK:  Aye.  Mr. Martin?

21         SENATOR MARTIN:  No.

22         THE CLERK:  No.  Mr. Massey?

23         SENATOR MASSEY:  Aye.

24         THE CLERK:  Aye.  Mrs. Matthews?

25         SENATOR BRIGHT MATTHEWS:  No.

```
 1   THE CLERK:  No.  Mr. Mike McElveen.

 2   SENATOR MCELVEEN:  No.

 3   THE CLERK:  No.  Mrs. McLeod?

 4   SENATOR MCLEOD:  No.

 5   THE CLERK:  No.  Mr. Peeler has leave.

 6   Mr. Rankin?

 7   SENATOR RANKIN:  Aye.

 8   THE CLERK:  Aye.  Mr. Rice?

 9   SENATOR RICE:  Aye.

10   THE CLERK:  Aye.  Mr. Sabb?  Not voting.

11   Mr. Scott?  Mr. Scott not voting.  Mrs. Senn?

12   Mrs. Senn has leave.  Mr. Setzler?

13   SENATOR SETZLER:  Aye.

14   THE CLERK:  Aye.  Mrs. Shealy?  Not voting.

15   Mr. Stephens?

16   SENATOR STEPHENS:  No.

17   THE CLERK:  No.  Mr. Talley?  Not voting.

18   Mr. Turner?

19   SENATOR TURNER:  Aye.

20   THE CLERK:  Aye.  Mr. Verdin?

21   SENATOR VERDIN:  Aye.

22   THE CLERK:  Aye.  Mr. Williams?

23   SENATOR WILLIAMS:  Aye.

24   THE CLERK:  Aye.  Mr. Young?

25   SENATOR YOUNG:  Aye.
```

1          THE CLERK:  Aye.

2          PRESIDENT ALEXANDER:  All senators?

3          Senator Sabb votes?

4          SENATOR SABB:  No.

5          PRESIDENT ALEXANDER:  Votes no.  Senator Davis

6  votes aye.  Senator Alexander votes aye.  Senator Scott

7  votes no.  Senator Hutto votes no.  All members voted.

8          All members have voted.  The polls are closed.

9          The clerk will tabulate.

10          By a vote of 25-11, the amendment is tabled.

11          The reading clerk will read the next amendment.

12          THE CLERK:  Next amendment is amendment number 4

13  by Senator Hutto.  It's a bill that strikes all after the

14  enacting words.

15          PRESIDENT ALEXANDER:  Senator from Orangeburg is

16  recognized to explain his amendment.

17          SENATOR HUTTO:  Thank you, members, I'm well

18  aware that it's Thursday afternoon and it's getting late,

19  so I want to offer you the opportunity to let me speak as

20  little as you'll let me speak by not asking me any

21  questions, and let me tell you what I'm trying to do.

22          I've got three amendments that have three

23  different plans.  I'm going to ask -- is this the right

24  one on the screen?  You're going to see these and fully

25  expect that they will meet the fate of the last amendments

1  that went up there and they're going to be tabled.

2          So the point of these amendments is to show you,

3  as Senator Edgefield pointed out, there are a lot of ways

4  to draw this map, okay?  And there are many ways that --

5  to configure this that keeps communities of interest

6  together in a different way than we may have had

7  communities of interest in the past.

8          And so -- but these maps that I'm showing you

9  have the end result of making the Congressional Districts

10  more competitive.  Some of them obviously are going to be

11  predominantly Republican and some of them, at least one,

12  will continue to be predominantly Democratic but it allows

13  two or three of them to be right at the 48 to 52 range in

14  competitiveness, and I think that that's what I hear the

15  voters want.  They want an opportunity to have a choice

16  and not have it dictated to them as to who their

17  Congressional representative would be.

18          So these are relatively self-explanatory, as you

19  can see, but this -- and I will tell you that these maps

20  are -- so that you don't think that I spent a lot of time

21  sitting around drawing these, these are maps that I've

22  taken from the public submissions that were made to the

23  committee, okay?  So these were offered.

24          There was a public submission opportunity.  I've

25  had to tweak a few of them to bring them into compliance,

Page 166

1  but the concepts of the communities of interest that the

2  individual citizens took time to work on are reflected in

3  these next three maps that I'm going to show you.

4          It keeps the 1st is generally a

5  Charleston-Lowcountry District.  It keeps the 7th as a

6  Myrtle Beach PD into Florence District.  It spans the 2nd

7  all the way the length of the I-95 corridor and as --

8  almost.  I mean, it's a little bit of the area because

9  I-95 does veer down into Colleton but for the most part it

10  takes those counties which we often talk about as being in

11  the corridor of shame and there is a community of

12  interest; rural, agricultural communities along that, and

13  that is now District 2.

14          District 6 is a central Midlands.  It keeps

15  Richland, Lexington and Fairfield together.

16          The 3rd District goes from Aiken up to Anderson

17  and those counties have been together for quite awhile.

18          District 4 is the mountainous area of the state,

19  is Greenville and the two what I call the mountain

20  counties, Oconee and Pickens.

21          And it leaves the 5th along the North Carolina

22  border, with Rock Hill and Spartanburg being the hubs at

23  either end.

24          So I offer this to you as another way to show

25  communities of interest can be kept together, while

Page 167

1   putting forward competitive Districts.

2            And with that, I move adoption.

3            PRESIDENT ALEXANDER:  The pending question is

4   adoption.  Senator from Charleston is recognized to table.

5            Move to table?  All in favor?

6            Senator from Darlington, what purpose do you

7   rise?

8            SENATOR MALLOY:  Just a point of clarity for the

9   Senate.

10           PRESIDENT ALEXANDER:  Are you going to ask him to

11   withhold his tabling motion?

12           SENATOR MALLOY:  Well, I would ask him to

13   respectfully withhold his tabling motion until the Senator

14   vacates the podium.

15           SENATOR HUTTO:  I have the next amendment, I'm

16   sorry.

