*SC NAACP v. Alexander,*
D.S.C. Case No. 3:21-cv-03302-MGL-TJH-RMG

# Exhibit A

Page 1

```
 1              UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF SOUTH CAROLINA
 2                    COLUMBIA DIVISION
 3
 4
 5   THE SOUTH CAROLINA STATE CONFERENCE OF THE NAACP,
     et al.,
 6
                  Plaintiffs,
 7
           vs.    CASE NO.:  3:21-CV-03302-MGL-TJH-RMG
 8
     THOMAS C. ALEXANDER, et al.,
 9
                  Defendants.
10
11
12   DEPOSITION OF:    SENATOR LUKE A. RANKIN
                       (APPEARING VIA VIRTUAL ZOOM)
13
     DATE:             August 2, 2022
14
     TIME:             10:52 AM
15
     LOCATION OF
16   THE DEPONENT:     Rankin & Rankin Law Firm
                       201 Beaty Street
17                     Conway, SC
18   TAKEN BY:         Counsel for the Plaintiffs
19   REPORTED BY:      TERRI L. BRUSSEAU
                       (APPEARING VIA VIRTUAL ZOOM)
20
21
22
23
24
25
```

Page 13

1       A.   Yes, in a bad faith case.  Insurance
2  bad faith case.
3       Q.   Um-hum.  Was that in your personal
4  capacity?
5       A.   Legal.
6       Q.   Oh, you were a lawyer representing a
7  party, but then you were also deposed in that case?
8       A.   Correct.
9       Q.   I see.  You've never been deposed in
10 your professional capacity as a member of the South
11 Carolina Senate?
12      A.   No.
13      Q.   Or in your personal capacity as Luke
14 Rankin?
15      A.   No.
16      Q.   Okay.  I'm just going to take a pause
17 here, Senator Rankin.  I see that I asked you about
18 whether anything was up on your laptop, but now I
19 can see that you're also looking at what might be a
20 desktop or another computer, is that right?
21      A.   Yes.
22      Q.   So let me just ask, are there materials
23 about this case up on your -- the computer that
24 you're looking at that's not your laptop?
25      A.   No.

Page 14

1  Q.   Okay.  Thanks.  Outside of depositions,
2  have you ever been a party to any other lawsuit
3  whether in your professional or personal capacity?
4  A.   In my dissolution of my first marriage,
5  that was the only time I was a litigant as best I
6  recall.
7  Q.   And you were a defendant there?
8  A.   No, plaintiff.
9  Q.   And have you ever been sued in your
10 professional capacity as a member of the South
11 Carolina Senate other than in this case?
12 A.   No.  Well, perhaps.  There may have
13 been litigation with a gubernatorial appointment --
14 appointment power, so I don't think anything in the
15 realm of redistricting, certainly not COVID-related
16 litigation, but I don't recall any specific other
17 instances of that.
18 Q.   What was the COVID litigation you're
19 talking about?
20 A.   Well, it could have been in terms of
21 our authority to do certain things.  Again, these
22 were litigated cases that the -- one school
23 district or perhaps Bass mandate litigation that
24 the state was a party, President Peeler was at that
25 time.  Again, in caption only would have been my

Page 15

1    involvement.  I've never participated in any
2    litigation in my official capacity otherwise.
3           Q.    Okay.  Were you in caption only sued as
4    a defendant in any other case?
5           A.    Not that I'm aware of, no.
6           Q.    Have you ever testified in court,
7    again, whether as to your personal capacity or
8    professional capacity?
9           A.    I have testified in a case involving
10   someone's competency either on a Will or a deed,
11   and that's been 20 plus years ago; otherwise, I
12   don't think I've ever testified in court.
13          Q.    In that case you weren't deposed
14   earlier and then testified, you just testified?
15          A.    No.  Yeah.
16          Q.    Okay. All right.  Let's talk a little
17   bit about your background before we get to the case
18   itself.  Where were you born, sir?
19          A.    Conway.
20          Q.    Is that in South Carolina?
21          A.    Yes.
22          Q.    And where did you grow up?
23          A.    Conway, South Carolina.
24          Q.    And you said you currently live in
25   Conway, South Carolina as well, is that right?

Page 16

1       A.   No, live about 14 miles east in Myrtle
2  Beach.
3       Q.   Okay.  How long have you lived in
4  Myrtle Beach?
5       A.   Since '88.
6       Q.   Have you ever lived outside of South
7  Carolina?
8       A.   No.
9       Q.   Let's walk through your educational
10 background.  Where did you go to college?
11      A.   University of South Carolina, '84
12 undergrad, and then law school '87.
13      Q.   What did you study in undergrad?
14      A.   Political science and history.
15      Q.   And then you said you graduated from
16 USC Law in '87?
17      A.   Correct.
18      Q.   Did you specialize in anything at the
19 law school?
20      A.   At the law school?
21      Q.   Um-hum.
22      A.   Graduation.
23      Q.   I hear you.  And did you take a job
24 right out of law school?
25      A.   I did.

