*SC NAACP v. Alexander,*
D.S.C. Case No. 3:21-cv-03302-MGL-TJH-RMG

# Exhibit F

Page 1

```
         IN THE UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF SOUTH CAROLINA
                   COLUMBIA DIVISION
         CASE NO. 3:21-CV-03302-MBS-TJH-RMG

 THE SOUTH CAROLINA STATE CONFERENCE OF
 THE NAACP, AND TAIWAN SCOTT, ON BEHALF
 OF HIMSELF AND ALL OTHER SIMILARLY
 SITUATED PERSONS,
           Plaintiffs,
     vs.
 THOMAS C. ALEXANDER, HENRY D. MCMASTER,
 IN HIS OFFICIAL CAPACITY AS GOVERNOR OF
 SOUTH CAROLINA; HARVEY PEELER, IN HIS
 OFFICIAL CAPACITY AS PRESIDENT OF THE
 SENATE; LUKE A. RANKIN, IN HIS OFFICIAL
 CAPACITY AS CHAIRMAN OF THE SENATE
 JUDICIARY COMMITTEE; JAMES H. LUCAS, IN
 HIS OFFICIAL CAPACITY AS SPEAKER OF THE
 HOUSE OF REPRESENTATIVES; CHRIS MURPHY,
 IN HIS OFFICIAL CAPACITY AS CHAIRMAN OF
 THE HOUSE OF REPRESENTATIVES JUDICIARY
 COMMITTEE; WALLACE H. JORDAN, IN HIS
 OFFICIAL CAPACITY AS CHAIRMAN OF THE
 HOUSE OF REPRESENTATIVES ELECTIONS LAW
 SUBCOMMITTEE; HOWARD KNABB, IN HIS
 OFFICIAL CAPACITY AS INTERIM EXECUTIVE
 DIRECTOR OF THE SOUTH CAROLINA STATE
 ELECTION COMMISSION; JOHN WELLS, JOANNE
 DAY, CLIFFORD J. ELDER, LINDA MCCALL,
 AND SCOTT MOSELEY, IN THEIR OFFICIAL
 CAPACITIES AS MEMBERS OF THE SOUTH
 CAROLINA STATE ELECTION COMMISSION,

           Defendants.

 DEPOSITION OF:    ANDREW THEODORE FIFFICK
                   (Appearing via VTC)

 DATE:             July 21, 2022

 TIME:             10:10 a.m.
```

Page 18

1    the substance of the communication that may have
2    been communicated back.  I'm just interested in how
3    it was communicated back and specifically by email,
4    by phone, by text, a combination thereof?
5         A.    It was phone.  It was phone.  There
6    might be some emails out there.  If there are,
7    y'all have got them.  I don't think so.  It was
8    easier for him to just look at the map and talk to
9    us and say thumbs up, thumbs down.  And, you know,
10   he said thumbs up on the one busting the task.
11   BY MS. ADEN:
12        Q.    How many of those meetings do you think
13   you had?
14        A.    Meetings with who?
15        Q.    Mr. Gore by phone.
16        A.    Phone calls with Mr. Gore about
17   congressional maps?
18        Q.    Yes.
19        A.    Maybe half a dozen.  And they were all
20   here's a map, do you think it's okay?
21        Q.    So you mentioned about six maps went to
22   Mr. Gore so you think approximately six calls or do
23   you think there were more calls about --
24        A.    I don't think there were more calls --
25   I don't think there were more calls than maps.  I

Page 58

1   you assisted in crafting legislation for the House?
2        A.   For the House, no.
3        Q.   For the Senate?
4        A.   Well, I mean, yeah.  I take that back.
5   Yes.  Yeah, because I work for the House not the
6   capacity with the Senate I've not worked -- well, I
7   guess, yeah.  Thinking, yeah, we do work on stuff
8   together.  So, yeah.  That incident, yes.
9        Q.   And that's like the nuts and bolts of
10  coming up with a bill?
11       A.   Correct.
12       Q.   Okay.  And have you assisted in your
13  current or past positions with shepherding
14  legislation through the legislative process?
15       A.   Yes.  And by shepherding, I'm not sure
16  what you mean there, but I think yes.  The answer
17  is yes.
18       Q.   What is your role -- describe for me
19  what you believe to have been your role in
20  developing congressional maps this cycle.
21       A.   Meeting with members, having them tell
22  me, Will Roberts, Charlie Terreni, Breeden John,
23  Maura Baker to a lesser extent, Paula how they
24  thought the maps should be drawn and watching Will
25  Roberts draw it and then submitting it, you know,

1      Q.   And what about constituent consistency?
2  Who would have been responsible for making that
3  determination?
4      A.   Again, everybody in the room
5  discussion.  And by seeing the map, you know, which
6  didn't change a lot of lines -- just about anybody
7  could make that initial change -- but again, this
8  was a first staff map so I don't know that we
9  really were cognizant of everything because we knew
10 it was going to change.  We knew the numbers were
11 going to change it.
12     Q.   And who would have been responsible for
13 determining whether the plan minimized divisions of
14 counties, cities and towns, and/or splits of VTDs?
15     A.   I think those are again numbers that
16 really would have happened but not determined.
17 It's just what the numbers were.
18     Q.   And district compactness?
19     A.   Compactness?
20     Q.   District compactness.
21     A.   Yeah.  I mean, I guess, you know,
22 everybody in the room kind of again looked at it
23 knowing that we were going to have many changes.
24 And all this would have gone on the back end up to
25 Charlie Terreni and John Gore.

1              So I think that analysis was
2     probably -- and actually now that I think about it,
3     that analysis may have been done by Grayson, the
4     other GIS operator.  Maybe he generated the reports
5     because -- I think that is the case now.  One of
6     the ways we wanted to make sure we had one person
7     drawing a map in the map room -- we didn't want to
8     have two GIS operators -- so we split the duties of
9     looking at the other maps for the bare bones,
10    statistics, and deviation.  I think we delegated
11    that, like I said, to Grayson.
12         Q.   And that bare bones assisting, was that
13    part of the information that was then given to
14    members alongside the maps?
15         A.   Yeah, I'm sure.  I'm pretty sure I
16    remember us having just the similar numbers like
17    that from the other maps in their reports when they
18    were presenting their maps.
19         Q.   Of the maps that were sent up to
20    Mr. Gore developed by Senate members, do you
21    recall -- and I don't want to know the nature of
22    your conversations -- but generally was it up and
23    thumbs up or thumbs down or was it back and forth
24    on any particular maps?
25              MR. TYSON:  Okay.  I'm going to object.

Page 285

1  That's attorney-client privilege.  Any kind of
2  discussion on that is going to potentially leak
3  into conversations of attorney-client.
4  BY MS. ADEN:
5       Q.   Okay.  On the Campsen map before it was
6  introduced, the legal analysis about its compliance
7  with Section 2 -- I'm sorry.  Any legal analysis
8  that would have been done on Campsen's 1, that
9  would have been performed by Terreni and Gore just
10 like with the other maps that had preceded it?
11      A.   I think initial review by Charlie
12 Terreni.  But, you know, is this map okay?  Did he
13 pass it?  That would have been John Gore.
14      Q.   Do you have any opinion about whether
15 the Campsen 1 Plan complied with the Senate's
16 redistricting criteria?
17      A.   I don't.
18      Q.   With respect to the Campsen map, was
19 there any discussion about increasing, decreasing,
20 or maintaining the black voting age populations in
21 certain districts?
22           MR. TYSON:  I'm going to object; asked
23 and answered numerous times.
24           MS. ADEN:  Actually, to be honest, I
25 can't remember which map we were talking about when