*SC NAACP v. Alexander,*
D.S.C. Case No.  3:21-cv-03302-MGL-TJH-RMG

# EXHIBIT 4

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

| | |
|---|---|
| THE SOUTH CAROLINA STATE CONFERENCE OF THE NAACP, and TAIWAN SCOTT, on behalf of himself and all other similarly situated persons,<br><br>　　　　　Plaintiffs,<br><br>　vs.<br><br>THOMAS C. ALEXANDER, in his official capacity as President of the Senate; LUKE A. RANKIN, in his official capacity as Chairman of the Senate Judiciary Committee; JAMES H. LUCAS, in his official capacity as Speaker of the House of Representatives; CHRIS MURPHY, in his official capacity as Chairman of the House of Representatives Judiciary Committee; WALLACE H. JORDAN, in his official capacity as Chairman of the House of Representatives Elections Law Subcommittee; HOWARD KNAPP, in his official capacity as interim Executive Director of the South Carolina State Election Commission; JOHN WELLS, Chair, JOANNE DAY, CLIFFORD J. ELDER, LINDA MCCALL, and SCOTT MOSELEY, in their official capacities as members of the South Carolina State Election Commission,<br><br>　　　　　Defendants. | Case No.  3:21-cv-03302-MBS-TJH-RMG<br><br><br><br>**HOUSE DEFENDANTS JAMES H. LUCAS, CHRIS MURPHY, AND WALLACE H. JORDAN'S ANSWERS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES REGARDING THE CONGRESSIONAL PLAN** |

1

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendants James H. Lucas, in his official capacity as Speaker of the House of Representatives, Chris Murphy, in his official capacity as Chairman of the House of Representatives Judiciary Committee, and Wallace H. Jordan, Chairman of the House of Representatives Redistricting Ad Hoc Committee, (collectively, the "House Defendants"), subject to the General Objections set forth below, hereby answer Plaintiffs' First Set of Interrogatories regarding the Congressional Plan as follows:

## **INTRODUCTION**

1.      By this response submitted hereto, House Defendants do not waive the legislative privilege, attorney-client privilege, the work product doctrine, and/or any other applicable privilege. Further, any and all inadvertent disclosure of such information, previously or in the future, shall not be deemed a waiver of the attorney-client privilege, the attorney product doctrine, or any other applicable privilege or immunity.

2.      House Defendants base their responses upon (1) a reasonable search of facilities and files that could reasonably be expected to contain responsive information, and (2) inquiries of House Defendants' staff and/or representatives who could reasonably be expected to possess responsive information.

3.      House Defendants respond to these Interrogatories regarding the Congressional Map with their current knowledge; however, the subject matter of these Interrogatories is under continuing investigation. House Defendants expressly reserve the right to use or rely upon information not submitted in response to these Interrogatories if they uncover such information during the course of their ongoing investigation. House Defendants reserve the right to supplement their responses to the extent any information they uncover in the course of their investigation is responsive to these Interrogatories.

4.      House Defendants have performed a diligent search and made reasonable inquiry to locate information in House Defendants' possession, custody, or control in an effort to fully respond to these Interrogatories. Plaintiffs should not construe House Defendants' responses as a representation that House Defendants has examined each and every document in their possession in connection with this response.

## GENERAL OBJECTIONS

1.      House Defendants object to Plaintiffs' First Set of Interrogatories regarding the Congressional Map to the extent that they seek information protected from disclosure by applicable privilege or protection, including without limitation, the legislative privilege, attorney-client privilege, and/or the work-product doctrine.

2.      House Defendants object to Plaintiffs' First Set of Interrogatories regarding the Congressional Map insofar as they seek information concerning matters unrelated to the subject matter of this lawsuit, on the grounds that they are overly broad, unduly burdensome, they purport to command House Defendants to provide information in a manner not proportional to the needs of this case, and because they seek information that is neither relevant to the subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence.

3.      House Defendants object to Plaintiffs' First Set of Interrogatories regarding the Congressional Map as not proportional to the needs of this case insofar as they implicate information, documents and communications spanning over a more than 30-year period.

4.      House Defendants object to Plaintiffs' First Set of Interrogatories regarding the Congressional Map to the extent that they seek information in a form inconsistent with the discovery process, including without limitation, information that is already within Plaintiffs' possession, custody, or control.

