*SC NAACP v. Alexander,*
D.S.C. Case No.  3:21-cv-03302-MGL-TJH-RMG

# EXHIBIT 7

Page 1

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF SOUTH CAROLINA
2                   COLUMBIA DIVISION
          CASE NO. 3:21-CV-03302-MBS-TJH-RMG
3

    THE SOUTH CAROLINA STATE CONFERENCE OF
4   THE NAACP, AND TAIWAN SCOTT, ON BEHALF
    OF HIMSELF AND ALL OTHER SIMILARLY
5   SITUATED PERSONS,
6               Plaintiffs,
7          vs.
8   THOMAS C. ALEXANDER, HENRY D. MCMASTER,
    IN HIS OFFICIAL CAPACITY AS GOVERNOR OF
9   SOUTH CAROLINA; HARVEY PEELER, IN HIS
    OFFICIAL CAPACITY AS PRESIDENT OF THE
10  SENATE; LUKE A. RANKIN, IN HIS OFFICIAL
    CAPACITY AS CHAIRMAN OF THE SENATE
11  JUDICIARY COMMITTEE; JAMES H. LUCAS, IN
    HIS OFFICIAL CAPACITY AS SPEAKER OF THE
12  HOUSE OF REPRESENTATIVES; CHRIS MURPHY,
    IN HIS OFFICIAL CAPACITY AS CHAIRMAN OF
13  THE HOUSE OF REPRESENTATIVES JUDICIARY
    COMMITTEE; WALLACE H. JORDAN, IN HIS
14  OFFICIAL CAPACITY AS CHAIRMAN OF THE
    HOUSE OF REPRESENTATIVES ELECTIONS LAW
15  SUBCOMMITTEE; HOWARD KNABB, IN HIS
    OFFICIAL CAPACITY AS INTERIM EXECUTIVE
16  DIRECTOR OF THE SOUTH CAROLINA STATE
    ELECTION COMMISSION; JOHN WELLS, JOANNE
17  DAY, CLIFFORD J. ELDER, LINDA MCCALL,
    AND SCOTT MOSELEY, IN THEIR OFFICIAL
18  CAPACITIES AS MEMBERS OF THE SOUTH
    CAROLINA STATE ELECTION COMMISSION,
19
                Defendants.
20
21  DEPOSITION OF:   ANDREW THEODORE FIFFICK
                     (Appearing via VTC)
22
    DATE:            July 21, 2022
23
    TIME:            10:10 a.m.
24
25

```
 1    everyone, but it was something that was on the back
 2    end so that outside counsel could check for.  And
 3    again, I'm not the expert here.  My impression is
 4    that on the back end, outside counsel might want to
 5    look at what I think is called the Section 2 claim
 6    where you might need to use racial data.  But it's
 7    my understanding there is no Section 2 claim and I
 8    don't recall outside counsel ever, you know,
 9    needing to use that data.  But that data was
10    available to everybody, and anybody who asked for
11    it, that sort of data was to go to them for sure.
12         Q.   And when you refer to outside counsel
13    having looked at it, are you referring to -- you
14    mentioned Mr. Terreni, you mentioned Mr. Gore, and
15    you mentioned Mr. Tyson.  Is that who you're
16    referring to?
17         A.   I don't recall Mr. Tyson doing a whole
18    lot of review.  It was kind of a hierarchal thing.
19    You know, Charlie was more involved because he's
20    here.  You know, we would bounce it off of Charlie
21    and then Charlie would send it on to John Gore.
22              And there really were very few maps so
23    it wasn't a whole lot of review.  I don't think we
24    drew more than 20 maps that outside counsel saw, if
25    that, probably less than that.  Probably less than
```

Page 14

1    five or six maps actually went to outside counsel

2    that we drew.  But the buck really stopped with

3    John Gore.  It would have been a John Gore

4    question.  Hey, John, does this pass the legal test

5    that you're aware of with your 20 something years

6    of experience with redistricting.

7         Q.   So to some understanding, there may

8    have been 20 congressional maps drawn, but 6 of

9    them -- around 6 of them, you say, filtered up to

10   John Gore who gave the final approval about whether

11   or not what?

12        A.   It's been a minute since this happened,

13   but my recollection is that's a ballpark.  Yeah,

14   I'd say maybe two dozen maps and maybe, you know,

15   five or six sent up the food chain.  And I guess

16   that perhaps maybe if you expanded to include, for

17   example, your map -- your two maps, I think you

18   sent us.  I think we sent those to John Gore as

19   well, but I don't remember him weighing in on them,

20   you know, in the same way he might have with us.

