# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
### COLUMBIA DIVISION

| | |
|---|---|
| THE SOUTH CAROLINA STATE CONFERENCE OF THE NAACP, and<br><br>TAIWAN SCOTT, on behalf of himself and all other similarly situated persons,<br><br>       Plaintiffs,<br><br>       v.<br><br>THOMAS C. ALEXANDER, in his official capacity as President of the Senate; LUKE A. RANKIN, in his official capacity as Chairman of the Senate Judiciary Committee; JAMES H. LUCAS, in his official capacity as Speaker of the House of Representatives; CHRIS MURPHY, in his official capacity as Chairman of the House of Representatives Judiciary Committee; WALLACE H. JORDAN, in his official capacity as Chairman of the House of Representatives Elections Law Subcommittee; HOWARD KNAPP, in his official capacity as interim Executive Director of the South Carolina State Election Commission; JOHN WELLS, Chair, JOANNE DAY, CLIFFORD J. EDLER, LINDA MCCALL, and SCOTT MOSELEY, in their official capacities as members of the South Carolina Election Commission,<br><br>       Defendants. | **Case No. 3-21-cv-03302-MGL-TJH-RMG**<br><br><br>**THREE-JUDGE PANEL**<br><br><br>**PLAINTIFFS' MOTION IN LIMINE TO PRECLUDE DEFENDANTS FROM INTRODUCING EVIDENCE OR ARGUMENT SUPPORTING A RATIONALE FOR CONGRESSIONAL MAP BASED ON VOTING RIGHTS ACT COMPLIANCE** |

## INTRODUCTION

Plaintiffs move to preclude Defendants from arguing or introducing evidence in support of the notion that Senate Bill 865 ("S. 865") can withstand constitutional strict scrutiny because it complies with Section 2 of the Voting Rights Act ("VRA")'s nationwide ban on prohibited vote dilution. There is no record that South Carolina's General Assembly made any assessment during the legislative process of whether prohibited vote dilution was occurring or would occur with S. 865. Instead, key legislators and staff operated under the misunderstanding that they must only defend against a Section 2 challenge rather than proactively take steps to ensure compliance with it. Nor have DefeFndants offered Section 2 compliance as an affirmative defense in their answers to Plaintiffs' Third Amended Complaint or their Motion for Summary Judgment. Defendants should therefore not be able offer any purported Section 2 compliance to justify S. 865's infirmities at trial.[1]

## LEGAL STANDARD

Under Federal Rule of Evidence ("Rule") 401, evidence is relevant at trial if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." *See also* Fed. R. Evid. 402, Advisory Committee Notes ("[E]vidence which is not relevant is not admissible."). Rule 403 then gives the Court discretion to exclude relevant evidence if "its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting of time, or needlessly presenting cumulative evidence." The Rule 403 analysis requires courts to

---

[1] Pursuant to Local Rule 7.02, Plaintiffs state that the Parties, prior to this filing, met and conferred in good faith on September 1, 2022. The Parties were unable to resolve the issues raised in this motion.

examine whether the introduction of certain evidence would be "distracting" to the "search for truth." *Doali-Miller v. SuperValu, Inc.*, 855 F. Supp. 2d 510, 522 (D. Md. 2012).

## ARGUMENT

Plaintiffs' unconstitutional racial gerrymandering and intentional discrimination claims require an assessment of the State's underlying interest in passing its congressional map. Concerning Plaintiffs' first claim, racial gerrymandering occurs when "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Bethune-Hill v. Virginia State Bd. of Elections*, 580 U.S. 178, 137 S. Ct. 788, 797 (2017) (internal citations and quotations omitted). Race predominates when "the legislature subordinate[s] traditional race-neutral districting principles to racial considerations." *Id.* Once Plaintiffs demonstrate that racial considerations were a predominate factor in drafting the congressional map, "[t]he burden [] shifts to the State to prove that its race-based sorting of voters serves a 'compelling interest' and is 'narrowly tailored' to that end." *Cooper v. Harris*, 137 S. Ct. 1455, 1464 (2017) (quoting *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 137 S. Ct. at 800–801 (2017)). The U.S. Supreme Court has assumed that compliance with Section 2 can constitute a compelling state interest. *See*, *e.g.*, *Bethune-Hill,* 580 U.S. at 801; *Shaw v. Hunt,* 517 U.S. 899, 915 (1996); *Bush v. Vera*, 517 U.S. 952, 990-91 (1996) (O'Connor, J., concurring). The Supreme Court has also assumed that a State's consideration of race in making a districting decision is narrowly tailored and thus satisfies strict scrutiny if the State has "good reasons" for believing that its decision is necessary to comply with the VRA. *Cooper*, 137 S. Ct. at 1464.

