*SC NAACP v. Alexander,*
D.S.C. Case No. 3:21-cv-03302-MGL-TJH-RMG

# Exhibit 1

   

October 8, 2021

*Sent via email*

Senate Judiciary Redistricting Subcommittee
South Carolina Legislature
101 Gressette Senate Office Building
Columbia, SC 29202
redistricting@scsenate.gov

    **Re:    Submitting Proposed Congressional and Senate Maps**

Dear Chair Rankin and Subcommittee Members:

    The NAACP Legal Defense and Educational Fund, Inc., American Civil Liberties Union ("ACLU"), South Carolina State Conference of the NAACP ("SC NAACP"), which has 77 branches and over 13,000 members throughout South Carolina, and ACLU of South Carolina, write to submit Congressional and state Senate redistricting plans that are illustrative of ways this Subcommittee may comply with its affirmative constitutional and statutory obligations and other guiding redistricting principles.

    As we conveyed in our letters on August 2, 2021, and September 27, 2021, this Subcommittee must, at minimum, meet its baseline affirmative obligations to comply with the U.S. Constitution and Section 2 of the Voting Rights Act ("VRA") when developing redistricting plans.[1] In satisfying these obligations, officials must ensure that *all* South Carolinians have equal access to representation, and, that the voting strength of South Carolina's racial minority voters is not illegally diluted or otherwise illegally minimized. To these ends, as described below, our proposed plans comply with the one-person, one vote

---

[1]    Letter from LDF, et al., to the S.C. Senate Judiciary's Redistricting Subcommittee (Sept. 27, 2021), https://www.naacpldf.org/wp-content/uploads/Follow-Up-Letter-to-SC-Senate-Redistricting-Subcommittee.9.27.2021_final.pdf; Letter from LDF, et al., to the S.C. Senate Judiciary Redistricting Subcommittee (Aug. 2, 2021), https://www.naacpldf.org/wp-content/uploads/Letter-to-South-Carolina-Senate-Judiciary-Redistricting-Subcommittee-8-2-21.pdf.

principle under the U.S. Constitution, and Section 2 of the VRA ban on racial discrimination in voting.

Equally important, we also write to reiterate our grave concerns that this body is ill-prepared to ensure a transparent process for considering maps that meaningfully reflect public input during *all* stages of the redistricting cycle.

## I. This Subcommittee Must Ensure Compliance with the U.S. Constitution and Section 2 of the Voting Rights Act.

As explained in our previous letters, this Subcommittee must ensure that any maps it adopts comply with the "One Person, One Vote" mandate of the Fourteenth Amendment's Equal Protection Clause, which requires states to ensure equal access to representation at all levels of government,[2] as well as Section 2's "nationwide ban on racial discrimination in voting."[3]

### A. Fulfilling the "One Person, One Vote" Requirement

Concerning congressional redistricting plans, as explained in our previous correspondence, districts must generally attain equality of population "as nearly as practicable."[4] State legislative bodies such as the South Carolina Senate may have population deviations within plus or minus five percent of the mathematical mean.[5] These requirements are intended to ensure both equal

---

[2] *Reynolds v. Sims*, 377 U.S. 533, 565–68 (1964); *id.* at 558 (quoting *Gray v. Sanders*, 372 U.S. 368, 381 (1963)) ("The conception of political equality from the Declaration of Independence, to Lincoln's Gettysburg Address, to the Fifteenth, Seventeenth, and Nineteenth Amendments can mean only one thing—one person, one vote."); *see* U.S. Const. amend. XIV, § 1 ("No State shall . . . deny to any person within its jurisdiction the equal protection of the laws.").

[3] *Shelby Cty., Ala. v. Holder*, 570 U.S. 529, 557 (2013); 52 U.S.C. § 10301(a) ("No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied . . . in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . .").

[4] *Wesberry v. Sanders,* 376 U.S. 1, 8 (1964); *Karcher v. Daggett,* 462 U.S. 725, 730–31 (1983) (holding that congressional districts must be mathematically equal in population, unless a deviation from that standard is necessary to achieve a legitimate state objective).

