*SC NAACP v. Alexander,*
D.S.C. Case No. 3:21-cv-03302-MGL-TJH-RMG

# Exhibit 2

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF SOUTH CAROLINA
 2                    COLUMBIA DIVISION
           CASE NO. 3:21-CV-03302-MBS-TJH-RMG
 3
    THE SOUTH CAROLINA STATE CONFERENCE OF
 4  THE NAACP, AND TAIWAN SCOTT, ON BEHALF
    OF HIMSELF AND ALL OTHER SIMILARLY
 5  SITUATED PERSONS,
 6               Plaintiffs,
 7        vs.
 8  THOMAS C. ALEXANDER, HENRY D. MCMASTER,
    IN HIS OFFICIAL CAPACITY AS GOVERNOR OF
 9  SOUTH CAROLINA; HARVEY PEELER, IN HIS
    OFFICIAL CAPACITY AS PRESIDENT OF THE
10  SENATE; LUKE A. RANKIN, IN HIS OFFICIAL
    CAPACITY AS CHAIRMAN OF THE SENATE
11  JUDICIARY COMMITTEE; JAMES H. LUCAS, IN
    HIS OFFICIAL CAPACITY AS SPEAKER OF THE
12  HOUSE OF REPRESENTATIVES; CHRIS MURPHY,
    IN HIS OFFICIAL CAPACITY AS CHAIRMAN OF
13  THE HOUSE OF REPRESENTATIVES JUDICIARY
    COMMITTEE; WALLACE H. JORDAN, IN HIS
14  OFFICIAL CAPACITY AS CHAIRMAN OF THE
    HOUSE OF REPRESENTATIVES ELECTIONS LAW
15  SUBCOMMITTEE; HOWARD KNABB, IN HIS
    OFFICIAL CAPACITY AS INTERIM EXECUTIVE
16  DIRECTOR OF THE SOUTH CAROLINA STATE
    ELECTION COMMISSION; JOHN WELLS, JOANNE
17  DAY, CLIFFORD J. ELDER, LINDA MCCALL,
    AND SCOTT MOSELEY, IN THEIR OFFICIAL
18  CAPACITIES AS MEMBERS OF THE SOUTH
    CAROLINA STATE ELECTION COMMISSION,
19
                 Defendants.
20
21  DEPOSITION OF:   ANDREW THEODORE FIFFICK
                     (Appearing via VTC)
22
    DATE:            July 21, 2022
23
    TIME:            10:10 a.m.
24
25
```

Page 2

1  LOCATION:         Robinson Gray, LLC
                     1310 Gadsden Street
2                    Columbia, South Carolina
3  TAKEN BY:         Counsel for the Plaintiffs
4  REPORTED BY:      KAREN M. ERNST, CSR
                     (Appearing via VTC)
5  _____
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 163

1  never known anybody who has done that.
2         Q.    Do you have any basis to believe that
3  racially polarized voting exists in South Carolina?
4         A.    I haven't considered it.  I've done no
5  analysis.  There's nothing I have that I can tell
6  you is dispositive of that or not.  We didn't do
7  that.
8         Q.    Like with respect to the 2020
9  presidential data, did you or other members of the
10 team developing congressional maps of legislators
11 have data to conduct racially polarizing voting
12 analyses?
13        A.    Again, since I don't know exactly how
14 you conduct one of those analyses, I don't know
15 whether we had sufficient information to do it.
16        Q.    You hired Will Roberts because you
17 believed that he had the expertise to develop maps
18 for the Senate; is that correct?
19        A.    Yes, ma'am.  He's a GIS operator, and
20 he's been drawing maps for 20 years or so.
21        Q.    And you hired Mr. Terreni and Mr. Gore
22 because you and members of the Senate collectively
23 believed that with their experience, they could
24 educate you, guide you on the legal compliance of
25 maps; is that fair?

