*SC NAACP v. Alexander,*
D.S.C. Case No. 3:21-cv-03302-MGL-TJH-RMG

# Exhibit 5

Page 1

```
IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION
-----------------------------------x
THE SOUTH CAROLINA STATE
CONFERENCE OF THE NAACP

            and

TAIWAN SCOTT, ON BEHALF OF HIMSELF    Case No.
AND ALL OTHER SIMILARLY SITUATED      3:21-CV-03302
PERSONS,                              JMC-TJH-RMG

                    Plaintiffs,

            Vs.

THOMAS C. ALEXANDER, IN HIS OFFICIAL
CAPACITY AS PRESIDENT OF THE SENATE;
LUKE A. RANKIN, IN HIS OFFICIAL CAPACITY
AS CHAIRMAN OF THE SENATE JUDICIARY
COMMITTEE; MURRELL SMITH, IN HIS OFFICIAL
CAPACITY AS SPEAKER OF THE HOUSE OF
REPRESENTATIVES; CHRIS MURPHY, IN HIS
OFFICIAL CAPACITY AS CHAIRMAN OF THE
HOUSE OF REPRESENTATIVES JUDICIARY
COMMITTEE; WALLACE H. JORDAN, IN HIS
OFFICIAL CAPACITY AS CHAIRMAN OF THE HOUSE
OF REPRESENTATIVES ELECTIONS LAW
SUBCOMMITTEE; HOWARD KNAPP, IN HIS
OFFICIAL CAPACITY AS INTERIM EXECUTIVE
DIRECTOR OF THE SOUTH CAROLINA STATE
ELECTION COMMISSION; JOHN WELLS, JOANNE
DAY, CLIFFORD J. EDLER, LINDA MCCALL,
AND SCOTT MOSELEY, IN THEIR OFFICIAL
CAPACITIES AS MEMBERS OF THE SOUTH
CAROLINA STATE ELECTION COMMISSION,
                       Defendants.
-------------------------------------x

    STENOGRAPHIC REMOTE VIRTUAL DEPOSITION
             CHARLES TERRENI
         Tuesday, August 16, 2022
```

Page 243

1      TERRENI
2  in that lawsuit, but I don't
3  specifically recall, but it wouldn't
4  surprise me.
5      Q.   Did you consider or are you
6  aware of anyone in the Senate who
7  considered any sources of data on
8  voting behavior as congressional
9  maps were developed?
10     A.   I'm sorry, I'm having
11 trouble with that question.  Could
12 you restate it for me?  Maybe if I
13 hear it again.
14     Q.   Let me strike that.  I'm
15 going to move on to something else.
16     You cited the Colleton County
17 case.  Do you dispute or have a
18 basis to dispute that there is --
19 that there continues to be racially
20 polarized voting in South Carolina?
21     A.   I don't know one way or the
22 other honestly.  I mean I have heard
23 people say it, express their views
24 on that both ways.
25     Q.   But you are not aware of

Page 244

1                    TERRENI
2     whether a racially polarized voting
3     analysis was conducted or are you
4     aware whether racially polarized
5     voting analysis was conducted by the
6     Senate as maps were being developed
7     for Congress?
8          A.   I am not aware that a
9     racially polarized voting analysis
10    was conducted by the Senate as maps
11    were being developed for Congress.
12    I have no knowledge of such a thing
13    and I don't believe it occurred.
14         Q.   Are you aware whether the
15    public or legislative members asked
16    for racially polarized voting
17    analysis to be conducted while
18    congressional maps were being
19    considered?
20         A.   I'm aware that some members
21    of the public and one member of the
22    general assembly, at least, Senator
23    Harpootlian, asked or suggested that
24    it should be done.
25         Q.   And do you know whether

1               TERRENI
2     that was acted upon?
3          A.   Yeah.  I know it wasn't.
4          Q.   Who made the decision not
5     to act upon those requests?
6          A.   The subcommittee.
7          Q.   Did they take a vote on
8     that?
9          A.   I think they have.  It was
10    during the, or at least they
11    declined to take a vote on it, but
12    the discussion we had in a public
13    subcommittee meeting in which
14    Senator Harpootlian advanced the
15    opinion that we should have a
16    racially polarized voting analysis
17    conducted in advance of the Senate
18    and congressional process.  I
19    expressed the opinion that it was
20    not useful.  And the Senate, we did
21    not, at least implicitly, the
22    subcommittee did not agree with
23    Senator Harpootlian, and I mean that
24    just the Senate did not vote or
25    direct us to conduct that.  I

Page 246

1            TERRENI
2    shouldn't say we.  I can't speak for
3    them.
4            After this question can we
5    take just a five-minute break?
6            MS. ADEN:  Yes.  Why don't we
7    stop and we will return to that.
8            THE WITNESS:  I appreciate
9    that.  We will come back at three
10   maybe.  Is that okay?
11           MS. ADEN:  Sounds great.
12           (Whereupon, there is a recess
13    in the proceedings.)
14       Q.   Before the break I believe
15   you mentioned not agreeing that a
16   racially polarized voting analysis
17   was necessary, at least in the early
18   part of 2021.  Can you explain why?
19       A.   Yes, ma'am.  We had no
20   reason to believe at the time that
21   we were going to have an issue with
22   Section 2 compliance.  No claims had
23   been asserted.  Nobody really
24   threatened them.  The sixth
25   congressional district which would