**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

| | |
|---|---|
| THE SOUTH CAROLINA STATE CONFERENCE OF THE NAACP, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>THOMAS C. ALEXANDER, *et al.*,<br><br>Defendants. | Case No.  3:21-cv-03302-MGL-TJH-RMG<br><br><br>**SENATE DEFENDANTS' AND HOUSE DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

Plaintiffs' Opposition To Senate And House Defendants' Joint Motion For Summary Judgment (Dkt. No. 358) rests on material omissions and misstatements of law and fact.  The reason is plain: despite broad-ranging discovery—including thousands of pages of documents and numerous depositions regarding internal legislative deliberations—Plaintiffs have failed to adduce "specific facts showing that there is a genuine issue for trial."  *Pachaly v. City of Lynchburg*, 897 F.2d 723, 725 (4th Cir. 1990).  Instead, the record demonstrates that Plaintiffs cannot discharge their "demanding" burden, *Easley v. Cromartie*, 532 U.S. 234, 241 (2001) ("*Cromartie II*"), to defeat the "presumption of legislative good faith" and prove that the Congressional Plan is tainted with unconstitutional racial discrimination, *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018).

Plaintiffs' attempt to salvage their case relies almost exclusively on the reports of their putative experts.  But—like the putative expert this Court rejected ten years ago in *Backus*—Plaintiffs' putative experts "failed to consider all the traditional race-neutral principles that guide redistricting in South Carolina."  *Backus v. South Carolina*, 857 F. Supp. 2d 553, 562 (D.S.C.), *aff'd*, 568 U.S. 801 (2012).  Thus, their analyses are "problematic," "incomplete," and "unconvincing," and they cannot carry Plaintiffs' burden.  *Id.* at 562–63.  Plaintiffs actually *admit* that their putative experts failed to consider all traditional redistricting principles in South

Carolina.  *See* Dkt. No. 358 at 23–24.  Plaintiffs, however, *never* mention this Court's holding in *Backus*, let alone explain how their putative expert analyses survive it.

In the end, Plaintiffs unquestionably "fail to make a showing sufficient to establish the existence of [] element[s] essential" to their racial gerrymandering and intentional discrimination claims.  *Cray Commc'ns, Inc. v. Novatel Computer Sys., Inc.*, 33 F.3d 390, 393 (4th Cir. 1994).  The Court should grant summary judgment and end this meritless litigation.  *See id.*; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## RESPONSE TO PLAINTIFFS' RULE 56(C)/LOCAL RULE 7.05(A)(4) STATEMENT

Plaintiffs' Rule 56(c)/Rule 7.05(A)(4) Statement, *see* Dkt. No. 358 at 2–16, relies on inadmissible evidence, contains many material omissions and misstatements of the record, and only underscores that Plaintiffs' claims cannot survive summary judgment.

Paragraphs 1, 4–10, 23, 29, 30, and 34–37 invoke inadmissible evidence from Plaintiffs' putative experts.  *See id.*  Even Plaintiffs concede, *see id.* at 23–24, that these putative experts "failed to consider all the traditional race-neutral principles that guide redistricting in South Carolina," *Backus*, 857 F. Supp. 2d at 562.  Their analyses are therefore "problematic," "incomplete," and "unconvincing," and they cannot carry Plaintiffs' burden.  *Id.* at 562–63.

Plaintiffs mischaracterize the movement of voters between Districts 1 and 6 as "massive" and "significant," and suggest that the "'cores of South Carolina's Congressional Districts bear little resemblance to the 2011 map," Dkt. No. 358 at 2–3, ¶¶ 2–4, when in fact the Congressional Plan preserves district cores at a higher rate than any alternative plan, *see* Dkt. No. 323 at 12–14.

Plaintiffs also draw an unwarranted inference when they suggest that the Congressional Plan results in "a dramatic underrepresentation of Black residents in South Carolina's Congressional delegation" because "Black residents represent over 25% of the state's Voting Age

Population" but only one African-American congressman currently represents South Carolina. Dkt. No. 358 at 6 ¶ 9. Black residents represented a *greater* share of South Carolina's voting age population under the 2010 Census results than under the 2020 Census results, and the Benchmark Plan upheld by this Court and the U.S. Supreme Court provided an identical level of representation for African-American voters, *see, e.g.*, *Backus*, 857 F. Supp. 2d at 565–570.

Moreover, there is nothing "duplicitous and secretive" in the "sequence of events leading to passage of the Congressional Plan," Dkt. No. 358 at 6; *see also id.* at 6–14, ¶¶ 10–32, as Plaintiffs' own putative expert conceded that the legislative process was generally analogous to and consistent with the process used in prior redistricting cycles, *see, e.g.*, Dkt. No. 323 at 31–34.

Plaintiffs' suggestion that the Senate used "additional, undisclosed criteria" to draw the Congressional Plan, Dkt. No. 358 at 8 ¶ 14, mischaracterizes the record. The requests and recommendations conveyed by Senator Rankin and others, *see id.*, were not "criteria" for judging the legality of the Congressional Plan but instead policy preferences for drawing the Plan, *see* Roberts Tr. 219:6–17 (Ex. 1); Terreni Tr. 178:6–179:15, 335:16–336:21 (Ex. 2). Moreover, in all events, Plaintiffs' own putative expert agreed that a legislature may use undisclosed criteria to draw a map. Duchin Tr. 104:4–10 (Ex. 3).

Plaintiffs' recitation of the events surrounding the emailing of proposed maps by the National Republican Redistricting Trust ("NRRT"), *see* Dkt. No. 358 at 8–11, ¶¶ 15, 18–22, omits material facts that the Senate Defendants have repeatedly pointed out to Plaintiffs. Specifically:

- Plaintiffs' statement that the Senate posted on its website every submission it "received" other than the NRRT maps, *see id.* at 8 ¶ 15, is false. Dalton Tresvant, a staffer for Democratic Congressman Jim Clyburn, provided a draft map to Senate staff that was never posted to the Senate website. *See* Roberts Tr. 78–80 (Ex. 1). Moreover, the NRRT maps were emailed after the deadline for public submissions and were never "accepted" by the Senate under the Redistricting Subcommittee's policy for such submissions. *See* Terreni Tr. 400:3–402:13 (Ex. 2).

