# Exhibit 1

Page 1

```
 1              UNITED STATES DISTRICT COURT
                DISTRICT OF SOUTH CAROLINA
 2                  COLUMBIA DIVISION
 3    THE SOUTH CAROLINA
      STATE CONFERENCE OF
 4    THE NAACP, et al,
 5              Plaintiffs,
 6         vs.               CASE NO.
                             3:21-CV-03302-MBS-TJH-RMG
 7    THOMAS C. ALEXANDER,
      et al,
 8
                Defendants.
 9
10    VIDEOCONFERENCE
11    DEPOSITION OF:   WILLIAM ROBERTS
12    DATE:            July 7, 2022
13    TIME:            9:35 a.m.
14    LOCATION:        1310 Gadsden Street
                       Mahogany Conference Room
15                     Columbia, SC
16    TAKEN BY:        Counsel for the Plaintiffs
17    REPORTED BY:     ERIC GLAZIER, Court Reporter
18
19
20
21
22
23
24
25
```

Page 2

1  APPEARANCES OF COUNSEL VIA VIDEOCONFERENCE:
2
3    ATTORNEYS FOR THE PLAINTIFFS:
4        NAACP LEGAL DEFENSE AND EDUCATIONAL
         FUND
5        BY:  JOHN S. CUSICK
         40 Rector Street
6        5th Floor
         New York, NY 10006
7        (212) 965-2269
         Jcusick@naacpldf.org
8
         and
9
         AMERICAN CIVIL LIBERTIES UNION
10       BY:  ADRIEL CEPEDA DERIEUX
         125 Broad Street
11       18th Floor
         New York, NY 10004
12       (212) 549-2500
         Acepedaderieux@aclu.org
13
     ATTORNEYS FOR DEFENDANTS
14       THOMAS C. ALEXANDER, in his official
         capacity as President of the Senate;
15       LUKE A. RANKIN, in his official
         capacity as Chairman of the Senate
16       Judiciary Committee:
17       ROBINSON GRAY
         BY:  ROBERT E. TYSON
18       1310 Gadsden Street
         Columbia, SC 29201
19       (803) 929-1400
         Rtyson@robinsongray.com
20
         and
21
         JONES DAY
22       BY:  JOHN M. GORE
         51 Louisiana Avenue NW
23       Washington, DC 20001
         Jmgore@jonesday.com
24
25

Page 3

1    ATTORNEYS FOR DEFENDANTS
         JAMES H. LUCAS, in his official
2        capacity as Speaker of the House of
         Representatives; CHRIS MURPHY, in his
3        official capacity as Chairman of the
         House of Representatives Judiciary
4        Committee; WALLACE H. JORDAN, in his
         official capacity as Chairman of the
5        House of Representatives Elections Law
         Subcommittee:
6
         NEXSEN PRUET
7        BY:  ANDREW MATHIAS
         104 South Main Street
8        Suite 900
         Greenville, SC 29601
9        (864) 282-1195
         Amathias@nexsenpruet.com
10
     ATTORNEYS FOR DEFENDANTS
11       JOHN WELLS, Chair, JOANNE DAY, CLIFFORD
         J. EDLER, LINDA McCALL, and SCOTT
12       MOSELEY, in their official capacities
         as members of the South Carolina
13       Election Commission:
14       BURR & FORMAN
         BY:  JANE W. TRINKLEY
15           MICHAEL R. BURCHSTEAD
         1221 Main Street
16       Suite 1800
         Columbia, SC 29201
17       (803) 753-3241
         Jtrinkley@burr.com
18       Mburchstead@burr.com
19
20   ALSO PRESENT VIA VIDEOCONFERENCE:
21       MARGARET LEATHERWOOD
         CYNDI NYGORD
22
23
24       (INDEX AT REAR OF TRANSCRIPT)
25

Page 4

1                P R O C E E D I N G S
2                       - - - - -
3           COURT REPORTER:  The attorneys
4  participating in this deposition acknowledge that
5  the reporter is not physically present in the
6  deposition room and that the reporter will be
7  reporting this deposition remotely.
8           They further acknowledge that in lieu
9  of an oath administered in person, I will
10 administer the oath remotely.
11          If any party has an objection to this
12 manner of reporting, please state it now.
13          Hearing none, I will proceed.
14          WILLIAM ROBERTS,
15 being first duly sworn, testified as follows:
16              EXAMINATION
17 BY MR. CUSICK:
18     Q.   Good morning, Mr. Roberts.  My name is
19 John Cusick.  I'm one of the attorneys representing
20 the plaintiffs in this lawsuit, The South Carolina
21 State Conference of the NAACP vs. Alexander.
22          If you don't mind, could you please
23 state your full name for the record, spelling your
24 first and last name?
25     A.   My name is William Francis Roberts, Jr.

Page 5

1  W-I-L-L-I-A-M is the first name.  Last name is
2  Roberts, R-O-B-E-R-T-S.
3      Q.   Great.  Thank you.
4           MR. CUSICK:  And I'll just take a
5  moment now, if everybody in the virtual room, if
6  you will, who is planning to make an appearance,
7  will do so in a moment.
8           And I'll start with any of your counsel
9  in your room, Mr. Roberts.
10          MR. GORE:  Good morning.  This is John
11 Gore of Jones Day for senate defendants Rankin and
12 Alexander.
13          MR. TYSON:  And Rob Tyson.  I'm with
14 John and Will.
15          MR. MATHIAS:  And this is Andrew
16 Mathias with Nexsen Pruet on behalf of the
17 individual house defendants.  With me in the room
18 is Meg Leatherwood, who's a Georgetown law student
19 and summer associate with us at Nexsen Pruet.
20          MS. TRINKLEY:  This is Jane Trinkley
21 with Burr & Forman.  I represent the election
22 defendants.
23          MR. DERIEUX:  Hi.  This is Adriel
24 Cepeda of the ACLU, also representing the
25 plaintiffs.

Page 14
1  maps?
2      A.  Yes.
3      Q.  Did you discuss any maps that were
4  produced during that conversation not by members of
5  the senate?
6      A.  Could you clarify what you mean by,
7  discuss the maps?
8      Q.  I might have misheard you, but you
9  talked about timelines for when you received maps
10  or proposed maps; is that right?
11      A.  That's correct.
12      Q.  And did that include all maps that were
13  submitted during the congressional redistricting
14  cycle or just maps proposed or created by the
15  senate?
16      A.  That would have been -- it would have
17  been maps from outside parties.
18      Q.  And who would those outside parties
19  have been?
20      A.  I don't recall the exact name of the
21  organization that submitted them.
22      Q.  Do you know what a type of -- let me
23  rephrase that.
24          Was it a partisan organization?
25      A.  Yes.

