# Exhibit 2

Page 1

```
 1
 2   IN THE UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF SOUTH CAROLINA
 3   COLUMBIA DIVISION
     ---------------------------------------x
 4   THE SOUTH CAROLINA STATE
     CONFERENCE OF THE NAACP
 5
                    and
 6
     TAIWAN SCOTT, ON BEHALF OF HIMSELF       Case No.
 7   AND ALL OTHER SIMILARLY SITUATED         3:21-CV-03302
     PERSONS,                                 JMC-TJH-RMG
 8
                          Plaintiffs,
 9
                    Vs.
10
     THOMAS C. ALEXANDER, IN HIS OFFICIAL
11   CAPACITY AS PRESIDENT OF THE SENATE;
     LUKE A. RANKIN, IN HIS OFFICIAL CAPACITY
12   AS CHAIRMAN OF THE SENATE JUDICIARY
     COMMITTEE; MURRELL SMITH, IN HIS OFFICIAL
13   CAPACITY AS SPEAKER OF THE HOUSE OF
     REPRESENTATIVES; CHRIS MURPHY, IN HIS
14   OFFICIAL CAPACITY AS CHAIRMAN OF THE
     HOUSE OF REPRESENTATIVES JUDICIARY
15   COMMITTEE; WALLACE H. JORDAN, IN HIS
     OFFICIAL CAPACITY AS CHAIRMAN OF THE HOUSE
16   OF REPRESENTATIVES ELECTIONS LAW
     SUBCOMMITTEE; HOWARD KNAPP, IN HIS
17   OFFICIAL CAPACITY AS INTERIM EXECUTIVE
     DIRECTOR OF THE SOUTH CAROLINA STATE
18   ELECTION COMMISSION; JOHN WELLS, JOANNE
     DAY, CLIFFORD J. EDLER, LINDA MCCALL,
19   AND SCOTT MOSELEY, IN THEIR OFFICIAL
     CAPACITIES AS MEMBERS OF THE SOUTH
20   CAROLINA STATE ELECTION COMMISSION,
21                       Defendants.
     -----------------------------------------x
22
        STENOGRAPHIC REMOTE VIRTUAL DEPOSITION
23                 CHARLES TERRENI
              Tuesday, August 16, 2022
24
25
```

Page 2

1
2       August 16, 2022
3       9:56 a.m.
4
5
6       T R A N S C R I P T of the
7    stenographic remote virtual deposition
8    of CHARLES TERRENI, pursuant to the
9    Federal Rules of Civil Procedure, held
10   remotely on Tuesday, August 16, 2022,
11   commencing at approximately 9:56 a.m.
12   (EST), reported by and before Erica
13   Ruggieri, a Registered Professional
14   Reporter, Certified Court Reporter,
15   and Notary Public of the State of New
16   York and New York.
17
18
19
20
21
22
23
24
25

Page 3

1
2   APPEARANCES OF COUNSEL:
3   (Via Videoconference)
4
5   ATTORNEYS FOR THE PLAINTIFFS:
6   THE SOUTH CAROLINA STATE CONFERENCE OF
7   THE NAACP AND MOON DUCHIN, PHD:
8   NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC.
9   BY: LEAH C. ADEN, ESQ.
10      JOHN CUSICK, ESQ.
11      40 Rector Street, Fifth Floor
12      New York, New York 10006
13      (917) 858-2870
14      laden@naacpldf.com
15      jcusick@naacpldf.org
16
17  ATTORNEYS FOR THE HOUSE DEFENDANTS:
18  NEXSEN PRUET, LLC
19  BY: ANDREW MATHIAS, ESQ.
20      104 South Main Street, Suite 900
21      Greenville, South Carolina 29601
22      (864) 370-2211
23      amathias@nexsenpruet.com
24
25

Page 4

1
2   APPEARANCES OF COUNSEL: (Cont'd)
3   (Via Videoconference)
4
5   ATTORNEYS FOR THOMAS C. ALEXANDER, IN HIS
6   OFFICIAL CAPACITY AS PRESIDENT OF THE
7   SENATE; lUKE A. RANKIN, IN HIS OFFICIAL
8   CAPACITY AS CHAIRMAN OF THE SENATE
9   JUDICIARY COMMITTEE;
10  ROBINSON GRAY STEPP & LAFFITTE, LLC
11  BY:  VORDMAN CARLISLE TRAYWICK III, ESQ.
12      1310 Gadsden Street
13      PO Box 11449
14      Columbia, SC 29211
15      (803) 231-7810
16      ltraywick@robinsongray.com
17
18  ATTORNEYS FOR ELECTION DEFENDANTS:
19  BURR & FORMAN, LLP
20  BY: JANE W. TRINKLEY, ESQ.
21      1221 Main Street, Suite 1800
22      Columbia, South Carolina 29201
23      803-799-9800
24      jtrinkley@burr.com
25

