# Exhibit 7

Page 1

```
            UNITED STATES DISTRICT COURT
              DISTRICT OF SOUTH CAROLINA
                 COLUMBIA DIVISION
 THE SOUTH CAROLINA
 STATE CONFERENCE OF
 THE NAACP, et al,
            Plaintiffs,
       vs.                CASE NO.
                          3:21-CV-03302-MBS-TJH-RMG
 THOMAS C. ALEXANDER,
 et al,

            Defendants.

 VIDEOCONFERENCE
 DEPOSITION OF:  SHANE MASSEY
 DATE:           August 2, 2022
 TIME:           10:43 a.m.
 LOCATION:       Edgefield, SC
 TAKEN BY:       Counsel for the Plaintiffs
 REPORTED BY:    ERIC GLAZIER, Court Reporter
```

```
                                                          Page 2
 1      APPEARANCES OF COUNSEL VIA VIDEOCONFERENCE:
 2           ATTORNEYS FOR THE PLAINTIFFS:
 3               ARNOLD & PORTER
                 BY:  ANDREW HIRSCHEL
 4                    JOHN HINDLEY
                      PAULA RAMER
 5               250 W. 55th St
                 New York, NY 10019
 6               Andrew.hirschel@arnoldporter.com
                 John.hindley@arnoldporter.com
 7               Paula.ramer@arnoldporter.com
 8
             ATTORNEYS FOR DEFENDANTS
 9               THOMAS C. ALEXANDER, in his official
                 capacity as President of the Senate;
10               LUKE A. RANKIN, in his official
                 capacity as Chairman of the Senate
11               Judiciary Committee:
12               ROBINSON GRAY
                 BY:  ROBERT E. TYSON
13                    VORDMAN CARLISLE TRAYWICK, III
                 1310 Gadsden Street
14               Columbia, SC 29201
                 (803) 929-1400
15               Rtyson@robinsongray.com
                 Ltraywick@robinsongray.com
16
17           ATTORNEYS FOR DEFENDANTS
                 JAMES H. LUCAS, in his official
18               capacity as Speaker of the House of
                 Representatives; CHRIS MURPHY, in his
19               official capacity as Chairman of the
                 House of Representatives Judiciary
20               Committee; WALLACE H. JORDAN, in his
                 official capacity as Chairman of the
21               House of Representatives Elections Law
                 Subcommittee:
22
                 NEXSEN PRUET
23               BY:  MICHAEL A. PARENTE
                 1230 Main Street
24               Suite 700
                 Columbia, SC 29201-6220
25               (803) 253-8247
                 Mparente@nexsenpruet.com
```

```
 1        ATTORNEYS FOR DEFENDANTS
              JOHN WELLS, Chair, JOANNE DAY, CLIFFORD
 2            J. EDLER, LINDA McCALL, and SCOTT
              MOSELEY, in their official capacities
 3            as members of the South Carolina
              Election Commission:
 4
              BURR & FORMAN
 5            BY:  JANE W. TRINKLEY
                   M. ELIZABETH CRUM
 6            1221 Main Street
              Suite 1800
 7            Columbia, SC 29201
              (803) 753-3241
 8            Jtrinkley@burr.com
              Lcrum@burr.com
 9
10
         ALSO PRESENT VIA VIDEOCONFERENCE:
11
              THOMAS RITZ
12            LEAH ADEN
13
14
15       (INDEX AT REAR OF TRANSCRIPT)
16
17
18
19
20
21
22
23
24
25
```

Page 4

1                P R O C E E D I N G S
2                      - - - - -
3              COURT REPORTER:  The attorneys
4    participating in this deposition acknowledge that
5    the reporter is not physically present in the
6    deposition room and that the reporter will be
7    reporting this deposition remotely.
8              They further acknowledge that in lieu
9    of an oath administered in person, I will
10   administer the oath remotely.
11             If any party has an objection to this
12   manner of reporting, please state it now.
13             Hearing none, I will proceed.
14                    SHANE MASSEY,
15   being first duly sworn, testified as follows:
16                    EXAMINATION
17   BY MR. HIRSCHEL:
18        Q.   Good morning, Senator Massey.
19        A.   Hey there.
20        Q.   My name is Andrew Hirschel.  I'm one of
21   the attorneys representing the plaintiffs in this
22   lawsuit, The South Carolina NAACP versus Alexander.
23             Will you please state your full name
24   for the record and spell your last name?
25        A.   Anthony Shane Massey, M-A-S-S-E-Y.

Page 134

1         A.    No, I think -- I think Fort Jackson is
2    definitely a community of interest.  There's a
3    large military population at the fort and around
4    the fort, and having them stay together -- and they
5    are all familiar -- I mean, Congressman Wilson has
6    been in that position for 20 years.  I mean, having
7    them be represented by the same person that they've
8    always known, I mean -- and I don't think it's
9    specifically spelled out, but I think that's
10   communities of interest and keeping core
11   constituencies together.
12        Q.    And protecting republican advantage in
13   Congressional District One, that's not in the
14   guidelines either, is it?
15        A.    Well, one of the things in the
16   guidelines was that -- was political -- as part of
17   the communities of interest definition, if I
18   remember, referenced political.  And so I think
19   that's part of it.  I mean, you know, frankly, not
20   doing that -- not protecting the First is political
21   malpractice.
22              So, I mean, I think you can -- I think
23   it fits into that category that you and I talked
24   about under, I think it was, paragraph A of Roman
25   numeral three.  But, you know, from my perspective

