# Exhibit 10

```
 1           IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF SOUTH CAROLINA
 2                    COLUMBIA DIVISION
          CASE NO. 3:21-CV-03302-MBS-TJH-RMG
 3
    THE SOUTH CAROLINA STATE CONFERENCE OF
 4  THE NAACP, AND TAIWAN SCOTT, ON BEHALF
    OF HIMSELF AND ALL OTHER SIMILARLY
 5  SITUATED PERSONS,
 6                Plaintiffs,
 7          vs.
 8  THOMAS C. ALEXANDER, HENRY D. MCMASTER,
    IN HIS OFFICIAL CAPACITY AS GOVERNOR OF
 9  SOUTH CAROLINA; HARVEY PEELER, IN HIS
    OFFICIAL CAPACITY AS PRESIDENT OF THE
10  SENATE; LUKE A. RANKIN, IN HIS OFFICIAL
    CAPACITY AS CHAIRMAN OF THE SENATE
11  JUDICIARY COMMITTEE; JAMES H. LUCAS, IN
    HIS OFFICIAL CAPACITY AS SPEAKER OF THE
12  HOUSE OF REPRESENTATIVES; CHRIS MURPHY,
    IN HIS OFFICIAL CAPACITY AS CHAIRMAN OF
13  THE HOUSE OF REPRESENTATIVES JUDICIARY
    COMMITTEE; WALLACE H. JORDAN, IN HIS
14  OFFICIAL CAPACITY AS CHAIRMAN OF THE
    HOUSE OF REPRESENTATIVES ELECTIONS LAW
15  SUBCOMMITTEE; HOWARD KNABB, IN HIS
    OFFICIAL CAPACITY AS INTERIM EXECUTIVE
16  DIRECTOR OF THE SOUTH CAROLINA STATE
    ELECTION COMMISSION; JOHN WELLS, JOANNE
17  DAY, CLIFFORD J. ELDER, LINDA MCCALL,
    AND SCOTT MOSELEY, IN THEIR OFFICIAL
18  CAPACITIES AS MEMBERS OF THE SOUTH
    CAROLINA STATE ELECTION COMMISSION,
19
                  Defendants.
20
21  DEPOSITION OF:   ANDREW THEODORE FIFFICK
                    (Appearing via VTC)
22
    DATE:           July 21, 2022
23
    TIME:           10:10 a.m.
24
25
```

Page 2

1  LOCATION:     Robinson Gray, LLC
              1310 Gadsden Street
2             Columbia, South Carolina
3  TAKEN BY:     Counsel for the Plaintiffs
4  REPORTED BY:  KAREN M. ERNST, CSR
              (Appearing via VTC)
5  _____

Page 3

1  APPEARANCES OF COUNSEL:
2     ATTORNEYS FOR PLAINTIFFS:
         THE SOUTH CAROLINA STATE CONFERENCE OF
3        THE NAACP, ET AL:
4        NAACP LEGAL DEFENSE AND EDUCATIONAL
         FUND
5        BY:  LEAH C. ADEN
             RAYMOND AUDAIN
6           (Appearing via VTC)
         40 Rector Street, 5th Floor
7        New York, New York 10006
         212-965-7715
8        laden@naacpldf.org
         raudain@naacpldf.org
9
      ATTORNEYS FOR DEFENDANTS
10       SENATOR THOMAS C. ALEXANDER AND SENATOR
         LUKE A. RANKIN:
11
      ATTORNEYS FOR DEPONENT
12       ANDREW THEODORE FIFFICK:
13       ROBINSON GRAY, LLC
         BY:  ROBERT E. TYSON
14           VORDMAN CARLISLE TRAYWICK, III
             (Appearing via VTC)
15       1310 Gadsen Street
         Columbia, South Carolina 29201
16       803-929-1400
         rtyson@robinsongray.com
17       ltraywick@robinsongray.com
18    ATTORNEYS FOR HOUSE DEFENDANTS:
19       NEXSEN PRUET, LLC
         BY:  JENNIFER HOLLINGSWORTH
20           MICHAEL PARENTE
             (Appearing via VTC)
21       1230 Main Street, Suite 700
         Columbia, South Carolina 29201
22       803-253-8247
         jhollingsworth@nexsenpruet.com
23       Mparente@nexsenpruet.com
24
25

