# Exhibit 11

3:21-cv-03302-MGL-TJH-RMG     Date Filed 09/09/22     Entry Number 378-11     Page 2 of 5

Brenda C. Murphy                                    August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 1

```
     IN THE UNITED STATES DISTRICT COURT
      FOR THE DISTRICT OF SOUTH CAROLINA
              COLUMBIA DIVISION
THE SOUTH CAROLINA STATE
CONFERENCE OF THE NAACP

     and

TAIWAN SCOTT, ON BEHALF OF HIMSELF
AND ALL OTHER SIMILARLY SITUATED
PERSONS,

          Plaintiffs,

     vs.           Case No. 3:21-CV-03302-MGL-TJH-RMG

THOMAS C. ALEXANDER, IN HIS OFFICIAL
CAPACITY AS PRESIDENT OF THE SENATE;
LUKE A. RANKIN, IN HIS OFFICIAL CAPACITY
AS CHAIRMAN OF THE SENATE JUDICIARY
COMMITTEE; MURRELL SMITH, IN HIS OFFICIAL
CAPACITY AS SPEAKER OF THE HOUSE OF
REPRESENTATIVES; CHRIS MURPHY, IN HIS
OFFICIAL CAPACITY AS CHAIRMAN OF THE HOUSE
OF REPRESENTATIVES JUDICIARY COMMITTEE;
WALLACE H. JORDAN, IN HIS OFFICIAL CAPACITY
AS CHAIRMAN OF THE HOUSE OF REPRESENTATIVES
ELECTIONS LAW SUBCOMMITTEE; HOWARD KNAPP,
IN HIS OFFICIAL CAPACITY AS INTERIM
EXECUTIVE DIRECTOR OF THE SOUTH CAROLINA
STATE ELECTION COMMISSION; JOHN WELLS,
JOANNE DAY, CLIFFORD J. EDLER, LINDA MCCALL,
AND SCOTT MOSELEY, IN THEIR OFFICIAL
CAPACITIES AS MEMBERS OF THE SOUTH CAROLINA
STATE ELECTION COMMISSION,

          Defendants.
_____

DEPOSITION OF:    BRENDA C. MURPHY
                  (Via Videoconference)

DATE:             Monday, August 8, 2022

TIME:             10:00 a.m.

LOCATION:         6111 North Main Street
                  Columbia, South Carolina
```

3:21-cv-03302-MGL-TJH-RMG     Date Filed 09/09/22     Entry Number 378-11     Page 3 of 5

Brenda C. Murphy                                  August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 2

1  TAKEN BY:     Counsel for Thomas Alexander
                and Luke Rankin
2
   REPORTED BY:  Elaine L. Grove-DeFreitas,
3               Independent Professional Reporter
                (Via Videoconference)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1  APPEARANCES OF COUNSEL:
2
     ATTORNEYS FOR THE PLAINTIFFS
3    THE SOUTH CAROLINA STATE CONFERENCE OF
     THE NAACP:
4
     NAACP LEGAL DEFENSE & EDUCATIONAL FUND,
5    INC.
       BY:  RAYMOND AUDAIN
6      BY:  JOHN CUSICK
     40 Rector Street
7    Fifth Floor
     New York, New York  10006
8    212-965-2200
     raudain@naacpldf.org
9    jcusick@naacpldf.org
     (Via Videoconference)
10   and
       BY:  ANTONIO L. INGRAM II
11   700 14th Street, NW
     Sixth Floor
12   Washington, D.C.  20005
     646-647-7754
13   aingram@naacpldf.org
     (Via Videoconference)
14
15
16   ATTORNEYS FOR THOMAS C. ALEXANDER AND
     LUKE A. RANKIN:
17
     ROBINSON, GRAY, STEPP & LAFFITTE, LLC
18     BY:  ROBERT E. TYSON, JR.
       BY:  LA'JESSICA STRINGFELLOW
19   1310 Gadsden Street
     Columbia, South Carolina  29201
20   803-929-1400
     rtyson@robinsongray.com
21   lstringfellow@robinsongray.com
     (Via Videoconference)
22
23
24
25

Page 4

1  APPEARANCES OF COUNSEL:
2
     ATTORNEYS FOR THE HOUSE DEFENDANTS:
3
     NEXSEN PRUET, LLC
4      BY:  JENNIFER HOLLINGSWORTH
       BY:  HAMILTON BARBER
5    1230 Main Street
     Suite 700
6    Columbia, South Carolina 29201
     803-771-8900
7    hbarber@nexsenpruet.com
     (Via Videoconference)
8
9
     ATTORNEYS FOR ELECTION DEFENDANTS:
10
     BURR & FORMAN, LLP
11     BY:  JANE W. TRINKLEY
     1221 Main Street
12   Suite 1800
     Columbia, South Carolina  29201
13   803-799-9800
     jtrinkley@burr.com
14   (Via Videoconference)
15
16
17 ALSO PRESENT:  Cyndi Nygord (Via Videoconference)
18
19
20
21
22
23
24
25

