**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

THE SOUTH CAROLINA STATE
CONFERENCE OF THE NAACP, *et al.*,

      *Plaintiffs*,

    v.

THOMAS C. ALEXANDER, *et al.*,

      *Defendants*.

Case No. 3:21-cv-03302-MGL-TJH-RMG

**THREE-JUDGE PANEL**

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
SENATE AND HOUSE DEFENDANTS' JOINT
MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................ 2

I.     PLAINTIFFS' RULE 56(c)/LOCAL RULE 7.05(A)(4) STATEMENT ........................... 2

     A.     There are Material Differences Between the Congressional Plan and the 2011 Map ........................................................................................................... 2

     B.     South Carolina's History, and the Duplicitous and Secretive Sequence of Events Leading to the Passage of the Congressional Plan, Demonstrates Racial Discrimination ........................................................................................ 6

     C.     Defendants' Awareness that the Congressional Plan was Racially Discriminatory and The Availability of Less Discriminatory Alternatives .......... 14

ARGUMENT ..................................................................................................................... 16

I.     DEFENDANTS MISSTATE THEIR BURDEN FOR SUMMARY JUDGMENT ........ 16

II.    DEFENDANTS HAVE NOT ESTABLISHED THE ABSENCE OF MATERIAL DISPUTED FACTS AS TO WHETHER THE CONGRESSIONAL MAP VIOLATES THE FOURTEENTH AND FIFTEENTH AMENDMENTS ..................... 17

     A.     Defendants Engaged in Unconstitutional Racial Gerrymandering ...................... 18

          1.     Race Predominated Over Traditional Redistricting Principles in Drawing the Challenged Districts ............................................................. 19

          2.     Race, Not Party Affiliation, Explains the Legislature's Changes to the Congressional Map ........................................................................... 25

          3.     Core Retention Is Not a Shield Against Racial Gerrymandering Claims ....................................................................................................... 30

     B.     Defendants Intentionally Discriminated on the Basis of Race ............................. 34

          1.     The Congressional Map Has a Racially Discriminatory Impact ............. 35

          2.     Defendants Enacted the Congressional Map With a Discriminatory Purpose .................................................................................................... 39

CONCLUSION .................................................................................................................. 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Perez,*
    138 S. Ct. 2305 (2018) (Sotomayor, J., dissenting) ................................................................. 2

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. at 249 (1986) ................................................................. 18

*Backus v. South Carolina,*
    857 F. Supp. 2d 553 (D.S.C.), *aff'd*, 568 U.S. 801 (2012) ................................................................. 34, 35

*Bartlett v. Strickland,*
    556 U.S. 1 (2009) ................................................................. 37

*Beer v. United States,*
    425 U.S. 130 (1976) ................................................................. 34

*Bethune-Hill v. Virginia State Board of Elections,*
    137 S. Ct. 788 (2017) ................................................................. *passim*

*Bethune-Hill v. Virginia. State Board of Elections,*
    141 F. Supp. 3d 505 (E.D. Va. 2015), *aff'd in part, vacated in part*, 137 S. Ct.
    788 ................................................................. 31, 32

*Bush v. Vera,*
    517 U.S. 952 (1996) ................................................................. 2, 27

*Colleton Cnty. Council v. McConnell,*
    201 F. Supp. 2d 618 (D.S.C. 2002) ................................................................. 34

*Collins v. City of Norfolk,*
    816 F.2d 932 (4th Cir. 1987) ................................................................. 20

*Cooper v. Harris,*
    137 S. Ct. 1455 (2017) ................................................................. 20, 27, 30

*Covington v. North Carolina,*
    316 F.R.D. 117 (M.D.N.C. 2016), *aff'd*, 137 S. Ct. 2211 (2017) ................................................................. 40

*Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.,*
    790 F.3d 532 (4th Cir. 2015) ................................................................. 17, 18

*Hunt v. Cromartie,*
    526 U.S. 541 (1999) (*Cromartie I*) ................................................................. 36

*Hunt v. Nuth,*
    57 F.3d 1327 (4th Cir. 1995) ........................................................................19

*Jacobs v. North Carolina Administrative Office of the Courts,*
    780 F.3d 562 (4th Cir. 2015) ...................................................................17, 18

*Miller v. Johnson,*
    515 U.S. 900 (1995) .............................................................19, 24, 26, 34

*North Carolina State Conference of NAACP v. McCrory,*
    831 F.3d 204 .....................................................................27, 36, 41, 42

*Shelby County v. Holder,*
    570 U.S. 529 (2013) ...................................................................................7

*Village of Arlington Heights v. Metropolitan Housing Development Corp.,*
    429 U.S. 252 (1977) ........................................................................ *passim*

*Wise v. Lipscomb,*
    437 U.S. 535 (1978) .................................................................................40

# INTRODUCTION

The House and Senate Defendants[1] ask this Court to decide this case in their favor without a trial by improperly elevating Plaintiffs' burden at the summary judgment stage. In an attempt to avoid a trial on the merits, they try to turn summary judgment into trial on the papers. But the Rule 56 standard is clear: without a showing from Defendants that there is not a single "genuine dispute as to any material fact," their motion ought to fail. *See* Fed. R. Civ. P. 56(c).

Instead of demonstrating an absence of factual disputes, Defendants raise only material points that are ripe for trial. On Plaintiffs' racial gerrymandering claim, Defendants lay out competing expert analyses that will doubtlessly require this Court to make credibility determinations at trial. They now claim that partisan political objectives drove the redistricting process, but the legislative record is far from clear that partisanship was a contemporaneous—or constitutional—justification for the Legislature's actions. If anything, it suggests the opposite. Defendants also allege that they could not have engaged in a racial gerrymander because they set out to retain the cores of prior districts. But that ignores that even a goal of preserving district cores—if true—cannot end the required inquiry where even Defendants concede that significant changes in population required significant changes to the benchmark Congressional map. It is precisely the choice to keep certain voters in certain districts and move hundreds of thousands of other voters in or out of them, that Defendants effectuated their racial gerrymander.

On Plaintiffs' intentional discrimination claim, Defendants hide behind *post-hoc* partisan explanations and suggest inapplicable legal standards apply to avoid addressing the mountain of evidence Plaintiffs have amassed for trial. And in addition to re-writing the law on intentional discrimination, Defendants dispute Plaintiffs' experts' analysis on numerous factual grounds. That

---

[1] Election Defendants have not joined the Motion. Unless stated otherwise, references to "Defendants" herein exclusively refer to the moving House and Senate Defendants.

is, rather than demonstrating a lack of disputed material facts, Defendants draw them out, highlighting the unequivocal need for trial in this case.

Because "the right to equal participation in our political processes [. . .] mean[s] little . . . if courts do not remain vigilant," *Abbott v. Perez*, 138 S. Ct. 2305, 2360 (2018) (Sotomayor, J., dissenting), this Court, contrary to Defendants' suggestions, should "decline to retreat" from their duty to rectify unconstitutional districting schemes, *Bush v. Vera*, 517 U.S. 952, 986 (1996). In fact, Plaintiffs have amassed evidence to support their racial gerrymandering and intentional discrimination claims far beyond what is necessary at summary judgment. Extensive factual evidence, including expert reports and deposition testimony, reveal that the South Carolina Legislature subordinated traditional redistricting principles to race in drawing the enacted Congressional map. And under the *Arlington Heights* framework, numerous procedural irregularities and lack of transparency during the redistricting process; the recent continuation of official discrimination in South Carolina political processes; and the Congressional map's discriminatory impact on Black voters demonstrate that the Legislature intentionally harmed Black voters based on race. Contrary to Defendants' mischaracterization of Plaintiffs' request for relief, Plaintiffs ask that this Court remedy these constitutional violations as appropriate—after adjudication on the merits.

Given the numerous material factual disputes surrounding Plaintiffs' racial gerrymandering and intentional discrimination claims, the Court should deny Defendants' Motion for Summary Judgment ("Motion" or "MSJ").

## I.     PLAINTIFFS' RULE 56(C)/LOCAL RULE 7.05(A)(4) STATEMENT

### A.     There are Material Differences Between the Congressional Plan and the 2011 Map

1.  The Congressional Plan's drafters significantly changed South Carolina's Congressional map.  These changes are most evident in the Charleston metropolitan area, but the map also made numerous surgical adjustments in predominantly Black metro areas surrounding Columbia, Sumter, and Orangeburg.  In particular, the new map:

- Cuts most of the City of Charleston out from Congressional District ("CD") 1, its historical home dating back to the early 1900s; Ex. 1 (Trende Dep. Tr.) at 119:2-11, 133:18-134:4; Ex. 2 (Trende Expert Rep.) at 10-16;

- Splits North Charleston, Summerville, and Ladson in an "erratic" manner with the "district line wind[ing] between counties, in and out of [North Charleston], and through neighborhoods with significant Black population"; Ex. 3 (Duchin Expert Rep.) at 17, fig.5;

- Splits Jasper County and moves most of it from CD1 to CD6; *id.* at 16;

- Splits Dorchester County "illogically" including having two non-contiguous pieces that have heavily Black portions of precincts moved from CD1 to CD6; *id.*;

- Redraws the "hook" from CD2 into Richland County by "crack[ing] voters by drawing district boundaries through an area in northern Richland with high BVAP"; *id.* at 18, fig.6.

- Splits the cities of Cayce, Columbia, and Forest Acres to "wrap around and divide the city of Columbia. . . . in a manner that cracks [the] Black population"; *id.* at 19, fig.7.

- Separates the predominantly Black community of Orangeburg (in CD6) from its predominantly Black suburbs (in CD2); *id.* at 18, fig.6.

- Splits the majority Black city of Sumter and neighborhoods of East Sumter and Mulberry between CD5 and CD6 with the "dividing line wend[ing] through a heavily Black region"; *id.* at 20-21, figs.8 & 9.

As Plaintiffs' expert Dr. Moon Duchin notes, "the reassignment . . . happen[s] in scattered chunks and shards, and is not aimed at healing key splits of cities and communities . . . including Columbia, Sumter, Orangeburg, and Charleston . . . in a way that neither respects traditional redistricting principles nor publicly identified community needs."  *Id.* at 15, fig.3.

2.  The Congressional Plan involved a massive migration and dislocation of voters from the 2011 Plan.  140,489 people (19.2% of the district population) were moved from CD1 to CD6, while

a different 52,799 people (7.2%) were moved from CD6 to CD1. Ex. 2 (Trende Rep.) at 18. 27,650 additional people were moved out of CD6, and many thousands of people were moved out of CDs 2 (14,397), 3 (14,001), 4 (43,030) and 5 (41,347). *Id.* CD7 was left with *de minimis* population change.

3. The significant migration of population out of CD6 makes no sense, as the 2020 Census showed that it had 84,741 fewer people than the target population. Ex. 4 (Benchmark Congressional Districts with 2020 Data). The number of people moved out of CD1 (140,489) was almost twice the district's overpopulation (87,689). Ex. 5 (Core Constituencies Report, House Plan 2 Senate Amendment 1); Ex. 4 (Benchmark Congressional Districts with 2020 Data). And there were significant movements of population out of CDs 2, 3, and 5, all of which were underpopulated or just slightly over the target population.

