# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICIT OF SOUTH CAROLINA
# COLUMBIA DIVISION

| | |
|---|---|
| The South Carolina State Conference of the NAACP, and Taiwan Scott, *on behalf of himself and all other similarly situated persons*,<br><br>Plaintiffs,<br><br>v.<br><br>Thomas C. Alexander, *in his official capacity as President of the Senate*; Luke A. Rankin, *in his official capacity as Chairman of the Senate Judiciary Committee*; James H. Lucas, *in his official capacity as Speaker of the House of Representatives*; Chris Murphy, *in his official capacity as Chairman of the House of Representatives Judiciary Committee*; Wallace H. Jordan, *in his official capacity as Chairman of the House of Representatives Elections Law Subcommittee*; Howard Knabb, *in his official capacity as interim Executive Director of the South Carolina State Election Commission*; John Wells, *Chair*, Joanne Day, Clifford J. Elder, Linda McCall, and Scott Moseley, *in their official capacities as members of the South Carolina State Election Commission*,<br><br>Defendants. | C/A No.: 3:21-cv-03302-TJH-RMG-MGL<br><br>**ORDER AND OPINION** |

Before the Panel is a motion for summary judgment filed by Defendants Thomas C. Alexander, Luke A. Rankin, James H. Lucas, Chris Murphy, and Wallace H. Jordan (collectively, the Senate and House Defendants). (Dkt. No. 323). Since Plaintiffs filed this lawsuit, G. Murrell Smith has replaced James H. Lucas as the Speaker of the House. Therefore, going forward, in accordance with Fed. R. Civ. P. 25(d), the Panel will substitute G. Murrell Smith for James H.

1

Lucas. Upon careful consideration of the motion, the response, and the record on summary judgment, the Panel denies Senate and House Defendants' motion.

## I. Background

Plaintiffs' Third Amended Complaint challenges the composition of three of South Carolina's Congressional Districts for the U.S. House of Representatives (Districts 1, 2, and 5) as unconstitutional racial gerrymanders in violation of the Equal Protection Clause of the Fourteenth Amendment. *See* (Dkt. No. 267 at 38 *et seq.*). Plaintiffs allege these districts were also drawn with an intentionally discriminatory intent in violation of the Equal Protection Clause of the Fourteenth and Fifteenth Amendments. Senate Bill 865 ("S. 865") enacted the allegedly unlawful Congressional Map.

Before the Panel is Senate and House Defendants' motion for summary judgment. (Dkt. No. 323). Plaintiffs filed a response in opposition the motion for summary judgment. (Dkt. No. 380). Senate and House Defendants filed a reply. (Dkt. No. 378). The matter is ripe for the Panel's adjudication.

## II. Legal Standard

Summary judgment is appropriate if a party "shows that there is no genuine dispute as to any material fact" and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In other words, the Court should grant summary judgment "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Props.,* 810 F.2d 1282, 1286 (4th Cir. 1987). "In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities in favor of the nonmoving party." *HealthSouth Rehab. Hosp. v. Am. Nat'l Red Cross*, 101 F.3d 1005, 1008 (4th Cir. 1996). The party seeking summary judgment bears the initial burden of

demonstrating to the Court that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in its pleadings. *See id.* at 324. Rather, the non-moving party must demonstrate that specific, material facts exist that give rise to a genuine issue. *See id.* Under this standard, "[c]onclusory or speculative allegations do not suffice, nor does a 'mere scintilla of evidence'" in support of the non-moving party's case. *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002) (quoting *Phillips v. CSX Transp., Inc.*, 190 F.3d 285, 287 (4th Cir. 1999)).

### III.    Discussion

Senate and House Defendants' motion for summary judgment moves to dismiss Plaintiffs' claims for racial gerrymandering in violation of the Equal Protection Clause of the Fourteenth Amendment and intentional discrimination in violation of the Equal Protection Clause of the Fourteenth and Fifteenth Amendments. (Dkt. No. 323). The parties largely dispute whether the State elevated race as the predominant redistricting criteria over other traditional redistricting factors in the movement of voters inside or outside particular congressional districts to advance political goals. The parties offer circumstantial evidence to support their positions to include testimony from various legislators along with expert opinions.

