*SC NAACP v. Alexander,*
D.S.C. Case No. 3:21-cv-03302-MGL-TJH-RMG

# Exhibit 15

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF SOUTH CAROLINA
 2                     COLUMBIA DIVISION
             CASE NO. 3:21-CV-03302-MBS-TJH-RMG
 3
      THE SOUTH CAROLINA STATE CONFERENCE OF
 4    THE NAACP, AND TAIWAN SCOTT, ON BEHALF
      OF HIMSELF AND ALL OTHER SIMILARLY
 5    SITUATED PERSONS,
 6                 Plaintiffs,
 7            vs.
 8    THOMAS C. ALEXANDER, HENRY D. MCMASTER,
      IN HIS OFFICIAL CAPACITY AS GOVERNOR OF
 9    SOUTH CAROLINA; HARVEY PEELER, IN HIS
      OFFICIAL CAPACITY AS PRESIDENT OF THE
10    SENATE; LUKE A. RANKIN, IN HIS OFFICIAL
      CAPACITY AS CHAIRMAN OF THE SENATE
11    JUDICIARY COMMITTEE; JAMES H. LUCAS, IN
      HIS OFFICIAL CAPACITY AS SPEAKER OF THE
12    HOUSE OF REPRESENTATIVES; CHRIS MURPHY,
      IN HIS OFFICIAL CAPACITY AS CHAIRMAN OF
13    THE HOUSE OF REPRESENTATIVES JUDICIARY
      COMMITTEE; WALLACE H. JORDAN, IN HIS
14    OFFICIAL CAPACITY AS CHAIRMAN OF THE
      HOUSE OF REPRESENTATIVES ELECTIONS LAW
15    SUBCOMMITTEE; HOWARD KNABB, IN HIS
      OFFICIAL CAPACITY AS INTERIM EXECUTIVE
16    DIRECTOR OF THE SOUTH CAROLINA STATE
      ELECTION COMMISSION; JOHN WELLS, JOANNE
17    DAY, CLIFFORD J. ELDER, LINDA MCCALL,
      AND SCOTT MOSELEY, IN THEIR OFFICIAL
18    CAPACITIES AS MEMBERS OF THE SOUTH
      CAROLINA STATE ELECTION COMMISSION,
19
                   Defendants.
20
21    DEPOSITION OF:   ANDREW THEODORE FIFFICK
                       (Appearing via VTC)
22
      DATE:            July 21, 2022
23
      TIME:            10:10 a.m.
24
25
```

```
                                            Page 12
```

1    state house maps, I believe.

2           Q.    And what about in an intentional racial

3    discrimination claim?  Are you familiar with

4    whether or not that claim has been raised?

5           A.    Now, I think that's something that's

6    been alleged.  I mean, I can tell you everything

7    I've seen from my perspective as the chief staff of

8    record research, that's baseless.

9           Q.    Okay.  And what do you understand a

10   racial gerrymander to mean?

11          A.    Again, I defer to outside counsel on

12   this issue, but I mean, I think it's when you draw

13   a map a way that subjugates traditional

14   redistricting principles in favor of drawing based

15   on race.

16          Q.    And how does that compare to your

17   understanding of an intentional discrimination

18   claim?

19          A.    I mean, I don't recall the difference

20   between the two, I just know that nothing I can

21   remember in the process resembled anything in terms

22   of race being a predominant factor.

23          Q.    Okay.  Was race a factor in the

24   development of the congressional map?

25          A.    It was something that was available to

Page 13

1    everyone, but it was something that was on the back

2    end so that outside counsel could check for.  And

3    again, I'm not the expert here.  My impression is

4    that on the back end, outside counsel might want to

5    look at what I think is called the Section 2 claim

6    where you might need to use racial data.  But it's

7    my understanding there is no Section 2 claim and I

8    don't recall outside counsel ever, you know,

9    needing to use that data.  But that data was

10   available to everybody, and anybody who asked for

11   it, that sort of data was to go to them for sure.

12        Q.    And when you refer to outside counsel

13   having looked at it, are you referring to -- you

14   mentioned Mr. Terreni, you mentioned Mr. Gore, and

15   you mentioned Mr. Tyson.  Is that who you're

16   referring to?

17        A.    I don't recall Mr. Tyson doing a whole

18   lot of review.  It was kind of a hierarchal thing.

19   You know, Charlie was more involved because he's

20   here.  You know, we would bounce it off of Charlie

21   and then Charlie would send it on to John Gore.

22             And there really were very few maps so

23   it wasn't a whole lot of review.  I don't think we

24   drew more than 20 maps that outside counsel saw, if

25   that, probably less than that.  Probably less than

