*SC NAACP v. Alexander,*
D.S.C. Case No. 3:21-cv-03302-MGL-TJH-RMG

# Exhibit 16

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

THE SOUTH CAROLINA STATE
CONFERENCE OF THE NAACP,
et al.,

    Plaintiffs,

vs.            CASE NO.: 3:21-CV-03302-MBS-TJH-RMG

THOMAS C. ALEXANDER,
et al.,

    Defendants.

---

| | |
|---|---|
| VIDEOTAPED DEPOSITION OF: | (Appearance via Video Conference) PAULA BENSON |
| DATE: | July 13, 2022 |
| TIME: | 10:04 a.m. |
| LOCATION: | Robinson Gray |
| | 1310 Gadsden Street |
| | Columbia, South Carolina |
| TAKEN BY: | Counsel for the Plaintiffs |
| REPORTED BY: | Mary K. Stepp, Court Reporter |
| | (Appearance via Video Conference) |

Page 97

1              BERNSTEIN
2         Do you see that?
3         A.   I do, subsection or Roman
4    numeral VII.
5         Q.   It lists a variety of
6    factors that may contribute to a
7    community of interest.  One of them,
8    for example, being voting behavior
9    or C?
10         Do you see that?
11         A.   I do.
12         Q.   What does that mean?
13         MR. MOORE:  Objection as to
14     form.
15         Q.   What does voting behavior
16    mean?
17         A.   In reading this I mean it
18    could be whether or not the
19    community is involved in the voting
20    process, the percentage of voting
21    age population that actually goes to
22    the polls and votes is how I would
23    interpret it.  I guess you could
24    even go further and say whether or
25    not in the primary because we don't

1     Q.    Did the binders, would they include BVAP
2     information?
3     A.    Only if that was part of what was printed
4     out from the Maptitude program software.
5     Q.    When you say, "only if that was part of
6     what was printed out of the Maptitude software," I
7     guess was it ever part -- my question to you is that,
8     was it ever part of what was printed out of the
9     Maptitude software?
10    A.    I -- I believe that there were times that
11    that information was included.  As I understood,
12    Maptitude had a certain set information that was
13    printed out on a -- on each particular plan.  And
14    once that there were plans for consideration, those
15    Maptitude pages were also run, which had that
16    information on it.
17    Q.    Uhm, do you know what kind of BVAP
18    breakdown Maptitude printed out?  Was it, for
19    example, district by district BVAP analysis?
20    A.    I -- I do not remember with certainty.
21    If -- if -- it seems as if -- honestly, I -- I would
22    have to look at documentation.  I -- I don't remember
23    with certainty.  I -- it seems as if it were district
24    by district, but I -- I'm -- I'm -- I'm making a
25    guess at that.

1        A.      Yes.
2        Q.      So what is this document?
3        A.      These are the 2021 Redistricting
4    Guidelines that were adopted by the Senate Judiciary
5    Committee Subcommittee on redistricting to be the
6    guidelines to be used in drawing maps and evaluating
7    proposals.
8        Q.      Thank you.  And what -- what was
9    the -- what was the point of the guidelines?
10       A.      That -- to acknowledge the legal
11   requirements and also to look to requirements
12   that -- or -- or if not necessarily requirements to
13   other factors that the courts have established that
14   may be considered in the redistricting process.
15       Q.      Is it only legal requirements or -- or do
16   they contain requirements that the legislature might
17   also consider important?
18       A.      Yes, both.
19       Q.      And -- and why -- why does the
20   subcommittee adopt a document like this?
21       A.      This -- this has been the tradition in
22   each of the cycles of redistricting that I -- I have
23   been involved in.  As -- in essence, the guidelines
24   that the subcommittee will follow in order to be able
25   to evaluate and to propose plans for consideration.

Page 123

1     guidelines were adopted.
2          Q.   Thanks.  Did -- did the final guidelines
3     also include input from members of the public?
4          A.   The guidelines were not adopted until
5     after all of the public hearings were held.  During
6     those public hearings, we have documents that were
7     disseminated to the public and -- and we encouraged
8     the public to give us information on the items that
9     they considered very important to include in the
10    guidelines.
11         Q.   And did you get any such information?
12         A.   We did.  Yes.
13         Q.   How so?
14         A.   Very -- very often there were many people
15    who were urging that counties be kept whole to the
16    extent possible.  There were many who were
17    recommending that precincts or VTDs not be flipped.
18              We received a lot of information about
19    particular communities of interest and how people
20    defined communities of interest.  And what things
21    that they looked at and what made a community of
22    interest.  And all of that was definitely considered.
23         Q.   And how did the guidelines impact the work
24    of staff in the redistricting process, once they were
25    adopted?

