*SC NAACP v. Alexander,*
D.S.C. Case No. 3:21-cv-03302-MGL-TJH-RMG

# Exhibit 22

Page 1

1                UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF SOUTH CAROLINA

3                      COLUMBIA DIVISION

4   - - - - - - - - - - - - - - - - +

5   THE SOUTH CAROLINA STATE CONFERENCE

6   OF THE NAACP, et al.

7             Plaintiffs                Case No.

8   V.                                  3:21-CV-03302-JMC-

9   THOMAS C. ALEXANDER  et al.         TJH-RMG

10            Defendants

11  - - - - - - - - - - - - - - - - +

12

13      VIDEOCONFERENCE DEPOSITION OF WALLACE H. JORDAN

14                  Columbia, South Carolina

15                 Wednesday, April 13, 2022

16                        10:03 a.m.

17

18

19

20

21  Reported by:  Danielle E. Lawrence

Page 41

1  that racially polarized voting mattered to your work on
2  the Redistricting Committee?
3  A.      I would also point you back again to the public
4  hearings across the state, and we heard testimony from
5  individuals, I believe, from different groups, including
6  the NAACP, that spoke up on that particular concern and
7  we listened and -- or at least I listened -- and took
8  heed that we needed to -- going back to my overarching
9  idea -- we needed to hear from everyone and take into
10 consideration what we were told.
11 Q.      Based on that testimony, do you recall any
12 requests to conduct a racially polarized voting analysis
13 from members of the public?
14 A.      I don't recall, but that doesn't mean that it
15 didn't happen.  I just don't recall.  Again, that was --
16 sometime back, now, it definitely factored into the
17 process, but it was some time back, and it was over ten
18 different stops across the entire state of South
19 Carolina.
20 Q.      And my last line of questions about your
21 employment that is liking taking you from what you would

Page 225

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

THE SOUTH CAROLINA STATE CONFERENCE OF
THE NAACP, et al.,

       Plaintiffs,

vs.               CASE NO. 3:21-cv-03302-MBS
                       TJH-RMG

THOMAS C. ALEXANDER, et al.,

       Defendant.

VTC
DEPOSITION OF:   WALLACE HERBERT JORDAN, JR.
                VOLUME II - Pages 225 through 444
                (Appearing by VTC)

DATE:           July 21, 2022

TIME:           10:03 a.m.

LOCATION:      Nexsen Pruet Law Firm
                1230 Main Street, 7th Floor

TAKEN BY:      Counsel for the Plaintiffs

REPORTED BY:   Susan M. Valsecchi, CRR
                Registered Professional Reporter
                (Appearing by VTC)

Page 279

1  highly correlated?
2       A.   When you say highly correlated, do you
3  mean in number, or in -- if you don't mind, further
4  explain that question.
5       Q.   In numbers, to the extent you know.
6       A.   Um, any number I would give you would
7  be a pure guess.  I would imagine it would connect
8  to where you are in the state and other points of
9  data as well.
10      Q.   Do other legislators hold a similar
11 view that race and party are correlated in South
12 Carolina?
13      A.   You mean to the degree I -- I can't
14 really speak for what every other legislator would
15 think.  I mean, it's a pretty well-known documented
16 concept.  To that degree, yes.
17      Q.   For congressional redistricting, did
18 you at all prioritize maximizing partisanship
19 considerations in the drawing or creation of any
20 maps?
21      A.   No.
22      Q.   Do you think that there's a risk of, if
23 you're maximizing partisanship considerations, that
24 it might inadvertently disproportionately impact
25 black voters in South Carolina?

