*SC NAACP v. Alexander,*
D.S.C. Case No. 3:21-cv-03302-MGL-TJH-RMG

# Exhibit 23

Page 1

```
             UNITED STATES DISTRICT COURT
              DISTRICT OF SOUTH CAROLINA
                   COLUMBIA DIVISION
   THE SOUTH CAROLINA
   STATE CONFERENCE OF
   THE NAACP, et al,
              Plaintiffs,
         vs.                CASE NO.
                            3:21-CV-03302-MBS-TJH-RMG
   THOMAS C. ALEXANDER,
   et al,

              Defendants.


   VIDEOCONFERENCE
   DEPOSITION OF:   WILLIAM ROBERTS
   DATE:            July 7, 2022
   TIME:            9:35 a.m.
   LOCATION:        1310 Gadsden Street
                    Mahogany Conference Room
                    Columbia, SC
   TAKEN BY:        Counsel for the Plaintiffs
   REPORTED BY:     ERIC GLAZIER, Court Reporter
```

1  of any maps that you drew?
2        A.   To figure out if the maps that we were
3  drawing complied with this, that was something the
4  attorneys would have looked at, not myself.
5        Q.   Got it.
6             Did you create or rely on any
7  additional documents to supplement this criteria?
8        A.   Not that I can recall.
9        Q.   Were you given any other documents
10 related to redistricting criteria?
11       A.   I believe that there was a letter
12 submitted by Senator Harpootlian at one point.
13 That was probably the only other document that I
14 recall that revolved around the guidelines.
15       Q.   Did you receive any other instructions
16 about criteria that you should focus on when
17 drawing maps?
18       A.   Yes, for the congressional districts,
19 we did.
20       Q.   And what were those instructions?
21       A.   The instructions were, don't touch the
22 seventh congressional district, Congressman Clyburn
23 wanted a minimal-change plan, and Congressman Joe
24 Wilson didn't want to go to Beaufort; he wanted to
25 keep Fort Jackson.

Page 119

1  boundaries is there, as well as minimizing
2  divisions of voting precinct boundaries.
3       Q.   But you'd agree that ease of election
4  administration is not something that is within
5  these guidelines?
6            DEFENSE COUNSEL:  Objection.
7  Mischaracterizes testimony.
8       A.   When you minimize divisions of county
9  boundaries and you minimize divisions of voting
10 precincts, you in fact make the election
11 administration easier.
12      Q.   How would somebody from a member of the
13 public know that in reading these three criteria?
14      A.   If they worked in elections, they would
15 understand that.
16      Q.   So only people who worked in elections
17 would understand that point?
18      A.   Not necessarily, but they would get the
19 gist of how this plays into the ease of election
20 administration.
21      Q.   Did you at all disclose in any of your
22 testimony to the public that ease of election
23 administration was a consideration?
24      A.   Not that I can recall.
25      Q.   For district compactness, in F, who was

Page 123

1        A.    Yes, that's correct.
2        Q.    Were there any other sources of
3   demographic information that you had access to
4   outside of BVAP?
5        A.    We had the entire PL 94-171 database
6   loaded into the mapping system.  So in addition to
7   BVAP.  We had numerous other racial categories as
8   well as ethnicity data.
9              MR. CUSICK:  I'm now going to mark as
10  Plaintiff's Exhibit 6, this is in Tab 19.  It's a
11  text message between Mr. Fiffick and Mr. Dalton
12  Oldham.  It has a Bates stamp numbering beginning
13  with South Carolina Senate page number ending at
14  4343.  I believe this will be Plaintiff's
15  Exhibit 6.  Just give me a moment, and I'll upload
16  it into Exhibit Share and then pull it up on the
17  screen.
18             (PLF. EXHIBIT 6, FIFFICK - OLDHAM TEXT
19  MESSAGES, was marked for identification.)
20  BY MR. CUSICK:
21       Q.    I'm only going to focus on the first
22  page.  I believe all the rest of the documents have
23  been redacted as not responsive, just so -- to ease
24  the reference here.
25             Do you see the first page ending in

