*SC NAACP v. Alexander,*
D.S.C. Case No. 3:21-cv-03302-MGL-TJH-RMG

# Exhibit 28

Page 1

1

2    IN THE UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF SOUTH CAROLINA
3    COLUMBIA DIVISION
     -------------------------------------x
4    THE SOUTH CAROLINA STATE
     CONFERENCE OF THE NAACP
5
                    and
6
     TAIWAN SCOTT, ON BEHALF OF HIMSELF        Case No.
7    AND ALL OTHER SIMILARLY SITUATED          3:21-CV-03302
     PERSONS,                                  JMC-TJH-RMG
8
                        Plaintiffs,
9
                  Vs.
10
     THOMAS C. ALEXANDER, IN HIS OFFICIAL
11   CAPACITY AS PRESIDENT OF THE SENATE;
     LUKE A. RANKIN, IN HIS OFFICIAL CAPACITY
12   AS CHAIRMAN OF THE SENATE JUDICIARY
     COMMITTEE; MURRELL SMITH, IN HIS OFFICIAL
13   CAPACITY AS SPEAKER OF THE HOUSE OF
     REPRESENTATIVES; CHRIS MURPHY, IN HIS
14   OFFICIAL CAPACITY AS CHAIRMAN OF THE
     HOUSE OF REPRESENTATIVES JUDICIARY
15   COMMITTEE; WALLACE H. JORDAN, IN HIS
     OFFICIAL CAPACITY AS CHAIRMAN OF THE HOUSE
16   OF REPRESENTATIVES ELECTIONS LAW
     SUBCOMMITTEE; HOWARD KNAPP, IN HIS
17   OFFICIAL CAPACITY AS INTERIM EXECUTIVE
     DIRECTOR OF THE SOUTH CAROLINA STATE
18   ELECTION COMMISSION; JOHN WELLS, JOANNE
     DAY, CLIFFORD J. EDLER, LINDA MCCALL,
19   AND SCOTT MOSELEY, IN THEIR OFFICIAL
     CAPACITIES AS MEMBERS OF THE SOUTH
20   CAROLINA STATE ELECTION COMMISSION,
21                          Defendants.
     -------------------------------------x
22
         STENOGRAPHIC REMOTE VIRTUAL DEPOSITION
23                 CHARLES TERRENI
             Tuesday, August 16, 2022
24
25

Page 79

1                    TERRENI

2         Q.    Yes.

3         A.    Yes, I have it.

4         Q.    From Adam Kincaid to Andrew

5    Fiffick.

6         A.    Yes, ma'am.

7         Q.    So you've seen this before?

8         A.    Yes.

9         Q.    Before even I sent it?

10        A.    Before you sent it, yes.

11        Q.    When did you see it?

12        A.    I think in the process of

13   discovery.

14        Q.    Is this the two maps that

15   you believe Mr. Oldham was referring

16   to in the text exchange that we just

17   went over?

18        A.    I believe so, yes, ma'am.

19        Q.    And it's your position,

20   correct me if I'm wrong, that in

21   speaking to Mr. Oldham you told him

22   that he could communicate to NRRT,

23   that they could share these maps

24   with Mr. Fiffick at his gmail?

25            MR. GORE:  Object to form.

Page 80

TERRENI

1

2      A.   Mr. Oldham or Mr. Kincaid,

3    whoever, needed an email address

4    with which to share these maps.  And

5    I believe, I don't specifically

6    recall, that we provided -- I

7    provided it to him probably.  I just

8    know that Mr. Oldham called, he

9    wanted to share these maps with us,

10   we allowed him to do so.

11       Q.   Did you know Mr. Kincaid

12   before he sent these emails?

13       A.   No, ma'am.

14       Q.   Have you talked to

15   Mr. Kincaid on the phone?

16       A.   No.

17       Q.   Have you emailed separately

18   with Mr. Kincaid about congressional

19   redistricting?

20       A.   No.

21       Q.   So Mr. Oldham is the go-to

22   to NRRT as far as you are concerned?

23       A.   No.  Mr. Oldham -- I don't

24   have a go-to to NRRT.

