*SC NAACP v. Alexander,*
D.S.C. Case No. 3:21-cv-03302-MGL-TJH-RMG

# Exhibit 46

Page 1

```
         UNITED STATES DISTRICT COURT
          DISTRICT OF SOUTH CAROLINA
             CHARLESTON DIVISION
THE SOUTH CAROLINA STATE CONFERENCE OF THE
NAACP, et al.,

             Plaintiffs,

   vs.   CASE NO. 3:21-CV-03302-JMC-TJH-RMG

THOMAS C. ALEXANDER, et al.,

             Defendants.

VIDEOCONFERENCE
DEPOSITION OF:   CHRIS MURPHY
                 (Attending by VTC)
DATE:            June 23, 2022
TIME:            10:09 a.m.
LOCATION:        Law Offices of
                 NEXSEN PRUET, LLC
                 205 King Street
                 Suite400
                 Charleston, South Carolina
TAKEN BY:        Counsel for the Plaintiff
REPORTED BY:     JULIE L. BONOMO
                 (Attending by VTC)
```

1    were in this case.  You mentioned the deadline.
2    You mentioned the significance of the legislation.
3    Is there anything else that, in your mind, turned
4    this into an extraordinary circumstance?
5         A.   Well, the fact that I had COVID, and I
6    wasn't going to go up to Columbia to chair a
7    meeting when I was suffering from a fever and other
8    effects of COVID and risk putting -- I mean, other
9    members contact COVID based on my being there at
10   the meeting was the underlying -- I guess, the
11   major extraordinary circumstance to this, so this
12   was not a relative run -- run-of-the-mill piece of
13   legislation.  If -- if this had not been
14   congressional redistricting, the meeting would have
15   been cancelled until I could attend.
16        Q.   In your time on the judiciary
17   committee, have there been other instances where
18   you or the chairman, whoever that was, was unable
19   to attend?
20        A.   Not that I can recall.
21        Q.   Okay.  I'm going to --
22        A.   This was -- go ahead.  I'm sorry.
23        Q.   No.  No, please.
24        A.   I'm done.
25        Q.   Okay.

1          A.   It would have been -- Rule 14 would
2     have been adopted when we came back to the House
3     after reorganization, so that would have been -- I
4     don't know -- the election was 2020, so it would
5     have been during 2021.  You adopt new rules at the
6     beginning of every new session.
7          Q.   And were you present for the
8     discussions about adopting Rule 14?
9          A.   Yes.  We would have adopted them at the
10    first meeting of the House judiciary committee in
11    June -- or excuse me, January of 2021.
12         Q.   And at that meeting, when Rule 14 was
13    eventually adopted, did anyone bring up the
14    significance of a piece of legislation as being
15    part of the extraordinary circumstances evaluation?
16              MR. MOORE:  Objection as to the form.
17              THE WITNESS:  I -- I can't remember if
18    it -- what discussions were made.  This rule was
19    not adopted as a stand-alone rule.  It was -- it
20    was adopted as part of our -- all of our rules that
21    we were going to operate under for the coming
22    two-year session.
23    BY MR. HIRSCHEL:
24         Q.   Why did you choose Representative
25    Newton?

1    A.   Weston is the chair of the subcommittee
2    -- of the constitutional law subcommittee, which is
3    considered, in the hierarchy of the House judiciary
4    subcommittees, as the most important committee.  He
5    deals with very complex legislation.  Weston is --
6    is a very bright attorney, a very experienced
7    attorney.  Weston is also the only other chairman
8    of a standing committee.  He chairs the legislative
9    oversight committee, which -- he's been chair of
10   that for, I would say, since -- well, since its
11   inception, at least four years.  He's chaired a lot
12   of meetings with a lot of complex issues.  He was
13   the most qualified person to chair this meeting
14   regarding the Congressional li- -- redistricting
15   plan.
16        Q.   Who's the vice chair of the judiciary
17   committee?
18        A.   The vice chair of the committee is
19   John R. King.
20        Q.   And did you have concerns that
21   Representative King would not have been up to the
22   task of presiding over this meeting?
23             MR. MOORE:  Objection as to the form.
24             THE WITNESS:  Representative King is --
25   is a nonlawyer.  The vice chair position is -- to

1               THE WITNESS:  I -- I never said I
2     didn't trust Representative King.  I said under
3     these extraordinary circumstances, that Weston
4     Newton, based on his vast experience and knowledge
5     of our rules and the fact that he has chaired other
6     full committee meetings, was best qualified for
7     this particular piece of le- -- legislation, but
8     don't -- I never said I didn't trust John R. King.
9     John R. King is a friend of mine.
10         Q.   Prior to this congressional
11    redistricting cycle, did Representative Newton have
12    any redistricting experience?
13         A.   No.  Weston came in after -- I think
14    the -- I was elected in 2012, and I believe Weston
15    Newton was elected in 20- -- no, I was elected in
16    2010.  Weston Newton was elected in 2012.
17         Q.   Okay.
18              MR. HIRSCHEL:  I want to introduce one
19    more exhibit, but I want to offer to take a break.
20    We've been going for a little over an hour.  It's
21    up to you all.
22              MR. MOORE:  A short break is fine.
23              MR. HIRSCHEL:  Okay.  Five minutes?
24              THE WITNESS:  That's fine with me.
25              MR. HIRSCHEL:  Okay.  Let's go off the

1   Q.   Do you know who else -- or rather, do
2   you know who would have known that the ad hoc
3   committee was creating a second new plan --
4           MR. MOORE:   Objection as to the form.
5           MR. HIRSCHEL:   -- prior to its posting
6   online?
7           MR. MOORE:   Objection as to the form.
8           THE WITNESS:   I would think that would
9   be a question for Chairman Jordan.
10  BY MR. HIRSCHEL:
11  Q.   So you don't have any insight into who
12  knew about the new plan before it was posted?
13  A.   No.  Again, I was not part of the ad
14  hoc committee process.
15  Q.   Okay.  Are you aware that this plan was
16  released on December 23rd, 2021?
17  A.   No.
18  Q.   Are you aware that the hearing on this
19  plan was scheduled for December 29th, 2021?
20  A.   I remember that they were having a
21  hearing on December 29th because that's -- I was
22  flying out to Las Vegas.
23  Q.   December 29th is two days before New
24  Year's, right?
25  A.   Yeah.  Yes, sir.

Page 91

1  Q. And do -- to your knowledge, do many
2  people in South Carolina travel during that time of
3  year?
4              MR. MOORE: Objection as to form.
5              THE WITNESS: I don't know who travels
6  or where they travel or what they do.
7  BY MR. HIRSCHEL:
8       Q. Is school out in your district on
9  December 29th?
10      A. Yes. That's part of the Christmas
11 break.
12      Q. Do you think that might make it more
13 complicated for folks to attend a hearing on a
14 draft map?
15      A. Well, I mean, they could either attend
16 the meeting in-person, or they could have viewed it
17 online.
18      Q. So it would or would not be more
19 difficult for them to attend a hearing on
20 December 29th as opposed to...
21      A. It's difficult on a -- on a regular day
22 to drive to Columbia.
23      Q. When you first saw this second plan,
24 what was your reaction to it?
25      A. I didn't really have -- have a reaction