*SC NAACP v. Alexander,*
D.S.C. Case No. 3:21-cv-03302-MGL-TJH-RMG

# Exhibit 58

Page 1

```
          UNITED STATES DISTRICT COURT
        FOR THE DISTRICT OF SOUTH CAROLINA
               COLUMBIA DIVISION


 THE SOUTH CAROLINA STATE CONFERENCE OF THE NAACP,
 et al.,

              Plaintiffs,

       vs.     CASE NO.:  3:21-CV-03302-MGL-TJH-RMG

 THOMAS C. ALEXANDER, et al.,

              Defendants.


 DEPOSITION OF:    SENATOR LUKE A. RANKIN
                   (APPEARING VIA VIRTUAL ZOOM)

 DATE:             August 2, 2022

 TIME:             10:52 AM

 LOCATION OF
 THE DEPONENT:     Rankin & Rankin Law Firm
                   201 Beaty Street
                   Conway, SC
 TAKEN BY:         Counsel for the Plaintiffs
 REPORTED BY:      TERRI L. BRUSSEAU
                   (APPEARING VIA VIRTUAL ZOOM)
```

1  mentioning these considerations.  So I'm going to
2  read this somewhat long list that could impact
3  whether something is a community of interest.  It
4  says:  Geographic, demographic, historic or other
5  characteristics that cause people to identify with
6  one another, including economic, social, cultural,
7  language, political and recreational activity
8  interests common to the area's population may
9  constitute communities of interest.  Did I get that
10  right?
11          A.   That's -- yeah.
12          Q.   Okay.  Was there any discussion of how
13  to weigh or assess all of these various possible
14  characteristics?
15          A.   No.
16          Q.   Okay.  For example, when it says
17  geographic, did you ever have a conversation or
18  create any further guidelines on what constituted a
19  geographic community of interest?
20          A.   Well, again, the past is somewhat
21  prologue here, and forgive me for defaulting to it,
22  but this plan largely represents what we did ten
23  years ago that was blessed by the court and DOJ at
24  that time.
25                   And so the variation in this plan

Page 153

1  largely is, as we talked about earlier, found in
2  the 6th and the 1st, 80 plus light one way, 80 plus
3  hit heavy in the other. So moving them was largely
4  what occupied our time and effect, I guess is the
5  basis of your suit, and so been there, done that.
6             And so these communities of interest,
7  perhaps not loved by all, perhaps not unanimously
8  endorsed by every speaker, but, again, there was
9  input from folks. They liked it the way they had
10 it. In the 7th right here, we like it the way we
11 have it. And so that is a refrain again, if we're
12 creating new territory here, you know, without the
13 blessing before, ten years before, then again maybe
14 we are forging new territory, but we've got again
15 some comfort, I do, in that the courts have blessed
16 this already.
17      Q.   So are you saying all of the
18 communities of interest in South Carolina stayed
19 the same from 2010 to 2020?
20      A.   What I'm saying is, again, no, people
21 move, the shifts in population. But within the
22 districts and based on our guidelines and based on
23 the law, we felt that we abided by maintaining
24 these as best we could.
25             Again, not splitting Summerville into

1    cute, but past is prologue.  We've been here, we've
2    done this, we considered it, we heard testimony,
3    and again the court will decide whether we violated
4    that.  But, again, that's not for me to say beyond
5    I think we abided this and considered it.
6         Q.   Okay.  But you did also say that people
7    moved around and communities change, is that right?
8         A.   Just -- in your neighborhood in DC, you
9    got a lot of people moving in, a lot of people
10   moving out, the ebb and flow of population.  Our
11   goal was to put 710 plus thousand for the 7th
12   congressional seats.  And, again, the area of flash
13   point is really the growth of the 1st, the lack of
14   growth of the 6th, almost by equal number.
15        Q.   Okay.  And what I'm asking is did your
16   telling me that population moved around in South
17   Carolina from 2010 to 2020, did communities of
18   interest move around?
19        A.   Again, I can't answer that.  We heard
20   both sides, testimony on both sides of that.  And
21   so we heard some they like it the way they got it,
22   we heard some say they would like to be put closer
23   to somebody else.  I mean, that's --
24        Q.   So some communities of interest did
25   move?

Page 168

1      A.   No, sir.
2      Q.   You didn't -- you didn't want one of
3  the goals of redistricting to be a six/one
4  republican majority?
5           MR. GORE:  Objection.  Foundation.
6           THE WITNESS:  I wanted a plan that
7  would pass the Senate, subcommittee, full committee
8  and be adopted by the body and signed by the
9  Governor.  That's what I wanted.
10 BY MR. TRIVEDI:
11     Q.   Okay.  So one of your goals -- I just
12 have to ask again.  One of your goals was not
13 partisan gain for republican?
14     A.   Politics is not -- this is not done in
15 a vacuum and so politics is a consideration, but
16 it's a matter of what votes are taken in the sub,
17 the full and the forum.
18     Q.   Okay.  So when you say politics was a
19 consideration, was shoring up a six/one republican
20 majority a consideration?
21     A.   Not for me, no.
22     Q.   Was it for any other subcommittee
23 member?
24     A.   You'll have to ask them.
25     Q.   Did you ever ask them?

Page 169

1  A. Did not.
2  Q. If you had heard from one of them that
3  shoring up a six/one republican majority was a
4  goal, would you have told them to reconsider?
5  A. Don't know.
6  Q. Okay. Was it a goal of any of the
7  staff members to create a map that shored up a
8  six/one republican majority?
9  A. You'll have to ask them.
10 Q. Okay. Was it a goal of yours to make
11 Congressional District 1 less competitive for
12 Democrats?
13 A. No.
14 Q. Was it a goal of yours to make
15 Congressional District 1 more reliably republican
16 going forward?
17 A. No.
18 Q. And none of the things that I've just
19 asked are contained in the guidelines, is that
20 right?
21 A. Again, my prior answer of a six/one
22 majority, I don't think you can find any of those
23 attributes or descriptions in that document, no.
24 Q. Okay. And going back one moment to
25 constituent consistency, I wish you all had used a