**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | |
|---|---|
| THE SOUTH CAROLINA STATE CONFERENCE OF THE NAACP, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> THOMAS C. ALEXANDER, *et al.*, <br><br> Defendants. | Case No. 3:21-cv-03302-MGL-TJH-RMG <br><br><br> **<u>SENATE DEFENDANTS' AND HOUSE DEFENDANTS' PROPOSED FINDINGS OF FACT</u>** |

Pursuant to this Court's order of October 14, 2022, *see* Dkt. No. 455, the Senate Defendants and the House Defendants submit the following proposed findings of fact.

## I.     THE ENACTED PLAN IS CONSTITUTIONAL

1.     Race was not the predominant factor motivating the 2022 Congressional redistricting plan (the "Enacted Plan").

2.     The General Assembly did not intentionally discriminate against any voters on the basis of race when it drew or adopted the Enacted Plan.

## II.     THE BENCHMARK PLAN AND THE 2020 CENSUS

### A.     The Benchmark Plan

3.     In 2002, this Court drew an updated districting plan governing South Carolina's Congressional districts. *Colleton Cnty. Council v. McConnell*, 201 F. Supp. 2d 618, 626, 663–69 (D.S.C. 2002).

4.     The 2002 Court-drawn plan maintained splits of Charleston County, Richland County, and other counties. *See id.* at 666 n.29.

5.     During the *Colleton County* litigation in 2002, the Court considered various alternative plans, including a plan submitted "at the apparent request of Congressman Clyburn"

that proposed "the relocation of Fort Jackson, the largest military installation in South Carolina, from its present home in the Second District, which is currently represented by Congressman Joe Wilson, to the Sixth District, which is currently represented by Congressman Clyburn." *Id.* at 664; *see id.* at 668 ("Congressman Clyburn testified that he requested the relocation of Fort Jackson from the Second District to the Sixth District ….").

6.      The Court "rejected the proposed relocation of Fort Jackson from the Second District to the Sixth District" because "such an important change to the core of an existing district in a redistricting plan . . . is clearly beyond the scope of our remedial authority." *Id.* at 668.

7.      The Court therefore deferred to the General Assembly's preference to keep Fort Jackson in District 2, along with the resulting hook shape in Richland County. *See id.*

8.      In 2011, the General Assembly enacted an updated districting plan (the "Benchmark Plan"). *Backus v. South Carolina*, 857 F. Supp. 2d 553, 557 (D.S.C.), *aff'd*, 568 U.S. 801 (2012).

9.      The Benchmark Plan split 12 counties. *See* Senate Exhibit ("SX") 28d.

10.     The Benchmark Plan maintained the split of Charleston County between Districts 1 and 6. *See id.*; *see* 10/12/22 AM Tr. at 64:13 (W. Roberts).[1]

11.     The Benchmark Plan split Dorchester County between Districts 1 and 6. SX 28d; *see* 10/12/22 AM Tr. at 64:15 (W. Roberts).

---

[1] Citations to trial transcripts identified by *date* reference the rough draft of the transcript because the final transcript has not yet been completed. *See* Dkt. No. 478.

Citations to trial transcripts identified by *volume* reference the final transcript, if one has been completed.

Citations to deposition transcripts are identified with the label "Dep."

12.     The Benchmark Plan split Beaufort County between Districts 1 and 6.  SX 28d; *see* 10/12/22 AM Tr. at 64:17 (W. Roberts).

13.     The Benchmark Plan split Berkeley County between Districts 1 and 6.  SX 28d; *see* 10/12/22 AM Tr. at 64:19 (W. Roberts).

14.     The Benchmark Plan split Orangeburg County between Districts 2 and 6.  SX 28d; *see* 10/12/22 AM Tr. at 64:21 (W. Roberts); *see also Colleton Cnty. Council*, 201 F. Supp. 2d at 667 (finding that "the western portions of Orangeburg County and Calhoun County are an important part of the existing core of the Second District").

15.     The Benchmark Plan split Richland County between Districts 2 and 6.  SX 28d; *see* 10/12/22 AM Tr. at 64:23 (W. Roberts).

16.     The Benchmark Plan split Sumter County between Districts 5 and 6.  SX 28d; *see* 10/12/22 AM Tr. at 64:25 (W. Roberts).

17.     The Benchmark Plan split Florence County between Districts 6 and 7.  SX 28d; *see* 10/12/22 AM Tr. at 65:2 (W. Roberts).

18.     The Department of Justice precleared the Benchmark Plan under Section 5 of the Voting Rights Act.  *Backus*, 857 F. Supp. 2d at 557.

19.     This Court upheld the Benchmark Plan against claims of racial gerrymandering, intentional discrimination, and Section 2 violations in *Backus*.  *See id.* at 558–70.

20.     Rejecting the racial gerrymandering claims, this Court held that the *Backus* plaintiffs "failed to establish that race was the predominant factor used in drawing the district lines in … the Congressional plan."  *Id.* at 560.

21.    This Court further held that "Defendants were able to *disprove* that race was the predominant factor by demonstrating that their decisions *adhered* to traditional race-neutral principles." *Id.* (emphasis added).

22.    This Court specifically held that Benchmark District 6 was not racially gerrymandered, *i.e.*, race did not predominate over traditional race-neutral principles in the drawing of the district. *Id.* at 564–65.

23.    This Court further held that the *Backus* plaintiffs lacked standing to maintain racial gerrymandering claims challenging the other Benchmark Districts. *Id.* at 560, 564.

24.    Rejecting the intentional discrimination claims, this Court held that the *Backus* plaintiffs failed to prove that the Benchmark Plan was enacted with a discriminatory purpose or had a discriminatory effect. *Id.* at 568–69.

25.    Rejecting the Section 2 claims, this Court held that the *Backus* plaintiffs failed to prove that the General Assembly intentionally discriminated in enacting the Benchmark Plan or that African-American voters could form a majority of voters in an additional district. *Id.* at 567.

26.    The Supreme Court summarily affirmed this Court's judgment. 568 U.S. 801.

27.    The *Backus* plaintiffs moved to set aside this Court's judgment following the Supreme Court's decision in *Shelby County v. Holder*, 570 U.S. 529 (2013). *See Backus v. South Carolina*, No. 3:11-cv-03120 (D.S.C. Aug. 29, 2013) (Dkt. No. 223).

28.    This Court denied the motion to set aside the *Backus* judgment. *See id.* (Dkt. No. 239).

29.    The Supreme Court dismissed the appeal of this Court's denial of the motion to set aside the *Backus* judgment. *See id.* (Dkt. Nos. 243, 244).

      **B.**      **The 2020 Census**

    30.    The U.S. Census Bureau originally planned to release redistricting data based on the 2020 census to the States by March 31, 2021. U.S. Census Bureau, *Census Bureau Statement on Redistricting Data Timeline*, Press Release Number CB21-CN.14 (Feb. 12, 2021), https://www.census.gov/newsroom/press-releases/2021/statement-redistricting-data-timeline.html; *see also* 13 U.S.C. § 141(c) (redistricting data to be "transmitted to each respective State" by April 1 the year following the Census).

    31.    However, due to delays related to the COVID-19 pandemic, the U.S. Census Bureau was late in releasing the census data to the States; it did not release the data until August 2021. *See* U.S. Census Bureau, *Census Bureau Delivers 2020 Census Redistricting Data in Easier-to-Use Format*, Press Release Number CB21-CN.63 (Sept. 16, 2021), https://www.census.gov/newsroom/press-releases/2021/2020-census-redistricting-data-easier-to-use-format.html; 10/12/22 AM Tr. at 35:19–20 (W. Roberts).

    32.    The belatedly released 2020 census data revealed that the Benchmark Plan had become malapportioned and needed to be redrawn to comply with the Constitution's one-person, one-vote mandate. *See* SX 28b.

    33.    In particular, the 2020 census data revealed massive population shifts away from predominantly African-American areas and toward coastal areas: Benchmark District 6 was underpopulated by 11.59%, and neighboring Benchmark District 1 was overpopulated by 11.99%. SX 28b; *see* 10/12/22 AM Tr. at 64:2–4 (W. Roberts).

    34.    The remaining districts were between 3.34% underpopulated and 3.97% overpopulated (District 2: 1.28% underpopulated; District 3: 3.34% underpopulated; District 4: 3.97% overpopulated; District 5: 0.70% overpopulated; District 7: 0.45% underpopulated). SX 28b.

35.    The 2020 census also provided data on the black voting-age population ("BVAP") levels in the Benchmark Districts.  In particular, under the 2020 census data:

      a.    Benchmark District 1's BVAP was 16.56%.  *Id.*

      b.    Benchmark District 2's BVAP was 23.06%.  *Id.*

      c.    Benchmark District 5's BVAP was 25.06%.  *Id.*

      d.    Benchmark District 6's BVAP was 51.04%.  *Id.*

36.    Six of the Benchmark Districts favored the Republican candidate for President and 1 Benchmark district, District 6, favored the Democratic candidate for President according to the 2020 Presidential election results.  *See* SX 28c.

37.    In Benchmark District 1, the Republican candidate received 53.03% of the vote; the Democratic candidate received 46.97%.  SX 28c.

38.    In Benchmark District 2, the Republican candidate received 55.78% of the vote; the Democratic candidate received 44.22%.  *Id.*

39.    In Benchmark District 5, the Republican candidate received 58.45% of the vote; the Democratic candidate received 41.55%.  *Id.*

40.    In Benchmark District 6, the Republican candidate received 32.10% of the vote; the Democratic candidate received 67.90%.  *Id.*

41.    Under the Benchmark Plan following the 2020 elections, Republicans represented 6 Congressional districts and a Democrat represented 1 district.

## III.    THE SOUTH CAROLINA HOUSE ENGAGED IN A ROBUST LEGISLATIVE PROCESS TO ADOPT THE ENACTED PLAN

42.    The South Carolina House of Representatives ("House") held a transparent, accessible, and robust legislative process to adopt the Enacted Plan, which originated in the Senate. 10/13/22 PM Tr. at 36:13-16; 50:9-12 (J. Jordan).

43.     That process included forming the House Redistricting Ad Hoc Committee ("Ad Hoc Committee"), establishing a dedicated redistricting website and email address, holding eleven public hearings across the state in September and October 2021, adopting the House Guidelines, making election data available to the public, holding Ad Hoc Committee and Committee hearings, unveiling multiple staff plans for additional public comments, convening a floor debate, and voting on multiple versions of Congressional maps on the House floor.

44.     Hundreds of members of the public actively participated in the House's legislative process, providing hours of live testimony and submitting thousands of pages of written or emailed testimony. *See* House Exhibit ("HX") 150.

### A.     The Ad Hoc Committee Is Formed And Adopts Guidelines And Criteria For Redistricting

45.     Former Speaker James H. "Jay" Lucas opted to use an Ad Hoc Committee to guide the House's redistricting process as it allowed for broader representation compared to procedures used in prior decades.  Lucas Dep. Vol. 2 at 18:8-13; 23:21-24.

46.     While the Election Laws Subcommittee oversaw the redistricting process in the 2011 redistricting cycle, the Election Laws Subcommittee was comprised of only four members and was dominated by three members from the York area.  10/13/22 PM Tr. at 8:17-9:9 (J. Jordan).

47.     In addition, three Republican members dominated the Election Laws Subcommittee – the sole Democratic member being Rep. John R. King.  *Id.* at 9:2-12 (J. Jordan).

48.     The Election Laws Subcommittee also had three white members and one African-American member – Rep. John R. King.  *Id.* at 9:13-15 (J. Jordan).

49.    House leadership believed that using an Ad Hoc Committee provided for more diverse, bipartisan, and geographically representative membership in the redistricting process than the Election Laws Subcommittee would have. *Id.* at 9:16-22 (J. Jordan).

50.    The decision to use an Ad Hoc Committee was motivated by a desire to have a more diverse and inclusive committee.  Lucas Dep. Vol. 2 at 23:21-24; Dennis Dep. at 54:6-20.

51.    Representative Christopher J. "Chris" Murphy, Chairman of the House Judiciary Committee, appointed the members of the Ad Hoc Committee on July 21, 2021.  *See* Plaintiffs' Exhibit ("PX") 209 at 2.

52.    Representatives Wallace H. "Jay" Jordan, Jr., Chair (House District 63, Congressional District 7);  Wm. Weston J. Newton (House District 120, Congressional District 1); Beth E. Bernstein (House District 78, Congressional District 2); Neal A. Collins (House District 5, Congressional District 3); Jason Elliott (House District 22, Congressional District 4); Brandon Michael Newton (House District 45, Congressional District 5); Justin I. Bamberg (House District 90, Congressional District 6); and Patricia Moore "Pat" Henegan (House District 54, Congressional District 7) were the members of the Ad Hoc Committee.  *See id.*

53.    Three of the Ad Hoc Committee members are Democrats: Representatives Henegan, Bernstein, and Bamberg.  10/13/22 PM Tr. at 8:3-6 (J. Jordan).

54.    Representatives Henegan and Bamberg are African-American.  *Id.* at 8:7-9 (J. Jordan).

55.    Representatives Henegan and Bernstein are female.  *Id.* at 8:10-11 (J. Jordan).

56.    Representative Jordan served as Chairman of the Ad Hoc Committee.  *Id.* at 4:15-22 (J. Jordan).; *see* PX 209 at 2.

57.    While Chairman Murphy formally appointed the Ad Hoc Committee members, Former Speaker Lucas selected the members of the Committee in order to ensure geographic, political, racial and gender diversity.  10/13/22 PM Tr. at 5:9-6:6 (J. Jordan); Lucas Dep. Vol. 2 at 23:21-24; Dennis Dep. at 54:6-20.

58.    Representative Brandon Newton ("Rep. Newton") resigned from the Ad Hoc Committee due to increased family obligations related to his infant child, and the Ad Hoc Committee functioned with seven members from that point on.  10/13/22 PM Tr. at 6:16-22 (J. Jordan).

59.    Speaker Lucas elected not to replace Rep. Newton because the public hearings were about to begin and because the partisan makeup of the Senate Subcommittee consisted of four Republicans and three Democrats.  Lucas Dep. Vol. 2 at 26:3-27:8; 10/13/22 PM Tr. at 6:7-15 (J. Jordan).

60.    Had Former Speaker Lucas replaced Rep. Newton with another House member from Congressional District 5, he would have selected Representative Bruce Bryant, who is a Republican, in order to maintain a balance of Republican to Democrats that most accurately reflects the balance that exists in the House as a whole.  10/13/22 PM Tr. at 6:16-22 (J. Jordan).

61.    However, former Speaker Lucas elected to proceed with a committee with a 4-3 Republican to Democrat balance as that mirrored the division in the Senate's redistricting committee.  Lucas Dep. Vol. 2 at 26:3-27:8.

62.    Rep. King was not selected for the Ad Hoc Committee for a number of appropriate reasons, including geography and partisan balance.  Dennis Dep. at 55:19-56:1.

63.    The Court finds that these reasons for not selecting Rep. King are not racially motivated.

64.     Each of the members of the Ad Hoc Committee had a reputation for being cooperative and collegial, but Rep. King did not have that same reputation.  10/13/22 PM Tr. at 7:10-20 (J. Jordan); *see also* Bernstein Dep. at 271:16-24.

65.     On August 3, 2021, the Ad Hoc Committee met and adopted the 2021 Guidelines and Criteria for Congressional and Legislative Redistricting ("House Guidelines").  PX 175; *see* PX 563, 564.

66.     The House Guidelines were unanimously adopted by the Ad Hoc Committee in its first meeting.  10/13/22 PM Tr. at 10:12-15 (J. Jordan).

67.     The House Guidelines were "guideposts" that recognize "key factors" for the Ad Hoc Committee to consider throughout the redistricting process.  Dennis Dep. at 117:10-17.

68.     However, per Mr. Dennis, the House Guidelines were not an exhaustive list of factors to be considered. For example, criteria such as incumbency consideration "encompasses the concept of core retention."  *Id.* at 126:16-21.

69.     While the exact words "partisan advantage" or "core retention" did not appear in the House Guidelines, incumbency consideration and communities of interest where the prior map that was "enacted and operated under for five election cycles, produced six Republican Congresspeople and one Democratic Congresspeople except for one cycle…certainly lends itself to the same results."  *Id.* at 152:4-14; *see also* 10/13/22 PM Tr. at 51:12-53:14 (J. Jordan).

70.     In addition, some of the criteria in the House Guidelines do not have a single, concrete definition, such as "community of interest."  10/13/22 PM Tr. at 11:2-21 (J. Jordan).

71.     However, county boundaries are specifically listed as a consideration for a community of interest, with smaller counties more likely to comprise a community of interest than larger counties.  *Id.* at 12:2-15 (J. Jordan); PX 175 at 2.

72.     In addition, "political beliefs" and "voting behaviors" are also listed as considerations for communities of interest.  10/13/22 PM Tr. at 12:16-13:1 (J. Jordan); PX 175 at 2.

73.     Finally, incumbents and their "current districts" were also taken into account in the redistricting process and included in the House Guidelines.  10/13/22 PM Tr. at 13:2-4; 536-14 (J. Jordan); PX 175 at 3.

74.     The Court finds that the House Guidelines are appropriate, race neutral, and traditional redistricting principles.

75.     The Court finds the House Guidelines to encompass the concepts of core retention and partisan advantage.

76.     The Court further finds that there were no irregularities in the House process with respect to the empanelment, makeup, staffing and operation of the House Ad Hoc Redistricting Committee.

### B.     The Ad Hoc Committee Holds Eleven Preliminary Public Hearings In September And October 2021

77.     The Ad Hoc Committee held a total of eleven preliminary public hearings in September and October 2021 to gather information from the public before drawing maps.  PX 176.

78.     Nine of the eleven public hearings were held in the evening.  *See id.*

79.     The first House public hearing was held on September 8, 2021 in Myrtle Beach. *See* PX 540, 541 (Myrtle Beach Public Hearing Video & Official Transcript).

80.     The second House public hearing was held on September 9, 2021 in Florence. *See* PX 542, 543 (Florence Public Hearing Video & Official Transcript).

81.     The third House public hearing was held on September 13, 2021 in Rock Hill. *See* PX 544, 545 (Rock Hill Public Hearing Video & Official Transcript).

82.     The fourth House public hearing was held on September 14, 2021 in Greenville. *See* PX 546, 547 (Greenville Public Hearing Video & Official Transcript).

83.     The fifth House public hearing was held on September 15, 2021 in North Charleston. *See* PX 548, 549 (North Charleston Public Hearing Video & Official Transcript).

84.     The sixth House public hearing was held on September 16, 2021 in Bluffton. *See* PX 550, 551 (Bluffton Public Hearing Video & Official Transcript).

85.     The seventh House public hearing was held on September 20, 2021 in Graniteville. *See* PX 552, 553 (Graniteville Public Hearing Video & Official Transcript).

86.     The eighth House public hearing was held on September 21, 2021 in Greenwood. *See* PX 554, 555 (Greenwood Public Hearing Video & Official Transcript).

87.     The ninth House public hearing was held on September 22, 2021 in Orangeburg. *See* PX 556, 557 (Orangeburg Public Hearing Video & Official Transcript).

88.     The tenth House public hearing was held on September 28, 2021 in Columbia. *See* PX 558, 559 (Columbia Public Hearing Video & Official Transcript). The public could provide oral testimony to the Ad Hoc Committee remotely via Microsoft Teams. *See* PX 176.

89.     The eleventh House public hearing was held on October 4, 2021 in Columbia. *See* PX 560, 561 (Columbia Public Hearing Video & Official Transcript). The public could provide oral testimony to the Ad Hoc Committee remotely via Microsoft Teams. *See* PX 176.

90.     A total of approximately 90 members of the public provided testimony at the public hearings. *See* PX 540–561 (Public Hearing Videos & Official Transcripts).

91.    Hundreds of members of the public provided written or emailed testimony in connection with the public hearings held in September and October 2021. *See* HX 150 (Public Comments).

92.    Many of those members provided their testimony through the House redistricting email inbox, while others called, left messages, or submitted hard copy documents. *See id.*

93.    The public input received through the public hearings was valuable, but public input in the legislative process does not necessarily encompass the views of all South Carolinians. Tr., vol. II, at 414:1–4 (M. Duchin).

94.    The Court finds that the process used by the House of Representatives and the Ad Hoc Committee provided ample opportunity for public input from early on in the redistricting process.

### C.    The House Establishes A Redistricting Website And A Dedicated Redistricting Email Inbox

95.    The House established a dedicated website for this redistricting cycle, which website could be accessed by anyone with internet access. *See* https://redistricting.schouse.gov/.

96.    The Ad Hoc Committee made extensive information available on the website, including information regarding the Benchmark Plan; Census data; the Guidelines; hearing and meeting information; links to videos of the public hearings and meetings; public submissions; draft plans; and archives of information regarding past redistricting cycles in South Carolina. *See id.*

97.    The website contained a "Plan Submission Form" link that allowed interested members of the public to submit proposed redistricting plans to the House. *See* https://redistricting.schouse.gov/plansubmission.html.

98.    The Ad Hoc Committee received four Congressional plans submitted through the website: two from Plaintiffs, one from the League of Women Voters of South Carolina, and one from an individual named Michael Roberts.  *See id.*

99.    The maps submitted by Plaintiffs both favored Democrats in Congressional District 1, the first with 52.7% Biden voter share and the second with 52.5%.  *See* SX 12; 92b.

100.    The map submitted by the League of Women Voters of South Carolina proposed a Congressional District 1 with a 51.7% Biden voter share.  *See id.*

101.    The website contained a repository of plans submitted by members of the public through the redistricting website.  *See* https://redistricting.schouse.gov/publicsubmissions.html.

102.    House staff posted supporting data for those publicly submitted maps to the website as well.  *See id.*

103.    The website featured contact information, including a dedicated redistricting email inbox and a telephone number for members of the public to provide input on redistricting. *See* https://redistricting.schouse.gov.

104.    The Court finds that the House's website made the process open, accessible, and transparent.

**D.    The Ad Hoc Committee Held Six Public Hearings In November And December 2021 And January 2022**

105.    Each of the six public hearings held in November and December 2021 and January 2022 took place at 1105 Pendleton Street, Columbia, SC and broadcasted live on the internet. *See* https://redistricting.schouse.gov/agendas.html.

106.    The first House public hearing was held on November 10, 2021.  *See* PX 566, 567 (Meeting Video & Official Transcript).

107.    The second House public hearing was held on November 16, 2021.  *See* PX 569, 570 (Meeting Video & Official Transcript).

108.    The third House public hearing was held on December 16, 2021.  *See* PX 572, 573 (Meeting Video & Official Transcript).

109.    The fourth House public hearing was held on December 29, 2021.  *See* PX 575, 576 (Meeting Video & Official Transcript).

110.    The fifth House public hearing was held on January 10, 2022.  *See* PX 578, 579 (Meeting Video & Official Transcript).

111.    At least 34 members of the public provided testimony at the public hearings.  *See* PX 566, 567, 569, 570, 572, 573, 575, 576, 578, 579 (Meeting Videos & Official Transcripts).

112.    At least 10 members of the public provided written testimony in connection with the public hearings held in September and October 2021. *See* HX 150 (Public Comments). Many of those members provided their testimony through the House redistricting email inbox. *See id.*

113.    The public input received through the public hearings was valuable, but it was not representative of the views of all South Carolina voters.  Tr., vol. II, at 414:1–4 (M. Duchin).

114.    The Court finds the House provided ample opportunity for the public to participate in the redistricting process.

### E.    Senate Bill 865 Was Introduced, Read For The First Time, And Referred To The House Judiciary Committee

115.    S. 865 was introduced in the House, read for the first time, and referred to the House Judiciary Committee on December 9, 2021.    *See* https://www.scstatehouse.gov/sess124_2021-2022/bills/865.htm.

116.     There was also a House version of a bill on Congressional redistricting – H. 4492. *See* HX 2 at 36.

117.     However, debate adjourned on that bill on January 26, 2022 and it did not pass the General Assembly.  *See* HX 4 at 14.

### F.     House Staff Prepare And Release The Congressional House Staff Plan

118.     Patrick Dennis, Chief Counsel for the House and Chief of Staff to the Speaker of the House, with technical assistance from Thomas Hauger, former Data Director/GIS Director at the House, drew the initial Congressional House Staff Plan ("House Staff Plan").  HX 5; *see also* Hauger Dep. Vol. 2 at 58:5–11, 17–25; Dennis Dep. at 192:23-193:13; 195:20-196:17; 10/13/22 PM Tr. at 13:18-21 (J. Jordan).

119.     The House Staff Plan was provided by House Staff to the Ad Hoc Committee to serve as a starting point for the Ad Hoc Committee's work.  *See id.*

120.     The House Staff Plan balanced population across all seven Congressional Districts.  *See* HX 9.

121.     The House Staff Plan largely tracked the 2011 Congressional Districts, but included Beaufort County in Congressional District 2.  HX 5, 7; Dennis Dep. at 197:3-18; 214:9-215:11.

122.     The House Staff Plan split 8 counties and 26 VTDs, although three of the VTD splits affected no population.  *See* HX 8.

123.     The House Staff Plan preserved 86.52% of the core of District 1, 66.11% of the core of District 2, 95.60% of the core of District 3, 98.94% of the core of District 4, 82.34% of the core of District 5, 64.42% of the core of District 6, and 99.37% of the core of District 7.  *See* HX 7.

124.     District 1's BVAP percentage in the House Staff Plan was 20.27%.  *See* HX 10.

125. District 6's BVAP percentage in the House Staff Plan was 50.67%. *See id.*

126. The House Staff Plan, including the map and data reports, was released publicly on the House Redistricting Website on December 13, 2021. *See* HX 150 at 1739–43.

127. The Ad Hoc Committee met on December 16, 2021 to receive comments on the House Staff Plan. *See* PX 572, 573 (Meeting Video & Official Transcript).

128. At that meeting, many individuals expressed their support for keeping Beaufort County in Congressional District 1. *See id.*

129. This included former Republican candidate for Congressional District 1 Lynz Piper Loomis, who stated she was "in support of keeping Beaufort in District 1." PX 572 at 30:13-14.

G. **Ad Hoc Committee Members Receive "Very Negative" Feedback Regarding The House Staff Plan**

130. The public feedback, particularly from Beaufort and Hilton Head, was "very negative towards" the House Staff Plan. 10/13/22 PM Tr. at 13:22-14:1 (J. Jordan).

131. The House Staff Plan was widely reported to make Congressional District 1 more politically competitive for Democrats and "less GOP dominant." PX 667; 10/13/22 PM Tr. at 14:12-13 (J. Jordan).

132. Chairman Jordan's name and photograph were widely associated with this move; despite the fact the map was a staff plan. *See* PX 667.This came at a time when Chairman Jordan was campaigning for a South Carolina Senate seat in the Republican primary race against now Senator Mike Reichenbach, who was criticizing Chairman Jordan for being "too moderate" in his representation in the House. *See id.*; 10/13/22 PM Tr. at 14:21-15:9 (J. Jordan).

133.    This type of feedback "did not help" Chairman Jordan's "standing in the republican community back home" at a time when he was running in a Republican primary race in the Florence area.  10/13/22 PM Tr. at 15:10-14 (J. Jordan).

134.    Lynn Teague of the League of Women Voters of South Carolina commented that the map made Congressional District 1 politically "competitive."  PX 572 at 10:11-13.

135.    The Trump vote share in Congressional District 1 in the House Staff Plan was only 50.8%.  SX 92b.

136.    Chairman Jordan received feedback opposing Beaufort County's inclusion and Congressional District 2 based on the fact it is more of a community of interest with coastal South Carolina than central South Carolina.  *See* HX 94.

137.    Representative Newton, who resides in Beaufort County, also caught "a lot of flack" [sic] for the House Staff Plan because Beaufort County has "very little in common with Lexington [County] and share more in common with coastal areas."  HX 88.

138.    Representative Newton received significant and meaningful public input expressing opposition to Beaufort County being in Congressional District 2.  *See* HX 82, 83, 86, 87, 88; Newton Dep. Vol. 2 at 120:5–9.

139.    Chief Counsel to the House Judiciary Committee Emma Dean had a "very rough count of around 450" emails sent from members of the public regarding the new map, most of which were critical of Beaufort County being included in Congressional District 2.  HX 82; *see also* 10/13/22 PM Tr. at 13:22-14:1 (J. Jordan).

140.    Specifically, Representative Newton received feedback from the Beaufort County Republican Party, from Kevin Hennelly, its chairman, and from Xiaodan Li, its State Executive Committee Member.  *See* HX 83, 87.

141.    Kevin Hennelly sent a text message to Representative Newton saying that there was lots of uproar about the House Staff Plan and "folks [were] not happy with Beaufort moving out of CD#1."  HX 87.

142.    Xiaodan Li sent a text message to Representative Newton saying that "most [of the] base would want to stay in CD1 to make sure Joe Cunningham won't succeed in 2022," a reference to a Democratic candidate not winning Congressional District 1.  HX 83.

143.    Representative Newton also received text messages from Senator George E. "Chip" Campsen III ("Senator Campsen") saying that Berkeley County and Beaufort County would be "asking to largely staying in 1st District – like we have in the Senate Staff plan."  HX 86.

144.    Senator Campsen also stated that Beaufort and Berkeley Counties "will be allies in pushing for major elements of Senate Staff Plan."  *Id.*

145.    This was because Beaufort and Berkeley Counties are solid Republican Counties. 10/13/22 PM Tr. at 103:9-24 (C. Campsen).

146.    With the inclusion of Beaufort and Berkeley Counties in Congressional District 1, all of Charleston County could not be included in Congressional District 1 as well because it would exceed the equal population requirements.   10/13/22 PM Tr. at 104:23-105:2 (C. Campsen).

147.    With Charleston County already split in the Benchmark Plan and its tendency to lean Democrat, Charleston County was a natural choice to split.  10/13/22 PM Tr. at 105:8-24; 138:13-16; 139:1-7 (C. Campsen).

148.    Members of the South Carolina federal delegation, including Congressman Jeff Duncan and Congressman Joe Wilson, expressed to Chairman Jordan directly and indirectly that

the South Carolina federal delegation was "unanimous in support of the Senate Congressional Map," which was "better for the 1ˢᵗ for sure." HX 93; *see also* HX 90, 95; 10/13/22 PM Tr. at 19:14-23:7 (J. Jordan).

149.    Representative Phillip D. Lowe, Chairman Jordan's seatmate, sent a text message to Chairman Jordan saying that Congressman Joe Wilson "wants a more central district," not a district that went "all the way to Hilton Head," as drawn in the House Staff Plan. HX 90; 10/13/22 PM Tr. at 19:14-20:12 (J. Jordan).

150.    Chairman Jordan was of the opinion that if six Republican incumbent Congresspeople were against the House Staff Plan, it would have been "virtually impossible" for that plan to pass the House or General Assembly as a whole. 10/13/22 PM Tr. at 51:21-24 (J. Jordan).

151.    Mr. Dennis sent Chairman Jordan and Representative Newton a text message saying that "after going through a dozen iterations, the truth is, when all of Beaufort [C]ounty is put with a significant portion or all of Charleston County you get a 50/50 district because there isn't room for the portions of Dorchester and Berkeley that pull [Congressional District 1] red," meaning Republican leaning. HX 81; 10/13/22 PM Tr. at 15:15-19:8 (J. Jordan).

152.    These statistics referred to party preference, not race. *See* HX 81.

153.    Representative Newton responded that all of Charleston County was not in Congressional District 1 previously, meaning it was already split between Congressional districts. *See id.*

154.    Representative Newton stated that the Senate would support a version of their plan with a forecasted 53.5% Republican vote share in Congressional District 1. *See id.*

155.    These statistics again referred to party preference, not race. *See id*

156.    Mr. Dennis responded, "At this point, I'm ready to just adopt [the Senate's] plan."

*Id.*

157.    The Guidelines include factors such as communities of interest (encompassing "[c]ounty boundaries," "political beliefs," and "voting behaviors"), public input, and incumbency consideration.  PX 175 at 2-3.

158.    The Court finds that respecting communities of interest, receiving public input, and considering incumbent feedback are all race-neutral factors and traditional redistricting principles.

**H.    House Staff Prepare And Release The Congressional House Staff Plan Alternative 1**

159.    Based on the overwhelming negative public feedback received from citizens and members of Congress regarding the House Staff Plan; a realization that, when Beaufort and Charleston are wholly within the same Congressional District, a swing district is created; and an understanding that the Senate would only support a version of their plan with a forecasted 53.5% Republican vote share in Congressional District 1, Chairman Jordan decided to propose an alternative Congressional plan.  10/13/22 PM Tr. at 23:8-23 (J. Jordan); *see also* HX 81.

