**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | |
|---|---|
| THE SOUTH CAROLINA STATE CONFERENCE OF THE NAACP, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> THOMAS C. ALEXANDER, *et al.*, <br><br> Defendants. | Case No.  3:21-cv-03302-MGL-TJH-RMG <br><br><br> **<u>SENATE DEFENDANTS' AND HOUSE DEFENDANTS' PROPOSED CONCLUSIONS OF LAW</u>** |

Pursuant to this Court's order of October 14, 2022, *see* Dkt. No. 455, the Senate Defendants and the House Defendants submit the following proposed conclusions of law.

**<u>INTRODUCTION</u>**

1.     "The Constitution entrusts States with the job of designing congressional districts." *Cooper v. Harris*, 137 S. Ct. 1455, 1463 (2017).

2.     Indeed, redistricting "is primarily the duty and responsibility of the State," and "[f]ederal-court review of districting legislation represents a serious intrusion on the most vital of local functions." *Miller v. Johnson*, 515 U.S. 900, 915 (1995).

3.     "'Electoral districting is a most difficult subject for legislatures,' requiring a delicate balancing of competing considerations." *Bethune-Hill v. Virginia State Bd. of Elections*, 137 S. Ct. 788, 797 (2017) (quoting *Miller*, 515 U.S. at 915).  "States must have discretion to exercise the political judgment necessary to balance competing interests," and "the good faith of a state legislature must be presumed." *Miller*, 515 U.S. at 915.

4.     Accordingly, federal courts must "exercise extraordinary caution in adjudicating claims that a State has drawn district lines on the basis of race." *Id.* at 915–16; *see Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018).

1

5.      Such caution is "especially appropriate … where the State has articulated a legitimate political explanation for its districting decision, and the voting population is one in which race and political affiliation are highly correlated." *Easley v. Cromartie*, 532 U.S. 234, 242 (2001) (*Cromartie II*).

6.      Thus, as this Court has explained, Plaintiffs bear a "heavy" burden of proof on their challenge to the Congressional redistricting plan the South Carolina General Assembly enacted earlier this year (the "Enacted Plan").  Dkt. No. 397 at 7; *see Cooper*, 137 S. Ct. at 1479; *Cromartie II*, 532 U.S. at 241.

7.      Although Plaintiffs initiated this suit with sweeping allegations that the General Assembly "used its redistricting power to … discriminate against [b]lack voters," Dkt. No. 267 ¶ 1, this Court was quick to note that "the evidence at trial may tell a different story," Dkt. No. 291 at 6.

8.      The trial evidence did just that.  As set out below, not only did Plaintiffs wholly fail to carry their burden to prove their claims of racial gerrymandering and intentional discrimination, but the evidence in fact confirmed that the Enacted Plan was based on traditional race-neutral districting principles rather than race.

9.      The Court enters judgment for Defendants.

# I.    PLAINTIFFS FAILED TO PROVE THEIR RACIAL GERRYMANDERING CLAIM

## A.    Plaintiffs Failed To Carry Their Demanding Burden On Their Racial Gerrymandering Claim

10.      As noted, Plaintiffs bear a "demanding" burden to prove their racial gerrymandering claim.  *Cooper*, 137 S. Ct. at 1479 (quoting, *e.g.*, *Cromartie II*, 532 U.S. at 241); *see* Dkt. No. 397 at 7 (discussing Plaintiffs' "heavy" burden).

11.     To carry this burden, Plaintiffs "must prove that 'race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district.'" *Cooper*, 137 S. Ct. at 1463 (quoting *Miller*, 515 U.S. at 916); *see* Dkt. No. 397 at 4.

12.     This requires Plaintiffs to prove that race was the General Assembly's "dominant and controlling consideration," *Shaw v. Hunt*, 517 U.S. 899, 905 (1996) (*Shaw II*), such that the General Assembly "subordinated" race-neutral districting principles to "racial considerations," *Cooper*, 137 S. Ct. at 1463–64 (quoting *Miller*, 515 U.S. at 916); *see* Dkt. No. 397 at 4.

13.     Moreover, because Plaintiffs allege that race is highly correlated with political affiliation in South Carolina, Plaintiffs must decouple race from politics and prove that "race *rather than* politics" predominantly motivated the Enacted Plan. *Cromartie II*, 532 U.S. at 243. In other words, Plaintiffs must "disentangle race from politics and prove that the former drove a district's lines." *Cooper*, 137 S. Ct. at 1473; *see* Dkt. No. 397 at 4.

14.     This requires Plaintiffs to prove that that "the legislature could have achieved its legitimate political objectives in alternative ways that are comparably consistent with traditional districting principles"—and "that those districting alternatives would have brought about significantly greater racial balance"—compared to the Enacted Plan. *Cromartie II*, 532 U.S. at 258.

15.     To do so, Plaintiffs "need an alternative map" here, where they "ha[ve] meager direct evidence of a racial gerrymander and need[] to rely on evidence of forgone alternatives." *Cooper*, 137 S. Ct. at 1481 (in such cases, "only" an alternative map can "carry the day").

16.     Where race and politics are correlated, disentangling them is critical because "political and racial reasons are capable of yielding similar oddities in a district's boundaries,"

*id.* at 1473, and "a jurisdiction may engage in constitutional political [line-drawing], even if it so happens that the most loyal Democrats happen to be black Democrats and even if the State were conscious of that fact," *Hunt v. Cromartie*, 526 U.S. 541, 551 (1999); *accord Rucho v. Common Cause*, 139 S. Ct. 2484, 2497 (2019).

17.    The gravamen of Plaintiffs' racial gerrymandering claim is that the General Assembly engaged in unconstitutional "packing" and "cracking" by moving—or, in some instances, failing to move—African-American voters into or out of District 6. *See* Dkt. No. 267 ¶ 7.

18.    Plaintiffs' theory of liability, however, cannot withstand scrutiny. For starters, Plaintiffs have not challenged District 6 as a racial gerrymander or alleged that voters in District 6 are victims of cracking or packing. *See* Dkt. No. 397 at 2; Tr., vol. I, at 43:2. To the contrary, Plaintiffs admit that voters in District 6 are not cracked because Enacted District 6 "may still be an effective district for Black voters." *See* Dkt. No. 267 ¶ 149. And they cannot claim that voters in District 6 are packed because all of their alternative plans place significantly more African-Americans of voting age in District 6 than the Enacted Plan. *See* FOF ¶¶ 487, 640, 656, 680, 705.

19.    Instead, Plaintiffs have challenged Districts 1, 2, and 5 as alleged racial gerrymanders because of how the Enacted Plan either perpetuated or changed the lines between each of those districts and District 6. *See, e.g.*, Dkt. No. 267 ¶¶ 5, 8, 150–53, 163–70. Thus, Plaintiffs attempt to challenge only one side of the same district lines—the District 1, 2, and 5 side—and *not* the mirror-image District 6 side. *See id.* Plaintiffs, however, nowhere explain how the lines between Districts 1 and 6, Districts 2 and 6, and Districts 5 and 6 somehow result in racial gerrymanders in Districts 1, 2, and 5 but not in District 6. Indeed, if anything, any racial

predominance in the lines involving District 6 and *three other districts* would have *triply* infected District 6 with racial gerrymandering compared to each of Districts 1, 2, and 5.  Yet Plaintiffs have not challenged District 6 as a racial gerrymander.

20.     Moreover, Plaintiffs' challenges to Districts 2 and 5 fail under their own proposed alternative plans.  Plaintiffs' central contention is that the General Assembly engaged in cracking or packing of African-American voters in order to "limit" their "ability to elect" candidates of their choice or "even influence elections."  Dkt. No. 267 ¶ 171.  Plaintiffs' own evidence demonstrated that African-American voters' candidates of choice in South Carolina are Democratic candidates.  *See* FOF ¶ 913.

21.     The alternative versions of Districts 2 and 5, however, do not provide African-American voters the "ability to elect" candidates of their choice or "even influence elections."  Dkt. No. 267 ¶ 171.  According to the election analysis conducted by Plaintiffs' own putative expert Dr. Duchin, *none* of the alternative versions of Districts 2 or 5 proposed to the General Assembly or in this litigation generates a win for the African-American candidate of choice/Democratic candidate.  *See* FOF ¶¶ 644, 646, 661, 663, 689, 688, 712, 714.  In fact, the African-American candidate of choice/Democratic candidate receives a *lower* vote share in *every* alternative version of District 2 than the candidate receives in Enacted District 2.  *See* FOF ¶¶ 645, 662, 687, 713.  And that candidate receives a lower vote share in every alternative version of District 5, other than the Amendment 2a version proposed by Senator Harpootlian, than the candidate receives in Enacted District 5.  *See* FOF ¶¶ 647, 664, 715.

22.     To be sure, the alternative versions of District 1 proposed to the General Assembly and in this litigation generate wins for the African-American candidate of choice/ Democratic candidate in certain past election contests.  *See* FOF ¶¶ 643, 660, 684, 710.  But Dr.

Duchin acknowledged that these results reflect "significant white crossover voting," and Dr. Liu similarly conceded the presence of "white crossover voting" in these results.  FOF ¶¶ 809, 916.

23.     In particular:

    a.     District 1 in NAACP Plan 1 has a BVAP of 34.02% and a Democratic vote share of 52.6%, FOF ¶¶ 640, 643;

    b.     District 1 in NAACP Plan 2 has a BVAP of 23.26% and a Democratic vote share of 52.5%, FOF ¶¶ 656, 660;

    c.     District 1 in the Amendment 2a Plan has a BVAP of 20.58% and a Democratic vote share of 51.83%, FOF ¶¶ 680, 684; and

    d.     District 1 in the League of Women Voters Plan has a BVAP of 22.57% and a Democratic vote share of 51.75%, FOF ¶¶ 705, 710.

24.     Plaintiffs therefore seek a Congressional map that places more white Democrats in District 1 (and moves Republicans to neighboring districts) and thereby makes District 1 a district where African-American voters can form a coalition with white crossover voters to "elect" their preferred candidates or "influence" the outcome of elections.  Dkt. No. 267 ¶ 171.

25.     But there is no "right to form political coalitions," *Bartlett v. Strickland*, 556 U.S. 1, 15 (2009), and "[a] redistricting plan that does not adversely affect a minority group's potential to form a majority in a district, but rather diminishes its ability to form a political coalition with other racial or ethnic groups, does not result in vote dilution on account of race," *Hall v. Virginia*, 385 F.3d 421, 431 (4th Cir. 2004); *see Baten v. McMaster*, 967 F.3d 345, 360–61 (4th Cir. 2020) (similar).

26.     For these reasons, Plaintiffs' racial gerrymandering claim fails as a matter of law.

27. Moreover, in all events, and as discussed below, Plaintiffs failed to carry their demanding burden on the racial gerrymandering claim against Districts 1, 2, or 5.

28. The Court enters judgment for Defendants on that claim.

**B.    Plaintiffs Failed To Prove That The General Assembly Subordinated Traditional Race-Neutral Districting Principles To Race**

29. "[T]raditional race-neutral principles that guide redistricting in South Carolina" include, among others, (a) the preservation of district cores, (b) the preservation of political subdivisions, voting districts, and communities of interest, (c) compactness and contiguity, (d) the protection of incumbents, and (e) the preservation of partisan advantage. *Backus*, 857 F. Supp. 2d at 562–63; *see Cooper*, 137 S. Ct. at 1464; *Miller*, 515 U.S. at 916; *Raleigh Wake Citizens Ass'n v. Wake Cnty. Bd. of Elections*, 827 F.3d 333, 352 (4th Cir. 2016).

