**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | |
|---|---|
| THE SOUTH CAROLINA STATE CONFERENCE OF THE NAACP, | Case No.  3:21-cv-03302-MGL-TJH-RMG |
| and | **THREE-JUDGE PANEL** |
| TAIWAN SCOTT, on behalf of himself and all other similarly situated persons, | |
| Plaintiffs, | |
| v. | |
| THOMAS C. ALEXANDER, in his official capacity as President of the Senate; LUKE A. RANKIN, in his official capacity as Chairman of the Senate Judiciary Committee; JAMES H. LUCAS, in his official capacity as Speaker of the House of Representatives; CHRIS MURPHY, in his official capacity as Chairman of the House of Representatives Judiciary Committee; WALLACE H. JORDAN, in his official capacity as Chairman of the House of Representatives Elections Law Subcommittee; HOWARD KNAPP, in his official capacity as interim Executive Director of the South Carolina State Election Commission; JOHN WELLS, Chair, JOANNE DAY, CLIFFORD J. ELDER, LINDA MCCALL, and SCOTT MOSELEY, in their official capacities as members of the South Carolina State Election Commission, | **PLAINTIFFS' CLOSING DEMONSTRATIVES** |
| Defendants. | |

Pursuant to the Court's order (ECF No. 488) and in the interest of public access, Plaintiffs hereby provide notice of filing of the demonstrative aid to be used during closing arguments on November 29, 2022.

Dated: November 25, 2022

Respectfully submitted,

Leah C. Aden**
Stuart Naifeh**
Raymond Audain**
John S. Cusick**
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector St, 5th Fl.
NY, NY 10006
Tel.: (212) 965-7715
laden@naacpldf.org

Santino Coleman***Fed. ID 11914
Antonio L. Ingram II**
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
700 14th St, Ste. 600
Washington, D.C. 20005
Tel.: (202) 682-1300
aingram@naacpldf.org

Adriel I. Cepeda Derieux**
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: (212) 549-2500
acepedaderieux@aclu.org

John A. Freedman**
Elisabeth S. Theodore*

*/s/ Allen Chaney*
Allen Chaney, Fed. ID 13181
AMERICAN CIVIL LIBERTIES
UNION OF SOUTH CAROLINA
Columbia, SC 29202
Tel.: (864) 372-6681
achaney@aclusc.org

Christopher J. Bryant, Fed. ID 12538
BOROUGHS BRYANT, LLC
1122 Lady St., Ste. 208
Columbia, SC 29201
Tel.: (843) 779-5444
chris@boroughsbryant.com

Somil B. Trivedi**
Patricia Yan**
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
915 15th St., NW
Washington, DC 20005
Tel.: (202) 457-0800
strivedi@aclu.org

Jeffrey A. Fuisz**
Paula Ramer**
ARNOLD & PORTER KAYE
SCHOLER LLP
250 West 55th Street

2

Gina M. Colarusso**
John M. Hindley**
ARNOLD & PORTER
KAYE SCHOLER LLP
601 Massachusetts Ave., N.W.
Washington, D.C. 20001
Tel: (202) 942-5000
john.freedman@arnoldporter.com

Janette M. Louard*
Anthony P. Ashton*
Anna Kathryn Barnes*
NAACP OFFICE OF THE GENERAL COUNSEL
4805 Mount Hope Drive
Baltimore, MD 21215
Tel: (410) 580-5777
jlouard@naacpnet.org

New York, NY 10019
Tel: (212) 836-8000
jeffrey.fuisz@arnoldporter.com
Sarah Gryll**
ARNOLD & PORTER KAYE
SCHOLER LLP
70 West Madison Street, Suite 4200
Chicago, IL 60602-4231
Tel: (312) 583-2300
sarah.gryll@arnoldporter.com

*Counsel for Plaintiff the South Carolina Conference of the NAACP*

* Motion for admission *Pro Hac Vice* forthcoming
** Admitted *Pro Hac Vice*
*** Mailing Address Only (working remotely from South Carolina)

3

**CERTIFICATE OF SERVICE**

I hereby certify that on November 25, 2022, a true and correct copy of the foregoing was served on all counsel of record by filing with the Court's CM/ECF service.


*/s/ Allan Chaney*
Allan Chaney

# COUNT 1: S.865 IS AN UNCONSTITUTIONAL RACIAL GERRYMANDER

How Defendants Unlawfully Cracked Black Communities and Dispersed Black Voters.

**Tuesday, November 29, 2022**

*South Carolina State Conference of the NAACP, et al v. Alexander et al.,* Case No. 3:21-cv-03302-MGL-TJH-RMG

## SUMMARY OF TRIAL

**Plaintiffs Have Proven That:**

1. S.865 disproportionately targets and splits Black communities, cities, and counties.
   - *E.g.*, Dr. Duchin, Mr. Oppermann.

2. S.865 is an extreme outlier when compared to hundreds of thousands of race-neutral maps.
   - *E.g.*, Dr. Duchin, Dr. Imai.

3. S.865 performs poorly in terms of traditional redistricting principles.
   - *E.g.*, Dr. Duchin, Mr. Oppermann, Ms. Teague, Sen. Harpootlian.

4. Defendants considered racial data for purposes other than compliance with the law.
   - *E.g.*, Sen. Campsen, Mr. Roberts, Mr. Terreni, Mr. John, Mr. Dennis.

**Defendants' *Post Hoc*, Pretextual Rationales:**

1. S.865 was motivated by partisan advantage.
   - <u>BUT</u> Defendants and staff disclaimed partisanship during redistricting process and prior to trial. *E.g.*, Sen. Campsen, Rep. Jordan, Sen. Rankin, Mr. Fiffick, Mr. John.
   - <u>BUT</u> S.865 treats Black Democrats differently. *E.g.*, Dr. Ragusa, Dr. Liu, and Dr. Duchin.

2. S.865 was motivated by the preferences of Rep. Jim Clyburn, the state's lone Black representative.
   - <u>BUT</u> Rep. Clyburn's preferences were not in fact prioritized. *E.g.*, Mr. Roberts, Mr. John, Rep. Jordan.

3. S.865 was motivated by core retention.
   - <u>BUT</u> core retention was a low-priority criterion, and S.865 is not least-change, particularly in Charleston. *E.g.*, PX No.175; SX No. 716; Dr. Duchin; Sen. Talley; Mr. Roberts.
   - <u>BUT</u> S.865 is an outlier even when compared to race-blind simulations with identical core retention outside of Charleston. *E.g.*, Dr. Imai.

# WHAT DO THE NUMBERS SAY?

```
 5          MR. GORE:  It was -- it was not done for a racial
 6   reason.  And we will hear evidence --
 7          JUDGE GERGEL:  Well, the question is:  What are the
 8   numbers?  I mean, nobody's ever admitted in the history of
 9   reapportioning that they intentionally did it for that reason.
10   So, the question is:  What do the numbers show us?  And I'm
11   raising it for all parties to give us those numbers.
```

Tr. 60:5–11 (Opening, Oct. 3, 2022).

# S.865: VOTER REDISTRIBUTION

| District | Overpopulated | Underpopulated | People Removed |
|----------|---------------|----------------|----------------|
| 1 | 87,689 | No | 140,489 |
| 2 | No | 9,375 | 14,397 |
| 5 | 5,082 | No | 41,407 |
| 6 | No | 84,741 | 80,469 |

*Compare* SDX No. 28e *with* SDX No. 29c; *see also* SDX No. 75 at 18, tbl. 4 (Defs.' expert report by Sean Trende)

# S.865'S VOTER MOVEMENTS

as *Amicus Curiae* 19 (some emphasis added). In other words, if the legislature must place 1,000 or so additional voters in a particular district in order to achieve an equal population goal, the "predominance" question concerns *which* voters the legislature decides to choose, and specifically whether the legislature predominately uses race as opposed to other, "traditional" factors when doing so.

*Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 273 (2015).

PX No. 67 at 15, fig.3 (Duchin expert report).



Figure 3: Terrain moved in and out of CD 6. Areas are colored in terms of their district reassignment. Yellow areas were moved from CD 6 to CD 2; blue was moved from CD 6 to CD 1, and purple areas were moved into CD 6 from the neighboring districts.

# HIGH-BVAP COUNTIES

| County | BVAP | WVAP | Split? |
|---|---|---|---|
| 1. Richland | 150,280 | 145,112 | Yes |
| 2. Charleston | 74,632 | 219,660 | Yes |
| 3. Greenville | 70,140 | 277,944 | Yes |
| 4. Spartanburg | 50,919 | 171,232 | Yes |
| 5. Florence | 43,669 | 55,977 | Yes |
| 6. Berkeley | 40,872 | 109,273 | No |
| 7. York | 40,697 | 14,7676 | No |
| 8. Orangeburg | 40,360 | 23,249 | Yes |
| 9. Sumter | 37,987 | 37,724 | Yes |

*See* CX No. 1 (ECF No. 473) (Court-ordered data).

Note: this data was presented incorrectly on pages 30 and 169 of Plaintiffs' proposed findings, which showed total population instead of voting-age population. The data is corrected here and will be corrected in Plaintiffs' amended proposed findings, after all final transcripts are received.

## S.865'S BVAP LEVELS

|              | CD 1  | CD 2  | CD 3  | CD 4  | CD 5  | CD 6  | CD 7  |
|--------------|-------|-------|-------|-------|-------|-------|-------|
| Previous2012 | 0.173 | 0.239 | 0.174 | 0.183 | 0.257 | 0.525 | 0.254 |
| Enacted2022  | 0.174 | 0.254 | 0.176 | 0.19  | 0.247 | 0.469 | 0.254 |

PX No. 67 at 9, tab.1 (Duchin report)

```
6  A.    And the question I was just addressing is: If the Black
7  voting age population came down in CD 6, where did it go up?
8  Right.  And so, it goes up some in CD 4, a hair in CD 3, goes
9  up some in CD 2, stays just about the same in CD 1.  And
10 later, we'll have an opportunity to see whether that very
11 dispersed increase in BVAP corresponds with electoral
12 opportunity in those districts.  And what we'll find later
13 when we look at election results, is that it does not, it does
14 not correspond to any meaningful opportunity across the other
15 districts in the state.
```

Tr. 291:6–15 (Duchin, Oct. 6).

# S.865: ATYPICAL, NON-COMPETITIVE BVAP RANGE



Dr. Moon Duchin, PhD, Tufts University



Figure 1: The box-and-whiskers plot shows the comparison of the four highlighted plans against an ensemble of 100,000 neutrally drawn plans (i.e., plans that consider population balance, contiguity, compactness, and the preservation of counties, but do not take racial or partisan data into account).

