# EXHIBIT A

*to*

*Senate Defendants' Notice of Filing Demonstrative Aid for Closing Argument*

# *S.C. NAACP v. Alexander et al.*

# Senate Defendants' Closing Argument

**PLAINTIFFS FAILED TO CARRY THEIR "DEMANDING" BURDEN**

**PLAINTIFFS BEAR A "DEMANDING" BURDEN ON THEIR CLAIMS.** *Easley v. Cromartie*, 532 U.S. 234, 242 (2001); *see also Miller v. Johnson*, 515 U.S. 900, 915-916 (1995).

**THEY FAILED TO CARRY IT.**

2

## PLAINTIFFS FAILED TO CARRY THEIR "DEMANDING" BURDEN

## PLAINTIFFS' EVIDENCE DOES NOT SHOW:

- **Subordination of traditional districting principles to race;**

- **Race rather than politics predominated; or**

- **Intentional discrimination based on race.**

## IN FACT, THE EVIDENCE PROVES TO THE CONTRARY.

3



South Carolina Congressional Districts with Benchmark Plan

CONFIDENTIAL                                                    SCSENATE_00027406



4

# WHAT DROVE THE ENACTED PLAN?

- **Complying with traditional districting principles, including:**

  – **Preserving district cores**

  – **Repairing county splits**

  – **Repairing VTD splits**

- **Politics**

- **Accommodating requests from Senate and House members, Congressman Wilson, and Congressman Clyburn**

## NOT RACE!

5

# SENATE AND HOUSE GUIDELINES
## (FOF 65-76, 263-287; PX 175; SX 3)



- **Derived from decisions of this Court and the Supreme Court**

- **Identify race-neutral traditional principles, including core preservation, avoiding county and VTD splits, and communities of interest**

- **Authorize consideration of "political" communities and data, "political beliefs," and "voting behavior"**

6

## THE ENACTED PLAN BEST PRESERVES DISTRICT CORES
## (FOF 478, 637, 653, 675, 699-700; SX 29c)



- **The Senate Guidelines identify "[p]reserving the cores of existing districts" as a traditional principle.**

- **The Enacted Plan is the best core preservation plan in the record: it outperforms all alternatives identified by Plaintiffs.**

- **Preserving district cores is the "clearest expression" of respecting communities of interest.** *Colleton County*, 201 F. Supp. 2d at 649.

# THE ENACTED PLAN REPAIRS COUNTY AND VTD SPLITS (FOF 480, PX 175, SX 3)



- **The Guidelines identify avoiding county and VTD splits as traditional principles.**

- **The Enacted Plan outperforms the Benchmark Plan on county splits (10 vs. 12) and VTD splits (13 vs. 52).**

- **The Enacted Plan outperforms both NAACP Plans on county and VTD splits.**

8

# THE ENACTED PLAN RESPECTS COMMUNITIES OF INTEREST (PX 175 & SX 3)

- **Preserving the cores of the Benchmark Districts is the "clearest expression" of the Enacted Plan's respect for communities of interest. (*Colleton County*)**

- **The Enacted Plan respects "political" communities of interest (PX 175, SX 3).**

- **The Enacted Plan respects communities identified in public testimony:**

  – **Fort Jackson in District 2 (*Colleton County;* FOF 5-7, 491, 517)**

  – **Gullah-Geechee heritage corridor in Sea Islands & Beaufort (FOF 507)**

  – **Sun City (FOF 428, 482)**

  – **Limestone 1 & 2 precincts with Lexington (FOF 383, 512)**

- **No plan identified by Plaintiffs respects all of these communities of interest (FOF 648-650, 665-667, 693-695, 717-719).**

9

## THE ENACTED PLAN IS CONTIGUOUS AND COMPACT
## (FOF 469, 476)



- **The Guidelines direct the General Assembly to draw contiguous and compact districts.**

- **The Enacted Districts are contiguous and compact.**

10

# THE ENACTED PLAN ALONE ACHIEVES THE GENERAL ASSEMBLY'S POLITICAL GOALS (PX 175 & SX 3)

- **House Guidelines VII (PX 175)**: communities of interest around "political beliefs" and "voting behavior"

- **Senate Guidelines III.A, IV (SX 3)**: "political" communities of interest and "political information"

11

# THE ENACTED PLAN ALONE ACHIEVES THE GENERAL ASSEMBLY'S POLITICAL GOALS (FOF 451-452, 462, 534, 552, 643, 660, 684-685, 710)



- **The General Assembly pursued the political goal of making District 1 a more Republican-leaning district.**

- **The Enacted Plan achieves that goal, increasing the Republican vote share in District 1 by 1.36% on the 2020 presidential election results.**

- **No plan identified or proposed by Plaintiffs achieves that result – as Plaintiffs concede (Pls.' FOF 797).**

- **All alternative plans make District 1 a majority-Democratic district.**

12

# THE ENACTED PLAN PROTECTS INCUMBENTS BETTER THAN PLAINTIFFS' ALTERNATIVES (FOF 465, 478, 494)

- **The Enacted Plan keeps incumbents with their core constituents, avoids pairing incumbents, and maintains the 6-1 Republican-Democratic split.**

- **No plan identified or proposed by Plaintiffs protects incumbents as well as the Enacted Plan.**

# THE ENACTED PLAN IS THE PRODUCT OF ROBUST LEGISLATIVE PROCESS (PART 1) (FOF 42-476, 590-633)

- **The General Assembly engaged in robust legislative process, including:**

  – **Holding public hearings across the State;**

  – **Establishing special committees to draft redistricting plans;**

  – **Adopting Redistricting Guidelines;**

  – **Holding subcommittee hearings, committee hearings, and floor debates;**

  – **Establishing special redistricting websites with maps, plans, and data;**

  – **Drawing plans for any senator who requested one, including Democrats; and**

  – **Receiving proposed plans and thousands of public comments through dedicated redistricting email addresses and websites.**

14

## THE ENACTED PLAN IS THE PRODUCT OF ROBUST LEGISLATIVE PROCESS (PART 2) (FOF 42-476, 590-633)

### Lynn Teague (LWV):

- "I think the Senate did a very fine job of organizing its hearings around the state." 10/6/2022 Trial Tr. 739:19–20.

