**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | |
|---|---|
| The South Carolina State Conference of the NAACP, and Taiwan Scott, *on behalf of himself and all other similarly situated persons*, | ) ) ) ) |
| | ) |
| Plaintiffs, | ) ) |
| | ) |
| v. | ) ) |
| | ) |
| Thomas C. Alexander, *in his official capacity as President of the Senate*; Luke A. Rankin, *in his official capacity as Chairman of the Senate Judiciary Committee*; G. Murrell Smith, Jr., *in his official capacity as Speaker of the House of Representatives*; Chris Murphy, *in his official capacity as Chairman of the House of Representatives Judiciary Committee*; Wallace H. Jordan, *in his official capacity as Chairman of the House of Representatives Elections Law Subcommittee*; Howard Knapp, *in his official capacity as interim Executive Director of the South Carolina State Election Commission*; John Wells, *Chair*, JoAnne Day, Clifford J. Elder, Linda McCall, and Scott Moseley, *in their official capacities as members of the South Carolina State Election Commission*, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| | ) |
| Defendants. | ) ) |

C/A No.: 3:21-cv-03302-MGL-TJH-RMG

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This matter is before the Court on Plaintiffs' challenge to the constitutionality of the South Carolina General Assembly's plan for congressional reapportionment, S. 865, regarding Congressional District Nos. 1, 2, and 5, which was enacted in 2022 following receipt of the 2020 census data. Plaintiffs' Third Amended Complaint brings two claims challenging Congressional District Nos. 1, 2, and 5. Count One alleges that the challenged districts violate Plaintiffs' rights

under the Equal Protection Clause of the Fourteenth Amendment because they are racially gerrymandered. (Dkt. No. 267 ¶¶ 160-167). Count Two alleges that the challenged districts were adopted with racially discriminatory intent and violate Plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment and their rights under the Fifteenth Amendment. (*Id.* ¶¶ 168-173). Defendants, which include certain members of the South Carolina House and Senate and staff and members of the South Carolina Election Commission, have denied liability and assert that the challenged districts comply with all lawful requirements and the General Assembly's traditional districting principles. This Court, a three-judge panel, was appointed by the Honorable Roger Gregory, Chief Judge of the United States Court of Appeals for the Fourth Circuit, on December 16, 2021, to address all matters arising out of South Carolina's reapportionment plans following receipt of the 2020 census data. (Dkt. No. 76).

## Procedural Background

This case commenced on October 12, 2021, prior to the adoption of the presently challenged reapportionment plan, alleging that the existing legislative districts were malapportioned. (Dkt. No. 1). Plaintiffs sought the appointment of a three-judge panel. The complaint was subsequently amended twice following the General Assembly adopting the 2022 reapportionment plans and challenged certain South Carolina House and Congressional Districts under the Fourteenth Amendment. (Dkt. Nos. 154, 267). The parties negotiated a resolution as to the challenged South Carolina House Districts, leaving only the congressional reapportionment plan in dispute in this litigation.[1]

The Court addressed extensive pretrial matters, including dispositive motions and numerous discovery disputes, and scheduled the congressional reapportionment portion of the case

---

[1] No suit has been filed to date challenging the South Carolina Senate reapportionment plan.

for trial to commence on October 3, 2022. The Court received the testimony of numerous witnesses over eight trial days and received into evidence hundreds of exhibits. Upon completion of the trial testimony, the Court directed the parties to submit proposed findings of fact and conclusions of law and then conducted closing arguments on November 29, 2022. The case is now ripe for disposition.

## Legal Standards

Plaintiffs assert claims for racial gerrymandering, in violation of the Fourteenth Amendment, and intentional racial discrimination under the Fourteenth and Fifteenth Amendments. (Dkt. No. 267 at 46-47). Challenges to state legislative reapportionment plans have been the subject of extensive litigation, particularly over the nearly three decades since the Supreme Court's landmark decision in *Shaw v. Reno*, 509 U.S. 630 (1993). *Shaw* involved the now infamous "I-85 district," which stretched across much of North Carolina and connected African American portions of various communities in some instances only by the narrow sliver of an interstate highway. *Id.* at 635-636. The Supreme Court made it clear that legislative districting plans which placed or excluded voters by race from a particular district were constitutionally suspect and "b[ore] an uncomfortable resemblance to political apartheid." *Id.* at 645, 647.

Two years later, the Supreme Court addressed a challenge to the Georgia congressional reapportionment plan in *Miller v. Johnson*, 515 U.S. 900 (1995). The Court again made plain that a state may not use "race as a basis for separating voters into districts." *Id.* at 911. The Court explained that a plaintiff in a racial gerrymandering case has the "burden [ ] to show, either through circumstantial evidence of a district's shape and demographics, or more direct evidence going to legislative purpose, that *race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district*." *Id.* at 916 (emphasis

added).  To make this showing, "a plaintiff must prove that the legislature subordinated traditional race neutral districting principles, including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests, to racial considerations."  *Id*.  If the plaintiff can demonstrate that the challenged legislative district was predominantly motivated by race, the burden shifts to the defendant to prove that "its race-based sorting of voters serves a 'compelling [state] interest' and is 'narrowly tailored' to that end."  *Cooper v. Harris*, 137 S. Ct. 1455, 1464 (2017).

It is well recognized that a court addressing a claim of racially discriminatory intent in the adoption of a districting plan by a state legislature faces a "formidable task," which requires the court to make a "sensitive inquiry" into all "circumstantial and direct evidence of intent to assess whether the plaintiffs have managed to disentangle race from politics and prove that the former drove a district's lines."  *Cooper*, 137 S. Ct. at 1473.  The burden of proof for plaintiffs to demonstrate discriminatory intent is a "demanding one."  *Easley v. Cromartie*, ("*Cromartie II*"), 532 U.S. 234, 241 (2001).  The Supreme Court made it clear in *Cooper*, however, that simply claiming a partisan purpose is not a license to "place a significant number of voters within or without a district."  *Cooper*, 137 S. Ct. at 1463-64.  The *Cooper* Court gave as an example the situation where "legislators use[d] race as their predominant districting criterion with the end goal of advancing their partisan interests . . . ."  *Id.* at 1473 n.7.  The use of race under these circumstances "triggers strict scrutiny" because "the sorting of voters on the grounds of race remains suspect even if race is meant to function as a proxy for other (including political) characteristics."  *Id*.

In attempting to sort out discriminatory intent, "[o]utright admissions of impermissible racial motivation are infrequent and plaintiffs often must rely upon other evidence."  *Hunt v.*

*Cromartie*, 526 U.S. 541, 553 (1999).  Further, claims that an experienced map drawer did not consult racial data in drawing the plan ring "hollow" when there is considerable circumstantial evidence that a district "sort[ed] voters on the basis of race" and racial data is "fixed" in the head of an experienced map drawer.  *Cooper*, 137 S. Ct. at 1477.

