**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | |
|---|---|
| THE SOUTH CAROLINA STATE CONFERENCE OF THE NAACP, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> THOMAS C. ALEXANDER, *et al.*, <br><br> Defendants. | Case No.  3:21-cv-03302-MGL-TJH-RMG <br><br><br> **DEFENDANTS' MOTION FOR A STAY OF THE COURT'S JANUARY 6, 2023 ORDER PENDING APPEAL TO THE SUPREME COURT** |

Defendants—the Senate Defendants, House Defendants, and the State Election Commission Defendants—have filed a notice of appeal of the Court's January 6, 2023 Order. Defendants now respectfully ask the Court to stay its Order pending completion of appellate proceedings in the United States Supreme Court.  There is a strong likelihood that Defendants will prevail on appeal: the Order misconstrues and misapplies the governing law on Plaintiffs' racial gerrymandering claim, miscalculates data regarding the Enacted Plan and Congressional District 1, and overlooks the essential discriminatory effects element of Plaintiffs' intentional-discrimination claim.[1]  Defendants will be irreparably harmed, and the public interest favors a stay, because the Court has enjoined enforcement of the General Assembly's duly enacted map for District 1.  On the other side of the scale, Plaintiffs will not be substantially harmed by a stay, as they have no entitlement to a court-drawn remedial plan that will only create an unnecessary

---

[1] Because the State Election Commission Defendants have consistently taken no position on the merits of the litigation, they do not join in Section I of this motion.  However, they do believe that their co-defendants have presented serious issues that may very well be meritorious and need to be resolved prior to the conduct of any other congressional election in South Carolina.  The State Election Commission Defendants join in Sections II and III of this motion because they strongly believe a stay should be granted for the reasons discussed in those sections.

risk of voter and election administration confusion.  The Court should preserve the status quo and grant a stay pending appeal.[2]

Because time is of the essence, Defendants ask the Court to enter an expeditious ruling on this motion.

## ARGUMENT

Federal courts apply a four-part standard in determining whether to grant a stay pending appeal: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."  *Nken v. Holder*, 556 U.S. 418, 426 (2009).  Each factor readily supports a stay pending appeal here.

## I.    Defendants will likely prevail on the merits of the appeal.

The January 6 Order contains multiple errors.  At the threshold, the Court was required to "presume[] . . . the good faith" of the General Assembly in adopting the Enacted Plan, but the Order failed to apply that presumption.  *Miller v. Johnson*, 515 U.S. 900, 915 (1995).  The Order, moreover, failed to analyze District 1 "as a whole."  *Bethune-Hill v. Va. State Bd. of Elecs.*, 580 U.S. 178, 192 (2017) (*Bethune-Hill I*).  And the Order did not inquire into the intent of the General Assembly "as a whole."  *Brnovich v. Dem. Nat'l Comm.*, 141 S. Ct. 2321, 2339 (2021).  Instead, the Order entirely ignored the South Carolina House and its voluminous evidence of political motivation.  Dkt. No. 493 at 6-7.  And it never explained how a single staffer's (alleged) intent could even be imputed to the *Senate* "as a whole."  *Brnovich*, 141 S. Ct. at 2339.  Each of these errors forms an independent ground for appellate reversal.  *See Abbott v. Perez*, 138 S. Ct.

_____

[2] Because this motion contains a full explanation, a supporting memorandum would serve no useful purpose.  *See* Local Civil Rule 7.04 (D.S.C.).  Further, after consultation, Plaintiffs

2305, 2326 (2018) (predominance finding "cannot stand" if it is "infect[ed]" with "errors of law" or a misapplication of the burden of proof).

Moreover, the Order is riddled with legal and factual "mistake[s]" that improperly relieved Plaintiffs of their "demanding" burden to prove that race was the General Assembly's "predominant consideration" in District 1. *Cooper v. Harris*, 581 U.S. 285, 309, 318-319 (2017). The Order fails to "disentangle race from politics," *id.* at 308, ignores that the Enacted Plan complies with, rather than "subordinates," traditional districting principles, *id.* at 291, and relies upon miscalculations of the purported racial effect of the Enacted Plan's changes in District 1.

A.     **The Court erroneously disregarded the alternative-map requirement.**

A plaintiff alleging a racial gerrymander bears the "demanding" burden to show that "race *rather than* politics *predominantly* explains" the legislature's adoption of the challenged district. *Easley v. Cromartie*, 532 U.S. 234, 243 (2001) (*Cromartie II*) (emphasis in original). But because "racial identification is highly correlated with political affiliation," "political and racial reasons are capable of yielding similar oddities in a district's boundaries." *Cooper*, 581 U.S. at 308. Moreover, "a jurisdiction may engage in constitutional political [line-drawing], even if it so happens that the most loyal Democrats happen to be black Democrats and even if the State were *conscious* of that fact." *Hunt v. Cromartie*, 526 U.S. 541, 551 (1999) (*Cromartie I*) (emphasis original); *see also Bush v. Vera*, 517 U.S. 952, 968 (1996) (plurality op.) ("there is no racial classification to justify" when "district lines merely correlate with race because they are drawn on the basis of political affiliation, which correlates with race").

Thus, a plaintiff alleging a racial gerrymander "must show at the least that the legislature could have achieved its legitimate political objectives in alternative ways that are comparably

_____

(continued…)

oppose the relief requested. *See* Local Civil Rule 7.02 (D.S.C.).

consistent with traditional districting principles"—and "that those districting alternatives would have brought about significantly greater racial balance"—compared to the challenged plan. *Cromartie II*, 532 U.S. at 258.  The Supreme Court unanimously agreed in *Cooper* that only one kind of "alternative," an alternative map, satisfies this requirement in a case where the plaintiff has "meager direct evidence of a racial gerrymander and need[s] to rely on evidence of forgone alternatives" to attempt to prove racial predominance.  *Cooper*, 581 U.S. at 322; *see also id.* at 335 (Alito, J., joined by Roberts, C.J., and Kennedy, J., concurring in the judgment in part and dissenting in part) (dissenting justices would have required an "alternative map" in all but the most "exceptional" racial gerrymandering cases).

