**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | |
|---|---|
| THE SOUTH CAROLINA STATE CONFERENCE OF THE NAACP, and | **Case No. 3-21-cv-03302-MGL-TJH-RMG** |
| TAIWAN SCOTT, on behalf of himself and all other similarly situated persons, | **THREE-JUDGE PANEL** |
| Plaintiffs, | |
| v. | |
| THOMAS C. ALEXANDER, in his official capacity as President of the Senate; LUKE A. RANKIN, in his official capacity as Chairman of the Senate Judiciary Committee; JAMES H. LUCAS, in his official capacity as Speaker of the House of Representatives; CHRIS MURPHY, in his official capacity as Chairman of the House of Representatives Judiciary Committee; WALLACE H. JORDAN, in his official capacity as Chairman of the House of Representatives Elections Law Subcommittee; HOWARD KNAPP, in his official capacity as interim Executive Director of the South Carolina State Election Commission; JOHN WELLS, Chair, JOANNE DAY, CLIFFORD J. EDLER, LINDA MCCALL, and SCOTT MOSELEY, in their official capacities as members of the South Carolina Election Commission, | |
| Defendants. | |

**PLAINTIFFS' POST-TRIAL PROPOSED AMENDED**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

## TABLE OF CONTENTS

INTRODUCTION ...........................................................................................................1

PROPOSED FINDINGS OF FACT ..............................................................................5

I.      BACKGROUND AND OVERVIEW OF CLAIMS.........................................5

        A.      The Congressional Map Prior to the 2020 Redistricting Cycle.............5

        B.      The 2020 Redistricting Cycle ................................................................6

        C.      Plaintiffs' Claims...................................................................................9

        D.      Parties And Witnesses .........................................................................10

II.     The Enacted Plan Is A Racial Gerrymander.................................................26

        A.      The Cracking of Black Communities Along CD 6 Boundaries to Deny Black
                Voters Electoral Impact in Any Other District...................................26

        B.      Race Predominated Over Traditional Redistricting Principles In Enacting
                Congressional District 1. ....................................................................49

        C.      Race Predominated Over Traditional Redistricting Principles In Enacting
                Congressional District 2. ....................................................................75

        D.      Race Predominated Over Traditional Redistricting Principles In Enacting
                Congressional District 5. ....................................................................92

        E.      Legislative Defendants and their staff considered race when drawing and
                evaluating the Enacted Plan and other proposals. .............................101

        F.      Defense Expert Sean Trende's Analysis Confirms That S.865 Is A Racial
                Gerrymander And Otherwise Fails To Rebut Plaintiffs' Claims. ...................112

        G.      Legislative Defendants Do Not Meet their Burden of Proof to Factually Show
                That the Predominant Use of Race Was Necessary to Meet a Compelling State
                Interest. ..............................................................................................118

III.    The Enacted Plan Violates the Prohibition on Intentional Discrimination under the
        Fourteenth and Fifteenth Amendments. .....................................................120

        A.      South Carolina's History of Voting Discrimination Against Black Voters. ....120

        B.      The South Carolina General Assembly's Enactment of S.865 Created a
                Discriminatory Impact. ......................................................................127

        C.      The Sequence of Events Reveals Legislators Hid Their Efforts to Suppress

Black Political Power Behind Pretextual and Tenuous Justifications. .............142

D.    The Sequence of Events Reveals Departures from Procedural Norms and Lack of Transparency During the Redistricting Process. ...........................................211

E.    Legislative Defendants' Post-Hoc Justifications to Justify Their Efforts to Suppress Black Political Power. .......................................................................221

F.    It Was Foreseeable That the Enacted Plan Would Dilute Black Voting Power. .................................................................................................................246

IV.  CONCLUSIONS OF LAW ........................................................................................272

A.    Standing .........................................................................................................272

B.    Count 1—Racial Gerrymandering ................................................................275

C.    Count 2: Intentional Racial Discrimination ..................................................305

V.   Plaintiffs' Requested Remedies ...................................................................................321

## INTRODUCTION

The evidence presented at trial overwhelmingly confirms that the congressional map passed through S. 865 (the "Enacted Plan") is an unconstitutional racial gerrymander in which "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Bethune-Hill v. Va. State Bd. of Elections*, 137 S. Ct. 788, 797 (2017). The Enacted Plan moves voters based on race in a manner which eliminates any reasonable opportunity that Black South Carolinians will be able to elect candidates of choice or otherwise influence elections anywhere outside of congressional district ("CD") 6, in a seven-district plan, for another decade.

That the Enacted Plan is a racial gerrymander is clear from "the [Challenged] district[s'] shape[s] and demographic[s]," which reflect its subordination of traditional redistricting principles, like respect for county and city boundaries, communities of interest, compactness, and contiguity to "racial considerations." *Cooper v. Harris*, 137 S. Ct. 1455, 1463-64 (2017). Reams of statistical analyses show that race is a significant factor in explaining the Enacted Map's lines, and that the Enacted Map is an extreme statistical outlier when compared to race-neutral plans. Moreover, the Enacted Plan's district lines weave in and out of predominantly Black communities along the borders between CDs 1, 2, and 5, and CD 6 in a way that consistently shows that traditional principles were disregarded. The Enacted Plan reassigned hundreds of thousands of South Carolinians, far more than necessary, to different congressional districts in service of precision-engineered districts that carefully calibrated their Black populations to a low enough level to deny Black voters the equal opportunity to participate in elections and be represented. Again and again, the South Carolina General Assembly assigned and reassigned voters differently depending on their race: communities with predominantly Black populations (like Sumter, Orangeburg, Richland, and Charleston counties, and the cities of

Columbia, Sumter, and Charleston) were all cracked—preventing Black voters from electing candidates of choice (or otherwise influencing elections), while communities with predominantly white populations (like Beaufort and Lexington counties and Sun City) were kept or selectively made whole to fortify white voting power in six districts.

The conclusion that the Enacted Plan is an unconstitutional racial gerrymander is reinforced by the considerable evidence of intentional discrimination. The *Arlington Heights* factors—all of them—support a finding that the General Assembly acted in an intentionally racially discriminatory manner.

The pernicious effects of the Enacted Plan were no accident: the Enacted Plan was passed notwithstanding forewarnings that it would harm Black communities. It was passed over vociferous opposition from nearly all Black South Carolina legislators and extensive public criticism that the Enacted Plan would stifle Black electoral opportunity. The General Assembly nonetheless passed the Enacted Map.

The Enacted Plan's pernicious effects also were no coincidence: the Enacted Map was drawn by white legislators and staff intimately familiar with the demographics of the communities they carved; and as they carved, their map room computer displayed the racial demographics, and consistently updated to alert the mapdrawers of their actions' demographic consequences. And the mapmakers acted in a surreptitious manner not only to conceal their consideration of race, but also to conceal the sources and true objectives of the Enacted Plan.

There is a fundamental lack of transparency to the Legislative Defendants' conduct in adopting the Enacted Plan and how they have defended it in this litigation. The Legislative Defendants' claim of "race blindness" is revealed to be a sham when one considers the deposition testimony of the many participants in the process who were not called at trial. And it

would not be hyperbole to say the Legislative Defendants' contemporaneous justifications for the Enacted Plan were replete with material misrepresentations, omissions, and inconsistencies.  This dissembling is, itself, powerful evidence of racially discriminatory intent.

That record of duplicity is matched by the justifications advanced in this litigation, which are *post-hoc* and contrary to the record.  For example, defense witnesses (including Defendants' lone expert) focused on "core retention" and assert similarity between the Enacted Plan and the 2011 map (the expert asserts similarity going back as far back as 1902, when Black people were *de jure* and *de facto* second-class citizens in South Carolina).  To the extent the Enacted Plan inherits some of the choices resulting in the 2011 map, it is undeniable that race-based choices are infused in those lines because that map was expressly drawn to comply with *both*, the Voting Rights Act's now-dormant Section 5 non-retrogression standard and its non-dilutive Section 2 safeguards.  Moreover, those justifications ring hollow given the massive, unnecessary displacement of voters to new districts under the Enacted Plan and the racially uneven manner in which these principles were implemented.

Defense witnesses also claimed in litigation that the explanation for the Enacted Map was to solidify Republican advantage in the super-majority of congressional districts. But key decisionmakers expressly rejected that rationale in legislative proceedings.  The rationale is also inconsistent with the evidence, statistical and otherwise, and should be rejected as *post-hoc*.  And to the extent defense witnesses attempted to shoehorn partisan aims into a goal of protecting incumbents, there were plenty of alternative proposed maps that respected incumbents (*i.e.*, did not pair them in districts) while also not cracking areas and communities lived in by Black voters to dilute their power. Even if the Court were to take the "party rather than race" argument at face value, however, Plaintiffs introduced statistical evidence from three experts that controlled for

partisan differences and found that race better explains the movement of voters—evidence that Defendants were unable to undermine or rebut.

It did not have to be this way: the public and Black legislative members and others repeatedly requested that the General Assembly consider the impact of lines on Black voters by conducting analyses of racial bloc voting patterns to observe where electoral opportunities do and do not exist in South Carolina.  The General Assembly was also presented with publicly-proposed maps that comply with the General Assembly's pronounced (rather than secret) redistricting criteria and even the requests of white residents (*e.g.*, in Beaufort) to be placed into their district of choice—*without* cracking Black voters, and denying Black electoral opportunity and influence in congressional elections.

Based on the detailed factual record, the Enacted Plan should be deemed a racial gerrymander for reasons similar to the U.S. Supreme Court findings in cases like *Cooper* and *Bethune-Hill*.  Like the defendants in those cases, South Carolina unconstitutionally disregarded traditional redistricting principles in engaging in surgical adjustments to sort Black voters among congressional districts; the State has disavowed the VRA as a defense to its race-conscious line drawing and therefore lacks a compelling justification.

Moreover, given the mosaic of what transpired during consideration of S.865 and predecessor versions of that map, this Court should separately find that *a* motivating purpose behind S.865 is to dilute South Carolinian Black voting strength through the cracking of Black voters.  It certainly is constitutionally infirm to treat any one Black voter—and here there are thousands upon thousands of Black South Carolinian voters harmed—differently than any one white voter—which the Enacted Plan does by responding to the preferences of white legislators and voters.

4

Courts (*e.g.*, *Perez v. Abbott*) have adjudicated claims of racial gerrymandering *and* intentional vote dilution alongside one another. Each have different standards, burdens of proof, and remedies.

Finally, whether in the racial gerrymandering context (*e.g.*, *Cooper*) or intentional discrimination context (*e.g.*, *North Carolina NAACP v. McCrory*), the Supreme Court has recognized that it is constitutionally infirm for the majority party, here white Republicans, to harm Black South Carolinians as a means to solidify their political power.

## PROPOSED FINDINGS OF FACT

I. **BACKGROUND AND OVERVIEW OF CLAIMS**

A. **The Congressional Map Prior to the 2020 Redistricting Cycle**

1. Following the 2010 Census, South Carolina gained a U.S. Congressional seat, making it necessary to redraw the State's seven Congressional election districts. The State's population also grew from 4,012,012 to 4,625,364 between 2000 and 2010. *Backus v. South Carolina*, 857 F. Supp. 2d 553, 557 (D.S.C. 2012).

2. Until the Supreme Court's decision in *Shelby County v. Holder*, 570 U.S. 529 (2013), South Carolina was a "covered" jurisdiction under Section 5 of the Voting Rights Act of 1965 and was required to submit its redistricting plans for "preclearance" from the federal government. *See* Determination of the Att'y Gen., 30 Fed. Reg. 9897, 9897 (Aug. 7, 1965); *Backus*, 857 F. Supp. 2d at 557-58.

3. The General Assembly enacted a seven-district Congressional plan in 2011. That plan was pre-cleared by the U.S. Department of Justice in 2011 and became effective thereafter. *Backus*, 857 F. Supp. 2d at 557.The 2011 plan retained Congressional District ("CD") 6 as a district comprised of a majority of minority voters ("majority-minority district"), as it was under the map enacted following the 2000 Census.

4. In defending CD 6's composition against a racial gerrymandering claim in *Backus v. South Carolina*, South Carolina legislative defendants pointed to the General Assembly's need "in addition to avoiding retrogression under Section 5 . . . to create majority-minority districts in which a compact minority group could elect its candidates of choice." Post-Trial Mem. of Def. Robert W. Harrell, Jr 10–11, *Backus v. South Carolina*, No. 3:11-cv-03120-PMD-HFF-MBS (D.S.C. Mar. 5, 2012), ECF No. 210.

5. In defending the 2011 plan in *Backus*, the legislative defendants underscored it was "legally necessary for the General Assembly to create majority-minority districts in certain areas" of South Carolina. *Id.* at 4. The *Backus* defendants explained to a three-judge panel of this Court that "[b]ecause it could easily be a violation of Section 2 [of the Voting Rights Act] *not to* create a majority minority district, the General Assembly was required to do so when the [*Thornburg v.*] *Gingles* factors were present." *Id.* at 5.

**B.    The 2020 Redistricting Cycle**

6. The 2020 Census count showed a continued increase in South Carolina's total population, such that the ideal district size for each of South Carolina's seven congressional districts went from 660,766[1] to 731,204 persons. PX No. 175 at 1-2. The State's total population grew by approximately 10.7%, from 4,625,364 to 5,118,425.[2]

7. The 2020 Census count also revealed significant population shifts and growth in the last decade. It showed that CD 1 was overpopulated by almost 12% with a population of 818,893—87,690 more people than the one-person-one-vote target. SDX No. 28b. By contrast,

---

[1]See S.C. House of Representatives Judiciary Comm., 2011 Guidelines and Criteria for Cong. and Legis. Redistricting 3, https://redistricting.schouse.gov/archives/2011/6334-1500-2011-Redistricting-Guidelines-(A0404871).pdf.
[2]S.C. Revenue & Fiscal Affairs Office, *Total Resident Population by Cnty.*, https://rfa.sc.gov/data-research/population-demographics/census-state-data-center/decennial-census-data/decennial-census-2020-data-release.

CD 6 was 11.59% underpopulated, and needed to gain 84,741 people to reach the target population.  SDX No. 28b.

       8.  To a lesser degree, CDs 2, 3, 4, and 5 were also underpopulated or over the equal-population target.  *See* SDX No. 28b.  CD 2 was underpopulated by 9,375 people, CD 3 by 24,419 people, and CD 7 by 3,268 people.  Meanwhile, CD 4 was overpopulated by 29,029 and CD 5 was overpopulated by 5,082.  SDX No. 28b.  Below is a table showing population shifts from 2010 Census to 2020 Census in all seven Congressional districts.  SDX No. 28b.

| District | 2010 Population | 2020 Population | Shift | Deviation from Ideal 2020 Population | Percent Deviation |
|---|---|---|---|---|---|
| 1 | 660,766 | 818,893 | +158,127 | +87,689 | 11.99% |
| 2 | 660,766 | 721,829 | +61,063 | -9,375 | -1.28% |
| 3 | 660,767 | 706,785 | +46,018 | -24,419 | -3.34% |
| 4 | 660,766 | 760,233 | +99,467 | +29,029 | 3.97% |
| 5 | 660,766 | 736,286 | +75,520 | +5,082 | 0.70% |
| 6 | 660,766 | 646,463 | -14,303 | -84,741 | -11.59% |
| 7 | 660,767 | 727,936 | +67,169 | -3,268 | -0.45% |

       9.  The demographic shifts since 2010 include significant changes in the population of South Carolina's Black citizen voting age population ("BCVAP").  In particular, racially diverse counties such as Charleston and Richland saw "pronounced BCVAP growth" that outpaced the rest of the State.  PX No. 120 at 7; Tr. 281:7-20 (Duchin, Oct. 4).

       10.   The 2020 Census data also revealed demographic shifts across South Carolina's geography.  Population growth in South Carolina's coastal areas exceeded growth in other areas of the State.  *See* PX No. 4 at 9.

11.     As constituent bodies of the South Carolina General Assembly, the House of Representatives and the Senate each have independent and shared duties under the State's Constitution to enact a U.S. Congressional redistricting plan that complies with the law.  S.C. Const., art III, sec. 1.

12.     In practice, after preparing and releasing a draft congressional map during the 2020 redistricting cycle, the House was pressured by national Republicans, including several Republican members of the South Carolina congressional delegation, to abandon their map in favor of the Senate's efforts, and largely abdicated its responsibility to draw and enact a lawful Congressional plan.  *See*, *e.g.*, Tr. 1812:3–13 (Jordan, Oct. 13); HDX Nos. 89, 90, 93.  *See infra* Section III(C)(iii).

13.     The current congressional map ("Enacted Map" or "Enacted Plan") was enacted by the General Assembly on January 26, 2022.  The plan was drawn by a core team of Senate staffers and agents, including legislative counsel, Mr. Andrew Fiffick and Mr. Charles Terreni, and Mr. Will Roberts, the Senate's chief cartographer.  They were supervised by Senator Luke Rankin, a white Republican, who chaired the Senate Judiciary Committee and the Senate Judiciary Redistricting Subcommittee.  Staff also received guidance from Senator Chip Campsen, a white Republican and Redistricting Subcommittee member, who was the primary proponent of the proposed plan that ultimately became the Enacted Map.  *See infra* Section III(C)(iii).

14.     Only a close cadre of Senate Redistricting Subcommittee staff members and Senators Rankin and Campsen played a meaningful, substantive role in the drawing of the Challenged Districts and the Enacted Plan as a whole.  *See infra* Sections III(C)(iii), III(D)..

15.     As Senator Harpootlian, a white Democrat, testified at trial, anyone

outside of a "core" group in charge of redistricting in the Senate was presented with a "fait accompli." Tr. 866:1 (Harpootlian, Oct. 7). Though a member of the Senate's Redistricting Subcommittee, Sen. Harpootlian added: "[w]e were non-participants. Our opinions didn't matter. My opinion didn't matter. The answers given were . . . inadequate in my opinion, and clearly race played, if not the factor, a huge factor in how this plan was composed." Tr. 866:2–866:7 (Harpootlian, Oct. 7).

     **C.**    **Plaintiffs' Claims**

    16.    Plaintiffs raise two claims challenging the Enacted Map.

    17.    First, Plaintiffs challenge Congressional Districts 1, 2, and 5 (collectively "Challenged Districts") on the grounds that they are racial gerrymanders not narrowly tailored to advance a compelling state interest ("Racial Gerrymandering Claim"). ECF No. 267 at 46-47 (Third Am. Compl.). Plaintiff Taiwan Scott resides in CD 1, and members of Plaintiff SC NAACP reside in all of the Challenged Districts. Tr. 1243:4–1243:12 (Murphy, Oct. 11); Tr. 493:15-23 (Scott, Oct. 4).

    18.    Second, Plaintiffs challenge the Enacted Plan as being adopted, at least in part, with a racially discriminatory purpose to intentionally discriminate against Black voters. ECF No. 267 at 47-48 (Third Am. Compl.). The facts clearly demonstrate that under S.865, Defendants treated Black voters, and Black voters only, including Plaintiff Scott and SC NAACP members, in a manner that was different from their treatment of white voters, in sorting voters among congressional districts. For the reasons detailed *infra* Section II(G), these practices do not serve a compelling interest and are not necessary or narrowly tailored to serve any compelling interest.

### D.    Parties And Witnesses

#### i.    Plaintiffs and Related Witnesses

19.    The South Carolina State Conference of the NAACP is a nonpartisan organization founded in 1939.  1238:23–1238:25 (Murphy, Oct. 11).  It is a subsidiary of the National Association for the Advancement of Colored People (NAACP) and is considered the oldest civil rights organization in South Carolina.  Tr. 1238:23–1239:5 (Murphy, Oct. 11).  The South Carolina Conference has approximately 13,000 members, with over 80 branches across the state of South Carolina.  Tr. 1242:16–1242:21 (Murphy, Oct. 11).  Its membership includes Black, registered voters in each of the congressional districts—as well as every county—in South Carolina.  Tr. 1243:4–1243:12 (Murphy, Oct. 11).

20.    Taiwan Scott is a resident of Hilton Head Island and lives in Congressional District ("CD") 1.  Tr. 493:14–23 (Scott, Oct. 4).  He identifies as a Black person, is a member of the Gullah Geechee community, and is a registered voter.  Tr. 493:8–10, 493:20–21, 495:21–495:4 (Scott, Oct. 4).  At trial, Mr. Scott testified about the harmful impacts of the current congressional map on him and his community, and about the harmful impact of not having responsive political representation.  *See*, *e.g.*, Tr. 500:22–504:10 (Scott, Oct. 4).

21.    Brenda Murphy is the president (and a member) of the South Carolina State Conference of the NAACP.  Tr. 1240:10–1240:12 (Murphy, Oct. 11).  She is a Black person and resides in Columbia, South Carolina.  Tr. 1237:22–1237:25 (Murphy, Oct. 11).  At trial, Ms. Murphy testified about the membership and activities of the South Carolina Conference, including its public participation in the redistricting process, as well as the impact of the Enacted Map on the organization's members.  Tr. 1238:23–1239:5, 1242:16–1242:21, 1243:4–1243:12, 1250:24–1252:4, 1264:13–1266:14 (Murphy, Oct. 11).

22.    James Felder, Sr. is a Black person and has been a member of the South

Carolina NAACP for nearly 70 years and has contributed to the advancement of civil rights in South Carolina for decades.  Tr. 1335:23–24, 1338:12–24, 1339:3–1340:22 (Felder, Oct. 12). Mr. Felder testified to the history of political discrimination in South Carolina, including his personal experience attending a segregated high school, as well as the impact of the Enacted Plan on Black communities in Richland and Sumter Counties.  Tr. 1336:13–1337:11, 1339:3–1340:1, 1341:15–1345:1, 1348:10–1350:6 (Felder, Oct. 12).

23.     Elizabeth Kilgore is a Black person, a resident of Sumter County, and is assigned to CD 5 under the Enacted Map.  Tr. 1216:15–1216:25 (Kilgore, Oct. 11).  Ms. Kilgore is a registered voter and a member of the South Carolina State Conference of the NAACP (as well as president of the Sumter Branch and secretary of the State Conference).  Tr. 1218:8–1218:22 (Kilgore, Oct. 11 PM).  She testified, among other things, about her interest in avoiding a split of the county and city of Sumter and the lack of meaningful political representation as a result of the split under the Enacted Map.  Tr. 1222:5–1224:22 (Kilgore, Oct. 11).

24.     Henry Griffin is a Black registered voter who resides in Stevens, South Carolina, in CD 1.  Tr. 522:13–522:3 (Griffin, Oct. 4).  He is a member of the South Carolina State Conference of the NAACP, specifically the Upper Berkeley Branch, where he serves as president.  Tr. 522:7–21 (Griffin, Oct. 4).  Mr. Griffin testified about the lack of responsive congressional representation for his community in CD 1.  Tr. 523:4–524:15 (Griffin, Oct. 4).

25.     Anjene Davis is a Black person, resident of North Charleston, and is assigned to CD 6 under the Enacted Plan.  Tr. 107:14–19 (Davis, Oct. 3).  Mr. Davis is active in his community and testified about the impacts of the CD 1 and CD 6 boundary, particularly the split of Charleston County, on Black communities.  *See*, *e.g.*, Tr. 87:2–88:17, 91:9–15, 93:20–91:4, 95:21–96:9 (Davis, Oct. 3).

ii.     **Defendants and Other Key Participants in Congressional Redistricting**

*Senate Defendants*

26.     Sen. Thomas Alexander is a white person and President of the South Carolina Senate, which largely drafted and passed Senate Bill 865 ("S. 865"), the current seven-district map ("Enacted Map" or "Enacted Plan") for electing South Carolina members of the U.S. House of Representatives.

27.     Sen. Luke Rankin is a white person and Chairman of the Senate Judiciary Committee and the Senate Judiciary Redistricting Subcommittee, which was responsible for drawing congressional plans, including the one that became S. 865. Rankin Dep. Tr. 102:11–16. In that capacity, Sen. Rankin supervised and directed the team of Senate staffers who worked on congressional redistricting. *See*, *e.g.*, Rankin Dep. Tr. 102:19–23 (Sen. Rankin agreeing that redistricting staff "worked for [him]"); John Dep. Tr. 280:12–23 (Senate staffer explaining that redistricting decisions were "ultimately" up to their "boss," Sen. Rankin).

*Senate Redistricting Staff and Counsel*

28.     A team of "nonpartisan staff" assisted the Senate Judiciary Committee and the Senate Judiciary Redistricting Subcommittee with congressional redistricting. *See*, *e.g.*, Baker Dep. Tr. 39:23–41:4 (repeatedly explaining that it was "very important" that the Senate staff was "nonpartisan" and served "all the members" of the Judiciary Committee); Fiffick Dep. Tr. 26:4–9.

29.     Charles "Charlie" Terreni was retained by the South Carolina Senate as outside counsel to help manage the 2020 redistricting process. Terreni Dep. Tr. 201:8–18. He was involved in two prior redistricting cycles and provided legal and practical advice during the 2020 cycle, including input on the Senate's redistricting guidelines. Terreni Dep. Tr. 183:5–13,

201:8–18, 215:18–22, 332:23–333:10, 417:3–6.  Mr. Terreni took direction "from Senator

Rankin," Terreni Dep. Tr. 152:3–13, and worked with the "core team" of Senate staffers

responsible for congressional redistricting: Andrew Fiffick, Will Roberts, Breeden John, Paula

Benson, and Maura Baker.  John Dep. Tr. 20:14–25.

   30. Andrew Fiffick, a member of the "core" Senate redistricting team, serves

as the Director of Research and Chief of Staff to the South Carolina Senate's Judiciary

Committee.  Fiffick Dep. Tr. 51:4–7, 52:3–4.  Mr. Fiffick reported to Senator Rankin.  Fiffick

Dep. Tr. 51:14–17.  During the congressional redistricting process, Mr. Fiffick was primarily

responsible for collecting feedback from Senators, meeting with Senators and Senate staff, and

providing proposed maps to Charles Terreni (outside counsel for the Senate) and John Gore

(counsel for Senate Defendants) for legal assessments.  *See*, *e.g.*, Fiffick Dep. Tr. 58:18–59:8.

When developing congressional maps, Mr. Fiffick took instruction from Senators on how to

apply and weigh the Senate's redistricting criteria, public testimony, and any other instructions.

*See*, *e.g.*, Tr. 95:15–20, 249:16–250:2, 298:23–299:7.  Mr. Fiffick testified that he and the rest of

the team served as "nonpartisan staff."  Fiffick Dep. Tr. 26:4–9.

   31. William "Will" Roberts, another member of the "core" Senate redistricting

team, served as the Senate's cartographer during the congressional and senate redistricting

processes. Tr. 1353:24–1354:17, 1355:2–6, 1369:18–19 (Roberts, Oct. 12).  Mr. Roberts testified

at trial that he was acting "in a nonpartisan role."  Tr. 1494:16–17 (Roberts, Oct. 12).  In that

capacity, Mr. Roberts was the primary person responsible for the technical aspects of drawing

maps, such as the operation of the redistricting software Maptitude. Tr. 1354:4–1355:6, 1365:15–

18; 1380:13–1381:9 (Roberts, Oct. 12).  Mr. Roberts was supervised by Mr. Fiffick, though he

"ultimately answer[ed] to" Sen. Rankin.  Tr. 1498:6–9 (Roberts, Oct. 12).

32.     Breeden John, another member of the "core" Senate redistricting team, served as a staff attorney for the Senate Judiciary Committee.  John Dep. Tr. 15:25–16:7.  With Mr. Roberts, he was primarily responsible for the technical work of map-drawing.  John Dep. Tr. 18:2–19:4, 20:14–25; Benson Dep. Tr. 91:10–18.  During his deposition, he testified about the relevant considerations for map-drawing, including the minimal role played by partisan advantage, Congress members' preferences for redistricting lines, and core retention, as well as legislators' request for race data.  *See*, *e.g.*, John Dep. Tr. 141:14–21, 221:7–222:24, 163:18–164:24, 127:19–129:3, 288:5-289:14.  Mr. John testified that he served as "nonpartisan staff." John Dep. Tr. 277:5–7.

33.     Paula Benson, another member of the "core" Senate redistricting team, is the Assistant Director of Research and a former Senate staff attorney with over 30 years of prior redistricting experience.  Benson Dep. Tr. 82:2–83:1, 134:1–5.  She is the "primary drafter" of the Senate's redistricting guidelines and was often present in the map room as maps were drawn, though she did not personally draw maps.  Benson Dep.  Tr. 82:11–83:1, 86:5–10, 91:10–18, 122:8–11.

34.     Maura Baker is a staff attorney with the South Carolina Senate Judiciary Committee, which she testified was a "nonpartisan" role.  Baker Dep. Tr. 39:23–41:4.  Ms. Baker was primarily responsible for the public-facing aspects of redistricting, including organizing written and public testimony.  Baker Dep. Tr. 38:2–8.  She was also present in the map room, though she did not draw any maps personally.  Benson Dep. Tr. 90:20–23, 91:10–18.

### *House Defendants*

35.     Rep. James Lucas is a white person who was the Speaker of the South Carolina House of Representatives during the 2020 congressional redistricting cycle. He selected

the members of the House Judiciary Ad Hoc Redistricting Committee in consultation with Judiciary Committee Chair Chris Murphy. Lucas (Vol. 1) Dep. Tr. 84:9–14.

36.     Rep. Chris Murphy is a white person who has been Chairman of the House Judiciary Committee since January 2021. Murphy (Vol. 1) Dep. Tr. 22:9–20. The House Judiciary Committee voted on congressional plans passed out of the House Redistricting Ad Hoc Committee. Murphy (Vol. 2) Dep. Tr. 17:10–25.

37.     Rep. Wallace "Jay" Jordan is a white person who has served as the Chairman of the House Redistricting Ad Hoc Committee, which consisted of eight members. Tr. 1761:4–1762:4 (Jordan, Oct. 13). The Ad Hoc Committee adopted the House's redistricting criteria and proposed two congressional maps, the second of which was based on and closely resembled the Senate proposal that was ultimately enacted as S. 865. Tr. 1766:16–1767:5, 1788:17–23, 1790:12–21 (Jordan, Oct. 13); Tr. 1837:6–11 (Campsen, Oct. 13).

*House Staff and Counsel*

38.     Patrick Dennis serves as General Counsel for the South Carolina House of Representatives and Chief of Staff for the Speaker of the House (previously Jay Lucas, and now Murrell Smith). Dennis Dep. Tr. 9:1–2, 50:1–4. In that capacity, Mr. Dennis managed the House's process for enacting a congressional map. *See*, *e.g.*, Dennis Dep. Tr. 58:15–59:8. Both of his roles are non-partisan. Dennis Dep. Tr. 231:3–11. As General Counsel, Mr. Dennis was responsible for assessing proposed congressional maps for compliance with the House's criteria and providing legal advice to House members and staff. *See*, *e.g.*, Dennis Dep. Tr. 58:15–59:8. He asserted that he was primarily responsible for drafting the first House staff map. Dennis Dep. Tr. 197:3–18, 232:22–233:6.

39.     Thomas Hauger is employed by the South Carolina House of Representatives, and he worked as the GIS and Data Director during the congressional map-

drawing process. Hauger (Vol. 2) Dep. Tr. 12:13–17.  He oversaw the technical aspects of the congressional redistricting process for the House and was responsible for drafting congressional maps and answering questions about data for House members and other staff.  Hauger (Vol. 2) Dep. Tr. 12:21–25.

40.     Emma Dean is Chief Counsel to the House Judiciary Committee. Dean (Vol. 1) Dep. Tr. 35:10–11. She worked closely with Patrick Dennis and Thomas Hauger on congressional redistricting.  Dean (Vol. 1) Dep. Tr. 213:9–17.  Dean was present in the map room on a daily basis, available to facilitate map room administration and answer legal questions.  Dean (Vol. 1) Dep. Tr. 37:24–38:21, 84:19–21, 123:24–124:9.

*Election Commission Defendants*

41.     Howard Knapp is the Executive Director of the South Carolina Election Commission, which is an independent commission overseeing election administration.  Knapp Dep. Tr. 15:17–16:3; *see also* S.C. Code Ann. §§ 7-3-10, *et seq.*, 7-13-10, *et seq.*, as amended. The Commission does not have control over the design of electoral maps.  Knapp Dep. Tr. 51:25–52:16.  Knapp testified at his deposition that it would take three to five months to implement and administer new House maps and there is no indication that the process would require more time for substantially fewer congressional districts.  Knapp Dep. Tr. 86:24–93:5.

42.     Defendants John Wells, Joanne Day, Clifford J. Edler, Linda McCall, and Scott Moseley are the five members of the South Carolina Election Commission, charged with the powers and duties of the Commission pursuant to S.C. Code Ann. §§ 7-3-10, *et seq.,* and 7-13-10, *et seq.*, as amended.  In addition, S.C. Code Ann. § 7-11-15 requires the Commission to design, distribute, and process forms for the statement of intention of candidacy, which candidates for U.S. Congressional seats under S.865 candidates must file during a specified time period.

43.    The Election Commission Defendants "take no position on the substantive issues offered by either party," but are "ready and prepared" to provide input on logistics and deadlines for remedial purposes.  Tr. 84:6–10 (Opening statements, Oct. 3).

***Other Key Participants***

44.    Sen. George "Chip" Campsen is a white person who was a member of the Senate Judiciary Redistricting Subcommittee and was the primary proponent of Senate Amendment 1, which ultimately became the Enacted Plan via S. 865.  Tr. 1816:13–16, 1816:23– 1817:6, 1839:21–24, 1872:6–12 (Campsen, Oct. 13).  During redistricting, he worked with Mr. Fiffick, Mr. John, Mr. Roberts, Mr. Terreni, and Ms. Benson.  Tr. 1818:10–17 (Campsen, Oct. 13).  Sen. Campsen has resided in Charleston County his entire life and represents Senate District 43, which spans parts of Charleston, Beaufort, and Colleton Counties.  Tr. 1816:13–16, 1816:23–1817:6 (Campsen, Oct. 13).

45.    Sen. Scott Talley is a white person and a member of the Senate Judiciary Committee and served on the Senate Judiciary Redistricting Subcommittee.  Talley Dep. Tr. 31:13-16.  During his deposition, Sen. Talley discussed the considerations relevant to redistricting in the Senate Subcommittee, including availability of race data and the absence of discussion of partisanship and core retention.  *See*, *e.g.*, Talley Dep. Tr. 23:12-24:21, 31:13-16, 72:18-73:5.

46.    Sen. Margie Bright Matthews is a Black person who served as a member of the Senate Judiciary Redistricting Subcommittee.  Tr. 776:14–16 (Matthews, Oct. 6).  She represents coastal Senate District 45, which includes parts of Jasper, Hampton, Colleton, Beaufort, and Charleston.  Tr. 775:12–23 (Matthews, Oct. 6).  Sen. Matthew's testimony focused on the flaws of the redistricting process, the contents of the Senate redistricting guidelines, the impact of the Enacted Map on Black communities in Charleston County, and discrimination

17

against Black voters. Tr. 780:3–787:9, 790:13-793:11 (Matthews, Oct. 6); Tr. 820:12–820:18 (Matthews, Oct. 7).

47.    Sen. Richard Harpootlian is a white person and served as a member of the Senate Judiciary Redistricting Subcommittee.  Tr. 863:11–863:14 (Harpootlian, Oct. 7).  Sen. Harpootlian submitted two alternative congressional plans known as Senate Amendment 2 and Senate Amendment 2a, which were drawn with the help of Robert Joseph Oppermann, a demographer retained by Sen. Harpootlian.  Tr. 896:25–897:17, 899:8–901:16 (Harpootlian, Oct. 7); Tr. 966:1–966:19 (Oppermann, Oct. 7).  At trial, Sen. Harpootlian testified about the flaws of the redistricting process, including the failure to prepare or consider a racially polarized voting analysis and failure to respond to public criticism, and compared his proposed map to the Enacted Plan (*i.e.*, Senate Amendment 1 or the Campsen Plan). Tr. 865:11–866:7, 873:3–873:10, 880:18–881:2, 899:25–900:12 (Harpootlian, Oct. 7).

48.    Rep. Neal Collins Representative is a white, Republican member of the House of Representatives who served as second vice chair for the House Judiciary Ad Hoc Redistricting Committee.  Collins Dep. Tr. 136:7–23. During his deposition, Rep. Collins testified about the considerations behind congressional redistricting, including his lack of awareness of any goal of increasing Republican vote share in CD 1.  Collins Dep. Tr. 57:2–22.

49.    Rep. Weston Newton is a white person who served on the House Judiciary Ad Hoc Redistricting Committee, and during congressional redistricting, Rep. Newton was designated to serve as chair of a Judiciary Committee meeting in lieu of and over the procedural objection of the vice chair, Rep. John King, who is a Black person.  Newton (Vol. 1) Dep. Tr. 42:1–6, 44:17–50:15.  Rep. Newton represents District 120, which includes Beaufort County, an area that has become more heavily populated by white persons.  Newton (Vol. 1) Dep. Tr.

35:11–37:3, 38:22–39:15. During his deposition, Rep. Newton repeatedly testified that he did not consider partisan gain during the congressional redistricting process, *e.g.*, Newton (Vol. 2) Dep. Tr. 63:7–12, 65:19–22, and "didn't ever see an indication" that partisan gain was being considered by anyone else, either, Newton (Vol. 2) Dep. Tr. 64:4–6. He further testified that he was aware of the shifts in racial demographics during redistricting. Newton (Vol. 2) Dep. Tr. 67:4–8, 152:19–153:6.

50.     Rep. Beth Bernstein is a white person who served as a member of the House Judiciary Ad Hoc Redistricting Committee. Bernstein Dep. Tr. 244:15–20. At her deposition, Rep. Bernstein testified that there was a lack of opportunity for her to participate in the map-drawing process as an Ad Hoc committee member. Bernstein Dep. Tr. 101:21–103:15.

51.     Rep. Gilda Cobb-Hunter is the longest serving Black member of the South Carolina House of Representatives and represents Orangeburg County. Tr. 113:1–3, 115:8–10 (Cobb-Hunter, Oct. 3). She is also a registered voter who resides in Orangeburg and is a member of the South Carolina NAACP (Branchville chapter). Tr. 110:7–8, 111:5–15 (Cobb-Hunter, Oct. 3). At trial, Rep. Cobb-Hunter testified about the impact of the Enacted Map on Orangeburg County and her constituents, as well as the congressional redistricting process. Tr. 116:25–118:2, 122:13–123:9 (Cobb-Hunter, Oct. 3).

52.     Rep. John King served as first vice chair of the House Judiciary Committee during the 2020 redistricting cycle. Tr. 622:3–16 (King, Oct. 6). He is a Black registered voter in CD 5, and is a member of the Rock Hill Branch of the South Carolina NAACP. Tr. 616:23–618:6, 72:20-23 (King, Oct. 6). At trial, Rep. King testified about the redistricting process, the circumstances surrounding his involuntary exclusion from a presiding role during a Judiciary Committee hearing on redistricting, and the impact of the Enacted Map

on Black communities.  Tr. 622:25–627:10, 635:5–638:24, 641:14–643:6 (King, Oct. 6).

53.    Rep. Kambrell Garvin represents and resides in Richland County.  Tr. 752:11–15 (Garvin, Oct. 6).  He is a Black registered voter, a member of the Columbia Branch of the South Carolina NAACP,[3] and assigned to CD 2 under the Enacted Plan.  Tr. 753:15–20 (Garvin, Oct. 6).  At trial, Rep. Garvin testified about the demographics of Richland County, the impact of the Enacted Map splitting Black communities in Richland and Columbia, as well as his views of the congressional redistricting process and Defendants' failure to respond to public input.  Tr. 755:8–759:22, 763:1–767:1. (Garvin, Oct. 6).

54.    Adam Kincaid is the President and Executive Director of the National Republican Redistricting Trust ("NRRT").  Oldham Dep. Tr. 78:15–20.  During the congressional redistricting process, Mr. Kincaid sent three maps to Mr. Andrew Fiffick, the Senate Judiciary Committee Chief of Staff, Kincaid Dep. Tr. 58:7–10, 71:2–13, which were shared in turn with the Senate's "core" team and Patrick Dennis, as General Counsel and Chief of Staff to the House Speaker.  *See* John Dep. Tr. 195:12–196:6; Dennis Dep. Tr. 38:23–39:6. Mr. Kincaid consulted with South Carolina's Republican congressional delegation and drew maps, such as the Palmetto, Wren, and Jessamine maps.  Kincaid Dep. Tr. 74:21–75:6, 82:22– 84:6, 87:5-20, 97:17–98:3, 101:16–102:2.

55.    Dale Oldham is national redistricting counsel for the Republican National Committee and helped the South Carolina Republican Senate Caucus develop a new Senate map this cycle. He facilitated the connection between Mr. Kincaid and the South Carolina Senate's staff, in particular Mr. Fiffick and Mr. Terreni.  Oldham Tr. 102:5–18, 123:3–11, 124:6–20;

---

[3]The Court may take judicial notice of the fact that Rep. Garvin is a longtime member of the Columbia Branch of the South Carolina NAACP, as noted in his state government profile.  *See* South Carolina Legislature, *Representative Kambrell H. Garvin* (last visited Nov. 4, 2022), https://www.scstatehouse.gov/member.php?code=0657954467.

Kincaid Dep. Tr. 77:6–13. Mr. Oldham examined Black voting-age population (BVAP), partisan performance, and communicated with Mr. Terreni to urge the latter to support the Jessamine map drawn by Mr. Kincaid and the NRRT. Oldham Dep. Tr. 121:6–18, 134:24–135:16, 137:12–25.

56.     Robert Joseph Opperman is an attorney, demographer, and map-drawer who was retained by Sen. Harpootlian to design alternative congressional maps. Tr. 897:13–897:17 (Harpootlian, Oct. 7); Tr. 963:22–23, 964:21–966:19 (Oppermann, Oct. 7). At trial, Mr. Oppermann testified about the flaws of Senate Amendment 1/Campsen Plan, which became the Enacted Plan, including its pattern of splitting areas with significant Black populations, non-land contiguity in CD 1, and the "dragonhead" shapes of CD 6. Tr. 968:19–969:15, 971:6–976:23 (Oppermann, Oct. 7). Mr. Oppermann also submitted written testimony to Mr. Fiffick and Mr. Roberts, comparing Senate Amendment 1 and Senate Amendment 2A (Sen. Harpootlian's proposed map) and explaining why the latter outperforms the former in terms of the Senate's redistricting guidelines. Tr. 991:21–992:9 (Oppermann, Oct. 7); *see* PX No. 330; PX No. 721.

57.     Lynn Teague resides in Columbia and is the vice president for issues and action of the League of Women Voters of South Carolina, a nonpartisan organization that grew out of the suffragist movement. Tr. 672:17–20, 673:24–674:25 (Teague, Oct. 6). She was involved in the submission of the League's proposed congressional map. Tr. 675:14–20 (Teague, Oct. 6). Ms. Teague's testimony compared the Enacted Plan against the League's proposed map and discussed the former's flaws, including its failure to respect communities of interest in Charleston and Richland Counties. Tr. 686:22–695:19 (Teague, Oct. 6).

### iii.     Plaintiffs' Expert Witnesses

58.     Dr. Moon Duchin is a professor of mathematics at Tufts University. At Tufts, Dr. Duchin leads an interdisciplinary research lab focused on redistricting. Tr. 221:4–

21

222:1 (Duchin, Oct. 3). At trial, Defendants did not challenge Dr. Duchin's expert

qualifications, and this Court "recognize[d] Dr. Duchin as an expert in redistricting, data science,

statistical methods, geographic and computational redistricting, demography and cartography,

and statistical uses of census data." Tr. 234:6–11 (Duchin, Oct. 3). Dr. Duchin's reports were

admitted as PX No. 67, PX No. 87, & PX No. 120. Dr. Duchin testified about the Challenged

Districts and how the lines of the Challenged Districts methodically include or excise areas with

significant Black voting populations, sacrificing traditional redistricting principles such as

compactness or county and municipal integrity to minimize Black electoral opportunities. PX

No. 67 at 11–13, 16–21, 25. Dr. Duchin also presented analysis on how the cracking of Black

voters among districts will reduce electoral opportunity for Black voters and how racial factors

predominated over partisan ones. PX No. 67 at 26–27. In addition, Dr. Duchin presented

alternative districts that follow traditional redistricting principles and confirmed that, based on

recent probative elections, those alternatives can secure additional electoral opportunity for

Black South Carolinians, including by altering a single boundary line in the Enacted Map. PX

No. 67 at 23–24.

        59. Dr. Baodong Liu is a professor of Political Science and Ethnic Studies at

the University of Utah, PX No. 48 at 24, who has served as an expert in several vote dilution

cases in six states and provided technical advice to the U.S. Department of Justice. PX No. 48 at

24, 40; *see, e.g., Caster v. Merrill*, No. 2:21-cv-1536-AMM, 2022 WL 264819, at *26, *69 (N.D.

Ala. Jan. 24, 2022), *cert. granted before judgment sub nom. Merrill v. Milligan*, 142 S. Ct. 879

(2022) ("[W]e find that Dr. Liu is a credible expert witness" who "thoroughly explained . . . the

conclusions [he] reached."). Defendants did not challenge Dr. Liu's expert qualifications, and

this Court recognized Dr. Liu as an expert in racial polarization, American political behavior,

and statistical and quantitative methods.  Tr. 551:22–24 (Liu, Oct. 6).  Dr. Liu's report(s) were

admitted as PX No. 48 and PX No. 62, and he testified at trial concerning an analysis of recent

South Carolina elections and concluded that racially polarized voting is present in South

Carolina.  Dr. Liu also testified about an "effectiveness" analysis he conducted comparing the

Enacted Plan to alternative plans submitted into the legislative record by Plaintiffs SC NAACP

and about his conclusion that the Enacted Plan results in less opportunity for Black voters to

elect candidates of choice as compared to alternative plans before the legislature in the presence

of demonstrated RPV patterns.  Finally, Dr. Liu testified about analyses he performed to

conclude that the movement of voters between districts in CDs 1 and 2 cannot be explained by

partisanship, as compared to racial objectives.  PX No. 48 at 3–5, 11–12, 14–15, 19; PX No. 62

at 6–7.

        60.     Dr. Jordan Ragusa is a College of Charleston political science professor

with expertise in congressional elections, South Carolina politics, and quantitative methods.  PX

No. 19 at 1.  He currently serves as Associate Chair of the College of Charleston's Political

Science Department, and is widely recognized in the field and cited as an expert on American

and South Carolina politics.  PX No. 19 at 16.  The Court recognized Dr. Ragusa as an expert on

Congressional elections, South Carolina politics, quantitative methods, and the application of

data to those methods.  Tr. 1028:23–1029:2 (Ragusa, Oct. 7).  His reports were admitted as PX

No. 19 and PX No. 26.  Dr. Ragusa testified about analyses he performed comparing the

movement of voting tabulation districts between the Enacted Plan and the 2011 plan currently in

effect.  He concluded that race was a significant factor in the composition of CDs 1, 2, 3, 5, and

6.  PX No. 19 at 4.  Dr. Ragusa also testified about regression analyses he performed to conclude

that the results he observed in the Enacted Plan cannot be explained by partisan—as opposed to

racial—objectives.

61.     Dr. Joseph Bagley is an Assistant Professor of History at Perimeter College, Georgia State University.  His specific area of study is United States constitutional and legal history, politics, and race relations, with a focus on the American South.  At trial, the Court recognized Dr. Bagley as an expert in "American political history, southern legal history, political analysis, historical methods, the history of race discrimination and voting with a particular focus on South Carolina and southern race relations and southern politics and law." Tr. 1101:14–1101:19 (Bagley, Oct. 11).  His report(s) were admitted as PX No. 17 and PX No. 18.  Dr. Bagley testified at trial about the history of racial discrimination in South Carolina and the sequence of events leading up to the enactment of the Enacted Plan, including procedural departures and lack of transparency.  *See*, *e.g.*, Tr. 1110:17–1111:9 (Bagley, Oct. 11).  Dr. Bagley drew from standard sources in historical and social scientific analysis, including, but not limited to: public documents from the South Carolina General Assembly's websites, such as video recordings and transcripts of legislative committee meetings, floor debate, and public hearings from June 2021 through January 2022; other information from the state's redistricting websites for the House and Senate; newspaper and journalistic articles; court opinions, briefs, and memoranda; public statements; and scholarly articles and books on voting rights in South Carolina.  Tr. 1103:6–1104:24 (Bagley, Oct. 11); PX No. 17 at 4.  Dr. Bagley also testified about South Carolina's history of discrimination against Black voters and its repeated failure to reapportion and redistrict in past cycles absent intervention from federal courts or the federal government.

62.     Dr. Kosuke Imai is a Harvard professor and founding developer of redistricting simulation algorithms.  His scholarship has been among the top 1% most cited in

each of the past four years. PX No. 32 at 3, 5. The Court recognized him as an expert in political science statistics, computational social sciences, and causal research inference methods. Tr. 1928:11–13 (Imai, Oct. 14). His report was admitted as PX No. 32. In his report and at trial, Dr. Imai testified about analyses he performed using computer simulations to produce 10,000 race neutral redistricting plans that produced alternative boundaries between CDs 1 and 6 while "freez[ing]" all other boundaries in the Enacted Plan. Tr. 1954:21–1955:9 (Imai, Oct. 14); PX No. 32 at 11–14, 24. In addition, Dr. Imai testified about a separate analysis he performed wherein he generated 10,000 alternative plans that redrew all seven Congressional districts. Tr. 1962:23–1963:20 (Imai, Oct. 14); PX No. 32 at 24. Six of seven districts in these plans were generated "without race as a factor," while all simulated alternatives to CD 6 had a BVAP parameter of 45-50% in order to approximate its composition in the Enacted Plan. Tr. 1974:19–1975:18 (Imai, Oct. 14); PX No. 32 at 14–15, 25. That allowed Dr. Imai to determine whether the choices the Enacted Plan reflects are necessary if legislators sought to keep CD 6 within approximately its current BVAP composition. Tr. 1975:8–18 (Imai, Oct. 14); PX No. 32 at 14–15, 25. Dr. Imai testified to his conclusion that race was a significant factor in drafting the Enacted Plan beyond the purpose of adhering to traditional redistricting criteria or a goal of keeping CD 6 in approximately its current racial composition. Tr. 1974:19–1975:18 (Imai, Oct. 14).

### iv. Defendants' Expert Witnesses

63. Mr. Sean Trende is the Defendants' sole expert in the case. He is a senior elections analyst working for RealClearPolitics. SDX No. 75 at 2. This Court recognized Mr. Trende as an expert in redistricting, political methodology, American elections, and American politics. Tr. 1630:11–14 (Trende, Oct. 13).

## II.    THE ENACTED PLAN IS A RACIAL GERRYMANDER.

### A.    The Cracking of Black Communities Along CD 6 Boundaries to Deny Black Voters Electoral Impact in Any Other District.

64.    The Enacted Plan's treatment of CD 6, which is adjacent to the Challenged Districts, is crucial to understanding the General Assembly's choices in the Enacted Plan.  *See* PX No. 67 at 14 (discussing CDs 1, 2, and 5 in relation to CD 6); *id.* at 23 (noting Challenged Districts "cannot be adequately analyzed without the inclusion of CD 6. . .").

65.    CD 6 "has, for the last few decades, been the congressional district with the largest percentage of African-American voters and residents."  Tr. 972:23–973:8 (Oppermann, Oct. 7).

66.    Unusual boundaries related to CD 6 are therefore particularly probative of potential racial gerrymandering.

67.    As Mr. Oppermann testified, the pattern of county splits along the boundaries of CD 6 suggests "a certain kind of intent."  Tr. 972:23–973:8 (Oppermann, Oct. 7).  The Senate's redistricting guidelines require a minimization of "divisions of county boundaries."  PX No. 716 at 2; Tr. 992:16–992:24 (Oppermann, Oct. 7).  To split a county is, therefore, "to depart from a guideline requirement."  Tr. 973:6–973:8 (Oppermann, Oct. 7).

68.    The Enacted Plan splits a total of 10 counties—eight of which "occur along the boundary of [Congressional] District 6."  Tr. 972:23–973:8 (Oppermann, Oct. 7).  A similar pattern exists for municipality and precinct splits, which should also be minimized under the legislature's guidelines.  PX No. 716 at 2; Tr. 973:9–973:19 (Oppermann, Oct. 7).

69.    The fact that multiple departures from usual redistricting practice consistently occur around the congressional district is highly suspect.

70.    Examining the population shifts, particularly of Black voters, in and

around CD 6 confirms a pattern of dividing Black communities and dispersing Black voters in a manner such that they are unlikely to impact electoral outcomes outside of CD 6.

71.    That pattern is particularly concerning where, as discussed *infra* II(A)(vi), race-neutral maps overwhelmingly provide greater electoral opportunity to Black voters when traditional redistricting criteria are followed. *See*, *e.g.*, PX No. 120 at 1-2, fig.1. As but one example, the League of Women Voters of South Carolina, a nonpartisan group, created a map that provided "excellent opportunity" for Black voters to elect a candidate of their choice outside of CD 6, even without prioritizing doing so. Tr. 684:11-24 (Teague, Oct. 6).

> **i.    Population shifts under the Enacted Plan are indicative of vote dilution.**

72.    Under the Enacted Plan, the Black Voting Age Population ("BVAP") in CD 6, which was previously a district comprised of a majority of Black voters ("majority-Black district"), dropped from 52.5% to 46.9%. PX No. 67 at 9, tbl. 1. White Voting Age Population in CD 6, however, *in*creased from 40% in the 2011 plan to approximately 44.6% in the Enacted Plan. PX No. 48 at 11, 13 tbl. 4. The first two rows of the table below (found at PX 67 at 9, tbl. 1) reflect these demographic changes.

|  | CD 1 | CD 2 | CD 3 | CD 4 | CD 5 | CD 6 | CD 7 |
|---|---|---|---|---|---|---|---|
| Previous2012 | 0.173 | 0.239 | 0.174 | 0.183 | 0.257 | 0.525 | 0.254 |
| Enacted2022 | 0.174 | 0.254 | 0.176 | 0.19 | 0.247 | 0.469 | 0.254 |
| SC-NAACP1 | 0.349 | 0.205 | 0.16 | 0.172 | 0.244 | 0.528 | 0.117 |
| SC-NAACP2 | 0.24 | 0.202 | 0.18 | 0.185 | 0.202 | 0.503 | 0.254 |
| Harpootlian | 0.212 | 0.219 | 0.156 | 0.162 | 0.337 | 0.497 | 0.184 |
| LWVSC | 0.233 | 0.197 | 0.169 | 0.191 | 0.244 | 0.488 | 0.245 |
| Foster | 0.244 | 0.208 | 0.143 | 0.153 | 0.202 | 0.323 | 0.496 |
| Muscatel | 0.167 | 0.248 | 0.178 | 0.184 | 0.247 | 0.488 | 0.254 |
| Harrison | 0.233 | 0.276 | 0.185 | 0.177 | 0.277 | 0.352 | 0.267 |
| Sukovich | 0.293 | 0.184 | 0.143 | 0.211 | 0.319 | 0.493 | 0.129 |
| Roberts | 0.233 | 0.315 | 0.197 | 0.386 | 0.321 | 0.167 | 0.151 |

73.    At present, CD 6 is "the only district in the state's plan that presents

electoral opportunity to Black voters." PX No. 67 at 14. *See also* PX No. 48 at 11-13 tbl. 4 ("the

Enacted Plan . . . only provides an ability to elect a BPC in only one district (CD 6)"). Under the

Enacted Plan, given the demographic changes discussed *supra* Section I(B), even if CD 6

performs for Black voters, its "racial compositional change certainly makes white voters more

influential [there] than they were prior to 2022." PX No. 67 at 11.

74.    Meanwhile, the BVAP "drop" in CD 6, "does not correspond to any

meaningful opportunity across the other districts in the state." Tr. 291:12–154 (Duchin, Oct. 4).

The Enacted Plan moves significant numbers of Black voters *out* of what was an already-

underpopulated CD 6 and disperses them between surrounding districts. PX No. 67 at 25 & tbl.

7; PX No. 120 at 2–4 & tbls. 1–4. In particular, of the 36,767 Black residents moved out of CD

6, 20,240 were moved to CD 1, 15,071 were moved to CD 2, 1,132 to CD 7, and 324 to CD 5.

SDX 29C. In conjunction with other population moves that moved Black residents out of these

districts, this dispersal all but ensures no meaningful increase in electoral opportunity for Black

voters outside of CD 6.

75.    As Dr. Moon Duchin testified, one would expect the opposite:

demographic trends suggest there should be greater opportunity for Black voters to elect

candidates of choice in the 2020 map. Tr. 283:15–284:8 (Duchin, Oct. 4). Since the 2010

redistricting cycle, the white share of the population in South Carolina has fallen, and "the

concentration of Black population is going up in relevant areas." Tr. 283:19–284:8 (Duchin,

Oct. 4). In addition, reducing the CD 6 BVAP percentage from 52.5% to 46.9% meant that more

Black voters should have become available to be allocated to neighboring districts. Tr. 284:18–

21 (Duchin, Oct. 4).

76.    But despite "more opportunity than ever to have Black voting power

reflected in other districts," Tr. 284:4–8 (Duchin, Oct. 4), the Enacted Plan strategically cracks and disperses Black voters who live near the boundaries of CD 6, ensuring that Black voters have no "meaningful opportunity" to elect candidates of choice outside CD 6.  Tr. 291:5–15 (Duchin, Oct. 4).  Indeed, the electoral opportunity for Black voters under the Enacted Plan "is even lower than" it was under the 2011 plan for CD 1 (the district with the most electoral opportunity outside of CD 6) and far lower than publicly proposed maps that Defendants rejected.  Tr. 563:7–15(Liu, Oct. 6) ("The Enacted Plan had the lowest average percent vote for Black preferred candidate[s]."); PX No. 48 at 13, tbl. 4.

77.     The Enacted Plan "spread[s] out" Black voters "fairly evenly" in the districts other than CD 6.  PX No. 48 at 11.  Three districts (CDs 1, 3, and 4) have BVAP of about 16-19%, while the other three (CDs 2, 5, and 7) have just about 25% BVAP.  *Id.* at 11 & tbl. 4.  *See also* SDX 29g (Senate analysis that CDs 1, 3 & 4 have BVAP between 16.7-18.5%, CDs 2, 5 and 7 have BVAP between 24-25%).  Because South Carolina exhibits high levels of racial polarization in voting, discussed in detail *infra* Section III(F), this distribution gives white voters a "clear advantage" and reduces Black voting strength to minimize Black voters' chances of electing or influencing elections in Congressional elections.  *Id.* at 11.

78.     As Dr. Duchin explained, "cracking" often involves "distribut[ing] the Black voting age population" into "districts where it isn't going to have an appreciable impact on opportunity" to elect Black voters' preferred candidate.  Tr. 343:15–18 (Duchin, Oct. 4).  The fact that "BVAP comes down significantly in CD 6, but the gains are dispersed across the other districts" in an inefficient manner "is exactly what cracking looks like."  Tr. 292:21–293:6; 343:14–344:5 (Duchin, Oct. 4); *see also* Tr. 292:20 (Duchin, Oct. 4).

79.     Changes from the 2011 plan to the Enacted Plan ultimately make

"indications of racial gerrymandering [] easy to detect."  PX No. 87 at 4.  While CD 6 sees "its [BVAP] share markedly diminished," "adjacent districts" did not "receive[] an increase in their BVAP share."  *Id.*  Instead, "the Black population was cracked over multiple districts in a manner that ensured that the opportunity to elect candidates of choice would remain out of reach."  *Id.*

80.    The Enacted Plan's unusual features act to counteract demographic changes in the State.  Notably, the district lines splitting Black communities tend to target areas where the increase of Black voting-age residents has been among the most pronounced since 2010, including in Richland and Charleston Counties.  Tr. 306:13-22 (Duchin, Oct. 4); PX No. 120 at 7.

81.    The following table, prepared with data from the Court's recent exhibit of demographic and geographic data, ECF No. 473, is illustrative.  The table lists all the nine counties in South Carolina with the highest number of Black voting-age persons in the county, and then notes whether or not the county is split.  Of the ten Counties split under the Enacted Plan, (i) five are the South Carolina counties with highest BVAP, and (ii) seven are the nine highest-BVAP counties.

| County | BVAP | WVAP | Split |
|--------|------|------|-------|
| Richland | 200,388 | 172,644 | Yes |
| Charleston | 97,954 | 263,560 | Yes |
| Greenville | 97,001 | 343,897 | Yes |
| Spartanburg | 70,165 | 214,440 | Yes |
| Florence | 59,378 | 69,021 | Yes |
| Berkeley | 57,233 | 137,840 | No |
| York | 57,020 | 188,015 | No |
| Orangeburg | 52,275 | 27,787 | Yes |
| Sumter | 51,044 | 46,442 | Yes |

82.    Notably, this list includes not only the largest counties in the state, but also smaller majority-Black counties (e.g., Florence, Orangeburg, and Sumter).  The remaining three

split counties are also counties where Black voting-age population was above the statewide

average: Jasper (43.6% BVAP), Colleton (39.5% BVAP), and Dorchester (30.0% BVAP).

<blockquote>

**ii.     The Enacted Plan disproportionately concentrated split counties along the CD 6 boundary.**

</blockquote>

83.     The Enacted Plan splits more counties, county subdivisions, cities, and

towns compared to several proposed plans that Defendants rejected.  Tr. 30:3-32:14 (Duchin,

Oct. 4 AM); PX No. 67 at 12-13, Tables 4 & 5 (Dr. Duchin expert report).

84.     The Enacted Plan splits 10 counties: Charleston, Colleton, Dorchester,

Jasper, Orangeburg, Richland, Greenville, Spartanburg, Sumter, and Florence.  In the table

below, Dr. Liu lists all 10 county splits in the Enacted Plan and shows the Districts into which

the Enacted Plan splits each respective county.

**Table 2: Split Counties based on Enacted Plan**

| County | Districts |
|---|---|
| Charleston | 1, 6 |
| Colleton | 1, 6 |
| Dorchester | 1, 6 |
| Jasper | 1, 6 |
| Orangeburg | 2, 6 |
| Richland | 2, 6 |
| Greenville | 3, 4 |
| Spartanburg | 4, 5 |
| Sumter | 5, 6 |
| Florence | 6, 7 |

85.     In the words of a set of talking points prepared for Senators for the floor

debate to support the Enacted Plan, the Enacted Plan treated "[c]ounty lines as more important in

some places than others."  PX No. 722.  In particular, the Enacted Plan disproportionately splits

counties along the CD 6 border with significant Black populations.  Indeed, as the table above

shows, the vast majority of county and municipality splits in the Enacted Plan occur along the

CD 6 boundary where communities of Black voters are located.  Speaking to this fact, Mr.

Oppermann explained that the "predominance" of splits implicating CD 6 and the "almost dearth" of similar splits elsewhere in the state are among "the strangest features" of Senate Amendment 1 (also known as the Campsen Plan), which ultimately became the Enacted Plan as S.865, as detailed *infra* Section III(C)(iii).  PX No. 721 at 6.

86.    Mr. Oppermann explained at trial that the Enacted Plan's county-splits primarily occur along parts of the CD 6 border "that contain a significant amount of African American population."  Tr. 975:2–976:6, 986:6–986:17 (Opperman, Oct. 7).  In fact, "eight of the 10 county splits occur along the boundary of District 6.  Only two of them are not along the boundary of District 6."  Tr. 972:24–973:1 (Opperman, Oct. 7); *see also* PX No. 721 at 3.  This is concerning because "District 6 has, for the last few decades, been the congressional district with the largest percentage of African American voters and residents."  Tr. 973:3-973:8; 988:8–989:4 (Opperman, Oct. 7); Tr. 1689:18–1690:6 (Trende, Oct. 13) (acknowledging 8 of 10 county splits are on the CD 6 border).

87.    Dr. Liu's analysis confirms Mr. Oppermann's testimony.  *See* PX No. 62 at 4-5.  The table below, for example, considers the racial makeup of the counties that are split under the Enacted Plan.  Dr. Liu observed that "[s]even of the 10 split counties have BVAPs greater than 25.28%—the share of BVAP at the state level according to the 2020 Census."  *Id.* at 5.  "Three of them have BVAPs of more than 41% of the total VAP.  In short, the counties that are split have a larger share of Black voters than the state BVAP share."  *Id.*

**Table 3: The Racial Composition of Split Counties, Enacted Plan**

| County | VAP | Black | White | Black % | White % |
|--------|-----|-------|-------|---------|---------|
| Charleston | 327819 | 74641 | 219685 | 22.77% | 67.01% |
| Colleton | 30042 | 10475 | 17835 | 34.87% | 59.37% |
| Dorchester | 115215 | 31948 | 77329 | 27.73% | 67.12% |
| Florence | 104040 | 43548 | 56968 | 41.86% | 54.76% |
| Greenville | 398064 | 74441 | 290451 | 18.70% | 72.97% |
| Jasper | 21314 | 7767 | 11616 | 36.44% | 54.50% |
| Orangeburg | 64365 | 39634 | 22803 | 61.58% | 35.43% |
| Richland | 319486 | 149669 | 153216 | 46.85% | 47.96% |
| Spartanburg | 251587 | 50922 | 171238 | 20.24% | 68.06% |
| Sumter | 73918 | 34919 | 34358 | 47.24% | 46.48% |

88.    Dr. Liu's analysis also confirmed the result Black voters have at least more than 7.18% probability of being assigned to a split county than to counties left whole—a difference that cannot be explained by random factor alone.  PX No. 62 at 6-7.  The table below reflects these findings, by comparing the 10 split counties with the 36 that are left whole in the Enacted Plan.  It shows that Black voters are about 30% of total voters in split counties, but only 23% of total voters in "non-split" counties.  *Id.* at 6.  Meanwhile, white voters make up approximately 60% of voters in the split county category and 70% of the "non-split" county vote share.  *Id.*  Taken together, these findings show that in the left figure showing split counties there are "disproportionately more Black [voters] compared to the right side . . . that is, the white racial group is much taller in terms of the height of the bar, and [the] Black group is much shorter on the right side of the non-split."  Tr. 588:22–589:17 (Liu, Oct. 6).  In short, Black voters are "much more likely to be put in the split counties as opposed to the non-split counties compared to whites."  Tr. 588:22–582:2 (Liu, Oct. 6).



Figure 1: Split Counties v. Non-Split Counties

89.    In short, the Enacted Map treats counties with significant Black populations differently than counties that do not.  Overall, the Enacted Map engaged in a pattern of "selective healing" in which counties with predominate white populations under the 2011 plan (like Beaufort) were chosen to be kept or made whole, while counties with significant Black populations were split or kept split.  As Dr. Duchin explained in her May 2022 report, "[t]he state's plan repairs splits selectively; it conspicuously fails to heal cities and other areas of particular salience for Black communities (such as the city of Sumter), as they were highlighted in the legislature's own public hearings."  PX No. 87 at 2; *see also id.* at 3 ("[S]plits clearly identified as being most harmful to Black voters—such as Sumter (40% White) and key neighborhoods of Charleston—are not addressed in the state's [] plan.  Instead, more heavily White cities (Beaufort – 65% White, Goose Creek – 58% White, Hanahan – 65% White) are made whole.").

90.    Defendants prioritized the preservation of majority-white counties, such as Beaufort, Edgefield, and Barnwell over counties with large Black populations, such as Charleston, Colleton, Florence, Jasper, Orangeburg, Richland, and Sumter, which are split in the Enacted Plan, and even when the counties' concerns were similar to those of the whiter counties.

91.    The testimony of Senator Massey—a white Republican senator who testified for Defendants at trial regarding their redistricting considerations—illustrated the racially disparate application of Defendants' redistricting criteria.  Tr. 1560:23–1561:16 (Massey, Oct. 12).  When Senator Massey testified concerning two smaller counties with majority-white populations, he explained that, if they were to be split, they would "never[] matter . . . . [I]f you split Edgefield into two different congressional district[s], we don't have enough people to matter to any member of Congress, whichever district it is.  And it would be the same for [Barnwell] . . . . They're never going to have any attention at all."  Tr. 1581:14–1582:1 (Massey Oct. 12).  The same, however, could be said for Jasper, Florence, Orangeburg, and Sumter, which are also small counties—with significant or majority-Black populations—that are nonetheless split under the Enacted Map.

92.    Similarly, the record shows that Defendants rejected proposals that would have simultaneously accommodated the concerns of Beaufort and Charleston County residents to remain whole and in CD 1—both coastal counties that wished to be in a coastal district—but Defendants implemented the splitting of Charleston County along racial lines.  *See* SDX 31a & 31c; PX No. 116 at 119:12-120:15, 146:5-150:9.

93.    The Legislature's choices of which counties to split are significant because fact and expert witnesses alike testified to the salience of counties as *per se* communities of interest in South Carolina.[4]  For example, Plaintiffs' expert Dr. Duchin testified that, based on

---

[4] Previous three-judge panels of this Court have also recognized the importance of counties as communities of interest in South Carolina.  *See Colleton Cnty. Council v. McConnell*, 201 F. Supp. 2d 618, 648 (D.S.C. 2002).  Indeed, "[m]any governmental services, such as fire and police protection, are organized along political subdivision lines, and counties and cities are often representative of a naturally existing community of interest."  *Id.* (internal citation omitted); *see also South Carolina NAACP v. Riley*, 533 F. Supp. 1178, 1180 (D.S.C. 1982) ("[T]he residents of a county have a community of interest.").

her review of public testimony across multiple states, South Carolinians are more "likely to cite their county as their community" compared to residents in other states. Tr. 255:15-22 (Duchin, Oct. 3). Similarly, Ms. Lynn Teague underscored that a guiding principle in the maps that the SC League of Women Voters submitted into the record was "avoid[ing] splits, especially at the county level." Tr. 688:6-18 (Teague, Oct. 6). The reason, Ms. Teague explained, is the League's belief that counties are "fairly old" in South Carolina and "over time, have developed cohesion." *Id.* Accordingly, counties "represent [] communities of interest in themselves in that they're governed as units, [] operating under the same ordinances and policies." *Id.*

94.    Even apart from the special significance of counties in South Carolina, Dr. Duchin explained that, in her experience, she considers it "good practice in redistricting to try not to cut [counties] up," to the extent not necessary to comply with constitutional and statutory principles, like non-dilution. Tr. 253:15–17(Duchin, Oct. 3). One reason for this is that keeping counties whole within districts makes them "more cognizable" and "eas[ier] to describe . . . and understand who lives in one district and who lives in another." Tr. 253:17–24 (Duchin, Oct. 3). Another is that "people who have shared interests as residents of the same county often [] might want to be kept together so that they have more voting strength and [] voice with their representative." Tr. 253:21-24 (Duchin, Oct. 3); *see also* Tr. 974:1–974:17 (Opperman, Oct. 7) (describing burdens on state and taxpayers of splitting counties because counties, not municipalities, administer elections); Tr. 1581:14–1582:1 (Massey, Oct. 12) (small split counties "are never going to have any attention" from Congress).

### iii.    The Enacted Plan disproportionately concentrates split municipalities and precincts along the CD 6 Border.

95.    Respect for the integrity of political subdivisions—limits such as counties and cities—is a traditional redistricting principle in its own right. PX No. 67 at 12. In South

Carolina, it is also named as a community of interest consideration in the House and Senate Guidelines, as discussed *infra* Section III(C)(i).  *See* PX No. 175 at 2; SDX No. 3 at 2.

96.    The Enacted Plan splits at least 20 cities.[5] PX No. 67 at 13, tbl. 5.  Ten of these splits happen along county lines—*i.e.*, "where the split [] occur[s] because a municipality includes more than one county."  PX No. 721 at 5.  For the remaining municipality splits, which are not dictated by county lines, "almost all" of those "splits occur in municipalities with substantial black population, and almost all of them occur along the boundaries of District 6." Tr. 988:14–989:4 (Oppermann, Oct. 7).  Eight of the ten municipality splits Mr. Oppermann identified are along the CD 6 border, cutting through the municipalities of Charleston, North Charleston, Sumter, Columbia, Hollywood, and Hardeeville.  Tr. 988:8–989:4 (Oppermann, Oct. 7); PX No. 721 at 5; *see also* PX No. 67 at n. 6 (Dr. Duchin's April 4 report, identifying Sumter as "roughly 51% Black by population").

97.    Eleven of the 13 precinct splits under the Enacted Plan also occur along the border of CD 6.  PX No. 721 at 3.  As with the other splits, the Enacted Plan's precincts disproportionately split Black communities.  *See* Tr. 988:23–989:4 (Oppermann, Oct. 7).

98.    The splits in what became the Enacted Plan are especially "troubling" given that numerous alternative plans available to the Legislature (e.g., the House staff plan, Senate Amendment 2a, and the League of Women Voter's Plan) demonstrate that many of those county and city splits are not necessary.  PX No. 67 at tbls. 4 & 5; SDX No. 62 at 8 (showing Amendment 2a and LWV plan had fewer county, municipal and VTD splits); SDX Nos. 31e, 33c, 68f (jurisdiction split analysis of Amendment 2a, House staff plan, and LWV plan); PX No. 721 at 3.

---

[5] Documents prepared by Senate Redistricting Subcommittee staff, however, reflect 22 split cities under the "Amendment 1,"plan that was eventually enacted.  SDX No. 62 at 8.

|                   | County Splits | Municipal Splits | VTD Splits |
|-------------------|---------------|------------------|------------|
| Enacted Plan      | 10            | 22               | 13         |
| Amendment 2A      | 7             | 15               | 10         |
| House Staff Plan  | 8             | N/A              | 26         |
| LWV Plan          | 6             | 11               | 12         |

99.    As described further *infra* Section II(B)(ii)(d), Dr. Kosuke Imai conducted a "statewide simulation" analysis that generated 10,000 plans drawing all seven South Carolina Congressional districts.  PX No. 32 at 14-21.  Except for CD 6,[6] none of the other districts in this analysis factored in racial data.  His simulated plans were also bound, as much as practicable, by redistricting criteria in the House and Senate Guidelines.  *See infra* at Section II(B)(ii)(d).  The histogram below (found in both Dr. Imai's report and at PX No. 45), shows the distribution of the number of split counties under the simulated plans, while the red vertical line shows the Enacted Plan's number of split counties.  Dr. Imai concluded that "on average," his 10,000 simulations "split fewer number of counties than the enacted plan."  PX No. 32 at 26.



100.    Similarly, the histogram below (found also at PX No. 46) shows the distribution of the number of split municipalities under Dr. Imai's 10,000 simulated plans, while the red line shows where the Enacted Plan falls in this range.  On average, the simulated plans "split fewer number of municipalities than the Enacted Plan."  PX No. 32 at 27.

---

[6]As explained further *infra*, this simulation also ensured that in the simulated plans CD 6 kept its BVAP between 45-50%, in order to approximate the Enacted Plan's CD 6 BVAP of about 47%.  *See* PX No. 32 at 9, n.4.



101.    In his testimony before the Senate Redistricting Committee, Mr. Oppermann stated that Senate Amendment 1's (which became the Enacted Plan) "bizarre shapes" can only be explained by "a predominant and overarching racial policy."  PX No. 114 at 26:7–24.  He further explained that the purpose of the Enacted Plan was "to concentrate black voting power in District 6 for the fig leaf of legal compliance, and otherwise diminish and destroy black voting power in every other part of the state . . . . Race is the only plausible explanation for [the lines], which suggests a predominant racial motive in those draws, which of course is unconstitutional."  *Id.*

       **iv.**    **The Enacted Plan does not respect communities of interest.**

102.    To assess whether the Enacted Plan or other maps in the legislative record respected South Carolina communities of interest, Dr. Moon Duchin reviewed the public testimony collected by the state.  PX No. 67 at 8; *see also* Tr. 255:5–9 (Duchin, Oct. 3).  Dr. Duchin's comprehensive review allowed her to consider communities that "came up or were cited a large number of times."  Tr. 256:9-25 (Duchin, Oct. 3).  Based on her review of "over a thousand pages" of testimony, Dr. Duchin was able to define the following as evident communities of interest in the record:  Richland, Sumter, Berkeley and Charleston Counties, and the "Low Country," which she understood to be a collection of four coastal counties: Charleston, Colleton, Jasper, and Beaufort.  Tr. 256:11-25 (Duchin, Oct. 3); PX No. 67 at 16.

103.    Based on Dr. Duchin's extensive review of the public testimony and her

assessment of the Enacted Plan, she concluded that the map largely "disregarded" the identified communities of interest.  PX No. 67 at 16, 18, 20.  As discussed in more detail below, that disregard is starkest in Charleston, one of the most frequently cited communities of interest.  *See* PX No. 67 at 15.

104.    Although the preservation of communities of interest is a traditional redistricting criterion listed in both the House and Senate Guidelines, PX No. 175 at 2–3; PX No. 716 at 2, and as discussed in more detail below *infra* Section III(C)(ii), the Legislative Defendants conducted approximately 20 public hearings to obtain feedback concerning communities of interest, PX Nos. 540–561, SDX No. 224–233A, in practice, however, Legislative Defendants did not rely on information learned at these hearings to draw congressional maps.

105.    Rather, key defense witnesses conceded that Legislative Defendants ultimately did not rely on information learned at those public hearings (about communities of interest, or anything else) in drawing Congressional maps for South Carolina.  *See* Tr. 28:7–11 (Roberts, Oct 12 AM) (explaining hearings didn't give him much information from "a cartography standpoint" and not "a lot of information for what [he was] looking for, such as communities of interest"); Hauger Dep. Tr. 88:13-17 ("Q. Are you aware of whether any public input was incorporated into the map that you and Mr. Dennis drew?  A. There was no public input on the map Mr. Dennis and I drew.").

106.    Several of the proposed maps the General Assembly rejected outperform the Enacted Map on preservation of communities of interest.

107.    For instance, unlike the Enacted Map, the League of Women Voters' map abides by the strong public demand for Charleston and Richland counties to be made whole and

keeps Charleston County whole in CD 1 as a community of interest, as the public implored. SDX  70a, *see also* Tr. 678:21-679:4 (Teague, Oct. 6).  Notably, by respecting traditional redistricting criteria and the existing demographic distribution in that region of the state, the League arrived at a map that created an additional opportunity district for Black voters—outside of CD 6—without prioritizing the creation of such a district.  Tr. 682:15-684:24 (Teague, Oct. 6). The same is not true of the Enacted Map, which instead subordinated traditional redistricting principles to suppress Black voting power in districts other than CD 6.

108.    Unlike the Enacted Map, the League's map responds to the strong public demand regarding Charleston and Richland communities of interest, including assigning all of Charleston County to CD 1 as a community of interest.  SDX No. 70a; *see also* Tr. 690:17-695:19(Teague, Oct. 6)

109.    Senate Amendment 2a, in addition to performing better on redistricting criteria overall, was far more responsive to the concerns of voters in Beaufort, Richland, Orangeburg, and Charleston, who all demanded that their communities (and counties) be kept intact in single districts.  Tr. 698:20-699:1 (Teague, Oct. 6); *see also* PX No. 67 at 16–21 (explaining how the Enacted Plan failed to respect coastal and Lowcountry counties, as well as Richland, Orangeburg, and Sumter).  Senate Amendment 2a allows Charleston, Orangeburg, Sumter, and Beaufort Counties to be whole, and its minimal split of Richland County to account for other redistricting criteria does not crack Black communities.  Tr. 981:10–983:17, 985:23–987:15 (Oppermann, Oct. 7); SDX 31a; SDX No. 31e; PX No. 32 at 18, fig.7 (Showing distribution of Black voters in Richland County).

110.    By contrast, the Enacted Map only honors Beaufort residents' requests to be placed into their district of choice.  Tr. 701:12–15 (Teague, Oct. 6).  Conspicuously,

Charleston, Orangeburg, Sumter, and Richland are far more diverse, and contain many more Black voters, than Beaufort, one of the counties with the largest white populations in the State. Tr. 700:22–701:11 (Teague, Oct. 6); Tr. 373:10–13 (Duchin, Oct. 4) (discussing split of majority-Black Orangeburg); *see infra* Table "BVAP/WVAP in Counties Split Between Districts 1 and 6 in Enacted Plan." The decision to reject community input and needlessly subordinate traditional principles in counties with high BVAP, *see infra* Section II(A)(ii), while honoring the requests of white voters from counties with predominately white populations, helps demonstrate the race predominated in the Enacted Map.

111.    Accordingly, to the extent that responding to public input from Beaufort residents was a contemporaneous priority of the General Assembly, as discussed in more detail *infra*, it still cannot explain the decision to adopt the Enacted Map. As Senate Amendment 2a and other maps show, the "Charleston *or* Beaufort" narrative that was pushed by Senate leadership was a false dichotomy.

### v.    The Enacted Map is Neither Compact Nor Land-Contiguous.

112.    Defendants' expert, Mr. Sean Trende, acknowledged that CD 2 is less compact under standard compactness measures in the Enacted Plan than it was under the 2011 plan. Tr. 1686:2–7 (Trende, Oct. 13) (recognizing CD 2 is "less compact than under the 2011 plan" "under all four metrics" Mr. Trende used). Mr. Trende also conceded that CD 6 is less compact in the Enacted Plan than it was in the 2011 plan. Tr. 1686:8–13 (Trende, Oct. 13). And he admitted that under his analysis, Districts 1 and 6 are less compact than any other district in the Enacted Map. Tr. 1686:2–20 (Trende, Oct. 13).

113.    As shown in Dr. Duchin's report, the Enacted Map is "definitely outperformed in compactness by several of the publicly submitted plans." Tr. 293:3-9 (Duchin, Oct. 4). The table below from Dr. Duchin's report shows that the Enacted Map is less compact

on at least two measures of compactness when compared to the maps proposed by Senator

Harpootlian (Senate Amendment 2a) and the League of Women Voters of South Carolina,

among others:

| | avg Polsby-Popper (higher is better) | avg Reock (higher is better) | Block cut edges (lower is better) |
|---|---|---|---|
| Previous2012 | 0.202 | 0.369 | 3217 |
| Enacted2022 | 0.210 | 0.361 | 2843 |
| Harpootlian | 0.235 | 0.327 | 2227 |
| LWVSC | 0.224 | 0.379 | 2392 |
| SC-NAACP1 | 0.165 | 0.270 | 3578 |
| SC-NAACP2 | 0.240 | 0.371 | 2343 |
| Foster | 0.273 | 0.376 | 2313 |
| Muscatel | 0.216 | 0.371 | 2955 |
| Harrison | 0.289 | 0.443 | 2074 |
| Sukovich | 0.208 | 0.324 | 2636 |
| Roberts | 0.177 | 0.308 | 3091 |

114.    Although Defendants argue that mathematical calculations should not be

used per the House guidelines, Dr. Duchin's unrebutted testimony is that "good quantitative

measures" of compactness "comport with" the eyeball test and that the measures she employed

include Polsby-Popper and Reock, the most frequently used compactness metrics in court.  Tr. -

249: 3-250:5 (Duchin, Oct. 3).  In any event, Defendants' expert, Mr. Sean Trende, also used

mathematical measures of compactness in his report to assess the Enacted Map.  *See* SDX No. 75

at 20; *see also* Tr. 1686:21–1687:3 (Trende, Oct. 13) ("Q. Okay.  And to be clear, you assessed

compactness using statistical measures even though the House guidelines provide that

compactness should not be judged upon any mathematical, statistical, or formula-based

calculation or determination?  A. Yeah. . . .").

115.    Even without using compactness scores, the Enacted Map is not visually

compact, with bizarre shapes along the CD 6 boundary.  As Mr. Oppermann explained to Senate

redistricting staff, the Enacted Plan "departs from compactness of shape along the boundaries of

District Six, notably around Richland County's boundary with Two and the

Charleston/Dorchester boundaries with One."  *See* PX No. 721 at 7 (discussing Senate

Amendment 1, which became the Enacted Plan).  When looking at the shape of CD 6, "[t]wo

dragon heads appear to stare one another down from across I-26, one nestled in a dismembered District One." PX No. 721 at 7. Defense expert, Mr. Trende, admitted on cross-examination that in all the redistricting cases he has been involved in, he had never seen another district that resembled CD 6's two-headed dragon. Tr. 1708:23–1709:14 (Trende, Oct. 13). The shape of CD 6 necessarily implicates the shapes of the adjacent Challenged Districts and results in many of the bizarre geographic features (including appendages and isthmuses) evident in CDs 1, 2, and 5.

116.    The Enacted Plan lacks land contiguity, unlike, for instance, Senate Amendment 2a and the SC League of Women Voters' proposal. PX No. 721 at 4; SDX No. 70a. As discussed above, under the Enacted Plan, "the northern and eastern portion of [CD 1] is not connected via a roadway to the southern and western portion of the district." Tr. 969:16–969:25 (Oppermann, Oct. 7). As a result, a person in some parts of CD 1 "would have to go through District 6 to get to another part of District 1." Tr. 970:1–970:6 (Oppermann, Oct. 7).

117.    Several of the proposed maps that the General Assembly rejected outperform the Enacted Map on these traditional redistricting principles.

118.    Overall, the SC League of Women Voters maps are far more consistent with traditional redistricting principles and with the House and Senate's own guidelines than the Enacted Plan. The SC LWV Maps, SDX No. 68a & 70a, have clear land contiguity, perform better than the Enacted Plan on every measure of compactness, PX No. 72, have fewer county splits and subdivision splits, PX No. 73, and split fewer cities and towns, PX No. 74.

119.    Similarly, Senate Amendment 2a also performed better overall than the Enacted Map under traditional redistricting principles and the legislature's own guidelines. Senate Amendment 2a was contiguous and had fewer county, municipal, and precinct splits than

the Enacted Plan.  PX No. 721 at 4-6; *see also* Tr. 986:7–986:24, 988:8–988:12, 989:12–990:8, 994:1–994:2 (Oppermann, Oct. 7).  Senate Amendment 2a is also more compact based on "geography and connectivity."  PX No. 721 at 7; *see also* Tr. 993:23–993:25 (Oppermann, Oct. 7).  Unlike the Enacted Plan, Senate Amendment 2a's "districts are all connected internally by land routes and its shapes are not irregular beyond the peculiarities of county boundaries."  PX No. 721 at 7.

> **vi.    The Enacted Plan is a statistical outlier in the way it deprives Black voters of electoral opportunity.**

120.    Expert testimony shows that the Enacted Plan is an extreme outlier in terms of how it assigns Black voters to ensure that there is *no* electoral opportunity outside of CD 6.  That was Dr. Duchin's conclusion after comparing the Enacted Plan to an ensemble of 100,000 race-neutral plans, which accounted for population balance, contiguity, compactness, and the preservation of counties.  PX No. 120 at 1-2, fig.1.



121.    As shown in the above Figure 1, the Enacted Map places an unusually high number of Black voters in the two districts where they are least likely to make an electoral difference; as a result, Defendants can maintain unusually low BVAP in the remaining districts that otherwise would have been more competitive for Black-preferred candidates Tr. 343:23-344:1 (Duchin, Oct. 4); *see also* PX No. 120 at 1 (explaining that the "state's plans [i.e., the

Enacted Plan, like the 2011 plan,] not only have unusually low BVAP in [the district with the second-highest BVAP in each plan], but indeed have unusually low BVAP in all districts except the highest and lowest").

122.    Specifically, compared to an ensemble of race-neutral maps, the Enacted Plan assigns unusually high BVAP to CD 6 (i.e., the district where Black voters are already likely to elect their preferred candidate) and to the district with the lowest BVAP in the state (*i.e.*, the district where Black voters are least likely to be able to elect their preferred candidate, which, in the case of the Enacted Map, is CD 1). PX No. 120 at 2, fig.1; *id.* at 6, tbl. 5 (table showing CDs with highest and lowest BVAPs under the Enacted Plan); Tr. 343:19-23 (Duchin, Oct. 4).

123.    Despite "more opportunity than ever to have Black voting power reflected in other districts," Tr. 284:4-8 (Duchin, Oct. 4), the Enacted Map strategically cracks and disperses Black voters who live near the boundaries of CD 6, as detailed *infra* Section II(A)(vi), ensuring that Black voters have no "meaningful opportunity" to elect candidates of choice outside CD 6. Tr. 291:6-15 (Duchin, Oct. 4).

124.    As a result of that pattern of cracking, Black-preferred candidates are unlikely to prevail in any district other than CD 6. PX No. 120 at 3–4; PX No. 48 at 13 Tbl. 4. By contrast, other proposed maps allow Black-preferred candidates to be competitive in two to four congressional districts. PX No. 120 at 3–4; Tr. 349:23–351:4 (Duchin, Oct. 4).

125.    The extreme way the Enacted Map confines Black voters' electoral impact to CD 6 is especially pronounced when looking at the congressional district with the second highest BVAP. Tr. 336:23-339:13 (Duchin, Oct. 4); PX No. 67 at 23, fig.10.



126.    As shown in Figure 10 above, compared to the ensemble of 100,000 race-neutral maps that comply with traditional redistricting criteria, the Enacted Map maintains an unusually low BVAP in the district with the second highest BVAP, creating an artificially low opportunity for Black voters to influence congressional elections outside of CD 6.  Tr. 337:13–338:10 (Duchin, Oct. 4); *see also* PX No. 48 at 11–13 (discussing how distribution of Black voters across districts other than CD 6 "lead to a clear advantage of white voters as Black voting strength is reduced to minimize their success in winning Congressional elections").

127.    In fact, the Enacted Plan is "more extreme than 99% of the [race-]neutral plans."  Tr. 342:3–11 (Duchin, Oct. 4).  Overall, less than 1% of the 100,000 race-neutral maps Dr. Duchin generated assigned a lower BVAP to the second-highest congressional district than did the Enacted Plan.  Tr. 339:10–17 (Duchin, Oct. 4).  Publicly proposed plans, such as Senate Amendment 2a, also assigned a higher BVAP to the second-highest district compared to the Enacted Map.  Tr. 338:11–339:9 (Duchin, Oct. 4); *see also* SX No. 31b (listing House Plan 2, Senate Amendment 2a Plan Stats).

128.    As discussed *infra* Section II(B)(ii)(d), II(D)(ii)(c), the focused simulations analyses Dr. Imai conducted on CDs 1 and 5 are entirely consistent with the conclusion that the Enacted Map is an extreme outlier in suppressing the BVAP in every other district except CD 6.

    **vii.**  **The Enacted Plan moves tens of thousands of voters unnecessarily.**

   129. Because of the underpopulation in CD 6 and the overpopulation in adjacent CD 1, most of the change in population was expected to occur between these two districts.  Accordingly, Senator Campsen testified that CD 1 needed to shed 88,000 people, while CD 6 needed to add 85,000 people, creating the possibility of a simple swap.  *See*, *e.g.*, Tr. 1907:11–15 (Campsen, Oct. 13) ("Q. You don't dispute that 140,000 residents were moved from District 1 to District 6 in the map, right?  A. Well, the Sixth District had to pick up 85,000, and the First had to shed 88,000 in rough numbers.  So that's where the change needed to happen, because they have to be equal."); *see also* SDX No. 75 at 16 (noting "boundaries between [CD 1] and [CD 6] see the most changes," which is "unsurprising, given that these districts were required to lose and gain a large number of residents, respectively").

   130. But the Enacted Map unexpectedly moved nearly 200,000 people between CDs 1 and 6, far more than necessary to account for the population disparity.  *See generally* SDX No. 29c.  *See also* SDX No. 75 at 18, tbl. 4 (Defendants' expert, Sean Trende's report showing that 140,489 people were moved from CD 1 to CD 6, and 52,799 people were moved from CD 6 to CD 1, and an additional 27,670 people to CDs 2, 5, and 7).  In other words, Defendants moved over 80,000 people out of CD 6, even though the district was *under*-populated.

   131. As shown in the following table, the population moves were disproportionate to the population imbalance of each district.  *Compare* SDX No. 28e *with* SDX No. 29c.

| District | Overpopulated | Underpopulated | People Removed |
|---|---|---|---|
| 1 | 87,689 | No | 140,489 |
| 2 | No | 9,375 | 14,397 |
| 5 | 5,082 | No | 41,407 |
| 6 | No | 84,741 | 80,469 |

132.    Similarly, Dr. Duchin showed how the reassignment of voters between districts happened "in scattered chunks and shards" that were "not aimed at healing key splits of cities and communities that were frequently cited in the public testimony."  PX No. 67 at 15. In the image below, yellow areas are those being moved from CD 6 to CD 2; blue areas are those being moved from CD 6 to CD 1; and purple areas are those being moved into CD 6 from neighboring districts.  PX No. 67 at 15.



**B.    Race Predominated Over Traditional Redistricting Principles In Enacting Congressional District 1.**

**i.    Data and District Composition**

133.    CD 1 consists of the entirety of Berkeley and Beaufort Counties and—due to splitting—portions of Charleston, Colleton, Dorchester, and Jasper Counties whose populations have significant white populations, as a whole.  PX No. 67 at 16; *See* CX No. 1 (ECF No. 473).  The Enacted Map is significantly reconfigured in Charleston County; whereas in the 2011 plan, CD 6 approached the Charleston peninsula from the northeast through Berkeley County, the Enacted Map approaches the peninsula from the west through Dorchester County and the St. Andrews/West Ashley communities.  *Compare* SDX No. 28a (2011 plan) *with* SDX

No. 29b (Enacted Map).  The Enacted Plan's split of Jasper County is another new feature, since Jasper County used to be intact in CD 6 in the 2011 plan.  But the Enacted Plan now includes a portion in the new CD 1.  *See id.*

134.    There were other major changes to CD 1 from the 2011 map.  Indeed, Mr. Roberts, the Senate's cartographer, acknowledged that the changes to Charleston County alone meant that the Enacted Map was "not a least changed plan" for that area.  Tr. 1555:19–25 (Roberts, Oct. 12).  Under the 2011 map, Beaufort County was split between CDs 1 and 6, but was moved entirely into CD 1 under the Enacted Map.  *Compare* SDX No. 28a (2011 map), *with* PX No. 489 (Enacted Map).  In addition, CD 1 previously only had a piece of Berkeley County; that county is now entirely within CD 1 under the Enacted Plan.  *See id.*  Finally, unlike in the Enacted Plan, CD 1 included the City of Charleston, such that the district was contiguous, with connections to the rest of the district via the Ravenel and Ashley bridges.  *See id.*

135.    The demographic data submitted to the Court shows the following demographics by county for CD 1 in the Enacted Plan:[7]

**CD 1 Composition w/ CD 6 Splits – Enacted Plan**

| County | WVAP Countywide | WVAP of Portion of County in CD1 | WVAP Portion of County in CD 6 | BVAP Countywide | BVAP of Portion of County in CD1 | BVAP of Portion of County in CD6 |
|---|---|---|---|---|---|---|
| Beaufort | 71.9% | ALL | NONE | 14.7% | ALL | NONE |
| Berkeley | 62.8% | ALL | NONE | 23.5% | ALL | NONE |
| Charleston | 67.0% | 82.0% | 55.3% | 22.8% | 10.7% | 32.1% |
| Colleton | 59.2% | 64.6% | 58.8% | 35.1% | 32.3% | 35.3% |
| Dorchester | 64.1% | 68.4% | 48.9% | 24.8% | 20.7% | 39.7% |
| Jasper | 50.3% | 84.4% | 42.3% | 33.6% | 7.0% | 39.8% |

---

[7] The figures in this table can be found in the data entered in the case docket as a Court Exhibit on October 27, 2022.  ECF No. 473.  They have been calculated simply by summing the AP BVAP and NH WVAP in each district/county area.

136.    With the exception of Beaufort and Berkeley Counties, which are entirely within the Enacted CD 1, the demographics above show that the portions of Charleston, Dorchester, Colleton, and Jasper that are now part of CD 1 categorically have much lower BVAP percentages than white VAP percentages.  The portion of Jasper County that the Enacted Plan assigns to CD 1 for example, has a BVAP of 7% while its WVAP is 84.4%.  Similarly, the portion of Charleston County in CD 1, with a BVAP of 10.7%, stands in dramatic contrast to the portion's WVAP at 82%.

137.    Similarly, Beaufort County, with a BVAP of 14.7%, has one of the lowest BVAPs of any county in the state.  According to the demographic data submitted to the Court, only three counties in the state have lower BVAPs than Beaufort County.  *See* ECF No. 473.

138.    These demographics mark a shift from the 2011 plan, where precincts split between CDs 1 and 6 were much more balanced in their racial composition, as the table below shows:

**CD 1 Composition w/ CD 6 Splits – 2011 Plan**

| County | WVAP Countywide | WVAP of Portion of County in CD1 | WVAP Portion of County in CD 6 | BVAP Countywide | BVAP of Portion of County in CD1 | BVAP of Portion of County in CD6 |
|--------|-----------------|----------------------------------|--------------------------------|-----------------|----------------------------------|----------------------------------|
| Beaufort | 70.4% | 72.4% | 46.8% | 18.0% | 15.5% | 46.8% |
| Berkeley | 66.3% | 69.7% | 48.9% | 24.4% | 20.0% | 46.6% |
| Charleston | 65.1% | 75.9% | 39.1% | 28.1% | 18.7% | 50.6% |
| Colleton | 58.6% | 99.0% | 57.9% | 37.7% | 0.6% | 38.3% |
| Dorchester | 68.2% | 71.7% | 49.4% | 25.2% | 21.1% | 46.8% |

139.    Under the Enacted Plan, CD 1's overall BVAP improbably remained virtually unchanged from the 2011 map, even though, as detailed *infra* Section II(E)(i), the Plan moved over 190,000 residents between CD 1 and formerly majority-Black CD 6, and the BVAP in CD 6 dropped by several points.  PX No. 87 at 4, Table 1 (Dr. Duchin report showing BVAP increased slightly from 17.3% to 17.4% in CD 1); SDX No. 29C; SDX No. 75 (Trende Rep.) at

18, Table 4 (showing that 140,489 people were moved from CD 1 to CD 6, and 52,799 people were moved from CD 6 to CD 1).

140.    The Enacted Plan's drastic changes from South Carolina's 2011 map beyond merely equalizing population between CD 1 and CD 6 are immediately evident in the Charleston metropolitan area.  As Dr. Duchin testified, the boundaries of CD 1 are indicative of "the cracking of Black communities."  Tr. 317:7-11 (Duchin, Oct. 4).  The district line between CDs 1 and 6 "winds in and out of the city [of Charleston], and through neighborhoods with significant Black population."  Ex. 3 (Duchin Expert Rep.) at 17 fig.5.

141.    The district line winding through Charleston County picks up a disproportionate number of Black residents and assigns them to CD 6, even more so than the 2011 map.  As of the 2020 Census, approximately 75,000 Black adults reside in Charleston County.  Tr. 307:21-308:10 (Duchin, Oct. 4, 2022).  Over 79% of those Black adults are assigned to CD 6 under the Enacted Plan.  Tr. 307:21-308:10 (Duchin, Oct. 4).  That 79% is far higher than in 2011, when the BVAP in Charleston County was "roughly split 50/50 between CD 6 and CD 1."  Tr. 1052:9–1052:22 (Ragusa, Oct. 7) (explaining that 2011 map placed "49 percent of the Black Voting Age Population [from Charleston County] in CD 6 and 51 percent in CD 1").  Actual figures, taken from data entered as the Court's exhibit (ECF No. 473), are shown here:[8]

| District | Percentage of Charleston County BVAP in 2011 Plan | Percentage of Charleston County BVAP in Enacted Plan |
|---|---|---|
| 1 | 47.3% (36,814 voters) | 20.6% (15,410 voters) |
| 6 | 52.7% (41,064 voters) | 79.4% (59,222 voters) |

---

[8]Numbers calculated by summing the BVAP of the precincts in each District's area of Charleston County and dividing those by the total BVAP of the county.

142.    In total, 35,629 Black residents were moved to CD 6 from CD 1, representing 24.5% of the Black population of CD 1. *See* Tr. 1701:2–8 (Trende, Oct. 13); Tr. 1052:9–1052:22 (Ragusa, Oct. 7); PX No. 26 at 4-6.

143.    The shift in CD 6's approach to the Charleston peninsula from the northeastern approach under the 2011 map to the western approach in the Enacted Map, mentioned above, accounts for a significant portion of BVAP shift from CD 1 to CD 6. According to the demographic data submitted to the Court, the St. Andrews/West Ashley precincts moved from CD 1 to CD 6 contained 13,459 Black residents of voting age. *See* ECF No. 473.  These precincts represent 18% of Charleston County's total BVAP, and are approximately 60% of the Charleston County BVAP moved from CD 1 to CD 6.

144.    As Will Roberts, the Senate's cartographer, acknowledged during this Court's questioning, the shift of the CD 6 boundary line in the Enacted Plan "followed the migration of African Americans from the city of Charleston to North Charleston."  Tr. 1554:11–22 (Roberts, Oct. 12). And Black voters in North Charleston were carefully excised into CD 6.

**ii.    Defendants Ignored Traditional Redistricting Criteria in Drawing CD 1.**

***a.    CD 1 under the Enacted Plan splits counties and precincts unnecessarily.***

145.    During public hearings, the House and Senate Redistricting Committees heard extensive testimony from Charleston County residents that they wanted Charleston County made whole under the congressional map.  PX No. 548; PX No. 549; SDX No. 231; SDX No. 231A; *see*, *e.g.*, PX No. 67 at 35-37; Tr. 877:13–877:22 (Harpootlian, Oct. 7) (Sen. Harpootlian explaining that "everybody from the Charleston area was outraged," and that "[a]lmost everybody [the Senate Committee] heard from, wanted Charleston kept whole and talked about how this split the county on a racial basis . . . .").  To a lesser extent, Beaufort County residents

made a similar request.  Tr. 877:13–877:22 (Harpootlian, Oct. 7) (Sen. Harpootlian: "I don't remember any other community being as vociferous or vocal as Charleston.").  However, despite the residents of Charleston and Beaufort making "very similar arguments," about wanting to be whole and in CD 1, only Beaufort County's concerns were accommodated in the Enacted Map, while the concerns of Charleston residents were disregarded.  Tr. 759:15–20, 761:5–14 (Garvin, Oct. 6).  As noted *supra* II(B)(i), Beaufort County has a significantly lower BVAP than counties in CD 1 that were split (Charleston, Dorchester, Colleton, and Jasper).

146.     As Senator Bright Matthews, who is a Black lawmaker and Democrat, explained at trial, there is a clear racial divide between those whose preferences were honored during Congressional redistricting and those who were ignored.  Specifically, Defendants listened to the residents of predominantly white Sun City, which straddles Beaufort and Jasper Counties, but not the residents of Charleston and North Charleston.  Tr. 858:2–859:3 (Bright Matthews, Oct. 7).

147.     Sen. Bright Matthews testified that "Sun City is white, white, white," whereas in Charleston, "those voters that were pulled out of the first [district] and snaked into the sixth, those are blacks.  The whites in Sun City and in Jasper said that they wanted to be in CD 1, they got what they wanted.  But the Blacks down the street from here in North Charleston, right across the river, Ashley River, . . . they were cut off and put into the same district with the folks in Richland County.  I can't make that make any sense to me."  Tr. 858:2–859:3 (Bright Matthews, Oct. 7); *see also* ECF No. 462-5 (Terreni Dep.) at 336:22-337:2 ("Q. You mentioned Sun City earlier being responded to in terms of that white majority area being kept together in Jasper County?  A. Yes."); Tr. 761:15–22 (Garvin, Oct. 6) (explaining that Charleston and Richland Counties have far more Black residents compared to Beaufort County).

148.    The differing treatment of Beaufort County and Charleston County residents is even more unusual because their concerns were not mutually exclusive—both counties could have been made whole in CD 1 consistent if traditional redistricting criteria had been faithfully applied.  This was clear from Senate Amendment 2a (SDX No. 31A & 31E), as well as at least three other draft maps the Senate staff prepared that kept Beaufort and Charleston Counties whole in CD 1.  *See* SDX No. 43A, 45C, 46F.  As Mr. Oppermann and Senator Harpootlian testified, Senate Amendment 2a was drafted to keep both counties whole in CD 1.  Tr. 896:25–900:19 (Harpootlian, Oct. 7) ("Q. So, just so we're clear, what were you trying to achieve with Senate Amendment 2? Exactness, contiguity, not using race as a basis for reapportionment, not violating Section 2 . . . If you notice, all of Charleston is in District 1 . . . Beaufort is in District 1 . . .  So, you haven't split those counties up."); Tr. 966:5–966:9, 976:24–977:4, 981:10–983:17 (Oppermann, Oct. 7).

149.    In fact, Defendant Jordan testified at trial that he received a text from Patrick Dennis, general counsel for the House and Chief of Staff to the House Speaker, who explained that "it is easy enough" to put all of Beaufort and Charleston Counties in CD 1.  Tr. 1772:10–1773:11 (Jordan, Oct. 13); HDX No. 81.  However, Rep. Jordan, who proposed the House's Alternative Plan 1, discussed in detail *infra* Section III(C)(iii), after public feedback to avoid splitting Beaufort County, never attempted to address the concerns around splitting Charleston County.  Tr. 1804:21–1805:13 (Jordan, Oct. 13); *see also* PX No. 575 at 4–5 (Defendant Jordan explaining at *Ad Hoc* Committee hearing that House's alternative map was drawn "to address the concerns that we heard from the public such as in Beaufort").  Rather, as discussed *infra* Section III(D) below, Defendant Jordan lied when asked during a January 10, 2022 hearing when he responded to a question from by Rep. Bernstein about keeping Beaufort

and Charleston Counties in the same congressional district by saying it was a "math problem" and there are "too many people in that area of the state to make those numbers." *See* PX No. 578 at 6:21–7:7. Defendant Jordan's representation during debate is directly contrary to what Patrick Dennis had told him several weeks earlier. HDX No. 81.

150.    Similarly, Breeden John, for example, testified that it was possible to keep both counties (*i.e.*, Charleston and Beaufort) whole in CD 1 in a way that complied with redistricting guidelines. John Dep. Tr. 206:8-16.

151.    In describing his process in drafting Senate Amendment 2a, Mr. Oppermann stated, "if you're doing a District 1 where Charleston County is whole, it's a Lowcountry district, as in the 2011 plan, and that also respects the community of interest of the coast and also the Gullah Geechee corridor, if you're building a district like that and using counties as building blocks, then of necessity, you would have Charleston County and Beaufort County." Tr. 982:15- 982:21 (Oppermann, Oct. 7). In the end, Senate Amendment 2a, discussed in detail *supra* Section II(A), was voted down in the full Senate. Tr. 901:8–901:10 (Harpootlian, Oct. 7); PX No. 116 at 146:5-150:11.

152.    The Enacted Map also split Dorchester County along racialized lines, cutting through six Voting Tabulation Districts ("VTDs") in a "particularly striking" manner.[9] Tr. 310:6-15 (Duchin, Oct. 4). As Dr. Duchin explains, the split VTDs again demonstrate a "clear" "pattern": each VTD is "split into a part that's higher Black population and a part that's mostly white," and "the part of the precinct with the higher Black population is exactly the part that ends up in CD 6." Tr. 310:6-311:13 (Duchin, Oct. 4).

153.    In Dorchester, "split precincts have a significant BVAP differential

---

[9]VTDs reflect a "snapshot"of voting precincts as they existed at the time of the census. Tr. 278:14–25 (Duchin, Oct. 4).

between the piece in CD 1 and the piece in CD 6, with higher Black population share on the CD

6 side, consistent with a strategy of cracking in CD 1." PX No. 67 at 16. That differential can be

seen at the table below, populated with the demographic data entered as a Court exhibit at ECF

No. 473.[10]

**Dorchester Split Precincts BVAP/WVAP Differential**

| District | BVAP | WVAP |
|----------|------|------|
| 1 | 20.1% | 72.9% |
| 6 | 42.1% | 32.9% |

154.    Overall, Dr. Duchin concluded based on a detailed review of CD 1 that the

district's features are "consistent with the cracking of Black communities." Tr. 313:23-25

(Duchin, Oct. 4).

> **b.    CD 1 lacks land contiguity for no apparent purpose.**

155.    Under the Senate Guidelines,  a district may be connected by water only if

it "is designed to meet the other criteria stated herein." *See* SDX No. 3 at 1-2.

156.    That does not hold true in Charleston County, where it is impossible to

reach Sullivan's Island in the northeast of CD 1 from James Island to the southwest, without

going through the Charleston Peninsula and CD 6. *See* Tr. 1708:5–15 (Trende, Oct. 13). Here,

"District 1 is completely severed by land. There is no road route to get from one portion of the

district to the other." Tr. 971:17–972:12 (Oppermann, Oct. 7).

157.    But the lack of land contiguity in the Enacted Plan does not serve another

---

[10] Table shows added BVAP and WVAP in areas of precincts on CD 1 and CD 6 sides of split
VTDs in Dorchester.  Relevant precincts are Beech Hill 2, Cypress, Delemars, Givhans, Givhans
2, Lincoln, and Windsor.

guideline.  Tr. 971:17–972:20 (Oppermann, Oct. 7).  During his testimony before the Senate

Redistricting Subcommittee, Mr. Oppermann testified that "having District 1 on one side of the

Charleston Peninsula, and on the other side of the Charleston Peninsula, but not connecting

anyway, [] is just one of many examples of bizarre choices, that do not follow traditional

redistricting criteria."  PX No. 114 at 19:13-20:6.

   158. Other proposed maps that Defendants rejected or the Senate staff drafted

maintained land contiguity.  PX No. 721 at 4; SDX Nos. 31A, 43A, 44D, 45C, 46F, 68A, 70A.

    ***c.*** ***The Enacted Plan does not preserve communities of interest in
CD 1.***

   159. As discussed, *supra* Section II(A)(iv), Dr. Duchin's assessment of the

legislative record concerning communities of interest identified Berkeley and Charleston

Counties, and the "Low Country," which she understood to be a collection of four coastal

counties: Jasper, Charleston, Colleton, and Beaufort.  Tr. 236:17-25 (Duchin, Oct. 3 PM); PX

No. 67 at 16.

   160. Based on Dr. Duchin's extensive review of the public testimony and her

assessment of the Enacted Plan, she concluded that the CD 1 and CD 6 boundaries "disregarded"

the coastal and Lowcountry communities of interest.  PX No. 67 at 16.

   161. That disregard is starkest in Charleston, one of the most frequently cited

communities of interest.  *See* PX No. 67 at 15.  In her review of the public testimony, Dr. Duchin

found "quite a large quantity of public testimony" "specifically talking about neighborhoods in

both Charleston and North Charleston that had been split, appealing for those splits to be

healed."  Tr. 313:12-314:22 (Duchin, Oct. 4).

   162. Despite public appeals to heal the Charleston splits, "that's not what

happened in the move from the [2011] benchmark to the enacted map."  Tr. 313:12-314:22

(Duchin, Oct. 4). Instead, as shown in Figure 5 below from Dr. Duchin's report, the CD 1/CD 6 boundary "cuts through Charleston and North Charleston, and it does so especially" through an area of Charleston that is "heavily Black." Tr. 312:11-17 (Duchin, Oct. 4).



Figure 5: North Charleston is split between CD 1 and CD 6 as the district line winds between counties, in and out of the city, and through neighborhoods with significant Black population.

163. Mr. Roberts, the Senate's cartographer, also acknowledged that the Enacted Plan splits the cities of Charleston and North Charleston.[11] *See* Tr. 1365:20–1366:3 (Roberts, Oct. 12). That split clearly occurs along racial lines, as shown in the tables discussed above, showing that over 79% of the BVAP from Charleston County is in CD 6 while less than 21% is in CD 1. *See supra* Section II(B)(ii).

164. At trial, Ms. Lynn Teague of the SC LWV also testified that keeping Charleston intact as a community of interest was a "very consistent theme" throughout the public testimony during consideration of congressional maps, and that community members "were

---

[11]Mr. Roberts suggested that Dr. Duchin's map had inaccurate municipal boundaries for the cities of Charleston and North Charleston; but he acknowledged that Dr. Duchin's municipal lines were not erroneous and were instead approximations that used precincts to construct the municipal boundary. *See* Tr. 1365:4–24 (Roberts, Oct. 12); Tr. 1535:9–17 (Roberts, Oct. 12). Because Dr. Duchin's map used precincts as building blocks, to the extent that any precinct is at least partially within city limits, that precinct is shown on the map as being part of the city. Tr. 1535:9–17 (Roberts, Oct. 12).

59

disturbed about how fragmented they felt their community was . . . in the existing maps." Tr. (Teague, Oct. 6). Ms. Teague explained that the "greater Charleston area" is a historic community of interest that has been united "for centuries" around a common economic hub—the Port of Charleston. Tr. 690:20–691:12 (Teague, Oct. 6).

165. Ms. Teague credibly described the greater Charleston area (Mount Pleasant, Charleston Peninsula, West Ashley, James and Johns Island) as a "very much integrated community" going back to the early 1700s. Tr. 690:20–691:12 (Teague, Oct. 6). Ms. Teague also explained that economic growth over the last decade has further strengthened the shared interests of Charleston residents as a single community of interest. Tr. 692:19–693:10 (Teague, Oct. 6).

166. The trial testimony of Rep. Kambrell Garvin, who is a Black legislative member, and watched a majority of the 2021 public hearings on redistricting and spoke about the concerns of Charleston residents on the House floor, echoed Ms. Teague's testimony. According to Rep. Garvin, residents from Charleston County expressed concern and confusion about being split from CD 1 and assigned to CD 6, a district that stretches approximately 100 miles to Richland County and does not share the concerns of coastal communities. Tr. 757:12–758:21 (Garvin, Oct. 6).

167. Rep. Gilda Cobb-Hunter, a Black legislative member and serves Orangeburg County, echoed Rep. Garvin's concerns about having her district assigned to CD 1. She testified: "It just seemed to me totally unreasonable to expect people in North Charleston, voters in North Charleston, to have some degree of commonality with people in Richland County. That was a stretch, in my view. And it just seemed to me to suggest, well, you know, they're all black people so it won't really matter." Tr. 141:6-11 (Cobb-Hunter, Oct. 3).

168.    Rep. Garvin also noted that Beaufort County residents also expressed a preference to be in CD 1 based on economic similarities with the coastal region—concerns that also apply to Charleston. Tr. 761:5–14 (Garvin, Oct. 6). Few, if any, members of the public expressed a preference for splitting Charleston County. Tr. 758:22–759:14 (Garvin, Oct. 6).

169.    Ultimately, the Enacted Plan did not reflect the public input from racially diverse counties, including criticism that the Senate Staff plan received at the November 29, 2022 Redistricting Subcommittee hearing. Tr. 886:2–887:2 (Harpootlian, Oct. 7 AM).

> **d.    Expert analysis shows that race predominated over other traditional, race-neutral redistricting principles in the Enacted Plan's design of CD 1.**

170.    Using the common social science technique of multivariate logistic regression and focusing on VTD racial composition, Dr. Jordan Ragusa concluded that "Black voters were excluded from the redrawn [CD 1] in both a statistically and substantively significant fashion." Tr. 1045:18–1045:23 (Ragusa, Oct. 7); PX No. 19 at 4-5 (explaining that "substantive" significance refers to the effect size and that the effect of race was "large"). Dr. Ragusa developed three statistical models. The first focused on VTDs surrounding CD 1 in the 2011 plan that were moved into the district in the Enacted Plan to determine the likelihood that a given VTD was moved *into* the enacted CD 1. The second looked to VTDs *within* CD 1 in the 2011 plan to assess the likelihood that a VTD was moved *out* of the old (2011) CD 1. And the third combined both approaches by examining which VTDs were moved into and kept into CD 1 in the Enacted Plan. *See* PX No. 19 at 2-3; Tr. 1035–1038 (Ragusa, Oct. 7). Dr. Ragusa's methodology follows a well-accepted methodology developed by Dr. Stephen Ansolabehere, which has been accepted to demonstrate a racial gerrymander. *See*, *e.g.*, *Cooper v. Harris*, 137 S. Ct. 1455, 1477-78 (2017).

171.    Specifically, by focusing on the BVAP "variable," Dr. Ragusa sought to

determine whether a VTD's BVAP could predict whether it was more or less likely to be taken out, moved into, or moved into or kept in CD 1 in the Enacted Plan.  Tr. 1038-39 (Ragusa, Oct. 7).  His analysis concluded that "VTDs with 100 Black voters had only a 13% chance of being moved out of [CD 1], compared to 60% for VTDs with 1500 Black voters."  PX No. 19 at 5, 8.  Simultaneously, "VTDs with 100 Black voters had an 80% chance of being moved into or kept in [CD 1], which compares to just 11% for VTDs with 1500 Black voters."  *Id.* at 5, 8; *see also* Tr. 1038–45 (Ragusa, Oct. 7) (discussing methodology and CD 1 findings).

172.     The table below shows Dr. Ragusa's findings on the likelihood that a given VTD was either moved out, moved into, or moved into or kept in CD 1 in the Enacted Plan.  It reflects that model one did not show a statistically significant connection between a VTD's BVAP (shown on X axis as number of Black persons of voting age in the district), and the likelihood that it was moved into CD 1 in the Enacted Plan.  However, model two reflects a statistically significant finding that precincts with larger BVAP were more likely to be moved out of CD 1.  Tr. 1043:6–1043:12 (Ragusa, Oct. 7).  Model three also shows a statistically significant finding that VTDs with large Black voting age populations were less likely to be moved into CD 1t and kept in the district.  Tr. 1043:13–1043:18 (Ragusa, Oct. 7).

| Table 1: Analysis of CD #1 | | | |
|---|---|---|---|
| | Model 1 | Model 2 | Model 3 |
| Variables | VTDs Moved In | VTDs Moved Out | VTDs Moved In/Kept In |
| Biden Vote | 0.13 | 0.39*** | -0.11 |
| BVAP | -0.10 | 0.18*** | -0.28*** |
| Total VAP | -0.02 | -0.14*** | 0.12*** |
| Constant | -0.81* | -2.06*** | 0.56* |
| N | 133 | 369 | 502 |

*** p<0.01, ** p<0.05, * p<0.1

173.     As discussed in more detail below, Dr. Liu conducted a similar analysis and reached similar conclusions about the movement of VTDs into and out of CD 1.  *See* PX No.

48 at 14-17 & 19-20 & Tables 6, 8 & 9.

174.    Separately, Dr. Kosuke Imai performed simulation analyses that identified CD 1 BVAP in the Enacted Plan as a clear statistical outlier when compared to thousands of simulated plans.  PX No. 32.  He concluded that "race played a significant role in determining district boundaries between Districts 1 and 6 in the enacted plan beyond the purpose of complying with [] traditional redistricting criteria."  Tr. 1974:15–18 (Imai, Oct. 14).

175.    First, Dr. Imai created an algorithm that produced 10,000 different race-blind ways of drawing the boundary between CD 1 and CD 6.  This "race-neutral" simulation left all other five districts' boundaries "frozen" as they are in the Enacted Plan.  The 10,000 simulated ways of drawing the CD 1/CD 6 boundary followed the House and Senate guidelines, discussed *infra* Section III(C)(i), as best possible within the context of a mathematical simulation.  For example: by ensuring equipopulation (within a .1% deviation)[12]; district contiguity; no incumbent pairings; that the number of county and municipality splits does not, on average, exceed that of the Enacted Plan; and that districts were, on average, as compact as the Enacted Plan.  *See* PX No. 32, at 8-9; Tr. 1941–1956 (Imai, Oct. 14).

176.    Dr. Imai's first simulation allowed him to determine "whether and to what

[12]For the purpose of his simulations, Dr. Imai used a maximum deviation of .1%.  In his testimony, Dr. Imai explained that this is an appropriate measure for simulation analysis that use precinct-level building blocks, since only plans using and possibly splitting census blocks could ensure exact population equality.  Tr. 1946:14–20 (Imai, Oct. 14).  Dr. Imai testified that precinct-level population is accepted among clinical researchers as an appropriate metric in simulating congressional redistricting plans.  *Id.* at 1945:24–1947:23 (Imai, Oct. 14).  Defendants' expert, Mr. Sean Trende, offered testimony that concurred with Dr. Imai's explanation.  Tr. 1673:17–1674:2 ("Q. And, when you presented those simulations in the Maryland case and in the New York case, you wrote in your reports that simulation analysis is widespread in political science? A. Yeah. Q. And you wrote it's been accepted by multiple courts, right? A. Oh, yeah.  I don't have any problem with simulation analysis properly done in the abstract, not at all. Q. And when you ran the simulations in those cases, you used a broadly accepted packaging R called Redist, right? A. Yes."), 1692:3–6 (Trende, Oct. 13)."

extent the enacted plan's inclusion or exclusion of Black voters in Districts 1 and 6 played a role

in determining the boundary of these two districts beyond the purpose of adhering to the

traditional redistricting criteria, including those specified in the South Carolina Guidelines."  PX

No. 32, at 3.  He concluded that none of his 10,000 race-blind simulations had a "lower BVAP

proportion for District 1" than the Enacted Plan, and that the enacted CD 1 had about 5.8% lower

BVAP than his average simulation.  PX No. 32 ¶¶ 27-29, 12 fig. 1, 13 fig. 2.  In short, the

Enacted Plan places "a disproportionately large number of black voters who live in Charleston

County into District 6, and as a result lowers the BVAP in District 1."  Tr. 1931:6–15 (Imai, Oct.

14).

177.    Dr. Imai's second simulation specifically focused on the boundary that

splits Charleston County between CD 1 and CD 6.  It generated another 10,000 "race-blind"

plans where the only difference in the entire map is the way of splitting Charleston County.  PX

No. 32 ¶ 30.  This analysis confirmed his previous finding by showing that under the Enacted

Plan, Charleston County has approximately 15,400 Black voters, whereas in his 10,000 race-

blind simulations approximately 24,900 Black voters live there.  *Id.* ¶ 32.  Only .2% of 10,000

race-blind simulations have fewer Black voters from Charleston County in CD 1, which makes

the Enacted Plan a statistical outlier.  *Id.*

178.    Lastly, Dr. Imai conducted a "statewide simulation" that generated 10,000

plans drawing all seven South Carolina Congressional districts.  In order to address the

possibility that the General Assembly drew CD 6 with a specific BVAP in mind to ensure that

the district performed for Black voters, consistent with the Voting Rights Act, Dr. Imai made

sure that all simulated plans kept CD 6 BVAP between 45–50%, in order to approximate the

Enacted Plan's CD 6 BVAP of about 47%.  *See* PX No. 32 at 9, 9 n.4 ("This range was chosen

so that it generally matches with the corresponding BVAP proportion under the enacted plan, which is 46.9%"). In addition to this "constraint," CD 6 retained all other operationalized criteria as described above. *See also* PX No. 32 at 9–10. The remaining six Congressional districts also shared these operationalized constraints but did not have an assigned BVAP proportion or range. *Id.*

179. Dr. Imai's statewide simulation analysis "enforced" and "bolstered" the conclusions he drew from his "localized" analyses of the CD 1 and CD 6 boundary. Tr. 38:25-39-3. For example, none of Dr. Imai's 10,000 simulated plans that kept CD 6 BVAP proportion between 45-50%, had a lower BVAP proportion for CD 1 than the Enacted Plan. That allowed Dr. Imai to conclude that the Enacted Plan remained a statistical outlier in the way it assigned disproportionately few Black voters to CD 1. PX No. 32 at 15-16.

180. Dr. Imai's statewide simulation also confirmed that the way the Enacted Plan splits Charleston County is in part responsible for CD 1's disproportionately low BVAP. *See* PX No. 32 at 16-17. Under 10,000 simulated plans in the statewide analysis, the City of North Charleston, where many Black voters live, was much more likely to be part of District 1 than District 6. *Id.* at 16.

181. Dr. Imai credibly testified that the likelihood that the distribution of Black voters between Districts 1 and 6 in Charleston County in the Enacted Plan was coincidental, as Sen. Campsen testified (*see* Tr. 1908:2–12, (Campsen, Oct. 13)), was "highly unlikely." Tr. 1967:9–17 (Imai, Oct. 14).

182. In fact, the likelihood of this distribution being the result of a coincidence is an "extremely astronomically small number." Tr. 1967:9–17 (Imai, Oct. 14).

183. Dr, Duchin's ensemble analysis similarly concludes that the distribution of

Black voters outside CD 6 kept BVAPs in other districts of the state artificially suppressed.  PX

No. 67 at 23-24 & Fig. 11.

### iii.    Race, Not Politics, Explains Movement of Voters Into and Out of CD 1.

184.    Plaintiffs' experts Dr. Baodong Liu, Dr. Jordan Ragusa, and Dr. Moon

Duchin credibly addressed and rebutted Defendants' *post hoc* partisanship defense (a defense

discussed more in depth *infra* Section III(E)).  Their analyses show that race, better than politics,

explains the legislative choices that resulted in the movement of voters into and out of CD 1.

185.    Dr. Liu conducted two analyses to determine how voters' party affiliation

and race identity affected their district assignments under the Enacted Plan.  Ultimately, Dr. Liu

concluded that the Enacted Plan's movement of Black Democrats differed from that of white

Democrats, and that, overall, Black voters were much less likely to be assigned to CD 1 as

compared to white voters, regardless of party affiliation.  PX No. 48 at 15-17 & tbl.6, 19-20 &

tbl.9.

186.    *First*, Dr. Liu used an empirical test to assess whether the Enacted Plan

moved Black and white voters differently even if they were of the same party.  PX No. 48 at 14-

16.  To assess the new CD 1 under S. 865, Dr. Liu used three categories to differentiate voters:

those whose VTD remained in CD 1 (the "Core" category), those whose VTD was moved into

CD 1 ("Into"), and those whose VTD was moved out of CD 1 ("Out") under the Enacted Plan.

PX No. 48 at 15; Tr. 568:12-569:5 (Liu, Oct. 6).  If race were not a driving factor in S. 865, then

one would expect that Black and white Democrats would be randomly distributed across the

three movement categories, without any statistical association between their race and their

assigned category.  PX No. 48 at 15, 17 ("[I]f party rather than race was the driving explanation .

. . , equal shares of white and Black voters with the same party affiliation would be impacted

across each category.").

187.    To identify the voters' party and race, Dr. Liu relied upon the racial turnout data from the 2018 Governor's Democratic and Republican primaries, which is provided by the South Carolina Election Commission.  PX No. 48 at 15-16.  The data from these partisan primaries are the most reliable data because in South Carolina (which does not have partisan voter registration data) voters may decide which party to vote for in a partisan primary.  PX No. 48 at 16.  The 2020 presidential general election data, for example, which the General Assembly relied on in developing congressional maps, *see*, *e.g.*, Tr. 1384:16–25 (Roberts, Oct. 12), would have been much less reliable and accurate for the purposes of this empirical analysis.  First, turnout for the 2020 presidential general election is much higher than a non-presidential election, and congressional elections occur in non-presidential election years as well. Tr. 567:20-568:3 (Liu, Oct. 6).  Second, in a presidential election, a voter may decide to vote for the candidate rather than with his or her affiliated party.  Tr. 568:4-11 (Liu, Oct. 6).  Third, Dr. Liu explained using the data available in South Carolina for the 2020 presidential election would make it difficult for him to differentiate race and party effectively as compared to a primary election where inferences can be drawn about party preferences.  Tr. 567:4-25 (Liu, Oct. 6).

188.    Through his empirical test, Dr. Liu concluded that Black Democrats were "much more likely to be moved" under the Enacted Plan than white Democrats.  PX No. 48 at 16-17.  As Dr. Liu testified at trial as to CD 1, Black voters were "disproportionately the target of movement" under the Enacted Plan, regardless of party affiliation.  Tr. 570:11-572:3 (Liu, Oct. 6).  That movement of Black voters reflects "the cracking of Black voters in the Northern Charleston area and moving them into CD 6" from CD 1.  PX No. 48 at 17.

189.    *Second*, Dr. Liu also conducted a verification study, using a "county

envelope" method originated by Dr. Stephen Ansolabehere and credited by the court in *Harris v. McCrory*, 159 F. Supp. 3d 600 (M.D.N.C. 2016), *aff'd sub nom. Cooper v. Harris*, 137 S. Ct. 1455, (2017). PX No. 48 at 19. This approach starts with a base area, or "envelope," of counties selected by whether any portion of them is included inside the relevant district, which for CD 1 includes Beaufort, Berkeley, Charleston, Colleton, Dorchester, and Jasper counties. PX No. 48 at 19. The goal of this approach is to analyze Defendants' decisions to assign voters from this envelope into a particular district. Tr. 574:4-6 (Liu, Oct. 6). If race is not a factor, then "regardless of whether it's a White voter or a Black voter, . . . [they should be] put in the same district [at] the same rate. But if race is a factor, we should see different rates" for Black and white voters. Tr. 574:10-14 (Liu, Oct. 6). This method can also determine whether, even when racially polarized voting exists, as shown it does in South Carolina, race or party is the driving force behind differing rates of voter assignment into the district; so Dr. Liu introduced data from the 2018 South Carolina primary gubernatorial race to "compare whether it's race or it's party that played a greater role." Tr. 574:15-19 (Liu, Oct. 6).

190. As to race alone, this method showed that white voters were far more likely to be assigned to CD 1 than Black voters, with 74.43% of white voters in the envelope assigned as opposed to 52.69% of Black voters assigned. PX No. 48 at 19, Table 8; Tr. 575:20-25 (Liu, Oct. 6). When introducing party data, the envelope analysis looked at the likelihood of four categories of voters from the envelope being assigned to CD 1: white Democrats, Black Democrats, white Republicans and Black Republicans. Tr. 576:8-11 (Liu, Oct. 6). Dr. Liu's analysis showed that race, rather than party, was more determinative of the movement of voters into CD 1, with white Democrats having "an almost 69 percent of probability of being put in the district from the envelope," but Black Democrats having "only [a] 50.65 percent of probability of

being put into the district." Tr. 576:13-17 (Liu, Oct. 6); PX No. 48 at 20, Table 9.

**Table 9: Enacted CD 1 and Assignments of Voters—race v. party**

| Party Primary | Number of Voters in Envelop | Number of Voters in District | (% of Group That is in District) |
|---|---|---|---|
| White_DEM | 24,083 | 16,614 | 68.99 |
| Black_DEM | 25,397 | 12,864 | 50.65 |
| White_REP | 85,108 | 68,716 | 80.74 |
| Black_REP | 2,053 | 1,697 | 82.67 |

191.     As Dr. Liu testified at trial, "being [from] the same party, and, yet, [the voters] are treated differently, obviously race is the driving factor, not party."  *See* Tr. 573:3-5 (Liu, Oct. 6).

192.     Dr. Ragusa, who studied the racial demographics of the precincts moved between the (2011) old and (2022) new map, found that the mapdrawers' movement of Black voters was both statistically significant and substantively significant in CD 1, with Black voters being excluded from this district.  PX No. 19 at 5, 8; Tr. 1045:18–1045:23 (Ragusa, Oct. 7). Thus, Dr. Ragusa concluded that "race was an important factor in the design of the 1st district." PX No. 19 at 5.

193.     In reaching his conclusions, Dr. Ragusa utilized a multivariate logistic regression analysis that controlled for and could thus disentangle the effects of additional potential factors like partisanship.  PX No. 19 at 3–4.  In other words, Dr. Ragusa's findings of "any significant effect of race cannot be explained away as a proxy effect of partisanship."  *Id.* at 4.  In CD 1, even when controlling for partisanship, race was a significant factor in two models of Dr. Ragusa's analysis, showing that Black voters were "significantly more likely to be moved out of the redrawn district," and "significantly less likely to be moved into and kept in the district."  *Id.* at 5; Tr. 1043:6–1043:18 (Ragusa, Oct. 7).  These results were both statistically significant at a 99% level of confidence.  PX No. 19 at 8; Tr. 1043:6–1043:18 (Ragusa, Oct. 7).

| Table 1: Analysis of CD #1 | | | |
|---|---|---|---|
| | Model 1 | Model 2 | Model 3 |
| Variables | VTDs Moved In | VTDs Moved Out | VTDs Moved In/Kept In |
| Biden Vote | 0.13 | 0.39*** | -0.11 |
| BVAP | -0.10 | 0.18*** | -0.28*** |
| Total VAP | -0.02 | -0.14*** | 0.12*** |
| Constant | -0.81* | -2.06*** | 0.56* |
| N | 133 | 369 | 502 |

*** p<0.01, ** p<0.05, * p<0.1



Figure 1: CD #1

194.    Additionally, Dr. Ragusa examined the analysis of Defendants' lone expert, Sean Trende, regarding the racial composition of CD 1. PX No. 26 at 4–9. While Mr. Trende compared the BVAP of the residents removed from CD 1 during the most recent redistricting (using his BVAP measure of 23.4%) to the BVAP of Charleston and Dorchester counties as a whole (22.5%) and argued based on these statistics that "the net effect of these moves on the racial composition of these districts is minimal," *id.* at 4, Dr. Ragusa noted that Mr. Trende's analysis was misleading since his comparison used the wrong denominator, and an apples-to-apples comparison would have focused on the portions of Charleston and Dorchester Counties that were actually within CD 1; by recalculating accordingly, there would be a 6.6%

gap between the BVAP of the residents removed from CD 1 (24.3%) and the BVAP of the

portions of Charleston and Dorchester Counties previously within CD 1 (17.7%).  *Id.* at 4-5; Tr.

1050:20–1052:5 (Ragusa, Oct. 7).

       195.    In response to Mr. Trende's analysis, Dr. Ragusa also examined the racial

and partisan characteristics of the precincts removed from CD 1 during this round of

redistricting.  PX No. 26 at 7–8.  Dr. Ragusa illustrated this racial and partisan data on a

scatterplot, showing that precincts with higher BVAP were more likely to be drawn out of CD 1

(62%) as compared to precincts with higher numbers of Democratic voters (41%).  *Id.*; Tr.

1053:25–1056:17 (Ragusa, Oct. 7).  In other words, "race had the larger effect than

partisanship."  Tr. 1055:9–1055:21 (Ragusa, Oct. 7).



      196.    Furthermore, Dr. Duchin, who conducted a separate analysis of race

versus partisanship, concluded that the electoral disadvantage imposed by the Enacted Map

disproportionately penalizes Black voters.  *See* PX No. 67 at 27.  Specifically, Dr. Duchin

assessed the Enacted Plan's "effectiveness" for Black voters across four recent statewide

elections including a Black-identified candidate whom Black voters considered their candidate of

choice.  PX No. 67 at 25.  By comparing the effectiveness of the Enacted Plan and other plans in

the legislative record against an ensemble of 100,000 generated "race-blind" plans, Dr. Duchin

concluded that the Enacted Plan suppresses electoral opportunity to a greater extent when a

Black Democrat is on the ballot, i.e., she found that such elections where racially polarized voting is the most pronounced.  Tr. 360:22–362:18; 363:15–23; 365:25–366:7 (Duchin, Oct. 4 AM).

> iv.    **The Legislative Record Shows That, Even Prior To Passage of S. 865, Legislative Defendants Were Aware That the Enacted Map Irrationally Cracked Black Communities in Charleston County.**

197.    Trial testimony from fact witnesses corroborates the demographic and statistical analyses performed by Plaintiffs' experts.  Before the General Assembly enacted S. 865, numerous Black lawmakers and members of the public informed Defendants about the consequences of splitting Black communities in the way that the Enacted Plan does.

198.    Ms. Teague, who was involved the submission of the SC League of Women Voters' proposed congressional plan that respected coastal communities of interest, explained that the redistribution of Charleston voters between CD 1 and CD 6 failed to adhere to traditional redistricting principles, Tr. 693:20–23 (Teague, Oct. 6), and that the lines can only be understood as a racially conscious attempt to assign the historically Black areas of Charleston County to CD 6, Tr. 693:24–694:3 (Teague, Oct. 6).

199.    Indeed, CD 6 in the Enacted Map cuts deep into coastal Charleston County—all the way to the tip of the Charleston peninsula and the Atlantic Ocean—to excise Black voters from the coastal district of CD 1 and assign them to the Midlands district of CD 6, which is anchored in Columbia, culturally different, and driven by a "very different" economic engine. Tr. 693:11–19 (Teague, Oct. 6).  Ms. Teague testified that in doing so, the Legislature cleaved the Charleston Port Authority—the economic anchor of Charleston County and beyond—into different Congressional districts. Tr. 691:23–692:14 (Teague, Oct. 6).

200.    During the January 19, 2022 Senate Redistricting Subcommittee hearing,

discussed in more detail *infra* Section III(C)(iii), Sen. Bright Matthews, who represents South

Carolina coastal communities, spoke of concerns about the way the then-proposed Enacted Plan

treated Charleston.  Sen. Bright Matthews warned that "[a]ccording to the numbers, it appears

that this is a typical gerrymandered" CD 6 where the plan had gone "into Charleston and pulled

out areas of West Ashley and other areas in North Charleston just to put blacks into

Congressional District 6.  And it creates . . . [what] looks like a funky boot print that goes into

Congressional District 1."  PX No. 115 at 24:24–25:7; *see also* Tr. 815:14–816:2 (Bright

Matthews, Oct. 7).

      201.    At trial, Sen. Bright Matthews echoed her prior concerns and spoke of

how constituents' requests to keep Charleston County in CD 1 went unanswered: "They broke up

Charleston.  They . . . took Charleston and basically went into the black community and snatched

them out of North Charleston. . . . even though we heard person after person come up and say

coastline is important, we have different issues than the middle part of the state and the upper

part of the state."  Tr. 790:13–24 (Bright Matthews, Oct. 6).

      202.    Similarly, speaking to the way in which CD 6 reaches from the Midlands

to the coast, Representative John King, a Black lawmaker, testified: "[w]hen you're dealing with

coastal versus the midlands or my area, our issues are totally different as a community...."  Tr.

643:24–644:1 (King, Oct. 6).  Representative King from York County, who vice-chairs the

House Judiciary Committee, underscored that while Black South Carolinians may have some

"similar interests" as a community, it would be wrong to assume that "the community of black

people" in different regions of the state is a single community of interest.  Tr. 643:17–644:1

(King, Oct. 6).

      203.    Sen. Bright Matthews also testified that the Enacted Map split the areas of

Ravenel, Hollywood, and Meggett, which are "heavily minority areas" and "Geechee Gullah [sic] communities" that "have the same community of interest." Tr. 792:14–793:11 (Bright Matthews, Oct. 6). She testified of her view that map drawers "went in and grabbed the black voters out of those areas" and "grabbed them out of Charleston when there's no reason. . . . they work here, they play here, they fish here, they hunt here." Tr. 793:12–18 (Bright Matthews, Oct. 6).

204.    Sen. Bright Matthews further testified regarding concerns about the disparate treatment of the heavily-white populated Jasper and Beaufort County areas in the Enacted Map, discussed *supra* Section II(A)(ii), including the decision to keep all of northern Beaufort together in CD 1 but omit the "predominantly black area" of Levy. Tr. 795:18–796:3 (Bright Matthews, Oct. 6).

205.    Mr. Anjene Davis, a Black registered voter in Charleston County and active community member, testified that the CD 1 and CD 6 boundary "is one of the most blatant ways in which race was used, because it took a portion of the black community away from District 1 which it sat previously and put it in District 6, thus further diluting the remaining Black voting power in District 1." Tr. 93:23–94:2 (Davis, Oct. 3). According to Mr. Davis, "many of those communities left in District 1 are also indigenous native Black communities" who are left without meaningful congressional representation. Tr. 94:2–4 (Davis, Oct. 3). The Enacted Map "continues that pattern of lumping all the black voters -- or a concentration of black voters into one particular congressional district." Tr. 94:15–17 (Davis, Oct. 3).

206.    Mr. Davis previously testified before the Senate Redistricting Subcommittee and asked that the Subcommittee "consider providing maps that would give equity to Black voters in marginalized communities," especially for the Gullah Geechee

community which is an indigenous Black community.  Tr. 89:15–90:20 (Davis, Oct. 3); *see also id.* 102:14–18.

207.    At trial, Mr. Davis credibly testified that the Enacted Map ultimately did not reflect the concerns that he and other members of the public had voiced prior to its adoption regarding the splitting of Black communities.  Tr. 91:5–8 (Davis, Oct. 3).  When looking at the map, one "can almost draw a direct line between the boundaries of the maps of Districts 1 and 6 and see them basically bisect—and sometimes trisect—black communities.  And it dilutes the already marginal voting capacity of those communities."  *Id.* 91:10–15; *see also id.* at 99:10–17 (testifying that "District 6 is packed with African-American voters.  In District 1, basically, the new map removed a significant percentage of African-American voters and placed them in District 6, leaving the remaining voters in District 1 and reducing the number of available voters in that district.").  The Black communities that were bisected between CD 1 and CD 6 are along Highway 17 and include "the western part of Charleston County, you're looking at Hollywood-Ravenel area, Edisto Beach, John's Island, Wadmalaw Island, parts of West Ashley, the Ponderosa communities . . . [and] McClellanville."  *Id.* 95:15–96:7.

## C.    Race Predominated Over Traditional Redistricting Principles In Enacting Congressional District 2.

### i.    Data and District Composition

208.    In the Enacted Map, CD 2 consists of "pieces of Orangeburg and Richland Counties," along with "the entirety of Aiken, Barnwell, and Lexington Counties."  PX No. 67 at 18.  The table below shows the demographics in these counties with data from the Court's recently-submitted exhibit.[13]

---

[13]Numbers are all in the "total"rows for each district/county.  They are calculated by summing up the AP BVAP and NH WVAP for all the VTDs in each district/county area.

**CD 2 Composition w/ CD 6 Splits – Enacted Plan**

| County | WVAP Countywide | WVAP of Portion of County in CD2 | WVAP Portion of County in CD 6 | BVAP Countywide | BVAP of Portion of County in CD2 | BVAP of Portion of County in CD6 |
|---|---|---|---|---|---|---|
| Aiken | 67.0% | ALL | -- | 23.6% | ALL | -- |
| Barnwell | 52.7% | ALL | -- | 42.6% | ALL | -- |
| Lexington | 74.1% | ALL | -- | 14.8% | ALL | -- |
| Orangeburg | 34.9% | 49.3% | 29.3% | 60.6% | 45.0% | 66.7% |
| Richland | 44.3% | 51.2% | 36.9% | 45.9% | 37.1% | 55.4% |

209.    For comparison, the table below shows the relevant demographics in CD 2 counties in the 2011 Plan.[14]

**CD 2 Composition w/ CD 6 Splits – 2011 Plan**

| County | WVAP Countywide | WVAP Portion of County in CD 2 | WVAP Portion of County in CD 6 | BVAP Countywide | BVAP of Portion of County in CD 2 | BVAP of Portion of County in CD 6 |
|---|---|---|---|---|---|---|
| Aiken | 70.6% | ALL | -- | 23.5% | ALL | -- |
| Barnwell | 54.6% | ALL | -- | 42.4% | ALL | -- |
| Lexington | 79.5% | ALL | -- | 13.5% | ALL | -- |
| Orangeburg | 35.8% | 56.6% | 30.0% | 61.1% | 40.5% | 66.8% |
| Richland | 48.5% | 63.1% | 34.2% | 44.3% | 28.0% | 60.3% |

210.    These figures show that the split counties in CD 2 are more racially diverse than the rest of the district.  For example, Orangeburg is a small, majority-Black county, that is "home to two historically [B]lack colleges, Claflin University [and] South Carolina State University."  Trial Tr. 116:5–9 (Cobb-Hunter Oct. 3).  It has a "unique history in th[e] state, and … in the civil rights tradition."  *Id.* at 116:10–11.  Richland is "nearly 50% African American," while CD 2 as a whole has a BVAP of 25.4%.  Tr, 315:18–20, 373:10–13 (Duchin, Oct. 4); Tr. 754:22-24 (Garvin, Oct. 6); PX No. 67 at 9, tbl. 1.

211.    Conversely, Lexington County which is kept whole in CD 2, has a BVAP

---

[14] As *supra*, numbers are all in the "total" rows for each district/county. They are calculated by summing up the AP BVAP and NH WVAP for all the VTDs in each district/country.area.

of 14.8%, one of the lowest BVAPs of any county in the state.  According to the demographic

data submitted to the Court, only four counties in the state have lower BVAPs than Lexington

County.  *See* CX No. 1.

212.    As highlighted in the figure below at "(A)," the city of Orangeburg is

"neatly separated from its suburbs" Tr. 315:20–25 (Duchin, Oct. 4), keeping the city in CD 6

while the suburbs become part of CD 2.  PX No. 67 at 18.  Dr. Duchin underscored that this

contrasts with the public comment available in the Senate website, which "indicates . . . that

Orangeburg has more in common with the adjoining areas of CD 2."  *Id.*



Figure 6: CD 2 is highlighted, with the Black voting age population as in Figure 1 and split cities outlined in red.

### ii.      Defendants Ignored Traditional Redistricting Criteria in Drawing CD 2.

#### a.      *CD 2 under the Enacted Plan splits counties, municipalities, precincts, and communities of interest unnecessarily.*

213.    Under the Enacted Map, the boundary between CD 2 and CD 6

unnecessarily splits Richland County (and the city of Columbia within) and Orangeburg County.

*See* Tr. 314:6–315:25 (Duchin, Oct. 4).

214.     The plans proposed by the SC League of Women Voters, for instance, draws both Richland and Orangeburg to be whole.  *See* SDX Nos. 68f, 70c; Tr. 694:8–20 (Teague, Oct. 6).  Similarly, Senate Amendment 2a kept Orangeburg whole and nearly the entirety of Richland County whole as well; under this amendment, the sliver of Richland assigned to CD 2 does not divide Black communities and implicates a minimal number of Black voters.  *See* Tr. 985:23–987:15 (Oppermann, Oct. 7); SDX No. 31a; PX No. 32 at 18, fig.7.  The House Staff plan similarly kept Orangeburg County whole and split much less of Richland County.  SDX No. 33c.

215.     Those unnecessary and unjustified county splits under the Enacted Plan were enacted over the consistent objections of affected community members.  Ms. Lynn Teague, who listened to public input regarding congressional redistricting, testified that reuniting Richland County was also a "very consistent theme" from community members prior to the Enacted Map's adoption. Tr. 678:21–679:4 (Teague, Oct. 6).  And Rep. Garvin, who serves Richland County, similarly testified that Richland residents wanted the county to be whole and did not see any reason to be paired with parts of Charleston.  Tr. 757:12–758:21 (Garvin, Oct. 6).

216.     Representative Cobb-Hunter, a Black Democrat who represents Orangeburg County, testified that her "preference, if there's an option to have all of Orangeburg County whole and not split [in the Congressional map], would be to have it whole, as opposed to split."  Trial Tr. 192: 7–9 (Cobb-Hunter Oct. 3)

217.     Dr. Duchin also documented similar sentiments among Orangeburg County residents based on her review of the public testimony the General Assembly collected. PX No. 67 at 18, 37.

218.    As Dr. Duchin testified, the splits of Richland and Orangeburg counties should have been clear candidates for being made whole under the Enacted Map.  The hook splitting Richland County is "a clear example of non-compactness" that could have been cured under the Enacted Plan, particularly given public opposition to the hook and the hook's inconsistency with municipal lines.  Tr. 314:19–315:5; 316:4–11 (Duchin, Oct. 4).  The split of Orangeburg County, a small, majority-Black county, also could have been (but was not) healed under the Enacted Map.  Tr. 315:18–20 (Duchin, Oct. 4).

219.    Unlike with Beaufort or Lexington County, predominantly white areas of South Carolina, the public concerns expressed by the residents of Richland County and Orangeburg County, two of the most heavily Black-populated counties in the state, were disregarded during the redistricting process, just as the views of Charleston County residents were ignored, detailed *supra* Section II(A)(ii), (iv).

220.    Although Senator Massey testified that "there's a big difference between splitting a smaller county versus a larger county" like "Richland or Charleston," Defendants' supposed prioritization of smaller counties—which appears nowhere in the redistricting guidelines—did not extend to small counties with large Black populations, such as Orangeburg or Sumter (as discussed *supra* Section II(A)(ii)).  Tr. 1607:10–13 (Massey, Oct. 12).  Tellingly, Senator Massey "agree[d]" with Mr. Terreni's guidance, shared by Mr. Fiffick early on January 20, that "county lines are more important in some places than others."  Tr. 1601:12–17 (Massey, Oct. 12); PX No. 722 at 2.

221.    And like the concerns of Charleston County, the preferences of Richland and Orangeburg residents could have been entirely or largely accommodated without splitting Beaufort County, but Defendants consistently rejected those options.  *See*, *e.g.*, SDX No. 30a

(Senate Amendment 2); SDX No. 31a (Senate Amendment 2a map); SDX No. 68a (SC League of Women Voters map).

222.    The splits of Richland and Orangeburg counties are therefore part of a pattern of "selective healing," in which counties with higher Black populations are split, while counties with higher white populations, such as Beaufort, Berkeley, and Lexington, are reunified or kept whole under the Enacted Plan.  Tr. 314:19–315:25 (Duchin, Oct. 4).  As stated in Dr. Duchin's rebuttal report, Defendants characterize favorably the restoration of white counties as "repairing," while they defend splits of Black communities as "core retention," discussed in more detail *infra* Section III(E).  PX No. 87 at 2.  In other words, "the 'repairing' and 'smoothing out' of boundaries was carried out in a highly selective manner by the state" of South Carolina.  PX No. 87 at 2.

### b.    CD 2's Cracking of Richland County and the City of Columbia.

223.    CD 2 features a "distinctive hook feature" which reaches into and carves out a piece of Richland County and Columbia, one of the primary communities of interest identified through Dr. Duchin's exhaustive review of public testimony and input.  Tr. 314:13-19 (Duchin, Oct. 4); PX No. 67 at 15.  At trial, witnesses described the hook as resembling a head of dragon or a hand of the Incredible Hulk.  Tr. 969:7–969:15 (Oppermann, Oct. 7); Tr. 763:4–19 (Garvin, Oct. 6).  The hook is "a clear example of non-compactness," as it is "neither functionally compact nor is it geometrically compact."  Tr. 314:21-315:3 (Duchin, Oct. 4).

224.    As Figure 7 from Dr. Duchin's report shows, the hook "wrap[s]around and divide[s] the city of Columbia" and its neighborhoods, splitting "both the city and the county in a manner that cracks Black population."  PX No. 67 at 19 & fig.7.  Critically, there are "high Black concentrations right around the area of the hook."  Tr. 315:5-7 (Duchin, Oct. 4); *see also*

PX No. 67 at 18 (Dr. Duchin explaining that the hook "appears to crack voters by drawing district boundaries through an area in northern Richland with high BVAP.").



Figure 7: District lines wrap around and divide the city of Columbia. This splits both the city and the county in a manner that cracks Black population.

225.    Given the cracking and non-compact nature of the CD 2 hook, the splits of Columbia and Richland County would have been natural "candidate[s] for healing" under the Enacted Map.  Tr. 314:21-315:7 (Duchin, Oct. 4).  Instead, the Enacted Map maintains the hook in a way that is not "cognizant of either the City [of Columbia] or of the public testimony."  Tr. 316:4-11 (Duchin, Oct. 4).  For instance, public testimony indicated that downtown Columbia and its surrounding areas should be treated as a whole, because "[t]hat's where a lot of people live and . . . work."  Tr. 316:19-317:6 (Duchin, Oct. 4).  "If the district line traced along the Richland County boundary, or at least divided the county in a less winding manner, it would avoid needless splitting and confusion."  PX No. 67 at 19.

226.    In addition, the way that the CD 2 hook splits Columbia (and smaller cities in the area) is atypical in that it does not "happen[] along major roads or along features of natural geography."  Tr. 316:12-18 (Duchin, Oct. 4).

227.    Mr. Roberts, the Senate's cartographer, also acknowledged that the

Enacted Plan splits the city of Columbia.[15] *See* Tr. 1363:18–20 (Roberts, Oct. 12).  That split

clearly occurs along racial lines, as shown in the tables discussed above.  It can also be easily

seen in the image below, which shades VTDs with higher BVAP darker than others:



228.    Fact witnesses further corroborate Dr. Duchin's demographic assessment

that the CD 2 hook cuts through Columbia and Richland in areas with high and growing BVAP.

229.    Rep. Kambrell Garvin, who resides in and represents Richland County,

testified that the hook reaches into Richland County and grabs neighborhoods where the

---

[15]Similar to his suggestion regarding North Charleston and Charleston, *see supra* n. 11., Mr. Roberts suggested that Dr. Duchin's map had inaccurate municipal boundaries for the city of Columbia; but he acknowledged that Dr. Duchin's municipal lines were not erroneous and were instead approximations that used precincts to construct the municipal boundary.  *See* Tr. 1362:15–24 (Roberts, Oct. 12); Tr. 1535:9–17 (Roberts, Oct. 12).  Because Dr. Duchin's map used precincts as building blocks, to the extent that any precinct is at least partially within city limits, that precinct is shown on the map as being part of the city.  Tr. 1535:9–17 (Roberts, Oct. 12 PM).

"African American population . . . has really exploded" since the last redistricting cycle. Tr. 765:23-766:10 (Garvin, Oct. 6). Moreover, those parts of Richland County, particularly Blythewood and the "northeast Columbia corridor," had recent success in electing Black candidates in local races, including a majority Black school board for the first time. Tr. 765:23-766:10 (Garvin, Oct. 6).

230. Mr. James Felder, who resides in downtown Columbia, testified that Black voters captured by the CD 2 hook are being separated from other parts of Richland and Columbia that are "predominantly Black." Tr. 1341:15–1343:4 (Felder, Oct. 12). Specifically, he testified that areas such as Eau Claire, Greenville, Dentsville, Keenan, and Edgewood, are heavily Black neighborhoods that are placed in CD 6. Tr. 1342:18–1343:4 (Felder, Oct. 12). That division of Black neighborhoods between CD 2 and CD 6 therefore prevents Black voters in Richland County from having a collective voice in congressional elections. *Id*.

231. In short, the design of CD 2 "is what it looks like to crack communities." Tr. 317:7-11 (Duchin, Oct. 4). And as Senator Harpootlian testified, there's "no reason" for CD 2's "bizarre" shape except for race. Tr. 890:2–890:17 (Harpootlian, Oct. 7).

> **c.** ***Expert analysis shows that race predominated over other traditional, race-neutral redistricting principles in the Enacted Plan's design of CD 2.***

232. Using multivariate logistic regression and focusing on VTD racial composition, Dr. Jordan Ragusa concluded that "Black voters were excluded" from the redrawn CD 2 in a "statistically significant and substantively meaningful fashion." Tr. 1047:3–1047:7 (Ragusa, Oct. 7); PX No. 19 at 5. Dr. Ragusa undertook three statistical models: model one, which looked at VTDs that were moved into the enacted CD 2; model two, which looked at VTDs that were moved out of the old CD 2; and model three, which looked at VTDs that were moved into and kept in CD 2 in the Enacted Plan. *See* PX No. 19 at 2-3; Tr. 1035:2–1040:5

(Ragusa, Oct. 7).

233.     Specifically, Dr. Ragusa focused on the BVAP variable in this VTD

analysis to determine whether a VTD's BVAP could predict whether it was more or less likely to

be taken out, moved into, or moved into or kept in CD 2 in the Enacted Plan.  *See* Tr. 1038:22–

1039:5 (Ragusa, Oct. 7).  His analysis concluded that "VTDs with 100 Black voters had a 36%

chance of being moved into [CD 2], compared to just 8% for VTDs with 1500 Black

voters."  PX No. 19 at 5, 9.  Simultaneously, "VTDs with 100 Black voters had a[] 90% chance

of being moved into or kept in [CD 2], compared to just 25% for VTDs with 1500 Black

voters."  *Id.*

234.     The table below shows Dr. Ragusa's findings on the likelihood that a

given VTD was either moved out, moved into, or moved into or kept in CD 2 in the Enacted

Plan.  While model two did not show a clearly statistically significant result, model one reflects a

statistically significant finding that VTDs with larger BVAP were less likely to be moved into

CD 2.  *See* PX No. 19 at 5, 9; Tr. 1045:23–1046:13 (Ragusa, Oct. 7).  Model three also shows a

statistically significant finding that VTDs with larger BVAP were less likely to be moved into

the district and kept in the district.  PX No. 19 at 5, 9; Tr. 1046:14–1047:2 (Ragusa, Oct. 7).

| Table 2: Analysis of CD #2 | | | |
|---|---|---|---|
| | Model 1 | Model 2 | Model 3 |
| Variables | VTDs Moved In | VTDs Moved Out | VTDs Moved In/Kept In |
| Biden Vote | 0.34*** | 0.32** | 0.04 |
| BVAP | -0.18** | -0.52* | -0.31*** |
| Total VAP | <-0.01 | -0.17*** | 0.17*** |
| Constant | -3.08*** | -0.87 | -0.03 |
| | | | |
| N | 128 | 295 | 423 |

*** $p<0.01$, ** $p<0.05$, * $p<0.1$

235.     As discussed in more detail below, Dr. Baodong Liu conducted a similar

analysis and reached similar conclusions about the movement of VTDs into and out of CD 2.

*See* PX No. 48 at 18 & 20–21 & Tables 7, 10 & 11.

236.    Separately, Dr. Kosuke Imai's "statewide analysis" also allowed him to focus on the Richland "hook."  *See* PX No. 32 ¶¶ 39–42.  By generating 10,000 simulated statewide plans that were "race-blind" as to all districts except CD 6 and kept CD 6 BVAP within a range of 45-50% to approximate its BVAP of 46.9% in the Enacted Plan, Dr. Imai sought to see "what kind of alternative districting is possible" if a mapmaker sought to ensure that CD 6 BVAP remained, approximately, at its level in the Enacted Plan.  *See* Tr. 1949:20–1950:24 (Imai, Oct. 14).

237.    Dr. Imai's statewide analysis showed that the decision to split Richland County into CD 2 and CD 6 is highly unusual when compared to 10,000 simulated plans. Specifically, "39.4% of the simulated plans do not split Richland County at all," instead assigning the entire county to CD 6.  *See* PX No. 32 ¶ 40.  Even when some simulated plans assign a part of Richland County to CD 2, they tend to include the northwestern corner of the county, where few Black voters live, rather than splitting Richland County's Black communities like the Enacted Plan does.



238.    Dr. Imai's statewide analysis also showed that, of the 2,388 simulated plans (out of 10,000) that *do* split Richland County between CD 2 and CD 6, the vast majority place significantly fewer Black voters in CD 2 than the Enacted Plan.  PX No. 32 ¶ 41.  In fact,

only 1% of the simulated plans include a larger number of Black voters in District 2 than the

Enacted Plan.  *Id.*  This allowed Dr. Imai to conclude that the Enacted Plan is a statistical outlier

to the degree it cracks a significant number of Black voters in Richland County and assigns them

to CD 2.



239.    Dr. Duchin's ensemble analysis similarly concludes that the distribution of

Black voters outside CD 6 kept BVAPs in other districts of the state (including CD 2) artificially

suppressed.  PX No. 67 at 23–24 & Fig. 11.

### iii.    Race, Not Politics, Better Explains Movement of Voters Into and Out of CD 2.

240.    Expert witnesses, through multiple methods, confirmed that the Enacted

Map treated Black voters differently, even when party affiliation and other factors are controlled

for.

241.    As explained in the methodological discussion for CD 1 above, *supra*

Section II(B)(iii), Dr. Liu utilized his empirical test and verification analysis to assess how

voters' party affiliation and race identity affected their district assignments under the Enacted

Plan for CD 2.  PX No. 48 at 17-18, 20-21.  Ultimately, Dr. Liu concluded that the Enacted

Plan's movement of Black Democrats differed from that of white Democrats, and that, overall,

Black voters were much less likely to be assigned to CD 2 as compared to white voters,

regardless of party affiliation.  PX No. 48 at 18 & tbl.7, 20-21 & tbl.11; Tr. 572:11-573:5, 577:6-578:5 (Liu, Oct. 6).  Dr. Liu's analysis disaggregated race and party and showed that "white Democrats have 70.87 percent of probability being assigned to [CD 2], whereas the Black democrats had less than 50 percent" chance, which reflects "a huge difference."  Tr. 577:6-578:5 (Liu, Oct. 6).  A similar racial gap was found between white Republicans and Black Republicans, again supporting the conclusion that "race, by far, is the driving force" as compared to party affiliation.  Tr. 577:6-578:5 (Liu, Oct. 6).

Table 11: Enacted CD 2 and Assignments of Voters—race v. party

| Party Primary | Number of Voters in Envelop | Number of Voters in District | (% of Group That is in District) |
|---|---|---|---|
| White_DEM | 21154 | 14991 | 70.87 |
| Black_DEM | 45343 | 22133 | 48.81 |
| White_REP | 74410 | 67433 | 90.62 |
| Black_REP | 1552 | 1065 | 68.61 |

242.    Thus, Dr. Liu's two separate analyses "confirmed that race outweighs party much more."  Tr. 578:1-5 (Liu, Oct. 6).

243.    Similarly, as explained in the methodological discussion above for CD 2, *supra* Section II(B)(iii).

244.    Dr. Ragusa studied the racial demographics of the precincts moved between the (2011) old and (2022) new map and found that, for CD 2, the effect of race on movement was both statistically significant and substantively significant (i.e., the race variable had a large effect).  PX No. 19 at 4–5, 9; Tr. 1047:3–1047:7 (Ragusa, Oct. 7).  Ultimately, Dr. Ragusa concluded that "race was an important factor in the design of the 2nd district."  PX No. 19 at 5.

245.    As explained above, *supra* Section II(B)(iii), Dr. Ragusa utilized a regression analysis that controlled for and disentangled the effects of factors such as party

87

affiliation. PX No. 19 at 3–4.  In other words, Dr. Ragusa's findings of "significant effect of race cannot be explained away as a proxy effect of partisanship or precinct size." *Id.* at 4.

246.    In CD 2, even when controlling for partisanship, race was a significant factor in at least two models of Dr. Ragusa's analysis, showing that Black voters were "significantly less likely to be moved into the redrawn district," and "less likely to be moved into and kept in the district." PX No. 19 at 5; Tr. 1045:23–1046:17 (Ragusa, Oct. 7).  These results were both statistically significant, at a 95% and 99% level of confidence, respectively.  PX No. 19 (Ragusa Expert Rep.) at 9.

| Table 2: Analysis of CD #2 | | | |
| --- | --- | --- | --- |
| | Model 1 | Model 2 | Model 3 |
| Variables | VTDs Moved In | VTDs Moved Out | VTDs Moved In/Kept In |
| Biden Vote | 0.34*** | 0.32** | 0.04 |
| BVAP | -0.18** | -0.52* | -0.31*** |
| Total VAP | <-0.01 | -0.17*** | 0.17*** |
| Constant | -3.08*** | -0.87 | -0.03 |
| | | | |
| N | 128 | 295 | 423 |

*** p<0.01, ** p<0.05, * p<0.1



Figure 2: CD #2

88

247.    Furthermore, as discussed *supra* Section II(B)(iii), Dr. Duchin, who conducted a separate analysis of race versus partisanship, concluded that the electoral disadvantage imposed by the Enacted Map does not fall equally on Democratic voters and instead disproportionately penalizes Black voters.  *See* PX No. 67 at 27.

248.    At trial, Mr. Roberts attributed the "hook" to an effort to accommodate Congressman Joe Wilson's request to keep Fort Jackson in CD 2.  Tr. 1403:22–1404:5 (Roberts, Oct. 12); Tr, 1478:10–12 (Roberts, Oct. 12).  This account is inconsistent with his statements and the testimony of other members of the Senate core redistricting team.  First, during the Senate Judiciary Redistricting Subcommittee hearing on November 29, 2021, Mr. Roberts stated that Congressman Wilson had "very little" input on redistricting.  PX No. 98 at 26:25–27:21. Additionally, according to Mr. Breeden John, another core member of the Senate staff responsible for map-drawing, the communication from Rep. Wilson's offices was in a single brief call, the Senate staff did not receive any instruction to prioritize the preferences of Congress members, and thus, those views had "equal weight" compared to those of other "members of the public"; the staff's approach to Congress members' views was to "accommodate where possible if it works with the overall plan," not "to elevate their requests as a primary driver."  John Dep. Tr. 51:10–52:4; 53:6–24; 55:8–13; 163:18–164:9.

249.    Mr. Terreni similarly described the call with Congressman Wilson as brief and did not recall him "mention[ing] anything about Fort Jackson in particular," and that his other suggestions were noncommittally taken "under advisement."  Terreni Dep. Tr. 110:19-25, 111:16–19.  Mr. Fiffick similarly testified that the call with Congressman Wilson's office was brief, he took the request as "anecdotes that were never reinforced by a member," and Senate staff "didn't act on" Congressman Wilson or any other suggestions from members of Congress,

except for Congressman Timmons' preference to keep CD 7 unchanged from the benchmark map.  Fiffick Dep. Tr. 81:5–17; 95:15–22.

250.    Notably, the Enacted Map's "hook" is not the same as the 2011 Plan's "hook" reflecting that it was redrawn to move several VTDs into and out of CD 6; this shows that map drawers had choices and the Enacted Map's "hook" reflects one option for including Fort Jackson in CD 2 among many.  It isn't difficult, for example, to draw the "hook" in a manner that both makes the feature more compact, has less of an impact, and keeps Fort Jackson in CD 2.  Redrawn as below, for example, the CD 2 "hook" would approach Fort Jackson more directly from the east of Columbia, bringing more of the high-BVAP VTDs to the north of Columbia into CD 2 and taking the low-BVAP VTDs in eastern Columbia out of CD 2.  The "hook" feature would be visibly more compact.  Based on the demographic data submitted to the Court, exchanging these VTDs between CD 2 and CD 6 as in this isolated redraw would shift CD 6 BVAP to 44.4% and CD 2 to 27.9%—a non-trivial increase of 3.5% in CD 2.[16]

### iv.    Fact Witnesses Confirm that CD 2 Irrationally Divides Communities.

251.    Ms. Lynn Teague, who grew up in Columbia and was involved in the creation of the map proposed by the SC League of Women Voters, testified that CD 2's hook makes no sense based on communities of interest or other redistricting principles.  Tr. 673:2–4., 679:21–680:8; 694:25–695:5 (Teague, Oct. 6, 2022).  She explained that although Richland and Lexington Counties share a border, "the things that divide them are huge," particularly since

_____

[16]These BVAPs were calculated by adding up BVAP of the precincts in the relevant areas. VTDs that moved in the map above from CD 6 to CD 2 are:  Lincolnshire, Meadowlake, Keels 2, Keels 1, Fairlawn, Killian, Longleaf, Sandlapper, Valley State Park, Spring Valley West, North Springs 3 (split). VTDs that moved in the map above from CD 2 to CD 6 are: Brandon 1, Brandon 2, Meadowfield, Woodlands, South Beltline, Hampton (split), Ward 17, Ward 16, Ward 24, Ward 25, South Forest Acres, Gregg Park, East Forest Acres, North Forest Acres, Cooper, Satchelford, Trenhold Road, Arcadia.

"Lexington has a very low minority population," and "Richland . . . is 49 [point] something percent Black." Tr. 694:8–18 (Teague, Oct. 6). Ms. Teague further testified that "it's observable that [the lines in the Enacted Map] crack Black neighbors."

      252. Ms. Teague's trial testimony is remarkably consistent with objections she raised during the legislative process that the "hook" resulted in splitting Black communities. At the November 29, 2021 Senate Redistricting Committee hearing, she testified: "We don't like CD 2 having a finger projecting through Columbia over to Fort Jackson . . . . The effort to get CD 2 to Fort Jackson, drives CD 2 through the [B]lack communities of Northwest Richland, separating them from neighboring communities to allow the incumbent to keep Fort Jackson within his district." PX No. 98 at 40:16–25.

      253. Rep. Garvin similarly testified that placing a piece of Richland County in CD 2, alongside predominantly white counties, including Lexington County, which has little in common with Richland, makes little sense—particularly given the well-known record of lynchings in Lexington County, which continues to impact the lives of Richland residents today. Tr. 764:10–766:15 (Garvin, Oct. 6). Rep. Garvin, who listened to a majority of the public hearings, recalled public concern about splitting Richland County and neighbors being split apart; he could not recall any member of the public expressing a desire to split Richland County. Tr. 758:17-179:8 (Garvin, Oct. 6).

      254. Ms. Teague also explained that placing Fort Jackson in CD 2 is unjustified by traditional redistricting principles. According to Ms. Teague, the Fort Jackson portion of Richland County that is captured by the CD 2 "hook" has "much more in common economically with the rest of Columbia than it does with Lexington." Tr. 695:14–19 (Teague, Oct. 6).

      255. As Rep. Garvin testified, the connection between Congressman Wilson's

position on the Armed Services Committee and placing Ft. Jackson in his congressional district

is extremely tenuous. *See* Tr. 771:24–772:12 (Garvin, Oct. 6). Congressman Wilson may

advocate for his positions on the Armed Services, including Fort Jackson, even if Fort Jackson

were not part of his district.

256.     Finally, Senator Harpootlian testified that the Senate Redistricting

Committee heard from community members who were "of course" concerned about the

"bizarre" boundary between CD 2 and CD 6. Tr. 880:15–880:23, 890:14–890:17 (Harpootlian,

Oct. 7) ("There's no question. There's no reason to carve Richland up on that bizarre sort of

parrot's feet thing other than race.").

**D.     Race Predominated Over Traditional Redistricting Principles In Enacting Congressional District 5.**

**i.     Data and District Composition**

257.     CD 5 contains "pieces of" Sumter County (split along the CD 6 boundary)

and Spartanburg County (split along the CD 4 boundary) along with the entirety of Cherokee,

York, Union, Chester, Lancaster, Fairfield, Kershaw, and Lee Counties. PX No. 67 at 20.

258.     These counties are listed below with their respective demographics in the

Enacted Plan.[17]

**CD 5 Composition w/ CD 6 Splits – Enacted Plan**

| County | WVAP Countywide | WVAP of Portion of County in CD5 | WVAP Portion of County in CD 6 | BVAP Countywide | BVAP of Portion of County in CD5 | BVAP of Portion of County in CD6 |
|---|---|---|---|---|---|---|
| Cherokee | 72.8% | ALL | -- | 20.5% | ALL | -- |
| Chester | 60.2% | ALL | -- | 35.1% | ALL | -- |
| Fairfield | 42.9% | ALL | -- | 53.3% | ALL | -- |
| Kershaw | 68.5% | ALL | -- | 24.2% | ALL | -- |
| Lancaster | 70.6% | ALL | -- | 20.3% | ALL | -- |
| Lee | 36.2% | ALL | -- | 61.1% | ALL | -- |

---

[17]As *supra*, numbers are all in the "total" rows for each District/county. They are calculated by summing up the AP BVAP and NH WVAP for all the VTDs in each district/county area.

| County | WVAP Countywide | WVAP of Portion of County in CD5 | WVAP Portion of County in CD 6 | BVAP Countywide | BVAP of Portion of County in CD5 | BVAP of Portion of County in CD6 |
|--------|-----------------|----------------------------------|-------------------------------|-----------------|----------------------------------|----------------------------------|
| Spartanburg | 67.9% | 80.3% | None. Split w/ CD4 | 20.2% | 10.3% | None. Split w/ CD4 |
| Sumter | 46.3% | 51.4% | 32.8% | 46.7% | 40.9% | 62.2% |
| Union | 65.6% | ALL | -- | 31.3% | ALL | -- |
| York | 69.3% | ALL | -- | 19.1% | ALL | -- |

259.    For comparison, a similar table showing demographics in the counties that made up CD 5 in the 2011 Plan is below.[18]

## CD 5 Composition w/ CD 6 Splits – 2011 Plan

| County | WVAP Countywide | WVAP Portion of County in CD 5 | WVAP Portion of County in CD 6 | BVAP Countywide | BVAP of Portion of County in CD 5 | BVAP of Portion of County in CD 6 |
|--------|-----------------|--------------------------------|--------------------------------|-----------------|-----------------------------------|-----------------------------------|
| Cherokee | 76.4% | ALL | -- | 19.5% | ALL | -- |
| Chester | 62.0% | ALL | -- | 35.9% | ALL | -- |
| Fairfield | 41.4% | ALL | -- | 56.8% | ALL | -- |
| Kershaw | 71.5% | ALL | -- | 24.3% | ALL | -- |
| Lancaster | 72.2% | ALL | -- | 23.1% | ALL | -- |
| Lee | 35.5% | ALL | -- | 62.4% | ALL | -- |
| Newberry | 63.7% | 61.8% | None. Split w/ CD3 | 30.1% | 31.9% | None. Split w/ CD3. |
| Spartanburg | 72.6% | 85.7% | None. Split w/ CD4 | 20.2% | 9.6% | None. Split w/ CD4 |
| Sumter | 49.0% | 56.3% | 21.5% | 46.2% | 38.5% | 75.3% |
| Union | 68.2% | ALL | -- | 30.3% | ALL | -- |
| York | 75.0% | ALL | -- | 18.7% | ALL | -- |

---

[18]As *supra*, numbers are all in the "total" rows for each District/county.  They are calculated by summing up the AP BVAP and NH WVAP for all the VTDs in each district/county area.

ii.     **Defendants Ignored Traditional Redistricting Criteria in Drawing CD 5.**

a.     *CD 5 under the Enacted Plan unnecessarily cuts across the County and City of Sumter.*

260.     Under the Enacted Map, the boundary between CD 5 and CD 6 unnecessarily splits Sumter County, as well as the city of Sumter, "one of the few localities in South Carolina" that is majority Black.  Tr. 317:14–318:19 (Duchin, Oct. 4); *see also* PX No. 67 at 20 n.6, 21.

261.     The Sumter split starkly cleaves the city's Black population, as the image below—prepared with the demographic data submitted to the Court—shows (benchmark lines in blue; Enacted Plain in yellow).  The shaded image corresponds to a Census-designated unit (or "CCD") named "Sumter" that approximates Sumter's City limits.[19]  The data submitted to the Court shows that the piece of Sumter in CD 6 has a considerably higher BVAP than the VTDs assigned to CD 5, as follows:[20]

---

[19]Census County Divisions or "CCDs," are "statistical geographic entities established cooperatively by the Census Bureau and officials of state and local governments . . . .  The primary goal of the CDD program [is] to establish and maintain a set of subcounty units that have stable boundaries and recognizable names." 83 Fed. Reg. 56285, 56285-87 (2018).

[20] Demographics of areas of Sumter in CD 5 and CD 6 were calculated by adding up the BVAP and WVAP of the precincts in each district.

**Sumter Demographic Split**

| District | BVAP | WVAP |
|---|---|---|
| 5 | 39.9% | 53.3% |
| 6 | 73.1% | 22.3% |



262.    The Sumter split is also unnecessary.  Senate Amendment 2a, the SC

LWV maps, and the House initial Staff Plan, discussed in more detail *infra* Section III(C)(iii),

among others, respected the Sumter community of interest.  Tr. 899:25–900:12 (Harpootlian,

Oct. 7); Tr. 985:7–985:10 (Oppermann, Oct. 7); SDX Nos. 31a; 33a; 68a; 70a.

263.    The Sumter split is yet another part of a pattern of "selective healing," in

which counties with higher Black populations are split, while counties with higher white

populations are reunified under the Enacted Plan.  PX No. 87 at 2.

**b.    The Enacted Plan does not preserve communities of interest in CD 5.**

264.    Based on Dr. Duchin's comprehensive review of public comments, "Sumter was a locus [sic] of significant amount of public testimony" regarding its status as a community of interest.  Tr. 317:14-318:19 (Duchin, Oct. 4); *see also* Tr. 880:15–880:23, 890:2–890:13 (Harpootlian, Oct. 7) (Sen. Harpootlian recounting public concerns around splitting Sumter during redistricting).

265.    As shown in Figure 9 below from Dr. Duchin's report, Defendants failed to respect both the county and the city as a community of interest, despite public interest in having Sumter whole.  PX No. 67 at 15, 20–21; Tr. 332:7–333:5 (Duchin, Oct. 4).



Figure 9:  Sumter, a small majority-Black city cited in public testimony as an important community, is split in the state's map as the CD 5/CD 6 dividing line wends through a heavily Black region.

According to a representative public comment from a Sumter resident, "Sumter is split down the middle," such that a "historic district" is cleaved, causing neighbors on nearby blocks to belong to different congressional districts.  *See* PX No. 67 at 37–38.

266.    Two majority Black neighborhoods, East Sumter and Mulberry, are also split by the Enacted Map.  PX No. 67 at 20.

267.    As with Richland County in CD 2, Sumter County in CD 5 is split in an

unusual manner, along "low-density residential roads," including a segment that is "in the middle of a cemetery." PX No. 67 at 20.

268.    Mr. Roberts, the Senate's cartographer, also acknowledged that the Enacted Plan splits the city of Sumter.[21] Tr. 1361:13–20 (Roberts, Oct. 12).  That split clearly occurs along racial lines, as shown in the tables discussed above.

269.    Fact witnesses further corroborate Dr. Duchin's demographic assessment of the Sumter split.  Mr. James Felder, who was born and raised in Sumter and remains familiar with Sumter, confirmed that the district boundary between CD 5 and CD 6 cuts directly through Black communities.  Tr. 1335:4–1335:14 (Felder, Oct. 12).  Specifically, on one side of the line are "predominantly African American" precincts assigned to CD 6, while neighboring precincts with "heavy Black populations" are placed in CD 5.  Tr. 1348:22–1349:21 (Felder, Oct. 12).  Those neighboring precincts placed in CD 5 include Ebenezer and others north of Highway 378.  Tr. 1348:22–1349:21 (Felder, Oct. 12).

270.    Mr. Opperman, who submitted his analysis of what would become the Enacted Plan to Senate redistricting staff, testified at trial that the Sumter split raised a "red flag." PX No. 721; Tr. 975:2–976:6 (Oppermann, Oct. 7).  Specifically, Mr. Opperman observed that the Sumter split implicated "a significant amount of African American population" and divided the population along "racial lines."  Tr. 975:2–976:6; 1025:15–1026:6 (Oppermann, Oct. 7) (explaining "the tendency was to include the more African-American portion of this or that municipality in [CD 6] rather than the district that it bordered").

---

[21]Similar to his claims about the municipal boundaries of other areas at issue, *see supra* nn. 11 & 15, Mr. Roberts suggested that Dr. Duchin's map had inaccurate municipal boundaries; but he acknowledged that the difference in Dr Duchin's figures is not an error.  Tr. 1360:4–9 (Roberts, Oct. 12); Tr. 1535:9–17 (Roberts, Oct. 12).  Rather, Dr. Duchin's map used precincts as building blocks, and to the extent that any precinct is at least partially within city limits, it is shown on the map as being part of the city.  Tr. 1535:9–17 (Roberts, Oct. 12 PM).

271.    Similarly, Sen. Harpootlian testified that the split between CD 5 and CD 6 takes place "basically on racial lines." Tr. 890:2–890:13 (Harpootlian, Oct. 7).

272.    Overall, as Dr. Duchin concluded, the split of Sumter County is again "consistent with the cracking of Black communities," and part of a pattern cracking in the districts surrounding CD 6.  Tr. 313:22–25 (Duchin, Oct. 4).

> **c.    Expert analysis shows that race predominated over other traditional, race-neutral redistricting principles in the Enacted Plan's composition.**

273.    Using multivariate logistic regression and focusing on VTD racial composition, Dr. Ragusa concluded that "Black voters were excluded from the redrawn [CD 5] in both a statistically significant and substantively consequential fashion."  PX No. 19 at 6.  Dr. Ragusa undertook three statistical models: model one, which looked at VTDs that were moved into the enacted CD 5; model two, which looked at VTDs that were moved out of the old CD 5; and model three, which looked at VTDs that were moved into and kept in CD 5 in the Enacted Plan.  *See* PX No. 19 at 2–3; Tr. 1035:2–1040:5 (Ragusa, Oct. 7).

274.    Dr. Ragusa focused on the BVAP variable in this VTD analysis to determine whether a VTD's BVAP could predict whether it was more or less likely to be taken out, moved into, or moved into or kept in CD 5 in the Enacted Plan.  *See* Tr. 1038:22–1039:5 (Ragusa, Oct. 7).  His analysis concluded that "VTDs with 100 Black voters had a 38% chance of being moved into [CD 5], compared to <1% for VTDs with 1500 Black voters."  PX No. 19 at 6, 12.  Simultaneously, "VTDs with 100 Black voters had a 76% chance of being moved into or kept in [CD 5], which compares to 52% for VTDs with 1500 Black voters."  PX No. 19 at 6, 12.

275.    The table below shows Dr. Ragusa's findings on the likelihood that a given VTD was either moved out, moved into, or moved into or kept in CD 5 in the Enacted Plan.  While model two did not show a statistically significant result, model one reflects a

statistically significant finding that VTDs with larger BVAP were less likely to be moved into CD 5.  PX No. 19 at 6, 12; *see also* Tr. 1048:2–1048:15 (Ragusa, Oct. 7).  Model three also shows a statistically significant finding that VTDs with larger BVAP were less likely to be moved into the district and kept in the district.  PX No. 19 at 6, 12; *see also* Tr. 1048:2–1048:15 (Ragusa, Oct. 7).

| Table 5: Analysis of CD #5 | | | |
|---|---|---|---|
| | Model 1 | Model 2 | Model 3 |
| Variables | VTDs Moved In | VTDs Moved Out | VTDs Moved In/Kept In |
| Biden Vote | 0.29* | 0.02 | 0.10* |
| BVAP | -0.51*** | 0.02 | -0.08** |
| Total VAP | 0.01 | -0.12*** | -0.03* |
| Constant | -1.76*** | -0.89** | 1.25*** |
| | | | |
| N | 122 | 362 | 484 |

*** p<0.01, ** p<0.05, * p<0.1

276.    Dr. Imai's "statewide analysis" *see supra* Section II(B)(ii)(d), also allowed him to focus on the district boundary between CD 6 and CD 5 in Sumter County.  PX No. 32 ¶¶ 43–45.  His simulations analysis showed that out of 10,000 simulated plans generated using constraints derived from South Carolina's House and Senate Guidelines (and keeping CD 6 BVAP within 2-3 percentage points of its BVAP composition in the Enacted Plan), only 1.2% of them split Sumter County into CD 5 and CD 6, like the Enacted Plan does.  *Id.* ¶ 44.  That allowed Dr. Imai to confirm that the Enacted Plan is a statistical outlier in the way it splits Sumter County.

| Pairings | Frequency |
|---|---|
| District 6 | 90.3% |
| District 6, District 7 | 4.5% |
| District 5 | 2.4% |
| District 5, District 6 | 1.2% |

277.    Ultimately, the effect of the enacted map is to cause Black voters in Sumter County who are assigned to CD 5 to lack voting power in congressional elections.  Tr. 1350:12–21 (Felder, Oct. 12); Tr. 1264:13–1265:1 (Murphy, Oct. 11).

> **iii.    Race, Not Politics, Better Explains Movement of Voters in CD 5.**

278.    As with the other districts, discussed *supra* Sections II(B)(iii), II(C)(iii), Plaintiffs' expert witnesses, through multiple methods, confirmed that the Enacted Map treated Black voters differently, even when party affiliation and other factors are controlled for.

279.    Dr. Ragusa studied the racial demographics of the precincts moved between the old and new map and found that Defendants' movement of Black voters was both statistically significant and substantively significant in CD 5, with Black voters being excluded from this district.  PX No. 19 at 6; Tr. 1048:2–1048:15 (Ragusa, Oct. 7).

280.    Ultimately, Dr. Ragusa concluded that "race was an important factor in the design of the 5th district."  PX No. 19 at 6.

281.    As explained *supra* Sections II(B)(iii), II(C)(iii), Dr. Ragusa utilized a regression analysis that controlled for and disentangled the effects of factors such as party affiliation.  PX No. 19 at 3–4.  In other words, Dr. Ragusa's findings of "significant effect of race cannot be explained away as a proxy effect of partisanship or precinct size."  PX No. 19 at 4.

282.    In CD 5, even when controlling for partisanship, race was a significant factor in two models of Dr. Ragusa's analysis, showing that Black voters were "significantly less likely to be added to the redrawn district," and "significantly less likely to be moved into and kept in the district."  PX No. 19 at 6; Tr. 1048:2–1048:15 (Ragusa, Oct. 7 PM).  These results were statistically significant at a 99% and 95% level of confidence, respectively.  PX No. 19 at

12.

| | Model 1 | Model 2 | Model 3 |
|---|---|---|---|
| Variables | VTDs Moved In | VTDs Moved Out | VTDs Moved In/Kept In |
| Biden Vote | 0.29* | 0.02 | 0.10* |
| BVAP | -0.51*** | 0.02 | -0.08** |
| Total VAP | 0.01 | -0.12*** | -0.03* |
| Constant | -1.76*** | -0.89** | 1.25*** |
| | | | |
| N | 122 | 362 | 484 |

Table 5: Analysis of CD #5

*** p<0.01, ** p<0.05, * p<0.1



Figure 5: CD #5

283.    Furthermore, as discussed below, Dr. Duchin, who conducted a separate analysis of race versus partisanship, concluded that the electoral disadvantage imposed by the Enacted Map does not fall equally on Democratic voters and instead disproportionately penalizes Black voters. *See supra* Section II(B)(iii).

### E.    Legislative Defendants and their staff considered race when drawing and evaluating the Enacted Plan and other proposals.

284.    The record before the Court shows that Legislative Defendants and their staff considered race during the redistricting process, including when drawing and evaluating maps, for reasons other than complying with the Voting Rights Act.

285.     As counsel to the Senate, Mr. Charles Terreni understood that race may play a role in assessing and developing proposed congressional plans.  Terreni Dep. Tr. 190:21–25, 191:9–192:6.  Mr. Terreni instructed Senate staff that "race may be considered during the redistricting process."  John Dep. Tr. 116:22–117:2.  He also testified that Senate Redistricting Subcommittee staff were aware of racially polarized voting patterns in South Carolina.  Terreni Dep. Tr. 241:12–24.

286.     As discussed *infra* Section III(C)(i), the House and Senate Redistricting Guidelines contemplate the use of race data and also that racial impact will be considered to ensure that a plan adopted in redistricting does not dilute minority voting strength or unjustifiably racially gerrymander.  *See* PX Nos. 175 at 1; 716 at 1.

### i.     Legislative Defendants and Other Legislators Considered Race for Reasons Other Than Compliance with Federal Law.

287.     As an initial matter, there is no serious question that legislators either know or are at least generally aware of their jurisdiction's racial makeup, even without being provided with racial data.

288.     Senator Campsen—who introduced the Campsen/Senate Amendment 1 map that the General Assembly eventually enacted—explained that he "can't help but know" "the concentrations of Black voters" even "without looking" at racial data for the areas he represents, which include parts of Charleston, Beaufort, and Colleton Counties.  Tr. 1816:25–1817:6; 1883:19–1884:11 (Campsen, Oct. 13).  Senator Campsen also testified that he has lived his "entire life" in Charleston—the area that saw the biggest change from the 2011 map and involved the movement of tens of thousands of Black voters.  Tr. 1816:15–16 (Campsen, Oct. 13).

289.     Senator Campsen also testified that other senators "generally" are aware of

the racial makeup of their districts as well. Tr. 1884:21–1885:5; 1885:15–25 (Campsen, Oct. 13).

290.    Mr. Andrew Fiffick, whose primary duties as chief of staff to the Senate Judiciary Committee included gathering senators' feedback on maps, similarly testified "that legislative members know the ethnicity of people who live in their district." Fiffick Dep. Tr. 58:18-59:8; 129:20-130:4.

291.    Representative Justin Bamberg—who served as a member of the House Redistricting Ad Hoc Committee and testified for Defendants at trial—similarly confirmed that he was aware of the BVAP increase in his district that occurred as a result of the latest round of redistricting. Tr. 1727:3–6, 1755:11–13 (Bamberg, Oct. 13).

292.    Representative Weston Newton, another member of the House Judiciary Redistricting Ad Hoc Committee, testified that he was aware of BVAP and the changes in racial composition in CD 1 and CD 6. Newton (Vol. 2) Dep. Tr. 67:4-8, 152:19-153:6.

293.    Apart from Legislative Defendants' background knowledge of the racial composition of the State, the legislative record and testimony by Senate staffers show that legislators, including Senators Campsen and Rankin, received and considered BVAP data.

294.    According to Mr. Breeden John, a core member of the Senate redistricting staff, Senator Campsen asked the staff for details about the voters who were being moved in the Charleston area, including "in terms of race." John Dep. Tr. 288:5-289:14. Indeed, during the January 19, 2022 Redistricting Subcommittee hearing, Sen. Campsen claimed— misleadingly[22]—that the portion of Charleston County that went into CD 6 had only a 10% higher BVAP than the portion that went into CD 1. *See* PX No. 115 at 50:15-51:13; SDX No.

---

[22]In fact, the BVAP from Charleston County assigned to CD 6 increased from "37,000 [people], or about 50 percent, to 60,000 [people], or 80 percent." Tr. 890:18–893:1 (Harpootlian, Oct. 7).

241 at 54:06-57:58 (video); *see also* Tr. 890:18–893:1 (Harpootlian, Oct. 7) (noting that neither

Senator Campsen, Mr. Terreni nor any other staff told Sen. Harpootlian that Sen. Campsen

misstated the 10% figure).

295.     Mr. John also testified that staff provided BVAP statistics to Senator

Rankin, who was "ultimately" responsible for making substantive decisions as the Chairman of

the Judiciary Committee, for him to evaluate proposed maps.  John Dep. Tr. 90:7-92:25; 180:20-

181:3; 219:22-220:9; 279:20-280:4.

296.     Generating and providing racial demographic data was a consistent

practice for the Senate staff, who included such data in the materials prepared for legislators'

consideration in advance of public hearings and proceedings on the Senate floor.  *See*, *e.g.*,

Fiffick Dep. Tr. 129:3-5; Benson Dep. Tr. 98:1-11; 155:1-23; Terreni Dep. Tr. at 285:21-286:3;

John Dep. Tr. 242:22-247:20.  Racial demographic data were generated by the Senate staff for

every map that was prepared or submitted for consideration.  SDX No. 28B, 28E, 28F, 29A, 29F,

29G, 30B, 30F, 30G, 31B, 31F, 31G, 32C, 32F, 32G, 33D, 33E, 34C. 34D. 35B. 35E. 35F. 38C,

38E, 39D, 39E, etc.  For many of these maps, this data was posted on the Senate Redistricting

Website.  Senate 2021 Redistricting | Archives (scsenate.gov).

297.     Testimony from Ms. Paula Benson, Senate redistricting staff member,

further corroborated that race data "certainly was considered" by legislators during redistricting.

*See* Benson Dep. Tr. 155:1-23.  Staff prepared a "notebook" for the Senate Subcommittee  that

contained demographic and BVAP data from Maptitude, and one of the charts in the notebook

specifically "looked at districts that were minority versus majority districts and whether or not

they had a 40 to 50 percent minority population or a 20 to 30 percent minority population."

Benson Dep. Tr. 97:5-22; 97:23-98:25; 155:5-17.

298.     In addition, racial demographic data were also made available to legislators upon request during the map drawing process. *See* Terreni Dep. Tr. 285:6-12 ("Q. And when members of the legislature would come in to consider congressional maps, was race data available to them as they were drawing maps?  A. If they requested it, it was."); Fiffick Dep. Tr. 129:9-15.

299.     Senator Campsen's categorical statement that he did not look at "racial data during the map-drawing process" is both incredible and shrewdly disingenuous.  Tr. 1851:7–9 (Campsen, Oct. 13).  First, Sen. Campsen conceded he knows the "racial makeup" of Charleston and other coastal areas where he has lived and represents, including "where the concentrations of Black voters are," even without looking at racial data.  Tr. 1883:19–22, 1884:3–11 (Campsen, Oct. 13).  Second, though he claimed that Senate staff drew Senate Amendment 1 without his or others' consultation, he acknowledged that staff had access to racial data—in fact, he "assume[d]" that the staff would be "looking at and having discussions about BVAP" after plans were created.  Tr. 1892:5–12 (Campsen, Oct. 13).  Moreover, he personally looked at the same race data himself, after the map was created and before it was enacted.  Tr. 1892:5–12 (Campsen, Oct. 13).  And as discussed previously, Senator Campsen even referenced BVAP numbers (albeit misleadingly) during a Senate Redistricting Subcommittee hearing.  *See* PX No. 115 at 50:15-51:13; SDX No. 241 at 54:06-57:58 (video).

300.     Similarly, Senator Campsen's testimony that he did not "have any racial targets" during the drafting of Senate Amendment 1 also lacks credibility and probative value.  Tr. 1851:15–24 (Campsen, Oct. 13).  First, as detailed *infra* Section II(E)(ii), the Senate staff reviewed BVAP statistics after each map was created but before it was published, including for Senate Amendment 1. Tr. 1528:1–3 (Roberts, Oct. 12); John Dep. Tr. 187:20-188:5, 189:23-

190:13.  Second, the fact that Senator Campsen does not recall staff mentioning racial targets to him means little—he told the staff that he did not "want to know the racial numbers" during drafting, and he certainly could have assessed whether each map's BVAP statistics were consistent with whatever targets he may have had in mind after the maps were drawn.  Tr. 1851:15–24 (Campsen, Oct. 13).  Finally, the fact that CD 1's BVAP remained essentially unchanged, increasing from 17.3% to 17.4%, despite nearly 200,000 people (many of whom were Black) being moved between CD 1 and CD 6, is indicative of a racial target, formalized or not.  PX No. 87 at 4, Table 1 (Dr. Duchin report showing BVAP increased slightly from 17.3% to 17.4% in CD 1); SDX No. 29C; SDX No. 75 (Trende Rep.) at 18, Table 4 (showing that 140,489 people were moved from CD 1 to CD 6, and 52,799 people were moved from CD 6 to CD 1).  The nearly 200,000-person movement amounts to over 25% of the size of a congressional district, yet the BVAP % in CD 1 changed, improbably, by only 0.1%.

301.    Notably, although legislators considered race when assessing proposed maps, the racial data generated by the Senate staff and provided to legislators were not prepared or used for the purposes of a Voting Rights Act or racially polarized voting analysis.  Senator Campsen, for instance, confirmed the Senate did not conduct a racially polarized voting analysis.  PX No. No.115 at 32:18-21, 35:17-20.  Senator Talley, also a member of the Subcommittee, testified that race data was available, and that he was unaware of any racially polarized voting analysis or any other legal analysis being done to ensure that the Enacted Map complied with the law.  Talley Dep. Tr. 23:12-24:21, 72:18-73:5.

302.    The Senate Redistricting Subcommittee and their staff also did not conduct racially polarized voting analyses—nor did they ask for such analyses to be performed.  *See* Tr. 1356:21–1357:2 (Roberts, Oct. 12).  Mr. Terreni advised the Senate Redistricting

Subcommittee that conducting a RPV analysis would have meant race "would have been in the middle of the room" and that it could lead to "making race or some artificial target."  Terreni Dep. Tr. at 246:14-247:21.  The Senate, therefore, did not conduct a RPV analysis, Terreni Dep. Tr. at 243:25-244:13, even though they could have hired someone to complete it, Terreni Dep. Tr. at 267:8-15.

303.    Mr. John also testified that, to his knowledge, senators and staff, despite considering race data, did not use such data to conduct a Section 2 or racially polarized voting analysis or to guard against vote dilution.  John Dep. Tr. 118:8-13, 120:6-25, 121:15-122:15, 124:2-125:2, 155:20-156:10, 186:6-187:3, 264:20-265:2.

304.    Mr. Patrick Dennis, as general counsel for the House and chief of staff to the House Speaker, did not review or was unaware of any racially polarized voting analysis or written assessment analyzing whether proposed congressional maps complied with the Voting Rights Act, such as by attempting to draw an additional majority-Black district.  *See*, *e.g.*, Dennis Dep. Tr. 101:13-18, 298:8-14.  Nor did House members, including members of the Redistricting Ad Hoc Committee, recall any racially polarized voting analysis being conducted.  *see*, *e.g.*, Collins Dep. Tr. 72:21-73:13, 141:15-143:4.

305.    In other words, the record shows that Defendants considered racial demographic data, including the demographics of areas at issue in this case, for reasons other than to ensure that Black residents' voting power would not be diluted.

ii.    **Key Members Of The Senate And House Redistricting Staff Also Considered Race During The Redistricting Process.**

306.    The Senate's core redistricting team and outside counsel developed the Senate's initial staff plan.  For this plan, Mr. Terreni provided input, along with Mr. Roberts and Mr. Fiffick.  *See*, *e.g.*, Terreni Dep. Tr. at 331:22-332:11; Fiffick Dep. Tr. at 245:19-25, 246:18-

247:16. The Jones Day law firm, trial counsel for Senate Defendants in the current case, also played a role in developing the Senate's staff plan by providing legal advice. Terreni Dep. Tr. at 287:20-25.

307.    Contrary to *post hoc* legal arguments otherwise, the Senate staff working on behalf of the Senate Judiciary Redistricting Subcommittee had access to BVAP data, considered that data while drawing proposed congressional maps, provided the data to Senators and staff to consider proposed congressional maps, and reviewed that data before publishing proposed maps and in seeking to justify certain proposed congressional plans.

308.    For its part, the House side does not dispute that race was considered and relied upon in the development and assessment of congressional plans. *See, e.g.*, Dennis Dep. Tr. at 174:2-4 ("Was I aware of, while I was drawing, what the racial makeup of what I was drawing was?  Yes."); *see also* Hauger Dep. Vol 2 Tr at 50:1-7 ("Q. When you drew maps with the software, what demographic data would show for proposed districts?  A. For proposed districts we would have number of housing units, the general population by ethnic breakdown, the voting age population by ethnic and racial breakdown as well.").

309.    Racial demographic data was available to the Senate core redistricting team as they developed redistricting plans.  Racial data was "available to everybody, and anybody who asked for it," Mr. Fiffick testified.  Fiffick Dep. at 13:9-11.  It was "loaded into the computer" that the Senate redistricting team "shared in the map room."  Fiffick Dep. at 124:4-7.  And it was "rel[ied] upon" as part of "[e]verything that's in the PL [Census] file."  John Dep. at 180:19-181:5.

310.    In particular, the Senate staff used the "Maptitude" software for

redistricting to draw congressional maps.[23]  Tr. 1380:13–14 (Roberts, Oct. 12).  Multiple

categories of racial data as well as total population were available to Mr. Roberts on Maptitude

as he drew congressional maps.  Tr. 1380:23–1381:2 (Roberts, Oct. 12).  BVAP data were

"actually displayed . . . at the bottom of the screen the entire time we were drawing." Tr. 1502:2–

6 (Roberts, Oct. 12). "[B]VAP was [] displayed in the statistics at the bottom of the screen the

entire time," and as Mr. Roberts moved district lines, he and other staff in the room "could see

on the statistics what the overall district BVAP would be."  Tr. 1502:5–6, 15–18 (Roberts, Oct.

12).

311.    The core redistricting team, including Mr. Roberts, could see BVAP data

in Maptitude as they made changes to draft plans. Tr. 1501:24–1502:18 (Roberts, Oct. 12).  Mr.

Roberts, Mr. Fiffick, and anyone else in the map room could "definitely" see BVAP displayed on

the screen. Tr. 1503:5–13 (Roberts, Oct. 12); *see also* Fiffick Dep. Tr. 124:4-7 ("Q: Are you

aware of whether race data was loaded into the computer that y'all shared in the map room?  A:

Oh, yeah.  It was, yeah, for sure."); Terreni Dep. Tr. 285:6-20; John Dep. Tr. 180:19-181:5. Mr.

Roberts also testified he always looked at BVAP *after* an iteration of a map was created. Tr.

1528:1–3 (Roberts, Oct. 12).

312.    Senate Subcommittee Staff reviewed BVAP statistics for at least CD 6

before publishing any proposed maps, to assess the impact of changes to the map.  John Dep. Tr.

187:20-188:5, 189:23-190:13.

313.    Senate staff also reviewed BVAP information for each district in Senate

Amendment 1, which would later become the Enacted Plan.  John Dep. Tr. 230:12-15.

314.    In addition, Mr. Terreni and Senate redistricting staff looked "at the racial

---

[23]Maptitude is "[s]oftware commonly used in redistricting."*Harris v. McRory*, 159 F. Supp. 3d
600, 619 (M.D.N.C. 2016).

3:21-cv-03302-MGL-TJH-RMG     Date Filed 02/03/23     Entry Number 499     Page 113 of 334

impact of different permutations of different plans" when the team was drawing maps. *See, e.g.*, Terreni Dep. Tr. at 195:25-197:6, 302:25-303:25. Mr. Roberts also confirmed that there were discussions about maintaining, increasing, or decreasing BVAP in a district among Senate redistricting staff and outside counsel, though he claimed he did not participate in those conversations. Tr. 1528:8–13 (Roberts, Oct. 12).

315.     Racial demographic data was also included in the completed plans that staff printed out for legal analysis. *See* Tr. 1531:16–19 (Roberts, Oct. 12); Tr. 1503:16–19 (Roberts, Oct. 12); Fiffick Dep. Tr. 124:13-23 (testifying that Mr. Terreni and Mr. Gore received maps along with race data).

316.     Mr. Will Roberts, the Senate's chief map drawer, is a lifelong South Carolinian who has deep knowledge of the geographic contours of the State. Tr. 1355:7–13, 1358:4–6 (Roberts, Oct. 12). Through his 20 years of work on South Carolina maps, Mr. Roberts has developed a deep knowledge of South Carolina's racial makeup. *See* Tr. 1503:20–23 (Roberts Oct. 12). In fact, Mr. Roberts testified that prior to his work on the Enacted Map, he had "always looked at race data" during his 20+ year career. Tr. 1499:20–23; 1501:15–23 (Roberts, Oct. 12). He has worked on redistricting for approximately 75 to 100 South Carolina localities over the course of his career. Tr. 1499:6–13 (Roberts, Oct. 12). Mr. Roberts is therefore "extremely familiar" with the demography and boundaries of city and towns in South Carolina. Tr. 1359:1–4 (Roberts, Oct. 12).

317.     On the stand, Mr. Roberts demonstrated his awareness of racial demographics impacted by the Enacted Map, including numerical breakdowns of populations that were moved from CD 1 to CD 6. When asked by the Court, Mr. Roberts discussed in detail the racial demographics of Deer Park and Lincolnville, both of which were moved from CD 1 to

CD 6 during redistricting.  Tr. 1550:12–1553:3 (Roberts, Oct. 12).  In fact, Mr. Roberts was able to recall specifically that Deer Park's "racial breakdown" was "10,000 whites to 8,500 African Americans."  Tr. 1553:16–20 (Roberts, Oct. 12).

318.    Mr. Roberts further acknowledged that the shift of the CD 6 boundary line "followed the migration of African Americans from the city of Charleston to North Charleston."  Tr. 1554:11–22 (Roberts, Oct. 12).

319.    Mr. Roberts also testified that the Redistricting Subcommittee was aware of race-based communities of interest and where they were located in South Carolina.  Specifically, Mr. Roberts acknowledged that the Gullah Geechee community is "an identifiable community based on race."  Tr. 1504:9–13 (Roberts, Oct. 12).  He further testified that the Redistricting Subcommittee "made Beaufort whole," in part, by "pull[ing] in that historical Gullah Geechee community out of the Shelby area and unit[ing] it with the Gullah Geeche in lady [sic]."  Tr. 1472:7–17 (Roberts, Oct. 12).  According to Mr. Roberts, Defendants sought to "tie[] that whole Gullah Geechee community together in Beaufort County."  *Id.*

320.    Accordingly, Mr. Roberts' suggestion in his testimony that he did not consider race (i.e., the race of voters and communities) is not credible.  Not only did the Senate staff regularly produce and examine racial data, Mr. Roberts, as his colloquy with the Court illustrates, is so intimately familiar with the racial composition of South Carolina that he did not need to see the data to know the impact of the Enacted Plan.

321.    Similarly, Mr. Terreni, who was involved in several previous redistricting cycles, was also aware of the racial demographics of South Carolina localities even without looking at racial data.  He knew, for example, that Jasper County had a significant Black population.  Terreni Dep. Tr. at 296:3-15.

**F.     Defense Expert Sean Trende's Analysis Confirms That S.865 Is A Racial Gerrymander And Otherwise Fails To Rebut Plaintiffs' Claims.**

322.     Mr. Sean Trende's analysis is unhelpful to Defendants for several reasons: the objective data in his report tend to support Plaintiffs' case that the Enacted Map disregarded traditional redistricting criteria in a manner consistent with a racial gerrymander, and the subjective analyses he presented are too limited, incomplete, and unexplained to have probative value.

323.     *First*, to the extent that he relied on objective, verifiable data, Mr. Trende largely confirmed that the Enacted Plan deviated from traditional redistricting principles in a manner consistent with a racial gerrymander, particularly regarding the challenged Congressional Districts 1, 2, and 5, all of which are adjacent to District 6.

324.     <u>Contrary to Defendants' argument, the Enacted Plan is not a least-change map:</u> Mr. Trende acknowledged that the population shifts under the Enacted Plan were far larger than necessary to achieve equal population.  *Compare* SDX No. 75 (Trende Rep. Tbl. 1) *with* SDX No. 75 (Trende Rep. Tbl. 4).  For example, Mr. Trende acknowledged that:

a.     Following the 2020 census, CD 5 was overpopulated by 5,082 people, but the Enacted Plan moved 41,407 people out of CD 5.  Tr. 1683:1–9 (Trende, Oct. 13).

b.     Following the 2020 census, CD 2 was underpopulated by 9,375 people, but even though the district was underpopulated, the Enacted Plan moved 14,397 people out of CD 2.  Tr. 1683:10–15 (Trende, Oct. 13).

c.     Following the 2020 census, CD 6 was underpopulated by 84,741 people, but not withstanding this underpopulation, the Enacted Plan moved 80,469 additional people out of CD 6.  Tr. 1683:16–23 (Trende, Oct. 13).

d.     Following the 2020 census, CD 1 was overpopulated by 87,689

people, but the Enacted Plan moved 140,489 people out of CD 1.  Tr. 1684:2–5 (Trende, Oct. 13).

All told, S.865 moved 334,069 people from their old districts in the 2011 map to new districts in the 2022 Enacted Map.  SDX No. 75 at Table 4; Tr. 1684:24–1685:2 (Trende, Oct. 13).

325.    <u>The challenged congressional districts are not compact</u>: Mr. Trende also acknowledged that, according to standard compactness measures, CD 2 in the Enacted Plan is less compact than it was under the 2011 plan, and Districts 1 and 6 are less compact than any other district on the Enacted Map.  Tr. 1686:2–20 (Trende, Oct. 13).

326.    <u>The Enacted Plan disproportionately splits counties on the border of CD 6</u>: Mr. Trende acknowledged that the county splits in S.865 are concentrated on the border of CD 6, with four split counties (Charleston, Dorchester, Colleton and Jasper) between CDs 1 and 6, two split counties (Richland and Orangeburg) between CDs 2 and 6, one split county (Sumter) between CDs 5 and 6, and another (Florence) between CDs 6 and 7. Tr. 1689:18–1690:6 (Trende, Oct. 13).  Mr. Trende further testified that the ten total county splits in the map had four more splits than necessary.  Tr. 1634:12–23 (Trende, Oct. 13).

327.    <u>The Enacted Plan divided counties by race</u>: For Sumter, Orangeburg, and Richland Counties, Mr. Trende presented BVAP maps of the counties, which demonstrate that the parts of those counties with higher or more substantial Black populations were placed in CD 6.  Tr. 1696:11–22 (Trende, Oct. 13) (discussing SDX No. 75 page 26 map (Sumter County), Tr. 1700:2–9 (Trende, Oct. 13) (discussing SDX No. 75 page 28 map (Orangeburg County) & page 32 map (Richland County)).

328.    <u>The Enacted Plan does not preserve cores of CDs 1 and 2</u>: Mr. Trende also

acknowledged that the cores of CDs 1 and 2 in the Enacted Plan no longer contain what he described as those districts' "anchors" for CD 1, the City of Charleston, and for CD 2, the City of Columbia. Tr. 1679:11–1680:15; 1681:10–1682:11 (Trende, Oct. 13); ECF 458-1 at 3, 5. Mr. Trende also acknowledged that Charleston County is no longer the largest county, population-wise, in CD 1. Tr. 1680:16–18 (Trende, Oct. 13).

329.    *Second*, Mr. Trende's presentation of objective factors was selective, in that he ignored traditional redistricting factors or factors identified under the Redistricting Guidelines, particularly those that were inconsistent with his thesis that the Enacted Plan improved the 2011 Plan. For example:

a.    Mr. Trende did not discuss municipal splits. Tr. 1687:21–1688:16 (Trende, Oct. 13); PX No. 87 at 2. Had he done so, he would have confirmed that S.865 had 22 city splits, more than under the 2011 Plan. SDX No. 62 at 8, 13.

b.    Mr. Trende did not present a BVAP map of Charleston County. Tr. 1703:16–20 (Trende, Oct. 13). Had he done so, he would have confirmed that under the Enacted Plan, the parts of Charleston counties with higher or more substantial Black populations were placed in CD 6. PX No. 77.

c.    Mr. Trende did not present any analysis of contiguity in his report. Tr. 1707:15–20 (Trende, Oct. 13). When confronted on cross-examination, he acknowledged that CD 1 was not "functionally" contiguous, because it was not possible to go from the northeast part of District 1 (Sullivan's Island) to the southwest part (James Island) without going through District 6. Tr. 1708:5–15 (Trende Oct. 13) & ECF 458-1 at 10. He acknowledged that this was a substantial drive. Tr. 1708:16–22 (Trende, Oct. 13) & ECF 458-1 at 11.

330.    *Third*, Mr. Trende's subjective assessments of S.865 were internally

inconsistent, incomplete, and misleading to the point where his conclusions are neither reliable nor helpful to the trier of fact. As he testified, he has previously noted that this type of subjective analysis is appropriately criticized for being little more than a "I-know-it-when-I-see-it standard." Tr. 1676:25–1677:8 (Trende, Oct. 13).

      331.    Mr. Trende's presentation of partisan data is unexplained, incomplete, and unreliable: For example, in Table 9 of his report, Mr. Trende reports with great precision the number of "Biden voters" shifted from the 2011 plan to the Enacted Plan (*e.g.*, 10,808 "Biden voters" were reportedly shifted from District 1 to District 6). SDX No. 75 at 23, Table 8. These precise claims are inconsistent with the facts that (i) there are seven precincts split between Districts 1 and 6 containing 16,345 people, Tr. 1691:12–24 (Trende, Oct. 13), SDX No. 29E, and (ii) South Carolina does not track or report election results below the precinct level. Tr. 1692:3–6 (Trende, Oct. 13). Being able to determine the partisanship of people shifted between congressional districts with the level of precision that Mr. Trende reports is premised on extrapolation of indeterminate data, and his conclusions are not reliable.

      332.    Mr. Trende's discussion of Sumter County relies on a data error: Mr. Trende acknowledged that he confused and mixed presentation of the total population with voting age population when discussing the movement of people in Sumter County from CD 5 to CD 6 and he never corrected or supplemented this information. Tr. 1692:7–1693:22 (Trende, Oct. 13). This renders his conclusions concerning the population movement between CDs 5 and 6 incomplete and unreliable.

      333.    Mr. Trende's analysis of CDs 5 and 6 is incomplete and misleading: Mr. Trende's analysis of CDs 5 and 6 obscures that 40.6% of the population moved from CD 5 to CD 6 was Black. Tr. 1694:3–1695:1 (Trende, Oct. 13) & SDX No. 29C (at District 5 grouping,

District 6 row). This compares to a pre-Enacted Plan Black population of 26.01% in CD 5. Tr. 1695:2–16 (Trende, Oct. 13 & SDX No. 28E. In other words, the proportion of voters moved from CD 5 to CD 6 had a significantly higher Black population than the voters who remained in CD 5.

334.    Mr. Trende's discussion of population movements between CDs 2 and 6 is incomplete, misleading, and unreliable: Mr. Trende's analysis examined only the demographic and partisan significance of the 23,771 people moved from CD 6 to CD 2—omitting the demographic or partisan significance of the reciprocal movement of 14,397 people from CD 2 to CD 6. Tr. 1697:13–22, 1698:21–24, 1699:11–1700:1 (Trende, Oct. 13); SDX No. 75 at Table 4. Although Mr. Trende acknowledged he could have "derived" the demographic and partisan composition of this population, he did not do so. Tr. 67:10-11 (Trende, Oct 13 AM). Without examining the reciprocal movements, Mr. Trende's conclusions regarding the demographic and partisan consequences of the population movements between CDs 2 and 6 are incomplete and unreliable.

335.    Mr. Trende's discussion of CDs 1 and 6 fails to consider the total movement of voters: In discussing the movement of people between CDs 1 and 6, Mr. Trende focuses on Charleston County. SDX No. 75 at 33-35. This focus obscures that while he presents the demographic and partisan significance of the 140,489 people moved from CD 1 to CD 6, he only discusses a small portion (5,309) of the 52,799 people moved from CD 6 to CD 1. Tr. 1703:11–15 (Trende, Oct. 13). *Compare* SDX No. 75 at 35 (discussing the "5,309 voters moved in from the 6th district to the 1st") *with* SDX No. 75 at Table 4 (noting that there were 52,799 people moved from CD 6 to CD 1). The failure to consider the full reciprocal movement of voters from CD 6 to CD 1 renders Mr. Trende's conclusions regarding the demographic and

partisan consequences of the population movements between CDs 2 and 6 incomplete and unreliable.

336.    <u>Mr. Trende's discussion of the demographics of CDs 1 and 6 is incomplete and misleading</u>: Mr. Trende's analysis compares the demographics of the population moved from CD 1 to CD 6 against the total demographics of Charleston and Dorchester Counties (*i.e.,* he used the wrong denominator) without considering that those counties were split under the 2011 map with approximately half of their Black populations already in CD 6.  *Compare* SDX No. 75 at 35 *with* PX No. 26 at 4-6).  Mr. Trende's analysis therefore obscures that 25.1% of the population moved from CD 1 to CD 6 was Black—a significantly higher percentage than the pre-Enacted Plan Black population of 17.78% in CD 1.  Tr. 1700:23–1701:9, 1701:23–1702:9 (Trende, Oct. 13) & SDX No. 29c (at District 6 grouping, District 1 row) & SDX No. 28e.  As both Dr. Ragusa and Dr. Duchin testified, the Enacted Plan assigned 79% of Black adults in Charleston County to CD 6.  Tr. 308:8–22 (Duchin, Oct. 4); Tr. 1052:9–1052:22 (Ragusa, Oct. 7). In other words, the proportion of voters moved from CD 1 to CD 6 had a significantly higher Black population than the voters who remained in CD 1, consistent with Dr. Ragusa's testimony as to the racial split of Charleston County.  Tr. 1052:9–1052:22 (Ragusa, Oct. 7).

337.    *Fourth*, Mr. Trende artificially limited the comparators for the Enacted Plan.  His comparative analysis only evaluated the Enacted Plan against the 2011 plan, and the only other plans he considered were historic plans.  Tr. 1678:1–22 (Trende, Oct. 13).  As a result, Mr. Trende did not consider the full range of plans that were submitted to or otherwise available to mapmakers.  Unlike the 2011 map and other predecessor maps, the publicly proposed plans are based on the demographic and legal landscape as it existed at the time the General Assembly

enacted S.865—those plans are far more indicative of the range of options available to the General Assembly, as well as Defendants' redistricting priorities.

338.    *Finally*, despite a limited qualitative analysis focused on historical maps, Mr. Trende did not conduct any other independent analysis, such as a simulations analysis, that he typically uses in other gerrymandering cases.  Tr. 1672:20–1673:24, 1677:13–15 (Trende, Oct. 13).  As Mr. Trende has observed in other reports, conducting an exclusively qualitative assessment-as he has done here—subjects the analysis to the critique that the expert is applying a "I-know-it-when-I-see-it standard."  Tr. 1676:25–1677:8 (Trende, Oct. 13).

**G.    Legislative Defendants Do Not Meet their Burden of Proof to Factually Show That the Predominant Use of Race Was Necessary to Meet a Compelling State Interest.**

339.    The Legislative Defendants have advanced no argument, evidence, or defense asserting that the district lines drawn in the Enacted Plan were narrowly tailored to serve a compelling state interest.

340.    The Legislative Defendants have disclaimed justification of the Enacted Plan as being grounded in compliance with the Voting Rights Act of 1965: "the Senate Defendants and the House Defendants have not asserted, and are not asserting at trial, a defense that alleged use of race to draw the Congressional Plan or the lines Plaintiffs challenge was 'reasonably necessary' to comply with the Voting Rights Act."  ECF No. 371 at 1 (Defendants' opposition to Plaintiffs' *in limine* motion to exclude evidence regarding VRA rationale).

341.    Defendants and their witnesses have testified that they did not consider any racially polarized voting analysis, which, among other VRA analyses, needed to be performed in order for Defendants to know whether the use of race in the Enacted Plan was "reasonably necessary" to comply with the VRA.  At the January 19, 2022 Senate Judiciary Committee hearing, Sen. Campsen stated, in response to Sen. Harpootlian's question as to

whether a racially polarized voting analysis was done, that he was "not aware of that being done here" and that a RPV analysis would only be done if a plaintiff "file[d] suit against [the congressional map]." PX No. 115 at 32:13-33:6; SDX No. 241 at 38:18-39:00 (video); *see* Tr. 873:11–873:20 (Harpootlian, Oct. 7) (Harpootlian testifying that "Senator Campsen said if somebody sues, that's when [an RPV analysis] becomes relevant"); *see also* supra Section II(E).

342.    Accordingly, Defendants have not made the requisite factual showing to assert a VRA-based defense to racial predominance in the absence of evidence that they conducted requisite VRA-based analyses, like assessing racial polarization. *See* ECF 371; *see also* Section IV(B).

343.    Plaintiffs' experts credibly testified, in any event, that compliance with the VRA's requirements cannot justify Defendants' legislative choices.

344.    For example, as discussed *supra* Section II(B)(ii)(d), Dr. Kosuke Imai's "statewide analysis" undertook to understand whether the cracking of Black communities along the boundary of CD 6—specifically, in the Challenged Districts—could be justified by a VRA-based legislative choice to ensure CD 6 BVAP remained at approximately its level in the enacted plan (46.9%) so as to not dilute Black voting strength. PX No. 32, at 9 n.4. Dr. Imai credibly testified to his findings that "race [] played a significant role in determining the boundaries between District 6 and its other surrounding districts … of the enacted plan, beyond the purpose of complying with the VRA and other traditional redistricting criteria[.]" *Id.* at 5.

345.    Dr. Duchin's testimony further corroborates that the cracking features of the Enacted Plan were not necessary to ensure that CD 6 remains an effective electoral district for minority voters. As discussed *supra* Section II(A)(vi), multiple publicly proposed plans were able to maintain a higher BVAP in CD 6 while also enhancing Black electoral opportunity in

other districts, while also outperforming the Enacted Map in terms of compactness and other

redistricting criteria.  *See* PX No. 67 at 9, 11-12 (Duchin expert report); PX No. 120 at 1-2

(Duchin supp. report); Tr. 338:19-339:9 (Duchin, Oct. 4).

III.    **THE ENACTED PLAN VIOLATES THE PROHIBITION ON INTENTIONAL DISCRIMINATION UNDER THE FOURTEENTH AND FIFTEENTH AMENDMENTS.**

A.      **South Carolina's History of Voting Discrimination Against Black Voters.**

346.    At trial, Plaintiffs introduced unrebutted evidence of South Carolina's long

and egregious history of official discrimination in voting, through the testimony of Dr. Joseph

Bagley and numerous legislative and fact witnesses, as discussed *infra*.

347.    Applying his expertise in American political history, southern legal

history, political analysis, historical methods, and the history of race discrimination in voting --

with a particular focus on South Carolina, southern race relations, and southern politics and law -

- Dr. Bagley testified at trial and produced two reports for this case. He drew from standard

sources in historical and social scientific analysis, including, but not limited to: public documents

from the South Carolina General Assembly's websites, such as video recordings and transcripts

of legislative committee meetings, floor debate, and public hearings from June 2021 through

January 2022; other information from the state's redistricting websites for the House and Senate;

newspaper and journalistic articles; court opinions, briefs, and memoranda; public statements;

and scholarly articles and books on voting rights in South Carolina. Tr. 1097:23–1098:1 (Bagley,

Oct. 11); PX No. 17 at 4.

348.    To assess intentional discrimination, Dr. Bagley applied the

methodological guidelines set forth by the Supreme Court in *Village of Arlington Heights v.*

*Metropolitan Housing Development Corporation*, 429 U.S. 252 (1977). The Court's guidelines are similar to those historians themselves apply to ascertain intentional discrimination. Tr. 1104:24–1105:11 (Bagley, Oct. 11). Under the *Arlington Heights* framework, courts may focus on five factors that are relevant to ascertaining intentional discrimination: (1) discriminatory impact, (2) historical background of discrimination, (3) the sequence of events leading up to the decision, (4) procedural or substantive deviations from the normal decision-making process, and (5) contemporaneous viewpoints expressed by the decision-makers. PX No. 17 at 3. Dr. Bagley analyzed the second, third, fourth and fifth *Arlington Heights* factors. PX No. 17 at 4; Tr. 1106:8–1107:17 (Bagley, Oct. 11).

349.    Dr. Bagley testified about the professional consensus surrounding South Carolina's long history of discrimination against its Black citizens, which has taken the form of, inter alia, vote denial and vote dilution tactics. Tr. 1110:17–1110:24 (Bagley, Oct. 11). In his report, Dr. Bagley concluded that his review of the evidence – specifically, the historical background of voting discrimination in South Carolina against Black citizens, the Enacted Plan's legislative history, irregularities in its drafting and enactment, and the statements by legislators during this process – supports a strong inference of discriminatory motive surrounding the enactment of S.865.  PX No. 17 at 4.

350.    For more than a century, South Carolina has been in the vanguard of instituting structures to deny or resisting structures to provide citizenship rights to Black people in America.  It was the first state to secede from the Union, Tr. 1112:18–1113:3 (Bagley Oct. 11), and, because of their interest in continuing to enslave Black people for incredible profit, South Carolina's planters were among the most ardent supporters of the Civil War, PX No. 17 at 4.  After the war, South Carolina was the first state to enact Black Codes, Tr. 1113:4–9 (Bagley

Oct. 11), and its Black Codes were the country's most severe, PX No. 17 at 5, Tr. 1113:4–1113:9

(Bagley Oct. 11).  Officials also resolved to prevent Black South Carolinians from voting and

purge the state of the Republican Party, and white Democrats orchestrated a campaign of racial

terror. PX No. 17 at 6. South Carolina became a one-party state with a white, localized "friends

and neighbors" approach to politics that excluded and persecuted Black South Carolinians. PX

No. 17 at 7. By 1902, there were no Black elected officials left at the state level, and Black voter

registration was a fraction of what it had been at the height of Reconstruction. PX No. 17 at 7.

351.    In the late 1940s, South Carolina Senator Strom Thurmond led a charge of

southern white Democrats out of the party, and he campaigned for President as a Dixiecrat. PX

No. 17 at 8. Mr. James Felder, a lifelong civil rights advocate in South Carolina and former

president and political action chair of the Columbia branch of the South Carolina NAACP,

testified that Thurmond preferred to refer to Black people in the state pejoratively as "nigras,"

declining to use even the term "negro," until over 100,000 Black residents registered to vote in

response to organizing efforts.  Tr. 1338:7–1339:19 (Felder, Oct. 12).  By 2000, white flight to

the Republican Party and Black identification with the Democratic Party was significant enough

that there were almost no Black Republicans and few remaining white Democrats in the South

Carolina General Assembly.  PX No. 17 at 20.

352.    In 1966, South Carolina became the first state to challenge the

constitutionality of the Voting Rights Act ("VRA"), and it was among the first states to enact

dilutive voting practices against Black voters. Tr. 1112:18–1115:5 (Bagley, Oct. 11).  When the

VRA passed, in 1965, there were no Black public officials in the state, even though 37 percent of

Black South Carolinians were registered to vote. PX No. 17 at 9. When faced with the inevitable

sharp increases in Black voter registration, South Carolina resorted to vote dilution practices. PX

No. 17 at 9. Across the state, county governing bodies switched to at-large voting systems, with multimember districts, numbered posts, and majority-vote requirements. PX No. 17 at 9-10.

353.     Following the VRA's enactment, South Carolina continued to restrict Black residents' efforts to register and vote. For the entire time Sections 4 and 5 of the VRA were in effect, South Carolina was a "covered" jurisdiction and required to preclear its laws concerning voting; the Justice Department objected to numerous legislative enactments. Most recently, in 2011, the Justice Department objected to the State's enactment of a strict voter photo identification law. PX No. 17 at 22. It concluded that the State had submitted no evidence of its stated concern and reason for the law – specifically, voter fraud – and it concluded that the State had done nothing to address the obviously disparate racial impact that the law would have if enacted. PX No. 17 at 22. Additionally, until 2000, the Confederate flag flew over the South Carolina State Capitol. The vote to remove it was contested, and lawmakers ultimately decided to have the flag fly on the Capitol grounds over a Confederate war memorial, voting to remove it only in 2015. PX No. 17 at 24.

354.     As a result of its discriminatory practices, South Carolina has faced a series of redistricting and pre-clearance challenges. Following the 1970 census, the Justice Department blocked a plan for the state Senate's reapportionment after concluding that it was likely to abridge minority voting rights. PX No. 17 at 11. South Carolina's efforts to redistrict its state House in the 1970s also brought on Justice Department objections and lengthy litigation. PX No. 17 at 12. In *Stevenson v. West*, 413 U.S. 902 (1973), the Supreme Court reversed a trial court's decision to uphold the House's use of multimember districts with numbered posts. But the legislature again created a plan that used such devices, leading the Justice Department to register an objection because of the "submergence of significant concentrations of Negro voters

into large majority multi-member districts and the magnification of this dilution of Negro voting strength by the numbered post and majority vote requirement." PX No. 17 at 12. The state finally relented and redistricted using single-member districts. PX No. 17 at 12.  In 1974, 13 Black candidates were elected to the state house, PX No. 17 at 12-13, but the state's Senate and congressional delegation remained all-white. PX No. 17 at 13. Moreover, Black representatives' presence in the state House led white legislators to abandon the longstanding system of legislative appointment of local governing bodies. PX No. 17 at 13. The authority to elect such bodies was delegated to the counties, and most of the counties adopted dilutive devices like numbered posts, staggered terms, overly-large districts, and majority vote requirements. PX No. 7 at 13.

355.    After the 1980 Census, the Justice Department determined that the state's House redistricting plan diluted and fragmented the minority vote in several counties, including Florence and Richland County. PX No. 17 at 13. The Justice Department also noted that it was aware of alternate proposals that would have avoided the fragmentation and dilution of minority voting strength, and that it received complaints alleging that such alternative proposals were rejected for racially discriminatory reasons. PX No. 17 at 13-14.

356.    After the 1990 Census, the governor was accused of vetoing the new state House and Senate redistricting plans because he wanted more safely white districts that Republicans could win. PX No. 17 at 14. In *Burton v. Sheheen*, a three-judge court ordered the use of a plan for the Senate establishing 11 districts with majority Black populations. PX No. 17 at 14. For the state House, the court adopted a plan that included 28 majority-minority districts. PX No. 17 at 15.

357.    After the 1990 Census, the South Carolina Assembly failed to pass a

congressional redistricting plan, and the court in *Burton* created one. PX No. 17 at 15. It drew CD 6 with a majority Black population, and Jim Clyburn was elected to Congress. PX No. 17 at 15. Clyburn became South Carolina's first Black representative in Washington in nearly a century. PX No. 17 at 15. He first ran against a white Republican, and the campaign was described in the media as having been tinged with racial controversy. PX No. 17 at 15. A television commercial featured a distorted photograph of Clyburn on a "Welfare Express" card, which his campaign manager described as reminiscent of blackface. PX No. 17 at 15. Clyburn characterized it as an effort to inject race into the campaign, and he insisted that the picture made him look like "Buckwheat." PX No. 17 at 15.

358.    Following the 2000 Census, the General Assembly passed redistricting plans for the state House and Senate and for the State's congressional districts.  But then-Governor Jim Hodges, a white Democrat, vetoed the bill because he found that the state legislative plans lacked sufficient "opportunity" districts for Black voters. PX No. 17 at 17. In 2002, the court in *Colleton County Council v. McConnell,* found overwhelming evidence of racially polarized voting. PX No. 17 at 18. The court adopted a plan for the state Senate that included 11 majority Black districts, 10 of which had a majority BVAP, and one opportunity district that sat just below 50 percent.  PX No. 17 at 18.  The court's plan for the state House established 31 majority Black districts, of which 28 had a majority BVAP.

359.    In 2010, although they passed with biracial support, that cycle's state legislative redistricting plan drew the ire of some Black and white Democrats who insisted that the plans packed Black voters into majority-minority districts to create safe, white districts for Republican candidates who would not have to campaign for Black votes. PX No. 17 at 18. South Carolina also gained a new U.S. congressional seat that cycle: CD 7. The legislature's

congressional redistricting plan maintained CD 6 as a majority-Black district in a manner that Rep. Gilda Cobb-Hunter criticized as unnecessarily packing CD 6 instead of drawing a second Black opportunity district. PX No. 17 at 18-19.  The plaintiffs in *Backus v. South Carolina* were found to have standing only to challenge CD 6, and the defendants in *Backus* defended that district by arguing they were "required by Section 2 to create majority-minority districts in which a compact minority group could elect its candidates of choice." They supported that decision by submitting a racially polarized voting analysis by Dr. Thomas Brunell, which showed that racially polarized voting was present and prevalent in South Carolina, justifying a majority-minority district.  *Backus v. South Carolina* 3:11-cv-03120 (D.S.C.) ECF Nos. 198 (Declaration of Dr. Thomas Brunell) at 1-6, 210 (*Post-Trial Memorandum of Defendant Robert W. Harrell, Jr.*), 211 (*Defendant Glenn F. McConnell's Post-Trial Memorandum*).

360.    By 2012, the Justice Department had objected to South Carolina state and local election changes 122 times. PX No. 17 at 21. Many of those objections involved redistricting measures, but others were aimed at blocking practices that diluted Black political and voting power at the local level in jurisdictions with significant Black population. PX No. 17 at 21. For example:

- Aiken County (in CD 2) was blocked from using numbered posts in all multi-member bodies in the county and from maintaining at-large positions on the school board. PX No. 17 at 21.

- Beaufort County was blocked from using at-large elections for county council. PX No. 17 at 21.

- The city of North Charleston was twice blocked from using at-large elections for its city council. PX No. 17 at 21.

- North Charleston was likewise blocked, more than once, from making racially selective and dilutive annexations, accepting only white areas to the point of leaving "'doughnut holes'" of Black neighborhoods unannexed. PX No. 17 at 21.

- The city of Charleston was blocked from reducing its Black majority city council districts in 2001 and from making racially selective and dilutive annexations. PX No. 17 at 21.

- Charleston County was blocked from using, for its charter council, multi-member districts, at-large elections, a majority vote requirement, residency requirements, and numbered posts. PX No. 17 at 21.

- Charleston County was also blocked from changing the method of electing the Board of Trustees for its school board from non-partisan to partisan elections and eliminating plurality victories by requiring head-to-head contests with a majority votes requirement. PX No. 17 at 21.

- Sumter also had its 2001 redistricting for county council blocked. PX No. 17 at 22.

- The city of Sumter was blocked from making racially selective annexations.  PX No. 17 at 22.

**B.     The South Carolina General Assembly's Enactment of S.865 Created a Discriminatory Impact.**

361.    As detailed in Plaintiffs' proposed findings of fact concerning racial predominance, *see supra* Section II(A)(i)*,* "strong signs of cracking are present" throughout the Challenged districts, all of which border Congressional District 6. Tr. 273:23–274:12 (Duchin, Oct. 4).

362.    Demographic and other changes since the 2010 redistricting cycle would

lead one would expect to see greater opportunity for Black voters to elect candidates of choice in the 2020 map. Tr. 283:15-284:8 (Duchin, Oct. 4). Statewide, Black residents comprise 26.78% of South Carolina's total population. PX No. 67 at 5. Using the most restrictive definition of Black population—that is, non-Hispanic respondents who choose Black and no other race, the statewide Black voting age population is 24.79% in South Carolina. *Id*. Since the 2010 redistricting cycle, the white share of the population in South Carolina has fallen, and "the concentration of Black population is going up." Tr. 283:7-284:22 (Duchin, Oct. 4). Racially diverse counties such as Charleston and Richland saw "pronounced BCVAP growth" that outpaced the rest of the State. PX No. 120 at 7; Tr. 283:15-284:8 (Duchin, Oct. 4). Reducing the CD 6 BVAP percentage from 52.5% to 46.9% meant that more Black voters should have become available to be allocated to neighboring districts. Tr. 283:22-25 (Duchin, Oct. 4). However, despite "more opportunity than ever to have Black voting power reflected in other districts," Tr. 284:4-8 (Duchin, Oct. 4), the Enacted Map strategically cracks and disperses Black voters who live near the boundaries of CD 6, as detailed *supra* Section II(B)(i)(f), ensuring that Black voters have no "meaningful opportunity" to elect candidates of choice outside CD 6. Tr. 291:6-15 (Duchin, Oct. 4).

363.    *Race-Based Line Drawing*: The district lines splitting Black communities tend to target areas where the concentration of Black voting age residents has increased since the last redistricting cycle. Tr. 306:13-22 (Duchin, Oct. 4). The Enacted Map, for example, cracks Black neighborhoods in Richland and Charleston Counties. Tr. 695:6–10 (Teague, Oct. 6); Tr. 306:13–22 (Duchin, Oct. 4); PX No. 120 at 7.



Figure 5: North Charleston is split between CD 1 and CD 6 as the district line winds between counties, in and out of the city, and through neighborhoods with significant Black population.



Figure 7: District lines wrap around and divide the city of Columbia. This splits both the city and the county in a manner that cracks Black population.

364.    High-density precincts serving Black voters were drawn out of CD 1. Tr. 693:24–694:3 (Teague, Oct 6); *see also* Tr. 1043:6–1045:23 (Ragusa, Oct. 7). As just one example, Charleston County's Black population was almost equally split between Congressional Districts 1 and 6 under the 2012 map. Tr. 1556:1–5 (Roberts, Oct. 12); *see also* Tr. 1051:24–1053:7 (Ragusa, Oct. 7).  But under S. 865, Charleston County's Black population is split with 80% in Congressional District 6 and 20% in Congressional District 1, Tr. 1556:6–15 (Roberts, Oct. 12), 1052:24–1053:7(Ragusa, Oct. 7), even though the Black population is spread out through Charleston County, Tr. 1557:17–23 (Roberts, Oct. 12).

365.    The shift in CD 6's approach to the City of Charleston from a northeastern to a western approach which resulted in moving St. Andrews/West Ashley precincts from CD 1 to CD 6 moved heavily Black neighborhoods to CD 6 – some 13,459 Black residents of voting age.  Describing this, Senator Bright Matthews noted that CD 6 went "into Charleston and pulled out areas of West Ashley and other areas in North Charleston just to put blacks into Congressional District 6.  And it creates . . . [what] looks like a funky boot print that goes into Congressional District 1."  PX No. 115 at 24:24–25:7. The Enacted Map also splits the areas of Ravenel, Hollywood, and Meggett, which are "heavily minority areas." Tr. 792:14–793:11 (Bright Matthews, Oct. 6).

366.    Mr. Roberts also conceded that moving the district lines into the Black community areas of North Charleston substantially affected the Black population's placement in Congressional Districts 1 and 6. Tr. 1558:20–1559:2 (Roberts, Oct. 12). Mr. Roberts acknowledged that this decision, along with other decisions, created a tremendous disparity for the placement of Black voters between Congressional Districts 1 and 6.  Tr. 1558:24–1559:5 (Roberts, Oct. 12). Indeed, this is consistent with Mr. Roberts' testimony. He conceded that Black residents living in the City of Charleston have a very close community of interest with other Black residents in Charleston County and far more in common than residents living in the City of Columbia. Tr. 1558:5–12 (Roberts, Oct. 12).

367.    Similarly, parts of Richland County where growth in Black population has "exploded" in recent years (and where residents have been successful in electing Black candidates to local offices) are placed in CD 2, alongside predominantly white counties, including Lexington County, which has a well-known history of lynching Black people and has little in common with Richland.  Tr. 764:10–766:15 (Garvin, Oct. 6).  Mr. Felder testified that

the CD 2 line separates parts of Richland County and the City of Columbia that are

"predominantly black." Tr. 1342:18–1343:4 (Felder, Oct. 12). This is consistent with Dr.

Duchin's observation that the CD 2 lines in Richland County "wrap[s]around and divide[s] the

city of Columbia" and its neighborhoods, splitting "both the city and the county in a manner that

cracks Black population." PX No. 67 at 19 & fig.7. Critically, there are "high Black

concentrations right around the area of that hook." Tr. 315:5–7 (Duchin, Oct. 4); *see also* PX

No. 67 at 18 (Dr. Duchin explaining that the hook "appears to crack voters by drawing district

boundaries through an area in northern Richland with high BVAP.").

 368.    Similarly, the split of Sumter County between CD 5 and CD 6 also "takes

away [Black voters'] voting strength," reducing their voting power in CD 5. Tr. 1349:22–

1350:24 (Felder, Oct. 12). As Dr. Duchin observed, citing a Sumter resident, "Sumter is split

down the middle," such that a "historic district" is cleaved, causing neighbors on nearby blocks

to belong to different congressional districts. *See* PX No. 67 at 37–38. The splintering of

Sumter County and the City of Sumter also causes confusion, in that voters mistakenly believe

that they are represented by the same congressperson as their neighbors and are then frustrated to

learn that they are forced to choose from a different slate of candidates. Tr. 1349:22–1350:24

(Felder, Oct. 12).

 369.    Splitting communities also "cause[s] confusion," as the Enacted Plan

assigns neighbors who "could shout across the street at each other" to different districts. Tr.

768:3–15 (Garvin, Oct. 6). For example, Richland residents assigned to CD 6 discover that they

are in the same district as parts of Charleston County more than 100 miles away, a part of the

state that they know little about. Tr. 767:5–768:15 (Garvin, Oct. 6).

370.    _Manipulation and Suppression of BVAP Levels_: When asked if it seemed that mapmakers drew the Enacted Map and "kept the percentage of black voting age population" in CD 1 "roughly the same" (at 17.3% pre-redistricting and 17.4% post-redistricting), Dr. Ragusa explained "that could have been by design and thus prevented the district from having a higher black voting age population."  Tr. 1075:16–1076:5 (Ragusa, Oct. 7); _see also_ PX 26 (Ragusa Expert Rebuttal Rep.) at 8–9.  In other words, mapmakers could have "froze[n] the BVAP at [around] 17.4 percent in the new district, thus preventing it from organically growing higher."  Tr. 1076:6–1076:13 (Ragusa, Oct. 7)

371.    As Dr. Duchin testified, the way that the Enacted Plan disperses Black voters around CD 6, in a manner that ensures no other district is competitive, is a statistical outlier when compared to a representative sample of plans that comply with traditional redistricting criteria. _See_, _e.g_., Tr. 335:10–16 (Duchin, Oct. 4); PX No. 67 at 23 fig.10; _see supra_ Section II(A)(i)(f).



Figure 10: This histogram compares the district with _second-highest_ BVAP in three current plans to those from 100,000 alternative plans. Most neutral plans are at or near 30% BVAP in their second highest district, while the state's plan is especially low. The SC-NAACP1 and Harpootlian plans are not cracked compared to the ensemble, even though they maintain CD 6 with BVAP levels above those in the state's plan.

372.    Compared to race-neutral maps generated in the simulations, the Enacted Plan assigns unusually high BVAP to CD 6 (i.e., the district where Black voters are already likely to elect their preferred candidate) and to the district with the lowest BVAP in the state (i.e., the district where Black voters are least likely to elect their preferred candidate). PX No. 120 at 2, fig.1; Tr. 343:20–23 (Duchin, Oct. 4).  By concentrating BVAP in those two districts where Black voters are not likely to make a difference in elections, the Enacted Plan is able to maintain unusually low BVAP in the remaining districts that otherwise could have been more competitive. Tr. 343:23–344:2 (Duchin, Oct. 4).



Figure 1: The box-and-whiskers plot shows the comparison of the four highlighted plans against an ensemble of 100,000 neutrally drawn plans (i.e., plans that consider population balance, contiguity, compactness, and the preservation of counties, but do not take racial or partisan data into account).

373.    The fact that "BVAP comes down significantly in CD 6 but the gains are dispersed across the other districts" in an inefficient manner "is exactly what cracking looks like." Tr. 292:15–24, 343:12–344:5 (Duchin, Oct. 4). Mr. Anjene Davis testified that the manner in which the maps were drawn "continues that pattern of lumping all the black voters or a

concentration of black voters into one particular congressional district[,]" continuing "a long-standing tradition of using race . . . to benefit . . . white voters." Tr. 94:13–95:20 (Davis, Oct. 3).

374.    _Movement of Black Voters_: Black voters have endured and are enduring unconstitutional discriminatory treatment based on how they were sorted into and out of districts. Looking at the demographics of the precinct movements, Dr. Liu conducted two analyses to determine how voters' party affiliation and race identity affected their district assignments under the Enacted Plan.  Ultimately, Dr. Liu concluded that the Enacted Plan's movement of Black Democrats differed from that of white Democrats, and that, overall, Black voters were much less likely to be assigned to CD 1 as compared to white voters, regardless of party affiliation.  PX No. 48 at 15-17 & tbl.6, 19-20 & tbl.9; _see supra_ Sections II(B)(iii), II(C)(iii).

375.    As Dr. Liu also testified about and demonstrated in his non-challenged rebuttal report, Black voters are disproportionately more likely to be in split counties than non-split counties. PX No. 62 at 4–6; Tr. 580:22–582:4 (Liu, Oct. 6). He found racial disparities in the counties that legislators selected to split. PX No. 62 at 4–7; Tr. 580:24–582:2 (Liu, Oct. 6). To make this determination, Dr. Liu relied on a very common and widely used methodology in social science known as the Chi-Square Test. Tr. 582:5–15 (Liu, Oct. 6).

376.    In addition, Dr. Duchin also found that S.865 "repairs splits selectively" and "conspicuously fails to heal cities and other areas of particular salience for Black communities" such as the city of Sumter. PX No. 87 at 2. She further detailed that the "splits clearly identified as being most harmful to Black voters—such as Sumter (40% White) and key neighborhoods of Charleston" are not healed in S. 865; however, "more heavily White cities (Beaufort – 65% White, Goose Creek – 58% White, Hanahan – 65% White) are made whole." PX No. 87 at 3.

377.     The electoral penalty imposed by the Enacted Map falls disproportionately on Black voters and is not felt equally by Democratic voters.  As Dr. Duchin testified, the Enacted Plan suppresses electoral opportunity to a greater extent when a Black Democrat is on the ballot, i.e., elections where racially polarized voting is the most pronounced. Tr. 360:22–362:18, 363:15–23, 365:25–366:7 (Duchin, Oct. 4).  Thus, white Democrats are able to achieve higher vote shares under the Enacted Plan than Black Democrats, and the Enacted Plan is less of an outlier when it comes to electoral opportunity in generic partisan contests. Tr. 360:22–362:18, 363:15–23, 365:25–366:7 (Duchin, Oct. 4).

378.     Dr. Ragusa's expert analysis also illustrates the discriminatory impact of the Enacted Map, in which "race was an important factor in the design of" multiple congressional districts, including CD 1, CD 2, and CD 5. PX No. 19 at 5–6.

379.     In CD 1, even when controlling for partisanship, Dr. Ragusa's analysis shows that Black voters were "significantly more likely to be moved out of the redrawn district," and "significantly less likely to be moved into and kept in the district." PX No. 19 at 5; Tr. 1043:6–1043:18 (Ragusa, Oct. 7).  These results were both statistically significant at a 99% level of confidence.  PX No. 19 at 8; Tr. 1043:6–1043:18 (Ragusa, Oct. 7).  In other words, Black voters were excluded from CD 1 "in both a statistically significant and substantively consequential fashion."  PX No. 19 at 5.

380.     In CD 2, even when controlling for partisanship, Dr. Ragusa's analysis shows that Black voters were "significantly less likely to be moved into the redrawn district," and "less likely to be moved into and kept in the district."  PX No. 19 at 5; Tr.  1045:23–1046:17 (Ragusa, Oct. 7).  These results were both statistically significant, at a 95% and 99% level of

confidence, respectively.  PX No. 19 at 9.  In other words, Black voters were excluded from CD 2 "in both a statistically significant and substantively consequential fashion."  PX No. 19 at 5.

381.    In CD 5, even when controlling for partisanship, Dr. Ragusa's analysis shows that Black voters were "significantly less likely to be added to the redrawn district," and "significantly less likely to be moved into and kept in the district."  PX No. 19 at 6; Tr. 1048:2– 1048:15 (Ragusa, Oct. 7).  These results were statistically significant at a 99% and 95% level of confidence, respectively.  PX No. 19 at 12.  In other words, Black voters were excluded from CD 5 "in both a statically significant and substantively consequential fashion."  PX No. 19 at 6.

382.    Dr. Liu also found that S.865 treats Black voters differently than white voters even where those voters are members of the same party in Congressional Districts 1 and 2. PX No. 48 at 14–21; Tr. 568:12–572:3, 575:4–578:5 (Liu, Oct. 6).

383.    Through his empirical test, Dr. Liu concluded that Black Democrats were "much more likely to be moved" under the Enacted Plan than white Democrats.  PX No. 48 at 16-17; *see supra* Sections II(B)(iii), II(C)(iii).  As Dr. Liu testified at trial as to CD 1, Black voters were "disproportionately the target of movement" under the Enacted Plan, regardless of party affiliation.  Tr. 570:11-572:3 (Liu, Oct. 6).  That movement of Black voters reflects "the cracking of Black voters in the Northern Charleston area and moving them into CD 6" from CD 1.  PX No. 48 at 17.  Dr. Liu also found similar results as to CD 2.  PX No. 48 at 18 & tbl.7, 20- 21 & tbl.11; Tr. 572:11-573:5, 577:6-578:5 (Liu, Oct. 6).

**Table 8: Enacted CD 1 and Assignments of Voters from the Envelope**

| Group | VAP in Envelope | VAP in District | (% of the Group in Envelope assigned to District) |
|---|---|---|---|
| Total | 82,8405 | 570,538 | (68.87%) |
| White | 545,365 | 405,889 | (74.43%) |
| Black | 175,920 | 92,684 | (52.69%) |
| Hispanic | 59,440 | 38,918 | (65.47%) |
| Other | 47,680 | 33,047 | (69.31%) |

**Table 9: Enacted CD 1 and Assignments of Voters—race v. party**

| Party Primary | Number of Voters in Envelop | Number of Voters in District | (% of Group That is in District) |
|---|---|---|---|
| White_DEM | 24,083 | 16,614 | 68.99 |
| Black_DEM | 25,397 | 12,864 | 50.65 |
| White_REP | 85,108 | 68,716 | 80.74 |
| Black_REP | 2,053 | 1,697 | 82.67 |

**Table 10: Enacted CD 2 and Assignments of Voters from the Envelope**

| Group | VAP in Envelope | VAP in District | (% of the Group in Envelope assigned to District) |
|---|---|---|---|
| Total | 768343 | 563028 | (73.28%) |
| White | 432872 | 360714 | (83.33%) |
| Black | 249655 | 134639 | (53.93%) |
| Hispanic | 41120 | 33556 | (81.61%) |
| Other | 44696 | 34119 | (76.34%) |

**Table 11: Enacted CD 2 and Assignments of Voters—race v. party**

| Party Primary | Number of Voters in Envelop | Number of Voters in District | (% of Group That is in District) |
|---|---|---|---|
| White_DEM | 21154 | 14991 | 70.87 |
| Black_DEM | 45343 | 22133 | 48.81 |
| White_REP | 74410 | 67433 | 90.62 |
| Black_REP | 1552 | 1065 | 68.61 |

384. <u>*The Enacted Plan Has Made it Less Likely Black Voters Can Elect Candidates of Choice*</u>: Because of the interaction between the cracking of Black communities in the presence of racially polarized voting, discussed *infra*, it is much more difficult, if not impossible, for Black voters to elect candidates of their choice in the Challenged Districts. PX No. 48 at 5–6.

385. Indeed, due to the cracking of Black communities, the Enacted Plan reduced Black voters' ability to elect candidates of their choice. PX No. 48 at 12–13; PX No. 67 at 25–26; PX No. 120 at 2–4. The resulting impact means Black voters are unable to elect or even influence elections in six out of the seven Congressional Districts. PX No. 48 at 12–13; PX No. 67 at 25–27; PX No. 120 at 2–4. By contrast, other maps that were submitted to the Legislature allow Black-preferred candidates to be competitive in two to four districts. PX No. 120 at 3–4; Tr. 349:23–351:4 (Duchin, Oct. 4).

386. Based on effectiveness analysis, Dr. Liu concluded that the Enacted Plan decreased electoral opportunities for Black voters based on an effectiveness analysis. Tr. 552:25–553:5 (Liu, Oct. 6). An effectiveness analysis allowed him to assess a plan's treatment of

138

electoral opportunities for Black voters. Tr. 560:20–561:6 (Liu, Oct. 6). His empirical analysis included three components, which could be easily replicated. Tr. 561:7–9 (Liu, Oct. 6). The first component of the effectiveness analysis compared the racial makeup of S. 865 against other congressional plans. Tr. 561:9–16 (Liu, Oct. 6). The second component of the analysis involved looking at racially polarized voting in the relevant election analyzed. Tr. 561:17–23 (Liu, Oct. 6); PX No. 48 at 12. As described *infra* Section III(f), the existence of racially polarized voting can enable a white voting bloc to usually defeat Black-preferred candidates in South Carolina. Tr. 561:17–23 (Liu, Oct. 6). The third component involved looking at how Black-preferred candidates performed in each congressional district under the competing plans. Tr. 561:24–562:3 (Liu, Oct. 6). In doing so, Dr. Liu looked at the average vote share that a Black-preferred candidate received. Tr. 561:9–16, 563:1–4 (Liu, Oct. 6); PX No. 48 at 12–13. As Dr. Liu testified, using the average vote share is a more reliable measure than white cross-over voting because it does not rely on any estimations. Tr. 565:13–23 (Liu, Oct. 6).

387.     In assessing the effectiveness of Senate Amendment 2A and two plans submitted to the legislature by SC NAACP (referred to as Plaintiff Plans 1 and 2), Dr. Liu found that those plans provide more electoral opportunity for Black voters compared to the Enacted Plan in Congressional District 1. Tr. 563:5–15 (Liu, Oct. 6); PX No. 48 at 13, 13 tbl.4. In fact, the Enacted Plan even provides less electoral opportunity in Congressional District 1. PX No. 48 at 13, 13 tbl.4. Senate Amendment 2a also provides more electoral opportunity for Black voters compared to the Enacted Plan in Congressional District 5. Tr. 564:4–9 (Liu, Oct. 6); PX No. 48 at 13, 13 tbl.4. S. 865 and the three above-mentioned plans maintain roughly equally electoral opportunities for Black voters in Congressional District 6. PX No. 48 at 13 tbl.4.

388.     Dr. Duchin corroborated Dr. Liu's findings regarding the reduced electoral

139

opportunity for Black voters under S.865 compared to other available maps. PX No. 67 at 25–27; PX No. 120 at 2–4.

389.    The Enacted map "puts African-American voters at a disadvantage," such that Black voters placed "don't have an opportunity to have an impact or sway on the congressional election." Tr. 761:23–762:9 (Garvin, Oct. 6).

390.    As Plaintiffs' fact witnesses have testified, dividing Black communities between multiple districts harms their ability to obtain congressional representation to address their needs.   For instance:

- Mr. Felder testified that his interests are not represented in congress and that his current congressperson for CD 2, Rep. Joe Wilson, has "not had any affinity with the black community," including when Mr. Felder was assigned to CD 2 in prior redistricting cycles.  Tr. 1341:18–1342:9 (Felder, Oct. 12).  Black residents "don't see" or "hear from" Rep. Wilson, who "doesn't show up" when invited to functions.  Tr. 1342:4–9 (Felder, Oct. 12).

- Rep. Garvin explained how Richland residents in CD 2 face a diabetic amputation crisis, but their congressional representative is not advocating for access to health care.  Tr. 768:16–769:2 (Garvin, Oct. 6).

- Similarly, Elizabeth Kilgore, President of the Sumter branch of the NAACP and Secretary of the South Carolina State Conference, testified that she does not feel that CD 5 representative Ralph Norman pays attention to her community.  Tr. 1224:11–1224:15 (Kilgore, Oct. 11). Kilgore detailed some of the needs in her community, including the need for a wellness center, better broadband, rental assistance, and food security. Tr. 1222:24–1223:21 (Kilgore, Oct. 11).  However,

she testified that she has "yet to see Representative Norman in my area." Tr. 1224:17 (Kilgore, Oct. 11). She also testified that Representative Norman voted against a bill that would have helped to reduce insulin costs, which is an important issue in her community. Tr. 1225:7–1225:14 (Kilgore, Oct. 11). "It's like my Black community is left out of the process altogether. We vote, but we don't count," she testified. Tr. 1225:24–1226:2 (Kilgore, Oct. 11).

- Henry Griffin, President of the upper-Berkeley Branch NAACP, also testified about his rural community's need for better broadband, and for clean water. Tr. 523:4–9 (Griffin, Oct. 4). He described how responsive congressional representation might help his branch address these issues. Tr. 523:10–524:6 (Griffin, Oct. 4). However, he testified that his Representative in CD 1 – Nancy Mace -- did not even bother to campaign in his community. Tr. 528:17–18 (Griffin, Oct. 4).

- President Murphy testified that the enacted map would lead to harmful outcomes for Black rural communities, especially in terms of opportunity for quality healthcare, economic development and educational resources. Tr. 1266:7–1266:14 (Murphy, Oct. 11).

- Rep. Cobb-Hunter testified that "while Congressman Clyburn has seniority and has been able to do some things for the district quite frankly, in my mind, there are a lot more things that could have been done and could still be done if we had the other six members of the congressional delegation were more sensitive, shall we say, to the needs of marginalized communities, communities of color in particular." Tr. 118:8–14 (Cobb-Hunter, Oct. 3).

- For example, Rep. Cobb-Hunter explained that South Carolina does not accept federal benefits such as Medicaid expansion. Tr. 117:12–15 (Cobb-Hunter, Oct. 3). Rep. Cobb-Hunter also testified about challenges with connectivity and the lack of broadband internet access for rural Black communities.  Tr. 117:3–9 (Cobb-Hunter, Oct. 3).

- Rep. King testified that not having congressional representation has impeded the ability for his community to advocate for federal funds for Historically Black Colleges and Universities such as Clinton College. Tr. 619:18–620:18 (King, Oct. 6).

### C.  The Sequence of Events Reveals Legislators Hid Their Efforts to Suppress Black Political Power Behind Pretextual and Tenuous Justifications.

#### i.  The House's and Senate's Public and Private Redistricting Criteria.

391.   On July 20, the House Redistricting Ad Hoc Committee held its first public meeting. PX Nos. 562 and 563. During this meeting, Chair Jordan introduced the House's proposed redistricting criteria and guidelines. PX No. 562 at 8:20-9:11.

392.   The House Redistricting Ad Hoc Committee adopted the criteria and guidelines (PX No. 175) at the end of its July 20 meeting. PX No. 562 at 9:25-11:4.

393.   The House considered these criteria to be authoritative.  In introducing the criteria, Chair Jordan characterized the criteria and guidelines as "our guiding principles that we'll be looking at . . . as we go through this process." PX No. 562 at 9:6-9. He further explained that the criteria and guidelines "are the things that we have to go by." PX No. 562 at 9:11-12. Although the House Redistricting Ad Hoc Committee did not seek input on the proposed criteria and guidelines from members of the public either before or during the hearing, Chair Jordan claimed that he and other members will be "talking with or asking the community" about the

document and seeking public feedback on redistricting in accordance with the guidelines. PX No. 562 at 9:13-16. Similarly, Mr. Dennis, as General Counsel to the House, testified he understood that the House's criteria to be "guideposts that recognize key factors [the House] need to consider." Dennis Dep. Tr. at 117:10-17. These criteria also informed the public on what criteria should be considered, and Mr. Dennis understood that it would be reasonable for members of the public to view the criteria as being consequential in the Ad Hoc Committee's review of proposed congressional maps. Dennis Dep. Tr. at 118:1-11. And Ms. Dean testified that legislators "heavily relied on" the redistricting guidelines. Dean (Vol. 2) Dep. Tr. 36:5-25

394.    The House also considered the guidelines to be comprehensive. The House Ad Hoc Redistricting Committee neither adopted nor relied upon any supplemental criteria. *See*, *e.g.*, Dennis Dep. Tr. at 124:6-13. At trial, Chair Jordan testified that the Ad Hoc Committee did not have any secret or hidden criteria not contained within the House's criteria and guidelines. Tr. 1792:5–12 (Jordan, Oct. 13). Similarly, Patrick Dennis testified that if supplemental criteria were developed, the House would have undergone a process and made those supplemental criteria available to the public. Dennis Dep. Tr. at 124:6-13; *see also* Tr. 1791:17–21 (Jordan, Oct. 13) ("Q. And you'd agree it wouldn't be fair to rely on criteria that's not shared with the public, right? A: I think it's very helpful to be transparent with the public when it comes to explaining to them the process by which we go through to draw these lines.").

395.    Under the House's criteria and guidelines, the first four Roman numerals—Constitution of the United States, Federal Law, State Law, and Equal Population/Deviation—are given priority. PX No. 175 at 1-3. As Mr. Dennis explained, these "prime" considerations would not be given a lower consideration if they conflicted with criteria or guidelines in other parts of the House's criteria and guidelines. *See*, *e.g.*, Dennis Dep. Tr. at

124:6-13.

396.    Under the House's criteria and guidelines, legislators may consider race

data in creating and developing congressional maps. PX No. 175 at 1. The criteria and guidelines

also prohibit the "dilution of racial or ethnic minority voting strength" and any congressional

map that is "demonstrated to have the intent or effect of dispersing or concentrating minority

population in a manner that prevents minorities from electing candidates of choice." PX No. 175

at 1.

397.    The House criteria and guidelines list several potential considerations that

may contribute to a community of interest. PX No. 175 at 2. Although "county boundaries,

municipality boundaries, and precinct lines may be considered as evidence of communities of

interest to be balanced," they "will be given no greater weight, as a matter of state policy, than

other identifiable communities of interest." PX No. 175 at 2.  While the House guidelines

provide incumbency may be considered, they further provide that "incumbency considerations

shall not influence the redistricting plan to such an extent as to overtake other redistricting

principles." PX No. 175 at 2.

398.    The following principles are *not* included in the House's criteria or

guidelines (PX No. 175):

    a.    Maintaining core constituencies, *see also* Tr. 1796:2–21 (Jordan,

        Oct. 13) ("Q. And you'd agree that core retention isn't mentioned

        in the House's criteria, right? A. Again, my layman's

        understanding, you could say it's contained within the incumbency

        aspect of it, the lines and the incumbency. But I would agree or

        concede that it's certainly not in black and white on the paper.");

b.      Reducing county, municipality, or VTD splits;

c.      Keeping Congressional District 7 as close to the 2011 map as possible;

d.      Relying on the 2011 map as the starting point for a new congressional map;

e.      Passing a minimal-change congressional map;

f.      Keeping Fort Jackson in Congressional District 2;

g.      Making Beaufort County whole;

h.      Prioritizing Congressional members' preferences;

i.      Including Beaufort County in Congressional District 1;

j.      Maintaining a 6-1 Republican advantage for Congressional seats;

k.      Increasing partisan gain, Tr. 1793:16–1794:3 (Jordan, Oct. 13);

l.      Making Congressional District 1 Republican leaning; and

m.     Prioritizing making smaller counties whole.

399.    On September 17, the Senate Redistricting Subcommittee held a hearing, in part, to consider proposed redistricting criteria and guidelines. PX No. 91; SDX No. 235. As Senator Rankin explained, the purpose of the hearing was to consider redistricting guidelines. PX No. 91 at 3:11-16.

400.    Like the House, the Senate considered its guidelines to be an authoritative and comprehensive set of criteria to be considered during the congressional redistricting process.

a.      After the Senate Redistricting Subcommittee voted to adopt the criteria and guidelines, Chair Rankin proclaimed that the criteria and guidelines would be "our guardrails, our end all and be all."

145

PX No. 91 at 56:5-8; Rankin Dep. Tr. at 175:24-176:8.

b.      Senator Campsen testified at trial that he similarly understood that
the Senate's redistricting criteria laid out the factors that would be
considered during congressional redistricting.  Tr. 1873:7–
13 (Campsen, Oct. 13). Senator Campsen testified he voted in
favor of publishing the Senate's criteria because it would provide
transparency and help members of the Senate and public know
what factors the Senate Redistricting Subcommittee was
considering and relying upon when drawing proposed
congressional maps. Tr. 1873:23–1874:3 (Campsen, Oct. 13).
Publishing the criteria was also meant to aid meaningful
participation by members of the public. Tr. 1874:4–6 (Campsen,
Oct. 13).

c.      Senator Talley, another Senate Redistricting Subcommittee
member, testified that Senate's redistricting criteria and guidelines
laid out considerations that they "should follow" through the
redistricting process, and did not feel like the Senate Redistricting
Subcommittee's maps could violate these guidelines.  Talley Dep.
Tr. 23:12-24:7, 25:4-10.  Senator Talley did not think a map would
be "seriously considered" if it did not meet these guidelines.
Talley Dep. Tr. 26:10-13.  Moreover, Sen. Talley was not aware of
any criteria or guidelines in addition to the published Senate
guidelines.  Talley Dep. Tr. 25:11-14.

d.     Senator Bright Matthews, a Black member of the Senate Redistricting Subcommittee, testified that she considered the Senate redistricting guidelines "binding" on the redistricting process.  Tr. 782:12–783:3 (Bright Matthews, Oct. 6).

e.     Ms. Paula Benson, a member of the core redistricting team who drafted the guidelines, testified the Senate's criteria and guidelines were an important document that the "subcommittee will follow in order to be able to evaluate and to propose plans for consideration." Benson Dep. Tr. at 119:19-25. She further testified the guidelines detailed "all the legal requirements and all the permissible things that can be considered by the subcommittee." Benson Dep Tr. at 120:1-11.

401.    The Senate Redistricting Subcommittee adopted its guidelines and criteria (SDX No. 3) on September 17, 2021.  PX No. 91 at 56:5-8.

402.    The Senate Redistricting Subcommittee did not amend or adopt any supplemental redistricting criteria or guidelines. Terreni Dep. Tr. 213:3-6.

403.    Under the Senate's redistricting criteria and guidelines, the first two Roman numerals—Requirements of Federal Law and Contiguity—are first tier considerations and mandatory. SDX No. 3 at 1-2. Under Roman numeral I(B), a congressional plan "must not have either the purpose or the effect of diluting minority voting strength and must otherwise comply with Section 2 of the Voting Rights Act, as expressed through *Thornburg v. Gingles* and its progeny, and the Fourteenth and Fifteenth Amendments to the U.S. Constitution." SDX No. 3 at 1. "A congressional plan must also avoid racial gerrymandering, meaning that while

147

consideration of race is permissible, race must not be the predominant factor in that race-neutral considerations are subordinated to racial considerations, unless that subordination is narrowly tailored to serve a compelling state interest." SDX No. 3 at 1.

404.    Under the third Roman numeral, the Senate may consider additional considerations, including "Communities of Interest," "Constituent Consistency," "Minimizing Divisions of County Boundaries," "Minimizing Divisions of Cities and Towns," "Minimizing Divisions of Voting Precinct Boundaries," and "District Compactness." SDX No. 3 at 2. But these lower tiered additional considerations "should be given consideration, where practical and appropriate, in no particular order." SDX No. 3 at 2. But a proposed congressional map could not violate federal law for the sake of adhering to one of these additional considerations. Terreni Dep. Tr. at 232:3-16.

405.    The Senate's criteria and guidelines also allowed for consideration of importable sources of demographic data, including race data. SDX No. 3 at 2.

406.    During the Senate Redistricting Subcommittee's September 17, 2021 meeting, Mr. Terreni proclaimed that "race may be a factor" in the drawing of congressional maps, and he asserted that the Senate Redistricting Subcommittee "should heed to that." PX No. 91 at 17:6–12.

407.    Sen. Harpootlian moved for an amendment for "the staff produce a written document that fully explains what the subcommittee should credit as sufficient evidence of a potential vote dilution that might warrant remedial racial -- racial district -- racial districting under Section 2 or the 14th and 15th amendment.  We should publish all data and analysis that might evidence or inform a conclusion so the public can review it and draw its own conclusions. A failure to justify these decisions with real evidence now needlessly risks this plan being

challenged at a later date in Federal Court…" PX No. 91 at 15:7–15:21. Sen. Harpootlian

amended his initial amendment to add the Gingles 1 framework. PX No. 91 at 35:6–35:9.

Additionally he moved to amend the guidelines so that "a redistricting plan for the general

assembly of Congress must not have either the purpose of effect of diluting minority voting

strength and must otherwise comply with Section 2 of the Voting Rights Act and the 14th and

15th Amendment." PX No. 91 at 36:20–36:25. Sen. Harpootlian' s Amendment passed. PX No.

17 at 28.

408.    During the Senate Redistricting Subcommittee's September 17, 2021

meeting, Mr. Terreni cautioned against conducting an RPV analysis because he asserted that the

Subcommittee "might be artificially setting [itself] up to meet certain racial targets where you

don't need to meet them." PX No. 91 at 17:1–5. At the same time, Mr. Terreni also

recommended that an RPV analysis may only be necessary once congressional districts were

drawn, but even then, it may not be required. PX No. 91 at 17:13–22.

409.    The Senate Redistricting Subcommittee voted down Senator Harpootlian's

motion, which included a request for an RPV analysis. PX No. 91 at 42:6–43:1. Senator

Campsen voted against the motion because he did not understand it. Tr. 60:15—61:1 (Campsen,

Oct 13 PM).

410.    During the Senate Redistricting Subcommittee's September 17, 2021

meeting, Mr. Terreni explained that members of the public identified their communities of

interest during the summer hearings, and that those communities of interests are "building

blocks" of redistricting plans. PX No. 91 at 65:11–17.

411.    The following principles are *not* included in the Senate's criteria or

guidelines (SDX No. 3):

a.    Keeping Congressional District 7 as close to the 2011 map as possible, *see also* Terreni Dep. at 267:22-268:4; Tr. 1522:11–14 (Roberts, Oct. 12);

b.    Making Congressional District 6 a least-change district, *see also* Tr. 1522:11–14 (Roberts, Oct. 12);

c.    Relying on the 2011 map as the starting point for a new congressional map;

d.    Passing a minimal-change congressional map, *see also* Terreni Dep. Tr. at 268:5-11;

e.    Keeping Fort Jackson in Congressional District 2, *see also* Terreni Dep. Tr. at 270:12-16, Tr. 1522:11–14 (Roberts, Oct. 12);

f.    Prioritizing Congressional members' preferences;

g.    Prioritizing making Beaufort County whole;

h.    Including Beaufort County in Congressional District 1, *see also* Terreni Dep. Tr. at 290:2-6;

i.    Making Congressional District 1 Republican leaning, *see also* Terreni Dep. Tr. at 270:17-271:1; and

j.    Prioritizing making smaller counties whole.

412.    Notwithstanding the understanding of numerous Senators on and staff to the Senate Redistricting Committee that the published guidelines were authoritative and comprehensive, Mr. Roberts testified that he and other Senate staff relied on a private (i.e., non-public) set of criteria and instructions that were concealed from members of the Senate Redistricting Subcommittee and members of the public. These secret criteria included:

a.     Mr. Roberts testified that Congressman Joe Wilson requested that Beaufort County *not* be included within Congressional District 2, which was honored in the Enacted Map. *See, e.g.*, Tr. 1528:24–1529:4 (Roberts, Oct. 12).

b.     Mr. Roberts testified that Congressman Wilson requested Fort Jackson be left in Congressional District 2, which Mr. Roberts honored in the Enacted Map. *See, e.g.*, Tr. 1478:10–12 (Roberts, Oct. 12).

c.     Mr. Roberts testified that Congressman Clyburn requested a minimal-change plan for just Congressional District 6, which was allegedly conveyed through Congressman Clyburn's staff member Dalton Tresvant in a meeting with Mr. Fiffick and Mr. Roberts. *See, e.g.*, Tr. 1517:2–8, 1519:8–10 (Roberts, Oct. 12). Neither Mr. Fiffick nor Mr. Roberts asked Mr. Tresvant what minimal change meant in CD 6, even though Mr. Roberts knew that CD 6 could not be a least-changed district because it required adding a large population to comply with total-population-deviation standard, following the 2020 Census. Tr. 1519:8–14 (Roberts, Oct. 12). Mr. Roberts never followed up with Mr. Tresvant. Tr. 1519:6–7 (Roberts, Oct. 12).

d.     Mr. Roberts testified that Congressman Clyburn, through Mr. Tresvant, requested that Sumter County be whole and fully within Congressional District 6. Tr. 1518:13–22 (Roberts, Oct. 12). But

unlike Congressman Wilson's requests, Congressman Clyburn's request regarding Sumter County was not honored in the Enacted Map.  Tr. 1518:18–22 (Roberts, Oct. 12).

e.  Mr. Roberts testified that Senator Rankin instructed Mr. Fiffick to not "touch" the Congressional District 7 lines, which was honored in the Enacted Map. *See, e.g.*, Tr. 1402:13–16 (Roberts, Oct. 12), Tr. 1516:10–15 (Roberts, Oct. 12).

f.  Mr. Roberts testified that Mr. Terreni, one of the Senate's outside redistricting counsel, instructed him to consider politics and partisanship in the drawing of congressional maps. Tr. 1495:3–14; 21–23 (Roberts, Oct. 12).

g.  Mr. Roberts testified that Grooms, who is a white legislator, instructed him to move all of Berkely County into Congressional District 1. Tr. 1523:18–20 (Roberts, Oct. 12).  This is reflected in the Enacted Map.

h.  Mr. Roberts testified the core redistricting team aimed to make Congressional District 1 more Republican leaning than the 2011 congressional plan.  Tr. 1422:14–25 (Roberts, Oct. 12). This is reflected in the Enacted Map.

413.    Mr. Roberts acknowledged during his testimony that implementing private, undisclosed criteria related to Congressional Districts 2, 6, and 7 constrained Mr. Roberts' ability to move certain populations in and out of Congressional Districts 1 and 6. Tr. 1523:11–14 (Roberts, Oct. 12).

414.    Mr. Roberts acknowledged during his testimony that it would have been helpful to publicly share the private criteria relating to Congressional Districts 2, 6, and 7. Tr. 1522:20–23 (Roberts, Oct. 12). But Mr. Roberts did not disclose these private criteria when he presented the Senate staff plan or in response to questions that he received during the Senate Redistricting Subcommittee's November 29 hearing. *See*, *e.g.*, Tr. 1522:11–19 (Roberts, Oct. 12). Rather, he stated at the November 29 hearing that the members of Congress who had been consulted had "very little" input on the map. PX No. 98 at 27:10-21.

415.    Nor were any of these instructions disclosed during the Senate Redistricting Subcommittee hearings on January 13, *see generally* PX No. 113; Senate Judiciary Committee on January 19, *see generally* PX No. 115; or Senate floor debate on January 20, *see generally* PX No. 116. But Mr. Roberts similarly never publicly disclosed the instructions he received from Senator Grooms, Mr. Terreni, or other members of the Senate core team to make CD 1 more partisan. *See*, *e.g.*, Tr. 1543:23–1544:5, 1426:13–15 (Roberts, Oct. 12).

        **ii.**      **Pre-Legislative Hearing Public Testimony About Redistricting**

416.    The Senate Redistricting Subcommittee held public hearings in July 2021 and August 2021 in Aiken, Conway, Orangeburg, Beaufort, Florence, Greenville, Rock Hill, Sumter, and Columbia, where it accepted real-time and written testimony—repeatedly asking the legislature to not pack and crack Black communities in redistricting. PX No. 17 at 27; SDX No. 80-87 224-233A. The House Ad Hoc Committee held hearings in September 2021 and October 2021, in Myrtle Beach, Florence, York, Greenville, North Charleston, Bluffton, Aiken, Greenwood, Orangeburg, and Columbia, where citizens expressed a desire for minority representation and the ability of Black voters to have an equitable opportunity to elect their candidates of choice in redistricting. PX No. 17 at 29; PX No. 540-559; PX No. 176.

417.    At the Senate's public hearings, Senator Luke Rankin repeatedly

explained that the hearings were organized to learn what the public considered to be their communities of interest. At the July 27, 2021, public hearing in Columbia, for instance, he encouraged participants to inform the Senate about their similar interests, "whether they're economic, cultural, recreational or historical, that create communities of interest that you want us to consider." SDX No. 224a at 9:8-12; SDX No. 224a at 8:19-25. At the August 10, 2021, hearing in Charleston, he assured the audience that "We're here to hear you and to listen to you as you tell us what you believe these communities of interest would be." SDX No. 231a at 7:12-14. In Sumter, he told the public that "Tonight we want to hear from you as to what you consider your communities of interest are." SDX No. 225a at 6:22-24. Senator Rankin also repeatedly encouraged participants to tell the Senators about the factors the public wanted the Senate to consider in drawing congressional districts.  S 224a at 8:19-25.  "Staff will work up plans in districts based on what we hear," he announced in Columbia.  S 224a at 9:4-5.  In Charleston, he told the public that their testimony would "help us shape these boundaries and help us decide on what criteria or guidelines these districts should be comprised of." S 231a at 7:14-17.  And in Sumter he told the audience that "your ideas, collectively, will help us shape district boundaries." S 225a at 7:11-12.  Therefore, input from the summer public hearings was intended to aid the Senate to draw congressional maps. *See*, *e.g*., Tr. 1900:22–24 (Campsen, Oct. 13).

418.     At the House's public hearings, Rep. Jay Jordan emphasized the importance of public input. In Columbia, he told participants that "[w]e welcome input as to important social, cultural, and historical context in which you describe your community." PX No. 560 at 6. In North Charleston, he told participants that "[t]he public's input is a crucial consideration of this committee as we formulate a proposed plan."  PX No. 548 at 5.  He made similar statements in Conway, Florence, York, Greenville, Bluffton, Aiken, Greenwood, and

Orangeburg. PX No. 540 at 5-8; PX No. 542 at 6-7; PX No. 544 at 7; PX No. 546 at 7-8; PX No. 550 at 6-7; PX No. 552 at 6-7; PX No. 554 at 8; PX No. 556 at 7.

419.    Members of the public and legislators notified the Senate redistricting subcommittee and the House Ad Hoc Redistricting Committee about important communities of interest. For example, citizens expressed concerns about the Senate and House redistricting committees not respecting communities of interest in Charleston County. Ms. Shayna Howell, stated, "I urge you to consider [Charleston] county a community of interest and not split it so many ways...While I appreciate the idea of the coast as a group of residents with shared interests, I believe we would be better served by districts that don't split so many county lines – residents of these coastal counties typically all care about our coastal resources – so their voice will not be diluted." PX No. 67 at 36. Mr. William Christopher asked for the Ad Hoc Redistricting Committee "to be consistent when you consider the county lines and city lines and not divide any communities, which should not be divided if it weren't for outside pressures" and lists Charleston as an area of concern. PX No. 544 at 17:12-18:19. Mr. Brady Quirk-Garvan explained,  "Keeping neighborhoods [and] geographic zones together are important not only because it allows constituents to know their representatives, but because it allows for greater economic progress. When Senators and House members draw elongated districts and stretch districts across rivers, oceans, and county lines, it creates problems when it comes to advocacy for district. It is difficult to be the best advocate for your constituents when a district involves multiple counties and widely different geographic areas. The needs of a dense suburb like Mt. Pleasant and Charleston County are very different from rural Berkeley County, and sometimes their needs are antithetical to one another; and yet we have districts where senators are asked to provide the same level of advocacy to both, and that just doesn't happen. Another example of

this is my congressional district, District 6, which runs from here in North Charleston up to Columbia. And I can assure you, living here, that North Charleston is much more intertwined with Charleston and the Lowcountry than it is with the Midlands." PX No. 67 at 35-36. Ms. Gloria Aslanidis shared, "My home is in the City of Charleston and the County of Charleston.... I'm sure Dorchester County is a lovely place to live, but I see no community of interest."

420.     There was also testimony about keeping counties whole. Ms. Kelly Gorby explained, "Charleston County deserved to be in one U.S. Congressional District. North Charleston problems, North Charleston interests should be considered with the rest of Charleston County and not with Columbia. That's where our airport is. That's where our tourists are coming into town. They're sleeping in those hotels. They're shopping at Tanger Outlets. There's really no reason that they shouldn't be considered in our same U.S. Congressional District." PX No. 67 at 35.  Mr. David Quick shared, "We need our – our congressional district not to stretch all the way down. We've got three hubs on the coast and, let's face it, the coast is one of our big drivers of South Carolina's economy. You've got – you've got the Grand Strand, you've got Charleston, and you've got Hilton Head and Beaufort. These are very distinct hubs. Let's try to think along those hub lines, you know, and those natural boundaries. And, really, let's make – let's make these lines make sense and not confuse voters anymore... And just like so many people said, people in North Charleston have more in common with people in Charleston than they do in Columbia." PX No. 67 at 36.

421.     Similarly, community members shared their concerns about CD 5 and communities of interest in Sumter. For example, Mr. Archie Parnell explained, "And here we are in Sumter and Sumter is split down the middle. The historic district where I live, three blocks down is a different congressional district. Two blocks up is a different congressional district...

And I think there is a community of interest here in Sumter and I would urge you to continue with your criteria that you've adopted years ago and, hopefully, keep counties together. Now, I realize that these various criteria are not all in one direction. Sometimes they conflict with each other and so you cannot just always have a win/win on everything. But I would urge you that the lines that are drawn in Sumter be redrawn in order to make it more of a unit, more of a community of interest." PX No. 67 at 37-38. Mr. John Reilly explained, "I'm not in a big populated area, but everything else I do is in Sumter. And everything that people in my neighborhood do is in Sumter. We're attached to Shaw, so that's kind of how we – everything is Sumter oriented, but our representation, if I have anything to say to anybody, is in Richland. Which really doesn't make any sense for us." PX No. 67 at 38. Mr. Anthony Nyser explained, "So like I was saying, I've only been a resident of South Carolina, namely Sumter, for a couple of years. The first two years I lived in town was normal. And then when I bought a home at the beginning of this year, I'm wanting to say it's about a three-mile difference between the old home and the new home, but I have a completely different representation at all levels. And that's something that was really concerning to me because I still shop at the same Piggly Wiggly. Everyone is Sumter still goes to the same one Starbucks. We all have very, very aligned interests, lifestyles. There's some obvious socioeconomic differences in town, but it's still one town, one community." PX No. 67 at 38.

      422.    Similarly, members of the public expressed concerns during the public hearings about the treatment of Columbia. For example, Mr. William Maxie explained, "And so when you go to redistrict this time – and there's been a lot of growth in South Carolina, and y'all have to make a lot of changes – I would urge you to make sure that these districts are fair, obviously, and equitable, but make sure that they make sense geometrically... I mean, you know,

the 2nd District is a good example where Representative Wilson is. I mean, it reaches around the City of Columbia, and to what end is that? I mean, do people in downtown Columbia not have that much in common with people from Forest Acres or people right across the river? No, they do. That's where a lot of those people live and a lot of those people work, so, you know, the shape of these districts is important, and y'all really need to make sure that towns and counties stay whole to make sure that our communities of interest are represented. That's not just a legal term. That's just the people that we live with and work with, that we worship with and that we spend all of our time with." PX No. 67 at 37. Ms. Jonnieka Farr, Co-chair of Columbia Branch of NAACP Political Action Committee and Chair Richland County Democratic Women's Council, explained, "I live in the Northeast Columbia area...I would like for the redistricting committee to ensure that redistricting is not done in such a way that arbitrary lines are drawn splitting neighborhoods." PX No. 67 at 37. In addition, Ms. Lynn Teague of the SC League of Women Voters, explained, "CD 2 should not have a finger projecting through Columbia. In Richland County, the effort to get CD 2 to Fort Jackson drives CD 2 through the Black communities of northwest Richland, separating them from neighboring communities to allow the incumbent to 'keep' Fort Jackson within 'his' district. Why must a legislator have a specific base within his district to protect it in deliberations of the House Armed Services Committee? Also, how does an incumbent's interest constitute a community of interest-especially where it requires violating a clear and very real community of interest of minority voters?" PX No. 67 at 37.

      423.    Similarly, members of the public expressed concerns about Orangeburg being split from CD 2. For example, Mr. Chester Palmer explained, "[Orangeburg County has] much more in common with Columbia and Richland and Lexington than we do with Charleston. And that's something that you need to consider when you redraw the district lines." PX No. 67 at

37. Mr. Larry Wagner echoed and explained, "Now, what do those folks down in the tail of Georgia have to do – a commonality with Orangeburg-Calhoun County where we live in St. Matthews?" PX No. 67 at 37.

424.    Legislators also expressed their concerns about both these same communities of interest and general concerns about diluting the Black vote during the redistricting process. For example, State Representative Jerry Govan, who is a Black legislative member, explained, "The redistricting process should incorporate more of the City of Orangeburg and more of the nearby suburbs, considering the history of this district... The City of Orangeburg and surrounding areas in Central Orangeburg County should continue to have a voice in their respective areas." PX No. 67 at 37. Representative Cobb-Hunter, a Black legislative member, also stated during the public hearing process, "And I'll start with the congressional maps because I saw something in the news that was very troubling to me. Don't know if there's any truth to it. I hope it's not, but I saw something that suggested that there would be an effort on the part of Republicans in the legislature to pack all -as many blacks as possible into the six congressional district so that Nancy Mace and the first congressional district will be in a stronger position to win reelection. I would encourage the Committee to resist the temptation to do that for this reason." PX No. 556 at 31:14-31:25. Representative Cobb-Hunter continued to raise these concerns and explained, "It is unfair to voters of color for any more voters of color to be packed into the six congressional districts. With a significant gain in population here in this state, there is a tremendous opportunity for South Carolina's seven congressional districts to be truly representative of South Carolina." PX No. 556 at 32:4-32:10.

425.    During the course these public hearings, no one sought or requested to have Charleston, Richland, Sumter, Orangeburg, or Florence Counties split, nor is there any

evidence that anyone thought it was important to keep the Charleston/Dorechester/Berkeley "tri-county" area all in CD 1, to make Berkeley County whole in CD 1, or that Charleston should have two representatives in Congress; for that matter, no one testified that other large municipalities in South Carolina, such as Columbia, Rock Hill, or Greenville should have two representatives in Congress. *See* SDX No. 231a; SDX No. 224a; SDX No. 225a; SDX No. 226a; SDX No. 227a; SDX No. 228a; SDX No. 229a; SDX No. 30a; SDX No. 231a; SDX No. 232a; SDX No. 233a; PX No. 540; PX No. 542; PX No. 544; PX No. 546; PX No. 548; PX No. 550; PX No. 552; PX No. 554; PX No. 556; PX No. 560. All of this is also true with respect to the hundreds of public comments related to these hearings. *See* SDX No. 9-16; SDX No. 80-90.

426.    The Enacted Map ignored the concerns of most of these communities, aside from listening to feedback to keep Beaufort whole in CD 1. SDX No. 29A. The vast majority of the calls to keep Beaufort whole came after December 14, 2021, when Senator Campsen started working to enlist Beaufort County activists to register their objections to the House Staff plan. SDX 9–16; SDX 94–95.

427.    Dr. Duchin found that district reassignments were not aimed at healing key splits of cities and communities that were frequently cited in the public testimony, including Columbia, Sumter, Orangeburg, and Charleston. PX No. 67 at 15. She found that this produces a map that cuts those areas in a way that neither respects traditional redistricting principles nor publicly identified community needs. PX No. 67 at 15.

iii.    **The Development of the Enacted Plan.**

*Development of the Senate's Staff Plan*

428.    As described above and in this subsection, the Senate's core redistricting team relied on the Senate's criteria and guidelines, along with a private set of criteria that was not disclosed to members of the public and Senators. *Supra* Section III(C)(i).

429.    The Senate's core redistricting team and outside counsel developed the Senate's initial staff plan. Mr. Terreni provided input, along with Mr. Roberts and Mr. Fiffick. *See*, *e.g.*, Terreni Dep. Tr. at 331:22-332:11; Fiffick Dep. Tr. at 245:19-25, 246:18-247:16. The law firm of Jones Day, counsel for Senate Defendants in the current case, also played a role in developing the staff plan by providing legal advice. Terreni Dep. at 287:20-25.  Questions about whether a map complied with the VRA, for example, would go to Mr. Gore, Terreni Dep. at 200:7-25, as well as legal questions about compliance with the Senate's redistricting criteria, Terreni Dep. at 160:13-163:23.

430.    As Mr. Roberts explained, assessment about compliance with the Voting Rights Act or federal law impacts how maps look and the process for drawing maps. Tr. 1531:3–5 (Roberts, Oct. 12). It also impacts the technical side of how Mr. Roberts would draw a map. Tr. 1530:23–1531:2 (Roberts, Oct. 12 PM).

431.    Senate Defendant witnesses testified that no Senator provided input into the development of the initial Senate staff plan. PX No. 98 at 37:7-18; Tr. 1872:3–6 (Campsen, Oct. 13); Tr. 1424:2–6 (Roberts, Oct. 12). They similarly testified that no Senator saw the draft plan before it was publicly released on November 23, 2021. Tr. 1832:7–12 (Campsen, Oct. 13); Tr. 1424:2–12 (Roberts, Oct. 12).

432.    There is no doubt that Mr. Roberts drew the staff plan from a purely technical perspective. Tr. 1515:3–5 (Roberts, Oct. 12). But he and the other Senate witnesses

provided inconsistent statements regarding who made substantive decisions on *why* lines were

drawn a certain way. Mr. Roberts, for example, claimed that the Senate's redistricting criteria

and guidelines were "just general principles that guide the redistricting process," but do not tell

him "where to put district lines." Tr. 1393:11–15 (Roberts, Oct. 12). Instead, Mr. Roberts

claimed that he took instructions from other people and "drew what [he] was told to draw," and

primarily received input from Mr. Terreni and Mr. Fiffick. *See*, *e.g.*, Tr. 1497:23–1499:5

(Roberts, Oct. 12). A decision whether to split a county, for example, would have been an

instruction by Mr. Terreni or Mr. Fiffick. Tr. 1519:3–5 (Roberts, Oct. 12).

433.    But Mr. Terreni testified he did not recall directing Mr. Roberts to draw

the staff plan in any specific way, Terreni Dep. at 288:9-19. Instead, Mr. Terreni testified that

Mr. Roberts brought a draft plan that he thought "was a good starting point" to Mr. Terreni and

the core redistricting team. Terreni Dep. at 290:4-15. Mr. Terreni and staff members then used

that draft as the basis for discussion to create the initial staff plan. Terreni Dep. at 290:4-15.

434.    Similarly, the Senate witnesses are inconsistent in how they describe the

role of public feedback in drafting maps. Mr. Terreni testified that Mr. Roberts was distilling and

incorporating feedback from the public hearings into the staff plan. Terreni Dep. at 295:3-10.

This understanding was consistent with Chair Rankin's public statements that staff were

instructed to develop a plan based on input from those hearings and other materials submitted by

members of the public. PX No. 98 at 3:9-4:10. At trial, however, Mr. Roberts testified that the

public feedback from the Senate's ten hearings over the summer didn't give him much

information from "a cartography standpoint," including not getting "a lot of information for what

[he was] looking for, such as communities of interest." Tr. 1366:24–1367:4 (Roberts, Oct. 12).

Mr. Roberts' trial testimony is directly inconsistent with Chair Rankin's public pronouncements

that the hearings did provide information about communities of interests. *See*, *e.g.*, PX No. 98 at

3:10-14 (Chair Rankin explaining that the Senate Redistricting Subcommittee "received

testimony across the state about communities of interest" from the ten hearings.).

435.     Indeed, Mr. Roberts testified he did not go back and review any of the

transcripts from the ten hearings when he was drawing maps or looking at communities of

interest. Tr. 1539:16–18 (Roberts, Oct. 12). But as discussed above, these ten public hearings

provided ample testimony about communities of interest and other commons themes relevant to

making decisions about drawing congressional district lines. *See infra* Section III(C)(ii).

436.     Senate staff elevated certain communities of interest over others. Even

though Mr. Roberts claimed the public hearings did not provide useful information, as described

directly above, Mr. Roberts still claimed he heard a "good amount of testimony on Sun City,"

including that community members represented they wanted to be part of CD 1. Tr. 1367:24–

1368:5 (Roberts, Oct. 12). The Senate staff prioritized purported public testimony to move Sun

City, which is a gated retirement community of majority white people within Jasper County that

has a significant Black population, into CD 1. Tr. 1470:21–24 (Roberts, Oct. 12); Terreni Dep.

Tr. 295:25-296:8. But what Mr. Roberts omitted and is clear within the record is community

members at these meetings had concerns about county and precinct splits, concerns about

packing and cracking Black communities and consideration of specific Communities of Interests.

PX No. 17 at 27.

437.     Similarly, there is a disconnect between Chair Rankin's testimony that

staff were instructed to draw the staff plan based on materials the Senate Redistricting

Subcommittee received, including maps proposed by members of the public and testimony about

those plans,  PX No. 98 at 3:20-4:3, and what the staff said: Mr. Terreni, Mr. Fiffick, and Mr.

Roberts testified they did not really engage with maps submitted by members of the public in developing the staff plan. *See*, *e.g.*, Fiffick Dep. Tr. at 283:11-20.

438.    Moreover, irrespective of any purported conversation with Mr. Tresvant, discussed below, Mr. Roberts conceded that he planned and prioritized the principle of preserving cores of existing districts over other traditional redistricting principles. Tr. 42:21–25, 1525:4–7 (Roberts, Oct. 12). Mr. Roberts could not recall who gave him the instruction to elevate maintaining cores of existing districts. Tr. 1524:24–1525:16 (Roberts, Oct. 12).

439.    The Senate Redistricting Subcommittee released the initial staff plan to the public on Tuesday, November 23. PX No. 98 at 5:1–5. Senators Harpootlian and Bright Matthews testified that they did not see the plan before it was released, and they were upset the plan was released on the Tuesday before Thanksgiving, with a public hearing scheduled the following Monday.  Tr.  828:19–829:10 (Matthews, Oct. 7); Tr. 865:23-25 (Harpootlian, Oct. 7). As discussed in more detail below, Mr. Roberts presented the plan to the Senate Redistricting Subcommittee and members of the public during the Subcommittee's November 29 hearing. *See* PX No. 98 at 4:23–7:16.

440.    As discussed in detail below, members of the public and Senators raised many concerns about the Senate staff plan at the November 29, 2021 hearing, including claims that it was harming Black voters and constituted a racially gerrymandered map. *See, e.g.*, PX 17 at 32–34; PX No. 98.

***NRRT Submission of Non-Public Maps.***

441.    At the November 29, 2021 Senate Redistricting Subcommittee meeting, staff disclosed that a national partisan group had submitted some sort of input to the members of the staff, unbeknownst to at least the Democratic members of the Committee. PX No. 17 at 32; PX No. 98 at 28:19-29:20.

442.    In response to a question by Senator Harpootlian, Mr. Roberts said that staff had heard from "some outside groups" after the initial staff map was published and that insofar as they might have heard from such groups prior to the publication of the map, it would not have affected the drawing of the map. By the end of the meeting, it was established that the Committee had input, *prior* to the publication of the Senate's initial map, from Adam Kincaid, Executive Director of the National Republican Redistricting Trust (NRRT). PX17 at 33; PX No. 98 at 67:15-24.

443.    The NRRT submitted three draft maps to the Senate redistricting staff through Andrew Fiffick's personal gmail address.  Kincaid Dep. Tr. 58:7-10, 71:2-13, 75:18-76:6; Fiffick Dep. Tr. 240:21-241:2; Terreni Dep. Tr. 79:19-80:10, 83:10-84:22. These maps were named by the Senate staff "Palmetto" (SDX No. 38A, PX No. 484), "Wren" (SDX No. 39A, PX No. 483), and "Jessamine" (SDX No. 41, PX No. 485).

444.    The NRRT maps were drawn by Adam Kincaid, the NRRT Executive Director, following his meetings with South Carolina's Republican congressional delegation (but not Congressman Clyburn) and their chiefs of staff during an in-person meeting in November 2021 that took place in Washington, D.C. Kincaid Dep. Tr. 74:21-75:6, 82:22-84:6. At that meeting, the congressmen who represented CDs 2, 3, 4, 5 and 7 advised Mr. Kincaid that they "wanted as much of their current districts as they could have," with Congressman Rice asking that Florence County remain split. Kincaid Dep. Tr. 84:15-85:13.

445.    The NRRT sent the "Palmetto" and "Wren" maps to Andrew Fiffick on the evening of November 18, 2021, five days before the Senate staff released their first map on November 23, 2021.  PX No. 493, PX No. 494; Tr. 1399:7–18 (Roberts, Oct. 12) (confirming Roberts saw the NRRT plans "before the staff plan").  Mr. Roberts testified at trial that he did

not start drawing the Senate Staff Plan until November 19, which is the day after the NRRT maps were received.  Tr. 1404:16–19 (Roberts, Oct. 12) Tr. 1515:12–14 (Roberts, Oct. 12).

446.     The NRRT sent the "Jessamine" map to Andrew Fiffick on November 24, 2021, the day *after* the Senate staff released their initial map and five days *before* the Senate Redistricting Subcommittee meeting to discuss the staff plan.  PX No. 491; Fiffick Dep. Tr. 236:19-237:11;  Kincaid Dep. Tr. 96:15-20, 106:12-16.

447.     In conveying these maps, the General Assembly was advised that these maps had the support of the Republican members of the delegation.  Specifically, after meeting with the Republican members of the delegation, Mr. Kincaid contacted Mr. Dale Oldham to ask how he could get his maps to the attention of the South Carolina mapmakers. Kincaid Tr. 77:6-78:11.  Mr. Oldham, in turn, contacted Mr. Terreni and advised him that the NRRT wanted to submit maps that had the consensus support of the South Carolina "Republican congressional delegation[]," though not the approval of Congressman Clyburn. Terreni Tr. 81:9-25, 83:10-84:22, 106:9-107:11, 120:5-17; Oldham Tr: 111:8-112:17.  Mr. Terreni was with other members of the Senate staff, including Mr. Fiffick and Roberts, when the NRRT maps were received and opened.  Terreni Dep. Tr. at 104:19-106:17, 120:5-23.

448.     Until Mr. Terreni's conversation with Mr. Oldham, he and the Senate's core redistricting team "had not heard from most" of the Congressional members. Terreni Dep. Tr. 140:3-12.

449.     Upon receiving the maps from the NRRT, the NRRT maps were seen by numerous members and agents of the Senate staff, including Messrs. Fiffick, Roberts, Terreni, possibly Paula Benson, probably Breeden John, and likely outside counsel in the Jones Day law firm.  Terreni Dep. Tr. at 82:2-86:7, 104:19-106:17; Fiffick Dep. Tr. 187:7-17.

450.    Mr. Roberts, in turn, prepared various analyses of the NRRT maps, including demographic analyses (SDX No. 38C, 38E, 39D, 39E), county and precinct split analyses (SDX No. 38D, 39C), and core constituency calculations (SDX No. 38B & 39B).

451.    Upon receiving the maps from the NRRT, Mr. Fiffick shared at least two of those maps with Patrick Dennis, General Counsel for the South Carolina House of Representatives and Chief of Staff to the House Speaker (then Lucas). Dennis Tr.37:13-39:12. Mr. Dennis, in turn, shared the NRRT maps with Thomas Hauger, and advised Speaker Lucas and Chairman Jordan that he had received maps from the NRRT.  Dennis Tr. 42:10-43:11, 44:13-16.

452.    There are substantial similarities between the NRRT plans, the initial Senate staff plan, and the Enacted Plan, particularly in their treatment of Black voters and residents, as well as in honoring requests from Republican congressional delegation members, which had a significant impact on Black populations.  As Mr. Fiffick acknowledged, his reaction upon seeing the Jessamine map was "it looking so much like our map," referring to the Senate's staff plan. Fiffick Dep. Tr. 233:9-10.

453.    Dr. Duchin's supplemental report provides an analysis of the Jessamine plan prepared by the NRRT, and she testified at trial that it closely resembles the Enacted Plan, even more so than the 2011 Plan.  PX No. 120 at 5; Tr. 321:1–23 (Duchin, Oct. 4).  Apart from a "novel T-shape" near Charleston County, "most of the rest of the districts" in the Jessamine plan "look identical" to the Enacted Map, with only small changes.  Tr. 321:1–23 (Duchin, Oct. 4). Dr. Duchin testified that, like the Enacted Plan, the Jessamine map keeps BVAP in CD 6 below 50%, while also creating a steep drop-off in the BVAP in the next highest BVAP district.  Tr. 322:7–16 (Duchin, Oct. 4).  In terms of various traditional redistricting criteria, the Jessamine

plan performs similar or slightly worse compared to the Enacted Map, and it is similarly outperformed by "many of the public proposals." Tr. 321:1–323:10 (Duchin, Oct. 4). In terms of electoral opportunity, the "pattern" is that "the benchmark plan, the enacted plan, and the [Jessamine] plan really confine electoral opportunity to . . . CD 6, while virtually all of the other publicly submitted plans find opportunity elsewhere in the state," where there is "some potential for building coalitions to support the Black candidate of choice." Tr. 355:21–356:9 (Duchin, Oct. 4).

454.    Mr. Fiffick testified he "may have" told Senator Campsen about the maps. Fiffick Tr. 191:10-14. Although Senator Campsen during his testimony was so eager to deny that he had seen the NRRT maps he cut off the questioner before he could say "Republican Redistricting Trust," he never denied that he had been told about the NRRT maps or their key features. Tr. 1833:8–14 (Campsen, Oct. 13). Nor did Senator Campsen dispute that his Amendment 1 bears striking similarities to the NRRT submissions.

455.    Like Senator Campsen's Amendment 1 (which became S.865), the NRRT maps provided that the BVAP of all congressional districts would be under 50 percent, with CD 1 having the lowest BVAP. *Compare* SDX No. 38E (Palmetto CD1 lowest BVAP at 18.04%) and 39E (Wren CD1 lowest BVAP at 17.08%) *with* SDX No. 29G (S.865 CD1 lowest BVAP at 16.72%).

456.    Like Senator Campsen's Amendment 1, the NRRT maps proposed keeping Beaufort County whole and entirely in CD 1. *Compare* SDX No. 29E *with* SDX No. 38D & 39C, Kincaid Dep. Tr. 80:4-81:4, 100:13-22; Terreni Dep. Tr. 114:12-19. Beaufort County had been split in the 2011 Map. *Compare* SDX No. 28D. As noted above, *supra* Section II.B, Beaufort County has the lowest BVAP (14.7%) of any County in CD 1 in the Enacted Plan,

and is among the whitest counties in the state; the inclusion of all 187,117 residents of Beaufort County in CD 1 has an outside impact on keeping the BVAP of CD 1 lower than *any* other district in the state.  As Senator Campsen testified, making Beaufort County whole and keeping it in CD 1 was an overriding priority in drafting S.865. HX 86; Tr. 1862:6–1863:1 (Campsen, Oct. 13).  And pressure to keep Beaufort County whole is what ultimately convinced the House mapmakers to abandon their plan, even though it worsened the split in Charleston County.  HX 81, Tr. 1772:5–1773:11 (Jordan, Oct. 13).

457.    Like Senator Campsen's Amendment 1, the NRRT maps kept Orangeburg, Sumter, Florence, Richland, and Charleston Counties split.  *Compare* SDX No. 29E *with* SDX No. 38DC & 39C. Kincaid Dep. Tr. 80: 4-20, 81:15-82:2, 99:11-101:3.  All of the NRRT maps brought CD 6 considerably further into the City of Charleston.  SDX No. 38A, 39A, 40. These split counties all had significant Black populations.  According to the demographic data ordered by the Court:

| County | BVAP | WVAP |
|---|---|---|
| Richland | 200,388 | 172,644 |
| Charleston | 97,954 | 263,560 |
| Florence | 59,378 | 69,021 |
| Orangeburg | 52,275 | 27,787 |
| Sumter | 51,044 | 46,442 |

458.    Like Senator Campsen's Amendment 1, the NRRT provided a map that allowed CD 6 to approach the City of Charleston peninsula from the west through Dorchester County through West Ashley/St. Andrews.  *Compare* SDX No. 29B (S.865 map) and SDX No. 40 Jessamine (western approach).[24]  As discussed above, the western approach had an outsize

---

[24] To be clear, the NRRT provided draft maps that allowed CD 6 to approach the City of Charleston peninsula from both the northeast from Berkeley County (as the 2011 map did) and the west. *See* 28A (2011 plan), 38A (Palmetto) & 39A (Wren) (northeastern approach).

impact on keeping the BVAP of CD 1 low; according to the Court's demographic data, the West Ashley/St. Andrews communities contain 13,459 Black residents of voting age, 18% of Charleston County's Black population, and all of these Black voters were moved from CD 1 to CD 6 under the NRRT Jessamine plan and the Enacted Plan. As Dale Oldham testified, he communicated to Mr. Terreni that western approach was inconsistent with a "least change" approach, but the western approach was made to accommodate specific requests from Congresswoman Mace. Oldham Dep. Tr. 144:3–145:15, 152:3–153:7.

459.    Like Senator Campsen's Amendment 1 and the Senate Staff plan, the NRRT maps involved far larger population movements between districts than were necessary to address population imbalance. *Compare* SDX No. 38B (Palmetto plan proposes to move from District 6, which was underpopulated by 84,741 people: 132.574 people to District 1, 37,284 people to District 2, and 21,526 people to District 5) *with* SDX No. 29C (final map moves from District 6: 52,799 people to District 1, 23,771 people to District 2, and 35,919 people to District 5).

460.    Like Senator Campsen's Amendment 1 and the Senate Staff plan, the NRRT maps provided for far greater core retention in CDs 2, 3, 4, 5 and 7 than for CDs 1 and 6. *Compare* SDX No. 29C (core constituencies of all S.865 districts range from 94.75% to 99.51% except CDs 1 (92.78%) and 6 (77.41%)) and SDX No. 32B (same for staff plan, except CD 1 (93.89%) and CD 6 (79.55%) *with* 38B (same for Palmetto, except CDs 1 (81.87%) and CD 6 (61.61%)).

461.    There were significant irregularities in the Legislative Defendants' handling of the NRRT maps, including efforts of Legislative Defendants to conceal the receipt of the NRRT map from the public and minority (in race and party affiliation) members of the

redistricting committees; these efforts to conceal the NRRT maps, include testimony downplaying the significance of the NRRT maps during this litigation and at trial.

462. For example, the NRRT maps were accepted by the Senate staff outside the time frame and official channels to receive map submissions from the public. Fiffick Dep. Tr. 194–195, 240–242; Terreni Dep. Tr. 83–84, 89. The maps were accepted even though Mr. Terreni instructed Mr. Oldham that maps should be submitted through the public portal. Terreni Dep. Tr. 137:3–2.

463. Similarly, the treatment of the NRRT maps differed from other outside map submissions, in that they were not made part of the public record. Senate procedures for receiving draft maps from the public required that submissions "be made part of the public record and will be made available in the same manner as other Redistricting Subcommittee public records." PX No. 323 at 1. The House posted the map submissions they received on their redistricting website, Hauger Dep. Tr. 29:15-18, and the Senate posted every submission they received as well, except for those it got from the NRRT. PX No. 4 at 29–35; Baker Dep. Tr. 86:22–87:6; Fiffick Dep. Tr. 203:24–204:11.

464. In violation of the Senate's Policy for Public Plan Submissions, none of the NRRT maps were ever published on the Senate redistricting website. PX No. 4 (Senate Responses 59-60). They were not published on the House website either. PX No. 3 (House Response 66).

465. The fact that the NRRT had submitted maps was not disclosed to minority members of the Senate Redistricting Subcommittee until the November 29, 2021 hearing. Tr. 882:18–883:1 (Harpootlian, Oct. 7).

466. After learning that the NRRT had submitted maps at the November 29,

2021 Senate Redistricting Subcommittee hearing, Senator Harpootlian asked to be provided the NRRT maps on the record.  Tr. 882:18–883:22 (Harpootlian, Oct. 7); PX No. 98 at 32:9–16; SDX No. 239 at 29:20.  Senator Harpootlian was never provided with a copy of the NRRT submissions.  Tr. 882:18–883:22 (Harpootlian, Oct. 7).

467.    Various statements of the Senate staff diminishing the importance of the NRRT submissions are contrary to the weight of evidence in the record.

468.    For example: Mr. Terreni testified that when he reviewed the NRRT plans he did not think they were "viable" given the timing, he only spent five to ten minutes looking at the plans, and "we had already a plan that we were going to bring to the subcommittee as a working start."  Terreni Dep. Tr. 99:24–100:15. This is inconsistent with Mr. Terreni's testimony later in his deposition that because the pedigree of the maps (i.e., as reflecting the wishes of members of the Republican congressional delegation), it did not make sense "to ignore" them, Terreni Dep. Tr. 136:11–137:2.  And Mr. Terreni's account of summarily disregarding the maps is inconsistent with the record: Mr. Terreni testified that at the time the NRRT maps were received, they were disregarded because the staff was almost done drafting the staff proposal. Terreni Dep. Tr. 136:9–25 (testifying the call from Oldham was "at the last minute as we were getting ready to post the staff plan . . . we were about to release the staff plan").  But Mr. Terreni's account is inconsistent with Will Roberts' trial testimony: Mr. Roberts testified that he did not start drafting the Senate staff plan, which became S.865, until November 19, the day after the NRRT maps were received.  Tr. 1404:16–19 (Roberts, Oct. 12), Tr. 1515:12–14 (Roberts, Oct. 12).

469.    Mr. Fiffick testified that upon receipt of the NRRT maps, the Senate staff spent "maybe four minutes look[ing] at each . . . and then we shelved them . . . we didn't do

anything with the maps. We didn't use the maps." Fiffick Dep. Tr. 189:14–16, 197:14–16. As noted above, Mr. Fiffick's account is inconsistent with Mr. Terreni's testimony. Terreni Dep. Tr. 136:11–137:2 ("We get this call from Dale that said I had this plan that . . . all the Republicans had . . . supported . . . So didn't make sense to me to ignore it."). Mr. Fiffick's account is also inconsistent with (i) the extensive demographic and other analyses Mr. Roberts conducted concerning these maps (SDX Nos. 38B, 38C, 38D, 38E, 39B, 39C, 39D, 39E), (ii) these maps being viewed by a wide number of Senate staff, and (iii) Mr. Fiffick providing these maps to Patrick Dennis, who, as General Counsel for the House and Chief of Staff to the Speaker, headed the mapmaking process for the House. Dennis Dep. Tr. 37:13-39:12.

470.    Mr. Fiffick also testified that he was never asked by Senator Harpootlian to provide a copy of the NRRT maps. Fiffick Dep. Tr. 208:1–208:7, 209:13–24. This is contradicted by the hearing transcript: Senator Harpootlian asked to be provided the NRRT map on the record. PX No. 98 at 32:9–16; SDX No. 239 at 29:20. Mr. Fiffick's testimony is also inconsistent with Mr. Terreni's, who says that the NRRT maps were offered to Senator Harpootlian. Terreni Dep. Tr. 391:10-21.

471.    Mr. Roberts also testified that he spent "five to 10 minutes" looking at these plans and concluded "we needed to move on to something else." Tr. 1400:12–18 (Roberts, Oct. 12). This testimony is inconsistent with (i) the extensive demographic and other analyses Mr. Roberts conducted concerning these maps (SDX Nos. 38B, 38C, 38D, 38E, 39B, 39C, 39D, 39E), (ii) Mr. Terreni's testimony that given the pedigree of the maps (*i.e.*, as reflecting the wishes of members of the Republican congressional delegation), it did not make sense "to ignore" them, Terreni Dep. Tr. 136:11–137:2 and (iii) the obvious similarities between the NRRT maps and the Enacted Map.

***November 29, 2021 Senate Redistricting Subcommittee Hearing***

472.     The Senate published its initial map on November 23, 2021, right before Thanksgiving, and many members raised issues with this timing during the November 29, 2021, meeting of the Senate redistricting subcommittee meeting. Tr. 1134:11–1134:25 (Bagley, Oct. 11); PX No. 98 at 7:23-8:3, 8:23-9:3, 20:13-16, 86:15-21.

473.     The feedback to the Senate initial plan was overwhelmingly negative. Tr. 1134:11–1134:19 (Bagley, Oct. 11). As Mr. Roberts testified during trial, "we got a lot of negative feedback on the staff plan that was put out for public consumption." Tr. 1426:19–21 (Roberts, Oct. 12)

474.     The Senate initial plan was called a "race-based gerrymander" and the product of a "partisan hack" in Washington D.C. Tr. 1135:1–1135:8 (Bagley, Oct. 11); PX No. 98 at 18:4-5, 20:11, 35:7-8. Legislators noted that this map carved Black residents out of CD 1 (Charleston) and combined them with Black residents in CD 6 (Richland), while leaving the more affluent and whiter areas of Charleston untouched and in CD 1. Tr. 1135:9–1135:19 (Bagley, Oct. 11); PX No. 98 at 23:6-14.  Witnesses also objected to the shape of CD 2, noting its' finger-like projection into Columbia to reach Fort Jackson. PX No. 98 at 40:16–40:19.

475.     During the November 29, 2021 Senate Redistricting Subcommittee public hearing, Mr. Roberts presented a description of the Senate initial plan. *See* PX No. 98 at 4:22–7:13. In describing the plan, Mr. Robert's did *not* disclose any of the instructions he received on above-mentioned private redistricting criteria. *See* PX No. 98 at 4:22–7:13. Nor did he describe how the Senate staff weighed the Senate's redistricting criteria. *See* PX No. 98 at 4:22–7:13. When asked about any input from Congressional members, Mr. Roberts disclaimed that they had any significant input, disclosing only that the staff had been contacted by Congressmembers Clyburn and Wilson, and that members of Congress had "very little" input. PX No. 98 at 26:25–

27:21, 28:11–13.

476.    During the November 29, 2021 Senate Redistricting Subcommittee public hearing, Sen. Campsen repeatedly emphasized that the purpose of the hearing was to receive public input on the initial staff plan. PX No. 98 at 37:7–18, 73:3–11. He further explained that the congressional redistricting process was "not even close to final" when explaining the initial staff plan as a first iteration. PX No. 98 at 37:7–18.

477.    No additional hearings were held to receive public input on the Senate's initial plan. Nor were there any updates about congressional redistricting plans until the Senate Redistricting Subcommittee posted proposed amendments on January 11, 2022.

***The Development of the House's Initial Staff Plan.***

478.    Mr. Dennis considered himself the primary substantive map-drawer for the House's initial staff plan. *See, e.g.*, Dennis Dep. Tr. 197:3–18, 232:22–233:6. In creating the staff's initial plan, Mr. Dennis set out to draw a "good," passable," and legally compliant map that would satisfy the House's criteria. Dennis Dep. 192:20–193:13. Mr. Hauger testified that he had a significant role in drawing creating this plan, referring to it as jointly being drawn by him and Mr. Dennis. *See, e.g.*, Hauger Vol. 2 Dep. Tr. 30:10–15. They began working on it in late November or early December 2021 because the House's Redistricting Ad Hoc Committee was not drawing anything; so, they took it upon themselves to draw something to present to the Committee.  Hauger Vol. 2 Dep. Tr. 58:19–25.

479.    For the staff's initial plan, Mr. Dennis claimed to have started with a blank slate (i.e., not the 2011 Plan), balancing population in the northwest districts then working his way down to CD 1 and making no effort to preserve the lines of the 2011 map for CDs 1 and 6. Dennis Dep. Tr. 197:3–18. Mr. Dennis testified he considered and used race data while drawing his map. *See, e.g.*, Dennis Dep. Tr. 174:2–4.

480.    The House ad hoc committee received a working draft staff plan ("Congressional House Staff Plan") for the first time on December 13, 2021.  PX No. 3 (House RFA Response 41].   The House's Redistricting Ad Hoc Committee published the House Staff plan on December 13, 2021. Hauger Vol. 2 Dep. Tr. 96:17-25.  Among other things:

- The Congressional House Staff Plan kept Sumter County together in one congressional district.  PX No. 3 (House RFA Response 47).

- The Congressional House Staff Plan kept Orangeburg County together in one congressional district.  PX No. 3 (House RFA Response 48).

- The Congressional House Staff Plan kept most of Richland County together in one congressional district.  PX No. 3 (House RFA Response 49).

- The Congressional House Staff Plan kept most of Charleston County together in one congressional district.  PX No. 3 (House RFA Response 50).

- The Congressional House Staff Plan provided that the First Congressional District would have a Black voting age population of 20.27%.  PX No. 3 (House RFA Response 51); SDX No. 33E.

481.    In developing these maps, Mr. Dennis explained that the House's redistricting criteria included the "guideposts" that needed to be considered. Dennis Dep. Tr. 117:10–17.  Mr. Hauger testified he and Mr. Dennis did not include in the House staff plan any public input that had been provided at previous hearings or from the public map submissions. Haguer Vol. 2 Dep. Tr. 88:13–17.

482.    Mr. Dennis and Mr. Hauger shared their initial draft plan with the House's Redistricting Ad Hoc Committee; Mr. Hauger testified he never received any feedback on the plan. Hauger Vol. 2 Dep. Tr. 82:2–13.

483.    Before the House's initial staff plan was made public, Mr. Dennis shared it with Mr. Fiffick. Dennis Dep. Tr. 114:1-16, 192:20–193:13.  Mr. Dennis testified he frequently communicated with Senate staff, particularly Mr. Fiffick and Charles Terreni, throughout the redistricting process, including once in the map room to discuss near-final versions of the plan the House and Senate ultimately passed. *See*, *e.g.*, Dennis Dep. Tr. 22:19–25, 168:4–15.

484.    As discussed above, Mr. Fiffick shared two NRRT maps (the Palmetto and Wren maps) with Mr. Dennis during the congressional redistricting process. Dennis Dep. Tr. 37:13–38:12. Mr. Dennis testified he shared the map with Mr. Hauger, and he informed Speaker Lucas and Representative Jay Jordan that he had received these maps, though he did not inform other Ad Hoc Committee members of the House's receipt of these maps. Dennis Dep. Tr. 42:19–43:11, 44:13–16.  Chairman Jordan later acknowledged the input of the NRRT at the December 29, 2021 House Ad Hoc Committee, saying that "their plans and inputs were received and as a result were available for consideration."  PX No. 575 at 28:11–18.

485.    Chair Jordan presented the Congressional House Staff Plan during the Ad Hoc Committee's hearing on December 16, 2021. PX No. 107 at 2–7:18; PX No. 3 (House RFA Response 58). In presenting the staff plan, Chair Jordan proclaimed that the plan "realizes the fundamental Constitutional goal of equality in voting, and likewise accords with the guidelines and criteria previously adopted by this Committee back on August the third, of 2021." PX No. 107 at 7:6–18.

486.    At this meeting, Committee members heard public testimony on its proposed map. This hearing revealed a general public perception that the Congresional House Staff Plan, while not perfect, was superior to the Senate staff initial plan.

487.    For example, Ms. Teague of the SC League of Women Voters described

the map "as not terrible map and it is not one we can be enthusiastic about, although we will say the numbers are not terrible at all." PX No. 572 at 9:10–9:13. Ms. Teague warned the committee, "that we've noticed that as the map proposals go through the multiple stages of this process, they seem to have a tendency to get worse. So, we would really love to see this one get better." PX No. 572 at 11:11–11:15.

488.    Although former Congressman Joe Cunningham opposed the map, he did say it was an "improvement over the Senate map," referring to the Senate's initial staff plan. PX No. 572 at 35:7–35:13.

***The House's Development of the Alternative Plan 1***

489.    After the publication of the House's Staff plan on December 13, 2021, Chair Jordan and others received numerous objections to the House Staff plan, including objections from members of the Republican congressional delegation and other State Representatives.  For example:

- Senator Campsen sent a text to *Ad Hoc* Committee Member Wesley Newton stating that "Beaufort and Berkely will be allies" and will be "asking to largely stay in 1st District -- like we have in Senate Staff plan." HDX No. 86.  Tr. 1862:6–10 (Campsen, Oct. 13);

- Senator Campsen called the House Majority Leader Gary Simril because he was "befuddled why the House would have proposed" a plan that "made the 1st a democratic district."  Tr. 1836:16–1837:5 (Campsen, Oct. 13)

- South Carolina State House Representative Phillip Lowe sent a text to Chair Jordan claiming that "Wilson wants a more central district not all the way to Hilton head."  HDX No. 90; Tr. 1776:15–1777:3 (Jordan, Oct. 13).

- On the same day, Representative Jeff Bradley sent a text to Chair Jordan to make a case that Beaufort County should be in Congressional District 1. HDX No. 94; Tr. 1777:8–19 (Jordan, Oct. 13).

- On December 17, Representative Doug Gilliam emailed Chair Jordan to inform him that Congressman Duncan had said the "SC Federal delegation unanimously supports the senate congressional maps." HDX No. 95.

- On December 19, U.S. Congressmember Jeff Duncan also followed up with a text to Chair Jordan that the "SC Federal Delegation is unanimous in support of the Senate Congressional Map. It is better for the 1st for sure." HDX No. 93; Tr. 1777:8–19 (Jordan, Oct. 13); *see also* Tr. 1779:4–21.

- Mr. Dennis had a 45-minute call with Congressmember Wilson, although he testified he could not recall the details of that conversation. Dennis Dep. Tr. 72:11–73:12.

490.     In addition to this feedback, following the release of the Staff Plan, the House Ad Hoc Committee started to receive numerous messages from residents of Beaufort County objecting to Beaufort County's placement in CD 2. HDX No. 83.

491.     These comments were instigated by Senator Campsen, who contacted Beaufort County activists on December 14 urging that they lodge objections to the House Staff plan. SDX No. 94-95.

492.     Commenting about the December 16, 2021 meeting, Chairman Jordan later observed that "we heard from many members of the public concerned with the inclusion of Beaufort County in the second congressional district." PX No. 575 at 4:20-22.

493.     In the midst of this onslaught, on December 17, Mr. Dennis wrote to Chair

Jordan and Rep. Newton that "the truth is, when all of Beaufort is put with a significant portion of or all of Charleston County you get a 50/50 district because there isn't room for the portions of Dorchester and Berkeley the pull the first red. . . we need to settle on what our priorities are." HDX No. 81 at 1.

494.    After two more days of this onslaught, Mr. Dennis threw in the towel.  In a text message thread with Chair Jordan and Rep. Weston Newton, on December 19, 2021, Mr. Dennis stated that he was "ready to just adopt" the Senate's plan. HDX No. 81 at 2.

495.    According to Thomas Hauger, following the December 16 hearing, Representative Jordan directed him to start a new map based on the Senate Staff plan, make some tweaks, and submit that as an alternative House staff plan.  Hauger Vol. 2 Dep. Tr. 82:13–15, 100:16–19.  Mr. Hauger testified that this Alternative Plan 1 was "created in just one session between [Hauger] and Representative Jordan," which took only about "[a]n hour or two." Hauger Vol. 2 Dep. Tr. 102:10–22.  Representative Jordan instructed Mr. Hauger about which changes to make, and he did not explain why he was using the Senate initial plan.  As Mr. Hauger worked with Representative Jordan to draft the new map, racial and ethnic demographic data was visible on the screen.  Hauger Vol. 2 Dep. Tr. 104:3–10.  Hauger did not have any substantive discussion about the changes with Jordan.  Hauger Vol. 2 Dep. Tr. 102:23–25.

496.    According to Mr. Hauger, Emma Dean was in the room with Hauger and Jordan, but there was no discussion about the redistricting criteria or legal advice regarding Alternative 1.  Hauger Vol. 2 Dep. Tr. 104:16–21.  Mr. Hauger acknowledged that in drafting the House's Alternative 1 map, it would have been possible to keep Charleston whole, but that Representative Jordan did not try to keep Sumter City or Charleston or Richland County whole. Hauger Vol. 2 Dep. Tr. 110:21–25, 111:8–14.  Mr. Hauger also testified that at no time did

Representative Jordan indicate or suggest how the plan they were drawing might have complied with the House's redistricting criteria, or how public input was being incorporated. Hauger Vol. 2 Dep. Tr. 114:19–115:11. Mr. Hauger also testified there was no discussion with Representative Jordan about maintaining Republican advantage or any other partisan considerations. Hauger Vol. 2 Dep. Tr. 100:20–106:13; 107:17–108:9; 110:14–113:14; 114:19–118:2. Mr. Hauger testified that, although Mr. Dennis stopped by the map room during the development of Alternative Plan 1, "he did not have an active role" in the development of that plan. Hauger Vol. 2 Dep. Tr. 104:22–105:9. Mr. Hauger testified Mr. Dennis "didn't provide any feedback" during the creation of the map in the map room, including based on Chair Jordan's proposed changes. Hauger Vol. 2 Dep. Tr. 105:2–25.

497.    Mr. Dennis' testimony is somewhat inconsistent with Mr. Hauger's account of how the Alternative Plan 1 was developed, particularly concerning Mr. Dennis and Chair Jordan's respective roles in the drafting of Alternative Plan 1. Mr. Dennis agreed that Alternative Plan 1 "was much closer to the Senate's map" than the initial House plan. Dennis Dep. Tr. 291:12–17. According to Mr. Dennis, while he acknowledged that Chairman Jordan "offered a lot of input" for Alternative Plan 1, he maintained that "Thomas Hauger and I were the primary authors of the map." *Compare* Dennis Dep. Tr. 232:22–233:6, *with* Tr. 1789:24–1790:6 (Jordan, Oct. 13) ("Q: Was Mr. Thomas *H involved in that plan as well? A. Yes, he was. He provided essentially the technical support -- computer skill I guess you'd say -- putting it on paper."). Mr. Dennis testified they had gotten input from Representative Jordan to "[p]ut [Beaufort] back into the 1st Congressional District," Dennis Dep. Tr. 244:24–245:4, but that he was "the author" of changes in Alternative Plan 1 such as "reach[ing] into Charleston County through CD6 from the southwest," and noted that this was "influenced by probably [the] Senate

map that existed at this point." Dennis Dep. Tr. 242:5–11. Mr. Dennis testified that he "could not have considered" partisan affiliation in drawing Alternative Plan 1 since he "did not view data on partisan affiliation." Dennis Dep. Tr. 303:15–23. He also *disclaimed* that the Ad Hoc Committee prioritized any consideration relating to creating a Republican advantage in either the initial staff or Alternative 1 plans. Dennis Dep. Tr. 151:13–19.

498.    Like for the development of the Congressional House Staff Plan, Mr. Dennis testified that he had access to racial demographic data on the Maptitude screen that he relied upon and could see racial data in real-time throughout the process for Alternative Plan 1. *See*, *e.g.*, Dennis Dep. Tr. 173:24-174:4, 243:18-244:1, 199:2–10. Mr. Dennis also testified he relied on a set of assumptions in creating these maps and reviewing other proposed maps to understand what type of electoral outcomes that maps would produce based on his experience working in South Carolina "over a long period of time."

499.    As discussed below, despite the relatively positive reception toward the Congressional House Staff Plan at the December 16 hearing, the House essentially abandoned its initial staff plan in favor of a completely new alternative plan much more like the widely criticized Senate initial plan. PX 17 at 33.

500.    The House Ad Hoc Committee released the House Alternative Staff Plan 1 on December 23, 2021. As Senator Campsen testified, the House Alternative Staff Plan 1 "closely mirror[ed] the Senate's initial staff plan." Tr. 1837:9–11 (Campsen, Oct. 13). One of the activists who had generated comments to the House sent a congratulatory email to, among others, Senator Campsen and Representative Newton, stating "we should all be proud of our efforts . . . the new map reflects what many have said to me: keep Beaufort County in CD #1." HDX No. 85.

501.    The voting age population summary posted on the South Carolina House Redistricting website for the Congressional House Staff Plan Alternative 1 indicates that the First Congressional District would have a "% NH18+_DOJ_Blk" of 15.67%.  SDX No. 331.  The Black voting-age population in CD 1 in the Congressional House Staff Plan Alternative 1, compared to the prior House staff plan, dropped from 20.67% to 15.67%.  *Compare* SDX No. 331 *with* SDX 33E.

502.    The voting age population summary posted on the South Carolina House Redistricting website indicates that the Congressional House Staff Plan Alternative 1 First Congressional District would have 89,553 "NH18+_DOJ_Blk" persons.  PX No. 3 (House RFA Response 81).

503.    Members of the public viewed House Staff Alternative 1 as very similar to the Senate's Initial Staff Plan.  Tr. 1138:9–1138:18 (Bagley, Oct. 11).  Like the Senate Staff plan, the House's Alternative Plan 1 prompted a lot of concerns and criticisms from members of the public and other House members, including allegations that the plan was a racially gerrymandered map.

504.    When the House Redistricting Committee met on December 29, 2021, Chairman Jordan explained: "Because of your feedback and important public input, we have released multiple options for these Federal Congressional Districts."  PX No. 575 at 4:8-11. Chairman Jordan noted that the Congressional House Staff Plan for congressional districts was posted on Monday, December 13, along with the Senate's initial staff plan, "as a point of comparison, and to receive input on."  PX No. 575 at 4:15–17.  He noted the December 16 meeting and the receipt of written submissions.  PX No. 575 at 4:17–20. Chairman Jordan explained: "In response to those plans we heard from many members of the public concerned

with the inclusion of Beaufort County in the second congressional district.  As a result, last week

on December 22nd we posted an alternative draft staff plan which attempts to address the

concerns that we heard from the public such as in Beaufort. The alternative staff plan also

includes some positive features from the Senate's draft plan as well."  PX No. 575 at 4:20–5:4.

505.     In response to this unexpected alternative plan, both legislators and

members of the public expressed surprise and confusion at this December 29 meeting.

506.     At this meeting, Ms. Teague of the SC League of Women Voters warned

that the Alternative Plan was an "obvious racial [and partisan] gerrymander and should be

rejected.  In most respects it[']s very similar to the map that was initially proposed in the Senate,

although the Senate subcommittee has so far wisely chosen not to act on that map."  PX No. 575

at 7:14–7:19.  Specifically, Ms. Teague pointed out that "[a]s in the Senate plan the current map

has district two cutting through northern Richland County, cracking substantial black

communities in a way that dilutes minority influence.  Black communities are also cracked

around Sumter."  PX No. 575 at 8:14–19.  Ms. Teague also noted that "the most obvious racial

gerrymander is the low country.  Dividing Charleston County and even the city of Charleston as

you have in this proposal serves principally to ensure low minority population in CD1 so that

white occupants of the lower Charleston peninsula, Mount Pleasant, and Seabrook and Kiawah

can dominate that district.  This plan reduces the black voting age population in CD 1 to 16

percent from 21 percent in your initial plan."  PX No. 575 at 8:23–9:7.

507.     Ms. Teague also acknowledged both "the public testimony focused on

keeping Beaufort County in CD1 and also over the past several months of many members of the

public who testified about concern of the fragmentation of the Charleston area," pointing out that

"[i]t isn't either or, there are other options in how the map can be drawn," and suggesting the

feasibility of developing a map in which both Beaufort and Charleston Counties could be whole in CD 1.  PX No. 575 at 9:10–16.  But Ms. Teague also noted that in choosing "whether it's more important to keep North Charleston with Charleston or Beaufort with Charleston, the answer should be obvious.  North Charleston and Charleston share a much bigger number of economic and social interests with one another than Beaufort and Charleston do," and Ms. Teague continued by noting that Charleston and Beaufort Counties could be at odds since "Charleston and Beaufort are sometimes in competition with respect to imported economic issues with federal implications."  PX No. 575 at 9:16–25.

       508.    SC NAACP President Murphy also testified at this meeting, explaining that "[t]he recently proposed House alternative map is especially concerning, it dilutes the black voting strength across the state.  It harms all voters in at least two ways.  First, it consolidates the political power of non-black voters everywhere except South Carolina's lone majority district.  And the only Congressional district with a black representative.  Which is we know CD6.  Second it all but ensures that CD 1 is uncompetitive politically and in so doing harms black voters."  PX No. 575 at 15:2–12.  President Murphy also noted her concern that this alternative plan was released on "December 22nd, before Christmas eve," and again emphasized the racial nature of the splits of Black communities, including "the same cuts through black communities in Richland County and the same cuts through Sumter as the flawed Senate proposal," the separation of much of Charleston and North Charleston, and the "splits of Dorchester and Berk[e]ley County," which "appear[] to follow racial lines."  PX No. 575 at 18:22–19:18.  President Murphy also pointed out in her written testimony that "[s]ubstantively . . . the House's alternative Congressional proposal closely resembles the Senate's much-criticized initial Congressional redistricting proposal," noting that in addition to features such as "similarly

apparently racially delineated split[s] between CD 1 and CD 6," the Alternative Plan 1 "boundaries for CDs 3, 4, 5, and 7 . . . are identical to those in the Senate's proposed map."  PX No. 594 at 15–16.

509.    At this meeting, Representative Bernstein stated that she had not known that a second draft staff House plan was even being drafted.  Representative Bernstein said, "I think it's important as the Committee just to get some questions answered, if possible. Because the last time we met . . . in this public forum, we had a map that we took . . . public testimony and some feedback from. And then last week, as I was out of town, a new map was drafted unbeknownst to me, I'm not sure about the other members of the Committee. . . . I guess I think it is pertinent, and prudent, . . . to ask certain questions of why an alternative map was drawn." PX No. 575 at 24:22–25:7.

510.    Chairman Jordan replied that the Alternative Plan 1 was meant to "sit[] on the same footing as" the original House staff plan.  PX No. 575 at 25:13–21.  But Rep. Bernstein questioned why the House would start from scratch with a new plan, and noted her particular concern with Alternative Plan 1, which "replicates more of the Senate map which received numerous complaints and vocalized concerns over it.  And I just don't know why we are even entertaining this alternative map, unbeknownst to me as a committee member."  PX No. 575 at 26:23–27:2, 29:20–30:5.  Rep. Bernstein emphasized that with the House initial staff plan as a "starting point," "there was probably no reason to have an alternative map."  PX No. 575 at 31:13–16.

511.    At this meeting, Rep. Bernstein also asked if "any national partisan groups" were "involved in preparation, discussion, with this alternative House plan."  PX No. 575 at 27:22–24.  Chairman Jordan responded that "as staff drew both plans they had the benefit

of lots of different testimony . . . as well as multiple proposals from individuals and national groups." PX No. 575 at 27:25–28:10. When Rep. Bernstein pressed again about whether "national partisan groups were consulted or involved in drafting of the [] alternative map," Chairman Jordan replied, "I don't know if I'd say they were consulted. I would say their plans and inputs were received and as a result were available for consideration." PX No. 575 at 28:11–18.

512.    The House Ad Hoc Redistricting Subcommittee had their final meeting on January 10, 2022. PX No. 17 at 37, PX No. 109.

513.    Rep. Bernstein continued to oppose Staff House Alternative Map 1 and continued to question the need for it in the first place. PX No. 17 at 37, PX No. 109 at 2:3–2:11. Rep. Newton responded to her indicated that he had constituents from Beaufort County telling him that they preferred to remain in CD 1. PX No. 109 at 2:13–2:24.

514.    Rep. Bernstein asked if there was a way for House Staff Alternative 1 contain both Charleston and Beaufort whole and in the same CD, to which Chairman Jordan replied, there was a "math problem" because "there's just . . . too many people in that area of the state to make those numbers." PX No. 109 at 5:16–6:5. Representative Newton repeated "The population is just too much . . . to take all of Beaufort and put with all of Charleston." PX No. 109 at 7:3–6. This was directly contrary to what Patrick Dennis had advised Chairman Jordan a few weeks earlier: it was possible to put Charleston and Beaufort County together in a district. HDX No. 81.

515.    Rep. Bernstein responded that part of Berkeley County could be taken out and that she thought it was of paramount importance, in any case, to keep Charleston whole, and that the House Staff Alternative Plan 1 was "packing" CD 6 by "carving out a portion of

Charleston County," particularly North Charleston, which has a significant Black population, was cut out and put into CD 6 because CD 6 is a majority-minority district. PX No. 109 at 6:6–7, 7:20–9:1. Chairman Jordan and Representative Newton responded that that is simply the way it was on the previous map and House Staff Plan Alternative 1 was only "br[inging] forward in this new map." PX No. 109 at 6:9–11, 8:15–9:1.  This was misleading, as House Staff Plan Alternative 1 (like the Enacted Plan) involved significant redrawing of the lines through Charleston County and the addition of significant new areas of Charleston County to CD 6.

516.    The House Ad Hoc Redistricting Committee voted the House Staff Plan Alternative 1 out of their committee for consideration by the full House Judiciary Committee, with Representative Bernstein and Henegan voting no, Representative Bamberg absent, and no Black legislators voting for the map. PX No. 109 at 12:2–14:11.

517.    The full House Judiciary Committee met on the same day, January 10, 2022, to consider House Staff Plan Alternative 1. PX No. 108.  The full House Judiciary Committee convened, with Rep. Weston Newton presiding in lieu of Chairman Chris Murphy, instead of Vice Chair King. PX No. 17 at 37. Vice Chair King challenged this decision. PX 108 at 3:5-7:14.

518.    Defendant Jordan described the process used to develop the House Staff Plan Alternative 1.  PX 108 at Tr. 7:22-13:4.  During the hearing, Defendant Jordan described House Staff Plan Alternative 1 as a "better version of the Senate proposal."  PX 108 at 51:24-52:1.

519.    Many members of the House expressed concerns with both the map and representations by House leadership about House Staff Plan Alternative 1. For example, Representative Thigpen questioned "what changed? What was the impetus?  What was the

rationale for drawing an alternate plan?  PX 108 at 44:7-10.  And Representative Bernstein said "the staff map that was first presented, which we had public testimony, was not perfect but it was much, much better than [House Staff Plan Alternative 1] . . . After hearing the concerns of some of the Beaufort County residents, we could have had a discussion, worked on maybe looking at the numbers. But instead, a staff plan alternative map, very similar to the controversial Senate map, was proposed an presented to the Committee at the same time that it was presented to the public. .. . why did we need a second map? We could have taken the first map . . . in the committee process, added amendments, but a second whole map that would usurp this first map, was proposed and presented"  PX No. 108 at Tr. 28:1-30:12

520.    Defendant Jordan explained the Committee's work to that point, indicating that the House Staff Plan Alternative 1 had been put forth in response to the public comments from Beaufort residents, a majority white community, wanting to stay in CD 1. PX No. 17 at 38, PX No. 108 at 9:19–9:23.  Rep. King noted that despite the subcommittee telling Rep. Bernstein that Beaufort and Charleston could not both be wholly included in CD 1, he disagreed. PX No. 108 at 13:20–16:13. Rep. Bernstein agreed, saying that she believed Beaufort and Charleston could be kept whole in a district and observed that the Committee  could have "split[ing] some of the smaller counties, like Berkeley or Dorchester County." PX 108 at Tr. 29:5-29:11. Defendant Jordan responded by saying that this could not be accomplished if the district was to have "731,204 people . . . to hit that number on the head. . . by sheer numbers, you can do certain things, but . . . when you move people from one area to the other, it creates ripple effects that roll out into the rest of the state. And remember, we have to hit the nail on the head population-wise."  PX 108 at Tr. 15:3-11, 20:9-17. Defendant Jordan did not address Representative Bernstein's suggestion regarding Berkeley or Dorchester Counties. PX 108.

521.    Rep. King noted his issues with House Staff Alternative Plan 1 and explained, "[b]ut what strikes me odd is the packing and cracking that you all did in Charleston County, which is insulting, when you -- at least -- at minimum. Because when you look at the opportunity for African Americans, which make up 26.8% of South Carolina, to have a voice in the congressional districts, we have been cracked so much and packed so much, till we don't have a voice but in one particular congressional district." PX No. 108 at Tr. 16:14-16:23. Rep. King further stated that House Staff Plan Alternative 1" plopped all the black folk in Congressional 6, made it a 47% African American district, which we did not have to do.  We could have spread some of that out to make these districts competitive, so that more people would have an opportunity to vote and have representation that reflects their community." PX 108 at Tr. 26:1-10.  Defendant Jordan responded that comparing the House Staff Plan Alternative 1 to the original House Staff Plan, it increased the BVAP of CD 2 from 19.5 to 23.96%.  PX 108 at 20:19-25.  Defendant Jordan, however, did not note that this was a smaller Black population in CD 2 than had been the case under the 2011 Plan, SDX 28 E (24.58%), and that the BVAP of CD 1 had dropped precipitously from the House Staff Plan to the House Staff Alternative Plan 1. *Compare* SDX No. 331 *with* SDX 33E (admitting from CD 1 BVAP dropped from 20.67% to 15.67%).

522.    The House Alternative Staff Plan 1 was adoptedby the House Judiciary Committee by a favorable vote, 13-6, with no Black Representatives on the Judiciary Committee voting in favor and the bill moved to the floor of the House of Representatives. PX No. 108 at 61:4–61:5.

523.    On January 12, 2022, the House Alternative Staff Plan 1 was considered by the full House of Representatives as House Resolution 4781/Senate Bill 865. PX No. 17 at 39.

Overall, as Dr. Bagley summarized, "[t]he debate on the floor further revealed Black legislators' concerns about transparency and public concern about the House's adoption of the widely-criticized Senate congressional plan." PX No. 17 at 39.

524.     Black legislators raised a myriad of concerns.  For example, Rep. King expressed again feelings that he was shut out of his proper role on the Ad Hoc Redistricting Committee and as Vice-Chair of the Judiciary Committee. PX No. 112 at 27:6–34:17, 85:4–86:6. Rep. King explained the significant of these departures and stated, "[d]is-procedure irregularity is particularly concerning because it took place during a meeting on congressional reapportionment. The majority broke its own rule. Let me restate that, the majority broke its own rule, in order to get this bill to the floor today.  And when we look at the map, you can see why. It is because this map is gerrymandered. It was drawn to elect six Republicans and only one Democrat. It cracked and packs African American communities, thus diluting the power of African Americans to -- African Americans to influence elections. This map breaks up counties and cities, in order to put as many black folk, or black voters, into one district." PX No. 112 at 85:4–86:6.

525.     Rep. Cobb Hunter asked "whether or not the plan that is before us, whether or not that plan, indeed, cracks populations of color in Charleston County, pack all of them into the 6th Congressional District? As opposed to being in the 1st Congressional District, thereby -- in the opinion of some -- rendering the 1st Congressional District less competitive?" PX No. 112 at 39:10–39:18. Chairman Jordan replied, "I would say I do not believe that's the case." PX No. 112 at 39:19–21.

526.     Rep. Matthews asked, "were the communities of color split? And I don't know if you know this about me, but I'm really particular about being clear. So, let me be very

clear, it was split. The 1st Congressional District was given the white areas of Charleston County, and Congressional District 6 was given the black areas of Charleston County, predominantly.  So, to -- the answer to her question, if you look at the data on your screen right now, in Congressional District 1, if you go to track 54, that's where you see the Charleston County. If you go for six, track 51, that's where you'll see the list or Charleston County. And when you look at the way those tracks were split, it is very clear, based on where people live how those were split." PX No. 112 at 59:4–59:24.

527. Dr. Bagley also described that this hearing "demonstrate[d] the legislative leadership's tendency to weigh some guidelines and some testimony more heavily than others. The concerns of residents of Beaufort, primarily Hilton Head, are given great weight, whereas the concerns of residents of Charleston, are brushed aside with explanations that existing boundaries, constituent consistency, and prior approval hold sway." PX No. 17 at 39.

528. For example, another Black legislator, Rep. Thigpen, asked "[t]he question I have, particularly to process, is when input was taken, public input, -- and I know we've weighed heavily on the input, I believe, from Beaufort County. When we talk about the input from Charleston, and other areas, was there more weight, more partiality -- if you would -- more importance given to input from one area than the next? Or how did you go about determining prioritizing the input?" PX No. 112 at 70:6–70:16.

529. Another Black Representative, Rep. Annie E. McDaniel echoed Thigpen's concerns and explained, "[a]nd people who are concerned about if we had started with Charleston and kept it whole -- which I'm hearing a lot of Beaufort wanted to be part of Charleston, and I'm also hearing that if we kept Beaufort and Charleston together, there still would have been room for other people of that -- to put in that district. So, if we had kept

192

Charleston and Beaufort whole, and started with that district first, then we could have went around and made the other districts." PX No. 112 at 79:16–80:1.

530.    Rep. McDaniel continued, "[s]o, there was an appetite to make a community whole that was once split. So, I guess I'm trying to figure out why it wasn't an appetite to keep Charleston whole, being it's one of the counties in the state that brings in a lot of revenue, we have the Port down there. We -- I mean, that's where most of the people who are moving from up North are moving to Charleston. So, I'm just still trying to understand that appetite of not keeping Charleston whole?" PX No. 112 at 82:6–82:17.

531.    Despite this feedback, a vote was held to advance to the third reading, with 73 ayes, all Republicans, and 35 nays, all Democrats. No Black members voted aye. PX No. 17 at 41. Ultimately, a full vote took place and the bill passed 74-35. PX No. 17 at 41.  The bill went to the Senate and the House voted to concur in the amended Senate Bill on January 26, 2022, with a vote of 72-33 with only one Black representative voting in favor. PX No. 17 at 41; PX No. 119 at 12:4–12:7.

*Development and Passage of Senate Amendment 1*

532.    Following the Senate November 29 hearing, Senator Campsen worked on a proposed Senate map aimed at keeping all of Beaufort County in CD 1.  As Senator Campsen testified, making Beaufort County whole and keeping it in CD 1 was his "primary goal" in drafting S.865, and that "Charleston had to be split."  HDX No. 86; Tr. 1862:6–1863:1 (Campsen, Oct. 13).  During trial, Senator Campsen testified that he "can't help but know" "the concentrations of Black voters" for the areas he represents, which include parts of Beaufort County.  Tr. 1816:25–1817:6; 1883:19–1884:11 (Campsen, Oct. 13).  As discussed above, *supra* Section II.B, Beaufort County has the lowest BVAP (14.7%) of any County in CD 1 in the Enacted Plan, and is among the whitest counties in the state; the inclusion of all of Beaufort

County in CD 1 had an outsize impact on keeping the BVAP of CD 1 lower than *any* other district in the state.

533.    Senator Campsen was the primary author and sponsor of Senate Amendment 1.  Tr. 1839:19–1840:4 (Campsen, Oct. 13).  Senator Campsen primarily worked on Senate Amendment 1 with Mr. Terreni, Mr. Fiffick, Mr. John, and Mr. Roberts.  Tr. 1818:13–15 (Campsen, Oct. 13); Terreni Dep. Tr. 332:16–334:4; Tr. 1429:10–21 (Roberts, Oct. 12).  And Senate staff took direction from Senator Campsen.  Fiffick Dep. Tr. 270:25–271:25.

534.    Senator Campsen and members of the Senate core team acknowledged that Senate Amendment 1 was a modification of the Senate's initial staff plan and the House's Alternative Plan 1 (which was, in turn, based on the initial Senate staff plan).  Terreni Dep. Tr. 331:17–21; Tr. 1837:6–23 (Campsen, Oct. 13).

535.    Senator Campsen claimed he did not want to see racial demographic numbers during the technical drawing of Senate Amendment 1 on Maptitude.  Tr. 76:15–17 (Campsen, Oct 13 PM).  But as described above and below, the core redistricting team, including Mr. Fiffick, Mr. Terreni, Ms. Benson, and Mr. Roberts, could see BVAP data in Maptitude as they were making changes to draft plans. *See supra* Section II(E) and *infra* Section III(F)(i)*;* Tr. 1501:24–1502:18 (Roberts, Oct. 12).  BVAP data were "actually displayed . . . at the bottom of the screen the entire time we were drawing."  Tr. 1502:2–6 (Roberts, Oct. 12).  Mr. Roberts, Mr. Fiffick, and anyone else in the map room could "definitely" see BVAP displayed on the screen.  Tr. 1503:5–13 (Roberts, Oct. 12).  And Senator Campsen acknowledged he (and others) reviewed BVAP statisitics after each iterations of the plan were completed.  Tr. 75:22–76:4 (Campsen, Oct 13 PM).

536.    Because the Senate's staff plan served as the basis for Senate Amendment

1, Mr. Roberts confirmed that the core redistricting team applied the same set of public and private criteria and guidelines used to develop Senate Amendment 1, including the same levels of prioritization for application purposes. Tr. 1515:16–1516:2 (Roberts, Oct. 12).

537.    As described above, the Senate's core redistricting team, including Mr. Roberts when he publicly presented the staff plan on November 29, never disclosed the specific private instructions they used in developing the Senate's staff plan, including the priority Mr. Roberts testified during trial he gave to members of Congress. *See supra* Section III(C)(i).   As noted earlier, this was directly contrary to what Mr. Roberts said during the Senate Redistricting Subcommittee's November 29 hearing, when Mr. Roberts disclaimed significant input by members of Congress, explaining that Congressmen had only "very little" input. PX No. 95 26:25-27:21, 28:11-13.

538.    According to Senator Campsen, Congressional members' instructions and views were given "little" to "no weight at all." Tr. 1880:15–22 (Campsen, Oct. 13).

539.    Mr. Fiffick corroborated Senator Campsen's testimony that any input from Congressional members was given little to no weight. Mr. Fiffick characterized the two- to three-minute conversations he had with Congressmembers as being so inconsequential that he considered any of their requests as "anecdotes." Fiffick Dep. Tr. 82:10–83:4, 95:15–22. He went further to explain that they did not act on any except Congressman Timmons' request to keep Congressional District 7 similar to the 2011 plan. Fiffick Dep. Tr. 95:15–22. Regarding the purported meeting with Mr. Tresvant, Mr. Fiffick recalled that Mr. Tresvant "didn't seem like he had any sort of message" and "just wanted to see what maps looked like." Fiffick Dep. Tr. 82:10–83:4, 95:15–22. Nor did Mr. Fiffick recall that Mr. Tresvant represented that Congressman Clyburn wanted a least-change CD 6. Fiffick Dep. Tr. 87:24–88:5. Even though

Mr. Tresvant provided a purported draft plan for CD 6, Mr. Fiffick thought the map was "unremarkable." Fiffick Dep. Tr. 87:24–88:5. Because no Senators asked his staff to use this map, Mr. Fiffick testified that neither he nor the core redistricting ever used it or implemented the draft map for congressional plans. Representative Jordan Jordan also confirmed at trial that the views of South Carolina's Congress members were not "elevate[d]" over the redistricting criteria, contradicting other defense witnesses' claim that the Enacted Map was drawn based on the preferences of Congress members.  Tr. 1795:8–12 (Jordan, Oct. 13).

540.    The Senate Redistricting Subcommittee released Senate Amendment 1 on January 11, 2022, two days before the Senate Judiciary Committee hearing where it was considered on January 13, 2022.  But Senator Campsen did not introduce or explain Senate Amendment 1 during the January 13 hearing. *See* PX No. 114 at 8:23–10:2.  Senator Harpootlian also introduced Senate Amendment 2 at the January 13 hearing.  PX No. 114.

541.    As discussed below, members of the public and Senators voiced many concerns and criticisms about Senate Amendment 1, including allegations that it would harm Black voters and be a racially gerrymandered map. *See, e.g.*, PX 114 at 10:9-11, 18:3-23:15, 28:7-29:13, 30:21-31:24. This was true even though members of the public only had one opportunity – at the January 13 Senate Ad Hoc Committee meeting – to testify the about Senate Amendment 1 (as well as Senate Amendment 2), and had less than 48 hours to review Senate Amendment 1 before being asked to provide oral testimony on the plan. PX No. 17 at 42; PX No. 114 at 8:9–9:1.

542.    In advance of the January 13, 2022 hearing Senator Campsen manufactured public support for Senate Amendment 1.  Beginning on January 11, Senator Campsen affirmatively reached out to activists throughout South Carolina, including non-

constituents, and requested they communicate their support for Senate Amendment 1.  SDX No. 97–112; Tr. 1827:22–23, 1867:10–21 (Campsen, Oct. 13).  Senator Campsen testified he did this because he believed that members of the public who lived in Beaufort County would not attend the January 13 hearing to support Senate Amendment 1.  Tr. 1894:5–13 (Campsen, Oct. 13). And his messages to these activists focused on keeping Beaufort County in CD 1.  SDX No. 107, 108, 110.

543.    After the release of Senate Amendment 2A (which kept all of Beaufort County in CD 1), on January 12, 2022, Senator Campsen changed his messaging and encouraged activists to communicate the importance of keeping Dorchester and Berkeley in CD 1 to preserve the "Tri-County Area."  SDX Nos. 101, 104-105, 113.  As discussed above, prior to this point, there had been no public support for preserving the "Tri-County Area" *See supra* III(C)(ii).

544.    In his communications with these activists, Senator Campsen failed to disclose that Senate Amendment 2, introduced by Senator Harpootlian, provided for Beaufort County to remain whole and in CD 1.  Tr. 1893:24–1895:5 (Campsen, Oct. 13).  Instead, he described Senate Amendment 2 as the "Democratic proposal," even though Senate Amendment 2 would have served his constituents in Beaufort and Charleston Counties because it made Beaufort and Charleston Counties whole and within CD 1.  SDX Nos. 101, 104–105.

545.    On January 13, 2022, the Senate Redistricting Subcommittee held a hearing to consider Senate Amendments 1 and 2. PX No. 114 at 5:18–23, 8:23–25.  Senator Campsen did not introduce or explain Senate Amendment 1 at the January 13 hearing. *See* PX No. 114 at 8:23–10:2.

546.    At the January 13 hearing and afterwards, members of the public roundly criticized Senate Amendment 1 as a racial gerrymander that failed to comply with traditional

redistricting principles For example:

- Ms. Michelle Brandt stated that cutting West Ashley and part of Charleston out of Congressional District 1 "is clearly racial gerrymandering."  PX No.114 at 28:11-14.

- Dr. Ashley Hink commented that "carv[ing] Charleston and North Charleston into the 6th Congressional District demonstrates how flawed this process has been . . . [a]nd clearly breaks the guidelines[.]"  PX No.114 at 34:10-14.

- Dr. Elizabeth Mack testified that "there's not really a great reason to put West Ashley or Johns Island in the same district as Columbia, but keep North Charleston and downtown in separate districts."  PX No. 114 at 65:16-21.

- Mr. Joe Kelly related that "there's one little" part of his neighborhood of West Ashley "that's carved out, to stay in the 1st Congressional District, while the rest is put into the 6th.  If you walk the streets of my neighborhood[], you see exactly why that is the case . . . I have black neighbors, there are not very many black people living on the other side of Savannah Highway. . . . it's pretty hard to defend that split on any grounds, other than racial grounds."  PX No.114 at 43:14-44:4.

- Lisa Izzo testified that "all of Charleston County should be in one district and it truly makes no sense to put West Ashley, John's Island, in the same district as Columbia."  PX No. 114 at 32:8-12.

- Mr. Steven Benecick stated, "[w]hen I look at Senate Amendment Map 1, especially South Carolina's 1st Congressional District, I see a map that fails to achieve either" compactness or the preservation of communities of interest.  PX No. 114 at 57:21-58:4.

- Mr. Austin Jackson stated "there is no way that Charleston County and my home County of Richland could share a community of interest.  We have different economic engines, we have different racial demographics.  Communities like Folly Beach and McClellanville have interests that Forrest Acres and East Dover could not possibly consider.  They have ports and we have the seat of State Government. . . in [Richland], the lines are split almost on racial lines. We have downtown Columbia and almost all of our majority black county is in District 6 . . . and everything else .. . in the Northeast, and in Blythewood are . .  out in District 2.  We in downtown Columbia have more in common with Forest Acres a Blythewood . .  than they do with Lexington and Swansea."  PX No. 114 at 76:3-77:14.

- Erika Greco testified that Amendment 1 "would remove my neighborhood of West Ashley . .. and place us in a district with counties in the midlands . .  our neighborhood floods constantly.  Flooding, ports, offshore drilling, coastal development, and a number of other factors are why Charleston County eds to be kept together . .  in map one, Charleston itself is taken out of the Charleston tri-county area." PX No. 114 at 96:13-97:24.

Many others testified similarly.  *See*, *e.g.*, PX No. 114.

547.    SC NAACP President Brenda Murphy submitted written testimony to the Senate Redistricting Subcommittee that "the Senate map designated as Amendment 1 continues a pattern of consistently flawed Congressional redistrict maps proposed by the Legislature this cycle," noting that "Black communities in key areas of the state like Charleston, Richland, and Sumter counties are cracked under Amendment 1."  PX No. 594 at 6–7. At the January 13 hearing, she said "Amendment 1 fails to reflect or respect black South Carolinians, voters, or

indeed any voters . . . Amendment 1 distorts and ignores communities of interest, it cracks black communities, it shows little respect for any voters in this state. And less for black voters in our state. . . . Amendment Two does not pack additional black voters into CD 6, while also providing black voters the opportunity to have an impact d influence the outcome of election[s] outside of CD 6. This is appropriate in a state where black voters are at least 29% of the voting age population." PX 114 at 90:18-95:2.

548. Witnesses who were present at the January 13 hearing also recalled these criticisms of Senate Amendment 1 at trial. Lynn Teague of the League of Women Voters testified that that when she looked at Senate Amendment 1, "it looked to me like there was a very pronounced racial factor in how the lines were drawn. . . I think race was a major tool that was used to achieve the ends of the map drawers." Tr. 701:22–702:5 (Teague, Oct. 6). Mr. Joey Oppermann described his concern over not just "the number of county and municipal splits," but "where they're concentrated," observing that "eight of the 10 county splits occur along the boundary of District 6." To "depart from a guideline requirement along the boundaries of" a district with historically high Black population, in his view, was "curious and concerning" and "suggest[ed] a certain kind of intent." Tr. 971:17–973:8 (Oppermann, Oct. 7).

549. Even proponents of Senate Amendment 1 at the January 13 hearing emphasized they supported it because it kept Beaufort County whole in CD 1. For example, Ann Ubelis, the Chair of the Beaufort Tea Party asked to "keep us united in District 1 with Charleston and our fellow coastal communities . . . [and] all of Beaufort County united in District 1." PX 114 at 79:3-20. Similarly, Matthew Sweeney testified on behalf of Senate Amendment 1 because it "keeps Beaufort County in CD 1." PX 114 at 69:25-70:2.

550. Neither Senator Campsen, Senator Harpootlian, or any other Senator

referred to Senate Amendment 2 as the "Democratic Plan" or "Senate Democratic Caucus Plan." PX No. 114. Yet Senator Campsen testified at trial that he assumed that anyone who supported Senate Amendment 2 was a Democrat. Tr. 1867:10–21 (Campsen, Oct. 13). "If they're supporting" Senate Amendment 2, "they probably are Democrats." Tr. 1869:13–17 (Campsen, Oct. 13). It didn't even matter to Senator Campsen that members of the public provided testimony in a non-partisan role; to him, "[i]t really [was] irrelevant whether they identify as a Democrat or not." Tr. 1869:18–21 (Campsen, Oct. 13). Even for groups that are non-partisan (like the SC League of Women Voters and the SC NAACP), Senator Campsen asserted that they are partisan, reluctantly conceding at trial that the SC League of Women Voters is "technically" non-partisan, Tr. 1866:16–21 (Campsen, Oct. 13), but insisting the SC NAACP seem to "support more Democratic candidates" even though they are non-partisan, Tr. 1897:6–23 (Campsen, Oct. 13).

551.     But even Senator Campsen's partisan assumptions are inconsistent with the record. Notably, Senator Campsen's supporters asserted that former Congressman Joe Cunningham had proposed Senate Amendment 2 (SDX No. 108), and during his testimony Senator Campsen asserted that former Congressman Joe Cunningham had a website with talking points, *see* Tr. 1896:12–16 (Campsen, Oct. 13), but nothing in the record supports that claim. Nor did he see any "Democratic Party" talking points, as he claimed at trial, before the January 13, 2022 hearing or before he astroturfed support for his plan. *See*, *e.g.*, Tr. 1825:1–7, 1896:16–18 (Campsen, Oct. 13). When confronted with this at trial, Senator Campsen cited talking points created by the Beaufort County Democratic Club that were circulated on January 17, four days after the hearing and six days after Senator Campsen commenced his efforts to rally activists. Tr. 1896:22–24 (Campsen, Oct. 13); SDX No. 115.

552.    On January 19, 2022, the Senate Judiciary Committee held a hearing to consider Senate Amendments 1 and 2a.  At this hearing, Senator Campsen fully explained Senate Amendment 1 for the first time. *See* PX No. 115 at 9:11–11:7. The Committee did not invite members of the public to provide testimony. *See* generally PX No. 115.

553.    Senator Campsen repeatedly asserted that Senate Amendment 1's goal was to adhere to the Senate's "redistricting principles," *see, e.g.*, PX No. 115 at 16:10–13, 21:14–15, 34:2, but aside from invoking this talisman, he never provided insight into how those specific principles were weighed or prioritized, *see generally* PX No. 115.  Rather, he provided a series of false, misleading, or contradictory explanations for Senate Amendment 1.

554.    For example, in his January 19 session, in response to questions from Senator Kimpsen and Stephens about BVAPs of certain districts:

- Senator Campsen claimed that the BVAP in CD 6 under Senate Amendment 1 went from "51.4 to 45.9" because the Senate "had to shed 100,000 voting age population because of population [] growth." PX No. 115 at 15:1–4.  In addition to being nonsensical (CD 6 was underpopulated and did not have to "shed" any population), this statement was misleading: Senator Campsen did not advise that Senate Amendment 1 moved 80,469 people out of CD 6, or that it moved 165,210 people into CD 6.  SDX No. 29C.

- Senator Campsen then reinforced this misleading claim by asserting that Senate Amendment 1 moved "100,947 voting age population from the First to the Sixth." PX No. 115 at 16:4–5.  The actual number of people moved from the First to the Sixth was 140,489, of whom 113,531 were of voting age.  SDX No. 29C.

555.    Similarly, in an exchange with Senator Hutto, a member who is white and

a Democrat, about whether it made sense to have two metropolitan (Charleston and Columbia) areas in a single congressional district and whether the cities of Charleston and Columbia could be in different congressional districts, PX No. 115 at 11:11–12:15, Senator Campsen:

- First claimed that Columbia and Charleston had been in the same district since "the 1990s . . [and] was reaffirmed in the *Bachus* decision." PX No. 115 at 11:17–24. This was not accurate. Senate Amendment 1 was the first time the cities of Columbia and Charleston had been placed in the same district; they were in different districts in all prior plans.

- then claimed that "all the major metropolitan areas" were split in the map, citing Greensville/Spartanburg and Columbia because "it's hard to keep that population whole." PX No. 115 at 12:2–7. This was neither accurate (Senate Amendment 1 did not split Rock Hill, which is larger than Greensville and Spartanburg) and non-responsive, since Greensville, Spartanburg, Rock Hill and other South Carolina municipalities are not placed in the same congressional district as other municipalities.

- then said that the map was taking a "least amount of change" approach "with regards to the dynamic of the Sixth District." PX No. 115 at 12:2–7. This was not accurate – the Sixth District had, by far, the lowest core retention of any district in Senate Amendment 1, and Senate Amendment 1 moved 80,469 people out of CD 6, or that it moved 165,210 people into CD 6. SDX No. 29C. And when Senator Hutto asked whether Senate Amendment 1 followed a "least change mode," Senator Campsen backed down and said "No" and least change was just "one factor." PX No. 115 at 12:19–13:4. The following day, and at trial, Senator

Campsen reversed course again and said that he intended Senate Amendment 1 to be a "minimal change plan." PX No. 116 at 25:1–4; Tr. 1840:12–16 (Campsen, Oct. 13).

556.    In response to questions from Senator Bright Matthews whether it was more important to "make sure that a district remains the same or following the flow of the census data," Senator Campsen responded that "one is no more important than another." PX No. 115 at 21:13–18. Senator Campsen also claimed throughout his presentation that the "panoply o[f] redistricting principles" were given equal weight. PX No. 115 at 21:13–18.  This is inconsistent with his trial testimony, however, in which Senator Campsen testified:

- he intended Senate Amendment 1 to be a "minimal change plan." Tr. 1840:12–16 (Campsen, Oct. 13).

- that in drafting Senate Amendment 1 his primary goal was "to have Beaufort County and Berkeley County in congressional district 1," recognizing that meant that Charleston County would have to remain split. Tr. 1862:6–10 (Campsen, Oct. 13).

- that his "goal was to produce a Republican plan" although he acknowledged he never disclosed that he "sought to improve or shore up a Republican advantage" in CD 1.  Tr. 1848:15–16, 1905:15–17 (Campsen, Oct. 13).

557.    In an exchange with Senator Harpootlian concerning the Senate's failure to conduct a racially polarized voting analysis, Senator Campsen stated that was "something that would happen if and when a plan is litigated" and he "wanted to be colorblind" Tr. 1864:13–17 (Campsen, Oct. 13).  But upon questioning, Senator Campsen acknowledged that his drafting of Senate Amendment 1 was not colorblind. Tr. 1881:25–1882:3, 1887:24–1888:1, (Campsen, Oct.

13), and as discussed above, there is overwhelming evidence that race was considered in drafting Senate Amendment 1. *See supra* Section II(E). Moreover, Senator Campsen acknowledged that the "page after page" of racial data available in the notebooks given to Subcommittee members. PX No. 115 at 33:14–34:7. And as for Senator Campsen's observation that a racially polarized voting analysis only need be conducted once litigation has started, Senator Campsen did not seem to understand that the Senate had already been sued. Tr. 873:11–874:9 (Harpootlian, Oct. 7).

558.    In response to questioning from Senator Harpootlian about whether the portion of Charleston County that had been shifted to the Sixth Congressional district had "significant African American population," Senator Campsen responded (after checking with staff) that the Black population of Charleston County was split "50/50" between CDs 1 and 6 and the portion of Charleston County shifted to CD 6 had BVAP of 31 percent, or "10 percent more than Charleston County as a whole." PX No. 115 at 48:23–51:10. This was inaccurate and misleading. While the Black population of Charleston County was split 50/50 between CDs 1 and 6 under the 2011 Plan, Senate Amendment 1 provided that 80 percent of the Black population of Charleston County would be in CD 6, and only 20 percent in CD 1. Tr. 1052:6–1053:7 (Ragusa, Oct. 7).

559.    In response to questions from Senator Sabb, Senator Campsen acknowledged that more members of the public expressed a preference for a plan that made Charleston County whole in CD 1 instead of Senate Amendment 1 which split Charleston between CDs 1 and 6. PX No. 115 at 57:5–16. But Senator Campsen claimed that there were a lot of emails the "other way." PX No. 115 at 57:17. This was misleading, because Senator Campsen failed to note that he had instigated those emails, and most of those emails only asked

for Beaufort County to be whole, not that Charleston County be split. *See*, *e.g.*, SDX No. 106.

560.    Senator Campsen also claimed that "there is a lot more input from folks who like being represented by two members of Congress" instead of one. PX No. 115 at 57:23–58:1. But again, the legislative record does not bear that out. Putting aside the fact that Senator Campsen also instigated an email pushing talking point the day before the Senate Redistricting Subcommittee's January 13 hearing on Senate Amendment 1, SDX No. 104, the only person to make such a claim during that hearing was a Beaufort County resident who tepidly claimed that Charleston County "probably benefits" from two congressmembers, PX No. 114 at 70:11–14. This talking point is also directly refuted by all the community members from Charleston County who repeatedly and at multiple public hearings advocated for Charleston County being whole. *See supra* Section III(C)(ii); PX 17 at 30, 32, 33, 35.  Moreover, no members of the public affirmatively asked for Charleston County or the City of Charleston to be split. *See generally* PX No. 98; PX No. 113.

561.    As described above in the section discussing the public hearings, Senator Campsen also repeatedly and publicly emphasized that Senate Amendment 1 reflected a "panoply o[f] redistricting principles that were given equal weight." *See*, *e.g.*, PX No. 115 at 21:13–18. At trial, Senator Campsen also claimed that he gave equal weight to the Senate's redistricting criteria and guidelines. Tr. 1877:1–3 (Campsen, Oct. 13). As one example, he claimed all public testimony was given equal weight. Tr. 1830:19–1831:5 (Campsen, Oct. 13).  But these proclamations are inconsistent with the record. *See supra* Sections III(C)(ii).  As one example, contrary to Senator Campsen's representation about redistricting criteria and guidelines being equally weighed, Mr. Roberts explained that the core redistricting team did not uniformly apply relevant public and private redistricting criteria and guidelines uniformly.  Tr.

1527:7–10 (Roberts, Oct. 12). Putting aside the fact that Senators and Senate staff concealed criteria and instructions that impacted the creation of Senate Amendment 1, they also concealed the fact that they were applying any in a non-uniform manner. PX No. 722 ("County lines are more important in some places than others."). Instead, the dis-uniformity became clear after the maps were published because it appeared "guidelines were to be applied differently depending on the congressional district," even though no one admitted it.  Tr. 896:4–896:9 (Harpootlian, Oct. 7).

562.    At the end of the January 19 hearing, the Senate Judiciary Committee voted to advance Senate Amendment 1 to the floor on a party line 14-8 vote, with all Black members voting no. PX No. 115 at 64–66; PX No. 4 at RFA No. 96; PX No. 17 at 46.

563.    Senator Campsen's misleading statements about Senate Amendment 1 continued during the January 20, 2022 Senate floor debate. For example, in response to an allegation of purported partisan gerrymandering, Senator Campsen denied that Senate Amendment 1 involved partisan gerrymandering, providing statistics that he conveyed to try to support his argument. PX No. 116 at 25:20–23.  This is contrary to his trial testimony that his "goal was to produce a Republican plan" although he acknowledged he never disclosed that he "sought to improve or shore up a Republican advantage" in CD 1.  Tr. 1848:15–16, 1905:15–17 (Campsen, Oct. 13).

564.    In describing District 1, Senator Campsen said in response to "allegations about some form of racial motivation" there was "very little change," noting that "the benchmark plan has in the 1st District 16.56 percent black voting age population.  Under this plan, Amendment 1, it has a 16.72 voting age population.  Very little change." PX No. 116 at 19–22. This was misleading.  As discussed above,  Senate Amendment 1 moved 140,489 people from

the 1st to the 6th Districts, and 52,799 people from the 6th to the 1st. SDX No. 29C. Moving

190,000 people in and out of a district is not "very little change." And at no point in this

presentation did Senator Campsen mention his goal of increasing the Republican advantage in

CD 1. *See generally* PX No. 116 at 20:22–30:17.

565.    Senator Campsen later reiterated "this is a minimal change plan . . . to the

extent District 1 and District 6 had the change, it's really driven by growth because the chairman

mentioned earlier, we had 87,000 people in the 1st District that had to -- we had to shed and we

had 84,000 people or 85,000 in the 6th District that the 6th District had to pick up." PX No. 116

at 25:1–19. *See also* PX No. 116 at 21:4–6 (same), 36:15–21 (same). This was misleading: in

reality, S.865 shifted 80,469 people *out of* CD 6 (even though it was underpopulated) and

140,489 people from CD 1 to CD 6. SDX No. 29C; Tr. 1683:16–1684:5 (Trende, Oct. 13) &

SDX No. 75 at tbl.4.

566.    In contrast to his statement to Senator Bright Matthews on January 19 that

he did not consider constituent consistency to be more important than other redistricting

principles, PX No. 115 at 21:13–18 ("one is no more important than another"), for the first time,

Senator Campsen appeared to elevate constituency consistency over other redistricting principles

by alleging Senator Harpootlian's Senate Amendment 2a violated the Senate's redistricting

criteria relating to constituent consistency. PX No. 116 at 26:7–15.

- When challenged on this, Senator Campsen backed down and again conceded constituent consistency is not an "overriding guideline that overrides others." PX No. 116 at 54:20–55:16, 63:6–17.

- And in presenting information about constituent consistency, Senator Campsen significantly overstated the consistency of CD 6, stating that "District 6 retains

more than 87 percent of its benchmark population."  PX No. 116 at 23:5–6.  This was misleading.  Senate Amendment 1 moved 80,469 people out of CD 6 and 165,210 people into CD 6, and the Senate's own core constituency analysis shows that the correct figure is 77.41%.  SDX No. 29C. Indeed, this 77.41% figure is the same number that the staff included in a draft of the talking points prepared for Senator Campsen's use.  PX No. 651 at 5 ("District 6 retains more than 77% of its Benchmark population").

567.    During the January 20, 2022 floor debate, Senator Campsen provided an overview about why he believed CDs 1 and 6 complied with some of the Senate's redistricting criteria. PX No. 116 at 20:22–30:19.  Regarding compliance with voting rights, Senator Campsen declared that there are no Section 2 of the VRA concerns because the BVAP in Congressional District 6 had not decreased compared to the 2011 map. PX No. 116 at 28:7–10; *see also* PX No. 115 at 32:13–24 (Senator Campsen claiming that a racially polarized voting analysis was not completed and would only be done in response to litigation). He also proclaimed that there is no "suggestion that District 6 cannot elect a candidate of choice." PX No. 116 at 28:9–10; Terreni Dep. Tr. 248:4–13. But as outside counsel Mr. Terreni conceded, that determination "was an educated guess" and not an analysis reduced to writing. Terreni Dep. Tr. 249:13–16.

568.    For avoiding racial gerrymandering, Senator Campsen claimed that principle is met because Senate Amendment 1 preserved many of the boundaries upheld in the *Backus* decision. PX No. 116 at 28:1–14. But at trial, Senator Campsen admitted he could not recall what district was challenged based on plaintiffs' standing. Tr. 92:7–11; *see Backus v. South Carolina*, 857 F. Supp. 2d 553, 564 (D.S.C. 2012) (the Court's analysis, including for the

racial gerrymandering claim, is limited to CD 6 because plaintiffs lacked standing to challenge the other districts). And as discussed throughout, most of the changes to the Enacted Plan involve CD 6 borders. *See supra* SectionII(A)(ii), III(A)(iii).

569.  During the introduction, Senator Campsen simply asserted that communities of interest are "honored," but did not provide details. PX No. 116 at 29:18–30:17.

570.  And importantly, Senator Campsen conceded that the 2011 map was enacted under a "different legal environment" and constructed under requirements that no longer apply relating to preclearance under Section 5 of the Voting Rights Act. PX No. 116 at 71:2–7, 72:20–22.

571.  Following completion of the Debate, Senate Amendment 1 passed the Senate by a vote of 26-15, with all Black Senators voting no. PX No. 116 at 94–98; PX No. 4; RFA No. 107; PX No. 17 at 47.

572.  At trial, Mr. Roberts asserted that it was up to the General Assembly to determine which tradeoffs to make when assessing Senate Amendment 1 against the relevant redistricting criteria and guidelines. Tr. 1444:18–20 (Roberts, Oct. 12). But neither the Senate nor the House had sufficient information to assess—let alone meaningfully—any tradeoffs. As discussed above, the Senate core redistricting team and a few key Senators concealed certain private criteria and the weight that the Senate's public redistricting criteria and guidelines were given from the public and full General Assembly. *See supra* Section III(C)(i). As discussed above the Senate's core redistricting team and Senator Campsen repeatedly made public statements about the application of the Senate's criteria and guidelines that were inconsistent and contradicted by what was being discussed privately during the development of Senate Amendment 1. Also detailed below in a separate section, Defendants at trial offered new and

post hoc justifications for the development of Senate Amendment 1. *See infra* Section III(E).

    **D.**    **The Sequence of Events Reveals Departures from Procedural Norms and Lack of Transparency During the Redistricting Process.**

    573.    Despite assertions to the contrary, the Senate Redistricting Subcommittee and the House Ad Hoc Redistricting Subcommittee failed to provide the opportunity for meaningful input from the public or legislators and departed from procedural norms.

    574.    At the start of the redistricting process, the Senate Redistricting Subcommittee publicly committed to drafting maps in a transparent way that would incorporate public input. For example, in the Subcommittee's initial press release on July 16, Chairman Rankin is quoted, "[t]he members of our bipartisan subcommittee represent a wide range of different experiences and perspectives. I look forward to our working together on a redistricting process that is fair and equitable to all South Carolinians." PX No. 17 at 25. A few days later, at the first committee meeting, Chairman Rankin said, "But we previously had developed the process that strives to be, and if I have my way and I think each of us to a person will insist on it being an open and transparent process to allow and encourage public participation. We will follow a similar process as they've done, again, historically." PX No. 89 at 6:3–6:9. Ms. Benson drafted a public submission policy "to help enable the public to be more part of the process. And if they indeed have recommendations for map drawing to help them, to the best of their capabilities, to submit what they would like to see." Benson Dep. Tr. 176:5–176:9. Ms. Benson further explained, "It's very important to have the public input. And -- and certainly people who represent the public want to have the public input, so that it can be an effective representation." Benson Dep. Tr. 176:19–176:22.

    575.    Leadership on the House Ad Hoc Redistricting Subcommittee made similar assertions. For example, at the beginning of the House's redistricting process, Chairman

Jordan said, "We look forward to this being a process that is transparent and open and hopefully one that the public will feel comfortable and want to engage in so that we can make it what it is supposed to be and needs to be." PX No. 90 at 12:16–12:21. Rep. Jordan claimed the public had a "voice" in the redistricting process and opportunity for input in the map drafting process. Tr. 1829:10–15, 1834:15–23 (Jordan, Oct. 13).

576.    Despite these assertions, the record is replete with examples of the Senate and the House not engaging in a transparent process and departing from established procedural norms in the drafting process. PX No. 17 at 24.

577.    As Dr. Bagley summarized: "members of the public, as well as legislators on the committees in charge of the redistricting process, had little time to review proposed maps before hearings because staff proposed maps would sometimes be published days before hearings or just before long holiday breaks. Numerous members of the public and of the committees that were tasked with producing maps complained that they lacked access to the actual map-drawing process. The public was given opportunities to weigh in via public hearings, but it is unclear how much weight their testimony was given, nor is any insight given into how those comments impacted amendments and changes to proposed maps. Committee members reported being blindsided by the appearance of maps and being at a loss for why certain changes would have taken place." PX No. 17 at 24.

578.    *Limiting Opportunities for Public Feedback*: As an initial matter it was difficult for the public to provide input into the map drawing process. For example, Senator Harpootlian raised concerns that the map room where proposed maps were being drawn was not available to the public. Tr. 1131:23–1132:4 (Bagley, Oct. 11). To increase transparency of the process, Sen. Harpootlian made a motion at the September 17, 2021, Senate Redistricting

Subcommittee meeting to allow South Carolina citizens access to the Subcommittee's

redistricting resources, including for technical assistance.  PX No. 91 at 68:14–69:16.  Sen.

Harpootlian' s motion was voted down 5-to-2 by the Subcommittee.  PX No. 91 at 72:23–73:5.

       579.    Public hearings became the primary method for concerned citizens to

provide their input; however, many members of the public who sought clarity about what

priorities drove the mapmaking process came away frustrated. Mr. Anjene Davis testified that he

attended a public hearing "seeking to gain insight as to how the maps would be drawn and what

would be the factors in drawing the map" and that he "didn't receive any of that." Tr. 64:20–22

(Davis, Oct. 3 AM). President Murphy testified about her concern that "most of the meetings

were held during the time that individuals were working.  So, it was very difficult for some to

attend meetings." Tr. 1252:25–1253:4 (Murphy, Oct. 11).  President Murphy also testified

regarding her concern that the public hearings did not all have virtual testimony options,

including the House only having "a couple" of virtual testimony opportunities "near the end."

Tr. 1253:18–1254:2 (Murphy, Oct. 11).  President Murphy testified that she had "transparency

concerns" about these public hearings, since it was only "the community[] giving feedback, but

we were not getting feedback from" the legislators.  Tr. 1254:6–1254:13 (Murphy, Oct. 11). Ms.

Lynn Teague testified that legislators submitted maps with insufficient time for public input. Tr.

677:10–678:16 (Teague, Oct. 6). Ms. Teague also testified that the maps did not reflect the

preferences the public raised and there was a lack of accountability. Tr. 679:5–10 (Teague, Oct

6.).  No feedback was given regarding the maps submitted by the SC NAACP and private

citizens. 1128:25–1129:9 (Bagley, Oct. 11). The respective redistricting subcommittees also

failed to indicate how they would take these maps into consideration, and the enacted map did

not reflect any aspects of the submitted proposals. Tr. 1128:25–1129:9 (Bagley, Oct. 11).

580.     _Lack of Transparency on Committees and Curtailing the Role of_

_Redistricting Committee Members_: Not only did members of the public express not being able to

participate in a transparent process, but even members of the relevant Senate and House

redistricting committees were left out of the congressional redistricting process. For

example, Sen. Harpootlian, a member of the Senate Redistricting Subcommittee, testified that

unlike this recent redistricting process for the 46 Senate districts, the congressional redistricting

process did not allow for opportunities for the Senate Redistricting Subcommittee members to

have input into proposed plans.  Tr. 864:13–865:4 (Harpootlian, Oct. 7). Sen. Harpootlian also

expressed his concerns about a Senate staff plan being released "the week before Thanksgiving,"

which he referred to as "'the immaculate deception,' because we had no inkling of what was in

it, how it was composed, what was weighed."  Tr. 865:11–865:22 (Harpootlian, Oct. 7); _see also_

PX No. 116 at 104:4–20.  Sen. Harpootlian testified that the hearings regarding this and similar

subsequent plans were "non-productive" since some of the Subcommittee members "were non-

participants.  Our opinions didn't matter."  Tr. 865:23–866:3 (Harpootlian, Oct. 7).

581.     In his testimony, Sen. Harpootlian contrasted how the congressional

redistricting process differed from the recent redistricting process for drawing Senate districts.

Based on his recent experience with Senate redistricting, he "assumed somebody would call

[him], ask [him] to come into the map room, look at it and get [his] comments." Tr. 882:9–

882:17 (Harpootlian, Oct. 7).  But instead, Sen. Harpootlian was "outraged" and "disappointed in

the staff, the chairman," for handling congressional redistricting "in a non-transparent way" by

just releasing maps without any input from at least some Subcommittee members.  Tr. 882:9–

882:17 (Harpootlian, Oct. 7).

582.     Sen. Harpootlian also testified that while he had "some very good

discussions about [his] senate district" with the staff, he "[n]ever heard from them on the congressional district. They were very reticent to share any information with [him] . . . . They didn't follow up and give [him] a copy of the republican submission" that he requested, and he believed that he "needed to do it" himself if he wanted to get a plan, so he "hired [his] own demographer." Tr. 897:2–897:15 (Harpootlian, Oct. 7).

583.    Other senators similarly felt shut out of the process. For example, during a November 29, 2021 Senate Redistricting Subcommittee meeting when the Senate's first staff plan was presented, Subcommittee member Sen. Bright Matthews noted that she had little notice of the Senate staff plan and had not had an opportunity to review it adequately prior to the meeting, and also wanted to "inquire of staff who they consulted with in drafting this map," because she would have expected to "have at least had some input into this map," considering that CD 6 and CD 1 "go straight through [the] six counties" that Sen. Bright Matthews represents. PX No. 98 at 23:23–24:6. Sen. Bright Matthews also emphasized that she was "astounded" that "no more notice . . . was given" regarding this draft map. PX No. 98 at 24:7–15. Sen. Bright Matthews explained, "On Tuesday, when I received notice [of the map's publication and of this meeting], my office was winding down; I knew I had depositions, this morning – this afternoon, and had to be in court this morning. I had to cancel everything immediately, because this is critically important, because it astounded me that no more notice was – was – should have – was given." PX No. 17 at 33.

584.    Sen. Bright Matthews testified that although the Senate was "promised that we would have an opportunity to tweak the map to make sure it was right," when Sen. Bright Matthews arrived at the January 20, 2022 Senate floor debate, she saw that the staff and the attorney, Mr. Terreni, "were huddled there and they had charts. I didn't have a chart. I was

on the committee." Tr. 818:21–819:10 (Bright Matthews, Oct. 7).  Sen. Bright Matthews objected multiple times, explaining that "if the state of South Carolina is paying for this work to be done, meaning these charts to be created, and paying for staff, every [S]enator in there is entitled to the documents."  Tr. 819:15–819:23 (Bright Matthews, Oct. 7).  Sen. Bright Matthews testified that in response to her procedural objections, they had to recess, and the meeting took a long time to get started because the Senators from the majority party initially "didn't want to provide us copies of" these charts and documents, including "a cheat sheet that they didn't want to provide [] to us."  Tr. 819:24–820:8 (Bright Matthews, Oct. 7).

585.    Sen. Harpootlian also learned that the NRRT had submitted a proposed congressional plan, and while he was "assured by staff that it played no part whatsoever in this plan or their composition of a plan," when Sen. Harpootlian asked to see the NRRT map, it was never provided to him. Tr. 882:18–883:1 (Harpootlian, Oct. 7).

586.    There were additional irregularities concerning the NRRT maps.  The NRRT maps were accepted by the Senate staff after the deadline for public submissions and outside the process required by the Senate's Policy for Public Submissions.  Fiffick Dep. Tr. 194–195, 240–242; Terreni Dep. Tr. 83–84, 89. The maps were accepted even though Mr. Terreni instructed Mr. Oldham that maps should be submitted through the public portal. Terreni Dep. Tr. 137:3–2.

587.    Further in violation of the Senate's Policy for Public Plan Submissions, which required that submissions "be made part of the public record and will be made available in the same manner as other Redistricting Subcommittee public records," PX No. 323 at 1, none of the NRRT maps was ever published on the Senate redistricting website.  Senate RFA Resp. Nos. 59–60.  They were not published on the House website either.  House RFA Resp. 66.  In this

regard, the treatment of the NRRT maps differed from every other outside map submission in that they were not made part of the public record.  The House posted the map submissions they received on their redistricting website, Hauger Dep. Tr. 29:15–18, and the Senate posted every submission they received as well, except for those it got from the NRRT.  Senate RFA Resp. Nos. 29–35; Baker Dep. Tr. 86:22–87:6; Fiffick Dep. Tr. 203:24–204:11.  The fact that the NRRT had submitted maps was not disclosed to minority members of the Senate Redistricting Subcommittee until the November 29, 2021 hearing, Tr. 882:18–883:1 (Harpootlian, Oct. 7), even though the fact that the NRRT had submitted maps was shared with Speaker Lucas, Chair Jordan, and "may have" been shared with Senator Campsen.  Dennis Dep. Tr. 42:10–43:11, 44:13–16; Fiffick Dep. Tr. 191:10–14.

588.    On the House side of the redistricting process, similar concerns were voiced. After the House released its initial plan on December 13 and had a public hearing on December 16, unbeknownst to some members of the House Ad Hoc Redistricting Committee, House staff made substantial revisions and released a substantially revised House Staff Alternative Plan 1 (very similar to the Senate Staff plan), on December 23, 2021.  At the House hearing on this plan, scheduled on December 29, 2021, Committee members and the public expressed surprise. People wondered why a second map was produced by staff to begin with, much less two days before Christmas, with a hearing scheduled during the holiday break. PX No. 17 at 35.

589.    At the December 29 hearing, Representative Bernstein objected, stating, "I think it's important as the Committee just to get some questions answered, if possible. Because the last time we met as a public -- in this public forum, we had a map that we took feedback from -- public testimony and some feedback from. And then last week, as I was out of town, a new

map was drafted unbeknownst to me, I'm not sure about the other members of the Committee. And so, I've – I guess I think it is pertinent, and prudent, to make -- to ask certain questions of why an alternative map was drawn." PX No. 575 at 24:22–25:7; PX No. 17 at 36: PX No. 3 at House RFA 73. Rep. Bernstein testified that she happened to hear about this Alternative Plan while she was "on a family vacation around Christmas time," and even "as a committee member [she] had not been given any notice that there would be an alternative map produced." Bernstein Dep. Tr. 154:19–155:11.

590. Rep. Bernstein testified that "it was unusual and probably borderline improper" that this new Alternative House Plan would have been drafted "unbeknownst to some members of the Ad Hoc Committee." Bernstein Dep. Tr. 162:4–12; *see also* PX No. 378 at 24:19–25:8; Tr. 1137:19–1139:1 (Bagley, Oct. 11); PX No. 3; House RFA 73. Although Rep. Bernstein "continually requested" more information about why this alternative plan was drawn, she never "got a clear answer of why we had this alternative map presented before us." Bernstein Dep. Tr. 162:25–164:15.

591. Even defense witness Rep. Bamberg testified that the was "not very involved in the development of the congressional maps" and not "active in the congressional redistricting process." Tr. 1749:9–19 (Bamberg, Oct. 13).

592. Both Committee members and rank-and-file legislators did not find out about proposed maps before they were released to the public. Tr. 760:12–761:4 (Garvin, Oct. 6); Tr. 829:8–829:14 (Harpootlian, Oct. 7); Bernstein Dep. Tr. 162:25–164:15; Tr. 828:19–829:10 (Bright Matthews, Oct. 7). Maps proposed by the public and amendments proposed by legislators were consistently rejected, and the outcome seemed predetermined. Tr. 760:25–761:4 (Garvin, Oct. 6).

593.    _Misrepresentations about Feasibility of Alternatives_: As discussed _supra_
Section III(C)(iii), in advocating for the Enacted Plan, sponsors made material
misrepresentations about the Enacted Plan.  In addition to these misrepresentations, sponsors of
the Enacted Plan lied about the viability of alternative maps. For example, on January 10, 2022,
Defendant Jordan misled his colleagues in the Judiciary Committee when he stated that keeping
both Charleston and Beaufort Counties in CD 1 was mathematically impossible.  PX No. 109 at
5–6 ("I don't think the math works in that scenario, there's just too many people in that area of
the state.").  Despite assertions to the contrary, the record reflects that Beaufort County and
Charleston County could have both been kept whole in CD 1 based on Senator Harpootlian's
Amendment. Tr. 1139:14–1140:10 (Bagley, Oct. 11). Indeed, Representative Jordan received a
text message on December 17, 2021, from Patrick Dennis, who explained that "it is easy
enough" to put all of Beaufort and Charleston Counties in CD 1.   HDX No. 81; Tr. 1772:10–
1773:11 (Jordan, Oct. 13).

594.    _Other Irregularities in Committee Process_: Black legislators also raised
issues of procedural irregularities throughout the Redistricting process. For example, the House's
election law subcommittee, tasked with issues related to voting and elections, was tasked in
previous cycles with redistricting. Tr. 622:25–624:3 (King, Oct. 6). The South Carolina House of
Representatives departed from its previous practice of delegating mapmaking to the election
subcommittee (under the Judiciary Committee) and instead created a new _Ad Hoc_ House
redistricting subcommittee. Tr. 89:5–90:3 (Cobb-Hunter, Oct. 3 AM).

595.    No members of the _Ad Hoc_ House redistricting subcommittee had
previous statewide redistricting experience. Tr. 90:5–90:15 (Cobb-Hunter, Oct. 3). No members
of the _Ad Hoc_ House redistricting subcommittee were from Charleston. Murphy Vol. 2 Dep. Tr.

24:1–10.

596.    Rep. Brandon Newton, the lone member of the *Ad Hoc* House

Redistricting Subcommittee from CD 5, resigned from the subcommittee.  No House member

from CD 5 was appointed to replace him. Murphy (Vol. 2 Dep. Tr. 26:10–25. Rep. King also

resided in CD 5 and had prior redistricting experience but nonetheless did not get selected to

serve on the committee. Tr. 620:23–622:2, Tr. 628:12–22 (King, Oct. 6).

597.    Rep. King was prevented from chairing the January 10, 2022 House

Judiciary Committee meeting, despite being Vice-Chair of the Judiciary Committee, in violation

of parliamentary rules, where a critical vote on the Congressional map occurred. Tr. 632:4–

640:19 (King, Oct. 6).  Rep. King learned of Rep. Murphy's invocation of Rule 14 and

appointment of Rep. Newton to chair the January 10 meeting at the January 10 meeting. Tr.

633:3–17 (King, Oct. 6).  In response, Rep. King asked for a point of order to understand why

he, as House Judiciary Vice Chair, would not serve as Chair in Rep. Murphy's absence as

prescribed under the House Judiciary Committee's rules. PX No. 17 at 38.

598.    Black legislators felt this decision constituted a racially discriminatory

decision. Tr. 629:10–18 (King, Oct. 6). The South Carolina Legislative Black Caucus voiced its

grievance to the Chair of the House Ad Hoc Committee, Representative Murphy, for this failure

to appoint Representative King.  PX No. 714.

599.    Rep. Murphy, Chair of the Judiciary Committee, invoked House Rule 14,

for "extraordinary circumstances" to appoint Rep. Weston Newton, a white Republican

congressman, to chair the meeting. Murphy Vol. 2 Dep. Tr. 37:15–22.  Rep. Murphy could not

recall any other instance in which "someone other than the chair of the judiciary committee"

presided over a meeting, but he felt that the pressures of the redistricting schedule could not

accommodate rescheduling the January 10 meeting.  Murphy Vol. 2 Dep. Tr. 47:1–48:11. In

March 2022, however, Rep. King, the vice chair, did preside over a non-redistricting-related

meeting of the Judiciary Committee. Tr. 637:8–20, 638:21–639:2 (King, Oct. 6).

600.    The exclusion of Rep. King echoes concerns by other legislators regarding

procedural irregularities and feelings of exclusion from the redistricting process. PX No. 17 at

36. For example, on the Senate side, Senator Gerald Malloy, a Black legislative member, rose to

register again his objection to moving forward with a vote at the January 20, 2022 Senate Floor

vote. PX No. 116 at 81:24–81:25. He noted again that there would be no second or third reading

and said, "We had about an hour and change of discussion" and that they had been repeatedly

told that "the information is online" on the website. PX No. 116 at 81:24–81:25. He argued that

that was not nearly enough time and consideration for something as important as a redistricting

bill. PX No. 116 at 79:24–85:13; PX No. 17 at 47. He said that there had been a measure of

bipartisan cooperation in 2010 because they had more time to consider things. PX No. 116 at

79:24–85:13, PX No. 17 at 47. And he noted that the process was so rushed this time that

legislators were arguing on the floor over who had received what information. PX No. 116 at

79:24–85:13, PX No. 17 at 47. He concluded, "I didn't sign up for this." PX No. 17 at 47.

**E.    Legislative Defendants' Post-Hoc Justifications to Justify Their Efforts to Suppress Black Political Power.**

601.    At trial, Defendants advanced three primary justifications for drawing the

S.865 plan: (i) that S.865 was drafted to reflect a map approved by Congressman James Clyburn;

(ii) that the map was drawn to give the Republicans an advantage in six of the congressional

seats and particularly in CD 1; and (iii) that the map was drafted as a "least change" map that

prioritized core retention.  These justifications are post-hoc, in that they were not raised

contemporaneously as a defense for S.865.  They are also contrary to the bulk of the evidence,

including inconsistencies with the contemporaneous legislative record and the evidence of the

Enacted Map's targeting of Black communities. The inconsistency between Defendants' post-

hoc justifications and the contemporaneous reasons they advanced for the drawing of S.865

demonstrate that they have offered false and pretextual justifications; the disconnect between the

justifications offered during the legislative process and the justifications offered now also

supports an inference that Defendants had an improper, discriminatory motive.

### i.    The "Clyburn" Map

602.    With regard to the "Clyburn" map, Will Roberts is the only witness who

testified that Congressman Clyburn's office had any role, much less any responsibility, for the

S.865 map.  Specifically, Mr. Roberts testified that in drawing maps, he "took direction from

Dalton Tresvant," Tr. 1498:25–1499:2 (Roberts, Oct. 12), and following his meeting with Mr.

Tresvant, Mr. Roberts drafted the "Milk plan,"[25] which he considered to be "the original basis

for the staff plan, which then became the basis for Senate Amendment 1."  Tr. 1515:6–15

(Roberts, Oct. 12).

603.    The Legislative Defendants never identified Congressman Clyburn or his

aide Dalton Tresvant in pretrial discovery responses as having any role or relevance to the

drafting of S.865 or any interim maps.  *See* PX No. 1 at Rogs 1–4, PX No. 2 at Rogs. 1–4; ECF

356-1, 356-2, 356-5.

604.    There is no contemporaneous support in the record for Mr. Roberts'

attribution of S.865 to Congressman Clyburn.  Contacts with Representative Clyburn's office

---

[25] Mr. Roberts testified that the Milk plan was based on a sketch of CD 6 purportedly provided by Mr. Tresvant.  Tr. 1411:2–1412:3 (Roberts, Oct. 12).  The document Defendants have identified as provided by Mr. Tresvant (SDX No. 37) appears indistinguishable from a sketch of CD 6 under the 2011 plan, rather than a new district plan.  *Compare* SDX No. 37 *with* SDX No. 28A (2011 Plan).

only came up during one legislative session, during which the Staff disclosed they had met with Mr. Tresvant.  PX No. 98 at 28:4–10, 34:9–13.  There was no suggestion during that or any other session that the Staff considered the map or concepts provided by Representative Clyburn to be critical in drafting the Staff or S.865 maps, much less that they were the "basis" for S.865.  PX Nos. 89, 91, 92, 93, 95, 114, 115, 116.

605.    Rather, when Mr. Roberts was asked during the legislative hearings about the role any member of Congress had played in drafting the map, he responded at the November 29 hearing "the input was very little."  PX No. 98 at 27:10–21.

606.    In addition to being inconsistent with his statement at the November 29 hearing, Mr. Roberts' trial testimony concerning the interaction with Mr. Tresvant is directly contradicted by his boss, Andrew Fiffick, who also attended the meeting with Mr. Tresvant.  Mr. Fiffick testified that Mr. Tresvant "just wanted to see what the maps looked like" and "didn't seem like he had any sort of message."  Fiffick Dep. Tr. 84:5–11.  Mr. Fiffick testified that he did not recall Mr. Tresvant representing that Rep. Clyburn wanted a least-change CD 6.  Fiffick Dep. Tr. 87:24–88:3.  Mr. John similarly testified he did not recall receiving any suggestion from Rep. Clyburn to adopt a least-change map. John Dep. Tr. 164:10–24.  Mr. Fiffick thought that the draft plan Mr. Tresvant provided for CD 6 was "unremarkable."  Fiffick Dep. Tr. 87:24–88:5. And Mr. Fiffick testified that because no Senators asked Senate staff to use Mr. Tresvant's map, neither he nor the redistricting team ever used or implemented it.  Fiffick Dep. Tr. 84:22–85:4, 86:7–20.  Indeed, when asked whether Mr. Tresvant's map "informed anything that Will Roberts did in terms of drawing up a congressional map," Mr. Fiffick reiterated "It did not because we operated on instructions of members and I never received any instructions that I can remember, obviously remember about that map."  Fiffick Dep. Tr. 86:21–82:2.

607. Nor did Mr. Terreni, a key member of the Senate core team, identify Rep. Clyburn or Mr. Tresvant as having supplied a starting point or played any kind of substantive role. Mr. Terreni testified that "[i]f we had somehow used these maps [from members of Congress] as the basis for something we proposed to the South Carolina Senate for its consideration with the subcommittee, I believe we literally said, hey, we got this map, you know, it has congressional input and style. . . . we didn't think it was useful. . . . so basically, you know, we . . . put it aside." Terreni Dep. Tr. 123:16–124:6.

608. And Mr. Roberts' testimony is also inconsistent with other aspects of the testimony of the Senate core redistricting team, who testified that, in general, any input from the South Carolina's congressional delegation was considered minimal or that any requests were given "equal weight" compared to those of other "members of the public." *See supra* Section III(C)(iii).

609. No other defense witness at trial – neither Senator Campsen nor Massey, nor any of the Representatives who appeared – testified or otherwise suggested that Representative Clyburn had provided the basis for S.865. To the contrary, Senator Campsen testified that the "starting point" for S.865 was the 2011 congressional plan. Tr. 1840:12–22 (Campsen, Oct. 13). And Representative Jordan testified that the views of South Carolina's Congress members were not "elevate[d]" over the House's redistricting criteria. Tr. 1795:8–12 (Jordan, Oct. 13).

610. There are critical differences between what Will Roberts claims Representative Clyburn requested and S.865 that make it clear there is little connection between those plans. Among other things:

a.     The Milk plan proposed to keep two counties along the CD 1/CD 6

border – Beaufort and Berkeley – split, while the Enacted Plan does not. *Compare* SDX No. 223A *with* SDX No. 29E. Conversely, the Milk plan keeps Jasper County whole, while the Enacted Plan splits it. *Id.*

b.    The Milk plan proposed 27 precinct splits, while S.865 has 10. *Compare* SDX No. 223A *with* SDX No. 29E.

c.    Roberts acknowledged that Congressman Clyburn asked that Sumter County be placed in his district. Tr. 1518:5–25 (Roberts, Oct. 12). The Enacted Plan did not place Sumter County in Congressman Clyburn's district and continued to split the County, as well as the City of Sumter. SDX No. 29E.

d.    Roberts acknowledged that Congressman Clyburn asked for a "least change" plan with respect to CD 6. Tr. 1419:22–23 (Roberts, Oct. 12); Tr. 1517:5–8 (Roberts, Oct. 12). But the Enacted Plan retains significantly less of the core of CD 6 than the Milk plan. *Compare* SDX No. 223D *with* SDX No. 29C.

e.    The Milk plan keeps much more of the core of CD 1 than the Enacted Plan. Under the Milk plan, CD 1 has the third highest core retention of any district. Under the Enacted Plan, CD 1 has the second lowest core retention of any district. *Compare* SDX No. 223D *with* SDX No. 29C.

f.    The Milk plan had CD 6 approach the City of Charleston peninsula from the northeast (as the 2011 Plan did). But the Enacted Plan

takes a western approach through Dorchester County and West

Ashley/St. Andrews. *Compare* SDX No. 223F *with* SDX No. 29B.

g. The Milk plan kept the majority of Charleston County in CD 1 and

kept the City of Charleston in CD 1, while the Enacted Plan does

not. *Compare* SDX No. 223A and SDX No. 223F *with* SDX No.

29A and SDX No. 29E.

h. The Milk plan was far more of a "least change" plan than the

Enacted Plan. It proposed far lower population exchanges between

districts, and significantly higher core retentions than the Staff or

the Enacted Plan.

611. To summarize some of the key differences between the proposals:

|  | Milk (SDX No. 223A, 223D) | S.865 (SDX No. 29C, 29E) |
|---|---|---|
| Beaufort Split | Yes | No |
| Berkeley Split | Yes | No |
| Jasper Split | No | Yes |
| Precincts Split | 27 | 10 |
| CD 6 Orientation to Charleston Peninsula | Northeast (through Berkeley) | West (through Dorchester) |
| CD 1 Core Retention | 97.34% (3rd Highest) | 92.78% (6th Highest) |
| CD 2 Core Retention | 97.91% (2d Highest) | 96.75% (3rd Highest) |
| CD 6 Core Retention | 83.15% (Lowest) | 77.41% (Lowest) |
| Population Moved from CD 1 | 107,117 | 140,489 |
| Population Moved from CD 2 | 5,932 | 14,397 |
| Population Moved from CD 6 | 38,435 | 80,469 |

612. Other aspects of Mr. Roberts' trial testimony concerning his interaction

with Mr. Tresvant defy credibility, including his admission that he never followed up with Mr.

Tresvant or shared the draft Milk or any other map with him to confirm it was consistent with

Congressman Clyburn's purported "direction," Tr. 1520:7–9 (Roberts, Oct. 12), his inconsistent

testimony whether Representative Clyburn wanted Sumter County kept whole.[26]

613.    In light of these discrepancies, there is no reason to credit Mr. Roberts'
otherwise uncorroborated testimony or Defendants' argument that Congressman Clyburn
provided "the original basis for the staff plan, which then became the basis for Senate
Amendment 1." Tr. 1515:6–10 (Roberts, Oct. 12).  This is a post-hoc rationale and, in any event,
is not supported by the record.

### ii.    Partisanship

614.    With regard to partisanship, a few Senate witnesses testified at trial that
S.865 was drafted to achieve a partisan political result, sometimes expressed as securing a 6-to-1
advantage in the congressional delegation, and sometimes as securing the Republican advantage
in CD 1.  *See* Tr. 1848:15–16 (Campsen, Oct. 13) ("my goal was to produce a Republican plan");
Tr. 1388:18–1390:17 (Roberts, Oct. 12) (testifying that Senator Campsen asked multiple times
for the map to achieve a certain political result, as did Senator Climer and Senator Grooms—
neither of whom were on the Senate Redistricting Subcommittee); Tr. 1422:18–25 (Roberts, Oct.
12) ("we knew we had a Republican-controlled general assembly and the only way we were
going to be able to get a map passed was to increase the Republican percentage in District 1").

615.    However, the overwhelming weight of the evidence, including testimony
from Defendants' own witnesses and staff and analyses by Plaintiffs' experts isolating the role of
race versus party affiliation, indicates that maintaining or expanding a partisanship advantage
does not explain the design of the Enacted Map.

---

[26] During cross examination, Mr. Roberts initially testified that Mr. Tresvant was not specific
about whether Rep. Clyburn wanted all of Sumter County or only the City of Sumter in CD 6.
Tr. 1518:5–8 (Roberts, Oct. 12). When confronted with his deposition testimony, Mr. Roberts
acknowledged that Rep. Clyburn wanted all of Sumter County, but the Enacted Map nonetheless
split both the county and city of Sumter. Tr. 1518:18–25 (Roberts, Oct. 12).

616.    Key defense witnesses expressly disavowed that partisanship or cementing a Republican advantage was a goal or purpose of S.865.  For example:

   a.    In stark contrast to his own trial testimony, Senator Campsen, the chief proponent of what became the Enacted Map, specifically made a point of denying that partisanship was the motivating factor for the map during the January 20, 2022 floor debate of S.865: "I want to also address the issue of some allegations of partisan gerrymandering.  I'd like to give some numbers that I think will demonstrate that that's really not the case."  PX No. 116 at 9:7–11, 25:20–23.

   b.    Senator Rankin, Chairman of the Senate Judiciary Committee and the Redistricting Subcommittee, testified that his "goal was to be as bipartisan as I could."  Rankin Dep. Tr. 104:5–6.  When asked whether "shoring up a six/one republican majority [was] a consideration," Senator Rankin testified "Not for me, no."  Rankin Dep. Tr. 168:18–21.  Senator Rankin also testified that it was not his goal "to make Congressional District 1 more reliably republican going forward."  Rankin Dep. Tr. 169:14–17.

   c.    Andy Fiffick, Chief of Staff of the Senate Judiciary Committee and a core member of the Senate redistricting team, testified that he was never instructed to make a 6-1 Republican map.  Fiffick Dep. Tr. 136:3–14, 138:2–9.

   d.    Breeden John, a Staff Attorney with the Senate Judiciary

Committee and another core member of the Senate redistricting
team, similarly testified he was not aware of anyone ever directing
(or otherwise mentioning) that they wanted to promote Republican
advantage in the congressional map.  John Dep. Tr. 143:5–18;
144:23–145:14; 279:20–280:4.  Mr. John also did not consider
partisan gain when drawing maps, and he did not recall Senator
Rankin—who supervised the staff—ever mentioning that he
wanted to promote Republican advantage in the congressional
map. John Dep. Tr. 143:5–18; 144:23–145:14; 279:20–280:4.

e.      Paula Benson, a Staff Attorney with the Senate and another core
member of the Senate redistricting team, also denied the notion
that partisan advantage played a role in the staff's considerations.
Asked at her deposition whether it was a "staff objective to draft a
map that preserved a 6 to 1 Republican advantage," Ms. Benson
replied: "no."  Benson Dep. Tr. 206:1–7.  Ms. Benson also testified
that subcommittee staff "did not set out to make sure that CD 1
was more Republican leaning than it was in the benchmark plan."
*Id.* at 205:5–8.  In her view as a member of Subcommittee staff,
"there was no effort to – to do that."  *Id.* at 204:18–23.

f.      On the House floor, Chairman Jordan was asked about the
involvement of partisan groups and Congress members.  PX No.
112 at 55:17–23 (Jan. 12, 2022 House Proceeding).  Chairman
Jordan expressly disclaimed the involvement of any "partisan

229

group, national or otherwise," and stated that "[n]one of that outside partisan stuff took place in this process."  PX No. 112 at 55:17–56:3.

617.    The legislative hearings and debates are devoid of any suggestion that S.865 or any predecessor map was justified on the basis that it was to secure any sort of partisan advantage for Republicans, either generally or specifically with regard to CD 1.  *See generally* PX Nos. 89–119.  The public record contains no evidence of legislators or staffers stating that they drew the enacted map to create a Republican partisan advantage. PX No. 18 at 11.

618.    Witness after witness testified that it was never suggested in hearings, floor debates, or at any other point in the mapdrawing process that partisanship was a goal or justification for S.865.  For example:

a.    In addition to the testimony of Senator Rankin and the Senate staff witnesses discussed above, another Republican member of the Senate Redistricting Subcommittee, Senator Talley, also did not recall any discussions about partisan gain or shoring up Republican vote share during the congressional redistricting process.  Talley Dep. Tr. 45:4–12.

b.    Senator Bright Matthews, another Senate Redistricting Subcommittee member, testified that the Subcommittee never discussed, either publicly or privately, that it was a goal of congressional redistricting to "make [R]epublican seats safer."  Tr. 787:5–13 (Bright Matthews, Oct. 6).

c.    Another Senate Redistricting Subcommittee member, Senator

Harpootlian, testified that no one ever stated that the map was drawn to maintain a six-to-one Republican advantage, and noted that Senator Campsen had represented "this was not a map based on partisan concerns." Tr. 889:5–889:11 (Harpootlian, Oct. 7). Sen. Harpootlian also testified that the Senate Redistricting Subcommittee "never discussed any Democratic-Republican vote in any district during the entire debate." Tr. 924:6–924:8 (Harpootlian, Oct. 7). Additionally, Sen. Harpootlian testified that, privately, he knew "a number of Republican Senators who [] don't care about preserving a six to one." Tr. 959:7–960:11 (Harpootlian, Oct. 7).

d.     On the House side, Representative Neal Collins, a Republican House member who served as second vice chair for the House Judiciary Ad Hoc Redistricting Committee, testified in his deposition that the issue of shedding residents in CD 1 to improve Republican prospects was never raised during his meetings on the Ad Hoc Committee, and it was not part of his focus and process. Collins Dep. Tr. 59:8–12. Nor did anything to that effect come up during the map drawing process. Collins Dep. Tr. 59:13–15; 57:16–22.

e.     Representative Newton, another member of the House Ad Hoc Redistricting Committee, repeatedly testified that he did not consider partisan gain during the redistricting process, *e.g.*,

Newton Dep. Tr. 59:25–60:3, 63:7–12, 65:19–22, and "didn't ever see an indication" that partisan gain was being considered by others either, Newton Dep. Tr. 64:4–6, 65:25–66:9.  Even when constituents mentioned partisan interests in private emails and texts, Rep. Newton did not respond and acknowledge partisan gain as a goal of congressional redistricting.  Newton Dep. Tr. 130:13–133:14.

f.     Rep. Newton also corresponded with Senators Campsen and Davis about congressional redistricting, but testified that he did not hear these Senators or any other legislator state that partisan gain was a goal of redistricting.  Newton Dep. Tr. 66:7–9.

g.     Rep. Bernstein, another House Ad Hoc Redistricting Committee member, also testified that she did not recall "any discussion about partisan advantage in CD 1 coming up during the map drawing process."  Bernstein Dep. Tr. 111:5–10.

h.     Lynn Teague, a leader of the nonpartisan SC League of Women Voters who was very involved in this redistricting cycle, testified that "in all the hearings that I participated in, I did not hear anyone say, gee, what we really want to do here is protect the party."  Tr. 696:11–13 (Teague, Oct. 6).  Even in Ms. Teague's private conversations with legislators, she did not hear that the House or Senate was attempting to protect Republican advantage in CD1.  Tr. 697:17–22 (Teague, Oct. 6).

619.    Indeed, numerous defense witnesses admitted that partisanship, achieving a 6-1 Republican map, or making CD 1 more Republican leaning was never openly raised during the legislative process, Tr. 1905:21–25 (Campsen, Oct. 13), Tr. 1603:7–1604:7 (Massey, Oct. 12), Tr. 1809:8–13 (Jordan, Oct. 13). The only explanation given at trial for this dearth of contemporaneous evidence was the self-serving assertion that legislators deemed it "unnecessary" to say the quiet part out loud.. In other words, these witnesses all confirmed that partisanship is a textbook example of a post-hoc rationale that was not raised during the legislative process.

620.    To the extent Defendants now advance partisanship as the true, secret, undisclosed motivation for the Enacted Plan, the concerted effort to avoid the suggestion of partisanship throughout the legislative process and the inconsistent invocation of this defense show it should be given little to no weight as a post hoc rationale. For example, in addition to the testimony described above by sponsors that they did not think disclosure of their partisan goal was necessary, Will Roberts testified that although he ran partisan analysis reports on each congressional plan submitted and provided these to Senator Campsen, he did not post these on the Senate Redistricting website. *See* Tr. 1390:20–1391:6 (Roberts, Oct. 12). This contrasts with the demographic analysis reports he ran on each congressional redistricting plan that was publicly submitted, all of which were made publicly available. *See* SDX Nos. 29A, 29F, 29G, 30B, 30F, 30G, 31B, 31F, 31G, 32C, 32F, 32G, 33D, 32E, 33H, 33I, 34C, 34D, 35B, 35E, 35F, 70B, 70D, 70E.

621.    Similarly, neither the Senate nor the House redistricting guidelines identify the preservation or promotion of partisan advantage as a criterion. *See generally* PX No. 175; PX No. 716.

622.     Numerous legislators and staff testified that partisan advantage was not identified in the published criteria in the Senate or House's redistricting guidelines, and some noted that they did not think it was an appropriate goal.

a.     On the Senate side, Senator Bright Matthews testified that the Senate Redistricting Subcommittee intentionally rejected references to partisanship or party identifiers in the guidelines.  Tr. 824:19–824:25, 856:5–856:9 (Bright Matthews, Oct. 7).

b.     Senator Talley also testified that partisan advantage was not part of the published Senate guidelines, and that there were no additional criteria or guidelines considered.  Talley Dep. Tr. 25:11–14, 45:19–46:3.

c.     And key Senate staffers—including Andy Fiffick, Charlie Terreni, and Breeden John—all testified that partisanship was not in the Senate guidelines.  Fiffick Dep. Tr. 136; Terreni Dep. Tr. 270:17–271:7; John Dep. Tr. 141:14–16, 142:11–16, 221:7–222:24.  Paula Benson, who was the "primary drafter" of the Senate guidelines, testified that it was not a staff objective to preserve a six-to-one Republican advantage.  Benson Dep. Tr. 122:8–11; 205:9–206.

d.     On the House side, Chairman Jordan admitted that "increasing partisan gain" and "maintaining a six-to-one Republican advantage" were not criteria in the Guidelines, and that the House did not have any "secret or hidden criteria."  Tr. 1792:10–19, 1795:8–10 (Jordan, Oct. 13).

e.     Representative Collins, testified in his deposition that he was unaware of any other guidelines that other members might have been using during the redistricting process. Collins Dep. Tr. 49:5–49:8. He also testified that the guidelines do not mention making CD 1 more reliably Republican, and there was nothing about partisan gain in the guidelines. Collins Dep. Tr. 57:2–57:11.

f.     Representative Newton similarly testified that the guidelines do not "say anything about partisan gain," and further testified that he did not "think" it would be "appropriate" to include partisan considerations in the guidelines. Newton Dep. Tr. 59:5–23 (also acknowledging that "making CD 1 less competitive for Democrats" or "more reliably Republican" were not included in the guidelines).

623.     Beyond the conspicuously silent public record, it is additionally noteworthy that even the private communications between legislators and staff lack any basis for concluding that partisanship drove the congressional redistricting process. The Parties have exchanged thousands of emails, texts, and other communications between legislators and staff about redistricting. If there were indeed a concerted effort to achieve partisan advantage, the Court would expect evidence of such a plan to appear in these communications. Instead, the silence speaks volumes. Whether it be the private text message thread involving Rep. Murphy, PX No. 216 ("I think it is always wise to collapse equal number of R's and D's"), or the Republican-only communications exchanged on the eve of the final floor debate, PX No. 722, it is clear that Defendants were not discussing their purported partisan agenda—even in private.

624.　But even if Defendants created and adopted the Enacted Map based in part on partisan considerations not identified in the guidelines or mentioned by legislators or staffers, the record shows that race continues to be a more significant factor than partisanship for the reasons discussed above and below.

625.　Moreover, the lines drawn in S.865 itself show that race predominated. This is clear from the analysis of the trial record, as well as comparing S.865 with some of the alternatives.

    a.　As discussed above *see supra* Sections II(B)(iii), (C)(iii), (D)(iii), the analysis of the S.865 plan by Drs. Duchin, Ragusa, and Liu, demonstrates that S.865 was drawn in a race-conscious way and that race is a more significant factor in explaining the mapdrawing decisions than partisanship.

    b.　As elucidated by Dr. Duchin's testimony, the Enacted Map suppresses electoral opportunity to a greater extent when a Black (rather than white) Democrat is on the ballot—i.e., elections where racially polarized voting is the most pronounced.  Tr. 360:22–362:18; 363:15–23; 365:25–366:7 (Duchin, Oct. 4).  Thus, white Democrats are able to achieve higher vote shares under the Enacted Plan than Black Democrats, and the Enacted Plan is less of an outlier when it comes to electoral opportunity in generic partisan contests.  Tr. 360:22–362:18; 363:15–23; 365:25–366:7 (Duchin, Oct. 4).  Dr. Liu's and Dr. Ragusa's testimony and report, as discussed above, also indicate that race is more predictive than

party affiliation when it comes to the treatment of Black voters under the Enacted Map. *See supra* Sections II(B)(iii), II(C)(iii), II(D)(iii).

c.    Comparing S.865 to maps drawn expressly to have a partisan effect (such as the NRRT maps) confirms that S.865 reduced the BVAP in CD 1 below the level necessary to achieve a partisan goal. The NRRT proposals had higher BVAPs for CD 1 than S.865. *Compare* SDX No. 38C (Palmetto CD 1 BVAP of 17.08%) *with* SDX No. 29G (S.865 CD 1 BVAP of 16.72%).

d.    Even if partisanship was considered, the district lines in the Enacted Plan illustrate that Defendants nonetheless used racial discrimination as the means to achieve those objectives. *See, e.g.*, Bernstein Dep. Tr. 231:6–21 (Rep. Bernstein, a House Redistricting Ad Hoc Committee member, testifying that in order to "craft[]" the Enacted Plan to be "beneficial to the majority party," the mapdrawers would "crack or . . . spread . . . the BVAP numbers to ensure that black vote was going to be diluted").

626.    Consistent with the predominance of race over partisanship, the defense witnesses who testified that partisanship was a goal emphasized that they subordinated those interests to other redistricting criteria. Indeed, Defendants could have gone much further if they genuinely wanted to solidify a 6-to-1 Republican advantage in the congressional map. Notably:

a.    After seeing the Senate's first draft map, the NRRT developed maps that Mr. Kincaid and Mr. Oldham believed "performed better

politically for Republicans" than the Senate's draft.  Oldham Dep.

Tr. 106:21–23, 107:21–108:15; Kincaid Dep. Tr. 101:8–102:2.

Mr. Kincaid was "particularly concerned about . . . Congressman

Mace's district" as drawn by the Senate.  Oldham Dep. Tr. 107:11–

13.  While as discussed above, the Enacted Plan adopts key

elements of the NRRT maps, the Senate, however, did not adopt

the NRRT map wholesale, despite its greater partisan advantage.

PX No. 314 at 205:12–207:15, 216:15–217:1.

b.     Representative Jordan and Senator Campsen similarly testified at

trial that they could have drawn CD 1 to be more Republican.  Tr.

1806:6–8 (Jordan, Oct. 13), Tr. 1881:5–9 (Campsen, Oct. 13) ("I

could have drawn a much stronger Republican district").

c.     In making this point, Sen. Campsen emphasized that, in

comparison to the post-2010 map, the Enacted Plan only increased

the "Trump vote" in CD 1 by 1.36%, even though Republicans

wanted a bigger increase.  PX No. 116 at 25:20–26:6.; *see also*

SDX No. 242 at 22:22:08–22:23:02; Tr. 1852:8–13 (Campsen,

Oct. 13).

d.     Throughout his testimony, Senator Campsen emphasized that he

only made CD 1 "a tiny bit more" Republican.  Tr. 1889:8–9

(Campsen, Oct. 13); s*ee also* Tr. 1890:10–13 ("hardly moved the

needle"); 1881:9–10 ("could have drawn a much more Republican

map").

e. The result was a CD 1 that Defendant Jay Jordan described as "unpredictable"— and that protecting Rep. Nancy Mace, the Republican incumbent in CD 1, did not meaningfully drive the map's design. *See* Tr. 1794:16–21 (Jordan, Oct. 13).

f. Senator Massey similarly testified that the Enacted Plan only "increased" the Republican advantage "a little bit," and "if I'd been involved in drawing [CD 1], it would have been safer for Nancy Mace." Tr. 1576:24–1577:1; 1593:15–1594:9 (Massey, Oct. 12).

627. The Court also takes notice that the Defendants did not call key legislators or staff noted above who denied the map was drawn to advantage Republicans. Notably, Senate Defendants did not call Defendant Rankin or Senate Redistricting Subcommittee member Talley to testify, nor did they call key staff such as Mr. Fiffick or Terreni who were integrally involved in the Enacted Plan; the House similarly did not call Representatives Newton or Collins or any staff who worked on the Enacted Plan. Rather, Defendants chose to call as two of their five fact witnesses legislators who were barely involved in the congressional redistricting process: Senator Massey and Representative Bamberg. While both of these witnesses testified as to the partisan objective of the plan, *e.g.,* Tr. 1561:13–1562:8, 1573:12–1574:1, 1596:7–13 (Massey, Oct. 12), Tr. 1745:4–15 (Bamberg, Oct. 13), their testimony is entitled to little weight due to their minimal involvement in the redistricting process. Specifically:

a. Rep. Bamberg admitted that he was "not very involved" in redistricting on the House side and he knew "nothing" about the Senate map that was enacted, the Senate process that led to its

passage, or the specifics of how racial groups were allocated under the Senate plan. Tr. 1749:9–19; 1756:6–21(Bamberg, Oct. 13).[27]

b.   Sen. Massey admitted that he "was really not all that involved at all until -- until the -- I think it was January 19th when the full judiciary committee met . . . And so really up until the 19th, I had very limited involvement." Tr. 1569:17–1570:3 (Massey, Oct. 12). Sen. Massey was not involved in the creation of the Enacted Map and was not a member of the Redistricting Subcommittee. Tr. 1597:4–6, 16–18 (Massey, Oct. 12). Sen. Massey acknowledged his only involvement was voting for the Campsen's Senate Amendment 1 out of the Senate Judiciary Committee and helping with the floor debate for S. 865. Tr. 1569:17–1570:3; 1585:10–1586:6 (Massey, Oct. 12).

628.   In light of the full record, there is no reason to credit the defense witnesses who claimed that the map can be justified on a partisan or political basis.  This is a post-hoc rationale and, in any event, is not supported by the record.

### iii.   Core Retention

629.   At trial, a few defense witnesses posited that S.865 could be justified as a

---

[27]To the extent that Rep. Bamberg has any relevant knowledge, the Court finds that he is not a credible witness. During cross examination, Rep. Bamberg refused to acknowledge that he recently won a close election as a Democrat and that the Republican supermajority then drew him a new district that is a "safer" seat. Tr. 1750:8–10; 1753:25–1754:5 (Bamberg, Oct. 13). After being confronted, Rep. Bamberg conceded that he won his previous election by a margin of merely 59 votes, Tr. 1754:4–5 (Bamberg, Oct. 13), and that his new seat is "safer" because it has a much higher BVAP percentage. Tr. 1749:23–1750:7; 1755:11–19 (Bamberg, Oct. 13). Rep. Bamberg's acknowledgement as to the BVAP increase in his district contradicts his earlier testimony that he does not look at or consider BVAP. Tr. 1755:7–8 (Bamberg, Oct. 13). Those episodes reveal a lack of candor, and the Court declines to rely on his testimony.

"least change" map that emphasized preservation of the cores of previous districts.  Tr. 1395:16–20, 1442:18–24, 1446:7–9 (Roberts, Oct. 12) (explaining that he prioritized "preserv[ing] the cores of the existing districts"); Tr. 1840:12–16 (Campsen, Oct. 13) (testifying that he considered it "important" that S.865 was a "minimal change" map).

630.    Core retention and "least change" were not raised in legislative debate as a defense of S.865 until the January 20, 2022 Senate final floor debate.  PX Nos. 89, 91–93, 95, 98, 114–115; Tr. 1145:16–22 (Bagley, Oct. 11); PX No. 18 at 11.  This was well after the Enacted Plan had been released and subjected to extensive criticism.  PX No. 114.

631.    In defending S.865, both Senator Massey and Senator Campsen overstated the core retention for District 6 -- both falsely claimed that "District 6 retains more than 87 percent of its existing benchmark population."  PX No. 116 at 18:11–12, 23:5-6.[28]  At the time they made this representation, the "core constituencies" analysis prepared by the Senate staff showed that District 6 only retained 77.41% of its population, a difference of almost 75,000 people.  *See* SDX No. 29C (at CD 6 grouping, CD 6 row).  The draft talking points prepared for the Senate floor statements also used the 77% figure, but were altered for use on the floor.  *Compare* PX No. 651 at 5, 7 (using 77 percent figure) *with* SDX No. 62 at 4, 6 (using 87 percent figure).

632.    In explaining that the plan was a "minimal change" plan, Senator Campsen also repeatedly understated the number of people shifted in and out of Districts 1 and 6.  For example, Senator Campsen stated "this is a minimal change plan . . . to the extent District

[28] Notably, this figure is considerably higher than what defense expert Mr. Trende calculated (82.8%).  SDX No. 75 at 18, tbl.3.  Even Mr. Trende's lower number, as Dr. Ragusa testifed, Dr. Jordan Ragusa credibly testified that this 82.8% core retention figure translates to more than 140,000 residents who were moved out of CD 1 during this round of redistricting—a number far in excess of the approximately 88,000 residents necessary to rebalance the population of the district.  Tr. 1056:18–1057:7 (Ragusa, Oct. 7); PX No. 26 at 24.

1 and District 6 had the change, it's really driven by growth because the chairman mentioned earlier, we had 87,000 people in the 1st District that had to -- we had to shed and we had 84,000 people or 85,000 in the 6th District that the 6th District had to pick up." PX No. 116 at 25:1–19. *See also* PX No. 116 at 21:4–6 (same), 36:15–21 (same). In reality, S.865 shifted 80,469 people *out of* CD 6 (even though it was underpopulated) and 140,489 people from CD 1 to CD 6. Tr. 1683:16–1684:5 (Trende, Oct. 13) & SDX No. 75 at tbl.4.

633. In important respects, S.865 was not a "least changed" plan, in that it unnecessarily moved many people from their districts, and did not have particularly high "core retention," particularly for Districts 1 and 6. All told, S.865 moved 334,069 people from their old districts to new districts. SDX No. 75 at Table 4; Tr. 1684:24–1685:2 (Trende, Oct. 13):

     a.     Although following the 2020 census, CD 5 was overpopulated by 5,082 people, S.865 moved eight times as many people (41,407 total) out of CD 5. SDX No. 28E, SDX No. 29C; Tr. 1683:1–9 (Trende, Oct. 13).

     b.     Following the 2020 census, CD 2 was underpopulated by 9,375 people, but even though the district was underpopulated, S.865 moved 14,397 people *out of* CD 2. SDX No. 28E, SDX No. 29C; Tr. 1683:10–15 (Trende, Oct. 13).

     c.     Following the 2020 census, CD 6 was underpopulated by 84,741 people, but notwithstanding this underpopulation, S.865 moved many additional people (80,469) *out of* CD 6. SDX No. 28E, SDX No. 29C; Tr. 1683:16–23 (Trende, Oct. 13).

     d.     Following the 2020 census, CD 1 was overpopulated by 87,689

people, but S.865 moved almost twice as many people as necessary (140,489) out of CD 1.  SDX No. 28E, SDX No. 29C; Tr. 1684:2–5 (Trende, Oct. 13).

e.     The "core retention" for CD 6 under S.865 was 77.41%.  SDX No. 29C. This was approximately 42,000 fewer residents remaining in CD 6 than under the Milk plan, which provided for 83.15% core retention for CD 6.  SDX No. 223D.

f.     The "core retention" for CD 1 under S.865 was 92.78%.  SDX No. 29C.  While this seems high, it is approximately 33,000 fewer residents continuing in CD 1 than under the Milk plan, which provided for 97.34% core retention in CD 1.  SDX No. 223D.

634.     Dr. Duchin's report and testimony also provided an example of an alternative map with very comparably high core retention that would be significantly less of an outlier in its distribution of Black voters.  In fact, Dr. Duchin demonstrated that altering a single boundary line in the Enacted Plan would suffice to make it a more typical map in terms of Black voting power.  Tr. 345:11–346:15 (Duchin, Oct. 4).  In other words, apart from that single boundary line, all of the remaining districts and boundaries in Dr. Duchin's illustrative map are identical to the Enacted Plan.  Thus, it is possible to maintain a "very high core retention" between the 2022 and 2011 maps, while generating "a much more demographically typical and more electorally promising map for Black voters."  Tr. 346:3–15 (Duchin, Oct. 4).

635.     Notably, that alternative identified by Dr. Duchin was merely one example out of "a vast number of ways to be less dilutive" of the Black vote: "tens of thousands of automatically generated plans all easily provide more [electoral] opportunity."  Tr. 368:12–17

(Duchin, Oct. 4).

636.     Similarly, Dr. Imai conducted a localized analysis in which he kept his

10,000 simulations identical to the Enacted Map but for a single boundary line within Charleston

County.  PX No. 32 at 30.  Despite maintaining the identical core retention outside of Charleston

County, Dr. Imai continued to find that race played a significant role in how the Enacted Map

was designed.  Tr. 1954:17–1955:9 (Imai, Oct. 14).

637.     As multiple defense witnesses testified, there was no reason why S.865

needed to prioritize core retention or continuity with the 2011 Plan.

a.     Chairman Jordan of the House Redistricting Ad Hoc Committee

testified at trial that core retention and creation of a least-changed

map were not part of the House's guidelines, and in fact, the

House's first proposal was not a least-changed map.  Tr. 1796:25–

1797:20 (Jordan, Oct. 13).

b.     Numerous witnesses, including Chairman Jordan and Patrick

Dennis, testified that the first House staff proposal was not based

on the 2011 Plan and was not a least-change map.  As Mr. Dennis

testified:

this map began with a blank slate rather than beginning
from a current Congressional district map. . . .

Q.     But to be clear, you did not say -- you did not start
with the 2011 map as the basis.  You said you had started
with a clean slate.

A.     For this map, yes, ma'am.

Dennis Dep. Tr. 197:3–198:6; *see also id.* 157:16–17 ("I'm not familiar

with the term 'least change.'"); Tr. 1797:15–18 (Jordan, Oct. 13) ("Q: The

first map the ad hoc committee came up with, that wasn't a least-changed

map, was it?  A: That's correct. . . . .");  *see generally* SDX No. 33A.

      c.      Senate witnesses also testified that there was no requirement that the map use the 2011 Plan as a starting point.  John Dep. Tr. 136:4–17 ("It's not a requirement").

638.    Moreover, contemporaneous evidence also shows that core retention was highly unlikely to be the motivation behind the Enacted Plan.  Indeed, legislators, including members of the redistricting committees, do not recall core preservation being mentioned as a justification.  For example, Sen. Talley, a member of the Senate Redistricting Subcommittee, did not recall core retention or preserving the cores of districts coming up during the congressional redistricting process.  Talley Dep. Tr. 41:25–42:6.  Rep. Bernstein, a member of the House Ad Hoc Redistricting Committee, also testified that she did not recall "core retention or any similar concept coming up with fellow legislators or staff during the map drawing process."  Bernstein Dep. Tr. 105:11–17.

639.    The record also shows that, even if core retention could explain part of the design of the Enacted Plan, the map may nonetheless be a racial gerrymander.  As Dr. Imai explained during trial, adhering to core retention risks importing all of the considerations that went into the prior map, including the prior map's utilization of race.  Tr. 1955:15–1956:18 (Imai, Oct. 14).  Similarly, Dr. Duchin testified that the use of core retention or incumbency protection are particularly "controversial," in that those criteria preserve the properties of the old map, including any vote-dilutive characteristics.  Tr. 260:6–261:6 (Duchin, Oct. 3).  In other words, core retention could serve to mask race-based considerations.

640.    In light of the full record, there is no reason to credit the defense witnesses

who claimed that the map can be justified on the basis of core retention. This is a post-hoc

rationale and, in any event, is not supported by the record.

    **F.    It Was Foreseeable That the Enacted Plan Would Dilute Black Voting Power.**

    641.    The General Assembly knew of the Enacted Map's foreseeable racial

impact on Black voters through their awareness of the historical record, their access to data,

including post 2020 demographic data, their consideration of less discriminatory alternative

maps, and statements made by both members of the public and legislators during the redistricting

process.

        **i.    The Legislative Defendants Had Access to and Considered Race Data in Drawing the Enacted Map.**

    642.    As discussed *supra* at Section II(E), the Legislative Defendants had access

to and considered race in drawing the Enacted Plan. Among other evidence:

        a.    The House Defendants do not dispute that race was considered and relied upon in its development, consideration, and assessment of congressional plans. *See*, *e.g.*, Dennis Dep. Tr. 174:2–4; Newton Vol. 2 Dep. Tr. 67:4–8, 152:19–153:6.

        b.    Multiple members of the Senate's core team acknowledged that race data was available and considered in developing the Enacted Plan. Fiffick Dep. at 13:9–11 (race data was "available to everybody"); Benson Dep. Tr. 155:1–23 (race data "certainly was considered"); Benson Dep. Tr. 97:5–22; 97:23–98:25; 155:5–17 (staff prepared notebooks for Senators that contained demographic and BVAP data from Maptitude); John Dep. Tr. 90:7–92:25; 180:20–181:3; 219:22–220:9; 279:20–280:4 (BVAP data was

provided to Senator Rankin); Terreni Dep. Tr. 285:21–286:3.

c.     Mr. Roberts testified that the core redistricting team, including Mr. Roberts, could see BVAP data in Maptitude as they were making changes to draft plans. Tr. 1501:24–1502:18 (Roberts, Oct. 12). BVAP data were "actually displayed . . . at the bottom of the screen the entire time we were drawing." Tr. 1502:2–6 (Roberts, Oct. 12). Mr. Roberts, Mr. Fiffick, and anyone else in the map room could "definitely" see BVAP displayed on the screen. Tr. 1503:5–13 (Roberts, Oct. 12). Mr. Roberts also acknowledged that he always looked at BVAP *after* an iteration of a map was created. Tr. 1528:1–3 (Roberts, Oct. 12).

d.     Racial demographic data were generated by the Senate staff for every map that was prepared or submitted for consideration. *See, e.g.*, SDX Nos. 28B, 28E, 28F, 29A, 29F, 29G, 30B, 30F, 30G, 31B, 31F, 31G, 32C, 32F, 32G, 33D, 33E, 34C. 34D. 35B. 35E. 35F. 38C, 38E, 39D, 39E, 42B, 43E, 43F, 44B, 45B, 46G, 68E, 68G, 70D, 70E.

e.     Breeden John specifically testified that Senator Campsen asked for details about the voters who were being moved in the Charleston area, including "in terms of race." Dep. Tr. 288:5–289:14. And Senator Campsen cited race data about Charleston County during the legislative debate. *See* PX No. 115 at 50:15–51:13; SDX No. 241 at 54:06–57:58.

      f.      Both Senator Campsen and Will Roberts were intimately familiar with the racial demographics of key geographies involved in drafting the Enacted Plan, such that even crediting their testimony that they did not look at race data, they would not have had to look at race data to understand the racial impact of the Enacted Plan. Tr. 1355:7–13, 1358:4–6 (Roberts, Oct. 12); Tr. 1503:20–23 (Roberts, Oct. 12). In Senator Campsen's words, he "can't help but know . . . the concentrations of Black voters" in his district. Tr. 1816:25–1817:6; 1883:19–1884:11 (Campsen, Oct. 13). Campsen further testified that other senators "generally" are aware of the racial makeup of their districts. Tr. 1884:21–1885:5; 1885:15–25 (Campsen, Oct. 13); *see also* Fiffick Dep. Tr. 58:18–59:8; 129:20–130:4 ("legislative members know the ethnicity of people who live in their district.").

643.     There is significant evidence that BVAP value were carefully calibrated in designing the Enacted Plan. Notably, the Enacted Plan gave CD 1, where Black voters historically have had the second greatest chance to elect candidates of choice, the smallest BVAP of any of the seven districts. And remarkably, the Enacted Plan had almost the same BVAP for CD 1 as the Enacted Plan, even though almost 200,000 voters were moved between CD 1 and CD 6. Although Senator Campsen called this a "coincidence," Tr. 1908:2–5 (Campsen, Oct. 13), Dr. Imai noted that odds of such a determination being made without considering race were "exceedingly, astronomically small." Tr. 1967:9–15 (Imai, Oct. 14). And as discussed *supra* Section II(A), the expert analyses of Drs. Imai and Duchin make it clear that it would have been

very difficult to have a BVAP in CD 1 as low as the Enacted Plan if traditional redistricting principles were followed in a race-neutral manner that complied with the VRA.

644.    The Legislative Defendants knew or should have known that suppressing the BVAP of districts outside CD 6 would dramatically lower the likelihood that Black voters would be able to elect candidates of choice.  This is clear from Dr. Liu's and Duchin's analyses that the Enacted Plan was far less likely to allow election of Black-preferred candidates anywhere except CD 6.  Tr. 563:5–15 (Liu, Oct. 6); PX No. 48 at 13, 13 tbl.4; PX No. 67 at 25-27; PX No. 120 at 2-4.

645.    And the Legislative Defendants' witnesses, including Senators Campsen, Massey, and Defendant Jordan all understood the consequences of these machinations: they all testified at trial that they intended to make CD 1 less competitive. *See*, *e.g.*, Tr. 1842:8–12, 1849:22–1850:7 (Campsen, Oct. 13); Tr. 1890:8–10 (Jordan, Oct. 13); Tr. 1576:12–1577:4 (Massey, Oct. 12).

### ii.    The Legislative Defendants Were Aware that there is Racially Polarized Voting in South Carolina.

646.    In drafting the Enacted Plan, the Legislative Defendants were aware, or should have been aware, that South Carolina has racially polarized voting to a very high degree. Racially polarized voting, or "racial bloc voting," refers to whether there is a pattern of voting along racial lines in which voters of the same race tend to support the same candidates, which usually differs from the candidates supported by voters of a different race. *See* PX No. 48 at 304; Tr. 553:15–25 (Liu, Oct. 6).

647.    In South Carolina, an awareness of racially polarized voting means that people understand that Black voters tend to vote differently and support different candidates than white voters within relevant districts. *See* Tr. 578:13–579:6 (Liu, Oct. 6).

648.    Evidence of racially polarized voting is essential to understanding how a congressional map may impact Black voters' electoral opportunities, especially in a case like this one with intentional vote dilution and racial gerrymandering claims. Tr. 553:11–25 (Liu, Oct. 6); PX No. 48 at 6. Reducing Black voters' ability to elect candidates of their choice or ability to impact the outcome of elections featuring their preferred candidates may harm Black voters. PX No. 48 at 11–12. This type of harm may occur in a congressional district with the presence of racially polarized voting because it "can function to deny or diminish Black voters' ability to elect or otherwise impact the election of their preferred candidates." PX No. 48 at 6. If racially polarized voting patterns exist in a congressional district, that means white voters tend to vote for the same candidate and constitute a majority of voters, who, as a bloc, usually defeat the Black voters' preferred candidate in that congressional district. PX No. 48, 3-4, 6; Tr. 561:17–21 (Liu, Oct. 6); PX No. 48 at 6. If it is shown, as it was at trial, that Black voters in South Carolina tend to prefer different candidates than white voters, then dispersing those Black voters among different congressional districts dilutes their voting strength because their electoral opportunities are diminished. Tr. 561:9–23, 578:18–579:6 (Liu, Oct. 6).

649.    In this case, House Defendants' counsel retained Dr. Thomas Brunell as an expert "to do racial bloc voting analysis as the state prepared to redraw maps" and before any litigation. PX No. 138A at 59:24–60:4, 61:18–22; PX No. 3 (House RFA Nos. 55–56). Dr. Brunell determined that the "evidence was quite clear that voting was racially polarized" in South Carolina based on the counties and statewide elections that he reviewed. PX No. 138A (Brunell Dep.) at 81:11–19. These findings are consistent with his previous work regarding racially polarized voting analysis in South Carolina. PX No. 3 at House RFA No. 58.

650.    Dr. Brunell, for example, explained that he found racially polarized voting

in South Carolina during the previous redistricting cycle as discussed above and that racially

polarized voting patterns have existed from the 1990s up through the current redistricting cycle.

PX No. 138A (Brunell Dep.) at 100:19–101:5; *supra* Sections III(A) and (F). Based on Dr.

Brunell's previous work, he even expected that "voting would be racially polarized." PX No.

138A (Brunell Dep.) at 81:6–13.

651.    Dr. Brunell presented his racially polarized voting analysis findings to

House Defendants' lawyers before any litigation commenced. PX No. 138A (Brunell Dep.) at

62:3–5. There was no difference in the finding he expected to produce pre- and post-litigation for

this case. PX No. 138A (Brunell Dep.) at 62:18–19, 80:12–15.

652.    Consistent with Dr. Brunell's analysis, House Defendants have admitted

that racially polarized voting exists statewide in South Carolina and in at least 25 counties. PX

No. 3 at House RFA No. 57.

653.    Although the Senate Defendants did not prepare (and, as discussed below,

stubbornly and adamantly refused to commission) their own RPV analysis, they should have

been aware both that South Carolina still has significant racially polarized voting, has a long

history of established racially polarized voting, and that the 2011 Plan was designed to address

racially polarized voting.  Notably, the Senate Defendants agents, including their outside

counsel, Charles Terreni, testified they were aware of racially polarized voting patterns in South

Carolina. Terreni Dep. Tr. 241:12–24. Likewise, based on his 20 years of redistricting work in

South Carolina, Mr. Roberts testified that he had "no doubt" there is racially polarized vote in

certain areas throughout South Carolina. Tr. 1528:19–21 (Roberts, Oct. 12).

654.    Beyond these admissions, the Legislative Defendants, for example, were

certainly aware that the 2011 Map and prior South Carolina maps were drawn in a race-

conscious manner to address findings of racially polarized voting.  For example, the Legislative

Defendants knew or should have known that in the litigation over the 2000 congressional map –

the *Colleton Cnty. County Council v. McConnell*, 201 F. Supp. 2d 618, 641 (D.S.C. 2002),

litigation – South Carolina officials stipulated that: (1) "[r]acially polarization is highest in

Black-white elections" and that "there is a well-documented hierarchy in the preference of Black

voters," such that "[w]ith few exceptions, Black voters demonstrate an overwhelming preference

for Black Democrats, as their representatives, followed by white Democrats, particularly in a

general election, but black voters virtually never vote for a Republican candidate," and (2)

"[a]lthough white voters will cross over to vote for Black candidates at a rate of 21% in general

elections, they will cross over to vote for a Black candidate in primary elections at a rate of only

8%." *Colleton Cnty. Council*, 201 F. Supp. at 641. And the *Colleton County* court found that:

"Voting in South Carolina continues to be racially polarized to a very high degree, . . . in all

regions of the state and in both primary elections and general elections." *Colleton Cnty. Council*

*v. McConnell*, 201 F. Supp. 618, 641 (D.S.C. 2002); *see also United States v. Charleston Cnty.*,

365 F.3d 341, 350 (4th Cir. 2004) (county voting "is severely and characteristically polarized

along racial lines"); *see also* PX No. 138A (Brunell Dep.) at 100:19–101:5.

655.    Similarly, the Legislative Defendants were undoubtedly aware that in

litigation over the 2011 Plan in the Backus case, the legislative defendants argued that in addition

to avoiding non-retrogression under Section 5 of the VRA, the "General Assembly was required

by Section 2 to create majority-minority districts in which a compact minority group could elect

its candidates of choice."  Post-Trial Mem. of Def. Robert W. Harrell, Jr., *Backus v. South*

*Carolina*, No. 3:11-cv-03120 (D.S.C.), ECF No. 210 (Mar. 5, 2012) at 8-10; Def. Glenn F.

McConnell's Post-Trial Mem., *Backus v. South Carolina*, No. 3:11-cv-03120 (D.S.C.), ECF No.

211 (Mar. 5, 2012) at 1. The Defendants made these arguments in response to claims by plaintiffs' claim that CD 6 was packed with Black voters over a 50% Black voting-age population. *See* Post-Trial Mem. of Def. Robert W. Harrell, Jr., *Backus*, 3:11-cv-03120, ECF No. 210 (Mar. 5, 2012).

656.     Indeed, in the *Backus* litigation, Legislative Defendants offered Dr. Thomas Brunell to present the racially polarized voting analysis he conducted.  Decl. of Dr. Thomas Brunell, *Backus v. South Carolina*, No. 3:11-cv-03120, ECF No. 198-1 (Mar. 01, 2012). Based on the elections and districts he reviewed, Dr. Brunell determined that racially polarized voting was present and prevalent in South Carolina, including in Congressional District 6. *Declaration of Dr. Thomas Brunell*, 3:11-cv-03120, ECF No. 198-1 (Mar. 01, 2012) at 1, 2–6. Dr. Brunell further concluded that the present of racially polarized voting justified the need for creating majority-minority districts to provide minorities with equal opportunity to elect candidates of their choice. *Id* at 1, 6.

657.     Although the Senate Defendants were undoubtedly aware that racially polarized voting had been found in the 2011 Plan, and if they had asked the House Defendants, would have been informed that racially polarized voting was still present in South Carolina, they inexplicably refused to conduct a racially polarized voting analysis in conjunction with the Enacted Plan.  Neither the Senate Defendants nor their staff conducted a racially polarized voting analysis—nor did they ask for such analyses to be done.  *See* Tr. 1356:21–1357:2 (Roberts, Oct. 12).

658.     Both legislators and members of the public repeatedly asked Defendants to conduct Section 2 and racially polarized voting analyses during the redistricting process.  *See*, *e.g.*, Tr. 1130:19–1131:18 (Bagley, Oct. 11) (explaining Sens. Matthews and Harpootlian

requested racially polarized voting analyses during Sept. 17, 2021 hearing); PX No. 3 at 35

(House Defendants admitting that Senate Redistricting Subcommittee was urged by NAACP

LDF to conduct RPV analysis), PX No. 3 at 36 (House Defendants admitting that Sen.

Harpootlian asked Judiciary Committee whether RPV analysis had been performed); PX No. 4 at

69 ("Senate Defendants admit that Senator Harpootlian asked at the September 17, 2021 meeting

if staff had racial bloc voting data and expressed his opinion that they should conduct a racial

bloc voting analysis."), 72 ("Senate Defendants admit that Sen. Harpootlian asked at the January

19, 2022 Senate Judiciary Committee meeting whether a racial bloc voting analysis had been

conducted."); Tr. 1258:22–1260:13 (Murphy, Oct. 11) (explaining that South Carolina NAACP

submitted testimony, available at PX No. 594, requesting racially polarized voting analysis).

Rep. Cobb Hunter also asked for a Section 2 analysis, including a racially polarized voting

analysis.  Tr. 136:7–138:5 (Cobb-Hunter, Oct. 3 AM); *see also* HDX No. 152 at 141:54–143:40.

659.    The Senate Defendants' ostensible reason for not conducting a racially

polarized voting analysis was a textbook example of "willful blindness" and "conscious

disregard": Mr. Terreni advised the Senate Redistricting Subcommittee that conducting such an

analysis would have meant race "would have been in the middle of the room" and that it could

lead to "making race or some artificial target."  Terreni Dep. Tr. 246:5–247:21. The Senate's

core staff similarly testified that they did not conduct racially polarized voting analysis so they

could claim their process was race-blind.  *See* Terreni Dep. Tr. 246:14–247:21 (describing

"downside" of RPV analysis would "expose [the Subcommittee] to accusations" of

discrimination); *see also* PX No. 91, at 16–17 (Mr. Terreni describing "peril of doing [RPV]

analysis" being "that you might be artificially setting yourself up to meet certain racial targets

where you don't need to meet them"); PX No. 722, at 2 ("General Questions" document sent by

Andy Fiffick on Jan. 20, 2022 noting "racial block voting analysis would expose the Senate to the accusation that it drew with racial targets in mind").

660.    Indeed, consistent with this advice to willfully blind themselves, during the January 19, 2022 Judiciary Committee meeting, Sen. Campsen stated that a racial polarization analysis would "happen if and when a plan is litigated," and rejected the suggestion that it would have been "productive" to do one before enacting a congressional plan because "it would have resulted in us perhaps taking race into account and having racial targets." PX No. 115, at 32, 33. Sen. Campsen said he "didn't consider" racial polarization, "*Gingles* or anything else," because he "wanted to be colorblind." PX No. 115 at 34.

661.    At trial, Sen. Campsen agreed that he "thought if he looked at BVAP, somebody might accuse [him] of drawing lines based on race." Tr. 1881:20–22 (Campsen, Oct. 13). Of course, as discussed above, there is extensive evidence that the Senate Defendants drew the lines in the Enacted Plan based on race.

662.    Had the Senate Defendants conducted a racially polarized voting analysis, there is no doubt they would have found, as House Defendants' expert Dr. Brunell and Plaintiffs' expert Dr. Liu, found that there is still strong racially polarized voting throughout South Carolina.

663.    To demonstrate the significance of the racially polarized voting that the Legislative Defendants intentionally disregarded, some discussion of Dr. Liu's analysis is illustrative. In making his assessment that there was racially polarized voting, Dr. Liu used the Ecological Inference method, which is the most advanced and reliable statistical procedure for racially polarized voting assessments within academic research and court cases. PX No. 48 at 4.

664.    Dr. Liu's definitions and methodology to assess racially polarized voting

are consistent with other experts in the field and for the voting rights cases that he has served as

an expert. Tr. 554:1–4, 554:14–22, 556:16–569:22, 557:11–559:1 (Liu, Oct. 6). Consistent with

common practices, Dr. Liu's racially polarized voting analysis also factors in white cross-over

voting as an empirical measure. Tr. 564:10–19, 600:10–13 (Liu, Oct. 6). Dr. Liu testified that it

is common in his expert work and for experts in the field to rely on data provided by other

people, including Plaintiffs' counsel in a case. Tr. 555:24–556:7, 603:3–17 (Liu, Oct. 6); *see also*

PX No. 48 at 41–42.

665.    Dr. Liu found very clear and high levels of racially polarized voting in

South Carolina. *See, e.g.*, Tr. 558:5–12, 559:8–12, 559:24–560:14, 560:7–11 (Liu, Oct. 6); PX

No. 48 at 6–11; *see also* PX No. 3 at House RFA No. 57. As Dr. Liu testified, Black voters by a

super majority of almost 90% or more vote for Black-preferred candidate in many of the

elections that he reviewed. Tr. 560:7–18 (Liu, Oct. 6). The findings from the general election

endogenous elections he reviewed, for example, confirm that:

a.    Black voters have expressed a clear preference for the same
candidate in the relevant districts and elections Dr. Liu reviewed
and that preference is a Black-preferred candidate. PX No. 48 at 5.

b.    White voters who are the majority of the electorate in the relevant
districts and elections Dr. Liu reviewed did not share the same
preference as Black voters. PX No. 48 at 5.

c.    Because of these racially polarized voting patterns, Black preferred
candidates were typically defeated in biracial elections.  PX No. 48
at 5.

666.    Dr. Brunell did not point out errors in Dr. Liu's methodology for assessing

racially polarized voting in the now-settled State House portion of this litigation. PX No. 138A

(Brunell Dep.) at 119:2–5. Dr. Liu relied on the same methodology for assessing racially

polarized voting in the Congressional portion of this litigation.

667.    Defendants have not disputed the data that Dr. Liu replied upon to assess

racially polarized voting. Nor have Defendants offered a rebuttal witness to dispute the data that

Dr. Liu relied upon. Tr. 614:19–615:2 (Liu, Oct. 6).

668.    Defendants do not contest Dr. Liu's racially polarized voting findings.

669.    The Legislative Defendants' awareness that there is ongoing racially

polarized voting in South Carolina shows that the Enacted Plan's impact was foreseeable: as Dr.

Liu and Dr. Duchin have both shown, the Enacted Plan was far less likely to allow election of

Black-preferred candidates anywhere except CD 6.  *See supra* II(B).

> ### iii.    The Legislative Defendants Were Presented with and Rejected Less Discriminatory Alternative Maps.

670.    During the legislative process, the Legislative Defendants were presented

with several alternative maps that better adhered to traditional redistricting criteria (contiguous,

more compact, fewer jurisdictional splits, better preserved communities of interest) and that

would have preserved or expanded the ability of Black voters to elect candidates of choice.

These included Senate Amendment 2A, the League of Women Voters maps, and the House staff

plan.  Each of these maps was rejected by the Legislative Defendants.

671.    As discussed *supra* Section II(B)(ii), (C)(ii), and (D)(ii), Amendment 2a,

the League of Women Voter maps, and the House staff plan perform better than the Enacted Plan

on a wide range of traditional redistricting criteria, including compactness, contiguity,

minimizing county, municipality, and precinct splits, and preserving communities of interest.

672.    The Senate Defendants were presented with analyses showing that

Amendment 2a and the LWV Plan performed better under traditional redistricting metrics than the Enacted Plan.  SDX No. 62 at 8; PX No. 721; *see supra* Section Section II(B)(ii), (C)(ii), and (D)(ii).

673.    As Dr. Duchin notes, each of these alternative maps provided significantly higher BVAPs in districts outside CD 6 than the Enacted Plan did. Several proposed maps, for example, had a higher BVAP in CD 1 compared to the Enacted Plan: the SC League of Women Voters' map proposed a 23.3% BVAP, Senate Amendment 2a proposed a 21.2% BVAP, and the House staff plan proposed a 20.72% BVAP. PX No. 67 (Duchin Rep.) at 9, tbl.9; SDX No. 33e. Concerning CD 5, as another example, Senate Amendment 2a proposed a 33.7% BVAP compared to the Enact Plan's 24.7%, which was a 1% lower BVAP than the 2011 Plan. PX No. 67 at 9, tbl.9.

674.    Likewise, using her ensemble method, Dr. Duchin generated alternative maps that provided more electoral opportunities than the Enacted Plan. In Figure 11, she illustrated how moving a single district boundary between CDs 2 and 5 would provide more electoral opportunities for Black voters (roughly 30% BVAP in CD 5) even if a map drawer kept CDs 1 and 6 the same as under the Enacted Plan, and even they prioritize high levels of "core rentention."  PX No. 67 (Duchin Rep.) at 23-24, fig.11; Tr. 345:11–346:10 (Duchin, Oct. 4).  In other words, "with very high core retention and minimal redrawing, we're able to get a much more demographically typical and more electorally promising map for Black voters." Tr. 346:12–15 (Duchin, Oct. 4). But as Dr. Duchin explained at trial, this type of alternative map is "far from unique." Tr. 347:13 (Duchin, Oct. 4). Instead, there are "many, many thousands of similar re-drawn" along these lines. Tr. 347:13–14 (Duchin, Oct. 4).  The Senate Defendants were presented with analysis showing that Amendment 2a and the LWV Plan provided

significantly higher BVAPs in districts outside CD 6 than the Enacted Plan did. SDX No. 62 at 9.

675.    And as Dr. Duchin testified, these alternative maps would have provided significantly higher opportunities for Black voters to elect candidates of choice outside CD 6. *See*, *e.g.*, *supra* Section II(A)(i)(f).

| | Black candidates of choice |
|---|---|
| Secretary of State 2018 | Melvin Whittenburg |
| Treasurer 2018 | Rosalyn Glenn |
| U.S. Senator 2020 | Jaime Harrison |
| President 2020 | Joe Biden / Kamala Harris |





**iv.    The Legislative Defendants Were Warned Again and Again During the Legislative Process that the Enacted Plan Would Dilute Black Voting Power.**

676.    Dr. Bagley chronicled that the legislative record is replete with testimony that the Enacted Map would adversely impact Black voters. Tr. 1132:22–1133:5, 1135:1–1135:8, 1135:9–1135:19, 1140:15–1141:3, 1141:17–1142:8, 1142:9–1142:18, 1145:23–1146:3, 1146:4–1148:13, 1211:13–1211:22 (Bagley, Oct. 11); PX No. 17 at 27–28, 30–37, 40–43, 45–48.

677. South Carolina citizens, advocates, and legislators, many of whom were Black, warned the Senate Redistricting Subcommittee and the House Ad Hoc Redistricting Subcommittee that the draft maps would dilute the Black vote, racially gerrymander and crack Black communities across South Carolina.

678. The Senate Redistricting Subcommittee and the House Ad Hoc Redistricting Committee heard a chorus of voices from both private citizens and elected officials, asking them to not draft maps that would dilute Black voting power in South Carolina.

679. Elected officials, such as Sen. Harpootlian, had concerns about Black vote dilution even before the inception of the maps. For example, in advance of the September 17, 2021 Senate Redistricting Subcommittee meeting, Sen. Harpootlian had sent a letter to Chairman Rankin that outlined some of his concerns for the Senate redistricting guidelines. *See* PX No. 322. In his letter, Sen. Harpootlian proposed that Subcommittee staff should "produce a written document that fully explains what the subcommittee should credit as sufficient evidence of potential vote dilution that might warrant remedial racial districting under § 2, or the 14th and 15th Amendments. Further, the subcommittee should also publish all data and analyses that might evidence or inform such a conclusion so the public can review it and draw its own conclusions." PX No. 322 at 2. Sen. Harpootlian continued by warning: "A failure to justify these decisions with real evidence now needlessly risks subjecting the legislative process to judicial review because a post-hoc justification is no defense to racial decision making and could lead to strict scrutiny. *Cf. Bethune-Hill v. Virginia State Bd. of Elections*, 137 S. Ct. 788, 799 (2017) ("The racial predominance inquiry concerns the actual considerations that provided the essential basis for the lines drawn, not post hoc justifications the legislature, in theory, could have used but in reality did not."). In the absence of such data and analysis, I do not believe the

State can credibly claim to be acting in furtherance of the VRA or the Constitution when subordinating other, race-neutral considerations to draw majority-minority districts."  PX No. 322 at 2.

680.    Similarly, Sen. Harpootlian advised that "the subcommittee should seek guidance from committee staff and then enact a policy that seeks to correct racial decision-making that serves as the predicate for the choices reflected in the benchmark plan."  PX No. 322 at 2.  Sen. Harpootlian explained in this letter that "[i]n light of U.S. Supreme Court precedent over the last decade, I believe our guidelines should be updated to recognize that districting decisions the legislature made a decade ago under the auspices of § 5, were based on a flawed view of the VRA that was unconstitutionally in effect at the time those decisions were made."  PX No. 322 at 2–3.  At the September 17, 2021, Senate Redistricting Subcommittee meeting, Sen. Harpootlian moved for the Subcommittee to "specifically reject this idea of non-retrogression" and "recognize that retrogression is not a criteri[on]."  PX No. 91 at 37:11–38:5.  Sen. Harpootlian further explained this point, noting that the previous district "lines were created in 2011 based on an unconstitutional principle.  So this is for the recognition that all these lines in all those area[s] should go out the window, and we got to start from scratch. . . . so why does this weird-looking district exist?  Well, it exists because the Justice Department in 2011 used non-retrogression as a criteri[on,] which no longer exists. . . . the history of this state is using unconstitutional principles to deny African-Americans the right to participate in a meaningful way in the electoral process.  This retrogression principle was used in my opinion, to help re-segregate our electoral politics."  PX No. 91 at 40:1–24.  He continued, "if we don't go back and do it right, then this is going to perpetuate the sins of the past, and again, there are many constituents out there who have been denied meaningful access to this system because of that

non-retrogression principle. That's why I think it should be a specific, enunciated principle." PX No. 91 at 41:7–41:14. Sen. Harpootlian pointed out how core preservation might be used to explain district lines, but emphasized that "if we're going to correct the [sins] of the past, we're going to have to do it on the floor because it won't happen unless folks stand up and recognize that it was a racially motivated principle that created many of these districts." PX No. 91 at 42:6–20.

681.    And, as Sen. Harpootlian explained in his September 16, 2021 letter to Chairman Rankin, the explanation of "communities of interest" in the Senate guidelines "means everything and nothing. In years past, this slippery language has been used to justify all manner of districting abuse by serving as an empty vessel that legislators can fill with any expedient justification." PX No. 322 at 3.

682.    Sen. Harpootlian made a motion to have the staff "produce a written document that fully explains what the subcommittee should credit as sufficient evidence of" vote dilution claims under the VRA or racial redistricting constitutional claims. PX No. 91 at 15:7–14. Sen. Harpootlian warned that a failure to justify the Subcommittee's redistricting decisions "with real evidence now needlessly risks this plan being challenged at a later date in Federal Court." PX No. 91 at 15:18–21. He continued by asking, "are we going to wait for somebody to sue us before we do that analysis?" PX No. 91 at 19:10–13. During the hearing, Mr. Terreni asserted that "race may be a factor" in the drawing of congressional maps, and he asserted that the Senate Redistricting Subcommittee "should heed to that." PX No. 91 at 17:6–12.

683.    These fears of vote dilution were raised during the redistricting process by community members, like President Murphy, who attended the Senate Redistricting Subcommittee meeting on November 12, 2021. Tr. 1258:22–1260:13 (Murphy, Oct. 11). She

warned the Senate about how the initial Senate Staff Plan would lead to "dilution of the Black

vote in South Carolina," and commented about "opportunity districts" for Black voters, and

emphasized that the Senate needed to "undertake a racially polarized voting analysis." Tr.

1258:22–1260:13 (Murphy, Oct. 11); *see also* PX No. 594.

        684.    In addition, Brett Bursey, from the South Carolina Progressive Network

Education Fund, shared his Black vote dilution concerns with the Senate Redistricting

Subcommittee after looking at the initial Senate Staff Plan as well and argued, "Today, the

weight of a black vote in South Carolina is three-fifths that of a white vote because of the

decades of minority-majority districts. The packing of blacks into districts has diminished the

strength of black votes. But that also diminishes the capacity for representative democracy." PX

No. 95 at 89:6–89:11. Mr. Bursey compared dilutive maps to the Three-Fifths Comprise from the

1789 Philadelphia Convention and the U.S. Constitution. PX No. 17 at 31. Mr. Bursey further

explained, "And one of the precepts that we've been working on for quite some time is that the

majority-minority districts that really started in a big way in 1990 and have continued to I believe

dilute the strength of black votes by having more Black voters in a district than is necessary for

said district to be able to elect a candidate of their choice. Clyburn's district again because we

have such large numbers exemplifies the excess capacity of having somewhere between 15 and

19 percent depending on whose numbers you use, more people of color, Black people, in that

district than would be necessary for people of color to win that district. And so, what that's done

is it reduced the effectiveness, the effective vote strength of a large percentage of people in that

district." PX No. 95 at 88:7–88:20

        685.    Mr. Eric Johnson also testified about the initial Senate Staff Plan "So, the

maps that have been released are a clear attempt by the majority to dilute the chances of Black

voters' election of preferred candidate while also attempting to eliminate the amount of Black

legislators currently serving. So, we must put this redistricting process under a very powerful

microscope and demand transparency and fairness throughout the entire redistricting process. We

must ensure all maps benefit the people and not just the interests of a particular party." PX No.

95 at 107:5–107:13.

        686.      Concerns about Black vote dilution also applied to the House Ad Hoc

Redistricting Subcommittee's maps as well.  Representative Gilda Cobb-Hunter, the longest

serving Black legislator in the House and former minority leader, has participated in three

redistricting cycles, and expressed concern about the Staff House Alternative 1 Plan diluting

Black voting power in CD 1 through splitting Black voters between Charleston and North

Charleston and similarly drawing CD 5 in a way that diluted Black voting power. Tr.89:8–15,

110:13–111:25, 112:2–10 (Cobb-Hunter, Oct. 3). Representative Cobb-Hunter did not vote for

the map because she felt it would hurt Black voters in South Carolina. Tr. 112:11–18, 118:25–

119:6 (Cobb-Hunter, Oct. 3). Community members shared these concerns. For example, on

December 29, 2021, a Black student at the College of Charleston described the House Staff

Alternative 1 map's gutting of the Black community in Charleston as unethical. PX No. 17 at 35.

        687.      In addition to concerns about Black vote dilution, the Senate Redistricting

Subcommittee and the House Ad Hoc Redistricting Committee heard a chorus of voices from

both private citizens and elected officials, asking them to not draft maps that racially

gerrymander Black communities in South Carolina.

        688.      For example, Mr. Joe Cunningham testified before the Senate that the

initial Senate staff plan was "awful" and a blatant racial gerrymander whose "sole purpose" was

to ensure Republican victories in all six congressional districts, except CD 6, by cracking Black

voters and other voters who would tend to vote for Black voter-preferred candidates. PX No. 17 at 32.  Similarly, Mr. Oppermann informed the Senate Redistricting Subcommittee that "[t]hose shapes can only be reasonably explained by an overarching racial -- a predominant and overarching racial policy. The point of which would be to concentrate black voting power in District 6 for the fig leaf of legal compliance, and otherwise diminish and destroy black voting power in every other part of the state." PX No. 17 at 43.  He continued, "[t]here is no other reasonable explanation for the lines in either the House plan that was passed, or Senate Amendment. Race is the only plausible explanation for that, which suggests a predominant racial motive in those draws, which of course is unconstitutional." PX No. 17 at 43.

689.    Moreover, Heather Odom of the South Carolina Coalition of Black Communities asked the Senate Redistricting Subcommittee to avoid dilution of Black voting strength and to avoid any form of gerrymandering. PX No. 17 at 31. Specifically, she explained, "[f]rom what I'm learning and what's been discussed is a 10-year process that we have the chance to make a difference in not having the voting process be diluted for the Black and brown community. And it doesn't look like the protection of the number of the majority and minority districts is happening. So, the implication here is that we're literally reshaping the communities and that's been provided in the testimonies today is that reshaping is tragic and it's very important that they understand the impact of that. And number three, gerrymandering I call it gerrymandering of faith diffuser and communities because you're giving one group over another a political advantage by drawing these maps, and it's completely unfair. And by doing this you make the residents feel less important and their vote less important.  And is that really what you want to happen here? So, that's -- for us to feel less important by giving our votes -- our vote is what puts you there in office." PX No. 95 at 111:6–111:24.

690.    There were similar concerns with the redistricting process on the House side as well. For example, Ms. Teague of the SC League of Women Voters called the House Staff Alternative 1 an "obvious racial and partisan gerrymander" and noted that it scored worse in most measures than the original House map. She noted that it was incredibly similar to the Senate's initial map, which she said the Senate Redistricting Committee had "wisely" not acted upon after it received a flurry of very negative feedback. She argued that the "most obvious" example of racial gerrymandering was the splitting of Charleston and the reduction of the BVAP in CD 1 vis-à-vis the original House plan. PX No. 17 at 35.

691.    Legislators and individuals with significant mapmaking experience concurred with this view. For example, Sen. Harpootlian asked Mr. John Ruoff, then consulting for the SC League of Women Voters on congressional redistricting but having decades of experience working within and outside of South Carolina's state and local governments on state and local-level redistricting, whether he believed the proposed Senate map to have represented a deliberate choice to take "most African American voters" and put them in CD 6 while keeping white voters in CD 1. Mr. Ruoff agreed, adding that it was his opinion that this was, then, in the Senator's words, "a race-based reapportionment plan to benefit incumbency." PX No. 17 at 34.

692.    Finally, the Senate Redistricting Subcommittee and the House Ad Hoc Redistricting Committee heard a chorus of voices from both private citizens and elected officials, asking them to not draft maps that would crack Black communities in South Carolina.

693.    For example, on the Senate side of the redistricting process, President Murphy of Plaintiff South Carolina NAACP asked the Senate Redistricting subcommittee to avoid packing Black voters into one district and then cracking them elsewhere, to consider not just one majority-minority district (*i.e.*, CD 6) but the possibility of opportunity districts outside

of CD 6 and consider conducting RPV analysis to determine where such opportunity districts might be. PX No. 17 at 31. Other citizens concurred in these concerns about dividing Black communities. For example, on December 16, 2021, Mr. Cunningham said the Senate's map also seemed to "start" by splitting Charleston and then making the numbers work after that. In his opinion, there was no reason other than race to do this. PX No. 17 at 34.  Senator Matthews, a Black legislative member, said that Black voters had been "carved out" of certain areas in order to pack and crack them in the initial Senate Staff Plan. PX No. 17 at 32.

694.    South Carolina citizens expressed similar concerns to the House Ad Hoc Redistricting Committee and President Murphy, on behalf of the SC NAACP, testified that when their coalition submitted proposed congressional maps to the House Ad Hoc Redistricting Committee on October 8, 2021, it also expressed concerns about "packing and cracking," including "North Charleston being split from Charleston," even though that community "used the same hospitals.  They're all right there close – on the coast.  Schools very similar.  Jobs work the same places."  Tr. 1255:7–16 (Murphy, Oct. 11); see also PX No. 11.  President Murphy also testified that "anybody living in Charleston knows that" West Ashley is "part of Charleston.  It's just over the bridge.  Why put West Ashley into a congressional district that's totally different, a rural community?"  Tr. 1256:6–14 (Murphy, Oct. 11). Speaking on behalf of the SC NAACP, President Murphy criticized what she characterized as the unnecessary splitting of Charleston, as well as Richland and Sumter, and the dilution of Black voting strength in general, but especially in CD 1. PX No. 17 at 35.

695.    Legislators also shared these concerns. For example, Representative King, a Black legislator, warned the House of Representatives that these maps would dilute the power of Black voters in CD 1 by cracking Charleston County and a community of interest in the

midlands and coastal areas. Tr. 641:7–642:2, 642:17–644:2, 645:10–646:17 (King, Oct. 6).

Specifically, Rep. King observed, "Congressional District 6 and Congressional 1 was cracked to

pull out heavily African American areas and put them in District 6, which makes Congressional

1 less competitive." Tr. 641:15–17 (King, Oct. 6). Rep. King explained that his colleagues,

elected officials "went into African American -- heavy African American communities and went

straight down and just cracked them to give us less of a voice as a people in one congressional

district that could be competitive versus putting us all in into congressional 6. It lessens the

opportunity to have a voice in congressional one." Tr. 641:19–24 (King, Oct. 6).

696.    Rep. King explained, "When I think about African Americans and our

voice in the district, it lessens our interests. And what I mean by that is, we would have less of a

voice in District 1, and in District 6 you have packed all the African Americans and cracked the

district to the disadvantage of African Americans in congressional 1." Tr. 643:1–7 (King, Oct.

6). Rep. King commented, "So those that are listening who are preparing to sue South Carolina?

Yes, this is party-driven lines. And how did they do it? They cracked the black districts and

packed and put them all in Congressional 6. Now, I respect my Congressman but I think he

needs competition over in Congressional District 5. I believe that we all should have." Tr.

644:15–20 (King, Oct. 6). Rep. King argued, "I don't think that they had the best interests of

African Americans or black people when they drew these lines. I think they through cracking and

packing of the districts, they -- because the party that is in control is the republican party, they

drew the lines. And so, I'm not saying that it was party-driven in reference to 1 outside weigh

one parties over the other. The party that is in control is the party that drew the lines to impact

and depreciate the vote of African Americans in the state." Tr. 644:23–645:6 (King, Oct. 6).

697.    Rep. King explained, "It all goes back to the impact of having to listen to

African Americans. And so when you crack districts, the opportunity for black constituents to be

heard in a district is lessened versus, you know, having a district[] that is competitive where the

representative will have to listen to the concerns of people who they might normally not listen to.

And in this case, take our issues to DC that are concerns for African American communities.

Right now, that voice is only heard by one Congressperson because they not interested in our

community. As I stated earlier, I have to call Congressman Clyburn when I want something done

in the African American community." Tr. 645:15–646:1 (King, Oct. 6).

698.    All of the problems Rep. King saw in the House map were present in the

enacted map. Tr. 646:8–11 (King, Oct. 6).

699.    Representatives Krystle Matthew, also a Black legislator, asked, "were the

communities of color split? And I don't know if you know this about me, but I'm really

particular about being clear. So, let me be very clear, it was split. The 1st Congressional District

was given the white areas of Charleston County, and Congressional District 6 was given the

black areas of Charleston County, predominantly." PX No. 17 at 40.

700.    These private citizens and elected officials illustrate a record that put the

Senate and the House on notice that the enacted map would harm Black voters. Yet, the enacted

map continued to contain all of the concerns raised by members of the public, the House, and the

Senate--despite the chorus of voices expressing that these features would hurt Black voters.

701.    In addition, the Senate Redistricting Subcommittee and House Ad Hoc

Redistricting Subcommittee solicited maps from the public for consideration in the redistricting

process.  Tr. 1128:25–1129:9 (Bagley, Oct. 11). Those committees accepted testimony regarding

those maps on December 16, 2021, and November 12, 2021, respectively. PX No. 95, PX No.

572.

702.    Both redistricting subcommittees heard testimony providing them with alternative and non-discriminatory maps, putting them on notice of the foreseeable harms effectuated in the enacted map. For example, the November 12 meeting of the Senate Redistricting Subcommittee heard testimony about a map submitted by the League of Women Voter's that had equal populations, was contiguous, and allowed for minority representation. PX No. 595, Tr. 680:9–16 (Teague, Oct. 6). The League of Women's Voters explained that their map was based on the "belief that maps should reflect communities of interest communities of interest and give voters a fair chance. And we felt that in the end we didn't want to gerrymander for competitiveness. We didn't want to prioritize it over thing. We felt in some communities it would arise naturally as a product of the nature of the community of interest. And that is what happened." Tr. 682:22–683:3 (Teague, Oct. 6). This submitted map gave voters a fair chance, reflected communities of interest and provided more opportunities for Black voters for the enacted map without making that a priority. Tr. 682:18–683:9, 684:13–16 (Teague, Oct. 6).

703.    Additionally, the Senate Redistricting Subcommittees had a map by Dakota Foster, a Stanford law student with family in Hilton head, whose submitted map had a majority-minority district and two other districts that would be competitive for Black voters. PX No. 95 at 73:19–73:25, 75:21–75:23.

704.    The Senate Redistricting Subcommittee had two maps submitted by the SC NAACP. PX No. 606; PX No. 607. Ms. Leah Aden described the SC NAACP maps to the committee and explained, "our coalitions propose two proposed plans, or two ways to comply with both the US constitution's Equal Population Mandate and the text and spirit of the Voting Rights Act as well as other federal and state redistricting principles. Our two plans in two very different ways correct for population disparities across the state. They maintain CD6 as a Section

2 compliance opportunity district where black voters are a majority and do not needlessly elevate CD6 black population. And I remind you in a state as President Murphy did where black voters are 29 percent of the voting-age population, black voters must not be packed into a single congressional district electing only 14 percent of the state's seven-member congressional district -- seven-member congressional delegation. Black voters deserve the opportunity to meaningful -- meaningfully participate in a (inaudible) election for more, more than one of seven congressional districts, and our plans show just two ways to provide such an opportunity." PX No. 95 at 100:2–100:20.

705.    Ms. Leah Aden reiterated the importance of the submitted maps to the committee and explained, "But I'd be remiss to not also mention that you've heard today not only from the League but also from the Stanford Lawsuits Clinic as well as other maps that it's possible to preserve CD 6 while also ensuring the influence and the voice of black people in areas outside of CD 6. There are far too many options on the table that this subcommittee has available to it to ensure that." PX No. 95 at 100:20–101:2; PX No. 604.

706.    On the House side of the redistricting process, those committee members heard similar testimony about the proposed maps. For example, during the December 16 meeting of the House Ad Hoc Redistricting Subcommittee the League of Women Voters explained their "own congressional map proposal shows it's very possible to draw a map that includes a reliable opportunity district from minority voters. And it also conforms to South Carolinas major region and broad communities of interest." PX No. 572 at 9:15–9:20.

707.    Mr. Blain-Spain, a community member, also testified about the proposed maps and said "the NAACP fair maps, South Carolina Democratic Party and other groups have submitted far better maps than what you're choosing to adopt. Go back and vote to merge those

271

competitive maps and adopt ones with most competitive districts, whether congressional or statewide Senate and House. You have this decennium of an opportunity to do right, the right thing by South Carolinians. On the state and congressional levels, use it wisely. This is an opportunity for all of us. We're on display, not only, across South Carolina, but to the world. I know some time we hate opposition. We hate to be in elections. We hate primaries, but that's democracy. Why not and when we talk about communities of interest, give the people the opportunity to elect their voters. Let's have better maps in South Carolina. Let's have better lines. Let's have a chance to clean up South Carolina." PX No. 572 at 17:8–18:1.

No feedback was given regarding the less discriminatory maps submitted by the SC NAACP and private citizens. Tr. 1128:25–1129:9 (Bagley, Oct. 11). However, the respective redistricting subcommittees did not indicate how they would take these maps into consideration and the enacted map did not reflect any aspect of the submitted proposals. Tr. 1128:25–1129:9 (Bagley, Oct. 11). The failure to consider and the rejection of these less discriminatory proposals also demonstrates that legislators were on notice of the enacted maps' foreseeable harm to Black voters in South Carolina

## IV.     CONCLUSIONS OF LAW

### *One-person, one vote in congressional redistricting*

708.     "States must draw congressional districts with populations as close to perfect equality as possible." *Evenwel v. Abbott*, 578 U.S. 54, 59 (2016); *Karcher v. Daggett*, 462 U.S. 725, 730–31 (1983).

### A.     Standing

709.     An individual or an organization representing such individuals has suffered an injury due to racial gerrymandering by living in a racially gerrymandered district. *See*, *e.g.*, *United States v. Hays*, 515 U.S. 737, 744–45 (1995) ("Where a plaintiff resides in a

racially gerrymandered district, . . . the plaintiff has been denied equal treatment because of the legislature's reliance on racial *criteria*, and therefore has standing to challenge the legislature's action") (emphasis added); *see also Gill v. Whitford*, 138 S. Ct. 1916, 1930 (2018) ("[A] plaintiff who alleges that he is the object of a racial gerrymander . . . has standing to assert only that his own district has been so gerrymandered."); *Shaw v. Hunt ("Shaw II")*, 517 U.S. 899, 904 (1996) ("[A] plaintiff who resides in a district which is the subject of a racial-gerrymander claim has standing to challenge the legislation which created that district, but that a plaintiff from outside that district lacks standing absent specific evidence that he personally has been subjected to a racial classification.").

710.    An organization that has members living in racially gerrymandered districts has standing to challenge those districts' composition if "the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires individual members' participation in the lawsuit." *Ala. Legis. Black Caucus v. Alabama.* ("*ALBC*"), 575 U.S. 254, 269 (2015) (quoting *Ala. Legis. Black Caucus v. Alabama*, 989 F. Supp. 2d 1227, 1291 (2013)).

711.    The harms that underlie a racial gerrymandering claim arise from being "personally . . . subjected to [a] racial classification." *Bush v. Vera*, 517 U.S. 952, 957 (1996). Separately but sufficiently, they can also arise from being represented by a legislator who believes his "primary obligation is to represent only the members" of a particular racial group. *Shaw v. Reno* ("*Shaw I*"), 509 U.S. 630, 648 (1993).  They directly threaten a voter who lives in the district attacked.  But they do not so keenly threaten a voter who lives elsewhere in the State." *ALBC*, 575 U.S. at 263 (emphasis omitted); *Hays*, 515 U.S. at 744–45.

712.    An organization has standing to challenge intentional discrimination when its members are denied "equal treatment" due to racial discrimination and need not prove the "ultimate inability to obtain [some] benefit" as a result. *Ne. Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993).

713.    Plaintiff Taiwan Scott lives in Congressional District 1 and challenges that district as a racial gerrymander and as intentionally racially dilutive. *See supra* Section I(B)(i). Because he lives in that District, the Court finds he has standing to challenge its composition. *See Hays*, 515 U.S. at 744–45. Because the mosaic of evidence demonstrates that Black voters were cracked in District 1 and other challenged congressional districts, the Court finds that Mr. Scott has standing to challenge the Enacted Map as intentionally racially discriminatory.

714.    Plaintiff SC NAACP has proven that it has members who live in racially gerrymandered districts in three different ways. *First*, consistent with the Court's instruction, Plaintiffs produced documents "related to establish[] organizational standing," showing that Plaintiff SC NAACP has members who reside in each of the Challenged Districts. *See* ECF No. 221 at 2 (Order). Those materials are the subject of an Attorneys' Eyes Only Order protecting their disclosure that the Court entered on June 16, 2022. *See* ECF No. 284.[29] *Second*, at trial— and in response to the Court's pointed questions on Plaintiff SC NAACP's standing—both House and Senate Defendants stipulated to Plaintiff SC NAACP having members in each of the Challenged Districts. *See* Tr. 1311:23–1312:11 (Oct. 11). *Third*, at trial, multiple witnesses testified that SC NAACP members reside in each of the Challenged Districts. Tr. 1243:4–12 (Murphy, Oct. 11) (President Murphy testifying that SC NAACP has "members who are registered voters in each of the congressional districts in South Carolina"); Tr. 521:21–522:3

---

[29] *See*, *e.g.*, ECF No. 281 at 3-5.

(Griffin, Oct. 4) (SC NAACP member Griffin testifying to residing in CD 1); Tr. 1296:13–16 (Murphy, Oct. 11) (President Murphy testifying that a "member of the NAACP" complained to her about CD 2 specifically after map was enacted); Tr. 753:19–20 (Garvin, Oct. 6) (SC NAACP member Garvin testifying to residing in CD 2)[30]; Tr. 617:21–618:6, 619:18–19 (King, Oct. 6) (SC NAACP member King testifying to residing in CD 5); Tr. 1218:24–25; 1218:1–9 (Kilgore, Oct. 11) (SC NAACP member Kilgore testifying to residing in CD 5). Because Plaintiff SC NAACP has members residing in each of the Challenged Districts, it has standing to challenge their composition as a racial gerrymander. *See ALBC*, 575 U.S. at 269.

715. Because the mosaic of evidence demonstrates that Black voters were cracked in the Challenged Districts, the Court finds that SC NAACP has standing to challenge the Enacted Map as intentionally racially discriminatory. *See Ne. Fla. Chapter of the Associated Gen. Contractors of Am.*, 508 U.S. at 666.

    **B.**    **Count 1—Racial Gerrymandering**

            **i.**    **Plaintiffs have shown that in enacting S.865 the Legislative Defendants subordinated traditional redistricting principles to racial considerations in drawing the Challenged Districts 1, 2, and 5.**

716. A party proves a racial gerrymandering claim regarding an electoral district under *Shaw I*, 509 U.S. at 630, and its progeny, in violation of the equal protection clause of the Fourteenth Amendment to the United States Constitution when: "(1) race is the 'dominant

---

[30] Representative Garvin testified to living in—and representing parts of—CD 2. *See supra* Section I(D)(ii). Rep. Garvin is a member of the Columbia Chapter of the SC NAACP. While he did not testify to his SC NAACP membership at trial, the Court can take judicial notice that Rep. Garvin has made his status as a member a fact of public record in government websites. *See* Representative Kambrell H. Garvin, Personal Information, S.C. Legislature, https://www.scstatehouse.gov/member.php?code=0657954467 (last visited Nov. 7, 2022); *see also Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (courts "may properly take judicial notice of matters of public record").

and controlling' or 'predominant' consideration in deciding 'to place a significant number of voters within or without a particular district," and " (2) the use of race is not 'narrowly tailored to serve a compelling state interest.'" *ALBC*, 575 U.S. at 260–61 (first quoting *Miller v. Johnson*, 515 U.S. 900, 913, 916 (1995), and then quoting *Shaw II*, 517 U.S. at 902).

717.    The Court's analysis begins with the presumption that legislators acted in "good faith," but that "presumption must yield . . . when the evidence shows that citizens have been assigned to legislative districts primarily based on their race. *Harris v. McCrory*, 159 F. Supp. 3d 600, 611 (M.D.N.C. 2016), *aff'd sub nom. Cooper v. Harris*, 137 S. Ct. 1455 (2017) (citing *Miller*, 515 U.S. at 915-16); *see also Abbott v. Perez,* 138 S. Ct. 2305, 2324–25 (2018) (in the redistricting context, recognizing this good faith presumption, while adjudicating an intentional discrimination claim under the *Arlington Heights* framework); *NC State Conf. of the NAACP v. Raymond,* 981 F.3d 295, 303 (4th Cir. 2020) (similar); *Smith v. Beasley*, 946 F. Supp. 1174, 1208 (D.S.C. 1996) (three-judge court).  Indeed, it is irrelevant whether legislators acted for "benign" reasons, *Shaw I*, 509 U.S. at 642–43, if the evidence shows that race predominated in the design of the districts.

718.    Racial gerrymandering claims require a two-step inquiry.  *First*, Plaintiffs must prove that race was the predominant factor in placing "a significant number of voters within or without a particular district.  *Cooper*, 137 S. Ct. at 1463-64 (internal quotations omitted).  Unlike an intentional race discrimination claim, discussed in more detail below, racial gerrymandering claims require that "[r]ace must not simply have been '*a* motivation for the drawing of a majority-minority district,' but '*the* predominant factor motivating the legislature's districting decision."  *Easley v. Cromartie* (*Cromartie II*), 532 U.S. 234, 241 (2001) (internal quotation marks and citation omitted) (quoting *Bush*, 517 U.S. at 959) (emphasis added)).

719.    Plaintiffs may rely on "direct evidence of legislative intent, circumstantial evidence of a district's shape and demographics, or a mix of both." *Cooper*, 137 S. Ct. at 1464 (internal quotation omitted). Racial gerrymandering claims "usually turn upon 'circumstantial evidence that race for its own sake, and not other districting principles was the legislature's dominant and controlling rationale in drawing' the lines of legislative districts." *North Carolina v. Covington*, 138 S. Ct. 2548, 2553 (2018) (quoting *Miller*, 515 U.S. at 913).

720.    Second, if race did predominate, strict scrutiny applies, and defendants bear the burden of proving that the use of race was "narrowly tailored" to satisfy a "compelling interest." *Cooper*, 137 S. Ct. at 1464 (internal quotations omitted).

721.    Satisfying the first step—that race was the predominant factor— necessarily "entails demonstrating that the legislature 'subordinated' other factors— compactness, respect for political subdivisions, partisan advantage, what have you—to 'racial considerations.'" *Cooper*, 137 S. Ct. at 1463-64 (quoting *Miller*, 515 U.S. at 916); *see also Colleton Cnty. Council v. McConnell*, 201 F. Supp. 2d 618, 646–49 (D.S.C. 2002) (identifying a non-exhaustive list of traditional redistricting principles used in South Carolina and that state traditional criteria "occupies a subordinate role to the federal directives embodied in the [U.S.] Constitution and the [VRA]").

722.    "[E]vidence that [] traditional principles took a back seat to racial considerations may include direct and circumstantial evidence of legislative intent, indications that a racial percentage within a given district was non-negotiable, bizarre or non-compact district shapes, and district lines that cut through traditional geographic boundaries or election precincts." *Raleigh Wake Citizens Ass'n v. Wake Cnty. Bd. of Elections*, 827 F.3d 333, 354 (4th Cir. 2016). Evidence also may include "district lines that are so bizarre or highly irregular on

their face—both by their geographic appearance and their demographic makeup—that they cannot be rationally understood as anything but an effort to separate voters based on race." *Shaw I*, 509 U.S. at 646–47.

723.    "Race may predominate even when a reapportionment plan respects traditional principles," however, and plaintiffs need not show that there was "a conflict or inconsistency between the enacted plan and traditional redistricting criteria." *Bethune-Hill v. State Bd. of Educ.*, 137 S. Ct. 785, 798–99 (2017); *see also Clark v. Putnam Cnty.*, 293 F.3d 1261, 1267–68 (11th Cir. 2002) ("The fact that other considerations may have played a role in … redistricting does not mean that race did not predominate."); *Harris*, 159 F. Supp. 3d at 615 ("[R]ace can be the predominant factor in the drawing of a district without the districting revisions being 'purely race-based.'").

724.    Racial gerrymandering claims apply to the boundaries of individual districts and require district-by-district analysis, though statewide evidence may be considered. *ALBC*, 575 U.S. at 262–63.  Because the "ultimate object of the inquiry" is the "legislature's predominant motive for the design of the district as a whole," the Court must "consider all of the lines of the district at issue," and "any explanation for a particular portion of the lines [] must take account of the districtwide context."  *Bethune-Hill*, 137 S. Ct. at 800.

725.    "[S]tark splits in the racial composition of populations moved into and out of disparate parts of [a] district, or the use of an express racial target," are examples of significant and "relevant districtwide evidence."  *See Bethune-Hill*, 137 S. Ct. at 800.

726.    In a court's holistic analysis, "the requirement that districts have approximately equal populations is a background rule against which redistricting takes place." *ALBC*, 575 U.S. at 273.  It "is not a factor to be treated like other nonracial factors when a court

determines whether race predominated over other, "traditional" factors in the drawing of district boundaries." *ALBC*, 575 U.S. at 273. As a result, the correct focus is not on, for example, the State's need to "place 1,000 or so additional voters in a particular district in order to achieve an equal population goal," the "predominance" question concerns *which* voters the legislature decides to choose, and specifically whether the legislature predominately used race as opposed to other, "traditional" factors when doing so.  *ALBC*, 575 U.S. at 273.

727.     For example, in *Cooper*, the Supreme Court found a racial gerrymander when state lawmakers and a mapmaker, in attempting to "place almost 100,000 new people" within an underpopulated district at issue: "chose to take most of [the] people from heavily black areas of Durham, [North Carolina], requiring a finger-like extension of the district's western" boundary; and, in so doing, increased the Black voting-age population ("BVAP") of the district by more than four percentage points and changing it from a plurality to majority-Black district. 137 S. Ct. at 1466. The mapmaker "sometimes could not respect county or precinct lines … because 'the more important thing' was to create a majority-minority district." 137 S. Ct. at 1469. "Within the same counties, the portions that fall inside" the district at issue "have black populations two to three times larger than the portions placed in neighboring districts." 137 S. Ct. at 1469. In another district the Supreme Court deemed a racial gerrymander in *Cooper*, which "had no need for significant total population changes" to address overpopulation, state lawmakers and a mapmaker "decided to reconfigure" it, "further narrowing its already snakelike body while adding areas at either end" of the district; "those changes appreciably shifted the racial composition of" the district including raising its BVAP by nearly seven percentage point and changing it from a plurality to majority-Black district. 137 S. Ct. at 1466; 1774-75.

728.     From an evidentiary perspective, plaintiffs may "rely upon either

'circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose' in proving a racial gerrymandering claim," and an "insistence that the [] legislature did not look at racial data" does not defeat strong circumstantial "evidence concerning the shape and demographics of those districts—that the districts unconstitutionally sort voters on the basis of race." *North Carolina v. Covington*, 138 S. Ct. 2548, 2553 (2018).

729.     The district court must perform a holistic analysis, but courts have found that "the division of counties, municipalities, and precincts may be evidence of racial predominance," as well as the legislature splitting "'communities of interest' and instead group[ing] areas with fractured political, social, and economic interests,' connected solely by race." *Covington v. North Carolina*, 316 F.R.D. 117, 137 (M.D.N.C. 2016), *aff'd*, 137 S. Ct. 2211 (2017) (quoting *Miller*, 515 U.S. at 908). The same holds true for evidence concerning the racial makeup of voters shifted in and out of districts to equalize population. *See*, *e.g.*, *Cooper*, 137 S. Ct. at 1475.

730.     In *Bethune-Hill*, for example, the district court credited expert testimony showing that the "boundary lines between districts frequently were small residential roads separating predominantly white and predominantly black neighborhoods," 326 F. Supp. 3d at 146, as well as evidence that when "VTDs, cities, and other places were split," most of the "portions allocated to challenged districts had a higher BVAP percentage than the portions allocated to non-challenged districts," 326 F. Supp. 3d at 147. The court also cited evidence that "black voters were moved from non-challenged districts into challenged districts at a higher rate than white or Democratic voters," whereas "white and Democratic voters were moved out of the challenged districts and into non-challenged districts at a higher rate than black voters." 326 F. Supp. 3d at 148.

731.    *Harris* also recognized the importance of looking at how different racial groups were moved to accomplish population equality, explaining that "[i]t is not about whether a legislature believes that the need for equal population takes ultimate priority," but rather whether the legislature placed race above nonracial considerations in determining which voters to allocate to certain districts in order to achieve an equal population goal." 159 F. Supp. 3d at 613. As the Supreme Court recognized in affirming the racial gerrymandering finding, one of two challenged districts was approximately the right size as it was, yet the "General Assembly incorporated tens of thousands of new voters and pushed out tens of thousands of old ones," and did so along racial lines: adding 35,000 more African-Americans of voting age while removing 50,000 fewer whites of that age." *Cooper*, 137 S. Ct. at 1474.

732.    The *Covington* court also found compelling evidence of racial predominance through analyzing how the state equalized population, with one of the challenged districts shedding only 2,145 Black residents, but over 38,000 white residents. *Covington*, 316 F.R.D. at 144. Like in *Bethune-Hill*, the challenged districts' boundaries mirrored racial demographic lines in several areas. In one senate district, the boundaries where counties were split "seem to trace areas that have a high proportion of African-Americans." 326 F. Supp. 3d at 142. In another, the county, municipality, and precinct splits showed similar patterns. 326 F. Supp. 3d at 143. In another district, predominantly white neighborhoods were "notably excluded" from the district, while "neighborhoods with substantial African-American populations, such as West End, Old Farm, and the area surrounding North Carolina Central University, were captured by the bizarre district lines." 326 F. Supp. 3d at 145. And in the City of Greensboro, three districts "together contain 70.67% of the city of Greensboro, but manage to capture 88.39% of Greensboro's African-American voting-age population," with the "remainder

of the voting-age African-Americans in Greensboro are split among three other districts." 326 F. Supp. 3d at 164.

733.    On remand in *ALBC*, the district court pointed to similar types of evidence in districts where it found racial predominance. In state senate district 23, the legislature "kept the core of the Clarke County portion of the district and pushed to the border of Washington County" but then "instead of taking in more of Clarke County," they "split Washington County." *ALBC II*, 231 F. Supp. 3d at 1084–85. This choice was made more "suspicious" by the fact that "Clarke County has a much lower black population percentage overall (43.88 percent) than the District 23 portion of Clarke County does (70.67 percent)." 231 F. Supp. 3d at 1084–85. And in splitting Washington County, the "drafters put an 82 percent Black population in District 23 from Washington County, which was only 25 percent Black overall." 231 F. Supp. 3d at 1089. In another district where the court found that race predominated, the court cited evidence that the city of Dothan "accounted for 16 percent of the district under the currently enacted plan, and 70 percent of the population included from Dothan in the enacted plan is black." 231 F. Supp. 3d at 1142. Further compounding this, the court explained that the split of Dothan "breaks the community of interest" there. In other districts, the court found persuasive evidence of disproportionate movement of population by race. In one district, the court noted that in repopulating an underpopulated district, the legislature "put a significantly higher percentage of black population in the district (68 percent) than the county as a whole (42 percent)." 231 F. Supp. 3d at 1098. In another district, the court cited evidence that "a net total of 52,490 people, black and white, were moved into and out of District 26," and as a net result, only "36 white individuals were added to District 26" as compared to a net gain of over 14,000 Black residents. 231 F. Supp. 3d at 1133.

734.    Likewise in *Page*, the legislature "moved over 180,000 people in and out of the districts" despite needing "to achieve an overall population increase of only 63,976 people." 2015 WL 3604029, at *12. Of the populations moved out of the underpopulated district, most "were predominantly white, while the populations moved into the District were predominantly African American." 2015 WL 3604029, at *12.

735.    Here, the fact and expert evidence shows that a substantial number of Black voters have been sorted in and out of the Challenged Districts because of their race such that race was the predominant factor in drawing those districts.

736.    While balancing the significant over population in CD 1 (by more than 80,000 voters) and underpopulation in CD 6 (by more than 80,000 voters), as in *Cooper*, the South Carolina legislature moved significantly more voters than were necessary to accomplish that end. *Compare Cooper*, 137 S. Ct at 1466, 1469 *with supra* Section II(A)(vii).

737.    This pattern also occurred with respect to CDs 2 and 5, though the legislature did not move nearly as many voters in and out of these districts due to the relative minimal malapportionment of those districts after the 2020 Census. *Compare Cooper*, 137 S. Ct at 1466, 1774–75 *with supra* Section II(A)(vii).

738.    While this excess movement of population is sufficient to raise suspicions as to the map, the overwhelming evidence of how race placed a role in those movements and did so in a way that subverted traditional districting principles, is what ultimately establishes racial predominance. As in *Bethune-Hill*, the fact and expert testimony reveals that the legislature moved a disproportionate share of Black voters that were available to be moved, for example, between CDs 1 and 6, and, that Black voters were moved at a higher share than white and Democratic voters, in the Challenged Districts. *Compare Bethune-Hill*, 326 F. Supp. 3d at 147,

148 *with supra* Sections II(B)(iii), II(C)(iii), II(D)(iii). Like in *Bethune-Hill* and *Cooper*, these significant population moves in and out of CD 1 appear to have been designed to achieve a precise racial target, with the BVAP of CD 1 essentially unchanged notwithstanding 190,000 people moving in and out of the district. *Compare Bethune-Hill*, 137 S. Ct. at 800 and *Cooper*, 137 S.C. at 1468, 1475 *with supra* Section II(E)(i) (discussing improbability of keeping BVAP of CD 1 essentially unchanged despite moving equivalent of 25% of the district's population).

739.    Like in *Cooper*, in the process of sorting voters among the Challenged Districts, South Carolina's General Assembly subordinated respect for political subdivisions and partisan advantage, among other public and private criteria, to crack Black voters in the Challenged Districts so that they lack any electoral opportunity outside of CD 6 and destroyed any chance to influence elections in CDs 1, 2, and 5. *Compare Cooper*, 137 S. Ct. at 1463–64 *with supra* Sections II(A)-(D).  In fact, similar to *Cooper*, the Challenged Districts conflict with legislatively-identified traditional redistricting principles—for example, by splitting numerous counties, cities, and VTDs, particularly those with significant populations of Black voters. *Compare Cooper*, 137 S. Ct. at 1469 n.3 *with supra* Section II(A)-(D).

740.    As the fact and expert testimony illuminated, the General Assembly engineered district boundaries for the Challenged Districts by cutting through neighborhoods lived in by Black people in Columbia, Sumter, and North Charleston, disregarding municipal boundaries in those areas, as well as county boundaries in Richland, Sumter, Charleston, and Orangeburg. *Compare Raleigh Wake Citizens Ass'n,* 827 F.3d at 354 with *supra* Section II(A)-(D).  Those political boundaries function as communities of interest under South Carolina tradition and criteria, but were disregarded such that residents in downtown Columbia are split into two districts, as are residents in Sumter City, as well as North Charleston and Charleston, as

examples. *See supra* Section II(A)-(C).  Like in *Covington*, Black voters in Columbia and North

Charleston live 100-miles away from one another, bonded seemingly only by their race rather

than a shared economy, media, and other needs. *Compare Covington*, 316 F.R.D. at 137 *with*

*supra* Section II(B)(ii)(c).

741.    Moreover, splitting these communities of interest along racial lines was

not compelled by efforts to heal divisions in other counties and communities of interest, as

Defendants suggest, as Plaintiffs identified alternative maps that could have accomplished

Defendants' purported goals of reuniting particularly counties (like Beaufort) -- without cracking

these predominantly Black communities. *See supra* Section II(A)(iv).

742.    For these and other reasons detailed *supra*, this Court finds that Plaintiffs

demonstrated that in enacting S.865 the Legislative Defendants subordinated traditional

redistricting principles to racial considerations in drawing the Challenged Districts 1, 2, and 5.

> **ii.     Burden-Shifting and the Relevance of Section 2 of the VRA in Racial Gerrymandering Lawsuits**

743.    Once a plaintiff establishes that race predominated, as in this case, the

burden shifts to the jurisdiction defending the redistricting plan to "demonstrate that its

districting legislation is narrowly tailored to achieve a compelling interest" and is "narrowly

tailored" to that end.  *Bethune-Hill*, 137 S. Ct. at 801 (citing *Miller*, 515 U.S. at 920).

744.    Compliance with the Voting Rights Act of 1965 ("VRA") is one such

compelling interest that can justify racial predominance *if* used in a narrowly tailored manner.

*See Wisc. Legis. v. Wisc. Elections Comm'n*, 142 S. Ct. 1245, 1248 (2022) ("our precedents hold

that a State can satisfy strict scrutiny if it proves that its race-based sorting of voters is narrowly

tailored to comply with the VRA"); *Cooper*, 137 S. Ct. at 1464 (the Supreme Court "has long

assumed that one compelling interest is complying with operative provisions of the Voting

Rights Act of 1965").

745.    A state legislature cannot shirk its responsibility to ensure that the districting plan it enacts complies with the VRA.  "A legislature undertaking a redistricting must assess whether the new districts it contemplates … conform to the VRA's requirements." *Cooper*, 137 S. Ct. at 1471.  The VRA requires legislatures to ask: "[t]o what extent must we preserve existing minority percentages in order to maintain the minority's present ability to elect the candidate of its choice?" *Id.* at 279.

746.    "Race-based" districting is "narrowly tailored" to advance the VRA only when the legislature had "good reasons" to conclude that the "Act demanded such steps." *Cooper*, 137 S. Ct. at 1469.  A state will have "good reasons" *if* it conducts "pre-enactment analysis with justifiable conclusions" of what the VRA demands before using race in drawing district lines.  *Abbott v. Perez*, 138 S. Ct. 2305, 2335 (2018).

747.    This means at a minimum that the state must have "good reason to think that all the '*Gingles* preconditions' are met," *Cooper*, 137 S. Ct. at 1470, based on "a strong showing of a pre-enactment analysis with justifiable conclusions," *Perez*, 138 S. Ct. at 2335.

748.    The *Thornburg v. Gingles* preconditions require proof of "(1) a geographically compact minority population sufficient to constitute a majority in a single-member district, (2) political cohesion among the members of the minority group, and (3) bloc voting by the majority to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 2331-32.

749.    The second and third *Gingles* preconditions consider whether there is racially polarized voting in a district. And the Supreme Court has recognized that longtime voting patterns are highly probative of racial polarization. *Gingles*, 478 U.S. 30, 57 (1986). If the

preconditions are established, a court considers the totality of circumstances to determine "whether the political process is equally open to minority voters." Gingles, 478 U.S. at 79; *see also Johnson v. DeGrandy*, 512 U.S. 997, 1011–1012 (1994) (satisfying the *Gingles* preconditions is necessary but not sufficient to show a § 2 violation; "courts must also examine other evidence in the totality of circumstances").

750.    Where defendants do not "conduct a § 2 analysis" and "in the absence of any investigation into what § 2 might require," the defendant "lacks any basis to argue that it had good reasons to believe § 2 of the VRA required . . . race-based boundaries." *Navajo Nation v. San Juan Cty.*, 929 F.3d 1270, 1289 (10th Cir. 2019); *see also Covington*, 316 F.R.D. at 168 ("to have a strong basis in evidence for the third *Gingles* precondition, a legislature must give consideration to the actual and potential effect of bloc voting on electoral outcomes. . . . The evidence in this case demonstrates this is exactly what Defendants did not do."); *Cooper*, 137 S. Ct. at 1434.

751.    As noted above, in *Cooper*, the Supreme Court found North Carolina's congressional plan improperly turned two districts in which Black voters formed the plurality of the districts into majority-Black districts, packing Black voters into those two districts to make the surrounding districts safer for white voters to elect their preferred candidates (*i.e.*, Republican candidates). The Court explained that candidates supported by Black voters were already winning there even without a majority, meaning that a VRA challenger could not satisfy the third *Gingles* factor. The Court held that the plan was a racial gerrymander because the state lacked a "*strong basis in evidence*" for believing that the VRA required majority-minority districts. *Cooper*, 137 S. Ct. at 1464 (emphasis added).

752.    In *Wisconsin Legislature*, the Supreme Court reversed a Wisconsin

Supreme Court decision imposing a redistricting plan that created additional majority-Black

districts in the state legislative map. In that case, the state had a map that showed the additional

districts were possible, but had not done *any* analysis of whether and to what extent racially

polarized voting and other relevant factors necessitated the creation of the additional districts.

142 S. Ct. at 1249 (emphasis added). The Supreme Court explained that a Section 2 analysis

requires a careful evaluation of the evidence at the district level rather than an improper reliance

on "generalizations" that the *Gingles* Section 2 preconditions were satisfied. 142 S. Ct. at 1250.

753.    Here, as detailed *supra* Sections II(G), III(F)(ii), Defendants adamantly

refused to conduct a Section 2 analysis and have expressly disclaimed they are asserting a

defense based on compliance with the VRA.[31] Defendants, therefore, have *not* asserted

compelling state interest that courts have recognized for its excessive race-based lined drawing.

Because of this, Defendants fail to meet their burden to even identify a compelling governmental

interest that justifies their excessive racial engineering, let alone show that their predominant use

of race was narrowly tailored to comply with such an interest.

754.    In any event, longtime voting patterns in South Carolina reflect a well-

documented history of racial polarization.  *See Gingles*, 478 U.S. at 57 (noting that longtime

voting patterns are probative of racial polarization; *United States v. Charleston Cnty.*, 318 F.

Supp. 2d 302, 307 (D.S.C. 2002) ("[R]acial polarization of voters continues to be characteristic

of South Carolina elections."); *Colleton Cnty. Council v. McConnell*, 201 F. Supp. 2d at 618

("Voting in South Carolina continues to be racially polarized to a very high degree . . . ."); *Smith

v. Beasley*, 946 F. Supp. 1174, 1202 (D.S.C. 1996) ("In South Carolina, voting has been, and still

---

[31]As indicated *supra* Section III(F)(ii), counsel for House Defendants hired a consultant who
found statewide evidence of RPV before congressional maps were drafted. There is no record
evidence this analysis was shared with the South Carolina General Assembly members.

is, polarized by race."); *Burton v. Sheheen*, 793 F. Supp. 1329, 1357-58 (D.S.C. 1992) (parties stipulated to "evidence of racially polarized voting in South Carolina" going back to 1984).

### iii. Post Hoc Explanations Do Not Change the Predominance Inquiry.

755.    Traditional redistricting factors are subordinated to race *if* they are considered "only after the race-based decision ha[s] been made." *Shaw II*, 517 U.S. at 907.

756.    Accordingly, "[t]he racial predominance inquiry concerns the actual considerations that provided the essential basis for the lines drawn, not *post hoc* justifications the legislature in theory could have used but in reality did not." *Bethune-Hill*, 137 S. Ct. at 799; *see generally Shaw II*, 517 U.S. at 908 n.4 ("To be a compelling interest, the State must show that the alleged objective was the legislature's 'actual purpose' for the discriminatory classification"); *cf. McCreary Cnty. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 864 (2005) (refusing to credit a hypothetically permissible purpose that is merely a sham).

757.    Particularly in the arena of racial discrimination, jurisdictions should not be permitted to rescue manifestations of unlawful intent with hypothetical interests invented for litigation purposes. *See United States v. Virginia*, 518 U.S. 515, 533 (1996) ("The justification must be genuine, not hypothesized or invented *post hoc* in response to litigation."). *N. Carolina State Conf. of NAACP v. McCrory*, 831 F.3d 204, 237-38 (4th Cir. 2016). This is because *post hoc* rationalizations during litigation provide little evidence as to the actual motivations of the legislature. *See Miss. Univ. for Women*, 458 U.S. at 730 (analyzing whether the State's recited justification was "the *actual* purpose" (emphasis added)).

758.    In the districting context, courts have repeatedly rejected defenses against racial gerrymandering or intentional racial discrimination claims that rely on evidence with little support in the legislative record.

759. For example, in *Covington*, the panel rejected an argument that partisanship rather than race accounted for the district lines because "aside from a few scattered references in the record to the 'political' nature of redistricting, or the fact that '[p]olitics has traditionally played a role in redistricting,'" there was "nothing in the record in connection with the districts at issue" suggesting partisanship motivated the process. 316 F.R.D. at 139. The court noted the redistricting committee chairs had disclaimed a pure partisan motive during the legislative process, further undercutting their post hoc arguments. *Id.*

760. Similarly, in *Harris v. McCrory*, 159 F. Supp. 3d 600, 614–15 (M.D.N.C. 2016), *aff'd sub nom. Cooper v. Harris*, 137 S. Ct. 1455 (2017), the court rejected defendants' argument that "the legislature configured CD 1 to protect the incumbent and for partisan advantage" where there was nothing in the legislative record to suggest as such. It specifically noted that the committee chairs issued a press release claiming that statements they engaged in partisan gerrymandering were "overblown and inconsistent with the facts," which the court found "serve[d] to discredit their assertions that their sole focus was to create a stronger field for Republicans statewide." *Harris v. McCrory*, 159 F. Supp. 3d at 620.

761. Similar principles operate outside of partisanship justifications as well. In *Alabama Legislative Black Caucus*, the Supreme Court discredited the district court's reliance on "following 'highway lines'" as a reason for the drawn district lines because highways were "not mentioned in the legislative redistricting guidelines." 135 S. Ct. at 1271–72. In *Hays v. State of Louisiana*, the court rejected explanations that socio-economic, rather than racial, factors accounted for the challenged district lines because there was no evidence that "socio-economic factors were relied on by legislators at the time of the drawing of the district." 936 F. Supp. 360, 369 (W.D. La. 1996). And in *Vera v. Richards*, the court rejected a communities-of-interest

rationale for the challenged districts proffered by experts because the record was devoid of such evidence and these were instead "more properly seen as post hoc descriptions of the boundaries." 861 F. Supp. 1304, 1323 (S.D. Tex. 1994), *aff'd sub nom. Bush v. Vera*, 517 U.S. 952 (1996).

762.    Here, as detailed *supra and infra*, Defendants have advanced at least three such *post hoc* defenses: partisanship, core constituency, and following Congressman Clyburn's "direction." Core constituency was lodged on the eve of enactment of S.865 and partisanship and Congressman Clyburn's purported preferences were raised as a defense only *after* the S.865 map had been drawn and enacted, and this litigation filed. In addition to being *post hoc*, as detailed *supra and infra*, these defenses are contrary to the weight of the evidence. None excuse the racial gerrymandering here.

### iv. The Predominant Use of Race for Partisan or Political Ends Still Garners Strict Scrutiny.

763.    In circumstances varying from the "usual case alleging a racial gerrymander" where partisanship may have played a role in districting, the State must "assert[] partisanship as a defense" to properly raise the issue. *Cooper*, 137 S. Ct. at 1473. This defense must be supported by the record and not merely a post hoc justification. It is only when a state both asserts and provides evidence that partisanship motivated districts lines, that the court must conduct "a sensitive inquiry into all circumstantial and direct evidence of intent" to determine whether the plaintiffs have "disentangle[d] race from politics and prove[n] that the former drove a district's lines."" *Bethune-Hill*, 326 F. Supp. 3d at 142 (quoting *Cooper*).

764.    In some circumstances, race and party are closely intertwined. *See*, *e.g.*, *United States v. Charleston Cnty.*, 365 F.3d 341, 352 (4th Cir. 2004) (Wilkinson, J.) (noting evidence that in South Carolina, party affiliation and race were "inextricably intertwined"); *Perez v. Abbott*, 253 F. Supp. 3d 864, 945 (W.D. Tex. 2017) ("A primary difficulty in this case

lies in the fact that race and political party affiliation are strongly correlated in Texas, and Defendants contend that they were merely engaged in partisan gerrymandering, which had a foreseeable negative effect on minority voting strength.").

765.    Yet the fact "that partisan politicking was actively at work in the districting process . . .  does not in any way refute the fact that race [can be] the legislature's predominant consideration." *Shaw*, 517 U.S. at 907; *see also Clark v. Putnam Cnty.*, 293 F.3d 1261, 1270 (11th Cir. 2002) (the "fact that other considerations may have played a role in ... redistricting does not mean that race did not predominate.").

766.    Even in a "mixed motive suit," where there is evidence of "other goals, particularly incumbency protection," race may still be "the 'predominant factor' in the drawing of each of the districts." *Bush*, 517 U.S. at 959; *see also Page v. Va. State Bd. of Elections*, No. 3:13-cv-678, 2015 WL 3604029, at *13 (E.D. Va. June 5, 2015) ("race can be a predominant factor in the drawing of a district without the districting revisions being 'purely race-based.").

767.    In *Cooper*, a racial gerrymandering case, the Supreme Court rejected a partisan defense after a mapmaker for the state claimed he drew a challenged district's boundaries based only on political data from one presidential election and displayed "no racial data, on his computer screen while mapping the district"; and "[o]nly *after* he drew a politics-based line between these adjacent areas... did he 'check[] the racial data and 'f[ind] out' that the resulting configuration of" the district at issue lacked a Section 5 of the VRA issue. 137 S. Ct. at 1476–77 (emphasis in original). Based on the net gain of thousands of Black voters in a county at the heart of a challenged district, relative to the net gain of Black voters across the district at issue, the court came away from the mapmaker's "self-contradictory testimony unpersuaded that this decisive influx of black voters was an accident." 137 S. Ct. at 1477. Instead "[w]hether the

racial make-up of the county was displayed on his computer screen or just fixed in his head, the court thought," the mapmaker's "denial of race-based districting 'r[ang] hollow.'" 137 S. Ct. at 1477. The Court also credited circumstantial support provided by expert testimony that race-not-politics explained a challenged district's boundaries by looking at the "region from which the mapmakers could have drawn the district's population" which found that "regardless of party, a black voter was three to four times more likely than a white voter to cast his ballot within" the borders of a challenged district. 137 S. Ct. at 1477.

768.    Like *Cooper*, the evidence shows here that even if the Legislature had mixed motivations, race rather than party better explains the lines drawn around voters in the Challenged Districts and that it predominates over partisanship and other districting considerations.

769.    Here, based on a variety of fact and expert evidence, the record shows that the legislature had an awareness of the race of voters before, during, and after sorting them among districts, as detailed *supra* Sections II(E), III(F). The fact and expert evidence also show that race was a significant factor in the sorting of voters and that when testing whether race as compared to party affiliation explained the distribution of voters, race was the answer.

770.    The claim of certain defense witnesses, as well as Defendants' overall claim that they were blind to race while line-drawing, is contradicted by extensive evidence, as detailed *supra* Sections II(E), III(E)(ii), and rings hollow, as in *Cooper*, 137 S. Ct. at 1476–77. Unlike *Cooper*, Defendants here admit racial data was displayed while they were mapping.  And as in *Cooper,* Defendants trumpet that they looked at the same kind of political data the *Cooper* Defendants did, the vote share for two candidates in a single presidential election, but as in *Cooper*, and as the expert testimony shows, one presidential election in a case about

congressional elections is insufficient data to reliably determine the likelihood of the party

affiliation of voters placed among congressional districts. By contrast, the analyses of Plaintiffs'

experts based on reliable data, multiple elections, and analyses, shows that Black voters were

moved disproportionately than white and Democrat voters in the Challenged Districts. *Supra*

Section II(A)-(D), (F).

771.    Finally, as the fact and expert testimony reflects, key legislative decision-

makers disavowed, again and again, that partisan advantage drove congressional line drawing

*before* enactment of S.865.  Partisan advantage was not an express or prioritized criterion in

either the House or Senate guidelines—beyond how incumbent protection, for example,

customarily features in redistricting.  But this evidence shows that even if incumbent protection

was a goal of Defendants, it too was subordinated to race. In reality, the evidence reflects that it

was only *during* litigation, including at trial, that a few select legislative representatives and a

single staff member proclaimed partisan advantage as an explanation for the lines. It also was

only during trial, that certain Defendants' witnesses, like Will Roberts, placed the blame on

Congressman Clyburn, the lone Black congressperson from South Carolina, and his staff for

purportedly seeking to lock-in minimal change in and around CD 6 to protect him as an

incumbent, as discussed *supra* Section III(E)(i). However, not only is this justification extremely

belated, but also it is not credible and is unsubstantiated by the trial record.

772.    Accordingly, this Court finds that the evidence shows that partisanship

factually does not explain the sorting of voters in the Challenged Districts and it is a post-hoc

explanation not supported by the contemporaneous record.

773.    Moreover, "the sorting of voters on the grounds of their race remains

suspect even if race is meant to function as a proxy for other (including political)

characteristics." *Cooper*, 137 S. Ct. at 1473 n.7; *see also id*. at 1464 n.1. Using race "as a proxy

for political characteristics" is "a racial stereotype requiring strict scrutiny is in operation." *Bush*,

517 U.S. at 968; *see also Veasey v. Abbott*, 830 F.3d 216, 241 n.30 (5th Cir. 2016) (en banc)

("acting to preserve legislative power in a partisan manner can also be impermissibly

discriminatory").

774.    Although "*Shaw*-type cases involve a different motive than intentional

vote dilution cases," *Perez v. Abbott*, 253 F. Supp. 3d 864, 947 (W.D. Tex. 2017), using race as a

means for partisan or political ends violates the Fourteenth Amendment equally in both.

775.    These same principles operate when lawmakers rely on racial

demographics to protect incumbents.  A redistricting plan may protect incumbents without

necessarily running afoul of the Fourteenth Amendment, but it may not do so if the means of

protecting incumbents rely upon seeking to "minimize or cancel out the voting strength of racial .

. . elements of the voting population."  *Gaffney v. Cummings*, 412 U.S. 735, 751 (1973); *see also*

*Ketchum v. Byrne*, 740 F.2d 1398, 1408 (7th Cir. 1984) (explaining that "devices employed to

preserve incumbencies" may be carried forward by racial discrimination); *Garza v. Cnty. of Los*

*Angeles*, 918 F.2d 763, 778 (9th Cir. 1990) (Kozinski, J., concurring and dissenting in part)

("[E]lected officials engaged in the single-minded pursuit of incumbency can run roughshod over

the rights of protected minorities.")

776.    Rather, "[i]ncumbency protection achieved by using race as a proxy is

evidence of racial gerrymandering."  *Clark v. Putnam Cnty.*, 293 F.3d 1261, 1271–72 (11th Cir.

2002). Thus, seeking to protect incumbents via packing or cracking of Black voters still

constitutes racial gerrymandering. *Id.*

777.    Additionally, traditional redistricting considerations can only serve as

evidence for nonracial motivation if they are actually carried out in a racially impartial manner. *See, e.g.*, *Vera v. Richard*s, 861 F. Supp. 1304, 1336 (S.D. Tex. 1994), *aff'd sub nom. Bush*, 517 U.S. at 952 ("Incumbent protection is a valid state interest only to the extent that it is not a pretext for unconstitutional racial gerrymandering."); *see also Vera* 517 U.S. at 966-71 (plurality opinion) (holding that race predominated when a legislature deliberately "spread[] the Black population" among several districts in an effort to "protect[] Democratic incumbents"); *N.A.A.C.P., Inc. v. Austin*, 857 F. Supp. 560, 575 (E.D. Mich. 1994) ("decreased compactness, is a valid consideration if the State is minimizing it in a consistent, racially impartial manner.").

778.   Courts have repeatedly affirmed that the unjustified targeting of minority voters for injury based on their race is unlawful, whether they are targeted based on animus, benign reasons, or as the means to achieve ultimate partisan ends. *See, e.g., Veasey*, 830 F.3d at 241 n.30 (en banc) (Haynes, J.) (noting that "[i]ntentions to achieve partisan gain and to racially discriminate are not mutually exclusive" and that accordingly, "acting to preserve legislative power in a partisan manner can also be impermissibly discriminatory"), *cert. denied*, 137 S. Ct. 612 (2017); *id*. at 241 (5th Cir. 2016) (en banc) (discussing the rapid increase in minority populations in Texas such that "the party currently in power is 'facing a declining voter base and can gain partisan advantage' through a strict voter ID law" was evidence that could support a finding of intentional discrimination based on race).

779.   Here, to reiterate, even were the Court to accept that partisan or incumbency-related goals were the actual, not *post hoc,* motivations for the legislature's decision in whole or part, the evidence shows that racial discrimination through the cracking of communities of interest of Black voters was the vehicle, rather than party affiliation, used to accomplish that goal. Thus, this Court finds that race still predominates in the Challenged

Districts.

> v.    **Purportedly Race-Neutral Motivations such as Preserving Cores of Existing Districts Do Not End the Racial Predominance Inquiry and May Itself Preserve or Create Race-Based Districts.**

780.    Defendants' contention that they sought to preserve district "cores" does not undermine Plaintiffs' evidence of racial predominance for several reasons. This is despite Plaintiffs' acknowledgment that this Court in *Colleton County* identified preserving the cores of existing districts as a race-neutral principle traditionally adhered to in South Carolina. *Colleton Cnty. Council v. McConnell*, 201 F. Supp. 2d 618, 646–49 (D.S.C. 2002) (involving a racial gerrymander challenge only to then CD 6 in South Carolina).

781.    *First*, core retention only concerns certain aspects of the district lines— because it only looks to past maps, "core preservation[] is not directly relevant to the origin of the new district inhabitants." *ALBC*, 135 S. Ct. at 1272. Thus, even if the 2011 map itself was not a racial gerrymander, the overarching use of race in drawing new lines may sometimes itself be sufficient to prove that race predominated. *Cf. Cooper*, 137 S. Ct. at 1477–78 (relying on expert testimony about racial disparities in where voters were moved in redistricting); *Bethune-Hill*, 326 F. Supp. 3d at 148 (similar).

782.    *Second*, core retention "holds a special place in the predominance balance …. [because it] 'may be used to insulate the original basis for [] district boundaries.'" *Bethune-Hill v. Va. State Bd. of Elections*, 141 F. Supp. 3d 505, 544 (E.D. Va. 2015) (quoting *ALBC*, 135 S. Ct. at 1251).

783.    When the legislature "chooses to rely on redistricting criteria highly correlated with race, like preserving the "cores" of unconstitutional districts or using election data to ensure incumbents elected in the racially gerrymandered districts," it cannot use such

criteria as a defense against racial predominance. *Covington*, No. 1:15-cv-399, 2018 WL 604732, at *4.

784.    In *Covington*, the Supreme Court affirmed the district court's conclusion of a racial gerrymander based on a defense of core retention, where the districts "retain[ed] the core shape" of previously racially gerrymandered districts and thus continued to bear the hallmarks of racial predominance. 138 S. Ct. at 2551; *see also Clark v. Calhoun Cnty.*, 293 F.3d 1261, 1263 (11th Cir. 2002) (finding districts that preserved prior cores were racially gerrymandered); *ALBC II*, 231 F. Supp. 3d at 1065 (same).

785.    Like the facts of this case, in *Page*, the court rejected a core retention justification for circumstantial evidence of racial gerrymandering because the legislature "moved over 180,000 people in and out of the districts" despite needing "to achieve an overall population increase of only 63,976 people." 2015 WL 3604029, at *12 (internal citations omitted). Moreover, the populations moved out of the underpopulated district "were predominantly white, while the populations moved into the District were predominantly African–American." 2015 WL 3604029, at *12.

786.    Courts have also recognized that elevating core retention over other legal redistricting requirements would thwart redistricting by freezing district lines in place regardless of demographic shifts. *See Robinson v. Ardoin*, --- F. Supp. 3d ---, No. 22-211, 2022 WL 2012389, at *42 (M.D. La. June 6, 2022) ("Core retention is not and cannot be central to [Section 2 analysis] because making it so would . . . allow[] states to forever enshrine the status quo regardless of shifting demographics."), *cert. granted before judgment sub nom. Ardoin v. Robinson*, 142 S. Ct. 2892 (2022); *see also Singleton v. Merrill*, 582 F. Supp. 3d 924, 1016 (N.D. Ala. 2022), *cert. granted before judgment sub nom. Merrill v. Milligan*, 142 S. Ct. 879 (2022)

298

(argued Oct. 4, 2022).

787.    Courts have been particularly wary of arguments that elevate core retention over other legal requirements or criteria where racial concerns could have played a predominant role in developing past "benchmark" maps, like South Carolina's 2011 congressional map. In those cases, elevating core retention would keep voters "segregated on the basis of race" by readopting prior plans. *Covington*, 138 S. Ct. at 2553.

788.    Here, as detailed *supra* Section III(E)(iii), Defendants baselessly assert core retention as a justification for S.865. Core retention by the terms of both legislative guidelines for the House and Senate are lower-tiered considerations that cannot take priority over constitutional and federal requirements including non-racial dilution and non-racial gerrymandering. In addition to being a low-level redistricting criterion in South Carolina, legislators only touted core retention as a justification for congressional line-drawing late in the legislative process, after the Enacted Plan had been released and already been subjected to extensive criticism. Therefore, any attempt to assert it as a primary justification for the lines in litigation should be viewed suspiciously, and as a *post hoc* rationale.

789.    As a factual matter, as in *Page*, 2015 WL 3604029, at *12, the record also reflects that given the population movement in South Carolina between 2010 and 2020, significant amounts of the cores of districts, notably CDs 1 and 6 were *not* preserved, given the thousands of voters exchanged between those districts. And even *if* the congressional plan at issue did rely on core preservation to some degree, it did not do so in a racially evenhanded manner, cracking Black communities while preserving others, particularly in the Challenged Districts, as detailed *supra* Section II(A)-(D). Respect for the cores of districts cannot be defensible if it *not* applied evenly and it is used to dilute Black voting strength. *See*, *e.g.*, *Vera v.*

299

*Richard*s, 861 F. Supp. 1304, 1336 (S.D. Tex. 1994), *aff'd sub nom. Bush v. Vera*, 517 U.S. 952

(1996) ("Incumbent protection is a valid state interest only to the extent that it is not a pretext for

unconstitutional racial gerrymandering."); *see also Vera* 517 U.S. at 966-71 (plurality opinion)

(holding that race predominated when a legislature deliberately "spread[] the Black population"

among several districts in an effort to "protect[] Democratic incumbents").

791.    Therefore, Defendants' belated and factually-unsupported core-retention

justification does not undermine the Court's finding of racial predominance in the Challenged

Districts.

### vi.    Section 5 of the VRA Preclearance Does Not Bar Liability Under Section 2 and/or Constitutional Provisions.

791.    Before the Supreme Court's decision in *Shelby County v. Holder*, 570 U.S.

529 (2013), Section 5 of the VRA barred covered jurisdictions from implementing any voting

change that has a discriminatory purpose or would have the effect of reducing the ability of

minority voters to elect a candidate of their choice.  42 U.S.C. §§ 1973c(b), (c). From the VRA's

enactment until *Shelby County*, South Carolina was deemed to be a covered jurisdiction.  *See*

*Gray v. S.C. State Election Comm'n*, No. 3:09-cv-2126, 2010 WL 753767, at *2 (D.S.C. Mar. 1,

2010). As a result, South Carolina Congressional plans were submitted for "preclearance" by

way of either a declaratory judgment from the U.S. District Court for the District of Columbia or

a submission to the U.S. Attorney General.  42 U.S.C. 1973c(a); *see also South Carolina v.*

*Katzenbach*, 383 U.S. 301 (1966).

792.    Maps or districting plans that the federal government "precleared" pre-

*Shelby County* have still been found to be unlawful racial gerrymanders when they sort voters by

race. For example, in *Miller v. Johnson*, 515 U.S. 900 (1995), the Supreme Court concluded

Georgia's redistricting map enacted the "very racial stereotyping the Fourteenth Amendment

forbids," *Miller*, 515 U.S. at 928, despite having been precleared, 515 U.S. at 909. More recently, the enacted plans that courts considered in both *Bethune-Hill* and *Alabama Legislative Black Caucus* had each been respectively precleared. The courts considered their merits under the Fourteenth Amendment all the same. *See Bethune-Hill v. Va. State Bd. of Elections*, 326 F. Supp. 3d 128, 138–39 (E.D. Va. 2018) (noting "United States Department of Justice 'precleared' the plan in accordance with Section 5 of the VRA"); *Ala. Legislative Black Caucus v. Alabama*, 989 F. Supp. 2d 1227, 1235 (M.D. Ala. 2013) (discussing preclearance of 2010 redistricting plan at issue in *ALBC* litigation), *vacated and remanded*, 575 U.S. 254 (2015). Though unsuccessful, South Carolina's Section 5-precleared state legislative and congressional maps were challenged as unconstitutional racial gerrymanders following the 2010 census. *Backus v. S.C.*, 857 F. Supp. 2d 553, 557–68 (2012).

793.    These post-preclearance legal challenges are consistent with the Supreme Court's recognition of the differencing legal frameworks at issue in redistricting; what is probative in a racial gerrymandering lawsuit, for example, is "whether the new districts" a legislature "contemplates (not the old ones it sheds) conform to the VRA's requirements." *Cooper*, S. Ct. 137 at 1471.

794.    Because Section 5 preclearance looks at retrogression and animus rather than racial predominance *per se*, and because the Enacted Plan's new boundaries themself provide strong evidence of racial predominance, the preclearance of the 2011 congressional plan does not undercut this Court's finding that the Challenged Districts are racial gerrymanders.

       **vii.**     **Plaintiffs do not need to introduce an alternative map in a racial gerrymandering lawsuit; it is but one evidentiary tool.**

795.    Although "a plaintiff will sometimes need an alternative map, as a practical matter, to make his case," there is no "one particular form of proof [needed] to prevail."

*Cooper*, 137 S. Ct. at 1479. "The Equal Protection Clause prohibits the unjustified drawing of district lines based on race. An alternative map is merely an evidentiary tool to show that such a substantive violation has occurred; neither its presence nor its absence can itself resolve a racial gerrymandering claim." 137 S. Ct. at 1480; 1480 n.15 ("When plaintiffs meet their burden of showing" that state lawmakers have sought to "suppress the electoral power of minority voters" then "there is no basis for subjecting them to additional—and unique—evidentiary hurdles, preventing them from receiving the remedy to which they are entitled.").

796.     Here, as detailed *supra* Section II(A), Plaintiffs point to alternative maps that satisfy traditional districting criteria and the State's own Guidelines without using race as the overriding factor and that provide electoral opportunity for Black voters outside of CD 6, as compared to the Enacted Map. These include alternatives available to the legislature for consideration *before* passage of the Enacted Map, such as the SC League of Women Voters' maps and Senator Harpootlian's Senate Amendment 2a.  It also includes the alternative plan that Dr. Duchin developed for this litigation—involving a change to a single boundary line while preserving the cores of districts and increased Black electoral opportunity.  *See supra* Section III(E)(iii).  As her credible testimony among other record evidence reflects, there are many more legally-compliant alternatives available to the General Assembly. *See supra*. But even were these alternatives not available, this would not prevent this Court from finding racial predominance based on the extensive additional evidence in the record.

797.     Admittedly, these alternative maps did not ensure a 6-1 Republican advantage in Congress.  But even if the law ordinarily required Plaintiffs to identify effective alternative maps (which it does not), it cannot make such a demand here, where Defendants' purportedly key criterion (partisan advantage) was hidden from the public.

***Plaintiffs' experts adequately addressed traditional redistricting criteria in South Carolina***

798.    Contrary to Defendants' contention, Fourth Circuit precedent holds that an expert witness opining on causation is not required to "rule out every possible alternative cause." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 265 (4th Cir. 1999).  Consistent with this principle, an expert opining in support of a racial gerrymandering claim need not account for each and every race-neutral redistricting criterion that a legislature could have considered for their testimony to be helpful to the Court.  *See*, *e.g.*, *Jacksonville Branch of NAACP v. City of Jacksonville*, No. 3:22-cv-493, 2022 WL 7089087, at *36, 38–39 (M.D. Fla. Oct. 12, 2022) (relying on Dr. Kosuke Imai's testimony over argument that that it did not address partisanship or incumbency protection).

799.    This principle is particularly true in this case, where Plaintiffs' four experts testifying as to their racial gerrymandering claim collectively address and account for the gamut of race-neutral criteria to establish that race predominated in the Enacted Plan's design. For example, as Dr. Duchin's reports and trial testimony evince, while her analyses may account for specific criteria, collectively all her analyses address all the traditional redistricting principles and House and Senate criteria. *See* Tr. 284:15-286:19 (Duchin, Oct. 4)*.* Indeed, while Dr. Duchin's 100,000 ensembles, *see supra* Section II(A) operationalize some, not all principles (e.g., population balance, contiguity, preservation of boundaries, compactness, and some communities of interest), other of her analyses consider incumbency, partisan advantage as compared to race, core retention, and/or Black electoral opportunity/non-dilution. *See id*. Dr. Liu, for example, considers respect for political boundaries, partisan advantage as compared to race, and/or Black electoral opportunity/non-dilution.  Dr. Imai's analyses likewise consider population balance, contiguity, preservation of boundaries, compactness, incumbency

preservation, non-dilution of Black voting strength, among others.  Conversely, Defendants' expert Mr. Trende did not address all race neutral-criteria: by his own admission, he did not consider municipal splits, communities of interest, non-dilution of Black voting strength, nor did he conduct a quantitative assessment of contiguity.

800.    This Court's judgment in *Backus v. South Carolina* is not to the contrary. In *Backus*, plaintiffs relied on a single expert who failed to address "all the traditional race-neutral principles that guide redistricting in South Carolina," including the General Assembly's redistricting guidelines and other criteria traditionally recognized by the Courts.  *See* 857 F. Supp. 2d 553, 562 (D.S.C. 2012).

801.    Plaintiffs' four experts clearly and credibly explained their consideration of numerous traditional redistricting criteria, including those found in the Senate and House Guidelines, such as compactness, contiguity, avoidance of incumbency pairings, communities of interest, and avoidance of county, municipal, and precinct splits.  Unlike the lone expert in *Backus*, Plaintiffs' experts have also credibly testified that alternative causes like core retention and partisan affiliation do not explain the way in which the Enacted Plan cracks Black South Carolinian voters.

802.    And unlike *Backus*, Plaintiff did here did not ask their experts or rely on them to provide an ultimate opinion as to racial predominance. Rather, the expert testimony here provides one source of evidence, albeit an important one, in the Court's duty to conduct a holistic analysis and make a finding of whether race predominated. The record shows it did and there is no asserted and demonstrated compelling interest for doing so.

C.      **Count 2: Intentional Racial Discrimination**

i.      **Plaintiffs have shown that S. 865 was motivated by a racially discriminatory purpose.**

803.    Although both arise under the Equal Protection Clause of the Fourteenth Amendment, a claim that "the State has enacted a particular voting scheme as a purposeful device to minimize or cancel out the voting potential of racial or ethnic minorities" is "analytically distinct" from a racial gerrymandering claim. *Miller v. Johnson*, 515 U.S. 900, 911 (1995) (citation and internal quotation marks omitted).

804.    In a *Shaw*-type racial gerrymandering claim, discussed above, the inquiry is not whether the legislature acted "with discriminatory versus benevolent motive, only whether race was the predominant motive in the decisionmaking, while in an intentional vote dilution case, we look to see whether intentional racial discrimination was *a* motivating factor in the districting decision." *Perez v. Abbott*, 253 F. Supp. 3d 864, 947 (W.D. Tex. 2017) (emphasis added).

805.    Courts have adjudicated racial gerrymandering claims about redistricting maps alongside claims that such maps are intentionally racially discriminatory. *See*, *e.g.*, Perez, 253 F. at 908 (adjudicating racial gerrymandering and intentional discrimination claims under the Fourteenth and Fifteenth Amendments, as well as the VRA, in a challenge to a Texas congressional district).

806.    For a racially discriminatory intent claim, when considering whether discrimination was a motivation for a facially neutral law, a court must undertake a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977).

807.    Courts must consider "all of the circumstances that bear upon the issue of

discriminatory intent," *Foster v. Chatman*, 136 S. Ct. 1737, 1748 (2016), "including the normal inferences to be drawn from the foreseeability of defendant's actions," *United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009). Indeed, in *Arlington Heights*, the Supreme Court considered a varied and non-exhaustive list of "subjects of proper inquiry in determining whether racially discriminatory intent existed." 429 U.S. at 266-68.

808.    Expert evidence is highly relevant in an intentional discrimination case. *See Hunter*, 471 U.S. at 229-30 (relying on experts to find discriminatory intent); *NAACP v. Gadsden Cty. Sch. Bd.*, 691 F.2d 978, 982 (11th Cir. 1982) (holding the district court clearly erred in discounting expert testimony on intentional discrimination).

809.    Challengers need not show that discriminatory purpose was the "sole[]" or even a "primary" motive for the legislation, just that it was "a motivating factor." *Hunter*, 471 U.S. at 265-66. Nor does discriminatory purpose require a showing of ill-will or animus toward minorities. *Id.*; *Perez v. Abbott*, 253 F. Supp. 3d 864, 948 (W.D. Tex. 2017); *see also Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 374 (2001) (Kennedy, J., concurring) ("Prejudice, we are beginning to understand, rises not from malice or hostile animus alone. It may result as well from insensitivity caused by simple want of careful, rational reflection or from some instinctive mechanism to guard against people who appear to be different in some respects from ourselves."); *Garza v. Cnty. of Los Angeles*, 918 F.2d 763, 778 n.1 (9th Cir. 1990) (Kozinski, J., concurring & dissenting in part) ("The lay reader might wonder if there can be intentional discrimination without an invidious motive. Indeed, there can.").

810.    As discussed above, an intent to disadvantage minority citizens to gain a perceived political or partisan benefit qualifies as discriminatory intent. *See League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 440 (2006) ("*LULAC*") (stating that taking away a

political opportunity just as minority voters were about to exercise it "bears the mark of intentional discrimination"); *Hunter v Underwood*, 471 U.S. 222, 233 (1985) (finding intentional discrimination where a state enacted a law to harm Black and poor white voters for partisan purposes); *McCrory*, 831 F.3d at 226–27 (similar).

811. Discriminatory purpose "may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another." *Washington v. Davis*, 426 U.S. 229, 242 (1976).

812. But the ultimate question remains: did the legislature enact a law "because of," and not "in spite of," its discriminatory effect. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256 (1979).

813. In *Arlington Heights*, the Court set forth a nonexhaustive list of factors to consider in making this sensitive inquiry. These include: "[t]he historical background of the [challenged] decision"; "[t]he specific sequence of events leading up to the challenged decision"; "[d]epartures from normal procedural sequence"; the legislative history of the decision; and of course, the disproportionate "impact of the official action—whether it bears more heavily on one race than another." *Arlington Heights*, 429 U.S. at 266-67.

814. In instructing courts to consider the broader context surrounding the passage of legislation, the Court has recognized that "[o]utright admissions of impermissible racial motivation are infrequent and plaintiffs often must rely upon other evidence." *Cromartie I*, 526 U.S. at 553.

815. A government entity "need not break its own rules to engage in unusual procedures" or outcomes. *McCrory*, 831 F.3d at 228.

816. Official actions motivated by a discriminatory purpose have "no

legitimacy at all under our Constitution." *City of Richmond v. United States*, 422 U.S. 358, 378–79 (1975). "Once racial discrimination is shown to have been a 'substantial' or 'motivating' factor behind enactment of the law, the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." *Hunter*, 471 U.S. at 228.

817.    Concerning a racially discriminatory impact, requiring a threshold minimum number of impacted voters or a specific degree of impact "is unquestionably wrong." *Chisom v Roemer*, 501 U.S. 380, 409 (1991) (Scalia, J. dissenting). Instead, as long recognized in voting cases, any amount of discriminatory impact—even, for example, to one Black voter—is sufficient to show that an intentionally discriminatory law violates the U.S. Constitution. *See, e.g., City of Pleasant Grove v. United States*, 479 U.S. 462, 471–72 n.11 (1987); *City of Port Arthur v. United States*, 459 U.S. 159, 168 (1982); *Anderson v. Martin*, 375 U.S. 399, 403–04 (1964); *Dillard v. Crenshaw Cty.*, 649 F. Supp. 289, 297 (M.D. Ala. 1986); *see also LULAC*, 548 U.S. at 438–40 ("Even if [the challenged plan's] disproportionality were deemed insubstantial, that consideration would not overcome the other evidence of vote dilution," including evidence that bore "the mark of intentional discrimination").

818.    When plaintiffs assert that a law has a discriminatory purpose, any relevant evidence of discriminatory impact, "even if not overwhelming impact, suffices to establish one of the circumstances evidencing discriminatory intent." *McCrory*, 831 F.3d at 231.

819.    When determining if this burden has been met, courts must be mindful that "racial discrimination is not just another competing consideration." *Arlington Heights*, 429 U.S. at 265–66. For this reason, the judicial deference accorded to legislators when "balancing numerous competing considerations" is "no longer justified." *Id*. Instead, courts must scrutinize the legislature's actual non-racial motivations to determine whether they alone can justify the

legislature's choices. *McCrory*, 831 F.3d at 221.

820.    The Supreme Court has found that a discriminatory, unconstitutional purpose can underlie the maintenance of dilutive voting practices. *See Rogers v. Lodge*, 458 U.S. 613, 622–27 (1982) (affirming finding that electoral system at issue "was being maintained for the invidious purpose of diluting the voting strength of the black population" in violation of the Fourteenth and Fifteenth Amendments to the Constitution).

821.    As detailed *supra* Section III, Plaintiffs have pointed to largely undisputed evidence that each of the *Arlington Heights* factors supports a finding of intentional discrimination.

822.    As detailed *supra* Section III(A), it is undisputed that the "historical background" of South Carolina includes a judicially-recognized, deep-seated and persistent historical and ongoing record of discrimination against Black people in voting and in many other aspects of civic life.

823.    As detailed *supra* Section III(B), the overwhelming weight of the evidence is that Black South Carolinians will bear the disproportionate impact of the Enacted Plan, in that Black South Carolinians will be deprived of the fair opportunity to elect congressional candidates of their choice.

824.    As detailed *supra* Section III(C), the overwhelming weight of the evidence is that the specific sequence of events leading up to the passage of the Enacted Plan, including the departures from the legislature's normal procedural sequence, all support a finding of intentional discrimination, including:

        a.    the failure to abide by the House and Senate guidelines;

        b.    the failure to disclose private map drawing criteria;

c.    the subjugation of announced redistricting criteria to these secret, private directives;

d.    the inconsistent application of criteria to different racial groups;

e.    that the House (elections law) committee that had for decades considered congressional redistricting, did not this cycle;

f.    that maps were developed largely *without* the input of members of the House (ad hoc) and Senate (sub) committees, including Black members, charged with leading on redistricting this cycle;

g.    the summary rejection by legislative and legislative-staff map drawers of the public testimony or public map submissions;

h.    the summary abandonment of the less discriminatory House initial staff map;

i.    the summary rejection of less discriminatory Senate Amendment 2a and League of Women Voters alternative maps;

j.    that maps were sprung on legislative members, notably Black and Democratic members, at the same time as the public;

k.    The General Assembly hid that NRRT provided three maps to the legislature which were accepted after the public submission deadline, at key moments when congressional maps were being developed, providing notice and copies of the maps to a limited number of legislative staff, but never Black and Democrat legislative members who specifically asked for them;

l.    the House's summary abandonment of its efforts to advance its

310

own map,

m.  The denial of a Black legislative member, Rep. King, the only one on his committee with statewide redistricting experience, of the opportunity to lead a key hearing on congressional mapping late in the legislative process for pretextual reasons; and,

n.  Senator Campsen's role in undermining the House plans and orchestrating public support for his plan.

**ii.  Relevance of Racially Polarized Voting to Intentional Racial Vote Dilution.**

825.  It is the political cohesiveness of the minority groups, as demonstrated by racial bloc voting patterns, that provides the political payoff for legislators who seek to dilute or limit the minority vote.  *McCrory*, 831 F.3d at 222.

826.  When there is "overwhelming evidence of bloc voting along racial lines," such "facts bear heavily on the issue of purposeful discrimination" because "[v]oting along racial lines allows those elected to ignore black interests without fear of political consequences, and without bloc voting the minority candidates would not lose elections solely because of their race." *Rogers v. Lodge*, 458 U.S. 613, 623 (1982); *see also Thornburg v. Gingles*, 478 U.S. 30, 71 n.33 (1986) ("racial hostility may often fuel racial bloc voting."). This Court, in *Backus*, set forth a non-exhaustive list of relevant factors to consider and weigh in determining discriminatory purpose under the Constitution that includes "whether bloc voting along racial lines exist." 857 F. Supp. 2d at 568.

827.  Indeed, proof of racially polarized voting "will ordinarily create a sufficient inference that racial bias is at work." *Nipper v. Smith*, 39 F.3d 1494, 1525 (11th Cir. 1994) (opinion of Tjoflat, J.).

828.    The Supreme Court squarely confronted this connection in *LULAC v. Perry.* There, the record evidence revealed racially polarized voting, such that 92% of Latinos voted against an incumbent of a particular party, whereas 88% of non-Latinos voted for him. 548 U.S. at 427. The Court explained how this racial polarization provided the impetus for the discriminatory vote dilution legislation at issue in that case: "In old District 23 the increase in Latino voter registration and overall population, the concomitant rise in Latino voting power in each successive election, the near-victory of the Latino candidate of choice in 2002, and the resulting threat to the" incumbent representative motivated the controlling party to dilute the minority vote. 548 U.S. at 428 (citation omitted).  Although the Court grounded its holding on the § 2 results test, which does not require proof of intentional discrimination, the Court noted that the challenged legislation bore "the mark of intentional discrimination." 548 U.S. at 440; *see also Clarke v. City of Cincinnati*, 40 F.3d 807, 812 (6th Cir. 1994) ("The VRA is rigorously focused on the distinct preferences of minority communities facing discrimination, not on generic partisan results." And "the Act's guarantee of equal opportunity is not met when ... '[c]andidates favored by blacks can win, but only if the candidates are white.'") (quoting *Smith v. Clinton*, 687 F. Supp. 1310, 1318 (E.D. Ark. 1988) (three-judge court)).

829.    Likewise, in *McCrory*, the Fourth Circuit recognized that "polarization renders minority voters uniquely vulnerable to the inevitable tendency of elected officials to entrench themselves by targeting groups unlikely to vote for them." 831 F.3d at 214.

830.    The surging—but not quite majority—Latino population in Pasadena and the City's decision to change its electoral map and plan shortly after the *Shelby County* decision removed the requirement for preclearance similarly bears "the mark of intentional discrimination." *LULAC*, 548 U.S. at 440. All these are objective measures or indications of an

intent to change to a 6–2 map and plan in order to dilute Latino votes, not merely knowing that this could occur. *Patino v. City of Pasadena*, 230 F. Supp. 3d 667, 726-27 (S.D. Tex. 2017), *judgment entered*, No. CV H-14-3241, 2017 WL 10242075 (S.D. Tex. Jan. 16, 2017).

831.    Unlike in a racial gerrymandering context, as discussed above, in cases alleging intentional racial vote dilution under the Constitution, the Supreme Court has held that plaintiffs need to offer "a reasonable alternative voting practice to serve as the benchmark 'undiluted' voting practice." *Reno v. Bossier Parish Sch. Bd.* (*Reno I*), 520 U.S. 471, 480 (1997).

832.    Here, despite refusing to put into the record any analysis of bloc voting along racial lines, the House's outside firm lawyers hired a consultant that found evidence of it; legislators cannot feign ignorance that courts have found RPV in past redistricting cycles; and the public warned legislators about the impact of lines on Black voters in light of indicia of RPV during consideration of congressional maps. *See supra* Section III(F). The General Assembly's maintenance of CD 6's high percentage of Black voters by surgically adding majority-Black communities to fix the district's severe underpopulation creates a strong inference of its awareness of RPV. Knowing the unexamined reality of racial bloc voting, Defendants reasonably understood the impact of cracking Black voters in the Challenged Districts to eliminate their ability to elect or influence elections outside of CD 6. Decisionmakers acknowledge their awareness of the competitiveness of certain elections outside of CD 6, such as the 2018 congressional election in CD 1. Under *Bartlett*, the elimination of this crossover district between Black and white voters in CD 1 should raise constitutional intentional vote dilution concerns. The fact and expert evidence show that the dilutive impact is likely to occur in all of the Challenged Districts. *See supra* Section III(B), (F). Consistent with *Rogers*, *McCrory*, and *Veasey*, the existence of racial bloc voting patterns in South Carolina is important context for

understanding why the General Assembly engaged in intentional vote dilution.

### iii. Intentionally Eliminating An Influence District Raises Constitutional Concerns.

833.    In *Cooper*, the Court rejected the argument that "whenever a legislature can draw a majority-minority district, it must do so," because there are circumstances in which "a crossover district would also allow the minority group to elect its favored candidates." 137 S. Ct. at 1472.

834.    The term crossover district refers to legislative districts "in which a minority group makes up less than a majority of the voting-age population, but where the minority group is large enough to usually elect its candidates of choice with sufficient support from voters of other groups who "crossover" to support the minority group's preferred candidates. *Bartlett v. Strickland*, 556 U.S. 1, 13 (2009); *see also Cooper*, 137 S. Ct. at 1470.

835.    While cross-over districts are not required under the VRA, the *Bartlett* Court noted that "if there were a showing that a State intentionally drew district lines to destroy otherwise effective crossover districts, that would raise serious questions under both the Fourteenth and Fifteenth Amendments." *Bartlett*, 556 U.S. at 24.

836.    In *Perez v. Perry*, the District Court for the Western District of Texas explained that "[a]s a legal matter the Supreme Court has recognized that if 'a State intentionally drew district lines in order to destroy otherwise effective crossover districts, that would raise serious questions under both the Fourteenth and Fifteenth Amendments.'" No. SA-11-CV-360, 2012 WL 13124278, at *20 (W.D. Tex. Mar. 19, 2012).

837.    In *Dickson v. Rucho*, the North Carolina Supreme Court noted: "We are aware of the Supreme Court's warning that 'if there were a showing that a State intentionally drew district lines in order to destroy otherwise effective crossover districts, that would raise

serious questions under both the Fourteenth and Fifteenth Amendments.'" *Dickson v. Rucho* ("*Dickson I*"), 766 S.E.2d 238, 253-55 (N.C. 2014).

838.    A State's "history of discrimination is not dispositive, [but] it is relevant to a court's determination of . . . intent." *Riddick by Riddick v. Sch. Bd. of City of Norfolk*, 784 F.2d 521, 539 (4th Cir. 1986).

839.    In the voting context, the Fourth Circuit has found a state's "history of race discrimination and recent patterns of official discrimination, combined with the racial polarization of politics in the state" to be "particularly relevant," especially when there is fairly recent evidence of the Sate engaging in "race-based vote suppression in particular." *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 223 (4th Cir. 2016).

840.    As detailed *supra* Section III(F)(iii), it was not necessary to dilute Black voting power to satisfy traditional redistricting principles. Various legally-compliant alternatives were and are available to the legislature. Dr. Duchin, as well as legislative amendments like that of Senator Harpootlian, offer non-dilutive alternatives to the Enacted Map while still pursuing stated redistricting goals. Indeed, Dr. Duchin's testimony shows increased electoral opportunity for Black voters under various alternatives maps as compared to the Enacted Map; she also shows the dilutive effect of the Enacted Map as compared to the 2011 map.

841.    This dilution of Black voting power in South Carolina is part of a historical pattern in the state, a state that has been challenged for its redistricting decisions in every cycle since 1970. And a state that has an undeniable record of racial harm in voting.

842.    Based on this and other evidence, detailed above, the Court finds that purposeful racial discrimination was *a* motivating purpose for S.865 and the General Assembly drew the lines because of its harm to Black South Carolinians and as a means to solidify control

over six of seven congressional districts.

### iv. Willful Blindfolding to Race

843.    Courts have relied on evidence that map drawers had racial data available; that it was loaded into and on display in "Maptitude" software as lines were drawn; that they eventually reviewed race data after drawing district boundaries; or on mapdrawers' and legislators' knowledge of racial demographics in a jurisdiction as helpful to determining whether consideration of race predominated in a redistricting plan.  *See Ga. State Conf. of NAACP v. Georgia*, 312 F. Supp. 3d 1357, 1364–65 (N.D. Ga. 2018) (where these factors present, noting "[t]his being the case, can anyone say the process for redrawing [challenged districts] was blind to the race of possible voters?").

844.    Although the record evidence shows otherwise in this case, even to the extent Defendants insist they did not look at race while initially drafting their new districts, as discussed *supra* Section II(E), this does not end the racial gerrymandering inquiry.  Rather, the court must perform a "holistic analysis" of each challenged district.  *Bethune-Hill*, 137 S. Ct. at 800.

845.    In *North Carolina v. Covington*, the Court rejected the legislature's argument that its map could not be a racial gerrymander because the "legislature instructed its map drawers not to look at race." 138 S. Ct. 2548, 2553 (2018). It explained that the court "turned up sufficient circumstantial evidence that race was the predominant factor governing the shape of" the challenged districts, and so its "insistence" that it "did not look at racial data . . . does little to undermine the District Court's conclusion—based on evidence concerning the shape and demographics of those districts—that the districts unconstitutionally sort voters on the basis of race."  138 S. Ct. 2548, 2553 (2018).

846.    Feigned ignorance and deliberate attempts to keep data about the racial

316

impact of the maps out of the record are tantamount to an admission of knowledge. "[D]eliberate ignorance is the equivalent of knowledge." *United States v. Schaffer*, 600 F.2d 1120, 1122 (5th Cir. 1979).

847.    Moreover, in the context of intentional racial discrimination claims, courts have found probative that legislator statements—as well as what he/she heard on and off the legislative floor, in committee meetings, and elsewhere—demonstrate that the reason he/she sought to prevent impact data from entering the legislative record was to evade future allegations of discrimination. *Cf. McCrory*, 831 F.3d at 230 (holding that North Carolina acted with discriminatory purpose in targeting Black voters with "surgical precision" based, in part, on the General Assembly's request for and receipt of race data that showed Black voters would be disproportionately impacted by the proposed legislation's restrictions on certain voter resources).

848.    Legislators' willful avoidance of widely known, but inconvenient, information does not preclude a finding that they had actual knowledge of facts that are "common sense." *Veasey*, 830 F.3d at 236.

849.    Regardless of whether legislators or map drawers had race turned off or on at particular points in the legislative process, "the legislature always is aware of race when it draws district lines, just as it is aware of age, economic status, religious and political persuasion, and a variety of other demographic factors." *Shaw v. Reno*, 509 U.S. 630, 646 (1993); *see also Backus v. South Carolina*, 857 F. Supp. 2d 553, 559 (D.S.C.), *aff'd*, 568 U.S. 801 (2012) ("Legislatures are almost always cognizant of race when drawing district lines . . . ."); *Harris*, 159 F. Supp. 3d at 604 (same).

850.    In *Cooper*, the Supreme Court recognized where a trial court thought a mapdrawer's "denial of race-based districting 'r[ang] hollow,'" considering "[w]hether the racial

make-up of the county was displayed on his computer screen or just fixed in his head." 137 S. Ct. at 1477.

851.    Here, to the extent Defendants liken the Enacted Map to the 2011 congressional enacted map precleared under Section 5 of the VRA, this Court has acknowledged that that "federal law require[d] that race be a consideration." *Backus*, 857 F. Supp. 2d at 565 (noting that in developing the 2012 enacted congressional map, South Carolina's "General Assembly had to consider race to create districts that complied with federal law, which it did."); *see also Colleton County Council v. McConnell*, 201 F. Supp. 2d 618, 637, 646 (D.S.C. 2002).

852.    Similarly, as this Court recognized in *Colleton County v. McConnell*, a State's consideration of its Section 2 obligations also necessarily requires jurisdictions like South Carolina to consider race.  201 F. Supp. 2d 618, 637 (D.S.C. 2002) ("[b]y prohibiting election plans that have the effect of diluting minority voting strength ... The Voting Rights Act necessarily forces states to consider race in the redistricting context.")

> v.    ***Post-Hoc* Explanations May be Evidence of Pretext in Intentional Discrimination Cases.**

853.    Particularly in the arena of racial discrimination, jurisdictions should not be permitted to rescue manifestations of unlawful intent with hypothetical interests invented for litigation purposes.  *See United States v. Virginia*, 518 U.S. 515, 533 (1996) ("The justification must be genuine, not hypothesized or invented *post hoc* in response to litigation."). *McCrory*, 831 F.3d at 237-38. This is because *post hoc* rationalizations during litigation provide little evidence as to the actual motivations of the legislature.  *See Miss. Univ. for Women*, 458 U.S. at 730 (analyzing whether the State's recited justification was "the *actual* purpose" (emphasis added)).

854.    For example, in the employment discrimination context, the Fourth Circuit

has found that the "fact that an employer has offered inconsistent post-hoc explanations for its employment decisions is probative of pretext." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 647 (4th Cir. 2002); *see also Veasey*, 830 F.3d at 236 (recognizing the pretext inquiry in employment discrimination cases relevant to constitutional intentional discrimination claims). In both the statutory and constitutional contexts, "people hide discriminatory intent behind seemingly legitimate reasons. . . . Context matters." *Veasey*, 830 F.3d at 236.

855.    In *Veasey*, the Fifth Circuit specifically recognized as "probative" of intentional discrimination "that many rationales were given for a voter identification law, which shifted as they were challenged or disproven by opponents." 830 F.3d at 240–41.

856.    Moreover, the advancement of pretextual or *post hoc* rationales is, itself, evidence of intentional discrimination.  This is because when someone offers a demonstrably false or nonsensical purpose for an action with a discriminatory effect, the court can "reasonably infer from [such] falsity . . . that the [defendant] is dissembling to cover up a discriminatory purpose."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) (internal punctuation and citations omitted); *cf. Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019) (courts "cannot ignore the disconnect between the decision made and the explanation given . . . [and] are not required to exhibit a naiveté from which ordinary citizens are free"),

857.    Here, the Court has found that Defendants' changing and inconsistent explanations from the process of drawing maps, to the post-drawing period of legislative debate, to the litigation itself are probative evidence of pretext and intent to discriminate.  In particular, the efforts of a defense witness to advance the theory that Representative Clyburn was the main architect of the Enacted Plan is not only not credible, but it undermines the same witnesses' (i.e., Will Roberts) already not credible testimony that he did not consider race in drawing the maps.

Similarly, when defense witnesses assert that the Enacted Plan was intended to advance partisan goals after the same witnesses denied the same during the legislative process, that suggests something more nefarious is going on and is indicative of discriminatory intent.

### vi. The Predominant Use of Race for Partisan or Political Ends Still Garners Strict Scrutiny.

858.    As explained *supra*, "the sorting of voters on the grounds of their race remains suspect even if race is meant to function as a proxy for other (including political) characteristics." *Cooper*, 137 S. Ct. at 1473 n.7; 1464 n.1. Using race "as a proxy for political characteristics" is "a racial stereotype requiring strict scrutiny is in operation." *Bush*, 517 U.S. at 968; *see also Veasey*, 830 F.3d at 241 n.30 (en banc) ("acting to preserve legislative power in a partisan manner can also be impermissibly discriminatory").

859.    For example, the Fourth Circuit correctly explained that "intentionally targeting a particular race's access to the franchise because its members vote for a particular party, in a predictable manner," violates the Fourteenth Amendment. *McCrory*, 831 F.3d at 222; *see also Perez*, 253 F. Supp. 3d at 949 (map was intentionally discriminatory where mapdrawers intentionally used race "in order to gain partisan advantage"); *Patino v. City of Pasadena*, 230 F. Supp. 3d 667, 727 (S.D. Tex. 2017) (where "the party in power stands to gain partisan advantage by diluting Latino votes, pursuing partisan advantage can—and here does—mean intending to dilute Latino votes.").

860.    Similarly, in *LULAC,* 548 U.S. at 423-24, the Supreme Court explained that the State's decision "to break apart a Latino opportunity district to protect the incumbent congressman from the growing dissatisfaction of the cohesive and politically active Latino community in the district" evinced "the mark of intentional discrimination." 548 U.S. at 440, 441.

861.    Thus, Courts have repeatedly affirmed that the unjustified targeting of minority voters for injury based on their race is unlawful, whether they are targeted based on animus, benign reasons, or as the means to achieve ultimate partisan ends. *See*, *e.g., Veasey*, 830 F.3d at 241 n.30 (en banc) (Haynes, J.) (noting that "[i]ntentions to achieve partisan gain and to racially discriminate are not mutually exclusive" and that accordingly, "acting to preserve legislative power in a partisan manner can also be impermissibly discriminatory"), *cert. denied*, 137 S. Ct. 612 (2017); *id*. at 241 (5th Cir. 2016) (en banc) (discussing the rapid increase in minority populations in Texas such that "the party currently in power is 'facing a declining voter base and can gain partisan advantage' through a strict voter ID law" was evidence that could support a finding of intentional discrimination based on race).

862.    Here, to the extent that the Legislature's motive was ultimately the pursuit of partisan gain, in whole or part, this does not undercut a finding of racial discrimination because the evidence shows that race was the vehicle used to advance that motive.  Rather, the weight of the evidence supports a finding of racial discrimination.

## V.    PLAINTIFFS' REQUESTED REMEDIES

863.    The Court should declare that Congressional Districts 1, 2, and 5 violate Plaintiffs' rights secured by the Fourteenth Amendment to the U.S. Constitution because each of those districts is a racial gerrymander not justified by any compelling governmental interest nor narrowly tailored to serve a compelling state interest.

864.    This Court should also declare S.865 violates Plaintiffs' rights secured by the Fourteenth and Fifteenth Amendments to the U.S. Constitution because the congressional map intentionally dilutes Black South Carolinians voting power.

865.    The Court should enjoin Defendants, including the Election Defendants, from qualifying candidates and conducting any elections under the congressional map adopted in

S.865 other than the elections presently scheduled to conclude on November 8, 2022. Given the Election Defendants' representations, Knapp Dep. Tr. at 51:25–52:6, 87:2–10, 92:16–93:5 (estimating it would take "three to five months" to run an election under a new map), this is enough time to implement a remedial plan well in advance of key election dates, including in the 2024 Congressional cycle. *See Reynolds v. Sims*, 377 U.S. 533, 585 (1964) (emphasis added) ("[O]nce a State's legislative apportionment scheme has been found to be unconstitutional, it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan.")

866.    This court has the authority to immediately remedy any constitutional violations with a special election. The Fourth Circuit discussing a voting right's remedy explained, "the timing of that relief was a matter within the discretion of the court" and that it is "the court's task to determine whether, under all the circumstances, implementation should be delayed until the next scheduled election or should occur immediately through the ordering of a special election." *Neal v. Harris*, 837 F.2d 632, 634 (4th Cir. 1987). The Court recognized that "citizens are entitled to have their rights vindicated as soon as possible so that they can vote for their representatives under a constitutional [] plan." *Smith v. Beasley,* 946 F. Supp. 1174, 1212 (D.S.C. 1996).

867.    Because the judiciary should not intrude on legislative policy any more than necessary, the Court ought to give the Legislature a first, "reasonable opportunity" to suggest in a timely fashion a constitutionally adequate plan to remedy the Fourteenth and Fifteenth Amendment violations. *Wise v. Lipscomb*, 437 U.S. 535, 540 (1978) ("When a federal court declares an existing apportionment scheme unconstitutional, it is therefore, appropriate, whenever practicable, to afford a reasonable opportunity for the legislature to meet constitutional

requirements by adopting a substitute measure rather than for the federal court to devise and order into effect its own plan."); *see Abrams v. Johnson*, 521 U.S. 74 (1997); *White v. Weiser*, 412 U.S. 783, 794–95 (1973); *Vander Linden v. Hodges*, 193 F.3d 268, 281 (4th Cir. 1999); *Smith v. Beasley*, 946 F. Supp. 1174, 1211–12 (D.S.C. 1996).

868.    While this Court should provide the legislature with an opportunity to remedy the constitutional violations, that does not mean it should defer to the legislature in determining whether the remedy is adequate. On the contrary, in remedying unconstitutional intentional racial discrimination, "the burden rests on the State to prove that its proposed remedy completely cures the harm." *N. Carolina State Conf. of NAACP*, 831 F.3d at 240 (citing *United States v. Virginia*, 518 U.S. at 547, for the proposition that the defendant "was obliged to show that its remedial proposal 'directly address[ed] and relate[d] to' the violation"); *see also Green v. Cnty. Sch. Bd. of New Kent Cnty.*, 391 U.S. 430, 439 (1968). ("The burden on [the entity violating the constitution] today is to come forward with a [remedial] plan that promises realistically to work, and promises realistically to work now.").

869.    If the Legislature submits a remedial plan that meets constitutional and statutory requirements while preserving state preferences, the Court must accept that remedial plan. *See Lawyer v. Dep't of Justice*, 521 U.S. 567, 576–77 (1997); *Edge v. Sumter Cnty. Sch. Dist.*, 775 F.2d 1509, 1512 (11th Cir. 1985).

870.    The Court should therefore give Defendants until March 31, 2023 to submit a remedial plan.  This is enough time for the Legislature—which will be in session from January 10 to May 11, 2023—to devise a remedy.  *See Covington*, 138 S. Ct. at 2550 (giving a legislature one month to devise a remedy); *Thomas v. Bryant*, 919 F.3d 2298, 312–13 (5th Cir. 2019) (giving the legislature 19 days to devise a remedy); *Covington v. North Carolina*, 316

F.R.D. 117, 177 (M.D.N.C. 2016) (directing legislature to draw remedial plan "in [its] next legislative session").

871.    The Election Defendants have represented it would take three to five months to implement any new maps for the State House of Representatives that were drawn by the General Assembly as a result of litigation. Knapp Dep. Tr. 86:24–87:10. If it would take them three to five months to implement 124 such districts, it should take no more than that for seven Congressional districts.

872.    Given the representations of the Election Defendants in this action, a deadline of three to five months is enough time to implement a remedial map.  This schedule also affords the Court sufficient time to consider whether the General Assembly's map adequately remedies the constitutional violations identified by the Court and, if necessary, consider alternative remedial maps and adopt a final remedial map.

873.    If the South Carolina General Assembly abdicates its responsibility to promptly cure the voting rights violations with a constitutional and legally valid remedy, or if it is not practical for that legislative body to act because of an imminent election, it becomes "the unwelcome obligation" of the Court to fashion a remedy. *Wise*, 437 U.S. at 540 (quoting *Connor*, 431 U.S. 407, 415 (1977); *Upham v. Seamon*, 456 U.S. 37, 41 (1982) ("[J]udicial relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so.") (citation omitted); *see also Colleton County Council v. McConnell*, 201 F. Supp. 2d 618, 626–27 (D.S.C. 2002).

874.    Indeed, as the Fourth Circuit and courts within it have recognized, the Court has authority to adopt a remedial plan *if* the Legislature is unable to do so in the time

allotted or *if* it adopts a plan that either fails to remedy a constitutional violation or is itself unlawful. *See McGhee v. Granville Cnty., N.C.*, 860 F.2d 110, 115 (4th Cir. 1988); *Smith v. Beasley*, 946 F. Supp. 1174, 1212–13 (D.S.C. 1996); *see also Harris v. McRory*, No. 1:13-cv-949, 2016 WL 3129213, at *2 (M.D.N.C. June 2, 2016).

875.    "In fashioning a reapportionment plan or in choosing among plans, a district court should not . . . 'intrude upon state policy any more than necessary.'" *Upham*, 456 U.S. at 41–42 (citation omitted). To avoid "otherwise standardless decisions," a court, "'as a general rule, should be guided by the legislative policies underlying' a state plan—even one that was itself unenforceable—'to the extent those policies do not lead to violations of the Constitution or the Voting Rights Act.'" *Perez*, 132 S. Ct. at 941 (citations omitted) (emphasis added). Because "[r]elief in redistricting cases is 'fashioned in the light of well-known principles of equity,'" "[a] district court must undertake an 'equitable weighing process' to select a fitting remedy for the legal violations it has identified, taking account of 'what is necessary, what is fair, and what is workable.'" *North Carolina v. Covington*, 137 S. Ct. 1624, 1625 (2017).

876.    Notwithstanding, if this Court must adopt a remedial plan to cure intentional racial discrimination because the General Assembly fails to do so, its remedial power is broad. *See Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 465–66, 471, 487 (1982) (permanently enjoining a statewide initiative that was formulated with racially discriminatory intent)). To be sure, "[a]n official action . . . taken for the purpose of discriminating . . . on account of . . . race has no legitimacy at all." *City of Richmond v. United States*, 422 U.S. 358, 378 (1975). As the Fourth Circuit explained, "the remedy for a [constitutional violation] must completely cure the harm wrought," and "laws passed with discriminatory intent inflict a broader injury and cannot stand." *N. Carolina State Conf. of NAACP v. McCrory*, 831 F.3d 204, 240 (4th

Cir. 2016), *cert. denied sub nom. North Carolina v. N. Carolina State Conf. of NAACP*, 137 S. Ct. 1399 (2017). Further, as the Supreme Court has explained, once a court finds intentional racial discrimination, the constitutional violator is "clearly charged with the affirmative duty to take whatever steps might be necessary to" ensure that the "racial discrimination [is] eliminated root and branch." *Green v. Cnty. Sch. Bd. of New Kent Cnty.,* 391 U.S. 430, 437–38 (1968).

877.     A remedy in a racial gerrymander and intentional racial discrimination case need also not be limited to changes in the challenged districts' boundaries. *See Harris v. McCrory*, No. 1:13-cv-949, 2016 WL 3129213, at *2 (M.D.N.C. June 2, 2016), *aff'd sub nom. Harris v. Cooper*, 138 S. Ct. 2711 (2018) ("[A]lthough the defendants contend that this Court's review is limited to whether the new Congressional Districts . . . pass constitutional muster, precedent suggests that we have a responsibility to review the plan as a whole."). The case law is mindful that "[d]istricts share borders." *Bethune-Hill v. Va. State Bd. of Elections*, 137 S. Ct. 788, 800 (2017). The Court is therefore "not precluded from authorizing a final judgment . . . that requires adjusting the boundaries of other districts," including unchallenged ones, "to the extent that doing so is required to redress the [] Plaintiffs' injuries . . . ." *League of United Latin Am. Citizens v. Abbott*, No. 3:21-cv-259, 2022 WL 1631301, at *11 (W.D. Tex. May 23, 2022).

878.     Upon a finding of unconstitutional discriminatory intent, Section 3(c) of the Voting Rights Act of 1965 authorizes the Court to require preclearance of future voting changes. Section 3(c) provides, in pertinent part, that:

> in any proceeding instituted by the Attorney General or an aggrieved person under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment in any State or political subdivision the court finds that violations of the fourteenth or fifteenth amendment justifying equitable relief have occurred within the territory of such State or political subdivision, the court, in addition to such relief as it may grant, shall retain jurisdiction for such period as it may deem appropriate and during such period no [voting change] different from that in force or effect at the time the proceeding was commenced shall be enforced unless and

326

until the court [or the Attorney General] finds that such [voting change] does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the voting guarantees set forth in section 10303(f)(2) of this title ... .

52 U.S.C. § 10302(c) (emphasis added.).

879.    Accordingly, this Court has the authority to issue an order pursuant to Section 3(c) of the Voting Rights Act, 52 U.S.C. § 10302(c).  Plaintiffs here are "aggrieved person[s]" who sued "to enforce the voting guarantees of the fourteenth or fifteenth amendment." *Id.*  In addition, "violations" of those constitutional provisions "justifying equitable relief have occurred within" South Carolina.  *Id.*  As such, the prerequisites to Section 3(c) "bail-in" relief have been met for this court to retain jurisdiction over this action and require South Carolina to obtain preclearance, for a necessary and appropriate period of time, from this Court or the U.S. Department of Justice for potentially any and all future changes in voting law impacting congressional redistricting consistent with Plaintiffs' prayer for relief in their Third Amended Complaint. *Compare* ECF No. 267 at 49 *with* Final Judgment and Order of Injunction, *Patino v. Pasadena*, No. 4:14-cv-03241, ECF. No. 162 at *3–5 (S.D. Tex. Jan. 16, 2017) (the trial court requiring the City of Pasadena, Texas to seek 3(c) review to any change to its election map or plan until June 30, 2023); *see also Jeffers v. Clinton*, 740 F. Supp. 585, 591–92 (E.D. Ark. 1990); *Brown v. Bd. of Sch. Comm'rs*, 542 F. Supp. 1078, 1101–03 (S.D. Ala. 1982).

880.    Plaintiffs brought this lawsuit under 42 U.S.C. § 1983, and prevailing parties in § 1983 actions ought to "ordinarily recover an attorney's fee . . . ."  *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983) (internal quotation marks and citation omitted).  Prevailing parties are also entitled to recover their expert fees.  *See* 42 U.S.C. § 19731(e).  Plaintiffs are therefore entitled to recover attorney's and expert fees.

881.    Plaintiffs who sue and prevail in actions under § 1983 also "are entitled to

recover reasonable court costs and expenses related to successful litigation." *Glidewell v. City of Greenville*, No. 09-cv-1932, 2012 WL 13124682, at *2 (D.S.C. Feb. 23, 2012); *see also Daly v. Hill*, 790 F.2d 1071, 1084 (4th Cir. 1986). As prevailing parties, Plaintiffs in this case are also entitled to recover reasonable court costs.

Dated:  February 3, 2023

Respectfully Submitted,

Leah C. Aden**
Stuart Naifeh**
Raymond Audain**
John S. Cusick**
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector St, 5th Fl.
NY, NY 10006
Tel.: (212) 965-7715
laden@naacpldf.org

/s/ *Santino Coleman*
Santino Coleman*** Fed. ID. 11914
Antonio L. Ingram II**
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
700 14th St, Ste. 600
Washington, D.C. 20005
Tel.: (202) 682-1300
scoleman@naacpldf.org
aingram@naacpldf.org

Adriel I. Cepeda Derieux**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: (212) 549-2500
acepedaderieux@aclu.org

John A. Freedman**
Elisabeth S. Theodore*
Gina M. Colarusso**
John M. Hindley**
ARNOLD & PORTER KAYE SCHOLER
LLP
601 Massachusetts Ave., N.W.
Washington, D.C. 20001
Tel: (202) 942-5000
john.freedman@arnoldporter.com

* *Motion for admission Pro Hac Vice*

Allen Chaney, Fed. ID 13181
AMERICAN CIVIL LIBERTIES UNION
OF SOUTH CAROLINA
Charleston, SC 29413-0998
Tel.: (843) 282-7953
Fax: (843) 720-1428
achaney@aclusc.org

Christopher J. Bryant, Fed. ID 12538
BRYANT LEGAL, LLC
126 W. Henrietta St.
Baltimore, MD 21230
Tel.: (843) 779-5444
chris@bryant.legal.com

Patricia Yan**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th St., NW
Washington, DC 20005
Tel.: (202) 457-0800
strivedi@aclu.org

Jeffrey A. Fuisz**
Paula Ramer**
Andrew Hirschel**
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
Tel: (212) 836-8000
jeffrey.fuisz@arnoldporter.com

Sarah Gryll**
ARNOLD & PORTER KAYE SCHOLER LLP
70 West Madison Street, Suite 4200
Chicago, IL 60602-4231
Tel: (312) 583-2300
sarah.gryll@arnoldporter.com

*Counsel for Plaintiffs the South Carolina
Conference of the NAACP and Taiwan Scott*

*forthcoming*
*\*\* Admitted Pro Hac Vice*
*\*\*\* Mailing address only (working*
*remotely from South Carolina)*

Janette M. Louard*
Anthony P. Ashton*
Anna Kathryn Barnes**
NAACP OFFICE OF THE GENERAL
COUNSEL
4805 Mount Hope Drive
Baltimore, MD 21215
Tel: (410) 580-5777
jlouard@naacpnet.org

\* Motion for admission *Pro Hac Vice*
forthcoming
\*\* Admitted *Pro Hac Vice*

*Counsel for Plaintiff the South Carolina*
*Conference of the NAACP*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on February 3, 2023, a true and correct copy of the foregoing was

served on all counsel of record by electronic mail.

/s/ *Santino Coleman*
Santino Coleman*** Fed. ID. 11914
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
700 14th St, Ste. 600
Washington, D.C. 20005
Tel.: (202) 682-1300
scoleman@naacpldf.org

*Counsel for Plaintiffs the South Carolina*
*Conference of the NAACP and Taiwan Scott*

*** *Mailing address only (working remotely*
*from South Carolina)*