# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
### COLUMBIA DIVISION

| | |
|---|---|
| THE SOUTH CAROLINA STATE CONFERENCE OF THE NAACP, and<br><br>TAIWAN SCOTT, on behalf of himself and all other similarly situated persons,<br><br>   Plaintiffs,<br><br>  v.<br><br>THOMAS C. ALEXANDER, in his official capacity as President of the Senate; LUKE A. RANKIN, in his official capacity as Chairman of the Senate Judiciary Committee; JAMES H. LUCAS, in his official capacity as Speaker of the House of Representatives; CHRIS MURPHY, in his official capacity as Chairman of the House of Representatives Judiciary Committee; WALLACE H. JORDAN, in his official capacity as Chairman of the House of Representatives Elections Law Subcommittee; HOWARD KNAPP, in his official capacity as interim Executive Director of the South Carolina State Election Commission; JOHN WELLS, Chair, JOANNE DAY, CLIFFORD J. EDLER, LINDA MCCALL, and SCOTT MOSELEY, in their official capacities as members of the South Carolina Election Commission,<br><br>   Defendants. | **Case No. 3:21-cv-03302-MGL-TJH-RMG**<br><br>**THREE-JUDGE PANEL**<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR STAY PENDING APPEAL** |

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................... 1

BACKGROUND ..................................................................................................................... 2

ARGUMENT ........................................................................................................................... 4

I.        Defendants Cannot Demonstrate Irreparable Harm. ..................................................... 5

II.      Other Equitable Factors Weigh Against A Stay. ........................................................... 9

      A.     Plaintiffs have been subjected to a racial target and are suffering an ongoing constitutional violation. ............................................................................................. 9

      B.     Public interest favors drawing a remedial map and a fair election. ...................... 10

III.     Defendants Are Unlikely to Prevail on Appeal. ......................................................... 10

      A.     The Court correctly determined Plaintiffs did not have to introduce an "alternative map" that entrenched a "6-1" partisan split. ......................................................... 11

      B.     The Court correctly found that race predominated in CD 1's design. .................. 15

            1.     The Court correctly found that Plaintiffs disentangled race from partisanship. .................................................................................................. 15

            2.     The Court correctly found Defendants subordinated traditional redistricting principles to racial considerations in CD 1 .......................... 19

            3.     The Court properly considered District 1 as a whole. ............................. 24

      C.     The Court assumed the General Assembly's "good faith," but in CD 1 the presumption yielded to the evidence. ................................................................... 27

      D.     The Court's finding of a racial target of 17% BVAP in CD 1 has robust support in the record. ............................................................................................................ 29

      E.     The Court did not err in finding intentional racial discrimination ....................... 32

CONCLUSION ...................................................................................................................... 35

# INTRODUCTION

Defendants[1] contend that the unanimous Court's decision "threatens" them with irreparable injury, ECF No. 495 ("Stay Mot.") at 24, even though the decision imposes no immediate obligations on Defendants. Any harm that may arise from the Court's ruling lies in the distant future, and Defendants do not come close to meeting "the exacting standards" warranted to stay the Court's judgment. *Condon v. Haley*, 21 F. Supp. 3d 572, 587 (D.S.C. 2014). By contrast, Plaintiff Taiwan Scott and Plaintiff South Carolina NAACP members living in Congressional District ("CD") 1—along with *every* CD 1 voter—have already been subject to an election in 2022 under an unconstitutionally enacted plan, and Defendants' effort to delay plans for a potential remedy, in case the decision is affirmed, threaten that same prospect for 2024 as well. The public interest thus favors continuing the remedial process so that Defendants can promptly implement constitutional districts if the U.S. Supreme Court affirms. And it is likely to do so. On the merits, this Court's careful and succinct factual findings that race predominated in CD 1's drawing and that the General Assembly intentionally discriminated in that district's design have strong support in the record. Indeed, there is extensive additional trial-record evidence that supports the findings beyond what the Court cited—and the Court's findings are not clearly erroneous.

None of the factors for a stay pending appeal lean Defendants' way, so their motion should be denied. *See Nken v. Holder*, 556 U.S. 418, 434 (2009).

---

[1] Election Commission Defendants have not joined in House and Senate Defendants' arguments that the latter have made a strong showing that they are likely to succeed on appeal. Stay Mot. at 1 n.1. Election Commission Defendants join in the motion in so far as they contend the other three stay factor requirements are met, *i.e.*, Defendants will suffer irreparable harm, as will other parties in the case, absent a stay, and that a stay is in the public interest. *Id.*

# BACKGROUND

After an eight-day trial, during which this Court received testimony from 24 witnesses, including six experts, and accepted into evidence hundreds of exhibits, this Court unanimously ruled that Defendants' design of CD 1 is a racial gerrymander and intentionally discriminates against Black voters in Charleston County. ECF No. 493 ("Op.") at 29–30.

The Court based these findings, in part, on the testimony of Plaintiffs' expert witnesses, including Dr. Jordan Ragusa's analysis that a precinct's racial makeup "was a stronger predictor of whether it was removed from [CD] 1 than its partisan composition." *Id.* at 19. It rejected Defendants' sole expert Sean Trende's "testimony and reports regarding" CD 1 as "unpersuasive." *Id.* at 20. And it further grounded its CD 1 findings on testimonial admissions from Defendants' main witnesses. These witnesses included: Will Roberts, whom Defendants touted as "the Senate cartographer who drew the enacted plan," Tr. Vol. I (Defs.' Opening) at 72:18–20:18–19; and Senator Chip Campsen, who "sponsored the enacted plan in the Senate," was its primary author, *id.* at 77; Tr. Vol. VII (Campsen) at 1839:21–24, and was the person from whom Mr. Roberts took his direction in drawing the enacted plan, Tr. Vol. VI (Roberts) at 1428:23–1429:23.

The Court's decision properly finds that Mr. Roberts carried out Senator Campsen's wishes by moving 30,000 African Americans in Charleston County alone—62% of the Black residents of CD 1—from CD 1 to CD 6 (Op. at 14–15), with the "percentage of African Americans in Charleston County in [CD] 1 [falling] from 19.8% at the time of the enactment of the 2011 plan to 10.3% in the 2022 plan," *id.* As the Court recognized, Mr. Roberts achieved this in part "by moving ten of the eleven VTDs with an African American population of 1,000 persons or greater out of [CD] 1, which included a move of over 11,300 African Americans from North Charleston and nearly 17,000 from the St. Andrews area" in Charleston County. *Id.* at 14. He did this despite being unable to name any shared "community of interest the residents of North Charleston would

2

have with the residents" of CD 6 in Columbia, other than "their common proximity to Interstate I-26, albeit over 100 miles apart." *Id.* at 14. The Court found it was "more than a coincidence" that despite moving more than 140,000 people out of CD 1, Roberts's plan produced an identical African American population in the 2022 plan of 17.8%," *i.e.*, nearly the same African American population present in the 2011 plan using 2020 census data. *Id.* at 16. Mr. Roberts himself did not deny that the shift of the CD 6 boundary line in the enacted plan "followed the migration of African Americans from the city of Charleston to North Charleston." Tr. Vol. VI (Roberts) at 1554:18–22. As the panel found, Senator Campsen's goals, which Mr. Roberts implemented, included keeping all of Beaufort and Berkeley Counties and a significant portion of Dorchester County in CD 1, as well as a 17% Black Voting Age Population ("BVAP") target. Op. at 11–12.

Other evidence in the record speaks to Mr. Roberts's use of race to accomplish Senator Campsen's goals, including his testimony that BVAP data was "displayed in the statistics at the bottom of the screen the entire time" he was drawing the map, and as he moved district lines, he and other staff in the room "could see on the statistics what the overall district BVAP would be." Tr. Vol. VI (Roberts) at 1502:7–18. Roberts admitted that he always checked BVAP again after finalizing a draft and presenting it to legislative counsel Charles Terreni, who would explicitly ask for BVAP data, Tr. Vol. VI (Roberts) at 1528:1–7, and Terreni consistently looked "at the racial impact of different permutations of different plans" along with Senate redistricting staff when the team was drawing maps. *See, e.g.*, ECF 462-5, Terreni Dep. Tr. at 195:25–197:6, 302:25–303:25.

Accordingly, this Court found that "race was the predominant motivating factor in the General Assembly's design of [CD] 1 and that traditional districting principles were subordinated to race." Op. at 20. The Court enjoined further elections in CD 1 "[u]ntil a legally compliant remedial plan is adopted" but allowed Defendants an "opportunity to submit a remedial plan to the

Court on or before March 31, 2023." *Id.* at 30–31. The next primary and general elections will not occur until the first half of 2024 and November 5, 2024, respectively.