17           PRESIDENT ALEXANDER:  So noted, thank you.

18           Pending question?

19           SENATOR HUTTO:  Move to table.

20           PRESIDENT ALEXANDER:  All in favor, say aye?

21           SENATE MEMBERS:  Aye.

22           PRESIDENT ALEXANDER:  I'll note any nos?  Ayes

23   have it.  So ordered.  The amendment is tabled.

24           The reading clerk will read the next amendment.

25           THE CLERK:  The next amendment is amendment

Page 168

1 number 5 by Senator Hutto.

2          It amends a bill by striking out --

3          PRESIDENT ALEXANDER:  Senator from Orangeburg is

4 recognized on this amendment.

5          SENATOR HUTTO:  You all are good at letting me

6 get it up and get it down quickly, so maybe we can do this

7 even quicker this time, maybe not.

8          This is another configuration that keeps Berkeley

9 and Charleston together.  Both of these last two have the

10 beauty for the most part, keeping Charleston whole.

11          The 2nd does what the 2nd has done from time to

12 time, which is drawing from Lexington through Aiken down

13 to the coast.  That's been not an unusual configuration

14 for the 2nd District.

15          The 6th keeps Columbia and Sumter, puts Fort

16 Jackson and Shaw Airfield in the same District in the 6th.

17 The 7th continues to be the beach area extending into the

18 PD.  The 5th is the Rock Hill based District.  The 4th is

19 Spartanburg and Greenville, both cities kept whole within

20 the 4th; and the 3rd is not completely different from the

21 3rd that we know which reaches all the way from Oconee

22 down through Edgefield and into Aiken.

23          So again, this is -- this map was submitted by

24 the NAACP as one of the ways that they suggested that you

25 could configure a map that would keep it together, keep

1  communities of interest together but again, it has the

2  advantage of making some of the Districts more competitive

3  politically and with that, I would offer this amendment.

4          PRESIDENT ALEXANDER:  The pending question is the

5  adoption of the amendment.

6          Senator from Charleston, what purpose?

7          SENATOR KIMPSON:  Move to table.

8          SENATOR HUTTO:  Rollcall.

9          PRESIDENT ALEXANDER:  Rollcall has been

10  requested.  Do five members...  more than five members

11  request?  I did.  The clerk will ring the bell.