1   Q.   What was that job?
2   A.   I worked with a firm here in Horry
3   County.
4   Q.   What kind of work did you do?
5   A.   Litigation.
6   Q.   General litigation, any specialty area?
7   A.   Civil litigation injury, death and
8   general -- some general practice, but mostly in the
9   injury law capacity on behalf of injured parties
10  and/or survivors of wrongful death cases.
11  Q.   Okay.  Do you mind walking me through
12  each of your jobs after that until you got to the
13  South Carolina Senate?
14  A.   Well, all in Conway.  There was a firm
15  that I started with that the nucleus of it
16  remained.  It was Hearn & Corbett when I first got
17  out.  We merged with a larger firm, Van Osdol
18  Stewart, et cetera.  There were a number of -- lots
19  of lawyers there.  Then we effectively demerged and
20  it became a smaller firm called Hearn, Brittain &
21  Martin.  And then in '91, I joined my father's
22  firm, and it's been Rankin & Rankin ever since.
23  Q.   What kind of work have you done at
24  Rankin & Rankin generally?
25  A.   The same type work, civil litigation,

Page 56

1  meet with him?
2       A.   Actual meetings, I -- I can't even
3  guesstimate.  Conversations from again July
4  forward, countless.  Countless.
5       Q.   Okay.  What kind of questions did you
6  ask him?
7       A.   Almost like Ed Koch, the former mayor
8  of New York City, how am I doing, how are we doing,
9  and effectively trying to move again the process to
10 the finish line, so...
11      Q.   Did you ever ask him if a proposed map
12 violated the law?
13      A.   Don't recall, but surely he testified
14 and/or opined to our committee, our subcommittee,
15 but specifically, I mean, I don't recall that
16 direct question and a direct answer.
17      Q.   So you --
18      A.   But I would have to say that he would
19 have endorsed these.
20      Q.   I know that he testified in the open
21 committee hearing that he believed that maps
22 were -- did not violate the law, but you never
23 asked him before he did that whether they did and
24 how they passed legal muster, you never had that
25 conversation with him?

Page 117

1   so to speak, the Ross Perot line.  I never felt the
2   need to do that.
3        Q.   How did you comfort yourself that
4   whatever they produced did, in fact, comply with
5   the law, despite your faith in them?
6        A.   Say that first part again.  Had I --
7        Q.   How did you -- did you ever for
8   yourself confirm that the maps that they were
9   producing complied with the law and the guidelines?
10       A.   Well, again, in deference to counsel,
11  Charlie Terreni and perhaps John Gore, again, the
12  collective opinion was that it would.  Now, I guess
13  you're going to attest that and we'll see what the
14  courts say in response to your claim.  But for our
15  purposes, all eyes wide open, we believed that it
16  did comply with the law.
17       Q.   And that's based on what you heard from
18  Mr. Terreni and Mr. Gore?
19       A.   Again, based on the work that we
20  started in July, based on the principles that we
21  adopted, based on the input from subcommittee
22  members, again, votes taken, considerations made
23  throughout this entire process with legal opinions
24  being offered at effectively every turn for the
25  staff and the subcommittee.

Veritext Legal Solutions
212-267-6868                www.veritext.com                516-608-2400

Page 120

1  process, but I said part of the mix of things that
2  give you comfort, that gave you comfort, were they
3  legal opinions from John Gore and Charlie Terreni?
4         A.    Correct.
5         Q.    Thank you.  We've talked about the
6  guidelines of it.  Let's look at them.  I'm going
7  to put them up on the screen.  It might take a
8  second because this is the first exhibit that we're
9  looking at and sometimes it's a little glitchy, so
10 bear with me.
11              MR. GORE:  Somil, if you're moving to a
12 new topic, I'd like to ask the court reporter
13 whether she needs a short break.
14              MR. TRIVEDI:  I can deal with a
15 five-minute break, actually.
16              COURT REPORTER:  I would love a
17 five-minute break.
18              THE WITNESS:  Let me ask you this:  I
19 need to be finished by five o'clock.
20              MR. TRIVEDI:  Can we go off the record,
21 Miss Terri?
22              COURT REPORTER:  We're off.
23              (Off the record.)
24              (A recess transpired.)
25 BY MR. TRIVEDI:

Page 198

1    Q.   Do you have an understanding that part
2  of what must be considered is a racially polarized
3  voting analysis?
4    A.   I really don't.
5    Q.   Did counsel, including Mr. Gore and
6  Mr. Terreni, ever say we have to conduct a
7  racially polarized voting analysis?
8         MR. GORE:  I'm going to object on
9  attorney/client privilege and instruct the witness
10 not to answer.
11 BY MR. TRIVEDI:
12   Q.   During the mapmaking process prior to
13 litigation, did any attorney tell you you have to
14 conduct a racially polarized voting analysis?
15        MR. GORE:  Again I'm going to object on
16 attorney/client privilege and instruct the witness
17 not to answer.
18 BY MR. TRIVEDI:
19   Q.   Did anyone acting in a nonlegal
20 capacity ever tell you you need to conduct a
21 racially polarized voting analysis?
22   A.   I don't recall.
23   Q.   As to the two questions that Mr. Gore
24 just instructed you not to answer, are you not
25 answering those questions because of that