3

5.      House Defendants object to Plaintiffs' First Set of Interrogatories regarding the Congressional Map to the extent they purport to impose obligations on House Defendants that are greater than or inconsistent with House Defendants' discovery-related obligations as set forth in applicable procedural rules governing discovery in this action.

6.      House Defendants object to the definition "predecessor maps" as overly broad and unduly burdensome to the extent such definition includes "any previous South Carolina House of Representatives redistricting map in whole or in part that were considered, created, developed, and/or proposed by Defendants."

7.      House Defendants object to the definition "you," "your," or "defendants" to the extent such definitions include "agents, advisors, employees, representatives, officers, consultants, contractors, or any person or entity acting or purporting to act on Defendants' behalf or subject to Defendants' control" without regard to whether such individual acted within the scope of his or her relationship with House Defendants. Such definition is overly broad, unduly burdensome, vague, ambiguous, and seeks irrelevant information not reasonably calculated to lead to the discovery of admissible evidence in this action. For purposes of responding to these Interrogatories, House Defendants will assume such definition includes only individuals or entities acting in their non-privileged capacities as House Defendants agents.

8.      House Defendants object to the definition of "document" or "documents" to the extent such definitions include "electronically stored information" to the extent such definition includes any "deleted" but recoverable electronic files and "slack (data fragments stored randomly from random access memory [RAM] on a hard drive during the normal operation of a computer [file slack and/or RAM slack] or residual data left on the hard drive after new data has overwritten some but not all of previously stored data)" as overly broad, unduly burdensome, vague,

4

ambiguous, and seeks irrelevant information not reasonably calculated to lead to the discovery of admissible evidence in this action.

9.     House Defendants object to Plaintiffs' First Set of Interrogatories regarding the Congressional Map insofar as they seek confidential information of House Defendants that is unrelated to the claims and defenses in this action and that, if disclosed, could irreparably harm House Defendants.

10.     These General Objections are applicable to each of the following responses, and failure to repeat an objection in response to a specific Interrogatory shall not be deemed a waiver of the objection. Further, when House Defendants specifically repeats one or more of these General Objections in response to a specific Interrogatory, such specific response is not a waiver of these General Objections.

Subject to and without waiving these General Objections, and subject to and without waiving the specific objections noted below, House Defendants answer Plaintiffs' First Set of Interrogatories regarding the Congressional Map as follows:

## **INTERROGATORIES**

### **INTERROGATORY NO. 1.**

Identify all persons in your office(s) involved in any evaluation, compilation, collection of data, estimate, report, study, or analysis concerning voting patterns, habits, behavior, demographic trends, or practices by race or ethnicity in South Carolina, created or dated from January 1, 2021 to the present regarding S. 865 and all Predecessor Maps.

**ANSWER:     House Defendants object to this Interrogatory to the extent "all Predecessor Maps" includes a definition so overbroad and excessive in scope as to make the Interrogatory impossible to answer. Notwithstanding this objection and assuming an appropriate scope of this Interrogatory in light of the allegations of the operative pleadings and the permissible scope of Fed. R. Civ. P. 26(a)-(b), in addition to the persons identified by House Defendants**

in their Initial Rule 26(a)(1) Disclosures with respect to the Congressional Plan, House Defendants identify Thomas Brunell and Sean Trende, testifying experts on behalf of House Defendants.

**INTERROGATORY NO. 2.**

Identify each person, other than a person intended to be called as an expert witness at trial, having discoverable information that tends to refute or support any position that You have taken or intend to take in this action, and state the subject matter of the information possessed by that person regarding S. 865 and all Predecessor Maps.

**ANSWER:    House Defendants object to this Interrogatory to the extent "all Predecessor Maps" includes a definition so overbroad and excessive in scope as to make the Interrogatory impossible to answer. Notwithstanding this objection and assuming an appropriate scope of this Interrogatory in light of the allegations of the operative pleadings and the permissible scope of Fed. R. Civ. P. 26(a)-(b), House Defendants refer Plaintiffs to their answer to Rule 26(a)(1)(A)(i) in the Initial Rule 26(a)(1) Disclosures with respect to the Congressional Plan.**

**INTERROGATORY NO. 3.**

Please provide the name and, if known, the address and telephone number of each individual involved and their role in considering, creating, developing, drafting, and proposing the maps adopted in S. 865 and all Predecessor Maps.