21   So maybe if you included outside folks' maps, maybe

22   it is more than five or six, but again I don't

23   specifically recall exactly.  I mean, ultimately I

24   think there were two maps that were sort of

25   numbered wrong.  I think that would have been

```
                                            Page 15
 1    Senator Harpootlian's and Senator Campsen's.
 2              And then there were other maps that
 3    members -- and I believe, if you recall, I even
 4    left you a voicemail about Senator Hutto wanting to
 5    present your all's maps, you know, on your all's
 6    behalf on the floor.  I don't recall if we had John
 7    Gore look at those or not.  But those would be the
 8    three or four extra maps, you know, outside
 9    submitted maps that would have gone up the food
10    chain.
11         Q.   And so the six that you're talking
12    about or ballpark six that you're talking about
13    that more than likely went to Mr. Gore, those were
14    all maps drawn by the legislature not including the
15    public?
16         A.   I don't remember if we sent him the
17    public maps or not.  I do remember that there was
18    no request for those maps to be looked at until at
19    the very earliest would have been those couple days
20    before the bill was on the floor the morning that I
21    left a voice mail for you to say, hey, you know, if
22    y'all want to submit something about your maps, do
23    that.  I don't recall that there was any sort of
24    rigorous analysis on John Gore's part with those
25    maps, but maybe there was.  I could be mistaken.
```

```
                                              Page 16
```

1          Q.   And the bill on the floor, you would be
2     talking about mid-January or so?
3          A.   I think it would have been 19th, 20th,
4     22nd, somewhere in that timeframe, yes, ma'am.
5          Q.   Were you the person who was responsible
6     for sending those maps to Mr. Gore?
7          A.   It would have been a shared thing.  It
8     would have been -- you know, it could have been
9     from Breeden.  It could have been from Will.  I
10    mean, it could have been from me.  It probably was
11    from Will because all that stuff was on his laptop
12    so I would imagine it was Will.  But one of us
13    could have hit send instead of him.  Most of the
14    time -- that was his laptop.  He made sure that was
15    his stuff.  He was the guy that drew the maps so I
16    would say my best recollection right now is that
17    Will would have sent the maps to Gore.
18         Q.   And you mentioned Breeden.  Is that
19    Breeden John?
20         A.   Yes, ma'am.
21         Q.   And you mentioned Will.  That's Will
22    Roberts?
23         A.   Yes, ma'am.
24         Q.   And who was the third person you
25    mentioned?

```
                                          Page 18
 1    the substance of the communication that may have
 2    been communicated back.  I'm just interested in how
 3    it was communicated back and specifically by email,
 4    by phone, by text, a combination thereof?
 5            A.   It was phone.  It was phone.  There
 6    might be some emails out there.  If there are,
 7    y'all have got them.  I don't think so.  It was
 8    easier for him to just look at the map and talk to
 9    us and say thumbs up, thumbs down.  And, you know,
10    he said thumbs up on the one busting the task.
11    BY MS. ADEN:
12            Q.   How many of those meetings do you think
13    you had?
14            A.   Meetings with who?
15            Q.   Mr. Gore by phone.
16            A.   Phone calls with Mr. Gore about
17    congressional maps?
18            Q.   Yes.
19            A.   Maybe half a dozen.  And they were all
20    here's a map, do you think it's okay?
21            Q.   So you mentioned about six maps went to
22    Mr. Gore so you think approximately six calls or do
23    you think there were more calls about --
24            A.   I don't think there were more calls --
25    I don't think there were more calls than maps.  I
```

Page 19

```
 1    mean, these maps were -- everything about these

 2    maps was pretty easy to see down in the Charleston

 3    area so it wasn't something that was difficult.  So

 4    I would say about the same number of calls as maps.

 5    And again, I could be wrong about the number of

 6    maps, but ballparking it, that's kind of where I

 7    get the number.

 8            Q.   Can you tell me who else was on those

 9    calls besides when you were on them?

10            A.    Those calls would have been made with

11    us sitting in Luke Rankin's office with a map on

12    the wall where Charlie Terreni -- at the very

13    least, Charlie Terreni, myself, Will Roberts, and

14    Breeden John would have been in there.

15                 It's possible here and there that Paula

16    Benson could have been in there.  It's possible

17    here and there that Maura Baker could have been in

18    there.  But those are the people that could have

19    been in those calls.

20                 I don't recall exactly who was there.

21    But at a minimum, I'm sure it would be at the very

22    least me, Charlie Terreni, and Will Roberts

23    because, like I said, Will always was who was

24    running the laptop, Charlie was my initial outside

25    counsel, and I was there.
```

Page 44

1    him or vice versa or were you equal colleagues?