For Plaintiffs' intentional racial discrimination claim, once Plaintiffs demonstrate that race was *a* motivating factor after weighing the factors laid out in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), "the burden [] 'shifts to the law's defenders to demonstrate that the law would have been enacted without this factor.'" *N.C. State*

*Conf. of NAACP v. McCrory*, 831 F.3d 204, 233 (4th Cir. 2016) (quoting *Hunter v. Underwood*, 471 U.S. 222, 228 (1985)). "A court assesses whether a law would have been enacted without a racially discriminatory motive by considering the substantiality of the state's proffered non-racial interest and how well the law furthers that interest." *Id.* at 233–34.

The General Assembly's predominate consideration of race over race-neutral redistricting principles to draw congressional districts in S. 865 was not narrowly tailored to a compelling governmental interest such as complying with the VRA. Indeed, there is no indication that the General Assembly: a) attempted to draw an additional, illustrative district comprised of a majority of geographically compact minority voters (beyond Congressional District 6 that historically has been the only such district); b) conducted a racially polarized voting ("RPV") analysis; or c) considered any other evidence in the totality of circumstances to assess whether South Carolina's redistricting plan provided an equal opportunity for Black voters to elect candidates of their choice.[2]

---

[2] As Plaintiff South Carolina NAACP warned South Carolina's legislature during the 2021 redistricting process, Section 2 "requires states, under certain circumstances, to draw districts that provide minority voters with an effective opportunity to elect their preferred candidates ('effective minority opportunity districts')." **Exhibit 1**, S.C. NAACP Letter (Oct. 8, 2021) (SCSENATE_00024959) at 4. And "[t]o fulfill that obligation," the legislature "must conduct a sensitive and 'an intensely local appraisal' of the 'totality of the circumstances,' under a 'functional view of the political process.'" *Id.* (citing *Thornburg v. Gingles*, 478 U.S. 30, 45, 79 (1986)) (internal quotation marks and citation omitted)).

*Gingles* has three preconditions for establishing liability, if: (1) a district can be drawn in which the minority community is sufficiently large and geographically compact to constitute a majority; (2) the minority group is politically cohesive; and (3) in the absence of a majority-minority district, candidates preferred by the minority group would usually be defeated due to the political cohesion of non-minority voters for their preferred candidates. *Gingles*, 478 U.S. at 30. After establishing these preconditions, a "totality of circumstances" analysis determines whether minority voters "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b).

Andrew Fiffick, Chief of Staff and Director of Research for the Senate Judiciary Committee, who testified that he was one of the core members of Senate legislative staff who was involved in congressional redistricting, was not aware that anyone attempted to draw a second majority-Black district. **Exhibit 2**, A. Fiffick Dep. (July 21, 2022) at 253:14-18 ("Q. But you are not aware of anyone affirmatively attempting to draw an additional majority black district? A. No. I don't recall ever doing that, no."); *see also id*. at 112:14–20; *id.* at 252:8–253:13. Indeed, the record evidence reflects that House and Senate Defendants sought to maintain the same number of majority-minority districts (i.e., one, in its 2021 congressional map as in its 2011 benchmark map (one)). *See*, *e.g*., *id.* at 256:17–23 ("Q. Did you set out to preserve the name number of majority-minority districts in the initial Staff Plan as existed in the 2011 Staff Plan? A. Because it was a least change map plan, I think that was sort of the necessary result that came about.").[3]

Additionally, various legislators and staff admitted that the General Assembly did not conduct a RPV analysis, despite the public and Senator Harpootlian, in particular, urging it to do so and having the data to do so, during the redistricting process. **Exhibit 3**, Senate Jud. Comm.

---

[3] This admission about maintaining the same number of majority-minority districts absent a functional analysis of that need raises another concern under the Supreme Court's racial gerrymandering precedent. *See*, *e.g.*, *Ala. Legislative Black Caucus v. Alabama*, 575 U.S. 254, 275–78 (2015) (holding that the VRA does not require districts to have "a particular numerical minority percentage," but concerns itself rather with "a minority's ability to elect a preferred candidate of choice"); *see also Bethune-Hill*, 137 S. Ct. at 797–802 (finding that the Virginia General Assembly conducted a functional analysis to establish that a 55% Black-voting age population threshold was appropriate in only one of 12 challenged districts, and remanding for further deliberations on the other 11 districts); *Bethune-Hill v. Va. State Bd. of Elections*, 326 F. Supp. 3d 128, 180 (E.D. Va. 2018) (emphasis in original) (on remand from the Supreme Court, ruling that 11 legislative districts were unconstitutional racial gerrymanders because "the legislature did not undertake *any* individualized functional analysis in [those] districts to provide 'good reasons to believe' that the 55% threshold was appropriate," as the narrow-tailoring component of strict scrutiny requires).