[5] *See Reynolds*, 377 U.S. at 568 ("The Equal Protection Clause demands no less than substantially equal state legislative representation for all citizens, of all places as well as of all races."); *see also Gaffney v. Cummings,* 412 U.S. 735, 744–45 (1973) ("minor deviations from mathematical equality among state legislative districts" are not constitutionally suspect, but "larger variations from substantial equality are too great to be justified by any state interest"); *Brown v. Thomson,* 462 U.S. 835, 842 (1983) (holding that apportionment plans with a maximum population deviation among districts of less than 10% are generally permissible, whereas disparities in excess of 10% most likely violate the "one person, one vote" principle).

2

electoral power for all voters and equal access to representation for all people throughout a state.[6]

The 2020 Census shows that South Carolina's total population is now 5,118,425 people.[7] Based on this number, the State has been apportioned seven seats in the U.S. House of Representatives.[8] Each congressional district must contain approximately one-seventh of the State's population, or approximately 731,204 people, to the extent practicable. Due to population changes, South Carolina's existing seven congressional districts, drawn after the 2010 Census, are now malapportioned and must be corrected. Of note, Congressional District ("CD") 6 is significantly underpopulated, while CD 1 is significantly overpopulated. As currently drawn, both rank among the most malapportioned congressional districts in the nation. Specifically, CD 6 has 646,463 people, which is 11.6% (84,741 people) smaller than ideal size, making it the 9th most underpopulated district in the country in percentage terms; meanwhile, CD 1 has 818,893 people, which is 12.0% larger (or 87,689 people more) than ideal size, making it the 28th most overpopulated district.[9]

Population deviations that may run afoul of the U.S. Constitution are also present in many of the existing 46 districts for the South Carolina Senate.[10] To be presumptively constitutional, the populations of these districts may not deviate from each other by more than 10% (*i.e.*, plus or minus 5 percentage

---

[6] *See Reynolds*, 377 U.S. at 567–68; *see also Kirkpatrick v. Preisler*, 394 U.S. 526, 531 (1967) (explaining that "[e]qual representation for equal number of people is a principle designed to prevent debasement of voting power and diminution of access to elected representatives."); *accord Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 137 (1961); *see also Garza v. County of Los Angeles*, 918 F.2d 763, 775 (9th Cir. 1990) (explaining how all residents have a "right to petition their government for services" and "[i]nterference with individuals' free access to elected representatives impermissibly burdens their right to petition the government").

[7] U.S. Census Bureau, *Table 2. Resident Population for the 50 States, the District of Columbia, and Puerto Rico: 2020 Census* (Apr. 26, 2021), https://www2.census.gov/programs-surveys/decennial/2020/data/apportionment/apportionment-2020-table02.pdf.

[8] U.S. Census Bureau, *Table 1. Apportionment Population and Number of Representatives by State: 2020 Census* (Apr. 26, 2021), https://www2.census.gov/programs-surveys/decennial/2020/data/apportionment/apportionment-2020-table01.pdf.

[9] Daily Kos, *Congressional District Population: Current vs. Ideal*, (Aug. 16, 2021), https://docs.google.com/spreadsheets/d/1VsWXBX_cVFcfaxHdlAMzzhJYRWgayzWxsJ3rdOlO-24/edit#gid=1761243994 (last visited Sept. 20, 2021).

[10] *See* S.C. Code § 2-1-70 (describing these districts as they were drawn following the 2010 Census).

3

points from the mathematical mean).[11] Based on 2020 Census data, numerous Senate districts exceed the presumptively permissible range of population deviation; some do so by substantial margins.[12] Any map this Subcommittee adopts must address these apportionment issues, as our illustrative maps, discussed below, do.

### B. Complying with Section 2 of the Voting Rights Act

Additionally, in fashioning redistricting plans both for South Carolina's congressional delegation and for the South Carolina Senate, this Subcommittee has an obligation under Section 2 of the VRA to ensure that, under the totality of circumstances, racial minority voters, such as Black South Carolinians, have an equal opportunity to participate in the electoral process and to elect representatives of their choice.[13]

Section 2 therefore requires states, under certain circumstances, to draw districts that provide minority voters with an effective opportunity to elect their preferred candidates ("effective minority opportunity districts"). To fulfill that obligation, this Subcommittee must conduct a sensitive and "an intensely local appraisal" of the "totality of the circumstances," under a "functional view of the political process."[14] This entails attention not only to the demographic composition of districts, but also to other factors such as "participation rates and the degree of cohesion and crossover voting."[15] Sometimes, but not always, such effective minority opportunity districts will be single-member districts

---

[11]     *See Brown*, 462 U.S. at 842.