Page 164

1      A.    That's correct.
2      Q.    Is it possible for the Senate to have
3   hired someone to examine racially polarized voting
4   patterns, any racially polarized voting patterns in
5   South Carolina?
6      A.    Is it possible that we could have, or
7   is it possible we did?
8      Q.    Is it possible that you could have?
9      A.    Certainly.  We could hire anybody to do
10  anything.
11     Q.    During the public hearings that you
12  participated in, the ten public hearings --
13  actually, let me correct that.  Were you -- let me
14  ask you a question before I get there.
15           Were you present at all ten hearings
16  that were held over the summer?
17     A.    I believe I was, yeah.
18     Q.    During the ten public hearings you were
19  present at and the legislative hearings that you
20  were present at, were you aware of legislators
21  and/or members of the public asking that racially
22  polarized voting analysis be conducted?
23     A.    I do know -- I remember some people in
24  the public asking for it.  I don't remember whether
25  or not members asked.

Page 165

1              If anyone did it, maybe it was Senator
2    Harpootlian maybe at some point, I think.  But it
3    was not in a direct -- it was not walk into Andy's
4    office and say, you need to go hire somebody to do
5    this.  My recollection is more of rhetorical
6    argument in a go-between amongst senators, if it
7    happened at all.
8         Q.   And no one in the map room asked you to
9    conduct a racially polarized voting analysis?
10        A.   I don't remember anybody ever sitting
11   in the map room saying population for polarized
12   voting analysis or asking anyone else in the map
13   room to do that.  I don't --
14        Q.   And it's -- oh, I'm sorry.
15        A.   I said I don't recall that, no.
16        Q.   And it's your position that Senator
17   Harpootlian may have been the person who asked for
18   it during public proceedings?
19        A.   It could be, and because he was doing
20   his own thing, doing his own map, all that, I mean,
21   I guess we all figured he was doing his own
22   racially polarized voting analysis.  I guess he
23   wanted to produce it --
24        Q.   And you're not aware -- oh, I'm sorry.
25        A.   I'm not aware -- I'm sorry.  Go ahead.

Page 253

1  recollection -- I guess we'd call this an eyeball
2  test -- I don't remember it being possible.
3         Q.   And do you think you can make a
4  determination about whether there can be a majority
5  black district based upon an eyeball view?
6         A.   Well, I mean, looking at it, looking at
7  the map and where the population was, I just don't
8  think we thought -- and this is in Section 2 House
9  so it would be much more in Charlie's wheelhouse,
10 but I don't think -- and also no one ever came to
11 us and asked us to do one either, so I think those
12 are the factors that kind of led us down that path.
13 I don't recall anybody ever asking us to do that.
14        Q.   But you are not aware of anyone
15 affirmatively attempting to draw an additional
16 majority black district?
17        A.   No.  I don't recall ever doing that,
18 no.
19        Q.   Was the political data, the 2020
20 presidential election data considered during the
21 development of this initial Staff Plan?
22        A.   I believe so, yes.
23        Q.   Was a racially polarized voting
24 analysis conducted during consideration of this
25 initial Staff Plan?

Page 254

1    MR. TYSON: Objection; asked and
2    answered numerous times.
3    THE WITNESS: No. Not to my knowledge,
4    no.
5    BY MS. ADEN:
6    Q. Who would have been responsible for
7    making the assessment that the initial Staff Plan
8    was not a racial gerrymander?
9    A. We would have relied upon Charlie
10   Terreni and John Gore.
11   Q. What about whether the districts were
12   contiguous? Who would have made that assessment in
13   the initial Staff Plan?
14   A. It would have probably been -- Will
15   drew the map so he could see whether things were
16   produced or not. So we all looked at the map, but
17   he was actually drawing a map so that's pretty much
18   a no brainer to draw a map that's contiguous.
19   Q. And what about communities of interest?
20   Who would have taken responsibility to ensure that
21   those kind of guideline criteria respecting
22   communities of interest was respected, reflected in
23   the initial Staff Plan?