3

- Every staffer who saw the NRRT maps looked at them for only a few minutes, dismissed them out of hand, and did not use or rely upon them in drafting the Congressional Plan. *See, e.g.*, Kincaid Tr. 49–60 (Dkt. No. 321-8); Fiffick Tr. 89–90, 184–189, 205–207, 213, 216–218 (Dkt. No. 321-9); Roberts Tr. 15–16, 251 (Dkt. No. 321-10); John Tr. 47, 195–199 (Dkt. No. 321-11); Campsen Tr. 93, 151–152 (Dkt. No. 321-12); Terreni Tr. 165:14–166:7 (Ex. 2).

Plaintiffs' statement that "the mapmakers did not consider . . . public testimony in drafting the Congressional Plan," Dkt. No. 358 at 9 ¶ 17, is false. Senate cartographer Will Roberts testified that he did consider public testimony in drawing the Congressional Plan. *See* Roberts Tr. 137:10–15, 205:13–206:16 (Ex. 1); Nov. 29, 2021 Tr. 6, 21–22 (Dkt. No. 323-39).

Plaintiffs' statement that "Senator George Campsen . . . denied that the map was drawn for partisan purposes," Dkt. No. 358 at 14 ¶ 31, incorrectly conflates the distinct concepts of a partisan gerrymander and consideration of politics. Senator Campsen (correctly) confirmed that the Congressional Plan is not a "partisan gerrymander," *see id.*, and that he did consider politics in the Plan, *see* Campsen Tr. 88:4–5, 148:11–12, 185:23–186:1 (Dkt. No. 323-24).

## ARGUMENT

## I.   SENATE DEFENDANTS AND HOUSE DEFENDANTS PROPERLY STATED THE SUMMARY JUDGMENT STANDARD

Plaintiffs' first argument posits that Defendants "misstate their burden for summary judgment" and "conflate the summary judgment and trial standards." Dkt. No. 358 at 17–18. But Plaintiffs never actually identify any such misstatements. Nor could they, because they ultimately *agree* with the summary judgment standard Defendants articulated.

As Defendants explained, they bear a preliminary burden to file a "properly supported" motion for summary judgment. Dkt. No. 323 at 10. Plaintiffs acknowledge that this merely requires Defendants to "'show[]'—that is, *point[] out* to the district court—that there is an absence of evidence to support [Plaintiffs'] case." *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015) (emphasis added) (quoting *Celotex Corp.*, 477 U.S.

4

at 325); *see* Dkt. 358 at 17.  This "initial responsibility," *Celotex Corp.,* 477 U.S. at 325, is "not onerous," *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013).  Rather, the moving party must only "inform[] the district court of the basis for its motion, and identify[] those portions of the pleadings, depositions, [and other evidence] which [they] believe[] demonstrate the absence of a genuine issue of material fact."  *Celotex Corp.*, 477 U.S. at 323.  Defendants undisputedly did just that in their motion for summary judgment, which amply "points out" the absence of evidence supporting Plaintiffs' case.  *Humphreys*, 790 F.3d at 540; *see Celotex Corp.*, 477 U.S. at 323.

So long as this modest initial responsibility is satisfied (and it is), Plaintiffs further agree that they "must" "present 'specific facts showing that there is a genuine issue for trial.'"  Dkt. No. 358 at 18 (quoting *Humphreys*, 790 F.3d at 540).  In other words, just as Defendants said, Plaintiffs must "make a showing sufficient to establish the existence of [the] element[s] essential to [their] case," including the demanding elements of their racial gerrymandering and intentional discrimination claims.  Dkt. No. 323 at 11 (quoting *Cray Commc'ns, Inc.*, 33 F.3d at 393); *see Celotex Corp.*, 477 U.S. at 322; *Cromartie II*, 532 U.S. at 242.

This straightforward conclusion does not "convert a motion for summary judgment into a trial on the merits."  Dkt. No. 358 at 18.  It simply recaps the (essentially undisputed) summary judgment standard, which exists to determine whether a trial is warranted in the first place.  Plaintiffs "may not escape summary judgment on the mere hope that something will turn up at the trial"; rather, to avoid summary judgment, they must make a sufficient evidentiary showing now.  *Ayers v. Pastime Amusement Co.*, 283 F. Supp. 773, 793 (D.S.C. 1968); *see Humphreys*, 790 F.3d at 540; *Celotex Corp.*, 477 U.S. at 323.   As explained in Defendants' motion and this reply, Plaintiffs' failure to satisfy this burden warrants summary judgment.

## II. SENATE DEFENDANTS AND HOUSE DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE RACIAL GERRYMANDERING CLAIM

Plaintiffs' Opposition and evidence confirm that they cannot carry their "demanding" burden on their racial gerrymandering claim, *Cromartie II*, 532 U.S. at 241, and in fact ask the Court to impose a racial gerrymander on South Carolina's voters. The Court should grant summary judgment. *See* Dkt. No. 323 at 11–24.

### A. Plaintiffs Cannot Show That The General Assembly Subordinated Traditional Districting Principles To Race

At the threshold, the Court should grant summary judgment on Plaintiffs' racial gerrymandering claim because Plaintiffs' evidence fails to show that the General Assembly "subordinated traditional race-neutral districting principles . . . to racial considerations" in the Congressional Plan. *Miller v. Johnson*, 515 U.S. 900, 916 (1995); *see also* Dkt. No. 323 at 11–20.

#### 1. Plaintiffs Cannot Show Racial Predominance In The Congressional Plan

Plaintiffs' various efforts to establish that the General Assembly subordinated traditional districting principles to race uniformly fail. *First*, Plaintiffs do not dispute the demanding standard governing their racial gerrymandering claim. In a brief aside, Plaintiffs misleadingly suggest that race "may predominate" in a redistricting plan "even when a reapportionment plan respects traditional principles." Dkt. No. 358 at 19 (quoting *Bethune-Hill v. Virginia State Bd. of Elections*, 137 S. Ct. 788, 798 (2017)). But Plaintiffs omit the rest of the sentence in *Bethune-Hill*, which specifies that "[r]ace may predominate even when a reapportionment plan respects traditional principles … *if* '[r]ace was the criterion that, in the State's view, could not be compromised,' *and* race-neutral considerations 'came into play only after the race-based decision had been made.'" *Bethune-Hill*, 137 S. Ct. at 798 (emphasis added) (quoting *Shaw II*, 517 U.S. at 907). That material omission aside, Plaintiffs point to no evidence that race was even used to draw lines, much less

that it was "the criterion . . . that could not be compromised" and took priority over "race-neutral considerations" in the Congressional Plan. *Id.*; *see* Dkt. No. 358 at 19–24.