Page 15
1      Q.  Would it have been the National
2  Republican Redistricting Trust?
3      A.  Yes.
4      Q.  And why did you talk about the timeline
5  for that submission of that map?
6      A.  We couldn't remember when those maps
7  were submitted.
8      Q.  Have you been in contact with anyone
9  from the National Republican Redistricting Trust?
10      A.  No.
11      Q.  Do you know who Mr. Adam Kincaid is?
12      A.  I've heard the name.  Never spoke to
13  him.  Don't know who he is.
14      Q.  Did Mr. Fiffick share maps with you
15  that were proposed by the National Republican
16  Redistricting Trust?
17      A.  Yes.
18      Q.  And that was during the redistricting
19  cycle?
20      A.  That's correct.
21      Q.  Did the discussion concern any other
22  maps outside of those that were produced by the
23  National Republican Redistricting Trust?
24      A.  No.  We were just trying to get a
25  timeline of when they were submitted in the

Page 16
1  process.
2      Q.  Do you recall how many maps were
3  submitted?
4      A.  I believe there was three.
5      Q.  Three maps?  Do you recall the timeline
6  for when they were shared with you?
7      A.  I know that two maps were sent at first
8  and then a third map was sent later on.  I do not
9  know the timeline of when that occurred or where we
10  were in the process.
11      Q.  Would Mr. Fiffick have a better
12  understanding of the timeline?
13      A.  They were sent to him, so I would
14  assume he has documentation of when those were
15  sent.
16      Q.  And then he forwarded those maps to
17  you?
18      A.  We tried to forward them over to us to
19  load them into the computer, but something was
20  going on with the email accounts, but somehow we
21  got them loaded into the computer to review.
22      Q.  Were they shared via Google Drive?
23      A.  I'm not sure how they were shared.
24      Q.  Do you have an understanding of this
25  lawsuit at all?

Page 17
1      A.  Not really.
2      Q.  Are you familiar with the claims that
3  are being alleged by plaintiffs?
4      A.  I don't know what the claims are.  I
5  haven't read the lawsuit.
6      Q.  Have you been deposed before?
7      A.  Yes.
8      Q.  In a personal or professional capacity?
9      A.  A professional capacity.
10      Q.  When was that?
11      A.  Several years ago.  I don't know the
12  exact year.
13      Q.  What was the nature of the dispute?
14      A.  So the previous office that I worked
15  for was required to run election reports, and what
16  we would do is, we would take the voter file from
17  the state election commission and we would run that
18  through our GIS system.  And what that would
19  produce is a map -- or actually map the individual
20  voters of the voter file so that we could compare
21  the districts that they were assigned to, to what
22  districts that they actually fell in on the map.
23          And so we began this process back
24  probably mid-2000s.  And so there was a budget
25  proviso put into the budget that required us to

Page 78

1  A. Yes.
2  Q. And who gave you that instruction?
3  A. That would have been a request by
4  Congressman Clyburn.
5  Q. Sorry. I think the...
6  (Off-the-record conference to address a
7  technical issue)
8  BY MR. CUSICK:
9  Q. Unfortunately, I'll have to repeat this
10 question just to make sure we're on the same page
11 for setting these other ones up.
12     We were talking about what you said, an
13 instruction from Representative Clyburn. Do you
14 recall that?
15 A. That's cor- -- yes.
16 Q. And could you repeat the instruction
17 that you said you were given?
18 A. They were looking for a minimal-change
19 plan.
20 Q. You said, least-change plan?
21 A. Minimal-change plan, yes.
22 Q. Minimal-change plan.
23     Was that specific to Congressional
24 District Six or for all congressional districts?
25 A. I'm not really sure.

Page 79

1  Q. You didn't ask any questions to follow
2  up?
3  A. No. They had brought us a map of what
4  they proposed as far as the district, and from what
5  we could tell looking at the map, it was a
6  minimal-change district just for the sixth
7  congressional district, or for Senator --
8  Congressman Clyburn's district.
9  Q. And just so the record's clear, you
10 said when you looked, it looked like a
11 minimal-change plan. Did they actually ever say it
12 was a minimal-change plan?
13 A. Yes. Yes, they -- that's what they
14 requested.
15 Q. And was this specific to just
16 Congressional District Six, the map that you were
17 shown?
18 A. It was of just Congressional District
19 Six. That's correct.
20 Q. So was the instruction by -- that you
21 understood for minimal change just related to
22 Congressional District Six?
23 A. Yes, as well as the seventh
24 congressional district, which we were told, don't
25 mess with the seventh congressional district.

Page 80

1  Q. Got it.
2     Was the map that they provided ever
3  publically posted?
4  A. No, it was not.
5  Q. Did you share it with any members of
6  the redistricting subcommittee?
7  A. I don't recall.
8  Q. Do you know who would recall?
9  A. Possibly Andy or Charlie.
10 Q. Why wouldn't you post a map that was
11 proposed online to the portal?
12 A. It was not submitted through the
13 portal, and it was an eight-and-a-half-by-eleven
14 printed sheet of paper.
15 Q. Would it have been possible to ask for
16 a map to upload publicly?
17 A. Possibly.
18 Q. So were maps that were only submitted
19 through the portal publicly uploaded?
20 A. I'd have to go back and look and see
21 what's up on the web now. I can't recall.
22 Q. Could it have been scanned and
23 uploaded?
24 A. That's possible, yes.
25 Q. Do you think it would have been

Page 81

1  appropriate for members of the public to understand
2  a map that was proposed by a congressman?
3  A. Was not my call to make.
4  Q. Whose call was it to make?
5  A. Either Andy or Charlie.
6  Q. Who made the call?
7  A. I don't recall.
8  Q. Based on your experience in drawing
9  maps, do you think it's helpful to share plans that
10 might be being considered as you're drawing maps
11 with members of the public?
12 A. Yes.
13 Q. What are the benefits of that?
14 A. Provide -- get public input back on --
15 and feedback back on the map.
16 Q. Did you ever share with any members of
17 the public that you were instructed to draw a
18 minimal change for Congressional District Six?
19 A. Yes. I believe it was in public
20 testimony when we rolled out the senate staff plan.
21 Q. That you were instructed by
22 Representative Clyburn's office to draw a
23 minimal-change map for CD Six?
24 A. I don't think we -- I did not state
25 that it was from Congressman Clyburn to draw a

21 (Pages 78 - 81)