Page 5

1
2   APPEARANCES OF COUNSEL: (Cont'd)
3   (Via Videoconference)
4
5   ATTORNEYS FOR SENATE DEFENDANTS:
6   ARNOLD & PORTER
7   BY: JOHN GORE, ESQ.
8      601 Massachusetts Ave NW
9      Washington DC 20001
10     (202) 942-5796
11     john.gore@arnoldporter.com
12  -and-
13  ROBINSON GRAY STEPP & LAFFITTE, LLC
14  BY:  CYNTHIA NYGORD, ESQ.
15      1310 Gadsden Street
16      PO Box 11449
17      Columbia, South Carolina 29211
18      (803) 231-7810
19      cnygord@robinsongray.com
20
21
22
23
24
25

Page 6

1  TERRENI
2  C H A R L E S  T E R R E N I,
3  called as a witness, having been
4  duly sworn by a Notary Public, was
5  examined and testified as follows:
6  EXAMINATION BY
7  MS. ADEN:
8     Q.  Good morning, Mr. Terreni.
9  I am Leah Aden.  It's nice to see
10 you.
11    A.  Nice to see you again.
12    Q.  I am currently, as you may
13 know, representing Plaintiffs in the
14 current challenge to certain
15 congressional districts and
16 Plaintiffs are the South Carolina
17 NAACP and Mr. Tai Scott.
18    Do you mind going ahead and
19 stating your name and spelling it
20 for the record, please?
21    A.  Certainly.  It's Charles,
22 C-H-A-R-L-E-S.  Terreni,
23 T-E-R-R-E-N-I.
24    Q.  So the correct
25 pronunciation is Terreni?

Page 7

1  TERRENI
2    A.  That's fine.
3    MS. ADEN:  And I'd like to
4  take a moment and ask everyone who
5  is representing parties in the case
6  to also go ahead and state their
7  name for the record beginning with
8  counsel for the plaintiffs.
9    MR. CUSICK:  Good morning.
10 This is John Cusick also with LDF
11 on behalf of the Plaintiffs.
12    MS. ADEN:  Mr. Gore, would you
13 go next, please.
14    MR. GORE:  Sure.  John Gore
15 for the Senate Defendants.
16    MR. TRAYWICK:  Lisle Traywick
17 of Robinson Gray also for the
18 Senate Defendants.
19    MS. TRINKLEY:  Jane Trinkley
20 with Burr & Forman for the Election
21 Defendants.
22    MR. MATHIS:  Andrew Mathias of
23 Nexsen Pruet for the individual
24 House Defendants.
25    MS. ADEN:  And I believe just

Page 8

1  TERRENI
2  for your knowledge, Mr. Terreni,
3  that Ms. Nygord is on the staff
4  team for one of the plaintiff
5  counsel, I believe the Senate
6  defendant team.  You may be
7  familiar but just so you know who
8  is on the line and I believe that
9  is everyone.
10    Q.  Mr. Terreni, you are a
11 lawyer; is that correct?
12    A.  Yes, ma'am.
13    Q.  But you are represented
14 here today.  Is that also correct?
15    A.  It is.
16    Q.  And who represents you?
17    A.  John Gore and Lisle
18 Traywick.
19    Q.  And they are with the Jones
20 Day law firm?
21    A.  John Gore is with the Jones
22 Day law firm.  Lisle Traywick is
23 with, they changed their name
24 recently, maybe he will refresh my
25 memory.  Robinson Gray.

Page 9

1  TERRENI
2    Q.  Gray?
3    A.  Yeah.
4    Q.  Have you taken depositions
5  before?
6    A.  Yes.
7    Q.  About how many times?
8    A.  Couple dozen at least.
9    Q.  So just so that we are on
10 the same page despite your having
11 taken depositions before, I'm going
12 to identify some basic ground rules
13 for how this deposition will proceed
14 today so we are on the same page.
15    You have been sworn in so you
16 are testifying under oath which
17 means that you are testifying as if
18 you are before a judge in a
19 courtroom with the same duty to
20 answer questions truthfully.
21    Do you understand?
22    A.  Yes.
23    Q.  And a court reporter,
24 Ms. Ruggieri, whose name I may
25 already mispronounced already is

Page 162

1  TERRENI
2  A. Yeah, it is.
3  Q. So with respect to many of
4  these that we just described it's a
5  factual question whether or not they
6  are split or not split, whole or not
7  split whole and your view --
8  Yes, I'm sorry?
9  A. No, I was nodding along,
10 sorry, go ahead.
11 Q. And then it becomes a legal
12 question in your view about whether
13 or not that split or that keeping of
14 a district as similar, you know, the
15 amount of how a district retains or
16 is not -- or is different from a
17 benchmark plan the degree to whether
18 or not that happens or if that
19 happens is a legal question in your
20 view or whether it's appropriate for
21 it to split or not split, whether
22 it's appropriate to retain this much
23 or that little, for you that's a
24 legal question of how the courts
25 will view those decisions?