Page 135

1     as a senator, that's something that's very
2     important to me, you know, is -- even though I
3     don't represent anybody who lives in the First,
4     it's important to me that we protect the First, and
5     I suspect that I was not alone in that
6     consideration.
7          Q.   You mentioned earlier trying to make
8     sure that Nancy Pelosi isn't Speaker of the House
9     any longer than necessary.  Apart from that, why
10    was it important to you to preserve the First, so
11    to speak?
12         A.   Isn't that enough?
13              Well, I mean, look, California's not
14    giving up -- not giving republican seats.  Right?
15    New Jersey's not giving up seats.  Illinois is not
16    giving up seats.  I'm not giving up a seat.  I
17    mean, I think it would be political malpractice for
18    the republican-controlled legislature to allow
19    for -- especially something like what Senator
20    Harpootlian proposed.  But it would be political
21    malpractice to draw a district such that the
22    democrats were more likely to win that district
23    than not.
24              And so I think that it was certainly
25    one of my concerns but, I think, also our

1    obligation to protect the First.
2         Q.   Does that really have anything to do
3    with communities of interest?
4         A.   Well, I mean, it's part of the
5    definition that they had included in there,
6    political.  I think that -- that factors in.  I
7    mean, those folks -- most of those folks were -- of
8    course, you know, the First was prob- -- I think,
9    the First was the most overpopulated, so it was the
10   one that had to give up some people.  But most of
11   those people have been in that congressional
12   district forever.
13             I mean, the First, as it relates to
14   Charleston, Berkley -- Berkley's been split some,
15   and Dorchester and Beaufort -- Beaufort way back
16   was split, but -- but yeah, I mean, I think that
17   factors into the political communities of interest.
18   But regardless, like I said earlier, I didn't even
19   really know that there were specific guidelines
20   that were developed by the subcommittee.  Frankly,
21   I don't care what those guidelines are.  I'm not
22   voting for something that's going to give away the
23   First.
24             MR. HIRSCHEL:  Okay.  I want to
25   introduce another exhibit.  I might come back to --

Page 213

1      are the Biden/Trump numbers.
2           Q.    Right.
3           A.    But based on that, it looks like it
4      would have been a democratic district, which is --
5      you know, frankly, that's what I expect from
6      Senator Harpootlian.  Right?  I mean, that's -- I
7      understand that's his goal.  His goal is to -- his
8      goal is to have more democratic seats.  And I
9      understand that.  That's fine.  My goal is to have
10     more republican seats.
11                And it looks like the amendment that he
12     prepared would have it set that it would be -- I
13     mean, president Biden would have won that district
14     as he had it drawn.
15          Q.    So in that Amendment 2A out of the
16     seven congressional districts, in Senator
17     Harpootlian's, how many democratic-leaning
18     districts would there have been?
19          A.    Looks like you would have had two --
20     two districts where Biden beat Trump, and then I
21     guess he's also made the Fifth something that could
22     go either way because it's basically the same
23     numbers as the benchmark for the First.  So he's
24     giving himself two and a half, maybe three.
25          Q.    So was a republican-controlled general

Page 214

1  assembly going to pass that?
2       A.   If we pass that, we all need to go
3  home.  I mean, that -- I think I used the term,
4  political malpractice, earlier.
5            That's one of those things where --
6  none of my people live in the First or the Fifth,
7  but if I go home having passed that district and we
8  had a congressional election and we elect -- we go
9  from seven republicans to four republicans in South
10 Carolina in the congressional delegation, I'm going
11 to hear about that from people back home, because
12 that's on us at that point.
13      Q.   How about the League of Women Voters,
14 what did they do in the first congressional
15 district?  What was their plan?  What was their --
16      A.   It's listed as well.  I mean, it's
17 similar to Harpootlian's plan.
18           And look, the other thing you've got to
19 consider in this is the growth, right, because, you
20 know, with the League's plan, they've got it at
21 51.75 democrat, 48.25 republican, but it's going to
22 move -- with the growth that we're experiencing in
23 that area, it's going to get more democratic, which
24 means under the plan we pass, it's going to get
25 closer.  Naturally that's what's going to happen.

Page 215

1          Under either one of these, this
2   wouldn't have been a competitive district in just a
3   couple cycles.  I mean, and they're not -- and I
4   get it.  Senator Harpootlian keeps -- kept talking
5   about having competitive districts.  He's not
6   looking for a competitive district.  He's looking
7   for a democratic district.
8          And what was going to happen over the
9   next several years was inevitable.  You're going to
10  have a democratic representative win anyway, but it
11  was going to be a solid democratic win under the
12  Harpootlian plan or the League plan, because they
13  both flipped it based on the numbers available.
14       Q.   Do you know whether as -- for the
15  League of Women Voters plan, whether they looked at
16  incumbency protection as part of their criteria?
17       A.   I don't know what they looked at.
18       Q.   Mr. Hirschel asked you several
19  questions about this and whether you looked at
20  alternatives and whether you had a responsibility
21  to look at those alternatives.
22          Now, looking at that -- well, let me
23  step back.  Strike that.
24          The comment that you had that you
25  started -- your goal was to protect the First, was