Page 4

1  APPEARANCES CONTINUED:
2     ATTORNEYS FOR ELECTION DEFENDANTS:
3        BURR & FORMAN, LLP
         BY:  MICHAEL L. BURCHSTEAD
4            JANE W. TRINKLEY
             (Appearing via VTC)
5        1221 Main Street, Suite 1800
         Columbia, South Carolina 29201
6        803-753-3261
         mburchstead@burr.com.
7        jtrinkley@burr.com
8     ALSO PRESENT:
9        CYNDI NYGORD
         SONORA CARROLL
10       RICK ROZOS
         MADISON VILLARREAL
11       (Appearing via VTC)

Page 5

1              THE REPORTER:  Can I get appearances,
2  please.
3              MS. ADEN:  So I'm Leah Aden, A-d-e-n,
4  and I'm appearing for the plaintiffs with the NAACP
5  Legal Defense Fund.  My colleague Raymond --
6              Do you mind introducing yourself?
7              MR. AUDAIN:  Raymond Audain,
8  A-u-d-a-i-n.  I'm also here for plaintiffs, and I
9  work with Leah at the Legal Defense Fund.
10             MR. TYSON:  Good morning, Karen.  I'm
11 Rob Tyson.  I'm counsel for Senator Alexander and
12 Senator Rankin, and I'm here with the deponent,
13 Andy Fiffick.
14             MS. HOLLINGSWORTH:  It's Jennifer
15 Hollingsworth.  I represent the House Defendants.
16             MR. TYSON:  Jennifer, you sound
17 horrible when you talk, just so you know.
18             MS. HOLLINGSWORTH:  Okay.  Thank you.
19 I'll do my best not to talk.
20             MR. BURCHSTEAD:  I'm Michael Burchstead
21 here on behalf of the Election Defendants.
22             MR. TRAYWICK:  Lisle Traywick here also
23 on behalf of the Senate Defendants.
24             MS. ADEN:  And I wanted to flag that
25 Sonora Carroll, who appears in the chat, is a legal

Page 38

1  gerrymandering claims?
2      A.  I'm sure there was but I don't really
3  specifically recall it, no.
4      Q.  Was there discussion of intentional
5  racial discrimination in voting claims?
6      A.  I don't remember any discussion about
7  that.  I mean, there could have been but that's so
8  beyond the pale that I don't think they brought
9  that up that I can recall.
10     Q.  And when you communicated with
11 Mr. Terreni in, you believe, starting on or around
12 in October, how did you primarily communicate with
13 him?
14     A.  We would all sit in the map room, which
15 was in Luke Rankin's office, with a map projected
16 on the wall, whatever map that might be from
17 whatever member who requested it and it was sort of
18 a discussion amongst myself, Will Roberts, Breeden
19 John, Paula Benson here and there, Maura Baker here
20 and there.
21     Q.  How many computers were in that room?
22     A.  One.
23     Q.  And besides the map -- so was the map
24 on the computer screen or was the map projected on
25 the wall off of the computer?

Page 39

1      A.  The map was being projected off of the
2  computer onto the wall.  We set that up so that a
3  member could come in and see.  But we also used it,
4  you know, when we were drawing maps in preparation
5  for something that a member to ask.  A member was
6  not always sitting there, you know, the whole time
7  we drew a map.  They would ask for something, Will
8  would draft a map, and then we would present it to
9  the member, and then like I said, we'd share it
10 with outside counsel with Mr. Terreni and Mr. Gore
11 for their analysis.
12     Q.  And you don't recall there being two
13 computer monitors in that room?
14     A.  Two monitors, no, not in the map room
15 for congressional, no.  There was one big screen.
16     Q.  And what was on the computer screen?
17 Was it the same image being projected or were there
18 windows with other information?
19     A.  It was the same as being projected.
20 That was the whole purpose.  I mean, we called that
21 Will driving.  We would see what he could see on
22 his laptop on the wall.  It was probably a ten by
23 ten projection onto the wall.
24     Q.  When you looked at maps, was there ever
25 data up on the screen that coincided with the maps?

Page 40

1      A.  Yeah.  It was, you know, the population
2  deviations.  There was political data.
3  Occasionally there was demographic data so, yeah,
4  that stuff was up there for sure.
5      Q.  And when you refer to demographic data,
6  are you referring to something else other than
7  population?
8      A.  We saw VDOT numbers occasionally if a
9  member asked for them.  I don't recall Senator
10 Campsen ever asking for that.  I think Senator Sabb
11 and I think Senator Bright Matthews might have.
12 But those were available.  I mean, and those were
13 also things we produced on the website so the
14 public could see as well.
15     Q.  You were in the room with Mr. Roberts
16 as he was drawing maps sometimes or did you see
17 them after he had completed drawing them?
18     A.  I'm sure there were some things that he
19 drew when I was not around, but a lot of the time I
20 was there in the room as he was drawing.  I mean,
21 bear in mind I've got seven, you know, staff
22 attorneys, you know, a dozen law clerks, and 350
23 bills that were in my committee at the time so I
24 wasn't with him all the time, but much of the time
25 I would say.