Page 5

1             I N D E X
                                  Page Line
2  EXAMINATION
3  BY MR. TYSON.................................. 6/3
4  BY MR. INGRAM................................. 84/24
5  CERTIFICATE OF REPORTER....................... 86
6
7             E X H I B I T S
8                                 Page Line
9  EXHIBIT 1, 6-26-21 SC State Conference, NAACP
   General Membership Meeting..................... 30/20
10
   EXHIBIT 2, 6-12-21 SC State Conference, NAACP
11 Executive Committee Meeting Minutes............ 57/14
12 EXHIBIT 3, 9-30-21 SC State Conference NAACP
   Reapportionment Coalition Meeting Minutes...... 73/7
13
14
15
16
17
18
19
20
21
22
23
24
25

Brenda C. Murphy  August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 6

1        BRENDA C. MURPHY,
2    being first duly sworn, testified as follows:
3           DIRECT EXAMINATION
4  BY MR. TYSON:
5       Q.   Good morning, Ms. Murphy.  My name is
6  Rob Tyson.  I'm an attorney for the Senate
7  Defendants, President Alexander, and Senator Rankin,
8  I guess as chair of the Judiciary Committee.
9           Thank you for being here.  Can you state
10 your name?
11      A.   My name is Brenda C. Murphy,
12 M-U-R-P-H-Y.
13      Q.   And where do you live, Ms. Murphy?
14      A.   Where do I live or where I am?
15      Q.   Yes, ma'am.  Either one.  Where do you
16 live and where are you now?
17      A.   Okay.  I live in Columbia, South
18 Carolina.  And I'm currently at 6111 North Main
19 Street, Columbia, South Carolina.
20      Q.   Well, very good.  And so I will go kind
21 of through the rules, but you have now become a pro
22 at being deposed.  But if you can't hear me or if I
23 ask a poor question, just ask me to repeat it.
24 Okay?
25      A.   Okay.

Page 7

1       Q.   But the simple rules are you know you're
2  under oath.  Correct?
3       A.   Yes.
4       Q.   Okay.  And so I'm going to ask some
5  questions, and the court reporter is recording them.
6  So when you speak, just make sure that you don't nod
7  or you don't shake or whatever; that you do speak so
8  the court reporter can hear you.  Okay?
9       A.   Okay.
10      Q.   I'm going to ask questions.  And there
11 might be a possibility or probably -- a probability
12 that Mr. Ingram is going to voice an objection.  And
13 if he does we will let him state his objection, and
14 then if you would just go on and answer my question
15 after he states his objection.  Okay?
16      A.   Okay.
17      Q.   We are not going to be here real long
18 today, but -- you know, it's my birthday and so --
19      A.   Happy birthday.
20      Q.   Thank you.  And not just that, but you
21 have been deposed, and I think we have a good
22 understanding of your testimony so I'm going to try
23 not to repeat or rehash that.  There might be some
24 overlap, so I apologize, but we are going to try to
25 kind of get to some stuff pretty quickly, just ask

Page 8

1  the relevant questions and move on.  Okay?
2       A.   Okay.
3       Q.   All right.  You know the State
4  Conference is the plaintiff in this case.  Correct?
5       A.   Yes, I do.
6       Q.   All right.  So you know we are going to
7  trial in a couple of months.  Right?
8       A.   Yes.
9       Q.   And you know the burden is on the
10 plaintiff to prove the case.  Correct?
11      A.   Yes.
12      Q.   So I'm going to ask questions today,
13 just giving you a heads-up, just to kind of make
14 sure I understand how you came about trying -- how
15 you became a plaintiff, and then just try to get a
16 little bit of a better understanding of what it is
17 that you think the General Assembly should have done
18 differently.  Okay?
19      A.   Okay.
20      Q.   No real tricks to it.  I just want to
21 know a little bit more about how you got in the
22 lawsuit and then why you got in the lawsuit, and
23 then what do you expect to get out of it.  Okay?
24      A.   Okay.
25      Q.   As you heard me say to the court

Page 9

1  reporter, we are going to take two depositions
2  today.  One, to start this morning, I'm just asking
3  you questions for you as Ms. Murphy.  Okay?  As
4  President Murphy.
5       A.   Okay.
6       Q.   Later, when we quit in an hour or two
7  and ask I questions about -- and we stop and then we
8  will go into it, we will have a 30(b)(6) deposition.
9  And when I ask those questions and then when you
10 respond, you're answering on behalf of the
11 organization.  Okay?
12      A.   Okay.
13      Q.   Do you see that difference?  Do you
14 understand that difference?
15      A.   I do.
16      Q.   Okay.  So the first part will be just
17 your personal opinion or how you see things
18 personally, and the second part will be you're
19 speaking for the organization.
20           What's difficult sometimes is that those
21 roles kind of blur, or those responsibilities kind
22 of blur.  So if my question is poor or you're not
23 sure if I am asking you a question as Brenda Murphy
24 versus as President Murphy, just let me know and
25 then we can figure out how to go from there.  Okay?