4. Following this migration, the alleged "cores" of South Carolina's Congressional Districts bear little resemblance to the 2011 map. This is most evident in CD1, where the City of Charleston has been excised out of its historical district, and CD6, which now stretches from Columbia to the sea's edge in Charleston Harbor. *See* Ex. 3 (Duchin Expert Rep.) at 3, 15 fig.3. And this is confirmed by statistical data. According to the House and Senate Defendants' own analysis, CD6 only retained 77.26% of its former residents, Exs. 6, 7 (Trende Dep. Exs. 9, 10), while their expert concludes that CD1's "core population retention" was only 82.84%. Ex. 2 (Trende Expert Rep.) at 18 tbl.3.

5. These population shifts were not "race neutral." Most dramatically, 35,629 Black CD1 residents were moved to CD6, representing 24.5% of the Black population of CD1. Ex. 6 (Trende Dep. Ex. 9). As Dr. Duchin observed, the district line weaves "in and out of the city, and through neighborhoods with significant Black population." Ex. 3 (Duchin Expert Rep.) at 17 fig.5. Dr.

Jordan Ragusa, who studied the racial demographics of the precincts moved between the old and new map, found the movement of Black voters was statistically significant in CDs 1, 2, 3, 5, and 6, with Black voters being excluded from CDs 1, 2, and 5 and kept or added to CDs 3 and 6, and that "race was an important factor in the design of [all of these] district[s]." Ex. 8 (Ragusa Expert Rep.) at 4-13.

6. Dr. Baodong Liu, also looking at the demographics of the precinct movements, concluded that Black voters were "much more likely to be moved out or moved into CD 1" than white voters, and the Congressional map kept "Black VAP in CD 1 low" by "moving out . . . Black voters from the Charleston area." Ex. 9 (Liu Expert Rep.) at 17, 17 n.18.

7. Race's role as a significant factor in drawing the Congressional Map was confirmed by Dr. Duchin and Dr. Kosuke Imai. Using computer simulations to generate 100,000 sample maps adhering to traditional race-neutral redistricting criteria, Dr. Duchin found that the Black Voting Age Population ("BVAP") of the second most diverse district in the Congressional Map (CD 2) was substantially lower than the average in her simulations. Ex. 3 (Duchin Expert Rep.) at 22-23, 23 fig.10; *see also* Ex. 10 (Duchin Suppl. Rep.) at 1 (reporting that the "state's plans [*i.e.*, the enacted plan, like the 2011 benchmark plan] not only have unusually low BVAP in [the district with the second-highest BVAP in each plan], but indeed have unusually low BVAP in all districts except the highest and lowest").

8. Using computer simulations to generate 10,000 sample "race-blind" maps, Dr. Imai similarly found that none of his simulations "has a lower BVAP proportion for District 1" in the Congressional Plan, and that the redrawn, enacted CD1 had about 5.8% lower BVAP than his average simulation. Ex. 11 (Imai Expert Rep.) at ¶¶ 27-29, 12 fig.1, 13 fig.2. Dr. Imai also found that the Congressional Plan's treatment of the Black population of Charleston County was an

extreme statistical outlier, with the BVAP of the portion of Charleston County in CD6 being 21.4% higher than the portion in CD1. *Id.* at 13-14, 14 fig.3. Dr. Imai found similar disparities between Richland and Sumter Counties. *Id.* at ¶¶ 39-45, 19 fig.8, 20 fig.9.

9. The result is a dramatic underrepresentation of Black residents in South Carolina's Congressional delegation. According to the 2020 decennial census, over 25% of South Carolinians (some 1,370,542 people) identified as Black on their census form, and Black residents represent over 25% of the state's Voting Age Population. Ex. 9 (Liu Expert Rep.) at 11; Ex. 25 (Senate Response to RFAs) at RFA Nos. 4-8, 13. By moving Black voters into CD6—the lone district that provided Black voters an ability to elect their preferred candidate in the State's 2011 benchmark plan and did not need additional Black voters to function—and cracking predominantly Black communities in the Charleston metro area to suppress BVAP in CD1, the Congressional Map reduces the ability of Black voters to elect candidates of choice from 2-3 seats to only one, and is "likely to be even less effective for Black voters' chance to elect [Black preferred candidates] in CD 1" than the prior plan. Ex. 9 (Liu Expert Rep.) at 11-13, 13 tbl.4.

**B.** **South Carolina's History, and the Duplicitous and Secretive Sequence of Events Leading to the Passage of the Congressional Plan, Demonstrates Racial Discrimination**

10. As discussed at length in the report of Dr. Joseph Bagley, South Carolina has a long history of racial discrimination against Black South Carolinians in its political processes. Ex. 12 (Bagley Expert Rep.) at 4-24. In every redistricting cycle since the Supreme Court established the "one person, one vote" standard, South Carolina's legislative maps have been challenged for discriminating against Black voters. *Id.* at 10-20, 24. In most of those challenges, the state's original map was deemed illegal. Moreover, prior to the decision in *Shelby County v. Holder*, 570 U.S. 529 (2013), the U.S. Department of Justice lodged pre-clearance objections to state and local election changes 122 times, including many redistricting decisions. *Id.* at 21.

11.   The primary work of drafting the new maps was conducted by legislative staff, supervised by legislative committees. ███████████████████████████████████████ ███████████████████████████████████████████████████ Ex. 13 (House Response to RFAs) at RFA No. 43; ████████████████████████. In the Senate, initial maps were drawn by Andrew Fiffick (Senate counsel), Will Roberts (Senate mapdrawer), Charlie Terreni (Senate counsel), and Breeden John (Senate counsel), with consultation of John Gore, counsel of record in this case. Ex. 15 (Fiffick Dep. Tr.) at 245:24-247:24.

12.   As they worked, mapmakers had ready access to racial demographic information, *id.* at 39:24-40:4, 42:19-25, which is generated by the Maptitude software. Ex. 16 (Benson Dep. Tr.) at 98:11-16. █████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████ Ex. 15 (Fiffick Dep. Tr.) at 128:21-129:15; ████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████

13.   In the Senate, the process was overseen by the Senate Judiciary Subcommittee on Redistricting.  *See* Ex. 19 (Fiffick Dep. Ex. 1). ██████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████

14.   Both the Senate and the House adopted criteria, which they posted on their websites. Ex. 21 (Newton Dep. Ex. 1), Ex. 19 (Fiffick Dep. Ex. 1). ████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████; Ex. 16 (Benson Dep. Tr.) at 119:2-18. ██

██████████████████████████████████████████████████████████

██████████████████████████████████████, on the Senate side, Senate staff acknowledged in testimony that Defendant Rankin directed various additional, undisclosed criteria that were to be considered in drafting the map—specifically, "don't touch the seventh congressional district, Congressman Clyburn wanted a minimal-change plan, and Congressman Joe Wilson didn't want to go to Beaufort [and] wanted to keep Fort Jackson." Ex. 23 (Roberts Dep. Tr.) at 64:20-25; *see also* Ex. 19 *(*Fiffick Dep. Tr.) at 248:24-249:15. █████████████████████████

████████████████████████████████████████████

15. The Senate also adopted procedures for receiving draft maps from the public, which required submissions would "be made part of the public record and will be made available in the same manner as other Redistricting Subcommittee public records." Ex. 24 (Fiffick Dep. Ex. 9) at 1. The House posted the map submissions they received on their redistricting website, Ex. 14 (Hauger Dep. Tr.) at 29:15-18, and the Senate posted every submission they received as well, except for those it got from one specific source—the National Republican Redistricting Trust ("NRRT"). Ex. 25 (Senate Response to RFAs) at RFA Nos. 29-35; Ex. 26 (Baker Dep. Tr.) at 86:22-87:6; Ex. 15 (Fiffick Dep. Tr.) at 203:24-204:11.

16. Early in the redistricting process, prior to the release of the 2020 Census data, the Senate and House organized separate series of public hearing tours. During these tours, many South Carolina residents testified about particular communities of interest they wanted to keep together or to have made whole. Ex. 12 (Bagley Expert Rep.) at 27, 29. As Defendants admit, "the majority of the folks we saw at the public hearing were there to advocate for changing the districts in a way that would have put all of Charleston into District 1." Ex. 15 (Fiffick Dep. Tr.) at 132:19-23. The

Subcommittee also heard about the importance of keeping racial minorities together to promote effective representation. Ex. 16 (Benson Dep. Tr.) at 123:13-22, 157:4-11; *see, e.g.*, Ex. 27 (November 12, 2021 Senate Judiciary Redistricting Tr.) at 88:7-90:24.

17.   Ultimately, however, the mapmakers did not consider this public testimony in drafting the Congressional Plan.  As Mr. Fiffick testified, at the time he helped put together the first draft of what became S.865, he does not remember considering "specific outside input prior to the staff map," and he is not aware of anyone evaluating the public submissions.  Ex. 15 (Fiffick Dep. Tr.) at 249:21-22, 280:4-7. ██████████████████████████

██████████████████████████████████████████████████

18. Before it released its initial draft map on November 23, Senate staff was contacted by NRRT representatives with draft maps.  Specifically, Dale Oldham contacted Charlie Terreni to advise that the NRRT had "worked with the [six members of the] Republican congressional delegation on some maps" and ask how the NRRT could submit maps, and Mr. Terreni provided Mr. Oldham with Andy Fiffick's personal (Gmail) address.  Ex. 28 (Terreni Dep. Tr.) at 79:19-80:10, 83:10-84:22.  On November 18, NRRT Executive Director Adam Kincaid sent two draft maps—labeled the "Wren" and "Palmetto" maps—to Mr. Fiffick.  Ex. 29 (Fiffick Dep. Ex. 10). Mr. Fiffick forwarded these maps to Mr. Roberts, and they were reviewed by at least Messrs. Fiffick, Roberts, Terreni, and likely outside counsel in the Jones Day law firm.  Ex. 28 (Terreni Dep. Tr.) at 82:2-86:7.  The following day, Mr. Terreni confirmed receipt of the maps to Mr. Oldham.  Ex. 30 (Terreni Dep. Ex. 1).

19.   Both the Wren and Palmetto maps included racial demographic data and BVAP numbers.  Exs. 31, 32 (Terreni Dep. Exs. 3, 4), 33, 34 (Fiffick Dep. Exs. 24, 25).  Like the Congressional Plan, neither Wren nor Palmetto had BVAP in any district higher than 50 percent,

and they provided that CD1 would have the lowest BVAP of any district in South Carolina. Ex. 28 (Terreni Dep. Tr.) at 98:14-99:11, 113:19-114:11. And like the Congressional Plan, Wren and Palmetto split the municipalities of Charleston, *id.* at 101:23-102:4, 114:12-25, and Sumter and Orangeburg as well. Both maps also left CD 7 essentially unchanged. *Id.* at 115:2-8.

20. Contrary to the policies laid out in the Senate's Policy for Public Plan Submissions, Ex. 24 (Fiffick Dep. Ex. 9), and in contrast to every other draft map submitted by the public and their publicly stated commitment to transparency, none of the maps submitted by the NRRT (including Wren, Palmetto, or Jessamine, discussed below) were ever published on the Senate or House redistricting websites. Ex. 13 (House RFA 66); Ex. 25 (Senate RFA 59-60). As Mr. Terreni testified, he did not know "how any member of the public would be aware of the Palmetto and Wren plan." Ex. 28 (Terreni Dep. Tr.) at 119:6-12.