"The Equal Protection Clause of the Fourteenth Amendment limits racial gerrymanders in legislative districting plans. It prevents a State, in the absence of 'sufficient justification,' from 'separating its citizens into different voting districts on the basis of race.'" *Cooper v. Harris*, 137 S.Ct. 1455, 1463-1464 (2017) (citing *Bethune–Hill v. Virginia State Bd. of Elections,* 137 S.Ct. 788, 797 (2017) (internal quotation marks and alteration omitted)). When a plaintiff sues State officials for drawing such race-based lines, a trial court follows a two-step analysis. First, the

plaintiff must prove that "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Miller v. Johnson,* 515 U.S. 900, 916 (1995).  That entails demonstrating that the legislature "subordinated" other traditional redistricting principles to racial considerations.  (*Id.*).  Those traditional principles may include "compactness, respect for political subdivisions, [and] partisan advantage . . . to 'racial considerations.'" *Cooper*, 137 S.Ct. at 1463–64 (citing *Miller*, 515 U.S. at 916)).  The plaintiff may make the required showing through "direct evidence" of legislative intent, "circumstantial evidence of a district's shape and demographics," or a mix of both.  *Cooper*, 137 S.Ct. at 1463-64.

Second, if the Plaintiff carries the burden of showing racial considerations predominated over others, the design of the district must withstand strict scrutiny.  *Cooper*, 137 S. Ct. at 1464 (citing *Bethune–Hill,* 137 S.Ct. at 800)).   The burden thus shifts to the State to prove that its race-based sorting of voters serves a "compelling interest" and is "narrowly tailored" to that end.  *Id.*

When a State presents the defense of partisanship to explain the drawing of district lines that might otherwise reflect racial gerrymandering, the trial court must engage in a "sensitive inquiry" into all "circumstantial and direct evidence of intent" to assess whether the plaintiffs have managed to disentangle race from politics and prove the former drove a district's lines." *Cooper*, 137 S. Ct. at 1473 (citing *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999) (*Cromartie I*)).   A plaintiff may satisfy the first step of its burden that race predominated over other redistricting factors "if the evidence reveals that a legislature elevated race to the predominant criteria in order to advance other goals, including political ones." *Cooper*, 137 S. Ct. at 1464, n. 1; *see Bush v. Vera*, 517 U.S. 952, 968-970 (1996) (plurality opinion) (holding that race predominated when a legislature deliberately "spread[] the Black population" among several districts in an effort to "protect[]

4

Democratic incumbents"); *Miller*, 515 U.S. at 914 (stating that the "use of race as a proxy" for "political interest[s]" is "prohibit[ed.").

In this case, Plaintiffs contend race predominated over traditional redistricting principles such as partisan advantage in redrawing the challenged district lines. (Dkt. No. 380 at 23-24). Plaintiffs point to the line in Charleston County that delineates Congressional District ("CD") 1 and CD 6 and argues that Black voters were moved from CD 1 to CD 6 for predominately racial reasons. (Dkt. No. 380 at 3-4, 24); *see also* (Dkt. No. 323-18, Duchin Rep. at 17, Figure 5) (noting North Charleston is split between CD 1 and CD 6 as the district line "winds between counties, in and out of the city, and through neighborhoods with significant Black population."). Plaintiffs' experts conclude race was a motivating factor in moving blocs of voters in or out of the challenged districts. *See* (Dkt. No. 323-27, Imai Rep. at ¶¶ 3, 17-21) (conducting race-blind simulation analysis of CD 1 and CD 6 to determine race played a significant role beyond the purpose of adhering to traditional redistricting criteria to determine the boundary of these two districts under the enacted Congressional Map); (Dkt. No. 323-19, Liu Rep. at 15-22) (stating race was a motivating factor in moving voting tabulation districts in or out of challenged CD 1 and CD 2 as Black voters regardless of party participation were much more likely to be moved in or out of those Districts); (Dkt. No. 323-29, Ragusa Rep. at 5-8) (analyzing whether a voting tabulation district was included or excluded from a redrawn district through statistical model with race, partisanship, and precinct size as variables to determine race was an important factor in moving voting tabulation districts in or out of CD 2, CD 5, and CD 6). In contrast, Defendants' expert offers the opinion that the enacted Congressional Map's changes to district lines between CD 2 and CD 6 and between CD 5 and CD 6 are largely explained by repairing voting precincts that were previously split. (Dkt. No. 323-32, Trende Rep. at 7-8)