```
                                               Page 86
 1   Clyburn's office?
 2          A.    Not on my part, no, not that I'm aware
 3   of any notes.
 4          Q.    Are you aware of anyone else who
 5   communicated with his office outside?
 6          A.    No.
 7          Q.    Now, you mentioned that the map that
 8   Senator Clyburn's office brought was sort of cast
 9   away?  Is that fair to say or was not implemented?
10          A.    I don't recall.  I don't think it was
11   implemented because no member of the Senate ever
12   came to us and said to do something with it.
13   That's my recollection.  I don't know where it
14   ended up.  Again, no member of the Senate came and
15   asked us to do anything with it so we didn't.  So I
16   don't know if it just ended up on the floor or in
17   the trash can or something.  I mean, and it didn't
18   sound like something that -- well, I know it wasn't
19   because Mr. Tresvant in Tom's office never followed
20   up.
21          Q.    Do you know whether that map informed
22   anything that Will Roberts did in terms of drawing
23   up a congressional map?
24          A.    It did not because we operated on
25   instructions of members and I never received any
```

Page 87

1    instruction that I can remember, obviously remember
2    about that map.
3          Q.   So you did not operate on the
4    assumption that Representative Clyburn's district
5    should minimally change from the old map to the new
6    map?
7          A.   I mean, that was something that was
8    articulated by the Senate members from the very
9    beginning.  They were going for the least change
10   map.  I mean, Luke Rankin mentions that many times
11   in the committee.  So that was well known across
12   the board, minimal changes.
13         Q.   Which members wanted a least change
14   map?
15         A.   I couldn't list them there's so many.
16         Q.   Where did they communicate this?
17         A.   Well, I mean, Rankin said it in open
18   testimony.  And I'm sure Campsen was in favor of
19   that, the least change map.  I know Rankin
20   explicitly told me he did not want the 7th district
21   to change at all.  So it was oral communications.
22   There may be some emails out there.  Y'all would
23   have them if they're out there.
24         Q.   But Representative Clyburn's office,
25   you're not aware that Representative Clyburn's

Page 93

1   trailing off.

2                THE WITNESS:  Yes.  Sorry.

3   BY MS. ADEN:

4        Q.   Mr. Fiffick, before we went on break,

5   you mentioned some of the information that you have

6   received from members of the U.S. Congress related

7   to the congressional map.  Did you learn that any

8   congressional member wanted to maintain CD7 as

9   similar to or exactly like how it appeared in the

10  2010 map?

11       A.   No, I did not.  Not specifically.

12       Q.   What do you mean not specifically?

13       A.   That information was not ever conveyed

14  to me specifically there was a member of congress

15  and that's the case.

16       Q.   Was it conveyed to someone else that

17  you're aware of?

18       A.   No.  No.  I mean, Senator Rankin wanted

19  to keep the setting the same.  I know that.

20       Q.   Did he say that publicly in any of the

21  proceedings that you were a part of?

22       A.   I believe he said at the very least

23  that it was a least change plan.

24       Q.   But no one specifically said keep CD7

25  as similar to the post-2010 map?

```
                                          Page 94
 1          A.    Senator Rankin.
 2          Q.    Did you ever see -- any of the
 3   recommendations that you got on these calls with
 4   Representative Wilson, Representative Clyburn,
 5   other members or their staff, were those
 6   recommendations ever committed to writing at any
 7   point?
 8          A.    Not by me and I'm not aware of anybody
 9   ever doing that either.  They were really simple
10   broad, easy to remember things that --
11          Q.    Were you -- I'm sorry.
12          A.    I think I've already said what they
13   were.  They were very broad, easy to remember
14   things.
15          Q.    Were they ever communicated -- did you
16   communicate these broad principles to any
17   subcommittee members?
18          A.    I'm sure I did.  I don't remember who
19   and when, but I'm sure we would have mentioned that
20   to Senator Campsen especially.
21          Q.    What about Senator Bright Matthews
22   since she's come to the map room?
23          A.    I would guess yeah, we probably
24   mentioned it to her too.  I don't remember
25   specifically mentioning it to her or Campsen.  But
```

                                        Page 119

1      there was that water contiguity is acceptable.  I

2      don't remember where that comes from, but that was

3      another thing that we referred to outside counsel

4      and they found acceptable.

5              Q.    Looking to the next category, Roman

6      Numeral III, Additional Considerations.  It's on

7      the next page.  Do you mind --

8              A.    Sure.

9              Q.    Well, I guess I'll look at it myself.

10     Is it fair to -- under Roman Numeral III,

11     Additional Consideration, it reads, Other criteria

12     that should be given consideration, where practical

13     and appropriate, in no particular order of

14     preference.

15              Am I reading accurately what follows

16     that category?

17              A.    Yes, ma'am.

18              Q.    Okay.  Did you understand the things

19     that follow in this part of the Senate guidelines

20     to be of lower priority to compliance with federal

21     law and the categories that preceded this section?

22              A.    That wasn't my understanding, but

23     that's -- well, yeah, based on outside counsel's

24     advice, yes, these were things that could not, you

25     know, or should not be considered over the

Page 120

1    federal --

2          Q.   But --

3          A.   -- guidelines.

4          Q.   I'm sorry.  I cut you off.

5          A.    I'm sorry.  My understanding from

6    outside counsel is that this stuff in No. III are

7    additional considerations that were not as

8    paramount as the federal -- requirements of federal

9    law, and then additional considerations, I think in

10   here it tells you in this document the difference

11   between the two.

12         Q.   And the words that I read, other

13   criteria that should be given consideration, where

14   practical and appropriate, in no particular order

15   of preference, does that also give support for the

16   idea that these are of lower priority than the

17   federal requirements that precede it?

18         A.    I mean, that could be construed that

19   way, yes, ma'am.  It's up to members of the Senate

20   to consider whatever they want to consider when

21   they're making decisions.  And when those decisions

22   were made and turned into maps based on those

23   decisions how they wanted the map drawn, we then

24   submitted them to outside counsel to review.

25         Q.    Looking at subcategory III(A), what is

Page 123

1    that's probably something that's a subjective term

2    that could be up to whatever member of the Senate,

3    you know, wanted to interpret it as they asked us

4    to draw the map.

5              Q.    You earlier mentioned that Will Roberts

6    and you in the map room and others had access to

7    race data.  Can you tell me a little bit more about

8    what data you had?

9              A.    I'm hardly an expert in all the DOJ

10   black, BVAP, non-Hispanic black.  It was that sort

11   of information.  I don't know the distinctions very

12   well, but it was information from the census.

13   There's some documents in here that y'all have

14   shown, you know, the charts that they produced that

15   reflected that information.

16             Q.    How did Will Roberts with you in the

17   room consider race in developing any of the maps

18   that you drew in that map room?

19             A.    I'm not aware that he did that at all.

20   If a member of the Senate in their own mind

21   considered it and then asked us to draft something,

22   they may have.  I don't know.  The maps were

23   drafted with the instruction numbers.  So it wasn't

24   a matter of Will considering the information, it's

25   not a member presenting the information, and then

                                                    Page 124

 1    us presenting the information and the maps to our

 2    outside experts who then decided whether or not

 3    they passed federal common law.

 4           Q.    Are you aware of whether race data was

 5    loaded into the computer that y'all shared in the

 6    map room?

 7           A.    Oh, yeah.  It was, yeah, for sure.

 8           Q.    Was it on a screen projected on the

 9    wall at any time as you were developing maps?

10           A.    I was not developing maps, but as

11    members came in and wanted to talk about maps, yes,

12    members came in and asked about those numbers.

13           Q.    For the maps that were transmitted to

14    Mr. Terreni and Mr. Gore, did they include

15    associated data with them?

16           A.    I'm sure they did.  I'm sure Charlie

17    Terreni saw the associated data when he was in the

18    room and I'm sure Will would bring set statistics

19    to John Gore when they sent any map to us.

20           Q.    And are you aware of whether race data

21    was one of the categories of data that was part of

22    that?

23           A.    I believe it was, yeah.

24           Q.    What other ways was race considered as

25    maps were developed, congressional maps were

Page 125

1    developed by you and the legislators during the

2    last cycle?

3         A.   I never considered it and I wasn't

4    developing maps.  I don't know the extent to how

5    much it, you know, entered into the mind of the

6    members that were in the map room.  But I can tell

7    you for a fact I don't remember Chip Campsen ever

8    asking about racial data ever.  And if Margie

9    Bright Matthews and Senator Sabb and Senator Scott

10   or some of the other folks that came to the map

11   room asked about it, it wasn't an aforethought.  It

12   was not something that I watched Will Roberts draw

13   a map based on it.

14        Q.   Did someone tell you to never consider

15   race data as you were developing maps?

16        A.   No.

17        Q.   So how did you know not to use it?

18        A.   Well, I mean, that's kind of really a

19   negative.  No one asked me to use it so I didn't

20   use it.  I didn't use it because I didn't draft the

21   map.  Will did based on instruction from the

22   senators, so...

23        Q.   But how did you know to use total

24   population data?

25        A.   These guidelines, I guess, is one way I

Page 126

1    used it.

2            Q.    Where do you see total population

3    identified in these guidelines?  Take a minute and

4    show it to me.

5            A.    I mean, this gets back to your point on

6    I(A)(2), but the last sentence there, congressional

7    redistrict plans should not have population

8    deviations greater than one person.

9            Q.    But does it tell you what data to look

10   at in order to determine compliance with that

11   guideline?

12           A.    Oh, no.  I guess that's pretty, I mean,

13   that's easy.  The census information is the factor.

14           Q.    Do you know what data you would use to

15   determine compliance with the Voting Rights Act?

16           A.    I guess it would depend on which part

17   of the Voting Rights Act you were talking about and

18   that's something I defer to outside counsel.

19           Q.    Which parts of the Voting Rights Act

20   are you aware of?

21           A.    I think it was Section 2 or Section 5.

22   Section 5 doesn't apply anymore.  But again, it

23   wasn't important.

24           Q.    What do you know about Section 2?

25           A.    I think it's probably in the

Page 127