Page 157

1       compelling state interest."
2            Q.   So, what did you understand "consideration
3       of race is permissible" to mean?
4            A.   That we could take into consideration
5       information that we had received from -- through the
6       testimony concerning where racial communities
7       existed, where there were issues that a racial
8       community would have in common, and to consider that
9       that -- that group needed to, to the extent possible,
10      be kept together in order to have the most effective
11      representation.
12           Q.   Based on -- in your experience and
13      knowledge, what are ways to determine that a map is a
14      result of racial gerrymandering?
15           A.   I -- I think very often in the past,
16      and -- and I think Shaw versus Reno was an example of
17      it.  Shape certainly comes into consideration, oddly
18      shaped districts.  Districts where municipalities
19      and -- and counties are split in -- in ways where
20      communities are split would -- would certainly
21      indicate a possibility of a gerrymandered situation.
22      Those I -- I would think, primarily.
23           Q.   And what steps do you take to ensure that
24      the maps you're drawing don't improperly consider
25      race?

Page 158

1          BERNSTEIN
2     I just don't know when that was
3     scheduled but I do know that we
4     after the 16th, December 16th
5     meeting we were going to meet again
6     before we would go back into
7     session, which would be the second
8     Tuesday in the month.
9          Q.    So if I represent --
10         A.    Would be the third Tuesday,
11    I'm getting all confused.
12         Q.    If I represented to you
13    that this hearing was on
14    December 29th, do you have any
15    reason to doubt that?
16         A.    That sounds --
17              MR. MOORE:  Objection as to
18     form.
19         A.    That sounds correct.  If
20    you could give me a date where you
21    -- I just don't know when it was
22    scheduled, if it was scheduled at
23    the December 16th meeting or after
24    this letter was released to the
25    public.

Page 159

1  BERNSTEIN
2    Q.  You mentioned that this was
3  -- you had vacation at this time
4  with Christmas; is that correct?
5    A.  Correct.
6    Q.  Was it difficult for you to
7  make time to attend this hearing?
8    A.  No.  I had plans to be
9  back, I think we traveled on
10 Christmas Day.  I'm Jewish so it
11 makes it easier with the Christmas
12 holiday.  In that respect.  So for
13 some reason I wanted to say it was
14 actually Christmas Day, could have
15 been the 26th that we were coming
16 back.
17      So I would have been in town
18 -- I'll tell you my office, law
19 office is located across from the --
20 across the street from the State
21 House.  But it's not as inconvenient
22 for me to attend meetings especially
23 in Columbia on short notice than it
24 would other members of the committee
25 or other members of the legislature.

1      effective in representing the people in that area.
2      And that met with the population requirements to be
3      within one person in each of the districts, so
4      that -- that they complied with population.
5           Q.    So, to recap and to be clear, subcommittee
6      staff did not set out to make sure that CD 1 was more
7      Republican leaning than it was in the benchmark plan?
8           A.    Not -- not that I'm aware of, no.
9           Q.    What about -- which might be 6 in 1, half
10     dozen of the other.  Did staff set out to make sure
11     that the map, as a whole, maintained 6 to 1
12     Republican advantage?
13          A.    Staff looked at how each of the
14     submissions had come in.  And, again, taking a
15     totality of the sectors and the guidelines, as well
16     as looking at how the districts could be best
17     configured for effective representation.  And that
18     was how a plan was arrived at.
19                But, ultimately, when the plan was
20     reported out of the subcommittee, it had to be agreed
21     upon by the subcommittee members.  There --
22     therefore, it -- it had to have a legislative
23     imprimatur.
24                And so all of those were factors in coming
25     up with the plan that got reported out of

Page 206

1     subcommittee to the full committee, and ultimately to
2     the Senate floor.
3         Q.   Of course.  And I understand that point.
4     My question was more -- goes more to whether it was
5     staff objective to draft a map that preserved a 6 to
6     1 Republican advantage?
7         A.   No.
8         Q.   I just have a few more questions.  These
9     are about the House's process.  Were -- in -- in
10    December of last year, were you aware that the
11    House's ad hoc committee was working on its first
12    staff plan?
13        A.   I -- I was not familiar with their
14    process, no.
15        Q.   Do you know when ad hoc committee in the
16    House released its first Staff plan?
17        A.   I -- I do not remember, off the top of my
18    head, no.
19        Q.   Did you review the House's staff plan?
20        A.   Honestly, I -- I work with staff on the
21    Senate plan.  I don't really remember an analysis of
22    the House plan.
23        Q.   You -- when you say you don't remember an
24    analysis of the House plan, do you recall if
25    subcommittee staff reviewed the draft plan?