Page 280

1    A.    I think that's a natural risk to every
2  person in South Carolina, not necessarily
3  disproportionate to any one group of people, but to
4  everyone.
5        Q.    Why didn't you consider maximizing
6  partisanship a criteria for redistricting?
7        A.    I don't think we considered maximizing
8  partisanship as a criteria.
9        Q.    Sorry, I was asking why didn't you
10 consider that.
11       A.    Oh, why didn't?
12             You know, we adopted a set of criteria
13 that is, in my mind, the tried-and-true criteria
14 for not just South Carolina redistricting this
15 time, but in the past as well.
16             And I believe -- again, I'm not an
17 expert on this -- but I believe that there's value
18 in that, both in legal precedence and in the way
19 we've done it correctly in the past.
20       Q.    Would you have any concerns if you
21 found out that the Senate's map prioritized
22 partisanship over other redistricting criteria?
23       A.    I would hope and assume that the Senate
24 used, as we did, an appropriate path and process to
25 arrive at the product they came up with.  As to

1    questions:  Why is it important to publish criteria
2    like this for members of the public?
3            A.   I think it sets out, you know, how we
4    go about completing the process of redistricting so
5    that the public understands there is in fact a
6    process and the variables that we look at in
7    completing that process.
8            Q.   What are the transparency benefits to
9    having a set of criteria that, as attested to,
10   guides the work of the Ad Hoc Committee when
11   they're creating or assessing maps?
12           A.   Well, I mean, there are many benefits
13   to transparency and just off -- in this respect, I
14   mean, we had many, many public hearings where the
15   public was given the opportunity to come in and
16   give their opinion as to this process.
17                And so providing them, you know, this
18   information I think is -- was helpful in them
19   participating in that process.
20           Q.   Is it helpful to provide this criteria
21   for people who want to draw maps or submit maps?
22           A.   Yes, I would think so.
23           Q.   And then if a map did not comply with
24   the criteria, what would your position be, if it
25   failed to meet -- to meet some of the core top four

1    that flew in the face of the previously established
2    criteria made available to the public, that
3    wouldn't be appropriate in my mind.
4         Q.   What if there was criteria that was
5    developed and not known to members of the public
6    that impacted the ability to draw certain districts
7    from being touched?
8              And I can be more specific on that one.
9    I just realized that might not be helpful.
10             If there was a criteria, for example,
11   that was being relied upon to not touch
12   Congressional District 5 but only the body
13   responsible for the maps knew that and didn't
14   disclose it to members of the public, would that be
15   a concern for you as an elected official?
16        A.   Yes.
17        Q.   Would it also be a concern if that
18   wasn't even shared with other elected officials in
19   the same body?
20        A.   Well, when you say to not touch a
21   particular district, you know, I think as part of
22   the process of redistricting you have to be able to
23   consider wherever the road of the criteria takes
24   you.
25             But I guess, in connection to -- or in

1     little bit before.  This was the one that the
2     Senate staff plan served as the basis of, but I'm
3     not sure if you want to go -- maybe we can go off
4     record for a moment, actually.
5              (A brief recess was held.)
6     BY MR. CUSICK:
7         Q.   So Chair Jordan, just before we went
8     off for break, I mentioned I wanted to talk about
9     the House Staff Plan Alternative 1 which was
10    created after the December 16th hearing.
11             Do you recall that map?
12        A.   Yes.
13             (EXHIBIT 12, Congressional House Staff
14             Plan Alternative 1, was marked for
15             identification.)
16    BY MR. CUSICK:
17        Q.   And I will bring it up in just one
18    moment.  This should be Tab 5 of your binder.  This
19    will be Plaintiff's Exhibit 12.  It's the
20    Congressional House Staff Plan Alternative 1 which
21    was posted officially on the redistricting
22    committee's website December 23rd, 2021.  And I
23    will pull it up on the screen too.
24             And, Chair Jordan, if I refer to it as,
25    like, Alternative 1, or the alternative plan, you

Page 356

1  will understand what I'm referring to?
2       A.    Yes.
3       Q.    Can you see it okay now?
4       A.    Yes, that's much better than the
5  hardcopy.
6       Q.    Yeah, and so could you walk me through
7  who was involved in the creation of this map?
8       A.    So it's the same people essentially
9  that were involved in creating the first staff
10 plan.
11            I think I referenced earlier, as a
12 result of once we produced the original staff plan,
13 we received a fair amount of criticism, especially
14 from the folks in the Beaufort area, and I think
15 that necessitated, as much as anything, to create
16 an alternative that you see here that was at least
17 something else for the committee, something
18 different for the Ad Hoc Committee to consider.
19            You know, at this point when it was
20 rolled out, it certainly wasn't necessarily what we
21 were going to adopt, but it was certainly something
22 we could look at and consider.
23      Q.    So just so I have everybody in my mind
24 of who was involved, it's Mr. Dennis, Mr. Hauger,
25 and you?