Page 130

1  minority candidate of choice.
2       Q.  And do you have any understanding on
3  whether an RPV analysis is helpful for that
4  determination?
5       A.  I don't know.  I've never conducted a
6  racially polarized voting analysis.
7       Q.  Have you worked on any redistricting
8  efforts where an RPV analysis was conducted?
9       A.  I don't recall.
10      Q.  And did I hear you don't recall whether
11 it was at all discussed in any of the federal cases
12 that you worked on as a technical advisor?
13      A.  That's correct.  I don't recall if it
14 was -- I never analyzed any RPV analysis.
15      Q.  Even if you didn't conduct an analysis,
16 are you aware that cartographers who draw maps do
17 look at RPV analyses?
18      A.  Could you repeat that question?
19      Q.  Even if you didn't conduct an RPV
20 analysis, based on your expertise in the field, are
21 you aware that map drawers might look to RPV
22 analyses when they're drawing maps?
23      A.  Yes.
24      Q.  And what is your understanding on why
25 they might do that?

Page 161

1  redistricting plan had passed.
2      Q.   Got it.
3           And so who was involved in the process
4  for creating the first staff plan that was publicly
5  proposed?
6      A.   That would have been the core
7  redistricting team of myself, Breeden John, Andy
8  Fiffick, Charlie Terreni, and Paula Benson.
9      Q.   Anyone else?
10     A.   Possibly could have been more members
11 of the judiciary staff.  I don't remember who was
12 in all the meetings when we were meeting to draw
13 this plan.
14     Q.   Did Mr. Gore have any involvement?
15     A.   Not with the drawing of the plan, no.
16     Q.   What about after it was drawn?
17     A.   I'm not sure if he was reached out for
18 legal advice on the plan or not.  I can't recall.
19     Q.   Aside from Mr. Terreni, any other
20 outside counsel?
21     A.   Not that I can recall at this point.
22     Q.   Even though he wasn't involved,
23 Mr. Gore, with the drawing of the map, was he at
24 all involved in any meetings during the creation of
25 this map or subsequently after iterations were

Page 164

1      iterations?
2              A.    Yes.
3              Q.    Were all of those saved, the different
4      changes for proposals, and stored in the Maptitude
5      software?
6              A.    They would have been stored in the
7      software as backup files every time the project was
8      closed out.
9              Q.    And why is Greenville, Columbia, and
10     Charleston kind of zoomed in on, if you will, for
11     this proposal?
12             A.    Those are the three largest -- the
13     three large metropolitan areas around the state, to
14     give better detail.
15             Q.    Who would you say was responsible for
16     overseeing the development of this initial staff
17     plan?
18             A.    Could you clarify that for me?
19             Q.    Just, who is responsible with final
20     decisions for overseeing this initial staff plan
21     before it was publicly posted?
22             A.    That would have been Charlie Terreni
23     and Andy Fiffick.
24             Q.    Any senators?
25             A.    I don't recall if any senators saw this

Page 165

1    before it was released or not.
2         Q.   Do you think it would have been helpful
3    to seek their input before it was released?
4         A.   It could have been, but then it
5    wouldn't have been a staff plan.  It would have
6    been a senator -- a senate plan.
7         Q.   Got it.
8              So the designation that it's a staff
9    subcommittee plan indicates no senators'
10   involvement in it?
11        A.   Not with the congressional districts,
12   no.
13        Q.   Who had the responsibility for
14   assessing and reviewing this plan before it was
15   publicly posted to see if it complied with
16   redistricting criteria?
17        A.   That would have been the attorneys.
18        Q.   Including Mr. Gore?
19        A.   I don't know exactly -- he was sought
20   for legal advice.  I just don't recall -- I wasn't
21   privy to a lot of those conversations, as it dealt
22   with attorney information.  So I wasn't involved in
23   a lot of those conversations.
24        Q.   Were you at all involved in any
25   conversations about compliance with redistricting