25       Q.   But Mr. Oldham is the

```
                                        Page 82

 1                    TERRENI
 2        Q.    And do you know -- how did
 3     you come to see them, can you
 4     describe what you understand
 5     happened once this Adam Kincaid sent
 6     Mr. Fiffick this zip file, how did
 7     it go from there to you seeing them?
 8        A.    One way or another the
 9     files were conveyed to Will Roberts
10     who loaded them in the Maptitude
11     software so that we could look at
12     them.
13        Q.    And by saying we looked at
14     them, who was that?
15        A.    Generally Mr. Roberts, me,
16     Mr. Fiffick, Breeden John may have
17     been there.  I don't believe anybody
18     else specifically but...
19        Q.    Do you know if these maps
20     were shared with Jones Day?
21        A.    I don't recall.  I think
22     so.
23        Q.    Did you share them with
24     Jones Day?
25        A.    I don't remember.
```

Page 83

1            TERRENI
2        Q.    How would you have shared
3     them with Jones Day?  Via email?
4        A.    I don't think I would have
5     shared them with Jones Day, it would
6     have been -- I would have had Mr.
7     Roberts or somebody send it to Jones
8     Day, if we did it.  I just don't
9     remember this.
10       Q.    Why would you have sent
11    them to Jones Day for what purpose?
12       A.    Because they were submitted
13    to the Senate -- they were
14    represented as having some political
15    consensus behind them and so just
16    for general informational purposes.
17       Q.    Political consensus of who?
18       A.    The congressional
19    delegation.  Specifically the
20    Republican congressional delegation.
21    Mr. Oldham told me they had worked
22    with the Republican congressional
23    delegations on some maps or map
24    delegation singular or rather he had
25    said they worked on the delegations

Page 84

1               TERRENI
2      -- with the delegation on maps.  I
3      asked him if the delegation included
4      Mr. Clyburn.  He said no, this is
5      the Republican delegation and that
6      was it.  That's what he told me.
7           Q.   And by -- so that means
8      that -- did you understand that to
9      mean that Mr. Oldham had
10     communicated with all six members of
11     the congressional delegation but
12     Representative Clyburn on this map
13     or both of these maps?
14          A.   I understood Mr. Oldham to
15     represent that the maps were
16     acceptable to the six members of the
17     delegation.  We did not discuss
18     whether he individually communicated
19     with each member or whether he
20     communicated with the staff or he
21     didn't do a role call.  Just what he
22     said.
23          Q.   Are you aware of whether --
24     are you aware that there were other
25     maps submitted by the public

```
 1                    TERRENI
 2        proposing congressional lines of
 3        this cycle?
 4             A.    Yes.
 5             Q.    Are you aware whether those
 6        maps were submitted to Jones Day?
 7             A.    I imagine Jones Day was
 8        made aware of various maps that were
 9        submitted.  I don't want to go in --
10        I don't think it's appropriate,
11        unless my attorney tells me so, to
12        go through each map that I submitted
13        to Jones Day, but yes Jones Day was
14        generally made aware of maps that
15        were submitted to the Senate.
16             Q.    How many maps did you share
17        with Jones Day?
18             A.    I don't know how many maps
19        I individually shared with Jones Day
20        again -- I mean it could have been
21        anybody on Senate staff.  I mean if
22        you are saying physically shared,
23        probably not many because Will
24        Roberts would have been the logical
25        person to do it.  I'm speculating
```

Page 86

```
 1                    TERRENI
 2       here.  I just don't -- I mean are
 3       you asking me you if we,
 4       collectively, the Senate staff
 5       shared maps with Jones Day, yes.
 6       The logistics of it, I'm sorry, I
 7       don't remember.
 8            Q.   How did you determine which
 9       maps you would have shared, you
10       collectively, the Senate, with Jones
11       Day?
12            A.   Maps that I thought had
13       some particular political
14       significance perhaps at a
15       constituency that would have made
16       them likely to adopt or the member
17       had some concerns about or had
18       questions about or was interested
19       in.  If someone -- I mean that's a
20       general answer but it's pretty much
21       accurate.
22            Q.   How would a nonpartisan
23       organization have factored into your
24       calculus of a map that had political
25       significance?
```

Page 89

1                    TERRENI
2       ahead.  You can answer.
3           A.    Well, we did not share
4       every map with Jones Day.  That
5       obviously involved some editorial
6       function which we exercised in
7       sending maps to Jones Day.  We did
8       not send every map to Jones Day.
9           Q.    The calculus for which maps
10      you would send to Jones Day was
11      essentially whether or not you
12      thought, you collectively thought
13      that a map had some political
14      significance, was likely to be
15      adopted or a member would be
16      interested in, those were the
17      contours of how you determine which
18      maps you would pick and potentially
19      submit to Jones Day?
20          A.    Those would be some of the
21      reasons, yes, for sending maps to
22      Jones Day, yes.
23          Q.    Looking at tab 58, and I
24      sent you 57, 58 is the associated
25      stats for the Wren map.  I think we