160.    Chairman Jordan's "chief concern" was having a plan that would pass the General Assembly.  10/13/22 PM Tr. at 23:17-23 (J. Jordan).

161.    Chairman Jordan did not believe that the House Staff Plan would have passed the House.  10/13/22 PM Tr. at 23:17-24:13 (J. Jordan).

162.    Mr. Dennis, again assisted by Thomas Hauger, drew the Congressional House Staff Plan Alternative 1 ("House Staff Alternative Plan"), with "a lot of input" from Chairman Jordan.  HX 12; Dennis Dep. at 232:22-233:21; 10/13/22 PM Tr. at 23:8-23 (J. Jordan).

163.    Chairman Jordan's input included instructions to begin with the Senate Staff Plan and make tweaks to that plan.  10/13/22 PM Tr. at 23:8-23 (J. Jordan); *see also* HX 81.

164.    Chairman Jordan's instructions did not include any mention of race or racial targets.  10/13/22 PM Tr. at 24:20-25 (J. Jordan).

165.    House Staff released the House Staff Alternative Plan, including the map and data reports, on its website December 22, 2021.  *See* HX 150 at 1421–25

166.    The House Staff Alternative Plan was released just prior to Christmas because of the time pressure the House was facing from this lawsuit and the stay implemented by the Court, which was set to expire on January 18, 2022.  *See* ECF No. 63.

167.    The House Staff Alternative Plan balanced the population across all seven Congressional Districts.  *See* HX 16.

168.    The House Staff Alternative Plan included Beaufort County wholly within Congressional District 1.  *See* HX 12.

169.    The House Staff Alternative Plan was "substantially similar" to the Senate Staff plan, but made some tweaks, including making Beaufort, Calhoun, and Orangeburg counties whole.  SX 71; *see also* HX 12; SX 32a.

170.    The House Staff Alternative Plan split 10 counties and 7 VTDs.  *See* HX 15.

171.    The House Staff Alternative Plan preserved 94.80% of the core of District 1, 95.09% of the core of District 2, 94.75% of the core of District 3, 98.09% of the core of District 4, 95.04% of the core of District 5, 77.77% of the core of District 6, and 99.51% of the core of District 7.  *See* HX 14.

172.    District 1's BVAP percentage in the House Staff Alternative Plan was 15.67%. *See* HX 17.

173.    District 6's BVAP percentage in the House Staff Alternative Plan was 47.57%. *See id.*

174.    Chairman Jordan set out to make District 1 more Republican-leaning in the House Staff Alternative Plan than it had been in the House Staff Plan. *See* HX 81; 10/13/22 PM Tr. at 23:8-24:13 (J. Jordan).

175.    Chairman Jordan knew that the Republican-controlled General Assembly would not pass a plan that did not improve District 1's Republican voting performance.  10/13/22 PM Tr. at 23:17-24:13 (J. Jordan).

176.    Congressional District 1 in the House Staff Alternative Plan has a Trump voter share of 54.5%.  SX 92b.

177.    The House Staff Alternative Plan preserved six districts where Republicans form the majority according to the 2020 Presidential election results.  *See id., see also* SX 32d.

178.    The House Staff Alternative Plan accommodated the requests made on behalf of the South Carolina Federal Delegation, including following the Senate Staff Plan, making Congressional District 2 more central, and increasing Republican voting power in Congressional District 1.  *See* HX 90, 93, 95.

179.    The House Staff Alternative Plan also accommodated the requests from the public, including Beaufort County being moved back into Congressional District 1.  *See* HX 82, 83, 86, 87, 88; Newton Dep. Vol. 2 at 120:5–9.

180.    The House Staff Alternative Plan also accommodated the Senate's partisan wishes.  *See* HX 81.

181.     The Court finds that respecting communities of interest, receiving public input, and considering incumbent feedback are all race-neutral factors and traditional redistricting principles that drove the need for, and the creation of, the House Staff Alternative Plan.

182.     The Court finds that the political reality of needing a plan that would pass both chambers of the South Carolina General Assembly also motivated the need for, and creation of, the House Staff Alternative Plan.

### I.     The Ad Hoc Committee Meets On December 29, 2021 To Receive Public Feedback On The House Staff Alternative Plan.

183.     The Ad Hoc Committee met on December 29, 2021 and received public comments on the House Staff Alternative Plan.  *See* PX 575, 576 (Meeting Video & Official Transcript).

184.     The Ad Hoc Committee received numerous emails from the public thanking them for listening to public input and creating an alternative with Beaufort County in Congressional District 1. *See, e.g.*, HX 150 at 1295-96, 1304, 1309-10, 1313, 1326-36, 1339-56; 1359-60, 1363-75, 1378-81, 1383-85, 1387-89.

185.     The majority of written comments from the public appreciated the Ad Hoc Committee's revised map that "listened to the feedback from Beaufort County," as the new map "reflects this input and reflects community of interest [of] the coastal areas of the Lowcountry." HX 150 at 1350.

### J.     The Ad Hoc Committee Meets On January 10, 2022 And Advances The House Staff Alternative Plan

186.     The Ad Hoc Committee met on January 10, 2022 to discuss House Staff Alternative Plan.  *See* PX 578, 579 (Meeting Video & Official Transcript).

187.    The Ad Hoc Committee voted along party lines to advance the House Staff Alternative Plan to the full House Judiciary Committee.  *See id.*

**K.    The House Judiciary Committee Meets On January 10, 2022 And Advances The House Staff Alternative Plan**

188.    The House Judiciary Committee met on January 10, 2022 to discuss House Staff Alternative Plan.  *See* PX 584, 585 (Meeting Video & Official Transcript).

189.    Chairman Murphy was not in attendance for that meeting due to his having been diagnosed with COVID-19 on the date of that meeting.  10/13/22 PM Tr. at 25:10-14 (J. Jordan); Murphy Dep. Vol. 2 at 38:21-24.

190.    Instead of rescheduling the meeting to a time he could be present as per regular procedure, given the fact that there was court-imposed deadline for the House and Senate to enact a Congressional plan, Chairman Murphy via letter designated Representative Newton—a member of the Ad Hoc Committee, Chairman of the House Oversight Committee, and Chairman of the Constitutional Laws Subcommittee—to chair the January 10, 2022 meeting.  HX 96 at 3; Murphy Dep. Vol. 2 at 38:21-40:20.

191.    Representative Newton's designation to chair the January 10, 2022 meeting was pursuant to Rule No. 14 of the 2021-2022 Session Rules of the House Judiciary Committee (adopted January 26, 2021) ("House Judiciary Rules").  HX 96 at 3; *see also* HX-153 at 2.

192.    Rule No. 14 of the House Judiciary Rules states, "In the event of extraordinary circumstances, including but not limited to natural disasters, severe weather, and Acts of God, the Chairman may designate alternative meeting arrangements and procedures."  HX-153 at 2.

193.    This rule was put into place because of the COVID-19 pandemic.  Dennis Dep. at 277:4-17.

194.    Mr. Dennis believed that Chairman Murphy having COVID "is about as extraordinary as is gets" under Rule 14, which was implemented as "purely a COVID rule, put in place because of the uncertainties of COVID." *Id.*

195.    Representative John King, First Vice Chairman of the Judiciary Committee, objected to Chairman Murphy's designation of Representative Newton to chair the January 10, 2022 meeting under the belief that Rule No. 1 of the House Judiciary Rules mandates the First Vice-Chairman preside over Committee meetings in the absence of the Chairman.  Tr., vol. III, at 632:8-16, 635:7-8 (J. King); *see also* HX-153 at 1.

196.    Mr. Dennis and others testified that that it is "normal process" for the Chairman to select someone other than the First Vice Chair as the position of First Chair because it is a "largely ceremonial" position.  Dennis Dep. at 277:18-278:5; 10/13/22 PM Tr. at 25:15-26:8 (J. Jordan).

197.    Mr. Dennis, who is very familiar and knowledgeable about the House's legislative process, did not agree that there was anything "irregular" about that meeting or "a circumvention of normal succession."  Dennis Dep.  at 279:4-280:5.

198.    The selection of Representative Newton was based on his membership on the Ad Hoc Committee, his experience chairing committees, including his service as Chair of both the House Oversight Committee and the Constitutional Laws Subcommittee of the Judiciary Committee, and his vast general experience running meetings.  10/13/22 PM Tr. at 26:9-23 (J. Jordan).

199.    Representative King was not as qualified for that role as Representative Newton. *Id.* at 26:24-27:21 (J. Jordan).

200.    Republican leadership, including Chairman Jordan, believed that the decision for Representative Newton to Chair that meeting was appropriate.  *Id.* at 23:17-24:13 (J. Jordan); Lucas Dep. Vol. 2 at 103:20-104:6.

201.    The Court finds that there is no provision in the House Judiciary Rules that assigns a priority to any particular rule.

202.    The Court finds that there was no impropriety in Chairman Murphy designating Representative Newton as the chair for the January 10, 2022 meeting because the following factors in total qualify as an extraordinary circumstance under Rule 14 of the House Judiciary Rules: (1) Chairman Murphy's COVID-19 diagnosis; (2) Representative Newton's familiarity with the plan at issue from having participated on the Ad Hoc Committee; (3) this Court's November 12, 2021 Order imposing a January 18, 2022 general deadline on the General Assembly to enact new Congressional  maps or face the lifting of a stay of litigation; and (4) the appropriately  held by Republican leadership that  Representative King as Acting Chair would have inappropriately delayed the process, a belief corroborated by Representative King's own testimony: "We would not have rushed and voted that particular piece of legislation out that day." Tr., vol. III, at 640:12-13 (J. King).

203.    The Judiciary Committee voted along party lines to advance the House Staff Alternative Plan.  10/13/22 PM Tr. at 27:22-28:6 (J. Jordan).

204.    Chairman Murphy submitted a favorable report with amendments on S. 865, a fact published in the House Journal on January 11, 2022.  *See* HX 2.

**L.    The Full House Passes S. 865 As Amended with House Staff Alternative Plan**

205.    On January 12, 2022, the House adopted a House Resolution to set by special order S. 865 (which contained the House Staff Alternative Plan at the time) for second reading

consideration on January 12, 2022, immediately following adoption of the special order resolution and to provide, following the roll call on each legislative day thereafter, for continuing special order consideration until S. 865 is given third reading or other disposition. *See* HX 3 at 44–45; 10/13/22 PM Tr. at 28:7-20 (J. Jordan).

206.    S. 865 was read the second time on January 12, 2022. *See* HX3 at 78.

207.    During second reading, the full House debated the bill on the House floor. *See id.*

208.    During this debate, Rep. King again voiced his personal frustration because he felt excluded from the process. Tr., vol. III, at 631:11-23 (J. King).

209.    In addition, Rep. Gilda Cobb-Hunter ("Rep. Cobb-Hunter") spoke and asked Chairman Jordan a series of questions, including one about a "Section 2 analysis." 10/13/22 PM Tr. at 28:21-29:5 (J. Jordan);  Tr., vol. I, at 134:14-24 (G. Cobb-Hunter).

210.    Prior to that, Chairman Jordan had not heard of a Section 2 analysis and had not previously been asked by Rep. Cobb-Hunter to perform such an analysis. 10/13/22 PM Tr. at 29:6-16 (J. Jordan).

211.    Had Rep. Cobb-Hunter asked Chairman Jordan to perform such an analysis, Chairman Jordan would have gone to staff and done "everything" the Ad Hoc Committee could do "to accommodate that request." 10/13/22 PM Tr. at 30:2-4 (J. Jordan).

212.    On the second reading, the yeas were 74 and the nays were 35. *See* HX 3 at 77.

213.    This vote was along party lines to advance the House Staff Alternative Plan. 10/13/22 PM Tr. at 30:5-10 (J. Jordan).

214.    S. 865 was read the third time and ordered returned to the Senate with amendments on January 13, 2022. *See* https://www.scstatehouse.gov/sess124_2021-

2022/bills/865.htm;  https://www.scstatehouse.gov/sess124_2021-2022/hj22/20220113.htm;  PX 113 at 3.

215.    On the third reading, the yeas were 68 and the nays were 36.  *See id.*

216.    The House Staff Alternative Plan was then sent to the Senate, but the Senate did not pass that plan.  10/13/22 PM Tr. at 30:11-21 (J. Jordan).

217.    Instead, the Senate amended the House Staff Alternative Plan and "sent back essentially their plan that [the House] eventually… adopted."  *Id.*

218.    At the end of the process, the House went with the Senate plan, which was enacted into law.  *See id.*

**M.    The House Concurs With The Senate's Congressional Plan – Senate Amendment 1**

219.    The Senate amended S. 865 with Senate Amendment 1 sponsored by Senator Campsen on January 20, 2022, thereby replacing the House's passed Congressional Plan with the Senate   Congressional   Plan.    *See*    https://www.scstatehouse.gov/sess124_2021-2022/bills/865.htm; PX 116 at 3, 97–98.

220.    The House received voluminous public feedback urging them to adopt the Senate plan.  *See, e.g.*, HX 150 at 1439, 1441, 1445-47, 1449-52, 1458, 1460-65, 1468-73, 1478-79, 1482-89, 1491, 1493-1496, 1500-03, 1506-11, 1514, 1517, 1520, 1525, 1528, 1531-32, 1534-35, 1541, 1543, 1548, 1550, 1554, 1558-59, 1566-68, 1573, 1577, 1588-89, 1610.

221.    S. 865 as amended by the Senate with Senate Amendment 1 was returned to the House on January 20, 2022.  PX 116 at 198.

222.    The House concurred with S. 865 (which now comprises the Senate's Congressional Plan) on January 26, 2022.  *See* HX 4 at 23–25.

223.    On the concurrence, the yeas were 72 and the nays were 33.  *See id.*

224.    Notably, Representative Robert Williams, an African-American Democrat, voted in favor of concurrence with S. 865. *See id* at 25.

225.    Representative Bamberg, also an African-American Democrat, voted against the bill, but not because it evidenced racial discrimination, but because it was hyper partisan. *See* 10/13/22 AM Tr. at 125:9–126:1 (J. Bamberg).

226.    Governor Henry McMaster signed into law S. 865 as Act 118 on January 26, 2022. *See* https://www.scstatehouse.gov/sess124_2021-2022/bills/865.htm.

227.    The Court finds the House did not elevate race as a predominant redistricting criteria over traditional redistricting factors in the movement of voters inside or outside Congressional Districts 1, 2, and 5 in Act 118 because the House played no role in developing the Congressional plan that was ultimately signed into law as Act 118.  Plaintiffs have not presented *any* evidence to the contrary that the House Defendants acted with any discriminatory intent or racially gerrymandered the enacted Congressional plan.

## IV.    THE SOUTH CAROLINA SENATE ENGAGED IN A ROBUST LEGISLATIVE PROCESS BEFORE DRAWING THE ENACTED PLAN

228.    The Senate engaged in an open, extensive, and robust legislative process to adopt the Enacted Plan.

229.    The Senate engaged in a more open, extensive, and robust legislative process to adopt the Enacted Plan than it ordinarily engages in to adopt legislation.  10/13/2022 PM Tr. at 73:3–8 (C. Campsen).

230.    Thousands of members of the public actively participated in the Senate's legislative process leading to adoption of the Enacted Plan.

231.    That process included forming the Senate Redistricting Subcommittee; holding ten public hearings across the state in July and August 2021; establishing a dedicated

redistricting website and email address; adopting the Senate Guidelines; making maps, plans, and election data available to the public; holding Subcommittee and Committee hearings; and convening a floor debate. *See, e.g.*, 10/13/2022 PM Tr. at 80:21–82:10 (C. Campsen).

A.   **The Senate Redistricting Subcommittee Is Formed And Holds Ten Public Hearings In July And August 2021**

232.   Senator Luke Rankin, chairman of the Senate Judiciary Committee, announced the formation of the Senate Redistricting Subcommittee on July 16, 2021. *See* Press Release (July 16, 2021), https://redistricting.scsenate.gov/docs/Press%20Release%20-%20Senate%20Judiciary%20Redistricting%20Subcommittee%2007-16-21.pdf.

233.   Senators Rankin, George E. "Chip" Campsen, III, Tom Young, Jr., Ronnie A. Sabb, Margie Bright Matthews, Scott Talley, and Richard A. "Dick" Harpootlian were the members of the Senate Redistricting Subcommittee. *See id.*; *see also* SX 1 at 1.

234.   Three of the Subcommittee members—Senators Sabb, Bright Matthews, and Harpootlian—are Democrats.

235.   Two of the Subcommittee members—Senators Sabb and Bright Matthews—identify as African American.

236.   Senator Rankin served as chairman of the Subcommittee. Rankin Dep. at 102:11–107:12.

237.   Senator Rankin chose the members of the Subcommittee to ensure geographic, political, and racial diversity. *See id.*

238.   Senator Young eventually left the Subcommittee when he joined the Senate Finance Committee, and the Subcommittee functioned with six members and an even partisan split from that point on. 10/13/2022 PM Tr. at 60:22–61:7 (C. Campsen).

239.    On July 20, 2021, the Subcommittee met and adopted "a statewide public hearing schedule to allow public input concerning the 2021 redistricting of South Carolina's forty-six State Senate and seven U.S. Congressional Districts."  SX 1 at 1 (July 20, 2021 Press Release).

240.    "The mission of these public hearings [was] to receive testimony and gather information about how people see the areas in which they live and what factors need[ed] to be considered when the Senate Districts and the Congressional Districts are redrawn."  *Id.*

241.    The Subcommittee held a total of ten public hearings in July and August 2021. *See id.*

242.    All of these public hearings were held in the evening.  *See id.*

243.    The first Senate public hearing was held on July 27, 2021 in Columbia.  *See* SX 224, 224a (Columbia Public Hearing Video & Official Transcript).

244.    The second Senate public hearing was held on July 28, 2021 in Sumter.  *See* SX 225, 225a (Sumter Public Hearing Video & Official Transcript).

245.    The third Senate public hearing was held on July 29, 2021 in Rock Hill.  *See* SX 226, 226a (Rock Hill Public Hearing Video & Official Transcript).

246.    The fourth Senate public hearing was held on August 2, 2021 in Greenville.  *See* SX 227, 227a (Greenville Public Hearing Video & Official Transcript).

247.    The fifth Senate public hearing was held on August 3, 2021 in Florence.  *See* SX 228, 228a (Florence Public Hearing Video & Official Transcript).

248.    The sixth Senate public hearing was held on August 4, 2021 in Beaufort.  *See* SX 229, 229a (Beaufort Public Hearing Video & Official Transcript).

249.    The seventh Senate public hearing was held on August 9, 2021 in Orangeburg. *See* SX 230, 230a (Orangeburg Public Hearing Video & Official Transcript).

250. The eighth Senate public hearing was held on August 10, 2021 in Charleston. *See* SX 231, 231a (Charleston Public Hearing Video & Official Transcript).

251. The ninth Senate public hearing was held on August 11, 2021 in Conway. *See* SX 232, 232a (Conway Public Hearing Video & Official Transcript).

252. The tenth Senate public hearing was held on August 12, 2021 in Aiken. *See* SX 233, 233a (Aiken Public Hearing Video & Official Transcript).

253. A total of approximately 292 members of the public provided testimony at the public hearings. *See* SX 224-233a (Public Hearing Videos & Official Transcripts).

254. The public input received through the public hearings was valuable, but it was not representative of the views of all South Carolina voters nor the only means through which South Carolinians could provide input. *See* 10/4/22 PM Tr. at 36:20 (M. Duchin).

**B.    The Senate Establishes A Redistricting Website And A Dedicated Redistricting Email Inbox**

255. The Senate established a dedicated redistricting website: https://redistricting.scsenate.gov/.

256. That website could be accessed by anyone in the world with internet access.

257. The Subcommittee made extensive information available on the website, including information regarding the Benchmark Plan; election and Census data; the Senate Redistricting Guidelines; meeting information, press releases, and links to videos of the public hearings; and archives of information regarding past redistricting cycles in South Carolina. *See id.*

258. The website contained a "Plan Submission" tab that allowed interested members of the public to submit proposed redistricting plans to the Senate. *See* https://redistricting.scsenate.gov/plansubmission.html.

259.    Members of the public submitted plans through the redistricting website. *See* https://redistricting.scsenate.gov/planproposal.html.

260.    Senate staff posted publicly submitted plans, including maps and supporting data, to the website as well. *See id.*

261.    The website featured a Contact tab with a dedicated redistricting email inbox and a telephone number for members of the public to provide input on redistricting. *See* https://redistricting.scsenate.gov/contact.html.

262.    Approximately 116 members of the public provided written testimony in connection with the public hearings held in July and August 2021. *See* SX 80-89 (Public Comments). Many of those members provided their testimony through the Senate redistricting email inbox. *See id.*

**C.    The Senate Redistricting Subcommittee Adopts Guidelines, A Public Submissions Policy, And A Deadline For Public Submissions At Its September 17, 2021 Meeting**

263.    The Senate Redistricting Subcommittee met on September 17, 2021, for the purpose of adopting guidelines for State Senate and Congressional redistricting. *See* SX 235 (Sept. 17, 2021 Meeting Video).

264.    The day before that meeting, Senator Harpootlian sent a letter to Senator Rankin requesting changes to the draft guidelines. *See* PX 322.

265.    During the meeting, Senator Harpootlian stated he "would move" for the Senate staff to prepare a racial bloc voting analysis. SX 235 at 15:34-15:48.

266.    Senator Bright Matthews interjected with a question whether the staff had "produce[d] a memo in reference to this particular voting rights issue that Senator Harpootlian is referring to." *Id.* at 15:48-16:28.

267.    Mr. Charlie Terreni, outside counsel to the Subcommittee, explained that the staff had not conducted a racial bloc voting analysis, that such an analysis might not be "productive," and that a racial bloc voting analysis could be performed "if needed" once a plan was produced. Mr. Terreni warned that conducting a racial bloc voting analysis could create a risk of allegations that the Senate drew redistricting plans with a racial target. *Id.* at 16:29-18:54.

268.    Senator Bright Matthews had no follow-up questions for Mr. Terreni. *Id.* at 18:54-19:20.

269.    Senator Harpootlian then asked whether the Subcommittee would compile and make available the election data needed for members of the public, such as "the League of Women Voters," to conduct their own racial bloc voting analysis. *Id.* at 19:20-20:35.

270.    Mr. Terreni answered that the Senate staff was compiling that election data and would make it publicly available. *Id.* at 20:35-21:44.

271.    Senator Harpootlian later clarified that he did *not* want a racial bloc voting analysis, but instead only the data needed to conduct such an analysis: "I don't want analysis. I want the data." *Id.* at 24:30-25:30.

272.    Senate staff worked with Dr. John Ruoff, who is affiliated with the League of Women Voters and in the past has been affiliated with Plaintiff SC NAACP, to compile the election data needed to conduct a racial bloc voting analysis. *See* PX 320 at 2.

273.    The Subcommittee made that election data available upon request through the Senate Redistricting website. *See id.*

274.    Senator Harpootlian made a motion to amend the draft guidelines to add "a more specific standard" for determining whether a plan complies with Section 2 of the Voting Rights Act. SX 235 at 22:20-23:02.

275.    Senator Harpootlian later "amended" his motion to request that the guidelines "adopt the three criteria" from the Supreme Court's decision in *Thornburg v. Gingles*, 478 U.S. 30 (1986). *Id.* at 30:54-31:26.

276.    The Subcommittee adopted that motion unanimously. *See id.* at 34:12-34:31.

277.    Senator Harpootlian made a separate motion to amend the guidelines to "specifically reject this idea of non-retrogression" and to "recognize that retrogression is not a criteria." *Id.* at 34:31-37:17.

278.    That motion failed for lack of a second. *See id.* at 43:00-43:05.

279.    Senator Harpootlian then made a motion to amend the guidelines to state that "correcting bizarrely shaped districts . . . and drawing compact shapes is the second most important priority of this subcommittee only subject to . . . one person, one vote." *Id.* at 43:05-46:20.

280.    That motion failed for lack of a second. *See id.* at 46:20-46:29.

281.    Senator Harpootlian moved to amend the definition of "community of interest" in the guidelines. *Id.* at 46:29-50:44.

282.    That motion failed for lack of a second. *See id.* at 50:44-51:06.

283.    Senator Harpootlian's final motion during the September 17, 2021 meeting sought to amend the guidelines to "expressly state that incumbency protection is not a criteria." *Id.* at 51:06-52:44.

284.    That motion failed for lack of a second. *Id.* at 52:44-52:50.

285.    Senator Bright Matthews stated that she "like[d] the way" the draft guidelines' definition of communities of interest "is written there," and moved to add the word "language" to the definition. *Id.* at 53:30-54:30.

286.    The Subcommittee adopted Senator Bright Matthews's amendment on a 5-2 vote. *Id.* at 55:30-56:00.

287.    Senator Sabb moved to adopt the guidelines as amended.  Senator Bright Matthews seconded that motion.  The Subcommittee adopted the Senate Guidelines on a 6-1 vote.  *Id.* at 56:00-57:07; SX 3 (Senate Guidelines).

288.    The Subcommittee also considered and adopted the 2021 Policy for Public Plan Submission.  *See* SX 235 at 57:49-1:14:21.

289.    Senator Harpootlian made a motion to amend the Policy "to allow the public to have access to technical assistance from this committee or its staff to assist them" in submitting proposed plans in the required ASCII format.  *Id.* at 108:15-1:13:22.

290.    That motion failed on a 5-2 vote.  *Id.* at 1:13:22-1:13:42.

291.    The Subcommittee adopted the 2021 Policy for Public Plan Submission on a 6-1 vote.  *Id.* at 1:13:42-1:14:21; *see also* SX 4 (2021 Policy for Public Plan Submission).

292.    The Policy states that "[a]ny redistricting plan developed outside the Senate which is to be presented for consideration by the Redistricting Subcommittee must . . . [b]e submitted through the Redistricting Subcommittee's website."  SX 4 ¶ 3(b).

293.    The Policy states that "[a]ll plans submitted to the Redistricting Subcommittee must meet the minimum guidelines established by the Redistricting Subcommittee" and that any plan submitted to the Redistricting Subcommittee must "[b]e reviewed by staff to ascertain the sufficiency of the submission."  *Id.* ¶¶ 2, 3(c).  "If the submission does not meet the minimum guidelines, it will not be accepted by the Redistricting Subcommittee."  *Id.* ¶ 3(c).

294.    The Policy further states "[a]ll plans submitted to and accepted by the Redistricting Subcommittee will be made part of the public record and will be made available in the same manner as other Redistricting Subcommittee public records." *Id.* ¶ 1(b).

295.    The Policy also states that "[t]he Redistricting Subcommittee will designate a time period during which it will accept redistricting plans for review and consideration." *Id.* ¶ 2.

296.    The Subcommittee unanimously adopted October 8, 2021 as the deadline for public submission of proposed plans.  SX 235 1:14:21-1:20:17.

## V.    THE SENATE'S MAP-DRAWING PROCESS

### A.    The Senate's "Core" Redistricting Team Drew A Draft Congressional Map For Every Senator Who Requested One Consistent With The Senate's Open-Door And Confidentiality Policies

297.    The core team for drawing the Congressional redistricting map on behalf of the General Assembly was Will Roberts, Andy Fiffick, Paula Benson, Breeden John, and Charlie Terreni.  *See* 10/12/22 AM Tr. 41:3–6 (W. Roberts).

298.    Mr. Roberts was the Senate cartographer at the time and drew the Congressional redistricting maps.  *See id.* at 21:21, 22:11–17 (W. Roberts).

299.    Mr. Terreni was outside counsel.  *See id.* at 41:8 (W. Roberts).  He did not draw maps.  *See id.* at 41:20 (W. Roberts).

300.    Mr. Fiffick is chief of staff for the Senate Judiciary Committee.  *See id.* at 41:10 (W. Roberts).

301.    In that role, he oversaw the process, set up meetings, and coordinated with members of the Senate.  *See id.* at 41:13–16 (W. Roberts).  He did not draw maps.  *See id.* at 41:18 (W. Roberts).

302.    Ms. Benson is a staff attorney who observed the process and gave input, but she never drew maps.  *See id.* at 41:21–24 (W. Roberts).

303.    Breeden John is a staff attorney trained as Mr. Roberts's "backup" on drawing maps as needed. *See id.* at 42:1–5 (W. Roberts). He did not draw any Congressional maps. *See id.* at 42:8 (W. Roberts).

304.    The core team was generally all present in the room while Mr. Roberts drew maps. *See id.* at 44:4–5 (W. Roberts).

305.    Grayson Morgan worked as a GIS contractor; Maura Baker worked as a staff attorney; and Madison Faulk worked as a staff attorney. Mr. Morgan was not present during the drawing of maps. Ms. Baker and Ms. Faulk ordinarily were not present during the drawing of maps. *See id.* at 42:10–43:2, 44:4–8 (W. Roberts). None ever drew maps. *See id.* (W. Roberts).

306.    Most of the Congressional map drawing took place in Senator Luke Rankin's office, where Mr. Roberts worked "pretty much daily." *See id.* at 43:11–44:1 (W. Roberts).

307.    Mr. Roberts drew maps on a laptop computer using the Maptitude software program. *See id.* at 43:18–44:1, 47:19 (W. Roberts).

308.    The laptop was connected to a projector, which projected an image approximately 12 feet by 12 feet for the other individuals in the room to see and provide input to Mr. Roberts. *See id.* at 43:19–24 (W. Roberts).

309.    Senator Rankin was never present for map drawing. *See id.* at 44:10 (W. Roberts).

310.    The Senate had an open-door policy permitting any member to visit the map room or to request that Mr. Roberts draw a Congressional map to any specifications they asked for. *See id.* at 37:5–11 (W. Roberts).

311.    The Senate also has a confidentiality policy for all legislation and amendments, including redistricting. *See id.* at 40:5–10 (W. Roberts).

312.    Under that policy, no staffer is permitted to share information about legislation, an amendment, or a map without "express consent from the member that requested it." *Id.*

313.    Mr. Roberts drew Congressional maps for a number of senators, including Senator Ronnie Sabb, Senator Wes Climer, Senator George E. "Chip" Campsen, III, Senator John Scott, and Senator Shane Martin. *See id.* at 44:11–46:9 (W. Roberts).

314.    Mr. Roberts drew over 20 Congressional redistricting maps throughout the drafting process. *See id.* at 47:25–48:2 (W. Roberts).

315.    Even though Mr. Roberts had worked with Senator Bright Matthews on redistricting for the Senate, Colleton County School District, and Jasper County School District, she did not ask Mr. Roberts to draw a Congressional map. *See id.* at 38:17–19, 46:10–17 (W. Roberts).

316.    Senator Richard Harpootlian also never asked Mr. Roberts to draw a Congressional map. *See id.* at 38:24–40:25 (W. Roberts).

### B.    The Map Drawer Started With The Benchmark Plan And Drew Lines Based On Politics, But He Never Drew Lines Based On Race

317.    The Senate staff began drawing Congressional redistricting maps in mid-November 2021, after staff had completed work on Senate redistricting. *See* 10/12/22 AM Tr. at 36:7–22 (W. Roberts).

318.    "[E]very single time" Mr. Roberts has drawn "a new redistricting plan" throughout his career, he has "start[ed] with the benchmark map." *Id.* at 62:10–11 (W. Roberts).

319.    Starting with the benchmark map allows Mr. Roberts "to preserve the cores of existing districts," which "is a traditional districting principle." *Id.* at 62:13–17 (W. Roberts).

320.    Starting with the benchmark map makes it easier to balance out population and to respect policy choices that already have been made for redistricting in that jurisdiction. *See id.* at 62:21–25 (W. Roberts).

321.    Starting with the benchmark maps also makes it easier to respect communities of interest and to keep incumbents in districts with their core constituents. *See id.* at 63:1–15 (W. Roberts).

322.    Mr. Roberts started with the Benchmark Plan when drafting the Senate Staff Plan and the Enacted Plan. *Id.* at 63:16–18 (W. Roberts).

323.    Mr. Roberts knew that the Benchmark Plan "had survived the court challenge in the *Backus* case and was also pre-cleared by the Obama Justice Department." *Id.* at 63:21–23 (W. Roberts).

324.    Mr. Roberts did not draw any Congressional maps or lines based upon race. *See id.* at 49:10–12 (W. Roberts).

325.    When drawing Congressional maps or lines, Mr. Roberts never used a racial target, never used race as a proxy for politics, and never used politics as a proxy for race. *See id.* at 49:13–18 (W. Roberts).