30. Plaintiffs failed to prove that the General Assembly subordinated these principles to race.

> **1.    *Plaintiffs' Challenge To The Benchmark Lines Preserved In The Enacted Plan Fails Because The Benchmark Plan Was Proven To Comply With Traditional Race-Neutral Districting Principles***

31. Plaintiffs purport to challenge both the district lines that Enacted Districts 1, 2, and 5 preserved from the Benchmark Plan and the changes that the Enacted Plan made to the lines between Districts 1 and 6, Districts 2 and 6, and Districts 5 and 6. *See supra* ¶ 19.

32. Plaintiffs' challenge to the district lines preserved from the Benchmark Plan fails because the *Backus* Court already upheld those lines as comporting with traditional districting principles.

33. Indeed, in *Backus*, this Court held not only that the challengers failed to carry their burden to prove that race predominated in the Benchmark Plan, but also that the defendants affirmatively "*disprove[d]* that race was the predominant factor" and "*demonstrate[ed]* that their

decisions adhered to traditional race-neutral principles."  857 F. Supp. 2d at 560 (emphasis added).

34.    Thus, in other words, the *Backus* Court upheld the Benchmark Plan at step one of the racial gerrymandering analysis—that race did not predominate.  The *Backus* Court never addressed step two of the analysis—whether the Benchmark Plan was narrowly tailored to comply with Section 5.  *See id.*

35.    Using the constitutional Benchmark Plan as a starting point, Mr. Roberts and the Senate staff made minimal changes in developing the Senate Staff Plan and the Enacted Plan.  *See* FOF ¶¶ 420, 422, 426-27, 474, 490, 493, 1132.  Indeed, both the Senate Staff Plan and the Enacted Plan were widely recognized as "least-change map[s]" or "minimal change plan[s]."  FOF ¶¶ 426-27; *see also* FOF ¶¶ 420, 422, 474, 490, 493, 1132.  This approach helped ensure that the Enacted Plan carried forward the Benchmark Plan's compliance with traditional race-neutral districting principles and made only changes aimed at achieving race-neutral objectives.

36.    In particular, this approach—starting with and making minimal changes to the Court-upheld Benchmark Plan—helped ensure that the Enacted Plan preserves the cores of existing districts, balances population, respects previously made policy choices, respects communities of interests, and keeps incumbents in districts with their core constituents.  *See* FOF ¶¶ 319-21.

37.    Plaintiffs have suggested that the Enacted Plan instead carries forward racial motivations that allegedly predominated in the Benchmark Plan.  Specifically, Plaintiffs have suggested that (1) the Benchmark Plan, particularly Benchmark District 6, was tainted by racial considerations because it was drawn to comply with Section 5 of the Voting Rights Act, (implying that *Backus* held that the Benchmark Plan was predominantly based on race but

survived strict scrutiny because South Carolina proved a Section 5 defense); and (2) the Enacted

Plan carries forward an impermissible racial motivation by preserving district cores.  *See* Tr., vol.

I, at 42:24–46:17, 50:2–11 (Court inquiry regarding this issue).

38.     But Plaintiffs' suggestion fails to carry their burden for three reasons.

39.     *First*, Plaintiffs have repeatedly and adamantly waived any argument challenging

District 6 under the Enacted Plan.  *See, e.g.*, *id.* at 43:2 (Plaintiffs' Counsel: "There is no

challenge to CD 6."); *see also* Dkt. No. 397 at 2 (noting that Plaintiffs challenge only Districts 1,

2, and 5).

40.     Due to Plaintiffs' waiver of this argument, this Court may not raise it *sua sponte*.

In accordance with the "principle of party presentation," "[c]ourts are essentially passive

instruments of government" that are limited to "decid[ing] *only* questions presented by the

parties" absent "extraordinary circumstances," and Plaintiffs have not even attempted to argue

that such circumstances exist here.  *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579, 1581

(2020) (emphasis added); *see Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 712 (4th

Cir. 2021).

41.     Without any argument challenging District 6 under the Enacted Plan, Plaintiffs

have no basis to argue that the alleged racial motivations underlying Benchmark District 6 were

somehow carried forward by the *other* districts they challenge in the Enacted Plan.

42.     *Second*, Plaintiffs wholly misunderstand *Backus*.

43.     Contrary to Plaintiffs' suggestion, *Backus* never addressed whether Benchmark

District 6 or the Benchmark Plan was drawn to comply with Section 5 or whether a Section 5

defense was available for the Benchmark Plan.  To the contrary, *Backus* never even *addressed*

that issue because it held that the challengers did *not* prove that race predominated in the

Benchmark Plan—and, in fact, that the General Assembly had proven that race did not predominate. 857 F. Supp. 2d at 560. There is no basis to Plaintiffs' suggestion that the Benchmark Plan was motivated by race or compliance with Section 5, let alone that such motivations drove the Enacted Plan. Instead, the Enacted Plan carried forward the Benchmark Plan's compliance with traditional race-neutral districting principles.

44.    Put another way, *Backus* held that the 2012 General Assembly's intent in enacting Benchmark District 6 was to comply with governing law by "adher[ing] to traditional race-neutral principles," not to adopt an unlawful racial gerrymander. 857 F. Supp. 2d at 560. Because no predominantly racial motivation drove the Benchmark Plan, no such motivation could have been carried forward in the Enacted Plan.

45.    *Third*, the 2012 General Assembly's intent in enacting the Benchmark Plan does not dictate its intent in adopting the Enacted Plan.

46.    This Court already recognized as much, holding that evidence concerning past redistricting cycles does not bear on "the intent of any legislator [or] the South Carolina General Assembly as a whole[]" in voting for plans this cycle. Dkt. No. 153 at 13, 17.

47.    Likewise, the Supreme Court has repeatedly explained that a legislature's past intent does not determine its current intent. "'[P]ast discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful'"; instead, "what matters" is the intent of the current legislature. *Abbott*, 138 S. Ct. at 2324 (quoting *City of Mobile v. Bolden*, 446 U.S. 55, 74 (1980) (plurality opinion)); *see infra* ¶¶ 210-12; *see also, e.g.*, *McCleskey v. Kemp*, 481 U.S. 279, 298 n.20 (1987) (courts "cannot accept official actions taken long ago as evidence of current intent").

48.    *Abbott* is on point.  There, the Supreme Court upheld a redistricting plan that was adopted by the 2013 Texas Legislature and made minimal changes to a lawful plan drawn by a court using a previously challenged 2011 plan as a starting point.  *Id.* at 2325.  Although the challengers argued that the 2013 plan was unlawful because it did not "cure the taint" of allegedly discriminatory intent behind the 2011 plan, the Supreme Court held that the intent behind the 2011 plans did not control, particularly because the 2013 Legislature had hewed to the lawful court-drawn plan.  *Id.*  The Supreme Court explained that "[u]nder these circumstances, there can be no doubt [that] what matters … is the intent of the 2013 Legislature," and "[t]he 2013 Legislature was not obligated to show that it had 'cured' the unlawful intent that the court attributed to the 2011 Legislature."  *Id.* at 2313, 2325.

49.    Indeed, *Abbott* confirms that courts "must" analyze intent by "look[ing] to the most recent enactment of the challenged provision, not the original [allegedly] tainted version," and courts may not require the recent enactment to "purge[]" the prior intent.  *Harness v. Watson*, 47 F.4th 296, 306–07 (5th Cir. 2022) (en banc).

50.    Accordingly, "what matters" here is the intent of the 2022 General Assembly, not the intent of the 2012 General Assembly concerning the Benchmark Plan.  *Abbott*, 138 S. Ct. at 2325. In adopting the Enacted Plan, the 2022 General Assembly hewed to a court-upheld Benchmark Plan while making changes to ensure population balance and compliance with other traditional districting principles.  FOF ¶¶ 318, 322-23; *see Abbott*, 138 S. Ct. at 2325.  Thus, the 2022 General Assembly was under no obligation to "cure" the (lawful and non-discriminatory) intent of the 2012 General Assembly that originally adopted the Benchmark Plan; the intent of the 2022 General Assembly controls.  *See Abbott*, 138 S. Ct. at 2324–25; *Harness*, 47 F.4th at 306–07.

11

2. *Plaintiffs Failed To Prove That Race Predominated In The Enacted Plan's Changes To District 1, 2, or 5*

51.    Plaintiffs next attempt to carry their heavy burden to prove that race was the General Assembly's "dominant and controlling consideration," *Shaw II*, 517 U.S. at 905, such that it "subordinated" traditional race-neutral districting principles to race, *Cooper*, 137 S. Ct. at 1463–64 (quoting *Miller*, 515 U.S. at 916); *see* Dkt. No. 397 at 4, by focusing on the Enacted Plan's changes to the district lines.  This effort also fails.

52.    In particular, Plaintiffs claim that specific changes the Enacted Plan made to lines in Districts 1, 2, and 5 (but somehow not the corresponding changes to lines in District 6) were predominantly motivated by race.  *See supra* ¶ 19.

53.    But the Enacted Plan's changes to the Benchmark District lines were based on requests received by Senate staff, public testimony, compliance with traditional race-neutral districting principles, and politics—not race.  *See* FOF ¶¶ 499-563.

54.    In particular, the Enacted Plan's changes involving the counties where Plaintiffs have raised challenges were not based on race, let alone a product of racial predominance.  Those changes reflect requests received by Senate staff, public testimony, compliance with traditional districting principle, and politics.  *See* FOF ¶¶ 500-04 (Jasper County); FOF ¶¶ 505-10 (Beaufort and Colleton Counties);  FOF ¶¶ 511-15 (Orangeburg County);  FOF ¶¶ 516-20 (Richland County);  FOF ¶¶ 521-25 (Sumter County);  FOF ¶¶ 526-29 (Florence County);  FOF ¶¶ 530-35 (Berkeley County);  FOF ¶¶ 536-42 (Dorchester County);  FOF ¶¶ 543-63 (Charleston County).

55.    Moreover, the Enacted Plan's changes to the line between Districts 1 and 6, including in Charleston County, were based on requests received by Senate staff, traditional race-neutral districting principles, and politics—not race.  *See* ¶¶ 564-89.

56.     In fact, the Enacted Plan's changes to the line between Districts 1 and 6 increase *both* District 1's Republican vote share *and* its BVAP percentage.  FOF ¶ 572.  The political effect of those changes—a 1.36% increase in District 1's Republican vote share—dwarfs their racial effect—a 0.16% increase in District 1's BVAP.  FOF ¶¶ 566-67.  These figures demonstrate that politics rather than race drove the Enacted Plan's changes to the line between Districts 1 and 6.

### 3.     *Plaintiffs' Putative Experts Failed To Control For Race-Neutral Principles, So Their Analyses Are Incomplete And Unpersuasive*

57.     Plaintiffs have relied heavily on four putative experts—Drs. Imai, Liu, Ragusa, and Duchin—who performed data analyses purporting to assess the role of race in the Enacted Plan.  *See* FOF ¶¶ 743, 806, 834, 854.

58.     Each of these putative experts, however, committed the same fatal error as the expert this Court rejected in *Backus*.

59.     There, the racial gerrymandering claim failed in part because the challengers' putative expert "failed to consider all the traditional race-neutral principles that guide redistricting in South Carolina" and, thus, this Court rejected the putative expert's analysis as "problematic," "incomplete," "unconvincing," and insufficient to carry the challengers' burden.  *Backus*, 857 F. Supp. 2d at 562–63.  Indeed, this Court held that the putative expert "was unable to provide the Court a reliable opinion that the General Assembly subordinated traditional race-neutral principles to race."  *Id.* at 563.