PX No. 120 at 2, fig.1 (Duchin supp. report).



Figure 10: This histogram compares the district with *second-highest* BVAP in three current plans to those from 100,000 alternative plans. Most neutral plans are at or near 30% BVAP in their second highest district, while the state's plan is especially low. The SC-NAACP1 and Harpootlian plans are not cracked compared to the ensemble, even though they maintain CD 6 with BVAP levels above those in the state's plan.

PX No. 67 at 22–23, fig.10 (Duchin report).

Figure 4: CD 1 is highlighted, with the Black voting age population as in Figure 1 and split cities outlined in red.

**CONGRESSIONAL DISTRICT 1**

A.    Split of Jasper County (small, majority-Black county).
B.    Split of Dorchester County (VTDs split on racial lines).
C.    Split of coastal community of interest.
D.    Split of Charleston County, including Charleston and North Charleston, and Black communities within them.

PX No. 67 at 16, fig.4 (Duchin report).

# 2011 MAP VS. ENACTED MAP



SX No. 28A (2011 Congressional Map).



SX No. 29B (Senate Amendment 1, which became S.865).

# 2011 MAP VS. ENACTED MAP: CHARLESTON COUNTY



2011 map: Close-up of Charleston, shaded to reflect precinct-level BVAP. *See* CX No. 1 (ECF No. 473) (Court-ordered data).

S.865: Close-up of Charleston, shaded to reflect precinct-level BVAP. *See* CX No. 1 (ECF No. 473) (Court-ordered data).

## S.865: SPLIT OF CHARLESTON COUNTY

| District | % of Charleston County BVAP in 2011 Plan | % of Charleston County BVAP in Enacted Plan |
|---|---|---|
| 1 | 47.3% (36,814 voters) | 20.6% (15,410 voters) |
| 6 | 52.7% (41,064 voters) | 79.4% (59,222 voters) |

*See* CX No. 1 (ECF No. 473) (Court-ordered data).

# S.865: JASPER AND DORCHESTER

| County | WVAP Countywide | WVAP % of County in CD1 | WVAP % of County in CD 6 | BVAP Countywide | BVAP % of County in CD1 | BVAP % of County in CD6 |
|--------|------|------|------|------|------|------|
| Beaufort | 71.9% | ALL | NONE | 14.7% | ALL | NONE |
| Berkeley | 62.8% | ALL | NONE | 23.5% | ALL | NONE |
| Charleston | 67.0% | 82.0% | 55.3% | 22.8% | 10.7% | 32.1% |
| Colleton | 59.2% | 64.6% | 58.8% | 35.1% | 32.3% | 35.3% |
| Dorchester | 64.1% | 68.4% | 48.9% | 24.8% | 20.7% | 39.7% |
| Jasper | 50.3% | 84.4% | 42.3% | 33.6% | 7.0% | 39.8% |

See CX No. 1 (Court-ordered data).

## S.865: DORCHESTER SPLIT PRECINCTS

|  | **BVAP** | **WVAP** |
|---|---|---|
| Portions of Split VTDs in CD 1 | 20.1% | 72.9% |
| Portions of Split VTDs in CD 6 | 42.1% | 32.9% |

*See* CX No. 1 (ECF No. 473) (Court-ordered data).

## S.865: BEAUFORT

| County | WVAP Countywide | WVAP % of County in CD1 | WVAP % of County in CD6 | BVAP Countywide | BVAP % of County in CD1 | BVAP % of County in CD6 |
|---|---|---|---|---|---|---|
| Beaufort | 71.9% | ALL | NONE | 14.7% | ALL | NONE |
| Berkeley | 62.8% | ALL | NONE | 23.5% | ALL | NONE |
| Charleston | 67.0% | 82.0% | 55.3% | 22.8% | 10.7% | 32.1% |
| Colleton | 59.2% | 64.6% | 58.8% | 35.1% | 32.3% | 35.3% |
| Dorchester | 64.1% | 68.4% | 48.9% | 24.8% | 20.7% | 39.7% |
| Jasper | 50.3% | 84.4% | 42.3% | 33.6% | 7.0% | 39.8% |

See CX No. 1 (ECF No. 473) (Court-ordered data).

# S.865: CD1 BVAP LEVELS

| | CD 1 | CD 2 | CD 3 | CD 4 | CD 5 | CD 6 | CD 7 |
|---|---|---|---|---|---|---|---|
| Previous2012 | 0.173 | 0.239 | 0.174 | 0.183 | 0.257 | 0.525 | 0.254 |
| Enacted2022 | 0.174 | 0.254 | 0.176 | 0.19 | 0.247 | 0.469 | 0.254 |

PX No. 67 at 9, tab.1 (Duchin report).

# S.865: TRADITIONAL REDISTRICTING PRINCIPLES

The design of CD 1 conflicts with TRPs and is "evidence of racial predominance":

1. Lack of "respect for political subdivisions," such as "the division of counties, municipalities, and precincts";

2. Splitting of "communities of interest" and "group[ing] areas with 'fractured political, social, and economic interests,' connected solely by race";

3. Lack of compactness, use of bizarre shapes; and

4. Lack of land contiguity.

*See Covington v. North Carolina*, 316 F.R.D. 117, 137 (M.D.N.C. 2016), *aff'd*, 137 S. Ct. 2211 (2017) (quoting *Miller v. Johnson*, 515 U.S. 900, 908 (1995)).

## S.865: CHARLESTON SPLIT

Defendants were aware that they could have accommodated both Charleston and Beaufort, as Mr. Breeden John testified at his deposition:

| 8 | Q. In drawing your maps or the |
|---|---|
| 9 | maps that you were drawing, would it |
| 10 | have been possible to have Beaufort |
| 11 | and Charleston both whole in CD 1? |
| 12 | A. Mathematically, sure. |

John. Dep. Tr. 206:8-16.



Senate Amendment 2a, SX No. 31A, was among other proposals that united Charleston and Beaufort.

# S.865: SPLIT OF COASTAL COMMUNITY OF INTEREST



Rep. Jordan (Chair of House Ad Hoc Committee)

Defendant Jordan admitted that Charleston and Beaufort share "common interests in that they're coastal communities and deal with things like hurricanes and evacuations, and floodings, and erosions and things like that, that necessarily other parts of the state don't deal with at all or to the same degree." Tr. 37:20–38:3 (Jordan, Oct. 13, PM) (rough).

Public calls for Beaufort and Charleston being made whole in CD 1.

*HX No. 81 (Dec. 17, 2021 text from Patrick Dennis)*

Jordan creates alternative plan to repair Beaufort only, based on Sen. Am. 1.

*PX No. 109 at 5–6 (Jan. 10, 2022 Judiciary hearing).*



*Sep. – Oct. 2021. See PX No. 17 at 29 (Bagley report).*

Jordan receives staff's message saying "easy enough" to put all of Beaufort and Charleston in CD 1.

*PX No. 575 at 4–5 (Dec. 29, 2021 Hearing).*

Jordan falsely claims that including all of Charleston in CD 1 is mathematically impossible.

# S.865: APPLICATION OF REDISTRICTING PRINCIPLES

3. **Shouldn't a plan split as few counties as possible?**

   a. Avoiding splits in county lines is one of several criteria that the subcommittee adopted, such as maintaining communities of interest and constituent consistency.

   b. The subcommittee placed priority with keeping counties whole.

   c. County lines are more important in some places than others.

PX No. 722 (Subcommittee talking points sent by Senate staff to Sens. Campsen, Rankin, Massey, and Talley).

# S. 865 AND GUIDELINES REGARDING CONTIGUITY

Under the Senate guidelines, a plan may rely on connection by water only if it "is designed to meet the other criteria stated herein."  SDX No. 3 at 1-2.

**II. CONTIGUITY.**   All legislative and congressional districts should be composed of contiguous geography. Contiguity by water is acceptable to link territory within a district provided that there is a reasonable opportunity to access all parts of the district and the linkage is designed to meet the other criteria stated herein. Point-to-point contiguity is acceptable so long as adjacent districts do not use the same vertex as points of transversal.

# S.865: CONTIGUITY

Defendants' expert, Mr. Trende, acknowledged that CD 1 is not land-contiguous:

| 7 | Q. | You're aware that there's no bridge or tunnel that allows one to drive from |
|---|---|---|
| 8 | | Sullivan's Island to James Island, right? |
| 9 | A. | Right, right. |

| 13 | Q. | To get from the Mt. Pleasant pier to James Island, you have to go through |
|---|---|---|
| 14 | | District 6.   It's a 6.7-mile drive.   Do you see that? |
| 15 | A. | I see that, yes. |

Tr. 74:3–15 (Trende, Oct. 13, AM) (rough).

Mr. Oppermann, whose Sen. Amend. 2A proposal is contiguous, criticized CD 1's design:

| 5 | The contiguity issue is exacerbated in that one |
|---|---|
| 6 | cannot get into District 1 within the Charleston peninsula. |
| 7 | In this plan, District 1 is completely severed by land.   There |
| 8 | is no road route to get from one portion of the district to |
| 9 | the other.   And those are some of the concerns.   The shaping |
| 10 | is a little different, the sort of snout of the dragonhead |

Tr. 972:4–9 (Oppermann, Oct. 12, PM) (rough).

## S.865: RAGUSA CD 1 ANALYSIS



Dr. Jordan Ragusa, PhD, College of Charleston

**Table 1: Analysis of CD #1**

| Variables | Model 1 VTDs Moved In | Model 2 VTDs Moved Out | Model 3 VTDs Moved In/Kept In |
|---|---|---|---|
| Biden Vote | 0.13 | 0.39*** | -0.11 |
| BVAP | -0.10 | 0.18*** | -0.28*** |
| Total VAP | -0.02 | -0.14*** | 0.12*** |
| Constant | -0.81* | -2.06*** | 0.56* |
| N | 133 | 369 | 502 |

\*\*\* p<0.01, \*\* p<0.05, \* p<0.1

PX No. 19 at 8; *see also* PX No. 26 (Ragusa rebuttal report) at 4–9.

- "VTDs with 100 Black voters had only a 13% chance of being moved out of [CD 1], compared to 60% for VTDs with 1500 Black voters." PX No. 19 at 5, 8 (Ragusa report).
- "VTDs with 100 Black voters had an 80% chance of being moved into or kept in [CD 1], which compares to just 11% for VTDs with 1500 Black voters." *Id.* at 5, 8

# S.865: STATEWIDE VRA ANALYSIS OF CD 1



Dr. Kosuke Imai, PhD, Harvard University



**Figure 4:** BVAP Proportion in District 1. Histogram represents the distribution of the Black voting-age population (BVAP) proportion, across 10,000 statewide simulated plans with the VRA constraint, within District 1. The red line indicates the corresponding BVAP proportion under the enacted plan.