- "I cannot recall anything that received as much process attention," and "I commended the senate staff for their responsible professional work." *Id.* 743:5–9.

# THE GENERAL ASSEMBLY DID NOT USE RACE TO DRAW THE ENACTED PLAN (FOF 409, 459)

- **The map drawer started with the Benchmark Plan upheld in *Backus*.**

- **The map drawer accommodated requests from:**

  – **Senator Rankin not to touch District 7 more than necessary;**

  – **Congressman Wilson to keep Fort Jackson in District 2 and not to extend District 2 to Beaufort; and**

  – **Congressman Clyburn to draw a "minimal change" map.**

- **The map drawer *never* used race to draw districts.**

- **The map drawer used political data to draw districts.**

16

# PLAINTIFFS' CLAIMS DO NOT ADD UP



**+ Line Between Districts 1 + 6**

**+ Line Between Districts 2 + 6**

**+ <u>Line Between Districts 5 + 6</u>**

**=   Districts 1, 2, and 5 ONLY**

# <u>BUT NOT DISTRICT 6</u>

# PLAINTIFFS SEEK A WORSE-PERFORMING VERSION OF DISTRICT 2: BLACK-PREFERRED CANDIDATE VOTE SHARE (2020 PRES.) (FOF 644-645, 661-662, 686-687, 712-713)

**PLAINTIFFS' ALTERNATIVE PLANS**

**SC NAACP PLAN 1: 37.9%**

**SC NAACP PLAN 2: 40.8%**

**AMENDMENT 2A (HARPO): 36.5%**

**LWV: 39.9%**

**ENACTED PLAN: 44.6%**

18

# PLAINTIFFS SEEK A WORSE-PERFORMING OR LOSING VERSION OF DISTRICT 5: BLACK-PREFERRED CANDIDATE VOTE SHARE (2020 PRES.) (FOF 646-647, 663-664, 688, 714-715)

**PLAINTIFFS' ALTERNATIVE PLANS**

**SC NAACP PLAN 1: 40.5%**

**SC NAACP PLAN 2: 37.9%**

**AMENDMENT 2A (HARPO): 46.9%**

**LWV: 40.0%**

## ENACTED PLAN: 40.8%

19

## PLAINTIFFS SEEK A CROSSOVER DISTRICT 1:
## BVAP & BLACK-PREFERRED CANDIDATE VOTE SHARE (2020 PRES.)
## (FOF 464, 486, 640, 643, 656, 660, 680, 684, 705, 710)

**SC NAACP PLAN 1**

**34.02% BVAP – 52.6% VOTE**

**SC NAACP PLAN 2**

**23.26% BVAP – 52.5% VOTE**

**AMENDMENT 2A (HARPO)**

**20.57% BVAP – 51.8% VOTE**

**LWV**

**22.57% BVAP – 51.7% VOTE**

## ENACTED PLAN

**16.72% BVAP – 45.6% VOTE**

20

## *BACKUS*: THE BENCHMARK PLAN COMPORTS WITH TRADITIONAL PRINCIPLES AND IS CONSTITUTIONAL

### *Backus:* The Benchmark Plan complies with traditional principles.

- Defendants "disproved" racial gerrymandering by "demonstrating that their decisions adhered to traditional race-neutral principles." 857 F. Supp. 2d at 560.

- NO STRICT SCRUTINY ANALYSIS = *NO PREDOMINANT USE OF RACE & NO USE OF RACE TO COMPLY WITH VRA*

- THE BENCHMARK LINES, COUNTY SPLITS, VTD SPLITS, AND DISTRICT CORES ARE ALL CONSTITUTIONAL.

21

## THE ENACTED PLAN'S CHANGES TO THE BENCHMARK PLAN COMPORT WITH TRADITIONAL PRINCIPLES



**The Enacted Plan's changes to the Benchmark Lines reflect:**

- **Compliance with traditional districting principles**

- **Politics**

- **Accommodating requests from Senate and House members, Congressman Wilson, and Congressman Clyburn**



22

# JASPER COUNTY: KEEPING SUN CITY TOGETHER
## (FOF 428, 482, 500-504)





- Moved Oaktie 2 and Sun City precincts to District 1

- Reflected public testimony and legislative record (as well as Clyburn Map) regarding Sun City community of interest in Beaufort and Jasper

- Supported by Senator Margie Bright Matthews, an African-American Democrat

23

# MAKING BEAUFORT COUNTY WHOLE
## (FOF 505-510)





- **Made Beaufort County whole**
- **United the Gullah-Geechee community in Beaufort and Sea Islands**
- **Eliminated a county split from the Benchmark Plan**
- **Eliminated split of Beaufort 1D VTD**

24

# ORANGEBURG: COMMUNITY OF INTEREST & VTDS (FOF 511-515)





- Maintained county split from Benchmark Plan and Clyburn Map

- Moved Limestone 1 & 2 VTDs to CD 2
  - Public testimony identifying community of interest with Lexington
  - Clyburn Map

- Repaired all 3 VTD splits – North 2, Pine Hill, Cordova 2

25

# RICHLAND COUNTY: FT. JACKSON, VTDs & FOLLOWING LINE (FOF 516-520)



- Maintained county split from Benchmark Plan and Clyburn Map

- Preserved hook shape around Fort Jackson that this Court upheld in *Colleton County* and *Backus*

- Repaired 19 of 21 VTD splits

- Followed the line between Senate Districts 21 and 22, facilitating election administration

26

# SUMTER: CONGRESSMAN CLYBURN & VTDs (FOF 521-525)





- **Maintained county split from Benchmark Plan and Clyburn Map**
- **Placed more of Sumter with Congressman Clyburn at his request**
- **Repaired 5 of 6 VTD splits**

27

# MAKING BERKELEY COUNTY WHOLE
## (FOF 530-535)





- Made Berkeley County whole

- Placed all of Berkeley County with incumbent Congresswoman Nancy Mace, who resided there

- Repaired a county split

- Repaired 3 VTD splits

- With corresponding moves in Dorchester and Charleston, made District 1 more Republican-leaning