A determination of discriminatory intent in the adoption of a reapportionment plan is based on the totality of evidence, and no single piece of evidence proves or disproves discriminatory intent.  Examination of intent must focus on each individual district and not on the plan as a whole. *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 264 (2015).  Circumstantial evidence of discriminatory intent in the adoption of a reapportionment plan can include the use of a racial target for a district, stark racial disparities between adjacent districts, unexplained departures from traditional districting principles, and the disproportionate movement of a significant number of a racially identifiable group's voters from one district to another.  *See Cooper*, 137 S. Ct. at 1468-69; *Alabama Legislative Black Caucus*, 575 U.S. at 267, 273; *Hunt*, 526 U.S. at 548.

Where race is found to be the predominant factor in the creation of a particular legislative district, the Court is mandated to review any districting plan under rigorous strict scrutiny standards.  A state may show a compelling state interest in the use of race as the predominant factor in drawing a legislative district where it is necessary to meet the requirements of the Voting Rights Act and the use of race is narrowly tailored to meet that compelling state interest.  *Cooper*, 137 S. Ct. at 1469-70.

A challenge under the Fourteenth Amendment to the lawfulness of a specific district within a congressional reapportionment plan may be brought by an individual residing within that district who claims he or she is a victim of an unlawful racial gerrymander.  *Gill v. Whitford*, 138 S. Ct.

1916, 1929-1930 (2018).    An organization that has members living in allegedly racially gerrymandered districts has standing to challenge those districts' composition if the interests at stake "are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires individual members' participation in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envt. Servs. (TOC), Inc*., 528 U.S. 167, 181 (2000).

### Findings of Fact

1.    The South Carolina House and the South Carolina Senate conducted independent, parallel efforts to adopt the South Carolina congressional reapportionment plan following receipt of the 2020 census data.  Both bodies conducted public hearings, established web sites, and had staff prepare draft proposals for consideration.  A number of citizens appeared at the public hearings advocating specific designs for the 2022 congressional plan, including residents from Beaufort and Charleston Counties urging that the counties be made whole in Congressional District No. 1.  *See* (PX-0067 at 35-36); (S11-16).  The House was the first body to adopt a proposed congressional districting plan and sent it to the Senate on January 13, 2022.  (PX-0113 at 3); (Tr. Vol. VII, Wallace Herbert Jordan, Jr. ("Jay Jordan") at 1784:25-1785:13; 1786:19-1787:3).  On January 20, 2022, the Senate amended the House plan in its entirety, substituting its own plan, Senate Amendment 1, for the one adopted by the House.  (PX-0116 at 3, 97-98); (Tr. Vol. VII, Jay Jordan at 1787:4-14).  The Senate's plan was returned to the House on January 20, 2022.  (PX-0116 at 198).  The House concurred with the Senate's plan without an amendment on January 26, 2022, and the Governor signed the bill into law the same day.  (HX-004 at 23-25).  The enacted plan is referred to as S. 865.[2]  Since the enacted plan was prepared by Senate staff, debated in the

---

[2]  S. 865 is available at: 2021-2022 Bill 865: Elections - REAPPORTIONMENT: Adopting 2020 Census and Establishing New Senate and House Districts (scstatehouse.gov)

Senate, and ultimately was adopted by both bodies and signed into law by the Governor, the Court will focus its analysis on the Senate plan.

2.     Congressional districts are required to have nearly equal population and the general practice is to vary no more than one person from the ideal population, which for South Carolina's congressional districts in 2020 was 731,203.  (Dkt. No. 473-1 at 69).  When the 2022 redistricting process commenced, five of South Carolina's seven congressional districts had relatively small amounts of deficiencies or excesses in population, ranging from .45% to 3.9%.  *See* (S28b).  Two of the districts, Congressional District Nos. 1 and 6, however, had significant population variances. Congressional District No. 1 had an excess in population of 87,689 (11.99%) and Congressional District No. 6 had a deficiency of 84,741 (11.59%).  (*Id.*).  Congressional District No. 6, which has been a majority black district since 1992 and is represented by Congressman James Clyburn, lost significant population as a result of the state becoming increasingly urban with many rural communities within the district experiencing a loss in population.  Further, the overall African American percentage of the total South Carolina population decreased between 2010 and 2020 from 28.2% to 25.9%, primarily as a result of predominantly white migration into the state over the prior decade.[3]  (Dkt. Nos. 473 at 76; 473-1 at 69).

---

[3]  The Court was presented with various data sets from the parties and their experts, which made comparisons and analysis challenging at times.  In order to establish one set of data for the Court to consider, the parties were directed to consult with the Court's technical advisor, Frank Rainwater, and to agree, if they could, on one set of data provided by Mr. Rainwater.  The parties subsequently advised the Court that they stipulated to Mr. Rainwater's data set, and the Court made that data set part of the record.  (Dkt. Nos. 456, 459, 460, 461, 472, 473, 473-1).  Another complication in comparing data was the use by the parties and their experts of different population categories.  Some used general population numbers (referred to as total population and "DOJ black" for the African American population).  Others used a different category, "any part black," which included persons who were of mixed race.  Still others used voting age population data and the corresponding "black voting age" population ("BVAP").  Since the General Assembly utilized general population totals and "DOJ black" in designing the congressional redistricting plan, the Court will utilize those numbers unless expressly indicated otherwise.  Further, the Court will refer

3.     Plaintiffs and Defendants point to past events in South Carolina's legal and political history to support their positions.  Plaintiffs note the state's difficult post-Reconstruction history extending from 1877 until the adoption of the 1965 Voting Rights Act, which was frequently characterized by political violence, intimidation, *de jure* segregation, and disenfranchisement. Plaintiffs also point to South Carolina's legal struggles with the Department of Justice and the federal courts regarding reapportionment plans from the 1970's through the early 2000's.  *See* (PX-0017, Expert Report of Joseph Bagley at 6-20); (Tr. Vol. V, Joseph Bagley at 1112:20 - 1114:21); *Colleton Cnty. Council v. McConnell*, 201 F. Supp. 2d 618 (D.S.C. 2002), *clarified* Apr. 18, 2022; *Smith v. Beasley*, 946 F. Supp. 1174 (D.S.C. 1996); *Stevenson v. West*, 413 U.S. 902 (1973).  Defendants, on the other hand, note that a three-judge panel in *Backus v. South Carolina*, 857 F. Supp. 2d 553 (D.S.C. 2012), *aff'd*, 568 U.S. 801 (2012), upheld the validity of the 2011 legislative reapportionment plan.  Both Plaintiffs and Defendants have points to make regarding the history in this area, which must be considered with the totality of the evidence to determine whether race predominated in the drawing of any of the challenged congressional districts.[4]

---

to population data from voter tabulation districts ("VTDs"), rather than precincts, since this was the data relied on by the General Assembly in adopting the 2022 reapportionment plan.  VTDs are utilized for reporting official census data, and precincts are created by local election officials. VTDs and precincts generally, but not always, are the same, but for consistency the Court will rely on official census data reported by VTDs.

[4]  The Court throughout this order addresses aspects of reapportionment plans adopted following the 2000, 2010, and 2020 census.  The reapportionment plan following the 2000 census was a court designed plan issued in *Colleton County Council v. McConnell* and will be referred to in this order as the "Colleton County Council plan."  The reapportionment plan adopted following the 2010 census was enacted by the General Assembly and signed by the Governor in 2011, and the plan subsequently survived a court challenge in *Backus v. South Carolina*.  This plan will be referred to in this order as the "2011 plan."  The reapportionment plan presently before the Court was adopted by the General Assembly based upon the 2020 census and will be referred to in this order as the "2022 plan."