Plaintiffs offered no "direct evidence of a racial gerrymander" and therefore "needed to rely on forgone alternatives" to prove their claims.  *Id.* at 321.  Plaintiffs did, however, introduce undisputed evidence that race and political affiliation are highly correlated in South Carolina. Tr. Vol. III 552, 558 (Liu); Tr. Vol. II 349 (Duchin).  Yet *none* of the alternative plans Plaintiffs presented at trial—NAACP Plan 1, NAACP Plan 2, Senate Amendment 2a, or the League of Women Voters Plan—achieved the General Assembly's "legitimate political objective[]," *Cromartie II*, 532 U.S. at 258, of "creat[ing] a stronger Republican tilt" in District 1, Dkt. 493 at 10, 12.  To the contrary, *all* of Plaintiffs' alternative plans "harm[]" that objective by turning District 1 from a majority-Republican district into a majority-Democratic district.  *Cooper*, 581 U.S. at 321; PX 120 at 3 tbl. 1; SX 31d; SX 68d.

Moreover, Plaintiffs' proposed alternative plans are not as "consistent with traditional districting principles" as the Enacted Plan.  *Cromartie II*, 532 U.S. at 258.  Because every one of Plaintiffs' alternative plans turns District 1 into a majority-Democratic district, they all fail to protect incumbents like the Enacted Plan does.  Moreover, as explained below, Plaintiffs'

alternative plans all preserve far less of the cores of *each* district than the Enacted Plan and fail to maintain communities of interest as well as the Enacted Plan.  *See infra* Part I.C.

Accordingly, Plaintiffs' own alternative maps foreclosed a finding in their favor here, *see Cooper*, 581 U.S. at 321; *Cromartie II*, 532 U.S. at 258, but the Court failed to apply the alternative-map rule.  The Court's only mention of Plaintiffs' failure to "provide[] an alternative map" reflected its erroneous belief that an alternative map is relevant only to illustrate a "remedy" for the alleged violation.  Dkt. 493 at 30.  The Court therefore missed that an alternative map is required to *prove* the alleged violation if not in all cases, *Cooper*, 581 U.S. at 335 (Alito, J., joined by Roberts, C.J., and Kennedy, J., concurring in the judgment in part and dissenting in part); *Cromartie II*, 532 U.S. at 258, then at a minimum in cases, such as this one, involving no "direct evidence of a racial gerrymander" and "rely[ing] on evidence of forgone alternatives," *Cooper*, 581 U.S. at 321.  In other words, while the *Cooper* majority opined that plaintiffs are not necessarily required to produce "one particular form of proof to prevail," it reinforced the alternative-map requirement in circumstantial cases like this one.  *Id.* at 319, 321.

The Court also erred in concluding that it was "not necessary for Plaintiffs to present an acceptable alternative map to prevail on their claims" because, in the Court's view, "a constitutionally compliant plan for Congressional District No. 1 can be designed without undue difficulty."  Dkt. 493 at 30.  That, however, misstates Plaintiffs' burden, as a constitutionally compliant plan, without more, provides no indication of whether "race *rather than* politics *predominantly* explains" the challenged plan.  *Cromartie II*, 532 U.S. at 258 (emphasis in original).  Accordingly, a plaintiff's burden is to come forward with a plan that isolates racial predominance as the explanatory variable in the challenged plan by controlling for "political objectives" and "traditional districting principles."  *Id.*  Indeed, the Supreme Court has

5

recognized that such an alternative "can serve as key evidence in a race-versus-politics dispute" and could be used to "disprove a State's contention that politics drove a district's lines [by showing] that the legislature had the capacity to accomplish all its partisan goals without moving so many members of a minority group into the district." *Cooper*, 581 U.S. at 317.

Finally, the Court's suggestion that Plaintiffs were excused from the alternative-map requirement because a map could be drawn "without undue difficulty," Dkt. 493 at 30, turns the well-settled "demanding" burden of proof on its head, *Cooper*, 581 U.S. at 319. If anything, that providing an alternative map is easy should be a reason to *require* one, since "producing a map that meets the *Cromartie II* test should not be hard if the predominant reason for a challenged plan really was race and not politics." *Id.* at 337 (Alito, J., concurring in the judgment in part and dissenting in part). Plaintiffs' failure to come forward with a proper alternative plan is fatal to their claims and warrants a stay pending appeal.

### B.     The Court failed to disentangle race and politics.

"As a result of [the] redistricting realities" that race and politics are "highly correlated" but the Fourteenth Amendment prohibits only racial gerrymandering, "a trial court has a formidable task" in a case involving competing racial and political explanations for the challenged district. *Cooper*, 581 U.S. at 308. "It must make a sensitive inquiry into all circumstantial and direct evidence of intent to assess whether the plaintiffs have managed to disentangle race from politics and prove that the former drove a district's lines." *Id.* (internal quotations omitted).

The Court acknowledged that the General Assembly had a political intent in District 1: in the Court's own words, the General Assembly "sought to create a stronger Republican tilt" in District 1, which had elected a Democratic representative in 2018 "in what was then regarded as a major political upset." Dkt. 493 at 10, 12. The Court therefore committed a reversible "legal

mistake" when it failed to "disentangle race from politics" in District 1 as a whole or even in Charleston County. *Cooper*, 581 U.S. at 308. In particular, while the Court pointed to the alleged racial effect of the Enacted Plan's changes in Charleston County (which it miscalculated and overstated, *see infra* Part I.C), it never engaged the voluminous evidence demonstrating that District 1 and the line in Charleston County are readily "[]explainable on grounds" of politics, *Cromartie II*, 532 U.S. at 242.

For example, the Court disregarded Senator Campsen's testimony that he never considered race or even reviewed racial data during the drawing of the Enacted Plan. Tr. Vol. VII 1850-51 (Campsen). It also never addressed Senator Campsen's testimony outlining his race-neutral political and policy reasons for preferring to make Beaufort and Berkeley Counties whole in District 1 while maintaining the split of Charleston County. Tr. Vol. VII 1823-1825, 1842-1844, 1878 (Campsen).

Moreover, the Court never mentioned Senate Majority Leader Shane Massey's trial testimony *at all*. It therefore did not mention the testimony from both Leader Massey and Senator Campsen that the Republican-controlled General Assembly would never have enacted, for obvious political reasons, any plan that turned District 1 into a majority-Democratic district. *See* Tr. Vol. VI 1561-1562, 1573-74 (Massey); Tr. Vol. VII 1835, 1856-1858 (Campsen). And the Court failed even to mention the evidence demonstrating that some members of the House understood that the Senate would only support a plan with at least a forecasted 53.5% Republican vote share in District 1, which is a political target—*not* a racial target. *See* HX 81.