## ARGUMENT

A stay pending appeal is "extraordinary relief," and requires the movant to meet a "heavy burden." *Winston-Salem/Forsyth Cnty. Bd. of Educ. v. Scott*, 404 U.S. 1221, 1231 (1971) (Burger, C.J., in chambers). "[T]he applicant must . . . show[] not only that the judgment of the lower court was erroneous on the merits, but also that the applicant will suffer irreparable injury if the judgment is not stayed pending his appeal." *Williams v. Zbaraz*, 442 U.S. 1309, 1311 (1979) (quoting *Whalen v. Roe*, 423 U.S. 1313, 1316 (1975) (Marshall, J., in chambers)). To determine whether to grant a stay pending appeal, the Court considers: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken*, 556 U.S. at 434 (citation omitted).

Defendants cannot justify "an intrusion into the ordinary processes of administration and judicial review." *Kentucky v. Biden*, 23 F.4th 585, 593 (6th Cir. 2022) (quotations omitted). First, they face no irreparable harm absent a stay: no congressional election will occur until 2024, which leaves plenty of time for the appellate process to play out. In the interim, the only practical effect of the panel's order is to provide Defendants an "opportunity," but no mandate, "to submit a remedial plan to the [panel] on or before March 31, 2023." Op. at 30. Second, Defendants have scant likelihood of successfully upending this Court's well-reasoned, highly fact-dependent determination, which faithfully applied existing precedent. Their motion should be denied for this reason alone. Third, as this Court held, Plaintiffs suffer "serious ongoing constitutional injury,"

due to Defendants' decision to use unlawful racial targeting during redistricting. *Id.* at 31. And finally, the public interest favors an expeditious remedy to the constitutional violations, such that the next congressional election in 2024 will can occur using district lines that do not racially discriminate and that do not face a manufactured time crunch to devise new maps.

## I.    Defendants Cannot Demonstrate Irreparable Harm.

Defendants cannot show that irreparable harm will follow if they comply with this Court's ruling, and their three-week delay in filing this motion belies their claimed irreparable harm. South Carolina's primary candidate filing deadline is over 12 months away; and the next general election in the enjoined district is more than 21 months away.[2] On this timeline, Defendants have not suffered injury because the Court's injunction will have no irreparable effect until an election occurs, leaving plenty of time for the appellate and remedial process to play out. Defendants can submit maps to the Court, the Court can enter judgment, and an appeal can proceed—all without staying the injunction.

While the unanimous panel enjoined elections from taking place in CD 1 under the current map, that injunction will have no effect, much less irreparable, on any election until mid-2024. For that reason, the notion that Defendants have been or imminently will be prevented from "'effectuating statutes enacted by [elected] representatives,'" is inapposite. Stay Mot. at 24 (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)). If Defendants timely file their jurisdictional statement in the Supreme Court, the Court will decide whether to summarily affirm or order briefing and argument this spring. If the Supreme Court opts not to summarily affirm, under the normal schedule, the Court will set argument for fall 2023 and could issue a decision as soon as December 2023 or early 2024. If it reverses, Defendants

---

[2] The 2024 election calendar has not been released so these dates are estimates based on past cycles.

have ample time to implement the enacted plan for 2024 elections, just as it already did in 2022 elections.

Nor has the Court yet ordered a remedy or entered final judgment. It allows that the General Assembly "may present the Court with a remedial map for consideration on or before March 31, 2023." Op. at 32. The Court's order does not require Defendants to legislatively enact or implement a new Congressional map by March 31, 2023. It does not direct that a special election take place or even suggest the possibility of one. Contrary to Defendants' claim, Stay Mot. at 25, Plaintiffs are not seeking a special election for CD 1 prior to 2024 elections. Defendants proffer a speculative course of events that cannot constitute imminent, irreparable harm. *See Nken*, 556 U.S. at 434–35 ("possibility of irreparable injury" insufficient to satisfy stay standard); *In re Revel AC, Inc.*, 802 F.3d 558, 571 (3d Cir. 2015) ("To establish irreparable harm, a stay movant must demonstrate an injury that is neither remote nor speculative, but actual and imminent.").

On these facts, merely *submitting* a remedial plan to the Court, if Defendants so chose, does not constitute *irreparable* harm. The General Assembly is in session and has the staff and technology needed to draft redistricting maps. This Court held that "a constitutionally compliant plan for Congressional District No. 1 can be designed without undue difficulty," Op. at 30, and Defendants do not offer any evidence refuting that conclusion. Moreover, some South Carolina legislative leaders have publicly stated that they will not redraw the enacted plan unless the Supreme Court orders them to do so, meaning that even if the *opportunity* to redraw a map could constitute legally cognizable "injury" (and it cannot), Defendants face no injury at all from the injunction, much less irreparable injury. Senate Majority Leader Shane Massey, who testified for

Defendants at trial, was clear: "[w]e don't need to draw anything until five members of the (U.S.) Supreme Court say we have to."[3]

In addition, Defendants inaccurately claim that "absent a stay, the Supreme Court could be faced with undoing any court-ordered remedial map." Stay Mot. at 26. It is not clear what this means when there are no elections until 2024 and no requirement to implement any proposed remedial maps before the Supreme Court's merits ruling. If the Supreme Court reverses, there will be nothing to "undo"—the 2024 elections will proceed under the old map.

As to Defendants' suggestion that the risk of voter confusion or logistical challenges in 2024 congressional elections cuts in favor of a stay, Stay Mot. at 26–27, the opposite is true. Remedial proceedings can well continue apace while Defendants appeal to the Supreme Court in the ordinary course. If that Court reverses, then voters will never vote under a remedial map and election officials will conduct elections under the same map as they did in 2022.

Plaintiffs, by contrast, risk serious irreparable harm if the remedial process does not proceed. South Carolina Election Commission Executive Director Howard Knapp testified at his 30(b)(6) deposition that it would take three to five months to implement and administer new state House maps (with up to 124 districts), *see* Pls.' Proposed Findings of Fact & Concl. of Law ("Pls.' Findings"), ECF 451-6 ¶ 865; so doing so for substantially fewer congressional districts should take even less time. But if the Supreme Court affirms and no work has been done on a remedial process, Defendants are likely to argue that it is too late under the *Purcell* doctrine to draw and

---

[3] Associated Press, *Abortion a Surprise Focus of the South Carolina Legislature*, U.S. News and World Report. (Jan. 10, 2023), https://www.usnews.com/news/best-states/south-carolina/articles/2023-01-10/abortion-a-surprise-focus-of-the-south-carolina-legislature.

implement a new map in time for the 2024 elections. *See, e.g.*, *Purcell v. Gonzalez*, 549 U.S. 1, 4–6 (2006) (per curiam).

Staying the remedial process risks subjecting Plaintiffs (and other South Carolinians) to a second election cycle under unconstitutional, racially gerrymandered and intentionally discriminatory lines—a clear irreparable injury. The remedial process must run parallel with any appellate process so that the Election Commission Defendants have sufficient time to implement any redrawn district lines in 2024.

These considerations—the outsize risks to voters on the one hand if work on a new map is postponed indefinitely, compared with the ease of snapping back to the old, existing map on the other—are why courts routinely refuse to stay the remedial process after striking down an unconstitutional map. If a stay issues but the Supreme Court affirms this Court's order, "the [State] would [] have to . . . rush to redraw districts at a much higher risk of error or be forced to hold another election under an unconstitutional plan." *Personhuballah v. Alcorn*, 155 F. Supp. 3d 552, 560 (E.D. Va. 2016). "By adopting a remedy now, [South Carolina] faces the lesser evil" of proposing new districts "at a time when it remains a relatively manageable risk." *Id.* If the Supreme Court reverses, the state "need only revert" to current voted-on districts, "a much less daunting challenge."[4]  *Id.*

Put simply—and as many other cases suggest—the remedial process should be allowed to play out during the appeals process. *See Cooper*, 577 U.S. 1129 (2016) (denying stay).[5]

---

[4] *See also Common Cause v. Rucho*, 284 F. Supp. 3d 780, 786 (M.D.N.C. 2018) ("[T]he timeline for drawing a new districting plan established by this Court's order—which requires the General Assembly to adopt a new districting plan before the candidate filing period *begins* and *months before* the primary and general elections—minimizes any harm to state interests.").

[5] *See also United States v. Hays*, 515 U.S. 737, 742 (1995); *McDaniel v. Sanchez*, 452 U.S. 130, 136 (1981); *Roman v. Sincock*, 377 U.S. 695, 703 (1964); *Wilson v. Minor*, 220 F.3d 1297, 1301 n.8 (11th Cir. 2000); *Larios v. Cox*, 305 F. Supp. 2d 1335, 1136–37 (N.D. Ga. 2004).