12          The pending motion is to table the amendment.

13          The reading clerk will read.

14          THE CLERK:  Mr. Adams?

15          SENATOR ADAMS:  Aye.

16          THE CLERK:  Aye.  Mr. Alexander?

17          PRESIDENT ALEXANDER:  Aye.

18          THE CLERK:  Aye.  Mr. Allen?

19          SENATOR ALLEN:  Aye.

20          THE CLERK:  Mr. Allen votes aye.  Mr. Bennett?

21          SENATOR BENNETT:  Aye.

22          THE CLERK:  Aye.  Mr. Campsen?

23          SENATOR CAMPSEN:  Aye.

24          THE CLERK:  Aye.  Mr. Cash?

25          SENATOR CASH:  Aye.

1    THE CLERK:  Aye.  Mr. Climer?

2    SENATOR CLIMER:  Aye.

3    THE CLERK:  Aye.  Mr. Corbin?

4    SENATOR CORBIN:  Aye.

5    THE CLERK:  Aye.  Mr. Cromer?

6    SENATOR CROMER:  Aye.

7    THE CLERK:  Aye.  Mr. Davis?

8    SENATOR DAVIS:  Aye.

9    THE CLERK:  Aye.  Mr. Fanning?

10   SENATOR FANNING:  No.

11   THE CLERK:  No.  Mr. Gambrell?

12   SENATOR GAMBRELL:  Aye.

13   THE CLERK:  Aye.  Mr. Garrett?

14   SENATOR GARRETT:  Aye.

15   THE CLERK:  Aye.  Mr. Goldfinch?

16   SENATOR GOLDFINCH:  Aye.

17   THE CLERK:  Aye.  Mr. Grooms?

18   SENATOR GROOMS:  Aye.

19   THE CLERK:  Aye.  Mrs. Gustafson?

20   SENATOR GUSTAFSON:  Aye.

21   THE CLERK:  Aye.  Mr. Harpootlian?

22   SENATOR HARPOOTLIAN:  No.

23   THE CLERK:  No.  Mr. Hembree has leave.

24   Mr. Hutto?

25   SENATOR HUTTO:  No.

1    THE CLERK:  No.  Mr. Jackson has leave.

2    Mr. Kevin Johnson?  Not voting.

3    Mr. Michael Johnson?

4    SENATOR M. JOHNSON:  Aye.

5    THE CLERK:  Aye.  Mr. Kimbrell has leave.

6    Mr. Kimpson?

7    SENATOR KIMPSON:  No.

8    THE CLERK:  No.  Mr. Loftis?

9    SENATOR LOFTIS:  Aye.

10   THE CLERK:  Aye.  Mr. Malloy?  Not voting.

11   Mr. Martin?

12   SENATOR MARTIN:  Aye.

13   THE CLERK:  Aye.  Mr. Massey?

14   SENATOR MASSEY:  Aye.

15   THE CLERK:  Aye.  Mrs. Matthews?

16   SENATOR BRIGHT MATTHEWS:  No.

17   THE CLERK:  No.  Mr. McElveen?

18   SENATOR MCELVEEN:  No.

19   THE CLERK:  No.  Mrs. McLeod?

20   SENATOR MCLEOD:  No.

21   THE CLERK:  No.  Mr. Peeler has leave.

22   Mr. Rankin?  Mr. Rankin votes aye.  Mr. Rice?

23   SENATOR RICE:  Aye.

24   THE CLERK:  Aye.  Mr. Sabb?

25   SENATOR SABB:  No.

1          THE CLERK:  No.  Mr. Scott votes no.

2          Mrs. Senn has leave.

3          Mr. Setzler?

4          SENATOR SETZLER:  No.

5          THE CLERK:  Votes no.  Mrs. Shealy?

6          SENATOR SHEALY:  Aye.

7          THE CLERK:  Aye.  Mr. Stephens?

8          SENATOR STEPHENS:  No.

9          THE CLERK:  No.  Mr. Talley?

10         SENATOR TALLEY:  Aye.

11         THE CLERK:  Aye.  Mr. Turner?

12         SENATOR TURNER:  Aye.

13         THE CLERK:  Aye.  Mr. Verdin?

14         SENATOR VERDIN:  Aye.

15         THE CLERK:  Aye.  Mr. Williams?

16         SENATOR WILLIAMS:  No.

17         THE CLERK:  No.  Mr. Young?

18         SENATOR YOUNG:  Aye.

19         THE CLERK:  Aye.

20         PRESIDENT ALEXANDER:  Have all members voted?

21         Senator from Williamsburg.  Senator Sabb.

22         SENATOR SABB:  I just have a request.

23         PRESIDENT ALEXANDER:  Senator Sabb.

24         SENATOR SABB:  Leave for the Senator from

25  Clarendon.

1            PRESIDENT ALEXANDER:  Without objection.

2            All members voted?  All members voted.

3            Senator Malloy votes aye.  Any other votes?  The

4   polls will close and the clerk will tabulate.

5            A vote of 27-12, the amendment is tabled.

6            The reading clerk will read the next amendment.

7            THE CLERK:  Amendment number 6 is by Senator

8   Hutto, amends a bill strikes all after the enacting.

9            PRESIDENT ALEXANDER:  Senator from Orangeburg is

10  recognized to explain his amendment.

11           SENATOR HUTTO:  And I find this one particularly

12  unique in several ways.  One is it creates a coastal

13  District.  It runs the -- so if you want a community of

14  interest, putting all the beach communities from Hilton

15  Head to Kiawah to Isle of Palms to Myrtle Beach and all

16  the things that go along with beaches and the coast -- and

17  look, Senator Campsen can tell you that's a District you'd

18  have to do by boat but anyway, it creates a coastal

19  District.

20           Then it takes a Berkeley-Dorchester District, and

21  forms it behind the coastal District as District and makes

22  that District 1.

23           It makes the 6th District, a District that's

24  centered around Columbia and Sumter, again putting two of

25  our military bases -- am I the right one?  Yeah, together.

1        Then the 5th is truly a PD District without
2  Myrtle Beach.  Now I hear from the PD sometimes, well,
3  y'all keep saying it's a PD District but only somebody
4  from the beach gets elected.
5        Well, this makes a PD District although it does
6  add Rock Hill in there, which could make it a little bit
7  interesting.
8        The 2nd District takes Lexington and Aiken which
9  have been together for awhile and Barnwell so the Savannah
10 River side is whole and then runs the 2nd up through
11 Anderson.
12       And this is one of the unique things.
13 Spartanburg is one of the cities that is always
14 complaining that, well, you know, we always get lumped in
15 with Greenville.  We're a pretty big city and why don't we
16 get consideration when you're drawing this?
17       Well, this creates a Spartanburg District and a
18 Greenville District, which is a pretty interesting thing
19 and we'll see how you senators from Spartanburg vote on
20 this.
21       But, look, it is -- it does keep the four --
22 basically the four major metropolitan -- or five, if you
23 count Rock Hill, major metropolitan cities and if you
24 count Florence, six, together wholly within Districts or
25 areas.  Now, admittedly, it splits the Tri-County area and

Page 175

1    Charleston but creates synergy along the coast.

2            So I offer this as my final amendment, which has

3    a lot of good things going for it but maybe not good

4    enough.

5            PRESIDENT ALEXANDER:  Senator from Horry, what

6    purpose do you rise?

7            SENATOR RANKIN:  See if the Senator will yield

8    for a friendly, perhaps, correction.

9            SENATOR HUTTO:  Sure.

10           SENATOR RANKIN:  I think you're confused,

11   respectfully.  You are offering a Senate plan that really

12   reflects Senator Campsen's District now.  So are you sure

13   this is a Congressional draw or a Senate draw?

14           SENATOR HUTTO:  Well, what I did is I took

15   Senator Campsen's District and just extended it to Myrtle

16   Beach.

17           SENATOR CAMPSEN:  Just a few more miles.

18           SENATOR HUTTO:  Just a few more miles up the

19   coast.

20           PRESIDENT ALEXANDER:  Senator from Charleston,

21   Senator Campsen, what purpose do you rise?

22           SENATOR CAMPSEN:  Senator, it is intriguing to

23   perhaps represent the entire coast but when you --

24           SENATOR HUTTO:  Daunting as well.

25           SENATOR CAMPSEN:  It would be daunting as well,

1  and so when you move from the podium, I'm going to move to

2  table.

3              PRESIDENT ALEXANDER:  Senator stepped away.

4              The Senator from Charleston is recognized.

5              SENATOR CAMPSEN:  Move to table.

6              PRESIDENT ALEXANDER:  Move to table.  All in

7  favor, say aye.  Any opposed?  The ayes have it.

8              So ordered.

9              The next amendment, the reading clerk will read.

10             THE CLERK:  Next amendment is number 8 by Senator

11  Scott.  It amends the bill, it strikes all after the

12  enacting words.

13             PRESIDENT ALEXANDER:  Senator from Richland

14  recognized on explaining your amendment.

15             SENATOR SCOTT:  Mr. President, members of the

16  Senate, I spoke earlier about moving some counties around

17  that I thought made more competitive sense, in terms of

18  how the Congressional District would actually look.

19             I took a real close look at some of the previous

20  drawings that we had done, especially the court plan in

21  2002 and we found that in the 3rd District, just like

22  what's there now, Anderson, Laurens, Abbeville, Saluda,

23  McCormick and Aiken was intact.

24             We looked at the 2nd on the 2nd shift ten years

25  ago but in 2002 in the court drawn plan, Lexington, Aiken,

1  Barnwell, Allendale, Hampton, Jasper and Beaufort were all

2  in the same county.