**ANSWER:    House Defendants object to this Interrogatory to the extent "all Predecessor Maps" includes a definition so overbroad and excessive in scope as to make the Interrogatory impossible to answer. Notwithstanding this objection and assuming an appropriate scope of this Interrogatory in light of the allegations of the operative pleadings and the permissible scope of Fed. R. Civ. P. 26(a)-(b), House Defendants refer Plaintiffs to the individuals identified in their response to Rule 26(a)(1)(A)(i) in the Initial Rule 26(a)(1) Disclosures with respect to the Congressional Plan.**

**INTERROGATORY NO. 4.**

Please identify the name, title, and if known, address of each person who shared with You any South Carolina House of Representative amendment to maps adopted in S. 865 or any Predecessor Map.

**ANSWER:    House Defendants object to this Interrogatory to the extent "any Predecessor**

6

Maps" includes a definition so overbroad and excessive in scope as to make the Interrogatory impossible to answer. Notwithstanding this objection and assuming an appropriate scope of this Interrogatory in light of the allegations of the operative pleadings and the permissible scope of Fed. R. Civ. P. 26(a)-(b), House Defendants are not aware of any person who shared a South Carolina House of Representatives amendment to the Congressional Plan adopted in S. 865. To the extent further answer is required, House Defendants defer to the objections and answers of the South Carolina Senate.

**INTERROGATORY NO. 5.**

Describe the process through which You incorporated public comments received in writing or through public or private hearings into the maps adopted by S. 865 and all Predecessor Maps.

**ANSWER:**   House Defendants object to this Interrogatory to the extent "all Predecessor Maps" includes a definition so overbroad and excessive in scope as to make the Interrogatory impossible to answer. Notwithstanding this objection and assuming an appropriate scope of this Interrogatory in light of the allegations of the operative pleadings, House Defendants defer to the objections and answers of the South Carolina Senate with regard to the manner in which the Senate incorporated public comments into the Congressional Plan adopted in S. 865.

**INTERROGATORY NO. 6.**

Describe the process that You used to consider, propose, and review draft maps adopted in S. 865 and all Predecessor maps through the Map Room and outside the Map Room.

**ANSWER:**   House Defendants object to this Interrogatory on the basis that "all Predecessor Maps" includes a definition so overbroad and excessive in scope as to make the Interrogatory impossible to answer and because as drafted it is vague and confusing. Notwithstanding this objection and assuming an appropriate scope of this Interrogatory in light of the allegations of the operative pleadings and the permissible scope of Fed. R. Civ. P. 26(a)-(b), House Defendants defer to the objections and answers of the South Carolina Senate with regard to the manner in which the Senate incorporated public comments into the Congressional Plan adopted in S. 865.

**INTERROGATORY NO. 7.**

Describe the process for how information and proposed maps and amendments to maps adopted in S. 865 and all Predecessor Maps were conveyed to You in the Map Room and outside the Map Room.

**ANSWER:**   House Defendants object to this Interrogatory on the basis that "all

7

**Predecessor Maps" includes a definition so overbroad and excessive in scope as to make the Interrogatory impossible to answer and because as drafted the Interrogatory is vague and confusing. Notwithstanding this objection and assuming an appropriate scope of this Interrogatory in light of the allegations of the operative pleadings and the permissible scope of Fed. R. Civ. P. 26(a)-(b), House Defendants defer to the objections and answers of the South Carolina Senate with regard to the manner in which the Senate incorporated public comments into the Congressional Plan adopted in S. 865.**

## INTERROGATORY NO. 8.

Describe how the information You conveyed to individuals in the Map Room was stored.

**ANSWER:    House Defendants object to this Interrogatory on the basis that it is vague, in that House Defendants are unable to discern what Plaintiffs seek with regard to "how . . . information . . . conveyed . . . was stored." Subject to this objection, House Defendants answer that maps drawn in the Map Room were stored on the computer hard drive in the Maptitude program.**

## INTERROGATORY NO. 9.

Describe the process through which You resolved any conflicts among requirements and

guidelines for districts adopted in S. 865 and all Predecessor Maps.