2    How would you define that working relationship?

3             A.   I would call us equal colleagues in

4    terms of the administrative situation, but I would

5    say that, you know, having known him and knowing

6    that he's been a lawyer for 20 years longer than

7    me, I defer to him on anything because I trust him.

8    He's a smart guy.  I mean, technically speaking, if

9    you look at a command chain, you know, I'm chief of

10   staff.  We hired Charlie, but, you know, the

11   practical matter this is his third redistricting

12   and my first.  Colleagues with great deference to

13   him I would say.

14           Q.    And in terms of hierarchy, is it fair

15   to say the decision of Mr. Gore trumped the

16   decision of both you and Mr. Terreni with respect

17   to congressional mapping?

18           A.    If it came down to it, yes, but I don't

19   recall a situation where Charlie Terreni disagreed

20   with John Gore.  So as a practical matter, yes, we

21   would have gone up the food chain to the DC

22   lawyers, but in reality, I don't remember that ever

23   happening.

24           Q.    And how would you describe your working

25   relationship with Mr. Breeden?  Did he report to

```
                                        Page 58
 1    you assisted in crafting legislation for the House?
 2           A.    For the House, no.
 3           Q.    For the Senate?
 4           A.    Well, I mean, yeah.  I take that back.
 5    Yes.  Yeah, because I work for the House not the
 6    capacity with the Senate I've not worked -- well, I
 7    guess, yeah.  Thinking, yeah, we do work on stuff
 8    together.  So, yeah.  That incident, yes.
 9           Q.    And that's like the nuts and bolts of
10    coming up with a bill?
11           A.    Correct.
12           Q.    Okay.  And have you assisted in your
13    current or past positions with shepherding
14    legislation through the legislative process?
15           A.    Yes.  And by shepherding, I'm not sure
16    what you mean there, but I think yes.  The answer
17    is yes.
18           Q.    What is your role -- describe for me
19    what you believe to have been your role in
20    developing congressional maps this cycle.
21           A.    Meeting with members, having them tell
22    me, Will Roberts, Charlie Terreni, Breeden John,
23    Maura Baker to a lesser extent, Paula how they
24    thought the maps should be drawn and watching Will
25    Roberts draw it and then submitting it, you know,
```

Page 59

```
1    to Charlie Terreni and John Gore for them to tell
2    us whether or not that they were kosher.  And I
3    think one of the things I made a point on my
4    personal level is making sure that the door was
5    open to anyone who needed to come to me -- in terms
6    of the members, if any member wanted to come in and
7    talk to us, I wanted to make sure nobody was left
8    out.
9         Q.   Did you have ideas for how the
10   congressional map should look?
11        A.   Not really no, I didn't.  I mean, we
12   deferred to the members on that.  That's above my
13   pay grade.
14        Q.   Deferred to members and deferred to
15   Mr. Gore?
16        A.   Deferred to members and then, I mean, I
17   wouldn't say I deferred to Mr. Gore in how to draw
18   the map.  We did defer to Mr. Gore and Mr. Terreni
19   on whether or not that they were legally sound maps
20   for sure.
21        Q.   What did you understand would be a
22   legally sound map?
23        A.    I mean, there's lots of different --
24   it's more of what wouldn't have been sound from my
25   understanding.  This is my first rodeo for
```

Page 107

1    adopted from prior redistricting, the 2002 opinion

2    of the three-judge court in Colleton County v.

3    McConnell, the 2012 opinion of the three-judge

4    court in Backus v. South Carolina, other court

5    decisions, and input received in public hearings

6    across the State.

7         Q.   Let me ask you have you read the

8    decisions in the Colleton County Council in the

9    Backus case that are cited here?

10        A.   It's been a long time but, yes.

11        Q.   A long time meaning when approximately?

12        A.   It would have been back in August,

13   July, September, somewhere in there.

14        Q.   Of 2021?

15        A.   Yeah.  Yeah.  That's right.

16        Q.   Do you know what other court decisions

17   are being referred to in that last clause?

18        A.   I don't.

19        Q.   And the input received in public

20   hearings across the state, what is that referring

21   to?

22        A.   The aggregated public testimony that

23   they had in those roads shows.