Tr. (Jan. 19, 2022) (SCNAACP_CD_006846) at 32:13–17; **Exhibit 4**, W. Jordan Dep. at 285:24–286:5, 397:13–15.[4]

In the context of this case, deposition testimony from Mr. Fiffick, Mr. Charlie Terreni, Senate Redistricting Counsel, and several legislators and other staff makes this fact abundantly clear. For example, Mr. Terreni explained:

> Q. But you are not aware of whether a racially polarized voting analysis was conducted or are you aware whether racially polarized voting analysis was conducted by the Senate as maps were being developed for Congress?
>
> A. I am not aware that a racially polarized voting analysis was conducted by the Senate as maps were being developed for Congress. I have no knowledge of such a thing and I don't believe it occurred.
>
> Q. Are you aware whether the public or legislative members asked for racially polarized voting analysis to be conducted while congressional maps were being considered?
>
> A. I'm aware that some members of the public and one member of the general assembly, at least, Senator Harpootlian, asked or suggested that it should be done.
>
> Q. And do you know whether that was acted upon?
>
> A. Yeah. I know it wasn't.
>
> Q. Who made the decision not to act upon those requests?
>
> A. The [Senate] subcommittee.

**Exhibit 5**, C. Terreni Dep. (Aug. 16, 2022) at 243:25–245:6; *see also* **Exhibit 6**, T. Hauger Dep. (June 28, 2022) at 86:10–15 ("Q. Was there any, to your knowledge, RPV analysis at all conducted for any map that you worked on during the Congressional redistricting cycle? A. To my knowledge, no."); **Exhibit 7**, W. Roberts Dep. (July 7, 2022) at 130:2-6 ("Q. And do you have any understanding on whether an RPV analysis is helpful for that determination? A. I don't know.

---

[4] Pursuant to the consent confidentiality order, House Defendants designated certain portions of Mr. Jordan's deposition as confidential. Plaintiffs noted their objections. Plaintiffs are attaching blank, placeholder version of Exhibit 4 and sending a true version of the relevant deposition transcript pages to the Court via email for *in camera* review.

I've never conducted a racially polarized voting analysis."); **Exhibit 2**, A. Fiffick Dep. at 163:2–7 ("Q. Do you have any basis to believe that racially polarized voting exists in South Carolina? A. I haven't considered it. I've done no analysis. There's nothing I have that I can tell you is dispositive of that or not. We didn't do that."), 164:18–165:7, and 253:23–254:4 ("Q. Was a racially polarized voting analysis conducted during consideration of this initial Staff Plan? A. No. Not to my knowledge, no.").

A RPV analysis considers whether there is a pattern of voting along racial lines in which voters of the same race tend to support the same candidates, which usually differs from the candidates supported by voters of a different race. This is the key consideration in determining whether a redistricting plan dilutes the vote of racial minority voters. *McCrory*, 831 F.3d at 221 (noting that RPV is "[O]ne of the critical background facts of which a court must take notice" in Section 2 cases); *Collins v. City of Norfolk, Va.*, 816 F.2d 932, 936–38 (4th Cir. 1987) (emphasizing that RPV is a "cardinal factor[]" that "weigh[s] very heavily" in determining whether redistricting plans violate Section 2 by denying Black voters equal access to the political process). During the legislative process, the SC NAACP urged that a RPV (and other analyses) were necessary to determine whether the high Black voting-age populations ("BVAPs") present in the districts that pack Black voters were necessary to comply with the VRA or whether cracking Black voters at BVAPs too low would render their votes essentially meaningless in the presence of RPV. *See*, *e.g*., **Exhibit 1**, S.C. NAACP Letter at 4.

The legislative sponsors and key staff also conceded that they failed to consider the history of voting discrimination and other indicia of equal opportunity to participate for Black voters in congressional redistricting. **Exhibit 7**, W. Roberts Dep. at 107:15–20; **Exhibit 6**, T. Hauger Dep. at 37:16-38:9; **Exhibit 3**, W.. Jordan Dep. at 374:9–375:11.

8

During the redistricting cycle and discovery in this case, the legislative sponsors and key staff contend that they are not obliged to consider Section 2 compliance until such time as they are sued for violating it.  Take one example from Senate floor debate:

> SENATOR HARPOOTLIAN: Okay. Was there any racial bloc voting analysis done? If so, by who?  Was there an expert?  Typically, they're experts involved. Was there any racial bloc voting analysis done in the – in compiling this plan?