[12]     *See* S.C. Senate Judiciary Redistricting Subcomm., *South Carolina Senate Districts*, https://redistricting.scsenate.gov/census.html (select "South Carolina Senate Districts" under the heading "2020 Population Statistics") (last visited Sept. 17, 2021).

[13]     52 U.S.C. § 10301(b); *Colleton Cty. Council v. McConnell*, 201 F. Supp. 2d 618, 632 (D.S.C. 2002) (quoting *Thornburg v. Gingles,* 478 U.S. 30, 47 (1986)) ("[Section] 2 prohibits the implementation of an electoral law that 'interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives.'"); *see also LULAC v. Perry,* 548 U.S. 399, 425 (2006) (describing the operation of the "totality of the circumstances" standard in the vote-dilution claims).

[14]     *Gingles,* 478 U.S. at 79, 45 (internal quotation marks and citation omitted).

[15]     Bernard Grofman, Lisa Handley, David Lublin, *Drawing Effective Minority Districts: A Conceptual Framework and Some Empirical Evidence*, 79 N.C. L. Rev. 1383, 1415 (2001); *see also id.* at 1415–16 ("South Carolina is a particularly useful state in which to examine participation rates by race as the state actually collects this data—there is no need to estimate black and white registration or turnout rates.").

4

comprised of a majority of Black voters ("majority-minority").[16] Thus, in drawing effective minority opportunity districts, this Subcommittee must not mechanically employ demographic thresholds. Nor must it minimize Black voters' electoral strength by "packing" Black voters into districts with unnecessarily high Black populations or by "cracking" them into districts with insufficient populations to provide Black voters with an opportunity to elect their preferred candidates. Doing either would likely violate Section 2 and the U.S. Constitution.[17]

At minimum, any maps that this Subcommittee adopts must preserve any effective U.S. congressional and state Senate districts that are VRA-compliant. And this Subcommittee should consider whether additional effective opportunity districts are possible. The Black populations in effective districts such as CD 6 and in certain Senate districts must not be cracked to dilute the effective voting power of Black communities in violation of Section 2. But at the same time, they also must not be artificially inflated beyond what is necessary for VRA compliance, which could violate the U.S. Constitution. Finally, this body must endeavor to ensure the efficacy and fairness of other districts for Black voters in all other circumstances. Indeed, as you have seen—and will continue to see, in hearing necessary additional testimony by community members—this is a paramount concern for your constituents. The maps proposed by the signatories, discussed below, satisfy all these requirements and goals.

Moreover, according to the 2020 Census, Black South Carolinians are approximately 27% of the State's total population and approximately 28.6% of the State's voting-age population.[18] An important, but not dispositive, factor under Section 2 is whether "minority voters form effective voting majorities in

---

[16]     *See, e.g., Cooper v. Harris*, 137 S. Ct. 1455, 1472 (2017) (rejecting the argument that "whenever a legislature can draw a majority-minority district, it must do so," because there are circumstances in which "a crossover district would also allow the minority group to elect its favored candidates.").

[17]     *Ala. Leg. Black Caucus v. Alabama*, 575 U.S. 254, 278 (2015); *Bethune-Hill v. Va. State Bd. of Elections*, 137 S. Ct. 788, 802 (2017) (finding 12 districts were unconstitutional racial gerrymanders because the legislature decided to make them all meet a 55% BVAP target for which there was no strong basis in evidence).

[18]     U.S. Census Bureau, Decennial Census (2020), South Carolina.

5

CONFIDENTIAL     SCSENATE_00024963

a number of districts roughly proportional to the minority voters' respective shares in the voting-age population."[19]

As noted above, an assessment of effective minority voting opportunity is a complex, fact-intensive analysis. But we offer a few observations about Black representation under the current Congressional and Senate redistricting plans below.