24   A. I think it would have been a kind of
25   everybody in the room discussion.

Page 255

1      Q.  And what about constituent consistency?
2  Who would have been responsible for making that
3  determination?
4      A.  Again, everybody in the room
5  discussion.  And by seeing the map, you know, which
6  didn't change a lot of lines -- just about anybody
7  could make that initial change -- but again, this
8  was a first staff map so I don't know that we
9  really were cognizant of everything because we knew
10 it was going to change.  We knew the numbers were
11 going to change it.
12     Q.  And who would have been responsible for
13 determining whether the plan minimized divisions of
14 counties, cities and towns, and/or splits of VTDs?
15     A.  I think those are again numbers that
16 really would have happened but not determined.
17 It's just what the numbers were.
18     Q.  And district compactness?
19     A.  Compactness?
20     Q.  District compactness.
21     A.  Yeah.  I mean, I guess, you know,
22 everybody in the room kind of again looked at it
23 knowing that we were going to have many changes.
24 And all this would have gone on the back end up to
25 Charlie Terreni and John Gore.

Page 256

1  Q. Have you heard of the term
2  effectiveness analysis?
3  A. I have not. Well, I can't place it. I
4  don't recall.
5  Q. During discussion of the initial Staff
6  Plan or development of the initial Staff Plan, was
7  there discussion about increasing, decreasing, or
8  maintaining the black voting age population in
9  particular districts?
10  A. No. I mean, I think everyone was
11  cognizant that, you know, drastic changes in a
12  staff map -- drastic changes meaning that we were
13  requested to produce a least change map was always
14  undoubtedly with problems. In answering all these
15  questions I'm giving, that was something we thought
16  about.
17  Q. Did you set out to preserve the same
18  number of majority-minority districts in the
19  initial Staff Plan as existed in the 2011 Staff
20  Plan?
21  A. Because it was a least change map plan,
22  I think that was sort of the necessary result that
23  came about.
24  Q. What role did partisan considerations
25  play in the development of the initial Staff Plan?

Page 360

**CERTIFICATE OF REPORTER**

I, Karen M. Beckman, Court Reporter and Notary Public for the State of South Carolina at Large, do hereby certify that the foregoing transcript is a true, accurate, and complete record to the best of my ability.

I further certify that I am neither related to nor counsel for any party to the cause pending or interested in the events thereof.

Witness my hand, I have hereunto affixed my official seal this 26th day of July, 2022, at Myrtle Beach, Horry County, South Carolina.

Karen M. Beckman
Court Reporter
My Commission expires
September 2, 2025

```
                                                              Page 368
 1   South Carolina State Conference Of Naacp v. Alexander, Thomas C. Et Al
 2   Andrew Theodore Fiffick (#5327918)
 3                    E R R A T A  S H E E T
 4   PAGE_____ LINE_____ CHANGE_____
 5   _____
 6   REASON_____
 7   PAGE_____ LINE_____ CHANGE_____
 8   _____
 9   REASON_____
10   PAGE_____ LINE_____ CHANGE_____
11   _____
12   REASON_____
13   PAGE_____ LINE_____ CHANGE_____
14   _____
15   REASON_____
16   PAGE_____ LINE_____ CHANGE_____
17   _____
18   REASON_____
19   PAGE_____ LINE_____ CHANGE_____
20   _____
21   REASON_____
22
23   _____    _____
24   Andrew Theodore Fiffick                    Date
25
```

Page 369

South Carolina State Conference Of Naacp v. Alexander, Thomas C. Et Al
Andrew Theodore Fiffick (#5327918)

**ACKNOWLEDGEMENT OF DEPONENT**

I, Andrew Theodore Fiffick, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

_____        _____
Andrew Theodore Fiffick                                Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

_____ DAY OF _____, 20___.

_____
NOTARY PUBLIC