*Second*, Plaintiffs principally posit their burden has been met by the inadmissible testimony and evidence of their putative experts, Drs. Duchin, Liu, Imai, and Ragusa. *See* Dkt. No. 358 at 21–24. However, even Plaintiffs concede, *see id.* at 23–24, that each putative expert "failed to consider all the traditional race-neutral principles that guide redistricting in South Carolina," *Backus*, 857 F. Supp. 2d at 562. Thus—like the analysis the Court rejected in *Backus*—Plaintiffs' putative expert analyses are "incomplete and unconvincing" and ultimately "unable" to show that "the General Assembly subordinated traditional race-neutral principles to race." *Id.* at 562–63.

Incredibly, Plaintiffs do not even mention this Court's holding in *Backus*, let alone attempt to distinguish it. Instead, Plaintiffs play tit for tat and point out that "Defendants' own expert, Mr. Trende" did not consider communities of interest in his expert report. Dkt. No. 358 at 24. But Defendants do *not* bear the burden of proof in this case. Plaintiffs do—and their failure to satisfy *Backus* is fatal to their case. *See Backus*, 857 F. Supp. 2d at 562. Moreover, Defendants have adduced substantial *other* evidence that the Congressional Plan respects communities of interest, including the communities of interest formed around the Benchmark Plan and other communities around the State. *See, e.g.*, *Colleton Cnty. Council v. McConnell*, 201 F. Supp. 2d 618, 649 (D.S.C. 2002) (three-judge court); Dkt. No. 323 at 15–16. By contrast, not only do Plaintiffs' putative experts each fail to consider several traditional race-neutral principles *individually*, they also fail *collectively* to consider some such principles, including core preservation and avoiding voting district splits. *See* Dkt. No. 323 at 17–20. This absence of evidence dooms their case. *See* Dkt. No. 358 at 19–24.

Plaintiffs nonetheless double down on their putative experts' analyses, arguing that they evince racial gerrymandering in the district lines Plaintiffs challenge in Charleston County, Dorchester County, Richland County, and Sumter County. *See id.* at 21–23. But Plaintiffs have only highlighted the flaws in their putative expert evidence. Neither Plaintiffs nor their putative experts address the race-neutral explanations for those lines, including core preservation; maintaining political subdivisions, voting districts, and communities of interest; incumbency protection; and politics. Dkt. No. 323 at 12–16. By wholly failing even to *address* these criteria, Plaintiffs and their putative experts are unable to prove "that the General Assembly subordinated traditional race-neutral principles to race." *Backus*, 857 F. Supp. 2d at 563.

*Third*, Plaintiffs fault the General Assembly for "declin[ing] to conduct any racially polarized voting ('RPV') analysis." The lone case Plaintiffs cite in support of the supposed obligation to conduct an RPV analysis arose under Section 2 of the Voting Rights Act, not a racial gerrymandering theory. *See Collins v. City of Norfolk*, 816 F.2d 932, 936–38 (4th Cir. 1987); *see* Dkt. No. 358 at 33 (recognizing that racial gerrymandering is "analytically distinct" from Section 2). Plaintiffs' failure to cite any case requiring a legislature to preemptively conduct an RPV analysis in order to avoid racial gerrymandering liability is understandable: no such case exists.

Nor could it. The prohibition on racial gerrymandering is a *limit* on a legislature's consideration of race in redistricting, not a *requirement* that it do so. *See, e.g.*, *Cromartie II*, 532 U.S. at 243 (race may not be "predominant" factor in redistricting absent satisfaction of strict scrutiny). Plaintiffs thus get it exactly backwards. The General Assembly's decision *not* to consider race via an RPV analysis does not show that the General Assembly *did* consider race, let alone that race was the General Assembly's "dominant and controlling consideration." *Shaw II*, 517 U.S. at 905. Indeed, conducting an RPV analysis would have risked interjecting *more* race

consciousness into the Congressional redistricting process—which is precisely why the General Assembly declined to conduct one, as Senator Campsen and outside counsel Charlie Terreni explained prior to the Congressional Plan's enactment.  *See* Sept. 17, 2021 Tr. 16:22–18:21 (Ex. 4); Jan. 19, 2022 Tr. 32:16–35:22 (Ex. 5).

*Fourth*, Plaintiffs note that "race data was available to *everyone* working on drawing the Congressional map," Dkt. No. 358 at 21 (emphasis original), but availability of racial data or even awareness of race does not establish racial predominance.  Indeed, "[l]egislatures are almost always cognizant of race when drawing district lines, and simply being aware of race poses no constitutional violation." *Backus*, 857 F. Supp. 2d at 562.  Moreover, mere awareness of race does not constitute "use" of race to draw lines, as Plaintiffs appear to believe.  Dkt. No. 358 at 21. Instead, "a legislature may be conscious of the voters' races without using race as a basis for assigning voters to districts." *Shaw II*, 517 U.S. at 905.

*Finally*, Plaintiffs make the half-hearted argument that Senate cartographer Will Roberts and staffer Breeden John testified that "the traditional, publicly disclosed, criteria here were subordinated to Defendant Rankin's dictates." Dkt. No. 358 at 24.  But Mr. Roberts and Mr. John offered no such testimony, as demonstrated by even a cursory review of the deposition transcript pages Plaintiffs cite.  *See* Roberts Tr. 201–02 (Ex. 1); John Tr. 50–55 (Ex. 6).  And in any event, "Defendant Rankin's dictates," Dkt. No. 358 at 24, had nothing to do with race.  Quite the opposite: even Plaintiffs maintain that Chairman Rankin's preferences *promoted* traditional districting principles by, for example, "minimizing" district-level "change" and preserving the community of interest around "Fort Jackson in District 2." *Id.*; *see* Dkt. No. 323 at 15; *see also* Massey Tr. 134:1–2 (Ex. 7) ("Fort Jackson is definitely a community of interest.").  Thus, even if traditional districting principles were subordinated to Chairman Rankin's alleged "dictates," Dkt. No. 358 at

24, that would not show that such principles were subordinated to "racial considerations," *Miller*, 515 U.S. at 916; *see Bush v. Vera*, 517 U.S. 952, 962 (1996) (plurality op.) ("[T]he neglect of traditional districting criteria is … not sufficient. For strict scrutiny to apply, traditional districting criteria must be *subordinated to race*."). The Court should grant summary judgment.