Page 110

1  Q. Did you expect members to ask for BVAP
2  breakdowns?
3  A. Yes. We produce those reports as well.
4  Q. Who made the request for breakdowns for
5  the data -- for the partisan breakdown data from
6  the subcommittee?
7  A. I know for a fact that Senator Campsen
8  requested it, but I believe -- I'd have to go back
9  and look at the notes. I think everybody is
10 provided with the same information. But there was
11 some specific request from Senator Campsen for the
12 information.
13 Q. Did you make it aware to all
14 subcommittee members that you had access to this
15 data?
16 A. Yes.
17 Q. Was that conveyed via email or other
18 means?
19 A. I don't remember how it was conveyed to
20 the members, but everybody knew that we had
21 political data.
22 Q. I think you mentioned that you saw data
23 for the most recent election returns. Did I hear
24 that right?
25 A. Yes. We had election data for the 2020

Page 111

1  presidential election, as well as the 2016 election
2  cycle as well. I believe it might have been -- I
3  think we had 2020 presidential and senate, and I
4  don't recall exactly what was on the 2016, because
5  we relied heavily on the 2020 presidential election
6  results in the construction of the plans.
7  Q. Did you request any primary election
8  results?
9  A. I don't recall at this moment.
10 Q. Do you know who would recall?
11 A. The request for the data from Clark
12 either came from Charlie or Andy.
13 Q. And so just to help my own orientation,
14 before any maps were drawn, what information was
15 provided -- what data sources were the
16 redistricting subcommittee made aware of that they
17 could have access to?
18 A. We had the 2020 census data and we
19 had -- we had the political data for 2020 and 2016.
20 I just don't know if the members were told that up
21 front or not.
22 Q. At any point, did you prepare packets
23 with all of that information based on the maps you
24 drew for all the members to assess?
25 A. Yes.

Page 112

1  Q. Did anybody else make specific requests
2  for certain data like the one you mentioned with
3  Senator Campsen throughout the process?
4  A. When we discussed maps with members,
5  that was something we typically discussed with
6  them, was the 2020 election performance in each of
7  the districts.
8  Q. You recall discussions with Senator
9  Campsen. Any other discussions about political
10 performance that you participated in with other
11 members?
12 A. Yeah. I had a conversation with
13 Senator Grooms. We had two maps that we were
14 looking at, trying to get some feedback on from
15 him. There was two maps. One of them had a
16 smaller Trump -- republican percentage number in
17 the first congressional district than the other.
18 We showed Senator Grooms both maps. He said he
19 liked both of them very much, but only one of them
20 was going to pass the South Carolina general
21 assembly.
22 Q. Do you have any sense why he liked one
23 map more than the other?
24 A. He said he liked both maps the same,
25 but one was going to pass the South Carolina

Page 113

1  general assembly and one wasn't.
2  Q. Did he explain why one was and one
3  wasn't?
4  A. He did. He said that the map that had
5  the lower republican -- the lower Trump number
6  would not have passed the South Carolina general
7  assembly.
8  Q. Was this the only political data that
9  you had access to for congressional redistricting,
10 was what was provided by Mr. Benson -- or was it
11 Mr. Benson? Sorry.
12 A. That was the only data that we actually
13 loaded into the mapping system. The state election
14 commission has a large database of previous
15 election results that we downloaded but never
16 pulled into a mapping format.
17 Q. Did you have any other contact with any
18 other senators outside of Senator Grooms who are
19 not part of the redistricting subcommittee about
20 congressional redistricting?
21 A. Not that I can recall at this moment.
22 Q. Do you know if Mr. Terreni or other
23 folks were involved in any, and then you received
24 information about those conversations or contact?
25 A. You'd have to ask them.

29 (Pages 110 - 113)

| | |
|---|---|
| Page 134 | Page 136 |
| 1   A.  It's something we took under | 1  which public comments influenced which lines. |
| 2  consideration in drafting the maps. | 2      Q.  And so did you go back and review |
| 3       MR. CUSICK:  I'm now going to mark an | 3  public comments? |
| 4  email from Madison Faulk to Maxine Henry titled, | 4      A.  No.  It was just something that we |
| 5  meeting minutes, which includes attachments of | 5  picked up, that I can recall, during public |
| 6  meeting minutes.  It's from public hearings Bates | 6  testimony. |
| 7  stamp numbering, South Carolina Senate ending in | 7      Q.  Do you recall if there was a transcript |
| 8  24941 through 24942 as Plaintiff's Exhibit 7.  I'll | 8  at all created, documenting all the public |
| 9  pull it up on the screen in a moment. | 9  comments? |
| 10      DEFENSE COUNSEL:  Which tab is it, | 10     A.  I know there was a court reporter |
| 11  John? | 11  present at the meetings. |
| 12      MR. CUSICK:  This should be Tab 30. | 12     Q.  Do you think it would have been |
| 13      (PLF. EXHIBIT 7, EMAIL RE: MEETING | 13  beneficial to hold additional hearings after the |
| 14  MINUTES AND ATTACHMENT, was marked for | 14  redistricting criteria was adopted by the senate? |
| 15  identification.) | 15     A.  That wasn't a decision that would have |
| 16  BY MR. CUSICK: | 16  been up to me to make. |
| 17      Q.  So the first page is an email between | 17     Q.  Even if it wasn't your decision, would |
| 18  Madison Faulk and Maxine Henry.  And then the | 18  it have been helpful, based on your experience as a |
| 19  second is just the first page of a summary of | 19  map drawer? |
| 20  testimony at some of these hearings, just the | 20     A.  I'd say, not really, because a lot of |
| 21  August 2nd one.  I will not be going over each one, | 21  the public comments we got was complaining about |
| 22  just a general placeholder here for you. | 22  the redistricting process.  It wasn't really |
| 23      I just want to see, do you recall at | 23  helpful when we were out -- from a mapping |
| 24  all ever seeing these summaries for any of the | 24  standpoint, I was out there to find out what the |
| 25  hearings? | 25  community's interests were from the public, and all |
| Page 135 | Page 137 |
| 1    A.  Yeah, I don't recall looking at these | 1  we got was a lot of feedback that they didn't like |
| 2  written summaries. | 2  the process, that it was rigged, and there was a |
| 3      Q.  Did you take notes during the public | 3  negative sentiment from the public.  We really |
| 4  hearings that you attended? | 4  didn't even make it out on the floor as a |
| 5      A.  Not that I recall, no. | 5  cartographer. |
| 6      Q.  How did you keep track of testimony and | 6      Q.  So in these ten hearings, you said you |
| 7  other things that were commented during the | 7  didn't get many information that you relied on as a |
| 8  hearings to make sure you were incorporating that | 8  cartographer? |
| 9  in any work that you conducted? | 9      A.  That's correct. |
| 10     A.  Could you repeat that question? | 10     Q.  And so what did you look to outside of |
| 11     Q.  You said you don't recall if you took | 11  these hearings for assessing public input or public |
| 12  notes? | 12  comments to help you as a cartographer in drawing |
| 13     A.  I did not take notes. | 13  congressional redistricting maps? |
| 14     Q.  Did not take notes. | 14     A.  Really just relied upon the public |
| 15      My question, then, was, what did you do | 15  comments at these hearings. |
| 16  to keep track of the information that was being | 16     Q.  You heard complaints, you said, about |
| 17  disclosed at these hearings? | 17  the process being rigged? |
| 18     A.  I just listened to the public testimony | 18     A.  Yeah, some of the -- being |
| 19  that was given. | 19  nontransparent and behind closed doors. |
| 20     Q.  And so could you walk me through how | 20     Q.  Did you hear any complaints that were |
| 21  the public testimony from these ten hearings | 21  similar after those hearings about the process not |
| 22  factored into the maps that you drew for | 22  being transparent? |
| 23  congressional redistricting? | 23     A.  I don't recall. |
| 24     A.  If I had a copy of the map in front of | 24     Q.  Do you think it would have been |
| 25  me, I could walk you through the map and tell you | 25  helpful, providing those instructions you received |