Page 163

1  TERRENI
2  A. Yes.
3  MR. GORE: Object to form.
4  You can answer.
5  A. Thank you. The
6  appropriateness or the legality, the
7  defensibility of one feature or
8  another of the plan would be core
9  constituency splitting counties, the
10 circumstances under which it's done,
11 the reasons for it, I think those
12 are legal questions, at least in the
13 context that they were posed to
14 Mr. Gore.
15 The fact that a plan splits a
16 county five times that's sort of a
17 factual issue that's generated on
18 Maptitude before. So are these
19 concepts like communities of
20 interest, I think they are a little
21 hazier, but I think it's safe to say
22 I didn't rely on Mr. Gore for his
23 knowledge of South Carolina.
24 Q. But you might ask -- you
25 might -- is it fair to say that you

Page 164

1  TERRENI
2  might have done an analysis of how
3  many splits there were of a
4  particular county or city, and you
5  might have both shared that data
6  with Jones Day and asked whether or
7  not that is defensible, both of
8  those could have been done in the
9  context of your communications with
10 Jones Day?
11 MR. GORE: I'm just going to
12 put an objection on the record. We
13 are getting really close to topics
14 and conversations that may have
15 been covered by attorney-client
16 privilege. So if the witness can
17 answer that without divulging
18 privileged conversations, he can do
19 so.
20 A. I'm sorry, can you repeat
21 that question?
22 Q. Yes. Would you have on
23 behalf of the Senate have asked
24 Jones Day or have shared with Jones
25 Day factual information about the

Page 165

1  TERRENI
2  number of splits in a particular
3  plan?
4  A. Yeah.
5  Q. Would you have asked Jones
6  Day to confirm whether those numbers
7  that you shared were accurate or
8  not?
9  A. No.
10 Q. You would -- would you have
11 expected that they would have
12 checked the accuracy of data that
13 you shared with them?
14 A. No.
15 Q. But you would have asked
16 them whether or not that number of
17 splits is defensible or not, is that
18 fair to say?
19 A. I could have, yeah. I
20 could have. I mean I -- when it
21 comes to a number of splits I mean
22 we had Maptitude and Will Roberts
23 for that. I didn't need John Gore
24 for that. You know, the Senate plan
25 with various attributes and I'd say

Page 166

1  TERRENI
2  the question generally was give us
3  your legal opinion whether this plan
4  complies with redistricting law and
5  whether it will be defensible in
6  litigation.
7    Q.  Just to be clear, any of
8  the plans that you would have sent
9  to Jones Day would have included
10 statistical data that captured some
11 racial demographics?
12   A.  No.  It could have.  It
13 didn't necessarily.  It's possible.
14 Often do.  But not -- we wouldn't
15 have mandate.  It wasn't pertinent
16 to the question so we probably
17 wouldn't have sent it.  I don't
18 know.
19   Q.  Looking back at this
20 retainer letter.
21   A.  Yes, ma'am.
22   Q.  How would you have
23 communicated or reported to Chairman
24 Rankin, by phone, by text, by email
25 or combination thereof?

Page 167

1  TERRENI
2    A.  Combination.  And in
3  person.
4    Q.  Are you still employed by
5  the Senate?
6    A.  I never was employed by the
7  Senate unless you count my time as a
8  Senate page.  I'm under contract.
9  Is the Senate paying my bills now,
10 yeah.
11   Q.  Are you still -- is this
12 retainer agreement still in effect
13 with respect to your work with the
14 Senate?
15   A.  Yes.
16   Q.  Looking at the second
17 paragraph it reflects your hourly
18 rate?
19   A.  Yes.
20   Q.  And shares the process by
21 which you will bill for your work on
22 behalf of the Senate.  Who do you
23 bill?
24   A.  The Senate.  I mean
25 specifically?

Page 168

1  TERRENI
2    Q.  Who did you send the bill
3  to?
4    A.  The bill goes to Andy
5  Fiffick and the Senate clerk.
6    Q.  Is it fair to say that
7  based upon this retainer you bill on
8  a monthly basis?
9    A.  I generally do, yes.
10   Q.  Okay.  Do you know the
11 source of those funds?
12   A.  The State of South
13 Carolina.
14   Q.  And this is, reflects a
15 retainer from December 30, 2019, is
16 that fair to say?  At the top of
17 South Carolina Senate?
18   A.  Yes, ma'am.
19   Q.  4353, it's dated
20 December 30, 2019?
21   A.  Yes, ma'am.
22   Q.  Do you know approximately
23 how much you have billed for your
24 work on redistricting under this
25 retainer since December 30, 2019?