Page 41

1      Q.  And did you observe Mr. Roberts looking
2  at racial data as he was drawing proposed
3  congressional maps?
4      A.  As he was drawing, I don't recall that,
5  but I do know he would have had access.  He would
6  have seen it.  I mean, yeah.  I mean, yeah.  Sure.
7  It's very possible.
8      Q.  Do you know where that data came from?
9      A.  I don't.  I think -- I guess it came
10 from the census.  I mean, I think Will and Breeden
11 aggregated that stuff and then there may have been
12 some -- I don't recall where that came from.  I
13 think it came from the Senate because I think
14 that's all census information.
15     Q.  And you mentioned some political data.
16 What are you referring to?
17     A.  The numbers for Trump and Biden in a
18 given area.
19     Q.  So just one election, the 2020
20 election?
21     A.  Yeah.  We didn't look back farther than
22 that, I don't believe, because I think there was
23 something about the way the absentee ballots were
24 put together.  So the prior stuff -- 2016 wasn't
25 accurate so we didn't go any farther back than that

11 (Pages 38 - 41)

Page 42

1  at least that I know of.
2      Q.  Where did you get the political data?
3      A.  I want to say -- I can't remember
4  specifically.  I think there may have been an
5  outside consultant that helped with that, but I
6  think ultimately it came from -- I would guess it
7  came from the election commission and then we
8  had -- I mean, I guess that's where it came from.
9  That's my recollection.
10     Q.  Did you specifically request data for
11 anyone that was used for the development of the
12 congressional map making?
13     A.  I did not, no.
14     Q.  Are you aware of who requested data for
15 congressional map making?
16     A.  I assume Will got that from the
17 election commission website.  I mean, that's pretty
18 easy stuff.  I think that's where he got it from.
19     Q.  And so you mentioned population
20 deviation numbers, political data, specifically the
21 2020 election results, and you mentioned
22 demographic data, specifically black voting age,
23 population data.  Was there any other data
24 available to you in the room when you were --
25     A.  Oh, yeah.  Sure.  I mean, y'all have

Page 43

1  got the exhibits that you've got here.  I can't
2  remember off the top of my head.  There was massive
3  amounts of data available, yes.
4      Q.  Okay.  I'm glad we dived into
5  substance, but I'm going to take us back for just a
6  second and try to understand a little bit more
7  about how you prepared for today's deposition and
8  then we'll drill down on some of what we've already
9  started to explore.
10     A.  Cool.
11     Q.  When were you first contacted by
12 counsel about potentially being deposed in this
13 case?
14     A.  I don't recall.  I mean, it was a
15 given.  It was a given.  But, I mean, I don't
16 recall because I knew I would be.
17     Q.  Because of the filing of the complaint?
18     A.  Yeah.  I mean, I figured with my role,
19 my title, where I worked, I figured I was going to
20 be deposed.  I don't remember when I first heard
21 about it but, yeah.
22     Q.  Let me ask you about the -- maybe I'll
23 just be going back and forth as you jog my memory
24 about things.  How would you describe your
25 relationship with Mr. Terreni?  Did you report to

Page 44

1  him or vice versa or were you equal colleagues?
2  How would you define that working relationship?
3      A.  I would call us equal colleagues in
4  terms of the administrative situation, but I would
5  say that, you know, having known him and knowing
6  that he's been a lawyer for 20 years longer than
7  me, I defer to him on anything because I trust him.
8  He's a smart guy.  I mean, technically speaking, if
9  you look at a command chain, you know, I'm chief of
10 staff.  We hired Charlie, but, you know, the
11 practical matter this is his third redistricting
12 and my first.  Colleagues with great deference to
13 him I would say.
14     Q.  And in terms of hierarchy, is it fair
15 to say the decision of Mr. Gore trumped the
16 decision of both you and Mr. Terreni with respect
17 to congressional mapping?
18     A.  If it came down to it, yes, but I don't
19 recall a situation where Charlie Terreni disagreed
20 with John Gore.  So as a practical matter, yes, we
21 would have gone up the food chain to the DC
22 lawyers, but in reality, I don't remember that ever
23 happening.
24     Q.  And how would you describe your working
25 relationship with Mr. Breeden?  Did he report to