3 (Pages 6 - 9)

3:21-cv-03302-MGL-TJH-RMG     Date Filed 09/09/22     Entry Number 378-11     Page 5 of 5

Brenda C. Murphy                                          August 8, 2022
The South Carolina State Conf vs. McMaster/Alexander

Page 42

1  Q. And you said you began to have concerns
2  prior to them drawing a map?
3  A. Well, we were concerned whenever many
4  individuals would talk -- well, they expressed
5  concerns about -- their feeling that their voices
6  were not heard. When litigation was filed it wasn't
7  until, actually, in January -- January, February.
8  So, you know, we had a chance to look at maps that
9  were shared and individuals could voice their
10 opinions.
11 Q. Okay. I think we will follow back up on
12 some of the litigation after a while.
13 A. Okay.
14 Q. Did you have a -- was it one of your
15 goals to try to ensure that another
16 majority-minority district was drawn of the seven
17 Congressional districts?
18 A. Was that a goal? Well, I don't think it
19 was a goal. The only thing that we were concerned
20 about is fair mapping and considering the criteria.
21 It would always be good to have increased Black
22 representation, but we know -- you know, there were
23 changes in populations and shifting of numbers.
24 Q. So you don't think it was a goal that
25 you were going to go in and try to see, of the seven

Page 43

1  Congressional districts, whether there could be
2  another majority African-American district?
3  MR. INGRAM: Objection.
4  THE WITNESS: No, that was never stated.
5  BY MR. TYSON:
6  Q. Was it a goal to make sure that the six
7  Congressional districts remained relatively the same
8  such that an African-American member -- person could
9  be elected there?
10 MR. INGRAM: Objection.
11 THE WITNESS: Let me say, whenever we
12 were looking at communities it was more to serve the
13 people, to ensure that packing and cracking did not
14 occur in certain areas to minimize the influence of
15 the Black voter. We had no -- you know, when we
16 looked at this it was not with the intention of
17 looking at who was where, not at all.
18 BY MR. TYSON:
19 Q. When you said that you looked at
20 criteria, what were some of those criteria that were
21 important to you? When you said you wanted to have
22 fair mapping, you considered criteria, what are some
23 of those criteria?
24 A. Communities being contiguous.
25 Communities of interest not done in such a way that

Page 44

1  there is splitting -- to minimize splitting.
2  Minimize packing in hopes of Black people being able
3  to have some influence over who is elected as their
4  representative.
5  Q. All right. So let's go through some of
6  those. You said it was important that they were
7  contiguous. Right?
8  A. Yes.
9  Q. That doesn't have anything to do with
10 race. Correct?
11 A. Well, I think the main thing is that
12 they are drawn in such a way that the Black vote has
13 some influence over who serves, the individual.
14 That's the primary goal.
15 Q. Yes, ma'am. But contiguous means that a
16 district would be next to each other. Right?
17 A. Yeah. Yeah.
18 Q. So that wouldn't have anything to do
19 with race. Correct?
20 A. Well, it might.
21 Q. The communities of interest, are there
22 communities of interest that don't involve race?
23 A. Well, yeah. If you look at subsets,
24 yes, community subsets within a community. But when
25 we are talking communities of interest, we are

Page 45

1  talking about those individuals that are served by,
2  you know, a county, for example, being split three
3  different ways, that's just not good. Individuals
4  with similar interests, use the same hospitals, are
5  being placed in another area where the interests are
6  not the same.
7  Q. And I agree with you. I'm not arguing
8  with you about what those communities look like.
9  But again, if we are trying to look at individuals
10 with similar interests or same interests are being
11 placed -- well, let's just look at it that way.
12 That doesn't just relate to African-American voters,
13 does it?
14 MR. INGRAM: Objection.
15 THE WITNESS: Well, you know, it depends
16 on how you look at that.
17 BY MR. TYSON:
18 Q. And that's right. That's 100 percent
19 accurate. But I was just trying to -- are there
20 communities of interest that could be -- that might
21 have same -- similar interests but might not be
22 African-American voters? Does that --
23 A. Yeah. Have similar interests, yes.
24 Q. Yes, ma'am.
25 A. I would say yes.

12 (Pages 42 - 45)