21. Five days after receiving the first NRRT map, the Senate staff released its first draft plan on November 23, 2021, the Tuesday before Thanksgiving. Ex. 15 (Fiffick Dep. Tr.) at 258:10-21. The initial Senate draft was substantially similar to the Congressional Plan in that it (i) extended CD 6 to include most of the City of Charleston (extending to the harbor), (ii) split predominantly Black communities in Sumter, Orangeburg, and Richland Counties, (iii) made the BVAP of CD1 the lowest of any of the districts (and even lower than the Palmetto or Wren plans), *compare* Ex. 35 (Population Summary, Staff Subcommittee Plan) *with* Exs. 31, 32 (Terreni Dep. Exs. 3, 4), and (iv) moved a large number of voters from CD 6 to CD 1 (44,698), and vice versa (132,387), Ex. 36 (Core Constituencies Report, Staff Subcommittee Plan).

22. The day after the Senate Staff posted its draft map, Mr. Oldham contacted Mr. Terreni again, Ex. 30 (Terreni Dep. Ex. 1); Ex. 28 (Terreni Dep. Tr.) at 116:8-117:5, and the NRRT submitted a third map called Jessamine. Ex. 37 (Terreni Dep. Ex. 6). The Jessamine map was

reviewed by Messrs. Fiffick, Roberts, and Terreni.  Ex. 28 (Terreni Dep. Tr.) at 120:5-23.  As Mr. Fiffick testified, he "remembered [the Jessamine map] looking so much like our map," *i.e.*, the Staff map that was just released. Ex. 15 (Fiffick Dep. Tr.) at 233:5-10.  The Jessamine map was never placed  on the Senate's redistricting website, and there is no evidence that the Senate staff shared it with Democratic members of the subcommittee, despite being asked to by Senator Harpootlian. *Id.* at 207:16-209:24; Ex. 38 (November 29, 2021 Senate Judiciary Redistricting Subcommittee Hearing Tr. ("Nov. 29 Hearing Tr.")) at 32:9-16.

23.  At the only Committee hearing on the Senate staff draft plan, on November 29, 2021, numerous witnesses and Committee members voiced their disapproval:  the Plan was criticized by witnesses as a "Racial gerrymander" who said that "Black communities were split," and Committee Member Senator Bright Matthews, who is  Black legislative member, observed that Black voters had been carved out of certain areas in order to pack and crack them, including carving Black voters out of Charleston. Ex. 12 (Bagley Rep.) at 32-33; Ex. 38 (Nov. 29 Hearing Tr.) at 8:11-10:5, 23:6-26:3, 40:10-25, 42:15-44:21, 53:6-55:24, 60:4-11.  A second Committee member, Senator Harpootlian, asked a witness whether the map "represented a deliberate choice to take most African American voters and put them in CD 6 while keeping white voters in CD1." Ex. 12 (Bagley Rep.) at 33; Ex. 38 (Nov. 29 Hearing Tr.) at 53:16-54:24.  And both Senators Bright Matthews and Harpootlian complained that they had not been consulted on the draft, that the map was released on the Tuesday before Thanksgiving, and that the hearing was slated for the first Monday after Thanksgiving. Ex. 12 (Bagley Rep.) at 32-33; Ex. 38 (Nov. 29 Hearing Tr.) at 8:1-9:1, 24:7-19, 32:21-33:4, 86:17-24.  This was the last time the Committee met until January 13, 2022, when it approved a substantially similar version of the map. Ex. 12 (Bagley Rep.) at 42-43.

24. The House Ad Hoc committee released the draft plan prepared by Messrs. Dennis and Hauger on December 13, 2021. Ex. 13 (House RFA 42); Ex. 39 (Lucas Dep. Ex. 1). Unlike the Senate draft (and the Congressional Plan) the House draft focused on minimizing county splits and compactness, and did not split Sumter or Orangeburg Counties, Ex. 13 (House RFAs 48-49); kept most of Charleston County in CD 1, Ex. 13 (House RFA 51), ████████████████████████;
kept most of Richland County together in CD 6, Ex. 13 (House RFA 50), ████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████ *See also* Ex. 13 (House RFA 52-53).

25. ████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████

26. ████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████

27. The revised House plan was released to the public on December 23, 2021. Prior to the release, not all Ad Hoc Committee members saw it; for example, Rep. Beth Bernstein never saw the revised map prepared by the House before it was posted on the website. Ex. 13 (House RFA 73); Ex. 44 (Bernstein Tr.) at 154:19-155:25; Ex. 45 (Transcript of South Carolina House Redistricting Ad Hoc Subcommittee Hearing, December 29, 2021 ("Dec. 29 Hearing Tr.")) at 24:25-25:5, 29:10-30:5.

28. The House held its public hearing on its revised staff plan on December 29, 2021. ███

████████████████████████████████████████████████████████

████████████████████████████████████

29. Responding to partisan critiques, certain legislators who led the redistricting process heard complaints about the "most obvious" example of racial gerrymandering in the splitting of Charleston and the reduction in CD 1 BVAP from the House staff plan, and that the unnecessary splitting of Charleston, Richland, and Sumter diluted Black voting strength, particularly in CD 1. Ex. 12 (Bagley Rep.) at 35-36; Ex. 45 (Dec. 29 Hearing Tr.) at 7:7-10:12.

30. At the January 11, 022 House Judiciary Committee, Defendant Murphy arranged for Representative Newton, who is white, to preside over the meeting, ████████████████████ rather than the Committee's Vice-Chair, Representative John King, who is Black. Unlike Representative King, Representative Newton had not been involved in the 2010 or any other congressional (or statewide) redistricting. Ex. 46 (Murphy Tr.) at 49:10-16; Ex. 20 (Lucas Tr.) at 104:7-13. Multiple Black legislators and the South Carolina Legislative Black Caucus objected to this during and following the hearing. Ex. 12 (Bagley Rep.) at 38, 40; ████████████████; Ex. 49 (Jan. 12 Hearing Tr.) at 58:1-7, 85:4-114:8. ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

31.  During the January 12, 2022 Floor Debate, Representative Jay Jordan stated: "I will tell you that no partisan group, national or otherwise, were involved in the drafting of this plan.  None of that outside partisan stuff took place in this process." Ex. 49 (Jan. 12 Hearing Tr.) at 55:24-56:10.  One of the Senate sponsors, Senator George Campsen similarly denied that the map was drawn for partisan purposes.  Ex. 50 (Jan. 20, 2022 Senate Tr.) at 9:7-11, 25:20-26:6 ("I want to also address the issue of some allegations of partisan gerrymandering … that's really not the case.").  At his deposition, Mr. Jordan further testified:



32.  No Black legislator voted for S.865 in the House Judiciary Committee.  Ex. 13 (House RFA 103) at 30.  Only a single Black legislator voted for final passage of S.865.  Ex. 13 (House RFA 117) at 32.

**C.     Defendants' Awareness that the Congressional Plan was Racially Discriminatory and The Availability of Less Discriminatory Alternatives**

33.  As discussed *supra*, mapmakers had access to racial demographic information when they drew the map, as it was generated by the Maptitude software ████████████████████ ████████  Ex. 15 (Fiffick Tr.) at 39:24-40:4, 40:15-41:7; Ex. 16 (Benson Tr.) at 98:11-16; █

██████████████████████████████████████████████████████ Racial demographic information was provided to Committee members with draft maps, Ex. 15 (Fiffick Tr.) at 128:21-129:15, and █████████████████████████████████████████████████████████████

████████████████████████████████

34.     Committee members were repeatedly warned that drafts of S.865 were racially discriminatory.  There were repeated objections to S.865 and its immediate predecessors on this basis in the Committee hearing process.  At the November 29, 2021 Senate Committee hearing, the initial staff plan was criticized by witnesses as a "Racial gerrymander" who noted that "Black communities were split," and Committee Member Senator Bright Matthews observed that Black voters had been carved out of certain areas in order to pack and crack them, including carving Black voters out of Charleston.  Ex. 12 (Bagley Rep.) at 32-33; Ex. 38 (Nov. 29 Hearing Tr.) at 8:11-10:5, 23:6-26:3, 40:10-25, 42:15-44:21, 53:6-55:24, 60:4-11.  A second Committee member, Senator Harpootlian asked a witness whether the map "represented a deliberate choice to take 'most African American voters' and put them in CD 6 while keeping white voters in CD 1."  Ex. 12 (Bagley Rep.) at 34; Ex. 38 (Nov. 29 Hearing Tr.) at 53:16-54:24.  Similar concerns were heard in the House.  At the December 29, 2021 hearing, the map was criticized as an "obvious racial and partisan gerrymander."  Ex. 12 (Bagley Rep.) at 35-36.  Witnesses testified that the "most obvious" example of racial gerrymandering was the splitting of Charleston and the reduction in CD1 BVAP from the House staff plan, and remarked that the unnecessary splitting of Charleston, Richland, and Sumter diluted Black voting strength, particularly in CD 1.  *Id.* at 35-36; Ex. 45, Dec. 29 Hearing Tr. at 7:7-10:12.

35.     When similar concerns were raised in the January 10, 2022 House Judiciary Committee (that the carve out of Charleston was racially motivated, Black voters packed into CD 6), Committee Member Neal Collins acknowledged that the Ad Hoc Committee had been "sensitive to the racial

aspect." Ex. 12 (Bagley Rep.) at 38; Ex. 51 (January 10, 2022 House Judiciary Committee Meeting Tr.) at 3:9-16. During House floor debate, Black legislators complained about the splitting of Charleston and the reduction of CD 1's BVAP. Ex. 12 (Bagley Rep.) at 40-41; Ex. 43, Jan. 12 Hearing Tr. at 52:4-55:6, 58:16-60:7, 72:2-74:15, 75:2-85:1, 86:13-88:4.

36. The South Carolina Legislature was also aware that it had less discriminatory alternatives, including the original House staff plan and the amendment offered by Senator Harpootlian, discussed below. During the January 13, 2022 House debate, Defendant Jordan noted that the CD 1 BVAP dropped from 20.27% in the original the House staff plan to 15.67% in the Congressional Plan. Ex. 12 (Bagley Rep.) at 40-41; Ex. 43 (Jan. 12 Hearing Tr.) at 72:2-74:3.

37. The South Carolina Legislature was presented with and either did not consider or rejected numerous other maps that met or did better on traditional redistricting principles (*i.e.,* fewer jurisdictions split, more compact) than the Congressional Plan. Ex. 3 (Duchin Rep.) at 9-13. Among these plans was a plan submitted by Senate Redistricting Subcommittee member Senator Richard Harpootlian. The Harpootlian map split fewer counties and municipalities than the Congressional Plan, and was more compact. *Id.* at 9-13, Ex. 52 (Fiffick Dep. Ex. 16). In addition, the Harpootlian plan put most of both Charleson and Beaufort Counties whole in CD 1, which would have created a district with BVAP of 21.2%. Ex. 12 (Bagley Rep.) at 42, Ex. 3 (Duchin Rep.) at 9. The Harpootlian plan was proposed as an amendment in the Senate Judiciary Committee and the Floor, but was tabled by a roll call vote. Ex. 12 (Bagley Rep.) at 48-49.