Senate and House Defendants contend the enacted Congressional Map adheres to traditional redistricting principles such as protecting incumbents and preserving political advantage rather than subordinating those factors to race. (Dkt. Nos. 323 at 12-14, 15-16; 378 at 10). Defendants' expert offers the opinion the enacted Congressional Map reflects modest changes from the 2011 Benchmark Plan which the court upheld against racial gerrymandering and other challenges in *Backus v. South Carolina*. 857 F. Supp.2d 553, 557 (D.S.C.), *aff'd*, 568 U.S. 801 (2012); (Dkt. No. 323- 32, Trende Rep. at 7-8). Senate and House Defendants argue the 2020 Census results revealed "significant population shifts away from predominantly African-American areas and toward more coastal areas" leaving CD 6 underpopulated by 84,741 votes and neighboring District 1 overpopulated by 87,689 votes. (Dkt. No. 323-4 at 2). Senate and House Defendants contend the enacted Congressional Map moved large portions of voters out of CD 1 and into CD 6 to equalize population. At the same time, it maintained a split of Charleston County between CD 1 and CD 6 that has been present for three decades. (Dkt. No. 323 at 5-6) (citing Dkt. No. 323-2; 323-6). In addition, the enacted Congressional Map maintains the partisan composition of six majority-Republican districts (CDs 1, 2, 3, 4, 5, 7) and one majority-Democratic district (CD 6) in South Carolina. (Dkt. No. 323-6). Senators and senate staff testified the State considered political data to determine it would move Democrats out of CD1 and into CD6 to strengthen the Republican leaning in CD 1. *See* (Dkt. No. 323-22, Roberts at 112-113, 170, 172, 180, 252:25-253); (Dkt. No. 323-23, Fiffick 256: 24-257:4); (Dkt. No. 323-25, S. Massey 134:12-136:23); *see also* (Dkt. No. 323-24, S. Campsen at 185:23-187:1) (explaining CD 1 turned into a swing district having narrowly elected Democrat Joe Cunningham in 2018 and Republican Nancy Mace in 2020). Defendants' expert concludes the enacted Congressional Map's changes to district

lines between CD 1 and CD 6 have a minimal effect on CD1's racial composition but increases its Republican vote share by three percent. (Dkt. No. 323-32, Trende Rep. at 8).

Upon a careful review of the record and viewing the evidence in a light most favorable to Plaintiffs as the non-moving party, the Panel finds several issues of material fact exist with regard to whether race was the predominant factor in drawing the challenged congressional district lines or whether the State engaged in intentional racial discrimination. At trial, the Panel will weigh the conflicting evidence to determine whether Plaintiffs carried the heavy burden of proving race predominated over other traditional redistricting factors. If Plaintiffs meet their burden, the Panel will determine whether the State had a compelling state interest using race in drawing the congressional district lines. Therefore, the Panel denies Senate and House Defendants' motion for summary judgment. (Dkt. No. 323).

**IV.     Conclusion**

For the foregoing reasons, Senate and House Defendants' motion for summary judgment is **DENIED**. (Dkt. No. 323).

_____
United States Circuit Judge

_____
United States District Judge

_____
United States District Judge

7

September 15, 2022
Charleston, South Carolina