```
 1   redistricting guidelines.  I would defer to outside
 2   counsel.  But I think it's basically that race
 3   cannot be the common factor in drawing a map.  It
 4   never came up because no one ever said it was a
 5   predominant factor.  Nobody asked for race to be a
 6   factor.  But again, I'll defer to outside counsel
 7   on that issue.
 8        Q.   So Senator Bright Matthews, Senator
 9   Sabb, Senator Harpootlian, none of those members,
10   Senator Hutto, none of those members ever asked for
11   race to be considered in the development of
12   congressional maps?
13        A.   I mean, I think race has to be
14   considered, but no one came and asked us to
15   consider race, no.  But I think that based on my
16   understanding from outside counsel, they had to
17   review numbers on maps and how the maps were drawn
18   to ensure compliance with state and federal law or
19   federal law.
20        Q.   And that was after the fact so you
21   looked to see whether race was considered or not
22   considered after the fact; is that your position?
23        A.   I mean, our outside counsel did that.
24   There were times when members asked about what's to
25   be back in this area, but it was not a predominant
```

                                                Page 128

1    factor.  It was not something someone came in and

2    said, hey, draw this this way so that X number of

3    folks or that X number of districts or whatever.

4    It was after the fact at least from my perspective

5    and outside counsel.  I can't tell you what was in

6    the heads of the members, but I can tell you no one

7    came in and said I want race to be a predominant

8    factor in drawing this map.

9            Q.    I think you mentioned that Ms. Benson

10   put together information -- well, let me ask you.

11           Did subcommittee members have maps and

12   data available to them as they were considering

13   maps during the public hearings?

14           A.    Yes.  There were notebooks.

15           Q.    Who put those notebooks together?

16           A.    Our clerical staff put them together.

17   Maps were printed out by, I guess, Will and Breeden

18   and then I guess Michelle McGee as our meeting

19   coordinator.  Purely as an administrative function

20   we put them in notebooks for the members.

21           Q.    And what was in those notebooks?

22           A.    To my recollection, it was maps and

23   statistics, demographic statistics.  I can't recall

24   off the top of my head all the different things

25   that were in the notebooks.  It was mostly maps --

Page 129

1   well, it was.  It was maps and demographic

2   information.

3           Q.   And would it have included racial

4   demographic data?

5           A.   I think it did.

6           Q.   Excuse me?

7           A.   I think it did, yes.  I do believe that

8   those things were in there.

9           Q.   And does that mean that racial

10  demographic data was available to members before

11  the final map was signed into law for the

12  congressional plan in South Carolina?

13          A.   Yes.  Even if it hadn't been in those

14  books, you know, someone could ask for it.  I don't

15  think they would have been denied the information.

16          Q.   You've worked in the legislature for

17  many years.  Is it fair to say that legislative

18  members know who lives in their district?

19          A.   Yes.

20          Q.   And is it fair to say that legislative

21  members know the ethnicity of people who live in

22  their district?

23          A.   I would think so, yeah, uh-huh.

24          Q.   The race of people who live in their

25  district?