Page 357

1        A.   Yes, for purposes of creation it went
2   through a similar plan.  I'm guessing that other
3   members of the team, so to speak, you know, would
4   have seen it, reviewed it, perhaps; but, again,
5   this is, as you see here, very much akin to the
6   Senate's plan.
7        Q.   And so I can't remember, have you
8   reviewed Mr. Hauger's deposition transcript in this
9   case?
10       A.   I looked at it, yes.
11       Q.   Do you recall his testimony saying that
12  this map was created in a single session, in the
13  map room?
14       A.   I don't.  I don't.  I don't recall
15  that.
16       Q.   Okay.
17       A.   I mean, I'm not saying that didn't
18  happen.  I take your word for that, that that's his
19  testimony.
20       Q.   I don't want to, you know, take
21  anything for granted.  I guess I can ask this
22  question:  Were you involved with Mr. Hauger in
23  drawing this map in the map room?
24       A.   I think I did come in the map room for
25  a little bit during the creation of this; you know,

Page 358

1    my thoughts on this, as I talked to Mr. Dennis and
2    Mr. Hauger, were, again, we needed an alternative
3    option for the committee to consider, having
4    received the input that we had received, could we
5    not take the Senate version, and, working off of
6    it, create an alternative that perhaps was more in
7    line with it and therefore providing the Ad Hoc
8    Committee sort of a spectrum to consider.
9         Q.   And so you made that suggestion, or
10   ask, to Mr. Dennis at some point after the December
11   16th hearing?
12        A.   Correct.
13        Q.   Did you at all seek any recommendations
14   or input from any other Ad Hoc Committee members
15   before your conversation with Mr. Dennis?
16        A.   I don't recall if I did or not.
17        Q.   And then the mechanics behind it are,
18   at some point, you're in the map room; is that
19   right?
20        A.   Yes.
21        Q.   And Mr. Hauger is there?
22        A.   Yes, he would have been there, yes.
23        Q.   Ms. Dean?
24        A.   Um, Ms. Dean could have been in and out
25   of the room, yes.

1        Q.   Mr. Dennis?
2        A.   Definitely.
3        Q.   Anyone else outside of those three
4   individuals and you?
5        A.   At that time, I don't think so.
6   Mr. Hauger may have had one or two of his
7   assistants in the room.  I can't remember for
8   certain.
9        Q.   And so either you or Mr. Dennis asked
10  Mr. Hauger to pull up the Senate map?
11       A.   Correct.  I think they were already
12  into that process when I showed up.
13       Q.   So Mr. Dennis and Mr. Hauger were
14  working on the map before you got there?
15       A.   I believe that's correct.
16       Q.   And so was the map created in one
17  sitting?
18       A.   Honestly, I don't remember a hundred
19  percent.  It's definitely possible that that's the
20  case.  Again, since we were working off of the
21  Senate plan essentially, that's definitely
22  possible.
23       Q.   And so you go to the map room, you
24  make -- this map makes changes to the Senate ones,
25  correct?