Page 176

1  peninsula as well as the North Charleston area.
2       Q.   Now, did you have some constraints at
3  all with any of the other instructions you were
4  given about CD Seven or Beaufort County being in CD
5  Two, based on what we discussed earlier about the
6  ripple effects of CD districts?
7       A.   Yeah, that's correct.  Without being
8  able to take Two down to Beaufort or messing with
9  the seventh, I couldn't put people into the ocean,
10  so I had to put them into the sixth.
11       Q.   Right.
12            So would it be fair to say there really
13  could only be at least for CD One and Six primarily
14  voters from those areas moved in and out?
15       A.   That's correct.
16       Q.   In your work in local redistricting --
17  let me rephrase that.
18            Who made the determinations that you
19  just discussed about specific areas to move in and
20  out?  For example, who made the decision to move
21  parts of Charleston into CD Seven versus for them
22  to -- or CD Six versus them to stay in CD One?
23       A.   Can you repeat that?  You've got me a
24  little confused.
25       Q.   I guess, who made the determines on

Page 201

1  work on a second map that was publicly posted and
2  shared?
3       A.   Yes.  That would have been the senate
4  amendment one plan.
5       Q.   Yeah.
6            And can you walk me -- who was involved
7  in the senate amendment one plan's creation?
8       A.   That would have been the core
9  redistricting group of Andy Fiffick, Charlie
10 Terreni, myself, Breeden John, and Paula Benson.
11      Q.   Anyone else?
12      A.   Possibly Maura Baker or Madison Faulk.
13 They were in and out of the room.
14      Q.   And were there any differences in the
15 data you had available to you for the creation
16 of -- or the creation of that map versus the senate
17 staff plan?
18      A.   Not that I can recall.  I think we used
19 the same data throughout the redistricting process.
20      Q.   Did you rely on the same priority
21 criteria in drawing that map?
22      A.   The map that was released as senate
23 amendment one was -- had the same criteria,
24 especially the don't touch the Seventh, Congressman
25 Clyburn wants a minimal change, Joe Wilson wants

1    proposal compared to the initial staff plan?
2         A.   I don't believe so.  The staff remained
3    the same throughout the entire redistricting
4    process.
5         Q.   Now, that Senator Campsen was involved
6    in this process -- I know we talked earlier that
7    Mr. Terreni kind of had the final responsibility on
8    certain decisions being made.
9              Did that change at all with this plan,
10   given Senator Campsen might have had some input?
11        A.   Can you repeat that one more time?
12        Q.   Got it.
13             Was Mr. Terreni -- or, I guess, who had
14   primary responsibility for final decisions over the
15   way certain districts were drawn in this plan?
16        A.   That would have been senators
17   themselves.
18        Q.   The full senate subcommittee?
19        A.   The subcommittee -- the senate
20   subcommittee would have voted on the plan, but this
21   is what came out of the changes that were made to
22   the staff plan from the public input.
23        Q.   Did you provide or did the core
24   redistricting team provide senate amendment one to
25   all the redistricting subcommittee members before

Page 242

1  BY MR. CUSICK:
2       Q.   Do you recall making this map,
3  Mr. Roberts?
4       A.   I'd have to see the map.  I do recall
5  doing a plan for Senator Sabb, yes.
6       Q.   And did it include keeping Charleston
7  and Beaufort whole --
8       A.   Yes.
9       Q.   -- whole counties?
10      A.   Yes.
11      Q.   Was it possible to do so and comply
12  with redistricting guidelines?
13      A.   Yes.
14      Q.   I should have just scrolled down,
15  because I didn't realize I had a PDF of this.
16           Is this the map?
17      A.   Yes, that looks like the map that we
18  did for Senator Sabb.
19      Q.   Do you recall when this was created?
20      A.   I do not.
21      Q.   And here, in all these maps you create,
22  you do include BVAP and other racial demographic
23  categories, correct?
24      A.   That's correct.  This was the typical
25  stat sheet that we would produce with all the maps.