Page 101

1                    TERRENI
2         A.    No.
3         Q.    Did you receive guidance
4    from Jones Day about the Wren plan
5    before you communicated it back to
6    Mr. Oldham?
7         A.    I don't believe so.
8         Q.    Do you have any reason to
9    dispute that in this map Sumter is
10   split, Sumter as a county is split?
11        A.    I don't know.
12        Q.    What about Orangeburg, do
13   you recall whether Orangeburg was
14   split as a county in this Wren plan?
15        A.    If you showed me the map, I
16   could, but I don't know.  I can't --
17   from memory, no, I don't have any
18   recollection.
19        Q.    Do you have any
20   recollection of how Beaufort was
21   treated in this Wren plan?
22        A.    No.
23        Q.    And what about Charleston,
24   the County of Charleston, do you
25   have any recollection of how

Page 102

1              TERRENI

2       Charleston was treated, whether

3       whole or split, in this Wren plan?

4            A.    I seem to recall the split.

5            Q.    Do you recall how much

6       CD 2, Representative Wilson's

7       district, how CD 2 fared under this

8       Wren plan?

9            A.    No.

10           Q.    And what about CD 7, do you

11      have any recollection of how CD 7

12      fared under this Wren plan?

13           A.    What do you mean by fared?

14           Q.    Whether it was kept whole,

15      whether it was split, do you have

16      any recollection?

17           A.    Of CD 7 whether it was

18      split?

19           Q.    Um-hmm.

20           A.    I'm sure it was changed.

21           Q.    Changed from when?

22           A.    The benchmark plan.

23           Q.    And the benchmark plan is

24      referring to the 2011, the plan

25      adopted and enacted after the 2011

Page 114

TERRENI

1   percentage of black voters in any of

2   the other congressional districts

3   outside of CD 6?

4        A.   Appears to be District 7,

5   the 24.82.

6        Q.   What is the lowest

7   percentage of black voters in any of

8   the districts under the Palmetto

9   plan?

10       A.   District 1, 17.08.

11       Q.   Looking back at the first

12  page, can you tell what district

13  Beaufort is in in this map?

14       A.   Appears to be mostly in

15  district -- well, it's all in

16  District 1, I believe, unless

17  there's a cut of my Hampton.  I

18  believe it's all in District 1.

19       Q.   And looking at Charleston

20  County can you tell where Charleston

21  County falls under the Palmetto

22  plan?

23       A.   In District 1 and

24  District 6.

```
 1                    TERRENI
 2         Q.   Do you have any view of
 3    whether congressional District 7 in
 4    this map looks changed from the
 5    benchmark map in 2011?
 6         A.   I would have -- honestly, I
 7    would have to compare it but it
 8    looks generally the same.
 9         Q.   Is there anything else
10    about the Palmetto plan that stands
11    out to you looking at it at this
12    moment?
13         A.   In what way?
14         Q.   Let's go back.  How long do
15    you remember spending looking at
16    this map in Senator Rankin's office?
17         A.   Five minutes, ten.
18         Q.   Is there a reason why you
19    only looked at it for five or
20    10 minutes?
21         A.   Yes, ma'am.  We had already
22    drawn a plan that we were getting
23    ready to propose.  We didn't see
24    this making any improvement.  We
25    thought District 6, we had some
```

```
 1                    TERRENI
 2       concerns about the way District 6
 3       was drawn just in the form of change
 4       and the regular shapes.  And we
 5       didn't see this as being the plan
 6       that we needed to spend more time
 7       worrying about.
 8            Q.   And you subsequently spoke
 9       to Mr. Oldham again and did you, to
10       be clear, did you ask him what -- he
11       initiated the sending of a second
12       map known as the Jessamine map.  Do
13       you recall that?
14            A.   That was a few days later.
15            Q.   Did you ask for that map or
16       did he just send it in response to
17       the feedback that you gave him about
18       the Palmetto and Wren?
19            A.   It was not solicited by me.
20       He sent it in response to the
21       feedback about Palmetto and Wren and
22       the staff plan, the release of the
23       staff plan.  And the release of the
24       staff plan would have been -- I
25       think he sent it after the staff
```

Page 117

```
 1              TERRENI
 2      plan was released and then posted to
 3      the website and I think his effort
 4      as he described it was to, quote
 5      unquote, improve on the staff plan.
 6          Q.   Did you at any time ever
 7      contemplate asking Mr. Fiffick to
 8      forward the maps from Mr. Kincaid
 9      received on November 18th to the
10      Senate redistricting email that had
11      been released to the public?
12          A.   I don't recall doing that
13      no.
14          Q.   Do you recall asking any of
15      the Senate staff to forward these
16      two maps to any member of the Senate
17      redistricting subcommittee?
18          A.   I don't recall doing that.
19          Q.   As you sit here today, do
20      you know whether any member of the
21      Senate subcommittee has ever seen
22      the Palmetto or the Wren plan?
23          A.   I believe Senator
24      Harpootlian saw them.
25          Q.   How so?
```