326.    Mr. Roberts never looked at the BVAP of any district or area to determine how or where to draw Congressional districts or lines. *See id.* at 49:19–21 (W. Roberts).

327.    No senator ever asked Mr. Roberts to draw a Congressional plan based upon race. *See id.* at 50:5–8 (W. Roberts).

328.    After he finished drawing a plan, Mr. Roberts provided BVAP information to Mr. Terreni if Mr. Terreni requested it to facilitate his legal review of the plan. *See id.* at 49:23–50:4 (W. Roberts).

41

329. The entire PL 94-171 database provided by the Census Bureau, including racial information, was available to Mr. Roberts in Maptitude. *See id.* at 48:3–19 (W. Roberts).

330. Maptitude displays racial data at the bottom of the screen and in the "pending changes" box while a user is drawing maps. *Id.* at 48:9–15 (W. Roberts); 10/12/22 PM Tr. at 38:6–11, 80:23–81:2 (W. Roberts).

331. The user is required to scroll to the bottom of the page and the bottom of the pending changes box to see racial data in Maptitude. *See* 10/12/22 PM Tr. at 38:6–11, 80:2–81:2 (W. Roberts). In other words, it does not immediately or automatically appear on the screen.

332. Maptitude also has a shading function to display racial data, but Mr. Roberts never activated that function when drawing Congressional maps. *See* 10/12/22 AM Tr. at 48:20–49:2.

333. Political data was also available to Mr. Roberts in Maptitude. *See id.* at 50:11 (W. Roberts).

334. That political data was compiled by a consultant named Clark Bensen. *See id.* at 50:12–15 (W. Roberts).

335. Unlike the election data published by the South Carolina State Election Commission, the data provided by Mr. Bensen was broken down to the sub-precinct Census block level. *See id.* at 50:21–51:18 (W. Roberts).

336. Mr. Bensen provided election data for the 2016 and 2020 elections, which were then loaded into Maptitude. *See id.* at 50:9–20 (W. Roberts).

337. The 2016 election data had flaws because that year the State Election Commission allocated all absentee ballots in a county to a single absentee precinct, rather than to the precinct of the voter's residence. *See id.* at 51:25–52:6 (W. Roberts).

338.   For the 2020 election, the State Election Commission reported absentee ballots at the precinct of the voter's residence.  *See id.* at 52:7–9 (W. Roberts).

339.   Mr. Roberts used the results of the 2020 Presidential election "between Donald Trump and Joe Biden" to draw Congressional maps.  *Id.* at 51:24–52:18 (W. Roberts).

340.   When Mr. Roberts drew maps, he displayed "the total population of the VTD and percent Trump in that VTD."  *Id.* at 52:17–18 (W. Roberts).

341.   Mr. Bensen's election data was made publicly available on the Senate Redistricting website, *see id.* at 52:19–53:9 (W. Roberts), and has been admitted into evidence in this case, *see* SX 243.

342.   Members of the Senate were aware that the election data was available to them. 10/12/22 AM Tr. at 54:23–25 (W. Roberts).

343.   Mr. Roberts drew maps and district lines based on politics "all the time" throughout the Congressional redistricting process.  *Id.* at 54:19–22 (W. Roberts).

344.   Members of the Senate asked Mr. Roberts to draw Congressional maps to achieve a certain political result.  *Id.* at 55:1–57:19 (W. Roberts).

345.   For example, Senator Campsen "asked multiple times to look at the political numbers and to make the First Congressional District more Republican-leaning based on the Trump/Biden numbers."  *Id.* at 55:20–23 (W. Roberts); *see also id.* at 57:17 (W. Roberts).

346.   Mr. Roberts never discussed racial or BVAP data with Senator Campsen, and Senator Campsen "never asked about the racial demographics of a district."  *Id.* at 55:24–56:9 (W. Roberts).

347.   Senator Climer also asked Mr. Roberts "to produce two maps with seven majority-Republican districts."  *Id.* at 56:13–14 (W. Roberts).

348.    Senators asked Mr. Roberts "all the time" to see the Trump/Biden breakdown in maps he drew, even when they were not the senator who requested that particular map. *Id.* at 56:15–18 (W. Roberts).

349.    Both Democratic and Republican senators asked Mr. Roberts for the Trump/Biden breakdown in maps he drew. *See id.* at 56:19–20 (W. Roberts).

350.    Mr. Roberts also discussed politics in Congressional redistricting with Senator Grooms. *See id.* at 56:21–57:14 (W. Roberts).

351.    Mr. Roberts presented two draft plans to Senator Grooms, who indicated that only the plan with the higher Trump number in District 1 would pass the General Assembly. *Id.* at 57:5–14 (W. Roberts).

352.    Using Maptitude, Mr. Roberts generated reports for every plan he drew for any senator, including a core constituency preservation report, a demographic report showing racial data, and a partisan analysis report showing Trump and Biden numbers for each district. *See id.* at 57:20–60:2 (W. Roberts).

353.    Mr. Roberts provided the full work-up of reports to the requesting senator along with every map he drew. *See id.* at 59:20–60:2 (W. Roberts).

354.    The reports were also posted online for any map that was offered as an amendment or would be discussed in the Senate Redistricting Subcommittee or full Senate Judiciary Committee. *Id.* at 59:15–19 (W. Roberts).

355.    The Senate Redistricting Guidelines provided general principles to guide Mr. Roberts's work, but they did not tell Mr. Roberts where to draw lines or dictate all decisions that must be made to draw a redistricting plan. *Id.* at 60:12–61:25 (W. Roberts).

VI.    **THE CORE TEAM RECEIVES REQUESTS AND CREATES THE SENATE STAFF PLAN**

A.    **The Core Team Rejects Draft Plans Provided Via Email By The National Republican Redistricting Trust**

356.    On November 18, 2021, Mr. Adam Kincaid of the National Republican Redistricting Trust ("NRRT") emailed a link to a Google Drive folder to Mr. Andy Fiffick, chief of staff to the Senate Judiciary Committee, at Mr. Fiffick's official Senate address. *See* SX 91.

357.    After Mr. Fiffick was unable to access the Google Drive folder through his official Senate email account, Mr. Kincaid emailed the link to Mr. Fiffick's Gmail account. *See* PX 324; Terreni Dep. at 60:22-62:22.

358.    The Google Drive folder contained two draft congressional redistricting plans, the Palmetto Plan and the Wren Plan. *See* 10/12/22 AM Tr. at 66:2–67:5 (W. Roberts); Fiffick Dep. at 327:10-328:12; Terreni Dep. at 115:14-117:5.

359.    Mr. Roberts, Mr. Fiffick, and Mr. Terreni spent a few minutes looking at the draft plans on November 19, 2021. *See* 10/12/22 AM Tr. at 67:9–11 (W. Roberts); Fiffick Dep. at 317:8-317:24; Terreni Dep. at 115:14-117:5.

360.    Mr. Roberts testified that the plans "looked like crap," had "bizarre shapes," and defied "explanation for the way the[y] [were] drawn." *See* 10/12/22 AM Tr. at 67:13–18 (W. Roberts); *see also* SX 38a (Palmetto Map); SX 39a (Wren Map); SX 4 ¶ 3(c) (all plans submitted by the public must "[b]e reviewed by staff to ascertain the sufficiency of the submission" and "[i]f the submission does not meet the minimum guidelines, it will not be accepted by the Redistricting Subcommittee").

361.    Mr. Roberts, Mr. Fiffick, and Mr. Terreni saved the Palmetto Plan and the Wren Plan on the Subcommittee computer system, generated the Maptitude reports, but took no further

action on them. *See* 10/12/22 AM Tr. at 67:9–22 (W. Roberts); Fiffick Dep. at 317:8-317:24; Terreni Dep. at 115:14-117:5; 10/13/2022 PM Tr. at 75:21–76:22 (C. Campsen).

362.    After the Senate Staff Plan was publicly released on November 23, 2021, Mr. Kincaid provided via email to Mr. Fiffick a third draft plan called the Jessamine Plan. *See* PX 325 (Nov. 24, 2022).

363.    Mr. Roberts does not recall ever reviewing the Jessamine Plan. *See* 10/12/22 AM Tr. at 68:13 (W. Roberts).

364.    Mr. Fiffick and Mr. Terreni recalled looking at the Jessamine Plan for no more than a few minutes. Fiffick Dep. at 317:8-317:24; Terreni Dep. at 115:14-117:5.

365.    Mr. Roberts did not look or refer back to the NRRT plans after he saw them for the first time. *See* 10/12/22 AM Tr. at 68:21–69:3 (W. Roberts).

366.    None of the NRRT plans influenced "at all" how Mr. Roberts drew any Congressional line or plan. *Id.* at 69:1–3 (W. Roberts).

367.    Mr. Kincaid drew the NRRT plans based on politics and did not consider race or demographic data in drawing the plans. Kincaid Dep. at 124:6-7, 123:16-17.

368.    All three NRRT plans were provided after the October 8, 2021 deadline for public submission of plans. SX 4 ¶ 2; SX 235 1:14:21-1:20:17; Terreni Dep. at 399:24-403:7.

369.    None of the NRRT plans was "submitted through the Redistricting Subcommittee's website." SX 4 ¶ 3(b); Terreni Dep. at 399:24-403:7.

370.    The NRRT plans were not accepted by the Senate Redistricting Subcommittee and were not posted on the Senate redistricting website because they did not comply with the Policy for Public Plan Submission. Fiffick Dep. at 327:10-328:12; Terreni Dep. at 399:24-403:7; SX 4 ¶¶ 2, 3(c).

371.    Mr. Charlie Terreni informed Mr. Dale Oldham, who was affiliated with Mr. Kincaid, that the NRRT plans had not been accepted.  Terreni Dep. at 56:2-63:23, 65:4-73:24, 122:22-126:5.

**B.    The Core Team Receives Requests From Senator Rankin And Congressman Wilson**

372.    Senator Rankin asked Mr. Roberts "not to touch" District 7 more than necessary in drawing the new Congressional plan.  10/12/22 AM Tr. at 69:8–11 (W. Roberts).

373.    That request made sense to Mr. Roberts because District 7 was very close to equal population under the 2020 Census results and borders a state line on one side and the ocean on another side.  *See id.* at 69:12–24 (W. Roberts); *see also* SX 13 at 331 (comment of City of Marion Mayor Ashley Brady).

374.    Congressman Joe Wilson spoke with Mr. Terreni by phone to discuss his requests related to the new Congressional plan.  10/12/22 AM Tr. at 70:9–25 (W. Roberts); Terreni Dep. at 109:6-111:21.

375.    Congressman Wilson conveyed that he wanted to keep Fort Jackson in District 2, where it had been placed since 2002, because he serves on the House Armed Services Committee.  10/12/22 AM Tr. at 70:17–71:4 (W. Roberts); Terreni Dep. at 109:6-111:21.

376.    Congressman Wilson also conveyed that while the voters of Beaufort County were politically good for him, he preferred not to have Beaufort in his district because it is a long drive from his home in Lexington County.  10/12/22 AM Tr. at 70:22–71:4 (W. Roberts); Terreni Dep. at 109:6-111:21.

C.    **Senate Staff And Outside Counsel Receive And Rely Upon Congressman Clyburn's Draft Map Provided By Mr. Dalton Tresvant**

377.    On November 19, 2021, Mr. Roberts and Mr. Fiffick met with Mr. Dalton Tresvant, a staffer for Congressman Clyburn. 10/12/22 AM Tr. at 71:11–13 (W. Roberts); SX 120.

378.    Mr. Tresvant verbally conveyed that Congressman Clyburn wanted a minimal change plan in District 6, did not want to gain new areas where he would be required to campaign, and wanted more of Sumter placed in District 6. 10/12/22 AM Tr. at 73:21–75:10 (W. Roberts).

379.    Mr. Tresvant provided a hard copy of a map showing the changes to District 6 that Congressman Clyburn requested. *See* SX 37; 10/12/22 AM Tr. at 71:2–75:25 (W. Roberts).

380.    The version of District 6 requested by Congressman Clyburn maintained the hook shape in Richland County that keeps Fort Jackson in District 2 with Congressman Wilson. *See* SX 37; 10/12/22 AM Tr. at 76:2–6 (W. Roberts).

381.    The version of District 6 requested by Congressman Clyburn did not extend District 2 into Beaufort County. *See* SX 37; 10/12/22 AM Tr. at 75:24–76:1 (W. Roberts).

382.    The version of District 6 requested by Congressman Clyburn made minimal changes to District 7. *See* SX 37; 10/12/22 AM Tr. at 75:24–76:1 (W. Roberts).

383.    The version of District 6 requested by Congressman Clyburn moved the Limestone area of Orangeburg County to District 2. *See* SX 37; 10/12/22 AM Tr. at 75:16–19 (W. Roberts).

384.    The version of District 6 requested by Congressman Clyburn placed more of Sumter County in District 6 than in the Benchmark Plan. *See* SX 37; 10/12/22 AM Tr. at 75:5–10 (W. Roberts).

385.    The version of District 6 requested by Congressman Clyburn maintained county splits in Beaufort, Colleton, Orangeburg, Richland, Sumter, Florence, Berkley, Dorchester, and Charleston.  *See* SX 37; 10/12/22 AM Tr. at 76:7–77:1 (W. Roberts).

386.    The version of District 6 requested by Congressman Clyburn also split Jasper County to place the Sun City area in District 1.  *See* SX 37; 10/12/22 AM Tr. at 74:15–18, 76:8 (W. Roberts).

387.    Mr. Tresvant did not provide a shapefile for the version of District 6 requested by Congressman Clyburn.  10/12/22 AM Tr. at 77:20–23 (W. Roberts).

388.    During their meeting, Mr. Roberts re-created the version of District 6 requested by Congressman Clyburn using Arc GIS and provided a hard copy to Mr. Tresvant.  *Id.* at 77:24–78:9 (W. Roberts).

389.    Later that day, Mr. Roberts used Maptitude to draw a statewide plan incorporating the version of District 6 requested by Congressman Clyburn.  *Id.* at 78:17–19 (W. Roberts).

390.    Mr. Roberts called that plan the Milk Plan.  *Id.* at 78:20–21 (W. Roberts); SX 223F (Milk Plan Map).

391.    The Milk Plan incorporated all of the changes to District 6 requested by Congressman Clyburn.  *See* SX 223F; 10/12/22 AM Tr. at 82:18–20 (W. Roberts).

392.    The Milk Plan split 12 counties and 27 voting tabulation districts (VTDs), although three of the VTD splits involve no population.  SX 223A.

393.    In addition to splitting Beaufort, Berkeley, Charleston, Richland, and Sumter, the Milk Plan also splits VTDs in those counties.  *Id.*; 10/12/22 AM Tr. at 81:3–82:4 (W. Roberts).

394.    The Milk Plan preserved 97.34% of the core of District 1, 97.901% of the core of District 2, 92.28% of the core of District 3, 96.17% of the core of District 4, 95.03% of the core

of District 5, 83.15% of the core of District 6, and 99.55% of the core of District 7.  *See* SX 223D; 10/12/22 AM Tr. at 83:6–85:3 (W. Roberts).

395.    The Milk Plan reduced the BVAP percentage in District 1 to 15.48% and in District 6 to 47.87%.  *See* SX 223C; 10/12/22 AM Tr. at 85:10–14 (W. Roberts).

396.    The Milk Plan preserved 6 districts where Republicans form the majority according to the 2020 Presidential election results.  *See* SX 223E; 10/12/22 AM Tr. at 85:21–23 (W. Roberts).

397.    The Milk Plan's version of District 1 has a 54.3% Republican vote share according to the 2020 Presidential election results.  *See* SX 223E (174,475 Democratic votes and 207,526 Republican votes).

398.    The Milk Plan accommodated the requests received on behalf of Senator Rankin, Congressman Wilson, and Congressman Clyburn.  *See* 10/12/22 AM Tr. at 75:24–76:6, 82:5–7 (W. Roberts).

399.    The Milk Plan made minimal changes to District 7.  *See* SX 223D; 10/12/22 AM Tr. at 75:21–23, 83:2–85:3 (W. Roberts).

400.    The Milk Plan maintained the hook shape in Richland County that keeps Fort Jackson in District 2 with Congressman Wilson.  *See* SX 223F.

401.    The Milk Plan did not extend District 2 into Beaufort County.  *See* SX 223F.

402.    Mr. Roberts relied upon the map provided by Mr. Tresvant and the Milk Plan to draw the Senate Staff Congressional Plan and Amendment 1, which became the Enacted Plan. 10/12/22 AM Tr. at 86:7–21 (W. Roberts).

403.    "[T]he Enacted Plan is really a modification of the Staff Plan, which originated from the Milk Plan."  *See id.* at 86:20–21 (W. Roberts).

404.    The Milk Plan was not posted on the Senate Redistricting website.  *Id.* at 86:2–6.

405.    Mr. Roberts "heavily" relied upon the map provided by Mr. Tresvant in drafting the Senate Staff Plan and the Enacted Plan.  *Id.* at 86:7–15.

406.    The map provided by Mr. Tresvant was not posted on the Senate Redistricting Website.  *Id.* at 77:2–4 (W. Roberts).

**D.    Senate Staff Prepare And Release The Senate Staff Congressional Plan**

407.    Mr. Roberts drew the Senate Staff Congressional Plan ("Senate Staff Plan"). 10/12/22 AM Tr. at 62:5–11 (W. Roberts); SX 32a.

408.    The Senate Staff Plan balanced the population across all seven congressional districts.  *See* 10/12/22 AM Tr. at 87:8–13 (W. Roberts); SX 32g.

409.    Mr. Roberts and the Senate staff did not consider race, look at racial data, use any racial targets, use race as a proxy for politics, or use politics as a proxy for race in drawing the Senate Staff Plan.  10/12/22 AM Tr. at 87:17–88:19 (W. Roberts).

410.    Mr. Roberts and the Senate staff looked at political numbers and election results to draw the Senate Staff Plan.  *Id.* at 87:14–16 (W. Roberts).

411.    Mr. Roberts and the Senate staff set out to make District 1 more Republican-leaning in the Senate Staff Plan because they knew that only a plan that made District 1 more Republican-leaning would pass the Republican-controlled General Assembly.  *Id.* at 89:2–12 (W. Roberts).

412.    To achieve this objective, Mr. Roberts pulled District 1 into the Hanahan area of Berkeley County and made Daniel Island whole in District 1.  Both are strong Republican areas. "[T]o get Democrats out" of District 1, Mr. Roberts placed West Ashley, more of the Charleston peninsula, and the Deer Park area in District 6.  *Id.* at 89:13–22 (W. Roberts).

413.    The Senate Staff Plan preserved 6 districts where Republicans form the majority according to the 2020 Presidential election results.  *See* SX 32d; 10/12/22 AM Tr. at 92:4–6 (W. Roberts).

414.    The Senate Staff Plan increased District 1's Republican vote share to 54.73% according to the 2020 Presidential election results, compared to 53.03% in the Benchmark Plan. *Compare* SX 32d, *with* SX 28c; *see also* 10/12/22 AM Tr. at 92:1–3 (W. Roberts).

415.    The Senate Staff Plan split 13 counties and 10 VTDs, although one of the VTD splits affected no population.  SX 32e.

416.    The Senate Staff Plan preserved 93.89% of the core of District 1, 97.78% of the core of District 2, 94.75% of the core of District 3, 98.09% of the core of District 4, 94.73% of the core of District 5, 79.55% of the core of District 6, and 99.51% of the core of District 7.  *See* SX 32b.

417.    District 1's BVAP percentage in the Senate Staff Plan was 16%.  *See* SX 32c.

418.    District 6's BVAP percentage in the Senate Staff Plan was 47.42%.  *See id.*

419.    The Senate Staff Plan accommodated the requests made on behalf of Senator Rankin, Congressman Wilson, and Congressman Clyburn.  *See* 10/12/22 AM Tr. at 90:9–13 (W. Roberts).

420.    The Senate Staff Plan made minimal changes to District 7.  *See* SX 32g; 10/12/22 AM Tr. at 90:11 (W. Roberts).

421.    The Senate Staff Plan maintained the hook shape in Richland County that keeps Fort Jackson in District 2 with Congressman Wilson and did not extend District 2 into Beaufort County.  *See* SX 32g; 10/12/22 AM Tr. at 88:1–3, 90:1–2 (W. Roberts).

422.    The Senate Staff Plan made minimal changes to District 6.  *See* SX 32g; 10/12/22 AM Tr. at 90:11–12 (W. Roberts).

423.    The Senate Staff Plan, including the map and data reports, was released publicly on November 23, 2021.  SX 32a-32g.

424.    No senator saw the Senate Staff Plan before it was released publicly because it was a staff plan.  10/12/22 AM Tr. at 90:14–91:2 (W. Roberts); Rankin Dep. at 137:10-141:20; 10/13/2022 PM Tr. at 75:6–13 (C. Campsen).

**E.    The Senate Redistricting Subcommittee Meets On November 29, 2021 And Receives Comments On The Senate Staff Plan**

425.    The Senate Redistricting Subcommittee met on November 29, 2021 and received public comments on the Senate Staff Plan.  *See* SX 239.

426.    Mr. Roberts described the Senate Staff Plan as "a minimal change plan" that achieves population equality "while maintaining the core constituencies of the districts."  *Id.* at 3:29-6:06.

427.    Dr. John Ruoff, who is affiliated with the League of Women Voters, agreed that the Senate Staff Plan "clearly" was "a least-change map."  *Id.* at 48:30-48:34.

428.    Senator Margie Bright Matthews stated that she supported splitting Jasper County to unite Sun City in a single district based on "many, many" pieces of public testimony that residents of the Jasper County portion of Sun City "felt like they had more in common with Beaufort."  *Id.* at 22:00-23:03.

429.    Former Congressman Joe Cunningham, a Democrat who represented District 1 from 2019 through 2021, testified at the meeting.  *Id.* at 10:10-22:00.

430.    Former Congressman Cunningham stated that the Senate Staff Plan "make[s] no sense unless, of course, the sole purpose of these maps is to make it harder for a Republican to lose." *Id.* at 11:40-11:50.

431.    He further stated that "[t]en years ago, this body intentionally drew the First District to make it virtually impossible for a Democrat to win." *Id.* at 11:50-12:00.

432.    He also offered his view that "the people who drew this map, it's just a game. It's just a political game, and it's just about winning, because ten years ago, this body drew a safe Republican district, and by the end of the decade it became a swing district. And this proposed map moves the goalpost yet again, to make it as hard as possible for a Democrat to win." *Id.* at 15:59-16:23.

433.    He continued: "[T]his map makes no sense unless your sole objective is to rig an election so one side cannot win." *Id.* at 16:36-16:45.

434.    He further alleged that the Senate Staff Plan was drawn "by a partisan hack in Washington, D.C." with help from incumbent members of Congress "to make themselves safer." *Id.* at 16:45-17:12.

435.    Former Congressman Cunningham alleged that the Senate Staff Plan was the product of "partisan gerrymandering." *Id.* at 18:00-18:50.

436.    He elaborated: "Nobody can leave this committee room and condemn the partisanship in Washington, D.C. and, at the same time, put the stamp of approval on partisan gerrymandering that lays before us." *Id.* at 19:54-20:05.

437.    Former Congressman Cunningham alleged that the Senate Staff Plan evinces gerrymandering because it gave District 1 the lowest BVAP percentage of any district in the state, left the tip of the Charleston Peninsula in District 1, removed "most of" John's Island from

District 1, created a First District that "does not represent an entire county," placed Mount Pleasant and West Ashley in different districts, and split Charleston County. *Id.* at 14:00-15:59.

438.    He also alleged that the Senate Staff Plan "divid[es] communities [of interest] based upon the color of their skin." *Id.* at 20:38-20:44.

439.    Senator Bright Matthews alleged that "black voters in Charleston County were carved out, and the more affluent areas went to make this a more representative map, where . . . a Republican could be elected." *Id.* at 23:15-23:33.

440.    She further stated: "the percentages that we have, it gives the first Congressional District, from what I'm seeing, it totally makes it into an electable and secure Republican district." *Id.* at 23:33-24:00.

441.    Former Congressman Cunningham alleged that the fact that District 1 had the lowest BVAP in the Senate Staff Plan "is what happens when you draw lines based on race.  And that's exactly what was done ten years ago, and when I talk about downtown Charleston, and that's exactly what happened today." *Id.* at 25:16-25:41.

442.    Senate staff confirmed at the meeting that they had received input regarding Congressional redistricting from Congressman Wilson and Mr. Tresvant on behalf of Congressman Clyburn. *Id.* at 26:50-27:45.

**F.    Senate Staff Investigates Former Congressman Cunningham's Racial Allegations And Determines That They Are Inaccurate**

443.    Following the November 29, 2021 meeting, Senate staff investigated former Congressman Cunningham's allegations.  10/12/22 AM Tr. at 93:6–94:15 (W. Roberts).

444.    Senate staff determined that former Congressman Cunningham's allegations were incorrect. *Id.* at 94:16–95:6 (W. Roberts).

445.    For example, the Senate Staff Plan had not been drawn by someone in Washington, D.C.  *Id.* at 93:13–18 (W. Roberts).

446.    District 1 was also the lowest-BVAP district in the Benchmark Plan upheld in *Backus*.  *See* SX 28b.

447.    The Benchmark Plan also split the Charleston Peninsula and Charleston County, as well as other counties along the district line between Districts 1 and 6.  SX 28a.

448.    Upon investigation, Senate staff learned that West Ashley, the Charleston Peninsula, and Deer Park are predominantly Democratic and are not predominantly black. 10/12/22 AM Tr. at 94:16–95:6 (W. Roberts).

## VII.    SENATE AMENDMENT 1/THE ENACTED PLAN

### A.    Senator Campsen Becomes The Sponsor Of Senate Amendment 1 And Considers Population And Politics, But Not Race

449.    Following the November 29, 2021 meeting and the staff investigation into former Congressman Cunningham's allegations, the Senate staff began drafting Senate Amendment 1, which eventually became the Enacted Plan.  10/12/22 AM Tr. at 95:7–14 (W. Roberts).

450.    Senator Campsen became the sponsor of Senate Amendment 1.  *Id.* at 95:11– 96:11, 98:13–99:20; 10/13/22 PM Tr. at 82:18–23 (C. Campsen).

451.    Senator Campsen wanted to ensure that Senate Amendment 1 made District 1 more Republican-leaning and conveyed this instruction to the Senate staff.  10/12/22 AM Tr. at 95:22–96:28, 98:13–99:20 (W. Roberts); 10/13/2022 PM Tr. at 80:1–81:24 (C. Campsen).

452.    Senator Campsen also conveyed to the Senate staff that any plan that did not make District 1 more Republican-leaning would not pass the Republican-controlled General Assembly.  10/12/22 AM Tr. at 98:13–99:5 (W. Roberts); 10/13/2022 PM Tr. at 78:5–12, 79:19– 21 (C. Campsen).

453.    Senator Campsen preferred to keep Charleston County split because, in his view, having two representatives means that Charleston County receives better representation in Washington, D.C. than if it had only one representative.  10/13/2022 PM Tr. at 85:1–87:5 (C. Campsen); SX 242 at 3:29:22-3:30:33.

454.    Senator Campsen believes that Charleston County is particularly well served by having one Democratic representative and one Republican representative so that Charleston's interests are represented when either party is in power in Washington, D.C.  10/13/2022 PM Tr. at 85:1–87:5 (C. Campsen); SX 242 at 3:29:22-3:30:33.

455.    Senator Campsen believes that Charleston County is particularly well served by Congressman Clyburn, who was in Charleston County with the U.S. Secretary of Transportation the day before Senator Campsen testified at trial.  10/13/2022 PM Tr. at 85:1-87:5 (C. Campsen); *see also* SX 242 at 3:29:22-3:30:33.

456.    During the process for drafting Senate Amendment 1, Senate staff provided Senator Campsen data regarding various draft and proposed plans.  10/12/22 AM Tr. at 97:1–101:11 (W. Roberts); 10/13/2022 PM Tr. at 87:25–89:11 (C. Campsen); SX 92a, 92b, PX 434.

457.    The data Senate staff provided Senator Campsen included data on county population and 2020 presidential election results in District 1, but did not include race data.  10/12/22 AM Tr. at 99:21–101:15 (W. Roberts); 10/13/2022 PM Tr. at 93:24–94:23 (C. Campsen); SX 92a, 92b, 434.

458.    Senator Campsen did not consider race, look at any race or BVAP data, or discuss the racial effect of any plan with anyone while Senate Amendment 1 was being drawn.  10/12/22 AM Tr. at 100:25–101:11 (W. Roberts); 10/13/2022 PM Tr. at 94:6–23 (C. Campsen).

**B.      Senate Staff Draws Senate Amendment 1 Without Using Race**

459.    Mr. Roberts and the Senate staff did not draw any lines in Senate Amendment 1 based on race, did not look at racial data while drawing Senate Amendment 1, did not consider BVAP data in drawing Senate Amendment 1, did not use race as a proxy for politics in drawing Senate Amendment 1, and did not use politics as a proxy for race in drawing Senate Amendment 1.  10/12/22 AM Tr. at 103:1–15 (W. Roberts).

460.    Mr. Roberts discussed BVAP in Senate Amendment 1 only with outside counsel Mr. Terreni after the plan was drawn.  *See id.* at 103:16–21 (W. Roberts).

461.    Mr. Roberts and the Senate staff did not make any changes to the Enacted Plan based on race.  *See id.* at 106:19–107:4 (W. Roberts).

462.    Mr. Roberts and the Senate staff set out to make District 1 more Republican-leaning in the Enacted Plan than it had been in the Benchmark Plan in order "to achieve the goal of the General Assembly to make the First a more Republican district."  *Id.* at 105:21–106:1, 114:14–19 (W. Roberts).

463.    The Enacted Plan achieves that goal.  *See* 10/12/22 AM Tr. at 114:14–19 (W. Roberts); SX 28c, 29d.

464.    Enacted District 1 has a 54.39% Republican vote share according to the 2020 presidential election results, which is higher than the 53.03% Republican vote share in Benchmark District 1.  10/12/22 AM Tr. at 114:9–13 (W. Roberts); SX 28c, 29d.

465.    The Enacted Plan maintains 6 districts where Republicans form the majority and 1 district where Democrats form the majority.  10/12/22 AM Tr. at 114:17–19 (W. Roberts); SX 29d.

466.    Mr. Roberts could have drawn District 1 with a higher Republican vote share than in Senate Amendment 1, but he and Senator Campsen rejected that option because it would have required dividing communities of interest in Charleston County and disregarding geographic features of the area.  10/12/22 AM Tr. at 101:16–102:25 (W. Roberts); 10/13/2022 PM Tr. at 80:21–81:24, 92:2–93:11 (C. Campsen).

467.    Mr. Roberts and the Senate staff set out to improve the plan's performance on traditional districting principles, including respecting communities of interest, repairing county splits, and repairing VTD splits.  10/12/22 AM Tr. at 106:2–13 (W. Roberts).

468.    The Enacted Plan achieves a total population deviation of one person, as directed by the Senate Redistricting Guidelines.  *See id.* at 107:25 (W. Roberts); SX 3.

469.    The Enacted Districts are contiguous, as directed by the Senate Redistricting Guidelines.  *See* 10/12/22 AM Tr. at 108:14 (W. Roberts); SX 3.

470.    Mr. Roberts and the Senate staff considered the "Additional Considerations" mentioned in the Senate Redistricting Guidelines across the state when Mr. Roberts drew the Enacted Plan.  *See* 10/12/22 AM Tr. at 108:15–25 (W. Roberts); SX 3.

471.    Mr. Roberts and the Senate staff "elevate[d]" some of the principles mentioned in the Senate Redistricting Guidelines.  10/12/22 AM Tr. at 109:1–9 (W. Roberts).

472.    Mr. Roberts and the Senate staff "made sure that we were going to start with the Benchmark Plan, which would have preserved the cores of existing districts and ma[d]e only modest changes to the lines to balance out population."  *Id.* at 109:3–7 (W. Roberts).

473.    Mr. Roberts and the Senate staff "also set out from the beginning to minimize divisions of county boundaries and to minimize divisions of voting precincts."  *Id.* at 109:7–9 (W. Roberts).

474.    Mr. Roberts and the Senate staff were interested in preserving the cores of existing districts because that is "a traditional districting principle and it was requested by Congressman Clyburn to have minimal change, so we were going to respect that.  You can also make the argument that preserving the cores of existing districts is also the same as respecting communities of interest." *Id.* at 109:12–16 (W. Roberts).

475.    Keeping counties and VTDs whole also facilitates election administration by "mak[ing] it a lot easier on election officials on election day." *Id.* at 109:19–20 (W. Roberts).