60.     Like the expert whose analysis could not carry the challengers' burden in *Backus*, each of Plaintiffs' putative experts "failed to consider all the traditional race-neutral principles that guide redistricting in South Carolina."  *Id.*; *see* FOF ¶¶ 759-69 (Dr. Imai), 817-29 (Dr. Liu), 852-53 (Dr. Ragusa), 895-900 (Dr. Duchin).

61.    In fact, each of Plaintiffs' putative experts failed to control for *numerous* race-neutral principles.  *See* FOF ¶¶ 759-69 (Dr. Imai), 817-29 (Dr. Liu), 852-53 (Dr. Ragusa), 895-900 (Dr. Duchin).

62.    For example, Dr. Imai's simulation analysis did not control for core preservation, avoiding VTD splits, preserving communities of interest, politics, partisan performance, or any constraint related to the Benchmark Plan, including the location or district assignment of VTDs or African-American voters under the Benchmark Plan.   FOF ¶¶ 759-69.

63.    Dr. Liu's "empirical study" and "verification study" purporting to examine race and politics in the Enacted Plan did not control for core preservation, avoiding VTD splits, preserving communities of interest, incumbency protection, the distance between the VTD and the district line, compactness, where African-American voters live locationally, or even contiguity.  FOF ¶¶ 817-29.

64.    Dr. Ragusa's "envelope analysis" did not control for core preservation, compactness, contiguity, avoiding VTD splits, avoiding political subdivision splits, compactness, partisan performance, politics, or communities of interest.  FOF ¶¶ 852-53.

65.    Dr. Duchin's "ensemble method" did not control for core preservation, incumbency protection, partisan performance, or communities of interest other than the few she deemed important.  FOF ¶¶ 895-900.

66.    As a result, these putative experts' analyses—and their "opinion[s] that race predominated"—are "incomplete and unconvincing" and cannot carry Plaintiffs' burden.  *Backus*, 857 F. Supp. 2d at 562–63.  Indeed, these putative experts are "unable to provide the Court a reliable opinion that the General Assembly subordinated traditional race-neutral principles to race."  *Id.* at 563.

14

67.     Put differently, because Plaintiffs' experts did not control for numerous race-neutral districting principles, their analyses did not "as a matter of logic ... eliminate other equally plausible causes" of the features of the Enacted Plan they observed and therefore are unpersuasive.  *Goodman v. Revco Disc. Drug Centers, Inc.*, No. 3:03-CV-2657, 2005 WL 6740407, at *4 (D.S.C. Aug. 18, 2005) (quoting *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999)); *see Templeton v. Bishop of Charleston*, No. 2:18-CV-02003, 2021 WL 3419442, at *6 (D.S.C. Aug. 5, 2021); *In re Pella Corp.*, 214 F. Supp. 3d 478, 483–85, 498 (D.S.C. 2016); *In re Lipitor Mktg., Sales Pracs. & Prod. Liab. Litig.*, 185 F. Supp. 3d 761, 781–82 (D.S.C. 2016); *Bishop v. Triumph Motorcycles (Am.) Ltd.*, No. 3:18-CV-186, 2021 WL 4316810, at *8 (N.D.W. Va. Sept. 22, 2021); *Hall v. Thomas*, 753 F. Supp. 2d 1113, 1149 (N.D. Ala. 2010); *see also In re Wholesale Grocery Prod. Antitrust Litig.*, 946 F.3d 995, 1003 (8th Cir. 2019) (affirming exclusion of expert whose analysis "failed to incorporate economic realities").

### 4.     *Dr. Liu's And Dr. Ragusa's Failure To Consider Contiguity Is Fatal To Their Envelope Analysis*

68.     In *Cromartie II*, the Supreme Court rejected an analysis substantially similar to the "envelope analysis" used by both Dr. Liu and Dr. Ragusa.  *See* FOF ¶¶ 827, 844.

69.     In particular, one of the *Cromartie II* plaintiffs' putative experts examined "all precincts in the six counties, portions of which ma[de] up" the challenged District 12.  *Cromartie II*, 532 U.S. at 247.

70.     The putative expert observed that precincts included in District 12 were more heavily African-American than the precincts excluded from District 12.  He therefore concluded that race predominated in the North Carolina General Assembly's selection of precincts to include in District 12.  *See id.*

71.    The Supreme Court rejected that analysis for two reasons.  *First*, the putative expert did not control for the fact that the more heavily African-American precincts were also more heavily Democratic than the other precincts and, therefore, failed to decouple race and politics. *See id.*

72.    *Second*, the putative expert had failed to demonstrate that any of the excluded precincts "were located near enough to District 12's boundaries or each other for the legislature as a practical matter to have drawn District 12's boundaries to have included them, without sacrificing other important political goals." *Id.*

73.    The envelope analysis employed by Dr. Liu and Dr. Ragusa suffers from the same flaw.

74.    By their own admission, Dr. Liu's and Dr. Ragusa's envelope analysis does not control for contiguity, one of the most "fundamental" districting principles. *Johnson v. Miller*, 864 F. Supp. 1354, 1384 (S.D. Ga. 1994), *aff'd*, 515 U.S. 900 (1995); FOF ¶¶ 827-28, 852.

75.    Dr. Liu's and Dr. Ragusa's envelope analysis treats all VTDs within a county as equally available to be placed in the same district, including VTDs that are not contiguous with the district or other VTDs in the district.  FOF ¶ 828; *Cromartie II*, 532 U.S. at 247 (putative expert examined "all precincts in the six counties, portions of which make up" the challenged District 12).

76.    The envelope approach treats all VTDs in Beaufort, Berkeley, Charleston, Colleton, Dorchester, and Jasper Counties as equally available for placement in District 1, even though those VTDs in total contain too much population for a single district.  FOF ¶ 829.

77.     By failing to control for contiguity, Dr. Liu and Dr. Ragusa cannot show that any precincts in the "envelopes" they identify "were located near enough to [a district's] boundaries

or each other for the legislature as a practical matter to have drawn [a district's] boundaries to have included them, without sacrificing other important political goals." *Cromartie II*, 532 U.S. at 247.

### 5. Dr. Imai's Simulation Analysis And Dr. Duchin's Ensemble Method Did Not Properly Control For The Factors They Did Consider

78.    Dr. Imai's simulation analysis and Dr. Duchin's ensemble method are also "problematic," "incomplete," and "unconvincing," *Backus*, 857 F. Supp. 2d at 562–63, because Dr. Imai and Dr. Duchin did not properly control for the criteria they did consider, *see In re Pella Corp.*, 214 F. Supp. 3d at 494 (expert analysis may not contain "analytical gap[s]").

79.    *First*, in programming their algorithms, Drs. Imai and Duchin did not adhere to the Guidelines' directives regarding population balance, *see* FOF ¶¶ 777, 901, compactness, *see* FOF ¶¶ 778-81, 856, or preservation of cores, FOF ¶¶ 770, 896.  Their failure to analyze the Enacted Plan in accordance with the "the guidelines and criteria that the General Assembly devised" is "[p]articularly troubling" and prevented them from properly "understanding" the General Assembly's redistricting decisions. *Backus*, 857 F. Supp. 2d at 562.

80.    *Second*, Dr. Imai's and Dr. Duchin's analyses did not adhere to governing legal constraints with respect to population equality.  *See* FOF ¶¶ 777, 901.  These errors are particularly egregious given that Dr. Imai's own prior study dictates that "successful … sampling methods must … incorporate[] realistic legal constraints."  FOF ¶¶ 771-72.

81.    Worse still, Dr. Duchin disregarded governing legal constraints by assuming that the General Assembly was obligated to use race in a manner that predominated over traditional districting principles.  *See* FOF ¶¶ 921-22.  This turned the governing law on its head: Dr. Duchin treated subordination of traditional districting principles as the General Assembly's *obligation* rather than the constitutional *violation* she purported to be testing for.  *See id.*  Dr.

Duchin's flawed premise tainted her entire analysis and alone rendered it unpersuasive. *See Tyger Const. Co. Inc. v. Pensacola Const. Co.*, 29 F.3d 137, 143 (4th Cir. 1994) (rejecting opinion based on a "faulty assumption"); *In re Lipitor Mktg., Sales Pracs. & Prod. Liab. Litig.*, No. 2:14-MN-02502, 2016 WL 2940784, at *5 (D.S.C. May 6, 2016) (similar); *see also Walker v. Contra Costa Cnty.*, No. 03-C-3723, 2006 WL 3371438, at *4–5 (N.D. Cal. Nov. 21, 2006) (rejecting "discriminatory intent" expert because she "misunderst[ood]" the governing law); *Exela Pharma Scis., LLC v. Eton Pharms., Inc.*, No. 20-CV-0365, 2022 WL 806524, at *3 (D. Del. Feb. 8, 2022) (collecting cases rejecting expert reports "premised on a misunderstanding of the law").

82.    Dr. Imai's analysis suffers from the same flaw because he programmed the algorithm to draw his statewide simulation plans with a BVAP "target" that could not be "compromise[d]." FOF ¶¶ 792-93. In other words, Dr. Imai's statewide simulation plans were drawn based upon race and, in fact, were racial gerrymanders. *See id.*; *Shaw II,* 517 U.S. at 907 (racial gerrymander exists where "race was the criterion that . . . could not be compromised"); *Cooper*, 137 S. Ct. at 1469 (finding racial gerrymander where "racial target had a direct and significant impact" on how the challenged lines were drawn).

83.    *Third*, Dr. Imai's analysis is fatally undermined by his own prior study, which affirms that in some cases algorithms based on the Markov Chain Monte Carlo approach do not yield a representative sample and instead generate sample plans that are systematically different from the true set of valid plans. *See* FOF ¶¶ 743, 757-58.

84.    *Fourth*, Dr. Duchin's communities-of-interest analysis is fundamentally flawed. Dr. Duchin considered only a few communities of interest that she hand-picked based on her qualitative reading of the public testimony. *See* FOF ¶ 862. She admitted that the public

testimony "definitely" was not representative of South Carolina voters, that "reasonable people" could identify different communities of interest than she did, and that she did not even quantify the number of public comments regarding each community of interest.  FOF ¶¶ 866-67, 869-70. She also admitted that she did not review thousands of emails regarding redistricting that were submitted to the General Assembly and that she ignored communities of interest that were "definitely" relevant to redistricting and were even identified in the public testimony.  FOF ¶¶ 864, 868.  As Dr. Duchin's own admissions make clear, her method of reading transcripts and "cherry-picking" preferred communities of interest lacks the "intellectual rigor" necessary to constitute persuasive expert testimony.  *In re Lipitor Mktg., Sales Pracs. & Prod. Liab. Litig.*, 892 F.3d 624, 631–32, 634 (4th Cir. 2018).  Indeed, the *Backus* Court flatly rejected expert testimony that similarly failed to consider significant "sources of information."  857 F. Supp. 2d at 562; *see Hines v. Wyeth*, No. CIV.A. 2:04-0690, 2011 WL 2680842, at *7 (S.D.W. Va. July 8, 2011) (rejecting testimony of expert who merely "read[] and summariz[ed]" documents that the trier of fact could review "on its own"); *Lippe v. Bairnco Corp.*, 288 B.R. 678, 688 (S.D.N.Y. 2003) (rejecting expert who sought to testify on intent by providing a "summation" of relevant facts); *see also City of Huntington v. AmerisourceBergen Drug Corp.*, No. 3:17-CV-1362, 2021 WL 1320716, at *2 (S.D.W. Va. Apr. 8, 2021) (collecting cases rejecting expert testimony that "merely regurgitates" admissible materials).