PX No. 32 at 14, 15 fig.3 (Imai report).

# S.865: LIU CD 1 ANALYSIS



Dr. Baodong Liu, PhD, University of Utah

**Table 9: Enacted CD 1 and Assignments of Voters—race v. party**

| Party Primary | Number of Voters in Envelop | Number of Voters in District | (% of Group That is in District) |
|---|---|---|---|
| White_DEM | 24,083 | 16,614 | 68.99 |
| Black_DEM | 25,397 | 12,864 | 50.65 |
| White_REP | 85,108 | 68,716 | 80.74 |
| Black_REP | 2,053 | 1,697 | 82.67 |

PX No. 48 at 20 (Liu report).

| | |
|---|---|
| 3 | disproportionately put into the out category. So, being the |
| 4 | same party, and, yet, you are treated differently, obviously |
| 5 | race is the driving factor, not party. |

Tr. 553:6–10; 573:3–5 (Liu, Oct. 6).

# S.865: THE SUPREME COURT AND THE ENVELOPE METHOD

## *Cooper v. Harris* endorsed the envelope method used by Dr. Ansolabehere, 137 S. Ct. 1455, 1477 (2017):

Finally, an expert report by Dr. Stephen Ansolabehere lent circumstantial support to the plaintiffs' race-not-politics case. Ansolabehere looked at the six counties overlapping with District 12—essentially the region from which the mapmakers could have drawn the district's population. The question he asked was: Who from those counties actually ended up in District 12? The answer he found was: Only 16% of the region's white registered voters, but 64% of the black ones. See App. 321–322.

## Dr. Ansolabehere's explanation of the envelope method:

the construction of CDs 1 and 12 in the Rucho-Lewis Map. The first type of analysis examines the envelope of counties in which a given CD is situated; that is, the set of counties that are partly or wholly in the CD. These counties are the approximate region or area in which each CD is drawn, and they contain the population from which each CD could be drawn without crossing county boundaries or completely reconfiguring the CD. Taking this as a potential population for a district, the analysis then computes the likelihood that a Registered Voter of a given race from this population was included in the given CD. If the lines were drawn without respect to

*Harris v. McCrory*, ECF No. 18-1 (M.D.N.C. Dec. 24, 2013).

## Dr. Ragusa and Dr. Liu used Dr. Ansolabehere's approved method:

```
13   Q.   You used the term "county envelope."  Can you describe
14   what that term refers to?
15   A.   Sure.  So, if a district sits partially within a county,
16   all of the precincts that are outside of the existing
17   district's boundaries are considered part of that county
18   envelope.  In other words, they're just outside the district
19   and they are those that could be added, and while mapmakers
20   stay within the same county.
```

Tr. 1035:7–24 (Ragusa, Oct. 7).

Congressional Map. This verification study is derived from an approach adopted by Dr. Stephen Ansolabehere in *Harris v. McCrory*, 159 F. Supp. 3d 600 (M.D.N.C. 2016), aff'd sub nom. *Cooper v. Harris*, 137 S. Ct. 1455, (2017).

Based on Dr. Ansolabehere's approach, the redistricting process involves the decision of drawing voters from a larger base area to assign them to the given district according to the redistricting plan. This larger base area is called the "envelope," which essentially is the collection of counties that encompass all sub areas that voters reside in. As explained above, in the Enacted CD 1, for example,

PX No. 48 at 19 (Liu expert report)

# EXPERT ANALYSES: RACIAL PREDOMINANCE IN CD 1

## Dr. Ragusa

- Race is predictive of district assignments under S. 865, after controlling for partisanship and precinct size. PX No. 19 at 4-5 (Ragusa report); *see also* PX No. 26 (Ragusa rebuttal report) at 4–9.

## Dr. Liu

- Black voters were much less likely to be assigned to CD 1 as compared to white voters, regardless of party affiliation. PX No. 48 at 15-17 & tbl.6, 19-20 & tbl.9 (Liu report).
- Black Democrats were much more likely to be moved under the Enacted Plan compared to white Democrats. *Id.*

## Dr. Imai

- The low number of Black residents assigned to CD 1 under the Enacted Plan is an extreme outlier, compared to 10,000 race-neutral simulations that are at least as compliant with guidelines and traditional redistricting principles.
- S.865 remains an outlier notwithstanding any attempt to maintain BVAP of CD 6.

## Dr. Duchin

- Compared to ensembles of 100,00 race-neutral simulations, S.865 significantly suppressed BVAP in every district except the district with the highest BVAP and the one with the lowest BVAP, ensuring that there would not be a second district that could perform for Black voters. PX No. 67 at 23-24 & Fig. 11 (Duchin report).

28

# CONGRESSIONAL DISTRICT 2



Figure 6: CD 2 is highlighted, with the Black voting age population as in Figure 1 and split cities outlined in red.

A.  Split of Orangeburg County (small, majority-Black county).
B.  Non-compact hook-shape reaching into Columbia.
C.  Splitting of Black communities within Columbia.

PX No. 67 at 18, fig.6 (Duchin report).

## S.865: CD 2 COUNTIES

| County | WVAP Countywide | WVAP of Portion of County in CD2 | WVAP Portion of County in CD 6 | BVAP Countywide | BVAP of Portion of County in CD2 | BVAP of Portion of County in CD6 |
|---|---|---|---|---|---|---|
| Aiken | 67.0% | ALL | -- | 23.6% | ALL | -- |
| Barnwell | 52.7% | ALL | -- | 42.6% | ALL | -- |
| Lexington | 74.1% | ALL | -- | 14.8% | ALL | -- |
| Orangeburg | 34.9% | 49.3% | 29.3% | 60.6% | 45.0% | 66.7% |
| Richland | 44.3% | 51.2% | 36.9% | 45.9% | 37.1% | 55.4% |

*See CX No. 1 (ECF No. 473) (Court-ordered data).*

# S.865: RICHLAND AND COLUMBIA COMMUNITIES

| | |
|---|---|
| 17 | Q.   And do you recall what the public concern was around |
| 18 | Richland, if any? |
| 19 | A.  The public concern around Richland was neighbors being |
| 20 | split, obviously, and Richland not being whole.  I think that |
| 21 | remains a concern for me and many others. |

Tr. 758:17–21 (Rep. Garvin, Oct. 6).

| | |
|---|---|
| 21 | Q.   Okay.  What were some of the key themes, if any, that you |
| 22 | can recall through that public input process? |
| 23 | A.  There were some very consistent themes.  We heard over |
| 24 | and over again that people were disturbed about how fragmented |
| 25 | they felt their community was.  This was true in Richland, it |

Tr. 678:21–679:4 (Teague, Oct. 6).

| | |
|---|---|
| 8 | Q.   Ms. Teague, you mentioned you live in Columbia.  Can you |
| 9 | describe just briefly the differences between what the League |
| 10 | did and what the enacted map does in the Richland County area? |
| 11 | A.  Yes.  We kept Richland in tact, rather than having CD 2 |
| 12 | intrude all through north Richland County and over into Fort |
| 13 | Jackson.  And we felt this was appropriate for a number of |
| 14 | reasons.  One is that Richland does represent a community of |
| 15 | interest.  The other is that Lexington and Richland are very |
| 16 | different.  They're close.  You see there, the little river is |
| 17 | what divides them.  But the other things that divide them are |
| 18 | huge.  Lexington has a very low minority population.  Richland |
| 19 | I think is 49.something percent Black.  Really different |
| 20 | interest represented. |

Tr. 693:11–19 (Teague, Oct. 6).

# S.865: CD 2 HOOK SPLITS RICHLAND AND COLUMBIA



See CX No. 1 (ECF No. 473) (Court-ordered data). Shaded to reflect precinct-level BVAP.

| 19 | Q. | Did you find anything about the racial impact of that |
| 20 | | hook that you mentioned? |
| 21 | A. | Well, the first thing that I would say about the hook is |
| 22 | | that it's a clear example of non-compactness.  It's neither |
| 23 | | functionally compact, nor is it geometrically compact.  And |
| 24 | | so, you might think, yes, it was present in the benchmark plan |
| 25 | | and has been a feature in South Carolina redistricting for |

| 1 | some time, but you might think that would be a candidate for |
| 2 | healing.  If the move to a new plan is an opportunity to heal |
| 3 | certain features, this might be one that would be under |
| 4 | consideration.  But, instead, it cracks Black voters along the |
| 5 | district boundaries.  And I think you can see that here by the |
| 6 | choropleth shading showing you high Black concentrations right |
| 7 | around the area of that hook. |

Tr. 314:19–315:7 (Duchin, Oct. 6).

# S.865: CD 2 IS "WHAT IT LOOKS LIKE TO CRACK COMMUNITIES"

**55.4%**
- BVAP of Richland County within CD 6

**37.1%**
- BVAP of CD 2 Hook (portion of Richland County within CD 2)

**25.4%**
- BVAP of CD 2 as a Whole

*See* CX No. 1 (ECF No. 473) (Court-ordered data); PX No. 67 at 9 (Duchin report).

| | |
|---|---|
| 7 | Q.   Okay.   Dr. Duchin, is what you observed in your detailed |
| 8 | review of CD 2 consistent with the cracking of Black |
| 9 | communities in CD 2? |
| 10 | A.   Yes.   I would say this is what it looks like to crack |
| 11 | communities. |

Tr. 317:7–11 (Duchin, Oct. 4).

# S.865: FT. JACKSON

2. Rep. Wilson had little to no input on the redistricting process, and staff did not prioritize Congressmembers' preferences. *See also* Terreni Dep. Tr. 110:19–25, 111:16–19 (no recollection of Ft. Jackson being mentioned); Fiffick Dep. Tr. 81:5–17, 95:15–22 (Senate staff "didn't act on" Congressman Wilson's suggestions).

| | |
|---|---|
| 15    SENATOR HARPOOTILAN:   A Congressman was | 18    Q.  For your map drawing |
| 16  -- prior to this map being drawn, | 19  process would you -- did you elevate |
| 17  Congressman was consulted and had input? | 20  potential requests or suggestions by |
| 18    MR. ROBERTS:  The input was very | 21  members of Congress for how they |
| 19  little. | 22  wanted districts to look? |
| 20    SENATOR HARPOOTILAN:  Was what? | 23    A.  Not really.  Kind of took |
| 21    MR. ROBERTS:  Very little. | 24  the approach of, you know, |
| 22    SENATOR HARPOOTILAN:  Well, that's | 25  accommodate where possible if it |
| 23  fine, who was that Congressman? | |
| 24    MR. ROBERTS:  Senator Wilson called us | |
| 25  and asked us about (inaudible). | |



```
1              JOHN
2  works with the overall plan, but we
3  weren't making, you know, we weren't
4  going to elevate their requests as a
5  primary driver behind their plan.
6  You know, if we could make it work
7  within the general scheme of a map,
8  then sure.  But didn't give it any
9  special importance really.
```

PX No. 98 at 27:15–28:13 (Nov. 29, 2021 Sen. Redist. Comm. Hearing)                    John Dep. Tr. 55:2–13; 163:18–164:9.