28

# DORCHESTER COUNTY: SHAPE, LINE & POLITICS
## (FOF 536-542)





- **Maintained county split from Benchmark Plan and Clyburn Map**

- **Moved heavily-Republican and heavily-white Saul Dam VTD to District 6 to improve shape**

- **Split 7 VTDs**
  - **5 VTDs: improved District 6's shape**
  - **2 VTDs: followed HD 98 line**
  - **In total, majority-Republican and majority-white**

29

# CHARLESTON COUNTY: TRADITIONAL PRINCIPLES & POLITICS (PART 1) (FOF 543-563)





- Maintained county split from Benchmark Plan and Clyburn Map
- Comported with public testimony supporting 2 representatives for Charleston
- Followed natural and geographic boundaries
- Placed coastal Charleston in CD 1
- Placed Charleston peninsula in CD 6

30

# CHARLESTON COUNTY: TRADITIONAL PRINCIPLES & POLITICS (PART 2) (FOF 543-563)





- Followed the county line around North Charleston, Deer Park, and Ladson

- Fixed all 5 VTD splits

- Moved Democratic areas from District 1 to District 6 (West Ashley, Deer Park, Ladson, Lincolnville)

- With corresponding moves in Berkeley and Dorchester, made District 1 more Republican-leaning

31

# DISTRICT 1 & 6 LINE: TRADITIONAL PRINCIPLES, NOT RACE (PART 1) (FOF 564-589)

# Enacted District 1

## Republican Vote Share: + 1.39%

## BVAP: + 0.16%

## DISTRICT 1 & 6 LINE: TRADITIONAL PRINCIPLES, NOT RACE (PART 2) (FOF 564-589)

# District 6 → District 1 vs. District 1 → District 6

## Higher Republican % (43.15% vs. 42.02%)

## Higher BVAP % (37.01% vs. 23.44%)

33

## DISTRICT 1 & 6 LINE: TRADITIONAL PRINCIPLES, NOT RACE (PART 3) (FOF 564-589)

# Beaufort County: District 6 → District 1

## Higher BVAP % Than District 1

## (42.66% vs. 16.72%)

34

## DISTRICT 1 & 6 LINE: TRADITIONAL PRINCIPLES, NOT RACE (PART 4) (FOF 564-589)

# Berkeley County: District 6 → District 1

## Higher BVAP % Than District 1

## (40.31% vs. 16.72%)

# Berkeley = Higher BVAP % Than Charleston

## (22.6% vs. 22.09%)

35

## DISTRICT 1 & 6 LINE: TRADITIONAL PRINCIPLES, NOT RACE (PART 5) (FOF 564-589)

# Charleston: 6 → 1 vs. 1 → 6

# Higher BVAP (37.97% vs. 22.07%)

## DISTRICT 1 & 6 LINE: TRADITIONAL PRINCIPLES, NOT RACE (PART 6) (FOF 564-589)

# Charleston 1&6: Decrease BVAP Disparity

## Benchmark (2010): 49.92% (6) vs. 18.44% (1)

## Benchmark (2020): 41.53% (6) vs. 14.65% (1)

## Enacted: 31.18% (6) vs. 10.42% (1)

# Charleston Portion Of CD 1: Less Democratic

## Benchmark: 52.29% vs. Enacted: 49.23%

37

## PLAINTIFFS' EVIDENCE FAILS TO CARRY THEIR DEMANDING BURDEN

- **The undisputed facts demonstrate that Plaintiffs cannot prove that the Enacted Plan is unconstitutional.**

- **Plaintiffs also have <u>no direct evidence</u> of racial gerrymandering or discriminatory intent.**

- **Plaintiffs offer a circumstantial case – but their circumstantial case ignores the circumstances.**

38

## PLAINTIFFS' EVIDENCE FAILS TO CARRY THEIR DEMANDING BURDEN

# <u>FAILURE #1</u>

**Plaintiffs' putative expert analyses are "incomplete" and "unconvincing" because the experts "fail[ed] to consider all of the traditional race-neutral principles that guide redistricting in South Carolina."**

*See Backus*, 857 F. Supp. 2d at 562-563.

39

## PLAINTIFFS' PUTATIVE EXPERT EVIDENCE USES FLAWED DATA (FOF 721-739)

- **Plaintiffs' putative experts Drs. Imai, Liu, and Duchin used a flawed and unverified dataset.**
  - **Dr. Liu: 91 split VTDs in the Enacted Plan**
  - **Enacted Plan: 13 split VTDs**
- **The dataset lists nonexistent precincts and places some precincts in the wrong counties.**
- **Neither Dr. Fifield nor Plaintiffs' putative experts verified the dataset.**

40

## DR. IMAI'S SIMULATION ANALYSIS
## IS INCOMPLETE AND UNCONVINCING (PART 1) (FOF 743-805)

- **Did not examine whether the General Assembly used race or how it drew the Enacted Plan**

- **Disregarded several traditional districting principles**

  - **Core preservation, avoiding VTD splits, communities of interest, keeping incumbents with core constituents, politics**

- **Misapplied other traditional principles**

  - **Not equal population (0.1%)**

  - **"Strengths" do not replicate weight General Assembly gave the factor**

  - **Considered plan-wide averages for compactness and splits**

41

## DR. IMAI'S SIMULATION ANALYSIS
## IS INCOMPLETE AND UNCONVINCING (PART 2) (FOF 743-805)

- **Used a racial target in his statewide simulations**

  – **Race-based simulation plans: 76.3% make Charleston whole in District 1; 39.4% make Richland whole in District 6; 90% make Sumter whole in District 6**

  – **The Enacted Plan does none of those**

- **Did not examine race-neutral explanations for the Enacted Plan**

  – **Traditional districting principles**

  – **Politics**

  – **Ft. Jackson**

  – **Congressman Clyburn's requests**

42

## DR. LIU'S ANALYSES ARE INCOMPLETE AND UNCONVINCING (PART 1) (FOF 498, 806-833)

- **Concedes that alternative versions of District 1 turn on crossover voting**

- **County splits analysis ignores the facts**

  – **Did not control for total population**

  – **Did not know that 9 of 10 counties were split in Benchmark Plan or that the Enacted Plan repairs two county splits along District 6 line**