A review of the history in this case must also consider the significant legal developments which have occurred since the 2010 reapportionment cycle, most notably the decisions by the United States Supreme Court in *Shelby County v. Holder*, 570 U.S. 529 (2013), which effectively eliminated the non-retrogression requirements of Section 5 of the Voting Rights Act, and *Cooper v. Harris*, 137 S. Ct. 1455, 1472, 1473 n.7 (2017), which made it clear that partisanship cannot be used as a proxy for race and that any predominant use of race to draw legislative districts must be narrowly tailored to meet a compelling state interest. These recent legal developments cast doubt on the present-day validity of the 2011 plan because Congressional District No. 6, with its 57.8% African American population at the time of enactment, was designed to satisfy the then-existing Section 5 non-retrogression requirements and exceeded any reasonable percentage necessary to allow African Americans to elect a candidate of their choice.[5]

4.    In advance of the 2020 reapportionment cycle, both the South Carolina House and South Carolina Senate adopted largely consistent reapportionment guidelines. (PX-0175; PX-0176). The Senate's 2021 Redistricting Guidelines set forth three categories of standards: satisfaction of the requirements of federal law, maintenance of contiguity within a district, and "additional considerations" that should be "given consideration, where practical and appropriate." (PX-0176 at 1-2). The section on federal law requirements, which is mandatory, referenced population equality, compliance with the Voting Rights Act, and "avoidance of racial gerrymandering." (*Id.* at 1). The guidelines recognize that "while consideration of race is permissible, race must not be the predominant factor," and the General Assembly cannot subordinate traditional districting principles "unless that subordination is narrowly tailored to serve

---

[5] The General Assembly recognized the impact of *Shelby County* and *Cooper* in its 2022 plan for Congressional District No. 6 by reducing the African American population of the district to 47.8%. (Dkt. Nos. 473 at 65; 473-1 at 59).

a compelling state interest." (*Id*.). The section of the guidelines relating to "additional considerations" set forth a broad array of factors, including communities of interest,[6] constituent consistency, district compactness, and minimizing divisions of counties, cities, and towns. (*Id.* at 2).

5.    Plaintiffs in this action include Taiwan Scott, who resides in Congressional District No. 1 and claims injury arising from the alleged racial gerrymander of Congressional District No. 1. (Tr. Vol. II, Taiwan Scott at 493:23). Plaintiff The South Carolina State Conference of the NAACP has members residing in each of the challenged congressional districts and the issues raised in this lawsuit are germane to the organization's purpose. (Tr. Vol. II, Henry Griffin at 521:19-522:7); (Tr. Vol. VI, James Felder, Sr. at 1335:10-14; 1338:12-25); (Tr. Vol. V, Elizabeth Kilgore at 1216:16-25; 1218:1-1219:12). Further, the claims asserted and the relief sought do not require the participation of individual members in the lawsuit.

<u>Congressional District No. 1</u>

6.    Congressional District No. 1 has long been anchored in Charleston County and consistently elected a Republican between 1980 and 2016. In 2018, the Democratic candidate, Joe Cunningham, was elected in what was regarded then as a major political upset. Two years later, the Republican candidate, Nancy Mace, defeated Cunningham. (S75, Expert Report of Sean Trende at 32-33). Both elections were close, with less than one percent separating the candidates.

7.    When the South Carolina House and Senate began considering congressional reapportionment in 2021, the Republican majorities in both bodies sought to create a stronger Republican tilt to Congressional District No. 1. Senator George "Chip" Campsen, a Republican

---

[6] "Communities of interest" are defined by "geographic, demographic, historic and other characteristics" and can include "economic, social, cultural, language, political, and recreational activity interests . . . ." (PX-0176 at 2).

senator from Charleston County and a member of the Senate Redistricting Subcommittee of the Senate Judiciary Committee, became the lead proponent of what would become the enacted congressional district plan. (Tr. Vol. VII, George Earl Campsen, III ("George Campsen") at 1816-1818; 1839:12-24). Early in the process, Senator Campsen publicly announced that his plan, known as Senate Amendment 1, would make whole in Congressional District No. 1 two previously split counties, Beaufort and Berkeley. (*Id.* at 1839:12-24); (HX-86); (S29b). He also sought to include a significant portion of a third county, Dorchester, in Congressional District No. 1. *See* (S29b). All three of these counties were regarded by Senator Campsen as strong Republican performing counties, and he explained at trial that he was seeking to include these counties in the reconfigured Congressional District No. 1 to give the district a stronger Republican lean. (Tr. Vol. VII, George Campsen at 1860:11-1861:8; 1837:21-1838:21).

8.    The General Assembly was provided a number of proposed congressional plans by various interested parties. These included plans presented by the League of Women Voters, Senator Richard Harpootlian (referred to as Senate Amendment 2a), and two by the NAACP. These various plans differed on the African American percentage of the total votes in Congressional District No. 1, with Senator Campsen's plan providing for 17%, Senator Harpootlian's plan for 21%, the League of Women Voters' plan providing for 23%, and one of the NAACP's plans providing for 24%. Analyses of partisan voting patterns within Congressional District No. 1 provided by both Plaintiffs and Defendants indicated that a district in the range of 17% African American produced a Republican tilt, a district in the range of 20% produced a "toss up district," and a plan in the 21-24% range produced a Democratic tilt. (PX-0067, Expert Report of Moon Duchin at 3 (Charts 2.1, 2.2)); (Dkt. No. 491-1, Senate Defendants' closing demonstrative at 21). The Court finds that this data demonstrating the need to limit the African American

population to a certain level to produce the desired partisan tilt resulted in a target of 17% African American population for Congressional District No. 1.

9.    The Senate's congressional reapportionment plan was prepared by an experienced cartographer, Will Roberts, who joined the Senate staff for the 2020 census reapportionment after working for nearly two decades with the South Carolina Revenue and Fiscal Affairs Office.  (Tr. Vol. VI, William Roberts ("Will Roberts") at 1353:14-1356:7).  In his former position, Roberts worked with the three-judge panel in *Backus* through the Court's technical adviser, Bobby Bowers, and routinely prepared reapportionment plans for counties, cities and school boards across the state.  (*Id.* at 1356: 8-15; 1357:3-1358:3).  From this work, Roberts was intimately familiar with South Carolina's demographic and geographic data, including its racial data.  (*Id.* at 1357-1359:3).

10.    As the principal creator for the enacted congressional plan, Roberts was offered by Defendants at trial to explain the design and details of the plan.  Roberts stated that he started the 2022 plan with the 2020 census data applied to the 2011 plan as his model and sought to create a "least change" plan.  (*Id.* at 1396:19-21).  He also stated that he received a map from the staff of Congressman James Clyburn and he incorporated the Clyburn staff proposals into the final plan.  (*Id.* at 1404:14-19; 1405:18-19; 1407:3-19; 1410:16-1411:23; 1419:13-1420:7).  Roberts denied considering racial data while drawing his plan, although he admitted to looking at racial data after drafting each version.  (*Id.* at 1421:3-4, 23-25; 1422:1-10; 1383:4-23).  Instead, he testified that he relied "one hundred percent" on data regarding "the partisan lean of the district."  (*Id.* at 1558:13-19).