The Court also failed to acknowledge the 2020 election data in the record, which proves the obvious political explanation for District 1 "as a whole," *Bethune-Hill I*, 580 U.S. at 192, and the district line in Charleston County in particular. Thus, the Court did not consider that the

political effect of the Enacted Plan's changes in District 1 is much greater than any racial effect: the Enacted Plan increases District 1's Republican vote share by 1.36% and its BVAP by 0.16%. SX 28b, 28c, 29d, 29g. Moreover, that none of Plaintiffs' alternative plans achieve the General Assembly's objective of strengthening the Republican majority in District 1 is fatal to their claims, *see supra* Part I.A, and evinces that the General Assembly's "intent" in adopting the Enacted Plan was political, not racial, *Cooper*, 581 U.S. at 308.

Even in Charleston County, the Court overlooked the election data showing that the district line "correlate[s] with" the General Assembly's "political" goals, *Bush*, 517 U.S. at 968 (plurality op.), and therefore is readily "[]explainable on grounds other than race," *Cromartie II*, 532 U.S. at 242. In particular, the Court failed to mention that:

- Charleston County is a 56.6% Democratic county according to the 2020 presidential election results, SX 243;

- The portion of Charleston County in Enacted District 6 is 64.6% Democratic according to the 2020 presidential election results, *id.*;

- The portion of Charleston County in Enacted District 1 is only 49.2% Democratic according to the 2020 presidential election results, *id.*; and

- The Enacted Plan's changes reduced the Democratic vote share in the District 1 portion of Charleston County by more than 3 percentage points according to the 2020 election results, *id.*

The Court also mentioned certain Charleston County VTDs that the Enacted Plan moved from District 1 to District 6—the Deer Park, Ladson, Lincolnville, and St. Andrews VTDs. Dkt. 493 at 14 n.7. The Court noted those VTDs' racial makeup but never their political makeup, let alone that moving those VTDs "correlate[s] with" and directly advanced the General Assembly's "political" objective. *Bush*, 517 U.S. at 968 (plurality op.). In fact, *all* of those VTDs have a higher Democratic vote share than BVAP percentage. SX 243; Dkt. No. 473. And the Court disregarded that:

- The Deer Park, Ladson, and Lincolnville VTDs, are majority-Democratic, ranging from 50.8% to 72.4% Democratic, SX 243, so moving them to District 6 advanced the goal of making District 1 more Republican-leaning.

- The same is true of the St. Andrews VTDs, which comprise the West Ashley area: taken together, that area is 57% Democratic (and has a BVAP of only 19.59%), Dkt. No. 473; SX 243, so removing it from District 1 makes that district more Republican-leaning.

The Court's invocation of the analyses of two of Plaintiffs' putative expert witnesses, Dr. Kosuke Imai and Dr. Jordan Ragusa, *see* Dkt. 493 at 17-19, actually underscores the failure to disentangle race from politics. As Dr. Imai told the Court on the stand, his analysis did not even examine, let alone control for, politics or partisan performance. Tr. Vol. VIII 1987-1988, 2007-2010 (Imai). It necessarily does nothing to "disentangl[e] race from politics." *Cooper*, 581 U.S. at 308.

Dr. Ragusa's analysis suffers from its own fatal flaws. At the threshold, Dr. Ragusa ignored several traditional districting principles, including core retention and contiguity. By ignoring contiguity, he treated as "excluded" from District 1 VTDs that were not geographically close to the district line. Tr. Vol. IV 1066 (Ragusa). And he made no attempt to establish that those VTDs "were near enough to District 1[]'s boundaries or each other for the [General Assembly] as a practical matter to have drawn [its] boundaries to have included them, without sacrificing other important political goals." *Cromartie II*, 532 U.S. at 247.

Moreover, Dr. Ragusa focused on the total number of African-Americans residing in a VTD. PX 19 at 2-4. But because VTDs vary in size, VTDs with the same total number of African Americans can vary wildly in their BVAP percentage. Thus, as Plaintiffs' own expert admitted, a VTD's BVAP percentage is more probative than its total African-American population for determining the effect of moving it on a district's racial composition. Tr. Vol. VIII at 1998 (Imai).

Dr. Ragusa's "partisanship" analysis is similarly flawed because he examined VTDs based on total Democratic votes rather than the Democratic vote percentage. PX 19 at 2-4. And his proposed comparison of VTDs' racial and political composition is apples-to-oranges because one reflects total population while the other reflects voter turnout. *See id.*

Finally, the Court's conclusion that the Senate's experienced and nonpartisan map drawer, Will Roberts, employed a racial target is legally and factually erroneous. *See, e.g.*, *infra* Part I.D. In all events, that conclusion reinforces, rather than remedies, the Court's "legal mistake" in failing to disentangle race and politics. *Cooper*, 581 U.S. at 309. After all, the Supreme Court has never upheld a finding of a racial target in a racial gerrymandering case without direct evidence or a legislator's admission that such a target existed. *See id.* at 316-18; *Bethune-Hill I*, 580 U.S. at 192. Even then, the Supreme Court has scrupulously required a showing that any racial target had "a direct and significant impact" on the challenged district's configuration. *Cooper*, 581 U.S. at 300. These holdings make perfect sense because they flow from the plaintiff's demanding burden to prove "race *rather than* politics *predominantly* explains" the challenge district. *Cromartie II*, 532 U.S. at 243 (emphasis in original).

The Court, however, found a racial target without direct evidence and without requiring a showing of any racial target's "direct and significant impact" on district lines. *Cooper*, 581 U.S. at 300. This case demonstrates the importance of those requirements. Because "[r]acial identification is highly correlated with political affiliation[,]" *id.* at 308; *Cromartie II*, 532 U.S. at 243, a district court could *always* attempt to infer the existence of a racial target from lines which "correlate with" both race and politics, *Bush*, 517 U.S. at 968. And drawing such a conclusion, as the Court did here, without any direct evidence or a showing of a direct and substantial impact would rewrite the plaintiff's burden of proof. Rather than presuming the

General Assembly's good faith and holding Plaintiffs to their burden to prove that "race *rather than* politics *predominantly* explains" District 1, *Cromartie II*, 532 U.S. at 243 (emphasis in original), the Court presumed bad faith and required the General Assembly to disentangle race and politics. Defendants are likely to succeed on this basis as well. *See Abbott*, 138 S. Ct. 2326.