**II.    Other Equitable Factors Weigh Against A Stay.**

    **A.    Plaintiffs have been subjected to a racial target and are suffering an ongoing constitutional violation.**

After carefully weighing the totality of the evidence and dozens of witnesses' credibility, the Court found that "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Miller v. Johnson*, 515 U.S. 900, 916 (1995).  Defendants racially gerrymandered Charleston County by moving over 30,000 African American individuals from their home district and making a "mockery of the traditional districting principal of constituent consistency."  Op. at 11–12, 15, 20.  Defendants did so to achieve a target of a 17% BVAP in CD 1.  The record strongly supports that finding:  in response to the Court's questions, Mr. Roberts admitted the enacted map abandoned his "least change" approach and made "dramatic changes" that "created tremendous disparity" in Charleston.  *Id.* at 13–14.  It moved 62% of the Black residents formerly assigned to CD 1 to CD 6, "bleaching" Black voters out of the Charleston County portion of CD 1 to achieve the racial target.  *Id.* at 14–15.  The Court found striking evidence that CD 1 voters were unconstitutionally sorted on the basis of race.  *Id.*  Granting a stay would perpetuate the ongoing harm caused by these illegal actions, delay the implementation of a legally compliant plan, and irreparably harm Plaintiffs and the public.

    "Infringing constitutional rights generally constitutes irreparable harm . . . ."  *Gimmett v. Freeman*, No. 22-1844, 2022 WL 3696689, at *2 (4th Cir. Aug. 25, 2022); *Leaders of a Beautiful Struggle v. Balt. Police Dept.*, 2 F. 4th 330, 346 (4th Cir. 2021) (en banc) ("the loss of constitutional freedoms 'for even minimal periods of time, unquestionably constitutes irreparable injury'") (quoting *Mills v. Dist. of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) and *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).  And "[u]ntil a legally compliant remedial plan is adopted,

Plaintiffs will continue to experience this serious ongoing constitutional injury." *Gimmett*, 2022 WL 3696689, at *2.

> **B.    Public interest favors drawing a remedial map and a fair election.**

The public interest also weighs heavily against a stay.  The Court has already recognized that "an injunction best serves the public interest."  Op. at 31.  Moreover, when a legislature impermissibly uses race to draw congressional districts, the public interest "militates against staying implementation of a remedy."  *Personhuballah*, 155 F.3d at 560.  That follows because the harms are necessarily "harms to *every voter*" in the racially gerrymandered district, all of whom have been duly injured by improper racial sorting.  *Id.* at 560–61 (emphasis added).  As the Court found, "[u]ntil a legally compliant remedial plan is adopted, Plaintiffs will continue to experience this serious ongoing constitutional injury."  Op. at 31.

The court in *Harris v. McCrory* denied a similar stay motion upon finding that, *inter alia*, the harms to the state are public harms, and "[t]he public has an interest in having congressional representatives elected in accordance with the Constitution."  2016 WL 6920368, at *2 (M.D.N.C. Feb. 9, 2016).  So did the court in *Personhuballah.*  155 F. Supp. 3d at 560–61 (harms to plaintiffs also are harms to every voter in the unconstitutional racially gerrymandered district); *see also Reynolds v. Sims*, 377 U.S. 533, 585 (1964) ("[o]nce a State's legislative apportionment scheme has been found to be unconstitutional, it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan.").  As described in Part I *supra*, arguments about disruption and confusion are misplaced because no congressional primary or general election will occur until 2024.

## III.    Defendants Are Unlikely to Prevail on Appeal.

Defendants cannot meet their burden to show there is "a fair prospect that a majority of the [Supreme] Court will vote to reverse the judgment below."  *Hollingsworth v. Perry*, 558 U.S. 183,

190 (2010) (per curiam). The Court built its ruling on a series of sound factual findings and credibility determinations that are not only supported by the record, but also are subject to "clear error" review. *See Easley v. Cromartie*, 532 U.S. 234, 242 (2001). Defendants' scattershot approach, challenging most of the Court's factual findings, reveals their lack of a cogent, meritorious argument. They do not come close to identifying clear error, which is reserved for when "the entire evidence . . . [leaves] the definite and firm conviction that a mistake has been committed." *Id.* (quotations omitted). Starting from a strong factual foundation, the Court straightforwardly applied relevant and governing precedent.

### A. The Court correctly determined Plaintiffs did not have to introduce an "alternative map" that entrenched a "6-1" partisan split.

Defendants are incorrect that the Court "disregarded" an "alternative map requirement," because there is no such requirement under controlling precedent. Stay Mot. at 3–4. As the Court correctly recognized, the Supreme Court held in *Cooper* that "neither [the] presence nor [] absence" of an alternative map can "itself resolve a racial gerrymandering claim." Op. at 30 (citing *Cooper*, 137 S. Ct. at 1479). This Court then that found the weight of the "totality of the evidence in the record and credibility of witnesses" supports the Court's finding that CD 1 is a racial gerrymander. *Id.* at 20. "When plaintiffs meet their burden of showing" lawmakers aimed to "suppress the electoral power of minority voters," there is no need for "additional—and unique evidentiary hurdles." *Cooper*, 137 S. Ct. at 1480 n.15.

An alternative map provides one of many types of evidentiary tools that can show racial predominance, including in cases where defendants assert a partisanship defense. *Id.* But a map "showing that the legislature had the capacity to accomplish [] its partisan goals without moving so many members of a minority group . . . . is not required if a plaintiff has other evidence to resolve the race versus politics question." *Jacksonville Branch of NAACP v. City of Jacksonville*,

--- F. Supp. 3d ---, No. 3:22-CV-493-MMH-LLL, 2022 WL 7089087, at *7 (M.D. Fla. Oct. 12, 2022), *denying stay pending appeal*, No. 22-13544, 2022 WL 16754389 (11th Cir. Nov. 7, 2022). As a result, courts have rejected an alternative-partisan-map requirement where "the evidence makes abundantly clear that race, although generally highly correlative with politics, did indeed predominate in the redistricting process." *Harris v. McCrory*, 159 F. Supp. 3d 600, 621 (M.D.N.C. 2016), *aff'd sub nom. Cooper v. Harris*, 581 U.S. 285 (2017); *Jacksonville Branch of NAACP*, 2022 WL 7089087, at *7.

This is not a case like *Easley v. Cromartie*, 532 U.S. 234 (2001), where Plaintiffs had "meager direct evidence of a racial gerrymander and need[ed] to rely on evidence of forgone alternatives." Stay Mot. at 4 (quoting *Cooper*, 581 U.S. at 322). The Court's conclusion cited, and was entirely consistent with, the extensive testimony and expert analyses Plaintiffs presented, which not only provided ample direct and circumstantial evidence of racial targeting and gerrymandering, but also disentangled the racial from the partisan component of the map drawing.

For starters, Dr. Imai presented separate simulations focused exclusively on redrawing the CD 1/CD 6 border and a separate analysis focused on redrawing the CD 1/CD 6 border **in Charleston County.** *See* Op. at 17–18 (relying on Dr. Imai). Those simulations allowed Dr. Imai to determine "whether and to what extent the inclusion or exclusion of Black voters" in those two districts "played a role in determining [their] boundary." PX No. 32 at 3. They showed that the enacted plan's treatment of CD 1 was an extreme outlier, producing a BVAP 5.8% lower than his average simulation, and that the enacted plan assigned almost 10,000 fewer Black Charleston County voters to CD 1 than the average plan. Pls.' Findings, ECF No. 482 at 174–182. Dr. Imai's compelling evidence was sound, and the weight the Court gave it cannot be clear error. *See*

*Hendricks v. Cent. Rsrv. Life Ins. Co.*, 39 F.3d 507, 513 (4th Cir. 1994) ("Evaluating the credibility of experts and the value of their opinions is a function . . . to which appellate courts must defer.").

Dr. Ragusa in turn presented a specific analysis that looked at precincts kept in, moved in, and moved out of CD 1 by using methodology that, among other places, formed a significant part of the plaintiffs' proof in *Cooper*. *See* 137 S. Ct. 1455, 1477–78 (2017) (citing analysis of Dr. Stephen Ansolabehere). Dr. Ragusa then performed a multivariate logistical regression to control for party strength, demonstrating that Black voters were "significantly more likely to be moved out of CD 1" and "significantly less likely to be moved into CD 1" and these trends "cannot be explained away as a proxy effect of partisanship." Pls.' Findings, ECF No. 482 at 192–95. As the Court acknowledged, that finding could "[]not be explained away as a proxy effect of partisanship." *Id.*; *see also* Op. at 18–19. While Defendants rehash the same arguments about Dr. Ragusa from their unsuccessful pretrial motions, *compare* Op. at 9 *with* ECF 346 & 323 at 19, they ignore that Dr. Ragusa's methodology to disentangle race from politics is well-accepted and favorably cited by the Supreme Court in *Cooper*. Moreover, Defendants' arguments about "contiguity" and "core retention" (Stay Mot. at 9) make no sense as applied to Charleston County or CD 1, in light of enacted plan's lines through Charleston County, which resulted in a district that had a radically lower level of "core retention" for Black as compared to white Charleston County residents. *See, e.g.*, Pls.' Findings, ECF No. 482 ¶¶ 329, 610(e), 63(f).