3          We looked at Richland in this plan, we stay

4  pretty close to the 2002 before we did a major shift in

5  the 2010 - '12 Richland, Calhoun, Orangeburg, Dorchester,

6  Clarendon, Williamsburg, Sumter, Florence and Lee, but

7  what I saw in the 2010 plan compared to -- the '10 or '12

8  plan compared to the court drawn plan, what we did, we

9  split a lot of counties.

10         In this particular plan that I have before you

11  today, the counties that are actually split, Kershaw split

12  just a tiny bit in Richland, just to make sure the one

13  vote process can only have that one vote deviation to make

14  some correction.  Aiken probably took the largest split.

15         Aiken is split between the 2nd, which has about

16  98,939, and the 3rd, which is 6 to 9,896.

17         We talked about Dorchester and Dorchester was an

18  original plan too but inside Dorchester, we only --

19  Dorchester split between the 5th and the 6th but the 6th

20  only got about 16 by 16,000 people.

21         Florence took a minor split in the 6th, 10,609.

22         Greenville County's only split between the 3rd

23  and the 4th to meet that one percent deviation, that's

24  4,341, that actually went into the 3rd District.

25         In looking at the 3rd District, for those who are

1 familiar with what's called GLEAMNS Country, Anderson was

2 added in that a long time ago.  Abbeville was also in it.

3          And so the other smaller counties that came in

4 too, it was Faville (ph), Faville and Kershaw, but if you

5 look at Faville and Kershaw, they all have something in

6 common now, especially over in the Senate drawn plan.

7          To eliminate the conversation we've been having

8 about Spartanburg and Greenville, Spartanburg is large

9 enough really to be what's called a base in a

10 Congressional District.

11          We've looked at Pickens and Oconee in which

12 Pickens has grown to about 31,000 and Oconee about 78,000.

13          Greenville is the base part of the Congressional

14 District, 521,000 persons.

15          So I took a real close look at the driving force

16 of the economic counters that I thought would create the

17 possibility of growth, especially when you looked at

18 smaller counties who were struggling, trying to make it.

19          Greenville had a population of 521,193, then

20 Richland County 416,146 and in Charleston County 408,

21 Horry County with 351 and there's that spot where we

22 talked about again 327,997.

23          And of course Lexington County, 339, and then

24 Anderson County.

25          And so if you look at the configuration of what

Page 179

1  we did with these seven Districts, we made sure that those

2  counties, with the exception of Greenville that we only

3  took about 4,000 out to meet the balance but the base of

4  the Greenville is within that in the 4th Congressional

5  District, which simply mean that these counties now

6  basically are made whole.

7          You said you couldn't draw a plan to make them

8  whole.  Yes, you can.  It just requires you to shift some

9  things around in those counties that already have

10 something in common.

11         I heard a conversation earlier about York County.

12 York County is slowly coming into its own with 282,000,

13 but because of its geographical location, York and

14 Spartanburg becomes those counties that attract people

15 that come in that particular region, which we got

16 Spartanburg with 300,000 and there's Cherokee with about

17 56,000, York County with 292 and Lancaster, which is one

18 of the faster growing counties that we have.

19         PRESIDENT ALEXANDER:  Senator from Orangeburg,

20 Senator Stephens, for what purpose do you rise?

21         SENATOR STEPHENS:  Senator, would you yield for a

22 question, please?

23         SENATOR SCOTT:  Just one more little minute.

24         PRESIDENT ALEXANDER:  Refuses at this time.

25         SENATOR SCOTT:  I'll come right back to you, I

Page 180

1  promise you.

2          And so we looked at a real discussion in looking

3  at the BVAP in this plan, which I thought was a better

4  plan, split less counties, made larger counties whole.

5          The 6th Congressional ends up with about

6  47.49 percent BVAP, which I thought was a good BVAP.

7          And looking at also, because of the splits you

8  had and the previous drawing, you narrowed a lot of

9  counties down and you gave those -- you gave the 6th an

10  opportunity to begin to have some growth.

11          Remember I mentioned a moment ago Kershaw, simply

12  because the back of Richland County when you get to Lugoff

13  is the Kershaw side which represented a mere -- McLeod

14  represents that small portion but it's slowly growing and

15  they've got a little bit of everything in common on that

16  part because of a lot of subdivisions have a lot of things

17  in common.

18          Dorchester was a conversation I guess because of

19  the new industry that's over there, I think Berkeley, one

20  of them Volvo and the other one has Mercedes-Benz.

21  Dorchester was always there.  So we did not harm

22  Dorchester, in terms of what we was trying to do.

23          We only put about 16,000 of that population, the

24  basic population it had, it had all before.

25          One of the most important things was looking at

1  counties like Orangeburg County.

2          Orangeburg County, ten years ago, had 90,000

3  population, it's down to 84,000 but we made Orangeburg

4  whole and in the Senate plan, Orangeburg and Dorchester

5  are, back of Berkeley, have a lot in common.

6          It was a conversation earlier about Berkeley

7  County, so we put Berkeley and Charleston together and so

8  we're looking at how these Congressional District

9  representatives can also help spread some of the growing

10 wealth inside of the smaller counties.

11         We looked at the 2nd Congressional District.

12         As I mentioned before, a lot of those counties

13 were in the 2nd Congressional District before and what we

14 did, we just split a bunch of counties and shifted

15 population over to the 6th.

16         I'm not saying you have to do that anymore

17 because a lot of smaller counties actually lost a lot of

18 population.

19         Barnwell, Allendale, Hampton and others are

20 always in the 2nd Congressional District, we just made a

21 shift.

22         I heard a conversation earlier about representing

23 Fort Jackson, the training center in which I'm in Richland

24 County.  If you're that close in what's called the

25 Midlands, which is Lexington and Richland, I'm more than

1  sure if the Senate -- if the Congressman from Lexington --

2  and this is if this happened and if it don't happen, that

3  he's going to do what's necessary to make sure that Fort

4  Jackson get what it needs.

5           This is the plan that I thought it made a lot

6  more sense in the Florence part is at the Lake City

7  portion of it.

8           The biggest thing was keeping these precincts

9  whole and narrowing these counties and move away from this

10  big discussion about what this person want, that person

11  doesn't want, to actually make the map look like something

12  that's within reason.