**ANSWER:    House Defendants object to this Interrogatory to the extent "all Predecessor Maps" includes a definition so overbroad and excessive in scope as to make the Interrogatory impossible to answer. Notwithstanding this objection and assuming an appropriate scope of this Interrogatory in light of the allegations of the operative pleadings and the permissible scope of Fed. R. Civ. P. 26(a)-(b), House Defendants defer to the objections and answers of the South Carolina Senate with regard to the process through which the Senate resolved any conflicts among requirements and guidelines for the Congressional Plan adopted in S. 865.**

## INTERROGATORY NO. 10.

Identify and explain any instances where You deviated from published guidelines/criteria

or traditional redistricting principles, including but not limited to any other guidelines/criteria You

considered regarding S. 865 and all Predecessor Maps.

**ANSWER:    House Defendants object to this Interrogatory to the extent "all Predecessor Maps" includes a definition so overbroad and excessive in scope as to make the Interrogatory impossible to answer. Notwithstanding this objection and assuming an appropriate scope of this Interrogatory in light of the allegations of the operative pleadings and the permissible scope of Fed. R. Civ. P. 26(a)-(b), House Defendants defer to the objections and answers of the South Carolina Senate with regard to whether the Senate deviated from published**

8

guidelines/criteria or traditional redistricting principles, including but not limited to any other guidelines/criteria the Senate considered, for the Congressional Plan adopted in S. 865.

**INTERROGATORY NO. 11.**

Describe the process through which You answered questions that were raised in writing, public hearings, or private meetings by members of the public or South Carolina General Assembly members for districts adopted in S. 865 and all Predecessor Maps.

**ANSWER:**    House Defendants object to this Interrogatory to the extent "all Predecessor Maps" includes a definition so overbroad and excessive in scope as to make the Interrogatory impossible to answer. Notwithstanding this objection and assuming an appropriate scope of this Interrogatory in light of the allegations of the operative pleadings and the permissible scope of Fed. R. Civ. P. 26(a)-(b), House Defendants defer to the objections and answers of the South Carolina Senate with regard to the manner in which the Senate answered questions raised in writing, at hearings or in meetings with regard to the Congressional Plan adopted in S. 865.

**INTERROGATORY NO. 12.**

Identify any Racially Polarized voting analysis conducted by You and any persons who conducted it regarding S. 865 or all Predecessor Maps.

**ANSWER:**    House Defendants object to this Interrogatory to the extent "all Predecessor Maps" includes a definition so overbroad and excessive in scope as to make the Interrogatory impossible to answer. Notwithstanding this objection and assuming an appropriate scope of this Interrogatory in light of the allegations of the operative pleadings and the permissible scope of Fed. R. Civ. P. 26(a)-(b), House Defendants defer to the answers of the South Carolina Senate with regard to any racially polarized voting analysis it conducted regarding S. 865.

**INTERROGATORY NO. 13.**

Identify the name, title, and professional address for each person consulted by You in answering these Interrogatories, specifying on which Interrogatory or Interrogatories such person was consulted.

**ANSWER:**    House Defendants object to this Interrogatory on the basis that it seeks disclosure of privileged information and is not calculated to lead to the discovery of admissible evidence. Subject to these objections, House Defendants consulted with legal counsel in answering these Interrogatories.

9

**INTERROGATORY NO. 14.**

Identify and explain what, if any, legislative inquiries, analyses, reports or findings were made into whether any South Carolina Congressional districts adopted in S. 865 and all Predecessor Maps would lead to liability under Section 2 of the Voting Rights Act, including, but not limited to, any racially polarized voting analysis identified in Plaintiffs' Interrogatory 12 and/or analysis as to whether districts will be effective to allow Black voters to elect candidates of their choice.

**ANSWER:    House Defendants refer Plaintiffs to their answer to Interrogatory No. 12.**

**INTERROGATORY NO. 15.**

Do You contend that the standard established by the U.S. Supreme Court in *Thornburg v. Gingles,* 478 U.S. 30 (1986) to assess a vote-dilution claim under Section 2 of the Voting Rights Act is the same standard used to assess preclearance compliance under Section 5 of the Voting Rights Act?  If the answer is yes, please specifically explain and identify the evidence or legal basis, if any, upon which you rely to support your contention.  If the answer is no, please specifically explain and identify the evidence or legal basis, if any, upon which you rely to support your contention.