24        Q.   So it's your position -- is Ms. Benson

25   the only person responsible for developing these

1    guidelines or did you have some role in that?

2         A.   No, I had no role in developing them.

3    We did run these up the food chain just like

4    anything else through Charlie Terreni and John

5    Gore.

6         Q.   You said Charlie Terreni and John Gore

7    also reviewed these?

8         A.   Yes, ma'am, I'm sure they did.  I don't

9    recall the specific instance of them reviewing it,

10   but I'm sure they looked it over.

11        Q.   And what was their role in reviewing

12   them?

13        A.   To sign off on them as being reasonable

14   or accurate and --

15        Q.   Legally sound?

16        A.   Legally sound.  That's a good way to

17   put it.

18        Q.   Outside of the things listed in this

19   paragraph, were there any other sources consulted

20   to develop these guidelines?

21        A.   And I'm sure in the review of these

22   guidelines by Charlie Terreni, Paula Benson, and

23   John Gore, I'm not sure what other resources they

24   used, but I think their collective experience was

25   part of it.  It's not necessarily mentioned there,

Page 124

1    us presenting the information and the maps to our

2    outside experts who then decided whether or not

3    they passed federal common law.

4             Q.   Are you aware of whether race data was

5    loaded into the computer that y'all shared in the

6    map room?

7             A.   Oh, yeah.  It was, yeah, for sure.

8             Q.   Was it on a screen projected on the

9    wall at any time as you were developing maps?

10            A.   I was not developing maps, but as

11   members came in and wanted to talk about maps, yes,

12   members came in and asked about those numbers.

13            Q.   For the maps that were transmitted to

14   Mr. Terreni and Mr. Gore, did they include

15   associated data with them?

16            A.   I'm sure they did.  I'm sure Charlie

17   Terreni saw the associated data when he was in the

18   room and I'm sure Will would bring set statistics

19   to John Gore when they sent any map to us.

20            Q.   And are you aware of whether race data

21   was one of the categories of data that was part of

22   that?

23            A.   I believe it was, yeah.

24            Q.   What other ways was race considered as

25   maps were developed, congressional maps were

Page 247

1    just provide the legal guidance that you've been

2    talking about since the beginning of the day?

3            MR. TYSON:  Asked and answered.

4    BY MS. ADEN:

5        Q.   Did he draw lines?  I know he was --

6    did he draw lines?

7        A.   He wasn't physically on the computer.

8    Will was always on the computer.

9        Q.   Was he sitting next to Mr. Roberts

10   directing him about where lines might go?

11       A.   Yeah.  I mean, Will was drawing these

12   things and, you know, if somebody noticed that,

13   hey, you might want to follow that river because

14   it's a geographic boundary or something, I don't

15   remember, you know.  But, I mean, yeah, he would

16   have been commenting about the map.  I wouldn't say

17   he drew it though.

18       Q.   Did you provide that type of

19   directions, you know, follow the river?  Did you

20   provide that type of guidance to Mr. Roberts?

21       A.   We all kind of commented on it all

22   together.  I mean, it was sort of an aggregate of

23   people discussing.  And then we got the map

24   together, and I think we sent it to John Gore, and

25   then we gave it to the subcommittee, and then they

Page 248

1    did what they wanted to do with it from there.

2          Q.   Did any subcommittee members have

3    involvement in the development of that initial

4    staff map?

5          A.   I think we may have spoken to some of

6    them.  I don't recall.  It would have been broad

7    strokes.  You know, it would have been like -- it

8    wouldn't have been -- I don't believe they sat in

9    the map room like they did subsequently.  I could

10   be wrong.  I may be mistaken, but I don't recall

11   that.

12         Q.   And those conversations with any

13   subcommittee members would have happened

14   informally, not because they came together in a

15   meeting of the subcommittee?

16         A.   That's right.  It would have been

17   informally.

18         Q.   And were there any involvement from

19   House staff members in the development of this

20   initial Staff Plan?

21         A.   General trend setting, ma'am, because

22   they gave me a separate thing, a separate one sheet

23   paper map that's similar.

24         Q.   Outside of the people that you

25   identify, Mr. Roberts, Mr. Terreni, yourself, and

Page 250

1    on different testimony and different criteria in

2    the maps.

3              Q.    What data did you rely on to develop

4    the initial Staff Plan?

5              A.    Census data.  I don't remember the

6    extent to which we relied on political data, but I

7    assume we did because they wanted the least change

8    map.  I'm almost positive we at some point had

9    instruction from somebody, maybe Senator Campsen,

10   to make sure that Congressional District 1 retained

11   its political numbers.  I can't recall for sure.