> SENATOR CAMPSEN: Well, that's not for – that's something that would happen if and when a plan is litigated.  As far as that analysis that – I'm not aware of that being done here, but that's something that – that would be what a – a plaintiff, if they were to file suit against this, would – would provide and argue.

*See, e.g.*, **Exhibit 8**, Senate Jud. Comm. Tr. (Jan. 19, 2022) (SCNAACP_CD_013197) at 32:13–24; **Exhibit 5**, C. Terreni Dep. at 246:14–247:21.  While incorrect in their understanding of their obligation,[5] Defendants willfully refusing to conduct a Section 2 analysis, including of RPV, demonstrates that their use of race in drawing the challenged districts was not for the purpose of VRA compliance.  Defendants should be prohibited from relying on any purported Section 2 compliance at trial as a basis to justify S. 865.[6]

## <u>CONCLUSION</u>

For the reasons stated above, Plaintiffs' motion in limine should be granted.

---

[5] *See Guidance under Section 2 of the Voting Rights Act, 52 U.S.C. 10301, for Redistricting and Methods of Electing Government Bodies*, U.S. Dept. of Justice (Sept. 1, 2021), https://redist.legis.la.gov/2020_Files/MtgFiles/Guidance%20under%20Section%202%20of%20t he%20Voting%20Rights%20Act,%2052%20U.S.C.%2010301,%20for%20redistricting%20and %20methods%20of%20electing%20government%20bodies.pdf (the U. S. Department of Justice's guidance on evaluating jurisdictions' compliance with Section 2).

[6] House and Senate Defendants also do not raise a Section 2 compliance affirmative defense in their answers. *See* ECF 301 & 302.

9

Dated:  September 2, 2022

Leah C. Aden**
Stuart Naifeh**
Raymond Audain**
John S. Cusick**
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector St, 5th Fl.
NY, NY 10006
Tel.: (212) 965-7715
laden@naacpldf.org

/s/ Santino Coleman
Santino Coleman*** Fed. ID. 11914
Antonio L. Ingram II**
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
700 14th St, Ste. 600
Washington, D.C. 20005
Tel.: (202) 682-1300
aingram@naacpldf.org

Adriel I. Cepeda Derieux**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: (212) 549-2500
acepedaderieux@aclu.org

John A. Freedman**
Elisabeth S. Theodore*
Adam Pergament**
Gina M. Colarusso**
John M. Hindley**
ARNOLD & PORTER KAYE SCHOLER
LLP
601 Massachusetts Ave., N.W.
Washington, D.C. 20001
Tel: (202) 942-5000
john.freedman@arnoldporter.com

*Motion for admission Pro Hac Vice
forthcoming
**Admitted Pro Hac Vice

Respectfully Submitted,

Christopher J. Bryant, Fed. ID 12538
BRYANT LEGAL, LLC
126 W. Henrietta St.
Baltimore, MD 21230
Tel.: (843) 779-5444
chris@bryant.legal.com

Somil B. Trivedi**
Patricia Yan**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th St., NW
Washington, DC 20005
Tel.: (202) 457-0800
strivedi@aclu.org

Allen Chaney, Fed. ID 13181
AMERICAN CIVIL LIBERTIES UNION
OF SOUTH CAROLINA
Charleston, SC 29413-0998
Tel.: (843) 282-7953
Fax: (843) 720-1428
achaney@aclusc.org

Jeffrey A. Fuisz**
Paula Ramer**
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
Tel: (212) 836-8000
jeffrey.fuisz@arnoldporter.com

Sarah Gryll**
ARNOLD & PORTER KAYE SCHOLER LLP
70 West Madison Street, Suite 4200
Chicago, IL 60602-4231
Tel: (312) 583-2300
sarah.gryll@arnoldporter.com

*Counsel for Plaintiffs the South Carolina
Conference of the NAACP and Taiwan Scott*

10

*** *Mailing address only (working
remotely from South Carolina)*

Janette M. Louard*
Anthony P. Ashton*
Anna Kathryn Barnes**
NAACP OFFICE OF THE GENERAL
COUNSEL
4805 Mount Hope Drive
Baltimore, MD 21215
Tel: (410) 580-5777
jlouard@naacpnet.org

* Motion for admission *Pro Hac Vice*
forthcoming
** Admitted *Pro Hac Vice*

*Counsel for Plaintiff the South Carolina
Conference of the NAACP*

11

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 2, 2022, a true and correct copy of the foregoing was served on all counsel of record by electronic mail.

<u>/s/ Santino Coleman</u>
Santino Coleman