First, although the race of elected officials does not necessarily correlate to voter preference, the U.S. Supreme Court has held that one of the "predominant" factors under Section 2 is "the extent to which members of the minority group have been elected to public office in the jurisdiction."[20] At present, only one out of seven members (14.3%) of South Carolina's Congressional delegation is Black. In the Senate, only 11 out of 46 members (23.9%) are Black.

Second, while demographic thresholds by themselves are not determinative of whether districts afford minority voters an effective opportunity to elect their preferred candidates, we provide the following information regarding current districts comprised of a majority of Black voters in South Carolina. Under the existing congressional plan, Black voters make up the majority in only one of South Carolina's seven congressional districts (14.3% of districts): CD 6. Under the current Senate redistricting plan, Black voters are the majority in four of 41 Senate districts (8.7% of districts): Districts 19, 21, 30, and 32.

## II. Additional Considerations Relevant to the Proposed Maps

Determining whether a given district's demographic composition will provide Black voters' equal access to the electoral process, as the U.S. Supreme Court noted in 2017, "is a difficult task, requiring, in the view of the Department of Justice, a 'functional analysis of the electoral behavior within the particular.

---

[19]     *Johnson v. De Grandy,* 512 U.S. 997, 1000 (1994).

[20]     *Gingles,* 478 U.S. at 37.

6

CONFIDENTIAL                                                                                                          SCSENATE_00024964

. . election district.'"[21] The U.S. Constitution demands an analysis that is no less nuanced and comprehensive.[22]

To these ends, the analyses underlying our submission development includes, but is not limited to, a review of:

- 2020 Census data, including racial demographic data;

- recent statewide and county-level voting patterns, including racially polarized voting patterns;

- how past and newly proposed districts may perform for voters;

- communities of interest and other redistricting principles like contiguity, compactness, and any incumbent protection; and,

- incorporation of community members' feedback.

In doing so, assessing and developing our plans required analyses that are fact- and context-specific, which is equally necessary for this Subcommittee's assessment and creation of any redistricting plans. Any redistricting following the 2020 Census, in short, must be conducted with an awareness of all appropriate indicia of the ability of Black voters and other voters to participate equally.[23]

---

[21] *Bethune-Hill v. Virginia State Bd. of Elections*, 137 S. Ct. 788, 801, 197 L. Ed. 2d 85 (2017) (quoting Guidance Concerning Redistricting Under Section 5 of the Voting Rights Act, 76 Fed. Reg. 7471 (2011)).

[22] *Id.* at 800 (in racial gerrymandering cases under the Fourteenth Amendment's Equal Protection Clause, "[a] holistic analysis is necessary to give [the] evidence its proper weight"); *Bethune-Hill v. Virginia State Bd. of Elections*, 326 F. Supp. 3d 128, 177 (E.D. Va. 2018) (holding that the "lack of an individualized assessment is strong evidence" that a legislature's use of race as a predominant consideration in redistricting was not narrowly tailored to achieve a compelling state interest); *Reynolds,* 377 U.S. at 578-79 (explaining relevant considerations for assessing compliance with the Constitution's equal-population mandate).

[23] *See Cooper*, 137 S. Ct. 1455 (affirming the Middle District Court of North Carolina's judgment that racial considerations predominated in the design of two districts, citing, among other things, uncontested evidence that mapmakers worked to ensure that Black voters remain in the voting minority).

7

Any racial bloc voting, for example, is one such consideration that we have reminded this Subcommittee it must consider and take into account.[24] As a general matter, racial bloc voting continues to exist in various elections in South Carolina.[25] That is, there is a continued pattern in statewide and other elections of white-preferred candidates defeating Black-preferred candidates, despite some white voter support for Black voters' candidates of choice. For example, according to our analysis of the 2020 election for U.S. Senate, Jaime Harrison, the candidate of choice of Black voters across South Carolina, received only 25% of white voter support and was defeated, despite receiving 98% of Black voter support. Similar statewide patterns have existed in elections featuring Black-preferred candidates in other key elections, such as in 2018 elections for the Secretary of State and State Treasurer.[26] Based on our analyses, similar patterns also exist at the county-level in many parts of the state.