### 2. Plaintiffs' Attempt To Explain Away Core Preservation Fails

Plaintiffs acknowledge that "constituent consistency" is a traditional race-neutral redistricting principle, Dkt. No. 358 at 18, and nowhere do they dispute the record evidence that the Congressional Plan outperforms all alternative plans on this criterion, *see* Dkt. No. 323 at 12–14. Plaintiffs nonetheless offer four arguments in an attempt to wave away this evidence. All fail.

*First*, Plaintiffs mischaracterize Defendants' position when they suggest that Defendants view core preservation as a "shield against racial gerrymandering claims." Dkt. No. 358 at 30. Rather, Defendants have shown that the Congressional Plan complies with this criterion rather than subordinating it to race. *See* Dkt. No. 323 at 12–14. Thus, the undisputed evidence on this criterion refutes Plaintiffs' claim—particularly in light of Plaintiffs' and their putative experts' utter failure even to address it. *See id.*; *see also Backus*, 857 F. Supp. 2d at 562–63.

*Second*, Plaintiffs make the bizarre—and false—assertion that the General Assembly has offered core preservation only as a "*post-hoc*" and "*after the fact*" justification for the Congressional Plan. Dkt. No. 358 at 31 (emphasis original). Even Plaintiffs and their putative expert, however, acknowledge that the General Assembly disclosed this justification *before* enactment of the Congressional Plan. *See id.* According to Dr. Bagley, core preservation was "among the [Senate] guidelines," was "listed as such by Chairman Rankin at the onset of the remote public hearings," and was "seriously considered[ed]" *before* the enactment of the Congressional Plan. Dkt. No. 358-59 at 2, 7; *see also* Dkt. No. 323-3 at 2 (Senate Redistricting Guidelines); Nov. 29, 2021 Tr. 5:6 (Ex. 8) (Will Roberts in November 2021: "minimal change

plan"); Jan. 20, 2022 Floor Tr. 23:8-24:19 (Ex. 9) (Senator Campsen reciting the Congressional

Plan's core-preservation statistics when he presented the Plan on the Senate floor).  On Plaintiffs'

own evidence, core preservation is an "actual, contemporaneous justification for the enacted map."

Dkt. No. 358 at 34.

Third, Plaintiffs point out that "core preservation" is not listed as a criterion in the House

Guidelines, id. at 31, but that does not undercut its existence as a justification for the Congressional

Plan.  After all, the Congressional Plan has to pass both the House and the Senate and, thus, had

to satisfy both bodies' criteria.

Fourth, Plaintiffs attempt to write core preservation out of the law of traditional districting

principles.  See, e.g., id. at 30 (citing Bethune-Hill v. Va. State Bd. of Elecs., 141 F. Supp. 3d 505,

544 (E.D. Va. 2015), aff'd in part, vacated in part, 137 S. Ct. 788).  But even Plaintiffs' favored

case recognizes that "[l]egislators' use of the core retention principle should certainly receive some

degree of deference" and declined to find a racial gerrymander in the plan before it.  Bethune-Hill,

141 F. Supp. 3d at 545, 571.  Moreover, Plaintiffs are incorrect when they suggest that the Court

in Backus did not uphold Benchmark Districts 1, 2, and 5 against racial gerrymandering challenges.

Dkt. No. 358 at 34.  The Court did precisely that when it dismissed such challenges to those

districts on standing grounds.  See Dkt. No. 347 at 8.  Anyway, core preservation is a traditional

race-neutral redistricting principle regardless of whether the predecessor plan or district has been

upheld against legal challenges, as Plaintiffs implicitly recognize.  See Dkt. No. 358 at 18.  The

Court should grant summary judgment.

### B.    Plaintiffs Cannot Show That Race Rather Than Politics Predominated

Summary judgment is also warranted because Plaintiffs have failed to decouple race from

politics and demonstrate that "race rather than politics predominantly motivated" the

Congressional Plan.  Cromartie II, 532 U.S. at 243; see Dkt. No. 323 at 20–23.

Plaintiffs once again principally point to their flawed putative expert evidence, *see* Dkt. No. 358 at 25–30, but as explained, that evidence is "incomplete and unconvincing" and ultimately "unable" to show that "the General Assembly subordinated traditional race-neutral principles to race." *Backus*, 857 F. Supp. 2d at 562–63; *see also* Dkt. No. 323 at 17–22.

Plaintiffs' four other arguments also fail to save their claims from summary judgement. *First*, Plaintiffs criticize as "post hoc" the extensive evidence establishing that the General Assembly pursued political objectives in the Congressional Plan. *See* Dkt. No. 358 at 20–21. At the threshold, the General Assembly need not even adduce evidence of its pursuit of political goals for at least two reasons. In the first place, "[p]olitics and political considerations are inseparable from districting and apportionment," and "[t]he reality is that districting inevitably . . . is intended to have substantial political consequences." *Gaffney v. Cummings*, 412 U.S. 735, 753 (1973). Moreover, *Plaintiffs* contend that race "is highly correlated with political affiliation," Dkt. No. 323-20 at 170:4–8; Dkt. No. 323-17 at 153:15–154:4, so they have assumed the demanding burden to decouple race from politics and demonstrate that "race *rather than* politics *predominantly* motivated" the Congressional Plan. *Cromartie II*, 532 U.S. at 243.