Page 166

1  criteria that didn't involve legal questions?
2     A.  Not that I can recall.
3     Q.  Do you know if any assessment of
4  whether this map complied with the Voting Rights
5  Act was conducted?
6     A.  I have no idea.
7     Q.  Did you take any steps from a technical
8  side to ensure that this map complied with
9  redistricting criteria?
10    A.  We ran a continuity check on it to make
11 sure everything was contiguous according to the
12 software algorithm, made sure that everything was
13 also assigned so there was no unassigned population
14 in the map.  And that's all I can recall at this
15 moment.
16    Q.  Even if you didn't conduct an RPV
17 analysis, do you know if any was contemplated or
18 conducted on this map, or for this map?
19    A.  I don't know.
20    Q.  Have you heard the term, effectiveness
21 analysis?
22    A.  No, I have not.
23    Q.  If I explained it as a study of two or
24 more redistricting plans using a set of metrics to
25 assess opportunities for voters, does that at all

Page 167

1  seem consistent or accurate with anything you've
2  heard about it?
3     A.  Can you say that one more time?
4     Q.  I guess maybe a simpler way is, were
5  there any assessments conducted that compared two
6  maps for how they might perform for certain voters?
7     A.  We did compare -- we did do sheets and
8  reports comparing this map to the benchmark map.
9     Q.  On what metrics for the comparison
10 purposes?
11    A.  Looked at population, looked at racial
12 make-up of the districts, as well as partisan
13 numbers.
14    Q.  And for the partisan numbers, was that
15 based on the 2020 presidential elections?
16    A.  Primarily, yes.
17    Q.  Any other elections?
18    A.  We did have 2016 data, but I don't
19 believe it was used in any kind of analysis.
20    Q.  We talked earlier about assessments to
21 see if maps might perform for racial minorities to
22 elect candidates of their choice.
23        Do you recall that discussion?
24    A.  Yes.
25    Q.  Were any assessments along those lines

Page 168

1  conducted for how this map might compare to other
2  ones that were proposed by members of the public?
3     A.  Not that I'm aware of.  We had no set
4  target or benchmark that we were trying to draw to
5  as far as racial make-up.
6     Q.  How did you determine what the BVAP
7  would be in each district?
8     A.  There was no set target we were trying
9  to get to for the BVAP in each district.  That's
10 just the calculation the software provides once the
11 district's drawn.
12    Q.  But it would be fair to say that you
13 can control what those targets were based on the
14 districts you were proposing in Maptitude?
15        DEFENSE COUNSEL:  Objection.
16 Mischaracterizes testimony.
17    A.  Can you repeat that one more time?
18    Q.  Yeah.  I was saying that, the BVAP
19 would change based on edits you were making in the
20 Maptitude software, right?
21    A.  That's correct.
22    Q.  Was there any discussion on what the
23 BVAP should be in CD Six, whether it should
24 increase, decrease, or stay the same compared to
25 the benchmark plan?

Page 169

1     A.  Not that I recall.
2     Q.  Was there any district-by-district
3  analysis conducted for each of these before the map
4  was publicly posted?
5     A.  Not that I can recall at this point.
6     Q.  I heard you say that there weren't any
7  targets for BVAP, but were there any other
8  discussions about increasing or decreasing BVAP in
9  districts outside of CD Six?
10    A.  Not that I can recall.
11    Q.  If you kept the core districts the same
12 or under a minimal change, would you agree that the
13 BVAP would likely stay the same in a congressional
14 district?
15    A.  Say that for me one more time.
16    Q.  Would you agree that if you were trying
17 to retain core constituency or a minimal-change
18 map, that you would expect the BVAP within
19 congressional districts to relatively be the same
20 compared to a benchmark plan?
21        DEFENSE COUNSEL:  Objection.
22 Foundation.
23    A.  It would depend on the geography -- it
24 would depend on the population which you were
25 moving into and out of districts.

Page 178

1    Q.  As you were drawing these, did you look
2  at any statewide or county-level voting patterns?
3    A.  We looked at the political information
4  typically at the VTD level when making these
5  changes.
6    Q.  Did you share with any redistricting
7  subcommittee members that there was a goal to
8  maximize CD One as republican-leaning?
9    A.  Can you repeat that question?
10    Q.  Did you share with any of the
11  redistricting subcommittee members a goal to
12  maximize CD One to be republican-leaning compared
13  to the benchmark plan?
14    A.  I don't recall.
15    Q.  Do you think it would have been
16  helpful?
17    A.  Possibly.
18    Q.  And why?
19    A.  To explain some of the questions we got
20  about the way the map worked.
21    Q.  Do you recall your testimony earlier
22  about the process being rigged that you heard
23  during public comments?
24    A.  Could you repeat that again?
25    Q.  Do you recall what we discussed earlier

Page 179

1  about the redistricting process being rigged that
2  members of the public expressed at different
3  hearings?
4    A.  Yes.
5    Q.  Do you think it would have been helpful
6  to share that a goal of CD One was maximizing it
7  being republican-leaning?
8    A.  I wouldn't say the goal is for us to
9  maximize this.  There's other ways to draw it which
10  we could have maximized the republican -- I
11  wouldn't say this is the maximization republican
12  plan from the first, but it was drawn not to dilute
13  the republican percentage in the first.
14    Q.  And how did you go on about assessing
15  dilution of republican voters?
16    A.  We looked at the benchmark performance
17  compared to the map that we were putting together.
18    Q.  When you were looking at specific VTDs
19  that you were moving in and out, did you at all
20  look at race of the voters within those VTDs?
21    A.  No, we did not.  We looked strictly at
22  the 2020 presidential election results.
23    Q.  Was it possible to look at race based
24  on the software you were using?
25    A.  That was possible, yes.