Page 169

1  TERRENI
2    A.  No, ma'am.
3    Q.  Would it be fair to say
4  that you have at least attempted to
5  on a monthly basis provide bills to
6  the Senate, Andy Fiffick or someone
7  else, on a monthly basis since
8  December 30, 2019?
9    A.  Generally speaking.  If
10 there was a month without a lot of
11 work I might have held the bill
12 until the next month, but we
13 generally bill monthly.
14   Q.  Do you know whether your
15 monthly bills, would they range in
16 amount of $5,000, $10,000, $20,000?
17   A.  It would vary.  I mean back
18 in 2019 they might have been very
19 small.  During -- after the PL data
20 came out they would have been
21 substantially more because I was
22 spending more time.  I don't really
23 -- I mean -- that's my answer.  I
24 don't know.
25   Q.  Between November and

43 (Pages 166 - 169)

Page 178

TERRENI

1  
2  aware, was there any vote to deviate
3  from these guidelines during this
4  past redistricting cycle?
5      A.  Not that I'm aware of.
6      Q.  Based upon the stated
7  purpose would you agree that the
8  public would reasonably look to this
9  document to understand the criteria,
10 the guidelines, the Senate would be
11 perhaps identified as useful to
12 developing proposals by the
13 legislature?
14     A.  Yeah.
15     Q.  And to evaluate the map
16 ultimately enacted by the
17 legislature?
18     A.  They would be one -- there
19 would be one measure.  I mean a
20 number of people submitted very
21 different policy proposals that they
22 asserted complied with the
23 guidelines.  And certainly with the
24 more objective measures such as plus
25 or minus one and that kind of thing.

Page 179

TERRENI

1  
2  They did.  I mean but they were very
3  different.  I mean so I'm not
4  sure -- yes, the public would look
5  to these guidelines but then express
6  their policy differences through the
7  guidelines.  In other words, they
8  might say well, no, I think my map,
9  which is, complies with the
10 guidelines, is a threshold matter is
11 a better policy choice than somebody
12 else's map just as you did versus
13 other maps that were for your
14 organization versus other maps that
15 were submitted.
16     Q.  Did you or the Senate
17 present the guidelines to the public
18 as rules for how the maps would be
19 judged?
20     A.  I don't recall using that
21 language, no.
22     Q.  Let's look at tab 49, which
23 is a document titled South Carolina
24 Senate Redistricting Subcommittee
25 2021 Public Hearings.  Tell us about

Page 180

TERRENI

1  
2  our community.  It's Bates stamped
3  South Carolina Senate 3745.
4      A.  Um-hmm.
5      Q.  Have you found that
6  document?
7      A.  I have.
8      (Plaintiffs' Exhibit 10, South
9  Carolina Senate Redistricting
10 Subcommittee 2021 Public Hearings,
11 Bates South Carolina Senate 3745,
12 marked for identification, as of
13 this date.)
14     Q.  Do you recognize this
15 document?
16     A.  Yes.
17     Q.  Did you help create it?
18     A.  I may have.
19     Q.  Can you read into the
20 record the first two sentences under
21 Redistricting Guidelines beginning
22 with "Redistricting guidelines or
23 criteria"?
24     A.  Yes.  "Redistricting
25 guidelines or criteria are the rules

Page 181

TERRENI

1  
2  of the road for how district lines
3  are redrawn in accordance with
4  state's population.  Criteria is
5  intended to make the districts easy
6  to identify and understand and to
7  ensure fairness and consistency."
8      Q.  So based upon this document
9  do you have any reason to disagree
10 that this document was publicized by
11 the Senate Judiciary Redistricting
12 Subcommittee during this last round
13 of redistricting?
14     A.  No.
15     Q.  And is it fair to say that
16 this document that was publicized
17 identified the redistricting
18 guidelines as rules of the road for
19 how lines will be redrawn?
20     A.  Yeah.  The rules of the
21 road for how lines would be drawn,
22 they are not the exclusive criteria
23 for how lines will be judged and I
24 feel confident everybody understood
25 that because they submitted vastly

46 (Pages 178 - 181)