Page 45

1  you?
2      A.  Yes.
3      Q.  And Mr. Roberts, did he also report to
4  you?
5      A.  Yes.
6      Q.  And what about Ms. Benson?
7      A.  She technically does report to me, but
8  it's a similar relationship with Charlie Terreni
9  that she's been doing this, not just this, but off
10 in the Senate for 35 years.  Technically, on a
11 chart she reports to me, but great deference on my
12 part because of her level of experience.
13     Q.  What did you do to prepare for today's
14 deposition?
15     A.  I met with Rob Gore -- I mean Rob Tyson
16 and Lisle Traywick and John Gore what, now, was it
17 twice, I believe, Rob?
18     Q.  When was that?
19     A.  This week.  Monday and Tuesday of this
20 week and then they presented me with a notebook
21 that I went through yesterday with I think John
22 Gore was here for most of that meeting.  The rest
23 of the time it was just me and Lisle and Rob.
24     Q.  And how long were each of those two
25 meetings approximately?

Page 138

1    A.  Yeah, sure.
2    Q.  Are you aware of any instruction by any
3  member of the legislature or anyone else that you
4  and the team developing maps should be drawing six
5  districts of the seven that lean Republican and
6  one district of the seven that leans Democrat?
7    A.  I don't recall anybody asking for that,
8  but that doesn't mean we didn't have it.  That
9  wasn't something that I remember.
10   Q.  Who would have been told to do that if
11  it had been told?
12   A.  It would have been articulated to, you
13  know, one of us in the map room or all of it at the
14  same time in the map room.  And so much of our
15  drafting was in realtime with the members, so it
16  would have been -- the most common way for any of
17  those instructions to occur would be in realtime in
18  the map room, either Zooming with a member of the
19  general assembly -- or a member of the Senate or
20  with a member of the Senate in the office.
21     I don't recall that happening.  You're
22  saying six Republican and one Democrat.  I don't
23  remember that being...
24   Q.  In looking at the guidelines in front
25  of you, do you see that as a criteria identified in

Page 139

1  this document?
2    A.  No.  No.  I mean, I -- no, I don't.  I
3  guess I'd go back to that other question.  No one
4  articulated it the way you're articulating it, six
5  and one, but there were people that said I want,
6  you know, the 1st district to stay Republican or
7  lean Republican.
8    Q.  Who were those people?
9    A.  Senator Campsen, I believe, felt that
10  was important.  And I think the rest of the
11  Republican majority voted the final way they voted
12  because they felt it was important.
13   Q.  When did Senator Campsen relay that he
14  wanted CD1 to stay Republican?
15   A.  I'm sure it would have been when we
16  were doing maps in November, December, you know,
17  during that subcommittee timeframe.  It was
18  never -- I don't think he wanted it skewed; I just
19  don't think he wanted it -- he felt that having two
20  members of congress in Charleston was a good thing.
21     And as a part of that, we also met with
22  Senator Clyburn in Charleston.  I think he thought
23  that was a good thing too because he's a powerful
24  guy.  And that dovetailed with his desire to keep
25  Charleston Republican.

Page 140

1    Q.  Outside of the map room, were you
2  present when Senator Campsen relayed that as a
3  priority of his on the floor of the legislature?
4    A.  I can't remember if he did or not.  I
5  don't remember.
6    Q.  Do you know if the public was aware
7  that that was a priority of Senator Campsen when he
8  was developing congressional maps?
9    A.  I think so, because a lot of people
10  wanted it the exact opposite.  It was a Republican-
11  Democrat thing.  But the folks that wanted to make
12  Charleston all within one district weren't
13  necessarily going to make CD1 a Democratic
14  district.  And the Republicans, vice versa.
15   Q.  What's that based on?
16   A.  Trump/Biden data.  It was political
17  data that was loaded in the software.
18   Q.  And who provided that political data?
19   A.  I forget the name of the consultant
20  that did that, but something had to be -- some sort
21  of census information or election commission data
22  or something.  We had some outside consultant, I
23  think, that aggregated that stuff and put it in a
24  format that it could be used in maps.  I'm not sure
25  who that was.