## ARGUMENT

## I. DEFENDANTS MISSTATE THEIR BURDEN FOR SUMMARY JUDGMENT

For summary judgment, Defendants must show that "there is no genuine dispute as to any material fact" and they are "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Courts "view the evidence 'in the light most favorable to the' nonmoving part[ies]"—here, Plaintiffs.

*Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568 (4th Cir. 2015) (citation omitted). If disputes of material fact remain, the Court must deny the motion. *See id.*

In order to "discharge[] [their] burden," the moving parties must "show[] that there is an absence of evidence to support the nonmoving party's case." *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015) (citation omitted). Only if Defendants meet this burden must Plaintiffs present "specific facts showing that there is a genuine issue for trial." *Id.* (citations omitted). Myriad such facts remain.

Summary judgment is not trial. Defendants conflate the summary judgment and trial standards and improperly assign a "demanding" trial burden to Plaintiffs on this motion. MSJ at 1, 11, 20. But Plaintiffs carry no such burden on summary judgment. Nor is it the Court's task at this stage to "weigh the evidence or make credibility determinations." *Jacobs*, 780 F.3d at 569 (citing *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007)). Even if the nonmoving party bears the burden of proof at trial, "all that is required [now] is that sufficient evidence supporting the claimed factual dispute be shown to require . . . judge to resolve the parties' differing versions of the truth . . . ." *Anderson*, 477 U.S. at 249 (1986) (internal quotation marks and citation omitted). The Court ought to reject Defendants' attempt to convert a motion for summary judgment into a trial on the merits.

## II. DEFENDANTS HAVE NOT ESTABLISHED THE ABSENCE OF MATERIAL DISPUTED FACTS AS TO WHETHER THE CONGRESSIONAL MAP VIOLATES THE FOURTEENTH AND FIFTEENTH AMENDMENTS

After discovery, myriad facts lie at the core of Plaintiffs' racial gerrymandering claim under the Fourteenth Amendment and intentional discrimination claim under the Fourteenth and Fifteenth Amendments. Defendants counter those facts with others, proffer partisan and other *post-hoc* (instead of contemporaneous) explanations for their redistricting choices and ask this

Court to accept their version of the truth on summary judgment. But this only highlights the very factual, live, and fundamental material disputes that defeat their motion. Especially when viewed in the light most favorable to Plaintiffs, these disputes (and the case) are ripe for trial.[2]

## A. Defendants Engaged in Unconstitutional Racial Gerrymandering

Racial gerrymandering occurs when "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Bethune-Hill v. Va. State Bd. of Elections*, 137 S. Ct. 788, 797 (2017) (internal citations and quotations omitted). Race predominates when "the legislature subordinate[s] traditional race-neutral districting principles to racial considerations." *Id.* Those principles may include: compactness; contiguity; respecting communities of interest defined by actual shared interests; minimizing county, municipal, and voting tabulation district ("VTD") boundaries; incumbency, and constituent consistency. *Miller v. Johnson*, 515 U.S. 900, 916 (1995); Ex. 19 (Senate Guidelines). *See also* Ex. 3 (Duchin Rep.) at 7-8 (describing South Carolina House and Senate 2021 guidelines and any variances between them); Ex. 61 (House Guidelines) (including slightly different list of principles than the Senate guidelines). "[R]ace may predominate even when a reapportionment plan respects traditional principles." *Bethune-Hill*, 137 S. Ct. at 798.

A legislature's motivations are also evaluated at the time of redistricting. Courts look to the "*actual* considerations that provided the essential basis for the lines drawn, not *post hoc*

---

[2] Defendants do not challenge Plaintiffs' standing in their motion for summary judgment. MSJ. They have thus waived standing arguments at this stage. *Hunt v. Nuth*, 57 F.3d 1327, 1338 (4th Cir. 1995) ("[A]ppellate courts generally will not address new arguments raised in a reply brief because it would be unfair to the appellee and would risk an improvident or ill-advised opinion on the legal issues raised."). Defendants are right, in any event, to shelve standing arguments: Plaintiff Taiwan Scott has standing to challenge South Carolina's Congressional plan as a resident of Congressional District 1 who is harmed by the racial gerrymandering and intentional vote dilution visited upon that district. *See* ECF 291 (Order and Opinion on Motions to Dismiss) at 3-5. Plaintiff South Carolina State Conference of the NAACP has associational standing because it has members who reside and are harmed by racial gerrymandering in the Challenged Districts. *Id.*

justifications the legislature in theory could have used but in reality did not." *Bethune-Hill*, 137 S. Ct. 788, 799 (emphasis added). Where race predominates in the redistricting process, the burden lies with defendants "to prove that its race-based sorting of voters" satisfies strict scrutiny. *Cooper v. Harris*, 137 S. Ct. 1455, 1464 (2017). Defendants must then show that the "race-based sorting of voters serves a 'compelling interest'" that is "'narrowly tailored' to that end." *Id.* (quoting *Bethune-Hill*, 137 S. Ct. at 800-01).

### 1. Race Predominated Over Traditional Redistricting Principles in Drawing the Challenged Districts

Defendants cannot show there are no disputed material facts regarding the predominant use of race in redrawing the lines for CDs 1, 2 and 5. Despite their refrain that they "adhered to [traditional redistricting] principles rather than subordinating them to race" (MSJ at 12-16), merely referencing "numerous and malleable" redistricting principles does not preclude a legislature from using race to gerrymander. *See Bethune-Hill*, 137 S. Ct. at 799. Indeed, Defendants point to extensive evidence adduced *by Plaintiffs* demonstrating that race predominated—and that party affiliation did not. MSJ at 17-20. And in the face of multiple requests from the public (including Plaintiff SC NAACP) and other legislators, Defendants declined to conduct any racially polarized voting ("RPV") analysis—a "cardinal factor" in avoiding unlawful racial dilution in redistricting. *Collins v. City of Norfolk*, 816 F.2d 932, 936-38 (4th Cir. 1987). Defendants cannot claim they simply knew—absent any analysis of whether those patterns hold true statewide as compared to in particular areas of the state *or* in all elections *or* certain elections—that race in South Carolina is "highly correlated with political affiliation," then say, again absent evidence, that their statewide line drawing, impacting particular areas of the state where they sorted voters does not harm Black voters. As explained *infra*, in particular through the testimony of Dr. Liu, cracking Black voters

would create the same harm in the absence of RPV.   And the evidence shows they did not—for two reasons.

First, Defendants contend that "race was not used to draw lines" in the Congressional map, MSJ at 2.  But the enacted map tells a different story.  For example, in Charleston County, the border between CD 1 and CD 6—which, by Defendants' admission is the key area of the state for this inquiry, *see* MSJ at 6 (citing "massive population shifts" between CD1 and CD6)—snakes around VTDs with high Black populations (as shown here in darker green shading) to carve those Black voters out of competitive CD1 and pack them into already-safe CD 6.



Defendants made this choice despite hundreds of residents of Charleston County and elsewhere urging Defendants to do the opposite and make that county—a community of interest by Defendants' own criteria—whole in CD1. *See* Ex. 3 (Duchin Rep.) at 8 (describing the relationship between COIs and political boundaries like counties under the Senate and House guidelines); *see also* Exs. 19, 61 (House and Senate Guidelines).  And they forged ahead with that

choice, despite public proposals and an amendment introduced by Senator Harpootlian that made Charleston County whole in CD 1. *See*, *e.g.*, Ex. 3 (Duchin Rep.) at 3-4 (providing visuals of publicly proposed maps and that of Senator Harpootlian).

███████████████████████████████████████████████████████

█████████████████████████████████████████ *See*, *e.g.*, Ex. 15 (Fiffick Dep.) at 12-13, 123-127; Ex. 23 (Roberts Dep.) at 123:2-8, 242:21-25; ████ ██████████████████████████; Ex. 28 (Terreni Dep.) at 192-197. This is consistent with Dr. Duchin's finding that both the House and Senate Defendants' respective guidelines for redistricting "clearly contemplate the use of race data." Ex. 3 (Duchin Rep.) at 7.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████; Ex. 15 (Fiffick Dep.) at 128; Ex. 23 (Roberts Dep.) at 242:21-25; Ex. 16 (Benson Dep.) at 97-98; *see also* Ex. 53 (Plan Comparison Sheets). Race data was even shared with Defendants' outside counsel, along with proposed maps that redistricting staff shared with them. Ex. 28 (Terreni Dep.) at 196-197; Ex. 15 (Fiffick Dep.) at 127. Defendants cannot simply ignore this evidence.

Having established that race was in fact "used," Plaintiffs' experts, among other evidence, show that race was also the predominant factor in drawing the Congressional Map. For example, Dr. Imai conducted redistricting simulation analysis incorporating the South Carolina House and Senate redistricting criteria as practicable and generated simulated redistricting plans without considering any data on race. Ex. 11 (Imai Rep.) at ¶¶ 3, 20-21. By examining whether the Congressional Map was unusual when compared with the ensemble of race-blind simulated plans,

Dr. Imai was able to focus on the role of race in the Congressional Map and determined that race played a significant role in drawing the boundary between CD1 and CD6. *Id.* at ¶¶ 6, 17-19.

Drs. Liu and Ragusa showed that race was a factor in moving voting tabulation districts ("VTDs") into or out of the Challenged Districts. Ex. 9 (Liu Rep. Ex. 140) at 14-21 (for CD1 and CD2); Ex. 8 (Ragusa Rep.) at 5-7 (for CD2, CD5, and CD6). Dr. Liu also found racial disparities in the counties that Defendants selected to split. Ex. 54 (Liu Rebuttal Rep. Ex. 141) at 4-7. This is despite Defendants' expert Sean Trende's contention that the state's enacted map places a high priority on "repairing" split counties and precincts. Indeed, Dr. Duchin finds that the number of split counties (and split precincts) in the enacted map is similar to that in the 2011 benchmark map, and, yet, there were alternative proposals offered during the legislative process, such as by Senator Harpootlian, with "substantially fewer political subdivision splits." Ex. 55 (Duchin Rebuttal Rep.) at 1; *see also id.* at 3. Dr. Duchin finds the state's enacted plan "repairs splits selectively" and "conspicuously fails to heal cities and other areas of particular salience for Black communities (such as in the city of Sumter)." *Id.* at 2. And she further details that the "splits clearly identified as being most harmful to Black voters—such as Sumter (40% White) and key neighborhoods of Charleston" are not healed in the enacted map; however, "more heavily White cities (Beaufort – 65% White, Goose Creek – 58% White, Hanahan – 65% White) are made whole"). *Id.* at 3.

Moreover, Dr. Duchin highlighted substantial discrepancies in the use of traditional redistricting principles in the challenged districts, including but not limited to:

*Concerning CD 1*

- "a noticeable racial skew" in "five out of six split precincts" that "do not follow any major roadways or bodies of water" in what she deems Dorchester County's illogical split in the enacted map; five of those split precincts that have significant BVAPs are put into CD 6, "consistent with a strategy of cracking in CD 1." Ex. 3 (Duchin Rep.) at 16.

- Three city splits in Charleston County that could have been kept whole. *Id.* at 17. This is in service of North Charleston being "split between CD 1 and CD 6 as the district line winds between counties, in and out of the city, and through neighborhoods with significant Black populations." *Id.*

*Concerning CD 2*

- The enacted plan preserves a "non-compact hook shape" in the Columbia area in Richland County in CD 2 in service of "drawing district boundaries through an area in northern Richland with high BVAP" to crack voters. *Id.* at 18.