```
 1            A.   I don't know how many of them know how
 2    many of which type of race or whatever, but, I
 3    mean, I think they live there so I would think so.
 4    I don't know.
 5            Q.   And they may know the economy, the
 6    economic background of members who live in their
 7    district?
 8            A.   That's right.
 9            Q.   Okay.  This communities of interest
10    back in the guidelines III(B) also references
11    historic characteristics.  What did you understand
12    that to mean?
13            A.   Where are you again?  I'm sorry.
14            Q.   III(B).  There's a number of different
15    things that are identified as communities of
16    interest and one of them is historic or other
17    characteristics, and I'd like to know what you
18    understood a historic characteristic to mean?
19            A.   In III(B)?
20            Q.   Yes.
21                 MR. TYSON:  III(A).  III(A).
22                 MS. ADEN:  III(A).  I'm sorry.  Thank
23    you for correcting me.
24                 THE WITNESS:  I mean, I think it speaks
25    for itself.  I mean, historic characteristics.  I
```

```
 1    mean, the City of Camden, it's called the City of
 2    Camden Historic District.  And the people from
 3    Camden are proud they're from Camden.  History is
 4    something that people think about, so...
 5            Q.   Are you familiar with the area West
 6    Ashley in Charleston?
 7            A.   I know where it is yes, ma'am.
 8            Q.   Did you hear about West Ashley during
 9    consideration of the congressional map?
10            A.   In the context of some members wanting
11    Charleston to be made whole as opposed to I believe
12    some people were saying kept whole, you would have
13    had to have put West Ashley and all of Charleston
14    County into the 1st Congressional District to
15    achieve the request for, say, Senator Sabb who has
16    that venue that I think is called Charleston
17    Strong.  Yes, you would have to -- that was -- yes.
18            Q.   Of the people who spoke about West
19    Ashley during the road shows or any of the
20    redistricting hearings that you were part of, did
21    the majority or minority of people who spoke about
22    it want West Ashley to remain in Congressional
23    District 1 or not?
24            A.   I don't recall specifically.  I do know
25    there were a lot of people that wanted Charleston
```

                                                    Page 132

1     to be all in one district.

2                    THE REPORTER:  I'm sorry.  I need to

3     interrupt.  Can we take a break?  I am having

4     issues with my computer.

5                    MS. ADEN:  Should we just tell the

6     court reporter --

7                    I mean, can you do that by 1:15 or do

8     you want until 1:30?

9                    MR. TYSON:  What time is it now?

10                   MS. ADEN:  It's 1:03.

11                   THE REPORTER:  1:30.

12                   (Off-the-record conference.)

13                   (A recess transpired.)

14                   THE REPORTER:  Would you like me to

15    read the last question?

16                   MS. ADEN:  Yes, please.

17                   (The court reporter read the question

18    commencing on page 131, line 18.)

19                   THE WITNESS:  Well, my recollection is

20    that probably the majority of the folks we saw at

21    the public hearing were there to advocate for

22    changing the districts in a way that would put all

23    of Charleston into District 1.

24                   And so I would say more people probably

25    would have wanted it in District 1 because they

1    wanted all the Charleston industry.  I don't recall
2    whether that was people professing it in terms of
3    West Ashley, but I do know that those people would
4    be the subset of the people that wanted Charleston
5    to be wholly encompassed into District 1, which
6    would have been -- wouldn't be a least change plan
7    as what we were instructed to do.
8              But I don't remember people saying, I'm
9    from West Ashley.  You know, I don't recall that,
10   but I'm sure that there were probably some from
11   this area.
12   BY MS. ADEN:
13        Q.   So you understood keeping Charleston
14   whole to --
15        A.   Well, I would say making it whole --
16             MR. TYSON:  Let her ask the question.
17             THE WITNESS:  Okay.
18             MS. ADEN:  Thank you.
19   BY MS. ADEN:
20        Q.   You understood keeping Charleston whole
21   in CD1 to be in conflict with the least change map
22   making process?
23        A.   I guess it would have been.  I don't
24   know.  Recalling off the top of my head, maybe I'm
25   mistaken.  But I guess it would have been a change

                                          Page 134

1    because, from my recollection, is that Charleston
2    was not all in one congressional district so I
3    guess that's my comprehension of it, looking back,
4    is that if the preexisting districts did not have
5    Charleston all in the 1st Congressional District
6    and a map, say, Ronnie Sabb's Charleston Strong
7    Map, I think, put it all into one district, that
8    seems to me would have been more of a change than
9    otherwise and maybe I'm incorrect on that.  I may
10   be remembering that wrong.
11        Q.   If you still have the Senate guidelines
12   in front of you, do you mind taking a moment and
13   looking at the guidelines and tell me where you see
14   reference to a least change congressional map.
15        A.   I would say that would be -- let's see,
16   in I(2) -- I(A)2, I think, Preserving the cores of
17   prior districts and avoiding contests between
18   incumbent representatives.
19        Q.   I(A)(2) is Congressional Districts for
20   me.  What are you looking at?
21        A.   Yes, ma'am.  It's right in the middle.
22   It's in the middle of the paragraph, Preserving the
23   cores of prior districts and avoiding contests
24   between incumbent representatives.  I think that
25   kind of encompasses that theory of the least change

Page 135

1    plan.  It does not say least change plan, if that's
2    what you're getting at.
3          Q.    How does the preserving -- how do you
4    view the preserving of cores of prior districts to
5    interact with the one person, one vote principle
6    which is discussed in that bullet?
7          A.    I would say that the one person, one
8    vote is more important than -- I mean, that's a
9    postulate map.  We didn't rank these things.  I
10   think we can all agree that that's a must.  You've
11   got to conform with the one person, one vote and
12   being within that one person, which -- I don't
13   think we ever drew a map that didn't do that.  They
14   all had to do that.
15         Q.    And so your position is that getting to
16   one person deviation is a priority unless --
17   because unless falling outside of that could be
18   justified by something like preserving a course of
19   prior districts; is that your understanding?
20         A.    No.  No.  We took that one person, one
21   vote thing so seriously, we never drew a map.  I
22   mean, never drew a map that wasn't -- that I can
23   recall that was outside the one person.  I mean,
24   that was something Will did every time, all the
25   time without anybody ever asking.  They wouldn't

Page 136

1    ask you not to do it.  That was sort of a -- like I
2    said, I would call that a postulate.
3              Q.   Were you ever instructed as a criteria
4    to make a 6-1 Republican-leaning map?
5              A.   A one -- make one lean Republican?
6              Q.   Make six lean Republican, one not --
7              A.   I don't recall --
8              Q.   -- districts?
9              A.   No, I don't recall ever having anybody
10   ask me to do that.  But it's all a matter of
11   semantics.  I mean, you can number anything you
12   want.  You can change the numbers.  You can swap
13   the numbers, the 1st on the 6th, the 6th for the
14   1st.  But no, no one ever asked me.
15             Q.   So it was not your understanding that
16   you were driven or members were driven to create a
17   congressional map where six districts based upon
18   political data or some other information suggested
19   that they would likely vote for Republican
20   candidates as compared to one district that would
21   likely vote for Democratic candidates?  That was
22   not something that guided the work that you were
23   aware was being done in the congressional mapping?
24             A.   Again, that was the whole context --
25             Q.   Yes, it was long.  It got narrative.