Page 375

1  therefore, you know, not be something that South
2  Carolinians as a whole can be proud of.
3         Q.    And in order to ensure a map is not
4  racially biased, who did you rely on to make that
5  determination?
6         A.    I mean, again, I think you bring your
7  own set of knowledge and understanding to the table
8  and then you rely on other members of your team,
9  members of the Ad Hoc Committee.  I mean, you know,
10 everyone's participation in this process is
11 important.
12        Q.    I know we talked earlier about partisan
13 considerations.  Was maintaining a 6:1 Republican
14 advantage in congress at all a criteria factor for
15 the Ad Hoc Committee in creation of this map?
16        A.    No.
17        Q.    What about the term "core retention"?
18        A.    I would put core retention, you know,
19 with some of the other technical terminology we've
20 used today; I have a layman's opinion of it but I'm
21 not a technical expert.
22        Q.    Is the term core retention mentioned at
23 all in the redistricting criteria?
24        A.    I don't believe so.
25        Q.    I think you mentioned Ms. Dean would

```
                                              Page 404
 1              A.   Yes.
 2                   MR. CUSICK:  And so I will pull that
 3              up.  This is Tab 3.  It will be Plaintiff's
 4              Exhibit 16.  It's a transcribed copy of the
 5              January 12th, 2022 House floor debate that
 6              was created by a court reporter.
 7                   (EXHIBIT 16, Video transcription of
 8              January 12, 2022 House proceedings, was
 9              marked for identification.)
10         BY MR. CUSICK:
11              Q.   Can you see that okay, Chair Jordan?
12              A.   Yes.
13              Q.   I'm going to go to Page 15.  I guess
14         it's probably easier just to confirm for a moment
15         just to show that where you're -- where your
16         remarks begin.
17                   And so do you see here, just on Page 6,
18         Representative Jordan, that your remarks begin?
19              A.   Yes.
20              Q.   And then again there's a break but they
21         pick back up on Page 7.  So I'm scrolling to Page
22         15.  And do you see that portion I just highlighted
23         for Lines 1 through 7?
24              A.   Yes.
25              Q.   And we've already talked about
```

Page 405

1  maintaining county boundaries when possible was not
2  explicitly included in the criteria, correct?
3       A.   That's -- that's correct.
4       Q.   And there's nothing in the criteria
5  explicitly that smaller counties should be
6  maintained when possible?
7       A.   Also correct.
8       Q.   And so why didn't you mention any of
9  these considerations when you were presenting the
10 map on December 29th to the public?
11      A.   I don't know, I didn't -- I don't have
12 a reason why I particularly left it out.  As I look
13 at -- you know, so at this stage, this is laying
14 out the plan now before the full House of
15 Representatives.  And the hope is, you know, that
16 the majority of the members of the House will adopt
17 the plan, or vote for the plan.
18           I can tell you my opinion is this is
19 information that I think, while it might not be
20 expressly part of the criteria, is information that
21 I think a majority of members would believe to
22 be -- add value to the plan.
23      Q.   Would it at all come as a surprise if
24 the transcript showed this was the first time you
25 explicitly mentioned these considerations during

1  trying to answer the question to the best of my
2  ability.  And I guess I carried some of my previous
3  knowledge through the committee process,
4  specifically with Representative Bernstein's
5  questions, that I gave that answer.
6          Q.   But I guess, as even just a step back,
7  why was it important for you to emphasize that
8  partisan groups were not involved in the drafting?
9          A.   I guess because the question had come
10 up a couple times and therefore I felt like it
11 was -- needed to be part of the answer.
12         Q.   And why do you think it was beneficial
13 to not have partisan groups involved in the
14 drafting of the plan?
15         A.   To me, it's always made more sense, you
16 know, as members of the General Assembly, we are
17 tasked with the responsibility of completing
18 redistricting.
19              Now, certainly we'll take input, as we
20 did in this process, through various organizations,
21 but ultimately the responsibility falls to the
22 General Assembly.
23              And it's not a partisan task; it's
24 a statewide process, that we didn't necessarily
25 need any help from a partisan group.

Page 437

1    litigation?
2         A.   I had not heard of that organization
3    until this litigation.
4         Q.   So you had not heard of -- you did not
5    learn of that organization during the process
6    itself but rather during the litigation brought by
7    NAACP and Taiwan Scott, correct?
8         A.   That's correct.
9         Q.   I believe there's a text message that
10   you produced from Sylleste Davis that references
11   Gary Simrill.
12            Did Gary Simrill have anything to do
13   with the congressional redistricting plan, or was
14   that text in reference to the House redistricting?
15        A.   I believe that text was in reference to
16   the House redistricting.  I base that on the
17   timeline and my recollection.
18        Q.   Okay.  We talked about how the public
19   input is actually part of the criteria.  Was there
20   any hidden criteria or guidelines?
21        A.   No.
22        Q.   Did you make any effort to withhold any
23   information from the public?
24        A.   No.
25        Q.   You referenced today that you had a