Page 119

```
 1                    TERRENI
 2        Mr. Fiffick shared those maps with
 3        Senator Harpootlian one way or the
 4        other?
 5             A.   No, ma'am.
 6             Q.   And do you know whether, as
 7        you sit here today, how any member
 8        of the public would be aware of the
 9        Palmetto and Wren plan being sent to
10        staff members of the Senate during
11        the redistricting process?
12             A.   I do not.
13             Q.   Let's look at tab 10, which
14        is another email from Adam Kincaid
15        and Andy Fiffick dated
16        November 24th, 2021, and is Bates
17        stamp number South Carolina Senate
18        ending in 3245 and this should be
19        Plaintiffs' Exhibit 5.
20             (Plaintiffs' Exhibit 5, Email
21         from Adam Kincaid to Mr. Fiffick,
22         Bates South Carolina Senate ending
23         in 3245, marked for identification,
24         as of this date.)
25             A.   Yes, ma'am.
```

```
 1                    TERRENI
 2         Q.   Have you seen this before?
 3         A.   In preparing for this
 4    deposition.
 5         Q.   Had you seen the contents
 6    of what was being transmitted from
 7    Mr. Kincaid to Mr. Fiffick, had you
 8    seen that before preparing for this
 9    deposition?
10         A.   In the context of the
11    Jessamine zip file I believe so,
12    yes.
13         Q.   Where would you have seen
14    the Jessamine zip file?
15         A.   In the Senate offices,
16    probably I believe Senator Rankin's
17    office.
18         Q.   Okay.  Do you recall who
19    was with you when you saw this map?
20         A.   I believe Andy would have
21    been and Will Roberts and I don't
22    recall anybody else but there could
23    have been other people.
24         Q.   And is there any reason why
25    after the first email from Adam
```

```
                                    Page 192

 1                   TERRENI

 2      Chairman Rankin instructed Senate

 3      staff not to consider race during

 4      congressional redistricting?

 5           A.   I don't recall him doing

 6      that.

 7           Q.   Is that something you would

 8      recall?

 9           A.   Probably.

10           Q.   Because it's important

11      whether or not the Senate could

12      consider race or not in drawing

13      redistricting lines?

14           A.   No.  It's just because it

15      would have been a specific

16      instruction from Senator Rankin.  I

17      mean when you say considering race,

18      if you are asking did Senate staff

19      look at the racial impact of various

20      draws or the racial composition in

21      districts under various draws, the

22      answer is yes.  Was it the

23      predominant factor in guiding

24      redistrict -- proposed redistricting

25      fans, no, and was it a predominant
```

Page 193

1                     TERRENI
2     factor for the subcommittee, I don't
3     believe it was.
4          Q.    Who would have made the
5     determination of whether or not race
6     was the predominant factor in
7     redrawing the congressional map?
8          A.    The courts.
9          Q.    So that decision, that
10    analysis of whether race was the
11    predominant factor in the redrawing
12    of South Carolina's congressional
13    map, that has not been determined
14    yet because litigation is ongoing?
15         A.    I mean that's the way I see
16    it.  If you are asking whether or
17    not we consider race as the
18    predominant factor, the answer is
19    no.
20         Q.    Because that's a factual
21    question because there hasn't been a
22    legal determination yet?
23         A.    Well, I suppose so.  I mean
24    obviously we don't think it was.
25    You seem to think that it was the

Page 194

1                          TERRENI

2         predominant factor and the courts

3         are going to have decide.

4              Q.   If an individual member

5         said during the redistricting

6         process that they did not consider

7         race, is it your position that they

8         were not instructed to do so by

9         Senator Rankin as far as you are

10        aware?

11             A.   I'm not aware of Senator

12        Rankin instructing individual

13        members to do things one way or

14        another.

15             Q.   Do you see anything, and

16        you can take a moment looking at

17        this guidance, do you see anything

18        in the guidance saying that race

19        would not be considered in the

20        development of redistricting lines

21        for maps in South Carolina during

22        this cycle?