476.    Mr. Roberts and the Senate staff "used the eyeball test" to ensure that districts were compact. *Id.* at 109:23 (W. Roberts).

477.    The Enacted Plan moved a total of 334,019 people—or only around 6.5% of South Carolina's total population of 5,118,425 people—into new districts from the Benchmark Plan.  *See* SX 75 at 18;  https://www.census.gov/library/stories/state-by-state/south-carolina-population-change-between-census-decade.html#:~:text=Population%20(up%207.4%25%20to%20331.4,or%20More%20Races%20 10.2%25).

478.    The Enacted Plan preserves 92.78% of the core of District 1, 96.75% of the core of District 2, 94.75% of the core of District 3, 98.09% of the core of District 4, 94.73% of the core of District 5, 77.41% of the core of District 6, and 99.75% of the core of District 7. 10/12/22 AM Tr. at 111:21–25 (W. Roberts); SX 29c.

479.    The Enacted Plan is a minimal-change plan in Districts 6 and 7.  10/12/22 AM Tr. at 112:6–8 (W. Roberts); 10/13/2022 PM Tr. at 83:11–84:15 (C. Campsen).

480.    The Enacted Plan splits 10 counties and 13 VTDs, compared to 12 split counties and 65 split VTDs, with 52 split VTDs affecting population, in the Benchmark Plan.  10/12/22 AM Tr. at 112:18–114:2 (W. Roberts); SX 28d, 29e.

481.    The Enacted Plan maintains splits in 9 counties that were split in the Benchmark Plan.  SX 28d, 29e.

482.    The Enacted Plan repairs county splits in Berkeley, Beaufort, and Newberry County and splits Jasper County to include the Sun City community of interest in District 1. 10/12/22 AM Tr. at 113:18–114:2 (W. Roberts).

483.    The Enacted Plan maintains splits in the three largest counties, and four of the five largest counties, in South Carolina by total population, all of which were split in the Benchmark Plan: Greenville County, Richland County, Charleston County, and Spartanburg County.  *See* ECF No. 473 2020 Census Data By VTD; *see also* South Carolina: 2020 Census, https://www.census.gov/library/stories/state-by-state/south-carolina-population-change-between-census-decade.html.

484.    Three of those counties—Greenville, Charleston, and Spartanburg—also have a lower BVAP percentage than the statewide average.  Tr., vol. III, at 610:23–611:7 (B. Liu); PX 62 at 5 tbl. 3.

485.    The Enacted Plan maintains splits in the three largest metropolitan areas in South Carolina, all of which were split in the Benchmark Plan: Greenville, Columbia, and Charleston. 10/13/2022 PM Tr. 87 (C. Campsen).

486.    District 1's BVAP percentage increased to 16.72% in the Enacted Plan from 16.56% in the Benchmark Plan.  10/12/22 AM Tr. at 115:1–12 (W. Roberts); SX 28b, 29g.

487.    District 6's BVAP percentage in the Enacted Plan is 45.9%.  SX 29g.

488.    The Sea Islands were split in the Benchmark Plan, but the Enacted Plan places them all in District 1 as a community of interest in response to public testimony.  10/13/2022 PM Tr. at 84:16–22 (C. Campsen).

489.    The Enacted Plan accommodates the requests made on behalf of Senator Rankin, Congressman Wilson, and Congressman Clyburn.  10/12/2022 AM Tr. at 112 (W. Roberts); SX 29b.

490.    The Enacted Plan makes minimal changes to District 7.  *See* SX 29c; 10/12/2022 AM Tr. at 112:6–12 (W. Roberts).

491.    The Enacted Plan maintains the hook shape in Richland County that keeps Fort Jackson in District 2 with Congressman Wilson.  *See* SX 29b; 10/12/2022 PM Tr. at 13:7–14:15, 51:16–18 (W. Roberts).

492.    The Enacted Plan does not extend District 2 into Beaufort County.  *See* SX 29b.

493.    The Enacted Plan makes minimal changes to District 6.  *See* SX 29b; 10/12/2022 AM Tr. at 112:6–10 (W. Roberts).

494.    According to Plaintiffs' own putative expert Dr. Duchin, the Enacted Plan does not pair any incumbents and thus performs comparably with the Benchmark Plan, NAACP Plans, Amendment 2a Plan, and revised League of Women Voters Plan.  *See* PX 67 at 13.

495.    In Districts 1, 2, and 5, the Enacted Plan limits the ability of all Democrats—black and white—to form a winning political coalition (and, conversely, it improves the ability of all Republicans—black and white—to do the same).  SX 29d.

496.    In fact, there are likely just as many or more white Democrats as black Democrats in each of the challenged districts.  In the 2020 election, when Benchmark District 1's BVAP was 16.56%, *supra* ¶ 35, Joe Biden received approximately 47% of the vote in that district—

which indicates that District 1 contains even more white Democrats than African-American Democrats, *see* SX 28c. That same year, District 2's BVAP was 23.06% and Joe Biden received 44.22% of the vote, while District 5's BVAP was 25.06% and Joe Biden received 41.55% of the vote. *See supra* ¶ 35; SX 28c. This likewise indicates that Districts 2 and 5 each contain even more white Democrats than African-American Democrats.

497. Thus, the Enacted Plan limits the ability of just as many or more white Democrats to form a winning political coalition as compared to black Democrats.

498. According to the "empirical test" performed by Plaintiffs' own putative expert Dr. Liu, the Enacted Plan, on net, moves far more Democratic voters than black voters across Districts 1 and 2. *See* PX 48 at 16 tbl. 6. In particular, the Enacted Plan moves a net of 1,213 black voters out of District 1, but a net of 4,591 Democratic voters—nearly four times as many— out of District 1. *See* PX 48 at 16 tbl. 6; *see also* Dkt. No. 323 at 23 (describing calculations). And the Enacted Plan moves a net of 441 black voters into District 2, but a net of 1,153 Democratic voters—more than two-and-a-half times as many—out of District 2. *See* PX 48 at 18 tbl. 7; *see also* Dkt. No. 323 at 23 (describing calculations). Indeed, Dr. Liu's statistics show that, on net, black Democrats were no more likely than white Democrats to be moved out of Districts 1 and 2. *See* PX 48 at 16 tbl. 6, 18 tbl. 7; *see also* Dkt. No. 378 at 18(describing calculations).

**C.    The Enacted Plan's Changes To The Benchmark Plan Reflect Requests Received By Senate Staff, Public Testimony, Compliance With Traditional Districting Principles, And Politics, Not Race**

499. The Enacted Plan was driven by the requests received by the Senate staff, public testimony, compliance with traditional districting principles, and politics, but not race. SX 47.

1.    **Jasper County: Public Input And Support Of Senator Bright Matthews and Congressman Clyburn**

500.    The Enacted Plan splits Jasper County and places the Oaktie 2 and Sun City precincts in District 1 with the Beaufort County.  SX 53; 10/12/22 PM Tr. at 6:14-7:23 (W. Roberts).

501.    This change reflected public input from the Senate public hearings that the Jasper County portion of Sun City forms a community of interest with the Beaufort County portion of Sun City.  *Id.*; PX 67 at 34; SX 229 at 1:07:29-1:09:19; SX 9 at 236; SX 11 at 194, 197; SX 12 at 33; SX 14 at 173, 175.

502.    Senator Bright Matthews publicly supported this change based on the public input regarding the Sun City community of interest.  SX 239 at 22:00-23:03.

503.    The Clyburn map provided by Mr. Tresvant also split Jasper County to place the Sun City portion in District 1 with Beaufort County.  SX 37; 10/12/22 AM Tr. at 74:14-18, 76:7-8 (W. Roberts).

504.    Race was not a factor in the Enacted Plan's treatment of Jasper County.  10/12/22 PM Tr. at 7:23 (W. Roberts).

2.    **Beaufort And Colleton Counties: Making County Whole And Uniting Gullah-Geechee Community Of Interest**

505.    The Enacted Plan makes whole Beaufort County, which was split in the Benchmark Plan.  SX 48; 10/12/22 PM Tr. at 8:2 (W. Roberts).

506.    Repairing this county split preserves the Beaufort County community of interest identified in public testimony.  10/12/22 PM Tr. at 8:2-9:12 (W. Roberts); PX 67 at 31-33, 35; SX 229 at 15:49-17:18, 23:40-26:03, 35:50-42:05, 52:36-59:10, 1:15:28-1:17:55; PX 550 at 39-45.

507.    Repairing this county split also preserves the Gullah-Geechee heritage corridor between the Sea Islands and Sheldon, which had been split in the Benchmark Plan and was identified as a community of interest in public testimony.  10/12/22 PM Tr. at 8:5-9:8 (W. Roberts); PX 67 at 33; SX 231 25:26-30:17.

508.    Repairing this county split also repairs the split of the Beaufort 1D VTD. 10/12/22 PM Tr. at 9:9-12 (W. Roberts); SX 28d, 29e.

509.    Colleton County was split in the Benchmark Plan and remains split in the Enacted Plan.  SX 48; 10/12/22 PM Tr. at 9:13-16 (W. Roberts).

510.    Race was not a factor in the Enacted Plan's treatment of Beaufort County or Colleton County.  10/12/22 PM Tr. at 9:19 (W. Roberts).

### 3.    Orangeburg County: Uniting A Community Of Interest And Repairing VTD Splits

511.    Orangeburg County was split in the Benchmark Plan and remains split in the Enacted Plan.  10/12/22 PM Tr. at 9:21-23 (W. Roberts); SX 28d, 29e, 54; *see also Colleton Cnty.*, 201 F. Supp. 2d at 667 (finding that "the western portions of Orangeburg County and Calhoun County are an important part of the existing core of the Second District").

512.    The Enacted Plan moves the Limestone 1 and 2 VTDs to District 2 in response to public testimony identifying those VTDs as a rural community of interest with neighboring Lexington County.  10/12/22 PM Tr. at 9:24-10:22 (W. Roberts); SX 230 21:09-25:23.

513.    The Clyburn map provided by Mr. Tresvant also moved these VTDs to District 2. *See* SX 37; 10/12/22 PM Tr. at 10:7-8 (W. Roberts).

514.    The Enacted Plan repaired all 3 VTD splits in Orangeburg County: North 2, Pine Hill, Cordova 2.  *See* 10/12/22 PM Tr. at 9:24-10:11 (W. Roberts); SX 75 26-28; SX 28d, 29e, 54.

515.    Race was not a factor in the Enacted Plan's treatment of Orangeburg County. 10/12/22 PM Tr. at 10:25 (W. Roberts).

**4.    Richland County: Fort Jackson, Repairing VTD Splits, And Following Senate District Line**

516.    Richland County was split in the Benchmark Plan and remains split in the Enacted Plan. *See* 10/12/22 PM Tr. at 11:4-17 (W. Roberts); SX 28d, 29e, 55.

517.    The Enacted Plan maintains the hook shape in Richland County to keep Fort Jackson in District 2, which is represented by Congressman Wilson.  10/12/22 PM Tr. at 11:18-24, 14:13-15 (W. Roberts); SX 55.

518.    The Enacted Plan repairs 19 of the 21 VTD splits in Richland County, which facilitates election administration.  10/12/22 PM Tr. at 12:7-14:12 (W. Roberts); SX 28d, 29e, 55.

519.    The Enacted Plan's line between Districts 2 and 6 follows the line between Senate Districts 21 and 22, which facilitates election administration.  10/12/22 PM Tr. at 12:7-14:2 (W. Roberts).

520.    Race was not a factor in the Enacted Plan's treatment of Richland County. 10/12/22 PM Tr. at 14:18 (W. Roberts).

**5.    Sumter County: Congressman Clyburn & Repairing VTD Splits**

521.    Sumter County was split in the Benchmark Plan and remains split in the Enacted Plan.  10/12/22 PM Tr. at 14:21-23 (W. Roberts); SX 28d, 29e, 56.

522.    The Enacted Plan places more of Sumter County in District 6 as requested by Congressman Clyburn, who was born in Sumter and has family ties there.  10/12/22 PM Tr. at 15:5-21 (W. Roberts); SX 37.

523.    The Clyburn map received from Mr. Tresvant kept Sumter County split.  *See* SX 37.

524.    The Enacted Plan repairs 5 of the 6 VTD splits in Sumter County.  10/12/22 PM Tr. at 15:12-24 (W. Roberts); SX 75 24-26; SX 28d, 29e.

525.    Race was not a factor in the Enacted Plan's treatment of Sumter County. 10/12/22 PM Tr. at 16:2 (W. Roberts).

### 6.    Florence County: Improving Shape & Repairing VTD Splits

526.    Florence County was split in the Benchmark Plan and remains split in the Enacted Plan.  10/12/22 PM Tr. at 16:6-8 (W. Roberts); SX 28d, 29e, 52.

527.    The Enacted Plan makes the shape of District 6 more compact around Lake City. 10/12/22 PM Tr. at 16:15-25 (W. Roberts).

528.    The Enacted Plan also repairs the split of the Hannah VTD.  *Id.*

529.    Race was not a factor in the Enacted Plan's treatment of Florence County. 10/12/22 PM Tr. at 17:3 (W. Roberts).

### 7.    Berkeley County: Repairing County Split & Making CD 1 More Republican-Leaning

530.    Berkeley County was split in the Benchmark Plan and is made whole in District 1 in the Enacted Plan.  10/12/22 PM Tr. at 17:6-8, 22-23 (W. Roberts); SX 28d, 29e, 49.

531.    Making Berkeley County whole also repairs three VTD splits: Yellow House, The Village, Daniel Island 2.  10/12/22 PM Tr. at 17:24-19:3 (W. Roberts); SX 28d, 29e, 49.

532.    Making Berkeley County whole in District 1 eliminates Benchmark District 6's finger-like extension into Berkeley County and Benchmark District 1's crab claw-like extension into Charleston County.  10/12/22 PM Tr. at 17:17-19:3 (W. Roberts); SX 49.

533.    The Enacted Plan places all of Berkeley County in the district represented by incumbent Congresswoman Nancy Mace, who resided in Berkeley County.  10/12/22 PM Tr. at 19:4-10 (W. Roberts).

534.    Placing all of Berkeley County in District 1, along with corresponding moves in Charleston County, makes District 1 more Republican-leaning in the Enacted Plan.  10/12/22 PM Tr. at 19:11-14 (W. Roberts).

535.    Race was not a factor in the Enacted Plan's treatment of Berkeley County. 10/12/22 PM Tr. at 19:17 (W. Roberts).

### 8.    Dorchester County: Improving Shape & Following Lines

536.    Dorchester County was split in the Benchmark Plan and remains split in the Enacted Plan.  10/12/22 PM Tr. at 19:20-22 (W. Roberts); SX 28d, 29e, 51.

537.    The Enacted Plan moves the Saul Dam VTD from District 1 to District 6 to improve District 6's shape and to provide a wider corridor into downtown Charleston.  10/12/22 PM Tr. at 20:8-21:4 (W. Roberts).

538.    The Saul Dam VTD's BVAP percentage is 8.5% and its Republican share of the two-party 2020 presidential election vote is 72.6%.  ECF No. 473 (2020 Census Data By VTD); SX 243.

539.    The Enacted Plan splits 5 VTDs in Dorchester County—Beech Hill 2, Delemars, Givhans, Givhans 2, and Cypress—to accommodate the move of the Saul Dam VTD to District 6, to improve District 6's shape, and to balance population.  10/12/22 PM Tr. at 21:17-22:13 (W. Roberts); SX 29e, 51.

540.    The Enacted Plan splits 2 VTDs in Dorchester County—Lincoln and Windsor—to follow the House District 98 line, which facilitates election administration.  10/12/22 PM Tr. at 21:5-16 (W. Roberts); SX 29e, 51.

541.    In total, the 7 VTDs split in Dorchester County are majority-Republican on the two-party vote share in the 2020 presidential election.  *See* SX 243.

542.    Race was not a factor in the Enacted Plan's treatment of Dorchester County. 10/12/22 PM Tr. at 22:16 (W. Roberts).

### 9.     Charleston County: Traditional Principles & Politics

543.    Charleston County was split in the Benchmark Plan and remains split in the Enacted Plan.  10/12/22 PM Tr. at 22:22-24 (W. Roberts); SX 28d, 29e, 50.

544.    Keeping Charleston County split comports with Senator Campsen's view that Charleston County is best served by having two congressional representatives, by having one Democratic and one Republican representative, and by being represented by Congressman Clyburn.  *See infra* ¶¶ 1137-38.

545.    Keeping Charleston County split also comports with public input that specifically supported maintaining two representatives for Charleston County.  SX 9 at 12, 67, 142, 206, 220, 237, 240, 260, 263, 291, 306, 308, 344-346, 347, 358; SX 10 at 110, 111, 113-114, 115; SX 11 at 357, 360-361, 442; SX 12 at 16, 29, 44, 97, 205, 316, 339, 375, 417, 421-423, 425, 427-429, 431; SX 13 at 390, 393, 405-409, 414, 426; SX 14 at 76, 267, 359, 363, 442, 488; SX 90.

546.    Even though the Senate staff determined that former Congressman Cunningham's racial allegations against the Senate Staff Plan were false, the Enacted Plan makes changes in Charleston to prevent further racial allegations against Amendment 1.  *See* 10/12/22 PM Tr. at 23:16-28:10 (W. Roberts).

547. The Enacted Plan redraws lines in Charleston County to track natural geographic features, including the Cooper River, Stono River, Ashley River, and Wappo Creek. 10/12/22 PM Tr. at 23:16-25:2 (W. Roberts); SX 50.

548. The Enacted Plan places all of the Charleston Peninsula in District 6. 10/12/22 PM Tr. at 25:6-10 (W. Roberts); SX 50.

549. The Enacted Plan places all of coastal Charleston in District 1. 10/12/22 PM Tr. at 25:3-5 (W. Roberts); SX 50.

550. The Enacted Plan repairs all 5 VTD splits in Charleston County. 10/12/22 PM Tr. at 25:11-17 (W. Roberts); SX 28d, 29e, 50.

551. The Enacted Plan follows the county line between Charleston County and Dorchester County to include Deer Park, Lincolnville, and Ladson in District 6. 10/12/22 PM Tr. at 25:18-26:25 (W. Roberts); SX 50.

552. The Enacted Plan makes District 1 more Republican-leaning by moving more heavily Democratic areas in Charleston County from District 1 to District 6. 10/12/22 PM Tr. at 27:21-28:10 (W. Roberts).

553. This includes moving the West Ashley area, which comprises the St. Andrews VTDs, from District 1 to District 6. See 10/12/22 PM Tr. at 25:18-26:13, 27:21-24 (W. Roberts).

554. West Ashley's BVAP percentage is 19.59% and its Democratic share of the two-party vote in the 2020 presidential election is 57%. See ECF No. 473 (2020 Census Data By VTD); SX 243.

555. This also includes moving the majority-Democratic Deer Park 1A, Deer Park 1B, Deer Park 2A, Deer Park 2B, Deer Park 2C, Deer Park 3, Lincolnville, and Ladson VTDs from District 1 to District 6. See 10/12/22 PM Tr. at 26:14-27:6, 27:21-24 (W. Roberts); SX 50.

556.    The Deer Park 1A VTD's Democratic share of the two-party vote in the 2020 presidential election is 72.4%.  *See* SX 243.

557.    The Deer Park 1B VTD's Democratic share of the two-party vote in the 2020 presidential election is 55.5%.  *See* SX 243.

558.    The Deer Park 2A VTD's Democratic share of the two-party vote in the 2020 presidential election is 59.8%.  *See* SX 243.

559.    The Deer Park 2B VTD's Democratic share of the two-party vote in the 2020 presidential election is 69.5%.  *See* SX 243.

560.    The Deer Park 2C VTD's Democratic share of the two-party vote in the 2020 presidential election is 50.8%.  *See* SX 243.

561.    The Lincolnville VTD's Democratic share of the two-party vote in the 2020 presidential election is 57.8%.  *See* SX 243.

562.    The Ladson VTD's Democratic share of the two-party vote in the 2020 presidential election is 59.9%.  *See* SX 243.

563.    Race was not a factor in the Enacted Plan's treatment of Charleston County.  *See* 10/12/22 PM Tr. at 28:13 (W. Roberts).

**D.    The Enacted Plan's Changes To The Line Between Districts 1 And 6 Were Animated By Traditional Principles And Politics, Not Race**

564.    The Enacted Plan makes changes to the line between Districts 1 and 6 in Jasper, Beaufort, Colleton, Berkeley, Dorchester, and Charleston Counties. SX 29b.

565.    Those changes were driven by compliance with traditional principles, the requests received by Senate staff, and politics, not race.  *See* 10/12/22 PM Tr. at 28:16-29:11 (W. Roberts).

566.    By making these changes, the Enacted Plan increases District 1's Republican vote share by 1.36% and its BVAP by 0.16%.  *See supra* ¶¶ 464, 486.

567.    Thus, the political effect of these changes is more significant than their effect on District 1's BVAP percentage.

568.    The Enacted Plan moves these VTDs from District 6 to District 1:

      a.    Jasper County: Oaktie 2 and Sun City

      b.    Beaufort County: Sheldon 1, Sheldon 2, Dale Lobeco, Seabrook 2, Seabrook 3, Burton 1C, Burton 1D (part)

      c.    Colleton County: Green Pond (part)

      d.    Berkeley County: Hilton Cross Road, Cross, Moultrie, Eadytown, Russellville, St. Stephen 1, St. Stephen 2, Alvin, Macedonia 2, Jamestown, Shulerville, Bethera, Huger, Cordesville, Cainhoy, Pine Grove, Pomflant, Sedgefield 2, Bushy Park, Hanahan 5 (part), Yellow House (part), The Village (part), Daniel Island 2, Daniel Island 3

      e.    Dorchester County: Delmars (part), Givhans (part), Givhans 2 (part)

      f.    Charleston County: Wadmalaw Island 1, Wadmalaw Island 2

ECF 437 (2020 Census Data By VTD & 2010 Census Data By VTD).

569.    The total BVAP percentage of these areas 37.01%, and the Republican vote share is 43.15%.  ECF 437 (2020 Census Data By VTD); SX 243.

570.    The Enacted Plan moves these VTDs from District 1 to District 6:

      a.    Dorchester County: Saul Dam, Beech Hill 2, Archdale, Archdale 2, Ashley River, Patriot, Windsor 2, Windsor (part), Lincoln (part), Ridgeville 2 (part)

      b.     Charleston County: Lincolnville, Ladson, Deer Park 1A, Deer Park 1B, Deer Park 2A, Deer Park 2B, Deer Park 2C, Deer Park 3 (part), North Charleston 28 (part), St. Andrews 1-37, Charleston 1-7, Charleston 8 (part), Charleston 9 (part)

ECF 437 (2020 Census Data By VTD & 2010 Census Data By VTD).

571. The total BVAP percentage of these areas is 23.44%, and the Republican vote share is 42.02%. *See* ECF 473 (2020 Census Data By VTD); SX 243.

572. In other words, the areas the Enacted Plan moved from District 6 to District 1 have both a higher BVAP percentage and a higher Republican vote share than the areas the Enacted Plan moved from District 1 to District 6. *See* ECF 473 (2020 Census Data By VTD); SX 243.

573. The Enacted Plan's treatment of Beaufort County, Berkeley County, and Charleston County demonstrates that compliance with traditional principles and politics, rather than race, drove the Enacted Plan's changes to the line between Districts 1 and 6.

574. The BVAP percentage of the areas moved from District 6 to District 1 in Beaufort County is 42.66%, approximately 26 percentage points higher than District 1's BVAP. *See* ECF 473 (2020 Census Data By VTD); SX 28b; SX 29g.

575. The BVAP percentage of the areas moved from District 6 to District 1 in Berkeley County is 40.31%, approximately 24 percentage points higher than District 1's BVAP. *See* ECF 473 (2020 Census Data By VTD); SX 28b; SX 29g.

576. In Charleston County, the total BVAP percentage of the areas moved from District 6 to District 1 is 37.97%, and the total BVAP percentage of the areas moved from District 1 to District 6 is 22.07%. *See* ECF 473 (2020 Census Data By VTD).

577.    In other words, the BVAP percentage of the areas in Charleston County moved from District 6 to District 1 (37.97%) is nearly 16 points higher than the BVAP percentage of the areas moved from District 1 to District 6 (22.07%).  *See* ECF 473 (2020 Census Data By VTD).

578.    Thus, the Enacted Plan moved higher-BVAP percentage areas in Beaufort, Berkeley, and Charleston County from District 6 to District 1 compared to the lower-BVAP percentage areas in Charleston it moved from District 1 to District 6.  *See* ECF 473 (2020 Census Data By VTD).

579.    The Enacted Plan placed all of Berkeley County in District 1 and moved the line between Districts 1 and 6 in Charleston County.  *Supra* ¶¶ 530, 564; SX 29b.

580.    Berkeley County, which the Enacted Plan makes whole in District 1, has a higher BVAP percentage (22.6%) than Charleston County (22.09%) under the 2020 Census data.  *See* ECF 473 (2020 Census Data By VTD); SX 28b; SX 29g.

581.    Moreover, the Enacted Plan also decreased the disparity in BVAP levels between the portions of Charleston County in Districts 6 and 1, respectively.  *See* ECF 473 (2020 Census Data By VTD).

582.    Under the 2010 Census data, the portion of Charleston County in Benchmark District 6 had a BVAP percentage of 49.92% and the portion of Charleston County in Benchmark District 1 had a BVAP percentage of 18.44%, a difference of 31.48 points.  *See* ECF 473 (2010 Census Data By VTD).

583.    Under the 2020 Census data, the portion of Charleston County in Benchmark District 6 had a BVAP percentage of 41.53% and the portion of Charleston County in Benchmark District 1 had a BVAP percentage of 14.65%, a difference of 26.88 points.  *See* ECF 473 (2020 Census Data By VTD).

584.    Under the 2020 Census data, the portion of Charleston County in Enacted District 6 has a BVAP percentage of 31.18% and the portion of Charleston County in Enacted District 1 has a BVAP percentage of 10.42%, a difference of 20.76 points. *See* ECF 473 (2020 Census Data By VTD).

585.    Charleston County's BVAP percentage decreased from 27.65% under the 2010 Census data to 22.09% under the 2020 Census data. *See* ECF 473 (2020 Census Data By VTD).

586.    The Enacted Plan also decreased the Democratic vote share in the portion of Charleston County in District 1.

587.    The Democratic vote share in the portion of Charleston County in Benchmark District 6 was 73.81% and in the portion of Charleston County in Benchmark District 1 was 52.29%. *See* SX 243.

588.    The Democratic vote share in the portion of Charleston County in Enacted District 6 is 64.64% and in the portion of Charleston County in Benchmark District 1 is 49.23%. *See* SX 243.

589.    The Enacted Plan thus decreased the Democratic vote share in the portion of Charleston County in District 1 by 2.06%. *See* SX 243.

**E.    The General Assembly's Consideration Of Politics In The Enacted Plan Was Contemporaneous And Well Known**

590.    "Politics and political considerations are inseparable from districting and apportionment," and "districting inevitably . . . is intended to have substantial political consequences." *Gaffney v. Cummings*, 412 U.S. 735, 753 (1973).

591.    The General Assembly contemporaneously considered politics and the political effect of redistricting when it drew, considered, and adopted the Enacted Plan.

592.    The House Guidelines expressly authorized the General Assembly to consider "political beliefs" and "voting behaviors" in identifying and drawing maps around communities of interest.  PX 175 at 2; *see also* 10/13/22 PM Tr. at 12:16-13:1 (J. Jordan).

593.    The Senate Guidelines expressly authorized the General Assembly to consider "political" communities of interest and "political information . . . in drafting and analyzing proposed redistricting plans."  SX 3 §§ III.A, IV.

594.    Every senator and staffer who participated in drawing and supporting the Enacted Plan testified that the General Assembly considered politics, and increasing District 1's Republican vote share, in the Enacted Plan.  *See* 10/12/22 AM Tr. at 50:11, 51:1-58:2, 87:14-92:9, 95:22-101:15, 105:19-106:1, 114:9-19 (W. Roberts); 10/13/2022 PM Tr. at 98:21-101:16 (C. Campsen); 10/12/22 PM Tr. at 93:7-21, 103:24-104:9 (S. Massey).

595.    Any plan that did not increase District 1's Republican vote share would not have passed the Republican-controlled General Assembly.  *See* 10/12/22 AM Tr. at 87-89, 105-106, 114 (W. Roberts); 10/13/2022 PM Tr. at 78-80, 95 (C. Campsen); 10/12/22 PM Tr. at 104:3-20 (S. Massey).

596.    In fact, Senate Majority Leader Shane Massey testified that it would have been "political malpractice" for the Republican-controlled General Assembly to make District 1 more Democratic.  10/12/22 PM Tr. at 104:3-20 (S. Massey).

597.    Senator Massey told Senator Rankin that the Republican Caucus was "not going to sacrifice the First" and allow a Democrat to be elected there.  *Id.* at 106:25-107:16 (S. Massey).

598.    Senate staff prepared and posted to the Senate Redistricting website a partisan analysis report showing the Trump/Biden vote shares in each district for each plan that was proposed by a senator.  *Supra* ¶¶ 352-54.

599.    Senator Rankin and Senator Campsen referred to the "Trump number" in various districts and plans during Senate hearings and the floor debate. SX 241 30:17-31:53, 56:22-56:27; SX 242 2:22:10-2:23:11.

600.    During the floor debate, Senator Campsen denied allegations that the Enacted Plan was a "partisan gerrymander."  SX 242 at 2:22:10-2:23:11.

601.    Senator Campsen explained at trial that he did not believe that the Enacted Plan meets the legal definition of a "partisan gerrymander" but that politics played a role in drafting and adopting the Enacted Plan.  10/13/2022 PM Tr. at 90:5-92:3 (C. Campsen).

602.    Opponents also attacked the Enacted Plan as a "partisan gerrymander."

603.    For example, former Congressman Cunningham alleged that the Senate Staff Plan was a "partisan gerrymander."  SX 239 11:40-20:05.

604.    Another opponent, Senator Margie Bright Matthews, disclaimed any allegation that the Enacted Plan was a racial gerrymander on the floor of the Senate.  *See* SX 242 2:57:30-3:20:15.

605.    During an exchange with Senator Campsen on the floor of the Senate, Senator Bright Matthews said, "I don't want this body, this Senate, to turn into what is in D.C. where we always doing dog whistling about race."  SX 242 at 3:15:53-3:16:04.

606.    Senator Margie Bright Matthews further stated "[W]e're not going to get into the racial gerrymandering thing because you and I both know in Charleston it matters not about your

race.  It is just that you went by how those people voted in West Ashley."  SX 242 at 3:19:20-3:19:35.

607.    Senator Bright Matthews went on: "It appears that there's a salamandering effect. Instead of pulling the 85,000 that Congressional District 6 needed, instead of pulling those out of Charleston, Orangeburg, the upper part of Dorchester and Berkley, there was apparently a decision to salamander into the lower part of Charleston, the Democratic voting area of Charleston, and snatch those people that are in my district and yours."  *Id.* at 3:19:35-3:20:15.

608.    Senator Bright Matthews continued: "Senator, you know I really appreciate you agreeing with me that our opposition to Senate Plan 1 versus 2 is not about racial.  It's about gerrymandering and packing, packing the Sixth Congressional District to make the First Congressional District more electable but with Trump numbers."  *Id.* at 3:21:42-3:22:11.

609.    Senator Bright Matthews confirmed at trial that politics "is involved in everything we do."  10/7/2022 AM Tr. at 49:9.

610.    Senator Marlon Kimpson also alleged on the Senate floor that the Enacted Plan is a partisan gerrymander.  *See* SX 242 at 3:52:25-4:02:48.

611.    Senator Kimpson alleged that the Enacted Plan was "designed by the National Republican Party in D.C."  SX 242 at 3:53:08-3:53:16.

612.    Senator Kimpson advocated for a "competitive map."  SX 242 at 3:54:22-3:54:30.

613.    Senator Kimpson continued: "if you look at every major vote we take in this General Assembly, it's along partisan lines."  SX 242 at 3:55:19-3:55:56.

614.    Senator Kimpson also distributed to the members in the chamber a decision of the Ohio Supreme Court striking down redistricting plans as partisan gerrymanders: "that was a

Ohio State Supreme Court case but it struck down, struck down gerrymandered districts, which I submit is what we are going to arguably pass today."  SX 242 at 4:01:02-4:01:54.