### 6.    *Plaintiffs' Putative Experts Committed Other Errors That Render Their Analyses And Testimonies Unpersuasive*

85.    Putative expert analysis and testimony is unpersuasive, if not inadmissible, unless it is shown to be (a) based on "scientific, technical, or other specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue," (b) "based on sufficient facts or data," and (c) "the product of reliable principles and methods" that have been

"reliably applied … to the facts of the case." Fed. R. Evid. 702; *see* Dkt. No. 393 at 5 (explaining that compliance with these criteria may affect the "weight" accorded to expert testimony at trial). Put differently, expert testimony must "rest[] on a reliable foundation" and be "relevant to the task at hand." *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 281 (4th Cir. 2021) (quoting *Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017)). Indeed, because faulty expert testimony can be "quite misleading," expert testimony must be based on "'intellectual rigor'" rather than the "ipse dixit" of the putative expert. *In re Lipitor Mktg., Sales Pracs. & Prod. Liab. Litig.*, 892 F.3d at 631–32; *see also Holesapple v. Barrett*, 5 F. App'x 177, 179 (4th Cir. 2001).

86.   Plaintiffs' experts violated these requirements in numerous ways.

87.   *First*, Plaintiffs' experts used a flawed dataset and failed to verify it. Drs. Liu, Imai, and Duchin used a flawed and unverified dataset provided by Plaintiffs' counsel, *see* FOF ¶¶ 721-39, and Dr. Liu did not even use accurate data on VTD splits or attempt to verify the accuracy of his data on VTD splits, *see* FOF ¶¶ 722-23, 729-30.

88.   *Second*, Plaintiffs' experts failed to control for the fact that race did not predominate in the Benchmark Plan on which the Enacted Plan was based. That is, they analyzed the Enacted Plan as a whole rather than the changes it made to the Benchmark Plan. As a result, they did not take into account the fact that the Enacted Plan was adopted based not on a blank slate, but rather on a Benchmark Plan that complied with traditional race-neutral districting principles. *See* FOF ¶¶ 760, 769-70, 773, 818-19, 852, 896; *see Backus*, 857 F. Supp. 2d at 562 (rejecting expert testimony that failed to consider information reflecting "what the General Assembly professed to be following"). This oversight is particularly glaring given that Dr. Imai admitted that the Benchmark Plan "[m]ight" have "affect[ed] the range of plans available to the

map drawer" if "the map drawer had started with the [B]enchmark [P]lan," which the map drawer indisputably did.  FOF ¶ 773.

89.     *Third*, Plaintiffs' putative experts did not take account of, let alone rebut, race-neutral explanations for the Enacted Plan.  For example, Dr. Duchin did not examine whether the changes to district lines in the counties Plaintiffs identify repaired county or VTD splits.  *See* FOF ¶¶ 879, 883, 887, 889.  Dr. Imai likewise was unaware that the hook shape in Richland County keeps Fort Jackson in District 2 with Congressman Wilson and that the Enacted Plan's changes to Sumter County comport with the requests of Congressman Clyburn.  *See* FOF ¶¶ 801, 805.

90.     *Fourth*, Plaintiffs' experts committed basic errors and oversights that undermine the persuasiveness of their analyses and testimonies.  For instance:

a.      Dr. Liu's "empirical study" relied upon the results of the 2018 gubernatorial primary, but he did not know whether the Election Commission allocated all absentee ballots cast in the 2018 election to a single countywide precinct rather than the precinct of the voter's resident—even though the Election Commission had done so in the 2016 election.  FOF ¶ 816.

b.      Dr. Imai erroneously stated that "all relevant districts" in his simulation plans "are on average at least as compact as the enacted plan," when his compactness analysis was in fact plan-wide.  FOF ¶¶ 778-79.

c.      Dr. Imai also was not aware that 6 is the minimum realistic number of county splits in a plan with 7 districts, and some of his simulation plans have as few as 4 or 5 county splits.  FOF ¶ 785.

d.  For her part, Dr. Duchin asserted in her report that at least three communities of interest—Beaufort County, the Gullah-Geechee community in the Sea Islands, and Sun City—are split in the Enacted Plan when, in fact, the Enacted Plan makes them whole. FOF ¶ 871. And her report did not use accurate boundary lines for the Cities of Sumter, Charleston, North Charleston, and Columbia. FOF ¶¶ 876, 888.

91.  In sum, the evidence presented by Plaintiffs did not prove that the General Assembly subordinated traditional race-neutral districting principles to race.

**C.  The Trial Evidence Confirmed That The Enacted Plan Was Based On Traditional Race-Neutral Districting Principles, Not Race**

92.  The trial evidence not only failed to satisfy Plaintiffs' demanding burden to prove that the General Assembly subordinated traditional race-neutral districting principles to race, *see supra* Section I.B, but in fact demonstrated that the General Assembly did *not* subordinate traditional race-neutral districting principles to race and instead carefully adhered to such principles, *compare Backus*, 857 F. Supp. 2d at 560. Indeed, Mr. Roberts and the Senate staff drew Senate Amendment 1 without using race at all; instead, the map was driven by requests received by the Senate staff, public testimony, and compliance with traditional race-neutral districting principles. FOF ¶¶ 499-589. Senator Campsen—the sponsor of Senate Amendment 1, which became the Enacted Plan—considered population and politics, but not race. FOF ¶¶ 450-58. And the data below confirms that the Enacted Plan adheres to traditional race-neutral districting principles and even outperforms Plaintiffs' preferred alternatives with respect to such criteria.

### 1.     *The Enacted Plan Preserves District Cores*

93.     This Court has long recognized that "preserving the cores of existing districts" is a traditional districting principle in South Carolina—and that compliance with this principle also fosters compliance with other race-neutral principles, such as maintaining communities of interest and respecting political boundaries. *Backus*, 857 F. Supp. 2d at 560; *see Colleton Cnty. Council v. McConnell*, 201 F. Supp. 2d 618, 647, 649 (D.S.C. 2002) (three-judge court).

94.     As this Court explained when drawing South Carolina's redistricting plans in 2002, "the cores in existing districts" are generally "the clearest expression of the legislature's intent to group persons on a 'community of interest' basis, and because the cores are drawn with other traditional districting principles in mind, they will necessarily incorporate the state's other recognized interests in maintaining political boundaries, such as county and municipal lines, as well as other natural and historical communities of interest." *Colleton Cnty. Council*, 201 F. Supp. 2d at 649.

95.     The Enacted Plan preserves the cores of existing districts. *See* FOF ¶ 478.

96.     In fact, the Enacted Plan dramatically outperforms the NAACP Plans, the Amendment 2a Plan, and the League of Women Voters Plan on this metric:

**Preservation Of Cores Of Existing Districts**

| District | Enacted Plan | NAACP 1 | NAACP 2 | Amendment 2a | LWV |
|---|---|---|---|---|---|
| 1 | 92.78% | 52.23% | 72.46% | 73.39% | 70.64% |
| 2 | 96.75% | 71.69% | 51.52% | 65.71% | 64.09% |
| 3 | 94.75% | 75.30% | 86.34% | 70.38% | 91.54% |
| 4 | 98.09% | 83.00% | 87.51% | 74.35% | 97.50% |
| 5 | 95.04% | 57.15% | 79.85% | 55.23% | 81.61% |
| 6 | 77.41% | 45.53% | 46.35% | 54.34% | 50.70% |
| 7 | 99.51% | 59.77% | 99.30% | 55.83% | 83.46% |

FOF ¶¶ 478, 637, 653, 675, 700.

97.    Under the Enacted Plan, District 6's core-preservation rate of 77.41% is not quite as high as the rates of other districts, but that is to be expected given that District 6's severe underpopulation required the addition of thousands of voters, *see* FOF ¶¶ 33-34, and, in any event, the rate still significantly outstrips the 45.53–54.34% rates achieved in District 6 by the alternative plans.

98.    Thus, rather than subordinating this traditional race-neutral principle to race, the Enacted Plan carefully adheres to it.

### 2.    *The Enacted Plan Preserves Political Subdivisions, Voting Districts, And Communities Of Interest*

99.    The Enacted Plan preserves political subdivisions and voting districts. *See* FOF ¶ 480.

100.    The Enacted Plan "necessarily" preserves political subdivisions by preserving district cores. *See Colleton Cnty. Council*, 201 F. Supp. 2d at 649; *supra* ¶¶ 95-96.

101.    Moreover, as the chart below illustrates, the Enacted Plan outperforms the Benchmark Plan and the NAACP Plans in preserving counties and voting districts affecting population.  The Enacted Plan also outperforms the Amendment 2a Plan in preserving voting districts, though the latter performs better on county preservation.  And although the Enacted Plan modestly underperforms the League of Women Voters Plan in preserving counties and voting districts affecting population, it significantly outperforms the League of Women Voters Plan in preserving district cores, *see supra* ¶ 96, and partisan advantage, *see infra* ¶¶ 133-34; FOF ¶¶ 708-11.  In fact, due to the poor political performance of the League of Women Voters Plan for Republicans, Senator Campsen conveyed to Mr. Roberts that the Plan "wasn't going to go anywhere."  FOF ¶ 716.

**Preservation Of Counties and Voting Districts**

|  | Enacted Plan | Benchmark Plan | NAACP 1 | NAACP 2 | Amend. 2a | LWV |
|---|---|---|---|---|---|---|
| County Splits | 10 | 12 | 14 | 11 | 6 | 6 |
| VTD Splits Affecting Population | 13 | 52 | 24 | 53 | 17 | 12 |

FOF ¶¶ 480, 638-39, 654-55, 678-79, 703-04.

102.    The General Assembly's pursuit of the goal of minimizing voting district splits is even more evident in the specific changes between Districts 1 and 6, Districts 2 and 6, and Districts 5 and 6.

103.    The changes between Districts 1 and 6 in Charleston County eliminated all 5 voting district splits that existed in Charleston County under the Benchmark Plan.  FOF ¶ 550.

104.     The changes between Districts 2 and 6 repaired 19 of the 21 voting district splits that existed in Richland County and all 3 of the voting district splits that existed in Orangeburg County under the Benchmark Plan.  FOF ¶¶ 514, 518.

105.     And the changes between Districts 5 and 6 eliminated 5 of the 6 voting district splits that existed in Sumter County under the Benchmark Plan.  FOF ¶ 524.

106.     The Enacted Plan also preserves communities of interest.  *See* FOF ¶¶ 375, 462-65, 488, 500-03, 506-07, 512, 517, 1135, 1164.

107.     The Enacted Plan "necessarily" preserves communities of interest by preserving district cores, because "the cores in existing districts" are generally "the clearest expression of the legislature's intent to group persons on a 'community of interest' basis."  *See Colleton Cnty. Council*, 201 F. Supp. 2d at 649; *Backus*, 857 F. Supp. 2d at 562; *supra* ¶¶ 95-96.

108.     Moreover, the Enacted Plan preserves the community of interest around Fort Jackson in District 2, which is a particularly significant community of interest because it is represented by Representative Joe Wilson, a member of the House Armed Services Committee.  *See* FOF ¶¶ 375, 517, 1164; *Colleton Cnty. Council*, 201 F. Supp. 2d at 648.  None of the alternative plans preserves this community of interest.  FOF ¶¶ 648, 665, 693, 717.

109.     The Enacted Plan preserves the Sun City community of interest, which was split in the Benchmark Plan.  FOF ¶¶ 500-03.  None of the alternative plans preserves this community of interest.  FOF ¶¶ 649, 666, 694, 718.

110.     The Enacted Plan preserves the community of interest formed by the Limestone precincts in Orangeburg County and neighboring Lexington County.  FOF ¶ 512.  None of the alternative plans preserves this community of interest.  FOF ¶¶ 650, 667, 695, 719.