# S.865: SPLIT OF ORANGEBURG COUNTY

At trial, Sen. Massey attempted to downplay splitting of Richland and Charleston as "larger" counties:

> 21  like, if you do this, Edgefield never matters.   Because Edgefield is small anyway.
> 22  We have fewer than 30 thousand people in the whole county.   And right now we're
> 23  at the edge of the congressional district.   But if you split Edgefield into two different
> 24  congressional district, we don't have enough people to matter to any member of
> 25  congress, whichever district it is.   And it would be the same -- well, actually you

Tr. 91:21-92:2 (Massey Oct. 12 PM).

> 1  splitting Edgefield is very different than splitting Greenville.   It's different than
> 2  splitting Richland or Charleston.   So, I think there's a big difference between
> 3  splitting a smaller county versus a larger county.

Tr. 111:1–3 (Massey, Oct. 12 PM) (rough).

*But*: Sen. Massey's small-county rule appears nowhere in the redistricting guidelines.  *See* PX. Nos. 175, 716.

*And*: Defendants nonetheless split Orangeburg, as well as Jasper in CD 1, both of which are smaller counties with majority or high Black populations.  Like Edgefield, Jasper also has fewer than 30,000 people, while Orangeburg has around 83,000.

Orangeburg also has a "unique history" in the state's civil rights tradition and is home to two HBCUs: Claflin and South Carolina State. Trial Tr. 116:5–11 (Cobb-Hunter, Oct. 3).

# S.865: RAGUSA CD 2 ANALYSIS



Dr. Jordan Ragusa, PhD, College of Charleston

| Table 2: Analysis of CD #2 | Model 1 VTDs Moved In | Model 2 VTDs Moved Out | Model 3 VTDs Moved In/Kept In |
|---|---|---|---|
| Variables | | | |
| Biden Vote | 0.34*** | 0.32** | 0.04 |
| BVAP | -0.18** | -0.52* | -0.31*** |
| Total VAP | <-0.01 | -0.17*** | 0.17*** |
| Constant | -3.08*** | -0.87 | -0.03 |
| N | 128 | 295 | 423 |

*** p<0.01, ** p<0.05, * p<0.1

PX No. 19 at 9 (Ragusa report).

- "VTDs with 100 Black voters had a 36% chance of being moved into [CD 2], compared to just 8% for VTDs with 1500 Black voters."  PX No. 19 at 5, 9 (Ragusa report).
- "VTDs with 100 Black voters had a[] 90% chance of being moved into or kept in [CD 2], compared to just 25% for VTDs with 1500 Black voters."  *Id.*

## S.865: LIU CD 2 ANALYSIS



Dr. Baodong Liu, PhD, University of Utah

**Table 11: Enacted CD 2 and Assignments of Voters—race v. party**

| Party Primary | Number of Voters in Envelop | Number of Voters in District | (% of Group That is in District) |
|---|---|---|---|
| White_DEM | 21154 | 14991 | 70.87 |
| Black_DEM | 45343 | 22133 | 48.81 |
| White_REP | 74410 | 67433 | 90.62 |
| Black_REP | 1552 | 1065 | 68.61 |

PX No. 48 at 20–21 (Liu report).

| 3 | disproportionately put into the out category.  So, being the |
| 4 | same party, and, yet, you are treated differently, obviously |
| 5 | race is the driving factor, not party. |

Tr. 553:6–10; 573:3–5 (Liu, Oct. 6).

# EXPERT ANALYSES: RACIAL PREDOMINANCE IN CD 2

## Dr. Ragusa

- Race is predictive of district assignments under S. 865, after controlling for partisanship and precinct size.  PX No. 19 at 5 (Ragusa report).

## Dr. Liu

- Black voters were much less likely to be assigned to CD 2 from the local envelope as compared to white voters, regardless of party affiliation.  PX No. 48 at 20-21 & tbl.11 (Liu report).

## Dr. Imai

- The number of Black residents assigned to CD 2 under the Enacted Plan is an extreme outlier, compared to 10,000 race-neutral simulations that are at least as compliant with guidelines and traditional redistricting principles.  PX No. 32 at 18–20 (Imai report).
- S.865 remains an outlier notwithstanding any attempt to maintain BVAP of CD 6.  *Id.*

## Dr. Duchin

- Compared to ensembles of 100,00 race-neutral simulations, S.865 significantly suppressed BVAP in every district except the district with the highest BVAP and the one with the lowest BVAP, ensuring that there would not be a second district that could perform for Black voters.  PX No. 67 at 23-24 & Fig. 11 (Duchin report).

Figure 8: CD 5 is highlighted, with the Black voting age population shown as in Figure [1] and the split city of Sumter (pop. 43,463) outlined in red.

# CONGRESSIONAL DISTRICT 5

A.  Sumter community of interest is split/not respected
B.  Split of Sumter (city and county) occurs at unusual locations.

PX No. 67 at 20, fig.8 (Duchin report)

# S.865: CD 5 SPLITS SUMTER



See CX No. 1 (Court-ordered data). Shaded green to reflect precinct-level BVAP.

Mr. James Felder: On one side of the congressional line are "predominantly African American" precincts assigned to CD 6, while neighboring precincts with "heavy Black populations" are placed in CD 5.  Tr. 13:18–14:12 (Felder, Oct. 12, AM) (rough).

7        Can you tell me anything about the African-American vote outside of

8    the city of Sumter? Are there other significant concentrations of African American

9    voters?

10        THE WITNESS:  Yes.  Up on the north side, 378.  In that area,

11    you've got heavy black populations there.  And the Ebenezer precinct, you've got a

12    heavy black population out there in Ebenezer, both of them, one and two.

Tr. 14:7–12 (Felder, Oct. 12, AM) (rough).

# S.865: SUMTER SPLIT

**Sumter Demographic Split**

| District | BVAP | WVAP |
|----------|------|------|
| 5 | 39.9% | 53.3% |
| 6 | 73.1% | 22.3% |

CX 1 (ECF No. 473) (Court-ordered data).

## S.865: RAGUSA CD 5 ANALYSIS



Dr. Jordan Ragusa, PhD, College of Charleston

| Table 5: Analysis of CD #5 | | | |
|---|---|---|---|
| | Model 1 | Model 2 | Model 3 |
| Variables | VTDs Moved In | VTDs Moved Out | VTDs Moved In/Kept In |
| Biden Vote | 0.29* | 0.02 | 0.10* |
| BVAP | -0.51*** | 0.02 | -0.08** |
| Total VAP | 0.01 | -0.12*** | -0.03* |
| Constant | -1.76*** | -0.89** | 1.25*** |
| N | 122 | 362 | 484 |
| *** $p<0.01$, ** $p<0.05$, * $p<0.1$ | | | |

PX No. 19 at 12 (Ragusa report).

- "VTDs with 100 Black voters had a 38% chance of being moved into [CD 5], compared to <1% for VTDs with 1500 Black voters."  PX No. 19 at 6, 12 (Ragusa report).
- "VTDs with 100 Black voters had a 76% chance of being moved into or kept in [CD 5], which compares to 52% for VTDs with 1500 Black voters."  *Id.*

# S.865: STATEWIDE VRA ANALYSIS OF CD 5



Dr. Kosuke Imai, PhD, Harvard University

**Table 1:** Frequency of Pairings of Districts in Sumter County in Statewide VRA Simulation. Only shows combination that appear in 1 percent or more of the 10,000 simulated plans.

| Pairings | Frequency |
|---|---|
| District 6 | 90.3% |
| District 6, District 7 | 4.5% |
| District 5 | 2.4% |
| District 5, District 6 | 1.2% |

44.    Table 1 further shows the relative frequency of district pairings that occur within Sumter County. The enacted plan's decision to split Sumter County into Districts 5 and 6 is highly unusual. In fact, only 1.2% of the 10,000 simulated plans split Sumter County into Districts 5 and 6, like the enacted plan does. In contrast, a vast majority of the simulated plans assign the entirety of Sumter County to a single district (2.4% for District 5 and 90.3% for District 6) without splitting the county.

PX No. 32 at 21 & tab.1 (Imai report).

# EXPERT ANALYSES: RACIAL PREDOMINANCE IN CD 5.

## Dr. Ragusa

- Race is predictive of district assignments under S. 865, after controlling for partisanship and precinct size.  PX No. 19 at 5 (Ragusa report).

## Dr. Imai

- The number of Black residents assigned to CD 5 under the Enacted Plan is an extreme outlier, compared to 10,000 race-neutral simulations that are at least as compliant with guidelines and traditional redistricting principles.  PX No. 32 at 20–21 (Imai report).
- S.865 remains an outlier notwithstanding any attempt to maintain BVAP of CD 6.  *Id.*

## Dr. Duchin

- Compared to ensembles of 100,00 race-neutral simulations, S.865 significantly suppressed BVAP in every district except the district with the highest BVAP and the one with the lowest BVAP, ensuring that there would not be a second district that could perform for Black voters.  PX No. 67 at 23-24 & Fig. 11 (Duchin report).

# RACE CONSIDERED: OVERVIEW

## Legislators

Legislators were aware of relevant racial demographics even without looking at data.

Legislators received racial data, including district-level BVAP, from staff in order to evaluate maps at *every* phase of their consideration of congressional maps.

Sen. Campsen reviewed detailed racial breakdown of Charleston-area movements.

Legislators claim to have relied on the 2011 map, which was race-conscious due to the State's constitutional and statutory obligations.

Map's design is indicative of racial targeting, making it highly unlikely that race was not considered.

## Redistricting Staff

BVAP data was available and visible during map-drawing, updating in real-time in response to changes.

Senate staff looked at racial impact of various plans and considered BVAP during map-drawing.

Mr. Roberts, Mr. Terreni, Mr. Fiffick, and other staff are intimately familiar with SC's racial demographics and geography and could not have ignored race.

At minimum, staff looked at racial data after each map was drawn, for purposes of evaluation.