- **"Empirical study" of race and partisan affiliation is flawed**

  – **Used 2018 open primary rather than 2020 general election**

  – **Did not control for core preservation, VTD or voter location, compactness, contiguity, avoiding VTD splits, or incumbency protection**

  – **Shows that black Democrats and white Democrats treated the same**

43

## DR. LIU'S ANALYSES ARE INCOMPLETE AND UNCONVINCING (PART 2) (FOF 806-833)



- **"Verification Study"/Envelope Approach ignores contiguity and other traditional principles**
  - **Core preservation, VTD or voter location, compactness, contiguity, avoiding VTD splits, and incumbency protection**

44

## DR. RAGUSA'S ENVELOPE ANALYSIS
## IS INCOMPLETE AND UNCONVINCING (FOF 834-853)

- **Used "county envelope" methodology supplied by Plaintiffs' counsel**

- **Did not control for several traditional districting principles**

  – **Contiguity, core retention, compactness, avoiding VTD splits, avoiding political subdivision splits, politics, communities of interest**

- **Concluded that race was a significant factor in 5 of 7 districts, including two districts Plaintiffs do not challenge (3 & 6)**

45

## DR. DUCHIN'S VARIOUS ANALYSES
## ARE INCOMPLETE AND UNCONVINCING (PART 1) (FOF 854-922)

- **"Communities of interest" analysis is flawed and "not authoritative"**

  - **Concedes that her analysis is "not authoritative," "definitely . . . not representative of the views of all South Carolina voters," and not the only "reasonable" view of communities of interest**

  - **Did not review entire public record or any of the legislative record**

  - **Did not discuss with members of the public their testimony or whether the Enacted Plan respects their communities**

  - **Misidentifies communities as split when they are not (Beaufort, Gullah-Geechee, Sun City)**

  - **All of her communities are counties or collections of counties—and they are all majority-Democratic counties.**

46

## DR. DUCHIN'S VARIOUS ANALYSES
## ARE INCOMPLETE AND UNCONVINCING (PART 2) (FOF 854-922)

- **Disregards race-neutral explanations for "split" communities of interest**

  – **Dorchester: Did not examine House District 98 line or politics**

  – **Charleston**

    • **Conceded that Summerville, Ladson, and North Charleston span multiple counties**

    • **Used inaccurate boundaries for cities of Charleston and North Charleston**

    • **Did not examine whether Enacted district line follows county line, places all of coastal Charleston in one district, or places all of peninsula in one district**

    • **Did not examine natural geographic boundaries, politics, or repairing VTDs**

47

## DR. DUCHIN'S VARIOUS ANALYSES
## ARE INCOMPLETE AND UNCONVINCING (PART 3) (FOF 854-922)

- **Disregards race-neutral explanations for "split" communities of interest**

  - **Jasper: Did not know that the split unifies Sun City in a single district, even though her report cites public testimony offering that explanation**

  - **Orangeburg**

    - **Did not recall public testimony supporting the split**

    - **Did not know which VTDs had been moved**

    - **Did not examine whether changes repaired split VTDs**

48

# DR. DUCHIN'S VARIOUS ANALYSES
# ARE INCOMPLETE AND UNCONVINCING (PART 4) (FOF 854-922)

- **Disregards race-neutral explanations for "split" communities of interest**
  - **Richland**
    - **Conceded that hook shape has been upheld in prior cases**
    - **Was "sure" that "fixing" hook shape would involve tradeoffs elsewhere**
    - **Did not examine whether changes repaired VTD splits**
    - **Used inaccurate boundaries for city of Columbia**

49

## DR. DUCHIN'S VARIOUS ANALYSES
## ARE INCOMPLETE AND UNCONVINCING (PART 5) (FOF 854-922)

- **Disregards race-neutral explanations for "split" communities of interest**
  - **Sumter**
    - **Did not examine whether public testimony or legislative record supported the split**
    - **Did not examine whether changes placed more of the city of Sumter in District 6**
    - **Did not examine whether changes repaired VTD splits**
    - **Used inaccurate boundaries for city of Sumter**

50

## DR. DUCHIN'S VARIOUS ANALYSES
## ARE INCOMPLETE AND UNCONVINCING (PART 6) (FOF 854-922)

- **"Ensemble method" is incomplete and unconvincing**
  - **Does not simulate how map was drawn or draw maps that could be enacted**
  - **Disregards several traditional districting principles**
    - **Core preservation, incumbency protection, politics**
  - **Misapplies other traditional principles**
    - **Not equal population (1%)**
    - **No communities of interest other than the 5 she identified**
    - **No data on county splits, municipal splits, or VTD splits**

51

## DR. DUCHIN'S VARIOUS ANALYSES
## ARE INCOMPLETE AND UNCONVINCING (PART 7) (FOF 854-922)

- "Electoral opportunity" analysis fails to decouple race and politics

  – **Black candidate of choice is always the Democrat**

  – **Concedes that "electoral opportunity" for black voters "likely" turns on "significant white crossover voting"**

  – **Concedes that black voters and crossover voters are treated the same, regardless of their race**

  – **Enacted Plan creates more opportunity for black voters in elections Dr. Duchin considers most probative than in other elections**

- Believes that the General Assembly must prioritize black electoral opportunity over compliance with traditional principles

52

# LYNN TEAGUE IS NOT AN EXPERT

- **Plaintiffs repeatedly cite testimony from Lynn Teague (Pls. FOF 57, 71, 93, 107-110, 164-165, 198-199, 215, 251-254, 363-364, 422, 487, 506-507, 548, 579, 618h, 690, 702).**

  - **Ms. Teague opposed the Enacted Plan (FOF 1029-1054).**

  - **Plaintiffs did not disclose Ms. Teague as an expert, and Ms. Teague conducted no expert analysis.**

  - **Ms. Teague did not consider race-neutral explanations for the Enacted Plan.**

  - **Ms. Teague has no knowledge of how the Enacted Plan was drawn.**

# JOSEPH OPPERMANN IS NOT AN EXPERT

- **Plaintiffs repeatedly cite testimony from Joseph Oppermann (Pls. FOF 47, 56, 65-68, 85-86, 96-97, 101, 109, 115-116, 119, 148, 151, 156-157, 214, 223, 262, 270, 548, 688).**