11.    Senator Campsen's announced intention to include Berkeley and Beaufort Counties whole in Congressional District No. 1, as well as portions of Dorchester County, presented a challenging problem for Roberts as he attempted to complete the Charleston County portion of the

district to produce a congressional district with a Republican tilt.  Berkeley County had a total population of 229,861 and an African American population of 54,440 (23.7%).  (Dkt. No. 473-1 at 6).  Beaufort County had a population of 187,117 and an African American population of 29,105 (15.6%).  (*Id.* at 3).  The portion of Dorchester County sought to be included in Congressional District No. 1 had a population of 127,543 and an African American population of 27,076 (21.2%).  (*Id.* at 10).  When the populations of these three counties were combined, they totaled 544,521 of the district's ideal population of 731,203 and had an African American percentage of 20.3%.  The racial composition of the Charleston County portion of Congressional District No. 1 at the time of enactment of the 2011 plan was 19.8% and Charleston County in the 2020 census had an African American population of 23.17%.  (Dkt. Nos. 473 at 9; 473-1 at 8, 51).  Any plan for Congressional District No. 1 that included the racial percentages of Charleston County utilized in the 2011 plan (19.8%) or the overall population of Charleston County based on the 2020 census (23.17%) would produce a district that was approximately 20% African American.  This would produce a "toss up" district and would exceed the 17% African American target sought to produce the desired partisan tilt.  Given the decision to include Beaufort and Berkeley Counties whole in Congressional District No. 1 and a significant portion of Dorchester County, it became necessary to reduce the African American population of the Charleston County portion of the district in the range of 10% to meet the 17% target for Congressional District No. 1.

12.     Reducing the African American population in Charleston County so low as to bring the overall black percentage in Congressional District No. 1 down to the 17% target was no easy task and was effectively impossible without the gerrymandering of the African American population of Charleston County.  Under the Court's close questioning, Roberts admitted he abandoned his "least change" approach and the Clyburn staff model he had relied on in all other

counties and made "dramatic changes" that "created tremendous disparity" within Charleston County. (Tr. Vol. VI, Will Roberts at 1556-1559:8). Roberts ultimately moved 62% (30,243 out of the 48,706) of the African American residents formerly assigned to Congressional District No. 1 to District No. 6, leaving only 18,463 African Americans in the Charleston portion of Congressional District No. 1. (Dkt. Nos. 473-1 at 8; 473 at 9). Roberts accomplished this, in part, by moving ten of the eleven VTDs with an African American population of 1,000 persons or greater out of Congressional District No. 1, which included a move of over 11,300 African Americans from North Charleston and nearly 17,000 from the St. Andrews area.[7] When asked what community of interest the residents of North Charleston would have with the residents of Congressional District No. 6 in Columbia, Roberts could only think of their common proximity to Interstate I-26, albeit over 100 miles apart.[8] (Tr. Vol. VI, Will Roberts at 1552:4-9).

13.      The movement of over 30,000 African Americans in a single county from Congressional District No. 1 to Congressional District No. 6 created a stark racial gerrymander of Charleston County. In the 2011 plan, Congressional District No. 6 extended from its Midlands base over 100 miles into downtown Charleston and utilized race conscious line drawing to include approximately one half of the County's African American residents in Congressional District No.

---

[7]  These included the movement of the following VTDs from Congressional District No. 1 to Congressional District No. 6, with the African American population in parentheses: Deer Park 1A (1,486), Deer Park 1B (2,198), Deer Park 2A (1,950), Deer Park 2B (1,309), Deer Park 3 (1,736), Ladson (1,988), Lincolnville (1,494), St. Andrews 9 (1,348), St. Andrews 18 (1,168), St. Andrews 27 (1,250). This left a single VTD in Congressional District No. 1 with an African American population of greater than 1,000: Johns Island 1B (1,122). (Dkt. No. 473-1 at 7, 48-51).

[8]  This explanation was oddly reminiscent of the defense of the I-85 district by the state in *Shaw v. Reno*, 509 U.S. at 636.

6.[9] This was done to satisfy the then existing non-retrogression requirements of Section 5 of the Voting Rights Act. With the Supreme Court's 2013 decision in *Shelby County* effectively eliminating the non-retrogression requirement, a fair question existed as to whether the continued racial division of Charleston County residents between Congressional District Nos. 1 and 6 was legally justifiable. Roberts' changes in Charleston County in the 2022 plan went in exactly the opposite direction, doubling down on the racial division of Charleston County by the movement of 62% of the African American residents of Congressional District No. 1 into Congressional District No. 6. These actions by Roberts made a mockery of the traditional districting principle of constituent consistency. As a result of these changes, 79% of Charleston County's African American population was placed into Congressional District No. 6 and 21% was placed into Congressional District No. 1, and the percentage of African Americans in Charleston County in Congressional District No. 1 fell from 19.8% at the time of the enactment of the 2011 plan to 10.3% in the 2022 plan.[10] (Dkt. Nos. 473-1 at 8, 51; 473-2 at 9). As a result of this effective bleaching of African American voters out of the Charleston County portion of Congressional District No. 1, Roberts was able to produce an African American percentage in Congressional District No. 1 of 17.8%.[11] (Dkt. No. 473-1 at 10).

---

[9] At the time of the enactment of the 2011 plan, 53% of Charleston's African American residents were in Congressional District No. 6 and 47% were in Congressional District No. 1. (Dkt. No. 473 at 9, 55).

[10] The changes in the racial division of the City of Charleston were even more stark as a result of the 2022 plan. At the time of the enactment of the 2011 plan, 66% of the City's African American population was in Congressional District No. 1 and 33% was in Congressional District No. 6. As a result of the 2022 plan, only 15% of the City's African American population remained in Congressional District No. 1, a drop of 77%.

[11] The Supreme Court in *Cooper* described an analogous situation where sponsors of the challenged congressional reapportionment plan moved 25,000 African American voters in Guilford County, North Carolina to another congressional district, which "played a major role" in

14.    Roberts sought to defend the movement of over 60% of Charleston County's African American population from Congressional District No. 1 on the basis that a majority of those moved from Congressional District No. 1 were white.  (Tr. Vol. VI, Will Roberts at 1550:12-23).  Roberts acknowledged, however, that if there was a target for the district of 17%, the inclusion of a VTD that was 35% African American would adversely impact the 17% objective.  (*Id.* at 1550-54).  Roberts specifically pointed to the Deer Park VTDs in North Charleston and noted off the top of his head that there were approximately 10,000 white residents and 8,500 black residents in the six Deer Park VTDs.[12]  (*Id.* at 1553:16-22).  He conceded that the percentage of black residents from the Deer Park precincts was "higher than the 17%." (*Id.*).

15.    When the 2020 census data was applied to the 2011 plan, Congressional District No. 1 had a population excess of 87,689 and an African American percentage of 17.8%.[13]  Rather than simply shed the excess population, the Roberts plan moved more than 140,000 residents out of Congressional District No. 1.  (*Id.* at 1555); (S75, Expert Report of Sean Trende at 18 (Tbl.4)).  Despite all of those changes in Congressional District No. 1, Roberts' plan produced an identical African American population in the 2022 plan of 17.8%, which the Court finds was more than a coincidence and was accomplished only by the stark racial gerrymander of the Charleston County portion of Congressional District No. 1.