### C.    The Court misconstrued and misapplied the predominance standard.

By disregarding the presumption of "good faith," abandoning "extraordinary caution," *Miller*, 515 U.S. at 915, and failing to examine District 1 "as a whole," *Bethune-Hill I*, 580 U.S. at 192, the Court incorrectly lowered Plaintiffs' demanding burden to show that "the legislature subordinated traditional districting principles . . . to racial considerations," *Cromartie I*, 526 U.S. at 547. Indeed, as part of its overly narrow focus on ending the "division of Charleston County," Dkt. 493 at 15, the Court disregarded volumes of evidence that the Enacted Plan complies with, rather than "subordinate[s]," traditional districting principles. *Cromartie I*, 526 U.S. at 547.

*First*, the Court did not consider that the Benchmark Plan conclusively "adhered to traditional race-neutral principles." *Backus v. South Carolina*, 857 F. Supp. 2d 553, 560 (D.S.C.), *aff'd*, 586 U.S. 801 (2012). The Benchmark Plan therefore was the logical starting point for drafting the Enacted Plan, and the General Assembly preserved high percentages of the cores of the Benchmark Districts, including 92.78% of the core of District 1. *See id.* (recognizing that "preserving the cores of existing districts" is a traditional principle); SX 29c. In fact, the Enacted Plan preserves a higher percentage of the core of *every* district than *every* alternative plan proposed by Plaintiffs at trial.

**Preservation Of Cores Of Existing Districts**

| District | Enacted Plan | NAACP 1 | NAACP 2 | Amend. 2a | LWV |
|---|---|---|---|---|---|
| 1 | 92.78% | 52.23% | 72.46% | 73.39% | 70.64% |
| 2 | 96.75% | 71.69% | 51.52% | 65.71% | 64.09% |
| 3 | 94.75% | 75.30% | 86.34% | 70.38% | 91.54% |
| 4 | 98.09% | 83.00% | 87.51% | 74.35% | 97.50% |
| 5 | 95.04% | 57.15% | 79.85% | 55.23% | 81.61% |
| 6 | 77.41% | 45.53% | 46.35% | 54.34% | 50.70% |
| 7 | 99.51% | 59.77% | 99.30% | 55.83% | 83.46% |

SX 29c; SX 31c; SX 34b; SX 35c; SX 68c.

The General Assembly's preservation of district cores also demonstrates its compliance with other "traditional districting principles." *Colleton Cnty. Council*, 201 F. Supp. 2d at 649. In fact, under South Carolina law, preserving district cores is "the clearest expression" possible of the General Assembly's respect for "communities of interest" because cores "necessarily incorporate the state's other recognized interests in maintaining political boundaries . . . as well as other natural and historical communities of interest." *Id.* The Court failed to acknowledge any of this—or that Plaintiffs' proposed alternatives, by preserving less of the cores of districts, also show less respect for "communities of interest" than the Enacted Plan. *Id.*

*Second*, the Enacted Plan actually improves upon the constitutional Benchmark Plan's compliance with traditional principles. Compared to the Benchmark Plan, the Enacted Plan reduces the number of split counties from 12 to 10 and the number of split VTDs from 65 to 13. SX 28d, 29e.

*Third*, the General Assembly's compliance with traditional principles is on full display in Charleston County. This is unsurprising, since Senator Campsen explained that he sought to comply with traditional principles in District 1 and Charleston County. Tr. Vol. VII 1838 (Campsen). In particular:

- The Benchmark Plan split the Charleston Peninsula, and the General Assembly made it whole in the Enacted Plan.

- The Benchmark Plan split the coastal Charleston community of interest, and the General Assembly made it whole in the Enacted Plan.

- The General Assembly repaired all 5 split VTDs in Charleston County.

- The General Assembly followed the Charleston-Dorchester county line to include the Deer Park, Lincolnville, and Ladson VTDs in District 6.

- The General Assembly conformed the district line in Charleston County to natural geographic features, including Cooper River, Stono River, Ashley River, and Wappo Creek.

SX 28d; SX 29e; SX 50.

*Fourth*, the General Assembly's adoption of District 1—including its changes in Charleston County—comported with, rather than "subordinated," the traditional race-neutral principle of politics. *Cromartie I*, 526 U.S. at 547; PX 175 at 2; SX 3 at 2 (communities of interest based on "politics" and "voting behavior"); *supra* Part I.B.

*Fifth*, the Enacted Plan is also the only plan presented at trial that keeps District 1 majority-Republican and maintains the 6-1 Republican-Democratic split in the congressional delegation. Thus, it is the only plan that complies with the traditional principle of protecting incumbents. *See Bush*, 517 U.S. at 964 (plurality op.).

Despite presiding over an eight-day trial at which the Enacted Plan's compliance with traditional districting principles featured prominently, the Court did not examine *any* of this evidence. The Court, in fact, never analyzed District 1's compliance with traditional districting principles "as a whole." *Bethune-Hill I*, 580 U.S. at 192. Indeed, the Court said little about traditional principles, focusing instead on its erroneous finding of a racial target in District 1. Dkt. 493 at 15; *see infra* Part I.D. But even if that racial-target theory were correct (it is not), the Court was still required to find that the General Assembly "subordinated traditional race-neutral

principles . . . to rac[e]." *Bethune-Hill I*, 580 U.S. at 187; *id.* at 190 ("[T]his Court to date has not affirmed a predominance finding . . . without evidence that some district lines deviated from traditional principles."); *Cooper*, 581 U.S. at 300 (racial target must have "direct and significant impact" on challenged district).

The most the Order offers is the suggestion that the line in Charleston County "subordinates" the traditional principles of "maintenance of constituencies, minimizing divisions of counties, and avoidance of racial gerrymandering." Dkt. 493 at 17. This suggestion is incorrect for three reasons.

*First*, the Court never examined District 1's performance "as a whole," *Bethune-Hill I*, 580 U.S. at 192, on "maintenance of constituencies," Dkt. 493 at 17. Had it done so, it would have uncovered that the Enacted Plan retains 92.78% of District 1's core, SX 29c—a high level that outperforms all of Plaintiffs' alternative plans.