Under clear error review, the Court's findings regarding the Plaintiffs' disentanglement of race from partisanship must be upheld so long as "plausible" in light of the *entire* record. *See United States v. Patterson*, 957 F.3d 426, 435 (4th Cir. 2021); *see also Anderson*, 470 U.S. at 573–74 (clear error asks whether "the district court's account of the evidence is plausible in light of the record viewed in its entirety"). In addition to the analyses of Drs. Imai and Ragusa cited by the

Court, Dr. Baodong Liu presented two distinct analyses that assessed the relative importance of partisanship and race. In one, he looked at each VTD that was moved into, retained, or moved out of CD 1 and found that the movement of Black Democrats differed significantly from the movement of white Democrats under the enacted plan. Pls.' Findings, ECF No. 482 at 187–188. Dr. Liu also conducted a verification study using Dr. Ansolabehere's *Cooper*-credited methodology and confirmed those findings. *Id.* at 189–190.

In short, Defendants badly misstate the trial record when they say that Plaintiffs failed "to disentangle race from politics." Stay Mot. at 9–10; *see also infra* Part III.B. Plaintiffs made disentangling partisanship from race a central focus of their expert trial presentation and established that race predominated in drawing the CD 1 line.

Defendants also misstate the law when they claim that because they did not ensure CD 1 remained firmly and indefinitely locked in for a Republican incumbent, "Plaintiffs' proposed alternative plans are not as 'consistent with traditional districting principles' as the Enacted Plan." Stay Mot. at 4. To start, entrenching partisan advantage is not a traditional districting principle— even if not constitutionally offensive. *See Rucho v. Common Cause*, 139 S. Ct. 2484, 2506, 2507 (2019). Moreover, because Plaintiffs proved that Defendants illegally considered race, the possibility that Defendants' plan also achieved partisan goals is not a *defense*. Defendants may propose a remedial map that achieves their partisan goals without illegally considering race, but it is not Plaintiffs' burden to do that for them.

As described *infra*, the Court identified multiple sources of direct and circumstantial evidence that proved Defendants used "race as their predominant districting criterion" even if they had an "end goal of advancing their partisan interests." *Cooper*, 581 U.S. at 308. Because

14

Plaintiffs "satisfied [their] burden of debunking [Defendants'] 'it was really politics' defense; there was no need for an alternative map to do the same job." *Id.* at 322.

### B.    The Court correctly found that race predominated in CD 1's design.

This Court's ruling on racial predominance in CD 1 rests on precise factual findings and has ample support in the record.  It is unlikely to be reversed.  *See Davis v. Richmond, Fredericksburg & Potomac R.R. Co.*, 803 F.2d 1322, 1327 (4th Cir. 1986).  A "strong showing" of likely success on appeal requires Defendants to do more than "merely restate[] arguments and recite[] cases from [their] previous filings." *Rodriguez Palomo v. Howard*, No. 1:19-CV-884, 2019 WL 9633647, at *1 (M.D.N.C. Dec. 17, 2019).  But that is most of what Defendants' motion does.  Even if Defendants' position were one of the "permissible views of the evidence," which it is not, "the factfinder's choice between [permissible interpretations] cannot be clearly erroneous." *Anderson*, 470 U.S. at 574.

### 1.    The Court correctly found that Plaintiffs disentangled race from partisanship.

Contrary to Defendants' suggestion (Stay Mot. at 6–11), the Court considered and rejected the possibility that Charleston County's racialized split was an accidental byproduct of Defendants' efforts to draw lines based on voters' partisanship.  *See, e.g.*, Op. at 18–19 (finding Dr. Ragusa's report "particularly probative").  Defendants would prefer it if the Court gave greater weight to their witnesses' protestations, but as the Court explained, "a case where people admitted their racial intent" almost never exists.  *See* Tr. Vol. IX (Closing Arg.) at 2083:5–6; *id.* at 2083:6–9 ("[T]the closest I have seen [to an admission] in a long time in one of these cases is Mr. Roberts's own testimony.").  Accordingly, the Court properly credited other evidence.  And under Supreme Court precedent, the trial court's choice between two plausible accounts "can virtually never be clear error." *Anderson*, 470 U.S. at 575; *see also Ferebee*, 957 F.3d at 417 ("[T]he district court's

15

resolution of a . . . factual question that is based on evidence found credible by the district court cannot be against the 'clear weight' of the evidence.").

As discussed above and the trial record reflects, Plaintiffs presented four separate experts who presented analyses that disaggregated partisan impact from race, and Defendants presented no expert evidence to the contrary. These same experts presented numerous other analyses demonstrating that Defendants consideration of race predominated in the drawing of CD 1.

Moreover, in ruling as it did on CD 1, this Court explained why Mr. Roberts's claim that he considered only partisanship (but not race) rang "hollow." Op. at 17. On appeal, that "assessment[] of witness credibility, . . . is deserving of the highest degree of appellate deference." *United States v. Thompson*, 554 F.3d 450, 452 (4th Cir. 2009). It is also well-supported. The Court pointed to "striking evidence" that voters had been sorted on the basis of race within Charleston County, as well as Mr. Roberts's "in-depth knowledge of the racial demographics of South Carolina," which he demonstrated from the stand. Op. at 16 & n.12. And by Mr. Roberts's own admission, he knew the BVAP while drawing the map and the Senate's redistricting staff reviewed BVAP after each map was drawn. Tr. Vol. VI (Roberts) at 1502, 1528.

Defendants claim the Court erred by disregarding testimony from Senator Campsen, who also testified that he "never considered race or even reviewed racial data *during* the drawing of the Enacted Plan." Stay Mot. at 17 (emphasis added). But Senator Campsen conceded on the stand that he knew the "racial makeup" of Charleston and other coastal areas where he has lived and represents, including "where the concentrations of Black voters are," even without looking at racial data. Tr. Vol. VII (Campsen) at 1883:19–22, 1884:3–11. He also acknowledged that redistricting staff had access to racial data—in fact, he "assume[d]" that the staff would be "looking at and having discussions about BVAP" after plans were created. Tr. Vol. VII (Campsen) 1892:5–12.

Moreover, even if the Court credited Senator Campsen's testimony that he did not look at race until after the enacted plan had been drawn, he personally looked at the racial data before advocating and voting for those district lines.  Tr. Vol. VII (Campsen) 1892:5–12.  Indeed, Senator Campsen even referenced BVAP numbers (albeit misleadingly) during a Senate Redistricting Subcommittee hearing.  *See* PX No. 115 at 50:15–51:13; SDX No. 241 at 54:06–57:58 (video). Considering the record as a whole, it is not clear error to disregard self-serving denials.  *See United States v. Lattimore*, 87 F.3d 647, 650–51 (4th Cir. 1996) (courts apply "particularly strong clear error standard to factual determinations when they are based on oral testimony").

Defendants also fault the Court for not specifically addressing Senator Shane Massey's testimony as to the General Assembly's political goals.  Stay Mot. at 7. That goes nowhere: the trial "court may examine the record as a whole and need not respond to every piece of conflicting evidence."  *Holton v. City of Thomasville Sch. Dist.*, 490 F.3d 1257, 1263 (11th Cir. 2007), *as clarified on denial of reh'g*, 521 F.3d 1318 (11th Cir. 2008).  Here, Senator Massey's claim that that the General Assembly "would never have enacted" "any plan that turned District 1 into a majority-Democratic district" is simply a non-sequitur.  *See* Stay Mot. at 7.  Defendants, Plaintiffs, and members of the public presented alternatives to the enacted plan with higher BVAPs for CD 1, balanced populations, did not subordinate the General Assembly's traditional redistricting principles, and did not turn CD 1 into a "majority-Democratic district."  *Compare id.*, *with* Op. at 11; *see also* PX 120 at 3–4.

Relatedly, Defendants claim that the Court erred by not addressing a text message chain between a House member and a House staffer (HX 81), Stay Mot. at 7, where one of the individuals on the chain reported "[h]earing senate will support their plan with 531/2 CD1."  HX 81. Defendants puzzlingly suggest the text between agents of the *House* is evidence of the *Senate*'s

17

true intentions. Stay Mot. at 7. But that would be inadmissible double-hearsay: the statement that the message sender reportedly heard is an out-of-court statement, as is the text message itself. Regardless, the Court was not required to interpret HX 81 the way Defendants would like it to—nowhere does the text message convey that the Senate would "only" support a plan with "at least a forecasted 53.5% Republican vote share in District 1." *See* Stay Mot. at 7. And a single text message from a single House member about what he was "hearing" about partisan goals certainly does not establish that partisanship played a greater role in how Defendants drew CD 1 given their use of a racial target and cracking Black communities in a manner more consistent with race than partisanship.[6] Ultimately, the Court was "not obliged to recite and analyze individually each and every piece of evidence presented by the parties." *Holton*, 425 F.3d at 1354.