13           We're looking at Sumter Counties and Sumter

14  always have been split and it really has not helped the

15  growth for Sumter and so we made Sumter whole.

16           Richland is the base of the 6th Congressional

17  Districts and I asked a question early on, given the

18  numbers that you had down in Charleston, it really didn't

19  make sense for that portion of a base portion of a

20  Congressional District to be that deep into Charleston.

21           I know we're looking at population.  That's where

22  the growth was.  That discussion was simply because folk

23  did not want to share and move these counties around that

24  made good common sense.

25           We kept the coast coastal, Charleston and

Page 183

1  Berkeley is all together.  So it takes care of the

2  import/export issues we had out there, and the PD -- and

3  we fragmented the PD so bad before, really and truly I can

4  remember my days in the governor's -- when I was in the

5  governor's office, the PD was a striving community.

6         Bringing them back together, we think that -- I

7  think that we can provide some extra help with the PD

8  counties beginning to work together.  There's very little

9  you can do about the Horry-Georgetown area but to get them

10 also in the base of that portion of Congressional District

11 begin to take a look at some of the issues that's actually

12 affecting the PD, the PD as a whole.

13        And so what my map indicates that with a little

14 extra effort, moving away from the political party of it

15 and trying to draw a map that makes more common sense,

16 that we look at the economic impact of this District.

17        I talked earlier about the shift that has

18 happened and what's going on in Orangeburg, but I think

19 you just kind of tied their hands when you put all of

20 those poor counties in one area.

21        And so Lexington becomes the base to help the

22 Calhoun, the Bamberg, the Allendale, and you come down to

23 Hampton when you get into more of an area where you do

24 have some tourism, and Colleton was also in the 2002 map

25 was in the 6th -- I'm sorry -- was in -- was in the 6th.

Page 184

1           Colleton this time is in the 2nd.  Hoping that we
2   can create some energy and some movement with some of the
3   larger counties helping with the tax base to create some
4   growth.  I'll entertain your questions, sir.
5           PRESIDENT ALEXANDER:  Senator from Orangeburg,
6   Senator Stephens, for what purpose do you rise?
7           SENATOR STEPHENS:  Ask the Senator a couple of
8   questions, please.
9           PRESIDENT ALEXANDER:  Senator yield?
10          SENATOR HUTTO:  Senator yields.
11          SENATOR STEPHENS:  Senator, looking at your map,
12  am I seeing correctly that Dorchester County is actually
13  split between District 1, 2 and 6?
14          SENATOR HUTTO:  Dorchester County is split
15  between Districts 6 and 5.  Six only picked up 16,005,
16  picked up 52,332, unless I left something out.
17          SENATOR STEPHENS:  I'm looking at the colors.
18          Maybe you can explain to me the colors.
19          The tan or the light yellow?
20          SENATOR HUTTO:  The light yellow is in the 2nd.
21          SENATOR STEPHENS:  The 2nd.
22          And that's swinging around from Lexington down
23  into Dorchester and Colleton County?
24          SENATOR HUTTO:  Yes, sir.
25          It picks up a very small portion of it.

1        SENATOR STEPHENS:  And then the whatever that

2   green-looking color is, that's District 1, correct?

3        SENATOR HUTTO:  The green color is 3.

4        SENATOR STEPHENS:  3?

5        SENATOR HUTTO:  That's the 3rd -- oh, I'm sorry.

6   That's one with Berkeley and Charleston making up the bulk

7   of that District -- that's correct -- with Charleston

8   having 400,000 -- 408,000 and Berkeley having the 229 and

9   there's something else that's...  I think that's a small

10  portion of Dorchester that's not picked up on this map.

11       SENATOR STEPHENS:  I'm seeing Dorchester, once

12  again, between 1, 2 and 6.

13       SENATOR HUTTO:  You're correct.  Correct.

14       SENATOR STEPHENS:  And with that in mind, what is

15  the --

16       SENATOR HUTTO:  Let me correct that and

17  Dorchester is in one by 93,107.  That's the heaviest

18  portion of the base that was left out of my notes.

19       SENATOR STEPHENS:  Do you know what percentage is

20  in the 2nd Congressional District of Dorchester?  I see it

21  look like the Ridgeville area.

22       SENATOR HUTTO:  That's Ridgeville, that's

23  correct.  It's a very small portion of it.

24       SENATOR STEPHENS:  So Senator, what is the BVAP

25  for the 2nd Congressional District; do you have that?

1          SENATOR HUTTO:  Yes, sir, I do.

2          In the 2nd Congressional District the BVAP is

3  19,882 -- 19,000 -- 19.82, I'm sorry.

4          SENATOR STEPHENS:  And the BVAP, then, for the

5  6th Congressional District?

6          SENATOR HUTTO:  In the 6th is 47.49.  Let me just

7  give them to you so you can jot them down.

8          The 1st was 22.47, the 2nd is 19.82, the 3rd is

9  24.37, the 4th is 13.80, the 5th is 19.07, the 6th is

10 47.49, and the 7th is 24.84.

11         SENATOR STEPHENS:  So with that in mind, Senator,

12 would you say that your map is more competitive --

13         SENATOR HUTTO:  Yeah.

14         SENATOR STEPHENS:  -- as far as Congressional

15 races are concerned?

16         SENATOR HUTTO:  Yes, for a number of reasons.

17         When you go down to -- and I apologize again for

18 leaving Dorchester out, it was just left out of my notes.

19         When you look at in Charleston, as an example --

20 and I don't know whether or not you've driven down there

21 lately, but it is rough.

22         SENATOR STEPHENS:  Yes, sir.

23         SENATOR HUTTO:  It's like little Charlotte now.

24         But because of Boeing, Volvo and Mercedes and the

25 port, it's a growing, growing, three growing counties.

1          So it didn't harm that growth but I wanted it to

2    be strong enough that adjacent to some other counties is

3    the possibility of a spillover, especially when you look

4    at local tax incentives and others to be able to make it

5    more competitive.