**ANSWER:    House Defendants make no contention as to a singular "standard" used to assess claims arising under Section 2 or Section 5 of the Voting Rights Act. Further answering, House Defendants direct Plaintiffs to the decision of the three-judge District Court for the District of South Carolina in the matter of *Colleton County Council v. McConnell*, 201 F. Supp. 2d 618 (D.S.C. 2002), opinion clarified (Apr. 18, 2002), for the below discussion and analysis of the similarities and differences of Section 2 and Section 5 of the Voting Rights Act:**

Although they share the goal of addressing the evils of racial discrimination, § 5 differs in important respects from § 2 of the Voting Rights Act. First, § 2 applies to *all* states, whereas § 5 applies only to those states, such as South Carolina, which have the worst reputation for historical and ongoing discrimination against blacks. Second, by requiring the creation of majority-minority districts where vote dilution under the *Gingles* test would

10

occur, § 2 looks beyond the status quo to ensure that a redistricting plan affords blacks an equal opportunity to elect the representatives of their choice as white voters enjoy. *See* 42 U.S.C.A. § 1973(b); *Gingles,* 478 U.S. at 47, 106 S.Ct. 2752. Section 5, in contrast, maintains the status quo. It only prevents "backsliding" in those jurisdictions subject to its requirements by prohibiting the implementation of any proposed voting change that has been enacted for a retrogressive purpose, *see Reno v. Bossier Parish Sch. Bd.,* 528 U.S. 320, 335, 120 S.Ct. 866, 145 L.Ed.2d 845 (2000) ("*Bossier Parish II* "), or that has a retrogressive effect on minority voting strength, *see Beer,* 425 U.S. at 141, 96 S.Ct. 1357. Section 5 requires no separate inquiry into the *Gingles* factors to determine whether an opportunity district must be created, but "mandates that the minority's [existing] *opportunity* to elect representatives of its choice not be diminished, directly or indirectly, by the State's actions." *Bush v. Vera,* 517 U.S. 952, 983, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996).

The distinction between § 2 and § 5 was expounded upon by the Supreme Court in *Reno v. Bossier Parish School Board,* 520 U.S. 471, 117 S.Ct. 1491, 137 L.Ed.2d 730 (1997) ("*Bossier Parish I*"). There, the Court struck down the Department of Justice's denial of preclearance under § 5 on the basis that the plan was, in the opinion of the Department of Justice, violative of § 2. *See id.* at 477, 117 S.Ct. 1491. This position, the Court held, would "make compliance with § 5 contingent upon compliance with § 2," and would effectively "replace the standards for § 5 with those for § 2." *Id.* The Court explained that such an interpretation would contradict its "longstanding recognition that the two provisions were designed to combat different evils, and, accordingly, to impose very different duties upon the States." *Id.*

Thus, in the redistricting context, Section 5 has a quite limited substantive goal—to insure that the state does not adopt a redistricting plan that, when compared to the existing or "benchmark" plan, "would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." *Beer,* 425 U.S. at 141, 96 S.Ct. 1357; *see Holder v. Hall,* 512 U.S. 874, 883, 114 S.Ct. 2581, 129 L.Ed.2d 687 (plurality opinion) ("Under § 5, then, the proposed voting practice is measured against the existing voting practice to determine whether retrogression would result from the proposed change."); *Bossier Parish I,* 520 U.S. at 478, 117 S.Ct. 1491 (explaining that "the jurisdiction's existing plan is the benchmark against which the 'effect' of voting changes is measured"). Thus,

> [i]n § 5 preclearance proceedings—which uniquely deal only and specifically with *changes* in voting procedures—the baseline is the status quo that is proposed to be changed: If the change "abridges the right to vote" relative to the status quo, preclearance is denied, and the status quo (however discriminatory *it* may be) remains in effect.

11

*Bossier Parish II,* 528 U.S. at 334, 120 S.Ct. 866.