12             Q.    How many meetings were held to develop

13   this initial plan?

14             A.    I don't remember.

15             Q.    More than one?

16             A.    Oh, yeah.  I'm sure.

17             Q.    How many versions of the initial Staff

18   Plan became the one that was introduced on the

19   23rd?

20             A.    I don't recall.

21             Q.    Were the guidelines consulted during

22   development of the initial Staff Plan?

23             A.    Yes.

24             Q.    And who assessed whether the guidelines

25   had been followed in the development of this

Page 251

1    initial Staff Plan?

2         A.    I think in the initial phase, it would

3    have been, you know -- Charlie would have been the

4    main word in the room whether or not we were

5    following the guidelines appropriately.  Paula was

6    in the room; I was in the room; will was in the

7    room; Breeden was in the room.  I don't know that

8    any one of us, you know, assumed the primary

9    enforcer of guidelines, but clearly Charlie's

10   experience and Will's experience and Paula's

11   experience, they had, you know, more experience.

12   So they had more experience, I suppose.

13             And then I do believe we sent it to

14   Gore before we published it as the Staff Plan.  I'm

15   almost positive we did.

16        Q.    I probably will not go through all the

17   criteria, but without doing that, is it your

18   position that multiple people assessed whether the

19   one person, one vote had been complied with with

20   the initial Staff Plan or was there one person?

21        A.    With that with one person, one vote, I

22   would say that was just Will with his computer

23   because, I mean, he could see it.  He could get it

24   down to one person, one, you know, deviation.  That

25   wasn't a judgment call really, that was just a

```
                                        Page 254
 1            MR. TYSON:  Objection; asked and
 2    answered numerous times.
 3            THE WITNESS:  No.  Not to my knowledge,
 4    no.
 5    BY MS. ADEN:
 6        Q.   Who would have been responsible for
 7    making the assessment that the initial Staff Plan
 8    was not a racial gerrymander?
 9        A.   We would have relied upon Charlie
10    Terreni and John Gore.
11        Q.   What about whether the districts were
12    contiguous?  Who would have made that assessment in
13    the initial Staff Plan?
14        A.   It would have probably been -- Will
15    drew the map so he could see whether things were
16    produced or not.  So we all looked at the map, but
17    he was actually drawing a map so that's pretty much
18    a no brainer to draw a map that's contiguous.
19        Q.   And what about communities of interest?
20    Who would have taken responsibility to ensure that
21    those kind of guideline criteria respecting
22    communities of interest was respected, reflected in
23    the initial Staff Plan?
24        A.   I think it would have been a kind of
25    everybody in the room discussion.
```

Page 255

1          Q.   And what about constituent consistency?
2     Who would have been responsible for making that
3     determination?
4          A.   Again, everybody in the room
5     discussion.  And by seeing the map, you know, which
6     didn't change a lot of lines -- just about anybody
7     could make that initial change -- but again, this
8     was a first staff map so I don't know that we
9     really were cognizant of everything because we knew
10    it was going to change.  We knew the numbers were
11    going to change it.
12         Q.   And who would have been responsible for
13    determining whether the plan minimized divisions of
14    counties, cities and towns, and/or splits of VTDs?
15         A.   I think those are again numbers that
16    really would have happened but not determined.
17    It's just what the numbers were.
18         Q.   And district compactness?
19         A.   Compactness?
20         Q.   District compactness.
21         A.   Yeah.  I mean, I guess, you know,
22    everybody in the room kind of again looked at it
23    knowing that we were going to have many changes.
24    And all this would have gone on the back end up to
25    Charlie Terreni and John Gore.

Page 277

```
 1          Q.    And do you know why the version that
 2    became Campsen 1, why that was the one selected
 3    from among the other iterations that may have led
 4    up to it?
 5          A.    I seem to recall that's the one he
 6    wanted to offer as an amendment.
 7          Q.    And it was his call?
 8          A.    I think he offered it as an amendment.
 9    I don't remember.  That would make sense.  I mean,
10    it had to be offered as an amendment and so I think
11    he offered it as an amendment.
12          Q.    And did this map also go to the -- you
13    mentioned Mr. Terreni was in the room with Senator
14    Campsen or on phone calls with Senator Campsen when
15    this was developed.  Was this map also sent to
16    Mr. Gore to review?
17          A.    Yes.  I'm sure.
18          Q.    Before it was offered?
19          A.    Yes.  I'm sure.
20          Q.    Okay.  Was there a subsequent version
21    of a map developed after it went up to Gore,
22    Mr. Gore?
23          A.    I don't remember.  I don't remember.
24    If there was, it was something that was minor
25    tweaked or if it was anything major, it would have
```