Any drawing of district lines in South Carolina must also be conducted with an awareness of the State's long history and ongoing record of racial discrimination. South Carolina's 1895 Constitution "was a leader in the widespread movement to disenfranchise [eligible Black citizens]."[27] Until 1965,

---

[24] *Gingles*, 478 U.S. at 48 n.15; *see also De Grandy*, 512 U.S. at 1007 (explaining that racially polarized voting increases the potential for discrimination in redistricting, because "manipulation of district lines can dilute the voting strength of politically cohesive minority group members*"); N. Carolina State Conf. of NAACP v. McCrory*, 831 F.3d 204, 221 (4th Cir. 2016) (noting that racially polarized voting is "[o]ne of the critical background facts of which a court must take notice" in Section 2 cases); *Collins v. City of Norfolk, Va.*, 816 F.2d 932, 936–38 (4th Cir. 1987) (emphasizing that racially polarized voting is a "cardinal factor[]" that "weigh[s] very heavily" in determining whether redistricting plans violate Section 2 by denying Black voters equal access to the political process).

[25] *See, e.g., Colleton Cty. Council*, 201 F. Supp. 2d at 643 ("Voting in South Carolina continues to be racially polarized to a very high degree . . . in all regions of the state and in both primary elections and general elections."); *see also, e.g., United States v. Charleston Cty., S.C.*, 365 F.3d 341, 350 (4th Cir. 2004) (county voting "is severely and characteristically polarized along racial lines"); *Jackson v. Edgefield Cty., S.C. Sch. Dist.*, 650 F. Supp. 1176, 1196 (D.S.C. 1986) (observing that "the outcome of each [election] could be statistically predicted and reasonably explained by the race of the voters"); *id.* at 1198 ("The tenacious strength of white bloc voting usually is sufficient to overcome an electoral coalition of black votes and white 'crossover' votes.").

[26] For example, in the 2018 election for Secretary of State, Melvin Whittenburg, the candidate of choice of Black voters across South Carolina, received only 23% of white voter support and was defeated, despite receiving 95% of Black voter support. In the 2018 election for State Treasurer, Rosalyn Glenn, the candidate of choice of Black votes across South Carolina, received only 21% of white voter support and was defeated, despite receiving 95% of Black voter support.

[27] *South Carolina v. Katzenbach*, 383 U.S. 301, 319 n.9 (1966).

8

the State enforced both a literacy test and a property test that were "specifically designed to prevent [Black people] from voting."[28] And after the Voting Rights Act's enactment in 1965, South Carolina promptly challenged the Act's constitutionality, continuing its historical practice of trying to deny equal voting rights to Black voters.[29] From 1972 to 2002, "discriminatory changes in voting practices or procedures in South Carolina" elicited over 120 objections from the U.S. Department of Justice,[30] including at least 27 objections in cases where a proposed state or local redistricting plan "ha[d] the purpose of or w[ould] have the effect of diminishing the ability of . . . citizens of the United States on account of race or color . . . to elect their preferred candidates of choice."[31] Of particular note, the State has consistently deployed discriminatory rules, practices, and redistricting schemes to deny Black voters equal access to the political process.[32] This history, as discussed in our previous correspondence, is especially relevant because the present redistricting cycle is the first in over 50 years in which Black South Carolina voters are unprotected by the Section 5 preclearance process.

As you continue to engage in the determinations necessary to the redistricting process, we submit, as Appendix 1 to this letter, correspondence during the present redistricting cycle between signatories and this body; as Appendix 2, two proposed congressional maps and associated statistical reports; and, as Appendix 3, a proposed Senate map and an associated statistical report for your consideration. We are providing shapefiles and block equivalency files

---

[28]    *Id.* at 310.

[29]    *See id.* at 307.

[30]    U.S. Department of Justice, *Voting Determination Letters for South Carolina*, https://www.justice.gov/crt/voting-determination-letters-south-carolina (last updated: Aug. 7, 2015) ("DOJ Objection Letters").

[31]    *Id.*; John C. Ruoff and Harbert E. Buhl, *Voting Rights in South Carolina 1982-2006*, Southern California Review of Law and Social Justice, Vol. 17(2) 643, 645, 655–57 (2008), https://weblaw.usc.edu/students/journals/rlsj/issues/assets/docs/issue_17/05_%20South_Carolina_Macro.pdf; *see* 52 U.S.C. § 10304(b).