In all events, Defendants have adduced substantial evidence that politics drove the Congressional Plan. *See* Dkt. No. 323 at 20–21. For one thing, the Senate Guidelines authorized the General Assembly to maintain "political" communities of interest and to use "political" data to draw the Congressional Plan. Dkt. No. 323-3 at 2. For another, throughout the redistricting process, legislative staff generated and publicly disclosed extensive data on the political make-up of districts under a variety of plans. *See* Dkt. No. 323 at 21. And numerous legislators and staffers—including Representative Justin Bamberg, an African-American Democrat—testified that politics drove the Congressional Plan. *See id.* at 20–21. All of this evidence of what legislators

12

and staffers did *at the time* establishes that politics was an "actual consideration[] that provided the essential basis for the lines drawn," not a "*post hoc* justification[] the legislature in theory could have used but in reality did not." *Bethune-Hill*, 137 S. Ct. at 799.

Plaintiffs are simply confused about the law on "post hoc" justifications. Plaintiffs' real complaint appears to be not that the General Assembly's political justification for the Enacted Plan is "post hoc," but instead that the General Assembly did not publicize that justification in the real-time legislative record to Plaintiffs' satisfaction. *See, e.g.*, Dkt. No. 358 at 20–21. But the Supreme Court's limitation on post hoc justifications focuses on the "actual consideration[s]" animating the legislature's decisionmaking, *not* whether those considerations were made public, much less at a particular time. *Bethune-Hill*, 137 S. Ct. at 799. Those actual considerations can be disclosed after the plan is enacted, particularly where, as here, courts override claims of legislative privilege and allow extensive discovery into private legislative deliberations. *See, e.g.*, *id.*

*Second*, Plaintiffs point out that certain legislators and staffers testified that they did not "consider partisan advantage as a goal of the redistricting process." Dkt. No. 358 at 25. But just as "[w]hat motivates one legislator to [support] a statute is not necessarily what motivates scores of others to enact it," what *doesn't* motivate one legislator may well motivate others and the "legislative body as a whole." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2255 (2022) (quoting *United States v. O'Brien*, 391 U.S. 367, 384 (1968)); *see Backus*, 857 F. Supp. 2d at 564–65. Here, ample evidence exists that legislators, including Senators Campsen and Massey, considered politics and that a plan that did not preserve the 6-1 Republican-Democratic composition would not have passed the General Assembly as a whole. *See* Campsen Tr. 67:6–18 (Ex. 12); Massey Tr. 134:12–136:1, 213:15–215:13 (Ex. 7); *see also* Dkt. No. 323 at 20–21.

*Third*, Plaintiffs recite the irrelevant and inapposite rule that a legislature may not use "race as a proxy" for politics without satisfying strict scrutiny. Dkt. No. 358 at 23. But Plaintiffs point to no *evidence* that any legislator or staffer—let alone the General Assembly as a whole—used race as a proxy for politics. *See id.* To the contrary, the undisputed evidence shows that legislators and staffers did not use race to draw any lines in the Congressional Plan and used the 2020 presidential election results, rather than racial data, to draw lines based on politics. *See, e.g.*, Dkt. No. 323 at 9; Roberts Tr. 110:22–111:6, 112:1–7, 167:14–19, 179:18–22, 239:24–240:2 (Ex. 1); Terreni Tr. 363:13–21 (Ex. 2); Fiffick Tr. 41:15–42:1, 139:6–17, 268:20–269:6 (Ex. 10).

Once again, Plaintiffs get the law backwards. A redistricting plan is not a racial gerrymander merely because its political effect is allegedly disadvantageous for African-American voters—even if the legislature "understood at the time of map-drawing that race and party are correlated." Dkt. No. 358 at 27. "[A] jurisdiction may engage in constitutional political [line-drawing], even if it so happens that the most loyal Democrats happen to be black Democrats and even if the State were *conscious* of that fact." *Hunt v. Cromartie*, 526 U.S. 541, 551 (1999) (emphasis original). And contrary to Plaintiffs' suggestion, such awareness does not require a jurisdiction to *increase* its race consciousness by conducting an RPV analysis. *See* Dkt. No. 358 at 26.

*Fourth*, Plaintiffs concede that they have not presented any alternative plan showing that the General Assembly "could have achieved its legitimate political objectives in alternative ways that are comparably consistent with traditional districting principles." *Cromartie II*, 532 U.S. at 258; *see* Dkt. No. 358 at 27–29. Plaintiffs attempt to excuse this failure by arguing that Defendants have "conceded" that they "are not required to present alternative maps for racial gerrymandering claims." Dkt. No. 258 at 29. Not so. Defendants explicitly argued that a challenger "must provide

an alternative map *in cases like this one*, where 'the plaintiffs ha[ve] meager direct evidence of a racial gerrymander and need[] to rely on evidence of forgone alternatives.'"  Dkt. No. 323 at 22 (quoting *Cooper*, 137 S. Ct. at 1481) (emphasis added).  Defendants also preserve the argument that the *Cooper* majority erred in holding that an alternative map is not required in all racial gerrymandering cases.  *See, e.g.*, *Cooper*, 137 S. Ct. at 1488–91 (Alito, J., dissenting) (dissenting justices concluding that an alternative map is always required).  The Court should grant summary judgment.

### C.    Plaintiffs Ask The Court To Impose A Racial Gerrymander

Finally, Plaintiffs' opposition confirms that *Plaintiffs* seek an impermissible racial gerrymander.  *See* Dkt. No. 323 at 24–25.  Indeed, Plaintiffs repeatedly contend that the General Assembly should have expressly considered race in order to increase the influence of (certain) black voters, namely black Democrats.  Dkt. No. 358 at 19 (the General Assembly should have conducting an RPV analysis to "avoid[]" "racial dilution"); *id.* at 27 (the General Assembly should have conducted an RPV analysis to "assess the impact of their sorting of voters between districts" and the "effect on the opportunity of [b]lack voters"); *id.* at 35 (faulting the General Assembly for "dilute[ing] Black voting opportunity in the challenged districts").  Yet Plaintiffs do not dispute that such efforts would "fail to satisfy strict scrutiny" and thus constitute a quintessential racial gerrymander.  Dkt. No. 323 at 24–25.