Page 180

1    Q.  Was there an instruction not to use or
2  to look at race?
3      DEFENSE COUNSEL:  Objection.  Asked and
4  answered.
5    A.  No, there was no direction not to look
6  at it.
7    Q.  And this just might be my own naivety
8  with the software, but is this there -- do you have
9  to turn on displays of different demographic
10  categories that are included in the Maptitude
11  software when you're making changes?
12    A.  Yes, it's possible to do that.
13    Q.  And so, I guess, what's displayed on
14  the screen when you're making the changes for
15  potential demographic categories that could be
16  shown?
17    A.  What we used was basically the total
18  population and the percent -- yeah, percent Biden
19  number, the percent Trump number when we were
20  drawing.
21    Q.  And so after this initial proposal was
22  finalized, was there any discussion of BVAP among
23  the districts before it was publicly posted?
24    A.  Not that I can recall right now.
25    Q.  Who do you consider the primary

Page 181

1  decision-makers for this proposal?
2    A.  That would have been the core
3  redistricting group of Mr. Terreni, Andy Fiffick,
4  myself, Breeden John, Paula Benson.
5    Q.  I'll take this map down for a second.
6      And so after the map's published on
7  November 23rd, the senate redistricting
8  subcommittee then holds a hearing on November 29th.
9  Do you recall that?
10    A.  Yes, I do.
11    Q.  For that hearing, were you asked to
12  conduct any outreach to members of the public?
13    A.  I don't recall if I was or not.
14    Q.  For that hearing, did you prepare any
15  materials?
16    A.  I would have prepared the maps and
17  stats as well as copies of the reports, but I don't
18  remember if we put anything together or not other
19  than that.  I can't recall.
20    Q.  Were you asked by anybody to speak at
21  the hearing?
22    A.  I believe I gave an overview -- I'd
23  have to go back and look at the transcript.  I
24  believe I gave an overview of the staff plan.
25    Q.  We can -- probably helpful to pull that

46 (Pages 178 - 181)

Page 198

1  between the two of us.  And that was also known to
2  the redistricting staff, as we produced several
3  reports for him to take a look at the numbers as
4  far as the percentage make-up of the Charleston
5  Coun- -- or of the First -- sorry -- the percentage
6  make-up of how much of Charleston County was in the
7  first congressional district, population-wise.
8       Q.  Do you recall generally when that
9  meeting -- or that phone call -- that phone call
10 occurred?
11      A.  I do not remember the exact time frame.
12 I really...
13      Q.  Was there --
14      A.  I don't know.
15      Q.  Was there any discussion with Senator
16 Campsen about the total populations or BVAP?
17      A.  No, not with BVAP.  The total
18 populations were going to be the same across the
19 board between all the districts as they were.  It
20 was just how much of Charleston County was going
21 into the First.
22      Q.  Got it.
23          Did he ask you to do any follow-up
24 steps based on that conversation?
25      A.  Can you clarify what you mean by,

Page 199

1  follow-up steps?
2       Q.  Or, I guess, was there any discussion
3  on how that might impact the maps you were drawing
4  or working on?
5       A.  Yeah.  So there were multiple maps that
6  we had that he was contemplating against -- about
7  and, you know, one of them had more of Charleston
8  County in the First, which brought the republican
9  performance down.  One of them had more of
10 Charleston County in the Sixth, which increased the
11 Trump performance in the First.
12          MR. CUSICK:  Now I'm going to bring up,
13 mainly just for ease of reference purposes, a press
14 release by the Senate Judiciary Committee as
15 Plaintiff's Exhibit 20.  That's on the senate
16 redistricting site.
17          (PLF. EXHIBIT 20, SENATE JUDICIARY
18 COMMITTEE PRESS RELEASE, was marked for
19 identification.)
20 BY MR. CUSICK:
21      Q.  Can you see this okay, Mr. Roberts?
22      A.  Yes.
23          DEFENSE COUNSEL:  Do you have a tab
24 number for this?
25          MR. CUSICK:  I'm trying to find where

Page 200

1  it might be.  I might have mislabeled this one.
2           Do you want to just take a minute to
3  review this, what's on the screen, if helpful?
4           DEFENSE COUNSEL:  Is this on the
5  website, John?
6           MR. CUSICK:  Yeah, this is pulled
7  directly from the senate -- it's a press release
8  from the senate redistricting subcommittee.
9           DEFENSE COUNSEL:  I'm handing Will my
10 computer.  I just pulled it up --
11          MR. CUSICK:  Perfect.
12          DEFENSE COUNSEL:  -- so he can see it
13 on the screen as well.
14 BY MR. CUSICK:
15      Q.  And so here, it states in the first
16 sentence, the senate redistricting subcommittee has
17 posted two proposed congressional plans to be
18 considered, one of which was referred to generally
19 as the senate amendment one plan and the other was
20 by Senator Harpootlian.
21          Do you recall that?
22      A.  I'd have to go back and look at what's
23 posted online.  I don't -- I couldn't tell you what
24 these were referring to in this, which two plans.
25      Q.  After the initial staff plan, did you

Page 201

1  work on a second map that was publicly posted and
2  shared?
3       A.  Yes.  That would have been the senate
4  amendment one plan.
5       Q.  Yeah.
6           And can you walk me -- who was involved
7  in the senate amendment one plan's creation?
8       A.  That would have been the core
9  redistricting group of Andy Fiffick, Charlie
10 Terreni, myself, Breeden John, and Paula Benson.
11      Q.  Anyone else?
12      A.  Possibly Maura Baker or Madison Faulk.
13 They were in and out of the room.
14      Q.  And were there any differences in the
15 data you had available to you for the creation
16 of -- or the creation of that map versus the senate
17 staff plan?
18      A.  Not that I can recall.  I think we used
19 the same data throughout the redistricting process.
20      Q.  Did you rely on the same priority
21 criteria in drawing that map?
22      A.  The map that was released as senate
23 amendment one was -- had the same criteria,
24 especially the don't touch the Seventh, Congressman
25 Clyburn wants a minimal change, Joe Wilson wants

Page 202

1  Fort Jackson, and don't go to Beaufort.
2         And then we took -- and that created
3  the original staff plan, and then we took the
4  public input that we received on the original staff
5  plan and made some modifications to the staff plan
6  to create this one.
7      Q.  Got it.
8         Did any members -- any senate
9  redistricting subcommittee members have input in
10 this -- in senate amendment one?
11     A.  Senator Campsen -- this is the one --
12 this is -- Senator Campsen possibly could have had
13 some input on this, this being the vehicle that was
14 moving forward.
15     Q.  Anyone else outside of Senator Campsen
16 that's part of the redistricting subcommittee?
17     A.  Not that I can recall.
18     Q.  And this is mainly just to make sure I
19 know if there are any differences, but were there
20 any changes in who was responsible for providing
21 legal advice on this proposal based on the initial
22 staff plan?
23     A.  Can you repeat that one more time?
24     Q.  Any differences in the make-up of
25 people who might have provided legal advice on this