Page 294

TERRENI

1  
2  Q. Did Adam Kincaid see this
3  initial staff plan before it was
4  publicized?
5  A. No.
6  Q. Did Reagen Kelly see this
7  initial staff plan before it was
8  publicized?
9  A. I'm almost certain he did
10 not because Reagan really expressed
11 at the beginning of the
12 congressional process that he
13 wanted -- he really didn't want
14 anything to do with it.
15 Q. He really didn't want to
16 what?
17 A. That he wasn't going to be
18 involved in the congressional
19 process. The only hedging I'm
20 getting is Reagen, certainly if
21 Reagen had walked in the room we
22 wouldn't -- knocked on the door and
23 wanted to come in we wouldn't have
24 turned him away, but I don't recall
25 him seeing it and I don't believe he

Page 295

TERRENI

1  
2  did.
3  Q. As the initial staff plan
4  was being developed, how was -- are
5  you aware of how Will Roberts or any
6  other Senate staffer was factoring
7  in the information received during
8  the public comment period?
9  A. Oh, he was there. He heard
10 it. He would have distilled it.
11 There were little details. You
12 know, an example that we all thought
13 of was there were members of Sun
14 City in Jasper County who expressed
15 a strong preference for remaining in
16 the same district with the remainder
17 of Sun City, which was largely
18 Beaufort County. So you'll see that
19 little protrusion in Jasper. That
20 was the result of public testimony.
21 So some of these features would be
22 absorbed in that way.
23 Q. Did Sun -- are the
24 demographics of Sun City largely
25 majority white?

Page 296

TERRENI

1  
2  A. I believe so, yes.
3  Q. But Jasper County is a
4  considered part of the black belt in
5  South Carolina?
6  A. Jasper County is a
7  significant African-American
8  population. I don't recall its
9  present demographics. There's been
10 a lot of spread out in Hilton Head
11 so I don't want to qualify that.
12 But generally speaking, yes, it
13 would be -- it would have a larger
14 African-American population than Sun
15 City, that's for sure.
16 Q. Do you know whether at any
17 point in developing the initial
18 staff plan or frankly any point
19 while the Senate was considering
20 congressional redistricting whether
21 anyone attempted to draw a Second
22 District in which black voters were
23 the majority of the district?
24 A. From the Senate staff or
25 the public submissions?

Page 297

TERRENI

1  
2  Q. Senate staff.
3  A. I don't believe anyone
4  purposefully set up to draw a black
5  majority District 6. I don't recall
6  if anyone drew a map in the course
7  of map drawing that was black
8  majority. That might not have been
9  the goal as far as I'm aware.
10 Q. My question I think was a
11 little bit different. But whether
12 outside of CD 6 whether anyone --
13 let's stop for a second. CD 6 prior
14 to this enacted map was a district
15 above 50 percent majority of black
16 voters under some measure of black
17 that the census provides?
18 A. Under the 2010 census that
19 certainly is the case. I don't
20 recall, Ms. Aden, if CD 6 was
21 majority black under the PL data
22 that was released. In other words,
23 prior CD 6 I don't know if there was
24 a majority district or at least a
25 BVAP majority district under the PL

75 (Pages 294 - 297)

Page 334

1   TERRENI
2   preferences of and various features
3   of the map.  Features of the map
4   that were inherited from the court.
5       Q.  Like with the initial staff
6   map do you know whether Senate
7   Amendment 1 was shared with Jones
8   Day before it was released to the
9   public?
10      A.  Senate Amendment 1?
11      Q.  Um-hmm.
12      A.  Probably.  Most likely.
13      Q.  Can you describe briefly
14  the process for how the initial
15  Senate staff plan was modified to
16  become Senate Amendment 1?
17      A.  Well, it was replaced at a
18  subcommittee.  There was a hearing
19  held by the subcommittee.  There was
20  public testimony on the plan,
21  various members came and inquired
22  about it, maybe shared concerns
23  about it, maybe suggested things
24  that should or shouldn't be done.
25  And ultimately the amendment

Page 335

1   TERRENI
2   emerged.  Maybe even the staff had
3   some ideas about how we could build
4   on it.  I believe at some point we
5   understood that Berkeley County
6   could be kept whole, for instance,
7   and so we did it.
8       Q.  Was that a priority to keep
9   Berkeley whole?
10      A.  No, it wasn't a specific
11  priority to keep Berkeley whole.
12  No, it was just a feature.
13      Q.  What were the priorities of
14  Senate Amendment 1 as far as you can
15  recall?
16      A.  Well, they preserved the
17  course of the existing districts in
18  a way that most other plans didn't.
19  I think for some members there was a
20  political consideration and they at
21  least preserved the competitive
22  nature of District 1 and its
23  viability for a Republican
24  candidate.  There's certainly no
25  guarantee.