Page 141

1    Q.  Are you aware of whether that data was
2  provided on the Senate Redistricting website?
3    A.  I think it was, yeah.  I think we did
4  have political data.
5    Q.  And you were not involved in any
6  analysis of that data?
7    A.  No, I wasn't.
8    Q.  We were talking about communities of
9  interest before the break, and as I understand from
10  your testimony today, you participated in the
11  public hearings.  Do you recall -- is it fair to
12  say there were about ten public hearings over the
13  summer?
14   A.  I think that's close, yeah.
15   Q.  And do you know how the redistricting
16  committee chose which counties to hold those
17  hearings in?
18   A.  I think we just looked at the most, you
19  know, central populus areas and areas that had a
20  tech school in the area because the tech schools,
21  that's what we used almost exclusively.  I think
22  all of our meetings were held at a tech school
23  except for maybe one just because they were very
24  accommodating and had an auditorium.
25     I think that was major population areas

Page 266

1  recall this bit. I think he was trying to decide
2  how many people in Daniel Island.
3      Q.  Was it common for Senator Campsen to
4  use his personal Gmail to correspond about
5  congressional redistricting?
6      A.  No, huh-uh. I mean, not that I can
7  recall. He didn't do a lot of email so, no.
8      Q.  Were you involved in the preparation of
9  the data reported here?
10     A.  No.
11     Q.  Do you know why there was a focus on
12 Charleston and Daniel Island?
13     A.  Because that's the area that Chip
14 Campsen represents.
15         MS. ADEN: Raymond, I'm not sure if 15
16 is the right document that you've uploaded into
17 Exhibit Share. It's South Carolina Senate 22549,
18 22550, which you might see at the end. Are you
19 hearing me because I can't hear you.
20         MR. AUDAIN: Yeah, I'm hearing you.
21 We're at 13. You said tab 70?
22         MS. ADEN: Yes. Oh, wait. I
23 understand why. I somehow got into the wrong
24 folder.
25         Can we go off the record for just two

Page 267

1  minutes? I want to make sure I'm in the right
2  folder.
3          THE REPORTER: Yes.
4          MS. ADEN: Okay. I'm back. Thank you.
5  BY MS. ADEN:
6      Q.  If you could look at the document
7  titled 2250 or Bates stamped 22550, I apologize.
8      A.  I don't see one marked that, but it's
9  the next page, I assume.
10     Q.  Yeah, I think it fell off. I apologize
11 for that too. South Carolina Senate 22550.
12     A.  Yep. I've got it.
13     Q.  What information is this chart
14 reporting?
15     A.  It looks like it's got -- is it maybe
16 that 19,000 people or subtracted 19,000 people from
17 Charleston and Daniel Island? Looks to be
18 comparisons population.
19     Q.  So the DI in the second set of data on
20 the bottom, DI is referring to Daniel Island?
21     A.  I think so.
22     Q.  And does it look like it's reporting
23 the population numbers and Trump support in several
24 counties under various plans?
25     A.  Yes, it is.

Page 268

1      Q.  And the counties include Charleston,
2  Berkeley, Dorchester, and Beaufort?
3      A.  Yes.
4      Q.  And the plans considered are the
5  Benchmark 2011 plan, the Senate Staff Plan, the
6  House Judiciary Plan, and the House Judiciary Plan
7  Senate Amendment 1?
8      A.  Yes.
9          MR. TYSON: Leah, I don't know, did you
10 say Benchmark 2011?
11         MS. ADEN: Sorry, 2020. Thank you for
12 correcting me. Benchmark 2020.
13 BY MS. ADEN:
14     Q.  Is it Benchmark 2020 or does it
15 actually say? But would you assume that it would
16 be or do you know?
17     A.  With the number that, I would assume it
18 would be. I don't know. I couldn't tell you from
19 this document.
20     Q.  Looking at all of the measures -- and I
21 want to focus on the Trump column -- does it
22 reflect that in all of the plans compared -- and
23 again, we don't know which benchmark we're
24 referring to, but between the plans compared, that
25 in Charleston, Berkeley, Dorchester, and Beaufort,

Page 269

1  that the Trump share of the vote increased from the
2  Benchmark Plan?
3      A.  Yes. I think you can see.
4      Q.  From 53 percent to over 54 percent in
5  some of those areas?
6      A.  Yes.
7      Q.  And it looks like under both measures,
8  the top columns -- the top rows and the bottom
9  rows, that the population of Charleston is reduced
10 significantly from the Benchmark Plans or reduced?
11     A.  Yes. I think so.
12     Q.  Is this the type of political data that
13 we've been discussing this afternoon that was
14 reported with plans that you and others who were
15 working on plans would provide?
16     A.  Sure. Yeah.
17     Q.  Did you attend the meeting where this
18 information -- was there a meeting where this
19 information was shared to Senator Campsen?
20     A.  I don't recall whether this was
21 something we shared with him at a meeting or got
22 to -- I'm sure at some point he talked with us
23 about it, I'd say. He wouldn't have just received
24 this information cold and not discussed it at some
25 point.