- Three cities are split in Richland County, as well as two precincts in a manner that does not appear to follow major roads and cracks Black populations. *Id.* at 19.

*Concerning CD 5*
- The enacted map splits the "city of Sumter and the neighborhoods of East Sumter and Mulberry" that "are three major majority-Black communities" with public testimony indicating that the city (and County) of Sumter both identify as communities of interest desiring to be kept whole. *Id.* at 20-21.

Defendants contend that Plaintiffs' experts did not incorporate *every* traditional redistricting principle into certain of their analyses and argue that this "alone warrants summary judgment" on Plaintiffs' racial gerrymandering claim. MSJ at 17, 20. As an initial matter, their attempts to minimize the weight and credibility of Plaintiffs' experts yet again conflates summary judgment with trial. *See Miller v. Johnson*, 515 U.S. 900, 916 (1995) (race-neutral redistricting principles "inform the plaintiff's burden of proof *at trial*" (emphasis added)). Moreover, Plaintiffs' experts, Drs. Duchin, Imai, Liu, and Ragusa conducted various analyses, not every one of which called for every TRP to be considered. Defendants cite to nothing requiring that every TRP be considered in every analysis. And each expert explained why they incorporated some principles and excluded others in specific analyses. *See, e.g.*, Ex. 56 (Duchin Dep.) at 65:15-67:10; Ex. 11 (Imai Rep.) at 58:2-11.[3] By design, these choices isolated specific variables that allowed these

---

[3] Of course, it is impossible for computer simulations to account for every possible map or incorporate every traditional districting criteria, but simulations offer one evidentiary tool among

experts to apply trusted methodology to evaluate the South Carolina legislature's use of race. *See*, *e.g.*, Ex. 3 (Duchin Rep.) at 27 (explaining that her "use of the neutral ensembles" is structured "to consider whether it is possible that such concentration of Black opportunity [in the enacted map]." Ex. 11 (Imai Rep.) at 58:2-11 (incorporating core retention of districts into Dr. Imai's simulations "would prevent . . . drawing any conclusions about the role race played in drawing … the enacted plan" because simulations would "inherit" unknown criteria from past line drawing). Of course, Defendants' own expert, Mr. Trende, understood this when he committed the same supposedly "fatal error" of not considering every redistricting principle. Ex. 2 (Trende Rep.) at 9 (noting report "dos [sic] not deal with communities of interest").

Defendants themselves operated with an erratic, inconsistent, self-serving reliance on select redistricting principles identified in their respective guidelines when developing maps, citing whatever criteria happens to support their position while discounting other criteria that do not. But the Senate's map drawer testified that the traditional, publicly disclosed, criteria here were subordinated to Defendant Rankin's dictates. Ex. 23 (Roberts Dep.) at 201-202 (identifying multiple non-written private criteria designed to appease members of the Republican congressional delegation, such as minimizing change to CD 7, keeping Fort Jackson in CD 2, and keeping Beaufort County out of CD 2, that explained Senate line-drawing); Ex. 57 (John Dep.) at 50-55 (disclaiming that Senate map drawing was influenced by requests from the Republican congressional delegation).

---

others, discussed by Plaintiffs' experts *infra*, that the Court can use to assess the legislature's predominate motive in drawing the lines of the Challenged Districts.

## 2. Race, Not Party Affiliation, Explains the Legislature's Changes to the Congressional Map

Ignoring the legislative record, deposition testimony of their own legislators, and extensive expert analyses in this case, Defendants contend that a partisan "political explanation" motivated the drawing of the Congressional map. MSJ at 1. But even if Defendants could now transform partisan gerrymandering into a "legitimate political objective[]," MSJ at 20, their attempt to rely on partisan goals fails on the law and the facts. Legally, it runs afoul of the Supreme Court's clear directive against *post-hoc* justifications. *See Bethune-Hill*, 137 S. Ct. at 799. And even if it had been a contemporaneous goal during the redistricting process, which it was not, the "use of race as a proxy" for "political interest[s]" is "based on the demeaning notion that members of the defined racial groups ascribe to certain 'minority views'" and is the "precise use of race . . . the Constitution prohibits." *Miller*, 515 U.S. 900 at 914. Further, Plaintiffs have proffered evidence showing that race, not party affiliation, accounts for the changes. If anything, Defendants' Motion raises anew a core factual dispute for the Court to resolve at trial.

Defendants try to graft *post-hoc* partisanship motivations onto the Congressional map but cannot hide the lack of record evidence that the legislature actually considered partisanship a goal *at the time of redistricting*. This is fatal to Defendants' defense because "[t]he racial predominance inquiry concerns the actual considerations that provided the essential basis for the lines drawn, not post hoc justifications the legislature in theory could have used but in reality did not." *Bethune-Hill*, 137 S. Ct. at 799. In fact, members of the House Ad Hoc Committee and the Senate Redistricting Committee and key individual staffers working with them have testified that they *did not* consider partisan advantage as a goal of the redistricting process. Ex. 58 (Rankin Dep.) at 168:11-169:23 ("Q: Was it a goal of yours to make Congressional District 1 more reliably Republican going forward?" A: No."); ███████████████████████; Ex. 15 (Fiffick

25

Dep.) at 128-38; Ex. 16 (Benson Dep. Tr.) at 205:5-8, 206:3-7.  Nor did key legislators or staff offer partisan considerations as a justification when they proposed draft plans or presented the final forms of proposed plans.  ████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

Ex. 58 (Rankin Dep.) at 169:18-23; Ex. 15 (Fiffick Dep.) at 136; █████████████████████

█; Ex. 28 (Terreni Dep.) at 270-271; ██████████████████████████

But assuming Defendants considered partisanship, they cannot, under the Fourteenth and Fifteenth Amendments, target Black voters based on race, even if they are doing so for partisan reasons as well.  *See N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 221-23 ("[I]ntentionally targeting a particular race's access to the franchise because its members vote for a particular party, in a predictable manner, constitutes discriminatory purpose."); *see also Cooper*, 137 S. Ct. at 1473 n.7 ("[I]f legislators use race as their predominant districting criterion with the end goal of advancing their partisan interests . . . their action still triggers strict scrutiny."); *Bush v. Vera*, 517 U.S. 952, 968 (1996) ("When legislatures use race 'as a proxy for political characteristics, a racial stereotype requiring strict scrutiny is in operation.'").  And, for the reasons explained, *infra*, there are material disputes about whether Defendants engaged in racial discrimination in advancing their partisan ends.

Moreover, Defendants concede that "race is 'highly correlated with political affiliation'" in South Carolina.  MSJ at 20 (citing *Easley v. Cromartie*, 532 U.S. 234, 243 (2001) (*Cromartie II*)); so too do key legislative counsel for Senate Defendants.  *See*, *e.g.*, Ex. 15 (Fiffick Dep.) at 160. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█, Ex. 23 (Roberts Dep.) at 130; Ex. 15 (Fiffick Dep.) at 253-254; Ex. 28 (Terreni Dep.) at 244-

248.  That is, Defendants now imply that they understood at the time of map-drawing that race and party are correlated.  But they refused to conduct an RPV analysis that would help enable them to assess the impact of their sorting of voters between districts.  As Dr. Liu explains:

> [t]hough Plaintiffs have not brought a Section 2 claim, their theory is that the effect of any cracking of Black voters must be considered with the existence of any RPV . . . .  [W]ithout RPV, the cracking of Black voters (if proved to be the case) would not have an effect on the opportunity of Black voters to elect candidates of their own choice. If Black and white voters in a disputed jurisdiction usually share the same preference for a particular candidate, or put another way, a sufficient number of white voters cross over usually to support the candidate preferred by Black voters (i.e., no RPV), then regardless how a district composed (including whether Black voters are cracked), the election outcomes should be consistent before and after the redistricting process. Ex. 9 (Liu Rep. at 6).

This acknowledgement spotlights a central factual question as to whether Defendants used race as a proxy for party in drawing the Challenged Districts.

Second, the evidence shows that race, not party, predominated in the legislature's re-drawing of the Challenged Districts.  Defendants' own, consistent refrain that the "flash point" in the Congressional map was the movement of people between Districts 1 and 6 illustrates this best.  Ex. 58 (Rankin Dep.) at 155.  District 1 was overpopulated by roughly the same number of people as its neighbor, District 6, was underpopulated.  *See* Ex. 4.  The core VTDs on the CD1 side of the border between these two districts that remained after redistricting had an average BVAP of about 11 percent.  Ex. 9 (Liu Rep.) at 16 tbl.6.  If Defendants' changes were motivated by party rather than race, as they contend, then the VTDs that were moved from District 1 into District 6 should roughly mirror the average BVAP of the border VTDs.  *See* Ex. 8 (Ragusa Rep.) at 5.  Instead, the average BVAP of the VTDs that Defendants chose to move from District 1 into District 6 was 22 percent.  Ex. 9 (Liu Rep.) at 16, 14 tbl.6.  This *disproportional* focus on race constitutes clear evidence that race, not party, predominated in the changes that "largely … occupied" Defendants' "time and [effort]." Ex. 58 (Rankin Dep.) at 152:25-153:5.  This is additionally evident if one looks

at districtwide implications.  Before redistricting, the BVAP of CD1 was 17.3%.  But voters moved from CD1 to CD6 had a BVAP of 24.3%—a nearly 7% difference.  Ex. 62 (Ragusa Rebuttal Rep.) at 7.

Defendants claim that alternative maps did not maintain the Legislature's desired 6-1 Republican split, and therefore were somehow illegitimate.  MSJ at 22.  But alternative maps were presented that could have been adjusted to maintain this purported *post-hoc* goal without gerrymandering based on race.  It's just that Defendants devised (or first voiced) their partisan-gerrymandering preference after the fact, in litigation, after all the alternative maps had been submitted.  Ex. 59 (Bagley Rebuttal Rep.) at 5-7; *see also supra*.

Still, Dr. Duchin identifies alternatives to the enacted map, including ones that sustain the majority party's advantage in most elections without cracking (and harming) Black communities.  Indeed, she provides an alternative plan that "leaves CD 6 and therefore CD1 nearly unchanged" as compared to the enacted districts except to uncrack challenged CD5 "mostly by changing a single (CD 2 / CD 5) boundary line."  Ex. 3 (Duchin Rep.) at 23-24; *see also* Ex. 55 (Duchin Rebuttal Rep.) at 1.  She further performed an "effectiveness" analysis of this alternative to the enacted districts in which "CD 5 does not always have a win for the Black candidate of choice—but that candidate receives at least 47.5% of the vote in each of the four elections [she analyzed using the alternative districts], winning outright in one of the four."  Ex. 3 (Duchin Rep.) at 23 n.8.[4]  So, unlike the plaintiffs in *Cromartie II* who relied on "evidence of forgone alternatives" through a "set of arguments of the would-have-could-have variety," *Cooper*, 137 S. Ct. at 1481,

---

[4] *See also id*. at 27 (explaining that "many alternatives that were available to the legislature" including that of Senator Harpootlian, whose proposed map is comparable or superior to the state's enacted map in all the TRPs considered by Dr. Duchin, but unlike the enacted map, would "tend to allow Black voters an opportunity to elect candidates of choice at a level in keeping with the human and political geography of the state"); *see also* Ex. 55 (Duchin Rebuttal Rep.) at 1, 4 (same).