```
                                                Page 137

 1                  Are you aware of any instruction by any
 2      member that those in the map room should draw a
 3      sixth district that leaned Republican and
 4      one district that leaned Democrat?
 5              A.   I don't think anybody ever asked us to
 6      do one where the 6th leaned Republican.  I think
 7      there's many members probably who wanted the 1st to
 8      lean Democrat.
 9                  MR. TYSON:  Leah, can I interject here?
10                  MS. ADEN:  Yes.
11                  MR. TYSON:  I think y'all are on
12      different pages.  You're talking about six of one
13      and one of the other, and, I think, Andy, you're
14      talking about the 6th district versus the 1st.
15                  THE WITNESS:  Yeah.  I thought you were
16      talking the 6th district -- you're talking about
17      all of them.  You're talking about six other
18      districts --
19                  MR. TYSON:  And I'm sorry to interrupt,
20      but I just wanted that --
21                  MS. ADEN:  Thank you for helping me
22      clarify.
23      BY MS. ADEN:
24              Q.   And if you could lean forward, I am
25      losing you.
```

                                            Page 138

1           A.    Yeah, sure.

2           Q.    Are you aware of any instruction by any

3      member of the legislature or anyone else that you

4      and the team developing maps should be drawing six

5      districts of the seven that lean Republican and

6      one district of the seven that leans Democrat?

7           A.    I don't recall anybody asking for that,

8      but that doesn't mean we didn't have it.  That

9      wasn't something that I remember.

10          Q.    Who would have been told to do that if

11     it had been told?

12          A.    It would have been articulated to, you

13     know, one of us in the map room or all of it at the

14     same time in the map room.  And so much of our

15     drafting was in realtime with the members, so it

16     would have been -- the most common way for any of

17     those instructions to occur would be in realtime in

18     the map room, either Zooming with a member of the

19     general assembly -- or a member of the Senate or

20     with a member of the Senate in the office.

21               I don't recall that happening.  You're

22     saying six Republican and one Democrat.  I don't

23     remember that being...

24          Q.    In looking at the guidelines in front

25     of you, do you see that as a criteria identified in

Page 160

1    would defer to outside counsel on -- I think that's

2    an analysis for racial gerrymandering that they

3    never -- that was never relayed.  No one came to us

4    and asked for that sort of analysis that I can

5    recall.

6              I think there was questions about

7    whether -- Senator Harpootlian asked if there was

8    some kind of analysis or something like that, but

9    he never asked us to do it.  No member never asked

10   us to do it.  So the practical matter is that

11   didn't have anything to do with us.

12        Q.   So it's your position that Senator

13   Harpootlian never asked you to study the

14   correlation between race and political affiliation

15   in South Carolina?

16        A.   My recollection is he asked us if we

17   did, if we had.  He may have, in the way he asked

18   it, implied that he wanted us to, but he never came

19   to us and said, Andy, I want you to do an analysis

20   of correlation between race and politics in South

21   Carolina, no.

22        Q.   In public testimony or in your work in

23   the Senate, whether you agree with this perception

24   or not, are you aware of a perception that black

25   voters tend to vote for Democrats and white voters

Page 194

1   his thing to turn it into a map.

2        Q.   How did you know that this had anything

3   to do with congressional redistricting based upon

4   the subject of the email and based upon you never

5   having talked to this person?

6        A.   I think Charlie Terreni is who told me.

7   I'm not sure about that.

8        Q.   But you get an email to your Gmail and

9   you get a file that asks you to download something

10  and you trusted what was being sent to you to

11  download it onto a flash drive and then take it to

12  the Senate's lone computer that's being used to

13  develop congressional maps to just see what's in

14  it.

15       A.   Yeah, because it was based on a

16  conversation that Charlie Terreni had.  We thought

17  maybe there were members going to follow up and

18  want to see the maps.

19       Q.   So you got this map and then you have a

20  conversation with Mr. Terreni where he makes you

21  aware that this was coming to you or how --

22       A.   This all happened in realtime.  My

23  recollection is that somehow Charlie knew there was

24  a map.  Somebody wanted to get us a map.  It was

25  someone Charlie knew.  I didn't know who it was.

Page 195

1    And Charlie trusted them enough, I guess.  And we
2    said, well, this guy wants to send a map.  He can't
3    do it through the Senate accounts, he's using a
4    Gmail box.  It could have just as easily been
5    Charlie's email box, but we just used mine because
6    my office happened to be right back in the other
7    room.
8          Q.   Would Mr. Terreni, as one of the key
9    decision makers, have been aware of the Senate
10   policy from September 2020 which delineated that
11   maps had to be submitted in a particular way?
12         A.   I'm sure he was, yeah.
13         Q.   So despite knowledge of that policy,
14   he, notwithstanding, agreed that NRRT could submit
15   a map that is out of compliance with multiple
16   provisions of that policy?
17         A.   I think it was that the portal might
18   not have been up or something.  I mean, I think it
19   was -- that's why I say there was a point in time
20   we stopped receiving maps.  It may have been
21   that -- this was way after all the other maps came
22   in.  So I suspect it was because -- it may be that
23   the portal may have been working more or something.
24         Q.   But you're not aware that Mr. Terreni
25   or anyone else who was a key decision maker told

Page 235

1      emails that he had received about the treatment of

2      Beaufort and Charleston?

3           A.   I don't remember him mentioning

4      thousands of emails about that.  I know he was of

5      the opinion that Charleston would benefit from

6      having two, you know, congressional districts.

7      That was a fact.  That sentiment would go along

8      with a position he received a lot of information

9      trying to persuade him about this.

10          Q.   Have you ever seen those communications

11     from the emails that Senator Campsen referenced

12     about the treatment of Charleston and Beaufort?

13          A.   I'm sure I've seen some of them, but I

14     don't know that I've seen all of them.  I recall it

15     was a very stark contrast with folks that either

16     wanted Charleston whole or they didn't want

17     Charleston whole.  So the nuances of each of those

18     and who they were from and all that, I can't say

19     right now.

20          Q.   Did you ever invite Mr. Kincaid to

21     submit public testimony like the call that I

22     received or the call that other members of the

23     public received during the legislative process?

24          A.   I did not.

25               MR. TYSON:  Object; asked and answered

1          A.   I don't remember the exact date.  It

2     would have been sometime after -- I don't remember

3     the exact date.

4          Q.   At that time did you have a plan for

5     the trajectory of how the bill would proceed

6     through the legislative process?

7          A.   A directory?

8          Q.   A trajectory, a plan for the process

9     that it would take through the legislative process.

10         A.    No, I did not.  I figured it would be

11     up to the subcommittee and full subcommittee, the

12     body, the full Senate.  No.

13         Q.    On November 23rd, the Senate

14     redistricting subcommittee publicly posted a plan

15     called the 2021 Staff State Congressional Plan.  Do

16     you recall that proposal?

17         A.    I can't envision it, but I do recall

18     that that happened, yes.

19         Q.    Did you have a role in developing the

20     staff's initial Staff Plan?

21         A.    Yeah.  Yeah, I guess I did.

22         Q.    What was that?

23         A.    You know, we'll withdraw things and

24     kind of eyeball things and see if -- we had some

25     direction from members.  I don't remember what

1    direction we had at that point from any, but we had
2    some direction from members.  And we just put
3    together a plan for them to start the data.
4         Q.   To start?
5         A.   Just a starting point.  I mean, they
6    had to start with something.  I think it was -- I
7    know what it was.  It was because we had -- Will
8    endeavored to draw a map that moved the requisite
9    80 something thousand people into the 6th out of
10   the 1st because it was an easy one to one swap.
11        Q.   Was the only way to make up the under
12   population in CD6 to take voters out of CD1?
13        A.   No.  There's all kind of ways to do it.
14        Q.   Okay.  Do you know how long it took
15   from start to finish to complete this initial Staff
16   Plan?
17        A.   I don't remember, no.
18        Q.   Besides you or Mr. Roberts, who would
19   you say had input into the initial Staff Plan?
20        A.   Charlie Terreni to the greatest extent.
21   To a lesser extent, Breeden John.
22        Q.   Why do you say Mr. Terreni?
23        A.   Because he was our outside counsel and
24   30 years of experience with redistricting.
25        Q.   Did he actually draw lines or did he

Page 247