23             A.   I don't think so.  And it

24        says race must not be the

25        predominant factor.  Yeah.  I mean

```
                                    Page 195
 1                    TERRENI
 2        I'm not aware of any instruction in
 3        the guidelines that says don't
 4        consider race.  Now, whatever
 5        individual members wanted to do
 6        could be that individual members
 7        said I'm just not going to look at
 8        race at all.  I mean I think that
 9        would be a permissible policy
10        decision on their part.  I had no
11        control over that.
12           Q.   I want to understand a
13        little bit more what you believe to
14        be the consideration of race and I
15        believe you recently testified a few
16        moments ago that it's looking at the
17        racial impact of lines on a
18        particular protected community, is
19        that fair to say?
20           A.   Yeah, by impact I mean you
21        change the composition of the
22        district is the starting point.
23           Q.   Is the --
24           A.   Is a starting point.
25           Q.   What else does
```

Page 196

1               TERRENI
2       consideration of race mean to you in
3       redrawing lines?
4           A.   As a practical matter we
5       consider race in that we look at the
6       racial impact of different
7       permutations or different plans when
8       we draw; in other words, it's a
9       question.  It is also a question,
10      no.  I said it could be a question.
11      What is the BVAP.  Why is that?
12      Because for one thing if it involves
13      a minority-majority district people
14      are going to raise questions about
15      that.  Did you pack it, did you
16      crack it.  Same questions you are
17      raising now.  So for us to just put
18      blinders on and say I don't want to
19      look at BVAP, I don't think is
20      practical in redistricting in South
21      Carolina.  Does it mean that
22      everything is guided by BVAP?  No.
23      It just means that, hey, if there's
24      going to be a substantial change in
25      this district, if there's going to

Page 197

```
1                    TERRENI
2       be a substantial change in the BVAP
3       of the district, there's substantial
4       inquiries in the BVAP for the
5       district that may raise some
6       questions that we have to explore,
7       either legal questions or practical
8       questions.  I may need to call
9       Mr. Gore UP and say hey, would this
10      district caused some legal concerns
11      from the racial gerrymandering
12      standpoint where because it's
13      resulting in a different BVAP
14      impact.  It's just one of those
15      things like county boundaries,
16      precinct boundaries, whatever you
17      should reconsider.
18           Q.   Could keeping BVAP as at
19      the relative same levels as the 2011
20      benchmark map also have a racial
21      impact?
22           A.   Could keeping BVAP -- I
23      mean it's going to be what it is,
24      right?  I mean you either drop it,
25      raise it or keep it the same.  It's
```

Page 231

                    TERRENI

1

2    mean Goodman, but I don't remember

3    at this time.

4         Q.   Do you know whether this

5    summary was provided to Senate

6    members?

7         A.   No.

8         Q.   Okay.  Going back to tab 1,

9    which is the guidelines.

10        A.   Okay.

11        Q.   Underneath Communities of

12   Interest under 3B on the second page

13   South Carolina Senate 22358 there is

14   a category called Constituent

15   Consistency.

16        Do you see that?

17        A.   Yes, ma'am.

18        Q.   And it says that:

19   "Preserving the cores of existing

20   districts, keeping incumbent

21   residences and districts with their

22   core constituents and avoiding

23   contests between incumbent

24   legislators should be considered."

25        Is that accurate?

Page 232

1              TERRENI
2         A.   Yes, ma'am.
3         Q.   And based upon where this
4    falls in the guidelines would you
5    agree that this is a subsidiary
6    consideration to federal law
7    requirements?
8         A.   Yeah.  And if you are
9    asking me could you violate federal
10   law for the sake of constituent
11   consistency, my answer would be no.
12        Q.   And by federal law we are
13   talking about compliance with one
14   person, one vote Section 2 and
15   nonracial gerrymandering?
16        A.   Yes, ma'am.
17        Q.   Did you have any concerns
18   that preserving the cores of
19   existing districts could bake in
20   lines that are harmful to compliance
21   with federal law?
22        A.   To the extent that I did, I
23   would have discussed them with
24   Mr. Gore.  In the final analysis my
25   answer would be no.

Page 244

TERRENI

1   
2       whether a racially polarized voting
3       analysis was conducted or are you
4       aware whether racially polarized
5       voting analysis was conducted by the
6       Senate as maps were being developed
7       for Congress?
8           A.   I am not aware that a
9       racially polarized voting analysis
10      was conducted by the Senate as maps
11      were being developed for Congress.
12      I have no knowledge of such a thing
13      and I don't believe it occurred.
14          Q.   Are you aware whether the
15      public or legislative members asked
16      for racially polarized voting
17      analysis to be conducted while
18      congressional maps were being
19      considered?
20          A.   I'm aware that some members
21      of the public and one member of the
22      general assembly, at least, Senator
23      Harpootlian, asked or suggested that
24      it should be done.
25          Q.   And do you know whether