615.    Members of the public criticized the Senate Staff Plan as being a "partisan gerrymander" or a partisan or political plan in favor of the Republican Party.  PX 10 at 245, 254; PX 12 at 335, 338, 359, 360, 367; PX 16c at 6-10, 18-20, 22, 24, 26, 29, 33; SX 16d at 1, 3-10; SX 16e at 1-10.

616.    Members of the public criticized Senate Amendment 1 as being a partisan "gerrymander" or a partisan or political plan in favor of the Republican Party.  SX 9 at 52, 81, 97, 102, 110, 113, 126, 143, 144, 149, 171, 172, 185, 186, 196, 197, 199, 204, 205, 208, 217, 219, 234, 254; SX 10 at 11, 25, 31, 35, 51, 65, 146; SX 12 at 32, 46, 258, 259, 266; SX 13 at 172, 241, 259, 290, 292, 301, 398, 427, 429; SX 14 at 1, 42, 113,  SX 15 at 33, 43; SX 90.

**F.    The Senate Releases Amendment 1 And Senate Amendment 2a And Receives Public Input**

617.    Senate Amendment 1, including the maps and data reports, was released to the public on January 11, 2022.  PX 67 at 33; SX 32a-32g.

618.    Senator Harpootlian sponsored Senate Amendment 2a as an alternative to Senate Amendment 1.

619.    Senate Amendment 2a, including the maps and data reports, was released to the public on January 11, 2022, the same day as Senate Amendment 1.

620.    Following the public release of Amendment 1 and Amendment 2a on January 11, 2022, members of the public provided input on those plans through the Senate Redistricting email inbox.  SX 90.

621.    Ms. Maura Baker compiled a chart documenting that public input.  SX 90.

622.    Approximately 35% of the public comments supported Amendment 2a and making Charleston County whole, while approximately 32% supported Amendment 1 and keeping Charleston County split.  The remaining comments did not express a clear preference. SX 90.

623.    Numerous members of the public expressed support for Amendment 1 because it kept Beaufort County in District 1 with "coastal Charleston."  SX 9 at 4-9, 12-15, 19-34, 37, 41-43, 46, 53-58, 61-63, 66, 67, 74, 76-77, 82-83, 86, 91-92, 96, 100, 201, 224, 226, 229, 234, 240, 246, 256, 258-259, 260, 264-265, 267, 270-271, 285, 287-289, 293, 295, 297, 299, 301, 303, 305, 309, 313, 315, 320-322, 329, 331, 335, 340, 344-346, 350-351, 353-354, 358, 360-364, 367-369, 371-375; SX 10 at 1-2, 4, 6, 13, 14, 18, 23, 27, 28, 29, 38, 41, 44-49, 52-54, 60-61, 71, 74, 77, 81, 83-84, 86, 88, 89, 91, 94, 96, 97, 99, 102, 104-109, 113-114, 118, 122, 124-125, 127, 130, 136, 141, 179, 183, 184, 188, 196, 207, 213, 217, 218, 222, 224, 225, 229, 234, 239, 242, 287, 289-293, 296-305, 307, 309-311, 315, 317, 324, 330, 334, 338, 357, 363, 366, 374, 377-379, 383-384, 386, 388, 389, 391, 398-400, 407, 409, 415, 421-422, 425-428, 432, 438, 440, 444, 446-448, 457-458, 461, 468, 470-471, 474, 476, 481-483, 485-486, 490; SX 11 at 326-327, 330-331, 334, 338, 340, 346-347, 349, 351, 368-69, 371, 374-381, 383-397, 399, 401-402, 404-406, 409-415, 418-426, 428-429, 431-454, 456, 458-461, 463-467, 469-477, 491-497, 500, 504, 507; SX 12 at 3-7, 9-12, 15, 16-18, 20-21, 34, 40, 48-49, 51, 97; SX 13 at 4-8, 11-12, 15, 16, 17, 19, 21, 23-29, 31-34, 36-37, 40, 43, 45, 47, 53, 55, 59, 63, 65-66, 71, 72, 83-84, 86, 88, 90-92, 101, 106-107, 111, 116, 123-124, 129-131, 138-139, 142, 144, 150-151, 161, 164, 177, 178, 187, 190-193, 195, 203-205, 208, 210, 213, 218-219, 224, 231-232, 235, 239, 243, 245, 254, 256, 263, 272, 275, 277, 285-289, 291, 293-297, 331, 347, 354, 355-356, 358, 372, 374, 377-379, 382, 384-388, 390-395, 397, 399-400, 403-410, 416-417, 419-421, 425; SX 14 at 67, 88, 99,

103, 115, 166, 172, 191-192, 195, 212, 221, 234, 266, 319, 321-323, 326-327, 330, 333-334, 338, 342-343, 346, 350, 352, 370, 372, 374-375, 377, 379, 380-384, 386-401, 403-409, 413-419, 421, 423-425, 427-429, 431-434, 436-437, 440-441, 445-458, 460, 462-465, 467-477, 480-483, 485-487, 490, 492-496; SX 15 at 2-3, 5, 8, 12-13, 16, 20-21, 23-28, 32, 34, 44; SX 16a; SX 16b at 3-4.

624.    The Redistricting Subcommittee met on January 13, 2022 to receive public input on Amendment 1 and Senator Harpootlian's proposal.  *See* SX 240.

625.    At the conclusion of the meeting, the Subcommittee voted unanimously to advance both amendments.  *See* SX 240 at 2:04:20-2:04:40.

### G.    The General Assembly Enacts Amendment 1 As The Enacted Plan

626.    The full Senate Judiciary Committee met on January 19, 2022 to consider Amendment 1 and Amendment 2a.  *See* SX 241.

627.    The Senate Judiciary Committee adopted Amendment 1 on a 14-8 vote.  *See* SX 241 at 1:13:40-1:17:25.

628.    Senator Harpootlian withdrew Amendment 2a from the Committee's consideration and reserved his right to present Amendment 2a on the Senate floor.  *See id.* at 1:16:07-1:16:45.

629.    The full Senate consider Amendment 1 and Amendment 2a on January 20, 2022. *See* SX 242.

630.    The Senate adopted Amendment 1 on a 26-15 vote.  *See* SX 242 at 4:02:50-4:07:00.

631.    The Senate voted to table Amendment 2a on a 26-13 vote.  *See* SX 242 at 5:23:40-5:27:33.

632.   The House passed Amendment 1 on a 72-33 vote on January 26, 2022.  *See* https://www.scstatehouse.gov/sess124_2021-2022/bills/865.htm.

633.   Governor McMaster signed Amendment 1 into law that same day.  *See* https://www.scstatehouse.gov/sess124_2021-2022/bills/865.htm.

## VIII.  PLAINTIFFS' ALTERNATIVE PLANS ARE NOT AS CONSISTENT WITH TRADITIONAL PRINCIPLES AS THE ENACTED PLAN AND DO NOT ACHIEVE THE GENERAL ASSEMBLY'S POLITICAL GOALS

634.   None of the alternative plans proposed during the legislative process or in litigation is as consistent with traditional districting principles as the Enacted Plan or achieves the General Assembly's political goals.

### A.   NAACP Plan 1

635.   Plaintiff South Carolina NAACP proposed NAACP Plan 1 to the General Assembly and referenced it in this litigation.  *See* SX 34a (map).

636.   NAACP Plan 1 has a total population deviation of 2, *see* SX 34d, and therefore does not adhere to the directive in the Constitution and the Senate Guidelines that "a congressional districting plan should not have population deviations greater than one person," SX 3 § I.A.2.

637.   NAACP Plan 1 preserves, as a percentage of total population, the cores of the existing Congressional districts as follows: 52.23% of District 1; 71.69% of District 2; 75.30% of District 3; 83.00% of District 4; 57.15% of District 5; 45.53% of District 6; and 59.77% of District 7.  SX 34b.

638.   NAACP Plan 1 splits 14 counties affecting population.  SX 34e.

639.   NAACP Plan 1 splits 24 voting districts affecting population.  *Id.*

640.    Under NAACP Plan 1, the BVAP is 34.02% in District 1, 19.88% in District 2, 23.82% in District 5, and 51.62% in District 6.  SX 34c.  The BVAP does not exceed 50% in any of the other districts.  *Id.*

641.    NAACP Plan 1 places more African-Americans of voting age in District 6 than the Enacted Plan.  *Compare* SX 34c (295,992 in NAACP Plan 1), *with* SX 29a (261,421 in Enacted Plan).

642.    NAACP Plan 1 does not maintain Republicans' political advantage, specifically their 6-1 Republican-to-Democratic advantage in Congressional seats.  *See* PX 67 at 25; PX 48 at 12–13 tbl. 4.

643.    NAACP Plan 1 flips District 1 from a majority-Republican district to a 52.6% Democratic district.  *See* PX 120 at 3 tbl. 1.

644.    According to the 2020 Presidential election results, District 2 in NAACP Plan 1 has a 37.9% vote share for the African-American candidate of choice/Democratic candidate and, therefore, does not result in any wins for that candidate under the election results that Plaintiffs' putative expert Dr. Duchin analyzed.  *See* PX 120 at 3-4, 8-11.

645.    The 37.9% vote share for the African-American candidate of choice/Democratic candidate in the NAACP Plan 1's District 2 is lower than the 44.6% vote share for that candidate in Enacted District 2.  *See* PX 120 at 3.

646.    According to the 2020 Presidential election results, District 5 in NAACP Plan 1 has a 40.5% vote share for the African-American candidate of choice/Democratic candidate and, therefore, does not result in any wins for that candidate under the election results that Plaintiffs' putative expert Dr. Duchin analyzed.  *See* PX 120 at 3-4, 8-11.

647.    The 40.5% vote share for the African-American candidate of choice/Democratic candidate in the NAACP Plan 1's District 5 is lower than the 40.8% vote share for that candidate in Enacted District 5.  *See* PX 120 at 3.

648.    NAACP Plan 1 does not maintain the community of interest around Fort Jackson in District 2.  SX 34a.

649.    NAACP Plan 1 does not preserve the Sun City community of interest in a single district.  SX 34a.

650.    NAACP Plan 1 does not preserve the community of interest formed by the Limestone precincts in Orangeburg County and neighboring Lexington County.  SX 34a.

**B.    NAACP Plan 2**

651.    Plaintiff South Carolina NAACP also proposed NAACP Plan 2 to the General Assembly and referenced it in this litigation.  *See* SX 35a (map).

652.    NAACP Plan 2 has a total population deviation of 4, *see* SX 35f, and therefore does not adhere to the directive in the Constitution and the Senate Guidelines that "a congressional districting plan should not have population deviations greater than one person," SX 3 § I.A.2.

653.    NAACP Plan 2 preserves, as a percentage of total population, the cores of the existing Congressional districts as follows: 72.46% of District 1; 51.52% of District 2; 86.34% of District 3; 87.51% of District 4; 79.85% of District 5; 46.35% of District 6; and 99.30% of District 7.  SX 35c.

654.    NAACP Plan 2 splits 11 counties affecting population.  SX 35d.

655.    NAACP Plan 2 splits 52 voting districts affecting population.  *Id.*

656.    Under NAACP Plan 2, the BVAP is 23.26% in District 1, 19.53% in District 2, 19.59% in District 5, and 49.17% in District 6.  SX 35b.  The BVAP does not exceed 50% in any of the other districts.  *Id.*

657.    NAACP Plan 2 places more African-Americans of voting age in District 6 than the Enacted Plan.  *Compare* SX 35f (283,932 in NAACP Plan 2), *with* SX 29a (261,421 in Enacted Plan).

658.    According to Dr. Duchin's analysis, NAACP Plan 2 indicates "cracking" of African-American voters because the BVAP in its second-highest BVAP district is 25.4%, which Dr. Duchin views as "especially low."  PX 67 at 9, 22–23.

659.    NAACP Plan 2 does not maintain Republicans' political advantage, specifically their 6-1 Republican-to-Democratic advantage in Congressional seats.  *See* PX 67 at 25; PX 48 at 12–13 tbl. 4.

660.    NAACP Plan 2 flips District 1 from a majority-Republican district to a 52.5% Democratic district.  *See* PX 120 at 3 tbl. 1.

661.    According to the 2020 Presidential election results, District 2 in NAACP Plan 2 has a 40.8% vote share for the African-American candidate of choice/Democratic candidate and, therefore, does not result in any wins for that candidate under the election results that Plaintiffs' putative expert Dr. Duchin analyzed.  *See* PX 120 at 3-4, 8-11.

662.    The 40.8% vote share for the African-American candidate of choice/Democratic candidate in the NAACP Plan 2's District 2 is lower than the 44.6% vote share for that candidate in Enacted District 2.  *See* PX 120 at 3.

663.    According to the 2020 Presidential election results, District 5 in NAACP Plan 2 has a 37.9% vote share for the African-American candidate of choice/Democratic candidate and,

therefore, does not result in any wins for that candidate under the election results that Plaintiffs' putative expert Dr. Duchin analyzed.  *See* PX 120 at 3-4, 8-11.

664.    The 37.9% vote share for the African-American candidate of choice/Democratic candidate in the NAACP Plan 2's District 5 is lower than the 40.8% vote share for that candidate in Enacted District 5.  *See* PX 120 at 3.

665.    NAACP Plan 2 does not maintain the community of interest around Fort Jackson in District 2.  SX 35a.

666.    NAACP Plan 2 does not preserve the Sun City community of interest in a single district.  SX 35a.

667.    NAACP Plan 2 does not preserve the community of interest formed by the Limestone precincts in Orangeburg County and neighboring Lexington County.  SX 35a.

**C.     Amendment 2a Plan (House Plan 2, Senate Amendment 2a)**

668.    Democrat Senator Richard Harpootlian hired Mr. Joey Oppermann to draw, and eventually proposed, Senate Amendment 2a as an alternative plan.  *See* SX 31a (map).

669.    Senator Harpootlian initially proposed a plan as Senate Amendment 2.  *See* SX30a.

670.    Senate Amendment 2 violated the one-person deviation requirement.  10/12/22 AM Tr. at 120:23–24 (W. Roberts).

671.    When informed of the violation, Senator Harpootlian directed Will Roberts "to fix [the plan] or get it fixed."  *Id.* at 121:4 (W. Roberts).

672.    The Amendment 2a Plan, or Senate Amendment 2a to House Plan 2, is the fixed plan.  *Id.* at 121:8–9 (W. Roberts).

673.    The Amendment 2a Plan is not a "minimal change plan."  *Id.* at 122:23–24 (W. Roberts); 10/7/22 PM Tr. at 72:4–6 (J. Oppermann).

674.    The Amendment 2a Plan makes "dramatic modifications" to the Benchmark Plan and "does not respect the cores of existing districts."  10/12/22 AM Tr. at 123:1–2 (W. Roberts).

675.    The Amendment 2a Plan preserves, as a percentage of total population, the cores of the existing Congressional districts as follows: 73.39% of District 1; 65.71% of District 2; 70.38% of District 3; 74.35% of District 4; 55.23% of District 5; 54.34% of District 6; and 55.83% of District 7.  SX 31c.

676.    The Amendment 2a Plan is not a "minimal change plan for District 6," "for Congressman Clyburn," or for District 7.  10/12/22 AM Tr. at 123:10–21, 124:12–14 (W. Roberts); 10/7/22 PM Tr. at 72:4–6 (J. Oppermann).

677.    Under the Amendment 2a Plan, "more than 45 percent of Congressman Clyburn's constituents would be new to him."  10/12/22 AM Tr. at 124:9–11 (W. Roberts).

678.    The Amendment 2a Plan splits 6 counties affecting population.  SX 31e.

679.    The Amendment 2a Plan splits 10 voting districts affecting population.  *Id.*

680.    Under the Amendment 2a Plan, the BVAP is 20.57% in District 1, 21.19% in District 2, 33.04% in District 5, and 48.60% in District 6.  SX 31b.  The BVAP does not exceed 50% in any of the other districts.  *Id.*

681.    The Amendment 2a Plan places more African-Americans of voting age in District 6 than the Enacted Plan.  *Compare* SX 31b (280,145 in Amendment 2a Plan), *with* SX 29a (261,421 in Enacted Plan).

682.    The Amendment 2a Plan does not maintain Republicans' political advantage, specifically the 6-1 Republican-to-Democratic advantage in Congressional seats.  *See* 10/12/22 AM Tr. at 124:21–25 (W. Roberts); PX 67 at 25; PX 48 at 12–13 tbl. 4.

683.    According to the 2020 Presidential election results, 5 districts in the Amendment 2a Plan would have favored the Republican candidate for President and 2 districts would have favored the Democratic candidate for President.  SX 31d; *see* 10/12/22 AM Tr. at 124:23 (W. Roberts).

684.    The Amendment 2a Plan flips District 1 from a majority-Republican district into a 51.83% Democratic district.  SX 31d.

685.    District 1 is not a Republican-leaning district under the Amendment 2a Plan. 10/12/22 AM Tr. at 124:25 (W. Roberts).

686.    According to the 2020 Presidential election results, District 2 in the Amendment 2a Plan has a 36.5% vote share for the African-American candidate of choice/Democratic candidate and, therefore, does not result in any wins for that candidate under the election results that Plaintiffs' putative expert Dr. Duchin analyzed.  *See* PX 120 at 3-4, 8-11.

687.    The 36.5% vote share for the African-American candidate of choice/Democratic candidate in the Amendment 2a Plan's District 2 is lower than the 44.6% vote share for that candidate in Enacted District 2.  *See* PX 120 at 3.

688.    According to the 2020 Presidential election results, District 5 in the Amendment 2a Plan has a 46.9% vote share for the African-American candidate of choice/Democratic candidate and, therefore, does not result in any wins for that candidate under the election results that Plaintiffs' putative expert Dr. Duchin analyzed.  *See* PX 120 at 3-4, 8-11.

689.    Senator Harpootlian described the Amendment 2a Plan as the "Democratic caucus plan" on the floor of the Senate.  SX 242 at 4:35:28-4:35:46.

690.    Members of the public specifically criticized the Amendment 2a Plan for looking "more like political gerrymandering than helping minority communities."  SX 9 at 12-13, 15, 21,

67, 206, 200, 226, 229, 259, 263, 267, 271, 287, 297, 299, 313, 320, 322, 329, 335, 337, 340, 344, 346, 347, 350, 354, 364; SX 10 at 83, 86, 88, 96, 99, 102, 104, 107-109, 112-114, 118, 121, 124, 127; SX 11 at 327, 340, 357, 361, 374-381, 383-386, 388, 390-396, 399-402, 404-406, 409-411, 414, 415, 417-418, 421, 423-426, 428-429, 431-432, 434, 438, 441-447, 451-454, 456, 458-459, 461, 463-464, 467, 469-473, 475-477, 493, 495, 504, 506; SX 12 at 3, 5, 6, 9, 10, 13, 15-17, 21, 26, 34, 36, 40, 48, 49, 97, 316; SX 13 at 139, 210, 357, 374, 377, 379, 386, 388, 391-395, 399, 403-410, 413, 416-417, 419-421, 428; SX 14 at 195, 234, 267, 359, 363, 372, 377, 379-390, 392-394, 396-401, 403-409, 413-414, 416, 419, 421-425, 427-428, 431-434, 436-437, 440-442, 445, 447, 449, 451-456, 458, 460, 462-465, 467-469, 472-473, 475, 477, 481-483, 485-488, 490, 492, 494; SX 15 at 2, 23, 32; SX 16a at 3; SX 16b at 3; SX 90.

691.    Other members of the public criticized the Amendment 2a Plan as being a partisan or political plan in favor of the Democratic Party. SX 9 at 244, 285, 288, 291, 296, 315, 317, 335; SX 10 at 101; SX 11 at 457; SX 12 at 44, 101; SX 14 at 166, 476, 478-480, 496; SX 90.

692.    Senator Campsen conveyed to Will Roberts that he would not vote for the Amendment 2a Plan because "[t]he Trump percentage was a lot lower" than in his preferred plan and the Benchmark Plan. 10/12/22 AM Tr. at 125:6–11 (W. Roberts).

693.    The Amendment 2a Plan does not maintain the community of interest around Fort Jackson in District 2. SX31a; 10/12/22 AM Tr. at 122:21–22 (W. Roberts).

694.    The Amendment 2a Plan does not preserve the Sun City community of interest in a single district. SX 31a.

695.    The Amendment 2a Plan does not preserve the community of interest formed by the Limestone precincts in Orangeburg County and neighboring Lexington County. SX 31a.

D.    **League of Women Voters Plan (Floor Amendment 3)**

696.    Senator Harpootlian also introduced the League of Women Voters Plan as Floor Amendment 3.  *See* SX 68a (map); PX 17 at 48.

697.    The League of Women Voters Plan has a total population deviation of 5, *see* SX 68b, and therefore does not adhere to the directive in the Constitution and the Senate Guidelines that "a congressional districting plan should not have population deviations greater than one person," SX 3 § I.A.2.

698.    The League of Women Voters Plan is not a "minimal change plan."  10/12/22 AM Tr. at 127:8–9 (W. Roberts).

699.    The League of Women Voters Plan "does not respect the cores of the existing districts under the [B]enchmark [P]lan." *Id.* at 127:11–12 (W. Roberts).

700.    The League of Women Voters Plan preserves, as a percentage of total population, the cores of the existing Congressional districts as follows: 76.04% of District 1; 64.09% of District 2; 91.54% of District 3; 97.50% of District 4; 81.61% of District 5; 50.70% of District 6; and 83.46% of District 7.  SX 68c.

701.    The League of Women Voters Plan is not a "minimal change" plan for District 6 or for Congressman Clyburn.  10/12/22 AM Tr. at 128:4–6 (W. Roberts).

702.    Under the League of Women Voters Plan, "nearly 50 percent of Congressman Clyburn['s] constituents would be new to him." *Id.* at 127:25–128:3 (W. Roberts).

703.    The League of Women Voters Plan splits 6 counties affecting population. SX 68f.

704.    The League of Women Voters Plan splits 12 voting districts affecting population. *Id.*

705.    Under the League of Women Voters Plan, the BVAP is 22.57% in District 1, 19.05% in District 2, 23.83% in District 5, and 47.65% in District 6.  SX 68b.  The BVAP does not exceed 50% in any of the other districts.  *Id.*

706.    The League of Women Voters Plan places more African-Americans of voting age in District 6 than the Enacted Plan.  *Compare* SX 68b (274,565 in League of Women Voters Plan), *with* SX 29a (261,421 in Enacted Plan).

707.    According to Dr. Duchin's analysis, the League of Women Voters Plan indicates "cracking" of African-American voters because the BVAP in its second-highest BVAP district is 24.5%, which Dr. Duchin views as "especially low."  PX 67 at 9, 22–23.

708.    The League of Women Voters Plan does not maintain Republicans' political advantage, specifically the 6-1 Republican-to-Democratic advantage in Congressional seats.  *See* SX 68d*;* 10/12/22 AM Tr. at 128:13–19 (W. Roberts); PX 67 at 25; PX 48 12–13 tbl. 4.

709.    According to the 2020 Presidential election results, 5 districts in the League of Women Voters Plan would have favored the Republican candidate for President and 2 districts would have favored the Democratic candidate for President.  *See* SX 68d*;* 10/12/22 AM Tr. at 128:13–19 (W. Roberts).

710.    In particular, the League of Women Voters Plan flips District 1 from a majority-Republican district into a 51.75% Democratic district and draws District 6 as a 64.91% Democratic district.  SX 68d.

711.    District 1 is not a Republican-leaning district under the League of Women Voters Plan.  10/12/22 AM Tr. at 128:17 (W. Roberts).

712.    According to the 2020 Presidential election results, District 2 in the League of Women Voters Plan has a 39.9% vote share for the African-American candidate of

choice/Democratic candidate and, therefore, does not result in any wins for that candidate under the election results that Plaintiffs' putative expert Dr. Duchin analyzed. *See* PX 120 at 3-4, 8-11.

713.    The 39.9% vote share for the African-American candidate of choice/Democratic candidate in the League of Women Voters Plan's District 2 is lower than the 44.6% vote share for that candidate in Enacted District 2. *See* PX 120 at 3.

714.    According to the 2020 Presidential election results, District 5 in the League of Women Voters Plan has a 40.0% vote share for the African-American candidate of choice/Democratic candidate and, therefore, does not result in any wins for that candidate under the election results that Plaintiffs' putative expert Dr. Duchin analyzed. *See* PX 120 at 3-4, 8-11.

715.    The 40.0% vote share for the African-American candidate of choice/Democratic candidate in the League of Women Voters Plan's District 5 is lower than the 40.8% vote share for that candidate in Enacted District 5. *See* PX 120 at 3.

716.    Senator Campsen conveyed to Will Roberts that the League of Women Voters Plan "wasn't going to go anywhere because it had … the Trump percentage lower than the benchmark in District 1" and that "Senator Campsen want[ed] to increase the Trump number [in] District 1." 10/12/22 AM Tr. at 129:9–15 (W. Roberts).

717.    The League of Women Voters Plan does not maintain the community of interest around Fort Jackson in District 2. SX 68a.

718.    The League of Women Voters Plan does not preserve the Sun City community of interest in a single district. SX 68a.

719.    The League of Women Voters Plan does not preserve the community of interest formed by the Limestone precincts in Orangeburg County and neighboring Lexington County. SX 68a.

720.     Senator Massey testified that the League of Women Voters Plan never would have passed the General Assembly because it splits rural counties, including Edgefield County where Senator Massey resides and which has been whole for over 70 years.  10/12/22 PM Tr. 95:17-20, 111:5-112:6.

## IX.    PLAINTIFFS' EXPERT AND FACT WITNESSES

### A.    Plaintiffs' Expert Witnesses Used Flawed Data And Incomplete Analyses

#### 1.    Plaintiffs' Dataset Was Flawed And Unverified

721.     Plaintiffs' expert witnesses used a flawed dataset provided by Plaintiffs' counsel.

722.     Dr. Liu's report states that the Enacted Plan splits 91 VTDs, PX 48 at 14, when in fact it splits only 13 VTDs, *see* SX 29e; Tr., vol. III, at 601:7–602:11 (B. Liu).

723.     Dr. Liu explained that he received the dataset, including the VTD data, from "the data team of ACLU" and did not verify the accuracy of that data.  Tr., vol. III, at 601:7–603:17, 604:22–25 (B. Liu).

724.     The ACLU dataset was prepared by Dr. Benjamin H. Fifield ("Dr. Fifield"), who at the time was employed by the ACLU.  *See* Fifield Dep. at 144:12-25.

725.     The ACLU dataset prepared by Dr. Fifield was provided to at least three of the Plaintiffs' expert witnesses: Dr. Duchin, Dr. Liu, and Dr. Imai.  *See id*.

726.     Dr. Fifield did not provide these expert with unprocessed raw data straight from the source, but instead Dr. Fifield performed at least some manipulation or processing of the data that was ultimately provided to those expert witnesses.  *See id*. at 95:21-96:5; 141:4-8; 141:16-142:4.;142:6-20.

727.     Dr. Fifield did not verify this data sent to experts against the data used by the General Assembly and he did not conduct geomatching of the census blocks to the VTDs.  *See id*. at 197:8-198:20; 196:2-20.

728.    The Court finds this data set to be important because there are errors in the Plaintiffs' experts' analyses.

729.    For example, as discussed above, Dr. Liu's report contains a table that shows a total of 91 total VTDs split into more than one Congressional District.  *See id*. at 115:22-117:7; Tr., vol. III, at 601:5–602:11 (B. Liu).

730.    However, the official political subdivision report produced by the General Assembly straight from the Maptitude software showed only 13 VTDs split in the enacted plan. Fifield Dep. at 118:20-22.

731.    Dr. Fifield could not account for this discrepancy.  *See id.* at 118:23-120:1.

732.    Dr. Fifield stated that, from a data scientist perspective, he would want to "investigate the discrepancy," but had not done so.  *Id*. at 120:3-11.

733.    Dr. Fifield also testified about other discrepancies in the data that was provided by the ACLU to Dr. Duchin, Dr. Imai, and Dr. Liu.  *See id*. at 200:6-201:3.

734.    The ACLU dataset contained several precincts that were listed as being located in the wrong counties.  *See id*. at 201:12-202:14.

735.    Dr. Fifield also testified that he did not confirm that his shapefile data had the correct precinct names.  *See id*. at 202:15-23.

736.    The ACLU dataset contained voting precincts that were not listed in the correct Congressional District or as being split between Congressional Districts when they were wholly included in only one Congressional District.  *See id*. at 203:2-207:8.

737.    For example, the ACLU dataset showed the King's Grant precinct and the Saul Dam precinct as being split between Congressional Districts 1 and 6 and the Monticello precinct as being split between Congressional District 2 and 6.  *See id*. at 203:2-204:20.

738.    However, the report generated by the General Assembly on political subdivisions showed that none of these three VTDs—with geographical boundaries corresponding to the precincts of the same name—were split.  *See id.* at 203:2-207:8; SX 29e.

739.    The Court finds that these errors in the ACLU dataset directly undercuts the credibility and veracity of the expert reports produced by Dr. Duchin, Dr. Liu, and Dr. Imai and their testimony on the same at trial.

### 2.    Plaintiffs' Expert Analyses Were Incomplete And Unconvincing

740.    In addition to relying upon—and not verifying—the flawed ACLU dataset, Plaintiffs' expert witnesses also used incomplete and unconvincing methodologies.

741.    Each of Plaintiffs' experts "failed to consider all the traditional race-neutral principles that guide redistricting in South Carolina" and, thus, their analysis is "problematic," "incomplete," "unconvincing," and insufficient to carry the challengers' burden.  *Backus*, 857 F. Supp. 2d at 562–63.

742.    Each of Plaintiffs' experts is "unable to provide the Court a reliable opinion that the General Assembly subordinated traditional race-neutral principles to race."  *Id.* at 563.

### a.    Dr. Kosuke Imai

743.    Based on his algorithmic "simulation analysis" using the Markov Chain Monte Carlo approach, Dr. Imai opined that "race played a significant role" in the Enacted Plan.  PX 32 at 4–5.

744.    Dr. Imai's simulation analysis relied upon the flawed ACLU dataset compiled by Ben Fifield, which Dr. Imai did not validate.  10/14/22 Tr. at 64:24–66:15 (K. Imai).

745.    Dr. Imai's simulation analysis did not "replicate a legislature's process for drawing a map."  10/14/22 Tr. at 18:14–16 (K. Imai).  Indeed, Dr. Imai "ha[d] no opinion … on how the [G]eneral [A]ssembly drew the plan."  *Id.* at 74:17–18 (K. Imai).

746.    Dr. Imai's simulation analysis did not analyze the "intent the [G]eneral [A]ssembly had when drawing the [E]nacted [P]lan." *Id.* at 60:18 (K. Imai).

747.    Dr. Imai's simulation analysis did not examine whether the General Assembly "actually used race to draw the [E]nacted [P]lan." *Id.* at 60:14–18 (K. Imai).

748.    Dr. Imai's simulation analysis did not examine whether the General Assembly "intentionally discriminated." *Id.* at 61:3–5 (K. Imai).

749.    Dr. Imai's simulation analysis involved programming an algorithm to generate sets of sample plans ("simulation plans") for comparison with the Enacted Plan. *See* PX 32 at 3–4; 10/14/22 Tr. at 17:2–8, 41:13–19 (K. Imai).

750.    Dr. Imai programmed the algorithm to consider only certain race-neutral districting principles and not others.

751.    For his "race-blind local simulation analysis" (or "localized district analysis") focusing on the boundary between Districts 1 and 6, Dr. Imai programmed the algorithm to maintain contiguity and population balance, avoid incumbent pairing, ensure that all plans are on average as compact as the Congressional Plan, and ensure that the numbers of split counties and municipalities is on average no greater than the corresponding numbers under the Congressional Plan. PX 32 at 8–9; 10/14/22 Tr. at 14:20–21 (K. Imai).

752.    Dr. Imai did not conduct a similar local simulation analysis for the boundary between Districts 2 and 6 or the boundary between Districts 5 and 6. 10/14/22 Tr. at 88:16–25 (K. Imai).

753.    Dr. Imai also conducted a county-specific "race-blind local simulation analysis" of the boundary between Districts 1 and 6 in Charleston County using the same controls. PX 32 at 9.

754.    Dr. Imai did not conduct a similar county-specific local simulation analysis for the boundary between Districts 1 and 6 in other counties, including Dorchester, Colleton, and Jasper. *See id.*

755.    According to Dr. Imai, race does not predominate in his either version of his "race-blind local simulation analysis" because that analysis does not use race.  10/14/22 Tr. at 60:4–7 (K. Imai).

756.    Dr. Imai's third and final analysis was a statewide simulation analysis.  Dr. Imai maintained the same controls and added one additional constraint: he required the BVAP in District 6 to be 45–50%.  PX 32 at 9–10.