111.    The Enacted Plan preserves the Beaufort County community of interest.  *See* FOF ¶ 506.

112.    The Enacted Plan preserves the Sea Islands community of interest, which was split in the Benchmark Plan.  *See* FOF ¶¶ 488, 1135.

113.    The Enacted Plan preserves the community of interest around the Gullah-Geechee heritage corridor, which was split in the Benchmark Plan.  *See* FOF ¶ 507.

114.    Consistent with the Redistricting Guidelines, the Enacted Plan preserves the Republican "political" community of interest in District 1 at a 54.39% level.  SX 3 at III.A; *see* FOF ¶¶ 462-65.  None of the alternative plans preserves this community of interest.  *See* FOF ¶¶ 642-43, 659-60, 683-84, 709-10.

115.    Thus, the General Assembly complies with, rather than subordinates, these traditional race-neutral districting principles.

### 3.    The Enacted Plan Is Contiguous And Compact

116.     The Enacted Plan is contiguous.  *See* FOF ¶ 469; SX 3 at II.

117.    The Enacted Plan is compact.  *See* FOF ¶¶ 476, 527.  In fact, according to several mathematical measures of compactness, the Enacted Plan performs comparably with the Benchmark Plan and South Carolina's other redistricting plans going back to at least 1982.  *See* SX 75 at 19–20 & tbls. 5–6.

118.    The Enacted Plan did not subordinate contiguity or compactness to race.

### 4.    The Enacted Plan Protects Incumbents

119.    The Enacted Plan advances the "legitimate state goal" of protecting incumbents by "avoiding contests between [them]."  *Bush v. Vera*, 517 U.S. 952, 964 (1996) (plurality opinion); *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 412 (2006) (plurality opinion) (similar); *see* FOF ¶ 494.

120. Indeed, according to Plaintiffs' own witness Dr. Duchin, the Enacted Plan does not pair *any* incumbents. FOF ¶ 494.

121. Thus, on this metric, the Enacted Plan performs comparably with the Benchmark Plan, NAACP Plans, Amendment 2a Plan, and the revised League of Women Voters' Plan. *See id.*

### D. Plaintiffs Did Not Prove That Race Rather Than Politics Predominated in the Enacted Plan

122. Plaintiffs failed to carry their demanding burden on their racial gerrymandering claim for yet another independent reason: they failed to disentangle race from politics and prove that that "race *rather than* politics" predominantly motivated the Enacted Plan. *Cromartie II*, 532 U.S. at 243; *see Cooper*, 137 S. Ct. at 1473; Dkt. No. 397 at 4.

#### 1. The Enacted Plan Preserves Republican Partisan Advantage

123. The General Assembly pursued a "legitimate political objective," *Cromartie II*, 532 U.S. at 258, by aiming to preserve and strengthen the 6-1 Republican-Democratic district composition that existed under the Benchmark Plan, particularly by increasing District 1's Republican percentage (or "Trump number" in the 2020 election) to make the district more Republican-leaning compared to the Benchmark Plan. *See* FOF ¶¶ 411-14, 462-65, 594-97, 716.

124. The Enacted Plan preserves "partisan advantage," a longstanding and legitimate race-neutral districting principle. *Cooper*, 137 S. Ct. at 1464; *see Raleigh Wake Citizens Ass'n*, 827 F.3d at 352.

125. In particular, the Enacted Plan preserves the pro-Republican composition of six districts, and thus the 6-1 Republican-to-Democrat split with respect to Congressional districts. FOF ¶¶ 462-65.

126.    The General Assembly's consideration of politics in the Enacted Plan was contemporaneous and well known.  *See* FOF ¶¶ 590-616.

127.    Indeed, multiple legislators and nonpartisan staffers—including opponents of the Enacted Plan—testified that politics drove the General Assembly's line-drawing decisions.  *See* FOF ¶¶ 343-45, 351, 451-52, 590-616, 1060, 1142-53, 1157-59, 1167-68, 1185, 1199.

128.    As to the lines between Districts 1 and 6 in particular, areas moved into District 1 from District 6 have both a higher Republican vote share and a higher BVAP percentage than areas moved into District 6 from District 1, demonstrating that the changes were driven by politics rather than race.  FOF ¶ 572; *see* FOF ¶¶ 566-89, 1199-1200.

### 2.    *Plaintiffs Failed To Prove That Race Rather Than Politics Explains The Enacted Plan*

129.    Plaintiffs did not carry their burden to prove that the General Assembly "could have achieved its legitimate political objectives in alternative ways that are comparably consistent with traditional districting principles"—and "that those districting alternatives would have brought about significantly greater racial balance"—compared to the Enacted Plan. *Cromartie II*, 532 U.S. at 258; *see Cooper*, 137 S. Ct. at 1473.

130.    To do so, Plaintiffs needed to provide an alternative map because they "ha[ve] meager direct evidence of a racial gerrymander and need[] to rely on evidence of forgone alternatives." *Cooper*, 137 S. Ct. at 1481 (in such cases, "only" an alternative map can "carry the day").

131.    Plaintiffs, however, wholly failed to do so.

132.    Each of the alternative plans proposed to the General Assembly or in litigation—including NAACP Plan 1, NAACP Plan 2, Amendment 2a, and the League of Women Voters'

Plan—preserves less of the cores of the Benchmark Districts than the Enacted Plan and does not preserve the communities of interest that the Enacted Plan preserves. *See supra* ¶ 96.

133.    Moreover, none of those alternative plans achieves the General Assembly's political objective of maintaining the 6-1 partisan split and making District 1 more Republican-leaning. *See* FOF ¶¶ 642-43, 659-60, 683-84, 709-10.

134.    To the contrary, each of the alternative plans turns District 1 into a majority-Democratic district and results in a 5-2 Republican-to-Democrat split with respect to Congressional districts. *Id.*.

135.    At most, these alternative plans prove that it was possible to draw another majority-Democratic district where African-American voters and white crossover voters could combine to elect candidates of their choice and where Republican voters were spread to neighboring districts. *See supra* ¶¶ 22-24.

136.    Thus, far from decoupling race and politics, the alternative plans prove that politics drove the Enacted Plan.

137.    Even apart from their failure to present an adequate alternative map, Plaintiffs have presented no other evidence proving that the General Assembly could have achieved its political objective in an alternative way that comparably adheres to traditional race-neutral districting principles. *See Cooper*, 137 S. Ct. at 1473; *Cromartie II*, 532 U.S. at 258.

138.    Plaintiffs have argued that the General Assembly used race as a proxy for politics in developing the Congressional Plan. *See, e.g.*, Dkt. No. 434 at 27.

139.    But the General Assembly considered politics directly, *see supra* ¶¶ 123-28, without considering race or employing race as a proxy for politics, *see* FOF ¶¶ 324-27, 409, 459, 504, 510, 515, 520, 525, 529, 535, 542, 563.

140. Indeed, no evidence supports that the General Assembly used race to pursue its political objective.

141. Alternatively, Plaintiffs have argued that the General Assembly's political objective in the Enacted Plan was a pretextual or post hoc invention employed to conceal a predominantly racial objective, *see, e.g.*, Tr., vol. I, at 28:1–8; Dkt. No. 434 at 25, but it was not. As an initial matter, this argument cannot be squared with Plaintiffs' argument that the General Assembly used race as a proxy for politics, *see supra* ¶ 138, because the latter argument is premised on the view that the General Assembly in fact pursued a political objective (albeit by using race as a proxy).

142. More fundamentally, the General Assembly's political objective was neither a pretext nor a post hoc invention. Rather, the General Assembly's consideration of politics and partisan advantage was contemporaneous with the drawing, consideration, and adoption of the Enacted Plan, and it was well known to legislators and the public. *See* FOF ¶¶ 590-616. Indeed, the General Assembly's political objective heavily informed the line-drawing decisions in the Enacted Plan, *see* FOF ¶¶ 343-45, 351, 451-52, 590-616, 1060, 1142-53, 1157-59, 1167-68, 1185, 1199, and election data confirms that the Enacted Plan in fact achieves this political objective—unlike the alternatives proposed by Plaintiffs, *see supra* ¶¶ 124-25, 133-34.

143. For all of these reasons, Plaintiffs did not prove that "race *rather than* politics *predominantly* explains" the Enacted Plan, and their racial gerrymandering claim fails. *Cromartie II*, 532 U.S. at 243 (emphasis in original).

### E.  Plaintiffs Ask The Court To Hold That the General Assembly Was Obligated To Impose a Racial Gerrymander

144.  Confirming that they have not carried their burden, Plaintiffs' racial gerrymandering claim hinges on an untenable premise: that the General Assembly was *obligated* to impose a racial gerrymander.

145.  At bottom, Plaintiffs fault the General Assembly for not engaging in the race-conscious exercise of developing a districting plan that achieves what Plaintiffs believe is the appropriate level of "black voting strength" or "black political power." *See, e.g.*, Tr., vol. I, at 26:14–17, 29:13-16.

146.  Plaintiffs even go so far as to propose race-conscious alternative plans that redraw District 1 to increase its BVAP to up to "34%"—or *more than double* its level in either the Benchmark Plan or the Enacted Plan under the 2020 Census results. *See* FOF ¶ 640.

147.  And Plaintiffs' own expert Dr. Duchin maintains that the General Assembly should have prioritized black electoral opportunity *even if* that goal conflicted with adherence to traditional race-neutral districting principles. FOF ¶¶ 921-22.

148.  Such subordination of traditional principles to race is the essence of a racial gerrymander. *See, e.g.*, *Cooper*, 137 S. Ct. at 1469.

149.  Indeed, intentionally increasing or maximizing black voting strength is unlawful where, as here, such action would subordinate traditional principles to race and fail to satisfy strict scrutiny. *See, e.g.*, *id.* at 1464, 1469; *Miller*, 515 U.S. 917–27.

150.  Although Plaintiffs fault the General Assembly for not intentionally pursuing certain levels of black voting strength, they have not even attempted to show that such measures could satisfy strict scrutiny.

151.    Nor could they: Section 2 of the Voting Rights Act does not require or justify creating an "influence," "crossover," or coalition district where the minority group does not form a majority—which is presumably why Plaintiffs have not brought a Section 2 claim.  *See Bartlett*, 556 U.S. at 13, 23–26.

152.    Moreover, no other compelling interest can justify intentionally pursuing certain levels of black voting strength in a district where black voters do not constitute a majority but seek to form a coalition with white crossover voters to elect Democratic candidates.  *See, e.g., id.*; *Miller*, 515 U.S. at 917–27.

153.    Thus, in Plaintiffs' view, the General Assembly racially gerrymandered by declining to enact a race-conscious and unlawful racial gerrymander.  That untenable position confirms that the Court should reject Plaintiffs' claim.

154.    Similarly, the Court rejects Plaintiffs' argument that the General Assembly engaged in racial gerrymandering by declining to conduct a racially polarized voting analysis.

155.    A racially polarized voting analysis may disclose whether a legislature has an obligation or justification to engage in race-conscious line-drawing in order to comply with Section 2.  *See, e.g.*, *Collins v. City of Norfolk*, 816 F.2d 932, 936–38 (4th Cir. 1987).

156.    But there is no requirement that a legislature conduct a racially polarized voting analysis in order to avoid racial gerrymandering liability—and Plaintiffs have identified no authority that there is.

157.    Nor could any such authority exist.  The prohibition on racial gerrymandering is a *limit* on a legislature's consideration of race in redistricting, not a *requirement* that it do so.  *See, e.g.*, *Cromartie II*, 532 U.S. at 243.