# RACE CONSIDERED: SEN. CAMPSEN



Sen. Campsen
(primary proponent
of what became
S.865)

| 18 | Q. | And how long have you lived in the Charleston? |
| 19 | A. | My entire life. |

| 2 | Q. | And you know where the concentrations of black voters are in those areas |
| 3 | | without looking -- |
| 4 | A. | Yes.   I can't help to know that.   I can't help but to know that, having been |
| 5 | | born and raised here. |

Tr. 48:18–19, 104:2–5 (Campsen, Oct. 13, PM) (rough).

Other legislators are similarly aware of race in their districts.  *E.g.*, Tr. 104:2–5
(Campsen, Oct. 13, PM) (rough); Fiffick Dep. Tr. 58:18-59:8,129:16-130:4.

# RACE CONSIDERED: VISIBLE DURING MAP DRAWING

## Race data was available to anyone who wanted it.

```
8    don't recall outside counsel ever, you know,
9    needing to use that data. But that data was
10   available to everybody, and anybody who asked for
11   it, that sort of data was to go to them for sure.
```

Fifick Dep. Tr. 12:23–13:11.

```
4    Q.   Are you aware of whether race data was
5    loaded into the computer that y'all shared in the
6    map room?
7    A.   Oh, yeah.  It was, yeah, for sure.
```

Fifick Dep. Tr. 124:4–7.

## BVAP was visible during map-drawing and updated in real time as changes are made.

```
21   A.    No.  The BVAP was actually displayed in the statistics at the bottom of the
22   screen the entire time we were driving.
23   Q.    So BVAP was visible on the screen while you were drawing maps?
24   A.    Yeah.  It was in the statistics window at the bottom of the screen.
```

Tr. 30:21–24 (Roberts, Oct. 12, PM) (rough).

```
25   Q.    So, you could see BVAP as you were making changes in real time as you
1    were drawing lines?
2    A.    We could see the statistics update after a change was made.
3    Q.    So if you moved a district line you could see if the BVAP went up or down,
4    right?
5    A.    You could see on the statistics what the overall district BVAP would be.
```

Tr. 30:25–31:5 (Roberts, Oct. 12, PM) (rough).

# RACE CONSIDERED: EVALUATING PLANS

## Each map was accompanied by a report containing race data.

```
21          Q.   Okay.  And you would agree,

22     though, that when maps were -- the

23     maps were proposed the initial staff

24     plan and those that follow that they

25     came along with a summary report
```

```
2      which included race data?

3          A.   Yes.
```

Terreni Dep. Tr. 285:6–12, 285:21–286:3.

## Mr. Roberts always looked at BVAP after each map was drawn, and others would discuss altering BVAP levels.

```
14    Q.   And you always looked at BVAP when you were looking at final product after

15    a iteration of it?

16    A.   Yes.

17    Q.   Mr. Terrine would ask you for it?

18    A.   Yes.

19    Q.   He'd ask for BVAPs, the whole team?

20    A.   That's correct.

21    Q.   You never participated in discussions about maintaining

22    increasing -- maintaining increasing or decreasing BVAPs in a district, right?

23    A.   Not that I can recall, no.

24    Q.   Those are discussions for the attorneys?

25    A.   Yes.   There were multiple conversations of which I was not a part of with the

1     attorneys and outside counsel.
```

Tr. 51:11–52:1 (Roberts, Oct. 12, PM) (rough).

## S.865: RACIALLY ENGINEERED

### BVAP % by District

| | CD 1 | CD 2 | CD 3 | CD 4 | CD 5 | CD 6 | CD 7 |
|---|---|---|---|---|---|---|---|
| Previous2012 | 0.173 | 0.239 | 0.174 | 0.183 | 0.257 | 0.525 | 0.254 |
| Enacted2022 | 0.174 | 0.254 | 0.176 | 0.19 | 0.247 | 0.469 | 0.254 |

PX No. 67 at 9, tab.1 (Duchin expert report)

BVAP outside of CD 6 largely frozen, despite significant growth and movement of Black populations in Richland and Charleston Counties.

BVAP in CD 1 remained essentially unchanged, despite nearly 200,000 people being exchanged with CD 6 (approx. 25% of district population).

S.865 disproportionately splits Black counties, along racialized lines and placing higher BVAP in CD 6, as discussed earlier.



PX No. 67 at 6, fig.1 (Duchin report) (dark blues indicate greatest BVAP growth).

**Table 4: Population Movements by District, 2012-2022 Lines**

| | To | | | | | | |
|---|---|---|---|---|---|---|---|
| From | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 1 | – | – | – | – | – | 140,489 | – |
| 2 | – | – | – | – | – | 14,397 | – |
| 3 | – | – | – | 14,001 | – | – | – |
| 4 | – | – | 7,111 | – | 35,919 | – | – |
| 5 | – | – | – | 31,309 | – | 10,038 | – |
| 6 | 52,799 | 23,771 | – | – | 346 | – | 3,553 |
| 7 | – | – | – | – | – | 286 | – |

SX No. 75 at 18, tab.4 (Trende report).

```
11    A.    The Senate guidelines have a number of expressed
12    preferences.  But certainly minimizing the division of county
13    splits, precinct splits, and municipal splits are listed.
14    Here, eight of the 10 county splits occur along the boundaries
15    of District 6.  Ten of the 13 precinct splits, if memory
16    serves, occur on the boundaries of District 6.  And eight of
17    the 10 municipal splits, where the split doesn't occur solely
18    as a function of a county line, eight of the 10 of those kinds
19    of splits also occur along the boundaries of District 6.
```

Tr. 973:4–19 (Oppermann, Oct. 7).

49

## S.865: A "COINCIDENCE"?

11   Q.   Dr. Imai, we've heard testimony that the distribution of black voters between

12   Districts 1 and 6 in Charleston County must be a coincidence because legislators

13   didn't look at race.

14        Does your analysis speak to whether a coincidence is likely?

15   A.   If it's a coincidence, it would be extremely astronomically small number.   So,

16   if you call that a coincidence, it is.   But my statistical analysis shows it's highly

17   unlikely.

Tr. 40:11–17 (Imai, Oct. 14, AM) (rough).

50

RACE, NOT PARTISANSHIP, PREDOMINATED IN S.865

Partisanship is a post hoc rationale that Defendants and their staff disclaimed prior to trial.

Expert analyses disentangled race from politics and concluded that race better explained S.865.

Defendants have not rebutted any of Plaintiffs' expert evidence.

# LEGISLATORS ON ROLE OF PARTISAN ADVANTAGE

## Senator Rankin (Chair of Judiciary Committee)

```
10    Q.  Okay.  Was it a goal of yours to make

11    Congressional District 1 less competitive for

12    Democrats?

13    A.  No.

14    Q.  Was it a goal of yours to make

15    Congressional District 1 more reliably republican

16    going forward?

17    A.  No.
```

Rankin Dep. Tr. 169:10–17.

## Senator Campsen (primary proponent of the Enacted Plan)

```
20    Now I want to also address the issue of some

21    allegations of partisan gerrymandering.  I'd like to give

22    some numbers that I think will demonstrate that that's

23    really not the case.

24        In the 1st District, if you look at the Trump

25    vote in the 1st, under the benchmark it was 53.03 percent.
```

```
                                              Page 26
1        That's the benchmark Trump vote in 2020.

2        Under Amendment 1, the vote would be

3    54.39 percent.  That's an increase of only 1.36 percent.
```

PX No. 116 25:20–26:3.

## SEN. CAMPSEN'S TRIAL TESTIMONY IS NOT CREDIBLE GIVEN INCONSISTENT AND MISLEADING STATEMENTS



Sen. Campsen
(primary proponent
of what became
S.865)

Falsely claims
that the cities of
Columbia and
Charleston had
been in same
district since
1990s.

*Jan. 19, 2022. See PX
No. 115 at 12:2–7 (Sen.
Jud. Comm. Tr.).*

Stated that
redistricting
principles
carried equal
weight, "one is
no more
important
than another."

*Jan. 19, 2022. See PX
No. 115 at 12:19–22
(Sen. Jud. Comm. Tr.).*

Reverses
course and
claims that
Senate
Amendment 1
is "a minimal
change plan."

*Oct. 13, 2022. Tr.
67:22–25 (Campsen,
Oct. 13, PM) (rough).*

Claims that true
"primary goal"
was to draw a
Republican CD
1, which he
admits had
never been
disclosed
previously.

      

*Jan. 19, 2022. See PX
No. 115 at 11:17–24
(Sen. Jud. Comm. Tr.).*

Falsely claims that
CD 6 was "least
change" despite
unnecessary
movements, and
misrepresents the
number of Black
voters who were
moved under
Sen. Amend. 1.

*Jan. 19, 2022. See PX
No. 115 at 21:13–18
(Sen. Jud. Comm. Tr.).*

Denies
following a
"least change"
model for
Senate
Amendment 1.

*Jan. 20, 2022. See PX
No. 116 at 25:1–4 (Sen.
Jud. Comm. Tr.).*

*See also Tr. 67:22–25
(Campsen, Oct. 13, PM)
(rough).*

Claims that
primary goal
was "to have
Beaufort
County and
Berkeley
County in
congressional
district 1."

*Oct. 13, 2022. Tr.
74:1–2, 120:8–10,
(Campsen, Oct. 13, PM)
(rough).*

## STAFFERS ON ROLE OF PARTISANSHIP

### Mr. Andrew Fiffick (Chief of Staff of Sen. Jud. Comm.)

```
2    Q.   Are you aware of any instruction by any
3    member of the legislature or anyone else that you
4    and the team developing maps should be drawing six
5    districts of the seven that lean Republican and
6    one district of the seven that leans Democrat?
7    A.   I don't recall anybody asking for that,
8    but that doesn't mean we didn't have it.  That
9    wasn't something that I remember.
```

Fiffick Dep. Tr. 138:2–9.

### Mr. Breeden John (one of the two Senate map-drawers)

```
6    Q.   Did you have any discussion
7    about increasing a Republican
8    advantage in any congressional
9    district?
10   A.   Not -- well, I don't recall
11   any discussions with Senator Rankin
12   where he said I will -- I want you
13   all to increase Republican advantage
14   in any district.
```

John Dep. Tr. 145:6–14.

### Ms. Paula Benson (author of Senate Guidelines)

```
5    Q.   So, to recap and to be clear, subcommittee
6    staff did not set out to make sure that CD 1 was more
7    Republican leaning than it was in the benchmark plan?
8    A.   Not -- not that I'm aware of, no.
```

```
3    Q.   Of course.  And I understand that point.
4    My question was more -- goes more to whether it was
5    staff objective to draft a map that preserved a 6 to
6    1 Republican advantage?
7    A.   No.
```

Benson Dep. Tr. 205:5–8, 206:3– 7.