  - **Mr. Oppermann, a well-known Democrat, opposed the Enacted Plan.**

  - **In fact, Mr. Oppermann was paid to oppose the Enacted Plan and to draft the Harpootlian Plan.**

  - **Plaintiffs did not disclose Mr. Oppermann as an expert, and he conducted no expert analysis.**

  - **Mr. Oppermann did not consider race-neutral explanations and has no knowledge of how the Enacted Plan was drawn.**

54

## PLAINTIFFS' EVIDENCE FAILS TO CARRY THEIR DEMANDING BURDEN

# <u>FAILURE #2</u>

**Plaintiffs claim that they do not need to propose an alternative plan (Pls.' FOF 795-797).**

**But an alternative map is required because Plaintiffs have "meager direct evidence of a racial gerrymander."**

***Cooper*, 137 S. Ct. at 1481; *see also id.* at 1488-91 (dissent) (alternative map always required).**

55

## PLAINTIFFS FAIL TO PROVIDE A PROBATIVE ALTERNATIVE PLAN

**No alternative identified by Plaintiffs:**

• **Achieves the General Assembly's political goals;**

• **Is comparably consistent with traditional principles;**

• **Achieves greater racial balance; or**

• **Could have been enacted by the General Assembly.**

*Cromartie II*, 532 U.S. at 258.

56

## NO ALTERNATIVE PLAN ACHIEVES THE GENERAL ASSEMBLY'S POLITICAL GOALS

**As Plaintiffs concede (Pls' FOF 797), their alternative plans do not maintain the 6-1 Republican-Democratic split.**

- **Enacted CD 1:**          **54.39% GOP (FOF 464)**

- **Amendment 2a CD 1:**     **48.17% GOP (FOF 684)**

- **LWV CD 1:**              **48.25% GOP (FOF 710)**

- **NAACP 1 CD 1:**          **47.4% GOP (FOF 643)**

- **NAACP 2 CD 1:**          **47.5% GOP (FOF 660)**

57

## NO ALTERNATIVE PLAN IS COMPARABLY CONSISTENT WITH TRADITIONAL PRINCIPLES

- **The Enacted Plan _preserves more of the core of every district_ than any alternative.**

- **The Enacted Plan is _the only plan that preserves these communities of interest_:**

    – **Fort Jackson in District 2**

    – **Sun City**

    – **Limestone 1 & 2 VTDs (Orangeburg) with Lexington**

58

## THE GENERAL ASSEMBLY COULD NOT HAVE ADOPTED NAACP PLAN 1

## NAACP PLAN 1 Is Flawed

- **Violates one-person, one-vote rule (FOF 636)**

- **Worse on core preservation, county splits, and VTD splits (FOF 637-639)**

- **More than doubles District 1's BVAP to over 34% (FOF 640)**

- **Worse for black-preferred candidates in Districts 2 & 5 (FOF 644-647)**

59

## THE GENERAL ASSEMBLY COULD NOT HAVE ADOPTED NAACP PLAN 2

## NAACP PLAN 2 Is Flawed

- **Violates one-person, one-vote rule (FOF 652)**

- **Indicates "cracking" of black voters under Dr. Duchin's analysis (FOF 658)**

- **Worse on core preservation, county splits, and VTD splits (FOF 653-655)**

- **Worse for black-preferred candidates in Districts 2 & 5 (FOF 661-664)**

60

# THE GENERAL ASSEMBLY COULD NOT HAVE ADOPTED AMENDMENT 2a PLAN

## Amendment 2a (Harpootlian) Plan Is Flawed And Partisan

- **Not a minimal change plan (FOF 673-674)**

- **Worse on core preservation and gives Congressman Clyburn 45% new constituents (FOF 674-677)**

- **Worse for black-preferred candidates in District 2 & does not result in any wins in District 5 (FOF 686-688)**

- **Senator Harpootlian called it "the Democratic caucus plan" on the Senate floor (FOF 689)**

- **Members of the public criticized it as "political gerrymandering" (FOF 690-691)**

61

## THE GENERAL ASSEMBLY COULD NOT HAVE ADOPTED LWV PLAN

### The LWV Plan Is Flawed

- **Violates one-person, one-vote rule (FOF 697)**

- **Indicates "cracking" of black voters under Dr. Duchin's analysis (FOF 707)**

- **Not a minimal change plan (FOF 698-699)**

- **Worse on core preservation and gives Congressman Clyburn nearly 50% new constituents (FOF 700-702)**

- **Worse for black-preferred candidates in Districts 2 & 5 (FOF 712-715)**

62

# THE GENERAL ASSEMBLY COULD NOT HAVE ADOPTED DUCHIN PLAN

## The Duchin Plan Is Flawed

- **Violates one-person, one-vote rule (drawn to 1% deviation)**

- **Does not change only a "single boundary line in the Enacted Plan," as Plaintiffs falsely claim (Pls.' FOF 634; *compare* 10.4 AM Tr. 81-82)**

- **Moves 8% of population in Enacted Plan—more than the Enacted Plan moves from the Benchmark Plan—and is worse on core preservation than the Enacted Plan (PX 87 at 1)**

- **Redraws District 5 to a "over 30% BVAP" (PX 67 at 23) compared with 24% in the Enacted Plan (SX 29g)**

- **Does not maintain 6-1 Republican-Democratic split (PX 67 at 23 n.8)**

63

## PLAINTIFFS' EVIDENCE FAILS TO CARRY THEIR DEMANDING BURDEN

# <u>FAILURE #3</u>

**Plaintiffs have failed to prove that "race rather than politics" predominantly explains the Enacted Plan.**

*Cromartie II*, **532 U.S. at 243.**

64

## PLAINTIFFS FAIL TO PROVE THAT RACE RATHER THAN POLITICS PREDOMINATES

- **No alternative plan carries Plaintiffs' burden.**

- **"Dr. Liu explained that using the data available in South Carolina for the 2020 presidential election would make it difficult for him to differentiate race and party effectively."  Pls.' FOF 187.**

- **But the Senate only used political data from the 2020 general election to draw the Enacted Plan.  Plaintiffs thus *concede* they cannot decouple party from race in the sole data that drove line-drawing.**

65

## PLAINTIFFS' EVIDENCE FAILS TO CARRY THEIR DEMANDING BURDEN

# <u>FAILURE #4</u>

**Plaintiffs failed to overcome the presumption of good faith and to show discriminatory effect or intent.**

*Arlington Heights*, 429 U.S. at 266; *Feeney*, 442 U.S. at 279; *Abbott*, 138 S. Ct. at 2325; *Backus*, 857 F. Supp. 2d at 576.