---

achieving a racial target.  *Cooper*, 137 S. Ct. at 1477.  This action was cited in *Cooper* to support a finding of a racial gerrymander.

[12]  Roberts, in response to the Court's questioning about the Deer Park VTDs, provided these figures off the top of his head for the "racial breakdown" for those VTDs.  His estimates were highly accurate.  The actual numbers for the Deer Park VTDs under the 2020 census data is 10,652 white residents and 9,171 black residents.  (Dkt. No. 473-1 at 48).  This is a reflection of the detailed knowledge Roberts possesses regarding the racial demographics of the state down to the individual precinct level.

[13]  The Court takes judicial notice of the 2020 census data applied to the 2011 plan found at the South Carolina Senate's official website.  *See* https://redistricting.scsenate.gov/planproposal.htm.

16.     Roberts failed to provide the Court with any plausible explanation for the abandonment of his "least change" approach in drawing the Charleston County portions of Congressional District Nos. 1 and 6 or the subordination of traditional districting principles, including maintenance of constituencies, minimizing divisions of counties, and avoidance of racial gerrymandering. Roberts also admitted that his movement of nearly 17,000 African Americans from St. Andrews was inconsistent with the Clyburn staff plan for Charleston County that he claimed to be faithfully following. (Tr. Vol. VI, Will Roberts at 1558:13-15). In light of the striking evidence that voters were "sort[ed] . . . on the basis of race" within Charleston County and Roberts' in-depth knowledge of the racial demographics of South Carolina, his claim that he did not consider race in drawing Congressional District No. 1 rings "hollow" to the Court. *Cooper*, 137 S. Ct. at 1477.

17.     The congressional reapportionment plan ultimately enacted, referred to as Senate Amendment 1, was prepared by Roberts and passed the South Carolina Senate without amendment on January 20, 2022. The House concurred in the plan, making no changes, on January 26, 2022, and the Governor signed the bill into law the same day.

18.     Plaintiffs offered expert testimony that provided further support for a finding that race predominated over all other factors in the design of Congressional District No. 1. Dr. Kosuke Imai, a professor in the Department of Statistics at Harvard University, and a qualified expert in political science statistics, computational social sciences, and causal inference research methods, conducted a race-blind simulation analysis of the racial composition and boundary lines of Congressional District No. 1 within Charleston County based on the 2020 census data. (Tr. Vol. VIII, Kosuke Imai at 1928:11-13). He conducted 10,000 race-blind simulations of the boundary lines in Charleston County and concluded that the 2022 plan "splits Charleston County by placing

a disproportionately large number of black voters into District 6, while assigning relatively few voters to District 1." (PX-0032, Expert Report of Kosuke Imai at 13); (Tr. Vol. VIII, Kosuke Imai at 1962:9-18). In Dr. Imai's simulations, the average African American population in Congressional District No. 1 is 9,500 voters greater than in the 2020 plan, which corresponds to a statistically significant 2.9 standard deviations. Only .2% of Dr. Imai's simulations produced fewer black voters in Congressional District No. 1 than the enacted plan. (PX-0032 at 14). Dr. Imai also conducted 10,000 race-blind simulations statewide and found Congressional District No. 1's BVAP population was "unusually low under the enacted plan," and the BVAP in the enacted plan was 6.5 percentage points lower than the simulated plans. (*Id.* at 15). Dr. Imai determined that none of the 10,000 simulated plans produced a BVAP lower than Congressional District No. 1 and these results were statistically significant. (*Id.* at 15); (Tr. Vol. VIII, Kosuke Imai at 1964:22-1965:10).

19.     Another Plaintiffs' expert, Dr. Jordan Ragusa, a professor of political science at the College of Charleston, and qualified expert in congressional elections, South Carolina politics, and the application of quantitative methods, analyzed the movement of VTDs in and out of a district and whether it was based on factors such as race and partisanship. (Tr. Vol. IV, Jordan Ragusa at 1028:24-1029:2); (PX-0019, Expert Report of Jordan Ragusa at 1-2). Race was measured using the number of African American voters in the VTD and the partisanship of the VTD was measured based on the number of votes for Joe Biden or Donald Trump in the 2020 general election. (PX-0019, Expert Report of Jordan Ragusa, at 1-2); (Tr. Vol. IV, Jordan Ragusa at 1031:23-1032:2). He also studied the likelihood that a VTD would not be moved based on either the number of African Americans within the VTD and/or its partisanship. (PX-0019, Expert Report of Jordan Ragusa, at 2). Dr. Ragusa analyzed VTDs within Congressional District No. 1 in the 2022 plan

and found that the decision to move a VTD out of the district was highly correlated to the number of African American voters within the VTD. (*Id.* at 4-5, 8). Where a VTD had 100-500 voters, the chance of being moved out of Congressional District No. 1 was no greater than 20%. (*Id.* at 8). However, when the number of African American voters became 1,000 or more, the chance of the VTD being moved out of Congressional District No. 1 rose to 40% and at 1500 voters the chance was 60%. (*Id.*); (Tr. Vol. IV, Jordan Ragusa at 1045:5-10) (testifying that he found as BVAP of a precinct in Congressional District No. 1 increased, the probability that that precinct was drawn out of the district also increased). Dr. Ragusa concluded that his results show that "black voters were excluded from [Congressional District No. 1] in both a statistically significant and substantively consequential fashion." (PX-0019, Expert Report of Jordan Ragusa, at 5); (Tr. Vol. IV, Jordan Ragusa at 1045:20-23). Dr. Ragusa concluded that his results show the racial composition of a VTD was a stronger predictor of whether it was removed from Congressional District No. 1 than its partisan composition. (PX-0026, Rebuttal Expert Report of Jordan Ragusa at 8 (Fig.1)); (Tr. Vol. IV, Jordan Ragusa at 1055:15-21). Dr. Ragusa's findings were particularly probative regarding changes in the Charleston County portion of Congressional District No. 1 in the 2022 plan, where ten of the eleven VTDs with African American populations of 1,000 or more were moved to Congressional District No. 6.

20.     Defendants' sole expert witness, Sean Trende, contended that the 2022 plan made "only modest changes" from the 2011 plan upheld in *Backus*. (S75, Expert Report of Sean Trende at 7). He described the changes in the Charleston County portion of Congressional District No. 1 as simply to conform the district to natural geographic boundaries. (*Id.* at 34). While there were "modest changes" in some of the congressional districts adopted in the 2022 plan, that is hardly a reasonable description of Congressional District No. 1. Further, Trende ignored the movement of

more than 30,000 African American residents out of the Charleston County portion of Congressional District No. 1 and the resulting stark racial gerrymander of Charleston County. The Court found Trende's testimony and reports regarding Congressional District No. 1 unpersuasive.