Moreover, the Court failed to consider uncontested data that belie its conclusion of a predominant racial motive in the Enacted Plan's changes to District 1. The areas that the Enacted Plan moved *into* District 1 had a *higher* African-American population percentage than the areas the Enacted Plan moved *out* of District 1. In particular, the areas the Enacted Plan moved into District 1 comprised 52,799 people, of whom 20,240—or 38.3%—were African American. SX 29c. By contrast, the areas the Enacted Plan moved out of District 1 comprised 140,489 people, of whom 35,629, or 25.4%, were African American. *Id.*

On net, as part of equalizing the total population between Districts 1 and 6, the Enacted Plan moved 87,690 people (140,489 minus 52,799) from District 1 to District 6, of whom 15,389 (35,629 minus 20,240)—or 17.5%—were African American. *Id.* Thus, the Enacted Plan moved far more white people than African Americans out of District 1. The result was that the Enacted

Plan slightly *increased* District 1's BVAP by 0.16%. SX 28b, 29g. In other words, far from "exil[ing] . . . African American citizens" from District 1, Dkt. 493 at 20, the Enacted Plan faithfully maintained district cores while making changes that had nothing to do with race.

The Enacted Plan's perpetuation of the Charleston County split also undermines the Court's complaint about "maintenance of constituencies." *Id.* at 17. After all, if anything, ending the decades-long split of Charleston County, as the Court suggested and Plaintiffs' alternative plans all do, is a starker departure from the principle of "maintenance of constituencies" than the Enacted Plan. *Id.*

Moreover, the Court's suggestion that the Enacted Plan's split of Charleston County evinces a racial purpose, *id.* at 20, is erroneous and rests on a miscalculation. The Court asserted that the Enacted Plan moved "over 30,000 African Americans" (or 62%) from District 1 to District 6 in "Charleston County." *Id.* at 14. That number is simply wrong. The Court apparently arrived at it by subtracting the total African-American population in the Charleston County portion of District 1 under the 2020 Census from the total African-American population in that portion under the 2010 Census. *Id.* But the BVAP in Charleston County decreased in the intervening decade from 27.7% to 22.1%. Dkt. 473. Thus, by the time the Enacted Plan was drawn in 2022, the African-American population in the District 1 portion of Charleston County had decreased from the level under the 2010 Census. As a result, the total number of African-Americans that the Enacted Plan moved out of District 1 in Charleston County is lower than the 30,000 number calculated by the Court.

Likewise, in focusing on the relative BVAP percentages of the District 1 and District 6 portions of Charleston County, the Court failed to account for the decrease in Charleston County's BVAP. For example, the Court stated that "the percentage of African Americans in

Charleston County in District No. 1 fell from 19.8% at the time of enactment of the 2011 Plan to 10.3% in the 2022 plan." Dkt. 493 at 15. But because of the demographic changes in Charleston County in the intervening decade, the decrease in the BVAP percentage in the Charleston County portion of District 6 was *even greater*: that percentage fell from 49.9% to 31.2%. Dkt. 473. Thus, the BVAP disparity between the District 6 and District 1 portions of Charleston County *decreased* under the Enacted Plan: that disparity was 30.1% in the Benchmark Plan under the 2010 Census (49.9% vs. 19.8%) and only 20.9% in the Enacted Plan under the 2020 Census (31.2% vs. 10.3%).[3]

The Court also observed that "79% of Charleston County's African American population was placed in Congressional District No. 6 and 21% was placed into District No. 1." Dkt. 493 at 15. Even on its own, this fact is not probative of a racial gerrymander. *See, e.g.*, *Cromartie I*, 526 U.S. at 551; *Bush*, 517 U.S. at 968 (plurality op.); *Miller*, 515 U.S. at 920 ("when members of a racial group live together in one community [or county], a reapportionment plan that concentrates members of the group in one district and excludes them from others may reflect wholly legitimate purposes"). It loses all meaning in the context of District 1 "as a whole." *Bethune-Hill I*, 580 U.S. at 192. After all, as mentioned, the Enacted Plan slightly *increased* District 1's BVAP percentage. Moreover, the Enacted Plan placed *100%* of the African-American residents of Berkeley County in District 1, even though Berkeley County was also split in the Benchmark Plan and has a higher BVAP percentage than Charleston County. Dkt. 473; SX 28b, SX 28d, SX 29e, SX 29g, SX 49.

---

[3] The Court did not explain how it arrived at the figure behind its suggestion that the African-American population in Charleston City in District 1 saw a "drop of 77%" in the Enacted Plan. Dkt. 493 at 15 n.10. In addition to failing to account for demographic changes between 2010 and 2020, this figure appears to be wrong or a "distorted picture . . . created by dividing one percentage by another." *Brnovich*, 141 S. Ct. at 2345.

*Second*, the Court's suggestion that the Enacted Plan's changes to Charleston County violate the principle of "minimizing divisions of counties" appears to reflect its erroneous view that the General Assembly was obligated to undo the Charleston County split that has been in place since 1994. Dkt. 493 at 17. Not so. Moreover, the Court ignored District 1 "as a whole," *Bethune-Hill I*, 580 U.S. at 192: the Enacted Plan *repaired* the splits of Beaufort and Berkeley Counties that had existed in the constitutional Benchmark District 1. And, as explained, maintaining the Charleston County split achieved Senator Campsen's political and policy goals, while adhering to traditional principles by eliminating all 5 VTD splits and conforming the district line to natural geography. Whatever the merits of these trade-offs, the General Assembly wields the "discretion to exercise the political judgment necessary to balance" these "competing interests," and its "good faith" in doing so "must be presumed." *Miller*, 515 U.S. at 915.

*Finally*, the Court's suggestion that the Enacted Plan's changes in Charleston County subordinate the traditional principle of "avoid[ing] racial gerrymandering," Dkt. 493 at 17, begs the question. It does not resolve whether "racial gerrymandering" occurred in the first instance.

The Court thus failed to base its predominance finding on "a sensitive inquiry into all circumstantial and direct evidence." *Cooper*, 581 U.S. at 308. Its failure to perform that "formidable task" is a "legal mistake" warranting a stay. *Id.*; *see also Abbott*, 138 S. Ct. 2326.

### D.    The Court clearly erred in finding a racial target.

Defendants have a likelihood of success based upon the legal errors mentioned above. *See supra* Parts I.A-C. But even if the Court had not committed legal error, the Defendants are likely to succeed on the merits because the record evidence, reviewed in its totality, leaves "the definite and firm conviction that a mistake has been committed." *Cromartie II*, 532 U.S. at 242.