Second, as explained *infra*, the Court's order carefully assessed the factual evidence to "disentangle" racial motives from political ones in CD 1 line-drawing. Defendants revive numerous arguments they raised to the Court both at trial and in failed dispositive motions over the past year and a half. But "re-argu[ing] . . . the issues without [] new analysis or case citation" is not enough to show "likelihood of success on appeal." *Spirit Airlines, Inc. v. Ass'n of Flight Attendants*, No. 14-cv-10715, 2015 WL 4757106, at *2 (E.D. Mich. Aug. 12, 2015) (quotation marks omitted). And to the extent Defendants quibble with the Court's allocation of weight to specific evidence or its credibility determinations, they show little chance of success. *See Walsh v. Vinoskey*, 19 F.4th 672, 677 (4th Cir. 2021) ("[W]e may not [under clear error review] reverse the district court's conclusion—even if we may have weighed the evidence differently.").

---

[6] Defendants have also disavowed that the House played any meaningful role in the enacted plan's lines and, thus, the Court "focus[ed] its analysis on the Senate" prepared, debated, and adopted plan. Op. at 6–7.

    *2. The Court correctly found Defendants subordinated traditional redistricting principles to racial considerations in CD 1.*

This Court relied on extensive evidence—including Defendants' changes to the 2011 plan, Defendants' witnesses' testimony, and several expert analyses—to conclude that the enacted plan is "a stark racial gerrymander of Charleston County." Op. at 14. Defendants' scattershot motion nitpicks at the Court's order, but offers nothing that the unanimous Court did not already consider and reject.

For example, Defendants incorrectly argue that the Court did not consider the enacted plan's preservation of old district "cores." Stay Mot. at 11. It did. The Court just found that Defendants jettisoned that goal when drawing CD 1—particularly in the Charleston area. Op. at 13–14. And the record supports that finding. Defendants' own key witness, Mr. Roberts, admitted to making "dramatic" and unnecessary "changes" to Charleston County, contrary to Rep. James Clyburn's office's claimed preferences. *Id.* at 16–17. As a result, even Defendants' lone expert, Mr. Trende, admitted that the enacted CD 1 lost its historical "anchor," *i.e.*, core—historically, the City of Charleston. Tr. Vol. VII (Trende) at 1679:11–1680:15. And contrary to the figures Defendants wish the Court had credited (*see* Stay Mot. at 11, claiming a 92.78% CD 1 core retention rate), Defendants' own expert testified that "the Enacted Plan" at best has "82.84 core retention in District 1." SDX 75 at 18 tbl. 3; Tr. Vol. VII (Trende) at 1643:22–1644:22.[7] Thus, the enacted plan does not in fact *preserve* CD 1's core. And in any event, Defendants' claim that the enacted plan preserves *other* parts of CD 1 says nothing about the unexplained departure from core preservation as a goal in the Charleston area. *See* Stay Mot. at 11. In the end, Defendants' argument only spotlights that lines around Charleston are an outlier: core preservation was

---

[7] Defendants inexplicably present on page 12 of their brief materially *different* core preservation calculations than their expert calculated. *Compare* Stay Mot. at 12 *with* SDX 75 at 18 tbl 3.

prioritized *except* when Defendants decided to relocate Black Charleston County residents to manipulate CD 1's BVAP.

Relatedly, Defendants claim the Court erred in not considering the 2011 plan as the starting point for its enacted plan analysis. *Id.* at 11. But the Court clearly addressed the 2011 plan; the Court correctly noted that demographics and the legal landscape in 2022 were materially different. *See* Op. at 7. 10–11, 15, 20. Among other things, the Court recognized that in 2011, the General Assembly needed to keep the split of Charleston County to comply with the non-retrogression requirement of Section 5 of the Voting Rights Act—but because that principle no longer applies, the Charleston split may no longer be "legally justifiable." *Id.* at 15.

The notion that the enacted plan "improves upon" the 2011 plan's compliance with traditional redistricting principles is also misguided. Stay Mot. at 12. This Court credited the testimony of Plaintiffs' expert, Dr. Imai, who showed that the enacted map differs significantly from race-blind maps with comparable (or better) performance on traditional redistricting principles. *See* Op. at 17–18. Accordingly, compliance with traditional redistricting principles cannot explain the enacted map's allocation of "a disproportionately large number of Black voters into District 6, while assigning relative few [Black] voters to District 1." *Id.* (citing Dr. Imai's report and testimony).

Nor did the Court fail to credit evidence on CD 1 communities of interest. Stay Mot. at 12. The Court specifically found that the enacted plan failed to respect the Charleston community of interest. Op. at 14. Indeed, Defendants' own demographer and mapmaker, Mr. Roberts, admitted that Black Charlestonians have little in common with other residents of CD 6 who may live "over 100 miles apart" other than "common proximity to Interstate I-26." *Id.* at 14.

20

In conclusory terms, as they did at trial, Defendants then try to justify CD 1 by claiming "politics" as a traditional redistricting principle. Stay Mot. at 13. But even if the Court were to adopt that definition of community of interest, which it did not, there was no evidence that the relevant divisions in CD 1 occur along political lines more so than racial lines—rather Defendants' own data show that the racial disparity is greater than the political disparity, whether judged by numerical differences or ratios:[8]

| | Portion of Charleston County in Enacted CD 6 | Portion of Charleston County in Enacted CD 1 | Difference between CD 6 and CD 1 | Ratio between CD 6 and 1 |
|---|---|---|---|---|
| BVAP % | 31.2% | 10.3% | 20.9% | 3:1 |
| Democratic % | 64.6% | 49.2% | 15.4% | 4:3 |

*See* Stay Mot. at 8, 16 (citing SDX 243 and ECF No. 473).

Perhaps realizing that they cannot plausibly defend Charleston County's makeup in CD 1, as they did during trial, Defendants take credit for cherry-picked "repairs" and non-uniform, inconsistent application of traditional redistricting principles. Stay Mot. at 12–13. They emphasize that the enacted plan makes whole the Charleston Peninsula and coastal Charleston, heals a handful of precincts, and selectively follows certain rivers or creeks when splitting Charleston County. *See id.* Maybe so. But as Mr. Roberts's own testimony made clear, the Charleston community of interest is not exclusively comprised of the peninsula or coastal region— parts of Charleston County assigned to CD 6 under the enacted plan, such as Deer Park, are part of a community of interest in CD 1 as well. Tr. Vol. VI (Roberts) at 1553:23–1554:15. Defendants bizarrely then argue that *keeping* certain parts of Charleston County split advances the "maintenance of constituencies." Stay Mot. at 15. Those conflicting arguments are revealing:

---

[8] The percentages in the chart below are from Defendants' stay motion, which cites to SDX 243 and other data from the trial record, ECF No. 473. *See* Stay Mot. at 8, 16.

according to Defendants, "heads you lose, tails I win." Failing to credit Defendants' inconsistent arguments is not a clear error, nor is the Court's eminently reasonable conclusion that Defendants "subordina[ted] traditional districting principles, including maintenance of constituencies, minimizing divisions of counties, and avoidance of racial gerrymandering." Op. at 17.

Defendants also overreach by saying that the enacted plan outperforms other maps on "the traditional principle of protecting incumbents," and cites *Bush v. Vera* for the notion that locking in a "6-1 Republican-Democratic split" is a legitimate redistricting principle. Stay Mot. at 14 (citing 517 U.S. 952, 964 (1996) (plurality)). *Vera* says nothing of the sort. The portion of the opinion that Defendants cite says that "incumbency protection" can be a "legitimate state goal" "in the limited form of 'avoiding contests between incumbents.'" *Vera*, 517 U.S. at 964. That "limited form" of incumbency protection is also found in Defendants' own redistricting guidelines, which—like *Vera*—nowhere suggest that "protecting incumbents" is the same as permanent partisan entrenchment.[9] And even if *Vera* could somehow be distorted to endorse this expansive form of incumbency protection, the case then says that the use of race "as a proxy for political characteristics" triggers strict scrutiny—precisely the scenario the Court identified. *See* Op. at 20; *Vera*, 517 U.S. at 968–69; *see also Cooper*, 581 U.S. at 291 n.1.

Defendants also boldly claim the Court "is simply wrong" about the number of Black residents affected. *See* Stay Mot. at 15. There were, in fact, approximately 30,000 Black Charlestonians in 55 VTDs who were moved from CD 1 to CD 6 under the enacted plan. *See* Ex. A.[10] In asserting the Court got the math wrong, Defendants mischaracterize this Court's method

---

[9] *See* PX 175 at 3; SDX 3.

[10] This information is a list of all 55 Charleston VTDs that were moved from CD 1 to CD 6, accounting for precincts that had been split under the 2011 plan; the calculation method is consistent with what the Court described in the order. *See* Op. at 7 n.3, 14 & n.7.

of calculation. *Compare* Stay Mot. at 15 *with* Op. at 14 & n.7. But the numbers do not lie: in the 55 VTDs at issue, approximately 30,691 Black Charlestonians were moved from CD 1 to CD 6, using the "any part Black" designation; alternatively, if using the "DOJ Black" category, approximately 29,401 Black Charlestonians were so moved. *See* Ex. A. Dr. Ragusa also testified about the number of voters shifted (Tr. Vol. IV (Ragusa) at 1052–1053; ECF 446-1 at 6), and so did Dr. Duchin, (Tr. Vol. II (Duchin) at 307:11–308:25). *See generally* Pls.' Findings, ECF No. 482 at 141–142.