6          So a small portion of Dorchester is in the 6th

7    and I anticipate the next fast growing county in that

8    region will probably be Orangeburg, with this beautiful

9    industrial park.  You also have the hospital facilities.

10   It does have three HPCUs there and also has a technical

11   school there, so there's so much possibility there.

12         And if I get -- Orangeburg begin to grow, then

13   I'm going to spill over back into the 2nd.

14         That will affect the Allendale, the Calhoun and

15   the other smaller counties that over in there.

16         SENATOR STEPHENS:  So I guess I can safely say

17   that if I'm thinking along your line of thinking, that

18   District 3, District 6 and District 7 will be the most

19   competitive of Districts?

20         SENATOR HUTTO:  Well, when you say "competitive,"

21   all I did in 7 was made the PD whole again.  I mean, when

22   they fragmented the PD and they really damaged the PD but

23   the PD is now made whole again, Chesterfield, Marlboro,

24   Darlington, Florence, Marian, Dillon, and of course Horry

25   just sits on the coast, for a long time was really not the

Page 188

1  PD but it became the PD.

2           And so it became the fastest growing because of

3  tourism but it still needs some attraction for us to be

4  able to come within that region to be able to become a

5  more desirable community, to find an industry that can

6  come in and help contain the growing economy.

7           The governor talked last night also about those

8  companies coming in.  Right now they're 4,890

9  manufacturing companies in South Carolina.

10          What is -- what my concern is is called physical

11  location.  I looked at three being built close to

12  Orangeburg but not in Orangeburg and one had been built in

13  Orangeburg what we're now seeing Orangeburg with loss in

14  population in Orangeburg, that surrounding would not have

15  happened.  These people moved out of the smaller counties,

16  moved into the larger counties but at some point you're

17  not going to be able to build fast enough, your road

18  infrastructure is not going to be in place fast enough to

19  be able to meet those mandates.

20          And if I look at the infrastructure portion of

21  it, it makes the infrastructure plan fit in that when I go

22  back over to looking at the 3rd -- used to be called

23  GLEAMNS Country and the Anderson was added and Abbeville

24  was always in it, but what they do have in common?

25          They're all small counties and so what we're

1  talking about with the rural initiative and the governor

2  having asked for $500 million to do some rural

3  initiatives, you really can begin to plan rural

4  initiatives, and in looking at those rural initiatives,

5  have a plan that basically meet the same infrastructure

6  need, economic with business growth needs, home, housing,

7  health care and those kinds of issues, you can actually

8  develop a plan that actually fit those particular

9  communities.

10          SENATOR STEPHENS:  Thank you, Mr. President.

11          Thank you, Senator.

12          PRESIDENT ALEXANDER:  Thank you.

13          Senator Matthews, for what purpose do you rise?

14          SENATOR BRIGHT MATTHEWS:  To see if the Senator

15  would yield.

16          SENATOR HUTTO:  Senator yields.

17          PRESIDENT ALEXANDER:  For questions?

18          SENATOR BRIGHT MATTHEWS:  Yes.

19          PRESIDENT ALEXANDER:  The Senator yields for

20  questions.

21          SENATOR BRIGHT MATTHEWS:  Senator, what was your

22  primary reason for placing Colleton, moving it from the

23  6th to the 2nd, other than is that just the way it shifts?

24          SENATOR HUTTO:  That's the way it shifted.

25          I can't go down there to get you.

Page 190

1          SENATOR BRIGHT MATTHEWS:  You just wanted to have

2  Colleton in there?

3          SENATOR HUTTO:  No, you've got to be contiguous,

4  and that made it hard for me to get -- you know, you're

5  right next door to Dorchester but if I did anymore, I mean

6  my -- what's required, that one vote margin, I could not

7  meet what the standard was.

8          SENATOR BRIGHT MATTHEWS:  What about all this

9  talk that we've heard about benchmark this, benchmark

10 that; did any of your map rely upon the old stuff from ten

11 years ago?

12         SENATOR HUTTO:  When I went back to 2002, when we

13 really began looking at drawing the 6th Congressional

14 District and that's before we added 2010 with the 7th.

15         The 7th District really is what has created the

16 big shift and the change in numbers, and I've heard a lot

17 of conversation today which counties had the same common

18 interests and which counties it don't.  I'm very serious.

19         If you were in the PD back in the day, you in

20 tobacco country.  If you were in the Lowcountry, you were

21 crops and other kinds of goods and services that comes to

22 market.

23         But somehow or another, the urbanites, in which I

24 live in the urban portion but I think I spend most of my

25 time working on the rural issues that we have in the

1 state, and we've got a lot of concern.

2          The glass can't be half-full.  The urban can't be

3 doing well, the rural doing bad, and the state doing good.

4          That's a false statement.

5          So when you actually go back and you look at and

6 you start at a beginning point before Horry County just

7 took off in growth and we had the big growth, you have to

8 come back and actually plug things back in to see whether

9 or not it actually makes sense from the way it was long

10 before we added another Congressional District and then

11 what I saw in the other plan, which is not a bad plan but

12 it's not the best plan.

13          And my plan is not playing political games, my

14 plan is all about what can we do to make sure rural

15 counties get what they need, manufacturing begin to take a

16 look at South Carolina and what we need to do as we

17 continue to grow, but grow and be able to meet the needs

18 of the community and slow down the shifting -- and you can

19 only grow 500,000.  Not that many folk passed away in

20 COVID -- and I'm sorry and I apologize to those families

21 who lost loved ones in COVID, it's a bad thing, but you

22 can't grow 500,000.

23          And you look at surrounding counties with people

24 that continue to shift to other areas and expect those

25 counties to maintain health care facilities.

1          And we debated that bill yesterday and I checked

2  my comments with that, and expecting these counties to be

3  able to pay just the basic cost with no tax base, that's

4  not going to work.