"Section 2, on the other hand, was designed as a means of eradicating voting practices that minimize or cancel out the voting strength and political effectiveness of minority groups." *Bossier Parish I,* 520 U.S. at 479, 117 S.Ct. 1491 (internal quotation marks omitted). It involves changes to the status quo itself. *See Bossier Parish II,* 528 U.S. at 334, 120 S.Ct. 866. Because a determination of vote dilution requires "the existence of an 'undiluted' practice against which the fact of dilution may be measured, a § 2 plaintiff must also postulate a reasonable alternative voting practice to serve as the benchmark 'undiluted' voting practice." *Bossier Parish I,* 520 U.S. at 480, 117 S.Ct. 1491. Thus, "the comparison must be made with a hypothetical alternative: If the *status quo* results in an abridgement of the right to vote or abridges the right to vote relative to what the right to vote *ought to be,* the status quo itself must be changed." *Bossier Parish II,* 528 U.S. at 334, 120 S.Ct. 866 (alterations and internal quotation marks omitted).

Because South Carolina is a covered jurisdiction under the Voting Rights Act, any redistricting plan that it adopts is subject to the preclearance requirements of § 5. *See Allen v. State Bd. of Elections,* 393 U.S. 544, 548–49, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969). A legislative plan still reflects "the exercise of legislative judgment" and "the policy choices of the elected representatives of the people"; such plans, therefore, remain subject to preclearance under § 5 even if later reviewed by a court. *See McDaniel,* 452 U.S. at 153, 101 S.Ct. 2224.

Generally, "a decree of the United States District Court is not within reach of Section 5 of the Voting Rights Act such that it must be precleared," *Abrams,* 521 U.S. at 95, 117 S.Ct. 1925 (internal quotation marks and alterations omitted), but "[t]he exception applies only to judicial plans devised by the court itself," not to legislative plans which are submitted to the court by the parties for consideration, *id.; see Lopez v. Monterey County,* 525 U.S. 266, 286, 119 S.Ct. 693, 142 L.Ed.2d 728 (1999). Because we have independently devised plans for each elective body from scratch, however, none of the plans implemented by this court order are subject to the preclearance requirements of § 5 and, accordingly, must be immediately implemented for the upcoming elections.

Even where the court elects to devise its own plan, such that it need not be precleared, the court must still " 'follow the appropriate § 5 standards, including the body of administrative and judicial precedents developed in Section 5 cases.' " *Abrams,* 521 U.S. at 96, 117 S.Ct. 1925 (quoting *McDaniel,* 452 U.S. at 149, 101 S.Ct. 2224). Thus, like state legislatures, we must ensure that our redistricting plan does not "lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise" in South Carolina. *Beer,* 425 U.S. at 141, 96 S.Ct. 1357.

*Colleton Cty. Council v. McConnell*, 201 F. Supp. 2d 618, 634–36 (D.S.C. 2002), opinion clarified (Apr. 18, 2002).

Respectfully submitted,

*s/ Jennifer J. Hollingsworth*

Mark C. Moore, Fed ID No. 4956
Jennifer J. Hollingsworth, Fed ID No. 11704
Erica H. Wells, Fed ID No. 13206
Hamilton B. Barber, Fed ID No. 13306
Michael A. Parente, Fed ID No. 13358
NEXSEN PRUET, LLC
1230 Main Street, Suite 700 (29201)
P.O. Box 2426
Columbia, SC 29202
Tel: 80.-771-8900
Email: MMoore@nexsenpruet.com
Email: JHollingsworth@nexsenpruet.com
Email: EWells@nexsenpruet.com
Email: HBarber@nexsenpruet.com
Email: MParente@nexsenpruet.com

William W. Wilkins, Fed. ID No. 4662
Andrew A. Mathias, Fed. ID No. 10166
Konstantine P. Diamaduros, Fed ID No. 12368
NEXSEN PRUET, LLC
104 S. Main Street, Suite 900 (29601)
Post Office Box 10648
Greenville, SC  29603-0648
Tel: 864.370.2211
Email: BWilkins@nexsenpruet.com
Email: AMathias@nexsenpruet.com
Email: KDiamaduros@nexsenpruet.com

*Attorneys for House Defendants James H. Lucas,*
*Chris Murphy, and Wallace H. Jordan*

April 6, 2022
Columbia, South Carolina

14

## CERTIFICATE OF SERVICE

I hereby certify that on April 6, 2022, a true and correct copy of **House Defendants' Answers to Plaintiffs' First Set of Interrogatories Regarding the Congressional Plan** was served on all counsel of record by electronic mail.

s/ Jennifer J. Hollingsworth
Jennifer J. Hollingsworth
Nexsen Pruet, LLC