Page 278

```
 1    gone back up.  So nothing would have ended up being

 2    passed out at a subcommittee or passed out at a

 3    full committee if it had not been, you know, across

 4    Mr. Gore's desk.

 5              Q.    In the six or so maps that we've been

 6    talking about, we talked about at the beginning,

 7    one of those six would have included this Campsen

 8    map, Campsen 1?

 9              A.    Of those six, I'm not sure what you

10    mean.  The ones that I previously said that I think

11    there was about a dozen maps and then you corrected

12    me and said it was really only seven.  Is that what

13    you're talking about?

14              Q.    So I thought that there were six maps

15    or six or so maps that were sent up to Mr. Gore.

16    Is that the number that you recall?

17              A.    I don't remember exactly.  It was

18    somewhere in that neighborhood.  Six to ten maps

19    were sent up, I think.  That could be me not

20    remembering.

21              Q.    Okay.  Because the seven I think we

22    were referencing were my representation I think

23    there were about seven maps introduced by the

24    public.

25              A.    That's right.  Yeah.  Thank you.
```

Page 302

```
 1    recall this specifically, but I would be pretty
 2    sure that we would have run this by John Gore as
 3    well, but I don't recall that specifically.
 4          Q.   There's a paragraph titled Adherence to
 5    the Voting Rights Act on page 22529.
 6          A.   Uh-huh.
 7          Q.   Do you think that Mr. Roberts was in a
 8    position to determine adherence to the Voting
 9    Rights Act?
10          A.   I think he's expressing his opinion,
11    but I don't know that it was determined.
12          Q.   And is that the same with the next
13    portion entitled Avoidance of racial
14    gerrymandering?  Is that Mr. Roberts' opinion on
15    that?
16          A.   I think that's an accurate way to
17    describe it.  That's his opinion.
18          Q.   Do you agree with it?
19          A.   I haven't had a chance to read the
20    whole thing in a long time.  So as I sit here, I
21    don't know that I have the resources to tell you in
22    the next ten minutes.  And plus, like I said, I
23    don't recall even in realtime responding to this
24    document.  So if this is something that Senator
25    Campsen wanted me to weigh in on, he did not ask me
```

Page 360

1                    CERTIFICATE OF REPORTER

2

3              I, Karen M. Beckman, Court Reporter and

4     Notary Public for the State of South Carolina at

5     Large, do hereby certify that the foregoing

6     transcript is a true, accurate, and complete record

7     to the best of my ability.

8              I further certify that I am neither

9     related to nor counsel for any party to the cause

10    pending or interested in the events thereof.

11             Witness my hand, I have hereunto

12    affixed my official seal this 26th day of July,

13    2022, at Myrtle Beach, Horry County,

14    South Carolina.

15

16

17

18

19

20

21

22

23                    Karen M. Beckman

                      Court Reporter

24                    My Commission expires

                      September 2, 2025

25

Page 368

1   South Carolina State Conference Of Naacp v. Alexander, Thomas C. Et Al

2   Andrew Theodore Fiffick (#5327918)

3                     E R R A T A   S H E E T

4   PAGE_____ LINE_____ CHANGE_____

5   _____

6   REASON_____

7   PAGE_____ LINE_____ CHANGE_____

8   _____

9   REASON_____

10  PAGE_____ LINE_____ CHANGE_____

11  _____

12  REASON_____

13  PAGE_____ LINE_____ CHANGE_____

14  _____

15  REASON_____

16  PAGE_____ LINE_____ CHANGE_____

17  _____

18  REASON_____

19  PAGE_____ LINE_____ CHANGE_____

20  _____

21  REASON_____

22

23  _____    _____

24  Andrew Theodore Fiffick                        Date

25

Page 369

1    South Carolina State Conference Of Naacp v. Alexander, Thomas C. Et Al

2    Andrew Theodore Fiffick (#5327918)

3                      ACKNOWLEDGEMENT OF DEPONENT

4         I, Andrew Theodore Fiffick, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____     _____

12   Andrew Theodore Fiffick                         Date

13   *If notary is required

14                      SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                      _____ DAY OF _____, 20___.

16

17

18                      _____

19                      NOTARY PUBLIC

20

21

22

23

24

25

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400