[32]    Mark A. Posner, *Current Conditions of Voting Rights Discrimination*, The Leadership Conference on Civil and Human Rights (Aug. 16, 2021), http://civilrightsdocs.info/pdf/voting/vra/2021/VRAA-2021-StateReport-SouthCarolina.pdf; LDF, *Democracy Diminished: State and Local Threats to Voting Post Shelby County, Alabama v. Holder*, (last updated October 6, 2021), https://www.naacpldf.org/wp-content/uploads/Democracy-Diminished_-10.06.2021-Final.pdf; Ruoff, *supra* note 31; DOJ Objection Letters, *supra* note 30.

9

for these maps to the Subcommittee by email, as well as uploading the block equivalency files to the Subcommittee's online portal.[33]

These maps address the Fourteenth Amendment's equal-population mandate, consider Section 2 compliance, and are informed by South Carolina's voting patterns, history, and other relevant data and information.[34] Our goal in developing these maps is to ensure that all voters have access to representation and Black voting power is not diluted in the process.

### III. Transparency During the Redistricting Process

We view our proposed maps as the beginning, not the end, of this process. These are not the only conceivable maps that could satisfy the criteria outlined above; nor do they purport to incorporate the extensive community input that is necessary to drafting equitable maps. They are simply examples of maps that we believe merit this Subcommittee's due consideration.

The Senate must therefore continue to facilitate this work and solicit community feedback at all stages of the redistricting process. To meet these objectives, this Subcommittee must provide meaningful opportunities for the public to testify and provide public comments on maps proposed by this Subcommittee or others, emphasizing that the public must have an opportunity to respond to proposed maps *before* any such maps are finalized or approved.

Unfortunately, however, as we conveyed in our September 27 letter, this Subcommittee has failed to provide updates about its redistricting process moving forward, following the cancellation of its plans to reconvene on October 12 to take up redistricting.[35] While we appreciate this Subcommittee's email response on September 29, 2021 acknowledging our concerns, it did not provide

---

[33]    *See Plan Submission Form*, South Carolina Redistricting 2021 – Senate Judiciary Committee, https://redistricting.scsenate.gov/plansubmission.html (last visited Oct. 8, 2021).

[34]    While we believe that these maps are *sufficient* for compliance with Section 2, we make no representations as to whether the demographic percentages in any particular district in these draft maps are *necessary* for Section 2 compliance. An assessment of that question would require a more finely detailed analysis, including of racial polarization patterns, which we are unable to complete under the Senate's strict timelines for draft map submissions.

[35]    *See* Mem. from Harvey S. Peeler, Jr., President of the South Carolina Senate, to Members of the South Carolina Senate (Sept. 24, 2021) (on file with authors) (President Peeler announcing that "[t]he Senate's Judiciary's Redistricting Subcommittee has stated that they will not be ready for the Senate to debate redistricting until later this year," and that, as a result, "I am cancelling the Senate's Regular Session which was scheduled to begin October 12, 2021.").

10

CONFIDENTIAL                                                                                                                    SCSENATE_00024968

answers to when the Senate intends to return to session to consider redistricting plans or when this Subcommittee plans to submit proposed maps.[36] Nor did the response provide a meaningful answer to what steps, if any, the Senate has taken to ensure that its timeline for considering and approving maps will be sufficient to allow any litigation that may be filed to be fully resolved before the March 30, 2022 candidate filing deadline for the June 2022 partisan primaries.