Moreover, Brenda Murphy, President of Plaintiff SC NAACP, admitted in her deposition that "the primary goal" in drawing the SC NAACP's proposed plans was to increase African-American voters' political "influence" in congressional elections.  Murphy Tr. 44:9–14 (Ex. 11).  Grasping at straws, Plaintiffs nonetheless suggest that they actually do not seek a racial gerrymander because, so far, they have merely asked the Court to enjoin the Congressional Plan and have not yet "asked this Court to draw any map."  Dkt. No. 358 at 39.  But there is no dispute

that, in Plaintiffs' view, the Congressional Plan is unlawful because it does not adequately increase the influence of certain black voters. *See id.*; Dkt. No. 323 at 24. And, of course, South Carolina must have a redistricting plan in place to conduct constitutional congressional elections—and Plaintiffs seek to replace the Congressional Plan with a map that they regard as lawful, *i.e.*, one that *does* aim to increase the influence of certain black voters—a racial gerrymander. *See, e.g.*. Dkt. No. 267 at 48–49. That remedy, however, is not available as a matter of law. *See* Dkt. No. 323 at 24–25. The Court should grant summary judgment.

## III. SENATE DEFENDANTS AND HOUSE DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE INTENTIONAL DISCRIMINATION CLAIM

Plaintiffs' intentional discrimination claim is not viable either. As their Opposition and evidence confirm, Plaintiffs cannot show that the General Assembly subjected black voters to "differential treatment" compared to "similarly situated" voters of another race. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439–40 (1985). Because the Congressional Plan has neither a discriminatory effect nor a discriminatory intent, the Court should grant summary judgment. *See* Dkt. No. 323 at 25–34.

### A. Plaintiffs Cannot Show That The Congressional Plan Has A Discriminatory Effect

Plaintiffs suggest that the discriminatory-effect inquiry merely considers whether the effect of the Congressional Plan "bears more heavily on one race than another," Dkt. No. 358 at 35 (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 (1977)), but the inquiry does not stop there. A wall of equal protection precedent specifies that an actionable discriminatory effect arises only if government action bears more heavily on members of one race compared to members of another race who are "similarly situated"—*i.e.*, "alike" in "all relevant respects." *Lowe v. City of Charleston*, No. 2:20-CV-04423, 2022 WL 1063978, at *2–3 (D.S.C. Apr. 8, 2022) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985), and

*Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)); *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001); *see also NAACP v. Snyder*, 879 F. Supp. 2d 662, 678 (E.D. Mich. 2012) (three-judge court) ("[T]he equal protection doctrine requires that the compared classes [in a redistricting challenge] be 'similarly situated.'"); *United States v. Washington*, No. CR 13-171-2, 2021 WL 120958, at *23 (E.D. Pa. Jan. 13, 2021) ("Evidence devoid of any comparison to 'similarly situated' individuals does not prove discriminatory effect."); *see* Dkt. No. 323 at 26.

Plaintiffs, moreover, misunderstand the *Arlington Heights* standard they invoke. In particular, Plaintiffs make the bizarre assertion that "it is irrelevant for discriminatory impact analysis that 'just as many or more' white Democrats as Black Democrats reside in each of the challenged districts." Dkt. No. 358 at 36–37. The reason Plaintiffs cite no support for this assertion is plain: the assertion is incorrect. After all, the showing that "just as many or more white Democrats as Black Democrats reside in each of the challenged districts" proves that the Congressional Plan's political effect does *not* "bear[] more heavily on one race than another," *id.* at 35, and alone warrants summary judgment on Plaintiffs' intentional discrimination claim, *see* Dkt. No. 323 at 26–28.

Plaintiffs attempt to avoid this result by arguing that Defendants' "partisan explanations" for the Congressional Plan's effects are "*post-hoc*." Dkt. No. 358 at 37. But there is nothing "post hoc" about Defendants' political justifications for the Congressional Plan. *See supra* pp. 12–13. In any event, Plaintiffs miss the point: the question is not whether Defendants have offered an *explanation* for the Congressional Plan but, rather, whether Plaintiffs can show that the Congressional Plan's effects "bear[] more heavily on one race than another." Dkt. No. 358 at 35. They cannot do so here, where the Congressional Plan's effects bear equally on *all* Democrats regardless of their race. *See* Dkt. No. 323 at 26–28.

17

Plaintiffs, in fact, make no serious effort to show that the Congressional Plan treats African-American voters differently than similarly situated white (Democratic) voters. Once again, they point to the analyses of their putative experts, Drs. Duchin and Liu, *see* Dkt. No. 358 at 35–39, but those analyses are "problematic," "incomplete," and incapable of carrying Plaintiffs' burden. *Backus*, 857 F. Supp. 2d at 562–63. Dr. Duchin did not even consider partisan performance, voting district splits, or communities of interest other than those she deemed important. Dkt. No. 323 at 9. More to the point, she in fact *conceded* that *all* Democrats experience the same political effect under the Congressional Plan *regardless* of their race. *See id.* at 9, 27–28. Plaintiffs contend that Dr. Liu "found that the Congressional map treats [b]lack voters differently than it treats white voters … where those voters are members of the same political party." Dkt. No. 358 at 36. But Dr. Liu's statistics actually show that, on net, black Democrats were no more likely than white Democrats to be moved out of Districts 1 and 2.[1] This is unsurprising since Dr. Liu's own numbers show that the Congressional Plan's political effect is far more pronounced than its alleged racial effect. *See* Dkt. No. 323 at 23. And Dr. Liu's analysis thus *disproves* Plaintiffs' contention that

---

[1] <u>District 1</u>: 1,464 net black Democrats moved out (3,640 black Democrats "out" minus 2,176 black Democrats "in") divided by 13,761 black Democrats in benchmark district (10,121 "core" black Democrats plus the 3,640 black Democrats moved "out") = <u>10.6% net chance of black Democrats being moved out</u>. Liu Rep. 16 tbl. 6 (Dkt. No. 323-19).

3,127 net white Democrats moved out (3,651 white Democrats "out" minus 524 white Democrats "in") divided by 19,476 white Democrats in benchmark district (15,825 "core" white Democrats plus the 3,651 white Democrats moved "out") = <u>16.1% net chance of white Democrats being moved out</u>. *Id.*

<u>District 2</u>: -434 net black Democrats moved out (496 black Democrats "out" minus 930 black Democrats "in") divided by 19,833 black Democrats in benchmark district (19,337 "core" black Democrats plus the 496 black Democrats moved "out") = <u>-2.2% net chance of black Democrats being moved out</u>. *Id.* at 18 tbl. 7.