Page 203

1  proposal compared to the initial staff plan?
2      A.  I don't believe so.  The staff remained
3  the same throughout the entire redistricting
4  process.
5      Q.  Now, that Senator Campsen was involved
6  in this process -- I know we talked earlier that
7  Mr. Terreni kind of had the final responsibility on
8  certain decisions being made.
9         Did that change at all with this plan,
10 given Senator Campsen might have had some input?
11     A.  Can you repeat that one more time?
12     Q.  Got it.
13        Was Mr. Terreni -- or, I guess, who had
14 primary responsibility for final decisions over the
15 way certain districts were drawn in this plan?
16     A.  That would have been senators
17 themselves.
18     Q.  The full senate subcommittee?
19     A.  The subcommittee -- the senate
20 subcommittee would have voted on the plan, but this
21 is what came out of the changes that were made to
22 the staff plan from the public input.
23     Q.  Did you provide or did the core
24 redistricting team provide senate amendment one to
25 all the redistricting subcommittee members before

Page 204

1  it was publicly posted?
2      A.  I don't recall.  I can't remember.
3      Q.  I think I know the answer to this, but
4  I've just got to run it down.
5         For assessing compliance with the
6  public redistricting guidelines, would that have
7  remained the same with Mr. Terreni and Mr. Fiffick,
8  and potentially outside counsel like Mr. Gore?
9      A.  The criteria would have remained the
10 same throughout the entire process.
11     Q.  And apologies.  Probably a bad question
12 on my end.
13        For the people who are making
14 determinations with whether a plan complied with
15 the criteria, would that have been the same folks
16 of Mr. Terreni and Mr. Fiffick and any outside
17 counsel like potentially Mr. Gore?
18     A.  They would have been the ones to make
19 sure that the map complied with the criteria, yes.
20 They would have done the legal analysis.
21     Q.  I won't run down all the different
22 tests I asked you about the first time with RPV and
23 district by district, but were there any reports or
24 analyses that were conducted on this plan that were
25 different or not conducted on the initial senate

Page 205

1  staff plan?
2      A.  I'd have to go back and look at all the
3  notes and the stat sheets and everything.  I can't
4  recall what was done on which plan.
5      Q.  Were there any discussions about
6  maintaining, increasing, or decreasing BVAP in any
7  of these districts?
8      A.  Not that I can recall.
9      Q.  What about how districts might perform
10 for black-preferred candidates?
11     A.  I don't recall any -- any discussion
12 about that.
13     Q.  Could you talk a little bit about how
14 public input was incorporated, who made
15 determinations for what comments were incorporated?
16     A.  Certainly.
17        At the public hearing that we had on
18 the original staff plan, there was a lot of public
19 comments we received.  One in particular was Joe
20 Cunningham, former congressman from the first
21 congressional district.  He spoke at great length
22 about the plan and how it divided communities of
23 interest in the Charleston area, how it was drawn
24 around racial lines.
25        And so we took that into consideration

Page 206

1  and moved the lines to follow the natural
2  geographic features around Charleston County.
3      Q.  Anything else for the process of
4  incorporating public input?
5      A.  With the first congressional district,
6  we also had public input originally in one of the
7  public meetings about the Sun City area of Jasper
8  County wanting to be put in the first congressional
9  district with the Sun City portion of Beaufort
10 County, which is almost right across the road from
11 each other, but it's divided by a county boundary.
12     So we took that into consideration,
13 leading that into -- in the First Congressional
14 District.  And that's about all I can recall as far
15 as public input on the first congressional
16 district, which we went through and changed.
17     Q.  Before it was publicly posted on
18 January 11th, but after it was -- it was finalized,
19 the drawing part of it, were there any discussions
20 about the BVAP in any of the districts?
21     A.  Not that I can recall.
22     Q.  Was it shared with anyone else, the
23 final version, before it was publicly posted,
24 outside of the core redistricting team?
25     A.  Not that I can recall.  It might have

Page 207

1  been sent to members.  I just -- I don't remember.
2      MR. CUSICK:  I'm now going to bring
3  up -- this is Tab 4, and it's the transcript from
4  the January 11th -- or January 13, 2022 hearing.
5  I'll pull it up on the screen in a moment.  This is
6  Plaintiff's Exhibit 22 (sic).  It's in Tab 4.
7      (PLF. EXHIBIT 21, 1/13/2022 VIDEO
8  TRANSCRIPTION, was marked for identification.)
9  BY MR. CUSICK:
10     Q.  I'm not going to go over this entire
11 transcript.  I kind of want to focus your attention
12 to Mr. Oppermann's testimony, if you recall that.
13     And I'll direct you to turn to Page --
14 and I'll bring it up on the screen.  It's Page 18,
15 it begins at.  I have it up on the screen, but let
16 me know if you can see that or have it up in front
17 of you.
18     A.  Yes, I've got it.
19     Q.  So he refers here in line 4 and 5,
20 offering testimony on behalf of what he calls, the
21 whole county map, which has been designated as
22 senate amendment two.  I think it also had been
23 referred to as the Harpootlian amendment at this
24 stage.
25     Do you recall that?

Page 208

1      A.  Vaguely, yes.
2      Q.  Did you review at all senate amendment
3  two?
4      A.  I put the map and stats and reports
5  together for senate amendment two, yes.
6      Q.  Did you conduct -- or did the core
7  redistricting team conduct any assessment of this
8  plan for how it compared to senate amendment one?
9      A.  You'd have to ask them.
10     Q.  By, them...
11     A.  The core redistricting team you just
12 referenced.
13     Q.  But you were not asked to conduct any
14 review or analysis?
15     A.  I wasn't conducting any legal analysis
16 on this.  I was providing maps and stats for the
17 binders.
18     Q.  Outside of legal analyses, did you
19 conduct any review on senate amendment two?
20     A.  Not that I recall.
21     Q.  Do you see on Page 20 that's up on the
22 screen lines 4, 5, and 6 have been highlighted?
23     Can you read that for me?
24     A.  It says, and more closely adheres to
25 continuity objectives under the committee's