Page 336

1   TERRENI
2       And there were some other
3   features, like Beaufort was kept in
4   the First District with Charleston,
5   Berkeley or at least partially
6   Charleston.  I mean there were -- I
7   could go on.  I don't know -- you
8   tell me.
9       Q.  Were there any other key
10  criteria that you think guided the
11  Senate Amendment 1?
12      A.  The criteria were the
13  criteria.  Was there any other key
14  input that guided Senate Amendment
15  1, there might have been.  Again,
16  I'm distinguishing between criteria
17  as the criteria adopted by the
18  subcommittee and political decisions
19  that were made by the membership in
20  the development of the map.  I think
21  those are two different things.
22      Q.  You mentioned Sun City
23  earlier being responded to in terms
24  of that white majority area being
25  kept together in Jasper County?

Page 337

1   TERRENI
2       A.  Yes.
3       Q.  Do you, sitting here today,
4   believe that the community in
5   Charleston was kept whole and
6   responded to in the same way as
7   those in Sun City?
8       MR. GORE:  Objection.
9   Mischaracterizes his testimony.
10      A.  Yeah, that's certainly not
11  my testimony.
12      Q.  That's a question.  Do you
13  think that --
14      A.  I don't think they are
15  comparable.
16      Q.  You don't think they are?
17      A.  Comparable.
18      Q.  How come?
19      A.  We are talking about a
20  sliver of Jasper County.  I don't
21  remember the specific population but
22  it was de minimis.  It is part of
23  the same -- as far as I know even
24  enclosed but it's certainly the same
25  planned community that has its bulk

85 (Pages 334 - 337)

Page 338

TERRENI

1 in Berkeley County so -- I mean
2 Beaufort County. So it really
3 wasn't a stretch to say we are going
4 to take Sun City and loop in this
5 little nub at the top of -- at the
6 bottom of Jasper County, top of
7 Beaufort, and keep the Sun City
8 place together. It's only -- I
9 don't know, but they certainly --
10 they have the same roads, they have
11 the same community events for its
12 connectivity. That seemed like a
13 fairly reasonable conclusion to
14 reach and it was not going to have
15 any kind of major political impact
16 on anybody one way or the other. So
17 we didn't see it as something that
18 would impact the Sixth District or
19 the First District one way or the
20 other. It was not a big enough
21 situation.
22     Charleston is very different.
23 Charleston in its current
24 configuration, you know, at least

(Lines numbered 1-25 starting with "TERRENI" on line 1.)

Page 339

TERRENI

1 the beginnings of it were drawn by
2 the United States District Court.
3 And Charleston County, as far as I
4 know, has never been unified in a
5 congressional district in, certainly
6 since single member districts maybe.
7 I stand corrected. If we go before
8 2000, my memory is fading a little
9 bit.
10     So no, I don't think there's a
11 comparison between, given the
12 peninsula of Charleston County in
13 District 1, I think they are apples
14 and oranges.
15   Q. If Charleston could be kept
16 whole in CD 1, comply with the
17 Senate's stated criteria, keep CD 7
18 untouched, largely untouched, would
19 the major political concern that
20 remains be making CD 1 not
21 Republican leading?
22   A. It's in the eye of the
23 beholder. I mean it's a -- well,
24 that's a policy decision to be made

Page 340

TERRENI

1 by the people voting on the plans.
2 It's not for me to say.
3     MS. ADEN: Can we take a
4 five-minute so I can streamline
5 with the time that's remaining?
6     THE WITNESS: Fine with me.
7     MS. ADEN: Could we go to 5:05
8 just to be even. That would be
9 helpful.
10     THE WITNESS: Sure.
11     (Whereupon, there is a recess
12 in the proceedings.)
13   Q. If I can have you look at
14 tab 5, which is a transcription of
15 -- which is a transcription of the
16 January 13, 2022, Senate Judiciary
17 hearing transcribed by a court
18 reporter service. This would be
19 Plaintiffs' Exhibit 20. And if you
20 could turn to page 18 in the top
21 right-hand corner.
22     (Plaintiffs' Exhibit 20,
23 Transcription of 1/13/2022 Senate
24 Judiciary hearing, marked for

Page 341

TERRENI

1 identification, as of this date.)
2   Q. Beginning at line 3.
3   A. I'm sorry, Ms. Aden, could
4 you identify what hearing is this?
5   Q. This is the January 13,
6 2022, Senate redistricting hearing.
7   A. The subcommittee?
8   Q. Yes.
9   A. And where did you want me
10 to go?
11   Q. To page 18, line 3. 18 in
12 the top right-hand corner, it's
13 South Carolina NAACP CD 19952.
14   A. Okay.
15   Q. Were you present at this
16 hearing?
17   A. I believe I was, yes.
18   Q. And you identified
19 Mr. Opperman earlier as someone who
20 worked with Senator Harpootlian, is
21 that fair?
22   A. Yes. I want to say that he
23 may have worked with some other
24 folks too. I'm not being cute, I