Plaintiffs have developed extensive expert reports and factual testimony to support their racial gerrymandering claim, *supra* II.A.1.  That is, although Plaintiffs are not required to present alternative maps for a racial gerrymandering claim—which Defendants concede—they did just that.  MSJ at 22 (citing *Cooper*, 137 S. Ct. at 1481).

Further, Defendants contend that Plaintiffs "must decouple race from politics" in order to show that race rather than party predominated in the Congressional map.  MSJ at 20.  Even if true at trial, this core dispute of material facts precludes summary judgment.  The record shows ample factual and expert evidence, discussed *supra*, on the legislature's predominant use of race.  And Plaintiffs' expert Dr. Liu, in particular, performed an empirical test on the enacted Congressional map to decouple race and party.  Ex. 9 (Liu Rep.) at 14-21.  Defendants' attempt to undercut his findings misrepresents the import of the report's figures.  *See* MSJ at 23.  Rather than base his conclusions on the "net" movement of individual voters, as Defendants assert, *see id.*, Dr. Liu found that "white Democratic voters are 17.3% of the total voters that remained in CD 1 while only 11.1% of these 'kept-in' voters are Black Democratic voters."  Ex. 9 (Liu Rep.) at 16. Dr. Liu similarly found that the "shares of white and Black voters with the same party affiliation" that were moved out of, or left in, CD2 were not equal.  *Id.* at 18.  That is, Dr. Liu, like Dr. Ragusa, found that Black voters were *disproportionately* more likely to be moved than were white voters within the same party in CDs 1 and 2.  This empirical evidence based on proportionality between groups—rather than the absolute numbers of net voters—indicates a "greater role of race than party."  *Id.*; *see also* Ex. 8 (Ragusa Rep.) at 4.

Additionally, Dr. Duchin performed analyses to "consider whether it is possible that such concentration of Black [electoral] opportunity is merely a function of political geography."  Ex. 3 (Duchin Rep.) at 27.  She found that it is not.  In particular, "[o]nly 12.4% of maps drawn in a

race-neutral fashion" as Defendants posit the enacted plan was "have as low an effectiveness score [for Black electoral opportunity] as the state's [enacted] plan when considering probative [historical] elections." *Id.* And further, she found that when considering even more historical electoral history data, the state's enacted plan, like the 2011 benchmark map, "are not outliers in their performance in generic partisan races." *Id.* However, "they only stand out in the [contests] with a Black candidate on the ballot, where the preferences of Black voters most diverge from those of White voters." *Id.* She posits, "it is not plausible that the concentration of Black voters in the state's [enacted] plan was merely a side effect of partisan concerns. The state's plan is quite ordinary . . . in its effectiveness for the generic Democratic voter, but only shows up as unusually ineffective … when the [contests] most probative for Black voters are separately considered." *Id.*; *see also* Ex. 55 (Duchin Suppl. Rep.) at 2-4, 8-11 (providing additional detail about the electoral history data she examined to provide evidence that "race was predominating over even partisan advantage in the enacted map").

### 3. Core Retention Is Not a Shield Against Racial Gerrymandering Claims

While preserving cores of prior districts may "appear[] to be facially neutral and serve[] neutral political values," core retention "holds a special place in the predominance balance." *Bethune-Hill v. Va. State Bd. of Elections*, 141 F. Supp. 3d 505, 544 (E.D. Va. 2015), ("*Bethune-Hill I*"), *aff'd in part*, *vacated in part*, 137 S. Ct. 788. It earns that "special place" because it is in conflict with the primary purpose of redistricting: adjusting electoral districts based on the changes to state populations over the course of a decade. *See id.* Moreover, it "may be used to insulate the original basis for the district boundaries," *id.*, which may have been unlawful when they were first drawn. Thus, where legislatures assert that district lines merely follow maps from prior

redistricting cycles, "courts should also examine the underlying justification for the original lines or original district."  *Id.* at 544-45.

Defendants use core retention to once again rationalize their actions in redistricting *after the fact*.  In truth, Defendants did not raise core retention as a primary consideration during, including during multiple public hearings and committee meetings, until January 2022.  Ex. 59 (Bagley Rebuttal Rep.) at 4-8.  As with the *post-hoc* partisan excuse for the redistricting lines discussed *supra*, Defendants' belated reliance on core retention to explain its redistricting choices should be rejected.  *See Bethune-Hill I*, 141 F. Supp. 3d at 545.

Nor does the record reflect that preservation of district cores, allegedly a facet of "constituent consistency," play a central role in the House and Senate redistricting guidelines: it is not listed at all in the House guidelines, and it is only listed under "Additional Considerations" in the Senate criteria—far below the mandates of federal constitutional and statutory law.  Exs. 19, 61 (House and Senate Guidelines); *see also* Ex. 28 (Terreni Dep.) at 231:11-232:16, 268:5-270:25; Ex. 15 (Fiffick Dep.) at 119:5-120:24; Ex. 16 (Benson Dep.) at 158:15-159:12.  "Constituent consistency" is also listed as having no particular predominance over other considerations in the Senate guidelines' "Additional Considerations" section such as keeping counties and cities whole. *Id.*  And Defendants have not defined—for the public during the redistricting process or now before this Court—the point at which core retention percentages sufficiently negate equal protection constitutional violations.  *See* MSJ at 13; *see also* Ex. 28 (Terreni Dep.) at 268-270.  In addition, if Defendants truly sought to minimize change from the 2011 plan, they would not have unnecessarily moved 52,799 people out of the underpopulated District 6 and into the overpopulated District 1, exacerbating the population imbalance and forcing even more changes from the 2011 plan.  *See* Ex. 2 (Trende Report) at 18. As such, their arguments that the

Congressional map's core retention rates preclude a finding of racial gerrymandering are inapposite. *See* MSJ at 13-14; *Bethune-Hill*, 137 S. Ct. at 799.

Further, Defendants' assertion that core retention precludes illegality is factually incorrect, especially given the drastic population imbalance between Districts 1 and 6 that made changes to the prior map necessary. Defendants concede the point when they assert that "six of the seven districts" have "high core retention rates," yet CD6's is "not quite as high" because "severe" population changes made it necessary to "add thousands of voters" into that district and move numerous others out of CD1. MSJ at 13. This is true. *See* Ex. 55 (Duchin Rebuttal Rep.) at 2, 4 n.4 (explaining that "South Carolina has been growing less White overall, with the WVAP share dropping" and "[g]reater Charleston and the Lowcountry region hav[ing] seen some of the greatest increases in BVAP overall"). Further, Defendants admit that the border between Districts 1 and 6 was "largely what occupied" Defendants' redistricting process. Ex. 58 (Rankin Dep.) at 152:25-153:5. Accordingly, high core retention in districts where cores did not change over the past decade (e.g., CDs 3, 4, 7) is a red herring at best—the significant changes in redrawing CDs 1 and 6 defeat Defendants' reliance on core retention.[5]

In any event, mere mention of core retention cannot shield legislative action from judicial inquiry into alleged constitutional violations. Yet this is exactly what Defendants ask of this Court. They claim that because the enacted Congressional map is "largely a continuation" of the 2011

---

[5] Defendants also miss the essence of Plaintiffs' claim concerning CDs 2 and 5. Whether there was largescale movements of voters to/from/within those districts are not appropriate inquiry for assessing racially discriminatory treatment. Instead, it is the way that Black, not white voters, are treated—regardless of the scale. As one example, Dr. Liu's analyses demonstrate that race, rather presumed party affiliation, is a driving factors to whether voters remained or were moved in and out of CD 2. Ex. 9 (Liu Rep.) at 20-21. Likewise, Defendants fail to examine and rebut the fact that Black voters are disproportionately more likely to be in split counties than non-split counties. Ex. 54 (Liu Rebuttal Rep.) at 4-6.

maps precleared under Section 5 of the VRA and upheld by this Court against constitutional and Section 2 claims, it cannot now be a racial gerrymander. MSJ at 2, 5, 12-14. In doing so, Defendants conflate several well-established judicial inquiries. Just as a racial gerrymandering claim is "analytically distinct" from a Section 2 vote dilution claim, *Miller v. Johnson*, 515 U.S. 900, 911 (1995) (citing *Shaw v. Reno*, 509 U.S. 630, 652 (1993)), the Section 5 non-retrogression standard is distinct from the applicable legal standard in a constitutional challenge. *Compare Beer v. United States*, 425 U.S. 130, 141 (1976) ("the purpose of Section 5 has always been to insure that no voting-procedure changes would be made that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise"), *with Bethune-Hill*, 137 S. Ct. at 797 ("a plaintiff alleging racial gerrymandering bears the burden 'to show […] that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district'") (citation omitted). Thus, prior review under a now-largely immobilized provision of the VRA (Section 5) say little about the present constitutional inquiry. ███████████████████████████████████

███████████████████████████████████████████████████████████

███████.[6]

It is true that this Court upheld one district—Congressional District 6—against a racial gerrymandering claim in *Backus v. South Carolina*. 857 F. Supp. 2d 553, 560 (D.S.C.), *aff'd*, 568 U.S. 801 (2012). But the Court did not uphold any of the prior versions of the Challenged Districts in this case (*i.e.*, CDs 1, 2, and 5) against such a claim. *See id.*; Ex. 1 (Trende Tr.) at 114:23-115:5. Even if it had, based on new census data and new sorting of voters), Defendants have been clear

---

[6] *See also Colleton Cnty. Council v. McConnell*, 201 F. Supp. 2d 618, 635 (D.S.C. 2002) (noting "in the redistricting context, Section 5 has quite a limited substantive goal," and citing retrogression standard laid out in *Beer*).

that CD6's "severe underpopulation [in 2020] required the General Assembly to add thousands of voters." MSJ at 13. Thus, even a plan with minimal change would differ substantially from the plan at issue in *Backus*. And South Carolinians' guarantee to vote in Congressional districts that have not been racially gerrymandered cannot be overcome by an outdated map that passed unrelated legal tests under substantially different demographic conditions. *See* Ex. 55 (Duchin Rebuttal Rep.) at 1, 2 (since "South Carolina's demographics and electoral dynamics . . . have all shifted in the last ten years," then "a map with very high core retention can be dilutive of Black voting power while its [2011] predecessor was acceptable under a different set of facts and rules.").

Moreover, even if core retention was a top redistricting criterion for Defendants, that need "not lock in the dilutive effects found in the state's [enacted] plan." Ex. 55 (Duchin Rebuttal Rep.) at 1. Indeed, an alternative map, discussed *infra*, retains "92% of the population" assigned to districts in the enacted map, as it "differs in a single boundary between two districts"; yet, that alternative proposal, "nonetheless outperforms" the state's enacted map "in terms of the ability of Black voters to elect their candidates of choice." *Id.*; *see also id.* at 2-3, 4.

In short, even if core retention had been the actual, contemporaneous justification for the enacted map, which it was not, and core retention was a legitimate guiding criterion for redrawing the lines after the 2020 Census, which under all circumstances it is not, core retention did not make it necessary to dilute Black voting opportunity in the challenged districts.