```
 1     just provide the legal guidance that you've been
 2     talking about since the beginning of the day?
 3               MR. TYSON:  Asked and answered.
 4     BY MS. ADEN:
 5          Q.   Did he draw lines?  I know he was --
 6     did he draw lines?
 7          A.   He wasn't physically on the computer.
 8     Will was always on the computer.
 9          Q.   Was he sitting next to Mr. Roberts
10     directing him about where lines might go?
11          A.   Yeah.  I mean, Will was drawing these
12     things and, you know, if somebody noticed that,
13     hey, you might want to follow that river because
14     it's a geographic boundary or something, I don't
15     remember, you know.  But, I mean, yeah, he would
16     have been commenting about the map.  I wouldn't say
17     he drew it though.
18          Q.   Did you provide that type of
19     directions, you know, follow the river?  Did you
20     provide that type of guidance to Mr. Roberts?
21          A.   We all kind of commented on it all
22     together.  I mean, it was sort of an aggregate of
23     people discussing.  And then we got the map
24     together, and I think we sent it to John Gore, and
25     then we gave it to the subcommittee, and then they
```

1    did what they wanted to do with it from there.

2         Q.   Did any subcommittee members have

3    involvement in the development of that initial

4    staff map?

5         A.   I think we may have spoken to some of

6    them.  I don't recall.  It would have been broad

7    strokes.  You know, it would have been like -- it

8    wouldn't have been -- I don't believe they sat in

9    the map room like they did subsequently.  I could

10   be wrong.  I may be mistaken, but I don't recall

11   that.

12        Q.   And those conversations with any

13   subcommittee members would have happened

14   informally, not because they came together in a

15   meeting of the subcommittee?

16        A.   That's right.  It would have been

17   informally.

18        Q.   And were there any involvement from

19   House staff members in the development of this

20   initial Staff Plan?

21        A.   General trend setting, ma'am, because

22   they gave me a separate thing, a separate one sheet

23   paper map that's similar.

24        Q.   Outside of the people that you

25   identify, Mr. Roberts, Mr. Terreni, yourself, and

Page 249

1    to, I guess, a lesser extent Mr. Breeden, is there

2    anyone else who was involved in the initial Staff

3    Plan development?

4         A.   I'm not sure there was some discussion

5    with members.  I don't recall specifics.  I don't

6    remember if at that point we already knew that Luke

7    Rankin, for example, didn't want the 7th changed at

8    all.  I think we probably knew that.  I can't

9    recall.  It would have been broad strokes like

10   that.

11        Campsen may have mentioned, you know,

12   talked to congressman in Charleston and keeping the

13   blue -- I'm sorry, the red nature, slight Trump

14   advantage.  He may have mentioned that to us.  I

15   don't remember that far back.

16        Q.   How did public input from the ten

17   hearings that you attended, how was it reflected or

18   implemented in that initial Staff Plan?

19        A.   Well, I mean, I think we took some of

20   it into account.  I mean, I don't remember exactly.

21   I do not remember specific outside input prior to

22   the staff map being put into the staff map, but the

23   general sense we got from the public and all that,

24   I think that was all to be refined by the members

25   based on what weight they had, what weight they put

Page 253

```
 1    recollection -- I guess we'd call this an eyeball

 2    test -- I don't remember it being possible.

 3          Q.    And do you think you can make a

 4    determination about whether there can be a majority

 5    black district based upon an eyeball view?