Page 245

```
 1                    TERRENI
 2     that was acted upon?
 3          A.   Yeah.  I know it wasn't.
 4          Q.   Who made the decision not
 5     to act upon those requests?
 6          A.   The subcommittee.
 7          Q.   Did they take a vote on
 8     that?
 9          A.   I think they have.  It was
10     during the, or at least they
11     declined to take a vote on it, but
12     the discussion we had in a public
13     subcommittee meeting in which
14     Senator Harpootlian advanced the
15     opinion that we should have a
16     racially polarized voting analysis
17     conducted in advance of the Senate
18     and congressional process.  I
19     expressed the opinion that it was
20     not useful.  And the Senate, we did
21     not, at least implicitly, the
22     subcommittee did not agree with
23     Senator Harpootlian, and I mean that
24     just the Senate did not vote or
25     direct us to conduct that.  I
```

```
 1                    TERRENI
 2       shouldn't say we.  I can't speak for
 3       them.
 4            After this question can we
 5       take just a five-minute break?
 6            MS. ADEN:  Yes.  Why don't we
 7        stop and we will return to that.
 8            THE WITNESS:  I appreciate
 9        that.  We will come back at three
10        maybe.  Is that okay?
11            MS. ADEN:  Sounds great.
12            (Whereupon, there is a recess
13        in the proceedings.)
14            Q.   Before the break I believe
15       you mentioned not agreeing that a
16       racially polarized voting analysis
17       was necessary, at least in the early
18       part of 2021.  Can you explain why?
19            A.   Yes, ma'am.  We had no
20       reason to believe at the time that
21       we were going to have an issue with
22       Section 2 compliance.  No claims had
23       been asserted.  Nobody really
24       threatened them.  The sixth
25       congressional district which would
```

Page 247

                    TERRENI

1
2    have been the likely target of that

3    claim had been upheld against a

4    Section 2 challenge by the court ten

5    years ago.  And the upside, if there

6    was one, of conducting a racially

7    polarized voting analysis in my

8    opinion outweighed the downside, at

9    least what I told the subcommittee,

10   and the downside being that all of a

11   sudden race would have been in the

12   middle of the room and that we would

13   risk making race or some artificial

14   target the -- derived from that

15   polarized voting analysis the

16   predominant factor or at least

17   expose ourselves to accusations that

18   it was.  So at that point with no

19   Section 2 claim -- facing no Section

20   2 claim we didn't think it was

21   necessary.

22        Q.   Are you aware of whether

23   the black voting age population in

24   congressional District 6 was reduced

25   as compared to under the 2011

Page 248

```
 1                    TERRENI
 2    benchmark map?
 3         A.    It was.
 4         Q.    Okay.  How did you or the
 5    Senate assess whether or not that
 6    district would still perform with
 7    the change in the BVAP having not
 8    looked at racial bloc voting
 9    patterns in that district?
10         A.    It was an educated judgment
11    in the sense that it was not a
12    substantial diminution of the black
13    population.  It was not all the
14    Senate districts around the state.
15    The minority Senate districts were
16    facing reduced black population
17    because the state Senate certainly
18    as a whole -- I mean, excuse me,
19    black population as a whole had been
20    reduced including the BVAP.
21         I had heard Congressman
22    Clyburn himself say that he didn't
23    think his district needed as much
24    BVAP.  I think he was quoted
25    publicly saying that.  And we didn't
```

Page 268

```
 1                     TERRENI
 2       2011 plan as possible for
 3       congressional redistricting?
 4            A.    No.   There's not.
 5            Q.    Is there anything within
 6       these guidelines expressly stating
 7       that the public and/or the
 8       legislature preferred a map that
 9       minimally made changes between the
10       2011 map and the one to be enacted?
11            A.    I don't think so.
12       Constituent consistency and
13       preserving cores was a factor but it
14       didn't express a preference, no.
15            Q.    Do you think the average
16       member of the public would
17       understand, would equate preserving
18       the cores of constituencies with
19       making a map that minimally changes
20       districts between the 2011 map and
21       the 2020 map?
22            A.    I don't know, but it
23       wouldn't be intended for them to
24       reach that understanding.   That
25       wasn't a foregone conclusion.   These
```

```
                                    Page 269
 1                    TERRENI
 2      criteria would have resulted in --
 3      could have weighed other factors
 4      above core constituent consistency
 5      or cores and the map could have been
 6      radically different than the one you
 7      submitted.
 8           Q.   Except for core
 9      constituency could not supercede
10      one person one vote Section 2
11      compliance and nondilution,
12      nonracial gerrymandering?
13           A.   And nonracial
14      gerrymandering?
15           Q.   It could not supercede
16      racial gerrymandering --
17              MR. GORE:  Object to form.
18              MS. ADEN:  I object to my own
19       form.
20           Q.   Core constituency could not
21      supercede compliance with one person
22      one vote compliance with Section 2
23      and it could not lead to racial
24      gerrymandering under the guidelines?
25           A.   Correct.
```