757.    Dr. Imai's own prior study affirms that in some cases algorithms based on the Markov Chain Monte Carlo approach do not yield a representative sample.  10/14/22 Tr. at 62:13–23 (K. Imai); *see* McCartan & Imai, *Sequential Monte Carlo for Sampling Balanced and Compact Redistricting Plans* (June 14, 2022), https://arxiv.org/pdf/2008.06131.pdf.

758.    Dr. Imai's own prior study affirms that in some cases algorithms based on the Markov Chain Monte Carlo approach generate sample plans that are systematically different from the true set of valid plans.  10/14/22 Tr. at 62:13–19, 63:2 (K. Imai); *see* McCartan & Imai, *Sequential Monte Carlo for Sampling Balanced and Compact Redistricting Plans* (June 14, 2022), https://arxiv.org/pdf/2008.06131.pdf.

759.    Dr. Imai did not program the algorithm to consider a wide range of other traditional race-neutral districting principles.

760.    Dr. Imai did not program the algorithm to consider the preservation of the cores of districts.  10/14/22 Tr. at 67:24–68:2 (K. Imai).

761.     Dr. Imai did not program the algorithm to consider the avoidance of voting district splits.  *Id.* at 68:24–69:8, 70:10 (K. Imai).  In fact, in all three of Dr. Imai's simulations, the Congressional Plan performs better than most of the simulated plans with respect to the avoidance of voting district splits.  *Id.* at 69:17–23 (K. Imai).

762.     Dr. Imai conceded that redistricting in South Carolina involves "tradeoffs" between avoiding municipal splits and avoiding VTD splits.  *Id.* at 70:6–10 (K. Imai).

763.     Dr. Imai, however, programmed the algorithm to control for avoiding municipal splits but not for avoiding VTD splits.  *See id.*

764.     Dr. Imai did not program the algorithm to consider the preservation of communities of interest.  *Id.* at 68:3–18, 87:15 (K. Imai).

765.     Dr. Imai did not program the algorithm to consider the keeping of incumbents with their core constituents.  *Id.* at 67:10–23 (K. Imai).

766.     Dr. Imai did not program the algorithm to consider partisan performance and did not consider election results.  *Id.* at 33:12, 70:16–23, 85:18, 89:14 (K. Imai).

767.     Therefore, Dr. Imai formed "no opinion on what role politics played in the [E]nacted [P]lan."  *Id.* at 71:8–9 (K. Imai).

768.     Dr. Imai did not program the algorithm to consider natural geographic boundaries.  *Id.* at 68:19–23, 89:18 (K. Imai).

769.     Dr. Imai did not program the algorithm to control for which district a VTD was in in the Benchmark Plan.  *Id.* at 83:18–84:4 (K. Imai).

770.     Dr. Imai did not program the algorithm to control for which district black voters lived in under the Benchmark Plan.  *See id.*

771.    Dr. Imai's own prior study dictates that "[f]or successful application, sampling methods must scale to large maps with many districts[,] incorporate[] realistic legal constraints[,] and accurately and efficiently sample from a selected target distribution."  10/14/22 Tr. at 63:11–17 (K. Imai) (quoting McCartan & Imai, *Sequential Monte Carlo for Sampling Balanced and Compact Redistricting Plans* (June 14, 2022), https://arxiv.org/pdf/2008.06131.pdf.

772.    Dr. Imai, however, did nothing to confirm that his simulation plans are legal. 10/14/22 Tr. at 63:15-64:5 (K. Imai).

773.    Dr. Imai's report did not contain any analysis accounting for the Benchmark Plan, even though he had conducted such an analysis and he admitted that the Benchmark Plan "[m]ight" have "affect[ed] the range of plans available to the map drawer" if "the map drawer had started with the [B]enchmark [P]lan."  *Id.* at 71:10–72:13 (K. Imai).

774.    Dr. Imai assigned "constraints" to each of his three simulations; those constraints included certain traditional districting principles but not others.  Dr. Imai assigned various "strengths" to each constraint; these strengths determined the likelihood that the algorithm would generate "sample plans that conform to the selected criterion."  PX 32 at 25.

775.    Dr. Imai conceded that changing the strength of any one, two, or all of the constraints in the algorithm "may change" the results of his simulation analyses.  10/14/22 Tr. at 73:23–74:5 (K. Imai).

776.    Dr. Imai, moreover, did not attempt to approximate the strengths that the General Assembly assigned to these criteria.  *See id.* at 74:6–75:11 (K. Imai).  Rather, Dr. Imai maintained that his algorithm and the assigned strengths were *not* used by the General Assembly in drawing maps.  *See id.* at 75:4–8 (K. Imai).

777.    Dr. Imai did attempt to control for population balance, but he did not adhere to the directive in the Constitution and the Senate Guidelines that "a congressional districting plan should not have population deviations greater than one person."   SX 3 § I.A.2.   Instead, he programmed the algorithm to permit population deviations of up to 0.1%, or approximately 730 people, in his simulation plans, PX 32 at 8–9 & n.3; 10/14/22 Tr. at 30:3–4, 73:3–6 (K. Imai).

778.    Dr. Imai programmed a compactness constraint, and his report states that "all relevant districts" in his simulation plans "are on average at least as compact as the enacted plan."  PX 32 at 9.

779.    Dr. Imai conceded at trial, however, that this statement is inaccurate.  10/14/22 Tr. at 79:6–25 (K. Imai).

780.    In fact, Dr. Imai's algorithm controls for plan-wide compactness, so some of his simulation plans are less compact than the Enacted Plan. *See id.*

781.    In attempting to consider compactness, Dr. Imai failed to adhere to the House Guidelines' directive that compactness should not be judged based on mathematical measures and should be judged in part by the configuration of prior plans, PX 175 VI, and the Senate Guidelines' directive that compactness should be judged based on geography and functional compactness, SX 3 III.F.  Instead, he merely used two mathematical measures of compactness. *See* PX 32 at 25–26; 10/14/22 Tr. at 37:7–16 (K. Imai).

782.    In attempting to control for county and municipality splits, Dr. Imai programmed the algorithm to control for the average number of splits across the set of simulation plans, not the actual number of splits in each simulation plan; thus, some of the simulation plans had more splits than the Enacted Plan.  10/14/22 Tr. at 76:6–19 (K. Imai).

783.    Dr. Imai did not program the algorithm to control for the total population sizes of split counties or municipalities. *Id.* at 77:6–13 (K. Imai).

784.    Dr. Imai did not program the statewide-simulation algorithm to consider only those simulation plans that split the same counties or municipalities as the Congressional Plan. *Id.* at 77:14–20 (K. Imai).

785.    Dr. Imai was not aware that 6 is the minimum realistic number of county splits in a plan with 7 districts, and some of his simulation plans have as few as 4 or 5 county splits. *Id.* at 78:2–24 (K. Imai); PX 32 at 26 fig. 12.

786.    Figure 1 in Dr. Imai's report relates to his localized simulation analysis of Districts 1 and 6. PX 32 at 12. Figure 1 examined total BVAP rather than BVAP percentage, and his report did not consider the effect of the simulation plans on partisan performance or Nancy Mace's reelection chances. *See* 10/14/22 Tr. at 80:1–83:17 (K. Imai).

787.    Figure 2 in Dr. Imai's report relates to his localized simulation analysis of Districts 1 and 6. Figure 2 concludes that, on average, his localized simulation plans have a BVAP percentage in District 1 around 5.8 points higher than Enacted District 1. PX 32 at 13.

788.    Dr. Imai's report did not examine the effect on District 6's BVAP resulting from this increase on District 1's BVAP, but he conceded at trial that District 6's BVAP would decrease by a corresponding share. 10/14/22 Tr. at 84:18–85:6 (K. Imai).

789.    Dr. Imai did not conduct any analysis of this decrease in District 6's BVAP on African-American voters' ability to elect their candidates of choice in District 6. *See id.* at 85:7–11 (K. Imai).

790.    Some of Dr. Imai's localized simulation plans increase District 1's BVAP by 10 percentage points or more, but he did not examine the effect of the corresponding BVAP

decrease in District 6 on African-American voters' ability to elect candidates of their choice in District 6. *Id.* at 85:20–86:21 (K. Imai).

791.   Dr. Imai's Charleston County localized simulation analysis did not control for partisan performance or Nancy Mace's reelection chances. *Id.* at 89:1–92:1 (K. Imai).

792.   Dr. Imai's statewide simulation drew simulated plans based on race by requiring the BVAP in District 6 to be 45–50% in each simulated plan.  PX 32 at 9; *see, e.g.*, 10/14/22 Tr. at 97:9–16, 101:18–21 (K. Imai).

793.   This 45%-50% BVAP range for District 6 was a "target" that could not be compromised.  10/14/22 Tr. at 94:12–95:16 (K. Imai).

794.   Dr.  Imai's report examined the results of his statewide simulation analysis in Charleston County, Richland County, and Sumter County, but not in any of the other counties split between District 6 and another district, such as Dorchester, Colleton, Jasper, and Orangeburg.  PX 32 at 14–21; 10/14/22 Tr. at 100:10–15, 106:1–8 (K. Imai).

795.   In Dr. Imai's statewide simulation that drew simulated plans based on race, 76.3% of the simulated plans placed all of Charleston County in District 1, 10/14/22 Tr. at 97:23–98:1 (K. Imai); 39.4% of the simulated plans placed all of Richland County in District 6, *id.* at 101:18–21 (K. Imai); and 90% of the simulated plans placed all of Sumter County in District 6, *id.* at 106:17–20 (K. Imai); PX 32 at 17 ¶ 39, 19 ¶ 40, 21 ¶ 43.

796.   Dr. Imai conceded that a map drawer who preferred to keep those counties split would have rejected all of those plans.  *See* 10/14/22 Tr. at 98:10–18, 103:10–15 (K. Imai).

797.   The Enacted Plan does not place all of Charleston County, Richland County, or Sumter County in a single district.  SX 29b.

798.    Dr. Imai conceded that making Charleston County whole in the Enacted Plan would have required other changes, which Dr. Imai did not analyze.  10/14/22 Tr. at 99:12–103:3 (K. Imai).

799.    Indeed, when Dr. Imai drew simulation plans based on race as part of the statewide simulation, the percentage of the plans that placed each of these counties in a single district was *higher* than when he drew simulation plans without considering race as part of the race-blind localized simulations.

800.    For instance, Dr. Imai's statewide simulations, which considered race, placed Charleston County as a whole county in District 1 far more often than in his other simulations, which did not consider race.  *Id.* at 97:9–16 (K. Imai); *see id.* at 98:4 (K. Imai).

801.    Turning to Richland County, Dr. Imai did not know the explanation for the Enacted Plan's hook shape around Fort Jackson in Richland County and did not know that the Court had upheld the hook shape in prior cases.  *Id.* at 100:22–101:6 (K. Imai).

802.    Dr. Imai did not analyze the effect of placing all of Richland County in District 6 on the ability of African-American voters to elect candidates of their choice in District 2.  *Id.* at 101:22–103:9 (K. Imai).

803.    Dr. Imai's statewide simulation plans, which are drawn based on race, on average place more black voters from Richland County in District 6 than the Enacted Plan.  *Id.* at 103:18–105:22 (K. Imai).

804.    Dr. Imai did not analyze, and did not know, whether African-American voters could elect candidates of their choice in District 2 under any of those plans.  *See id.* at 105:13–22 (K. Imai).

805.     Dr. Imai did not analyze whether any of the changes the Enacted Plan made in Sumter County reflected requests from Congressman Clyburn.  *See id.* at 107:3–6 (K. Imai).

### b.     *Dr. Baodong Liu*

806.     Dr. Liu is a political science professor at the University of Utah.  PX 48 at 2.

807.     Dr. Liu performed an "effectiveness analysis" that attempted to compare the ability of "[b]lack voters … to elect the candidates of their choice" in four state-wide elections under the Congressional Plan and alternative plans.  *Id.* at 12.

808.     Based on this "effectiveness analysis," Dr. Liu opined that "[b]lack voters" have less "opportunity to elect their preferred candidates" under the Enacted Plan compared to alternative proposals.  *Id.* at 21; *see* Tr., vol. III, at 553:4–5 (B. Liu).

809.     Dr. Liu conceded that, under his effectiveness analysis, alternative proposals for District 1 performed for African-American candidates of choice due to the presence of "white crossover voting."  Tr., vol. III, at 600:10–13 (B. Liu).

810.     Dr. Liu also performed an "empirical test" and "verification study" that attempted to use "race and party" registration data to compare, respectively, the numbers of black Democrats, black Republicans, white Democrats, and white Republicans who were moved into and out of Districts 1 and 2.  *See* PX 48 at 14–21.

811.     Based on this "empirical test" and "verification study," Dr. Liu opined that "there is strong empirical evidence that race, rather than presumed party affiliation, is a driving factor in whether voters remain or are moved in and out of the districts challenged by Plaintiffs, particularly CDs 1 and 2, in the [Congressional] Plan."  *Id.* at 12*; see id.* at 5–6; Tr., vol. III, at 553:9–10 (B. Liu).

812. Dr. Liu performed similar analyses with respect to District 5 but did not include them in his report because he "did not find either the support for party as a factor or race as a factor." Tr., vol. III, at 578:6–12 (B. Liu).

813. Dr. Liu's "empirical study" and "verification study" relied upon the flawed ACLU dataset he received from Plaintiffs' counsel. *Id.* at 604:22–25 (B. Liu).

814. In fact, Dr Liu did not even use accurate data on voting district splits or attempt to verify the accuracy of his data on voting district splits; the actual number of voting district splits under the Enacted Plan is only 13, significantly "less than the number [he] reported." *Id.* at 602:9–11 (B. Liu); *see id.* at 601:5–603:17 (B. Liu); PX 48 at 14 tbl. 5.

815. Dr. Liu's "empirical study" relied upon the results of the 2018 gubernatorial primary rather than the 2020 Presidential election. Tr., vol. III, at 603:19–605:16 (B. Liu).

816. While the Election Commission allocated all absentee ballots cast in the 2016 election to a single countywide precinct rather than the precinct of the voter's residence, Dr. Liu did not know whether the Election Commission used the same method for the 2018 gubernatorial primary. *See id.*.

817. In performing each of his analyses, Dr. Liu did not control for nearly every traditional race-neutral districting principle.

818. Dr. Liu's analyses did not control for the preservation of the cores of districts. *Id.* at 607:6, 607:25, 608:4 (B. Liu).

819. Dr. Liu did not control for the distance between the VTD and the district line in the Benchmark Plan. *Id.* at 607:1–4 (B. Liu).

820. Dr. Liu's analyses did not control for compactness. *Id.* at 607:8, 608:2 (B. Liu).

821. Dr. Liu's analyses did not control for contiguity. *Id.* at 607:10, 608:13 (B. Liu).

822.    Dr. Liu's analyses did not control for the avoidance of voting district splits.  *Id.* at 607:14, 608:6 (B. Liu).

823.    Dr. Liu's analyses did not control for the preservation of communities of interest. *See* PX 48 at 14–21.

824.    Dr. Liu's analyses did not control for the protection of incumbents.  Tr., vol. III, at 607:10 (B. Liu).

825.    Dr. Liu's analyses did not control for the avoidance of incumbent pairing.  *Id.* at 608:8 (B. Liu).

826.    Dr. Liu's analyses did not control for where African-American voters live locationally.  *Id.* at 607:17, 608:10 (B. Liu).

827.    Dr. Liu's "verification study" used the envelope approach, which also does not control for contiguity.  *Id.* at 608:13 (B. Liu).

828.    The envelope approach treats all VTDs within a county as equally available to be placed in the same district, including VTDs that are not contiguous with the district or other VTDs in the district.  *Id.* at 609:18–610:4 (B. Liu).

829.    The envelope approach treats all VTDs in Beaufort, Berkeley, Charleston, Colleton, Dorchester, and Jasper Counties as equally available for placement in District 1, even though those VTDs in total contain too much population for a single district.  *Id.* at 610:5–13 (B. Liu).

830.    Dr. Liu's rebuttal report examined the BVAP levels of the ten counties that are split in the Enacted Plan.  *See* PX 62 at 3 tbl. 5.

831.    Dr. Liu conceded that three of those counties—Greenville, Charleston, and Spartanburg—have a lower BVAP percentage than the statewide average.    Tr., vol. III, at 610:23–611:7 (B. Liu).

832.    Dr. Liu did not examine or control for the total population size of those counties. *See id.* at 71:23–72:10 (B. Liu).

833.    Dr. Liu also was not aware that nine of those ten counties were split in the Benchmark Plan.  *See id.* at 613:8–614:1 (B. Liu).

       *c.*     *Dr. Jordan Ragusa*

834.    Based on his untested "county envelope analysis," Dr. Ragusa opined that "race was a significant factor" in the Enacted Plan.  PX 19 at 4.

835.    Dr. Ragusa has no formal education or training specifically on redistricting. 10/7/22 PM Tr. at 117:16-19 (J. Ragusa).

836.    Dr. Ragusa has not taught a class specifically on redistricting.  *Id.* at 117:1-2 (J. Ragusa).

837.    Dr. Ragusa described his expertise as that of a "generalist" but nothing specific to redistricting.  *Id.* at 119:15-21 (J. Ragusa).

838.    Dr. Ragusa had never written any articles or books specifically addressing redistricting matters.  *Id.* at 120:3-8 (J. Ragusa).

839.    Dr. Ragusa only looked at the "effects" of the Congressional plan and not at the reasons why the map drawers drew the Congressional plan.  *Id.* at 117:1-2 (J. Ragusa).

840.    Dr. Ragusa had not been qualified as an expert witness involving redistricting prior to this case.  *Id.* at 120:11-13 (J. Ragusa).

841.    Dr. Ragusa did not have a comprehensive knowledge of the term "redistricting principles" since he had not been involved in redistricting matters before this case. *Id.* at 124:15-231; 125:1-6 (J. Ragusa).

842.    Dr. Ragusa was provided the analysis methodology by Plaintiffs' counsel to follow for his expert report since he had not written an expert report before this case. *Id.* at 121:12-17 (J. Ragusa).

843.    Dr. Ragusa did not know anything about his county method analysis prior to Plaintiffs' counsel giving him information about the analysis. *Id.* at 122:14-17 (J. Ragusa).

844.    Dr. Ragusa's "county envelope" analysis moved VTDs from one portion of the "county envelope" into the adjacent county even though they might not be geographically close. *Id.* at 123:13-20 (J. Ragusa).

845.    Dr. Ragusa concluded "race was a statistically significant factor" in five of the seven congressional districts. *Id.* at 127:19-23 (J. Ragusa).

846.    Dr. Ragusa did not conclude race was the predominant factor" in drawing these districts.  He did not use the word "predominance" in his report or rebuttal report. *Id.* at 127:24-128:10 (J. Ragusa).

847.    Dr. Ragusa understood that the Plaintiffs did not follow his analysis that race was a significant factor in 5 Congressional Districts since the Plaintiffs only challenged three congressional districts in the Enacted Plan: 1, 2, and 5. *Id.* at 129:22-130:20 (J. Ragusa).

848.    Dr. Ragusa conceded that the map drawers could have drawn the districts for a lot of other factors or reasons other than race. *Id.* at 131:8-17 (J. Ragusa).

849.    Dr. Ragusa conceded that Congressional District 1 of the Enacted Plan had a higher BVAP than the Benchmark Plan. *Id.* at 131:25-132:14 (J. Ragusa).

850.    Dr. Ragusa testified that the core retention percentage of 83% was not "statistically large" but he did not state what percentage he believed was required for a district to preserve a "large share" of its core.  *Id.* at 134:1-19 (J. Ragusa).

851.    Dr. Ragusa acknowledged compactness, contiguity, and core preservation were traditional redistricting principles and that they were included as part of the Senate's guidelines. *Id.* at 136:5- 19 (J. Ragusa).

852.    Dr. Ragusa conceded his envelope analysis did not control for compactness, core retention, and contiguity.  *Id.* at 136:5-19 (J. Ragusa).

853.    Dr. Ragusa's envelope analysis also did not control for avoiding VTD splits, avoiding political subdivision splits, compactness, partisan performance, politics, or communities of interest.  PX 19 at 1–4; *see also* SX 76 at 8–11.

### d.    *Dr. Moon Duchin*

854.    Dr. Duchin is a mathematics professor at Tufts University.  *See* PX 67 at 2.

855.    Dr. Duchin submitted a report, a rebuttal report, and "supplemental information" in this case.  *See id.*; PX 87; PX 120.

856.    Dr. Duchin's report compares the Enacted Plan and other plans on measures of compactness, but Dr. Duchin failed to adhere to the House Guidelines' directive that compactness should not be judged based on mathematical measures, PX 175 VI, and the Senate Guidelines' directive that compactness should be judged based on geography and functional compactness, SX 3 III.F; *see* Tr., vol. II, at 400:14–17 (M. Duchin).  Instead, her report used three mathematical measures to analyze compactness.  PX 67 at 8, 11; *see* Tr., vol. II, at 401:9–11 (M. Duchin).

857.    Section 5 of Dr. Duchin's report is titled "Detailed district review."  PX 67 at 14.

858.    Section 5 of Dr. Duchin's report states that the Enacted Plan moves areas "in scattered chunks and shards, and is not aimed at healing key splits of cities or communities that were frequently cited in the public testimony, including Columbia, Sumter, Orangeburg, and Charleston." *Id.* at 15.

859.    Dr. Duchin asserts that these moves do not "respect[] traditional districting principles," but her report does not analyze whether these moves heal county splits, heal VTD splits, or are explained by politics, partisan performance, or incumbency protection. *Id.*; *see also* Tr., vol. II, at 407:20–411:2 (M. Duchin).

860.    Dr. Duchin's report examines five communities of interest: Columbia, Sumter, Orangeburg, Charleston, and what Dr. Duchin calls the "Lowcountry," which is the combination of Jasper, Charleston, Colleton, and Beaufort Counties.  PX 67 at 15–16.

861.    Each of these communities of interest is a whole county or a combination of whole counties.  Tr., vol. II, at 454:20–455:11 (M. Duchin).

862.    Dr. Duchin purported to select the five communities of interest based on her "good-faith effort," having read about "what folks had to say [during the public testimony]" given in July and August 2021, months before the Enacted Plan was drawn, released publicly, and adopted.  Tr., vol. I, at 257:1–7 (M. Duchin); *see* Tr., vol. II, at 413:2–5 (M. Duchin).

863.    Dr. Duchin did not discuss that testimony with the member of the public who gave it, does not know whether the member of the public used the same definition of the community of interest as she did, and does not know whether the member of the public believes that the Enacted Plan respects his or her community of interest.  Tr., vol. II, at 416:9–417:2, 417:13–424:7 (M. Duchin).

864. Dr. Duchin admitted that the communities of interest she selected "definitely" were not "the only communities of interest identified by the public testimony." *Id.* at 412:17–19 (M. Duchin).

865. Dr. Duchin admitted that her analysis of communities of interest was not "an authoritative syntheses of all [the public] testimony [concerning communities of interest]." Tr., vol. I, at 257:1–3 (M. Duchin).

866. Dr. Duchin did not count or otherwise quantify the number of public comments regarding each community of interest. Tr., vol. II, at 413:6–8 (M. Duchin).

867. Dr. Duchin admitted that the public testimony "definitely" was "not representative of the views of all South Carolina voters." *Id.* at 414:1–4 (M. Duchin); *see id.* at 414:25–415:2 (M. Duchin).

868. Dr. Duchin did not review the legislative record or the thousands of emails regarding redistricting that were submitted to the House and Senate redistricting email addresses. *Id.* at 414:8–20 (M. Duchin).

869. Dr. Duchin conceded that there is "no question" that "reasonable people could identify different" communities of interest in South Carolina than the ones she identified. *Id.* at 414:25–415:2 (M. Duchin).

870. For example, Dr. Duchin acknowledged that a member of the public whose testimony she cited in her report stated that "[a]s the first congressional district representative on the DNR board, I can attest to the first congressional district is a community of interest." PX 67 at 33; Tr., vol. II, at 424:22–425:11 (M. Duchin).

871. Dr. Duchin's report asserts that the following communities of interest are split in the Enacted Plan when, in fact, the Enacted Plan makes them whole.

    a.    Beaufort County: The Enacted Plan makes Beaufort County whole. Dr. Duchin's report, however, asserts that Beaufort County is "split" in the Enacted Plan, PX 67 at 16, and cites public testimony identifying Beaufort County as a community of interest as examples of "Coastal and Lowcountry COIs disregarded" in the Enacted Plan, *see id.* at 31 (B. Lotz); 32 (T. Murray, J. Strutek, M. Rivera-Vazquez, C. DeVries); 35 (L. Cunningham, E. Mayer).

    b.    Gullah-Geechee Community: The Enacted Plan unites the Gullah-Geechee heritage corridor in Beaufort County and Edisto Island, but Dr. Duchin's report cites public testimony identifying that community of interest as an example of a "Coastal and Lowcountry COIs disregarded" in the Enacted Plan, *id.* at 31, 34 (Q. Quet).

    c.    Sun City: The Enacted Plan unites Sun City in District 1, but Dr. Duchin's report cites public testimony identifying that community of interest as an example of a "Coastal and Lowcountry COIs disregarded" in the Enacted Plan, *id.* at 31, 34 (T. Wyld).

872.    Dr. Duchin's report claims that "Dorchester County [is] split illogically," including by splitting precincts, PX 67 at 16, but she did not consider, or review the legislative record for, justifications for those splits, such as whether they followed the boundary for House District 98, Tr., vol. II, at 429:19–24 (M. Duchin).

873.    Dr. Duchin's report claims that "Charleston County [is] split erratically" because it splits cities identified in the public testimony: Summerville, Ladson, and North Charleston. PX 67 at 17.

874.    Each of these cities was split in the Benchmark Plan.  Tr., vol. II, at 435:9–12 (M. Duchin).

875.    Dr. Duchin acknowledges that Summerville and Ladson span two counties and that North Charleston spans three counties, *see id.* at 435:13–16 (M. Duchin), but did not examine whether the Enacted Plan's splits of these cities follow the county line, *id.* at 430:18–431:13 (M. Duchin), even though she agrees that "South Carolinians identify their community of interest by their county . . . more than in some other states" she has studied, *id.* at 436:3–5 (M. Duchin).

876.    Dr. Duchin's report did not use accurate boundary lines for the cities of Charleston and North Charleston.  *Id.* at 430:7–17 (M. Duchin); 10/12/22 Tr. at 32:16; *see* SX 67 at 17.

877.    Dr. Duchin did not examine whether the Enacted Plan places all of coastal Charleston in a single district.  *See* Tr., vol. II, at 433:12–20 (M. Duchin).

878.    Dr. Duchin did not examine whether the Enacted Plan places the entire Charleston peninsula in a single district.  *Id.* at 433:21–24 (M. Duchin).

879.    Dr. Duchin did not examine whether the Enacted Plan follows natural geographic boundaries in Charleston County, the political effect of the Enacted Plan's treatment of Charleston County, or whether the Enacted Plan's changes to Charleston County repair split VTDs.  *Id.* at 433:21–435:4 (M. Duchin).

880.    Dr. Duchin's report also takes issue with the Enacted Plan's split of "Jasper County" and placement of "two precincts in CD 1," PX 67 at 16, but she was not aware that the split unifies Sun City in a single district, Tr., vol. II, at 437:10–23 (M. Duchin).

881.    Dr. Duchin also could not recall any public testimony supporting the split of Jasper County to unify Sun City, even though her own report quotes such testimony. *See id.* at 436:10–22 (M. Duchin); PX 67 at 34.

882.    Dr. Duchin's report criticizes the Enacted Plan for "separat[ing]" Orangeburg "from CD 2." PX 67 at 18.

883.    Dr. Duchin acknowledged that Orangeburg was split in the Benchmark Plan, that she could not recall any public testimony in support of maintaining the split, that she did not know which VTDs the Enacted Plan moved in Orangeburg, and that she did not examine whether the Enacted Plan's changes in Orangeburg repaired VTD splits. Tr., vol. II, at 438:3–439:4 (M. Duchin).

884.    Dr. Duchin's report takes issue with the Enacted Plan's alleged splits "in and around Columbia" in Richland County. PX 67 at 19.

885.    Dr. Duchin conceded that the hook shape in Richland County has been present in past plans, including the Benchmark Plan and the 2002 court-drawn plan, and has been upheld as legal in prior cases. Tr., vol. II, at 439:5–440:11 (M. Duchin).

886.    Dr. Duchin also was "sure" that fixing the hook shape would involve tradeoffs and might be worse for the map on other traditional criteria. *Id* at 440:12–15 (M. Duchin).

887.    Dr. Duchin did not examine whether the Enacted Plan's changes in Richland County repaired VTD splits. *Id.* at 441:2–7 (M. Duchin).

888.    Dr. Duchin's report did not use accurate boundary lines for the City of Columbia. 10/12/22 Tr. at 30:10; *see* PX 67 at 19.

889.    Dr. Duchin's report also takes issue with the Enacted Plan's split of Sumter County, *see* PX 67 at 20, but Dr. Duchin did not examine whether the legislative record or public

testimony supported that split, whether the Enacted Plan's changes place more of the City of Sumter in District 6, or whether those changes repair split VTDs, Tr., vol. II, at 441:8–443:18 (M. Duchin).

890. Dr. Duchin's report did not use accurate boundary lines for the City of Sumter. 10/12/22 Tr. at 27:7; *see* SX 67 at 21.

891. Section 6 of Dr. Duchin's report is titled "Vote dilution compared to the neutral baseline" and recounts the results of her "ensemble method" for analyzing the Enacted Plan. PX 67 at 22.

892. Like Dr. Imai's simulation analysis, Dr. Duchin's ensemble method involved programming an algorithm to generate large sets of sample plans for comparison with the Enacted Plan in a purported effort to determine the role of race in the Enacted Plan. *Id.* at 22.

893. Dr. Duchin's ensemble method is not intended to simulate how a person draws a map or how the Enacted Plan was drawn. Tr., vol. II, at 450:15–23 (M. Duchin).

894. Dr. Duchin's ensemble method is also not intended to draw plans that are ready to be adopted. *Id.* at 451:6–9 (M. Duchin).

895. Dr. Duchin programmed the algorithm to consider only certain race-neutral districting principles and not others. *See id.* at 450:24–451:5 (M. Duchin).

896. Dr. Duchin did not program to algorithm to consider the preservation of the cores of districts. *Id.* at 334:8 (M. Duchin)

897. Dr. Duchin did not program the algorithm to consider the protection of incumbents. *Id.* at 334:24 (M. Duchin).

898. Dr. Duchin did not program the algorithm to consider partisan performance. *Id.* at 334:20–22 (M. Duchin).

899.    In fact, Dr. Duchin "[b]uil[t] the plans … in a party-blind way."  *Id.*

900.    Dr. Duchin did not program the algorithm to consider the preservation of communities of interest other than the five communities she selected based on her review of the public hearing record.  Tr., vol. I, at 257:14–16 (M. Duchin); *see* PX 67 at 30; PX 86.

901.    Dr. Duchin did attempt to control for population balance, but she did not adhere to the Senate Guidelines' directive that "a congressional districting plan should not have population deviations greater than one person," SX 3 at I.A.2; instead, she programmed the algorithm to permit population deviations of up to 1%, or approximately 7,300 people, in her simulated plans, PX 67 at 7, 29; *see* Tr., vol. II, at 452:4–15 (M. Duchin).

902.    Dr. Duchin's report contains no data on how her ensemble plans perform with respect to county splits, municipality splits, or compactness.  PX 67 at 22; *see* Tr., vol. II, at 453:8–454:12 (M. Duchin).

903.    Dr. Duchin believes that "[c]racking" of African-American voters "would tend to show up as unusually low BVAP in the second-highest district."  PX 67 at 22.

904.    She therefore compared the second-highest BVAP district in human-drawn plans to the second-highest BVAP district in her ensemble plans.  *See id.* at 22–23.

905.    Dr. Duchin calls the BVAP in the Enacted Plan's second-highest BVAP district "especially low" and indicative of cracking because it is 25.4%.  *Id.* at 23.

906.    The BVAP in the NAACP Plan 2's second-highest BVAP district is also 25.4%.  *See id.* at 9.

907.    The BVAP in the League of Women Voters Plan's second-highest BVAP district is even lower, only 24.5%.  *See id.* at 9.

908.    Dr. Duchin conceded that, because there is no incumbency consideration in her ensemble method, Congressman Clyburn may not reside in the highest-BVAP district in an ensemble plan and may, in fact, live in the lowest-BVAP district.  Tr., vol. II, at 459:19–460:13 (M. Duchin).