158.    As a matter of law, the General Assembly's decision not to consider race—through a racially polarized voting analysis or otherwise—cannot establish that the General Assembly *did* consider and use race as its predominant factor.  *See id.*

159.    To the contrary, that the General Assembly did not use race establishes that race was not the General Assembly's "dominant and controlling consideration" in drawing the Enacted Plan.  *Shaw II*, 517 U.S. at 905.

160.    Indeed, if anything, conducting a racially polarized voting analysis would have interjected more race consciousness into redistricting.

161.    The General Assembly's decision not to conduct a racially polarized voting analysis was lawful and underscores that it did not engage in racial gerrymandering.

* * *

162.    Plaintiffs failed to carry their burden to prove racial gerrymandering, and the Court enters judgment for Defendants on that claim.

## II.    PLAINTIFFS DID NOT PROVE INTENTIONAL DISCRIMINATION

### A.    Plaintiffs Failed To Carry Their Burden On Their Intentional Discrimination Claim

163.    Plaintiffs bear a heavy burden to prove intentional discrimination.  *Abbott*, 138 S. Ct. at 2324; *Backus*, 857 F. Supp. 2d at 567.

164.    To carry this burden in the context of an intentional "vote dilution" claim under the Equal Protection Clause of the Fourteenth Amendment, Plaintiffs must prove that "the districting scheme has a discriminatory effect and the legislature acted with a discriminatory purpose."  *Backus*, 857 F. Supp. 2d at 567 (citing *Washington v. Finlay*, 664 F.2d 913, 919 (4th Cir. 1981)).  (To the extent that an intentional vote dilution claim is cognizable under the

Fifteenth Amendment, it is "essentially congruent with [such] claims under the Fourteenth Amendment." *Id.* at 569.)

165.    To prove discriminatory effect, Plaintiffs must prove that the Enacted Plan has "disproportionately adverse" effects upon black voters, *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979), compared to "similarly situated" white voters, *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439–40 (1985).

166.    Additionally, Plaintiffs must provide proof of "a reasonable alternative voting practice [that can] serve as the benchmark undiluted voting practice." *Backus*, 857 F. Supp. 2d at 568 (quoting *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 480 (1997)).

167.    To prove discriminatory intent, Plaintiffs must "overcome the presumption of legislative good faith" and demonstrate that the General Assembly "acted with invidious [discriminatory] intent." *Abbott*, 138 S. Ct. at 2325.

168.    Plaintiffs' intentional discrimination claim necessarily fails with their racial gerrymandering claim, and even setting aside that fatal flaw, the claim fails because Plaintiffs did not prove that the Enacted Plan has a discriminatory effect or discriminatory intent.

### B.    Plaintiffs' Intentional Discrimination Claim Fails With Their Racial Gerrymandering Claim

169.    Given that the racial gerrymandering claim fails because Plaintiffs did not prove that the General Assembly adopted the Enacted Plan with a predominantly racial motivation, *see supra* Section I, the intentional vote dilution claim necessarily fails as well.

170.    This Court has noted that it is "dubious" whether an intentional vote dilution claim is tenable absent proof of racial predominance.  Tr., vol. I, at 51:7.  For good reason. The claims fail together here because Plaintiffs have pleaded them with the same legal theories of liability and harm.

171.    As to the comparable standards of liability, both claims hinge on whether the General Assembly acted with an impermissible racial intent.  Whether this intent is termed a predominantly racial motivation (*see Cooper*, 137 S. Ct. at 1463) or an invidious discriminatory intent (*Abbott*, 138 S. Ct. at 2325), the analysis hinges on whether the General Assembly intentionally took action based on race.  And for purposes of both claims, this critical issue is assessed based on similar evidence of legislative intent, specifically direct evidence, circumstantial evidence, or a mix of both.  *See Cooper*, 137 S. Ct. at 1464; *Arlington Heights*, 429 U.S. at 266.

172.    Both claims also rest on the same theories of liability.  To show both racial gerrymandering and intentional discrimination, Plaintiffs contend that the General Assembly departed from or subordinated traditional race-neutral districting principles and its own Guidelines. *See, e.g.*, Dkt. No. 267 ¶¶ 9–10.

173.    And both claims rest on the same theory of harm.  For purposes of both their racial gerrymandering claim and their intentional discrimination claim, Plaintiffs allege that the General Assembly adopted the Enacted Plan in order to harm black voters' electoral prospects. *See, e.g.*, Dkt. No. 267 ¶ 4 (the Enacted Plan, by imposing "racially gerrymandered congressional districts" and pursuing a "discriminatory purpose," seeks to "discriminate against [b]lack South Carolinian voters to limit their electoral opportunity").

174.    Thus, because Plaintiffs failed to prove their racial gerrymandering claim, they necessarily failed to prove their intentional discrimination claim.

### C.    Plaintiffs Did Not Prove That The Enacted Plan Has A Discriminatory Effect

175.    Moreover, the Court rejects the intentional discrimination claim because Plaintiffs failed to prove that the Enacted Plan has a discriminatory effect for at least three reasons.

176.    *First*, Plaintiffs' theory of discriminatory effect fails as a matter of law.

177.    Plaintiffs fault the General Assembly for failing to draw an additional district where black voters can form a coalition with white crossover voters to "elect" their preferred candidates or "influence" the outcome of elections.   Dkt. No. 267 ¶ 171.   Thus, Plaintiffs' alleged discriminatory effect in this case is that black voters are placed in districts without a sufficient number of white Democratic voters to elect Democratic candidates in general elections.

178.    But there is no "right to form political coalitions," *Bartlett*, 556 U.S. at 15, and "[a] redistricting plan that does not adversely affect a minority group's potential to form a majority in a district, but rather diminishes its ability to form a political coalition with other racial or ethnic groups, does not result in vote dilution on account of race," *Hall*, 385 F.3d at 431; *see Baten*, 967 F.3d at 360–61 (similar).

179.    Indeed, "[t]he Equal Protection Clause [and] the Fifteenth Amendment … are aimed only at ensuring equal political opportunity: that every person's chance to form a majority is the same, regardless of race or ethnic origin.   Coalition suits provide minority groups with a political advantage not recognized by our form of government, and not authorized by the constitutional and statutory underpinnings of that structure."   *Nixon v. Kent Cnty.*, 76 F.3d 1381, 1392 (6th Cir. 1996) (en banc) (citations omitted); *see Hall*, 385 F.3d at 431; *see also Bartlett*, 556 U.S. at 15 ("[M]inority voters are not immune from the obligation to pull, haul, and trade to find common political ground.").

180.    *Second*, even setting aside the problem above, Plaintiffs failed to prove that the Enacted Plan has a "disproportionately adverse" effect on black voters, *Feeney*, 442 U.S. at 279, compared to "similarly situated" white voters, *City of Cleburne*, 473 U.S. at 439–40.

181.    Members of one race are "similarly situated" with members of another race only if they are "alike" in "all relevant respects."  *Lowe v. City of Charleston*, No. 2:20-CV-04423, 2022 WL 1063978, at *2–3 (D.S.C. Apr. 8, 2022) (quoting *City of Cleburne*, 473 U.S. at 439, and *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)); *see Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001); *see also NAACP v. Snyder*, 879 F. Supp. 2d 662, 678 (E.D. Mich. 2012) (three-judge court) ("[T]he equal protection doctrine requires that the compared classes [in a redistricting challenge] be 'similarly situated.'"); *United States v. Washington*, No. CR 13-171-2, 2021 WL 120958, at *23 (E.D. Pa. Jan. 13, 2021) ("Evidence devoid of any comparison to 'similarly situated' individuals does not prove discriminatory effect.").

182.    Voters' political affiliations are highly "relevant" in the context of redistricting, *Lowe*, 2022 WL 1063978, at *2–3; after all, redistricting is "inseparable" from "[p]olitics and political considerations," *Rucho*, 139 S. Ct. at 2497 (quoting *Gaffney v. Cummings*, 412 U.S. 735, 753 (1973)).

183.    Thus, Plaintiffs were required to prove that the Enacted Plan has a disproportionately adverse effect on black voters compared to white voters *of the same political affiliation*.

184.    Plaintiffs have not proven that the Enacted Plan has any such effect.

185.    To the contrary, in the three districts Plaintiffs challenge (Districts 1, 2, and 5), the Enacted Plan affects black Democrats and white Democrats in exactly the same way.

186.    In the challenged districts, the Enacted Plan limits the ability of *all* Democrats—black *and* white—to form a winning political coalition (and, conversely, it improves the ability of *all* Republicans—black *and* white—to do the same).  *See* FOF ¶¶ 495-97.

187.     In fact, there are likely *just as many or more* white Democrats as black Democrats in each of the challenged districts, and thus the Enacted Plan likely limits the ability of *just as many or more* white Democrats to form a winning political coalition as compared to black Democrats.  *See id.*  Moreover, according to data presented by Plaintiffs' own expert, black Democrats were no more likely than white Democrats to be moved out of Districts 1 and 2.  *See* FOF ¶ 498.

188.     *Second*, Plaintiffs failed to provide proof of "a reasonable alternative voting practice [that can] serve as the benchmark undiluted voting practice."  *Backus*, 857 F. Supp. 2d at 568 (quoting *Reno*, 520 U.S. at 480).

189.     In comparing the Enacted Plan with a reasonable alternative plan, "dilution is not merely a lack of proportional representation and … the maximum number of possible majority-minority districts cannot be the standard."  *Id.* (quotation marks omitted).

190.     Rather, the comparison "requires" an alternative that "rest[s] on some idea of a reasonable allocation of power between minority and majority voters."  *Id.* (quotation marks omitted).

191.     Plaintiffs have not presented evidence proving that any proposed alternative plan achieves a "reasonable allocation of power between minority and majority voters."  *Id.* (quotation marks omitted).

192.     Furthermore, none of the proposed alternative plans are mandatory under Section 2 because none forms a district other than District 6 where black voters constitute a majority. *See* FOF ¶¶ 640, 656, 680, 700; *Reno*, 520 U.S. at 480; *Backus*, 857 F. Supp. 2d at 568.

193.     And each of the proposed alternative plans performs worse than the Enacted Plan on traditional race-neutral districting principles.  *See supra* Section I.C.

194.    Plaintiffs therefore have not provided the "reasonable alternative" benchmark necessary to prove that the Enacted Plan has a discriminatory effect by comparison. *Backus*, 857 F. Supp. 2d at 568.

**D.    Plaintiffs Did Not Prove That The General Assembly Adopted The Enacted Plan With Discriminatory Intent**

195.    Plaintiffs' intentional discrimination claim independently fails because Plaintiffs did not "overcome the presumption of legislative good faith" and prove that the General Assembly "acted with invidious [discriminatory] intent." *Abbott*, 138 S. Ct. at 2325; *see Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977).

196.    As a member of this Court recently emphasized, the Supreme Court has "specifically held" that "'awareness of consequences' is not enough to show discriminatory intent." *Coal. for TJ v. Fairfax Cnty. Sch. Bd.*, No. 22-1280, 2022 WL 986994, at *4 (4th Cir. Mar. 31, 2022) (Heytens, J., concurring) (quoting *Feeney*, 442 U.S. at 279).

197.    Rather, Plaintiffs must prove that the General Assembly "as a whole," *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2350 (2021), selected the Enacted Plan "*because of*, not merely *in spite of*," its (nonexistent) "adverse effects upon an identifiable group," *Feeney*, 442 U.S. at 279 (emphasis added); *see Coal. for TJ*, 2022 WL 986994, at *4 (Heytens, J., concurring); *United States v. Charleston Cnty.*, 316 F. Supp. 2d 268, 305 (D.S.C. 2003), *aff'd*, 365 F.3d 341 (4th Cir. 2004).