# EXPERT ANALYSES: RACE, NOT PARTISANSHIP

## Dr. Liu

- Black voters were much less likely to be assigned to CDs 1 and 2 as compared to white voters, regardless of party affiliation.  PX No. 48 at 15–17 & tbls.6, 7, 19–20 & tbls.9, 11 (Liu report).
- Black Democrats were much more likely to be moved under the Enacted Plan compared to white Democrats. *Id.*

## Dr. Ragusa

- Race is predictive of how Defendants assigned voters to CDs 1, 2, and 5, even after controlling for partisanship and precinct size.  PX No. 19 at 4–5 (Ragusa report); *see also* PX No. 26 (Ragusa rebuttal report) at 4–9.

## Dr. Duchin

-  S.865 performs particularly poorly for Black voters and is otherwise "unremarkable" in its performance for "the generic Democratic voter."  PX No. 67 at 27 (Duchin report).

# EXPERTS: REDISTRICTING PRINCIPLES

| Expert | Compactness | Communities of Interest | Contiguity | Core Retention | County Splits | Pop. Balance | Incumbency Pairings | Minority Electoral Opportunity | Municipal Splits | Partisan-ship | Precinct or VTD Splits | Public Input |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Duchin | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Imai | ✓ | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | ✓ | |
| Liu | | ✓ | | | ✓ | | | ✓ | | ✓ | ✓ | |
| Ragusa | ✓ | ✓ | ✓ | ✓ | ✓ | | | ✓ | | ✓ | ✓ | |

## vs.

| Trende | ✓ | ✗ | ✗ | ✓ | ✓ | ✓ | ✓ | ✗ | ✗ | ✓ | ✓ | ✗ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

# DEFENDANTS' FLAWED EXPERT ANALYSIS



Mr. Sean Trende

Unlike Plaintiffs' experts, Mr. Trende *failed* to:

1. Disaggregate the effects of race and party, *see* SX No. 75 (Trende report);

2. Consider the overall, bi-directional movement of voters between districts, e.g., Tr. 65:10-18, 66:13-15, 66:24-67:11 (Trende, Oct. 13, AM) (rough);

3. Discuss basic redistricting factors such as municipal splits and contiguity, Tr. 57:12-58:3 (Trende, Oct. 13, AM) (rough); PX No. 87 at 2 (Duchin rebuttal report);

4. Consider proportionality of Black voters moved under S.865, rather than raw numbers;

5. Assess voting patterns and electoral opportunity for Black voters under S.865 or any map;

6. Compare S.865 against alternative maps actually available to Defendants.

# Legislative Defendants' Asserted Application of Traditional Redistricting Principles, By County

By South Carolina county; as asserted in Senate Defs.' and House Defs.' Proposed Findings of Fact, at Part VII.C

● Principles applied

| Counties: / Principles | Beaufort | Berkeley | Charleston | Colleton | Dorchester | Florence | Jasper | Orangeburg | Richland | Sumter |
|---|---|---|---|---|---|---|---|---|---|---|
| County splits | ● | ● | | | | | | | | |
| VTD splits | | | | | | ● | | ● | ● | ● |
| Shape/compactness | | | | | ● | ● | | | | |
| State legislative districts | | | | | ● | | | | ● | |
| Public input | | | | | | | ● | | | |
| Legislator's input | | | | | | | ● | | | ● |
| Communities of interest | ● | | | ● | | | | ● | | |
| Partisanship | | ● | ● | | | | | | | |
| Unnamed "traditional principles" | | | ● | | | | | | | |

# SUMMARY OF DISTRICTS

## CD 1

- Splitting of Charleston County and Black communities along racialized lines.
- Evidence of racial target—BVAP remains essentially unchanged despite significant growth and movement of Black voters.
- Race, not party, is primary driver.
- Non-compact, non-contiguous.
- Outlier as compared to hundreds of thousands of race-blind simulations that control for redistricting guidelines and traditional redistricting factors

## CD 2

- Splitting of Richland and Orangeburg Counties and their Black communities along racialized lines.
- Evidence of racial target—BVAP remains essentially unchanged despite significant growth and movement of Black voters.
- Race, not party, is primary driver.
- Bizarre, non-compact hook shape targeting areas with growing Black population.
- Outlier as compared to hundreds of thousands of race-blind simulations that control for redistricting guidelines and traditional redistricting factors

## CD 5

- Splitting of Sumter County and City and Black communities along racialized lines.
- Evidence of racial target—BVAP remains essentially unchanged despite significant movement of voters.
- Race, not party, is primary driver.
- Outlier as compared to hundreds of thousands of race-blind simulations that control for redistricting guidelines and traditional redistricting factors

CORE RETENTION CAN'T EXPLAIN S.865'S CRACKING OF BLACK VOTERS.

S.865 is not a least-change map.

Core retention is a low-priority criterion.

Expert analyses confirm that S.865 remains an outlier even after controlling for core retention.

Core retention is capable of disguising a plan's racist features, particularly when applied selectively.

## S.865: UNNECESSARY REDISTRIBUTION

| District | Overpopulated | Underpopulated | People Removed |
|----------|---------------|----------------|----------------|
| 1 | 87,689 | No | 140,489 |
| 2 | No | 9,375 | 14,397 |
| 5 | 5,082 | No | 41,407 |
| 6 | No | 84,741 | 80,469 |

*Compare* SDX No. 28e *with* SDX No. 29c; *see also* SDX No. 75 at 18, tbl. 4 (Defs.' expert report by Sean Trende)

# S.865: CD 1 CORE RETENTION

CD 1 does not retain Charleston as its "core," as a result of movements far in excess of the district's overpopulation.



Dr. Jordan Ragusa, PhD, College of Charleston

| 17 | And, second, Mr. Trende claims that CD 1 retains a large |
| 18 | share of its core and also that CD 1 continues to be anchored |
| 19 | in Charleston.  I believe both of those claims are incorrect. |

Tr. 1050:17–19 (Ragusa, Oct. 7); PX No. 26 (Ragusa rebuttal) at 2–4.

**Table 1: CD #1 County Cores**

| County | Old VAP | Old Percent | New VAP | New Percent | Change |
|---|---|---|---|---|---|
| Jasper | 0 | 0% | 4,368 | 1% | +1% |
| Colleton | 1,186 | <1% | 2,099 | <1% | 0% |
| Dorchester | 105,017 | 16% | 94,831 | 17% | +1% |
| Beaufort | 142,046 | 22% | 151,768 | 27% | +5% |
| Berkeley | 150,383 | 23% | 173,949 | 30% | +7% |
| Charleston | 242,758 | 38% | 143,523 | 25% | -13% |
| District Total | 641,390 | | 570,538 | | |

PX No. 26 at 4, tab.1.

# CORE RETENTION: LOW PRIORITY AND *POST HOC*

1. Under House guidelines, the concept of a "core" does not appear at all.
   i. PX No. 175 (House guidelines).

2. Under the Senate guidelines, it appears as an "additional consideration" which should be considered only "where practical and appropriate" and after non-dilution principles are met.
   i. PX No. 716 (Senate guidelines); Tr. 261:12–262:5 (Duchin, Oct. 3).

3. The Senate Redistricting Subcommittee never discussed core retention.
   i. Talley Dep. Tr. 41:25–42:6; Bernstein Dep. Tr. 105:11–17.

4. Defendants and their staff did not have to use the 2011 map as the starting point.
   i. John Dep. Tr. 136:4–17; Dennis Dep. Tr. 197:3–198:6; Tr. 33:8-14 (Jordan, Oct. 13, PM) (rough).

5. Core retention and "least change" were not raised in legislative debate as a defense of S.865 until the January 20, 2022 Senate final floor debate, when the map was already final.
   i. PX Nos. 89, 91–93, 95, 98, 114–115; Tr. 47:10–47:15 (Bagley, Oct. 11, AM); PX No. 18 at 11.

| 25 | So do you recall core |
| --- | --- |
| | TALLEY |
| 1 | |
| 2 | retention, or preserving the cores of |
| 3 | existing districts, coming up during the |
| 4 | map drawing process? |
| 5 | A.  Specific to the congressional |
| 6 | districts, I do not. |

Talley Dep. Tr. 41:25–42:6.

## SELECTIVE HEALING AND CORE RETENTION

**Defendants' redistricting choices consistently harm Black communities.**

```
13   redistricting involves choices.  That's going to be a common
14   refrain in my testimony.  But, what I see here is patterns of
15   selective healing.  So, for instance, Beaufort and Berkeley
16   Counties used to be split and are healed in the new map.  I
```

```
19   Orangeburg, which is one of the very small number of majority
20   Black counties in the state, is not chosen for healing.  And
```

Tr. 315:13–16, 315:19–20 (Duchin, Oct. 4).

```
13   of intent.  Since this portion of the state has a higher
14   African-American population relative to rest of the state, I
15   thought it was concerning that county, precinct and municipal
16   splits were almost entirely clustered along the boundaries of
17   District 6.
```

```
4    two, disproportionately, the municipalities that are split are
5    municipalities that contain a significant amount of
6    African-American population.
```

Tr. 976:1–6, 986:13–17 (Oppermann, Oct. 7).

**Defendants dismiss splitting Black communities simply because those counties were split under 2011 plan, without addressing public input or the possibility of making them whole.**

511. Orangeburg County was split in the Benchmark Plan and remains split in the Enacted Plan. 10/12/22 PM Tr. at 9:21-23 (W. Roberts); SX 28d, 29e, 54; *see also Colleton*

516. Richland County was split in the Benchmark Plan and remains split in the Enacted Plan. *See* 10/12/22 PM Tr. at 11:4-17 (W. Roberts); SX 28d, 29e, 55.

521. Sumter County was split in the Benchmark Plan and remains split in the Enacted Plan. 10/12/22 PM Tr. at 14:21-23 (W. Roberts); SX 28d, 29e, 56.

543. Charleston County was split in the Benchmark Plan and remains split in the Enacted Plan. 10/12/22 PM Tr. at 22:22-24 (W. Roberts); SX 28d, 29e, 50.

Defs.' Proposed Findings at 64–69.

**In contrast, Defendants claim credit for "repairing" splits in white cities and counties while citing public input from those areas.**

505. The Enacted Plan makes whole Beaufort County, which was split in the Benchmark Plan. SX 48; 10/12/22 PM Tr. at 8:2 (W. Roberts).

506. Repairing this county split preserves the Beaufort County community of interest identified in public testimony. 10/12/22 PM Tr. at 8:2-9:12 (W. Roberts); PX 67 at 31-33, 35;

530. Berkeley County was split in the Benchmark Plan and is made whole in District 1

Defs.' Proposed Findings at 64–69.