66

## PLAINTIFFS FAIL TO SHOW DISCRIMINATORY EFFECT
## (COL 169-194)

### Plaintiffs Fail To Show Discriminatory Effect Because:

- **Race did not predominate.**

- **All voters are treated the same under traditional districting principles.**

- **All white Democratic voters and all black Democratic voters are treated the same.**

- **Plaintiffs seek a crossover district for Democratic voters, not a performing district for African-American voters.**

67

## PLAINTIFFS FAIL TO SHOW DISCRIMINATORY INTENT
## (COL 195-243)

**Plaintiffs Fail To Show Discriminatory Intent Because:**

- **As Dr. Bagley and Ms. Teague admit, the General Assembly gave more process than on any other legislation.**

- **Any departures from "regular" process were not for racial reasons.**

- **Past history does not taint Enacted Plan.**

68

## DR. BAGLEY'S ANALYSIS
## IS INCOMPLETE AND UNCONVINCING (FOF 923-994)

- **Lacks any personal or scholarly experience, much less expertise, in South Carolina history and redistricting**

- **Relied upon long-past history dating as far back as the colonial era**

- **Presented one-sided version of the Enacted Plan's legislative history focusing on statements by Plan opponents**

- **Concedes that the General Assembly gave more process to redistricting than to other legislation**

- **Provides no standard for a "regular" legislative or redistricting process**

- **Does not consider race-neutral explanations for alleged "irregularities"**

- **The three complaints from Democrats are not "procedural irregularities"**

69

# PLAINTIFFS RESORT TO MISREPRESENTATIONS OF THE RECORD

## Plaintiffs Misrepresent The Record

1. **Clyburn Map**

2. **Politics**

3. **Core Retention**

4. **Alleged Racial Intent**

# PLAINTIFFS MISREPRESENT THE RECORD

# PLAINTIFFS' MISREPRESENTATION #1

# CLYBURN MAP

71

## MR. ROBERTS RELIED UPON THE CLYBURN MAP
### (FOF 307-406)

- **Mr. Roberts and Mr. Fiffick testified that they met with Dalton Tresvant, a staffer for Congressman Clyburn.**

- **Mr. Roberts received a draft map of District 6 from Mr. Tresvant.**

- **The Clyburn Map maintained splits in all of the same counties involving District 6 as the Benchmark Plan and split Jasper County.**

- **Mr. Roberts used the Clyburn Map to draw the Milk Plan, which became the basis of the Senate Staff Plan and the Enacted Plan.**

- **Notably, Plaintiffs never deposed or called Mr. Tresvant or Congressman Clyburn to contradict Mr. Roberts's testimony.**

## PLAINTIFFS MISREPRESENT THE RECORD REGARDING THE CLYBURN MAP (PART 1)

- **Mr. Roberts allegedly said that Congressman Clyburn had "very little" input at November 29, 2021 hearing (Pls.' FOF 605).**

  – The transcript is incorrect: that statement was made by Mr. Fiffick, not Mr. Roberts (SX 239 27:00-28:00).

  – Mr. Fiffick's statement was that Congressman Wilson—*not Mr. Tresvant*—had "very little" input on the map (SX 239 27:00-28:00).

73

## PLAINTIFFS MISREPRESENT THE RECORD REGARDING THE CLYBURN MAP (PART 2)

- **Mr. Fiffick could not remember whether Mr. Tresvant provided a map or made certain requests (Pls.' FOF 606).**
  - **Mr. Fiffick's memory does not override Mr. Roberts's memory.**
  - **The Senate Defendants produced the Clyburn Map to Plaintiffs in discovery—but Plaintiffs *never* asked any deponents about it.**

74

## PLAINTIFFS MISREPRESENT THE RECORD REGARDING THE CLYBURN MAP (PART 3)

- **Other legislators and staff were unaware of Clyburn Map (Pls.' FOF 607-609).**

  – **Only Mr. Roberts and Mr. Fiffick met with Mr. Tresvant, and only Mr. Roberts drew Congressional maps.**

- **Mr. Terreni allegedly testified that the team "put . . . aside" the Clyburn Map (Pls.' FOF 610).**

  – **That was testimony about the NRRT Maps.**

  – **Terreni: "[W]e took Congressman Clyburn's ideas under advisement from Dalton."  Terreni Dep. 111:19-21.**

75

## PLAINTIFFS MISREPRESENT THE RECORD REGARDING THE CLYBURN MAP (PART 4)

- **The Milk Plan and the Enacted Plan have differences (Pls.' FOF 610-611).**

  – **Mr. Roberts made other changes and accommodated other requests in drawing the Enacted Plan.**

- **Mr. Roberts never followed up with Mr. Tresvant (Pls.' FOF 612).**

  – **Communications with Mr. Tresvant were handled by the chief of staff, Mr. Fiffick, who sent Mr. Tresvant a subsequent text (SX 120).**

76

## PLAINTIFFS MISREPRESENT THE RECORD

## PLAINTIFFS' MISREPRESENTATION #2

# POLITICS

## THE GENERAL ASSEMBLY'S POLITICAL GOAL WAS CONTEMPORANEOUS AND WELL KNOWN (FOF 590-606)

- "Politics [is] inseparable from districting." *Gaffney*, 412 U.S. at 753.

- "Voting behavior," "political beliefs," and "political" communities and data are all mentioned in the Guidelines.

- Mr. Roberts, Senator Campsen, and Senator Massey all confirmed that the Enacted Plan was drawn based on politics.

- Partisan analysis reports were released publicly.

- "Trump number" was provided in hearings and on the floor.

- Senator Rankin stated that voters in West Ashley were moved into District 6 because they are Democrats.