21.     After carefully weighing the totality of evidence in the record and credibility of witnesses, the Court finds that race was the predominant motivating factor in the General Assembly's design of Congressional District No. 1 and that traditional districting principles were subordinated to race. The Court finds that to achieve a target of 17% African American population in Congressional District No. 1, Charleston County was racially gerrymandered and over 30,000 African Americans were removed from their home district. State legislators are free to consider a broad array of factors in the design of a legislative district, including partisanship, but they may not use race as a predominant factor and may not use partisanship as a proxy for race. *Cooper*, 137 S. Ct. at 1473. The Court finds that when Roberts was presented as a given that Beaufort and Berkeley Counties and a portion of Dorchester County would be included in Congressional District No. 1 in the 2022 plan, there was no practical way for him to achieve the African American population target of 17% through the use of traditional districting principles. By his own admission, Roberts abandoned the principles of "least change" that he had followed in other parts of the state and treated Charleston County in a fundamentally different way than the rest of the state. (Tr. Vol. VI, Will Roberts at 1555-58). The strategies he employed ultimately exiled over 30,000 African American citizens from their previous district and created a stark racial gerrymander of Charleston County and the City of Charleston. As Mr. Roberts admitted under the Court's questioning, the changes he implemented in Charleston County were "dramatic" and "created tremendous disparity" in the placement of African Americans within Congressional Districts Nos. 1 and 6 in Charleston County. (*Id.* at 1556, 1558-59).

22.    Plaintiffs further challenge the placement of two Jasper County precincts, Oakatie 2 and Sun City, in Congressional District No. 1.   These two precincts have a total of 4,581 residents, 81.8% of whom are white and 7.4% of whom are African American.  (Dkt. No. 473-1 at 10).  The balance of Jasper County, which was placed with Congressional District No. 6, has a total of 24,210 residents, 38.5% of whom are white and 39.2% of whom are African American. (*Id.* at 54).  Defendants assert that Oakatie 2 and Sun City precincts are largely part of the Sun City retirement community, which is predominantly based in Beaufort County, and share a strong community of interest with the balance of the Sun City community.  Beaufort County has a total of eight Sun City precincts that total 12,278 residents.  (Dkt. No. 473-1 at 3).  Defendants further note that the splitting off of the two Jasper County precincts and placing them in Congressional District No. 1 with the eight other Sun City precincts was provided for in the Clyburn staff plan and was supported by the local African American state senator who represents the area, Senator Margie Bright-Matthews.  (Tr. Vol. III, Margie Bright-Matthews at 794:15-795:8); (Tr. Vol. VI, Will Roberts at 1367:24-1368:5).  After reviewing the totality of the evidence, the Court finds that Plaintiffs have not carried their burden to prove that the inclusion of the two Jasper County precincts in Congressional District No. 1 was predominantly based upon race.

23.    Plaintiffs additionally assert that race predominated in the splitting of certain precincts in Dorchester County which are alleged to be along racial lines.  Plaintiffs appear to argue that these split precincts should have been placed in their entirety in Congressional District No. 1.  The record reflects that there are seven split precincts in Dorchester County, with portions of those precincts in Congressional District Nos. 1 and 6. (Dkt. No. 473-1 at 8-11, 52-53). Defendants assert that five of the VTDs were split to improve the shape of Congressional District No. 6 and two of the VTDs were moved to track the districting line of state House District No. 98.

(Tr. Vol. VI, Will Roberts at 1485:6-17). The total number of African American residents placed in these split VTDs in Congressional District No. 6 is only 2,437 and appears to have a *de minimis* effect on the overall racial composition of the district. (Dkt. No. 473-1 at 52-53). Only one of these split VTDs, Lincoln, had more than 500 African American residents placed in Congressional District No. 6. (*Id.* at 8-11, 52-53). Plaintiffs have offered no other evidence to support their claim of a racially motivated splitting of precincts in Dorchester County. Taking the evidence in its totality, the Court finds that Plaintiffs have failed to carry their burden to prove that race predominated in the splitting of the seven precincts in Dorchester County.

<u>Congressional District No. 2</u>

24.     Congressional District No. 2 has traditionally been anchored in the Midlands and western portions of the state, with its largest populations in Lexington, Richland, and Aiken Counties. Plaintiffs assert that the portion of Congressional District No. 2 in Richland County that hooks around the northern and western portion of the county fractures African American communities and is predominantly motivated by race. Plaintiffs also allege that the movement of two precincts from Congressional District No. 6 to Congressional District No. 2 in the Limestone area of Orangeburg County was predominantly based upon race.

25.     Congressional District No. 2 includes an irregular shaped "hook" that travels from the northwestern portion of Richland County, adjacent to the Lexington County line, and travels along Richland County's northern and eastern borders and then connects to Fort Jackson, one of the nation's largest military training sites. This design dates back to the 1992 reapportionment plan and was adopted at that time to accommodate the preference of the late Congressman Floyd Spence, who was chair of the House Armed Services Committee. *Colleton Cnty. Council*, 201 F. Supp. 2d at 668. When the "hook" was originally adopted, this area was mostly rural and was

largely an undeveloped portion of Richland County. Over the last 30 years, the population in the area has grown considerably as has the percentage of African Americans within this area. In just the last decade, the overall population of the "hook" has increased from approximately 195,000 to over 223,000 and the African American population has grown from approximately 57,000 to over 83,000. (Dkt. Nos. 473 at 18-20; 473-1 at 16-18).

26.    Plaintiffs assert that the African American community in northeastern Richland County is fractured as the result of the "hook," placing one portion of the community in Congressional District No. 6 and a contiguous set of VTDs in Congressional District No. 2. (Tr. Vol. III, Lynn Teague at 678:21-25; 694:8-20); (Tr. Vol. III, Kambrell Garvin at 758:17-21; 765:20-766:15); (Tr. Vol.VI, James Felder at 1341:15-1343:4). Data from the 2020 census lends support to this claim. Congressional District No. 2 includes a number of VTDs with African American populations over 50% which are immediately contiguous with VTDs with large African American populations in Congressional District No. 6.[14] Additionally, there is a cluster of additional VTDs in northeastern Richland County adjacent to Rice Creek 1 and 2 which have significant African American populations.[15]

27.    Dr. Imai produced 10,000 race blind simulation plans and found the division of Congressional District Nos. 2 and 6 within Richland County is highly unusual and only about 1%

---

[14]  These VTDs include the following with the African American population in parentheses: Monticello (50.4%), Rice Creek 1 (73.9%), Rice Creek 2 (65.4%), North Spring 2 (50.3%), North Spring 3 (63.7%), Midway (66.4%), Brandon 1 (62.7%), and Brandon 2 (59.7%). There are also additional VTDs in Congressional District No. 2 immediately contiguous with Congressional District No. 6 with populations 40-49% African American, including Harbison 1, Harbison 2, Blythewood 3, North Springs 1, and Woodfield. (Dkt. No. 473-1 at 18-20).

[15]  These VTDs include the following with the African American population in parentheses: These include Ridge View 1 (58.3%), Ridge View 2 (63.1%), Parkway 1 (69.9%), Parkway 2 (60.1%), Parkway 3 (76.2%), Estates (37.9%), Bookman (48.5%), and Pontiac 2 (35.4%). (Dkt. No. 473-1 at 18-20).

of the plans produced a greater number of African American voters in Congressional District No.

2. He concluded that "the enacted plan cracks black voters" who live in Richland County. (PX-

0032, Expert Report of Kosuke Imai at 18-19).