At the threshold, the evidence discussed above that the Court failed to acknowledge, *supra* Parts I.A-C, demonstrates the Court's "mistake" in finding racial predominance on an

incomplete record, *see Cromartie II*, 532 U.S. at 242. So, too, does the showing that the Court miscalculated the racial effect of the Enacted Plan's changes in Charleston County. *See supra* Part I.C.

That leaves the Court's finding that Mr. Roberts employed a racial target as a proxy for politics in District 1. The Court never explained how this alleged target could be imputed to the General Assembly "as a whole." *Brnovich*, 141 S. Ct. at 2339. In all events, the Court's conclusions drawn from the testimony of the "experienced" and nonpartisan Mr. Roberts, Dkt. 493 at 12, were erroneous.

*First*, the Court asserted that adopting a 17% African-American racial target as a proxy for politics was necessary "to produce the desired partisan tilt" in District 1, Dkt. 493 at 11-12, but it cited no record support for that assertion. In fact, the record *contradicts* it in evidence the Court did not consider. The "desired partisan tilt" was much more easily and accurately produced by drawing the Charleston County line based on partisan data—namely, the 2020 election data. *See* SX 243. Indeed, whereas race is *highly* correlated with politics, election data is *perfectly* correlated with politics. The Court never mentioned the election data in the record, much less explained why the General Assembly would use a racial target as a *proxy* for politics instead of the more precise election data *directly* for politics.

*Second*, the Court declared that "Senator Campsen's announced intention to include Berkeley and Beaufort Counties whole in Congressional District No. 1, as well as portions of Dorchester County, presented a challenging problem for Roberts as he attempted to complete the Charleston County portion of the district to produce a congressional district with a Republican tilt." Dkt. 493 at 12-13. But no record support was cited for this statement. Nor does any exist: the availability of sub-precinct political data in fact made drawing Republican-leaning versions

of District 1 along the parameters Senator Campsen requested an easy task. Mr. Roberts drew several such plans; each time he conveyed them to Senator Campsen, he noted the political composition—but *never* the racial composition—of the districts. SX 92a, SX 92b.

In fact, if anything, the decision to include Berkeley County "whole in Congressional District No. 1," Dkt. 493 at 13, disproves the Court's theory that the General Assembly used a racial target as a proxy for politics in District 1. According to figures cited by the Court, Berkeley County has a higher African-American population percentage than Charleston County. *Id.* at 17. Thus, had the map drawer (or the General Assembly) been using a racial target as a proxy for politics, the Enacted Plan would have excluded Berkeley County rather than Charleston County from District 1. That it instead included Republican-majority Berkeley County and excluded a majority-Democratic portion of Charleston County only underscores that the General Assembly drew lines based upon politics and traditional principles, not race.

*Third*, the Court noted its view that Mr. Roberts did not respect communities of interest and "abandoned his least change approach and the Clyburn staff model" in Charleston County. *Id.* at 13-14. Once again, that is not an accurate description of the Enacted Plan's compliance with traditional districting principles. *See supra* Parts I.A-C. Moreover, in all events, any departure from respecting communities of interest or maintaining district cores does not establish that those traditional principles were "subordinated . . . to racial considerations," *Cooper*, 581 U.S. at 292, instead of politics or other traditional principles, *see supra* Parts I.A-C. Mr. Roberts explained all of this to the Court. He did not "fail[] to provide the Court with any plausible explanation" for the Enacted Plan's approach to Charleston County, Dkt. 493 at 17, but instead provided an explanation based on politics and traditional principles, *see* Tr. Vol. VI 1353-1560 (Roberts).

19

Any departures from the Clyburn staff model likewise are wholly consistent with politics and traditional districting principles. *See supra* Parts I.A-C. Moreover, the Clyburn staff model maintained a Republican majority in District 1. SX 223e. It also moved more African-Americans out of District 1—and resulted in a lower BVAP percentage in District 1—than the Enacted Plan. SX 223c. Thus, it did even *more* of what the Court believes tainted the Enacted Plan with racial predominance than the Enacted Plan did. *Compare* Dkt. 493 at 12-17.

*Fourth*, the Court appears to have based its conclusion on what it described as the "coincidence" that the total African-American population percentage in Benchmark District 1 and Enacted District 1 are the same. *Id.* at 16. But that "coincidence" is completely consistent with the Enacted Plan's preservation of 92.78% of District 1's core. The Court should have presumed the General Assembly's "good faith" in any coincidence, *Miller*, 515 U.S. at 915; instead, it effectively presumed the opposite.

Moreover, in all events, that "coincidence" *disproves* the existence of a racial target. After all, Benchmark District 1 elected a Democratic representative in 2018 at the 17.8% African-American total population level. Accordingly, if the General Assembly had used race as a proxy for politics, adopting a 17.8% target would have *harmed* its goal of making District 1 more Republican-leaning. In other words, if the General Assembly had adopted a racial target as a proxy for politics, it would have adopted a target *lower* than the 17.8% level that had resulted in a Democrat winning election in District 1. Instead, the General Assembly adopted a plan that increased District 1's Republican vote share by 1.36% while slightly increasing its BVAP. Thus, the "coincidence" demonstrates that the General Assembly was concerned with District 1's political composition, not its racial composition.

*Fifth*, the Court devoted significant attention to the racial effect of the Enacted Plan's changes to Charleston County, and claimed that Mr. Roberts agreed that those changes were "dramatic" and created "tremendous disparity." Dkt. 493 at 20. But, as explained, the Court incorrectly calculated those effects, *see supra* Part I.C, and any such effects do not establish a predominant racial "purpose[]," *Cooper*, 581 U.S. at 299; *see, e.g.*, *supra* Parts I.A-C; *Miller*, 515 U.S. at 920; *Cromartie I*, 526 U.S. at 551; *Bush*, 517 U.S. at 968.