Defendants' speculation that the Court derived the evidence that the enacted plan moved 30,000 Black residents in Charleston County from CD 1 to CD 6 by comparing 2020 to 2010 numbers also rings hollow, Stay Mot. at 15, ignoring the Court's own description of how this number was calculated. *See* Op. at 14 & fn. 7. In any case, the Defendants are wrong: the BVAP of the Charleston County VTDs moved from CD 1 to CD 6 was over 22%, a number substantially higher (over five percentage points) than the BVAP of CD 1 under the enacted plan. *Compare* Ex. A (moved VTD BVAP was 22.1%) *with* SDX 29G (enacted map CD 1 had 16.72% BVAP). Keeping these VTDs in CD 1 would have materially increased CD 1's BVAP. Defendants then accuse the Court of failing to account for the "decrease in Charleston County's BVAP" or that the Black "population had decreased" in Charleston County. Stay Mot. at 15. But comparing 2010 and 2020 BVAP numbers is not relevant given that the total population of Charleston County swelled between 2010 and 2020.[11]

Defendants engage in similar mathematical obfuscation throughout their analysis, Stay Mot. at 14–16, switching between metrics, making mismatched comparisons between CD 1,

---

[11]   *See* U.S. Census Bureau, Quick Facts, Charleston Cnty., S.C., https://www.census.gov/quickfacts/fact/table/charlestoncountysouthcarolina,US/LND110210 (showing population of 350,209 in 2010, and 408,235 in 2020).

Charleston County, and "District 6 portions of Charleston County," and relying on voting-age percentages rather than total population figures as it suits their purposes. Yet a bottom up, VTD-by-VTD count of the 55 moved precincts confirms that the enacted plan moved 30,000 Charleston County Black residents from CD 1 to CD 6, as the Court found, primarily from areas with significant populations of Black individuals in North Charleston, Deer Park, and St. Andrews areas. *See* Exhibit A. As noted above, these VTDs had a higher BVAP than the enacted map CD 1, such that keeping these VTDs in CD 1 would have substantially raised the district's BVAP.

Defendants also challenge the Court's finding that "79% of Charleston County's African American population was placed in [CD] 6," arguing that the percentage on its own "is not probative of a racial gerrymander." Stay Mot. at 16. But the Defendants ignore that the Court and the trial testimony focused on the fact that these percentages were a "result of these changes" and demonstrated the massive shift of Black population from the 2011 plan. *See* Op. at 15; Tr. Vol. IV (Ragusa) at 1052–1053; *see also* ECF No. 446-1 at 6 (noting that the 79/21 split was a significant shift from 49/51 split under the 2011 map).

In short, Defendants have not identified any redistricting principle or substantial evidence that this Court failed to consider—let alone demonstrate that the "*clear weight* of the evidence . . . as a whole" contradicts this Court's ruling. *See United States v. Ferebee*, 957 F.3d 406, 417 (4th Cir. 2020) (quotations omitted).

### 3. The Court properly considered District 1 as a whole.

Defendants inexplicably contend that the Court failed to consider CD 1 as a whole. *See* Stay Mot. at 13–14. That is wrong for several reasons.

First, the Court discussed all relevant parts of CD 1, not just Charleston County. The findings outlined the redistricting process and how the enacted plan's "lead proponent" sought to move all of Beaufort and Berkeley Counties into CD 1, while including only a portion of

24

Dorchester County. Op. at 11–12, 20. Defendants also fail to mention that the Court meticulously discussed and considered evidence bearing on *other* parts of CD 1 that were in dispute—and ruled in *Defendants'* favor. *See id.* at 21–22 (discussing that the changes in Jasper and Dorchester Counties were not the result of unconstitutional line-drawing). And while Defendants' claim that the Court failed to consider the fact that some Black residents were moved into CD 1 from CD 6, *see* Stay Mot. at 14–16, the Court specifically explained that adding parts of Berkeley and Dorchester Counties to CD 1 significantly increased the BVAP in the district (which Defendants then offset with changes in Charleston to reach their 17% target). Op. at 13–14.

Still, Defendants complain that the Court purportedly failed to consider that, "on net," after all of those movements in CD 1, the BVAP in the district "slightly *increased*" by 0.16%. Stay Mot. at 14–15 (emphasis in original). The record says otherwise. At trial, the Court had an exchange with Mr. Roberts concerning the increase in BVAP in CD 1 compared to the 2011 plan— and the Court specifically referred to the increase as "very slight."[12] So the Court was aware of the minuscule increase in CD 1's BVAP but was not swayed by it.

Second, misleadingly citing percentages, Defendants contend that the Court "failed to consider" data showing that the areas moved into CD 1 had a higher BVAP percentage than the areas moved out of CD 1. *See* Stay Mot. at 14. This is yet another failed argument Defendants pressed at trial. *See* Senate & House Defs.' Proposed Findings of Fact, ECF No. 480 ¶ 570. But

---

[12] *See* Tr. Vol. VI (Roberts) at 1551:2–12

> Judge Gergel: … The previous district had been around 17-and-a-half percent African American, correct, CD 1?
> Mr. Roberts:  I believe so, yes, sir.
> Judge Gergel: And that's where it ended up again, correct?
> Mr. Roberts:  That's correct.
> Judge Gergel: Okay.
> Mr. Roberts:  There's a slight increase from the benchmark as far as the—
> Judge Gergel: Right. Very slight. ….

the Court rightly focused on the actual effect of the movements, which is to "doubl[e] down on the racial division of Charleston County" and move "62% of the African residents" of CD 1 into CD 6. *See* Op. at 15. Because even if the slice added to CD 1 has a higher BVAP percentage, Defendants' own numbers show that it is a much smaller slice than the piece taken *out* of CD 1. *See* Stay Mot. at 14. Due to that size disparity, Defendants acknowledged that far more Black South Carolinians (35,629) were moved out of CD 1 than were added (20,240). *Id.* In that context, Defendants have failed to explain *why* the difference in BVAP percentage is meaningful.

Third, Defendants obscure the unexplained movement of Black residents in CD 1 by arguing that overall, more white residents were moved between CD 1 and CD 6 than Black residents. *See* Stay Mot. at 14–15. But this Court directly rejected this argument. *See* Op. at 16 (finding unpersuasive the argument that "a majority of those moved from Congressional District No. 1 were white"). With good reason. As Mr. Roberts acknowledged under the Court's questioning, one can influence "the racial numbers of the district" even by moving areas that are minority Black. Tr. (Roberts) 1551:12–21 (Mr. Roberts agreeing that moving an area that is 35% Black could alter BVAP). Defendants' argument therefore rests on a "fact" that was neither overlooked nor material.

Fourth, Defendants claim the Court failed to account for the decline in Charleston County's BVAP percentage from 2011 to 2022, when the Court noted that the BVAP percentage of the portion of Charleston County in CD 1 fell from 19.8% in 2011 to 10.3% under the enacted plan. Stay Mot. at 15–16. But Defendants' omissions are telling. To start, Defendant do not dispute that the enacted plan contributed significantly to that decline in CD 1's BVAP percentage and the disparity in the BVAP percentages in the split pieces of Charleston County. Nor do Defendants acknowledge that the 10.3% BVAP in the portion of Charleston County remaining in

CD 1 is far below the 23.17% BVAP percentage of Charleston County as a whole. *See* Op. at 13. In short, the record as a whole supports the Court's finding that Defendants' actions exacerbated the racialized split between the two parts of Charleston County.

Fifth, Defendants assert that the Court erred in finding that the split of Charleston County is inconsistent with the principle of "minimizing division of counties." Stay Mot. at 17. Defendants seem to suggest that, viewing CD 1 as a whole, splitting Charleston County allowed them to make Beaufort and Berkeley Counties whole. *See id.* But Defendants could have kept all three counties whole. *See, e.g.*, SDX 31a & 31c (Senate Amendment 2a). The Court therefore did not clearly err in finding that the split of Charleston County failed to advance the legislature's stated-principle of minimizing county splits.

Finally, Defendants' last resort is to attribute the Charleston County split to Senator Campsen's "political and policy goals." Stay Mot. at 17. That is consistent with the Court's finding that the Charleston County split was prompted by Senator Campsen's decision to make Beaufort and Berkeley whole in CD 1 and have parts of Dorchester also in the district. Op. at 11–13. As the Court carefully reasoned, however, Defendants also decided that the influx of Black residents from those decisions must be offset by "bleaching" Charleston County. *Id*. at 12, 13.