5          SENATOR BRIGHT MATTHEWS:  Senator, did you keep

6  Fort Jackson in the 2nd?

7          SENATOR HUTTO:  No, Fort Jackson is in the --

8  before there was a 6th, there was a 2nd and all the 2nd

9  had Richland and Lexington County in it.  There is a 6th

10  and there is a 2nd.  The 2nd, as indicated, has a

11  population of 293,991 and the 6th in Richland County has a

12  population of 416,000.

13          They deserve what those representatives are in

14  the base part of the economic picture to make them whole,

15  and this map makes them whole.

16          SENATOR BRIGHT MATTHEWS:  Thank you.

17          SENATOR HUTTO:  Move for adoption of the plan.

18          PRESIDENT ALEXANDER:  The Senator from

19  Dorchester, for what purpose do you rise?

20          SENATOR BENNETT:  If the Senator would yield for

21  a question.

22          SENATOR HUTTO:  Senator yields for a question.

23          SENATOR BENNETT:  Thank you, Senator.  I'm

24  looking at this map, Senator, I've been listening

25  attentively for hours now on different views, and while we

1  often are able to draw a very pretty map with as little

2  angles as possible, this one happens to have -- picking up

3  on the Senator from Orangeburg's comments, I see not only

4  Dorchester County here split into two, it looks like

5  three, to me.

6          SENATOR HUTTO:  It's three, it's three splits.

7          SENATOR BENNETT:  And it certainly divides the

8  city of Summerville, which makes up the bulk of the

9  population in Dorchester County into two of the three.

10         And I get back, Senator, was that the intention?

11         SENATOR HUTTO:  Let's talk about that.

12         In the base of where Dorchester is that makes up

13  where your growing community is, along with Berkeley and

14  Charleston, that portion is kept whole.

15         So Berkeley, Charleston and that portion of

16  Dorchester is kept whole.

17         SENATOR BENNETT:  Well, Senator, it's not kept

18  whole.

19         SENATOR HUTTO:  Not the county, the base of your

20  growing economic picture is whole.

21         SENATOR BENNETT:  It's not even the economic

22  base, Senator, it's -- that portion is split between two

23  Congressional Districts here and one of them, again

24  getting back to the point that we've made over and over

25  again during this debate of this communities of interest

1  of the Tri-County area, those communities are interlocked

2  and for that, for that reason, Senator, unless you have

3  more, I'm going to respectfully move to table your

4  amendment.

5          SENATOR HUTTO:  As soon as I sit down, you have

6  the right and the pleasure to do that.

7          Let me just try to answer your question because

8  no matter what I put up here today, you're going to move

9  to do that anyway, but I'm going to put these plans out

10  there.

11          Dorchester County, the discussion all day long

12  was to come through Dorchester County to get to

13  Charleston.

14          When you look at the previous plan that you've

15  had, that I went back to 2002, Dorchester County was split

16  then, it was in the 6th Congressional District.

17          And so to leave the larger portion of Dorchester

18  County in the 1st with 93,000 in total population and only

19  16,000 actually went into the 6th, and over into the

20  5th...  I'm sorry.  It went into the 6th.

21          Only 16,000 went into the 6th.

22          PRESIDENT ALEXANDER:  Senator from Richland, he's

23  relinquishing the floor.

24          SENATOR HUTTO:  I'm done.

25          SENATOR BENNETT:  If the Senator is done, I

Page 195

1  respectfully move to table the amendment.

2          PRESIDENT ALEXANDER:  The Senator from Dorchester

3  has moved to table the amendment.

4          The Senator from Richland has asked for a

5  rollcall.  Five members -- yeah, I'm going to.