Answers to these questions are necessary to ensure that this Subcommittee leave sufficient time for public and any judicial review. As we conveyed in our September 27 letter, if the Senate does not reconvene to consider and approve redistricting plans until December 2021 or January 2022, that unnecessary delay will likely impede a court from ruling on the constitutionality of your maps before the candidate filing deadline in March. Without time for sufficient judicial review, the court and the public are unnecessarily placed in the impossible position of leaving an unconstitutional plan in place or striking the plan down close to an election, which could breed voter "confusion and consequent incentive to remain away from the polls." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). In the 2010 redistricting cycle, for example, the federal district court for the District of South Carolina took nearly four months to adjudicate constitutional claims related to redistricting. *Backus v. South Carolina*, 857 F. Supp. 2d 553 (D.S.C.), *aff'd*, 568 U.S. 801 (2012). Similarly, during the 1990 and 2000 redistricting cycles, South Carolina federal court needed nearly six months to draw new plans after the State's political branches failed to enact new maps, leaving in place the old districts that violated the principle of one-person-one-vote. *Colleton Cty. Council*, 201 F. Supp. 2d at 618; *Burton v. Sheheen*, 793 F. Supp. 1329, 1337 (D.S.C. 1992), *vacated on other grounds*, 508 U.S. 968 (1993).

Transparency and robust public input are necessary to assist this Subcommittee with its affirmative obligations to comply with the U.S. Constitution, Section 2 of the Voting Rights Act, and other legal considerations and redistricting principles. Based on the law, South Carolina's recent history, and the Senate Redistricting Guidelines—which appropriately prioritize constitutional compliance[37]—the Senate should revisit its process immediately and ensure ample time for meaningful consideration and analysis, for the public

---

[36] Email from Paula G. Benson, Assistant Director of Research and Senior Staff Attorney, S.C. Judiciary Committee, to LDF, et al. (Sept. 29, 2021) (on file with authors).

[37] S.C. Senate Judiciary Comm., Redistricting Subcomm., *2021 Redistricting Guidelines* (Sept. 17, 2021), https://redistricting.scsenate.gov/docs/Senate%20Redistricting%20Guidelines%20Adopted%209-17-21.DOCX.

11

to digest its maps, and for courts to adjudicate any constitutional claims well in advance of the 2022 election cycle. In the meantime, we appreciate this Subcommittee's confirmation on September 29 that it intends to hold public hearings—at some undefined point—to receive comments on maps proposed by members of the public and this Subcommittee, as well as future Subcommittee meetings. But for reasons described above, this process and the release of the timeline must occur as soon as possible.

\*     \*     \*

Please feel free to contact Leah Aden, Deputy Director of Litigation at the Legal Defense Fund, at laden@naacpldf.org, and Somil Trivedi, Senior Staff Attorney at the ACLU, at strivedi@aclu.org, with any questions or to discuss these issues in more detail. We look forward to hearing from you soon and working together for the people of South Carolina.

Sincerely,

/s/ *Leah C. Aden*
Leah Aden, Deputy Director of Litigation
Stuart Naifeh, Manager of the Redistricting Project
Raymond Audain
John S. Cusick
Steven Lance
Evans Moore
Tonya Farrow-Chestnut
NAACP Legal Defense & Educational Fund, Inc.
40 Rector Street, 5th Fl.
New York, NY 10006

/s/ *Somil Trivedi*
Somil Trivedi, Senior Staff Attorney
Patricia Yan
Samantha Osaki
American Civil Liberties Union
125 Broad St.
New York, NY 10004

12

|  |  |
|---|---|
|  | */s/ Brenda Murphy*<br>Brenda Murphy, President<br>South Carolina State Conference of the NAACP<br>(803) 754-4584 |
|  | */s/ Allen Chaney*<br>Frank Knaack, Executive Director<br>Allen Chaney, Director of Legal Advocacy<br>American Civil Liberties Union of South Carolina<br>P.O. Box 20998<br>Charleston, SC 29413 |
| Cc (*via* email): | Sen. Harvey S. Peeler, Jr.<br>President, South Carolina Senate<br><br>Senate Sen. A. Shane Massey<br>Majority Leader, South Carolina Senate<br><br>Sen. Brad Hutto<br>Minority Leader, South Carolina Senate<br><br>Rep. Patricia Moore Henegan<br>Chair, South Carolina Legislative Black Caucus<br><br>Rep. Ivory Thigpen<br>Chair-Elect, South Carolina Legislative Black Caucus |
| Enc. (*via* email): | Appendix 1, Correspondence<br>Appendix 2, Proposed Congressional Maps<br>Appendix 3, Proposed Senate Map<br>Data Files |

CONFIDENTIAL                                                                                                         SCSENATE_00024971