1,587 net white Democrats moved out (1,682 white Democrats "out" minus 95 white Democrats "in") divided by 15,733 white Democrats in benchmark district (14,051 "core" Democrats plus the 1,682 white Democrats moved "out") = <u>10.1% net chance of white Democrats being moved out</u>. *Id.*

black Democrats were "push[ed] disproportionately" into District 6.  Dkt. No. 358 at 37; *see United States v. Charleston Cnty.*, 318 F. Supp. 2d 302, 317–18 (D.S.C. 2002) (a party cannot create a triable issue via contradictory affidavits).

Plaintiffs also fall back on a variety of arguments that the Congressional Plan "disregard[s] traditional principles such as maintaining whole counties and cities" and fails to "respect[] [the General Assembly's] own criteria."  Dkt. No. 358 at 38; *see also id.* at 36–37.  But the Congressional Plan *better* complies with traditional districting principles, including traditional principles that Plaintiffs and their putative experts have wholly ignored, than any alternative plans proposed to the General Assembly or the Court.  *See* Dkt. No. 323 at 11–20.  Thus, if—as Plaintiffs believe—a plan's compliance with traditional districting principles is the metric for judging discriminatory effect, the Court should uphold the Congressional Plan on summary judgment.

Finally, Plaintiffs contend that they are not complaining about the General Assembly's failure to create "coalition districts" of African-American and white Democrats.  Dkt. No. 358 at 35–36.  This contention fails: because Plaintiffs do not seek creation of a majority-black district, they *necessarily* seek coalition districts where African-American voters can elect their preferred (Democratic) candidates with support from white Democratic voters.  Even Plaintiffs' own putative experts admit as much.  *See, e.g.*, Dkt. No. 323 at 26–28.  And Plaintiffs' contention that they "have not asked this Court to draw any map," Dkt. No. 358 at 39, is both irreconcilable with their Third Amended Complaint, *see* Dkt. No. 267 at 48–49, and nonsensical, since South Carolina must have a map in place to conduct constitutional congressional elections.  The Court should grant summary judgment.[2]

---

[2] There is another, independent reason why Plaintiffs have not established a discriminatory effect.  They do not respond to—and thus concede—the argument that they have failed to present a "reasonable alternative voting practice," which is necessary to show a discriminatory effect in

**B.  Plaintiffs Cannot Show That The General Assembly Enacted The Congressional Plan For A Discriminatory Purpose**

Plaintiffs' attempts to show an "invidious [discriminatory] intent" fare no better.  *Abbott*, 138 S. Ct. at 2325.  In fact, Plaintiffs admit that no "direct" evidence supports that the General Assembly—whose "good faith" is concededly presumed—enacted the Congressional Plan for an discriminatory purpose.  Dkt. No. 358 at 39–40, 45; *see* Dkt. No. 323 at 29.  And Plaintiffs' "circumstantial" evidence—the only evidence that Plaintiffs offer on discriminatory intent—does not satisfy Plaintiffs' stringent burden either.  Dkt. No. 358 at 40.

Start with Plaintiffs' multi-century historical narrative.  Despite accepting that "what matters" is the "intent of the *current* legislature," Dkt. No. 358 at 41 (quoting *Abbott*, 138 S. Ct. at 2325), Plaintiffs identify no evidence connecting their historical narrative to the General Assembly's current intent in enacting the Congressional Plan.  *See id.* at 40–41.  Indeed, the most "recent[]" events Plaintiffs cite occurred more than a decade ago under different circumstances.  *Id.* (citing the (precleared and upheld) 2010 Benchmark Plan and a 2011 DOJ objection to a photo identification law).  Such events cannot "condemn" today's Congressional Plan.  *Abbott*, 138 S. Ct. at 2324; *see* Dkt. 323 at 30–31.

Perhaps recognizing the gap between their historical materials and the current legislature, Plaintiffs insist that "even 'long-ago history' may 'bear heavily' in this inquiry."  Dkt. No. 358 at 41 (purporting to quote *N. Carolina State Conf. of NAACP v. McCrory*, 831 F.3d 204, 223 (4th Cir. 2016)).  But Plaintiffs misleadingly quote *McCrory*, which merely states that pernicious historical discrimination may "bear[] more heavily … *than it might otherwise*" when the current legislature's action is the "*first* meaningful restriction[]" since the historical incident, because the

---

this context.  Dkt. No. 323 at 28 n.10; *see* Dkt. No. 358 at 35–39; *see also, e.g.*, *UFP E. Div., Inc. v. Selective Ins. Co.*, No. 4:15-CV-2801, 2017 WL 499083, at *1 n.2 (D.S.C. Feb. 6, 2017).

legislature might "pick[] up where it left off." 831 F.3d at 223 (emphasis added). And even when the past and present are that closely connected, the historical discrimination still carries "limited weight." *Id.* Here, Plaintiffs do not argue that the Congressional Plan is the "first" electoral legislation since any pernicious historical incident, so past intent cannot be imputed to the present on the ground that the General Assembly might pick up where it left off "long-ago." *Id.* Plaintiffs' historical narrative does not even merit the "limited weight" contemplated in *McCrory*. *Id.*

As to the supposed "procedural irregularities" and other deficiencies in the legislative process, Dkt. No. 358 at 41–45, Plaintiffs have not even attempted to show that the General Assembly deviated from any norms "in order to accomplish a discriminatory goal" or "target[] any identifiable minority group." Dkt. No. 323 at 33 (quoting *Rollerson v. Brazos River Harbor Navigation Dist. of Brazoria Cnty.*, 6 F.4th 633, 640 (5th Cir. 2021), and *Rollerson v. Port Freeport*, No. 18-cv-0235, 2019 WL 4394584, at *8 (S.D. Tex. Sept. 13, 2019), *aff'd*, 6 F.4th 633); *see* Dkt. No. 358 at 45. Plaintiffs instead maintain, without citing any authority, that "the law" requires no such showing. Dkt. No. 358 at 45. But that unsupported assertion is simply wrong, as demonstrated by the authorities identified by Defendants and ignored by Plaintiffs. *See Rollerson*, 6 F.4th at 640; *Rollerson*, 2019 WL 4394584, at *8; Dkt. No. 323 at 32–33 (citing, *e.g.*, *Coal. for TJ*, 2022 WL 986994, at *5 (Heytens, J., concurring)).