Page 209

1  guidelines.
2      Q.  Did you or anyone in the core
3  redistricting team assess whether this statement
4  was accurate?
5      A.  I don't recall.
6      Q.  Did you have any opinion of that
7  statement based on senate amendment one?
8      A.  According to the software that we used,
9  the Maptitude software, both plans are contiguous.
10     Q.  Then on the same page, he states, the
11 whole county map more closely hues to the regions,
12 the distinct regions of the state.
13     Did you or anyone on the core
14 redistricting team assess whether that statement
15 was accurate as compared to the senate amendment
16 one plan?
17     A.  I don't recall.
18     Q.  On Page 21, lines 21 to 25, he states,
19 with respect to minimal county splits, clearly the
20 whole county map is preferable in this sense to
21 amendment one or the plan passed by the house,
22 which have ten county splits, that is not
23 necessary.
24     Did you or anyone assess whether that
25 statement was accurate?

|  | Page 218 |  | Page 220 |
|---|---|---|---|
| 1 | Q. I'll pivot to a different question. | 1 | redistricting team? |
| 2 | How could anyone outside of the core | 2 | A. The public would not have known the |
| 3 | redistricting team know that they met criteria on | 3 | recommendations that were made by Congressman |
| 4 | maps if you didn't disclose the instructions that | 4 | Clyburn and Congressman Wilson. |
| 5 | were given to you by members that were not included | 5 | Q. And so if they didn't know about those |
| 6 | in the redistricting criteria? | 6 | recommendations, how would they then contact their |
| 7 | A. You lost me. You keep -- can you | 7 | congress members to ask them about instructions |
| 8 | clarify that question? | 8 | that might impact redistricting? |
| 9 | Q. How could anybody outside of the | 9 | A. I guess they could have picked up the |
| 10 | redistricting core team who submitted maps know | 10 | phone or emailed. |
| 11 | that they met their criteria if there were certain | 11 | Q. But how would they know if the senate |
| 12 | criteria that were not publicly disclosed that you | 12 | core redistricting team didn't provide or share |
| 13 | and other members were elevating or relying upon? | 13 | that there were instructions they were given or |
| 14 | DEFENSE COUNSEL: Object to form. | 14 | recommendations they were given that guided the |
| 15 | A. Could you clarify that one more time? | 15 | maps that were being drawn? |
| 16 | I'm getting a little confused. | 16 | A. Can you repeat that one more time? |
| 17 | Q. Let's -- do you agree that the senate | 17 | Q. How would they know to pick up the |
| 18 | redistricting subcommittee adopted a set of | 18 | phone to call their congress members to discuss |
| 19 | criteria that guided their work? | 19 | criteria or recommendations that only the core |
| 20 | A. Yes. | 20 | redistricting team knew about and guided their work |
| 21 | Q. And we've already talked about that | 21 | and were not publicly disclosed? |
| 22 | there was a set of instructions that you and the | 22 | A. They would not have known about the |
| 23 | core redistricting team were aware of, correct? | 23 | recommendations. |
| 24 | A. That's correct. | 24 | Q. Did Senator Bright Matthews know about |
| 25 | Q. And those instructions were not at all | 25 | these instructions? |

|  | Page 219 |  | Page 221 |
|---|---|---|---|
| 1 | publicly disclosed, right? | 1 | A. You'd have to ask her. I don't know |
| 2 | A. That's correct. | 2 | what she knows and what she doesn't know. |
| 3 | Q. And they were not within the | 3 | Q. Did you ever discuss them with her? |
| 4 | redistricting guidelines adopted by the senate? | 4 | A. I don't recall. |
| 5 | A. That's correct. | 5 | Q. Did you ever discuss it with Senator |
| 6 | Q. And so how would anybody outside of the | 6 | Sabb? |
| 7 | core redistricting team who submitted maps know | 7 | A. I don't recall. |
| 8 | whether they met the criteria the core | 8 | Q. Did you ever tell her about these |
| 9 | redistricting team was relying upon? | 9 | instructions, either her or Senator Sabb? |
| 10 | A. See, I -- I would say that the | 10 | A. I don't recall. |
| 11 | guidelines were publicly available. The don't | 11 | Q. Do you think it would have been helpful |
| 12 | touch the Seventh, Clyburn wants a minimal-change | 12 | so either one of those members could have then |
| 13 | District Six, Joe Wilson doesn't want to go to | 13 | shared that with their constituents? |
| 14 | Beaufort and he wants to keep Fort Jackson, I would | 14 | A. It would have been helpful, yes. |
| 15 | say those are recommendations that the core | 15 | Q. What about to Mr. Oppermann? |
| 16 | redistricting group decided to use in drawing the | 16 | A. Yes, it would have been helpful to him |
| 17 | map, and not actual criteria. | 17 | as well. |
| 18 | Q. Yep, you -- you've already conceded | 18 | Q. Senator Harpootlian? |
| 19 | that point, but I'm asking, if those | 19 | A. Would have been helpful as well, but I |
| 20 | recommendations that you testified earlier to were | 20 | don't know if he -- if that was relayed to him or |
| 21 | relied upon in the maps you were drawing were only | 21 | not. |
| 22 | known to the core redistricting team, how would | 22 | Q. How about for any of the senators who |
| 23 | members of the public know that the maps they | 23 | offered amendments? |
| 24 | submitted complied with criteria that was only | 24 | A. That would have been helpful as well, |
| 25 | internally being relied upon by the core | 25 | but I don't know if they were aware or not. |

Page 238

 1  one plan was voted out of the redistricting
 2  subcommittee.  Do you recall that?
 3      A.  I don't recall it, but I'll take your
 4  word for it.
 5      Q.  I guess, did you -- for the senate
 6  amendment one plan, did you work out any changes or
 7  iterations of it that were considered after the
 8  public hearing?
 9      A.  I don't recall.
10      Q.  I'm now going to pull up some maps --
11  or stats that were included in maps because I
12  unfortunately do not have Maptitude, so there were
13  certain things I could not open on this computer,
14  but hopefully some of them might -- you might
15  recall, and there are some maps.  So the first
16  one --
17          MR. CUSICK:  Mr. Gore, these will be
18  the tabs beginning on 35, and they're a series of
19  different maps.  The first one is Tab 35, marked as
20  Plaintiff's Exhibit 27.  It's got a Bates stamp
21  ending in 25791, and it's titled, 7 Member
22  Republican Plan Stats.  I'll pull it up on the
23  screen as well.
24          (PLF. EXHIBIT 27, 7 MEMBER REPUBLICAN
25  PLAN STATS, was marked for identification.)