86 (Pages 338 - 341)

Page 362

TERRENI

Q. Yes. And is that South Carolina Senate 3260 to 326 --
A. I have to 368, yes, yes, I'm sorry. It begins with 60 and ends with 68.
   (Plaintiffs' Exhibit 23, Email from Will Roberts to Mr. Opperman, Bates South Carolina Senate 3260 to 3268, marked for identification, as of this date.)
Q. And this is from Will Roberts to Mr. Opperman copying Andy Fiffick. You are not copied on this email; is that correct?
A. I don't appear to be, no.
Q. Do you recall seeing this?
A. As I said before, I was aware that Will ran these reports and I think I saw these reports, yeah.
Q. If you can go to 3264, which is pdf pages 5 of 9, there's an analysis of each of the districts and the share, the total number of

Page 363

TERRENI

voters and the share of voters for Biden as compared to Trump. Would you agree?
A. Yes, ma'am.
Q. Were these types of analysis done, these particular ones about the vote shares in each of these districts, do you remember this one done for Senate Amendment 1?
A. I believe so, yes.
Q. Do you know if it was done for the initial staff plan?
A. Probably.
Q. And do you know. Well, strike that.
A. It may not have been printed but we looked at partisan numbers. Specifically these 2020 Trump/Biden numbers.
Q. And who gave you those numbers or that data to do those numbers, is this Vincent, Clark Vincent data?

Page 364

TERRENI

A. Yes, ma'am.
Q. On January 19, 2022, the full Senate Judiciary Committee held a hearing on congressional redistricting. I want to ask you to look at tab 25, which is an email from Will Roberts to Andy Fiffick dated January 16, 2022. This will be Plaintiffs' Exhibit 24. And the subject is analysis for Senator Campsen with an attachment that says notes on Senate Amendment 1.
   (Plaintiffs' Exhibit 24, Email from Will Roberts to Andy Fiffick, marked for identification, as of this date.)
A. Yes.
Q. Do you recall this email and attached analysis?
A. No.
Q. Would an analysis such as this where it appears that or would you agree that Will Roberts appears to have done an analysis of whether

Page 365

TERRENI

Senate Amendment 1 complies with one person one vote, if you look at 22529?
A. Yeah.
Q. And whether it adheres to the Voting Rights Act?
A. Appears that he did that.
Q. And whether it avoids racial gerrymandering?
A. He says he did.
Q. And whether it respects contiguity or achieves contiguity among districts?
A. Yes.
Q. 22560 is talking about contiguity?
A. Yes.
Q. And it does an analysis of communities of interest also on 22530?
A. Yes.
Q. And it also looked at cores of existing districts on 22530?
A. Yes.

92 (Pages 362 - 365)

Page 398

1  TERRENI
2  Q. Mr. Terreni, I'd like to
3  get a little more clarity on your
4  role in the redistricting process.
5  Did you draw any redistricting maps?
6  A. No.
7  Q. Did you draw any
8  redistricting lines?
9  A. No.
10  Q. Did you dictate the drawing
11  of any maps or lines?
12  A. No.
13  Q. So today if you testified
14  that "we" drew a plan, did you
15  meaning to include yourself in the
16  "we" who drew the plan?
17  A. Not in the sense of drawing
18  it. And if I said that, I was being
19  inartful and I appreciate you
20  pointing it out, Mr. Gore.
21  Q. So what did you mean by
22  that?
23  A. What I meant was the Senate
24  redistricting staff and specifically
25  the members -- and the members of

Page 399

1  TERRENI
2  the Senate drew a plan. Some
3  members of the Senate came in and
4  said I want to see this or that done
5  and I would like that include in the
6  amendment and ultimately -- well,
7  ultimately it's the senator and
8  Senate that draws the plan, it's not
9  staff, but the staff can certainly
10  go through the mechanics of it, the
11  staff drew a staff plan.
12  Did I draw it specifically,
13  no. Was I present while it was
14  being drawn, yes. Did I facilitate
15  the process, yes. Did I dictate
16  where a line went or not, no. Did I
17  convey some institutional knowledge
18  about the preferences of different
19  members or the congressional
20  delegation, yes.
21  Q. Who is the decision-maker
22  as to which plan would be enacted?
23  A. The Senate.
24  Q. Mr. Terreni, can you open
25  tab 1, Plaintiffs' Exhibit 7?