## B. Defendants Intentionally Discriminated on the Basis of Race

It is "well established" that state action pursued with discriminatory intent violates the Equal Protection Clause. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). A legislature intentionally discriminates based on race where race is "a motivating factor" in its redistricting decisions. *Id.* at 265-66. Because "rarely can it be said that a legislature" is "motivated solely by a single concern," Plaintiffs need not allege that race was the "dominant" or

"primary" purpose. *Id.* at 265. Instead, courts evaluating an intentional discrimination claim must engage in a "sensitive inquiry into such circumstantial and direct evidence of intent." *Id.* at 266.

*Arlington Heights* guides the inquiry into discriminatory purpose. An "important starting point" is whether the "impact of the official action . . . bears more heavily on one race than another." *Id.* (internal quotation marks and citations omitted). In most cases, courts then must look to particular "evidentiary source[s]" indicative of discriminatory intent. *Id.* at 267. These include but are not limited to: "[t]he historical background of the [challenged] decision;" "[t]he specific sequence of events leading up to the challenged decision"; "[d]epartures from normal procedural sequence"; and the legislative history of the decision, "especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." *Id.*; *see also McCrory*, 831 F.3d at 221. It is well-settled that "[o]utright admissions of impermissible racial motivation are infrequent and plaintiffs often must rely upon other evidence." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999) (*Cromartie I*).

At the summary judgment stage, genuine disputes of material facts related to a state legislature's discriminatory intent must be resolved at trial. *See id.* Indeed, summary judgment is generally inappropriate in intentional discrimination cases like this one because the "legislature's motivation is itself a factual question." *Id.* The record is clear that Defendants are not entitled to summary judgment on this claim.

### 1. The Congressional Map Has a Racially Discriminatory Impact

A map has a racially discriminatory impact when it "bears more heavily on one race than another." *Arlington Heights*, 429 U.S. at 266. Rather than assert that this is not the case with the enacted plan, as discussed *supra*, Defendants again try to graft *post-hoc* partisanship explanations onto the Congressional map and ignore clear evidence of racially discriminatory impact on Black South Carolinians. Defendants also misstate Plaintiffs' claims as asking for "coalition" districts

and try to shoehorn Plaintiffs into a different legal framework for vote dilution claims that the Supreme Court rejected in *Bartlett v. Strickland*. MSJ at 3, 26-28; 556 U.S. 1 (2009). In reality, Plaintiffs have presented straightforward claims and ample evidence of cracking in the Congressional map that disproportionately harms Black voters.

Dr. Liu, for example, finds undeniable RPV patterns in South Carolina. Ex. 9 (Liu Rep.) at 6-11, 21. Defendants do not—and cannot—contest these findings.[7] Nor can they dispute that an RPV analysis is essential to understanding the effect that the cracking of Black voters has on a redistricting plan. As Dr. Liu explains, "in a congressional district in which white voters are the majority or supermajority of voters, RPV can function to deny or diminish Black voters' ability to elect or otherwise impact the elections of their preferred candidates." Ex. 9 (Liu Rep.) at 6. As described below, the RPV analysis is also essential to effectiveness analysis for the same reasons. It would be much more difficult for Black voters to elect a candidate of their choice in a district with RPV because of white bloc voting. *Id* at 5.

Defendants claim the enacted map "does not have a discriminatory effect" on Black voters but rather "has an effect on Democrats." MSJ at 27. But Plaintiffs' experts found the opposite to be true. Dr. Liu, for example, found that the Congressional map treats Black voters differently than it treats white voters, even where those voters are members of the same political party. Ex. 9 (Liu Rep. Ex. 140) at 14-21. And, just as the net number of voters moved between the challenged districts asks the wrong question for racial gerrymandering, *supra*, it is irrelevant for discriminatory impact that "just as many or more" white Democrats as Black Democrats reside in

---

[7] Indeed, before any maps were proposed, House Defendants hired an expert who first assumed RPV patterns and then also found such patterns to exist based on two recent statewide elections. Ex. 63 (Brunell Dep. Tr.) at 59:20-61:22, 62;3-21, 80-12-22, 100:19-101:12; Ex. 64 (Brunell Expert Report).

each of the challenged districts.  MSJ at 27.  That is, Plaintiffs' expert analyses of the changes to the map once again undercut Defendants' repeated attempts to impose *post-hoc* partisan explanations at every stage of their argument.

Instead, the map shows that Defendants: drew lines directly through Black communities in the historic neighborhood of West Ashley, North Charleston, and Charleston, artificially splitting Black communities between CDs 1 and 6 and pushing disproportionately Black Democrats into CD6; split the city of Sumter (and neighborhoods within it in which Black communities reside), dispersing Black voters between CDs 2 and 6; and ran roughshod via Black communities in Richland, dispersing them between CDs 2 , 5, and 6.  Ex. 8 (Ragusa Rep.) at 4; Ex. 3 (Duchin Rep.) at 15; *see also* Ex. 66 (providing visuals of the cracking of specific areas of the enacted map in CDs 2 and 5).  "[T]he reassignment" of key areas in the challenged districts "happen[s] in scattered chunks and shards, and is not aimed at healing key splits of cities and communities that were frequently cited in the public testimony [collected by Defendants], including Columbia, Sumter, Orangeburg, and Charleston."  Ex. 3 (Duchin Rep.) at 15.  Such "cracking" of Black communities is quintessential evidence of discriminatory impact.  Defendants' decision to do so despite ample warning of dilution from the public and other legislators shows that the impact on Black voters was foreseeable and preventable.  Ex. 60 (January 2022 Written testimony of Opperman/Harpootlian comparing SA1/Campsen & SA2/Harpootlian); Ex. 28 (Terreni Dep.) at 315:12-25; Ex. 15 (Fiffick Dep.) at 292:6-295:25.

Indeed, Dr. Duchin opines, "considering . . . the increased Black population in the Columbia and Charleston areas … we would expect increased electoral opportunities for Black voters to be reflected in the Congressional plan."  Ex. 3 (Duchin Rep.) at 27.  The enacted map does the opposite: "instead, Black population is cracked across Congressional districts 1, 2, and 5 in a way that demonstrably diminishes Black voters' ability to elect candidates of choice."  *Id.*; *see also* Ex. 55

(Duchin Rebuttal Rep.) at 4 (describing how despite CD 6's BVAP drop of 5-6 percentage points in the enacted map from the 2011 benchmark, neither CDs 5 nor 7 received increased BVAP share; instead, Black voters were cracked across multiple districts).

Drs. Liu and Duchin also found that the enacted map reduced Black voters' ability to elect candidates of their choice or impact the outcome of elections featuring candidates of their choice. Ex. 9 (Liu Rep.) at 11-14; Ex. 3 (Duchin Rep.) at 25-26. That is, by disregarding traditional principles such as respect for maintaining whole counties and cities, to disperse Black voters into and among districts (Duchin's analysis), in the presence of RPV in which Black voters and white voters tend to prefer different candidates in South Carolina elections (Dr. Liu's analysis), Defendants ensured Black voters' voices were silenced in every congressional district outside of CD6 in which they were cracked and rendered a minority of voters. *See, e.g.*, Ex. 9 (Liu Rep.) at 12-13; Ex. 55 (Duchin Suppl. Rep.) at 1-2.

Indeed, had Defendants respected their own criteria and left Black communities in these areas intact in the manner proposed during the legislative process (e.g., by Senator Harpootlian), Black voters' power would not be relegated to CD 6. Ex. 55 (Duchin Rebuttal Rep.) at 4 ("the strict confinement of Black electoral opportunity to a single district—CD6—emerges as the leading hypothesis for the design principles that drove the construction of the Enacted 2022 plan"). For example, Dr. Duchin considered electoral history data to ascertain whether candidates of choice of Black voters can be effective in the enacted map as compared to under the 2011 benchmark map and other proposed maps in 2021. Ex. 3 (Duchin Rep.) at 25-26. She found that like the state's 2011 benchmark map, the enacted map "confine[s] Black electoral opportunity to a single district" demonstrated by the fact that "all four Black candidates of choice" in the four probative historical elections (from 2018 and 2020) she considered "would have won the district, while none of them

would have one in the other six districts." *Id.* at 25; *see also* Ex. 9 (Liu Rep.) at 12-13. By comparison, her analysis of these historical elections under other proposed maps shows that other plans for the legislature's consideration would have extended effectiveness for Black voters to more districts, including CD 1. Ex. 3 (Duchin Rep.) at 25. Contrary to Defendants' assertion that this indicates that "Plaintiffs ask the Court to draw" competitive influence districts, this evidence of the potential to create additional districts that would perform effectively for Black voters in more elections directly relates to the discriminatory impact of the enacted map. MSJ at 26; Ex. 3 (Duchin Rep.) at 25-27; Ex. 55 (Duchin Suppl. Rep.) at 6, 8-11; Ex. 9 (Liu Rep.) at 11-13.

Indeed, despite Defendants' attempts to rewrite the Prayer for Relief in the Third Amended Complaint, Plaintiffs have not asked this Court to draw any map. Plaintiffs allege that Defendants have intentionally discriminated against Black South Carolinians and ask this Court to enjoin the unconstitutional Congressional map. No more, no less. It is the role of the Court to grant relief, and consideration of remedies—let alone who is responsible for developing them—before adjudication on the merits, much less at summary judgment, is improper. *See Covington v. North Carolina*, 316 F.R.D. 117, 176 (M.D.N.C. 2016), *aff'd*, 137 S. Ct. 2211 (2017) ("Having found […] racial gerrymanders in violation of the Equal Protection Clause, we must now address the proper remedy"); *see also Wise v. Lipscomb*, 437 U.S. 535, 540 (1978) ("When a federal court declares an existing apportionment scheme unconstitutional, it is therefore, appropriate . . . to afford a reasonable opportunity for the legislature to meet constitutional requirements by adopting a substitute measure . . . .").

## 2. Defendants Enacted the Congressional Map With a Discriminatory Purpose

Despite the presumption of "good faith" on behalf of a state legislature, MSJ at 1 (citing *Miller v. Johnson*, 515 U.S. 900, 915 (1995)), the Supreme Court (and other courts) continue to

adjudicate intentional racial discrimination claims and "has recognized that '[o]utright admissions of impermissible racial motivation are infrequent and plaintiffs often must rely upon other evidence.'" *McCrory*, 831 F.3d at 221 (citing *Cromartie I*, 526 U.S. at 553). The fact that no legislator deposed by Plaintiffs made such a bald admission, *see* MSJ at 9, 29-20, is unsurprising and not dispositive. This Court must therefore "consider the broader context surrounding the passage of legislation," *id.*, including by looking to circumstantial evidence of discriminatory intent, *Arlington Heights*, 429 U.S. at 266.

There is substantial circumstantial evidence of intentional racial discrimination in the record to create triable issues of fact. The record shows that S. 865 is part of a long history of racial discrimination in South Carolina political processes, and the 2020 South Carolina redistricting process deviated from established procedures and rules of transparency. Ex. 12 (Bagley Rep.) at 4-24. Ultimately, Defendants had a choice between at least two proposed maps— one that cracked Black voters between challenged districts like CDs 1 and 6, CDs 5 and 6, CDs 2 and 6, and CDs 2 and 5, and one that did not. Despite hundreds of citizens, organizations, and experts explaining how damaging the former choice would be to Black voters, Defendants willfully chose it anyway.