 6          A.    Well, I mean, looking at it, looking at

 7    the map and where the population was, I just don't

 8    think we thought -- and this is in Section 2 House

 9    so it would be much more in Charlie's wheelhouse,

10    but I don't think -- and also no one ever came to

11    us and asked us to do one either, so I think those

12    are the factors that kind of led us down that path.

13    I don't recall anybody ever asking us to do that.

14          Q.    But you are not aware of anyone

15    affirmatively attempting to draw an additional

16    majority black district?

17          A.    No.   I don't recall ever doing that,

18    no.

19          Q.    Was the political data, the 2020

20    presidential election data considered during the

21    development of this initial Staff Plan?

22          A.    I believe so, yes.

23          Q.    Was a racially polarized voting

24    analysis conducted during consideration of this

25    initial Staff Plan?
```

1              MR. TYSON:  Objection; asked and

2    answered numerous times.

3              THE WITNESS:  No.  Not to my knowledge,

4    no.

5    BY MS. ADEN:

6         Q.   Who would have been responsible for

7    making the assessment that the initial Staff Plan

8    was not a racial gerrymander?

9         A.   We would have relied upon Charlie

10   Terreni and John Gore.

11        Q.   What about whether the districts were

12   contiguous?  Who would have made that assessment in

13   the initial Staff Plan?

14        A.   It would have probably been -- Will

15   drew the map so he could see whether things were

16   produced or not.  So we all looked at the map, but

17   he was actually drawing a map so that's pretty much

18   a no brainer to draw a map that's contiguous.

19        Q.   And what about communities of interest?

20   Who would have taken responsibility to ensure that

21   those kind of guideline criteria respecting

22   communities of interest was respected, reflected in

23   the initial Staff Plan?

24        A.   I think it would have been a kind of

25   everybody in the room discussion.

Page 258

1    in any district.

2         Q.   Did you have a goal of getting BVAP in

3    any particular district outside of CD6?

4         A.   No.  We didn't have a goal in CD6 per

5    se.  There was no goal to sort of say get CD6 BVAP

6    on any district.

7         Q.   But there was a goal to keep the map as

8    minimally changed at least as Senator Rankin --

9         A.   Correct.  Yes, ma'am.

10         Q.   Turning to November 29th, after the

11    Senate Redistricting Committee published the map,

12    what, if anything, did you do on congressional

13    redistricting from November 23rd until the 29th

14    when it was published?

15         A.   You know, I don't recall exactly what

16    was going on at that point.  That would have been

17    around Thanksgiving?

18         Q.   Around that time, yes.

19         A.   Then probably not too much because that

20    week was probably shut down or at least not very

21    active because it was Thanksgiving.

22         Q.   For the November 29th hearing, did you

23    prepare any materials?

24         A.   I did not that I recall.

25         Q.   Were those materials similar to the

Page 280