Page 270

```
 1                    TERRENI
 2        Q.   Do you see anything in
 3    these guidelines that articulates
 4    that Beaufort should remain in CD 1
 5    and not be put in CD 2?
 6        A.   Not explicitly.  That's an
 7    outcome.
 8        Q.   But that is something that
 9    was debated during the legislative
10    process?
11        A.   Yes.
12        Q.   And similarly you don't see
13    anything expressly in these
14    guidelines that says keep Fort
15    Jackson in CD 2 with -- in CD 2?
16        A.   Again, not expressly, no.
17        Q.   And is there anything in
18    this instruction that says make
19    Congressional District 1 likely to
20    elect a Republican congressional
21    candidate or be Republican leaning?
22        A.   Not specifically, no.
23        Q.   And unspecifically where do
24    you think it says that or suggests
25    that?
```

Page 271

1                    TERRENI
2          A.    It doesn't -- I'm sorry --
3     it doesn't specifically say that or
4     even nonspecifically.  It does say
5     congressional District 1 should be
6     Republican leaning.  No, that's not
7     a guideline.
8          Q.    In tab 12, which should be
9     plaintiffs Exhibit 17.
10         A.    Tab 12, okay.
11         Q.    This should be an email
12    cover from Holi, H-O-L-I, Miller, or
13    two Ls.  Is that two Ls or one L?  I
14    can't see.  Two Ls, H-O-L-L-I Miller
15    on behalf of Senator Harpootlian
16    copying you, Mr. Terreni dated
17    September 16, 2021 with the subject
18    "Notice of redistricting
19    subcommittee meeting" and it's
20    attaching a letter to Luke Rankin.
21    This is Bates stamped South Carolina
22    Senate 3387 to 95.  Can you take a
23    moment to -- I'll direct you to
24    particular things, but it's a
25    nine-page pdf.

```
                                      Page 332

 1                    TERRENI

 2      for having produced an initial

 3      draft.  If you are talking about the

 4      Senate staff plan, I would credit

 5      the Senate staff with producing it

 6      in the Senate -- developing the

 7      Senate staff plan with Will acting

 8      as protographer and with input

 9      everyone else.  But Will was the

10      prime -- had the template for that

11      claim, yes.

12           Q.   Can we refer to the Senator

13      Campsen map as the Senate Amendment

14      1?

15           A.   Yes.

16           Q.   Would it be fair to say

17      that Will Roberts, you Mr. Terreni,

18      Breeden John, Senator Campsen,

19      Senator Rankin were involved in the

20      development of Senate Amendment 1?

21           A.   Yes.  In different ways but

22      yes.

23           Q.   What do you mean in

24      different ways?

25           A.   A Senate amendment is just
```

Page 333

1                     TERRENI
2       that.  It was an amendment that is
3       sponsored by a Senate majority and
4       ultimately voted on and adopted by
5       the Senate.  So in that sense it's
6       not my plan.  Did I assist in its
7       development, yeah.  I would say I
8       did, in providing practical or legal
9       advice regarding the plan.
10      Supporting them and advancing it.
11           But at that point it was
12      beyond the staff plan so I just want
13      to make sure by saying did we
14      participate, it was not a
15      relationship among equals.
16           Q.   When you say practical
17      advice about the Senate amendment
18      plan, what's an example of what that
19      would encompass?
20           A.   Well, it would encompass,
21      like, institutional recollection
22      about what maybe some members of the
23      delegation's preferences were, what
24      decisions had been made by the court
25      on the record regarding those

Page 334

1                        TERRENI

2          preferences of and various features

3          of the map.  Features of the map

4          that were inherited from the court.

5               Q.    Like with the initial staff

6          map do you know whether Senate

7          Amendment 1 was shared with Jones

8          Day before it was released to the

9          public?

10              A.    Senate Amendment 1?

11              Q.    Um-hmm.

12              A.    Probably.  Most likely.

13              Q.    Can you describe briefly

14         the process for how the initial

15         Senate staff plan was modified to

16         become Senate Amendment 1?

17              A.    Well, it was replaced at a

18         subcommittee.  There was a hearing

19         held by the subcommittee.  There was

20         public testimony on the plan,

21         various members came and inquired

22         about it, maybe shared concerns

23         about it, maybe suggested things

24         that should or shouldn't be done.

25         And ultimately the amendment

Page 335

1                    TERRENI

2       emerged.  Maybe even the staff had

3       some ideas about how we could build

4       on it.  I believe at some point we

5       understood that Berkeley County

6       could be kept whole, for instance,

7       and so we did it.