909.    The median BVAP in the highest-BVAP district in Dr. Duchin's ensemble plans is only around 35%.  *See* PX 120 at 2 fig. 1.

910.    The median BVAP in the highest-BVAP district in Dr. Duchin's ensemble plans is only around 15%.  *See id.*

911.    Section 7 of Dr. Duchin's report and her supplemental information purport to analyze "Electoral opportunity for Black voters" by providing reconstituted election results in each district.  PX 67 at 25; PX 120 at 2.

912.    Dr. Duchin compared the Enacted Plan's "electoral opportunity for Black voters," as she defined it, to the electoral opportunity in her ensemble plans and alternative plans proposed to the General Assembly, such as the two NAACP Plans, Amendment 2a, and the League of Women Voters Plan.  *See* PX 67 at 25; PX 120 at 2.

913.    In every election contest Dr. Duchin analyzed, the African-American candidate of choice was a Democrat.  *See* PX 120 at 2–4, 8–11; Tr., vol. II, at 473:17–474:11 (M. Duchin).

914.    Dr. Duchin conceded that because her ensemble plans were drawn to be politically neutral, they generate more wins for the African-American preferred candidate/Democrat than a plan that was drawn to favor Republicans.  *See* Tr., vol. II, at 474:12–475:1 (M. Duchin).

915.    According to Dr. Duchin's analysis, the Enacted Plan creates more opportunity for the African-American candidate of choice in the four elections she deemed most probative of

African-American voting opportunity—4 wins in 28 contests (around 14%)—than in the other, less-probative elections she analyzed—8 wins in 62 contests (around 12.5%). *See id.* at 475:2–476:5 (M. Duchin); PX 67 at 25–26.

916. Dr. Duchin also conceded that "electoral opportunity for Black voters," as she defined it, "likely" turns on the presence of "significant white crossover voting." Tr., vol. II, at 468:14–470:24 (M. Duchin).

917. For example, Joe Biden, the African-American preferred candidate in the 2020 Presidential election, received 51.8% of the vote in District 1 in the Amendment 2a Plan, PX 120 at 3 tbl. 1, where the BVAP is only 21.2%, *see* PX 67 at 9.

918. Joe Biden also received 51.7% of the vote in District 1 in the League Of Women Voters Plan, *see* PX 120 at 3 tbl. 1, where the BVAP is only 23.3%, *see* PX 67 at 9.

919. Dr. Duchin conceded that any election in which the African-American candidate of choice received less than 50% of the vote "[w]ould have been a loss" for that candidate. Tr., vol. II, at 468:2–6 (M. Duchin).

920. Dr. Duchin acknowledged that where the African-American candidate of choice or Democratic candidate does not prevail, every voter who voted for that candidate did not have her "preference reflected in the outcome," regardless of the race of the voter. *Id.* at 473:17–474:3 (M. Duchin).

921. In Dr. Duchin's view, in the event of a conflict between promoting minority electoral opportunity and adhering to traditional race-neutral districting principles, the General Assembly was obligated to promote minority electoral opportunity rather than adhere to traditional race-neutral districting principles. *Id.* at 390:7–13 (M. Duchin); *see id.* at 389:6–390:13 (M. Duchin).

922.     In other words, Dr. Duchin believed that the General Assembly was obligated to use race in a manner that predominated over traditional districting principles.  *See id.* at 389:6–390:13 (M. Duchin).

### e.     Dr. Joseph Bagley

923.     The NAACP Legal Defense and Education Fund (LDF) retained Dr. Bagley as an expert before the General Assembly started drawing maps.  10/11/22 AM Tr. at 73:17–74:4 (J. Bagley).

924.     Dr. Bagley "was asked to examine the [G]eneral [A]ssembly's enactment of S865 and place that in a socially historical context and to determine if it was [his] opinion that there was evidence here of a possible discriminatory intent."  *Id.* at 17:17–21 (J. Bagley).

925.     Dr. Bagley specifically focused on the historical background of the decision, the specific of events leading up to the challenged decision, procedural or substantive departures from normal procedure, and contemporaneous statements of legislators.  *Id.* at 21:9–14 (J. Bagley); *see also Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 267–68 (1977).

926.     In formulating his opinions, Dr. Bagley claimed he was guided by "the common standards of historiography" in his analysis.  10/11/22 AM Tr. at 17:23–24 (J. Bagley).

927.     According to Dr. Bagley, he did not "take any one source as the gospel" but "weigh[ed] a myriad of sources against one another" and "against the historiography in the field that is secondary versus primary sources."  *Id.* at 18:1–6 (J. Bagley).

928.     Dr. Bagley testified he has no legislative experience or experience in redistricting. *Id.* at 70:18–24 (J. Bagley).

929.    Dr. Bagley has never published any articles on the topic of redistricting.  *Id.* at 71:7–8 (J. Bagley).

930.    Before this case, Dr. Bagley had never conducted any research specifically related to South Carolina, *id.* at 71:20–24 (J. Bagley), and conducted all "primary research about South Carolina for the first time for purposes of this litigation," *id.* at 72:24–73:2 (J. Bagley).  *Cf.* Fed. R. Evid. 702, advisory committee note (noting a court should consider "[w]hether experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for the purposes of testifying"); *Bowers v. Norfolk S. Corp.*, 537 F. Supp. 2d 1343, 1354–64 (M.D. Ga. 2007) (finding experts' opinions lacked independent bases because they did not form the "opinions independent of the litigation" but instead "in the context of the litigation").

931.    Dr. Bagley has not published any articles, books, or blog posts about South Carolina history.  10/11/22 AM Tr. at 72:14–16 (J. Bagley).

932.    Dr. Bagley has "never presented or participated in any round tables, symposia[,] or anything of the like about South Carolina history or about redistricting."  *Id.* at 73:3–6 (J. Bagley).

933.    In each case in which Dr. Bagley has offered expert testimony, he has been retained by LDF and concluded the evidence supported a finding of racial discrimination.  *Id.* at 74:14–17 (J. Bagley).

934.    In his opening report, Dr. Bagley discussed South Carolina history in relatively "summary" fashion.  *Id.* at 77:19–21 (J. Bagley).

935.    Dr. Bagley conceded he could not draw a straight line from the Civil War and Reconstruction and the Tillman Constitution all the way to the General Assembly's redistricting decisions in 2022.  *Id.* at 77:22–78:1 (J. Bagley).

936.    Dr. Bagley also conceded "that much more recent history is more relevant.  But I come to this as a historian and not a lawyer and a judge.  And so, for me, the history even going back, as I do, to the founding of this South Carolina as a colony is still relevant."  *Id.* at 26:23–27:4 (J. Bagley).

937.    Thus, Dr. Bagley testified that—as a historian—he presented "this within a broader context by making it relevant, making the more history as relevant as [he] could."  *Id.* at 78:19–22 (J. Bagley).

938.    According to Dr. Bagley, "the actions of individuals in the 18th century are not necessarily directly indicative of the intent of someone in 2022, but at the same time, I don't feel like you can discount something simply because it is relatively longer ago.  For us as historians that's what it's all about."  *Id.* at 27:4–9 (J. Bagley).

939.    The historical events cited by Dr. Bagley occurred more than a decade ago.  *See* PX 17 at 21–22.  The most recent Department of Justice objection to voting practices under Section 5 of the Voting Rights Act occurred in 2011, *see id.* at 22, and nearly all of the cited objections involved local practices, not state practices, *see id.* at 21–22.  In fact, according to Dr. Bagley himself, "the last DOJ objection to a statewide South Carolina redistricting plan" occurred two and a half decades ago, in 1997.  *Id.* at 22.

940.    Turning to the legislative sequence of events, Dr. Bagley testified "it's clear that there are a chorus of voices that speak to their concerns [about] little time in the process to review maps that staff are producing" and "repeated concerns about general lack of access to the

actual map-drawing process." 10/11/2022 AM Tr. at 38:21–39:4 (J. Bagley). These all came from members of the minority party.

941. Dr. Bagley also testified regarding "repeated concerns voiced about selective incorporation of feedback or selected application of adopted guidelines." *Id.* at 39:4–6 (J. Bagley). Again, these all came from members of the minority party and citizens opposed to the Staff Map and Enacted Plan.

942. Dr. Bagley further testified about "committee members reporting being blind sided by the publication or modification of maps." *Id.* at 39:6–7 (J. Bagley). Again, these were members of the minority party.

943. Last, Dr. Bagley spoke about "decisions being made without support that's in the sort of documentary or public record." *Id.* at 39:8–9 (J. Bagley).

944. The Court must begin with a presumption of legislative good faith. *Abbott*, 138 S. Ct. at 2324.

945. Neither Dr. Bagley's opening report nor his rebuttal report mention the presumption. *See* PX 17, PX 18.

946. Although the Court does not require the use of magic words, a review of Dr. Bagley's report reveals he did not apply the presumption at all either.

947. Dr. Bagley discussed the legislative process the Senate used during the redistricting process, noting the Senate Redistricting Subcommittee held public hearings across the State "to gather input from the public about the redistricting process." 10/11/22 AM Tr. at 41:6–12 (J. Bagley).

948.    During these hearings, Dr. Bagley said citizens spoke about keeping communities of interest together, limiting VTD splits, concerns with packing and cracking, and "consistent concerns expressed about the transparency of the process." *Id.* at 41:16–42:3 (J. Bagley).

949.    Dr. Bagley noted the public was also given an opportunity to submit written testimony. *Id.* at 42:4–7 (J. Bagley).

950.    As for the oral and written testimony, Dr. Bagley complained that "there's no indication of how feedback would be given or how analysis would be performed." *Id.* at 42:14–15 (J. Bagley).

951.    Dr. Bagley never testified whether providing real-time feedback was a standard redistricting practice, whether it had been done before in South Carolina, or whether it is part of the normal legislative process.

952.    Dr. Bagley next testified about the meeting at which the Senate Redistricting Subcommittee adopted guidelines for the redistricting process. *Id.* at 45:14–46:25 (J. Bagley).

953.    Dr. Bagley noted that Senator Harpootlian proposed several amendments to the draft guidelines during this meeting, one of which was adopted. *Id.* at 45:16–46:7 (J. Bagley).

954.    He also noted that Senator Margie Bright Matthews' amendment was adopted. *Id.* at 46:11–13 (J. Bagley).

955.    But Dr. Bagley failed to mention that, when Senator Harpootlian's other failed amendments came up for a vote, they did not even receive a second.  In other words, even his Democratic colleagues on the Subcommittee—both of whom are African American—did not agree with the amendments.

956.    Dr. Bagley then briefly explained the public feedback received at the remaining Subcommittee hearings.

957.    Prior to this case, Dr. Bagley "had never observed a legislative hearing" or "floor debate" in South Carolina. *Id.* at 73:7–12 (J. Bagley).

958.    Dr. Bagley was only "generally familiar" with the legislative process in South Carolina. *Id.* at 71:14–19 (J. Bagley).

959.    In watching and discussing the videos of legislative hearings and debate, Dr. Bagley made unilateral determinations as to "what was relevant to [him] as a historian." *Id.* at 75:3–6 (J. Bagley).

960.    According to Dr. Bagley, "the vast majority of comments that are made during the process are from the opponents" to the Enacted Plan. *Id.* at 75:20–25 (J. Bagley).

961.    And he "presented the public comments . . . where they represented a chorus of voices." *Id.* at 76:4–7 (J. Bagley).

962.    Dr. Bagley had no personal knowledge as to whether there was coordination among Democrats, Plaintiffs here, or other groups, and he did nothing to control for that possibility. *Id.* at 76:22–77:6 (J. Bagley).  Instead, Dr. Bagley's analysis was focused solely on public testimony "and the historical context." 10/11/22 AM Tr. at 77:13–15 (J. Bagley).

963.    Dr. Bagley identified three alleged procedural irregularities, which he defined as "departures from normal procedure," *id.* at 86:20–22 (J. Bagley), in the Congressional redistricting process: (1) legislators and members of the public complained about the timing of meetings and when maps were posted; (2) legislators did not know where staff plans came from; and (3) Rep. John King, a Democrat, did not get to hold the gavel at a meeting of the House Judiciary Committee in the absence of Chairman Chris Murphy. *Id.* at 87:13–18, 90:18–20, 91:21–24 (J. Bagley).

964. These alleged procedural irregularities were "[n]ot necessarily in [his] view, but in the view of those people who are speaking out." *Id.* at 86:18–19 (J. Bagley).

965. Indeed, Dr. Bagley was not asked to—nor did he—study the redistricting process utilized in South Carolina for the 2011 cycle or perform a comparative analysis. *Id.* at 71:9–13 (J. Bagley).

966. Dr. Bagley also did not present "a standard for redistricting against which [the Court] could judge this cycle of redistricting"; instead, Dr. Bagley testified he presented "where there is a chorus of voices saying it is their opinion that a standard had been deviated from." *Id.* at 74:18–23 (J. Bagley).

967. When asked if criticism from the public and opposing legislators is "a standard about what's normal and what's not normal," Dr. Bagley replied that "[i]t's, in their view, a statement of deviation from what ought to be standard." *Id.* at 87:3–12 (J. Bagley).

968. Dr. Bagley's complaint about the timing is unfounded. Will Roberts and Breeden John explained that they did not begin working on the Congressional map until after the Senate map was complete.

969. As Dr. Bagley conceded, starting with the Senate's own districts before moving to Congressional districts was "not unusual for redistricting." *Id.* at 89:11–17 (J. Bagley).

970. Once the Staff Plan was complete, staff posted it to the website.

971. As a former Senate staffer testified at the public night hearing in Orangeburg, the public has no idea how hard staff works on redistricting. *See* SX230 at 36:00–37:48.

972. Dr. Bagley, however, did not include in his report or testimony any of the praise staff received from the public—or appreciation from Senators from both parties—at the end of the process for their hard work.

973.    Dr. Bagley's next complaint about who saw the Staff Plan before it was posted is equally unfounded: the uncontroverted testimony in the record reveals that no Senator—Republican or Democrat—saw the Staff Plan before it was posted.

974.    As Mr. Roberts testified, it was just a starting point based off of the Benchmark Plan.

975.    Dr. Bagley also fails to explain how it was a procedural irregularity for members of the Subcommittee not to have known about various plans before they were introduced.

976.    On cross-examination, Dr. Bagley confirmed he was not saying it's a bad idea to have options.  10/11/22 AM Tr. at 91:11–12 (J. Bagley).

977.    When asked if he was familiar with the internal protocol for staff working with members on maps and amendments, Dr. Bagley pivoted and said "that members who are familiar with that protocol seem to be taken aback and even blind sided at times in the process."  *Id.* at 92:14–19 (J. Bagley).  Again, all those folks were members of the minority party.  *Id.* at 92:20–21 (J. Bagley).

978.    In any event, the draft maps about which Dr. Bagley says members of the public—as well as Democrats on the House and Senate subcommittees—complained were not the map that ultimately passed the General Assembly.  *Id.* at 91:5–20 (J. Bagley).

979.    Finally, while Plaintiffs have made much ado about the Rep. John King incident, the Court is simply not convinced.

980.    Even if the Court dove into whether the House Judiciary Committee violated its own rules by skipping over Rep. King to chair the meeting, this was merely one of dozens of hearing held throughout the redistricting process, it was not about the plan that ultimately passed

the General Assembly, and it really does not matter because the Enacted Plan was drawn and developed by the Senate.

981.    Dr. Bagley, to his credit, agreed that a member's "failure to preside over one meeting" does not "somehow taint[] the entire process." *Id.* at 92:4–8 (J. Bagley).

982.    The Court last considers Dr. Bagley's testimony about contemporaneous statements in the legislative record.

983.    Regarding the "keep Charleston whole" mantra, Dr. Bagley conceded that he was "[n]ot necessarily" suggesting that "senators were required to [] make Charleston whole just because a chorus of people in public testimony said they wanted that." 10/11/22 AM Tr. 103:16–19 (J. Bagley).

984.    Dr. Bagley "agree[d] that others took a contrary position." *Id.* at 103:20–22 (J. Bagley); *see also* SX 231 at 15:45–20:03 (Mayor of Folly Beach testifying about beach islands had more in common with each other than with Charleston and North Charleston).

985.    Dr. Bagley further agreed that "keeping Charleston whole" was not specified in the guidelines, nor was the Senate required to elevate that concern over all other guidelines. 10/11/22 AM Tr. 103:6–15 (J. Bagley).

986.    In his report, Dr. Bagley called Senator Campsen's justifications of his amendment "a questionable rationale." PX 18 at 8.

987.    Dr. Bagley, however, did not analyze any other districting criteria for purposes of this case. 10/11/22 AM Tr. at 107:6–8 (J. Bagley); *cf. Backus*, 857 F. Supp. 2d at 562–63 (rejecting putative expert's analysis as "problematic," "incomplete," "unconvincing," and insufficient to carry challengers' burden because he "was unable to provide the Court a reliable opinion that the General Assembly subordinated traditional race-neutral principles to race").

988.    Dr. Bagley also opined on the House redistricting process.  10/11/22 AM Tr. at 109:21–110:7 (J. Bagley).

989.    Dr. Bagley simply watched videos of House hearings and read transcripts of those hearings and was compensated at a rate of $150 an hour to do so.  *See id.* at 110:4–12 (J. Bagley).

990.    Dr. Bagley had no prior experience with the House's redistricting process or even the House's legislative process in general.  *See id.* at 110:19–111:1 (J. Bagley).

991.    Dr. Bagley cited Plaintiffs and Plaintiffs' counsel at least eight or nine times in his report.  *See id.* at 116:15–18 (J. Bagley).  Dr. Bagley also cited the testimony of former Democratic Congressman Joe Cunningham.  *See id.* at 118:2–16 (J. Bagley).

992.    However, Dr. Bagley failed to cite a Republican candidate who was running in Congressional District 1, Lynz Piper Loomis, who spoke at one House hearing.  *See id.* at 116:19–117:6 (J. Bagley).

993.    The Courts finds that there are many material omissions in Dr. Bagley's report and an undue emphasis on statements of Democratic actors and a dearth of statements from Republican actors.

994.    The Court finds that Dr. Bagley's report and testimony lack credibility and persuasiveness because of the biased selections included in his report, the lack of expert methodology employed, and conclusory opinions.

### B.    PLAINTIFFS' FACT WITNESSES

#### 1.    SC NAACP President Brenda Murphy

995.    Plaintiffs called SC NAACP President Brenda Murphy as a witness at trial.

996.    Ms. Murphy testified that "she and the members of the SC NAACP were heavily involved in the redistricting cycle."  10/11/22 PM Tr. at 61:6–10 (B. Murphy).

997.    Ms. Murphy testified that the General Assembly gave the State Conference of the NAACP notices of all the legislative meetings, and they were passed on to the NAACP members. *Id.* at 61:11-18 (B. Murphy).

998.    Ms. Murphy testified the State Conference provided samples of testimony for their members to use in communications with their representatives. *Id.* at 61:21-62:6 (B. Murphy).

999.    Ms. Murphy testified the State Conference of the NAACP's attorneys drafted the sample points to be included in the legislative process and part of the legislative record. *Id.* at 62:7-24 (B. Murphy).

1000.    Ms. Murphy testified that she and members were able to testify at the Senate and the House's public hearings across the State. *Id.* at 63:13-25 (B. Murphy).

1001.    Ms. Murphy stated that she was able to participate in the legislative process by testifying at the Senate subcommittee meetings discussing the Congressional plan. *Id.* at 65:6-18 (B. Murphy).

1002.    Ms. Murphy stated the State Conference of the SC NAACP had the opportunity to submit proposed Congressional plans to the Senate. *Id.* at 65:19-24 (B. Murphy).

1003.    Ms. Murphy testified the NAACP proposed maps did not use the Senate's redistricting criteria of incumbency protection. *Id.* at 69:4-16 (B. Murphy).

1004.    Ms. Murphy testified the NAACP proposed maps did not use the Senate's redistricting criteria of partisan data. *Id.* at 69:17-23 (B. Murphy).

1005.    Ms. Murphy testified that "race was the biggest factor in drawing fair maps in order for black people to have an influence over what happens to them." *Id.* at 70:3-24 (B. Murphy).

1006.   During Ms. Murphy's testimony, when she was asked whether the NAACP map was compact, Judge Gergel responded, "I think we can see that it's not compact and that she all but told you it wasn't really serious." *Id.* at 72:1-22 (B. Murphy).

1007.   Ms. Murphy conceded there "wasn't a need for change if the population shifts aren't much." *Id.* at 79:9-18 (B. Murphy).

1008.   Ms. Murphy testified that on September 30, 2021, the minutes reflected the State Conference needed plaintiffs to be identified. *Id.* at 86:59-87:1 (B. Murphy).

### 2.      Taiwan Scott

1009.   Plaintiffs called named Plaintiff Taiwan Scott to the stand. *See* Tr., vol. II, at 493:7.

1010.   Mr. Scott is a resident of Hilton Head Island, South Carolina. *See id.* at 493:15 (T. Scott).

1011.   Mr. Scott is a resident of Congressional District 1. *See id.* at 493:23 (T. Scott).

1012.   Mr. Scott has resided in Congressional District 1 since 2012. *See id.* at 507:19–21 (T. Scott).

1013.   Mr. Scott is also a member of the Gullah Geechee community on Hilton Head Island. *See id.* at 494:5–497:4 (T. Scott).

1014.   According to Mr. Scott, the Gullah Geechee community spans from Beaufort County to North Charleston. *See id.* at 501:14–21 (T. Scott).

1015.   Mr. Scott complained that the Gullah Geechee community has continued to be split between Congressional District 1 and Congressional District 6 in the latest Congressional redistricting plan. *See id.* (T. Scott).

1016.   Mr. Scott alleged that General Assembly's failure to include North Charleston in Congressional District 1 ensured that African-Americans in Congressional District 1 did not have an opportunity to elect a candidate of their choice.  *See id.* at 502:17–25 (T. Scott).

1017.   Mr. Scott conceded that the Gullah Geechee community in Beaufort County were fully drawn into Congressional District 1.  *See id.* at 508:5–8 (T. Scott).

1018.   Mr. Scott also conceded that African-Americans residing in North Charleston have the ability to elect a candidate of their choice in Congressional District 6.  *See id.* at 510:8–12 (T. Scott).

1019.   Mr. Scott acknowledged that he did not participate in the Congressional redistricting process, and he did not reach out to his state representative or state senator about redistricting.  *See id.* at 511:16–24 (T. Scott).

### 3.    Senator Dick Harpootlian

1020.   Senator Harpootlian was lead counsel for Plaintiffs in the *Backus* case. 10/7/22 AM  Tr. at 99:6-9 (R. Harpootlian).

1021.   He testified that he lost at all possible levels, twice at the United States Supreme Court, the U.S. District Court of South Carolina, the U.S. District Court for the District of Columbia, and the Obama Department of Justice.  *Id.* at 93:7-21,  99:6-101:7 (R. Harpootlian).

1022.   Even after all those courts disagreed with him and blessed the Benchmark Plan, Senator Harpootlian believed the Plan was still improper and illegal even though no court had agreed with him.

1023.   Senator Harpootlian testified his plan favored Democrats more than the Enacted Plan. Senator Harpootlian recognized and testified that his plan was favored by the Democratic

Party and would have elected at least 2 Democrats to Congress. *Id.* at 117:13-118:7 (R. Harpootlian).

1024.   Senator Harpootlian testified that the Enacted Plan split fewer counties than the *Backus* plan. *Id.* at 123:14-20 (R. Harpootlian).

1025.   Senator Harpootlian was surprised Plaintiffs had not challenged District 6. *Id.* at 124:7-15 (R. Harpootlian).

1026.   Senator Harpootlian testified that he had enough time to draft an alternative plan after the staff plan was rolled out in November of 2021. *Id.* at 127:25-128:9 (R. Harpootlian).

1027.   Senator Harpootlian testified that the Enacted Plan was "one constructed to meet some arcane political goal." *Id.* at 129:1-7 (R. Harpootlian).

1028.   Senator Harpootlian acknowledged his plan was "just a different way of drawing a map and its communities of interest." *Id.* at 133:7-23 (R. Harpootlian).

### 4.     Lynn Teague

1029.   Lynn Teague ("Ms. Teague") is the Vice President for Issues and Action of the League of Women Voters of South Carolina. *See* Tr., vol. III, at 672:19–20 (L. Teague).

1030.   The League of Women Voters of South Carolina partnered with Plaintiff South Carolina NAACP and was in close communication during the redistricting process. *See id.* at 676:2–22 (L. Teague).

1031.   However, the League did not join in the present lawsuit. *See id.* at 704:25–705:2 (L. Teague).

1032.   The League also removed their letterhead and Ms. Teague stopped signing onto the Plaintiffs' coalition letters at some point before the October 8, 2021 letter because they did not have the "same interests." *See id.* at 705:20–706:5 (L. Teague).

1033.   The League exited calls with the South Carolina NAACP after raising a "concern that having active members of the legislature involved gave the appearance of partisanship." *See id.* at 709:4–9 (L. Teague); HX 121.

1034.   The League submitted a map separate and apart from the NAACP.  *See* Tr., vol. III, at 712:6–8 (L. Teague).

1035.   The League's Plan included Beaufort County in Congressional District 2, despite hearing public opposition to such a move.  *See id.* at 712:14–713:1 (L. Teague).

1036.   The League's Plan also included Bennettsville in Marlboro County with Moncks Corner in Berkeley County in Congressional District 7.  *See id.* at 713:6–13 (L. Teague).

1037.   Ms. Teague testified that Congressional District 7 is "not a least-changed option" in the League's Plan.  *Id.* at 713:14–21 (L. Teague).

1038.   Ms. Teague testified that the League's Plan was "not a least-changed plan."  *Id.* at 713:18–21 (L. Teague).

1039.   Further, the League's Plan retained only 45.2% of Congressional District 6 compared to the Benchmark plan.  SX 70E.

1040.   The League did not consider core retention and did not consider their map to be a least changed plan.  Tr., vol. III, at 721:25–722:9 (L. Teague).

1041.   The League prioritized keeping counties whole and elevated that concern over compactness, competitiveness, and incumbency protection, which was not considered at all.  *See id.* at 714:23–715:8 (L. Teague).

1042.   However, the League's Plan split Marlboro County, Edgefield County, and Barnwell County, which all have less than 27,000 residents and had not previously been split. *See id.* at 715:16–716:21 (L. Teague).

1043.  The League's Plan split 23 VTDs, which is 10 more than the Enacted Plan. *See id.* at 715:9–14 (L. Teague).

1044.  The League's Plan did not have a deviation of one person. *See id.* at 716:22–717:10 (L. Teague).

1045.  Ms. Teague testified that the League's Plan would not give the same political advantage to Republicans as the enacted plan.  *See id.* at 726:7–18 (L. Teague).

1046.  Ms. Teague testified that, "if you'd like to walk through the process, I'll say the Senate did a very fine job of organizing its public hearings around the state."  *See id.* at 739:18–20 (L. Teague).

1047.  Ms. Teague confirmed that "the body of testimony and feedback was not just limited to folks who" testified in person "or virtually at public hearings," and she "would be astonished if [constituents] didn't" contact legislators directly.  *Id.* at 741:6–15 (L. Teague).

1048.  Ms. Teague agreed that the entire redistricting process took six months, which was "[a]ctually a little longer" than "the length of normal legislative session."  *Id.* at 742:18–25 (L. Teague).  She said "[i]t seemed like eternity."  *Id.* at 742:22 (L. Teague).

1049.  Ms. Teague testified that redistricting "[a]bsolutely" "received a lot of process" and she "[could not] recall anything that received as much process" in the General Assembly.  *Id.* at 743:1–9 (L. Teague).

1050.  Ms. Teague also "commended the senate staff for their responsible professional work."  *Id.* at 743:7–9 (L. Teague).

1051.  Ms. Teague agreed that "counting numbers on public testimony is no substitute[] for analysis."  *Id.* at 744:3–5 (L. Teague).

1052.   Ms. Teague also agreed that the League of Women Voters Plan performed worse than the Enacted Plan on core preservation, was not a minimum change plan for Congressman Clyburn, and was worse on VTD splits.  *Id.* at 746:21–747:14 (L. Teague).

1053.   Ms. Teague conceded that the League used criteria that was different than the House and Senate guidelines.  *Id.* at 747:6–8 (L. Teague).

1054.   Further, in drawing the League's maps, Ms. Teague said that the League did not look at political data from 2020.  *Id.* at 748:11–13 (L. Teague).

**5.    Henry Griffin**

1055.   Plaintiffs called Henry Griffin, a resident of St. Stephens, South Carolina, to the stand.  Tr., vol. II, at 521:11-14.

1056.   Mr. Griffin is president of the Upper Berkeley Branch of the NAACP and Vice President of the South Carolina State Conference of the NAACP.  *Id.* at 522:12-21.

1057.   According to Mr. Griffin, his residence was moved from Congressional District 6 to Congressional District 1 as a result of reapportionment this cycle.  *Id.* at 522:2-5.

1058.   Mr. Griffin conceded he did not participate in the Congressional redistricting process, nor did he reach out to his state representative or state senator about redistricting.  *Id.* at 526:8-13.

1059.   Further, because Mr. Griffin has never spoken with Congresswoman Mace, he conceded he could not say whether she would be responsive to the needs of the Black community.  *See id.* at 528:10-20.

1060.   Mr. Griffin testified he believes that politics played a role in how the maps were drawn.  *Id.* at 528:21-23.

### 6.    Anjene Davis

1061.  Anjene S. Davis ("Mr. Davis") is a resident of North Charleston and resides and works in Congressional District 6.  *See* Tr., vol. I, at 85:2–18 (A. Davis).

1062.  Mr. Davis previously resided in Congressional District 6 and had resided in Congressional District 6 since high school.  *See id.* at 95:5–8 (A. Davis).

1063.  Mr. Davis testified that he was not personally harmed by redistricting this cycle. *See id.* at 98:11–14 (A. Davis).

1064.  Mr. Davis is involved in several community organizations and activism projects in the North Charleston and surrounding areas.  *See id.* at 85:20–88:17 (A. Davis).

1065.  Mr. Davis attended one public redistricting hearing on August 10, 2021.  *See id.* at 89:1–17 (A. Davis).

1066.  Mr. Davis discussed marginalized communities, including the indigenous black communities and the Gullah Geechee community.  *See id.* at 89:18–90:20 (A. Davis).

1067.  Mr. Davis believed that the district line between Congressional District 1 and Congressional District 6 bisected the black communities and diluted the voting capacity of those communities.  *See id.* at 91:5–15 (A. Davis).

1068.  Mr. Davis also believed that areas that were bisected included Hollywood, Ravenel, Awendaw, McCellanville, and West Ashley.  *See id.* at 95:21–96:9 (A. Davis).

1069.  However, Awendaw and McCellanville were previously located in Congressional District 1 and remain in Congressional District 1 in the enacted plan.  *See id.* at 100:19–101:11 (A. Davis).

1070.  Similarly, Hollywood and Ravenel were previously located in Congressional District 6 and remain in Congressional District 6 in the enacted plan.  *See id.* at 101:12–21 (A. Davis).

1071.  Mr. Davis also agreed that West Ashley was a fast growing suburb of the downtown Charleston peninsula, that West Ashley is within the city of Charleston, and that West Ashley is governed by the Charleston City Council.  *See id.* at 104:15–106:6 (A. Davis).

1072.  The Court finds that the communities of Awendaw and McCellanville were not split by the Enacted Plan.

1073.   The Court finds that the communities of Hollywood and Ravenel are not split by the Enacted Plan.

1074.  The Court finds that these four communities remained in their prior respective Congressional Districts based on the traditional redistricting principle of core retention and such a decision was not motivated by race.

1075.  The Court finds that West Ashley and the downtown Charleston peninsula are a community of interest and it was appropriate for both to be included in the same Congressional District and such a decision was not motivated by race.

### 7.    Elizabeth Kilgore

1076.  Elizabeth Kilgore ("Ms. Kilgore") is a resident of Sumter County. See 10/11/22 PM Tr. at 3:3–4 (E. Kilgore).

1077.  Ms. Kilgore is the Secretary for the South Carolina State Conference of the NAACP and the President of the Sumter County Branch of the NAACP.  *See id.* at 3:2–6 (E. Kilgore).

1078.  Ms. Kilgore expressed concern that all of Sumter County is not in the same congressional district.  *See id.* at 8:14–16 (E. Kilgore).