198.    Plaintiffs have not satisfied this stringent standard.

**1.    *Plaintiffs Did Not Present Direct Evidence Proving Discriminatory Intent***

199.    Plaintiffs presented no "direct evidence" that the General Assembly enacted the Plan for an invidious discriminatory purpose. *Arlington Heights*, 429 U.S. at 266.

200.     Plaintiffs did not, for instance, present any racist "statements" made by any legislator who voted for the Enacted Plan, let alone by the entire General Assembly. *DHS v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1916 (2020).

201.     Nor did Plaintiffs present any other type of direct evidence that legislators or the General Assembly were "motivated" to enact the Plan "because of" its alleged adverse effect on black voters. *Coal. for TJ*, 2022 WL 986994, at *4 (Heytens, J., concurring) (quoting *Feeney*, 442 U.S. at 279).

202.     To the contrary, each legislator and staffer who testified at trial attested that he or she did not develop, assess, or vote for the Enacted Plan based upon race. *See* FOF ¶¶ 346, 458, 1151 (C. Campsen); FOF ¶¶ 1160-61 (S. Massey); FOF ¶¶ 324-26 (W. Roberts); *see also* FOF ¶ 327 (no Senator asked Mr. Roberts to draw a Congressional plan based upon race).

### 2.     *Plaintiffs Did Not Present Circumstantial Evidence Proving Discriminatory Intent*

203.     In addition to presenting no direct evidence in support of their claim, Plaintiffs failed to present "circumstantial" evidence proving that the General Assembly enacted the Plan for an invidious discriminatory purpose. *Arlington Heights*, 429 U.S. at 266.

204.     Plaintiffs have attempted to carry their burden by relying on (i) "impact of the official action," (ii) the "historical background of the decision," and (iii) the "legislative … history," "sequence of events leading up to the … decision," and "[d]epartures from the normal procedural sequence." *Id.* at 266–67; *see* Dkt. No. 434 at 35.

205.     But this circumstantial evidence does not come close to proving that the General Assembly acted with a discriminatory intent.

<u>The Impact of the Enacted Plan Does Not Prove Discriminatory Intent</u>

206.    As explained above, Plaintiffs failed to prove that the Enacted Plan has a discriminatory "impact" or effect. *Arlington Heights*, 429 U.S. at 266; *see supra* Section II.C.

207.    Even if Plaintiffs had provided such proof, "impact alone" is "rare[ly]" "determinative" of a legislature's intent, and "the Court must look to other evidence." *Arlington Heights*, 429 U.S. at 266 & n.15; *see Charleston Cnty.*, 316 F. Supp. 2d at 306.

<u>The Historical Background of the Enacted Plan Does Not Prove Discriminatory Intent</u>

208.    The historical evidence presented by Plaintiffs, particularly Dr. Bagley's report and testimony, does not prove that the General Assembly enacted the Plan with an invidious discriminatory intent.

209.    Dr. Bagley discussed South Carolina's historical treatment of black voters, ranging from the Civil War and Reconstruction to the Civil Rights movement, past legislative enactments, and past redistricting cycles in South Carolina.  *See* FOF ¶¶ 934-39.

210.    But as noted, courts "cannot accept official actions taken long ago as evidence of current intent," *McCleskey*, 481 U.S. at 298 n.20, and "[p]ast discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful," *Abbott*, 138 S. Ct. at 2324 (quoting *City of Mobile*, 446 U.S. at 74 (plurality opinion)); *see also, e.g.*, *Bishop of Charleston v. Adams*, 538 F. Supp. 3d 608, 615 (D.S.C. 2021) (rejecting "efforts to draw a straight line through the unconscionable discrimination of the past to the judicial and administrative decisions of the present"); *Greater Birmingham Ministries v. Sec'y of State for State of Alabama*, 992 F.3d 1299, 1325 (11th Cir. 2021) ("*GBM*") ("outdated intentions of previous generations" do not "taint" "legislative action forevermore on certain topics").

211. This Court recognized as much earlier in this case, holding that evidence from past redistricting cycles does not bear on "the intent of any legislator [or] the South Carolina General Assembly as a whole[]" in voting for plans this cycle. Dkt. No. 153 at 13, 17.

212. Instead, "what matters" is the intent of the current legislature, *Abbott*, 138 S. Ct. at 2324, in "the precise circumstances surrounding the passing of the [challenged] law," *GBM*, 992 F.3d at 1325–26; *accord Brnovich*, 141 S. Ct. at 2349; *see also Harness*, 47 F.4th at 306–07 ("[T]he most recent enactment is the one that must be evaluated under the Equal Protection Clause.").

213. Dr. Bagley's historical evidence does not demonstrate that the 2022 General Assembly enacted the 2022 Enacted Plan with an invidious discriminatory intent.

214. Indeed, similar evidence of South Carolina's historical treatment of black voters was previously before this Court in prior redistricting challenges, but this Court nonetheless rejected the challengers' intentional discrimination claims. *See Backus*, 857 F. Supp. 2d at 557, 568; *Charleston Cnty.*, 316 F. Supp. 2d at 289 n.23, 305–06. The same result is warranted in this case, which, if anything, arises later in time from the cited historical events than did the prior redistricting challenges that this Court rejected.

215. Furthermore, the historical events cited by Dr. Bagley are much too "remote in time" to be "probative" here. *Regents*, 140 S. Ct. at 1916; *see Abbott*, 138 S. Ct. at 2324–25; *GBM*, 992 F.3d at 1325 ("an unlimited look-back to past discrimination" is not probative of present intent). Indeed, each event occurred *more than a decade* ago under different circumstances, and in many instances much longer ago. *See* FOF ¶ 939. Such events cannot "condemn" today's Enacted Plan. *Abbott*, 138 S. Ct. at 2324.

216.    Moreover, any connection between these historical events and the Enacted Plan is too attenuated, if not entirely absent, to prove that the Plan has a discriminatory intent.

217.    As this Court already recognized, the past redistricting cycles cited by Dr. Bagley do not bear on "the intent of any legislator [or] the South Carolina General Assembly as a whole[]" in voting for the Plan.  Dkt. No. 153 at 13, 17.  In all events, the prior redistricting cycle favors Defendants.   In *Backus*, this Court held that South Carolina had proven that the Benchmark Plan did not subordinate traditional race-neutral districting principles to race but instead adhered to such principles.  857 F. Supp. 2d at 560.  Thus, to the extent that the intent behind the Benchmark Plan bears on the Enacted Plan, it confirms that the Enacted Plan likewise aims to adhere to traditional race-neutral districting principles.  *See Abbott*, 138 S. Ct. at 2324-25 (finding no discriminatory intent where map was based on a court-approved map); *supra* ¶¶ 46-50.

218.    Furthermore, the cited historical events that did *not* involve redistricting—which are even further removed from the current redistricting cycle than prior cycles—do not bear on the General Assembly's intent either.

219.    Nearly all of the cited Department of Justice objections to various voting practices under Section 5 of the Voting Rights Act involved *local* practices and had nothing to do with *state* practices, let alone with the 2022 General Assembly and its redistricting decisions.  *See* FOF ¶ 939.

220.    In fact, in the Department of Justice's most recent decision concerning state-level redistricting in South Carolina, it precleared the Benchmark Plan.  *See Backus*, 857 F. Supp. 2d at 557.  According to Dr. Bagley himself, "the last DOJ objection to a statewide South Carolina redistricting plan" occurred two and a half decades ago, in 1997.  FOF ¶ 939.

221.    Lacking a sufficient connection to the Enacted Plan, the dated historical evidence cited by Dr. Bagley does not prove that the General Assembly enacted the Plan with an invidious discriminatory intent. *See Abbott*, 138 S. Ct. at 2324; *see also Harness*, 47 F.4th at 309 (finding no proof of discriminatory intent even where there was evidence of racial discrimination *during* the decade of enactment, because the evidence was not proven to "refer[] to or bear[] on" the specific enactment at issue); *cf. N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 223 (4th Cir. 2016) (historical discrimination carries "limited weight" even where, unlike here, it is very closely connected to the particular enactment at issue).

<u>The Legislative History of the Enacted Plan Does Not Prove Discriminatory Intent</u>

222.    Plaintiffs also failed to prove discriminatory intent based on the Enacted Plan's "legislative … history," the "sequence of events" leading up to the enactment of the Plan, and the "procedural" regularity of that sequence. *Arlington Heights*, 429 U.S. at 266–67.

223.    Importantly, "procedural irregularities are not themselves proof of discriminatory intent." *Coal. for TJ*, 2022 WL 986994, at *5 (Heytens, J., concurring); *Rollerson v. Brazos River Harbor Navigation Dist. of Brazoria Cnty.*, 6 F.4th 633, 640 (5th Cir. 2021) ("procedural violations do not demonstrate invidious intent of their own accord"); *GBM*, 992 F.3d at 1326 (truncated debate, use of cloture, party-line vote, and lack of support from black legislators were not indicative of discriminatory intent).

224.    Rather, procedural irregularities are "relevant" only "to the extent they 'afford evidence that improper purposes are playing a role.'" *Coal. for TJ*, 2022 WL 986994, at *5 (Heytens, J., concurring) (quoting *Arlington Heights*, 429 U.S. at 267).

225.    In other words, the violations "must have occurred in a context that suggests the decision-makers were willing to deviate from established procedures *in order to accomplish a*

*discriminatory goal*." *Rollerson*, 6 F.4th at 640 (emphasis added). Thus, "fail[ure] to follow the proper procedures against all individuals," when such conduct is not "targeted to any identifiable minority group," is not indicative of discriminatory intent. *Rollerson v. Port Freeport*, No. 18-cv-0235, 2019 WL 4394584, at *8 (S.D. Tex. Sept. 13, 2019), *aff'd*, 6 F.4th 633; *see also League of United Latin Am. Citizens v. Abbott*, No. 1:21-cv-0991, 2022 WL 1410729, at *26–28 (W.D. Tex. May 4, 2022) ("[T]he presumption of good faith is overcome only when there is a showing that a legislature acted with an ulterior *racial* motive.").

226.    Plaintiffs have not proven that the Enacted Plan's legislative history and procedural background were irregular, let alone that any irregularities were driven by "improper purposes," *Coal. for TJ*, 2022 WL 986994, at *5 (Heytens, J., concurring), or "discriminatory goal[s]," *Rollerson*, 6 F.4th at 640.

227.    To the contrary, just as he has done "[e]very single time" he has drawn a redistricting plan, Mr. Roberts drew the Senate Staff Plan and the Enacted Plan by starting with the Benchmark Plan. FOF ¶¶ 318, 322. And the General Assembly engaged in an open, extensive, and robust legislative process in adopting the Enacted Plan. *See* FOF ¶¶ 42-448. That process included extensive public participation by thousands of citizens, public hearings across the state, a dedicated redistricting website and email address for public input, a nonpartisan cartographer who maintained an open-door policy throughout the legislative process, numerous committee hearings, floor debate, and the wide publicization of draft maps, plans, and election data. FOF ¶¶ 43, 228-31, 310; *see* FOF ¶¶ 42-448.

228.    Dr. Bagley purported to identify "a chorus of voices" raising concerns about the legislative process, but these concerns were voiced by members of the minority party or opponents of the Enacted Plan. *See* FOF ¶¶ 940-42, 960, 977.