# S.865: OUTLIER COMPARED TO SIMULATIONS WITH NEARLY IDENTICAL CORE RETENTION



Dr. Kosuke Imai, PhD, Harvard University



PX No. 32 at 13, 14 fig.3 (Imai report).

# OPTIONS FOR CORE RETENTION



Dr. Moon Duchin,
PhD, Tufts
University

```
5    A.   I think this speaks to core retention, not only because
6    I've only redrawn part of the state while keeping the other
7    three districts intact, but because I only moved a single
8    boundary line. I measured the core retention of this
9    alternative plan and found it to be over 92 percent in
10   agreement with the State's Plan. And that means, even if you
11   took the extremely high bar of agreeing more than 90 percent
12   with the State's map, this passes that test. So, with very
13   high core retention and a minimal redrawing, we're able to get
14   a much more demographically typical and much more electorally
15   promising map for Black voters.
```

Tr. 346:5–15, 370:19–371:5 (Duchin, Oct. 4).



Alternative districts

PX No. 67 at 24, fig.11
(Duchin report).

66

# CORE RETENTION'S "SPECIAL" STATUS

Dr. Duchin: core retention is "controversial," may preserve vote dilutive properties

```
6    Q.  And based upon your experience in redistricting, what do
7    you think about core retention as a criteria for drawing
8    lines?
9    A.  Right.  I would say that of many of the ones that we've
10   discussed, cores and incumbents are controversial.  Certainly
```

```
3    will tend to maintain that.  And if the old plan was dilutive,
4    then a plan with high core retention will tend to maintain
5    that.  The same is true for communities of interests.  If you
```

Tr. 260:6–10, 261:3–5 (Duchin, Oct. 3).

Dr. Imai: core retention could "mask" race

```
17   Q.  Would using a core retention constraint mask the effect of race in the current
18   plan?
19   A.  That's another way of saying that.  If race was used the previous plan, that
20   could mask the role race plays.
```

Tr. 88:17–20 (Imai, Oct. 14, AM) (rough).

Core retention "holds a special place in the predominance balance …. [because it] 'may be used to insulate the original basis for [] district boundaries.'" *Bethune-Hill v. Va. State Bd. of Elections*, 141 F. Supp. 3d 505, 544 (E.D. Va. 2015) (quoting *ALBC*, 135 S. Ct. at 1251).

When the legislature "chooses to rely on redistricting criteria highly correlated with race," like preserving cores, it cannot use such criteria as a defense against racial predominance. *Covington v. North Carolina*, No. 1:15-CV-399, 2018 WL 604732, at *4 (M.D.N.C. Jan. 26, 2018)

67

## DEFENDANTS CANNOT USE REP. JIM CLYBURN TO JUSTIFY S.865

Defendants' never identified Rep. Clyburn or his staff as having relevant knowledge about S.865 or Defendants' defenses

Senate staff testified that Rep. Clyburn's preferences were given little to no weight.

Key differences with S.865 show that Rep. Clyburn's map was not the basis for the Enacted Plan.

# STAFFERS: REP. CLYBURN'S ROLE

1. Mr. Roberts stated at Senate Redistricting hearing that Rep. Clyburn and Rep. Wilson had "very little" input. PX No. 98 at 27:15–28:13 (Nov. 29, 2021 hearing)

2. Mr. John testified that requests of congressmembers were not "elevated . . . as a primary driver" and were not given "any special importance." PX No. 98 at 27:15–28:13 (Nov. 29, 2021 hearing).

3. Mr. Fiffick testified that Rep. Clyburn's staff, Mr. Tresvant, "just wanted to see what the maps looked like" and didn't have "any sort of message" during meeting. Fiffick Dep. Tr. 84:5–11.

4. Mr. Fiffick, who supervised Mr. Roberts, testified that Mr. Tresvant's map was never implemented and did not inform the staff "in terms of drawing up a congressional map." Fiffick Dep. Tr. 84:22–85:4, 86:21–82:2.

5. Ultimately, Mr. Roberts did not honor Rep. Clyburn's preference to have all of Sumter in CD 6, and he did not follow up with Rep. Clyburn's office at any point. Tr. 43:21–44:4, 44:13–14 (Roberts, Oct. 12 PM) (rough).

# REP. CLYBURN'S MAP'S DIFFERENCES

| | Milk (SDX No. 223A, 223D) (Clyburn) | S.865 (SDX No. 29C, 29E) |
|---|---|---|
| Beaufort Split | Yes | No |
| Berkeley Split | Yes | No |
| Jasper Split | No | Yes |
| Precincts Split | 27 | 10 |
| CD 6 Orientation to Charleston Peninsula | Northeast (through Berkeley) | West (through Dorchester) |
| CD 1 Core Retention | 97.34% (3rd Highest) | 92.78% (6th Highest) |
| CD 2 Core Retention | 97.91% (2d Highest) | 96.75% (3rd Highest) |
| CD 6 Core Retention | 83.15% (Lowest) | 77.41% (Lowest) |
| Population Moved from CD 1 | 107,117 | 140,489 |
| Population Moved from CD 2 | 5,932 | 14,397 |
| Population Moved from CD 6 | 38,435 | 80,469 |

Sen. Campsen's and Mr. Roberts' trial testimonies are irreconcilably inconsistent and neither should be credited:

- *Campsen*: 2011 map was "starting point" for the Enacted Plan. Tr. 67:23–68:5 (Campsen, Oct. 13 PM) (rough).

- *Roberts*: Clyburn map was "original basis" for the Enacted Map. Tr. 41:7–10 (Roberts, Oct. 12 PM) (rough).

INADVERTENTLY OMITTED FIGURE FROM PLAINTIFFS' PROPOSED FINDINGS AT PAGE 90, PARAGRAPH 250



# COUNT 2: INTENTIONAL RACIAL VOTE DILUTION

How Defendants Intentionally and Unconstitutionally Discriminated Against Black Voters

*ARLINGTON HEIGHTS* FACTORS

**Impact of S.865 on Black voters,**

Pls' FOF Section III(B)

**Foreseeability of the impact of S.865 on Black voters,**

Pls' FOF Section III(F)

**Historical background of voting discrimination in South Carolina,**

Pls' FOF Section Section III(A)

**Sequence of legislative events leading to the adoption of S.865,**

Pls' FOF Section III(C)

**Procedural and substantive departures from the General Assembly's normal decision-making processes and legislative rules leading to the adoption of S.865,**

Pls' FOF Section III(D)

**The availability of less discriminatory alternatives before the General Assembly enacted S.865,**

Pls' FOF Section III(F)(ii)

**The tenuous justifications offered by the General Assembly for S.865,**

Pls' FOF Sections III(C), (E)

# RACIALLY DISCRIMINATORY IMPACT

Disproportionate sorting of Black voters even when controlling for party,
Pls' FOF Section III(B)

Selective choices to heal VTDs, cities, and county splits for white voters and maintain and split VTDs, cities, and county for Black voters,
Pls' FOF Sections II(A)(ii), (C)(ii)(a), (D)(ii)(a); III(B)

Reduced electoral opportunities for Black voters,
Pls FOF Section III(B)

# RACIALLY DISCRIMINATORY IMPACT

**Table 6**
**Race v Party in CD 1 of Enacted Plan, South Carolina[16]**

|  | White_Dem | Black_Dem | White_Rep | Black_Rep |
|---|---|---|---|---|
| Core | 15,825 (17.3%) | 10,121 (11.1%) | 64,331 (70.3%) | 1,236 (1.4%) |
| Into | 524 (9.0%) | 2,176 (37.2%) | 2,742 (46.8%) | 415 (7.1%) |
| Out | 3,651 (22.1%) | 3,640 (22.0%) | 9,103 (55.0%) | 164 (1.0%) |

PX No. 54 (Dr. Liu)



PX No. 55 (Dr. Liu)

# REDUCTION OF ELECTORAL OPPORTUNITIES

|  | CD 1 | CD 2 | CD 3 | CD 4 | CD 5 | CD 6 | CD 7 |
|---|---|---|---|---|---|---|---|
| Previous2012 | 0.470 | 0.442 | 0.310 | 0.396 | 0.416 | 0.678 | 0.406 |
| Enacted2022 | 0.456 | 0.446 | 0.310 | 0.406 | 0.408 | 0.663 | 0.406 |
| Jessamine | 0.440 | 0.440 | 0.310 | 0.406 | 0.407 | 0.693 | 0.406 |
| SC-NAACP1 | 0.526 | 0.379 | 0.331 | 0.360 | 0.405 | 0.655 | 0.435 |
| SC-NAACP2 | 0.525 | 0.408 | 0.310 | 0.397 | 0.379 | 0.663 | 0.406 |
| Harpootlian | 0.518 | 0.365 | 0.347 | 0.342 | 0.469 | 0.656 | 0.387 |
| LWVSC | 0.517 | 0.399 | 0.308 | 0.404 | 0.400 | 0.649 | 0.408 |
| Foster | 0.529 | 0.335 | 0.365 | 0.378 | 0.376 | 0.521 | 0.578 |
| Muscatel | 0.478 | 0.443 | 0.313 | 0.399 | 0.409 | 0.647 | 0.406 |
| Harrison | 0.520 | 0.444 | 0.317 | 0.394 | 0.449 | 0.543 | 0.416 |
| Sukovich | 0.521 | 0.340 | 0.364 | 0.349 | 0.448 | 0.662 | 0.414 |
| Roberts | 0.522 | 0.512 | 0.396 | 0.503 | 0.510 | 0.329 | 0.315 |

PX No. 122 (Dr. Duchin): 2020
Presidential Election –
Biden/Harris – statewide share

# REDUCTION OF ELECTORAL OPPORTUNITIES

|  | CD 1 | CD 2 | CD 3 | CD 4 | CD 5 | CD 6 | CD 7 |
|---|---|---|---|---|---|---|---|
| Previous2012 | 0.443 | 0.408 | 0.305 | 0.371 | 0.408 | 0.681 | 0.410 |
| Enacted2022 | 0.433 | 0.413 | 0.305 | 0.380 | 0.401 | 0.658 | 0.409 |
| Jessamine | 0.414 | 0.407 | 0.305 | 0.380 | 0.400 | 0.691 | 0.409 |
| SC-NAACP1 | 0.526 | 0.351 | 0.322 | 0.340 | 0.396 | 0.647 | 0.414 |
| SC-NAACP2 | 0.505 | 0.385 | 0.305 | 0.375 | 0.365 | 0.646 | 0.409 |
| Harpootlian | 0.494 | 0.343 | 0.333 | 0.324 | 0.464 | 0.639 | 0.382 |
| LWVSC | 0.496 | 0.376 | 0.302 | 0.380 | 0.396 | 0.631 | 0.406 |
| Foster | 0.507 | 0.323 | 0.345 | 0.368 | 0.363 | 0.495 | 0.579 |
| Muscatel | 0.450 | 0.410 | 0.308 | 0.375 | 0.401 | 0.653 | 0.409 |
| Harrison | 0.499 | 0.433 | 0.313 | 0.369 | 0.440 | 0.518 | 0.421 |
| Sukovich | 0.513 | 0.320 | 0.344 | 0.337 | 0.443 | 0.642 | 0.399 |
| Roberts | 0.499 | 0.498 | 0.390 | 0.500 | 0.492 | 0.312 | 0.300 |