78

## THE GENERAL ASSEMBLY'S POLITICAL GOAL WAS CONTEMPORANEOUS AND WELL KNOWN (FOF 590-606)

- **Opponents attacked the Senate Staff Plan and the Enacted Plan on "partisan" and "political" grounds.**
  - **Former Congressman Cunningham (FOF 429-436, 603)**
  - **Senator Bright Matthews (FOF 604-609)**
  - **Senator Kimpson (FOF 610-614)**
  - **Members of the public (FOF 615-616)**
- **Senator Bright Matthews _disclaimed_ allegation of racial gerrymandering on the Senate floor (FOF 604-609).**

79

## PLAINTIFFS MISREPRESENT THE RECORD ON POLITICS (PART 1) (PLS.' FOF 614-628)

- **Senator Campsen denied that the Enacted Plan is a "partisan gerrymander" (Pls.' FOF 615(a)).**

  – **Senator Campsen explained that "partisan gerrymandering" is a legal term and that his denial is consistent with the use of politics in the Enacted Plan (FOF 600-601).**

  – **As Senator Campsen explained, the Enacted Plan is not a partisan gerrymander because it does not subordinate all other traditional districting principles.**

  – **Senator Campsen cited "Trump number" on the Senate floor (FOF 599).**

80

## PLAINTIFFS MISREPRESENT THE RECORD ON POLITICS (PART 2) (PLS.' FOF 550-551, 614-628)

- **Senator Campsen allegedly "assumed that anyone who supported Senate Amendment 2 was a Democrat" (Pls.' FOF 550-551).**

  – Senator Campsen received a Beaufort County Democratic Party email directing its members how to testify on the morning of January 13 (SX 112), *before* the Subcommittee hearing that day and the "January 17" date Plaintiffs claim (Pls.' FOF 551).

  – Moreover, the Democratic Party was well organized: individuals whose testimony Plaintiffs cite are well-known Democrats (Pls.' FOF 419-423 (Quirk-Garvan, Quick, Parnell, Farr, Palmer)).

81

## PLAINTIFFS MISREPRESENT THE RECORD ON POLITICS (PART 3) (PLS.' FOF 614-628)

- **Legislators and staffers said politics did not play a role or that they were not instructed to use politics (Pls.' FOF 616(b)-618(g)).**
  - Those statements say nothing about how map was drawn or the factors that drove the key decisionmakers.
- **Lynn Teague never heard anyone discuss politics (Pls.' FOF 618(h)).**
  - Ms. Teague was not in the map room and has no knowledge of how Enacted Plan was drawn.
  - Other opponents alleged politics in the Enacted Plan.

82

## PLAINTIFFS MISREPRESENT THE RECORD ON POLITICS (PART 4) (PLS.' FOF 614-628)

- **Partisanship is not mentioned in the Guidelines (Pls.' FOF 621-622).**

  – **House Guidelines recognize communities of interest around "political beliefs" and "voting behavior" (PX 175).**

  – **Senate Guidelines recognize "political" communities and information (SX 3).**

- **Plaintiffs' experts rejected politics defense (Pls.' FOF 625).**

  – **Plaintiffs' expert analyses are incomplete and unconvincing.**

83

# PLAINTIFFS MISREPRESENT THE RECORD

## PLAINTIFFS' MISREPRESENTATION #3

# CORE PRESERVATION

## PLAINTIFFS MISREPRESENT THE RECORD ON CORE RETENTION (PART 1) (PLS.' FOF 629-640)

- **Core preservation is a *post hoc* justification raised on January 19, 2022 (Pls.' FOF 630).**

  – **Even on Plaintiffs' version of events, this justification was offered prior to enactment on January 20, 2022 (Pls. FOF 630).**

  – **"Minimal change" and "least change" were themes throughout the legislative process.**

  – **Dr. Ruoff agreed with Mr. Roberts at the November 29, 2021 that the Senate Staff Plan was "a least-change map" (FOF 427).**

85

## PLAINTIFFS MISREPRESENT THE RECORD ON CORE RETENTION (PART 2) (PLS.' FOF 629-640)

- **Senators Campsen and Massey "overstated the core retention in District 6" (Pls.' FOF 631).**
  - Senators Campsen and Massey read off a document provided by staff.
  - The accurate figure was provided to all senators on the floor.
  - The accurate figure still outperforms all alternatives.
  - Any discrepancy did not change any legislator's vote.
  - Plaintiffs did not ask Senators Campsen and Massey about this at trial.

86

## PLAINTIFFS MISREPRESENT THE RECORD ON CORE RETENTION (PART 3) (PLS.' FOF 629-640)

- **Other legislators did not recall discussions of core retention (Pls.' FOF 637-638).**

  – **Those statements say nothing about how the map was drawn or the factors that drove the key decisionmakers.**

- **Plaintiffs' experts rejected core preservation defense (Pls.' FOF 634-635, 639).**

  – **Plaintiffs' expert analyses are incomplete and unconvincing.**

87

## PLAINTIFFS MISREPRESENT THE RECORD

## <u>PLAINTIFFS' MISREPRESENTATION #4</u>

# ALLEGED RACIAL INTENT

88

## PLAINTIFFS MISREPRESENT THE RECORD ON ALLEGED RACIAL INTENT (PART 1)

- **Legislative record "shows" that the General Assembly was "aware that the Enacted Map irrationally cracked Black communities in Charleston" (Pls.' FOF 197-207).**

  – **Allegations of the Enacted Plan's opponents are not proof (COL 229).**

  – **Plaintiffs' counsel drafted the talking points for NAACP members and even testified themselves at hearings to manufacture the record for this lawsuit.**

  – **Senate staff had determined that former Congressman Cunningham's cracking allegations were false (FOF 443-448).**

  – **The objective proof demonstrates that there is no cracking, including in Charleston (FOF 564-589).**

89

## PLAINTIFFS MISREPRESENT THE RECORD ON ALLEGED RACIAL INTENT (PART 2)

- **"Legislative Defendants and their staff considered race when drawing and evaluating the Enacted Plan" (Pls.' FOF 284-286, 307, 310, 311).**

  - Mr. Roberts, Senator Campsen, and others all testified that they did not use race or BVAP to draw or choose maps or lines.