28.     Defendants assert that the Richland County "hook" has existed for 30 years and

was included in the court designed plan in *Colleton County Council* in 2002 and approved by the

*Backus* court in 2012.[16]  Defendants assert that the present congressman for Congressional District

No. 2, Joe Wilson, is the ranking member of the House Armed Services Committee and is expected

to become the chairman of the Armed Services Committee in the new Congress.  Defendants state

that Congressman Wilson sought to keep Fort Jackson in his district.  They further note that

Congressman Clyburn's staff plan recommended the maintenance of the "hook" in Congressional

District No. 2 for the 2022 plan.  *See* (S37); (Tr. Vol. VI, Will Roberts at 1409:6-13).

29.     Plaintiffs have shown that the maintenance of the "hook" splits the sizeable African

American community in northeast Richland County, but they have failed to satisfy their burden of

proving that the inclusion of the "hook" in the 2022 plan was *predominantly* based upon race.  The

consistent use of the "hook" as a feature of Congressional District No. 2 since 1992, the judicial

approval of the design by three-judge panels in *Colleton County Council* in 2002 and *Backus* in

2012, the preference of the ranking member of the Armed Services Committee to keep Fort

Jackson within his district, and the recommendation to continue the "hook" in the Congressman

Clyburn staff plan, all support a race neutral basis for this design.

30.     Plaintiffs also challenge the movement of two majority African American VTDs,

Limestone 1 and 2, in Orangeburg County from Congressional District No. 6 to Congressional

---

[16]  The court in *Colleton County Council* specifically addressed the placement of Fort Jackson in
Congressional District No. 2 versus Congressional District No. 6 and approved the placement in
Congressional District No. 2 in the court designed plan.  201 F. Supp. 2d at 668.

District No. 2.[17]  Plaintiffs assert that the movement of the two Limestone VTDs was predominantly based upon race.  Defendants assert that the decision to move the two Limestone VTDs was prompted by requests at public hearings, where local residents asserted that they had a greater community of interest with nearby Lexington County.  (Tr. Vol. VI, Will Roberts at 1473:18-1474:7; 1499:14-19).  Defendants note that the two Limestone VTDs are located in the western portion of Orangeburg County and other contiguous VTDs in Orangeburg County were placed in Congressional District No. 2 in the 2002 court designed reapportionment plan.  The court in *Colleton County Council* explained the placement of certain Orangeburg VTDs in Congressional District No. 2 was based on evidence presented showing that the "western portions of Orangeburg County" are "an important part of the existing core of the Second District." *Colleton Cnty. Council*, 201 F. Supp. 2d at 667.  Further, the Congressman Clyburn staff plan provided for the movement of the two Limestone VTDs from Congressional District No. 6 to Congressional District No. 2.  (Tr. Vol. VI, Will Roberts at 1423:11-17; 1473:19-1474:7); (S37).

31.    The Court finds that the Plaintiffs have failed to carry their burden of proving that the placement of Limestone 1 and 2 in Congressional District No. 2 was predominantly based upon race.

Congressional District No. 5

32.    Plaintiffs challenge the division of Sumter County between Congressional District Nos. 5 and 6 and assert that race predominated over all other factors in the drawing of the district lines.  Congressional District No. 5 covers most of the north central portion of South Carolina extending to the North Carolina state line.  The district is anchored by York County, which has

---

[17] Limestone 1 has an African American population of 61.9% and Limestone 2 has an African American population of 66.9%.  (Dkt. No. 473-1 at 16).

grown significantly in recent years primarily as a bedroom community for Charlotte, North Carolina. Sumter County is situated in the most southeastern portion of Congressional District No. 5 and has not experienced the significant population growth of the counties closest to the North Carolina border.

33.    Sumter County has been divided along racial lines since the creation of Congressional District No. 6 in 1992 as part of a design to create a district in which African Americans could elect a candidate of their choice. The three-judge panel in *Colleton County Council* adopted a court plan in 2002 that provided for the racial division of Sumter County to maintain compliance with the Voting Rights Act. 201 F. Supp. 2d at 663-65. This split was continued in the 2011 plan and that plan was approved by a three-judge panel in *Backus*, 857 F. Supp. 2d at 570.

34.    The Sumter County changes in the 2022 plan regarding Congressional District Nos. 5 and 6 were unremarkable, moving a little less than 1,000 African American voters from Congressional District No. 5 to Congressional District No. 6.[18] The racial division of Sumter County was carried over from the 2011 plan and represented an ongoing effort to maintain Congressional District No. 6 as a district in which African Americans could elect a candidate of their choice. Plaintiffs have failed to satisfy their burden of showing that the design of Congressional District No. 5 was predominantly based on race beyond lawful compliance with the Voting Rights Act.

---

[18] The Sumter County portion of Congressional District No. 6 increased in total population in the 2022 plan from 22,569 to 28,895. The Sumter County African American population increased in Congressional District No. 5 from 17,216 to 18,189. (Dkt. Nos. 473 at 63-64; 473-1 at 58).

**Conclusions of Law**

1.      Plaintiff Scott has standing to assert a challenge to Congressional District No. 1. Plaintiff South Carolina State Chapter of the NAACP has standing to challenge Congressional District Nos. 1, 2, and 5.

2.      Plaintiffs assert in Count One of the Third Amended Complaint that Congressional District Nos. 1, 2, and 5 were the product of racial gerrymandering in violation of their rights under the Fourteenth Amendment.  A challenge to a legislative reapportionment plan must be based on an examination of individual districts and not on the plan as a whole.  *Alabama Legislative Black Caucus*, 575 U.S. at 264.  To prevail, Plaintiffs must show that race was the predominant factor in the adoption of one or more legislative districts within the plan.  *Miller*, 515 U.S. at 916.  If Plaintiffs have carried their burden of proving that race predominated in the adoption of one or more legislative districts within the plan, the burden shifts to the Defendants to prove that "its race-based sorting of voters serves a 'compelling [state] interest' and is 'narrowly tailored' to that end." *Cooper*, 137 S. Ct. at 1464.

3.      The Court finds that race was the predominant factor motivating the General Assembly's adoption of Congressional District No. 1.  With the movement of over 30,000 African American residents of Charleston County out of Congressional District No. 1 to meet the African American population target of 17%, Plaintiffs' right to be free from an unlawful racial gerrymander under the Equal Protection Clause of the Fourteenth Amendment has been violated.  Defendants have made no showing that they had a compelling state interest in the use of race in the design of Congressional District No. 1 and thus cannot survive a strict scrutiny review.  *Cooper*, 137 S. Ct. at 1464.  Consequently, Plaintiffs are entitled to judgment as a matter of law in regard to Count One of the Third Amended Complaint concerning Congressional District No. 1.

4.    Plaintiffs have failed to carry their burden to prove that race was the predominant factor in the adoption of Congressional District Nos. 2 and 5.  Consequently, Defendants are entitled to judgment as a matter of law regarding Count One of Plaintiffs' Third Amended Complaint concerning Congressional District Nos. 2 and 5.