*Finally*, the Court faulted Mr. Roberts for his "in-depth knowledge of racial demographics in South Carolina." Dkt. 493 at 17. The Court pointed to Mr. Roberts's trial testimony regarding the racial make-up of Deer Park. *Id.* at 16 & n.12. Mr. Roberts explained that he checked the racial demographics of the Deer Park VTDs only after a Democratic activist alleged that the Senate staff plan's treatment of those VTDs was a racial gerrymander. Tr. Vol. VI 1548 (Roberts). Mr. Roberts, moreover, did not know the racial demographics of other areas that the panel asked him about. Tr. Vol. VI 1550 (Roberts). And Mr. Roberts provided "highly accurate" testimony, Dkt. 493 at 16 n.12, regarding the political composition of not only the Deer Park VTDs, but also the Lincolnville, Ladson, and St. Andrews VTDs, Tr. Vol. VI 1428, 1431, 1435, 1490-92 (Roberts). Thus, if anything, Mr. Roberts had even *better* knowledge of the State's political demographics than of its racial demographics—yet the Court discounted his political explanation for moving those VTDs.

Anyway, as the Supreme Court has emphasized, mere "awareness" of demographic data and the consequences of districting decisions on racial groups does not prove a racial gerrymander because a legislature is "almost always" "aware" of race and other demographic factors when drawing district lines, but "it does not follow that race predominate[d] in the

redistricting process." *Miller*, 515 U.S. at 916; *see Bethune-Hill*, 580 U.S. at 187; *Cromartie I*, 526 U.S. at 551. A stay is warranted.

**E.    The Court erred in finding intentional discrimination in the absence of any discriminatory effect.**

The Court's ruling for Plaintiffs on their intentional vote-dilution claim is likewise legal error. In the Court's view, that claim was subject to the same "predominant motivation" standard as the racial gerrymandering claim. Dkt. 493 at 28-30. But because the Court erred in finding predominance, *supra* Part I.A–D, its ruling on the intentional vote-dilution claim cannot stand either.

Moreover, even apart from that problem, the Court erred in another independent way: it failed to make any finding on the essential discriminatory effect element of the intentional vote-dilution claim. That element required a showing that the General Assembly "as a whole," *Brnovich*, 141 S. Ct. at 2350, adopted the Enacted Plan "because of, not merely in spite of," its (non-existent) "adverse effects upon an identifiable group," *Pers. Adm'r of Mass v. Feeney*, 442 U.S. 256, 279 (1979) (emphasis added). In other words, Plaintiffs were required to show that the Enacted Plan has a "disproportionately adverse effect" upon some citizens based upon their race, *id.*, compared to other "similarly situated" citizens, *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439-40 (1985). The Court failed to address this essential element, and its judgment on Count Two is accordingly erroneous.

In all events, the Court not only failed to find a discriminatory effect; it *could not* find such an effect as a matter of law. In challenging District 1, Plaintiffs essentially faulted the General Assembly for failing to draw the district in a way that enabled African-American voters to form a coalition with white crossover voters to "elect" their preferred Democratic candidates or "influence" the outcome of elections. Dkt. 267 ¶ 171. But this theory of discriminatory effect

fails as a matter of law because there is no "right to form political coalitions." *Bartlett v. Strickland*, 556 U.S. 1, 15 (2009). Thus, as courts have recognized, "[a] redistricting plan that does not adversely affect a minority group's potential to form a majority in a district, but rather diminishes its ability to form a political coalition with other racial or ethnic groups, does not result in vote dilution on account of race." *Hall v. Virginia*, 385 F.3d 421, 431 (4th Cir. 2004).

"The Equal Protection Clause [and] the Fifteenth Amendment … are aimed only at ensuring equal political opportunity: that every person's chance to form a majority is the same, regardless of race or ethnic origin. Coalition suits provide minority groups with a political advantage not recognized by our form of government, and not authorized by the constitutional and statutory underpinnings of that structure." *Nixon v. Kent County*, 76 F.3d 1381, 1392 (6th Cir. 1996) (en banc); *see Hall*, 385 F.3d at 431. As the Supreme Court has observed, "minority voters are not immune from the obligation to pull, haul, and trade to find common political ground." *Bartlett*, 556 U.S. at 15. That is just a commonplace fact of political life, not an adverse effect cognizable under the Fourteenth Amendment.

Even setting aside that problem, Plaintiffs failed to prove that the Enacted Plan has a "*disproportionately* adverse" effect on black voters, *Feeney*, 442 U.S. at 279 (emphasis added), compared to "similarly situated" white voters, *City of Cleburne*, 473 U.S. at 439-40. As the Supreme Court has explained, members of one race are "similarly situated" with members of another race only if they are "alike" in "all relevant respects." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). Moreover, of course, voters' political affiliations are highly relevant in the context of redistricting because redistricting is "inseparable" from "[p]olitics and political considerations." *Gaffney v. Cummings*, 412 U.S. 735, 753 (1973). Thus, Plaintiffs were required to prove that the

Enacted Plan has a disproportionately adverse effect on African-American voters compared to white voters *of the same political affiliation*.

But Plaintiffs did not—and could not—carry this burden because the Enacted Plan affects African-American Democrats and "similarly situated" white Democrats *in exactly the same way*. *See City of Cleburne*, 473 U.S. at 439-40. That is, the Enacted Plan limits the ability of *all* Democrats—African-American and white—to form a winning political coalition in District 1 (and, conversely, it improves the ability of *all* Republicans—African-American and white—to do the same). In fact, there are *just as many or more* white Democrats as African-American Democrats in District 1, confirming that the Enacted Plan bears equally on comparable members of both races. *See* SX 28b; SX 28c (in the 2020 presidential election, when District 1's BVAP was only 16.56%, the Democratic candidate received 47% of the vote in the district). As Plaintiffs' own putative expert put it, "in a district [like District 1] that always elects Republicans," "[a]ny voter who voted for a Democrat is not seeing their preferred candidate elected," regardless of the race of the voter. Tr. Vol. II 473-474 (Duchin). Nor does it come close to proving a cognizable discriminatory effect. *See Feeney*, 442 U.S. at 279; *City of Cleburne*, 473 U.S. at 439-40. A stay is warranted.

## II.    Defendants will be irreparably harmed absent a stay.

The Court's decision and accompanying injunction are not only erroneous, but also threaten Defendants with "irreparable injury." *Nken*, 556 U.S. at 426. The order enjoining elections in the General Assembly's "duly enacted" District 1 "clearly inflicts irreparable harm on the State." *Abbott*, 138 S. Ct. at 2324 n.17. "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). That is particularly true here, where redistricting is "primarily the duty and responsibility of the State

through its legislature or other body, rather than of a federal court." *Chapman v. Meier*, 420 U.S. 1, 27 (1975).