### 4. The Court assumed the General Assembly's "good faith," but in CD 1 the presumption yielded to the evidence.

Defendants wrongly argue that the Court "disregard[ed] the presumption of 'good faith.'" Stay Mot. at 11. State legislatures' presumption of good faith in redistricting has a well-settled breaking point. It applies "until a claimant makes a showing sufficient to support th[e] allegation" of "race-based decisionmaking." *Miller*, 515 U.S. at 915. At that point, the "presumption must yield." *Harris v. McCrory*, 159 F. Supp. 3d 600, 611 (M.D.N.C. 2016), *aff'd sub nom. Cooper v. Harris*, 137 S. Ct. 1455 (2017). And that is true *even if* the legislature acted in good faith. *See*

*Smith v. Beasley*, 946 F. Supp. 1174, 1208 (D.S.C. 1996) ("good faith of the legislature does not excuse . . . constitutional violation of separating voters according to race"); *see also Shaw*, 509 U.S. at 642–43.

The Court followed these principles with "extraordinary caution." *Miller*, 515 U.S. at 916. It rigorously reviewed the extensive direct and circumstantial evidence to properly adjudicate Plaintiffs' racial gerrymandering and intentional discrimination claims (the latter discussed more below). *See, e.g.*, *Abbott v. Perez*, 138 S. Ct. 2305, 2326–27 (2018) (evidence is "relevant to the extent [it] naturally give[s] rise to—or tend[s] to refute—inferences regarding" legislative intent; must be "weighed together with any other direct and circumstantial evidence"). It focused on key trial fact and expert testimony; undisputed geographic and demographic data provided by an experienced court-appointed technical advisor; and the specific movement of voters across South Carolina's congressional map. Op. 11–22. On appeal, its conclusion that "race predominated over all other factors in the design of [CD] 1" *id.* at 17, will be upheld so long as it is "plausible." *Cooper*, 581 U.S. at 308–09. Defendants are therefore not likely to successfully argue that the Court erroneously ignored a good faith presumption. *See id.* at 309 n.8 (presumption not "a kind of super-charged, pro-State presumption on appeal, trumping clear error review").

Still, Defendants argue that "the Court disregarded volumes of evidence that the enacted plan complies with, rather than subordinates, traditional districting principles." Stay Mot. at 11 (citations omitted). These arguments at most "'argue that the evidence [they] presented was more compelling than the evidence [Plaintiffs] presented.'" *vonRosenberg v. Lawrence*, 429 F. Supp. 3d 175, 188 (D.S.C. 2019) (quotations omitted). That is not enough for a "strong showing" of success on the merits. *Nken*, 556 U.S. at 426. On appellate review, the Supreme Court "give[s] singular deference to a trial court's judgments about the credibility of witnesses." *Cooper*, 581

U.S. at 309. As in *Cooper*, *id.* at 315–16, this panel was ultimately and justifiably "unpersuaded" by testimony that a "decisive influx of black voters was an accident." Op. at 16, 20.

### C. The Court's finding of a racial target of 17% BVAP in CD 1 has robust support in the record.

Defendants are unlikely to prevail in showing that this Court committed clear error in finding a racial target. In fact, the Court's analysis can hardly be disputed on this factual record.

First, the Court acknowledged and accepted the "announced intention" of Senator Campsen, the enacted plan's chief proponent, to include all of Berkeley and Beaufort Counties in CD 1, along with certain parts of Dorchester County. Op. at 12–13; *see also* Tr. Vol. VII (Campsen) 1862:6–10 (testifying that having Beaufort and Berkeley in CD 1 was a "primary goal"). There is no dispute that those changes, as the Court found, would increase CD 1 BVAP to about 20% unless offset by the removal of Black residents elsewhere in CD 1, *e.g.*, Charleston County. Op. at 13. From there, the Court made a sound factual finding that it was "effectively impossible" to move that many Black Charlestonians out of CD 1 without targeting Black residents for the movement. *Id.* Indeed, Mr. Roberts, Defendants' chief mapmaker, testified at trial that the Charleston County area was singled out for "dramatic changes" unlike anywhere else in the enacted plan. *Id.* at 13–14.

The Court then confirmed its view of the systematic removal of Black residents from CD 1 by examining the precise, precinct-level changes made by Mr. Roberts in Charleston County. *Id.* at 14. Among other observations, the Court found notable that Mr. Roberts moved ten of the eleven precincts in Charleston County with 1,000 or more Black residents—a movement that Mr. Roberts acknowledged made little sense in terms of communities of interest. *Id.* & n.7.

Other facts in the record confirm that Defendants were clearly aware that a 17% BVAP target was needed to produce a Republican advantage. For example, the BVAP of CD 1 in the

Senate plans remained consistently below 17% from the initial November 23, 2021 staff proposal through final passage, *compare* SDX 32G *with* SDX 29G, despite a significant reconfiguration of the district line through Charleston County, *compare* SDX 32A *with* SDX 29B. Similarly, the Senate rejected the House staff's initial proposal, which had a CD 1 BVAP of over 20%. *See* SDX 33E (House staff plan which had CD 1 BVAP of 20.27%); Tr. Vol. VII (Campsen) 1836:16–21 (Campsen reporting being "befuddled" by the House's initial plan); Pls.' Findings, ECF No. 482 ¶ 489 (detailing objections to House plan). In response to pressure, the House lowered the CD 1 BVAP below 17%—and House staff admitted to relying on racial data in real time as the revisions were made. *Id.* ¶ 498.

Against that backdrop, Defendants cannot deny that, after adding and subtracting tens of thousands of Black residents to and from CD 1—and despite overall moving nearly 200,000 people between CD 1 and CD 6—they kept the CD 1 BVAP essentially unchanged. PX No. 87 at 4, Table 1 (Dr. Duchin report showing BVAP increased slightly from 17.3% to 17.4% in CD 1); SDX No. 29C; SDX No. 75 (Trende Rep.) at 18, Table 4 (showing that 140,489 people were moved from CD 1 to CD 6, and 52,799 people were moved from CD 6 to CD 1). The nearly 200,000-person movement amounts to over 25% of the size of a congressional district, yet the BVAP % in CD 1 changed, improbably, by only 0.1%. That infinitesimal change buttresses the Court's finding that Defendants employed a racial target, premised on a stereotype that Black voters are interchangeable politically: for nearly every Black resident added to CD 1 from Berkeley County or elsewhere, a corresponding Black resident (primarily from Charleston) was pushed out of CD 1. *See Vera*, 517 U.S. at 968 (when "race is used as a proxy for political characteristics, a racial stereotype requiring strict scrutiny is in operation.").

30

Defendants then incorrectly suggest that a racial target must be imputed to the legislature *as a whole*, and suggest the Court was wrong to rely on evidence from key decisionmakers at the core of the mapdrawing process.  That has never been the law, as recent cases like *Cooper* and *Covington* make clear.  *See Cooper*, 581 U.S. at 295, 300, 307, 311, 313–316 (closely focusing on evidence involving "State's mapmakers" like redistricting committee chairs and "hired mapmaker" Thomas Hofeller); *Covington v. North Carolina*, 283 F. Supp. 3d 410, 415 (M.D.N.C.) (same), *aff'd sub nom.*, *North Carolina v. Covington*, 138 S. Ct. 2548 (2018).  In any event, the "as a whole" language that Defendants transfuse from *Brnovich v. Democratic National Committee* is inapplicable here, as the language Defendants cite comes from the Supreme Court's discussion of specific text in Section 2 of the Voting Rights Act, a claim not raised in this case.  *See* 141 S. Ct. 2321, 2339 (2021).

Additionally, the Supreme Court has explicitly rejected that type of analysis in the racial gerrymandering context, holding that a district court's analysis as to whether legislative "Acts as a whole constitute racial gerrymanders," *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 262 (2015), pursued "a legal unicorn, an animal that exists only in the legal imagination," *id.* at 263.  Rather, despite a finding that the intent of the legislature as a whole was to pursue "a policy of prioritizing mechanical racial targets above all other districting criteria," *id.* at 267, the relevant inquiry was whether race predominated on a district-by-district basis.  The Supreme Court has accordingly rejected the legislature-as-a-whole approach in favor of an analysis of whether "evidence concerning the shape and demographics" of individual districts shows that "the districts unconstitutionally sort voters on the basis of race."  *Covington*, 138 S. Ct. at 2553.

**D.  The Court did not err in finding intentional racial discrimination.**

This Court correctly ruled in Plaintiffs' favor with respect to both their racial gerrymandering claim for CD 1, and their claim that CD 1 was motivated by intentional discrimination against Black voters.  Op. at 32.  Although Defendants focus primarily on the racial gerrymandering claim in their stay motion, Stay Mot. at 2–21, their challenge on the intentional discrimination claim is similarly untenable, *id*. at 22–24.