6          Got more than five.  Five members have.

7          Clerk will ring the bell.

8          The reading clerk will call the roll.

9          THE CLERK:  Mr. Adams?

10          SENATOR ADAMS:  Aye.

11          THE CLERK:  Aye.  Mr. Alexander?

12          PRESIDENT ALEXANDER:  Aye.

13          THE CLERK:  Aye.  Mr. Allen?

14          SENATOR ALLEN:  Aye.

15          THE CLERK:  Aye.  Mr. Bennett?

16          SENATOR BENNETT:  Aye.

17          THE CLERK:  Aye.  Mr. Campsen?

18          SENATOR CAMPSEN:  Aye.

19          THE CLERK:  Aye.  Mr. Cash?

20          SENATOR CASH:  Aye.

21          THE CLERK:  Aye.  Mr. Climer?

22          SENATOR CLIMER:  Aye.

23          THE CLERK:  Aye.  Mr. Corbin?

24          SENATOR CORBIN:  Aye.

25          THE CLERK:  Aye.  Mr. Cromer?

1    SENATOR CROMER:  Aye.

2    THE CLERK:  Aye.  Mr. Davis?

3    SENATOR DAVIS:  Aye.

4    THE CLERK:  Aye.  Mr. Fanning?

5    SENATOR FANNING:  No.

6    THE CLERK:  No.  Mr. Gambrell?

7    SENATOR GAMBRELL:  Aye.

8    THE CLERK:  Aye.  Mr. Garrett?

9    SENATOR GARRETT:  Aye.

10   THE CLERK:  Aye.  Mr. Goldfinch?

11   SENATOR GOLDFINCH:  Aye.

12   THE CLERK:  Aye.  Mr. Grooms?

13   SENATOR GROOMS:  Aye.

14   THE CLERK:  Aye.  Mrs. Gustafson?

15   SENATOR GUSTAFSON:  Aye.

16   THE CLERK:  Aye.  Mr. Harpootlian?

17   SENATOR HARPOOTLIAN:  No.

18   THE CLERK:  No.  Mr. Hembree has leave.

19   Mr. Hutto?

20   SENATOR HUTTO:  No.

21   THE CLERK:  No.  Mr. Jackson has leave.

22   Mr. Kevin Johnson has leave.

23   Mr. Michael Johnson?

24   SENATOR M. JOHNSON:  Aye.

25   THE CLERK:  Aye.  Mr. Kimbrell has leave.

Page 197

1    Mr. Kimpson?  Mr. Kimpson not voting.

2    Mr. Loftis?

3    SENATOR LOFTIS:  Aye.

4    THE CLERK:  Aye.  Mr. Malloy?  Not voting.

5    Mr. Martin?

6    SENATOR MARTIN:  Aye.

7    THE CLERK:  Mr. Martin votes aye.  Mr. Massey?

8    SENATOR MASSEY:  Aye.

9    THE CLERK:  Aye.  Mrs. Matthews?

10   SENATOR BRIGHT MATTHEWS:  No.

11   THE CLERK:  No.  Mr. McElveen?

12   SENATOR MCELVEEN:  No.

13   THE CLERK:  No.  Mrs. McLeod?

14   SENATOR MCLEOD:  No.

15   THE CLERK:  No.  Mr. Peeler has leave.

16   Mr. Rankin?

17   SENATOR RANKIN:  Aye.

18   THE CLERK:  Aye.  Mr. Rice?

19   SENATOR RICE:  Aye.

20   THE CLERK:  Aye.  Mr. Sabb?

21   SENATOR SABB:  No.

22   THE CLERK:  No.  Mr. Scott votes no.

23   Mrs. Senn has leave.

24   Mr. Setzler?

25   SENATOR SETZLER:  No.

1           THE CLERK:  No.  Mrs. Shealy?

2           SENATOR SHEALY:  Aye.

3           THE CLERK:  Aye.  Mr. Stephens?

4           SENATOR STEPHENS:  No.

5           THE CLERK:  No.  Mr. Talley?

6           SENATOR TALLEY:  Aye.

7           THE CLERK:  Aye.  Mr. Turner?

8           SENATOR TURNER:  Aye.

9           THE CLERK:  Aye.  Mr. Verdin?

10          SENATOR VERDIN:  Aye.

11          THE CLERK:  Mr. Verdin votes aye.  Mr. Williams?

12          SENATOR WILLIAMS:  No.

13          THE CLERK:  No.  Mr. Young?  Mr. Young votes aye.

14          PRESIDENT ALEXANDER:  Have all members voted?

15          Senator Malloy votes aye.  Other members?

16          Yes, ma'am, Senator from Colleton, state your

17  request.

18          SENATOR BRIGHT MATTHEWS:  To give the Senator

19  from Charleston, Senator Kimpson, leave prior to the vote.

20          PRESIDENT ALEXANDER:  Without objection.

21          Any other votes?  Hearing none, poll is closed,

22  the clerk will tabulate.

23          By a vote of 27-11, the amendment is tabled.

24          There's no further amendments.

25          The bill is returned to the House.

Page 199

1          Senator from...  thank you, sir.

2          Senator from Edgefield.

3          SENATOR MASSEY:  Mr. President, it's a long

4  Thursday for the 2nd week of session but I think we've

5  accomplished what we needed to accomplish today, so I want

6  to see if anybody has any unanimous consent requests

7  before we adjourn for the week.

8          PRESIDENT ALEXANDER:  Senator from Horry, for

9  what purpose do you rise?

10          SENATOR RANKIN:  To mention very briefly, if I

11  can, everyone's attention very briefly, Senator from

12  Darlington as well.

13          Folks, though we didn't vote this one out

14  unanimously or save two ney votes as we did on the Senate

15  plan, I do want to thank each of you.  The indulgences of

16  everyone who didn't have an option to be here but for us,

17  hello Senator from Richland -- particularly the judiciary

18  staff and subcommittee staff and the members of this full

19  committee and this entire Senate.

20          Again, not unanimous, but done with openness, a

21  little hiccup, but transparency and hopefully in the vein

22  of Micah 68, with justice, with mercy, and most humbly.

23          And so folks, thank you all, on behalf of myself

24  and all of our staff, and God bless you.  I'm done.

25          PRESIDENT ALEXANDER:  Senator from Williamsburg.

Page 200

1          SENATOR SABB:  Mr. President, I just wanted to

2    follow up on the chairman's comments and express my

3    appreciation for the staff.  I thought they were

4    incredible.  I think the Senator from Horry is absolutely

5    correct when he says that there were hiccups here and

6    there, but we could not have asked for a more hard working

7    staff, nor one anymore responsive to our requests.

8          So thank you for that.

9          SENATOR:  Round of applause.

10         PRESIDENT ALEXANDER:  Senator from Richland --

11         SENATOR HARPOOTLIAN:  I want to echo.

12         PRESIDENT ALEXANDER:  -- what purpose do you

13   rise?

14         SENATOR HARPOOTLIAN:  While this has been a

15   little bit contentious here today, the staff, Michelle,

16   Joey, and Mora, and of course all these folks that worked

17   hard, we had a number of subcommittee meetings, they've

18   been very helpful.

19         And while we may differ on the legal piece and

20   the policy piece, I want to thank everybody for their

21   attention and the work of the staff.  Thank you.

22         PRESIDENT ALEXANDER:  Thank you.  So noted.

23         Senator from Edgefield, what purpose do you rise?

24         SENATOR MASSEY:  Mr. President, there are no

25   other unanimous consent requests.

1          I move the Senate to now adjourn.

2          PRESIDENT ALEXANDER:  All in favor, say aye.

3          SENATE MEMBERS:  Aye.

4          PRESIDENT ALEXANDER:  Opposed, no.  The ayes have

5   it.  We are adjourned until noon on Tuesday.

6          (End of recording.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 202

```
 1              C E R T I F I C A T E

 2

 3

 4         I, TERRI NESTORE, Certified Shorthand Reporter/

 5   Transcriptionist, do hereby certify that I was authorized

 6   to transcribe the foregoing recorded proceeding, and that

 7   the transcript is a true and accurate transcription of my

 8   shorthand notes, to the best of my ability, taken while

 9   listening to the provided recording.

10

11         I further certify that I am not of counsel or

12   attorney for either or any of the parties to said

13   proceedings, nor in any way interested in the events of

14   this cause, and that I am not related to any of the

15   parties thereto.

16

17

18   Dated this 24th day of January, 2022.

19

20

21         _____

22         TERRI NESTORE, CSR 5614, RPR, CRR

23

24

25
```