In all events, Plaintiffs have not identified any actual deviations from legislative procedures. They assert that the Senate subcommittee "contradicted" its submissions policy by engaging with the NRRT, but as noted, the NRRT maps were emailed after the deadline for public submissions and were never "accepted" by the subcommittee under its policy for such submissions. *See* Terreni Tr. 400:3–402:13 (Ex. 2). Plaintiffs also object to a handful of other incidents throughout the months-long legislative process, such as the House's use of an "ad hoc

committee" and various map drawers, the assignment of Representative Newton rather than Representative King to "run" a Judiciary Committee meeting, the dissemination of proposed maps shortly before hearings, and the reliance on legislators' undisclosed "private instructions." Dkt. No. 358 at 42–45. Although these incidents drew a few partisan objections, *see id.* at 43 (noting the Black Caucus's "grievance" concerning the Newton assignment), Plaintiffs do not argue that any of them actually violated the General Assembly's procedures—likely because such discretionary decisions and judgment calls are well within the bounds of mainstream political behavior. Indeed, as Plaintiffs' own putative expert admitted, the legislative process was generally analogous to and consistent with the process used in prior redistricting cycles. *See, e.g.*, Dkt. No. 323 at 31–34.

Moreover, the General Assembly's purported "lack of transparency and responsiveness," Dkt. No. 358 at 42, does not establish an invidious intent. Plaintiffs contend that "Defendants all but abdicate their roles as representatives" because Defendants maintain that they "could not have incorporated all public input." Dkt. No. 358 at 41; *see* Dkt. No. 323 at 32. But Defendants' view is uncontroversial. After all, "[t]he process of legislating often involves tradeoffs, compromises, and imperfect solutions," so of course Defendants were unable to incorporate all public input— particularly since input from some members of the public was irreconcilable with input from other members of the public. *Preseault v. I.C.C.*, 494 U.S. 1, 19 (1990). Relatedly, although Plaintiffs contend the General Assembly "def[ied] repeated warnings from legislators and the public that the proposed map would dilute [b]lack voting strength," Dkt. No. 358 at 42, the Constitution forbids the General Assembly from intentionally increasing black electoral influence here and, moreover, the legislature necessarily could not have followed the conflicting "warnings" of all legislators and citizens. *See supra* pp. 8–9, 15–16; Dkt. No. 323 at 32. Nor, for that matter, was the General

Assembly required to "consider and analyze" certain maps to Plaintiffs' liking. Dkt. No. 358 at 41. While failing to do so might clash with Plaintiffs' conception of the "best practices and good government," Bagley Tr. 143:11–12, 67:13–14 (Dkt. No. 323-41), it does not show that the General Assembly "acted with invidious intent," *Abbott*, 138 S. Ct. at 2325.

Finally, Plaintiffs attempt to manufacture a showing of racial discrimination from the General Assembly's decision to keep Sun City whole but not to reunify North Charleston or Charleston County, *see* Dkt. No. 358 at 45, fails. The decision to keep Sun City whole by splitting two voting districts from the rest of Jasper County reflected public input and testimony—and, in fact, was supported by Senator Margie Bright Matthews, an African-American Democrat. *See* Nov. 29, 2021 Tr. 6, 21–22 (Dkt. No. 323-39); *see also* Dkt. No. 323 at 15; Terreni Tr. 295:3–22 (Ex. 2). That action was not "comparable" to the decision not to repair the splits of North Charleston or Charleston County given the size of the population involved and the fact that Charleston has been split in several successive redistricting plans, including the plan drawn by this Court in 2002. *See* Terreni Tr. 337:3–339:15 (Ex. 2).

Recognizing that inquiries legislative motives "are a hazardous matter," the Supreme Court has long been "reluctant" to attribute the motivations of individual legislators or others to "the legislative body as a whole"—even when such motivations are "backed" by direct evidence. *Dobbs*, 142 S. Ct. at 2255. Plaintiffs' limited circumstantial evidence is all the more inadequate. The Court should grant summary judgment on the intentional discrimination claim.

## CONCLUSION

The Court should grant summary judgement and dismiss Plaintiffs' suit.

September 9, 2022                    Respectfully submitted,

/s/ Robert E. Tyson Jr.
Robert E. Tyson, Jr. (7815)
Vordman Carlisle Traywick, III (12483)
La'Jessica Stringfellow (13006)
ROBINSON GRAY STEPP & LAFFITTE, LLC
1310 Gadsden Street
Post Office Box 11449 (29211)
Columbia, South Carolina 29201
(803) 929-1400
rtyson@robinsongray.com
ltraywick@robinsongray.com
lstringfellow@robinsongray.com

John M. Gore (admitted *pro hac vice*)
Stephen J. Kenny (admitted *pro hac vice*)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Phone: (202) 879-3939
Fax: (202) 626-1700
jmgore@jonesday.com
skenny@jonesday.com

*Counsel for Senate Defendants*

/s/ Mark C. Moore
Mark C. Moore (Fed. ID No. 4956)
Jennifer J. Hollingsworth (Fed. ID No. 11704)
Hamilton B. Barber (Fed. ID No. 13306)
Michael A. Parente (Fed. ID No. 13358)
NEXSEN PRUET, LLC
1230 Main Street, Suite 700
Columbia, SC 29201
Telephone: 803.771.8900
MMoore@nexsenpruet.com
JHollingsworth@nexsenpruet.com
HBarber@nexsenpruet.com
MParente@nexsenpruet.com

William W. Wilkins (Fed. ID No. 4662)
Andrew A. Mathias (Fed. ID No. 10166)
Konstantine P. Diamaduros (Fed. ID No. 12368)
NEXSEN PRUET, LLC

24

104 S. Main Street, Suite 900
Greenville, SC 29601
Telephone: 864.370.2211
BWilkins@nexsenpruet.com
AMathias@nexsenpruet.com
KDiamaduros@nexsenpruet.com

Rhett D. Ricard (Fed. ID No. 13549)
NEXSEN PRUET, LLC
205 King Street, Suite 400
Charleston, SC 29401
Telephone: 843.720.1707
RRicard@nexsenpruet.com

*Counsel for House Defendants*