Page 239

 1  BY MR. CUSICK:
 2      Q.  Do you have that in front of you,
 3  Mr. Roberts, or can you see it?
 4      A.  Yes.
 5      Q.  Did you draw this map or do you recall
 6  what plan this refers to?
 7      A.  Yes, I do recall this.
 8      Q.  Who drew this map?
 9      A.  I did.
10      Q.  And who directed you to draw it?
11      A.  I don't recall if it was Andy -- it was
12  either Andy Fiffick or Senator Wes Climer.
13      Q.  Sorry.  Senator who?
14      A.  Wes Climer.
15      Q.  Climer?
16      A.  C-L-I-M-E-R.
17      Q.  And I assume this means seven members
18  of the republican party for each -- all seven
19  congressional districts should be republican under
20  this map?
21      A.  That is correct.
22      Q.  Do you recall when it was created?
23      A.  I do not.
24      Q.  What did you do to determine whether
25  these districts would perform?  Just looking at

Page 240

 1  2020 election data returns?
 2      A.  That's correct.
 3          MR. CUSICK:  And now for what are Tabs
 4  36 and Tab 49, these will be -- Tab 36 will be
 5  Plaintiff's Exhibit 28.  It's titled, 7 Member
 6  Republican Plan 2 Stats, with a Bates number ending
 7  in 25798.
 8          (PLF. EXHIBIT 28, 7 MEMBER REPUBLICAN
 9  PLAN 2 STATS, was marked for identification.)
10          MR. CUSICK:  And then Plaintiff's
11  Exhibit 29 is in Tab 49, with a Bates stamp ending
12  in South Carolina Senate 26828.
13          And they both are stats for the same
14  plan.  Give me one moment to just pull those up.
15          (PLF. EXHIBIT 29, IMAGE FILE, was
16  marked for identification.)
17          DEFENSE COUNSEL:  Sorry, John.  This
18  second tab, which one was it, 37?
19          MR. CUSICK:  36, and then the second
20  one is 49.
21          DEFENSE COUNSEL:  Thank you.
22  BY MR. CUSICK:
23      Q.  And so the first one here is -- can
24  you -- I'll zoom in.  Do you see, seven-member
25  republican plan two stats?

Page 241

 1      A.  Yes.
 2      Q.  Is this a different plan from the one
 3  we just discussed?
 4      A.  I'd have to see the maps.
 5      Q.  Do you recall who directed you to draw
 6  any other seven-member republican plans?
 7      A.   It would have been either Andy Fiffick
 8  or Senator Wes Climer again.
 9      Q.  Got it.
10          There are quite a few maps, so I'm just
11  trying to get my bearings to make sure we have the
12  intel.  I think this next one should be a little
13  easier to discern.
14          MR. CUSICK:  This is --
15          (Background noises).
16          MR. CUSICK:  Let's go off record for a
17  moment.
18          (Off-the-record conference)
19          MR. CUSICK:  I pulled up what is marked
20  as Plaintiff's Exhibit 30.  This is Tab 37.  It's
21  labeled, Sabb Charleston Beaufort whole stats.
22          (PLF. EXHIBIT 30, SABB CHARLESTON
23  BEAUFORT WHOLE STATS, was marked for
24  identification.)
25

61 (Pages 238 - 241)

Page 250

1  you continue to work on any other redistricting
2  efforts outside of South Carolina?
3      A.  No, not outside of South Carolina.
4      Q.  I think otherwise, that's all the
5  questions I have on my end.
6          MR. CUSICK:  I just want to say thanks
7  again, and we'll turn it over to -- I don't know if
8  first Mr. Mathias or Ms. Trinkley have any
9  questions, and then to Mr. Gore and Mr. Tyson.
10         MR. MATHIAS:  No questions.
11         MS. TRINKLEY:  I have no questions, and
12 I do not need a copy of the transcript.
13         MR. CUSICK:  Well, I appreciate that
14 optimism.  I'm not sure if Mr. Gore or Mr. Tyson
15 have any other questions that they want for...
16         DEFENSE COUNSEL:  I do have some
17 questions.  Can we take just a two-minute break?
18         MR. CUSICK:  Yes, yes, totally.
19         (After a recess, proceedings were
20 continued as follows:)
21             EXAMINATION
22 BY MR. GORE:
23     Q.  Mr. Roberts, Mr. Cusick's asked you
24 several questions today about -- (inaudible).
25

Page 251

1          (Off-the-record conference to address a
2  technical issue)
3  BY MR. GORE:
4      Q.  Mr. Cusick's asked you several
5  questions today about the National Republican
6  Redistricting Trust maps.
7          Do you recall that conversation?
8      A.  Yes, I do.
9      Q.  Do you recall how long you spent
10 reviewing those maps when they were submitted?
11     A.  We pulled them up and maybe spent five
12 to ten minutes on them.  It was not very long at
13 all.
14     Q.  What did you think of those maps?
15     A.  They looked like crap, is what I told
16 our staff, our legal team, that there was bizarre
17 shapes that made no sense of why they drew the
18 districts like they did.
19     Q.  What, if anything, did you do with
20 those maps?
21     A.  Just kept them on the computer and
22 moved on to the next.
23     Q.  Mr. Cusick also asked you several
24 questions about Zoom meetings in which I
25 participated as outside counsel.

Page 252

1          Do you recall that?
2      A.  Yes.
3      Q.  Did I ever draw any maps?
4      A.  No.
5      Q.  Did I ever direct the drawing of any
6  district lines?
7      A.  No.
8      Q.  Did I ever share any maps that someone
9  else had drawn?
10     A.  No.
11     Q.  Okay.
12         Mr. Cusick asked you about public
13 comments that the redistricting project was rigged.
14 Do you remember that conversation?
15     A.  Yes, I do.
16     Q.  Do you think the process was rigged?
17     A.  No.
18     Q.  How would you describe the process?
19     A.  I'd say it was a pretty transparent
20 process as far as the map drawing and the
21 information that's available to the public.  I'd
22 say that politics really drove the decisions that
23 were made on the map.
24     Q.  Can you elaborate on that?
25     A.  Senator Campsen really played a large

Page 253

1  role in determining which map made it to the
2  full -- to the -- out of subcommittee, and he
3  really wrestled with the fact that, you know, he
4  was moving a large chunk of Charleston out of the
5  first congressional district, which was his home
6  county.  And he was having to determine, do I want
7  more of Charleston or do I want more republican
8  representation in the first congressional district.
9  And so that was a real political decision he had to
10 make.
11     Q.  And did he ever tell you which decision
12 he made?
13     A.  Yes, he did.  He told me he was going
14 with the plan that had the higher Trump percentage
15 over more of Charleston.
16     Q.  Now, earlier this morning, you
17 discussed whether you considered BVAP with
18 Mr. Cusick.
19         Do you remember that?
20     A.  Yes.
21     Q.  And he asked you whether considering
22 BVAP is helpful in drawing a plan and whether you
23 did on past clients.
24         Do you remember that?
25     A.  Yes.

64 (Pages 250 - 253)