Page 400

1  TERRENI
2  A. Yes, sir.
3  Q. This is the 2021 policy for
4  public plan submissions. Do you
5  recall discussing this with Ms. Aden
6  today?
7  A. I do.
8  Q. Paragraph 2 of this
9  document, the first sentence of that
10  paragraph reads: "The redistricting
11  subcommittee will designate a time
12  period during which it will accept
13  redistricting plans for review and
14  consideration."
15  Did I read that correctly?
16  A. You did.
17  Q. Did the subcommittee
18  designate a time period for
19  accepting plan submissions?
20  A. It did.
21  Q. Were any of the plans
22  emailed by the National Republican
23  Redistricting Trust provided before
24  that deadline?
25  A. No.

Page 401

1  TERRENI
2  Q. Is that the reason why
3  those plans were not posted on the
4  website?
5  A. Yes. I mean that's --
6  yeah. I mean they were sent to us
7  at the last minute, we looked at
8  them. There wasn't a subcommittee
9  hearing for anybody to comment on.
10  We didn't use them, we didn't
11  consider them and so we didn't post
12  them. I'm not sure a lot of thought
13  was given it to, Mr. Gore.
14  Q. Let me point your attention
15  to paragraph I-B. And the first
16  part of I-B reads: "All plans
17  submitted to and accepted by the
18  redistricting subcommittee will be
19  made part of the public record and
20  will be made available in the same
21  manner as other redistricting
22  subcommittee public records."
23  Did I read that correctly?
24  A. You did.
25  Q. Were the National

101 (Pages 398 - 401)

Page 402

1  TERRENI
2  Republican Redistricting Trust plans
3  ever accepted by the redistricting
4  subcommittee within the meaning of
5  this document?
6     A.  No, sir.
7     Q.  Why not?
8     A.  Because they were never
9  accepted and brought before the
10 subcommittee for public testimony
11 and for questions by the members of
12 the subcommittee.  They were not
13 presented to the subcommittee.
14    Q.  Do you know whether any
15 member of the subcommittee or any
16 member of the Senate ever saw those
17 plans?
18    A.  Before or after the
19 subcommittee?
20    Q.  Either.
21    A.  Before no.  Afterwards upon
22 request I believe Senator
23 Harpootlian saw them.  I don't
24 believe anybody else wanted to see
25 them.

Page 403

1  TERRENI
2     Q.  Did it violate any Senate
3  redistricting subcommittee policy or
4  this document for you and others to
5  look at the National Republican
6  Redistricting Trust plans?
7     A.  No, sir.
8     Q.  Mr. Terreni, can you turn
9  to tab 45, Plaintiffs' Exhibit 11?
10    A.  Yes, sir.
11    Q.  Is this the subpoena that
12 was served on you in this case?
13    A.  Yes.
14    Q.  And do you recall earlier
15 today discussing with Ms. Aden some
16 handwritten notes you took of public
17 hearings in 2021?
18    A.  Yes, sir.
19    Q.  Can you scroll down to page
20 11 of this exhibit?
21    A.  Yes, sir.
22    Q.  This is Request For
23 Production No. 1 towards the bottom
24 of the page.  Calls for "all
25 documents you provided to

Page 404

1  TERRENI
2  defendants, committee members or the
3  South Carolina General Assembly or
4  communications between you and
5  defendants committee members or the
6  South Carolina General Assembly."
7     Did you ever provide your
8  handwritten documents to defendants,
9  committee members or the South
10 Carolina General Assembly?
11    A.  No, sir.
12    Q.  Were your handwritten notes
13 communications between you and
14 defendants, committee members or the
15 South Carolina General Assembly?
16    A.  No.
17    Q.  Would you scroll down to
18 the next page, page 12 of the
19 document, page 15 of the pdf.
20    A.  Yes, sir.
21    Q.  Request For Production 2
22 calls for "all correspondence and
23 documents you received from Mr. Adam
24 Kincaid, the National Republican
25 Redistricting Trust, Fair Alliance

Page 405

1  TERRENI
2  America, Magellan Consulting or
3  anyone else."
4     Were your handwritten notes --
5  did I read that correctly?
6     A.  Yes, sir.
7     Q.  Were your handwritten
8  notes, correspondence or documents
9  you received from Mr. Kincaid, the
10 National Republican Redistricting
11 Trust, Fair Alliance America,
12 Magellan Consulting or anyone else?
13    A.  No, sir.
14    Q.  Scroll down to Request For
15 Production No. 3.  This one asks
16 again for "all documents you
17 provided to or received from
18 defendants, committee members or the
19 South Carolina General Assembly and
20 communications between you and
21 defendants, committee members or the
22 South Carolina General Assembly
23 relating to the following hearings."
24    Did I read that correctly?
25    A.  You did.

102 (Pages 402 - 405)