First, Defendants argue that the State's history of discrimination is "too remote." MSJ at 30. But that ignores that the Supreme Court has identified historical discrimination as probative of intentional discrimination. *Arlington Heights*, 429 U.S. at 266-68. Even still, Plaintiffs' expert Dr. Joseph Bagley's report shows that discrimination against Black South Carolinians has continued "even very recently." Ex. 12 (Bagley Rep.) at 49; *see also id.* at 10-24 (showing that in each redistricting cycle from 1970 through 2010, South Carolina's legislative map(s) has been challenged for discrimination against Black voters); *id.* at 22-23 (documenting federal government

objections to proposed voting changes, including in 2011 when South Carolina attempted to impose a strict photo identification law).

Further, even "long-ago history" may "bear heavily" in this inquiry because failure to take that into account "would risk allowing that troubled history to pick up where it left off … to the detriment of African American voters[.]" *McCrory*, 831 F.3d at 223 (internal quotation marks and citations omitted). Indeed, Dr. Bagley's chronicle reaches into the past decade to describe instances of official discrimination in redistricting and voting more broadly, as well as other areas of legislative activity. Ex. 12 (Bagley Rep.) at 20-24. This is especially relevant given that "what matters," as Defendants note, "is the intent of the current legislature." MSJ at 30 (citing *Abbott v. Perez*, 138 S. Ct. 2305, 2325 (2018)) (internal quotation marks omitted). This is certainly probative of that same legislature's racially discriminatory intent during this redistricting process. Ex. 12 (Bagley Rep.) at 12-15.

On the second and fourth *Arlington Heights* factors, which direct courts to consider the legislative record and process for enacting the Congressional map, Defendants all but abdicate their roles as representatives and state that "the General Assembly could not have incorporated all public input." MSJ at 32. This refers to the public input that the Senate and House actively sought—at least theoretically—in hearings in the summer of 2021 before accepting maps from the public and proposing their own maps. Instead, the record shows that the Senate did not meaningfully consider and analyze any of the seven publicly submitted maps posted on its website. *See* Ex. 15 (Fiffick Dep.) at 280-284 (explaining that unless and until a legislative member sought to offer a publicly submitted map as an amendment, virtually nothing was done with those maps). Nonetheless, key legislative members engaged with the National Republican Redistricting Trust (NRRT) often enough to accept three maps submitted by that partisan organization—outside of

the timeframe and form for submission of public maps. Ex. 15 (Fiffick Dep.) at 194-195, 240-242; Ex. 28 (Terreni Dep.) at 83-84, 89. They also provided feedback on some of those maps, because they, unlike the maps submitted by non-partisan and Democratic-affiliated groups, were viewed as having something to contribute to the legislative process. *Id*. To this day, legislative counsel, Andy Fiffick, acknowledged that the only way the public would know about those NRRT submitted maps is if they sought them through a public records request because they were never well-publicized and made accessible on the Senate's website. Ex. 15 (Fiffick Dep.) at 202; Ex. 28 (Terreni Dep.) at 119; Ex. 23 (Roberts Dep.) at 119 (explaining that publicly posting the maps would've been beneficial for mapdrawers). Thus, Plaintiffs have detailed a strong lack of transparency and responsiveness throughout the process, from defying repeated warnings from legislators and the public that the proposed map would dilute Black voting strength in the state, *see supra*, to considering certain public input and largely disregarding most of it on proposed maps. Ex. 12 (Bagley Rep.) at 24-41 (cataloguing transparency concerns raised by the public and based an assessment of the full public record).

Defendants attempt to paint the process leading up to the enactment of the Congressional map as "robust" and "generally analogous" to prior redistricting cycles. MSJ at 31. But Plaintiffs have described "a number of procedural irregularities" and departures from prior processes in both the House and the Senate. Ex. 12 (Bagley Rep.) at 38; *Arlington Heights*, 429 U.S. at 267 ("departures from normal procedural sequence" are indicative of discriminatory intent). For example, the House formed an ad hoc committee to handle redistricting, instead of assigning the task to the Elections Subcommittee as it had in past cycles. *See* Ex. 12 (Bagley Rep.) at 41.

███████████████████████████████████████████

███████████████████████████████████████████

[REDACTED]

At one point in the House's consideration of congressional maps before the House Judiciary Committee, members decided to bypass the Committee's first vice-chair, Representative John King, a Black Democrat with statewide redistricting experience, in filling the Chairman's vacancy. Ex. 12 (Bagley Rep.) at 38. The South Carolina Legislative Black Caucus voiced its grievance to the Chair of the House Ad Hoc Committee, Representative Murphy, for this failure to appoint Representative King. *See* Ex. 48 (Letter from the SC LBC). [REDACTED]

[REDACTED]

In the Senate, a redistricting subcommittee was also formed to lead the development of Senate maps. But ultimately, those maps were drawn behind closed doors by a handful of legislative staff and select (non-Black) committee members. The initial Senate plan was created by staff cartographer, Will Roberts, legal counsel, Andrew Fiffick, and another legal counsel, Charles Terreni. Ex. 23 (Roberts Dep.) at 161:3-8, 164:24-165:6; Ex. 15 (Fiffick Dep.) at 246:18-21. As noted, the Senate engaged directly with outside partisan groups through private channels that contradicted the Subcommittee's submissions policy around the same time as it considered its initial staff plan. *See supra.* Following a November 29 public hearing in which one key Senate

---

[8] Plaintiffs have not yet deposed Mr. Dennis and confirm his role in the redistricting process, but plan to.

staffer described public feedback on the staff plan as "harsh" and "strong criticism" from the public, Ex. 57 (John Dep.) at 201:16-202:5, the Senate offered an Amendment, which known as the "Campsen Amendment" that ultimately became the enacted Congressional map. But the Senate Subcommittee waited over a month and a half to release this plan. And the Subcommittee posted the plan less than 48 hours before a hearing on the plan, which limited public review—let alone meaningful review.

On the House side, the initial proposed staff map that met general approval from the public and representatives was abruptly replaced by an "alternative" proposal that mirrored the Senate staff's map. Ex. 12 (Bagley Rep.) at 35. Consistent with limiting meaningful public review and participation on the Senate side, the House's Ad Hoc Committee published the "alternative" plan on December 22, less than a week before a hearing on this plan and during a timeframe where many families are celebrating holidays. *Id*.

Additionally, as noted above, key legislative staff and members either arbitrarily elevated redistricting criteria or relied upon private instructions not disclosed to members of the public or even certain legislators. ██████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████ the Senate, as another example, the primary map drawer, Mr. Roberts, admitted that he was given non-public instructions that he relied upon and limited his ability to draw lines in certain districts and move certain populations. Ex. 23 (Roberts Dep.) at 176:2-15. Key legislative staff and members also considered a plethora of "political" preferences—such as not changing as much as possible the lines of CD 7 between the 2011 benchmark and 2020 redraw or keeping Sun City in Jasper County whole—that were unwritten, unpublicized, and

inconsistently applied.  Ex. 28 (Terreni Dep.) at 332-339, 412; Ex. 15 (Fiffick Dep.) at 87, 93-94, 130.  Indeed, while the legislature responded to the majority-white Sun City's demand to be kept whole, it rejected in its enacted plan the public's clamor to keep areas with significant majority of Black residents, such as in North Charleston whole with Charleston County in CD1.  Ex. 28 (Terreni Dep.) at 332-339, 412; *see also* Ex. 3 (Duchin Rep.) at 17 (documenting other communities with significant Black populations that were split, including community members urging against such in testimony from public hearings held by the state); Ex. 55 (Duchin Rebuttal Rep.) at 3 (similar); Ex. 54 (Liu Rebuttal Rep.) at 4-7 (documenting the racial makeup of counties selectively split in the enacted map).

Instead of addressing these blatant departures from the Legislature's normal course and norms of transparency, Defendants turn the *Arlington Heights* inquiry—meant to probe circumstantial evidence of discriminatory intent—on its head by arguing that Plaintiffs must show that the Legislature deviated from the norm by "target[ing]" an "identifiable minority group."  MSJ at 33.  In other words, Defendants want to reshape an established judicial inquiry into circumstantial evidence into a requirement that Plaintiffs show direct evidence of racial motives.  That is not the law.  Plaintiffs have adduced ample evidence of discriminatory purpose that, at the very least, highlights a key factual dispute to be resolved at trial.

## CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that this court deny Senate and House Defendants' Motion for Summary Judgment.

Dated: September 2, 2022

Leah C. Aden**
Stuart Naifeh**
Raymond Audain**
John S. Cusick**
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector St, 5th Fl.
NY, NY 10006
Tel.: (212) 965-7715
laden@naacpldf.org


Adriel I. Cepeda Derieux**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: (212) 549-2500
acepedaderieux@aclu.org


John A. Freedman**
Gina M. Colarusso**
John M. Hindley**
ARNOLD & PORTER KAYE SCHOLER
LLP
601 Massachusetts Ave., N.W.
Washington, D.C. 20001
Tel: (202) 942-5000
john.freedman@arnoldporter.com

Respectfully Submitted,

/s/ *Santino Coleman*
Santino Coleman, Fed. ID.11914***
Antonio L. Ingram II**
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
700 14th St, Ste. 600
Washington, D.C. 20005
Tel.: (202) 682-1300
scoleman@naacpldf.org

Christopher J. Bryant, Fed. ID 12538
BRYANT LEGAL, LLC
126 W. Henrietta St.
Baltimore, MD 21230
Tel.: (843) 779-5444
chris@bryant.legal

Somil B. Trivedi**
Patricia Yan**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th St., NW
Washington, DC 20005
Tel.: (202) 457-0800
strivedi@aclu.org

Allen Chaney, Fed. ID 13181
AMERICAN CIVIL LIBERTIES UNION
OF SOUTH CAROLINA
Charleston, SC 29413-0998
Tel.: (843) 282-7953
Fax: (843) 720-1428
achaney@aclusc.org

Jeffrey A. Fuisz**
Paula Ramer**
ARNOLD & PORTER KAYE SCHOLER
LLP
250 West 55th Street
New York, NY 10019
Tel: (212) 836-8000
jeffrey.fuisz@arnoldporter.com

Sarah Gryll**

ARNOLD & PORTER KAYE SCHOLER
LLP
70 West Madison Street, Suite 4200
Chicago, IL 60602-4231
Tel: (312) 583-2300
sarah.gryll@arnoldporter.com

*Counsel for Plaintiffs the South Carolina
Conference of the NAACP and Taiwan Scott*

Janette M. Louard*
Anthony P. Ashton*
Anna Kathryn Barnes**
NAACP OFFICE OF THE GENERAL
COUNSEL
4805 Mount Hope Drive
Baltimore, MD 21215
Tel: (410) 580-5777
jlouard@naacpnet.org

*Counsel for Plaintiff the South Carolina
Conference of the NAACP*

* Motion for admission *Pro Hac Vice*
forthcoming
** Admitted *Pro Hac Vice*
*** *Mailing address only (working remotely
from South Carolina)*

## CERTIFICATE OF SERVICE

I hereby certify that on September 2, 2022, a true and correct copy of the foregoing was served on all counsel of record by electronic mail.

/s/ *Santino Coleman*
Santino Coleman