```
 1          A.    I mean, other than looking at them
 2     online, I don't recall what he may have done now
 3     with the maps.
 4          Q.    Who was responsible for evaluating the
 5     seven or so public maps?
 6          A.    I mean, I guess we assumed they were
 7     going to stand on their own merit.  Now, if a
 8     member asked to do amendments, that more work would
 9     be done on them, but that didn't happen until the
10     very last minute when I made that phone call to you
11     about Senator Hutto the day before the floor when
12     he said, hey, I want these maps to be amendments.
13          Q.    And we didn't talk in response to your
14     outreach to me; is that correct?
15          A.    That's correct.  I left you a voice
16     mail.  I did leave you a voice mail.
17          Q.    But you and I did not connect on that?
18          A.    We did not, no.  And just to finish
19     that answer, I made similar phone calls to other
20     people that submitted their maps that say, hey, do
21     I do have your maps.  Do you have talking points?
22     If anyone wants to present your map, you need -- to
23     have a chance, you probably need to get something
24     so you can say what you want to say about your map.
25          Q.    For instance, Senator Harpootlian
```

Page 281

1    introduced maps by the league.  And is that what

2    you mean?  Was that an occasion where you had

3    outreach?

4              A.    Yeah.   That would have been the two

5    days -- the days before the maps were on the floor

6    were when we filed and got requests for amendments

7    using your map basically.

8              Q.    Sorry?

9              A.    And I believe there's testimony about

10   those maps too.  So members had testimony.  The

11   members knew the maps were there.  We didn't get

12   any requests about them until Senator Hutto asked

13   about them that I can recall until Senator Hutto

14   asked about them maybe two days before the hearing.

15             Q.    But the maps that the public proposed

16   did not inform the work that the staff was doing

17   except to the extent that a member of the

18   legislature expressed an interest in them and then

19   you paid attention to them or how did you consider

20   the seven proposed maps from the public in the

21   review process?

22             A.    I think some of those other maps may

23   have been formed when Margie Bright Matthews or

24   Senator Sabb asked questions off of them, but I

25   don't recall specifically sitting down and saying,

Page 282

1    well -- or any of us sitting down and saying we've

2    got these seven public maps independent of

3    direction from a member wherein you'd sit down and,

4    you know, draw and analyze the maps or use them in

5    that way.

6              And some of them had problems with them

7    too.  Some of them were just -- I mean, Will ran

8    the numbers.  Realized I don't know that all of

9    them were maps that we -- the initial screening

10   process -- there were some initial -- I'm recalling

11   better now -- there were some initial, you know,

12   like, for example, is this with English?  There's

13   usually just something more you do in Maptitude.

14   You can't just look at it, so...

15        Q.   Was that done for each of the seven

16   maps, the initial screening?

17        A.   I think he did do that.  That

18   deviation, I think he did that.  I'm almost sure

19   because I remember when we reached out to some

20   people -- I can't remember which ones they were --

21   some people were just barely out of mediation.  We

22   could tell it was in error.  You know, we didn't

23   want to reject the map.  I don't remember which one

24   it was.  There was at least one or two where they

25   were, you know, within fix ability as it were that

Page 283

1    we did not want them to not have maps that they
2    couldn't propose.
3         Q.   But who made that -- I'm sorry.  I
4    missed the name of the person who made that
5    deviation analysis.
6         A.   I believe that's just something Will
7    popped up in Maptitude.
8         Q.   But he was not looking at assessing the
9    maps for anything outside of deviation that you're
10   aware of?
11        A.   Bare bones, deviation, and could this
12   map be even proposed?
13        Q.   And those were provided to members of
14   the subcommittee and made available to the public.
15   So then your position is that if one of the members
16   identified that one as something they wanted to
17   move forward with, that's how those maps will
18   become alive, but otherwise, your team was not
19   engaging with those public maps?
20        A.    Not to any great extent, no.  We did
21   print out similar bare bones analysis -- I wouldn't
22   say bare bones -- similar analysis to document for
23   Senator Campsen.  I think we did print out
24   documents -- and you should have them -- similar to
25   that for each of the submitted maps.

Page 284

1              So I think that analysis was

2    probably -- and actually now that I think about it,

3    that analysis may have been done by Grayson, the

4    other GIS operator.  Maybe he generated the reports

5    because -- I think that is the case now.  One of

6    the ways we wanted to make sure we had one person

7    drawing a map in the map room -- we didn't want to

8    have two GIS operators -- so we split the duties of

9    looking at the other maps for the bare bones,

10   statistics, and deviation.  I think we delegated

11   that, like I said, to Grayson.

12        Q.   And that bare bones assisting, was that

13   part of the information that was then given to

14   members alongside the maps?

15        A.   Yeah, I'm sure.  I'm pretty sure I

16   remember us having just the similar numbers like

17   that from the other maps in their reports when they

18   were presenting their maps.

19        Q.   Of the maps that were sent up to

20   Mr. Gore developed by Senate members, do you

21   recall -- and I don't want to know the nature of

22   your conversations -- but generally was it up and

23   thumbs up or thumbs down or was it back and forth

24   on any particular maps?

25              MR. TYSON:  Okay.  I'm going to object.

Page 292

1    of that nature.  I don't remember if this map is

2    that.

3              Q.   Okay.  I would like you to keep this to

4    the side or keep it available to you because we're

5    going to return to it very shortly.

6              MS. ADEN:  But in the interim, I wanted

7    to have Raymond pull a tab 31, which is Bates

8    stamped 3260 to 68.

9              (EXHIBIT 15, Email from Will Roberts to

10   Robert Joseph Oppermann dated January 18, 2022,

11   Bates labeled SCSENATE_00003260-00003265, was

12   marked for identification.)

13   BY MS. ADEN:

14             Q.   This is an email from Will Roberts to

15   Mr. Oppermann dated January 18.  And it has a

16   number of attachments, the House Plan Senate 2

17   Amendment, Core Constituencies, A Partisan

18   Analysis.

19             A.   I got it.

20             Q.   Okay.  Are you familiar with these

21   reports?

22             A.   I'm not personally familiar with them,

23   but I'm not surprised that Will was happy to, you

24   know, press a couple buttons and easily get the

25   information in this document.

Page 293

1          Q.   Did you see reports like these for

2     other maps that were prepared for the Senate's

3     consideration?

4          A.   I couldn't say exactly, but, yes, I

5     think they would have been -- yeah.  They certainly

6     were available.  I don't know that they were

7     printed out for all of them in every iteration of

8     their plans, you know.  But, yes, this information

9     certainly would have been available.

10         Q.   Okay.  During the January 13th hearing,

11    Mr. Oppermann -- do you recall that he provided an

12    analysis of the map that he had drawn with Senator

13    Harpootlian for an overview, a summary?

14         A.   I do remember him providing an

15    overview, a summary, yeah.  I have not gone back

16    and read the transcript.  I saw it, uh-huh.

17         Q.   Do you recall having any basis to

18    disagree with his representations about what the

19    map did or did not do?

20         A.   I didn't do an analysis of his maps.  I

21    took him at his word from what he said, but I have

22    no reason to believe one way or the other of my own

23    information.  He seemed like a nice fellow.

24         Q.   Would it be fair to say the overall

25    public supported Amendment 2 at the hearing where

Page 294

1    it was considered?

2          A.    The public in general, I don't know.  I

3    don't recall exactly -- I didn't count heads in the

4    audience so I don't recall specifically how many

5    supported it.

6              MS. ADEN:  Okay.  If we can look at

7    what is tab 30, Raymond.

8    BY MS. ADEN:

9          Q.    And this is Bates stamped 3269 to 3277.

10   This is an email cover from Mr. Oppermann to you,

11   Mr. Fiffick, dated January 17th, 2022.  It has an

12   attachment entitled Written testimony offered to

13   the Senate Redistricting Subcommittee.

14             MR. TYSON:  Hey, Leah, can you cite the

15   Bates numbers again so we can try to find it?

16             MS. ADEN:  Yes.  3269 to 3277.

17             Raymond, it's tab 30 for us.

18             MR. AUDAIN:  That should be up.

19             MS. ADEN:  Okay.

20             THE WITNESS:  It's 3269 at the bottom?

21   BY MS. ADEN:

22         Q.    Yes.

23         A.    Okay.  Yep.

24             (EXHIBIT 16, Email to Andy Fiffick from

25   Robert Joseph Oppermann dated January 17, 2022,

1    Bates labeled SCSENATE_00003269-00003277, was

2    marked for identification.)

3    BY MS. ADEN:

4         Q.   Okay.  Have you seen this document

5    before?

6         A.   I'm sure I've seen it if it was sent to

7    me.

8         Q.   Does it reflect that Mr. Oppermann is

9    comparing the Campsen Plan to the Harpootlian Plan?

10         A.   It does look to be a comparison, yes,

11    ma'am.

12         Q.   And is it fair to say that this

13    document walks through each of the criteria

14    identified in the Senate's guidelines that we

15    talked about at length earlier in the day in

16    comparison of his view of how the Campsen Plan as

17    compared to the Oppermann Plan complies with those

18    criteria?

19         A.   It appears to be from looking at it,

20    yeah.

21         Q.   Did you assess those comparisons?

22         A.   I'm sure I read most of this, but I did

23    not do an analysis to further compare it.  It was

24    presented and available to the members and I didn't

25    feel the need to go back and -- no, I didn't do any