8            Q.   Was that a priority to keep

9       Berkeley whole?

10           A.   No, it wasn't a specific

11      priority to keep Berkeley whole.

12      No, it was just a feature.

13           Q.   What were the priorities of

14      Senate Amendment 1 as far as you can

15      recall?

16           A.   Well, they preserved the

17      course of the existing districts in

18      a way that most other plans didn't.

19      I think for some members there was a

20      political consideration and they at

21      least preserved the competitive

22      nature of District 1 and its

23      viability for a Republican

24      candidate.  There's certainly no

25      guarantee.

```
 1                    TERRENI
 2          And there were some other
 3      features, like Beaufort was kept in
 4      the First District with Charleston,
 5      Berkeley or at least partially
 6      Charleston.  I mean there were -- I
 7      could go on.  I don't know -- you
 8      tell me.
 9          Q.   Were there any other key
10      criteria that you think guided the
11      Senate Amendment 1?
12          A.   The criteria were the
13      criteria.  Was there any other key
14      input that guided Senate Amendment
15      1, there might have been.  Again,
16      I'm distinguishing between criteria
17      as the criteria adopted by the
18      subcommittee and political decisions
19      that were made by the membership in
20      the development of the map.  I think
21      those are two different things.
22          Q.   You mentioned Sun City
23      earlier being responded to in terms
24      of that white majority area being
25      kept together in Jasper County?
```

Page 337

```
 1                     TERRENI
 2           A.    Yes.
 3           Q.    Do you, sitting here today,
 4      believe that the community in
 5      Charleston was kept whole and
 6      responded to in the same way as
 7      those in Sun City?
 8             MR. GORE:  Objection.
 9       Mischaracterizes his testimony.
10           A.    Yeah, that's certainly not
11      my testimony.
12           Q.    That's a question.  Do you
13      think that --
14           A.    I don't think they are
15      comparable.
16           Q.    You don't think they are?
17           A.    Comparable.
18           Q.    How come?
19           A.    We are talking about a
20      sliver of Jasper County.  I don't
21      remember the specific population but
22      it was de minimis.  It is part of
23      the same -- as far as I know even
24      enclosed but it's certainly the same
25      planned community that has its bulk
```

```
                                          Page 338

 1                    TERRENI
 2        in Berkeley County so -- I mean
 3        Beaufort County.  So it really
 4        wasn't a stretch to say we are going
 5        to take Sun City and loop in this
 6        little nub at the top of -- at the
 7        bottom of Jasper County, top of
 8        Beaufort, and keep the Sun City
 9        place together.  It's only -- I
10        don't know, but they certainly --
11        they have the same roads, they have
12        the same community events for its
13        connectivity.  That seemed like a
14        fairly reasonable conclusion to
15        reach and it was not going to have
16        any kind of major political impact
17        on anybody one way or the other.  So
18        we didn't see it as something that
19        would impact the Sixth District or
20        the First District one way or the
21        other.  It was not a big enough
22        situation.
23             Charleston is very different.
24        Charleston in its current
25        configuration, you know, at least
```

Page 339

```
 1              TERRENI
 2      the beginnings of it were drawn by
 3      the United States District Court.
 4      And Charleston County, as far as I
 5      know, has never been unified in a
 6      congressional district in, certainly
 7      since single member districts maybe.
 8      I stand corrected.  If we go before
 9      2000, my memory is fading a little
10      bit.
11           So no, I don't think there's a
12      comparison between, given the
13      peninsula of Charleston County in
14      District 1, I think they are apples
15      and oranges.
16        Q.   If Charleston could be kept
17      whole in CD 1, comply with the
18      Senate's stated criteria, keep CD 7
19      untouched, largely untouched, would
20      the major political concern that
21      remains be making CD 1 not
22      Republican leading?
23        A.   It's in the eye of the
24      beholder.  I mean it's a -- well,
25      that's a policy decision to be made
```

```
                                    Page 412

  1                 TERRENI
  2      one person in Sun City.  Do you
  3      recall hearing testimony from
  4      members of the public about keeping
  5      Charleston County whole even if it
  6      had been split in previous maps?
  7           A.   I do.
  8           Q.   Would you agree that more
  9      people testified in support of
 10      keeping Charleston County whole than
 11      compared to the treatment of Sun
 12      City?
 13           A.   Yes.
 14           Q.   Looking at the Senate
 15      redistricting criteria adopted on
 16      September 17th, under Additional
 17      Considerations is one of the
 18      criteria that should be considered
 19      keeping counties whole, maintaining
 20      counties?
 21           A.   It's -- one of the criteria
 22      is minimizing of county boundaries.
 23           Q.   And so minimizing the
 24      splits of counties, including
 25      Charleston, would thus comply with
```