1079.  Ms. Kilgore currently resides in Congressional District 5, which is the same congressional district she resided in prior to the enactment of S. 865.  *See id.* at 18:13–15 (E. Kilgore).

1080.  The Court assigns little weight to Ms. Kilgore's testimony because her testimony does not materially assist the Court in resolving any disputes of fact, including whether the State in redistricting congressional districts intentionally discriminated against Black voters or elevated race as the predominant redistricting criteria over other traditional redistricting factors in the movement of voters inside or outside particular congressional districts to advance political goals.

### 8.     Charles Boykin

1081.  Charles Boykin ("Mr. Boykin") was a co-chair of Plaintiff South Carolina State Conference of the NAACP Reapportionment Committee and is also a member of Plaintiff South Carolina State Conference of the NAACP Executive Committee.  Boykin Dep. at 40:11-17.

1082.  Mr. Boykin explained that filing litigation was a decision that would require a vote of the Executive Committee and "would also involve communication with the National body as well."  *Id.* at 33:2-8.

1083.  Mr. Boykin believed that minutes would be kept of this vote.  *Id*. at 34:12-17.

1084.  The Court has not been provided such minutes as Plaintiffs did not produce them in discovery.

1085.  Mr. Boykin believed that the vote in this litigation occurred in the summer, which would have been prior to the General Assembly receiving Census data or drawing maps.  *See id*. at 34:18-35:4.

1086.   Mr. Boykin had no recollection of being presented a draft complaint or any evidence of racial gerrymandering or racial discrimination prior to the vote on litigation.  *Id*. at 35:12-16; 38:16-24.

1087.   In his role as chair, Mr. Boykin led at least one meeting prior to the filing of litigation involving discussions on the identification of prospective plaintiffs and witnesses for this litigation.  *See id*. at 52:8-13; 62:13-24; *see also* HX 34.

1088.   Roughly a week before the initial lawsuit was filed in this case, Mr. Boykin, a reapportionment co-chair and Executive Committee meeting, was not aware if any plaintiffs or witnesses were identified.  Boykin Dep. at 63:23-64:2.

### 9.    James Felder

1089.   Plaintiffs next called James Felder, a resident of Columbia, South Carolina. 10/12/22 AM Tr. at 2:8-9.

1090.   Mr. Felder is a lifelong member of the South Carolina State Conference of the NAACP.  *See id.* at 6:13 (J. Felder).

1091.   Mr. Felder previously held several leadership positions within his local branch of NAACP to include Columbia Branch President and executive director of the South Carolina State conference of the NAACP.  *See id.* at 6:21-25 (J. Felder).

1092.   Mr. Felder resides in Congressional District 6.  *See id.* at 8:21-24 (J. Felder).

1093.   Mr. Felder criticized the fact that Columbia is split between Congressional District 2 and Congressional District 6.  *See id.* at 9:5-11 (J. Felder).

1094.   Mr. Felder alleged that African-American voters were drawn out of Congressional District 2 and drawn into Congressional District 6.  *See id.* at 9:17-10:5 (J. Felder).

1095.  Mr. Felder conceded that politics indeed plays a role in the redistricting process. *See id.* at 14:3-6 (J. Felder).

1096.  Mr. Felder also conceded that several of the Columbia neighborhoods that were drawn out of Congressional District 2 and into Congressional District 6 were majority white and reliably voted for democratic candidates.  *See id.* at 14:15-15:7 (J. Felder).

## X.    SENATE AND HOUSE WITNESSES

### A.    Senator Chip Campsen

1097.  Senator Chip Campsen, who resides on the Isle of Palms, has lived in the Charleston area his entire life.  10/13/22 PM Tr. at 59:15–17 (C. Campsen).

1098.  Senator Campsen represents Senate District 43, which "is a long coastal district that's about half of South Carolina's coast.  It runs from Bulls Bay in northern Charleston County to Port Royal Sound in Beaufort County.  It includes Charleston, Beaufort and Colleton County, parts of them."  *Id.* at 60:3–7 (C. Campsen).

1099.  He is chairman of the Senate Fish, Game, and Forestry Committee.  *Id.* at 60:13 (C. Campsen).

1100.  Senator Campsen testified that, by way of example, he has worked on the following "legislation that's helped black people": (1) he's "worked extensively over the years with Senator Malloy, who's an African-American democrat from Darlington and one of [his] best friends in the Senate, on sentencing reform"; (2) he was "instrumental in protecting Bay Point Island, in Port Royal Sound, which is just right seaward of St. Helena Island, which is kind of home base of the Gullah Geechee nation"; he secured "almost $2 million in the state budget just this year for the Penn Center," which was "one of the first schools for freed slaves [] established in 1862"; and (3) he "led the charge to stop offshore drilling successfully on the east

coast" and "worked closely with Senator Harpootlian on that bill" along with the Gullah Geechee nation. *Id.* at 61:25–63:13 (C. Campsen).

1101.   Senator Campsen worked closely with Queen Quet, in particular, on offshore drilling, and she called Senator Campsen her buddy during the public night hearing in Charleston. *Id.* at 63:14–23 (C. Campsen).

1102.   As for voting rights legislation, Senator Campsen testified that he authored the "election reform bill that passed the [G]eneral [A]ssembly in May of this year with a unanimous vote." *Id.* at 64:10–12 (C. Campsen).

1103.   As a member of the Senate Judiciary Committee, Senator Campsen was involved in the redistricting process this cycle and served on the Senate Redistricting Subcommittee. *Id.* at 60:14–61:10 (C. Campsen).

1104.   The partisan makeup of the Subcommittee was evenly split after Senator Tom Young left to take a position on the Senate Finance Committee. *Id.* at 61:2–5 (C. Campsen).

1105.   During the redistricting process, Senator Campsen worked with the following Senate staff: Andy Fiffick, Breeden John, Will Roberts, Charlie Terreni, and occasionally Paula Benson. *Id.* at 61:8–15 (C. Campsen).

1106.   The testimony offered at the public night hearings was not "the only manner in which the Senate received feedback about communities of interest, or the guidelines, or the plans." *Id.* at 65:1–5 (C. Campsen).  The Senate also received feedback via "[e]-mail, telephone, [and] talking to people in the community." *Id.* at 65:5–7 (C. Campsen).  There's "lots of different ways to communicate with constituents." *Id.* at 65:8–10 (C. Campsen).

1107.   Further, testimony received at a public hearing received no greater weight than any other form of feedback Senator Campsen received. *Id.* at 73:18–21 (C. Campsen).

1108.   Senator Campsen confirmed, however, that the Senate could not "accommodate what everyone desires" in the process and Senator Rankin said as much at the beginning of the public hearing in Charleston.  *Id.* at 65:22–23 (C. Campsen); SX 231 at 10:28–39.  The Senate did not "hide the ball" on that.  10/14/22 PM Tr. at 66:5 (C. Campsen).

1109.   With respect to "testimony from members in the community who wanted to 'keep Charleston whole,'" Senator Campsen testified he "thought that was really a subterfuge for making the first district a democratic district."  *Id.* at 66:7–12 (C. Campsen).

1110.   Further, when asked what he thought public testimony seeking to make the First Congressional District "competitive" meant, Senator Campsen said "either 50/50 – but most of the actual things they proposed were turning it into a democratic district."  *Id.* at 67:22–25 (C. Campsen).

1111.   Senator Campsen testified that there was a "[v]ery strong sentiment in Beaufort" for keeping Beaufort County whole and in Congressional District 1.  *Id.* at 66:13–20 (C. Campsen).

1112.   Senator Campsen stated he recalled public input seeking to make Berkeley County whole.  *Id.* at 66:24–67:1 (C. Campsen).

1113.   Senator Campsen also remembered receiving input from citizens who wanted Charleston, Dorchester, and Berkeley counties together in a congressional district, noting there was "a long history" of the Tri-County area being "integrated culturally" and "economically" "for decades."  *Id.* at 67:4–9 (C. Campsen).

1114.   Senator Campsen testified that he affirmatively reached out to constituents about the Congressional plan "because [he] saw clear evidence that the democratic party was very active in providing talking points, getting people to come out and make comments.  And the

republican party was doing nothing . . . on that front. So, I didn't want to have nothing. I knew that there were constituents and people who wanted to keep the 1st a republican district." *Id.* at 68:5–11 (C. Campsen); *see also* SX116.

1115. "[A]s far as arguing for a plan that would keep the 1st district a republican district," Senator Campsen said "he knew that there were republicans out there who cared about that. They had expressed that to [him], so [he] let them know: If you want to be heard, now's the time to be heard." 10/13/22 PM Tr. at 69:20–24 (C. Campsen).

1116. In reaching out to one of his constituents, Xiaodan Li, a Chinese immigrant who lives in Beaufort, Senator Campsen described Senate Amendment 1 as the Republican Plan and Senate Amendment 2 the Democrat Plan. *Id.* at 70:24–71:5, 68:24–25 (C. Campsen); *see also* SX106.

1117. Senator Campsen testified unequivocally that politics is in the guidelines. 10/13/22 PM Tr. at 71:24–25 (C. Campsen); *see also* SX3.

1118. Regarding the process, Senator Campsen testified that "the public was given a voice," and no other piece of legislation as received as much process as redistricting during his "over a decade" of service in the General Assembly. 10/13/22 PM Tr. at 72:13–14; 73:3–8 (C. Campsen).

1119. Senator Campsen said he had full and complete access to Senate staff, and so did other members of the Senate. *Id.* at 73:12–17 (C. Campsen).

1120. Senator Campsen did not see the Staff Plan before it was publicly released. *Id.* at 75:6–9 (C. Campsen). To his knowledge, neither did any other senator—Republican or Democrat. *Id.* at 75:10–13 (C. Campsen).

1121.   Senator Campsen testified that "staff repudiated [NRRT's] recommendations" and told him that NRRT's "plan wasn't worth looking at, because it wasn't defensible.  And I never looked at it."  *Id.* at 76:1–4 (C. Campsen).

1122.   Senator Campsen did not think any other Senator looked at the NRRT plan and stated simply, "All I know is that staff looked at it and rejected it basically out of hand."  *Id.* at 76:14–17 (C. Campsen).

1123.   From November 23, 2021, when the Staff Plan was rolled out, until January 20, 2022, when the Enacted Plan passed the Senate, Senator Campsen testified that the public had "ample opportunity to provide input" during that 60-day period.  *Id.* at 76:14–20 (C. Campsen).

1124.   Upon reviewing the League of Women Voters map, Senator Campsen said it never would have passed the Republican-controlled General Assembly because the districts did not look like the benchmark plan, "CD1 had a Biden vote share of 51.75 percent, and a Trump vote share of 48.25 percent," and Beaufort and Jasper Counties would have been in CD2.  *Id.* at 78:5–79:1 (C. Campsen).

1125.   Further, after viewing the initial House staff plan, Senator Campsen testified he called House Majority Leader Gary Simrill and Rep. Weston Newton and asked: "Do y'all really plan to do that?  Because, you know, we don't think that's going to pass the Senate.  I'd be surprised if it actually passed your republican-controlled House.  But are y'all open to something different?  And the answer was yes."  *Id.* at 79:22–80:5 (C. Campsen).

1126.   The House then produced an alternative staff plan that more closely mirrored the Senate plan.  *Id.* at 80:6–11 (C. Campsen).

1127.   Senator Campsen "took that plan with staff work and input from other members" and "worked on kind of perfecting that [] plan.  And I think we did a lot better job of following

the redistricting guidelines than the House had, in that we followed geographic boundaries" and "kept the barrier islands together." *Id.* at 80:21–81:1 (C. Campsen).

1128.   According to Senator Campsen, "there's a lot of instances along the way where I could have made it a lot more republican district, but it would have violated some of these other redistricting principles," so he did not and, instead, "we end up with something that's really just barely a republican district." *Id.* at 81:1–6 (C. Campsen).

1129.   Senator Campsen "wanted to draw a district that would be republican, because it had been republican" and he is "a republican," while "honoring redistricting principles as best as [he] could, and also be in complian[ce] with applicable law." *Id.* at 81:11–17 (C. Campsen).

1130.   In fact, from the House Alternative Staff Plan to Senate Amendment 1, the Trump vote share in CD1 actually decreased. *Id.* at 81:22–24 (C. Campsen).

1131.   Senator Campsen's plan—Senate Amendment 1—went "through subcommittee, full committee, and then ma[d]e it to the floor," and "Democrats were able to offer and discuss amendments." *Id.* at 82:3–8 (C. Campsen).  And they did.  *Id.* at 82:9–10 (C. Campsen).

1132.   He thought it was important to make Senate Amendment 1 a minimal change plan because the Benchmark Plan had survived numerous legal challenges 10 years ago, which is "like yesterday in redistricting time." *Id.* at 83:11–20 (C. Campsen).

1133.   Indeed, Senator Campsen felt like the Benchmark Plan "was a pretty good starting point" given that "you had to make changes in the 1st and the 6th because the first had to shed 88,000 people, and the 6th had to pick up 85,000 people.  And the rest of the state had grown consistent with the statewide rate of growth, and so they could largely remain the same.  And that's really largely what the plan does." *Id.* at 83:22–84:3 (C. Campsen).

1134.   The Senate barely touched District 7 because "we didn't want to have that fight again" like last cycle, and "the growth rate was about right on par with the grown rate statewide." *Id.* at 84:9–11 (C. Campsen).

1135.   The Enacted Plan kept all the sea islands together in CD1, and Senator Campsen said "that is a very unique community of interest, consistent with public testimony he heard. *Id.* at 84:16–21 (C. Campsen).

1136.   Although Senator Campsen considered making Charleston whole, "then you would end up with Charleston being a democratic-controlled district, majority democratic district, based upon the political data we had." *Id.* at 84:25–85:11 (C. Campsen).

1137.   Moreover, Senator Campsen thought it was better for Charleston to have two Congressmen, instead of just one, because it "benefit[s] the local community.  It's really bread-and-butter things.  Like, when we get a hurricane, are we going to get FEMA down here quickly or not?  Are we going to get the extra special treatment?  Do we have influence with the incumbent administration?  And so, I'd rather have two congressman [than] one any day.  In fact, if you're going to have a democrat and republican mix in your delegation, I'd rather it be a republican and a democrat, like Charleston has. Because, I don't suspect Nancy Mace has near as much influence with the Biden administration as Jim Clyburn does.  I know that's not true.  Jim Clyburn has more influence with the Biden Administration perhaps than anyone in the nation, because he probably wouldn't be president if it weren't for Jim Clyburn." *Id.* at 85:15–86:19 (C. Campsen).

1138.   As Senator Campsen noted, Charleston had an example of that the day before he testified, as Congressman Clyburn hosted the U.S. Secretary of Transportation at the Port of Charleston, "talking about the road system, talking about electronic vehicles and BMW and

Volvo producing electric vehicles and policy regards to that.  All that is right there in the news yesterday, how beneficial it is to have Jim Clyburn representing Charleston County."  *Id.* at 86:20–87 (C. Campsen).

1139.   Senator Campsen testified that the three largest population centers in the state—Greenville, Charleston, and Richland—all have county splits in the Enacted Plan.  "It's hard not to split them, because you have to comply with the one-man-one-vote requirement."  *Id.* at 87:6–11 (C. Campsen).

1140.   When asked why Senator Campsen denied that Senate Amendment 1 was a partisan gerrymander, Senator Campsen explained as follows: "Because in my mind a partisan gerrymander is when you subordinate everything else to drawing partisan lines – or almost everything else.  And that is not what I did. . . .  I wasn't subordinating everything else to the partisan numbers.  I was honoring other redistricting principles."  *Id.* at 90:5–17 (C. Campsen).  Also, partisan gerrymandering "is a term of art."  *Id.* at 91:23 (C. Campsen).

1141.   But Senator Campsen clarified that did not mean politics was not involved.  *Id.* at 91:3–4 (C. Campsen).

1142.   According to Senator Campsen, "partisan numbers are taken into account.  You don't have Illinois drafting republican districts when they could draft democrat districts."  *Id.* at 91:8–11 (C. Campsen).

1143.   Indeed, Senator Rankin explained during a Senate Judiciary Committee meeting that voters in West Ashley were moved because they voted for Democrats, not based on race.  *Id.* at 93:16–22 (C. Campsen); *see also* SX 241 at 56:22–57.  Indeed, Senator Campsen did not "keep track of the racial numbers as we were drawing maps."  10/13/22 PM Tr. at 93:24–25 (C. Campsen).

1144.   Senator Campsen also provided political numbers to Senator Margie Bright Matthews multiple times in committee and on the floor.  *Id.* at 154:20–25 (C. Campsen).

1145.   Staff never mentioned racial targets when drafting Senate Amendment 1 for Senator Campsen.  *Id.* at 94:17–19 (C. Campsen).

1146.   While "the senate prides itself with being collegial and bipartisan," some votes clearly come down on party lines, and the Congressional redistricting plan was one of those issues.  *Id.* at 96:20–98:5 (C. Campsen).

1147.   Senator Campsen agreed that Congressional redistricting was "clearly political," and it was clear "early on" in the process it was going to be different than Senate redistricting "because there would be a fight over this republican first district into a democratic district.  It was pretty clear that was going to be a fight."  *Id.* at 98:25–99:9 (C. Campsen).  Indeed, the decision had "national implications" on who would control Congress.  *Id.* at 99:10–25 (C. Campsen).

1148.   Senator Campsen confirmed that Senator Harpootlian identified his plan as the Democratic Caucus plan.  *Id.* at 100:15–17, 152:7–9 (C. Campsen); *see also* PX 116 at 114:19–21.

1149.   Senator Harpootlian's plan would have changed the partisan makeup of South Carolina's congressional delegation from 6–1 to 5–2 (and one toss-up) in terms of Republicans to Democrats.  *Id.* at 100:18–25 (C. Campsen).

1150.   Senator Campsen said that was never going to pass the Republican-controlled Senate.  *Id.* at 101:2–4 (C. Campsen).

1151.   Senator Campsen confirmed that race was neither a motivating factor nor the predominant factor in enacting Senate Amendment 1.  *Id.* at 101:17–21 (C. Campsen).  His

decisions were based on politics and traditional districting principles.  *Id.* at 101:23–24 (C. Campsen).

**B.    Senate Majority Leader Shane Massey**

1152.    Senator Massey testified that "partisanship was the primary factor" in the crafting of the Enacted Plan. 10/12/22 PM Tr. at 93:7-21 (S. Massey).

1153.    Senator Massey testified that he and the members of the Senate Republican Caucus understood politics could be used in crafting the plan.  *Id.* at 94:3-8 (S. Massey).

1154.    Senator Massey testified that Edgefield County had been in the 3rd Congressional District for over 70 years.  *Id.* at 95:17-20 (S. Massey).

1155.    Senator Massey stated that the legislative process that produced the Enacted Plan was thorough and the Enacted Plan received much more public and legislative feedback than other pieces of legislation.  *Id.* at 98:13-24; 100:2-19 (S. Massey).

1156.    Senator Massey knew that 5 of the 7 congressional districts did not need to be changed much given that their population was close to the ideal population figure.  *Id.* at 101:7-102:8 (S. Massey).

1157.    Senator Massey testified that politics was going to be considered whether it was in the guidelines or not since congressional redistricting is about the political makeup of the state's congressional districts.  *Id.* at 103:24-104:9 (S. Massey).

1158.    Senator Massey stated that it would have been "political malpractice" to pass a plan that made it more likely that a Democrat candidate would win the 1st Congressional District.  *Id.* at 104:3-20 (S. Massey).

1159.    Senator Massey told Senator Rankin that the Republican Caucus was "not going to sacrifice the 1st" and allow a Democrat to be elected.  *Id.* at 106:25-107:16 (S. Massey).

1160.   Senator Massey explained that the composition of the 1st District was not about race but always about the growth from out of state residents. *Id.* at 107:25-108:13 (S. Massey).

1161.   Race did not play a factor in adopting the Enacted Plan. *Id.* at 1108:15-109:5 (S. Massey).

1162.   Senator Massey testified that if CD 1 only had approximately 16% BVAP when Joe Cunningham won in 2018, a large percentage of white voters must have voted for him. *Id.* at 109:21-110:14 (S. Massey).

1163.   Senator Massey testified that the League of Women Voters plan split Edgefield County and for that reason the plan was never going to pass. Also, the plan was not going to be adopted because it split a number of rural counties. *Id.* at 111:5-112:16 (S. Massey).

1164.   Senator Massey explained he was the advocate for the Enacted Plan during floor debate in the Senate. He described the Enacted Plan kept Fort Jackson in the 2nd District which was an important community of interest. *Id.* at 116:23-117:20 (S. Massey).

1165.   Also during the floor debate, Senator Massey described how the Enacted Plan kept Congressional Clyburn's district with a high percentage of his constituents from the Benchmark Plan. *Id.* at 118:6-119:5 (S. Massey).

1166.   During the floor debate, Senator Massey spoke about how Senator Harpootlian's characterization of the 6th District being bleached was inaccurate based on the actual data. *Id.* at 120:25-121:22 (S. Massey).

1167.   Senator Massey said that he always looked first at the partisan data in the charts when reviewing maps. *Id.* at 122:1-26 (S. Massey).

1168.   Senator Massey stated that Senator Harpootlian's plan created at least one more Democrat district—and possibly two—and was never going to pass the General Assembly for political and partisan reasons.  *Id.* at 123:22-124:23 (S. Massey).

### C.    Representative Justin Bamberg

1169.   Representative Bamberg has served in the South Carolina House of Representatives since 2014. *See* 10/13/22 AM Tr. at 102:8–10 (J. Bamberg).

1170.   Representative Bamberg is a Democrat and a member of the House Democratic Caucus, as well as the South Carolina Legislative Black Caucus.  *See id.* at 102:11–103:3 (J. Bamberg).

1171.   Representative Bamberg is a practicing attorney at his law firm, Bamberg Legal. *See id.* at 103:9–20 (J. Bamberg).

1172.   Representative Bamberg has a civil rights practice.  *See id.* at 104:13–19 (J. Bamberg).

1173.   Representative Bamberg is committed to causes that hold persons accountable for racial discrimination.  *See id.* at 107:3–109:9 (J. Bamberg).

1174.   Representative Bamberg currently serves on the House Judiciary Committee, House Ethics Committee, and House Ad Hoc Rules Committee.  *See id.* at 109:19–23 (J. Bamberg).

1175.   Representative Bamberg testified that he does not believe that any of the members of the Ad Hoc Committee would participate in or tolerate purposeful discrimination.  *See id.* at 111:17–21 (J. Bamberg).

1176.   Representative Bamberg testified he was selected by Joe Biden and Senator Bernie Sanders to serve on a committee to prepare the plan for how the White House would

approach criminal justice reforms if Joe Biden were to become elected as President of the United States.  *See id.* at 113:7–15 (J. Bamberg).

1177.   Representative Bamberg recalls hearing public testimony about whether Congressional District 2 should contain Beaufort County or Charleston should be split.  *See id.* at 116:22–117:9 (J. Bamberg).

1178.   Representative Bamberg testified that Representative John King does not have a similar reputation among his peers in the House of being collegial and cooperative as the members of the Ad Hoc Committee as it was ultimately constituted.  *See id.* at 122:13–25 (J. Bamberg).

1179.   Representative Bamberg testified that in his few years on House Judiciary Committee, he has never seen a meeting run solely by the First or Second Vice Chair.  *See id.* at 123:17–110:3 (J. Bamberg).

1180.   Representative Bamberg did not attend the January 10, 2022 House Judiciary Committee meeting where the House Judiciary Committee voted to and advanced the House Staff Alternative Plan to the full House for consideration.  *See id.* at 124:23–25 (J. Bamberg).

1181.   Representative Bamberg voted against the House Staff Alternative Plan but not because he felt it discriminated against African-American voters or was a plan based on race. *See id.* at 125:9–126:1 (J. Bamberg).

1182.   As testified by Representative Bamberg, the House Staff Alternative Plan was not the congressional plan signed into law by Governor Henry McMaster.  *See id.* at 126:23–127:3 (J. Bamberg).

1183.   Representative Bamberg testified that Representative Cobb-Hunter did not personally request of him that the Ad Hoc Committee perform a Section 2 Voting Rights

Analysis or ask him whether the Ad Hoc Committee had performed a Section 2 Voting Rights Analysis. *See id.* at 127:4–23 (J. Bamberg).

1184. Representative Bamberg testified that he does not believe the House Staff Alternative Plan was in any way motivated by race or an intent to racially discriminate. *See id.* at 127:24–128:4 (J. Bamberg).

1185. Representative Bamberg believes hyper-partisanship politics was pivotal in the congressional redistricting process. *See id.* at 128:5–15 (J. Bamberg).

1186. Representative Bamberg was not involved in the South Carolina Senate's redistricting process, including the line drawing that was done in the Senate to create the congressional plan adopted by the Senate and ultimately signed into law by Governor McMaster. *See id.* at 139:5–19 (J. Bamberg).

### D.    Expert Sean Trende

1187. The Court accepted Mr. Sean Trende as an expert in redistricting, political methodology, American elections, and American politics. 10/13/22 AM Tr. at 13:20-22.

1188. Mr. Trende testified regarding the Enacted Plan's performance under, and compliance with, traditional districting principles recognized in this Court's prior cases in *Colleton County* and *Backus* and in the House and Senate Guidelines. *See id.* at 14:7-15:11 (S. Trende); *see also* SX 75 at 9.

1189. Mr. Trende opined, consistent with the available data and statistics, that the Enacted Plan performs well on traditional districting principles and even outperforms the Benchmark Plan upheld in *Backus* on those principles. 10/13/22 AM Tr. at 15:8-16:21 (S. Trende); SX 75 at 7.

1190.   Mr. Trende explained that, in a redistricting plan with seven districts, the realistic minimum number of county splits is six.  10/13/22 AM Tr. 17:14-23 (S. Trende).

1191.   Mr. Trende noted that the Enacted Plan decreased the number of county splits from 12 to 10 and the number VTD splits from 65 to 13 compared to the Benchmark Plan. *Id.* at 17:5-13 (S. Trende).

1192.   Mr. Trende responded to Dr. Duchin's criticism that his comparison of the number of VTD splits in the Benchmark Plan and the Enacted Plan was "misleading."   He explained that his comparison was not misleading because he "look[ed] at what the map was that the legislature was looking at when it redrew.  And by that point, there were 65 precinct splits that it addressed the bulk of."  *Id.* at 18:19-19:20 (S. Trende).

1193.   Mr. Trende continued: "I also think the fact that they had very few precinct splits at the beginning of 2012, if anything, suggests that they have consistently been concerned about having a low number of precinct splits."  *Id.* at 19:20-24 (S. Trende).

1194.   Mr. Trende examined the cores of South Carolina's Congressional districts back to the early 1900s and discovered that the cores have remained stable over time.  *See id.* at 19:25-30:10 (S. Trende).

1195.   Mr. Trende examined the changes in districts' BVAP under the Enacted Plan using the DOJ Black metric that the General Assembly used to draw and analyze the Enacted Plan.  *See id.* at 30:11-32:12 (S. Trende).

1196.   Mr. Trende testified about the changes in districts' political composition under the Enacted Plan.  *See id.* at 32:13-34:22 (S. Trende).

1197.   Mr. Trende analyzed the specific changes in district lines the Enacted Plan made in Sumter, Orangeburg, Richland, and Charleston counties.  *Id.* at 34:23-41:3 (S. Trende).

1198.   Mr. Trende confirmed that these changes repaired VTD splits, comported with traditional districting principles, and made District 1 more Republican-leaning.  *See id.* (S. Trende).

1199.   Mr. Trende analyzed the change of the line between Districts 1 and 6 in Charleston County.  He concluded, consistent with the available demographic and political data, that "[t]he moves end up being, on net, race neutral" and "what changes is the politics."  *Id.* at 40:14-40:21 (S. Trende); *see also* PX 75 at 35.

1200.   Mr. Trende further explained: "You move . . . some African-American areas of Berkeley that have white Trump voters" into District 1 and "some [African-Americans] in the Charleston area that have more liberal white voters" into District 6, "changing the [political] composition" of District 1.  10/13/22 AM Tr. at 40:17-21 (S. Trende); *see also id.* at 50:9-12 ("[T]he legislature put  in some African-American voters in the Charleston area, but it put in a lot of white liberal voters as well from North Charleston to the west of Charleston.").

1201.   Mr. Trende also testified regarding his rebuttal report. *See* SX 76.

1202.   Mr. Trende explained that Dr. Imai's simulation analyses did not control for every factor in the House and Senate Guidelines, including core preservation.  10/13/22 AM Tr. at 42:8-44:12 (S. Trende).

1203.   Mr. Trende demonstrated that Dr. Imai's simulation plans have "much lower core retention" scores on average than the Enacted Plan.  *See id.* at 45:7-47:14 (S. Trende).

1204.   For example, the mean core retention score in District 6 in Dr. Imai's simulation plans is 43.7 %, meaning that on average more than 56% of Congressman Clyburn's constituents would be new to him under the simulation plans.  *See id.* at 47:17-48:2 (S. Trende).

1205.   Mr. Trende confirmed that it is possible to control for core preservation using Dr. Imai's simulation analysis, which Mr. Trende has used in prior cases.   *Id.* at 94:10-21 (S. Trende).

1206.   Mr. Trende also explained that Dr. Imai's simulation plans do not control for partisan performance or politics.   *See id.* at 48:3-49:5 (S. Trende).

1207.   Moreover, "Dr. Imai's simulation plan consistently produces District 1's that are more Democratic than the actual enacted map."   *Id.* at 48:13-16 (S. Trende).

1208.   In fact, "91 percent" of the districts in which Nancy Mace is placed in Dr. Imai's simulation plans were carried by then-candidate Joe Biden in 2020.   *Id.* at 48:17-21 (S. Trende).

1209.   The average Biden vote share in the districts in which Nancy Mace is placed in Dr. Imai's simulation plans is around 52%.   *Id.* at 48:24-49:5 (S. Trende).

1210.   Mr. Trende also pointed out problems with Dr. Ragusa's analysis: it uses hard-count BVAP data rather than BVAP percentages; does not control for several traditional districting principles, including core retention, reducing VTD splits, preserving communities of interest, or keeping counties and municipalities intact; and uses an "envelope" analysis that does not control for compactness.   *Id.* at 50:13-55:9 (S. Trende).

November 10, 2022                         Respectfully submitted,
Columbia, South Carolina

                                         /s/Robert E. Tyson, Jr.
                                         Robert E. Tyson, Jr. (7815)
                                         Vordman Carlisle Traywick, III (12483)
                                         La'Jessica Stringfellow (13006)
                                         ROBINSON GRAY STEPP & LAFFITTE, LLC
                                         Post Office Box 11449 (29211)
                                         Columbia, South Carolina 29201
                                         (803) 929-1400
                                         rtyson@robinsongray.com
                                         ltraywick@robinsongray.com
                                         lstringfellow@robinsongray.com

                                         John M. Gore (admitted *pro hac vice*)
                                         Stephen J. Kenny (admitted *pro hac vice*)
                                         JONES DAY
                                         51 Louisiana Avenue, N.W.
                                         Washington, D.C. 20001
                                         Phone: (202) 879-3939
                                         Fax: (202) 626-1700
                                         jmgore@jonesday.com
                                         skenny@jonesday.com

                                         *Counsel for Senate Defendants*

                                         /s/ Mark C. Moore
                                         Mark C. Moore (Fed. ID No. 4956)
                                         Jennifer J. Hollingsworth (Fed. ID No. 11704)
                                         Hamilton B. Barber (Fed. ID No. 13306)
                                         Michael A. Parente (Fed. ID No. 13358)
                                         NEXSEN PRUET, LLC
                                         1230 Main Street, Suite 700
                                         Columbia, SC 29201
                                         Telephone: 803.771.8900
                                         MMoore@nexsenpruet.com
                                         JHollingsworth@nexsenpruet.com
                                         HBarber@nexsenpruet.com
                                         MParente@nexsenpruet.com

                                         William W. Wilkins (Fed. ID No. 4662)
                                         Andrew A. Mathias (Fed. ID No. 10166)
                                         Konstantine P. Diamaduros (Fed. ID No. 12368)
                                         NEXSEN PRUET, LLC
                                         104 S. Main Street, Suite 900

Greenville, SC 29601
Telephone: 864.370.2211
BWilkins@nexsenpruet.com
AMathias@nexsenpruet.com
KDiamaduros@nexsenpruet.com

Rhett D. Ricard (Fed. ID No. 13549)
NEXSEN PRUET, LLC
205 King Street, Suite 400
Charleston, SC 29401
Telephone: 843.720.1707
RRicard@nexsenpruet.com

*Counsel for House Defendants*