229.    The Supreme Court has "often cautioned against the danger, when interpreting a statute, of reliance upon the views of its legislative opponents.  In their zeal to defeat a bill, they understandably tend to overstate its reach.  The fears and doubts of the opposition are no authoritative guide to the construction of legislation.  It is the sponsors that we look to . . . ." *NLRB v. Fruit & Vegetable Packers & Warehousemen, Loc. 760*, 377 U.S. 58, 66 (1964).

230.    Dr. Bagley also noted that not all public feedback was incorporated into the Enacted Plan.  *See* FOF ¶ 941.  But "[t]he process of legislating often involves tradeoffs, compromises, and imperfect solutions," and here some input was irreconcilable with other input, so the General Assembly necessarily was unable to incorporate all input.  *Preseault v. I.C.C.*, 494 U.S. 1, 19 (1990).

231.    Further, Dr. Bagley was not given, and did not review, the legislatively privileged materials produced after his deposition, which included emails and text messages from constituents to legislators.  10/11/2022 AM Tr. at 77:7–12; *cf. Fernandez v. Spar Tek Indus., Inc.*, No. 0:06-cv-3253-CMC, 2008 WL 2185395, at *6 (D.S.C. May 23, 2008) (stating "an opinion based on an inadequate or inaccurate factual foundation cannot be a reliable opinion, no matter how valid the principles and methods applied or how well-qualified the expert").

232.    Nor did Dr. Bagley's reports and testimony give a full and accurate picture of public feedback.  On direct, for example, Dr. Bagley argued there was no evidence "in the public record that was available to [him], and available to other people speaking in this process," to support Senator Campsen's claim "that in his view, and in the view of certain of his constituents, [] it was preferable or better to have two members of Congress representing Charleston." 10/11/22 AM Tr. at 59:20–60:4.  Dr. Bagley acknowledged he testified in his deposition that Senator Campsen's statement "about two representatives for Charleston appears out of thin air."

*Id.* at 100:12–15. But on cross-examination, Senate Defendants' counsel showed a video in which a member of the public did make that argument. *See id.* at 100:21–25; SX240 at 1:13:27–1:14:22. When confronted with this evidence, Dr. Bagley merely dismissed the statement as being made "relatively late in the process," though he had to concede that Senator Campsen's statement was made "[w]hen his amendment was at issue." 10/11/2022 AM Tr. at 101:4–10. As Dr. Bagley had already conceded, Senator Harpootlian's plan and Senator Campsen's plans were the "two plans that were in contention" come January 13, 2022. *Id.* at 99:5–13. When asked whether it made "sense that that's when senators really start[ed] focusing on various attributes of the plan," Dr. Bagley replied, "Possibly." *Id.* at 99:14–16.

233. The record, however, supports this conclusion. Before the Harpootlian and Campsen plans were debated on January 13, 2022, the only plan truly before the Senate was the Staff Plan from November 23, 2022, and no senator had seen that plan before it was publicly posted. Under these circumstances, Dr. Bagley's complaints about when in the process various Senators discussed the attributes of maps is both unpersuasive and beside the point. The record shows exactly when members of the Senate focused on Congressional redistricting: at the January 13, 2022 subcommittee meeting; at the full Senate Judiciary Committee meeting on January 19, 2022; and during the debate on the Senate floor on January 20, 2022.

234. Moreover, as Dr. Bagley conceded, he is not qualified to offer legal opinions—even though he purported to do so in his rebuttal report—about impermissible ex post facto justifications offered about a plan. *See* 10/11/22 AM Tr. at 65:11-13.

235. Finally, while Plaintiffs have made much ado about the Rep. John King incident, the Court is simply not convinced.

236.    The decision not to appoint Rep. King to preside at the hearing was not racially motivated.  It was motivated by a desire to complete the committee's business in a timely fashion.

237.    Even if the Court dove into whether the House Judiciary Committee violated its own rules by skipping over Rep. King to chair the meeting, this was merely one of dozens of hearing held throughout the redistricting process, it was not about the plan that ultimately passed the General Assembly, and it really does not matter because the Enacted Plan was drawn and developed by the Senate.

238.    Dr. Bagley, to his credit, agreed that a member's "failure to preside over one meeting" does not, in and of itself, "somehow taint[] the entire process." *Id.* at 92:4–8.

239.    As Dr. Bagley admitted, he simply watched videos, read transcripts, and made unilateral relevancy determinations to present his narrative of public feedback and the legislative debate.  But the Court is equally capable of engaging in this exercise, and indeed, that is the Court's job.  *Cf. Hines*, 2011 WL 2680842, at *7 (rejecting testimony of expert who merely "read[] and summariz[ed]" documents the trier of fact could review "on its own"); *Lippe*, 288 B.R. at 688 (rejecting expert who sought to testify on intent by providing a "summation" of relevant facts); *AmerisourceBergen Drug Corp.*, 2021 WL 1320716, at *2 (collecting cases rejecting expert testimony that "merely regurgitates" admissible materials).

240.    In addition, "as is forgivable in an adversary system," Dr. Bagley "showed signs of partiality to his side's position" by selectively focusing on opponents' wishes for a Congressional redistricting plan and, therefore, his testimony "must be viewed critically." *League of United Latin Am. Citizens v. Abbott*, 2022 WL 1410729, at *13 (W.D. Tex. May 4, 2022).  Dr. Bagley placed undue emphasis on the statements of Democrats, and his testimony

and reports had a dearth of statements from Republicans.  When he did mention Republicans, Dr. Bagley immediately sought to discredit whatever they said.  Put simply, Dr. Bagley's one-sided narrative was biased and contained material omissions.  As a result, it is not helpful to the Court's analysis of the legislative process for purposes of determining legislative intent.

241.    By questioning the motives of the bill's proponents and seeking to explain the motives of its opponents, Dr. Bagley—whether intentionally or not—was also making credibility determinations and opining on intent.  *See, e.g.*, 10/11/2022 AM Tr. at 83:15–18 (stating there was "obfuscation"); PX 18 at 8 (Bagley Rebuttal Report) (calling Senator Campsen's explanation regarding "the ubiquity of waterways in the Low Country" a "questionable rationale").  Neither is appropriate for an expert.  *See Invs. Title Ins. Co. v. Bair*, No. 9:05-cv-1434, 2007 WL 9735299, at *1 (D.S.C. June 5, 2007) (holding "in a bench trial, the court, as the trier of fact, is the sole judge of the credibility of witnesses and the weight to be given their testimony"), *aff'd*, 296 F. App'x 332 (4th Cir. 2008); *NAACP v. Molly Darcy, Inc.*, No. 4:11-cv-01293, 2012 WL 4473138, at *7 (D.S.C. Sept. 26, 2012) ("Any statement or opinion to the effect that [the expert] believed a particular reason given by Defendant was not the primary motivation . . . or that he does not find a reason of Defendant plausible is not admissible.  Such statements or opinions are not helpful . . . and a waste of time."); *In re Diet Drugs Prod. Liab Litig.*, 2000 WL 876900, at *9 (E.D. Pa. June 20, 2000) (stating "[t]he question of intent is" for factfinders "and not one for experts"); *Taylor v. Novartis Pharm. Corp.*, 2013 WL 5118945, at *4 (S.D. Fla. Apr. 22, 2013) ("motivation or intent is not a proper subject of expert testimony."); *Kaufman v. Pfizer Pharm., Inc.*, 2011 WL 7659333, at *9 n.8 (S.D. Fla. Aug. 4, 2011) ("The Court will exclude all of Dr. Parisian's opinions about Defendants' motives and state of mind, regardless of where or how they appear in her expert report."); *In re Rezulin Prod. Liab. Litig.*,

309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004) ("Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony."); *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009) (precluding testimony as to "the knowledge, motivations, intent, state of mind, or purposes" because it "is not a proper subject for expert . . . testimony").

242.    When questioned about how he made relevancy determinations and upon what accepted methods he relied to reach his opinions, Dr. Bagley repeatedly said he was just communicating what a chorus of people said.  *See, e.g.*, 10/11/2022 AM Tr. at 86:2–8, 18–19. Putting aside whether such parroting requires the imprimatur of an expert, that is not a sound methodology.  *Cf. Wickersham v. Ford Motor Co.*, No. 9:13-cv-1192-DCN; 9:14-cv-0459-DCN, 2016 WL 5349093, at *2 (D.S.C. Sept. 26, 2016) (stating that, in analyzing reliability, "the focus 'must be solely on principles and methodology, not on the conclusions that they generate'" (quoting *Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579, 591 (1993))); *Nucor Corp. v. Bell*, No. 2:06-cv-02972-DCN, 2008 WL 4442571, at *4 (D.S.C. Jan. 11, 2008) ("The Supreme Court has advised district courts to require more than the mere '*ipse dixit*' of the expert witness."); *Holesapple v. Barrett*, 5 F. App'x 177, 180 (4th Cir. 2001) (expert opinions must be supported "by something more than the 'it is so because I say it is so' of the expert").  For the reasons set forth above, nor is it reliable for ascertaining legislative intent, particularly given that Dr. Bagley focused almost exclusively on opponents to the Enacted Plan.

243.    The Court therefore affords Dr. Bagley's reports and expert testimony very little weight.

\* \* \*

244.    For these reasons, Plaintiffs failed to carry their burden to prove intentional discrimination.

## CONCLUSION

245.     Because Plaintiffs failed to carry their burden on either of their claims, the Court

enters judgment for Defendants.

November 10, 2022                          Respectfully submitted,
Columbia, South Carolina

                                          /s/Robert E. Tyson, Jr.
                                          Robert E. Tyson, Jr. (7815)
                                          Vordman Carlisle Traywick, III (12483)
                                          La'Jessica Stringfellow (13006)
                                          ROBINSON GRAY STEPP & LAFFITTE, LLC
                                          Post Office Box 11449 (29211)
                                          Columbia, South Carolina 29201
                                          (803) 929-1400
                                          rtyson@robinsongray.com
                                          ltraywick@robinsongray.com
                                          lstringfellow@robinsongray.com

                                          John M. Gore (admitted *pro hac vice*)
                                          Stephen J. Kenny (admitted *pro hac vice*)
                                          JONES DAY
                                          51 Louisiana Avenue, N.W.
                                          Washington, D.C. 20001
                                          Phone: (202) 879-3939
                                          Fax: (202) 626-1700
                                          jmgore@jonesday.com
                                          skenny@jonesday.com

                                          *Counsel for Senate Defendants*

                                          s/ Mark C. Moore
                                          Mark C. Moore (Fed. ID No. 4956)
                                          Jennifer J. Hollingsworth (Fed. ID No. 11704)
                                          Hamilton B. Barber (Fed. ID No. 13306)
                                          Michael A. Parente (Fed. ID No. 13358)
                                          NEXSEN PRUET, LLC
                                          1230 Main Street, Suite 700
                                          Columbia, SC 29201
                                          Telephone: 803.771.8900
                                          MMoore@nexsenpruet.com
                                          JHollingsworth@nexsenpruet.com
                                          HBarber@nexsenpruet.com
                                          MParente@nexsenpruet.com

William W. Wilkins (Fed. ID No. 4662)
Andrew A. Mathias (Fed. ID No. 10166)
Konstantine P. Diamaduros (Fed. ID No. 12368)
NEXSEN PRUET, LLC
104 S. Main Street, Suite 900
Greenville, SC 29601
Telephone: 864.370.2211
BWilkins@nexsenpruet.com
AMathias@nexsenpruet.com
KDiamaduros@nexsenpruet.com

Rhett D. Ricard (Fed. ID No. 13549)
NEXSEN PRUET, LLC
205 King Street, Suite 400
Charleston, SC 29401
Telephone: 843.720.1707
RRicard@nexsenpruet.com

*Attorneys for House Defendants*