PX No. 124 (Dr. Duchin)
2018 Secretary of State –
Whittenburg – statewide share

# REDUCTION OF ELECTORAL OPPORTUNITIES

**Table 4: Effective Analyses for Enacted Congressional Redistricting Plans, SC[15]**

| District | CD 1 | CD 2 | CD 3 | CD 4 | CD 5 | CD 6 | CD 7 |
|---|---|---|---|---|---|---|---|
| BVAP (original)# | 17% | 24% | 17% | 18% | 26% | 53% | 25% |
| Enacted Plan | 17% | 25% | 18% | 19% | 25% | 47% | 25% |
| Harpootlian Plan | 21% | 22% | 16% | 16% | 34% | 50% | 18% |
| Plaintiff_Plan 1 | 35% | 21% | 16% | 17% | 24% | 53% | 12% |
| Plaintiff_Plan 2 | 24% | 20% | 18% | 19% | 20% | 50% | 25% |
|  |  |  |  |  |  |  |  |
| WVAP (original) | 71% | 67% | 74% | 68% | 66% | 40% | 67% |
| Enacted Plan | 71% | 64% | 74% | 67% | 67% | 45% | 67% |
| Harpootlian Plan | 67% | 69% | 74% | 72% | 58% | 43% | 72% |
| Plaintiff_Plan 1 | 54% | 70% | 74% | 70% | 67% | 40% | 78% |
| Plaintiff_Plan 2 | 65% | 69% | 74% | 68% | 70% | 42% | 67% |
|  |  |  |  |  |  |  |  |
| RPV (original) | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Enacted Plan | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Harpootlian Plan | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Plaintiff_Plan 1 | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Plaintiff_Plan 2 | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
|  |  |  |  |  |  |  |  |
| Average % vote for BPC (original) | 45% | 42% | 31% | 38% | 41% | 68% | 41% |
| Enacted Plan | 44% | 42% | 31% | 39% | 41% | 66% | 41% |
| Harpootlian Plan | 50% | 35% | 33% | 33% | 47% | 64% | 38% |
| Plaintiff_Plan 1 | 53% | 36% | 32% | 35% | 40% | 65% | 42% |
| Plaintiff_Plan 2 | 51% | 39% | 31% | 38% | 37% | 65% | 41% |

PX No. 52 (Dr. Liu)

## FORESEEABILITY OF S.865'S DISCRIMINATORY IMPACT

Redraw based on race-conscious 2011 map

Receipt of 2020 Census race data, including at bloc level

Awareness of race at *every* stage in the drawing, assessment, and consideration of congressional plans

Awareness of concentration of Black populations

Awareness of racially polarized voting patterns

Requests by the public and Black legislators to assess the racial impact of proposed congressional plans

Warnings that proposed congressional plans cracked Black communities and minimized Black electoral opportunities

# PRIVATE CRITERIA

**Implemented**

- Don't touch CD 7
- Keep Fort Jackson in CD 2
- Don't include Beaufort County in CD 2
- Make Berkeley County whole and move it into CD 1
- Maintain a 6-1 Republican advantage for congressional seats
- Make CD 1 Republican leaning

# ARBITRARY AND INCONSISTENT APPLICATION OF CRITERIA

## Regarding Congressional members' preferences

| | |
|---|---|
| **Senator Campsen** | "little" to "no weight at all" – Tr. 100:5-13 (Campsen, Oct. 13 PM) (rough) |
| **Andrew Fiffick, Director of Research and Chief of Staff to the South Carolina Senate's Judiciary Committee** | "anecdotes" – Fiffick Dep. Tr. 82:10-83:4, 95:15-22 |
| **Will Roberts, Senate Cartographer** | "very little" input – PX 95 26:25-27:21, 28:11-13 |
| **Representative Jordan** | not "elevated" over other redistricting criteria – Tr. 31:15-18 (Jordan, Oct. 13 PM) (rough) |
| **Breeden John, Staff Attorney for the Senate Judiciary Committee** | "equal weight" compared to those of other "members of the public" – John Dep. Tr. 55:8-11, 163:18-164:9 |

# ARBITRARY AND INCONSISTENT APPLICATION OF CRITERIA

```
 3        Q.   And it reads:  "Maintaining
 4    communities of interest constituent
 5    consistency, minimizing divisions of
 6    city and county boundaries,
 7    minimizing divisions of ETDs and
 8    district compactness were all given
 9    consideration in no particular order
10    of preference and applied equally
11    across all seven districts."
12         Do you agree with that?
13        A.   I'm not sure what he means
14    by that.  Were they applied
15    uniformly across all seven
16    districts, no.  Were they applied
```

Terreni Dep. at 337:3-16

```
 3   Q.   But were there some **weighted more in certain districts -- vary depending on
 4   the district, true?
 5   A.   Not necessarily.   I mean, it depends on what the other requests were that
 6   were coming in.
```

Tr. 51:3-6 (Roberts,
Oct. 12 PM) (rough)

c.  County lines are more important in some places than others.

PX No. 722 at 2

# ARBITRARY AND INCONSISTENT APPLICATION OF HOUSE/SENATE CRITERIA

```
 9        A little recap, again, we -- in July,
10   met to organize.  Then on the 27th of July
11   through August the 12th, ten public hearings
12   were conducted, where we received testimony
13   across the state about communities of
14   interest.  August 12th, we made the newly
```

Sen. Rankin's public remarks on Nov. 29, 2021. PX No. 98 at 3:9-14

```
 4   Q.   Did you attend any of the hearings that the Senate redistricting committee
 5   held in July of 2021?
 6   A.   I believe I attended all of them.
 7   Q.   What do you recall about those meetings?
 8   A.   Really a lot of people complaining, complaining about the process.   A lot of
 9   people asking for the maps to be drawn politically fair.   We didn't -- from a
10   cartography standpoint, we didn't get a lot of information that we were looking for,
11   such as communities of interest.   You know, there was a lot of talk about the
```

```
24   And from a cartographic standpoint, it was hard to figure out what communities of
25   interest these folks were talking about.
```

Tr. 28. 4-11, 24-25 (Roberts, Oct. 12 AM) (rough)

# ARBITRARY AND INCONSISTENT APPLICATION OF HOUSE/SENATE CRITERIA

## Role of Redistricting Criteria and Guidelines

| | |
|---|---|
| Senator Campsen | "panoply o[f] redistricting principles" were given equal weight — PX No. 115 at 21:13-18; Tr. 97:8-10 (Campsen, Oct. 13 PM) (rough) <br><br> All public testimony given equal weight – Tr. 59:23-60:7 (Campsen, Oct. 13 PM) (rough) |
| Senator Rankin | "Our guardrails, our end all and be all" – PX No. 91 at 56:5-8; Rankin Dep. Tr. at 175:24-176:8 |
| Paula Benson | "all the legal requirements and all the permissible things that can be considered by the subcommittee" – Benson Dep. Tr. at 120:1-11 |
| Representative Jordan | "our guiding principles" and "the things that we have to go by" – PX No. 562 at 9:6-12 <br><br> no private or hidden criteria considered not considered within the House's criteria and guidelines Tr. 29:3-8 (Jordan, Oct. 13 PM) (rough) |
| Patrick Dennis | "guideposts that recognize key factors [the House] need[s] to consider" – Dennis Dep. Tr. at 117:10-17 |

# TENUOUS JUSTIFICATIONS FOR S.865 – PARTISANSHIP

- Witnesses expressly disavowed partisanship or cementing a Republican advantage was a goal or purpose, Pls' FOF Section III(E)(ii)

  - Sen. Rankin: "Not for me" – Rankin Dep. Tr. 168:18-21

  - Sen. Campsen: "not the case" – PX No. 116 at 9:7-11, 25:20-23

  - Rep. Jordan: "[n]one of that outside partisan stuff took place in this process" PX No. 112 at 55:17-56:3

  - Andrew Fiffick: never instructed to make a 6-1 Republican map – Fiffick Dep. Tr. 136:3-14, 138:2-9

- Not in House's or Senate's criteria or guidelines, Pls' FOF Sections  III(C)(i), (E)(ii)

- Not stated in the public record, Pls' FOF Section III(E)(ii)

# TENUOUS JUSTIFICATIONS FOR S.865 – CONGRESSMAN CLYBURN "MAP"

|  | Milk (SDX No. 223A, 223D) | S.865 (SDX No. 29C, 29E) |
|---|---|---|
| Beaufort Split | Yes | No |
| Berkeley Split | Yes | No |
| Jasper Split | No | Yes |
| Precincts Split | 27 | 10 |
| CD 6 Orientation to Charleston Peninsula | Northeast (through Berkeley) | West (through Dorchester) |
| CD 1 Core Retention | 97.34% (3rd Highest) | 92.78% (6th Highest) |
| CD 2 Core Retention | 97.91% (2d Highest) | 96.75% (3rd Highest) |
| CD 6 Core Retention | 83.15% (Lowest) | 77.41% (Lowest) |
| Population Moved from CD 1 | 107,117 | 140,489 |
| Population Moved from CD 2 | 5,932 | 14,397 |
| Population Moved from CD 6 | 38,435 | 80,469 |

- Key differences in Senate's Milk Plan (which draws from Clyburn's partial districts 'map') and S.865, Pls' FOF ¶ 611

- No other witnesses corroborated that the Clyburn "Map" was a source:

  - Andy Fiffick: Tresvant Map was "unremarkable." Fiffick Dep. Tr. 87:24-88:5.

  - Charlie Terreni: "We didn't think it was useful." Terreni Dep. Tr. 123:16-124:6.

  - Will Roberts: Members of Congress "input was very little." PX No. 98 at 27:10-21.

- No attributions in the public record, Pls' FOF ¶¶ 604-05.

- Defendants did not identify either Congressman Clyburn or his aide Dalton Tresvant in any pretrial discovery responses as having any role or relevance in the drafting of S.865 or any interim maps, Pls FOF ¶ 603 .