  - Mr. Roberts looked at race data in past mapdrawings (Pls.' FOF 316) to comply with now-inoperative Section 5 (10.12 PM Tr. 82:1-13).

  - Test is whether legislators used race to draw lines in a way that predominated or discriminated.  *Cooper*, 137 S. Ct. at 1463-1464; *Feeney*, 442 U.S. at 279.

90

## PLAINTIFFS MISREPRESENT THE RECORD
## ON ALLEGED RACIAL INTENT (PART 3)

- **Legislators are "generally aware of" race and racial composition of the areas they represent (Pls.' FOF 287-298).**

  – **Mere awareness of race is not racial predominance or discriminatory intent.  *Feeney*, 442 U.S. at 279.**

- **Mr. Roberts "acknowledged" that the changes in Charleston "followed the migration of African Americans" (Pls.' FOF 144).**

  – **Mr. Roberts "ha[s]n't studied the migration" and took the Court's "word for it."  10.12 PM Tr. 87:1-3.**

91

## PLAINTIFFS MISREPRESENT THE RECORD ON ALLEGED RACIAL INTENT (PART 4)

- **Senator Campsen's testimony that he did not consider race is "incredible."  (Pls.' FOF 299- 305).**

  – **Every witness confirmed Senator Campsen did not want to know racial numbers during mapdrawing. Plaintiffs even concede he didn't (Pls.' FOF 300).**

  – **Senator Campsen first looked at BVAP numbers "for the floor debate" because he had "been accused of taking race into account when [he] hadn't" and had to "defend" himself. Tr. 125:17-19 (Campsen, Oct. 13 PM).**

92

## PLAINTIFFS MISREPRESENT THE RECORD
## ON ALLEGED RACIAL INTENT (PART 5)

- **Racial data was available to Senate staff in Maptitude and to senators in reports (Pls.' FOF 306-321).**

  - **User must scroll to racial data or activate the shading function in Maptitude, and Mr. Roberts did neither while drawing maps (FOF 331).**

  - **Reports showing racial data were prepared at the touch of a button in Maptitude for all plans, not only the NRRT plans as Plaintiffs suggest (Pls.' FOF 450).**

  - **Mere *availability* of racial data does not establish *use* of race to draw lines, much less predominance or discrimination. *Cooper*, 137 S. Ct. at 1463-1464; *Feeney*, 442 U.S. at 279.**

93

## PLAINTIFFS MISREPRESENT THE RECORD
## ON ALLEGED RACIAL INTENT (PART 6)

- **The Enacted Plan reduces District 6's BVAP (52.5% to 46.9%) but does not increase black electoral opportunity elsewhere (Pls.' FOF 71-82).**

  – **There were no "more Black voters . . . available to be allocated to neighboring districts" (FOF 75).**

    - **The statewide BVAP % decreased in the 2020 Census.**

    - **Benchmark District 6 with 52.5% BVAP was 11.59% underpopulated.**

    - **The Enacted Plan *increases* District 6's *total* BVAP number compared to the Benchmark Plan (SX 28b & 29g).**

    - **Plaintiffs' alternatives increase District 6's *total* BVAP number even more than the Enacted Plan (SX 31g, 34c, 35b, 68g).**

94

## PLAINTIFFS MISREPRESENT THE RECORD
## ON ALLEGED RACIAL INTENT (PART 7)

- **The General Assembly allegedly used "private . . . criteria" (Pls.' FOF 391-415).**

  - **The Guidelines did not tell the map drawer where to draw lines or dictate all decisions in the Enacted Plan (FOF 355).**

  - **The requests honored by the map drawer were not criteria.**

  - **Respecting those requests was not an intentional use of race.**

  - **Plaintiffs seek changes to the map not in the Guidelines, such as unsplitting Charleston County.**

95

## PLAINTIFFS MISREPRESENT THE RECORD
## ON ALLEGED RACIAL INTENT (PART 8)

- **The General Assembly allegedly disregarded public testimony (Pls.' FOF 416-440).**
  - **The General Assembly followed public input, including on communities of interest (FOF 428, 500-504, 506-507, 512, 517).**
  - **The Enacted Plan involves tradeoffs, including in incorporating public input, that are within the province of the General Assembly (COL 230);** *Miller*, **515 U.S. at 915.**

96

# PLAINTIFFS MISREPRESENT THE RECORD ON ALLEGED RACIAL INTENT (PART 9)

- **The map drawer allegedly relied upon the NRRT Maps (Pls.' FOF 441-471).**

  – Mr. Roberts turned to Congressional redistricting in "mid-November" (FOF 317), not on "November 19" (Pls.' FOF 405).

  – The Senate staff reviewed only briefly—and did not use or rely upon—the NRRT maps (FOF 356-371).

  – Jessamine Map was based on Senate Staff Plan (FOF 362).

  – The NRRT maps were drawn using political data and without any racial data (FOF 367).

97

## PLAINTIFFS MISREPRESENT THE RECORD
## ON ALLEGED RACIAL INTENT (PART 10)

- **Senate Defendants' decision not to conduct racially polarized voting analysis is "willful blindness" (Pls.' FOF 659).**

  – **The Senate had no legal obligation to conduct a racially polarized voting analysis (COL 155-161).**

  – **The Senate's decision not to conduct a racially polarized voting analysis does not establish racial predominance or discrimination (COL 155-161).**

  – **Conducting a racially polarized voting analysis would have interjected *more* race-consciousness into redistricting.**

98

## PLAINTIFFS' CLAIMS FAIL ON THE RECORD EVIDENCE

### <u>To rule for Plaintiffs, the Court would have to</u>:

1.  **Ignore the presumption of good faith**

2.  **Ignore the undisputed evidence of compliance with traditional principles**

3.  **Jettison *Backus* – twice!**

    •   **Reject Benchmark Lines, which comport with traditional principles**

    •   **Embrace incomplete and unconvincing putative expert analyses**

4.  **Conclude that Roberts, Campsen, Bamberg, and others all lied**

5.  **Adopt Plaintiffs' misrepresentations of the record**

6.  **Hold that *not* drawing lines based on race is racial *discrimination***

99

## WHAT SHOULD THE COURT DO?

# The Court Should Enter Judgment For <u>Defendants</u>.