5.    Plaintiffs have asserted claims under Count Two of the Third Amended Complaint that Congressional District Nos. 1, 2 and 5 were adopted with a racial discriminatory intent or purpose.  Plaintiffs assert that a racial discriminatory intent or purpose in a legislative reapportionment plan can be established by showing that race was *a* motivating factor in the adoption of the plan.  Plaintiffs rely on *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), which involved a challenge to a municipality's refusal to rezone in favor of multi-family, racially integrated housing.  The Supreme Court developed in *Arlington Heights* a two-part test for Equal Protection claims arising out of such a challenge.  First, plaintiffs must show that a discriminatory purpose was "a motivating factor." *Id*. at 265-66.  Once the plaintiff has shown that race was a motivating factor, the burden shifts to the defendants to "establish [] that the same decision would have resulted even had the impermissible purpose not been considered." *Id.* at 270 n.21.

The Supreme Court has addressed claims of racial discrimination in legislative reapportionment plans under the Fourteenth Amendment in a series of cases since *Shaw v. Reno*. In *Miller v. Johnson*, the Supreme Court recognized that "federal court review of districting legislation represents a serious intrusion on the most vital of local functions" and that the courts "must exercise extraordinary caution in adjudicating claims that a state has drawn district lines on the basis of race." 515 U.S. at 915-16.  The *Miller* Court held that a plaintiff's burden in a challenge to a reapportionment case on the basis of race is to show that "race was the predominant factor"

-28-

motivating the placement of a significant number of voters "within or without a particular district" and that the legislature subordinated race neutral districting principles to "racial considerations." *Id.* at 916. If a plaintiff meets that burden, the challenged district may survive only if the state can demonstrate a compelling state interest and that any predominant use of race was narrowly tailored to meet that compelling state interest. *See Wisconsin Legislature v. Wisconsin Elections Commission*, 142 S. Ct. 1245, 1248 (2022); *Cooper*, 137 S. Ct. at 1464; *Hunt*, 526 U.S. at 547.

The Supreme Court has relied upon the predominance standard repeatedly in challenges to state redistricting plans and explained the highly sensitive nature of federal court review of such a core state function mandates such a rigorous standard. While *Arlington Heights* has been cited in Supreme Court redistricting cases to describe the type of circumstantial evidence that could establish discriminatory intent,[19] the Supreme Court's redistricting cases have not varied from *Miller's* requirement of a predominance standard. Consequently, the Court finds that a determination that race was "*a* motivating factor" (but not the predominant factor) in regard to a challenged state redistricting plan would not be sufficient to sustain a claim under the Fourteenth or Fifteenth Amendments.

6.     The proper standard for establishing racially discriminatory intent in a challenge to a legislative reapportionment plan is the predominance standard set forth in *Miller*. Applying the *Miller* standard to Plaintiffs' Count Two claims and relying upon the same findings of fact and reasoning set forth above regarding Count One, the Court finds that race was the predominant factor motivating the General Assembly's design of Congressional District No. 1, and Defendants have made no showing that they had a compelling state interest in the use of race in the design of Congressional District No. 1. Consequently, Plaintiffs are entitled to judgment as a matter of law

---

[19] *E.g.*, *Cooper*, 137 S. Ct at 1479; *Miller*, 515 U.S. at 905; *Shaw*, 509 U.S. at 643.

regarding their claim of racially discriminatory intent asserted in Count Two of the Third Amended Complaint concerning Congressional District No. 1.

7.     Based upon the *Miller* standard and the findings of fact and reasoning set forth above regarding Count One, Plaintiffs have failed to carry their burden to prove that race was the predominant factor in the design of Congressional District Nos. 2 and 5.  Consequently, Defendants are entitled to judgment as a matter of law regarding the claims of racially discriminatory intent under Count Two of the Third Amended Complaint concerning Congressional Districts Nos. 2 and 5.

8.     Plaintiffs have not provided an alternative map that provides a remedy to the constitutional defects of Congressional District No. 1.  Sometimes, a plaintiff in a redistricting case must present an alternative map to demonstrate, as a practical matter, that his or her remedy is possible.  It is well settled, however, that plaintiffs are not forced in Equal Protection cases to produce "one particular form of proof to prevail."  *Cooper*, 137 S. Ct. at 1479.  In this matter, it is apparent to the Court that a constitutionally compliant plan for Congressional District No. 1 can be designed without undue difficulty, and it was thus not necessary for Plaintiffs to present an acceptable alternative map to prevail on their claims.

9.     Upon a finding that a challenged legislative district is unconstitutional, it is well settled that the legislature should be given a reasonable opportunity to recommend for consideration a remedial plan that meets constitutional standards. *Wise v. Lipscomb*, 437 U.S. 535, 540 (1978).  To that end, the Court will provide the Defendants the opportunity to submit a remedial plan to the Court on or before March 31, 2023.

10.     Where a "legislative apportionment scheme has been found to be unconstitutional, it would be the unusual case in which a court would be justified in not taking appropriate action to

insure that no further elections are conducted under an invalid plan." *Reynolds v. Sims*, 377 U.S. 533, 585 (1964).  Plaintiffs seek for the Court to permanently enjoin Defendants from conducting any election under the 2022 plan until a legally compliant remedial plan is adopted.  (Dkt. No. 267 at p. 48).  To obtain a permanent injunction, Plaintiffs must satisfy a four-factor test before a court may grant such relief.  Plaintiffs must demonstrate: (1) that they have suffered irreparable harm absent the injunction; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that the balance of equities tips in their favor; and (4) that such an injunction would serve the public interest.  *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 31-33 (2008).

Absent a permanent injunction in this case, Plaintiffs will suffer irreparable harm that cannot be remedied at law.  Under the state's 2022 plan, Congressional District No. 1 is a racial gerrymander in violation of Plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment.  Until a legally compliant remedial plan is adopted, Plaintiffs will continue to experience this serious ongoing constitutional injury.  *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) ("Courts routinely deem restrictions on fundamental voting rights an irreparable injury.").  Only an injunction mandating a new redistricting plan, not monetary damages, may remedy Plaintiffs' injury.  With respect to the remaining factors, the balance of equities tips in favor of Plaintiffs and an injunction best serves the public interest.

Consequently, the Court hereby enjoins the conducting of an election under Congressional District No. 1 until a constitutionally valid apportionment plan is approved by this Court.  *See Johnson v. Miller*, 864 F. Supp. 1354, 1393 (S.D. Ga. 1994), *aff'd and remanded Miller v. Johnson*, 515 U.S. 900 (1995).

**Conclusion**

Based on the foregoing, the Court declares Congressional District No. 1 a violation of Plaintiffs' rights asserted in Counts One and Two of the Third Amended Complaint and enters judgment for Plaintiffs.  Elections in Congressional District No. 1 are enjoined until further order of this Court.  The Court enters judgment for Defendants regarding Plaintiffs' claims against Congressional District Nos. 2 and 5 under Counts One and Two of the Third Amended Complaint and enters judgment for Defendants regarding those claims.  The South Carolina General Assembly may present the Court with a remedial map for consideration on or before March 31, 2023.

**AND IT IS SO ORDERED**.


_____
Mary Geiger Lewis
United States District Judge


_____
Toby J. Heytens
United States Circuit Judge


_____
Richard M. Gergel
United States District Judge

January 6, 2023
Charleston, South Carolina