Even more concretely, the Court's order contemplates remedial proceedings and judicial imposition of a new map well before the Supreme Court will complete appellate proceedings in this case in the ordinary course. The Court has granted the General Assembly until "March 31, 2023" to propose a new map, Dkt. 493 at 30, and Plaintiffs have indicated that they may seek a special election in any court-drawn version of District 1. Any remedial map would necessarily affect at least one additional district, if not more. In other words, Plaintiffs want three elections, three years in a row, in one, two, or more congressional districts with potentially different district lines.

The State Election Commission Defendants are required to implement the procedures, tasks, and timelines established in state law as well as the deadlines and procedures necessary to comply with the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), 52 U.S.C. § 20301, *et seq*., and the National Voter Registration Act (NVRA), 52 U.S.C. § 20501, *et seq.* In conjunction with the various counties that may be affected by a remedial reapportionment map, these tasks include, but are not limited to, identifying and reassigning voters to the proper congressional district, opening candidate filing, conducting primary elections, including runoffs as necessary, and conducting the general election. Each of the election cycles requires the State Election Commission and affected counties to comply with the requirements (including mailing ballots not less than 45 days prior to the election) of UOCAVA. Any change to statutorily established election timelines and procedures can lead to voter and election administration confusion. Additionally, any changes in the statutory election schedule can create logistical and feasibility challenges for the State Election Commission Defendants and the affected counties.

But appellate proceedings will last months, and most likely into next year, before the Supreme Court issues a decision. Absent a stay, the Supreme Court could be faced with undoing any court-ordered remedial map late in the 2024 election calendar, with the attendant risk of voter and election administration confusion. *See, e.g.*, *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006) (per curiam); *Merrill v. Milligan*, 142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurring in grant of applications for stays). A stay is the only way to prevent a costly and unnecessary remedial proceeding and to preserve Defendants' right to appeal and to receive effectual relief on appeal.

### III. A stay is in the public interest and will not substantially injure the other parties interested in the proceeding.

The last two factors—"the public interest" and that "other parties will not be substantially harmed," *Nken*, 556 U.S. at 426—also favor a stay. To begin, the "harm to the [party]" and "the public interest" "merge when the Government is" the party. *Nken v. Holder*, 556 U.S. 418, 435-36 (2009). And, as noted above, the harm to Defendants and the public is obvious: the Court's order has enjoined the State "from effectuating statutes enacted by representatives *of its people*" and seeks to impose a remedial proceeding on the State. *New Motor Vehicle Bd. of Calif. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers) (emphasis added); *see supra* Part II. "The presumption of constitutionality" of state enactments is "an equity to be considered in favor of [the State] in balancing hardships," not just "a factor to be considered in evaluating success on the merits." *Walters v. Nat'l Ass'n of Radiation Survivors*, 468 U.S. 1323, 1324 (1984) (Rehnquist, J., in chambers).

As discussed in Section II, it is clearly in the public interest to minimize disruption and confusion in the election process. The public interest would not be served if voters in one or more congressional districts have to select a congressional candidate before the issues have been resolved by the Supreme Court.

26

On the other side of the ledger, a stay will not significantly affect Plaintiffs.  Plaintiffs have no entitlement to a court-drawn plan now, which would only create an unnecessary risk of voter and election administrator confusion and an erosion of public confidence if the Supreme Court reverses the Order and reinstates the General Assembly's Enacted Plan.  *See, e.g.*, *Purcell*, 549 U.S. 1, 4-5; *Merrill*, 142 S. Ct. at 880 (Kavanaugh, J., concurring).

## CONCLUSION

The Court should stay its January 6 Order pending appeal to the Supreme Court.

January 27, 2023
Columbia, South Carolina

Respectfully submitted,

/s/Robert E. Tyson, Jr.
Robert E. Tyson, Jr. (7815)
Vordman Carlisle Traywick, III (12483)
La'Jessica Stringfellow (13006)
ROBINSON GRAY STEPP & LAFFITTE, LLC
Post Office Box 11449 (29211)
Columbia, South Carolina 29201
(803) 929-1400
rtyson@robinsongray.com
ltraywick@robinsongray.com
lstringfellow@robinsongray.com

John M. Gore (admitted *pro hac vice*)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Phone: (202) 879-3939
Fax: (202) 626-1700
jmgore@jonesday.com

*Counsel for Senate Defendants*

/s/ Mark C. Moore
Mark C. Moore (Fed. ID No. 4956)
Jennifer J. Hollingsworth (Fed. ID No. 11704)
Hamilton B. Barber (Fed. ID No. 13306)
Michael A. Parente (Fed. ID No. 13358)
NEXSEN PRUET, LLC
1230 Main Street, Suite 700
Columbia, SC 29201
Telephone: 803.771.8900
MMoore@nexsenpruet.com
JHollingsworth@nexsenpruet.com
HBarber@nexsenpruet.com
MParente@nexsenpruet.com

William W. Wilkins (Fed. ID No. 4662)
Andrew A. Mathias (Fed. ID No. 10166)
Konstantine P. Diamaduros (Fed. ID No. 12368)
NEXSEN PRUET, LLC
104 S. Main Street, Suite 900
Greenville, SC 29601
Telephone: 864.370.2211

BWilkins@nexsenpruet.com
AMathias@nexsenpruet.com
KDiamaduros@nexsenpruet.com

Rhett D. Ricard (Fed. ID No. 13549)
NEXSEN PRUET, LLC
205 King Street, Suite 400
Charleston, SC 29401
Telephone: 843.720.1707
RRicard@nexsenpruet.com

*Counsel for House Defendants*

/s/ Jane W. Trinkley
M. Elizabeth Crum (Fed. Bar #372)
Jane W. Trinkley (Fed. Bar #4143)
Michael R. Burchstead (Fed. Bar #102967)
BURR & FORMAN LLP
Post Office Box 11390
Columbia, SC 29211
Telephone: (803) 799-9800
Facsimile: (803) 753-3278

Thomas Wells Nicholson (Fed. Bar #12086)
tnicholson@elections.sc.gov
SOUTH CAROLINA ELECTION
COMMISSION
1122 Lady St., 5th Floor,
Columbia, S.C. 29250
Telephone: 803-734-9063
Facsimile: 803-734-9366

*Attorneys for Election Commission Defendants*