Before addressing the arguments in Defendants' motion, Plaintiffs respectfully disagree with the Court's conclusion that discriminatory intent claims require demonstrating that race was the predominant factor motivating legislative action.  *See* Op. at 29–30.  When assessing an intent claim, challengers need not show that a discriminatory purpose was the "sole[]" or even a "primary" motive for the legislation, just that it was "*a* motivating factor."  *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977) (emphasis added); *see also* Pls.' Findings, ECF No. 482 ¶¶ 804–05, 809.  That is because official actions motivated by a discriminatory purpose have "no legitimacy at all under our Constitution."  *City of Richmond v. United States*, 422 U.S. 358, 378 (1975).  When plaintiffs allege that the State has "enacted a particular voting scheme as a purposeful device 'to minimize or cancel out the voting potential of racial or ethnic minorities,'" *Miller*, 515 U.S. at 911 (quoting *Mobile v. Bolden*, 446 U.S. 55, 66 (1980)), the plaintiffs have alleged a vote dilution claim, which is governed by the *Arlington Heights* standard, and courts have applied that framework to such claims.  *Arlington Heights*, 429 U.S. at 265–66; *see also Rogers v. Lodge*, 458 U.S. 613, 622–27 (1982); *Perez v. Abbott*, 253 F. Supp. 3d 864, 947 (W.D. Tex. 2017).

By contrast, racial predominance claims under *Shaw* and its progeny are "'analytically distinct'" from intentional "vote dilution claim[s].'"  *Miller*, 515 U.S. at 911 (quoting *Shaw*, 509

32

U.S. at 652). The "essence of the equal protection claim recognized in *Shaw* is that the State has used race as a basis for separating voters into districts," *id.*, which, under Supreme Court precedent, is a stigmatic injury to *all* voters regardless of whether or not their vote is diluted. *See Shaw*, 509 U.S. at 650–51. But because a *Shaw* claim does not require evidence that the legislature purposefully seeks to disadvantage voters based on race, and because the Court has recognized that the legislature will always be aware of race, *Shaw* requires evidence that race predominated in drawing of districts before strict scrutiny applies, *Miller*, 515 U.S. at 909–10, 916. Nothing in *Shaw* or its progeny undermines the well-settled rule that, in intentional vote dilution claims governed by cases like *Rogers*, *Arlington Heights* remains the governing standard with respect to motive. Defendants are therefore wrong to say that the Court's racial gerrymandering and intent claims findings rise and fall together. Stay Mot. at 22.

In any event, Defendants' objection to the Court's holding on Count II of the Complaint focuses on their erroneous claim that the Court failed "to make any finding on the essential" element of discriminatory effect under a racial intent standard. Stay Mot. at 22. But that conclusory claim falls apart. As the Court explained, "stark racial disparities between adjacent districts" and the "disproportionate movement of a significant number of a racially identifiable group's voters from one district to another" may be, among other factors, "[c]ircumstantial evidence of discriminatory intent." Op. at 5. As the Court found, Black voters were "disproportionately" targeted for movement into and out of CD 1. *See id.* at 17–20; *see also* Pls.' Findings, ECF No. 482 ¶¶ 187–195 (Dr. Ragusa's analyses that Black voters were "significantly more likely to me moved out of CD 1" and "significantly less likely to be moved into CD 1" and Dr. Liu's analysis that Black Democrats were far more likely to be moved out of CD 1 than white Democrats). The Court's application of a racially discriminatory impact standard is consistent

33

with well-settled precedent. Any amount of a racially discriminatory impact—let alone, the finding here of a significant impact—is sufficient to support a racial intent finding. *See, e.g.*, *City of Pleasant Grove v. United States*, 479 U.S. 462, 471–72 n.11 (1987); *City of Port Arthur v. United States*, 459 U.S. 159, 168 (1982); *see also N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 231 (4th Cir. 2016) (explaining that any relevant evidence of discriminatory impact, "even if not overwhelming impact, suffices to establish one of the circumstances evidencing discriminatory intent."). Indeed, requiring a threshold minimum of impacted voters or a specific degree of impact "is unquestionable wrong." *Chisom v. Roemer*, 501 U.S. 380, 409 (1991) (Scalia, J. dissenting).

Second, Defendants attempt to minimize the racially discriminatory impact the Court found by claiming that the enacted plan "limits the ability of *all* Democrats" to have an effective district. Stay Mot. at 23–24. But that is inconsistent with Plaintiffs' fact and expert evidence (discussed above) showing Black voters were disproportionately targeted for movement and treatment in the enactment of CD 1. *See, e.g.*, Op. at 13–14, 17–20; *see also* Pls.' Findings, ECF No. 482 ¶¶ 187–190. Indeed, as the Court concluded, Defendants' lone expert witness "ignored the movement of more than 30,000 African American residents out of the Charleston County portion of [CD] 1." Op. at 19–20. But even if the discriminatory impact had an equal political impact on voters—it did not—the enacted map treated Black voters differently than it treated white voters even when those voters are members of the same political party.[13] *See, e.g.*, *id.* at 18–19; *see also supra* III(B)(1).

---

[13] Just a brief examination of Dr. Duchin's non-cherry-picked reports and testimony shows why reliance on a single quote from her is misplaced to support Defendants' claim here. *Compare* Pls.' Findings, ECF No. 482 ¶¶ 363, 372–73, 376–77, 385, 388 *with* Stay Mot. at 24.

Third, Defendants argue the Court "faulted the General Assembly for failing to draw" CD 1 in a way that "enabled African-American voters to form a coalition with white crossover voters to 'elect' their preferred Democratic candidates or 'influence' the outcome of election." Stay Mot. at 22–23. That is false: the Court did not make any such finding or rely on any such theory to find a discriminatory impact. *See generally* Op. Tellingly, Defendants only cite Plaintiffs' Third Amended Complaint—not the Court's order—to support this argument. Stay Mot. at 22.

## CONCLUSION

Defendants' motion for a stay pending appeal should be denied.

Dated:  February 3, 2023

Respectfully Submitted,

Leah C. Aden**
Stuart Naifeh**
Raymond Audain**
John S. Cusick**
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector St, 5th Fl.
NY, NY 10006
Tel.: (212) 965-7715
laden@naacpldf.org

Santino Coleman*** Fed. ID. 11914
Antonio L. Ingram II**
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
700 14th St, Ste. 600
Washington, D.C. 20005
Tel.: (202) 682-1300
scoleman@naacpldf.org
aingram@naacpldf.org

Adriel I. Cepeda Derieux**
Ming Cheung**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: (212) 549-2500
acepedaderieux@aclu.org

John A. Freedman**
Elisabeth S. Theodore*
Gina M. Colarusso**
John M. Hindley**
ARNOLD & PORTER KAYE SCHOLER
LLP
601 Massachusetts Ave., N.W.
Washington, D.C. 20001
Tel: (202) 942-5000
john.freedman@arnoldporter.com

*/s/ Allen Chaney*
Allen Chaney, Fed. ID 13181
AMERICAN CIVIL LIBERTIES UNION
OF SOUTH CAROLINA
Charleston, SC 29413-0998
Tel.: (843) 282-7953
Fax: (843) 720-1428
achaney@aclusc.org

Christopher J. Bryant, Fed. ID 12538
BRYANT LEGAL, LLC
126 W. Henrietta St.
Baltimore, MD 21230
Tel.: (843) 779-5444
chris@bryant.legal.com

Patricia Yan**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th St., NW
Washington, DC 20005
Tel.: (202) 457-0800
pyan@aclu.org

Jeffrey A. Fuisz**
Paula Ramer**
Andrew R. Hirschel**
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
Tel: (212) 836-8000
jeffrey.fuisz@arnoldporter.com

Sarah Gryll**
ARNOLD & PORTER KAYE SCHOLER LLP
70 West Madison Street, Suite 4200
Chicago, IL 60602-4231
Tel: (312) 583-2300
sarah.gryll@arnoldporter.com

*Counsel for Plaintiffs the South Carolina
Conference of the NAACP and Taiwan Scott*

*\* Motion for admission Pro Hac Vice
forthcoming
\*\* Admitted Pro Hac Vice*

*\*\*\* Mailing address only (working remotely from South Carolina)*

Janette M. Louard*
Anthony P. Ashton*
Anna Kathryn Barnes**
NAACP OFFICE OF THE GENERAL
COUNSEL
4805 Mount Hope Drive
Baltimore, MD 21215
Tel: (410) 580-5777
jlouard@naacpnet.org

\* Motion for admission *Pro Hac Vice*
forthcoming
\*\* Admitted *Pro Hac Vice*

*Counsel for Plaintiff the South Carolina Conference of the NAACP*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 3, 2023 a true and correct copy of the foregoing was

served on all counsel of record by electronic mail.

/s/ Allen Chaney
Allen Chaney, Fed. ID 13181
AMERICAN CIVIL LIBERTIES UNION
OF SOUTH CAROLINA
Charleston, SC 29413-0998
Tel.: (843) 282-7953
Fax: (843) 720-1428
achaney@aclusc.org

*Counsel for Plaintiffs the South Carolina*
*Conference of the NAACP and Taiwan Scott*